# EXHIBIT 29

Berman and Li *Injury Epidemiology*        (2020) 7:50
https://doi.org/10.1186/s40621-020-00277-8

Injury Epidemiology

**SHORT REPORT**                                                                       **Open Access**

# Characteristics of criminal cases against physicians charged with opioid-related offenses reported in the US news media, 1995–2019


Check for updates

Julia B. Berman[1] and Guohua Li[1,2*]

## Abstract

**Background:** Pharmaceutical companies and drug distributors are intensely scrutinized in numerous lawsuits for their role in instigating the opioid epidemic. Many individual physicians have also been held accountable for activities related to prescribing opioid medications. The purpose of this study was to examine the epidemiologic patterns of criminal cases against physicians charged with opioid-related offenses reported in the US news media.

**Methods:** We searched the Nexis Uni® database for news media reports on physicians who had been arrested, indicted or criminally charged for illegally prescribing opioids between January 1995 and December 2019. Data collected from the news media reports include defendant's age, sex, clinical specialty, type of crime and legal consequences.

**Results:** The annual number of criminal cases against physicians charged with opioid-related offenses reported in the US news media increased from 0 in 1995 to 42 in 2019. Of the 372 physician defendants in these criminal cases, 90.1% were male, 27.4% were 65 years and older, and 23.4% were charged in Florida. Of the 358 physician defendants with known clinical specialty, 245 (68.4%) practiced in internal medicine, family medicine, or pain management. Drug trafficking was the most commonly convicted crime (accounting for 54.2% of all convicted cases), followed by fraud (19.1%), money laundering (11.0%) and manslaughter (5.6%). Of the 244 convicted physicians with known sentences, 85.0% were sentenced to prison with an average prison term of 127.3 ± 120.3 months.

**Conclusions:** The US news media has reported on an increasing number of opioid-related criminal cases against physicians from a wide variety of clinical specialties. The most commonly convicted crime in these cases is drug trafficking, followed by fraud, money laundering, and manslaughter.

**Keywords:** Drug overdose, Drug trafficking, Opioid epidemic, Medical fraud, Prescription opioids

* Correspondence: GL2240@cumc.columbia.edu
[1]Department of Anesthesiology, Columbia University Vagelos College of Physicians and Surgeons, 622 West 168th Street, PH5-534, New York, NY 10032, USA
[2]Department of Epidemiology, Columbia University Mailman School of Public Health, 622 West 168th Street, PH5-534, New York, NY 10032, USA

**Exhibit 0015**



© The Author(s). 2020 **Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated in a credit line to the data.

Berman and Li *Injury Epidemiology*        (2020) 7:50

## Background

Misuse and overdose of opioids is a public health crisis in the United States and many other countries. From 1999 to 2018, nearly 450,000 people in the United States died from overdoses involving prescription opioids (Centers for Disease Control and Prevention (CDC), 2020; Hedegaard et al., 2020). The opioid epidemic was triggered in the 1990s by physician overprescribing of opioid analgesics (Brady et al., 2014; Chihuri and Li, 2019; Hedegaard et al., 2020; Li and Chihuri, 2020). While a significant proportion of those prescriptions might be well-intentioned, clinical treatment for a variety of pain syndromes, there are some medical professionals who prescribe and dispense opioid prescriptions for personal profit. It is illegal for physicians to prescribe a controlled substance with no legitimate medical purpose and outside the usual course of professional practice (Rigg et al., 2010). Such physicians can be charged with drug trafficking and face severe legal consequences (Rigg et al., 2010). Physicians and clinics responsible for these illegal prescriptions are colloquially known as "pill mills," common characteristics of which include physicians prescribing narcotics without conducting physical examinations or consulting medical records, allowing patients to pick their own medicine, treating pain with pills only, prescribing a set number of pills and giving the patient a specific date to return for more, accepting cash only and crowded waiting rooms (Rigg et al., 2010). These physicians have played an important part in perpetuating the opioid epidemic in the United States (Kennedy-Hendricks et al., 2016).

Reducing opioid prescriptions, particularly illegal opioid prescriptions, could help limit the overall quantity of opiates being distributed to the communities and thereby decrease the availability and consumption of these addictive drugs. In recent years, pharmaceutical companies and drug distributors have been intensely scrutinized in numerous lawsuits for their role in instigating the opioid epidemic. Many individual physicians have also been held accountable for activities related to prescribing opioid medications. The purpose of this study was to examine the epidemiologic patterns of criminal cases against physicians charged with opioid-related offenses reported in the US news media.

## Methods

Nexis Uni® is an electronic database that houses an archive of public record documents, such as full-text newspapers, business and legal publications, and journals. An initial search was conducted on the database with search terms "overprescribing opioids", "overprescribe opioids", "overprescribed opioids", and "pill mill." The search was refined with terms ("doctor" or "dr." or "MD") AND ("sentenced" or "charged" or "convicted" or "sentence"

or "charge") AND ("years" or "fined" or "months" or "prison") AND ("pill mill") AND ("opioid" or "narcotic" or "drugs") and limited to publications released after January 1st, 1995. The database was queried with these terms so as to identify news media articles that reported incidents of physicians overprescribing opioids since 1995. The search yielded over 2000 results of full-text newspapers and court reports, which were manually examined to extract a list of physicians, who, according to the news media reports, had been arrested, criminally charged, or indicted for illegally prescribing opioids. Duplicate physicians were manually excluded by reviewing names.

Next, individual searches for each physician were executed on Nexis Uni®; the database was queried using only the physician name, in order to produce narrower, more focused results. From these searches, the following information was ascertained: name, state in which the incident occurred, type of medical facility in which the physician worked (hospital, private practice, etc.), medical specialty, age at the time of incident, sex, type of criminal charge, and outcome of the legal proceeding. Multiple news media reports were examined for each physician. Further, these articles uncovered other physicians who fit the search criteria but had not come up in the initial search; these physicians were added to the list. Searches on Google News were carried out for physicians with incomplete information. Data collected from news media reports for each physician involved in these incidents were analyzed using descriptive statistics such as frequencies, percentages, means, and standard deviations.

## Results

During January 1995 through December 2019, the US news media reported on a total of 372 physicians who were involved in opioid-related criminal cases, exclusive of reports on 12 physicians involved in civil lawsuits for negligent opioid prescribing behaviors. There were no opioid-related criminal cases against physicians reported in the US news media between 1995 and 1998. Of the 372 criminal cases covered by the US news media, 231 (86.3%) occurred between January, 2010 and December, 2019 (Fig. 1), and nearly a quarter (23.4%) occurred in Florida, followed by Pennsylvania (12.1%), Georgia (6.5%), West Virginia (5.6%), Ohio (5.4%), New York (5.4%) and Tennessee (5.1%) (Fig. 2).

The vast majority (90.1%) of physicians involved in the criminal cases were male. Ages of the physicians ranged from 33 to 87 (mean = 58.6 ± 10.7 years), with 27.4% being 65 years and older. Information on clinical specialty was available for 358 physicians. These physicians practiced in a variety of clinical specialties, with 25.7% in family medicine, 24.9% in internal medicine, and 17.9% in pain management (Fig. 3).

Berman and Li *Injury Epidemiology*        (2020) 7:50



**Fig. 1** Annual Frequency of Criminal Cases against Physicians Charged with Opioid-Related Offenses Reported in the US News Media, 1995–2019

Nearly all the physicians prosecuted for opioid-related offenses (98.8%) worked in private practices. Of the 250 cases with known outcomes, representing 67.2% of the 372 cases, 246 physicians (98.4%) were convicted and 4 (1.6%) were acquitted. Drug trafficking accounted for 54.2% of the crimes convicted, followed by fraud (19.1%), money laundering (11.0%), manslaughter (5.6%), and other or unknown (10.1%). Of the 244 convicted physicians with known sentences, 85.0% served time in prison, with an average prison term of 127.3 (± 120.3)



**Fig. 2** Frequency of Criminal Cases against Physicians Charged with Opioid-Related Offenses Reported in the US News Media by State, 1995–2019

Berman and Li *Injury Epidemiology*      (2020) 7:50



**Fig. 3** Frequency of Criminal Cases against Physicians Charged with Opioid-Related Offenses Reported in News Media by Clinical Specialty, United States, 1995–2020

months and an average probation term of 65.5 (± 61.0) months.

## Discussion

Results of this study indicate that criminal cases against physicians charged with opioid-related offenses increased over time between 1995 and 2019, with the majority of the cases occurring between 2010 and 2019. This temporal pattern is generally consistent with the time trend of the opioid epidemic in the United States (Skolnick, 2018; Hedegaard et al., 2020). The geographic pattern of the criminal cases against physicians, however, might be more reflective of enforcement intensity on the state level. For instance, Florida passed laws in 2010 and 2011 that considerably reduced physicians' ability to distribute opioids at the site of care, and subsequently, Florida law enforcement implemented initiatives to arrest and prosecute physicians who did not abide by these laws, resulting in an immediate hike in criminal cases against physicians charged with opioid-related offenses (Kennedy-Hendricks et al., 2016).

Our study also found that the vast majority of physicians involved in these criminal cases were male and worked in private practice. While men are known to be more prone than women to commit crimes

(Burton et al., 1998), private practice presents a work environment that is less strictly regulated and supervised than hospitals. It is also noteworthy that over a quarter of the criminal cases included in the study involved physicians aged 65 years and older. As of 2018, about 17% of US physicians were older than 65 years (Elflein, 2019). The overrepresentation of older physicians in opioid-related criminal cases is likely multifactorial, including lower awareness of trends in pain management and heightened risk associated with the private practice environment. Further, physicians involved in opioid-related criminal cases reported in the US news media came from a broad range of clinical specialties, underscoring the needs for continuing attention to aberrant opioid prescribing patterns in all specialty areas.

This study is limited by the availability of information in the news media reports. Although news media has long been used for sentinel surveillance on infrequent, newsworthy events, such as drowning involving children with autism (Guan and Li, 2017) and alcohol-impaired airline pilots (Kraus and Li, 2006), they tend to capture the more severe incidents (Rainey and Runyan, 1992). Therefore, our findings are likely biased toward criminal cases involving

Berman and Li *Injury Epidemiology*      (2020) 7:50

serious offenses. Finally, our study was limited to physicians criminally charged with opioid-related offenses. Physicians involved in civil cases related to opioid prescribing practice were not included in this study. It is necessary to point out that many advanced healthcare practitioners other than physicians are also prescribers of opioid analgesics and may have been criminally charged during the study period as well.

## Conclusions

Our study sheds light on the issue of legal accountability of physicians amid the opioid epidemic. The results suggest that there have been increasing prosecutions for opioid-related crimes against physicians in the past decade, with severe legal consequences such as long-term prison sentences. The most commonly convicted offense in these criminal cases is drug trafficking (i.e., illegal distribution of controlled substances), followed by fraud, money laundering, and manslaughter.

**Role of funder/sponsor**
The Centers for Disease Control and Prevention had no role in the preparation, review and approval of the manuscript, and the decision to submit the manuscript. Its contents are solely the responsibility of the authors and do not represent the official view of the Centers for Disease Control and Prevention.

**Authors' contributions**
Both authors contributed sufficiently to this manuscript; JB performed literature search and review, abstracted data, performed statistical analyses, and drafted the manuscript. GL conceptualized the study, secured the funding, supervised the data collection and analysis, and critically revised the manuscript. Both authors read and approved the final manuscript.

**Funding**
The research was supported by grant 1 R49 CE002096 from the National Center for Injury Prevention and Control, Centers for Disease Control and Prevention to the Center for Injury Epidemiology and Prevention at Columbia University.

**Availability of data and materials**
Data analyzed in the current study were abstracted from news media reports and are available from the corresponding author upon request.

**Ethics approval and consent to participate**
Not applicable.

**Consent for publication**
Not applicable.

**Competing interests**
GL is Editor-in-Chief of Injury Epidemiology. He was not involved in the peer-review or handling of the manuscript. The authors have no other competing interests to disclose.

Received: 11 May 2020 Accepted: 19 August 2020
Published online: 01 October 2020

## References

Brady JE, Wunsch H, DiMaggio C, Lang BH, Giglio J, Li G. Prescription drug monitoring and dispensing of prescription opioids. Public Health Rep. 2014; 129(2):139–47.
Burton VS, Cullen FT, Evans TD, Alarid LF, Dunaway RG. (1998). Gender, self control, and crime. J Res Crime Delinq 1998;35 (2): 123–147.
Centers for Disease Control and Prevention (CDC). Understanding the Epidemic. March 19, 2020. https://www.cdc.gov/drugoverdose/epidemic/index.html. Accessed April 20, 2020.
Chihuri S, Li G. State marijuana laws and opioid overdose mortality. Inj Epidemiol. 2019;6:38.
Elflein J. Ages of U.S. physicians 2018. September 19, 2019. https://www.statista.com/statistics/415961/share-of-age-among-us-physicians/#:~:text=As%20of%202018%2C%20the%20largest,aged%2035%20years20or20younger. Accessed June 30, 2020.
Guan J, Li G. Characteristics of unintentional drowning deaths in children with autism spectrum disorder. Inj Epidemiol. 2017;4(1):32.
Hedegaard H, Miniño AM, Warner M. Drug overdose deaths in the United States, 1999-2018. NCHS Data Brief. 2020;356:1–8.
Kennedy-Hendricks A, Richey M, McGinty E, Stuart E, Barry C, Webster D. Overdose deaths and Florida's crackdown on pill mills. Am J Public Health. 2016;106(2):291–7.
Kraus CK, Li G. Pilot alcohol violations reported in U.S. newspapers, 1990-2006. Aviat Space Environ Med. 2006;77(12):1288–90.
Li G, Chihuri S. Is marijuana use associated with decreased use of prescription opioids? Toxicological findings from two US national samples of drivers. Subst Abuse Treat Prev Policy. 2020;15(1):12.
Rainey DY, Runyan CW. Newspapers: a source for injury surveillance? Am J Public Health. 1992;82(5):745–6.
Rigg K, March S, Inciardi J. Prescription drug abuse and diversion: role of the pain clinic. J Drug Issues. 2010;40(3):681–702.
Skolnick P. The opioid epidemic: crisis and solutions. Annu Rev Pharmacol Toxicol. 2018;58:143–59.

**Publisher's Note**
Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

Ready to submit your research?  Choose BMC and benefit from:

- fast, convenient online submission
- thorough peer review by experienced researchers in your field
- rapid publication on acceptance
- support for research data, including large and complex data types
- gold Open Access which fosters wider collaboration and increased citations
- maximum visibility for your research: over 100M website views per year

**At BMC, research is always in progress.**

**Learn more** biomedcentral.com/submissions



WORLD

# Doctor gets 6 months in abortion patient death

A doctor has been sentenced six months in jail after pleading guilty to manslaughter in the case of a woman who died after he performed an abortion on her.

Sept. 14, 2010, 3:28 PM EDT / Source: The Associated Press

**By DENISE LAVOIE**

A doctor was sentenced Tuesday to six months in jail after pleading guilty to involuntary manslaughter in the case of a woman who died after he performed an abortion on her.

Dr. Rapin Osathanondh, who is originally from Thailand, was sentenced in the 2007 death of Laura Hope Smith, 22. He pleaded guilty Monday, just as his trial was about to begin.

Under a sentencing recommendation that prosecutors and Osathanondh's attorneys agreed to, he was sentenced to six months, but will be eligible for parole after serving three months. His jail term will be followed by nine months of home confinement with electronic monitoring. He had faced a maximum of 20 years. He is also banned from working as a doctor or teaching medicine ever again.

Smith was 13 weeks pregnant when she went to see Osathanondh for an abortion in his Cape Cod office. She was pronounced dead later that day.

Prosecutors charged Osathanondh with manslaughter, alleging that he failed to monitor her while she was under anesthesia, delayed calling emergency services when her heart stopped, and later lied to try to cover up his actions.

Osathanondh, who was also a research associate at the Harvard School of Public Health, resigned his medical license the same day the state Board of Registration in Medicine issued a scathing list of charges against him, alleging that he had "engaged in conduct that calls into question his competence to practice medicine."

> **Exhibit**
> **0016**

The board said Osathanondh did not have any means of monitoring Smith's heart, and did not have oxygen or a functioning blood pressure cuff in the room during Smith's abortion. The board also alleged that he "failed to adhere to basic cardiac life support protocol" and did not call an ambulance in a timely manner.

Smith's father, Tom Smith, described how he and his wife, Eileen, adopted Laura after she was left in an orphanage in her native Honduras and later abused by an American couple. He said she studied cosmetology in high school, sang in a choral group and was in demand to sing the national anthem at school ball games.

"You, sir, destroyed a precious flower that grew and ... blossomed in our lives, not accidentally, but purposely," he said, looking directly at Osathanondh.

Smith's mother, Eileen, said her faith in the medical community has been shattered by Osathanondh's actions. "No family should have to go through this," she said.

## Recommended



ASIAN AMERICA

**Barbie launches Kristi Yamaguchi doll in skater's iconic Olympic look**



ISRAEL-HAMAS WAR

**U.S. reviewing whether to restrict military aid to IDF unit accused of human rights abuses**

Osathanondh, 67, who is originally from Thailand, had been licensed to practice medicine in Massachusetts since 1974.

He did not speak in court Tuesday, but his lawyer, Paul Cirel, said Osathanondh had expressed "most profound remorse and regret for Laura Smith's death."

Cirel said Osathanondh came to the United States in the 1960s and had performed thousands of safe abortions before Smith's death.

"This is regrettably – terribly – the one complication, the one problem that ever came up in his practice," Cirel said.

David Angueira, an attorney who represented Smith's family in a medical malpractice lawsuit, said the case was settled Tuesday for $2 million.

Eileen Smith was asked by a reporter if she was happy to see Osathanondh taken away in handcuffs to begin serving his sentence.

"Nobody won. Laura got justice, but it's a tragedy all the way around," she said.

---

DENISE LAVOIE

## Sponsored Stories

by Taboola

RTHA STEWART & MARLEY SPOON

ople in Mount Pleasant are Loving Martha Stewart's Meal Kit

LINE SHOPPING TOOLS

nazon's Worst Nightmare: Thousands Canceling Prime for This Clever Hack

SEARCHES

ount Pleasant: Small Prefab Houses For Seniors At Lowest Prices Ever

LEBRITY HQ

You Remember Her? Better Sit Down Before You See Her Today

Taboola Feed

MSCHF Big Red Boots Men's Size 11 BRB Brand New AUTHENTIC DEADSTOCK

4/26/24, 3:16 PM                                    Doctor gets 6 months in abortion patient death

eBay US | Sponsored

Shop

## Carter's Size 4T Toddler Boys Pull-On Poplin Shorts Khaki

Easy on and super comfy, this durable pair is perfect for your little one on the go.

cartersus | Sponsored

Buy now

## Sophia Bush comes out as queer, confirms relationship with Ashlyn Harris

Actor Sophia Bush came out as queer in an emotional essay in Glamour and confirmed she's in a relationship with retired soccer player Ashlyn Harris.

NBC NEWS

## Athletic Fit Shorts - Light Blue - Waist 32 / Light Blue

Built on the forefront of fit and comfort - these are the perfect shorts for guys with athletic legs. The fit is built for guys who need more room in the seat, thighs, and quads while still looking to achieve a casual, tapered look. The ...

State & Liberty | Sponsored

Buy now

9

Doctor gets 6 months in abortion patient death



# Doctor in badly botched abortion is tried for manslaughter

BY VERENA DOBNIK

Updated 8:44 PM EDT, May 1, 2018

NEW YORK (AP) — A doctor who performed a badly botched abortion that caused a patient to bleed to death was characterized by prosecutors on Tuesday as careless, greedy and someone who operated far outside the medical norm.

A jury in Queens heard closing arguments in the case against Dr. Robert Rho, who was charged with manslaughter in the 2016 death of Jamie Lee Morales.

The criminal prosecution of doctors over medical errors is rare, but Assistant District Attorney Brad Leventhal said Rho's mistakes went beyond civil malpractice.

During the operation, Rho severed Morales' uterine aorta, ripped her cervix and pierced her uterine wall. Profuse post-operative bleeding forced the doctor to perform another procedure, but that did not fix the damage, prosecutors said.

Rather than call an ambulance, prosecutors said, Rho sent Morales home with her sister, despite signs she was in grave condition, because he wanted to get back to seeing other patients.

"It's about greed and arrogance," Leventhal said. "Jaime Morales bled to death because this defendant did nothing."

Morales, 30, fell unconscious in her sister's car. Medics responding to a 911 call took her to the hospital, where she died.

Defense attorney Jeffrey Lichtman said Morales' death was a tragedy but was not a crime.

He told the jury Morales was conscious and speaking when she left the clinic and Rho was not aware of how badly she had been injured.

**Exhibit
0017**

Lichtman told the jurors that while they might be swayed by the graphic realities of Morales' abortion, "don't be led by your emotion; this is too important."

"The people who have doubt about this case, I ask you to stand strong," he said.

The attorney said Morales never told Rho she suffered from medical conditions that made her prone to more intense bleeding.

Jury deliberations were expected to begin on Wednesday.

Rho, of Lake Success, closed his clinic and surrendered his medical license after Morales' death.

Even before the death, Rho, 53, had been investigated by state officials over concerns that he was performing procedures improperly and using assistants who lacked medical training, witnesses said at the trial.

Prosecutors said Morales had been turned down by other abortion providers because she was 25 weeks pregnant. The state allows abortions at 24 weeks or more only if the woman's life or health is endangered.

The last criminal prosecution in New York over a mishandled abortion was in 1995, when obstetrician David Benjamin was convicted of murder after a patient bled to death from a rip in her uterus during an abortion.

Philadelphia doctor Kermit Gosnell was convicted in 2013 of involuntary manslaughter after a patient got a fatal overdose of sedatives during an abortion. He also was convicted of murder for performing extremely late-term abortions, snipping the spines of infants born alive during the procedures.

———

This story has been corrected to show the state allows, not bars, abortions at 24 weeks or more only if the woman's life or health is endangered.

ACT #2017-_____66_____

1   SB85

2   173333-2

3   By Senators Pittman, Waggoner, Williams, Scofield, Orr,

4   Livingston, Albritton, Allen, Glover, Marsh, Reed, Stutts,

5   McClendon and Shelnutt

6   RFD: Finance and Taxation General Fund

7   First Read: 07-FEB-17



MAR -7 2017
RECEIVED
GOVERNOR'S OFFICE

SB85

1    SB85

2

3

4    <u>ENROLLED</u>, An Act,

5            To amend Section 22-1-11, Code of Alabama 1975,

6    relating to false statements or claims on applications for

7    payment of medical benefits from the Medicaid Agency, to

8    provide that a person must knowingly engage in the conduct in

9    order to be subject to the criminal penalties; to provide that

10   the criminal penalties do not apply to certain activity

11   excepted by federal law; to provide for a six-year statute of

12   limitations; and to define person to include business

13   entities; and in connection therewith would have as its

14   purpose or effect the requirement of a new or increased

15   expenditure of local funds within the meaning of Amendment 621

16   of the Constitution of Alabama of 1901, now appearing as

17   Section 111.05 of the Official Recompilation of the

18   Constitution of Alabama of 1901, as amended.

19   BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

20           Section 1. Section 22-1-11, Code of Alabama 1975, is

21   amended to read as follows:

22           "§22-1-11.

23           "(a) Any person who, with intent to defraud or

24   deceive, makes, or causes to be made or assists in the

25   preparation of any false statement, representation, or

Page 1

14

SB85

1    omission of a material fact in any claim or application for

2    any payment, regardless of amount, from the Medicaid Agency,

3    knowing the same to be false; or with intent to defraud or

4    deceive, makes, or causes to be made, or assists in the

5    preparation of any false statement, representation, or

6    omission of a material fact in any claim or application for

7    medical benefits from the Medicaid Agency, knowing the same to

8    be false; shall be guilty of a Class C felony ~~and upon~~

9    ~~conviction thereof shall be fined not more than ten thousand~~

10   ~~dollars ($10,000) or imprisoned for not less than one nor more~~

11   ~~than five years, or both~~. The offense set out herein shall not

12   be complete until the claim or application is received by the

13   Medicaid Agency or the contractor with the Medicaid Agency or

14   its successor.

15           "(b) Any person who knowingly solicits or receives

16   any remuneration, including any kickback, bribe, or rebate,

17   directly or indirectly, overtly or covertly, in cash or in

18   kind:

19           "(1) In return for referring an individual to a

20   person for the furnishing or arranging for the furnishing of

21   any item or service for which payment may be made in whole or

22   in part by the Medicaid Agency or its agents, or

23           "(2) In return for purchasing, leasing, ordering, or

24   arranging for or recommending purchasing, leasing, or ordering

25   any good, facility, service, or item for which payment may be

Page 2

15

SB85

1    made in whole or in part by the Medicaid Agency, or its agents

2    shall be guilty of a Class C felony ~~and upon conviction~~

3    ~~thereof, shall be fined not more than ten thousand dollars~~

4    ~~($10,000) or imprisoned for not less than one nor more than~~

5    ~~five years, or both~~.

6            "(c) Any person who <u>knowingly</u> offers or pays any

7    remuneration including any kickback, bribe, or rebate directly

8    or indirectly, overtly or covertly, in cash or in kind to any

9    person to induce a person to refer an individual to a person

10   for the furnishing or arranging for the furnishing of any item

11   or service for which payment may be made in whole or in part

12   by the Medicaid Agency or its agents, or to purchase, lease,

13   order, or arrange for or recommend purchasing, leasing, or

14   ordering any good, facility, service, or item for which

15   payment may be made in whole or in part by the Medicaid

16   Agency, or its agents, shall be guilty of a Class C felony ~~and~~

17   ~~upon conviction thereof shall be fined not more than ten~~

18   ~~thousand dollars ($10,000) or imprisoned for not less than one~~

19   ~~nor more than five years, or both~~.

20           "(d) (1) Subsections (b) and (c) of this section

21   shall not apply to a discount or other reduction in price

22   obtained by a provider of services or other entity under

23   Medicaid if the reduction in price is properly disclosed and

24   appropriately reflected in costs claimed or charges made by

25   the provider or entity to the Medicaid Agency or its agents,

Page 3

16

SB85

1  or any amount paid by an employer to an employee who has a

2  bona fide employment relationship with employer for employment

3  in the provision of covered items or services.

4          "(2) Subsections (b) and (c) shall not apply to any

5  payment practice identified as an exception enumerated in 42

6  C.F.R. 1001.952.

7          "(e) Any two or more offenses in violation of this

8  section may be charged in the same indictment in separate

9  counts for each offense and the offense shall be tried

10  together, with separate sentences being imposed for each

11  offense for which the defendant is found guilty.

12          "(f) No prosecution under this section may be

13  commenced after six years from the date of the completion of

14  the offense.

15          "(g) For the purposes of this section, the term

16  "person" includes any individual, partnership, corporation, or

17  association."

18          Section 2. Although this bill would have as its

19  purpose or effect the requirement of a new or increased

20  expenditure of local funds, the bill is excluded from further

21  requirements and application under Amendment 621, now

22  appearing as Section 111.05 of the Official Recompilation of

23  the Constitution of Alabama of 1901, as amended, because the

24  bill defines a new crime or amends the definition of an

25  existing crime.

Page 4

SB85

1             Section 3. This act shall become effective on the
2       first day of the third month following its passage and
3       approval by the Governor, or its otherwise becoming law.

SB85

1

2

3   _Kay Ivey_

4   President and Presiding Officer of the Senate

5

6   Speaker of the House of Representatives

7   SB85
8   Senate 14-FEB-17
9   I hereby certify that the within Act originated in and passed
10  the Senate.
11
12                          Patrick Harris
13                          Secretary
14

15   _____

16
17  House of Representatives
18  Passed: 07-MAR-17

19   _____

20
21  By: Senator Pittman

APPROVED  _3.14-2017_

TIME  _8:30 A.M._

_Robert Bentley_
**GOVERNOR**

Page 6

Alabama Secretary Of State
Act Num....: 2017-66
Bill Num...: S-85
Recv'd 03/14/17   11:42amSLF

19

## SENATE ACTION

DATE: _____ 20___
RD 1 RFD _____

I hereby certify that the notice & proof is attached to the Bill, SB _____ as required in the General Acts of Alabama, 1975 Act No. 919.

**PATRICK HARRIS,**
**Secretary**

This Bill was referred to the Standing Committee of the Senate on F&TG

and was acted upon by such Committee in session and is by order of the Committee returned therefrom with a favorable report w/amd(s) _____ w/sub _____ w/eng sub _____
yeas _____ nays _____ abstain _____
this _____ day of _____ 20___

_____ Chairperson

DATE: 2-9 _____ 20___
RF _____ RD 2 CAL

I hereby certify that the Resolution as required in Section C of Act No. 81-889 was adopted and is attached to the Bill, SB _____
yeas 25 _____ nays 5 _____ abstain 0 _____

**PATRICK HARRIS,**
**Secretary**

DATE: 2-14-17
PASSED ☑ / PASSED AS AMENDED ☐ / RD 3 at length ☐
yeas 25 nays 2 abstain 0
And was ordered sent forthwith to the House.

**PATRICK HARRIS,**

---

## HOUSE ACTION (OVER)

DATE: _____ 20___
RD 1 RFD _____

**REPORT OF STANDING COMMITTEE**

This bill having been referred by the House to its standing committee on WM&C

was acted upon by such Committee in session, and returned therefrom to the House with the recommendation that it be Passed,
w/amd(s) _____ w/sub _____
this 22nd day of Feb _____ 20___

_____ ,Chairperson

DATE: 8-03 _____ 20___
RF _____ RD 2 CAL

DATE: _____ 20___
RE-REFERRED ☐   RE-COMMITTED ☐
COMMITTEE _____

I hereby certify that the Resolution as required in Section C of Act No. 81-889 was adopted and is attached to the Bill, SB 35
YEAS 87 NAYS _____

**JEFF WOODARD,**
**Clerk**

SPONSORS

20

20

Confidential – Attorneys' Eyes Only



PRE-IND 169098

MEETING REQUEST AND BRIEFING PACKAGE FOR
RIGT-272 (ESTRADIOL)

Proposed Indication: As a part of a feminizing regimen in the management of
gender incongruence

Meeting Type: Type B Meeting

Meeting Goal Date: November 27, 2023

The Research Institute for Gender Therapeutics, Inc.
1150 Walnut Street, 2nd Floor
Newton, Massachusetts 02461

CONFIDENTIAL

This document contains proprietary information that is not to be copied or distributed to anyone
outside of the recipient without the written approval of the Research Institute for Gender
Therapeutics, Inc.



Exhibit
0020

HHS-0169993

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                                    Type B Meeting Briefing Package

## TABLE OF CONTENTS

List of Figures ................................................................................................................. 3

List of Abbreviations and Specialist Terms ................................................................... 4

1.  APPLICATION NUMBER ...................................................................................... 5

2.  PRODUCT NAME .................................................................................................... 5

3.  CHEMICAL NAME AND STRUCTURE ................................................................ 5

4.  PROPOSED REGULATORY PATHWAY ............................................................... 5

5.  PROPOSED INDICATION ....................................................................................... 5

6.  DOSAGE FORM, ROUTE OF ADMINISTRATION AND DOSING REGIMEN .... 6

7.  PEDIATRIC STUDY PLAN ..................................................................................... 6

8.  HUMAN FACTOR ENGINEERING ........................................................................ 6

9.  COMBINATION PRODUCT INFORMATION ........................................................ 6

10. LIST OF INDIVIDUALS WHO WILL ATTEND THE MEETING ......................... 7

11. BACKGROUND ........................................................................................................ 7

    11.1.1 Regulatory History of RIGT-272 ..................................................................... 7

12. Profile ........................................................................................................................ 8

    12.1.1 Profile of RIGT-272 (estradiol) ...................................................................... 8

13. Current Status of the Development Program ............................................................. 8

    13.1.1 Proposed Clinical Development Plan .............................................................. 8

14. STATEMENT OF PURPOSE ................................................................................... 9

15. PROPOSED AGENDA ............................................................................................. 10

16. LIST OF PROPOSED QUESTIONS ........................................................................ 10

    *16.1 Nonclinical* ................................................................................................... *10*

    *16.2 Clinical* .......................................................................................................... *11*

    *16.3 Procedural* ..................................................................................................... *12*

17. INFORMATION TO SUPPORT DISCUSSIONS .................................................... 14

Attachment 1: Protocol Synopsis ................................................................................. 14

18. References ................................................................................................................. 15

22

HHS-0169994

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                                    Type B Meeting Briefing Package

## List of Figures

Figure 1: Structure of RIGT-272 ......................................................................................................... 5
Figure 2: Schematic of Proposed Program for RIGT-272……………………………………………..8

HHS-0169995

23

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                             Type B Meeting Briefing Package

### List of Abbreviations and Specialist Terms

| Abbreviation or Specialist Term | Explanation |
| --- | --- |
| AE | Adverse event |
| CAS | Chemical Abstracts Service |
| DCEP | Division of Cardiometabolic and Endocrine Pharmacology |
| DSM-5-TR | The Diagnostic and Statistical Manual of Mental Disorders, Version 5 |
| DUOG | Division of Urology, Obstetrics, and Gynecology |
| E2 | Estradiol |
| FDA | US Food and Drug Administration |
| GAHT | Gender Affirming Hormone Therapy |
| ICD-10 | International Classification of Diseases, Tenth Revision |
| ICD-11 | International Classification of Diseases, Eleventh Revision |
| IND | Investigational new drug |
| NDA | New drug application |
| OCP | Office of Clinical Pharmacology |
| OND | Office of New Drugs |
| ORO | Office of Regulatory Operations |
| ORPURM | Office of Rare Diseases, Pediatrics, Urologic and Reproductive Medicine |
| OTS | Office of Translational Sciences |
| PIND | Pre-investigational new drug |
| RIGT | Research Institute for Gender Therapeutics, Inc. |
| TGD | Transgender or Gender Diverse Individuals |
| WPATH | World Professional Association for Transgender Health |

HHS-0169996

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                                            Type B Meeting Briefing Package

## 1.   APPLICATION NUMBER

Pre-IND number 169098 has been pre-assigned.

## 2.   PRODUCT NAME

The development designation for this drug is RIGT-272 (estradiol).

## 3.   CHEMICAL NAME AND STRUCTURE

CAS Number 50-28-2

RIGT-272 (estradiol) is a white crystalline powder, chemically described as estra-1,3,5(10)-triene-3,17ß-diol. Estradiol has an empirical formula of $C_{18}H_{24}O_2$ and molecular weight of 272.39. Estradiol is the most potent and principal intracellular human estrogen.

**Figure 1: Structure of RIGT-272**



## 4.   PROPOSED REGULATORY PATHWAY

The proposed regulatory pathway is 505(b)(2).

RIGT plans to reference an existing approved New Drug Application (NDA) for estradiol, however, for the purposes of this meeting, the specific reference NDA has not been defined (see Section 6).

## 5.   PROPOSED INDICATION

RIGT is planning to develop RIGT-272 as a part of a feminizing regimen in the management of gender incongruence.

Research Institute for Gender Therapeutics, Inc.      Confidential                              Page 5

HHS-0169997

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                          Type B Meeting Briefing Package

## 6. DOSAGE FORM, ROUTE OF ADMINISTRATION AND DOSING REGIMEN

RIGT-272 plans to study a FDA-approved form of estradiol for the proposed indication. The final ester (e.g., valerate or cypionate) and formulation (e.g., oral, intramuscular, transdermal, or sublingual) has not been selected.

## 7. PEDIATRIC STUDY PLAN

RIGT intends to enroll reproductive-aged adolescents in the current development program (see Question 5).

Consistent with the approved labeling of exogenous estradiol therapies, RIGT plans to submit a partial waiver for adolescent persons younger than reproductive-age.

## 8. HUMAN FACTOR ENGINEERING

Not applicable.

## 9. COMBINATION PRODUCT INFORMATION

Not applicable.

## 10. MEETING TYPE

RIGT is requesting a Type B Pre-IND meeting focused on the Nonclinical, Clinical, and procedural aspects of the planned 505(b)(2) NDA.

## 11. SUGGESTED DATES AND TIMES FOR MEETING

RIGT requests a meeting on the week of 27 November 2023 and has no notable conflicts during that week.

## 12. PROPOSED MEETING FORMAT

RIGT requests a 60-minute videoconference format meeting with FDA.

Research Institute for Gender Therapeutics, Inc.     Confidential                    Page 6

HHS-0169998

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                                    Type B Meeting Briefing Package

## 13. LIST OF REQUESTED FDA MEETING ATTENDEES AND/OR DISCIPLINE REPRESENTATIVES

This meeting involves clinical, nonclinical, and procedural aspects of the planned 505(b)(2) NDA for RIGT-272 as a part of a feminizing regimen in the management of gender incongruence. Therefore, RIGT requests that the following FDA staff attend the meeting:

- Audrey Gassman, MD, Deputy Director, Division of Urology, Obstetrics, and Gynecology (DUOG), Office of Rare Diseases, Pediatrics, Urologic and Reproductive Medicine (ORPURM), Office of New Drugs (OND)

- Medical Officer, DUOG, ORPURM, OND

- Director, Division of Pharm/Tox for ORPURM

- Clinical Pharmacology Team Leader, Division of Cardiometabolic and Endocrine Pharmacology (DCEP), Office of Clinical Pharmacology (OCP), Office of Translational Sciences (OTS)

- Regulatory Project Manager, Office of Regulatory Operations (ORO)

## 14. LIST OF INDIVIDUALS WHO WILL ATTEND THE MEETING

- Bradford C. Sippy –President, RIGT

- Nicole J. LaRocque – Chief Operating Officer, RIGT

- Judith Boice PhD – Clinical Development Consultant, RIGT

- Paul Tarantino PhD – Nonclinical Development Consultant, RIGT

- Travis E. Helm – Regulatory Consultant - RIGT

- Carl Streed Jr. MD, MPH – Clinical Advisor

- Zil Goldstein NP – Clinical Advisor

- Dallas Ducar NP – Clinical Advisor

- Jamison Green PhD – Policy Advisor

## 15. BACKGROUND

### 15.1.1 Regulatory History of RIGT-272

No IND or NDA for RIGT-272 has previously been submitted to FDA.

Versions of exogenous estradiol and related esters have been FDA-approved for over 50 years.

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                                    Type B Meeting Briefing Package

## 16. Profile

### 16.1.1 Profile of RIGT-272 (estradiol)

RIGT has not yet selected a form/formulation of estradiol for the proposed program, but RIGT will utilize an existing, commercially-available, FDA-approved product.

## 17. Current Status of the Development Program

### 17.1.1 Proposed Clinical Development Plan

Estradiol, in various formulations, is recommended, alone or as part of a feminizing regimen, for gender affirming hormone therapy in transgender/gender diverse (TGD) individuals (Coleman 2022 and UCSF Guidelines). This use is supported by major medical associations in the United States, including the Endocrine Society and the American Medical Association (AMA 2023).

However, despite estradiol's broad support and status as the standard of care, the use of estradiol for gender affirming hormone therapy is currently not FDA approved, and no registrational quality programs of sufficient size or design have been conducted to support such an approval (Veale 2022).

Given the known pharmacology and large historic experience with estradiol for both gender affirming care and other uses, the Sponsor proposes that one pivotal Phase III study of sufficient design and control should be adequate to support the proposed indication.

The Sponsor is proposing a two-part study, Part I and Part II, to provide evidence of efficacy and safety for the proposed indication for RIGT-272.

Part I consists of a double-blind, randomized (1:1:1), placebo-controlled portion where estradiol, or matching placebo, at two dose levels, will be administered as adjunct to an anti-androgen (spironolactone) as part of a feminizing regimen for 12 weeks. The primary endpoint is the change from baseline in estrogen levels at Week 12 and the key secondary endpoint is change from baseline in secondary sexual characteristics, specifically breast bud development, at Week 12. A tertiary endpoint of change from baseline in the Gender Preoccupation and Stability Questionnaire (GPSQ-2) is also proposed.

Part II will consist of a 52-week, double-blind, long-term extension where maintenance of estradiol's effect observed in Part I will be monitored. Subjects randomized to placebo in Part I will be re-randomized to one of the two proposed active dose arms. A schematic for the proposed program is provided in Figure 2.

HHS-0170000

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                                    Type B Meeting Briefing Package

**Figure 2: Schematic of Proposed Program for RIGT-272**



All subjects will have RIGT-272 or placebo for RIGT-272 titrated for the 1st 6 weeks in Part I with the goal of attaining estrogen levels of ≥100 pg/mL to <200 pg/mL for the Low-Dose Titration Group and ≥200 to <400 pg/mL for the High-Dose Titration Group. Those on placebo will be titrated according to a blinded, sham titration schedule.

In Part II, subjects who received placebo in Part I will have RIGT-272 titrated over the 1st 6 weeks while those who received RIGT-272 will be maintained on the dose they were on at the end of Part I but will also be titrated with placebo for RIGT-272 according to a blinded, sham titration schedule.

Though estradiol is used clinically for a variety of clinical presentations in gender affirming care, the Sponsor is proposing, for the purposes of this program, to standardize the study to subjects new to estradiol for use as a feminizing agent.

A detailed study synopsis of the proposed program, including inclusion/exclusion criteria, adverse events (AEs) of special interest, and visit schedule is provided at Attachment 1.

## 18.  STATEMENT OF PURPOSE

The Research Institute for Gender Therapeutics (RIGT) is a nonprofit pharmaceutical company and 501(c)(3) public charity established to bring the clinical treatment of TGD individuals into standard medical practice by researching, developing, and seeking FDA approval of therapeutic options for gender incongruence.

There is a significant unmet medical and social need for an FDA-approved feminizing agent in the management of gender incongruence/gender dysphoria (hereafter referred to as gender incongruence, see below and related Question 6).

Gender incongruence is the psychological distress that results from an incongruence between one's sex assigned at birth and one's gender identity (APA 2022). Gender incongruence is a life-threatening condition, as adults with gender incongruence are nine times more likely to attempt

HHS-0170001

Confidential – Attorneys' Eyes Only

suicide than the general population (Transequality 2015). In 2022, 5% of adults under age 30 in the United States identified as being transgender or non-binary, indicating that the population of those who suffer from gender incongruence is large and growing (Pew Survey 2022).

The medical terminology used to describe TGD Individuals is evolving. The Diagnostic and Statistical Manual of Mental Disorders, (DSM-5-TR) of the American Psychiatric Association currently uses the term gender dysphoria to describe the distress that results from an incongruence between one's sex assigned at birth and one's gender identity (DSM-5 2013). This term is considered pejorative by the gender diverse community as it characterizes the condition as inherently abnormal and a psychiatric condition versus a physiologic and sexual health issue. This characterization contributes to minority stress and stigma of this population. Gender incongruence is no longer seen as pathological or a mental disorder in the world health community and the medical necessity of treatment and care is clearly recognized. Therefore, RIGT is proposing to use the updated ICD-11 (WHO 2019) language for the condition, gender incongruence, for our proposed indication to help de-pathologize the condition.

Estradiol, in various formulations, is recommended, alone or as part of a feminizing regimen, for gender affirming hormone therapy in TGD individuals (). As noted above, this use is supported by major medical associations in the United States, including the Endocrine Society and the American Medical Association(AMA 2023).

Despite its broad support and status as the standard of care, the use of estradiol for gender affirming hormone therapy is currently not FDA approved. The lack of registrational-quality clinical study(ies) and associated FDA approval is frequently cited by proponents of anti-trans legislation as a basis to ban or restrict care (Pharmaceutical Technology 2023). These legislative efforts intervene between doctors and patients, criminalize care and increase negative outcomes, minority stress and stigma for this marginalized population.

RIGT is requesting feedback and guidance from the Division on a proposed development plan for the stated indication to support an investigational new drug (IND) and a subsequent potential NDA application.

Key topics/areas for discussion with the Division are:

a.  Feedback on the proposed clinical development plan
b.  Feedback on the proposed pivotal study and associated endpoints
c.  Feedback on the proposed indication
d.  Procedural Questions

## 19. PROPOSED AGENDA

Introductions – 5 minutes
Discussion of preliminary FDA comments – 45 minutes
Closing Remarks and Meeting Summary – 10 minutes

## 20. LIST OF PROPOSED QUESTIONS

### 20.1 Nonclinical

Estradiol is the standard of care as a feminizing agent for the management of gender incongruence, with a known safety profile derived from extensive clinical experience.  As an endogenous

HHS-0170002

RIGT-272
PIND 169098                                                            Type B Meeting Briefing Package

hormone, present in biological males, and common in mammalian species, the toxicological profile of estradiol is well characterized.  The Sponsor is unaware of any specific safety concern for estradiol which warrants new nonclinical data for the proposed indication.

> **Question 1:** The Sponsor proposes that no new nonclinical evaluations are necessary to support the planned clinical development program for RIGT-272.  Does the Division agree?

## 20.2   Clinical

RIGT proposes to develop RIGT-272 as part of a feminizing regimen in the management of gender incongruence. There is an urgent unmet medical and social need for an FDA-approved feminizing agent in the management of gender incongruence (also referred to as gender dysphoria, see Question 6).  Gender incongruence is a life-threatening condition, as adults with gender incongruence are nine times more likely to attempt suicide than the general population. There are currently no FDA-approved treatments for gender incongruence.  RIGT believes, at the proposed doses, RIGT-272 could provide significant efficacy in the management of this condition and does not introduce inappropriate risks.

> **Question 2:** Does the Division agree that the study (see Section 17), as designed, is appropriate to evaluate the safety and efficacy of RIGT-272 for the intended indication, particularly with respect to planned endpoints, inclusion/exclusion criteria, and duration?

Estradiol, alone or in combination with other active ingredient(s), is currently FDA-approved for a variety of indications and is an off-label standard of care as a feminizing agent in the management of gender incongruence.  Given estradiol's known pharmacology and physiological effects, a single positive efficacy and safety study, in the proposed population, is unlikely to be due to random chance, and therefore could support a finding of efficacy and safety.

> **Question 3:** Does the Division agree that a single, well-designed Phase III study (see Section 17), that establishes the safety and efficacy of RIGT-272, as part of a feminizing regimen in the management of gender incongruence, could be adequate to support a 505(b)(2) NDA?

Given the heightened public scrutiny the first approval of an agent for gender incongruence will likely garner, RIGT is cautious to ensure the proposed program for RIGT-272 is robust. A placebo-controlled study is the gold standard in assessing safety and efficacy.

However, patients with gender incongruence are under significant distress.  Estradiol is a potent physiologically active agent whose desired effects are potentially obvious to the patient and potentially irreversible.  Therefore, it is difficult ethically and procedurally to conduct a placebo-controlled program with estradiol as a monotherapy.

HHS-0170003

In order to bridge these conflicting positions, RIGT is proposing a program to assess estradiol versus placebo as an adjunct to an anti-androgen (spironolactone), the combination of which is currently a standard of care in this population. This would provide all subjects with an active agent while enabling the ability to assess the effects of estradiol versus placebo.

> **Question 4:** Does the Division agree that the proposal to conduct a placebo-controlled program for RIGT-272 as an adjunct to baseline use of an anti-androgen (spironolactone) is an appropriate approach to provide evidence of efficacy and safety for RIGT-272 while addressing the risks associated with the use of only placebo in such a population?

Gender incongruence has a significant and growing prevalence in adolescents and young adults. Physiologically RIGT is unaware of any distinction between the etiology of gender incongruence in a reproductive-age adolescent, and a legal, $\geq 18$ years of age, adult; the current approved uses of estradiol are not limited to use in adults. Additionally, RIGT is concerned that the exclusion of adolescents from the proposed program will make it extremely difficult to conduct a stand-alone program in adolescents. Therefore, the proposed program is currently designed to include adults, and adolescents of reproductive age, assigned male sex at birth with gender incongruence who are seeking to start on a feminizing regimen.

> **Question 5:** Does the Division agree that the proposal to include adolescent subjects of reproductive age in the proposed program is appropriate?

### 20.3   Procedural

RIGT is proposing to utilize the term gender incongruence for the proposed indication for RIGT-272. The term gender incongruence is recognized by both the World Professional Association of Transgender Health Standards of Care 8th Version and in the International Classification of Diseases and Related Health Problems, 11th Version of the World Health Organization (ICD-11). Gender dysphoria, the current terminology utilized to describe the distress that results from an incongruence between one's sex assigned at birth and one's gender identity in the DSM-5-TR, is considered pejorative by the gender diverse community as it characterizes the condition as inherently abnormal and a psychiatric condition. This characterization contributes to minority stress and stigma of this population. Therefore, RIGT is proposing to use the updated ICD-11 language for the condition, gender incongruence, to help de-pathologize the condition.

> **Question 6:** Does the Division agree that the proposed indication, including the preferred diagnostic term of gender incongruence, is appropriate?

As a 501(c)(3) public charity, RIGT plans to initiate the proposed program under a Research Investigational New Drug application (Research IND). Upon completion of the program, RIGT plans to publish and make available the underlying data of the proposed study for either RIGT or

HHS-0170004

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                             Type B Meeting Briefing Package

a future commercial Sponsor to use, in combination with reference to an existing approved NDA for estradiol, as the basis of a 505(b)(2) NDA.

**Question 7:** Does the Division have any comments on the Sponsor's proposed plan to submit a Research IND to support a future 505(b)(2) NDA for RIGT-272 for the proposed indication?

HHS-0170005

33

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098                                                          Type B Meeting Briefing Package

## 21.  INFORMATION TO SUPPORT DISCUSSIONS

**Attachment 1: Protocol Synopsis**

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics
Protocol: RIGT-272-FEM-301

RIGT-272 (estradiol)
06 September 2023

# Clinical Protocol

A Double-Blind, Placebo-Controlled, Parallel-Group Phase III Study with a Long-term Extension to Evaluate the Efficacy and Safety of Estradiol as Part of a Feminizing Regimen for the Management of Gender Incongruence

**Protocol: RIGT-272-FEM-301**

**Date: 06 September 2023**

**Pre-IND 169098**

The Research Institute for Gender Therapeutics, Inc.

1150 Walnut Street, 2nd Floor
Newton, Massachusetts 02461

---

### Confidentiality Statement

---

This confidential document is the property of The Research Institute for Gender Therapeutics, Inc. No unpublished information contained herein may be disclosed without prior written approval from the Research Institute for Gender Therapeutics. Access to this document must be restricted to relevant parties.

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170007

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics      RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301      06 September 2023

# 1.0   SYNOPSIS

| **Name of Sponsor Company:** The Research Institute for Gender Therapeutics | **Drug Under Study:** RIGT-272 (estradiol) |
|---|---|

| **Title of Protocol:** A Double-Blind, Placebo-Controlled, Parallel-Group Phase III Study with a Long-term Extension to Evaluate the Efficacy and Safety of Estradiol as Part of a Feminizing Regimen for the Management of Gender Incongruence |||
|---|---|---|

| **Protocol Number:** RIGT-272-FEM-301 | **Phase:** III | **Indication:** Gender Incongruence |
|---|---|---|

**Study Objectives**

**Primary Objective:**

1. To evaluate circulating estrogen levels of gender incongruent subjects treated with estradiol versus placebo as part of a feminizing regimen.

**Key Secondary Objectives:**

1. To evaluate the efficacy of estradiol administration versus placebo as part of a feminizing regimen in the development of secondary sex characteristics in gender incongruent subjects as measured by breast bud development.

**Tertiary Efficacy Objective:**

1. To evaluate the efficacy of estradiol administration versus placebo as part of a feminizing regimen in the management of gender incongruence as measured by the Gender Preoccupation and Stability Questionnaire, second edition (GPSQ-2).

**Safety Objective:**

2. To evaluate the safety and tolerability of estradiol administration versus placebo as part of a feminizing regimen in subjects with gender incongruence based on adverse events (AEs), physical examinations, vital signs, clinical laboratory evaluations, bone density measurements and electrocardiograms (ECGs).

**Study Efficacy Endpoints: Part I**

All efficacy endpoints will also be analyzed and summarized at each observation time.

**Primary Endpoint:**

1. The change from baseline in circulating estrogen levels at Week 12 (the average of 2 serum estrogen blood samples obtained during Week 12).

2

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170008

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics      RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301      06 September 2023

**Key Secondary Efficacy Endpoints:**

1. Breast bud development (Tanner Stage 2) compared with baseline at Week 12.

**Tertiary Efficacy Endpoints:**

1. The change from baseline in the subject assessment of the Gender Preoccupation and Stability Questionnaire (GPSQ-2) at Week 12 (assessed at scheduled visits).

**Study Efficacy Endpoints: Long-term Extension (Part II)**

The maintenance of effect in Part II of the study will be assessed by:

1. The maintenance of circulating estrogen levels.
2. Breast bud development (Tanner Stage 2) at Week 64 compared with Baseline and Week 12 measures.
3. The subject assessment of the GPSQ-2 (assessed at scheduled visits).

**Study Design:**

This is a randomized-start, placebo-controlled, parallel-group, double-blind, Phase III study performed under in-house blinding conditions (the Sponsor will also be blinded to treatment arms). In Part I of the study, subjects will be randomly assigned to one of 3 treatment arms (RIGT-272 Low-titration Group, RIGT-272 High-titration Group, Placebo Group). In Part II, subjects randomized to the RIGT High- and Low-titration groups will remain on the titrated dose they were receiving at the end of Part I. Subjects who received placebo will be randomly assigned (in a 1:1 ratio) to the RIGT-272 Low-titration Group and the RIGT-272 High-titration Group. All subjects (including those on placebo for estrogen) will also receive spironolactone. The treatment arms are further described below.

Subjects will be screened to determine eligibility and those who meet all of the eligibility criteria will return for Randomization within the allowed 45-day screening period.

Part I (Placebo-Controlled Period)

Subjects will return to the clinic for Randomization (**Visit 2**) within 45 days of **Visit 1**. Subjects who meet all study inclusion criteria, none of the exclusion criteria and all Randomization criteria will be randomized in a 1:1:1 ratio to one of 3 treatment arms:

- RIGT-272 Low-titration Group: estradiol starting dose 2 mg once daily titrated over the first 6 weeks to achieve serum estrogen levels of $\geq 100$ pg/mL to $<200$ pg/mL. Spironolactone starting dose of 50 mg twice daily titrated over the first 6 weeks to

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170009

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics                RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301                                    06 September 2023

achieve a serum testosterone level of <50 ng/dL with a maximum dose of 100 mg twice
daily.

- RIGT-272 High-titration Group: estradiol 2 mg once daily starting dose titrated over 6
  weeks to achieve serum estrogen levels of ≥200 pg/mL to <400 pg/mL. Spironolactone
  starting dose of 50 mg twice daily titrated over the first 6 weeks to achieve a serum
  testosterone level of <50 ng/dL with a maximum dose of 100 mg twice daily.

- Placebo: placebo for estradiol 2 mg starting dose titrated over 6 weeks according to a
  blinded, sham titration schedule. Spironolactone starting dose of 50 mg twice daily
  titrated over the first 6 weeks to achieve a serum testosterone level of <50 ng/dL with
  a maximum dose of 100 mg twice daily.

  **Note:** The starting dose for spironolactone can be reduced to 25 mg once daily for
  subjects who desire (or require due to medical history) a low dose or slow upward
  titration. Subjects who have undergone a bilateral orchiectomy are not required to take
  spironolactone if their serum testosterone level is <50 ng/dL at baseline.

Subjects will be provided with a subject information card and instructed to keep the card with
them throughout the study. Subjects will be required to complete the General Anxiety Disorder
Questionnaire-7 (GAD-7), GPSQ-2 and the Patient Health Questionnaire (PHQ-9) at the visits
outlined in the Schedule of Assessments (Table 1).

Part II (Long-Term Extension)

At the end of 12 weeks, subjects who complete the blinded, placebo-controlled portion of the
study (Part I) will automatically continue to the long-term extension (Part II) for up to an
additional 52 weeks. Subjects randomized to the RIGT-272  Low- and High-titration Groups
in Part I will remain on  the doses they were on at the end of Part I and subjects randomized to
placebo in Part I will be randomly assigned to the RIGT-272 Low-titration Group and the
RIGT-272 High-titration Group in a 1:1 ratio. A period of titration for estradiol will occur for
all subjects in Part II (including those randomized to RIGT-272 in Part I according to a blinded,
sham titration schedule) to maintain the blind.

 All subjects will continue to receive spironolactone at the doses they were taking at the end of
Part I.

The total maximum time on study for Part I (including the Screening) is approximately
19 weeks and 52 weeks for Part II for a total of up to 71 weeks. The anticipated total number
of planned visits is 13; 2 of which are only blood-draw visits (**Visit 5** and **Visit 9**).

Any subject who does not withdraw consent and who discontinues early in Part I will be asked

4

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170010

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics      RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301              06 September 2023

(if willing and able) to remain in the study through Week 12 for collection of assessments.

**Blood Sampling for Serum Estrogen**

All subjects will have blood samples drawn at baseline and at Weeks 2, 4, 6, 12, 14, 16, 18, 28, 40, 52 and 64 to assess serum estrogen levels.

In addition to blood draws that will occur in the clinic, subjects will be required to have a blood sample drawn on at least 1 additional day in the week prior to both their Week 12 (**Visit 6**) and Week 64 (**Visit 13**) visits. The average of these 2 samples will be used to calculate the Week 12 and Week 64 estrogen levels, respectively.

All blood samples for assessment of serum estrogen will be assessed by an external vendor and the Sponsor and investigators will not have access to the data prior to the unblinding of the study.

**Breast Bud Evaluation**

Three-dimensional (3-D) Ultrasound will be used to evaluate breast buds, e.g., mammary and ductile tissue volume, and will be assessed by an external vendor.

| | |
|---|---|
| **Subject Population:** Adolescents of reproductive age and adults assigned male sex at birth with plans to newly start feminizing hormone therapy. | |
| **Number of Subjects:** Approximately 140 subjects screened to ensure 114 subjects randomized (38 per treatment group). It is expected that all subjects will continue in the Part II of the study. | **Number of Centers:** Approximately X sites in the United States, Netherlands, Canada, and Australia. |
| **Test Product and Doses:** RIGT-272 and matching placebo. Starting dose of RIGT-272 will be 2 mg with titration to achieve serum estrogen levels of ≥100 pg/mL to <200 pg/mL (Low-titration Group) or ≥200 pg/mL to <400 pg/mL (High-titration Group). | **Route of Administration:** Current dosing presumes oral estradiol but final formulation is to be determined. |

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

5

HHS-0170011

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics       RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301                       06 September 2023

**Figure 1**        **Study Schema**



All subjects will have RIGT-272 or placebo for RIGT-272 titrated for the 1st 6 weeks in Part I with the goal of attaining estrogen levels of ≥100 pg/mL to <200 pg/mL for the Low-Dose Titration Group and ≥200 to <400 pg/mL for the High-Dose Titration Group. Those on placebo will be titrated according to a blinded, sham titration schedule.

In Part II, subjects who received placebo in Part I will have RIGT-272 titrated over the 1st 6 weeks while those subjects who received RIGT-272 will be maintained on the dose they were on at the end of Part I but will also be titrated with placebo for RIGT-272 according to a blinded, sham titration schedule.

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170012

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics                    RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301                                         06 September 2023

**Criteria for Inclusion/Exclusion:**

*Inclusions:* Subjects may be included in the study only if all the following criteria are met:

1. Adult and adolescents of reproductive age assigned male sex at birth who experience a strong and persistent cross-gender identification coupled with persistent discomfort with their sex as evidenced by reporting a history of two of the following for at least six months:

   a. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)

   b. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)

   c. A strong desire for the primary and/or secondary sex characteristics of the other gender

   d. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender)

   e. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

2. Able and willing to give written informed consent and authorize the use of personal health information in order to protect subject confidentiality, as required by local regulations (e.g., Health Insurance Portability and Accountability Act [HIPAA]).

3. Willing to administer spironolactone as part of the feminizing regimen throughout the trial.

   **Note:** Subjects who have undergone bilateral orchiectomy are not required to administer spironolactone as long at their baseline testosterone is <50 ng/dL.

4. Able and willing to comply with study requirements.

*Exclusions:* Subjects are excluded from the study if any of the following criteria are met:

1. Any medical condition or clinical laboratory test which, in the judgment of the Investigator, makes the subject unsuitable for the study.

2. Adolescent subjects who have been treated with a gonadotropin-releasing hormone (GnRH) modulator for the purpose of avoiding puberty.

3. Has a history of breast augmentation surgery prior to study entry or is expected to have any gender-affirming surgery during the course of the study.

4. Known hypersensitivity to estradiol or spironolactone (if required as per inclusion #5) or any of their components.

5. A history of venous thrombotic events (i.e., deep vein thrombosis, pulmonary embolism).

7

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170013

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics        RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301                                06 September 2023

6. Currently has uncontrolled or poorly controlled hypertension (systolic blood pressure ≥150 mmHg and/or diastolic blood pressure of ≥90 mmHg for adults and systolic blood pressure of ≥140 mmHg and/or diastolic blood pressure of ≥90 mmHg for adolescents at Screening after repeated measurements).

   Note: All subjects are required to have their blood pressure measured 3 times with a 5-minute rest in between each measurement and the average of the 3 measures is to be recorded. Subjects who require a longer period of rest for blood pressure measurements that fall within the entry criterion are allowed to rest for a longer period of time and have their blood pressure retested.

7. Has a history of alcohol or substance abuse, that in the opinion of the Investigator, makes the subject unsuitable for enrollment.

8. Has a history of suicide attempt within 1 year.

9. Has a score of ≥20 on the Patient health questionnaire—9 (PHQ-9).

10. Has a positive drug screen for drugs of potential abuse at Screening or just prior to Randomization (amphetamine, barbiturates, benzodiazepines, cocaine, opiates, phencyclidine, propoxyphene) except if explained by use of allowed prescription medicines.

11. The use feminizing agents or anti-androgens other than those specified by the protocol throughout the study.

12. Currently using spironolactone or derivatives of spironolactone (e.g., Eplerenone) for other indications (e.g., heart failure, hypertension, edema).

13. Contraindications for the use of spironolactone or derivatives of spironolactone including hyperkalemia and Addison's disease.

14. A history of cancer: Exceptions: (1) subjects with adequately treated basal cell carcinoma may participate; (2) subjects with other malignancies which have been successfully treated ≥1 years prior to Screening, where appropriate follow-up has revealed no evidence of recurrence from the time of treatment through the time of Screening.

15. Estimated glomerular filtration rate (using the Chronic Kidney Disease Epidemiology Collaboration [CKD-EPI] equation) of <30 milliliters/minute.

16. A history of moderate or severe cirrhosis.

17. Has participated in an interventional study and received study treatment within 30 days (or within 5 half-lives of the investigational agent, whichever is longer) prior to Screening.

18. Previous registration in this study.

19. Subjects who are employees of the Sponsor, relatives of, or staff directly reporting to the Investigator.

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170014

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics                RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301                                    06 September 2023

**Statistical Analysis:**

**Efficacy:**

This double-blind, placebo-controlled study is designed to evaluate the efficacy and safety of RIGT-272 (estradiol) as part of a feminizing regimen versus placebo for the management of gender incongruence over 12 weeks followed by an additional 52-week long-term extension to further evaluate the maintenance of effect and safety of RIGT-272.

The primary endpoint is the change from baseline in circulating estrogen levels at Week 12. This will be the average of 2 blood samples taken during the 12th week of the study for which serum estrogen concentrations will be determined with the goal of maintaining average estradiol levels of ≥100 and <200 pg/mL in the RIGT-272 Low-titration Group and ≥200 to <400 pg/mL in the RIGT-272 High-titration Group compared with estrogen levels at baseline and with those on placebo. The study will be stratified by bilateral orchiectomy (Yes/No).

Although the primary endpoint for this trial will focus on serum estrogen, the power for the key secondary efficacy endpoint requires a larger sample size than for the primary endpoint and thus will dictate the sample size and power. The key secondary endpoint is the change from baseline in breast bud development at Week 12.

The final analysis of the Part I data will be carried out once all subjects have completed Part I of the study. The final analysis of Part II data will occur once subjects have completed Part II of the study.

Additional details will be provided in the statistical analysis plan (SAP).

**Power:**

Study power is based on the change from baseline in breast bud development (clinically meaningful increase in mammary and ductile tissue volume) at Week 12.

Of note, the sample size will be updated with a calculation of power for breast-bud development.

**Safety:**

Adverse events will be summarized, and event rates will be presented by treatment arm. Confidence intervals will be provided for adverse events of special interest (AESIs). Physical examinations, vital signs, ECG parameters, and clinical laboratory data will be summarized by treatment group and dose in terms of change from baseline status. Bone mineral density will also be measured during the study.

9

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170015

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics　　　　RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301　　　　　　　　　　　　06 September 2023

At Screening and randomization, subjects with be required to complete the PHQ-9 to assess for depression and will be excluded from participation if they score ≥20 indicative of severe depression. Similarly, the PHQ-9 will be completed at each visit throughout the trial and subjects with a score of ≥20 and at least a 2-point increase from baseline at any visit will be discontinued from the study due to severe depression and referred for counseling.

The AESIs include the incidence of events listed below as well as the incidence of discontinuation due to these AEs. The AESIs are as follows:

- Cardiovascular events
- Hypertension
- Laboratory measures:
  - Elevated triglycerides
  - Elevated low density lipoprotein (LDL)
  - Elevated fasting glucose
  - Elevated glycosylated hemoglobin (HgbA1c)

10

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170016

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics                                    RIGT-272 (estradiol)
Protocol: RIGT-272-FEM-301                                                        06 September 2023

## 2.0   SCHEDULE OF ASSESSMENTS

**Table 1        Schedule of Assessments for Study Visits**

| Procedure | Screening | 12Week Randomized Start, Double-blind Placebo Controlled Period (Part I) | | | | | 52-Week Open Label Extension (Part II) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | up to 45 days Before Day 1 Visit 1 | Day 1 Visit 2 Random -ization | Week 2 Visit 3 | Week 4 Visit 4 | Week 6 Visit 5 (Blood-draw visit only) | Week 12 Visit 6 | Week 14 Visit 7 | Week 16 Visit 8 | Week 18 Visit 9 (Blood-draw visit only) | Week 28 Visit 10 | Week 40 Visit 11 | Week 52 Visit 12 | Week 64 (EOS) Visit 13 (or Permanent Discontinu ation from Study) |
| Visit Window | NA | NA | ±2 Days | ±2 Days | ±2 Days | ±3 Days | ±2 Days | ±2 Days | ±2 Days | ±3 Days | ±3 Days | ±3 Days | ±3 Days |
| Informed consent | X | | | | | | | | | | | | |
| Inclusion and exclusion criteria | X | X | | | | | | | | | | | |
| Physical examination including height and weight[1] | X | X | | | | X | | | | X | | | X |
| Breast bud assessment (3-D ultrasound) | | X[2] | | | | X | | | | X | | | X |
| Height and weight only | | | X | X | | | X | X | | | X | X | |
| Vital signs[3] | X | X | X | X | | X | X | X | | X | X | X | X |
| Medical history | X | X | | | | | | | | | | | |
| Demographics | X | | | | | | | | | | | | |
| Prior/concomitant medication review | ←——————————————————————————————————————————————————————————→ | | | | | | | | | | | | |

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

11

HHS-0170017

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics
Protocol: RIGT-272-FEM-301

RIGT-272 (estradiol)
06 September 2023

| Procedure | Screening | 12 Week Randomized Start, Double-blind Placebo Controlled Period (Part I) | | | | | 52-Week Open Label Extension (Part II) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | up to 45 days Before Day 1 Visit 1 | Day 1 Visit 2 Random-ization | Week 2 Visit 3 | Week 4 Visit 4 | Week 6 Visit 5 (Blood-draw visit only) | Week 12 Visit 6 | Week 14 Visit 7 | Week 16 Visit 8 | Week 18 Visit 9 (Blood-draw visit only) | Week 28 Visit 10 | Week 40 Visit 11 | Week 52 Visit 12 | Week 64 (EOS) Visit 13 (or Permanent Discontinuation from Study) |
| Visit Window | NA | NA | ±2 Days | ±2 Days | ±2 Days | ±3 Days | ±2 Days | ±2 Days | ±2 Days | ±3 Days | ±3 Days | ±3 Days | ±3 Days |
| Review of current and changes in alcohol, tobacco and caffeine use[4] | X | X | X | X | | X | X | X | | X | X | X | X |
| Urine drug screen[5] | X | X | | X | | X | | | | | | | X |
| Complete Laboratory assessments (Hematology, Chemistry including lipid panel, Urinalysis) | X | X | | X | | X | | X | | X | X | X | X |
| Blood sample for estrogen and testosterone assessment[6] | | X | X | X | X | X | X | X | X | X | X | X | X |
| 12-lead ECG Assessment | X | X | | | | X | | | | | | | X |
| Randomization | | X | | | | | | | | | | | |
| Estradiol/PBO study drug dispensing; 2 mg/day starting dose (witnessed first dose)[7,8] | | X | X | X | | X | X | X | | | | | X |

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

12

HHS-0170018

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics
Protocol: RIGT-272-FEM-301

RIGT-272 (estradiol)
06 September 2023

| Procedure | Screening | 12Week Randomized Start, Double-blind Placebo Controlled Period (Part I) | | | | | 52-Week Open Label Extension (Part II) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | up to 45 days Before Day 1 Visit 1 | Day 1 Visit 2 Random-ization | Week 2 Visit 3 | Week 4 Visit 4 | Week 6 Visit 5 (Blood-draw visit only) | Week 12 Visit 6 | Week 14 Visit 7 | Week 16 Visit 8 | Week 18 Visit 9 (Blood-draw visit only) | Week 28 Visit 10 | Week 40 Visit 11 | Week 52 Visit 12 | Week 64 (EOS) Visit 13 (or Permanent Discontinuation from Study) |
| Visit Window | NA | NA | ±2 Days | ±2 Days | ±2 Days | ±3 Days | ±2 Days | ±2 Days | ±2 Days | ±3 Days | ±3 Days | ±3 Days | ±3 Days |
| Spironolactone dispensing; 50 mg bid starting dose (witnessed first dose)[9] | | X | | | | X | | | | | | | |
| Provide subject information card | | X | | | | | | | | | | | |
| Blood samples for serum estrogen and testosterone | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Bone Mineral Density | | X[2] | | | | X | | | | | | | X |
| GAD-7 | | X | | | | X | | | | | X | | X |
| GPSQ-2 | | X | X | X | X | X | X | X | X | X | X | X | X |
| PHQ-9 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Study drug collection/accounting/ review | ←——————————————————————————————————————→ | | | | | | | | | | | | |
| AE/SAE review | ←——————————————————————————————————————→ | | | | | | | | | | | | |

13

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170019

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics
Protocol: RIGT-272-FEM-301

RIGT-272 (estradiol)
06 September 2023

Abbreviations: AE = adverse event; ECG= electrocardiogram; EOS = end of study; GAD-7 = General Anxiety Disorder Questionnaire-7; GPSQ-2 = Gender Preoccupation and Stability Questionnaire 2nd Edition; PBO = placebo; PHQ-9 = Patient Health Questionnaire; SAE = serious adverse event; 3-D = 3-dimensional.

**Note:** Subjects are considered completed in Part I at Week 12/**Visit 6** and will automatically be eligible for the long-term extension (Part II). All subjects will receive blinded, active study drug at **Visit 6** for Part II.

[1]A physical examination will be performed at Screening, **Visit 6** and the EOS Visit (**Visit 13**) (at minimum assessment of: general appearance, skin, head, ears, eyes, nose, throat, neck, lungs, cardiovascular (CV) system, abdomen, lymph nodes, and musculoskeletal system/extremities/joints). A brief physical examination (including height and weight) will be performed at **Visit 2** (Randomization), **Visit 6** and **Visit 10** (at minimum, assessment of skin, lungs, CV system, and abdomen). Interim physical examinations may be performed at the discretion of the Investigator, if necessary, to evaluate AEs or clinical laboratory abnormalities.

[2]The 3-D ultrasound for breast bud assessment and bone mineral density assessment for **Visit 2** (Randomization) is to occur within 7 days after **Visit 2**.

[3]Vital signs will include systolic and diastolic blood pressure, heart rate, respiratory rate, and body temperature, after the subject has been seated for at least 5 minutes. Recorded blood pressure is to be the average of 3 measures with at least 5 minutes between each measure.

[4]Check with subject to confirm if there are any changes to their alcohol, tobacco and caffeine use.

[5]Urine drug screen includes amphetamine, barbiturates, benzodiazepines, cocaine, opiates, phencyclidine and propoxyphene.

[6]In addition to blood draws at scheduled visits, subjects will have blood samples drawn at least 1 additional day in the week prior to **Visit 6** and **Visit 13** so that the average of 2 blood draws can be used to calculate serum estrogen at these 2 visits.

[7]Estradiol dosing will be titrated to achieve estrogen serum blood levels of ≥100 to <200 pg/mL in the RIGT-272 Low-titration Group and ≥200 to <400 pg/mL in the RIGT-272 High-titration Group. Titration is to occur regardless of the treatment assignments in Parts I and II. At the start of Part I, blinding will occur through a blinded, sham titration schedule for those receiving PBO. In Part II, blinding will also occur through a blinded, sham titration schedule which adds placebo for estradiol to the regimen of subjects who received estradiol in Part I. Titration will occur over the first 6 weeks based on serum estrogen levels from **Visit 3**, **Visit 4** and **Visit 5**.

[8]All estradiol study drug supplies are to be collected from all subjects and new supplies are to be dispensed at **Visit 6** for Part II.

[9]Titration of spironolactone (to achieve serum testosterone levels of <50 pg/dL) is to occur at the start of Part I over the first 6 weeks based on serum testosterone levels from **Visit 3**, **Visit 4** and **Visit 5**.

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

14

HHS-0170020

Confidential – Attorneys' Eyes Only

The Research Institute for Gender Therapeutics
Protocol: RIGT-272-FEM-301

RIGT-272 (estradiol)
06 September 2023

Page Intentionally Blank

15

Proprietary and Confidential - Property of The Research Institute for Gender Therapeutics, Inc.

HHS-0170021

Confidential – Attorneys' Eyes Only

RIGT-272
PIND 169098

Type B Meeting Briefing Package

## 22. References

1. Coleman, E., et al. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. International Journal of Transgender Health, 23(S1), S1-S260.https://doi.org/10.1080/26895269.2022.2100644

2. https://transcare.ucsf.edu/guidelines

3. https://www.endocrine.org/news-and-advocacy/news-room/2023/ama-gender-affirming-care

4. Veale et al. Setting a research agenda in trans health: An expert assessment of priorities and issues by trans and nonbinary researchers, International, Transgender Health, 23:4, 392-408, DOI: 10.1080/26895269.2022.2044425

5. https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

6. 2015 U.S. Transgender Survey, available at https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf

7. Survey of U.S. adults conducted May 16-22, 2022 by Pew Research Center, available at https://www.pewresearch.org/short-reads/2022/06/07/about-5-of-young-adults-in-the-u-s-say-their-gender-is-different-from-their-sex-assigned-at-birth/

8. https://www.pharmaceutical-technology.com/features/legal-challenges-put-off-label-use-of-gender-affirming-care-drugs-in-jeopardy/?cf-view

9. American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.

10. https://www.who.int/standards/classifications/frequently-asked-questions/gender-incongruence-and-transgender-health-in-the-icd

Confidential – Attorneys' Eyes Only

## DOCUMENT INFORMATION PAGE

This page is for FDA internal use only. Do **NOT** send this page with the letter.

| | |
|---|---|
| **Application #(s):** | PIND169098 |

| | |
|---|---|
| **Communication Type:** | Correspondence |
| **Communication Group:** | Meeting |
| **Communication Name:** | Final Written Response |
| **Communication ID:** | (COR-MEET-09) |

| | |
|---|---|
| **Drafted by:** | KBerhanu 10/3/23 |
| **Clearance History:** | JVivar 11/8/23; YSun 11/8/23; KVogt 11/8/23; EDurmowicz 11/8/23; ECovert 11/8/23; IComstock 11/13/23; AKotak 11/14/23; STuchman 11/14/23; MKhurana 11/14/23; EAlbuquerque 11/14/23; ABenedict 11/14/23; MKober 11/15/23; CKoepke 11/15/23; NKim 11/15/23; CChang 11-16-23; JMaynard 11/16/23 |
| **Finalized:** | |
| **Filename:** | |

| | |
|---|---|
| **Goal Impact** | Closes the meeting minutes goal |
| **Signatory Authority:** | CPMS, RPM, or Meeting Chair |
| **Use Statement:** | Use to send the official written responses to sponsor when a written response only is granted in lieu of a meeting. For meetings where a discussion is held with the sponsor, use (COR-MEET-03) (COR-BLAMEET-03). |
| **Notes:** | **Note**: Pre-submission meetings for applications in the Program: In rare cases where additional agreement(s) are reached _after_ the pre-submission meeting, document the additional agreement(s) as follows: |

- If the minutes of the pre-submission meeting have not issued yet, document the late agreement(s) in the pre-submission meeting minutes as a post-meeting note or addendum.

- If the minutes of the pre-submission meeting have issued, document the late agreement(s) in an Advice Letter to the applicant. Link the Advice Letter to the incoming meeting documents (meeting request, meeting package) and reference the pre-submission meeting

**Exhibit 0021**

Confidential – Attorneys' Eyes Only

> minutes in DARRTS. (i.e. Select YES to the question "Do you want to add a reference to a communication that is already checked into DARRTS?")
>
> When checking letter into DARRTS, choose the Communication Name listed as **Final written response**.
>
> Use the applicant product code name to identify the proposed biological product because the proper (nonproprietary) name of the biological product is NOT determined until approval. If there is no product code name, contact the Office of Therapeutic Biologics and Biosimilars (OTBB).

**Meeting Types and Due Dates:**

| Meeting Type | Respond Within: | Meeting Scheduled/ WR Due Within: | Background Package Due: | Preliminary Comments Due: |
|---|---|---|---|---|
| **A** | 14 days | 30 days | At time of request | Internal goal: 2 days before meeting |
| **B** | 21 days | 60 days | 30 days before meeting/WRO | Internal goal: 2 days before meeting |
| **B(EOP)** | 14 days | 70 days | 50 days* before meeting/WRO | **PDUFA VII: 5 days before meeting** |
| **C** | 21 days | 75 days | 47 days^ before meeting/WRO | **PDUFA VII: 5 days before meeting** |
| **C (new surrogate endpoints)** | 21 days | 75 days | At time of request | **PDUFA VII: 5 days before meeting** |
| **D** | 14 days | 50 days | At time of request | **PDUFA VII: 5 days before meeting** |
| **INTERACT** | 21 days | 75 days | At time of request | **PDUFA VII: 5 days before meeting** |
| **CPAM** | 21 days | 75 days | At time of request | **5 days before meeting** |

NOTE: All days are calendar days.
*Meeting package cannot be due earlier than 20 days after receipt of meeting request
^Meeting package cannot be due earlier than 28 days after receipt of meeting request

**Biosimilar Meeting Types and Due Dates:**

HHS-0169974

Confidential – Attorneys' Eyes Only

| Meeting Type | Respond Within: | Meeting Scheduled/ WR Due Within: | Background Package Due: | Preliminary Comments Due: |
|---|---|---|---|---|
| **BIA** | 21 days | 75 days | At time of request | Internal goal: 2 days before meeting |
| **BPD Type 1** | 14 days | 30 days | At time of request | Internal goal: 2 days before meeting |
| **BPD Type 2a** | 21 days | 60 days | At time of request | Internal goal: 2 days before meeting |
| **BPD Type 2b** | 21 days | 90 days | At time of request | **BsUFA III: 5 days before meeting** |
| **BPD Type 3** | 21 days | 120 days | At time of request | **BsUFA III:5 days before meeting** |
| **BPD Type 4** | 21 days | 60 days | 14 days from receipt of meeting request | Internal goal: 2 days before meeting |

Version: 07/24/2023

**END OF DOCUMENT INFORMATION PAGE**

**The letter begins on the next page.**

Reference ID: 5278923

HHS-0169975

Confidential – Attorneys' Eyes Only



PIND169098

**MEETING REQUEST-
WRITTEN RESPONSES**

The Research Institute for Gender Therapeutics, Inc.
Attention: Travis Helm
Regulatory Affairs
1150 Walnut Street, 2nd Floor
Newton, MA 02461

Dear Travis Helm:

Please refer to your pre-investigational new drug application (PIND) file for estradiol.

We also refer to your submission dated September 19, 2023, containing a meeting request. The purpose of the requested meeting was to discuss the proposed development plan for estradiol, as part of a feminizing regimen in the management of gender incongruence.

Further reference is made to our Meeting Granted letter dated October 2, 2023, wherein we stated that written responses to your questions would be provided in lieu of a meeting.

The enclosed document constitutes our written responses to the questions contained in your September 19, 2023, background package.

If you have any questions, call Kidist Berhanu, Regulatory Project Manager at (301) 837-7665.

Sincerely,

{See appended electronic signature page}

Christina Chang, M.D., M.P.H.
Director
Division of Urology, Obstetrics, and Gynecology
Office of Rare Diseases, Pediatrics, Urology, and
Reproductive Medicine
Office of New Drugs
Center for Drug Evaluation and Research

Enclosure: Written Response

Confidential – Attorneys' Eyes Only



## WRITTEN RESPONSES

| | |
|---|---|
| **Meeting Type:** | Type B |
| **Meeting Category:** | Pre-IND |
| **Application Number:** | 169098 |
| **Product Name:** | estradiol |
| **Proposed Indication:** | As a part of a feminizing regimen in the management of gender incongruence |
| **Applicant Name:** | The Research Institute for Gender Therapeutics, Inc. |
| **Regulatory Pathway:** | 505(b)(2) of the Federal Food, Drug, and Cosmetic Act |

## 1.0   BACKGROUND

The Sponsor, The Research Institute for Gender Therapeutics, Inc. (RIGT), plans to study a commercially available FDA-approved form of estradiol as part of a feminizing regimen in the management of gender incongruence. The Sponsor has not yet selected the final ester or formulation of estradiol for the proposed program.

The Sponsor proposes to conduct one Phase 3 trial in adults and reproductive-aged adolescents to provide evidence of efficacy and safety for the proposed indication. Part 1 of this trial will be double-blind, placebo-controlled, and randomized (1:1:1) to two doses of estradiol or matching placebo as an adjunct to spironolactone as part of a feminizing regimen for 12 weeks. The primary endpoint is the change from baseline in estrogen levels at Week 12 and the key secondary endpoint is change from baseline in secondary sexual characteristics, specifically breast bud development, at Week 12. A tertiary endpoint of change from baseline in the Gender Preoccupation and Stability Questionnaire (GPSQ-2) is also proposed. Part II of this trial will be a 52-week, double-blind, long-term extension to evaluate safety of estradiol. Subjects randomized to placebo in Part I will be re-randomized to one of the two proposed active dose arms.

The Sponsor also plans to seek a partial waiver for adolescent persons younger than reproductive age.

RIGT is requesting this pre-IND meeting to gain feedback and guidance from the FDA on the proposed clinical development plan (study and associated endpoints, proposed indication) and procedural questions to support an investigational new drug (IND) and a subsequent potential NDA application.

HHS-0169977

Confidential – Attorneys' Eyes Only

PIND 169098
Page 2

## 2.0    QUESTIONS AND RESPONSES

**Introductory Comment:**
Your background package contains very limited information. After you have identified a specific investigational product for your program (including the product's formulation and route of administration), we are open to further discussion in Type C guidance meeting(s).

**Question 1:**
The Sponsor proposes that no new nonclinical evaluations are necessary to support the planned clinical development program for RIGT-272. Does the Division agree?

***FDA Response to Question 1:***
No, we do not agree. We acknowledge that the toxicological profile of estrogens is generally well understood in individuals assigned female at birth (AFAB). However, nonclinical data will be needed to support the safety and labeling aspects of your estrogen product for the new use in transgender/gender diverse individuals who are assigned male at birth (AMAB) and are seeking male-to-female transition. These data should inform the mechanism of action of your estrogen product for the intended indication and the potential for your estrogen product to induce reproductive and developmental toxicity and carcinogenicity in the intended population (AMAB individuals at adult and adolescent ages). These nonclinical data could be obtained from the published literature, right-of-reference to studies conducted by other sponsors/applicants, nonclinical studies you opt to conduct, or reliance on FDA's previous findings of safety of a Listed Drug for which you establish an adequate scientific bridge.

General considerations regarding nonclinical studies to assess the potential for a drug to cause endocrine and non-endocrine effects that are unintentional and adverse can be found in the M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals: Guidance for Industry and the Nonclinical Evaluation of Endocrine-Related Drug Toxicity: Guidance for Industry.

The adequacy of the nonclinical data you propose to rely on to inform the safety of your estrogen product will be a review issue at the time of IND opening.

To support your drug development program, ensure that your IND submission includes the following:

1. A clear identification of the active pharmaceutical ingredient and its strength

2. A clear identification of the route of administration and dose regimen

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169978

Confidential – Attorneys' Eyes Only

PIND 169098
Page 3

3. A description of if/how you intend to scientifically bridge your drug product to a Listed Drug product to support reliance on FDA's nonclinical findings of safety of the estrogen in your drug product for the intended population and the proposed indication

4. A quantitative description of the composition of your drug product, including all excipients

   a. Excipients that have not been used in a similar context (dose, route of administration, duration) in approved drugs may require nonclinical evaluation of safety prior to the initiation of clinical studies. For additional information, refer to the Guidance for Industry: Nonclinical Studies for the Safety Evaluation of Pharmaceutical Excipients, at https://www.fda.gov/media/72260/download.

5. A quantitative description of the impurity profile of your drug substance and drug product to enable a nonclinical risk assessment

   a. Acceptance criteria for impurities should follow the recommendations in the Q3A Guidance, the Q3B(R2) Guidance, the Q3C(R8) Guidance, and the Q3D(R2) Guidance, as appropriate.

   b. Impurities or degradants that are identified as structural alerts should be at or below acceptable qualification thresholds, as described in the Guidance for Industry: M7 Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk.

   c. You may use nonclinical data from the literature or conduct nonclinical studies to adequately qualify impurities or degradants found to exceed acceptable thresholds described in the appropriate guidance documents.

**Question 2:**
Does the Division agree that the study (see Section 17), as designed, is appropriate to evaluate the safety and efficacy of RIGT-272 for the intended indication, particularly with respect to planned endpoints, inclusion/exclusion criteria, and duration?

***FDA Response to Question 2:***
No, we do not agree. See Introductory Comment.

We have the following general comments regarding your program based on the limited information you provided in the background package. We can provide additional comments and recommendations upon confirmation of your selected product and submission of a complete protocol.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Confidential – Attorneys' Eyes Only

PIND 169098
Page 4

1. Select a primary efficacy endpoint to assess a clinical outcome that is most meaningful to your intended population (e.g., degree of the development of secondary sexual characteristics in transgender females or reduction of distress associated with gender incongruence). It is unlikely that a clinically meaningful change after treatment initiation can be demonstrated following a short-term treatment with estradiol. Change from baseline in estrogen levels at Week 12 is not a clinical outcome.

   a. Clarify your rationale for a 12-week placebo-controlled period in Part I of your proposed clinical trial. To provide substantial evidence of effectiveness for your product, there may be other study designs (i.e., not placebo-controlled) to address the requirement for adequate and "well-controlled" investigation(s).

   b. Once you have identified a clinically meaningful outcome measure(s) for your clinical trial(s), identify the appropriate measurement(s) and scales that will be used to assess your endpoints.

2. Provide detailed information regarding the dose titration plan based on the type of the estrogen product you select.

3. Justify your proposal for a low-dose and high-dose titration group in your study design. The supraphysiologic levels of estradiol (200-400pg/mL) in the high-dose titration group are potentially associated with increased risk of thromboembolic disease, liver dysfunction, and hypertension in this population without the prospect for additional clinical benefit.

4. Provide a schedule for dose reduction if a subject develops adverse reactions such as hypertension.

5. It is unclear how you define "reproductive-age adolescent." Consider the following definition and inclusion criteria for the safe enrollment of adolescent subjects:

   a. AMAB, transfemale participant, after their 13th birthday

   b. Tanner stage ≥G2/B2

   c. Adolescent assent and parent/guardian permission/informed consent

   d. No medical contraindications to sex hormone treatment, including but not limited to, serious cardiac, hepatic, or renal disease

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169980

Confidential – Attorneys' Eyes Only

PIND 169098
Page 5

    e.  Adolescent has declined, or is not a candidate for GnRH agonist treatment, or has had continued distress associated with gender incongruence on GnRH agonist treatment

    f.  The presence of a documented psychological evaluation and clearance by a mental health professional that confirms the diagnosis of gender incongruence, assesses the adolescent's cognitive maturity and emotional stability, and assesses the ability of the subject to provide informed assent. Psychological evaluation must conclude that the pediatric subject has achieved adequate decision-making capacity to provide informed assent.

    g.  Confirmation by a mental health professional of the persistence of distress associated with gender incongruence, that any coexisting psychological, medical, or social problems that could interfere with the treatment have been adequately addressed, and that the adolescent has the mental capacity to understand that the treatment with estrogen may be irreversible.

6.  Provide justification for excluding subjects who have been treated with a gonadotropin-releasing hormone (GnRH) modulator for the purpose of avoiding puberty.

7.  Provide justification for the coadministration of spironolactone to study participants throughout the treatment periods in Parts I and II of your clinical study. Spironolactone can cause gynecomastia and may affect the assessment of the clinical outcome and safety profile collected.

8.  Revise your protocol to add the following exclusion criteria for all adolescent and adult subjects:

    a.  Subjects younger than 13

    b.  Subjects without completed mental health consultation

    c.  Inadequate decision-making capacity

    d.  Known hypersensitivity to the drug(s)

    e.  Active or history of deep vein thrombosis or pulmonary embolism

    f.  Active or history of cardiovascular or thrombotic disorders (such as myocardial infarction, uncontrolled hypertension). Uncontrolled hypertension should be defined based on accepted thresholds in adults and for adolescents based on thresholds established to define Stage I

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169981

Confidential – Attorneys' Eyes Only

PIND 169098
Page 6

hypertension in the American Academy of Pediatrics (AAP) Clinical Practice Guidelines for Screening and Management of High Blood Pressure in Children and Adolescents.[1]

g.  Known liver or renal dysfunction

h.  Known or history of gallbladder disease

i.  Known or history of hypertriglyceridemia

j.  Family history of hereditable thrombophilias (e.g., Factor V Leiden)

k.  History of BRCA or other familial breast cancers

l.  Known or suspected pituitary adenomas

m. Known or suspected breast or other hormonally sensitive cancers (such as testicular cancer or melanoma)

n.  History of psychosis or suicidal ideation within the last 30 days. Patients with psychosis or suicidal ideation within the last 30 days will be required to undergo thorough counselling before being re-considered for enrollment.

o.  Blood pressure measurement above accepted thresholds for hypertension in adults and for adolescents based on thresholds by the assigned sex at birth established to define Stage I hypertension in the American Academy of Pediatrics Clinical Practice Guidelines for Screening and Management of High Blood Pressure in Children and Adolescents (AAP Hypertension Guideline).[2]

p.  AST/ALT > upper limit of normal in any patient

---

[1] Flynn JT, Kaelber DC, Baker-Smith CM, Blowey D, Carroll AE, Daniels SR, de Ferranti SD, Dionne JM, Falkner B, Flinn SK, Gidding SS, Goodwin C, Leu MG, Powers ME, Rea C, Samuels J, Simasek M, Thaker VV, Urbina EM; Subcommittee On Screening And Management Of High Blood Pressure In Children. Clinical Practice Guideline for Screening and Management of High Blood Pressure in Children and Adolescents. Pediatrics. 2017 Sep;140(3):e20171904.
[2] Flynn JT, Kaelber DC, Baker-Smith CM, Blowey D, Carroll AE, Daniels SR, de Ferranti SD, Dionne JM, Falkner B, Flinn SK, Gidding SS, Goodwin C, Leu MG, Powers ME, Rea C, Samuels J, Simasek M, Thaker VV, Urbina EM; Subcommittee On Screening And Management Of High Blood Pressure In Children. Clinical Practice Guideline for Screening and Management of High Blood Pressure in Children and Adolescents. Pediatrics. 2017; 140(3): e20171904.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169982

Confidential – Attorneys' Eyes Only

PIND 169098
Page 7

   q. Hyperkalemia as defined by a measured serum potassium level above the upper limit of normal reference value from the laboratory performing the assay

   r. Low bone mineral density (BMD), as defined by a lumbar spine BMD Z-score < - 1.5, assessed at screening

   s. History of a pathologic fracture

   t. Incarcerated individuals

9. Include subject-stopping and study-stopping criteria in your revised clinical protocol.

10. Include a plan to collect follow-up safety data for subjects who either withdrew or were withdrawn from the study due to safety events.

11. Submit an Informed Consent Document (ICD) and a parental permission form/ICD/assent form. Ensure that all study subjects have been informed of the potentially irreversible effects of estradiol therapy as well as side effects of treatment, including counseling regarding future fertility and potential adverse effect on sexual function.

12. In adolescents, in addition to monitoring linear growth, consider including a baseline bone mineral density assessment to occur prior to randomization to prevent enrollment of study subjects with low BMD as well as follow-up assessments of bone age to assess the potential for continued linear growth and to monitor for premature epiphyseal closure during treatment with estradiol.

13. Only a protocol synopsis is submitted for the planned Phase 3 study. In the full protocol, clearly define the clinical question of interest the study is intended to answer including the primary estimand(s) of interest and strategies to handle potential intercurrent events (such as, study discontinuation due to adverse events or lack of efficacy or receiving prohibited medications). In defining the primary estimand(s) of interest, consult the draft ICH E9 (R1) addendum (https://www.fda.gov/media/148473/download).

**Question 3:**
Does the Division agree that a single, well-designed Phase III study (see Section 17), that establishes the safety and efficacy of RIGT-272, as part of a feminizing regimen in the management of gender incongruence, could be adequate to support a 505(b)(2) NDA?

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Confidential – Attorneys' Eyes Only

PIND 169098
Page 8

### *FDA Response to Question 3:*
It is premature to comment on the adequacy of your proposed clinical study to support the safety and efficacy of RIGT-272 based on the limited information you provided. See our response to Question 2.

### Question 4:
Does the Division agree that the proposal to conduct a placebo-controlled program for RIGT-272 as an adjunct to baseline use of an anti-androgen (spironolactone) is an appropriate approach to provide evidence of efficacy and safety for RIGT-272 while addressing the risks associated with the use of only placebo in such a population?

### *FDA Response to Question 4:*
No, we do not agree. See our response to Question 2 above.

### Question 5:
Does the Division agree that the proposal to include adolescent subjects of reproductive age in the proposed program is appropriate?

### *FDA Response to Question 5:*
Your proposal to include adolescents of reproductive age in the proposed study is reasonable. See our response to Question 2 for additional comments and recommendations.

A future marketing application for this drug product is subject to the requirements under the Pediatric Research Equity Act (PREA) because this is a new indication. As a new indication, your marketing application should contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable. Submit an initial Pediatric Study Plan (iPSP) for review to reach an Agreed iPSP prior to the submission of your future marketing application for this proposed indication. See the section on PREA REQUIREMENTS below.

### Question 6:
Does the Division agree that the proposed indication, including the preferred diagnostic term of gender incongruence, is appropriate?

### *FDA Response to Question 6:*
It is premature to discuss the indication of your proposed product. See our response to Question 2.

### Question 7:
Does the Division have any comments on the Sponsor's proposed plan to submit a Research IND to support a future 505(b)(2) NDA for RIGT-272 for the proposed indication?

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169984

Confidential – Attorneys' Eyes Only

PIND 169098
Page 9

**_FDA Response to Question 7:_**
Because the purpose of the studies to be conducted under this IND application is to provide data to support a marketing application, your IND application would be classified as a commercial application.

## PREA REQUIREMENTS

Under the PREA (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Please be advised that under the Food and Drug Administration Safety and Innovation Act (FDASIA), you must submit an Initial Pediatric Study Plan (iPSP) within 60 days of an End-of-Phase-2 (EOP2) meeting. In the absence of an EOP2 meeting, refer to the draft guidance below. The iPSP must contain an outline of the pediatric study or studies that you plan to conduct (including, to the extent practicable study objectives and design, age groups, relevant endpoints, and statistical approach); any request for a deferral, partial waiver, or waiver, if applicable, along with any supporting documentation, and any previously negotiated pediatric plans with other regulatory authorities. The iPSP should be submitted in PDF and Word format. Failure to include an Agreed iPSP with a marketing application could result in a refuse to file action.

For additional guidance on the timing, content, and submission of the iPSP, including an iPSP Template, please refer to the draft guidance for industry _Pediatric Study Plans: Content of and Process for Submitting Initial Pediatric Study Plans and Amended Pediatric Study Plans._[3] In addition, you may contact the Division of Pediatric and Maternal Health at 301-796-2200 or email Pedsdrugs@fda.hhs.gov. For further guidance on pediatric product development, please refer to FDA.gov.[4]

## DATA STANDARDS FOR STUDIES

Under section 745A(a) of the FD&C Act, electronic submissions "shall be submitted in such electronic format as specified by [FDA]." FDA has determined that study data contained in electronic submissions (i.e., NDAs, BLAs, ANDAs and INDs) must be in a format that the Agency can process, review, and archive. Currently, the Agency can

---

[3] When final, this guidance will represent the FDA's current thinking on this topic. For the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.
[4] https://www.fda.gov/drugs/development-resources/pediatric-and-maternal-health-product-development

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169985

PIND 169098
Page 10

process, review, and archive electronic submissions of clinical and nonclinical study data that use the standards specified in the Data Standards Catalog.[5]

On December 17, 2014, FDA issued the guidance for industry *Providing Electronic Submissions in Electronic Format - Standardized Study Data.* This guidance describes the submission types, the standardized study data requirements, and when standardized study data are required. Further, it describes the availability of implementation support in the form of a technical specifications document, *Study Data Technical Conformance Guide*, as well as email access to the eData Team (cder-edata@fda.hhs.gov) for specific questions related to study data standards. Standardized study data are required in marketing application submissions for clinical and nonclinical studies that started after December 17, 2016. Standardized study data are required in commercial IND application submissions for clinical and nonclinical studies that started after December 17, 2017. CDER has produced a Study Data Standards Resources web page[6] that provides specifications for sponsors regarding implementation and submission of clinical and nonclinical study data in a standardized format. This web page will be updated regularly to reflect CDER's growing experience in order to meet the needs of its reviewers.

For commercial INDs and NDAs, Standard for Exchange of Nonclinical Data (SEND) datasets are required to be submitted along with nonclinical study reports for study types that are modeled in an FDA-supported SEND Implementation Guide version. The FDA Data Standards Catalog, which can be found on the Study Data Standards Resources web page noted above, lists the supported SEND Implementation Guide versions and associated implementation dates.

Although the submission of study data in conformance to the standards listed in the FDA Data Standards Catalog will not be required in studies that started on or before December 17, 2016, CDER strongly encourages IND sponsors to use the FDA supported data standards for the submission of IND applications and marketing applications. The implementation of data standards should occur as early as possible in the product development lifecycle, so that data standards are accounted for in the design, conduct, and analysis of clinical and nonclinical studies. For clinical and nonclinical studies, IND sponsors should include a plan (e.g., in the IND) describing the submission of standardized study data to FDA. This study data standardization plan (see the FDA Study Data Technical Conformance Guide) will assist FDA in identifying potential data standardization issues early in the development program.

If you have not previously submitted an eCTD submission or standardized study data, we encourage you to send us samples for validation following the instructions at FDA.gov. For general toxicology, supporting nonclinical toxicokinetic, and carcinogenicity studies, submit data in the Standards for the Exchange of Nonclinical

---

[5] http://www.fda.gov/forindustry/datastandards/studydatastandards/default.htm
[6] http://www.fda.gov/ForIndustry/DataStandards/StudyDataStandards/default.htm

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169986

Confidential – Attorneys' Eyes Only

PIND 169098
Page 11

Data (SEND) format. The validation of sample submissions tests conformance to FDA supported electronic submission and data standards; there is no scientific review of content.

The Agency encourages submission of sample data for review before submission of the marketing application. These datasets will be reviewed only for conformance to standards, structure, and format. They will not be reviewed as a part of an application review. These datasets should represent datasets used for the phase 3 trials. The FDA Study Data Technical Conformance Guide (Section 7.3 eCTD Sample Submission pg. 44) includes the link to the instructions for submitting eCTD and sample data to the Agency. The Agency strongly encourages Sponsors to submit standardized sample data using the standards listed in the Data Standards Catalog referenced on the FDA Study Data Standards Resources web site. When submitting sample data sets, clearly identify them as such with **SAMPLE STANDARDIZED DATASETS** on the cover letter of your submission.

Additional information can be found at FDA.gov.[7]

## LABORATORY TEST UNITS FOR CLINICAL TRIALS

CDER strongly encourages IND sponsors to identify the laboratory test units that will be reported in clinical trials that support applications for investigational new drugs and product registration. Although Système International (SI) units may be the standard reporting mechanism globally, dual reporting of a reasonable subset of laboratory tests in U.S. conventional units and SI units might be necessary to minimize conversion needs during review. Identification of units to be used for laboratory tests in clinical trials and solicitation of input from the review divisions should occur as early as possible in the development process. For more information, please see the FDA website entitled Study Data Standards Resources[8].

## SUBMISSION FORMAT REQUIREMENTS

The Electronic Common Technical Document (eCTD) is CDER and CBER's standard format for electronic regulatory submissions. The following submission types: **NDA, ANDA, BLA, Master File** (except Type III) and **Commercial INDs** must be submitted in eCTD format. Submissions that do not adhere to the requirements stated in the eCTD Guidance will be subject to rejection. For more information, visit FDA.gov.[9]

The FDA Electronic Submissions Gateway (ESG) is the central transmission point for sending information electronically to the FDA and enables the secure submission of regulatory information for review. Submissions less than 10 GB must be submitted via

---

[7] https://www.fda.gov/industry/study-data-standards-resources/study-data-submission-cder-and-cber
[8] http://www.fda.gov/ForIndustry/DataStandards/StudyDataStandards/default.htm
[9] http://www.fda.gov/ectd

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169987

Confidential – Attorneys' Eyes Only

PIND 169098
Page 12

the ESG. For submissions that are greater than 10 GB, refer to the FDA technical specification *Specification for Transmitting Electronic Submissions using eCTD Specifications*. For additional information, see FDA.gov.[10]

## STUDIES IN HUMANS MAY NOT BE CONDUCTED UNDER THIS PIND

Before you may conduct studies in humans, you must submit a full Investigational New Drug Application (IND, see 21 CFR Part 312) by amending this PIND with the required information. Include the above PIND number in Box 7A of the form FDA 1571 submitted with your IND. Send your IND submission in eCTD format through the ESG. Submissions that do not adhere to the requirements stated in the eCTD Guidance will be subject to rejection. For more information, visit FDA.gov.[11]

## 505(b)(2) REGULATORY PATHWAY

The Division recommends that sponsors considering the submission of an application through the 505(b)(2) pathway consult the Agency's regulations at 21 CFR 314.54, and the draft guidance for industry *Applications Covered by Section 505(b)(2)* (October 1999).[12] In addition, FDA has explained the background and applicability of section 505(b)(2) in its October 14, 2003, response to a number of citizen petitions that had challenged the Agency's interpretation of this statutory provision (see Docket FDA-2003-P-0274-0015, available at Regulations.gov.[13]

If you intend to submit a 505(b)(2) application that relies for approval on FDA's finding of safety and/or effectiveness for one or more listed drugs, you must establish that such reliance is scientifically appropriate, and must submit data necessary to support any aspects of the proposed drug product that represent modifications to the listed drug(s). You should establish a "bridge" (e.g., via comparative bioavailability data) between your proposed drug product and each listed drug upon which you propose to rely to demonstrate that such reliance is scientifically justified.

If you intend to rely on literature or other studies for which you have no right of reference but that are necessary for approval, you also must establish that reliance on the studies described in the literature or on the other studies is scientifically appropriate. You should include a copy of such published literature in the 505(b)(2) application and identify any listed drug(s) described in the published literature (e.g., by trade name(s)).

If you intend to rely on the Agency's finding of safety and/or effectiveness for a listed drug(s) or published literature describing a listed drug(s) (which is considered to be

---

[10] http://www.fda.gov/ForIndustry/ElectronicSubmissionsGateway
[11] http://www.fda.gov/ectd
[12] We update guidances periodically. For the most recent version of a guidance, check the FDA Guidance Documents Database https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.
[13] http://www.regulations.gov

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169988

Confidential – Attorneys' Eyes Only

PIND 169098
Page 13

reliance on FDA's finding of safety and/or effectiveness for the listed drug(s)), you should identify the listed drug(s) in accordance with the Agency's regulations at 21 CFR 314.54. It should be noted that 21 CFR 314.54 requires identification of the "listed drug for which FDA has made a finding of safety and effectiveness," and thus an applicant may only rely upon a listed drug that was approved in an NDA under section 505(c) of the FD&C Act. The regulatory requirements for a 505(b)(2) application (including, but not limited to, an appropriate patent certification or statement) apply to each listed drug upon which a sponsor relies.

If FDA has approved one or more pharmaceutically equivalent products in one or more NDA(s) before the date of submission of the original 505(b)(2) application, you must identify one such pharmaceutically equivalent product as a listed drug (or an additional listed drug) relied upon (see 21 CFR 314.50(i)(1)(i)(C), 314.54, and 314.125(b)(19); see also 21 CFR 314.101(d)(9)). If you identify a listed drug solely to comply with this regulatory requirement, you must provide an appropriate patent certification or statement for any patents that are listed in the Orange Book for the pharmaceutically equivalent product, but you are not required to establish a "bridge" to justify the scientific appropriateness of reliance on the pharmaceutically equivalent product if it is scientifically unnecessary to support approval.

If you propose to rely on FDA's finding of safety and/or effectiveness for a listed drug that has been discontinued from marketing, the acceptability of this approach will be contingent on FDA's consideration of whether the drug was discontinued for reasons of safety or effectiveness.

We encourage you to identify each section of your proposed 505(b)(2) application that is supported by reliance on FDA's finding of safety and/or effectiveness for a listed drug(s) or on published literature (see table below). In your 505(b)(2) application, we encourage you to clearly identify (for each section of the application, including the labeling): (1) the information for the proposed drug product that is provided by reliance on FDA's finding of safety and/or effectiveness for the listed drug or by reliance on published literature; (2) the "bridge" that supports the scientific appropriateness of such reliance; and (3) the specific name (e.g., proprietary name) of each listed drug named in any published literature on which your marketing application relies for approval. If you are proposing to rely on published literature, include copies of the article(s) in your submission.

In addition to identifying the source of supporting information in your annotated labeling, we encourage you to include in your marketing application a summary of the information that supports the application in a table similar to the one below.

| **List the information essential to the approval of the proposed drug that is provided by reliance on the FDA's previous finding of safety and effectiveness for a listed drug or by reliance on published literature** |
| --- |

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169989

Confidential – Attorneys' Eyes Only

PIND 169098
Page 14

| Source of information (e.g., published literature, name of listed drug) | Information Provided (e.g., specific sections of the 505(b)(2) application or labeling) |
|---|---|
| *(1) Example: Published literature* | *Nonclinical toxicology* |
| *(2) Example: NDA XXXXXX "TRADENAME"* | *Previous finding of effectiveness for indication A* |
| *(3) Example: NDA YYYYYY "TRADENAME"* | *Previous finding of safety for Carcinogenicity, labeling section B* |
| *(4)* | |

Please be advised that circumstances could change that would render a 505(b)(2) application for this product no longer appropriate. For example, if a pharmaceutically equivalent product were approved before your application is submitted, such that your proposed product would be a "duplicate" of a listed drug and eligible for approval under section 505(j) of the FD&C Act, then it is FDA's policy to refuse to file your application as a 505(b)(2) application (21 CFR 314.101(d)(9)). In such a case, the appropriate submission would be an Abbreviated New Drug Application (ANDA) that cites the duplicate product as the reference listed drug.

## PATIENT-FOCUSED ENDPOINTS

An important component of patient-focused drug development is describing the patient's perspective of treatment benefit in labeling based on data from patient-focused outcome measures [e.g., patient-reported outcome (PRO) measures]. Therefore, early in product development, we encourage sponsors to consider incorporating well-defined and reliable patient-focused outcome measures as key efficacy endpoints in clinical trials, when appropriate, and to discuss those measures with the Agency in advance of confirmatory trials. For additional information, refer to FDA's guidance for industry *Patient-Reported Outcome Measures: Use in Medical Product Development to Support Claims.*

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 5278923

HHS-0169990

Confidential – Attorneys' Eyes Only

Signature Page 1 of 1

-----------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

CHRISTINA Y CHANG
11/17/2023 09:41:01 AM

Reference ID: 5278923

HHS-0169991

Confidential – Attorneys' Eyes Only

**The Research Institute for Gender Therapeutics, Inc.**
**1150 Walnut Street, 2nd Floor**
**Newton, Massachusetts 02461**



September 19, 2023

Audrey Gassman, MD, Deputy Director
US Food and Drug Administration
Center for Drug Evaluation and Research
Division of Urology, Obstetrics, and Gynecology
5901-B Ammendale Road
Beltsville, MD 20705-1266

**Subject: PIND 169098**
**RIGT-272 (ESTRADIOL)**
**TYPE B MEETING REQUEST AND PACKAGE**

Dear Dr. Gassman,

Reference is made to the FDA Guidance Document "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products" (December 2017) and to 21 CFR 312.82.

The Research Institute for Gender Therapeutics, Inc. (RIGT) is an IRS recognized 501(c)(3) public charity focused on researching, developing, and seeking FDA approval of therapeutic options for gender dysphoria.

The first development program for RIGT is RIGT-272 (Estradiol), as a part of a feminizing regimen in the management of gender incongruence.  RIGT is requesting a pre-investigational new drug Type B meeting with FDA to discuss the proposed development plan and procedural topics for RIGT-272.

RIGT is hereby providing an electronic copy of the Meeting Request and corresponding Meeting Package. All literature references are provided in electronic (.pdf) form. Note that, regarding citations to websites and FDA documents, .pdf reference copies are not provided.

This submission has been made through the FDA CDER NextGen Portal, please contact me at 609-865-4661, or at TEHelm@gendertherapeutics.org (Unsecured) if there are any questions concerning this submission.  RIGT is seeking a secure email connection with FDA and will contact the Regulatory Project Manager promptly upon completion.

Sincerely,

Travis Helm
Regulatory Affairs
The Research Institute for Gender Therapeutics, Inc.
Newton, MA 02461

**Exhibit**
**0022**

---

HHS-0169992



# Cell Reports Medicine

CellPress
OPEN ACCESS

## Commentary

# Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare

Katherine L. Kraschel,[1] Alexander Chen,[2] Jack L. Turban,[3,4] and I. Glenn Cohen[2,*]
[1]Solomon Center for Health Law & Policy, Yale Law School, New Haven, CT, USA
[2]Harvard Law School, Cambridge, MA, USA
[3]Division of Child & Adolescent Psychiatry, Stanford University School of Medicine, Stanford, CA, USA
[4]Present address: Division of Child & Adolescent Psychiatry, University of California, San Francisco, CA, USA
*Correspondence: igcohen@law.harvard.edu
https://doi.org/10.1016/j.xcrm.2022.100719



Exhibit
0023

In the past two years, in 25 US states, bills have been introduced to restrict access to gender-affirming medical care for minors. Some have already become law. We show how these bills, while purporting to "protect" trans youth, are really an assault on their ability, along with their parents' and physicians', to make healthcare choices and to receive medically necessary care. We discuss the evidence-based guidelines for the care of these patients, the positions taken by major medical societies against these bills, and the landscape of legal challenges that are being brought against these enacted laws.

Legislators in 25 US states have introduced bills to restrict access to gender-affirming medical care for minors in the past two years (Table 1). To date, these bills have become law in Alabama, Arkansas, and Arizona. On their face, these efforts claim to "protect" trans (we use the terms "trans" and "transgender" interchangeably) youth. However, as we discuss in this commentary, far from helping them, these laws prevent them from receiving medically necessary care that learned professional societies have established. For this reason, relevant professional organizations including The American Medical Association, The American Academy of Pediatrics, The American Psychiatric Association, and The American Academy of Child & Adolescent Psychiatry have explicitly voiced opposition to these laws.[1] These proposed bills and laws share common flaws—they are based on false claims about standards of care and health outcomes for people with gender dysphoria, and they are based on inaccurate, biased, and misleading representations of the evidence base.[2]

The mechanisms by which these laws and proposed legislation seek to limit access to care vary. Some states would criminalize the acts of medical professionals or parents for providing care. For example, Alabama's law, passed in April of this year, makes providing pubertal

suppression or gender-affirming hormones to minors a Class C felony, punishable with up to ten years in prison. Some states would require a medical licensing board to discipline and possibly revoke the license of professionals who provide gender-affirming care to minors. Some states have also considered other modes of restriction, including imposing reporting requirements on educators or limiting public funding.

Thankfully, most of these bills have not passed, and some are no longer under consideration. However, given the growing number of states in which this type of legislation was introduced this year and the number of states that reintroduced legislation in 2022 that failed to pass in 2021, state legislators show no signs of relenting. In addition, if the legislative process fails, some states may take action through their executive branch. The Texas legislature did not pass proposed legislation that would have stripped Texas healthcare providers of their medical license for providing gender-affirming care to minors and made such care child abuse. In response, Governor Greg Abbott issued an Executive Directive, affirming a non-binding opinion of the state attorney general that gender-affirming care constitutes child abuse and ordering its Department of Family and Protective Services to investigate parents who provide their children

such care. As discussed below, enforcement of the Alabama and Arkansas laws is currently blocked by federal courts while legal challenges proceed, and Governor Abbott's order is enjoined by Texas state courts.

## Standards of care in treating transgender youth

There is nothing inherently unhealthy or abnormal about being trans. However, some trans individuals suffer from a condition termed gender dysphoria, the criteria for which are set out in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) and include "a marked incongruence between one's experienced/ expressed gender and assigned gender, of at least six months' duration, that is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[3]

A series of evidence-based clinical guidelines set out the treatment for gender dysphoria, in particular the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of gender-dysphoric/ gender-incongruent persons and the World Professional Association for Transgender Health Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People.[4,5] These guidelines set out the criteria for who is




OPEN ACCESS

**Cell Reports Medicine**
Commentary

**Table 1. Proposed state bills and laws to limit access to gender-affirming medical care for transgender adolescents in 2021 and 2022**

| State | bill and brief summary of some major provisions |
|---|---|
| Alabama | HB1/SB10 (2021)/HB266/SB184 (enacted 2022): Criminalizes the provision of some gender-affirming medical or surgical care to transgender adolescents and requires school personnel to reveal the gender identity of transgender youth to their parents. |
| Arizona | SB1511 (2021): Adds some gender-affirming medical and surgical care to the state's definition of child abuse and criminalizes physician activity of this sort. SB1138 (enacted 2022): Prohibits the provision of gender-affirming surgical care to transgender minors. |
| Arkansas | HB1570/SB347 (enacted 2021): Prohibits the provision of some gender-affirming medical or surgical care to transgender adolescents and prohibits the use of public funds for gender-affirming care. Recently became law when the state legislature overrode the Governor's veto. |
| Florida | HB935 (2021)/HB211(2022): Criminalizes the provision of some gender-affirming medical and surgical care to transgender adolescents. |
| Georgia | HB401 (2021): Criminalizes the provision of gender-affirming medical and surgical care to transgender adolescents. Creates civil claim against medical professionals who provide gender-affirming care to transgender minors. |
| Idaho | HB675 (2022): Criminalizes the provision of gender-affirming medical care to transgender adolescents. Adds gender-affirming medical care to the definition of genital mutilation of a child. |
| Indiana | SB224 (2021): Prohibits the provision of gender-affirming surgical and medical care to transgender minors. |
| Iowa | HF193 (2021): Subjects health professionals to civil liability and disciplinary sanction for the provision of some gender-affirming medical and surgical care to transgender adolescents. |
| Kansas | HB2210 (2021): Criminalizes the provision of some gender-affirming medical or surgical care to transgender adolescents. |
| Kentucky | HB253/SB84 (2022): Subjects health professionals to civil liability and disciplinary sanction for the provision of some gender-affirming medical and surgical care to transgender adolescents. Prohibits the use of public funds for gender-affirming care to minors. |
| Louisiana | HB575 (2021)/HB570 (2022): Criminalizes the provision of some gender-affirming medical or surgical care to transgender adolescents. Prohibits school personnel to withhold from parents or legal guardians "information related to a minor's gender or sex that is inconsistent with the minor's sex." Creates civil liability for providers and parents in violation. Prohibits the use of public funds for gender-affirming care to minors. |
| Mississippi | HB1147 (2022)/SB2728 (2022): Prohibits provision of or referral for gender-affirming surgical and medical care to transgender minors. Prohibits the use of public funds for any gender-affirming medical care to transgender minors. |
| Missouri | HB33 (2021): Subjects medical professionals who provide some gender-affirming medical or surgical care to transgender adolescents to possibility of healthcare license revocation. Establishes that parents or guardians who obtain some gender-affirming medical or surgical care for transgender adolescents shall be reported to the state's child welfare division. HB2649 (2022): Subjects medical professionals who provide some gender-affirming medical or surgical care to transgender adolescents to possibility of healthcare license revocation. Disallows public funds to any organization or individual who provides gender-affirming care to transgender minors. Creates civil claim against medical professionals who provide gender-affirming care to transgender minors. |
| Montana | HB 427 (2021): Prohibits the provision of gender-affirming surgical and medical care to transgender minors. |
| New Hampshire | HB68 (2021): Criminalizes the provision of gender-affirming healthcare to transgender minors. |
| North Carolina | SB514 (2021): Subjects medical professionals who provide some gender-affirming medical or surgical care to transgender adolescents to having their healthcare license revoked and authorizes civil liability. Prohibits use of public funds for gender-affirming care. Requires government employees to reveal the gender identity of transgender youth to their parents in writing. Prohibits the use of public funds for gender-affirming medical or surgical care. |
| Ohio | HB 454 (2021): Prohibits the provision of gender-affirming surgical and medical care to transgender minors. Subjects providers to possibility of healthcare license revocation and civil liability. Prohibits the use of public funds for gender-affirming care to transgender minors. |

*(Continued on next page)*

# Cell Reports Medicine
## Commentary



CellPress
OPEN ACCESS

| Table 1. Continued | |
|---|---|
| State | bill and brief summary of some major provisions |
| Oklahoma | SB583 (2021)/HB3240 (2022): Subjects medical professionals who provide some gender-affirming medical or surgical care to transgender adolescents to have their healthcare license revoked. |
| | SB676 (2021): Criminalizes the provision of some gender-affirming medical or surgical care to transgender adolescents. Establishes criminal penalties for parents who obtain some gender-affirming medical or surgical care for their children. |
| | HB3240 (2022): Creates civil liability for providers and parents in violation. Prohibits the use of public funds for gender-affirming care to minors. |
| South Carolina | HB4047 (2021): Criminalizes the provision of some gender-affirming medical or surgical care to transgender adolescents. Requires school personnel to reveal the gender identity of transgender youth to their parents. |
| South Dakota | HB1057 (2020): Criminalizes the provision of gender-affirming medical or surgical care to transgender adolescents. |
| Tennessee | SB657 (2021): Criminalizes the provision of gender-affirming medical or surgical care to a transgender adolescent unless both parents or guardians of the adolescent provide a signed written statement from two physicians and an additional board-certified child and adolescent psychiatrist recommending such interventions. |
| | HB2835/SB2696 (2022): Subjects medical professionals who provide some gender-affirming medical or surgical care to transgender adolescents to have their healthcare license revoked. Creates civil penalty for medical professionals. Prohibits use of public funds by any entity or person providing gender-affirming care to a minor. |
| Texas | HB68 (2021): Adds some gender-affirming medical and surgical care to the state's definition of child abuse. |
| | HB1339 (2021): Prohibits the provision of some gender-affirming medical or surgical care to transgender adolescents Prohibits malpractice insurance providers from providing coverage for damages related to gender-affirming medical or surgical care for transgender adolescents. |
| | Governor's Executive Directive (2022): Orders investigations into parents and medical facilities providing healthcare to transgender adolescents. Based on non-binding interpretation from attorney general that classified gender-affirming care as child abuse. |
| Utah | HB127 (2022): Subjects medical professionals who provide some gender-affirming medical or surgical care to transgender adolescents to have their healthcare license revoked. |
| West Virginia | HB2171 (2021): Criminalizes the provision of some gender-affirming medical or surgical care to transgender adolescents. |
| Wisconsin | SB915 (2022): Prohibits the provision of gender-affirming surgical and medical care to transgender minors. Creates civil liability for providers in violation. Prohibits the use of public funds for gender-affirming care to minors. |

Table adapted from and expanded from the one published in ref.[1] Table up to date as of July 1, 2022.

competent to provide gender-affirming care as well as the comprehensive processes that should be followed prior to initiating care. They emphasize that medical interventions are not considered for prepubertal children and that interventions for adolescents are considered in a stepwise fashion from most reversible (i.e., pubertal suppression) to less reversible (i.e., gender-affirming hormones including estrogen or testosterone).

While some of these interventions are reversible (i.e., the temporary pausing of endogenous puberty from gonadotropin-releasing hormone agonists [GnRHas]), endogenous puberty itself is irreversible and can cause substantial lifelong psychological distress for those with gender dysphoria, while also often creating the need for more-invasive surgeries later in life. In addition to their use for gender dysphoria, GnRHas have been used in

the treatment of central precocious puberty dating back to the 1970s,[4] providing longitudinal safety data for their use in the pediatric population. Research from the precocious puberty literature has shown that, despite assertions by some legislators, these medications do not appear to cause infertility.[6] However, there is some concern that going directly from pubertal suppression to gender-affirming hormones like estrogen or testosterone may impair fertility. For that reason, existing guidelines recommend fertility counseling prior to adolescent patients pursuing such care, so that they may consider fertility-preservation options.[4]

Under existing guidelines, gender-affirming genital surgery is not considered for minors, but gender-affirming chest surgery may be considered for trans masculine adolescents on a case-by-case basis, weighing the substantial risks

of surgery against the potential mental and physical health benefits for each individual patient.[7,8] Current guidelines highlight the importance of both informed consent from a minor's parents and informed assent from the minors themselves prior to the initiation of any gender-affirming medical or surgical care. Alabama's law provides an example of the flawed reasoning behind these laws. It erroneously claims, among other things, that standard treatment for a transgender adolescent would include genital surgery, when, in fact, the current consensus in the field is to wait until the patient reaches the age of majority before pursuing such surgical procedures.

### Documented benefits of gender-affirming care

A substantial body of literature exists documenting the benefits of gender-affirming



**Cell Reports Medicine**
Commentary

medical interventions, where indicated, for adolescents with gender dysphoria. Over a dozen studies have collectively linked such care to improvements in depression, anxiety, and suicidality.[9,10] Nonetheless, legislators have ignored or omitted any mention of the benefits of gender-affirming care in their legislative findings and have overstated the number of adolescents whose gender dysphoria dissipates without gender-affirming care.

It is problematic for the state to interpose itself and prevent the provision of care that is evidence-based, meets clinical guidelines, and takes place in circumstances where parents, adolescents, and healthcare providers are all aligned and supportive of what they view as the best medical treatment for a given adolescent. Legislators appear to have singled out trans adolescent care while allowing professionals, parents, and adolescents to together decide the best course of action for *other* treatments posing potential risks. For example, states have not sought to prohibit, let alone criminalize, the performance of pediatric breast reduction to address excess breast tissue, back pain, or social anxiety. Indeed, it is telling that a state like Arkansas that bans gender-affirming care expressly allows surgical inventions for minors with intersex conditions, even though such procedures have irreversible, long-term consequences.[11] Arkansas permits these procedures with infants that are too young to consent, yet it prohibits gender-affirming care when competent adolescents agree with their parents and healthcare providers that such standard of care treatment is in the patient's best interest. Many of these laws prohibit the use of GnRHas for gender dysphoria while still allowing use of these medications for central precocious puberty. All this is even more startling against the backdrop of the practice of medicine outside care for trans patients—many standard-of-care treatments carry some risk to the patient, but the net risk-to-benefit ratio combined with the patient's consent justifies going forward. A rule that requires an intervention to be absolutely free of risk would rule out much of current medical practice, yet that is what legislators are selectively applying to gender-affirming care.

Healthcare providers are fiduciaries for their patients. They are trained, guided by practice guidelines, and use their discretion and medical judgment in partnership with their patient (and in the case of a minor, the patient's parents as well) to provide care that is in their patient's best interests. These statutes would transform their fiduciary duty into a criminal act. In many states, criminal prosecutions begin with "The People v.," reflecting the idea that criminalization is a way a community communicates its moral opprobrium. The criminalization of medical care, with its attendant chilling effect, should be avoided in all but the clearest cases of misconduct. Far from misconduct, the care these providers seek to give assenting adolescents and their consenting parents is evidence-based and guided by established guidelines of the profession. As has always been true in areas like medical malpractice, in determining what is the standard of care, courts and legislators should look to the medical profession as reflected by the leading medical bodies to determine the best medical practices for patients. Once again, gender-affirming care is being singled out in a way one would not countenance for other areas of medicine.

In addition to their flawed reasoning, suspect justifications, and problematic intrusion into the practice of medicine, laws restricting transgender minors' access to gender-affirming care also raise legal issues. They may violate the US Constitution, state constitutions, the Affordable Care Act, or the Americans with Disabilities Act.

Transgender minors, their parents, and their healthcare providers have brought several legal challenges against restrictions to accessing gender-affirming care for transgender youth.[12–14] Preliminary rulings in Alabama and Arkansas indicate that these laws face significant legal headwinds because of the ways they infringe on the rights of transgender minors, their parents, and their providers as protected by the US Constitution's 14th Amendment Equal Protection and Due Process Clauses.

First, these laws violate the rights of transgender minors under the 14th Amendment's Equal Protection Clause because they constitute sex-based classifications that discriminate against transgender people without an "exceedingly persuasive" justification. In the Alabama case, a federal court rejected Alabama's argument that its criminal ban was constitutional because it protected children against "experimental" treatments, finding that Alabama "produce[d] no credible evidence to show that transitioning medications are 'experimental,'" and that "at least twenty-two major medical associations in the United States endorse these medications as well-established, evidence-based methods for treating gender dysphoria in minors."[12] And in the Arkansas case, a federal court held that Arkansas' stated rationale of protecting children was pretextual because its law allowed the same types of treatments for cisgender minors that it banned for transgender minors.[13] The Alabama case also similarly found that "medical providers have used transitioning medications for decades to treat medical conditions other than gender dysphoria, such as central precocious puberty… [and] hormone therapies for patients whose natural hormone levels are below normal."[12]

Second, these laws interfere with the fundamental rights of parents to direct the care, custody, and control of their children under the 14th Amendment's Due Process Clause. Courts have recognized that this right includes "the fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary,"[13] which includes "transitioning medications subject to medically accepted standards."[12]

Third, these laws likely violate the Equal Protection rights of physicians who provide gender-affirming care to transgender patients by treating them worse than physicians who provide other types of medically accepted care.[13] In the Arkansas case, the court expressed grave concern that Arkansas' law "interfer[es] with the patient-physician relationship, unnecessarily regulat[es] the evidence-based practice of medicine and subject[s] physicians who deliver safe, legal, and medically necessary care to civil liability and loss of licensing." By barring "healthcare providers in [Arkansas from] consider[ing] the recognized standard of care for adolescent gender dysphoria,… the State has ensured that its healthcare providers

# Cell Reports Medicine
## Commentary



OPEN ACCESS

do not have the ability to abide by their ethical standards, which may include medically necessary transition-related care for improving the physical and mental health of their transgender patients."[13]

Finally, as is the case in Texas, if legislatures decline to pass restrictions and a state's executive branch responds by issuing declarations or orders to restrict or criminalize care, such executive action may be vulnerable to legal challenges under states' administrative procedures acts. In Texas, a state court issued a temporary restraining order prohibiting the Department of Family and Protective Services from following Governor Abbott's directive to investigate parents of transgender youth accessing gender-affirming care. The court issued the order, concluding that the plaintiffs stated a valid cause of action that Governor Abbott violated Texas's Administrative Procedures Act.[14] Other challenges may also be possible, including claims under state constitutions and federal enforcement of the Affordable Care Act's anti-discrimination provision or the Americans with Disabilities Act.

In short, lower courts are likely to continue to rule that "[p]arents, pediatricians, and psychologists—not the State or [a] Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis."[12] Although not binding in the United States and not involving *parental* consent, the United Kingdom's Court of Appeal took a significant position in Bell v. Tavistock, overturning a lower court ruling that severely curtailed the administration of puberty-suppressing medications to transgender minors and was based on the proposition that minors are highly unlikely to have the ability to consent to such treatments.[15] The Court of Appeal ruled that doctors, rather than a blanket legislative or judicial rule, should determine on a case-by-case basis whether minors are able to consent to any specific treatment.[15]

It is less clear whether courts will be prepared to strike down bans on gender-affirming surgeries for transgender minors—in the Alabama case, the court declined to enjoin a provision of the Alabama law that "bans sex-

altering surgeries on minors" without legal analysis.[12]

## Conclusion

Cynics will see the more than 25 bills seeking to interfere with the gender-affirming care for trans youth as just one more tried-and-true attempt to use the lives and freedoms of sexual and gender minority Americans for political advantage as election season looms. We have argued that these bills ignore the evidence-based clinical guidelines that set out the treatment for gender dysphoria and the evidence base documenting the benefits of gender-affirming medical interventions, where indicated, for adolescents with documented gender dysphoria. We also highlight how it is ethically problematic for the state to interpose itself into the individual medical decisions of adolescents, their parents, and healthcare providers by preventing the provision of evidence-based care that meets clinical guidelines. These laws may disproportionally affect some of the most marginalized within the trans community, those without the resources or support to move or travel out of state for care. As we discuss, some of these laws have already faced legal challenges on a myriad of theories. Those fighting for trans youth to have the freedom to choose gender-affirming care have succeeded in some of the court challenges thus far. It is not yet clear how these challenges will culminate given a conservative Supreme Court that has increasingly deferred to states and expressed skepticism of constitutional rights to make very personal medical choices, as we have recently seen with abortion.

While this commentary has focused on the US where these legislative attacks have intensified over the last two years, we are also seeing attacks on the rights of trans youth across the globe. As a small and insular minority, we are sad to see trans youth become targets for political gain.

## ACKNOWLEDGMENTS

None of the authors received funding directed at this manuscript. We thank Lauren Andrews, Gwen Byrne, Seran Gee, and Sarah Nealon for excellent research assistance.

## DECLARATION OF INTERESTS

J.L.T. reports receiving textbook royalties from Springer Nature, expert witness payments from the ACLU & Lambda Legal (including for cases discussed in this manuscript), and research funding from The American Academy of Child & Adolescent Psychiatry and their Industry Partners (Arbor & Pfizer) as well as from The Sorensen Foundation.

## REFERENCES

1. Turban, J.L., Kraschel, K.L., and Cohen, I.G. (2021). Legislation to criminalize gender-affirming medical care for transgender youth. JAMA 325, 2251. https://doi.org/10.1001/jama.2021.7764.

2. Boulware, S.D., Kamody, R., Kuper, L., McNamara, M., Olezeski, C., Szilagyi, N., and Alstott, A. (2022). Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment for Transgender Children and Adolescents Rely on Inaccurate and Misleading Scientific Claims. 20.2139/ssrn.4102374. https://medicine.yale.edu/childstudy/policy-and-social-innovation/lgbtq-youth/report%20on%20the%20science%20of%20gender-affirming%20care%20final%20april%2028%202022_437080_54636_v2.pdf.

3. American Psychiatric Association (2013). Diagnostic and Statistical Manual of Mental Disorders, 5th edition (American Psychiatric Publishing). Arlington, VA.

4. Hembree, W.C., Cohen-Kettenis, P.T., Gooren, L., Hannema, S.E., Meyer, W.J., Murad, M.H., Rosenthal, S.M., Safer, J.D., Tangpricha, V., and T'Sjoen, G.G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. J. Clin. Endocrinol. Metabol. 102, 3869–3903. https://doi.org/10.1210/jc.2017-01658.

5. The World Professional Association for Transgender Health (WPATH), Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, p. 24. Available for: Version 7. https://www.wpath.org/publications/soc

6. Neely, E., Lee, P., Bloch, C., Larsen, L., Yang, D., Mattia-Goldberg, C., and Chwalisz, K. (2011). Leuprolide acetate 1-month depot for central precocious puberty: hormonal suppression and recovery. Int. J. Pediatr. Endocrinol. 2010, 1. https://doi.org/10.1186/1687-9856-2010-398639.

7. Olson-Kennedy, J., Warus, J., Okonta, V., Belzer, M., and Clark, L.F. (2018). Chest reconstruction and chest dysphoria in transmasculine minors and young adults: comparisons of nonsurgical and postsurgical cohorts. JAMA Pediatr. 172, 431–436. https://doi.org/10.1001/jamapediatrics.2017.5440.

8. Mehringer, J.E., Harrison, J.B., Quain, K.M., Shea, J.A., Hawkins, L.A., and Dowshen, N.L. (2021). Experience of chest dysphoria and



OPEN ACCESS

**Cell Reports Medicine**
*Commentary*

masculinizing chest surgery in transmasculine youth. Pediatrics *147*. e2020013300. https://doi.org/10.1542/peds.2020-013300.

9. Turban, J.L., King, D., Kobe, J., Reisner, S.L., and Keuroghlian, A.S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS One *17*, e0261039. https://doi.org/10.1371/journal.pone.0261039.

10. van der Miesen, A.I., Steensma, T.D., de Vries, A.L., Bos, H., and Popma, A. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. J. Adolesc. Health *66*, 699–704. https://doi.org/10.1016/j.jadohealth.2019.12.018.

11. H.B. 1570 § 3, Ark Code Ann. § 20-9-1501(6)(B)(i).

12. E.-T. v. Marshall, No. 2:22-cv-184-LCB (M.D. Ala. 2022).

13. Brandt v. Rutledge, 551 F. Supp. 3d 882 (E.D. Ark. 2021).

14. PFLAG, Inc. V. Abbott, 22-002569, Tex. Dist. Ct., 459th District (Travis County).

15. Bell v. Tavistock, U.K. Court of Appeal [2021] EWCA Civ 1363.

Opinion



# Legislation to Criminalize Gender-Affirming Medical Care for Transgender Youth

Jack L. Turban, MD, MHS
Division of Child & Adolescent Psychiatry, Stanford University School of Medicine, Stanford, California.

Katherine L. Kraschel, JD
Solomon Center for Health Law & Policy, Yale Law School, New Haven, Connecticut.

I. Glenn Cohen, JD
Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics, Harvard Law School, Boston, Massachusetts.

Supplemental content

**Legislation** seeking to criminalize or otherwise prevent the provision of gender-affirming care for transgender adolescents is on the rise. This Viewpoint describes these laws and explains why they are harmful and potentially unlawful.

## Caring for Transgender Youth

Transgender adolescents are those whose gender identity (ie, their psychological sense of their own gender) is incongruent with their sex assigned at birth.[1] According to a 2017 study from the Centers for Disease Control and Prevention, 1.8% of 118 803 surveyed adolescents in the United States identified as transgender.[2] In this same study, approximately 35% of transgender adolescents reported having attempted suicide, highlighting the importance of the mental health concerns affecting this population.[2]

Affirmation of an adolescent's transgender identity is associated with favorable mental health outcomes.[1,3,4] Major medical organizations have outlined best practices for supporting transgender adolescents.[1,3,4] These include facilitation of a social transition (ie, taking on the name, pronouns, and other elements of gender expression that match the adolescent's gender identity), consideration of pubertal suppression (ie, gonadotropin-releasing hormone analogues that temporarily and reversibly pause puberty to prevent the development of secondary sex characteristics that often cause psychological distress for transgender youth), and consideration of gender-affirming hormones (ie, medications including estradiol and testosterone that induce physical feminization or masculinization, respectively, that align with the adolescent's gender identity). Although research has not established that these interventions cause infertility, guidelines recommend that adolescents be offered fertility preservation options prior to treatment with gender-affirming hormones, given the theoretical risk that these medications may impair fertility.[1,3,4] Although gender-affirming genital surgery is generally not recommended until adulthood, these guidelines note that some transmasculine adolescents may benefit from masculinizing chest surgery to lessen chest dysphoria.[1,3,4]

## Laws Restricting Physician Autonomy and Expertise

Medical professionals, using their training and autonomy and working with patients and families, are best positioned to determine when gender-affirming medical or surgical care is warranted. Yet despite opposition from major medical organizations, including the American Medical Association, the American Academy of Pediatrics, and the American Psychiatric Association (**Table**), legislators in several US states have introduced legisla-

| Table. Statements Opposing Legislation to Limit Gender-Affirming Medical Care for Transgender Youth[a] | |
|---|---|
| Organization | Policy statement title |
| American Medical Association | AMA fights to protect health care for transgender patients |
| American College of Physicians, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American Osteopathic Association, and others | Frontline physicians oppose legislation that interferes in or criminalizes patient care |
| American Psychiatric Association | Position statement on treatment of transgender (trans) and gender diverse youth |
| American Academy of Pediatrics | American Academy of Pediatrics speaks out against bills harming transgender youth |
| American Academy of Child and Adolescent Psychiatry | AACAP statement responding to efforts to ban evidence-based care for transgender and gender diverse youth |
| The Endocrine Society and The Pediatric Endocrine Society | Discriminatory policies threaten care for transgender, gender diverse individuals |
| World Professional Association for Transgender Health & US Professional Association for Transgender Health | Statement in response to proposed legislation denying evidence-based care for transgender people under 18 years of age and to penalize professionals who provide medical care |

[a] Links to the statements are available in eTable 2 in the Supplement.

tion to criminalize the provision of such care (for a summary of proposed legislation see eTable 1 in the Supplement). Arkansas recently became the first state to have such a bill become law, after the state legislature overturned the governor's veto. Physicians and public health experts should be aware of these legislative initiatives and their likelihood to cause serious harm to transgender adolescents and their families.

The bills that have been introduced in state legislatures are diverse, but all have the central aim of removing access to gender-affirming medical care, surgical care, or both for transgender youth. For example, Alabama House Bill 1 (HB1) classified the provision of pubertal suppression or gender-affirming hormones as a class C felony and included potential punishment of physicians with up to 10 years in prison for prescribing these medications. If passed, this bill would have also forced teachers to reveal transgender students' gender identities to their parents without their consent. This could result in some youth becoming homeless or experiencing physical or emotional abuse from unaccepting families.[5]

These bills also represent an assault on key tenets of the medical profession—that physicians are best equipped to determine, both through clinical practice

**Corresponding Author:** Jack L. Turban, MD, MHS, 401 Quarry Rd, Palo Alto, CA 94304 (jturban@stanford.edu).

© 2021 American Medical Association. All rights reserved.

Exhibit 0025

Downloaded from jamanetwork.com by University of California - Irvine user on 04/27/2024

Opinion   Viewpoint

guidelines and other forms of professional self-regulation, what care will promote the health of individual patients. While the practice of medicine is not wholly without state regulation—licensure requirements, tort liability, etc—for the most part the existing legal, ethical, and cultural superstructure trusts medical professionals to exercise their discretion and act as a medical fiduciary. The use of criminal penalties, in particular, should be of substantial concern for physicians. These bills could transform their fiduciary care for patients into criminal acts.

These bills also propagate a range of factual inaccuracies about transgender youth. Alabama HB1, for example, falsely asserted that gender-affirming medical interventions increase risk of mental illness and suicide, despite research showing that access to these interventions is associated with improved mental health outcomes.[1,3,4]

## Legality

Although these bills represent a wide range of provisions affecting medical care, each of which may raise different legal issues, there are good arguments that many of these laws may violate the Affordable Care Act (ACA) and perhaps the US Constitution, state constitutions, or the Americans with Disabilities Act.

To understand the legal challenges affected transgender people might bring should these bills become law, consider Kadel v Fowell (446 F Supp 3d 1, [MDNC 2020]), a case currently being litigated in federal district court. In Kadel, transgender employees of the University of North Carolina and North Carolina State University sued their respective employers whose insurance plan "denies coverage for medically necessary treatment if the need stems from gender dysphoria, as opposed to some other condition." The plaintiffs alleged that the plan would cover medically necessary mastectomies for either sex but not if the need was related to gender affirmation. They brought claims that the insurance plan violated 2 provisions of federal law—antidiscrimination protections in Title IX and the ACA—as well as the Equal Protection Clause of the Fourteenth Amendment of the US Constitution. A recent opinion in the case denying the universities' motion to dismiss the case and allowing each of the plaintiffs' claims to move forward, illustrates why some of the challenges to these new state laws appear likely to succeed.

The Kadel court determined that the insurance plan violates Title IX, because it constituted discrimination "on the basis of sex" within the meaning of Title IX (20 USC §1681[a]). Notably, the US Supreme Court has reached a similar conclusion regarding the interpretation of "because of such individual's...sex" as to Title VII,

governing employment, in Bostock v Clayton County (140 SCt 1731, 1741 [2020]). It appears likely other courts will interpret language like this, which forms the backbone of most antidiscrimination law, in the same way. Similarly, the Kadel court allowed the plaintiffs' claims that the plan violates section 1557 of the ACA to move forward. Section 1557 makes it illegal for any health program or activity receiving federal financial assistance (which the defendant universities are) to discriminate "on the basis of sex" or other prohibited grounds (42 USC § 18116[a]). In addition, the Kadel court signaled that the policy might violate the equal protection clause of the US Constitution's Fourteenth Amendment. The court wrote that the plan's exclusion discriminates on the basis of gender and thus the state must show that the exclusion of gender dysphoria serves "important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives," what it called a "demanding standard," to be constitutional. To be clear, the US Supreme Court has not yet reached this constitutional question and given the change in the Court's composition since its last decision in favor of transgender rights and the differences between constitutional and statutory interpretation, a similar ruling on this point is not assured.

Beyond the arguments raised in Kadel, other challenges might be brought to these bills. In states that have equal protection clauses in their state constitutions, plaintiffs could bring similar equal protection claims in state court. Other litigants have also argued that individuals with gender dysphoria qualify as disabled within the meaning of the Americans with Disabilities Act and the Rehabilitation Act.[6] These challenges have thus far had a mixed track record in terms of success, but some transgender individuals may challenge these laws on the disability theory in addition to the ACA section 1557 theory.

While it appears all these arguments have merit, the uncertainty over success heightens the need for advocacy now, to keep proposed legislation from becoming law.

## Conclusions

Some parents of transgender youth have highlighted the high stakes involved in these legislative debates, "This could mean death for my child."[7] Physicians and mental health experts in states considering these bills should consider contacting their state representatives to provide them with evidence-based information about transgender youth, their medical care, and how physicians can best support these patients.

ARTICLE INFORMATION

**Published Online:** May 24, 2021.
doi:10.1001/jama.2021.7764

**Correction:** This article was corrected on June 4, 2021, to add a financial disclosure that was inadvertently omitted during editing.

**Conflict of Interest Disclosures:** Dr Turban reported receiving textbook royalties from Springer Nature, a pilot research award for general psychiatry residents from the American Academy of Child & Adolescent Psychiatry, supported by industry donors (Pfizer and Arbor), and serving as an expert witness on behalf of the American Civil Liberties Union and Cooley LLP. No other disclosures were reported.

REFERENCES

**1.** Rafferty J; Committee on Psychosocial Aspects of Child and Family Health; Committee on Adolescence; Section on Lesbian, Gay, Bisexual, and Transgender Health And Wellness. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. Pediatrics. 2018;142(4): e20182162. doi:10.1542/peds.2018-2162

**2.** Johns MM, Lowry R, Andrzejewski J, et al. Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students. MMWR Morb Mortal Wkly Rep. 2019;68(3):67-71. doi:10.15585/mmwr.mm6803a3

**3.** Coleman E, Bockting W, Botzer M, et al Standards of care for the health of transsexual, transgender, and gender-nonconforming people,

version 7. Int J Transgend Health. 2012;13(4):165-232. doi:10.1080/15532739.2011.700873

**4.** Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/ gender-incongruent persons. J Clin Endocrinol Metab. 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658

**5.** Choi SK, Wilson BD, Shelton J, Gates GJ. Serving Our Youth 2015: The Needs and Experiences of Lesbian, Gay, Bisexual, Transgender, and Questioning Youth Experiencing Homelessness. Williams Institute; 2015.

**6.** Szemanski A. When trans rights are disability rights. Harv J Law Gend. 2020;43:137-168.

**7.** Kidd KM, Sequeira GM, Paglisotti T, et al. "This could mean death for my child." J Adolesc Health. Published online October 13, 2020. doi:10.1016/j. jadohealth.2020.09.010

© 2021 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 04/27/2024

78

 Frontiers in Pharmacology

ORIGINAL RESEARCH
published: 09 June 2022
doi: 10.3389/fphar.2022.892574



# Recommendations on Off-Label Drug Use in Pediatric Guidelines

Min Meng [1,2,3,4], Qi Zhou [5,6], Wenjuan Lei [4], Min Tian [4], Ping Wang [5,6], Yunlan Liu [7], Yajia Sun [7], Yaolong Chen [1,2,3,5,6,7,8,9,10]* and Qiu Li [2,3,11]*

[1]Department of Chevidence Lab Child & Adolescent Health, Children's Hospital of Chongqing Medical University, Chongqing, China, [2]Ministry of Education Key Laboratory of Child Development and Disorders, National Clinical Research Center for Child Health and Disorders, China International Science and Technology Cooperation Base of Child Development and Critical Disorders, Children's Hospital of Chongqing Medical University, Chongqing, China, [3]Chongqing Key Laboratory of Pediatrics, Chongqing, China, [4]Department of Pharmacy, Gansu Provincial Hospital, Lanzhou, China, [5]Institute of Health Data Science, Lanzhou University, Lanzhou, China, [6]Evidence-Based Medicine Center, School of Basic Medical Sciences, Lanzhou University, Lanzhou, China, [7]School of Public Health, Lanzhou University, Lanzhou, China, [8]Research Unit of Evidence-Based Evaluation and Guidelines, Chinese Academy of Medical Sciences (2021RU017), School of Basic Medical Sciences, Lanzhou University, Lanzhou, China, [9]WHO Collaborating Centre for Guideline Implementation and Knowledge Translation, Lanzhou, China, [10]GRADE Center, Lanzhou University, Lanzhou, China, [11]Department of Nephrology, Children's Hospital of Chongqing Medical University, Chongqing, China

OPEN ACCESS

Edited by:
Luciane Cruz Lopes,
University of Sorocaba, Brazil

Reviewed by:
Albert Figueras,
Universitat Autònoma de Barcelona,
Spain
Joel Lexchin,
York University, Canada
Isabela Heineck,
Federal University of Rio Grande do
Sul, Brazil

*Correspondence:
Qiu Li
liqiu809@hospital.cqmu.edu.cn
Yaolong Chen
chevidence@lzu.edu.cn

Specialty section:
This article was submitted to
Pharmacoepidemiology,
a section of the journal
Frontiers in Pharmacology

Received: 09 March 2022
Accepted: 20 April 2022
Published: 09 June 2022

Citation:
Meng M, Zhou Q, Lei W, Tian M,
Wang P, Liu Y, Sun Y, Chen Y and Li Q
(2022) Recommendations on Off-
Label Drug Use in Pediatric Guidelines.
Front. Pharmacol. 13:892574.
doi: 10.3389/fphar.2022.892574

**Objective:** To systematically analyze the supporting evidence, drug information, and the type of off-label drug use in recommendations on off-label drug use in pediatric guidelines.

**Methods:** A cross-sectional study was performed by systematic search through MEDLINE (via PubMed) and Embase databases to identify literature published from 1 January 2018, to 31 December 2020. Only pediatric clinical practice guidelines that included recommendations on off-label use of drugs were included. We present descriptive information on the sources of the included guidelines, country, publication year, evidence grading system used, details on the types of off-label drug use, and the types of studies used as references to support the recommendations.

**Results:** A total of 66 pediatric guidelines with 605 recommendations were included. Eighty-seven (14.4%) recommendations did not cite any references; and the remaining 518 recommendations were supported by 2,240 references (mean 4.3 references/recommendation). The most common types of studies cited were pediatric RCTs ($n = 314$, 14.0%), pediatric case series studies ($n = 260$, 11.6%), and reviews ($n = 255$, 11.4%). Twenty-one percent ($n = 470$) of the references were studies on adults. One hundred and forty (23.1%) recommendations were graded using the Grading of Recommendations, Assessments, Development, and Evaluations (GRADE) system, of which 37 (26.4%) were graded as strong but supported with only C or D level of evidence. The most commonly reported type of information in the recommendations was indication (n = 499, 82.5%). The most commonly addressed type of off-label drug use in the 523 positive recommendations was unapproved population ($n = 255$, 48.8%). Sixty-nine (11.4%) recommendations explicitly reported the drug use as off-label.

**Conclusion:** Children may be exposed to medical risks due to gaps in reporting and evidence of off-label drug use recommendations in pediatric guidelines.

Keywords: pediatric guidelines, recommendations, off-label use of drugs, evidence-based medicine, children

79

## INTRODUCTION

Off-label use of drugs is highly common in pediatrics (Schrier et al., 2020; Sweileh, 2021) due to delays in updating drug instructions and difficulties in conducting clinical trials (Hudgins et al., 2018; Hwang et al., 2018; Wu et al., 2019; Carmack et al., 2020). The prevalence of pediatric off-label drug prescriptions has been estimated to range from 3.2% to 95% overall, 26%–95% in neonates (Allen et al., 2018; Balan et al., 2018), 2.7%–51.2% in outpatients, and 9.0%–79.0% in inpatients (Li et al., 2016; Zhou Y. et al., 2021). However, sometimes off-label use of drugs could be inappropriate or without proven therapeutic benefit. Medical decisions involving off-label drug use should thus be based on the existing evidence (Frattarelli et al., 2014; Ito, 2017) to avoid irrational medication use. Clinical Practice Guidelines (CPGs) that aim to collect, grade and summarize the latest available evidence are the best option for mitigating the risk of irrational pharmaceutical use and the liability associated with the off-label use of drugs (guidelines., 2011).

At present, there are gaps in the reporting and evidence of off-label drug recommendations in pediatric guidelines. The lack of evidence for pediatric off-label use of drugs raises concerns about efficacy and safety. Some guidelines did not mention that the recommended treatment was off-label, potentially complicating clinical practice (Kochanek et al., 2019). In addition, there is often substantial variation in the information reported between different guidelines that recommend the same drug for off-label use (Zhou P. et al., 2021). Indications, dosage, cautions, medication regimen, side effects, pharmacological mechanisms, and drug interactions are all included in the guidelines of specific drugs. However, guidelines not focusing on one specific drug are usually less comprehensive in reporting drug related information. Moreover, there are more adverse drug reactions associated with off-label prescribing that are not supported by good evidence (Eguale et al., 2016). As a result, there is a need to better clarify the current evidence for pediatric off-label drug use in pediatric guidelines to assist in the judicious use of drugs.

This study focuses on recommendations on off-label drug use in pediatric guidelines published in the last 3 years, with the aim to demonstrate the variability in reporting recommendations, present information on drugs recommended for off-label use for different disease categories, and analyze the evidence on off-label drug use in pediatrics. Our study will provide a reference for guideline developers to present recommendations on off-label use of drugs and for pediatricians to guide the off-label administration of drugs.

## METHODS

### Study Design
A cross-sectional study was conducted.

### Search Strategy
We performed a systematic search through MEDLINE (*via* PubMed) and Embase databases to identify literature published from 1 January 2018, to 31 December 2020, with the terms "infant," "newborn*," "adolescent," "child*," "pediatric*," "guideline*," and "recommendation*" (**Supplementary Table S1**).

### Inclusion and Exclusion Criteria
We included articles that met the following criteria: 1) the article was a guideline published in an academic journal between 2018 and 2020; 2) the guideline addressed exclusively pediatric clinical practice; and 3) the guideline contained recommendations on off-label use of drugs. Duplicates, guidelines that included adults, translated guidelines, executive summaries, or articles published in languages other than English were excluded.

### Study Selection
Retrieved records were exported into Endnote X9 (version 9.3.1). Six investigators were divided into three groups (Group 1: Min Meng & Ping Wang, Group 2: Yunlan Liu & Wenjuan Lei, and Group 3: Min Tian & Yajia Sun). The identified records were divided between the three groups. In all groups both investigators independently screened first the titles and abstracts of the identified records, and then the full texts of the potentially eligible articles. Disagreements were solved by consensus or consultation with the senior investigators.

### Data Extraction
Two pharmacists with experience in clinical pharmacy independently extracted the information in the guidelines containing recommendations related to the off-label use of drugs. For pediatric guidelines with clear recommendations, the information on the off-label drug was further analyzed. The extracted information included: 1) basic information: publisher (organization), publication time, target population, disease category, disease (Pocai, 2019) (ICD-11 classification), number and content of recommendations, number of positive and negative recommendations (see definition below), used evidence grading systems, and conflict of interests (**Supplementary Table S2**); 2) Information on off-label drug use: content of the recommendations, name of the drug (or drug class, depending on whether a specific drug or a class of drugs is mentioned in the recommendation), details of the drug administration (indication, route of administration, dose, precise dosage, course of treatment, precautions, adverse reactions, contraindications, others), types of off-label drug use (see categorization in the next paragraph), types of cited literature, content of the evidence, and the level of recommendation according to the GRADE grading system (**Supplementary Table S3**) (Atkins et al., 2004a).

A negative recommendation was defined as a recommendation using unambiguously negative terms, such as "no," "against," "avoid," or "contraindication." A suggestion was considered positive if it contains both positive and negative descriptions. The types of off-label use were categorized into the following groups (Aronson and Ferner, 2017): 1) unapproved indication: the drug was recommended for a condition not mentioned in the drug instructions; 2) unapproved age: the drug was recommended for children outside the age range specified in the instructions; 3) unapproved population group: the drug was approved for the indication in adults but not in

80

Meng et al.                                                                                     Off-Label Drugs in Pediatric Guidelines



**FIGURE 1 |** Guideline screening process.

children; 4) unapproved route of administration; 5) unapproved dosage or frequency: dose and frequency inconsistent with the description in the instructions; or 6): unlicensed: the drug or hospital preparation was not approved or was withdrawn, by the US Food and Drug Administration (FDA). The FDA instructions and the Micromedex pharmaceutical information system were used to determine the drug class and type of off-label use (https://www.micromedexsolutions.com/). If a pharmaceutical could be classified into multiple drug classes, we determined the most appropriate drug class based on the ailment addressed in the guidelines (**Supplementary Table S3**).

Two investigators independently extracted the data and conducted two pilot rounds to improve consistency. Discrepancies were resolved through consultation with the senior investigators.

## Data Analysis

A descriptive statistical analysis of the included studies was performed, which presents the characteristics of the guidelines

and information on off-label drugs. The distribution of reference types for off-label drug recommendations, drug ranking (highlighted drugs are on the WHO Model List of Essential Medicines for Children - 8th list, 2021 (WHO, 2021b)), and drug classes were also studied descriptively. Excel 2021 was used to collect and analyze the data (version 16.54).

## RESULTS

## Characteristics of Included Guidelines

We identified 1,465 articles through the electronic database searches, and 66 guidelines (containing 605 recommendations) were finally included after the title/abstract and full-text screening. The full process of the literature search is shown in **Figure 1**.

The first authors of the 66 guidelines were from 18 countries, with nearly one-third from the United States ($n = 19$, 28.8%), and more than 80% ($n = 58$, 87.9%) from high-income countries. A

**TABLE 1 |** Characteristics of the included guidelines.

| Characteristic | | Number of articles | Percentage (%) |
|---|---|---|---|
| First author's country | United States | 19 | 28.8 |
| | United Kingdom | 8 | 12.1 |
| | Australia | 5 | 7.6 |
| | Canada | 5 | 7.6 |
| | France | 5 | 7.6 |
| | Italy | 5 | 7.6 |
| | Other[a] | 19 | 28.7 |
| Publication year | 2018 | 29 | 43.9 |
| | 2019 | 19 | 28.8 |
| | 2020 | 18 | 27.3 |
| Disease system | Endocrine, nutritional or metabolic diseases | 7 | 10.6 |
| | Immune system diseases | 7 | 10.6 |
| | Respiratory diseases | 6 | 9.1 |
| | Digestive system diseases | 6 | 9.1 |
| | Diseases of the blood or blood-forming organs | 5 | 7.6 |
| | Other[b] | 35 | 53.0 |
| Evidence grading system | Reported | 42 | 65.2 |
| | Not reported | 24 | 36.4 |
| Conflicts of interest | Yes | 19 | 28.8 |
| | No | 29 | 43.9 |
| | Without reported | 18 | 27.3 |
| Developer | Professional associations and organizations | 56 | 84.8 |
| | Group of individuals | 4 | 6.1 |
| | Not reported | 6 | 9.1 |
| Clarity of recommendations[c] | Clear | 47 | 71.2 |
| | Unclear | 19 | 28.8 |
| Proportion of recommendations on drug use[d] | 0% ~ 49.9% | 28 | 60.9 |
| | 50.0% ~ 99.9% | 15 | 32.6 |
| | 100% | 3 | 6.5 |
| Proportion of drug use recommendations on off-label use[e] | 0% ~ 49.9% | 14 | 30.4 |
| | 50.0% ~ 99.9% | 20 | 43.5 |
| | 100% | 12 | 26.1 |

[a]India, Germany, Israel, South Africa, Saudi Arabia, Austria, Japan, China, Turkey, Brazil, Poland, and South Korea.
[b]Musculoskeletal or connective tissue diseases; signs, symptoms, or clinical findings; ear or mastoid disease; skin diseases; visual system disorders; certain infectious or parasitic diseases; circulatory system diseases; genitourinary diseases; injury, poisoning, or some other external cause; neurological diseases; tumors, and others that could not be classified.
[c]The recommendations were clear if they were explicitly highlighted (e.g., in bold face) or stated individually, and unclear if they were narrative and embedded in paragraphs throughout the guidelines.
[d]The number of drug-use recommendations divided by the total number of recommendations.
[e]The number of off-label drug recommendations divided by the number of recommendations on drug use.

grading system for evidence was adopted in 42 (63.6%) guidelines, conflicts of interest was declared in 19 (28.8%) guidelines, with 9 (13.6%) guidelines may had commercial involvement in the recommendation of off-label use, and 56 (84.8%) guidelines were produced by professional societies or organizations.

Endocrine, nutritional, or metabolic disorders (n = 7, 10.6%), and immune system diseases (n = 7, 10.6%) were the most frequently addressed disease systems. The number of recommendations could not be counted in 20 (30.3%) guidelines because of the ambiguousness of the recommendations. Forty-six (69.7%) guidelines had clear recommendations, of which twelve only discussed drugs. **Table 1** lists the characteristics of the included guidelines.

## Types of References for Recommendations on Off-Label Drug Use

The guidelines contained a total of 605 recommendations on off-label drug use, including 523 positive (86.4%) and 82 negative (13.6%) recommendations. Eighty-seven (14.4%) recommendations had no references. We analyzed 1869 references for the 441 positive recommendations with references, and 371 references for 77 negative recommendations with references. The mean number of references per recommendation was 4.3 (4.2 for positive recommendations and 4.8 for negative recommendations). Pediatric randomized controlled trials ($n$ = 314, 14.0%), pediatric case series ($n$ = 260, 11.6%), and reviews ($n$ = 255, 11.4%) were the most common types of reference (**Figure 2**). A total of 470 (21.0%) references were studies from adults.

## Grading of Evidence Supporting the Recommendations on Off-Label Drug Use

The GRADE evidence grading system was used in 140 (23.1%) of the 605 recommendations for off-label use of drugs. The quality of evidence was GRADE level D in 70 (53.4%), GRADE level C in 47 (35.9%), GRADE level B in 13, 9.9%), and GRADE level A in 1



**FIGURE 2 |** The types of references cited to support the recommendations.



**FIGURE 3 |** Strength of the off-label drug use recommendations and quality of the supporting evidence according to the GRADE grading system.

(0.8%) study. There were more weak ($n = 86$, 65.6%) than strong ($n = 45$, 34.4%) recommendations, including 37 (26.4%) strong recommendations supported with GRADE C or D level evidence (**Figure 3**).

## Information on Off-Label Drug Use
The content and extent of the information reported varied considerably between the recommendations on off-label drug use. The indication was reported in 499 (82.5%), route of administration in 253 (41.8%), dosage in 183 (30.2%), precise dosage in 128 (21.2%), precautions in 175 (28.9%), adverse reactions in 88 (14.5%), course of treatment in 78 (12.9%),

contraindications in 30 (5.0%) and other information in 60 (9.9%) recommendations.

## Types of Off-Label Drug Use
Sixty-nine (11.4%) of the 605 assessed recommendations clearly and explicitly stated the use of the drug as off-label. Among the 523 positive recommendations, 255 (48.8%) addressed use for unapproved population, 201 (38.4%) for unapproved indication and 185 (35.4%) for unapproved age, 20 (3.8%) the use of unlicensed drugs, and 15 (2.9%) drug use with unapproved dosage or frequency and 7 (1.3%) with unapproved route of administration.

**TABLE 2 |** The details of the most frequently recommended off-label drugs.

| Drug name | WHO EMLc | Types of off-label drug use | Indication | Types of references for recommendations |
|---|---|---|---|---|
| Acetaminophen | Yes | Unapproved age | Postoperative analgesia | Pediatric case-series |
| | | | Pain control after tonsillectomy | Pediatric RCT; systematic review or meta-analysis |
| | | | Pain management for acute severe colitis | Pediatric case-series |
| | | | Postoperative pain management | Pediatric RCT; pediatric cohort; pediatric case control study; pediatric case-series; systematic review or meta-analysis; review; pediatric guideline |
| Fentanyl | No | Unapproved population group | Postoperative pain management | Pediatric RCT; pediatric trial; pediatric case control study; pediatric case-series; systematic review or meta-analysis; review; pediatric guideline |
| | | | Pain management for retinopathy of prematurity | Pediatric case-series |
| Ropivacaine | No | Unapproved population group | Postoperative pain management | Pediatric RCT; pediatric trial; pediatric cohort; pediatric case report; systematic review or meta-analysis; review; pediatric guideline |
| | | | Regional anesthesia | Pediatric RCT; pediatric trial; adult trail; pediatric cohort; adult trail; pediatric case control study; adult case control study; pediatric case-series; pediatric case report; adult case report; systematic review or meta-analysis; review; consensus |
| Cyclosporine | No | Unapproved indication | Ulcerative colitis | Pediatric trial; pediatric cohort; pediatric case-series; adult case series; systematic review or meta-analysis |
| | | | Warm autoimmune haemolytic anaemia | Adult RCT; pediatric case-series; review |
| | | | Juvenile dermatomyositis | Pediatric case-series; pediatric guideline |
| | | | Steroid-resistant nephrotic syndrome | pediatric RCT; pediatric case-series; systematic review or meta-analysis; review |
| | | | Psoriasis | pediatric case-series; systematic review or meta-analysis |
| | | | Psoriasis | pediatric case-series; pediatric case report; guideline or consensus; expert opinion |
| | | | Glomerular diseases | adult RCT |
| Bupivacaine | Yes | Unapproved indication | Postoperative pain | Pediatric RCT; pediatric trial; pediatric cohort; pediatric case-series; systematic review or meta-analysis; review; pediatric guideline |
| | | Unapproved age unapproved route of administration | Regional anesthesia | Pediatric RCT; adult trail; pediatric cohort; pediatric case control study; adult case control study; pediatric case-series; pediatric case report; adult case report; adult case series; systematic review or meta-analysis; review |
| Tramadol | No | Unapproved population group | Postoperative pain | Pediatric RCT; pediatric trial; pediatric case-series; cross-sectional study; systematic review or meta-analysis; review; pediatric guideline |
| Tacrolimus | Yes | Unapproved indication | Ulcerative colitis | Adult RCT; pediatric cohort; pediatric case-series; adult case series; systematic review or meta-analysis |
| | | | Ulcerative colitis | Adult RCT; adult trail; adult cohort; pediatric case-series; pediatric case report; systematic review or meta-analysis |
| | | | Juvenile dermatomyositis | Systematic review or meta-analysis; guideline or consensus |
| | | | Steroid-resistant nephrotic syndrome | Pediatric RCT; systematic review or meta-analysis |
| | | | Psoriasis (topical) | Pediatric trial; pediatric case-series; adult case report; systematic review or meta-analysis |
| | | | Glomerular diseases during the COVID-19 pandemic | Adult RCT |
| Infliximab | Yes | Unapproved age | Ulcerative colitis | Pediatric RCT; adult RCT; pediatric cohort; adult cohort; pediatric case control study; pediatric case-series; cross-sectional study; systematic review or meta-analysis; review |
| | | | Ulcerative colitis | Pediatric RCT; adult RCT; adult trial; adult cohort; adult case series; cross-sectional study; systematic review or meta-analysis; guideline or consensus |
| | | | Juvenile idiopathic arthritis | Pediatric RCT |

*(Continued on following page)*

84

**TABLE 2 |** (Continued) The details of the most frequently recommended off-label drugs.

| Drug name | WHO EMLc | Types of off-label drug use | Indication | Types of references for recommendations |
|---|---|---|---|---|
| | | Unapproved population group | | |
| | | Unapproved indication | Psoriasis | — |
| | | | Psoriasis | Expert opinion |
| Mycophenolate mofetil | No | Unapproved indication | Autoimmune pancreatitis with a concomitant diagnosis of inflammatory bowel disease | — |
| | | | Warm autoimmune haemolytic anaemia | Pediatric case-series; cross-sectional study; systematic review or meta-analysis; review |
| | | | Juvenile idiopathic arthritis–associated Uveitis | Adult case control study |
| | | | Immunoglobulin A vasculitis | Pediatric RCT; pediatric cohort; adult case control study; pediatric case-series |
| | | | Juvenile dermatomyositis | Pediatric case-series |
| | | | Steroid-resistant nephrotic syndrome | Pediatric RCT; pediatric cohort |
| | | | Glomerular diseases during the COVID-19 pandemic | Pediatric case-series; guideline or consensus |
| Morphine | Yes | Unapproved population group | Postoperative pain | Pediatric RCT; pediatric trial; pediatric case control study; pediatric case-series; systematic review or meta-analysis; review; pediatric guideline |
| | | | Regional anesthesia | Review |
| | | | Pain for retinopathy of prematurity | Pediatric case-series |
| | | | Needle procedures | Pediatric RCT; cross-sectional study |

WHO EMLc: World Health Organization Model List of Essential Medicines for Children (2021).

## Ranking of Specific Off-Label Drugs and Drug Types in the Recommendations

We obtained a total of 941 drug names (652 specific medicines and 289 drug classes) from the 605 off-label drug recommendations. The three most commonly mentioned individual drugs were acetaminophen ($n = 31$, 3.3%), fentanyl ($n = 28$, 3.0%) and ropivacaine ($n = 24$, 2.6%). The three most commonly mentioned drug classes were nonsteroidal anti-inflammatory drugs (NSAIDs; $n = 46$, 4.9%), low molecular weight heparins (LMWHs; $n = 28$, 3.0%), and anticoagulants ($n = 24$, 2.6%) (**Supplementary Table S4**).

We analyzed detailed recommendations of the top ten off-label drugs (**Table 2**), of which five drugs were not on the World Health Organization Model List of Essential Medicines for Children. There was fentanyl, ropivacaine, cyclosporine, tramadol, and mycophenolate mofetil. Moreover, there were no references to support the use of infliximab for psoriasis and mycophenolate mofetil for pancreatitis with autoimmune pancreatitis in children, respectively.

## Recommendations for Acetaminophen or Nonsteroidal Anti-Inflammatory Drugs (NSAIDs)

Acetaminophen and NSAIDs were the most commonly mentioned drug and drug classes, respectively. Positive recommendations on these drugs provided detailed information on the use of the medication, whereas negative recommendations only addressed the indications that are not suggested (**Table 3**). The contents of drug information

descriptions were diverse among the different diseases, and we could not identify any pattern. The recommendation on NSAIDs for post-tonsillectomy pain control reported the most detailed drug information, including indications, route of administration, dose, precise dosage, adverse effects, and contraindications.

## DISCUSSION

### Main Findings

This study identified 605 recommendations on off-label drug use from 66 pediatric guidelines. About 90% of the recommendations did not explicitly designate their recommended drug as off-label use. Various types of references were cited to support the recommendations, with more than one-fifth being adult studies and 15% of the recommendations lacking references. More than a quarter of the recommendations that were graded using the GRADE evidence system were classified as strong but based on low or very low quality evidence.

### Evidence Supporting the Recommendations on Off-Label Drug Use in Pediatric Guidelines

The majority of clinical decisions are based on the principles of evidence-based medicine (Djulbegovic and Guyatt, 2017). However, in many cases, only low-quality evidence or evidence from adult populations is available to inform the treatment of children. For example, to support off-label pharmacological use in neonates, case reports (Tobin, 2010),

**TABLE 3** | Diseases and information covered by the recommendations on off-label use of nonsteroidal anti-inflammatory drugs (NSAIDs) and acetaminophen.

| | Drug | Disease | Indication | Route of administration | Dose | Precise dosage | Course of treatment | Precautions | Adverse reactions | Contraindications |
|---|---|---|---|---|---|---|---|---|---|---|
| Negative recommendations | Acetaminophen | Acute severe ulcerative colitis | ✓ | | | | | | | |
| | | Minor procedures | ✓ | | | | | | | |
| | | Non-systemic: polyarthritis, sacroilitis, and enthesitis | ✓ | | | | | | | |
| | | Immunoglobulin A vasculitis-associated arthropathy | ✓ | | | | ✓ | ✓ | ✓ | ✓ |
| Positive recommendations | Acetaminophen and NSAIDs | Pediatric rheumatic disease | ✓ | | | | | ✓ | | |
| | NSAIDs | Postoperative pain | ✓ | ✓ | ✓ | ✓ | | ✓ | | |
| | NSAIDs | Pain of pediatrics ulcerative colitis | ✓ | | | | | | | |
| | | Symptomatic treatment of arthralgia of psoriasis | ✓ | | | | | | | |
| | | Painful headache after acute mild traumatic brain injury | ✓ | | | | | ✓ | | |
| | | Otalgia of acute otitis media | ✓ | ✓ | ✓ | ✓ | | | | |
| | | Pain control after tonsillectomy | ✓ | ✓ | ✓ | ✓ | | | ✓ | |
| | | Pain of retinopathy surgery | ✓ | ✓ | ✓ | ✓ | | | | ✓ |

expert opinions, and evidence extrapolated from data on other populations are frequently used (Slater et al., 2020). When a new drug is launched, evidence is first usually only available on adults. In the early phases of a public health emergency, only low-level evidence, such as case series, is available (Hudgins et al., 2018; Lagler et al., 2021). Treatment of psychiatric disorders in children is often based on evidence from adults (Sharma et al., 2016), and only case reports are often available for rare diseases (Whitley and Chepke, 2020). As a result, strong recommendations are sometimes generated based on expert consensus (Rosen et al., 2018) and indirect evidence of similar diseases (Liu et al., 2020), as well as based on conclusions from disease features and clinical practice experience. However, the inconsistency between the quality of the evidence and the strength of the recommendation may contradict the critical principles of evidence-based medicine, creating a danger to clinical practice (Yao et al., 2021). As a result, it is critical that recommendations on the off-label use of drugs in pediatric guidelines are based on a reliable methodological pathway or framework (Cheng et al., 2007). However, there is currently no standardized framework for creating recommendations for the use of off-label drugs in children (Casali et al., 2015; Agrawal et al., 2019; Jiang et al., 2020; Stolbach et al., 2020; Remi et al., 2021). In general, the development of clinical guidelines should follow the GRADE Working Group's "Five Paradigmatic Situations Warranting Strong Recommendation Despite Low or Very Low-Quality Evidence in Effect Estimates," which has proven to offer a reliable framework (Andrews et al., 2013). This framework, unfortunately, does not resolve the clinical aspects regarding off-label use of drugs in children, and the interpretation and judgments of the GRADE framework may vary between individuals. Furthermore, even if guideline developers strictly adhere to the framework, the subjective nature of expert consensus (Yao et al., 2021), potential conflicts of interest (Stahl, 2013; Joshi et al., 2019), and lack of transparency in many guidelines still present severe risks for clinical practice.

Furthermore, this analysis found that each off-label drug recommendation had an average of 4.3 references. A diverse range of literature types was cited, including books (Cheung et al., 2018), databases (Grover and Avasthi, 2019), internet resources (Leboulanger et al., 2020), instructions (Caffarelli et al., 2019), and scientific letters (Lim et al., 2020). There is a research gap in how to grade evidence from these types of sources in the optimal way (AAP, 2004; Atkins et al., 2004b; Milano, 2015; SIGN, 2017; Blanco-Reina et al., 2017). It is also worth noting that 15% of off-label drug recommendations lacked references, being based on either expert opinions (Menter et al., 2020), or even not reporting the source (Litwin et al., 2018).

## Reporting the Recommendation on Off-Label Drug Use in Pediatric Guidelines

Off-label drug use is presented in the recommendations in diverse ways. Drug-specific guidelines usually report detailed information on the drug, such as pharmacological effects, pharmacokinetic characteristics, dosage or precise dosage, indications, route of administration, co-administration,

regimen, contraindications, precautions, adverse reactions, and monitoring (Simm et al., 2018; Zhou P. et al., 2021). In clinical guidelines not focusing on any specific drug, there is however wide variation in how the recommendations on off-label drug use are reported. Indications and methods of administration tend to be reported frequently, whereas information on the dose or accurate dosage is often lacking, and sometimes even the safety indicators are not appropriately addressed. Given the legal (Mayrhofer, 2014) and safety risks (Schrier et al., 2020) associated with pediatric off-label use of drugs (Schrier et al., 2020), it is also critical to clearly describe if a drug in a recommendation is beyond instructions, since the approval of instructions indicates the availability of high-quality evidence-based support. However, less than 15% of the guidelines for children included in this study specifically noted that the recommended use was off-label.

## NSAIDs Used Off-Label

Although many pediatric guidelines suggest NSAIDs or paracetamol for pain, fever or inflammation in children (Turner et al., 2018; Vittinghoff et al., 2018; Mitchell et al., 2019; Ozen et al., 2019; Pirelli et al., 2019; Ringold et al., 2019; Wahezi et al., 2020), they should be taken with caution due to the possibility of adverse reactions such as hypersensitivity reactions (Kidon et al., 2018), renal damage (Gong et al., 2021), and even kidney failure (Gong et al., 2021; Bensman, 2019). However, the reporting of recommendations on NSAIDs in pediatric guidelines is inadequate, which is due to several reasons and may potentially lead to inappropriate drug use. First, pediatric guidelines are usually applicable to children of all ages, but the recommendations do not specify which age groups of children they apply to (Turner et al., 2018). Second, there is a wide range of NSAIDs available, with different therapy ranges and approved ages. Despite this, the recommendations (Ringold et al., 2019) do not declare or clarify which specific NSAIDs are suggested, which might lead to confusion in clinical practice. Finally, as shown in **Table 3**, the information on NSAIDs stated in the recommendations differs greatly between the guidelines (Turner et al., 2018; Vittinghoff et al., 2018; Ozen et al., 2019; Ringold et al., 2019; Wahezi et al., 2020). There are discrepancies in the content and degree of detail stated in different guidelines when NSAIDs are proposed as off-label drugs, which might be attributable to subjective selection by guideline developers.

## Off-Label Drugs Not on World Health Organization Model List of Essential Medicines for Children

In our research, many off-label drugs recommended by guidelines are not on the World Health Organization Model List of Essential Medicines for Children, but they are evidence-based or rational in many cases. WHO has developed a list of essential medicines mainly based on the safety, efficacy, and cost-effectiveness of medicines over the past 44 years (WHO, 2021a), but the committee has not taken into account feedback from professional societies and organizations that develop

clinical guidelines, resulting in the exclusion of medicines with better evidence from the list (Dugani et al., 2018). On the other hand, off-label drugs that are not on the list and recommendations that are not supported by the evidence should be noticed and considered, such as infliximab for psoriasis (Menter et al., 2020), which might have a possible conflict of interest. According to our analysis, more than 10% of off-label drug guidelines involve possible commercial promotion, consistent with the current situation (Abbas et al., 2018).

### Strengths and Limitations

This study is to our knowledge the first systematic analysis of the reporting of off-label drug recommendations in pediatric guidelines and reveals some gaps in reporting. To ensure a correct extraction of data on off-label drug use, experienced clinical pharmacists reviewed and analyzed the recommendations independently, and inconsistencies were discussed with pediatric clinical experts. However, this study also has some limitations. The study only included English-language guidelines from the last 3 years, without searching websites for additional guidelines. Local web pages or local medical organizations' web pages usually publish guidelines in non-English, which may include more irrational off-label drug recommendations (Meng et al., 2022). To ensure consistency, the FDA prescription instructions were adopted as criteria for categorizing the type of off-label use of drugs, which may not be completely consistent with the drug instructions used in the target setting of the guideline.

## CONCLUSION

Recommendations on off-label drug use are commonly given in pediatric guidelines, despite the substantial risk of clinical practice being misled. The quality of the evidence supporting the recommendations does not however always match the strength of the recommendations; the recommendations were often based on expert opinion and lacked a declaration of the methodology; and the content and extent of the information reported for recommended off-label drugs varied greatly between the guidelines. Most recommendations involving off-label drug use did not explicitly state that the recommended administration is off-label, which may easily lead to inappropriate off-label use of drugs in children.

## DATA AVAILABILITY STATEMENT

The original contributions presented in the study are included in the article/**Supplementary Material**, further inquiries can be directed to the corresponding authors.

## AUTHOR CONTRIBUTIONS

YC and QZ designed the study and edited the article. MM, MT, WL, PW, YL, and YS searched the data. MM, MT, and QL

analyzed the data. MM and MT drafted the article. QL and YC revised the article. All authors approved the final version of the article.

## FUNDING

This research was funded by the Chevidence Lab Child & Adolescent Health of Chongqing Medical University's Children's Hospital's Key Project in 2021. The study's design and execution were not influenced by the major project.

## ACKNOWLEDGMENTS

We acknowledge Janne Estill, MD, PhD (University of Geneva), for his assistance in writing the article.

## SUPPLEMENTARY MATERIAL

The Supplementary Material for this article can be found online at: https://www.frontiersin.org/articles/10.3389/fphar.2022.892574/full#supplementary-material

## REFERENCES

Abbas, M., Pires, D., Peters, A., Morel, C. M., Hurst, S., and Holmes, A. (2018). Conflicts of Interest in Infection Prevention and Control Research: No Smoke without Fire. A Narrative Review. *Intensive Care Med.* 44 (10), 1679–1690. doi:10.1007/s00134-018-5361-z

Agrawal, S., Vamadevan, P., Mazibuko, N., Bannister, R., Swery, R., Wilson, S., et al. (2019). A New Method for Ethical and Efficient Evidence Generation for Off-Label Medication Use in Oncology (A Case Study in Glioblastoma). *Front. Pharmacol.* 10, 681. doi:10.3389/fphar.2019.00681

Allen, H. C., Garbe, M. C., Lees, J., Aziz, N., Chaaban, H., Miller, J. L., et al. (2018). Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature. *J. Okla State Med. Assoc.* 111 (8), 776–783.

American Academy of Pediatrics Steering Committee on Quality Improvement and Management (2004). Classifying Recommendations for Clinical Practice Guidelines. *Pediatrics* 114 (3), 874–877. doi:10.1542/peds.2004-1260

Andrews, J. C., Schünemann, H. J., Oxman, A. D., Pottie, K., Meerpohl, J. J., Coello, P. A., et al. (2013). GRADE Guidelines: 15. Going from Evidence to Recommendation-Determinants of a Recommendation's Direction and Strength. *J. Clin. Epidemiol.* 66 (7), 726–735. doi:10.1016/j.jclinepi.2013.02.003

Aronson, J. K., and Ferner, R. E. (2017). Unlicensed and Off-Label Uses of Medicines: Definitions and Clarification of Terminology. *Br. J. Clin. Pharmacol.* 83 (12), 2615–2625. doi:10.1111/bcp.13394

Atkins, D., Best, D., Briss, P. A., Eccles, M., Falck-Ytter, Y., Flottorp, S., et al. (2004a). Grading Quality of Evidence and Strength of Recommendations. *Bmj* 328 (7454), 1490. doi:10.1136/bmj.328.7454.1490

Atkins, D., Eccles, M., Flottorp, S., Guyatt, G. H., Henry, D., Hill, S., et al. (2004b). Systems for Grading the Quality of Evidence and the Strength of Recommendations I: Critical Appraisal of Existing Approaches the GRADE Working Group. *BMC Health Serv. Res.* 4 (1), 38. doi:10.1186/1472-6963-4-38

Balan, S., Hassali, M. A. A., and Mak, V. S. L. (2018). Two Decades of Off-Label Prescribing in Children: a Literature Review. *World J. Pediatr.* 14 (6), 528–540. doi:10.1007/s12519-018-0186-y

Bensman, A. (2019). Non-steroidal Anti-inflammatory Drugs (NSAIDs) Systemic Use: The Risk of Renal Failure. *Front. Pediatr.* 7, 517. doi:10.3389/fped.2019.00517

Blanco-Reina, E., Muñoz-García, A., Cárdenas-Aranzana, M. J., Ocaña-Riola, R., and Del Prado-Llergo, J. R. (2017). Assessment of Off-Label Prescribing: Profile, Evidence and Evolution. *Farm Hosp.* 41 (4), 458–469. doi:10.7399/fh.2017.41.4.10562

Caffarelli, C., Paravati, F., El Hachem, M., Duse, M., Bergamini, M., Simeone, G., et al. (2019). Management of Chronic Urticaria in Children: a Clinical Guideline. *Ital. J. Pediatr.* 45 (1), 101. doi:10.1186/s13052-019-0695-x

Carmack, M., Hwang, T., and Bourgeois, F. T. (2020). Pediatric Drug Policies Supporting Safe and Effective Use of Therapeutics in Children: A Systematic Analysis. *Health Aff. (Millwood)* 39 (10), 1799–1805. doi:10.1377/hlthaff.2020.00198

Casali, P. G., Bruzzi, P., Bogaerts, J., and Blay, J. Y. (2015). Rare Cancers Europe (RCE) Methodological Recommendations for Clinical Studies in Rare Cancers: a European Consensus Position Paper. *Ann. Oncol.* 26 (2), 300–306. doi:10.1093/annonc/mdu459

Cheng, A. C., Robinson, P. M., and Harvey, K. (2007). Off-label Use of Medicines: Consensus Recommendations for Evaluating Appropriateness. *Med. J. Aust.* 186 (7), 379–380. doi:10.5694/j.1326-5377.2007.tb00947.x

Cheung, A. H., Zuckerbrot, R. A., Jensen, P. S., Laraque, D., and Stein, R. E. K. (2018). Guidelines for Adolescent Depression in Primary Care (GLAD-PC): Part II. Treatment and Ongoing Management. *Pediatrics* 141 (3). doi:10.1542/peds.2017-4082

Djulbegovic, B., and Guyatt, G. H. (2017). Progress in Evidence-Based Medicine: a Quarter Century on. *Lancet (London, Engl.* 390 (10092), 415–423. doi:10.1016/S0140-6736(16)31592-6

Dugani, S., Wasan, K. M., and Kissoon, N. (2018). World Health Organization and Essential Medicines. *J. Pharm. Sci.* 107 (5), 1261–1262. doi:10.1016/j.xphs.2017.12.019

Eguale, T., Buckeridge, D. L., Verma, A., Winslade, N. E., Benedetti, A., Hanley, J. A., et al. (2016). Association of Off-Label Drug Use and Adverse Drug Events in an Adult Population. *JAMA Intern. Med.* 176 (1), 55–63. doi:10.1001/jamainternmed.2015.6058

Frattarelli, D. A., Galinkin, J. L., Green, T. P., Johnson, T. D., Neville, K. A., Paul, I. M., et al. (2014). Off-label Use of Drugs in Children. *Pediatrics* 133 (3), 563–567. doi:10.1542/peds.2013-4060

Gong, J., Ma, L., Li, M., Ma, L., Chen, C., Zhao, S., et al. 31 (2021). Non-steroidal Anti-inflammatory Drugs Associated Acute Kidney Injury in Hospitalized Children: a Systematic Review and Meta-Analysis. *Pharmacoepidemiol Drug Saf.* doi:10.1002/pds.5385

Grover, S., and Avasthi, A. (2019). Clinical Practice Guidelines for the Management of Schizophrenia in Children and Adolescents. *Indian J. Psychiatry* 61 (Suppl. 2), 277–293. doi:10.4103/psychiatry.IndianJPsychiatry_556_18

Hudgins, J. D., Bacho, M. A., Olsen, K. L., and Bourgeois, F. T. (2018). Pediatric Drug Information Available at the Time of New Drug Approvals: A Cross-Sectional Analysis. *Pharmacoepidemiol Drug Saf.* 27 (2), 161–167. doi:10.1002/pds.4351

Hwang, T. J., Tomasi, P. A., and Bourgeois, F. T. (2018). Delays in Completion and Results Reporting of Clinical Trials under the Paediatric Regulation in the European Union: A Cohort Study. *PLoS Med.* 15 (3), e1002520. doi:10.1371/journal.pmed.1002520

Ito, S. (2017). Drugs for Children. *Clin. Pharmacol. Ther.* 101 (6), 704–706. doi:10.1002/cpt.675

Jiang, Q., Zeng, W., Yu, J., Liu, H., Mao, M., and Li, Y. (2020). Development of the First Value Assessment Index System for Off-Label Use of Antineoplastic Agents in China: A Delphi Study. *Front. Pharmacol.* 11, 771. doi:10.3389/fphar.2020.00771

Joshi, G. P., Benzon, H. T., Gan, T. J., and Vetter, T. R. (2019). Consistent Definitions of Clinical Practice Guidelines, Consensus Statements, Position Statements, and Practice Alerts. *Anesth. analgesia* 129 (6), 1767–1770. doi:10.1213/ANE.0000000000004236

Kidon, M., Blanca-Lopez, N., Gomes, E., Terreehorst, I, Tanno, L., Ponvert, C., et al. (2018). EAACI/ENDA Position Paper: Diagnosis and Management of Hypersensitivity Reactions to Non-steroidal Anti-inflammatory Drugs

(NSAIDs) in Children and Adolescents. *Pediatr. Allergy Immunol.* 29 (5), 469–480. doi:10.1111/pai.12915

Kochanek, P. M., Tasker, R. C., Carney, N., Totten, A. M., Adelson, P. D., Selden, N. R., et al. (2019). Guidelines for the Management of Pediatric Severe Traumatic Brain Injury, Third Edition: Update of the Brain Trauma Foundation Guidelines, Executive Summary. *Neurosurgery* 84 (6), 1169–1178. doi:10.1093/neuros/nyz051

Lagler, F. B., Hirschfeld, S., and Kindblom, J. M. (2021). Challenges in Clinical Trials for Children and Young People. *Arch. Dis. Child.* 106 (4), 321–325. doi:10.1136/archdischild-2019-318676

Leboulanger, N., Sagardoy, T., Akkari, M., Ayari-Khalfallah, S., Celerier, C., Fayoux, P., et al. (2020). COVID-19 and ENT Pediatric Otolaryngology during the COVID-19 Pandemic. Guidelines of the French Association of Otorhinolaryngology (AFOP) and French Society of Otorhinolaryngology (SFORL). *Eur. Ann. Otorhinolaryngol. Head. Neck Dis.* 137 (3), 177–181. doi:10.1016/j.anorl.2020.04.010

Li, Y., Jia, L., and Teng, L. (2016). A Systematic Review of Off-Label Drug Use at Home and Abroad for Pediatrics. *Chin. J. Hosp. Pharm.* 36 (23), 2114–2119.

Lim, J. S., Kim, E. Y., Kim, J. H., Yoo, J. H., Yi, K. H., Chae, H. W., et al. (2020). Clinical Practice Guidelines for Dyslipidemia of Korean Children and Adolescents. *Ann. Pediatr. Endocrinol. Metab.* 25 (4), 199–207. doi:10.6065/apem.2040198.09910.3345/cep.2020.01340

Litwin, M., Niemirska, A., Obrycki, Ł., Myśliwiec, M., Szadkowska, A., Szalecki, M., et al. (2018). Guidelines of the Pediatric Section of the Polish Society of Hypertension on Diagnosis and Treatment of Arterial Hypertension in Children and Adolescents. 22(2), 45–73. doi: doi:10.5603/ah.2018.0007

Liu, E., Smyth, R. L., Luo, Z., Qaseem, A., Mathew, J. L., Lu, Q., et al. (2020). Rapid Advice Guidelines for Management of Children with COVID-19. *Ann. Transl. Med.* 8 (10), 617. doi:10.21037/atm-20-3754

Mayrhofer, M. (2014). Off Label Use of Analgesics in Pediatric Perioperative Pain Therapy from a Legal Perspective: Austrian Interdisciplinary Recommendations on Pediatric Perioperative Pain Management. *Schmerz* 28 (1), 65–66. doi:10.1007/s00482-013-1385-z

Meng, M., Wang, P., Lan, H., Lei, W., Shen, Q., Zhou, Q., et al. (2022). Analysis on Off-Label Use of Drugs in Pediatric Guidelines and Consensus Published by Chinese Authors. *Chin. J. Pediatr.* 60 (3), 215–220. doi:10.3760/cma.j.cn112140-20210923-00813

Menter, A., Cordoro, K. M., Davis, D. M. R., Kroshinsky, D., Paller, A. S., Armstrong, A. W., et al. (2020). Joint American Academy of Dermatology-National Psoriasis Foundation Guidelines of Care for the Management and Treatment of Psoriasis in Pediatric Patients. *J. Am. Acad. Dermatol* 82 (1), 161–201. doi:10.1016/j.jaad.2019.08.049

Milano, G. (2015). The Hierarchy of the Evidence-Based Medicine Pyramid: Classification beyond Ranking. *Joints* 3 (3), 101. doi:10.11138/jts/2015.3.3.101

Mitchell, R. B., Archer, S. M., Ishman, S. L., Rosenfeld, R. M., Coles, S., Finestone, S. A., et al. (2019). Clinical Practice Guideline: Tonsillectomy in Children (Update). *Otolaryngol. Head. Neck Surg.* 160 (1_Suppl.), S1–s42. doi:10.1177/0194599818801757 10.1177/0194599818807917

Ozen, S., Marks, S. D., Brogan, P., Groot, N., de Graeff, N., Avcin, T., et al. (2019). European Consensus-Based Recommendations for Diagnosis and Treatment of Immunoglobulin A Vasculitis-The SHARE Initiative. *Rheumatol. Oxf.* 58 (9), 1607–1616. doi:10.1093/rheumatology/kez041

Pirelli, A., Savant Levet, P., Garetti, E., Ancora, G., Merazzi, D., Bellieni, C. V., et al. (2019). Literature Review Informs Clinical Guidelines for Pain Management during Screening and Laser Photocoagulation for Retinopathy of Prematurity. *Acta Paediatr.* 108 (4), 593–599. doi:10.1111/apa.14523

Pocai, B. (2019). The ICD-11 Has Been Adopted by the World Health Assembly. *World Psychiatry* 18 (3), 371–372. doi:10.1002/wps.20689

Remi, C., Weingärtner, K., Hagemann, V., Bausewein, C., and Hodiamont, F. (2021). Off-label Drugs in Palliative Care: a Group Delphi Treatment Recommendation Process. *BMJ Support Palliat. Care* 11 (2), 180–187. doi:10.1136/bmjspcare-2019-002165

Ringold, S., Angeles-Han, S. T., Beukelman, T., Lovell, D., Cuello, C. A., Becker, M. L., et al. (2019). 2019 American College of Rheumatology/Arthritis Foundation Guideline for the Treatment of Juvenile Idiopathic Arthritis: Therapeutic Approaches for Non-systemic Polyarthritis, Sacroiliitis, and Enthesitis. *Arthritis Care Res. Hob.* 71 (6), 717–734. doi:10.1002/acr.2387010.1002/art.40884

Rosen, R., Vandenplas, Y., Singendonk, M., Cabana, M., DiLorenzo, C., Gottrand, F., et al. (2018). Pediatric Gastroesophageal Reflux Clinical Practice Guidelines: Joint Recommendations of the North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition and the European Society for Pediatric Gastroenterology, Hepatology, and Nutrition. *J. Pediatr. Gastroenterol. Nutr.* 66 (3), 516–554. doi:10.1097/mpg.0000000000001889

Schrier, L., Hadjipanayis, A., Stiris, T., Ross-Russell, R. I., Valiulis, A., Turner, M. A., et al. (2020). Off-label Use of Medicines in Neonates, Infants, Children, and Adolescents: a Joint Policy Statement by the European Academy of Paediatrics and the European Society for Developmental Perinatal and Pediatric Pharmacology. *Eur. J. Pediatr.* 179 (5), 839–847. doi:10.1007/s00431-019-03556-9

Scottish Intercollegiate Guidelines Network (2017). *Key to Evidence Statements and Grades of Recommendations.* Management.

Sharma, A. N., Arango, C., Coghill, D., Gringras, P., Nutt, D. J., Pratt, P., et al. (2016). BAP Position Statement: Off-Label Prescribing of Psychotropic Medication to Children and Adolescents. *J. Psychopharmacol.* 30 (5), 416–421. doi:10.1177/0269881116636107

Simm, P. J., Biggin, A., Zacharin, M. R., Rodda, C. P., Tham, E., Siafarikas, A., et al. (2018). Consensus Guidelines on the Use of Bisphosphonate Therapy in Children and Adolescents. *J. Paediatr. Child. Health* 54 (3), 223–233. doi:10.1111/jpc.13768

Slater, R., Moultrie, F., Bax, R., van den Anker, J., and Bhatt, A. (2020). Preterm Health: Time to Bridge the Evidence Gap. *Lancet* 396 (10255), 872–873. doi:10.1016/s0140-6736(20)31977-2

Stahl, S. M. (2013). Off-label Prescribing: Best Practice or Malpractice? *CNS Spectr.* 18 (1), 1–4. doi:10.1017/s1092852913000011

Stolbach, A. I., Mazer-Amirshahi, M., Marino, R., Nelson, L. S., and Sugarman, J. (2020). ACMT Position Statement: Off-Label Prescribing during COVID-19 Pandemic. *J. Med. Toxicol.* 16 (3), 342–345. doi:10.1007/s13181-020-00784-6

Sweileh, W. M. (2021). 24 Global Research Publications on Systemic Use of Off-Label and Unlicensed Drugs: A Bibliometric Analysis (1990-2020). *Int. J. Risk Saf. Med.* doi:10.3233/jrs-210012

The World Bank (2022). Countries and Economies [Online]. Available at: https://data.worldbank.org/country.

Tobin, J. R. (2010). Use of Pharmaceuticals 'off-Label' in the Neonate. *Best. Pract. Res. Clin. Anaesthesiol.* 24 (3), 451–460. doi:10.1016/j.bpa.2010.02.015

Turner, D., Ruemmele, F. M., Orlanski-Meyer, E., Griffiths, A. M., de Carpi, J. M., Bronsky, J., et al. (2018). Management of Paediatric Ulcerative Colitis, Part 2: Acute Severe Colitis-An Evidence-Based Consensus Guideline from the European Crohn's and Colitis Organization and the European Society of Paediatric Gastroenterology, Hepatology and Nutrition. *J. Pediatr. Gastroenterol. Nutr.* 67 (2), 292–310. doi:10.1097/mpg.0000000000002036

Ucosfdtcp, I. o. m. (2011). *Clinical Practice Guidelines We Can Trust.* Washington (DC): National Academies Press US.

Vittinghoff, M., Lönnqvist, P. A., Mossetti, V., Heschl, S., Simic, D., Colovic, V., et al. (2018). Postoperative Pain Management in Children: Guidance from the Pain Committee of the European Society for Paediatric Anaesthesiology (ESPA Pain Management Ladder Initiative). *Paediatr. Anaesth.* 28 (6), 493–506. doi:10.1111/pan.13373

Wahezi, D. M., Lo, M. S., Rubinstein, T. B., Ringold, S., Ardoin, S. P., Downes, K. J., et al. (2020). American College of Rheumatology Guidance for the Management of Pediatric Rheumatic Disease during the COVID-19 Pandemic: Version 1. *Arthritis Rheumatol.* 72 (11), 1809–1819. doi:10.1002/art.41455

Whitley, L. E., and Chepke, C. (2020). A Pediatric Neurobehavioral Treatment Challenge. *eNeurologicalSci* 20, 100244. doi:10.1016/j.ensci.2020.100244

WHO (2021a). Executive Summary: The Selection and Use of Essential Medicines 2021: Report of the 23rd WHO Expert Committee on the Selection and Use of Essential Medicines. [Online]. Available at: https://www.who.int/publications/i/item/WHO-MHP-HPS-EML-2021.(Accessed 01 2021).

WHO (2021b). *WHO Model List of Essential Medicines for Children.* [Online]. Available at: https://www.who.int/publications/i/item/WHO-MHP-HPS-EML-2021.03. (Accessed 01 2021).

Wu, W., Tang, Z., Chen, J., and Gao, Y. (2019). Pediatric Drug Development in China: Reforms and Challenges. *Pharmacol. Res.* 148, 104412. doi:10.1016/j.phrs.2019.104412

89

Yao, L., Ahmed, M. M., Guyatt, G. H., Yan, P., Hui, X., Wang, Q., et al. (2021). Discordant and Inappropriate Discordant Recommendations in Consensus and Evidence Based Guidelines: Empirical Analysis. *Bmj* 375, e066045. doi:10.1136/bmj-2021-066045

Zhou, P., Wang, X., Zhang, X., Xu, B., Tong, X., Zhou, W., et al. (2021a). Recommendations on Off-Label Use of Intravenous Azithromycin in Children. *Int. J. Clin. Pract.* 75 (7), e14010. doi:10.1111/ijcp.14010

Zhou, Y., Zhang, Y., He, H., and Hua, Z. (2021b). Systematic Review of Off-Label Drug Use in Hospitalized Neonates. *J. Pediatr. Pharm.* 27 (02), 34–39.

**Conflict of Interest:** The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

**Publisher's Note:** All claims expressed in this article are solely those of the authors and do not necessarily represent those of their affiliated organizations or those of the publisher, the editors, and the reviewers. Any product that may be evaluated in this article, or claim that may be made by its manufacturer, is not guaranteed or endorsed by the publisher.

*Copyright © 2022 Meng, Zhou, Lei, Tian, Wang, Liu, Sun, Chen and Li. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) and the copyright owner(s) are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.*

**LEADING ARTICLE**

Pediatr Drugs 2002; 4 (6): 353-359
1174-5878/02/0006-0353/$25.00/0

© Adis International Limited. All rights reserved.

# Unlicensed and Off-Label Drug Use
## Issues and Recommendations

*Sharon Conroy*

Academic Division of Child Health, University of Nottingham, Derbyshire Children's Hospital, Derby, United Kingdom

**Abstract**

Most adult patients would expect to receive only medicines which have been shown to be well tolerated, effective, and of a high quality. The licensing process to which most drugs are subjected gives the best assurance available that these criteria are met. However, every day, children are required to take medicines which are either not licensed, or are being used outside the terms of their license. Consequently, we cannot be sure that they meet the high standards we require for adult patients. This situation exists wherever children are treated across the world, and when they are in hospital or treated at home. The drugs involved are not obscure; they are routinely used drugs, and many are the mainstay of pediatric therapeutics.

The terms 'unlicensed' and 'off-label' should not be taken to imply disapproval, nor incorrect or improper use of drugs, as such prescribing is a vital part of everyday pediatric drug therapy. It is essential because the gold-standard randomized clinical trials supporting adult medicine are often unavailable for children's treatments. Adequate information is not available to ensure that children have timely access to well tolerated and effective medicines with accurate, scientifically justified prescribing information. Many problems arise from this situation, including the lack of availability of appropriate pediatric drug formulations, poor prescribing information, and increased risk of medication errors and unanticipated adverse drug reactions. This situation is unacceptable.

The US has taken the lead to change this situation by providing legislation and incentives to the pharmaceutical industry to perform pediatric clinical trials. Funding has been provided to set up research facilities where trials can be conducted by experienced pediatric investigators using imaginative, innovative, and noninvasive testing methods. The rest of the world should learn from these experiences and follow this lead to ensure that children have the same rights as adults to well tolerated and effective medicines.

The drug licensing process was introduced in the 1960s in the US and the UK as a response to several drug-related tragedies. One was the birth of babies with phocomelia (a shortening or complete absence of the limbs) and other defects, following their mother's ingestion of thalidomide. This drug was known to be very well tolerated in adult patients; however, a lack of knowledge of its effect on the developing fetus following ingestion at a critical point in pregnancy, led to these unfortunate consequences. Another was the 'grey baby' syndrome caused by chloramphenicol due to unawareness of the neonate's inability to metabolize this drug, leading to cyanosis, cardiorespiratory collapse, and death in several babies.

## 1. The Licensing Process

Following these incidents legislation was passed in the US and the UK requiring that new drugs must be shown, by substan-

tial evidence, to be not only well tolerated but also effective in the licensed conditions for use.[1]

Most adults would insist that the drugs they take be supported by the three fundamental standards provided by this process, i.e. drugs are well tolerated, effective, and of a high quality. However, studies[2-18] have demonstrated that every day, children are required to take medicines which are either unlicensed, i.e. they have not been subjected to the licensing process, or are used in an off-label manner, i.e. they are being used outside the terms of the license. The tolerability, efficacy, and quality of these prescriptions cannot therefore be guaranteed.

## 2. Examples of the Use of Unlicensed and Off-Label Medicines

### 2.1 Unlicensed Medicines

Unlicensed medicines must be used when no appropriate

**Exhibit 0027**

formulation of a drug is commercially available. Some examples are outlined in the following sections.

### 2.1.1 Extemporaneous Dispensing

This often involves crushing tablets, or opening capsules and suspending the contents to produce a liquid formulation that a child can take. These preparations have little information regarding bioavailability and stability to support their use.

### 2.1.2 Purchase of Unlicensed Formulations

Purchase of unlicensed products from a 'specials' pharmaceutical manufacturer means that these preparations will be prepared under good manufacturing conditions, and may have undergone quality assurance processes. They will not, however, have been through clinical trials to determine the indications and dose regimens for their use.

### 2.1.3 Purchasing of Drugs Licensed in Other Countries

Drugs that are licensed in other countries, but not in the country in question, may be imported. There is great variation between countries as to product availability. For example, in Australia many preparations available elsewhere in a commercially licensed form are not available.[19]

### 2.1.4 'Named Patient Supplies'

Pharmaceutical companies may supply unlicensed drugs on a 'named-patient' basis; for example, captopril 2mg tablets.

### 2.1.5 Use of Chemicals

This may be necessary to treat rare conditions for which there is no licensed preparation or pharmaceutical grade material available; for example, betaine is used to treat homocystinuria.[20]

## 2.2 Off-Label Drug Use

Off-label drug use refers to use outside the conditions of the product license in terms of the following:

### 2.2.1 Dose

This may need to be lower (or higher) than recommended depending on the age and bodyweight of the child, as drug-handling capacity is constantly changing through the developmental stages of life.

### 2.2.2 Patient Age

Drugs are often not licensed in children under a certain age, or not at all for children, even if they are commonly used.

### 2.2.3 Indication

Drugs may be used to treat childhood illnesses not covered by the license.

### 2.2.4 Route of Administration

Alternative routes of administration may be necessary in children; for example intramuscular injections are avoided whenever possible.

### 2.2.5 Contraindications

These may need to be disregarded. Occasionally, aspirin, for example, is contraindicated in children due to its assocation with Reye's syndrome; however, it is used for its antiplatelet effect in Kawasaki disease.

## 3. The Extent of Unlicensed and Off-Label Drug Use in Children

The extent of unlicensed and off-label drug use in children has been documented and is known to be widespread.[2-18] Table I provides a summary of studies to date. It must be stressed that the terms unlicensed and off-label do not imply disapproval or that the practice is improper, but that pharmaceutical companies have not performed clinical trials and, therefore, evidence of tolerability and efficacy is not available to satisfy licensing purposes.[21,22] Provision is made in law for doctors to prescribe, pharmacists to dispense, and nurses to administer unlicensed and off-label drugs. The responsibility for this prescribing will, however, lie with the prescriber.[23] Statements from UK and US pediatric professional bodies highlight that unlicensed and off-label drug use is a vital part of children's drug therapy.[21-25] This practice should use the best information available and should be justifiable as being in accordance with a respectable, responsible body of professional opinion. A prescriber could be subject to claims of malpractice if he/she denied a patient the best potential treatment just because it was unlicensed or off-label.[22,26,27] UK and US pediatric professional bodies advise that it is generally not necessary to obtain consent from parents/caregivers or child patients, to prescribe or administer such drugs, any more than it is for other prescribed drugs.

## 4. The Nature of Unlicensed and Off-Label Drug Use in Children

Table I shows the common unlicensed and off-label drugs identified in studies to date. It can be seen that many are drugs needed on an everyday basis to treat common childhood ailments, such as analgesics, antibiotics and bronchodilators.

Other studies have concentrated on specific areas of prescribing. A UK study of children treated by their general practitioner in the community showed that of 63 newly marketed drugs, 44 (70%) were prescribed for children during the early postmarketing period, but only 6 (10%) were licensed for patients <12 years of age.[15] The group of drugs most widely used off-label were

© Adis International Limited. All rights reserved.

**Table I.** Summary of the extent of unlicensed and off-label drug use in children

| Clinical setting | Country | No. of patients | No. of prescriptions | UL prescriptions (%) | OL prescriptions (%) | Patients receiving UL or OL drugs (%) | Most common UL/OL drugs | Reference |
|---|---|---|---|---|---|---|---|---|
| General pediatric hospital | US | | 951 | | 7 | | Sedatives, opioid analgesics | Thompson and Heflin[2] |
| PICU | UK | 166 | 862 | 14 | 23 | 70 | Morphine, midazolam, chloral hydrate, dobutamine | Turner et al.[3] |
| A&E | US | 521 | | | | 34 | Bronchodilators, benzodiazepines, opioid analgesics | McKinzie et al.[4] |
| Medical + surgical | UK | 609 | 2013 | 7 | 18 | 36 | Diclofenac, morphine, salbutamol (albuterol), ipratropium | Turner et al.[5] |
| NICU | UK | 70 | 455 | 10 | 55 | 90 | Antibiotics, vitamins, caffeine | Conroy et al.[6] |
| Medical + surgical | Australia | 200 | 735 | 16 (UL + OL) | | 36 | Metoclopramide, bowel prep. (colonlytely), ondansetron, clonidine, chloral hydrate | Turner[7] |
| Various specialties | UK | 1046 | 4455 | 35 (UL + OL) | | 48 | | Turner et al.[8] |
| Medical | Europe | 624 | 2262 | 7 | 39 | 67 | Analgesics, bronchodilators, inhaled corticosteroids | Conroy et al.[9] |
| NICU | France | 40 | 257 | 10 | 63 | | | Avenel et al.[10] |
| General practice | UK | 1175 | 3347 | 0.3 | 11 | | Systemic antibiotics, antiasthmatics | McIntyre et al.[11] |
| Medium + intensive care | The Netherlands | 238 | 2139 | 48 | 18 | 92 | | 't Jong et al.[12] |
| General practice | France | 989 | 2522 | 4 | 29 | 56 | Eye-drops, topical skin preps (salbutamol, hepatitis B vaccine, acetylcysteine) | Chalumeau et al.[13] |
| Ambulatory day unit | Israel | 132 | 222 | 8 | 26 | 42 | Ferrous carbonate, thyroxine, cisapride, salbutamol | Gavrilov et al.[14] |

**A&E** = accident and emergency; **NICU** = neonatal intensive care unit; **OL** = off-label; **PICU** = pediatric intensive care unit; **UL** = unlicensed.

antiepileptic agents, with 30% of children treated for epilepsy receiving off-label drugs. It has also been estimated that there are many children prescribed off-label antidepressants in general practice.[16]

One-third of analgesic agents administered to children in hospital have been shown to be off-label, with paracetamol being the most common of these.[17] This was usually in terms of high off-label doses which were recommended for postoperative pain relief by a national pediatric formulary. These were calculated using the child's bodyweight, and resulted in doses greater than the licensed doses, which are based on age bands. High percentages of nonsteroidal anti-inflammatory drugs and opioid analgesics used were also off-label.

Sixty percent of antidotes recommended for the treatment of human poisonings were found to be unlicensed or off-label.[18]

Fourteen unlicensed antidotes had only been used in animal experiments and a small number of human patients in certain poison centers.

## 5. Problems Resulting from Unlicensed and Off-Label Drug Use

### 5.1 Lack of Appropriate Formulations

Children are usually unable to swallow tablets and capsules. Palatable liquid formulations are needed to facilitate administration and accurate measurement of pediatric doses, but often these are not commercially available. This leads to a need for extemporaneous dispensing or purchase of unlicensed preparations.

© Adis International Limited. All rights reserved.

Pediatr Drugs 2002; 4 (6)

### 5.2 Choice of Dose

This is a problem when there is no licensed pediatric dose. Prescribing doses that are too small may result in suboptimal therapy, or overdosing may lead to adverse drug reactions. Many pediatric dose reference sources are available, but in some cases provide conflicting advice. They tend to be based on local practice and experience, not hard evidence. Collaboration between the Neonatal and Paediatric Pharmacists Group and the Royal College of Paediatrics and Child Health in the UK has resulted in the publication of 'Medicines for Children'.[24,28] This publication reflects the current use of drugs in children; unlicensed or off-label drugs are highlighted. It is a useful reference source and is supported by extensive peer review. However, it does not take the place of information gained from properly conducted clinical trials.

### 5.3 Adverse Drug Reactions

Probably the greatest concern created by the use of unlicensed and off-label drugs is that of unanticipated adverse drug reactions (ADRs). Age-dependent changes in pharmacokinetics and pharmacodynamics may not be known when a drug is used in an unlicensed or off-label manner. Children experience different diseases compared with adults, which may create differences in drug handling. The effects of drugs on growth and development are also important. It has been suggested that there may be a higher incidence of ADRs to drugs used in an unlicensed or off-label manner. While this is not clear, it is a cause for concern.[8,27] Drugs tested in clinical trials are likely to have ADRs detected at an early stage due to close monitoring of patient responses. Drug use in the everyday clinical setting is unlikely to be monitored to this extent; ADRs may be missed or observed too late.

### 5.4 Medication Errors

Different reference sources quote doses in different ways, therefore to minimize the risk of prescribing errors, it is essential to be familiar with the way the reference works. A lack of appropriate pediatric formulations complicates administration. Frequently, a small proportion of an injection vial content is required to administer the calculated dose. It is often possible to measure a 10 times or even 100 times overdose for a small baby from one vial, when there is no appropriate dosage strength available for these patients. Fatalities have occurred as a result.[29,30]

### 5.5 Patient Information Leaflets

Patient information leaflets (PILs) reflect the information in the license. If a drug is being used in an off-label manner then the PIL may contain information to concern a parent/caregiver. Counseling by a doctor or pharmacist who has the knowledge to explain this issue, should allay fears; however, many doctors and pharmacists are unaware when the prescriptions they write or dispense are off-label. Options may be to produce generic PILs, explaining why it is necessary to use unlicensed and off-label medicines,[25] or for manufacturers to change the PIL statement to 'this medicine may sometimes be used in children' to avoid unnecessary worry.[31]

### 5.6 Lack of Postmarketing Surveillance

Drugs undergo extensive postmarketing surveillance in order to detect ADRs, which may only become apparent on widespread use. This relies on spontaneous reporting by prescribers who may be inhibited to report when using unlicensed and off-label drugs. However, they are encouraged by the regulatory bodies to report in order to detect unrecognized interactions and adverse effects.[22,32]

### 5.7 Interface Issues

In order to maintain an uninterrupted supply of children's medicines, which may have had to be purchased from a 'specials' manufacturer or prepared extemporaneously, good communication between the hospital and community pharmacies is essential. Similarly, it is useful if hospital pediatricians inform general practitioners when asking them to continue prescribing unlicensed or off-label drugs for the child at home.

## 6. Difficulties in Conducting Clinical Trials in Children

Consent to participate in a clinical trial must be obtained based on adequate, clear information which must be voluntary, and the individual giving consent must be legally 'competent' to do so, i.e. they must have the intellectual capacity to make a decision and have the standing in law to take it. Children aged 16 years and older are presumed to be able to consent in their own right for therapeutic purposes, in the absence of any factors to suggest they are not competent. Children <16 years of age may still be legally competent to consent to treatment, where the practitioner judges them to be mature enough to understand the risks and benefits and to make a decision.[23]

It is popularly thought of as 'unethical' to test drugs in children, particularly in studies that may not directly benefit them, and the decisions of ethical committees have reflected this for some years. However, this attitude seems to be changing as the need for children to have access to well tolerated, effective med-

© Adis International Limited. All rights reserved.                                                          Pediatr Drugs 2002; 4 (6)

icines, and awareness of the need for clinical trials grows.[33] It is unethical to continue to subject children to using drugs in ways that we cannot be confident are optimal. Many pediatricians are highlighting the fact that given full information, most children and parents would support properly conducted studies of new and existing medicines rather than continue with the practice of using unlicensed and off-label drugs.[34,35]

Practical difficulties such as venepuncture are suggested to be an obstacle to testing drugs in children. However, by performing trials in centers involving experienced pediatric clinical investigators, innovative, imaginative, and noninvasive techniques can be increasingly employed to minimize the sampling needed. Such techniques include the use of population pharmacokinetics, whereby individual children provide fewer samples of blood, and the use of breath-testing techniques, whereby drug/disease state interactions can be studied using breath samples for analysis.[36]

There is also the hard economic truth that the market for drugs in children is comparatively small. Drug trials are expensive to perform and the recompense gained by testing a drug in children is likely to be limited. While drug companies are allowed to put a disclaimer in their license stating 'insufficient evidence to support use in children', they are unlikely to volunteer to perform expensive trials without an incentive, be that legal or financial.[37]

### 7. Developments in the US

In the early 1990s a number of mainly voluntary measures were introduced by the Food and Drug Administration (FDA) to encourage the pharmaceutical industry to submit pediatric labeling information.[38] Unfortunately, these initiatives were not sufficient to improve the situation substantially. The FDA Modernization Act (FDAMA) was subsequently introduced in 1997.[39] This provided economic incentives in the form of 6 months' extension of any existing exclusivity or patent protection on a drug for which the FDA has requested pediatric studies, and the manufacturer has conducted such studies in accordance with the FDAMA requirements. The FDA also introduced the Pediatric Rule in 1999 requiring that manufacturers of certain new drugs conduct studies to provide adequate labeling for their use in children.[38] Such drugs include those likely to be used in a substantial number of children, or those offering a 'meaningful therapeutic benefit' to children over existing treatments. 'Meaningful therapeutic benefit' was defined as a significant improvement in the treatment, diagnosis, or prevention of a disease, compared with marketed products adequately labeled for that use in the relevant pediatric population.[38] This statement is somewhat open to interpretation. The legislation has resulted in, for example, a large

number of drugs to treat cardiovascular disease being studied. While needed in children, these are not treatments required for major causes of morbidity, and there is no need for multiple choices of, for example, antihypertensive agents, of which 22 are being studied under FDAMA.[40] Stricter controls are needed to ensure that only drugs of clinical value to children are studied. However, despite such limitations the effects of this legislation to January 2001 have done much to generate clinical studies and useful prescribing information for children. In <3 years, 58 pediatric studies have been conducted and exclusivity granted to 25 drugs. Drugs to treat a variety of conditions, e.g. gastroesophageal reflux, diabetes mellitus, pain, and asthma have, or soon will have, pediatric use information in their licenses. However, there are still gaps in the information being provided, e.g. older drugs that are not eligible for the financial incentive of enhanced patent protection, drugs with low sales, and drugs for neonates are being neglected. Amendments to the FDAMA are planned, including consideration of how to address these deficiencies.

The US National Institute of Child Health and Human Development has provided funding to establish a Pediatric Pharmacology Research Unit Network.[41] This provides a platform for the conduct of clinical trials of old and new drugs directed towards pediatric licensing. Collaboration between the 13 research units making up the network, the FDA, and the pharmaceutical industry is encouraged, and resources provided for pharmacokinetic and pharmacodynamic research.[41] Their primary objective is to increase the number of drugs licensed for use in children until all drugs used in children are licensed.

### 8. Developments in Europe

In September 1997 the 'European guidance on clinical investigation of medicinal products in children' was published.[42] This provides useful advice to the pharmaceutical industry regarding when and how drugs should be tested in children. The document carries no legislative power, and a recent study suggested that it is not having a significant effect.[43] Between January 1995 and April 1998, 45 drugs were licensed through the European Medicines Evaluation Agency; 29 were of potential use in children, but only 10 of these (34%) were licensed for such use.[43]

Networks of experienced pediatric clinical investigators have been established, such as the European Network for Drug Investigation in Children.[33,44] These collaborators aim to facilitate clinical and scientific research into medicines in children, raise awareness of the issue, and set up multicenter investigations.[33] The Committee on Safety of Medicines in the UK has set up pediatric working groups to develop strategies to ensure that children are considered throughout the regulatory processes.[33] Pe-

© Adis International Limited. All rights reserved.
Pediatr Drugs 2002; 4 (6)

diatric clinical pharmacology training posts are beginning to be established in the UK to address the fact that there are only three pediatric clinical pharmacologists at the current time. In December 2000, the European Union Council recognized pediatric medicines as a high priority and invited the regulatory body to identify measures to ensure that children have access to medicines that have been shown to be suitable for their use.[33] This has resulted in the publication of a consultation document 'Better Medicines for Children', with the the aim of improving the availability of suitable medicines for children.[45] It is hoped that this will result in legislation and other actions to improve the situation.

Interest and commitment to the issue is therefore developing in Europe; however, action is urgently required to address the situation and to learn from the lead taken in the US.

### 9. Developments in Australia

The situation has also been highlighted in Australia where families are financially disadvantaged if prescribed unlicensed and off-label medicines. Recommendations to improve the situation have been prepared reflecting the actions taken in the US and Europe.[46,47]

### 10. International Conference on Harmonization

In July 2000, the International Conference on Harmonization (ICH), including representatives from Europe, the US, and Japan, issued ICH Topic E11 Clinical Investigation of Medicinal Products in the Paediatric Population.[48] This guidance has the goal of encouraging and facilitating timely pediatric medicinal product development internationally. It provides an outline of critical issues in pediatric drug development and approaches to safe, efficient and ethical study. Recommendations on timing and types of studies, an agreement regarding age category definitions, and a section on the ethics of pediatric clinical investigation are included in the guidance.

### 11. Conclusions

The use of unlicensed and off-label drugs in children is widespread. Day-to-day problems and dilemmas for healthcare professionals and parents caring for children can result. Children have the same rights to well tolerated and effective high-quality medicines as adults do. To continue with the current situation is unacceptable and a direct contravention of these rights. Progress in the US is being made, and discussions and guidelines are proliferating elsewhere. Urgent action is required by governments, healthcare professionals and caregivers alike to change this long-standing situation.

### References

1. Kauffman RE. Status of drug approval processes and regulation of medications for children. Curr Opin Pediatr 1995; 7: 195-8
2. Thompson DF, Heflin NR. Frequency and appropriateness of drug prescribing for unlabeled uses in pediatric patients. Am J Hosp Pharm 1987; 44: 792-4
3. Turner S, Gill A, Nunn T, et al. Use of off-label and unlicensed drugs in paediatric intensive care units. Lancet 1996; 347: 549-50
4. McKinzie JP, Wright SW, Wrenn KD. Pediatric drug therapy in the emergency department: does it meet FDA-approved prescribing guidelines. Am J Emerg Med 1997; 15: 118-21
5. Turner S, Longworth A, Nunn AJ, et al. Unlicensed and off label drug use in paediatric wards: prospective study. BMJ 1998; 316: 343-5
6. Conroy S, McIntyre J, Choonara I. Unlicensed and off label drug use in neonates. Arch Dis Child Fetal Neonatal Ed 1999; 80: F142-5
7. Turner S. Unregistered and off-label drug use in paediatric inpatients. Aust J Hosp Pharm 1999; 29: 265-8
8. Turner S, Nunn AJ, Fielding K, et al. Adverse drug reactions to unlicensed and off-label drugs on paediatric wards: a prospective study. Acta Paediatr 1999; 88: 965-8
9. Conroy S, Choonara I, Impicciatore P, et al. Survey of unlicensed and off label drug use in paediatric wards in European countries. BMJ 2000; 320: 79-82
10. Avenel S, Bomkratz A, Dassieu G, et al. The incidence of prescriptions without marketing product license in a neonatal intensive care unit [in French]. Arch Pediatr 2000; 7: 143-7
11. McIntyre J, Conroy S, Avery A, et al. Unlicensed and off label prescribing of drugs in general practice. Arch Dis Child 2000; 83: 498-501
12. 't Jong GW, Vulto AG, de Hoog M, et al. Unapproved and off-label use of drugs in a children's hospital [letter]. N Engl J Med 2000; 343: 1125
13. Chalumeau M, Treluyer JM, Salanave B, et al. Off label and unlicensed drug use among French office based paediatricians. Arch Dis Child 2000; 83: 502-5
14. Gavrilov V, Lifshitz M, Levy J, et al. Unlicensed and off-label medication use in a general pediatrics ambulatory hospital unit in Israel. Isr Med Assoc J 2000; 2: 595-7
15. Wilton LV, Pearce G, Mann RD. The use of newly marketed drugs in children and adolescents prescribed in general practice. Pharmacoepidemiol Drug Saf 1999; 8 Suppl. 51: S37-45
16. Martin RM, Wilton LV, Mann RD, et al. Unlicensed and off label drug use for paediatric patients: general practitioners prescribe SSRIs to children off label [letter]. BMJ 1998; 317: 204
17. Conroy S, Peden V. Unlicensed and off label analgesic use in paediatric pain management. Paediatr Anaesth 2001; 11: 431-6
18. Lifshitz M, Gavrilov V, Gorodischer R. Off-label and unlicensed use of antidotes in paediatric patients. Eur J Clin Pharmacol 2001; 56: 839-41
19. Turner S. Unlicensed and off-label drug use in Australia. Paediatr Perinatal Drug Ther 2000; 4: 24-7
20. Turner S, Nunn AJ, Choonara I. Unlicensed drug use in children in the UK. Paediatr Perinatal Drug Ther 1997; 1: 52-5
21. Committee on Drugs. Unapproved uses of approved drugs: the physician, the package insert, and the FDA. Pediatrics 1978; 62: 262-4
22. Committee on Drugs. Unapproved uses of approved drugs: the physician, the package insert, and the FDA: subject review. Pediatrics 1996; 98: 143-5
23. Bendall C. The prescription and supply of drugs in children from a legal viewpoint. Paediatr Perinatal Drug Ther 1999; 3: 49-54
24. Royal College of Paediatrics and Child Health, and the Neonatal and Paediatric Pharmacists Group. Medicines for children. London: RCPCH Publications Limited on behalf of the RCPCH and the Neonatal and Paediatric Pharmacists Group, 1999
25. Joint RCPCH/NPPG Standing Committee on Medicines. The use of unlicensed medicines or licensed medicines for unlicensed applications in paediatric practice: policy statement. London: Royal College of Paediatrics and Child Health, 2000
26. Cote CJ. Adverse drug reactions and the package insert. Acta Paediatr 1999; 88: 925-7

© Adis International Limited. All rights reserved.

27. Cote CJ, Kauffman RE, Troendle GJ, et al. Is the "therapeutic orphan" about to be adopted. Pediatrics 1996; 98: 118-23

28. Hull D. Birth of a formulary. Arch Dis Child 1999; 81: 197-201

29. Koren G, Barzilay Z, Greenwald M. Tenfold errors in administration of drug doses: a neglected iatrogenic disease in pediatrics. Pediatrics 1986; 77: 848-9

30. Burchell HB. A misplaced decimal of digitalis dose and tiny Jose Eric Martinez dies. Am J Cardiology 1997; 80: 1121-2

31. Choonara I, Nunn T, Hull D. Medicines for children [editorial]. J Pharm Med 1995; 5: 95-6

32. Committee on Safety of Medicines and Medicines Control Agency. ADRs with unlicensed use. Curr Probl Pharmacovig 1997; 23: 12

33. Stephenson T. Medicines for children: the last century and the next. Arch Dis Child 2001; 85: 177-9

34. Schaad UB. Drug therapy in children: still more art than science. Curr Opin Infect Dis 2001; 14: 301-2

35. Essex C, Rylance G. Children have rights to medicines [letter]. BMJ 1997; 315: 62

36. Conroy S, McIntyre J, Choonara I, et al. Drug trials in children: problems and the way forward. Br J Clin Pharmacol 2000; 49: 93-7

37. Kmietowicz Z. Drug industry is unwilling to run trials in children [news]. BMJ 2000; 320: 1362

38. Department of Health and Human Services, US Food and Drug Administration. The pediatric exclusivity provision. Rockville (MD): Status report to congress, 2001 Jan

39. The Food and Drug Administration Modernization Act of 1997. Public Law 105-115, 105th Congress. Rockville (MD); 1997 Nov: 1-21

40. 't Jong GW, van den Anker JN, Choonara I. FDAMA's written request list: medicines for children [letter]. Lancet 2001; 357: 398

41. Kearns GL. The pediatric pharmacology research unit network: proof of concept. Paediatr Perinatal Drug Ther 1999; 3: 9-14

42. European Agency for the Evaluation of Medicinal Products. Note for guidance on clinical investigation of medicinal products in children. London: European Agency for the Evaluation of Medicinal Products, 1997

43. Impicciatore P, Choonara I. Status of new medicines approved by the European Medicines Evaluation Agency regarding paediatric use. Br J Clin Pharmacol 1999; 48: 15-8

44. Bonati M, Choonara I, Hoppu K, et al. Closing the gap in drug therapy [letter]. Lancet 1999; 353: 1625

45. European Commission Consultation. 'Better medicines for children'. Proposed regulatory action on paediatric medicinal products. [online]. Available from URL: http://pharmacos.eudra.org/F2/ [Accessed 2002 May 23]

46. Smith K. Registering paediatric medicines in Australia. Regul Affairs J 1998; 9: 304-8

47. The Australian Association of Paediatric Teaching Centres. Pharmaceuticals for children. Deakin West (ACT): Australian Association of Paediatric Teaching Centres, 1997

48. The European Agency for the Evaluation of Medicinal Products. Note for guidance on clinical investigation of medicinal products in the paediatric population. London: European Medicines Evaluation Agency, 2000: CPMP/ICH/2711/99

Correspondence and offprints: Mrs *Sharon Conroy*, Academic Division of Child Health, University of Nottingham, Derbyshire Children's Hospital, Clinical Sciences Building, Uttoxeter Road, Derby, DE22 3NE, UK.
E-mail: sharon.conroy@nottingham.ac.uk

© Adis International Limited. All rights reserved.

Pediatr Drugs 2002; 4 (6)

Research

Original Investigation | HEALTH CARE REFORM

# Association of Off-label Drug Use and Adverse Drug Events in an Adult Population

Tewodros Eguale, MD, PhD; David L. Buckeridge, MD, PhD; Aman Verma, PhD; Nancy E. Winslade, PharmD; Andrea Benedetti, PhD; James A. Hanley, PhD; Robyn Tamblyn, PhD

**IMPORTANCE** Off-label use of prescription drugs has been identified as an important contributor to preventable adverse drug events (ADEs) in children. Despite concerns regarding adverse outcomes, to date, no systematic investigation of the effects of off-label drug use in adult populations has been performed.

**OBJECTIVE** To monitor and evaluate off-label use of prescription drugs and its effect on ADEs in an adult population.

**DESIGN, SETTING, AND PARTICIPANTS** A cohort of 46 021 patients who received 151 305 incident prescribed drugs was assembled from primary care clinics in Quebec, Canada, using the Medical Office of the XXIst Century electronic health record, which supports documentation of treatment indications and treatment outcomes. Prescriptions dispensed from January 1, 2005, through December 30, 2009, were followed up from the date of the prescription to the date the drug use was discontinued, the end of treatment, or the end of follow-up (December 30, 2010). Data were analyzed from January 5, 2012, to March 15, 2015.

**EXPOSURES** Off-label prescription drug use with and without strong scientific evidence.

**MAIN OUTCOMES AND MEASURES** Adverse drug events in off-label use with and without strong scientific evidence. Analysis used multivariate marginal Cox proportional hazards regression for clustered data with the drug as the unit of analysis.

**RESULTS** A total of 3484 ADEs were found in the 46 021 study patients, with an incidence rate of 13.2 per 10 000 person-months. The rate of ADEs for off-label use (19.7 per 10 000 person-months) was higher than that for on-label use (12.5 per 10 000 person-months) (adjusted hazard ratio [AHR], 1.44; 95% CI, 1.30-1.60). Off-label use lacking strong scientific evidence had a higher ADE rate (21.7 per 10 000 person-months) compared with on-label use (AHR, 1.54; 95% CI, 1.37-1.72). However, off-label use with strong scientific evidence had the same risk for ADEs as on-label use (AHR, 1.10; 95% CI, 0.88-1.38). The risks for ADEs were higher for drugs approved from 1981 to 1995 (14.4 per 10 000 person-months; AHR, 1.62; 95% CI, 1.45-1.80) and for those used by women (14.3 per 10 000 person-months; AHR, 1.17; 95% CI, 1.06-1.28), patients receiving 5 to 7 drugs (12.1 per 10 000 person-months; AHR, 3.23; 95% CI, 2.66-3.92), and patients receiving cardiovascular drugs (15.9 per 10 000 person-months; AHR, 3.30; 95% CI, 2.67-4.08) and anti-infectives (66.2 per 10 000 person-months; AHR, 6.33; 95% CI, 4.58-8.76). Patients with a 1-unit increase in the continuity of care index had a 19% increase in ADEs (AHR, 1.19; 95% CI, 1.12-1.26).

**CONCLUSIONS AND RELEVANCE** Off-label use of prescription drugs is associated with ADEs. Caution should be exercised in prescribing drugs for off-label uses that lack strong scientific evidence. Future electronic health records should be designed to enable postmarket surveillance of treatment indications and treatment outcomes to monitor the safety of on- and off-label uses of drugs.

Invited Commentary page 63

Supplemental content at jamainternalmedicine.com

**Exhibit 0028**

*JAMA Intern Med.* 2016;176(1):55-63. doi:10.1001/jamainternmed.2015.6058
Published online November 2, 2015.

**Author Affiliations:** Author affiliations are listed at the end of this article.

**Corresponding Author:** Tewodros Eguale, MD, PhD, Department of Epidemiology, Biostatistics, and Occupational Health, McGill University, 1140 Pine Ave W, Morrice House, Montreal, QC H3A 1A3, Canada (tewodros.eguale@mail.mcgill.ca and tewodros.eguale@mcphs.edu).

55

Copyright 2016 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

O ff-label prescribing of drugs is common[1,2] and has been identified as a potentially important contributor to preventable adverse drug events (ADEs). Significant deleterious effects can occur with off-label use of some drugs, such as cardiac valve damage with fenfluramine and phentermine (fen-phen),[3] status epilepticus with tiagabine hydrochloride,[4] thrombocytopenia with quinine sulfate,[5] and thromboembolic events with recombinant factor VIIa.[6,7] Despite concerns about adverse outcomes, no systematic investigation of the effect of real-life off-label use on adverse events has been performed.

The Institute of Medicine and drug regulatory agencies have envisioned a postmarket surveillance system in which patterns of drug use, indications for the use (on- and off-label), and associated ADEs could be tracked.[8-10] However, an explicit link between prescribed drugs and their indication is rarely documented, making it challenging to measure off-label use and its effects.[11] Recently, methods to support the documentation of treatment indication, reasons for discontinuation of treatment orders, and ADEs have been developed, and evidence supports *requiring* these elements in electronic prescription.[12,13] These new features provide a unique opportunity to monitor and evaluate off-label use and its effect on ADEs systematically. The results from such monitoring can provide important guidance to initiatives aimed at regulating off-label use and strengthening the role of drug regulatory bodies (eg, the US Food and Drug Administration and Health Canada).[14,15]

## Methods

### Context

The study was conducted in Quebec, Canada, a province that provides health insurance for all 8.5 million residents. In 2003, the Medical Office of the XXIst Century (MOXXI), a community-based clinical information system, was created to link beneficiary, medical billing, and pharmacy claim data to create a longitudinal electronic health record (EHR) for patients.[16] Evidence of validity for the data has been shown, and these data have been used frequently for health services and epidemiologic research.[17] One hundred thirteen primary care physicians participate in the MOXXI research program, and these physicians work in office-based practices in Montreal or Quebec City. The MOXXI data overrepresent older patients and patients with frequent physician visits.[16]

In the MOXXI EHR, physicians must document the treatment indication for each new electronic prescription, the reasons for dose changes and drug discontinuation orders, and the nature of any ADEs (**Figure 1** and the eFigure in the Supplement). After a new prescription is entered through the MOXXI system, the patient may fill the prescription at a pharmacy and may experience an ADE. At the next visit to a MOXXI physician, if the prescription is not renewed, the reason for discontinuation must be documented within the MOXXI system. In this way, the reasons for all discontinuations of drug use are recorded. The reasons for discontinuation are grouped into the following 5 domains: safety (eg, adverse drug reaction, allergic response, or drug interaction), effectiveness (eg, ineffective treatment, no longer necessary), prescribing or dispensing errors, factors as-

sociated with adherence to the medication regimen (eg, simplifying treatment, substitution of a less expensive drug), and factors such as patient request and discontinuations by other physicians. The ADEs are documented using a prepopulated, drug-specific ADE list that is mapped to the Medical Dictionary for Regulatory Activities (MedDRA) classification. Physicians can also search from the global list of ADEs or can use free text to enter a specific ADE description. To support clinical decision making, treatment indications automatically populate the patient's list of medical problems. Prior failed treatment and reasons for discontinuations of drug treatment (eg, ADE, hypotension) are listed under each indication.

### Design and Study Population

To evaluate the association between off-label use and ADEs, a prospective cohort of 46 021 adult patients (aged ≥18 years) with an incident prescription for a drug was assembled from January 1, 2005, through December 30, 2009. A drug prescription was considered incident if the same drug had not been prescribed or dispensed in the past 12 months. Prescriptions were followed up from the date of the prescription to the date the drug use was discontinued, the end of treatment, or the end of follow-up (December 30, 2010). The MOXXI research program was approved by the institutional review board of McGill University. Patients and physicians provided written informed consent to be part of the research program.

### Adverse Drug Events

*Adverse drug events* were defined as discontinuations of drug use made by physicians owing to an adverse drug reaction or an allergic reaction. Prior evaluation of the validity of these data found an 85.7% concordance between the electronic documentation of ADEs with the medical record.[13] The ADEs were categorized using MedDRA, which includes system organ classes and preferred terms. The system organ classes represent the highest hierarchy that provides the broadest concept for data retrieval and analysis, and preferred terms provide a distinct descriptor of sign, symptom, diagnosis, or surgical or medical procedure.

### Risk for ADEs and Off-label Use

The indication recorded for each prescription was classified as on-label or off-label use according to the Health Canada drug approval database.[18] Compared with the medical record, the sensitivity (completeness) and the positive predictive value (correctness) of the documentation of electronic treatment indication in the MOXXI system were 98.5% and 97.0%, respectively.[12] Indications were considered approved by Health Canada (or on-label) if they could be matched to the therapeutic indication reported in the drug's package insert as of December 2010. Any indication that could not be matched to the labeled indication was considered off-label. For each off-label drug indication, the level of evidence supporting the drug's overall efficacy was categorized using the DrugPoints System (Thomson Reuters). Strong evidence exists when (1) the drug is effective or favors efficacy for the off-label treatment indication, (2) the drug is recommended for at least most patients with the off-label treatment indication, and (3) the

Copyright 2016 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

Off-label Drug Use and Adverse Drug Events in Adults                                    **Original Investigation** Research

---

Figure 1. Documentation in the Medical Office of the XXIst Century Electronic Health Record (MOXXI EHR)

Reasons for discontinuation



Adverse drug reaction



If a medication (eg, gabapentin) is discontinued, the physician must choose a reason for discontinuing use of the drug. If the reason selected is an adverse drug event, the reaction is documented. TID indicates 3 times per day.

---

studies used to evaluate efficacy and the strength of evidence include at least 1 randomized controlled trial.[2,19] Accordingly, we created the following 2 variables: (1) on- or off-label use and (2) off-label use with and without strong scientific evidence. In eTable 1 in the Supplement, we tabulated selected drugs and off-label indications with and without strong scientific evidence.

We measured *drug class* as a potential risk factor for ADEs because the central nervous system (CNS), cardiovascular, and anti-infective classes were more often implicated in ADEs.[20,21] *Drug age*, defined as the year the drug was approved for marketing, was included because ADEs were more likely to be reported with recently approved drugs than older drugs.[22] Drug age was categorized into the following 3 groups: before 1981; 1981 through 1995; and after 1995 (recent approval).

For patient characteristics, we included age and measures of comorbidity (Charlson comorbidity index; range, 0-25; 1 or greater indicates increased risk for death)[23] because older

patients[6,21] and those with more than 1 comorbidity[24] may have a higher risk for ADEs. Patient sex was included because higher rates of ADEs were reported for women than men.[25,26] The number of drugs the patient was taking was included because it was shown to be the most important risk factor for ADEs.[20,27,28] The continuity of care (COC) index was included to correct for possible surveillance bias in the opportunity to detect ADEs because patients with better continuity have fewer emergent visits,[29] possibly because ADEs and disease exacerbations are more likely to be detected and averted. The COC index was defined as the ratio of the number of a patient's visits to the primary care physician to the square root of the patient's total outpatient visits and calculated using the medical services claims.[30]

## Statistical Analysis

Data analysis was performed from January 5, 2012, to March 15, 2015. Incidence rates of discontinuations of drug use ow-

**Copyright 2016 American Medical Association. All rights reserved.**

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

100

Table 1. Drug and Patient Characteristics

| Characteristic | Data[a] |
|---|---|
| Prescription (n = 151 305) | |
| On-label use | 133 458 (88.2) |
| Off-label use | 17 847 (11.8) |
| With strong evidence | 3416 (2.3) |
| Without strong evidence | 14 431 (9.5) |
| AHFS class | |
| Gastrointestinal tract | 7811 (5.2) |
| Central nervous system[b] | 38 370 (25.4) |
| Ear, nose, and throat | 7552 (5.0) |
| Hormone and synthetics | 20 589 (13.6) |
| Formulary restricted[c] | 5069 (3.4) |
| Anti-infective | 15 719 (10.4) |
| Autonomic[d] | 8087 (5.3) |
| Cardiovascular | 34 860 (23.0) |
| Other[e] | 13 248 (8.8) |
| Drug (n = 630) | |
| Before 1981 | 292 (46.3) |
| 1981-1995 | 158 (25.1) |
| 1996-2005 | 180 (28.6) |
| Patient (n = 46 021) | |
| Age, y | |
| 18-64 | 29 712 (64.6) |
| ≥65 | 16 309 (35.4) |
| Mean (SD) [range] | 58.2 (16.8) [18.5-101.0] |
| Median (IQR) | 59.5 (47.5-70.5) |
| Sex | |
| Men | 18 039 (39.2) |
| Women | 27 982 (60.8) |
| Charlson comorbidity index[f] | |
| 0 | 34 638 (75.3) |
| ≥1 | 11 383 (24.7) |
| No. of drugs used | |
| 1-2 | 15 686 (34.1) |
| 3-4 | 10 993 (23.9) |
| 5-7 | 10 243 (22.3) |
| ≥8 | 9099 (19.8) |
| Continuity of care[g] | |
| Mean (SD) | 1.09 (0.64) |
| Median (IQR) | 1.00 (0.88) |

Abbreviations: AHFS, American Hospital Formulary Service; IQR, interquartile range.

[a] Unless otherwise indicated, data are expressed as number (percentage) of prescribed drugs. Percentages have been rounded and may not total 100.

[b] For example, includes antidepressants, antipsychotics, anticonvulsants, anxiolytics, and antimigraine medicines.

[c] Also known as conditional listing, used in relation to drug expenditure policy, whereby the prescribing physician needs to justify the clinical need before the costs of therapy will be covered.

[d] Includes drugs such as albuterol sulfate, terbutaline sulfate, and cyclobenzaprine hydrochloride.

[e] Includes antihistamines, blood thinners and anticoagulants, and antineoplastics.

[f] Ranges from 0 to 25; 1 or greater indicates increased risk for death.

[g] Defined as the ratio of the number of a patient's visits to the primary care physician to the square root of the patient's total number of outpatient visits calculated using the medical services claims.

ing to ADEs were calculated by dividing the number of incident cases by the number of person-months of follow-up, both overall and by exposure classification. Person-months were calculated per drug-patient pair starting from the first day of prescription to the discontinuation of drug use, the end of treatment, or the end of the study (December 30, 2010). The hazard ratio (HR) was calculated with the drug as the unit of analysis, and drugs were nested within patients. In univariate and multivariate analyses, we fit a marginal Cox proportional hazards regression model using a robust sandwich covariance estimator to construct 95% CIs that accounted for intracluster dependence.[31] The 2 off-label variable indicators were included in the Cox proportional hazards regression model separately. Proportionality assumptions were tested by examining covariate-time interaction terms and Schoenfeld and Martingale residuals.[32]

## Results

A total of 46 021 patients received 151 305 incident prescriptions from January 1, 2005, through December 30, 2009. Off-label use was reported in 17 847 prescriptions (11.8%); in 14 431 of these cases (80.9%), the off-label uses lacked scientific evidence (Table 1). Mean (SD) patient age was 58.2 (16.8) years. Patients were predominantly women (27 982 [60.8%]); 11 383 patients (24.7%) had a Charlson comorbidity index of 1 or greater, and 19 342 (42.0%) used more than 4 unique drugs during the study period. Of the 630 prescribed drugs, 292 (46.3%) had been approved for market before 1981, whereas 180 (28.6%) were approved after 1995. The mean (SD) COC index was 1.09 (0.64). The follow-up time for a prescription ranged from 1 day to almost 6 years (median, 386 days; mean, 530 days).

The distribution of off-label use (with and without strong scientific evidence) by American Hospital Formulary Service drug class is shown in eTable 2 in the Supplement. For the 38 370 CNS drugs found, off-label use and off-label use without scientific evidence were reported in 9814 of 38 370 prescribed drugs (25.6%) and 8157 prescribed drugs (21.3%), respectively. Among the CNS drugs, off-label use was highest for anticonvulsants (2158 [65.6%]), antipsychotics (669 [51.4%]), and antidepressants (3657 [33.5%]); off-label use without strong scientific evidence for these drugs was reported in 2116 (64.3%), 668 (51.3%), and 3063 (28.1%), respectively.

Physicians discontinued 3484 drug treatments owing to ADEs. Most ADEs (2456 [70.5%]) occurred in the first year of treatment and, among these, 1228 (50%) occurred in the first 3 months. eTable 3 in the Supplement shows selected drugs with high levels of off-label use and the proportion of drugs with discontinuation of use owing to ADEs. The overall incidence rate of ADEs for all drugs was 13.2 per 10 000 person-months. The ADE rate for on-label use was lower (12.5 per 10 000 person-months) than for off-label use (19.7 per 10 000 person-months), a 44% increase in the risk for ADEs with off-label use (adjusted HR [AHR], 1.44; 95% CI, 1.30-1.60) (Table 2 and Figure 2). When off-label use was stratified to off-label use with and without strong scientific evidence, the ADE rates were 13.2 and 21.7 per 10 000 person-months, respectively. Com-

Copyright 2016 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

**Table 2. Association of ADEs and Drug and Patient Characteristics**

| Characteristic | No. of ADEs | Person-months, No. per 10 000 | IR per 10 000 Person-months | HR (95% CI)[a] Univariate | HR (95% CI)[a] Multivariate Adjusted[b] |
|---|---|---|---|---|---|
| On-label use | 2968 | 237.5 | 12.5 | 1 [Reference] | 1 [Reference] |
| Off-label use | 516 | 26.2 | 19.7 | 1.48 (1.35-1.64) | 1.44 (1.30-1.60) |
|   With strong scientific evidence | 81 | 6.1 | 13.2 | 1.04 (0.84-1.30) | 1.10 (0.88-1.38) |
|   Without strong scientific evidence | 435 | 20.1 | 21.7 | 1.62 (1.45-1.80) | 1.54 (1.37-1.72) |
| AHFS class | | | | | |
|   Gastrointestinal tract | 98 | 16.0 | 6.1 | 1 [Reference] | 1 [Reference] |
|   Central nervous system[c] | 1096 | 60.7 | 18.1 | 2.82 (2.27-3.49) | 3.06 (2.46-3.79) |
|   Ear, nose, and throat | 32 | 11.6 | 2.8 | 0.42 (0.28-0.66) | 0.44 (0.29-0.69) |
|   Hormone and synthetics | 548 | 43.2 | 12.7 | 2.06 (1.64-2.59) | 2.62 (2.09-3.29) |
|   Formulary restricted[d] | 114 | 11.8 | 9.7 | 1.66 (1.26-2.19) | 1.89 (1.43-2.49) |
|   Anti-infectives | 80 | 1.2 | 66.2 | 5.63 (4.10-7.75) | 6.33 (4.58-8.76) |
|   Autonomic[e] | 141 | 16.8 | 8.4 | 1.39 (0.95-2.02) | 1.73 (1.17-2.55) |
|   Cardiovascular | 1354 | 85.7 | 15.9 | 2.73 (2.21-3.37) | 3.30 (2.67-4.08) |
|   Other[f] | 21 | 16.7 | 1.3 | 0.18 (0.11-0.29) | 0.23 (0.14-0.38) |
| Drug age | | | | | |
|   Before 1981 | 754 | 75.3 | 10.0 | 1 [Reference] | 1 [Reference] |
|   1981-1995 | 1140 | 79.1 | 14.4 | 1.49 (1.34-1.64) | 1.62 (1.45-1.80) |
|   1996-2009 | 1590 | 109.3 | 14.5 | 1.49 (1.35-1.65) | 1.55 (1.39-1.73) |
| Patient age, y | | | | | |
|   18-64 | 2079 | 162.2 | 12.8 | 1 [Reference] | 1 [Reference] |
|   ≥65 | 1405 | 101.6 | 13.8 | 1.16 (1.07-1.27) | 0.98 (0.90-1.07) |
| Sex | | | | | |
|   Men | 1251 | 107.0 | 11.7 | 1 [Reference] | 1 [Reference] |
|   Women | 2233 | 156.7 | 14.3 | 1.19 (1.09-1.30) | 1.17 (1.06-1.28) |
| Charlson comorbidity index[g] | | | | | |
|   0 | 2388 | 185.3 | 12.9 | 1 [Reference] | 1 [Reference] |
|   ≥1 | 1111 | 78.4 | 14.1 | 1.11 (1.02-1.22) | 0.89 (0.81-0.98) |
| No. of drugs used | | | | | |
|   1-2 | 128 | 29.4 | 4.4 | 1 [Reference] | 1 [Reference] |
|   3-4 | 378 | 50.3 | 7.5 | 1.86 (1.52-2.28) | 1.90 (1.55-2.33) |
|   5-7 | 899 | 74.4 | 12.1 | 3.10 (2.56-3.76) | 3.23 (2.66-3.92) |
|   ≥8 | 2079 | 109.6 | 19.0 | 4.93 (4.10-5.94) | 5.29 (4.39-6.38) |
| COC index, mean (SD)[h] | 1.09 (0.64) | | | 1.22 (1.16-1.30) | 1.19 (1.12-1.26) |

Abbreviations: ADE, adverse drug event; AHFS, American Hospital Formulary Service; COC, continuity of care; HR, hazard ratio; IR, incidence rate.

[a] Calculated using a marginal Cox proportional hazards regression model with a robust sandwich covariance estimator to account for intraclass correlation.

[b] Results from 2 multivariate analyses are included. The HR estimates for the other covariates when off-label use was divided according to scientific evidence was not shown here because the difference was not substantial.

[c] For example, includes antidepressants, antipsychotics, anticonvulsants, anxiolytics, and antimigraine medicines.

[d] Also known as conditional listing, used in relation to drug expenditure policy, whereby the prescribing physician needs to justify the clinical need before the costs of therapy will be covered.

[e] Includes drugs such as albuterol sulfate, terbutaline sulfate, and cyclobenzaprine hydrochloride.

[f] Includes antihistamines, blood thinners and anticoagulants, and antineoplastics.

[g] Ranges from 0 to 25; 1 or greater indicates increased risk for death.

[h] Defined as the ratio of the number of a patient's visits to the primary care physician to the square root of a patient's total number of outpatient visits calculated using the medical services claims. The HRs are calculated per 1 unit.

pared with on-label use, the AHRs (95% CI) for off-label use with and without strong scientific evidence were 1.10 (0.88-1.38) and 1.54 (1.37-1.72), respectively (Table 2 and **Figure 3**). Proportionality assumptions for the HRs were not violated. The median time to discontinue drug use owing to an ADE was shorter for drugs used off-label (146 days) compared with those used on-label (179 days).

Anti-infectives had the highest ADE rate (66.2 per 10 000 person-months), more than a 6-fold increase in risk for ADEs compared with gastrointestinal tract drugs (AHR, 6.33; 95% CI, 4.58, 8.76). Central nervous system and cardiovascular drugs had ADE rates of 18.1 and 15.9 per 10 000 person-months, respectively. Drugs approved after 1995 had ADE rates that were 55% higher than drugs approved before 1981 (AHR, 1.55; 95% CI, 1.39-1.73), and the same is true for drugs approved from 1981 to 1995 (AHR, 1.62; 95% CI, 1.45-1.80) (Table 2).

Dose-response relationships were identified between the number of drugs the patient used and the risk for ADEs, in which patients using 8 or more drugs had more than a 5-fold increased

risk for ADEs compared with patients using 1 to 2 drugs (AHR, 5.29; 95% CI, 4.39-6.38). Patients 65 years and older exhibited an increased risk for ADEs in an unadjusted analysis compared with younger cohorts; however, the increased risk did not persist after adjusting for the number of drugs and patients' comorbidities. Women also had a higher risk for ADEs than men (14.3 vs 11.7 per 10 000 person-months, respectively; AHR, 1.17; 95% CI, 1.06-1.28. After adjusting for other patient characteristics, the patients with a Charlson comorbidity index of 1 or greater had a lower risk for ADEs compared with patients with an index of 0 (AHR, 0.89; 95% CI, 0.81-0.98). The COC index was an important determinant of ADE detection, with a 19% increase in ADE rate per 1-unit increase in the COC index (AHR, 1.19; 95% CI, 1.12-1.26) (Table 2). In a subanalysis, we fit a model to drugs predominantly used for chronic conditions (by removing the anti-infective group) and found a slight change in the AHR for off-label use without strong scientific evidence (1.58; 95% CI, 1.41-1.77).

The ADEs related to the gastrointestinal tract, nervous, respiratory, and musculoskeletal system organ classes were docu-

Copyright 2016 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

mented the most frequently (eTable 4 in the Supplement). Selected examples of ADEs associated with the most frequently used off-label drugs include akathisia resulting from the use of gabapentin for neurogenic pain; agitation associated with the use of amitriptyline hydrochloride for migraine; hallucinations with the use of trazodone hydrochloride for insomnia; QT interval prolongation with the use of quetiapine fumarate for depression; and weight gain with the use of olanzapine for depression.

## Discussion

This study is, to our knowledge, the first to systematically evaluate the association between off-label use of drugs and the risk for ADEs in an adult population. The study is also the first to use electronically documented treatment indications and treatment outcomes to measure off-label drug use and ADE occurrence.[2,12,13] We found that off-label use of drugs was associated with ADEs after adjusting for important patient and drug characteristics. Moreover, we noted a risk gradient with higher rates of ADEs for off-label uses lacking strong scientific evidence.

Although the intrinsic nature of the drug to cause ADEs is the same for on-label and off-label uses, it may be modified by a number of factors, including the off-label disease condition. In addition, the lack of approval from a regulatory body implies a lack of safe dose ranges and inadequate information on contraindications, which in aggregate make ADEs more likely. We found that 4 in 5 off-label prescriptions lacked strong scientific evidence, and this group had higher rates of ADEs. Off-label use may be clinically appropriate given the complexity of the patient's condition, the lack of alternative effective drugs, or after exhausting approved drugs. However, a lack of physician knowledge of approved treatment indications[33] was shown to be 1 factor for off-label prescribing. Physicians are finding it difficult to keep up with rapidly changing medication information, and this lack of knowledge is affecting treatment of patients.[34] Studies[20,27,28,35] have shown that the number of drugs used by a patient strongly influences the risk for ADEs owing to an increased risk for inappropriate prescribing,[36] drug-drug interaction,[37] and drug-disease interaction.[38] Similarly to other studies,[20,21,39] we found the rates of ADEs were significantly higher among patients using drugs from the anti-infective, cardiovascular, and CNS drug classes. We also found the same age effect that was reported from the French pharmacovigilance study,[40] with the oldest group having a higher crude incidence rate of ADEs; however, after adjusting for the number of drug treatments, the effect disappears. Overall, this finding shows that the number of prescribed drugs is the strongest risk factor for ADEs.[20,41] In our study, a higher risk for ADEs was observed for women, even after accounting for the COC index to mitigate the effect of high consultation rates among women. We also identified patients with a higher COC index as having a high risk for ADEs, possibly owing to surveillance detection biases with more opportunity to identify ADEs in their earlier stages.

Using appropriately configured computerized decision support systems, we could fill the knowledge gap in off-label prescribing by supplying clinicians with information on drug approval status and the degree of scientific evidence at the point of care. In addition, the inclusion of treatment indication in the electronic prescription would facilitate communication among physicians, pharmacists, and patients and may decrease medication errors[42] (eg, wrong-patient errors and look-alike and sound-alike drugs). At the same time, these technologies could allow physicians to participate actively in the systematic collection of data to evaluate the benefits and risks associated with the off-label use of drugs. Moreover, monitoring patients in the community with a nurse or an interactive voice response system to detect drug-related problems[43] and relaying this information to a community pharmacist or the treating physician would be one option of detecting and ameliorating these risks.

The study has several limitations. First, ADE identification depends on physicians and patients. Physicians are known to miss medication-related symptoms, and patients may not inform their physicians about all of their symptoms.[44] Second, ADEs among patients with comorbidities may not be as easily attributed to the drug (vs the concurrent disease) and may not be identified. Third, patients with severe ADEs may visit hospitals and other physicians, and the ADEs might not be recorded in their EHR. All these limitations might have resulted in an underestimation of ADE incidence. However, the underestimation of ADE rates will likely affect on-label and off-label uses equivalently and thus not bias the association between drug approval status and ADEs.[33] Although the ADEs were severe enough to warrant discontinuation of drug use, the ADEs were not documented with a severity scale, which limited subgroup analysis.

When classifying off-label use, we only considered the drug and the treatment indication. Our off-label definition did not consider the dosage, frequency, route of administration, duration of treatment, and patients' age range. A wider definition of off-label use could have increased the prevalence of off-label use.

In recent years, drug regulatory bodies have created mechanisms to expedite the drug review process and to give the public rapid access to drugs. In addition, they have mandated the life-cycle approach to drug evaluation with ongoing pharmacovigilance and risk evaluation and mitigation strategies. For example, France has passed a law to monitor off-label drug use and study the benefit-risk ratios of these uses in collaboration with the pharmaceutical industry.[15] In this study, we demonstrated that an EHR system tailored to document treatment indications and the reason for treatment discontinuation can be used to monitor off-label drug use and its outcomes. Such a system can help to tackle fundamental problems in postmarketing surveillance of drugs, namely, the lack of an explicit link between prescribed drugs and their indication for use and the underreporting of ADEs. Large-scale documentation of drug indications, ADEs, and clinical variables within the EHR can facilitate powerful observational studies, comparative safety and effectiveness trials, and decision support systems. Moreover, linking a prescribed drug with an indication and outcome (eg, ADE) could be a meaningful-use objective, thereby advancing meaningful use to meaningful benefit.[45]

Copyright 2016 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

103



**Figure 2. Cumulative Hazard Ratios (HRs) of Adverse Drug Events (ADEs) According to On-label and Off-label Use**

| No. at risk | | | | | | |
|---|---|---|---|---|---|---|
| On-label drug use | 133 458 | 70 328 | 40 458 | 23 213 | 12 315 | 4069 | 0 |
| Off-label drug use | 17 847 | 7829 | 4051 | 2414 | 1230 | 368 | 0 |

The comparison has not been adjusted for drug and patient characteristics (HR, 1.48; 95% CI, 1.35-1.64). After adjustment for such variables on multivariate analysis and taking into account the correlation within the patient, the difference between the 2 groups was statistically significant (adjusted HR, 1.44; 95% CI, 1.30-1.60; $P < .001$).



**Figure 3. Cumulative Hazard Ratios (HRs) of Adverse Drug Events (ADEs) According to On-label and Off-label Use With and Without Strong Scientific Evidence**

| No. at risk | | | | | | |
|---|---|---|---|---|---|---|
| Off-label drug use without evidence | 14 431 | 6042 | 3056 | 1792 | 894 | 271 | 0 |
| Off-label drug use with evidence | 3416 | 1787 | 995 | 622 | 336 | 97 | 0 |
| On-label drug use | 133 458 | 70 328 | 40 458 | 23 213 | 12 315 | 4069 | 0 |

The comparison has not been adjusted for drug and patient characteristics. The unadjusted HRs (95% CI) for off-label use with and without strong scientific evidence were 1.04 (0.84-1.30) and 1.62 (1.45-1.80), respectively. After adjustment for such variables on multivariate analysis and taking into account the correlation within the patient, the adjusted HR (95% CI) for off-label use with and without strong scientific evidence were 1.10 (0.88-1.38; $P = .40$) and 1.54 (1.37-1.72; $P < .001$), respectively.

In our study, the cost of ADEs was not measured. However, the cost can be estimated using previously published figures. Adverse effects that occur in nonhospital settings may lead to emergency department visits and hospital admissions. The mean cost of an emergency department visit without hospital admission has been estimated to range from $549 to $704 per ADE, whereas the estimated mean cost of treating an ADE resulting in hospital admission has been estimated to range from $5118 to $11 789 (in 2014 US currency).[46] The median prevalence rate of hospitalizations resulting from ADEs has been estimated at 4.6%.[47]

The present study found 3484 ADEs in 46 021 patients; thus, the mean cost per ADE would range from $759 to $1214. Likewise, the mean cost per study patient would be $51 to $77.

## Conclusions

Off-label drug use, and particularly off-label use without strong scientific evidence, is a risk factor for ADEs. Hence, physicians and physician organizations should recognize

Copyright 2016 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

the enormity of the problem and be active participants in the promotion of cautious prescribing of drugs for off-label uses lacking strong scientific evidence. Future EHRs should be designed to enable postmarketing surveillance of treatment indications and treatment outcomes to monitor the safety of on- and off-label uses of drugs.

**ARTICLE INFORMATION**

**Accepted for Publication:** September 10, 2015.

**Published Online:** November 2, 2015.
doi:10.1001/jamainternmed.2015.6058.

**Author Affiliations:** Department of Epidemiology, Biostatistics, and Occupational Health, McGill University, Montreal, Quebec, Canada (Eguale, Buckeridge, Verma, Benedetti, Hanley, Tamblyn); Department of Medicine, McGill University, Montreal, Quebec, Canada (Eguale, Buckeridge, Winslade, Tamblyn); Division of General Medicine and Primary Care, Brigham and Women's Hospital, Harvard Medical School, Boston, Massachusetts (Eguale); Department of Social and Administrative Pharmacy, Schoool of Pharmacy, MCPHS University, Boston, Massachusetts (Eguale); Department of Mathematics and Statistics, McGill University, Montreal, Quebec, Canada (Hanley).

**Author Contributions:** Drs Eguale and Tamblyn had full access to all the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.

*Study concept and design:* Eguale, Buckeridge, Verma, Winslade, Hanley, Tamblyn.

*Acquisition, analysis, or interpretation of data:* Eguale, Buckeridge, Verma, Benedetti, Hanley, Tamblyn.

*Drafting of the manuscript:* Eguale, Verma, Hanley, Tamblyn.

*Critical revision of the manuscript for important intellectual content:* Eguale, Buckeridge, Verma, Winslade, Benedetti, Tamblyn.

*Statistical analysis:* Eguale, Buckeridge, Verma, Benedetti, Hanley.

*Obtained funding:* Tamblyn.

*Administrative, technical, or material support:* Verma, Winslade.

*Study supervision:* Buckeridge, Tamblyn.

**Conflict of Interest Disclosures:** None reported.

**Additional Contributions:**
Rosa Rodriguez-Monguio, PhD, and Enrique Seoane-Vasquez, PhD, provided input in estimation of the cost of adverse drug events. Neither was financially compensated.

**REFERENCES**

1. Radley DC, Finkelstein SN, Stafford RS. Off-label prescribing among office-based physicians. *Arch Intern Med.* 2006;166(9):1021-1026.

2. Eguale T, Buckeridge DL, Winslade NE, Benedetti A, Hanley JA, Tamblyn R. Drug, patient, and physician characteristics associated with off-label prescribing in primary care. *Arch Intern Med.* 2012;172(10):781-788.

3. Connolly HM, Crary JL, McGoon MD, et al. Valvular heart disease associated with fenfluramine-phentermine. *N Engl J Med.* 1997;337(9):581-588.

4. Flowers CM, Racoosin JA, Kortepeter C. Seizure activity and off-label use of tiagabine. *N Engl J Med.* 2006;354(7):773-774.

5. US Food and Drug Administration. FDA issues second warning against treating leg cramp with quinine. http://www.medscape.com/viewarticle

/724798. Published July 8, 2010. Accessed September 28, 2015.

6. Levi M, Levy JH, Andersen HF, Truloff D. Safety of recombinant activated factor VII in randomized clinical trials. *N Engl J Med.* 2010;363(19):1791-1800.

7. Avorn J, Kesselheim A. A hemorrhage of off-label use. *Ann Intern Med.* 2011;154(8):566-567.

8. Waller PC, Evans SJ. A model for the future conduct of pharmacovigilance. *Pharmacoepidemiol Drug Saf.* 2003;12(1):17-29.

9. Schiff GD, Rucker TD. Computerized prescribing: building the electronic infrastructure for better medication usage. *JAMA.* 1998;279(13):1024-1029.

10. Institute of Medicine, Committee on the Assessment of the US Drug Safety System. Baciu A, Stratton K, Burke SP, eds. *The Future of Drug Safety: Promoting and Protecting the Health of the Public.* Washington, DC: National Academies Press; 2006.

11. Dal Pan GJ. Monitoring the safety of medicines used off-label. *Clin Pharmacol Ther.* 2012;91(5):787-795.

12. Eguale T, Winslade N, Hanley JA, Buckeridge DL, Tamblyn R. Enhancing pharmacosurveillance with systematic collection of treatment indication in electronic prescribing: a validation study in Canada. *Drug Saf.* 2010;33(7):559-567.

13. Eguale T, Tamblyn R, Winslade N, Buckeridge D. Detection of adverse drug events and other treatment outcomes using an electronic prescribing system. *Drug Saf.* 2008;31(11):1005-1016.

14. Stafford RS. Regulating off-label drug use: rethinking the role of the FDA. *N Engl J Med.* 2008;358(14):1427-1429.

15. Emmerich J, Dumarcet N, Lorence A. France's new framework for regulating off-label drug use. *N Engl J Med.* 2012;367(14):1279-1281.

16. Tamblyn R, Huang A, Perreault R, et al. The Medical Office of the 21st Century (MOXXI): effectiveness of computerized decision-making support in reducing inappropriate prescribing in primary care. *CMAJ.* 2003;169(6):549-556.

17. Tamblyn R, Eguale T, Huang A, Winslade N, Doran P. The incidence and determinants of primary nonadherence with prescribed medication in primary care: a cohort study. *Ann Intern Med.* 2014;160(7):441-450.

18. Health Canada. Drug Product Database. 2009. http://www.hc-sc.gc.ca/dhp-mps/prodpharma /databasdon/index-eng.php. Modified June 18, 2015. Accessed September 28, 2015.

19. Walton SM, Schumock GT, Lee KV, Alexander GC, Meltzer D, Stafford RS. Prioritizing future research on off-label prescribing: results of a quantitative evaluation. *Pharmacotherapy.* 2008;28(12):1443-1452.

20. Hutchinson TA, Flegel KM, Kramer MS, Leduc DG, Kong HH. Frequency, severity and risk factors for adverse reactions in adult out-patients: a prospective study. *J Chronic Dis.* 1986;39(7):533-542.

21. Budnitz DS, Pollock DA, Weidenbach KN, Mendelsohn AB, Schroeder TJ, Annest JL. National

surveillance of emergency department visits for outpatient adverse drug events. *JAMA.* 2006;296(15):1858-1866.

22. Weber JCP. Epidemiology of adverse reactions to nonsteroidal anti-inflammatory drugs. In: Rainsford KD, Velo GP, eds. *Advances in Inflammation Research.* New York, NY: Raven Press; 1984:1-6.

23. Charlson ME, Pompei P, Ales KL, MacKenzie CR. A new method of classifying prognostic comorbidity in longitudinal studies: development and validation. *J Chronic Dis.* 1987;40(5):373-383.

24. Zhang M, Holman CD, Price SD, Sanfilippo FM, Preen DB, Bulsara MK. Comorbidity and repeat admission to hospital for adverse drug reactions in older adults: retrospective cohort study. *BMJ.* 2009;338:a2752.

25. Martin RM, Biswas PN, Freemantle SN, Pearce GL, Mann RD. Age and sex distribution of suspected adverse drug reactions to newly marketed drugs in general practice in England: analysis of 48 cohort studies. *Br J Clin Pharmacol.* 1998;46(5):505-511.

26. Pouyanne P, Haramburu F, Imbs JL, Bégaud B; French Pharmacovigilance Centres. Admissions to hospital caused by adverse drug reactions: cross sectional incidence study. *BMJ.* 2000;320(7241):1036.

27. Jacubeit T, Drisch D, Weber E. Risk factors as reflected by an intensive drug monitoring system. *Agents Actions Suppl.* 1990;29:117-125.

28. Sarkar U, López A, Maselli JH, Gonzales R. Adverse drug events in US adult ambulatory medical care. *Health Serv Res.* 2011;46(5):1517-1533.

29. Gill JM, Mainous AG III, Nsereko M. The effect of continuity of care on emergency department use. *Arch Fam Med.* 2000;9(4):333-338.

30. Tamblyn R, Abrahamowicz M, Dauphinee D, et al. Physician scores on a national clinical skills examination as predictors of complaints to medical regulatory authorities. *JAMA.* 2007;298(9):993-1001.

31. Chuang SK, Wei LJ, Douglass CW, Dodson TB. Risk factors for dental implant failure: a strategy for the analysis of clustered failure-time observations. *J Dent Res.* 2002;81(8):572-577.

32. Bellera CA, MacGrogan G, Debled M, de Lara CT, Brouste V, Mathoulin-Pélissier S. Variables with time-varying effects and the Cox model: some statistical concepts illustrated with a prognostic factor study in breast cancer. *BMC Med Res Methodol.* 2010;10:20.

33. Chen DT, Wynia MK, Moloney RM, Alexander GC. US physician knowledge of the FDA-approved indications and evidence base for commonly prescribed drugs: results of a national survey. *Pharmacoepidemiol Drug Saf.* 2009;18(11):1094-1100.

34. Schiff GD. Computerized prescriber order entry: models and hurdles. *Am J Health Syst Pharm.* 2002;59(15):1456-1460.

35. Zopf Y, Rabe C, Neubert A, Hahn EG, Dormann H. Risk factors associated with adverse drug reactions following hospital admission:

**Copyright 2016 American Medical Association. All rights reserved.**

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

Off-label Drug Use and Adverse Drug Events in Adults

a prospective analysis of 907 patients in two German university hospitals. *Drug Saf.* 2008;31(9): 789-798.

**36**. Steinman MA, Landefeld CS, Rosenthal GE, Berthenthal D, Sen S, Kaboli PJ. Polypharmacy and prescribing quality in older people. *J Am Geriatr Soc.* 2006;54(10):1516-1523.

**37**. Johnell K, Klarin I. The relationship between number of drugs and potential drug-drug interactions in the elderly: a study of over 600 000 elderly patients from the Swedish Prescribed Drug Register. *Drug Saf.* 2007;30(10):911-918.

**38**. Corsonello A, Pedone C, Corica F, Mussi C, Carbonin P, Antonelli Incalzi R; Gruppo Italiano di Farmacovigilanza nell'Anziano (GIFA) Investigators. Concealed renal insufficiency and adverse drug reactions in elderly hospitalized patients. *Arch Intern Med.* 2005;165(7):790-795.

**39**. Bates DW, Miller EB, Cullen DJ, et al; ADE Prevention Study Group. Patient risk factors for adverse drug events in hospitalized patients. *Arch Intern Med.* 1999;159(21):2553-2560.

**40**. Bégaud B, Martin K, Fourrier A, Haramburu F. Does age increase the risk of adverse drug reactions? *Br J Clin Pharmacol.* 2002;54(5):550-552.

**41**. Gurwitz JH, Avorn J. The ambiguous relation between aging and adverse drug reactions. *Ann Intern Med.* 1991;114(11):956-966.

**42**. Galanter W, Falck S, Burns M, Laragh M, Lambert BL. Indication-based prescribing prevents wrong-patient medication errors in computerized provider order entry (CPOE). *J Am Med Inform Assoc.* 2013;20(3):477-481.

**43**. Forster AJ, Auger C; ISTOP ADE Investigators. Using information technology to improve the

monitoring of outpatient prescribing. *JAMA Intern Med.* 2013;173(5):382-384.

**44**. Gandhi TK, Weingart SN, Borus J, et al. Adverse drug events in ambulatory care. *N Engl J Med.* 2003;348(16):1556-1564.

**45**. Classen DC, Bates DW. Finding the meaning in meaningful use. *N Engl J Med.* 2011;365(9):855-858.

**46**. Rodríguez-Monguió R, Otero MJ, Rovira J. Assessing the economic impact of adverse drug effects. *Pharmacoeconomics.* 2003;21(9):623-650.

**47**. Al Hamid A, Ghaleb M, Aljadhey H, Aslanpour Z. A systematic review of hospitalization resulting from medicine-related problems in adult patients. *Br J Clin Pharmacol.* 2014;78(2):202-217.

---

*Invited Commentary*

# Off-label Drug Use and Adverse Drug Events
## Turning up the Heat on Off-label Prescribing

Chester B. Good, MD, MPH; Walid F. Gellad, MD, MPH

**Yelling "Fire!" in a crowded theater** without any imminent danger is an oft-cited example of free speech that is not protected. For many years, the US Food and Drug Administration (FDA) has prohibited the promotion of unapproved uses of drugs. This restriction has recently been challenged under the guise of free speech. In a potential landmark decision in August 2015, a federal judge ruled against the FDA's restrictions on off-label drug promotion, referencing protection by the First Amendment.[1] Critics of off-label drug promotion point to dietary supplements as an example of the kinds of claims that are commonplace when regulation is lax and worry about an erosion of the authority of the FDA to ensure safety and efficacy of drugs.[2] Are these concerns about safety warranted? Does evidence show that off-label prescribing might be less safe than on-label prescribing? In light of these concerns, the study of off-label drug use and adverse drug events by Eguale and colleagues[3] in this issue of *JAMA Internal Medicine* is particularly timely.



Related article page 55

The FDA has substantial responsibility and authority in the preapproval process of new drugs to ensure safety, efficacy, and accuracy in the approved label. The postapproval period is far less regulated. Although the FDA is clearly interested in postapproval drug safety and occasionally provides approval contingent on performance of additional studies, once a drug reaches the market, literally millions of patients may be exposed to that drug with limited ability to track its safety or effectiveness. Physicians are not legally required to follow the approved labeled indications, and the FDA even recognizes that off-label use of drugs may constitute good medical practice in some cases.[4]

Of course, many examples of appropriate off-label uses of medications exist, and in some situations, off-label use of a drug may be the standard of care. Digoxin is approved for rate control in atrial fibrillation, whereas use of metoprolol is off-label. However, metoprolol, but not digoxin, is first-line therapy for rate control in evidence-based clinical guidelines. Moreover, off-label use may precede approval for an indication. Thalidomide was approved to treat leprosy in 1998. In 1999, it was reported to be effective for multiple myeloma[5]; by 2003, the manufacturer of thalidomide reported that 92% of its sales came from the off-label use.[6] Eventually in 2006, the multiple myeloma indication was added to the label.

Because physicians are not required to document intended indications, tracking off-label drug use is challenging. By all accounts, off-label prescribing is common. Among office-based physicians in 2001, an estimated 21% of overall prescriptions were off-label.[7] Off-label use of cardiac medications and anticonvulsants was especially common, and the investigators reported that almost three-quarters of all off-label use had little or no scientific evidence to support the indication.[7] Perhaps contributing to off-label use of drugs is a general lack of physician knowledge of FDA indications, with the frequent assumption of FDA approval for off-label indications with uncertain or absent evidence of benefit.[8]

Although evidence of overall safety of off-label prescribing is limited, many individual reports of patient harm exist. A Knight Ridder investigational news series in 2003 alleged that off-label prescribing was routine and resulted in death or serious injuries to many patients.[9] The report documented examples of adverse outcomes associated with off-label use of antipsychotics to treat behavioral issues in elderly patients with dementia, anticonvulsants to treat bipolar disorder, terbutaline for premature labor, and fluoxetine hydrochloride for pain. Other common off-label uses can have less serious but undesirable outcomes. For example, sleeping pills, approved only for short-term management of insomnia, are prescribed long term, leading to tolerance. Stimulants, such as modafinil, are used to

**Copyright 2016 American Medical Association. All rights reserved.**

Downloaded from jamanetwork.com by University of California - Irvine user on 03/29/2024

106

HEALTH CARE

Exhibit
0029

# Off-label use of medicines: consensus recommendations for evaluating appropriateness

Madlen Gazarian, Maria Kelly, John R McPhee, Linda V Graudins, Robyn L Ward and Terence J Campbell

O*ff-label* (unlabelled or unapproved) prescribing refers to prescribing a registered medicine for a use that is not included or is disclaimed in the product information.[1] Examples include use in a different indication, patient age range, dose or route to that which is approved by regulatory authorities. An *unlicensed* or unregistered medicine is a medicine or dosage form of a medicine that has not been evaluated nor approved in Australia and hence not entered on the Australian Register of Therapeutic Goods.

Much has been published about the extent of, and problems associated with, the off-label and unlicensed use of medicines, particularly in children.[2-8] The extent of off-label prescribing is reported to be between 7.5% and 40% in adults,[2-5] and may be up to 90% in some hospitalised paediatric patients.[6-10] Although the product information may be the main reference for many prescribers, in some cases the best available evidence may not be reflected in the product information,[11] so off-label and yet evidence-based prescribing may be the more appropriate choice. This may be because new evidence has become available after marketing (as there is currently no provision for regular updating of the product information) or because there is insufficient incentive for the sponsor to seek an extension of labelling. However, in most cases, adequate research evidence to support off-label prescribing is lacking. A recent survey of 150 million off-label prescriptions in the United States found that 73% had little or no scientific support, even when sources other than the product information were searched.[12] Thus, only a small proportion of off-label prescribing may be justified by scientific evidence.

While off-label prescribing is not illegal,[13-16] and may sometimes be clinically appropriate (eg, exceptional use in an appropriately informed patient with serious disease, when there are no alternatives and potential benefits outweigh potential risks),[17] it brings with it a number of clinical, safety and ethical issues.[13,15,18] For example, prescribers may expose children to ineffective therapies and to unknown risks of adverse events by extrapolating from adult data.[16] There is now accumulating evidence of resulting harm, with increased incidence and seriousness of adverse drug reactions associated with off-label and unlicensed medicines use in children.[19] Furthermore, some long established off-label uses have been shown to either be ineffective or harmful when subjected to proper evaluation (eg, deaths associated with propofol used for sedation in paediatric intensive care).[20,21]

In contrast to the considerable literature about the extent and consequences of off-label prescribing, there has been no specific guidance to help clinicians trying to make decisions about the appropriateness of such prescribing. Most clinicians perceive off-label prescribing as appropriate and believe that the benefits outweigh the risks.[22] However, their awareness of consequences appears to be minimal, with a low level of concern about risk of side effects, unevaluated efficacy and issues surrounding informed consent.[23] This raises questions about the validity of their risk–benefit analysis when making decisions about off-label prescribing. Recent legislative and regulatory initiatives in the US[20,21] and,

## ABSTRACT

- Off-label prescribing is the prescription of a registered medicine for a use that is not included in the product information. The practice is common, with rates up to 40% in adults and up to 90% in paediatric patients.

- Off-label prescribing is not illegal and may sometimes be clinically appropriate, but is associated with a number of clinical, safety and ethical issues. To date, no explicit guidance has been available to help clinicians assess appropriateness in off-label prescribing.

- We describe the development of a guide for clinicians, policymakers and funders of health care in evaluating the appropriateness of medicines proposed for off-label use.

- Three broad categories of appropriate off-label use are identified:
  ➢ off-label use justified by high-quality evidence;
  ➢ use within the context of a formal research proposal; and
  ➢ exceptional use, justified by individual clinical circumstances.

- An appropriate process for informed consent is proposed for each category.

- If there is no high-quality evidence supporting off-label use, and the medicine is not suitable for exceptional or research indications, its use is generally not recommended. This will reduce inappropriate use, enhance patient safety by reducing exposure to unnecessary risk, and may stimulate more clinically relevant medicines research.

MJA 2006; 185: 544–548

more recently, the European Union,[24] have provided incentives and inducements for the pharmaceutical industry to undertake more medicines research in children. Eventually these initiatives may reduce the need to consider off-label prescribing in many instances.[20] Until such time, practitioners are expected to "use their professional judgement" to determine the appropriateness of off-label use in individual patients,[17] although no explicit guidance in exercising such judgement is available. In addition, the legal and ethical ramifications of such prescribing appear to be a source of confusion, with variability in opinions and practice among prescribers and professional organisations.[10,14,17]

We describe the development of a practical and explicit approach to guide clinicians (doctors, pharmacists and nurse practitioners), policymakers (eg, drug and therapeutics committees [DTCs], authors of medicines compendia, therapeutic guidelines developers) and funders of health care (government and nongovernment organisations) in systematically evaluating the appropriateness of medicines proposed for off-label use. These consensus recommendations are intended to help distinguish between off-label use that is justified by high-quality evidence, and innovative therapy that may be justified in individual clinical circum-

13263771, 2006, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.5694/j.1326-5377.2006.tb00685.x by University Of California - Irvine, Wiley Online Library on [28/03/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**HEALTH CARE**

**1 Working party members**

Professor Terence Campbell (Chair), Professor of Medicine, University of New South Wales and St Vincent's Hospital, Sydney, NSW.

Ms Kanan Gandecha, Acting Deputy Chief Pharmacist, Pharmaceutical Services Branch, NSW Health, Sydney, NSW.

Dr Madlen Gazarian, Senior Lecturer, School of Women's and Children's Health, University of New South Wales, Paediatric Clinical Pharmacologist and Rheumatologist, Sydney Children's Hospital, Randwick, Sydney, NSW.

Ms Linda Graudins, Medication Safety and Quality Use of Medicines Pharmacist, Sydney Children's Hospital, Randwick, Sydney, NSW.

Ms Maria Kelly, Executive Officer, NSW Therapeutic Advisory Group, Sydney, NSW.

Ms Jennifer MacDonald, Deputy Director, Pharmacy, John Hunter Hospital, Newcastle, NSW.

Mr John McPhee, Consultant in Health Law, Honorary Associate, Centre for Values, Ethics and Law in Medicine, University of Sydney, Sydney, NSW.

Ms Terry Melocco, Director of Pharmacy, St Vincent's Hospital, Sydney, NSW.

Ms Elizabeth Perks, Director of Pharmacy, Prince of Wales Hospital and Sydney Children's Hospital, Randwick, Sydney, NSW.

Professor Robyn Ward, Professor of Medicine, University of New South Wales, Senior Oncologist, St Vincent's Hospital, Sydney, NSW.   ◆

stances (exceptional use) or that should be pursued in a research context. We also provide guidance on appropriate processes for informed consent.

**Consensus development process**

Quality use of medicines (QUM) is defined by the Pharmaceutical Health and Rational use of Medicines Committee as selecting management options wisely; choosing suitable medicines if a medicine is considered necessary; and using medicines safely and effectively. New South Wales Therapeutic Advisory Group (NSW TAG) is an independent state government-funded organisation that aims to promote QUM in the state's public hospitals and the wider community through collaboration and consensus. The NSW state public health system provides access to nearly 17 000 beds and is responsible for over 1.5 million admissions annually.[25] NSW TAG's membership comprises clinical pharmacologists, directors of pharmacy and other clinicians, representing DTCs from 50 teaching and non-teaching hospitals.

A working party of NSW TAG (Box 1) was established by identifying areas of expertise considered relevant to address the issue of off-label prescribing and to develop recommendations to guide appropriate practice. Nominations were called from NSW TAG members with expertise or special interest in this area. Gaps in expertise (eg, law and ethics) were identified, and appropriate non-TAG members were invited to join the working party. The final working party included hospital-based doctors and pharmacists with expertise in paediatrics, general medicine, oncology, clinical pharmacology and therapeutics, clinical epidemiology, and evidence-based medicine; a consultant in health ethics and law; a representative from the NSW Department of Health; and a representative from the NSW TAG secretariat. The Chair of the working party was a former member of the Australian Drug Evaluation Committee, and two members of the working party are current members of the Pharmaceutical Benefits Advisory Committee.

Our process of consensus development involved consultation with NSW TAG members; NSW teaching hospitals' DTCs; Pharmaceutical Services Branch, NSW Health Department; and MotherSafe (the Medications in Pregnancy Advisory Service in NSW). Overall, there was no strong dissent and any disagreements were resolved by discussion.

**Recommendations**

*Assessing appropriateness — evaluation of evidence*

To provide a systematic process for evaluating the appropriateness of any proposed off-label use, a decision algorithm (Box 2) with accompanying explanatory notes was developed. The notes guide clinicians considering off-label use of a particular medicine in answering the question: "Is there high-quality evidence supporting its use?"

In general, the answer to this question is derived from a critical evaluation of the best available patient-based research evidence on both efficacy and safety. The level of rigour of this evaluation should be similar to that used by the Therapeutic Goods Adminis-



**2 Assessing appropriateness of off-label medicines use**

Will this medicine be used according to a registered indication, age, dose and route?

**NO**
(ie, off-label use of registered medicine for different indication, age, dose or route)

**YES**
• Follow the usual process for consent to therapy

Is there high-quality evidence supporting its use?
*Evaluate published research evidence about safety and efficacy*

**YES**
Routine off-label use justified

**NO**
Off-label use generally NOT justified, but may be appropriate for:

• Follow the usual process for consent to therapy

• Discuss additional issues of off-label status

• In some cases, it may be appropriate to document the informed consent process and/or to obtain written informed consent

**Use within formal research**
• approved by institutional research ethics committee; AND
• written informed consent obtained

OR

**Exceptional use in an individual patient IF:**
• there is a serious underlying disease or condition; AND
• there is some evidence to support potential beneficial effect; AND
• potential benefits outweigh potential risks; AND
• standard therapy has been trialled or is inappropriate; AND
• use has been approved by institutional drug committee; AND
• written informed consent obtained

1326577, 2006, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.5694/j.1326-5377.2006.tb00689.x by University Of California - Irvine, Wiley Online Library on [24/03/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## HEALTH CARE

tration for clinical evaluation of medicines submitted for registration approval. Accepted guidelines for critical appraisal of therapeutic studies,[26-29] for grading of "strength of evidence"[30,31] and for deciding about applicability of research evidence to individual patient circumstances[32,33] can be used in answering this question. Various Australian bodies, such as state-based therapeutics advisory groups (eg, NSW TAG) or the National Prescribing Service Ltd, are available to help clinicians (in hospital and community practice) and policymakers (eg, hospital DTCs) evaluate the published literature for new medicines or proposed new uses of existing medicines. Special consideration may need to be given to the needs of special populations (eg, paediatric patients). Systematically developed, evidence-based drug information resources such as the *Australian medicines handbook, Therapeutic guidelines,* or international resources such as guidance from the National Institute for Health and Clinical Excellence in the United Kingdom or the Canadian Agency for Drugs and Technologies in Health should also be consulted. However, these resources are generally not timely enough to provide useful guidance for very newly marketed medicines,[34] which is the category where many off-label uses initially occur.[35]

Routine off-label use can be justified if there is high-quality evidence supporting efficacy or effectiveness, and sufficient evidence about the medicine's safety profile to suggest an overall reasonable benefit–risk ratio for a given clinical context (eg, need for longer-term outcome data if a medicine is intended for long-term use). This is especially pertinent with newly marketed medicines, as the available evidence about safety at the time of registration is limited, with a more complete profile emerging only after larger numbers of people have been exposed over a longer period of time. The available efficacy and safety data should be weighed against the seriousness of the underlying condition. As a general rule, the less serious the clinical need, the higher the level of evidence needed to support off-label use of the medicine. Individual patient values and preferences should also be considered.[36]

Existing guidelines and systems for ranking evidence are focused mostly on *efficacy* evaluation. The types of studies that should be sought to evaluate the full spectrum of *safety* of a particular medicine are broader. In many instances, only observational studies (eg, cohort or case–control studies) from postmarketing surveillance, rather than randomised controlled trials or meta-analyses, will provide the necessary data. This applies particularly to rare but potentially serious adverse effects (eg, serious sepsis and death associated with anti-tumour necrosis factor therapy[37]) or those which manifest after prolonged exposure (eg, hepatotoxicity with low-dose weekly methotrexate for rheumatoid arthritis[38]) or after a long latent period (eg, infertility after chemotherapy for cancer in childhood[39]).

In some instances, high-quality research evidence supporting the use of a particular medicine (eg, older off-patent medicines) may not be available and may be unlikely ever to become available. However, there may be extensive experience supporting the efficacy and safety of such medicines. Although such data or "expert opinion" is considered to be of lower quality than high-quality research evidence, there are examples where it may be used to inform decisions about off-label use of a medicine. There are several authoritative medicines compendia that make recommendations for appropriate use supported either by research evidence and/or consensus opinion based on extensive experience with

various medicines. These include the *Australian medicines handbook, Therapeutic guidelines* (Australia) and the *British national formulary for children* (UK). Other "authoritative" sources may include recommendations from professional societies, although the quality and validity of some of these can be quite variable. Less formal sources of support based on "experience" or "opinion" are less acceptable, and caution is recommended when considering this level of support for off-label use.[30,40] It should be emphasised that this category of support for off-label use needs to be systematically reviewed as new research evidence becomes available. For example, some recent US initiatives have stimulated research into off-label uses of medicines in children, generating new evidence about efficacy, safety, and appropriate dosing, with significant implications for long established prescribing practices.[20] The current process for determining the content of the product information should be reviewed to allow more timely collation and effective dissemination of available new evidence to all prescribers.

These issues can be addressed by applying the algorithm (Box 2), which identifies three broad categories of appropriate off-label use:

• use justified by high-quality evidence;
• use within the context of a formal research proposal; and
• exceptional use, justified by individual clinical circumstances (see Box 2 for criteria).

If there is no high-quality evidence supporting off-label use of a particular medicine, and it is not suitable for exceptional or research indications, its use is generally not recommended. Moreover, answering, "yes" to the question "is there high-quality evidence supporting its use?" means that the drug may be used, not necessarily that it should be used in a specific context. Proposed routine off-label uses of new medicines may only be justified if there is evidence from comparative studies showing an advantage in effectiveness and/or safety and/or cost-effectiveness over existing alternatives. For newly marketed medicines, such evidence will only emerge after the passage of time, so caution should be exercised in considering the appropriateness of proposed off-label uses of most new medicines. Policymakers, including DTCs, guideline developers, and authors of medicines compendia and other decision-support resources (eg, electronic prescribing packages), should resist making recommendations for routine off-label uses before such evidence becomes available, as this may encourage widespread off-label use inappropriately and diminish the incentive to conduct the research that is needed.

### Patient consent

Previous advice from US and UK professional organisations has been that no special provisions for institutional review or informed consent were needed for proposed off-label uses of registered medicines.[10,17] However, not all categories of off-label use carry the same level of risk, and so a more explicit approach to the type of patient consent process that might be appropriate is also needed.

***Usual consent to therapy:*** When there is high-quality evidence supporting off-label use of a medicine (ie, routine off-label use is justified), the usual process of obtaining consent for treatment should be followed. This includes discussing with the patient/parents/carer the reason for using the medicine, possible alternative therapies and potential side effects. As the medicine is being used off-label, additional information about any uncertainties associated with such use should be given. In some cases, patients

15265377, 2006, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.5694/j.1326-5377.2006.tb00693.x by University Of California – Irvine, Wiley Online Library on [29/03/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## HEALTH CARE

may require additional information to address specific concerns. Documentation of the consent process is recommended and, in some cases, obtaining written consent may be appropriate.

*Written informed consent:* When there is no high-quality evidence supporting routine off-label use of a medicine, there may still be a case for its use in a particular patient (see "exceptional use" criteria in Box 2), but there may be a higher level of risk. In such cases, an independent evaluation of the medicine's potential benefits and risks should be undertaken (eg, by a DTC) and, if appropriate, approval should be given for individual "exceptional use". Alternatively, use may occur within the context of a formal research proposal that has been evaluated and approved by an institutional research ethics committee. In either case, written informed consent is required.

A more detailed analysis of the legal and ethical dimensions associated with consent and the administration of off-label medicines can be found at <http://www.ciap.health.nsw.gov.au/nswtag/publications/otherdocs/off_label_use_registered_medicines.pdf>.

## Conclusions

These recommendations provide a systematic approach for clinicians and policymakers in evaluating the appropriateness of medicines proposed for off-label use, with a number of resulting benefits. First, by helping to distinguish more explicitly between off-label medicines use supported by scientific evidence and innovative therapy, they should help promote evidence-based prescribing. Second, limiting off-label use of medicines to situations where it is justified by prespecified criteria will reduce inappropriate use (including that which may be inappropriately promoted by the pharmaceutical industry)[41] and enhance patient safety by reducing exposure to unnecessary risk. Third, a more explicit process for patient consent will help to better inform patients, parents and carers about the benefits and risks associated with innovative therapy. Fourth, the systematic identification of gaps in knowledge in areas of clinical need will help set the future research agenda, which in turn should result in more useful new knowledge to inform future treatment decisions. Finally, these recommendations may be useful when making decisions about the allocation of scarce health resources.

Although these recommendations were initially developed with a focus on off-label use of registered medicines, the principles apply equally to unlicensed medicines use. Essentially, if sound, evidence-based principles are applied in making clinical decisions about off-label or unlicensed medicines use, then the ethical and legal dilemmas will also have been satisfactorily addressed.

These recommendations have already influenced policy at a number of levels in NSW, including the Department of Health and individual hospital or Area Health Service DTCs, with almost 90% of NSW TAG member hospitals endorsing the recommendations for implementation. Some members of the pharmaceutical industry in Australia also appear to find these recommendations useful for determining appropriate practice. While the recommendations were developed specifically to guide public hospital practice, the general principles are relevant for all prescribers. Wider dissemination should promote broader discussion of the key issues and help contextualise recommendations for a range of settings. Ultimately, wider adoption of key recommendations should promote both better practice (more evidence-based prescribing) and help stimulate more clinically relevant medicines research, which in turn will support better prescribing decisions in an ongoing way.

## Acknowledgements

We acknowledge the valuable contribution to the consensus development process provided by: the Sydney Children's Hospital Experimental or Unapproved Medication Use Working Party; Dr Debra Kennedy, Director, MotherSafe, (Medications in Pregnancy Advisory Service), the Royal Hospital for Women, Randwick; Ms Karen Kaye, Executive Officer, NSW TAG; NSW Health Pharmaceutical Services Branch.

## Competing interests

None identified.

## Author details

**Madlen Gazarian**, MB BS(Hons I), MSc(ClinEpi), FRACP, Senior Lecturer[1] and Paediatric Clinical Pharmacologist and Rheumatologist[2]
**Maria Kelly**, BPharm, DipEd, Executive Officer, NSW Therapeutic Advisory Group[3]
**John R McPhee**, BCom(Hons)(LegStud), Consultant in Health Law, Honorary Associate[4]
**Linda V Graudins**, BPharm, DipHospPharm, FSHP, Medication Safety and Quality Use of Medicines Pharmacist[2] and Conjoint Lecturer[1]
**Robyn L Ward**, MB BS(Hons I), PhD, FRACP, Professor of Medicine[1] and Senior Oncologist[5]
**Terence J Campbell**, MD, PhD, FRACP, Professor of Medicine[1,5]

1 University of New South Wales, Sydney, NSW.
2 Sydney Children's Hospital, Randwick, Sydney, NSW.
3 NSW Therapeutic Advisory Group, Sydney, NSW.
4 Centre for Values, Ethics and Law in Medicine, University of Sydney, Sydney, NSW.
5 St Vincent's Hospital, Sydney, NSW.
*Correspondence:* M.Gazarian@unsw.edu.au;
nswtag@stvincents.com.au

## References

1 Turner S. Unregistered and off-label drug use in paediatric inpatients. *Aust J Hosp Pharm* 1999; 29: 265-268.
2 Rayburn W, Farmer K. Off-label prescribing during pregnancy. *Obstet Gynecol Clin North Am* 1997; 24: 471-479.
3 Laetz T, Silberman G. Reimbursement policies constrain the practice of oncology. *JAMA* 1991; 266: 2996-2999.
4 Brosgart C, Mitchell T, Charlebois E, et al. Off-label drug use in human immunodeficiency virus disease. *J Acquir Immune Defic Syndr Hum Retrovirol* 1996; 12: 56-62.
5 Douglas-Hall P, Fuller A, Gill-Banham S. An analysis of off-licence prescribing in psychiatric medicine. *Pharm J* 2001; 267: 890-891.
6 McIntyre J, Conroy S, Avery A, et al. Unlicensed and off label prescribing of drugs in general practice. *Arch Dis Child* 2000; 83: 498-501.
7 Pandolfini C, Impicciatore P, Provasi D, et al. Off-label use of drugs in Italy: a prospective, observational and multicentre study. *Acta Paediatr* 2002; 91: 339-347.
8 Conroy S, Choonara I, Impicciatore P, et al. Survey of unlicensed and off-label drug use in paediatric wards in European countries. *BMJ* 2000; 320: 79-82.
9 Cuzzolin L, Zaccaron A, Fanos V. Unlicensed and off-label uses of drugs in paediatrics: a review of the literature. *Fundam Clin Pharmacol* 2003; 17: 125-131.
10 Stephenson T. Medicines for children — the last century and the next. *Arch Dis Child* 2001; 85: 177-179.
11 Cohen JS. Dose discrepancies between the physician's desk reference and the medical literature, and their possible role in the high incidence of dose-related adverse drug events. *Arch Intern Med* 2001; 161: 957-964.
12 Radley DC, Finkelstein SN, Stafford RS. Off-label prescribing among office-based physicians. *Arch Intern Med* 2006; 166: 1021-1026.

## HEALTH CARE

1326377, 2006, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.5694/j.1326-5377.2006.tb00689.x by University Of California - Irvine, Wiley Online Library on [29/03/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

13 Blum R. Legal consideration in off-label medication prescribing. *Arch Intern Med* 2002; 162: 1777-1779.

14 Kelly M, Gazarian M, McPhee J. Off-label prescribing [letter]. *Aust Prescr* 2005; 28: 7.

15 Collier J. Paediatric prescribing: using unlicensed drugs and medicines outside their licensed indications. *Br J Clin Pharmacol* 1999; 48: 5-8.

16 Gazarian M. Why are children still therapeutic orphans? [editorial]. *Aust Prescr* 2003; 26: 122-123.

17 American Academy of Pediatrics, Committee on Drugs. Uses of drugs not described in the package insert (off-label uses). *Pediatrics* 2002; 110: 181-183.

18 Neubert A, Dormann H, Weiss J, et al. The impact of unlicensed and off-label drug use on adverse drug reactions in paediatric patients. *Drug Saf* 2004; 27: 1059-1067.

19 European Medicines Agency (EMEA). Evidence of harm from off label or unlicensed medicines in children, London: EMEA, October 2004 (EMEA/11207/04). http://www.emea.eu.int/pdfs/human/peg/1120704en.pdf (accessed Oct 2006).

20 Roberts R, Rodriguez W, Murphy D, Crescenzi T. Pediatric drug labelling. Improving the safety and efficacy of pediatric therapies. *JAMA* 2003; 290: 905-911.

21 Schreiner M. Paediatric clinical trials: redressing the imbalance. *Nat Rev Drug Discov* 2003; 2: 949-961.

22 Tan E, Stewart K, Pearce C, et al. Understanding off-label and unlicensed prescribing: combining qualitative and quantitive methodologies. *Clin Exp Pharmacol Physiol* 2004; 31 Suppl 1: A84.

23 Ekins-Daukes S, Helms P, Taylor M, McLay J. Off-label prescribing to children: attitudes and experience of general practitioners. *Br J Clin Pharmacol* 2005; 60: 145-149.

24 European Parliament. Committee on the Environment, Public Health and Food Safety. Draft recommendation for second reading on the Council common position for adopting a regulation of the European Parliament and of the Council on medicinal products for paediatric use and amending Regulation (EEC) No 1768/92, Directive 2001/20/EC, Directive 2001/83/EC and Regulation (EC) No 726/2004. http://www.europarl.europa.eu/meetdocs/2004_2009/documents/pr/605/605939/605939en.pdf (accessed Oct 2006).

25 NSW Department of Health. Annual report (2002–03). Sydney: NSW Health, 2003: 210.

26 Guyatt G, Sackett D, Cook D. How to use an article about therapy or prevention. A. Are the results of the study valid? *JAMA* 1993; 270: 2598-2601.

27 Guyatt G, Sackett D, Cook D. How to use an article about therapy or prevention. B. What were the results and will they help me in caring for my patients? *JAMA* 1994; 271: 59-63.

28 Levine M, Walter S, Lee H, et al. How to use an article about harm. *JAMA* 1994; 271: 1615-1619.

29 Oxman A, Cook D, Guyatt G. VI. How to use an overview. *JAMA* 1994; 272: 1367-1371.

30 National Health and Medical Research Council. How to use the evidence: assessment and application of scientific evidence. Handbook series on preparing clinical practice guidelines. Canberra: NHMRC, 2000.

31 Harbour R, Miller J. A new system for grading recommendations in evidence based guidelines. *BMJ* 2001; 323: 334-336.

32 Dans AL, Dans LF, Guyatt GH, Richardson S. How to decide on the applicability of clinical trial results to your patient. *JAMA* 1998; 279: 545-549.

33 Craig JC, Irwig LM, Stockler MR. Evidence-based medicine: useful tools for decision making. *Med J Aust* 2001; 174: 248-253.

34 Ferner R, McDowell S. How NICE may be outflanked. *BMJ* 2006; 332: 1268-1271.

35 Schirm E, Tobi H, de Jong-van den Berg LTW. Risk factors for unlicensed and off-label drug use in children outside the hospital. *Pediatrics* 2003; 111: 291-295.

36 McAlister F, Strauss S, Guyatt G, Haynes R. Integrating research evidence with the care of the individual patient. *JAMA* 2000; 283: 2829-2836.

37 Hyrich K, Silman A, Watson K, Symmons D. Anti-tumour necrosis factor therapy in rheumatoid arthritis: an update on safety. *Ann Rheum Dis* 2004; 63: 1538-1543.

38 Weinstein A, Marlowe S, Korn J, Farouhar F. Low-dose methotrexate treatment of rheumatoid arthritis. *Am J Med* 1985; 79: 331-337.

39 Stevens MCG, Mahler H, Parkes S. The health status of adult survivors of cancer in childhood. *Eur J Cancer* 1998; 34: 694-698.

40 Guyatt G, Sinclair J, Cook D, et al. How to use a treatment recommendation. *JAMA* 1999; 281: 1836-1843.

41 Steinman MA, Bero LA, Chren M-M, Landefeld CS. The promotion of gabapentin: an analysis of internal industry documents. *Ann Intern Med* 2006; 145: 284-293.

(Received 9 Mar 2006, accepted 4 Sep 2006)                                                                ❏

111

a prospective analysis of 907 patients in two German university hospitals. *Drug Saf*. 2008;31(9): 789-798.

**36.** Steinman MA, Landefeld CS, Rosenthal GE, Berthenthal D, Sen S, Kaboli PJ. Polypharmacy and prescribing quality in older people. *J Am Geriatr Soc*. 2006;54(10):1516-1523.

**37.** Johnell K, Klarin I. The relationship between number of drugs and potential drug-drug interactions in the elderly: a study of over 600 000 elderly patients from the Swedish Prescribed Drug Register. *Drug Saf*. 2007;30(10):911-918.

**38.** Corsonello A, Pedone C, Corica F, Mussi C, Carbonin P, Antonelli Incalzi R; Gruppo Italiano di Farmacovigilanza nell'Anziano (GIFA) Investigators. Concealed renal insufficiency and adverse drug reactions in elderly hospitalized patients. *Arch Intern Med*. 2005;165(7):790-795.

**39.** Bates DW, Miller EB, Cullen DJ, et al; ADE Prevention Study Group. Patient risk factors for adverse drug events in hospitalized patients. *Arch Intern Med*. 1999;159(21):2553-2560.

**40.** Bégaud B, Martin K, Fourrier A, Haramburu F. Does age increase the risk of adverse drug reactions? *Br J Clin Pharmacol*. 2002;54(5):550-552.

**41.** Gurwitz JH, Avorn J. The ambiguous relation between aging and adverse drug reactions. *Ann Intern Med*. 1991;114(11):956-966.

**42.** Galanter W, Falck S, Burns M, Laragh M, Lambert BL. Indication-based prescribing prevents wrong-patient medication errors in computerized provider order entry (CPOE). *J Am Med Inform Assoc*. 2013;20(3):477-481.

**43.** Forster AJ, Auger C; ISTOP ADE Investigators. Using information technology to improve

monitoring of outpatient prescribing. *JAMA Intern Med*. 2013;173(5):382-384.

**44.** Gandhi TK, Weingart SN, Borus J, et al. Adverse drug events in ambulatory care. *N Engl J Med*. 2003;348(16):1556-1564.

**45.** Classen DC, Bates DW. Finding the meaning in meaningful use. *N Engl J Med*. 2011;365(9):855-858.

**46.** Rodríguez-Monguió R, Otero MJ, Rovira J. Assessing the economic impact of adverse drug effects. *Pharmacoeconomics*. 2003;21(9):623-650.

**47.** Al Hamid A, Ghaleb M, Aljadhey H, Aslanpour Z. A systematic review of hospitalization resulting from medicine-related problems in adult patients. *Br J Clin Pharmacol*. 2014;78(2):202-217.

## Invited Commentary

# Off-label Drug Use and Adverse Drug Events
## Turning up the Heat on Off-label Prescribing

Chester B. Good, MD, MPH; Walid F. Gellad, MD, MPH

**Exhibit 0030**

**Yelling "Fire!" in a crowded theater** without any imminent danger is an oft-cited example of free speech that is not protected. For many years, the US Food and Drug Administration (FDA) has prohibited the promotion of unapproved uses of drugs. This restriction has recently been challenged under the guise of free speech. In a potential landmark decision in August 2015, a federal judge ruled against the FDA's restrictions on off-label drug promotion, referencing protection by the First Amendment.[1] Critics of off-label drug promotion point to dietary supplements as an example of the kinds of claims that are commonplace when regulation is lax and worry about an erosion of the authority of the FDA to ensure safety and efficacy of drugs.[2] Are these concerns about safety warranted? Does evidence show that off-label prescribing might be less safe than on-label prescribing? In light of these concerns, the study of off-label drug use and adverse drug events by Eguale and colleagues[3] in this issue of *JAMA Internal Medicine* is particularly timely.



Related article page 55

The FDA has substantial responsibility and authority in the preapproval process of new drugs to ensure safety, efficacy, and accuracy in the approved label. The postapproval period is far less regulated. Although the FDA is clearly interested in postapproval drug safety and occasionally provides approval contingent on performance of additional studies, once a drug reaches the market, literally millions of patients may be exposed to that drug with limited ability to track its safety or effectiveness. Physicians are not legally required to follow the approved labeled indications, and the FDA even recognizes that off-label use of drugs may constitute good medical practice in some cases.[4]

Of course, many examples of appropriate off-label uses of medications exist, and in some situations, off-label use of a drug may be the standard of care. Digoxin is approved for rate control in atrial fibrillation, whereas use of metoprolol is off-label. However, metoprolol, but not digoxin, is first-line therapy for rate control in evidence-based clinical guidelines. Moreover, off-label use may precede approval for an indication. Thalidomide was approved to treat leprosy in 1998. In 1999, it was reported to be effective for multiple myeloma[5]; by 2003, the manufacturer of thalidomide reported that 92% of its sales came from the off-label use.[6] Eventually in 2006, the multiple myeloma indication was added to the label.

Because physicians are not required to document intended indications, tracking off-label drug use is challenging. By all accounts, off-label prescribing is common. Among office-based physicians in 2001, an estimated 21% of overall prescriptions were off-label.[7] Off-label use of cardiac medications and anticonvulsants was especially common, and the investigators reported that almost three-quarters of all off-label use had little or no scientific evidence to support the indication.[7] Perhaps contributing to off-label use of drugs is a general lack of physician knowledge of FDA indications, with the frequent assumption of FDA approval for off-label indications with uncertain or absent evidence of benefit.[8]

Although evidence of overall safety of off-label prescribing is limited, many individual reports of patient harm exist. A Knight Ridder investigational news series in 2003 alleged that off-label prescribing was routine and resulted in death or serious injuries to many patients.[9] The report documented examples of adverse outcomes associated with off-label use of antipsychotics to treat behavioral issues in elderly patients with dementia, anticonvulsants to treat bipolar disorder, terbutaline for premature labor, and fluoxetine hydrochloride for pain. Other common off-label uses can have less serious but undesirable outcomes. For example, sleeping pills, approved only for short-term management of insomnia, are prescribed long term, leading to tolerance. Stimulants, such as modafinil, are used to

**JAMA Internal Medicine**  January 2016  Volume 176, Number 1    **63**

**Copyright 2016 American Medical Association. All rights reserved.**

Downloaded from jamanetwork.com by University of California - Irvine user on 04/27/2024

enhance wakefulness and alertness, exposing college students to dependency on these medications. Consequently, the paucity of literature comparing the rates of adverse events with off-label prescribing relative to on-label prescribing is remarkable. The study by Eguale et al[3] is, to our knowledge, the most extensive and informative study to evaluate the safety of off-label drug use in an adult population to date.

There is much to like about this study. Investigators leveraged the unique capabilities of a comprehensive electronic health record in Quebec that requires physicians to enter indications for new prescriptions and documentation of reasons for drug discontinuation. This system provides an innovation in measuring off-label use, but it also improves on the usual voluntary method of reporting adverse events by capturing data at the time of discontinuation. Treatment indications were classified as on-label or off-label based on whether they could be matched with the drug's package insert. More than 46 000 adult patients received approximately 150 000 new prescriptions during the study period, and those patients were tracked for nearly 6 years. Off-label indications were classified as with or without strong evidence to support the indication. Thus, a large number of patients and prescriptions provide power to examine the safety of off-label prescribing.

Off-label prescribing occurred for 11.8% of all new prescriptions, which is a conservative figure because this definition focused only on the indication on the label and did not assess dosing, age, sex, or other clinical issues included in the label. Most concerning, off-label use was supported by strong evidence less than 20% of the time. Patients receiving prescriptions for off-label indications that lacked strong evidence were 54% more likely to experience an adverse drug event significant enough to warrant discontinuation of that treatment. Age, increasing comorbidities, and receipt of a greater number of drugs all significantly increased the likelihood of adverse drug events.

Although these findings are persuasive and innovative, they come as no surprise. Physicians can rightfully assume that labeled indications are supported by evidence of safety and efficacy based on careful review by the FDA. When clinicians expand prescribing beyond the cleverly devised confines of the labeled indication, they enter an arena of the unknown in many cases. Although in some clinical circumstances the off-label prescribing is clearly within the best interests of the patient, Eguale and colleagues[3] have documented that this scenario occurs infrequently. Even in situations where an off-label indication has been studied, pharmacokinetics, drug-disease interactions, and other safety considerations are unlikely to have been studied systematically to the level required during the FDA drug approval process. Likewise, few clinicians have the time or the motivation to review evidence for those off-label indications to arrive at a balanced assessment of the risks and benefits to support the appropriate use of that drug. Because clinicians are frequently in error regarding approved drug indications,[8] patients are unlikely to be advised when they are prescribed medications for off-label use in most situations. These circumstances threaten the safe, effective, and informed use of medications by patients.

Might changes in rules for promotion of off-label indications based on free speech arguments lead to a situation akin to crying fire in a crowded theater? Unlike the example of the crowded theater, off-label promotion must be "truthful and non-misleading," although experts raise concerns that drug companies will not carefully follow this guidance.[1] Eguale and colleagues[3] have provided compelling evidence that off-label prescribing is frequently inappropriate and that prescribing in these circumstances increases the risk for an adverse event substantially. The FDA and the courts must carefully consider these findings as they contemplate guidance that would relax regulations to permit promotion of drugs beyond their labeled indications.

**ARTICLE INFORMATION**

**Author Affiliations:** Pharmacy Benefits Management Services, US Department of Veterans Affairs, Hines, Illinois (Good); Division of General Medicine, Department of Medicine, University of Pittsburgh, Pittsburgh, Pennsylvania (Good, Gellad); Center for Health Equity Research and Promotion, Veterans Affairs Pittsburgh Healthcare System, Pittsburgh, Pennsylvania (Good, Gellad); Department of Pharmacy and Therapeutics, University of Pittsburgh School of Pharmacy, Pittsburgh, Pennsylvania (Good).

**Corresponding Author:** Chester B. Good, MD, MPH, Center for Health Equity Research and Promotion, Room 2A135, Veterans Affairs Pittsburgh Healthcare System, University Drive C, Pittsburgh, PA 15240 (chester.good@va.gov).

**Published Online:** November 2, 2015. doi:10.1001/jamainternmed.2015.6068.

**Conflict of Interest Disclosures:** Dr Good reported serving as an unpaid advisor to the US Food and Drug Administration (FDA) Drug Safety Oversight Board. Dr Gellad reported serving as Dr Good's alternate to the FDA Drug Safety Oversight Board.

**Disclaimer:** The contents represent the views of the authors only and not necessarily those of the

Department of Veterans Affairs or the US Government.

**Correction:** This article was corrected on December 14, 2015, to fix the location of the study being commented on.

**REFERENCES**

**1**. Johnson C. FDA barred from restricting company's promotion of fish-oil drug. *Washington Post.* http://www.washingtonpost.com/news/wonkblog/wp/2015/08/07/fda-barred-from-restricting-companys-promotion-of-fish-oil-drug/. Accessed August 9, 2015.

**2**. Avorn J. In opposition to liberty: we need a "sovereign" to govern drug claims. *Ann Intern Med.* 2015;163(3):229-230.

**3**. Eguale T, Buckeridge DL, Verma A, et al. Association of off-label drug use and adverse drug events in an adult population [published online November 2, 2015]. *JAMA Intern Med.* doi:10.1001/jamainternmed.2015.6058.

**4**. US Food and Drug Administration. Regulatory information. "Off-label" and investigational use of marketed drugs, biologics, and medical devices:

information sheet. http://www.fda.gov/RegulatoryInformation/Guidances/ucm126486.htm. Updated June 25, 2014. Accessed August 9, 2015.

**5**. Singhal S, Mehta J, Desikan R, et al. Antitumor activity of thalidomide in refractory multiple myeloma. *N Engl J Med.* 1999;341(21):1565-1571.

**6**. Tsao A. Thalidomide's surprising Act IV. http://www.bloomberg.com/bw/stories/2003-09-23/thalidomides-surprising-act-iv. Published September 23, 2003. Accessed August 8, 2015.

**7**. Radley DC, Finkelstein SN, Stafford RS. Off-label prescribing among office-based physicians. *Arch Intern Med.* 2006;166(9):1021-1026.

**8**. Chen DT, Wynia MK, Moloney RM, Alexander GC. U.S. physician knowledge of the FDA-approved indications and evidence base for commonly prescribed drugs: results of a national survey. *Pharmacoepidemiol Drug Saf.* 2009;18(11):1094-1100.

**9**. Adams C, Young A. Risky Rx: a Knight Ridder investigation. http://www.mcclatchydc.com/news/politics-government/article24476629.html. November 2-4, 2003. Accessed August 9, 2015.

Copyright 2016 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by University of California - Irvine user on 04/27/2024



## HHS Public Access
### Author manuscript
*Int J Transgend.* Author manuscript; available in PMC 2016 October 15.

Published in final edited form as:
*Int J Transgend.* 2015 ; 16(2): 97–102. doi:10.1080/15532739.2015.1075929.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

# The Role of Assent in the Treatment of Transgender Adolescents

**Daniel E. Shumer, MD**[1] and **Amy C. Tishelman, PhD**[1,2]

[1]Boston Children's Hospital, Division of Endocrinology, Boston, Massachusetts, USA

[2]Boston Children's Hospital, Department of Urology

### Keywords

transgender; adolescent; assent; consent; developmental delay; autism

## Introduction

There is evolving evidence that individuals with certain forms of developmental disabilities may have higher prevalence of gender noncomformity than individuals without developmental disabilities (Bedard, Zhang, & Zucker, 2010; de Vries, Noens, Cohen-Kettenis, van Berckelaer-Onnes, & Doreleijers, 2010; Gallucci, Hackerman, & Schmidt, 2005; Landén & Rasmussen, 1997; Robinow, 2009; Strang et al., 2014). Gender Dysphoria (GD) is a diagnosis formalized by the Diagnostic and Statistical Manual of Mental Health Disorders, 5th edition, used to describe incongruence between the gender assigned at birth and the experienced or desired gender. GD is only diagnosed when this incongruence is accompanied by clinically significant distress or impairment in social, school, or other important areas of functioning (American Psychiatric Association, 2013). Because adolescence is a period marked by robust cognitive, social, and emotional changes, many in the field recommend that those with suspected gender dysphoria and/or gender incongruence have a careful evaluation prior to consideration of a medical intervention (e.g., Tishelman, Kaufman, Edwards-Leeper, Mandel, Shumer & Spack). The Endocrine Society and the World Professional Association of Transgender Health (WPATH) recommend treatment with medications which suppress puberty, and also with cross-sex hormones, in carefully assessed adolescents presenting in gender clinics as transgender (Coleman et al., 2012; Hembree et al., 2009).

In this paper we illustrate some of the general complexities that can occur in this field through the use of a case composite report, based on our clinical experience at a gender clinic associated with a large pediatric hospital in the United States. We describe an adolescent with co-occurring gender dysphoria and developmental challenges, and then discuss issues of patient assent and prescribing medical therapy in this patient population.

**Address correspondence to:** Daniel Shumer, MD, Boston Children's Hospital, Division of Endocrinology, 300 Longwood Avenue, Boston, MA 02115, Daniel.shumer@childrens.harvard.edu, Phone: 617-355-7476, Fax: 617-730-0194.

**Financial Disclosure:** The authors have no financial relationships relevant to this article to disclose.

**Conflict of Interest:** The authors have no conflicts of interest to disclose.



Exhibit
0031

## Case Composite Report

### Psychological Evaluation

The patient's and family's initial on-site interaction with our clinic consisted of a comprehensive psychological evaluation. The goals of the evaluation, conducted by a licensed clinical psychologist, are to independently evaluate the child's gender status and identity, understand the child and family's needs, and provide information relevant to the possible initiation of medical treatment. Within this context, the evaluation provides information regarding a youth's mental health status, developmental concerns, and family and social support (see Tishelman et al, in press, for more detail). The evaluation consisted of a clinical interview with the patient and father, along with standardized measures addressing behavioral issues, anxiety, depression, and an autism and ADHD screening. These included the Child Behavior Checklist and Youth Self Report (Achenback & Rescorla, 2001), the Children's Depression Inventory 2 (Kovacs, 1992), and the Piers-Harris Children's Self-Concept Scale (Piers & Herzberg, 2002)). In addition, a number of measures were used to assess gender identity, including the Utrecht Gender Dysphoria Scale (Cohen-Kettenis & VanGoozen, 1997) and the Recalled Childhood Gender Identity/Gender Role Questionnaire (Zucker et al., 2006); relevant documents were reviewed (e.g., prior neuropsychological assessment data), and collateral informants were contacted with prior family authorization (e.g., psychotherapist; school counselor).

### Referral Information

John was a 14 year-old natal male of African descent when he was referred to our clinic for a psychological evaluation, to assist in determining whether medical intervention would be beneficial. He was referred to as John, and with male pronouns, at the time of referral and had not transitioned to living as a female. John and his family expressed interest in pursuing puberty-blocking medication. His father, John's primary caretaker, stated at the outset of the evaluation that John wanted to be a girl.

### Background Information

John was adopted from foster care when he was two-years old. Little is known of his early years, and he was placed into foster care after being found abandoned at a fast food restaurant at 18 months of age. His current family consisted of another, older adopted male, and his father. His adoptive mother was deceased.

According to his father, John's development was delayed, with his receptive and expressive language posing particular challenges. By the time he presented in our clinic he had been tested multiple times throughout his life. The most recent neuropsychological evaluation, conducted about 1 year prior to the evaluation, noted that his nonverbal skills were in the low average range, but that he has significant cognitive challenges related to verbal processing, expression and comprehension. Other important areas of concern for John included severe behavioral dysregulation, with a history of tantrums at school and at home, and verbal aggression. He was in a regular 8th grade classroom, at school, with a 1:1 aide at his side throughout the day, and received a range of other academic services tailored to his needs. John's father reported that he was always "different" with regard to gender. He stated

that as a toddler and preschooler he liked to play with dolls and with girls, was always disinterested in sports and other activities stereotypically often associated with boys, and very early on insisted on wearing female underwear. At approximately age 12, John started to experiment with wearing make-up. His father reported that he was very accepting, noting that they had a number of close friends and relatives who were "gay."

Given John's disruptive behavior at school, and his atypical presentation, John was often ostracized and bullied by boys at school. This had been a chronic problem, although his father had strongly advocated on his behalf. John did have some female friends at school and a couple of male and female youth in his neighborhood who were accepting of him. At about the age of 11, John started saying that he did not like boys, and did not want to be a boy. According to his father, starting at the age of 12, John started saying that he was a girl and not a real boy. His father took him to a psychotherapist with experience working with gender variant youth, where John and his family were in therapy for several months prior to the coming to our clinic. When contacted, John's therapist, Dr. Smith, stated that John's father was devoted to John, and wanted to act on his behalf, whatever that path might be. Dr. Smith also stated that he felt that John believed he was a girl, but that he was not sure that John had a grasp of what that entailed in a deeper sense.

John presented as happy to be at the evaluation. It was notably difficult for him to participate in the evaluation, however. He was observed not to comprehend some basic words, such as "sad" and "angry," and was unaware of typical terms for many body parts. He had a propensity to answer yes-no questions, even if he did not actually comprehend what was being asked. He often asked if his father could answer in his stead and stated that he was bored. Nevertheless, based on the confluence of information obtained, he appeared to meet DSM-5 criteria for gender dysphoria (American Psychiatric Association, 2013). In our clinic's multidisciplinary conference, we discussed whether the patient would be eligible to receive hormonal suppression as outline by The Endocrine Society's clinical practice guidelines (Hembree et al., 2009) and the World Professional Association for Transgender Health (WPATH) standards of care for treatment of transgender adolescents (Coleman et al., 2012). According to The Endocrine Society guidelines, patients are eligible for pubertal suppression only if they meet several readiness criteria. For example, patients must meet criteria for gender dysphoria, be at least Tanner stage 2, and have adequate psychologic and social support, all criteria met by our patient. However, they must also have "knowledge and understanding of the expected outcomes of GnRH analog treatment [the medication which blocks production of pubertal hormones], cross-sex hormone treatment, and sex reassignment surgery, as well as the medical and social risks and benefits of sex reassignment (Hembree et al., 2009). During the initial psychological assessment the patient had not demonstrated this level of understanding.

Similarly, the WPATH Standards of Care suggests that the adolescent give informed consent, in addition to consent of the parents, as a minimum criterion prior to receiving puberty suppressing medication (Coleman et al., 2012). The American Academy of Pediatrics (AAP) Committee on Bioethics recognizes that children and adolescents are not capable of providing fully informed consent, but that decision-making involving older children and

*Int J Transgend.* Author manuscript; available in PMC 2016 October 15.

adolescents "should include, to the greatest extent feasible, the assent of the patient". The AAP describes assent as including the following:

1. Helping the patient achieve a developmentally appropriate awareness of the nature of his or her condition.

2. Telling the patient what he or she can expect with tests and treatment(s).

3. Making a clinical assessment of the patient's understanding of the situation and the factors influencing how he or she is responding (including whether there is inappropriate pressure to accept testing or therapy) (AAP, 1995).

Cameron & Murphy (2006) evaluate the process of obtaining consent in a research study with participants at four levels of comprehension ability. In their discussion, they present a number of implications of their work, and suggest that the consent process may be more time consuming, that it may need to be individualized, and that adapted procedures may be warranted. Others also explore such questions (e.g., Lewis & Porter, 2004; Lloyd, 2012), suggesting that in many cases great care must be taken, and approaches may need to be adapted to ensure no undue coercion. In addition, literature discussing pediatric assent for research emphasizes that ability to understand all nuances of the research is not required for assent (Roth-Cline & Nelson, 2013). Creative methods of informing children about risks and benefits, such as with pictures, may improve understanding and aid in obtaining assent (Adcock, Hogan, Elci, & Mills, 2012).

The clinical team turned to our hospital's Ethics Committee for further guidance. After careful consideration of the issues, the Committee and the clinical team developed an individualized strategy for understanding the patient's comprehension of the proposed intervention, and for obtaining assent, involving developmentally appropriate verbal and visual approaches. In this case, the endocrinologist created drawings demonstrating anatomy and typical male and female pubertal changes and referred to these drawings when guiding the patient through the risks and benefits of pubertal suppression. The patient was able to convey comprehension through spontaneous generation of questions indicative of his concerns ("The [GnRH analog] medication will stop my mustache from getting bigger?" and "The medication won't make me develop breasts yet?". He used verbal and nonverbal communication (pointing to the visual depictions) to express a desire to avoid further progression of male puberty, and desire to eventually progress through a female puberty. The patient was prescribed GnRH agonist therapy to suppress puberty; the potential use of cross-sex hormones will be discussed in future visits, and a careful assent procedure will need to be developed in the event that cross-sex hormones are considered. Such an assent procedure would need to include understanding of the irreversible changes resulting in estrogen therapy and implications regarding impaired fertility. In the interim, John was encouraged to further explore his gender preferences, with the flexibility of a time frame that relieved the burden of immediate decisions, through the use of puberty suppressors.

## Discussion

Cases similar to the one described may become more common as providers continue to adopt The Endocrine Society's and WPATH's guidelines for treatment of transgender

adolescents. While our patient was not diagnosed with autism, there is evolving evidence that patients presenting to gender clinics have higher than expected rates of autism and autism spectrum disorder. In a study from the Netherlands the prevalence of autism spectrum disorder in children and adolescents presenting for evaluation of gender dysphoria was 7.8%, much higher than the prevalence in the Dutch pediatric population (de Vries et al., 2010). Another study from a pediatric neuropsychology program in the US demonstrated greater prevalence of gender variance in patients with autism spectrum disorder and attention deficit hyperactivity disorder than in non-referred controls (Strang et al., 2014). A small descriptive study of adults with developmental disabilities found 4 of 32 participants to have gender dysphoria (Bedard et al., 2010).

There may be clinical situations where patients with carefully diagnosed gender dysphoria, who otherwise meet eligibility and readiness criteria, are not able to provide meaningful consent due to cognitive or verbal disability. In other medical conditions, such as cancer or diabetes, medical interventions would never be withheld from these patients provided parents or guardians are available to make proxy medical decisions. This comparison requires acknowledgement that treatment of gender dysphoria with pubertal suppression and cross sex hormones continues to remain controversial, is the subject of continued research, and requires careful individualized assessment, whereas the decision to treat of cancer or diabetes with medical interventions is typically not controversial. However, as clinicians continue to prescribe hormonal interventions for gender dysphoria, they must also be prepared to prescribe these interventions in situations where patients are not able to demonstrate clear "knowledge and understanding" of the interventions. Nevertheless, the psychological evaluation would need to be carefully constructed to provide a thorough comprehension of the client's gender issues, to the extent possible.

One of the complications of working with individuals with developmental differences is that they may have a harder time understanding the spectrum of gender and sexuality options. In particular, some individuals with non-conforming gender presentations may simply be atypical males or females, and others may not fit precisely into a binary model of gender. We are hopeful that John, as well as others in similar circumstances, will use the period of time afforded by puberty-blockers, to explore their own identities in a way that will be authentic and comfortable for them.

A fresh look at the issue of consent and assent, as relevant to the care of transgender adolescents is recommended. For instance, the AAP Committee of Bioethics on notes that pediatricians "should not necessarily treat children as rational, autonomous decision makers." They should, instead, "give serious consideration to each patient's developing capacities for participating in decision-making, including rationality and autonomy". In addition to specifying the essential elements of assent, as noted above, they clarify some of the problems with relying solely on parental or guardian judgment or "proxy consent", including that the medical provider has the legal and ethical duty to render competent care based on a youth's need. This obligation can transcend and exist separately from a guardian's wishes and opinions (AAP, 1995). It is therefore imperative, especially in issues involving fundamental aspects of identity, to represent the adolescent's voice and will to the extent possible. The committee also notes that as children develop, they should be given increased

responsibility for personal health care, and be involved in an interactive process with parents and providers (AAP, 1995). We believe that this standard applies to children with developmental differences as well, as highlighted by our case composite, utilizing a flexible model based on the unique conglomeration of factors associated with every adolescent and family.

Thus, we suggest providers assess for developmental differences prior to initiation of pubertal suppression or cross sex hormones. Explanation of medical treatment options, risks and benefits of treatment, and the assent or consent process should be individualized whenever feasible for each patient based on their level of understanding, and a comprehension of their abilities. Youth who are eager for treatment should not have it withheld based on developmental differences, unless it is not possible to make a determination of treatment needs. Any other approach would present significant risk of discriminating against gender dysphoric adolescents with developmental disabilities, and potentially lead to emotional harm to youth who are already vulnerable.

## Acknowledgments

**Funding Sources:** Dr. Shumer is supported by NIH grant 1T32HD075727-01

## References

American Academy of Pediatrics Committee on Bioethics. Informed consent, parental permission, and assent in pediatric practice. Pediatrics. 1995; 95:314–317. [PubMed: 7838658]

Achenback, TM.; Rescorla, LA. Manual for ASEBA School-Age Forms & Profiles. University of Vermont, Research Center for Children, Youth & Families; Burlington, Vermont: 2001.

Adcock KG, Hogan SM, Elci OU, Mills KL. Do illustrations improve children's comprehension of assent documents? J Pediatr Pharmacol Ther. 2012; 17(3):228–235. [PubMed: 23258965]

American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. 5th edition. Washington DC.: 2013.

Bedard C, Zhang HL, Zucker KJ. Gender identity and sexual orientation in people with developmental disabilities. Sex Disabil. 2010; 28:165–175.

Cohen-Kettenis PT, VanGoozen SHM. Sex reassignment of adolescent transsexuals: A follow-up study. Journal of the American Academy of Child and Adolescent Psychiatry. 1997; 36:263–271. [PubMed: 9031580]

Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, Zucker K. Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7. International Journal of Transgenderism. 2012; 13(4):165–232. doi: 10.1080/15532739.2011.700873.

De Vries ALC, Noens ILJ, Cohen-Kettenis PT, van Berckelaer-Onnes I. a, Doreleijers T. a. Autism spectrum disorders in gender dysphoric children and adolescents. Journal of Autism and Developmental Disorders. 2010; 40(8):930–6. doi:10.1007/s10803-010-0935-9. [PubMed: 20094764]

Gallucci G, Hackerman F, Schmidt C. Gender identity disorder in an adult male with Asperger's syndrome. Sexuality and Disability. 2005; 23(1):35–40.

Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal H. a, Gooren LJ, Meyer WJ, Spack NP, Montori VM. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. The Journal of Clinical Endocrinology and Metabolism. 2009; 94(9):3132–54. doi: 10.1210/jc.2009-0345. [PubMed: 19509099]

Kovacs, M. Children's Depression Inventory Manual. Multi-Health Systems, Inc.; North Tonawanda, NY: 1992.

*Int J Transgend.* Author manuscript; available in PMC 2016 October 15.

119

Landén M, Rasmussen P. Gender identity disorder in a girl with autism--a case report. European Child & Adolescent Psychiatry. 1997; 6(3):170–3. Retrieved from http://www.ncbi.nlm.nih.gov/pubmed/9383652. [PubMed: 9383652]

O, A. A. of P. C. Informed consent, parental permission, and assent in pediatric practice. Pediatrics. 1995; 95:314–317. [PubMed: 7838658]

Piers, EV.; Herzberg, DS. Piers-Harris Children's Self-Concept Scale-Second Edition Manual. Western Psychological Services; Los Angeles, CA: 2002.

Robinow O. Paraphilia and transgenderism: A connection with asperger disorder? Sexual and Relationship Therapy. 2009; 24(2):143–151.

Roth-Cline M, Nelson RM. Parental permission and child assent in research on children. The Yale Journal of Biology and Medicine. 2013; 86(3):291–301. Retrieved from http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=3767214&tool=pmcentrez&rendertype=abstract. [PubMed: 24058304]

Strang JF, Kenworthy L, Dominska A, Sokoloff J, Kenealy LE, Berl M, Wallace GL. Increased Gender Variance in Autism Spectrum Disorders and Attention Deficit Hyperactivity Disorder. Archives of Sexual Behavior. 2014 doi:10.1007/s10508-014- 0285-3.

Zucker K, Mitchell J, Bradley S, Tkachuk J, Cantor J, Allin S. The Recalled Childhood Gender Identity/Gender Role Questionnaire: psychometric properties. Sex Roles. 2006; 57(7):469–483.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

# FDA AND THE PRACTICE OF MEDICINE:
# LOOKING AT OFF–LABEL DRUGS

### Wendy Teo[*]

I. INTRODUCTION ........................................................................ 305
II. FDA AND THE PRACTICE OF MEDICINE ................................... 306
    A.   *Defining the "Practice of Medicine"* ........................ 306
    B.   *Legal Basis for the Non-Interference with the Practice of Medicine* ............................................................... 307
    C.   *The Dilemma that the FDA Faces* ............................. 309
III. OFF-LABEL DRUGS .................................................................. 310
    A.   *What Does "Off-Label" Mean?* ................................ 310
    B.   *Use of Off-Label Prescription Drugs* ........................ 311
    C.   *Current Regulations Pertaining to Off-Label Drugs* . 312
    D.   *Off-Label Drugs and the First Amendment* ............... 313
IV. SHOULD THE FDA REGULATE THE USE OF OFF-LABEL DRUGS? .............................................................................. 316
    A.   *Arguments for Regulations* ....................................... 316
    B.   *Arguments Against Regulations* ................................ 319
V. POSSIBLE SOLUTIONS .............................................................. 324
    A.   *State Regulations* ...................................................... 324
    B.   *Drugs Not Approved in United States* ........................ 325
    C.   *FDA to Explore Other Options* ................................. 326
VI. CONCLUSION ......................................................................... 327

## I. INTRODUCTION

The Food and Drug Administration ("FDA") has always taken a deferential stance with regard to the practice of medicine, and maintains that it will not interfere with the physicians' autonomy in this regard.

[*] B.A., 2011, University of Cambridge, BM BCh., 2014, Oxford Medical School, L.L.M., 2016, Harvard Law School. I would like to thank Professor Peter Barton Hutt for his guidance and advice in the writing of this article, as well as Professor Glenn Cohen and Ms. June Casey for their unwavering support. I would also like to thank my family for always being there and last but not least, I am immensely grateful to Ms. Jessica Formichella and the editors of the Seton Hall Legislative Journal for choosing to publish this paper and for their tireless efforts in the run-up to the publication.

305

This is otherwise known as the "practice of medicine exception." However, the reality is that it is often difficult to draw a clear line between the role of FDA in safeguarding the public from unsafe drugs and the autonomy that physicians have in prescribing off-label medication in the practice of medicine.

This article first will first define what constitutes the "practice of medicine" and outline the deferential stance position that the FDA has adopted towards this practice. This is supported by a discussion of the legal basis for this deferential stance, a position that Congress has also reiterated over the years. The article then explores the prevailing attitudes of physicians and patients toward off-label drugs, current regulations pertaining to the prescription and advertising of off-label drugs, and recent cases that look into restriction of advertising and promoting of off-label uses of drugs. Next, the article dives into a balanced and in-depth discussion as to whether the FDA should regulate the use of off-label drugs, even if it means potentially encroaching and infringing the boundaries of the practice of medicine exception. Lastly, the article sets out brief recommendations that may help address the dilemma.

## II. FDA AND THE PRACTICE OF MEDICINE

### A. Defining the "Practice of Medicine"

Before plunging into a meaningful discussion of the interaction between the FDA and the practice of medicine, it is first appropriate to define what the "practice of medicine" encompasses.

What exactly is the "practice of medicine?" Is the "practice of medicine" whatever that the physicians say it is, or is it a question of how to properly treat patients? If it is the former, then the "practice of medicine" clearly lies within the prerogative of physicians and is a field in which regulatory bodies have no role intruding upon. If it is the latter, then in the name of safeguarding the public health, perhaps there is some foundation for the government to intervene and impose regulations.

It naturally follows that the definition of "practice of medicine" that this paper chooses to adopt will influence all of the arguments subsequently raised. However, there is no clear uniform answer: the definitions of "practice of medicine" have fluctuated over time, states and jurisdictions. For instance, an article in the Journal of American Medical Association in 1908 defined the practice of medicine simply as the "art of healing," while at the same time, states like New York and Ohio only considered that an individual practiced medicine if he administered drugs

or performed surgery.[1]

Modern legal definitions do not provide much clarity, with different states reaching different conclusions on whether the same activity involves the practice of medicine.  For example, the District of Columbia Court of Appeals considers a physician's testimony as a non-treating expert witness to fall under the umbrella of the practice of medicine.[2]  The Missouri Court of Appeals however, takes the opposite stance.[3]  Therefore, it is difficult to reach a uniform position on certain activities, and states and courts have also grappled with defining and delineating the boundaries of the practice of medicine.  For instance, it is unclear if physicians can rightfully claim to engage in the practice of medicine when they review insurance coverage decisions or when non-physicians, whose duties overlap with actual physicians, can be said to cross the line into practicing medicine.[4]

Generally, most state statutes and courts broadly define the practice of medicine as involving at least two activities: (1) diagnosing a disease, condition or injury; and (2) prescribing, administering or providing a treatment for that disease, condition or injury.[5]

### B.  *Legal Basis for the Non-Interference with the Practice of Medicine*

The FDA has always been clear on its stance: it does not regulate the practice of medicine between physicians and patients.[6]  Although there are no existing statutes that specifically outline or guide this prohibition, the FDA's deference to physicians is borne from Congressional intent.

The Federal Food, Drug, and Cosmetic Act of 1938 ("FFDCA") provides the primary source of FDA's regulatory power over drugs.  Although the FFDCA, in effect, expanded the federal regulatory

---

[1]  *What Constitutes the Practice of Medicine*, 299 JAMA 463, 463 (2008); Smith v. Lane, 31 N.Y. Sup. Ct. (24 Hun 632) 634-35 (1881); *see also* Nelson v. State Bd. of Health, 57 S.W. 501, 505 (Ky. 1900) (holding that an osteopath is not required to be licensed because he does not "prescribe or administer medicine or perform surgery"); State v. Liffring, 55 N.E. 168, 168-69 (Ohio 1899) (concluding that a treatment is not medical practice unless it includes the administration of drugs).

[2]  *See* Joseph v. D.C. Bd. of Med., 587 A.2d 1085, 1091 (D.C. 1991).

[3]  *See* Missouri Bd. of Registration for the Healing Arts v. Levine, 808 S.W.2d 440, 443 (Mo. Ct. App. 1991).

[4]  Lars Noah, *Ambivalent Commitments to Federalism in Controlling the Practice of Medicine*, 53 KAN. L. REV. 149, 162-64 (2004).

[5]  Noah, *supra* note 4, at 162; Cynthia Marietta & Amy L. McGuire, *Direct-to-Consumer Genetic Testing: Is It the Practice of Medicine?*, 37 J. L. MED. AND ETHICS, 369, 371 (2009).

[6]  Carol Berry, *The Dividing Line Between the Role of the FDA and the Practice of Medicine: A Historical Review and Current Analysis*, HARV. UNIV. LIBRARY (1997).

TEO (DO NOT DELETE)                                                    9/5/2017 3:30 PM

authority, the legislative debates preceding the enactment of the FFDCA demonstrated that Congress had never intended for FDA to regulate the practice of medicine.[7]

During the course of amending the FFDCA in passing the Drug Amendments of 1962, Congress once again repeated their stance of FDA's non-interference with the practice of medicine.[8]  In subsequent amendments, provisions were included to reinforce this stance.  Section 214 of the Food and Drug Administration Modernization Act of 1997 states that "nothing in [the FFDCA] shall be construed to limit or interfere with the authority of a healthcare practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship."[9]  Furthermore, the Food and Drug Administration Amendments Act of 2007 explicates that "nothing in this section shall be construed to. . .limit the practice of medicine."[10]  Evidently, this doctrine has been reiterated throughout the years, and it is important to note that Congress has adopted a similarly deferential stance in protecting professional autonomy in other federal healthcare legislation, such as the Medicare statute, Fertility Success Rate and Certification Act of 1992 and the Drug Addiction Treatment Act of 2000.[11]

---

[7]   *See* ROBERT P. BRADY, FUNDAMENTALS OF LAW & REGULATION: AN IN-DEPTH LOOK AT FOOD & DRUG ADMINISTRATION MODERNIZATION ACT 423-424 (David G. Adams & Richard M. Cooper eds., 1st ed. 1997); *see also* Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 350 (2001) ("[T]he FDA's mission [is to] . . . regulate . . . without directly interfering with the practice of medicine"); James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 FOOD & DRUG L.J. 71, 76 (1998) ("[The] FDA never has had authority to regulate the practice of medicine; physicians may use legally marketed drugs or devices in any way that they believe, in their professional judgment, will best serve their patients").

[8]   Pub. L. No. 87-781, 76 Stat. 780 (codified in scattered sections of 21 U.S.C.).  *See* S. Rep. No. 87-1552, at 1998 (1962) ("[T]he . . . [Act] should not interfere with the professional function of the physician.  FDA clearance would assure physicians that a drug effectively produces certain physiological actions, but the physician, not the FDA, would determine whether these specific physiological effects would be useful or beneficial with respect to particular patients.").

[9]   Pub. L. No. 105-115, § 214, 111 Stat. 2296, 2348 (codified at 21 U.S.C. § 396).

[10]   Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85, § 1111(d), 121 Stat. 823, 976 (codified at 42 U.S.C. § 247d-5a(d)).

[11]   Health Insurance for the Aged Act, Pub. L. No. 89-97, § 102(a), 79 Stat. 290, 291 (1965) (codified at 42 U.S.C. § 1395) ("Nothing in [the Medicare statute] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine."); Pub. L. No. 102-493, § 3(i)(1),106 Stat. 3146, 3149 (codified at 42 U.S.C. § 263a-2(i)(1)) ("In developing the [federal embryo laboratory] certification program, the [Department of Health and Human Services] may not establish any regulation, standard, or requirement which has the effect of exercising supervision or control over the practice of medicine in assisted reproductive technology programs."); Pub. L. No. 106-310, § 3502, 114 Stat. 1222, 1226 (codified at 21 U.S.C. § 823(g)(2)(H)(i)) ("Nothing in such regulations or

2017]          *FDA AND THE PRACTICE OF MEDICINE*          309

### C.  The Dilemma that the FDA Faces

Not surprisingly, there exists an apparent tension between respecting physicians' autonomy in caring for individuals in their practice of medicine and the need for the government to regulate such practices and safeguard public health.  A common viewpoint amongst physicians is that flexibility is crucial for them to judge what is best for each individual patient and to provide effective medical care of the highest quality.[12]  The focus of ethical medical teaching has always been to do what is in the best interest of the individual patient and to respect each patient's autonomy.  In contrast, the focus with the study of medicine in public health lies on the well-being of the entire population at large.[13]  As Jeffrey Drazen—a physician and editor-in-chief of the New England Journal of Medicine—pointed out, the practice of medicine is done "on an individual basis, with the best interests of the patient foremost in the practitioner's mind."[14]

The tension between the FDA and physicians over the scope of practice of medicine has led to various clashes in the field, such as the use of pre-approved medical devices or autologous stem cell therapies.  In the latter, the FDA determined in 2008 that the autologous stem cell therapies performed by Regenerative Sciences (a Colorado-based medical practice and its  physician owners) constituted a "drug" under section 201(g) of the Federal Food, Drug, and Cosmetic Act ("FFDCA") and a "biological product" under section 351(i) of the Public Health Service Act ("PHSA").[15]  This move expanded the scope of FDA's regulatory authority over physicians working on stem cell research and treatment.

This paper will focus closely and solely on the tension and controversy generated by the use of off-label drugs by physicians.

---

practice guidelines may authorize any Federal official or employee to exercise supervision or control over the practice of medicine or the manner in which medical services are provided.").

[12]  Solomon J, Raynor DK, Knapp P, Atkin K, *The Compatibility of Prescribing Guidelines and The Doctor-Patient Relationship: A Primary Care Mixed-Methods Study*, 62 BR J GEN PRACT. 275, 275 (2012).

[13]  BERNARD LO, RESOLVING ETHICAL DILEMMAS: A GUIDE FOR CLINICIANS 12–14 (5th ed. 2013); *see also* LAWRENCE O. GOSTIN, PUBLIC HEALTH LAW: POWER, DUTY, RESTRAINT (2nd ed. 2008).

[14]  Jeffrey M. Drazen, *Government in Medicine*, 356 NEW ENG. J. MED. 2195, 2195 (2007).

[15]  Letter from Mary A. Malarkey, Dir. of Compliance and Biologics Quality, U.S. Food & Drug Admin., to Christopher J. Centeno, M.D., Med. Dir., Regenerative Sci., Inc. (July 25, 2008), *available at* http://www.fda.gov/BiologicsBloodVaccines/GuidanceCompliance RegulatoryInformation/ComplianceActivities/Enforcement/UntitledLetters/ucm091991.htm.

TEO (DO NOT DELETE)                                               9/5/2017 3:30 PM

310          *SETON HALL LEGISLATIVE JOURNAL*          [Vol. 41:2

### III. OFF-LABEL DRUGS

With respect to the use of off-label drugs, it is crucial to note that this tug-of-war over the scope of practice of medicine goes beyond the FDA and physicians; there are other important stakeholders deeply involved with vested and personal interests.    Third party payers increasingly question their duty to expend payments for drugs that have not been proven reliably effective, even if these drugs may be the only viable treatment option available.[16]    Pharmaceutical companies are interested in expanding their markets and increasing profits by bypassing expensive by bypassing expensive clinical trials needed for FDA approval.[17]  The consumers, i.e., the public at large, wants to know that drugs that are available in the market are supported by clinical evidence and are sold at affordable prices.[18]   The FDA, being responsible for matters that affect the nation's health and welfare, has an obligation to try and balance these seemingly incompatible goals.   In view of these conflicting and contradictory interests, where should the line be drawn?

Before examining the interests of these parties and the weight of the arguments for and against regulation of the use of off-label drugs, it makes sense to first gain a better understanding of the current state of affairs by looking at the current regulations and recent legal cases about the use of such drugs.

#### A.   What Does "Off-Label" Mean?

The FDA acts on behalf of the federal government and is responsible for regulating the entry, sale, promotions, and marketing of drugs in United States.  The relevant statute that guides this process is the Federal Food, Drug, and Cosmetic Act, which was first enacted in 1938 and underwent a series of amendments in 1962.  The FFDCA stipulates a "preclearance" regulatory system, which states that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application . . . is effective with respect to such drug."[19]  The approval process for a new drug is long, arduous, and highly expensive, involving numerous phases of testing on animals and humans.

The FDA only allows new drugs to enter the marketplace for the

---

[16]   Randall Stafford, *Regulating Off-Label Drug Use – Rethinking The Role of The FDA*, 358 NEW ENG. J. OF MED. 1427, 1428 (2008).

[17]   *Id.*

[18]   *Id.*

[19]   21 U.S.C. § 355(a) (2012).  *See also* Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, 52 Stat. 1040, 1043 (1938), *amended by* Drug Amendments of 1962, Pub. L. No. 87-781, 76 Stat. 780 (1962) (current version at 21 U.S.C. §§ 301-399f).

2017]              *FDA AND THE PRACTICE OF MEDICINE*              311

uses that the pharmaceutical company has applied and managed to get approval for.[20]   Moreover, given that the FDA is also responsible for regulating the advertising of such drugs by pharmaceutical companies, it requires that all of the approved uses be indicated on a drug's label.[21] "Off-label" uses of a drug refer to the use or prescription of the drug in a manner that has not been authorized by the FDA through its approval process for new drugs.

### B.   Use of Off-Label Prescription Drugs

Off-label use can arise in different ways, but it mainly refers to the use of drugs in ways that have not been approved by the FDA. Drugs can be used for an unapproved indication.  For example, the antipsychotic agent, quetiapine, is approved for treating psychosis, but can also be prescribed for different medical conditions like depression.  They can also be used in unapproved populations, like paroxetine, that is approved for treating depression in adults, but is are also used to treat depression in children.[22]   Other ways of using drugs in an off-label manner is to prescribe them in a non-approved dosage form or dose regimen.[23] Physicians use drugs for indications outside of the approved uses when they extend the use of approved drugs to milder forms of an approved indication, or a closely related condition (e.g., the use of anti-asthmatic montelukast (commonly known as Singulair) for chronic obstructive pulmonary disease), or other conditions which have similar physiological pathways (e.g., the use of the antidiabetic drug metformin to treat polycystic ovarian syndrome) or to conditions that have similar and overlapping symptoms.[24]

Off-label prescribing is legal and is so common that it can be found in almost every field of modern medicine.  In a recent study done in 2006, off-label use was shown to account for approximately twenty-one percent of all prescriptions of 160 common drugs.[25]

The most common medical fields in which off-label drugs are being prescribed are oncology, rare diseases, AIDS treatment, and pediatrics; while the highest rates of off-label use were for anticonvulsants (seventy-four percent), antipsychotics (sixty percent), and antibiotics (forty

---

[20]   Rodney Smolla, *Off-Label Drug Advertising and The First Amendment*, 50 WAKE FOREST L. REV. 81 (2015).
[21]   21 U.S.C. § 321(p)(1) (2016).
[22]   Stafford, *supra* note 16, at 1427.
[23]   Stafford, *supra* note 16, at 1427.
[24]   Stafford, *supra* note 16, at 1427.
[25]   David C. Radley, Stan N. Finkelstein & Randall Stafford, *Off-Label Prescribing Among Office-Based Physicians*, 166(9) ARCHIVES OF INT'L MED 1021 (2006).

312          *SETON HALL LEGISLATIVE JOURNAL*          [Vol. 41:2

percent).[26]  In 1911, the General Accounting Office found that twenty-five percent of all anticancer drugs were prescribed off-label and fifty-six percent of cancer patients were on at least one drug that was being prescribed off-label.[27]  In the field of pediatric medicine, it has been estimated that sixty-two percent of drugs prescribed for children are for off-label uses.[28]

The use of off-label drugs is so ubiquitous that, not only are they being used in most medical specialties, they can be part of guideline-recommended practices, including in the use of aspirin in diabetes for prophylaxis against cardiovascular disease, and can even be a first-line therapy in some cases, such as the use of gabapentin for painful diabetic neuropathy, in addition to its approved use in the treatment of herpes zoster.  Some drugs that pose a high risk of side effects, even for their approved uses, are also being used off-label as a last resort, e.g., the use of tacrolimus for autoimmune disease, in addition to its approved use in transplantation.[29]

## C.  *Current Regulations Pertaining to Off-Label Drugs*

Broadly speaking, off-label activities can take three basic forms: off-label use by consumers at large who purchase these drugs over the counter, off-label prescription of drugs by physicians and providers, and off-label marketing and promotion by pharmaceutical companies.[30]  In general, off-label prescribing largely influences off-label use by consumers, which is in turn influenced greatly by off-label advertising and promotion to physicians.  The FDA has sought to regulate and restrict the extent of off-label use, mainly by restricting the pharmaceutical industry's marketing practices and, to a much smaller extent, prescribing by physicians.[31]  This unique behavior is presumably driven by the FDA's deferential stance toward the practice of medicine exception, although it is debatable whether interfering with the industry's attempts to promote off-label uses to physicians is in effect an indirect interference with the practice of medicine.

---

[26]   Stafford, *supra* note 16, at 1427; James O'Reilly and Amy Dalal, *Off-Label or Out of Bounds? Prescriber and Marketer Liability for Unapproved Uses of FDA-Approved Drugs*, 12 ANNALS OF HEALTH L. 295, 298 (2003).

[27]   U.S. GENERAL ACCOUNTING OFFICE, GAO/PEMD-91-14, OFF-LABEL DRUGS: REIMBURSEMENT POLICIES CONSTRAIN PHYSICIANS IN THEIR CHOICE OF CANCER THERAPIES (1991).

[28]   Alicia T.F. Bazzano et al., *Off-Label Prescribing to Children in the United States Outpatient Setting*, 9 ACAD. PEDIATRICS 81, 83 (2009).

[29]   Stafford, *supra* note 16, at 1427.

[30]   O'Reilly and Amy Dalal, *supra* note 26.

[31]   Stafford, *supra* note 16, at 1428.

2017]          *FDA AND THE PRACTICE OF MEDICINE*          313

With regard to prescribing off-label uses, the FDA uses changes in drug labeling such as black box warnings to alert physicians that special caution is required, and imposes specific restrictions on drug availability to curb off-label uses to limited settings.[32]   The FDA imposes much stricter rules on the industry's marketing practices.   Prior to its 1997 amendments, the FFDCA expressly forbade the sale of a drug that has unapproved uses written on its label or was advertised for unapproved uses.[33]   In other words, pharmaceutical companies were only allowed to promote or advertise prescription drugs for uses that were approved by the FDA or uses that were "on" the new drug's label.

Following major lobbying from pharmaceutical companies, the FFDCA underwent a series of amendments in 1997.   Section 401 of the FDA's Modernization Act allows drug manufacturers to distribute information regarding the off-label use, on the condition that the manufacturer satisfies a list of requirements.[34]   These requirements include only disseminating information that is not abridged, false, misleading, or posing a significant health risk to the public; the manufacturer has to conduct all clinical research found in the disseminated materials, and include in all disseminated materials prominent disclaimers clarifying that the information disclosed concerns a drug that has not been approved by the FDA for that particular use.[35]

The medical industry has always welcomed the exchange of scientific information with the drug industry and preferred the open dissemination of truthful, non-misleading information relating to all beneficial uses for approved products.[36]   In fact, both the pharmaceutical industry and the medical professions believe that the FDA's regulations encroach upon their freedom of speech and freedom to practice medicine respectively, and hinder them from keeping up with medical breakthroughs and scientific discoveries.[37]

*D.   Off-Label Drugs and the First Amendment*

Given that the full exchange of drug-related information between pharmaceutical companies and physicians influences the latter's medical knowledge, it follows that pharmaceutical companies' freedom of speech

---

[32]   Stafford, *supra* note 16, at 1428.

[33]   *See* 21 U.S.C. §§ 355(a), 331(d), 321(p) (2000).

[34]   Pub. L. No. 105-115, § 401, 111 Stat. at 2356-57 (codified at 21 U.S.C. § 360a).

[35]   *Id.*

[36]   Katherine Helm, *Protecting Public Health from Outside the Physician's Office: A Century of FDA Regulation From Drug Safety Labeling to Off-Label Drug Promotion*, 18 FORDHAM INTELL. PROP., MEDIA AND ENT. L. J. 1177, 153-55 (2007).

[37]   *Id.* at 153-54.

TEO (DO NOT DELETE)                                                                                    9/5/2017 3:30 PM

314            *SETON HALL LEGISLATIVE JOURNAL*            [Vol. 41:2

is intimately linked to physicians' freedom to practice medicine. Hence, in examining the FDA's possible interference with the practice of medicine, we also need to look at how it might do so indirectly by restricting the freedom of speech.

First Amendment challenges to the FDA's ban on off-label promotion have been raised on the grounds that it restricts the freedom of speech. There are two recent cases that directly impacted the constitutionality of the FDA's authority. In *Sorell v. IMS Health*, the U.S. Supreme Court held that a Vermont law that restricted the "sale, disclosure, and use of pharmacy recordsFalsereveal[ing] the prescribing practices of individual doctors" violated First Amendment free speech protections.[38] To reduce state healthcare costs, Vermont intended to hinder drug manufacturers' ability to use the information gained from the prescribing practices of doctors to influence them to prescribe brand-name drugs instead of generic equivalents.[39] The Supreme Court explicitly stated that "[s]peech in aid of pharmaceutical marketing. . . is a form of expression protected by the Free Speech Clause of the First Amendment" and that Vermont sought "to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers – that is, by diminishing detailers' ability to influence prescription decisions."[40] The court in *Sorell* stated, "the 'fear that people would make bad decisions if given truthful information' cannot justify content–based burdens on speech."[41] The court noted that the First Amendment's hostility to paternalistic regulations is applied with "full force, when the audience, in this case prescribing physicians, consists of 'sophisticated and experienced' consumers," which is the same audience of the off-label promotions that the FDA is attempting to restrict.[42]

Although the *Sorell* holding examined pharmaceutical marketing and not specifically at the FDA regulatory authority to regulate off-label promotion, it predicted how courts would decide the FDA's ability to restrict manufacturers from providing truthful information to physicians about off-label uses of approved drugs.[43]

This prediction came to fruition in the Second Circuit decision, *United States v. Caronia*, where a pharmaceutical company, and its

---

[38]  Sorrell v. IMS Health Inc., 564 U.S. 552, 557 (2011).
[39]  *Id.* at 560-61.
[40]  *Id.* at 557, 577.
[41]  *Id.* at 577.
[42]  *Id.*
[43]  Ashley Zborowsky, *Rethinking Off-Label Regulation in The Wake of Sorrell v. IMS Health: Can State Involvement Compensate for Waning State Authority to Curb Commercial Free Speech?*, 13 MINN. J. L. SCI. & TECH. 925, 934 (2012).

2017]        *FDA AND THE PRACTICE OF MEDICINE*              315

marketing agents, were caught promoting statements based on their personal experiences on the off-label uses of the prescription drug Xyrem.[44]  Given that the statements made by the defendants were truthful and not false or misleading, the issue in *Caronia* revolves purely around the legality of the FDA's restrictions on the act of off-label marketing itself.[45]  At the time *Caronia* was decided, the key case on commercial speech protections was *Central Hudson Gas and Electric Corp. v Public Service Commission*, where the Supreme Court created a four-part test: (1) whether the expression is protected by the First Amendment and for commercial speech to fall under this category it must concern lawful activity and not be misleading; (2) whether the asserted governmental interest is substantial; (3) whether the regulation directly advances the governmental interest asserted; and (4) whether it is not more extensive than is necessary to serve that interest.[46]

Accordingly, in *Caronia* the Second Circuit applied the four-pronged commercial speech test set out in *Central Hudson*.[47] Consequently, the court found that the speech concerned lawful activity and was not misleading under the first prong and that the FDA's interest in safeguarding public safety and health was "substantial" under the second prong, but the FDA's regulatory regime failed to advance the governmental interest in a direct and material way under the third prong.[48] Further, the court found that the regulation is broader than necessary to serve the interest under the fourth prong.[49]  The Court pointed out that, "prohibiting off-label promotion . . . while simultaneously allowing off-label use 'paternalistically' interferes with the ability of physicians and patients to receive potentially relevant treatment information . . . [which] could inhibit, to the public's detriment, informed and intelligent treatment decisions."[50]

In holding that the restricting commercial speech should be a last resort under the First Amendment, the court in *Caronia* dealt a blow to the FDA's authority to restrict off-label marketing, thereby compromising the FDA's authority to use commercial speech as a proxy to regulate undesirable off-label prescriptions.[51]  The Court's decision in

---

[44]   Unites States v. Caronia, 703 F.3d 149, 156-57 (2d Cir. 2012).

[45]   *Id.* at 165.

[46]   Central Hudson, Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 566 (1980).

[47]   Unites States v. Caronia, 703 F.3d 149, 164-66 (2d Cir. 2012).

[48]   *Id.* at 166.

[49]   *Id. at* 165-67.

[50]   *Id.* at 166.

[51]   Zborowsky, *supra* note 43, at 937; Rodney Smolla, *Off- Label Drug Advertising and The First Amendment*, 50 WAKE FOREST L. REV. 81, 110 (2015).

316          *SETON HALL LEGISLATIVE JOURNAL*          [Vol. 41:2

*Caronia* brings the FDA closer to confronting its dilemma: how can it balance its role in safeguarding public health without interfering with physicians' autonomy to freely practice medicine?

### IV. SHOULD THE FDA REGULATE THE USE OF OFF-LABEL DRUGS?

Should the FDA regulate the use of off-label drugs in the name of public safety, but at the risk of interfering with the practice of medicine, which may in turn also endanger public health? As Helm points out, the "double-edged sword of drug regulation can cut deeply both ways."[52]

### A. Arguments for Regulations

There are various reasons for which the FDA should take on a more active role in regulating off-label uses. For starters, in view of the conflicting interests of different stakeholders, one can argue that it is the role of the FDA as a federal regulatory body to step in to balance these interests.[53] Interests such as increasing access and availability can be at odds with ensuring safety and efficacy.[54]

There is also a highly worrying possibility that pharmaceutical companies may shun the expensive and complicated approval process by "gaming the system."[55] Equipped with the knowledge that they can sell their products for a wide range of uses once a singular use has been approved, drug companies will choose to seek approval for narrow indications. The relevant clinical trials for narrow indications are less expensive and tedious, and they do so with the hope that they can gain approval faster and market the product for both its approved and unapproved uses.[56] In the short term, patients will be placed at risk of being harmed by drugs that are being used for purposes that have not been proven to be safe and effective.[57] In the long run, the underhanded shortcuts adopted by pharmaceutical companies to bypass the FDA's strict review and approval process severely undermines the drug efficacy requirements, which may end up chipping away at the foundation of evidence-based medicine.[58]

Save for regulations imposed by the FDA on off-label prescription and promotion, drug companies also have minimal incentives to expend time, money, and resources to prove the safety and efficacy of the

---

[52]  Helm, *supra* note 36, at 167.
[53]  Stafford, *supra* note 16, at 1427.
[54]  Helm, *supra* note 36, at 163-64.
[55]  Stafford, *supra* note 16, at 1427-28.
[56]  Helm, *supra* note 36, at 164.
[57]  O' Reilly and Dalal, *supra* note 26, at 307.
[58]  Stafford, *supra* note 16, at 1427.

2017]          *FDA AND THE PRACTICE OF MEDICINE*          317

unindicated uses.[59]   Generic drugs are often produced by smaller pharmaceutical firms that do not have the capital or financial backing to pay for the expenses that are required to push a drug through the new drug application process.   Brand-name drugs that are already widely used off-label are rarely put through the process by pharmaceutical companies that can afford the trials, simply because carrying out such expensive trials could potentially end up producing clinical evidence that does not support the unapproved use and thus subjects the companies to suffering from loss of profits.[60]   Competing drug manufacturers are also less inclined to carry out research about the safety of their own drugs when they see other manufacturers making sales from similar drugs sold for the same unindicated use, especially since doing research will only lead to lost sales from creating delays.[61]   Thus, there is an obvious need for the FDA to step in to impose regulatory control, as market forces provide insufficient incentives for drug companies to protect their consumers.[62]

Another potential concern is that it would be wholly irresponsible to leave it to the pharmaceutical industry and physicians to dictate the use of drugs, when pharmaceutical companies have minimal incentives to monitor the safety and efficacy of the drugs and individual physicians do not have the resources to carry out the extensive and expensive trials needed to reliably and accurately prove its efficacy.   In fact, the trials reported in the materials that pharmaceutical companies distribute to physicians to convince them of the efficacy of off-label uses are often of poor quality, industry-sponsored, and are compared to placebos rather than existing approved therapies.[63]   With minimal incentives to drive the pursuit of reliable, controlled data on the efficacy of drugs for new indications, physicians run the risk of making treatment choices that are unsafe.[64]

This is especially important as the average consumer expects the FDA to have thoroughly screened and evaluated every drug that is available in the market for drug safety and efficacy, which is in line with the common expectation that FDA is irrefutably responsible for safeguarding public health and safety.   By permitting off-label uses to occur without subjecting the drugs to rigorous safety checks, the FDA is undermining the expectations of the average consumer.[65]   As Public

---

59   Stafford, *supra* note 16, at 1427.
60   Stafford, *supra* note 16, at 1427.
61   O'Reilly and Dalal, *supra* note 26, at 307.
62   O'Reilly and Dalal, *supra* note 26, at 309.
63   Stafford, *supra* note 16, at 1428.
64   Helm, *supra* note 36, at 167.
65   Stafford, *supra* note 16, at 1428.

TEO (DO NOT DELETE)                                                    9/5/2017 3:30 PM

318          *SETON HALL LEGISLATIVE JOURNAL*          [Vol. 41:2

Citizen, a consumer watchdog group, asserted in a congressional submission, deregulating the drug companies will "place the economic well–being of multinational pharmaceutical manufacturers above the health and safety of the American public and. . .weaken [the] law meant to protect the public from needless drug – induced injury."[66]  Besides, if serious safety concerns about approved uses for drugs already on the market are constantly being raised, surely that equates to even more cause for concern when it comes to off-label uses that have not gone through the rigorous testing process.

In 2006, a study revealed that 73 percent of off–label prescriptions lacked any "firm scientific evidence."[67]  This may be driven in part by the fact that physicians may hold wrong or inaccurate beliefs of the level of evidence supporting a drug's indications.  A survey done by the University of Chicago Medical Centre revealed that physicians were more likely to (incorrectly) believe that a specific use of a drug was FDA–approved if they themselves prescribed it for that indication.[68]  This underscores the potential risk of off-label uses, even if that risk is unintentional, and emphasizes the need for the FDA to step in and oversee drug prescribing practices.[69]

Proponents for imposing regulation go even further and claim that the untested use of drugs is unethical and potentially unsafe.[70]  After all, isolated case reports published in peer–reviewed journals telling the successes of unapproved uses cannot compare to controlled and rigorous clinical trials and strict FDA scrutiny of the drug's safety profile.[71]

A case in point is the increased risk of heart attack and stroke that were brought about from Merck's promotion of the off-label use of rofecoxib (Vioxx) in treating rheumatoid arthritis, outside of its FDA-approved use for relieving pain.[72]  What makes the situation more aggravating is that these risks were only discovered after widespread use

---

66    O' Reilly and Dalal, *supra* note 26, at 305-06.

67    Radley et. al, *supra* note 25, at 1023.

68    Rick Nauert, *Off-Label Use May Be Off-Track*, PSYCH CENTRAL, (Aug. 24, 2009), http://psychcentral.com/news/2009/08/24/off-label- use-may-be-off-track/7926.html.

69    Amy E. Todd, *No Need for More Regulation: Payors and Their Role in Balancing the Cost and Safety Considerations of Off-Label Prescriptions*, 37 AM. J.L. & MED. 422, 426 (2011) ("[W]hile off-label prescribing can be very beneficial to some patients, this common practice can also be unnecessary and, in some cases, very risky.").

70    Steven R. Salbu, *Off-Label Use, Prescription, and Marketing of FDA-Approved Drugs: An Assessment of Legislative and Regulatory Policy*, 51 FLA. L. REV. 181, 202 (1999).

71    *See* Charles Marwick, *Implementing the FDA Modernization Act*, 279 JAMA 815 (1998).

72    Stafford, *supra* note 16, at 1429; John Cairns, *The Coxibs and Traditional Nonsteroidal Anti-Inflammatory Drugs: A Current Perspective on Cardiovascular Risks*, 23(2) CAN. J. CARDIO, 125 (2007).

2017]          *FDA AND THE PRACTICE OF MEDICINE*          319

of the drug among patients who didn't stand to benefit much from choosing rofecoxib over the existing treatment of choice.[73]

There are other notorious examples where the use of off-label medications have gone awry and caused more harm than good. The E1 prostaglandin analogue, Misoprostol, was approved in 1988 for the prevention and treatment of gastric ulcers, but was later prescribed off-label to induce labor for elective abortions.[74] Unfortunately, it was later found to cause uterine rupture in pregnant women.[75] Thalidomide is another tragic example; it was initially used as a sedative and was later approved to treat leprosy, but it was also prescribed for off-label purposes such as cancer and AIDS.[76] It was found that when pregnant women consumed the drug, their babies were born with severe and permanent limb deformities.[77] These examples serve to highlight the dangers of permitting un-indicated uses of drugs that have not been approved by the FDA.

## B.  *Arguments Against Regulations*

There is some force in the argument that science should dictate the practice of medicine, not law. As Beck and Azari say, "[f]or a product to have the most effective potential benefits, law and regulation. . .must follow, not precede science."[78] It often takes a prolonged period of time for regulations to be put in place because the FDA approval process is notorious for being time-consuming, arduous and expensive.[79] The process for approval in 2000 was estimated to take between seven to ten years.[80] In practical terms, this means that medical discoveries in the field of practice often happen at a faster pace than the FDA approval process.[81] For instance, the approved use for aspirin was for pain relief as an anti-

---

[73]  Carolanne Dai, Randall Stafford, Caleb Alexander, *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release: Non-Selective Diffusion of a Selectively Cost-Effective Innovation*, 165 ARCHIVES OF INT'L MED. 171 (2005).

[74]  Dov Fox, *Safety, Efficacy and Authenticity: The Gap Between Ethics and Law in FDA Decisionmaking*, 2005 MICH. S. L. REV.1135, 1168 (2005).

[75]  *Id.*

[76]  Shuang Zhou, Fengfei Wang, *Tze-Chen Hsieh, Joseph Wu, Erxi Wu, Thalidomide – A Notorious Sedative to a Wonder Anticancer Drug*, 20 CURR MED CHEM 4102 (2014).

[77]  Fox, *supra* note 74, at 1168; *see also* Joseph G. Contrera, *The Food and Drug Administration and the International Conference on Harmonization: How Harmonious will International Pharmaceutical Regulations Become?*, 8 ADMIN. L.J. AM. U. 927, 935 n.33 (1995).

[78]  James M. Beck & Elizabeth Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 FOOD & DRUG L.J. 71, 79 (1998).

[79]  O' Reilly and Dalal, *supra* note 26, at 304.

[80]  O' Reilly and Dalal, *supra* note 26, at 304.

[81]  Fox, *supra* note 74, at 1165.

TEO (DO NOT DELETE)                                                                9/5/2017 3:30 PM

320          *SETON HALL LEGISLATIVE JOURNAL*          [Vol. 41:2

inflammatory drug but it was prescribed by physicians off-label for many years to reduce the risk of heart attacks and it wasn't until 1998 that the FDA finally approved such use.[82]

Furthermore, while new additions may eventually be included on the list of approved uses following a supplemental new drug application, this is more of an exception than the norm. The FDA approval process is immensely expensive and a recent study done by Tufts Centre for the Study of Drug Development pegs the cost of developing a new drug that ultimately gains market approval at $2.6 billion.[83] As mentioned earlier, drug companies either do not have the financial backing to do so and even if they do, they have no incentives to carry out expensive trials that could produce undesirable outcomes for their drugs and thus reduce profits.[84] Given that there are minimal incentives for pharmaceutical companies to push for FDA approval for off-label uses of drugs, it is not surprising that the unapproved additions may never be added onto the label.

In treating patients, there are often many variations in clinical histories and the best form of treatment for one patient with a condition may not necessarily be the most ideal treatment of choice for a different patient with the exact same condition. For physicians to act in the best interest of the individual patient, the physician needs to have the freedom to prescribe the most appropriate medication for that particular patient, even if it is for a use that has not been approved. In fact, an off-label drug is sometimes the first-line of therapy or the recommended drug in clinical guidelines. In 1994, George Lundberg of the American Medical Association said when he testified before Congress and stated, "prescribing FDA-approved drugs for off-label uses often is necessary for optimal patient care."[85] For a physician to be so restricted as to be unable to prescribe what is appropriate or even necessary to treat the patient would entail a regrettable step backwards and a clear, unwanted intrusion into the practice of medicine.

Although, approved drugs for treating a medical condition may exist, the current treatments available may be unsatisfactory.[86] There are still many medical conditions for which we there is no cure, and these conditions range from infectious diseases such as AIDS to hereditary

---

[82]   Peter J. Gross & Linda S. Svitak, *Drug and Device Litigation in the 21st Century*, 27 WM. MITCHELL L. REV. 271, 286 (2000).

[83]   *Cost to Develop and Win Marketing Approval for a New Drug Is $2.6 Billion*, TUFTS CENTRE FOR THE STUDY OF DRUG DEVELOPMENT, *available at* http://csdd.tufts.edu/news/complete_story/pr_tufts_csdd_2014_cost_study (last visited Apr. 19, 2016).

[84]   Stafford, *supra* note 16, at 1427-28.

[85]   Beck & Azari, *supra* note 78, at 79.

[86]   Fox, *supra* note 74, at 1165.

2017]        *FDA AND THE PRACTICE OF MEDICINE*                321

conditions such as cystic fibrosis and even cancer.[87]   As a result, a practitioner's freedom to prescribe an off-label drug that is not approved by the FDA has advantages: it drives innovation in clinical practice and enables physicians to adopt new practices based on emerging clinical or research evidence that may be insufficient for FDA approval or have yet to be presented to FDA for approval.  In doing so, physicians offer much-needed hope to patients who have run out of viable approved options amongst approved drugs.

A perfect example of an area of medicine in which patients and physicians often must rely on innovative uses of off-label drugs is the area of oncology.  A drug may be approved to treat Cancer A but has not been approved to treat Cancer B.  If the principle of pathophysiology behind both cancers is the same, as is the case with most cancers, it is likely that the drug will also be of benefit to a patient afflicted with Cancer B.  Therefore, it is medically appropriate for physicians, in the absence of other safe or effective options, to resort to a last ditch attempt in prescribing these drugs for unapproved ways.[88]   In fact, the use of off-label drugs in the field of oncology is so extensive that the American Society of Oncology wrote a letter to the FDA in 1998 stating that "the labeling of anticancer products frequently presents an incomplete or even inaccurate picture of the current state of medical knowledge. . .for virtually every cancer drug, appropriate medical usage differs from the terms of the product labeling."[89]

Another group of patients for whom off-label drugs may be life savings are patients who suffer from "orphan" conditions.[90]   Federal Law defines "orphan" diseases as those diseases that affect fewer than 200,000 Americans, including debilitating conditions such as Lou Gehrig's disease and cystic fibrosis.[91]   The expected profits to be gained from such a small group of consumers is dwarfed by the anticipated costs of conducting research and carrying out expensive clinical trials for "orphan" conditions, which accounts for the reluctance of drug

---

[87]   Fox, *supra* note 74, at 1165.

[88]   Fox, *supra* note 74, at 1166.

[89]   Letter from John R. Durant, Executive Vice President, Am. Soc'y of Clinical Oncology, to Michael A. Friedman, Acting Comm'r, FDA (July 21, 1998), *available at* https://www.fda.gov/ohrms/DOCKETS/dockets/98n0222/c000039.pdf.

[90]   See O'Reilly and Dalal, *supra* note 26, at 305 (*citing* Karen Bradshaw, *The Food and Drug Administration Modernization and Accountability Act of 1997: Is It the Answer to the Off-Label Advertising Debate*?, 12 ANNALS OF HEALTH L. 295 (1998)).

[91]   *See, e.g.*, I. Scott Bass et al., *Off-Label Promotion: Is FDA's Final Guidance on Industry-Supported Scientific and Educational Programs Enforceable?*, 53 FOOD & DRUG L.J. 193 (1998).

TEO (DO NOT DELETE)                                        9/5/2017  3:30 PM

322          *SETON HALL LEGISLATIVE JOURNAL*          [Vol. 41:2

companies to invest in making drugs to treat these diseases.[92]  Hence, it is hardly surprising that patients afflicted with orphan conditions rely heavily on the use of off-label drugs, so much so that the Abbey Meyers, President of the National Organization for Rare Diseases reports that "90% of [such patients] must rely on 'off-label uses to have any treatment at all.'"[93]

It is understandably misleading to think that patient populations who rely heavily on off-label drugs are restricted only to small, isolated groups.  Large patient populations such as pregnant women and children are also immensely reliant on off-label use of drugs too.  It is much more tricky, problematic and expensive to conduct controlled clinical human trials on children and pregnant women, and drug companies lack the financial motivation to pursue such research.[94]  The American Academy of Pediatrics estimates that 80% of drugs prescribed for children are being prescribed for off-label uses.[95]  Without off-label drugs, these significantly large patient populations will be left out in the cold without any treatment at all.[96]

In light of these arguments, it becomes clear that the unethical human experimentation objection to off-label drug use is severely undermined, especially when one draws a distinction between medical research and medical practice.  Medical practice refers to the diagnosis and treatment of the individual patient while medical research refers to the general development of scientific knowledge of the human body, for which tests must be carried out under strict controls and with patient's informed consent.[97]  Since off-label use often arises with the primary goal of benefitting the individual patient, rather than the desire to advance the general progress of scientific knowledge, it falls squarely into the field of medical practice, not medical research.[98]  Bearing this in mind, the objection to "unethical human experimentation" is less persuasive and may even be misplaced.

There are also benefits that can be derived from lifting restrictions

---

[92]  O' Reilly and Dalal, *supra* note 26, at 304.

[93]  *Off-Label Drug Use and FDA Review of Supplemental Drug Applications, Hearing Before the Subcomm. on Human Resources and Intergovernmental Relations of the H. Comm. on Government Reform and Oversight*, 104th Cong. 1 (1996) (statement of Abbey S. Meyers, President, Nat'l Org. of Rare Disorders).

[94]  Fox, *supra* note 74, at 1165.

[95]  Robert Levine, ETHICS AND REGULATION OF CLINICAL 241 (Yale U. Press, 2nd ed. 1986).

[96]  William L. Christopher, *Off-Label Drug Prescription: Filling the Regulatory Vacuum*, 48 FOOD AND DRUG L.J. 247, 248 (1993).

[97]  George J. Annas, *Questing for Holy Grails: Duplicity, Betrayal and Self-Deception in Postmodern Medical Research*, 12 J. CONTEMP. HEALTH L. & POL'Y 297, 323 (1996).

[98]  Fox, *supra* note 74, at 1169.

on data sharing between drug companies and physicians.  Precisely because the use of off-label drugs is so widespread, the dissemination of accurate information by drug companies can increase physicians' access to the most updated literature on these drugs, which in turn allows them to provide the optimal care for their patients.[99]  Given advances in information technology made in the last decade, physicians are finding it increasingly difficult to keep abreast of the deluge of information that is available in every medical journal regarding the efficacy of off-label uses in treating a variety of conditions and there is the risk of physicians missing out on a key study or crucial piece of research that may influence his treatment choices.[100]  Having drug companies present physicians with information on how and when to use a drug for un-indicated uses in a concise and truthful manner may be beneficial for both patients and physicians.[101]  The fear that pharmaceutical companies will insidiously sway the minds of unknowing physicians with misleading information can also be allayed.  Physicians themselves believe that off-label promotion to physicians should be without restrictions, in view of the physicians' general familiarity with the FDA–approval process and their capability to independently assess the legitimacy of a drug manufacturer's claims.[102]  The Second Circuit in *Caronia* astutely observed that "as off-label drug use itself is not prohibited, it does not follow that prohibiting the truthful promotion of off-label drug usage would. . . reduc[e] patient exposure to unsafe and ineffective drugs."[103]

An explicit argument must be made for the autonomy of physicians and for their freedom to practice medicine without undue interference from the FDA.  All the aforementioned arguments support this point directly or indirectly, e.g. off-label drugs benefit patients' and physicians' act in the best interests of patients in their practice of medicine.  As Beck and Azari puts it succinctly, "if the physician's considered professional judgment is that a particular use of a particular product is the best treatment for a particular patient, professional responsibility demands that this course of treatment be followed."[104]  In fact, physicians may be guilty of malpractice if they fail to act according to the off-label standard

---

[99]   Gregory Conko, *Hidden Truth: The Perils and Protections of Off-Label Drug and Medical Device Promotion*, 21 HEALTH MATRIX 149, 165 (2011).

[100]   *Id.* at 150 ("[Physicians not paid by a drug or device manufacturer] are free to tout to benefits of off-label uses in any way to any listener.").

[101]   Richard C. Ascroft, *The Impact of the Washington Legal Foundation Cases on Pharmaceutical Manufacturer Practices in the United States*, 34 IND. L. REV. 95, 99 (2000).

[102]   Helm, *supra* note 36, at 153-154.

[103]   *Caronia*, 703 F.3d at 166.

[104]   Beck & Azari, *supra* note 78, at 100.

TEO (DO NOT DELETE)                                                    9/5/2017 3:30 PM

324            *SETON HALL LEGISLATIVE JOURNAL*            [Vol. 41:2

of care.[105]  In 2007, the American Medical Association ("AMA") passed Resolution 918 that not only permits physicians to use off-label drugs, but also encourages it when clinical evidence, expert consensus opinion, or accepted standards of care support such uses.[106]  Furthermore, the resolution calls for support for "the autonomous clinical decision making authority of a physician."[107]  Many in the medical community also adopt this stance, and feel that the government should not hinder a physician's freedom to practice medicine when using an off-label drug is optimal for patient care.[108]

## V. POSSIBLE SOLUTIONS

Given the FDA's dilemma in choosing to safeguard public safety versus overstepping its boundaries and intervening with the practice of medicine, there is merit in briefly exploring a few solutions that could possibly address both of these concerns.

### A.   State Regulations

Unlike the FDA, states have traditionally been recognized to have broad authority to regulate the practice of medicine in order to protect the safety, health, and welfare of the people within the state.[109]  In contrast to the skepticism that FDA faces for intervening with the practice of medicine, states have always been able to exercise this authority in a variety of ways; including adopting vaccination and quarantine laws, as well as establishing modern licensing requirements for medical practitioners.[110]  Courts have also upheld a broad range of state laws that regulate the practice of medicine—making it clear that the states have the authority to do so.[111]  Since regulating the practice of medicine is a space that has always been reserved for states, states should be involved in examining off-label prescribing practices.[112]  There is a caveat, however, that different states must cooperate to ensure successful regulation of off-label activity, or else state residents can choose to travel to other states

---

[105]   Margaret Z. Johns, *Informed Consent: Requiring Doctors to Disclose Off-Label Prescriptions and Conflicts of Interest*, 58 HASTINGS L.J. 967, 969 (2007).

[106]   Zborowsky, *supra* note 43, at 939.

[107]   Zborowsky, *supra* note 43, at 939.

[108]   Zborowsky, *supra* note 43, at 939.

[109]   Patricia J. Zettler, *Toward Coherent Federal Oversight of Medicine*, 51 SAN DIEGO L. REV. 427, 446 (2015).

[110]   Noah, *supra* note 3, at 159.

[111]   Noah, *supra* note 3, at 159.

[112]   Amy E. Todd, *No Need for More Regulation: Payors and Their Role in Balancing the Cost and Safety Considerations of Off-Label Prescriptions*, 37 AM. J.L. & MED. 422, 429 (2011).

2017]        *FDA AND THE PRACTICE OF MEDICINE*        325

with fewer restrictions; hence, defeating the goal of implementing state-based restrictions.[113]

## B.  *Drugs Not Approved in United States*

Another option that can be explored but has not yet gained much traction is for the FDA to speed up approval of new indications of drugs that have already been approved in other countries.

The European equivalent of the FDA is the European Medicines Agency, and pharmaceutical companies have to satisfy both the different approval processes set out by both the EMA and the FDA in order for new drugs to be marketed in the European Union and the United States respectively.[114]  This can be costly, duplicative, and time consuming. There has been academic debate calling for the cooperation of both the FDA and EMA to streamline and align the approval processes, which will facilitate drug development and allow for quicker (and less expensive) access without necessarily compromising the safety and efficacy of drugs.[115]

Even if the approval processes in both agencies were to remain different, there is value in permitting the use of drugs that have been approved by either agency (*i.e.* reciprocity), consequently reducing delay or the waste of duplicated resources.[116]  A case of meningitis outbreak in Princeton in 2013 highlights the feasibility of reciprocity: seven cases of the type B strain were diagnosed in Princeton, and while there exists a vaccine (Bexsero) for treatment of the outbreak the FDA has yet to approve its use.[117]  This same vaccine has been approved by EMA since January 2013 and is available in Europe and Australia, and after lobbying by the Centers for Disease Control and Prevention, the FDA gave special permission to import and use the vaccine.[118]  In fact, reciprocity is the major premise behind a bill introduced by Senator Ted Cruz and Mike Lee, "Reciprocity Ensures Streamlined Use of Lifesaving Treatments Act

---

[113]   Zborowsky, *supra* note 43, at 94.

[114]   *The FDA and Slower Cures*, W.S.J. (Feb. 28, 2011), http://www.wsj.com/articles/SB10001424052748703766704576009512990553104.

[115]   Lynn Howie et al, *A Comparision of FDA and EMA Approval: Implications for Drug Development and Cost of Care*, 27 ONCOLOGY 1195, 1195 (2013).

[116]   *Reform Options*, FDAREVIEW.ORG, http://www.fdareview.org/09_reform.php#3 (last visited Apr. 20, 2016).

[117]   Paul Howard and Yevgeniy Feyman, *If a Drug Is Good Enough for Europeans, It's Good Enough for Us*, HEALTH AFFAIRS BLOG (Feb. 14, 2014), http://healthaffairs.org/blog/2014/02/14/if-a-drug-is-good-enough-for-europeans-its-good-enough-for-us/.

[118]   Conor Friedersdorf, *Ted Cruz's Best Idea for Overhauling The FDA*, THE ATLANTIC (Dec. 18, 2015), http://www.theatlantic.com/politics/archive/2015/12/ted-cruzs-best-idea-for-overhauling-the-fda/421158/.

TEO (DO NOT DELETE)                                                    9/5/2017 3:30 PM

326            *SETON HALL LEGISLATIVE JOURNAL*            [Vol. 41:2

of 2015." The proposed bill will allow for "reciprocal marketing approval of [drugs]. . . that are authorized to be lawfully marketed abroad" in a list of selected countries.[119] There have also been previous bills, such as Speeding Access to Already Approved Pharmaceutical Act, that attempt to tackle this "drug lag".[120]

Legislation which aim to push for approval or the speeding up of approval of new indications of drugs already approved in other countries, such as the bill discussed above, is a feasible measure that warrants more attention.

## C. *FDA to Explore Other Options*

Instead of viewing the FDA as an opposing regulatory body whose sole aim is to set up indiscriminate barriers for the use of off-label drugs at every turn, it is worthwhile looking to the FDA to adopt a role where it works alongside physicians and pharmaceutical companies to ensure that consumers derive the maximum benefit from off-label uses. For instance, the FDA may consider taking it upon itself to collect post-marketing data from users in a methodical manner to assess and balance harms and benefits of off-label uses. Alternatively, the FDA can collate and analyze existing evidence from any reliable non-randomized controlled clinical trial before distributing its findings to practitioners.[121]

As the Second Circuit in *Caronia* suggested, there are many regulatory mechanisms other than restricting speech that FDA could impose to advance its interests—*e.g.* providing guidance to doctors and patients to help differentiate misleading and inaccurate promotion from truthful information; developing disclaimer systems to warn consumers and providers; developing "safety tiers within the off-label market. . . to distinguish between drugs"; or making it mandatory for drug manufacturers to list all anticipated indications when they first submit a new drug for the approval process—which could "enabl[e] physicians, the government and patients to track a drug's development."[122] The last suggestion has also been echoed by critics like Stafford, in the hope that this will preempt any attempt on the part of pharmaceutical companies to circumvent the rigorous testing process for what is most likely the

---

[119]   BILL FOR RECIPROCITY ENSURES STREAMLINED USE OF LIFESAVING TREATMENT ACTS OF 2015, http://www.cruz.senate.gov/files/documents/Bills/20151211_FDA.pdf.
[120]   Alexander Gaffney, *Bill Wants Drugs Approved in Europe to be Available More Quickly to US Patients*, REGULATOR AFFAIRS PROFESSIONAL SOCIETY (Mar. 20, 2015), http://www.raps.org/Regulatory-Focus/News/2015/03/20/21778/Bill-Wants-Drugs-Approved-in-Europe-to-be-Available-More-Quickly-to-US-Patients/.
[121]   Stafford, *supra* note 16, at 1429.
[122]   *Caronia*, 703 F.3d 149, at 167-68.

2017]        *FDA AND THE PRACTICE OF MEDICINE*                327

primary use.[123]

## VI. CONCLUSION

There is no easy solution to the existing dilemma of how FDA can strike a balance between safeguarding public safety and respecting physicians' autonomy to practice medicine freely without any intervention.  This article has highlighted the numerous arguments supporting, as well as resisting the implementation of regulations by the FDA.  Fortunately, there exist a few solutions that we can explore in isolation or combination to help address this dilemma; such as looking into allowing EMA-approved indications to be applied here in the U.S. or speeding up the FDA approval process.  It remains to be seen if the aforementioned suggestions will ever gain sufficient traction to achieve tangible outcomes, but it is important nonetheless to encourage intellectual discourse in this area, with the hope that patients can benefit from the even the smallest steps taken in the right direction.

---

[123]    Stafford, *supra* note 16, at 1429.

# FDA

in the

## TWENTY-FIRST

## CENTURY

*The Challenges of Regulating Drugs
and New Technologies*

EDITED BY

Holly Fernandez Lynch
and I. Glenn Cohen

Columbia University Press
New York

Exhibit
0033

FDA IN THE TWENTY-FIRST CENTURY

Columbia University Press

*Publishers Since 1893*

New York  Chichester, West Sussex

[cup.columbia.edu](cup.columbia.edu)

Copyright © 2015 Columbia University Press

All rights reserved

E-ISBN 978-0-231-54007-0

Library of Congress Cataloging-in-Publication Data

FDA in the twenty-first century : the challenges of regulating drugs and
new technologies / Edited by Holly Fernandez Lynch and I. Glenn Cohen.

pages cm

Includes bibliographical references and index.

ISBN 978-0-231-17118-2 (cloth : alk. paper) —
ISBN 978-0-231-54007-0 (e-book)

1. United States. Food and Drug Administration.
2. Drugs–Law and legislation–United States.

I. Lynch, Holly Fernandez, editor.

II. Cohen, I. Glenn, editor.

III. Title: Food and Drug Administration in the twenty-first century.

KF3871.F34 2015

363.19'20973–dc23

2015001340

A Columbia University Press E-book.

CUP would be pleased to hear about your reading experience
with this e-book at [cup-ebook@columbia.edu](cup-ebook@columbia.edu).

Cover design: Noah Arlow

References to websites (URLs) were accurate at the time of writing.
Neither the author nor Columbia University Press is responsible for URLs
that may have expired or changed since the manuscript was prepared.

FDA IN THE TWENTY-FIRST CENTURY

**PART TWO**
**Preserving Public Trust and Demanding Accountability**

Introduction
*Christopher Robertson*

CHAPTER SIX
Global Trends Toward Transparency in
Participant-Level Clinical Trials Data
*Alla Digilova, Rebecca Li, Mark Barnes, and Barbara Bierer*

CHAPTER SEVEN
Conflicts of Interest in FDA Advisory Committees:
The Paradox of Multiple Financial Ties
*Genevieve Pham-Kanter*

CHAPTER EIGHT
The Crime of Being in Charge: Executive

Culpability and Collateral Consequences
*Katrice Bridges Copeland*

CHAPTER NINE
Recalibrating Enforcement in the Biomedical Industry:
Deterrence and the Primacy of Protecting the Public Health
*Patrick O'Leary*

**PART THREE**
**Protecting the Public Within Constitutional Limits**

Introduction
*I. Glenn Cohen*

CHAPTER TEN
Prospects for Regulation of Off-Label Drug Promotion in
an Era of Expanding Commercial Speech Protection
*Aaron S. Kesselheim and Michelle M. Mello*

146

had never submitted these studies to the FDA as part of a formal supplemental new drug application (NDA) package.

However, off-label uses may also be dangerous and non-evidence based. One widely cited study of prescribing patterns for 160 commonly used drugs found a 21 percent off-label prescription rate and concluded that 73 percent of such off-label uses lacked evidence (Radley et al. 2006). Antipsychotic drugs are commonly used off label in elderly patients with dementia and affective disorders (Alexander et al. 2010), but such use has been associated with a higher mortality risk (Wang et al. 2005).

Thus, a major concern about off-label drug use is that it may involve considerable risk for patients without proven benefit (Levi et al. 2010). A second concern is that high spending on drugs used for non-evidence-based, off-label purposes strains the budgets of payers like Medicaid, leading them to tighten eligibility requirements or reduce the services they provide (Pear 2011).

Although FDA does not restrict physicians from prescribing drugs off label, it does forbid pharmaceutical manufacturers from promoting the use of drugs for off-label purposes (Kesselheim 2011). This stance is not a capricious attempt to restrict manufacturers from communicating to physicians about their products. Rather, FDA's approach was a response to major problems caused by the lack of such regulation. Widespread manufacturer promotion of the safety of medical products in the absence of formal regulatory approval of those products led to cases in which patients died after taking products with poisonous constituents (sulfanilamide elixir, 1938), gave birth to babies with devastating congenital anomalies (thalidomide, 1962) (Avorn 2012), or used contraceptive devices that caused bacterial sepsis (Dalkon Shield, 1974) (Wood 2005). Even more common was the promotion of drugs to treat conditions for which they lacked efficacy (Waxman 2003). Thus, consensus grew that it was in the public's interest for manufacturers to prove that a medication actually worked and was safe for that use before it could be sold and promoted.

Notwithstanding FDA's prohibition on off-label promotion, it persists. Recent examples of pharmaceutical promotion of non-evidence-based off-label uses leading to widespread patient morbidity and mortality include rofecoxib (Vioxx) (Krumholz et al. 2007), rosiglitazone (Avandia) (Moynihan 2010), paroxetine (Paxil) (Wadman 2004), fenfluramine/phentermine (Fen-Phen) (Kolata 2007), and telithromycin (Ketek) (Ross 2007).

FDA considers off-label promotion to violate the provision of the FDCA that bars pharmaceutical manufacturers from introducing a new drug into interstate commerce unless it and its label have secured FDA approval (21 USC § 355(d)). Manufacturer-distributed materials that explain the uses of the drug are considered part of the labeling even if not packaged with the drug (21 USC § 321(m)). A second provision prohibits manufacturers from introducing into interstate commerce "misbranded" drugs (21 USC § 352). Drugs can be misbranded for false or misleading labeling information or labeling that does not bear "adequate directions for use" (21 USC § 352(f)(1)). The combination of the requirements for approval and the misbranding provision provides two avenues for FDA to argue that it is illegal for a drug's labeling to discuss uses of the drug that FDA has not validated as being supported by substantial evidence.

Notably, FDA's prohibition on manufacturers' ability to discuss off-label uses is not absolute. Companies can respond to unsolicited questions from health care professionals and others about unapproved uses. Companies can also distribute reprints of medical journal articles and support continuing medical education programs in which off-label uses are discussed. These "safe harbors" have been set forth in clear, explicit FDA guidance documents (Food and Drug Administration 2014) and the 1997 FDA Modernization Act (FDAMA).

## II. COMMERCIAL SPEECH AND THE COURTS

Drug manufacturers and some affiliated activists have objected to FDA control over the scope of their marketing,



**Georgia Law Review**

Volume 56 | Number 2                                                    Article 5

2022

# Off-Label Innovations

David A. Simon

*Harvard Law School*, dsimon@law.harvard.edu



Follow this and additional works at: https://digitalcommons.law.uga.edu/glr

 Part of the Food and Drug Law Commons

**Recommended Citation**

Simon, David A. (2022) "Off-Label Innovations," *Georgia Law Review*: Vol. 56: No. 2, Article 5.
Available at: https://digitalcommons.law.uga.edu/glr/vol56/iss2/5

This Article is brought to you for free and open access by Digital Commons @ University of Georgia School of Law.
It has been accepted for inclusion in Georgia Law Review by an authorized editor of Digital Commons @ University
of Georgia School of Law. Please share how you have benefited from this access For more information, please
contact tstriepe@uga.edu.

## Off-Label Innovations

### Cover Page Footnote

Research Fellow, Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Harvard Law School. I wrote this Article during my time as a Visiting Associate Professor & Frank H. Marks Intellectual Property Fellow at George Washington University Law School and as a Fellow at the Hanken School of Economics. I gratefully acknowledge the financial support from the Academy of Finland research project, Fairness, Morality and Equality in International and European Intellectual Property Law (FAME-IP). For comments and suggestions, I thank Michael Abramowicz, Amy Kapczynski, Edith Beerdsen, Sam Brunson, Dan Burk, Rebecca Eisenberg, Scott Kieff, Lynn LoPucki, Lidiya Mishchenko, Faraz Sanei, Sonia Suter, James Tierney, the participants at the 2020 Intellectual Property Scholars Conference at Stanford Law School, the Junior Scholars Workshop, the Seminar on IPR and Pharmaceutical Innovation at the Hanken School of Economics, the 18th Annual Works-in-Progress in Intellectual Property Colloquium hosted by American University Washington College of Law, Texas A&M University School of Law, and University of Utah S.J. Quinney College of Law, the American Association of Law School's New Voices in IP Program, and the Third IP & Innovation Researchers of Asia (IPIRA) Conference. I owe special thanks to Dhanay Cadillo Chandler, Samuel F. Ernst, Dmitry Karshtedt, Erika Lietzan, Lisa Larrimore Ouellette, W. Nicholson Price II, Rachel Sachs, and Ana Santos Rutschman, all of whom provided extensive feedback. I thank the Georgia Law Review for the diligent work.

This article is available in Georgia Law Review: https://digitalcommons.law.uga.edu/glr/vol56/iss2/5

# OFF-LABEL INNOVATION

*David A. Simon*[*]

*Modern medicine faces many significant problems. This Article is about two of them. The first is that approved drugs have many potential therapeutic uses that are never identified, investigated, or developed. The second is the routine practice of physicians prescribing approved drugs for unapproved uses—so-called "off-label" uses. These problems seem very different. Failure to invest in potential new uses is an innovation problem: firms lack incentives to research and develop new uses of old drugs. The problem of off-label uses, on the other hand, is one of safety and efficacy: off-label uses are risky because they are not supported by the same level of evidence as approved uses. While descriptively accurate, this is not the only accurate description. Each of these problems is also one of information— a lack of information about the safety and efficacy of prescribing approved drugs for unapproved uses. Because all new uses of approved drugs are off-label uses, gathering safety and efficacy information about off-label uses, in effect, produces safety and efficacy information about many new uses. Not only*

*[*] Research Fellow, Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Harvard Law School. I wrote this Article during my time as a Visiting Associate Professor & Frank H. Marks Intellectual Property Fellow at George Washington University Law School and as a Fellow at the Hanken School of Economics. I gratefully acknowledge the financial support from the Academy of Finland research project, Fairness, Morality and Equality in International and European Intellectual Property Law (FAME-IP). For comments and suggestions, I thank Michael Abramowicz, Amy Kapczynski, Edith Beerdsen, Sam Brunson, Dan Burk, Rebecca Eisenberg, Scott Kieff, Lynn LoPucki, Lidiya Mishchenko, Faraz Sanei, Sonia Suter, James Tierney, the participants at the 2020 Intellectual Property Scholars Conference at Stanford Law School, the Junior Scholars Workshop, the Seminar on IPR and Pharmaceutical Innovation at the Hanken School of Economics, the 18th Annual Works-in-Progress in Intellectual Property Colloquium hosted by American University Washington College of Law, Texas A&M University School of Law, and University of Utah S.J. Quinney College of Law, the American Association of Law School's New Voices in IP Program, and the Third IP & Innovation Researchers of Asia (IPIRA) Conference. I owe special thanks to Dhanay Cadillo Chandler, Samuel F. Ernst, Dmitry Karshtedt, Erika Lietzan, Lisa Larrimore Ouellette, W. Nicholson Price II, Rachel Sachs, and Ana Santos Rutschman, all of whom provided extensive feedback. I thank the *Georgia Law Review* for the diligent work.

701

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

702                    *GEORGIA LAW REVIEW*              [Vol. 56:701

*that, but some off-label uses may be new: physicians may
innovate by prescribing drugs off-label. Reframing these two
seemingly disparate problems in terms of a common
information deficit enables a single, information-based
solution. This solution—which draws on the existing suite of
innovation policy levers—incentivizes providers, rather than
pharmaceutical companies, to generate the post-market
information needed to address both problems.*

TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 705

II. THE PROBLEM OF OFF-LABEL USES & THE PROBLEM OF
NEW USES................................................................. 715
  A. THE PROBLEM OF OFF-LABEL USES ............................ 715
    *1. Off-Label Use* ..................................................... 716
    *2. The Problem of Off-Label Uses as an*
    *Informational Problem* ..................................... 722
  B. THE PROBLEM OF NEW USES ..................................... 726
    *1. Patent Law* ...................................................... 728
    *2. Market & Data Exclusivity*............................... 733
    *3. The Problem of New Uses as an Informational*
    *Problem* ............................................................ 736
  C. THE COMMON INFORMATIONAL OVERLAP .................. 738

III. PROVIDERS AS A TOOL TO SOLVE THE PROBLEMS OF NEW
AND OFF-LABEL USES ................................................. 740
  A. DATA COLLECTION AND ELECTRONIC HEALTH RECORDS
  ............................................................................ 741
  B. INSTITUTIONAL BODIES AND EXPERTISE ................... 742
  C. INSTITUTIONAL KNOW-HOW AND EXPERIENCE.......... 746
  D. THE FDA'S REAL WORLD EVIDENCE PROGRAM ................748

IV. INCENTIVES ................................................................ 749
  A. INCENTIVES GENERALLY............................................ 750
  B. BUILDING OUT EXISTING GOVERNMENT PROGRAMS.... 752
  C. NEW GOVERNMENT PROGRAMS: MARKET INCLUSIVITY
  ............................................................................ 759
    *1. Eligibility & Qualification* ............................... 759
    *2. Market Inclusivity Subsidy* .............................. 763
  D. TAX CREDITS AND GRANTS ......................................... 770
  E. MODIFIED MARKET EXCLUSIVITY, ROYALTIES, AND SUA
  SPONTE LABEL EXPANSIONS ...................................... 778

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

704 *GEORGIA LAW REVIEW* [Vol. 56:701

V. CONCLUSION.................................................................784

154

*OFF-LABEL INNOVATION*

# I. INTRODUCTION

In 1966, the Food and Drug Administration (FDA) approved the drug amantadine hydrochloride (amantadine) for the prevention of Asian influenza A (H2N2).[1] Doctors began prescribing the drug shortly thereafter.[2] One patient who was prescribed the drug also happened to suffer from Parkinson's disease (Parkinson's).[3] To her surprise—and the surprise of her neurologists—many of her neurological symptoms lessened shortly after starting a course of the medication.[4] Those doctors—who noted that "[s]uch serendipitous findings are not rare[,] . . . especially in chronic diseases"—proceeded to study amantadine's effect on Parkinson's.[5] But it would be another seven years before the FDA approved amantadine to treat that condition.[6]

---

[1] Thomas H. Maugh II, *Panel Urges Wide Use of Antiviral Drug*, 206 SCIENCE 1058, 1058 (1979) (noting FDA approval following clinical trials that demonstrated 70 percent reductions in illness from influenza A).

[2] The story of amantadine's unanticipated development is recounted in G. Hubsher, M. Haider & M.S. Okun, *Amantadine: The Journey from Fighting Flu to Treating Parkinson Disease*, 78 NEUROLOGY 1096, 1096–99 (2012).

[3] *See id.* ("[A] 58-year-old woman with [Parkinson's] had reported . . . an improvement in rigidity, tremor, and akinesia while taking amantadine for flu.").

[4] Robert S. Schwab, Albert C. England, Jr., David C. Poskanzer & Robert R. Young, *Amantadine in the Treatment of Parkinson's Disease*, 208 JAMA 1168, 1168 (1969) ("[S]he experienced a remarkable remission in her symptoms of rigidity, tremor, and akinesia.").

[5] *Id.*; *see also* Robert S. Schwab, David C. Poskanzer, Albert C. England, Jr., & Robert R. Young, *Amantadine in Parkinson's Disease: Review of More Than Two Years' Experience*, 222 JAMA 792, 792–95 (1972) (describing prospective observational research).

[6] *See* Letter from Henry E. Simmons, Director, U.S. Food & Drug Admin., to E.I. du Pont de Nemours & Co. (Apr. 17, 1973) (on file with author) [hereinafter U.S. Food & Drug Admin., Notice of Approval] (approving Amantedine); Maugh, *supra* note 1, at 1058 (noting that the FDA approved Symmetrel, DuPont's trade name for amantadine, to treat Parkinson's in 1973*); see also* J. Máté et al., *Prophylactic Use of Amantadine During Hong Kong Influenza Epidemic*, 17 ACTA MICROBIOLOGICA ACADEMIAE SCIENTAIARUM HUNGARICAE 285, 285 (1970) (evaluating prophylaxis of drug for "Hong Kong flu"); U. Strömberg, T.H. Svensson & B. Waldeck, *On the Mode of Action of Amantadine*, 22 J. PHARMACY & PHARMACOLOGY 959, 961 (1970) (observing that the drug's effectiveness against Parkinson's is "brought about by an amphetamine-like mechanism"); Stanley Fahn, George Craddock & Gerald Kumin, *Acute Toxic Psychosis from Suicidal Overdosage of Amantadine*, 25 ARCHIVES NEUROLOGY 45, 45 (1971) (hypothesizing that amantadine functions similarly to other Parkinson's drug treatments by releasing dopamine from neuronal storage sites); B. Cox & C.S. Williams, *Cardiovascular Responses to Amantadine Hydrochloride in the Rat and Rabbit*, 43 BRITISH

706                    *GEORGIA LAW REVIEW*                [Vol. 56:701

In the interim, and even after its approval for Parkinson's,[7] doctors would prescribe amantadine for an increasing number of unapproved conditions, including shingles,[8] chronic fatigue syndrome,[9] hepatitis,[10] autism,[11] Jakob-Creutzfeldt Disease,[12]

---

J. PHARMACOLOGY 575P, 575P (1972) (investigating the cardiovascular actions of amantadine).

[7] Amantadine has undergone several labeling changes relating to Parkinson's, and the FDA has approved new forms of the drug as recently as 2018. *See Amantadine*, PARKINSON'S FOUNDATION, https://www.parkinson.org/Understanding-Parkinsons/Treatment/Prescription-Medications/Amantadine-Symmetrel (last visited Mar. 2, 2022) (listing different forms of amantadine used to mitigate Parkinson's).

[8] *See, e.g.*, A.W. Galbraith, *Treatment of Acute Herpes Zoster with Amantadine Hydrochloride (Symmetrel)*, 4 BRIT. MED. J. 693, 693 (1973) (stating that the study of 100 patients was initiated after the author received personal communication from another physician, G.H. Lloyd, who reported that "amantadine reduced the duration of pain, produced more rapid healing, and prevented postherpetic neuralgia").

[9] *See* Marjorie A. Bowman, Julienne K. Kirk, Robert Michielutte & John S. Preisser, *Use of Amantadine for Chronic Fatigue Syndrome*, 157 ARCHIVES INTERNAL MED. 1264, 1264 (1997) (explaining that a four-patient trial was stimulated by other research showing use of amantadine and symptom reduction (fatigue) in patients suffering from multiple sclerosis).

[10] *See* Jill Palmer Smith, *Treatment of Chronic Hepatitis C with Amantadine*, 42 DIGESTIVE DISEASES & SCIS. 1681, 1682 (1997) (stating that the purpose of study was to test the "safety and efficacy of amantadine in patients with chronic hepatitis C infection"); Isabelle Fouchard Hubert, Françoise Lunel, Jean-François Cadranel, Frédéric Iberti & Paul Calès, *Treatment of Chronic Hepatitis C with Amantadine*, 94 AM. J. GASTROENTEROLOGY 2316, 2316–17 (1999) (reporting an open-label, prospective pilot study of sixteen patients based on Smith's initial report and finding that amantadine was not effective in inducing a biochemical or virological response in patients suffering from chronic hepatitis C); Pierre Deltenre et al., *Evaluation of Amantadine in Chronic Hepatitis C: A Meta-Analysis*, 41 J. HEPATOLOGY 462, 462–73 (2004) (finding mixed results and suggesting further clinical trials on amantadine for chronic hepatitis C).

[11] *See* Bryan H. King et al., *Double-Blind, Placebo-Controlled Study of Amantadine Hydrochloride in the Treatment of Children with Autistic Disorder*, 40 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 658, 659 (2001) (hypothesizing amantadine might be effective in treating neurobehavioral disorders based on its mechanism of action and limited reports in the medical literature, including as treatment for brain injury).

[12] For example, one doctor published an article explaining how he treated a patient with Jakob-Creutzfeldt Disease, a rare neurodegenerative disease affecting the brain. *See* J. Braham, *Jakob-Creutzfeldt Disease: Treatment by Amantadine*, 4 BRIT. MED. J.212, 213 (1971) (noting that the doctor hypothesized that amantadine might be effective based on its initial results treating Parkinson's disease).

epilepsy,[13] and traumatic brain injury (TBI).[14] And they would do so despite the unknown efficacy and risks of prescribing amantadine

---

[13] *See* W. Donald Shields, Jean L. Lake & Harry T. Chugani, *Amantadine in the Treatment of Refractory Epilepsy in Childhood: An Open Trial in 10 Patients*, 35 NEUROLOGY 579, 579 (1985) (noting that the authors first administered the drug to two patients based on a hypothesized link to amantadine's mechanism of action and noticed immediate reduction in symptoms and then proceeded to conduct a ten-patient open trial (citing L.F. Quesney, F. Andermann & P. Gloor, *Dopaminergic Mechanism in Generalized Photosensitive Epilepsy*, 31 NEUROLOGY 1542, 1542–44 (1981))). This, in turn, has spurred further investigation into amantadine's use in other epileptic conditions. *See* Rujuta B. Wilson, Yazan Eliyan, Raman Sankar & Shaun A. Hussain, *Amantadine: A New Treatment for Refractory Electrical Status Epilepticus in Sleep*, 84 EPILEPSY & BEHAV. 74, 75 (2018) (testing the hypothesis that "amantadine may target mechanisms that underlie ESES and associated epileptic encephalopathy").

[14] In 1988, one doctor posited that amantadine might be helpful to treat brain injuries based on anecdotal reports "suggest[ing] that amantadine may have some benefit in the chronic TBI patient," as well as limited research on rats. C. T. Gualtieri, *Pharmacotherapy and the Neurobehavioural Sequelae of Traumatic Brian Injury*, 2 BRAIN INJURY 101, 107 (1988) (discussing Rocco F. Marotta, Nancy Logan, Michael Potegal, Murray Glusman & Eliot L. Gardner, *Dopamine Agonists Induce Recovery from Surgically-Induced Septal Rage*, 269 NATURE 513, 513 (1977)); *see also* Thomas Gualtieri, Mark Chandler, Tena B. Coons & Lloyd T. Brown, *Amantadine: A New Clinical Profile for Traumatic Brain Injury*, 12 CLINICAL NEUROPHARMACOLOGY 258, 260 (1989) (discussing the author's previous innovative off-label use as the impetus for undertaking study of amantadine for brain injury (citing Mark C. Chandler, Jarrett L. Barnhill & C. Thomas Gualtieri, *Amantadine for the Agitated Head-Injury Patient*, 2 BRAIN INJURY 309, 310 (1988))); Gualtieri et al., *supra*, at 260 (discussing how amantadine could be used to treat patients with head injuries). That hypothesis was subsequently taken up in limited research. *See, e.g.*, Marilyn F. Kraus & Pauline M. Maki, *Effect of Amantadine Hydrochloride on Symptoms of Frontal Lobe Dysfunction in Brain Injury: Case Studies and Review*, 9 J. NEUROPSYCHIATRY CLINICAL NEUROSCIENCES 222, 224 (1997) (reviewing the literature and noting that amantadine's "use in other disorders, such as epilepsy, dementia, and brain injury, has been prompted by case studies or small controlled studies showing improvements in cognitive functioning, EEG records, activity levels, or depressive symptoms"); R. Van Reekum et al., *N of 1 Study: Amantadine for the Amotivational Syndrome in a Patient with Traumatic Brain Injury*, 9 BRAIN INJURY 49, 50 (1995) (stating that the hypothesis of the study was that amantadine would improve the rehabilitation of a patient with amotivational syndrome, which developed after a traumatic brain injury). It is also interesting to note that one of these physicians continued to find innovative off-label use of another drug, methylphenidate (Ritalin), for the same condition (TBI). *See* Randall W. Evans, C Thomas Gualtieri & Debra Patterson, *Treatment of Chronic Closed Head Injury with Psychostimulant Drugs: A Controlled Case Study and an Appropriate Evaluation Procedure*, 175 J. NERVOUS & MENTAL DISEASE 106, 109 (1987) (noting that closed head injury patients "may find partial relief from attentional, memory, and behavioral impairments" after taking methylphenidate). Methylphenidate is now commonly used to treat the sequelae of TBI. *See* Samir Al-Adawi et al., *Methylphenidate Improves Executive Functions in Patients with Traumatic Brain Injuries: A Feasibility Trial*

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

708          *GEORGIA LAW REVIEW*          [Vol. 56:701

for new indications in populations—some of whom probably took other medications—with underlying health conditions. Researchers identified some of these potential uses from the initial investigation spurred by the first patient report.[15] Other uses, including amantadine's uses for treating Jakob-Creutzfeldt Disease and epilepsy, were tested by physicians prescribing this approved drug for unapproved uses—they were prescribing "off-label."[16]

How were so many doctors prescribing approved drugs for such different unapproved uses, especially given that those unapproved uses had unknown risks? While this may seem puzzling, it is actually quite common. Physicians frequently prescribe drugs off-label.[17] And in some areas of medicine, such as cardiology and psychiatry, off-label prescriptions predominate.[18] Yet, the discovery of amantadine as a treatment for Parkinson's and other conditions, and its slow development for many of those uses, highlights two important problems for medicine that remain unsolved—and how to solve them.

One is the "Problem of Off-Label Uses."[19] Off-label uses may not be supported by the same level of evidence as approved, on-label uses. Patients prescribed drugs off-label are, therefore, subjected to a greater risk of harm. The risk, however, is often necessary for patients with limited or no efficacious on-label treatments. At the time doctors discovered that amantadine might have some effect on Parkinson's, for example, no known curative treatments for it

---

*via the Idiographic Approach*, 20 BMC NEUROLOGY 103, 104 (2020), https://bmcneurol.biomedcentral.com/track/pdf/10.1186/s12883-020-01663-x.pdf.

[15] *See, e.g.*, Hubsher, *supra* note 1, at 1098 (noting that the initial research spurred the role of L-dopa as a response predictor).

[16] *See* David C. Radley, Stan N. Finkelstein & Randall S. Stafford, *Off-label Prescribing Among Office-Based Physicians*, 166 ARCHIVES INTERNAL MED. 1021, 1025 (2006) (explaining the background of off-label medicine use).

[17] *See id.* at 1025 (finding that "about 21% of all estimated uses for commonly prescribed medications were off-label").

[18] *See id.* at 1023–25 ("Off-label use was most common among cardiac Medications."); *see, e.g.*, CAVALLA, *infra* note 86, at 13 (noting the prevalence of off-label prescriptions "may be up to 90% in some hospitalised paediatric patients"),

[19] *See* Ryan Abbott & Ian Ayres, *Evidence and Extrapolation: Mechanisms for Regulating Off-Label Uses of Drugs and Devices*, 64 DUKE L.J. 377, 388 (2014) ("The central problem with off-label use is that there is an information deficit.").

existed.[20] Like all off-label uses, amantadine's safety and efficacy profile for Parkinson's was largely unknown because it hadn't been researched either through observational studies (where researchers make observations without any interventions)[21] or experimental randomized controlled clinical trials (RCT)[22] (where researchers typically randomize subjects into treatment and control groups and ensure that neither the subject nor the researcher knows who is in which group).[23] The same is true for its current off-label use by doctors to treat many other conditions, such as TBI.[24]

One reason for the lack of research into new uses of existing drugs, including widespread off-label uses, is because of a different challenge, dubbed the "Problem of New Uses"[25]: patent law and drug regulation—which work well for some kinds of novel drug development[26]—don't always provide sufficient economic incentives

---

[20] Even today there is no known cure. Most therapies attempt to address the neuromotor symptoms that the disease causes. *See e.g.*, Hubsher, *supra* note 1, at 1097 (noting that several prior animal studies focused on symptoms of "psychomotor agitation").

[21] *See* ALLAN K. HACKSHAW, A CONCISE GUIDE TO OBSERVATIONAL STUDIES IN HEALTHCARE 1–24 (2015). Observational studies can take different forms. *Id.* at 10–13.

[22] *See, e.g.*, DAVID MACHIN & PETER M. FAYERS, RANDOMIZED CLINICAL TRIALS: DESIGN, PRACTICE AND REPORTING 23–39 (2010) (explaining the general structure of randomized clinical trials); SHEIN-CHUNG CHOW & JEN-PEI LIU, DESIGN AND ANALYSIS OF CLINICAL TRIALS: CONCEPTS AND METHODOLOGIES 167–207 (3d ed. 2014) (reviewing eight design types of clinical trials); TOM BRODY, CLINICAL TRIALS: STUDY DESIGN, ENDPOINTS AND BIOMARKERS, DRUG SAFETY, AND FDA AND ICH GUIDELINES 131–41 (2011) (describing one and two arm trials).

[23] Some aspects of the amantadine drug safety profile were known from previous applications. *See* Hubsher, *supra* note 1, at 1097. But the safety and efficacy profile for the specific dosages, indication, and patient populations was unknown. *See id.*

[24] *See supra* note 14 and accompanying text.

[25] *See* Rebecca S. Eisenberg, *The Problem of New Uses*, 5 YALE J. HEALTH POL'Y L. & ETHICS 717, 717 (2005) [hereinafter Eisenberg, *The Problem of New Uses*] (examining "the problem of motivating firms to invest in rigorous testing of new uses for previously approved drugs"); *see also* Benjamin N. Roin, Solving the Problem of New Uses 2–3 (Oct. 14, 2016) (unpublished manuscript), https://www.bu.edu/law/files/2016/10/Solving-the-Problem-of-New-Uses-Ben-n.-Roin.pdf ("This well-known gap in the incentives for pharmaceutical innovation—known as 'the problem of new uses'—causes most (and perhaps almost all) of these potential new medical treatments to remain untested hypotheses." (footnotes omitted)).

[26] *See infra* note 28 and accompanying text. *But see* Eric Budish, Benjamin N. Roin & Heidi Williams, *Do Firms Underinvest in Long-Term Research? Evidence from Cancer Clinical Trials*, 105 AM. ECON. REV. 2044, 2044–85 (2015) (noting that existing incentives can actually discourage investment in clinical trials with longer lag times from invention to commercialization and that existing patent laws reinforce this phenomenon by rewarding the

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

710          *GEORGIA LAW REVIEW*          [Vol. 56:701

for companies to research and develop (R&D) new uses for old drugs (and existing off-label uses).[27] Although R&D for new uses is much cheaper than R&D for new drug molecules,[28] firms often don't pursue it because they can't exclude others (enough) from using the results.[29]

Research on amantadine illustrates this.[30] The FDA approved amantadine in 1966, the same year the United States Patent and Trademark Office (PTO) issued to DuPont two patents related to amantadine.[31] From 1966 until 1983 when amantadine's patents expired—and especially before Congress enacted the Hatch-

---

inventor of a pharmaceutical with longer patent terms (via patent term extensions) and penalizing greater commercial lags with shorter patent terms).

[27] The general phenomenon of finding new uses for existing compounds is called "repurposing" or "repositioning." Sometimes this means only finding new uses of approved drugs; other times it means finding new uses of approved drugs or abandoned pharmaceutical candidates. *Compare* Marina Sirota et al., *Discovery and Preclinical Validation of Drug Indications Using Compendia of Public Gene Expression Data*, 3 SCI. TRANSLATIONAL MED. 96ra77, 96ra77 (2011) (using the former definition), *with* Divya Sardana et al., *Drug Repositioning for Orphan Diseases*, 12 BRIEFINGS IN BIOINFORMATICS 346, 346 (2011) (using the latter definition).

[28] There are almost no studies documenting the clinical development time for new indications of existing drugs. *But see, e.g.*, Joseph A. DiMasi, *Innovating by Developing New Uses of Already-Approved Drugs: Trends in the Marketing Approval of Supplemental Indications*, 35 CLINICAL THERAPEUTICS 808, 809, 816–17 (2013) [hereinafter DiMasi, *sNDAs*] (analyzing the "application-review times for new uses of already-approved drugs").

[29] *See* Amy Kapczynski & Talha Syed, *The Continuum of Excludability and the Limits of Patents*, 122 YALE L.J. 1900, 1942–43 (2013) (explaining that "there are some highly nonexcludable goods whose development a patent system will fail to incentivize because the private returns appropriable using patents remain lower than the private costs of creation or validation").

[30] Another example is chenodeoxycholic acid (Chenodiol), which physicians discovered as an off-label treatment for cerebrotendinous xanthomatosis (CTX) decades ago. *See* Dr. Patroula Smpokou, Remarks at Nat'l Ctr. for Advancing Translational Scis. Meeting: Repurposing Off-Patent Drugs: Research & Regulatory Challenges 63 (Apr. 6, 2020) [hereinafter NCATS Meeting], https://ncats.nih.gov/files/repurposing-off-patent-drugs_research--regulatory-challenges_day-1-transcript_04-06-2020.pdf. Since then, physicians have used the drug off-label as the treatment of choice for CTX, and it is now the standard of care. *Id.* No company has sought a Supplemental New Drug Application (sNDA) or New Drug Application (NDA) for Chenodiol to treat CTX.

[31] *Compare* U.S. Food & Drug Admin., Notice of Approval, *supra* note 6 (approving amantadine for use in treating Parkinson's), *with* U.S. Patent No. 3,391,142 (filed Feb. 9, 1966) (issued July 2, 1968).

Waxman Act in 1984[32]—DuPont had incentives to invest in clinical trials needed to obtain FDA approval for other possible indications, including Parkinson's.[33] The strength of these incentives, of course, waned as 1983 and 1984 drew closer, and largely dried up thereafter.[34] As the patent term decreased, DuPont's ability to recoup investment costs and turn a profit also decreased.[35] Because shrinking patent terms framed smaller and smaller windows to generate a return, incentives to invest in new uses of the patented drug decreased along with the patent term.

When the patent expired, generics could enter the market and drive down the price of the drug.[36] Research on new uses of amantadine, as a result, hasn't moved as quickly as research on its use to treat Parkinson's, for example.[37] This problem does not disappear *even if* pharmaceutical companies have the proper incentives to invest in research of some off-label or new uses. There are thousands, potentially tens of thousands, of new uses; it's impossible for drug companies to finance clinical trials for every new use, or even for a majority of them.

These two Problems seem separate and unrelated—and most scholars have approached them that way.[38] The Problem of Off-Label Uses is a safety and efficacy problem: off-label use is

---

[32] *See* U.S. Patent No. 3,256,329 (filed June 9, 1964) (issued June 14, 1966) (issuing an original patent for amantadine); U.S. Patent No. 3,257,456 (filed May 4, 1964) (issued June 21, 1966) (issuing patent for "2-Adamantanone and derivatives"). Although the patents expired in 1983, the existing regulatory regime made it difficult for generics to enter the market even after a patent expired. *See infra* Section II.B. That changed with the Hatch-Waxman Act of 1984. *See infra* Section II.B. Given the limited evidence, it is not entirely clear whether it was the patent or the Hatch-Waxman Act that changed the investment landscape.

[33] See *infra* Section II.B.

[34] *See supra* note 32.

[35] *See infra* note 147.

[36] Generics did enter the market in 1987 when FDA approved Upsher Smith Labs' Abbreviated New Drug Application (ANDA). *See Product Details for ANDA 070589*, ANDA: 070589,   U.S.   FOOD   &   DRUG   ADMIN., .https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=A&Appl_No =070589#23616, (last visited Mar. 5, 2022) (noting that Upsher Smith Laboratories LLC applied for the approval and that the drug was approved on August 5, 1986).

[37] There are a variety of other relevant differences between drug approval now and drug approval in 1973 that make the comparison inexact.

[38] I refer to the "Problem of New Uses" and "Problem of Off-Label Uses" collectively as "the Problems." When I discuss either individually, I refer to them, where appropriate, as "Problem."

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

712     *GEORGIA LAW REVIEW*     [Vol. 56:701

potentially harmful and wasteful because doctors prescribe drugs for unapproved uses without sufficient evidence of the safety and efficacy to support them. The Problem of New Uses is an innovation problem: pharmaceutical companies lack incentives to invest in R&D of new uses of approved drugs.[39] Framing the Problems separately leads many scholars to propose discrete solutions to each of them. Scholars focused on off-label use have, by and large, proposed limitations on the practice.[40] Those concerned with new uses, by contrast, recommend various tweaks to patent law and market exclusivity to capture new uses.[41] While the former attempt to reduce unnecessary off-label use, the latter try to increase the number of safe and effective new uses. Unfortunately, neither has succeeded—and it's still unclear how to make headway in either domain.

One reason the Problems seem intractable is because of the way they are framed—as separate and unrelated. This Article's first contribution is to make them tractable by reframing them in terms of their commonalities, rather than their differences: the information needed to solve, or at least ameliorate, both Problems is often the same information. Because all new uses of approved drugs are off-label uses, safety and efficacy information about approved new uses is also safety and efficacy information about off-label uses. Safety and efficacy information about off-label uses, in many cases, will also be safety and efficacy information about new uses. Put another way, information about off-label uses can be information about new uses, and information about new uses is always information about off-label uses.[42]

---

[39] *See* Kapczynski & Syed, *supra* note 29 (explaining that patent law can have distortive (demand) effects because some kinds of informational goods can be difficult to exclude despite their high social value that cannot be resolved by resorting to internal features of patent law and arguing that government should be involved in a greater range of research-related activities).

[40] *See infra* Section II.A.

[41] *See infra* Section II.B.

[42] The quantity of off-label uses that are also new uses depends, in part, on how you define "new uses." Defining the question by reference to evidence makes all off-label uses new uses. If you define it by reference to *undiscovered* uses, then the overlap shrinks considerably. Discussions of new uses frequently fail to distinguish between these different senses of "new uses" and, therefore, tend not to see the similarities between the two problems. See *infra* Section II.C for a full discussion.

Recognizing the informational overlap enables this Article to make a second contribution: the entities best positioned to solve both Problems are not pharmaceutical companies, but providers—entities that actually provide services, such as hospitals, academic medical centers, health systems, healthcare networks, and even small office-based physician practices. The rationale for targeting providers is simple. They generate, or have the capability to generate, much of the needed post-market information about off-label drug prescriptions, use, and effects. And many providers, particularly large providers, have existing systems to monitor prescriptions and patients that can be leveraged to track and analyze off-label use. They also have institutional resources and knowledge that can be deployed to research off-label uses. The problem is that they lack incentives to do so.

Identifying the optimal set of incentives without further study is not possible. Instead, this Article seeks to illustrate how some incentives might capture innovative off-label uses, as well as data about off-label use and its effects. Four possible incentives—three ex ante (push) and one ex post (pull)—are reviewed. Two of the push incentives are government subsidies. The first is an existing government program that could be retooled for off-label use. The second is a new government subsidy to stimulate data collection, organization, and dissemination about off-label uses. The third push incentive is a tax credit. The fourth and final inducements discussed are variants of pull incentives that aim to produce data from clinical trials and observational studies: royalties, payments, or prizes for evidence development that result in FDA approval. The goal of Part III of the Article is not to assess which of these is best; rather, it's designed to show that there are a variety of policy levers that can be pulled to deliver the desired outcome: more safety and efficacy information about new and off-label uses.

Tackling the problems this way—by recognizing their informational commonality—has several significant benefits. First, it's efficient. Addressing both problems at the same time, with the same solution, costs less than addressing both at different times, with different solutions. Second, it's synergistic: addressing the Problem of New Uses will increase the number of better-supported uses and decrease the number of unsafe or ineffective off-label

uses.[43] The result is more uses supported by better evidence and fewer uses supported by weak or no evidence. At the same time, addressing the problem of off-label uses will help ameliorate the problem of new uses by identifying and researching innovative and valuable off-label uses. Third, it circumvents the problem of potentially negative information that typically dogs new uses.[44] Because drug manufacturers that conduct R&D of new uses risk discovering that the new use—or, worse still, the current approved use—is not safe and effective, they may be reluctant to do so.[45] Finally, this approach doesn't disturb existing incentives to pursue new drugs or new treatments. This is important because the existing incentive framework does produce valuable information, including some information about unapproved new uses of approved drugs.

   Implementing new incentive structures, or leveraging old ones, entails costs—costs of legislative changes, of administration, of information collection and analysis. These costs are substantial. But they can't be properly known or weighed without further research. While that study can't be undertaken here, this Article seeks to achieve a more modest aim: to show that, whatever the costs, focusing attention on providers is one way to both identify new uses

---

[43] *See infra* Section III.C. It will do this, however, only if it generates the kind of information needed for FDA approval. Even if this change doesn't result in an expanded indication, it would still provide much needed and valuable information about safety and efficacy (or at least effectiveness). Although the concepts of efficacy and effectiveness are not identical, I use them interchangeably throughout this Article. For a discussion of the FDA's trend toward accepting less traditional evidence, see Section II.C.

[44] *See* Rebecca S. Eisenberg & W. Nicholson Price, *Promoting Healthcare Innovation on the Demand Side*, 4 J.L. & BIOSCIENCES 3, 14 (2017) (describing opportunities to fund new uses).

[45] This worst-case scenario is what happened with the drug Vioxx (rofecoxib). The FDA approved Merck's NDA in 1999 for the treatment for osteoarthritis, acute pain, and primary dysmenorrhea. *See* Letter from Brian E. Harvey, Acting Division Director, U.S. Food & Drug Admin., to Dr. Evan M. Braunstein, Merck & Co., Inc. (Dec. 16, 2003), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2003/021042_S024_VIOXXTM_APPROV.pdf. In 2000, Merck conducted research into whether the drug could prevent recurrent colon polyps. *See Vioxx (rofecoxib) Questions and Answers*, U.S. Food & Drug Admin, (Sept. 30, 2004), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/vioxx-rofecoxib-questions-and-answers. The results of this new study showed that those who took the drug had an "increased risk [for] cardiovascular events such as heart attack and strokes." *Id.* Merck voluntarily pulled the drug from the market in 2004. Rebecca S. Eisenberg & W. Nicholson Price, *Promoting Healthcare Innovation on the Demand Side*, 4 J.L. & BIOSCIENCES 3, 10 (2017).

of approved drugs and generate better information about the safety and efficacy of off-label uses.

Part II of this Article explains the Problems of Off-Label Uses and the Problems of New Uses in detail. Both of these Problems, it shows, often overlap. In many cases, safety and efficacy information about off-label uses will be safety and efficacy information about new uses. And, in other cases, information about new uses of existing drugs will also be information about new, off-label uses that providers are testing in the field. In other words, there is a large informational overlap between the two Problems. Part III argues that providers are an untapped source of potential information that could ameliorate, if not solve, both Problems. Part IV describes potential provider-based incentives that would generate data to fill the informational deficit common to both Problems. While it doesn't offer one specific solution, it proposes several mechanisms—some old, some new, some push, some pull—to incentivize providers to produce, collect, analyze, and publish more information about innovative and existing off-label uses.

## II. THE PROBLEM OF OFF-LABEL USES & THE PROBLEM OF NEW USES

The purpose of this Part is to explain both Problems and how they are related to the same information. Section A explains the Problem of Off-Label Uses, why it's a problem, and how scholars have proposed to rectify it. Section B follows the same structure with respect to the Problem of New Uses. Section C shows how these two Problems often stem from a lack of identical information. This informational overlap naturally suggests a solution that focuses on the entities best positioned to collect the needed information: providers.

### A. THE PROBLEM OF OFF-LABEL USES

Patients with diseases that lack FDA-approved treatments still need access to drugs that might help them. Prescribing drugs under these conditions, however, is often risky because the safety and efficacy data are limited. This is, as I explain below, a problem of

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

716            *GEORGIA LAW REVIEW*            [Vol. 56:701

information. And most scholars have tried to solve it by limiting off-label use.

   *1. Off-Label Use.* Off-label use occurs when a physician prescribes an approved drug for an unapproved use.[46] Approved drugs are those that the FDA has decided, at the insistence of pharmaceutical companies, are safe and effective for an intended use. Without this approval, drugs generally can't reach the market.[47] To obtain approval, a drug company must demonstrate to the FDA that a drug is safe and effective for an intended use by "substantial evidence."[48] It begins this process by filing an Investigational New Drug Application (IND),[49] which shows the

---

   [46] Off-label uses are also referred to in the literature as "unapproved" uses. *See, e.g.*, M.M. Saiyed, P.S. Ong & L. Chew, *Off-Label Drug Use in Oncology: A Systematic Review of Literature*, 42 J. CLINICAL PHARMACY & THERAPEUTICS 251, 256 (2017). When physicians prescribe an *unapproved drug*—a drug not approved for any use by the FDA—the use is *unlicensed. Id.* at 251. Both off-label and unapproved uses are different from *compassionate use* or *expanded access*, which occurs when the FDA temporarily allows patients with serious conditions to access "investigational medical products . . . outside of clinical trials when no comparable or satisfactory alternative therapy options are available." *Expanded Access*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/news-events/public-health-focus/expanded-access (last updated Mar. 23, 2021).

   [47] *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval . . . is effective with respect to such drug."); *see also Enforcement Activities, Unapproved Drugs*, U.S. FOOD & DRUG ADMIN. (June 2, 2021), https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs (last visited Apr. 26, 2022) ("Federal law requires all new drugs in the U.S. be shown to be safe and effective for their intended use prior to marketing."). *But see id.* ("FDA permits some unapproved prescription drugs to be marketed [under three conditions].").

   [48] *See* 21 U.S.C. § 355(d) ("[T]he term 'substantial evidence' means evidence consisting of adequate and well-controlled investigations . . . by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded . . . that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof."); 21 C.F.R. § 314.50(d)(5)(v) (2020) (setting forth requirements for the effectiveness of data); 21 C.F.R. § 314.126 (2020) (stating the purpose of conducting clinical drug investigations and describing the characteristics of a well-controlled study).

   [49] *See* 21 C.F.R. § 312.23 (2020) (requiring sponsors intending to conduct clinical investigations to submit an IND with specific content and format requirements); PETER BARTON HUTT, RICHARD A. MERRILL & LEWIS A. GROSSMAN, FOOD AND DRUG LAW 674 (4th ed. 2014) (explaining that "a manufacturer must first obtain FDA approval of a new drug application" and that the FDA created the IND procedure to implement the congressional exemption allowing new drug sponsors "to carry out the clinical testing necessary to support FDA approval of an NDA").

FDA that the target drug has undergone preclinical testing in animals.[50] Once the IND goes into effect,[51] there are usually three phases of review.[52] In Phase I,[53] the company conducts clinical trials with a small number of healthy volunteers to determine how the drug works in the body, its relative safety, and, preliminarily, its effectiveness.[54] Phase II studies are directed toward efficacy.[55] They are usually somewhat larger than Phase I studies, up to a few hundred participants, and are controlled using the relevant patient population.[56] Once a sponsor successfully completes Phase I and II studies, it enters Phase III, conducting larger clinical trials to determine the drug's overall safety and efficacy.[57] A drug sponsor can and usually does consult with the FDA during any Phase, but it is not required to do so.[58] After completing all three Phases, the drug sponsor can submit a new drug application (NDA) based on the results of its clinical trials.[59] In the NDA, the sponsor must also make various filings and attestations about the drug and its

---

[50] *See* 21 C.F.R. § 312.23(a)(8) (2020) (dictating that the IND plan should include "information about pharmacology and toxicological studies of the drug involving laboratory animals"). These tests must have been conducted using good laboratory practices. 21 C.F.R. § 58 (2020); *see also* Ctr. for Drug Evaluation & Rsch., U.S. Dep't of Health & Hum. Servs., Guidance for Industry, Investigators, and Reviewers: Exploratory IND Studies 2–3 (2006) [hereinafter IND Guidance], https://www.fda.gov/files/Guidance-to-Industry-and-Reviewers---Exploratory-IND-Studies-%28PDF%29.pdf (stating that an IND containing information on "any risks anticipated based on the results of pharmacologic and toxicological data collected during studies of the drug in animals" must be submitted before human studies can begin); Hutt et al., *supra* note 49, at 671 ("During preclinical drug development, a sponsor evaluates the drug's toxic and pharmacologic effects through *in vitro* and *in vivo* laboratory animal testing.").

[51] The IND will go into effect unless the FDA issues a clinical hold within 30 days of receiving the IND. 21 C.F.R. § 312.40(b)(1) (2020).

[52] 21 C.F.R. § 312.21 (2020).

[53] In 2006, the FDA released guidance on so-called "Phase 0" studies, which were intended to act as a "exploratory IND stud[ies]" occurring very early in Stage 1. IND Guidance, *supra* note 50, at 1.

[54] 21 C.F.R. § 312.21(a) (2020).

[55] *See* 21 C.F.R. § 312.21(b) (2020) ("Phase 2 includes controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication . . . .").

[56] 21 C.F.R. § 312.21(b) (2020).

[57] 21 C.F.R. § 312.21(c) (2020).

[58] *See The Drug Development Process, Step 3: Clinical Research*, U.S. Food & Drug Admin. (Jan. 4, 2018), https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

[59] 21 C.F.R. § 314.105(c) (2020).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

718 *GEORGIA LAW REVIEW* [Vol. 56:701

manufacturing practices.[60] The purpose of an NDA is to convince the FDA that the drug is safe and effective for its intended use.[61]

Drug makers expend large quantities of time and money building their cases for the FDA, most of which are unpersuasive.[62] The most recent estimates peg new drug development capitalized costs at between $1,395 million and $2,558 million,[63] a figure that has grown continually since Congress implemented the modern regulatory regime in 1962.[64] If a drug sponsor convinces the FDA to approve a "new drug," its approval is limited to using the drug for a specific

---

[60] 21 C.F.R. § 314.50 (2020).

[61] *See The Drug Development Process, Step 4: FDA Drug Review*, U.S. FOOD & DRUG ADMIN. (Jan. 4, 2018), https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review. In some cases, sponsors conduct Phase IV studies. These studies include post-marketing surveillance imposed by the FDA and "real world" tests of a drug after it hits the market. *See* Viraj Suvarna, *Phase IV of Drug Development*, 1 PERSPS. CLINICAL RSCH. 57, 57–58 (2010).

[62] *See* Joseph A. DiMasi, Henry G. Grabowski & Ronald W. Hansen, *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J. HEALTH ECON. 20, 23 (2016) [hereinafter DiMasi et al., *Innovation in the Pharmaceutical Industry*] (estimating an 11.83% overall probability that a drug that enters clinical testing will eventually be approved); J.A. DiMasi, L. Feldman, A. Seckler & A. Wilson, *Trends in Risks Associated with New Drug Development: Success Rates for Investigational Drugs*, 87 CLINICAL PHARMACOLOGY & THERAPEUTICS 272, 276 (2010) ("For self-originated new drugs that first entered clinical testing in 1993–2004 and were observed through mid-2009, the results indicated that approximately one in six drugs that enter the clinical testing pipeline will eventually obtain approval for marketing in the United States."); Henry Grabowski, *Increasing R&D Incentives for Neglected Diseases: Lessons from the Orphan Drug Act*, *in* INTERNATIONAL PUBLIC GOODS AND TRANSFER OF TECHNOLOGY UNDER A GLOBALIZED INTELLECTUAL PROPERTY REGIME 457, 462 (Keith E. Maskus & Jerome H. Reichman eds., 2005) ("[I]t it takes several hundred million dollars to discover, develop, and gain regulatory approval for a new medicine."). *But see* Dan L. Burk & Mark A. Lemley, *Levers in Patent Law*, 89 VA. L. REV. 1575, 1616 & n.131 (2003) (noting that the $800 million R&D figure is "almost certainly inflated" because it includes sizeable advertising budgets).

[63] *See* DiMasi et al., *Innovation in the Pharmaceutical Industry*, *supra* note 62, at 26 (finding fully capitalized total costs of $2558 million per approved new drug during the 2000s to mid 2010s); Steve Morgan, Paul Grootendorst, Joel Lexchin, Colleen Cunningham & Devon Greyson, *The Cost of Drug Development: A Systematic Review*, 100 HEALTH POL'Y 4, 7 tbl.1 (2011) (compiling studies and total estimates of cost of drug development); Joseph A. DiMasi, Ronald W. Hansen & Henry G. Grabowski, *The Price of Innovation: New Estimates of Drug Development Costs*, 22 J. HEALTH ECON. 151, 162 tbl.1 (2003) [hereinafter DiMasi et al., *The Price of Innovation*] (finding an average out-of-pocket clinical period cost for investigational compounds of $60.6 million).

[64] *See, e.g.*, DiMasi et al., *The Price of Innovation*, *supra* note 63, at 154 fig.1 (displaying the upward trend in inflation-adjusted industry R&D expenditures from 1963 to 2000).

indication (condition), at a specific dose, by a specific route of administration, often in a specific population.[65] By law, all of this information must appear on the drug's labeling.[66] Drug manufacturers are not permitted to market their products in a manner inconsistent with the approved NDA or drug labeling.[67]

But physicians aren't bound by labels. Because the FDA doesn't regulate the practice of medicine,[68] physicians are free to prescribe any approved drug for a different indication, at a different dose, by a different route of administration, in a different patient

---

[65] *See* 21 U.S.C. § 355 (2018) (regulating "new drugs"); 21 C.F.R. §310.3(g)–(h) (2020) (defining "new drug substance" and establishing that the newness of a drug may arise from, among other reasons,"[t]he newness of a dosage, or method or duration of administration or application, or other condition of use prescribed, recommended, or suggested in the labeling of such drug").

[66] 21 C.F.R. §§ 201.50, 201.51, 201.55, 201.56, 201.57 (2019) (setting out labeling requirements for a drug's statement of identity, net quantity, dosage, and other content and format standards). *But see id.* § 201.58 (providing that applicants can request the FDA to waive labeling requirements).

[67] *See, e.g.,* 21 U.S.C. § 355(a) (2018) (requiring approval for new drugs); 21 U.S.C. § 352(a)(1) (2018) (requiring drugs to conform to labeling approved under 21 U.S.C. § 355); 21 C.F.R. § 201.100(c)(1) (2019) (requiring labels for prescription drugs for human use to bear adequate information for use); 21 U.S.C. § 321(m) (2018) (defining labeling). For more about how the FDA prosecutes off-label regulation, see David A. Simon, Evidence-Based Regulation of Off-Label Information 7–8 (Oct. 18, 2021) (unpublished manuscript) (on file with author) [hereinafter Simon, *Off-Label Information*] ("Beyond labeling, the FDA can prosecute claims of off-label promotion using its power to regulate drug advertising."). *See also* David A. Simon, *Trademark Law & Consumer Safety*, 72 FLA. L. REV. 673, 711 (2020) [hereinafter Simon, *Consumer Safety*] (explaining that since Congress expanded the power and scope of the FDA's authority in 2007, the FDA has increasingly used trademark law to regulate both prescription and over-the-counter drugs).

[68] *See FDA's Role in Regulating Medical Devices*, U.S. FOOD & DRUG ADMIN. (Aug. 31, 2021), https://www.fda.gov/medical-devices/home-use-devices/fdas-role-regulating-medical-devices ("FDA regulates the sale of medical device products . . . and monitors the safety of all regulated medical products. . . . The FDA does not have the authority to[] [r]egulate a physician's or nurse's practice.").

720            *GEORGIA LAW REVIEW*            [Vol. 56:701

population.[69] When they do, they are prescribing "off-label."[70] They are prescribing an approved drug for a *use* that the FDA did not approve.[71] Although what counts as off-label use isn't static[72] or uniformly defined,[73] this description is useful and precise enough for purposes of this Article.[74]

Physicians prescribe drugs off-label for various reasons. Sometimes there are no front-line treatments for a particular condition.[75] So the physician may try an approved medication for another condition by using it off-label in an attempt to provide relief

---

[69] *See* Philip M. Rosoff & Doriane Lambelet Coleman, *The Case for Legal Regulation of Physicians' Off-Label Prescribing*, 86 NOTRE DAME L. REV. 649, 650, 661–64 (2011) ("Typical off-label uses (OLU) include promoting, prescribing, and ingesting substances for conditions other than those for which they were approved, in higher- or lower-than-indicated dosages, and in populations other than those in which they were tested."); *see also* U.S. FOOD & DRUG ADMIN., "OFF-LABEL" AND INVESTIGATIONAL USE OF MARKETED DRUGS, BIOLOGICS, AND MEDICAL DEVICES: GUIDANCE FOR INSTITUTIONAL REVIEW BOARDS AND CLINICAL INVESTIGATORS (1998), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/label-and-investigational-use-marketed-drugs-biologics-and-medical-devices ("Good medical practice and the best interests of the patient require that physicians use legally available drugs, biologics and devices according to their best knowledge and judgement. If physicians use a product for an indication not in the approved labeling, they have the responsibility to be well informed . . . .").

[70] Even outside the United States, the definition is largely the same. *See, e.g.*, Marc Dooms, David Cassiman & Steven Simoens, *Off-Label Use of Orphan Medicinal Products: A Belgian Qualitative Study*, 11 ORPHANET J. RARE DISEASES 1, 1 (2016) ("Off-label use of a medicinal product entails the intentional use of the medicinal product for any indication, population, dosage, administration route or treatment duration other than that approved by a country's regulatory authority.").

[71] Not all off-label uses are reimbursed either by private insurance or by the Centers for Medicare & Medicaid Services (CMS). *See* Simon, *Off-Label Information*, *supra* note 67, at 41.

[72] *See* Saiyed et al., *supra* note 46, at 256 ("Prescribing practices reported as 'off-label' in the literature years back might not be considered off-label today due to changes in prescribing information.").

[73] *See* Joana Magalhães et al., *Use of Off-Label and Unlicenced Drugs in Hospitalised Paediatric Patients: A Systematic Review*, 71 EUR. J. CLINICAL PHARMACOLOGY 1, 8 (2015) (listing different methodologies of determining what off-label use entails, stating "there was no consensus on a common definition of off-label and unlicensed drugs").

[74] An off-label use isn't an "improper, illegal, contraindicated, or investigational use." Xiulu Ruan & Alan David Kaye, *Off-Label Prescribing: Justified or Not?*, 31 AM. J. MED. QUALITY 101, 101 (2016).

[75] *See, e.g.*, Mahmoud Chehab, Alosh Madala & J.C. Trussell, *On-Label and Off-Label Drugs Used in the Treatment of Male Infertility*, 103 FERTILITY & STERILITY 595, 595 (2015) (describing the necessity of off-label treatments for male infertility without known cause).

for a patient where there might otherwise be none.[76] Other times, clinical data may not exist for the *population* the doctor treats despite using the medication to treat the same *condition* as one listed on the approved labeling.[77] This is common in pediatric practices, for example, because children often can't be included in study populations for ethical reasons.[78] Physicians treating these patient populations often *must* prescribe drugs off-label—the patient population is different—because sponsors can't or won't conduct the clinical trials necessary for FDA approval.[79] On occasion, as well, an off-label use may be the standard of care to treat a particular condition.[80] Doctors, for example, frequently

---

[76] *See, e.g.*, Svetlana Goločorbin Kon, Ivana Iličković & Momir Mikov, *Reasons for and Frequency of Off-Label Drug Use*, 68 MEDICINSKI PREGLED 35, 38 (2015) (noting that the lack of effective and safe treatments is a primary reason for off-label use).

[77] *See, e.g.*, Martha M. Rumore, *Medication Repurposing in Pediatric Patients: Teaching Old Drugs New Tricks*, 21 J. PEDIATRIC PHARMACOLOGY & THERAPEUTICS 36, 37 (2016). *But see* 26 U.S.C. § 45(e)(11)(C) (providing tax credits for clinical testing expenses for certain drugs); *infra* Section III.D (discussing how tax incentives can induce providers to institute off-label use).

[78] *See, e.g.*, Marc A. Rodwin, *Rooting out Institutional Corruption to Manage Inappropriate Off-Label Drug Use*, 41 J.L. MED. & ETHICS 654, 655 (2013) ("[R]esearch protocol typically excludes children . . . who are more vulnerable to adverse drug reactions (which might reflect badly on the drug) . . . ."); Jennifer L. Herbst, *How Medicare Part D, Medicaid, Electronic Prescribing, and ICD-10 Could Improve Public Health (But Only If CMS Lets Them)*, 24 HEALTH MATRIX 209, 241 (2014) [hereinafter Herbst, *Medicare Part D*] ("[M]any of the patients historically covered by Medicaid—children . . . are also often excluded from clinical trials for both ethical and practical reasons."); *id.* at 241–43 (describing the benefits of private insurer, Medicare, and Medicaid databases providing "a broader cross-section of the population").

[79] The Best Pharmaceuticals for Children Act (BPCA) has changed this somewhat, but sponsors are still reluctant to conduct trials on children below the age of 12. *See* 21 U.S.C. §§ 355a, 355c (detailing the application and approval process for "[p]ediatric studies of drugs" and "[r]esearch into pediatric uses for drugs and biological products"); Rumore, *supra* note 77, at 36–37, 37 tbl.1 (discussing several reasons why companies are reluctant to conduct research in the pediatric population, such as how the FDA does not mandate pediatric ages to be tested, indicating some medications received exclusivity by testing in 12- to 17-year-olds, and listing various provisions of the BPCA).

[80] See Jennifer L. Herbst, The Short-Sighted Value of Inefficiency: Why We Should Mind the Gap in the Reimbursement of Outpatient Prescription Drugs, 2 CASE W. RES. J.L. TECH. & INTERNET 1, 3 (2011) [hereinafter Herbst, Short-Sighted] ("Off-label use of prescription drugs . . . occasionally reflects the recognized standard of care for a disease or condition.").

722                 *GEORGIA LAW REVIEW*              [Vol. 56:701

prescribe amitriptyline[81] to treat neuropathic pain[82] even though it is approved only to treat depression.[83]

Prescribing drugs off-label is considered an essential part of medicine for several reasons. First, it allows physicians to tailor treatment choices to individual patients.[84] Second, off-label use enables physicians to treat patients when, as noted above, no on-label treatment options exist, or where the off-label use is the standard of care.[85] Finally, and this is a point I return to in Section II.C, off-label prescribing is a source of innovation in drug use and development.

*2. The Problem of Off-Label Uses as an Informational Problem.* Although off-label uses are important, they can also be riskier than on-label uses. Off-label uses may not be supported by the same kind or quantity of evidence as on-label uses.[86] Some may be supported by a single case report or a series of them or by varying kinds of

---

[81] Joseph Acton, John E. McKenna & Ronald Melzack, *Amitriptyline Produces Analgesia in the Formalin Pain Test*, 117 EXPERIMENTAL NEUROLOGY 94–95 (1992) (describing that Amitriptyline is a drug designed to treat depression that has been shown to have other uses). Another example is chenodeoxycholic acid (Chenodiol), described *supra* note 30.

[82] *See, e.g.*, Acton et al., *supra* note 81, at 94–95 ("Amitriptyline . . . [is] often extremely effective in relieving various forms of chronic pain."); Kalso Eija, Tasmuth Tiina & Neuvonen Pertti J, *Amitriptyline Effectively Relieves Neuropathic Pain Following Treatment of Breast Cancer*, 64 PAIN 293, 301 (1995) ("The number of daily activities being disturbed by pain and the effect of pain on daily life were significantly reduced with amitriptyline."); R. Andrew Moore, Sheena Derry, Dominic Aldington, Peter Cole & Phillip J. Wiffen, *Amitriptyline for Neuropathic Pain in Adults*, COCHRANE DATABASE SYSTEMATIC REVS. 1, 2 (2015), http://doi.wiley.com/10.1002/14651858.CD008242.pub2 ("Amitriptyline is commonly used to treat neuropathic pain conditions . . . ."). *But see* Diana D. Cardenas, Catherine A. Warms, Judith A. Turner, Helen Marshall, Marvin M. Brooke & John D. Loeser, *Efficacy of Amitriptyline for Relief of Pain in Spinal Cord Injury: Results of a Randomized Controlled Trial*, 96 PAIN 365, 372 (2002) ("Possibly amitriptyline might be more efficacious for certain types of pain, but our exploratory analyses did not reveal such effects. . . . ").

[83] The FDA approved amitriptyline (trade name Elavil) for depression on April 7, 1961 in NDA 012703 (approval for new molecular entity). *See* Food and Drug Admin., Determination that Elavil (Amitriptyline Hydrochloride) Oral Tablets, 10, 25, 50, 75, 100, and 150 Milligrams, Were Not Withdrawn from Sale for Reasons of Safety or Effectiveness, 82 Fed. Reg. 49,032, 49,033 (Oct. 23, 2017) (describing how Elavil was "initially approved on April 7, 1961" for "relief of symptoms of depression").

[84] *See infra* note 186.

[85] *See supra* notes 75–76 and accompanying text.

[86] *See, e.g.*, DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 8–11 (2015) (discussing how "the prescription of a drug in an off-label fashion, based as it is on limited evidence, does not itself result in the enlargement of the evidence base").

observational studies, clinical trials, or meta-analyses. One study even claims to show that a large portion of off-label uses lacks any evidentiary basis.[87] If true, this means limited or no safety and efficacy data support existing prescribing practices. If limited data do exist, they may be confined to closely related indications or consist of limited reporting of use or case studies in the literature.

This lack of information poses serious risks to, and imposes real monetary costs on, patients who fall outside of the approved labeling. Off-label use increases the chance of adverse events.[88] These risks increase as evidence for the relevant use thins out.[89] One reason for this is that drug effects are hard to predict. Even the same dose of a drug can have wildly different effects in disparate patient populations. Children, for example, metabolize drugs differently than adults, complicating attempts by physicians to extrapolate dosage from one to the other.[90] A lack of studies involving children, however, makes extrapolation necessary.[91] Patients also may have comorbidities, or simply different genotypes, that make adverse reactions more or less likely.[92] In psychiatry, where off-label use is prevalent, the risk is not merely using a drug with limited evidence but failing to treat the underlying behavioral

---

[87] *See* David C. Radley, Stan N. Finkelstein & Randall S. Stafford, *Off-label Prescribing Among Office-Based Physicians*, 166 ARCHIVES INTERNAL MED. 1021, 1025 (2006) ("[W]e found that about 21% of all estimated uses for commonly prescribed medications were off-label, and that 15% of all estimated uses lacked scientific evidence of therapeutic efficacy.").

[88] Some studies have reported higher rates of adverse events for off-label uses than on-label ones—rates that increase as the evidentiary support for the off-label use decrease. *See, e.g.*, Tewodros Eguale, David L. Buckeridge & Aman Verma, *Association of Off-label Drug Use and Adverse Drug Events in an Adult Population*, 176 JAMA INTERNAL MED. 55, 61 (2016) (concluding based on a study comparing on-label adverse drug effects to off-label adverse drug effects that off-label drug use increases the risk for adverse drug effects); *see also* CAVALLA, *supra* note 86, at 9–10 (noting that increased risk for adverse drug reactions also applies to younger pediatric patients and for psychiatric care).

[89] *See* Eguale, *supra* note 88, at 61 ("Off-label drug use, and particularly off-label use without strong scientific evidence, is a risk factor for [adverse drug effects].").

[90] *See* J.D. Momper, Y. Mulugeta & G.J. Burckart, *Failed Pediatric Drug Development Trials*, 98 CLINICAL PHARMACOLOGY & THERAPEUTICS 245, 245 (2015).

[91] *See* CAVALLA, *supra* note 86, at 9, 13 (noting a lack of understanding of off-label use for pediatric patients and reviewing prevalence of off-label use in pediatric practices and finding rates as high as 76%).

[92] *See, e.g.*, Eguale, *supra* note 88, at 57 (including "age and measures of comorbidity" in a study "because older patients and those with more than 1 comorbidity may have a higher risk for" adverse drug effects (footnotes omitted)).

724             *GEORGIA LAW REVIEW*          [Vol. 56:701

problem.[93] Because of these risks, and the costs associated with improper prescriptions, almost every commentator discussing the topic is concerned with the relative safety and efficacy of off-label uses.[94]

The difficulty presented by off-label uses, as Ryan Abbott and Ian Ayres note, results from an information deficit: because off-label uses generally are not supported by the same evidence as approved uses, patients taking a drug off-label may be exposed to risks without knowing whether a drug is safe and effective.[95] The problem is exacerbated by features of patent law that fail to provide adequate incentives to generate the clinical trial data needed to fill this gap entirely.[96] The result is the Problem of Off-Label Uses: off-label use occurs necessarily and frequently, but there may be insufficient information about the safety and efficacy of these uses. In other words, there often may be insufficient information about the type, frequency, and effects of off-label use.

Because the Problem of Off-Label Uses results from lack of information, some scholars have proposed to solve it using more data.[97] Abbott and Ayres, for example, focus on a centralized, top-

---

[93] *See* CAVALLA, *supra* note 86, at 12–13 (describing how in cases of depression, higher off-label dosages may be used with the desire to ensure greater efficacy, but that use could cause various safety issues).

[94] *See, e.g.,* Radley et al., *supra* note 16, at 1021 ("Although this practice provides a pathway to innovation in clinical practice, it raises key concerns about risks to patients and costs to the health care system."); CAVALLA, *supra* note 86, at 13 ("In most cases . . . , adequate research evidence to support off-label prescribing is lacking."); Abbott & Ayres, *supra* note 19, at 388 (noting a lack of research for off-label uses).

[95] *See* Abbott & Ayres, *supra* note 19, at 388; Sandra H. Johnson, *Polluting Medical Judgment? False Assumptions in the Pursuit of False Claims Regarding Off-Label Prescribing*, 9 MINN. J.L. SCI. & TECH. 61, 65 (2008) ("[T]he prevalence of off-label prescribing is a manifestation both of learning patterns in the medical profession and deficiencies in the production and dissemination of clinical knowledge."); *id.* at 82–83 (noting that safety concerns from lack of information are prevalent for all drugs, not just off-label uses); *see also* Evans, *infra* note 124, at 439–50 (explaining that a drug's safety and efficacy profile cannot be known until the drug has been on the market for a sufficient period of time due to the ways premarket safety trials are conducted); Louis Lasagna, *Discovering Adverse Drug Reactions*, 249 JAMA 2224, 2225 (1983) (stating that reporting by physicians after original FDA approval is the most important way that drug manufactures and the FDA can learn about long-term adverse drug effects).

[96] *See infra* Sections III.A–B.

[97] *See* Abbott & Ayres, *supra* note 19, at 399. As noted below, not all proposals to curb off-label use focus on this information deficit. *See infra* note 101; *see also* CAVALLA, *supra* note

down approach that relies on the FDA to gather, police, evaluate, and communicate information about off-label uses.[98] This includes the creation of a new labeling system.[99] George Horvath argues for a skinny version of Abbott and Ayres' proposal, where the volume of off-label sales triggers manufacturer obligations to disclose off-label uses.[100] Others, such as David Kwok and Mark Rodwin, view off-label prescribing as a practice to be curbed and propose various legal

---

86, at 173–74 (arguing for higher professional standards, changing reimbursement incentives, and tracking off-label outcomes); Muriel R. Gillick, *Controlling Off-Label Medication Use*, 150 ANNALS INTERNAL MED. 344, 345–46 (2009) (arguing that off-label use should be regulated in the same manner as medical devices, using a two-step review process, including a CMS National Coverage Determination, for drugs that are expensive and risky); Ralph F. Hall & Elizabeth S. Sobotka, *Inconsistent Government Policies: Why FDA Off-Label Regulation Cannot Survive First Amendment Review Under* Greater New Orleans, 62 FOOD & DRUG L.J. 1, 45–46 (2007) (canvassing a variety of approaches to curb off-label prescribing, including a reimbursement ban, a prescription ban, preemption of product liability cases for on- but not off-label uses, tax incentives and rebates for expanded indications, greater patent exclusivity for on- and off-label uses, and mandating sNDAs for "for products the manufacturer knows are being used in any significant off-label manner"); United States v. Caronia, 703 F.3d 149, 168 (2d Cir. 2012) ("To minimize off-label use, or manufacturer evasion of the approval process for such use, the government could create other limits, including ceilings or caps on off-label prescriptions.").

[98] *See* Abbott & Ayres, *supra* note 19, at 399–412. (advocating for a new coding system for off-label uses). Similar proposals with respect to labeling have been developed in other countries as well. *See, e.g.,* Hanbin Wu & Gao Wu, *Strategy to Address Innovative Off-Label Medication Use in China: Grading Management*, 70 EUR. J. CLINICAL PHARMACOLOGY 1271, 1272 (2014) (arguing for a five-category system to indicate the nature of the off-label prescribing in China).

[99] *See* Abbott & Ayres, *supra* note 19, at 412–17 (providing an overview of the proposed "tiered labeling system"). But it is not clear how much this would help. *See* CAVALLA, *supra* note 86, at 11 (noting a recent study in the United States showing that "widespread ignorance of what drugs were actually approved for"); Donna T. Chen, Matthew K. Wynia, Rachael M. Moloney & G. Caleb Alexander, *U.S. Physician Knowledge of the FDA-Approved Indications and Evidence Base for Commonly Prescribed Drugs: Results of a National Survey*, 18 PHARMACOEPIDEMIOLOGY & DRUG SAFETY 1094, 1099 (2009) (finding that physicians misconstrue the meaning of FDA approval in determining a drug's efficacy for a certain use); Johnson, *supra* note 95, at 79 (reviewing literature in which physicians ignore warning letters and black box warnings).

[100] George Horvath, *Off-Label Drug Risks: Toward a New FDA Regulatory Approach*, 29 ANNALS HEALTH L. & LIFE SCIS. 101, 127 (2020); *see also* Philip M. Rosoff & Doriane Lambelet Coleman, *The Case for Legal Regulation of Physicians' Off-Label Prescribing*, 86 NOTRE DAME L. REV. 649, 652 (2011) (describing four categories of off-label use (OLU): "OLU justified by high-quality evidence, OLU justified by some but not high-quality evidence, OLU justified by the need or desire to innovate, and unjustified OLU").

726                      *GEORGIA LAW REVIEW*              [Vol. 56:701

mechanisms to put financial pressure on drug manufacturers to do so.[101] While each of these proposals has merit, they all approach the Problem of Off-Label Uses as a standalone challenge. And they aim to meet that challenge—however they frame it—by beefing up existing regulatory frameworks. By doing so, they fail to capitalize on the possibility of solving the Problem a different way, as well as the opportunity to simultaneously address a different problem: the Problem of New Uses.[102]

## B. THE PROBLEM OF NEW USES

New uses of old drugs are sorely needed. Not only are R&D costs for novel drug compounds increasing, but total investment in drug development has also consistently declined since 1950.[103] Both

---

[101] *See* David Kwok, *Controlling Excessive Off-Label Medicare Drug Costs Through the False Claims Act*, 27 HEALTH MATRIX 185, 211, 220 (2017) (arguing for reimbursement caps and noting that "[r]egardless of the precise optimal reimbursement rate, all reform proposals hinge upon one critical piece of information: tying patient indication to the prescription"); *id.* at 209, 219–20 (proposing using the False Claims Act's civil liability claw-back mechanism to lower drug prices for off-label prescriptions reimbursed under Medicare Part D, capping off-label reimbursement "at a rate tied to the competitive, patent-protected market for treatment of the condition"); Rodwin, *supra* note 78, at 659 (proposing making off-label prescribing more expensive for manufacturers so that they will discourage the practice); *see also* Herbst, *Short-Sighted*, *supra* note 80, at 4 (proposing a regulatory fix by requiring "diagnosis codes on claims submitted for federal reimbursement of outpatient prescription drugs under the Medicare Part D and Medicaid programs"); Herbst, *Medicare Part D*, *supra* note 78, at 214, 223 (arguing that CMS should require diagnostic codes for all prescriptions as a condition of reimbursement but not for coverage determinations).

[102] While some legal scholars have noted in passing the innovative nature of off-label prescribing, most proposals focus on restricting off-label prescribing to limit risks rather than to capture and cultivate the effects of off-label prescribing when it occurs. *See, e.g.*, Abbott & Ayres, *supra* note 19, at 390–91 (contending that "[o]ff-label drug use . . . may also serve as a pathway to innovation" and noting the failure to capture this information but focusing on problems with current off-label use and marketing); Rodwin, *supra* note 78, at 659 (proposing a limit to off-label prescribing by changing pharmaceutical firms' economic incentives); Kwok, *supra* note 101, at 188 (putting forth a proposal of a new "theoretical reimbursement framework that eliminates this distortion and unfairness by capping off-label reimbursements at a competitive level"); Horvath, *supra* note 100, at 127 (proposing that a manufacturer should have a duty to disclose available clinical data "once off-label prescriptions account for a certain volume or percentage of a drug's total prescriptions").

[103] *See* Jack W. Scannell et al., *Diagnosing the Decline in Pharmaceutical R&D Efficiency*, 11 NATURE REVS. DRUG DISCOVERY 191, 191 (2012) (showing that the number of new FDA drugs approved "per billion US dollars of R&D spending in the drug industry has halved

176

increased R&D costs and decreased spending on R&D reduce the overall number of available new drugs.[104] As investments in new drugs become riskier, firms take fewer chances for higher returns.[105] When investments are successful, they are expected to generate large profits, which also translates into high drug prices.

With costs rising and investment declining, new uses of approved drugs are particularly attractive. Compared to new drug development, new use development is dirt-cheap.[106] Thrift is made possible by existing knowledge about how to manufacture the drug, as well as information about its safety, toxicity, pharmacokinetics, mechanism of action, and even its effect on gene expression, all of which reduce the total investment required to bring the drug to market.[107] "Big Data" promises to reduce these costs even further by screening various uses before they are tested in a lab or clinical trial.[108] But they are difficult to commercialize. Traditional means of creating incentives for drug research and development—patent monopoly and market exclusivity—do not work as well for new uses of old drugs, giving rise to the Problem of New Uses.

This Section explains why. It shows that this problem, like the Problem of Off-Label Uses, is also one of information. The problem is not, in other words, that we don't have the right tools; it's that we aren't using them because we've relied on the wrong kind of entity (the pharmaceutical company), or at least wrongly relied *primarily*

---

approximately every [nine] years since 1950" and that costs have been growing steadily ever since). In a 2021 paper, Katherine Liddell and John Liddicoat show that government investment in new uses has far eclipsed private sector innovation. *See* Johnathon Liddicoat, Kathleen Liddell, Mateo Aboy & Jakob Wested, *Has the EU Incentive for Drug Repositioning Been Effective? An Empirical Analysis of the "+1" Regulatory Exclusivity*, 52 INT'L REV. INTELL. PROP. & COMPETITION L. 825, 826–27 (2021) (studying the effectiveness of European incentives to marketing authorization holders to create new uses).

[104] *See* Scannell et al., *supra* note 103, at 191 ("R&D efficiency, measured simply in terms of the number of new drugs brought to market . . . has declined fairly steadily.").

[105] *See id.* at 193–94 ("Progressive lowering of the risk tolerance of drug regulatory agencies obviously raises the bar for the introduction of new drugs . . . .").

[106] *See* Roin, *supra* note 26, at 4–5 (stating that developing a new drug costs an estimated $1.2 billion while repurposing a drug only costs $300 million on average).

[107] *See id.* at 5, 21, 42, 46 (contending that new use development is much quicker because of the familiarity with the drug).

[108] *See, e.g.*, Sudeep Pushpakom et al., *Drug Repurposing: Progress, Challenges and Recommendations*, 18 NATURE REVS. DRUG DISCOVERY 41, 55 (2019) (discussing the benefits of big data).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

728          *GEORGIA LAW REVIEW*          [Vol. 56:701

on that entity, to produce the needed information. To get there, Subsections 1 and 2 briefly explain how patent law and market and data exclusivity fail to incentivize R&D of new uses of old drugs. Subsection 3 then explains how these two seemingly different problems often arise because of the same informational deficit: lack of information about the use and effects of drugs off-label.

*1. Patent Law.* Patent law, in particular, has played a critical role in new drug pharmaceutical development. It encourages drug development by dangling the prospect of a twenty-year legal monopoly for any novel, useful, and non-obvious invention.[109] Patent owners can use this to prevent others from making, using, offering to sell, or selling the patented invention.[110] In return, inventors must disclose what they patented.[111]

Merely obtaining a patent on a novel drug compound isn't, by itself, enough to generate profit. That's because drug companies must first obtain FDA approval to market a drug. Without this approval, a patented drug can't be sold to consumers. Patents, in other words, are options to commercialize the drug.[112] Exercising these options requires significant investment in research and clinical trials—neither of which guarantees market success or even market entry.[113] Just to reach the market, the drug maker must use this data to convince the FDA that the drug is safe and effective.[114] Both the research and regulatory review process can last many years, and most trials peter out before Phase III trials take place.[115]

---

[109] *See* 35 U.S.C. §§ 101–02(a), 103,154(a)(2); *see also* U.S. CONST. art. I, § 8, cl. 8 ("To promote the Progress of Science and useful Arts, securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . .").

[110] *See* 35 U.S.C. § 271(a) (setting forth the requirements for patent infringement).

[111] *See* CRAIG ALLEN NARD, THE LAW OF PATENTS 3 (4th ed. 2017) (noting that patent law offers "potential financial reward as an inducement to invent" and "to disclose technical information").

[112] *See* Michael Abramowicz, *The Danger of Underdeveloped Patent Prospects*, 92 CORNELL L. REV. 1065, 1073 (2007) [hereinafter Abramowicz, *Underdeveloped Patent Prospects*] ("[A] patent provides its holder a series of options . . . [such as] a development option to commercialize the invention."); *see also* Christopher A. Cotropia, *Describing Patents as Real Options*, 34 J. CORP. L. 1127, 1137 (2009) ("[The] exclusive use of the invention allows the patent holder to commercialize the invention and sell it at a supra-competitive price.").

[113] *See infra* Section III.B.

[114] *See infra* note 124 and accompanying text.

[115] For a recent study that found that the mean time between beginning clinical trials and market approval was 96.8 months (and 80.8 months from beginning clinical trials until

At the same time, doctrinal pressures in patent law require inventors to file their applications early.[116] This means that drugs aren't normally approved for marketing until long after the filing date of the underlying patent, shortening the "effective" term of the patent.[117] Partially for that reason,[118] Congress enacted the Hatch-Waxman Act to extend patent terms, recapturing time lost during the FDA's review.[119] At the end of the patent term, a generic manufacturer can file an Abbreviated New Drug Application (ANDA) to reach the market quickly, increasing competition and lowering drug prices.[120]

Although this framework works well for some novel drug development, it isn't as conducive to stimulating R&D into new uses for old drugs.[121] One reason is doctrinal. Patent law's doctrines

submission of an NDA), see DiMasi et al., *Innovation in the Pharmaceutical Industry*, *supra* note 62, at 24. This did not include earlier stages of drug development, including preclinical research. *Id.* For earlier estimates, see, for example, Joseph A. DiMasi, *New Drug Development in the United States from 1963 to 1999*, 69 CLINICAL PHARMACOLOGY & THERAPEUTICS 286, 291 (2001).

[116] *See* Benjamin N. Roin, *Unpatentable Drugs and the Standards of Patentability*, 87 TEX. L. REV. 503, 518 (2009) (discussing the novelty doctrine); Rebecca S. Eisenberg, *The Role of the FDA in Innovation Policy*, 13 MICH. TELECOMM. & TECH. L. REV. 345, 351–52 (2007) (discussing novelty and statutory standards).

[117] *See, e.g.*, Henry G. Grabowski & John M. Vernon, *Effective Patent Life in Pharmaceuticals*, 19 INT'L J. TECH. MGMT. 98, 99 (2000) ("[E]ffective patent time is lost by pharmaceutical products because of the long period that a new drug spends in clinical trials and regulatory review.").

[118] *See, e.g.*, Gerald J. Mossinghoff, *Overview of the Hatch-Waxman Act and Its Impact on the Drug Development Process*, 54 FOOD & DRUG L.J. 187, 188 (1999) (detailing efforts by the Carter and Reagan Administrations to address pharmaceutical patents).

[119] *See* 35 U.S.C. § 156 (setting forth guidelines for extending a patent term).

[120] *See* IMS INST. FOR HEALTHCARE INFORMATICS, PRICE DECLINES AFTER BRANDED MEDICINES LOSE EXCLUSIVITY IN THE U.S. (2016) ("measur[ing] price declines following loss of exclusivity for every medicine that first became available as a generic between 2002 and 2014").

[121] Drug companies routinely file sNDAs for new indications, dosages, and patient populations. *See* DiMasi, *sNDAs*, *supra* note 28, at 818 (noting the increase in new-use approvals driven by new pediatric indications). But until recently, there was no data about whether these supplemental filings are made by drug companies with patents or market exclusivity over a use they are supplementing. *See* E-mail from Joseph DiMasi to David Simon (Oct. 27, 2020, 5:41 PM) (on file with author). A recent study found that new indications *exclusivities* are *never* added to the drug label after generics enter the market. *See* Babak Sahragardjoonegani, Reed F. Beall, Aaron S. Kesselheim & Aidan Hollis, *Repurposing Existing Drugs for New Uses: A Cohort Study of the Frequency of FDA-Granted New*

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

730 *GEORGIA LAW REVIEW* [Vol. 56:701

aren't equipped to protect all new uses.[122] Even if drug manufacturers do find and patent a new use, their reward is a method patent, which is difficult to enforce.[123] In some cases, manufacturers have successfully used new-use method patents covering an approved use of an existing off-patent drug to block

---

*Indication Exclusivities Since 1997*, 14 J. PHARM. POL'Y & PRAC. 1, 6 (2021). While this study adds important information, it does not examine all new indications, only those that received exclusivity. This information is critically important to understand just what effects patent law and drug regulation have on the quantity, quality, and type of sNDA applications. While the system may be working as intended, it is also possible that companies are using patent law and market exclusivities to extend their economic monopoly by filing sNDAs toward the end of the existing term of legal protection without conducting significant research. Data are simply not available to analyze these questions.

[122] The doctrines of novelty and nonobviousness present clear hurdles. *See* Abramowicz, *Underdeveloped Patent Prospects, supra* note 112, at 1100 (discussing issues with the nonobviousness doctrine); BTG Int'l Ltd. v. Teva Pharms. USA, Inc., 352 F. Supp. 3d 352, 387 (D.N.J. 2018), *appeal dismissed as moot*, BTG Int'l Ltd. v. Amneal Pharms. LLC, 923 F.3d 1063 (Fed. Cir. 2019) (finding obvious the combination of abiraterone acetate and prednisone to treat prostate cancer and reduce side effects); Acorda Therapeutics, Inc., v. Roxane Labs., Inc., 903 F.3d 1310, 1337 (Fed. Cir. 2018) (discussing the holding from Merck & Co. v. Teva Pharms. USA, Inc., 395 F.3d 1364 (Fed. Cir. 2005), and explaining that "the earlier patent and FDA regulatory approval [depress] incentives for others" to investigate new uses).

[123] *See* Timothy R. Holbrook, *Method Patent Exceptionalism*, 102 IOWA L. REV. 1001, 1014–18, 1033–34 (2017) (discussing the downsides of method patents and reviewing relevant court rulings). There are also public relations obstacles to enforcing method patents. *See* Sean B. Seymore, *Patenting New Uses for Old Inventions*, 73 VAND. L. REV. 479, 499–501 (2020) ("Method-of-use claims are difficult to enforce."); Eisenberg, *The Problem of New Uses, supra* note 25, at 724 ("[T]hese remedies are generally less satisfactory than an injunction that would stop a competitor from making the product entirely."); Rebecca S. Eisenberg, *The Role of the FDA in Innovation Policy*, 13 MICH. TELECOMM. & TECH. L. REV. 345, 351 (2007) [hereinafter Eisenberg, *Role of FDA*] (characterizing method patents as "less valuable").

2022]               *OFF-LABEL INNOVATION*               731

generic entrants.[124] But until recently,[125] these suits usually required that the *approved labeling* read on a new use patent.[126]

---

[124] Companies also attempt to extend their monopolies by "product-hopping": patenting new formulations, such as extended release, of the same drug to extend their existing monopoly. *See* Dmitry Karshtedt, *The More Things Change: Improvement Patents, Drug Modifications, and the FDA*, 104 IOWA L. REV. 1129, 1134–36 (2019) [hereinafter Karshtedt, *Improvement Patents*] (detailing the reformulation of the drug Namenda to prevent generic entrants into the market); Michael D. Frakes & Melissa F. Wasserman, *Patent Office Reform and Drug Pricing* (forthcoming 2022) (manuscript at 4–5) (on file with author) (noting the extended period of exclusivity resulting from pharmaceutical patenting practices). To obtain product-hopping patents, drug companies will typically file a new NDA and use clinical trial data to support safety and efficacy findings. *See, e.g.*, CTR. FOR DRUG EVALUATION & RSCH., APPLICATION NUMBER 22-525: SUMMARY REVIEW (2010), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022525orig1s000sumr.pdf (stating that a single clinical trial had been performed for Namenda XR). The FDA also approved the drug subject to a small neurotoxicity study in female rats. Letter from Russell Katz, Director, Ctr. for Drug Evaluation & Rsch., U.S. Food & Drug Admin., to Michael Niebo, Forrest Labs., Inc. (June 21, 2010), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022525Orig1s000Approv.pdf. But because FDA approval is not comparative—because safety and efficacy are measured against a placebo and another drug—the "new" drug may be clinically identical to the pioneer. *See* Karshtedt, *Improvement Patents*, *supra* note 124, at 1140 ("The agency typically does not ask the sponsor to furnish any data suggestive of clinical distinctiveness between a drug's new form and its previous one . . . ."); Barbara J. Evans, *Seven Pillars of a New Evidentiary Paradigm: The Food, Drug, and Cosmetic Act Enters the Genomic Era*, 85 NOTRE DAME L. REV. 419, 491 (2010) (noting that comparative study data rarely exist); Theodore W. Ruger, *After the FDA: A Twentieth-Century Agency in a Postmodern World*, *in* FDA IN THE 21ST CENTURY 80–83 (Holly Fernandez Lynch & I. Glenn Cohen eds., 2015) ("FDA has codified by longstanding regulation a policy of assessing efficacy against placebo controls.").

[125] Glaxosmithkline LLC v. Teva Pharms. USA, Inc., 976 F.3d 1347, 1356 (Fed. Cir. 2020), *rehearing granted, opinion withdrawn* (Feb. 9, 2021), *on rehearing*, 7 F.4th 1320 (Fed. Cir. 2021) (upholding a jury verdict of induced infringement of a method patent where the jury found that promotion of the generic version of a brand name drug could infringe the method patent covering the use of brand name drug where the generic drug manufacturer knows its drug will be substituted for the brand name drug).

[126] *See, e.g.*, AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1058–61 (Fed. Cir. 2010) (holding that recommended "downward titration" language on the label of an ANDA could induce users to infringe a method patent covering a one-per-day use of the underlying drug because *some* patients using the generic would, according to the label, *necessarily* have to use the product once-per-day when titrating down to the lowest effective dose); Sanofi v. Watson Labs. Inc., 875 F.3d 636, 645–646 (Fed. Cir. 2017) ("The content of the label in this case permits the inference of specific intent to encourage the infringing use."); Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd., 887 F.3d 1117, 1130 (Fed. Cir. 2018), *cert. denied sub nom.* Hikma Pharm. USA Inc. v. Vanda Pharm. Inc., 140 S. Ct. 911 (2020) (affirming the district court's finding of induced infringement). *But see* Bayer Schering Pharma AG v. Lupin, Ltd., 676 F.3d 1316, 1321–25 (Fed. Cir. 2012) (reaffirming *Warner-Lambert* and finding no grounds

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

732                    *GEORGIA LAW REVIEW*                    [Vol. 56:701

Whenever that doesn't happen—when the generic label simply includes the off-patent use or doesn't specifically require practicing the new method[127]—it's difficult, though now potentially easier than in the past,[128] to enforce a new use patent.[129] So once the patent protection of an existing drug lapses, generics can usually enter the market by filing an ANDA. And once the generic enters the market, doctors can prescribe the drug for *any approved or unapproved use*, including patented new uses.

With only a modest threat of inducement actions, generics can potentially free-ride on the innovative use.[130] And there is very little

---

for inducement based on the labeling of the drug, where the allegedly infringing labeling occurred in the "pharmacodynamics" subsection of the "Clinical Pharmacology" label and federal regulations expressly provided that such sections did not indicate approved uses); Erika Lietzan, *Paper Promises for Drug Innovation*, 26 GEO. MASON L. REV. 168, 194–95 ("Under current law, it can be very hard to establish that a generic company induced infringement of a patent claiming a protected use omitted from the labeling."). It is possible to imagine contributory infringement for *advertising* off-label, on-patent uses. But this situation doesn't arise frequently because of limits on off-label advertising. Simon, *Off-Label Information*, *supra* note 67, at 7–9.

[127] This practice of "carving out" the infringing use, also known as "skinny-labeling," is permitted by law. *See* 21 U.S.C. § 355(j)(2)(A)(viii) (allowing inclusion of "a statement that the method of use patent does not claim" a use for which the applicant is seeking approval); *see also* 21 C.F.R. § 314.94(a)(8)(iv) (2020) (detailing rules for comparing proposed and approved labeling for ANDAs).

[128] A Federal Circuit panel recently reheard a case in which it affirmed a jury's finding of infringement under a seemingly looser evidentiary standard. *See* Glaxosmithkline LLC v. Teva Pharms. USA, Inc., 7 F.4th 1320, 1340 (Fed. Cir. 2021) ("It was fair for the jury to infer that when Teva distributed and marketed a product with labels encouraging an infringing use, it actually induced doctors to infringe.").

[129] *See, e.g.*, Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1362 (Fed. Cir. 2003) ("Because Apotex is not submitting an application to sell a drug for . . . the only use covered by the patent involved in this case, . . . Apotex is entitled to summary judgment . . . ."); AstraZeneca Pharms. LP v. Apotex Corp., 669 F.3d 1370, 1380 (Fed. Cir. 2012) (finding noninfringement based on the same reasoning in *Warner-Lambert*); Allergan, Inc. v. Alcon Lab'ys, Inc., 324 F.3d 1322, 1324 (Fed. Cir. 2003) (basing a finding of noninfringement on *Warner-Lambert*); *Bayer Schering Pharma*, 676 F.3d at 1326 (finding noninfringement based on the same reasoning in *Warner-Lambert* and *Allergan*).

[130] *See Underdeveloped Patent Prospects*, *supra* note 112, at 1069–70 ("With the patent in the public domain, any private party desiring to perform such scientific testing must also consider the possibility that third parties will free ride on the information its tests produce."). The free-riding problem is not as much of a concern when a drug is brought to market under an existing patent term because the patentee will have incentives, if not to develop, then at least to market as many novel uses as possible. *See id.* at 1102–03. This is a feature of drug regulation that is often seen as a problem, rather than a benefit. *Id.* at 1070. But the free-

*OFF-LABEL INNOVATION*

pioneer drug companies can do about it.[131] State laws requiring generic substitution and insurance reimbursement rules[132] also reduce firms' incentives to invest in R&D of new uses for approved drugs whose patents have expired.[133] If firms can't exclude generics from market entry through an off-patent drug with an on-patent indication *and* doctors are free to prescribe drugs off-label, then a pioneer will have no ability to charge supra-competitive prices. Some new uses, in other words, will go undeveloped.

2. *Market & Data Exclusivity.* Patent law, it turns out, isn't currently incentivizing firms to adequately invest in unapproved new uses of approved drugs. For some of the same reasons, patent law is particularly bad at incentivizing other drugs, such as those for rare diseases where the market is often too small to risk drug development.[134] To provide an incentive in cases where patent law

---

riding problem will exist as to post-patent and drug exclusivity terms for off-label uses. The problem here is that no one has sufficient incentive to invest in persuasion (clinical trials) because current prescribing practices enable generics to be used for off-label uses.

[131] *See infra* notes 144–147 and accompanying text.

[132] States began enacting these laws in the 1970s. *See* Henry G. Grabowski & John M. Vernon, *Substitution Laws and Innovation in the Pharmaceutical Industry*, 43 L. & CONTEMP. PROBS. 43, 49 (1979). Substitution laws, which all states have, take two forms. *See* New York *ex rel.* Schneiderman v. Actavis PLC, 787 F.3d 638, 644–45 (2d Cir. 2015). "[T]he first type of law specifies whether it is mandatory or permissive for a pharmacist to substitute a generic bioequivalent. The second type of law regulates whether the pharmacist should assume the patient's consent for generic substitution, or if they must explicitly request consent." Yan Song & Douglas Barthold, *The Effects of State-Level Pharmacist Regulations on Generic Substitution of Prescription Drugs*, 27 HEALTH ECON. 1717, 1718 (2018). States may have either or both kinds of laws. *See id.* For more detailed rules about when and what drugs can be substituted by whom, see generally Jesse C. Vivian, *Generic-Substitution Laws*, 33 U.S. PHARMACIST 30 (2008). Importantly, as well, some states prevent insurers from refusing to reimburse off-label uses. *See, e.g.*, Richardson v. Miller, 44 S.W.3d 1, 14 (Tenn. Ct. App. 2000) (describing Tennessee's statute prohibiting insurers from declining to pay for off-label uses); *see also* James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 FOOD & DRUG L.J. 71, 76–77 & n.56 (1998) (discussing the policy guiding New Jersey's statute requiring insurers to pay for off-label uses).

[133] *See* Roin, *supra* note 26, at 33–35 (outlining how generic drugs can enter markets and reduce pharmaceutical investments with off-patent indications); *see also Warner-Lambert*, 316 F.3d at 1359 (rejecting plaintiff's claim that indication-based exclusivity undercut its market).

[134] *See* David Duffield Rohde, *The Orphan Drug Act: An Engine of Innovation? At What Cost?*, 55 FOOD & DRUG L.J. 125, 126–27 (2000) ("[R]are diseases, with their small patient

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

734            *GEORGIA LAW REVIEW*            [Vol. 56:701

fails, Congress created various periods of regulatory "exclusivity"—periods in which the FDA will not approve the same drug for the same indication or will not allow competitors to use the successful applicant's data for its own application—for firms that develop and seek approval of various drugs.[135] Examples of some exclusivity periods include seven years of market exclusivity for drugs treating rare diseases,[136] five years of data exclusivity for new chemical entities (NCEs),[137] three years of data exclusivity for new uses of existing drugs,[138] and 180 days of market exclusivity for the first generic filer of an existing drug.[139] This incentive is particularly powerful for NCEs because the FDA will not approve any other drug with the same active ingredient during the statutorily defined period.[140] With the market to itself, a drug company can recoup investment costs and extract rents. Market exclusivity, in this way, provides an incentive for drug development where patent law can't or won't.

Although regulatory exclusivity is expressly designed to incentivize R&D of new uses, it's dysfunctional for two different reasons. First, just as with orphan drugs, it's often irrational to pursue new uses—even with the prospect of three-year data exclusivity—because there are better margins elsewhere.[141] Firms pursuing new uses may find smaller patient populations, less serious diseases, and little patent protection. Although "back-end" regulatory exclusivity helps mitigate the lack of patent protection,

---

populations, provided little or no economic incentive . . . to invest research dollars in search of a cure whose development costs could not be recouped.").

[135] *See* Roin, *supra* note 26, at 10. I also refer to uses protected by market exclusivities as "protected uses." The EU has a similar approach for market and data exclusivity, but it functions somewhat differently, though with similar null effect, for new uses of approved drugs. *See* Liddicoat et al., *supra* note 103, at 826–27, 843.

[136] The Orphan Drug Act of 1983, 21 U.S.C. § 360cc; 21 C.F.R. § 316.31 (2020). In 1997, Congress sought to encourage clinical trials in pediatric populations by providing a six-month patent term extension or market exclusivity to firms that successfully completed such studies. 21 U.S.C. §§ 355a(b)(1), (c)(1), 355c.

[137] 21 U.S.C. § 355(c)(3)(E)(ii).

[138] 21 U.S.C. § 355(c)(3)(E)(iii).

[139] 21 U.S.C. § 355(j)(5)(B)(v).

[140] 21 C.F.R. § 314.108(b)(2) (2020).

[141] *See* Rohde, *supra* note 134, at 125–28 (describing the rationale for market exclusivity for orphan drugs).

184

it is often not enough to induce firms to invest in new uses.[142] Firms are better off investing in drugs that have a wider consumer base and a longer exclusivity period. Novel drug development, despite its increased risks, pays much higher returns.[143]

Second, regulatory exclusivity, like ANDA approval, is indication specific.[144] A generic can file an ANDA for any approved use not covered by a regulatory exclusivity.[145] If the FDA approves that ANDA, physicians can and will prescribe the drug for the protected use.[146] Because the FDA doesn't prevent physicians from prescribing the generic drug for protected uses, the generic use can

---

[142] *See* Rohde, *supra* note 134, at 126 (detailing how the pharmaceutical industry "was concerned more with making profits through rational business decisions" and, because new drugs are more profitable and incentivized than new uses, the industry focuses R&D on new drugs and therapies).

[143] Perhaps even more profitable is extending the exclusivity of an existing drug through various legal and market-based machinations. *See* Karshtedt, *Improvement Patents*, *supra* note 124, at 1209–10 (contending that "there are reasons to believe that new use inventions are under-incentivized under the current regime").

[144] *See* Bristol-Myers Squibb Co. v. Shalala, 91 F.3d 1493, 1500 (D.C. Cir. 1996) (finding that the pioneer drug manufacturer is only granted three-year exclusivity for new *indications* that it adds to the label itself and not for new *indications* added by other manufacturers); Sigma-Tau Pharms., Inc. v. Schwetz, 288 F.3d 141, 146 (4th Cir. 2002) (finding that the agency's provision concerning exclusivity "of the same drug product for the same *indication*" was reasonable under the Food, Drug, and Cosmetic Act (emphasis added)). The difference, however, is that new uses can theoretically be enforced, while market exclusivities provide for no private enforcement mechanism. *See infra* Part III; Erika Lietzan, *Paper Promises for Drug Innovation*, 26 Geo. Mason L. Rev. 168, 207 (2018) (arguing that Benjamin Roin's proposal isn't workable because it requires private enforcement of market exclusivity). *But see* Sam F. Halabi, *The Drug Repurposing Ecosystem: Intellectual Property Incentives, Market Exclusivity, and the Future of "New" Medicines*, 20 Yale J.L. & Tech. 1, 28–29 (2018) (noting that a price increase of an existing drug after market exclusivity was granted for new orphan indications). For orphan drugs there is another risk: a competitor drug can enter the market because it is "clinically superior." 21 C.F.R. § 316.3(b)(14)(i)–(ii) (2020) (creating an exception in the definition of "same drug" that "if the subsequent drug can be show to be clinically superior to the first drug, it will not be considered the same drug"); Berlex Lab'ys, Inc. v. Food & Drug Admin., 942 F. Supp. 19, 27 (D.D.C. 1996) (affirming FDA's approval of a competitor product under the Orphan Drug Act based on its clinical superiority).

[145] This is true even if the generic changes the proposed dosage to better match the use still subject to market exclusivity. *See* Spectrum Pharms., Inc. v. Burwell, 824 F.3d 1062, 1066, 1067–68 (D.C. Cir. 2016).

[146] The generic label must "carve out" any references to drugs currently under market exclusivity. 21 C.F.R. § 314.94(a)(8)(iv) (2020). This results in a "skinny label."

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

736                     *GEORGIA LAW REVIEW*                  [Vol. 56:701

erode the profits gained through regulatory exclusivity.[147] This fact, combined with mandatory state substitution laws, effectively destroys the pioneer's exclusivity. So the promise of regulatory exclusivity often doesn't incentivize the research and development of new uses.

   *3. The Problem of New Uses as an Informational Problem.* In short, neither market exclusivities nor new-use patents will block a generic from entering the market. Once the generic breaks into the market, the pioneer has little incentive to seek FDA approval for a new use because any such approval won't provide market exclusivity, or at least not any meaningful form of it. But even where a new use is both patented and approved by the FDA, in most cases the generic can avoid infringement by filing an ANDA for only non-infringing or unprotected uses. Firms, therefore, will be reluctant to expend resources to develop new uses—either by filing new-use patents or seeking market exclusivities for new uses.[148] This, in a nutshell, is the Problem of New Uses: how can the law incentivize the discovery of new unapproved uses when patent law and drug regulation can't protect the inventor from free-riding?

   This problem, in turn, is about the appropriate incentives necessary to generate two kinds of information: information about *possible* new use candidates and safety and efficacy information about *identified* new uses.[149] Most of the existing proposals tacitly assume that these questions can be answered together, so their solutions assume that fixing market incentives for pharmaceutical companies will solve both informational Problems. One group of

---

[147] *See Spectrum Pharms.*, 824 F.3d at 1066, 1068 (holding plausible the FDA's interpretation of 21 C.F.R. § 316.3(b)(12), (14), which explains that the exclusivity periods apply to the "same drug for the same use or indication" and states that "*[s]ame drug* means: . . . a drug that contains the same active moiety as a previously approved drug and is intended for the same use as the previously approved drug," to allow carve outs and varied generic dosages resulting in ANDA approval).

[148] To the extent it generates new use patents *despite this* is a curious phenomenon. If the patentee can't recoup costs or extract rents, then the patentee has effectively wasted her money. At the same time, this creates a positive spillover, one that simultaneously achieves and undermines the entire purpose of patent law: it excludes from the world a method that all physicians and patients are free to use. *But see* Karshtedt, *Improvement Patents*, at 1178–91 (arguing that by "product hopping" pharmaceutical companies extend patents to maintain market power once the primary patent protection expires without adequate evidence that supports a switch).

[149] This distinction is explained in more detail *infra* Section II.C.

scholars thinks the real problem is not with the laws but with their enforcement. Patent law and market exclusivities, in other words, could prevent free-riding, but only if they are enforced differently. Erika Lietzan, for one, argues that the solution is to bolster the doctrine of contributory infringement and FDA rules to enable better enforcement.[150] Benjamin Roin, on the other hand, thinks that better enforcement is a matter of better information.[151] Currently drug companies don't have access to information about when physicians are prescribing drugs off-label. If they did, drug companies could enforce their new-use patents. In other words, what's problematic about new uses is not a gap in the patent or drug laws, but one in information.

New uses, it's true, can be found by drug companies. But they can be—and often are—found by other actors, like physicians.[152] More recent work by Sam Halabi on the secondary use market has shown that enforcement-centered proposals miss a substantial part of innovative activity and are, therefore, unlikely to solve the Problem of New Uses entirely.[153] Halabi's research shows that repurposing occurs through a variety of direct and indirect mechanisms, including off-label marketing, serendipity, directed research, and private-academic partnerships.[154] Crucially, however, this scholarship—whether focused on the enforcement of traditional legal tools or the alternative ecosystem for new uses—doesn't directly tie the Problem of New Uses to the one of Off-Label Uses.

---

[150] Lietzan, *Paper Promises*, *supra* note 144, at 195–204, 208–09 (detailing the difficulty in pursuing private action against generic drug companies and contending that "[t]he problem is not that the patent and regulatory exclusivity statutes are poorly drafted" then explaining how to strengthen federal law and contributory infringement as potential solutions to infringement).

[151] *See* Roin, *supra* note 26, at 59–60 (addressing different strategies to solve the problems raised herein but ultimately focusing on the use of informational technology, such as tracking de-identified patient prescribing and medical records, to enforce new-use patents).

[152] *See* Halabi, *supra* note 144, at 30 (listing academic researchers, clinicians, and pharmaceutical firm researchers as drivers of new drug indications). Halabi also notes, importantly, that firms reached for patent law by moving one step backwards in the chain of drug development: patenting *the method of finding new uses* itself. *See id.* at 37.

[153] *See id.* (discussing the secondary use market as a source of patent activity).

[154] *See id.* at 30, 32, 36 (describing serendipitous discovery, big data and in silico screening, and industry-university partnerships).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

738                 *GEORGIA LAW REVIEW*                 [Vol. 56:701

C. THE COMMON INFORMATIONAL OVERLAP

While the Problems of New Uses and Off-Label Uses seem different, they are actually the same problem. The information needed to *validate* a new use—to determine whether it is safe and effective for a given use—is the same information needed to validate an off-label use. That's because *any* new use of an approved drug is an off-label use. In other words, safety and efficacy information about new uses is also safety and efficacy information about off-label uses.

The converse is also sometimes true. Off-label uses may turn out to be new. Validating these off-label uses, then, will also validate the new uses. *Identifying* a new use, however, is a task that can occur only for uses that are new.[155] And this excludes a large portion of drugs prescribed off-label. To put things another way, the Problem of New Uses is concerned with *both* identification and validation; the Problem of Off-Label Uses is concerned only with validation. The fact that both Problems are about substantially the same information suggests that a single informational remedy could solve both Problems.[156]

Despite this fact, most solutions to either Problem tend to ignore it. Because scholars view each problem as distinct, their solutions tend to focus on entities that are unlikely to be able to solve them. For off-label uses, this means increasing government regulation to limit the practice. Predictably, most scholarship in this camp emphasizes the drawbacks of off-label prescribing rather than its

---

[155] Just how "new" an off-label use must be for it to be considered "new" is a matter of definitional hair splitting. The National Center for Advancing Translation Sciences (NCATS) Discovering New Therapeutic Uses for Existing Molecules program (New Therapeutic Uses Program), for example, attempts to "accelerate the pace at which discoveries are turned into new preventions, treatments and cures for human diseases." *About New Therapeutic Uses*, NAT'L CTR. FOR ADVANCING TRANSLATION SCIS., https://ncats.nih.gov/ntu/about (last visited Mar. 3, 2022). The program is principally focused on *repurposing* drugs for *undiscovered* or *unidentified* new uses, not researching and developing existing off-label uses with insufficient safety and efficacy data. *See id.* But "new uses" might simply refer to existing off-label uses without sufficient safety and efficacy information.

[156] Some subsets of new uses are not problems to be solved but rather are solved problems. Currently firms *do* file sNDAs over some new uses. *See infra* Part III. For these approved new uses, existing incentive structures *seem* to be working to both identify and generate R&D for the new uses. *See infra* Part III.

innovative potential.[157] Besides squelching potentially innovative activity, discouraging off-label use also has another unintended consequence: it decreases the total amount of information about the incidence, nature, and effects of off-label use. This poses a real problem for any solution that seeks more information about off-label uses.

New uses, on the other hand, are seen as a problem for pharmaceutical companies to solve. All they need are the right incentives. Unfortunately, scholars have yet to identify them. But even if they could find proper incentives, both Problems would still remain. That's because increased R&D of new uses by pharmaceutical companies won't necessarily lead to more *public knowledge* of either identification or validation of new uses—or even to a large number of developed new uses. For one thing, there are simply too many potential new uses to investigate. For another, not all new uses, even if developed, will be profitable. Additionally, competition concerns may drive large firms to keep new uses secret. More than that, however, a firm-based solution ignores the fact that physicians, not just firms, identify and prescribe many new uses.[158] It also overlooks the large caches of information about off-label uses generated by other parties, such as payers and, as argued in the next Part, providers.

---

[157] *See* Rodwin, *supra* note 78, at 654–55 (discussing the drawbacks of off-label prescriptions, including undermining the FDA's mission to regulate the drug market and protect patients).

[158] The problem here is that physicians don't communicate their innovations because there are limited incentives for them to do so. Eric von Hippel, Harold DeMonaco & Jeroen P.J. de Jong, *Market Failure in the Diffusion of Clinician Developed Innovations: The Case of Off-Label Drug Discoveries*, 44 Sci. & Pub. Pol'y 121, 128 (2017). For a recent attempt to correct this market failure, see *supra* note 179. Legal obstacles to some effective modes of communication exacerbate this market failure in information diffusion. *See* Simon, *supra* note 67, at 14, 17 (explaining legal and practical challenges of the current FDA approach to off-label information dissemination); Christopher Robertson, *The Tip of the Iceberg: A First Amendment Right to Promote Drugs Off-Label*, 78 Ohio St. L.J. 1019, 1022 (2017) (noting that the NDA and sNDA processes eliminate advertising for off-label uses, which means "physicians must rely on peer-reviewed articles and anecdotes from other physicians to learn about new [off-label] uses, rather than on company promotional efforts").

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

740 *GEORGIA LAW REVIEW* [Vol. 56:701

## III. PROVIDERS AS A TOOL TO SOLVE THE PROBLEMS OF NEW AND OFF-LABEL USES

Solving both the Problems of Off-Label and New Uses requires recognizing that they are substantially the same informational problem. This Part proposes to fill the common informational hole by targeting the entities that are in a unique position to, or that already, collect data on, evaluate, research, or modulate off-label uses: providers—hospitals, healthcare networks, and even small physician practices. Not all providers, of course, are the same. Large academic medical centers may be more likely to conduct clinical trials than small physician-based practices. Insofar as providers have the capability to do any of these activities, they are not the only relevant entities. As others have pointed out, payers like insurance companies also have capabilities and pertinent information that could assist in generating the information needed for better drug regulation.[159]

But no one has yet made the case for providers. This Part does so. It explains why targeting providers is likely to produce actionable information that can mitigate or solve both Problems. Section A details provider infrastructure, such as electronic health records and digital prescribing systems, that can track prescriber and patient off-label activity. Sections B and C then show that providers have institutional features that make them ideal loci for information generation, analysis, and diffusion. This sometimes includes institutional infrastructure or organizational units that systematically track and monitor off-label uses (e.g., digital prescribing software and pharmacy and therapeutics committees), conduct clinical trials and observational studies (e.g., institutional review boards, trained and experienced personnel, and research support), and diffusion (e.g., marketing departments, research output, and know-how). Section D concludes by exploring how provider-based incentives dovetail with the FDA's new program

---

[159] *See, e.g.*, Eisenberg & Price, *supra* note 45, at 19 (calling notice to "demand side" innovation and remarking that payers may help curb unsafe and less effective off-label use because they have both an incentive to provide cheaper care and the access to some of the relevant information); Rachel E. Sachs, *Promoting Demand-Side Innovation: Prizes for Payers*, 4 J.L. & BIOSCIENCES 391, 391 (2017) (diving into the active role insurance companies may take in the innovation process).

(RWE Program), which is considering how it can use so-called "real-world evidence" "to help to support the approval of a new indication" for a previously-approved drug.[160]

## A. DATA COLLECTION AND ELECTRONIC HEALTH RECORDS

Providers already have access to voluminous amounts of information about patients, including their prescriptions and diagnoses. Health care providers increasingly use digital information systems for at least some aspect of their practice. As part of the Electronic Health Records (EHR) Incentive Programs, explained below,[161] almost all hospitals,[162] and large percentages of other providers,[163] have adopted EHRs. Most providers now collect basic information about all of their patients in digitized form,

---

[160] 21 U.S.C. § 355g. The FDA has already begun promoting the integration of clinical trials into practice settings. U.S. FOOD & DRUG ADMIN., FRAMEWORK FOR FDA'S REAL-WORLD EVIDENCE PROGRAM 10–11 (2018) [hereinafter FDA RWE FRAMEWORK], https://www.fda.gov/media/120060/download; Barbara J. Evans, *The Future of Prospective Medicine Under the Food and Drug Administration Amendments Act of 2007*, *in* Ruger, *supra* note 124, at 96–100 (detailing the evolution of processes that have been in place to collect real-world evidence).

[161] In April 2018, the CMS changed the program name from "EHR Incentive Programs" to "the Promoting Interoperability Programs." *Promoting Interoperability Programs*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms (last visited Apr. 23, 2022). Related programs also exist. *E.g.*, ACT NETWORK, https://www.actnetwork.us/national (last visited Apr. 23, 2022) (explaining that the "ACT Network is a real-time platform allowing researchers to explore and validate feasibility for clinical studies" funded by the National Institutes of Health that seeks to share EHR among providers participating in clinical trials and currently claims to have over 150 million patient records).

[162] *See* Julia Adler-Milstein & Ashish K. Jha, *HITECH Act Drove Large Gains in Hospital Electronic Health Record Adoption*, 36 HEALTH AFFS. 1416, 1419, 1421 (2017) (exploring the large percentages of HER adoptions in hospitals); *see also 2018 Medicare Electronic Health Record (EHR) Incentive Program Payment Adjustment Fact Sheet for Hospitals*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Oct. 10, 2017), https://www.cms.gov/newsroom/fact-sheets/2018-medicare-electronic-health-record-ehr-incentive-program-payment-adjustment-fact-sheet-hospitals ("We note that over 96% of eligible hospitals are meaningful users.").

[163] Chun-Ju Hsiao & Esther Hing, *Use and Characteristics of Electronic Health Record Systems Among Office-based Physician Practices: United States, 2001-2012*, 111 NAT'L CTR. HEALTH STAT. DATA BRIEF 1, 1–8 (2012), https://www.cdc.gov/nchs/data/databriefs/db111.pdf (showing that EHR increased among office-based physicians from 18.2% in 2001 to 71.8% in 2012).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

742                    *GEORGIA LAW REVIEW*                    [Vol. 56:701

including prescriptions, diagnoses, and patient histories.[164] Not only do providers already collect some of the needed information, but their use of EHRs also makes collecting additional information about off-label uses—and creating data fields for that new information—easier than developing a new (software) system from scratch. While new data collection and organization may increase demands on software and marginally increase short-term costs, data collection itself should be relatively simple with low fixed costs. Using existing EHR systems—and building them out—could also capture innovative off-label uses by, for example, allowing (or creating incentives for) physicians to flag uses that they think are new. Software systems could also capture various features of the new use that might enable researchers to identify the conditions under which new uses are likely to be discovered and, if discovered, when they are likely to be safe and effective.

## B. INSTITUTIONAL BODIES AND EXPERTISE

All providers have the ability to collect certain kinds and quantities of information about off-label use. Many, as noted above, could leverage this capacity to collect information about off-label and new uses that they initiate simply by practicing medicine. Large providers, in particular, have the ability to collect more data and in a more systematic and nuanced way than smaller providers. Some, in fact, already have an institutional body designed to collect and analyze information about drug prescriptions, use, and effects: the Pharmacy and Therapeutics committee (P&T committee).[165]

---

[164] *See, e.g.*, 42 C.F.R. §§ 495.20(d)(1)(i) (2020) (computerized provider order entry), (d)(2) (drug interactions and allergy checks), (d)(3) (diagnosis information), (d)(4) (e-prescribing), (d)(5) (indication tracking), (d)(6) (medication allergy list), (d)(7) (demographics), (d)(8) (vital signs), (d)(9) (smoking status), (d)(10) (clinical quality measurements), (d)(11) (tracking clinical compliance), (d)(12) (patient record copies), (d)(13) (patient clinical summaries), (d)(14) (information exchange), (d)(15) (privacy protections).

[165] Hospitals first established P&T committees in 1936. *See* Robin Feldman, *The Devil Is in the Tiers*, 8 J.L. & BIOSCIENCES 1, 7–8 & n.30 (2021). They became requirements for Joint Commission accreditation in 1965. *Id.* The Joint Commission accredits hospitals both independently and for Medicare and Medicaid. *See infra* notes 166, 168, 244.

A hospital's P&T committee develops a "formulary" of drugs that the provider uses to determine which drugs to dispense.[166] The formulary represents the judgment of the institution's medical staff about the safety and efficacy of various drugs.[167] The P&T committee also evaluates and monitors the use of medications; collects information about adverse events, reporting, and medication errors; and develops "clinical care plans" and guidelines.[168] At more sophisticated providers, the P&T committee is the primary liaison between the pharmacy and the medical staff.[169] Various subcommittees report and make recommendations

---

[166] *See* David Shulkin, *Reinventing the Pharmacy and Therapeutics Committee*, 37 P&T 623, 623 (2012) ("[T]he P&T committee has the overarching goal of ensuring the safe, appropriate, and cost-effective use of pharmaceuticals."). In 2008, the influential American Society of Health-System Pharmacists (ASHP) published guidelines for institutions seeking to establish a formulary and P&T system. *See* Christy Ciccarello et al., *ASHP Guidelines on the Pharmacy and Therapeutics Committee and the Formulary System*, 78 AM. J. HEALTH-SYS. PHARM. 907, 915 (2021) [Ciccarello, *ASHP Guidelines*]. It also offers accreditation for those that conform to its guidelines. *See id.* at 907. This accreditation, however, is not an approved Medicare accreditation under 42 U.S.C. § 1395bb or 42 C.F.R. § 482 *et seq. See id.* at 907, 913. For an in-depth review on how the formulary system works at a large medical center, see David B. Nash, Mary L. Catalano & Cindy J. Wordell, *The Formulary Decision-Making Process in a US Academic Medical Centre*, 3 PHARMACOECONOMICS 22, 22–35 (1993). There is considerable variation among hospitals both in the substantive content of formularies and the processes by which they manage them. *See* Ellena Anagnostis, Cindy Wordell, Yor Guharoy & Robert Beckett, *A National Survey on Hospital Formulary Management Processes*, 24 J. PHARM. PRAC. 409, 410–11 (2011). Anagnostis, Wordell, Guharoy, and Beckett, for example, found that although most institutions had written policies for how medications' additions to the formulary are requested and reviewed, they had far fewer policies for formulary deletion. *See id.* at 411; *see also* Gordon D. Schiff et al., *Drug Formulary Decision-Making: Ethnographic Study of 3 Pharmacy and Therapeutics Committees*, 76 AM. J. HEALTH-SYS. PHARM. 537 (2019) (noting that findings showed "wide variations" in "discussions of new drug formulary requests").

[167] *See* Nash et al., *supra* note 166, at 23 ("[T]he medical staff of an institution, working through the pharmacy and therapeutics committee, evaluates, appraises, and selects . . . those [drugs] that are considered most useful to patient care.").

[168] Ciccarello, *ASHP Guidelines*, *supra* note 166, at 908; *see also* Nash et al., *supra* note 166 at 23, 25 (explaining the structure and function of P&T committees); Darryl S. Rich, *Pharmacies' Noncompliance with 2009 Joint Commission Hospital Accreditation Requirements*, 67 AM. J. HEALTH-SYS. PHARM. 144, 144–45 (2010) (explaining the various ways in which P&T committees may add a drug to the formulary either because of an FDA-approved labeling or because the P&T committee has determined it should be added).

[169] Nash et al., *supra* note 166, at 25.

744             *GEORGIA LAW REVIEW*             [Vol. 56:701

to the P&T committee, which then makes recommendations to the medical staff and administration of the provider.[170]

Some providers, in other words, have a built-in infrastructure to generate, collect, monitor, analyze, and operationalize information about off-label uses[171]—and to do so at a level of granularity not normally available elsewhere. At one provider, the P&T committee will do all of the following in a ten-month cycle: "evaluate 45 new drugs for formulary addition, review 3 therapeutic classes of drugs, discuss 150 adverse events, . . . review 10 drug use evaluations," and "review[] the medical staff policies regarding the prescribing and dispensing of medications in the institution."[172] Put differently, P&T committees are a significant source of information about off-label use that is currently underutilized.[173]

P&T committees not only have expertise in evaluating drugs, but they also have unique information about innovative new uses. Physicians may request a new addition to the formulary—and that new addition may be an innovative off-label use. While not all innovative new uses will take place at providers with P&T committees, they all will take place at *a* provider. Regardless of whether the physician works in a hospital with a P&T committee or a small practice, she has limited incentives to both collect information about and disseminate any discovered new use.

---

[170] *Id.* at 24–25.

[171] This framework has been used to evaluate pre-1938 drugs that the FDA wants to test for efficacy and safety. Colleen M. Culley, Beth Ann Carroll & Susan J. Skledar, *Formulary Decisions for Pre-1938 Medications*, 65 AM. J. HEALTH-SYS. PHARM. 1363, 1364–66 (2008). When Congress passed the 1962 Kefauver-Harris Amendments, it grandfathered in drugs that had been sold prior to 1938. CTR. FOR DRUG EVALUATION & RSCH., U.S. DEP'T OF HEALTH & HUM. SERVS., GUIDANCE FOR STAFF AND INDUSTRY: MARKETED UNAPPROVED DRUGS COMPLIANCE POLICY GUIDE, SEC. 440.100,11 (2011). The FDA evaluated drugs approved between 1938 and 1962 in its Prescription Drug Wrap-Up. *Id.* at 11.

[172] Nash et al., *supra* note 166, at 25.

[173] Federal regulations also require Medicare Part D sponsors that use formularies (graded pricing mechanisms) to create a P&T committee develop and implement them. 42 C.F.R § 423.120(b) (2020). All Part D sponsors use formularies to decide which drugs to reimburse. Although, theoretically, this process is designed to reduce drug spending, it has, in practice, led to significant price distortions and increases. *See, e.g.*, ROBIN FELDMAN, DRUGS, MONEY, & SECRET HANDSHAKES: THE UNSTOPPABLE GROWTH OF PRESCRIPTION DRUG PRICES 39–42 (2019) ("Medicare health insurance plans may create incentives in certain circumstances for higher drug prices.").

While P&T committees may have information but lack incentives to disseminate it, the providers where they're located typically have other infrastructure that could do so rather efficiently.[174] Academic medical centers and hospitals, for example, have institutional resources allocated to marketing, publication, and dissemination of various kinds of information (e.g., research, promotional material). Some also have students, graduate students, administrative staff, compliance departments, and marketing officers. All of these institutional resources make academic medical centers and (larger) hospitals well placed to disseminate whatever information they collect and analyze. Large healthcare networks with smaller embedded healthcare practices—like NorthShore University HealthSystem,[175] Mass General Brigham,[176] and Health Partners[177]—have similar advantages.

Small providers, which constitute almost half of all medical practices, face different challenges.[178] They are, for example, less

---

[174] The growing body of medical networks—such as Partners Healthcare (Massachusetts), Northshore (Illinois), and Health Partners (Minnesota)—impose P&T requirements on providers in their networks. *See infra* notes 175–177. As consolidation in HealthCare services increases, so does the potential for standardizing these collection, organization, and analysis of off-label use.

[175] This includes five hospitals in the Chicagoland area, including a "900 physician multispecialty group practice." *Organizational Profile*, NORTHSHORE UNIV. HEALTHSYSTEM, northshore.org/about-us/organizational-profile/ (last visited Apr. 23, 2022).

[176] Until 2019, this entity was known as Partners Healthcare. *See Our Story*, MASS GENERAL BRIGHAM, https://www.massgeneralbrigham.org/who-we-are/our-story (last visited Apr. 23, 2022). The organization includes "16 member institutions that encompass a range of health care organizations. In addition to our academic medical centers, these include top-tier specialty hospitals, community hospitals, a rehabilitation network, a health insurance plan, a physician network, a teaching organization, and many locations for urgent and community care." *Id.*

[177] HealthPartners is "the largest consumer governed nonprofit health care organization in the nation – serving more than 1.8 million medical and dental health plan members nationwide. Our care system includes a multi-specialty group practice of more than 1,800 physicians that serves more than 1.2 million patients." *Our History*, HEALTHPARTNERS, https://www.healthpartners.com/about/ (last visited Apr. 23, 2022). HealthPartners also runs an "Institute" that conducts clinical research. *See Research*, HEALTHPARTNERS INST., https://www.healthpartners.com/institute/research/ (last visited Apr. 23, 2022).

[178] Carol K. Kane, *Updated Data on Physician Practice Arrangements: For the First Time, Fewer Physicians Are Owners than Employees*, AM. MED. ASS'N 5, 13 (2019) (noting that "[i]n 2018, 56.5 percent of physicians worked in practices with 10 or fewer physicians" while 14.7 percent worked in practices with fifty or more physicians and the remaining 20.3 percent working in practices between eleven and forty-nine physicians).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

746            *GEORGIA LAW REVIEW*            [Vol. 56:701

equipped to collect granulated data and disseminate it to the same extent as large providers. But they still may have valuable information about innovative off-label uses, and capturing this information, along with other off-label uses, is critical to solving both problems.

The FDA and the National Institutes of Health's National Center for Advancing Translational Sciences (NCATS) recently recognized this in the context of innovative off-label use and have launched a pilot program designed to correct the market failure in diffusion noted above.[179] While this recent initiative—which uses a decentralized, voluntary reporting model—is an interesting and positive development, it is designed to collect limited information about innovative off-label uses; without additional incentives, it is unlikely to solve both Problems.[180] And, as explained in Part III, any incentive structure that seeks to generate information about off-label uses must be responsive to provider characteristics.

## C. INSTITUTIONAL KNOW-HOW AND EXPERIENCE

In addition to resources, providers also have institutional know-how. Many providers, for example, have experience conducting clinical trials and observational studies.[181] Sometimes providers themselves initiate these trials and fund them publicly; other times

---

[179] This program, known as CURE ID, allows physicians anywhere in the world to report new uses to a government repository using a computer application. *CURE Drug Repurposing Collaboratory*, CRITICAL PATH INST., https://c-path.org/programs/cdrc/ (last visited Apr. 23, 2022). It is part of a larger project between the FDA and NCATS to aid in "repurposing and inform[ing] future clinical trials for diseases of high unmet medical need. The initiative includes emerging/reemerging diseases, anti-microbial drug resistant infections, neglected infectious diseases as well as rare oncology diseases where there are limited treatment options." *Id.* The drug is being pilot-studied with COVID-19. *Id.* Perusing the existing application shows that activity is minimal but has potential with greater practice-integration, data capture, and outreach. *Id.*

[180] Presently, the focus is on collecting and disseminating information on innovative uses of drugs to treat COVID-19.

[181] *See, e.g.*, Ruijun Chen et al., *Publication and Reporting of Clinical Trial Results: Cross Sectional Analysis Across Academic Medical Centers*, BMJ (Feb. 17, 2016), https://www.bmj.com/content/352/bmj.i637 (identifying 4,347 clinical trials at fifty-one academic medical centers in the United States from 2007 to 2010); *supra* note 177 (discussing HealthPartners Institute).

providers partner with private industry.[182] With greater incentives to gather safety and efficacy information about off-label uses, providers can capitalize on their existing knowledge base and skills and potentially expand their capacity. The benefits of doing this may extend beyond simply generating data: limited evidence suggests that providers who engage in clinical trials are likely to provide better care to non-trial patients.[183]

Despite the promise of both P&T committees and providers generally as a source of information about both off-label and new uses, there's little information about how providers collect and analyze information about off-label use, or if they do so at all. This is true despite the information reporting requirements on many providers.[184] The limited data that exist show that only a small number of providers have a policy in place to review off-label use, let alone analyze potentially beneficial new uses.[185] Providers that have policies lack incentives to share this information with outside providers or health care professionals.[186] One is a problem of generation, collection, and analysis. The other a problem of

---

[182] Even smaller providers now have experience with clinical trials. *E.g.*, Sean R. Tunis, Daniel B. Stryer & Carolyn M. Clancy, *Practical Clinical Trials: Increasing the Value of Clinical Research for Decision Making in Clinical and Health Policy*, 290 JAMA 1624, 1627 (2003) (explaining that practical clinical trials take place in diverse clinical settings, which often include community-based clinics).

[183] *See* Sumit R. Majumdar et al., *Better Outcomes for Patients Treated at Hospitals That Participate in Clinical Trials*, 168 ARCHIVES INTERNAL MED. 657, 659 (2008).

[184] Besides its meaningful use criteria, *supra* note 162 and accompanying text, Medicare requires all of its certified institutional providers to "submit an annual cost report." *Cost Reports*, CTR. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Cost-Reports (last visited Apr. 23, 2022) (providing general cost report information and the cost reports of prior years); 42 C.F.R. § 413.20 (2020) (describing cost reports and their requirements).

[185] *See* Anagnostis et al., *supra* note 166, at 413 (noting variable formulary addition practices and that "(31%) of [the] 52 [responding] institutions[in the survey] have a policy and/or procedure for approving a medication for an off-label indication").

[186] *See, e.g.*, Kathleen Liddell, David A. Simon & Anneke Lucassen, *Patient Data Ownership: Who Owns Your Health?*, 8 J.L. & BIOSCIENCES 1, 47 (2021) (explaining that granting healthcare providers property rights over patients' data does not necessarily encourage sharing access to data across jurisdictions); Barbara J. Evans, *Much Ado About Data Ownership*, 25 HARV. J.L. & TECH. 69, 103–04 (2011) (discussing the high costs and many disadvantages of developing a centralized, national database containing individuals' complete medical history).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

748          *GEORGIA LAW REVIEW*          [Vol. 56:701

diffusion. Providers, while currently not meeting either of the challenges, could do so with the right incentives.

D. THE FDA'S REAL WORLD EVIDENCE PROGRAM

All of these features—use of EHRs, along with institutional expertise knowledge, know-how, and experience—make providers an important source of information about off-label use. But there is another reason for tapping the information they have about new and off-label uses: providers will be significant sources of "real world evidence" (RWE) that the FDA can rely upon to approve new uses of previously-approved drugs. Real world evidence is evidence derived from real world data (RWD): "clinical evidence regarding the usage and potential benefits or risks of a medical product derived from analysis of RWD."[187] RWE includes data from EHRs (including test results), claims, pragmatic trials, and observational studies.[188] The term became important in 2016, when Congress, as part of the 21st Century Cures Act, mandated that the FDA "establish a program to evaluate the potential use of real world evidence" to approve new indications[189] and to issue guidance to industry on the topic.[190]

While the FDA intends to use more RWE in approving new indications,[191] it has noted that the task is not without significant challenges, including data formatting, quality, and consistency (in capture).[192] As one example, the FDA notes that EHRs may not record patient symptoms, either in response to medication or at the conclusion of treatment, in a structured or standardized manner—

---

[187] RWE Framework, *supra* note 160, at 29.

[188] *See* Liddell, *supra* note 186, at 6 (detailing how health information can be generated by a typical check-up); RWE FRAMEWORK, *supra* note 160, at 5, 11 (identifying examples of real world evidence).

[189] 21 U.S.C. § 355g(a).

[190] 21 U.S.C. § 355g(e)(1). In response to this congressional mandate, the FDA published its framework in 2018 and issued draft guidance in 2019. *See* RWE FRAMEWORK, *supra* note 160, at 3; U.S. FOOD & DRUG ADMIN., SUBMITTING DOCUMENTS USING REAL-WORLD DATA AND REAL-WORLD EVIDENCE TO FDA FOR DRUGS AND BIOLOGICS, DRAFT GUIDANCE (2019).

[191] *See* RWE FRAMEWORK, *supra* note 160, at 13.

[192] *See id.* at 15–17; Dr. Jacqueline Corrigan-Curay, *in* NCATS Meeting, *supra* note 30, at 60–61 (noting that validating clinical data is difficult because it may be collected sporadically or in many different forms, citing an example from the Sentinel Initiative where "there were 70 different ways to represent a single, very simple platelet count").

or at all.[193] Claims data, too, may exclude important metrics such as symptom severity and disease response.[194]

Many, but not all, of these problems result from the manner in which providers (or payers) collect information. Incentives that induce providers to generate off-label information can, as shown below, also be structured to mitigate or eliminate some of the challenges of using RWD and RWE.[195] Obtaining good information about off-label use, for example, requires some minimum amount of data in a uniform format. The same information is required to make assessments about the effects of off-label and new uses. Giving providers incentives to produce this information not only generates more useful, complete, and reliable information about off-label and new uses but also is a source of potential evidence that can be used to add a new indication to the drug label. This may be crucial if new approval pathways, such sua sponte FDA label changes or citizen petitions, are used. In sum, providers are capable of both generating information about new and off-label uses and compiling it in a format likely to qualify as RWD. What providers lack, however, are the incentives to do so. The next Part explains some of the potential incentive choices.

## IV. Incentives

This Part evaluates several potential incentives that could induce providers to capture and develop actionable data about off-label and new uses. The goal of this Part isn't to argue for any particular incentive or to show how every incentive might apply to providers. It is, instead, to show that incentives *can* induce providers to generate, collect, analyze, and disseminate information about off-label and new uses. For this reason—and because space is limited—this Part uses four examples to illustrate how provider incentives could work. One, described in Section B, is an existing government program designed to encourage providers to adopt EHRs. Section C then proposes a new incentive—market inclusivity—that would pay providers directly for implementing

---

[193] *See* RWE FRAMEWORK, *supra* note 160, at 17.

[194] *See id.* at 17–18.

[195] *See id.* at 25 (discussing how the FDA will assess data standards and implementation strategies to ensure that RWD and RWE are central to drug development).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

750              *GEORGIA LAW REVIEW*              [Vol. 56:701

systems to track, organize, and publish data on off-label uses. Section D examines how a traditional push incentive, tax credits, could induce providers to engage in validation of off-label uses. Finally, Section E considers how altering the FDA approval process and regulatory exclusivity might further incentivize providers to conduct validation on off-label uses. Before exploring any of these incentives in detail, Section A explains the incentives traditionally used to stimulate pharmaceutical development.

A. INCENTIVES GENERALLY

Stimulating providers to collect, analyze, and disseminate information about off-label uses requires incentives. This, one will notice, is the same task typically performed by pharmaceutical companies. It is therefore reasonable to consider how the same suite of incentives used to stimulate pharmaceutical companies to engage in information generation can be applied to providers. These incentives fall into two categories. First, *push* or *ex ante* incentives are supply-side incentives that subsidize research: government

grants,[196] public-private partnerships,[197] and tax benefits.[198] Second, *pull* or *ex post* incentives are demand-side incentives that create a viable market for drug discovery: prizes,[199] patents, and regulatory exclusivity.[200]

---

[196] The U.S. government funds clinical trials through various agencies, including the National Institutes of Health (NIH); National Heart, Lung, and Blood Institute (NHLBI); the Centers for Disease Control and Prevention (CDC); the FDA; and the CMS. *See* Robert M. Califf, Deborah A. Zarin, Judith M. Kramer, Rachel E. Sherman, Laura H. Aberle & Asba Tasneem, *Characteristics of Clinical Trials Registered in ClinicalTrials.gov, 2007–2010*, 307 JAMA 1838, 1841 tbl.1 (2012) (noting that the NIH funded around only 9% of all studies in ClinicalTrials.gov); Pearl A. McElfish, Rachel S. Purvis, M. Kathryn Stewart, Laura James, Karen H. Kim Yeary & Christopher R. Long, *Health Research Funding Agencies' Policies, Recommendations, and Tools for Dissemination*, 12 PROG. CMTY. HEALTH P'SHIP, 473, 475–78 (2018) (describing the funding policies of CDC, CMS, FDA, and NIH grants); David Gordon, Wendy Taddaei-Peters, Alice Mascette, Melissa Antman, Peter G. Kaufmann & Michael S. Lauer, *Publication of Trials Funded by the National Heart, Lung, and Blood Institute*, 369 NEW ENG. J. MED. 1926–34 (2013) (conducting "an extensive evaluation of the publication of the results of NHLBI-funded trials of cardiovascular interventions"); ORPHAN PRODUCTS CLINICAL TRIALS GRANTS PROGRAM, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/industry/about-orphan-products-grants (last visited Apr. 23, 2022) (describing the Orphan Products Clinical Trials Grants Program). The NIH currently funds some clinical trials for new uses of approved, off-patent drugs, but the Director of NCATS at the NIH notes that the "NIH does not like to pay for these." Dr. Christopher P. Austin, *in* NCATS Meeting, *supra* note 30, at 5.

[197] *See, e.g.*, *Templates for Success: Speeding the Formation of Public-Private Partnerships*, NAT'L CTR. FOR ADVANCING TRANSLATION SCIS., https://ncats.nih.gov/pubs/features/ntu-template (last visited Apr. 23, 2022); Rutger Daems, Edith Maes & Guy Nuyts, *Advancing Pharmaceutical R&D on Neglected Diseases: Valuing Push and Pull Economic Incentive Mechanisms* 10–12 (Maastricht Sch. Mgmt. Working Paper, No. 2013/11, 2013), http://web2.msm.nl/RePEc/msm/wpaper/MSM-WP2013-11.pdf; Henry Grabowski, *Increasing R&D Incentives for Neglected Diseases: Lessons from the Orphan Drug Act*, *in* INTERNATIONAL PUBLIC GOODS AND TRANSFER OF TECHNOLOGY UNDER A GLOBALIZED INTELLECTUAL PROPERTY REGIME 457, 463–64 (Keith E. Maskus & Jerome H. Reichman, eds. 2005).

[198] *See* 26 U.S.C. § 45C (laying out the orphan drug tax credit conditions); 26 U.S.C. § 41 (stating tax credits for research activities). For further discussion, see *infra* Section III.B.*3*.

[199] *See* WILLIAM W. FISHER, III & TALHA SYED, INFECTION: THE HEALTH CRISIS IN THE DEVELOPING WORLD AND WHAT WE SHOULD DO ABOUT IT ch.5 1 (Stanford University Press) (forthcoming), https://cyber.harvard.edu/people/tfisher/Infection_Prizes.pdf (explaining how a government prize system would incentivize pharmaceutical development and create a market); *see generally* James Love & Tim Hubbard, *The Big Idea: Prizes to Stimulate R&D for New Medicines*, 82 CHI.-KENT L. REV. 1519 (2007).

[200] Daems et al., *supra* note 197, at 12.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

752               *GEORGIA LAW REVIEW*               [Vol. 56:701

While the traditional method for generating new drugs has been dominated largely by patent law[201] and regulatory exclusivity,[202] it would be unwise to assume that the same mix of incentives—or the same incentives in exactly the same forms—will work for providers. Providers and drug companies have fundamentally different concerns, business models, and organizational structures. For incentives to be effective, they must be mindful of these differences.

Determining the optimal set, form, and breadth of provider incentives is beyond the scope of this Article. For that reason, the remainder of this Part doesn't attempt to explain the advantages and drawbacks of every possible incentive. Instead, it uses four examples to illustrate how incentives might induce providers to collect information that they already have or have the ability to produce. This information consists principally of either (1) existing data about the nature, incidence, and effect of off-label use or (2) data from observational studies and pragmatic or clinical trials. Some incentives, as shown below, can apply to both types of information, but they will have to be adjusted to ensure that they generate the right kind of information in each case.

## B. BUILDING OUT EXISTING GOVERNMENT PROGRAMS

One way to incentivize providers to engage in a desired behavior is to pay them.[203] Congress used this strategy in 2009 to induce

---

[201] *See, e.g.*, James Bessen & Michael J. Meurer, Patent Failure: How Judges, Bureaucrats, and Lawyers Put Innovators at Risk 16, 18 (2008) (describing how patent law creates incentives for pharmaceutical development).

[202] *See supra* note 200.

[203] There are other efforts to gather data, though. *See, e.g.*, *All-Payer Claims Databases*, AGENCY FOR HEALTHCARE RSCH. & QUALITY, https://www.ahrq.gov/data/apcd/index.html (last visited Apr. 23, 2022) (describing the project to update and improve state claims data from private insurance companies); Roxanne M. Andrews, *Statewide Hospital Discharge Data: Collection, Use, Limitations, and Improvements*, 50 HEALTH SERVS. RSCH. 1273, 1273–99 (2015) (describing Agency for Healthcare Research and Quality's (AHRQ) grants to states to update statewide discharge databases with race-ethnicity data); CTRS. FOR MEDICARE & MEDICAID SERVS., NATIONAL COVERAGE DETERMINATIONS WITH DATA COLLECTION AS A CONDITION OF COVERAGE: COVERAGE WITH EVIDENCE OF DEVELOPMENT § V.A (2006) (explaining that the CMS will provide coverage in some cases where there is "adequate evidence to determine that an item or service is reasonable and necessary" but that further evidence is needed that is not routinely available on claims forms); *id.* § V.B (explaining that CMS will cover items where there is insufficient evidence to determine an item is reasonable

providers to adopt EHRs,[204] awarding subsidies (push incentives) to providers,[205] states,[206] and Native American tribes.[207] Payment was conditioned on eligible providers adopting "meaningful uses" of EHR.[208] Meaningful uses was defined in detail, and the requirements were phased in through three stages over five years.[209] Providers that hit the CMS benchmarks obtained the subsidy;[210] those that failed to do so received nothing and, as of

---

and necessary but where additional clinical data would aid in this determination, including requiring "added safety, patient protections, monitoring, and clinical expertise").

[204] This was included in the American Recovery and Reinvestment Act (ARRA) of 2009, part of which was the HITECH Act. *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009) (codified as amended in scattered sections of 16 U.S.C. & 42 U.S.C.) (enacting an economic stimulus package in response to the Great Recession).

[205] *See, e.g.*, ARRA of 2009 § 4101(a) (codified at 42 U.S.C. 1395w-4(o)) (detailing meaningful use requirements and incentives); *id.* § 4101(b) (codified at 42 U.S.C. § 1395w–4(a)(7)) (detailing payment adjustments for physician services); *id.* § 4101(c) (codified at 42 U.S.C. § 1395w-23 (l)) (defining MA-affiliated eligible professionals); *id.* § 4102(a)(1) (codified 42 U.S.C. § 1395ww(n)) (detailing hospital incentives for use of certified CHR technology); *id.* § 4102(a)(2) (codified at 42 U.S.C. § 1395f(l)(3)) (describing payment requirements for inpatient hospital services).

[206] *See* HITECH Act § 3013 (codified at 42 U.S.C. 300jj–33). HITECH Act § 3014 (codified at 42 USC § 300jj–34) (describing grants to Native American tribes).

[207] HITECH Act § 3014 (codified at 42 USC § 300jj–34) (describing grants to Native American tribes).

[208] Eligible providers included physicians, Medicare advantage organizations, hospitals, critical access hospitals, MA organizations for certain affiliated hospitals, and states participating in Medicaid. 42 U.S.C. § 1395w–4(o) (SSA § 1848(o)) (defining eligible professionals); *id.* § 1395w–23(l) (SSA § 1853(1)) (detailing Medicare Advantage Organizations for certain affiliated professionals); *id.* § 1395ww(n) (SSA § 1886(n)) (defining eligible hospitals); *id.* § 1395f(l) (SSA § 1814(l)) (discussing payment to critical access hospitals); *id.* § 1395w–23(m) (SSA § 1853(m)) (detailing MA organizations for certain affiliated hospitals), 1396b(a)(3)(F), (t) (SSA 1903(a)(3)(F) & 1903(t)) (guiding states participating in Medicaid). Physicians, for example, were eligible for either the Medicare or Medicaid subsidy depending on whether they treated Medicare patients, or a certain volume of Medicaid patients. Eligible physicians could then elect to receive a subsidy under either program, but not both. *See* 42 U.S.C. § 1395w–4(k)(3) (defining eligible professional); Discussion on the Relationship Between a Stage 1 Meaningful Use Objective and Its Associated Measure, 75 Fed. Reg. 44,314, 44,437–38 (July 28, 2010) (noting initial election with one-time ability to switch elections); *id.* at 44,438 (noting that hospitals can choose between Medicare fee-for-service EHR incentive or the Medicare Advantage EHR incentive *and* the Medicaid EHR incentive).

[209] *See infra* note 205 (citing C.F.R.).

[210] *See, e.g.*, 42 U.S.C. § 1395ww(n)(3) (defining meaningful EHR user for hospitals and noting that the HHS secretary will set the standard). Implementation rules are located at 42

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

754            *GEORGIA LAW REVIEW*            [Vol. 56:701

2015, were penalized.[211] Eligible hospitals,[212] for example, were entitled to a $2,000,000 base payment with additional payments determined by the number of patients discharged and a payment cap of $6,370,400.[213] Since 2015, providers that failed to meet the "meaningful use" requirements had their Medicare payments reduced.[214]

By the time the payments sunset in 2018,[215] the federal government had paid out around $25 billon under this program.[216]

---

C.F.R. § 495.20 (2020) (defining meaningful use objectives and measures for EPs, eligible hospitals, and critical access hospitals (CAHs) before 2015); 42 C.F.R. § 495.22 (defining meaningful use objectives and measures for EPs, eligible hospitals, and CAHs for 2015 through 2018); 42 C.F.R. § 495.24 (defining stage 3 meaningful use objectives and measures for EPs, eligible hospitals and CAHs for 2019 and subsequent years).

[211] 42 U.S.C. §§ 1395w–4(a)(7), 1395w–23(l)(4),1395ww(b)(3)(B)(ix)(I), 1395w–23(m)(4).

[212] Not all hospitals were eligible; psychiatric, rehabilitation, long-term care hospitals were ineligible. 42 C.F.R. § 412.23.

[213] 42 U.S.C. § 1395ww(n)(2); EHR INCENTIVE PROGRAM, MEDICAID HOSPITAL INCENTIVE PAYMENTS CALCULATIONS (2013), https://www.cms.gov/regulations-and-guidance/legislation/ehrincentiveprograms/downloads/mln_medicaidehrprogram_tipsheet_e p.pdf; EHR INCENTIVE PROG. & CMS, MEDICAID HOSPITAL INCENTIVE PAYMENTS CALCULATIONS (2013), https://www.cms.gov/Regulations-andGuidance/Legislation/EHRIncentivePrograms/Downloads/MLN_TipSheet_MedicaidHos pitals.pdf.

[214] Medicare reduced payments by the 25% in 2015 (reporting period 2013), 50% in 2016 (reporting period 2014), and 75% in and after 2017 (reporting period 2015). *See* 2018 MEDICARE ELECTRONIC HEALTH RECORD (EHR) INCENTIVE PROGRAM PAYMENT ADJUSTMENT FACT SHEET FOR HOSPITALS (2017), https://www.cms.gov/newsroom/fact-sheets/2018-medicare-electronic-health-record-ehr-incentive-program-payment-adjustment-fact-sheet-hospitals. "This payment adjustment is applied as a reduction to the applicable percentage increase to the Inpatient Prospective Payment System (IPPS) payment rate, thus reducing the update to the IPPS standardized amount for these hospitals." *Id.*; *see* 42 U.S.C. §§ 1395ww(b)(3)(B)(ix), 1395f(l)(4) (establishing downward payment adjustments under Medicare, beginning with FY 2015, for eligible hospitals and CAHs that do not successfully demonstrate meaningful use of CEHRT for certain EHR reporting periods); *see also* Ian Ayres & Amy Kapczynski, *Innovation Sticks: The Limited Case for Penalizing Failures to Innovate*, 82 U. CHI. L. REV. 1781, 1822 (2015) (arguing that penalties serve as a valuable incentive tool, including in the medical provider context).

[215] Medicare Access and CHIP Reauthorization Act of 2015, § 101(b)(1)(A), Pub. L. No. 114-10, 129 Stat. 87 (codified at 42 U.S.C. § 1305). Hospitals in Puerto Rico were an exception, but the CMS made clear that "in no case may any Medicaid eligible hospital receive an incentive after CY 2021 (§ 495.310(f), 75 FR 44319)." Changes for Hospitals and Other Providers, 85 Fed. Reg. 58,966 (Sept. 18, 2020).

[216] *See supra* note 214. One article suggests the amount paid out as of 2015 was $28.1 billion, but I could not validate that number. Stephen T. Mennemeyer, Nir Menachemi,

---

This included over $8.6 billion to eligible providers,[217] over $475 million to Medicare Advantage organizations,[218] and over $15 billion to eligible hospitals.[219]

While a price tag of nearly $4 billion per year seems expensive, it was effective.[220] Just how effective is another question. Research shows that hospitals eligible for the subsidies adopted EHR at greater than those that were ineligible. But the increase was modest (16.5% adoption per year for eligible hospitals versus 5.5% for ineligible hospitals) and had a more pronounced effect on for-profit hospitals than on not-for-profit hospitals.[221] This effect, however, didn't appear to hold for ambulatory (outpatient) care centers.[222] Despite its uncertain effects, Congress decided to

---

Saurabh Rahurkar & Eric W. Ford, *Impact of the HITECH Act on Physicians' Adoption of Electronic Health Records*, 23 J. AM. MED. INFORMATICS ASS'N 375, 375 (2016).

[217] *See EP Recipients of Medicare I Incentive Payments (ZIP) (File 1 of 2)*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/DataAndReports (last visited Apr. 23, 2022) (showing calculations in 2012 equaling $2,851,324,173.83 and calculations in 2013 equaling $2,568,028,821.01); *EP Recipients of Medicare I Incentive Payments (ZIP) (File 2 of 2)*, CTRS. FOR MEDICARE & MEDICAID SERVS. https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/DataAndReports (last visited Apr. 23, 2022) (showing calculations in 2014 equaling $1,890,620,970.41, in 2015 equaling $948,403,852.66, and in 2016 equaling $422,403,778.59).

[218] *See Medicare Advantage Organization Providers Payments (ZIP)*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/DataAndReports (last visited Apr. 23, 2022) (citing MAO incentive totaling $475,772,506.27).

[219] *See EH Recipients of Medicare EHR Incentive Payments (ZIP)*, CTRS. FOR MEDICARE & MEDICAID SERVS.), https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/DataAndReports (last visited Apr. 23, 2022) (providing calculations of incentive payments totaling $15,182,882,175.39 from 2012 to 2016).

[220] *See* Julia Adler-Milstein & Ashish K. Jha, *HITECH Act Drove Large Gains in Hospital Electronic Health Record Adoption*, 36 HEALTH AFFS. 1416, 1419, 1421 (2017) (finding statistically significant differences between adoption rates of EHR by eligible hospitals (16.5% per year) and ineligible hospitals (5.5% per year); *see also* Daniel Walker, Arthur Mora, Mollye M. Demosthenidy, Nir Menachemi & Mark L. Diana, *Meaningful Use of EHRs Among Hospitals Ineligible for Incentives Lags Behind That of Other Hospitals, 2009–13*, 35 HEALTH AFFS. 495, 495–501 (2016) (finding that eligible hospitals grew their EHR from 4.5% in 2009 to 44.3% in 2013 while ineligible hospitals rose only modestly during the same period (psychiatric hospitals from 0% to just under 10%; rehabilitation hospitals from 1.3% to around 15%; and long-term care hospitals from 0.6% to around 12%)).

[221] Adler-Milsten & Jha, *supra* note 162, at 1421.

[222] Mennemeyer et al., *supra* note 216, at 376–77.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

756            *GEORGIA LAW REVIEW*            [Vol. 56:701

continue the program but not the payments, folding the EHR requirements into an existing CMS incentive system.[223]

The blueprint of the meaningful use program, or others like it, could be used to stimulate providers to systematically collect, organize, and disseminate information about off-label uses. Like the meaningful use subsidy, an "off-label subsidy" would require a system to capture, organize, and publish off-label uses.[224] Whether this subsidy should specify the precise infrastructure necessary to generate this information is something Congress or federal agencies should study.[225] At a minimum, however, the off-label subsidy would specify the kinds of information collected, the form in which it should be collected, and the terms by which it should be disseminated to a centralized government database, which should, to the greatest extent possible, be made available to enterprising third-parties and to the public at large.[226] After a sufficient period

---

[223] Many of the requirements for the subsidy, however, have been folded generally into the Medicare Quality Payment Program (MQPP) and specifically into the Merit-Based Payment System (MIPS). Centralized Partnership Audit Regime, 83 Fed. Reg. 41,968 (Aug. 18, 2018). Under the MQPP, Medicare rewards of penalizes providers reimbursement based on their compliance with MQPP requirements. *See* CHIP Act, Pub. L. No. 111-3, § 101(b)(1)(B), 123 Stat. 8, 11 (2009) (retaining meaningful use determinations for merit-based incentive payments); 41 C.F.R. § 414.1415 (2020) (detailing the Merit-Based Incentive Payment System and Alternative Payment Model Incentive).

[224] "Publish" here does not necessarily mean publication in peer reviewed journals. It means something closer to "making publicly available the information in a format that would normally be accepted by a peer-reviewed journal." This avoids the problem of studies that journals are unlikely to publish confirming the null hypothesis.

[225] One issue that should be studied is how much implementation costs are or should be offset by existing EHR systems.

[226] This proposal folds nicely into a noted area of concern for the FDA: how to generate more reliable information that can be used to assess safety and efficacy. *See* FDA RWE FRAMEWORK, *supra* note 160, at 16–17 (stating the importance of examining data relevance to determine the full range of outcomes for studies on health ailments). It might also be an opportunity for the FDA to make headway into specifying a uniform format for IEHR—a problem that is particularly important as the FDA reviews more EHR information. *Id.* at 17–18. Under the RWE Program, the FDA is also considering data standards for RWE. *Id.* at 25. Making data available publicly raises privacy-related concerns under the Health Insurance Portability and Accountability (HIPAA) Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified primarily in Titles 26, 29, and 42 of the United States Code); 45 C.F.R. § 164.306 (2020). Most of these concerns, however, can be swept away under one of the many exceptions to HIPAA protections, including disclosures required by law and for public health activities and purposes. 45 C.F.R. § 164.512(a)–(b). Any ancillary privacy-related concerns could be addressed by the agency charged with collecting the information. One potential

---

of time, the incentives for the off-label subsidy—like the meaningful use subsidy—could be folded into the existing CMS payment system.

Depending on the goals of the program, the off-label subsidy might also address the structural changes needed to conduct reliable prospective observational studies or pragmatic clinical trials. The subsidy could specify payments for setting up and conducting observational studies. Compared to clinical trials, observational studies and pragmatic clinical trials are cheaper and are more feasible for smaller, less sophisticated providers.[227] Maintaining the knowledge infrastructure for these trials may be a particularly important aspect of leveraging innovative new uses—testing them out before running full-on clinical trials. Maintaining provider incentives to continue observational studies, however, might cost more than the meaningful use subsidy. Unlike the fixed costs of adopting EHR, the fixed costs of conducting observational studies are higher and do not decrease with the same effect as do those associated with EHRs. If this strategy is pursued, it will require commitment to a permanent and more expansive role for the government in pharmaceutical drug development.

Using an existing government program has several benefits. First, there is a ready-made framework on which to build. In the course of constructing this framework, the CMS has acquired specialized knowledge about how to implement subsidies, which providers might respond to them, and how to close the existing incentive gaps. Second, the subsidy appears to be relatively successful, at least as to some providers.[228] While it's difficult to extrapolate the effect of this subsidy to one directed at off-label use, it's not unreasonable to assume that a similar subsidy would have similar effects. At the very least, then, providers would probably seek the economic benefits of collecting information in the manner specified by the law. And the benefit here is likely to be much stronger than in the case of EHRs. In the context of EHRs, remember, providers were already beginning to adopt the relevant technology. But the issue for off-label uses is a collective action

---

solution, for example, would be to restrict access to information disclosed to the centralized database, leaving only claims data completely publicly accessible.

[227] *See infra* note 292.

[228] *See supra* notes 203204.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

758        *GEORGIA LAW REVIEW*        [Vol. 56:701

problem: providers are not converging on a uniform set of standards for data collection and formatting. The subsidy would help to do so. Finally, to the extent that some fixed costs involve technological capacity or professional know-how, subsidizing those costs might lower the total fixed costs over the long run.

With the meaningful use subsidy, the opposite worry arose because not all providers were eligible to participate: driving down the cost of EHR technology placed ineligible providers in a position to purchase a lower-cost, inferior good. By reducing prices, the subsidy may have caused more inefficiency, or at least might not have done much to increase it.[229] It is not clear how this might affect information collection of off-label uses. An off-label use subsidy would be directed primarily at collection, organization, formatting, and dissemination of data on off-label use. As such, the quality of the underlying technology used to capture that data is less important, provided that it collects data with roughly the same accuracy and information output as superior systems.

Another shortcoming of the meaningful use subsidy was its exclusion of certain providers. While many providers—including small, office-based providers were eligible[230]—some hospitals were not. Psychiatric, rehabilitation, and long-term care hospitals were ineligible.[231] Following this path for off-label use would be a significant missed opportunity, particularly because a large percentage of off-label use occurs in psychiatry.[232] Additionally, many rehabilitation hospitals treat patients with no known cures or few treatments, such as TBI, stroke, and chronic pain.[233] Tracking and studying off-label use in these settings is crucial to obtaining information about both identification and validation of new uses. They should, therefore, be eligible for the off-label subsidy.

---

[229] *See, e.g.*, Mennemeyer et al., *supra* note 216, at 378 (discussing the effect of the subsidy on the adoption rate of the "Any EHR system").

[230] *See* Brian K. Bruen, Leighton Ku, Matthew F. Burke & Melinda Beeuwkes Buntin, *More Than Four in Five Office-Based Physicians Could Qualify for Federal Electronic Health Record Incentives*, 30 HEALTH AFFS. 472, 474 (2011) (discussing the eligibility of small offices for federal electronic health record incentives).

[231] *Id.* at 477.

[232] See *supra* notes 11, 18 and accompanying text.

[233] Medicare has a specific definition of "rehabilitation hospital" for coverage and reimbursement purpose I42 U.S.C. §§ 1395x(e), 1395ww(j)(1); 42 CFR §§ 482.1 *et seq.*, 412.20, 412.604.

Further study is needed, of course, to evaluate the costs and benefits of using a subsidy modeled on the one used for EHRs. This would require evaluating, among other things, eligibility, who could qualify, the benchmarks required for qualification, and the structure, amount, and duration of the subsidy. In the next Section, I explore some of the requirements that are crucial to any government subsidy and how they might be implemented in the context of a new kind of subsidy: market inclusivity.

C. NEW GOVERNMENT PROGRAMS: MARKET INCLUSIVITY

Existing government programs provide an off-the-shelf framework that reduces implementation costs. But, as we've seen, there are still challenges to applying an existing framework off-label, as it were: different problems may require modification of existing systems or different systems altogether.[234] While the last Section describes the former, this Section describes the latter: what I call the *market inclusivity* subsidy (MI Subsidy). Under this program, providers who implement systems to generate, collect, organize, and disseminate information about off-label prescriptions are entitled to obtain a direct government payment for each off-label use they track, with the size of the payment dependent on the frequency and detail with which providers track it. Below I explain how this potential solution would leverage existing provider capabilities, which vary by size and type, to collect, organize, and disseminate information about off-label uses.

*1. Eligibility & Qualification.* Like the meaningful use subsidy, the MI Subsidy would have three components: eligibility, qualification, and payment. Eligibility represents the possible universe of individuals or entities that could obtain the subsidy. Given that the subsidy is designed to collect as much information as possible about off-label uses, in principle any provider should be eligible.

---

[234] Providers aren't the only option, either. *See* Eisenberg, *The Problem of New Uses*, *supra* note 25, at 739 (discussing the limited options that providers have when the FDA sequesters valuable data). More recently, Congress has tried to combat this problem through increased monitoring and information collection. *See generally* The Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85, 121 Stat. 823 (codified as amended in various sections of 21 U.S.C.). As I explain below, this includes the Sentinel Initiative.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

760    *GEORGIA LAW REVIEW*    [Vol. 56:701

Eligibility is a necessary but not sufficient condition for obtaining the subsidy. Eligible providers must still qualify for the subsidy, which they can do by meeting conditions specified by the government. By setting qualifications, the government forces eligible providers seeking the subsidy to engage in the desired activity. Here the desired activity is to collect information about off-label uses, organize it, and disseminate it. Just what kind of information—and the manner in which it should be collected, organized, and disseminated—is open to debate.

But the debate is not without boundaries. To solve or mitigate both Problems, information about off-label uses must have certain characteristics. First, the data must be of a minimum type and quantity. Information must contain, for example, the patient's diagnosis and the prescribed drug, including the dose, method of administration, and frequency. It may also include other information, such as previous prescriptions (both on- and off-label), patient compliance, follow ups, adverse reactions, and other drugs the patient is taking.

Second, this data must be uniformly formatted. While uniformity isn't a logical necessity, it is a practical one. Without it, efficient data-mining and analysis would be impossible. Uniformly formatted data enables information pooling and, hence, analysis of a single dataset.[235] A requirement of some minimum kind or amount of data increases the value of the dataset: the more information required, the more valuable the data set. At the same time, additional requirements increase costs to providers: the higher the minimum threshold, the greater the initial fixed costs to gather it.[236] To determine the optimal formatting and minimum requirements, the relevant federal agencies could form a commission, conduct a pilot study, or both.[237]

---

[235] *See* Joachim Roski, George W. Bo-Linn & Timothy A. Andrews, *Creating Value in Health Care Through Big Data: Opportunities and Policy Implications*, 33 HEALTH AFFS. 1115, 1116 (2014), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2014.0147.

[236] The relationship is not exactly one-to-one. Some data might be quite easy to get (e.g., low initial fixed costs) because of existing systems, while other data may be expensive to obtain (e.g., high initial fixed costs).

[237] This might be an opportunity for the FDA to make headway into specifying a uniform format for EHRs—a problem that is particularly important as the FDA reviews more EHR information. *See* FDA RWE FRAMEWORK, *supra* note 160, at 17–18 (explaining that tools

Third, uniformly formatted data must be communicated or disclosed to the public (or a public agency) for the system to function properly. The government, and even private actors, can't realize the benefits of data collection if the data are not available for analysis. And, if data collection is done right, a dissemination or publication requirement has the potential to cure the market failure in diffusion of innovative new uses.[238] Put another way, if the program causes providers to collect information on innovative new uses, the dissemination requirements will ensure that those new uses are diffused.

Dissemination could take a variety of forms. One option is to disclose data to the FDA, either by using an existing information-collection program, such as the Sentinel Initiative,[239] or by developing a new one, either within the FDA or in a collaborative effort with the CMS. Another is requiring providers to publish (some limited) data on their own websites, a government website, or a third-party service. Some combination of these—and others—is also possible.[240]

Whatever and however information is produced, it's important to balance government expectations with provider capabilities. In general, smaller providers—which constitute around 50% of all providers[241]—are less sophisticated, have less technology, and have fewer resources than large providers. Data collection requirements for small providers, then, should probably be less onerous than those for larger providers. One can imagine a program where small providers have fewer system and data output obligations (e.g.,

---

must be developed in order to induce more effective use of RWE); *see also id.* at 25 (stating that under the RWE Program, the FDA is also considering data standards for RWE.).

[238] The CURE ID program attempts to fix this market failure by decentralized data gathering. *See* CURE Drug Repurposing Collaboratory, *supra* note 179 (explaining that CURE ID is dedicated to capturing clinical outcome data to advance drug repurposing and inform future clinical trials).

[239] *See* FDA RWE FRAMEWORK, *supra* note 160, at 29 (defining the Sentinel Initiative as "a long-term effort to create a national electronic system for monitoring FDA-regulated medical products").

[240] There are HIPAA concerns with publishing data publicly that could counsel against a dichotomous or layered approach in which some basic claims level data are published and other data are submitted to the government for research purposes.

[241] *See* Kane, *supra* note 178, at 5 ("In 2018, 56.5 percent of physicians worked in practices with 10 or fewer physicians . . . .").

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

762                *GEORGIA LAW REVIEW*                [Vol. 56:701

minimum requirements to track and disseminate prescription, adverse reactions, drug, dose, formulation, diagnosis, existing medications, and refill requests) than large providers (e.g., minimum requirements to implement a formulary, track all off-label uses, patient follow up, off-label requests, etcetera, and disseminate that information). Small providers could still be encouraged to collect information required of large providers, as explained below, through additional incentive mechanisms, like bonus payments, that are built into the subsidy program.

With respect to large providers, Congress could leverage the significant resources and structure of institutions like hospitals, including P&T committees, to collect more data and to implement evidence-based reforms for off-label uses. Congress might, for example, mandate that larger providers build out and maintain a dynamic formulary system. This formulary system could include, among other things, a process for requesting, reviewing, approving, and tracking off-label uses, as well as one for disseminating all of this information in an organized and uniformly formatted manner.[242]

Although some minimum requirements for a formulary system are desirable, formulary systems needn't be identical—at least not at first. Some amount of experimentation is beneficial, and based on current practices, we should expect it to occur. Formulary and P&T procedures and practices vary quite widely by institution.[243] And although most hospitals have a formulary and a P&T committee,[244] not many providers have systems in place to capture the needed

---

[242] Not all off-label uses will be off-formulary; some off-label uses will be on the formulary.

[243] *See generally* Anagnostis et al., *supra* note 166 (detailing different member institutions' standards of practice).

[244] Formularies are required to be eligible for Medicare payments. *See* 42 C.F.R. § 482.25 (2020) ("A formulary system must be established by the medical staff to assure quality pharmaceuticals at reasonable costs."). The regulations don't require hospitals to establish a P&T committee specifically. *See generally* 42 U.S.C. § 1395bb; 42 C.F.R. § 482 *et seq.* But as part of the eligibility process, Medicare allows providers to obtain accreditation to avoid more onerous state surveys. In essence, the government has farmed out the eligibility-determination process to various organizations, the most prominent of which is the Joint Commission.

data.[245] This is true even though providers are quite adept at collecting information for non-formulary (and off-label) uses.[246]

It's also not that surprising. Each provider may have different needs and institutional structures, politics, and financial outlooks. Because of these differences, each provider is best positioned to evaluate its own needs and develop a system suited to it. As more providers seek MI Subsidies, practices will shift and become more efficient. Providers that comprise numerous hospitals or practice groups may seek to integrate or consolidate their formularies and P&T committees as the benefits of doing so become apparent.[247] Eventually, the FDA (or a similar agency) could commission a study on the practices of providers and, based on its findings, use its rulemaking authority to standardize and modernize market inclusivity requirements.[248]

*2. Market Inclusivity Subsidy.* The third component of market inclusivity is a subsidy. Eligible providers that qualify for a MI Subsidy would obtain a direct payment for all "covered drugs."[249] A "covered drug" means any drug used off-label that the provider tracks with the specified system, as explained in more detail below.[250] In general, providers that track more drugs with greater

---

[245] *See* Anagnostis et al., *supra* note 166, at 412–13 (showing that although non-formulary use seems to be better tracked, *what* providers "tracked," varies throughout the data). Formularies, of course, may include many off-label uses that may not be tracked with regularity.

[246] *See* Anagnostis et al., *supra* note 166, at 412 (describing tracking methods for non-formulary medication use).

[247] Large healthcare networks, which continue to grow, operate like franchises and impose formulary requirements on their "members."

[248] Traditional clinical trials use standardized procedures for information collection and recording. *See, e.g.,* An-Wen Chan et al., *SPIRIT 2013 Statement: Defining Standard Protocol Items for Clinical Trials*, 158 ANNALS INTERNAL MED. 200, 202 tbl.1 (2013) (recommending plans for data collection, management, and analysis as part of the standard protocol for clinical trials). The FDA could apply a similar approach here. In the initial phases, the FDA could roll out a pilot program to determine feasibility and areas for improvement.

[249] The average cost would likely reflect private pricing schemes under Medicare Part D. But it would also include the costs of drugs under Medicaid.

[250] If the provider intends to claim tax credits for clinical trial research using this system, rules might also require the system to include a process integrating the system into clinical trials. The FDA has already begun promoting the integration of clinical trials into practice settings. *See* U.S. FOOD & DRUG ADMIN., FRAMEWORK FOR FDA'S REAL-WORLD EVIDENCE PROGRAM 10–11 (2018) [hereinafter FDA RWE FRAMEWORK], https://www.fda.gov/media/120060/download.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

detail would obtain a greater subsidy than those who track fewer drugs with less detail. This should induce providers to track as many off-label uses as possible while accounting for the different capabilities of providers to track and monitor off-label use. The overall benefits of this subsidy could be significant given that patients fill over four billion prescriptions per year.[251] The exact amount of the MI Subsidy, however, should be set only after sufficient research to determine the optimal subsidy to induce providers to engage in the desired activity.

Without that research, though, it is possible to offer a few comments about how this payment system might be structured. First, economic incentives should drive providers to collect as much information about off-label uses as possible. This will ensure that the system captures not only information about existing off-label uses but also information about new, innovative off-label uses. Second, payments should be progressive: the more information providers collect, and the more useful it is, the larger the payment should be. Third, the incentive should encourage providers to disseminate, as well as to collect and organize as described in Section III.B, the off-label information that they track.

One method for achieving these aims is a point-based system. Under a point-based system—such as the one the CMS currently uses to incentivize alternative payment structures and quality improvements[252]—the government scores entities along the desired metrics by assigning them points based on compliance with specified requirements.[253] Various weighting techniques, along with "bonus" points, can be used to emphasize some metrics over others or to tailor incentives to different providers. Small providers—

---

[251] *Total Number of Retail Prescriptions Filled Annually in the United States from 2013 to 2025 (In Billions)*, STATISTA, https://www.statista.com/statistics/261303/total-number-of-retail-prescriptions-filled-annually-in-the-us (last visited Apr. 24, 2022).

[252] *See* 42 C.F.R. §§ 414.1300–414.1465 (2020) (setting incentive payments for providers that participate in eligible alternative payment models); 42 U.S.C. § 1395w–4 (describing a fee schedule-based payments, a quality reporting system, and a merit-based incentive payment system).

[253] The CMS, for example, evaluates based on "quality performance," "cost performance," "improvement activities performance," and "Promoting Interoperability performance," the last of which is the EHR subsidy that the CMS folded into its requirements after the original subsidy expired. 42 C.F.R. § 414.1380(a)(1) (2020).

office-based practices with one or two physicians, for example[254]—can receive bonus points for taking actions that larger providers must take as a matter of course.[255] Generally speaking, though, entities that excel on the specified metrics receive more points than those that perform poorly. Points are then compiled, weighted, and summed.[256]

Currently, the CMS uses the sum to adjust providers' Medicare Part B payments: entities with high scores receive more payments than those that receive lower scores.[257] Weighting can be made according to point totals, point totals relative to historical "benchmarks," or some combination of the two.[258] In some cases, low performing entities will not score any points (i.e., will not receive payment for that metric) or may be penalized if they don't meet minimum point requirements in that category.[259] Maximum or "top out" payments can also be set for providers that score the maximum number of points in any given year or in consecutive years.[260]

Congress could use a similar, but more robust, system to incentivize providers to collect, organize, and disseminate information about off-label uses. This probably would require creating a new subsidy system that falls outside the scope of the existing point-based system—perhaps even outside of the CMS—which incentivizes providers by making adjustments to their payments under Medicare Part B.

There are several reasons for devising a new subsidy system rather than folding new requirements into an existing program. The

---

[254] The CMS, for example, awards "bonus points . . . in small practices that submit data on at least 1 quality measure." *Id.* § 414.1380(a)(1)(i).

[255] Bonus points are also given for treating complex patients. *Id.* § 414.1380(c)(3).

[256] *See id.* § 414.1380(c) (providing final score calculation formulas).

[257] *See* 42 C.F.R. § 414.1405 (providing payment adjustment factors based on how their final score compares to performance thresholds and applying the adjustment factors to Part B payments); *see also* 42 C.F.R. § 414.1380(b)(1)(ii) (overviewing benchmark requirements).

[258] *E.g.*, 42 C.F.R. § 414.1380(c) (providing methodology by which CMS weights and reweights performance categories). This is similar to the concept of "yardstick competition." Ian Ayres & Amy Kapczynski, *Innovation Sticks: The Limited Case for Penalizing Failures to Innovate*, 82 U. CHI. L. REV. 1781, 1786 (2015).

[259] *See, e.g.*, 42 C.F.R. § 414.1380(a)(1)(i), (c) (describing how, "for the quality performance category, measures are scored between zero and 10 measure achievement points" and explaining the corresponding formula for calculating the final score of an eligible clinician).

[260] *See, e.g.*, 42 CFR § 414.1380(b)(1)(iv) ("CMS will identify topped out measures in the benchmarks published for each Quality Payment Program year.").

766           *GEORGIA LAW REVIEW*           [Vol. 56:701

first is that reimbursements under Medicare Part B may not be sufficiently tied to the activity that the subsidy is designed to address. The aim of the MI subsidy is to reduce the overall incidence of improper prescriptions and increase the number of proper prescriptions, not to improve care or service delivery *under Medicare Part B*.[261] Relatedly, providers do not generally receive compensation for prescription drugs;[262] compared to services, providers receive almost no money for prescription drug costs.[263] Folding additional payment adjustments into Part B, therefore, might unduly affect the existing incentives (i.e., Medicare Part B adjustments). Finally, although many providers serve individuals whom public insurance covers, not all serve a sufficiently large number of them. To capture as many uses as possible requires paying as many people as possible.[264]

A new point system could take many forms. In the next few paragraphs, though, I try to roughly sketch one of these possible forms, as well as some of its potential drawbacks. In this system, recall, providers can qualify by meeting certain minimum requirements for collecting, formatting, organizing, and disseminating data.[265] Each of these categories, as well as others, could serve as potential metrics along which to evaluate providers and incentivize them to collect, organize, and disseminate more data with greater granularity. Within the collection metric, for

---

[261] Reducing unnecessary prescriptions may reduce costs under Medicare Part B because patients may experience fewer adverse events and need less care. The primary savings, however, will rebound to Medicare Part D, consumers, and payers.

[262] The CMS does reimburse some drug costs to providers under Medicare Part B and uses an incentive to induce providers to treat large proportions of low-income patients. 42 U.S.C. § 256(a)(1)–(3). The GAO recently found that the discount seemed to encourage prescribing higher cost drugs. U.S. Gov't Accountability Off., GAO-15-442, Medicare Part B Drugs: Action Needed to Reduce Financial Incentives to Prescribe 340B Drugs at Participating Hospitals (2015), https://www.gao.gov/products/GAO-15-442.

[263] Providers that obtain certain drugs can obtain payments under Medicare Part B, but this is not, by and large, the majority of prescription drug costs. *See* Cole Werble, *Medicare Part B*, Health Affs. (Aug. 10, 2017), https://www.healthaffairs.org/do/10.1377/hpb20171008.000171/full/.

[264] Casting a wider net, of course, will be more expensive. And it may raise sustainability concerns for the program.

[265] When the Meaningful Use Program began, its first stage had fifteen "core objectives" that incentives were designed to induce eligible professionals to satisfy. 42 CFR § 495.20(d) (2020).

example, providers could earn points for performance in categories like "prescription capture," "patient follow-up," "symptom tracking," "event tracking," and "outcomes." Providers that captured only the drug and the off-label use for which it was prescribed would receive the minimum number of points. Additional points could be awarded for how well or poorly providers tracked patient compliance, prescription changes (e.g., dosage, administration, discontinuation, and additional/alternative medications), and event reporting (e.g., symptom reduction and side-effects or adverse events). A separate category of points, or bonus points, could be used for "innovative" new uses that a provider captures and disseminates.

Similar point categories could be developed for organization and dissemination (by exceeding minimum requirements and meeting additional standards). Providers, for example, could receive points for disclosing the minimum level of data and additional points for publishing some of the data on public-facing websites or in peer-reviewed journals, disseminating it to drug compendia or even to insurance providers. Eventually, metrics could be "benchmarked" to past performance and subsidies allocated based on performance relative to the benchmark.

Rewards can be a powerful motivator, but in appropriate circumstances, penalties can spur the desired activity as well. It is, therefore, worth considering how the new program might penalize providers for noncompliance.[266] Compared to "carrot" like subsidies, "stick" like fines are much less costly.[267] And they are also useful for specifying and enforcing a minimum baseline of activity below which providers can't fall.[268] Like the existing EHR Program, this suggests that providers should be *mandated* to collect some minimum quantum and quality of information or else face penalties. Unlike the EHR program, however, penalties under the MI subsidy program would not result in decreased Medicare adjustments;

---

[266] *See* Ayres & Kapczynski, *supra* note 214, at 1822 (describing how using potential penalties incentivized producer innovation as it relates to Medicare's hospital reimbursements).

[267] *See id.* at 1799–1800 ("Most importantly, . . . sticks do not need to be paid. Carrots, by contrast, can be used up—if they are paid as a reward to one person, they cannot also be paid to another.").

[268] *See id.* at 1803.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

768           *GEORGIA LAW REVIEW*           [Vol. 56:701

rather, they would come as some other form of liability, such as a fine.

There are, of course, drawbacks to using penalties to spur behavior. If compliance costs are not identical for all actors, penalties may disproportionately affect those who are least able to comply.[269] Actors who have difficulty meeting minimum requirements may be forced to exit the market or to change their business models in socially undesirable ways. This problem could arise in the off-label information context if minimum requirements are set too high for some or all providers. Small providers, in particular, may be less equipped to absorb the costs of implementing a new off-label information system. Penalizing them for failing to implement it could have serious negative effects, such as reductions in quality of care or staff.

Additionally, sticks are difficult to calibrate correctly when the expected social value of the desired activity isn't known.[270] Tying cost to expected social value is challenging because estimating the existing cost of unnecessary or improper prescriptions is very difficult—partly because there isn't good quality information about off-label prescriptions.[271] But the government doesn't actually have to know the expected social value of the information generated, and it probably couldn't reliably estimate it if it tried. It can, instead, determine the expected cost *to the provider* and set a penalty that is sufficiently high to induce the provider to engage in the desired activity but small enough that it will not affect the quality of the provider's existing services (or have other negative effects).

These difficulties suggest that a better approach might be a program that induces providers to participate (by promising payment) and then later penalizes participating providers for noncompliance with program standards (by imposing discontinuing payment or imposing a fine). Dangling a reward to induce provider participation will encourage providers' self-selection into the

---

[269] *See id.* (describing how sticks may work best when "citizens have more or less equal compliance costs" as opposed to more complex situations).

[270] *See id.* at 1802.

[271] *See, e.g.,* STUART WRIGHT, DEP'T OF HEALTH & HUM. SERVS., MEMORANDUM REPORT: ENSURING THAT MEDICARE PART D REIMBURSEMENT IS LIMITED TO DRUGS PROVIDED FOR MEDICALLY ACCEPTED INDICATIONS (2011) [hereinafter Wright, *Medicare Part D Reimbursement*] (noting that there is a lack of information for off-label prescriptions).

program based on the projected economic benefit. Once in the system, provider behavior can be influenced by increasing or decreasing payments based on their performance. Rewarding participation would also enable a more effective system of sticks: because providers have already selected into the system, fining providers that fail to meet the minimum requirements is less likely to have the undesirable consequences described above.

Subsidizing costs this way, however, may also lead to socially undesirable prescribing patterns. Providers may prescribe and track more drugs off-label to obtain greater subsidies. While this risk is real, there are several existing mechanisms that disincentivize prescribing in this manner. One is tort law. Physicians who prescribe in ways that are detrimental to patients' health face legal liability. Another is the physician's professional obligation.[272] Ethics rules require physicians to treat patients in an ethical manner; prescribing drugs unnecessarily and solely for profit runs afoul of these rules.[273] Physicians who violate ethics rules risk losing their license.[274]

Costs imposed by law and professional organizations, however, may not be a sufficient disincentive. Legally, for example, it is quite difficult to prove medical negligence based on an off-label use.[275] And physicians can avoid professional sanction by pointing to some medical rationale for prescribing off-label. To combat this, subsidies could be tied to the average rate of prescribing off-label. With

---

[272] *See, e.g.*, Medical Practice Act of 1987, 225 ILL. COMP. STAT. §§ 60/2, 60/10 (delegating the power to regulate the practice of medicine to the Illinois Department of Financial and Professional Regulation); 68 ILL. ADMIN. CODE tit. 68 §§ 1285.200–1285.280 (2005) (stating regulations governing practice of medicine, including standards for ethical conduct and the procedures for disciplinary action).

[273] *See, e.g.*, ILL. ADMIN CODE tit. 68, § 1285.240 (2005) (describing standards of unethical or unprofessional conduct in medical practice).

[274] *See, e.g.*, Medical Practice Act of 1987, 225 ILL. COMP. STAT. § 60/22(A)(18) (listing "[p]romotion of the sale of drugs . . . in such manner as to exploit the patient for financial gain" as a violation of professional conduct punishable by license revocation).

[275] *See, e.g.*, Philip M. Rosoff & Doriane Lambelet Coleman, *The Case for Legal Regulation of Physicians' Off-Label Prescribing*, 86 NOTRE DAME L. REV. 649, 666 (2011) (noting off-label malpractice claims are rare in published cases). The more exotic the use, the greater the threat of liability. *See* James O'Reilly & Amy Dalal, *Off-Label or Out of Bounds? Prescriber and Marketer Liability for Unapproved Uses of FDA-Approved Drugs*, 12 ANNALS HEALTH L. 295, 317 (2003); Johnson, *supra* note 95, at 68 (noting off-label use can become the standard of care, making physicians potentially liable for *not* prescribing off-label).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

770             *GEORGIA LAW REVIEW*             [Vol. 56:701

sufficient data, the administering government entity could calculate the average number of off-label prescriptions for a given use and break out the data by provider type. It could then specify an "allowable" range around the average prescription volume per provider type. Providers whose prescription volume fell outside of a specified range wouldn't qualify for reimbursement.

An alternative strategy would use additional inducements to curb socially undesirable behavior. Rather than punish providers for overprescribing, this strategy would reward them for tracking information that is most needed. The administering agency could, for example, award more points for off-label information for rare diseases, understudied diseases, or promising uses. The predicted effect, following the logic above, would be more off-label prescriptions (and information) and a corresponding increase in the supply of information about the safety and effectiveness of off-label uses in the areas where they are most needed or most likely to be useful.

One final, but important, question is how long this subsidy should last. Like with the meaningful use subsidy, the MI Subsidy should be responsive to the costs associated with developing, implementing, and maintaining the required system. The largest cost to providers will be implementing the information system. Once implemented, the costs of maintaining the system are unlikely to outpace the fixed costs of creating it. While this may change with more sophisticated data collection (e.g., large providers), continuing to collect information will be much less costly after providers implement data-collection systems. The precise amount of this subsidy, how it should be maintained, and whether it should be phased out entirely are all questions that are beyond the scope of this Article. At the very least, however, Congress should consider various options for continuing the subsidy, including phasing it out completely, folding the subsidy into existing incentives, or requiring renewal certifications for continued payments.

D. TAX CREDITS AND GRANTS

Direct government payments are not the only kind of subsidy available to incentivize provider information collection, organization, and dissemination. Tax incentives also can induce providers to (a) institute information collection, organization

220

systems, and procedures to capture off-label use, frequency, and effects; or (b) generate data from clinical trials and (prospective) observational research.[276] Because I focused mainly on (a) in the previous two Subsections, here I limit the discussion to (b). At bottom, tax incentives are a way to get private parties to do things by paying them.[277] There are two kinds of tax incentives: credits and deductions. Tax credits provide a dollar-for-dollar reduction in tax liability.[278] Tax deductions, on the other hand, reduce the taxpayer's taxable income.[279] Both can represent a government subsidy to engage in a particular activity.[280]

Tax incentives are not new to pharmaceutical development. Congress has used them in the past to stimulate production of information about drugs—specifically clinical trial data about drugs used to treat rare diseases.[281] In the Orphan Drug Act (ODA), for

---

[276] Here I don't mean to limit "clinical trials" to double-blind, randomized controlled trials. It could also include so-called "practical" clinical trials. *See, e.g.*, Sean R. Tunis, Daniel B. Stryer & Carolyn M. Clancy, *Practical Clinical Trials: Increasing the Value of Clinical Research for Decision Making in Clinical and Health Policy*, 290 JAMA 1624, 1626 (2003).

[277] *See* Daniel J. Hemel & Lisa Larrimore Ouellette, *Beyond the Patents-Prizes Debate*, 92 TEX. L. REV. 303, 307–08 (2013) ("[I]ncentives—like patents—leverage the value of information held by private parties.").

[278] *See Policy Basics: Tax Exemptions, Deductions, and Credits*, CTR. ON BUDGET & POL'Y PRIORITIES, https://www.cbpp.org/research/federal-tax/tax-exemptions-deductions-and-credits (last updated November 24, 2020) ("Taxpayers subtract their credits from the tax they would otherwise owe to determine their final tax liability.").

[279] *See id.* ("[D]eductions indirectly reduce the amount of taxes a filer owes by reducing his or her 'taxable income,' which is the amount of income on which a filer pays taxes.").

[280] Let's assume a taxpayer has $100 in taxable income and is taxed at a rate of 35%. A $35 deduction would reduce the taxpayer's taxable income to $65, which would be taxed at the rate of 35%, for a total tax bill of $22.75. A $35 tax credit, on the other hand, would reduce the taxpayers total tax *liability* of $35 to $0 (100*.35=35-35).

[281] Existing law uses a combination of both deductions and tax credits. *See* David M. Richardson, *Orphan Drug Tax Credit: An Inadequate Response to an Ill-Defined Problem*, 6 AM. J. TAX POL'Y 135, 168–69 (1987) (stating that the federal government agreed to fund "a maximum of 73 percent of the portion of the orphan drug research expenses that constituted 'qualified clinical testing expenses'"); Nina J. Crimm, *A Tax Proposal to Promote Pharmacologic Research, to Encourage Conventional Prescription Drug Innovation and Improvement, and to Reduce Product Liability Claims*, 29 WAKE FOREST L. REV. 1007, 1057 (1994) (noting that the Section 174 deduction did not provide a sufficient incentive to stimulate drug R&D, and as a result, Congress enacted the Economic Recovery Tax Act of 1981 which created the Section 41 research tax credit); William Natbony, *The Tax Incentives for Research and Development: An Analysis and a Proposal*, 76 GEO. L.J. 347, 382 (1987) ("Congress elected to offer businesses a tax credit for increasing (not merely paying) research

772                *GEORGIA LAW REVIEW*                [Vol. 56:701

example, Congress provided drug companies additional tax incentives that allowed them to claim a tax credit of 50%[282] (later reduced to 25%[283]) of all expenses on human clinical testing of an orphan drug.[284] Companies could avail themselves of this maximum credit only when they performed human clinical trials for orphan drugs.[285]

A similar system could be used to subsidize providers to engage in R&D of new and off-label uses. One option would borrow from the Orphan Drug Act but expand the amount of credit available from 25% to 100% of all human clinical trials and prospective observational studies conducted by providers.[286] Just like the current tax credit for research activities in Section 41 of the Tax Code, this tax credit would apply only to *increased* research

---

and experimental expenditures."). *Compare* 26 U.S.C. § 45C (describing a tax credit for clinical testing for certain drugs for certain rare diseases), *with* 26 U.S.C. § 174 (describing a deduction for "research and experimental expenditures"). Two tax credits apply regardless of whether the research in question is for orphan drugs. *See* 26 U.S.C. § 41(a)(1)–(2) (explaining the general rule for calculating the research credit for increasing research activities). In 2014, the Treasury Department issued final regulations concerning Section 174 deductions. *See* Research Expenditures, 79 Fed. Reg. 42,193, 42,194 (July 21, 2014) (clarifying deductions for tangible property but also eliminating some uncertainty regarding whether some drug-related expenses could be deducted, including pilot models). Given that all of the proposed research activities—at least at first—would take place before filing an NDA and concern a drug with an uncertain safety and efficacy profile, they will be deductible under Section 174. *See* Crimm, *supra* note 281, at 1055, 1067, 1069 (arguing that tax incentives should be available for research that does not necessarily lead to new a new drug but nonetheless leads to pharmaceutical advancements).

[282] Orphan Drug Act, Pub. L. No. 97-414, 96 Stat. 2049, 2053 (1983) (codified at 26 U.S.C. § 45(a)).

[283] Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2133, § 13401(a) (2017) (codified at 26 U.S.C. § 45C(a)).

[284] The Tax Code does not allow for double- or triple-dipping on deductions and credits, but deductions may cover activities that credits do not, and vice versa. *See* 26 U.S.C. § 280C(c)(1) (disallowing deduction for qualified research activities determined as a credit); *id.* § 280C(c)(2) (requiring a like kind reduction in credits where qualified research expenses are capitalized rather than deducted).

[285] *See* 26 U.S.C. § 45C(b)(2)(A) (defining clinical testing as testing carried out under the ODA for rare diseases); *id.* § 45C(b)(2)(B) (defining testing as some types of "[h]uman clinical testing"); *id.* § 45C(d)(1) (defining rare disease or condition); Richardson, *supra* note 281, at 173 (noting ODA was not designed "to foster basic research into the causes of orphan diseases or conditions or to fund or otherwise encourage preclinical testing").

[286] Alternatively, Congress could provide a 100% tax credit and then reduce the other applicable credits by the claimed credit.

activities.[287] Put another way, providers could obtain a tax credit only for those clinical trials and observational studies they wouldn't have otherwise undertaken.

Another option is to benchmark the "base rate" to the initial year the tax credit is claimed. This would allow providers to engage in the same level of research year-after-year without losing the tax credit. Research "increases," in other words, would always be determined by a "base rate" set by the initial year the provider claimed the tax credit.

Although it's not entirely clear that this is the best approach, there are at least three reasons favoring a dollar-for-dollar, fixed-base-amount tax credit. First, providers, unlike pharmaceutical companies, have no way to recoup investment costs.[288] And that's the entire point: information collection and analysis is not something that providers use to generate profits.[289] Second, providers have less financial wherewithal than large pharmaceutical firms to engage in research.[290] Third, existing tax incentives available to pharmaceutical companies may not be available to providers.[291] Whatever the optimal approach, Congress

---

[287] *See* 26 U.S.C. § 41(a) (stating that the Section 41 tax credit of 20% for incremental research is available only for "qualified research" expenses exceeding a "base amount"); 26 U.S.C. § 41(d)(1)(A) (noting that obtaining tax credits under Section 41 requires satisfying the definition of R&E expenditure under Section 174); Crimm, *supra* note 281, at 1059–60 (describing prerequisites for the tax credit); *see also* Lily L. Batchelder, Fred T. Goldberg, Jr. & Peter R. Orzag, *Efficiency and Tax Incentives: The Case for Refundable Tax Credits*, 59 STAN. L. REV. 23, 32–42 (2006) (describing refundable tax credits); Crimm, *supra* note 281, at 1076 (stating that tax credits under the ODA are "neither refundable nor recapturable."). It is not clear whether this would make a real difference to providers, who will usually have substantial taxable income. *See* Natbony, *supra* note 281, at 351 (noting that current R&D incentives prejudice companies with no current taxable income). For those with less substantial income, however, the benefits of a refundable tax credit could be quite significant.

[288] It is possible to offer a reward for a provider that produces important research, but it would require significant changes to the drug approval process. *See infra* Section IV.E.

[289] Third parties may still use the publicly available data for profitable uses, of which there are likely to be many. See *infra* note 300.

[290] It may even be worth considering making these tax credits refundable—applicable regardless of whether providers have any taxable income. *See* Hemel & Ouellette, *supra* note 277, at 337 (explaining this feature of tax credits in other jurisdictions).

[291] *See* Crimm, *supra* note 281, at 1052–55 (noting uncertainty of Section 174 deductions for research directed at new products but emphasizing that research that "eliminates uncertainty concerning the development or improvement of a quality product" may be

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

774             *GEORGIA LAW REVIEW*              [Vol. 56:701

should consider these differences when deciding the type and amount of any tax credit.

While tax incentives to providers are important, they don't necessarily optimize information generation. For various reasons—size, location, demographics, or sophistication—individual providers may not be able to produce the kind of information we desire. For that reason, effective tax incentives will encourage providers to collaborate.[292] At the very least, the tax incentive structure should not make it less attractive to collaborate than to conduct research individually. Unlike the current tax credit for university research,[293] the tax credit for providers might allow multiple providers to claim a (non-refundable or refundable) tax credit for the relevant portion of the research conducted with other providers.[294]

This is also an opportunity to encourage collaboration between large and small providers[295] or between industry and providers.[296] Providers may work with payors to build out better pricing

---

deducted). Given that the research might simply provide more information about a use, and not to a new product, this deduction may not be available. *Id*. at 1052–53.

[292] Practical or pragmatic clinical trials, for example, may require numerous community-based clinics jointly participate. *See* Tunis et al., *supra* note 276, at 1626–27. Sometimes smaller providers may actually provide a more efficient option for clinical trials. *See* Johnson, *supra* note 95, at 96–97.

[293] *See* Crimm, *supra* note 281, at 1072–73 (noting criticism of Section 41(a)(2) credit on grounds it does not "reward research undertaken by R&D consortia or alliances"). Credits can be claimed, however, for the qualified research expenses under Section 41(a)(1). *See* 26 U.S.C. § 41(b)(3)(C) (stating that up to 75% of qualified research expenses paid or incurred by the taxpayer to qualified consortia qualify as contract research expenses and are subject to the 20% credit under Section 41(a)(1)).

[294] This would make any congressional action somewhat more complicated than simply trading on the existing tax credit structure.

[295] *See e.g.*, Charles D. Cobau, *Clinical Trials in the Community: The Community Clinical Oncology Program Experience*, 74 CANCER 2694, 2694 (1994) (describing a program designed to transfer knowledge from large research institutions to small providers).

[296] *See* Eisenberg & Price, *supra* note 44, at 17 (noting that comparativeness studies frequently involve partnering with healthcare payors like insurance companies to leverage large datasets)*; see also* Thomas O. Stair, Caitlin R. Reed, Michael S. Radeos, Greg Koski & Carlos A. Camargo, *Variation in Institutional Review Board Responses to a Standard Protocol for a Multicenter Clinical Trial*, 8 ACAD. EMERGENCY MED. 636, 636–641 (2001) (noting that a local institutional review board (IRB) was inefficient and proposing a nationalized standard for IRB review of multicenter clinical trials).

mechanisms or evidence.[297] Or third-party coordination services may emerge to help organize, coordinate, and collect research across providers (and potentially the pharmaceutical industry). Congress would need to keep these concerns in mind when finalizing the precise scope and details of this incentive.

Offering a tax credit to providers that generate information is important, but it won't necessarily solve either Problem. As Section II.C. showed, information must be organized, analyzed, and disseminated. Any tax credit should therefore be conditioned on some kind of dissemination. One method might be to mandate that providers register and publish all results on clinicaltrials.gov, a measure that currently isn't required for observational studies.[298] Congress might also consider requiring providers to publish any results, even if they show that a drug is not effective, in a format that would normally be sufficient to satisfy peer-reviewed journals.[299] Another option is to require providers to submit raw data and information, including study design and protocols, patient notes, etcetera, to the FDA for purposes of detailed evaluation for,

---

[297] *See* Eisenberg & Price, *supra* note 44, at 29–30 (noting that payors have best practices and guidelines).

[298] In 1997, Congress enacted the Food and Drug Administration Modernization Act, which required IND applications for experimental treatments of serious and life-threatening diseases trials to register with the NIH. *See generally* Food and Drug Administration Modernization Act of 1997, Pub. L. No. 105-115, 111 Stat. 2296. Ten years later, Congress passed the FDAAA, which expanded the clinical trials required to register and expanded reporting requirements for results. *See generally* Food and Drug Amendments Act of 2007, Pub. L. No. 110-85, 121 Stat. 823 (2007). In 2000, the NIH, working with the FDA, launched clinicaltrials.gov to serve as the central registry. *See History, Policies, and Laws*, CLINICALTRIALS.GOV, https://clinicaltrials.gov/ct2/about-site/history (last visited Apr. 26, 2022). Currently federal regulations require only some clinical trials to be registered. *See* 42 C.F.R. § 11.60 (2020) (listing requirements of voluntary registration); *id.* § 11.62 (stating conditions under which mandatory registration is required). Specifically, only drugs in controlled trials require registration. *See id.* at § 11.60(a) (specifying that this section applies "[i]f a responsible party voluntarily submits clinical trial information for a clinical trial"). This excludes small feasibility studies and observational studies. *See* 42 C.F.R. § 11.22(b)(1)(ii) (2020). Under my proposals, providers undertaking these studies will be required to register and publish in clinicaltrials.gov. The penalties for failing to register would be substantial.

[299] In many cases, this never happens. *See e.g.,* Joseph S. Ross, Tony Tse, Deborah A. Zarin, Hui Xu, Lei Zhou & Harlan M. Krumholz, *Publication of NIH Funded Trials Registered in ClinicalTrials.gov: Cross Sectional Analysis,* 344 BMJ d7292 (2012). If trials are discontinued because of safety or efficacy concerns, it is critically important to make this information publicly available in a central repository.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

776            *GEORGIA LAW REVIEW*            [Vol. 56:701

among other things, safety and quality checks. Some centralized database or repository of this information would be critical.[300]

Using tax credits this way may be particularly effective because it ties them directly to outputs.[301] Unlike tax credits to pharmaceutical companies, tax credits to providers will produce *something*. That something, of course, may show nothing; the results may be inconclusive or may show that the drug has no known therapeutic effects. But even if the something is about nothing, *knowing* something about nothing is better than not knowing about anything at all. There's no risk that providers, unlike pharmaceutical firms, will bury results showing that a drug is not safe and effective because they don't have strong incentives to do so. Quite the opposite, to claim the tax credit, they *must* disseminate their data.[302]

Tax credits may be an attractive choice because they are more efficient than other push incentives, such as a government grant, for two reasons. First, administrative costs can be lower.[303] The government doesn't have to make allocation or investment decisions based on little or no information about the *known* safety and

---

[300] While not all information can be public, making as much public as possible is likely to stimulate private industry to use it. This is already happening in other contexts, such as drug reimbursement and FDA regulation. *Compare* Simon, Off-Label Information, *supra* note 67, at 21–23 (describing drug compendia), *with* REDICA SYS. (FORMERLY GOVZILLA), https://govzilla.com/ (last visited Apr. 26, 2022) (providing a fee-for-service searchable database of FDA data on inspections, enforcement, and registration), DEFINITIVE HEALTH CARE, https://go.definitivehc.com/ (last visited Apr. 26, 2022) (collecting and publishing public information from the FDA), *and* FIRST DATABANK, https://www.fdbhealth.com/ (last visited Apr. 26, 2022) (collecting and publishing a variety of government statistics).

[301] *See* Hemel & Ouellette, *supra* note 277, at 326 ("[T]he most important question is not whether tax credits increase R&D inputs (i.e., spending), but whether tax credits increase R&D outputs (i.e., innovation).").

[302] They also may have an obligation to disclose safety risks they identify both to patients and to the doctors who treat them. *See, e.g.,* Kinetic Co. v. Medtronic, Inc., 672 F. Supp. 2d 933, 943 (D. Minn. 2009) (noting that once the hospital and physicians became aware of a risk posed by a device, they had an obligation to replace the product to avoid further injury caused by manufacturer). Pharmaceutical companies also have duties to disclose information, which can result in a purposeful failure to generate it. *See* Daniel R. Cahoy, *Medical Product Information Incentives and the Transparency Paradox*, 82 IND. L.J. 623, 628–29 (2007) (describing ex ante and ex post incentives to produce and disclose information).

[303] *See* Hemel and Ouellette, *supra* note 277, at 364–66 (noting "there is no evidence to support the claim that the administrative and compliance costs associated with R&D tax incentives are any greater than those associated with other innovative policy tools").

Simon: Off-Label Innovations

efficacy, as well as the *unknown* (or now well-known) risks, of the thousands of off-label uses.[304] The private market will. Second, this makes the tax credit efficient from another perspective: providers are likely to know their competences and capacities better than the government. Each provider can assess the value of research that qualifies for the tax credit. Providers with the best capabilities—those that have the infrastructure and know-how to conduct this research—are the most likely to avail themselves of the tax credit.[305]

None of this is meant to suggest that (non-refundable) tax credits should be preferred over grants or other subsidies in every case. Grants and subsidies have their own advantages, including an ability to shape research in a more nuanced and directed way. Grants (or refundable tax credits) also may provide a greater incentive for for-profit providers than for tax-exempt and not-for-profit providers. Not-for-profit hospitals, for example, may derive little or no benefit from a non-refundable tax credit because they have no tax liability.[306] In such cases, grants may be a more effective means for inducing providers to engage in clinical trials despite their higher administration costs.

Tax credits, though, do offer some unique advantages for for-profit providers that seek to engage in large-scale information generation efforts. And they have a proven record of inducing some R&D activity in the pharmaceutical space.[307] Given that nearly half of all physicians work for small, for-profit providers (small practices or as solo practitioners), it's also worth exploring how tax incentives might induce them to engage in observational studies and pragmatic clinical trials. Regardless of whether tax incentives are aimed at large providers, small providers, or both, they must be responsive to the financial pressures and structures of the providers that they aim to influence. Further research into the financial

---

[304] In some cases, risks will be known based on existing research.

[305] Because of this, the tax credit may not be as effective as a direct subsidy, which might entice even the uninitiated providers to seek payment. Alternatively, a tax credit could be structured on a sliding scale designed to provide the greatest benefit (e.g., refundable tax credits) to those least likely to utilize the credit because of resource limitations. *See* Johnson, *supra* note 95, at 98 (noting that larger academic medical centers may be able to outpace smaller ones because they can build in bigger margins to grants and research activities).

[306] *See* 26 U.S.C. § 501(c)(3) (exempting nonprofit organizations from taxes if they meet certain requirements).

[307] *See supra* notes 277, 281.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

778              *GEORGIA LAW REVIEW*              [Vol. 56:701

structure and compensation models of these providers is therefore needed before recommending specific tax incentives.

### E. MODIFIED MARKET EXCLUSIVITY, ROYALTIES, AND SUA SPONTE LABEL EXPANSIONS

Push incentives, discussed above, are the most natural fit because providers aren't structured to take advantage of the traditional pull incentives, such as regulatory exclusivity and patent law. But it may be possible to harness a version of regulatory exclusivity to stimulate more research. Doing so, however, would require changes to how the FDA approves supplemental indications.[308]

Currently drug approval—both for a new drug (which requires an NDA) and a new use (which requires an sNDA)—requires filing an application.[309] While it is conceivable that multiple providers might collaborate in research necessary to obtain FDA approval, they have little financial incentive to do so. FDA approval, of course, is beneficial because it signals a use's safety and efficacy. This is good for patients and physicians. Medicare uses this signal for payment decisions, reimbursing for almost all approved uses of approved drugs.[310] This is good for drug companies. For new uses, FDA approval entails regulatory (data) exclusivity.[311] This could be

---

[308] Most literature on off-label uses assumes that the proper endpoint for research is FDA approval. *See, e.g.*, Dr. Bobbie Ann Mount, *in* NCATS Meeting, *supra* note 30, at 10 ("In an ideal world, we would like to solve the problems that exist between somebody coming up with a new idea for a therapeutic indication pair and actually getting that indication on a drug label."). It is not entirely clear that this is necessary or even desirable. Given the existing profile of many off-label uses, the FDA review may not be necessary for determining whether a drug is safe and effective. Or, if it is, it may be better to off-load that process to a private entity already doing this work. *See* Simon, *Off-Label Information*, *supra* note 67, at 19. *See* Kevin W. Su, Cary P. Gross, Nicholas S. Downing, Kerin B. Adelson & Joseph S. Ross, *Cancer Therapeutic Clinical Trials Supporting FDA Approval and Compendia Inclusion*, 9 AM. J. PHARM. BENEFITS 122, 127–28 (2017) (noting that evidentiary standards that compendia used for addition of off-label uses in cancer matched the one used by the FDA to approve supplemental indications).

[309] A drug sponsor may file either an NDA or an sNDA for a new use of a previously approved NDA. *See* 21 C.F.R. § 314.71 (2020).

[310] *See* 42 U.S.C. § 1395w-104(b)(3)(G)(iv) (Medicare Part D); Rachel E. Sachs, *Delinking Reimbursement*, 102 MINN. L. REV. 2307, 2314–15 (2018) (discussing Medicare Part B).

[311] *See supra* note 140.

good for drug companies but is of little use to providers because they usually have no ownership interest in the relevant drug (company).

One way to nudge providers to file applications is by modifying regulatory exclusivity. Instead of offering providers regulatory (data) exclusivity, which has little economic value, the government can provide them with a small royalty payment if their research is used to support an approved new use. In the same way a lottery attracts a large volume of players that are guaranteed to lose, this system might induce providers to (conduct and) publish their studies even when the chance of winning, and the amount to be won, is minute. Unlike a lottery, though, winners are paid, in part, for the quality of their efforts, not merely for their payment to play.

Payouts could be made according to an endless variety of formulae. One might calculate a fixed royalty per new use approved based on a percentage of the retail price of the drug. Another might leave the rate up to an administrative tribunal at the FDA or some other administrative agency within the department of Health and Human Services (the HHS), as occurs in other areas of law.[312] Whatever the approach, the rate should be small enough to only marginally increase drug prices and large enough to provide a modest inducement to providers to engage in research.[313] Royalties would be paid to providers only if they make *all* of their data publicly accessible.[314] A provider who seeks to participate in the royalty scheme, in other words, must make all of its data available to the public.

Providers would be entitled to an amount proportionate to their research contribution used for FDA approval. More robust studies would entitle providers who conducted them to a greater share of the royalty than providers who conducted smaller, uncontrolled

---

[312] If a fixed royalty rate increases investment in more profitable uses at the expense of less profitable ones, the royalty-setting entity should have the flexibility to alter royalty rates to change incentives. One possibility is to have the GAO evaluate royalty effects and make recommendations to the FDA at regular intervals (e.g., every five years). Some government agencies already do this. *See* 17 U.S.C. § 801 (explaining that the copyright royalty board sets rates and reasonable terms for royalty payments).

[313] Another possibility is to direct all royalties to a fund that is managed by a board or trustee on behalf of all participating providers. The board or trustee would make decisions about how to allocate the funds it receives from royalty payments.

[314] Universal formatting issues are less of a problem here because standard protocols on clinical trials exist. *See supra* note 248 and accompanying text.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

780                 *GEORGIA LAW REVIEW*                [Vol. 56:701

studies.[315] The FDA or the CMS could leverage existing evidence-rating systems to evaluate the quality of any given study and assign it weight for purposes of the royalty payment.[316]

A royalty might encourage providers to collaboratively research new uses and file NDAs for them. But it's not clear that the returns will be sufficiently high to encourage collaboration because the FDA approval process is expensive and because it will be difficult to exclude others from the new uses, reducing or eliminating the ability to charge supracompetitive prices. One alternative approach would be to use this incentive system but change the drug approval process. Rather than require applications for every new use, the FDA could consider and expand drug uses either by petition or sua sponte.

A petition approach, which the FDA uses for a variety of matters including drug approval,[317] would allow interested entities to lobby the FDA to consider expanding a drug's labeling.[318] Upon reaching some threshold—a certain quality of information or a certain number of petitions, for example—the FDA could voluntarily initiate a review for the expanded indication. The FDA would then have either the option or the obligation (if some threshold was met) to consider expanding the labeling to cover the new use in question. It could then solicit further comments and information from interested parties and conduct its own evaluation of existing evidence.

---

[315] This could be implemented in various ways. One method would be to use the studies cited on the approved drug labeling. Another might be for the FDA to use internal scoring systems to quantify what role that the study played in approval of the new use.

[316] For some general background on different rating systems, see Simon, *Off-Label Information*, *supra* note 67, at 27–29.

[317] Regulations currently allow citizens to petition the FDA to take "administrative action." *See* 21 C.F.R. §§ 10.25, 10.30 (2020). A similar process could be used for providers seeking modified market exclusivity rights. The definition is broad enough to include label expansions. *See id.* § 10.3 ("Administrative action includes every act, including the refusal or failure to act, involved in the administration of any law by the Commissioner . . . ."); *see also* Michael A. Carrier & Daryl Wander, *Citizen Petitions: An Empirical Study*, 34 CARDOZO L. REV. 249, 259–63 (2012) (explaining citizen petitions and how companies can use them in anticompetitive ways by, for example, delaying generic and brand-name competitor entry).

[318] Citizens can file a petition specifically seeking to delay an ANDA, a 502(b)(2) drug application (a "paper" NDA), or NDA. *See* 21 C.F.R. § 10.31(a)(1). For example, petitions can be used to request withdrawal of guidance documents. *See* 21 C.F.R. § 10.115(f)(4).

Alternatively, the FDA could consider labeling updates sua sponte, something it has begun doing with certain cancer drugs,[319] and something it could do for other drugs under recently introduced legislation.[320] The FDA's current program could serve as a test case for a future in which the FDA "approves" new uses on its own initiative.[321] In this universe, the FDA would need to continually evaluate data on off-label uses as information becomes available. This approach would make good sense if other incentives designed to increase data about off-label uses—like those discussed above—were successful.[322] If chosen, this path would require a more systematic approach to evaluating new efficacy indications, including a detailed framework for initiating a review, reviewing, and eventually expanding indications.

One version of this could include an FDA-initiated notice-and-comment period. During this period, the FDA would solicit

---

[319] Currently the FDA is updating labeling for oncology drugs in a somewhat related way through Project Renewal. *See Project Renewal*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/about-fda/oncology-center-excellence/project-renewal (last visited Apr. 26, 2022). The details of this project are quite scanty, but there are two goals. The first is to update labeling that is not consistent with the current standards in 42 C.F.R. § 201.56. The second is to assess labeling for drugs with "significant off-label use in" oncology. *See Project Renewal FAQ*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/about-fda/project-renewal/project-renewal-faq (last visited Apr. 26, 2021).

[320] Representatives Brett Guthrie and Doris O. Matsui recently introduced legislation that proposed to do something similar for previously-FDA approved drugs that had been withdrawn and were not covered by a patent or regulatory exclusivity. *See* Making Objective Drug Evidence Revisions for New Labeling Act of 2020, H.R. 5668, 116th Cong. (2d Sess. 2020).

[321] Under the Sentinel Initiative, the FDA has evaluated a number of drugs for safety concerns on its own. It also has, in limited cases, used non-traditional evidence to approve an NDA. *See* FDA RWE FRAMEWORK, *supra* note 160, at 9 ("In limited instances, FDA has accepted RWE to support drug product approvals, primarily in the setting of oncology and rare diseases."); Tony Durmowicz & Mike Pacanowski, *Novel Approach Allows Expansion of Indication for Cystic Fibrosis Drug*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/drugs/news-events-human-drugs/novel-approach-allows-expansion-indication-cystic-fibrosis-drug (last visited Apr. 26, 2022) ("To approve the indication expansion, a novel approach was used that relied on evidence from laboratory-based in vitro assay data."); Sandra Levy, *FDA Approves Expanded Indication for Amarin's Vascepa*, DRUG STORE NEWS, https://drugstorenews.com/fda-approves-expanded-indication-amarins-vascepa (last visited Apr. 26, 2022) (summarizing the FDA's approval of Amarin).

[322] When Congress enacted the 21st Century Cures Act, it provided that this kind of evidence could be used to support an NDA. *See* 21st Century Cures Act, H.R. 34, 114th Cong. (2016).

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

782                    *GEORGIA LAW REVIEW*                    [Vol. 56:701

information about the safety and efficacy of a new indication that it's considering.[323] After obtaining public comment, the FDA could issue a new label if the evidence merited an update. Another might build on the recent legislation the House of Representatives passed (the MODERN Labeling Act).[324] The legislation, while specific to a narrow set of potential new uses,[325] authorized the Secretary of HHS to identify drugs whose labels merited updating based on several criteria.[326] The Secretary could identify drugs by entering into agreements with third parties to review evidence, by soliciting public input by holding public meetings, by soliciting public comments, or by "other means, as the Secretary determines appropriate."[327]

Either approach—petition or sua sponte—would give various organizations (patient rights advocates, consumer groups, pharmaceutical companies, and providers) the ability to seek expanded indications based on safety and efficacy data. With a formal petitioning process, this is obvious. But even with no official petitioning process, various stakeholders can pressure the FDA to study expanded indications—much in the same way groups petition the FDA for compassionate use.[328] It may even incentivize providers to collaborate on observational studies and pragmatic or clinical trials so that information could be packaged to the FDA in the most persuasive and coherent format.

---

[323] For potential problems with notice-and-comment rulemaking, see for example, Richard Murphy, *Enhancing the Role of Public Interest Organizations in Rulemaking via Pre-Notice Transparency*, 47 WAKE FOREST L. REV. 681, 687–88 (2012).

[324] *See* Making Objective Drug Evidence Revisions for New Labeling Act of 2020, H.R. 5668, 116th Cong. (2d Sess. 2020) (discussing the legislation).

[325] The legislation defined "covered drug" as one with no existing patent or regulatory exclusivity protections and whose prior FDA approval had been withdrawn for reasons unrelated to safety or effectiveness. *See* Making Objective Drug Evidence Revisions for New Labeling Act of 2020, H.R. 5668, 116th Cong. § (a)(1)(A)–(B) (2d Sess. 2020).

[326] *See* Making Objective Drug Evidence Revisions for New Labeling Act of 2020, H.R. 5668, 116th Cong. § 2(a)(1)(A)–(C) (2d Sess. 2020) (defining "covered drug"); *id.* § 2(b) (authorizing HHS Secretary to identify drugs for labeling updates).

[327] *Id.* § 2(b)(1)–(2).

[328] *See* Expanded Access, *supra* note 46. Activists during the HIV/AIDS epidemic were crucial to moving the FDA toward the current expanded access paradigm. *See also* E. Nichols, *Historical Perspective – Expanding Access to Investigational Therapies for HIV Infection and AIDS*, NCBI BOOKSHELF (1991), https://www.ncbi.nlm.nih.gov/books/NBK234129/ (emphasizing the historical background of the expanded access program).

This kind of system is not without risk. One principal worry is that the system will perpetuate the shortcomings of the existing private market—namely, providers will engage in research that pays the highest return, or the quickest one.[329] This could mean investing in research in drugs most likely to obtain approval (based on previous research) or those that generate the most sales. In either case, the system would bend toward maximizing the reward rather than patient benefit.

While this is a real problem, it is not insurmountable. Royalties or payments could be structured to reflect need instead of, or in addition to, sales. Alternatively, a fixed fee—or a prize[330]—could be used to reduce some of the distortionary effects of profit-seeking that occur in the current pharmaceutical market. Prizes—rewards for achieving a goal set by the government—could also be tied to various socially desirable outcomes, such as approval of a new indication for treatment of a rare disease or of a widespread disease with limited or no treatments. The size of the prize could be determined by studying the likely social benefit from obtaining the desired information.[331]

Attention to rewards should not obscure the positive externalities of generating negative information. Providers that engage in information generation that shows a drug *is not* safe or effective have done something socially beneficial. That particular off-label use can be ruled out, saving the costs of the medication, any potential costs of adverse events, and potentially, an improved patient outcome with alternative or no treatment. To ensure that there are adequate incentives to invest in trials that may produce such information, any rewards system should account for the positive externalities of negative information. To do so, it's important that any royalty or reward system is coupled with incentives like those discussed in Sections A–C and potentially

---

[329] *See* Budish et al., *supra* note 26, at 2045–46. (noting that "corporate short-termism and fixed patent terms reinforce each other in distorting private research dollars away from long-term investments").

[330] Rachel E. Sachs, Paul B. Ginsburg & Dana P. Goldman, *Encouraging New Uses for Old Drugs*, 318 JAMA 2421, 2422 (2017) ("The government or foundations could provide prizes or financial incentives to payers, health care systems, or manufacturers for conducting new-use research.").

[331] *See* Sachs et al., *supra* note 330, at 2422 ("The reward amount could be tied to a useful clinical and policy end point, such as reduced nursing home admissions.").

784                     *GEORGIA LAW REVIEW*                [Vol. 56:701

others not yet known. This is particularly important for providers because they, along with payers, are one of the few entities that has a direct interest—improving patient outcomes[332]—in producing negative information about drugs that might be harmful or useless.[333]

## V. Conclusion

This Article has argued that two of medicine's pressing problems—doctors prescribing approved drugs for unapproved uses and firms lacking incentives to develop new uses of existing drugs—often arise from the same informational deficit: a lack of safety and efficacy information about the unapproved uses of approved drugs, so-called off-label uses. It pointed out that all new uses of approved drugs are off-label uses, and some off-label uses are new. Safety and efficacy information about new uses, in other words, will always be safety and efficacy information about off-label uses. And some information about off-label uses will be information about new uses.

This observation revealed a new possible solution to both of these tricky Problems: incentivize those entities that already produce, or have the capability to produce, this information to collect, organize, and disseminate it. Healthcare providers, it was noted, not only have this capability but also have a variety of institutional competencies and advantages that make them a rich potential source of the needed information. To show how these provider-oriented inducements might function, this Article adapted four incentives from the existing innovation literature: two subsidies, a tax credit, and a royalty or a prize. Each of these examples

---

[332] Providers may have countervailing financial interests if they are compensated based on (service) volume. More prescriptions may lead to larger payments. And more adverse events from off-label prescriptions, for example, may increase the overall profit margin of a provider. But providers also have ethical and legal obligations when they treat patients that limit the influence of these potentially socially undesirable economic incentives. *See* Frank A. Riddick, Jr., *The Code of Medical Ethics of the American Medical Association*, 5 OCHSNER J. 6, 5–7 (2003). Doctors certainly don't set out to cause adverse events, and the primary aim of treatment isn't to inflate provider costs.

[333] Eisenberg & Price, *supra* note 44, at 5 ("Studying the consequences of past clinical care to improve healthcare practice is an important research frontier with the potential to yield valuable innovations.").

illustrated that there are ways to leverage provider capabilities to help solve both of these important problems.

What this Article did not do—and what future work should do—was explore all possible incentives that could be applied to providers and their advantages and disadvantages. This would have required a more detailed analysis of providers and their current institutional operations and infrastructure. Prizes, for example, might be useful to generate data on off-label uses—even if those data are negative. But a particular type of prize may work well for large but not small providers, or vice versa, because of economic and resource constraints or specialization. Beyond the specific setting in which prizes may be used, as an incentive they are less effective when the social value of the desired activity is difficult to estimate. Similar analysis applies to non-refundable tax credits. While they work well for pharmaceutical companies, they may not work for providers like hospitals, many of which are non-profit entities. In such cases, a direct cash payment—a grant or refundable tax credit—might do more to induce providers to maintain systems that collect, organize, and disseminate information about off-label uses, particularly if grants are made more than once. In other words, each type of incentive has its own benefits and drawbacks that need to be assessed relative to the social problems they are designed to address and the entities to which they apply. These issues, and many others, should be addressed in future research.

Georgia Law Review, Vol. 56, No. 2 [2022], Art. 5

786          *GEORGIA LAW REVIEW*          [Vol. 56:701

No. 23-2366

# In the
# United States Court of Appeals
## for the Seventh Circuit

K.C., et al.,

*Plaintiffs-Appellees,*

v.

INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING
BOARD OF INDIANA, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division, No. 1:23-cv-00595-JPH-KMB.
The Honorable **James P. Hanlon**, Judge Presiding.

## BRIEF OF *AMICI CURIAE* BIOMEDICAL ETHICS AND PUBLIC HEALTH SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

KATHLEEN HARTNETT
JULIE VEROFF
ZOË HELSTROM
COOLEY LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111-4004
(415) 693-2000

ELIZABETH F. REINHARDT
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 842-7800

KATELYN KANG
(*Counsel of Record*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2103
(212) 479-6000

**Exhibit 0035**

*Attorneys for Amici Curiae*

 COUNSEL PRESS · (866) 703-9373                    PRINTED ON RECYCLED PAPER

Case: 23-2366      Document: 66      Filed: 09/27/2023      Pages: 60

Save As      Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian,

Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooley LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: *Katelyn Kang*      Date: 9/25/2023

Attorney's Printed Name: Katelyn Kang

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✔    No ☐

Address: 55 Hudson Yards New York, NY 10001-2103

Phone Number: (212) 479-6000      Fax Number: (212) 479-6275

E-Mail Address: kkang@cooley.com

rev. 12/19 AK

238

# ADDENDUM A

## List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law & Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

| Save As | Clear Form |
|---|---|

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian,

Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooley LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

   N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: *Elizabeth Reinhardt*      Date: 9/25/2023

Attorney's Printed Name:  Elizabeth Reinhardt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✔]

Address:  1299 Pennsylvania Avenue, NW Washington, DC 20004-2400

Phone Number:(202) 842-7800      Fax Number: (202) 842-7899

E-Mail Address: ereinhardt@cooley.com

rev. 12/19 AK

## ADDENDUM A

<u>List of *Amici Curiae*</u>

*Amici* include the following individuals, whose affiliations are provided for

identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty
Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law &
Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

Case: 23-2366     Document: 66     Filed: 09/27/2023     Pages: 60

**Save As**     **Clear Form**

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
  Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian,

  Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, see Addendum A for additional parties.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
  Cooley LLP

(3) If the party, amicus or intervenor is a corporation:

  i) Identify all its parent corporations, if any; and

   N/A

  ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: *Julie Veroff*  Date: 9/25/2023

Attorney's Printed Name: Julie Veroff

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ] No [✔]

Address: 3 Embarcadero Center, 20th Floor San Francisco, California 94111-4004

Phone Number: (415) 693-2000  Fax Number: (415) 693-2222

E-Mail Address: jveroff@cooley.com

rev. 12/19 AK

## ADDENDUM A

<u>List of *Amici Curiae*</u>

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

247

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law &
Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian,

Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooley LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature:  *Kathleen Hartnett*    Date: 9/25/2023

Attorney's Printed Name:  Kathleen Hartnett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [✔]

Address:  3 Embarcadero Center, 20th Floor San Francisco, California 94111-4004

Phone Number: (415) 693-2000    Fax Number: (415) 693-2222

E-Mail Address: khartnett@cooley.com

rev. 12/19 AK

## ADDENDUM A

### List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty
Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law &
Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2366

Short Caption: K.C., et al. v. Individual Members of the Medical Licensing Board of Indiana, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Lisa C. Ikemoto, Yvonne Lindgren, Maya Manian,

Michelle Oberman, Rachel Rebouche, Nadia N. Sawicki, Michael R. Ulrich, *see* Addendum A for additional parties.

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooley LLP

(3)   If the party, amicus or intervenor is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature:  *Zoë Helstrom*    Date:  9/25/2023

Attorney's Printed Name:  Zoë Helstrom

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✔]

Address:  3 Embarcadero Center, 20th Floor San Francisco, California 94111-4004

Phone Number:  (415) 693-2000    Fax Number:  (415) 693-2222

E-Mail Address: zhelstrom@cooley.com

rev. 12/19 AK

## ADDENDUM A

### List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for

identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty
Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Dabney P. Evans**
Associate Professor of Public Health
Emory University

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Elizabeth Kukura**
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

**Yvonne Lindgren**
Associate Professor of Law
University of Missouri – Kansas City School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Nadia N. Sawicki**
Georgia Reithal Professor of Law and Co-Director, Beazley Institute for Health Law &
Policy
Loyola University Chicago School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law

**Ruqaiijah Yearby**
Kara J. Trott Professor in Health Law
The Ohio State University, Moritz College of Law

**TABLE OF CONTENTS**

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ..................................................................................... ii

STATEMENT OF INTEREST ................................................................................. 1

INTRODUCTION ................................................................................................... 1

I.  THE HEALTH CARE BAN REFLECTS A FUNDAMENTAL MISUNDERSTANDING OF HOW SCIENTIFIC KNOWLEDGE AND MEDICAL STANDARDS ARE GENERATED. ....................................................... 3

    A.  The Medical Care Targeted by the Health Care Ban Is Not "Experimental." ............................................................................................. 4

    B.  Medical Knowledge Is Credibly Generated Through Multiple Methods, Not Just Randomized Control Trials and "Long-Term" Studies. ...................................................................................................... 5

    C.  Off-Label Drug Use Is Legal, Common, and, When Medically Indicated, Safe and in Service of a Patient's Best Interest. .......................... 11

II.  THE HEALTH CARE BAN CONTRAVENES KEY TENETS OF BIOMEDICAL ETHICS. .............................................................................. 16

    A.  The Health Care Ban Forces Providers to Disregard Patients' Autonomy. .................................................................................................. 16

    B.  The Health Care Ban Forces Providers to Violate Their Duty of Beneficence. ................................................................................................ 21

        1.  The Health Care Ban's Treatment Prohibition Forces Providers to Violate Their Duty of Beneficence. ............................. 23

        2.  The Health Care Ban's Referrals Prohibition Forces Providers to Violate Their Duty of Beneficence and Undermines Public Health. ................................................................. 24

    C.  The Health Care Ban Forces Providers to Violate Their Duty of Justice. ...................................................................................................... 27

CONCLUSION .................................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) .................................................................................................26

*Brandt v. Rutledge,*
    47 F.4th 661 (8th Cir. 2022) ......................................................................................8

*Brandt v. Rutledge,*
    No. 21-2875 (8th Cir. Jan. 19, 2022) ....................................................................3, 23

*Buckman Co. v. Pls.' Legal Comm.,*
    531 U.S. 341 (2001) ...........................................................................................12, 13

*Conant v. Walters,*
    309 F.3d 629 (9th Cir. 2002) ...................................................................................25

*Matter of Lawrance,*
    579 N.E.2d 32 (Ind. 1991) ......................................................................................16

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
    475 U.S. 1 (1986) ....................................................................................................26

*Planned Parenthood Cincinnati Region v. Taft,*
    444 F.3d 502 (6th Cir. 2006) .............................................................................11, 12

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)................................................................................................24

*Wollschlaeger v. Governor, Fla.,*
    848 F.3d 1293 (11th Cir. 2017) ..............................................................................25

-ii-

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Statutes**

Ind. Code § 25-1-20-4(b)(3) ..................................................................................13

Ind. Code § 25-1-22-13(c) ....................................................................................21

Ind. Code § 25-22.5-1-2.1 ....................................................................................17

Ind. Code § 27-8-20-7 ..........................................................................................13

Ind. Code § 34-18-12 ............................................................................................16

S.E.A. 480 § 13(b) ................................................................................................24

**Other Authorities**

Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment* (Sept. 18, 2017) ...................20

Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015)..........................................................12

Am. Med. Ass'n, *Code of Medical Ethics Opinion 1.1.1, Patient-Physician
    Relationships*.................................................................................................22

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.1.1, Informed Consent* ............................20

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.2.1, Pediatric Decision
    Making*........................................................................................................18

Am. Soc'y of Clinical Oncology, *Recent Developments in Medicare Coverage
    of Off-Label Cancer Therapies*, 5 J. Oncology Practice (2009) .............................................13

Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment:
    Coverage of off-label drug indications*, 24 J. Clinical Oncology (2006)...............................13

Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical
    Considerations with Transgender Children and Youth in Family Therapy*, 23
    J. of Fam. Psychotherapy 296 (2012)...................................................................20

-iii-

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Anthony J. Hatswell et al., *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016) ........................................................................9

Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141 (1987) .........................................................................7

Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017) ....................................18, 27

Beth A. Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J. Bioethical Inquiry 151 (2021).........................................................................................................19

Br. of Am. Acad. of Pediatrics, et al. as *Amici Curiae* Supporting Plaintiffs, *Brandt v. Rutledge*, No. 21-2875 (8th Cir. Jan. 25, 2022) .................................3, 23

Brendan J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023) .................................................................7, 8

Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002 (2014).........................................6

Christopher M. Wittich et al., *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982 (2012) ................................... *passim*

Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs* 4 (Feb. 23, 2021) ..............................12

Denise Thomson et al., *Controlled Trials in Children: Quantity, methodological quality and descriptive characteristics of Pediatric Controlled Trials published 1948-2006*, 5 PLoS One (2010) ...............................................................6

Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211 (2008) ...........................................................6

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8
    Med., Health Care & Philos. 307 (2005) ..............................................................8

*Good medical practice: Duties of a doctor registered with the General Medical
    Council*, Gen. Med. Council (2001) ....................................................................22

H. Christine Allen et al., *Off-Label Medication Use in Children, More Common
    Than We Think: A Systematic Review of the Literature*, 111 J. Okla State
    Med. Assoc. 776 (2018) ....................................................................................14

Holger Schünemann et al. (eds.), *Grading of Recommend., Assess., Dev. &
    Eval. Handbook* 14 (2013) ...................................................................................9

Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*,
    64(4) J. Clinical Epidemiol. 401 (2011) ..........................................................9, 10

Human Rights Watch, *"I Want to Be Like Nature Made Me": Medically
    Unnecessary Surgeries on Intersex Children in the US* (2017)..............................21

J. R. Vevaina et al., *Issues in biomedical ethics*, 39 Disease-a-Month 869
    (1993).................................................................................................................1

Jack L. Turban et al., *Access to gender-affirming hormones during adolescence
    and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2
    (2022)..................................................................................................................8

James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed
    Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71
    (1998)..............................................................................................................14, 15

Jessica Kremen et al., *Addressing Legislation That Restrict Access to Care for
    Transgender Youth*, 147 Pediatric Perspectives (2021)..................................18, 19

John J. Smith, *Physician Modification of Legally Marketed Medical Devices:
    Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55
    Food & Drug L.J. 251 (2000)..............................................................................13

José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and
    Complete Integration*, 15 BMC Med. Res. Methodol. (2015)................................4

-v-

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Katrien Oude Rengerink et al., *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015) ...............................................................................................................6

Katherine L. Kraschel et al., *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022)...............................................................................................................8, 28

Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017) ...................................................................................................3

Kristina R. Olson et al., *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (2016)...............................................................................................................23

Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians Ethics Manual* 170, Annals of Internal Medicine 86 (7th ed. 2019) ........................ *passim*

Luisa Kcomt et al., *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608) SSM - Population Health 1 (2020) ...................................28

Meredithe McNamara et al., *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1 (2022) ...................................................................................................10

Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978)........................................................................4

Natalie S. Blencowe et al., *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015).............................................7

Norman P. Spack et al., *Children and adolescents with gender identity disorder referred to a pediatric medical center*, 129 Pediatrics (2012).................................23

Off-Label Prescription of Medications for Treatment and Prevention of COVID-19, Op. Ind. Att'y Gen. 2022-1 (Feb. 23, 2022)........................................... *passim*

Parth Shah et al., *Informed Consent* (2021) ...............................................................17

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

Phillip E. Wagner et al., 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans\* Healthcare Support Seeking* 51 (Oct. 2016)....................................28

Rainer S. Beck et al., *Physician-Patient Communication in the Primary Care Office: A Systematic Review*, 15 J. Am. Bd. Fam. Pract. (2002) .........................................25

Richard E. Redding, *Children's Competence to Provide Informed Consent for Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695 (1993)...........................................19

Robert J. Ligthelm et al., *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007) .................................................................10

Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, Univ. of Ill. L. Rev. 939 (2007) .............................................26

Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* (8th ed. 2019)....................................................................................................................... *passim*

U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018) ........................................................................................................................................4

U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017)....................................................................................11

William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014) .........................................................................................................................15

World Medical Association, *Declaration of Geneva* (1948)....................................................22

-vii-

## STATEMENT OF INTEREST[1]

*Amici curiae* listed in the Appendix are professors of law, medicine, and public health who teach and write about biomedical ethics and health-related rights and discrimination.  Biomedical ethics, sometimes referred to as bioethics, is "the discipline of ethics dealing with moral problems arising in the practice of medicine and the pursuit of biomedical research." J. R. Vevaina et al., *Issues in biomedical ethics*, 39 Disease-a-Month 869 (1993), https://pubmed.ncbi.nlm.nih.gov/8243220.  *Amici* have a strong interest in ensuring that principles of biomedical ethics are accurately described and properly applied.  They submit this brief to explain how Indiana Senate Enrolled Act 480 is inconsistent with foundational principles of biomedical ethics.

## INTRODUCTION

Indiana Senate Enrolled Act 480 (the "Health Care Ban" or "Ban") is an extreme and unjustified intrusion into the medical profession.  The law categorically prohibits health care professionals from providing gender-affirming care to their transgender minor patients with gender dysphoria, even when the patient, the patient's parent(s), and the patient's medical providers all agree that the care is medically appropriate and in the patient's best interest.  Although allegedly promoting medical ethics, the Health Care Ban in fact contravenes fundamental and well-established principles of biomedical ethics and

---

[1] *Amici* certify that no person or entity, other than *amici curiae*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.  The parties have consented to the filing of this brief.

1

reflects a misunderstanding of how medical knowledge is generated, creating serious, harmful consequences for individual patients and public health more generally.

Core principles of biomedical ethics include respect for autonomy, beneficence, and justice. The Health Care Ban eviscerates each of these principles. The Ban deprives minor patients of their ability to decide whether to receive medically necessary and appropriate treatment to which they and their parents have given informed consent (autonomy). The Ban forces providers to deny their patients care that is known to alleviate suffering, and thus to abandon their patients to serious physical and mental harm (beneficence). And the Ban compels providers to deny care that only patients who are transgender need, thereby exacerbating stigma and inequity and damaging trust in the medical profession (justice).

Indiana endeavors to rationalize these harms by suggesting that gender-affirming care is unsound or experimental, including by reference to arguments about randomized control trials and off-label use of prescription drugs. That position is unfounded and badly misunderstands how medical knowledge is credibly generated, particularly in the context of pediatric care. Randomized control trials are not, and have never been, requisite for medical care to be considered appropriate, and in fact are ill-suited for many types of treatment. And off-label use is legal, commonplace, and often necessary to serve a patient's best interest. Far from being "experimental," the gender-affirming care prohibited by the Health Care Ban is developed through rigorous and appropriate

2

methods and is recommended by every major medical association in the United States.

In sum, by singling out and banning gender-affirming care for transgender minors, the Health Care Ban undermines biomedical ethics, science, and public health, without any regard for the grave harm that will come from denying vulnerable patients critical health care. This Court should affirm the preliminary injunctions granted below.

## I.   THE HEALTH CARE BAN REFLECTS A FUNDAMENTAL MISUNDERSTANDING OF HOW SCIENTIFIC KNOWLEDGE AND MEDICAL STANDARDS ARE GENERATED.

The gender-affirming care prohibited by the Health Care Ban is developed through rigorous and appropriate methods and is recommended by every major medical association in the United States. Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017); Br. of Am. Acad. of Pediatrics, et al. as *Amici Curiae* Supporting Plaintiffs at 8-22, *Brandt v. Rutledge*, No. 21-2875 (8th Cir. Jan. 25, 2022) ("AAP Br."). Nonetheless, Indiana often wrongly characterizes gender-affirming care as "experimental" and not evidence-based, pointing in support of that erroneous view to the lack of randomized control trials documenting the efficacy of the prohibited treatment and the fact that using puberty blockers and hormone therapy for gender-affirming care is not approved by the U.S. Food and Drug Administration. (Def.-Appellants' Opening Br. ("OB") 18, 20, 36, 51.) These arguments reflect a fundamental misunderstanding of medical practice and the ways medical knowledge and treatment guidelines are generated, particularly in the context of pediatric care. Medical providers are not and

have never been restricted to providing only those treatments that have been generated via randomized control trial and received FDA approval for the particular indication. Indeed, as explained herein, such restrictions would be impractical and unethical.

**A.      The Medical Care Targeted by the Health Care Ban Is Not "Experimental."**

Although Indiana seeks to justify its ban on gender-affirming care for minors as preventing "experimental" treatment, Indiana wrongly conflates clinical care with clinical research and fails to engage with the ethical standards attendant to each.

Medical care delivered by a clinician to a patient and clinical research have distinct purposes and processes. *See, e.g.*, Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978) (discussing the importance of distinguishing between research and clinical practice); U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018), https://www.fda.gov/patients/clinical-trials-what-patients-need-know/clinical-research-versus-medical-treatment (describing differences between clinical research and medical treatment in terms of intent, intended benefit, funding, timeframe, and other factors). In the clinical care setting, the provider's aim is to improve a patient's health, and the provider is duty bound to act in that patient's best interest. By contrast, the aim of a research study is to generate knowledge useful for *future* patients. *See* José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and Complete Integration*, 15 BMC Med. Res. Methodol. (2015),

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4323129/.  A research study's protocols

must be ethically designed and administered, but there is no obligation to do what is in

each participant's best interest.  Importantly, receiving gender-affirming care does not

automatically render a patient a subject of a research study (and certainly not an

"experimental" one unmoored from ethical standards); gender-affirming care is known

to advance the individual patient's best interest and is provided as clinical care for that

purpose.

> **B.    Medical Knowledge Is Credibly Generated Through Multiple Methods,
> Not Just Randomized Control Trials and "Long-Term" Studies.**

In addition to conflating research and treatment, opponents of gender-affirming

care often misunderstand how medical knowledge is credibly and rigorously generated

in suggesting that the lack of randomized control trials is dispositive.  There is no one

method used to generate medical knowledge, and no one method is considered requisite

to a treatment being deemed medically appropriate.  Rather, medical knowledge and

practice are informed by a range of research and clinical inputs.

A randomized control trial—where some participants are randomly assigned to a

treatment group and others are randomly assigned to a control group—is one of many

types of credible research designs used to evaluate a medical intervention.  Medical

interventions also can be and often are evaluated through observational studies, which

include cross-sectional studies (based on data collected from a single point in time), and

longitudinal studies (based on data collected from particular individuals over time).  *See,*

5

*e.g.*, Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211–217 (2008), https://www.sciencedirect.com/science/article/pii/S1936879808001702. In addition, randomized *clinical* trials, which compare different established interventions to one another, may be used to inform medical treatment. For example, a randomized clinical trial has been used to evaluate sex hormone treatment for gender dysphoria, comparing different, established pharmacological treatments to one another. *See* Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002–3011 (2014), https://www.jsm.jsexmed.org/article/S1743-6095(15)30626-3/fulltext.

Study methods other than randomized control trials may be preferable in some circumstances, given that randomized control trials are not always feasible, appropriate, or the most reliable way to evaluate a medical intervention. For instance, randomized control trials are rarely used for interventions focused on children or pregnant people, or for surgical interventions. *See, e.g.*, Denise Thomson et al., *Controlled Trials in Children: Quantity, methodological quality and descriptive characteristics of Pediatric Controlled Trials published 1948–2006*, 5 PLoS One (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2948021/; Katrien Oude Rengerink et al., *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015),

6

https://bmcpregnancychildbirth.biomedcentral.com/articles/10.1186/s12884-015-0641-x;

Natalie S. Blencowe et al., *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015), https://doi.org/10.1186/s13063-015-0918-4. Randomized control trials also are only ethical when there is clinical "equipoise," which means they are only appropriate when there is genuine uncertainty about whether the intervention will be more effective than the control. *See* Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141–145 (1987), https://www.nejm.org/doi/full/10.1056/NEJM198707163170304. That is because it is unethical to knowingly expose participants to an inferior intervention or control. For example, in acknowledging limitations to its analysis, a 2023 open-label randomized clinical trial assessing the effect of testosterone therapy compared with no treatment on gender dysphoria, depression, and suicidality explained that the trial was limited to three months in order to insure that "participants would not be disadvantaged by waiting longer than standard of care waiting times of 3 months for an initial consultation." Brendan J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2809058 ("Nolan").

This principle plainly applies to the banned treatments for gender dysphoria: performing randomized, placebo-controlled trials on the efficacy of that treatment would

be unethical, because the prevailing view among the medical community is that for patients who need it, hormone therapy is superior to a lack of pharmacological treatment. *See* Nolan.

Likewise, any critique of the lack of "long-term studies" on the safety and efficacy of gender-affirming care, particularly for minors, is misplaced, as there are many such studies.[2] And in any event, longitudinal studies need not last for some unspecified "long-term" period to be reliable, nor are such studies always the most ethically and legally appropriate. Often, other reliable and trustworthy methods are preferable. For example, before conducting longitudinal studies involving children, researchers must consider a child's privacy and autonomy all while maintaining data integrity—a sometimes difficult balancing act that can be avoided by using an alternative study design. *See, e.g.*, Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8 Med., Health Care & Philos. 307 (2005), https://doi.org/10.1007/s11019-005-0978-4.

---

[2] *See, e.g.*, Jack L. Turban et al., *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2 (2022), https://doi.org/10.1371/journal.pone.0261039 (collecting studies); Katherine L. Kraschel et al., *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022) ("Kraschel") https://doi.org/10.1016/j.xcrm.2022.100719 ("Over a dozen studies have collectively linked [gender affirming care] to improvements in depression, anxiety, and suicidality."); *see also Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) ("According to surveys of the research on hormone treatment for adolescents done by the British National Institute for Health & Care Excellence, several studies have shown statistically significant positive effects of hormone treatment on the mental health, suicidality, and quality of life of adolescents with gender dysphoria. None has shown negative effects.").

8

Additionally, any argument that the Health Care Ban is justified because gender-affirming care for minors is supported only by "low-quality" evidence, is based on an erroneous understanding of what it means for evidence to be graded as "low-quality." Under the GRADE system, which is often used for presenting summaries of evidence and making clinical practice recommendations, the level of quality ascribed to evidence is based on the type of research methodology used— evidence generated via a randomized control trial is typically labeled "high quality" and evidence generated via an observational study is typically labeled "low quality."  Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*, 64(4) J. Clinical Epidemiol. 401 (2011) ("Balshem"); Holger Schünemann et al. (eds.), *Grading of Recommend., Assess., Dev. & Eval. Handbook* 14 (2013) ("GRADE Handbook").  Randomized trials with limitations such as inconsistent results or publication bias will go down in quality, and observational studies with a dose-response gradient (relationship between a stimulus and a response) or large magnitude of effect will go up in quality.  GRADE Handbook at 13.

These "high quality" and "low quality" labels under GRADE thus are descriptive of the underlying method, but they do not necessarily reflect the reliability of the evidence generated.[3]  As noted, observational evidence is sometimes favored for both

---

[3] Many treatments for other conditions, such as drugs for cancer and hematologic disorders, for example, are in widely accepted use without having been studied through randomized, controlled clinical trials.  *See* Anthony J. Hatswell, *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016), https://pubmed.ncbi.nlm.nih.gov/27363818/.

ethical and practical reasons.  And with gender-affirming care, randomized control trials are not appropriate for the reasons described above.  Because randomized control trials are often inappropriate or infeasible, research that falls in the technical category of "low quality" can still be reliable and valuable when it comes to clinical practice.  *See* Meredithe McNamara et al., *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1, 15 (2022) ("McNamara").  Indeed, low-quality evidence may be sufficient to justify a strong recommendation for clinical care.  GRADE Handbook at 5; Balshem at 402-04 ("A particular level of quality does not imply a particular strength of recommendation.  Sometimes, low or very low quality evidence can lead to a strong recommendation.").  Were it otherwise, whole swaths of modern care for which randomized control trials are inappropriate for ethical and/or practical reasons would be called into question.  *See* Robert J. Ligthelm et al., *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007), https://pubmed.ncbi.nlm.nih.gov/18036390/ (noting that observational evidence is sometimes favored for both ethical and practical reasons).  For example, despite their "low quality" technical category, observational studies have been used in forming the Cholesterol Guidelines of the American College of Cardiology and the American Heart Association.  *See* McNamara at 16.  The same is true for a range of other treatments, from gall bladder surgery to the determination that aspirin is not appropriate to treat fevers in children.  *See id.* at 14, 16.

10

**C.      Off-Label Drug Use Is Legal, Common, and, When Medically Indicated, Safe and in Service of a Patient's Best Interest.**

Off-label use is legal, accepted, and, when medically indicated, safe and in service of a patient's best interest.  As Defendant-Appellant Attorney General of the State of Indiana has elsewhere explained, "[o]ff-label prescribing and use of medications is a common and widespread practice in health care and falls within the standard of competent care."  Off-Label Prescription of Medications for Treatment and Prevention of COVID-19, Op. Ind. Att'y Gen. 2022-1 at 10 (Feb. 23, 2022), https://content.govdelivery.com/attachments/INAG/2022/02/22/file_attachments/208329 2/Official%20Opinion%202022-1.pdf; *see also Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006) (observing that off-label use is "a widely employed practice").

An understanding of the FDA approval process makes clear why there is nothing unsafe or inappropriate about off-label use.  Garnering the FDA's approval of a drug requires showing that it is both safe—*i.e.*, the benefits outweigh the potential risks—and effective for its intended use.  *See* U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017), https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.  It is well-established practice that once a drug has been approved by the FDA, health care providers may then prescribe it for other medically appropriate uses and in other dosages.  *See Taft*, 444 F.3d at 505; Op.

11

Ind. Att'y Gen. 2022-1 at 4 ("Per the FDA, once a drug is FDA-approved, [health care providers] may prescribe it for an unapproved use when they judge that it is medically appropriate for their patient."  (citation omitted)).  Such off-label use occurs because medical knowledge about how a drug might be beneficial in a different context or a different dosage continues to develop after FDA approval, but it is often too costly and impractical for drug makers to put each possible use of a drug through the FDA's "formal, lengthy, and expensive" approval process.  Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015), https://www.cancer.org/treatment/treatments-and-side-effects/treatment-types/off-label-drug-use.html (noting that off-label drug use is "well-documented and very common in" oncology, "pediatrics and HIV/AIDS care").  In addition, providers often prefer that drug makers *not* seek approval for every off-label use, given that it could increase the cost of the drug and limit the scope of its clinical application, all of which would make it less available to their patients.  *See* Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs* 4 (Feb. 23, 2021), https://sgp.fas.org/crs/misc/R45792.pdf.

Off-label use is common and "generally accepted."  *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 351 (2001); Christopher M. Wittich et al., *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982–990 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538391/ (discussing off-label drug uses that have "become widely entrenched in clinical practice and become predominant

treatments for a given clinical condition" and citing studies showing that in a group of commonly used medications, 21% of prescriptions were for off-label use).  For example, about half of drugs used to treat cancer are prescribed off label.  *See* Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment: Coverage of off-label drug indications*, 24 J. Clinical Oncology 3206–3208 (2006), https://ascopubs.org/doi/10.1200/JCO.2006.06.8940.

Off-label use is legal because FDA approval only limits how a drug can be marketed—*i.e.*, a drug cannot be marketed for a use different from its FDA-approved use—but not how a physician can prescribe it.  *See Buckman*, 531 U.S. at 351 & n.5; John J. Smith, *Physician Modification of Legally Marketed Medical Devices: Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55 Food & Drug L.J. 251–252 (2000) (discussing off-label use and noting that "regulatory efforts are directed primarily at device marketing by manufacturers, not device use by physicians"); Op. Ind. Att'y Gen. 2022-1 at 4 ("Off-label use is not prohibited by the FDA or the [Food, Drug, and Cosmetic Act].").

In fact, multiple federal and state laws have been enacted in recent years to promote and protect off-label prescriptions, as has the federal government and Indiana. *See, e.g.*, Ind. Code § 27-8-20-7 (prohibiting insurers from excluding coverage of covered drugs on the grounds that they are not FDA approved for certain uses); Ind. Code § 25-1-20-4(b)(3) (protecting healthcare workers from liability for administering off-label prescriptions to treat COVID-19); Am. Soc'y of Clinical Oncology, *Recent Developments in*

13

*Medicare Coverage of Off-Label Cancer Therapies*, 5 J. Oncology Practice 18–20 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2790627/ (discussing 1993 legislation requiring Medicare to cover off-label uses of anti-cancer drugs and an expansion of Medicare's off-label coverage in 2008).

Off-label use is especially common and important in treating minors, as Defendant-Appellant the Attorney General of the State of Indiana has elsewhere acknowledged. *See* Op. Ind. Att'ys Gen. 2022-1 at 4 (noting the prevalence of off-label use in pediatric care). Minors are often excluded from clinical drug studies, including for ethical reasons. *See* Wittich (citing study finding that nearly 80% of children discharged from pediatric hospitals were taking at least one off-label medication and discussing range of widely practiced off-label drug uses in pediatric population); H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. Okla State Med. Assoc. 776–783 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6677268 (surveying ten years of literature and finding that "[t]he use of off-label medications in children remains a common practice for pediatric providers").

Finally, and critically, off-label use is often essential for delivering the best care. James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71–104 (1998), https://pubmed.ncbi.nlm.nih.gov/11795338/ ("Off-label use is widespread in the medical

14

community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize."); William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2519223 (explaining that in some circumstances, "a physician's failure to prescribe the medical product for such an unapproved use can constitute medical malpractice"); Op. Ind. Att'y Gen. 2022-1 at 4 (recognizing that "off-label use of a medication" is sometimes "*the* standard of care for the treatment of a condition or illness").  Accordingly, "the decision to prescribe a medication off-label is one that is best left to consultation between the patient and [health-care provider] in consideration of the medical circumstances of each situation."  Op. Ind. Att'ys Gen. 2022-1 at 10 (professing that "the [Office of the Attorney General] does not wish to interfere with such issues confined to the patient-doctor relationship").

Thus, off-label use is legal, common, and often essential for delivering medically necessary care.

\* \* \*

In sum, the Health Care Ban does not prohibit treatment that is "experimental" or non-evidence based.  Any arguments to the contrary are based on a fundamental misunderstanding of both how scientific knowledge is generated and the FDA approval process.  Treatment methods do not require a randomized control trial or on-label use to

15

be safe and effective.  Indiana's contradictory and contrary position, if accepted, would undermine a significant portion of modern medical practice, including almost all forms of pediatric health care and much of adult health care.

## II.   THE HEALTH CARE BAN CONTRAVENES KEY TENETS OF BIOMEDICAL ETHICS.

The Health Care Ban is directly at odds with key tenets of biomedical ethics: respect for autonomy, beneficence, and justice.  Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics*, 13 (8th ed. 2019).  These universal principles, which are the cornerstones of modern-day healthcare standards, guide providers' treatment decisions regardless of the type of medical care they are providing.

### A.   The Health Care Ban Forces Providers to Disregard Patients' Autonomy.

As a general matter, the Ban repeatedly acknowledges the importance of obtaining informed consent and respecting patient decision making, reflecting the core biomedical ethical principle of respect for autonomy.  That principle requires that patients have the ability to decide whether to receive appropriate medical care within the framework of informed consent.  Beauchamp & Childress at 105.  For example, Indiana has codified a definition of "informed consent" and has rendered the failure to adequately obtain informed consent tortious.  *See, e.g.*, Ind. Code § 34-18-12 (establishing informed consent); *Matter of Lawrance*, 579 N.E.2d 32, 38 (Ind. 1991) (citing *Revord v. Russell*, 401 N.E.2d 763, 766 (Ind. Ct. App. 1980) (outlining Indiana's common law doctrine of informed consent)).  Indiana has also enacted a "Right to Try" law, which allows a terminally ill patient to use

16

non-FDA approved drugs and medical products in order to treat their illness as long as they provide informed consent. Ind. Code § 25-22.5-1-2.1 (2022). In stark contrast to these laws reflecting the core principle of autonomy, the Health Care Ban attacks autonomy by preventing individuals from pursuing, and health care professionals from providing, beneficial medical treatment with due regard for a patient's interests.

Empowering a patient's autonomy is essential to the integrity of the provider-patient relationship, as well as the patient's individual liberty and ability to determine the course of their life. In keeping with that bioethical principle, "the physician's professional role [is] to make recommendations on the basis of the best available medical evidence and to pursue options that comport with the patient's unique health needs, values, and preferences." Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians* ("ACP") *Ethics Manual* 170, Annals of Internal Medicine 86 (7th ed. 2019), https://www.acpjournals.org/doi/10.7326/m18-2160; *see also* Beauchamp & Childress at 105 (respect for autonomy requires health care professionals "to disclose information, to probe for and ensure understanding and voluntariness, and to foster adequate decision making"). Informed consent is a crucial mechanism for ensuring respect for autonomy. In all non-emergency encounters, the provider is obligated to offer the patient material information and guidance, but the patient must be trusted and empowered to make the informed and voluntary decision that best advances their interests. *See* Parth Shah et al., *Informed Consent* (2021), https://www.ncbi.nlm.nih.gov/books/NBK430827/. After the

17

patient makes their decision, the provider's duty is to "protect and foster [the] patient's free, uncoerced choices."  ACP *Ethics Manual* at 74.

Where, as here, the patients at issue are minors, the informed consent process usually involves the provider, the minor patient, and the minor's parents.  When that is so, each actor has an important role to play: the provider offers medical instruction, the parents provide stewardship and consent, and the minor—assisted by that medical instruction and parental stewardship—provides assent.  *See* Am. Med. Ass'n ("AMA"), *Code of Medical Ethics Opinion 2.2.1, Pediatric Decision Making*, https://www.ama-assn.org/delivering-care/ethics/pediatric-decision-making (discussing the importance of "[r]espect and shared decision making" between parents and minors "in the context of decisions for minors"); Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017), http://dx.doi.org/10.18357/ijcyfs82201716754 (discussing relational ethics).

The process of informed consent (which, for minors, also frequently includes their parents) involves five core elements: 1) patient competence, 2) disclosure, 3) comprehension, 4) voluntariness, and 5) consent.  Beauchamp & Childress at 122.  As to the first element, parents generally have competence to participate in the informed consent process on behalf of their minor children, and many adolescent patients also have the competence to participate in the informed consent process, including in the context of gender-affirming care.  *See* Jessica Kremen et al., *Addressing Legislation That Restrict*

*Access to Care for Transgender Youth*, 147 Pediatric Perspectives (2021),

https://pubmed.ncbi.nlm.nih.gov/33883246/ (minor patients who are transgender

"possess decisional capacity, and with guardian consent and the support of a

multidisciplinary team, [] are able to contribute to decisions in their own best interests

about [Gonadotropin Releasing Hormones] and gender-affirming hormones"); Beth A.

Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of*

*Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J.

Bioethical Inquiry 151–164 (2021), https://pubmed.ncbi.nlm.nih.gov/33502682/

(concluding, based on qualitative empirical analysis, that "trans[gender] youth

demonstrated the understandings and abilities characteristic of the capacity to consent to

hormone therapy and that they did consent to hormone therapy with positive

outcomes"); Richard E. Redding, *Children's Competence to Provide Informed Consent for*

*Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695, 707 (1993),

https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1759&context=wlulr

("Research . . . indicates that children often are capable of making important life decisions

in a rational manner, including decisions about medical and psychological treatment.").

Once competence has been established, the elements of disclosure and

comprehension require the provider to accurately and sensitively present relevant

information about any diagnosis; the nature and purpose of recommended interventions;

the burdens, risks, and expected benefits of all options, including forgoing treatment; and

19

any limitations to the medical community's knowledge regarding burdens, risks, and expected benefits. AMA, *Code of Medical Ethics Opinion 2.1.1, Informed Consent*, https://www.ama-assn.org/delivering-care/ethics/informed-consent; Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical Considerations with Transgender Children and Youth in Family Therapy*, 23 J. of Fam. Psychotherapy 296, 287–303 (2012), http://dx.doi.org/10.1080/08975353.2012.735594.

For the fourth element, voluntariness, the provider must then assess the patient's (and, if not a mature minor, the parents') ability to understand relevant medical information and the implications of treatment alternatives and to make an independent, voluntary decision. AMA *Informed Consent*. Fifth, and finally, the patient—and, where the patient is a minor, usually the parents as well—decides how to proceed.

From the perspective of biomedical ethics, a decision that is made jointly by a parent and child, aligns with a provider's recommendation, and is discerned through a process of informed consent should be fully respected. Indeed, medical professionals, parents, and adolescents are regularly entrusted to together decide the best course of treatment, including when the treatment has significant risks or permanent effects. Pediatric chemotherapy or radiation, for example, are subject to principles of informed consent, despite the potential lasting effects on growth development and reproductive capabilities. *See, e.g.*, Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment* (Sept. 18, 2017), https://www.cancer.org/treatment/children-and-cancer/when-your-child-has-

20

cancer/late-effects-of-cancer-treatment.html.   Pediatric breast reduction performed to address excess breast tissue, back pain, or social anxiety; pediatric rhinoplasty; and orthopedic surgery on minors following sports injuries likewise can have enduring impacts.  There is nothing unique about gender-affirming care that demands a different scheme than allowing care when the provider, patient, and parents all agree about the best course of action.[4]

By prohibiting health care providers from offering medically necessary and appropriate treatment to adolescents with gender dysphoria and denying patients the ability to access such care when they and their parents have given informed consent, the Health Care Ban disrespects autonomy and undermines the provider-patient relationship.

**B.    The Health Care Ban Forces Providers to Violate Their Duty of Beneficence.**

The duty to act in the best interest of the patient is called beneficence, and is best understood as "a group of norms pertaining to relieving, lessening, or preventing harm and providing benefits and balancing benefits against risks and costs."  Beauchamp &

---

[4] The Health Care Ban expressly allows surgical inventions to be performed on minors with intersex conditions or for conditions outside of gender-affirming care, including infants too young to participate in the decision-making process, even though such procedures have irreversible, long-term consequences and raise serious ethical concerns.  *See* Ind. Code § 25-1-22-13(c); Human Rights Watch, *"I Want to Be Like Nature Made Me": Medically Unnecessary Surgeries on Intersex Children in the US* (2017), https://www.hrw.org/sites/default/files/report_pdf/lgbtintersex0717_web_0.pdf.

Childress at 13; *see also id.* at 217 ("[M]orality requires that we treat persons autonomously and refrain from harming them, but morality also requires that we contribute to their welfare.").[5]  Medical professionals all over the world take oaths and are held to duties that encompass beneficence.  For example, the World Medical Association's "Modern Hippocratic Oath" requires physicians to attest upon admission to the medical profession that the "health of [their] patient[s] will be [their] first consideration."  World Medical Association, *Declaration of Geneva* (1948).  Likewise, the United Kingdom's General Medical Council requires physicians to "make the care of your patient your first concern." *Good medical practice: Duties of a doctor registered with the General Medical Council*, Gen. Med. Council 70–78 (2001),  https://www.gmc-uk.org/ethical-guidance/ethical-guidance-for-doctors/good-medical-practice/duties-of-a-doctor.  And the AMA recognizes that "[t]he practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering."  AMA, *Code of Medical Ethics Opinion 1.1.1, Patient-Physician Relationships*,  https://www.ama-assn.org/system/files/code-of-medical-ethics-chapter-1.pdf.

---

[5] A related principle, nonmaleficence, concerns avoiding the causation of harm.  Nonmaleficence thus prohibits action while beneficence requires it.  The Health Care Ban contravenes both principles.

22

### 1. The Health Care Ban's Treatment Prohibition Forces Providers to Violate Their Duty of Beneficence.

Applying the principle of beneficence to the treatment of a patient with gender dysphoria is straightforward. When untreated, gender dysphoria has serious mental and physical consequences, including anxiety, depression, self-harm, and suicidality. *See, e.g.,* Norman P. Spack et al., *Children and adolescents with gender identity disorder referred to a pediatric medical center*, 129 Pediatrics (2012), https://pubmed.ncbi.nlm.nih.gov/22351896; Kristina R. Olson et al., *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (Part 3: Caring for Transgender                                    Children)                              (2016) https://publications.aap.org/pediatrics/articleabstract/137/3/e20153223/81409/Mental-Health-of-Transgender-Children-Who-Are. By contrast, evidence from both research and clinical experience makes clear that gender-affirming care improves patients' health and alleviates their suffering. *See* Dkt. 27, Plaintiff's Memorandum in Support of Motion for Preliminary Injunction at 8-10, 19, 25-26; AAP Br. at 19-21 (collecting evidence showing that gender-affirming care improves overall well-being; significantly lowers risk of depression, anxiety, and other negative mental health outcomes; and reduces rates of substance abuse and suicide attempts). Withholding care for gender dysphoria as the Health Care Ban requires thus can result in serious harm to patients, contrary to the core principle of beneficence.

23

**2.      The Health Care Ban's Referrals Prohibition Forces Providers to Violate Their Duty of Beneficence and Undermines Public Health.**

In addition to prohibiting health care professionals from providing gender affirming care to adolescents with gender dysphoria, the Health Care Ban also prohibits them from making referrals for such care.  S.E.A. 480 § 13(b).  The Health Care Ban thus prevents patients and their parents from learning from trusted sources about where to access treatment for gender dysphoria, undermining their ability to receive that care.  Depriving patients of information from their health care providers about treatment options is dangerous for individual patient health and for public health more broadly.

The duty of beneficence encompasses a provider's obligation—if they cannot personally provide care—to refer the patient to someone who can.  *See ACP Ethics Manual* at 14 (explaining that a provider is not "obligated to recommend, perform or prescribe" a reproductive service, but, as in any other medical situation, "has a duty to inform the patient about care options and alternatives or refer the patient for such information, so that the patient's rights are not constrained").  The Health Care Ban forces providers to violate this duty by leaving their patients both without care and without referrals to get that care elsewhere.  By design, the Health Care Ban requires providers to stay silent in the face of their patients' actual medical needs.  *Cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("[T]he free flow of . . . speech" has "great relevance in the fields of medicine and public health, where information can save lives." (quotation marks omitted)).

24

Stifling the flow of information between patients and their providers about accessing treatment undermines the integrity of the provider-patient relationship and individual patient health. "An integral component of the practice of medicine is the communication between a doctor and a patient." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002); *see also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1313 (11th Cir. 2017) (en banc) (similar). Being able to engage in open dialogue with and access accurate and reliable information from one's provider about treatment options is critical to a patient's health in multiple respects, including promoting patient adherence to treatment plans. *See, e.g.*, Rainer S. Beck et al., *Physician-Patient Communication in the Primary Care Office: A Systematic Review*, 15 J. Am. Bd. Fam. Pract. (2002), https://pubmed.ncbi.nlm.nih.gov/11841136 ("When patients are informed and involved in decision making, they are more adherent to medical recommendations and carry out more health-related behavior change"). This is so even when—and perhaps especially when—there is societal debate about a proper course of treatment. If patients are denied competent information from a reliable source—their health care provider—about where they can obtain medically competent care, they will be forced to obtain that information elsewhere. "But word-of-mouth and the Internet are poor substitutes for a medical doctor; information obtained from chat rooms and tabloids cannot make up for the loss of individualized advice from a physician with many years of training and experience." *Conant*, 309 F.3d at 644 (Kozinski, J., concurring). Preventing the flow of information from

25

providers about where to access treatment is harmful not only for individual health, but for society and public health more broadly.  Society "regard[s] private, professional communication between doctors and patients as a significant source of expert, dependable information. . . .  This knowledge, once received, is pertinent to much more than our personal decisions about receiving medical care.  It is relevant to how we think about the provision of medical care generally."  Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech,* Univ. of Ill. L. Rev. 939, 977–78 (2007).  "[I]f the state could freely . . . manipulate the trustworthy information that we were able to receive from our physicians"—including referrals for treatment—it would raise serious concerns, for society depends on "knowledge that our doctors can uniquely provide, so that we can decide for ourselves what our medical care ought to be."  *Id.* at 977–78; *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (explaining that the First Amendment is concerned with government efforts to "limit[] the range of information and ideas to which the public is exposed").

In short, restricting speech about where to obtain treatment based on a particular viewpoint as the Health Care Ban requires will undermine public trust in health care providers, with the likely consequence of leading people to ignore the recommendations of their providers, or to avoid health care settings altogether.  *See infra II.C* (describing distrust resulting from denial of care); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("The First Amendment directs us to be especially skeptical of regulations

26

that seek to keep people in the dark for what the government perceives to be their own good.").

\* \* \*

The principle of beneficence obligates providers to remove conditions that will cause harm to others. Beauchamp & Childress at 219. By mandating that providers deny care to their patients with gender dysphoria when the patient and their parents seek that care and the provider deems it medically indicated, and then abandon them with no referral for alternative sources for treatment, the Health Care Ban forces providers to cause harm to their patients and, thus, to violate their core duty of beneficence.

### C.      The Health Care Ban Forces Providers to Violate Their Duty of Justice.

A third core principle of bioethics—justice—requires providers to acknowledge inequalities in the delivery of medical care and to work toward fair, equitable, and appropriate treatment for all. Beauchamp & Childress at 267–68; Clark, *Ethics in Child & Youth Care Practice with Transgender Youth* at 79. The Health Care Ban undermines this ethical duty of providers by creating a complete barrier to transgender adolescents receiving gender-affirming care.

The Health Care Ban denies care to minor patients based on their identity as transgender: care is banned only if it is for "gender transition procedures," which is care that only transgender individuals seek. The Health Care Ban thus imposes medical strain on only those patients. For example, the Ban, if allowed to go into effect, may force

27

families with minors who are transgender to consider moving out of state or to endure the negative health effects from stopping hormone therapy and to fear for their ability to survive without treatment.  (*See* Dkt. 1, Compl. ¶¶ 104, 124, 143, 144, 159; SA30; Plaintiff-Appellees' Br. 15-17.)  These potential costs are on top of the many socioeconomic and geographic barriers to gender-affirming care that transgender youth often already face. *See* Phillip E. Wagner et al., 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans\* Healthcare Support Seeking* 51 (Oct. 2016) (noting "[t]he difficult decisions trans\* individuals make in regard to their healthcare have been well documented" and include "[f]inancial barriers, insurance issues, and access to services").  The Health Care Ban exacerbates and reinforces these already significant challenges by preventing transgender youth from accessing the gender-affirming healthcare they require.

Also, being denied coverage for gender-affirming care may lead transgender people to avoid seeking medical care altogether, or to choose between their health care, their food, their safety, or their housing.  *See* Kraschel at 5 (noting potential of legislative restrictions on gender-affirming care to disproportionally affect marginalized communities).  Avoiding or delaying care leads "to poorer physical and mental health outcomes."  Luisa Kcomt et al., *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608) SSM - Population Health 1 (2020), https://www.sciencedirect.com/science/article/pii/S2352827320302457.

As a matter of biomedical ethics and its core principle of justice, medical practitioners must not cause patients to fear seeking care, nor deny them care that, by definition, only people who are transgender need. The Health Care Ban forces health care providers to violate this principle by mandating discrimination against a vulnerable and stigmatized population.

* * *

The Health Care Ban is unsupported by biomedical ethics or any of its core principles. To the contrary, the Ban commands their violation, for no legitimate purpose, resulting in physical and emotional suffering.

## CONCLUSION

The Health Care Ban is an unwarranted restriction on the provision of health care: it contravenes multiple, fundamental principles of biomedical ethics and fails to rationally protect minors, instead mandating their harm. Permitting the Ban to take effect would open the door to unprecedented state intrusion into medicine and patient rights. This Court should reject such a result and affirm the preliminary injunctions granted below.

29

Dated: September 27, 2023

Respectfully submitted,

*/s/ Katelyn Kang*

Kathleen Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: (415) 693-2000

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2103
Telephone: (212) 479-6000

Elizabeth F. Reinhardt
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
Telephone: (202) 842-7800

*Attorneys for Amici Curiae*

30

**CERTIFICATE OF SERVICE**

I certify that on September 27, 2023, this document was electronically filed with

the clerk of the court for the U.S. Court of Appeals for the Seventh Circuit and served

through CM/ECF upon all counsel of record in this case.


/s/ *Katelyn Kang*
Katelyn Kang

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the foregoing Amicus Brief complies with Fed. R. App. P. 29(c) and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,746 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This document complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Palatino Linotype 12-point type face throughout, and Palatino Linotype is a proportional spaced typeface that includes serifs.

Dated: September 27, 2023

/s/ Katelyn Kang
Katelyn Kang
One of the Attorneys for Amicus

No. 23-12155

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

AUGUST DEKKER, ET AL.,

*Plaintiffs-Appellees*

v.

SECRETARY, FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, ET AL.,

*Defendants-Appellants*

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:22-CV-00325-RH-MAF (Hinkle, J.)

---

### BRIEF OF *AMICI CURIAE* BIOMEDICAL ETHICS AND
### PUBLIC HEALTH SCHOLARS IN SUPPORT OF
### PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2103
Telephone: (212) 479-6000
kkang@cooley.com

Kathleen Hartnett
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: (415) 693-2000
khartnett@cooley.com
zhelstrom@cooley.com

*Counsel for Amici Curiae*

**Exhibit 0036**

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1-1, the undersigned counsel for *amici curiae* Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Charlene Galarneau, Joanna Grossman, Lisa C. Ikemoto, Maya Manian, Michelle Oberman, Dara Purvis, Rachel Rebouché, Jessica Silbey, and Michael R. Ulrich certify that each *amicus curiae* is an individual.  They do not have a parent corporation and no publicly held corporation owns 10% or more of their stock.

*Amici curiae* further certify that the following persons and parties, in addition to the above-named *amici*, may have an interest in the outcome of this case:

1. Academic Pediatric Association, *Amicus*

2. Alstott, Anne, *Amicus*

3. Ahmed, Aziza, *Amicus*

1. Altman, Jennifer, *Counsel for Plaintiffs*

2. American Academy of Child and Adolescent Psychiatry, *Amicus*

3. American Academy of Family Physicians, *Amicus*

4. American Academy of Nursing, *Amicus*

5. American Academy of Pediatrics, *Amicus*

6. American College of Obstetricians and Gynecologists, *Amicus*

7. American College of Osteopathic Pediatricians, *Amicus*

8.  American College of Pediatricians, *Amicus*

9.  American College of Physicians, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

10. American Medical Association, *Amicus*

11. American Pediatric Society, *Amicus*

12. American Psychiatric Association, *Amicus*

13. Anderson, Barrett, *Counsel for Amicus*

14. Antommaria, Armand, *Witness*

15. Association of American Medical Colleges, *Amicus*

16. Bailey, Andrew, *Counsel for Amicus*

17. Baker, Kellan, *Witness*

18. Bardos, Andy, *Counsel for Amicus*

19. Barnes, Brian, *Counsel for Amicus*

20. Beato, Michael, *Counsel for Defendants*

21. Biggs, Michael, *Witness*

22. Biomedical Ethics and Public Health Scholars, *Amicus*

23. Bird, Brenna, *Counsel for Amicus*

24. Boergers, Kathleen, *Counsel for Amicus*

25. Boulware, Susan, *Amicus*

26. Bowdre, Alexander Barrett, *Counsel for Amicus*

27. Brackett, John Matthew, *Witness*

28. Bridges, Khiara M., *Amicus*

29. Bronni, Nicholas J., *Counsel for Amicus*

30. Brown, Louis, Jr., *Amicus*

31. Burleigh, Clifton Francis, Jr., *Amicus*

32. Cameron, Daniel, *Counsel for Amicus*

33. Cantor, James, *Witness*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

34. Carr, Chris, *Counsel for Amicus*

35. Chriss, Simone, *Counsel for Plaintiffs*

36. Chuang, Ming, *Counsel for Amicus*

37. Clark, Kaila, *Counsel for Amicus*

38. Cohen, David S., *Amicus*

39. Cohen, I. Glenn, *Amicus*

40.Commonwealth of Kentucky, *Amicus*

41. Commonwealth of Massachusetts, *Amicus*

42. Commonwealth of Virginia, *Amicus*

43. Cory, Alyssa L., *Counsel for Amicus*

44. Coursolle, Abigail, *Counsel for Plaintiffs*

45. Dalton, Ann, *Witness*

46. DeBriere, Katherine, *Counsel for Plaintiffs*

47. Dekker, August, *Plaintiff*

48. Ding, Michael, *Counsel for Witness/Third-Party Miriam Grossman*

49. District of Columbia, *Amicus*

50. Do No Harm, *Amicus*

51. Doe, Jane, *Plaintiff*

52.Doe, John, *Plaintiff*

53. Doe, Susan, *Plaintiff*

54. Donovan, Kevin, *Witness*

55. Dunn, Chelsea, *Counsel for Plaintiffs*

56. Edmiston, E. Kale, *Witness*

57. Endocrine Society, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

58. English, Jeffrey, *Witness*

59. Ethics and Public Policy Center, *Amicus*
60. Figlio, Erik, *Counsel for Amicus*

61. Fitch, Lynn, *Counsel for Amicus*

62. Florida Agency for Health Care Administration, *Defendant*

63. Florida Chapter of the American Academy of Pediatrics, *Amicus*

64. Florida Policy Institute, *Amicus*

65. Florida Voices for Health, *Amicus*

66. Galarneau, Charlene, *Amicus*

67. Gibson, Benjamin J., *Counsel for Amicus*

68. Gonzalez-Pagan, Omar, *Counsel for Plaintiffs*

69. Griffin, Steven J., *Counsel for Amicus*

70. Griffin, Tim, *Counsel for Amicus*

71. Grossman, Joanna, *Amicus*

72. Grossman, Miriam, *Witness/Third-Party Discovery Producer*

73. Halley, Ted, *Amicus*

74. Hartnett, Kathleen, *Counsel for Amicus*

75. Hasson, Mary Rice, *Counsel for Amicus*

76. Helstrom, Zoe, *Counsel for Amicus*

77. Heyer, Walt, *Amicus*

78. Hilgers, Michael T., *Counsel for Amicus*

79. Hinkle, Robert, *U.S. District Court Judge*

80. Hruz, Paul William, *Witness*

81. Hussein, Abdul-Latif, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

82. Hutton, Kim, *Witness*

83. Ikemoto, Lisa – *Amicus*

84. Isasi, William, *Counsel for Amicus*

85. Jacobs, Dylan L., *Counsel for Amicus*

86. Janssen, Aron Christopher, *Witness*

87. Jazil, Mohammad, *Counsel for Defendants*

88. K.F., *Plaintiff*

89. Kaliebe, Kristopher Edward, *Witness*

90. Kamody, Rebecca, *Amicus*

91. Kang, Katelyn, *Counsel for Amicus*

92. Karasic, Dan, *Witness*

93. Kiefel, Camille, *Witness*

94. Kline, Robert, *Counsel for Amicus*

95. Kniffin, Eric Nieuwenhuis, *Counsel for Amicus*

96. Knudsen, Austin, *Counsel for Amicus*

97. Kobach, Kris W., *Counsel For Amicus*

98. Krasovec, Joseph, *Counsel for Amicus*

99. Kuper, Laura, *Amicus*

100. Labrador, Raúl R., *Counsel for Amicus*

101. LaCour, Edmund G. Jr., *Counsel for Amicus*

102. Lannin, Cortlin, *Counsel for Amicus*

103. Laidlaw, Michael, *Witness*

104. Lappert, Patrick, *Witness*

105. Ladue, Jade, *Plaintiff*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

106. Levine, Stephen, *Witness*

107. Little, Joseph, *Counsel for Plaintiffs*

108. Loewy, Karen L., *Counsel for Plaintiffs*

109. Manian, Maya, *Amicus*

110. Marshall, Steve, *Counsel for Amicus*

111. Marstiller, Simone, *Former Defendant*

112. Mauler, Daniel, *Counsel for Amicus*

113. McCotter, R. Trent, *Counsel for Amicus*

114. McKee, Catherine, *Counsel for Plaintiffs*

115. McNamara, Meredithe, *Amicus*

116. Meszaros, Marie Connelly, *Amicus*

117. Miller, William, *Counsel for Plaintiffs*

118. Miyares, Jason, *Counsel for Amicus*

119. Mondry, Emily, *Counsel for Amicus*

120. Morrisey, Patrick, *Counsel for Amicus*

121. Morrison, Rachel N., *Amicus*

122. Nangia, Geeta, *Witness*

123. National Association of Pediatric Nurse Practitioners, *Amicus*

124. Nordby, Daniel E., *Counsel for Witness/Third-Party Miriam Grossman* and *Counsel for Amicus*

125. Norohna, Maya, *Amicus*

126. North Central Florida Council of Child and Adolescent Psychiatry, *Amicus*

127. Oberman, Michelle, *Amicus*

128. Olezeski, Christy, *Amicus*

129. Olson-Kennedy, Johanna, *Witness*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

130. Paxton, Ken, *Counsel for Amicus*

131. Pediatric Endocrine Society, *Amicus*

132. Perko, Gary, *Counsel for Defendants*

133. Polston, Ricky L., *Counsel for Amicus*

134. Pratt, Christine, *Amicus*

135. Pratt, Joshua E., *Counsel for Defendants*

136.  Purvis, Dara, *Amicus*

137. Ramer, John, *Counsel for Amicus*

138.  Rebouché, Rachel, *Amicus*

139. Reinhardt, Elizabeth, *Counsel for Amicus*

140. Reyes, Sean, *Counsel for Amicus*

141. Richards, Jay W., *Amicus*

142. Rivaux, Shani, *Counsel for Plaintiffs*

143. Rokita, Theodore E., *Counsel for Amicus*

144. Rothstein, Brit, *Plaintiff*

145. Samuels, Valerie, *Counsel for Amicus*

146. Schechter, Loren, *Witness*

147. Scott, Sophie, *Witness*

148. Severino, Roger, *Amicus*

149. Shaw, Gary, *Counsel for Plaintiffs*

150. Sheeran, Andrew, *General Counsel for Defendant AHCA*

151. Shumer, Daniel, *Witness*

152. Silbey, Jessica, *Amicus*

153. Skrmetti, Jonathan, *Counsel for Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

154. Societies for Pediatric Urology, *Amicus*

155. Society for Adolescent Health and Medicine, *Amicus*

156. Society for Pediatric Research, *Amicus*

157. Society of Pediatric Nurses, *Amicus*

158. State of Alabama, *Amicus*

159. State of Arkansas, *Amicus*

160. State of California, *Amicus*

161. State of Delaware, *Amicus*

162. State of Georgia, *Amicus*

163. State of Idaho, *Amicus*

164. State of Illinois, *Amicus*

165. State of Indiana, *Amicus*

166. State of Iowa, *Amicus*

167. State of Kansas, *Amicus*

168. State of Louisiana, *Amicus*

169. State of Maryland, *Amicus*

170. State of Mississippi, *Amicus*

171. State of Missouri, *Amicus*

172. State of Montana, *Amicus*

173. State of Nebraska, *Amicus*

174. State of New York, *Amicus*

175. State of North Dakota, *Amicus*

176. State of Oregon, *Amicus*

177. State of Rhode Island, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

178. State of South Carolina, *Amicus*

179. State of Tennessee, *Amicus*

180. State of Texas, *Amicus*

181. State of Utah, *Amicus*

182. State of West Virginia, *Amicus*

183. Szilagyi, Nathalie, *Amicus*

184. Thompson, David, *Counsel for Amicus*

185. Ulrich, Michael, *Amicus*

186. Veta, D. Jean, *Counsel for Amicus*

187. Van Meter, Quentin, *Witness*

188. Van Mol, Andre, *Witness*

189. Weida, Jason, *Defendant*

190. Wilson, Alan, *Counsel for Amicus*

191. World Professional Association for Transgender Health, *Amicus*

192. Zanga, Joseph, *Witness*

## TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ................................................................. C1

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................... 1

STATEMENT OF THE ISSUES ................................................................. 2

SUMMARY OF THE ARGUMENT .......................................................... 3

ARGUMENT .............................................................................................. 5

I.     GENDER-AFFIRMING CARE IS SUPPORTED BY A
       SUBSTANTIAL BODY OF EVIDENCE THAT DOES NOT
       JUSTIFY SINGLING IT OUT FOR DIFFERENTIAL
       TREATMENT. ..................................................................................... 5

II.    THE CHALLENGED EXCLUSION CONTRAVENES KEY
       TENETS OF BIOMEDICAL ETHICS. ........................................... 20

       A.    The Challenged Exclusion Forces Providers to Disregard
            Patients' Autonomy. ............................................................. 21

       B.    The Challenged Exclusion Forces Providers to Violate Their
            Duty of Beneficence. ............................................................ 27

       C.    The Challenged Exclusion Forces Providers to Violate Their
            Duty of Justice. ..................................................................... 30

CONCLUSION ........................................................................................ 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ..........................................................11, 29

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021)......................................................29

*Buckman Co. v. Pls.' Legal Comm.*,
   531 U.S. 341 (2001)......................................................................16, 17

*Eknes-Tucker v. Governor of Alabama*,
   80 F.4th 1205 (11th Cir. 2023) ........................................................8, 19

*L.W. v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ....................................................19, 20, 21

*Planned Parenthood Cincinnati Region v. Taft*,
   444 F.3d 502 (6th Cir. 2006) ........................................................15, 16

**Statutes**

Fed. R. App. P.
   29(a)(2) .........................................................................................1
   29(a)(4)(E) .....................................................................................1

Fla. Admin. Code 59G-1.050(7) ..................................................*passim*

Fla. Stat.
   § 499.0295(2)(a)(3)..........................................................................22
   § 766.103.......................................................................................21

Okla. Rev. Stat. § 63-1-2604 ...........................................................17

Senate Bill 254 .......................................................................*passim*

**Other Authorities**

Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment*
   (Sept. 18, 2017).............................................................................26

Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015) ....................................16

Am. Med. Ass'n, *Code of Medical Ethics Opinion 1.1.1*, *Patient-Physician Relationships* ........................................................................28

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.1.1*, *Informed Consent* ......................................................................................25

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.2.1*, *Pediatric Decision Making* ..............................................................................23

Am. Soc'y of Clinical Oncology, *Recent Developments in Medicare Coverage of Off-Label Cancer Therapies*, 5 J. Oncology Practice (2009) .........................................................................................18

Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment: Coverage of off-label drug indications*, 24 J. Clinical Oncology (2006) ..............................................................................17

Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical Considerations with Transgender Children and Youth in Family Therapy*, 23 J. of Fam. Psychotherapy 296 (2012)...........................25

Anthony J. Hatswell *et al.*, *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016) ...........................14

Ayden I. Scheim *et al.*, *Health and Health Care Among Transgender Adults in the United States*, 43 Annual Rev. of Pub. Health 503 (2021) ...........................................................................................5

Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141 (1987) .......................................................10

Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017) .....................................................................................23, 30

Beth A. Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J. Bioethical Inquiry 151 (2021) ........................................................24

Brendan J. Nolan *et al.*, *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023)...................... 10-11

Carla Pelusi *et al.*, *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002 (2014) .................................................................................9

Christopher M. Wittich *et al.*, *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982 (2012) ........................................................................................ 16-17

Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs* (Feb. 23, 2021) .........................................................................16

Denise Thomson *et al.*, *Controlled Trials in Children: Quantity, methodological quality and descriptive characteristics of Pediatric Controlled Trials published 1948-2006*, 5 PLoS One (2010) ........................ 9-10

Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211 (2008) ....................9

Fla. Standard Jury Instruction No. 402.7 ...............................................21

Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8 Med., Health Care & Philos. 307 (2005)..........................................12

Gesine Meyer *et al.*, *Safety and rapid efficacy of guideline-based gender-affirming hormone therapy: an analysis of 388 individuals diagnosed with gender dysphoria*, European J. of Endocrinology 155 (2020).........................................................................5

*Good medical practice: Duties of a doctor registered with the General Medical Council*, Gen. Med. Council (2001) ...................................................28

H. Christine Allen *et al.*, *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. Okla. State Med. Assoc. 776 (2018) .......................................18

Holger Schünemann *et al.* (eds.), *Grading of Recommend., Assess., Dev. & Eval. Handbook* 14 (2013) .......................................12, 13, 14

Howard Balshem *et al.*, *GRADE guidelines: 3. Rating the quality of evidence*, 64(4) J. Clinical Epidemiol. 401 (2011) ........................................12, 14

J. R. Vevaina *et al.*, *Issues in biomedical ethics*, 39 Disease-a-Month 869 (1993) ...................................................................................................1

Jack L. Turban *et al.*, *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2 (2022) ........................................................11

James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71 (1998) ................................................................ 18-19

Jessica Kremen *et al.*, *Addressing Legislation That Restrict Access to Care for Transgender Youth*, 147 Pediatric Perspectives (2021).......................24

John J. Smith, *Physician Modification of Legally Marketed Medical Devices: Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55 Food & Drug L.J. 251 (2000) ...........................................17

José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and Complete Integration*, 15 BMC Med. Res. Methodol. (2015) ..............................................................................................7

Katherine L. Kraschel *et al.*, *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022) ...................................................11, 29, 31

Katrien Oude Rengerink *et al.*, *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015).......................................................10

Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017)..............................................................................5

Kristina R. Olson *et al.*, *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (Part 3: Caring for Transgender Children) (2016)................29

Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians Ethics Manual* 170, Annals of Internal Medicine 86 (7th ed. 2019) ...............................................................................22, 23

Luisa Kcomt *et al.*, *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608) SSM - Population Health 1 (2020) ............................................................. 31-32

Meredithe McNamara *et al.*, *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1 (2022).................................................13

Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978).........................................7

Natalie S. Blencowe *et al.*, *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015) .....................................................................10

Norman P. Spack *et al.*, *Children and adolescents with gender identity disorder referred to a pediatric medical center*, 129 Pediatrics (2012) ................................................................. 28-29

Parth Shah *et al.*, *Informed Consent* (2021).............................................23

Phillip E. Wagner *et al.*, 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans* Healthcare Support Seeking* 51 (Oct. 2016) .................................................................31

Richard E. Redding, *Children's Competence to Provide Informed Consent for Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695 (1993) ............................................................... 24-25

Robert J. Ligthelm *et al.*, *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007) ...............................14

Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* (8th ed. 2019)................................................................*passim*

U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018)..................................................................7

U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017) ............................ 15-16

William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014) ........................................................19

World Medical Association, *Declaration of Geneva* (1948)...................................27

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* listed in the Appendix are professors of law, medicine, and public health who teach and write about biomedical ethics and health-related rights and discrimination.  Biomedical ethics, sometimes referred to as bioethics, is "the discipline of ethics dealing with moral problems arising in the practice of medicine and the pursuit of biomedical research."  J. R. Vevaina et al., *Issues in biomedical ethics*, 39 Disease-a-Month 869 (1993), https://pubmed.ncbi.nlm.nih.gov/8243220.  *Amici* have a strong interest in ensuring that principles of biomedical ethics are accurately described and properly applied.  They submit this brief to explain how Florida Administrative Code 59G-1.050(7) and Senate Bill 254 are inconsistent with foundational principles of biomedical ethics.

---

[1] *Amici* certify that no person or entity, other than *amici curiae* or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.  Fed. R. App. P. 29(a)(4)(E).  The parties have consented to the filing of this brief.  Fed. R. App. P. 29(a)(2).

## STATEMENT OF THE ISSUES

Whether the District Court correctly enjoined Defendants-Appellants from enforcing Rule 59G-1.050(7) of the Florida Administrative Code and Senate Bill 254.

## SUMMARY OF THE ARGUMENT

From flu shots to cancer treatments, medical providers regularly support patients (and their parents, when the patients are minors) in deciding whether a given medical treatment is necessary and appropriate for them, without any undue interference from the State.

The Florida statute at issue in this appeal, Rule 59G-1.050(7) of the Florida Administrative Code and Senate Bill 254 (collectively, the "Challenged Exclusion" or the "Exclusion"), upend that normal operation of medical practice for a specific, targeted group of patients:  transgender Medicaid beneficiaries seeking gender-affirming medical care for gender dysphoria.  The Exclusion outlaws the normal course of medical decision-making for these individuals, under which a patient and their medical providers carefully deliberate to make an informed, individualized decision about whether gender-affirming care is medically appropriate and in the best interest of the particular patient.  The State imposed this sweeping Exclusion even though every major medical organization in the United States has concluded that gender-affirming care, including for minors, is not only safe and effective, but is the *only* evidence-based treatment for gender dysphoria.

Categorically barring patients from accessing evidence-based treatment is irreconcilable with foundational precepts of biomedical ethics, particularly where, as here, that treatment is the *only* evidence-based treatment available for a given

medical need and the prohibition applies *only* to a group of patients singled out because of their identity.

As explained further below, core principles of biomedical ethics include respect for autonomy, beneficence, and justice.  Because a denial of Medicaid coverage is effectively a denial of care for Medicaid beneficiaries, the Challenged Exclusion deprives economically disadvantaged transgender patients of their ability to receive medically necessary and appropriate treatment to which they have given informed consent (autonomy).  It forces providers to deny their patients care that is known to alleviate suffering, and thus to abandon their patients to serious physical and mental harm (beneficence).  And it compels providers to deny care that only patients who are transgender need, thereby exacerbating stigma and inequity and damaging trust in the medical profession (justice).

Florida tries to justify these harms by suggesting that gender-affirming care lacks a sound evidentiary base.  That position is unfounded and badly misunderstands how medical knowledge is credibly generated.  Randomized control trials are not, and have never been, requisite for medical care to be considered appropriate, and in fact are ill-suited for many types of treatment.  Nor must longitudinal studies always be of a particular duration to be reliable.  And off-label use is legal, commonplace, and often necessary to serve a patient's best interest.  The

gender-affirming care prohibited by the Exclusion has been developed through rigorous and appropriate methods and rests on a strong evidentiary basis.

In sum, the Challenged Exclusion singles out and effectively bans gender-affirming care for economically disadvantaged transgender patients based on false notions of science, public health, and biomedical ethics, without considering the grave harm that will come from denying vulnerable patients critical health care. This Court should affirm the District Court's Findings of Fact and Conclusions of Law.

## ARGUMENT

### I.   GENDER-AFFIRMING CARE IS SUPPORTED BY A SUBSTANTIAL BODY OF EVIDENCE THAT DOES NOT JUSTIFY SINGLING IT OUT FOR DIFFERENTIAL TREATMENT.

The gender-affirming care prohibited by the Challenged Exclusion was developed through rigorous and appropriate methods and is recommended by every major medical association in the United States. Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017); Ayden I. Scheim et al., *Health and Health Care Among Transgender Adults in the United States*, 43 Annual Rev. of Pub. Health 503, 510 (2021); *see also* Gesine Meyer et al., *Safety and rapid efficacy of guideline-based gender-affirming hormone therapy: an analysis of 388 individuals diagnosed with gender dysphoria*, European J. of Endocrinology 155 (2020). Nonetheless, the State characterizes gender-affirming care as "experimental" and questionable treatment that has not been sufficiently

vetted, pointing to the lack of randomized control trials supporting the efficacy of hormone therapy, the duration of the longitudinal studies completed to date, and what they call "low quality" or "very low quality" evidence on gender affirming care. *See* Defs.' Br. 1, 7-8, 11-12, 14-15, 38. Likewise, the State's putative experts also emphasize that using puberty blockers and hormone therapy for gender-affirming care is not approved by the U.S. Food and Drug Administration ("FDA"). Doc. 246 at 49.

These claims about gender affirming care are wrong. As the District Court found, the medical care targeted by the Exclusion is supported by a strong evidentiary base, both in and of itself and in comparison to the evidentiary basis underlying many other forms of commonly provided care. Such attempts to justify the Exclusion reflect a fundamental misunderstanding of medical practice and the ways medical knowledge and treatment guidelines are generated, particularly in the context of pediatric care. Medical providers are not and have never been restricted to providing only those treatments that have been generated via randomized control trial and received FDA approval for the particular indication. Indeed, as explained herein, such restrictions would be impractical and unethical. The medical care targeted by the Exclusion is based on appropriate, ethical study and medical knowledge—it is not "experimental."

To start, the State conflates clinical care with clinical research and fails to engage with the ethical standards attendant to each. Medical care delivered by a clinician to a patient and clinical research have distinct purposes and processes. *See, e.g.*, Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978) (discussing the importance of distinguishing between research and clinical practice); U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018), https://www.fda.gov/patients/clinical-trials-what-patients-need-know/clinical-research-versus-medical-treatment (describing differences between clinical research and medical treatment in terms of intent, intended benefit, funding, timeframe, and other factors). In the clinical care setting, the provider's aim is to improve a patient's health, and the provider is duty bound to act in that patient's best interest. By contrast, the aim of a research study is to generate knowledge useful for *future* patients. *See* José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and Complete Integration*, 15 BMC Med. Res. Methodol. (2015), https://www.ncbi.nlm.nih.gov /pmc/articles/PMC4323129/. A research study's protocols must be ethically designed and administered, but there is no obligation to do what is in each participant's best interest. Importantly, receiving gender-affirming care does not automatically render a patient a subject of a research study (and certainly not a

subject of experimentation unmoored from ethical standards); gender-affirming medical care has been known to advance individual patients' best interests and is provided as clinical care for that purpose. The very use of the label "experimental" in this context is thus misleading.

Further, opponents of gender-affirming care like the State often misunderstand how medical knowledge is credibly and rigorously generated, and so, among other things, wrongly suggest that the lack of randomized control trials means the care has not been appropriately vetted. *See, e.g.*, *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1217 (11th Cir. 2023) (citing witness emphasizing lack of randomized studies). Not so. There is no one method used to generate medical knowledge in all contexts, and no one method is considered requisite to a treatment being deemed medically appropriate. Rather, medical knowledge and practice are informed by a range of research and clinical inputs that are often dependent on the type of care, context, and state of development. Here, for example, the District Court found that "there is now extensive clinical experience showing excellent results from treatment [of gender dysphoria in minors] with GnRH agonists and cross-sex hormones." Doc. 246 at 40.

A randomized control trial—where some participants are randomly assigned to a treatment group and others are randomly assigned to a control group—is one of many types of credible research designs used to evaluate a medical intervention.

Medical interventions also can be and often are evaluated through observational studies, which include cross-sectional studies (based on data collected from a single point in time), and longitudinal studies (based on data collected from particular individuals over time). *See, e.g.*, Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211–217 (2008), https://www.sciencedirect.com/science/article/pii/S1936879808001702. In addition, randomized *clinical* trials, which compare different established interventions to one another, may be used to inform medical treatment. For example, a randomized clinical trial has been used to evaluate sex hormone treatment for gender dysphoria, comparing different, established pharmacological treatments to one another. *See* Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002–3011 (2014), https://www.jsm.jsexmed.org/article/S1743-6095(15)30626-3/fulltext.

Study methods other than randomized control trials and extended longitudinal studies may be preferable in some circumstances, given that these are not always feasible, appropriate, or the most reliable way to evaluate a medical intervention. For instance, randomized control trials are rarely used for interventions focused on children or pregnant people, or for surgical interventions. *See, e.g.*, Denise Thomson et al., *Controlled Trials in Children: Quantity, methodological quality and*

*descriptive characteristics of Pediatric Controlled Trials published 1948–2006*, 5 PLoS One (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2948021/; Katrien Oude Rengerink et al., *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015), https://bmcpregnancychildbirth.biomedcentral.com/articles/10.1186/s12884-015-0641-x; Natalie S. Blencowe et al., *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015), https://doi.org/10.1186/s13063-015-0918-4.   Randomized control trials also are only ethical when there is clinical "equipoise," which means they are only appropriate when there is genuine uncertainty about whether the intervention will be more effective than the control.  *See* Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141–145 (1987), https://www.nejm.org/doi/full/10.1056/NEJM198707163170304.  That is because it is unethical to knowingly expose participants to an inferior intervention or control. For example, in acknowledging limitations to its analysis, a 2023 open-label randomized clinical trial assessing the effect of testosterone therapy compared with no treatment on gender dysphoria, depression, and suicidality explained that the trial was limited to three months in order to insure that "participants would not be disadvantaged by waiting longer than standard of care waiting times of 3 months for an initial consultation." Brendan J. Nolan et al., *Early Access to Testosterone*

*Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2809058.

This principle plainly applies to the excluded treatments for gender dysphoria: performing randomized, placebo-controlled trials on the efficacy of that treatment would be unethical, because the prevailing view among the medical community is that for patients who need it, hormone therapy is superior to a lack of pharmacological treatment. *See id.*

Likewise, opponents of gender-affirming care critique the lack of "long-term studies" regarding its safety and efficacy. This too is wrong. In reality, there are many long-term studies supporting the provision of gender-affirming care to treat gender dysphoria, including for minors.[2] Moreover, the underlying premise of this argument—that long-term studies are necessary to prove a treatment's efficacy and

---

[2] *See, e.g.*, Jack L. Turban et al., *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2 (2022), https://doi.org/10.1371/journal.pone.0261039 (collecting studies); Katherine L. Kraschel et al., *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022), https://doi.org/10.1016/j.xcrm.2022.100719 ("Over a dozen studies have collectively linked [gender affirming care] to improvements in depression, anxiety, and suicidality."); *see also Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) ("According to surveys of the research on hormone treatment for adolescents done by the British National Institute for Health & Care Excellence, several studies have shown statistically significant positive effects of hormone treatment on the mental health, suicidality, and quality of life of adolescents with gender dysphoria. None has shown negative effects.").

safety—is mistaken.  Longitudinal studies need not last for some unspecified "long-term" period to be reliable, nor are such studies always the most ethically and legally appropriate.  Often, other reliable and trustworthy methods are preferable.  For example, before conducting longitudinal studies involving children, researchers must consider a child's privacy and autonomy all while maintaining data integrity—a sometimes difficult balancing act that can be avoided by using an alternative study design.  *See, e.g.*, Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8 Med., Health Care & Philos. 307 (2005), https://doi.org/10.1007/s11019-005-0978-4.

The State also betrays its erroneous understanding of what it means for evidence to be graded as "low-quality."  Defs.' Br. 29.  Under the GRADE system, which is often used for presenting summaries of scientific evidence and making clinical practice recommendations, the level of quality ascribed to evidence is based on the type of research methodology used— evidence generated via a randomized control trial is typically labeled "high quality" and evidence generated via an observational study is typically labeled "low quality."  Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*, 64(4) J. Clinical Epidemiol. 401 (2011); Holger Schünemann et al. (eds.), *Grading of Recommend., Assess., Dev. & Eval. Handbook* 14 (2013) ("GRADE Handbook").  Randomized trials with limitations such as inconsistent results or publication bias will go down in quality,

and observational studies with a dose-response gradient (relationship between a stimulus and a response) or large magnitude of effect will go up in quality. GRADE Handbook at 13.

These "high quality" and "low quality" labels under GRADE thus are descriptive of the underlying method, but they do not necessarily reflect the reliability of the evidence generated. As noted, observational studies are sometimes favored for both ethical and practical reasons. For example, despite their "low quality" technical category, observational studies have been used in forming the Cholesterol Guidelines of the American College of Cardiology and the American Heart Association. *See* Meredithe McNamara et al., *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1, 16 (2022). The same is true for a range of other treatments, from gall bladder surgery to the determination that aspirin is not appropriate to treat fevers in children. *See id.* at 14, 16. And with gender-affirming medical care, randomized control trials are not appropriate for the reasons described above. Because randomized control trials are often inappropriate or infeasible, research that falls in the technical category of "low quality" as that term is used in the GRADE system can still be reliable and valuable when it comes to clinical practice. *See* McNamara at 15.

As the District Court found, "low-quality" evidence may be and often is sufficient to justify a strong recommendation for clinical care under that same grading system. Doc. 246 at 40 ("The record includes unrebutted testimony that only about 13.5% of accepted medical treatments across all disciplines are supported by 'high' quality evidence on the GRADE scale."); *see also* GRADE Handbook at 5; Balshem at 402-04 ("A particular level of quality does not imply a particular strength of recommendation. Sometimes, low or very low quality evidence can lead to a strong recommendation."). Accordingly, the treatment for many other conditions, such as drugs for cancer and hematologic disorders, are widely recommended and used based on similarly "low-quality" evidence, without having been studied through randomized, controlled clinical trials. *See* Anthony J. Hatswell et al., *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016), https://pubmed.ncbi.nlm.nih.gov/27363818/. Indeed, if the "low-quality" label were enough to render care suspect, whole swaths of modern care for which randomized control trials are inappropriate for ethical and/or practical reasons would be called into question. *See* Robert J. Ligthelm et al., *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007), https://pubmed.ncbi.nlm.nih.gov/18036390/ (noting that observational evidence is sometimes favored for both ethical and practical reasons). As the District Court

explained, "the fact that research-generated evidence supporting these treatments gets classified as 'low' or 'very low' quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria, or that medical treatments should not be provided consistent with the research results and clinical evidence." Doc. 246 at 39.

Furthermore, a medication need not be approved by the FDA for a particular indication to be safe and effective for that indication. Off-label drug use is legal, accepted, and, when medically indicated, safe and in service of a patient's best interest. *See Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006) (observing that off-label use is "a widely employed practice"); Doc.90 at 38 (similar). Thus, as the District Court explained, "[t]hat the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose." Doc. 246 at 49.

An understanding of the FDA approval process makes clear why there is nothing unsafe or inappropriate about off-label use. Garnering the FDA's approval of a drug requires showing that it is both safe—*i.e.*, the benefits outweigh the potential risks—and effective for its intended use. *See* U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017), https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-

drug-review-process-ensuring-drugs-are-safe-and-effective.   It is well-established practice that once a drug has been approved by the FDA, health care providers may then prescribe it for other medically appropriate uses and in other dosages at their discretion without pharmaceutical companies first having to return to the FDA and seek approval for each indication.  *See Taft*, 444 F.3d at 505.  Such off-label use occurs because medical knowledge about how a drug might be beneficial in a different context or a different dosage continues to develop after FDA approval, but it is often too costly and impractical for drug makers to put each possible use of a drug through the FDA's "formal, lengthy, and expensive" approval process.  Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015), https://www.cancer.org/treatment/treatments-and-side-effects/treatment-types/off-label-drug-use.html (noting that off-label drug use is "well-documented and very common in" oncology, "pediatrics and HIV/AIDS care"); Doc. 246 at 49-50.  In addition, providers often prefer that drug makers *not* seek approval for every off-label use, given that it could increase the cost of the drug and limit the scope of its clinical application, all of which would make it less available to their patients.  *See id.*; Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs* 4 (Feb. 23, 2021), https://sgp.fas.org/crs/misc/R45792.pdf.

Off-label use of medication is common and "generally accepted." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 351 (2001); Christopher M. Wittich et al.,

*Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982–990 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538391/ (discussing off-label drug uses that have "become widely entrenched in clinical practice and become predominant treatments for a given clinical condition" and citing studies showing that in a group of commonly used medications, 21% of prescriptions were for off-label use). For example, about half of drugs used to treat cancer are prescribed off label. *See* Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment: Coverage of off-label drug indications*, 24 J. Clinical Oncology 3206–3208 (2006), https://ascopubs.org/doi/10.1200/ JCO.2006.06.8940.

Off-label use is legal because FDA approval only limits how a drug can be marketed—*i.e.*, a drug cannot be marketed for a use different from its FDA-approved use—but not how a physician can prescribe it. *See Buckman*, 531 U.S. at 351 & n.5 (explaining that "[o]ff-label usage . . . is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine"); John J. Smith, *Physician Modification of Legally Marketed Medical Devices: Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55 Food & Drug L.J. 251–252 (2000) (discussing off-label use and noting that "regulatory efforts are directed primarily at device marketing by manufacturers, not device use by physicians").

In fact, multiple federal and state laws have been enacted in recent years to promote and protect off-label prescriptions. *See, e.g.*, Okla. Rev. Stat. § 63-1-2604 (prohibiting health insurers from excluding coverage of off-label cancer treatments); Am. Soc'y of Clinical Oncology, *Recent Developments in Medicare Coverage of Off-Label Cancer Therapies*, 5 J. Oncology Practice 18–20 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2790627/ (discussing 1993 legislation requiring Medicare to cover off-label uses of anti-cancer drugs and an expansion of Medicare's off-label coverage in 2008).

Off-label use is especially common and important in treating minors. Minors are often excluded from clinical drug studies, including for ethical reasons. *See* Wittich (citing study finding that nearly 80% of children discharged from pediatric hospitals were taking at least one off-label medication and discussing range of widely practiced off-label drug uses in pediatric population); H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. Okla State Med. Assoc. 776–783 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6677268 (surveying ten years of literature and finding that "[t]he use of off-label medications in children remains a common practice for pediatric providers").

Finally, and critically, off-label use is often essential for delivering the best care. James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed*

*Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71–104 (1998), https://pubmed.ncbi.nlm.nih.gov/11795338/ ("Off-label use is widespread in the medical community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize."); William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2519223 (explaining that in some circumstances, "a physician's failure to prescribe the medical product for such an unapproved use can constitute medical malpractice").

Thus, off-label use is legal, common, and often essential for delivering medically necessary care. Any suggestion otherwise—including the Sixth Circuit's contention, embraced by the Eleventh Circuit, that off-label use signals that "the FDA is not prepared to put its credibility and testing protocols behind the [drug's] use," *L.W.*, 83 F.4th at 478; *see also Eknes-Tucker*, 80 F.4th at 1225 n.19—greatly misunderstands and misstates how the FDA works.

\* \* \*

In sum, none of the State's proclaimed "justifications" for the Challenged Exclusion hold up to scrutiny. Contrary to the State's claims, the Challenged Exclusion does not prohibit treatment that is "experimental." The State's arguments are based on a fundamental misunderstanding of both how scientific knowledge is

generated and the FDA approval process.  Treatment methods do not require a randomized control trial, observational studies of a specific length, exclusively "high quality" evidence, or on-label use to be safe and effective.  Indeed, were the State's erroneous arguments an acceptable basis for excluding medical care coverage, a significant portion of modern medical practice could be excluded from coverage, including almost all forms of pediatric health care, much of adult health care, and a significant portion of cancer care, and would inflict unjustifiable harm on transgender Medicaid beneficiaries.

## II.   THE CHALLENGED EXCLUSION CONTRAVENES KEY TENETS OF BIOMEDICAL ETHICS.

The Challenged Exclusion eliminates a patient's ability to make a decision, together with their medical providers, about whether accessing a safe and effective form of treatment is in their best interest.  As a result, the Exclusion is directly at odds with key tenets of biomedical ethics: respect for autonomy, beneficence, and justice.  Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics*, 13 (8th ed. 2019).  These universal principles, which are the cornerstones of modern-day healthcare standards, guide providers' treatment decisions regardless of the type of medical care they are providing, and can provide "meaningful guidance" to courts assessing wholesale bans on and/or exclusions of coverage for care.  *Contra L.W.*, 83 F.4th at 478.  To be clear, *amici* do not invoke these principles to suggest that they provide the legal test pursuant to which judges should "assess the validity of

[the Exclusion]." *Id.* Rather, *amici* discuss how the Exclusion compromises these principles rather than protecting them. *Amici* have a strong interest in ensuring that courts and policymakers alike have an accurate understanding of bioethics, and the discussion that follows accordingly explains why the Exclusion is irreconcilable with bioethical principles and therefore why any asserted interest in advancing bioethics should not be credited.

### A.    The Challenged Exclusion Forces Providers to Disregard Patients' Autonomy.

As a general matter, Florida has repeatedly acknowledged the importance of obtaining informed consent and respecting patient decision making, reflecting the core biomedical ethical principle of respect for autonomy. That principle requires that patients have the ability to decide whether to receive appropriate medical care within the framework of informed consent. Beauchamp & Childress at 105. For example, Florida has rendered the failure to adequately obtain informed consent tortious and has created a standard jury instruction on how to evaluate the negligent failure to obtain informed consent. Fla. Stat. § 766.103 (discussing medical malpractice claim involving lack of informed consent); Fla. Standard Jury Instruction No. 402.7. Florida also has enacted a "Right to Try" law, which allows a terminally ill patient, in consultation with their physician, to give "informed

consent" to use non-FDA approved drugs and medical products in order to treat their illness. Fla. Stat. § 499.0295(2)(a)(3).[3]

In stark contrast to these laws reflecting the core principle of autonomy, the Challenged Exclusion attacks autonomy by preventing individuals from pursuing, and health care professionals from providing, beneficial medical treatment with due regard for a patient's interests.

Empowering a patient's autonomy is essential to the integrity of the provider-patient relationship, as well as the patient's individual liberty and ability to determine the course of their life. In keeping with that bioethical principle, "the physician's professional role [is] to make recommendations on the basis of the best available medical evidence and to pursue options that comport with the patient's unique health needs, values, and preferences." Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians Ethics Manual* 170, Annals of Internal Medicine 86 (7th ed. 2019) ("ACP *Ethics Manual*"), https://www.acpjournals.org/doi/10.7326/m18-2160; *see also* Beauchamp & Childress at 105 (respect for autonomy requires health care professionals "to disclose information, to probe for and ensure understanding and voluntariness, and to foster adequate decision making"). Informed consent is a crucial mechanism for

---

[3] Florida's "Right to Try" law also undermines the State's argument that off-label usage is problematic and therefore a sufficient justification to prohibit care.

ensuring respect for autonomy.  In all non-emergency encounters, the provider is obligated to offer the patient material information and guidance, but the patient must be trusted and empowered to make the informed and voluntary decision that best advances their interests.  *See* Parth Shah et al., *Informed Consent* (2021), https://www.ncbi.nlm.nih.gov/books/NBK430827/.  After the patient makes their decision, the provider's duty is to "protect and foster [the] patient's free, uncoerced choices."  ACP *Ethics Manual* at 74.

Where, as here, the patients at issue include minors, the informed consent process usually involves the provider, the minor patient, and the minor's parents. When that is so, each actor has an important role to play: the provider offers medical instruction, the parents provide stewardship and consent, and the minor—assisted by that medical instruction and parental stewardship—provides assent.  *See* Am. Med. Ass'n ("AMA"), *Code of Medical Ethics Opinion 2.2.1*, *Pediatric Decision Making*, https://www.ama-assn.org/delivering-care/ethics/pediatric-decision-making (discussing the importance of "[r]espect and shared decision making" between parents and minors "in the context of decisions for minors"); Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017), http://dx.doi.org/10.18357/ijcyfs82201716754 (discussing relational ethics).

The process of informed consent (which, for minors, also frequently includes their parents) involves five core elements: 1) patient competence, 2) disclosure, 3) comprehension, 4) voluntariness, and 5) consent. Beauchamp & Childress at 122. As to the first element, parents generally have competence to participate in the informed consent process on behalf of their minor children, and many adolescent patients also have the competence to participate in the informed consent process, including in the context of gender-affirming care. *See* Jessica Kremen et al., *Addressing Legislation That Restrict Access to Care for Transgender Youth*, 147 Pediatric Perspectives (2021), https://pubmed.ncbi.nlm.nih.gov/33883246/ (minor patients who are transgender "possess decisional capacity, and with guardian consent and the support of a multidisciplinary team, [] are able to contribute to decisions in their own best interests about [Gonadotropin Releasing Hormones] and gender-affirming hormones"); Beth A. Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J. Bioethical Inquiry 151–164 (2021), https://pubmed.ncbi.nlm.nih.gov/33502682/ (concluding, based on qualitative empirical analysis, that "trans[gender] youth demonstrated the understandings and abilities characteristic of the capacity to consent to hormone therapy and that they did consent to hormone therapy with positive outcomes"); Richard E. Redding, *Children's Competence to Provide Informed Consent for*

*Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695, 707 (1993), https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1759&context= wlulr ("Research . . . indicates that children often are capable of making important life decisions in a rational manner, including decisions about medical and psychological treatment.").

Once competence has been established, the elements of disclosure and comprehension require the provider to accurately and sensitively present relevant information about any diagnosis; the nature and purpose of recommended interventions; the burdens, risks, and expected benefits of all options, including forgoing treatment; and any limitations to the medical community's knowledge regarding burdens, risks, and expected benefits.  AMA, *Code of Medical Ethics Opinion 2.1.1, Informed Consent*, https://www.ama-assn.org/delivering-care/ethics/informed-consent; Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical Considerations with Transgender Children and Youth in Family Therapy*, 23 J. of Fam. Psychotherapy 296, 287–303 (2012), http://dx.doi.org/10.1080/08975353.2012.735594.

For the fourth element, voluntariness, the provider must then assess the patient's (and, if not a mature minor, the parents') ability to understand relevant medical information and the implications of treatment alternatives and to make an independent, voluntary decision.  AMA *Informed Consent*.  Fifth, and finally, the

patient—and, where the patient is a minor, usually the parents as well—decides how to proceed.

From the perspective of biomedical ethics, a decision that is made by a patient (and, when a minor, jointly with a parent/guardian) through a process of informed consent and that aligns with a provider's recommendation should be fully respected. Indeed, medical professionals and patients are regularly entrusted to together decide the best course of treatment, including when the treatment has significant risks or permanent effects. Pediatric chemotherapy or radiation, for example, are subject to principles of informed consent, despite the potential lasting effects on growth development and reproductive capabilities. *See, e.g.*, Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment* (Sept. 18, 2017), https://www.cancer.org/treatment/children-and-cancer/when-your-child-has-cancer/late-effects-of-cancer-treatment.html. Pediatric breast reduction performed to address excess breast tissue, back pain, or social anxiety; pediatric rhinoplasty; and orthopedic surgery on minors following sports injuries likewise can have enduring impacts. There is nothing unique about gender-affirming care that justifies denying coverage even though the provider, and the patient (and the patient's parents, when a minor) all agree about the best course of action.

By prohibiting health care providers from offering medically necessary and appropriate treatment to economically disadvantaged patients with gender dysphoria

and denying patients the ability to access such care when they have given informed consent, the Challenged Exclusion disrespects autonomy and undermines the provider-patient relationship.

### B.   The Challenged Exclusion Forces Providers to Violate Their Duty of Beneficence.

The duty to act in the best interest of the patient is called beneficence, and is best understood as "a group of norms pertaining to relieving, lessening, or preventing harm and providing benefits and balancing benefits against risks and costs." Beauchamp & Childress at 13; *see also id.* at 217 ("[M]orality requires that we treat persons autonomously and refrain from harming them, but morality also requires that we contribute to their welfare.").[4]  Medical professionals in the United States and around the world take oaths and are held to duties that encompass beneficence. The World Medical Association's "Modern Hippocratic Oath" requires physicians to attest upon admission to the medical profession that the "health of [their] patient[s] will be [their] first consideration."  World Medical Association, *Declaration of Geneva* (1948).  Likewise, the United Kingdom's General Medical Council requires

---

[4] A related principle, nonmaleficence, concerns avoiding the causation of harm. Nonmaleficence thus prohibits action while beneficence requires it.  The Challenged Exclusion contravenes both principles.

physicians to "make the care of your patient your first concern." *Good medical practice: Duties of a doctor registered with the General Medical Council*, Gen. Med. Council 70–78 (2001), https://www.gmc-uk.org/ethical-guidance/ethical-guidance-for-doctors/good-medical-practice/duties-of-a-doctor.  And the AMA recognizes that "[t]he practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering."  AMA, *Code of Medical Ethics Opinion 1.1.1*, *Patient-Physician Relationships*, https://www.ama-assn.org/system/files/code-of-medical-ethics-chapter-1.pdf.

Medicaid embodies the principal of beneficence by ensuring the welfare of economically disadvantaged individuals.  The program provides individuals with increased access to and better quality of health care.  The government thus prevents harm by providing patients with safe and beneficial health care.  Conversely, the denial of such care results in serious harm to individuals and negatively impacts the health, safety, and well-being of a community.

Applying the principle of beneficence to the treatment of Medicaid beneficiaries with gender dysphoria is straightforward.  When untreated, gender dysphoria has serious mental and physical consequences, including anxiety, depression, self-harm, and suicidality. *See, e.g.*, Norman P. Spack et al., *Children and adolescents with gender identity disorder referred to a pediatric medical center*,

129 Pediatrics (2012), https://pubmed.ncbi.nlm.nih.gov/22351896; Kristina R. Olson et al., *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (Part 3: Caring for Transgender Children) (2016) https://publications.aap.org/pediatrics/articleabstract/137/3/e20153223/81409/Mental-Health-of-Transgender-Children-Who-Are; Doc. 246 at 21 (crediting testimony that denying gender-affirming care "will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide"); Doc. 246 at 40. By contrast, evidence from both research and clinical experience makes clear that gender-affirming care improves patients' health and alleviates their suffering. *See, e.g.*, *Brandt*, 47 F.4th at 671; *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021); Kraschel at 4. In order to practice beneficence, practitioners must act for the benefit of the patient and promote their welfare. This is not possible when the State denies Medicaid coverage to transgender beneficiaries. The Challenged Exclusion prohibits providers from administering care that would relieve their patient's suffering. Withholding care for gender dysphoria thus can result in serious harm to patients, contrary to the core principle of beneficence.

In sum, the principle of beneficence obligates providers to remove conditions that will cause harm to others. Beauchamp & Childress at 219. By mandating that providers deny care to their economically disadvantaged patients with gender

dysphoria when the patient seeks that care and the provider deems it medically indicated, the Challenged Exclusion forces providers to cause harm to their patients and, thus, to violate their core duty of beneficence.

### C.   The Challenged Exclusion Forces Providers to Violate Their Duty of Justice.

A third core principle of bioethics—justice—requires providers to acknowledge inequalities in the delivery of medical care and to work toward fair, equitable, and appropriate treatment for all. Beauchamp & Childress at 267–68; Clark, *Ethics in Child & Youth Care Practice with Transgender Youth* at 79. The Challenged Exclusion undermines this ethical duty of providers by barring transgender Medicaid beneficiaries from receiving gender-affirming care. Specifically, the Exclusion denies care to a certain class of economically disadvantaged patients based on their transgender identity: coverage for care is banned only if it is for treatment of gender dysphoria, which is care that only transgender individuals seek. Moreover, by limiting access to care for only Medicaid beneficiaries, the Exclusion requires providers to differentiate between their economically disadvantaged transgender patients and all other patients seeking the same care. The Exclusion thus imposes medical strain and financial costs on only those patients who rely on Medicaid.

For example, the Exclusion, if allowed to go into effect, may force Medicaid beneficiaries who are transgender to consider moving out of state or to endure the

negative health effects from stopping hormone therapy and to fear for their ability to survive without treatment.  *See* Doc. 1, Compl. ¶¶ 213, 248.  These potential costs are on top of the many socioeconomic and geographic barriers to gender-affirming care that transgender youth often already face.  *See* Phillip E. Wagner et al., 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans\* Healthcare Support Seeking* 51 (Oct. 2016) (noting "[t]he difficult decisions trans\* individuals make in regard to their healthcare have been well documented" and include "[f]inancial barriers, insurance issues, and access to services").  The Exclusion exacerbates and reinforces these already significant challenges by preventing transgender Medicaid beneficiaries from accessing the gender-affirming healthcare they require.

Also, being denied coverage for gender-affirming care may lead transgender people to avoid seeking medical care altogether, or to choose between their health care, their food, their safety, or their housing.  Compl. ¶¶ 145, 148, 150, 152, 243-244; s*ee also* Kraschel at 5 (noting potential of legislative restrictions on gender-affirming care to disproportionally affect marginalized communities).  Avoiding or delaying care leads "to poorer physical and mental health outcomes."  Luisa Kcomt et al., *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608)   SSM   -   Population   Health   1   (2020), https://www.sciencedirect.com/science/article/pii/S2352827320302457.

Medical practitioners must not cause patients to fear seeking care, nor deny them care that, by definition, only people who are transgender need. The Challenged Exclusion forces health care providers to violate the core biomedical ethics principle of justice by mandating discrimination against a vulnerable, economically disadvantaged, and stigmatized population. By prohibiting transgender Medicaid beneficiaries from accessing treatment for gender dysphoria simply because they are transgender and economically disadvantaged, the Challenged Exclusion deprives them of their autonomy and signals that they are not worthy of beneficence. Without autonomy and beneficence, only injustice can occur.

\* \* \*

The Challenged Exclusion is unsupported by biomedical ethics or any of its core principles. To the contrary, the Exclusion commands their violation, for no legitimate purpose, resulting in physical and emotional suffering.

## CONCLUSION

Unwarranted restrictions on the provision of health care by the State are unethical and detrimental to public health. The Challenged Exclusion contravenes multiple, fundamental principles of biomedical ethics and requires providers to harm their transgender patients who are Medicaid beneficiaries. Were the State permitted to enforce the Challenged Exclusion, it would open the door to unprecedented State

intrusion into medicine and patient rights.  This Court should reject such a result and affirm the District Court's Findings of Fact and Conclusion of Law.

Dated November 29, 2023                    Respectfully Submitted,

                                           /s/ Kathleen Hartnett
                                            Kathleen Hartnett
Katelyn Kang                                Zoë Helstrom
COOLEY LLP                                  COOLEY LLP
55 Hudson Yards                             3 Embarcadero Center, 20th Floor
New York, NY 10001-2103                     San Francisco, California 94111-4004
Telephone: (212) 479-6000                   Telephone: (415) 693-2000
kkang@cooley.com                            khartnett@cooley.com
                                            zhelstrom@cooley.com

                                           *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on November 29, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Eleventh Circuit and served through CM/ECF upon all counsel of record in this case.

Dated: November 29, 2023                    */s/ Kathleen Hartnett*
                                             Kathleen Hartnett

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,420 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: November 29, 2023

*/s/ Kathleen Hartnett*
Kathleen Hartnett

# APPENDIX

## List of *Amici Curiae*

*Amici* include the following individuals, whose affiliations are provided for

identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and
Faculty Director, Petrie-Flom Center for Health Law Policy, Biotechnology &
Bioethics
Harvard Law School

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law