# EXHIBIT 30



DePaul Journal of Health Care Law

Volume 15
Issue 2 *Fall 2013*

Article 3

October 2015

# Active Verification and Vigilance: A Method to Avoid Civil and Criminal Liability When Prescribing Controlled Substances

Michael C. Barnes

Stacey L. Sklaver

Follow this and additional works at: https://via.library.depaul.edu/jhcl

Recommended Citation

Michael C. Barnes & Stacey L. Sklaver, *Active Verification and Vigilance: A Method to Avoid Civil and Criminal Liability When Prescribing Controlled Substances*, 15 DePaul J. Health Care L. 93 (2013)
Available at: https://via.library.depaul.edu/jhcl/vol15/iss2/3

This Article is brought to you for free and open access by the College of Law at Digital Commons@DePaul. It has been accepted for inclusion in DePaul Journal of Health Care Law by an authorized editor of Digital Commons@DePaul. For more information, please contact digitalservices@depaul.edu.

**Exhibit
0037**

# ACTIVE VERIFICATION AND VIGILANCE: A METHOD TO AVOID CIVIL AND CRIMINAL LIABILITY WHEN PRESCRIBING CONTROLLED SUBSTANCES

*By Michael C. Barnes and Stacey L. Sklaver\**

## INTRODUCTION

On June 25, 2009, tragic news broke that the King of Pop, Michael Jackson, had died. Jackson had suffered a sudden and fatal cardiac arrest due to a prescription-drug overdose.[1] Jackson's personal physician, Dr. Conrad Murray, had prescribed the fatal medication dosage in an attempt to relieve Jackson from an insomnia-ridden state.[2] Subsequently, a jury found Murray guilty of involuntary manslaughter, and he received the maximum sentence of four years in prison.[3]

Following Murray's sentencing on November 29, 2011, Los Angeles District Attorney Steve Cooley signaled that, going forward, he would continue to be aggressive in holding physicians[4] criminally liable for their roles in patient deaths[5] resulting from prescribed controlled substances.[6]

---

\* Michael C. Barnes is the managing attorney at DCBA Law & Policy. Stacey L. Sklaver is an associate attorney at DCBA Law & Policy. The authors thank Stewart B. Leavitt, MA, PhD for his editing contributions, and Raven Merlau for her research contributions.

1. Michael Jackson's Amended Death Certificate was released on July 7, 2009, by the State of California listing the cause of death as acute propofol intoxication. *See* Alan Duke, *Michael Jackson Dead at 50 after Cardiac Arrest*, CNN.COM (June 25, 2009), *available at*
http://articles.cnn.com/2009-06-25/entertainment/michael.jackson_1_marlon-jackson-entertainer-michael-jackson-jermaine-jackson?_s=PM:SHOWBIZ.

2. Sentencing Memorandum at 2, *People v. Murray*, (Super. Ct. L.A. County, 2011, No. 073164) *available at* http://ww2.lasuperiorcourt.org/hp/acpo5a55nwx1mc451lmzkt55/1479942870.pdf.

3. Jury Instructions at 7, *People v. Murray* (Super. Ct. L.A. County, 2011, No. 073164) *available at* http://ww2.lasuperiorcourt.org/hp/acpo5a55nwx1mc451lmzkt55/1477575899.pdf; Sentencing Memorandum, *supra* note 2, at 4.

4. Although the legal suggestions in this paper apply to all prescribers, the focus will be on physicians. *See Who Can Prescribe and Administer Rx in Washington State?*, WASH. ST. DEP'T HEALTH (Aug. 2012), *at* http://www.doh.wa.gov/portals/1/Documents/Pubs/690158.pdf (discussing which licensed professionals can write prescriptions.).

5. Jennifer Medina, *Doctor Is Guilty in Michael Jackson's Death*, NY TIMES (Nov. 7, 2011), *available at* http://www.nytimes.com/2011/11/08/us/doctor-found-guilty-in-michael-jacksons-death.html.

6. *See* 42 U.S.C. § 802 (2006). The Controlled Substances Act defines "controlled substances" to mean "drugs or other substances" as found in schedules I through V. These schedules contain drugs that have a high potential for abuse. 42 U.S.C. § 812 (2006). Such drugs include diazepam (Valium), propofol (Diprivan), hydrocodone (Vicodin), carisoprodol (Soma), oxycodone (OxyContin), oxycodone with paracetamol/acetaminophen (Percocet, Tylox), propoxyphene (Darvon), hydromorphone (Dilaudid),

Less than a year later, Cooley stayed true to his word.[7] On March 1, 2012, Dr. Hsui-Ying "Lisa" Tseng was arrested.[8] Mr. Cooley charged Dr. Tseng with second-degree murder for the deaths of three of her patients that had suffered fatal overdoses of prescription medications that she had prescribed.[9] Although it is more common for physicians to face civil liability, the homicide charges against doctors Murray and Tseng, and against many physicians throughout the United States, demonstrate the increasingly varied, yet severe, forms of legal liability that physicians may face for improperly prescribing controlled substances.[10]

According to the Centers for Disease Control and Prevention ("CDC"), prescription drug abuse[11] in the United States is an epidemic[12] that is gaining widespread recognition.[13] Accompanying the rise in abuse is a rise in the number of deaths associated with prescription drug overdoses.[14] In 2010, seven people died each day from prescription drug overdoses in Florida alone.[15] As a result, states understandably have

---

lorazepam (Atvan), midazolam (Versed), alprazolam (Xanax), morphine sulfate (MS Contin), and meperidine (Demerol). This Article refers to prescription medications by their generic names.

7. *See* Hailey Branson-Potts, *Doctor Accused of Murder in Overdoses Ignored Signs, Witness Says*, L.A. TIMES (June 6, 2012), *available at* http://articles.latimes.com/2012/jun/06/local/la-me-0606-lisa-tseng-20120606.

8. Press Release, Sandi Gibbons, L.A. Cnty. Dist. Attorney's Office, *Rowland Heights Doctor Charged with Murder in Patient Deaths* (Mar. 1, 2012), *available at* http://da.lacounty.gov/mr/archive/2012/030112a.htm.

9. Linda Deutsch & Greg Risling, *Hsiu-Ying 'Lisa' Tseng, Calif. Doctor, Charged with Murder in Patients' Prescription Overdose Deaths*, HUFFINGTON POST (Mar. 3, 2012), *available at* http://www.huffingtonpost.com/2012/03/05/hsiu-ying-lisa-Tseng-murder-charge-unethical-doctor_n_1321161.html; *see also The War on Pill Mills*, AM. NEWS REPORT (Mar. 5, 2011), *at* http://americannewsreport.com/the-war-on-pill-mills-8813413.

10. *See* Deutsch & Risling, *supra* note 9; *The War on Pill Mills*, *supra* note 9; *see also* Julia Dahl, *Doctors and Drugs: Is it Murder when a Patient ODs?*, CBS NEWS (Mar. 12, 2012), *available at* http://www.cbsnews.com/8301-504083_162-57394532-504083/doctors-and-drugs-is-it-murder-when-a-patient-ods (discussing a Florida physician who is charged with first-degree murder).

11. *See National Prescription Drug Abuse Prevention Strategy*, CTR. LAWFUL ACCESS & ABUSE DETERRENCE, 7 (2010), *available at* http://claad.org/downloads/2010_National_Strategy.pdf. "Prescription Drug Abuse" is "the intentional self-administration of a medication for a nonmedical purpose such as 'getting high.'" This definition "includes all degrees of medication use with the intention of experiencing a high, from teens swallowing pills from medicine cabinets to inveterate addicts 'shooting' morphine. Abuse and nonmedical use are synonymous" for the purpose of this Article. It includes all controlled substances, whether they be benzodiazepines, stimulants, or opioids—both long and short acting.

12. *See Glossary*, CTR. FOR DISEASE CONTROL AND PREVENTION, http://www.cdc.gov/vaccines/about/terms/glossary.htm#e. The CDC defines "epidemic" as "[t]he occurrence of more cases of disease than expected in a given area or among a specific group of people over a particular period of time."

13. *See Prescription Drug Overdoses—a U.S. Epidemic*, CTR. FOR DISEASE CONTROL & PREVENTION (Jan. 13, 2012), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6101a3.htm.

14. *See id.*

15. Lizette Alvarez, *Florida Shutting 'Pill Mill' Clinics*, NY TIMES (Aug. 31, 2011), *available at* http://www.nytimes.com/2011/09/01/us/01drugs.html?pagewanted=all.

moved to interrupt the supply of prescription medications to drug abusers.[16]

Although drug abusers may acquire prescription medications through illicit channels, many others obtain prescriptions directly from prescribers.[17] Although at the fringe, some physicians operate pill mills, acting as little more than drug dealers.[18]  However, the vast majority of physicians prescribe controlled substances in good faith, legitimately trying to manage patients' medical ailments, such as a chronic pain, anxiety, or insomnia.[19] Yet, states, such as Florida,[20] are simultaneously imposing stronger legal duties upon physicians and seeking criminal sanctions against physicians who improperly prescribe controlled substances.[21]

Prior to the epidemic, many scholars and courts alike had opposed the imposition of criminal liability on physicians for improper prescribing, fearing that such liability would create a chilling effect: physicians would refrain from properly treating patients who legitimately needed certain prescription medications out of fear of criminal sanctions if a patient died from an overdose.[22] However, the issue for physicians is more nuanced than just whether or not to prescribe controlled substances, and the belief that that physicians should be held criminally liable when their patients die from prescription drug overdoses, is gaining traction.[23]

---

16. *See* Deutsch & Risling, *supra* note 9; *War on Pill Mills, supra* note 9.

17. *See War on Pill Mills, supra* note 9.

18. *See, e.g.*, Deonarine v. State, 967 So. 2d 333, 337 (Fla. Dist. Ct. App. 2007) (convicting the defendant physician of trafficking a controlled substance after he wrote multiple prescriptions in bad faith); Ashley Dutko, *Florida's Fight Against Prescription Drug Abuse: Prescription Drug Monitoring Program*, 34 NOVA L. REV. 739, 744 (2010).

19. *See, e.g.*, Diane E. Hoffman, *Treating Pain v. Reducing Drug Diversion and Abuse: Calibrating the Balance in our Drug Control Laws and Policies*, 1 ST. LOUIS U. J. HEALTH L. & POL'Y 231, 277 (2008) (stating that most courts will hear a good faith defense to charges resulting from a prescription overdose).

20. *See* H.R. 7095, 113th Cong. (2011). Florida House Bill No. 7095 requires physicians to actively verify patients' suitability for the use of controlled substances and remain vigilant in ensuring controlled substances continue to be appropriate for their patients, a model used by this article.

21. *Id.*; *see also* Medscape Today News, *State-by-State Opioid Prescribing Policies*, *available at* http://www.medscape.com/resource/opioid/opioid-policies.

22. *See, e.g.*, Danielle M. Nunziato, Note, *Preventing Prescription Drug Overdose in the Twenty-First Century: Is the Controlled Substances Act Enough?*, 38 HOFSTRA L. REV. 1261, 1269 (2009) ("Many scholars oppose holding physicians criminally liable under the CSA or the state penal laws for the death of a patient out of fear that this will discourage physicians from providing palliative treatment to patients suffering from chronic pain."); James R. Blaufuss, *A Painful Catch-22: Why Tort Liability for Inadequate Pain Management Will Make for Bad Medicine*, 31 WM. MITCHELL L. REV. 1093, 1095 (2005).

23. Erica Trachtman, Note, *A Horrific Violation of Trust: Prosecuting Doctors for Patients' Prescription Overdoses*, AM. CRIM. L. REV. (Feb. 21, 2012), *available at* http://www.americancriminallawreview.com/Drupal/blogs/blog-entry/horrific-violation-trust-prosecuting-doctors-patients%E2%80%99-prescription-overdoses-02-21 ("Despite opposition from the American Medical Association that the tort system is sufficient for holding physicians accountable for negligently prescribing medication, the Drug Enforcement Administration reports a steady rise in successful criminal

When a patient dies of a prescription drug overdose, the physician may face legal actions ranging from civil liability to first-degree murder.[24] As more prosecutors bring charges against physicians, these physicians willing to prescribe controlled substances may not be able to accurately predict when they could face criminal liability.[25] Additionally, courts have begun to reject long-standing defenses that physicians have used in the past.[26]

Moreover, controlled substances are not appropriate for certain patients, even when such patients have a legitimate medical need for the medication, especially if the patients have previously abused or exhibit signs that they are likely to abuse controlled substances. This article establishes that physicians who prescribe controlled substances must, on a case-by-case basis, actively verify that treatment via controlled substances is an appropriate option for their patients, diligently ensure that the patients remain suitable candidates after the physicians have prescribed such medication, and willingly change the course of treatment if the patients exhibit any signs of abuse—a method that this paper deems "active verification and vigilance."[27] This method, when thoroughly documented in medical records, helps to satisfy physicians' duties under civil law, the Controlled Substances Act ("CSA"),[28] state controlled substances acts, and state homicide laws.[29] Therefore, to protect patients from foreseeable harm and to make both civil liability and criminal convictions less likely, physicians must adequately and diligently employ the method of active verification and vigilance when prescribing controlled substances.[30]

---

prosecutions of physicians, from just 15 convictions in 2003 to 43 in 2008.").

24. *See infra* Part IV.A-B.

25. *See* Frank L. Sapienza, *Abuse Deterrent Formulations and the Controlled Substances Act (CSA)*, 70 DRUG & ALCOHOL DEPENDENCE S23, S30 (2012) (stating that " . . . differentially scheduled products, formulations and substances could also lead to confusion regarding appropriate criminal charges, penalties and sentencing issues" in a discussion of the CSA).

26. *See infra* Parts IV, V and Table 1 (discussing the good faith, contributory negligence, calculated risk, and willful ignorance defenses).

27. *See* Stewart B. Leavitt & Gary M. Reisfield, *Introducing "Understanding UDT in Pain Care,"* PAIN TREATMENT TOPICS (Aug. 27, 2012), *available at* http://updates.pain-topics.org/2012/08/introducing-understanding-udt-in-pain.html?m=1. The concept of "vigilance" in this article is based on the definition of pharmcovigilence, which is defined as the science and activities related to the "detection, assessment, understanding, and prevention of adverse effects or other problems related to medication prescribing and use" in order to "enhance the care and safety of patients."

28. Controlled Substances Act of 1970, 42 U.S.C. §§ 801-971 (2006).

29. *See infra* Part III.

30. This article defines "active verification" as (1) verifying a patient's medical history, (2) checking prescription monitoring program databases, (3) determining whether other treatments that did not involve controlled substances were tried and failed by using drug tests before first prescribing, and (4) continuing to

This article serves as a guide to physicians[31] and their legal counsel to help them better determine when physicians can be held civilly and criminally liable if their patients die from improperly using controlled substances while under the physicians' care. It analyzes both civil and criminal case law at both the state and federal levels, determines which defenses are no longer viable, and makes recommendations as to what steps physicians should take to avoid liability. Part I first explores the problem of prescription drug abuse in the United States, and the resulting increase in legal proceedings involving physicians. Part II provides an overview of the medical standard of care, the CSA test as well as state controlled substances act tests for criminal liability, and various homicide doctrines. Part III establishes that physicians must, to the best of their ability, actively verify patient suitability for controlled substances before beginning treatment and must remain vigilant throughout the course of treatment to better comply with legal requirements imposed by civil law, the CSA, state controlled substances acts, and state homicide statutes. Part IV discusses civil cases in which courts have held physicians liable for their patients' deaths due to overdoses of controlled substances. Part V discusses how physicians may be held criminally liable for failing to actively verify patient suitability before beginning treatment and remain vigilant throughout the course of treatment. It reviews federal and state criminal cases in which courts have held physicians liable when improper prescribing practices resulted in patient deaths. It highlights defenses on which physicians may no longer rely, further emphasizing the need for physicians to actively verify patient suitability for controlled substances before beginning treatment and remain vigilant throughout the course of treatment. This article concludes by asserting that, if physicians properly adhere to the method of active verification and vigilance, they have a better chance of providing adequate care for their patients and avoiding civil and criminal liability at state and federal levels.

## I. THE GROWING PROBLEM OF PRESCRIPTION DRUG ABUSE

Whitney Houston, Michael Jackson, Heath Ledger, and Anna Nicole Smith are just a few of the many modern-day celebrities whose prescription drug-related deaths have highlighted the national problem of

---

test and monitor patients throughout their treatment to ensure the patients do not use the controlled substance improperly.

31. This article addresses liability faced solely by physicians. However, physician extenders and other practitioners may also be held liable if they practice on their own, and could still be required to defend themselves even if they were acting under the direct supervision of physicians. This is an issue of agency relationships, and is beyond the scope of this paper.

prescription drug abuse.[32] According to the Centers for Disease Control and Prevention, "prescription drug abuse is the fastest growing drug problem in the United States."[33] In 2010, approximately 16,651 people in the United States died as result of unintentional overdoses involving prescription opioid pain relievers.[34]

Several classes of prescription medications are prone to abuse.[35] One such class is the aforementioned opioid pain relievers.[36] Since 2003, deaths due to prescription opioid overdoses have outpaced deaths due to heroin and cocaine overdoses combined.[37] Prescription opioids include hydrocodone, oxycodone, morphine, hydromorphone, and meperidine.[38] Physicians prescribe such medications because opioids can "effectively change the way a person experiences pain," making the pain more tolerable.[39] Yet, opioids may also result in a heightened sense of pleasure, making such medication prone to abuse.[40]

Central nervous system ("CNS") depressants are another class of prescription medications that patients often abuse.[41] CNS depressants are sedatives that enhance the effect of gamma-aminobutyric acid in the brain, subsequently slowing brain activity.[42] CNS depressants include propofol, barbiturates, and benzodiazepines, like alprazolam and diazepam.[43]

---

32. Nunziato, *supra* note 22 at 1262; *Whitney Houston Dead: Officials Confirm Prescription Drugs Found in Hotel Room*, HUFFINGTON POST (Feb. 13, 2012), *available at*
http://www.huffingtonpost.com/2012/02/13/whitney-houston-death-prescription-drugs-found-hotel-room_
n_1274533.html.

33. *Prescription Drug Overdoses—a U.S. Epidemic*, *supra* note 13.

34. Press Release, Ctr. for Disease Control & Prevention, *Opioids drive continued increase in drug overdose deaths*, (Feb. 20, 2013), *available at*
http://www.cdc.gov/media/releases/2013/p0220_drug_overdose_deaths.html; *See* Stewart B. Leavitt, *Drug Overdose Deaths Still Rising in U.S.*, PAIN TREATMENT TOPICS (Feb. 19, 2013), *available at* http://updates.pain-topics.org/2013/02/drug-overdose-deaths-still-rising-in-us.html (stating that of those 16,651 deaths involving opioids, 4,903 were the result of opioid use alone and the rest of the deaths involved a combination of opioids and alcohol, other prescription medications, or illicit drugs).

35. *See Commonly Abused Drugs Chart*, NAT'L INST. ON DRUG ABUSE (Mar. 2011), *available at* http://www.drugabuse.gov/drugs-abuse/commonly-abused-drugs/commonly-abused-drugs-chart (stating that classes prone to abuse include opioid pain relievers, stimulants, and CNS depressants).

36. *See id.*

37. *Prescription Drug Overdoses—a U.S. Epidemic*, *supra* note 13.

38. James Zacny, et al., *College on Problems of Drug Dependence taskforce on prescription opioid non-medical use and abuse: position statement*, 69 DRUG & ALCOHOL DEPENDENCE 215 (2003).

39. UT Dep't of Human Serv., *Substance Abuse & Mental Health: Opioids*, *available at* http://www.dsamh.utah.gov/opioids.htm.

40. *Prescription Drug Overdoses—a U.S. Epidemic*, *supra* note 13.

41. *Id.*

42. *Id.*

43. *Id.*

Abusers often mix CNS depressants with other prescription medications, such as stimulants like amphetamines.[44]

A third class of highly-abused controlled substances is stimulants, which includes methylphenidate, dextroamphetamine, and pemoline. Individuals tend to abuse stimulants because doing so may result in many of the same euphoric effects as cocaine.[45] Yet, stimulants also have other negative effects. High doses of stimulants can lead to an increased risk of addiction, cardiovascular complications, increased blood pressure, headaches, panic episodes, aggressive behavior, suicidal or homicidal tendencies, and overdose-related deaths.[46]

When a physician improperly prescribes a controlled substance, he can face professional responsibility, civil, and criminal legal proceedings.[47] For example, the Osteopathic Medical Board of California alleged that Dr. Lisa Tseng improperly prescribed drugs to a number of patients, eventually leading to Dr. Tseng's voluntary surrender of her license.[48] Dr. Tseng also settled civil suits for the wrongful deaths of five of her patients who died of prescription drug overdoses.[49] Soon after, Los Angeles County District Attorney Steve Cooley brought second-degree murder charges against Dr. Tseng.[50]

Criminal charges are becoming more frequent as states attempt to crack down on so-called pill mills and the rogue prescribers who operate out of them. Pam Bondi, Florida's Attorney General, describes such physicians as "drug dealers in white coats."[51] As states enact tougher laws to deter improper prescribing, physicians who legitimately prescribe

---

44. *Id.*

45. Barbara Prudhomme White, et al., *Stimulant Medication Use, Misuse, and Abuse in an Undergraduate and Graduate Student Sample*, 54 J. AM. COLL. HEALTH 261 (2006).

46. *Id.*

47. Nadia N. Sawicki, *Character, Competence, and the Principles of Medical Discipline*, 13 J. HEALTH CARE L. & POL'Y 285, 287-88 (2010); *see also* Amy J. Dilcher, *Damned if They Do, Damned if They Don't: The Need for a Comprehensive Public Policy to Address the Inadequate Management of Pain*, 13 ANNALS HEALTH L. 81, 92 (2004) ("[T]he number of DEA actions against health care providers is increasing."); U.S. Dep't of Justice, *Cases Against Doctors* (Mar. 22, 2013), *available at* http://www.deadiversion.usdoj.gov/crim_admin_actions/doctors_criminal_cases.pdf.

48. Gibbons, *supra* note 8; *see also* Linda Deutsch, *Dr. Hsui-Ying 'Lisa' Tseng, California Doctor Charged With Murder of 3 Patients*, HUFFINGTON POST, (Mar. 1, 2012), *available at* http://www.huffingtonpost.com/2012/03/01/dr-hsui-ying-lisa-tseng-arrested_n_1314934.html.

49. Miriam Hernandez, *Dr. Lisa Tseng Prescribes Meds to Undercover Agent—Caught on Tape*, ABC LOCAL (June 21, 2012), *available at* http://abclocal.go.com/kabc/story?section=news/local/los_angeles&id=8710399.

50. Linda Deutsch, *Dr. Hsui-Ying 'Lisa' Tseng Dubbed 'Doctor Feelgood' During Murder Investigation*, HUFFINGTON POST, (Mar. 2, 2012), *available at* http://www.huffingtonpost.com/2012/03/02/dr-hsui-ying-lisa-tseng-doctor-feelgood_n_1316262.html.

51. Alvarez, *supra* note 15.

controlled substances face greater scrutiny and risk of civil and criminal liability.[52] They must know and abide by the proper standards of care.

## II. THE MEDICAL STANDARD OF CARE, THE ANALOGOUS CSA STANDARD, AND HOMICIDE DOCTRINES

When prescribing medications, physicians have a legal duty to abide by the medical standard of care or face liability for breaching such standard.[53] Courts use various tests to determine the medical standard of care.[54] Additionally, the CSA imposes a criminal duty on physicians that draws from the medical standard of care, and all states have their own controlled substances acts, which are typically modeled after the CSA.[55] This Part provides an overview of the standard of care and physicians' duties under the CSA and under state laws.

### A. Tests for the Medical Standard of Care in Civil Cases

Courts rely on a medical standard of care in medical malpractice cases to determine physicians' legal duties to their patients.[56] Although there is no widely accepted definition for the standard of care that governs the medical community, state courts tend to use one of two tests to determine the standard: the "medical customs" test and the "reasonable, prudent physician" test.[57] Courts that apply the medical customs standard of care evaluate a defendant physician's conduct by comparing such conduct with that of his peers in the medical community.[58] The party

---

52. *See, e.g.*, FLA. STAT. § 893.055(9) (2012) (stating that prescribers face a first-degree misdemeanor offense if they "willfully and knowingly fail to report the dispensing of a controlled substance"); *see also* Scott Wartman, *Pill Mill Bill is Affecting Legitimate Patients, Doctors Say*, CINNCINATI.COM, (Aug. 10, 2012), *available at* http://news.cincinnati.com/article/20120813/NEWS0103/308130009/Pill-mill-bill-affecting-legitimate-patients-doctors-say.

53. *See, e.g.*, Peter Moffett & Gregory Moore, *The Standard of Care: Legal History and Definitions: the Bad and Good News*, 12 W. J. EMERG. MED. 109, 109-12 (2011).

54. *Id.* The duty of care is one element of the medical malpractice test, which is a type of professional negligence. The four elements include the following: (1) the physician owed a legal duty to the patient by undertaking care or treatment of the patient; (2) the physician breached his duty to the patient by failing to conform to the relevant standard of care; (3) the breach caused an injury; and (4) the patient suffered damage. *See* Budd v. Nixen, 491 P.2d 433, 436 (Cal. 1971).

55. *See infra* Part II.B; *see also* Richard L. Braun, *Uniform Controlled Substances Act of 1990*, 13 CAMPBELL L. REV. 365, 365 (1991).

56. Dirk C. Strauss & J. Meirion Thomas, *What Does the Medical Profession Mean by "Standard of Care?"*, 27 J. CLINICAL ONCOLOGY e192, e193 (2009); Robert I. Simon, *The Standard-of-Care Testimony, Best Practices or Reasonable Care?*, 33 J. AM. ACAD. PSYCHIATRY L. 8 (2005), *available at* http://www.jaapl.org/content/33/1/8.full.

57. *Id.*

58. *Id.*; Simon, *supra* note 56.

seeking to establish a customary practice in court typically does so by presenting evidence in the form of expert testimony.[59]

According to the Supreme Court decision, *Daubert v. Merrell Dow Pharmaceuticals Inc.*,[60] a proponent presenting expert testimony must prove that the expert has scientific knowledge and that such knowledge is valid.[61] Courts determine validity by considering various factors.[62] Such factors include whether:

1. Scientists have tested the theory or technique and deemed it valid;

2. Peers have reviewed the idea or it has been published in scientific journals;

3. The relevant scientific community has generally accepted the theory or technique as valid; and

4. Standards have been circulated, usually in the form of consensus statements or clinical guidelines, to govern the operation of the technique and the known or potential rate of error involved in the technique.[63]

The factors focus on methodology and principles rather than simply the ultimate conclusions generated.[64]

However, many other courts throughout the United States have expressly rejected deference to medical customs, reframing the medical standard of care in terms of the "reasonable, prudent physician" test.[65] In fact, the courts of at least twenty-one states have applied a form of the

---

59. *See, e.g.*, Raines v. Lutz, 341 S.E.2d 194, 196 (Va. 1986) (holding that expert testimony is normally required on the standard of care, deviation from standard of care, and causation); Walski v. Tiesenga, 72 Ill. 2d 249, 256 (1978) (holding that the plaintiff must establish the standard of care for medical malpractice through an expert witness).

60. Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).

61. *Id.* at 589.

62. *Id.*

63. *Id.*

64. *Id.*; *see also* Strauss, *supra* note 56, at e193.

65. *See, e.g.*, Philip G. Peters, Jr., *The Quiet Demise of Deference to Custom: Malpractice Law at the Millennium*, 57 WASH. & LEE L. REV. 163, 164 (2000) (noting that twelve states have expressly rejected giving deference to medical customs, and nine more states have rephrased their standard of care to address the reasonable, prudent physician rather than customs in the medical community); Leonard J. Nelson III, et al., *Medical Liability and Health Care Reform*, 21 HEALTH MATRIX 443, 453 (2011) (noting the trend toward replacing the traditional medical standard of care with the reasonable prudent physician standard of care).

reasonable, prudent physician test.[66] The reasonable, prudent physician test is not determined by the average physician.[67] Even if 99 of 100 physicians perform the same inadequate technique or ascribe to a certain theory, a court can still find the physicians negligent if such technique or theory caused harm to patients.[68] Courts have held that negligence cannot be excused just because other physicians use similar practices or the medical community widely accepts such practice.[69] As such, the reasonable, prudent physician test is more stringent than the medical customs test, focusing more on whether a physician's action or omission could cause the patient harm, rather than customary acceptance.[70] Therefore, physicians must protect themselves by not only taking into account what is customary, but also what any reasonable, prudent physician would do in a like situation to prevent harm to a patient.

## B. The CSA's and State Controlled Substances Acts' Criminal Duties

Physicians must also adhere to standards and duties imposed by the CSA and state controlled substances acts. In response to a growing illicit drug problem in the U.S., Congress passed the CSA, which granted the U.S. Drug Enforcement Administration ("DEA") authority to investigate and prosecute prescribers.[71] The Act created five schedules that classify

---

66. These states include California, Colorado, the District of Columbia, Florida, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Minnesota, Nevada, Pennsylvania, Ohio, Oklahoma, Texas, Virginia, Wisconsin, and Wyoming. *See, e.g.*, Smethers v. Campion, 108 P.3d 946, 954 (2005); Darling v. Charleston Cmty. Mem'l Hosp., 211 N.E. 2d 253, 257 (1965); Favalora v. Aetna Cas. & Sur. Co., 144 So. 2d 544, 550 (1962); Peters, *supra* note 65, at 172-85.
67. Simon, *supra* note 56.
68. *Id.*
69. *See, e.g.*, The T. J. Hooper, 60 F.2d 737, 738 (1932); Helling v. Carey, 519 F.2d 981, 983 (1974); Simon, *supra* note 56.
70. *See, e.g.*, Gilbert v. Sycamore Mun. Hosp., 622 N.E.2d 788, 795 (Ill. 1993) (stating that the standard of care is "the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess."); McPherson v. Ellis, 287 S.E.2d 892, 895 (N.C. 1982), stating:

> [a] physician or surgeon who undertakes to render professional services must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess; he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and he must use his best judgment in the treatment and care of his patient. . . . He is held to the standard of professional competence and care customary in similar communities among physicians engaged in his field of practice.

Helling v. Carey, 519 P.2d 981, 983 (Wash. 1974) (citing The T.J. Hooper, 60 F.2d 737 (2d Cir. 1932)) (describing the reasonable, prudent physician test and stating that courts must set their own standards rather than leaving it up to the medical community because "there are precautions so imperative that even their universal disregard will not excuse their omission").
71. 21 U.S.C. § 878 (2006); *1970-1975*, U.S. Drug Enforcement Admin., *available at* http://www.justice.gov/dea/about/history/1970-1975.pdf.

controlled substances based on considerations, such as degree of actual or relative potential for abuse, scientific evidence of pharmacological effect, public health risks, and psychic or physiological dependence liability.[72] Schedule I contains substances that lack any accepted medical use in treatment.[73] Schedules II through V contains controlled substances that state-licensed physicians may prescribe as long as they have registered with the DEA to do so.[74]

The CSA also imposes upon physicians duties regarding receiving and maintaining records of controlled substances, writing or faxing prescriptions, providing refills, transferring a controlled substance to another registered prescriber, providing proper security for storage of controlled substances, and reporting and completing the proper paperwork for theft or significant loss of controlled substances.[75]

In addition to the CSA, each state has statutes that regulate physicians' ability to prescribe controlled substances.[76] Such statutes typically fall under the states' own controlled substances act, which are usually modeled after the CSA.[77] State statutes can impose additional duties on physicians who prescribe controlled substances.[78] Thus, physicians must also be aware of the controlled substances act that applies in their state.

Federal courts applying the CSA and many state courts applying their own controlled substances acts determine criminal liability based on a three-step test. The court must determine whether (1) the physician knowingly and intentionally furnished a prescription for a controlled substance; (2) the physician's behavior serves a "legitimate medical purpose;" and (3) the physician acts within "the usual course of medical practice."[79]

---

72. 21 U.S.C. § 811(c) (2006).

73. 21 U.S.C. § 812 (2006).

74. *Id.*; U.S. Dep't Justice, *Practitioner's Manual, Section II—General Requirements*, DRUG ENFORCEMENT ADMIN.: OFF. DIVERSION CONTROL (2006), *available at* http://www.deadiversion.usdoj.gov/pubs/manuals/pract/section2.htm.

75. 21 C.F.R. § 1301.71(a); U.S. Dep't Justice, *Practitioner's Manual, An Informational Outline of the Controlled Substances Act*, DRUG ENFORCEMENT ADMIN.: OFF. DIVERSION CONTROL (2006), http://www.deadiversion.usdoj.gov/pubs/manuals/pract/index.html.

76. Braun, *supra* note 55.

77. *Id.*

78. *Id.*

79. *See, e.g.*, 21 U.S.C. § 841(a)(1) (2006); State v. Moody, 393 So. 2d 1212, 1214-5 (La. 1981); United States v. Rosenberg, 515 F.2d 190, 196-7 (1975) (holding that the phrases "in the usual course of professional practice" and "legitimate medical purpose" have the same meaning); *see also* United States v. Moore, 423 U.S. 122, 141-2 (1975); *see also* Deborah Hellman, *Pushing Drugs or Pushing the Envelope: The Prosecution of Doctors in Connection with Over-Prescribing Opium-Based Drugs*, 28 PHIL. & PUB. POL'Y Q. 7 (2008), *available at*

Physicians can meet these duties under CSA by abiding by the medical standard of care.[80] Although the CSA test is used for criminal liability, it is consistent with the medical standard of care, and courts have applied both the reasonable, prudent physician and medical customs tests in CSA cases.[81] For instance, in *United States v. Alerre*, the defendant physicians faced criminal charges for drug distribution, drug conspiracy, and money-laundering.[82] The lower court had allowed an expert physician to testify that the defendants had issued prescriptions that were "inconsistent with the dosages that a prudent physician in the state of South Carolina would give [under] the standard of care."[83] The lower court permitted the jury to *consider* but not necessarily *convict* based on what a "reasonable physician would have done," *i.e.*, the same civil test used for the medical standard of care.[84] The appellate court upheld the lower court's decision to permit the jury to consider the medical standard of care.[85] It stated that a showing of breach of the medical standard of care—a civil standard—is relevant to establish that the physician breached his duties to the patient under criminal law as long as the jury was also properly instructed on the criminal standard for liability.[86]

Similarly, in *United States v. Chube*,[87] the Fourth Circuit upheld the lower court's convictions of Dr. Randall Chube and Dr. David Demaret Chube II for unlawful distribution of a controlled substance, which the physicians argued that they used to treat their patients' chronic pain.[88] The circuit court noted that the government was required to show that the defendant "knowingly and intentionally acted 'outside the course of professional practice' and without 'a legitimate medical purpose.'"[89] The court further stated that it was "impossible sensibly to discuss the question of whether a physician was acting outside the usual course of professional practice without a legitimate medical purpose without mentioning the

---

http://digitalcommons.law.umaryland.edu/cgi/viewcontent.cgi?article=1801&context=fac_pubs.    Please note that while many of these cases also list "acting in good faith" as an additional element, this Article shows that physicians can no longer rely upon "good faith," as discussed below.

80. *See supra* Part II.A.

81. *See* United States v. Alerre, 430 F.3d 681, 686 (4th Cir. 2005); United States v. Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994) (noting that the lower court confused the reasonable, prudent physician standard with the legitimate medical purpose standard when advising an expert on the witness stand, yet ultimately holding that the lower court's definition of the criminal standard was correct).

82. *Id.* at 684.

83. *Id.* at 686.

84. *Id.* at 687.

85. *Id.* at 691.

86. *Id.*

87. U.S. v. Chube II, 538 F.3d 693 (4th Cir. 2008).

88. *Id.* at 694.

89. *Id.* at 695.

usual [medical] standard of care."[90] Thus, the medical standard of care and the CSA test often contain the same requirements, and a physician can meet his duties to his patients under the CSA by complying with the medical standard of care.

### C. Homicide Doctrines

When a patient dies due to a prescription drug-related overdose, prosecutors can choose to charge the physician and apply state homicide laws. Although some courts have been reluctant to find physicians criminally liable for breaching the standard of care due to such physicians' benign motives in inflicting injury on patients,[91] many other courts are less apprehensive when such breach results in a patient's death. [92]When physicians violate the CSA or state law regulating controlled substances, state medical boards typically suspend physicians' medical licenses temporarily or place physicians on probation.[93] However, if a physician is convicted under a state homicide statute, his license can be permanently revoked, making such charge a more enticing option for prosecutors aiming to deter improper prescribing in particularly egregious cases.[94]

Some prosecutors, in states such as California, have charged physicians with involuntary manslaughter and second-degree murder.[95] Other prosecutors, in states such as Georgia, have charged physicians with felony-murder.[96] Florida prosecutors have gone so far as to charge physicians with first-degree murder.[97] Given that the distinctions between these legal doctrines are so nuanced, it is helpful to provide a quick and simplified overview. This section will use California terminology to discuss involuntary manslaughter and second-degree murder, Georgia terminology to discuss felony-murder, and Florida terminology to discuss

---

90. *Id.* at 698.

91. Leonard J. Nelson III, Helling v. Carey, *Revisited: Physician Liability in the Age of Managed Care*, 25 SEATTLE U. L. REV. 777, 785 (2002).

92. *See infra*, Part III; *see also* Laura D. Seng, *Legal and Regulatory Barriers to Adequate Pain Control for Elders in Long-Term Care Facilities*, 6 N.Y. CITY L. REV. 95, 101 (2003) (stating that "criminal prosecution[s] of physicians are unfortunately a necessary evil" in a discussion of prescription drug abuse).

93. Trachtman, *supra* note 23.

94. States have the power to revoke physicians' licenses to practice medicine if the physicians have been found guilty of improper or unlawful conduct. *See, e.g.*, Younge v. State Bd. of Registration for Healing Arts, 451 S.W.2d 346, 347 (Mo. 1969). The purpose of such action is to protect the public rather than to punish the physician. *Id.* One study found that 69% of physicians convicted of murder, manslaughter, or involuntary manslaughter convictions had their licenses revoked. Paul Jung, et al., *U.S. Physicians Disciplined for Criminal Activity*, 16 HEALTH MATRIX 335, 349 (2006).

95. *See infra* Part V.B.

96. *Id.*

97. *Id.*

first-degree murder. Each of these states—California, Georgia, and Florida—have adjudicated cases against physicians using these criminal doctrines respectively, as discussed below.[98]

## 1. Involuntary Manslaughter

Involuntary manslaughter is an unintentional, unlawful killing committed without malice aforethought but committed with criminal negligence.[99] To be convicted of involuntary manslaughter, the defendant must have either committed a killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."[100] Criminal negligence is defined as the reckless or grossly negligent commission of a highly dangerous act.[101] A person acts with criminal negligence when he should be, but is not, aware of the substantial and unjustifiable risk to human life.[102] The conduct is such a departure from the reasonable, prudent person's conduct under the same circumstances that it shows "disregard of human life or an indifference to consequences," thus establishing the objective, reasonable, prudent physician standard in the criminal context.[103]

## 2. Second-Degree Murder

Second-degree murder is a lesser-included offense of first-degree murder.[104] Case law defines second-degree murder as a murder that is committed with malice aforethought.[105] A court will presume malice aforethought exists if (1) an assailant deliberately performs an unlawful act resulting in death, (2) the assailant knows that his conduct endangers the life of another, and (3) the act is executed without provocation or sudden passion.[106]

In order to act with malice, the defendant must have known that his act threatened a life, but continued to act with conscious disregard of that threat regardless of his knowledge.[107] In other words, it requires a

---

98. *Id.*
99. People v. Anderson, 141 Cal. App. 4th 430, 432 (2006).
100. CAL. PENAL CODE § 192(b) (West 2012).
101. *See, e.g.,* People v. Ochoa, 966 P.2d 442, 451 (Cal. 1998); *see also* People v. Breverman, 77 Cal. Rptr. 2d 870, 875 (1998).
102. Haaris Syed, *Developments in California Homicide Law*, 36 LOY. L.A. L. REV. 1371, 1443 (2003).
103. *Id.* at 1443-4.
104. CAL. PENAL CODE § 189 (West 2012); *see also* People v. Castaneda, 51 Cal. 4th 1292, 1328 (2011).
105. People v. Prince, 156 P.3d 1015, 1077 (Cal. 2007).
106. People v. Lasko, 23 Cal. 4th 101, 107 (2000).
107. CAL. PENAL CODE § 187 (West 2012).

conscious disregard for life where the accused actually appreciated the risk involved.

Malice may be express or implied.[108] Express malice murder requires an actual intent to kill.[109] According to the California Penal Code, second-degree murder with implied malice requires the following:

> (1) [The defendant] intentionally committed an act;

> (2) The natural and probable consequences of the act were dangerous to human life;

> (3) At the time [the defendant] acted, [he] knew [his] act was dangerous to human life; and

> (4) [He] deliberately acted with conscious disregard for [human] life.[110]

Therefore, a state court will find a physician guilty of second-degree murder for knowingly and intentionally committing an act dangerous to human life where the physician appreciated the risk.[111]

There is a subtle distinction between second-degree murder with implied malice and involuntary manslaughter. Second-degree murder with implied malice requires the defendant to actually realize the risk to human life created by the conduct and to act with conscious disregard.[112] Involuntary manslaughter requires that the defendant's conduct endanger a life, but the defendant does not objectively realize the risk and acts without conscious disregard.[113] In other words, unlike criminal negligence, which is determined by the objective standard of the reasonable person, second-degree murder with implied malice requires a determination that the accused was aware of the risk to life that his actions created and consciously disregarded that risk.[114]

---

108. CAL. PENAL CODE § 188 (West 2012).
109. People v. Gonzalez, 278 P.3d 1242, 1251 (Cal. 2012).
110. CALCRIM § 520 (2012).
111. People v. Nieto Benitez, 840 P.2d 969, 975 (Cal. 1992).
112. *Compare* CAL. PENAL CODE § 187 (2012) *with* CAL. PENAL CODE § 192 (2012).
113. CALCRIM § 580 (2012) (California criminal jury instructions).
114. *Id.*

### 3. First-Degree Murder; Felony-Murder

First-degree murder is defined as (1) the unlawful killing of a human being with premeditation or (2) felony-murder.[115] Felony-murder occurs when, in the commission of a felony, the defendant causes the death of another human being irrespective of malice.[116] In some states, defendants can only be charged with felony-murder if they commit certain, specific felonies.[117] However, in Georgia, a defendant can be charged for felony-murder for any felony resulting in death if the felony is dangerous per se, or if the felony creates a foreseeable risk of death by attendant circumstances.[118] The prosecutor must show a direct, causal connection between the commission of the felony and the death.[119] The court will not find that legal cause existed if (1) a coincidence occurs that was not reasonably foreseeable; or (2) an abnormal response occurs.[120] Although the defendant need not act with malice or intent to kill another human being, he must possess the criminal intent to commit the underlying felony.[121] The sentence for felony-murder in Georgia is life imprisonment or death.[122]

## III. THE METHOD OF ACTIVE VERIFICATION AND VIGILANCE

Controlled substance prescribers should actively verify patient suitability for treatment before beginning such treatment and remain vigilant throughout the course of treatment to help meet their legal duty under civil law, the CSA, and state homicide laws.[123] By taking and properly documenting steps to comply with this method, physicians can significantly improve their likelihood of satisfying the medical standard of care and of avoiding homicide charges in the event of a patient overdose. This Part discusses the steps that physicians can take to satisfy this method

---

115. FLA. STAT. ANN. § 782.04 (2012).
116. GA. CODE ANN. § 16-5-1(c) (2012).
117. *See, e.g.*, ALA. CODE § 13A-6-2 (2012); FLA. STAT. § 782.04 (2012); KAN. STAT. ANN. §§ 21-5402, 21-2515 (2012); VA. CODE § 18.2-32 (2012).
118. Ford v. State, 262 Ga. 602, 603 (1992).
119. *See* State v. Crane, 279 S.E.2d 695, 696 (Ga. 1981) (refusing to hold the defendant liable for the victim's death because someone other than the defendant caused the death).
120. Skaggs v. State, 278 Ga. 19, 20 (2004).
121. Flanders v. State, 279 Ga. 35, 39 (2005).
122. GA. CODE ANN. § 16-5-1(d) (2012).
123. *See* H.R. 7095, *supra* note 20; *see also* STEVEN D. WALDMAN, PAIN REVIEW 674-675 (2009); Ronald L. Scott, *Physicians' Obligation to Review Electronic Health Records Prior to Treatment*, U. HOUSTON L. CTR HEALTH L. PERSPECTIVES (Aug. 2006), *available at* http://www.law.uh.edu/healthlaw/perspectives/2006/(RS)ObligationReviewEHR.pdf.

and how taking and documenting these steps can help physicians avoid both civil and criminal liability.

## A. Approaches to Active Verification and Vigilance

When contemplating prescribing controlled substances, physicians should first actively verify the suitability of such treatment and then remain vigilant by continuously monitoring whether such treatment is still appropriate. Physicians can meet these tasks in a number of different ways.

### 1. Approaches to Active Verification

Physicians should actively verify that their patients are suitable for treatment with controlled substances to help comply with the medical standard of care, and to meet the "legitimate medical purpose" and "usual course of medical practice" prongs of the CSA test. For examples of tasks used to actively verify, physicians can look to Florida Statute § 456.44, which imposes a legal duty on physicians to meet certain "standards of practice."[124] Florida's mandatory standards of practice include (1) completing a medical history and physical examination before beginning any treatment and documenting such medical record; (2) developing an individualized treatment plan for each patient that states objectives to be used to determine treatment success; and (3) changing treatment for patients with signs or symptoms of substance abuse.[125]

Physicians can also satisfy this method of active verification in other ways. For instance, a physician can verify that the patient has a disorder that calls for treatment with controlled substances and that the patient tried other treatments, such as taking non-controlled substance medications or attending therapy sessions, before resorting to controlled substances.[126] A physician can also verify by speaking with other physicians who treated the patient in the past,[127] by reviewing reports of the patient's medical history,[128] and by utilizing prescription monitoring programs ("PMPs").[129]

---

124. FLA. STAT. ANN. § 456.44 (2011); H.R. 7095, 113th Cong. (2011).
125. FLA. STAT. ANN. § 456.44 (2011).
126. The American Academy of Pain Medicine adopted a joint consensus statement on guidelines for prescribing controlled substances. It states that physicians must consider alternative treatment methods before prescribing controlled substances. J. David Haddox, *Legal and Clinical Issues in Prescribing Controlled Substances*, 6 CANCER CONTROL JOURNAL 1 (1999), *available at* http://moffittcancercenter.com/moffittapps/ccj/v6ns/article7.htm.
127. *See, e.g., Use of Controlled Substances for the Treatment of Chronic Pain*, AZ. STATE MED. BD., *available at* http://www.azmd.gov/statutes-rules/7_policy.aspx (stating that physicians must conduct an evaluation before prescribing controlled substances, which includes "corroboration of medical history by reviewing patient's medical records and/or speaking with patient's former physicians").
128. *Id.*
129. PMPs are electronic databases that function as depositories for information about controlled

Physicians can use PMPs to identify factual circumstances that suggest prescription drug diversion,[130] abuse, or addiction.[131] At the onset of treatment, a physician can check the state PMP before prescribing a controlled substance.[132] Physicians must always obtain informed consent from the patient before beginning any treatment.[133]

Physicians can also verify through drug testing, which is an objective clinical tool used to assess whether patients are taking prescribed medications, taking the prescribed dosage, taking unauthorized controlled medications, using illicit substances, or taking combinations of medications and illicit substances that may induce adverse drug interactions at any given point in time.[134] Drug testing usually includes both a preliminary screening test and a confirmatory test to ensure accuracy, reliability, and specificity.[135]

Taking all of these measures into account, the physician can then make an informed decision as to whether treatment using controlled substances is appropriate for the patient based on an individual, case-by-case assessment. If the physician determines that the patient may not be able to comply with the physician's usage instructions or has a past history of abuse, the physician must adjust treatment in order to avoid foreseeable harm to the patient.[136] This method can be scaled up or down, at the

---

substances. U.S. Dep't. Justice, *State Prescription Drug Monitoring Programs*, DRUG ENFORCEMENT AGENCY: OFF. DIVERSION CONTROL (Oct. 2011), *available at*
http://www.deadiversion.usdoj.gov/faq/rx_monitor.htm.

130. Some believe that a physician's duty is solely to the patient rather than society, and therefore, do not have a duty to prevent diversion. *See, e.g.*, Victor R. Fuchs, *The Doctor's Dilemma—What is "Appropriate" Care?*, 365 N. ENGL. J. MED. 585-7, (Aug. 18, 2011), *available at* http://www.nejm.org/doi/full/10.1056/NEJMp1107283. However, this is not true. Pursuant to the CSA, physicians have a duty to both protect the patients' health and safeguard society against diversion of controlled substances. 21 C.F.R. § 1301.71(a) (2006).

131. Ctr. for Disease Control &Prevention, *Policy Impact: Prescription Painkiller Overdoses*, (Nov. 29, 2012), *available at* http://www.cdc.gov/homeandrecreationalsafety/rxbrief/.

132. Barth L. Wilsey, et al., *Prescription Opioid Abuse in the Emergency* Department, 33 J.L. MED. & ETHICS 770, 772, 775 (2005) (stating that patients taking controlled substances require monitoring, and examinations "must be supplemented with toxicology screening in order to detect the true incidence of prescription drug abuse").

133. *See* U. Mich. Health System, *Example Clinical Policy, Clinic Policy Regarding Patients on Long-Term Controlled Substances*, *available at*
http://www.med.umich.edu/1info/FHP/practiceguides/pain/policy.pdf.

134. Leavitt & Reisfield, *supra* note 27 (also noting that such tests are useful because patients are expected to test positive for prescribed medications that otherwise might be considered substances of abuse and to test negative for non-prescribed controlled medications and illicit drugs).

135. *Id.*

136. Alfred V. Anderson, et al., *Opioid Prescribing: Clinical Tools and Risk Management Strategies*, MN.GOV, 5 (Dec. 31, 2009), *available at*
http://mn.gov/health-licensing-boards/images/Opioid_Prescribing_Clinical_
Tools_and_Risk_Management_Strategies.pdf (stating that physicians must recognize aberrant controlled substance-related behaviors and "formulate a differential diagnosis to identify, prevent, or treat medication

prescriber's discretion, according to the anticipated risk. Physicians should also properly document every tool they use while practicing the method of active verification so that they may later use such documentation as evidence of their legitimate efforts to prevent foreseeable harm, should harm ultimately result. By utilizing these approaches, the physician may be able to meet his duty under civil law, the CSA, and state homicide statutes by actively verifying that the patient is suitable for treatment using controlled substances.

## 2. Approaches for Vigilance

Active verification is only the first step; physicians also should remain vigilant in order to reduce the risk of diversion, misuse, and abuse[137] of controlled substances under civil law, the CSA, and homicide laws. This means that once the physician has determined that treatment with controlled substances is suitable, he must continue to monitor the patient in order to ensure that such treatment remains suitable, and if the patient shows signs of risk, the physician must change the treatment. Physicians can do this by taking certain steps, which may include requiring follow-up appointments periodically to assess the efficacy of treatment and consider adverse drug effects; and requiring monitoring of medication usage by performing drug tests and checking the PMP to ensure patient compliance.[138]

If a physician discovers that the patient has begun to abuse the medication or determines that treatment using controlled substances is no longer suitable for the patient, then he must change the course of treatment in order to prevent foreseeable harm to the patient.[139] The physician should properly document the steps he has taken to change the course of treatment in order to protect himself should harm ultimately arise. By remaining vigilant throughout the patient's course of treatment, the physician is more

---

misuse, abuse, and inadequate treatment").

137. Ctr. for Disease Control & Prevention, *Policy Impact: Prescription Painkiller Overdoses* (Nov. 29, 2012), *available at* http://www.cdc.gov/homeandrecreationalsafety/rxbrief/. Misuse is distinguishable from abuse. Abuse, as defined above, is "the intentional self-administration of a medication for a nonmedical purpose such as 'getting high.'" In contrast, misuse is "the use of medication for a medical purpose other than as directed or indicated, whether willful or unintentional, and whether harm results or not. Misusing medications includes behaviors such as self-medicating without a prescription, using the medication for another indication than that for which it was prescribed, and increasing the dose of a prescribed medication." *See also* Ctr. for Lawful Access & Abuse Deterrence, *National Prescription Drug Abuse Prevention Strategy*, (2010), *available at* http://claad.org/downloads/2010_National_Strategy.pdf.

138. H.R. 7095, 113th Cong. (2011)

139. Leavitt & Reisfield, *supra* note 27 (noting that courts usually find that routine testing is a standard of responsible practice, also noting that all major federal guidelines for Kentucky, New York, and Washington state that physicians should use drug tests when prescribing controlled substances).

likely to meet his duty under civil law, the CSA, and state homicide statutes because he is truly making a legitimate effort to prevent foreseeable harm.

## B. Active Verification and Vigilance to Prevent Civil and Criminal Liability

This section discusses the rationale for why active verification and vigilance will protect physicians from liability.

### 1. Meeting the Physicians' Duty Under Civil Law: Medical Customs Test

As discussed above, when determining whether a certain practice is customary in the medical community, proponents of evidence will offer expert testimony to establish validity under the five-part *Daubert* test.[140] Active verification and vigilance meet this test. Although such methods can sometimes be subjective or imprecise, various members of the medical community have tested and deemed the technique of active verification and vigilance valid through the use of scientific studies.[141] Additionally, multiple peers in the medical community have reviewed the technique of active verification and vigilance, have published articles in various scientific journals, and have acknowledged that such techniques are accepted by the scientific community.[142] They have also been established as standards in clinical guidelines.[143] In fact, fifteen states have adopted the

---

140. Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 589 (1993) (holding that factors establishing validity include (1) whether the technique has been tested and deemed valid, (2) whether it has been submitted for peer review or publication, (3) whether it has been accepted in the scientific community, (4) whether standards were circulated to govern the operation of the theory or technique, and (5) whether the potential rate of error involved is known.).

141. *See, e.g.*, R.C. Robinson, et al., *Screening for Problematic Prescription Opioid Use*, 17 CLINICAL J. PAIN 220-8 (2001) (providing empirical research on screening for problematic controlled substance behavior).

142. *See, e.g.*, *Guideline for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain, Evidence Review*, AM. PAIN SOC'Y, *available at* http://www.americanpainsociety.org/uploads/pdfs/Opioid_Final_Evidence_Report.pdf.; M.L. Fleming et al., *PSY50 Prescription Monitoring Programs' Utilization*, 14 VALUE HEALTH A68 (2011); N. Katz et al., *(944): Survey of Current Prescription Monitoring Programs: Update and Future Trends*, 8 J. PAIN S87 (2007); David E. Joranson, et al., *Pain Management and Prescription Monitoring*, 23 J. PAIN & SYMPTOM MGMT. 231-8 (2002); Donna G. Benedict, *Walking the Tightrope: Chronic Pain and Substance Abuse*, 4 J. NURSE PRACTITIONERS 604-9 (2008) (providing prescribing guidelines for chronic opiate therapy consistent with the methods to comply with duty to actively verify and remain vigilant).

143. Fed'n of State Med. Bds. of the U.S., *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*, FED'N STATE MED. BDS. U.S. (May 2, 1998), *available at* http://www.fsmb.org/pdf/2004_grpol_controlled_substances.pdf (stating that "physicians should monitor patient compliance in medication usage and related treatment plans"). In May 2012, the Substance Abuse and Mental Health Services Administration published its first guide to clinical drug testing in primary care. *See also* Substance Abuse & Mental Health Serv. Admin., *Clinical Drug Testing in Primary Care* (2012),

Federation of State Medical Boards "Model Guidelines for the Use of Controlled Substances for the Treatment of Pain."[144] The guidelines include approaches consistent with the method of active verification and vigilance, such as evaluating patients' medical history to determine suitability; developing treatment plans; periodically reviewing the course of treatment and the patients' compliance with such plan; and adjusting treatment if patients show signs of abuse.[145] Additionally, the error rates of certain active verification and vigilance techniques are known.[146] Therefore, active verification that a patient is suitable for treatment with controlled substances and remaining vigilant throughout the course of treatment is consistent with the medical customs test established in *Daubert*.[147]

### 2. Meeting the Physicians' Duty Under Civil Law: Reasonable, Prudent Physician Test

Under the reasonable, prudent physician test, physicians must act with the caution that a reasonable physician in similar circumstances would exercise in providing care to prevent harm to a patient.[148] It is reasonable and prudent for a physician to actively verify patient suitability for controlled substances before treatment and remain vigilant throughout the course of treatment because controlled substances are dangerous by nature, requiring additional caution when prescribing. By actively verifying and remaining vigilant, a physician can avoid improperly prescribing controlled substances to a patient with a history of abuse, and the physician can detect abuse if the patient develops dangerous habits. Therefore, active verification and vigilance can help a physician prevent patient overdoses and other harm, which is consistent with the reasonable, prudent physician test.

### 3. Meeting the Physicians' Duty Under The CSA

Moreover, physicians should actively verify and remain vigilant to meet the requirements of the CSA. As discussed above, physicians

---

*available at* http://store.samhsa.gov/shin/content//SMA12-4668/SMA12-4668.pdf.

144. *State-by-State Opioid Prescribing Policies, supra* note 21.

145. *See, e.g.,* David E. Joranson, et al., *Pain Management and Prescription Monitoring*, 23 J. PAIN & SYMPTOM MGMT. 231-8 (2002); *see also State-by-State Opioid Prescribing Policies, supra* note 21.

146. *See, e.g.,* L.R. Webster, et al., *Predicting Aberrant Behaviors in Opioid-Treated Patients: Preliminary Validation of the Opioid Risk Tool*, 6 PAIN MED. 432-442 (2005) (providing statistics on the accuracy of screening tools that predict which individuals may develop aberrant behavior when prescribed controlled substances).

147. *See supra* Part I.B.; *see also Daubert*, 509 U.S. at 589.

148. Strauss & Thomas, *supra* note 56.

prescribing controlled substances must not knowingly and intentionally prescribe controlled substances without a legitimate medical purpose or outside the usual course of medical practice under the CSA.[149] Actively verifying the suitability of treatment with controlled substances and remaining vigilant prevents the physician from acting "without a legitimate medical purpose," because it requires the physician to verify whether the patient has a need for the prescription and to act accordingly. It prevents a physician from acting "outside the usual course of medical practice" because it requires the physician to verify whether a controlled substance prescription is appropriate for the patient, to periodically verify that the patient is not using the prescription improperly, and to change the course of treatment if the patient exhibits dangerous behaviors. Failure to actively verify and remain vigilant may result in criminal liability under the CSA.[150] In fact, one study identified thirty-two cases in which federal and state prosecutors found that physicians were prescribing controlled substance outside the usual course of medical care, sometimes simply for writing prescriptions to patients who then diverted the medication.[151] Therefore, physicians should actively verify a patient's suitability for controlled substances before beginning treatment and remain vigilant throughout the course of treatment to better comply with the CSA.

### 4. Meeting the Physicians' Duty Under State Statutes

Active verification and vigilance, and, in particular, certain approaches of which physicians can use to comply with this method, are explicit in some states' controlled substance acts and implicit in others. For example, Delaware, Nevada, New York, and Tennessee have statutes that explicitly state that physicians must check the PMP before prescribing controlled substances.[152] Kentucky and Tennessee also require physicians to check the PMP at monthly intervals to ensure that patients who have been prescribed controlled substances are properly refilling their

---

149. *See, e.g.*, 21 U.S.C. § 829 (2006); United States v. Rosenberg, 515 F.2d 190, 196-7 (9th Cir. 1975) (holding that the phrases "in the usual course of professional practice" and "legitimate medical purpose" have the same meaning); *Moore*, 423 U.S. at 141-2; *Rosenberg*, 515 F.2d at 193; Hellman, *supra* note 79.

150. *See* 42 U.S.C. § 841(a)(1); *see also Rosenberg*, 515 F.2d at 193; *see also* David L. Robinson, *Bridging the Gaps: Improved Legislation to Prohibit the Abuse of Prescription Drugs in Virginia*, 9 APPALACHIAN J. L. 281, 294 (2010); *see also* Steven Dubovsky, *Big Brother May Be Watching What You Prescribe*, J. WATCH PSYCHIATRY, (2007) (stating that physicians prescribing controlled substances must "document a careful history, examination, and treatment plan; schedule appropriate follow-up visits; and resist patients' pressures to prescribe risky medications" in order to comply with the requirements of the CSA).

151. Dubovsky, *supra* note 150.

152. DEL. CODE ANN. tit. 16, § 4798(e)(2012); NEV. REV. STAT. § 639.23507 (2012); N.Y. PUB. HEALTH L. § 3343-a(2) (2012); TENN. CODE ANN. § 53-10-310 (2012).

prescriptions in compliance with instructions and are not "doctor-shopping."[153] Other states, such as Kentucky and Ohio in addition to Delaware and Nevada require physicians to check the PMPs when they believe that patients are seeking controlled substances for reasons other than treatment of existing medical conditions, therefore ensuring legitimate medical need before prescribing.[154] Arizona, Kentucky, Tennessee, Utah, and Vermont require all licensed prescribers and dispensers to register with, but not necessary use, the PMP database.[155]

Additionally, the Boards of Medicine in Florida, New York, and various other states have issued legislative guidelines that instruct physicians to create treatment plans, perform drug tests, and engage in periodic review of patients who are prescribed controlled substances.[156] Although such guidelines are not mandatory, the Boards will consider such guidelines when they make determinations at physician hearings.[157]

Louisiana, New Jersey, and Massachusetts require physicians to schedule check-ups every six weeks, three months, and six months, respectively, in order to assess the appropriateness of controlled substance treatment.[158] Eighteen states require physicians to obtain patients' informed consent before prescribing controlled substances.[159] Iowa requires physicians to adopt effective treatment plans, engage in periodic reviews and consultations, and terminate pharmacotherapy if necessary.[160] As such, physicians are required to take steps to actively verify and remain vigilant under many state-controlled substances acts.[161]

---

153. KY. REV. STAT. ANN. § 218A.172(2) (2012) (requiring practitioners to review the PMP no less than once every three months for all available data on patients prescribed controlled substances); TENN. COMP. R. & REGS. § 1200-34-01-.07(1)(a)(7) (2012) (requiring health care providers to access and review patient information in the PMP upon each new admission and once every six months thereafter).

154. DEL. CODE ANN. tit. 16, § 4798(12)(e) (West 2012); KY. REV. STAT. ANN. § 218A.172(1) (2012); NEV. REV. STAT. § 639.23507(A) (2012); OHIO REV. CODE ANN. § 4731.11 (West 2012). *See also States that Require all Licensed Prescribers and/or Dispensers to Register with PMP Database*, NAT'L ALLIANCE FOR MODEL STATE DRUG LAWS (2012), *available at*

http://www.namsdl.org/documents/StatesthatRequirePractitionerstoRegisterorHaveAccesstoPMP07312012. pdf (Providing a list of the rest of the states that require physicians to check the PMPs in certain situations).

155. *States that Require all Licensed Prescribers and/or Dispensers to Register with PMP Database, supra* note 154.

156. FLA. ADMIN CODE ANN. 64B8-9.013 (2010); Leavitt & Reisfield, *supra* note 27.

157. FLA. ADMIN CODE ANN. 64B8-9.013 (2010).

158. *State-by-State Opioid Prescribing Policies, supra* note 21.

159. These states include Arizona, Arkansas, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Nebraska, New Hampshire, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, and West Virginia. *Id.*

160. *Id.*

161. Although the website is limited to opioids, rather than all controlled substances, Medscape provides a state-by-state summary of prescriber requirements consistent with and containing many tools used in the method of active verification and vigilance. *State-by-State Opioid Prescribing Policies, supra* note 21.

## 5. Meeting the Physicians' Duty Under State Homicide Statutes

Physicians must actively verify and remain vigilant under state homicide statutes as well. As mentioned above, involuntary manslaughter is an unintentional, unlawful killing with gross negligence, a disregard for human life, or indifference to consequences.[162]

Second-degree murder is an unlawful killing in which the defendant knowingly and intentionally commits an act dangerous to human life with appreciation of the risk.[163] The element of "knowledge" is imputed on every physician who prescribes controlled substances. As defined by the CSA and adopted by many state-controlled substance acts,[164] controlled substances have high potential for abuse.[165] Such medications can lead to severe psychological or physical dependence and have limited medical uses.[166] For that reason, the DEA requires physicians who plan to prescribe controlled substances to register before doing so,[167] and certain states require additional education and training before the physicians can prescribe controlled substances.[168] Given the extent of the prescription drug epidemic and present-day resources available for prescriber education, physicians cannot legitimately claim that they are unaware of the risk of death to patients for whom they prescribe controlled substances. Therefore, involuntary manslaughter is no longer the most appropriate charge in controlled substance homicide cases. With knowledge of the dangers of controlled substances, if a physician does not actively verify patient suitability for controlled substances and remain vigilant throughout treatment, the physician is acting with conscious disregard and can be charged with second-degree murder.[169]

First-degree murder includes felony-murder, or a death caused while the defendant was in the commission of the felony, irrespective of malice.[170] In a few states, it is a felony for physicians to dispense, prescribe, or administer controlled substances outside the scope of

---

162. *Developments in California Homicide Law*, *supra* note 102, at 1443-4.

163. *See supra* Part II.C.2.

164. *E.g.*, FLA. STAT. § 893.02 (2012); PA. CODE § 25.72(c) (2012); TEX. HEALTH & SAFETY CODE ANN. § 481.033(c) (West 2012).

165. 21 U.S.C. § 812 (2006).

166. *Id.*

167. 21 U.S.C. § 822 (2006).

168. These states include: Delaware, Louisiana, Montana, Nevada, New Mexico, Pennsylvania, South Carolina, and Utah. Nat'l Alliance for Model State Drug Laws, *States that Require Authorized Users to Undergo Training for Use of PMP*, (Sept. 12, 2012), http://www.namsdl.org/documents/StatesthatRequireAuthorizedUserstoUndergoTraining09112012.pdf.

169. *See People v. Cravens*, 53 Cal. 4th 500, 512-3 (2012) (defining "conscious disregard").

170. FLA. REV. STAT. § 782.04 (2012); GA. CODE ANN. § 16-5-1(c) (2012).

practice, similar to the CSA test.[171] If a physician improperly prescribes a controlled substance, and such behavior results in his patient's overdose-related death, then he can be found guilty of felony-murder. However, if the physician actively verifies and remains vigilant, he will be complying with the medical standard of care and can prevent patient overdoses and the resultant felony-murder charges.

Therefore, physicians must actively verify and remain vigilant to prevent and interrupt risky behavior in their patients who they treat with controlled substances. By practicing and properly documenting steps to actively verify and remain vigilant, physicians likely can satisfy the medical standard of care and avoid liability under the CSA, state-controlled substance acts, and state homicide statutes.

## IV. CIVIL LIABILITY FOR FAILURE TO ACTIVELY VERIFY AND REMAIN VIGILANT

As shown above, physicians can face civil liability if they improperly prescribe controlled substances without actively verifying and remaining vigilant.[172] To further illustrate this fact and to point out defenses that are no longer viable in light of evolving case law regarding medical practice, this Part provides cases in which physicians have and have not been held liable for improperly prescribing controlled substances. It shows how physicians who actively verify and remain vigilant have not been held liable, and physicians who typically exhibit a pattern of failing to practice such technique have been held liable.

One such case is *Taglieri v. Moss*.[173] In *Taglieri*, the New Jersey Superior Court affirmed a lower court's partial summary judgment that a physician was civilly liable for his patient's abuse of controlled substances.[174] The plaintiff in *Taglieri* alleged that his former physician, Dr. Albert Moss, was the proximate cause of his prescription drug addiction.[175] Dr. Moss began treating the plaintiff with oxycodone and carisoprodol after a laminectomy failed to cure the patient of chronic back pain.[176] In order to facilitate prescription refills, Dr. Moss gave the plaintiff

---

171. *See* MICH. COMP. LAWS § 333.7401 (2012); GA. CODE ANN. § 16-13-41 (2010).
172. *See Final Order, In re: Jon Porter, M.D.*, STATE OF VT. BD. MED. PRACTICE, *available at* http://healthvermont.gov/hc/med_board/documents/FinalOrder1.4.12.pdf (clearing Dr. Jon Porter of unprofessional document stemming from his Physician Assistant overprescribing controlled substances).
173. Taglieri v. Moss, 842 A.2d 280 (N.J. Super. 2004).
174. *Id.* at 289.
175. *Id.* at 283.
176. *Id.*

post-dated and undated prescriptions.[177] Dr. Moss testified that he "provided prescriptions for a larger supply to accommodate [the plaintiff], for whom it was difficult to make frequent trips to the doctor's office."[178] Despite Dr. Moss's testimony that he believed his prescribing behavior was acceptable, the court found that, by so prescribing, Dr. Moss violated the reasonable, prudent physician test for the medical standard of care.[179] The court took note of the fact that Dr. Moss only saw the plaintiff once every three months,[180] despite the New Jersey law that forbids a physician from prescribing Schedule II controlled substances in more than a thirty-day supply, with limited exceptions, one of which being a requirement that the physician must evaluate the patient's continued need for the prescription at least every thirty days.[181]

This suggests that the court felt Dr. Moss had provided inadequate oversight of the plaintiff's prescription medication use. Dr. Moss had breached the standard of care by failing to actively verify patient suitability for controlled substances before prescribing such medication and to remain vigilant throughout the course of treatment because he had not taken steps to ensure that treatment with controlled substances was still appropriate for his patient. As a result, his good faith defense failed.

In *Argus v. Scheppegrell*,[182] a Louisiana court upheld a finding that Dr. William Scheppegrell violated his duty of care by prescribing controlled substances to a patient for weight control.[183] The 18-year-old patient was 5'6" tall and weighed ninety-seven pounds.[184] Yet, Dr. Scheppegrell continued to prescribe the medication in increased dosages even after the patient's mother informed him that the patient had become addicted.[185] As a result, the patient died of an overdose. The court found that Dr. Scheppegrell's prescribing was the proximate cause of the patient's death, stating that Dr. Scheppegrell had blatantly disregarded his duty of care.[186] Dr. Scheppegrell defended by claiming that the patient was contributorily negligent, but the court held that the patient's negligence could not be both a foreseen risk that imposes a duty on the physician and, at the same time, a defense to an action for damages for breach of that

---

177. *Id.* at 282-3.
178. *Id.* at 284.
179. *Taglieri*, 842 A.2d at 286.
180. *Id.* at 284.
181. N.J. ADMIN. CODE § 13:35-7.6(c) (2004).
182. Argust v. Scheppegrell, 472 So.2d 573 (La. 1985).
183. *Id.* at 574.
184. *Id.*
185. *Id.*
186. *Id.* at 576-77.

duty.[187] Thus, contributory negligence was not a valid defense,[188] and active verification of the patient's suitability for controlled substances before prescribing them and vigilance throughout the course of treatment on the part of Dr. Scheppegrell could have prevented the death of his patient.

In *Ballenger v. Crowell*,[189] a North Carolina court also held that contributory negligence was not a valid defense.[190] There, a physician breached his duty of care by continuing to prescribe controlled substances to a patient who had developed an addiction and died from an overdose.[191] The court held that the fact that a patient becomes addicted to a medication, continues treatment under the physician's care, and the patient knowingly continues her addiction will not make her contributorily negligent unless the patient does something wrong or unless the patient knows her doctor is negligent.[192] Here, the plaintiff believed she would be addicted for the rest of her life because the defendant physician told her so.[193] Therefore, neither wrongful conduct nor knowledge of the physician's negligence was present, and the court ruled that the fact that the plaintiff knew she was an addict and actively sought the medication did not make her contributorily negligent.[194]

In contrast, in *Posner v. Walker*,[195] a Florida court threw out a jury verdict that a physician had negligently caused a patient's death from overdose.[196] The court went on to enter judgment in favor of the physician.[197] In *Posner*, the court described the great lengths to which the physician, Dr. Ira Posner, had gone in order to wean the patient off of controlled substances.[198] Dr. Posner suggested that the patient seek alternative pain management.[199] Additionally, over the years, he treated the patient with a variety of approaches, including anti-inflammatories, physical therapy, steroid injections, non-opioid medications, and surgery.[200] The court noted that the patient failed to tell Dr. Posner that she

---

187. *Id.* at 577.
188. *Id.*
189. Ballenger v. Crowell, 247 S.E.2d 287 (N.C. App. 1978).
190. *Id.* at 291.
191. *Id.* at 293.
192. *Id.* at 294.
193. *Id.* at 291.
194. *Id.* at 291-2.
195. Posner v. Walker, 930 So. 2d 659 (Fla. App. 2006).
196. *Id.* at 668.
197. *Id.*
198. *Id.* at 665-6.
199. *Id.* at 665.
200. *Id.*

had met with other physicians and received prescriptions while Dr. Posner was treating her.[201] When Dr. Posner discovered other physicians were also prescribing the patient medications, he asked them to stop.[202] Dr. Posner also had the patient meet with a pain management team that included himself and multiple other specialists, and he denied her more medicine until she agreed to detoxification.[203]

In contrast to Judge Pastor who sentenced Dr. Murray in Michael Jackson's death, as discussed below,[204] the court in *Posner* was willing to shift responsibility from Dr. Posner to the patient.[205] Unlike Dr. Murray, Dr. Posner had tried nearly every available treatment, from physical therapy and injections to biofeedback and anti-inflammatory medications, to control his patient's pain and wean her off of pain medications.[206] The court was sympathetic to Dr. Posner, noting that, "[a]s a physician, Dr. Posner [could not] make his patients do exactly as he tells them."[207] Dr. Posner had remained active and vigilant, and as a result, he was not found liable.

Therefore, physicians must assert and document efforts to verify patient suitability for controlled substances before prescribing them and remaining vigilant throughout the course of treatment to avoid civil liability, as Dr. Posner did. They cannot rely on certain defenses, such as good faith and contributory negligence, but complying with this method can help protect physicians from liability.

## V. HOMICIDE CHARGES FOR FAILURE TO ACTIVELY VERIFY AND REMAIN VIGILANT

Civil law, which is aimed at compensating the victim, sometimes does not go far enough when a physician could have prevented a patient's controlled substance-related death through active verification and vigilance.[208] First and foremost, the victim has already died, making the survivor's civil proceeding too little and too late. Physicians also carry medical malpractice insurance, covering costs that they may incur from civil liability and obstructing much of the deterrent effect that litigation

---

201. *Posner*, 930 So. 2d at 667.
202. *Id.* at 666.
203. *Id.*
204. *See supra* Part V.B.1.a.
205. *Id.*
206. *Id.*
207. *Id.*
208. Sawicki, *supra* note 47 (noting civil law is aimed at victim compensation and criminal law is aimed at punishing wrongdoers).

may have.[209] The decedent's survivors may be compensated, but the physician may continue the same dangerous acts that he had committed in the past.[210] The case of *People v. Tseng*[211] exemplifies this point. In *People v. Tseng*, which is discussed at length below,[212] five separate families sued Dr. Tseng for wrongful death after their family members died from overdoses.[213] Dr. Tseng settled with all five families and continued her dangerous prescribing practices, which caused an additional seven deaths.[214] The civil suits did not deter her.

Criminal proceedings, which are specifically aimed at punishing the wrongdoer and preventing repeat offenses,[215] are sometimes necessary. In recent years, courts increasingly have been willing to find physicians criminally liable when a patient dies due to controlled substance overdose and the physician had prescribed the fatal medication.[216] In fact, the DEA has reported a steady rise in successful criminal prosecutions of physicians, from just fifteen convictions in 2003 to forty-three in 2008.[217]

Physicians can avoid homicide charges through active verification and vigilance. For instance, it is an absolute defense to both civil and criminal liability for improper prescribing or dispensing in West Virginia if a physician makes a good faith reliance on the information contained in the PMP database when he prescribed or refused to prescribe a controlled substance.[218] Yet, by failing to actively verify patient suitability for controlled substances and remain vigilant thereafter, a physician exposes himself to homicide charges.[219]

This Part discusses federal and state criminal cases in depth. It focuses on states that have been particularly aggressive in prosecuting

---

209. *See Addressing the Medical Malpractice Insurance Crisis: Alternatives to Damage Caps*, 26 N. ILL. U. L. REV. 413, 431 (2006) (noting that under the current system, "the deterrent effect of the tort system is blunted by malpractice insurance").

210. *See id.* ("Although there is some deterrent effect in the loss of reputation associated with a malpractice claim, the majority of the deterrence, primarily economic cost, is absorbed by the insurance company.").

211. *People v. Tseng*, (Super. Ct. L.A. County, 2012, No. 394495) (pending).

212. *See infra* Part V.B.2.

213. Hernandez, *supra* note 49.

214. *Id.*; AP Staff Writer, *CA Doctor Ordered to Trial in 3 Drug Deaths*, THE EXAMINER (June 26, 2012), *available at* http://washingtonexaminer.com/ca-doctor-ordered-to-trial-in-3-drug-deaths/article/feed/ 2006561#.UD5x T8FISXs (noting that prosecution offered testimony about a total of twelve of Tseng's patients who died of drug overdoses, although the prosecution only brought charges for three of those deaths).

215. Hernandez, *supra* note 213; *CA Doctor Ordered to Trial in 3 Drug Deaths*, *supra* note 216.

216. Trachtman, *supra* note 23.

217. *Id.*

218. W. VA. CODE R. § 60A-9-5(g) (2012).

219. *See supra* Part III.B.

physicians for improperly prescribing controlled substances repeatedly or to extreme levels. It also establishes that physicians may be able to avoid criminal liability through active verification and vigilance.

## A. Federal Controlled Substances Act Cases

At the federal level, prosecutors frequently charge physicians for crimes under the CSA.[220] Successful federal prosecutions have paved the way for state prosecutors to become more aggressive and to do away with the "good faith" defense. This section discusses some of those federal cases.

*Moore v. United States*[221] was groundbreaking for the prosecution of physicians under the CSA. There, the United States Supreme Court held that physicians "can be prosecuted [for improperly prescribing controlled substances despite being licensed and registered to do so] when their activities fall outside the usual course of professional practice."[222] The Court found Dr. Moore guilty of knowingly and unlawfully distributing and dispensing a controlled substance because Dr. Moore prescribed medication in large quantities to patients at their requests, in the requested amount, and at a price based on the number of pills.[223]

Since *Moore*, lower courts have struggled with defining what physician conduct falls in or out of "the usual course of professional practice" in improper prescribing cases.[224] *Moore* provided little guidance on this issue because the case involved a physician who abdicated all professional responsibility.[225] The Court further complicated matters by upholding the lower court's jury instructions that, for a guilty verdict, the jury had to conclude that the defendant physician had prescribed the medications "other than in good faith," making good faith an element of the liability test for the first time.[226] Later courts held that a jury instruction

---

220. 21 U.S.C. § 801 (2006); 21 U.S.C. § 971 (2006).

221. 423 U.S. 122 (1975).

222. *Moore*, 423 U.S. at 124.

223. Diane E. Hoffman, *New Perspectives on Familiar Issue: Treating Pain v. Reducing Drug Diversion and Abuse: Recalibrating the Balance in Our Drug Control Laws and Policies*, 1 ST. LOUIS U. J. HEALTH L. & POL'Y 231, 282 (2008).

224. Robinson, *supra* note 150, at 294 (stating that "defining the bounds of 'legitimate' medical practice is a subjectively vague and somewhat obscure concept, which inevitably results in vast amounts of physician discretion").

225. *Moore*, 423 U.S. at 125-6.

226. *Id.* at 138-9 stating:

> The trial judge assumed that a physician's activities are authorized only if they are within the usual course of professional practice. He instructed the jury that it had to find beyond a rea-sonable doubt that a physician, who knowingly or intentionally, did dispense or distribute [methadone] by prescription, did so other than in good faith for detoxification in the usual

to determine whether a physician had acted in good faith was sufficient to guide the jury in finding whether a physician had the "intent to act as a pusher rather than a medical professional."[227]

In *United States v. Feingold*,[228] the Ninth Circuit affirmed the conviction of a physician for the unlawful distribution of a controlled substance under the CSA.[229] The government indicted Dr. Jeffrey Feingold on 185 counts of illegal distribution of controlled substances, including diazepam, hydrocodone, oxycodone, and oxycodone with paracetamol/acetaminophen.[230] Dr. Feingold authorized refills of his prescriptions at rapid rates, sometimes within a day or two.[231] Two undercover DEA agents visited Dr. Feingold, posing as patients.[232] Dr. Feingold prescribed controlled substances to both, without even examining the agent-patients.[233]

In his defense, Dr. Feingold argued that he was "merely an incompetent doctor" that had always prescribed medications in good faith and had genuinely, if naively, believed patients when they requested pills.[234] He explained his excessive prescription-writing as a lack of training, in both managing opioid medications and in identifying opioid seekers, but that he always prescribed in the genuine belief that such medication was necessary to treat his patients' legitimate and serious medical conditions.[235] However, the court explained that good faith was not merely having good intentions towards a patient, but "an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country."[236]

Dr. Feingold argued that he lacked the proper *mens rea*, or guilty mind. The court noted that, to find a physician guilty under the CSA, a practitioner must act with intent to distribute controlled substances outside

---

course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States.

227. United States v. Feingold, 454 F.3d 1001, 1008 (9th Cir. 2006).

228. *Id.* at 1001.

229. *Id.* at 1013. The CSA makes it unlawful for any person to knowingly or intentionally distribute or dispense a controlled substance without proper authorization. 21 U.S.C. § 841(a). Furthermore, a prescription for a controlled substance is only allowed if it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a) (2006). In *Moore*, the Supreme Court held that a physician who prescribes outside of the usual course of his professional practice is subject to criminal liability. *Moore*, 423 U.S. at 124.

230. *Feingold*, 454 F.3d at 1004-5.

231. *Id.* at 1005.

232. *Id.*

233. *Id.*

234. *Id.* at 1006.

235. *Id.* at 1005.

236. *Feingold*, 454 F.3d at 1006.

the course of professional practice, acting as a "pusher rather than a medical professional."[237] And although Dr. Feingold argued that he was simply an incompetent physician who honestly tried to help his patients manage their pain, the court still found that he had the requisite intent, upholding the conviction.[238] The court noted that he prescribed drugs "to people whom he knew to be addicts, to people whom he never examined, to people whom he never met, and to undercover law enforcement officials" who essentially told him they wanted narcotics, and he dispensed controlled substances in extreme.[239] He did not determine whether such patients had a legitimate medical need, and if so, whether they were suitable for treatment with controlled substances. Nor did he remain vigilant throughout the course of treatment to ensure patients were properly using their medications, instead choosing to act outside the usual course of medical practice, and as a result, the court affirmed his convictions.

In the same year that the Ninth Circuit decided *Feingold*, the Fourth Circuit decided *United States v. Hurwitz*[240] and *United States v. McIver*[241] under the CSA. Dr. William Hurwitz, a physician who operated a pain clinic in Virginia, managed pain with controversially high doses of various opioid medications, including methadone, oxycodone, and hydromorphone.[242] After several of Dr. Hurwitz's patients were arrested for attempting to sell prescription drugs, they cooperated with federal investigators and identified Hurwitz as the source of such medication.[243] A jury convicted Dr. Hurwitz of "50 counts of illegal drug distribution, including conspiracy to distribute controlled substances, and charges related to drug trafficking that resulted in one death and serious bodily injury to others."[244] Dr. Hurwitz received a sentence of twenty-five years in prison.[245]

Dr. Hurwitz appealed the district court's decision, in part because Judge Leonard Wexler barred the jury from considering whether Dr. Hurwitz had prescribed the medications in good faith in their verdict

---

237. *Id.* at 1008.
238. *Id.* at 1010.
239. *Id.* at 1005.
240. United States v. Horowitz, 459 F.3d 463 (4th 2006).
241. United States v. McIver, 470 F.3d 550 (4th 2006).
242. *Hurwitz*, 459 F.3d at 466.
243. *Id.* at 466-7.
244. News Release, U.S. Drug Enforcement Agency, Virginia Pain Doctor Sentenced to 25 Years (2005), *available at* http://crime.about.com/od/drugwar/a/dea050420.htm.
245. *Id.*

determination.[246] Dr. Hurwitz argued that, despite the controversy of his treatment plans, they had a valid medical purpose.[247] Dr. Hurwitz later suggested that a small segment of his patients had taken advantage of his practice.[248] He argued that problems arose because he was ill-equipped to deal with drug-seeking patients.[249]

The government argued that Dr. Hurwitz's treatment plans were outside the usual course of professional practice, even for physicians who provide high-dose opioid therapy.[250] An expert for the prosecution testified that high-dose therapy generally entailed about 200 milligrams of morphine a day to a patient.[251] In contrast, Dr. Hurwitz prescribed a median of 2,000 milligrams of morphine or its equivalent a day to his individual patients.[252]

The Fourth Circuit held that the jury should have been able to consider whether Dr. Hurwitz prescribed in good faith.[253] It vacated Dr. Hurwitz's conviction and remanded the case for a new trial.[254] At his second trial, on July 13, 2007, the jury convicted Dr. Hurwitz on sixteen counts of drug trafficking.[255] U.S. District Court Judge Leonie Brinkema sentenced Dr. Hurwitz to less than five years, a substantial reduction from his vacated twenty-five year sentence.[256] In her ruling, Judge Brinkema indicated that she believed Dr. Hurwitz had helped more patients than he had harmed.[257] In fact, one patient testified that Dr. Hurwitz's treatments allowed her to regain her life and live in considerably less pain.[258] Judge Brinkema concluded that "the mere prescription of huge quantities of opioids [did not necessarily] mean anything."[259] Moreover, she did not find Dr. Hurwitz's high dose therapy to be outside the usual course of practice,

---

246. *Hurwitz*, 459 F.3d at 466.
247. *Id.*
248. Jerry Markon, *Va. Pain Doctor's Prison Term Is Cut to 57 Months*, WASH. POST (July 14, 2007), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/07/13/AR2007071301035.html.
249. *Id.*
250. *Hurwitz*, 459 F.3d at 467.
251. *Id.*
252. *Id.*
253. *Id.* at 481-2.
254. *Id.* at 482.
255. Markon, *supra* note 248.
256. *Id.*
257. *Id.*
258. *Hurwitz*, 459 F.3d at 468.
259. John Tierny, *A Win for Dr. Hurwitz, a Loss for the Pill-Counters*, NY TIMES (July 13, 2007), *available at* http://tierneylab.blogs.nytimes.com/2007/07/13/a-win-for-dr-hurwitz-a-loss-for-the-pill-counters.

noting that "an increasing body of respectable medical literature and expertise supports those types of high-dosage, opioid medications."[260]

The court also held that although good faith generally is relevant when determining whether a physician violated the CSA, the district court had not erred by refusing to allow Hurwitz to present the injury with instructions to find him not guilty if he subjectively acted in good faith.[261] The court noted that "allowing criminal liability to turn on whether the defendant-doctor complied with his own idiosyncratic view of proper medical practices" is inconsistent with prior case law.[262] It went on to say that "to permit a practitioner to substitute his or her views of what is good medical practice for standards generally recognized and accepted in the United States would be to weaken the enforcement of our drug laws in a critical area." As such, Hurwitz received a multi-year prison sentence.[263] Thus, physicians should follow standards generally recognized and accepted in the medical community when prescribing controlled substances. The approaches to active verification and vigilance summarized in Part III, section A above will likely satisfy this requirement.

In *McIver*, the Fourth Circuit affirmed the convictions of Dr. Ronald McIver.[264] Dr. McIver operated a pain management clinic in South Carolina and prescribed oxycodone, methadone, and morphine, among other controlled substances, to his patients.[265] Like Dr. Hurwitz, Dr. McIver managed his patients' pain with high-dosage opioid therapy.[266] The court cited numerous ways that Dr. McIver's prescribing history did not accord with the usual course of professional practice.[267] For example, Dr. McIver rarely offered non-drug pain therapy.[268] He also continued to prescribe after he suspected patients were addicted.[269] In one case, he continued prescribing after finding a syringe in a patient's possession and after the patient told Dr. McIver he only used the syringe for fishing.[270] Interestingly, Dr. McIver had written to the South Carolina Health

---

260. Markon, *supra* note 248.
261. *Hurwitz*, 459 F.3d at 476-80.
262. *Id.* at 478.
263. Markon, *supra* note 248.
264. United States v. McIver, 470 F.3d 550, 565 (4th Cir. 2006).
265. *Id.* at 553, 557-8.
266. Tina Rosenberg, *When is a Pain Doctor a Drug Pusher?*, NY TIMES (Jun. 17, 2007), *available at* http://www.nytimes.com/2007/06/17/magazine/17pain-t.html?pagewanted=all&_r=0 (noting that civil cases are often filed after criminal charges).
267. *McIver*, 470 F.3d at 554.
268. *Id.*
269. *Id.*
270. *Id.* at 554-5.

Department about his suspicions that the patient was selling his prescription medication.[271] However, given that Dr. McIver continued to prescribe medications to the patient, and therefore, failed to be vigilant in the course of treatment by changing his treatment methods, the court gave little weight to Dr. McIver's letter.[272]

In *United States v. Merrill*,[273] the Eleventh Circuit affirmed the conviction of Dr. Thomas Merrill, after five of his patients died of drug overdoses while under his care.[274] A jury had found Dr. Merrill guilty of a litany of violations under the CSA, including four counts stating that the deaths resulted from the use of the prescribed medications.[275] The jury rejected Dr. Merrill's argument that there was no way he could have "foreseen the deaths of patients who did not follow proper dosage instructions."[276] As shown above, physicians have imputed knowledge of the dangers of prescribing controlled substances, so his patients' improper usage should have been foreseeable. He also argued that his only fault was that he trusted his patients too much.[277] Yet, trust alone is not appropriate. A physician has a duty to do more than trust a patient; he must make a legitimate effort or use best practices in an attempt to determine whether the patient has an actual medical need for the controlled substance, and, if so, that the patient properly uses it. It is never possible to be fully confident that the patient is doing what the physician directed, but this method protects the physician in addition to the patient. When properly documented, it can show that the physician has taken appropriate steps to avoid foreseeable harm.

Dr. Merrill appealed the jury's verdict, arguing, among other things, that there had been insufficient evidence for the jury to convict him.[278] The Eleventh Circuit rejected a good faith standard of intent and instead focused solely on whether the physician objectively acted in accordance with the usual course of professional practice.[279] The court found that there had been sufficient evidence against Dr. Merrill to affirm the jury's

---

271. *Id.* at 555.
272. *Id.*
273. United States v. Merrill, 513 F.3d 1293 (11th Cir. 2008).
274. *Id.* at 1309.
275. News Release, U.S. Drug Enforcement Admin., Florida Physician Sentenced To Life Imprisonment On Drug And Fraud Charges Arising Out Of Improper Dispensing Of Controlled Substances (Jul. 11, 2006) *available at* http://www.justice.gov/dea/pubs/states/newsrel/mia071106.html.
276. Melissa Nelson, *Florida Doctor's OxyContin Trial Begins, Prosecutors Say Man Overprescribed Painkiller, Causing Six Deaths*, CHARLESTON GAZETTE, January 11, 2006, at P5C.
277. *Id.*
278. *Merrill*, 513 F.3d at 1298-9.
279. *Id.* at 1306.

verdict.[280] It noted that the evidence had shown that Dr. Merrill had written multiple prescriptions for similar medications to the same patient during one visit; performed few, if any, physical examinations; maintained poor records of the medications he had prescribed patients; did not run any toxicology screens; and ignored warnings from other medical professionals that a patient was addicted to prescription medications.[281] Good faith was not a viable defense because, before prescribing, Dr. Merrill failed to ensure that his patients had a legitimate medical need and were suited for treatment involving controlled substances. After beginning treatment, he failed to be vigilant.

## B. State Cases

States throughout the country have increased their enforcement efforts in order to curb prescription drug abuse.[282] In many of those states, homicide cases are currently pending against physicians due to improper prescribing of controlled substances.[283] This section focuses on cases from aggressive states such as California, Florida, Georgia, and Nevada.

## 1. California

Over the past decade, California courtrooms have hosted some of the most highly publicized homicide trials of physicians who improperly prescribed controlled substances. This section focuses on cases from aggressive states such as California, Florida, Georgia, and Nevada.

### a. People v. Murray

Dr. Conrad Murray met pop icon Michael Jackson in 2006, when he treated Jackson and his children for the flu.[284] In the spring of 2009, Jackson asked Dr. Murray to serve as his personal physician during a

---

280. *Id.* at 1297-8.

281. *Id.*

282. *See, e.g.,* Alvarez, *supra* note 15; *see also* TEX. HEALTH & SAFETY CODE ANN. §§ 481.181-481.186 (West 2012) (stating inspections, evidence, and miscellaneous law enforcement provisions).

283. *See, e.g.,* Ihosvani Rodriguez, *'Pill Mill' Doctors Charged in Deaths of Nine Patients,* SUN SENTINEL, (Jul. 20, 2012), *available at* http://articles.sun-sentinel.com/2012-07-20/news/fl-pill-mill-doctors-indictments-2-20120720_1_oxycodone-pills-pill-mill-doctors-pain-pills (charging two Florida physicians for the deaths of nine patients); *see also* Sheila Stogsdill, *Doctor Charged in Drug Overdose,* TULSA WORLD, July 10, 2012, at A12 (charging a Oklahoma physician with second-degree manslaughter for the death of a nursing instructor who died from a prescription drug overdose). These are just a few of the many criminal charges against physicians in July and August of 2012.

284. Nick Allen, *Conrad Murray: Cardiologist Whose Incompetence Turned Him into Michael Jackson Killer,* TELEGRAPH (Nov. 7, 2011), *available at* http://www.telegraph.co.uk/culture/music/michael-jackson/8867887/Conrad-Murray-cardiologist-whose-incompetence-turned-him-into-Michael-Jackson-killer.html.

series of concerts in England, and Dr. Murray subsequently started treating Jackson for insomnia.[285] On June 25, 2009, Jackson died of cardiac arrest.[286] Later, forensic tests revealed that a drug overdose caused the cardiac arrest.[287] The Los Angeles County Coroner named the cause of death as "acute propofol intoxication" and "intravenous injection by another."[288]

Propofol is a powerful medication, most often given to surgical patients as a sedative.[289] While propofol produces a sleep-like loss of consciousness, the anesthetic's effect is actually closer to a coma.[290] FDA-approved labeling provides that propofol "should be administered only by persons trained in the administration of general anesthesia."[291]

Dr. Murray administered propofol, among other prescription medications, to Jackson on a nightly basis over the course of two months, in an effort to treat Jackson's insomnia.[292] Dr. Murray had become concerned that Jackson had grown dependent on propofol to sleep. Yet, on June 25, 2009, after administering doses of diazepam, lorazepam, and midazolam[293] to Jackson, who still could not fall asleep, Murray reluctantly acquiesced to Jackson's requests and once again administered propofol.[294] Shortly thereafter, Jackson was non-responsive and later pronounced dead.[295] Los Angeles County District Attorney Steve Cooley subsequently charged Dr. Murray with involuntary manslaughter.[296]

The court instructed the jury to find Dr. Murray guilty of involuntary manslaughter if he "committed a lawful act but acted with criminal negligence," and such act caused Jackson's death.[297] The court defined

---

285. *See* Duke, *supra* note 1.

286. *Id.*

287. *See* Michael Jackson's Amended Death Certificate, *supra* note 1.

288. *Id.*

289. The DEA has issued a proposed rule to place propofol into schedule IV of the CSA. 21 C.F.R. § 1308 (2010).

290. Matthew Edlund, M.D., *Comas Don't Count as Sleep*, PSYCHOLOGY TODAY (Oct. 13, 2011), *available at* http://www.psychologytoday.com/blog/the-power-rest/201110/comas-dont-count-sleep.

291. Federal Drug Admin., *Diprivan (propofol) Injectable Emulsion*, 14 (2008), *available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2008/019627s046lbl.pdf.(FDA labeling for Propofol).

292. Sentencing Memorandum, *supra* note 2.

293. Diazepam, lorazepam, and midazolam are all controlled substances found in schedule IV. U.S. Dep't of Justice, *Controlled Substances—Alphabetical Order*, DRUG ENFORCEMENT ADMIN.: OFF. DIVERSION CONTROL, (Apr. 25, 2013), *available at*
http://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf.

294. *See* Transcript of Recorded Interview of Conrad Murray, at 42, 82, *People v. Murray*, (Super. Ct. L.A. County, 2009, No. 073614).

295. Sentencing Memorandum, *supra* note 2, at 2.

296. John M. Curtis, *Opening Statements in Dr. Conrad Murray Trial*, EXAMINER (Sept. 27, 2011), *available at* http://www.examiner.com/article/opening-statements-dr-conrad-murray-trial.

297. Jury Instructions, *supra* note 2, at 7.

"criminal negligence" as a reckless action "that creates a high risk of death or great bodily injury and a reasonable person would have known that acting in that way would create such a risk."[298] It further instructed the jury that the defendant was charged with involuntary manslaughter based upon the theory of criminal negligence stemming from the failure to perform a legal duty.[299] It explained that a physician "who assumed the responsibility to treat and care for a patient has a legal duty to treat and care for that patient," and that a physician fails to perform a legal duty if he causes the patient's death.[300] The death must be the direct, natural, and probable consequence of the act or the failure to perform a legal duty, and the death would not have happened without the act or the failure to perform a legal duty."[301]

The court found that Murray acted with an extreme callousness for Jackson's safety and with a strong disregard for the risk of death, rather than with due caution.[302] Murray breached the standard of care simply by treating Jackson's insomnia with propofol.[303] The prosecution called expert witnesses to testify on the standard of care in the medical community.[304] One such witness, Dr. Nader Kamangar, testified that Dr. Murray's treatment of Jackson's insomnia with propofol was "beyond comprehension" and "disturbing."[305] The court found that Murray "had repeatedly subjected Jackson to a dangerous, unprecedented pharmaceutical experiment" by administering propofol on a nightly basis for over two months, in addition to benzodiazepines; that Murray failed to provide the proper monitoring equipment or additional personnel that would have been able to save Michael Jackson's life; and that Murray personally failed to monitor Jackson.[306] Thus, Dr. Murray breached his duty of care by failing to determine whether Jackson was suited for treatment using propofol. The jury found Murray guilty of involuntary manslaughter on November 7, 2011.[307]

Superior Court Judge Michael Pastor found Dr. Murray's treatment of Jackson's insomnia with propofol to be outside the bounds of the

---

298.  *Id.*
299.  *Id.*
300.  *Id.* at 7-8.
301.  *Id.*
302.  Sentencing Memorandum, *supra* note 2, at 2.
303.  *Id.*
304.  Linda Deutsch, *Sleep Expert: Drugs Caused Michael Jackson's Death*, CNSNEWS.COM (Oct. 14, 2011), *available at* http://cnsnews.com/news/article/sleep-expert-drugs-caused-michael-jacksons-death.
305.  *Id.*
306.  Sentencing Memorandum, *supra* note 2, at 4.
307.  *Id.*

standard of care, calling it "experimental."[308] Dr. Murray had defended himself by claiming that Jackson engaged in doctor-shopping.[309] Judge Pastor rejected the defense's "criminal contributory negligence" argument that Jackson should bear responsibility for his own death because he sought prescription medications.[310] Even so, it was no excuse because Dr. Murray could have consulted with Jackson's previous physicians, could have used the state's PMPs, could have drug tested Jackson, or, as Judge Pastor noted, could have "walked away and said 'no' as countless [other physicians] did."[311] As a result of this lack of verification of the appropriateness of the treatment, Judge Pastor sentenced Dr. Murray to four years in prison without probation, the maximum possible sentence.[312]

### b. People v. Tseng

At a conference following Dr. Murray's conviction, a member of the press asked District Attorney Cooley whether "he had filed the case just because the alleged victim was Michael Jackson."[313] Cooley said no, indicating that Jackson's celebrity status did nothing more than raise the media interest in the case.[314] Given the relative rarity of homicide charges against prescribing physicians, some may have been skeptical; however, in March 2012, Cooley charged Dr. Lisa Tseng with second-degree murder.[315] Following her arrest, Cooley made his position clear, releasing a statement that noted that "prescription drug overdose deaths have reached epidemic proportions" and "[e]nough is enough. Doctors are not above the law."[316]

The DEA began to investigate Dr. Tseng in 2007.[317] During a three-year investigation, the DEA found that Dr. Tseng had written an average of twenty-five prescriptions a day.[318] Additionally, an L.A. Times investigation in 2010 linked Dr. Tseng to eight patient deaths.[319] Federal

---

308. *Id.*
309. *Id.*
310. *Id.*
311. *Id.*
312. Sentencing Memorandum, *supra* note 2, at 4.
313. Martin Kasindorf, *Jackson Fans, Family See Justice in Doctor's Guilty Verdict*, USA TODAY (Nov. 8, 2011), *available at* http://www.usatoday.com/news/nation/story/2011-11-04/michael-jackson-doctor-trial-verdict/51113244/1.
314. *Id.*
315. Deutsch & Risling, *supra* note 9.
316. *The War on Pill Mills*, *supra* note 9; *see also* Dahl, *supra* note 10.
317. Girion et al., *Doctor Charged in Fatal Prescription Overdoses*, LA TIMES, (Mar. 1, 2012), *available at* http://articles.latimes.com/2012/mar/01/local/la-me-drug-doctor-20120302.
318. Deutsch & Risling, *supra* note 9.
319. Girion, *supra* note 317.

prosecutors considered charging Dr. Tseng under a federal drug-dealing statute.[320] However, in the end, federal prosecutors left Dr. Tseng's case in the hands of Cooley.[321] Cooley subsequently charged Dr. Tseng for the deaths of three of her patients—Joey Rovero, Vu Nguyen, and Steven Ogle.[322] In addition, Cooley charged Dr. Tseng with twenty-one other felony counts for prescribing controlled substances, such as oxycodone and alprazolam, without a medical purpose.[323]

Cooley's choice of second-degree murder rather than involuntary manslaughter, of which Dr. Murray had been convicted, was a bold decision. Not only had few physicians been convicted of second-degree charges, but also a second-degree murder conviction in California carries a much heavier sentence.[324] An involuntary manslaughter conviction carries a maximum sentence of four years.[325] In contrast, a second-degree murder conviction carries a minimum of fifteen years.[326]

Cooley charged Dr. Tseng under a different theory than that under which he charged Dr. Murray. Cooley charged Dr. Murray under the theory that Dr. Murray had been criminally negligent in his administration of controlled substances to Jackson.[327] Cooley charged Dr. Tseng under the theory of implied malice.[328] In Dr. Tseng's case, malice could be implied because Dr. Tseng knew some of her other patients had died from overdoses.[329] Therefore, she should have known that her prescriptions were potentially deadly.[330] Yet, she did not alter her prescribing approaches.[331]

Following a preliminary hearing, Superior Court Judge M.L. Villar de Longoria decided that Dr. Tseng would indeed stand trial for the murders of Rovero, Nguyen, and Ogle.[332] The gravity of the charges, combined with the rarity of attempting to hold a physician criminally liable for the death of a patient, undoubtedly contributed to the extensive

---

320. *Id.*
321. *Id.*
322. Branson-Potts, *supra* note 7.
323. Deutsch, *supra* note 48.
324. Beth Karas, *Should Conrad Murray be on Trial for Murder?*, CNN.COM (Oct. 17, 2011), *available at* http://insession.blogs.cnn.com/2011/10/17/should-conrad-murray-be-on-trial-for-murder.
325. CAL. PENAL CODE §193(c) (West 2012).
326. CAL. PENAL CODE § 190(b) (West 2012).
327. Sentencing Memorandum, *supra* note 2, at 4.
328. Deutsch & Risling, *supra* note 9.
329. *Id.*
330. *Id.*
331. *Id.*
332. Linda Deutsch, *California Doctor Ordered to Trial on Second-Degree Murder Charges in 3 Drug Overdose Deaths*, ASSOCIATED PRESS (June 26, 2012), *available at* http://bigstory.ap.org/article/trial-decision-due-ca-doctor-drug-deaths.

nature of the preliminary hearing.[333] Over a three-week period, forty witnesses testified, including "members of law enforcement, the coroner's office, former staff members at Tseng's clinic, expert witnesses, former patients and family members of patients."[334] The prosecution also presented over 100 pieces of evidence.[335] Witnesses testified that Dr. Tseng prescribed them controlled substances with very little examination or, in some cases, with no examination at all.[336]

One of the patients who died under Dr. Tseng's care was Joey Rovero, a 21-year-old college student.[337] Dr. Tseng prescribed Rovero oxycodone, alprazolam, and carisoprodol after he came to her office complaining of a sore wrist and feelings of anxiousness.[338] Dr. Tseng did not identify which wrist was bothering Rovero, nor did she probe why Rovero was feeling anxious.[339] Rovero later died "from a mixture of alcohol and moderate to trace levels" of the drugs that Dr. Tseng had prescribed to him.[340] She did not actively verify that the use of controlled substances was appropriate for him. Nor did she try an alternative approach to treatment with controlled substances first, even though she could have simply prescribed aspirin for his sore wrist.

In order to establish implied malice, the prosecution asserted that Dr. Tseng had ample notice that her prescribing methods were dangerous, given that three other patients had died of overdoses during 2007 and 2008.[341] Moreover, the prosecution argued that Dr. Tseng received notice through other means.[342] For example, one patient's father had called Dr. Tseng in 2010 and implored her to stop writing prescriptions for his son.[343]

According to the defense, Dr. Tseng wrote each prescription in good faith and for the purpose of helping her patients cope with their pain.[344] Dr. Tseng's five-attorney team tried to shift the blame from Dr. Tseng to her

---

333. *Id.*
334. *Id.*
335. *Id.*
336. Melanie C. Johnson, *Witness Says Rowland Heights Doctor Gave Her Hundreds of Pills*, DIAMOND BAR PATCH (June 16, 2012), *available at* http://diamondbar.patch.com/articles/witness-says-rowland-heights-doctor-gave-her-hundred-of-pills.
337. Deutsch & Risling, *supra* note 9.
338. *Id.*
339. *Id.*
340. *Id.*
341. Deutsch, *supra* note 332.
342. *See* Hailey Branson-Potts, *Former Addicts: Doctor Charged with Murder Was Easy Mark for Drugs*, L.A. TIMES (Jun. 14, 2012), *available at* http://latimesblogs.latimes.com/lanow/2012/06/doctor-rowland-heights-murder-charges-drugs.html.
343. *Id.*
344. Deutsch, *supra* note 332.

patients.[345] For instance, on cross-examination of one of Dr. Tseng's patients, who served as a witness for the prosecution, the defense pressed the patient to admit that she was aware she was addicted to controlled substances and was abusing the prescriptions Dr. Tseng wrote for her.[346] Some patients acknowledged that they mixed their medications with alcohol.[347] Dr. Tseng's defense argued that Dr. Tseng could not know which patients were abusing drugs, nor could she be blamed if patients did not follow her dosing instructions.[348] Dr. Tseng stated that if a "patient decides to take a month's supply in a day, then there's nothing I can do about that."[349] Yet, Dr. Tseng could have taken steps to actively verify patient suitability for controlled substances before prescribing them, and then remained vigilant throughout the course of treatment. She could have tried treatments using non-controlled substances first. She could have checked California's PMP to determine whether her patients were doctor shopping to divert or abuse medications.[350] Periodic urinalysis tests could have alerted her to disqualifying conditions, such as alcohol use, addiction, and non-compliance with dosage instructions.

In deciding that Dr. Tseng would stand trial for murder, Judge Villar de Longoria accepted the prosecution's theory of implied malice.[351] During his ruling, Judge Villar de Longoria said, "[Dr. Tseng] continued to prescribe these narcotics in high doses even after she was told something was terribly wrong and young men were overdosing and dying."[352] He made particular note of the high number of patients who died of overdoses while under her care.[353]

Dr. Tseng was arraigned on August 7, 2012, where she pleaded not guilty to three counts of second-degree murder, one felony count of prescribing drugs using fraud, and twenty felony counts of prescribing drugs without a legitimate purpose.[354] If convicted, she faces a maximum prison term of forty-five years to life.[355]

---

345. *See* Hernandez, *supra* note 213.
346. *Id.*
347. Deutsch, *supra* note 332.
348. *Id.*
349. Deutsch & Risling, *supra* note 9.
350. *See* Off. of Attorney Gen., *Controlled Substance Utilization Review and Evaluation System (CURES), California Prescription Drug Monitoring Program (PDMP)* (2013), *available at* http://oag.ca.gov/cures-pdmp.
351. *Id.*
352. *Id.*
353. *Id.*
354. *Arraignment Set for Doctor Charged in 3 Overdose Deaths*, KTLA.COM (Aug. 7, 2012), *available at* http://www.ktla.com/news/landing/ktla-rowland-heights-doctor-arrested,0,2086189.story.
355. *Id.*

### c. People v. Fisher

Dr. Frank Fisher operated a California pain clinic from 1995 to 1999.[356] In February 1999, Dr. Fisher was arrested and charged with prescribing excessive amounts of controlled substances and five counts of first-degree murder based on the prescription overdoses of his patients.[357] Prosecutors claimed that Dr. Fisher overprescribed pain medications such as oxycodone, causing five overdose deaths, that he ran a drug mill, and that he was billing for treating patients with no legitimate medical need.[358] The charges were later reduced to involuntary manslaughter due to inadequate evidence.[359] At trial, the prosecution mainly argued that Dr. Fisher was the largest prescriber of Oxycontin in the state.[360] In his defense, Dr. Fisher showed that he adhered to the accepted standards of care, fulfilling the duty of the active verification of patient suitability for controlled substances before prescribing them and vigilance throughout the course of treatment by providing the following treatment:

- Rigorous pre-treatment screening to exclude potential abusers of pain medications;

- Mandatory mental health evaluations of all chronic pain patients by a licensed professional;

- Ejection of patients caught lying, diverting medication, or ingesting non-therapeutic doses; and

- Regular and frequent blood and urine testing for medication serum levels, as well as for illegal substances.[361]

These steps established that Dr. Fisher had abided by the standard of care. The court acquitted Dr. Fisher of all charges, and four wrongful death suits that were brought against him were all dismissed. The case highlighted the importance of establishing active verification and vigilance as an effective defense for physicians.[362]

---

356. Hoffman, *supra* note 19 at 225.
357. *Id.*; *see also* Steve Geissinger, *Physician is Charged with Manslaughter*, SAN DIEGO SOURCE (Aug. 14, 1999), http://www.sddt.com/News/article.cfm?SourceCode=19990816cn#.UY-yDbWsiSo.
358. Geissinger, *supra* note 357.
359. Hoffman, *supra* note 19 at 239-40.
360. *Id.* at 240.
361. *Id.*
362. *Id.* This case highlights an important problem—physicians who follow the verification and vigilance

136        DEPAUL JOURNAL OF HEALTH CARE LAW   [VOL. 15.2:93

## 2. Florida

Florida, a state particularly impacted by the prescription drug epidemic,[363] currently has two cases pending in which physicians have been charged with first-degree murder.[364] In March 2010, Dr. Sergio Rodriguez was indicted for three counts of first-degree murder for the overdose deaths of three of his patients, and his trial is still pending.[365] The criminal complaint alleged that Dr. Rodriguez caused the deaths of his patients "through the unlawful prescription of a controlled substance, oxycodone, by means of prescription issued in bad faith and not in the course of his professional practice."[366] He knowingly distributed controlled substances outside the scope of his professional medical practice without legitimate medical purposes.[367] Although Dr. Rodriguez operated a pediatric office, he saw adult patients and prescribed them controlled substances without examining them.[368]

In August 2011, a state grand jury indicted Dr. Gerald Klein, a physician who worked at a pain clinic, with first-degree murder, and his trial is also currently pending.[369] Dr. Klein's patient died of a prescription drug overdose after obtaining a single prescription from Dr. Klein for more than 200 pills at one time without determining a legitimate medical need.[370] The patient died of combined drug toxicity the day after receiving the prescription.[371] Three board-certified pain management doctors all agreed that no medical reason existed for Dr. Klein to prescribe such large

---

method may still end up on trial. Even if the result of the trial is a finding of no liability, which is more likely for physicians who practice verification and vigilance, the mere fact the case is brought can damage a physician's reputation, insurability, and finances. This problem could likely be reduced by ensuring that prosecutors obtain adequate education and training on how to recognize dangerous prescribing practices and when to refer such cases to licensing authorities versus pursuing them as criminal matters.

363. Florida Office of Drug Control, *Florida's Prescription Drug Diversion and Abuse Roadmap 2012-2015, available at*
http://myfloridalegal.com/webfiles.nsf/WF/KGRG-8T8L5K/$file/PrescriptionDrugDiversionAndAbuse
Roadmap.pdf.

364. Dahl, *supra* note 10.

365. Deutsch & Risling, *supra* note 9; *see also* Michael LaForgia, *Doctor Charged with Murder in Overdose Deaths of 3 Men*, PALM BEACH POST, March 13, 2010, at 1A.

366. Dahl, *supra* note 10.

367. FL Dep't of Law Enforcement, *Palm Beach County Doctor Indicted on Murder Charges* (Mar. 12, 2010), *available at* http://www.fdle.state.fl.us/Content/News/March-2010/Palm-Beach-County-Doctor-Indicted-on-Murder-Charge.aspx.

368. Staff Writer, *Florida Doctor Charged with Murder in Overdose Deaths*, ASSOCIATED PRESS (Mar. 12, 2012), *available at* http://www.ocala.com/article/20100312/articles/100319888?tc=ar.

369. Dahl, *supra* note 10; *see also* Michael LaForgia, *Feds Hope to Crush Pill Czars*, PALM BEACH POST, August 24, 2011 at 1A.

370. Dahl, *supra* note 10; *see also Death on Owners' Hands*, PALM BEACH POST, August 24, 2011 at 10A.

371. Dahl, *supra* note 10.

doses of controlled substances.[372] Dr. Klein's attorney told Circuit Judge Joseph Marx that he plans to present evidence that the patient had been doctor-shopping at the time of his death and ignored Dr. Klein's orders not to take pills that a relative had given him, a defense that this Article has shown will likely fail.[373]

### 3. Georgia

Georgia is another state that has pursued murder charges in improper prescribing cases.[374] In Georgia, a physician can be charged with felony-murder if the death of a patient results from controlled substance use.[375] Felony-murder, as defined by Georgia law, occurs when the defendant commits the offense of murder in the commission of a felony, and the defendant causes the death of another human being irrespective of malice.[376] The sentence for felony-murder is life imprisonment or death.[377] In *Hulme v. State*,[378] the court stated that felony-murder was appropriate in controlled substance homicides:

> In Georgia, although we have no controlled-substance homicide statute, a person may be convicted of felony murder in this State when, in the commission of a felony, he causes the death of another human being irrespective of malice. The only limitation on the type of felony that may serve as an underlying felony for a felony murder conviction is that the felony must be inherently dangerous to human life. For a felony to be considered inherently dangerous, it must be dangerous per se or it must by its circumstances create[ ] a foreseeable risk of death.[379]

In *Chua v. State*,[380] the jury found the defendant-physician guilty of not only violating Georgia's controlled substances act, but of felony-murder.[381] In *Chua*, the patient died of an overdose of a mixture of controlled substances, including morphine, oxycodone, and methadone,

---

372. *Death on Owners' Hands*, *supra* note 370.

373. Daphne Duret, *Bail Set for Pain Clinic Doctor in Murder Trial*, PALM BEACH POST, September 3, 2011 at 1B.

374. *See id.*; Alvarez, *supra* note 15.

375. Hulme v. State, 544 S.E.2d 138, 140-11 (Ga. 2001); *see also* Chua v. State, 710 S.E.2d 540 (Ga. 2011).

376. GA. CODE ANN. § 16-5-1(c) (2012).

377. *Id.*

378. *Hulme*, 544 S.E.2d at 138.

379. *Id.* at 140-11.

380. *Chua*, 710 S.E.2d at 540.

381. *Id.*

which Dr. Noel Chua had prescribed.[382] Dr. Chua had prescribed oxycodone on November 28, 2005 and then distributed methadone to the patient days later on December 9 and December 12, 2005.[383] Dr. Chua had obtained the patient's previous medical records, which showed a pattern of prescription drug abuse, but failed to adjust the patient's treatment plan, therefore failing to verify the appropriateness of treatment with controlled substances and to remain vigilant to prevent foreseeable patient harm.[384]

Dr. Chua also ignored a nurse who warned him that the patient had an addiction, and he continued to provide the patient with controlled substance prescriptions, again failing to act after learning facts that typically necessitate a change in the treatment plan.[385] The defense argued that Dr. Chua treated the patient in the usual course of practice, and that the pain medications were necessary to help relieve the patient's chronic pain and headaches.[386] In affirming Dr. Chua's conviction, the court stressed Dr. Chua's inaction despite evidence that the patient was addicted to prescription medications.[387]

When prescribing controlled substances, verifying the patient's history to ensure the patient's suitability for treatment with controlled substances is vital, but is not enough; a physician must also be vigilant and change the course of treatment when the physician finds out that treatment using controlled substances is not appropriate for the patient.

### 4. Nevada

In Nevada, a physician may be convicted of first-degree or second-degree murder, if "the death of a person was proximately caused by a controlled substance which was sold, given, traded, or otherwise made available to him."[388] Depending on whether the prosecutor decides to charge the physician with first-degree or second-degree murder, the physician can receive a minimum sentence of twenty-five years in prison and a maximum sentence of the death penalty.[389]

---

382. *Id.*
383. *Id.*
384. *Id.*
385. *Id.*
386. Teresa Stepzinksi, *Chua Murder Conviction Upheld by Georgia Supreme Court,* FLORIDA TIMES (May 31, 2011), *available at* http://jacksonville.com/news/crime/2011-05-31/story/chua-murder-conviction-upheld-georgia-supreme-court.
387. *Chua,* 710 S.E.2d at 544.
388. NEV. REV. STAT. § 453.333 (2012).
389. NEV. REV. STAT. §§ 200.030, 453.333 (2012).

In 2011, Dr. Richard Teh was arrested, pursuant to this statute, on a second-degree murder charge for prescribing "inappropriate doses" of schedule II-IV controlled substances to a patient who subsequently died.[390] Although the prosecution charged Dr. Teh with acting with malice aforethought,[391] Dr. Teh's attorney argued that Dr. Teh never intended to harm the patient by prescribing the pain medication.[392] He further stated, "there was no malice, no intent to kill," and yet, prosecutors were willing to bring the charge anyway.[393] However, the prosecutors ultimately dropped the case when the coroner's office changed its ruling on the cause of death.[394]

In 2008, a Nevada jury convicted Dr. Harriston Bass of second-degree murder[395] along with forty-nine counts of selling a controlled substance and nine counts of possession with the intent to sell, after one of his patients died from taking hydrocodone prescribed to her by Dr. Bass.[396] Dr. Bass ran a mobile medical service called "Docs 24-7," through which he made house calls to patients at their homes and hotel rooms.[397] His car was outfitted with a portable refrigerator that he used as his mobile pharmacy.[398] Although he was not certified as a pharmacist and was not authorized to sell or dispense controlled substances, Dr. Bass routinely dispensed the medications for money.[399] The prosecution had accused Dr. Bass of selling the decedent 900 hydrocodone pills.[400] However, only trace amounts of the medication were found in the decedent's toxicology report, suggesting the decedent was diverting the medications.[401] The Nevada Supreme Court affirmed his convictions and a sentence of twenty-five years to life.[402]

---

390. Criminal Complaint at 1, *Nevada v. Teh*, (Super. Ct. Clark County, 2011, No. 11F03617X). (charging Dr. Teh with violating Nev. Rev. Stat. §§ 200.010, 200.030, 453.333 for selling, giving, trading, or otherwise making available controlled substances to the patient with malice aforethought); *see also* Paul Harasim & Mike Blasky, *Murder Charge Upsets Doctors*, LAS VEGAS R.J., Apr. 3, 2011, at 1B.

391. Criminal Complaint, *supra* note 390, at 1.

392. Harasim & Blasky, *supra* note 390.

393. Criminal Complaint, *supra* note 390, at 1.

394. Francis McCabe, *Murder Charge Against Doctor to be Dropped, Memo Shows*, LAS VEGAS REV. J., Apr. 3, 2011, at 3B (changing the case of death to pneumonia rather than an overdose).

395. Second-degree murder in Nevada is almost anything besides a "willful, deliberate and premeditated killing." NEV. REV. STAT. § 200.030 (2012).

396. Ed Vogel, *Justices Uphold Doctor's Conviction in Overdose Death*, LAS VEGAS R. J., (May 19, 2010), *available at* http://www.reviewjournal.com/news/justices-uphold-doctors-conviction-overdose-death.

397. Harasim & Blasky, *supra* note 390.

398. *Id.*

399. Vogel, *supra* note 396.

400. *Id.*

401. *Id.*

402. Harasim & Blasky, *supra* note 390.

## C. What Do These Cases Tell Physicians?

There are a few common threads in these cases. Mainly, they demonstrate the defenses on which physicians can no longer rely in light of the need to actively verify a patient's suitability for controlled substances before beginning treatment and to remain vigilant throughout the course of treatment. This section provides a discussion of such defenses. Additionally, please see Table 1 for a list of defenses and cases in which such defenses have been rejected.

### 1. The Good Faith Defense

As established in *Tseng*, *Feingold*, *Hurwitz*, and *Merrill*, physicians cannot rely on the good faith defense, in which a defendant argues that he prescribed based on his belief that such prescription was appropriate, to protect themselves against criminal liability.[403] Although a patient may have a condition that can be treated with controlled substances, the physician must determine that the patient has a legitimate medical need for treatment with controlled substances rather than another type of treatment. When a physician simply prescribes controlled substances without verifying that the patient is suited for such treatment, he may have good intent, but mere intention likely will not save him from liability based on the imputed knowledge of the dangers of prescribing controlled substances.

### 2. Willful Ignorance and Calculated Risk

Good faith standards may encourage "willful ignorance," which occurs when a physician continues to prescribe, despite his awareness of a number of red flags, as in the cases of Dr. Tseng and Dr. Chua.[404] The physician deliberately avoids learning the facts that, if known, would require the physician to change his prescribing actions.[405]

It is questionable whether a physician could continue to prescribe controlled substances despite his awareness of red flags, but still act in good faith, especially because courts have looked unfavorably at physicians when they disregarded warnings.[406]However, defenders of such conduct argue that physicians can use the "calculated risk" defense, in which the physician believes that any benefit derived from the treatment,

---

403. *See supra* Part V.A-B.
404. *Id.*
405. *See* Hellman, *supra* note 79.
406. *See, e.g., Chua*, 710 S.E.2d at 540 (2011).

such as cessation of pain, would outweigh negative consequences, such as possibility of addiction to the controlled substance.[407]

This calculated risk argument is weak because proper medical practice requires that the physician evaluate, manage, and, if necessary for patient safety, respond to the risks of prescribing controlled substances. If the physician takes steps to actively verify patient suitability for controlled substances, he will have a greater likelihood of knowing, before writing the first prescription, whether the patient could be seeking to divert or abuse controlled substances.[408]For example, if the patient has a history of abuse, the physician will know that the risk requires a specialized approach to treatment.[409] Even if the physician preliminarily determines that the controlled substance is appropriate for the patient, if the physician is properly following the calculated risk theory, then certain red flags, such as PMP data or urinalysis results can alert him that the risk of the controlled substance has begun to outweigh its benefit and that a different method of treatment is now necessary.[410]

Moreover, the CSA test, which requires a physician to prescribe to patients with a legitimate medical need and inside the course of usual medical practice, prevents certain risk-taking.[411] Many states require physicians to undergo training pertaining to controlled substances to learn what is within the usual course of medical practice.[412] Other practices, such as prescribing large dosages of controlled substances without properly verifying the patient's suitability for the medication, as doctors Hurwitz, McIver, and Merrill had done, violate the first part of the CSA test because the physician has not determined whether the patient has a legitimate medical need for such treatment. Risky practices, such as providing rapid refills without knowledge of the patient's proper use of the medication, as

---

407. *Id.* (noting that "it isn't reckless to risk a harmful action, even if it is very likely to occur, if the harm is significantly smaller than the harm that inaction may cause" and that a physician "is obligated to care more about alleviating the suffering of his patient than he cares about avoiding harm to society").

408. *See* H.R. 7095*, supra* note 20; *see also* STEVEN D. WALDMAN, PAIN REV. 674-5 (2009); *see also* Scott, *supra* note 123.

409. *See* Hellman, *supra* note 79.

410. *See id.*

411. *See, e.g., Feingold*, 454 F.3d at 1008; *Merrill*, 513 F.3d at 1309; *People v. Tseng*, (Super. Ct. L.A. County, 2012, No. 394495).

412. These states include Louisiana, Montana, Nevada, New Jersey, Pennsylvania, South Carolina, and Utah. LA. REV. STAT. ANN. § 40:1007 (2012); NEV. REV. STAT. § 453.1545 (2012); UTAH CODE ANN. § 58-37f-402 (2012); Nat'l Alliance for Model State Drug Laws, *Statutes that Require Certain Authorized Users to Undergo Training and/or Completion of Educational Course Before Accessing PMP Data* (2012), *available at* http://www.namsdl.org/documents/StatesthatRequireAuthUserstoReceiveTrainingPriorto AccessingPMP07232012.pdf (noting that the state PMP representatives of Montana, New Jersey, Pennsylvania, and South Carolina all require all authorized users to complete a training program before being granted access).

Dr. Feingold had done, violate the second part of the CSA test because such method is outside the usual course of medical practice.

Therefore, physicians should not rely on the willful ignorance or calculated risk defenses even if they believe that using controlled substances adequately treats their patients' symptoms, as doctors Chua, Feingold, Hurwitz, McIver, Merrill, and Moore had attempted to do.[413]

### 3. Trusting the Patient

Similarly, trusting a patient is not enough to protect a physician against criminal liability. Dr. Feingold, Dr. Merrill, and Dr. Tseng all argued unsuccessfully that they simply trusted their patients to a fault.[414] Yet, the courts still found them guilty.[415] Although a physician's trust in his patient is important to help the patient feel respected,[416] physicians are still required to determine whether their patients have a legitimate medical need for treatment with controlled substances and to then prescribe within the usual course of medical practice. Blindly accepting a patient's word that he experiences sharp pains or strong headaches, as in *Feingold, Merrill,* and *Tseng,* is not sufficient to prescribe controlled substances. A physician must legitimately attempt to verify the need for such treatment and ensure that such treatment is, and remains, necessary and appropriate. However, with respect to active verification, a physician can never be certain of such need because many disorders or symptoms of disorders for which controlled substances are prescribed do not present significant physical or measurable manifestations, and can only be assessed and reported by the patient himself. Examples are pain, anxiety, and adult Attention Deficit Disorder.

When active verification and vigilance are consistently carried out when prescribing controlled substances, the stigma of not relying upon trust alone is removed. Although some patients can find testing offensive or intimidating, it is a practice that can help ensure a physician's compliance with the standard of care.[417] When a physician checks a PMP or incorporates drug testing into treatment plans regardless of what the patients say, the physician can rightly state that he is not taking such actions because he does not believe his patients. Rather, the physician

---

413. *See* Hellman, *supra* note 79.
414. *See supra* Part V.A-B.
415. *Id.*
416. *See* Hellman, *supra* note 79.
417. Leavitt & Reisfield, *supra* note 27.

takes these actions because he is required to do so for medical and legal reasons.

### 4. Lacking Foreseeability

Lacking foreseeability is also no longer a valid defense. Dr. Tseng, Dr. Murray, and Dr. Merrill all argued that they had no way to foresee whether patients would follow the proper dosage instructions.[418] The foreseeability defense is similar to arguing contributory negligence. For example, Dr. Murray defended that Jackson self-administered the propofol when Dr. Murray had left the room.[419] Dr. Murray also argued that he did not know that, the night before Jackson's death, Jackson had taken other medications that Dr. Murray prescribed.[420] Yet, the courts found all of these physicians liable regardless.[421] Like contributory negligence, lack of foreseeability is not a valid defense because the physicians have imputed knowledge of the risks involved in prescribing controlled substances. They become aware of this risk at the moment they are required to register with the DEA to prescribe controlled substances, a step that alerts physicians to the seriousness of prescribing such medication.

Additionally, lack of foreseeability is a weak argument because physicians have methods of assessing the likelihood of adverse events at their disposal, as discussed above. If they make efforts to verify patient suitability for controlled substances and remain vigilant throughout the course of treatment, they likely will be able to spot signs of diversion, misuse, or abuse before it is too late. Therefore, unique risks associated with each patient's controlled substance use are increasingly foreseeable.

### 5. Risky Prescribing

Risky prescribing without actively verifying patient suitability for controlled substances and without remaining vigilant throughout the course of treatment can result in a breach of duty under civil law, the CSA, and state homicide statutes. Physicians can no longer rely on the defenses of good faith,[422] willful ignorance,[423] trusting the patient,[424] calculated

---

418. *See supra* Part V.A-B.
419. *See supra* Part V.B.
420. *Id.*
421. *See supra* Part V.A-B.
422. *Feingold*, 454 F.3d at 1008; *Hurwitz*, 459 F.3d at 466; *Merrill*, 513 F.3d at 1309; Deutsch, *supra* note 332 (discussing the rejection of Dr. Tseng's good faith defense).
423. *See Chua*, 710 S.E.2d at 544; Stepzinksi, *supra* note 386 (discussing how the court rejected Dr. Chua's argument that he prescribed high dosages of controlled substances to properly treat his patient's pain); Branson-Potts, *supra* note 342 (noting that Dr. Tseng ignored her patient's father when he told her about his son's abuse of controlled substances).

risk,[425] or lack of foreseeability.[426] Thus, as these defenses are not viable, physicians who prescribe controlled substances without actively verifying patient suitability for controlled substances before prescribing and remaining vigilant throughout the course of treatment are more exposed than ever to criminal liability.

## CONCLUSION

Prescription drug abuse is a well-known and widespread epidemic. When physicians claim that they do not know that controlled substances are dangerous and perhaps deadly to their patients, it does not ring true. Similar skepticism shrouds claims that they do not know what dosages their patients are taking, that their patients had been doctor-shopping, or that the patients had a history of controlled substance abuse. Physicians must determine the appropriateness of prescribing controlled substances through active verification and vigilance. When physicians fail to take these steps, they are knowingly breaching the reasonable, prudent person standard of care and the CSA test by placing their patients at risk of harm. As such, breaching physicians can be charged with anything ranging from a civil fine to first-degree murder. As case law evolves, physicians should no longer rely on certain, long-standing defenses. Thus, if physicians actively verify and remain vigilant, while properly documenting the tools used to practice such method, they can improve their likelihood of avoiding both civil and criminal liability at the federal and state levels. More importantly, they can help protect their patients from unnecessary and preventable adverse events, including death.

---

424. *See Feingold*, 454 F.3d at 1006; *see supra* note 277 and accompanying text; *see supra* note 345 and accompanying text.

425. *See* Chua, 710 S.E.2d at 544; Hurwitz, 459 F.3d at 466 (choosing to prescribe his patients high dosages of controlled substances to treat their pain after obtaining the patients' medical records and being told of patients' addictive behavior); Stepzinksi, *supra* note 387 (discussing how the court rejected Dr. Chua's argument that he prescribed high dosages of controlled substances to properly treat his patient's pain).

426. *See Merrill*, 513 F.3d at 1309; Nelson, *supra* note 276 (discussing how the court rejected Dr. Merrill's foreseeability defense); Deutsch, *supra* note 332 (discussing the prosecution's rejection of Dr. Tseng's foreseeability defense).

## TABLE 1

| Defense | Definitions | Cases that rejected this defense |
|---|---|---|
| **Good Faith** | A state of mind denoting honesty of purpose, freedom from intention to defraud, and generally speaking, means being faithful to one's duty or obligation.[427] | *Taglieri v. Moss, United States v. Tseng, United States v. Feingold, United States v. Hurwitz, & United States v. Merrill* |
| **Contributory Negligence / "Criminal" Contributory Negligence** | The act or omission amounting to want of ordinary care on the part of the plaintiff, which, concurring with the defendant's negligence, is the proximate cause of injury.[428] | *Argus v. Scheppegrell, Ballenger v. Crowell, People v. Murray, & People v. Tseng* |
| **Trusting the Patient** | Physician's reliance on the information that a patient tells him without properly verifying whether such information is accurate. | *United States v. Feingold, United States v. Merrill, & United States v. Tseng* |
| **Calculated Risk** | A chance of failure or success whose degree of probability has been estimated before some undertaking is entered upon.[429] | *United States v. Chua, United States v. Feingold, United States v. Hurwitz, United States v. McIver, United States v. Merrill, & United States v. Moore* |
| **Lack of Foreseeability** | Lack of reasonable anticipation that harm or injury is likely to result from certain acts or omissions.[430] | *United States v. Tseng, United States v. Murray, & United States v. Dr. Merrill* |

---

427. BLACK'S LAW DICTIONARY 693 (6th ed. 1990).
428. *Id.* at 1033.
429. *Calculated Risk Definition*, MERRIAM-WEBSTER.COM, *available at* http://www.merriam-webster.com/dictionary/calculated%20risk.
430. BLACK'S LAW DICTIONARY, *supra* note 428 at 649.



Back to 71



OFF-LABEL PRESCRIBING

This edition first published 2015 © 2015 by John Wiley & Sons, Ltd.

*Registered Office*

John Wiley & Sons, Ltd., The Atrium, Southern Gate, Chichester, West Sussex,

PO19 8SQ, UK

*Editorial Offices*

9600 Garsington Road, Oxford, OX4 2DQ, UK

The Atrium, Southern Gate, Chichester, West Sussex, PO19 8SQ, UK

111 River Street, Hoboken, NJ 07030-5774, USA

For details of our global editorial offices, for customer services and for information about how to apply for permission to reuse the copyright material in this book please see our website at www.wiley.com/wiley-blackwell.

The right of the author to be identified as the author of this work has been asserted in accordance with the UK Copyright, Designs and Patents Act 1988.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, except as permitted by the UK Copyright, Designs and Patents Act 1988, without the prior permission of the publisher.

Designations used by companies to distinguish their products are often claimed as trademarks. All brand names and product names used in this book are trade names, service marks, trademarks or registered trademarks of their respective owners. The publisher is not associated with any product or vendor mentioned in this book.

Limit of Liability/Disclaimer of Warranty: While the publisher and author(s) have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. It is sold on the understanding that the publisher is not engaged in rendering professional services and neither the publisher nor the author shall be liable for damages arising herefrom. If professional advice or other expert assistance is required, the services of a competent professional should be sought.

*Library of Congress Cataloging-in-Publication Data*

Cavalla, David, author.

   Off-label prescribing : justifying unapproved medicine / David Cavalla.

      p. ; cm.

   Includes bibliographical references and index.

   ISBN 978-1-118-91207-2 (cloth)

   I. Title.

   [DNLM:   1. Off-Label   Use.   2. Drug   Approval.   3. Pharmaceutical

57

OFF-LABEL PRESCRIBING

Preparations.   QV 748]

  RM300

  615.1–dc23

      2014028488

A catalogue record for this book is available from the British Library.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books.

Cover image: © Dan Jubb
Cover design by Dan Jubb

## Chapter 5
## Do no harm: Safety and efficacy

The essential message of this chapter is that off-label medicines involve a higher risk of adverse drug reactions (ADRs) than properly licensed alternatives and are less likely to be efficacious. How does this arise? A doctor's perception about the validity of prescribing off-label is often informed by his or her concept of relatedness. It is this principle which runs through this chapter, and I will point out reasons why the preconception is not (or may not be) valid. A practitioner's hypothesis is not necessarily more valid than any other therapeutic hypothesis from a medical researcher or a pharmaceutical scientist; these people also tend to believe that their theories are correct and are even able to convince other people of the merit in investing time and money in pursuing their ideas. Pharmaceutical companies often embark on drug development campaigns to uncover secondary uses, there being sufficient consensus and commitment to justify the expenditure of very large amounts of money over long periods of time: alas, for the vast majority of these programmes, when put to the test, 'the best laid schemes o' mice an' men gang aft agley' (as in Robert Burns' poem 'To a Mouse'), and the developments are abandoned before a product can be commercialised. The failure rates are not as high as de novo R&D, but they are nevertheless significant: historical analysis suggests that 25% of developments around secondary uses for existing compounds are successful, compared to the 10% statistic applicable to new drugs [100].

As far as safety is concerned, a variety of studies have shown an increase in risk associated with off-label prescriptions as opposed to licensed alternatives (see Table 5.1). As far as the overall relative risk is concerned, a series of studies have identified greater proportions of ADRs in paediatric patients prescribed off-label medicine, as opposed to products used in accordance with the approved status. The relative risk

OFF-LABEL PRESCRIBING

varies from 1.53 to 3.44, with the average roughly equating to slightly more than a doubling of risk for such patients. It is important to recognise here that we are talking about all kinds of adverse effects here, from the very mild to the very severe. Theoretically, this observation could be a result of an increase in very minor side effects, in which case the import of such observations might (rightfully) be discarded as 'unimportant'.

**Table 5.1** Summary of studies showing increased risk of ADRs in paediatric patients treated with off-label medicine compared to treatment in accordance with approved status.

| Study description | Country | Study year | Relative ADRs[*] | References |
|---|---|---|---|---|
| 1388 paediatric inpatients | United Kingdom | 2013 | 2.25 | [113] |
| 272 paediatric inpatients | Brazil | 2008 | 2.44 | [116] |
| 1419 paediatric outpatients | France | 2002 | 3.44 | [16] |
| 936 paediatric inpatients | United Kingdom | 1999 | 1.53 | [18] |

[*] Adverse drug events (ADEs) describe any untoward medical occurrence that happens during drug treatment whether or not caused by the drug. ADRs form a part of ADEs, being defined as an unintended noxious response to a drug.

However, when we look at the types of ADR involved, again it seems that more of the ADRs associated with off-label medicine are serious compared to approved drug treatments. A study based on an analysis of the Danish national ADR database for children and adolescents from 1998 to 2007 showed that 60% of ADRs associated with off-label medicine were serious compared with a figure of 35% for drugs administered in accordance with their label [20]. A study from 2004 of ADRs in the United Kingdom drawn from paediatric patients reported that 35% of recorded ADRs involved off-label or unlicensed medicine and that 6 out of 10 medicines implicated in fatalities were off-label or unlicensed [117]. These reports have been picked up by the EMA, who pointed out a need for better scientific evaluation of the use of unlicensed or off-label medicines in children and further analysis of the specificity of paediatric ADRs.

OFF-LABEL PRESCRIBING

They also noted that the real situation may be worse, since they were concerned about underreporting of paediatric ADRs associated with the use of unlicensed or off-label medicines [118].

The association of off-label use with excess ADRs is not confined to paediatric medicine. A study from a French regional drug monitoring centre among the general population (both children and adults) reported that more off-label prescriptions resulted in an ADR compared with approved medicines [119]. In a later study, 45% of patients with an ADR had been given an 'inappropriate' prescription. Although the control rate of off-label prescriptions is not reported here, we have seen a consensus level of one in five prescriptions from multiple other authors [120]; taking this figure, the risk of ADRs associated with off-label prescriptions would appear to be more than double that of approved medication [121]. Finally, we see a similar situation in medical devices, where the off-label use of sirolimus stents (to keep open a previously blocked blood vessel) is associated with a threefold higher rate of adverse cardiac events than on-label use [122] and similarly for biliary stents, which help to keep open the bile duct if obstructed. These devices are often used off-label in the peripheral vasculature, such that approximately 1 million off-label uses of biliary stents occurred from 2003 through 2006 and are associated with a truly alarming 81.2% of the adverse events [123].

Overall, a review from 2012 concluded rather cautiously that 'the results of previous studies have indicated that there may be some association between off-label and unlicensed medicine use and ADR risk', although it also called for further clarification on the situation [124]. Despite this cautious conclusion, the concordant previous evidence cited here calls for far more concern about the general use of off-label medicine. Not only are adverse events more commonly associated with the practice, but the events that are seen are of a more serious nature. The present level of evidence is generally to prove an association, rather than prove a causal relationship. It could be that off-label medicine is used in more serious conditions, where there is no licensed alternative. More work is needed to clarify this possibility,

61

OFF-LABEL PRESCRIBING

information, specific paediatric formulations are often not available.

As discussed earlier, studies in various paediatric hospital environments have shown a considerable proportion of medicines used outside the product licence. But in addition, there were some examples where the drug comprising the active ingredient had not received any licence at all (an unlicensed drug). A study based on over 66 000 dispensing records for the year 2000 in Dutch children showed that unlicensed drug use is highest among 0- to 1-year-olds (at 35%), whereas off-label medicine is highest in 12- to 16-year-olds (at 27%) [149]. Taken together, among all age groups of children, the proportion of off-label and unlicensed drug uses was 37% of all prescriptions. However, beneath the overall figures, certain areas showed even higher levels of unlicensed or off-label use. For instance, the proportion of unlicensed diuretics was over 70%, and the level of unlicensed steroid use was nearly 60%. As for off-label use, this was particularly high (over 80%) among anti-migraine, hypnotic and sedative drugs and nearly 75% for eye and ear drugs. Given that these statistics involve various drugs with some serious side effects, it is of huge importance for patient safety that the doses are correctly calculated. But the problem is that in paediatrics, the patient may be a premature infant weighing 500 g or a fully grown adolescent weighing as much as 100 kg. In addition to concerns about safety in overdose, we should also be concerned about lack of efficacy if the dose is too low.

Paediatric drugs have usually been used off-label by extrapolating efficacy, dosing, administration and side effect profiles from adult studies. However, children differ pharmacokinetically from adults, and medication for adults cannot simply be administered in smaller doses. There are plenty of examples from the history of paediatric pharmacology illustrating that newly marketed drugs may have incomplete adverse event profiles that make it inadvisable for widespread community utilisation in youths and children before uncommon or rare serious adverse events are known. Several cases illustrate the risks even for commonly used and accepted treatments.

62

OFF-LABEL PRESCRIBING

their treatment period. The conclusions, based on two SSRIs, fluoxetine (Prozac) and venlafaxine (Effexor), are broadly that these drugs do diminish depression, do so more effectively in older adults than in younger ones, that suicide and thoughts thereof are correlated with depressive mood rather than SSRIs, and that suicide and thoughts thereof are far more common in younger adults than old ones.

So, depressed children and depressed adults behave quite differently, and many antidepressants (not just SSRIs, but also older drugs like amitriptyline, imipramine and desipramine) carry warnings about increased suicidality specifically in younger people [151]. These warnings, in fact regulatory warnings in general, are not always adhered to by the medical profession. A study of off-label paediatric use in Germany showed that 17% of the instances involved the prescriber ignoring recommendations on active ingredient, dose units or formulations for a specific age group. In this study, the authors noted that the prescription of quinolones to children was observed, even though there was a restriction regarding the use of quinolone antibiotics in children because of cartilage and joint toxicity. So too was the off-label prescription of 1% xylometazoline nasal drops for babies: xylometazoline and oxymetazoline nasal drops are available in different drug concentrations specifically designed for different age groups, so the prescription to a baby of a concentration of drug designed for a child reflects poor care [157].

These and other histories teach numerous lessons individually. Considered as a group, however, they make it clear that safe and rational prescribing of drugs to children requires controlled studies of drugs in children. Concern regarding this issue was raised some years ago, as a result of which various changes were made to the regulations in the EU and in the United States to promote the generation of specific developments for the paediatric population. These measures and an assessment of how well they have worked are dealt with in further detail in Chapter 8.

63

OFF-LABEL PRESCRIBING

of an anticoagulant resulting in haemorrhage; and opiate overdose associated with respiratory depression.

Nobody has reported specifically on how many of the fatal ADRs are due to off-label medicine, but let's see if we can produce an estimate, using the information so far communicated. From page 71, adverse events run at around two- to threefold that of drugs prescribed on-label; we noted in that section that the proportion of serious events in off-label use is higher, but there are limited data for this factor, so (cautiously) let's exclude it. Doing so will probably give rise to a lower figure of off-label fatal ADRs rather than the opposite. Noting the previously quoted number of overall deaths associated with drug-related adverse events (106 000) and assuming a risk factor of between two- and threefold, we can calculate that between one in three and three in seven drug-related deaths occur as a result of this practice, namely, 35 000–45 000 per year in the United States. On a pro rata basis, using the figures quoted in the Introduction on p. xv, this equates to a figure of

approximately 100 000 deaths annually across the OECD countries.

Can we approach a better understanding of this issue if we also look at it the other way around, in other words identifying off-label drug use and seeing how much of it is associated with fatal adverse events?

Let's take the example of quinine. A study from Eguale, looking at prescriptions written for off-label indications, reports that quinine is frequently prescribed for the treatment of night-time leg cramps. This is despite the assessed evidence that quinine derivatives are not recommended for routine use in this indication, being only modestly effective and hampered by their toxicity [162]. In 2010, the FDA placed a warning against the off-label use of quinine sulphate for nocturnal leg cramps, or restless leg syndrome, and a black box warning was added to the product label. Over a 3-year period to 2008, the FDA received 38 reports of serious side effects associated with the use of quinine including some cases of permanent kidney

OFF-LABEL PRESCRIBING

with a practice in medicine which is, by any acceptable standard, anything but evidence based.

## Quality of evidence

The fallacy of the argument for use of a drug outside regulatory approval is widely appreciated when the evidence for its efficacy is poor. Off-label medicine can only really be appropriate in these circumstances if the patient is seriously ill and there is no alternative treatment. Where evidence is poor, the safety of the drug also needs to be concomitantly greater. This can be easily seen by the invalidity of a prescription of, for instance, an antibiotic for the common cold or in fact of any ineffective therapeutic treatment (like homeopathy).

'If there is not evidence presented to the FDA about a given indication, it certainly is a user-beware situation', said Jerry Avorn, professor of medicine at Harvard Medical School. A similar view comes from Adriane Fugh-Berman, MD, associate professor of Georgetown University Medical Center and director of PharmedOut.org, who says that 'Without clinical trials, physicians are essentially operating in an "evidence-free zone"'. PharmedOut is a project that educates doctors about the influence of pharmaceutical companies on prescribing patterns. Another quote comes from Diana Zuckerman, president of the National Research Center for Women and Families in Washington: 'So many drugs are being used by so many patients without objective research [or] evidence, based on their experience with relatively small numbers of patients, doctors may believe that the drugs are effective, but that is not conclusive evidence – and certainly not evidence that those medications are the best choices available' [165].

**Strong evidence**

I want to move on now to talk a little about situations where there is good evidence for off-label medicine. There are two reasons for this. The first is to balance the perception that we are confronted by quackery everywhere we look, since the landscape is actually quite heterogeneous, with small

OFF-LABEL PRESCRIBING

that scurvy was essentially a result of ill-digested and putrefying food within the body, bad water, excessive work and a damp living environment which prevented healthful perspiration. Medical myths of that time often had data-defying lives of their own, but surely today, we could count on a more incisive scientific analysis.

Off-label medicine has sometimes been characterised as a long-standing medical practice that has, for commercial reasons, not been subjected to high-quality clinical trials and consequent regulatory scrutiny; however, according to this characterisation, that deficit should not detract from its rightful place in medical practice. Yet we have also seen how some long-established off-label uses have been shown to either be ineffective or harmful when subjected to proper evaluation (such as the deaths associated with chloramphenicol when used in paediatric care). Examples such as these are called 'medical reversals'; how common are they?

A recent study looked at 363 articles in *New England Journal of Medicine*, in particular analysing situations in which new studies contradict current practice [201]. The study found that only a minority (38%) of current practices were affirmed by this analysis, compared with 40% [148] that were shown to be ineffective and a further 22% where the evidence was inconclusive. This tells us the danger of accepting arguments about 'standard of care' without formal proof and of course raises some concern for the majority of off-label prescriptions, for which there is little or no scientific support.

A good example involves the use of bone marrow transplants in breast cancer. In 1986, doctors from the Harvard Medical School and other hallowed Bostonian medical institutions reported using very high doses of chemotherapy to eliminate residual cancer in patients with advanced disease and then resuscitating them with using their own bone marrow that had been previously harvested [202]. The results from a small, uncontrolled 'proof of principle' trial were positive, thus providing evidence of both feasibility and potential

# Chapter 6

# Liability, injustice and reimbursement: who should pay?

## A prescriber's ethical and professional duties

Before dealing with the legal issues around off-label prescribing, we need to put the ethical context right. The point has been made that off-label prescriptions should not be viewed as scientifically or ethically unsound when there are good clinical data to support a particular therapeutic indication [206]. The trouble is that there are only good data in about 25% of off-label use, suggesting that the other 75% *should* be regarded as ethically unsound. This difficulty has found its way into various professional medical guidelines as we saw earlier. The underlying scientific basis for off-label prescribing also becomes a significant legal issue in determining liability suits. The ethical context frames the legal situation, and given that the country-by-country situation differs with respect to professional guidelines, it is not surprising that there are differences between countries in terms of the liability issues.

In addition to the importance of the evidential basis, two other ethical factors come into play. First, the situation of the patient, and second that of alternative medical treatments. Clearly, the more serious the disease and the more bereft of licensed therapeutic alternatives, the more justifiable is an off-label prescription. The treatment of cancer in a child is perhaps one area highly likely to be seen as ethically justified for such a treatment option.

But there is one area where healthcare professionals are unlikely to get much sympathy, and that is when accepting the industry shilling for promulgating off-label pseudomedicine.

determination of the medical profession to resist off-label regulation. However, all is not lost; there are ways, as we shall discover in [Chapter 8](#), of reining in some of this practice, but we do need to consider new approaches, different from those of the past, to put a brake on the over-prevalent practice of off-label medicine.

## Notes

[1] Interestingly, in March 2014, the House of Representatives of the US State of Oklahoma voted overwhelmingly in favour of a bill to ban the off-label use of drugs to induce abortions. Oklahoma is among five states – the others are Arizona, North Dakota, Ohio and Texas – that have sought to restrict medical abortions by limiting or banning off-label uses of drugs. In arguing for the passage of the bill, proponents argued that the law would reduce patient harm, since a number of women had died while being prescribed drugs to induce abortions [227].

[2] It is only fair to note, however, that Pfizer's appearance in off-label litigation both in 2004 and 2013 is as a result of corporate acquisitions it made. The earlier case arose from its takeover of Parke-Davis/Warner-Lambert, and the later case from its takeover of Wyeth.

and without regulatory assessment of efficacy. What is it about a drug's second use which allows us to accept a different regulatory standard from that applied in its first use?

Whichever angle it is viewed from, we have a problem.

Off-label prescriptions run on average at the rate of one in five of all prescriptions, of which there are billions worldwide, so it is not a trivial issue. Adverse events from off-label medicine run at around two- to threefold that of drugs prescribed on-label. Noting the number of overall deaths associated with drug-related adverse events from page 87 (106 000) and assuming a relative risk factor of between two and threefold, we calculated in Chapter 5 that there are around 35 000–45 000 deaths per year associated with off-label drug use in the United States. On a pro rata basis, using the figures quoted on page 88, this equates to a figure of approximately 100 000 deaths annually across the OECD countries. This is a substantial amount of patient harm for a group of medicines of which three quarters have little or no good scientific evidence for their benefit.

We need to do more to justify this situation. A lot more.

Three trends in medicine make off-label prescriptions an issue where yesterday's practice is not acceptable. First is the increasing demand for safety in the drugs we take. The balance of benefit and risk is slanting evermore towards a concern for risk over and above a yearning for benefit. Second, the patient–doctor relationship has changed enormously since the end of the Second World War. Doctors are still held in respect, certainly more so than the pharmaceutical companies who make the medicines, but the respect is qualified. The reason is partly because patients are better educated and have better access to information but also because their expectations have changed. Informed consent is critical.

And the third trend is the increase in evidence as a basis for current medical practice. The old shibboleths are being challenged as experimental trials disprove the prevailing

Back to 126

# California Code, Health and Safety Code - HSC § 11153

Current as of January 01, 2023 | Updated by [FindLaw Staff](#)

(a) A prescription for a controlled substance shall only be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. Except as authorized by this division, the following are not legal prescriptions: (1) an order purporting to be a prescription which is issued not in the usual course of professional treatment or in legitimate and authorized research; or (2) an order for an addict or habitual user of controlled substances, which is issued not in the course of professional treatment or as part of an authorized narcotic treatment program, for the purpose of providing the user with controlled substances, sufficient to keep him or her comfortable by maintaining customary use.

(b) Any person who knowingly violates this section shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, or in a county jail not exceeding one year, or by a fine not exceeding twenty thousand dollars ($20,000), or by both that fine and imprisonment.

(c) No provision of the amendments to this section enacted during the second year of the 1981-82 Regular Session shall be construed as expanding the scope of practice of a pharmacist.

**Back to chapter list**                 **Previous part of code**        **Next part of code**

Cite this article: FindLaw.com - California Code, Health and Safety Code - HSC § 11153 - *last updated January 01, 2023* | https://codes.findlaw.com/ca/health-and-safety-code/hsc-sect-11153/

Copy

Read this complete California Code, Health and Safety Code - HSC § 11153 on Westlaw

FindLaw Codes may not reflect the most recent version of the law in your jurisdiction. Please verify the status of the code you are researching with the state legislature or via Westlaw before relying on it for your legal needs.


Exhibit 0039



The Development of State Pharmaceutical Law

Author(s): David L. Cowen

Source: *Pharmacy in History*, 1995, Vol. 37, No. 2 (1995), pp. 49–58

Published by: American Institute of the History of Pharmacy

Stable URL: https://www.jstor.org/stable/41111675

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*American Institute of the History of Pharmacy* is collaborating with JSTOR to digitize, preserve and extend access to *Pharmacy in History*

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

Exhibit
0040

# The Development of State Pharmaceutical Law

*by David L. Cowen**

THE study of the development of laws pertaining to pharmacy is a study of the history of pharmacy in its educational, professional, and economic aspects. Moreover, the development reflects the development in American society in general. One need point only to the impact of Jacksonian democracy on American life and the paucity of legislation of the health professions until well into the nineteenth century. Or one might point to the growth of consumerism, or to the impact of a flourishing suburbia on the American city, or to the tremendous burgeoning of the medical and pharmaceutical sciences, as they affected pharmaceutical law.

I shall here jump over the colonial and early national periods of American history. The single piece of legislation seeking to regulate pharmacy in the British colonies—the Virginia statute of 1736—and the vagaries of the local and four state laws regulating pharmacy in the period before the Civil War, I have covered elsewhere and they need no further discussion than that to be found in Sonnedecker's *Kremers and Urdang's History of Pharmacy.*

In 1868 John Maisch and the American Pharmaceutical Association (APhA) had become interested in state legislation regulating pharmacy. Their efforts, especially the model law composed by Maisch in 1869 and his dedicated sponsorship and support of such a law, and, at the same time, in a few of the states, the medical profession's initiative and support, proved successful. By the end of the century, with the exception of Nevada, every state then in the Union, and the Indian Territory, had passed laws regulating the practice of pharmacy.[1] But Maisch's success, without in any way belittling it, reflected the fact that pharmacy had progressed to a point where regulation was needed and American society had matured to the point where the role of the government in the regulation of the health professions was acceptable. The agrarian society in which Jacksonian democracy had flourished gave way to an urbanized and industrialized society after the Civil War. It is important to remember that in the period from 1860 to 1890 the country had undergone an economic revolution: the population had doubled; the national wealth, it was estimated, had quadrupled. By 1894 the United States had jumped from fourth place as a manufacturing nation in 1860 to first of all the world, producing more than the combined total of Great Britain and Germany.[2] It was in this milieu that pharmacy was developing, itself pressured by a variety of forces, the new medical and pharmaceutical sciences, the growth of the pharmaceutical industry, and the inroads of unfettered competition, including that from the proprietary industry.

In general the state pharmacy laws of the last three decades of the nineteenth century followed the pattern of establishing a state board

*Professor of History, Emeritus, Rutgers University.

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms



*John Maisch developed a model for state legislation regulating pharmacy.*

of pharmacy composed of pharmacists; of establishing the qualifications for eligibility to take the examination, usually on the basis of apprenticeship and with special allowance for those who had formal education in pharmacy; of providing for the examination of pharmacists and assistant pharmacists; and of exercising a degree of police power over the pharmacist and his shop, including the revocation of license. It is worth noting that even before the passage of pharmacy practice acts, that is, before 1870, under the police power, at least twenty-five states or territories had some statutory provisions against drug adulteration, over twenty-five had legislation regulating the sale of poisons, and over twenty-five had laws on abortion, some specifically prohibiting the sale of abortifacients by pharmacists. After the passage of the federal Comstock law of 1873 several of the states had passed laws prohibiting the sale of contraceptives.[3]

This pattern of the pharmacy practice laws was not to change. The proposed model law of 1900 developed by James H. Beal that was endorsed by the APhA, did suggest certain refinements, but left the basic pattern intact. Indeed the pattern still remains the basis of the laws in all the states, as an examination of the Survey of pharmacy law put out at intervals by the National Association of Boards of Pharmacy (NABP) readily reveals. Yet there have been significant changes in the law of pharmacy that derive from a variety of forces that I have hinted at above.

First were the changes that reflected developments in pharmacy itself. Maisch's model law had not received the actual approval of the APhA, for there were both an ideological opposition to such laws on laissez-faire grounds and a fear on the part of some that such laws would open a can of worms and subject pharmacy to ever-increasing regulation.[4] The fear of a burgeoning bureaucracy has a long history. "Most of the opposition to pharmaceutical legislation comes from the pharmacists themselves," Beal was to say in 1900.[5] But the objections and opposition were overcome, for the APhA gave its approval to Beal's model.[6]

Beal's proposals sought to refine and improve upon certain aspects of the Maisch proposals. They sought: to streamline registration procedures; to place more emphasis on the protection of the pharmacist rather than the regulation of the pharmacist; to make examination the only avenue to registration, even of graduates; and to leave the matter of adulteration to separate legislation and not make it a part of pharmacy practice laws. The last of these, adulteration, as Beal was well aware, was the subject of "independent food and drug legislation already adopted in many states and soon to be adopted in all others."[7]

## Education and Licensure

The mechanism of examination and licensure was most important. Beal's proposal that the candidate for examination be a "graduate of a reputable school of pharmacy"[8] did not get a quick response. Although New York in 1905 and Pennsylvania in 1906 enacted socalled "prerequisite laws" and although seven more states did so before 1918, twenty-four jurisdictions did not do so until the 1920s, fourteen did not do so until the 1930s and five did not do so until 1941 and after. Indeed, when

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

Beal made his proposal no state required high school graduation; Rhode Island was the first to do so in 1910. Altogether only seven states imposed such a requirement before 1920 and thirty other jurisdictions did so in the 1920s.[9] It is interesting to note that a few states required college graduation before they required high school graduation for admission.

Beal also proposed that four years of experience in pharmacy be required by applicants for examination. But the requirements enacted by the states were so varied—and continue to be so—as to length of time, as to whether experience was to be prior to, during, or after graduation, and as to counting college attendance toward experience, that it is impossible to find a common pattern. Some of these requirements, be it noted, derived from regulations promulgated by boards of pharmacy rather than from statutory law.

Beal's proposals did receive serious consideration[10] and it cannot be said that they had no impact, but the changes that took place reflected the development of the pharmaceutical sciences and the demand they placed on the educational establishment to meet their challenge. As the pharmacy curriculum increased in length, the legal requirement of college graduation automatically kept pace: the educational developments determined the law. By the same token, the assistant pharmacist, provided for in the state statutes (and a stage Beal would have required all pharmacists to go through) began to disappear as educational requirements became more demanding. By 1938 laws in several states, Minnesota and New Jersey among them, began to ease the assistant pharmacist position out of the picture.[11] By 1973, no state granted new assistant pharmacist certificates, but twenty-nine jurisdictions allowed existing certificates to be renewed.[12]

The increasing need of the pharmacist to keep abreast of new developments in the pharmaceutical and medical sciences created the demand for continuing education. The need was highlighted in the Pharmaceutical Survey of 1949 and colleges of pharmacy inaugurated a variety of programs in the 1950s.[13] Even before this, in 1941, the idea of mandatory continuing education had been broached at a meeting of District 2 of the National Association of Boards of Pharmacy, but it was not until 1964, as Robert Buerki has pointed out, that the idea took



*Proposals by James H. Beal for state pharmacy legislation refined and improved upon earlier proposals by Maisch.*

hold. In 1967 Kansas and Florida enacted mandatory continuing education laws; in 1971 California and Ohio followed suit; during the 1970s most of the states fell in line.[14] The NABP 1992 Survey of Pharmacy Law, in its summary of continuing education requirements, listed only Colorado, Hawaii, New York, Utah, and Wisconsin as "states supporting no related activities."

## The General Merchant

Pharmacy laws, to oversimplify the situation, dealt basically with who might practice pharmacy. If it were true that only trained and competent pharmacists might practice, then it followed that allowance needed to be made for those areas of the country where no pharmacy was to be found and where general merchants traditionally sold medicines. The statutes thus all made some kind of allowance for the sale of drugs in rural areas. The statutes varied: allowances were made on the basis of distance from a pharmacy; in some states a special schedule of drugs that could be sold in rural areas was developed; some allowed the sale of only pre-

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

packaged drugs bearing the name of a registered pharmacist; some made special allowance for proprietary and patent medicines; some made special allowance for "domestic remedies," and some required the licensing of general stores that sold drugs. Definitions of "patent" and "proprietary" drugs and "domestic remedies" varied as well, and these laws were not readily enforceable. A survey made under the auspices of the National Drug Trade Conference, published in 1957, vividly illustrated the diversity of the state laws and the very great amount of litigation they engendered.[15]

**Economic Pressures**

There were, of course, economic considerations behind these aspects of the law, but the problems faced by pharmacy went beyond those posed by rural general stores. Almost simultaneous with the passage of the pharmacy laws of the late nineteenth century, pharmacy encountered competition from department store and grocery interests and from price cutters in its own ranks. The emergence of the chain drugstore, and controversy with the Proprietary Association seemed to pile insult upon injury. Pharmacy sought to meet these challenges on the federal level as well as on the state level. On the federal level a Rebate Plan, a Campion Plan, a Worcester Plan, a Tripartite Plan, and a Serial Numbers Plan fell afoul of the Sherman Antitrust Act. "Fair trade" became the rallying cry of pharmacy, and some relief was found under the federal Miller-Tydings Act of 1937. Attempts to get a more effective national trade bill failed.[16]

The state pharmacists did not rely solely on national legislation. All but twelve states followed the lead of California (1931) in enacting state fair trade laws, but their activities under these laws led to federal conspiracy in restraint of trade indictments, and fines. Fair trade lasted so long as the suppliers were willing to cooperate and gradually the legislation lost its effectiveness. By the late 1960s no longer was it significant.[17]

The state pharmacists resorted to other approaches to protect their economic interests. First, boards of pharmacy sought to enforce provisions in the law that restricted the dispensing of medicines to registered pharmacists. As already intimated, these attempts met with little

success. Relatively rarely did court decisions favor pharmacy's position, as they did in New York in 1910 and in Minnesota in 1931.[18] Rather, court decisions interpreted the laws to deny pharmacy the exclusive right to dispense proprietary and patent medicines, even if they carried U.S.P. and N.F. designations.[19] Pharmacy tried another approach in its efforts to curtail competition. It had, almost from the beginning of state legislation, sought to restrict the ownership and management of pharmacies to registered pharmacists. This, it was believed, would limit the growth of the chain store and keep pharmacies out of department stores. But again, pharmacy was to be thwarted by the American constitutional system. Already in 1909 a Georgia court rejected the requirement that pharmacies could be owned only by pharmacists, although compounding and dispensing required a licensed pharmacist.[20] A Pennsylvania statute of 1927 that provided that no partnerships or corporations could own a pharmacy unless all partners or members were registered pharmacists was declared invalid by both the Supreme Court of Pennsylvania and the Supreme Court of the United States (in the so-called Liggett Case).[21] Legislation in other states met a similar fate, but in 1973, in a landmark decision, the United States Supreme Court expressly overruled the Liggett case and, upon remand to the North Dakota Supreme Court, a North Dakota statute that required that a majority of the stock in a corporate owned pharmacy to be held by registered pharmacists, was deemed constitutional.[22]

In the 1940s the challenge to pharmacy's exclusive right to dispense medicine became intensified. The growth of the supermarket and the potential sensed by the Proprietary Association in that growth led to confrontations that were again to impinge on the economic well-being of the community pharmacist. The weapons of price maintenance statutes and of the denial of permits to operate a pharmacy except by registered pharmacists were proving ineffective or illegal. (Attempts to curb mail-order and vending machine sales of drugs also proved difficult.)[23] State board regulations and proposed legislation sought to limit the granting of permits only to establishments "operated solely as pharmacies," to no avail. In the 1950s the Proprietary Association counterattacked in the courts and in state legislative halls, selecting New Jersey, New York,

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms



and Minnesota as the main battlegrounds. The state pharmaceutical associations discovered all over again that the courts either interpreted the meaning of domestic, proprietary, and patent medicines unfavorably to them, or that the clarification of the terms was left to legislatures that chose to leave things in the status quo. Their only successes came in blocking the Proprietary Association's attempts to get state legislation that would remove even the few remaining barriers. The end result was that the shelves of supermarkets now abound with all varieties of packaged medicines. Efforts—still ongoing—by pharmacists to create by law a "third class" of medicines, a class of non-prescription drugs that could be sold only by registered pharmacists, have been unsuccessful. Prescription drugs still could be dispensed only by the registered pharmacist, but the community pharmacist found

that the supermarket could compete in this areas as well by hiring qualified pharmacists.[24] New Jersey succeeded in placing an "Ethics Law" on the statute books (1965). Intending to curb advertising of prescription drug prices, the act proscribed the use of such terms as "cut rate," "discount," "bargain," or "terms of similar connotation." And in a further feint toward the supermarket pharmacy, the act provided that pharmacies "shall not offer professional services under terms and conditions which tend to interfere with or impair the free and complete exercise of professional judgment and skill."[25] A "Patient Counseling Law," passed in New Jersey in 1993 required the pharmacist to offer to counsel the patient and to "conduct a prospective drug review before each new prescription is dispensed."[26] The New Jersey laws met with considerable opposition from chain store and supermarket

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

interests; in 1976 the Supreme Court of the United States struck down as unconstitutional the provisions of a Virginia statute that outlawed the advertising of prescription drugs.[27]

Quite another economic problem faced the community pharmacist. Governmental regulations, HMOs, insurance schemes, and such were increasingly limiting the patient's ability to patronize any pharmacy. Over twenty states have recently enacted "Freedom of Choice" laws to counteract this practice.[28]

### Impact of the Federal System

The American system of federalism has resulted in variations in the pharmacy laws of the fifty states and Puerto Rico, as the reference to the diversity in the experience requirements prior to examination has indicated. One development that sought to bring some sense of unity was the system of reciprocity by which pharmacists registered in one state could practice in another. As early as 1910 a law in Kentucky empowered the board of pharmacy to grant licenses on the basis of reciprocity.[29] By the 1930s, statutes in Kansas, Pennsylvania, New Jersey, and Alabama, among others, also permitted granting licenses by reciprocity. (Maine licensed pharmacists from other states, but without the requirement of reciprocity.)[30] Each state required that the applicant come from a state where the degree of competency required was equal to its own. In 1955 the NABP reported that all states had reciprocity arrangements, with the exception of California and New York. Florida had a limited arrangement.[31] But each state decided for itself the conditions upon which it would accept those registered in other states, and the variations remained a characteristic of the American federal system. The reciprocity system was buttressed by the development of the NABP Licensure Examinations, which eventually were required by every state with the exception of California.[32]

Whereas the federal system promoted diversity in state pharmacy laws, as the power of the federal government grew and it increasingly made use of the commerce clause of the Constitution and its taxing power, Washington became more directly involved in matters that had previously been entirely within the province of state law. The states often followed the leader, and in the process,

a measure of uniformity resulted in some areas. The Constitution limited the controls by the federal government to interstate commerce or the power to tax; the states sought to bring the same controls to commerce within the state. It has already been noted that little Comstock laws were enacted by the states after 1873; the same thing was to happen in other areas.

Laws seeking to curtail the adulteration of drugs in the United States go back to a statute of the Territory of Orleans of 1808 that proscribed the selling of drugs that were "injured, moulded, discomposed, or sophisticated,"[33] and to a Rhode Island statute of 1844 that proscribed "fraudulently adulterating" any drug or medicine.[34] A model bill proposed by the National Board of Trade influenced enactments in Massachusetts, New York, and Michigan by 1882,[35] and although there were said to be only nine states that had any pure food and drug laws in 1890,[36] by the time the federal Food and Drugs Act was passed in 1906, twenty-one states "previously had enforced food (or food and drug) laws," as Sonnedecker and Urdang pointed out.[37] James Harvey Young has described them as a "chaos of divergent and sometimes ludicrously severe state laws."[38] After the passage of the federal law, these twenty-one states "rushed through new or amended legislation," seven more states enacted new laws and three more enacted laws that lacked enforcement provisions. In 1912 it was reported that forty-four states had adopted a new pattern of food and drug legislation.[39] After the passage of the 1938 Federal Food, Drug and Cosmetic Act state legislators were rather slow to follow suit. By 1947 only ten states had passed corollary laws,[40] but a model law proposed by the Association of Food and Drug Officials had been adopted by about twenty-four states by 1953.[41] It needs to be noted that by 1912 other agencies, like boards of health, were in control of enforcement; only a few state boards of pharmacy retained jurisdiction in the field.[42]

The story was very similar with regard to the dispensing of poisons. State regulation of poisons also goes back to the 1808 Territory of Orleans Act already mentioned. It included a provision that placed restrictions on the sale of "any suspicious or dangerous remedy."[43] Although there were several states that had poison laws before the Civil War, Alabama in 1852 and

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

Georgia in 1860, for example, such laws did not become general until the 1870s and 1880s. A 1912 survey indicated that every state and territory had a law regulating the same and dispensing of poisons,[44] and variation was again much in evidence. The laws usually required that the pharmacist be certain that the patron knew the poisonous nature of a drug and that it was to be used for a legitimate purpose. The laws required distinctive labeling (including in some states, antidotes) that varied from state to state. Varied also were the requirements of maintaining a poison register and the information that needed to be recorded.[45] Dangerous poisons, usually defined as those destructive of human life in doses of five grains or less, often listed in "Schedule A," required poison register recording; less dangerous poisons, defined as those destructive of human life in sixty grains or less, often listed in a "Schedule B," did not.[46]

Even more directly showing the impact of federal law was the legislation controlling the dispensing of narcotic drugs. Clinical concepts of addiction did not develop until the 1870s,[47] and the need for governmental regulation did not gain acceptance until early in the twentieth century. A "welter" of state laws, sometimes initiated by police officials and sometimes meeting with apathy or opposition by pharmacists, as in New Jersey in 1904 and 1908,[48] proved inadequate. The laws were described as chaotic and easily evaded; a national law was essential,[49] and the passage of the Harrison Narcotic Act of 1914 again provided a federal pattern for state legislation. However, not until the National Conference of Commissioners on Uniform State Laws proposed a Uniform State Narcotic Act in 1932 was some degree of uniformity obtained. By 1938 more than twenty-seven states and by 1962 all but four states had adopted (and adapted) the model law;[50] the chief disagreement among them being what were to be classed as exempt preparations.[51] As to be noted later, the states began to repeal their narcotic acts after the passage of the federal Drug Abuse Control Amendments of 1965,[52] although in a few states these acts still remain on the statute books.[53] Enforcement of state narcotic laws has not rested with state boards of pharmacy.

The new drug explosion that began with the introduction of sulfanilamide indicated that substances other than long-recognized poisons and narcotics required control. A few states regulated the sale of sulfanilamide and penicillin, but states that had laws similar to the federal Food, Drug and Cosmetic Act of 1938 found that these drugs could be regulated under those laws.[54] Before 1938 it was possible in some states for the pharmacists to dispense non-narcotic drugs and non-poisonous drugs, including barbiturates, without a prescription.[55] This the 1938 Act sought to correct, but pharmacists found certain provisions onerous and succeeded in getting a clarification in the passage of the Durham-Humphrey Amendment of 1951.[56] By 1960, dangerous drug laws, essentially barbiturate laws, were on the statute books of virtually every state.[57]

Some semblance of sanity was introduced into this maze of laws with the passage of the federal Controlled Substances Act of 1970. The Harrison Narcotic Act, the Drug Abuse Control Amendments of 1965, and some fifty federal laws altogether were replaced. The new law classified drugs into five categories, essentially based on the degree or potentiality of abuse.[58] The states followed suit. Narcotic and depressant-stimulant drug laws were repealed and replaced with laws based on a Uniform Controlled Substances Act approved by the National Conference of Commissioners on Uniform State Laws.[59] Edward R. Squibb saw the proposed model law of 1869 creating "a whole train of offices and office holders";[60] he could not foresee what would be wrought in a century of the country's development.

**Professional Development**

By and large the state laws that have just been described involved the practice of pharmacy on the community level. But the changes that have taken place in pharmacy, in both of what might be called the general and specialized pharmaceutical practice, have had their impact on state law.

As the pharmacist's knowledge and expertise have expanded, and the length of time devoted to education and internship has expanded, the pharmacist has not only found himself or herself with enhanced duties and responsibilities, but also with a desire for enhanced recognition and for the assumption of a place in the delivery of health care commensurate with his or her knowledge and abilities. A

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

visible point of impact of this relatively new pharmaceutical outlook on state law is the patient profile. In the 1970s, state law and sometimes regulations of the state board of pharmacy required the maintenance of patient medication records.[61] Intended primarily to enhance the pharmacist's consultative role and give the pharmacist a more direct involvement in monitoring the patient's drug therapy, it codified practices already in use by the more professional pharmacists.

Another point of impact of professional developments on state law was in the matter of drug product selection, that is substitution, or as some prefer, therapeutic substitution or therapeutic interchange. In the 1950s, putting a long-time ethical standard into law, "a majority of the states had enacted 'antisubstitution laws'," which required the pharmacist to dispense the exact brand prescribed.[62] By 1970 almost every state had such a law or regulation.[63] The laws were intended to protect the consumer from inferior or toxic medicines.[64] But in seeking to enhance the recognition of the abilities and role of the pharmacist, the APhA sought to have these laws modified.[65] Consumer demand for lower drug costs, and pressures from federal Medicaid requirements (and, after 1984, the Federal Drug Price Competition and Patent Term Restoration Act) entered the picture and substitution of generics for a brand name became much more significant than the substitution of one brand for another. In addition, there was a demand for therapeutic substitution—the substitution of drugs that were not the same chemical entity. In the 1970s, the states repealed or revised their antisubstitution laws and enacted laws permitting the pharmacist to select (and sometimes requiring) substitutes, usually of a cheaper drug product.[66] By 1978 twenty-five states had passed such legislation; in some the substitution of a cheaper equivalent was made mandatory.[67] Only the state of Washington has specific legislation permitting therapeutic substitution.[68] The laws of the states varied, of course, in all aspects. Some states required that the substitution be of "therapeutic equivalence," others required "generic equivalence," some established formularies of acceptable interchange, and others adopted formularies listing drugs for which no interchange was acceptable.[69] The growing importance of institu-

tional pharmacy—in hospitals where there were full-fledged pharmacies and in small hospitals and nursing homes where a full-time pharmacist was not available—has also had an impact on state pharmacy law. Many states have laws and regulations governing the regulation of such institutions, and issue special permits for their operation. Some require that pharmacists serve on the therapeutics committee, legally giving recognition to the importance of the pharmacist in hospital practice. In still another illustration of the impact of federal law on state law, the "Conditions of Participation" which outline the minimum standards that qualify a hospital or nursing home for Medicaid or Medicare reimbursement have been incorporated into state laws.[70] Among these conditions is the requirement that "a formulary system be established."[71]

Finally, the laws requiring the patient profile, the patient counseling laws, the substitution laws, and laws permitting and defining the scope of clinical pharmacy are all evidence of the changing role of the pharmacist.

## Conclusion

The history of state laws pertaining to pharmacy obviously reflect the development of pharmacy scientifically, professionally, and economically. There is one aspect of this change that has not been mentioned in this paper, but that is worth noting. Namely, as the role of the pharmacist in counseling, in patient monitoring, and in making substitutions increases, his or her civil liability increases.

This study has shown, also, that there is no better illustration of the encroachment of the power of the federal government into activities that were previously entirely within the province of the states, than what goes on daily behind the prescription counter.

One other change not explicitly indicated in this study, but of significance, is the fact that in this process of legislative changes, pharmacy has lost its power of self-policing. The old close association between state boards of pharmacy and state pharmaceutical associations often written into the laws of the late nineteenth century is gone. The state boards of pharmacy are no longer composed only of pharmacists and they are no longer the independent entities they were originally created to be. The boards

56                      Pharmacy in History

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

(among other professional boards) were placed under the jurisdiction of such state agencies as the Department of Health (Rhode Island), the Department of Consumer Protection (Connecticut), the Department of Professional and Vocational Standards (California), and the Board of Regents (New York).[72]

## Notes and References

1. G. Sonnedecker, rev., *Kremers and Urdang's History of Pharmacy*, 4th ed. (Philadelphia, 1976), 381-2.
2. A.M. Schlesinger, *Political and Social Growth of the American People 1865-1940*, 3rd ed. (New York, 1941), 43, 60.
3. D.J. Garrow, *Liberty and Sexuality: The Right to Privacy and the Making of Roe v. Wade* (New York, 1994), 15-16, 716 n. 25.
4. See Sonnedecker, *History of Pharmacy* (n. 1), 216.
5. In his comments at the discussion of the proposed model (*Proceedings of the American Pharmaceutical Association* 48 (1900): 318).
6. *Proceedings of the American Pharmaceutical Association* 48 (1900): 309.
7. J.H. Beal, "The Evolution of Pharmacy Laws in the United States," *American Druggist and Pharmaceutical Record* 36 (1900): 180.
8. The draft law is to be found in *The Proceedings of the American Pharmaceutical Association* 48 (1900): 309-318. The quotation is from p. 310.
9. The data are from the National Association of Boards of Pharmacy statistics in W. Pettit, *Manual of Pharmaceutical Law*, 3rd ed. (New York, 1962), 23-5.
10. For example, in 1900 the New Jersey Pharmaceutical Association directed its legislative committee to consider the Beal model law, although "it was believed that the New Jersey law already approached the model law more closely than any other state law." D.L. Cowen, *The New Jersey Pharmaceutical Association* (Trenton, 1970), 18.
11. C.L. O'Connell and W. Pettit, *A Manual of Pharmaceutical Law* (Philadelphia, 1938), 24.
12. National Association of Boards of Pharmacy, *Survey of Pharmacy Law July 1, 1973*, 9.
13. Robert A. Buerki, "Historical Perspective," in J.R. Arndt and S.J. Coons (eds.), *Continuing Education in Pharmacy* (Alexandria, VA, 1987), 26.
14. Robert A. Buerki, "Historical Development in Continuing Pharmaceutical Education in American Universities" (Ph.D. dissertation, Ohio State University, 1972), 239, 306-8; Buerki, "Historical Perspective" (n. 13), 27.
15. J.M. Seus, *A Survey of State Pharmacy Laws Relating to the Sale by General Merchants of Non-Prescription Drugs . . .* (APhA: Washington, c. 1957).
16. Cowen, *New Jersey Pharmaceutical Association* (n. 10), 70.
17. Cowen, *New Jersey Pharmaceutical Association* (n. 10), 70.
18. *State Board of Pharmacy v. Matthews* 197 N.Y. 353; *State v. Woolworth Co.* 184 Minn. 51. O'Connell and Pettit, *Manual of Pharmaceutical Law* (n. 11), 14, 34.
19. E.g., *State v. Geest* (1929) 118 Neb. 562. W.R. Arthur, *The Law of Drugs and Druggists* (St. Paul, 1935), 186-7.
20. W.R. Arthur, *The Law of Drugs and Druggists*, 3rd ed. (St. Paul, 1947), 66.
21. Arthur, *Law of Drugs* (n. 20), 83.
22. D. B. Brushwood, *Medical Malpractice Pharmacy Law* (Colorado Springs, 1986), 134-5.
23. W. Pettit, *Manual of Pharmaceutical Law*, 2nd ed. (New York, 1957), 131; H. Wetherbee and B.D. White, *Cases and Materials on Pharmacy Law* (St. Paul, 1980), 228.
24. For the details of the legislative and litigious tug-of-war, see, for example, the account of the New Jersey experience, in Cowen, *New Jersey Pharmaceutical Association* (n. 10), 47 ff.
25. Chap. 120, New Jersey Laws, 1965.
26. The Law can be found in the *New Jersey Journal of Pharmacy* 66, No. 8 (1993): 12.
27. L. Langley, "The Battle Over Patient Consultation in New Jersey," *New Jersey Journal of Pharmacy* 66, No. 8 (1993): 13. Brushwood, *Medical Malpractice* (n. 22), 101.
28. Personal communication from Alvin N. Geser, Executive Officer, New Jersey Pharmaceutical Association.
29. Arthur, *Law of Drugs* (n. 20), 24.
30. O'Connell and Pettit, *Manual of Pharmaceutical Law* (n. 11), 28.
31. Pettit, *Manual of Pharmaceutical Law* (n. 13), 28-9, 30-3.
32. National Association of Boards of Pharmacy, *1986-1987 Survey of Pharmacy Law* (Park Ridge, Ill., 1987), 14.
33. D.L. Cowen, "America's First Pharmacy Laws," *Journal of the American Pharmaceutical Association, Practical Pharmacy Edition* 3 (1942): 164.
34. G. Sonnedecker and G. Urdang, "Legalization of Drug Standards under State Laws in the United States of America." *Food Drug Cosmetic Law Journal* 8 (1953): 746-7.
35. Sonnedecker and Urdang, "Legalization of Drug Standards" (n. 34), 745-6.
36. J.H. Young, *Pure Food: Securing the Federal Food and Drugs Act of 1906* (Princeton, 1989), 96.
37. Sonnedecker and Urdang, "Legalization of Drug Standards" (n. 34), 751.
38. Young, *Pure Food* (n. 36), 292.
39. Sonnedecker and Urdang, "Legalization of Drug Standards" (n. 34), 751.
40. Arthur, *Law of Drugs* (n. 20), v.
41. Sonnedecker and Urdang, "Legalization of Drug Standards" (n. 34), 752.
42. Sonnedecker and Urdang, "Legislation of Drug Standards" (n. 34), 752.
43. Cowen, "American's First Pharmacy Laws" (n. 33), 164.
44. M.I. Wilbert and M.G. Motter, *Digest of Laws and Regulations in Force in the United States Relating to Possession, Use, Sale and Manufacture of Poisons and Habit-Forming Drugs* (*Public Health Bulletin* No. 56, November 1912).
45. W. Pettit, *Manual of Pharmaceutical Law* (New York, 1949), 32.
46. C.T. DeMarco, *Pharmacy and the Law* (Germantown, Md., 1975), 23-4, and see Pettit, *Manual of Pharmaceutical Law*, 2nd ed. (n. 23), 116.
47. H.W. Morgan, *Drugs in America: A Social History, 1800-1980.* (Syracuse, 1981), 5.
48. Cowen, *New Jersey Pharmaceutical Association* (n. 10), 19.
49. Morgan, *Drugs in America* (n. 47), 102.
50. O'Connell and Pettit, *Manual of Pharmaceutical Law* (n. 11), 43; Pettit, *Manual of Pharmaceutical Law*, 3rd ed. (n. 9), 72.
51. Pettit, *Manual of Pharmaceutical Law*, 3rd. ed. (n. 9), 72.
52. DeMarco, *Pharmacy and the Law* (n. 46), 154.
53. J.L. Fink III, K.W. Marquardt and L.M. Simonsmeier, *Pharmacy Law Digest* (St. Louis, 1991), CS-3.

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms

80

54. Pettit, *Manual of Pharmaceutical Law*, 3rd ed. (n. 9), 116-7.
55. *Pharmacy Law Digest* (n. 53), DC-11.
56. *Pharmacy Law Digest* (n. 53), DC-10, 11, 12.
57. Pettit, *Manual of Pharmaceutical Law*, 3rd ed. (n. 9), 112-5.
58. DeMarco, *Pharmacy and the Law* (n. 46), 155-7.
59. DeMarco, *Pharmacy and the Law* (n. 46), 154-5.
60. Quoted in Sonnedecker, *History of Pharmacy* (n. 1), 216.
61. *Pharmacy Law Digest* (n. 53), CL-61; Wetherbee and White, *Cases and Materials* (n. 23), 72-3.
62. Sonnedecker, *History of Pharmacy* (n. 1), 217.
63. *Pharmacy Law Digest* (n. 53), CL-38.
64. H. Wetherbee and T.R. Sharpe, "Drug Product Selection Legislation: A Comparative Analysis," *American Journal of Pharmacy* 150 (1978): 171.
65. Sonnedecker, *History of Pharmacy* (n. 1), 217.
66. Wetherbee and White, *Cases and Materials* (n. 23), 76.
67. Wetherbee and Sharpe, "Drug Product Selection Legislation" (n. 64), 171-2, 175.
68. *Pharmacy Law Digest* (n. 53), CL-44.
69. Wetherbee and Sharpe, "Drug Product Selection Legislation" (n. 64), 171-2, 175.
70. Wetherbee and White, *Cases and Materials* (n. 23), 85.
71. *Pharmacy Law Digest* (n. 53), DC-325.
72. Pettit, *Manual of Pharmaceutical Law*, 3rd ed. (n. 9), 22.



*U.S. Department of Agriculture, Bureau of Chemistry, Pharmacology Laboratory, during World War One.*

58

Pharmacy in History

This content downloaded from
68.105.125.195 on Thu, 02 May 2024 03:52:37 +00:00
All use subject to https://about.jstor.org/terms