# EXHIBIT 31

DRUGS AND THE PHARMACEUTICAL SCIENCES VOLUME 185

# The Pharmaceutical
# Regulatory Process
## Second Edition



edited by
Ira R. Berry
Robert P. Martin

informa

**Exhibit**
0041

# The Pharmaceutical Regulatory Process

## DRUGS AND THE PHARMACEUTICAL SCIENCES

A Series of Textbooks and Monographs

**Executive Editor**
**James Swarbrick**
*PharmaceuTech, Inc.*
*Pinehurst, North Carolina*

### Advisory Board

Larry L. Augsburger
*University of Maryland*
*Baltimore, Maryland*

Jennifer B. Dressman
*University of Frankfurt Institute of*
*Pharmaceutical Technology*
*Frankfurt, Germany*

Anthony J. Hickey
*University of North Carolina*
*School of Pharmacy*
*Chapel Hill, North Carolina*

Ajaz Hussain
*Sandoz*
*Princeton, New Jersey*

Joseph W. Polli
*GlaxoSmithKline Research Triangle Park*
*North Carolina*

Stephen G. Schulman
*University of Florida*
*Gainesville, Florida*

Yuichi Sugiyama
*University of Tokyo, Tokyo, Japan*

Geoffrey T. Tucker
*University of Sheffield*
*Royal Hallamshire Hospital*
*Sheffield, United Kingdom*

Harry G. Brittain
*Center for Pharmaceutical Physics*
*Milford, New Jersey*

Robert Gurny
*Universite de Geneve*
*Geneve, Switzerland*

Jeffrey A. Hughes
*University of Florida College*
*of Pharmacy*
*Gainesville, Florida*

Vincent H. L. Lee
*US FDA Center for Drug*
*Evaluation and Research*
*Los Angeles, California*

Kinam Park
*Purdue University*
*West Lafayette, Indiana*

Jerome P. Skelly
*Alexandria, Virginia*

Elizabeth M. Topp
*University of Kansas*
*Lawrence, Kansas*

Peter York
*University of Bradford School of*
*Pharmacy*
*Bradford, United Kingdom*

1. Pharmacokinetics, Milo Gibaldi and Donald Perrier
2. Good Manufacturing Practices for Pharmaceuticals: A Plan for Total Quality Control, Sidney H. Willig, Murray M. Tuckerman, and William S. Hitchings IV
3. Microencapsulation, edited by J. R. Nixon
4. Drug Metabolism: Chemical and Biochemical Aspects, Bernard Testa and Peter Jenner
5. New Drugs: Discovery and Development, edited by Alan A. Rubin
6. Sustained and Controlled Release Drug Delivery Systems, edited by Joseph R. Robinson
7. Modern Pharmaceutics, edited by Gilbert S. Banker and Christopher T. Rhodes
8. Prescription Drugs in Short Supply: Case Histories, Michael A. Schwartz
9. Activated Charcoal: Antidotal and Other Medical Uses, David O. Cooney
10. Concepts in Drug Metabolism (in two parts), edited by Peter Jenner and Bernard Testa
11. Pharmaceutical Analysis: Modern Methods (in two parts), edited by James W. Munson
12. Techniques of Solubilization of Drugs, edited by Samuel H. Yalkowsky
13. Orphan Drugs, edited by Fred E. Karch
14. Novel Drug Delivery Systems: Fundamentals, Developmental Concepts, Biomedical Assessments, Yie W. Chien
15. Pharmacokinetics: Second Edition, Revised and Expanded, Milo Gibaldi and Donald Perrier
16. Good Manufacturing Practices for Pharmaceuticals: A Plan for Total Quality Control, Second Edition, Revised and Expanded, Sidney H. Willig, Murray M. Tuckerman, and William S. Hitchings IV
17. Formulation of Veterinary Dosage Forms, edited by Jack Blodinger
18. Dermatological Formulations: Percutaneous Absorption, Brian W. Barry
19. The Clinical Research Process in the Pharmaceutical Industry, edited by Gary M. Matoren
20. Microencapsulation and Related Drug Processes, Patrick B. Deasy
21. Drugs and Nutrients: The Interactive Effects, edited by Daphne A. Roe and T. Colin Campbell
22. Biotechnology of Industrial Antibiotics, Erick J. Vandamme
23. Pharmaceutical Process Validation, edited by Bernard T. Loftus and Robert A. Nash
24. Anticancer and Interferon Agents: Synthesis and Properties, edited by Raphael M. Ottenbrite and George B. Butler
25. Pharmaceutical Statistics: Practical and Clinical Applications, Sanford Bolton
26. Drug Dynamics for Analytical, Clinical, and Biological Chemists, Benjamin J. Gudzinowicz, Burrows T. Younkin, Jr., and Michael J. Gudzinowicz
27. Modern Analysis of Antibiotics, edited by Adjoran Aszalos

28. Solubility and Related Properties, Kenneth C. James

29. Controlled Drug Delivery: Fundamentals and Applications, Second Edition, Revised and Expanded, edited by Joseph R. Robinson and Vincent H. Lee

30. New Drug Approval Process: Clinical and Regulatory Management, edited by Richard A. Guarino

31. Transdermal Controlled Systemic Medications, edited by Yie W. Chien

32. Drug Delivery Devices: Fundamentals and Applications, edited by Praveen Tyle

33. Pharmacokinetics: Regulatory • Industrial • Academic Perspectives, edited by Peter G. Welling and Francis L.S. Tse

34. Clinical Drug Trials and Tribulations, edited by Allen E. Cato

35. Transdermal Drug Delivery: Developmental Issues and Research Initiatives, edited by Jonathan Hadgraft and Richard H. Guy

36. Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms, edited by James W. McGinity

37. Pharmaceutical Pelletization Technology, edited by Isaac Ghebre-Sellassie

38. Good Laboratory Practice Regulations, edited by Allen F. Hirsch

39. Nasal Systemic Drug Delivery, Yie W. Chien, Kenneth S. E. Su, and Shyi-Feu Chang

40. Modern Pharmaceutics: Second Edition, Revised and Expanded, edited by Gilbert S. Banker and Christopher T. Rhodes

41. Specialized Drug Delivery Systems: Manufacturing and Production Technology, edited by Praveen Tyle

42. Topical Drug Delivery Formulations, edited by David W. Osborne and Anton H. Amann

43. Drug Stability: Principles and Practices, Jens T. Carstensen

44. Pharmaceutical Statistics: Practical and Clinical Applications, Second Edition, Revised and Expanded, Sanford Bolton

45. Biodegradable Polymers as Drug Delivery Systems, edited by Mark Chasin and Robert Langer

46. Preclinical Drug Disposition: A Laboratory Handbook, Francis L.S. Tse and James J. Jaffe

47. HPLC in the Pharmaceutical Industry, edited by Godwin W. Fong and Stanley K. Lam

48. Pharmaceutical Bioequivalence, edited by Peter G. Welling, Francis L.S. Tse, and Shrikant V. Dinghe

49. Pharmaceutical Dissolution Testing, Umesh V. Banakar

50. Novel Drug Delivery Systems: Second Edition, Revised and Expanded, Yie W. Chien

51. Managing the Clinical Drug Development Process, David M. Cocchetto and Ronald V. Nardi

52. Good Manufacturing Practices for Pharmaceuticals: A Plan for Total Quality Control, Third Edition, edited by Sidney H. Willig and James R. Stoker

53. Prodrugs: Topical and Ocular Drug Delivery, edited by Kenneth B. Sloan

54. Pharmaceutical Inhalation Aerosol Technology, edited by Anthony J. Hickey

55. Radiopharmaceuticals: Chemistry and Pharmacology, edited by Adrian D. Nunn

56. New Drug Approval Process: Second Edition, Revised and Expanded, edited by Richard A. Guarino

57. Pharmaceutical Process Validation: Second Edition, Revised and Expanded, edited by Ira R. Berry and Robert A. Nash

58. Ophthalmic Drug Delivery Systems, edited by Ashim K. Mitra

59. Pharmaceutical Skin Penetration Enhancement, edited by Kenneth A. Walters and Jonathan Hadgraft

60. Colonic Drug Absorption and Metabolism, edited by Peter R. Bieck

61. Pharmaceutical Particulate Carriers: Therapeutic Applications, edited by Alain Rolland

62. Drug Permeation Enhancement: Theory and Applications, edited by Dean S. Hsieh

63. Glycopeptide Antibiotics, edited by Ramakrishnan Nagarajan

64. Achieving Sterility in Medical and Pharmaceutical Products, Nigel A. Halls

65. Multiparticulate Oral Drug Delivery, edited by Isaac Ghebre-Sellassie

66. Colloidal Drug Delivery Systems, edited by Jörg Kreuter

67. Pharmacokinetics: Regulatory • Industrial • Academic Perspectives, Second Edition, edited by Peter G. Welling and Francis L. S. Tse

68. Drug Stability: Principles and Practices, Second Edition, Revised and Expanded, Jens T. Carstensen

69. Good Laboratory Practice Regulations: Second Edition, Revised and Expanded, edited by Sandy Weinberg

70. Physical Characterization of Pharmaceutical Solids, edited by Harry G. Brittain

71. Pharmaceutical Powder Compaction Technology, edited by Göran Alderborn and Christer Nyström

72. Modern Pharmaceutics: Third Edition, Revised and Expanded, edited by Gilbert S. Banker and Christopher T. Rhodes

73. Microencapsulation: Methods and Industrial Applications, edited by Simon Benita

74. Oral Mucosal Drug Delivery, edited by Michael J. Rathbone

75. Clinical Research in Pharmaceutical Development, edited by Barry Bleidt and Michael Montagne

76. The Drug Development Process: Increasing Efficiency and Cost Effectiveness, edited by Peter G. Welling, Louis Lasagna, and Umesh V. Banakar

77. Microparticulate Systems for the Delivery of Proteins and Vaccines, edited by Smadar Cohen and Howard Bernstein

78. Good Manufacturing Practices for Pharmaceuticals: A Plan for Total Quality Control, Fourth Edition, Revised and Expanded, Sidney H. Willig and James R. Stoker

79. Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms: Second Edition, Revised and Expanded, edited by James W. McGinity

80. Pharmaceutical Statistics: Practical and Clinical Applications, Third Edition, Sanford Bolton

81. Handbook of Pharmaceutical Granulation Technology, edited by Dilip M. Parikh

82. Biotechnology of Antibiotics: Second Edition, Revised and Expanded, edited by William R. Strohl

83. Mechanisms of Transdermal Drug Delivery, edited by Russell O. Potts and Richard H. Guy

84. Pharmaceutical Enzymes, edited by Albert Lauwers and Simon Scharpé

85. Development of Biopharmaceutical Parenteral Dosage Forms, edited by John A. Bontempo

86. Pharmaceutical Project Management, edited by Tony Kennedy

87. Drug Products for Clinical Trials: An International Guide to Formulation • Production • Quality Control, edited by Donald C. Monkhouse and Christopher T. Rhodes

88. Development and Formulation of Veterinary Dosage Forms: Second Edition, Revised and Expanded, edited by Gregory E. Hardee and J. Desmond Baggot

89. Receptor-Based Drug Design, edited by Paul Leff

90. Automation and Validation of Information in Pharmaceutical Processing, edited by Joseph F. deSpautz

91. Dermal Absorption and Toxicity Assessment, edited by Michael S. Roberts and Kenneth A. Walters

92. Pharmaceutical Experimental Design, Gareth A. Lewis, Didier Mathieu, and Roger Phan-Tan-Luu

93. Preparing for FDA Pre-Approval Inspections, edited by Martin D. Hynes III

94. Pharmaceutical Excipients: Characterization by IR, Raman, and NMR Spectroscopy, David E. Bugay and W. Paul Findlay

95. Polymorphism in Pharmaceutical Solids, edited by Harry G. Brittain

96. Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, edited by Louis Rey and Joan C.May

97. Percutaneous Absorption: Drugs–Cosmetics–Mechanisms–Methodology, Third Edition, Revised and Expanded, edited by Robert L. Bronaugh and Howard I. Maibach

98. Bioadhesive Drug Delivery Systems: Fundamentals, Novel Approaches, and Development, edited by Edith Mathiowitz, Donald E. Chickering III, and Claus-Michael Lehr

99. Protein Formulation and Delivery, edited by Eugene J. McNally

100. New Drug Approval Process: Third Edition, The Global Challenge, edited by Richard A. Guarino

101. Peptide and Protein Drug Analysis, edited by Ronald E. Reid

102. Transport Processes in Pharmaceutical Systems, edited by Gordon L. Amidon, Ping I. Lee, and Elizabeth M. Topp

103. Excipient Toxicity and Safety, edited by Myra L. Weiner and Lois A. Kotkoskie

104. The Clinical Audit in Pharmaceutical Development, edited by Michael R. Hamrell

105. Pharmaceutical Emulsions and Suspensions, edited by Francoise Nielloud and Gilberte Marti-Mestres

106. Oral Drug Absorption: Prediction and Assessment, edited by Jennifer B. Dressman and Hans Lennernäs

107. Drug Stability: Principles and Practices, Third Edition, Revised and Expanded, edited by Jens T. Carstensen and C. T. Rhodes

108. Containment in the Pharmaceutical Industry, edited by James P. Wood

109. Good Manufacturing Practices for Pharmaceuticals: A Plan for Total Quality Control from Manufacturer to Consumer, Fifth Edition, Revised and Expanded, Sidney H. Willig

110. Advanced Pharmaceutical Solids, Jens T. Carstensen

111. Endotoxins: Pyrogens, LAL Testing, and Depyrogenation, Second Edition, Revised and Expanded, Kevin L. Williams

112. Pharmaceutical Process Engineering, Anthony J. Hickey and David Ganderton

113. Pharmacogenomics, edited by Werner Kalow, Urs A. Meyer and Rachel F. Tyndale

114. Handbook of Drug Screening, edited by Ramakrishna Seethala and Prabhavathi B. Fernandes

115. Drug Targeting Technology: Physical • Chemical • Biological Methods, edited by Hans Schreier

116. Drug–Drug Interactions, edited by A. David Rodrigues

117. Handbook of Pharmaceutical Analysis, edited by Lena Ohannesian and Anthony J. Streeter

118. Pharmaceutical Process Scale-Up, edited by Michael Levin

119. Dermatological and Transdermal Formulations, edited by Kenneth A. Walters

120. Clinical Drug Trials and Tribulations: Second Edition, Revised and Expanded, edited by Allen Cato, Lynda Sutton, and Allen Cato III

121. Modern Pharmaceutics: Fourth Edition, Revised and Expanded, edited by Gilbert S. Banker and Christopher T. Rhodes

122. Surfactants and Polymers in Drug Delivery, Martin Malmsten

123. Transdermal Drug Delivery: Second Edition, Revised and Expanded, edited by Richard H. Guy and Jonathan Hadgraft

124. Good Laboratory Practice Regulations: Second Edition, Revised and Expanded, edited by Sandy Weinberg

125. Parenteral Quality Control: Sterility, Pyrogen, Particulate, and Package Integrity Testing: Third Edition, Revised and Expanded, Michael J. Akers, Daniel S. Larrimore, and Dana Morton Guazzo

126. Modified-Release Drug Delivery Technology, edited by Michael J. Rathbone, Jonathan Hadgraft, and Michael S. Roberts

127. Simulation for Designing Clinical Trials: A Pharmacokinetic-Pharmacodynamic Modeling Perspective, edited by Hui C. Kimko and Stephen B. Duffull

128. Affinity Capillary Electrophoresis in Pharmaceutics and Biopharmaceutics, edited by Reinhard H. H. Neubert and Hans-Hermann Rüttinger

129. Pharmaceutical Process Validation: An International Third Edition, Revised and Expanded, edited by Robert A. Nash and Alfred H. Wachter

130. Ophthalmic Drug Delivery Systems: Second Edition, Revised and Expanded, edited by Ashim K. Mitra

131. Pharmaceutical Gene Delivery Systems, edited by Alain Rolland and Sean M. Sullivan

132. Biomarkers in Clinical Drug Development, edited by John C. Bloom and Robert A. Dean

133. Pharmaceutical Extrusion Technology, edited by Isaac Ghebre-Sellassie and Charles Martin

134. Pharmaceutical Inhalation Aerosol Technology: Second Edition, Revised and Expanded, edited by Anthony J. Hickey

135. Pharmaceutical Statistics: Practical and Clinical Applications, Fourth Edition, Sanford Bolton and Charles Bon

136. Compliance Handbook for Pharmaceuticals, Medical Devices, and Biologics, edited by Carmen Medina

137. Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products: Second Edition, Revised and Expanded, edited by Louis Rey and

138. Supercritical Fluid Technology for Drug Product Development, edited by Peter York, Uday B. Kompella, and Boris Y. Shekunov

139. New Drug Approval Process: Fourth Edition, Accelerating Global Registrations, edited by Richard A. Guarino

140. Microbial Contamination Control in Parenteral Manufacturing, edited by Kevin L. Williams

141. New Drug Development: Regulatory Paradigms for Clinical Pharmacology and Biopharmaceutics, edited by Chandrahas G. Sahajwalla

142. Microbial Contamination Control in the Pharmaceutical Industry, edited by Luis Jimenez

143. Generic Drug Product Development: Solid Oral Dosage Forms, edited by Leon Shargel and Isadore Kanfer

144. Introduction to the Pharmaceutical Regulatory Process, edited by Ira R. Berry

145. Drug Delivery to the Oral Cavity: Molecules to Market, edited by Tapash K. Ghosh and William R. Pfister

146. Good Design Practices for GMP Pharmaceutical Facilities, edited by Andrew Signore and Terry Jacobs

147. Drug Products for Clinical Trials, Second Edition, edited by Donald Monkhouse, Charles Carney, and Jim Clark

148. Polymeric Drug Delivery Systems, edited by Glen S. Kwon

149. Injectable Dispersed Systems: Formulation, Processing, and Performance, edited by Diane J. Burgess

150. Laboratory Auditing for Quality and Regulatory Compliance, Donald Singer, Raluca- Ioana Stefan, and Jacobus van Staden

151. Active Pharmaceutical Ingredients: Development, Manufacturing, and Regulation, edited by Stanley Nusim

152. Preclinical Drug Development, edited by Mark C. Rogge and David R. Taft

153. Pharmaceutical Stress Testing: Predicting Drug Degradation, edited by Steven W. Baertschi

154. Handbook of Pharmaceutical Granulation Technology: Second Edition, edited by Dilip M. Parikh

155. Percutaneous Absorption: Drugs–Cosmetics–Mechanisms–Methodology, Fourth Edition, edited by Robert L. Bronaugh and Howard I. Maibach

156. Pharmacogenomics: Second Edition, edited by Werner Kalow, Urs A. Meyer and Rachel F. Tyndale

157. Pharmaceutical Process Scale-Up, Second Edition, edited by Michael Levin

158. Microencapsulation: Methods and Industrial Applications, Second Edition, edited by Simon Benita

159. Nanoparticle Technology for Drug Delivery, edited by Ram B. Gupta and Uday B. Kompella

160. Spectroscopy of Pharmaceutical Solids, edited by Harry G. Brittain

161. Dose Optimization in Drug Development, edited by Rajesh Krishna

162. Herbal Supplements-Drug Interactions: Scientific and Regulatory Perspectives, edited by Y. W. Francis Lam, Shiew-Mei Huang, and Stephen D. Hall

163. Pharmaceutical Photostability and Stabilization Technology, edited by Joseph T. Piechocki and Karl Thoma

164. Environmental Monitoring for Cleanrooms and Controlled Environments, edited by Anne Marie Dixon

165. Pharmaceutical Product Development: In Vitro-In Vivo Correlation, edited by Dakshina Murthy Chilukuri, Gangadhar Sunkara, and David Young

166. Nanoparticulate Drug Delivery Systems, edited by Deepak Thassu, Michel Deleers, and Yashwant Pathak

167. Endotoxins: Pyrogens, LAL Testing and Depyrogenation, Third Edition, edited by Kevin L. Williams

168. Good Laboratory Practice Regulations, Fourth Edition, edited by Anne Sandy Weinberg

169. Good Manufacturing Practices for Pharmaceuticals, Sixth Edition, edited by Joseph D. Nally

170. Oral-Lipid Based Formulations: Enhancing the Bioavailability of Poorly Water-soluble Drugs, edited by David J. Hauss

171. Handbook of Bioequivalence Testing, edited by Sarfaraz K. Niazi

é

172. Advanced Drug Formulation Design to Optimize Therapeutic Outcomes, edited by Robert O. Williams III, David R. Taft, and Jason T. McConville

173. Clean-in-Place for Biopharmaceutical Processes, edited by Dale A. Seiberling

174. Filtration and Purification in the Biopharmaceutical Industry, Second Edition, edited by Maik W. Jornitz and Theodore H. Meltzer

175. Protein Formulation and Delivery, Second Edition, edited by Eugene J. McNally and Jayne E. Hastedt

176. Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms, Third Edition, edited by James McGinity and Linda A. Felton

177. Dermal Absorption and Toxicity Assessment, Second Edition, edited by Michael S. Roberts and Kenneth A. Walters

178. Preformulation Solid Dosage Form Development, edited by Moji C. Adeyeye and Harry G. Brittain

179. Drug-Drug Interactions, Second Edition, edited by A. David Rodrigues

180. Generic Drug Product Development: Bioequivalence Issues, edited by Isadore Kanfer and Leon Shargel

181. Pharmaceutical Pre-Approval Inspections: A Guide to Regulatory Success, Second Edition, edited by Martin D. Hynes III

182. Pharmaceutical Project Management, Second Edition, edited by Anthony Kennedy

183. Modified Release Drug Delivery Technology, Second Edition, Volume 1, edited by Michael J. Rathbone, Jonathan Hadgraft, Michael S. Roberts, and Majella E. Lane

184. Modified-Release Drug Delivery Technology, Second Edition, Volume 2, edited by Michael J. Rathbone, Jonathan Hadgraft, Michael S. Roberts, and Majella E. Lane

185. The Pharmaceutical Regulatory Process, Second Edition, edited by Ira R. Berry and Robert P. Martin

# The Pharmaceutical Regulatory Process

## Second Edition

edited by

### Ira R. Berry
*International Regulatory Business Consultants, LLC*
*Freehold, New Jersey, USA*

### Robert P. Martin
*RPMartin Consulting*
*Lebanon, Pennsylvania, USA*

**informa**
healthcare

Informa Healthcare USA, Inc.
52 Vanderbilt Avenue
New York, NY 10017

© 2008 by Informa Healthcare USA, Inc.
Informa Healthcare is an Informa business

No claim to original U.S. Government works
Printed in the United States of America on acid-free paper
10 9 8 7 6 5 4 3 2 1

International Standard Book Number-10: 1-4200-5868-1 (Hardcover)
International Standard Book Number-13: 978-1-4200-5868-0 (Hardcover)

This book contains information obtained from authentic and highly regarded sources. Reprinted
material is quoted with permission, and sources are indicated. A wide variety of references are
listed. Reasonable efforts have been made to publish reliable data and information, but the author
and the publisher cannot assume responsibility for the validity of all materials or for the conse-
quence of their use.

No part of this book may be reprinted, reproduced, transmitted, or utilized in any form by any
electronic, mechanical, or other means, now known or hereafter invented, including photocopying,
microfilming, and recording, or in any information storage or retrieval system, without written
permission from the publishers.

For permission to photocopy or use material electronically from this work, please access
www.copyright.com (http://www.copyright.com/) or contact the Copyright Clearance Center, Inc.
(CCC) 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400. CCC is a not-for-profit organiza-
tion that provides licenses and registration for a variety of users. For organizations that have been
granted a photocopy license by the CCC, a separate system of payment has been arranged.

**Trademark Notice:** Product or corporate names may be trademarks or registered trademarks, and
are used only for identification and explanation without intent to infringe.

### Library of Congress Cataloging-in-Publication Data

The pharmaceutical regulatory process / edited by Ira R. Berry,
Robert P. Martin. – 2nd ed.
    p. cm. – (Drugs and the pharmaceutical sciences ; v. 185)
   Includes bibliographical references and index.
   ISBN-13: 978-1-4200-7042-2 (hardcover : alk. paper)
   ISBN-10: 1-4200-7042-8 (hardcover : alk. paper) 1. Pharmacy–Law and
legislation–United States.   2. Drugs–Law and legislation–United States.
I. Berry, Ira R., 1942–   II. Martin, Robert P. (Robert Paul)   III. Series.
   [DNLM: 1. Legislation, Drug–United States.   2. Guideline Adherence–
legislation & jurisprudence–United States.   3. Pharmaceutical Preparations–
standards–United States. W1 DR893B v.185 2008 / QV 33 AA1 P5365 2008]
   KF2036.D7P47 2008
   344.7304′233–dc22

                                                                    2008042661

For Corporate Sales and Reprint Permission call 212-520-2700 or write to: Sales Department, 52
Vanderbilt Avenue, 7th floor, New York, Ny 1017.

Visit the Informa Web site at
www.informa.com

and the Informa Healthcare Web site at
www.informahealthcare.com

# Preface

This book is a follow-up to the First Edition that described the regulatory process by which sponsors of pharmaceutical products receive approval to market—especially for the U.S. market and through the approval by the U.S. Food and Drug Administration (FDA). The First Edition provided a history of pharmaceutical regulations, policies, and guidances. This Second Edition, now several years later, describes the many changes that have taken place such that terminology is different, updated requirements are based on stricter scientific standards and with some product registrations and industry practices facing basic changes in a constantly changing regulatory environment. This Second Edition contains the subject matter from the First Edition, but with in-depth, updated, and reformed requirements. New additions cover the need for established drug safety standards for post-approval marketed products, marketing drugs that have not required regulatory approval, and the increased supply of APIs and drug products from foreign countries. Just as for the First Edition, this Second Edition is intended to provide an understanding of the requirements to obtain regulatory approval to market a pharmaceutical product and also the policies and procedures needed by pharmaceutical companies to create and implement regulatory compliance postapproval. This book provides the most current information available from industry professionals, practicing attorneys, and FDA regulators—to be used by students, industry professionals, and any person needing to understand the mechanisms and means to establish regulatory compliance for pharmaceutical products and company practices.

The first section of the book includes chapters that describe the legal requirements needed to obtain regulatory approval of pharmaceutical products and remain in regulatory compliance. The first chapter describes the history, "Pharmaceutical Regulations Before and After the Food, Drug, and Cosmetic Act." From the drug approval system that was revised in 1984 and updated in the 1990s, there have been significant changes in order to create a more reasonable and practical regulatory scheme. The chapter "Modernizing the Food and Drug Administration" reviews the substantive legal changes that have been made to FDA and the regulatory process. "The New Drug Approval Process—Before and After 1962" chapter contains the basic requirements for a sponsor to obtain approval of a New Drug. The next chapter focuses on the "Generic Drug Approval Process: Hatch-Waxman Update." The importance of generic drugs to reduce health-care costs is ever more important and this chapter is focused on these issues. The regulation of biological products and the debate regarding creation of a legislative scheme for "follow-on biologics" continue to present many medical, scientific, and regulatory issues that are covered in the chapter "FDA Regulation of Biological Products." The next chapter, "FDA's Antibiotic Regulatory Scheme: Then and Now," addresses the current requirements for

regulatory approval of an antibiotic product. The chapter "Generic Drugs in a Changing Intellectual Property Landscape" describes current patent issues relating to the relationship between New Drugs and Generic Drugs. "The Influence of the Prescription Drug User Fee Act on the Approval Process" chapter has been updated with major legislative revisions that impact the requirements for drug safety reviews, product regulatory approvals, and marketing practices. The next chapter, "Clinical Research Requirements for New Drug Applications," provides an update to the clinical testing requirements for pharmaceutical products. "The Post-Approval Marketing Practices Regarding Drug Safety and Pharmacovigilance" the chapter describes the requirement for a pharmacovigilance program that should be designed to document and prevent widespread safety issues related to a pharmaceutical product postapproval. The next chapter describes the history and current programs for "Drugs Marketed Without FDA Approval." Approval from FDA is not required prior to marketing all pharmaceutical products; however, this issue has been receiving a good amount of attention from FDA—and industry has been focused on working with FDA to keep these products in regulatory compliance following current standards. The issues are complex and the chapter provides an excellent review and explanation. The chapter "FDA Regulation of Foreign Drug Imports, the Need for Improvement" follows and describes the current problems and issues that have arisen from the expanded scope of the importation of pharmaceuticals from foreign countries.

The second section of the book deals with updated specific regulatory requirements for product applications for approval and also postmarketing practices. The first chapter describes the role of "Active Pharmaceutical Ingredients" in regulatory approval of a drug product. It is common for an API to be produced by a different manufacturer from the dosage form manufacturer such that the regulatory requirements must be clear. The next three chapters describe the industry's current views for "Obtaining Approval of NDAs and ANDAs from a Chemistry, Manufacturing and Controls Perspective," "Obtaining Approval of a Generic Drug: Pre-1984 to the Present," and "New Developments in the Approval and Marketing of Nonprescription or OTC Drugs." Emphasis is given to the Common Technical Document format. Along with these three chapters, the next chapter should be followed alongside— "Current Good Manufacturing Practice and the Drug Approval Process," which is a critical part of the process for pharmaceutical product regulatory approvals. The next chapter, "The Influence of the USP on the Drug Approval Process," continues to be necessary for registration of pharmaceuticals as compliance with this compendium on pharmaceutical standards is required. The chapter "Ways, Means and Evolving Trends in the U.S. Registration of Drug Products from Foreign Countries" describes current issues related to the registration and marketing of drugs produced in foreign countries such as drug safety, the critical path to develop new drugs, and evidence needed to establish efficacy. The chapter "Impact of Government Regulation on Prescription Drug Marketing and Promotion" addresses the continually increased depth and enforcement taken by FDA in marketing and advertising practices. The next chapter addresses "CMC Post-Approval Regulatory Affairs: Constantly Managing Change." This continues to be a critically important practice that needs to be followed postapproval so that change for improvement can be implemented. The last chapter, "Living with 21 CFR Part 11 Compliance," covers the significant changes that have occurred for electronic documentation, with a discussion of computer validation.

This Second Edition provides an update to the significant changes that have occurred in the regulation of pharmaceutical products since the First Edition was published. These changes have made the First Edition a basic history book in government regulations and requirements in many respects. This new edition provides invaluable information—just as the First Edition—to the newcomer working in the pharmaceutical industry as well as to students. The world of regulations for the pharmaceutical industry is constantly changing—the basics remain the same as a foundation—but the science, interpretation, and implementation expand as technology increases.

Ira R. Berry
Robert P. Martin

# Contents

Preface ..... iii
Contributors ..... ix

## PART 1  LEGAL REQUIREMENTS FOR REGULATORY COMPLIANCE

**1.** Pharmaceutical Regulation Before and After the Food, Drug,
and Cosmetic Act   1
*John P. Swann*

**2.** Modernizing the Food and Drug Administration   29
*Arthur Y. Tsien, Esq.*

**3.** The New Drug–Approval Process—Before and After 1962   45
*Michael P. Peskoe*

**4.** Generic Drug-Approval Process: Hatch–Waxman Update   61
*Marc S. Gross, Jay Lessler, S. Peter Ludwig, and Amanda L. Vaught*

**5.** FDA Regulation of Biological Products   103
*Michael S. Labson, Krista Hessler Carver, and Marie C. Boyd*

**6.** FDA's Antibiotic Regulatory Scheme: Then and Now   131
*Irving L. Wiesen, Esq.*

**7.** Generic Drugs in a Changing Intellectual Property Landscape   143
*Neil F. Greenblum, Esq., Michael J. Fink, Esq., Stephen M. Roylance, Esq.,
P. Branko Pejic, Esq., Sean Myers-Payne, Esq., and Paul A. Braier, Esq.*

**8.** The Influence of the Prescription Drug User Fee Act on the Approval
Process   181
*Marc J. Scheineson, Esq.*

**9.** Clinical Research Requirements for New Drug Applications   199
*Gary L. Yingling, Esq., and Ann M. Begley, Esq.*

**10.** Postapproval Marketing Practices Regarding Drug Safety and
Pharmacovigilance   217
*Robert P. Martin*

**11.** Drugs Marketed Without FDA Approval   229
Jane Baluss and David Rosen

**12.** FDA Regulation of Foreign Drug Imports: The Need for Improvement   237
Benjamin L. England

PART II   REGULATORY REQUIREMENTS FOR PRODUCT APPROVALS AND
        AFTER

**13.** Active Pharmaceutical Ingredients   255
Max S. Lazar

**14.** Obtaining Approval of New Drug Applications and Abbreviated New
Drug Applications from a Chemistry, Manufacturing, and Controls
Perspective   269
Dhiren N. Shah

**15.** Obtaining Approval of a Generic Drug, Pre-1984 to the Present   283
Loren Gelber

**16.** New Developments in the Approval and Marketing of Nonprescription or
OTC Drugs   313
William J. Mead

**17.** Current Good Manufacturing Practice and the Drug Approval Process   325
Ira R. Berry

**18.** The Influence of the USP on the Drug Approval Process   335
Edward M. Cohen

**19.** Ways, Means, and Evolving Trends in the U.S. Registration of Drug
Products from Foreign Countries   349
Alberto Grignolo

**20.** Impact of Government Regulation on Prescription Drug Marketing and
Promotion   371
Daniel Glassman, Gene Goldberg, and Barbara Spallitta

**21.** CMC Postapproval Regulatory Affairs: Constantly Managing Change   411
Leo J. Lucisano, Kevin A. Miller, and Lorien Armour

**22.** Living with 21 CFR Part 11 Compliance   429
Richard L. Burcham

Index ..... 455

## Contributors

**Lorien Armour**   Armour CMC Regulatory Consulting, LLC, Durham, North Carolina, U.S.A.

**Jane Baluss**   Foley & Lardner LLP, Washington, D.C., U.S.A.

**Ann M. Begley, Esq.**   K. & L. Gates LLP, Washington, D.C., U.S.A.

**Ira R. Berry**   International Regulatory Business Consultants, LLC, Freehold, New Jersey, U.S.A.

**Marie C. Boyd**   Covington & Burling LLP, Washington, D.C., U.S.A.

**Paul A. Braier, Esq.**   Greenblum & Bernstein, P.L.C., Reston, Virginia, U.S.A.

**Richard L. Burcham**   BPI Technologies, Corp., Irving, Texas, U.S.A.

**Krista Hessler Carver**   Covington & Burling LLP, Washington, D.C., U.S.A.

**Edward M. Cohen**   EMC Consulting Services, Newtown, Connecticut, U.S.A.

**Benjamin L. England**   Benjamin L. England & Associates, LLC, FDAImports.com, Inc., Columbia, Maryland, U.S.A.

**Michael J. Fink, Esq.**   Greenblum & Bernstein, P.L.C., Reston, Virginia, U.S.A.

**Loren Gelber**   RRI Consulting Inc., Lake Wylie, South Carolina, U.S.A.

**Daniel Glassman**   Medimetriks Pharmaceuticals, Inc., Fairfield, New Jersey, U.S.A.

**Gene Goldberg**   Medimetriks Pharmaceuticals, Inc., Fairfield, New Jersey, U.S.A.

**Neil F. Greenblum, Esq.**   Greenblum & Bernstein, P.L.C., Reston, Virginia, U.S.A.

**Alberto Grignolo**   PAREXEL International Corporation, Waltham, Massachusetts, U.S.A.

**Marc S. Gross**   Darby & Darby, P.C., New York, New York, U.S.A.

**Michael S. Labson**   Covington & Burling LLP, Washington, D.C., U.S.A.

**Max S. Lazar**   FDA Regulatory Compliance Consulting, Surprise, Arizona, U.S.A.

**Jay Lessler**   Darby & Darby, P.C., New York, New York, U.S.A.

**Leo J. Lucisano**   GlaxoSmithKline, Research Triangle Park, North Carolina, U.S.A.

**S. Peter Ludwig**   Darby & Darby, P.C., New York, New York, U.S.A.

Contributors

**Robert P. Martin**   RP Martin Consulting, Lebanon, P.A., U.S.A.

**William J. Mead**   Consultant, Rowayton, Connecticut, U.S.A.

**Kevin A. Miller**   GlaxoSmithKline, Research Triangle Park, North Carolina, U.S.A.

**Sean Myers-Payne, Esq.**   Greenblum & Bernstein, P.L.C., Reston, Virginia, U.S.A.

**P. Branko Pejic, Esq.**   Greenblum & Bernstein, P.L.C., Reston, Virginia, U.S.A.

**Michael P. Peskoe**   Edwards Angell Palmer & Dodge LLP, Boston, Massachusetts, U.S.A.

**David Rosen**   Foley & Lardner LLP, Washington, D.C., U.S.A.

**Stephen M. Roylance, Esq.**   Greenblum & Bernstein, P.L.C., Reston, Virginia, U.S.A.

**Marc J. Scheineson, Esq.**   Alston & Bird LLP, Washington, D.C., U.S.A.

**Dhiren N. Shah**   Aventis Pharmaceuticals, Kansas City, Missouri, U.S.A.

**Barbara Spallitta**   Reckitt Benckiser, Inc., Parsippany, New Jersey, U.S.A.

**John P. Swann**   FDA History Office, Rockville, Maryland, U.S.A.

**Arthur Y. Tsien, Esq.**   Olsson Frank Weeda Terman Bode Matz PC, Washington, D.C., U.S.A.

**Amanda L. Vaught**   Darby & Darby, P.C., New York, New York, U.S.A.

**Irving L. Wiesen, Esq.**   Law Offices of Irving L. Wiesen, Esq., New York, New York, U.S.A.

**Gary L. Yingling, Esq.**   K. & L. Gates LLP, Washington, D.C., U.S.A.



# 1 Pharmaceutical Regulation Before and After the Food, Drug, and Cosmetic Act

**John P. Swann**

*FDA History Office, Rockville, Maryland, U.S.A.*

## INTRODUCTION: 19TH-CENTURY BACKGROUND TO DRUG REGULATION IN THE UNITED STATES

Federal drug regulation in 19th-century America was a fleeting phenomenon, limited in part by a lack of both scientific capacity and sustained political exigency. Citizens stood a better chance of being safeguarded by their own states, although the legislation and enforcement varied widely in this period. By the turn of the 20th century, Connecticut, Georgia, Illinois, Iowa, the Oklahoma territory, California, and most other states had outlawed drug adulteration and/or failure to label a medicine that had morphine, cocaine, digitalis, nux vomica, chloroform, cantharides, strychnine, ergot, or a host of other substances [1,2]. Typically, violations were considered as misdemeanors and were penalized accordingly. But absent a federal proscription, it was all the protection a citizen might hope for.

Still, there were some notable though short-lived developments at the national level. Baltimore physician James Smith, inspired by the marketing of spurious smallpox vaccine, convinced Congress to pass a law in 1813 to ensure the provision of reliable vaccine. Under this law, the president appointed a so-called vaccine agent (Smith) "to preserve the genuine vaccine matter, and to furnish the same to any citizen of the United States, whenever it may be applied for, through the medium of the post office." The blame for a smallpox outbreak in North Carolina in 1822 was assigned to vaccine supplied by the vaccine agent, although this was never proven. The impact of the event led to repeal of the vaccine act and restoration to states of the responsibility for pure and effective smallpox vaccine [3].

The publication of the *The Pharmacopeia of the United States of America* in 1820 was a milestone in the history of drug regulation because it established a national compendium of drug standards to help respond to what medical and pharmaceutical professionals observed to be an increasingly corrupt drug supply. Ultimately, it would prove to be unique among most legally recognized publications of this kind in the world because it was, and still is, a private venture. There had been occasional local compilations of standard drugs and their preparation, the first of which was the *Lititz Pharmacopeia* of 1778. But the convention that assumed responsibility for a national collection of drug standards and their preparation had something broader in mind.

Led by New Hampshire native Lyman Spalding, 11 physician delegates from medical societies and schools across the country, representing four districts, met in Washington in January 1820 to discuss drafts and recommendations from district proceedings and what would and would not be included in the USP. The first USP aimed "to select from among substances which possess medical power, those, the utility of which is most fully established and best understood; and to form from

them preparations and compositions, in which their powers may be exerted to the greatest advantage" (4). The USP thus endeavored to elevate the pharmaceutical armamentarium in a way that would make both the practice of medicine and the practice of pharmacy more reliable (5–8).

The first federal law that addressed pharmaceuticals in general invoked the USP as well as other pharmacopeias. Lewis Caleb Beck's 1846 publication, *Adulteration of Various Substances Used in Medicine and the Arts, with the Means of Detecting Them: Intended as a Manual for the Physician, the Apothecary, and the Artisan,* revealed an American marketplace rife with adulterated medicines. Opium, one of the most valued medicines, was most frequently subjected to fraud, mixed with all manner of deceptive ingredients, such as gum arabic, sand, and lead. Beck identified many other drugs commonly adulterated, including tartar emetic, quinine, and rhubarb. It was a state of affairs perhaps best captured by British statesman and pharmacist Jacob Bell, who related the widespread belief abroad that drugs rendered unsuitable by decay or fraud were still "good enough for America" (9).

If Beck's book provided the scientific evidence why the United States needed a law to protect the drug supply, then the Mexican–American War (1846–1848) provided the political impetus. Many in Congress blamed adulterated drugs for the massive wartime deaths. In truth, considering the drugs then available, it would have made little difference whether or not the drugs were pure. Squalid camps, inadequate nutrition, and an understaffed medical corps were largely responsible for deaths due to disease—about 10% of the total fighting force each year, a rate seven times the mortality rate due to combat (10). The continuing prevalence of drug adulteration in the 1840s, particularly evident in the ports, produced, as James Harvey Young observed, "a sense of outrage." Senator John Davis of Massachusetts believed that, "If we can stop the importation of the spurious drug from abroad, we shall know how to deal with those who may choose to go into their adulteration in the United States" (11). Such sentiments, combined with Congress's conception of pharmaceutical fraud in the Mexican–American conflict and the documentation supplied by Beck, helped shape a law that attempted to bring some order to the chaos.

The Drug Import Law, signed by President James K. Polk on June 26, 1848, required the examination of all drugs that came into the ports of New York, Boston, Philadelphia, Baltimore, Charleston, and New Orleans for "quality, purity, and fitness for medical purposes." The law identified the USP as well as the pharmacopeias and dispensatories of Edinburgh, London, France, and Germany as the source of standards used by the port examiners in their appraisals. Drugs had to be labeled with the name of the manufacturer and the place of preparation. The Secretary of the Treasury was authorized to appoint suitably qualified personnel at each of these ports. Any drug so adulterated or deteriorated to fall short of the standard of purity or strength as established by these compendia would not pass the customhouse. The owner or consignee could request a reexamination by an analytical chemist endorsed by the medical profession and the local school of medicine or pharmacy. But if that analysis upheld the port examiner, the violative drug would be either removed by the owner or destroyed by the port (12).

Initially, the law was enforced vigorously by those appointed by Secretary of the Treasury Robert J. Walker. In the first few months, the New York port was reported to have turned away over 90,000 pounds of drugs. Some even hoped, like

Senator Davis, that it might be possible to address the problem of domestic traffic in problematical drugs. However, the impact of the law soon diminished. In part, this was due to inadequately developed methods of analysis, a problem that pharmacists, in particular, tried to rectify. But the problem also rested in the appointment of unqualified individuals to special examiner positions, appointments which began to be awarded more on the basis of political debts than the suitable qualifications as stated in the law. By 1860, Edward Squibb announced that the law was barely enforced any more, and that remained the case despite the efforts of some physicians and pharmacists for the remainder of the century (13–15).

## EARLY REGULATION OF BIOLOGICAL THERAPIES

The next significant milestone in the history of regulating therapeutic products in the United States followed a major advancement in biological therapeutics. In 1890, Emil von Behring and Shibasaburo Kitasato, working at the Robert Koch Institute in Berlin, announced that they had successfully treated diphtheria by injecting patients with blood serum of animals immunized against the pathogen. The last two decades of the 19th century witnessed the identification of nearly two dozen microorganisms responsible for disease, and the work of von Behring, Kitasato, Louis Pasteur, Emile Roux, and others applied these discoveries to develop and refine biological treatments for these diseases (16,17).

State and local public health laboratories and a few commercial concerns soon began producing their own diphtheria antitoxin once European scientists perfected the production methodology. On the eve of this milieu, Joseph Kinyoun, head of the Hygienic Laboratory of the U.S. Marine Hospital Service (later renamed the Public Health Service), warned the Surgeon General in November 1894 of "... what will evidently ensue in our country. Many persons will, during the ensuing year, commence to prepare the (antidiphtheria) serum as a business enterprise, and there will, without a doubt, be many worthless articles called antitoxin thrown upon the market. All the serum intended for sale should be made or tested by competent persons. The testing, in fact, should be done by disinterested parties. The danger with us is perhaps greater than could exist here (in Germany) under any circumstances" (18). Early in 1895, the Hygienic Laboratory developed a standard diphtheria antitoxin for distribution (19–21). Businesses, as Kinyoun suspected, indeed took up production, but it was the antitoxin manufactured by a municipal public health laboratory that launched a movement for regulatory intervention (Fig. 1).

In October 1901, the St. Louis Health Department produced a batch of antitoxin that killed 13 children being treated for diphtheria; the cause of death in each case was tetanus. An investigation led by the city council and the health department revealed that the consulting bacteriologist who had produced the antitoxin had used a horse that contracted and later died of tetanus. The bacteriologist allegedly was aware of the horse's condition but failed to destroy the product or otherwise prevent its distribution. Although he was unaware of the tainted source of the antitoxin, the janitor in the laboratory had responsibility for bottling the product; he complicated recovery of the antitoxin by initially claiming that the antitoxin had been destroyed. The incident in St. Louis was not an isolated one. There were other accidents also involving biological medicines, such as about 100 cases of postvaccination tetanus that occurred in Camden, New Jersey, in the Fall of 1901, where nine children died.

4                                                                                    Swann



BETTER NOT VACCINATE THAN VACCINATE WITH IMPURE VIRUS.

**FIGURE 1**   This cartoon from *Puck*, 1880, deftly captures the fear of vaccination with unreliable vaccine matter. *Source*: Courtesy of William Helfand.

But it was the St. Louis disaster that was specifically invoked (22) in the hearings on a bill that proposed bringing production of biologics under federal control. Introduced on April 5, 1902, President Theodore Roosevelt signed the Biologics Control Act on July 1, 1902, virtual light speed compared to the quarter-century it took for the admittedly more comprehensive and much more hotly contested Food and Drugs Act of 1906 (23). The Hygienic Laboratory was responsible for enforcement of the 1902 legislation.

Drawing upon extant legislation in Europe, this law required manufacturers of any biological medicine or analogous product to be licensed annually by the government, and licensure was predicated on a satisfactory and unannounced

inspection of the establishment. All aspects of production could be examined, including records. Samples of licensed products were obtained on the open market and tested at the Hygienic Laboratory for purity and potency. Licenses could be suspended pending correction of a manufacturing or product defect, and violation of the law was subject to a fine of up to $500 and/or imprisonment for up to 1 year. While there certainly were cases of license suspensions, there appears to be little evidence that the Hygienic Laboratory pursued fines or imprisonment under the law until the early 1960s (24–26). The number of licenses issued by the Hygienic Laboratory grew quickly, from 13 concerns licensed to produce mostly diphtheria antitoxin and smallpox vaccine in 1904, to two dozen operations producing about 20 different medicines in 1908, to 41 establishments licensed for over 100 biologics in 1921 (27–30).

## FEDERAL AND PRIVATE REGULATION OF DRUGS
## IN THE EARLY 20TH CENTURY

Other federal agencies offered limited regulation over pharmaceuticals beginning in the early 20th century. The Post Office Department, for example, was able to prosecute some products that were otherwise beyond the reach of the government under the postal fraud laws of 1872 and 1895 (31,32). These laws prohibited the use of mail to collect money under fraudulent pretenses. Violations resulted in a fraud order, wherein the offending mail was intercepted and returned to the sender. Thus in 1928 the Post Office secured a fraud order, upheld on appeal, against Tuberclecide, a worthless treatment for tuberculosis, and years earlier against Habitina, an alleged drug addiction cure that contained both morphine and heroin (33,34). The Federal Trade Commission (FTC) exercised its jurisdiction over drug advertising from time to time following its establishment in 1914. For example, it attempted to regulate Marmola, a hazardous thyroid preparation intended for weight reduction, on two occasions in the 1920s and 1930s (35). The Wheeler-Lea Amendment of 1938 clarified FTC's unique authority over all drug advertising, although jurisdiction over prescription drug advertising was transferred to the U.S. Food and Drug Administration (FDA) in 1962 (36–38).

Ironically, probably the most significant effort to regulate prescription drugs prior to 1938 was a private venture that was voluntary, under the American Medical Association (AMA). Shortly after the turn of the century, the AMA and the American Pharmaceutical Association (APA) combined resources to press for the establishment of a federal authority that would certify drugs—and thus help rid the landscape of patent medicines. These not only posed a threat to the public health but they also represented some competition for physicians. Nostrums certainly played an important role in the retail business of many pharmacists, but others in the profession excoriated their sale. The AMA abandoned the idea of federal certification and instead formed its own Council on Pharmacy and Chemistry in 1905, a 15-member group that included physicians, pharmacists, pharmacologists, chemists, and government representatives. The AMA Board of Trustees charged the council to publish an annual volume of proprietary pharmaceuticals approved by the council that were not, according to pharmacopeial rules, permitted in the USP (39–41).

Manufacturers submitted to the council evidence to support any claims made for the drug and a proposed name, and the council relied heavily on the advice of outside consultants to evaluate these data. An accepted drug would be included

in its compendium, *New and Nonofficial Remedies* (NNR), which entitled the firm to label its drug with the council's "accepted" seal. But under the council's rules, no pharmaceutical would be admitted to NNR if it had "unwarranted, exaggerated or misleading statements as to therapeutic value." Moreover, a drug would not be accepted if its firm derived substantial earnings from products not listed in NNR. But rejection by the council meant more than just failure to appear in NNR or enhance its label. Unaccepted drugs were denied the right to advertise in the family of AMA journals (42–45).

The council terminated its acceptance program in 1955, largely due to the AMA's depletion of cash reserves and a growing apathy for the program within the association, according to one informed observer (46). However, the council continued to publish its compendium of drugs for reference use of the profession. With the proscriptive element of the program inactivated, the possibility existed in which a drug might be advertised in the *Journal of the American Medical Association* (*JAMA*) for an indication not supported in NNR (47). Moreover, firms were less compelled to submit the sort of evidence to the council that they had in the past, such that the council's consultants had to search for supplemental data on NNR candidates elsewhere. Still, NNR included comparative assessments of a drug's efficacy, something FDA did not do when the efficacy statutes were passed (48–50).

## THE DRUG MARKETPLACE AT THE TURN OF THE CENTURY

Federal regulation over the bulk of the drug supply was still nonexistent at the turn of the 20th century. It was a menacing marketplace. Despite the existence of several comprehensive drug compendia—including the USP—there were no legally required standards of identity for drugs, whether the pharmaceuticals were prescribed by a physician and dispensed by a pharmacist (so-called ethical drugs) or purchased directly by the consumer for self-medication. Some of the manufacturers of the former by this time had quality-control procedures in place and produced standardized drugs of predictable therapeutic response. Parke-Davis was the first firm to subscribe to this approach, introducing 20 chemically assayed fluidextracts of botanicals by 1883 (51,52). Parke-Davis and Mulford were the early leaders in the production of biologicals, a venture that by definition and by law required the institutionalization of science. Incorporating science was, as Jonathan Liebenau points out, good business for drug manufacturers even at this early stage. And they made sure their clientele knew it (53).

But science was still very much in its infancy for most of the American pharmaceutical industry at the turn of the century. It was an expensive proposition, and many company chiefs remained to be convinced that more (or any) science and research necessarily meant more business (54). To be sure, even the ethical industry had its share of scientifically questionable products. One of Eli Lilly and Company's best sellers at this time was Succus Alterans, a blood purifier and treatment for rheumatism, syphilis, and a variety of skin diseases that Lilly supposedly derived from a Creek Indian remedy (55). In 1889, Smith Kline & French purchased the D. B. Hand Company and then manufactured and distributed the Hand line of products, still under the Hand brand. This inventory consisted of teething lotions, colic cures, croup and cough medicine, worm elixir, and other preparations advertised for infants and children. Like so many other pediatric products of other firms



**FIGURE 2** Hunt's Remedy, manufactured since 1850, illustrates the unrestricted claims and eye-catching advertising imagery that characterized many patent medicines at the turn of the 20th century. This particular advertisement was used for the design of a 1998 U.S. postage stamp to commemorate the 1906 Food and Drugs Act.

at this time, these Hand medicines typically contained alcohol, opium, and chloral hydrate (56–58).

But regardless of the extent to which the ethical industry marketed nostrums, it paled next to the patent medicine industry, those who vended William Radam's Microbe Killer, Mrs. Winslow's Soothing Syrup, Swaim's Panacea, Benjamin Bye's Soothing Balmy Oils to cure cancer, Dr. Hollick's Aphrodisiac Remedy, and on and on (59). Nostrums were omnipresent in late 19th-century America, and their rise, not coincidentally, was paralleling that of advertising. Products appealed to exotica, the medical knowledge of Native Americans, death, religion, patriotism, mythology, and eventually new developments in science. Nothing but the size of the bottle prevented patent medicines makers from claiming anything and putting anything in their products (Fig. 2). At the same time, the biomedical sciences awaited elaboration, leaving medicine ill equipped to deal with most diseases. If there were a demand for cancer and arthritis cures, baldness remedies, bust developers, and manhood restorers, a cure could be supplied. And if there were not a demand, that too could be manufactured.

The nostrum industry undoubtedly knew how to market its wares, but companies also promoted their interests in more surreptitious ways. For example, they subdued any curiosity in the press with their economic strength. By the 1890s, patent medicine manufacturers used so-called "red clauses" in their advertising contracts to muzzle newspapers and magazines. The contracts would be voided if a state law regulating nostrums were passed. Thus, not only were many editorials silent on the need for such laws, they actively campaigned against them.

## THE FEDERAL FOOD AND DRUGS ACT OF 1906

Such was the pharmaceutical landscape in America as the 20th century began. A few muckraking journalists helped reveal the red clauses, the false testimonials, the nostrums laden with harmful ingredients, the unfounded cures for cancer, tuberculosis, syphilis, narcotic addiction, and other serious as well as self-limited diseases. The most influential patent medicine exposé was a 10-part series entitled "The Great American Fraud," by Samuel Hopkins Adams, which began in *Collier's* on October 7, 1905, and ended the following February. A subsequent series by Adams examined doctors who advertised fake clinics. That same month saw the publication of another work that, more than any other single event, spurred on passage of a comprehensive federal law. Socialist writer Upton Sinclair published *The Jungle*, a fact-based novel about immigrant life and the meatpacking industry of Chicago. Sinclair's shocking and revolting story was verified by government undercover investigators.

The search for a federal law to correct abuses in the food and drug marketplace began long before Adams and Sinclair initiated their investigations. Congress received the first bill to address these concerns in January 1879, although that version addressed only foods; some months later another bill, this time encompassing drugs as well as foods, was introduced in the House. Every session of Congress for the next 25 years considered at least one sweeping food and drug control bill (60). Those who believed they would be adversely affected by an omnibus law managed to thwart passage of the dozens of bills that were introduced during this span. But their opponents obviously were equal to the task—or at least persistent.

Many championed a food and drug law, but one person more than any other was responsible for keeping the need for such a law squarely in front of both the Congress and the people. Harvey Washington Wiley was a chemist on the faculty of Purdue University when he came to Washington in 1883 to become the fourth chief chemist in the Department of Agriculture. From the time of his arrival in the capital, Wiley was an enthusiastic, infectious, and effective champion for remedial legislation. When he was not stumping for a law, he was publishing extensively on the proliferation of food adulteration (61). His forceful personality and commitment to reform brought together important but disparate groups to help lobby Capitol Hill, including state food and drug officials, the General Federation of Women's Clubs, the APA, and the AMA (62–64).

On June 30, 1906, President Roosevelt signed the Food and Drugs Act into law (65), nearly 4 years to the day after he signed the Biologics Control Act. The law prohibited interstate commerce in adulterated or misbranded foods and drugs. It was unlawful to add an ingredient to a food that would represent a health hazard, result in a filthy or decomposed product, conceal damage, or substitute for the food itself. If the manufacturer chose to label the weight or measure of the food, that had

to be done accurately. A food or drug label could not be false or misleading in any particular.

A drug under the act was any substance intended for the cure, mitigation, or prevention of disease in humans or animals. It could not be sold in any condition of purity, strength, or quality other than that stated in the USP or the *National Formulary*, unless the specific variation from that standard was stated on the label. The presence and amount of 11 dangerous ingredients, including heroin, morphine, cocaine, and alcohol, had to be labeled on all drugs (and foods). Violative goods were subject to seizure and, if upheld by the court, destruction. Infractions were considered misdemeanors, and those behind the offense could be fined up to $500 and imprisoned for up to one year. The Bureau of Chemistry of the Department of Agriculture, the home of more chemists than anywhere else in the U.S. government (66), was assigned to enforce the law and promulgate regulations (67).

## APPLYING THE NEW LAW TO DRUGS

One immediate impact of the law was to persuade many patent medicine manufacturers to remove ingredients from their preparations that were subject to labeling. Therapeutic claims, however, were another story. The Bureau of Chemistry quickly applied the law to products that bore false therapeutic claims, based on a charge of misbranding. About 100 such cases were made in 5 years (68). However, when the bureau tried to move against Dr. Johnson's Mild Combination Treatment for Cancer, the firm prevailed over the bureau in court. The case reached the Supreme Court in 1911, which ruled in a 6–3 decision against the government. The majority believed that the 1906 act pertained only to the identity of ingredients in a product. Moreover, the Court believed that the Bureau of Chemistry was capable of making an informed judgment about a drug's contents, "but hardly so as to medical effects." Finally, based on an earlier case involving the Post Office, the court argued that ideas about therapeutics were still too far ranging to come to definitive conclusions (69).

President William Howard Taft asked Congress to develop a legislative solution for the 150 pending drug misbranding cases, as well as those yet to come. Among these cases, according to the president, were "some of the rankest frauds by which the American people were ever deceived" (70). Congress responded in 1912 with the Sherley Amendment, couched as severely as members believed possible without infringing on expressions of opinion. The new law prohibited statements about a product's ingredients or its curative or therapeutic effect that were false and fraudulent (71,72). However, to establish fraud meant that the bureau of chemistry had to show that the manufacturer knew the product was worthless—that there was intent to defraud the consumer. This proved to be difficult in many cases.

For example, Lee Barlett, a former shirt salesman from Pittsburgh, promoted a medicine called Banbar, an extract of the horsetail weed, as an effective treatment for diabetes. Barlett sold Banbar for $12 a pint, a hefty price in the 1920s, but it allowed diabetics to take their medicine orally rather than administering injections of insulin, which Frederick Banting and his colleagues at the University of Toronto had introduced in 1923. The government took Barlett to court for selling a misbranded drug. Elliott P. Joslin, the internationally recognized authority on diabetes, was the plaintiff's principal witness. On the basis of the 12,000 diabetic patients he saw every year, Joslin testified that insulin—combined with diet and exercise—was



**FIGURE 3**   Pharmacologists in the Bureau of Chemistry employed biological assays to develop the first reference standards issued to industry to promote compliance with the testing requirements for select pharmaceuticals in USP X (1926).

the only effective treatment for this disease. The defense offered hundreds of testimonial letters on behalf of Banbar. The jury found in favor of the defense, despite the fact that the government presented death certificates—attributed to diabetes—for individuals who had submitted these testimonials (73).

Under Wiley, enforcement of the Food and Drugs Act weighed heavily toward foods. Of the first 1000 actions taken by the bureau up to 1911, fewer than one quarter dealt with drugs. And those drug actions typically addressed patent medicines; as seen earlier, false therapeutic claims were a driving force for action. Official drugs such as belladonna and asafetida were the subjects of fewer than 100 of these actions. Most defendants did not challenge the bureau, but rather paid their fines, adjusted their labeling, and continued to advertise as before, since the latter was beyond the reach of the 1906 law (74).

Carl Alsberg followed Wiley as chief chemist in 1912, and he continued to favor foods. But he also focused more attention on ethical drugs. To address these, the bureau developed new analyses for crude drugs, and by the 1920s bureau scientists pioneered biological assays for ergot, digitalis, and other drugs, which were adopted by the USP (75) (Fig. 3). The bureau also monitored drugs dispensed by pharmacists in the District of Columbia (believing state pharmacy boards were the more appropriate monitor elsewhere) beginning in the 1910s and found substantial deviations from official standards. By the early 1930s, FDA and the APA reached an agreement as to what would be considered reasonable tolerances for dispensed drugs (76).

When Walter Campbell succeeded Alsberg in 1921, he revitalized the drug regulatory effort, beginning with the appointment of George Hoover, a physician and chemist, to head drug regulation. The bureau consequently expanded its interests from crude drugs to tablets, discovering fairly wide variations from official standards. But by this time, when the Republicans came to power and the policy was made to be more cooperative with business, court action began to be superseded by negotiation. Hoover met with the pharmaceutical industry's trade associations, the American Drug Manufacturers Association and the American Pharmaceutical Manufacturers Association, which in turn formed so-called contact committees to investigate the tablet problems in cooperation with the bureau. The committees helped improve tableting technologies and negotiated with the bureau over allowable deviations from the labeled amount of active ingredient. But in the New Deal era, drug regulation took a less collaborative tone with industry (77).

## TOWARD THE 1938 FOOD, DRUG, AND COSMETIC ACT

The 1906 act was arguably the pinnacle of Progressive Era legislation, but the difficulty of prosecuting medicines with false therapeutic claims was just one of many shortcomings of the 1906 act. Foods did not have standards, cosmetics and medical devices were unregulated, the penalties imposed by the law were paltry relative to the crime, with the exception of the 11 ingredients there was no required listing of drug ingredients, factory inspections—although interpreted and executed by the bureau as warranted under the law—were not explicitly authorized, and although the law prohibited a food that was made to be unsafe, there was no similar protection for drugs. By the 1920s, and increasing considerably after Franklin Roosevelt became president in 1932, FDA began to publicize rather creatively the more egregious examples of deceptive and hazardous products that were on the market and perfectly within the law, an argument for a new comprehensive law (78). Indeed, shortly after FDR's inauguration, Congress began considering bills that would replace the Food and Drugs Act and plug the holes left in consumer protection legislation (79).

The public's vulnerability became dramatically clear in October 1937. Months after the introduction of the wonder drug sulfanilamide, the S. E. Massengill Company of Bristol, Tennessee, began investigating a liquid dosage form for the drug. Their investigation consisted of finding a solvent in which the drug would dissolve (sulfanilamide was known to be stubbornly insoluble) and flavoring and coloring the preparation so as to be especially useful for children and others not inclined toward tablets. Quality control amounted to little more than an organoleptic appraisal. Harold Watkins, the company chemist, selected diethylene glycol as the vehicle for the sulfa without testing the solvent or even examining the medical literature. Had he at least bothered to look, the latter certainly attested to the glycol's poisonous nature. He did not bother testing it himself, he claimed, because glycols were related to glycerin, which had long been used in medicines. The company thus began shipping its Elixir Sulfanilamide from Tennessee and its Kansas City office in early September.

On October 11, a representative from the Tulsa County Medical Society contacted the AMA to inform them that several deaths in the Oklahoma county appeared to be associated with the Massengill product. The physician wanted to

know what the AMA's Council on Pharmacy and Chemistry could tell them about the preparation. Neither Elixir Sulfanilamide nor any Massengill product had ever been accepted by the Council. The FDA heard about the suspicious deaths 3 days after the AMA from a New York physician with ties to Massengill. FDA learned that the Elixir was involved in all the Tulsa fatalities, at which point the agency dispatched its chief medical officer and one of its finest field investigators to Bristol to investigate. They learned that proprietor Samuel E. Massengill issued an inadequate recall notice and that 240 gallons remained unaccounted for.

FDA dedicated virtually its entire field force to tracking down the remaining product—although forced to rely on a technical error for legal cause. Nothing in the 1906 act prohibited unsafe drugs. Rather, FDA was allowed to seize Elixir Sulfanilamide because it was misbranded; an elixir, by definition, had to employ alcohol, and the Massengill medicine of course had none. Most physicians and pharmacists encountered by FDA investigators during the frantic recovery effort were helpful, but some were uncooperative and even obstructive, no doubt to deflect personal responsibility and liability. Much was recovered from warehouses, pharmacy shelves, and medicine cabinets, but overall, Elixir Sulfanilamide killed at least 107, mostly in the South.

Many were children, such as the 6-year-old girl from Tulsa who perished in this ordeal (Fig. 4). Her mother, Marie Nidiffer, wrote to President Roosevelt on November 9: "Tonight Mr. Roosevelt that little voice is stilled. The first time I ever had occasion to call in a doctor for her and she was given the Elixir of Sulfanilamide. Tonight our little home is bleak and full of despair. . . . Even the memory of her is mixed with sorrow for we can see her little body turning to and fro and hear that little voice screaming with pain and it seems as though it drives me insane. . . . Tonight President Roosevelt as you enjoy your little grandchildren of whom we read about, it is my plea that you will take steps to prevent such sales of drugs that will take little lives and leave such suffering behind. . . ." (80–82).

The bills to correct the gaps in the 1906 act had been delayed and diluted over the previous 5 years. However, the impact of the Elixir Sulfanilamide tragedy was to strengthen the drug provisions of the latest bills and in fact propel passage of the law itself. Roosevelt signed the bill on June 25, 1938 (83). The Food, Drug, and Cosmetic Act brought medical devices and cosmetics under regulation, provided for standards of identity for foods, prohibited once and for all false therapeutic claims on drug labeling, required that drugs be labeled with adequate directions for use, authorized factory inspections (which had been executed anyway under the bureau's interpretation of the old law), instituted court injunctions for violative products, corrected abuses in the quality and packaging of foods, instituted adequate drug manufacturing controls (84), and, most important from the standpoint of the history of drug regulation, mandated that all new drugs had to be shown by the manufacturer to be safe before they could be marketed—the birth of the new drug application (NDA). The premarket provision, inspired by the fear of another Elixir Sulfanilamide disaster, had an immediate impact, with over 6000 new drug applications filed in the first 9 years and 13,000 by 1962 (85).

## DRUG REGULATION AND THE POSTWAR CHEMOTHERAPEUTIC REVOLUTION

One early development under the drug provisions of the 1938 act concerned self-medication. The law called for adequate directions for use by the patient, and by

*Pharmaceutical Regulation Before and After the Food, Drug, and Cosmetic Act*   **13**



**FIGURE 4** The face of a drug disaster. This excerpt from a moving letter to President Roosevelt from Mrs. J. Nidiffer of Tulsa describes her anguish and helplessness over the loss of her 6-year-old daughter, Joan Marlar. Ironically, sulfanilamide saved the life of FDR's son just 1 year earlier, not long after American clinicians got their hands on the drug.

1940 FDA issued nearly 30 detailed warning statements to be labeled on a variety of drugs. For example, bromides were labeled with the following: "Warning: Frequent or continued use may lead to mental derangement, skin eruptions or other serious effects. Do not take more than the dosage recommended. Not to be taken by those suffering from kidney disease" (86).

However, it was FDA's opinion within weeks of the law that some drugs simply could not be labeled with adequate directions. For example, the use of a sulfa drug in a venereal disease was hardly routine, complicated as it was by both the adverse reactions that many of the early sulfas produced and the identification and progress of the disease. In other words, FDA ruled that in some cases medical expertise had to be involved in the medication process for the drug to be safe. The agency identified an increasing number of drugs that had to be labeled for dispensing only on the order of a physician or dentist; the birth of another standard of modern medicine, the prescription drug (87–90). This created confusion about how a drug would be categorized—prescription or nonprescription—and who would have primary responsibility for that designation. The absence of statutory direction was resolved in 1951 when the Durham–Humphrey Amendment was passed. That law established broad parameters for deciding which drugs merited designation as prescription legend status and which could be available over the counter (91).

The illegal sale of two groups of prescription drugs, amphetamines and barbiturates, took up more of FDA's drug enforcement time in the 1940s, 1950s, and 1960s than all other drug violations under the 1938 act combined. At first the agency focused on pharmacies, some of which were either selling these drugs over the counter without a prescription or incessantly refilling old prescriptions that did not authorize any refills. By the mid-1950s, FDA's attention turned to the trucking industry, a major source of traffic in these pharmaceuticals, where some spectacular and highly publicized highway crashes were directly connected to the use of amphetamines and barbiturates (92). Eventually many other drugs prone to abuse, such as hallucinogens, were consolidated for special interdiction by FDA under the Drug Abuse Control Amendments of 1965 (93,94). However, 3 years later that function was transferred to what would become the Drug Enforcement Administration (DEA).

The introduction of the sulfa drugs, beginning with sulfanilamide in 1935, launched a revolution in chemotherapy. Statutes and regulations did their best to keep track of new therapies. For example, literally hours before expiration of the patent on insulin (and the University of Toronto's oversight of quality control in the production of the hormone) in 1941, Congress passed the Insulin Amendment to require FDA to test every batch of insulin produced for strength, quality, and purity to ensure its safety and effectiveness (95). A similar law in 1945 provided for FDA certification of batches of penicillin—a service carried out by FDA beginning in 1943 for the War Production Board's supply of penicillin headed for troops. As additional antibiotics were discovered, laws were passed to accommodate them (96–98).

As mentioned earlier, companies flooded FDA with drug applications at the outset. The agency received an average of over 100 NDAs monthly from 1938 to 1941 because sponsors were apparently unsure of what constituted a new drug. NDA 1596, received on August 30, 1939 and approved on September 20, 1939, was for 4-H Household Cough Syrup, consisting of horehound, molasses, and vinegar. The Aiellos Ped-Vale Company submitted NDA 407 on January 12, 1939, for Aiellos Foot Remedy Powder, made up solely of boric acid; FDA approved the application on April 1 of that year. During this period, seven firms and one physician submitted NDAs for aspirin that were approved by FDA. Interestingly, in January 1945 the agency ruled that the indications for aspirin were so well known to consumers that directions for use were not required. Aspirin lollipops, though, were a different matter, requiring a physician's prescription (99–102).

The application submission rate slowed during World War II and the early postwar years to about 350 annually. However, it picked up again in the 1950s to approximately 400 each year, when research funds flooded laboratories almost as fast as pathbreaking new medicines flooded the marketplace. Upon the end of hostilities in Europe, the Committee on Medical Research of the Office of Scientific Research and Development disbursed remaining wartime research funds to the National Institutes of Health (NIH). This source of funding, together with strong congressional support, launched in full force the modern era of autonomously peer-reviewed extramural funding of biomedical research at NIH (103).

In addition, the pharmaceutical industry accelerated a trend that began in the period between the wars, pouring more and more revenue into research and development (104,105). That decision might have been made a little easier by the success of their wartime experience with penicillin, synthetic anti-infective agents, and other drugs. Thus, a host of antibiotics, diuretics, ataractics, corticosteroids, antispasmodics, and other classes of drugs proliferated during that decade (106,107). Of course, the number of supplements grew as the base number of NDAs increased. And then there were some drugs that yielded scores or even hundreds of NDAs, such as diethylstilbestrol and rauwolfia serpentina. David Cavers reports that the latter led to applications from 319 different firms and was included in 2500 different medicines (108).

## COMING TO GRIPS WITH EFFICACY BEFORE 1962

Another drug regulation policy was growing increasingly important in the 1950s—the relationship between drug safety and drug efficacy. The idea of federally mandated effectiveness in medicines was nothing new at this time. For example, regulations issued by the National Institutes of Health (formerly the Hygienic Laboratory) in 1934 required that biologics had to work: "[A] license for new products shall not be granted without satisfactory evidence of therapeutic or prophylactic efficiency" (109). This formalized a policy that had been in place for years.

In the late 1930s, FDA promulgated a rule requiring manufacturers of oral or otherwise inert ovary, suprarenal, pituitary, prostate, pineal, and mammary extracts to label their products with a statement that such an article "does not contain any known therapeutically useful constituent of the glands mentioned." Of course, even under the 1906 act, actions taken against patent medicines that made false therapeutic claims were implicitly driven by efficacy considerations (considerations that the Supreme Court believed were ahead of their time). The Insulin Amendment, Penicillin Amendment, and the other antibiotic amendments literally invoked efficacy as a prerequisite for certification by FDA. Reviews of certain NDAs that claimed to treat serious diseases such as pneumonia certainly took efficacy into account (110). The concept that in certain cases a drug could not be safe without being effective was employed but never pressed forward as an official policy—until Hepasyn® came along.

The Hepasyn story began in the early 1930s, when various researchers observed that cancerous tissue bore a high concentration of the amino acid, arginine, which appeared to promote cell division in tumors. Some tried to exploit this observation by applying the liver enzyme arginase, which helps to hydrolyze arginine, as a possible treatment to control tumor growth. Success was fleeting for most. However, dentist Wesley G. Irons, working as an anatomist at the Schools of

Pharmacy and Dentistry at the University of California at San Francisco in the 1940s, claimed to have success treating animal tumors with arginase. When his funding fell through at the university, Irons was offered funding and laboratory space at the San Francisco College of Mortuary Science, a source for cadavers in Irons's classes.

The mortuary school reserved commercial rights to Irons's work and served as the manufacturing establishment for Hepasyn, the name they gave to arginase. In November 1950, the school arranged with a Hollywood clinician to test arginase, and within a year 100 patients had received the substance. Eventually, the Hollywood physician began treating other cancer patients on an ambulatory basis once a week at the mortuary school. The story became even more curious after Irons and the school parted company, but the San Francisco school submitted an NDA late in 1953. FDA inspectors visited the mortuary school and found serious production problems, such as organoleptic sterility testing. The NDA contained results for only 10 patients, although the sponsors claimed to have data on 175 patients. FDA, not surprisingly, considered the application incomplete and requested more data. As problematical as the manufacturing operation was, FDA chose to focus on the clinical evidence submitted by the college (Fig. 5).

By October 1955, the application was deemed complete enough for a review. The agency's strategy was made clear to a medical officer in San Francisco: "We have given considerable thought to the proper handling of this application and have decided in conjunction with (General Counsel William) Goodrich that since this preparation is ineffective in the treatment of malignant disease its use is not safe in such situations. In other words, while section 505 does not refer to efficacy we are going to try and take the position that efficacy is so intimately bound up in the use of this material that the lack of efficacy will make it unsafe for use" (111). The Hepasyn review thus was not going to be just another NDA evaluation. Rather, it was to be a blatant stand on therapeutics and the law. FDA's expectation or hope was that the San Francisco College of Mortuary Science, its application denied on the basis of lack of efficacy, would appeal the decision in an administrative hearing.

In late December of that year, FDA Commissioner George Larrick informed the college that its NDA was denied because of misleading statements and omissions, because of inadequate manufacturing and control procedures, and because "safety has not been proven because of lack of proof of efficacy in diseases that are invariably fatal unless treated with adequate efficacious means" (112). While there was not a surfeit of bona fide treatments for the cancers Hepasyn claimed to benefit, there certainly were some. An approved yet ineffective Hepasyn, the reasoning went, would lead some patients to delay or possibly avoid treatment with established effective treatments. Larrick informed the mortuary school that if the NDA were not withdrawn, a hearing notice—as provided in the 1938 act to sponsors who wished to petition adverse NDA decisions by FDA—would be issued next month. Led by medical officer Barbara Moulton, FDA continued to assemble its case for a hearing. Medical director Albert Holland observed that this case "may well be a precedent-establishing case no matter which way the courts decide it." But in the end the courts would not have the opportunity, as the San Francisco school withdrew the application rather than face the hearing (113).

FDA had another chance to press the safety-efficacy policy a few years later, and this time the drug firm was more accommodating. On September 9, 1959, FDA approved Eaton Laboratories' application for Altafur (furaltadone), a systemic antibacterial agent. However, FDA's reevaluation of the NDA as a rising number of neurological and other adverse reactions came to light led the agency to question



**FIGURE 5**   The San Francisco College of Mortuary Science served as the manufacturer, ambulatory clinic, and new drug application sponsor for a cancer treatment. FDA used this opportunity to press for a formalized policy mandating an efficacy requirement in some drugs. *Source*: Courtesy of the San Francisco History Center, San Francisco Public Library.

the efficacy of Altafur (114). Among other issues, FDA believed there were insufficient reports in the application from experts in the treatment of infectious diseases, and certain claims would have required unattainable plasma levels even at triple the recommended dosage. The agency did not explain why these issues were not apparent at the time of the application.

Eaton Laboratories submitted additional data, but FDA said that evaluation of those data should be done in the venue of a formal hearing over suspension of the Altafur NDA; its lack of effectiveness did not justify its toxicity. The hearing began in January 1961 and lasted several weeks. The hearing examiner was persuaded by the testimony of Maxwell Finland of Harvard, George Jackson of Illinois, and other experts on infectious diseases who disputed Altafur's claim of therapeutic value. The examiner decided that efficacy was indeed relevant to Altafur's safety considering the diseases treated—diseases amenable to effective treatment by other, less toxic drugs on the market. The NDA for Altafur was suspended in August 1962,

less than 2 months before Congress passed the Kefauver–Harris Drug Amendments
(115,116).

## KEFAUVER, KEVADON, AND A NEW APPROACH TO DRUG REGULATION

Estes Kefauver of Tennessee was not the first senator to voice concern about the
increasing cost of drugs. Fellow Democrat Warren Magnuson of Washington had
heard complaints from constituents and also learned about the rising cost of drugs
in America as a member of the Labor, Health, Education, and Welfare Subcom-
mittee. But Kefauver, chairman of the Subcommittee on Antitrust and Monopoly
since January 1957, was in a position to explore this development in depth. Thus,
in December 1959, following an extensive investigation by his staff that began the
previous year, Kefauver initiated hearings into administered prices in the pharma-
ceutical industry. The early testimony provided some headline-grabbing statistics
into how the pharmaceutical industry arrived at drug prices. For example, the com-
mittee learned that the German firm Schering had purchased bulk estradiol progy-
non (for symptoms associated with menopause) from Roussell of France for resale
in the United States. When the committee compared the cost of the bulk prod-
uct and what Schering charged for tablets produced therefrom, they discerned a
markup of 7000% (117). The Schering president objected that such a hyperbolic fig-
ure ignored the costs of manufacturing, advertising, distribution, and research on
this drug. Kefauver replied that Schering would have incurred no research costs for
this Roussell drug itself.

When the hearings shifted into a study of drug costs as a function of research
expenses in the industry, A. Dale Console, a former medical director at Squibb, testi-
fied that research indeed leads to many failures, but that "the problem arises out of
the fact that (firms) market so many of their failures" (118). The hearings thus took
on another dimension by investigating advertising practices of the pharmaceutical
industry and the delivery of information about their drugs to doctors. Records sub-
poenaed by Kefauver from the 22 largest firms revealed that in 1958 they expended
an average of one-fourth of their gross income on advertising. Investment in detail
men represented a considerable portion of that expense, as estimates for the same
year indicated a detail force for the industry of 15,000, or one for every 10 doctors
(119).

The committee also heard about the relationship between FDA and the phar-
maceutical industry. Former FDA medical officer Barbara Moulton described an
acquiescent agency, frequently and inappropriately deferring to the wishes of firms.
The committee's inquiry into Henry Welch, director of the Antibiotic Division at
FDA who developed a lucrative business in medical reprint sales with drug compa-
nies, revealed a high-ranking regulatory official who was, at minimum, far too cozy
with regulated interests (120). After 10 months of hearings, Kefauver's committee
had raised a number of concerns, concerns that soon would be reflected in proposed
legislation, introduced by Kefauver on April 12, 1961 (121–124).

Kefauver first addressed patents in his bill, severely curtailing the monopoly
that drug companies would have on their products (an outgrowth of another facet
of the hearings). The bill also gave FDA increased authority over drug produc-
tion, distribution, and advertising. Food and Drug's inspection authority would be
enhanced to uphold stronger quality-control standards in a system reminiscent of
that applied to biologics. Advertising would include explicit and prominent warn-
ings, again responding to problematical issues during the hearings. The law would

extend FDA's role for batch certification of selected antibiotics to all such drugs, not just those covered by the amendments up to the early 1950s. The drug clearance provision of the 1938 act, in which a drug application became effective after 60 days unless prevented by specific FDA action, would be ended under this bill. Finally, sponsors would have to show drugs to be effective as well as safe (125).

Opposition emerged quickly. The AMA, for example, came out strenuously opposed to the effectiveness requirement, arguing that only the physician can make a determination if a drug works or not. The industry, operating in part through its trade association, the Pharmaceutical Manufacturers Association, worked vehemently against elements of the bill that would affect its profits and force firms to advertise a drug's adverse reactions as well as its indications. The support of the White House was tepid at best (126). The process of negotiation, dilution, and revision ensued once Kefauver's bill cleared his subcommittee, proceeded to a parent committee, and then to the full Senate. However, unbeknownst to Kefauver and his colleagues, at this time a drug disaster was developing that would have an impact on Kefauver's law analogous to the legislative effect of the Elixir Sulfanilamide tragedy.

On September 12, 1960, the William S. Merrell Company of Cincinnati submitted an application for Kevadon, known generically as thalidomide. Merrell was the U.S. licensee for the German firm Chemie Grünenthal, which introduced this sedative in Europe in 1956. The application was routed to Frances Kelsey, who had replaced Barbara Moulton. Kelsey's superiors believed that this apparently straightforward NDA would be appropriate for a newcomer. However, Kelsey found the chronic toxicity data inadequate to support the safety of the drug and the labeling unsuitable. Merrell continued to append data to the application, which Kelsey continued to find inadequate to the task. The contacts between Merrell and Kelsey or her superiors thereafter occurred almost weekly until the spring, as the firm was rushing to make March 1 launch date for Kevadon. At this time, Kelsey also was deeply involved in FDA's administrative hearing with Eaton Laboratories over Altafur.

But crucial news emerged in February 1961, when the medical officer read a report in the December 1960 issue of the *British Medical Journal* that associated long-term use of thalidomide with peripheral neuritis. When representatives from Merrell met with Kelsey in May to discuss this revelation (which Merrell believed rather inconsequential, assuming the effects were reversible), Kelsey requested evidence that Kevadon would be safe in pregnancy. Although the request was based on a theoretical consideration stemming from the neurological side effect, it was consistent with Kelsey's own training as a pharmacologist at the University of Chicago, and it was shared by her medical officer colleagues at FDA. Merrell and outside clinical investigators representing the company continued to argue that Kevadon was effective and safe relative to the barbiturates, the firm now hoping to meet a November 1961 launch in time for the holidays.

On the last day of that month, Merrell reported to Kelsey that thalidomide had been withdrawn from Germany, where use of the drug had been correlated with severe congenital abnormalities. On March 8, 1962, Merrell withdrew its NDA for Kevadon. The United States narrowly escaped the fate of many other countries. But the agency learned in April for the first time the true scale of Merrell's investigation. Over 1100 doctors received Kevadon (the agency had assumed from three to six dozen investigators were involved), and the investigation involved about 20,000 patients, 624 of whom were pregnant. Despite assurances by Merrell that a recall

had been completed, field investigators discovered that over 25,000 doses were still unaccounted for in August, prompting an Elixir Sulfanilamide–like national search for outstanding samples of the drug. Seventeen cases of thalidomide-induced phocomelia occurred in the United States, seven of which were documented to be caused by thalidomide obtained outside the Merrell study (127–129).

The shock of what might have happened with thalidomide wrested the drug regulation reform bill from congressional inertia, and President Kennedy, surrounded by Kefauver, Kelsey, and others, signed the bill into law on October 10, 1962 (130) (Fig. 6). Although much had changed in the bill Kefauver introduced, still some elements remained. Attempts to cut costs via patent adjustments were long gone, as was the biologics-like system of licensing (although firms had to register). Manufacturers had to prove that their drugs were effective as well as safe—not just drugs introduced from that point forward, but all new drugs introduced since 1938. FDA's control over the clinical investigation of drugs was clarified and strengthened, and a surprise provision required experimental subjects to give informed consent. Safety, effectiveness, and reliability of a drug would be further provided for by requiring that production adhere to current good manufacturing practice, although that provision was made clear in FDA regulations as far back as the early 1940s (131). New drug clearance would no longer be based on an application becoming effective automatically after 60 days unless FDA action indicated otherwise; a new drug now could be marketed only with FDA's assent. Oversight of prescription drug advertising was transferred from FTC to FDA. And finally, drug inspectors



**FIGURE 6**   President Kennedy hands Senator Kefauver one of the pens used to sign the 1962 Drug Amendments. Among those looking on is Frances Kelsey, standing second from left.

would have enhanced access to establishment records other than financial or personnel documents (132).

## CONCLUSION

The 1962 law was a landmark in the history of drug regulation, and no law since then has been as sweeping in its coverage of the pharmaceutical enterprise. But subsequent laws and regulations stand out, too, for many reasons. For example, the rise in the consumer movement certainly had an impact on drug regulation. The issuance of one of the first patient package inserts in 1970 for oral contraceptives followed pointed protest by women's health advocates against AMA's opposition to this precedent in patient education (133). The Vitamins and Minerals Amendment (Proxmire Amendment) of 1976, which prevented FDA from limiting potency of supplements or regulating them as drugs, was due in no small part by organized efforts of consumers to inundate their members of Congress and FDA with letters of protest on a scale unheard of at that time (134,135). The National Organization for Rare Disorders led the effort behind the Orphan Drug Act of 1983 to persuade pharmaceutical companies to develop drugs, otherwise unprofitable, for diseases with small patient populations (136,137).

In the same year, as part of an overall revision of investigational new drug (IND) procedures (the IND rewrite), FDA proposed so-called treatment-use INDs, expanding physician and patient access to experimental drugs for therapeutic rather than investigational purposes in patients "with serious diseases or conditions, for whom alternative therapies do not exist or cannot be used" (138–140). However, there were several restrictions to treatment INDs, such as the need to have a firm request treatment IND status, to be treated by a physician skilled in therapy of that disease, and to have no other therapies available. Activists representing HIV and AIDS victims, families, and friends engaged FDA directly on this issue and helped not only to relax these restrictions but also to refocus the overall drug development and evaluation process. FDA thereafter would consult with sponsors to plan more efficient clinical studies of drugs for life-threatening and severely debilitating diseases, modeled on the testing and evaluation of AZT (zidovudine approved in 1987 for patients with HIV) (141,142). Moreover, continuing pressure by AIDS activists for expedited access to experimental therapies figured in a policy announced by FDA Commissioner Frank Young in July 1988. Individuals would be allowed to return to the country with a 3-month supply of any drug desired as long as the agency ensured that the product was not fraudulent, counterfeit, or harmful, and if the traveler presented the name and address of the physician responsible for the treatment. The volleying over IND and NDA policies between FDA and the AIDS community continued into the 1990s (143).

The history of drug regulation has come full circle, from the second decade of the 19th century, when a Maryland physician persuaded Congress to pass a law to ensure genuine smallpox vaccine, to the first decade of the 21st century, when the United States again faced smallpox vaccination as a policy issue. In between we have witnessed a vast array of stimuli to changes in the way drugs are regulated. Therapeutic disaster and concomitant outrage, of course, are perhaps the most visible sources for tectonic shifts in policy. But political upheaval, organized social action, institutionalization of professional authority, the political and economic strength of the drug industry, the will and whims of all three branches of

government, the manner in which the fourth estate captures and conveys regula-
tory issues, and basic shifts in therapeutics itself all have had an impact on the way
this country regulates drugs. FDA often refers to itself as a science-based regulatory
agency, but the context for drug regulation over the past 200 years has been and will
always be much broader than science and law.

## REFERENCES AND NOTES

1. Wedderburn AJ. A Compilation of the Pharmacy and Drug Laws of the Several States and
   Territories. Bulletin 42, Division of Chemistry, U.S. Department of Agriculture. Washing-
   ton, DC: GPO, 1894, passim.
2. Sonnedecker G, Urdang G. Legalization of drug standards under state laws in the United
   States of America. Food Drug Cosmetic Law J 1953; 8:741–760.
3. Hutt PB, Merrill RA. Food and Drug Law: Cases and Materials. 2nd ed. Westbury, NY:
   Foundation Press, 1991:660–661 (quote from p. 660).
4. Pharmacopoeia of the United States of America. Boston, MA: Charles Ewer, 1820:17.
5. Sonnedecker G. The founding period of the U.S. pharmacopeia: I. European antecedents.
   Pharm Hist 1993; 35:151–162.
6. Sonnedecker G. The founding period of the U.S. pharmacopeia: II. A national movement
   emerges. Pharm Hist 1994; 36:3–25.
7. Sonnedecker G. The founding period of the U.S. pharmacopeia: III. The first edition.
   Pharm Hist 1994; 36:103–122.
8. Anderson L, Higby GJ. The Spirit of Voluntarism, A Legacy of Commitment and Contri-
   bution: The United States Pharmacopeia. Rockville, MD: USP, 1995:7–25.
9. Quoted in Ridgway C. Good Enough for America! The Drug Import Law of 1848. Madi-
   son, WI: Seminar paper, University of Wisconsin, Madison, WI, 1986. Cited in: Young JH.
   Pure Food: Securing the Federal Food and Drugs Act of 1906. Princeton, NJ: Princeton
   University Press, 1989:7.
10. Young. Pure Food, pp. 6–7.
11. Congressional Globe. 30th Cong., 1st sess., December 1, 1847 – August 15, 1848, p. 858.
12. Drug Import Act. Pub L No. [30–45]. 9 U.S. Stat 237, June 26, 1848 (quote is from
    Sec 1).
13. Young. Pure Food, pp. 14–17.
14. Okun M. Fair Play in the Marketplace: The First Battle for Pure Food and Drugs. DeKalb,
    IL: Northern Illinois University Press, 1986:14–15.
15. Sonnedecker G. Contributions of the pharmaceutical profession toward controlling the
    quality of drugs in the nineteenth century. In: Blake JB, ed. Safeguarding the Public: His-
    torical Aspects of Medicinal Drug Control. Baltimore, MD: Johns Hopkins University
    Press, 1970:105–111.
16. Dowling HF. Fighting Infection: Conquests of the Twentieth Century. Cambridge, MA:
    Harvard University Press, 1977.
17. Lechevalier HA, Solotorovsky M. Three Centuries of Microbiology. New York, NY:
    McGraw-Hill, 1965; New York, NY: Dover, 1974.
18. Treasury Department, Marine Hospital Service. Annual Report of the Supervising
    Surgeon-General of the Marine-Hospital Service of the United States for the Fiscal Year
    1895. Washington, DC: GPO, 1896:327.
19. Treasury Department, Marine Hospital Service. Annual Report of 1895, 1896:329–335.
20. Kondratas RA. Biologics control act of 1902. In: The Early Years of Federal Food and Drug
    Control. Madison,WI: American Institute of the History of Pharmacy, 1982:11.
21. The laboratory notebook that documents the Hygienic Laboratory's work (in the posses-
    sion of the Center for Biologics Evaluation and Research, Food and Drug Administration,
    Bethesda, Maryland) and a sample of the standard itself (in the possession of the Division

of Science, Medicine, and Society, National Museum of American History, Smithsonian Institution, Washington, DC) were incorporated as part of an exhibit, "Safety for Millions: The Biologics Control Act of 1902 Centennial," National Museum of American History, Smithsonian Institution, Washington, DC, September 2002.

22. U.S. Congress, House. Sale of Viruses, Etc., in the District of Columbia. Report No. 2713, to Accompany H R 15289, 57th Cong., 1st sess., June 27, 1902, pp. 6–7 (testimony of George M. Kober, Acting Chairman, Medical Society of the District of Columbia, Washington, DC, April 16, 1902). Reproduced in: Legislative History of the Regulation of Biological Products. N. p.: Division of Biologics Standards, National Institutes of Health, Department of Health, Education, and Welfare, 1967.

23. Biologics Control Act. Pub L No. 57–244. 32 U.S. Stat 728, July 1, 1902.

24. Perhaps it is more accurate to say that any charges brought under the 1902 act or under its consolidation in the 1944 Public Health Service Act were not contested. The suit brought by the government against John P. Calise and the Westchester Blood Bank in 1962 for altering expiration dates appears to be the first litigated case of any kind under the 1902 Biologics Act.

25. Solomon JM. Legislation and regulation in blood banking. In: Schaeffer M, ed. Federal Legislation and the Clinical Laboratory. Boston, MA: G. K. Hall, 1981:150.

26. Hutt PB, personal communication, September 12, 2002, who suspects that Calise might have been the first case.

27. Kondratas. Biologics Control Act of 1902.

28. Treasury Department, Public Health and Marine-Hospital Service. Annual Report of the Surgeon-General of the U.S. Public Health and Marine-Hospital Service of the United States for the Fiscal Year 1904. Washington, DC: GPO, 1904:372.

29. Treasury Department, Public Health and Marine-Hospital Service. Annual Report of the Surgeon-General of the U.S. Public Health and Marine-Hospital Service of the United States for the Fiscal Year 1908. Washington, DC: GPO, 1909:44.

30. Center for Biologics Evaluation and Research, Food and Drug Administration. Science and the Regulation of Biological Products: From a Rich History to a Challenging Future. N. p.: [CBER], 2002.

31. 17 U.S. Stat 322–323, June 18, 1872.

32. 28 U.S. Stat 963, March 2,1895.

33. Young JH. The Medical Messiahs: A Social History of Health Quackery in Twentieth-Century America. Princeton, NJ: Princeton University Press, 1967; rev. ed., 1992:66 ff., 86–87.

34. Kebler LF. Public health conserved through the enforcement of postal fraud laws. Am J Public Health 1922; 12:678–683.

35. Young. Medical Messiahs, pp. 122–128.

36. Young. Medical Messiahs, pp. 296–315.

37. Wheeler-Lea Amendments. Pub L No. 75–447. 52 U.S. Stat 111, March 21, 1938.

38. Handler M. The control of false advertising under the Wheeler-Lea act. Law Contemp Problems 1939; 6:91–110.

39. Fishbein M. A History of the American Medical Association. Philadelphia, PA: W.B. Saunders, 1947:226–227, 235–236.

40. Smith A. The council on pharmacy and chemistry and the chemical laboratory. In: Fishbein. American Medical Association, pp. 876–877, 884–885.

41. Burrow JG. The prescription drug policies of the American Medical Association. In: Blake. Safeguarding the Public, pp. 113–114.

42. Starr P. The Social Transformation of American Medicine. New York, NY: Basic Books, 1982:133.

43. Marks H. The Progress of Experiment: Science and Therapeutic Reform in the United States, 1900–1990. Cambridge MA: Cambridge University Press, 1997:23–41.

44. Smith. Council on pharmacy and chemistry and the chemical laboratory, pp. 870 ff.

45. Smith AE. The council on pharmacy and chemistry. J Am Med Assoc 1944; 124:434 ff.

46. Dowling HF. Medicines for Man: The Development, Regulation, and Use of Prescription Drugs. New York, NY: Alfred A. Knopf, 1970:170–177.

47. It was more than a possibility; see the case of Clarin (heparin potassium), as discussed in U.S. Congress, Senate, Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary. Drug Industry Antitrust Act. Hearings pursuant to S. Res. 52 on S. 1552, 87th Cong., 1st sess., September 13 and 15, 1961 and December 12–13, 18–29, 1961, Part 5. Washington, DC: GPO, 1962, pp. 2587–2588. Reproduced in: A Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments 20: 329–330.

48. Bishop J. Drug evaluation programs of the AMA, 1905–1966. J Am Med Assoc 1966; 196:122–123.

49. New program of operation for evaluation of drugs. J Am Med Assoc 1955; 158:1170–1171.

50. Dowling HF. The impact of the new drug laws on the council on drugs of the American Medical Association. Clin Res 1965; 13:162–165.

51. Weikel MK. Research as a Function of Pharmaceutical Industry: The American Formative Period. M. S. thesis, Madison, WI: University of Wisconsin, 1962:29–36.

52. Cowen DL. The role of the pharmaceutical industry. In: Blake. Safeguarding the Public, p. 73.

53. Liebenau J. Medical Science and Medical Industry: The Formation of the American Pharmaceutical Industry. Baltimore, MD: Johns Hopkins University Press, 1987, passim, but especially, pp. 57–78.

54. Swann JP. Academic Scientists and the Pharmaceutical Industry: Cooperative Research in Twentieth-Century America. Baltimore, MD: Johns Hopkins University Press, 1988:9–23.

55. Madison JH. Eli Lilly: A Life, 1885–1977. Indianapolis: Indiana Historical Society, 1989:27, 52.

56. Young JH. "Even to a sucking infant": Nostrums and children. In: American Health Quackery: Collected Essays by James Harvey Young. Princeton, NJ: Princeton University Press, 1992:135, 138.

57. Nelson GL, ed. Pharmaceutical Company Histories. Bismarck, ND: Woodbine, 1983; 1:161.

58. Liebenau J. A case unresolved: Mrs. George vs. Dr. Hand and his colic cure. Pharm Hist 1989; 31:135–138.

59. The best source on the history of patent medicines remains Young JH. The Toadstool Millionaires: A Social History of Patent Medicines in America before Federal Regulation. Princeton, NJ: Princeton University Press, 1961. Young's Medical Messiahs and his American Health Quackery also address this subject.

60. Young. Pure Food, pp. 50–51.

61. Wiley typically emphasized the problem of food adulteration as a more serious public health issue than drug adulteration, perhaps in part because of his scientific interests.

62. On Wiley and his time, see Wiley HW. An Autobiography. Indianapolis: Bobbs-Merrill, 1930.

63. Anderson OE. The Health of a Nation: Harvey W. Wiley and the Fight for Pure Food. Chicago, IL: University of Chicago Press, 1958.

64. Young. Pure Food.

65. Food and Drugs Act of 1906. Pub L No. 59–384. 34 U.S. Stat 768, June 30, 1906.

66. Thackray A, et al. Chemistry in America, 1876–1976: Historical Indicators. Dordrecht: D. Reidel, 1985:126–131.

67. For bibliographic information on the variety of regulations issued by the bureau at this time, see A Guide to Resources on the History of the Food and Drug Administration: Published Primary Sources: Sources on Regulation and Enforcement. <http://www.fda.gov/oc/history/resourceguide/ sources.html>, January 18, 2002.

68. Sellers A, Grundstein ND. Administrative Procedure and Practice in the Department of Agriculture under the Federal Food, Drug, and Cosmetic Act of 1938. 308-page typescript in 2 parts. Part I: 12 (files, FDA History Office, Rockville, MD).

69. White MG, Gates OH. Decisions of Courts in Cases under the Federal Food and Drugs Act. Washington, DC: GPO, 1934:267–269 (quote is from p. 268).

70. Quoted in Young, "Drugs and the 1906 Law". In: Blake. Safeguarding the public, p. 149.

71. Sellers, Grundstein. Administrative Procedure and Practice. 1: 14–15, n. 31.

72.  Sherley Amendment of 1912. Pub L No. 62–301. 37 U.S. Stat 416, August 23, 1912.
73.  Lamb RdeF. American Chamber of Horrors. New York, NY: Farrar and Rinehart, 1936:64–68.
74.  Young: Drugs and the 1906 Law, pp. 147–152.
75.  Young: Drugs and the 1906 Law, pp. 149–152.
76.  Swann JP. FDA and the practice of pharmacy: prescription drug regulation to 1951. Pharm Hist 36: 57–59, 1994.
77.  Young. Drugs and the 1906 Law, pp. 153–156.
78.  On the effort by FDA to promote the need for a new law, see Kay G. Healthy public relations: The FDA's 1930s legislative campaign. Bull Hist Med 2001; 75:446–487.
79.  The standard source on the construction of the 1938 Food, Drug, and Cosmetic Act is Jackson CO. Food and Drug Legislation in the New Deal. Princeton, NJ: Princeton University Press, 1970.
80.  An excellent source on the Elixir Sulfanilamide disaster is Young JH. Sulfanilamide and diethylene glycol. In: Parascandola J, Whorton JC, eds. Chemistry and Modern Society: Historical Essays in Honor of Aaron J. Ihde. American Chemical Society Symposium Series 228. Washington, DC: American Chemical Society, 1983:105–125.
81.  Elixir of Death. RubinTarrant Productions, History Channel, December 11, 2003.
82.  The letter quoted is reproduced in the files, FDA History Office, Rockville, MD.
83.  Food, Drug, and Cosmetic Act. Pub L No. 75–717. 52 U.S. Stat 1040, June 25, 1938.
84.  A recent article has shed light on this provision of the act, largely forgotten by those who would believe a requirement for good manufacturing practices began in 1962 (or even later). Cooper DE. Adequate controls for new drugs: Good manufacturing practice and the 1938 federal food, drug, and cosmetic act. Pharm Hist 2002; 44:12–23.
85.  Cavers DF. The evolution of the contemporary system of drug regulation under the 1938 Act. In: Blake. Safeguarding the Public, pp. 167–168.
86.  Warning Statements for Drug Preparations. TC-14, November 1, 1940. Reproduced in: Kleinfeld VA, Dunn CW. Federal Food, Drug, and Cosmetic Act: Judicial and Administrative Record, 1938–1949. Chicago, IL: Commerce Clearing House, c. 1949:574–578; quote is from p. 577.
87.  Marks HM. Revisiting "the origins of compulsory drug prescriptions." Am J Public Health 1995; 85:109–115.
88.  Swann. FDA and the practice of pharmacy.
89.  To Distributors of Sulfanilamide and Related Drugs. TC-1, August 26, 1938. Reproduced in: Kleinfeld, Dunn. Federal Food, Drug, and Cosmetic Act, p. 561.
90.  The generalization about prescription drugs applies, of course, only to nonnarcotic drugs. Narcotics could be dispensed only under a doctor's authorization under the Harrison Narcotic Act of 1914.
91.  An Act to Amend the Federal Food, Drug, and Cosmetic Act. Pub L No. 82–215. 65 U.S. Stat 648, October 26, 1951.
92.  The illegal trade in amphetamines and barbiturates in the trucking industry received dramatic treatment on television in the early 1960s: 330 Independence SW. The Dick Powell Theater, NBC, March 20, 1962.
93.  Drug Abuse Control Amendments of 1965. Pub L No. 89–74. 79 U.S. Stat 226, July 15, 1965.
94.  Swann JP. Drug abuse control under FDA, 1938–1968. Public Health Rep 1997; 112:83–86.
95.  Insulin Amendment of 1941. Pub L No. 77–366. 55 U.S. Stat 851, December 22, 1941.
96.  Penicillin Amendment of 1945. Pub L No. 79–139. 59 U.S. Stat 462, July 6, 1945.
97.  Streptomycin Amendment. Pub L No. 80–16. 61 U.S. Stat 11, March 10, 1947.
98.  Aureomycin Amendment of 1949. Pub L No. 81–164. 63 U.S. Stat 409, July 13, 1949, which accounted for chlortetracycline, chloramphenicol, and bacitracin.
99.  Cavers. Drug regulation under the 1938 act, p. 167.
100. Directions for Use. TC-426, January 22, 1945. Reproduced in: Kleinfeld, Dunn. Federal Food, Drug, and Cosmetic Act, p. 746.
101. Lollipops Containing Aspirin. TC-130, March 7, 1940. Reproduced in: Kleinfeld, Dunn. Federal Food, Drug, and Cosmetic Act, p. 620.

102. Specific NDAs were collected from NDA summary data, files, FDA History Office, Rockville, MD.

103. Mandel RH. A Half Century of Peer Review, 1946–1996. Bethesda, MD: Division of Research Grants, National Institutes of Health, 1996, especially pp. 16 ff. Year-by-year drug application data can be found in "New Drug Application Approvals and Receipts, Including New Molecular Entities, 1938 to Present," http://www.fda.gov/oc/history/NDAapprovals.html, 2007.

104. Swann. Academic Scientists and the Pharmaceutical Industry.

105. Landau R, Achilladelis B, Scriabine A. Pharmaceutical Innovation: Revolutionizing Human Health. Philadelphia, PA: Chemical Heritage Press, 1999:72 ff.

106. de Haen P. Compilation of new drugs, 1940 thru 1975. Pharm. Times 1976; 42(3):40–75.

107. de Haen P. New Drug Parade: A Historical Minireview, 1954–1982. Poster Exhibit Presentation. Drug Information Association Annual Meeting, Washington, D. C., July 28, 1983. Englewood, CO: Paul de Haen International, 1983.

108. Cavers. Drug regulation under the 1938 act, pp. 164 (rauwolfia), 167 (NDA submission rates).

109. U.S. Department of the Treasury, Public Health Service. Regulations for the Sale of Viruses, Serums, Toxins and Analogous Products in the District of Columbia and in Interstate Traffic. Misc. Publication No. 10, Approved March 13, 1934. Washington, DC: GPO, 1934:3.

110. Swann JP. Sure cure: Public policy on drug efficacy before 1962. In Higby GJ, Stroud EC, ed. The Inside Story of Medicines: A Symposium. Madison, WI: American Institute of the History of Pharmacy, 1997:228–232, 235–237.

111. Granger GA to Weilerstein RW. October 14, 1955, NDA 9214, Misc. File IV, FDA Records, Rockville, MD.

112. Quoted in Swann. Sure cure, p. 244.

113. The Hepasyn case is drawn from Swann. Sure cure, pp. 237–246 (Holland quote is from p. 244).

114. Around the same time, an HEW-requested review of antibiotic decisions made by FDA in the wake of the Henry Welch affair, conducted by the National Research Council, led to a similar conclusion. See Swann. Sure cure, p. 248.

115. Mintz M. The Therapeutic Nightmare. Boston, MA: Houghton Mifflin, 1965:54–56.

116. Swann. Sure cure, pp. 246–250.

117. Harris R. The Real Voice. New York, NY: Macmillan, 1964:59–64.

118. Quoted in Harris. The Real Voice, pp. 78–79.

119. Harris. The Real Voice, pp. 88–91. Greene JA. Prescribing by Numbers: Drugs and the Definition of Disease (Baltimore, MD: Johns Hopkins University Press, 2007), offers an in-depth analysis of pharmaceutical advertising that includes this period.

120. McFadyen RE. FDA's regulation and control of antibiotics in the 1950s: The Henry Welch Scandal, Félix Martí-Ibáñez, and Charles Pfizer and Co. Bull Hist Med. 1979; 53(2):159–169.

121. Harris. The Real Voice, captures the hearings succinctly, though weighted toward Kefauver's perspective; the preceding description draws from pp. 5–116.

122. McFadyen RE. Estes Kefauver and the Drug Industry. Ph.D. dissertation, Atlanta, GA: Emory University, 1973.

123. The complete hearings are reproduced in A Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments 17:178–558 (Report No. 448, pursuant to S. Res. 52, a study of administered prices in the drug industry, June 27, 1961); 17:559–807 (Hearings, Part 1; July 5, 6, 18–21, 25, 1961); 18:1–212 (Hearings, Part 1; cont.); 18:213–944 (Hearings, Part 2; exhibits and appendices); 19:1– 799 (Hearings, Part 3; October 16–18, 31, 1961 and November 1, 9, 1961); 19:800–899 (Hearings, Part 4; December 7–9, 1961); 20:1–313 (Hearings, Part 4; cont.); 20:314–797 (Hearings, Part 5; September 13, 15, 1961, December 12–13 and 18–20, 1961). In addition, the hearings before the Committee on Interstate and Foreign Commerce in the House of Representatives on the Drug Industry Act of 1962 (H R 11581 and 11582), under Chairman Oren Harris of Arkansas, June 19–22,

1962 and August 20–23, 1962, are reproduced in A Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments 21:170–883.

124. On Kefauver in general, see Fontenay CL. Estes Kefauver: A Biography. Knoxville, TN: University of Tennessee Press, 1980.

125. U.S. Congress, Senate. S 1552. A bill to amend and supplement the antitrust laws with respect to the manufacture and distribution of drugs, and for other purposes, 87th Cong., 1st sess., April 12, 1961. Reproduced in: A Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments 17:121–144.

126. Harris. The Real Voice, pp. 123–153.

127. The preceding account is drawn from U.S. Congress, Senate, Subcommittee on Reorganization and International Organizations of the Committee on Government Operations. Interagency Coordination in Drug Research and Regulation. Hearings pursuant to S. Res. 276, 87th Cong., 2nd sess., August 1, 9, 1962, Part 1 of 2. Washington, DC: GPO, 1963:75 ff.

128. McFadyen RE. Thalidomide in America: A brush with tragedy. Clio Med 1976; 11:79–86.

129. Knightley P, et al. Suffer the Children: The Story of Thalidomide. New York, NY: Viking Press, 1979, which provides the most detail to this story.

130. Two months earlier Kennedy conferred on Kelsey the President's Award for Distinguished Federal Civilian Service (the highest award for federal civilian service) for work that "... prevented a major tragedy of birth deformities in the United States ...;" Presentation of The President's Award for Distinguished Federal Civilian Service. Program, the White House, August 7, 1962, files, FDA History Office. See the report that made public Kelsey's role in the Kevadon review: M Mintz. "Heroine" of FDA Keeps Bad Drug Off Market. Washington Post, July 15, 1962.

131. Swann JP. The 1941 sulfathiazole disaster and the birth of good manufacturing practices. PDA J Pharmaceut Sci Technol 1999; 53:148–153.

132. Drug Amendments of 1962. Pub L No. 87–781. 76 U.S. Stat 780, October 10, 1962.

133. See Marks LV. Sexual Chemistry: A History of the Contraceptive Pill. New Haven, CT: Yale University Press, 2001:150–152.

134. Health Research and Health Services Amendments of 1976. Pub L No. 94–278. 90 U.S. Stat 401, April 22, 1976.

135. Apple RD. Vitamania: Vitamins in American Culture. New Brunswick, NJ: Rutgers University Press, 1996.

136. Orphan Drug Act. Pub L No. 97–414. 96 U.S. Stat 2049, January 4, 1983.

137. Basara LR, Montagne M. Searching for Magic Bullets: Orphan Drugs, Consumer Activism, and Pharmaceutical Development. New York: Haworth Press, Pharmaceutical Products Press, 1994:143 ff.

138. 48 Fed Reg 26721,26728–26730, 26742–26743, June 9, 1983.

139. Cf. 52 Fed Reg 8850–8857, March 19, 1987.

140. 52 Fed Reg 19466–19477, May 22, 1987, which reproposed and then finalized the proposal—after 4 years. This citation itemized several diseases as illustrations of those normally considered immediately life-threatening, including advanced AIDS cases, advanced congestive heart failure, and severe combined immunodeficiency syndrome, as well as examples of serious diseases, such as Alzheimer's disease, advanced Parkinson's disease, and active advanced lupus. Treatment INDs would not apply to those suffering the latter group of serious diseases (p. 19467).

141. 53 Fed Reg 41516–41524, 44144.

142. The President's Task Force on Regulatory Relief certainly had a significant role as well in this reappraisal of the drug approval process.

143. For a summary of investigational drug revisions and the role of AIDS activists, see Young JH. AIDS and the FDA. In: Hannaway C, Harden V, Parascandola J, eds. AIDS and the Public Debate. Amsterdam: IOS Press, 1995:54–66; see also Arthur A. Daemmrich, Pharmacopolitics: Drug Regulation in the United States and Germany. Chapel Hill, NC: University of North Carolina Press, 2004:96 ff.

 ## Modernizing the Food and Drug Administration

**Arthur Y. Tsien, Esq.**
*Olsson Frank Weeda Terman Bode Matz PC, Washington, D.C., U.S.A.*

### INTRODUCTION AND OVERVIEW

In recent years, Congress has enacted and the president has signed into law a number of significant changes to the Federal Food, Drug, and Cosmetic Act (FDC Act) to modernize the Food and Drug Administration's (FDA) regulation of drugs and biological products. This chapter summarizes the significant changes.

These legislative changes began with the Prescription Drug User Fee Act of 2002 (PDUFA) (1), enacted in October 2002. PDUFA imposed user fees and other fees related to the review of new drug applications. In exchange for paying user fees, drug sponsors got the benefit of substantially shortened review times in the form of "performance goals." PDUFA has been enhanced and reauthorized three times since its inception, so that the current program is authorized until 2012. The major impact of PDUFA on FDA's drug review process is discussed in chapter 8.

The Food and Drug Administration Modernization Act (FDAMA) (2), enacted in November 1997, made substantial changes to FDA's practices and procedures. FDAMA was discussed in detail in chapter 6 of the first edition of this book.

The Best Pharmaceuticals for Children Act (BPCA) (3), enacted in January 2002, revised and reauthorized the 6-month pediatric exclusivity provisions added to the FDC Act by FDAMA. These changes are discussed in section "Pediatric Studies Exclusivity" of this chapter.

The Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (commonly called the Bioterrorism Act) (4), enacted in June 2002, provided for the accelerated approval of drugs and biologicals to be used in the event of a bioterrorism attack or similar public health emergency. These provisions are discussed in section "Accelerated Approval of Priority Countermeasures" of this chapter. It also required public disclosure of a drug or biological sponsor's failure to fulfill its commitment to conduct postmarketing studies. These provisions are discussed in section "Reports of Postmarketing Approval Studies" of this chapter.

The Pediatric Research Equity Act (5), enacted in December 2003, gave FDA the statutory authority to require sponsors of applications for drugs and biologicals to conduct clinical studies to assess the safety and effectiveness of their products in children. These provisions are discussed in section "Mandatory Pediatric Assessment" of this chapter.

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (6), enacted in December 2003, made fundamental changes to 180-day exclusivity for abbreviated new drug applications (ANDAs), including circumstances under which 180-day exclusivity is forfeited. The MMA also revised statutory provisions regarding the timing of the notice of a Paragraph IV certification given to the patent owner and the holder of new drug application (NDA) referenced

in an ANDA or 505(b)(2) NDA, the provisions regarding the filing of a declaratory judgment action by an ANDA or 505(b)(2) NDA sponsor to obtain patent certainty, and the 30-month delay of final approval for an ANDA or 505(b)(2) NDA. These provisions are discussed in chapter 4.

The Dietary Supplement and Nonprescription Drug Consumer Protection Act (7), enacted in December 2006, amended the FDC Act to impose adverse event reporting requirements on manufacturers and distributors of nonprescription drugs that are marketed outside of FDA's premarket approval system. These provisions are discussed in section "Adverse Event Reporting for Nonprescription Drugs" of this chapter.

The Food and Drug Administration Amendments Act of 2007 (FDAAA) (8), was enacted on September 27, 2007. FDAAA's changes relevant to drugs and biologicals include the following:

- Prescription drug user fees were reauthorized for another 5 years (now expiring in 2012). A new voluntary user fee program for FDA review of direct-to-consumer television advertisements for prescription drugs was authorized. These changes are discussed in chapter 8.
- Substantial new requirements regarding postmarketing studies and safety of marketed prescription drugs and biologicals were added. These provisions are discussed in chapter 10.
- Provisions of existing law that requires most sponsors of drug and biological applications to assess the safety and effectiveness of their products in pediatric populations were reauthorized (now expiring in 2012) and expanded. Provisions concerning 6-month pediatric exclusivity were also reauthorized (now expiring in 2012) and expanded. These changes are discussed in sections "Mandatory Pediatric Assessment" and "Pediatric Studies Exclusivity" of this chapter.
- Provisions of the Public Health Service Act requiring the establishment of "data banks" regarding clinical trials and experimental treatments were substantially expanded. These changes are discussed in section "Clinical Trial Registry and Results Database" of this chapter.
- New limitations on citizen petitions that seek to block or delay the final approval of ANDAs and 505(b)(2) NDAs were added to the FDC Act. These changes are discussed in section "Citizen Petitions Affecting Generic Drug Approvals" of this chapter.

## PEDIATRIC STUDIES

### Mandatory Pediatric Assessment

As discussed in section 2.2 of chapter 6 of the first edition of this book, in 1999 FDA adopted a final rule that required that sponsors of certain newly approved and marketed drugs and biologicals conduct clinical studies to provide adequate labeling for the use of their products in children. That rule was challenged in federal district court, and FDA was barred from enforcing it because the court concluded that FDA did not have the statutory authority to issue the rule. In response to that decision, the Pediatric Research Equity Act was enacted into law in 2003. Those provisions had a sunset date of October 1, 2007.

Section 402 of FDAAA amended section 505B of the FDC Act (9) to reauthorize these requirements through October 1, 2012.

Section 402 of FDAAA also made some changes to the pediatric study require-ments in section 505B of the FDC Act. As amended, section 505B of the FDC Act requires that an application (or supplement) for a new active ingredient, new indi-cation, new dosage form, new dosing regimen, or new route of administration for a drug or biological include a pediatric assessment, unless the requirement is waived or deferred. The pediatric assessment must:

> contain data, gathered using appropriate formulations for each age group for which the assessment is required, that are adequate (i) to assess the safety and effectiveness of the drug or the biological product for the claimed indications in all relevant pediatric subpopulations, and (ii) to support dosing and admin-istration for each pediatric subpopulation for which the drug or the biological product is safe and effective.

Where appropriate, FDA may conclude that pediatric effectiveness can be extrapolated from studies of the drug or biological in adults, or that extrapolation between different pediatric age groups is appropriate. FDA may defer submission of some or all required pediatric assessments until a specified date after product approval or licensure. If the submission of the pediatric assessment is deferred, the applicant must report to FDA on an annual basis regarding progress made in meet-ing the assessment requirement.

FDA is authorized to grant partial or full waivers of the pediatric assessment based on a number of criteria, including findings by FDA that the necessary studies are impossible or highly impracticable, that there is evidence strongly suggesting that the product would be ineffective or unsafe in all pediatric age groups, or that the product does not represent a meaningful therapeutic benefit over existing thera-pies and is not likely to be used by a significant number of pediatric patients. Where appropriate, the basis for FDA's decision to grant a waiver must be included in the labeling of the drug or biological.

Similar provisions apply to approved, marketed drugs and biologicals. FDA is authorized to require applicants to submit pediatric assessments by a specified date. FDA can also grant partial and full waivers.

The failure to submit a required pediatric assessment is, expressly, not a basis for withdrawal of approval of a drug or revocation of the license of a biological. However, the drug or biological may be considered "misbranded" and subject to seizure or injunction.

Where appropriate, FDA may require a drug or biological sponsor to include labeling information regarding the results of a pediatric assessment, and regarding whether the assessment does or does not demonstrate that the product is safe and effective in pediatric populations or subpopulations. If a product sponsor and FDA cannot agree on labeling changes, the dispute is to be referred to FDA's Pediatric Advisory Committee. FDA may deem a drug or biological to be misbranded if the sponsor does not agree to make a labeling change requested by FDA.

During the first year, following a labeling change based on a pediatric assess-ment, all adverse event reports regarding the drug or biological must be referred to FDA's Office of Pediatric Therapeutics. That office must provide the adverse event reports for review by the Pediatric Advisory Committee and obtain the recommendations of that advisory committee. FDA may, if appropriate, follow this process in subsequent years.

Unless FDA requires otherwise by regulation, the requirements for pediatric assessments do not apply to orphan drugs. However, the pediatric assessment requirements do apply to ANDAs and 505(b)(2) NDAs. Thus, for example, the sponsor of an ANDA submitted pursuant to an approved ANDA suitability petition (see chap. 4) for a new dosage form (e.g., liquid, where the reference product is a tablet or a capsule) will find itself having to conduct a pediatric assessment or seeking a waiver.

FDA is required to make publicly available data regarding its processing of pediatric assessments, waivers, and deferrals; the internal FDA medical, statistical, and clinical pharmacology reviews of pediatric assessments; and a study and report to Congress to be conducted by the Institute of Medicine.

Section 402(b) of FDAAA provides that, with minor exceptions, the revised requirements of section 505B of the FDC Act apply to pediatric assessments that were pending or deferred on September 27, 2007.

Section 403 of FDAAA added new section 505C of the FDC Act (10) that requires FDA to establish an internal pediatric review committee, consisting of FDA employees. Under section 505B(f) of the FDC Act (11), among other functions, the internal committee is required to consult with drug and biological revision divisions regarding pediatric plans and assessments, and to review all requests for assessments, deferrals, and waivers. The internal committee is required to conduct a retrospective review and analysis of a representative sample of pediatric assessments submitted and referrals and waivers granted by September 27, 2008. Based on that review, FDA is required to issue recommendations to drug and biological review divisions and guidance to industry related to pediatric studies. FDA, in consultation with the internal committee, is required to track and make available to the public information regarding pediatric assessments and related topics.

## Pediatric Studies Exclusivity

As discussed in section 2.1 of chapter 6 of the first edition of this book, FDAMA added new section 505A of the FDC Act (12) to provide 6 months of extra-market exclusivity, if the sponsor of a drug application conducted pediatric studies in response to FDA's "written request" for such studies. In 2002, the BPCA reauthorized and revised these provisions. Section 502 of FDAAA further amended section 505A of the FDC Act to reauthorize this provision, so that it now sunsets on October 1, 2012.

FDAAA also made a number of substantive changes to section 505A. Most importantly, pediatric exclusivity must now be awarded at least 9 months before the expiration of the underlying nonpatent 3-, 5-, or 7-year exclusivity period or Orange Book patent that is to be extended. Under prior law, a qualifying study could be submitted at any time before expiration of the underlying exclusivity period or patent. FDA then had up to 90 days to determine whether the study qualified for an additional 6 months of exclusivity. During that 90-day time period, final approval of ANDAs and 505(b)(2) NDAs was blocked, giving the innovator drug sponsor a de facto exclusivity period. (In practice, however, the de facto exclusivity period did not work to the disadvantage of ANDA and 505(b)(2) NDA sponsors, as FDA has granted pediatric exclusivity in essentially all instances.)

Among other changes to section 505A of the FDC Act made by the FDAAA, qualifying studies may include, where deemed appropriate by FDA, preclinical studies (such as animal studies). FDA's written request for a pediatric study may now encompass both approved and unapproved uses, a change from prior FDA

policy. At the time of submission of a pediatric study pursuant to a written request, the applicant is required to submit all postmarketing adverse event reports. An NDA or supplemental NDA with proposed labeling or proposed labeling revisions based on new pediatric information resulting from studies conducted pursuant to FDA's written request will get the benefit of priority review by FDA. FDA now has 180 days to review a submitted pediatric study to determine whether it complies with FDA's written request, compared with 60 days under prior law.

If FDA determines that a pediatric study does or does not demonstrate that the studied drug is safe and effective in pediatric populations or subpopulations, product labeling is required to include information about the results of the study and FDA's conclusions (including a conclusion that the study results are inconclusive, if this is the case).

Sponsors of studies that result in labeling changes are required to distribute to physicians and other health-care providers, at least annually (or more frequently, if FDA determines that it would be beneficial), information about labeling changes related to pediatric use. With some minor exceptions, the new provisions apply to pediatric written requests issued on or after September 27, 2007.

## CLINICAL TRIAL REGISTRY AND RESULTS DATABASE

As discussed in section 4.1 of chapter 6 of the first edition of this book, FDAMA added new subsection (j) to section 402 of the Public Health Service Act (PHS Act) (13). Section 402(j) of the PHS Act required the National Institutes of Health (NIH), in cooperation with FDA and others, to establish a "data bank" consisting of a registry of clinical trials and information regarding experimental treatments that may be available. In brief, as established by FDAMA, the data bank was required only to list clinical trials and experimental treatments for "serious or life-threatening diseases and conditions."

Section 801 of FDAAA substantially expanded the clinical trial registry requirement so that it applies to all clinical trials (except phase I trials) for all diseases and conditions. The "responsible party" (defined as the trial sponsor or the principal investigator, if so designated by the trial sponsor) for a clinical trial is required to submit to NIH information describing the trial, recruitment information, contact information, and administrative data. For unapproved drugs or unlicensed biological products, the information submitted is required to include whether there is an expanded access program for those who do not qualify for enrollment in the clinical trial. In general, the information must be submitted within 21 days after the first patient is enrolled in the trial. Data regarding trials that were ongoing as of September 27, 2007 must be submitted by December 25, 2007, except the data regarding a then-ongoing trial that is not for a serious or life-threatening disease or condition must be submitted by September 27, 2008.

NIH is required to post data into the data bank within 30 days after submission, regardless of whether the product is approved or not approved. The data bank must be in a format that is searchable by keyword and by a number of specified criteria.

Over time, the clinical trials registry database will expand to include links for accessing information on the results of clinical trials:

• By December 25, 2007, NIH is required to include information regarding the clinical trials that form the primary basis of an efficacy claim and regarding

postapproval trials, including links to FDA summaries presented to an advisory committee, FDA summaries of pediatric studies, FDA public health advisories, FDA drug approval packages, MedLine citations to any publications regarding the clinical trial, and the entry for the drug in the National Library of Medicine database of structured product labels.

- By September 27, 2008, NIH is required to include information regarding the "basic results" of trials for approved drugs and licensed biologicals, including demographic and baseline characteristics of the patient sample, primary and secondary outcomes, a point of contact for scientific information, and disclosure of any agreements that restrict the principal investigator's ability to discuss the trial results or to publish information concerning the trial results.
- By March 27, 2009, FDA is required to determine, through rulemaking, the best method for including information regarding serious adverse and frequent adverse events in a manner and form that is useful and not misleading to patients, physicians, and scientists.
- By September 27, 2010, FDA is required to adopt regulations to expand the database to include a summary of each clinical trial and its results written in nontechnical, understandable language for patients (if possible), as well as information regarding the protocol. The regulations must encompass all approved drugs and licensed biologicals. FDA is authorized to, but need not, extend the database to unapproved or unlicensed products.

Premarket approval applications for drugs and biologicals must include a certification that all applicable clinical trial data bank requirements have been satisfied. Among other remedies, civil money penalties are available for violations (14).

Finally, section 801(d) of FDAAA preempts state or local requirements for the registration of clinical trials. It also provides a rule of construction that submitted clinical trial information concerning an unapproved use of a drug or biological is not to be taken as evidence of the drug's or biological's "intended use."

## PREAPPROVAL ISSUES

### Combination Products

Section 503(g) of the FDC Act (15) has long addressed the regulation of combination products that are typically the combination of a device and a drug or the combination of a device and a biological. The Medical Device User Fee and Modernization Act of 2002 (16) amended section 503(g) to require FDA to establish, within the Office of the Commissioner, a new office to ensure the prompt assignment of applications for combination products to the appropriate agency centers, to ensure timely and effective premarket review, to ensure consistent postmarketing regulation of like products to the extent permitted by law, and to resolve disputes among FDA Centers. The office is required to be staffed with employees with appropriate scientific and medical expertise.

### Critical Path Initiative

FDA launched its Critical Path Initiative in March 2004 (17). The Critical Path Initiative is FDA's effort to stimulate and facilitate a national effort to modernize the sciences through which drugs, biologicals, and other FDA-regulated products are developed, evaluated, approved, and manufactured.

FDAAA added three new sections to the FDC Act to further FDA's Critical Path Initiative.

First, section 601 of FDAAA amended the FDC Act by adding new section 770 (18) to establish the "Reagan-Udall Foundation for the Food and Drug Administration," a nonprofit corporation whose purpose is "to advance the mission of the Food and Drug Administration to modernize medical, veterinary, food, food ingredient, and cosmetic product development, accelerate innovation, and enhance product safety."

The Foundation's Board of Directors is to consist of four ex officio members, the FDA Commissioner, the Director of the National Institutes of Health, the Director of the Centers for Disease Control and Prevention, and the Director of the Agency for Healthcare Research and Policy, with 14 voting members appointed for staggered 4-year terms by the four ex officio government members from industry, professional groups, academia, consumer or patient organizations, and health-care providers. As required, the four ex officio members met in October 2007 and in November 2007, appointed the remaining members of the Foundation Board (19). Federal employees are not eligible to serve as appointed members of the Foundation Board, but may serve on committees that advise the Foundation or be detailed to assist the Foundation.

FDA is required to fund the Foundation at an annual level of between $500,000 and $1,250,000 from its appropriated funds; the Foundation may also accept funding from other sources, including private sources.

Second, new section 771 of the FDC Act (20), also added by FDAAA section 601, requires the Foundation to be located in the metropolitan Washington, D.C. area.

Third, new section 772 of the FDC Act (21), also added by FDAAA section 601, requires FDA to report to Congress on an annual basis regarding the activities of the Reagan-Udall Foundation.

Fourth, new section 910 of the FDC Act (22). added by section 602 of FDAAA, established the Office of the Chief Scientist within the Office of the FDA Commissioner. The new office is charged with overseeing FDA's own research programs, and ensuring that there is no duplication of research efforts supported by the Reagan-Udall Foundation.

Finally, section 603 of FDAAA added new section 566 to the FDC Act (23) that authorizes FDA to enter into public–private partnerships with institutions of higher learning or tax-exempt charitable institutions to help FDA implement the Critical Path Initiative, including fostering the development of drugs and biologicals.

## Accelerated Approval of Priority Countermeasures

Section 122 of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, enacted in June 2002 in response to the 9/11 terrorist attacks, added new section 506A of the FDC Act (24). This provision authorizes FDA to designate drugs, biologicals, and medical devices that are potential "priority countermeasures" for responding to a bioterrorism attack (or similar public health emergency) as eligible for "fast-track" review under section 506 of the FDC Act (25). FDA is permitted to grant approval based on evidence of effectiveness derived from animal studies.

As mandated by statute, FDA issued a final rule regarding the use of animal trials to establish effectiveness of drugs and biologicals when clinical trials in humans cannot be conducted ethically (26).

## Priority Review to Encourage Treatments for Tropical Diseases

Section 1102 of FDAAA added new section 524 to the FDC Act (27) to establish a "priority review" system for drugs and biologicals for preventing or treating a tropical disease. Tropical disease is defined as any of 16 listed diseases (including well-known diseases such as tuberculosis, malaria, cholera, and leprosy), or any other infectious disease for which there is no significant market in developed countries and that disproportionately affects poor and marginalized populations. A drug or biological that is eligible for priority review is to be reviewed by FDA under a 6-month "review clock," rather than FDA's standard review clock.

To receive the benefit of priority review, a prospective drug or biological sponsor must notify FDA at least 1 year before the submission of its application. That notification must include a binding commitment to pay a special priority review user fee, in addition to the usual PDUFA drug application user fee (see chap. 8). The amount of the special priority review user fee is to be determined by FDA. Unlike other user fees, there are no waivers, exemptions, reductions, or refunds of the priority review user fee. However, a sponsor paying the priority review user fee receives a "priority review voucher," which may be sold for use by another sponsor.

FDA may issue priority review vouchers starting September 27, 2008, for applications to be submitted starting September 27, 2009.

## Antibiotic Drugs

Section 911 of FDAAA added new section 511 to the FDC Act (28). The new provision requires FDA to issue, by September 27, 2008, guidance concerning the conduct of clinical trials for antibiotic drugs, including specifically antimicrobials that treat acute bacterial sinusitis, acute bacterial otitis media, and acute bacterial exacerbation of chronic bronchitis. The guidance is required to address appropriate models and valid surrogate markers. FDA is also required to review and update the guidance by September 2012. The purpose of the new provision is to address the so-called "moving target" with regard to clinical trials to support approval of antibiotics, particularly with regard to the specified diseases or conditions.

In addition, section 1111 of FDAAA requires FDA to identify (where such information is reasonably available) and publicly update "clinically susceptible concentrations," which is defined as "specific values that characterize bacteria as clinically susceptible, intermediate, or resistant to the drug (or drugs) being tested." FDA is required to make this information publicly available on the internet within 30 days after it becomes available. This provision is expressly not to be construed to restrict the prescribing of antibiotics by physicians or to limit the practice of medicine.

Finally, section 1112 of FDAAA requires FDA to convene a public meeting regarding which serious and life-threatening infectious diseases, such as diseases due to gram-negative bacteria and other diseases due to antibiotic-resistant bacteria, potentially qualify for orphan drug grants or other incentives.

## Advisory Committee Referral

Section 918 of FDAAA added new subsection (s) to section 505 of the FDC Act (29). The new subsection (s) requires FDA to refer an application for a new active

ingredient (including a biological product) to the appropriate FDA advisory committee for review. If FDA does not refer the application to an advisory committee for review, it must provide a summary of the reasons why the agency did not do so in its action letter on the application.

This new provision was effective upon enactment. It seems unlikely that this new provision will change prevailing FDA practice, as FDA almost always refers applications for products with new active ingredients to an advisory committee before approval.

## Single-Enantiomer Exclusivity

Section 1113 of FDAAA added new subsection (u) to section 505 of the FDC Act (30) to provide an optional exclusivity period for certain drugs containing single enantiomers.

FDA's longstanding interpretation is that a single enantiomer of a previously approved racemic mixture is not regarded as a "new chemical entity" (NCE) that is eligible for 5-year NCE exclusivity (31). New section 505(u) does not change that interpretation. Rather, the new provision creates an optional exception, under which a sponsor can elect for a single enantiomer to "not be considered the same active ingredient as that contained in the approved racemic drug"—that is, the sponsor can elect for the enantiomer to be considered a new active moiety that is eligible for 5-year NCE exclusivity—if all of the following conditions are met:

- The single enantiomer has not been previously approved except in the approved racemic drug.
- The application for the enantiomer includes full reports of clinical studies (other than bioavailability studies) necessary to support the approval, which studies were sponsored by the applicant, i.e., it is a "full" 505(b)(1) NDA.
- The application does not rely on any studies that support the approval of the racemic drug.
- The enantiomer is not intended for a use that is in a "therapeutic category" for which the racemic drug has been approved, or for which any other enantiomer of the racemic drug has been approved. Therapeutic category is defined by the USPs list for purposes of the Medicare Part D prescription drug benefit; FDA is authorized to revise the categories through rulemaking.

A qualifying sponsor must elect to receive the benefit of this provision. The election may only be made in an NDA submitted after September 27, 2007, and before October 1, 2012. If the sponsor elects to use this provision, FDA is prohibited from approving the enantiomer for any condition of use in the therapeutic category in which the racemic drug has been approved for 10 years. The labeling of the enantiomer would have to include a statement that it has not been approved for any condition of use for the racemic drug.

## POSTAPPROVAL ISSUES

### Reports of Postmarketing Approval Studies

The provisions of section 506B of the FDC Act (32), added by FDAMA in 1997, are discussed in section 3.5 of chapter 6 of the first edition of this book. In brief, section 506B provided FDA with additional authority for monitoring the progress

of postmarketing studies that drug and biological applicants had agreed to conduct, including the submission of annual reports to FDA until each study is completed or terminated.

In 2002, the Bioterrorism Act added new subsections (d) and (e) to section 506B of the FDC Act to require FDA to publish a statement on the agency's internet site if studies were not submitted to FDA in timely fashion, including (if appropriate) the reasons why the failure to complete the study were not deemed acceptable by FDA. FDA also may (but need not) require a drug or biological sponsor to notify health-care practitioners of the failure to complete a study and the questions of clinical benefit or safety that remain unanswered as a result of that failure.

FDA has issued a guidance document regarding the implementation of these requirements for drugs and biologicals (33).

## Prescription Drug Safety Information for Patients and Providers

Section 915 of FDAAA added new subsection (r) to section 505 of the FDC Act (34) to address postmarketing drug safety information for patients and providers. The purpose of the new provision is to improve the transparency of information about prescription drugs and improve the access of patients and health-care providers to drug information.

By September 27, 2008, FDA is required to make available, via a single internet Web site, easily searchable drug safety information that is currently found on a variety of federal government Web sites. The information is required to include patient labeling and patient package inserts, medication guides, a link to the clinical trials registry and results data bank (discussed in section "Clinical Trial Registry and Results Database" of this chapter), recent and current FDA safety information and alerts (such as information about product recalls, Warning Letters, and import alerts), publicly available information about implemented RiskMAPs and risk evaluation and mitigation strategies, and guidance documents and regulations relevant to drug safety. The Web site also must provide access to data summaries regarding surveillance related to known and serious side effects (see chap. 10).

Eighteen months after approval or after use of the drug by 10,000 individuals, whichever is later, the Web site must include a summary analysis of adverse drug reaction reports received by FDA. The Web site must enable patients, health-care providers, and drug sponsors to submit adverse event reports.

Within 21 days after initial approval or after the approval of a supplemental application that results in a labeling change, FDA is required to post approved professional labeling and any required patient labeling on the Web site.

## Public Availability of Drug Approval Package

Under a longstanding FDA regulation, a summary of the safety and effectiveness data and information that support a drug approval are "immediately" available for public disclosure after approval, with very limited exceptions (35). In practice, however, the public availability of a data summary, often referred to as "summary basis of approval" (SBA), varies widely. In some cases, information is available on FDA's Web site within days of a drug approval. In other cases, the information is not in fact publicly available for months or even years, despite the submission of multiple requests for such information pursuant to the Freedom of Information Act.

FDAAA section 916 amended section 505(l) of the FDC Act (36) to address this situation. As amended, FDA is now required to post the "action package"

for approval of an NDA drug or a biological on its Web site within 30 days after approval if the approval involves a new active ingredient, and within 30 days after the third Freedom of Information Act request for the documents for any other NDA drug or biological. While 505(b)(2) NDAs are within the scope of the new provision, the new provision does not affect the public availability of information regarding the approval of ANDAs.

The action package includes documents generated by FDA related to review of the application, labeling, a "summary review" that documents the agency's review process (including any critical issues and disagreements with the drug sponsor and within the FDA review team and how they were resolved), the "decision document" of the Division Director and Office Director, and identification of each FDA employee who participated in the approval decision and who consents to have his or her name included in the package. In addition to making the action package available, FDA is required to post on its internet site a "summary review that documents the agency's review process, including critical issues and disagreements with the applicant and within the FDA review team, within 48 hours after approval, unless FDA needs additional time for the redaction of nondisclosable information.

To preserve the integrity of the review process, section 505(l) of the FDC Act provides that a "scientific review" is considered the work of the reviewer and may not be altered by either the reviewer or management once final.

The new provision was effective upon enactment.

## Prescription Drug Distribution

Section 913 of FDAAA added new section 505D to the FDC Act (37). The new provision requires FDA to develop, by March 2010, a "standardized numerical identifier" to be applied to a prescription drug at the point of manufacture and repackaging at the "package or pallet level." The purpose of the identifier is "to facilitate the identification, validation, authentication, and tracking and tracing of the prescription drug" through the supply chain. In developing the standard, FDA is required to consult with other federal agencies, manufacturers, distributors, pharmacies, and other stakeholders in the pharmaceutical supply chain. To the extent practicable, the standard developed is to be harmonized with international consensus standards and is to take into account appropriate technologies, such as radio frequency identification. The underlying purpose is to provide technology to help secure the prescription drug supply chain against counterfeit, diverted, expired, or otherwise substandard drugs.

Other than requiring FDA to engage in standards development, FDAAA did not impose any requirements in this area. However, further federal legislative developments seem likely, possibly in response to conflicting state requirements. At the time of this writing, California law will require that most prescription drugs have an electronic record (known as a "pedigree") that tracks each package size distributed by a manufacturer through the supply chain to the pharmacy, health-care provider, or other person authorized to dispense or administer the prescription drug. Each package is required to have a unique identification number established at the point of manufacture (38). The assignment of a unique identifier to each package of a prescription drug is commonly known in the industry as "serialization," while the ability to trace the distribution history of any particular package of a prescription drug is known as "track and trace."

## OTHER ISSUES

### Importation of Prescription Drugs

In general, foreign versions of drugs and biologicals that are not FDA approved for sale in the United States may not be lawfully imported into the United States, as the foreign versions are regarded as unapproved drugs or unlicensed biologicals. In 2003, section 1121 of the MMA added section 804 of the FDC Act (39) to create an exception for imports from Canada, if certain conditions are met. Among other requirements, a licensed pharmacist or a licensed prescription drug wholesale distributor can be authorized to import from Canada prescription drugs, other than controlled substances, biologicals, intravenous or parenteral drugs, infused drugs, and drugs inhaled during surgery. FDA is required to adopt regulations regarding detailed submissions to be made to FDA by prospective importers, including laboratory testing to ensure that the drug complies with all established standards and specifications. FDA is directed to exercise its enforcement discretion to permit individuals to make importations for personal use.

Importantly, section 804 does not go into effect unless the Secretary of Health and Human Services certifies to Congress that implementation of section 804 will pose "no additional risk to the public's health and safety," and will result in a "significant reduction in the cost of covered products to the American consumer." To date, that certification has not been made, so section 804 has not gone into effect. Similarly, previous versions of section 804 enacted in 1990 and 1993 never went into effect because no HHS Secretary was willing to make similar required certifications (40).

### Adverse Event Reporting for Nonprescription Drugs

The Dietary Supplement and Non-Prescription Drug Consumer Protection Act (DSNPDCPA) (41), enacted in December 2006, added new section 760 to the FDC Act (42), to require manufacturers, packers, and distributors of certain nonprescription drugs to report serious adverse events to FDA. Serious adverse events are defined as adverse events that result in death, a life-threatening experience, inpatient hospitalization, a persistent or significant disability or incapacity, or a congenital anomaly or birth defect, or adverse events that require medical intervention to prevent one of those outcomes. The manufacturer, packer, or distributor identified on the label is required to submit to FDA any report received regarding a serious adverse event within 15 business days after receipt, using the MedWatch form. In addition, the responsible manufacturer, packer, or distributor must submit to FDA, within 15 business days after receipt, any new medical information related to a submitted serious adverse event report received within 1 year of the initial report. The responsible manufacturer, packer, or distributor is required to maintain records of all adverse events (not just serious adverse events) received for 6 years that are subject to routine FDA inspection.

Section 760 of the FDC Act includes a rule of construction, under which the submission of any adverse event report is not to be construed as an admission that the nonprescription drug involved caused or contributed to the adverse event.

Under section 760, inconsistent or additional state and local requirements for mandatory adverse event reporting are preempted. FDA is authorized to provide adverse event reports and information to its state and local counterparts under memoranda of understanding. However, state and local officials are expressly

prohibited from making personally identifiable information publicly available without the written consent of FDA and the person submitting the information. State and local officials are also prohibited from using any safety report received from FDA in a manner inconsistent with federal law.

New subsection (x) of section 502 of the FDC Act (43) deems a drug subject to the new requirements to be misbranded, if its label does not provide a domestic address or a domestic phone number for consumers to report adverse events.

Section 760 of the FDC Act applies only to nonprescription drugs that are not the subject of an NDA or ANDA approval. Covered drugs consist of products marketed under an "OTC monograph," as well as other products marketed on the basis of the manufacturer's or distributor's view that the product is exempt from FDA's premarket approval requirements. Products that are the subject of an approved NDA or ANDA are already subject to a variety of reporting requirements, including, but not limited to, the reporting of adverse events (44).

In October 2007, FDA issued a draft guidance to assist manufacturers and distributors in complying with the new adverse event reporting requirements (45).

The DSNPDCPA also added essentially identical requirements that apply to dietary supplements in new section 761 of the FDC Act (46).

The new provisions became effective in December 2007.

## Toll-Free Number for Adverse Event Reporting

Section 17 of the BPCA, enacted in January 2002, required FDA to adopt a regulation requiring that the labeling of each drug that is the subject of an approved NDA or ANDA include a toll-free number maintained by FDA for the purpose of receiving reports of adverse events only, but not for purposes of receiving medical advice (47).

FDA has implemented this requirement, in part, by means of its new requirements for the labeling of human prescription drugs and biologicals (48). These requirements are being phased in, and apply initially to newly approved products and products with newly approved efficacy supplements (49).

## Citizen Petitions Affecting Generic Drug Approvals

Section 914 of FDAAA added new subsection (q) to section 505 of the FDC Act (50), to address citizen petitions and other efforts to block or delay the approval of an ANDA or a 505(b)(2) NDA. The new provision is intended to address widely held concerns of the generic drug industry and others that citizen petitions are sometimes used solely for the purpose of prolonging the innovator firm's monopoly.

FDA is prohibited from delaying the approval of a pending ANDA or 505(b)(2) NDA unless the request is in the form of a citizen petition, and FDA determines that "a delay is necessary to protect the public health." If FDA determines that a delay is necessary, FDA must so notify the sponsor of the pending application within 30 days after making its determination that a delay is necessary. The notification must include a brief summary of the specific substantive issues raised that form the basis of the determination that a delay is necessary and, if applicable, a description of any additional information that the applicant needs to submit to permit the agency to review the petition promptly. FDA may provide the notification either in writing or during a meeting. Information conveyed to the applicant is considered to be part of the application and subject to the usual public disclosure rules applicable to pending applications.

If FDA determines that a petition was submitted with the primary purpose of delay and the petition does not on its face raise "valid scientific or regulatory issues," FDA may summarily deny the petition. FDA may (but need not) issue guidance regarding the factors that the agency will take into consideration in deciding whether a petition was submitted primarily for purposes of delay.

FDA is required to make a final decision on a petition related to an ANDA or 505(b)(2) NDA final approval within 180 days, and this time period cannot be extended for any reason.

If the final approval of an ANDA that has 180-day exclusivity rights is delayed because of a petition, the 30-month period for obtaining tentative approval to avoid forfeiture of the 180-day exclusivity rights (see chap. 7) is extended by the period during which the petition was pending before FDA.

Citizen petitions and comments on petitions are required to contain a new, detailed certification or verification, under penalty of perjury. The certification or verification must disclose the date on which information regarding the action requested first became known to the party on whose behalf the petition or comment is submitted. In addition, the petition or comment must disclose the identity of any persons or organizations from whom the submitter of the comment has received, or expects to receive, compensation. Thus, "blind" petitions and comments submitted by law firms, consultants, and experts will no longer be possible, if such petitions or comments relate to the final approval of an ANDA or 505(b)(2) NDA.

If FDA fails to issue a final decision within 180 days after submission, FDA's failure to act is deemed to be final agency action for judicial review purposes. (This does not mean that a court will automatically consider a challenge to a petition. For example, a court could refuse to consider a lawsuit on the basis that the matter is not considered "ripe" for judicial determination.) If a lawsuit is filed against FDA with regard to any issue raised in a petition before FDA has issued a final decision or 180 days has passed without FDA action, the court is required to dismiss the lawsuit without prejudice on the basis that administrative remedies were not exhausted.

Citizen petitions that relate solely to the timing of ANDA final approval as a result of 180-day exclusivity are excluded from the new provisions. Similarly, a petition submitted by the sponsor of an application that relates solely to that sponsor's application is outside the scope of the new provisions.

This new provision became effective upon enactment.

### Prohibition Against Food with Added Drugs or Biological Products

Section 912 of FDAAA established a new "prohibited act" in section 301(ll) of the FDC Act (51). The commission of a prohibited act can result in federal court legal action, including product seizure (52), injunction (53), or criminal prosecution of business entities and individuals (54).

The new provision prohibits the addition to food of any approved drug, licensed biological, or other drug or biological that is the subject of completed or ongoing "substantial" publicly disclosed clinical studies. The new provision includes four exceptions:

- The drug or biological was marketed in food before approval, licensure, or before substantial clinical investigations were started.
- FDA has approved use of the drug or biological in food by means of notice-and-comment rulemaking.

- The drug or biological enhances the safety of the food and does not have an independent biological or therapeutic effect on humans. In addition, the use either conforms to a food additive regulation, a "generally recognized as safe" regulation, a premarket notification that has not been disputed by FDA, an effective food contact substance notification, or the drug or biological was marketed for smoking cessation before September 27, 2007.
- The drug is an approved animal drug.

The new provision is self-executing and became effective upon enactment.

## Pharmacy Compounding

FDA's recent efforts to regulate pharmacy compounding are described in section 5.5 of chapter 6 of the first edition of this book. In brief, section 503A of the FDC Act (55), added by FDAMA, was declared invalid in its entirety in 2001 by the U.S. Court of Appeals for the Ninth Circuit on the basis that the restrictions on the advertising of compounded drugs were unconstitutional. The U.S. Supreme Court upheld the Ninth Circuit's decision that the advertising restrictions were unconstitutional, but did not expressly address the Ninth Circuit's conclusion that the statutory advertising restrictions could not be severed from the remaining provisions of section 503A of the FDC Act.

In light of these court decisions, FDA issued a Compliance Policy Guide to set forth its enforcement policy on pharmacy compounding (56). FDA assumed that all of section 503A of the FDC Act is invalid.

In August 2006, a Texas federal district court reached a different conclusion regarding the severability of section 503A of the FDC Act. That court concluded that the unconstitutional prohibitions on the advertising of compounded drugs could be severed from the remainder of section 503A, meaning that the remaining provisions remain in effect (57). The district court concluded that the remaining provisions of section 503A demonstrate that Congress recognized that compounding is an approved and lawful practice. Specifically, the district court held that compounded drugs, when created for an individual patient pursuant to a prescription from a licensed practitioner, are exempt from the FDC Act's premarket approval provisions. As of this writing, FDA's appeal of that decision is pending (58). Pending a decision on appeal, FDA is taking the position that the district court decision applies only in the Western District of Texas.

The case also concerned the compounding of drugs from bulk ingredients for nonfood animals. The court concluded that drugs compounded from legal bulk ingredients by pharmacists do not require premarket approval.

Cast in simple terms, the underlying controversy in this area is the dividing line between drug manufacturing, which is subject to active FDA regulation, including but not limited to premarket approval, and pharmacy compounding, which is not subject to FDA active regulation and is generally regulated by the states in connection with the practice of pharmacy.

## REFERENCES

1. Pub L No. 107–188.
2. Pub L No. 105–115.
3. Pub L No. 107–109.
4. Pub L No. 107–188.

*Tsien*

5. Pub L No. 108–155.
6. Pub L No. 108–173.
7. Pub L No. 109–462.
8. Pub L No. 110–85.
9. 21 USC §355c.
10. 21 USC §355d.
11. 21 USC §355c(f).
12. 21 USC §355a.
13. 42 USC §282(j).
14. FDC Act sections 301(jj) and 303(f)(3), 21 USC §§331(jj) and 333(f)(3).
15. 21 USC §353(g).
16. Pub L No. 107–250.
17. General information is available at: http://www.fda.gov/oc/initiatives/criticalpath.
18. 21 USC §379dd.
19. See 72 Fed Reg 56362 (Oct. 3, 2007) (seeking nominations).
20. 21 USC §379dd-1.
21. 21 USC §379dd-2.
22. 21 USC §399a.
23. 21 USC §360bbb-5.
24. 21 USC §356-1.
25. 21 USC §356.
26. 21 CFR §314.600 et seq. and §601.90 et seq.
27. 21 USC §360n.
28. 21 USC §360a.
29. 21 USC §355(s).
30. 21 USC §355(u).
31. See 54 Fed Reg 28872, 28898 (July 10, 1989) and 62 Fed Reg 2167 (Jan. 15, 1997).
32. 21 USC §356b.
33. Available at http://www.fda.gov/cder/guidance/5569fnl.pdf; announced in 71 Fed Reg 8307 (Feb. 16, 2006).
34. 21 USC §355(r).
35. 21 CFR §314.430(e)(2).
36. 21 USC §355(l).
37. 21 USC §355e.
38. Cal. Bus. & Prof. Code §4034.
39. 21 USC §384.
40. Congressional Research Service Report for Congress: Importing Prescription Drugs: Objectives, Options, and Outlook (Jan. 26, 2007) at 6, 7.
41. Pub L No. 109–462.
42. 21 USC §379aa.
43. 21 USC §352(x).
44. See 21 CFR §314.80.
45. Available at http://www.fda.gov/cder/guidance/7950dft.pdf; announced in 72 Fed Reg 58313 (Oct. 15, 2007).
46. 21 USC §379aa-1.
47. 21 USC §355b.
48. 21 CFR §201.57(a)(11).
49. See 21 CFR §201.57 and § 201.56(c).
50. 21 USC §355(q).
51. 21 USC §331(ll).
52. FDC Act section 304, 21 USC §334.
53. FDC Act section 302, 21 USC §332.
54. FDC Act section 303, 21 USC §333.
55. 21 USC §353a.
56. CPG 460.200, available at www.fda.gov/ora/compliance_ref/cpg/cpgdrg/cpg460-200.html; announced in 67 Fed Reg 39409 (June 7, 2002).
57. *Medical Center Pharmacy v. Gonzales*, 451 F. Supp. 2d 854 (WD Tex. 2006).
58. Appeal No. 06–51583 (5th Cir).

## 3   The New Drug–Approval Process—Before and After 1962

**Michael P. Peskoe**
*Edwards Angell Palmer & Dodge LLP, Boston, Massachusetts, U.S.A.*

### INTRODUCTION

The history of the regulation of pharmaceuticals in the United States has been an evolving one, shaped by both historical events and perceptions of medical need. It has also been affected significantly by the ongoing tensions between the various societal components involved either directly or indirectly in the process: what are now commonly known as "stakeholders." These include the pharmaceutical industry, the government [mostly as represented by the U.S. Food and Drug Administration (FDA) and its predecessor agencies], the consuming public (either represented by proxy by the government or by self-appointed consumer groups, but rarely by consumers themselves), and the medical profession. It has also been shaped, in part, by the general evolution of administrative and regulatory practice during the past 40 years. Although the regulation of pharmaceuticals predates significantly the regulation of the subject matter of many other modern regulatory agencies, such as the Environmental Protection Agency (EPA), the Federal Aviation Administration (FAA), the National Traffic and Motor Vehicle Safety Agency (NHTSA), the Consumer Protection Safety Commission (CPSC), and the Federal Trade Commission (FTC), its recent evolution has been affected by the development of modern tenets of American administrative law and practice.

While the need for federal government approval of pharmaceuticals prior to their marketing has been a fundamental part of the regulatory landscape for more than 60 years, it was not always so. Notwithstanding the greatly diminished controversy over this policy that exists today, particularly with respect to government's prior approval of drug effectiveness, pressures continue to be applied to the approval system. These pressures result from both external events and market forces. As a consequence, the country's drug approval regulatory system still presents an interesting study of the evolution of a regulatory system almost 100 years old, yet still fluid and subject to continuing change.

### THE FEDERAL FOOD AND DRUGS ACT OF 1906

Known as the Wiley Act, in honor of Henry A. Wiley, the first director of the government's Office of Chemistry in the Department of Agriculture, and also as the Pure Food and Drugs Act, this first foray into actual government regulation of drugs embodies concepts that still remain in the current legislation, although in a secondary role. The act proscribed the manufacture and interstate shipment in the United States of adulterated or misbranded drugs (or foods), making both criminal (a misdemeanor).

1.   "Adulterated" and "misbranded" were defined in the law, in a manner more limited than today. The former was defined essentially as noncompliance with

45

the United States Pharmacopeia or National Formulary, or generally if strength or purity fell below the "professional standard or quality" under which the drug was sold.

2. The latter proscribed any statement in either the package or the label of a drug regarding the article or its ingredients that was false or misleading in any particular, or if the drug were an imitation of another drug, or if the packaging were removed, or failed to contain a statement on the label of the quantity of any alcohol or other named potentially toxic substances.

3. No prior approval requirements were contained in the statute, nor was there any suggestion that they were entertained. Rather, the act was essentially a truth-in-labeling statute, directed in part at controlling the manufacture and sale of worthless and potentially dangerous patent medicines and requiring the government to find illegal conduct after the fact if it wished to prosecute.

## THE 1912 SHIRLEY AMENDMENT

In a 1911 Supreme Court decision, *United States v. Johnson* (4), involving a criminal indictment for the interstate shipment of medicine falsely labeled as a cure for cancer, the court found that the proscription in the 1906 law against the misbranding of drugs dealt only with false statements as to characteristics of identity, such as strength, quality, or purity, but not with claims of effectiveness. As a result, in 1912 Congress added language to the misbranding provisions that proscribed, in the case of drugs, "any statement regarding curative or therapeutic effect, which is false and fraudulent" (5). Although extending the statute's enforcement reach to fraudulent claims of efficacy, the amendment gave FDA no premarket approval power over drugs or related products.

## 1938 FEDERAL FOOD, DRUG, AND COSMETIC ACT

### Statutory Drug–Approval Provisions

In 1933, Congress began a 5-year effort at amending the 1906 act that would ultimately create the framework of human drug regulation that exists today. Between the initiation of congressional debate and passage, over 100 children died from taking a drug called Elixir Sulfanilamide, in which a manufacturer placed a well-known and accepted drug, sulfanilamide, into a new vehicle, diethylene glycol (now used in antifreeze), that was unfortunately fatally toxic to those who took it.

As enacted, the new Federal Food, Drug, and Cosmetic Act of 1938 added the first requirements for premarket approval of drugs. It defined both "drugs" and "new drugs" in a manner still utilized today: the former to encompass the wide range of medicants sold or likely to be sold to alleviate human disease, and the latter in a manner that would effectively subject to prior approval every new drug entity and product and, after the agency's lawyers were through interpreting the law, older ones as well.

As enacted in 1938, "new drug" was defined as follows (6):

Sec. 201 . . .
(p) The term "new drug" means—
(1) Any drug the composition of which is such that such drug is not generally recognized, among experts qualified by scientific and experience to evaluate

the safety of drugs, as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to enactment it was subject to the Food and Drugs Act of 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use; or

(2) Any drug the composition of which is such that such drug, as a result of investigations to determine its safety for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

At the same time that it defined "new drug," the new law prohibited the introduction or delivery for introduction into interstate commerce of any new drug unless an application filed pursuant to the new act was "effective with respect to such drug" (7). This was the initial premarket approval requirement for drugs.

A new drug application (NDA) was required to contain "full reports of investigations which have been made to show whether or not such drug is safe for use" (8), as well as articles used as components, a full statement of composition, methods used in and facilities and controls used for manufacturing, processing and packing the drug, samples of the drug as required by the secretary, and specimens of labeling (9).

An application would become effective on the sixtieth day after filing, unless the effective date was postponed in writing to such time, not to exceed 180 days, as the agency determined necessary "to study and investigate the application" (10). In other words, an application would become effective without further action by the agency within 60 days unless the agency stopped it from becoming so. The agency's ability to so forestall an application from becoming effective was limited to 180 days (11). Provisions were also included establishing requirements for the agency's decision not to approve an application (12). These included provisions that the investigations did not include adequate tests by all methods reasonably applicable to show whether or not the drug was safe for use under the conditions set forth in labeling; that such tests show that the drug is unsafe for use under those conditions; that the methods for manufacture, processing or packing are inadequate to preserve identity, strength, quality, and purity; or whether the information submitted in the application or on the basis of any other information was insufficient to determine whether the drug was unsafe for use. However, the agency was required, in reaching any such conclusion, to provide both notice and an opportunity for hearing to any applicant whose application was determined not worthy of approval (13).

The new statute also empowered the agency, specifically, to suspend the effectiveness of an approved application, again following notice and opportunity for hearing, if it found that clinical experience, new test methods, or even methods not thought applicable at the time of approval showed the drug to be unsafe for use under its labeled indications or that the application was found to contain any untrue statement of material fact (14).

Should a manufacturer contest the agency's order suspending the effectiveness of an application, its recourse would be filing an action in federal district court (15). In keeping with what are now modern tenets of administrative law, any new factual matters were required to be presented to the agency before any adjudication by the court. The agency conclusions as to any findings of fact were deemed

conclusive (16). Finally, the new law imposed an obligation on the agency to develop regulations exempting drugs solely for investigational use from the above restrictions (17).

The statutory framework enacted in 1938 is still the model in use today, with additions and modifications as outlined in the remainder of this chapter up to 1997. In establishing global criteria for premarket approval contained in the concept of "new drug," the new law all but assured from that time forward that government would now evaluate drugs prior to their marketing. Definitions were written broadly: not only "new drug" but the definition of "drug" itself was written to be inclusive (18). Moreover, by including within the new drug definition the concept of "general recognition," requiring that a determination of safety be recognized based on the views of experts, Congress gave the agency power to establish high barriers to market entry. On the other hand, the new law gave significant credence to an approval earned under the statute; withdrawal of an application, once approved, was not made particularly easy for the government to accomplish.

### The 1938 "Grandfather" Provisions and "Old Drug" Status

Two provisions deserve special comment. The statute did exempt or "grandfather" certain drugs from the new drug requirements. This exemption included any drug marketed under the 1906 act whose labeling had not changed (19). Thus, at least in this respect, the law did not portend to reach backward unless an existing drug's labeling had at some point been changed. The second exemption concerned those drugs that might be determined to be "not new," that is, where "general recognition" of safety might already exist. In that the exemption from "new drug" status was obviously desirable to drug manufacturers, this would be a future area of contention.

Finally, the "new drug" definition also seemed to create a situation in which "new drug" status was fluid, in which a drug that might be "new" today would at some point no longer be so and would no longer be subject to the myriad requirements applicable only to new drugs. This was contained in the second "new drug" definition, which stated, in essence, that a drug recognized by experts as safe for labeled conditions on the basis of tests conducted to establish safety, but not otherwise, and not used to a "material extent" or for a "material time" under such conditions, would nonetheless still be a new drug (20). The converse of this, that such a drug used for a material extent or for a material time would no longer be a "new drug," suggests that such a drug might ultimately graduate to a post–"new drug" status. To date, no post-1938 prescription drug has done so.

### Regulation of Antibiotics and Insulin

In 1941, Congress added new special approval provisions to the 1938 act regarding drugs composed wholly or partly of insulin. Unlike the existing provisions, section 506 required that, prior to distribution, insulin be batch certified by the agency "if such drug has such characteristics identity . . . strength, quality and purity . . . as necessary to insure safety and efficacy of use" (21). This was essentially a requirement that the agency itself test a sample of each batch of insulin prior to release by the manufacturer and stemmed from concern that insulin manufactured from live organisms required further protections compared to other drugs.

Similarly, in 1945 batch-certification requirements for penicillin were added in a new section 507 and were modeled after the insulin requirements (22). Over

the next several years, the requirements were extended to additional antibiotics, culminating in an extension to all antibiotics in 1962 (23). The added requirements stemmed from the fact that antibiotics were derived from microorganisms, resulting in a concern that actual batch testing by the government should be required as a condition of marketing. Although these sections included a specific requirement for effectiveness, it was assumed as part of the certification process that appropriate proof of identity, strength, quality, and purity would necessarily permit a conclusion regarding effectiveness. Ultimately, due to the added expense to the agency of supporting a batch-certification laboratory and growing confidence in the manufacturing processes of both insulin and antibiotics, both products were exempted from certification. Later, as part of legislation adopted in 1997, both sections were repealed (24). Insulin and antibiotics are now regulated like other new drugs.

## THE DRUG EFFECTIVENESS AMENDMENTS OF 1962

### Approval Provisions

The modern era of drug regulation begins with the drug effectiveness amendments of 1962. These amendments added the requirement that all new drugs be proven effective as well as safe and far more detailed requirements for the safety testing of new drugs prior to marketing, the latter as a direct result of the thalidomide tragedy that occurred in Europe (and almost in the United States) in the latter 1950s and early 1960s. The addition of an effectiveness requirement was made exceedingly complicated by the added requirement that all drugs whose safety and effectiveness were established between 1938 and 1962 would be made retroactively subject to the new effectiveness standard.

The 1962 amendments accomplished these objectives in several ways. Initially, the statutory definition of "new drug" in section 201(p) of the act was amended by adding the words "and effectiveness" following "safety" where it appeared in the section (25). Thus, any drug whose effectiveness was not a matter of "general recognition" by experts qualified by scientific training and experience to evaluate effectiveness would be a new drug for that additional reason and subject to premarket approval requirements for effectiveness as well as safety.

The requirement for general recognition of effectiveness has been the cornerstone of the agency's now generally accepted interpretation of the section that once a new drug, always a new drug. As noted earlier, section 201(p)(2) of the act provided an alternative new drug definition: a drug's safety or effectiveness could be recognized (as opposed to "generally recognized") on the basis of investigations, but the drug would still be a new drug if it had not been used to a material extent or for a material time. This suggested a possibility that new drugs ultimately could "graduate" from new drug status over time, ending their need to be subject to an effective NDA and similarly ending their obligation to comply with numerous requirements applicable to new drugs, but not to "not new drugs." It is this potential statutory movement from new drug to not new drug status that has not been acknowledged by FDA; nor sought by manufacturers, at least for the past three decades; and nor has the issue been given publicity in the numerous statutory amendments to the act that have occurred during the past 15 years.

Other significant changes in the FDA approval process were also implemented by the 1962 amendments. Perhaps most importantly, the amendments

replaced the "passive approval" mechanism of the 1938 act, which permitted
an NDA to become effective automatically after a 60-day period, with an active
approval scheme. Section 505(c) of the act provided that (20):

> Within one-hundred and eighty days after the filing of an application under
> subsection (b), or such additional period as may be agreed upon by the Sec-
> retary, and the applicant, the Secretary shall either—(A) approve the appli-
> cation if he then finds that none of the grounds for denying approval . . .
> applies, or (B) give the applicant notice of an opportunity for hearing before
> the Secretary . . . on the question whether such application is approvable.

The new legislation also expanded significantly the provisions of the 1938
act regarding the statutory bases for refusing to approve a submitted application
[section 505(d)] and for withdrawing approval of an approved application [section
505(e)].

With respect to the refusal to approve an application, the statute left the exist-
ing provisions regarding lack of safety intact, but added to them the following pro-
scription regarding the new effectiveness requirement (27):

> If the Secretary finds that, evaluated on the basis of the information submitted
> to him as part of the application and any other information before him with
> respect to such drug, there is a lack of substantial evidence that the drug will
> have the effect it purports or is represented to have under the conditions of use
> prescribed, recommended, or suggested in the proposed labeling thereof . . .
> he shall issue an order refusing to approve the application. . . . As used in
> this subsection . . . the term "substantial evidence" means evidence consisting
> of adequate and well-controlled investigations, including clinical investiga-
> tions, by experts qualified by scientific training and experience to evaluate the
> effectiveness of the drug involved, on the basis of which it could fairly and
> responsibly be concluded by such experts that the drug will have the effect it
> purports or is represented to have under the conditions of use prescribed, rec-
> ommended, or suggested in the labeling or proposed labeling thereof.

Thus, unlike the statutory safety test, which required simply that studies
demonstrate safety, the statutory test of effectiveness, set forth ironically in the
statutory section containing criteria for withholding approval, was legislated as one
of "substantial evidence" requiring "adequate and well-controlled investigations,
including clinical investigations by experts qualified . . . to evaluate the effectiveness
of the drug involved" (28). This requirement of substantial evidence of effective-
ness would play a paramount role in the decades following the 1962 enactment in
enabling FDA to set the bar high before approving a drug as safe and effective (29).

With respect to those provisions concerning the withdrawal of an approved
(i.e., effective) application, the amendments added provisions for the withdrawal of
an application should there be new information, evaluated together with the evi-
dence available when the application was approved, that there was a lack of sub-
stantial evidence that the drug would have the effect it was represented to have
according to its labeling (30). The amendments also added new provisions for the
immediate suspension of the effectiveness of an application should the secretary
find an imminent hazard to the public health. The authority to implement this sec-
tion was reserved to the secretary, and was not delegable to the FDA (31).

In response to the then recent thalidomide episode, Congress also greatly
expanded the statutory provisions regarding the investigation of drugs. While the
1938 act had simply authorized the promulgation of regulations exempting such

drugs from the prohibition against interstate shipment of unapproved new drugs, the 1962 amendments directed that the regulations consider including the submission to FDA, before the undertaking of any clinical tests using such a drug; reports of preclinical tests (including animal tests) to justify the proposed clinical tests (32) signed agreements between investigators and sponsors of investigations that patients to whom the drug administered will be under the investigator's direct or indirect supervision (33); and the establishment and maintenance of records obtained as a result of the investigational use that will enable the secretary to evaluate the safety and effectiveness of the drug in the event of the filing of an NDA (34).

What was not optional under the amendments, however, was that any such clinical trial exemption be conditioned on the requirement that investigators certify to sponsors that any study subjects be informed that the drugs were investigational and obtain their consent (except where not feasible or contrary to the best interests of the study subjects) (35). As a result of these provisions and the regulations that followed, and notwithstanding the regulatory provision that such an exemption will become effective automatically after 30 days unless delayed by the agency (36), there is no area of FDA regulation where the agency has more unrestricted power than in its oversight of clinical investigations.

### The 1962 Grandfather Clause

The amended new drug definition also extended the category of drugs not subject to the new drug provisions, that is, those considered "grandfathered." First, in section 201(p), it essentially extended the 1938 grandfather clause through the 1962 enactment so that a drug that was subject to the 1938 clause (because it was subject to the 1906 act and its labeling had not been changed) and exempt thereby from the new drug provisions would continue to be exempt, now from the new effectiveness requirement as well, if its labeling had continued to remain unchanged. The number of drugs that continue to meet these criteria has never been fully documented; it is safe to say that FDA views the category as an anachronism and, to the extent that it is required to focus on any such drugs as part of a regulatory event, it has had little difficulty arguing successfully that grandfather status is no longer applicable.

A new grandfather provision was enacted in 1962 that would, when the criteria were met, exempt such a drug from the effectiveness but not the safety provisions of the act. Section 107(c)(4) of the 1962 amendments specified a four-part test: on the day immediately preceding the enactment date, October 10, 1962, the drug was commercially sold in the United States, was not a new drug as defined by then in effect section 201(p) (meaning that it was generally recognized as safe on that date), was not subject to an NDA on that date (meaning under the 1938 act), and was intended for use solely for its labeled indications as they existed on that day (in short, its labeling could not have changed).

### The DESI Review and the Imposition of Effectiveness on Pre-1962 Drugs

The addition of an effectiveness requirement in 1962 was made more complicated for the agency by the added requirement that all new drugs approved solely for safety under the 1938 act be subject to the new effectiveness standard unless grandfathered (see earlier).

"Transitional amendments" enacted as section 107(c) implemented this legislative scheme in the following manner (37). First, any NDA that was "effective" on the day before the new amendments were enacted (the enactment date) was

deemed approved as of the enactment date (38), the new effectiveness amendments did not apply to any such "deemed approved" application as long as the application was not withdrawn or suspended when intended solely for use under its preenactment date indications (but not as to any changed indications) (39), and the provision permitting withdrawal of an approved application for a lack of substantial evidence of effectiveness as to existing uses was determined not to apply until one of the following events occurred: the expiration of a 2-year period beginning on the enactment date or the withdrawal or suspension of the application (40).

These provisions effectively applied the new effectiveness standard on October 10, 1964, to all drugs approved under the 1938 act and permitted their withdrawal if effectiveness had not been established. All post-1938-approved applications had been simply "deemed" approved under the 1962 amendments for a 2-year grace period (41). While withdrawal for lack of effectiveness was not automatic, first requiring the agency to initiate and conduct withdrawal proceedings under section 505(e), the premarket approval requirements of the statute permitted the agency to allege that effectiveness had not been established, shifting the burden on pre-1962 applicants to then produce the necessary information to demonstrate substantial evidence of effectiveness in order to prevent withdrawal.

Due to administrative difficulties attendant to implementation of this section, FDA ultimately contracted with outside groups, notably the National Academy of Sciences and National Research Council, to review the available data, usually as compiled by manufacturers, on all pre-1962-approved drugs, and to make recommendations to FDA on whether there existed for those drugs the substantial evidence of effectiveness now required by the statute. This process became known as the Drug Efficacy Review Implementation, or "DESI" Review, and took the better part of 25 years, until the mid-1980s, to complete, although even to this day certain drugs remain on the market in a state of regulatory limbo, with no final determinations having been made as to their effectiveness under the 1962 standard (42).

## Important Legal Developments Regarding the 1962 Amendments

The 1962 amendments to the drug-approval process, particularly the increased burdens for prior approval for "new drugs," generated significant efforts by various components of the pharmaceutical industry to avoid the added regulation imposed by the new amendments, particularly insofar as they rewrote the rules applicable to drugs already on the market. This also resulted from the significant procedural protections written into the earlier law, and continued in the new law, for applications that had already become "effective." Over the next two decades, certain disagreements involving the agency's interpretation of the amended new drug, "grandfather," and effectiveness provisions of the statute wound their way through the courts, culminating in several court decisions that ultimately both supported the agency's strict "high bar" and inclusive interpretation of the new amendments and set the tone of the agency's review policies for the next several decades.

In USV *Pharmaceutical Corp. v. Weinberger* (43), decided in 1973, the issues were the scope of the grandfather and transitional amendments enacted in 1962. This manufacturer had products containing the same active ingredient, some of which were covered by pre-1962 NDAs, and some of which were not. Of the criteria found in the 1962 grandfather exemption, one was that the drug not be covered by an effective application on the effective date. The court found that, while NDAs were

intended and applied to individual products, in this instance it would consider none of the products to be lawfully subject to the exemption even though they were literally not subject to an NDA at the time, as the exemption was intended to treat all products whether or not of different manufacturers containing the same active ingredient the same, that is, as either new or not new. The court also found that a manufacturer was not capable of deactivating an existing NDA so as to also avail himself of the exemption. The net effect of the opinion was to include any drug that had at any time been subject to the new drug provisions enacted in 1938 to also be subject to the effectiveness requirements enacted in 1962.

In *Weinberger v. Bentex Pharmaceuticals, Inc.* (44), decided at the same time as USV, the court squarely faced the question of who decided what constituted general recognition of effectiveness—FDA or the courts. In this case, the court interpreted the act as authorizing FDA, subject to judicial review, as the locus of jurisdiction on the new drug question for both individual drugs and classes of drugs, determining that such questions were to be administratively determined by the agency, and not de novo in the courts.

In *Ciba Corp. v. Weinberger* (45), again decided at the same time as USV and Bentex, the court further established FDA, in the context of its withdrawal of pre-1962 NDAs for the manufacturer's failure to establish effectiveness, as the administrative agency responsible for making new drug determinations in an administrative setting, reviewable in the Court of Appeals, but not subject to having the new drug issue litigated in other court proceedings.

Finally, in the last and probably the most important case, *Weinberger v. Hynson, Westcott & Dunning* (46), also decided with the other cases noted, the court reviewed the withdrawal of the NDA of a drug subject to the transitional amendments of the 1962 act, that is, one approved under the 1938 act for safety but ostensibly lacking substantial evidence of effectiveness, and thus subject to proceedings for NDA withdrawal. In so doing, it sustained the validity of FDA's then new Summary Judgment regulations, which permitted the agency, following publication of a Notice of Opportunity for Hearing, to then deny a hearing and summarily withdraw the NDA when the applicant did not tender information in response sufficient to make a prima facie showing that it could demonstrate substantial evidence of effectiveness through the statutory standard requiring adequate and well-controlled clinical investigations. In addition, the court also sustained FDA's view that whether a drug's effectiveness was supported by substantial evidence was part of the new drug determination, and not simply requirements that must be met following a new drug determination. This case and the others decided with it effectively made all post-1938 drugs new drugs subject to NDA requirements for effectiveness and largely closed the door on the efforts of companies to avoid the requirements for adequate and well-controlled studies by claiming "not-new-drug" status under the "new-drug" definition.

This 1973 "grand slam" for FDA in the U.S. Supreme Court regarding the scope of the 1962 amendments was the beginning of a multidecade trend in which the agency seemed relatively invincible in its efforts to expand the statute, in both its old and new drug provisions, particularly regarding the effectiveness requirements of the act (47). Under the rubric of "protecting the public health," FDA was able to establish and maintain through several significant court victories its expansionist view of its mandate to control the new drug process at both the macro and micro levels. Other cases decided in the next several years further solidified that mind-set.

In 1975, the Supreme Court decided *United States v. Park* (48). While involving a criminal prosecution of a senior manager of a national food company for sanitation failures, it affirmed earlier cases establishing strict criminal liability for senior company managers for violations of the act, including, theoretically, violations involving the drug provisions of the act.

In 1979, in *United States v. Rutherford* (49), the Supreme Court held that drugs for terminally ill patients whose safety or effectiveness were unproven were subject to the new drug provisions of the act. In this case, notwithstanding that all parties conceded that the cancer patients involved were surely to die from their disease, and that no other remedies were available, the court refused to allow the sale of laetrile, an unproven cancer remedy, by finding an implied exception to the safety and effectiveness requirements.

In 1983, in *United States v. Generix Drug Corp.* (50), the court resolved the additional question of the application of the new drug definition to generic versions of approved drugs. While innovator drugs were subject to NDAs, generic versions were not, and the question before the court was whether the "new drug" definition applied to them. Specifically, did the new drug definition apply only to the active ingredient, potentially exempting generic products from new drug regulation, or each specific product, both innovator and generic, thereby subjecting all versions of the drug to the new drug provisions. Again, the court sustained FDA's expansive reading of the new drug definition, concluding that the new drug–licensing provisions were applicable to individual products, including each separate generic product, and not merely the active ingredient. It relied in its opinion on the fact that each generic product would be different, at least in inactive ingredients or excipients, from the innovator, raising issues of safety and effectiveness warranting premarket review.

By the time the Generix case was decided, FDA's view of the regulatory world of new drugs was essentially institutionalized. The new drug provisions were seen to apply to all prescription drug products, both brand and generic, and once applied to a drug product, were attached indefinitely. Little attention was paid then, or has been paid since, to the notion that drugs in new drug status could evolve to a post-, nonregulated, old drug status, notwithstanding inferences both in the new drug definition as well as in several court opinions that such was Congress's original intent.

## THE POST-1962 ERA

The two decades after 1962 were not ones of substantial legislative attention to the new drug–approval process. Other issues were more prominent. The growth in public financing of drug purchases under Medicaid caused a revolution in the public's perception of the value of generic drugs. While industry complained continuously about delays in getting drugs through FDA's approval mechanism, Congress did not engage the issue. Efforts to rewrite the Federal Food, Drug, and Cosmetic Act that were initiated in the late 1970s came to naught, while FDA revised its own IND and NDA regulations in a manner that, while clarifying certain concepts such as compassionate INDs and drug adverse event reporting, embraced the notion that FDA's requirements for proof of safety and effectiveness would not be relaxed in order to promote innovation or for drugs for use in treating serious and fatal diseases, notwithstanding the lack of alternatives for either patients or doctors.

## The Orphan Drug Act of 1983

In 1982, recognizing that certain diseases involved only small numbers of patients and were thus being largely ignored by pharmaceutical companies due to the lack of financial incentives to development, Congress initiated legislation specifically directed at this problem. The Orphan Drug Act of 1983 provided federal financial incentives for drug development heretofore unavailable and also presaged other significant legislative developments that would come years later (51).

As enacted, the Orphan Drug Act applied to drugs for any disease or condition "which occurs so infrequently in the United States that there is no reasonable expectation that the cost of developing and making available in the United States a drug for such disease or condition will be recovered from sales in the United States for such drug." It provided two major financial incentives to companies that would undertake to develop these products. First, the act provided a tax credit based on clinical trial expenses. Second, it provided a 7-year "exclusivity" for any nonpatentable drug, during which time FDA would be unable to approve an NDA or biological product license for the same drug for the same disease or condition. On a nonfinancial level, and to some extent foretelling later legislative developments, FDA was mandated to provide prospective orphan drug candidate applicants with "written recommendations for the non-clinical and clinical investigations" that the agency believed would be necessary for approval. This provision dented, perhaps for the first time, FDA's view that manufacturers were entirely responsible for the development of the studies required for approval, and that it was not FDA's role to prejudge trial design, and by inference data produced from such design, prior to submission of the data for approval (52).

In 1984 and 1985, Congress further amended the act to make its enticement provisions more appealing. To reduce complexity regarding qualifications for orphan drug exclusivity, the test was made far more objective and inclusive: an orphan disease was defined as any disease or condition that affected fewer than 200,000 persons in the United States, or that affected more than 200,000 persons but for which there was still no reasonable expectation that development costs could be recovered from sales (53). Second, the exclusivity provision was changed to no longer be contingent on the availability of patent protection; all orphan drugs approved would receive a 7-year exclusivity under which FDA would not be permitted to approve the same drug for the same disease or condition (54). At the same time, FDA took the position that, while it would assist in the development of appropriate trials for approval, and while the law did provide incentives previously unavailable to development initiatives, it did not in any way reduce the scientific burden on manufacturers to establish effectiveness based on adequate and well-controlled clinical trials (55).

## The Era of Shifting Priorities

Two events merged in the latter years of the 1980s and continued through the early 1990s that, together, significantly altered the FDA's implementation of the requirements for investigation and approval of new drugs. The AIDS crisis was one; while FDA was able to fend off the demands of cancer patients in the 1970s and 1980s who desired access to unproven cancer drugs, it was not able to curtail access to unproven AIDS therapies by patients afflicted with an unexpected, and unremittingly lethal, new disease. The second event was more subtle. For years, the industry had relentlessly criticized the agency for what it perceived as the delay in

getting it to act on pending applications. Review and approval times could stretch into years, for no apparent reason, despite a long-standing legislative provision requiring agency action on pending NDAs within 180 days of filing. Comparisons were frequently made during this period to approval times in other developed countries, mostly the United Kingdom, where it was often said drug-approval times were substantially less for the same drugs than in the United States—a so-called drug lag—with no apparent loss in safety.

Unlike the cancer population, AIDS victims were young people who were suffering egregiously before invariably losing their lives in their prime, rather than, as with most cancer patients, if not in old, than at least in middle age. They also shared other characteristics. Many were homosexual males from middle-class families living in the same neighborhoods in major urban areas and were able to coalesce into an active political force, no doubt enhanced by the support of their healthy, or at least not-yet-sick, colleagues. A further distinction from the cancer patients of the previous decade was the position of the medical establishment, always a force in FDA decisions and policy, if not always an apparent force. Unlike the cancer scenario, where doctors at least had some drugs and procedures to offer, for AIDS they had none that were remotely promising, leaving them as hopeless as their patients.

FDA's adherence to the regulatory system that had served well for two decades, a reliance on scientific proof of safety and effectiveness prior to permitting the marketing of any drug no matter how serious the disease or the availability of alternative therapies, did not play well to an audience of suffering and dying young men and their frustrated physicians. FDA relied initially on its traditional safety valve for making available unproven drugs, the "compassionate IND," under which drugs under investigation could be made available with the sponsor's consent to individual practitioners for individual patients outside of study protocols. This, however, was woefully insufficient in scope to deal with a growing national epidemic, and FDA's initial reliance became problematic. The combination of pressures from constant criticism based on supposed drug lag together with the agency's inability to handle the AIDS crisis fostered two reform movements that have altered its approval processes, perhaps permanently.

On the issue of drug lag, and to respond to agency representations that at least some of that issue was based on limited resources, Congress undertook to impose, against the agency's will, at least initially, "user fees." These fees, common elsewhere in government, are simply the government's charging for the performance of its services—in this particular case, its licensing function. Resisted initially by FDA as a potential intrusion of its independence, it has now become an accepted part of the new medical product landscape, providing funds to the agency to enhance its approval performance, although at some cost to the traditional opaqueness of the approval processes that had previously existed. While not necessarily impacting the actual requirements for approval, the user fee legislation (56) did tacitly recognize, if not validate, the industry's dissatisfaction with the approval process, and essentially required FDA, in return for its new funding source, to make the process more responsive to industry desires in two fundamental ways— the time required for agency action on applications, and providing industry with more awareness of the status of applications and access to the agency during the process.

### The User Fee Act of 1992

The Prescription Drug User Fee Act of 1992 (PDUFA), beginning with fiscal year 1993 and continuing for 5 years, required set fees for each NDA (and biological product licenser supplement containing clinical data, though not bioequivalence data), to be paid in part at the time of submission and prior to approval. These fees were not insignificant, set at the outset in 1993 at $100,000 for a full NDA, and half that for a supplement, to $233,000 in 1997. Certain exemptions, such as one for certain small businesses, were included. It also required certain establishment fees and product fees.

Documentation on the concessions (euphemistically referred to as "performance goals") made by FDA in 1992 is not readily available; however, documentation provided with the renewal of user fees in 1997 indicates that both review times and more transparency in the approval process were uppermost in the minds of reformers. Action was expected on 90% of "standard" applications within 12 months, and on "priority" applications, those for serious diseases, within 6 months. Actual approval was not necessarily expected but, rather, FDA's initial review of the application and the issuance of an action letter. Other measurements involved 12-month review of standard efficacy supplements, 6-month review of priority efficacy supplements, and 6-month review of manufacturing supplements. These criteria were made more restrictive in the years following 1997. Other actions involved responses to requests for meetings, scheduling meeting dates, issuance of minutes following meetings, responding to sponsor clinical hold responses, dispute resolution, study protocol assessments, and simplifying action letters, all of which were designed to give manufacturers a more reliable sense of the agency's actions on pending applications, as well as make it more difficult for the agency to modify its views or position on such applications (57).

The dynamic of the user fee legislation seems to be universally seen as positive. Similar legislation has now been enacted for both animal drugs and medical devices. For detailed information on the effects of this legislation and for subsequent changes in the approval requirements resulting from the AIDS epidemic, see the chapters in this book regarding PDUFA and the FDA Modernization Act of 1997.

## REFERENCES AND NOTES

1. Wiley Act, Pub L No. 59–384, 34 Stat 768 (1906), sec 1, 2.
2. Wiley Act, sec 7.
3. Wiley Act, sec 8.
4. 221 U.S. 488 (1911).
5. 37 Stat 416 (1912).
6. 1938 act, Pub L No. 75–717, 52 Stat 1040 (1938), sec 201(p).
7. 1938 act, sec 505(a).
8. 1938 act, sec 505(b)(1)(A).
9. 1938 act, secs 505(b)(1)(B)–505(b)(1)(F).
10. 1938 act, sec 505(c).
11. *Id.*
12. 1938 act, sec 505(d).
13. *Id.*
14. 1938 act, sec 505(e).
15. 1938 act, sec 505(h).

16. *Id.*
17. 1938 act, sec 505(i).
18. 1938 act, sec 201(g).
19. 1938 act, sec 201(p).
20. 1938 act, sec 201(p)(2).
21. 55 Stat 851 (1941).
22. 59 Stat 463(1945).
23. 76 Stat 780, 785(1962). See Hutt and Merrill, Food and Drug Law, Cases and Materials, Foundation Press, 1991; 521–522.
24. Pub L No. 105–115 (1997).
25. Federal Food, Drug and Cosmetic Act, (FDCA) sec 201(p)(1), sec 201(p)(2), 21 USC 321(p)(1), (p)(2); Pub L No. 87–781 (1962).
26. FDCA, sec 505(c); 21 USC 355(c).
27. FDCA, sec 505(d); 21 USC 355(d).
28. *Id.*
29. As with the 1938 act, the act provided significant procedural protections to manufacturers whose applications were not deemed worthy of approval, including notice, and opportunity for hearing, which, if granted, was contemplated to be a full administrative hearing.
30. The requirement for "new information" is considered by the agency to include a reevaluation of existing information, rather than requiring wholly new information as a prerequisite for withdrawal.
31. FDCA, sec 505(e), 21 USC 355(e). See, also, 21 CFR.
32. FDCA, sec 505(i)(1), 21 USC 355(i)(1).
33. FDCA, sec 505(i)(2), 21 USC 355(i)(2).
34. FDCA, sec 505(i)(3), 21 USC 355(i)(3).
35. FDCA, sec 505(i), 21 USC 355(i).
36. See 21 CFR 312.40.
37. Sec 107(c), Pub L No. 87–781 (1962).
38. Sec 107(c)(2).
39. Sec 107(c)(3).
40. Sec 107(c)(3)(B).
41. Secs 107(c)(2) and 107(c)(3)(B).
42. A "News Along the Pike" publication of FDA dated December 3, 2003, reports that, under the DESI review, FDA evaluated 3443 drugs having 16,000 claims, removing 1099 of them from the market.
43. 412 U.S. 655 (1973).
44. 412 U.S. 645 (1973).
45. 412 U.S. 640 (1973).
46. 412 U.S. 609 (1973).
47. FDA did not win every case. Nor does this discussion begin to discuss the judicial history. Rather, it includes the two cases that best reflect the agency's success at persuading the court, under the mantra of protecting the public health, to read the new drug definition expansively. One significant loss by the agency involved its efforts, through regulation, to control the distribution of the drug methadone. FDA believed that "safe" under section 505 included the potential for possible misuse, rather than simply inherent safety, and could thus regulate postapproval distribution of a new drug. In *American Pharmaceutical Ass'n. v. Weinberger*, 530 F2d 1054 (DC Cir1976); affirming 377 F Supp 824 (DC DC, 1974), the courts disagreed, interpreting safety to mean inherent safety for the uses in labeling, thus invalidating postapproval distribution restrictions. Regardless of this opinion, FDA has successfully controlled postapproval distribution of certain potentially toxic drugs through "voluntary" arrangements with manufacturers reached during the approval process.
48. 421 U.S. 658 (1975).
49. 442 U.S. 544 (1979).
50. 460 U.S. 453 (1983).

51.  96 Stat 2049 (1983). The diseases used as examples were not necessarily obscure. Muscular distrophy, for example, widely known through annual telethons, was a principal example, and was particularly noteworthy in that a well-known actor, Jack Klugman, whose brother suffered from the disease, used his then significant celebrity status to promote the legislation and enhance its passage. Another example, amyotrophic lateral sclerosis, was also well known as Lou Gherig's disease. The orphan drug provisions are codified at sects 525–528 of the FDCA, 21 USC 360 aa–360 dd.

52.  In providing for tax credits and exclusivity, this legislation presaged similar, but far more controversial provisions in the 1984 Drug Price Competition and Patent Term Restoration Act, and later in the Pediatric Exclusivity Act. It appears that such provisions are now routinely considered appropriate to entice and reward manufacturers to develop new drugs or new uses for existing drugs.

53.  98 Stat 2815 (1984).

54.  99 Stat 387 (1985).

55.  In an attempt to provide some additional level of competition, FDA has taken the position that it will not consider orphan drugs to be the same, despite similarities, if a second manufacturer can show "clinical benefit," and will thereby permit such a manufacturer to break the 7-year exclusivity. See 21 CFR 316.

56.  Pub L No. 102–571 (1992).

57.  See letter from Donna Shalala to Thomas Bliley, November 12, 1977.



# 4 Generic Drug-Approval Process: Hatch–Waxman Update

**Marc S. Gross, Jay Lessler, S. Peter Ludwig, and Amanda L. Vaught**
*Darby & Darby, P.C., New York, New York, U.S.A.*

## OVERVIEW OF GENERIC DRUG-APPROVAL PROCESS UNDER HATCH–WAXMAN

The regulatory scheme for approval of generic drugs changed in April 1984 with enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the "Hatch-Waxman" or "Waxman-Hatch" Act (1). The act was intended to balance the interests of consumers, the brand-name (innovator) pharmaceutical industry, and the generic drug industry to "make available more low cost generic drugs [and] to create a new incentive for increased expenditures for research and development of certain products which are subject to pre-market approval" (2). Since enactment of the statute, generic drugs have increased from 19% of prescriptions in 1984 to 67% in 2007 and, in 1998, accounted for savings to consumers of $8 to 10 billion (3).

Breaking new ground, Title I of Hatch–Waxman authorized the marketing of generic drugs upon approval of Abbreviated New Drug Applications (ANDAs) (4). Under the Act, an ANDA can be approved upon submission of evidence that the active ingredient of the generic drug is the "bioequivalent" of a drug previously approved by the Food and Drug Administration (FDA) after submission of a full New Drug Application (NDA), without having to submit studies establishing the safety and efficacy of the drug (5). Hatch–Waxman contains similar provisions respecting ANDAs and so-called "505(b)(2) applications" or "paper NDAs," which rely on safety and/or efficacy data submitted in a prior NDA (6).

Title II of Hatch–Waxman provided for specific extensions of patents covering drugs (and other products) subject to "regulatory review" by FDA and other governmental agencies (7). This provision was intended to balance the benefits of ANDA practice by providing brand-name drug companies with the restoration of portions of the terms of their drug patents lost during the testing period required for approval of the drugs. Patent term extensions under 35 USC §156 (Section 156 extensions), as well as patent extensions implemented 10 years after enactment of Hatch–Waxman pursuant to the Uruguay Round of Negotiations under the General Agreement on Tariffs and Trade (8), authorized extended drug patent terms to brand-name companies.

The Hatch–Waxman statutory scheme incorporates several provisions relating to the submission and approval of both ANDAs and 505(b)(2) applications subject to certain patent and other marketing exclusivities for drugs granted to brand-name companies. The act also specifically provides a "safe harbor" for companies seeking approval of generic drugs, that is, the statute specifies that it is not an act of patent infringement to use a patented invention "solely for uses reasonably related to the development and submission of information" for FDA or other

governmental approval (9). On the other hand, Hatch–Waxman provides that an applicant for an ANDA or a 505(b)(2) applicant must make an appropriate certification respecting marketing of the generic drug vis-à-vis any patents for the same drug that are listed by the brand-name NDA holder in FDA's list of "Approved Drug Products With Therapeutic Equivalence Evaluations" (commonly referred to as the "Orange Book") (10).

Where the generic applicant certifies that there are no patents listed in the *Orange Book* (a "Paragraph I Certification") or that any listed patents have previously expired (a "Paragraph II Certification"), the drug may enter the marketplace immediately upon FDA approval. Where the applicant certifies that any listed patent has not yet expired but will expire on a particular date and that it will not enter the market until after that date (a "Paragraph III Certification"), FDA may approve the ANDA and make it effective as of the patent expiration date.

Where the applicant for generic approval intends to market the drug prior to expiration of any patent(s) listed in the *Orange Book*, the applicant makes a certification that, in its opinion, the patent(s) are not infringed or are invalid (a "Paragraph IV Certification"), and it notifies the NDA holder and patent owner accordingly (11). In such instance, the statute provides that the NDA holder/patent owner may then initiate a patent infringement action against the applicant for generic approval and FDA must suspend approval of the ANDA or 505(b)(2) application for up to 30 months (the "30-month stay"), subject to the earlier of a court determination or the expiration of the listed patent(s) (12).

In an effort to encourage generic drug entry into the pharmaceutical market, the Hatch–Waxman Act provides a commercial incentive to those generic companies who are the first to file ANDAs incorporating Paragraph IV Certifications challenging infringement or validity of *Orange Book*–listed brand-name pharmaceutical patents. Thus, in the event the listed brand-name patent(s) are adjudged to be invalid or not infringed prior to their normal expiration date(s); the first generic filer(s) entitled to approval of their ANDAs receive a 180-day exclusivity period during which no other ANDA can be approved for the same product (13). In such circumstances, the first entity or entities to file an ANDA can be the only generic marketer(s) for 180 days.

In addition, Hatch–Waxman incorporates several provisions limiting the filing or approval of ANDAs and 505(b)(2) applications in view of marketing "exclusivities" previously obtained by a brand-name NDA holder. Chief among such limitations is a 5-year bar on submitting an application for generic drug approval following approval of an NDA on a "new chemical entity" (NCE) (14), and a 3-year bar on obtaining approval of a generic drug application following approval of an NDA based on new clinical investigations respecting a previously approved drug (15). There is also a 7-year bar on obtaining approval of any drug application following approval of an orphan drug for the same indication (16). Finally, pediatric exclusivity, which is granted upon completion of pediatric studies requested by FDA, prevents generic drug approval for an additional 6 months after expiration of any pertinent patent listed in the *Orange Book*. Pediatric exclusivity also extends the 3-year, 5-year, and 7-year exclusivities by 6 months (17).

FDA's approval scheme for ANDAs containing Paragraph I, II, III, or IV Certifications is illustrated in Figures 1 and 2 (18).

Since enactment of Hatch–Waxman, several amendments have been made to enhance and prevent abuse of the Hatch–Waxman scheme. For instance, changes



**FIGURE 1**  ANDA Patent Certifications.

made to Hatch–Waxman in the Medicare Prescription Drug Improvement, and Modernization Act of 2003 (hereinafter "the 2003 Statutory Changes") were designed to limit brand-name companies to the opportunity to obtain a single 30-month stay of approval of ANDA or 505(b)(2) applications for the resolution of patent infringement litigation respecting listed drug patents. More recently, the Food and Drug Administration Amendments Act of 2007 (FDAAA) provided that optically pure enantiomers of previously approved drugs may be considered new chemical entities and thus receive 5 years of market exclusivity if certain conditions are met. FDAAA also prevents delay of generic approval based on a third-party submission of citizen petitions suggesting that generic applications should not be approved, unless delay is necessary to protect public health.

## LISTING PATENTS IN THE *ORANGE BOOK*

### Requirements

In 1984, for the first time, Hatch–Waxman required each NDA applicant to identify any patent which claims the drug for which the NDA was submitted or a method of using such drug which the applicant believed could reasonably be asserted against potential generic infringers (19). The patent information must be submitted during the pendency of the NDA. On the other hand, if a patent eligible for listing in the *Orange Book* is granted after approval of the NDA (or even after the filing of an ANDA seeking approval of a generic equivalent of the listed product), then the patent information must be submitted within 30 days after grant of the patent (20). The information submitted during pendency of an NDA must be set forth in FDA Form 3542a, while information for listing submitted after approval of an NDA must

Gross et al.



**FIGURE 2**  Paragraph IV Certifications.

be incorporated in FDA Form 3542 (21). Under Hatch–Waxman, the generic applicant must make a patent certification as to each such listed patent (22), and if the patent is not listed until after filing of the ANDA, amend its application accordingly (23).

On the other hand, if the brand-name company fails to submit the patent information for listing in the *Orange Book* within the 30-day period after the grant of the patent, the generic applicant need not submit an amended certification and the patent owner may not initiate an infringement suit under 35 USC §271(e)(2) (24).

Further, a brand-name company cannot obtain a 30-month stay of generic approval based on the listing of a patent after the filing of the ANDA (25).

In one recent case, *Eisai*, the NDA holder, owned a patent which claimed the active pharmaceutical ingredient donepezil hydrochloride in its commercial drug products Aricept® and Aricept ODT® (26). While Eisai properly submitted the forms to list its patent for Aricept in 1996, Eisai failed "by . . . repeated oversights" to submit the proper forms and information to FDA for Orange Book listing of the patent for Aricept ODT, which was approved in 2005 (27). Accordingly, FDA did not list the patent until more than 5 months after the generic party filed its ANDA (28). By reason of such error, which the district court characterized as "more than merely 'clerical,'" (29) the ANDA applicant did not have to submit a Paragraph IV certification, and Eisai was not entitled to the 30-month stay of approval of the ANDA that the prompt commencement of suit would have achieved. Additionally, the district court dismissed the lawsuit for lack of subject matter jurisdiction due, in part, to the ANDA applicant's failure to submit a Paragraph IV certification.

The patents for which information must be submitted in connection with an NDA include those directed to the drug substance (active ingredient), the drug product (formulation or composition), and methods of use (indications) approved for the listed drug product (30). The patents thus submitted to FDA are listed in the *Orange Book* (31), and are the "listed patents" or "Orange Book patents".

Since enactment of Hatch–Waxman, brand-name companies have submitted patents for listing in the *Orange Book* directed to a wide range of subject matter, which include different forms of an active drug substance, for example, anhydrous or hydrated forms, salts, enantiomers or crystal forms of the active substance, different formulations of the drug, metabolites formed in patients after administration of the drug, and methods of use of the drug whether or not previously approved by FDA (32). The listing of multiple patents in the *Orange Book* has compelled ANDA and 505(b)(2) applicants to make multiple patent certifications and, in some instances, resulted in the imposition of multiple 30-month stays of generic product approvals, with consequent delays of generic entry into the market.

FDA does not review the propriety of patents submitted by NDA holders for listing in the *Orange Book* because FDA "does not have the expertise to review patent information" (33). Rather, if the accuracy or relevance of patent information submitted for listing in the *Orange Book* is disputed by an ANDA or 505(b)(2) applicant it must notify FDA. The agency will then ask the NDA holder to confirm the correctness of the patent information, and unless the NDA holder withdraws or amends its patent information, FDA "will not change the patent information in the" *Orange Book* (34). The agency's failure to review patent listings in the *Orange Book* for possible delisting provoked criticism, and prompted proposals for reform.

In response to such criticisms, FDA implemented several rule changes in 2003 (hereafter "the 2003 Rule Changes"). Under those regulations, drug substances that are the same active ingredients as the subject of NDAs, but in different physical forms, that is, polymorphs (35), must be submitted for listing in the *Orange Book*. An NDA holder or patent owner must, however, establish that a polymorph claimed in a patent will "perform the same as the drug product described in the NDA with respect to such characteristics as dissolution, solubility, and bioavailability" for listing (36). To establish such "sameness" for a polymorph, the NDA holder or patent owner must submit detailed test data in five different categories, using forms specified in the 2003 Rule Changes (37).

Further in accordance with the 2003 Rule Changes, the listing of product-by-process patents is permitted (38), provided, however, that to be submitted for listing "the product-by-process patent must claim the drug product that is the subject of the NDA" and the drug product must be novel (39).

On the other hand, when "the drug that is the subject of [a new drug] application contains an antibiotic drug and the antibiotic drug was the subject of any application" received by FDA on or before November 20, 1997, the *Orange Book* listing requirements of the Hatch–Waxman Act do not apply (40).

Finally, patents for products approved pursuant to a biologics license application are not subject to the listing requirement and, therefore, are not listed in the *Orange Book*.

In addition, the 2003 Rule Changes prohibit submitting patents for listing which claim packaging, metabolites, or intermediates [in addition to the previous prohibition against the submission of process patents claiming methods of making drug substances (active ingredients)] (41). Packaging is distinct from finished dosage forms for approved drug products, which must be submitted for listing (42). A metabolite is defined by FDA as a "chemical compound that results after the active ingredient of the drug has broken down inside the body"; metabolites may not be submitted for listing since they are not the active ingredients described in NDAs (43). Finally, intermediates, "materials that are produced during preparation of the active ingredient and are not present in the finished drug product," may not be submitted for listing (44). FDA considers intermediates as "in-process materials" as distinguished from drug substances or components in a finished drug product (45).

### Challenges to Listing

In several cases, ANDA applicants sought to compel FDA to delist patents improperly listed in the *Orange Book*. Those efforts were without success; the Court of Appeals for the Federal Circuit held that delisting is a private right of action both barred by the FDCA and not a recognized defense to a claim of patent infringement (46). While the Federal Circuit held out the possibility that a generic company might secure federal jurisdiction on some other basis (47) (e. g., by an action against the listing company in a counterclaim to a patent infringement suit), any attempt by a generic company to seek delisting would involve substantial additional delays during which it would be barred from the market by reason of the continued patent listing in the *Orange Book*.

In its 2003 Rule Changes, FDA declined to create any administrative procedures for challenging patent listings or for delisting patents. Instead, it affirmed its long-standing view that it has only a ministerial role in overseeing *Orange Book* listings (48). However, in an effort to "reduce confusion and help curb attempts to take advantage of this process (the Hatch–Waxman administrative scheme)" (49), the agency restricted the types of patents and supporting evidence required for listing (see Section "Requirements" of this chapter).

The 2003 Statutory Changes made no alterations to the requirements for the types of patents which must be submitted for listing in the *Orange Book*. The amendments, however, provided a remedy for improper listings. In the event a patent infringement action is commenced based on the filing of an ANDA or 505(b)(2) application, the applicant may assert a counterclaim to correct or delete the patent listing if the patent does not claim the approved drug or an approved method of

use (50). The counterclaim may not seek damages. To date, there has not been a successful action for improper listing without a patent infringement lawsuit being filed by the patent owner or NDA holder.

### Delisting and Relisting

FDA does not normally take affirmative action to delist a patent, rather, it allows the patent to expire, terminating the effect of listing. When requested by the NDA holder for the listed patent, however, FDA will delist the patent. This can lead to unusual situations where, for example, an ANDA filer having 180-day marketing exclusivity may seek relisting of a patent to preserve its exclusivity vis-à-vis other generic filers (51). In the cited case, Mylan had obtained 180-day generic market exclusivity until September 2007, in view of the March 25, 2007, expiration of the applicable Pfizer patent and subsequent 6-month pediatric exclusivity (52). On Pfizer's request, FDA delisted the Pfizer patent on June 22, 2007, and held that Mylan's exclusivity did not survive the March expiration date of the patent (53). Notwithstanding Mylan's repeated efforts to enjoin the agency's action (and thus delay generic competition for up to 3 months, by eight other ANDA filers), the courts held FDA's interpretation of the law as reasonable and refused to grant mandatory injunctive relief to Mylan (54).

## ABBREVIATED NEW DRUG APPLICATIONS

### The "Listed" Drug

Under Section 505(j) of Hatch–Waxman, an ANDA may be filed for a generic version of any "listed drug" (55). FDA deems any drug for which an NDA has previously been approved a listed drug and lists the drug in the *Orange Book* (56). Both drugs, previously approved under ANDAs (57), and antibiotics (58) are regarded as listed drugs.

An ANDA must include all of the information required in an NDA except, significantly, full reports of investigations demonstrating that the drug is safe and effective in use. Additionally, the ANDA must show (*i*) the labeling of the drug for which the ANDA is sought is the same as the approved labeling for the listed drug; (*ii*) the generic drug, its route of administration, dosage form, and strength are the same as the listed drug, or supply such information respecting any differences as FDA may require; and (*iii*) the generic drug is bioequivalent to the listed drug; and also (*iv*) supply information regarding the status of any *Orange Book*–listed patents on the approved drug (59).

### Establishing Equivalence to the Listed Drug

Initially, an ANDA filer must show that the conditions of use identified in its proposed labeling have been previously approved for the listed drug on which the ANDA is based (60). According to the statute, the ANDA must incorporate the same labeling as that previously approved for the listed drug, except for any changes required because of differences approved on the basis of a suitability petition (see Section "Suitability Petitions for Drugs That Differ From Listed Drug" of this chapter) or because the generic drug and the listed drug are "produced or distributed by different manufacturers" (61). Changes in the proposed labeling, which may be approved under FDA regulations, include the listing of differences in expiration

date, formulation, bioavailability, pharmacokinetics, or revisions made to comply with current FDA labeling guidelines (62). Consistent with the case law, the current regulation also specifically authorizes the "omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act" (63).

This provision, coupled with a "Section (viii) Statement" (see Section "Section VIII Statement of Listed Use Patents Which Do Not Cover Indications for Which Approval Is Sought" of this chapter), provides a mechanism for avoiding infringement of listed method-of-use patents for indications for which generic applicants do not seek approval

An ANDA applicant must establish that the active ingredient(s) in its prospective generic product are the same as those in the listed drug (64). In case one of the active ingredients is different, the ANDA applicant must demonstrate both: (1) that FDA approved a suitability petition for the new drug and (2) that the different active ingredient is either an active ingredient of a different listed drug, or is not a "new drug" within the meaning of Hatch–Waxman (65).

Finally, the ANDA must show that the new drug is "bioequivalent" to the listed drug (66). As defined by statute, a generic drug is bioequivalent to a listed drug if

(a) the rate and extent of absorption of the respective drugs do not significantly differ from one another, or

(b) there is no significant difference in the extent of absorption of the respective drugs and the difference in the rate of absorption of the respective drugs is intentional, reflected in the proposed labeling of the generic drug, not essential to achieving effective concentrations and considered medically insignificant. (67)

FDA may exercise discretion in determining whether the evidence submitted to show bioequivalence is adequate (68), and FDA has discretion to waive the requirement for proof of bioequivalence (69).

## Additional Requirements

Although FDA does not require safety testing data in support of an ANDA, it may consider safety questions associated with the identity or concentrations of the inactive ingredients of the generic drug. Thus, approval of an ANDA may be denied if the agency finds that the inactive ingredients are unsafe under the conditions set forth in the proposed labeling for the drug, or the composition of the drug is unsafe because of the type or quantity of the inactive ingredients in the composition (70). The regulations specify a number of changes in the inactive ingredients of a generic product on which the agency may predicate a "reasonable basis to conclude that one or more of the inactive ingredients of the proposed drug or its composition raises serious questions of safety" (71) and may refuse approval. FDA has considerable latitude in determining whether the identity or amounts of inactive ingredients in a generic drug may adversely affect the safety of the drug.

## Suitability Petitions for Drugs That Differ From Listed Drug

If a party wants to submit an ANDA for a new drug which differs in specific respects from the listed drug to which the ANDA refers, it may submit a suitability petition to FDA seeking permission to file such an application (72). Such petitions may be

filed where the new drug has (*i*) a different active ingredient, (*ii*) a different route of administration, (*iii*) a different dosage form, or (*iv*) a different strength from the listed drug (73). Any different active ingredient must be within the "same pharmacological or therapeutic class" as the active ingredient in the listed drug, and the modified drug must be expected to have "the same therapeutic effect" as the listed drug (74). When the party filing a suitability petition seeks approval to incorporate a different active ingredient than a listed drug having more than one active ingredient, it must establish (*i*) the other active ingredients of the new drug are the same as the active ingredients of the listed drug, and (*ii*) the different active ingredient is an active ingredient of a different listed drug, or that the different active ingredient is an active ingredient of a drug which is not a "new drug" under the FDCA (75).

Consistent with the statutory provisions, FDA should grant a suitability petition unless it finds that investigations must be conducted to show:

1. the safety and efficacy of the modified drug or of any of (*i*) its active ingredients, (*ii*) route of administration, (*iii*) dosage form or (*iv*) strength, which differ from the listed drug; or
2. that the drug may not be adequately evaluated for approval as safe and effective on the basis of the information required in an ANDA. (76)

The procedure for submitting a suitability petition is set forth in FDA regulations (77). The petition must identify the listed drug, incorporate a copy of the proposed labeling for the generic product (as well as a copy of the approved labeling for the listed drug), and make the several specific showings outlined in the regulation.

By statute, FDA must either approve or disapprove a suitability petition within 90 days of the date of the petition's submission (78).

### Removal of *Orange Book* Listing of a Drug

Hatch–Waxman specifies that listing of a drug in the *Orange Book* will be terminated if either its approval is withdrawn or suspended, or the drug is withdrawn from sale for safety or efficacy reasons (79). FDA will not approve an ANDA when the approval of the corresponding NDA for the listed drug has been withdrawn or suspended and FDA has "published a notice of opportunity for hearing to withdraw approval of the listed drug," or when the secretary has determined that the listed drug has been withdrawn from sale for safety or efficacy reasons (80).

Withdrawal of approval of a listed drug may occur where, after due notice and opportunity for hearing, FDA finds (*i*) that the drug is unsafe for use under the conditions for which it was approved, (*ii*) that there is a lack of substantial evidence that the drug is effective under the conditions set forth in the product labeling, or (*iii*) that the NDA contained any untrue statement of material fact (81). An ANDA holder may submit written comments in response to the notice of opportunity for hearing issued on the proposed withdrawal of the related listed drug. In the event of a hearing, the ANDA holder may join as a nonparty participant (82). If the Secretary of Health and Human Services finds that continued use of the drug presents "an imminent hazard to the public health" (83), then the ANDA will be withdrawn when FDA enters a final decision withdrawing approval of the listed drug (84).

## APPROVAL OF GENERIC DRUGS UNDER SECTION 505(B)(2)

This section of Hatch–Waxman provides for approval of certain drugs without full safety and efficacy investigations, whereas NDAs require such information under Section 505(b)(1). 505(b)(2) applications may apply when the applicant has not obtained a "right of reference or use" from the party for which the full safety and efficacy investigations were previously conducted (85).

FDA interprets the provisions of Section 505(b)(2) to sanction reliance by a generic applicant on the safety and/or efficacy data submitted in a prior NDA for the related listed drug (86). Hence, the "paper NDA" denomination has been used because the applicant relies on laboratory and clinical data from a third party. A number of 505(b)(2) applications have been filed for approval of salts differing from the NDA-approved salts of the same active ingredients, where the generic applicants rely on data previously submitted to FDA by the NDA holders (87). In one such instance, the NDA holder/patent owner unsuccessfully challenged the foregoing FDA interpretation by a citizen petition (88).

As noted later, 505(b)(2) applicants must make patent certifications and comply with patent notice provisions analogous to those required for ANDA applicants (89). Because of the similar requirements, FDA may refuse to accept 505(b)(2) applications for drugs which are duplicates of listed drugs and are eligible for approval of ANDAs under Section 505(j) (90).

### Reliance Upon Literature

Investigations relied upon by a 505(b)(2) applicant may include both studies which it owns and reports from studies owned by third parties. Such studies may include both clinical and animal safety and efficacy tests. FDA views all such tests submitted in a 505(b)(2) application as having been "relied upon" by the 505(b)(2) applicant (91).

### Variants of Listed Drugs

505(b)(2) applications are necessary for new generic drugs which sufficiently differ from the prior listed drugs that suitability petitions for filing ANDAs would not be approved. For example, this is the case where the listed drug has only one active ingredient (92). Accordingly, as indicated earlier, the filing of a 505(b)(2) application is appropriate where, for example, the generic drug for which approval is sought is a different salt of the listed drug (72).

## FDA ACTION ON ANDAS AND 505(B)(2) APPLICATIONS

An ANDA or 505(b)(2) application may not be submitted within 5 years after the approval of an NDA for an NCE, unless the application contains a Paragraph IV Certification, in which case the application may be submitted on the fourth anniversary of the approval of the NDA (93).

Under Hatch–Waxman, FDA must approve an ANDA unless it finds that the methods and facilities of the applicant are inadequate to assure the identity, strength, quality, and purity of the drug, or the information submitted in the application is insufficient to meet the other statutory requirements (94). On the other hand, since a 505(b)(2) application is basically an NDA, it must meet each of the requirements for an NDA save that it may rely upon investigations of safety

and efficacy which were not conducted by the applicant and for which it has not obtained a right of reference (91).

The statute provides the agency must complete its review of the sufficiency of an ANDA or 505(b)(2) application within 180 days of initial receipt of the application (95). During the review period, FDA may either approve or disapprove the application. If it disapproves the application, it must give the applicant notice (a "not approvable letter") and provide it with the opportunity to amend the application, withdraw it, or request a hearing to challenge the agency's grounds for denying approval (96). The opportunity to request a hearing is designed to provide the applicant with the opportunity to contest the grounds asserted by the agency for denying approval of the application (97).

Alternatively, if FDA approves the ANDA or 505(b)(2) application, the effective date of approval may be delayed (14) on any of the various grounds indicated later, or revoked based upon subsequent court order (98).

## PATENT CERTIFICATIONS

### Types of Certifications

An applicant for an ANDA or a 505(b)(2) application must certify to FDA that, in its opinion and to the best of its knowledge, with respect to each listed patent which claims the drug or a use of the drug for which the applicant is seeking approval, that:

1. The patent information which the NDA holder is required to file (including the identification of any listed patent) has not in fact been filed (a Paragraph I Certification),
2. The listed patent has expired (a Paragraph II Certification),
3. The listed patent will expire on some specified date and the ANDA or 505(b)(2) applicant does not intend to commence marketing the drug for which it seeks approval until after that date (a Paragraph III Certification), or
4. The listed patent is invalid or will not be infringed by the manufacture, use, or sale of the drug for which the ANDA or 505(b)(2) application is submitted (99).

FDA regulations provide that a Paragraph IV Certification may be based on the asserted unenforceability of the listed patent as well as noninfringement or invalidity thereof (100).

### Content of Certifications

The Paragraph I Certification simply permits the ANDA or 505(b)(2) applicant to inform FDA that the NDA holder has not listed any patents, which might affect the agency's approval of the application (101). Similarly, the Paragraph II Certification serves to inform FDA that a previously listed *Orange Book* patent has expired, and would not have any effect on approval by the agency. In like manner, a Paragraph III Certification informs FDA when a listed patent will expire, thus providing notice to the agency to delay approval of the ANDA or 505(b)(2) application until that date. (Fig. 2).

The Paragraph IV Certification, on the other hand, imposes certain obligations on each of (*i*) the ANDA or 505(b)(2) applicant, (*ii*) the owner of the listed patent,

and (*iii*) FDA. The initial obligation is imposed on the applicant, who must include a statement in its application that it will provide notice of its application and the basis for its position to the owner of each challenged listed patent and the holder of the NDA for the listed drug, or the representatives thereof (102).

## NOTICE TO PATENT OWNER AND HOLDER OF NDA ACCOMPANYING PARAGRAPH IV CERTIFICATION

The notice required of the ANDA or 505(b)(2) applicant making a Paragraph IV Certification must state that an application for approval has been submitted to FDA (103). The notice states applicant's intent to engage in the commercial manufacture, use, or sale of the listed drug before the expiration of the patent as to which the certification has been made (104). The notice must include, inter alia, a "detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed" (105).

FDA regulations provide that the notice of "factual and legal basis" must set forth a detailed statement for each claim of the listed patent for which a Paragraph IV Certification is submitted and provide a "full and detailed explanation of why the claim is not infringed" and/or such an explanation of the grounds supporting the allegation of invalidity (or, alternatively, unenforceability) of each such claim (106). The regulations further require that the notice given by the ANDA applicant must identify the ANDA number; the established name, if any, of the proposed drug product; the active ingredient, strength, and dosage form of the proposed drug product; and the patent number and expiration date of each of the listed patents believed to be invalid, unenforceable, or not infringed (107).

When the Paragraph IV Certification is in the ANDA or 505(b)(2) application, the notice of the factual and legal basis for the certification must be given to the patent owner/NDA holder (104) no later than 20 days after the postmark date on the notice from FDA of filing of the application (108). When the certification is in an amendment or supplement to the generic application, the notice must be given at the same time as the submission of the amendment or supplement (109).

Assuming compliance with the procedural requirements, FDA presumes the notice to be effective upon receipt by the patent owner and NDA holder, and counts the day following the date of receipt as the first day of the 45-day period provided in Hatch–Waxman for possible commencement of infringement litigation, as described later (110).

Brand-name companies have asserted in some infringement actions (predicated on Paragraph IV Certifications) that ANDA applicants have not satisfied the requirement to provide a sufficient notice of the factual and legal basis for asserting noninfringement or invalidity of listed patents, and sought court orders remedying allegedly deficient notices. To date, no such orders have been issued (111).

## Section VIII Statement of Listed Use Patents Which Do Not Cover Indications for Which Approval Is Sought

Hatch–Waxman provides that Paragraph IV Certifications need not be made in ANDAs or 505(b)(2) applications for *Orange Book*–listed use patents that do not claim a use for which the applicant seeks approval. In this instance, the statute (and

FDA rules) provides that the applicant may file a statement that the use patent does not claim such a use (112). A "Section viii Statement" is significant since it may avoid the necessity to submit a Paragraph IV Certification and thus preclude the patent owner from commencing an infringement suit and invoking the 30-month stay of approval of the generic drug.

FDA has disclaimed any role in assessing whether a use patent covers an indication for which an ANDA or 505(b)(2) applicant seeks approval (113). Moreover, it has taken the position that it must accept the representations by the NDA holder as to the scope of the use patent. In a number of instances, FDA held a Section viii Statement improper and instead required a Paragraph IV Certification (114). FDA's approach has been specifically endorsed by the courts (115). In another case, however, a trial court ordered FDA to accept an ANDA applicant's Section viii Statement in lieu of a Paragraph IV Certification (116). The court did not take issue with FDA's policy of "deference to NDA holders' characterizations of the scope of use patents" but found, on the specific facts of the case, that the patent owner had consistently distinguished the use claimed in the method patent in question from the indication for which the ANDA applicant sought approval.

In *Aventis Pharma Deutschland GMBH v. Cobalt Pharmaceuticals, Inc.*, Cobalt contended in their Section viii Statement that they would not market generic ramipril for treating heart failure (117). Rather, Cobalt intended to market ramipril "solely for treating hypertension and reducing the risk of heart attack, stroke, and death from cardiovascular causes" (118). Cobalt's knowledge that some physicians may prescribe generic ramipril for treating heart failure was considered to be "'legally irrelevant' to an active inducement analysis" (119).

In order to refine its treatment of Section viii Statements, FDA, in its 2003 Rule Changes, modified the declaration required of an NDA holder for listing of a method-of-use patent. It now requires that the declarant must

> ... describe each individual method of use [and identify the related patent claim(s)] for which a patent is submitted for listing, and identify the corresponding language found in the labeling of the approved NDA that corresponds to that method of use. (120)

By requiring greater particularity in the declaration, FDA may take more of a substantive role in evaluating the propriety of Paragraph IV Certifications vis-à-vis Section viii Statements.

### Amending ANDAs or 505(b)(2) Applications to Make Paragraph IV Certifications

When an ANDA or 505(b)(2) applicant amends its application to make a Paragraph IV Certification, the statute requires notification of the listed patent owner and NDA holder (121). The generic applicant may meet this requirement by amending a Paragraph III Certification to a Paragraph IV Certification. The applicant can also add a Paragraph IV Certification for a newly listed patent during the pendency of the application (122). A notice of the factual and legal basis for the Paragraph IV Certification must be sent "at the same time that the amendment... is submitted to FDA" (123). FDA regulations do not require an ANDA or 505(b)(2) applicant to amend its prior certifications if either the NDA holder failed to provide the requisite patent information within 30 days after patent issuance, or if the application originally contained appropriate patent certifications (124).

An ANDA or 505(b)(2) applicant who amends the application to add a Paragraph IV Certification need only to provide notice to the NDA holder and patent owner if:

1. The application did not already contain a Paragraph IV Certification with respect to the same patent, or
2. There was not a full opportunity for the NDA holder to obtain a 30-month stay (125).

As pointed out earlier, the statute still requires notice of amended or supplemental Paragraph IV Certifications. The 2003 act provided, however, for only a 30-month stay of FDA approval upon the initiation of an infringement suit based on patents listed in the *Orange Book* prior to the filing of an ANDA or 505(b)(2) application—not the amendment or supplementation—of such an application. (See Section "The 30-Month Stay" later.)

## THE SAFE HARBOR EXEMPTION FROM PATENT INFRINGEMENT

As part of the effort to balance the rights of brand-name and generic pharmaceutical manufacturers, the Hatch–Waxman Act provided that the development of information by or for generic drug companies for the purpose of preparing ANDAs or 505(b)(2) applications does not constitute patent infringement. Thus, Hatch–Waxman amended the patent statute to provide that "[i]t shall not be an act of infringement to make, use, offer to sell, or sell … a patented invention … solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs" (126).

In the recent *Integra* case, the Supreme Court illuminated both the breadth and depth of the safe harbor (127). The court held that research results that were not intended to be submitted to FDA but which may lead to data suitable for such purpose were within the safe harbor.

Integra owned five patents relating to Arginine-Glycine-Aspartic acid (RGD) peptides (128). While the patents were in force, Merck collaborated with the Scripps Research Institute on research to reverse tumor growth. The process required an RGD peptide to inhibit angiogenesis. As part of their collaboration, Merck funded research at Scripps to investigate RGD peptides produced by Merck as potential drug candidates. Once Scripps identified a primary candidate, Merck performed the "toxicology tests necessary for FDA approval to proceed with clinical trials." Ultimately, Merck investigated several RGD peptides, but only initiated a project to "guide one of its RGD peptides through the regulatory process in the United States" (129).

Integra filed suit against Merck and Scripps for infringing its patents relating to RGD peptides. The district court found for Integra, and explained that "'any connection between the infringing Scripps experiments and FDA review was insufficiently direct to qualify for the [§271(e)(1) exemption]'" (130). On appeal, the Federal Circuit found the safe harbor inapplicable as Merck's sponsorship of Scripps's research work "'was not clinical testing to supply information to FDA, but only general biomedical research to identify new pharmaceutical compounds'" (131).

The Supreme Court reversed the Federal Circuit, stating the text of the statute "provides a wide berth for the use of patented drugs in activities related to the

federal regulatory process" (132). The court went on: "[w]e think it apparent from the statutory text that §271(e)(1)'s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the FDCA" (133). The language of the statute leaves no room for "excluding certain information from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included" (134). Thus, while Merck did not ultimately submit all of its research on RGD peptides to FDA, Merck had a "reasonable basis for believing that the experiments [would] produce 'the types of information that are relevant to an IND or NDA'" (135).

The safe harbor, then, supplies protection for research into potential drug candidates that may reasonably produce data relevant for submission to FDA:

Properly construed, §271(e)(1) leaves adequate space for experimentation and failure on the road to regulatory approval: At least where a drugmaker has a reasonable basis for believing that a patented compound may work, through a particular biological process, to produce a particular physiological effect, and uses the compound in research that, if successful, would be appropriate to include in a submission to the FDA, that use is "reasonably related" to the "development and submission of information under . . . Federal law" (136).

On remand, the Federal Circuit applied the Supreme Court's interpretation of the safe harbor provision and reversed the district court's finding of infringement (137). The court highlighted the fact that the accused experiments occurred after discovery of the underlying "physiological effect"—the angiogenesis-inhibiting properties of the RGD peptides (138). In addition, the experiments produced information relevant to "efficacy, mechanism of action, pharmacology, or pharmacokinetics" of Integra's claimed compounds (139). Thus Merck's research activities met the court's criterion of being "reasonably related to research that, if successful, would be appropriate to include in a submission to the FDA" (140).

The Supreme Court further indicated that its decision had no bearing on "whether, or to what extent, §271(e)(1) exempts from infringement the use of 'research tools' in the development of information for the regulatory process" (141). On remand, the Federal Circuit noted that Integra was not an appropriate case "to make new law on the issue of whether patent claims to research tools (however that term may be defined) are excluded from the ambit of Section 271(e)(1)" (142). Such a case is yet to occur.

The safe harbor also applies to International Trade Commission (ITC) proceedings where a party alleges the unlawful importation of products made abroad by a patented process (143).

## SUBMISSION OF AN ANDA OR 505(B)(2) APPLICATION AS AN ACT OF PATENT INFRINGEMENT

To balance the safe harbor rights of generic applicants to develop information for ANDA or 505(b)(2) filings, Hatch–Waxman provided that the submission of an ANDA or 505(b)(2) application may be treated as (what the Supreme Court has characterized as) an "artificial act of infringement" for a drug claimed in a patent or the use of which is claimed in a patent (144). Thus, the patent statute was amended to specify that "[i]t shall be an act of infringement to submit . . . [an ANDA or 505(b)(2) application] . . . if the purpose of such submission is to

obtain [FDA] approval ... to engage in the commercial manufacture, use, or sale of a drug ... claimed in a patent before the expiration of such patent" (145). The question of whether a Paragraph IV certification must be included in the ANDA or 505(b)(2) application to establish the statutory tort has been at issue in several cases (146).

In two separate cases (*Teva v. Abbott* and *Glaxo v. Apotex*), a Northern District of Illinois court held that the submission of an ANDA without a Paragraph IV certification was sufficient to be considered an artificial act of infringement and to establish subject matter jurisdiction (147). In so holding, the court relied on the language of §271(e)(2), which mentions neither patent certifications nor any other limitation on the type of ANDA that would suffice to establish infringement. Both of these cases involved antibiotics approved by FDA before November 21, 1997, which are exempt from *Orange Book* listing requirements (148).

However, in the recent Eisai litigation, a different district court, citing a number of prior interpretations of the statute by the Supreme Court and the Federal Circuit (149), read §271(e)(2) to require that an ANDA or 505(b)(2) application must contain a Paragraph IV certification to constitute an act of infringement (150). Based on that interpretation, the Eisai court dismissed Eisai's infringement suit since the allegedly infringed patent "was not listed in the Orange Book for the drug at issue [when the ANDA was filed] and the ANDA contained no Paragraph IV certification against the patent" (151).

Hatch–Waxman provides that a patent owner has 45 days after receiving notice of a Paragraph IV Certification to sue the ANDA [or 505(b)(2)] applicant for infringement (152). The applicant is required to notify FDA "immediately" upon the filing of suit within the 45-day period (153). If the patentee does not file an infringement action within the 45-day period, FDA may immediately approve the ANDA or 505(b)(2) application. If, on the other hand, the patent owner initiates suit, FDA cannot approve the application until the expiration of the 30-month stay for resolution of the litigation, as more fully set forth later (12).

Accordingly, upon receipt of notice of Paragraph IV Certifications, brand-name pharmaceutical companies frequently sue ANDA and 505(b)(2) applicants during the 45-day notice period, which forestalls generic competition in the marketplace for the 30-month period(s) sanctioned by Hatch–Waxman (154).

## Scope and Jurisdiction of Infringement Actions Commenced Under 35 USC §271(e)(2)

The artificial act of infringement under 35 USC §271(e)(2) is limited to indications for which approval is sought. It is not an act of infringement under §271(e)(2) to submit an ANDA to market a listed drug for a different indication than an unapproved indication covered by a listed use patent (155).

NDA holders are authorized to list patents in the *Orange Book* which they believe "could reasonably be asserted ... [against an unlicensed party] engaged in the manufacture, use or sale of the drug" (156). In the past, ANDA or 505(b)(2) applicants could not seek patent delisting in infringement suits based on *Orange Book*–listed patents (157). A number of antitrust suits were commenced; however, they were predicated on the mala fides of *Orange Book* listings (158). Moreover, as indicated in Section "Challenges to Listing" earlier, an ANDA or 505(b)(2) filer sued

on the basis of a Paragraph IV Certification may counterclaim for an order requiring the NDA holder to correct or delete the listing (50).

With respect to personal jurisdiction, it has been held that U.S. subsidiaries of foreign generic manufacturers actively involved in ANDA filings are subject to jurisdiction under §271(e)(2) (159). On the other hand, actions under that provision for infringement by third-party manufacturers that supply the active ingredients of generic drugs in issue in ANDAs have been dismissed (160).

## Right of ANDA or 505(b)(2) Applicants to Seek Declaratory Judgments

Hatch–Waxman precludes an ANDA or 505(b)(2) applicant from initiating a declaratory judgment action for noninfringement or invalidity of a listed patent within the 45-day period after receipt of its notice of the factual and legal basis for its Paragraph IV Certification (161). This provision facilitates initial commencement of a patent infringement suit and the consequent 30-month stay in accordance with the statutory scheme.

On the other hand, it has been held that an ANDA or 505(b)(2) applicant may seek a declaratory judgment during the 45-day period on other grounds, or file a counterclaim in the infringement suit for a declaratory judgment that it is not infringing other, unlisted patents (162). In either instance, it need only be shown that there is an actual controversy between the parties.

The 2003 statutory changes further sanctioned the commencement of an action for declaratory judgment of noninfringement of a patent for which a Paragraph IV Certification has been made, provided that:

a) the NDA holder or patent owner did not file an infringement suit within 45 days after receiving notice of such certification; (163) and
b) in any case in which the notice from the ANDA or 505(b)(2) applicant asserts non-infringement, and the notice is accompanied by a document offering confidential access to the ANDA or 505(b)(2) application for the sole purpose of determining whether an infringement action should be brought (164). The document offering confidential access must contain such restrictions as to persons entitled to access, and the use and disposition of any information accessed as would apply had a protective order been entered to protect trade secrets and confidential business information. A request for access under an offer of confidential access is considered an acceptance of the terms and restrictions in the offer and creates an enforceable contract.

Any ANDA or 505(b)(2) application to which confidential access is provided may be redacted by the applicant to remove information not relevant to any issue of patent infringement.

Any action for declaratory judgment brought subject to the foregoing provisions must meet the case or controversy requirements of 28 USC §2201 (165), and can only be commenced in the judicial district in which the defendant has its principal place of business or a regular and established place of business (166).

The Congressional intent was to make a claim for declaratory judgment of noninfringement subject to the constitutional requirement for determining whether

a "case or controversy" is presented sufficient to support jurisdiction. That test has been furthered by the Federal Circuit decision in *Teva v. Novartis* (167), applying the recent landmark Supreme Court decision in *MedImmune v. Genentech* (168).

In *Teva*, the court reversed the dismissal of a declaratory judgment action commenced by Teva, which had filed an ANDA certifying noninfringement of five *Orange Book*–listed Novartis patents and been sued for infringement of only one of those patents. Teva sought a declaratory judgment of noninfringement for the remaining four patents to establish "patent certainty." The Federal Circuit, relying on *MedImmune*, pointed out that:

> In *MedImmune*, the Supreme Court in a detailed footnote stated that our two-prong "reasonable apprehension of suit" test "conflicts" and would "contradict" several cases in which the Supreme Court found that a declaratory judgment plaintiff had a justiciable controversy. *127 S. Ct. at 774 n.11*. In *MedImmune*, the Court disagreed with our "reasonable apprehension of imminent suit" test and re-affirmed that the "actual controversy" requirement in the Declaratory Judgment Act is the same as the "Cases" and "Controversies" requirement in Article III. *Id. at 771*. The Court further re-affirmed that an "actual controversy" requires only that a dispute be "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.'" (169)

Based thereon, the court reasoned that:

> Allowing Teva's declaratory judgment action is consistent with the "controversy" requirement in Article III and the Declaratory Judgment Act because the suit will achieve a final determination that resolves the entire dispute between Teva and Novartis. Teva has experienced real and actual injury. Consequently, Teva's injuries are traceable to Novartis' conduct and those injuries can be redressed by a favorable judicial decision. Therefore, Teva has established standing and an actual controversy sufficient to confer jurisdiction under the Declaratory judgment Act. (170)

The Teva court concluded:

> [A] declaratory judgment plaintiff is only required to satisfy Article III, which includes standing and ripeness, by showing under "all the circumstances" an actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (171)

Accordingly, under the *Teva* case an ANDA filer may seek a declaratory judgment as to noninfringement of an *Orange Book*–listed patent which has not been asserted against it so long as it can establish a real and immediate dispute between it and the NDA holder/patent owner affecting its legal rights.

In *Pfizer v. Ranbaxy*, a district court granted, based on a covenant not to sue, a motion to dismiss a declaratory judgment action by the ANDA-filer Ranbaxy (172). The court found no valid patent to enforce due to the pending reissue patent (173). The court had no jurisdiction Hatch–Waxman because "(1) Pfizer cannot enforce a pending reissue application against Ranbaxy; (2) any reissued patent has not been listed in the FDA Orange Book and cannot be until it has issued, 21

USC §355(c)(2); and (3) Ranbaxy has not had to certify against a reissued patent" (174).

More recently, the Federal Circuit found a "substantial controversy" justifying declaratory judgment jurisdiction for an ANDA filer even where the NDA holder had granted the generic company a covenant not to sue on an *Orange Book*–listed patent (175). The Caraco case is instructive as to the complexity which may occur in Hatch–Waxman litigations. In Caraco, the first ANDA filer, Ivax, had been held to infringe one of Forest's two *Orange Book*–listed patents (the '712 patent). Forest did not sue Ivax for infringement of the other listed patent (the '941 patent), and Ivax had not sought declaratory relief as to noninfringement or invalidity of that patent (176). The court held that since Ivax could not trigger its 180-day exclusivity period before the expiration of both the '712 and '941 patents, subsequent Paragraph IV filers (including Caraco) could not trigger the exclusivity period (and thus expedite their own market entry) until both patents were held not infringed or invalid (177). Accordingly, notwithstanding Forest's covenant not to sue Caraco on the '941 patent, since Caraco's market entry was dependent on the conclusion of Ivax's exclusivity period, the court, citing *MedImmune*, held Caraco and Forest had a substantial legal controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" (178).

### Right of Patent Owners to Seek Declaratory Judgments

The courts have recognized that the *MedImmune* decision also affects the scope of a patent owner's right to seek declaratory relief in the face of imminent infringement, but have yet to define the "outer boundaries" of such jurisdiction (179). In activities outside the Hatch–Waxman sphere, the Federal Circuit has held that "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise" (180).

Where the safe harbor exemption under §271(e)(1) is in issue, however, the patent owners' rights are more limited. Thus, in *Eisai* the district court dismissed the patentees' declaratory judgment claim (181), holding that "activities protected by the safe harbor provision cannot serve as the basis for a declaratory judgment of actual future infringement" (182). The court dismissed the claim notwithstanding the ANDA applicant's assertion that it might launch the generic product at risk upon FDA approval and stipulation that it would provide Eisai with 45-day notice before commencing marketing (183). The court concluded that the "parties' stipulation allows sufficient time to resolve certain issues by way of an infringement action and a potential motion for preliminary relief, if Eisai so chooses" (184). How the court would have ruled in the absence of the stipulation is subject to conjecture.


## DELAYS IN THE APPROVAL OF ANDAS AND 505(B)(2) APPLICATIONS

### Patent-Related Delays

*Delays Attributable to Patent Term Extensions*

Delays in approval of ANDAs or 505(b)(2) applications may be prolonged because of extensions of the listed patents on which Paragraph IV Certifications must be

made. Such extensions may result from patent term extensions under 35 USC §156 or because of the 20-year term provisions under the URAA.

### Section 156 Term Adjustments

To be eligible for a term extension under Section 156, a patent relating to a drug product:

1. Must be in force when the application for term extension is filed in the U.S. Patent and Trademark Office, (185)
2. The term of the patent must not have been previously extended (186),
3. An application for the extension must be filed by the patent owner or its agent and must meet certain formal requirements, (187)
4. The drug product covered by the patent must have been subject to an FDA review period before its commercial marketing or use, (188) and
5. FDA approval for commercial marketing or use after such review period must be the first commercial marketing or use of the drug product (189).

The scope of any drug product patent extended under Section 156 shall, during the extension period, be limited to any "use approved for the product"

1. under FDA law (190) and
2. on or after the expiration of the review period on which the extension was based (191).

The period of term extension may not exceed 5 years (192), but may be shorter depending upon the delay in obtaining regulatory approval as determined by a specific calculation (193). Under this provision, the period of the extension is reduced by any delays in the regulatory review procedure attributable to the NDA applicant (194). In any case, the patent term may not be extended beyond 14 years from the date of approval of the NDA for the drug product (195).

The scope of a patent claiming a drug product is limited during the period of term extension to any FDA-approved use(s) and to drug products containing the approved active ingredient and salts and esters thereof (196).

### URAA Extensions

The URAA conformed U.S. patent law with foreign law by providing that the term of a U.S. patent issued on or after June 8, 1995, extends 20 years from its effective filing date, rather than 17 years from its issue date. Thus, a patent issuing after June 8, 1995, claiming an effective U.S. filing date less than 3 years before its issue date is entitled to a term of 20 years from the effective filing date. On the other hand, a patent issued on an application filed after June 8, 1995, but claiming an effective filing date more than 3 years before its issue date, is entitled to the 20-year term from the effective filing date (and will thus be in force less than the original 17-year patent term from the issue date) (197). Accordingly, the effect of a prior listed patent on an ANDA or 505(b)(2) application may depend on its term under the URAA provisions.

### The 30-Month Stay

When an ANDA or 505(b)(2) applicant certifies that the patent or patents listed in the *Orange Book* respecting the drug would not be infringed by the proposed generic drug product or that the patent or patents are invalid or unenforceable (a Paragraph

IV Certification), FDA will, if an infringement action is commenced by the patent owner or NDA holder within the 45-day notice period, defer approval for the 30-month stay period, as discussed later (12).

By delaying approval of an ANDA or 505(b)(2) application under which a generic applicant seeks to enter the market prior to expiration of a listed patent or patents, the stay provision protects the brand-name company's exclusive market-pending completion of the infringement litigation. At the same time, the 30-month stay enables the generic applicant to obtain a judicial determination of infringement and validity of any listed patents without incurring the liability it might otherwise risk were it marketing the generic drug and facing a possible award of damages based on the patent owner's lost profits. (In some cases, this potential liability could be more than the generic company's total revenue from the sales of its drug, in view of the typical differences in the prices and profits of brand-name and generic products.)

The "30-month stay" is in fact somewhat of a misnomer. Hatch–Waxman provides that if an infringement action is initiated during the 45-day notice period, approval of an ANDA or 505(b)(2) application is delayed until the earlier of expiration of the 30-month period, or the date of a district court decision holding the patent(s) invalid or not infringed (198). The 30-month stay may be modified, if before the expiration of that period the court hearing the infringement action determines that the patent is valid and infringed and grants an injunction (199), or determines that one of the parties has not reasonably cooperated in expediting the action (200).

If the ANDA or 505(b)(2) application is filed between the fourth and fifth years after approval of a drug product which received NCE exclusivity, the 30-month stay is extended to $7^1/_2$ years from the date of approval of the brand-name company's NDA (201).

Additionally, the 30-month stay is extended by 6 months where the drug product has received pediatric exclusivity (202).

The 2003 Statutory Changes simplified and restricted the grant of the 30-month stay. Thus, the stay may only be obtained with respect to patents listed in the *Orange Book* prior to the filing of the ANDA or 505(b)(2) application; no 30-month stay will be triggered as to any patents which are listed after the filing date of the ANDA or 505(b)(2) application (12).

### 180-Day Marketing Exclusivity for ANDAs
Hatch–Waxman provides a specific incentive to generic drug companies to file ANDAs seeking approval to market generic forms of listed drugs prior to expiration of brand-name companies' patents for such drugs, namely the right to 180-days of marketing exclusivity vis-à-vis later ANDA filers (13). There is no comparable exclusivity accorded a 505(b)(2) applicant who may successfully challenge the validity or infringement of an asserted listed patent. Interpretation of the 180-day exclusivity provision led to considerable controversy (and changes in agency positions), as discussed later.

### Separate Exclusivity Periods for Different Dosage Forms
### and Different Listed Patents
Before the 2003 Statutory Changes, the Hatch–Waxman Act did not specify whether separate 180-day exclusivities would be accorded to independent ANDA applicants

who may first make Paragraph IV Certifications for different dosage forms of the same listed drug, or to those independent Paragraph IV filers who may be the first to certify as to different listed patents for the same listed drug (203). FDA thus fashioned individual regulatory policies as to each of these situations.

Initially, the agency awarded separate 180-day exclusivity periods to different ANDA filers based upon the priority of their Paragraph IV Certifications respecting different strengths of the same listed drug. That policy was challenged and upheld as a reasonable exercise of the agency's discretion under the Administrative Procedures Act (APA) (204).

Similarly, neither the statute nor FDA regulations specifically provided for single or multiple exclusivities based upon priority of Paragraph IV Certifications as to multiple listed patents relating to a single drug. In one case, the agency interpreted its regulations to warrant separate exclusivity awards to two different generic applicants based on the priority of their Paragraph IV Certifications respecting two different listed patents (205). In a subsequent proceeding involving twelve listed patents, FDA decided that the award of independent exclusivity periods to either of two Paragraph IV filers would result in a blocking situation where neither party could be given approval until the other party's exclusivity as to certain patents had run. The agency decided that any 180-day exclusivity award would be shared between the two applicants (206). In yet another more recent case, FDA refused to provide any shared exclusivity where there was no possibility of blocking exclusivities (207).

The 2003 Statutory Changes eliminated the possibility of independent exclusivity periods for different generic applicants based on different listed patents. Only one 180-day exclusivity period may be obtained for a listed drug and that period is based on patents for which a Paragraph IV Certification is first made by any generic applicant (208). Under the amendments to the statute, multiple "first applicants" who submit substantially complete ANDAs with Paragraph IV Certifications on the same day and subsequently obtain approval of their applications are eligible for 180-day exclusivity (209). Pursuant to these amendments, multiple generic applicants frequently file ANDAs on the same day (210). These "first applicants" may obtain shared exclusivity during the one 180-day exclusivity period. FDA grants the 180-day exclusivity independently for each approved dosage form.

### Commercial Marketing of the Generic Drug by a First Applicant Triggers the 180-Day Exclusivity

Prior to enactment of the 2003 Statutory Changes, Hatch–Waxman provided that the 180-day exclusivity provision would be triggered, inter alia, on the date FDA received notice of the first commercial marketing by any first ANDA applicant (211). This could occur (i) in the relatively rare instance in which an ANDA applicant commenced marketing after the 30-month stay and prior to a court decision in an infringement action predicated on its filing, (ii) where the owner of the listed patent had not sued for infringement, or (iii) where the ANDA applicant had agreed to market the listed drug pursuant to a settlement of infringement litigation (212). In one case relating to the last-mentioned situation, FDA had interpreted the statutory reference to "commercial marketing of the drug under the previous application" as embracing marketing by the ANDA applicant under license from the NDA holder

after settlement of its litigation. Since more than 180 days had passed after com-
mencement of such use, the agency concluded that the 180-day period had run and
that other generic manufacturers could commence marketing. Upon attack under
the APA, the court held that FDA's interpretation of the statutory language was
reasonable and denied a preliminary injunction to the first filer (213).

   The 180-day exclusivity period is only triggered by commercial marketing of
the listed drug by any first ANDA applicant(s) (214). As pointed out in the next
section, the decision of a court (on either the district court or appellate court level)
does not directly trigger the 180-day exclusivity period, but may be the precursor
of a "forfeiture event" for which the exclusivity period may be forfeited by the first
applicant.

### The Effect of a "Court Decision" on Approval of an ANDA and Triggering of the 180-Day Exclusivity

Prior to enactment of the 2003 Statutory Changes, the 180-day exclusivity could be
effective, inter alia, on the "date of a decision of a court" in an infringement action
based on a Paragraph IV Certification (215). FDA initially interpreted the date of
the court decision as the date on which "the court . . . enters final judgment from
which no appeal can be or has been taken" (216). Subsequently, in response to a
number of adverse court decisions the agency amended its rules to provide that
with respect to ANDAs containing Paragraph IV Certifications filed after March
2000, a decision of a trial court would trigger the 180-day exclusivity (217). In later
litigation in which a trial court held a patent invalid and the patent owner and
generic applicant had subsequently entered into a settlement agreement, it was
held that the 180-day exclusivity period was triggered by the trial court decision
(218).

   In yet another case, a court held that the 180-day exclusivity period would
commence as of the date of a decision dismissing a declaratory judgment action for
lack of subject matter jurisdiction where the plaintiff generic company lacked rea-
sonable apprehension of a patent infringement suit (219). Such holding was incon-
sistent with a previously proposed FDA rule and caused the agency to withdraw the
prior regulation (220). In its subsequently published notice, FDA was constrained
to indicate that it would continue "to make 180-day exclusivity decisions on an
issue-by-issue basis . . . [and] will also carefully evaluate possible options for future
rule making addressing 180-day exclusivity and the timing of ANDA approvals"
(221).

   Under the 2003 Statutory Changes, approval of an ANDA or 505(b)(2) applica-
tion may be made effective on the date on which a district court enters a judgment
holding the listed patent invalid or not infringed, permitting (but not requiring)
subsequent commercial marketing. Based on such marketing, the 180-day exclusiv-
ity period may commence (222). However, FDA does not have power to enforce the
180-day exclusivity period (223).

### The First ANDA Applicant(s) Making a Paragraph IV Certification is Awarded Exclusivity

Prior to enactment of the 2003 Statutory Changes, FDA regarded only the first appli-
cant making a Paragraph IV Certification to be entitled to the 180-day exclusivity.
In the event of an adverse decision in an infringement suit against the Paragraph IV
applicant, FDA regulations provide that the applicant must amend its certification

to a Paragraph III Certification indicating that it will not seek approval to market the generic product until the expiration of the listed patent (224). In its subsequently withdrawn August 1999 proposed rule, FDA suggested that only the first Paragraph IV filer could be eligible for the 180-day exclusivity and would lose such award if it amended its certification to a Paragraph III certification for any reason (225).

In one case in which the first filer amended its certification to a Paragraph III Certification after settlement with the patent holder, FDA asserted that the first filer retained its exclusivity, but the court found this "'best of all worlds'" interpretation in favor of the first filer to be "inconsistent with [the] purpose of Hatch-Waxman," and that the first filer's 180-day exclusivity period had already run (226). In a subsequent case, the first Paragraph IV filer settled its litigation with the patent holder, but did not amend its certification to a Paragraph III Certification. FDA concluded that it should treat the Paragraph IV Certification as though it had been changed to a Paragraph III Certification. The court disagreed, finding such construction unreasonable under the APA. The court did not reach the rights of the later filer because it found that the exclusivity period had run after the first filer had settled with the patent owner and commenced commercial marketing under the NDA.

In a further example of a disputed interpretation of the 180-day exclusivity provisions, FDA initially concluded that exclusivity could only be awarded to a Paragraph IV filer that had successfully prevailed in its litigation with the patent owner (227). Following multiple adverse court decisions, the agency issued a Guidance indicating that it would no longer enforce this "successful defense" requirement (228), and thereafter issued an interim rule removing the requirement (229). Further, it has been held that the first Paragraph IV filer may obtain exclusivity even when it is not sued based on the certification (230).

Under the 2003 Statutory Changes, the amendment by a first applicant of the Paragraph IV Certification for all of the patents for which it has submitted such a certification is a forfeiture event for which the first applicant will forfeit its 180-day exclusivity period (231).

### Transfer or Waiver of Exclusivity

Prior to the 2003 Statutory Changes, the Hatch–Waxman Act did not provide that the 180-day exclusivity may be transferred from one Paragraph IV filer to another, or waived in favor of a subsequent filer. Nevertheless, FDA permitted transfer or waiver in particularly, complex factual contexts. Thus, the agency permitted a first Paragraph IV filer to waive its marketing exclusivity in favor of a subsequent filer where the exclusivity period had commenced and the first filer had not yet obtained agency approval and thus could not obtain the benefit of exclusivity (232).

More recently, FDA interpreted the statute to permit sharing the potential 180-day exclusivity where two Paragraph IV filers had differing priorities with respect to the multiple listed patents asserted by the prior NDA holder/patent owner (233). Subsequently, when the trial court held that the sharing applicants infringed various of the listed patents, FDA permitted waiver of the exclusivity in favor of a third filer whose generic product was held not to infringe the patents in question (234).

### Forfeiture of Exclusivity

The 2003 Statutory Changes expressly provide that 180-day exclusivity may be forfeited based upon any of a number of distinct "forfeiture event(s)," and that in the

event of such forfeiture no subsequent filer will be eligible for a 180-day exclusivity period (235).

The forfeiture provisions were adopted by Congress in an effort to halt the widespread practice of "ANDA parking" among innovators and first to file generics. In a typical "parking" arrangement, a first-to-file generic would agree with the innovator to delay entering the market until some time in the future, in effect "parking" the 180-day period of exclusivity. Such a "parking" agreement would not only delay market entry by the first-to-file generic, but also by any subsequent ANDA filer until after the exclusivity period, expiration of the patent, or a subsequent ANDA filer obtains a favorable appellate decision. "Parking" was particularly troublesome when the litigation between the first-to-file generic company and the innovator was settled without a court decision on the merits and the innovator did not commence litigation against subsequent ANDA filers.

The events defined in the 2003 Statutory Changes for which the first applicant may forfeit the 180-day exclusivity period include:

    (I)  The later of

  (aa)  its failure to market the drug 75 days after approval of its application (AA), or 30 months after filing of the application (BB), whichever is earlier; or

  (bb)  as to the first applicant or any other applicant that has received tentative approval of its application, at least one of the following has occurred:

        75 days after a final decision or order in an infringement or declaratory judgment action holding the patent invalid or not infringed (AA);

        a court has signed a settlement order or consent decree entering a final judgment that the patent is invalid or not infringed (BB); or the patent has been withdrawn from listing by the NDA holder (CC); (236)

  (II)  Its withdrawal of the application, or if FDA considers the application to have been withdrawn as a result of an administrative determination that the application did not meet the requirements for approval; (237)

 (III)  It amends or withdraws its Paragraph IV Certification; (238)

 (IV)  It fails to obtain tentative approval of its application within 30 months after filing; (239)

  (V)  It enters into an agreement with another ANDA applicant, the NDA holder, or the patent owner, which has been held in a final decision in an action brought by the Federal Trade Commission or Attorney General to violate the antitrust laws; (240) or

 (VI)  All of the patents as to which the ANDA filer had filed a Paragraph IV Certification have expired (241).

As provided in (I) earlier, forfeiture of the 180-day exclusivity period cannot be premised on the failure of the first applicant to market the drug within the 75-day period after its effective approval date or after 30 months of its application date, unless there has previously been, inter alia, a final decision that the patent is invalid or not infringed.

As noted earlier, in the event of any such forfeiture, no subsequent ANDA filer will be eligible for any 180-day exclusivity (234).

The impact of these antiparking provisions has been diluted by a 2008 FDA decision that Teva Parenteral Medicines had not forfeited its 180-day exclusivity period by failing to market the product at issue (granisetron) within 30 months of filing its ANDA because there had been no court decision or court-signed settlement order or consent decree adverse to the patent, and the patent had not been delisted from the *Orange Book* (242). The decision (in the form of a letter ruling from FDA dated January 17, 2008) provided that

> 180 day exclusivity is not forfeited for failure to market when an event under subpart (aa) has occurred, but—as in this case—none of the events in subpart (bb) has occurred. The 'failure to market' provision results in forfeiture when there are two dates on the basis of which FDA may identify the 'later' event as described in section 505(j)(5)(D)(i)(I). The provision does not affect a forfeiture when an event under subpart (aa) has occurred, but no event under subpart (bb) has yet occurred. (243)

Under this FDA ruling, the first filer will not forfeit its 180-day exclusivity period (even if 30 months have elapsed since the ANDA was filed with FDA by that filer), if there has not been an appellate court decision against the patent or the patent has not been removed from the *Orange Book*. This issue may be taken up by Congress and the courts in an effort to strengthen the exclusivity forfeiture provisions.

### Delays in ANDA or 505(b)(2) Approvals Based on Marketing/Data Exclusivities

Hatch–Waxman contains several other exclusivity provisions which delay approval of ANDAs and 505(b)(2) applications. Of principal interest is the 5-year marketing exclusivity for NCEs (244), the 3-year marketing exclusivity for new or supplemental NDAs supported by new clinical investigations (245), and the 6-month exclusivity for pediatric studies.

With the exception of the pediatric exclusivity provisions, each of these marketing exclusivities was added to Hatch–Waxman in 1984 in last minute negotiations with a group of brand-name drug companies that objected to the terms originally negotiated prior to enactment of the legislation. These provisions were thus added to provide additional protection for the brand-name companies in the form of additional delays in the approval of generic drugs.

### 15-Year Exclusivity for New Chemical Entities

The 5-year NCE exclusivity applies to drugs which do not contain any active ingredient, including any ester or salt thereof, which has been approved in any prior NDA after the 1984 enactment of Hatch–Waxman.

The NCE exclusivity differs from the other marketing exclusivities in that it prohibits the submission of an ANDA or 505(b)(2) application—not merely its approval—prior to expiration of the exclusivity period (246). In view of the period required to obtain approval of the ANDA or 505(b)(2) application, this provision effectively extends NCE exclusivity beyond 5 years.

An ANDA or 505(b)(2) application incorporating a Paragraph IV Certification may be submitted 4 years after approval of an NDA entitled to NCE exclusivity. However, if an infringement action is commenced within the fifth year of the NCE exclusivity, the statute provides that the 30-month stay pending the patent

infringement proceeding will be extended, if necessary, so that the period after approval of the application entitled to NCE exclusivity totals $7^{1}/_{2}$ years, equal to the sum of the 5-year marketing exclusivity and the 30-month stay (247). Thus, an ANDA or 505(b)(2) application incorporating a Paragraph IV Certification may be filed within the fifth year of an NCE marketing exclusivity, but may not be approved until $7^{1}/_{2}$ years after the grant of the application entitled to NCE exclusivity, if the brand-name patent holder initiates an infringement suit as discussed earlier.

FDA interprets the term NCE as referring to the "active moiety" of the previously approved NDA, that is, the molecule or ion (excluding the groups which form an ester or salt or other noncovalent derivative of the molecule) which is responsible for the physiological or pharmacological action of the drug (248). According to FDA, a prodrug which is not a salt or ester of a previously approved product is an NCE and entitled to 5-year exclusivity (249). Similarly, FDA has considered metabolites, which are not salts or esters of previously approved drugs as NCEs (250).

For many years, optically pure enantiomers (251) of previously approved racemates (252) could qualify only for 3-year exclusivities for new clinical investigations of previously approved active drug moieties, and not for 5-year NCE exclusivities (253). However, under the Food and Drug Administration Amendments Act of 2007 (FDAAA), an applicant for an NDA for an enantiomer of a previously approved racemate (or an ester or salt thereof) may obtain an NCE exclusivity for the enantiomer under certain specified conditions.

First, the applicant for the enantiomer NDA must "elect to have the single enantiomer not be considered the same active ingredient as that contained in the approved racemic drug" (254). Further, the enantiomer NDA must not be for a use (*i*) in a therapeutic category in which the approved racemic drug has been approved, or (*ii*) for which any other enantiomer of the racemic drug has been approved (255).

Where the enantiomer NDA holder receives exclusivity, FDA may not approve the enantiomer for use in the therapeutic category in which the racemate was approved until 10 years after approving the enantiomer NDA (256).

Under the new provision, an ANDA applicant may thus be subject to both a 5-year delay in obtaining approval for use of the enantiomer in the distinct therapeutic category in which the enantiomer NCE has been approved and a 10-year delay in obtaining approval of the enantiomer in the therapeutic category in which the racemate NCE was originally approved. Future litigation relating to this provision is likely.

This provision of the FDAAA is effective as to enantiomer NDAs filed between September 27, 2007 and October 1, 2012 (257).

### 3-Year Exclusivities for NDAs or Supplemental NDAs Based on New Clinical Investigations

The 3-year exclusivity provisions prohibit approval—not submission—of an ANDA or a 505(b)(2) application for 3 years after approval of an NDA or supplemental NDA approved on the basis of "reports of new clinical investigations (other than bioavailability studies) essential to the approval . . . and conducted or sponsored by the person submitting the NDA or supplemental NDA" (258).

### Pediatric Exclusivity

In 1997, 2002, and again in 2007, the FDCA was amended to provide a 6-month exclusivity period for conducting pediatric studies of listed drugs (259). The

pediatric exclusivity delays the approval of ANDAs and 505(b)(2) applications for
an additional 6 months after expiration of any pertinent listed patents, and extends
the 5-year and 3-year marketing exclusivities for 6 months (260). The pediatric
exclusivity was originally effective as to NDAs filed before January 1, 2002, and,
as of this writing, has been extended to NDAs submitted prior to October 1, 2012
(261).

Pediatric exclusivity applies both to previously approved drugs and drugs
which are the subject of pending NDAs. The procedures for obtaining pediatric
exclusivity are described elsewhere in this text.

If a 6-month pediatric exclusivity has been accorded to a particular drug, an
additional 6-month exclusivity may be added to the 3-year exclusivity for a sup-
plemental NDA (262). A second 6-month pediatric exclusivity may not, however,
further delay ANDA approvals subject to patent certifications (263). The omission
of any approved pediatric indication from the labeling for an ANDA will not further
delay approval of the generic drug (264).

The immense financial consequences of the expiration of marketing exclusiv-
ities to both brand-name and generic drug companies accounts for the complexity
and intensity of recent confrontations respecting the right to market major drug
products. These were no more evident than in the disputes respecting the final
days of pediatric exclusivities on AstraZeneca's omeprazole proton pump inhibitor
(Prilosec) and Pfizer's amlodipine besylate antihypertensive (Norvasc).

### The Revocation of Approval to Market Apotex's Generic Omeprazole

In litigation involving Apotex, FDA revoked the prior approval of Apotex's generic
omeprazole based on AstraZeneca's pediatric exclusivity, notwithstanding Apo-
tex's more than 3 years prior marketing of the generic drug product (265). The per-
tinent facts were as follows:

| | |
|---|---|
| December 5, 2002 | Apotex filed an ANDA |
| October 6, 2003 | FDA granted final approval of Apotex's ANDA |
| October 6, 2003 | Apotex commenced marketing its generic product |
| April 20, 2007 | Astra's patents for Prilosec expired |
| June 14, 2007 | District court held the Apotex product infringed Astra-Zeneca's patents and that pediatric exclusivity applied, until October 20, 2007 |
| June 28, 2007 | FDA revoked Apotex's final approval of its ANDA |
| June 28–October 20, 2007 | Apotex precluded from marketing |

Notwithstanding Apotex's prior marketing of its generic omeprazole product
and the district court's holding of infringement after expiration of the AstraZeneca
patents, Apotex was precluded from marketing for 4 months because of the pedi-
atric exclusivity.

### Mylan's 180-Day Exclusivity to Market Generic Amlodipine

In a complex series of events Mylan extended its generic exclusivity on amlodipine
besylate vis-à-vis Apotex and other generic marketers based on Pfizer's pediatric
exclusivity, notwithstanding Apotex's success in invalidating the Pfizer patent. The
unique chronology respecting Mylan's and Apotex's ANDAs was as follows:

| Date | Mylan | Apotex |
|---|---|---|
| 11/27/01 | Pediatric exclusivity for Norvasc granted | |
| 5/02 | ANDA filed with Paragraph IV Certification (first Filer) | |
| 9/20/02 | Infringement suit filed (30-mo stay inapplicable) (266) | |
| 4/13/03 | | ANDA filed |
| 7/30/03 | | Infringement suit filed |
| 10/3/05 | ANDA approved | |
| 1/24/06 | | D.Ct. held patent valid and infringed (267) |
| 3/16/07 | D.Ct. held patent valid and infringed, and enjoined approval of ANDA until after patent expiration (268) | |
| 3/22/07 | | Fed Cir Reversed D.Ct., holding Pfizer patent invalid (269) |
| 3/23/07 | Fed Cir stayed injunction, Mylan began marketing its product and asserted that 180-day exclusivity commenced (270) | |
| 3/25/07 | Patent expired | |
| 4/18/07 | FDA held Mylan's 180-day marketing exclusivity expired when patent expired; Apotex's ANDA blocked by pediatric exclusivity until mandate issued on Fed Cir decision (271) | |
| 5/21/07 | Fed Cir mandate issued; generic marketing possible | |
| 5/23/07 | | ANDA approved |
| 6/22/07 | FDA delists Pfizer's patent for Norvasc (272) | |

The above are but a few of the multiple legal proceedings initiated in efforts to obtain or maintain exclusive marketing rights in amlodipine besylate. Mylan was the first to file a paragraph IV ANDA, which normally would reserve the 180-day exclusivity period for Mylan. The district court, however, found the Pfizer patent valid and infringed. Apotex, meanwhile, had filed suit to obtain approval of its ANDA and also lost at the district court. On Apotex's appeal to the Federal Circuit, the court invalidated Pfizer's patent.

Although Apotex was the successful party, Mylan received de facto exclusivity because it was the first to file its ANDA. Apotex's ANDA remained blocked by Pfizer's pediatric exclusivity until the Federal Circuit issued its mandate.

The above table illustrates the application and limitations of the patent and 180-day and pediatric marketing exclusivities. Before FDA delisted Pfizer's patent from the *Orange Book* on June 22, Mylan and Apotex had the only approved ANDAs for generic Norvasc. Subsequent to June 22, numerous generics received FDA approval and entered the market.

### FDA Procedures for Resolving Marketing Exclusivity Issues

Beginning in 2007, FDA began soliciting public comments on a case-by-case basis for marketing exclusivity issues that it was unprepared to resolve (273). After

*Gross et al.*

expiration of the public comment period, FDA issues a written decision available with the comments submitted by third parties on a public docket (274).

In the case of amlodipine besylate, Mylan sued FDA before it determined whether Mylan was entitled to a 180-day exclusivity period. FDA informed the court that it proposed to seek public comments from interested parties and subsequently issue a determination. The court agreed to FDA's proposal and enjoined FDA from approving any ANDAs until a few days after FDA's determination to provide the court with sufficient time to review the determination (275).

## WITHDRAWAL OF APPROVAL OF AN ANDA

As indicated in Section "Removal of *Orange Book* Listing of a Drug" earlier, FDA may withdraw or suspend approval of an ANDA when the approval of the listed drug on which the ANDA relies is either withdrawn or suspended. Further, approval of an ANDA or a 505(b)(2) application may be withdrawn on the basis of evidence showing that the drug is unsafe for use or ineffective, or that the ANDA or 505(b)(2) application contains any untrue statement of material fact (81). A further provision sanctioning the withdrawal of approval of ANDAs was added by the Generic Drug Enforcement Act of 1992. That amendment specifically provides that FDA must withdraw approval of an ANDA if it finds that the approval "was obtained, expedited, or otherwise facilitated through bribery, payment of an illegal gratuity, or fraud or material false statement" (276), or may withdraw approval of an ANDA if it finds that the applicant has "repeatedly demonstrated a lack of ability to produce the drug . . . and has introduced, or attempted to introduce, such adulterated or misbranded drug into commerce" (277).

## CITIZEN PETITIONS

FDA states that the appropriate procedure for challenging any of its actions is the filing of a "citizen petition," a written request that FDA take specific action (278) in accordance with its regulations (279).

Citizen petitions frequently urge FDA to impose additional requirements for the approval of ANDAs and 505(b)(2) applications. In the past, FDA delays in deciding such petitions have resulted in corresponding delays in ANDA and 505(b)(2) approvals and consequent generic competition. For a number of years assertions were made that a number of citizen petitions had been filed for frivolous purposes and were an abuse of the administrative process, prompting proposed FDA action (280).

The recent FDAAA addresses possible abuses of the citizen petition process, providing that citizen petitions will not delay approval of a pending ANDA or 505(b)(2) application unless FDA determines that a delay is necessary to protect public health (281).

Citizen petitions submitted to FDA must include a certification substantiating the bona fides of the petition, including an identification of the date the petitioner became aware of the basis for the petition and the persons from whom any consideration was or would be received respecting the petition (282).

Under FDAAA, the agency must take final action on all citizen petitions within 180 days after their submission (283). The petition may be denied if FDA determines it "was submitted with the primary purpose of delaying the approval

of an application and the petition does not on its face raise valid scientific or regulatory issues" (284). Alternatively, if FDA determines that public health concerns necessitate delay of generic drug approval, then FDA must provide its reasons to the generic applicant within 30 days of making such a determination. Specifically, FDA must provide a brief summary of the substantive issues raised in the petition that form the basis of its determination and, if applicable, any clarification or additional data that the generic applicant should submit to expedite FDA's review of the citizen petition (285).

Where the approval of an ANDA filed by a first applicant eligible for 180-day exclusivity is delayed as the result of a citizen petition covered under the FDAAA, the deadline for obtaining approval or tentative approval of the ANDA to avoid forfeiture of the 180-day exclusivity is extended. The period of the extension is "equal to the period beginning on the date on which [FDA] received the petition and ending on the date of final agency action on the petition (inclusive of such beginning and ending dates), without regard to whether [FDA] grants, in whole or in part, or denies, in whole or in part, the petition." (287). Thus, a first applicant whose ANDA is delayed as a result of a petition will not automatically forfeit eligibility for 180-day exclusivity if tentative approval is not obtained within 30 months after the date on which the application is filed (288).

A party dissatisfied with FDA's action on a citizen petition may seek judicial review in district court. FDA contends that the petitioner must first obtain a final decision on a citizen petition before it seeks judicial relief, and will raise the exhaustion of administrative remedies defense in any lawsuit not preceded by the determination of a citizen petition (289).

## REFERENCES AND NOTES

1. Pub L No. 98–417, 98 Stat. 1585, Federal Food, Drug, and Cosmetic Act (FDCA), Human Drug Approval Provisions, FDCA §505, 21 USC §355. Provisions similar to those discussed herein have been enacted for the approval of animal drugs in the Generic Animal Drug and Patent Term Restoration Act of 1988, Pub L No. 100–670, 102 Stat. 3971 (1988). The animal drug approval provisions are outside the scope of this discussion.
2. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F3d 1562, 1568 (Fed Cir 1997) (quoting H R Rep. No. 98–857 (I), at 14–15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647–48).
3. IMS 2007 U.S. Pharmaceutical Market Performance Review, http://www.imshealth.com/ims/portal/front articleC/027776599_3665.83470499,00.html (last viewed Apr. 8, 2008); July 2002 U.S. Federal Trade Commission (FTC) Report, "Generic Drug Entry Prior to Patent Expiration: An FTC Study" (the July 2002 FTC Report), page i and 9 [citing "How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry," Congressional Budget Office (July 1998) at 31].
4. FDCA §505(j), codified at 21 USC §355(j). For convenience, 21 USC §355, et seq. are referred to herein by the appropriate FDCA sections, namely §§505 et seq.
5. A generic drug is "bioequivalent" to a previously approved drug if the extent and rate of absorption of the respective drugs do not differ significantly from one another. FDCA §505(j)(8)(B).
6. FDCA §505(b)(2).
7. Pub L No. 98–417, Title II (1984), and Pub L No. 100–670, Title II (1988) (creating 35 USC §156, and amending 35 USC. §§271 and 282).
8. Pub L No. 103–465, 108 Stat. 4809 (1994), the Uruguay Round Agreements Act (URAA).

9.  35 USC §271(e)(1). In its latest interpretation of the scope of the exemption, the Federal Circuit has held that §271(e)(1) does not preclude patent infringement by drug development activities "far beyond those necessary to acquire information for FDA approval of a patented pioneer drug already on the market." *Integra Life Sciences I, Ltd. v. Merck KGaA*, 331 F3d 860, 867 (Fed Cir June 6, 2003).

10. FDCA §505(j)(2)(A)(vii), (viii), [ANDAs]; and §505(b)(2)(A)(iv) [§505(b)(2) applications]. The "Orange Book" was so named because it was published by the FDA with orange covers.

11. FDCA §505(j)(2)(A)(vii)(IV) [ANDAs]; 21 Code of Federal Regulations ("CFR") 314.94(a)(12)(i)(A)(4), [ANDAs]; and FDCA §505(b)(2)(A)(iv) [§505(b)(2) applications]. Under the FDA's 2003 modified regulations (the "2003 Rule Changes" herein) discussed later, the notice requirements were not required for all Paragraph IV certifications, in order to provide only a single 30-month stay per listed drug product (see Section 10.1.2 later). The regulatory changes were nullified in this respect in the 2003 statutory amendment to 21 USC §355 under the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MPDIMA"), Title XI Access to Affordable Pharmaceuticals (the "2003 Statutory Changes" herein). The amended statute requires the notice with all Paragraph IV Certifications, whether made in generic drug applications or in amendments or supplements to such applications. For convenience, the amended statutory sections, 21 USC §355, et seq. are referred to herein by the appropriate FDCA Sections, namely §505, et seq., and by their proposed MPDIMA Sections.

12. FDCA §505(j)(5)(B)(iii); amended by MPDIMA §1101(a)(2)(A) [ANDAs]; and §505(c)(3)(C) amended by MPDIMA §1101(b)(2)(B) [§505(b)(2) applications].

13. FDCA §505(j)(5)(B)(iv) [ANDAs] amended by MPDIMA §1102(a) (1)(iv)(I); there is no comparable exclusivity period for the first filer of a section 505(b)(2) application.

14. FDCA §505(j)(5)(D)(ii) amended by MPDIMA §1101(a)(2)(B) [ANDAs]; and §505(c)(3)(D)(ii) amended by MPDIMA §1101(b)(2)(C) [section 505(b)(2) applications].

15. FDCA §505(j)(5)(D)(iii) and (iv) amended by MPDIMA §1101(a)(2)(B) [ANDAs]; and §505(c)(3)(D)(iii) amended by MPDIMA §1101(b)(2)(C) [section 505(b)(2) applications].

16. 21 USC §360bb and §360 cc(a).

17. FDCA §505(a), (b), and (c).

18. July 2002 FTC Report, pp. 6, 8.

19. FDCA §§505(b)(1) and (c)(2).

20. FDCA §§505(b)(1) and (c)(2); and 21 CFR §314.94(a)(12)(B)(vi).

21. 21 CFR §314.53 (c)(2)(i), (ii).

22. FDCA §505(j)(2)(A)(vii) [ANDAs]; and §505(b)(2)(A) [505(b)(2) applications].

23. 21 CFR §314.94(a)(12)(B)(vi) [ANDAs]; and 21 CFR §314.52(d) [505(b)(2) applications]. Under the 2003 Statutory Changes an ANDA or 505(b)(2) applicant must give notice to the patent holder within 20 days from the date the FDA acknowledges filing of the ANDA or 505(b)(2) application, or at the time at which the applicant submits an amendment or supplement to the application. FDCA §(j)(2)(B)(ii) amended by §1101 (a)(1)(A)[ANDAs]; and FDCA §505(b)(3)(B) amended by MPDIMA §1101(b)(1)(A) [505(b)(2) applications].

24. 21 CFR 314.94(a)(12)(B)(vi); *Abbott Labs., Inc. v. Zenith Labs., Inc.*, 35 U.S.P.Q.2 d 1161 (N.D. Ill. 1995) (dismissing claim for patent infringement where plaintiff failed to list patent within 30-day period after issuance of patent).

25. FDCA §505(c)(3)(C); FDCA §505(j)(5)(B)(iii).

26. *Eisai Co., Ltd. v. Mutual Pharmaceutical Co., Inc.*, 2007 U.S. Dist. LEXIS 93585 (D.N.J. Dec. 20, 2007) (Not for Publication).

27. *Id.* at *12.

28. *Id.* at *15–18.

29. *Id.* at *15.

30. 21 CFR §314.53(b).

31. 21 CFR §§314.53(e) and 314.3(b).

32. See October 24, 2002 proposed FDA rulemaking, "Applications for FDA Approval to Market a New Drug: Patent Listing Requirements and Application of 30-Month Stays on

Approval of Abbreviated New Drug Applications Certifying That a Patent Claiming a Drug is Invalid or Will Not Be Infringed," 21 CFR Part 314 [Docket No. 02N-0417], RIN 0910-AC48 section II A.

33. 59 Fed Reg 50338, 50343 (Oct. 3, 1994) ("The agency believes that its scarce resources would be better utilized in reviewing applications rather than reviewing patent claims.").

34. 21 CFR §314.53(f); Abbreviated New Drug Application Regulations, 54 Fed Reg 28872, 28910 (July 10, 1989) ("In deciding whether a claim of patent infringement could reasonably be asserted . . . the agency will defer to the information submitted by the NDA applicant."); see also *AaiPharma v. Thompson*, 296 F3d 227 (4th Cir 2000); and *Watson Pharms., Inc. v. Henney*, 194 F Supp 2d 442, 445 (D.Md. 2001).

35. 21 CFR §314.53(b) (2003). As used in the rule, polymorphs "include chemicals with different crystalline structures, different waters of hydration, solvates, and amorphous forms." 68 Fed Reg 36676, 36678 (June 18, 2003).

36. 68 Fed Reg 36676, 36678 (June 18, 2003).

37. 21 CFR §314.53(b), (c) (2003). The categories include:

    (i)   a full description of the polymorphic form, including its physical and chemical characteristics; its synthesis; the process controls used during manufacture and packaging; and such specifications and analytical methods as necessary to assure its identity, strength, quality and, purity;

    (ii)  the executed batch record for a drug product containing the polymorph and documentation that the batch was manufactured under GMP conditions;

    (iii) demonstration of bioequivalence between the executed batch of the drug product containing the polymorph and the drug product described in the NDA;

    (iv)  a list of all components used in the manufacture of the polymorph-containing drug product and a statement of the composition of the drug product; a statement of the specifications and analytical methods for each component as are necessary to demonstrate pharmaceutical equivalence and comparable product stability; and

    (v)   comparative in vitro dissolution testing on 12 dosage units, the executed test batch and NDA product. 68 Fed. Reg. 36676, 36679 (June 18, 2003).

38. As used in the rules, a product-by-process patent is one which "claims a product by describing or listing process steps to wholly or partially define the claimed product." 68 Fed Reg 36676, 36679 (June 18, 2003). Under U.S. patent law, a product-by-process patent claim is directed to the product, i.e., is a "product claim" but defines the product by reference to the steps used to make the product.

39. 68 Fed Reg 36676, 36680 (June 18, 2003).

40. The Food and Drug Modernization Act of 1997, Pub L No. 105–115, 111 Stat. 2296, §125(d)(2)(ii); *Proposed Rule: Marketing Exclusivity and Patent Provisions for Certain Antibiotic Drugs*, 65 Fed Reg 3623, 3624 (Jan. 24, 2000); *Guidance for Industry and Reviewers: Repeal of Section 507 of the Federal Food, Drug, and Cosmetic Act*, revised May 1998, p. 2.

41. 21 CFR §314.53(b) (2003).

42. The FDA lists current dosage forms which may be listed as including metered aerosols, capsules, metered sprays, gels, and prefilled drug delivery systems. 68 Fed Reg 36676, 36680 (June 18, 2003).

43. 68 Fed Reg 36676, 36680 (June 18, 2003).

44. *Id.*

45. *Id.*

46. See *Mylan Pharms., Inc. v. Thompson*, 268 F3d 1323 (Fed Cir 2001), *cert. denied*, 123 S. Ct. 340 (2002); and *Andrx v. Biovail Corp.*, 276 F3d 1368 (Fed Cir 2002).

47. See *Mylan*, 268 F3d at 1329 and 1333, n. 3; and *Andrx*, 276 F3d at 1379, n. 8. Subsequently, in *AaiPharma v. Thompson*, 296 F3d at 235–43, the Court of Appeals for the Fourth Circuit held that FDA's "purely ministerial approach" to *Orange Book* listing was not arbitrary and capricious under the Administrative Procedure Act (APA), but approved of antitrust actions brought against NDA holders who use improper *Orange Book* listings to extend monopoly power. 296 F3d at 243.

48. 68 Fed Reg 36676, 36684 (June 18, 2003).

49. 68 Fed Reg 36676 (June 18, 2003).
50. MPDIMA §1101(a)(2)(C)(ii)[ANDAs]; and MPDIMA §1101(b)(2)(D)(ii)[505(b)(2) applications].
51. *Mylan Laboratories v. Leavitt*, 495 F Supp 2d 43 (D.D. C. 2007).
52. *Id.* at 45.
53. *Id.* at 46.
54. *Id.* at 49.
55. FDCA §505(j)(2) and (4).
56. FDCA §505(j)(7).
57. FDCA §505(j)(7)(A)(ii).
58. 54 Fed Reg 28872 (July 10, 1989).
59. FDCA §505(j)(2)(A).
60. FDCA §505(j)(2)(A)(i).
61. FDCA §505(j)(2)(A)(v).
62. 21 CFR §314.70.
63. 21 CFR §314.94(a)(8)(iv). See *Bristol-Myers Squibb Co. v. Shalala*, 91 F3d 1493, 1496 (DC Cir 1996). (Bristol-Myers Squibb's complaint seeking to enjoin the FDA from approving an ANDA for captopril which omitted an approved indication for treating diabetic nephropathy was remanded to the trial court with instructions to dismiss.)
64. FDCA §505(j)(2)(A)(ii)(I).
65. FDCA §505(j)(2)(A)(ii)(I), (II), and (III).
66. FDCA §505(j)(2)(A)(iv).
67. FDCA §505(j)(8)(B).
68. FDCA §505(j)(8)(A)(ii) amended by MPDIMA §1103(a)(1); FDCA §505(j)(8)(c) amended by MPDIMA §1103(a)(2); *Schering Corp. v. Sullivan*, 782 F Supp 645 (D.D. C. 1992), vacated for mootness, 995 F2d 1103 (DC Cir 1993); *Schering Corp. v. FDA*, 51 F3d 390 (3rd Cir 1995); and *Fisons Corp. v. Shalala*, 860 F Supp 859 (D.D. C. 1994).
69. In *Fisons*, 860 F Supp at 866, the court approved an FDA regulation permitting the waiver of a specific type of in vivo testing for categories of drugs where in vivo bioequivalence was self-evident based on other bioequivalence data in the application.
70. FDCA §505(j)(4)(H).
71. 21 CFR §314.127(a)(8)(ii)(A)(1)–(7) (1997).
72. FDCA §505(j)(2)(C).
73. FDCA §505(j)(2(C)(i).
74. FDCA §505(j)(2)(A)(iv).
75. FDCA §505(j)(2)(A)(ii).
76. FDCA §505(j)(2)(C)(i) and (ii).
77. 21 CFR §314.93.
78. FDCA §505(j)(2)(C); and 21 CFR §314.93(e).
79. FDCA §505(j)(7)(C).
80. FDCA §505(j)(4)(I); and 21 CFR §314.127(a)(9) and (a)(11) (1997).
81. FDCA §505(e).
82. 21 CFR §314.151(b)(2).
83. 21 CFR §314.151(c)(7); and 21 CFR §314.150(a)(1).
84. 21 CFR §314.150(c)(7).
85. FDCA §505(b)(2); the "Right of Reference or Use" simply refers to approval by the prior party, generally the NDA holder, to the generic applicant to refer to or use its prior safety or efficacy investigations. 21 CFR 314.3(b). When such a "Right of Reference or Use" is relied upon by a 505(b)(2) applicant, it is required to provide in its application a written statement by the owner of the data from each such investigation that the applicant may rely on such data in support of the application and that it will provide the FDA access to the underlying raw data supporting the report of the investigation. 21 CFR 314.50(g)(3).
86. Draft Guidance For Industry Applications Covered by §505(b)(2), Center for Drug Evaluation and Research, October 1999.
87. For example,505(b)(2) Application No. 021–435 filed by Dr. Reddy's Laboratories for approval of amlodipine maleate, relying on data submitted by Pfizer in its NDA for amlodipine besylate (NORVASC®).

88. Citizen petition by Pfizer Inc. and Pharmacia Corporation, No. 01P-0323 (filed July 27, 2001), and Amendment to Citizen Petition (Apr. 4, 2002); and Pfizer Inc. Citizen petition dated October 11, 2002.

89. FDCA §505(b)(2)(A) and (3).

90. 21 CFR §314.101(d)(9).

91. 21 CFR §314.3.

92. FDCA §505(j)(4)(C)(i).

93. See Note (14), supra; and 21 §CFR 314.108(b)(2).

94. FDCA §505(j)(4)(A) [ANDAs]; and §505(d)(1) [505(b)(2) applications].

95. FDCA §505(j)(5)(A) [ANDAs]; and §505(c)(1) [505(b)(2) applications].

96. 21 CFR §314.127 [ANDAs]; and 21 CFR 314.125 [505(b)(2) applications]. Notwithstanding the theoretical opportunity for a hearing, the FDA may deny a hearing if it concludes there are no material factual issues to be determined.

97. FDCA §505(j)(5)(C) amended by MPDIMA §1101(a)(2)(B) [ANDAs]; and §505(c)(1) [505(b)(2) applications].

98. *Apotex, Inc. v. FDA,* 508 F Supp 2d 78 (D.D. C. Sept. 17, 2007).

99. FDCA §505(b)(2)(A); FDCA §505(j)(2)(A)(vii).

100. See *Merck & Co., Inc. v. Danbury Pharmacal, Inc.,* 694 F Supp 1 (D. Del. 1988), *aff'd,* 873 F2d 1418 (Fed Cir 1989); 21 CFR §314.94 (a)(12)(i)(A)(4).

101. 21 CFR §314.94(a)(12)(ii); the regulations specify that this certification be in the following form: In the opinion and to the best knowledge of (name of applicant), there are no patents that claim the listed drug referred to in this application or that claim a use of the listed drug.A certification to substantially the same effect is required with respect to 505(b)(2) applications. 21 CFR 314.50(i)(1)(i)(B)(ii).

102. FDCA §505(j)(2)(B)(i) amended by MPDIMA §1101(a)(1)(A) [ANDAs]; and §505(b)(3) amended by MPDIMA §1101(b)(1)(A) [505(b)(2) applications]; 21 CFR §314.95(a)(1).

103. 21 CFR §§314.52(c)(1) and 314.95(c)(1).

104. FDCA §505(j)(2)(B)(ii) amended by MPDIMA §1101(a)(1)(A) [ANDAs]; FDCA §505(b)(3)(B) amended by MPDIMA §1101(b)(1)(A) [505(b)(2) applications].

105. FDCA §505(j)(2)(B)(iv)(II); FDCA §505(b)(3)(D)(ii).

106. 21 CFR §314.95(c)(6) and (i); and 21 CFR §314.94 (a)(12)(i)(A)(4).

107. 21 CFR §314.95(c)(2)-(5).

108. FDCA §505(j)(2)(B), amended by MPDIMA, §1101(a)(1)(A) [ANDAs], and FDCA §505(b)(3)(B) amended by MPDIMA §1101(b)(1)(A) [505(b)(2) applications].

109. FDCA §505(j)(2)(B)(ii) amended by MPDIMA §1101(a)(1)(A) [ANDAs], and FDCA §505(b)(3)(B), amended by MPDIMA §1101 (b)(1)(A)[505(b)(2) applications]. The prior law had no time limit. This raised issues as to the effective filing date of an ANDA, Paragraph IV, and who was the first to file for the purpose of awarding 180 days of market exclusivity. In a suit filed by Purepac against FDA on October 29, 2003 in the District of Columbia, Purepac alleged that it was entitled to first-to-file status because a Paragraph IV certification in an original ANDA is deemed effectively submitted on the date it is received by the FDA and that the date of notification to the patent holder is irrelevant. "The Pink Sheet," Vol. 65, No. 46, p. 12 (Nov. 17, 2003). In this instance, FDA awarded first-to-file status to Ivax based upon its original ANDA with a Paragraph IV certification, submitted one day prior to Purepac's notice to the NDA holder of its amended ANDA with a Paragraph IV certification. "The Pink Sheet," Vol. 65, No. 46, p. 12 (Nov. 17, 2003). Purepac later withdrew its action against the FDA and agreed to share 180-day exclusivity with Ivax. "The Pink Sheet," Vol. 65, No. 48, p. 17 (Dec. 1, 2003).

110. 21 CFR §314.95(f); and FDCA §505(j)(5)(B)(iii). FDA requires the ANDA applicant to provide it with a return receipt or other evidence of the date of receipt of the notice by the patent owner and NDA holder. 21 CFR §314.95(e).

111. In *AstraZeneca AB v. Mutual Pharm. Co.,* 221 F Supp 2d 528 (E.D.Pa. 2002), the court denied such relief, holding that the ANDA applicant's notice was sufficient in that it alerted the patent owner to the applicant's claim of noninfringement. However, in three other cases courts have held that insufficient notices could ultimately be relied upon in litigation in support of an award of attorney's fees for willful infringement. *Yamanouchi Pharm. Co. Ltd. v. Danbury Pharmacal, Inc.,* 231 F3d 1339, 1347–48 (Fed Cir 2000); *Eli*

Lilly & Co. v. Zenith Goldline Pharms., Inc., 2001 WL 1397304, at *25–26 (S.D. Ind. Oct. 29, 2001); Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc., 459 F Supp 2d 227 (S.D. N.Y. 2006).

112. FDCA §505(j)(2)(A)(viii) [ANDAs]; FDCA §505(b)(2)(B) [505(b)(2) applications]; and 21 CFR 314.94(a)(12)(iii).

113. See Patent Provisions Rulemaking, 59 Fed Reg 50338, 50345 (Oct. 3, 1994) ("FDA does not have the resources to review patent information for its accuracy and relevance to an NDA."); Proposed ANDA Rules, 54 Fed Reg 28872, 28909 (July 10, 1989) ("because the FDA has no experience in the field of patents, the agency has no basis for determining whether a use patent covers the use sought by the generic applicant").

114. See Proposed ANDA Rules, 54 Fed Reg 28872, 28909 (July 10, 1989) ("The agency believes that [this] approach more fairly implements Congress' intent that patent owners receive pre-approval notice of potentially infringing patents.").

115. See AaiPharm, Inc. v. Thompson, 296 F3d 227, 241 (4th Cir 2002) ("[T]he whole point of the Act's [P]aragraph IV [C]ertification scheme is to let private parties sort out their respective intellectual property rights through patent infringement suits while the FDA focuses on its primary task of ensuring the drugs are safe and effective. This division of labor is appropriate because the FDA has no expertise in making patent law judgment."); Watson Pharm., Inc. v. Henney, 194 F Supp 2d 442, 445 (D. Md. 2001) ("[the FDA] has no expertise—much less any statutory franchise—to determine matters of substantive patent law. In making its decision to list a patent, therefore it is entirely appropriate and reasonable for the FDA to rely on the patentee's declaration as to coverage, and to let the patent infringement issues play out in other, proper arenas . . .").

116. Purepac Pharm. Co. v. Thompson, 238 F Supp 2d 191 (D.D. C. 2002), affirmed, Torpharm, Inc. v. Purepac Pharm. Co., 2004 U.S. App. LEXIS 767 (C.A. D.C. Jan. 20, 2004). (Warner-Lambert, the patent owner, had consistently represented to the FDA that the patent in question claimed the use of the drug gabapentin to treat neurodegenerative diseases—not epilepsy—the only approved indication for the drug, the prior patent for the epilepsy use having expired. Purepac sought only approval for the epilepsy indication. Based upon the specific record, the district court ordered the FDA to vacate its decision not to approve Purepac's ANDA because it did not include a Paragraph IV Certification respecting the indication for the treatment of neurodegenerative disease for which Purepac did not seek approval (and which had not been previously approved by the agency). In view of the court's decision, the FDA subsequently delisted the patent and required that the applicants with pending ANDAs for gabapentin products withdraw any prior certifications or Section viii Statements as to that patent. See January 28, 2003 letter from Gary Buehler, Director Office of Generic Drugs, FDA to "ANDA Applicant for Gabapentin" (Jan. 28, 2003 Buehler letter) (available at http://www.fda.gov/cder/ogd/75350.479pat.pdf). The Court of Appeals affirmed. 2004 U.S. App. LEXIS 767 *23–24.

In a subsequent decision, the court found that the FDA had acted within its discretion in precluding another generic applicant (Torpharm) from maintaining a Paragraph IV Certification as to the patent in question and asserting 180-day exclusivity based on that patent. Torpharm v. Thompson, 260 F Supp 2d 69 (D.D. C. Apr. 25, 2003), affirmed 2004 U.S. App. LEXIS 767*32.

117. 355 F Supp 2d 586, 590 (D. Mass. 2005).

118. Id.

119. Id. at 599.

120. 68 Fed Reg 36676, 36682 (June 18, 2003).

121. FDCA §505(j)(2)(B)(ii)(II); FDCA §505(b)(3)(B)(ii); 21 CFR §314.95(d); In the Torpharm case, the court held that it was within the discretion of the FDA to hold that the operative date (assuming proper notice) for the filing of an amended Paragraph IV Certification was the date of receipt of the certification (260 F Supp 2d at 81–82) and that the penalty for an applicant's failure to provide notice at the same time as its amended certification was postponement of the effective date of the certification to the date of transmission of the notice of the amendment (260 F Supp 2d at 78–79).

122. *Id.*
123. *Id.*
124. 21 C.F.R. §314.94(a)(12)(vi); 68 Fed Reg 36676, 36684 (June 18, 2003).
125. 21 CFR §§314.52(a)(3) and 314.95(a)(3) (2003).
126. 35 USC §271(e)(1).
127. *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193 (2005).
128. *Merck* at 197 [*quoting Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F3d 860, 866 (Fed Cir 2003)].
129. *Merck* at 197–199.
130. *Integra Lifesciences I, Ltd. v. Merck KGaA*, Civ. Action No. 96 CV-1307 JMF (S.D. Ca., Mar. 6, 2001), App. To Pef. For Cert. 49 a.
131. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F3d 860, 866 (Fed Cir 2003).
132. *Merck* at 202.
133. *Id.*
134. *Id.*
135. *Merck* at 208 (quoting Brief of the United States as amicus.)
136. *Merck* at 207 (quoting §271(e)(i)).
137. *Integra Lifesciences I Ltd. v. Merck KGaA*, 496 F3d 1334, 1348 (Fed Cir 2007) (*Integra*).
138. *Id.* at 1339.
139. *Id.*
140. *Id.* at 1348.
141. *Merck* at 205, n. 7. The court noted that the RGD peptides were not used at Scripps as a research tool, noting Judge Newman's statement in dissent in the prior Federal Circuit decisions that "[u]se of an existing tool in one's research is quite different from study of the tool itself." 331 F3d at 878.
142. *Integra* at 1348; the court cited an N.I.H. regulation defining research tools as "tools that scientists use in the laboratory including cell lines, monoclonal antibodies, reagents, animal models, growth factors, combinational chemistry and DNA libraries, clones and cloning tools (such as PCR), methods, laboratory equipment and machines." 64 Fed Reg. 72090, 72092 n. 1 (Dec. 23, 1999).
143. *Amgen, Inc. v. U.S. International Trade Commission*, slip no. 2007–1014, 2008 U.S. App. LEXIS 5751 (Fed Cir Mar. 19, 2008).
144. 35 USC §271(e)(2); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990).
145. 35 USC §271(e)(2).
146. *Eisai Co., Ltd. v. Mutual Pharmaceutical Co., Inc.*, 2007 U.S. Dist. LEXIS 93585, *8 et seq. (D. N. J. Dec. 20, 2007); *Teva Pharm. USA Inc. v. Abbott Labs.*, 301 F Supp 2d 819 (N.D. Ill. 2004); *Glaxo Group Ltd. v. Apotex, Inc.*, 272 F Supp 2d 772 (N.D. Ill. 2003).
147. *Teva Pharm.* at 829–30; *Glaxo Group* at 775.
148. When the Hatch–Waxman Act was enacted in 1984, the *Orange Book* listing requirement only applied to drugs approved under 21 USC §355 and therefore did not apply to antibiotic drugs which were approved under a different statute, 21 USC §357. See Proposed Rule: Marketing Exclusivity and Patent Provisions for Certain Antibiotic Drugs, 65 Fed Reg 3623, 3624 (Jan. 24, 2000). In 1997, Congress adopted the Food and Drug Administration Modernization Act of 1997 (FDAMA) which repealed §357 and required all new drug applications for antibiotic drugs be submitted under §355 (FDAMA, Pub L No. 105–115, 111 Stat. 2296). FDAMA, however, provided that products containing an old antibiotic drug, i.e., an antibiotic drug approved by FDA on or before the enactment of FDAMA (Nov. 21, 1997), would remain exempt from the *Orange Book* listing requirements of the Hatch–Waxman Act.
149. *Eisai* at *9–11 [citing *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661 (1990); *Bristol-Myers Squibb Co. v. Royce Labs Inc.*, 69 F3d 1130 (Fed Cir 1995); *aaiPharma Inc. v. Thompson*, 296 F3d 227 (Fed Cir 2002); and *Allergan, Inc. v. Alcon Labs, Inc.*, 324 F3d 1322 (Fed Cir 2003)].
150. *Eisai* at *12.
151. *Id.* at *13.
152. FDCA §505(c)(3)(C).
153. 21 CFR §314.107(f)(2).

154. See July 2002 FTC Report, p. 14 ["The data revealed 75 drug products, out of a total of 104 NDAs (72 percent), in which the brand-name company sued the first generic applicant."].

155. *Warner-Lambert Co. v. Apotex Corp.*, 316 F3d 1348 (Fed Cir 2003). [In another case involving the drug gabapentin (see references 101 and 102 above) the court held that Warner-Lambert could not assert infringement of the patent directed to the unapproved use for treating neurodegenerative diseases, where both the patent on the listed products and the approved indication (the treatment of epilepsy) had previously expired. Although Apotex had submitted a Paragraph IV Certification, the court noted that it was effectively a Section viii Statement of a nonapplicable use patent.]; see also *Allergan, Inc. v. Alcon Labs*, 324 F3d 1322 (Fed Cir Mar. 28, 2003); *cert. denied*, 2003 U.S. Lexis 8602 (Dec. 1, 2003).

156. 21 C.F.R. §314.53.

157. See *Mylan Pharms.*, 268 F3d at 1331 (Fed Cir 2001) ("A review of the amendments shows no explicit provisions allowing an accused infringer to defend against infringement by challenging the propriety of the Orange Book listing of the patent.").

158. See *In re Buspirone Anti-Trust Litig.*, 185 F Supp 2d 363 (S.D. N.Y. 2002), in which the district court held that the brand-name defendant was not entitled to Noerr-Pennington immunity against claims arising out of its allegedly fraudulent listing of an *Orange Book* patent. As of this writing, this case is on appeal.

159. *Wyeth v. Lupin Ltd.*, 505 F Supp 2d 303, 306–307 (D.Md. 2007); and *Aventis Pharma Deutschland GMBH v. Lupin Ltd.*, 403 F Supp 2d 484, 494 (E.D. Va. 2005).

160. *SmithKline Beecham Corp. v. Geneva Pharms., Inc.*, 287 F Supp 2d 576 (E.D.Pa. 2002); *SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, 2001 U.S. Dist. LEXIS 1935 (N.D. Ill. 2001).

161. FDCA §505(j)(5)(C)(i)(I)(aa) amended by MPDIMA §1101 (a)(2)(C) [ANDA]; FDCA §505(c)(3)(D)(i)(I)(aa) amended by MPDIMA §1101(b)(2)(D) [505(b)(2) applications].

162. *Kos Pharmaceuticals, Inc. v. Barr Laboratories, Inc.*, 242 F Supp 2d 311 (S.D. N.Y. 2003).

163. FDCA §505(j)(5)(C)(i)(I)(bb) amended by MPDIMA §1101(a)(2)(C) [ANDAs]; FDCA §505(c)(3)(D)(i)(I)(bb) amended by MPDIMA §1101(b)(2)(D) [505(b)(2) applications].

164. FDCA §(j)(5)(C)(i)(I)(cc) amended by MPDIMA §1101(a)(2)(C) [ANDAs]; FDCA §355(c)(3)(D)(i)(cc) amended by MPDIMA §1101(b)(2)(D) [505(b)(2) applications].

165. 35 USC 271(e)(5), created by MPDIMA §1101(d).

166. FDCA §355(j)(5)(C)(i)(II) amended by MPDIMA §1101(a)(2)(C) [ANDAs]; FDCA §355(c)(3)(D)(i)(II) amended by MPDIMA §1101(b)(2)(D).

167. *Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.*, 482 F3d 1330 (Fed Cir 2007).

168. *MedImmune, Inc., Petitioner v. Genentech, Inc.*, 127 S.Ct. 764 (Jan. 9, 2007).

169. *Teva* at 1339.

170. *Id.* at 1346.

171. *Id.* at 1338, quoting *MedImmune*, 127 S.Ct. at 771.

172. *Pfizer, Inc. v. Ranbaxy Laboratories Ltd.*, 525 F Supp 2d 680 (D. Del. Nov. 29, 2007).

173. *Id.* at 686.

174. *Id.* at 687 (citing *Teva*, 482 F3d at 1344).

175. *Caraco Pharmaceutical Laboratories Ltd. v. Forest Laboratories*, 2008 U.S. App. LEXIS 6838 (Fed Cir Apr. 1, 2008); see also *Merck & Co, Inc. v. Watson Labs., Inc.*, 2006 U.S. Dist. LEXIS 36026 (D. Del. June 2, 2006); cf. *Janssen Pharmaceutica v. Apotex, Inc.*, 2007 U.S. Dist. LEXIS 75967 (D.N.J. Oct. 11, 2007), *Merck & Co., Inc. v. Apotex, Inc.*, 488 F Supp 2d 418 (May 21, 2007).

176. *Adenta GmbH v. OrthoArm, Inc.*, 501 F3d 1364 (Fed Cir 2007); *Maxwell v. Stanley Works, Inc.*, 2008 U.S. App. LEXIS 323 (Fed Cir Jan. 8, 2008); *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F3d 897 (Fed Cir 2008); *Caraco Pharm. Labs., Ltd. v. Forest Labs., Ltd.*, 2008 U.S. App. LEXIS 6838 (Fed Cir Apr. 1, 2008).

177. *Caraco*.

178. *Id.* at *27–28.

179. *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F3d 1271, 1284 (Fed Cir 2007); see also *Adenta GmbH v. OrthoArm, Inc.*, 501 F3d 1364 (Fed Cir 2007), *Maxwell v. Stanley Works, Inc.*, 2008 U.S. App. LEXIS 323 (Fed Cir Jan. 8, 2008), *Micron Tech., Inc. v. Mosaid Techs.,*

*Inc.*, 518 F3d 897 (Fed Cir 2008), *Caraco Pharm. Labs., Ltd. v. Forest Labs., Ltd.*, 2008 U.S. App. LEXIS 6838 (Fed Cir Apr. 1, 2008)].

180. *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F3d 1372, 1381 (Fed Cir 2007).

181. *Eisai* at *13.

182. *Id.* at *15.

183. *Id.*

184. *Id.* at *18.

185. 35 USC §156(a)(1).

186. 35 USC §156(a)(2).

187. 35 USC §156(a)(3).

188. 35 USC §156(a)(4).

189. 35 USC §156(a)(5).

190. 35 USC §156(b)(1)(A)(i).

191. 35 USC §156(b)(1)(B).

192. 35 USC §156(g)(6)(A).

193. 37 CFR 1.775.

194. 35 USC §156(c).

195. 35 USC §156(c)(3).

196. 35 USC §156(b)(1).

197. 35 USC §154(a)(2). Under a transitional provision, patents in force on June 8, 1995 (without prior term adjustment) are entitled to a term of 20 years from their effective filing dates or 17 years from their issue dates, whichever is greater.

198. By way of example, a 30-month stay had been reduced for lack of reasonable cooperation by the brand-name company in *Andrx Pharms., Inc. v. Biovail Corp.*, 175 F Supp 2d 1362, 1375 (S.D. Fla. 2001), *rev'd*, 276 F3d 1368, 1376 (Fed Cir 2002), and extended because of failure of a generic company to reasonably cooperate in *Eli Lilly Co. v. Zenith-Goldline Pharms., Inc.*, 2001 WL 238090 (S.D. Ind. Mar. 8, 2001). An extension of the 30-month stay was denied in *Zeneca Ltd. v. Pharmachemie B.V.*, 16 F Supp 2d 112 (D. Mass. 1998).

199. *Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 2008 U.S. App. LEXIS 6786 (Fed Cir 2008).

200. GlaxoSmithKline obtained five overlapping 30-month stays, commencing in 1998 and extending to September 2003, by the multiple listing of several patents related to the drug paroxetine, followed by sequential infringement suits against Apotex, one of several generic ANDA applicants. July FTC Report, pp. 51–52 and 33–34. See also *Dey, L.P. v. Ivax Pharmaceuticals, Inc.*, 2005 U.S. Dist. LEXIS 31039 (C.D. Cal. Nov. 4, 2005), *den'd mtn for reconsideration*, 2005 U.S. Dist. LEXIS 39475 (C.D. Cal. Dec. 22, 2005); FDA Proposed Rule on Patent Listing Requirements and 30-Month Stays on ANDAs, 67 Fed Reg 65448, 65454–56 (Oct. 24, 2002).

201. 21 USC §355(j)(5)(F)(iii).

202. 21 USC §355 a(b).

203. The statute and FDA regulations required that ANDAs *may* be separately filed for individual dosage forms of the same listed drug. 21 CFR 314.92(a)(1).

204. *Apotex, Inc. v. Shalala*, 53 F Supp 2d 454 (D.D. C. 1999), *aff'd*, 1999 WL 956686 (DC Cir Oct. 8, 1999). Subsequently, separate 180-day marketing exclusivities were accorded to Barr Laboratories as the first to make a Paragraph IV Certification as to the 10-mg and 20-mg dosage forms of fluoxetine hydrochloride (Eli Lilly's Prozac®), and Dr. Reddy's Laboratories as the first to make such a certification as to the 40-mg dosage form of the same drug, following the court decision holding the last to expire of Lilly's listed patents invalid.

205. August 2,1999 Response to Citizen's Petitions re: cisplatin, Docket No. 99P-1271/PSA 1 and PSA 2.

206. November 16, 2001 letter from Gary Buehler, Director Office of Generic Drugs, FDA, to Andrx Pharmaceuticals and GenPharm, Inc. Re: Omeprazole Delayed-Release Capsules (available at www.fda.gov/cder/ogd/shared.exclusivity.htm). Neither Andrx nor GenPharm was subsequently accorded exclusivity, the courts having held that the listed

patents in question are valid and infringed by their respective dosage forms. *In re Omeprazole Patent Litig.*, 222 F Supp 2d 423 (S.D. N.Y. 2002), affirmed 2003 U.S. App. LEXIS 24899 (Fed Cir 2003), rehearing denied, 2004 U.S. App. LEXIS 2197, 2198 (Fed Cir Jan. 23, 2004).

207. *Torpharm, Inc. v. Food and Drug Administration*, 2004 U.S. Dist. LEXIS 524 (D.C.D.C., Jan. 8, 2004). On February 6, 2004, the FDA and Alphapharm PTY Ltd., the Intervenor-Defendant, appealed to the Court of Appeals for the District of Columbia.

208. FDCA §505(j)(5)(B)(iv)(II)(bb) amended by MPDIMA §1101(a)(1).

209. FDCA §505(j)(5)(B)(iv)(I) (prior to the 2003 Statutory Changes).

210. *Eli Lilly and Co. v. Actavis Elizabeth LLC*, 2:07-cv-03770 (D.N.J.) (DMC/MF) [filers include: (1) Actavis Elizabeth LLC; (2) Apotex, Inc.; (3) Aurobindo; (4) Glenmark Pharmaceuticals Inc., USA; (5) Sun Pharmaceuticals; (6) Synthon Labs, Inc.; (7) Teva Pharmaceuticals; (8) Zydus Pharmaceuticals USA, Inc.; (9) Sandoz, Inc.; and (10) Mylan Pharmaceuticals, Inc.]; *Schering Corp. v Zydus Pharmaceuticals, USA, Inc.*, 3:06-cv-04715 (D.N.J.) (MC/TJB) [filers include: (1) Orgenus Pharma., Inc.; (2) Perrigo, Co.; (3) Geopharma Inc.; (4) Glenmark Pharmaceuticals Inc., USA; (5) Caraco Pharmaceutical Laboratories Ltd. (or Sun Pharmaceutical Laboratories, Ltd.); (6) Belcher Pharmaceuticals, Inc.; (7) Lupin Pharmaceuticals, Inc.; (8) Zydus Pharmaceuticals USA, Inc.; (9) Sandoz, Inc.; (10) Mylan Pharmaceuticals, Inc.; (11) Ranbaxy Inc.; (12) Dr. Reddy's Labs, Inc.; and (13) Watson Pharmaceuticals, Inc.].

211. Generally, ANDA applicants are reluctant to so proceed because of the magnitude of potential damages in the event of an adverse determination in infringement litigation.

212. *Mylan Pharms., Inc. v. Thompson*, 2001 WL 1654781 (N.D. W.Va. 2001).

213. *Id.*

214. FDCA §505(j)(5)(B)(iv)(I) amended by MPDIMA §1102(a)(1).

215. FDCA §505(j)(5)(B)(iv)(II) (prior to the 2003 Statutory Changes).

216. 64 Fed Reg 42873 (Aug. 6, 1999).

217. 65 Fed Reg 43233 (July 13, 2002); Guidance for Industry, "Court Decisions, ANDA Approvals, and 180-Day Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act (March 2000), published at 65 Fed Reg 16922 (Mar. 30, 2000), citing *TorPharm, Inc. v. Shalala*, 1997 U.S. Dist. LEXIS 21983 (D.D.C. Sept. 15, 1997), appeal withdrawn and remanded, 1998 U.S. App. LEXIS 4681 (DC Cir Feb. 5, 1998), vacated No. 97–1925 (D.D. C. Apr. 9, 1998); *Mova Pharm. Corp. v. Shalala*, 140 F3d 1060 (DC Cir 1998); *Granutec, Inc. v. Shalala*, 46 U.S.P.Q. 2 d 1398 (4th Cir 1998); and *Mylan Pharms., Inc. v. Shalala*, 81 F Supp 2d 30 (D.D.C. 2000).

218. *Mylan Pharms., Inc. v. Henney*, 94F Supp 2d 36, 58 (D.D. C. 2000), vacated as moot sub nom; and *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F3d 627, 632 (DC Cir 2002).

219. *Teva Pharms., USA, Inc. v. FDA*, 182 F3d 1003 (DC Cir 1999).

220. 67 Fed Reg 66593 (Nov. 1, 2002), "180-Day Generic Drug Exclusivity For Abbreviated New Drug Applications," withdrawing proposed rule published in 64 Fed Reg 42873 (Aug. 6, 1999).

221. 67 Fed Reg 66594 (Nov. 1, 2002).

222. FDCA §505(j)(5)(B)(iii)(I) amended by MPDIMA §1102(a)(1).

223. *Mylan Pharmaceuticals, Inc. v. FDA*, 454 F3d 270 (4th Cir 2006) ("The statute does not grant the FDA the power to prohibit the marketing of authorized generics during the 180-day exclusivity period afforded to a drug company in Myaln's position.").

224. 21 CFR §314.94(a)(12)(viii)(A).

225. 64 Fed Reg 42873 (Aug. 6, 1999).

226. *Mylan Pharms., Inc. v. Henney*, 94 F Supp 2d 36, 41, 57–58 (D.D. C. 2000), vacated as moot sub nom.

227. 21 CFR §314.107(c)(1) (1997), revoked in 63 Fed Reg 59712 (Nov. 5, 1998).

228. FDA, "Guidance for Industry: 180 Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to Federal Food, Drug and Cosmetic Act," 63 Fed Reg 37890 (July 14, 1998), citing *Mova Pharm. Corp. v. Shalala*, 955 F Supp 128 (D.D. C. 1997), *aff'd*, 140 F3d 1060 (DC Cir 1998); and *Genentech, Inc. v. Shalala*, 1998 WL 153410 (4th Cir 1998); see also *Andrx Pharms., Inc. v. Friedman*, No. 98–0099 (D.D. C. Mar. 30, 1998).

229. 63 Fed Reg 59710 (Nov. 5, 1998).

230. *Purepac Pharm. Co. v. Friedman*, 162 F3d 1201 (DC Cir 1998).
231. FDCA §505(j)(5)(D)(i)(III) amended by MPDIMA §1101(a)(2).
232. In *Boehringer Ingleheim Corp. v. Shalala*, 993 F Supp 1 (D.D. C. 1997), the court denied a temporary restraining order seeking to preclude approval of a waiver by GenPharm Inc. of an exclusive period to market ranitidine hydrochloride in favor of Granutec, Inc.a later filer. The court concluded that the FDA's interpretation of the statute, approving the waiver agreement between GenPharm and Granutec, was not arbitrary and capricious, and an abuse of discretion or otherwise in violation of the APA.
233. November 16, 2001 letter from Gary Buehler, Director Office of Generic Drugs, FDA, to Andrx Pharmaceuticals and GenPharm, Inc. re. Omeprazole Delayed-Release Capsules (available at www.fda.gov/cder/ogd/shared.exclusivity.htm).
234. Andrx and GenPharm were thus able to waive exclusivity in favor of Kremers Urban Development Co. (Kudco) and Schwarz Pharma, Inc. which the trial court had held not to infringe the various omeprazole dosage form patents held valid by the trial court. See *Astra Aktiebolag v. Adnrx Pharms., Inc.*, 222 F Supp 2d 423 (S.D. N.Y. 2002).
235. MPDIMA §1102(a)(2)(D).
236. MPDIMA §1102(a)(2)(D)(i)(I).
237. MPDIMA §1102(a)(2)(D)(i)(II).
238. MPDIMA §1102(a)(2)(D)(i)(III).
239. MPDIMA §1102(a)(2)(D)(i)(IV).
240. MPDIMA §1102(a)(2)(D)(i)(V).
241. MPDIMA §1102(a)(2)(D)(i)(VI).
242. January 17,2008 letter from Gary Buehler, Director Office of Generic Drugs, FDA to Marc A. Goshko of Teva Parenteral Medicines regarding ANDA 77–165 for granisetron hydrochloride injection (1 mg/mL) (available at http://www.fda.gov/ohrms/dockets/DOCKETS/07n0389/07n-0389-let0003.pdf).
243. *Id.* at 5.
244. FDCA §§505(j)(5)(D)(ii); 505(c)(3)(D)(ii).
245. FDCA §§505(j)(5)(D)(iii) and (iv); 505(c)3)(D)(iii).
246. FDCA §§505(j)(5)(D)(ii); 505(c)(3)(D)(ii).
247. *Id.*
248. 21 CFR §314.108(a).
249. 54 Fed Reg 28872 m 28898 (July 10, 1989).
250. Clarinex® (desloratidine), which is a metabolite of Claritin® (Loratidine), received 5-year exclusivity.
251. Enantiomers are optical isomers of a chiral compound that are mirror images of one another.
252. A racemate is a mixture containing equal amounts of the enantiomers of a chiral compound.
253. 54 Fed Reg at 28898 (July 10, 1989); 59 Fed Reg 50338, 50359 (Oct. 3, 1994); 62 Fed Reg 2167, 2168 (Jan. 15, 1997).
254. Food, Drug, and Cosmetic Act (FDC Act) §505(u)(1), as amended by Food and Drug Administration Amendments Act of 2007 (FDAAA) §1113.
255. *Id.* §505(u)(1)(B), as amended by FDAAA §1113.
256. *Id.* §505(u)(2)(A), as amended by FDAAA §1113. The therapeutic category is identified in accordance with the list developed by the United States Pharmacopeia pursuant to section 1860D–4(b)(3)(C)(ii) of the Social Security Act and as in effect on September 27, 2007. The FDA must publish this list and may amend it by regulation. FDAAA §1113; FDC Act §505(u)(3).
257. FDAAA §1113; FDC Act §505(u)(4).
258. FDCA §§505(j)(5)(D)(iii) and (iv); 505(c)(3)(D)(iii).
259. The Food and Drug Administration Modernization Act of 1997, Pub L No. 105–115 (1997), Section 111; and Best Pharmaceuticals for Children Act, Pub L No. 107–109 (2002), §505 a(b)(2)(B).
260. FDCA §505 a(b)(1) [ANDAs] and FDCA §505 a(c)(1) [505 (b)(2) applications].
261. FDCA §505 a(q).

262. FDCA §505 a(b)(1)(ii) [ANDAs] and (c)(1)(ii) [505(b)(2) applications].
263. FDCA §505 a(g).
264. FDCA §505 a(l).
265. *Apotex v. FDA*, 508 F Supp 2d 78 (D.D. C. Sept. 17, 2007).
266. *Pfizer Inc. v. Mylan Labs Inc.*, No. 02-cv-1628 (W.D. Pa. Feb. 27, 2007).
267. *Pfizer Inc. v. Apotex*, No. 03 C 5289, 2006 U.S. Dist. LEXIS 95778 (N.D. Ill.).
268. *Pfizer Inc. v. Mylan Labs Inc.*, 2007 U.S. Dist. LEXIS 18699 (W.D. Pa.).
269. *Pfizer Inc. v. Apotex, Inc.*, No. 480 F3d 1348 (Fed Cir 2007).
270. *Pfizer Inc. v. Mylan Labs, Inc.*, No. 236 Fed. Appx. 608 (Fed Cir Jun. 5, 2007).
271. April 18, 2007 Letter from Gary Buehler, Director of Office of Generic Drugs, CDER, FDA to ANDA Applicant/Holder for Amlodipine Besylate Tablets.
272. *Mylan Laboratories, Inc. v. Leavitt*, 495 F Supp 2d 43 (D.D. C. Jun. 29, 2007).
273. FDA has solicited comments for resolving marketing exclusivity issues in granisetron hydrochloride (Kytril) (Oct. 11, 2007), ramipril (Altace) (Oct. 3, 2007), midodrine hydrochloride (Proamatine) (Aug. 7, 2007), acrabose (Precose) (Sept. 26, 2007), and amlodipine besylate (Norvasc) (Mar. 28, 2007).
274. Public dockets for specific matters can be found on the FDA Web site (http://www.fda.gov/ohrms/dockets/default.htm).
275. April 18, 2007 Letter from Gary Buehler, Director of Office of Generic Drugs, CDER, FDA to ANDA Applicant/Holder for Amlodipine Besylate Tablets.
276. FDCA §335 c(a)(1).
277. FDCA §335 c(a)(2).
278. 21 CFR §10.30.
279. 21 CFR §§10.25(a), 10.30.
280. Proposed Rule, Citizen Petitions; Actions That Can be Requested by Petition; Denials, Withdrawals, and Referrals for Other Administrative Action, 64 Fed Reg 66822 (Nov. 30, 1999); and Remarks of Sheldon Bradshaw, Chief Counsel, FDA at the Generic Pharmaceutical Association's first annual Policy Conference, (Sept. 19, 2005).
281. FDCA §§505(q)(1)(A) as added by FDAAA §914(a).
282. FDCA §§505(q)(1)(H), (I) as added by FDAAA §914(a).
283. *Id.* §505(q)(1)(F), as amended by FDAAA §914(a).
284. *Id.* §505(q)(1)(E), as amended by FDAAA §914(a).
285. *Id.* §505(q)(1)(B), as amended by FDAAA §914(a).
286. FDCA §505 (j)(5)(D)(i) (IV).
287. FDCA §505 (q)(1)(G), as amended by FDAAA §914 (a).
288. FDCA §505 (j)(5)(D)(i)(IV).
289. 21 CFR §10.45(b), (c).



**5**

# FDA Regulation of Biological Products[*]

**Michael S. Labson, Krista Hessler Carver, and Marie C. Boyd**

*Covington & Burling LLP, Washington, D.C., U.S.A.*

## INTRODUCTION

Biologics as a category contain some of the oldest and earliest regulated preventative and therapeutic medicinal products known, as well as the newest and the most novel. The wide array of products regulated as "biologics" has presented regulatory challenges over the years. The Food and Drug Administration (FDA) and its predecessor agencies from time to time have responded to scientific developments by adopting ad hoc approaches to biologics regulation that defy fully coherent and unified explanation. Change within this product category has also caused shifting approaches over the years with respect to the agency component that has chief responsibility for regulating the products, both in terms of which agency within the government and which offices within an agency have principal regulatory responsibility.

In recent years, Congress and FDA have endeavored to harmonize the regulation of biologics, particularly therapeutic biologics, with traditional chemistry-based drugs. At the same time, some unique features of biologics regulation remain, both for historical reasons and because of unique scientific, legal, and regulatory considerations for biologics and special categories of biologics. This theme of harmonizing the regulation of biological products and traditional drug products while retaining unique approaches for biologics is seen in the current active debate in the Congress over whether and how to create of an abbreviated approval scheme for pseudogeneric versions of innovator biologics (known as "follow-on biologics"). It remains to be seen how this new chapter of biologics regulation will be written, as the negotiation of the specific features of this new potential approval pathway unfolds.

In order to understand the important debate around follow-on biologics and the regulation of biologics more generally, it is critical to begin with the history of biologics regulation. We thus begin with that history, and then review the scope of the definition of "biological product," product jurisdiction issues, and regulatory approval requirements for special types of biologics. We conclude by returning to the specific topics under consideration in the ongoing debate on follow-on biologics.

---

[*] Michael Labson is a partner and Krista Carver and Marie Boyd are associates at Covington & Burling LLP in Washington, D.C. Marie is admitted to the Maryland bar and not admitted to the bar of the District of Columbia. She is supervised by principals of the firm. The views expressed here are solely those of the authors and do not necessarily reflect the views of the firm or its clients.

## HISTORY OF BIOLOGICS REGULATION

Unlike in many other countries, the regulation of biologics and drugs evolved separately in the United States. The earliest biologics law focused on the regulation of the establishments making biologics, whereas initial drug legislation focused on the safety of the drugs themselves. Because most biologics meet the statutory definition of drugs, technically they have been subject to both authorities. As both sets of regulation evolved to require premarket approval or licensure of products, this created a problematic situation of the dual regulation of biologics. It was unclear whether biologics should be approved under the Federal Food, Drug, and Cosmetic Act (FDCA) or licensed under the Public Health Service Act (PHSA), and there was also uncertainty about which agency or later which Center or Division at FDA should review the applications. Over time, the regulation of biologics became consolidated at the FDA, and the FDA developed a series of formal and informal interpretations and agreements to assign pathways and organizational responsibility for product review. In recent years, both Congress and the agency have attempted to harmonize the regulation of biologics and drugs further. Nevertheless, the approval process for biologics continues to involve more searching review of the manufacturing process than in the case of drugs, in recognition of the greater importance of these inquiries to the safety and efficacy of biologic products.

This section provides an overview of the historical development of the biologics laws, the incidents and occurrences that triggered major changes in biologics regulation, the evolution of the dividing line between products subject to licensure and those subject to approval, and the recent harmonization efforts.

### The Biologics Control Act of 1902

As has often been the case in the food and drug context, the first major biologics law was enacted in response to tragedy. During a 1901 diphtheria epidemic in St. Louis, 13 children died from receiving a diphtheria antitoxin contaminated with tetanus (1). Also in the fall of 1901, nine children died from administration of contaminated smallpox vaccine in Camden, New Jersey (2). These events spurred prompt congressional action. In the following year, Congress passed with little debate or opposition an untitled act, now commonly known as the Biologics Control Act (3).

The Biologics Control Act created an establishment-licensing scheme for biologics facilities (4). Under this act, manufacturers of "any virus, therapeutic serum, toxin, antitoxin, or analogous product applicable to the prevention and cure of diseases in man" were required to obtain a license from the Secretary of the Treasury before shipping their products in interstate commerce (5). The Biologics Control Act also prohibited false labeling or marking of biologics packages (6). In line with the act's emphasis on establishments rather than products themselves, it authorized the Department of Treasury officials to inspect biologics facilities, and provided that establishment licenses were granted contingent on the manufacturer's consent to such inspections (7). The Hygienic Laboratory of the Public Health and Marine Hospital Service, later renamed the National Institutes of Health (NIH), administered the Act (8).

The Biologics Control Act contained no requirement that biologics themselves be safe, pure, and potent. It also did not impose any product testing or premarket approval requirements. The Act's early focus on facilities rather than products reveals the importance of the manufacturing process to the safety and efficacy of biologics.

## The Public Health Service Act

In 1944, the Biologics Control Act was revised and recodified as a new section 351 of the PHSA. To this day, this section of the PHSA provides the basic framework for biologics licensing. The 1944 Act added a product licensure requirement to the existing establishment license requirement and provided that facilities and biologics could not be licensed unless "the establishment and the products for which a license is desired meet standards, designed to insure the continued safety, purity, and potency of such products" (9). Biologics manufacturers were thereafter required to obtain approval of an establishment license application (ELA) and product license application (PLA) before marketing a product.

The 1944 Act also provided that the FDCA, enacted in 1938, applied to biologics (10). Many biologics meet the definition of "drug" under the FDCA because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease (11). To avoid duplicative approval processes, however, the Public Health Service indicated that biologics regulated under the PHSA would not be subjected to the FDCA's premarket approval provisions (12). It also clarified which products would be subjected to premarket approval under the FDCA and which to premarket licensure under the PHSA. It issued a regulation providing that a product would be "analogous" to a "therapeutic serum,"– and hence regulated under the PHSA– if it was "composed of whole blood or plasma or containing some organic constituent or product other than a hormone or amino acid derived from whole blood, plasma, or serum" (13). Consequently, hormone products such as insulin, somatropin, and conjugated estrogens were first approved under the FDCA, not the PHSA (14).

## The Cutter Incident, Continuing Controversy, and Eventual Transfer of Biologics Regulation to FDA

For the years following passage of the Biologics Control Act, the NIH or its predecessor administered the biologics laws. Several transfers of this authority within NIH occurred. Beginning in 1948, the National Microbiological Institute, a unit of NIH, regulated biologics (15). In 1955, tragedy prompted change in the responsible agency component for biologics regulation. In that year, the National Microbiological Institute issued a license for a polio vaccine made by Cutter Laboratories (16). Written protocols for vaccine production and safety testing were the only required conditions for licensure (17). Unfortunately, two of the first batches of the Cutter polio vaccine contained the live virus. It caused 260 cases of polio, 192 of which were paralytic (18). In the ensuing controversy, responsibility for biologics regulation was transferred again to the newly created Division of Biologics Standards (DBS), an independent entity within NIH, and regulations were strengthened to require more thorough testing before licensure (19).

Nevertheless, controversy continued to surround NIH's administration of the biologics laws. In March 1972, J. Anthony Morris, a DBS research scientist, and his coauthor attorney James S. Turner contended that a "major breakdown of scientific integrity" had occurred at DBS, because the division's research function was overshadowing its regulatory function (20). According to Morris and Turner, DBS "lag[ged] so far behind as to be jeopardizing the very concept of vaccine therapy by its scientific mismanagement" (21). In that same month, the General Accounting Office (GAO) published a report describing DBS's failure to enforce its potency standards (22). According to the report, 130 of 221 vaccine lots released between 1966 and 1968 did not meet DBS's potency standards, and the division released lots

"even when its tests showed the potency of the vaccines to be as low as 1 percent of the established standards" (23).

In the wake of these publications, the Secretary of the Department of Health, Education, and Welfare re-delegated authority to regulate biological products to both FDA and DBS (24). The notice also required FDA and DBS to "enforce, and apply all applicable provisions of the [FDCA], as amended, with respect to those human drugs that are biological products" (25). Biologics hence became subject to the FDCA's safety and efficacy requirements. Four months later, DBS's authority was fully transferred to FDA, and the Secretary created the Bureau of Biologics to administer that authority (26). FDA promptly proposed a review of the safety, effectiveness, and labeling of all licensed biologics, known as the "Biologics Review" (27). Manufacturers were generally required to produce "substantial evidence" of product effectiveness (28). FDA initiated proceedings to revoke the licenses of biologics that did not adhere to the safety, effectiveness, or labeling standards of the FDCA (29).

### The Biotechnology Revolution and Regulation of Recombinant Products

Recombinant DNA and other biotechnology advances may have changed the face of science and medicine, but their development did not result in substantial alterations to the existing FDCA and PHSA schemes for biologics regulation. Following the early development of biotechnology products, FDA issued "Points to Consider" draft documents providing guidance on manufacturing, testing, characterization, and processing of such products (30). Further, in its 1986 "Statement of Policy for Regulation Biotechnology Products," FDA indicated that the regulation of biotechnology products would proceed under existing statutory authorities, "based on the intended use of each product on a case-by-case basis" (31).

This statement essentially resulted in recombinant versions of biologics being regulated under the same statute under which their naturally derived counterparts had been regulated. Indeed, this 1986 statement simply represented a more formal statement of what had already become agency practice. FDA had already approved recombinant insulin under the FDCA, like its naturally derived counterpart (32). This policy did have significance with respect to recombinant products for which there was no naturally derived counterpart, like erythropoietin and interferon. FDA regulated these under the PHSA, because they were deemed analogous to blood-derived products and therapeutic serums in terms of intended use and technological characteristics.

### Evolution of the Agency Review Process for Various Biologics

FDA's internal agency policies for review of biologics applications changed in the late 1980s and early 1990s. In 1982, the Bureau of Biologics was merged with the Bureau of Drugs to form the National Center for Drugs and Biologics (NCDB), but just 6 years later NCDB was split into two centers, the Center for Biologics Evaluation and Research (CBER) and the Center for Drug Evaluation and Research (CDER) (33). CBER was assigned primary authority for "licensing of manufacturers to produce biological products" and regulating "biological products under the biological product control provisions of the [PHSA] and applicable provisions of the [FDCA]" (34). CDER, meanwhile, was responsible for "FDA policy with regard to the safety, effectiveness, and labeling of all drug products for human use" and reviewing NDAs (35).

Because most biologics are also drugs, this declaration of jurisdiction was not particularly helpful. As discussed below, Congress directed FDA to review its policies for assignment of review responsibility of particular products in connection with the Safe Medical Devices Act of 1990 (SMDA) (36). FDA responded by releasing three intercenter agreements, one between CDER and CBER, and the others between each of these centers and the Center for Devices and Radiological Health (CDRH). The CDER/CBER intercenter agreement granted CBER primary review authority over "protein, peptide, or carbohydrate products produced by cell culture" (except for those previously derived from human or animal tissue and approved as drugs) and "protein products produced in animal body fluids by genetic alteration of the animal" (37). The agreement also provided that these products were "subject to licensure" under the PHSA (38). In sum, CBER was to review most therapeutic proteins using the PHSA's premarket licensure authorities.

In keeping with historical distinctions, CDER was given primary authority over hormone products without respect to their method of manufacture and specifically including insulin, human growth hormone, and pituitary hormones (39). CDER continued to regulate such hormone products under the FDCA. Further, it received jurisdiction over products "produced by chemical synthesis that are intended to be analogies of cytokines, thrombolytics, or other biologics" (40).

## Harmonization of the Drug and Biologics Review Process: PDUFA, FDAMA, and the Transfer of Therapeutic Proteins to CDER

Beginning in 1992, congressional action helped to harmonize the distinct application and review procedures for drugs and biologics. The Prescription Drug User Fee Act of 1992 (PDUFA) (42) commenced this harmonization process at a procedural level. It subjected biologics applications and new drug applications (NDAs) to the same user fees and performance goals (41). Consequently, the entire review timeline for both biologics applications and NDAs is the same. FDA has subsequently taken steps to integrate the content and format of biologics and drug applications and the agency procedures for meeting with sponsors about such applications.

In enacting the Food and Drug Administration Modernization Act of 1997 (FDAMA) (42), Congress took additional steps to harmonize biologics and drug review. FDAMA abolished the requirement that biologics manufacturers obtain separate product and establishment licenses. It replaced the ELA/PLA requirement with one integrated Biologic License Application (BLA) (43). In this regard, the process for biologics applications was made to resemble that for drugs more closely. FDAMA also directed FDA to "take measures to minimize differences in the review and approval" of products requiring BLAs under the PHSA and products requiring NDAs under the FDCA (44). FDAMA codified the agency practice of applying the FDCA to biologics, and exempted biologics with approved BLAs from the requirement to have an approved NDA under the FDCA (45).

Post-FDAMA, FDA has continued harmonization efforts. In 2003, it transferred the review of most therapeutic protein applications from CBER to CDER, thereby giving one center, CDER, primary authority to review the bulk of such applications and further enabling the harmonization of the review for therapeutic protein products licensed under the PHSA and proteins and other drugs approved under the FDCA (46). Specifically, FDA moved review of "[p]roteins intended for therapeutic use, including cytokines (e.g. interferons), enzymes (e.g. thrombolytics), and other novel proteins . . . includ[ing] therapeutic proteins derived from plants,

animals, or microorganisms, and recombinant versions of these products" to CDER (47). Insulin and other hormones remained with CDER. Under the transfer terms, CBER retained jurisdiction over cell and tissue products, blood products, gene and cell therapy products, and therapeutic vaccines (48).

## WHAT IS A BIOLOGIC? CURRENT STATUTORY AND REGULATORY DEFINITIONS

Against the backdrop of the history of biologics regulation provided in the previous section, this section provides a brief overview of the statutory and regulatory definitions of the term "biological product." The next section then provides an examination of product jurisdiction.

Section 351 of the PHSA includes a list of the type of products that constitute "biological products." This section provides that a "biological product" is

> a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings (49).

FDA has defined many of the important terms that comprise this definition of "biological product" by regulation in 21 CFR §600.3(h).

(1) A *virus* is interpreted to be a product containing the minute living cause of an infectious disease and includes but is not limited to filterable viruses, bacteria, rickettsia, fungi, and protozoa.
(2) A *therapeutic serum* is a product obtained from blood by removing the clot or clot components and the blood cells.
(3) A *toxin* is a product containing a soluble substance poisonous to laboratory animals or to man in doses of 1 milliliter or less (or equivalent in weight) of the product, and having the property, following the injection of non-fatal doses into an animal, of causing to be produced therein another soluble substance which specifically neutralizes the poisonous substance and which is demonstrable in the serum of the animal thus immunized.
(4) An *antitoxin* is a product containing the soluble substance in serum or other body fluid of an immunized animal which specifically neutralizes the toxin against which the animal is immune (50).

Of particular note, in 21 CFR §600.3(h)(5) FDA has specified when a product is analogous to a virus, therapeutic serum, or a toxin or antitoxin.

A product is analogous:

(i) To a virus if prepared from or with a virus or agent actually or potentially infectious, without regard to the degree of virulence or toxicogenicity of the specific strain used.
(ii) To a therapeutic serum, if composed of whole blood or plasma or containing some organic constituent or product other than a hormone or an amino acid, derived from whole blood, plasma, or serum.
(iii) To a toxin or antitoxin, if intended, irrespective of its source of origin, to be applicable to the prevention, treatment, or cure of disease or injuries of man through a specific immune process (51).

In addition, FDA by regulation has defined trivalent organic arsenicals (52) and stated when a product is deemed applicable to the prevention, treatment, or cure of diseases or injuries of man (53). It has also defined the term "radioactive biological product" by regulation (54).

Although the FDCA does not define "biological products," the definitions of "drug" and/or "device" in the act encompass almost all such products as discussed in the following section (55). Accordingly, biological products generally meet not only the definition of biological product under the PHSA, but also the definition of drug or device under the FDCA and thus, except where otherwise provided, are subject to provisions applicable to drugs or devices.

## PRODUCT JURISDICTION

As noted, FDA has repeatedly recognized that "biological products are also either drugs or medical devices as defined in the [FDCA]" (56). Although section II shows that FDA has adopted shifting approaches throughout the years to the governing statutory premarket authorities and review center for given biologics, Congress and FDA have taken steps to clarify these points and to assure that biologics are not subject to duplicative approval requirements. Specifically, the SMDA directed FDA to adopt procedures for assigning "primary jurisdiction" for a given product to a particular component of the agency (57), and in the Medical Device User Fee and Modernization Act of 2002 (MDUFMA), Congress obligated FDA to establish an Office of Combination Products (OCP) to oversee product classification and ensure prompt assignment of combination products (58).

OCP's regulations differentiate "drugs," "devices," "biologics," and "combination products." A product is a combination product if it consists of (1) products that are physically or chemically combined to form one entity; (2) products packaged together; (3) a separately packaged approved product and investigational product, if the investigational product is intended for use only with the approved product, both products are needed to achieve the intended use, and the labeling of the approved product must be changed upon approval of the investigational product; and (4) investigational products that are labeled for use only with a specified other investigational product, if both products are necessary to achieve the intended use (59).

OCP resolves jurisdictional issues in two situations. First, it determines appropriate classification, applicable approval authorities, and assignment for a noncombination product where its jurisdiction is "unclear or in dispute" (60). Second, it assigns responsibility for approval of combination products by determining their "primary mode of action" (61). The sponsor may file a "request for designation" and the agency will respond with a letter of designation (62). The following subsections provide an overview of jurisdictional issues at the biologic/drug and biologic/device margins and with respect to combination products featuring a biologic.

### Biologic Vs. Drug

FDA's primary jurisdictional tasks for a product that is both a drug and biologic are to determine which statutory approval process is applicable to the given product, and which center at FDA will review it. The latter inquiry is governed by the CBER/CDER agreements discussed above. The former requires more explanation.

Section 351(j) creates a presumption that products meeting both definitions will be subjected to licensure under the PHSA rather than approval under the FDCA. It exempts the sponsor of a product that is both a drug and biologic from the requirement of obtaining an approved NDA before shipping the product in interstate commerce, where the sponsor has an approved BLA covering the product (63). There is no similar provision in the FDCA, and the PHSA forbids shipping of a product meeting the biologic definition without approval of a BLA (64). Thus, if a product falls into one of the listed categories of biologic products in 351(i), or is "analogous" to one of these products, it will be subjected to the PHSA's licensing requirement rather than the NDA requirement under section 505 of the FDCA.

It is relatively simple to determine whether a product falls into one of the explicitly listed categories of 351(i). The challenge comes in determining whether a product is analogous to the listed products such that it qualifies as a biologic. As described above, FDA has promulgated regulations describing when a product is analogous to a listed biologic, including one providing that a product is analogous to a therapeutic serum, and hence regulated under the PHSA, if it was "composed of whole blood or plasma or containing some organic constituent or product *other than a hormone* or amino acid derived from whole blood, plasma, or serum" (65).

However, these regulations do not end the inquiry. For example, erythropoeitins are regulated under the PHSA as analogous to blood products, even though they are technically hormones, and hormones are explicitly excluded from the list of products that are analogous to a therapeutic serum under 21 CFR §600.3 (66). In essence, FDA employs an ad hoc approach to determining which products are subject to the different approval authorities of the FDCA and PHSA. This approach is informed by the history and context of a given product, and constrained by FDA's previous statements concerning the statutory authorities that govern a product, such as those in the 1991 intercenter agreement.

## Biologic Vs. Device

The FDCA defines "device" as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article" that is intended for diagnostic purposes, for use in the "cure, mitigation, treatment, or prevention of disease, in man or other animals, or for use to "affect the structure or any function of the body," but which does not "achieve its primary intended purposes through chemical action within or on the body," and "which is not dependent upon being metabolized for the achievement of its primary intended purposes" (67). Many products fulfill this definition in addition to that of a "biological product." For example, a reagent might fall within one of the categories that comprises the definition of biological products under the PHSA while also being a device because it is used for diagnostic purposes.

To clarify the appropriate statutory authorities and agency review center for such products, CBER and CDRH, entered into an intercenter agreement in 1991 that describes general principles governing these inquiries. This agreement provides that CDRH will regulate all devices "not assigned categorically or specifically assigned to CBER" (68). CDRH "will use the device authorities of the [FDCA]" and "any other authorities delegated to it, as appropriate" to regulate devices assigned to it (69).

The agreement designates CBER as the lead agency for medical devices "utilized in or indicated for the collection, processing, or administration of

biological products to ensure their safety and effectiveness " (70). More specifi-
cally, CBER has primary authority over devices used in conjunction with blood
products, blood components, and analogous products; clinical laboratory tests
associated with blood banking procedures, including in vitro tests for blood donor
screening; and in vitro tests for HIV and other retroviruses (71). CBER utilizes the
device authorities of the FDCA to regulate medical devices that are used in con-
junction with an in vivo licensed biologic or analogous product; in vitro reagents
for processing or quality assurance of biologics; devices used for determining tissue
type; and devices (other than reagents) used "in preparation of, in conjunction with,
or for the quality assurance of" a blood bank–related biologic (72). CBER, instead,
applies the PHSA to in vitro reagents subject to licensure and certain combination
products (73).

Because many new products present issues not contemplated in formulating
the 1991 intercenter agreement, FDA has proceeded via case-by-case regulation of
product jurisdiction in recent years. OCP has posted on its Web site redacted letters
of designation and a general "Jurisdictional Determinations" publication to pro-
vide industry and regulators with guidance about appropriate classification and
assignment for various products. A summary of FDA's jurisdictional determina-
tions shows that the vast majority of devices are regulated by CDRH (74).

## Combination Products Featuring a Biologic

For combination products, assignment is made based on the product's "primary
mode of action"—the "single mode of action . . . that provides that most important
therapeutic action of the combination product" (75). The combination product is
reviewed by the agency center that regulates products with that primary mode of
action (76). When the primary mode of action inquiry is not determinative, a prod-
uct is assigned to the center that reviews products with similar questions of safety
and efficacy, or if there is none, to the agency center with most expertise on the
issues that the product presents (77).

The 1991 intercenter agreements between CBER and both CDRH and CDER
outline the basic principles governing combination product jurisdiction. CBER has
primary jurisdiction in the case of a device–biologic combination when the device
is a delivery system for the biologic packaged with the biologic (e.g., an allergen
patch), devices that are prefilled with biologics during the manufacturing pro-
cess, and devices that are in vivo or implanted delivery systems for use with a
licensed biologic (78). This center also has primary responsibility for reviewing
drug–biologic combinations where the drug enhances the efficacy or ameliorates
the toxicity of the biologic (79). In contrast, CDER regulates biologic–drug combi-
nations where the biologic enhances the efficacy or ameliorates the toxicity of the
drug (80).

In practice, few combination products are approved through the BLA route.
In 2006, for example, FDA received 231 combination product applications (81). Out
of the 91 involving premarket approval applications (as opposed to investigational
applications), FDA required BLAs for only 2, but called for 12 NDAs and 75 device
submissions (82). One of these BLAs was for a convenience kit, and the other was
for a prefilled biologic delivery system (83). In large part, these uneven statistics
are due to the much larger number of applications for drug–biologic combination
products. Of the 231 applications received in 2006, 66 were for devices coated or
impregnated with a drug, and 70 were for prefilled drug delivery systems (84).

*Labson et al.*

## REGULATORY PROCESS AND APPROVALS

### General Approval and Postapproval Requirements

Section 351 of the PHSA provides the basic framework for the licensure of bio-
logics (85). The FDCA also applies to biologics even if licensed under the PHSA,
although biologics with an approved biologics license are not required to have an
approved application under section 505 of the FDCA, which governs the NDA and
approval processes (86). There are many similarities, however, between the regu-
lation of drugs and biologics. Furthermore, as noted earlier, Congress has directed
the FDA to "take measures to minimize differences in the review and approval"
of products required to have approved BLAs under section 351 of the PHSA and
products required to have approved NDAs under section 505 of the FDCA (87).

The regulation of investigational drugs and investigational biologics is one
area in which the regulation of drugs and biologics is similar. The regulations in
21 CFR part 312 apply "to all clinical investigations of products that are subject to
section 505 of the Federal Food, Drug, and Cosmetic Act or to the licensing provi-
sions of the Public Health Service Act," except as provided in 21 CFR §312.2 (88).
These regulations set forth the procedures and requirements governing the use of
investigational new drugs—a term that includes "biological drug[s] . . . used in a
clinical investigation" as well as "biological product[s] . . . used in vitro for diagnos-
tic purposes" (89). A biologic for which an investigational new drug application
(IND) is in effect under 21 CFR part 312 "is exempt from the premarketing approval
requirements that are otherwise applicable and may be shipped lawfully for the
purpose of conducting clinical investigations of that drug" (90).

Section 351 of the PHSA prohibits the introduction or delivery for introduc-
tion into interstate commerce of any biological product unless a biologics license
is in effect for the product, and each package of the product is plainly marked
with certain identifying information, including the license number of the manufac-
turer (91). To obtain a biologics license a manufacturer must submit, among other
things, a BLA and data from nonclinical laboratory and clinical studies that demon-
strate the manufactured product meets the prescribed requirements (92). The BLA
must also include "[a] full description of manufacturing methods" (93). A BLA is
approved by the secretary on the basis of a demonstration that "the biological prod-
uct that is the subject of the application is safe, pure, and potent" and "the facility
in which the biological product is manufactured, processed, packed, or held meets
standards designed to assure that the biological product continues to be safe, pure,
and potent" (94).

The regulations in 21 CFR §600.3 define "safety," "purity," and "potency"
(95). The definition of potency—"the specific ability or capacity of the product, as
indicated by appropriate laboratory tests or by adequately controlled clinical data
obtained through the administration of the product in the manner intended, to effect
a given result" (96)—is of particular significance because this term "has long been
interpreted to include effectiveness" (97). Thus, the standard for the approval of a
BLA is basically the same as that for an NDA, which under section 505 of the FDCA
must be shown to be "safe" and "effective" (98). Under section 351, the applicant
(or other appropriate person) must also consent to the inspection of the facility that
is the subject of the BLA (99).

In addition to providing the basic regulatory framework for BLAs, section
351 of the PHSA prohibits falsely labeling or marking any package or container
of any biological product or altering any label or mark so as to falsify it (100). It

also contains provisions that provide for the inspection of any establishment for the propagation or manufacture and preparation of any biological product, the recall of products presenting "an imminent or substantial hazard to the public health," and penalties for violations, among other things (101).

Biologics are subject to a variety of regulatory requirements post approval. These requirements include reporting requirements for deviations, adverse events, distribution, and postmarketing study progress, lot release requirements, and labeling standards (102). Manufacturers are required to report postmarketing adverse experiences for biologics to the FDA under 21 CFR §600.80 (103). FDA may require the manufacturer to undertake formal phase IV studies or postmarketing commitments, which are subject to annual reporting requirements under 21 CFR §601.70 (104). In addition, the regulations require manufacturers to test each lot for conformity with applicable standards prior to the release of the product under 21 CFR §610.1 (105). Under 21 CFR §610.2, the FDA may require that samples of any licensed product as well as protocols showing the results of the applicable tests be sent to the agency, and upon notification by the agency not be distributed until the lot is released (106). There are also ongoing requirements for meeting current good manufacturing practices.

An applicant must inform FDA "about each change in the product, production process, quality controls, equipment, facilities, responsible personnel, or labeling established in the approved license application(s)" (107). A major change, i.e., a "change in the product, production process, quality controls, equipment, facilities, or responsible personnel that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the product as they may relate to the safety or effectiveness of the product," requires a supplemental submission and approval prior to the distribution of the product (108). A change that has "a *moderate* potential to have an adverse effect" requires a supplemental submission at least 30 days prior to distribution of the product (109). A minor change, i.e., a change that has "a *minimal* potential to have an adverse effect" must be documented in an annual report (110).

### Vaccines

Vaccines play an important role in the promotion of public health (111). Vaccines are regulated by the FDA as biologics under the authority of the PHSA and the FDCA (112), and as such are subject to the general regulatory requirements described in the preceding section. The vaccines that the FDA has licensed for immunization and distribution in the United States include vaccines for childhood diseases such as diphtheria, polio, measles, and whooping cough, as well as vaccines for influenza, cervical cancer, and potential bioterrorism agents such as anthrax (113).

In addition to regulating product approval and manufacturing, FDA and other government agencies play a somewhat unique role with respect to vaccines by actively facilitating product development and production (114). This FDA role is illustrated by the seasonal influenza vaccine production process (115). Each year FDA's Vaccines and Related Biological Products Advisory Committee meets to select the influenza virus strains that it recommends comprise the influenza vaccine for use in the upcoming U.S. influenza season as the virus mutates (116). In addition, "[o]nce the strains are selected, the FDA, CDC, or other WHO collaborating centers can produce reference influenza viruses … [that] are provided to the licensed vaccine manufacturers to generate the 'seed virus' for further

manufacturing influenza vaccine" and "CBER produces and provides manufactur-
ers with antiserum, which they use to test vaccine potency for each influenza strain"
(117). FDA has issued guidance that "outline[s] the regulatory pathways for the
rapid development and approval of [safe and effective influenza vaccines for sea-
sonal use]" (118). In its guidance on the licensure of seasonal inactivated influenza
vaccines, FDA discusses the clinical data needed for traditional and accelerated
approval of a BLA for a new seasonal inactivated influenza vaccine (119).

### Blood

FDA's regulation of blood and blood components seeks to ensure the safety of the
nation's blood supply, while not unduly decreasing the availability of these prod-
ucts, which are "used for transfusion or for the manufacture of pharmaceuticals
derived from blood and blood components, such as clotting factors" (120). The FDA
utilizes five layers of overlapping safeguards to help minimize the transmission of
infectious diseases: (i) donor screening; (ii) donor deferral lists; (iii) blood testing;
(iv) quarantine; and (v) investigation, correction, and notification of problems and
deficiencies (121).

Blood and blood components and derivatives are specifically listed as biolog-
ical products in the PHSA and as biologics are subject to the licensing requirements
of PHSA (122). FDA heavily regulates these products; there are a number of regu-
lations that establish standards for the manufacturing of these products as well as
the products themselves. For example, blood and blood component manufacturers
must follow the current Good Manufacturing Practices for blood and blood com-
ponents set forth in 21 CFR part 606 (123). The current Good Manufacturing Prac-
tices for blood and blood components establish standards for organization and per-
sonnel, plants and facilities, equipment, production and process controls, finished
product control, laboratory controls, and records and reports (124). These quality
standards are comparable to those for pharmaceutical manufacturers (125).

FDA generally inspects facilities that manufacture or participate in the manu-
facture of blood and blood components for human use biennially, although "prob-
lem" facilities are inspected more frequently (126). In addition, under 21 CFR part
607 all owners or operators of establishments that engage in the manufacturing of
blood and blood products must register with the FDA pursuant to section 510 of
the FDCA and submit a list of products to the FDA, unless exempt (127). And 21
CFR parts 630 and 640 set forth general requirements for blood, blood components,
and blood derivatives as well as additional standards for blood and blood products,
respectively (128). "Whole blood" for example, which "is defined as blood collected
from human donors for transfusion to human recipients"—is subject to regulations,
which in addition to establishing general requirements contain detailed provisions
on the suitability of donors, collection of the blood, testing of the blood, and modifi-
cations to blood (129). It must be tested for syphilis (130), human immunodeficiency
virus (types 1 and 2), hepatitis (types B and C), and human T-lymphotropic virus
(types I and II) (131).

In 1997, the FDA initiated the Blood Action Plan (132). The plan, which the
FDA is implementing with the Centers for Disease Control, the NIH, and the
Centers for Medicare and Medicaid Services (formerly the Health Care Financing
Administration), is focused on specific areas of concern, such as updating the blood
regulations and developing strategies to address emerging infectious diseases,
which may threaten the blood supply (133). Present initiatives of the Blood Action

Plan include, for example, "developing several additional regulations to incorporate existing guidance documents and identified needs" (134).

In addition to regulating blood and blood components and derivatives, FDA "also regulates related products such as cell separation devices, blood collection containers, and HIV screening tests that are used to prepare blood products or to ensure the safety of the blood supply " (135).

## Tissue

FDA regulates human cell, tissue, and cellular and tissue-based products (HCT/Ps) under 21 CFR parts 1270 and 1271. While these parts are similar in that they both regulate human tissue, they differ in their coverage and scope. Part 1270 regulates human tissue, which it defines as

> any tissue derived from a human body and recovered before May 25, 2005, which:
>
> (1) Is intended for transplantation to another human for the diagnosis, cure, mitigation, treatment, or prevention of any condition or disease;
> (2) Is recovered, processed, stored, or distributed by methods that do not change tissue function or characteristics; and
> (3) Is not currently regulated as a human drug, biological product, or medical device .... (136).

This definition excludes vascularized human organs, semen and other reproductive tissue, human milk, and bone marrow (137). Part 1270 requires donor screening and testing, written procedures and records, and the inspection of tissue establishments, but its provisions are less comprehensive than those in the more recent part 1271.

In 1997, FDA announced a proposed plan to change its approach to the regulation of human tissue in two documents—"Reinventing the Regulation of Human Tissue" and "Proposed Approach to Regulation of Cellular and Tissue-Based Products" (138). This plan eventually led to a series of rules, which comprise part 1271 (139). This part defines HCT/Ps as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient" (140). Examples of HCT/Ps include "bone, ligament, skin, dura mater, heart valve, cornea, hematopoietic stem/progenitor cells derived from peripheral and cord blood, manipulated autologous chondrocytes, epithelial cells on a synthetic matrix, and semen or other reproductive tissue" (141). Vascularized human organs for transplantation and whole blood, blood components, and blood derivatives, among other things, are excluded from consideration as HCT/Ps under the regulations (142).

Part 1271 creates a tiered, risk-based approach to the regulation of HCT/Ps. An HCT/P that meets all the criteria of §1271.10 is regulated solely under section 361 of the PHSA and the regulations in part 1271 (143). To meet the criteria of this section an HCT/P must be minimally manipulated, intended for homologous use only, and not involve the combination of the cells or tissues with another article except as permitted by the regulation (144). In addition to meet the criteria of this section, an HCT/P must either (1) not have a systemic effect and not be dependent on the metabolic activity of living cells for its primary function; or (2) have a systemic effect or be dependent on the metabolic activity of living cells for its primary function and be for autologous use, allogenic use in a close blood relative,

*Labson et al.*

or reproductive use (145). An HCT/P that does not meet this criteria or qualify for an exception is regulated as drug, device, and/or biological product under the FDCA and/or section 351 of the PHSA, and the applicable regulations in title 21, chapter 1, which require, among other things, that the requirements in subparts B, C, and D of part 1271 are followed (146).

Part 1271 establishes registration and listing procedures for HCT/P establishments, donor eligibility requirements, and current good tissue practice (CGTP) requirements (147). In addition, for HCT/Ps that meet the criteria of §1271.10, part 1271 establishes reporting, labeling, and inspection and enforcement requirements (148). Products regulated as drugs, devices, and/or biological products are not subject to these requirements, because they are already subject to similar requirements (149).

Following FDA's implementation of the HCT/P regulations, there were reports that some tissue recovery establishments were not following the requirements for tissue recovery. In late August 2006, FDA announced that it was forming a Human Tissue Task Force (HTTF) "to assess the effectiveness of the implementation of the new tissue regulations, which went into effect in 2005" (150). In addition, in September 2006 FDA issued a guidance document entitled "Compliance with 21 CFR Part 1271.150(c)(1) – Manufacturing Arrangements" (151). The guidance was motivated at least in part by the fact that then-ongoing "FDA investigations of some recovery establishments under contract, agreement, or other arrangement with processing establishments ... identified significant violations of CGTP requirements" (152). The HTTF released a report in June 2007 that concluded that "there are no significant industry-wide problems in the recovery of human tissues used for transplantation" based on data from inspections of 153 major tissue recovery firms (153).

## Cellular and Gene Therapy

Human gene therapy is an emerging technology that uses gene therapy products to introduce genetic material into the body to replace faulty or missing genetic material to treat or cure a disease or abnormal medical condition. This therapy presents significant promise as well as the potential for serious adverse events (154), and accordingly has been subjected to intense public interest and scrutiny. As described below, FDA regulates human gene therapy products, which are biologics. As of September 2000, FDA was overseeing approximately 210 active IND gene therapy studies (155). To date, however, FDA has not approved any gene therapy product for sale (156).

The NIH is also actively involved in the oversight of human gene therapy. NIH "evaluate[s] the quality of the science involved in human gene therapy research, and ... fund[s] the laboratory scientists who invent and refine the tools used for gene transfer clinical studies" (157). And its Recombinant DNA Advisory Committee (RAC), which was established in 1974 "in response to public concerns regarding the safety of manipulating genetic material through the use of recombinant DNA techniques," serves as a "forum for open, public deliberation on the panoply of scientific, ethical, and legal issues raised by recombinant DNA technology," among other things (158).

In 1993 FDA published a notice in the *Federal Register* on the application of existing statutory authorities to human somatic cell and gene therapy products (159). The notice focused on premarket approval issues for this emerging technology (160). FDA indicated that although existing statutory authorities were "enacted

prior to the advent of somatic cell and gene therapies, [they] are sufficiently broad in scope to encompass these new products and require that areas such as quality control, safety, potency, and efficacy be thoroughly addressed prior to marketing" (161). In the statement, the FDA defined both somatic cell therapy—"the prevention, treatment, cure, diagnosis, or mitigation of disease or injuries in humans by administration of autologous, allogeneic, or xenogeneic cells that have been manipulated or altered ex vivo"—and gene therapy, "a medical intervention based on modification of the genetic material of living cells" (162). The notice gave examples of these products and how they are regulated. For example, "[c]ellular products intended for use as somatic cell therapy are biological products subject to regulation pursuant to the PHS Act and also fall within the definition of drugs in the [A]ct" (163). Similarly, "[s]ome gene therapy products (e.g., those containing viral vectors) to be administered to humans fall within the definition of biological products and are subject to the licensing provisions of the PHS Act as well as to the drug provisions of the [A]ct" whereas "[o]ther gene therapy products, such as chemically synthesized products, meet the drug definition but not the biological product definition and are regulated under the relevant provisions of the Act only" (164). The FDA has also published a number of guidance, and draft guidance, documents that discuss different aspects of the regulation of human somatic cell and gene therapy, including the 1998 Guidance for Human Somatic Cell Therapy and Gene Therapy (165).

### Pharmacogenomic Pairings

Use of genetic or genomic tests in tandem with therapies implicates special regulatory issues. One or both of the components of these pairings may be biologics. FDA has generally regulated these novel products on an ad hoc basis. In some cases, it allows the products to be approved or cleared separately, typically where the products are intended for general uses rather than just for use with one another. In an increasing number of cases, however, FDA will mandate that the products be simultaneously authorized for marketing either through combination product status or as a condition to approval of the therapy.

According to FDA, linked approval may be necessary where "diagnostic testing may prove to be so integral in the use of the new [biologic] that testing will be considered a prerequisite to use," such as when "there is reasonable certainty" that the biologic will work "only in biomarker positive patients" (166). FDA has increasingly indicated a preference for joint approvals in recent years.

Where genetic information is useful but patients have a "reasonable" response to treatment without it, FDA has stated that review of the test "can be subsumed in the general review of the therapeutic and may not require independent credentialing of the assay as a diagnostic test for expected clinical use of the drug" (167). FDA allows separate approval of a biologic and the accompanying diagnostic test (1) where the test is used in patient selection but the therapy is safe and effective in the general population for the indication, and (2) where the test provides information about drug dosing or adverse events (168). The approved labeling of the biologic and pharmacogenomic test may cross-reference the other product in these cases.

### FOLLOW-ON BIOLOGICS

Current law provides no abbreviated pathway for approval of follow-on versions of biologics that were licensed under the PHSA (169). Instead, sponsors of biologics

subject to licensure must perform full clinical trials and submit a full BLA for such products. There has been a recent push for creation of a regime for follow-on biologics (FOBs). In the first term of the 110th Congress, four bills were introduced on the topic and one—sponsored by Senators Kennedy, Clinton, Hatch, and Enzi—gained some momentum. In the second term, Representative Eshoo introduced a fifth bill, H.R. 5629, which adopts much of the text of the Kennedy bill but incorporates some key differences.

Stakeholders have vigorously debated the appropriate content and structure of FOB legislation, in light of the scientific and regulatory differences between drugs and biologics. Numerous issues must be resolved before FOB legislation can pass. In particular, Congress must make decisions regarding (1) the appropriate scope of products subject to the new pathway; (2) the approval standard and data requirements for FOBs; (3) interchangeability designations for FOBs; (4) naming of FOBs; (5) data exclusivity for innovators; and (6) a scheme for deciding patent issues associated with FOB market entry. This section examines these issues for legislative resolution in more detail, in light of existing proposals.

### Scope of Products Eligible for the Pathway

Congress must determine whether the new pathway for FOBs will be available for follow-on versions of PHSA-licensed biologics only, or whether follow-on versions of FDCA proteins will be eligible or required to use this pathway. It also must decide whether it will permit follow-on versions of FOBs and whether it is appropriate to permit certain types of FOBs given the current state of science.

Stakeholders have expressed varying views on these issues. Some believe it is appropriate to leave the FDCA regime unaltered, allow follow-on versions of any type of biologic to be approved in the current state of science, and permit approval of follow-on versions of FOBs themselves. This approach is embodied in H.R. 1038, which creates a pathway for licensure of biologics that are "comparable" to any PHSA-licensed product, including FOBs (170).

However, many others, including those at the Department of Health and Human Services (171), have expressed concern that the current state of science does not permit safe and effective follow-on versions of many products, such as vaccines and blood products. Further, the possibility of "follow-ons of follow-ons" presents additional scientific concerns. Under the proposed FOB regimes, the initial FOB is licensed based on its similarity to the innovator product, which in turn was licensed based on full clinical data. While a subsequent FOB may be similar to the first FOB, it will not necessarily be similar to the innovator product, and hence the available data may not support its safety and efficacy. Finally, many FOBs present the same scientific issues, whether the innovator products were subject to a BLA or NDA. Indeed, FDA's article in *Nature Reviews Drug Discovery* acknowledges this reality by referring to the products at issue as "follow-on protein products" (172).

In light of these scientific issues, S. 1505 and H.R. 1956 preclude follow-on versions of FOBs and limit the initial regime to allowing for approval of follow-on versions of biotechnology-derived therapeutic proteins (173). These bills would also require that such FOBs be licensed under the PHSA rather than approved under sections 505(j) or 505(b)(2) of the FDCA (174). The Kennedy and Eshoo bills require follow-on versions of FDCA proteins to be approved under the new FOB pathway 10 years after enactment (175). They authorize FDA to determine that any product other than a recombinant protein cannot properly serve as a reference product in

the current state of science (176). Congress must determine which of these proposals takes the appropriate approach toward the scope of products eligible for the FOB pathway.

## Approval Standard and Data Requirements

Stakeholders also hotly contest the appropriate approval and data requirements for FOBs. Debate over this issue derives primarily from the scientific differences between biologics and small molecule drugs. The prospective FOB industry argues that FOBs can be adequately characterized in many cases, and thus clinical data may not be necessary to show such FOBs are safe and effective (177). According to these stakeholders, clinical testing would be expensive and unethical and would simply drive up the price of FOBs.

In contrast, others contend that a pathway like section 505(j) of the FDCA is inappropriate for FOBs. High-ranking FDA staff member Janet Woodcock, has stated that the "current limitations of analytical methods, and the difficulties in manufacturing a consistent product" render a "sameness" analysis inappropriate for biologics (178). The FOB's differences from the reference product could cause it to have significantly different safety and effectiveness than the reference product. *See* Safe and Affordable Biotech Drugs: the Need for a Generic Pathway: Hearing Before the H. Comm. on Oversight and Government Reform, 110th Cong., at 3 (March 26, 2007) (statement of Henry G. Grabowski, Ph.D., Duke University), <http://oversight.house.gov/documents/20070416132526.pdf> (last accessed September 16, 2008) ("Biologicals made with different cell lines or manufacturing facilities can exhibit significantly different efficacy and safety characteristics."). Finally, some also note the possibility of immunogenic adverse events associated with use of biologics —a risk not present in the small molecule context (179)—in finding that generally to assure safe and effective FOBs (180).

The existing proposals reflect that the Hatch–Waxman framework, established in 1984, for the approval of generic versions of traditional drug products cannot be simplistically applied to FOBs. All five proposals require that the FOB be "highly similar" to the innovator product, rather than the "same" as in the small molecule context (181). For example, S. 1695 generally requires the FOB applicant to show its product is "biosimilar" to the reference product by demonstrating, among other things, that the FOB is "highly similar" to the reference product. Further, the four bills generally require nonclinical and clinical testing of FOBs, though FDA is permitted to waive such requirements, if it deems this appropriate under S. 1695, H.R. 5629, and H.R. 1038 (182).

The bills do differ substantially in the explicit scope of testing required. H.R. 1038 mandates submission of "data from chemical, physical, and biological assays, and other nonclinical laboratory studies," as well as data from "any" clinical studies "necessary" to "confirm safety, purity, and potency" of the FOB (183). S. 1695 calls for performance of animal studies and "a clinical study or studies," which include testing of immunogenicity, sufficient to show that the FOB is safe, pure, and potent (184). H.R. 1956 and S. 1505 obligate FOB manufacturers to perform comparative nonclinical tests and comparative clinical trials show that the FOB is similar to the reference product in terms of safety, purity, and potency (185). Legislators will have to choose among the wide range of clinical testing proposals. Scientific and patient safety concerns will strongly influence this decision.

## Interchangeability

Because FOBs will at best be highly similar to innovator products, they will not meet the current standard of therapeutic equivalence established for generic drugs. This standard requires the follow-on product to be pharmaceutically equivalent to the innovator product, meaning that the follow-on contains the same active ingredient and is the same dosage form, strength, and route of administration as the innovator product (186). The generic must also be bioequivalent to the innovator product in order to be considered therapeutically equivalent (187). Consequently, stakeholders have debated whether FOBs should be interchangeable with innovator products at all. Given that automatic substitution through pharmacy dispensing largely drives the generic drug market, this issue appears particularly critical to the financial success of FOBs.

Again, the existing proposals take different tacks on these issues. H.R. 1956 and S. 1505 preclude interchangeability determinations for FOBs, reflecting views that FOBs will inevitably have some differences from pioneer products (188). Indeed, FDA's Janet Woodcock expressed doubt about the ability of FOBs to be interchangeable (189). Nonetheless, the other proposals would permit interchangeability determinations under certain circumstances. H.R. 1038 allows interchangeability designations where the FOB and the reference product are "comparable" (lack clinically meaningful differences) and can be "expected to produce the same clinical result as the reference product in any given patient" (190). To be interchangeable under S. 1695 and H.R. 5629, the FOB must be biosimilar to the reference product; must be expected to produce the same clinical result as the reference product in any given patient; and for multiple use products, the risk in terms of the safety or diminished efficacy of switching between the two products may not be greater than the risk of using the reference product without the switch (191). Given the economic significance of the interchangeability determination issue, Congress will likely place particular emphasis on this issue in negotiating final FOB legislation.

## Naming of FOBs

Biotechnology stakeholders also debate whether FOBs should have the same non-proprietary names as their relevant innovator products. Prospective follow-on manufacturers contend that these products should have the same names because they will be highly similar and using the same names will foster competition in the biotechnology sphere (192). Others have argued that identical names are inappropriate because they will foil attempts at sound pharmacovigilance, rendering it impossible to determine whether an adverse event was caused by the FOB or pioneer product (193).

The Kennedy bill does not take a position on this issue, but instead opts for silence. H.R. 5629, in contrast, requires unique naming of FOBs (194). Similarly, both Inslee and Gregg mandate that each FOB has a distinct name, either the name selected for it by the United States Adopted Name Council (USAN), if unique, or a distinct official name designated by FDA (195). H.R. 1038 requires FOBs to have the same name as their reference products (196).

## Data Exclusivity

One of the most controversial issues on the table for FOB legislation is the appropriate period of data exclusivity for innovators, i.e., the length of time after innovator approval during which no follow-on version of the innovator product may

be approved. Follow-on manufacturers contend that data exclusivity postpones the competition that leads to lower prices, and thus should be kept to a minimum (197). Others emphasize the importance of data exclusivity as an incentive to innovate in the first place, particularly in view of the rising cost of bringing a novel biotech product to market (198). Moreover, they contend additional years of exclusivity should be available based on approval of the reference product for new indications, to encourage studying approved biologics for helpful new conditions of use.

The existing proposals also take distinct approaches to data exclusivity. H.R. 1038 provides no data exclusivity period of any kind. S. 1695 provides a 12-year term, but offers no additional exclusivity for new uses (199). Eshoo would grant an initial 12-year term, and also allow innovators to obtain 6 months pediatric exclusivity and/or an additional 2 years of exclusivity if the reference product is approved for a "medically significant" new use (200). S. 1505 and H.R. 1956 both allow for an initial term of 14 years of data exclusivity (201). They also provide for additional exclusivity in the case of new indications with "significant clinical benefit" (202). Congress will need to decide the appropriate length of the initial and supplemental data exclusivity period before FOB legislation can become reality.

## Patent Provisions

Many biotechnology stakeholders seek a vastly different scheme for resolution of patent issues than that in the small molecule context, where the innovator must file patent information that FDA then lists in the so-called "*Orange Book*" and generics must certify to these patents when filing their applications (203). Some stakeholders believe that FOB legislation should contain no patent provisions at all, rendering the generally applicable Patent Act the governing framework for resolution of patent issues concerning FOB market entry. The Inslee bill reflects this thinking, as it has no patent provisions.

The other bills provide a scheme for private communication to identify relevant patents, some more complicated than others. S. 1695 sets forth a complex scheme requiring the BLA holder and FOB applicant to identify patents for fast-track litigation through a series of list exchanges and negotiation (204). The scheme enables the FOB manufacturer to dictate the total number of patents that may be subjected to fast-track litigation (205). S. 1505 proposes a simpler framework in which FDA publishes notice of an FOB application; the patent owner may identify patents it believes are implicated by production or sale of the FOB and the FOB manufacturer must provide a written explanation about such patents, which constitutes an act of infringement giving rise to litigation (206). H.R. 1038 permits the FOB applicant to request patent information from the innovator at any time, and then the applicant may optionally provide a notice challenging identified patents, which gives rise to infringement litigation (207). H.R. 5629 provides a private patent identification process triggered by filing of the FOB application, with the FOB applicant being required to challenge relevant patents, if it seeks approval before their expiry (208). It also includes separate provisions to ensure third party patents are identified and litigated (209).

At a basic level, Congress will need to determine whether to include patent provisions in FOB legislation at all. If it does cover patent issues in the FOB legislation, it will need to decide whether to create a public system for identifying relevant patents (like Hatch-Waxman) or a private system, as in the existing proposals. Moreover, Congress will need to assure compliance with free trade agreement

requirements, which require pharmaceutical legislation to "link" FDA approval of a biologic to expiry of patent exclusivity (210). Congress will need to grapple with these complicated considerations surrounding the proper patent regime for FOBs to arrive at final legislation.

## CONCLUSION

Throughout the last century, biological products themselves and their regulation have ebbed and flowed. Because Congress has been unclear about the appropriate premarket approval regime for biological products, FDA was forced to regulate on an ad hoc basis for many years. As a result, U.S. biologics regulation is distinct in that two frameworks govern rather than one. In recent years, Congress has begun to harmonize the two processes, but manufacturing considerations remain more important for biologics than small molecule drugs. This history and the resulting patchwork approach to regulation at times have added to the complexity of creating an FOB framework. Time marches on nonetheless, and over 100 years after the first biologics regulatory statute, we stand poised on the verge of a new frontier. Time will tell, but the development of an FOB regime presents all indications of being a landmark development for our food and drug laws.

## REFERENCES

1. CBER, Centennial Book: From a Rich History to a Challenging Future 13 (2002), available at http://www.fda.gov/Cber/inside/centennial.htm.
2. *Id.*
3. *See id.; see also* Peter Barton Hutt, Richard A. Merrill & Lewis A. Grossman, Food and Drug Law: Cases and Materials 877 (Foundation Press 2007).
4. Pub. L. No. 57–244, 32 Stat 728, 728 (1902).
5. *Id.*
6. *Id.* at 728–29.
7. *Id.* at 729.
8. CBER, Centennial Book: From a Rich History to a Challenging Future, *supra* note 1, at 7.
9. Pub. L. No. 78–410, 58 Stat. 682, 702 (1944).
10. *See id.* at 703 ("Nothing contained in this Act shall be construed as in any way affecting, modifying, repealing, or superseding the provision of the [FDCA]"); *see also* Hutt, Merrill & Grossman, *supra* note 3, at 877–78.
11. FDCA §201(g) (1938).
12. 12 Fed Reg 410, 410 (Jan. 21, 1947).
13. *Id.* at 411 (emphasis added).
14. Premarin (conjugated estrogens) Approval Details, NDA No. 04–782 (approved May 8, 1942), http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction = Search.DrugDetails; FDA, Ever Approved Drug Products Listed by Active Ingredient, at 2291 (printout dated Aug. 2, 1989)(obtained via FOIA request) (insulin approval information); Asellacrin (somatropin) Approval Details, NDA No. 17–726 (July 30, 1976), http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction = Search.DrugDetails.
15. CBER, Centennial Book: From a Rich History to a Challenging Future, *supra* note 1, at 7.
16. *Id.* at 20.
17. *Id.*
18. *Id.*
19. *Id.*
20. Nicholas Wade. Division of Biologics Standards: Scientific Management Questioned, 175 Science, Mar. 3, 1972; 966,966–67.

21.  *Id.* at 966.
22.  GAO. Problems Involving the Effectiveness of Vaccines 2 (1972).
23.  *Id.*
24.  37 Fed Reg 4004, 4004 (Feb. 25, 1972).
25.  *Id.*
26.  37 Fed Reg 12865, 12865 (June 29, 1972).
27.  37 Fed Reg 16679, 16679 (Aug. 18, 1972); Hutt, Merrill &  Grossman, *supra* note 3, at 882.
28.  37 Fed Reg at 16679.
29.  *See, e.g.,* 42 Fed Reg 62162 (Dec. 9, 1977)(noting opportunity for hearing on intent to revoke certain licenses for bacterial vaccines and bacterial antigens).
30.  *E.g.* 49 Fed Reg 1138, 1138 (Jan. 9, 1984); 49 Fed Reg 23456, 23456 (June 6, 1984); 53 Fed Reg 5468, 5468 (Feb. 24, 1988); 54 Fed Reg 46305, 46305 (Nov. 2, 1989).
31.  51 Fed Reg 23309, 23310 (June 26, 1986).
32.  Press Release No. 82–50, Department of Health and Human Services (Oct. 29, 1982).
33.  CBER, Centennial Book: From a Rich History to a Challenging Future, *supra* note 1, at 7.
34.  52 Fed Reg 38275, 38275 (Oct. 15, 1987).
35.  *Id.*
36.  *See* Pub. L. No. 101–629 §16, 104 Stat. 4511, 4526 (1990).
37.  Intercenter Agreement Between CDER and CBER (effective Oct. 31, 1991) [hereinafter CDER/CBER Intercenter Agreement], §III(B)(1)(f) & (g). FDA also promulgated a regulation vesting all three centers with authority to approve the applications typically handled by other centers. 56 Fed Reg 58758, 58759 (Nov. 21, 1991), issuing 21 CFR §5.33. For example, CBER became authorized to approve new drug applications (NDAs) as well as biologics applications. This regulation was later removed from the Code of Federal Regulations and treated as an internal agency policy. 69 Fed Reg 17285, 17285 (Apr. 2, 2004).
38.  CDER/CBER Intercenter Agreement §III(B)(1).
39.  *Id.* §III(A)(6).
40.  *Id.* §III(A)(5)(a).
41.  Pub. L. No. 102–571 §103, 106 Stat. 4491, 4492.
42.  Pub. L. No. 105–115, 111 Stat. 2296 (1997).
43.  *Id.* §123(a)(2), 111 Stat. at 2323 (codified at 42 USC §262(a)(1)(A)).
44.  *Id.* §123(f), 111 Stat. at 2324 (codified at 21 USC §355 note).
45.  *Id.* §123(g), 111 Stat. at 2324 (codified at 42 USC §262(j)).
46.  68 Fed Reg 38067, 38068 (June 26, 2003).
47.  CBER, Transfer of Therapeutic Products to the Center for Drug Evaluation and Research (2003), http://www.fda.gov/cber/transfer/transfer.htm.
48.  *See id.;* 68 Fed Reg at 38068.
49.  42 USC §262(i) (2006).
50.  21 CFR §600.3(h) (emphasis added).
51.  21 CFR §600.3(h)(5).
52.  "Trivalent organic arsenicals" are defined as "arsphenamine and its derivatives (or any other trivalent organic arsenic compound) *applicable to the prevention, treatment, or cure of diseases or injuries of man.*" 21 CFR §600.3(i) (emphasis in original).
53.  FDA has specified that

> [a] product is deemed applicable to the prevention, treatment, or cure of diseases or injuries of man irrespective of the mode of administration or application recommended, including use when intended through administration or application to a person as an aid in diagnosis, or in evaluating the degree of susceptibility or immunity possessed by a person, and including also any other use for purposes of diagnosis, if the diagnostic substance so used is prepared from or with the aid of a biological product.

21 CFR §600.3(j).

54.  "Radioactive biological product" is defined as "a biological product which is labeled with a radionuclide or intended solely to be labeled with a radionuclide." 21 CFR §600.3(ee).

55.  FDCA §201(g) defines "drugs" as

(A)  articles recognized in the official United States Pharmacopeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and

(B)  articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and

(C)  articles (other than food) intended to affect the structure or any function of the body of man or other animals; and

(D)  articles intended for use as a component of any article specified in clause (A), (B), or (C). . . .

21 USC  §321 (2006). This definition of drugs excludes food and dietary supplements.

56.  Intercenter Agreement Between CDER and CBER (effective Oct. 31, 1991), §II.

57.  Pub. L. No. 101–629 §16, 104 Stat 4511, 4526 (1990).

58.  Pub. L. No. 107–250 §204, 116 Stat 1588, 1611–1612 (2002).

59.  21 CFR §3.2(e).

60.  21 CFR §3.3.

61.  *Id.*

62.  21 CFR §§3.7, 3.8.

63.  PHSA §351(j).

64.  *Id.* §351(a).

65.  21 CFR §600.3(h)(5)(ii) (emphasis added).

66.  21 CFR §600.3(g)(5)(ii).

67.  FDCA §201(h).

68.  Intercenter Agreement Between CBER and CDRH (effective Oct. 31, 1991), §III.

69.  *Id.* §II.

70.  *Id.*

71.  *Id.* §VI.

72.  *Id.* §VI(A).

73.  *Id.* §VI(B)(1).

74.  FDA, Jurisdictional Determinations, http://www.fda.gov/oc/combination/determinations.html.

75.  21 CFR §§3.2(m), 3.4.

76.  21 CFR §3.4(a).

77.  21 CFR §3.4(b).

78.  Intercenter Agreement Between CBER &  CDRH (effective Oct. 31, 1991), §VI(B)(2).

79.  Intercenter Agreement Between CDER and CBER (effective Oct. 31, 1991), §III(D)(1)(c).

80.  *Id.* §III(d)(2)(b).

81.  FDA, Report on FY 2006 OCP Requirements, http://www.fda.gov/oc/combination/report2006/requirements.html.

82.  *Id.*

83.  *Id.*

84.  *Id.*

85.  42 USC §262.

86.  *Id.* §262(j); *see also* 21 USC §355.

87.  Pub. L. No. 105–115, 111 Stat. 2296 (1997).

88.  21 CFR §312.2.

89.  *Id.* §312.1, -.3(b).

90.  *Id.* §312.1.

91.  42 USC §262(a)(1)(B).

92.  21 CFR §601.

93.  *Id.*

94.  42 USC §262(a)(2)(B)(i)–(ii).

95.  21 CFR §600.3(p), (r), (s). Safety is defined as "the relative freedom from harmful effect to persons affected, directly or indirectly, by a product when prudently administered,

taking into consideration the character of the product in relation to the condition of the recipient at the time." 21 CFR §600.3(p). Purity is defined as "relative freedom from extraneous matter in the finished product, whether or not harmful to the recipient or deleterious to the product" and "includes but is not limited to relative freedom from residual moisture or other volatile substances and pyrogenic substances." *Id.* §600.3(r).

96.  *Id.* §600.3(s).
97.  U.S. Food and Drug Administration, Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products (May 1998), available at http://www.fda.gov/CBER/gdlns/clineff.pdf.
98.  *See* 21 USC §355.
99.  42 USC §262(a)(2)(B)(ii).
100.  *Id.* §262(b).
101.  *See generally id.* §262.
102.  *See* 21 CFR §600.14 (reporting of biological product deviations); 21 CFR §610.1-.2 (release requirements); 21 CFR §600.80 (postmarketing reporting of adverse experiences); 21 CFR §600.81 (distribution reports); 21 CFR §601.70 (postmarketing studies); 21 CFR pt. 610, subpt. G (labeling standards).
103.  21 CFR §600.80.
104.  21 CFR §601.70.
105.  21 CFR §610.1.
106.  21 CFR §610.2.
107.  21 CFR §601.12(a).
108.  21 CFR §601.12(b).
109.  21 CFR §601.12(c) (emphasis added).
110.  21 CFR §601.12(d) (emphasis added).
111.  *See* U.S. Food and Drug Administration, Vaccine Frequently Asked Questions, http://www.fda.gov/cber/faq/vacfaq.htm (last visited Feb. 24, 2008) (noting that the number of cases of diphtheria, pertussis, measles, and meningitis, have been decreased by about 96% to 100% because of vaccination); *see also* Hutt, Merrill & Grossman, *supra* note 3, at 894.
112.  42 USC §262(i), (j).
113.  U.S. Food and Drug Administration, Vaccines Licensed for Immunization and Distribution in the United States, http://www.fda.gov/cber/vaccine/licvacc.htm (last visited Feb. 24, 2008).
114.  Hutt, Merrill & Grossman, *supra* note 3, at 896.
115.  *See* Linda Bren, Influenza: Vaccination Still the Best Protection, FDA Consumer Magazine (Sept.–Oct. 2006), available at http://www.fda.gov/fdac/features/2006/506.influenza.html (last visited Mar. 25, 2008); *see generally* U.S. Food and Drug Administration, Influenza Virus Vaccine, http://www.fda.gov/cber/flu/flu.htm (last visited Mar. 25, 2008).
116.  Linda Bren, *supra* note 115; *see also* U.S. Food and Drug Administration, Influenza Virus Vaccine, http://www.fda.gov/cber/flu/flu.htm (last visited Mar. 25, 2008) (providing links to information on the influenza virus vaccine for each U.S. influenza season since 1999–2000).
117.  Linda Bren, *supra* note 115.
118.  U.S. Food and Drug Administration, FDA News, FDA Finalized Guidance for Pandemic and Seasonal Influenza Vaccines (May 31, 2007), available at http://www.fda.gov/bbs/topics/NEWS/2007/NEW01645.html.
119.  U.S. Food and Drug Administration, Guidance for Industry: Clinical Data Needed to Support the Licensure of Seasonal Inactivated Influenza Vaccines (May 2007), available at http://www.fda.gov/cber/gdlns/trifluvac.pdf. FDA has also issued guidance on the licensure of pandemic influenza vaccines. U.S. Food and Drug Administration, Guidance for Industry: Clinical Data Needed to Support the Licensure of Pandemic Influenza Vaccines (May 2007), available at http://www.fda.gov/cber/gdlns/panfluvac.pdf.
120.  U.S. Food and Drug Administration, Blood, available at http://www.fda.gov/cber/blood.htm (last visited Feb. 23, 2008).

*Labson et al.*

121. U.S. Food and Drug Administration, Have You Given Blood Lately? Consumer Update (Oct. 4, 2007), http://www.fda.gov/consumer/updates/blooddonations100407.html# oversight (last visited Jan. 30, 2008).

122. 42 USC §262(a)(1), (i); Hutt, Merrill & Grossman, *supra* note 3, at 918.

123. 21 CFR pt. 606.

124. *Id.*

125. U.S. Food and Drug Administration, Blood, www.fda.gov/cber/blood.htm (last visited Jan. 29, 2008).

126. *See, e.g.,* U.S. Food and Drug Administration, Compliance Program Guidance Manual, chapter 42: Blood and Blood Products, Inspection of Licensed and Unlicensed Blood Banks, Brokers, Reference Laboratories and Contractors—7342.001, available at http://www.fda.gov/cber/cpg/7342001bld.pdf (last visited Jan. 29, 2008).

127. 21 CFR pt. 607.

128. *Id.* pt. 630 (donor notification); *Id.* pt. 640 (additional standards for blood and blood products).

129. *Id.* pt. 640, subpt. A.

130. *Id.* §640.5(a).

131. *Id.* §640.5(f); *see also id.* §610.40.

132. U.S. Food and Drug Administration, Blood Action Plan, available at http://www. fda.gov/cber/blood/bap.htm (last visited Feb. 24, 2008).

133. *Id.*

134. *Id.*

135. U.S. Food and Drug Administration, Blood, www.fda.gov/cber/blood.htm (last visited Jan. 29, 2008).

136. 21 CFR §1270.3(j).

137. *Id.*

138. U.S. Food and Drug Administration, Reinventing the Regulation of Human Tissue (Feb. 1997), http://www.fda.gov/cber/tissue/rego.htm; U.S. Food and Drug Administration, Proposed Approach to Regulation of Cellular and Tissue-Based Products (Feb. 28, 19997), available at http://www.fda.gov/cber/gdlns/celltissue.pdf.

139. *See, e.g.,* 70 Fed Reg 29949 (May 25, 2006); 69 Fed Reg 68612 (Nov. 24, 2004); 69 Fed Reg 29786 (May 25, 2004); 66 Fed Reg 5447 (Jan. 19, 2001).

140. 21 CFR §1271.3(d).

141. *Id.*

142. *Id.*

143. 21 CFR pt. 1271.

144. *Id.*

145. *Id.*

146. 21 CFR pt. 1271, subpt. A; *see also* 66 Fed Reg at 5449.

147. 21 CFR pt. 1271, subpt. B, C, & D.

148. *Id.* subpt. E & F.

149. 69 Fed Reg at 68614.

150. U.S. Food and Drug Administration, FDA News, FDA Forms Task Force on Human Tissue Safety (Aug. 30, 2006), available at http://www.fda.gov/bbs/topics/NEWS/ 2006/NEW01440.html.

151. U.S. Food and Drug Administration, Guidance for Industry: Compliance with 21 CFR Part 1271.150(c)(1): Manufacturing Arrangements (Sept. 2006), available at http:// www.fda.gov/cber/gdlns/cgtpmanuf.pdf.

152. *Id.*

153. *See* Press Release, U.S. Food and Drug Administration, FDA Releases Human Tissue Task Force Report (June 12, 2007), available at http://www.fda.gov/bbs/topics/ NEWS/2007/NEW01650.html (last visited Jan. 25, 2008).

154. *See, e.g.,* Larry Thompson. Human Gene Therapy Harsh Lessons, High Hopes, FDA Consumer Magazine (Sept.–Oct. 2000), available at http://www.fda.gov/fdac/ features/2000/500.gene.html (last visited Feb. 22, 2008) (discussing the death of an 18-year-old patient who died from a reaction to a gene therapy treatment); U.S. Food and Drug Administration, FDA Talk Paper, FDA Places Temporary Halt on Gene Therapy

Trials Using Retroviral Vectors in Blood Stem Cells (Jan. 14, 2003), available at http://www.fda.gov/bbs/topics/ANSWERS/2003/ANS01190.html (last visited Feb. 22, 2008) (announcing a temporary halt on gene therapy trials using retroviral vectors in blood stem cells after reports of a second child in a French gene therapy trial developing "a leukemia-like condition").

155. U.S. Food and Drug Administration, Human Gene Therapy and The Role of the Food and Drug Administration (Sept. 2000), http://www.fda.gov/cber/infosheets/genezn.htm (last visited Feb. 22, 2008).

156. U.S. Food and Drug Administration, Cellular and Gene Therapy, http://www.fda.gov/cber/gene.htm (last visited Feb. 22, 2008) (stating that "FDA has not yet approved any human gene therapy product for sale").

157. U.S. Food and Drug Administration, Human Gene Therapy and The Role of the Food and Drug Administration (Sept. 2000), http://www.fda.gov/cber/infosheets/genezn.htm (last visited Feb. 22, 2008).

158. Recombinant DNA Advisory Committee, About RAC, http://www4.od.nih.gov/oba/rac/aboutrdagt.htm (last visited Feb. 23, 2007).

159. 58 Fed Reg 53248 (Oct. 14, 1993).

160. *Id.*

161. *Id.*

162. *Id.* at 53250–53251.

163. *Id.* at 53249 (internal citations omitted).

164. *Id.*

165. U.S. Food and Drug Administration, Guidance for Industry: Guidance for Human Somatic Cell Therapy and Gene Therapy (Mar. 1998), available at http://www.fda.gov/cber/gdlns/somgene.pdf (last visited Feb. 22, 2008).

166. FDA, Drug-Diagnostic Co-Development Concept Paper, at 21 (April 2005).

167. *Id.,* at 21 (April 2005).

168. *See* FDA. Table of Valid Genomic Biomarkers in the Context of Approved Drug Labels, http://www.fda.gov/cder/genomics/genomic_biomarkers_table.htm.

169. Letter of Steven K. Galson, Director, CDER, to Kathleen M. Sanzo, Esq., Morgan, Lewis & Bockius LLP; Stephan E. Lawton, Esq., Biotechnology Industry Organization; and Stephen J. Juelsgaard, Esq., Genentech, Docket Numbers 2004P-0231, 2003P-0176, 2004P-0171, and 2004 N-0355 (May 30, 2006), available at http://www.fda.gov/ohrms/dockets/dockets/04P0231/04P-0231-pdn0001.pdf, at 2 n.7.

170. HR 1038, 110th Cong. §2(a)(1) (2007) (creating new section 351(i)(3) of the PHSA). This bill was also introduced with identical text in the Senate, as S 623. We refer to it for simplicity as HR 1038.

171. Letter of Michael O. Leavitt, Secretary of Health and Human Services, to The Honorable Edward M. Kennedy, Chairman, Senate Committee on Health, Education, Labor and Pensions, at 3 (26 June 2007)("At present, the science does not exist to adequately protect patient safety and ensure product efficacy for an abbreviated follow-on pathway for all biologic products, and questions exist whether some products, such as vaccines or blood products, would ever lend themselves to such a pathway").

172. Janet Woodcock et al. The FDA's assessment of follow-on protein products: A historical perspective, 6 Nature Reviews Drug Discovery Advance Online Publication, at 1–2 (April 13, 2007).

173. HR 1956, 110th Cong. §2(a)(2) (2007)(creating new section 351(k)(1)(B) of the PHSA); S 1505, 110th Cong. §2(a)(2) (2007)(creating new section 351(k)(1)(B)(ii) of the PHSA).

174. HR 1956 §2(a)(2) (creating new section 351(k)(3)(D) of the PHSA); S 1505 §2(a)(2) (creating new section 351(k)(7)(E) of the PHSA).

175. S 1695, 110th Cong. §2(b)(3) (creating new section 351(i)(4) of the PHSA); Id. §2(e)(4) HR 5629, 110th Cong. §101(b).

176. S 1695, 110th Cong. §2(a)(2) (creating new section 351(k)(8)(E) of the PHSA); HR 5629, 110th Cong. §101(a) (creating new section 351(k)(9)(C) of the PHSA).

177. Comments of GPha, Docket No. 2004 N-0355, C9, at 8, 11 (2004), http://www.fda.gov/ohrms/dockets/dockets/04n0355/04n-0355-c000009-vol4.pdf ("If the results [of analytical tests] met appropriate standards of comparability, then the need to conduct

*Labson et al.*

further studies, such as preclinical, pharmacokinetic, pharmacodynamic, or clinical studies could be reduced or even eliminated").

178.  Janet Woodcock et al. The FDA's assessment of follow-on protein products: A historical perspective, 6 Nature Reviews Drug Discovery Advance Online Publication, at 1, 7 (April 13, 2007).

179.  *See, e.g.,* Daan J. A. Crommelin et al., Shifting paradigms: biopharmaceuticals versus low molecular weight drugs, 266 Int'l J. Pharmaceutics 3, 4 (2003).

180.  Safe and Affordable Biotech Drugs: the Need for a Generic Pathway: Hearing Before the H. Comm. on Oversight and Government Reform, 110th Cong., at 11–12 (March 26, 2007) (statement of Janet Woodcock, M.D., Deputy Commissioner and Chief Medical Officer, FDA), <http://oversight.house.gov/documents/20070326104056-22106.pdf> (last accessed September 16, 2008) ("The ability to predict immunogenicity of a protein product, particularly the more complex proteins, is extremely limited. Therefore, some degree of clinical assessment of a new product's immunogenic potential will ordinarily be needed.").

181.  *See* S 1695 §2(a)(2) (creating new section 351(k)(2)(A)(i)(I)(aa) of the PHSA); S 1505 §2(a)(2) (creating new section 351(k)(2)(B)(ii)) of the PHSA); HR 1038 §2(a)(2) (creating new section 351(i)(4) of the PHSA); HR 1956 §2(a)(2) (creating new section 351(k)(1) of the PHSA); HR 5629 §101(a) (creating new section 351(k)(2)(a)(i)(I) of the PHSA).

182.  S 1695 §2(a)(2) (creating new section 351(k)(2)(A)(i)(I)(bb)-(cc) and 351(k)(2)(A)(ii) of the PHSA); S 1505 §2(a)(2) (creating new section 351(k)(4)(B)(iv) & (v) of the PHSA); HR 1038 §2(a)(2) (creating new section 351(i)(4) of the PHSA); HR 1956 §2(a)(2) (creating new section 351(k)(5)(iv)& (v) of the PHSA).

183.  HR 1038 §2(a)(2) (creating new section 351(i)(4) of the PHSA); HR 5629 §101(a) (creating new section 351(k)(2)(a)(i) of the PHSA).

184.  S 1695 §2(a)(2) (creating new section 351(k)(2)(A)(i)(I)(bb)-(cc) of the PHSA).

185.  S 1505 §2(a)(2) (creating new section 351(k)(4)(B)(iv) & (v) of the PHSA); HR 1956 §2(a)(2) (creating new section 351(k)(5)(iv)& (v) of the PHSA).

186.  Approved Drug Products with Therapeutic Equivalence Evaluations, at v–vi (2008).

187.  *Id.* at vii–viii.

188.  S 1505 §2(a)(2) (creating new section 351(m) of the PHSA); HR 1956 §2(a)(2) (creating new section 351(2)(D) of the PHSA).

189.  Safe and Affordable Generic Biotech Drugs: The Need for Generic Pathway. Hearing Before the H. Comm. on Oversight and Government Reform, 110th Cong., at 11–12 (March 26, 2007) (statement of Janet Woodcock, M.D., Deputy Commissioner and Chief Medical Officer, FDA), <http://oversight.house.gov/documents/20070326104056–22106.pdf> (last accessed Feb. 18, 2008).

190.  HR 1038 §2(a)(2) (creating new section 351(i)(5) of the PHSA).

191.  S 1695 §2(a)(2) (creating new section 351(k)(4) of the PHSA); HR 5629 §101(a) (creating new section 351(k)(4) of the PHSA).

192.  *See* GPha, Letter to World Health Organization Regarding the International Nonproprietary Name Programme (Aug. 10, 2006), http://www.gphaonline.org/AM/ Template. cfm?Section = Issues& Template = /CM/ContentDisplay.cfm& ContentID = 2694.

193.  *See* Letter of Michael O. Leavitt, Secretary of Health and Human Services, to The Honorable Edward M. Kennedy, Chairman, Senate Committee on Health, Education, Labor and Pensions, at 6 (26 June 2007) ("Therefore, the Administration believes that legislation should recognize the potential impact on pharmacovigilance and prescribing and require that these products be assigned a distinguishable, non-proprietary name for safety purposes.")

194.  HR 5629 §101(a) (creating new section 351(k)(10) of the PHSA).

195.  HR 1956 §§2(a)(2), 3 (creating new section 351(l) of the PHSA and sections 502(y)& (z) and 503(b)(6) of the FDCA); S 1505 §§2(a)(2), 3 (creating new sections 351(l) of the PHSA and 502(y)& (z) and 503(b)(6) of the FDCA).

196.  HR 1038 §3(a)(2) (creating new section 351(k)(6) of the PHSA).

197.  *See* GPha, GPhA Statement on Sens. Kennedy-Enzi-Clinton-Hatch Biogenerics Legislation, http://www.gphaonline.org/AM/Template.cfm?Section = Press_Releases& TEMPLATE = /CM/HTMLDisplay.cfm& ContentID = 3560 ("we continue to oppose

the extension of 12 years of market exclusivity that this legislation grants brand biotech-
nology companies. Such an arbitrary and excessive period of time is not only unprece-
dented and unwarranted, but more importantly, would unjustifiably delay access to
affordable competition and choice for consumers and businesses alike").

198. *E.g.* Safe and Affordable Biotech Drugs: the Need for a Generic Pathway: Hearing Before
the H. Comm. on Oversight and Government Reform, 110th Cong., at 12, 14 (March 26,
2007) (statement of Henry G. Grabowski, Ph.D., Duke University), <http://oversight.
house.gov/documents/20070416132526.pdf> (last accessed September 16, 2008)
199. S 1695 §2(a)(2) (creating new section 351(k)(7) of the PHSA).
200. HR 5629 §101(a) (creating new section 351(k)(7)& (8) of the PHSA).
201. S 1505 §2(a)(2) (creating new section 351(k)(7) of the PHSA); HR 1956 §2(a)(2) (creating
new section 351(k)(3) of the PHSA).
202. S 1505 §2(a)(2) (creating new section 351(k)(7) of the PHSA); HR 1956 §2(a)(2) (creating
new section 351(k)(3) of the PHSA).
203. *See* FDCA §505(b), 505(j).
204. S 1695 §2(a)(2) (creating new section 351(l) of the PHSA).
205. *Id.* §2(a)(2) (creating new section 351(l)(5) of the PHSA).
206. S 1505 §2(a)(2) (creating new section 351(k)(8) of the PHSA).
207. HR 1038 §3(a)(2) (creating new section 351(k)(17) of the PHSA)
208. HR 5629 §101(a) (creating new section 351(l)(10) of the PHSA).
209. *Id.* §101(a) (creating new section 351(l)(4)(B) of the PHSA).
210. *See, e.g.,* Free Trade Agreement Between the United States and the Republic of Korea,
Article 18.9(5), available at http://www.ustr.gov/assets/Trade_Agreements/Bilateral/
Republic_of_Korea_FTA/Final_Text/asset_upload_file273_12717.pdf.



# 6  FDA's Antibiotic Regulatory Scheme: Then and Now

**Irving L. Wiesen, Esq.**
*Law Offices of Irving L. Wiesen, Esq., New York, New York, U.S.A.*

## INTRODUCTION

An antibiotic is a drug containing any quantity of any chemical substance produced by a microorganism and which has the capacity to inhibit or destroy microorganisms in dilute solution (1). AQ The history of antibiotic regulation demonstrates the interplay between regulatory schemes, which are artifacts of history, and the scientific/regulatory constraints and marketing conditions in which they operate. Largely an outgrowth of a narrow legislative fix of a scientific and regulatory need, the antibiotic regulatory scheme grew to unwieldy proportions as the market for such drugs increased. Accordingly, the FDA, within the statutory mandate, increasingly revised the regulatory requirements governing antibiotic drugs, gradually eliminating them in successively more radical revamping of its drug approval requirements. This window into FDA rule and policymaking finally closed in 1997, when Congress enacted the Food and Drug Administration Modernization Act, which finally and unambiguously put an end to the particular, and peculiar, requirements for antibiotic drugs.

## Antibiotics Regulation: A Brief History

In 1906, Congress passed the first comprehensive scheme of federal law to regulate the marketing of pharmaceutical products. Lacking an approval requirement, however, the Food and Drug Act of 1906 merely proscribed the entry into interstate commerce of drugs, which were "misbranded" or "adulterated." In 1938, Congress passed the Food Drug and Cosmetic Act, which remains the overall federal drug regulatory scheme to this day. The FDCA introduced for the first time a requirement that all drugs marketed in the United States after enactment of the act be reviewed prior to marketing. The criterion of such review, however, was merely for safety; no requirement of effectiveness existed until passage of the Drug Amendments of 1962.

Antibiotics and insulin-containing drugs were added to the regulatory scheme beginning in a series of steps starting in 1941 and culminating in 1945 (2) and were also contained in the 1962 amendments. However, in contrast, the procedures for establishing safety and efficacy which were applicable to other "new drugs," antibiotics were subject to a far different regulatory scheme. This scheme was two-pronged, requiring that antibiotics adhere to a drug "monograph" published by the FDA, and also, that each batch of antibiotic be certified by FDA as conforming to established standards of manufacture and conformity with specifications.

Under the monograph system, FDA issues a set of rules that are given broad applicability to any prospective marketer. Any prospective marketer may market the product in conformity with the rules and specifications contained in the

monograph without preclearance of the product per se. In the case of antibiotics, the monographs were developed on the basis of the first product reviewed and approved in the antibiotic class. Thereafter, any prospective marketer merely needed to show it was bioequivalent to the first product on which the monograph was developed, and that it was following the specifications of the monograph.

In this way, the antibiotic approval mechanism paralleled and prefigured the approval mechanism for generic drugs, by which subsequent versions of a drug are approvable based upon standards developed in connection with the first-approved product. Like generic drugs prior to 1962, the first-approved applicant owned no proprietary rights in the information used in approval of the product, which could bar approval of subsequent applicants who relied on the first approval.

Attendant to the monograph system, antibiotics were also subject to a batch certification requirement, which was instituted due to the relative newness of antibiotic manufacturing. Thus, notwithstanding the existence of the monograph, antibiotics were also subject to a requirement that served as a counterpart to the monograph system, which was the requirement of "batch certification." This requirement, enshrined in the FDCA statute (3), required that each batch of antibiotic be certified by FDA to conform to regulations of identity, strength, quality, and purity. To meet this requirement, the antibiotic marketer provided a sample of each batch of the antibiotic to FDA prior to marketing for laboratory testing and certification so that the requirements for marketing set forth by the statute were met. Batches that were found by FDA to meet the required standards were issued an "Antibiotic Certificate," which permitted their shipment in interstate commerce, "Certified by FDA" (4).

Unsurprisingly, the batch certification requirement represented a huge burden on both manufacturers and the FDA. As recounted by its chief, Antibiotic Drug Review Branch of the FDA, the mechanism had long become expensive, time-consuming, and ultimately a bottleneck in drug distribution.

The law required the government to charge fees to manufacturers requesting the required certification tests. Fees in excess of $5 million were collected annually on a user-cost basis to carry on the testing and certification program. The regulated industry's demands on the agency's testing service increased year by year, as the market grew larger and larger. The agency's testing services became slower and slower due to personnel and facilities limitations imposed by the Office of Management Budget. As a result, during the late 1970s, large quantities of antibiotic products were being held in quarantine for many weeks by industry while waiting for FDA's clearance at a time when interest rates were at an all-time high (5).

As a result, FDA increasingly took advantage of its power under the statute (6) to exempt antibiotic products or manufacturers from the batch certification requirement, if the FDA determined that it was not needed to assure the safety and effectiveness of the drug product. FDA took several increasingly significant steps: in October 1980, it indicated to the industry that testing of topical antibiotics would no longer be required. As described by the FDA, this small step was not effective, leading to a cascade of events.

Such limited deregulation (topical antibiotic exemption) was not sufficient to relieve stock buildup. The agency then tried selective testing where certain tests were skipped and certifications granted on the basis of the manufacturer's test results. With less testing, there was less income to support the laboratories' costs and the program headed for a financial deficit (7).

Finally, on September 7, 1982, FDA determined that it was eliminating entirely the batch certification program as unnecessary to assure the safety and effectiveness of antibiotics, whose manufacturing by then had become well understood and whose consistency had proven itself over many years of practice. The new program was made effective on October 1, 1982. Instead of the batch certification procedure, the industry and FDA were now guided by compendial and regulatory specifications—specifically, FDA's monographs setting forth standards of identity, strength, quality, and purity—and by FDA's Good Manufacturing Practice Regulations and Policies applicable to production (8). In 1986, this exemption was extended to over-the-counter antibiotics, which complied with the applicable monograph.

As a result of the FDA's revamping its antibiotic approval process, the way was now cleared for significant new activity by manufacturers and enhanced delivery of antibiotic products to the market. The FDA described the effect of this "deregulatory" effort shortly after in 1986.

At the time batch-by-batch testing of antibiotic products was terminated by FDA, there were approximately 65 domestic and 52 foreign manufacturers having products tested for marketing. Since that phase of deregulation, 25 additional domestic and 8 foreign companies have submitted one or more Form 5/6 applications to enter the U.S. antibiotic market for the first time (9). The FDA analysis concluded, "[a]s deregulation occurs, growth and competition in the industry follows" (10).

The certification regulations remained in effect as a standard of drug quality by which adulteration and misbranding could be gauged. Nevertheless, FDA retained the power to reimpose the requirement for certification, where it determined that a manufacturer or several manufacturers experienced a problem that was believed to pose a significant potential health risk. In such an event, the requirement for certification would be reimposed only on the company or companies in which the problem was evident (11). This process remained in effect until the recent repeal of the entire antibiotic application scheme by Congress in the Food and Drug Modernization Act of 1997, discussed below.

## THE CERTIFICATION PROCESS

At the time the antibiotic provisions were enacted in 1945, the only antibiotic product on the market was penicillin. In subsequent years, well over a hundred additional antibiotic products were developed and approved by the FDA. Most of these approvals were under the 1945 regulatory scheme, which used a monograph system in conjunction with batch certification. To receive permission to market a product, the applicant was required to address a request for certification of a batch of an antibiotic drug to the commissioner of the FDA. The application was required to contain information describing the batch, including results of testing required by the regulations, and batch composition. Each batch shipped in interstate commerce was required to adhere to stated standards of identity, strength, quality, and purity. Additionally, batches were required to have results for tests and methods of assay, including sterility tests, biological tests, microbiological assays, chemical tests, and tests for certain antibiotic dosage forms.

In its application, the manufacturer was required to submit actual samples of each batch of antibiotic which FDA would test in its own laboratories. Upon review and confirmation by the FDA that the batch met appropriate requirements, the FDA

would certify the batch as safe and effective, and fit for distribution in interstate commerce. These certifications were contained in an "Antibiotic Certificate" issued by the FDA to the applicant. Batches that were released prior to such FDA certification were deemed misbranded under section 502 (1) of the FDCA, and were subject to seizure and other legal sanctions.

Certification was a creature of FDA discretion. FDA was authorized to withhold certification of any batches, which it deemed required a further demonstration of safety and effectiveness. In this respect, FDA could require any additional testing or other information it deemed appropriate, and it did so in cases where new information or other changed circumstances indicated that the standard certification may no longer have been sufficient (12). Moreover, FDA had the power to suspend certification procedures for any person or company that was found to have used fraud, misrepresentation, or concealment in the application for certification, or had otherwise falsified records required by the regulations to be maintained by the company.

The 1962 Drug Amendments added a requirement that drugs demonstrate efficacy, in addition to safety, prior to distribution—a requirement that was equally applicable to antibiotics. Prior to these amendments, the FDA had been authorized to certify certain antibiotics as safe and effective: penicillin, streptomycin, chlortetracycline, chloramphenicol, and bacitracin. Other antibiotics available at the time were either classified as safe and effective or were generally recognized as safe, and therefore did not require a finding of effectiveness prior to marketing. As a result of the 1962 amendments, which now required proof of effectiveness, FDA determined that antibiotics marketed under a pre-1962 New Drug Application (NDA) would be certified or released from certification under the pre-1962 regulatory scheme, despite the fact that the pre-1962 regulatory scheme did not review drugs for efficacy. To address the new efficacy requirements, FDA determined to proceed under the rubric of its Drug Efficacy Study Implementation Program (DESI) to provide appropriate regulations for these antibiotics.

As a result of the 1962 amendments, FDA required the submission for several antibiotics of scientific evidence of "substantial well-controlled clinical studies" demonstrating the effectiveness of the product. Products that failed to provide such evidence had their certifications revoked and the regulations under which they were marketed repealed by the FDA. Legal challenges to this action failed (13). In addition, after review of submissions for other antibiotics, FDA withdrew certification and revoked approval of several antibiotic and antibiotic combination products that did not meet the FDA's standards of substantial scientific evidence (14).

**Exemptions from Certification Requirements**

Under the FDCA, FDA was permitted to exempt certain products from certification as a requirement for proving safety and efficacy. Accordingly, the FDA exempted antibiotic drugs from the requirements of certification (15). Promulgated by the FDA to relieve the bottleneck in antibiotic approvals, this new regulation exempted from the certification requirements of the FDCA all antibiotic drugs provided there was an approved antibiotic application for each product.

The antibiotic approval process had previously been contained in the FDA's Form FD-1675, rather than in a regulation. This form contained the information required to be submitted by the applicant for approval of the antibiotic, and was also referred to as a "Form 5" and "Form 6" application. Form 5 applications were

for antibiotics for which no standards had previously been developed as shown in 21 CFR, Parts 440 to 455; Form 6 applications were for products for which such standards already existed and contained in the regulation.

In 1985, the FDA published new regulations known as the "NDA Rewrite Regulations," which entirely revamped the application procedures for drug products. In these regulations, the FDA dispensed with the previous regulatory scheme of Form 5 and Form 6 for antibiotics, and replaced it with appellations that more closely mirrored those of nonantibiotic drugs. Accordingly, after May 23, 1985, antibiotic applications were classified as either "New Antibiotic Drug Applications" or "Abbreviated Antibiotic Drug Applications" (16). Consonant with the new regulatory framework, applicants, and manufacturers could now make certain changes in their products, without requiring prior FDA approval (17).

## FDAMA

In 1997, President Clinton signed into law the Food and Drug Administration Modernization Act of 1997 (FDAMA). This act, which was designed in part to introduce legal mechanisms to permit the speedier and broader introduction of pharmaceutical products to consumers, also addressed a number of prevailing historical anomalies in the FDA's review and approval process. Among those anomalies was the approval mechanism for antibiotics, whose distinction from the general class of pharmaceuticals had long lost any scientific rationale. Accordingly, section 125 of Title I of the Act repealed section 507 of the FDCA, which contained the separate application scheme for antibiotics. Essentially, the import of the repeal is that antibiotics would, with certain exceptions, be reviewed and approved on the same basis as any other pharmaceutical product.

The act specifically provided, moreover, that any full applications (NDA's) approved under FDCA section 597 before the signing into law of FDAMA would be deemed to have been submitted and filed under the general pharmaceutical provisions, section 505(b) of the FDCA, and approved for safety and effectiveness under section 505(c) thereof. In addition, all abbreviated applications (ANDAs) approved under section 507 would be deemed to have been filed and approved under section 505(j) of the act, applicable to ANDAs for general pharmaceutical products.

One consequence of the effective dating of the repeal, however, was that antibiotic applications submitted to the FDA before the date of FDAMA were not subject to the patent listing and notification requirements, as well as the exclusivity attendant thereto.* The inevitable result was that post-FDAMA applications for pre-FDAMA ("old") antibiotics were not required to include patent information and

---

* Under Section 505 of the FDCA, abbreviated new drug applications are required to certify the status of their product in relation to the patents claimed by the "listed" product in the *Orange Book*. These certifications indicate whether the product infringes the listed product, whether the applicant claims no patents of the listed product apply to the applicant's product, whether listed patents apply, or whether listed patents apply but the patents are invalid. The application itself is deemed a legal infringement of any patents, and therefore may precipitate a patent infringement lawsuit by the owner of the listed drug against the applicant who certifies that listed patents apply, but are invalid. The statute provides a period of exclusivity to the first to file such a certification, in the event of a patent infringement lawsuit by the listed product owner.

were not eligible for the exclusivities of sections 505(c) or 505 (j) of the FD&C Act. This included applications for a new dosage form or new indication for an "old" antibiotic.

## FDA's Proposed Rule

In the *Federal Registers* of May 12, 1998, (18) and January 5, 1999, (19) the FDA issued conforming amendments to its regulations to remove provisions that were made obsolete by FDAMA, specifically the provisions that governed certification of antibiotic drugs (20).

Under section 125(d) (1), drugs that had been approved pursuant to section 507 of the act were now to be deemed approved under the standard new drug provisions of the act, and would be considered as NDA drugs. These drugs, having been approved under the previous regulatory scheme, had not been subject to the patent and exclusivity provisions of the act that were enacted under the Drug Price Competition and Patent Restoration Law ("Waxman-Hatch"), enacted in 1984, which were contained in section 505 of the act. Accordingly, FDAMA also exempted antibiotic-related drug applications from the drug exclusivity and patent listing provisions of Waxman-Hatch. As a result, section 125 of FDAMA exempted from the exclusivity and patent listing requirements all applications that contained an antibiotic drug that was the subject of a marketing application received by the FDA under former section 507 of the act and received by the FDA prior to the enactment of FDAMA on November 21, 1997. This included applications that were withdrawn, not filed, or even refused approval under section 507.

In 2000, the FDA published a proposed rulemaking notice in the *Federal Register*, wherein it fleshed out its approach to its regulatory stance on marketing exclusivity and patents for antibiotic drugs (21).

Notwithstanding the relatively bright-line distinctions contained in FDAMA, an issue that was reminiscent of the original enactment of the Waxman-Hatch Amendments, i.e., the definition of the type of drug product included in its strictures, still remained. In the case of FDAMA's section 125 exemption, therefore, it remained unclear what constituted an "antibiotic" exempt from the requirements and benefits of drug exclusivities and patent listing.*

Accordingly, in the *Federal Register* of January 24, 2000, FDA proposed regulations governing the exemption of antibiotic applications from regulatory provisions governing marketing exclusivity and patents (22). In its notice, the FDA noted that under the former section 507 of the act antibiotic drugs were not subject to the patent listing and exclusivity provisions of section 505. Under section 125 of the Modernization Act, however, this distinction is preserved "with an expansive line" (23). Under section 125, applications are exempted which contain an antibiotic drug which was the subject of a marketing application received by FDA under former section 507 prior to the enactment of FDAMA on November 21, 1997. Drugs

---

* The effect of "drug listing" in the *Orange Book*, for example, is to grant the owner of the Reference Listed Drug ("RLD") an automatic 30-month stay of approval in the event the RLD owner sued a generic applicant for patent infringement following certification by the generic applicant that its product did not infringe the patent of the RLD.

approved and marketed under former section 507 as well as drugs that were the subject of applications, "which may have been withdrawn, not filed, or refused approval under section 507 of the act" were similarly excluded from the patent listing and exclusivity provisions of section 505 (24).

The term "antibiotic drug," the FDA recounted, is defined in section 125 of FDAMA as

> [a]ny drug (except for drugs for use in animals other than humans) composed wholly or partly of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin, or any other drug intended for human use containing any quantity of any chemical substance which is produced by a microorganism and which has the capacity to inhibit or destroy micro-organisms in dilute solution (including a chemically synthesized equivalent of any such substance) or any derivative thereof.

21. USC 321(jj) From this definition, the FDA concluded that the term "antibiotic drug" refers not only to the active chemical substance but also to any derivative of the substance, such as a salt or ester of the substance. Accordingly, FDA determined that section 125's applicability applied to any drug that is the subject of a marketing application containing an "active moiety," which could be found in a drug application submitted to the agency prior to the enactment of FDAMA.* In defending its position, FDA noted that it had previously taken the same position for nonantibiotic drugs with regard to patent listing and exclusivity.

In interpreting the exclusivity provisions in the Hatch-Waxman Amendments, the agency concluded that Congress did not intend to confer significant periods of exclusivity on minor variations of previously approved chemical compounds. Therefore, the agency determined that it is appropriate to assess whether the drug seeking exclusivity is a new chemical entity, that is, a drug that does not contain any previously approved active moiety (25).

Having established that the congressional intent was to exempt from patent listing and exclusivity any applications for the same "active moiety" of a prerepeal antibiotic drug, FDA went on to propose a mechanism "[t]o help interested persons determine which drug products [are] exempt from the marketing exclusivity and patent provisions" by maintaining in the Code of Federal Regulations a list of the names of each prerepeal active moiety, in section 314.109(b) of the CFR This list, FDA indicated, is intended to be comprehensive and to provide interested persons a means of determining whether a marketing application would be for a drug that contains a prerepeal antibiotic.† Included with its proposed rule was a list of these active moieties of prerepeal antibiotics, which the FDA considered exempt from patent listing and exclusivity provisions of section 505 of the act (26).

---

* FDA defined an "active moiety" as the "molecule or ion responsible for physiological or pharmacological action, excluding appended portions that would cause the drug to be an ester, salt, or other noncolvalent derivative of the molecule." 65FR at 3625.

† Although intended to be comprehensive, FDA notably stressed its use as an aid to interested parties, but without legal effect. Thus, if any products were inadvertently omitted from the list, such omissions would not affect the regulatory status of the application; the application would still be exempt from patent listing and exclusivity, notwithstanding inadvertent omission from the list. 65FR at 3625.

## FDA'S GUIDANCE

In implementing the repeal, FDA issued a guidance document in which it outlined a new numbering system for applications subject to the old and new regulatory schemes, and in addition, more clearly defined which applications were subject to the respective statutory frameworks (27). The guidance indicated that the section 125 exemption contained in the Modernization Act applicable to "old" antibiotics applied to applications that contained in whole, or in part (i.e., as part of a combination product), an antibiotic drug, as defined in the act (28). Moreover the guidance made clear that the antibiotic contained in the application would need to have been received by the FDA prior to FDAMA, whether or not approved, marketed, marketed and withdrawn by the sponsor for any reason, submitted and withdrawn by the sponsor, and not further submitted. Action letter templates for section 507 drugs would no longer be used, nor would monographs for antibiotics be published or maintained.

With respect to bulk drug applications, prior to FDAMA, FDA had required that bulk antibiotic drug substances be either batch certified or exempted from batch certification via an approved antibiotic drug application. FDA had used an approval mechanism for bulk antibiotics that was similar to the approval mechanism for finished antibiotic applications. Under the new scheme, FDA indicated that it would treat information regarding bulk drug substances as Drug Master Files (DMFs), like their nonantibiotic counterparts. Accordingly, this information would no longer require specific approval, but rather, like DMFs, would merely be filed with the agency and considered as part of the drug application. Like nonantibiotics, antibiotics could also henceforth contain drug substance information in the finished product application itself (29). As a result, all unapproved bulk applications that were pending at the FDA were converted by the FDA into DMFs, and assigned DMF reference numbers.

## A RETURN TO THE DEFINITION OF ANTIBIOTIC

This chapter began with a definition of the term "antibiotic"; however, in light of the critical economic consequences of this designation for any particular product as discussed above, it is perhaps not surprising that the courts would have the last word on the subject of what constitutes an antibiotic. This issue came up in the case of *Allergan v. Crawford* (30) litigated in the District Court of Washington, D.C., under the following circumstances.

A product known as "Restasis®" marketed by Allergan, Inc., is a topical ophthalmic emulsion of cyclosporine used to treat an eye condition known as keratoconjunctivities (or dry eye disease). This product was submitted to the FDA in a New Drug Application in 1999 and was approved by the FDA in December 2002. As noted by the court, the issue is that "[t]he distinction between drugs entitled to market exclusivity/patent protection and those not so entitled, depends on whether the drug is classified as an 'antibiotic' that was subject to FDA review prior to 1997." In this case, the FDA classified Restasis as an antibiotic and accordingly denied it Waxman-Hatch exclusivity; Allergan argued that its mechanism of action proved otherwise, i.e., it was not an antibiotic, but rather an immunosuppressive drug and accordingly entitled to exclusivity.

In the course of its application process, Allergan submitted its application to the FDA in 1999 as a nonantibiotic, and it was so approved by the FDA in 2002.

However, in March of the following year, the FDA informed the company that the active ingredient, cyclosporine, was an antibiotic previously approved by the FDA prior to the enactment of FDAMA and its repeal of section 507. Accordingly, it was therefore not eligible for the Waxman-Hatch protections under section 125(d) (2). Interestingly—and crucially, in the eyes of Allergan—Restasis is not approved for any antibiotic use. In fact, the company pointed out the FDA-approved labeling for the product specifically contraindicates its use where an eye infection is present.

It turns out that the issue of the antibiotic status of cyclosporine was itself a prior controversy at the FDA earlier in connection with the drug applications of its innovator, Sandoz Pharmaceuticals, for approval of its Sandimmune® drug product. This product, developed and indicated to suppress organ rejection in transplant patients, was approved by the FDA in 1983 and classified as an antibiotic under section 507. Follow-on applications using the same active ingredient were approved as nonantibiotics in 1994, but then were reversed and reclassified as antibiotics. Sandoz strongly objected to the reclassification, and in fact, the record shows that the decision was itself highly controversial within the FDA. As the court noted, the record showed that "many members in Pilot Drug [FDA] did not agree nor understand why Sandimmune is classified [as] an antibiotic." The company pointed to the statutory language for antibiotics and argued in effect that mere antibiotic activity in vitro, which did not correlate with antibiotic activity in vivo except at unsafely high concentrations, did not cause the product to be classified as an antibiotic given that such antibiotic activity was not relevant to its therapeutic use in humans notwithstanding the existence of such activity.

The FDA effectively agreed with Sandoz, but nevertheless held to its position on narrower grounds. Noting that it agreed that "no credible evidence or rationale was identified that would support the conclusion that cyclosporine has any clinically relevant antibacterial activity," the FDA nevertheless found that "cyclosporine has been shown to possess antifungal activity against 2 relevant human pathogens" in in vitro and animal studies and therefore should remain classified as an antibiotic drug. The FDA applied this antibiotic classification to three approved NDAs and two pending NDAs of Sandoz in 1995.

Allergan cited this and subsequent similar FDA controversies in its attempt to classify its product as a nonantibiotic. At bottom, Allergan argued that its drug was approved for no antibiotic indications and that the FDA as a matter of statutory interpretation should have construed the term "antibiotic drug" in section 125(d) (2) of FDAMA "to mean antibiotic drug product rather than antibiotic active moiety." The former, "product," was dependent on the product as a whole in the context of its indication, whereas the latter, "moiety," related solely to the active drug substance in any of its forms and indications. The FDA determined that the statutory definition related to the drug substance "the definition does not reference a particular quantity of the drug substance, nor a particular indication." Reviewing the scientific study, the FDA noted that cyclosporine in fact has antimicrobial activity against two fungal pathogens at concentrations that are found in plasma following administration of the drug to patients at its recommended doses. Accordingly, it was properly classified as an antibiotic.

The court, noting the plausibility of Allergan's view of the law, nevertheless found that the FDA's action was more consistent with the language of FDAMA. The statute, the court noted, defined "antibiotic" as "any other drug intended for

human use containing any quantity of any chemical substance which is produced by a microorganism and which has the capacity to inhibit or destroy microorganisms in dilute solution. . ." 21 USC section 321(jj). Thus, the court found that the language was quite explicit in including in the definition any ingredient in any quantity that destroys microorganisms in dilute solution. Its "intended use" under the statutory language referred, the court held, merely to the fact that it is intended for use in humans, not necessarily for "antimicrobial" use per se, as Allergan argued. Under these criteria, the court found that cyclosporine was clearly included in the class of products defined by the statute as "antibiotic."

Turning to the term "dilute solution," Allergan argued that it clearly referred to the use of the drug and its activity at the levels found in its own product, Restasis, rather than its concentration in the predecessor product, Sandimmune, where it was present in far higher concentrations. The court, adopting the view of the FDA, rejected this contention, by noting that the statutory language did not define "dilute solution" further, and consequently, did not determine what evidence the FDA should consider in determining the antimicrobial character of the ingredient. That it was antimicrobial in concentrations found in Sandimmune, therefore, settled the matter notwithstanding that the amounts in Restasis were not antimicrobial. In other words, its approval at the higher dose in Sandimmune rendered the ingredient an antibiotic, irrespective of the fact that Restasis itself was not antibiotic in effect. At bottom, the FDA's scientific expertise was given great—and decided—deference by the court.

As this case shows, the stakes involved in the classification of a product as antibiotic are quite high, and, as it turns out, a definition believed long-settled has again, in light of the intense economic consequences, come up for renewed debate. The court's decision, however, in so firmly supporting the FDA's scientific expertise and granting it the deference intended by Congress, has in all likelihood settled this issue—at least until another economically weighty set of facts presents yet another angle for intellectual attack.

## CONCLUSION

The history and development of antibiotic regulation represents a process of increasing evolution of a particular legislative scheme that had, over time, increasingly outstripped the historical circumstances and needs that were its provenance. Revised by the FDA to take account both of changing scientific standards and regulatory and marketplace realities, the scheme was finally abandoned entirely by the Congress and folded into the standard drug regulations, thereby putting an end to its unique approval mechanism and separate status.

## REFERENCES

1. FDCA §507(a), 21 USC 357(a).
2. Pub. L. No. 77–366, 55 Stat 851 (1941); Pub. L. No. 79–139, 59 Stat 463 (1945); codified at 21 USC §356.
3. FDCA §507(a), 21 USC 357.
4. John D. Harrision. Antibiotic Application Requirements. Clin Res Practices & Drug Reg Affairs 1986; 4(4);265, 267.

5.  *Id. at 267.*
6.  21 USC §357(a).
7.  Harrison. *Id. at 267.*
8.  See FDA Proposal, 47FR 19957. May 5, 1982; see also former 21 CFR 314.50, 314.55.
9.  Harrison. *Id. at 269.*
10. *Id.*
11. FDA Order, 47 FR 39155. September 7, 1982.
12. See *Barr Laboratories, Inc. v. Harris*, 482 F. Supp. 1183 (DDC 1980).
13. See *Pfizer, Inc. v. Richardson*, 434 F2 d 536 (2 d Cir 1970).
14. See In the Matter of Antibiotic Antifungal Drugs (FDA 1988). 1988–1989n FDC LRept
    Dev Trans Bind at 38070.
15. 21 CFR 433.1(a) (repealed).
16. See former 21 CFR 314.
17. See former 21 CFR 314.70.
18. 63 FR 26066.
19. 64 FR 396, 64 FR 26657 (May 17, 1999).
20. 21 CFR parts 430–460
21. Marketing Exclusivity and Patent Provisions for Certain Antibiotic Drugs. 65 FR 3623
    (Jan. 24, 2000).
22. 65 FR 3623 (Jan. 24, 2000).
23. *Id. at 3624.*
24. *Id.*
25. *Id.*
26. 65 FR at 3625.
27. Guidance for Industry and Reviewers: Repeal of Section 507 of the Federal Food, Drug
    and Cosmetic Act. FDA Center for Drug Evaluation and Research ("CDER"). May 1998.
28. Section 201(jj) of the FDCA.
29. Guidance for Industry: Drug Master Files for Bulk Antibiotic Drug Substances.FDA Cen-
    ter for Drug Evaluation and Research ("CDER"). November, 1999.
30. Civil Action No. 03–2236 (RMC). U.S. District Court. District of Columbia. (Jan. 19, 2005).



# 7 Generic Drugs in a Changing Intellectual Property Landscape

Neil F. Greenblum, Esq., Michael J. Fink, Esq.,
Stephen M. Roylance, Esq., P. Branko Pejic, Esq.,
Sean Myers-Payne, Esq., and Paul A. Braier, Esq.

*Greenblum & Bernstein, P.L.C., Reston, Virginia, U.S.A.*

## INTRODUCTION

In almost any industry in the United States, there is no built-in mechanism for detecting patent infringement. Therefore, the typical patent owner would normally be blissfully unaware of any possible infringers unless he or she monitors the marketplace, or unless an allegedly infringing product or process happens by chance to be brought to the patent owner's attention. Nearly always, this will happen only after the alleged infringer is already on the market.

As for the alleged infringer, he or she is under no obligation to search for patents, or to study any allegedly blocking patents (although this would sometimes be advisable). Further, an alleged infringer is under no obligation to bring any finding to the attention of the patent owner.

Due to the highly regulated nature of the drug industry in the United States, however, there is an interplay between patents and drug regulation that is unique among all industries—an interplay that is actually designed to encourage patent litigation and bring generic products to market prior to patent expiration. Details of this interplay are presented in chapter 4, and will not be elaborated upon here. Because of this interplay, however, it is critical for members of the pharmaceutical industry, both branded and generic, to have an understanding of patents and issues that can arise during patent litigation.

This chapter will present an overview of U.S. patent law, and on how patents, litigation, and administrative procedures are strategically employed in the pharmaceutical industry. The section "Life-Cycle Strategies for Branded Products" of this chapter addresses several common strategies—commonly referred to as evergreening—used by the branded pharmaceutical industry to delay generic entry, and to lengthen brand product exclusivity in the market. The section "Current Issues of Importance to the Generic Industry" of this chapter addresses issues commonly raised in patent litigation, including validity, infringement, and enforceability. This section also addresses preliminary injunctions, an issue that is often not sufficiently addressed in Hatch–Waxman litigation. The section "FTC Scrutiny of Agreements with Generics" of this chapter addresses the heightened scrutiny by the Department of Justice and the Federal Trade Commission (FTC) given to agreements between brand companies and generics. Conclusions are presented in the last section of this chapter.

## LIFE-CYCLE STRATEGIES FOR BRANDED PRODUCTS

### Patent Strategies

*Introduction*

While the laws and rules that pertain to obtaining a pharmaceutical patent in the United States are the same as for other technologies, many of the underlying strategies will differ considerably. For example, because a pharmaceutical product's entry into the U.S. market is dictated, and in some instances slowed, by the Food and Drug Administration (FDA), managing the timing of patent application filing is particularly important. For this reason as well, multifaceted strategies to maximize the term of the patent are often employed. Still further, understanding who the target potential infringer is, be it an innovator or generic company, is also critical to obtaining a useful patent. These issues and others are presented in the following discussion.

*Initial Filing Strategy*

The term of a U.S. patent is 20 years from the effective U.S. filing date (1). Thus, for a U.S. utility application having no priority claim, the effective U.S. filing date is the date on which the application is filed in the U.S. Patent and Trademark Office (PTO) and granted a filing date (2). For a U.S. utility application that claims priority to an earlier filed U.S. utility application, the effective filing date is the filing date of the earlier filed U.S. application to which priority is claimed; if there are multiple priority claims, the filing date is the earliest filing date of the applications to which priority is claimed (3). Patent Cooperation Treaty (PCT) international applications have an effective U.S. filing date that is the date the PCT international application is filed (35 USC §365), but if priority of such PCT application is claimed to an earlier filed U.S. application, then the aforementioned rules apply. Finally, U.S. utility applications that claim priority to U.S. provisional applications or foreign applications have as their effective filing date the date of filing the U.S. utility application in the United States (4).

Under most circumstances, the effective U.S. filing date for calculating a patent term is also the U.S. filing date for purposes of considering novelty-defeating art (5). This is not true, however, for applications that claim priority to U.S. provisional applications—in those instances, the effective date for considering novelty-defeating provisions [35 USC §102(b)] is the provisional application filing date (6). Thus, the provisional application provides advantages that are not afforded by foreign priority applications (7).

It is important to keep in mind that priority claims, particularly to U.S. provisional or foreign applications, only serve their intended purpose if the priority application fully describes the invention that is ultimately claimed. In the United States, the priority application will entitle the applicant to its filing date only if it fully supports, as required by 35 USC §112, the invention claimed in the later filed U.S. utility application (8). There is, therefore, little to be gained from filing an ill-conceived or rushed priority application, as such applications often partially, or completely, fail to support the invention that is later claimed.

Other strategic concerns, such as publication of the inventive concept, should be considered. For example, it often serves a business interest on the part of the inventor or the assignee of a patent application to publish a description of the invention in a journal article or similar publication. Such publication will not

necessarily bar patentability in the United States if a U.S. provisional or nonprovisional application fully disclosing the invention is filed within 1 year of the publication date of the description of the invention (9). For purposes of determining what date to "docket" for calculating the 1-year anniversary, it is important to consider that many journals electronically prepublish online prior to an actual publication date, and to plan accordingly.

Because a U.S. nonprovisional application will automatically be published, the prior art effect of the application itself should also be considered (10). However, a U.S. application can be filed, under limited circumstances, with a request for nonpublication, which allows the patent applicant to maintain the inventive concept in relative secrecy during the prosecution of the patent (11). If the patent applicant chooses to foreign file the application, perhaps via a PCT application, a request for nonpublication in the United States, cannot be made (or if it has already been made, the applicant must inform the U.S. PTO) (12).

A PCT application, on the other hand, allows applicants to file an application in a language other than English to delay the prior art effect of that application as a pending U.S. application (13). The PCT process also provides to patent applicants the results of an earlier prior art search than would be obtained by filing first in the United States, which allows for the possibility of a more streamlined examination when ultimately entering the United States (14).

Of course, application-filing strategy must be considered in light of the overall patent strategy. For patent applications filed early in the life of a product line, such as those directed to the active ingredient or for a composition, patent term can be critical. Patents that are prosecuted to complement existing patents, however, are often prosecuted with an eye toward rapid issuance, and priority claims may not be favored. Ultimately, a carefully conceived plan for developing an entire portfolio will yield the best results.

### Patent Drafting Strategy

As with application filing strategy, strategy for preparing a patent application requires careful consideration of the strategic purpose of the patent. For example, is the patent intended to protect the invention from infringement by innovator companies, which might produce an analogous product with a different active ingredient, or is it intended to stop the generic company, which will produce a bioequivalent product using the same active ingredient? The former requires a patent strategy that will support broad generic claims, while the latter allows for prosecution of claims narrowly tailored to cover only the marketed product. A failure to carefully consider these issues before drafting and filing a patent application can result either in a significant waste of money or in a worthless patent.

Patent strategies aimed at stopping innovator companies can often be made without consideration of the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (*Orange Book–*) listing strategies. That is, innovator competitors will often enter the market by way of a new drug application process that requires no notice to existing market players. Lawsuits resulting from such market entries occur after entry into the market has already begun, and patents asserted in such lawsuits need not be listed in the *Orange Book*.

Patent strategies aimed at stopping other innovator companies that often focus on obtaining broad generic claims to classes of compounds. While the PTO will grant such patents, they are more difficult to obtain. A patent applicant is

entitled to claim that which he has set forth in a manner that demonstrates that he had possession of the claimed invention (35 USC §112, first paragraph, written description), and which he teaches how to make and use (35 USC §112, first paragraph, enablement) (15). Obviously, it is more difficult to demonstrate possession of and to teach how to make and use an entire class of compounds than it is for a single compound. Additionally, even if the production of all of the compounds in a class has been sufficiently described, there is no guarantee that the bioactivity of those compounds will all be the same. While there is no formal requirement, the PTO is increasingly requiring some demonstration of actual possession of the claimed invention, and this adds very significantly to the cost in generating data sufficient to support generic claims.

Because of their generic, and upstream, nature, logic suggests that patents directed to generic processes for making or discovering new drug products, or to precursor compounds used in the production of, a drug product could be quite powerful. However, patents directed to processes for making drug products cannot be listed in the *Orange Book*, which generally renders these patents useful only outside an abbreviated new drug applications (ANDA) context (16). Additionally, the Supreme Court decision in *Merck v. Integra* raised serious questions about the usefulness of patents directed to discovering new drug products, in any context (17).

While patents for stopping innovator companies can be drafted without regard to the FDA-approved product (i.e., the "reference listed drug"), patents for stopping generic companies often cannot. Patents for hindering generic competitors, in most instances, are drafted with the goal of listing the patent in the *Orange Book*. In order to list the patent in the *Orange Book*, at least one claim of the patent must "cover" the *Orange Book* reference listed drug product (18). A patent with claims that cannot be listed in the *Orange Book* may only have value in lawsuits outside the context of ANDA filings, which considerably lessens its value.

Although patents listed in the *Orange Book* must include at least one claim that covers the product, many different types of claims can achieve that purpose. Claims directed to a particular active ingredient, salts, polymorphs, formulations, the active ingredient in combination with other drugs, methods of using the active ingredient, and devices including the active ingredient, can all be listed in the *Orange Book* (19). As noted earlier, patents including only claims for processes, or methods, for making a reference listed drug product cannot be listed in the *Orange Book*, but products made by certain processes (i.e., "product by process" claims) can be listed in the *Orange Book* (20). Thus, where possible, never prosecute a pharmaceutical application with claims limited to methods of making, and always try to include "product by process" claims along with method of making claims.

While claims to a generic class will certainly be more effective in stopping the innovator company, a far narrower claim scope can still effectively stop the generic competitor. That is, because an ANDA can only be filed for the "same" drug [21 USC §355(j)], patent claims that are limited to a specific drug are still quite valuable. Indeed, because ANDA applicants must produce the same active ingredient, arguments for noninfringement of a patent to an active ingredient can seldom be made, and ANDA applicants most often simply wait until the expiration of the "basic compound patent."

Additionally, because an ANDA applicant must demonstrate that its product is bioequivalent to the reference listed product [21 USC §355(j)], patent claims that

cover a range of bioequivalence are quite valuable as well. This regulatory requirement for bioequivalence has led innovators to seek patent protection for in vitro dissolution profiles and for in vivo drug plasma levels for their drug products, both of which can be used to demonstrate bioequivalence (*Orange Book* at xii 27th ed. 2007). Patents having claims to both in vitro dissolution profiles and in vivo drug plasma levels are very difficult to avoid infringing by ANDA applicants, and thus, those patents are often challenged on validity grounds. Such challenges are often less than clean cut.

Patents having claims directed to new uses of *Orange Book*–listed products are of more limited value. While such patents can be listed for a product in the *Orange Book* if the claimed use is approved by the FDA (21 CFR §314.53), ANDA applicants can avoid certifying with regard to these patents by simply stating to the FDA that they do not seek approval for that approved use (21). This process, often called a "little eight" certification, renders such late-listed method of use patents of only marginal value.

In conclusion, in drafting and filing a pharmaceutical patent application, it is critical to understand not only the basic invention, but how the patent will be used in the market. A failure to appreciate the business strategy can result in a significant waste in resources.

### Patent Prosecution Strategy—Continuing Prosecution

Patent applicants must continue to be mindful of the overall patent strategy throughout prosecution as well. There are numerous pitfalls and traps for the unwary, and strategies that may be beneficial for one market strategy may be useless for others.

For example, for the reasons noted earlier, patent claims directed to methods of making, or to methods of using a drug product, may be of limited value. As the PTO will often restrict claims directed to a basic compound into one application, claims to methods of making into another application, and methods of using into a third application, the potential usefulness of these applications must be evaluated prior to proceeding in their prosecution. However, where the claimed use is the sole approved indication, prosecution of the method of use claims may be the most expedient way to obtain an *Orange Book* listable patent.

Continuation patent applications are frequently used, with considerable success, to develop a significant patent portfolio based on an original well-written patent application. It is often advisable to file a continuation application, where the claims already obtained are of more limited scope or usefulness, or where they exclude certain desired embodiments. It is also frequently advisable to maintain pendency of a family of applications that are deemed by the applicant to be of high value in protecting a product line. However, patent applicants should understand that the longer a patent application remains pending, the greater the opportunity for critical issues to be identified by the PTO. This can be troublesome when litigation on the basic patent is concurrently ongoing. Thus, embarking on a continuation application filing strategy must be made in view of a cost-to-benefit consideration.

Continuation-in-part (CIP) applications (having some "old" and some "new" matter) are viewed by some inexperienced practitioners as a means for supplementing the disclosure of a sparse patent application, or of adding new embodiments discovered after an original filing date. However, such CIP applications should only be

filed after a very careful consideration, and complete understanding, of the implications and ramifications of such filings. For example, claims in CIP applications are only entitled to the filing dates of earlier filed applications to the extent that they are *completely* supported by those earlier applications—if even a small portion of a claim is supported only by the new matter, that claim is only entitled to the filing date of the new application (22). Moreover, a CIP's term is 20 years from the filing date of the earliest application to which priority is claimed. These often-misunderstood facts result in the filing and prosecution of many patent applications of marginal value.

### Patent Prosecution Strategy—Maximizing and Enhancing Term

To avoid unnecessary costs in the form of extension-of-time fees, it behooves patent applicants in all technology areas to prosecute their patent applications diligently. Additionally, based upon "guarantees" made by the PTO to diligently examine patent applications, the PTO provides for positive patent term adjustments if it fails to diligently examine a patent application. However, the positive adjustments can be offset by an applicants' failure to diligently prosecute the application.

Basically, the PTO provides for a single day of positive patent term adjustment for each day of delay beyond: (*i*) 14 months from filing (a U.S. utility application or national stage of a PCT application) to a first office action on the merits, (*ii*) 4 months for responding to an applicant's reply to an office action or appeal brief, (*iii*) 4 months for acting on a favorable appeal from the Board of Patent Appeals or Court of Appeals for the Federal Circuit, and (*iv*) 4 months to issue a patent after applicant pays the issue fee (23). Additionally, the PTO further provides 1 day of patent term adjustment for each day of pendency beyond 3 years of total pendency, not including the above-noted specific guarantees (24).

But, filing a continuation application will erase any positive adjustment accumulated in a parent application—that is, the accumulated term adjustment will not carry forward (25). Furthermore, positive adjustments will be offset by an applicant's failure to engage in reasonable efforts to prosecute the application, as demonstrated by a failure to respond to any office action within 3 months (26). The PTO will also reduce the positive adjustment if an applicant files an amendment, such as a preliminary amendment, that necessitates a supplemental action by an examiner, or by submitting a nonresponsive or supplemental reply (27). In order to maximize patent term, it is important to understand what actions during prosecution may result in a modification of the term of the patent.

Even after patent issuance, some strategies still exist for obtaining a longer effective patent term. Enacted as a component of the Hatch–Waxman Act, 35 USC §156 provides for patent term extensions for some products in certain situations. This was intended to enable the owners of patents on certain human drugs, food or color additives, medical devices, animal drugs, and veterinary biological products to restore to the terms of their patents some of the time lost while awaiting approval from the FDA (28). Briefly, the extension is available to obtain up to five additional years, provided the enforceable term will not be greater than 14 years from the first FDA approval of the product (even if it has multiple indications) (29). The extension is also only available for one patent, even if multiple patents cover a product (30). The application for extension must be filed by the patentee, with the PTO, within 60 days (not 2 months) from FDA approval of the product; the FDA determines the length of the regulatory approval process; and the PTO determines

applicant's eligibility, the length of the extension, and issues a certificate for the extension (31).

## Citizen Petitions

On September 27, 2007, the President signed H R 3580, the FDA Amendments Act of 2007 (the Act), which reauthorizes a number of Food and Drug programs including the Prescription Drug User Fee Act (PDUFA) and Medical Device User Fee Act (MDUFA); extends and modifies authorities related to pediatric uses of drugs and medical devices; and expands current authority related to postmarketing surveillance of drugs. As is relevant to this section, the act amended the Federal Food, Drug, and Cosmetic Act (FFDCA) to curb abuses of the citizens petition process, and applies to both ANDAs and new drug approval applications submitted pursuant to section 505(b)(2).

The acts require that a party submitting a citizens petition must provide a certification and verification that the citizens petition is being submitted in good faith and not for the purposes of delaying approval of a pending drug application, and authorizes the FDA to deny a citizens petition if the FDA determines, at any time, that the petition was submitted for purposes of delaying a pending drug application. The act also prohibits the FDA from delaying the approval process, while considering the citizens petition, unless the FDA make a finding that the petition raises issues such that delay is necessary "to protect the public health." The act, however, sets a 180-day limit, which cannot be extended, to take action on a citizens petition.

As early as 2000, the FTC had recognized that, due in part to the unique nature of pharmaceuticals regulation and legislation, citizens petitions were ripe for abuse. Specifically, the FTC noted that:

> Citizen petitions often raise legitimate issues concerning matters before the FDA, and issues raised in citizen petitions have played useful roles in ensuring the safety of various drug products. The FTC staff comment cautioned, however, that regulatory processes can provide an opportunity for anticompetitive abuses, and offered suggestions the FDA may wish to consider to discourage such abuse.

> The staff comment noted that, in an industry where entry is regulated, such as those regulated by the FDA (e.g., medical devices, pharmaceuticals, etc.), "to delay competition may be a lucrative strategy for an incumbent," through "improper petitioning." The FTC staff said that its own observation of the pharmaceutical industry shows that existing product holders have an incentive to block generic entrants and may do so by raising concerns about a potential generic entrant's drug application before the FDA. "A competitor may raise these concerns itself or have them raised by independent parties (either individuals or groups) by providing consideration to file a citizen petition raising the issues, so as to disguise the anticompetitive intent behind the petitioning. The effect of such a petition," the staff said, "could be to delay FDA approval of a rival drug application, even if the petition is not ultimately upheld." (32)

The passage of time confirmed the FTC's concerns about the potential for citizens petition abuses, which is illustrated by Gary Buehler's testimony before congress in 2006.

> A high percentage of the petitions OGD reviews are denied. An analysis of petitions answered between calendar years 2001 and 2005, raising issues about

*Greenblum et al.*

the approvability of generic products (42 total responses), showed that FDA denied 33, denied three in part, and granted six. It should be noted that when petitions are granted, wholly or in part, it is often because FDA already has the proposed scientific or legal standard in place or is already planning to take the action that the petition requests. While the citizen petition process is a valuable mechanism for the Agency to receive information from the public, it is noteworthy that very few of these petitions on generic drug matters have presented data or analysis that significantly altered FDA's policies. Of the 42 citizen petition responses examined, only three petitions led to a change in Agency policy on the basis of data or information submitted in the petition.

(Statement of Gary Buehler, R.Ph, Director of the Office of Generic Drugs, Center for Drug Evaluation and Research, FDA before U.S. Senate Special Committee on Aging on July 20, 2006). It is against the backdrop of these potential abuses that the act was signed into law.

With respect to the act, it amended section 505 of the FFDCA by adding a new subsection limiting the use of the citizen petition process to delay approval of generic drug applications (33). The amendments apply to both ANDAs submitted pursuant to section 505(j) of the FFDCA and new drug approval applications submitted pursuant to section 505(b)(2) (34).

The amendments require that a party submitting a citizens petition (or any supplement, comment or response thereto) must submit certifications and verifications, with the petition, establishing that it is being submitted in good faith (35). Specifically, the petitioner must provide written certification stating that:

> I certify that, to my best knowledge and belief: (a) this petition includes all information and views upon which the petition relies; (b) this petition includes representative data and/or information known to the petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure that any representative data and/or information which are unfavorable to the petition were disclosed to me. I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date: _____ If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: _____ I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition (36).

The certification must also contain the date on which such information first became known to such party and the names of such persons or organizations inserted in the first and second blank space, respectively (37). The petitioner must also submit a verification stating that:

> The Secretary shall not accept for review any supplemental information or comments on a petition unless the party submitting such information or comments does so in written form and the subject document is signed and contains the following verification: "I certify that, to my best knowledge and belief: (a) I have not intentionally delayed submission of this document or its contents; and (b) the information upon which I have based the action requested herein first became known to me on or about _____ If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: _____ I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition." (38)

As with the certification, the verification must contain the date on which such information first became known to the party and the names of such persons or organizations inserted in the first and second blank space, respectively (39).

Absent such certifications and verifications, the FDA is prohibited from accepting a citizens petition. If at any time, the FDA determines that any citizens petition or related submission is being made to delay approval; of an ANDA or section 505(b)(2) application, the FDA may deny the citizens petition (40). The FDA may also deny a citizens petition which it determines on its face does not raise valid scientific or regulatory issues (41).

Upon receiving a properly certified and verified citizens petition, the FDA is prohibited from delaying approval of a pending ANDA or 505(b)(2) application as a result of any request to take action relating to the application either before or during consideration of the request. The amendment establishes the general presumption that a citizens petition should not delay FDA's review of that pending application (42). This presumption, however, may be overcome, and the FDA may delay approval of a pending application, upon a showing that:

1. The request is a written citizen petition submitted pursuant to 21 CFR §10.30 or is a petition seeking an administrative stay of action, and
2. The FDA determines that a delay is necessary "to protect the public health."

The act does not set specific time limits within which the FDA is required to review a citizens petition to make the "public health" determination (43). But, upon making such a determination, the FDA must delay the review of the ANDA or 505(b)(2) application to protect the public health, and the FDA is required to notify the applicant of the delay within 30 days (44). This action is considered to be part of the application itself and is subject to the same confidentiality and disclosure requirements as a pending application (45). In making such a notification, the FDA must provide the following information:

- The fact that the FDA has determined a delay in the application review is necessary to protect the public health as a result of either a citizen petition or a petition for an administrative stay of action.
- Any clarification or additional data the applicant should submit to the docket on the petition to permit FDA to review the petition promptly.
- A brief summary of the specific substantive issues raised in the petition which form the basis of FDA's determination that the delay is necessary to protect the public health (46).

The act also authorizes FDA to issue guidance identifying the factors that it will use to determine when a petition is submitted for the primary purpose of delay. The new subsection further requires that the FDA must take action on a petition within 180 days after submission (47). This 180-day limit may not be extended for any reason, including FDA's determination it is necessary to delay review of the application to protect the public health (48). The act provides that civil action can be brought against the agency for an issue raised in the petition only after the FDA has taken final action (49). Final agency action is defined to include a final decision within the meaning of 21 CFR §10.45(d) or expiration of the 180-day period without a final FDA decision (50).

In addition, prior to the act, a generic first filer could forfeit its 180-day exclusivity by failure to obtain tentative approval (FOTA) within 30 months from when

the ANDA was filed. This was problematic when a delay in approval was caused by a citizen petition. As amended by the act, if any citizen petition delays approval of an ANDA, then the 30-month FOTA period for determining forfeiture (unrelated to the 30-month stay of approval) is extended by the amount of time the citizen petition was pending before the FDA (51). The extension of the 30-month FOTA period is granted regardless of whether the citizen petition is ultimately granted or denied (52). This provision helps to protect a first filer from FOTA forfeiture where a delay in approval is caused by a citizen petition.

## CURRENT ISSUES OF IMPORTANCE TO THE GENERIC INDUSTRY

### Patent Validity Issues

As part of the approval process, an ANDA applicant must make a certification addressing each patent listed in the *Orange Book* that claims the drug (53). The ANDA applicant must certify that (I) no such patent information has been submitted to the FDA; (II) the patent has expired; (III) the patent is set to expire on a certain date; or (IV) the patent is invalid or will not be infringed by the manufacture, use, or sale of the new generic drug for which the ANDA is submitted (54). These are commonly referred to as paragraph I, II, III, and IV certifications.

When an ANDA contains a paragraph IV certification, the ANDA applicant must give notice to the patentee and the NDA holder and provide a detailed basis for its belief that the patent is not infringed, invalid, or unenforceable (55). Further, in order to obtain the 180-day exclusivity afforded by the Hatch–Waxman Amendments, the ANDA applicant generally must prevail on these issues in court.

Accordingly, it is essential that a successful generic competitor have a working understanding of patent validity, unenforceability, and infringement concepts. These concepts are discussed later.

### Validity in General

Proving that a patent is invalid (or even unenforceable) is a very difficult challenge. Patent claims are presumed to be valid (56). This presumption can be overcome only by clear and convincing evidence (57).

In order for a court to uphold the validity of a patent claim, the claim must meet the statutory requirements of Title 35 of the United States Code. A patent claim may be held invalid in litigation if the claimed invention fails to satisfy the novelty and/or nonobvious subject matter conditions for patentability set forth in the patent laws, namely 35 USC §§102 and 103 or if it fails to satisfy the requirements of adequacy of description, "enablement," "best mode," or "definiteness" of 35 USC §112.

### Patent Claims Are Not Valid If They Are Anticipated Or Obvious

One of the first steps in evaluating a potential generic drug project should be an extensive investigation and review of the development of the technology, which is the context of the particular drug in question. As a first step, a comprehensive prior art "search" should be conducted (as well as a complete investigation of potential "prior art" activities, such as public disclosure, public uses, and the general context of the development of the drug). The goal is to uncover prior art which would potentially render the relevant patent(s) invalid and/or unenforceable by reason,

among other things, of "anticipation" or "obviousness." Both of these concepts are, necessarily, legalistic, and are discussed in detail later. Additionally, the patent itself and its history should be thoroughly studied to determine compliance with other requirements, also discussed later.

### Anticipation

Anticipation under 35 USC §102 requires the disclosure in a single piece of prior art (this can be a "publication" or an "event") of each and every limitation of a claimed invention (58). If the prior art does not anticipate (exactly disclose) the claimed invention, in a single reference, the question of whether the prior art renders the claimed invention obviously remains. "Obviousness" is discussed in more detail later.

### Obviousness

The determination of obviousness under §103 is a question of law (59). Specifically, §103 provides, in pertinent part, that:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in §102 of this Title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The language of §103 requires that the evaluation of obviousness be from the perspective of a *hypothetical* person "of ordinary skill in the art at the time that the invention was made" (60). The proper approach to making a determination of obviousness was first described by the Supreme Court in *Graham v. John Deere Co* (61). Specifically, it was stated that: Under §103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art is to be resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined (62).

Other evidence of nonobviousness such as long-felt but unsolved need, commercial success, failure of others, copying, and unexpected results must also be considered in a determination of obviousness (63).

The Supreme Court has recently elaborated on this approach (64). An obviousness analysis requires "an expansive and flexible approach" with "a broad inquiry [that] invites courts, where appropriate, to look at any secondary considerations that would prove instructive" (65). "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results" (66). "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed" (67). For example, obviousness may be proved by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims (obvious to try). Specifically, "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her

technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense" (68).

### Patent Claims Must Also Satisfy the Requirements of 35 USC §112

35 USC §112, first and second paragraphs, sets forth essentially three requirements for a patent: (*i*) the "written description" and "enablement" requirements, (*ii*) the "best mode" requirement, and (*iii*) the requirement of distinct claiming.

### The Written Description Requirement

What is recited in the claims of a patent must be supported by a "written description" thereof in the specification. To fulfill the written description requirement, a patent specification must describe the invention and do so in sufficient detail that one skilled in the art can clearly conclude that "the inventor invented the claimed invention" (69).

### Enablement

35 USC §112, first paragraph, requires the patent specification to have an enabling disclosure. Specifically, §112, first paragraph, provides in pertinent part that:

> The specification shall contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same....

The specification need only be enabling to a person "skilled in the art to which it pertains, or with which it is most nearly connected" (70). In determining whether a patent has an adequate disclosure, it is necessary to bear in mind that "[p]atents are written for those skilled in the relevant art, and thus, an applicant need to not divulge every piece of information which a lay person would need to operate the invention most effectively" (71). The Federal Circuit has recently determined that the issue of whether a claimed invention is enabled by the specification is a matter of law (72).

In determining whether a disclosure is adequate under 35 USC §112 the question is "whether the disclosure is sufficiently definite to guide those skilled in the art to its successful application ... some experimentation, provided it is not an undue amount, is permissible. However, nothing must be left to speculation or doubt" (73). The specification must provide more than "an invitation to experiment in order to determine *how* to make use of [the inventor's] alleged discovery ... the law requires that the disclosure in the application shall *inform* them *how* to use, not how to find out how to use for themselves" (74).

### Best Mode

35 USC §112 requires that the patent applicant set forth the best mode of practicing the invention known to the applicant at the time the application for patent is filed. A best mode analysis has two components: the first inquiry focuses on whether the inventor knew of a mode of practicing his invention at the time he filed his patent application which he considered to be better than any other. If he did have a best mode, the next question is whether the inventor disclosed it and did so adequately to enable one of ordinary skill in the art to practice the best mode (75).

### Distinct Claiming

35 USC §112, second paragraph, states that:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Under this statute, the general requirement is that the claims, read in light of the specification, reasonably apprise those skilled in the art of the scope of the invention (76). A decision as to whether a claim is invalid under the second paragraph of §112 requires a determination whether those skilled in the art would understand what is claimed (77).

### "Double Patenting" Is Prohibited

An inventor is only entitled to a single patent for a patentable invention. This is reflected in 35 USC §101 which states that:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain *a patent* therefore. . . .

This prohibition is referred to as "statutory double patenting." In addition to statutory double patenting, the doctrine of "judicially created" or nonstatutory double patenting has been propounded. "[N]on-statutory, or 'obviousness-type,' double patenting is a judicially created doctrine adopted to prevent claims in separate applications or patents that do not recite the 'same' invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection" (78).

### The True Inventors Must Be Named

A patent is invalid if more or fewer than the true inventors are named (79). Because a patent is presumed valid under 35 USC §282, there follows a presumption that the named inventors on a patent are the true and only inventors (80).

When two or more persons jointly invent, they must jointly apply for a patent (81). Coinventors must so apply "even though . . . they did not physically work together or at the same time, . . . each did not make the same type or amount of contribution, or . . . each did not make a contribution to the subject matter of every claim of the patent" (82). Because conception is the touchstone of inventorship, each "joint inventor must contribute in some significant manner to the conception of the invention" (83). "Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice" (84). "An inventor may solicit the assistance of others when perfecting the invention without 'losing' any patent rights" (85).

Because coinventors need not contribute to the subject matter of every claim of the patent, inventorship is determined on a claim-by-claim basis (86).

### Practical Application

As a practical matter, an initial goal is often to locate and identify "anticipatory" prior art, as defined earlier. However, such a "smoking gun" is rare, and so resort must be had to other prior art, or other attacks on validity, also outlined earlier.

Thus, it is often necessary to acquire and piece together a mosaic of information which tells the whole story of the context and development of the drug, as well as activities "behind the scenes," which could give rise to meaningful, credible attacks on the patent.

Thus, in the context of the true facts surrounding the development of the drug, the alleged "invention" may be merely an obvious combination of old elements. Or the invention may have been the next (and obvious) progression of ideas which have long existed.

In conducting such an investigation, care should be taken to keep all of the foregoing requirements in mind. Thus, an inventor's (or company's) own patents and publications can be "prior art" with respect to the patent in question. And the award of more than one patent to a particular inventor or company may also give rise to prohibited "double patenting" (discussed earlier), thus invalidating the patent on those grounds.

Other bases for proving invalidity and/or unenforceability, such as failure to comply with the "best mode" requirement, inequitable conduct ("fraud") and inventorship issues are often only developed as a result of the "discovery" process which takes place after litigation has started.

### Patent Infringement Issues

In view of requirement that a "paragraph IV" ANDA applicant make the certification discussed earlier (and eventually obtain a judgment of noninfringement and the award of 180-day market exclusivity), it is also essential that a successful generic competitor have a working understanding of patent infringement concepts. These concepts are discussed later.

#### General Infringement Concepts

Patent infringement involves the violation of the rights of the owner (or licensee) of the patent. Ownership of a patent confers the right to exclude others from making, using, selling, or offering for sale the invention within the United States, or importing the invention into the United States (87). Infringement of a patent is the unauthorized use of a patent owner's exclusive rights as defined by the claims of the patent (88). Thus, acts such as the unauthorized making, using, or selling of the claimed invention, or importing or offering the claimed invention for sale, can constitute infringement.

The claims are the specific part of the patent (found at that portion of the patent with the heading "Claims" or "What is claimed is") that define the patent grant and set its boundaries, that is, they establish the patentee's legal rights (89).

Thus, claims must be construed or interpreted to ascertain what they cover.

#### Construction of Claims

In determining the meaning and scope of the claims, it is first necessary to analyze the relationship of the claims to the specification and prosecution history of the subject patent (90).

In construing a claim, claim terms are given in their ordinary and accustomed meaning, unless examination of the specification, prosecution history, and other claims indicate that the inventor intended otherwise (91). The best source for interpreting a technical term used in a claim is the specification from which it arose and guided, as needed, by the prosecution history (92). The evolution of restrictions in

the claims, during the course of examination in the PTO, reveals how those closest to the patenting process—the inventor and the patent examiner—viewed the subject matter (93).

With regard to scope, in construing a claim, care should be taken to avoid a construction that reads on the prior art. [C]laims should be read in a way that avoids ensnaring prior art if it is possible to do so (94). Also with regard to scope, [w]hether or not claims differ from each other, one cannot interpret a claim to be broader than what is contained in the specification and claims as filed (95).

Moreover, [b]ecause the applicant has the burden to "particularly point out and distinctly claim the subject matter which the applicant regards as his invention" (96), if a claim is susceptible to both a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of whether it is "supported," courts will adopt the narrower of the two (97).

### Closed, Partially Closed, and Open Terminology

When evaluating the scope of a particular claim, care should be taken to ascertain whether "closed," "partially closed," or "open" terminology is employed in the claim. Such terminology is almost always indicated by the use of certain key terms. In this regard, "consisting of" indicates a "closed claim," the use of "consisting essentially of" indicates a partially closed claim, while the use of "comprising" indicates an open claim. "Closed" claims are not open to the inclusion of additional elements beyond what is recited in the claim. Thus, a "closed" claim reciting a composition "consisting of" components A, B, and C would not be infringed by a composition containing A, B, C, and D. Conversely, an "open" claim reciting a composition "comprising" elements A, B, and C would be infringed by a composition containing A, B, C, and D. The use of "consisting essentially of" presents a gray area. Such claims are open to infringement by matter having an additional element, if the additional element does not alter the "basic and novel" character of the invention.

### Infringement

A proper infringement analysis requires that the question of infringement be evaluated both literally and under the doctrine of equivalents.

For literal infringement to exist, an accused product must fall clearly within the literal language of the claim(s) in question (98). Every element of the claim must be present in the accused matter for literal infringement to be properly found (99).

### All Elements Rule

A patent claim cannot be infringed if any limitation of the claim, or its substantial equivalent, is not present in the accused matter (100). The claim is compared with the proposed or accused matter on an element-by-element basis (101). However, two physical components of an accused device may be viewed in combination to serve as an equivalent of one element of a claimed invention, as long as no claim limitation is thereby wholly vitiated (102).

### Doctrine of Equivalents

Even when a claim is not literally infringed, such a claim may be infringed under the doctrine of equivalents. Infringement under the doctrine of equivalents is appropriately applied in situations in which no literal infringement has taken place, but in

which an alleged infringer has only made unimportant and insubstantial changes or substitutions in the patented subject matter which, though adding nothing, would be enough to otherwise evade the reach of law (103).

Although the determination of equivalence involves a determination of whether the accused product embodies only an insubstantial change from the patented invention, the essential inquiry remains: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention? (104). Thus, a determination of equivalence needs to be made, as an objective inquiry, and on an element-by-element basis (105).

### Prosecution History Estoppel

The prosecution history of the patent is of great importance in interpreting the scope of the claims, because equivalence will not be found if it is limited by prosecution history estoppel or if the equivalent item is in the public domain (106). Prosecution history estoppel applies as a limitation to the doctrine of equivalents after the claims have been properly interpreted and no literal infringement is found (107). As the Court of Appeals for the Federal Circuit has repeatedly held, other players in the marketplace are entitled to rely on the record made in the Patent Office [sic.] in determining the meaning and scope of the patent (108).

The US Supreme Court has now stated that, where an applicant does not state a reason for an amendment made to the claims during prosecution, prosecution history estoppel will be presumed (109). Moreover, if a claim element is amended for purposes of patentability, there is no longer a range of equivalency (110). Thus, the prosecution history can limit the interpretation of the patent claims to exclude any interpretation disclaimed or disavowed during the prosecution to secure allowance of the claims (111). Unmistakable assertions made by the applicant to the PTO in support of patentability, whether or not required to secure allowance of the claim, also may operate to preclude the patentee from asserting equivalency (112).

### Prior Art Can Limit the Scope of Application of the Doctrine of Equivalents

There are other limitations on the scope of coverage that can be asserted under the doctrine of equivalents. For example, for infringement under the doctrine of equivalents to be properly found, the asserted range of equivalents must not be so broad as to encompass prior art teachings (113). Claims should be construed, if possible, so as to sustain validity. If such construction would result in invalidity of the claims, the appropriate legal conclusion is one of noninfringement, not invalidity (114).

### Practical Application

The challenge of avoiding infringement in the *Orange Book* context lies in the fact that the drug which is the subject of the ANDA must be bioequivalent to the listed drug (the listed drug presumably being covered by a listed patent), and the bioequivalence must be proven to the satisfaction of the FDA; all while avoiding the claim(s) of the patent.

Avoiding infringement can often boil down to this question: Is there something that the patent claim requires that can be avoided in designing the drug or dosage form in question? If such a claim requirement is not found in the drug or dosage form in question, either literally or equivalently, then the claim is not infringed.

Accordingly, when choosing or designing a drug product, once a patent of concern is identified (such as a patent listed in the *Orange Book* covering the listed drug), choose or design the product so that one or more "elements" of the claim of the *Orange Book* patent is not present in the product. This can be as simple as avoiding the use of a claimed excipient (or equivalent thereof) in a drug formulation. Ordinarily, the patent specification and the prosecution history of the application for the patent will need to be studied so that one can determine whether certain or various alternatives to claimed elements should be properly considered by a court to be equivalent to the claimed elements.

Of course, the development of noninfringement strategies also can involve considerations that are much more complex than the mere omission of a claim element. Such considerations are beyond the scope of this chapter.

### Direct and Indirect Infringement

As noted, 35 USC §271(a) provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent." These are known as acts of direct infringement.

Other than direct infringement, it is also possible to indirectly infringe a patent through inducement of infringement and contributory infringement. In order to establish induced or contributory infringement, there must be an act of direct infringement (115). In the absence of an act of direct infringement, therefore, there can be no liability for indirect infringement (116).

Inducement usually arises in the context of patents related to methods of treatment and situations wherein the accused product is associated with a package insert containing instructions for administering a drug. Induced infringement is defined in 35 USC §271(b), which provides that "whoever actively induces infringement of a patent shall be liable as an infringer." Although the statute does not specify what constitutes "active inducement," courts have generally held that it requires "proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent" (117). To succeed on the theory of inducement of infringement, a plaintiff must prove that the defendants' actions "induced infringing acts and that they knew or should have known their *actions* would induce actual infringement" (118). However, mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven (119). With respect to intent, obtaining a noninfringement opinion by competent patent counsel may negate the intent element by proving that the alleged infringer did not believe it was infringing the patent (120).

As a practical matter, in the context of pharmaceutical cases, when inducement arises, it often does so in situations involving method claims (such as claims directed to a method of treatment, or a specific blood plasma level profile) and situations wherein an alleged infringer "instructed" others to "infringe" the claims of the patent at issue (such as by means of a package insert or similar administration instructions so as to result in, e.g., the claimed method of treatment or blood plasma level profile). In such cases, it should be noted that package inserts and the language of patent claims rarely comport exactly with each other. Thus, generic companies are advised to scrutinize the differences between the patent claims and the package insert at issue and ascertain what language from the insert can be used without infringing the claims.