# EXHIBIT 32

A second type of indirect infringement is contributory infringement. Defined in 35 USC §271(c), contributory infringement essentially requires that a material component of a patented invention, having no substantial noninfringing use, is sold, offered for sale, or imported into the United States. However, "[t]he mere sale of a product capable of substantial non-infringing uses does not constitute indirect infringement of a patent" (121). Furthermore, contributory infringement under 35 USC §271(c) requires that the contributory acts must occur in the United States (122).

These issues are discussed in further depth in Indirect Patent Infringement in the U.S.: Points to Consider for Generic and API Manufacturers. Journal of Generic Medicines. 2007; 4:287–292.

### Willful Infringement

The patent laws provide that a court may increase the amount of damages assessed for infringement up to three times the amount found or assessed. 35 USC.

§284. This can be based on a determination that the infringement was "willful."

The Court of Appeals for the Federal Circuit in *In re Seagate*, 497 F.3 d 1360 (Fed Cir 2007), addressed the issue of the appropriate standard to determine willful infringement. After over ruling the Court's earlier decision in *Underwater Devices*, which set a lower threshold for willful infringement that was more akin to negligence, the Federal Circuit held that "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness"(123). The Federal Circuit also stated that "there is no affirmative obligation to obtain opinion of counsel" and thus abandoning the affirmative duty of care formerly necessary to avoid willful infringement (124).

The standard now required to establish willful infringement is stricter than prior to the *In re Seagate* decision. Objective recklessness requires the "patentee must show with clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent" (125). The patentee must further show that "this objectively-defined risk... was either known or so obvious that is should have been known to the accused infringer" (126).

In any event is almost always a wise approach to obtain a well-reasoned opinion of noninfringement from competent patent counsel.

### Preliminary Injunctions

In patent litigations, generally a patent owner can request the court to issue a preliminary injunction, whereby the court enjoins the alleged infringer(s) from continuing to infringe the patent(s) at issue. In paragraph IV pharmaceutical cases, however, the infringing activity is simply the filing of an Abbreviated New Drug Application (ANDA) with the FDA. As no actual infringing product has been made, used, sold, offered for sale, or imported into the United States without the patent owner's authorization, the automatic 30-month stay eliminates the need to seek a preliminary injunction at the outset of the litigation (127). Furthermore, because the litigation is often completed within the 30 months, preliminary injunctions are often unnecessary. However, if the patentee does not file a paragraph IV litigation within the required 45 days of receiving notice of the filing, or if the 30-month stay in the litigation will expire prior to completion of the litigation, a preliminary injunction may be requested by the patent owner (128).

### Requirements

Courts have the statutory authority to grant preliminary injunctions in patent cases (129). A preliminary injunction is not to be routinely granted (130). In determining whether to issue a preliminary injunction, a court will evaluate the following four factors: (*i*) a reasonable likelihood of success on the merits, (*ii*) irreparable harm, (*iii*) that the balance of hardships tips in its favor, and (*iv*) the impact of the injunction on the public interest (131). The court will evaluate and balance the four factors in determining whether to issue a preliminary injunction (132). Although no single factor is dispositive, the patentee must establish the first two factors, that is, likelihood of success on the merits and irreparable harm, otherwise the court will not issue the injunction (133).

### Reasonable Likelihood of Success on the Merits

When the court evaluates likelihood of success on the merits, it will take into account all defenses raised by the nonmoving party, for example, validity, enforceability, and infringement. The patent owner must show that it will likely prove that the accused infringer infringes the asserted patent(s) and that the asserted patent claims will likely withstand the challenge to their validity and enforceability. Although patents are statutorily presumed valid (134), a court should not issue a preliminary injunction if the nonmoving party raises one or more defenses which demonstrate a substantial question concerning infringement, validity, and/or enforceability of the patent (135). It is the patent owner's burden to show that the nonmoving party's defenses lack substantial merit (136).

The burdens at the preliminary injunction stage track the burdens at trial (137). Thus, the patent owner must show that it will likely prove that the accused infringer infringes at least one valid and enforceable patent claim (138). Likewise, in order to defeat the injunction based on invalidity or unenforceability defenses, the nonmoving party, as the party bearing the burden of proof on those issues at trial, must establish a substantial question of invalidity or unenforceability, that is, that it is likely to succeed in proving invalidity or unenforceability of the asserted patent(s) (139).

An accused infringer may avoid a preliminary injunction by showing only a substantial question as to invalidity, as opposed to the higher clear and convincing standard required to prevail on the merits (140). Indeed, vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself (141).

### Irreparable Harm

A preliminary injunction is intended to preserve the legal interests of the parties against future infringement, which may have market effects never fully compensable in monetary terms. As such, a patentee must establish that monetary recompense is inadequate (142). However, when the patentee makes a clear showing of likelihood of success on the merits, the patentee is entitled to a presumption of irreparable harm (143). Nevertheless, in some cases a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits, such as when the remaining factors are considered and balanced (144). For example, courts have determined that the extent of potential harm suffered by a party can be insufficient to permit an injunction to be granted (145).

Other forms of irreparable harm may be asserted, such as irreversible price erosion, loss of good will, potential layoffs of employees, and the discontinuance of clinical trials that are devoted to other medical uses for the drug.

Once the patent owner has established the showing necessary to raise the presumption of irreparable harm, the nonmoving party must produce evidence sufficient to establish the absence of irreparable harm.

### *Balance of Hardships*

When balancing hardships, the court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the nonmoving party will incur if the injunction is granted (146).

### *Public Interest*

There is a public interest in protecting rights secured by valid patents. The general rule has been that where the patents are shown to be valid, the public interest is best served by enforcing them.

However, in pharmaceutical cases, the focus of the public interest analysis should center on whether there exists some critical public interest that would be injured by the grant of preliminary relief. Thus in every pharmaceutical case, the public interest should be carefully evaluated.

In sum, whether a preliminary injunction is granted depends upon the facts of the particular case. When a likelihood of success on the merits can be established, the remaining three factors will usually favor the patent owner, and a preliminary injunction is more likely to be granted.

### Inequitable Conduct

A patent may be rendered unenforceable due to inequitable conduct (147). A finding of inequitable conduct results in the permanent unenforceability of the entire patent (148). Inequitable conduct is based upon a breach of the duty of disclosure, candor, and good faith imposed by Rule 1.56 of the U.S. PTO (149):

§1.56 Duty to disclose information material to patentability.

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. [...]. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct (150).

Noteworthy is that the duty is not only imposed on the inventor(s) but is imposed also on every individual associated with the filing and prosecution of a patent application (151). The duty to disclose information continues from the time the application is filed until the patent is granted (152).

To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (*i*) made an affirmative misrepresentation of material fact, failed to disclose material information, submitted false material information, and (*ii*) intended to deceive the PTO (153).

Information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and:

1. It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim, or
2. It refutes, or is inconsistent with, a position the applicant takes in:
   a. Opposing an argument of unpatentability relied on by the office, or
   b. Asserting an argument of patentability (154).

A *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability (155).

The intent element of inequitable conduct requires that "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive" (156). Intent rarely can be, and need not be, proven by direct evidence (157). Instead, an intent to deceive is usually inferred from the facts and circumstances surrounding the conduct at issue (158). Gross negligence alone is insufficient to justify an inference of intent to deceive the PTO (159).

If a court finds that the requirements of materiality and intent have been established by clear and convincing evidence, it must then balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable (160). Under the balancing test, "[t]he more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa" (161).

It is inequitable conduct to withhold material information from a patent examiner or submit false material information with the intent to deceive or mislead the examiner into granting a patent (162). Inequitable conduct can be based upon a variety of deceptive conduct, including withholding material prior art (163), withholding translations of foreign prior art publications or submitting only partial translations (164), withholding information about prior sales or use (165), withholding or providing false information regarding inventorship (166), withholding or providing false information regarding enablement or the best mode (167), wrongly making a priority claim to an earlier-filed application that does not provide support (168), misrepresenting material facts to the examiner (169), submitting false affidavits (170), making misrepresentations regarding a prior art search in a petition to make special (171), making a misrepresentation of unintentional abandonment in a petition to revive (172), and wrongly claiming small entity status (173).

A finding of inequitable conduct not only renders the entire patent unenforceable but may in certain instances also infect subsequent related applications, rendering them unenforceable as well (174). Lastly, if a court finds a patent unenforceable for inequitable conduct, the case may be deemed exceptional, and the prevailing party may be entitled to its attorneys' fees (175).

Recent Federal Circuit decisions have shed light on the types of actions in the pharmaceutical industry that would result in findings of inequitable conduct. For example, in *Impax Labs., Inc. v. Aventis Pharm. Inc.*, Aventis was charged with inequitable conduct for withholding certain test data from the examiner during prosecution of the patents-in-suit (176). The district court initially determined that the data withheld was immaterial because it did not produce test results that indicated a level of overall effectiveness, and thus would not have been relevant to the PTO during prosecution (177). In addition, the court pointed out that there was an absence on the part of Aventis of an intent to deceive the PTO (178). The Federal Circuit agreed, pointing out that the data withheld did not refute any position taken or held by Aventis during prosecution of the patent-in-suit (179). Finally, the Federal Circuit noted that there was no evidence that a "reasonable examiner" would have considered the withheld information important in deciding whether to allow the patent (180).

In *Warner-Lambert Co. v. Teva Pharms. USA Inc.*, Teva claimed that Warner had committed inequitable conduct by failing to disclose the existence of Merck's product Vasotec, which Warner had utilized during the testing stage of the patent-in-suit (181). In response, Warner claimed that it had only utilized Vasotec during an initial investigatory stage in order to ascertain information regarding certain pH levels (182). In addition, because the majority of Warner's trials and testing centered around other issues, Warner's scientists determined that its initial use of Vasotec was not material to its application to the PTO (183). In its opinion, the Federal Circuit determined that although it appeared Vasotec did exemplify a high level of materiality, Warner's failure to disclose it did not rise to the level of inequitable conduct (184). The Court noted that Warner had acted in good faith in not disclosing its use of Vasotec because its decision to do so was based on its belief that the product contained no relevance to the application at issue (185). Finally, the court pointed out that because Warner exhibited only "limited familiarity" with the Vasotec formulation, its conduct in withholding disclosure did not rise to the level of inequitable conduct (186).

In *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, Zenith claimed that Lilly had omitted material subject matter from its Information Disclosure Statement, including a relevant patent and a scientific article (187). The district court refused to find inequitable conduct, pointing out that despite its omission of a seemingly relevant patent, Lilly had in fact disclosed a different patent that contained identical technical disclosures to the omitted patent (188). In addition, the court noted that the examiner had found, and relied on the article that Lilly had omitted (189). Thus, in upholding the district court's refusal to find inequitable conduct, the Federal Circuit determined that neither omission was sufficiently material to give rise to a finding of inequitable conduct (190).

Finally, in *In re Metoprolol Succinate Patent Litig.*, the district court determined that inequitable conduct had occurred when Astra failed to disclose to the PTO factual information relating to the actual inventor of metoprolol succinate (191). As a result, the court concluded that due to Astra's actions, the patent-in-suit would have not been entitled to its priority, and thus would have been denied as anticipated by prior art (192). In its decision, the court noted that Astra's motivation not to reveal the dispute over inventorship was great, based on its risk of losing patentability of its invention (193). In reversing the district court's finding, the Federal Circuit determined that the district court had erred by "equating a

presence of incentive with an intent to deceive" (194). It thus concluded that whether Astra's actions had risen to the level of inequitable conduct could not be determined solely on its underlying incentives, but required a more factually laden determination (195).

## FTC SCRUTINY OF AGREEMENTS WITH GENERICS

Over the past 10 years, FTC scrutiny of the pharmaceutical industry, and settlements including "reverse payments" in Paragraph IV litigations has expanded dramatically (196). All settlement agreements in Paragraph IV litigations must now be filed with the FTC and Department of Justice Antitrust Division (DOJ) for possible review (197). The agreements must be filed within ten (10) business days of execution and prior to commercial marketing of the generic drug (198). After reviewing the agreements, the FTC and/or DOJ may file an antitrust action that may result in civil penalties, forfeiture of the 180-day market exclusivity, and/or an injunction (199).

The FTC's scrutiny of settlement agreements falls into two categories. The first category is settlement agreements under which the generic manufacturer agrees to stay off the market, including voluntary forfeiture of the 180-day market exclusivity, and settlement agreements that cover noninfringing products, that is, those that exceed the scope of the patent(s)-at-issue. The second category is settlement agreements that include so-called reverse payments. Although the FTC has been aware of reverse payment settlements for some time, the agency did not focus on the anticompetitive implications of reverse payments until recently (200).

The courts, however, have not shared the FTC's concern with respect to the second category of settlement agreements. The courts, in private antitrust actions, have sided with the FTC finding that the first category of settlement agreements may violate antitrust laws (201). The courts, however, have yet to find the second category of settlement agreements involving reverse payments in violation of antitrust laws (202). Specifically, the Second and Eleventh Circuit Court of Appeal, in the *Tamoxifen* and *Schering-Plough* case respectively, overturned FTC findings that settlement agreements involving reverse payments violated antitrust laws, and the Supreme Court declined to review the appellate courts' decisions.

### History of FTC Scrutiny of Settlement Agreements

In 1999, the FTC ordered 28 brand-name manufacturers and 50 generic manufacturers to submit any agreements relating to an ANDA filing (including any full or partial settlement agreements) the respective companies had entered after December 31, 1994 (203). The results of this survey served as the basis for the FTC's 2002 report entitled Generic Drug Entry Prior to Patent Expiration: An FTC Study ("FTC Study") (204). The study provided, inter alia, a detailed analysis of the settlement agreements and their effect on competition, along with a variety of specific and general recommendations for legislative changes to the Hatch–Waxman Act to address competition concerns identified in the study. Most of the proposed legislative fixes were intended to curtail anticompetitive gaming of the ANDA processes, which in the view of the FTC subverted the legislation's purpose of promoting generic competition (205).

Although the FTC Study discusses a number of settlement agreements involving reverse payments, including some of the earliest Paragraph IV settlements

identified in the study, the FTC never opines that reverse payments alone raise antitrust issues, or should be deemed illegal (206). Rather, the study expressly states that it "does not reach any conclusions about the competitive effects of [settlements involving brand payments]" (207).

Specifically, the FTC Study identifies four interim settlement agreements as posing potential antitrust issues, including the agreements which ultimately reached the Eleventh Circuit in *Schering-Plough*, and notes that the FTC had brought enforcement actions against those involved in three of the agreements (208). Incidentally, all of the challenged settlement agreements involved reverse payments, which the study does not address with particularity. The study, instead, discusses the potential forfeiture of the 180-day market exclusivity as the primary focus of the enforcement action (209).

Testimony by FTC commissioners further illustrates the FTC's apparent ambivalence to reverse payments. In a 2000 speech, FTC Commissioner Anthony identified reverse payments as problematic to the extent that such reverse payments occur in connection with settlements that fall into the first category. That is, settlements that include the forfeiture of the 180-day market exclusivity, and/or that exceed the scope of the patent(s) at issue (210).

### The FTC's Attention Has Shifted to Reverse Payments

More recently, the FTC has shifted its position on reverse payment settlements, and now advocates holding any settlement agreement involving reverse payments per se illegal. In his April 10, 2007, statements before the FTC, Commissioner J. Thomas Rosch started by discussing the FTC's "efforts to combat what we consider to be illegal 'reverse payments' made by branded drug makers to generic drug makers in patent litigation settlements between branded and generic firms instituted under the Hatch-Waxman Act" (211). Commissioner Rosch then went on to address the Eleventh Circuit's decision in the *Schering-Plough* case that overturned an FTC finding that the reverse payment in that case constituted a violation of the antitrust laws (212). By way of background, the FTC had found that the settlement agreement was tantamount to a market division agreement between a competitor (the branded) and a potential competitor (the generic) (213), which the FTC observed that the Supreme Court has held is illegal (214). The commissioner also addressed the *Tamoxifen* case where, based upon facts similar to *Schering-Plough*, a divided Second Circuit essentially followed the Eleventh Circuit (215). In particular, the commissioner testified that "We [the FTC] believe *Tamoxifen* and *Schering-Plough* are bad law. More specifically, we [the FTC] continue to believe that most, if not all, reverse payments are illegal if they are made at the same time a generic agrees not to compete as soon as it could if it won its challenge to the branded's patent" (216).

Thereafter, on May 2, 2007, Commissioner Jon Leibowitz testified before Congress expressed the support, seeking approval of a bill that would make reverse payments per se illegal (217). "Simply put, we believe that H R 1902 [which is currently pending] is a fundamentally sound approach to eliminate the pay-for-delay settlement tactics employed by the pharmaceutical industry that could cost American consumers (and the federal government) billions of dollars annually" (218).

In describing the FTC's position, Commissioner Leibowitz stated that:

> There is particular urgency to pharmaceutical competition issues today. Recent appellate decisions are making it difficult to challenge so-called exclusion

payments—or reverse payments; that is, patent settlements in which the brand-name drug firm pays the generic to stay out of the market. If these decisions are allowed to stand, drug companies will enter into more and more of these agreements, and prescription drug costs will continue to rise rapidly. Indeed, in the past year, we have seen a dramatic increase in these types of deals—from none in fiscal year 2004 to more than a dozen in FY 2006.

A legislative approach could provide a swifter and cleaner solution. For that reason, we strongly support legislation to prohibit these anticompetitive payments. Both your approach, Mr. Chairman, and the bipartisan measure reported out of the Senate Judiciary Committee would ensure that consumers continue to have access to low-priced generics. But we also recognize that these issues are complex. So, we want to work with you—and other interested parties—as the bill moves forward (219).

## Agreements That Forfeit the 180-day Generic Market Exclusivity or Settlements That Covered Noninfringing Products Are Per Se Violations of Antitrust Laws

### FTC Enforcement Action Regarding the Abbott–Geneva Hytrin® and Hoescht–Andrx Cardizem CD® Agreements

The first two reported FTC enforcement actions challenging Paragraph IV settlements were brought against the Abbott–Geneva Hytrin Agreement (220) and the Hoescht–Andrx Cardizem CD Agreement (221). Both FTC complaints alleged that the settlement agreements resulted in voluntary forfeiture of the 180-day market exclusivity, and that the agreements included products that were not covered by the patent, that is, exceeded scope of patent(s)-in-suit (222). The cases resulted in consent orders in 2000 and 2001, respectively, requiring Abbott and Hoechst Marion Roussel to refrain from entering any agreement with terms that would require the generic manufacturer to voluntarily forfeit its 180-day market exclusivity, or that would require the generic manufacturer to forego research or marketing a drug product that is not covered by the patent(s)-at-issue (223). The companies were also required to refrain from entering partial settlement agreements involving reverse payment; however, the consent order was silent as to reverse payments in a final settlement agreement that would terminate the litigation (224).

### FTC Enforcement Action Regarding the Bristol-Myers Squibb Agreements

The FTC also brought a complaint against Bristol-Myers Squibb Corporation (BMS) alleging violations of antitrust laws relating, inter alia, to settlement to the BuSpar® litigation and BMS's activities in prosecuting and enforcing the Taxol® patents (225). The FTC complaint alleged that BMS had engaged in a number of anticompetitive acts relating to BuSpar, a medication used to treat anxiety, and two anticancer drugs, Taxol and Platinol, for over 10 years (226). Specifically, the FTC alleged that BMS had improperly settled a lawsuit relating to BuSpar, paying Schein $72.5 million, in order to preserve the validity and enforceability of certain patents while simultaneously keeping generic manufacturers off the market. The FTC also alleged antitrust violations based upon BMS's procurement and listing of a patent covering the active metabolite of BuSpar. On the eve of the expiration date of the patent covering the method for using BuSpar to treat anxiety, BMS filed a continuation application covering the method of using a metabolite of BuSpar. BMS obtained allowance of its patent claim covering the metabolite less than 2 months before expiration of the BuSpar patent. Thereafter, BMS requested and obtained an expedited issuance of

*Greenblum et al.*

its new metabolite patent and subsequently listed this patent in the *Orange Book*. BMS then pursued lawsuits against ANDA filers relating to this new patent, triggering the automatic 30-month stay.

Relating to Taxol, the FTC alleged that BMS had engaged in anticompetitive activities by fraudulently obtaining patents from the U.S. PTO by making false and misleading statements to the PTO and by failing to disclose relevant references, and that BMS then had listed the unenforceable patents in the *Orange Book*. The FTC further alleged that BMS attempted to list a patent obtained under a license agreement with American Bioscience, Inc. that BMS could not reasonably believe was valid.

In its settlement with the FTC, BMS agreed that it would not continue to list its metabolite patent and would discontinue its patent infringement lawsuits. BMS also agreed not to pursue royalties from any license relating to its Taxol patents, or to initiate any 30-month stay relating to either its BuSpar or Taxol products. BMS further agreed not to initiate any 30-month stay relating to certain other categories of patents deemed to be improperly listed in the *Orange Book*. BMS also agreed that it would not enter into cash reverse payment settlements, but also agreed not to enter into reverse payment agreements in which it would provide something of value to the potential generic manufacturer (ANDA filer).

## Court Rulings on Agreements That Forfeit the 180-day Generic Market Exclusivity or Settlements that Covered Noninfringing Products Also Finding Them Are Per Se Violations of Antitrust Laws

As noted, the courts have sided with the FTC, in private antitrust actions, in the context of the Abbott–Geneva Hytrin, Hoescht–Andrx Cardizem CD, and BMS BuSpar settlement agreements.

### *The Abbott–Geneva Settlement Agreement on Hytrin® Private Antitrust Action*

The court found the Abbott–Geneva Agreement on Hytrin, a drug prescribed for the treatment of high blood pressure and benign prostatic hyperplasia, to be a horizontal restraint of trade that was a per se violation of the Sherman Act (227).

The agreement provided, inter alia, that Abbott would pay Geneva $4.5 million per month beginning on April 30, 1998. The agreement also provided that in the event of "Final Judgment in Geneva's Favor" (228), Abbott's monthly payments to Geneva would stop and Abbott would pay into escrow $4.5 million per month until the earlier of the "Generic Entry Date," the "Appellate Judgment," or the date of "Final Judgment in Abbott's Favor" (229). The settlement agreement further provided that Geneva would receive the amount in escrow if Geneva prevailed in any appeal. Otherwise, the amount in escrow would be returned to Abbott. Under the agreement, upon a Final Judgment in Abbott's favor, Abbott would have no obligation to make any payment to Geneva. Finally, the agreement provided that Abbott had the option to terminate payments if the Generic Entry Date had not occurred on or before February 18, 2000.

In August 1999, Abbott and Geneva terminated the agreement. As of the date of termination, Abbott had paid a total of $49.5 million into escrow. As part of the termination agreement, $45 million in escrow funds were returned to Abbott. Had Geneva launched on August 13, 1999, without first having terminated the agreement, Abbott would have asserted that Geneva was in breach of the agreement. Geneva launched its generic product on August 13, 1999. Since going to market

with a generic form of terazosin hydrochloride in August 1999, Geneva has been an actual competitor of Abbott.

The court found that for purposes of this analysis, the following relevant facts are undisputed and dispositive. It is undisputed that Abbott and Geneva were actual or potential competitors at the time the agreement was executed. It is also undisputed that pursuant to the agreement, Abbott agreed to pay Geneva $4.5 million per month in exchange for Geneva's agreement not to market its generic terazosin hydrochloride products in the United States until a final appellate judgment on the merits of the '207 patent infringement action. The agreement, therefore, guaranteed Abbott that its only potential competitor at the time would, for a substantial price, refrain from marketing its FDA-approved generic version of Hytrin even after an adverse district court ruling as to the validity of '207 patent. This restraint exceeded the scope of the '207 patent, and had the effect of keeping Geneva's generic capsule product, which had already received final FDA approval on March 30, 1998, off the market until August 13, 1999. Further, because of the regulatory framework under Hatch–Waxman, the agreement had the additional effect of delaying the entry of other generic competitors, who could not enter the market until the expiration of Geneva's 180-day period of marketing exclusivity, which Geneva (as stated in the agreement) did not intend to relinquish. As the Sixth Circuit concluded in reviewing a nearly identical agreement, "there is simply no escaping the conclusion that the Agreement . . . was, at its core, a horizontal agreement to eliminate competition" in the domestic market for terazosin hydrochloride drugs, a "classic example" of an output-reducing, naked restraint on trade that qualifies for per se treatment (230).

### The Hoechst Marion Roussel and Andrx Settlement Agreement on Cardizem CD® Private Action

Likewise, the court found the settlement agreement between Hoescht Marion Roussel, Inc. (HMR) and Andrx Pharmaceuticals, Inc. relating to Cardizem CD a per se violation of the antitrust laws. Under that settlement agreement Andrx, in exchange for quarterly payments of $10 million, would refrain from marketing its generic version of Cardizem CD even after it had received FDA approval.[231] Andrx would remain off the market until the occurrence of one of the end dates contemplated by the agreement. Although Andrx and HMR terminated the agreement and the payments in June 1999 (before any of the specified end dates occurred.), HMR paid Andrx (between July 1998 and June 1999), $89.83 million, while Andrx kept its generic product off the market. The court found that, "[b]y delaying Andrx's entry into the market, the Agreement also delayed the entry of other generic competitors, who could not enter until the expiration of Andrx's 180-day period of marketing exclusivity, which Andrx had agreed not to relinquish or transfer" (232). The court then, based upon these facts, observed that "[t]here is simply no escaping the conclusion that the Agreement, all of its other conditions and provisions notwithstanding, was, at its core, a horizontal agreement to eliminate competition in the market for Cardizem CD throughout the entire United States, a classic example of a *per se* illegal restraint of trade" (233).

### The BuSpar® and Taxol® Private Antitrust Action

In the BuSpar antitrust action, the court, upon BMS's motion to dismiss, ruled that BMS was not entitled to immunity from antitrust liability under the *Noerr–Pennington* doctrine, and that BMS's complained of activities were sufficient to state

a claim for violation of the antitrust laws (234). There were also numerous proce-
dural motion filed in the Taxol litigation. Ultimately, however, BMS settled both the
BuSpar and Taxol private antitrust actions for \$670 million (235).

## Courts Rulings Regarding the FTC's Enforcement Actions Against
## Settlement Agreements Involving Reverse Payments

The FTC has taken the position that any settlement agreement involving reverse
payments is a per se violation of the antitrust laws. However, to date, the courts
have not shared the FTC view on these settlement agreements.

### *The Schering-Plough Settlement Agreements With Upsher and ESI*

In *Schering-Plough*, the offending payments with respect to Upsher were primar-
ily licensing fees paid under an ancillary licensing agreement. The Schering-
Plough/Upsher settlement agreement was a three-part license agreement, under
which Schering-Plough paid: (*i*) \$60 million in royalty fees; (*ii*) \$10 million in mile-
stone royalty payments; and (*iii*) 10 or 15% royalties on sales, and Schering-Plough's
board approved of the transaction upon an express finding that the license was valu-
able to Schering-Plough (236).

In analyzing the settlement agreement and determining to challenge it, the
FTC thoroughly analyzed any business justifications for the license agreement,
including the negotiations, the market demand, the market value of the licensed
products, and Schering-Plough's failure to bring the products to market (237). Based
upon this analysis, the FTC concluded that Schering-Plough paid a price inflated
above the market value for the licensed products, and that the licensing fees were
merely a pretext to delay generic entry (238).

However, on appeal the Eleventh Circuit rejected the FTC's conclusion that
the licensing payments were an improper attempt to delay market entry of the
generic, and questioned the FTC's analysis. Specifically, the Eleventh Circuit opined
that the FTC had not given enough weight to the outcome of the apparent arm's-
length negotiations (239). The Eleventh Circuit also noted that, although hindsight
indicated that the arrangement had not paid off for Schering-Plough, this was not
atypical because pharmaceutical companies often invest large sums of money on
compounds that ultimately never make it to the market; and as such, this fact was
not indicative of bad faith in reaching the settlement agreement (240). Additionally,
the court also cited severe facts as objective indicia of legitimate business negotia-
tion, including the fact that different people negotiated the license agreement and
the patent dispute, and Schering-Plough's "long-documented and ongoing interest"
in licensing one of the products (241).

In the ESI Lederle, Inc. (ESI) settlement, Schering-Plough and ESI participated
in 15 months of court-supervised mediation, which was ultimately fruitless (242).
Eventually, Schering-Plough offered to divide the remaining patent life with ESI
and allow ESI to enter the market with its product nearly 3 years before the patent's
expiration date (243). Although ESI accepted the offer, ESI also demanded payment
to settle the case (244). The Judge suggested that Schering-Plough offer to pay ESI
\$5 million, which was attributed to legal fees, but ESI sought a \$10 million payment
(245). The Judge and Schering-Plough devised an amicable settlement whereby
Schering-Plough would pay ESI up to \$10 million should ESI receive FDA approval
by a certain date (246). Because it appeared unlikely to Schering-Plough that ESI

would receive FDA approval by this date, the Judge intimated that, if Schering-Plough's prediction proved true, it would not have to pay the $10 million. The Judge then oversaw execution of the settlement agreement (247).

In its hearing before the FTC, Schering-Plough sought to justify the payments citing the active involvement and approval of the Judge (248). The FTC acknowledged that Schering was subject to "intense, and perhaps unseemly, judicial pressure" from a "settlement-minded judge," and observed that in view of this pressure the company may well have been concerned about its future litigation prospects, for example, the FTC noted that perhaps the court's pressure to settle could have weakened Schering-Plough's perceived bargaining strength (249). The FTC, however, was not persuaded and faulted Schering-Plough for bowing to the court's pressure, and stated that Schering should have sought out a creative alternative to making payments (250).

On appeal, the Eleventh Circuit was concerned by the FTC's complete discounting of the courts involvement, and likely coercive role, in crafting the settlement terms (251). Specifically, the Eleventh Circuit noted that "[v]eritably, the Commission's opinion would leave settlements, including those endorsed and facilitated by a federal court, with little confidence" (252). After the Eleventh Circuit reversed the FTC's findings, the FTC petitioned for certiorari, but the Supreme Court did not accept the case.

### The Tamoxifen Settlement Agreement

The Tamoxifen settlement agreement included, among other things, a so-called "reverse payment" of $21 million from the defendant patent-holders Zeneca, Inc., AstraZeneca Pharmaceuticals LP, and AstraZeneca PLC (collectively "Zeneca") to the defendant generic manufacturer Barr Laboratories, Inc. ("Barr"), and a license from Zeneca to Barr allowing Barr to sell an unbranded version of Zeneca-manufactured tamoxifen. The settlement agreement was contingent on obtaining a vacatur of the judgment of the district court that had heard the infringement action holding the patent to be invalid (253). Thereafter, consumers brought a private antitrust action arguing that the excessive nature of the reverse payments (not the reverse payments alone) was a violation of the antitrust laws, and the district court dismissed the action (254).

The Second Circuit in *Tamoxifen*, specifically, considered and rejected the argument that "excessive" reverse payments could lead to a presumption of antitrust liability (255). The Second Circuit observed that, under certain circumstances, a reverse payment settlement could be illegal, particularly if the settlement is merely a device for circumventing the antitrust laws (256). As an example, the court cited a scenario under which the underlying patent litigation is a "sham," or otherwise objectively baseless, involving a patent that would almost certainly not survive a judicial challenge (257). The Second Circuit, however, opined that, in cases where there "is nothing suspicious about the circumstances of a patent settlement, then to prevent a cloud from being cast over the settlement process a third party should not be permitted to haul the parties to the settlement over the hot coals of antitrust litigation" (258). The court then posited that even if one were to assume that the large reverse payments belied the fact that the patent owner lacked confidence in prevailing in the patent litigation, such a lack of confidence does not amount to an antitrust violation (259).

Based upon these finding, the Second Circuit upheld the district court's dismissal, and the plaintiffs petitioned for certiorari with the FTC joining the request. Again, however, the Supreme Court declined to review the case.

## Outlook

The FTC has essentially taken the universal position that in every Paragraph IV litigation, consumers have a vested interest in the litigation based upon the possibility that a successful challenge will lead to lower pharmaceutical costs (260). The FTC argues that any settlement between the parties that improperly benefits the litigating parties at the expense of the consumer is a presumptive violation of the antitrust laws (261).

The FTC, however, appears prepared to allow parties to settle lawsuits by compromising on a marketing date prior to the patent's expiration, without cash payments, because "the resulting settlement presumably would reflect the parties' own assessment of the strength of the patent" (262). The FTC views these "benchmark" settlement terms as consumer and business friendly because they resolve the uncertainty of the litigation early and provide some guaranteed benefit to consumers in proportion to the probability that the patent challenge would succeed (263). By contrast, the FTC generally views any settlement involving reverse payments as anticompetitive, because it fails to provide as much consumer benefit as the so-called "benchmark" agreement (264). The FTC perceives any reverse payment as conclusive indicia of, and a quid pro quo for, delayed generic market entry, on the grounds that were it not for the reverse payment the parties would have either settled on an earlier entry date, or not settled and litigated the case to completion—either scenario benefiting consumers relative to the reverse payment settlement (265). It is important to note that, in the FTC's view, essentially any settlement involving reverse payments is illegal, irrespective of the strength or weakness of the underlying patent case; the FTC's believes that the strength of the underlying patent litigation is only relevant where the cases is objectively baseless or sham patent suit (266).

In addition, it is important to note that pending legislation before the House and Senate would ban certain reverse payment settlements (267). The legislative history of the Senate bill expresses strong support for the FTC's treatment of reverse payment settlements, and criticizes the Eleventh and Second Circuits' *Schering-Plough* and *Tamoxifen* decisions for "revers[ing] the Federal Trade Commission's long-standing position [by upholding the reverse payment settlements challenged in those cases]" (268). The legislation would make it unlawful for any person, in connection with the sale of a drug product, to directly or indirectly be a party to any agreement resolving or settling a patent infringement claim which—(*i*) an ANDA filer receives anything of value; and (*ii*) the ANDA filer agrees not to research, develop, manufacture, market, or sell the ANDA product for any period of time (269).

In conclusion, the FTC and DOJ can be expected to review every patent settlement agreement where the generic manufacturer agrees not to go to market. The FTC will also likely find any settlement agreement that results in a voluntary forfeiture of the 180-day market exclusivity, or which affects products outside the scope of the patent(s)-at-issue, a violation of the antitrust laws. The FTC will also closely scrutinize any settlement agreement including reverse payments, and likely find them in violation of the antitrust laws; however, it is unclear at present what would

be the ultimate outcome of any of these situations given the Second and Eleventh Circuit's rulings.

## CONCLUSIONS

There is no such thing as a "typical" Hatch–Waxman litigation. The number and type of issues that can be raised makes each litigation unique. Whether one talks of patent or FDA laws and regulations, procedural litigation considerations, or even settlement talks, the number of issues that can be raised, and variations on them, sometimes seems limitless.

The primary aim of this chapter is to provide an overview of the U.S. statutes and regulations that are designed to encourage litigation in order to bring generics to market as early as possible. This system is often described as "a sensitive balance" between the branded and generic industries. There is little doubt that each side of this debate believes that the system is skewed too heavily in favor of the other side, and perhaps this itself indicates the health and vitality of the U.S. system.

## REFERENCES AND NOTES

1. U.S. utility applications pending on or prior to June 6, 1995, have a term that is the better of 17 years from issuance, or 20 years from the effective U.S. filing date. 35 USC §154.
2. 35 USC §154.
3. 35 USC §120.
4. 35 USC §119.
5. 35 USC §102.
6. 35 USC §119(e).
7. 35 USC §119(a).
8. 35 USC §119(e).
9. 35 USC §102(b).
10. 35 USC §122.
11. 35 USC §122.
12. 35 USC §122.
13. 35 USC §102(e).
14. PCT Rule 43.
15. 35 USC §112.
16. 21 USC §355.
17. *Merck v. Integra*, 545 U.S. §193 (2005).
18. 21 CFR §314.53.
19. 21 CFR §§314.3 and 314.53; see, e.g., Draft Guidance for Industry: Bioavailability and Bioequivalence Studies for Nasal Aerosols and Nasal Sprays for Local Action (Apr. 2003) at lines 208–211 (recognizing that a formulation together with container is the "drug product").
20. 21 CFR §314.53(c)(2)(L). Note that some courts have ignored process limitations in determining infringement of product by process claims, although others have considered such limitations. See *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F2d 1565, 1583 (Fed Cir 1991) (holding that product-by-process claims "are not limited to product prepared by the process set forth in the claims"); *Atl. Thermoplastics Co. v. Faytex Corp.* 970 F2d 834, 846–847 (Fed Cir 1992) (holding that "process terms in product-by-process claims serve as limitations in determining infringement"), *reh'g en banc denied*, 974 F2d 1279 (Fed Cir 1992).
21. 21 USC §355(j)(2)(A)(viii).
22. See 35 USC §120.

23. 35 USC §154(b).
24. 35 USC §154(b).
25. 37 CFR 1.704(c)(11). In addition, filing a Request for Continued Examination tolls the 3-year pendency clock. 37 CFR §1.703.
26. 35 USC §154(b).
27. 37 CFR §1.704.
28. 35 USC §156.
29. 35 USC §156.
30. 35 USC §156.
31. 35 USC §156.
32. FTC Staff Comments on FDA's Proposed Regulations to Improve Efficiency of Citizen Petition Process, March 9, 2000 (www.ftc.gov/opa/2000/03/fdacitpet.shtm).
33. Section(q).
34. Section (q)(1)(A).
35. Sections (q)(1)(H) and (I).
36. Section (q)(1)(H).
37. Id.
38. Section (q)(1)(H).
39. Id.
40. Section (q)(1)(H).
41. Id.
42. Section (q)(1)(A).
43. Section (q)(1)(A).
44. Section (q)(1)(A).
45. Id.
46. Section (q)(1)(B)(i–iii).
47. Section (q)(1)(F).
48. Id.
49. Section (q)(2)(B).
50. Section (2)(A)(i).
51. Section (q)(1)(G).
52. Id.
53. 21 USC §355(j)(2)(A)(vii).
54. 21 USC §355(j)(2)(A)(vii)(I–IV).
55. 21 USC § 355(j)(2)(B)(i); 21 CFR §314.95(c)(6).
56. 35 USC §282.
57. *Woodland Trust v. Flowertree Nursery, Inc.*, No. 97-1547 (Fed Cir July 10, 1998); *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F2d 1464, 1467, 15 U.S.P.Q.2d 1525, 1527 (Fed Cir 1990); *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F2d 1350, 1360, 220 U.S.P.Q. 763, 770–771 (Fed Cir 1984), *cert. denied*, 469 U.S. 821 (1984).
58. *Celeritas Technologies, Ltd. v. Rockwell International Corporation*, Nos. 97-1512, 1542 (Fed Cir, July 20, 1998); *Applied Medical Resources Corporation v. United States Surgical Corporation*, No. 97-1526 (Fed Cir June 30, 1998); *Rockwell International Corporation v. the United States*, Nos. 97-9065, -9068 (June 15, 1998).
59. *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F2d 1561, 1566-68, 1 U.S.P.Q. 1593, 1595–1597 (Fed Cir 1987), *cert. denied*, 481 U.S. 1052 (1987).
60. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F2d at 1379, 231 U.S.P.Q. at 90.
61. *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966).
62. *Id.*, 383 U.S. at 17, 148 U.S.P.Q. at 467.
63. *Greenwood v. Hattori Seiko Co., Ltd.*, 900 F2d 238, 241, 14 U.S.P.Q.2d 1474, 1476 (Fed Cir 1990); *Graham v. John Deere Co.*, 383 U.S. at 17, 148 U.S.P.Q. at 467.
64. See, e.g., *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. __, __, 127 S.Ct. 1727, 1739 (2007) [citing *Graham v. John Deere Co.*, 383, 17-18 U.S. 1 (1966)]; *Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc.*, 344 F3d 1186, 1195–1196 (Fed Cir 2003); *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F3d 1362, 1367 (Fed Cir 2003).
65. KSR, 127 S.Ct. at 1739.

66. *Id.*
67. *Id.* at 1742.
68. *Id.*
69. *The Regents of the University of California v. Eli Lilly and Company,* 96-1175 (Fed Cir July 22, 1997), quoting *Lockwood v. American Airlines, Inc.* 107 F. 3d 1565, 1572, 41 U.S.P.Q.2d 1961, 1966 (Fed Cir 1997); *In re Gosteli,* 872 F2d 1008, 1012, 10 U.S.P.Q.2d 1614, 1618 (Fed Cir 1989)("The description must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed").
70. See *DeGeorge v. Bernier,* 768 F2d 1318 (Fed Cir 1985).
71. *Dow Chemical Co. v. American Cyanamid Co.,* 615 F Supp 471 (D.C. La. 1985), *aff'd.,* 816 F2d 617 (Fed Cir 1987).
72. *Amgen v. Chugai Pharmaceutical Co., Ltd.,* 927 F2d 1200, 1212 (Fed Cir 1992).
73. *In re Eltgroth,* 164 U.S.P.Q 221, 223 (CCPA 1970).
74. *In re Gardner,* et. al., 166 U.S.P.Q. 138, 141 (CCPA 1970)(emphasis original).
75. *In re Hayes Microcomputer Products, Inc.,* 982 F3d 1527, 1536–1538 (Fed Cir 1992).
76. See *Hybritech v. Monoclonal Antibodies, Inc.,* 802 F2d 1367, 1385 (Fed Cir 1986).
77. *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 927 F2d at 1212 (claims must "reasonably apprise those skilled in the art" as to their scope and be "as precise as the subject matter permits.")
78. *Metoprolol Succinate Patent Litig. v. KV Pharm. Co.,* 494 F3d 1011, 1016 (Fed Cir 2007); *Perricone v. Medicis Pharm. Corp.,* 432 F3d 1368, 1372–1373 (Fed Cir 2005).
79. *Gemstar v. TV Guide International, Inc.,* 383 F3d 1352, 1381 (Fed Cir 2004); *Jamesbury Corp. v. United States,* 518 F2d 1384, 1395 (Ct. Cl. 1975).
80. See *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F3d 976, 980 (Fed Cir 1997).
81. 35 USC §116.
82. *Id.* §116.
83. *Fina Oil & Chem. Co. v. Ewen,* 123 F3d 1466, 1473 (Fed Cir 1997); see also *Ethicon,* 135 F3d at 1460.
84. *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F2d 1367, 1376 (Fed Cir 1986) (internal quotation marks omitted).
85. *Trovan, Ltd. v. Sokymat SA,* 299 F3d 1292, 1302 (Fed Cir 2002).
86. *Id.*
87. 35 USC §154.
88. See 35 USC §271 ("[W]hoever without authority makes, uses, offers to sell or sells any patented invention within the United States or imports into the United States any patent invention during the term of the patent therefor, infringes the patent.").
89. *Fromson v. Anitec Printing Plates, Inc.,* 132 F3d 1437, 1441 (Fed Cir 1997).
90. See, e.g., *Kopykake Enterprises, Inc. v. The Lucks Co.,* 264 F3d 1377, 1381 (Fed Cir 2001); *Alpex Computer Corp. v. Nintendo Co. Ltd.,* 102 F3d 1214, 1220 (Fed Cir 1996); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F2d 1559, 1566 (Fed Cir 1992); *SRI Int'l v. Matsushita Electric Corp. of America,* 775 F2d 1107, 1118 (Fed Cir 1985)(en banc).
91. *ATD Corporation* at 540; *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F3d 1270, 1277 (Fed Cir 1995).
92. *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F3d 1473, 1478 (Fed Cir 1998).
93. *Id.*
94. *Harris Corp. v. IXYS Corp.,* 114 F3d 1149, 1153 (Fed Cir 1997). Note, however, that the Court of Appeals for the Federal Circuit has held that practicing the prior art is not a defense to per se literal infringement. *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,* 279 F3d 1357,. 61 U.S.P.Q.2d 1647 (Fed Cir 2002).
95. *ATD Corp. v. Lydall, Inc.,* 159 F3d 534, 541 (Fed Cir 1998) [quoting *Tandon Corp. v. U.S. International Trade Commission,* 831 F2d 1017, 1024 (Fed Cir 1987)].
96. 35 USC § 112.
97. *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F3d 1335, 1344 (Fed Cir 1998).
98. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607 (1950); see *Warner Jenkinson Co. v. Hilton-Davis Chem. Co.,* 520 U.S. 17, 28–30 (1997).

99.  *Warner Jenkinson*, at 20–30; *General American Transportation Corp. v. Cryo-Trans Inc.*, 93 F3d 766, 770 (Fed Cir 1996) [citing *Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F2d 1279, 1282 (Fed Cir 1986)]; *Transmatic* at 1277.

100.  *Warner Jenkinson, supra; Hughes Aircraft Co. v. United States*, 140 F3d 1470, 1476–1477 (Fed Cir 1998); *Renishaw PLC v. Marpossa Societa' Per Azio001*, 158 F3d 1243 (Fed Cir 1998) (affirming lower court finding of no infringement because accused device lacked claim limitation); *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F2d 1251, 1259 (Fed Cir 1989); *Julien v. Zeringue*, 864 F2d 1569, 1571 (Fed Cir 1989).

101.  *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F2d 931, 935 (Fed Cir 1987), *Warner Jenkinson, supra.*

102.  *Ethicon Endo-Surgery Inc. v. United States Surgical Corp.*, 149 F3d 1309, 1320 (Fed Cir 1998).

103.  *Graver Tank*, at 608; *Warner Jenkinson, supra; Insta-Foam Prod. v. Universal Foam Sys., Inc.*, 906 F2d 698, 702 (Fed Cir 1990).

104.  *Warner Jenkinson, supra.*

105.  *Id.*

106.  *Warner Jenkinson*, at 28–30.

107.  *Schwarz Pharma, Inc. v. Paddock Labs. Inc.*, 504 F3d 1371, 1375–1376 (Fed Cir 2007).

108.  *Vehicular Technologies Corporation, v. Titan Wheel Int'l, Incl.*, 141 F3d 1084, 1091 (Fed Cir 1998)(citing *Lemelson v. General Mills, Inc.*, 968 F2d 1202, 1208 (Fed Cir 1992)).

109.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 739–740 (2002).

110.  *Festo Corp. v. Shoketsu Kinzoku Kabushiki Co.*, 344 F3d 1359, 1367–1370 (Fed Cir 2003).

111.  *Jonsson v. Stanley Works*, 903 F2d 812, 817 (Fed Cir 1990).

112.  *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F2d 1165, 1174 (Fed Cir 1993).

113.  *Interactive Pictures Corporation v. Infinite Pictures*, 274 F3d 1371, 1380 (Fed Cir 2001); *We Care, Inc. v. Ultra-Mark Int' l Corp.*, 930 F2d 1567, 1570–1571 (Fed Cir 1991); *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F2d 677, 684 (Fed Cir 1990).

114.  *Carman Industries, Inc. v. Wahl*, 724 F2d 932, 941 (Fed Cir 1983).

115.  *Novartis Pharms Corp. v. Eon Labs Mfg., Inc.*, 363 F3d 1306, 1308 (Fed Cir 2004) (holding that "... it is well settled that there can be no inducement or contributory infringement absent an underlying direct infringement.").

116.  *Id.*

117.  *Rodime PLC v. Seagate Tech., Inc.*, 174 F3d 1294, 1306 (Fed Cir 1999).

118.  *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F2d 544, 553 (Fed Cir 1990) (emphasis added); *DSU Medical Corp. v. JMS Co., LTD.*, 471 F3d 1293, 1304 (Fed Cir 2006).

119.  *Id.* at 1594.

120.  *DSU Medical Corp.*, at 1307.

121.  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F3d 1263 (Fed Cir 2004).

122.  *DSU Medical Corp.*, at 1303.

123.  *Id.* at 1371.

124.  *Id.* The Federal Circuit expressly stated that "the reasoning contained in [opinions of counsel] ultimately may preclude a [finding of recklessness]. *In re Seagate*. Although distinction is made between oral and written opinion, the weight given to the type of opinion is based on circumstance. See *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.* 2001 WL 1397304 at *19 (S.D. Ind. 2001) ("Reliance on oral opinions of counsel is not favored ... Oral opinions carry less weight, for example, because they must be proved perhaps years after the event, based only on testimony which may be affected by faded memories and the forces of contemporaneous litigation ... Nevertheless, reliance on an oral opinion is not necessarily unreasonable as a matter of law.") Compare, e.g., *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F2d 1554, 1558–1559 (Fed Cir 1986) (affirming finding that infringement was not willful where infringer relied on oral opinion of outside patent counsel), with *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F3d 1523, 1531 (Fed Cir 1993) (affirming finding of willfulness; oral opinion of invalidity from counsel was not credible, and infringer did not obtain credible written opinion until 20 months after beginning infringement)." (citations omitted).

125.  *Id.*

126. *Id.*
127. Technically, the filing of an ANDA necessitates prior production of infringing products, however, products and manufacturing acts for purposes of submitting an ANDA are exempt from patent infringement pursuant to the safe harbor provisions of the Hatch–Waxman Act. See 21 USC §§355 and 360; 35 USC §§156 and 271(e).
128. Although patent holders are free to seek preliminary injunctions after the 30-month stay has expired, they may not be successful. Recently, Altana Pharma and Wyeth sought a preliminary injunction upon the expiration of the 30-month stay. The U.S. District Court for the District of New Jersey determined that an injunction was unnecessary because any harm to the patent holder could be measured and compensated monetarily, and thus was not the type of irreparable harm that would necessitate an injunction. *Altana Pharma AG v. Teva Pharm.*, 2007 U.S. Dist. LEXIS 67285 (D.N.J. 2007).
129. 35 USC §283 (2006).
130. *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F3d 1319, 1324 (Fed Cir 2004) [quoting *Intel Corp. v. ULSI Sys. Tech. Inc.*, 995 F2d 1566, 1568 (Fed Cir 1993)].
131. *Jack Guttman, Inc. v. Kopykake Enters. Inc.*, 302 F3d 1352, 1356 (Fed Cir 2002).
132. *Polymer Techs., Inc. v. Bridwell*, 103 F3d 970, 977 (Fed Cir 1996).
133. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F3d 1343, 1350 (Fed Cir 2001) [quoting *Hybritech, Inc. v. Abbott Labs.*, 849 F2d 1446, 1451 (Fed Cir 1988)].
134. 35 USC §282 (2006).
135. *Abbott Labs. v. Andrx Pharmaceuticals Inc.*, 473 F3d 1196, 1200–1201 (Fed Cir 2007); *See In re Seagate Technology LLC*, 497 F3d 1360, 1374 (Fed Cir 2007).
136. *Abbott Labs.*, at 1200–1201.
137. *See Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 428–430 (2006).
138. *Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*, 429 F3d 1364, 1372 (Fed Cir 2005).
139. *Abbott Labs*, at 1200–1201.
140. *In re Seagate Technology*, at 1374.
141. *Amazon.com, Inc.*, 239 F3d at 1359.
142. *Nutrition 21 v. United States*, 930 F2d 867, 871–872 (Fed Cir 1991).
143. *See Smith Int'l, Inc., v. Hughes Tool Co.*, 718 F2d 1573, 1581 (Fed Cir 1983).
144. *In re Seagate Technology LLC*, at 1374.
145. *Serio-US Industries, Inc. v. Plastic Recovery Technologies Corp.*, 267 F Supp 2d 466, 469 (D.Md. 2003); *Reebok Int'l Ltd. v.J. Baker, Inc.*, 32 F3d 1552, 1557–1558 (Fed Cir 1994).
146. *Ortho-Mcneil Pharmaceutical, Inc., v. Mylan Laboratories Inc.*, Nos. CIV.A.04–1689, 06-757, 06-5166, 2007 WL 8695-45 at *1 (D.N.J. Oct. 23, 2006).
147. *McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F3d 897, 913 (Fed Cir 2007).
148. See, e.g., *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F3d 1550, 1556–1557 (Fed Cir 1995).
149. *See Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 471 F3d 1369, 1381 (Fed Cir 2007); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F3d 1326, 1342 (Fed Cir 2005); *Nilssen v. Osram Sylvania, Inc.*, 504 F3d 1223, 1229 (Fed Cir 2007).
150. 37 CFR §1.56 (2006).
151. *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.*, 394 F3d 1348, 1351 (Fed Cir 2005); *Molins PLC v. Textron, Inc.*, 48 F3d 1172, 1178 (Fed Cir 1995).
152. *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F2d 801, 803 (Fed Cir 1991); *McKesson* at 917–918.
153. *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 468 F3d 1366, 1374 (Fed Cir 2006); *Nilssen* at 1229.
154. 37 CFR §1.56(b) (2006); *See Agfa Corp. v. Creo Products Inc.*, 451 F3d 1366, 1377 (Fed Cir 2006).
155. See, e.g., *Agfa Corp.* at 1377.
156. *Impax Labs.*, at 1374–1375 [quoting *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F2d 867, 876 (Fed Cir 1988)].
157. *Cargill Inc. v. Canbra Foods, Ltd.*, 476 F3d 1359, 1364 (Fed Cir 2007); *In re Metroprolol Succinate Patent Litig.*, 494 F3d 1011, 1020 (Fed Cir 2007); *Impax Labs*, at 1375.
158. *Id.*; *Eli Lilly & Co.*, at 1381.

159. *Eli Lilly & Co.*, at 1382; *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F2d 867, 876 (Fed Cir 1988)

160. See *Eli Lilly & Co.*, at 1381; *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F3d 684, 693 (Fed Cir 2001).

161. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F3d 1253, 1256 (Fed Cir 1997); Cargill at 1364.

162. *Molins* at 1178.

163. See *Labounty Manufacturing Inc. v. United States Int'l Trade Commission*, 958 F2d 1066, 1070–1072, 1076–1077.

164. See, e.g., *Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd.* 204 F3d 1368 (Fed Cir 2000).

165. See *Dippin' Dots, Inc. v. Mosey*, 476 F3d 1337, 1345 (Fed Cir 2007).

166. See *Bellehumeur v. Bonnett*, 127 Fed. Appx. 480, 486 (Fed Cir 2005); *Board of Educ. ex rel Bd. Of Trustees of Florida State University v. American Bioscience, Inc.*, 333 F3d 1330, 1344 (Fed Cir 2003).

167. See *Consolidated Aluminum Corp. v. Foseco Intern. Ltd.*, 910 F2d 804 (Fed Cir 1990).

168. See *Li Second Family Ltd. Partnership v. Toshiba Corp.*, 231 F3d 1373, 1378–1380 (Fed Cir 2000).

169. *Digital Control* at 1318.

170. *Id.* at 1321.

171. See *General Electro Music Corp. v. Samick Music Corp.*, 19 F3d 1405, 1411–1412 (Fed Cir 1994).

172. See *Lumenyte Intern. Corp. v. Cable Lite Corp.*, 1996 U.S. App. LEXIS 16400 *at 3–4, (Fed Cir 1996).

173. See *Nilssen* at 1231.

174. *Nilssen* at 1230.

175. See, e.g., *Agfa Corp.* at 1380; *Bellehumeur* at 486–487.

176. *Impax Labs.* at 1375.

177. *Id.* at 1375–1376.

178. *Id.* at 1376.

179. *Id.* at 1377.

180. *Id.*

181. *Warner-Lambert* at 1343.

182. *Id.*

183. *Id.* at 1343–1344.

184. *Id.* at 1346–1347.

185. *Id.* at 1347.

186. *Id.* at 1348.

187. *Eli Lilly* at 1383.

188. *Id.*

189. *Id.*

190. *Id.*

191. *In re Metoprolol Succinate* at 1020–1021.

192. *Id.*

193. *Id.*

194. *Id.* at 1021.

195. *Id.*

196. See, e.g., FTC, Generic Drug Entry Prior to Patent Expiration: An FTC Study, pp. 24, 25 & nn. 2–3 (2002); http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf ("FTC Study").

197. Medicare Modernization Act of 2003, §1112(a)(1).

198. *Id.* at §1113.

199. *Id.* at §1115.

200. The earliest identified reverse payment settlement in the FTC Study was executed in March 1993. The settlement agreements analyzed in the FTC Study were either executed after December 31, 1994 or were in effect at the time of the 2001 FTC. FTC Study, p. 3.

201. See *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F Supp 2d 1279 (S.D. Fla. 2005); see *In re Cardizem CD Antitrust Litig.*, 332 F3d 896 (6th Cir 2003).

202. *In re Tamoxifen Citrate Antitrust Litig.*, 466 F3d 187 (2d Cir 2006), cert. denied, 127 S. Ct. 3001 (2007); *Schering-Plough Corp. v. FTC*, 402 F3d 1056 (11th Cir 2005), *cert. denied*, 126 S. Ct. 2929 (2006).

203. The FTC sent out special orders pursuant to Section 6(b) of the Federal Trade Commission Act. 15 USC §46(b) (2000). FTC Study, p. 3.

204. See, generally, FTC Study.

205. *Id.* at i–xi.

206. See *id.* at 31 (of the 20 agreements identified, 9 were reverse payment settlements).

207. *Id.* at 25.

208. *Id.* at 25 & n. 3. The FTC Study also reveals that the FTC instituted only 1 enforcement action with respect to 20 identified final Paragraph IV settlement agreements. *Id.* at 25 n. 2.

209. See *id.* at 57–63.

210. Commissioner Sheila F. Anthony Remarks before ABA Antitrust and Intellectual Property Group entitled "Riddles and Lessons from the Prescription Drug Wars: Antitrust Implications of Certain Types of Agreements Involving Intellectual Property," June 1, 2000; http://www.ftc.gov/speeches/anthony/sfip000601.htm.

211. April 10, 2007 Oral Statement of Commissioner J. Thomas Rosch, FTC Oversight Hearing, Committee on Commerce, Science and Transportation, United States Senate, http://www.ftc.gov/speeches/rosch/070410Roschsenatestatment.pdf.

212. Id.

213. *In the Matter of Schering-Plough Corporation*; Docket No. 9297; http://www.ftc.gov/os/adjpro/d9297/index.shtm.

214. *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990)(per curiam).

215. *In re Tamoxifen Citrate Antitrust Litig.*, 429 F3d 370 (2d Cir 2005).

216. Oral Statement of Commissioner J. Thomas Rosch, FTC Oversight Hearing, Committee on Commerce, Science and Transportation, United States Senate, April 10, 2007; http://www.ftc.gov/speeches/rosch/070410Roschsenatestatment.pdf.

217. Prepared Statement of the Federal Trade Commission Before the Committee on the Judiciary of the United States Senate on Anticompetitive Patent Settlements in the Pharmaceutical Industry: The Benefits of a Legislative Solution, January 17, 2007; http://www.ftc.gov/speeches/leibowitz/070117anticompetitivepatentsettlements.senate.pdf.

218. *Id.*

219. *Id.*

220. *In the Matter of Abbott Labs.*; Docket No. C-3945; http://www.ftc.gov/os/caselist/c3945.shtm.

221. *In the Matter of Hoechst Marion Roussel, Inc.*; Docket No. 9293; http://www.ftc.gov/os/caselist/d9293.shtm.

222. *In the Matter of Abbott Labs.*; Docket No. C-3945; http://www.ftc.gov/os/caselist/c3945.shtm and *In the Matter of Hoechst Marion Roussel, Inc.*; Docket No. 9293; http://www.ftc.gov/os/caselist/d9293.shtm.

223. *Id.*

224. *Id.*

225. *In the Matter of Bristol-Myers Squibb Company*; Docket No. C-4076, http://www.ftc.gov/os/2003/04/bristolmyerssquibbcmp.pdf.

226. *Id.*

227. See *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F Supp 2d 1279 (S.D. Fla. 2005).

228. The Abbott–Geneva Settlement Agreement defined "Final Judgment in Geneva's Favor" as "the entry pursuant to Federal Rule of Civil Procedure 79(a) by the United States District Court for the Northern District of Illinois in Case No. 96 C 3331 of a final, appealable judgment that Geneva's Terazosin Hydrochloride Products do not infringe or would not infringe any valid and enforceable claim of the '207 patent."

229. "Final Judgment in Abbott's Favor" was defined as "the entry pursuant to the Federal Rule of Civil Procedure 79(a) by the United States District Court for the Northern

District of Illinois in Case No. 96 C 3331 of a final, appealable judgment that Geneva's
Terazosin Hydrochloride Products infringed or would infringe any valid and enforce-
able claim of the "207 patent."

230.  See *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F Supp 2d 1279 (S.D. Fla. 2005).
231.  See *In re Cardizem CD Antitrust Litig.*, 332 F3d 896 (6th Cir 2003).
232.  *Id.* at 907–908.
233.  *Id.*
234.  See *In re Buspirone Patent Litig.*, 185 F Supp 2d 363 (S.D.N.Y. 2002).
235.  BMS settles antitrust litigation—Pharmacy News, Drug Store News, Michael Johnsen,
      January 20,2003.
236.  *Schering-Plough Corp. v. FTC*, 402 F3d 1056 (11th Cir 2005), *cert. denied*, 126 S. Ct. 2929
      (2006).
237.  *Id.* at 1069–1070.
238.  *Id.* at 1070.
239.  See *id.* at 1070–1071.
240.  *Id.* at 1071.
241.  *Id.* at 1069.
242.  *Id.* at 1060.
243.  *Id.* at 1060–1061.
244.  *Id.*
245.  *Id.*
246.  *Id.*
247.  *Id.*
248.  In the Matter of Schering-Plough Corporation; Docket No. 9297; http://www.ftc.gov/
      os/adjpro/d9297/index.shtm.
249.  *Id.*
250.  *Id.*
251.  See *Schering-Plough Corp. v. FTC*, 402 F3d 1056, 1071–1072 (11th Cir 2005), *cert. denied*,
      126 S. Ct. 2929 (2006).
252.  *Id.* at 1072.
253.  *In re Tamoxifen Citrate Antitrust Litig.*, 466 F3d 187 (2d Cir 2006), *cert. denied*, 127 S. Ct.
      3001 (2007).
254.  *In re Tamoxifen Citrate Antitrust Litig.*, 466 F3d 187 (2d Cir 2006), *cert denied, Joblove v. Barr
      Labs, Inc.*, 127 S.Ct. 3001 (2007).
255.  *Id.* at 208–210.
256.  *Id.* at 208.
257.  *Id.* at 208.
258.  *Id.* at 208.
259.  *Id.* at 208.
260.  Petition for Writ of Certiorari at 17–18, *FTC v. Schering-Plough Corp.*, http://www.ftc.
      gov/os/adjpro/d9297/index.shtm.
261.  *Id.* at 19.
262.  *Id.* at 18.
263.  *Id.*
264.  *Id.*
265.  *Id.*
266.  *In the Matter of Schering-Plough Corporation*; Docket No. 9297; http://www.ftc.gov/
      os/adjpro/d9297/index.shtm.
267.  Preserve Access to Affordable Generics Act, S. 316, 110th Cong. (2007); Protecting Con-
      sumer Access to Generic Drugs Act, H R 1902, 110th Cong. (2007).
268.  S. 316 §2(a)(8).
269.  *Id.* §3. and H R 1902.



# 8   The Influence of the Prescription Drug User Fee Act on the Approval Process

**Marc J. Scheineson, Esq.**

*Alston & Bird LLP, Washington, D.C., U.S.A.*

## SUMMARY OF THE PRESCRIPTION DRUG USER FEE ACT OF 1992 (PDUFA I) (OCT. 1, 1993, TO SEPT. 30, 1997)

### Nature of the Deal

In 1991, when Dr. David Kessler sat in his new desk chair in his downtown Washington, D.C., office, shortly after being nominated and confirmed as the Commissioner of Food and Drugs, he asked himself the recurring question, "How can so few employees with such a limited federal budget perform all the responsibilities expected of us?" At that time, the U.S. Food and Drug Administration (FDA) had fewer than 8000 employees in 25 districts across the United States. Its budget was just over $850 million. Its jurisdiction included inspecting the entire domestic processed food supply, sampling and inspecting imported products under its jurisdiction, reviewing and approving the export of regulated products to foreign countries, inspecting every product manufacturing establishment every 2 years and the country's entire blood supply, reviewing and approving applications and labeling and promotion for new prescription drugs, generic drugs, animal drugs, biologics, vaccines, medical devices, completing over-the-counter drug regulations, conducting surveillance on those approved products, soliciting and investigating adverse reaction reports, supervising the labeling and sale of medical foods, infant formulas, teas, dietary supplements, cosmetics, regulating every product that emits radiation (including light bulbs, cellular telephones, lasers, microwave ovens, television sets), inspecting the kitchens of commercial aircraft and cruise ships, and, with whatever time was left, making sure that product advertising was truthful, fairly balanced, and not false or misleading. This was a relatively paltry budget, especially when compared to the $2 billion budget of the U.S. Department of Agriculture to support hundreds of thousands of employees with a tenth of the jurisdiction. FDA states that it regulates products that comprise $0.25 of every consumer dollar spent. In reality, it regulates nearly one quarter of the American economy. On top of all this pressure, Dr. Kessler was bombarded with industry and congressional pressure to streamline and expedite the review of promising new life-saving prescription drugs and biologics. Those approvals were averaging 2 to 3 years following submission of complete new drug applications (NDAs) and what are now called Biologics Licensing Applications (BLAs). Nonpriority applications for "me-too" drugs could take 5 years or more to preview and approve.

Dr. Kessler convened his policy, legal, and legislative team. Viewing proposals by other agencies to adopt "user fees" to pay the cost of specialized government services that benefited identified categories of Americans, the terms of his offer to industry soon became clear. Would companies be willing to pay for the review

of their product applications if it meant faster review? Those additional resources would, in turn, be dedicated to paying the salaries of additional product reviewers. All applications would be assigned to expand agency personnel immediately. They would not wait for months, and sometimes years, until a reviewer was available to pick it up and read it.

Gerald Mossinghoff, president of what was then the Pharmaceutical Manufacturers Association and is now PhRMA, was called in by the commissioner and his team. Mossinghoff, a former commissioner of the Patent and Trademark Office (PTO), was initially skeptical. PTO had made a similar proposal to expedite review of patent applications. Applicants opposed the measure. Then when a nominal fee structure was adopted, all the new money flowed directly into the general federal treasury; it had not been dedicated to supplementing PTO resources. Even if money could be so dedicated, would not HHS budget cutters just reduce FDA's appropriated funds by the amount of revenue from private sources? This would be a zero-sum gain. He also did not believe that companies should have to pay the government to do its job. Was not that what taxes were for?

Finally, an industry committee was formed to work with FDA and the Congress. A creative new proposal was worked out. PhRMA and the Industrial Biotechnology Association (a predecessor of the Biotechnology Industry Association) agreed on behalf of its member companies to support significant fees in the hundreds of thousands of dollars for NDAs, BLAs, and establishment registrations, if the fees met the following criteria. They had to be ($i$) additive to existing FDA baseline appropriations; ($ii$) fully dedicated to the approval of new drugs and biologics; ($iii$) reasonable amounts; ($iv$) based on a long-term government commitment to specific improvements in the approval process; and ($v$) part of performance goals that should be established by the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER) to evaluate improvements in the review and approval process.

These parameters were creatively hammered out into specific legislative language in a series of painstakingly long drafting sessions. Meetings were held in the office of the House Legislative Counsel, David Meade, among representatives of FDA's Office of Legislative Affairs, the PhRMA/IBC working group, the Department of Health and Human Services Assistant Secretary for Legislation, Bill Schultz (Rep. Henry Waxman), Mark Childress (Sen. Edward Kennedy), and Anne LaBelle (Sen. Orrin Hatch). Innovative new provisions insured that the industry's fees did not disappear into general government coffers or that direct FDA appropriations were not reduced by the amount of private funds received. FDA's existing fiscal 1992 appropriations became a baseline that had to increase by at least an established cost-of-living adjustment every year or the authority to assess private user fees would terminate. Legal commitments were made that the fees would supplement FDA's direct appropriations. CDER and CBER developed specific plans to hire 600 new full-time equivalent employees. FDA refused to commit to statutory language requiring a specific time frame for application review. It agreed, however, to issue a side letter to congressional committee chairmen containing nonbinding "performance goals." These goals would include a designated percentage of applications that would be reviewed and acted upon within one year of submission for standard applications and within 6 months of submission for priority applications (involving drugs to treat serious and life-threatening illnesses for which no comparable therapy was currently available). The law would expire in 5 years. It

would require periodic congressional reauthorization as a mechanism to force FDA to be accountable for these performance goals or risk losing hundreds of millions of user fee funds that would support hundreds of new employees and infrastructure improvements.

Once the deal was reached behind the scenes between industry, FDA, and the Democratic and Republican Committee leadership, legislation was introduced. It was reviewed in cursory hearings and passed in Congress with remarkable speed. On October 29, 1992, the President signed the Prescription Drug User Fee Act of 1992 in the Rose Garden of the White House amid great fanfare and celebration. If CDER's and CBER's detailed action plans could be administered properly, the new law would revolutionize the American drug review process. It would push the industry, and the quality of American health care, ahead of our European counterparts. Drug applications would be reviewed immediately upon completion and filing. Review time would be cut in half. An efficient new system would restore resources and accountability to FDA. Pharmaceutical manufacturers were not buying approvals. The insular FDA Center review structure would not allow that to happen. They were, however, dedicating large sums of money in fees for the opportunity to participate in a more interactive process potentially marketing their new drugs years in advance of the prior system. Patients would no longer be required to wait additional years to gain access to life-saving new therapies. FDA would quantify its progress through written reports to congressional oversight authorities on an annual basis. If the experiment did not work, the parties would pull the plug after the initial 5-year term. The authorization bill creating the user fee program still required separate appropriations legislation to allow the government to fund FDA and collect the private funds. On July 2, 1993, the president signed a supplemental appropriation bill allowing FDA to collect user fees due from October 1, 1992, through September 31, 1993, the government fiscal year (FY).

## Type of User Fees

In order for these fees not to be viewed as taxes (and thereby incur the jurisdiction of the congressional taxing committees which did not support the concept of dedicated user fees), the new law was intended to divide the fee burden across existing manufacturers. Segments were created which relied directly on the payment for real FDA services, including (1) the review of drug/biologic applications (application fees), (2) insuring safe manufacturing processes (establishment fees), and (3) monitoring adverse reports, recalls, labeling, etc. (product fees). These three segments insured that a company with a lot of product applications but few products on the market currently or with no existing manufacturing facility would not bear the entire burden of funding FDA review operations. Likewise, if a company marketed many products or maintained numerous facilities, it could afford to sustain FDA's CDER and CBER operations more easily than a new company with few products. Therefore, the fees were divided into three segments, as summarized below.

### Application Fees
#### Who Pays?

Fees are assessed for the submission of certain human drug or biological applications. Human drug applications include new drug applications (NDAs), Pre-Licensing Applications and Establishment Licensing Applications for biologics which have been consolidated into Biological Licensing Applications (BLAs), and

initial certification of antibiotic drugs (which became NDAs in the FDA Modernization Act in 1997). Also included are product efficacy and manufacturing supplements. Expressly excluded from application fees, and also from FDA performance commitments, were (*i*) over-the-counter drugs, which commonly do not require advance FDA approval (except for Rx-to-OTC switches, which do commonly contain clinical information and are included), (*ii*) generic drug applications (ANDAs), (*iii*) new animal drug applications (NADAs), (4) blood products, (*iv*) allergenic extracts, (*v*) in vitro diagnostics, and (*vi*) large-volume parenterals.

### Fee Schedule

One-third of the total annual revenue was required to come from each fee category. For the term covered by PDUFA I, these fees, which were calculated to meet the total designated income required to hire 600 additional reviewers based on the number of applications actually filed, as well as support staff and computer back-up, included $100,000 per application (FY 1993); $162,000 (FY 1994); $208,000 (FY 1995); $204,000 (FY 1996); and $223,000 (FY 1997). For applications not requiring review of clinical data, fees were reduced by one-half.

### Payment Terms

One-half of the fee was due on submission. One-half of the amount submitted was returned, if the application was not accepted for filing by FDA. The remaining payment was due within 30 days of when FDA sent its action letter, or when the applicant withdrew its application.

### *Drug Establishment Fees*
### Who Pays?

An Rx drug user fee was due from each person (corporation) that owned an establishment in which at least one Rx drug (or biologic) was manufactured during the relevant fiscal year. If the drugs made in the establishment are all subject to generic competition, no fee would accrue. So that the user fee would not be deemed a tax, the payer had to have at least one application pending for FDA review after September 1, 1992. FDA later interpreted this requirement to mean that if the other establishment fee criteria were met, an original application or supplement (with or without clinical data) that was pending after that date would trigger establishment fees for all qualifying establishments. Contract manufacturers that were not registrants on an FDA application were exempt from this fee.

### Prescription Drug Establishment

A separate fee was due on each establishment maintained by the applicant. Both foreign and domestic establishments were subject to a fee, if the products they made were marketed in the United States (1). One or more buildings located within 5 miles of each other were classified as one establishment. The facility had to make one or more Rx drugs manufactured in "finished dosage form," interpreted by FDA to mean in a form approved for administration to a patient without further manufacturing (2). Finally, it had to be under the management of the applicant listed on the NDA or BLA. FDA later interpreted this to mean that the applicant need not be the holder of the approved NDA or BLA for the product manufactured at the establishment.

## Fee Schedule

Payment was due annually on each Rx drug establishment, as billed by FDA based on its establishment registration list, and as adjusted at the end of the previous year based on the fees needed to reach the total income amount required by this segment of the user fee. Those amounts were $60,000 (FY 1993), $88,000 (FY 1994); $129,000 (FY 1995); $135,300. (FY 1996); and $138,000 (FY 1997).

## Payment Terms

The establishment fee is due on or before January 31 of each calendar year. FDA routinely sends out an invoice based on establishments contained in its establishment registration list. Many of those establishments listed and billed may not conform to the requirements of PDUFA. The initial FDA mailings were overly broad. Therefore, manufacturers should have notified FDA regarding incorrect or unauthorized billing.

### Drug Product Fees

A separate annual fee was assessed to each manufacturer based on the number of Rx drug products listed in FDA's product registry.

## Who Pays?

The fee is assessed to "each person named as an applicant on a human drug application" for each Rx drug (or biologic) listed on FDA's product registration list. The applicant is required to have at least one application or supplement pending agency review in the year the product fee was assessed (beginning after Sept. 1, 1992). A listed product is exempt from the fee once it has generic competition (3). Innovator antibiotic drug products (approved under §507) are subject to product fees. Generic antibiotic drug products (those that are not the first approval of a particular antibiotic drug) are not subject to product fees (4).

## Fee Schedule

The fee for each listed drug included $6000 (FY 1993); $9400 (FY 1994); $12,200 (FY 1995); $12,600 (FY 1996); $14,000 (FY 1997).

## Payment Terms

Product fees were due at the time of the first product listing in each calendar year. The product must be listed as required by §510 to be subject to the product fee. FDA considers a product to be listed on the date of receipt of the initial submission of information, whether or not the agency finds that the information submitted was complete or requests additional information (5). A product is considered delisted, and no longer assessed a fee, on the date of the agency's receipt of the submission deleting the product from the Drug Listing. A product is subject to the fee if it is listed under §510, whether or not it is actually marketed or even if it is only marketed abroad. If a product is transferred from one NDA/BLA holder to another during a fiscal year, the first holder will assess the product fee in that fiscal year.

## Performance Goals

In negotiating the user fee program, FDA was determined to informally offer nonbinding goals. It refused to include inflexible standards in the language of the statute. In a compromise, industry acquiesced to a side letter sent to the Chairman and the Ranking Member of the House Committee on Energy and Commerce,

Rep. John Dingell (D-MI) and Rep. Norman Lent (R-NY). These goals provided the expectations of regulated industry and the Congress concerning review times that would deem the program successful and allow its reauthorization for successive 5-year terms. PhRMA and BIO reportedly believed that if the resources of its member companies failed to shorten review times in accordance with the written goals included in the letter, it could successfully persuade the Congress to shut down the program.

The letter to the Congress stated the following:

1. The additional user fee revenues would be dedicated to expediting the drug review and approval process.
2. Priority NDAs and BLAs that were complete would be reviewed and acted on (through the issuance of an action letter) within 6 months of submission.
3. Standard NDAs and BLAs that were complete would be reviewed and acted on within 12 months of submission.
4. Priority supplements and amendments (or those not requiring review of clinical data) would be reviewed and acted on within 6 months of submission.
5. Standard supplements and amendments would be reviewed and acted on within 6 months of submission.
6. Applications resubmitted following the receipt of a nonapproval letter would be acted on within 6 months of submission.
7. Application backlogs were to be eliminated within 18 months to 2 years.
8. The goals were to be achieved based on a staggered schedule with 55% compliance with applications received in 1994 moving to 90% compliance in 1997.

## Small Business Exception

The law allowed a company to pay one-half of the prescribed application fee, not payable until 1 year following the submission (6), if it maintained fewer than 500 employees (including affiliates) and had no Rx or biologic drug product on the market (7). An affiliate was defined as one business with direct or indirect control of another, one business with the power to control another, or a third party that controls or has the power to control both businesses (8). For these qualifying small businesses, FDA sends an invoice 1 year following the submission for the first installment of the fee, whether or not an action letter was issued. The second installment is due at the same time if an action letter was already issued. The number of an applicant's employees is calculated using the procedures of the Small Business Administration contained in 13 CFR Part 121. The suggested procedure to request the exemption is to submit an application to FDA's Office of the Ombudsman. The written request must contain the details of the applicant and fee for which a waiver or reduction is requested. It must also contain information and analysis showing that the statutory criteria for the waiver or reduction have been met (9). The request for the small business exemption should be submitted approximately 90 days before the application is submitted. It must also contain a statement from a responsible officer of the company that it has fewer than 500 employees, has no Rx drugs on the market and does not intend to introduce any within the next 12 months, and expects to submit an application within 90 days (10). The Office of Ombudsman as waiver officer will review the request, review product listings, and will refer the small business criteria consideration to the SBA. A written acknowledgment of the decision will be made. If the request for exemption is denied, an approval process is available as summarized in FDA's draft interim guidance.

## Fee Waiver or Reduction

A fee may be waived or reduced if (*i*) FDA did not spend substantial time or resources in reviewing the application before it was withdrawn, (*ii*) it is necessary to protect the public health, the fee would present a significant barrier to innovation, the fee would exceed the cost incurred in reviewing the application, (*iii*) a competing copy of the drug is not subject to the fee, or (*iv*) the fee was paid previously and the applicant is resubmitting the application (11). These provisions allow FDA to consider the limited resources of the entity when evaluating requests for a fee waiver or reduction. It requests a range of information to evaluate whether user fees present a barrier to an entity's ability to develop or market specific products or otherwise continue to pursue innovative technology. The criteria used by FDA include the following:

*Protect Public Health; Significant Barrier to Innovation*—FDA believes that the annual establishment fee is the greatest barrier under this category. Therefore, most of the fee waivers or reductions granted for public health or innovation reasons relate to small entities where annual establishment fees would be disproportionate in relation to revenues. FDA requests a certified statement from the entity and its affiliates concerning annual revenues, both domestic and foreign. Commercial and financial information is not releasable to the public under the Freedom of Information Act (12). FDA evaluates the annual cost of user fees versus the entity's gross annual revenues, the resources of the entity's parent, and other major funding sources. Lack of profitability is not considered evidence of limited resources.

*Fees paid would exceed cost of FDA review*—In order for a government assessment to constitute a true fee for the use of services and not a tax, the law insures that the cost of those services approximates the level of the fee. Therefore, FDA may waive all or a portion of the user fee amount if the fee exceeds the anticipated cost of rendering application review and related services (13). FDA was attempting to quantify the cost of the major elements associated with its review of common applications and supplements (14). Few, if any, fee reductions have been based on this provision, in part because FDA interpreted the provision to determine not just the agency cost of reviewing the one application for which the fee was assessed, but also the cost of reviewing all active applications of that person, including INDs, NDAs, BLAs, supplements, and amendments (15). The agency made it clear, however, that an applicant can apply for such a fee reduction if its application was not accepted for filing and the fee was paid (16).

*Reduction because of Paper NDA for Same Product*—A fee waiver or reduction request can be made by an NDA sponsor who submitted an application under §505(b)(1) (full-NDA), if assessing such fee would be inequitable because an application or supplement for a product containing the same active ingredient was filed by another person under §505(b)(2) (paper NDA) of the act (17).

## Increases and Adjustments

The law provides an annual total amount of user fees that are established each fiscal year by congressional appropriation committees. FDA then sets the level of its specific application, establishment, and product fees in November for the next fiscal year to raise the annual user fee level appropriated by the Congress. FDA's scheduled fee rates are announced by a notice in the *Federal Register*. The application fee

*Scheineson*

rates were set by statute, but are to be adjusted annually for cumulative inflation. Total application fee revenues are structured to increase or decrease each year as the number of fee-paying applications to FDA increases or decreases. Each year, FDA is required to set establishment fees and product fees so that the estimated total fee revenue from each of these two categories will equal the total revenue FDA expects to collect from application fees that year. This procedure continues the arrangement under which one-third of the total user fee revenue is projected to come from each of the three types of fees.

## Appropriated Fee Amounts

Each year that user fees are authorized, they must be contained in the annual appropriations legislation for FDA (appropriated by the Agriculture, Rural Development and Related Agencies Subcommittees of Appropriations). In PDUFA I (for the fiscal years Oct. 1, 1993, through Sept. 30, 1997), the appropriated amounts for total Rx drug user fees, as adjusted for the number of applications actually filed, were as follows: $36 million (FY 1993); $56,284,200 (FY 1994); $77,415,000 (FY 195); $79,981,200 (FY 1996); and $84 million (FY 1997).

## Effect of Failure to Pay Fees

Under the initial user fee legislation, unless fees were paid timely when assessed, applications would not be accepted for filing or review would be discontinued.

## Annual Reports

Two annual reports were required to be prepared by FDA and submitted to the House Energy and Commerce Committee and to the Senate Labor and Human Resources Committee. The first report would quantify FDA's progress in achieving its performance goals and would be filed within 60 days following the end of the first fiscal year (by Nov. 29, 1993). This became known as the "Performance Report" and has been filed annually since. A second report was required to review implementation of FDA's new authorities under the act and how it used the fees collected. This became known as the "Financial Report" and has been filed annually since. This report was due within 120 days after the end of the fiscal year (by Mar. 29, 1994). Annual FDA PDUFA reports are available at www.fda.gov/cder/pdufa/mainpduf.htm

## Five-Year Sunset

The act was terminated after 5 years, effective on September 30, 1997. The purpose of this "sunset" was to provide an opportunity for Congress and industry to meet with FDA to assess the program and FDA's progress in expediting application review. Since FDA hired more than 600 FTEs, the agency has enormous pressure to meet its obligations or risk losing significant funding, which sustained that increased workforce. If the program was not reauthorized at the end of that term, FDA would likely be forced to fire its new reviewer workforce. Since enactment of this FDA legislation was considered mandatory every 5 years, its reenactment for two successive 5-year periods has been used as a vehicle to pass other FDA and health-related reforms.

## Animal Drug Study

Finally, since manufacturers of animal drugs were not invited to participate in the PDUFA program, the legislative drafters agreed, at the request of industry, to

require FDA to prepare a study evaluating whether to impose user fees on new animal drug applications to improve existing review processes. The report was due to Congress by January 4, 1994.

## SUMMARY OF FDA MODERNIZATION ACT OF 1997 (PDUFA II) (OCT. 1, 1997, TO SEPT. 30, 2002)

### Modifications of Prior Law

Based on FDA's significant progress to reform its review of Rx drug and biologics applications, Congress reauthorized PDUFA as part of broader FDA Reform Act legislation (FDAMA). This new Title 1 of FDAMA (called PDUFA II) amended PDUFA I and extended it through September 30, 2002. In July 1998, FDA released a Five-Year Plan for PDUFA II that presented the major assumptions FDA was making and how it intended to use its additional resources in order to achieve the new goals associated with the amended act.

### New Fee Amounts

1. *Application Fees:* $256,846 (applications including data), $128,423 (applications without data and supplements with data) (FY 1998); $272,282 (applications including data), $136,141 (applications without data and supplements with data) (FY 1999); $285,740 (applications including data), $142,870 (applications without data and supplements with data) (FY 2000); $309,647 (applications including data), $154,823 (applications without data and supplements with data) (FY 2001); $313,320 (applications including data), $156,600 (applications without data and supplements with data) (FY 2002).
2. *Establishment Fees:* $141,966 (FY 1998); $128,435 (FY 1999); $141,971 (FY 2000); $145,989 (FY 2001); $140,199 (FY 2002).
3. *Product Fees:* $18,591 (FY 1998); $18,364 (FY 1999); $19,959 (FY 2000); $21,892 (FY 2001); $21,630 (FY 2002).

### Performance Goals

As part of the consideration of PDUFA II, FDA again agreed to a series of performance goals against which its performance would be measured when reauthorization of a successive 5-year term was considered in 2002. The goals for CDER and CBER review included the following:

| Original NDAs, BLAs, and efficacy supplements | Standard application | Priority application |
| --- | --- | --- |
| FY 1998 | 90% in 12 months | 90% in 6 months |
| FY 1999 | 30% in 10 months 90% in 12 months | 90% in 6 months |
| FY 2000 | 50% in 10 months 90% in 12 months | 90% in 6 months |
| FY 2001 | 70% in 10 months 90% in 12 months | 90% in 6 months |
| FY 2002 | 90% in 10 months | 90% in 6 months |

Ninety percent of manufacturing supplements requiring approval were to be reviewed in 6 months, with a sliding scale to be reviewed in 4 months (30% in FY 1999, 50% in FY 2000, 40% in FY 2001, and 90% in FY 2002). Resubmission of original NDAs/BLAs were to be considered in 6 months, with a sliding scale to be considered in 4 months and then 2 months.

Other performance goals unrelated to application reviews were built into the PDUFA II regime. FDA was required to monitor responses to requests for meetings (70% of requests were to be responded to within 14 days moving to 90% by 2001). Type A meetings were to occur within 30 calendar days of the agency receiving the meeting request, Type B meetings within 60 calendar days, and Type C meetings within 75 calendar days. FDA meeting minutes were to be available to the sponsor within 30 calendar days after the meeting. They would clearly outline the important agreements, disagreements, issues for further discussion, and action items from the meeting in bulleted form, and need not be in great detail (18).

Procedures for clinical holds were also carefully delineated. FDA centers would respond to a sponsor's complete response to a clinical hold within 30 days of the agency's receipt of a sponsor's response. Ninety percent of such responses must be timely after FY 1999.

Procedures for major dispute resolution were also quantified. By 2001, 90% of procedural and scientific matters would be responded to within 30 days, which involved drug reviews that could not be resolved at the divisional level and for which a formal dispute resolution petition was filed. A series of conditions was provided, which included (*i*) that the disputes should first be worked through the review chain from the reviewer to the Division Director, (*ii*) that the FDA-timed responses to grant or deny the appeal could be oral (followed by written confirmation within 14 days) or written, and (*iii*) that the reasons for a denial must be provided. Many of these conditions conform to FDA guidance for formal dispute resolution.

Sponsors frequently consult review staff seeking comments on protocol design. The PDUFA II performance standards contain a 45-day time frame and procedural outline for this feedback process. Miscellaneous issues also include using user fee resources to update FDA's information management infrastructure to allow for paperless INDs and human drug applications, use of complete response letters in lieu of action letters, separate information request letters from each discipline reviewing an application, and a definition of terms used in this document.

## SUMMARY OF PRESCRIPTION DRUG USER FEE AMENDMENTS OF 2002 (PDUFA III) (OCT. 1, 2002, TO—SEPT. 30, 2007)

### Modifications of Prior Law

In 2002, the Prescription Drug User Fee Amendments of 2002 were included as Title 5 of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002. Rx drug user fees were reauthorized for another 5 years until September 30, 2007. The level of fees increased to reflect a decline in the number of applications filed with the agency. In addition, a detailed letter dated June 4, 2002, was prepared for the regulated industry and the Congress under the signature of HHS Secretary Thompson (19). The letter transmitted detailed new performance goals and procedures prepared by the agency (20).

## New Fee Amounts

1. *Application fees:* $533,400 (applications including data), $266,700 (applications without data and supplements with data)(FY 2000) (FY 2001) (FY 2003).
2. *Establishment fees:* $209,900 (FY 2003).
3. *Product fees:* $32,400 (FY 2003).

## Performance Goals

Application review times maintained the final schedule proposed as part of PDUFA II: original standard applications and efficacy supplements with data—90% within 10 months; original priority applications and efficacy supplements with data—90% within 6 months; class 1 resubmissions—90% within 2 months; class 2 resubmissions—90% within 6 months; and resubmitted efficacy supplements (class 1) reduced from 6 to 2 months for review.

Meeting management goals were refined in the PDUFA III document. CDER and CBER committed to notifying parties requesting meetings, teleconferences, or videoconferences within 14 calendar days of receiving an industry request for a formal meeting with the date, time, place, and expected FDA attendees. Meetings continued to be classified as Type A, B, or C, and detailed procedures for requesting the meetings were provided.

Procedures similar to PDUFA II were provided for clinical hold responses, major dispute resolution, and protocol design review. FDA also agreed to conduct two pilot programs to evaluate the development of a continuous marketing application.

## Impact of User Fees on Rx Drug Approvals

There is no question that the enactment and implementation of PDUFA led to the dramatic restructuring of the agency and its industry relationship. Reviewers and their superiors within the FDA product centers were accountable for the pace of their work for the first time. Review time decreased from a median time in excess of 2 years or more to within 1 year for standard applications and 6 months for priority applications. Hundreds of new employees were retained to review data and to interact with the regulatory officials of constituent product sponsors. FDA has consistently reported to the Congress in its annual Performance and Financial Reports that it met and exceeded all its performance goals under PDUFA I, II, and III (for drugs but not biologics). It has noted a trend, however, of fewer original applications and efficacy supplements that pay the largest component of application fees under the act. The number of original new product applications submitted and filed each year increased steadily in the early years, from 88 in FY 1993 to 133 in FY 1997. From FY 1997 to FY 2000, the growth reportedly leveled off, and in FYs 2001 and 2002 application submissions and filings dropped substantially (21). Twenty-five percent fewer applications were filed with FDA in 2001 than in 2000. The number of priority applications was down more than 60% in 2001 from the previous year and was less than half the level of any year since FY 1997 (22). Since priority applications often represent significant therapeutic gains, the Congress commissioned a report by the General Accounting Office (GAO) to evaluate the cause of this decline.

At the same time, FDA continued to report increased productivity. In congressional testimony, FDA Deputy Commissioner Lester Crawford reported approval of 66 new drugs in 2001, 24 of which were new molecular entities (23). Ten of the 66 new drugs (seven of the new molecular entities) received priority review and were

*Scheineson*

reportedly reviewed and approved in the median time of 6 months. CBER reviewed a total of 16 complex BLAs in the median time of 13.8 months and approved them in the median time of 20.3 months. Two priority BLAs were reviewed in the median time of 11.5 months and approved in the median time of 13.2 months.

Finally, FDA reported that 50% of all new drugs worldwide were launched in the United States, and American patients have access to 78% of the world's new drugs within the first few years of their introduction (24). The agency advocated a need to use some PDUFA resources for rigorous safety monitoring of newly approved drugs in the first few years after a product is on the market to quickly detect unanticipated problems outside the application, and a definition of terms used in this document.

## SUMMARY OF PRESCRIPTION DRUG USER FEE AMENDMENTS OF 2007 (PDUFA IV) (OCT. 1, 2007 TO –SEPT. 30, 2012)

### Modifications of Prior Law

In 2007, the Prescription Drug User Fee Amendments of 2007 were included as Title 1 of the Food and Drug Administration Amendments Act of 2007. Rx drug user fees were reauthorized for another 5 years until September 30, 2012. The level of fees increased to reflect a decline in the number of applications filed with the agency. In addition, a detailed letter dated September 27, 2007, was prepared for the regulated industry and the Congress under the signature of HHS Secretary Leavitt (19). The letter transmitted detailed new performance goals and procedures prepared by the agency (20). Overall, FDA believes that this reauthorization of PDUFA "will provide significant benefits for those who develop medical products, and for those who use them.""

### New Fee Amounts

1. *Application fees:* $1,178,000 (applications including data), $589,000 (applications without data and supplements with data)(FY 2008).
2. *Establishment fees:* $392,700 (FY 2008).
3. *Product fees:* $65,030 (FY 2008).

### Performance Goals

Application review times maintained the final schedule proposed as part of PDUFA II and III: original standard applications and efficacy supplements with data—90% within 10 months of receipt; original priority applications and efficacy supplements with data—90% within 6 months; class 1 resubmissions (resubmitted after a complete response letter, not approvable or approvable letter that requests limited additional information such as labeling, safety updates, stability, assays, final release testing, etc.)—90% within 2 months; class 2 resubmissions (any other items including presentation to an advisory committee)—90% within 6 months; and resubmitted efficacy supplements (class 1)—90% within 2 months and class 2—90% within 6 months.

---

* http://www.fda.gov/oc/initiatives/advance/fdaaa.html, Sept. 27, 2007.

Meeting management goals were further refined in the PDUFA IV document. CDER and CBER committed to notifying parties requesting meetings, teleconferences, or videoconferences within 14 calendar days of receiving an industry request for a formal meeting with the date, time, place, and expected FDA attendees. Meetings continued to be classified as Type A, B, or C, and detailed procedures for requesting the meetings were provided.

Procedures similar to PDUFA III were provided for clinical hold responses, major dispute resolution, and special protocol design review. FDA also agreed to amend its regulations and procedures to provide for the issuance of either "approval" or "complete response" letters at the completion of a review cycle for a marketing application. It also agreed to submit deficiencies to a sponsor in the form of a "discipline review" letter on a rolling basis as submitted where comments on the separate parts of the application can be provided more quickly when each discipline finished its initial review of its section of the pending application. This is preferable to waiting longer for all division reviews to be consolidated before any feedback is provided to the applicant.

## FDA Drug Safety Enhancement and Modernization

Twenty-five million dollars of total user fees revenue of $459,412,000 was authorized in FY 2008 to fund significant new drug safety initiatives at FDA, with that amount adjusted for inflation and changes in workload in subsequent years through 2012. FDA's written Performance Goals and Procedures details an elaborate program as summarized below.

### Development of a 5-Year Plan

FDA will develop and periodically update a 5-year plan describing activities that will lead to enhancing and modernizing FDA's drug safety activities/system. The plan will (*i*) assess current and new methodologies for collecting adverse event information at various points during the product lifecycle; (*ii*) identify epidemiology best practices and develop guidance; (*iii*) expand CBER/CDRH database acquisition; (*iv*) develop and validate risk management and risk communication tools; (*v*) improve postmarket IT systems; and (*vi*) improve coordination among the centers' review offices and surveillance offices.

### Review Proprietary Names to Reduce Medication Errors

User fee revenue will be used to create a more predictable system to review proprietary names proposed by sponsors, including reviewing 50% of proprietary name submissions during FY 2009

Within 180 days of receipt; 70% in FY 2010 and 90% in FYs 2011 and 2012; create a process and pilot program where a sponsor can request reconsideration of names found unacceptable by submitting a written rebuttal with supporting data or request a meeting within 60 days; publish a final guidance on the contents of a complete submission package for a proposed proprietary name by the end of FY 2008 and procedure for review in the Manual of Policies and Procedures; and draft guidance on best practices for naming, labeling, and packaging drugs to reduce medication errors.

*Scheineson*

### Streamline First-Cycle Reviews

FDA has committed to communicating with drug sponsors much earlier concerning substantive review issues identified during the initial filing review within 14 calendar days after the 60-day filing date for 90% of applications. FDA will also inform the sponsor of the planned timeline for review of the application and provide greater transparency. Procedure will conform to FDA's Guidance for Review Staff and Industry: Good Review Management Principles and Practices for PDUFA Products.

### Improve FDA Operating Efficiencies

FDA has committed to streamline and modernize its existing drug review processes including the issuance of new guidance related to some of its Critical Path priorities including clinical hepatotoxicity (FY 2008), noninferiority trials (FY 2008), adaptive trial designs (FY 2008), use of end of phase-2 meetings (FY 2008), multiple endpoints in clinical trials (FY 2009), imaging standards for use as an endpoint in clinical trials (FY 2011), and will schedule workshops to further science and develop guidance concerning predictive toxicology, biomarker qualification, and evaluation of applications with missing data.

### Direct-to-Consumer Television Advertising

PDUFA IV included significant authority to use user fee revenue and assess sponsors additional fees to hire approximately 27 new FTEs, and to tighten regulation of direct-to-consumer broadcast advertising ($6.25 million in 2008 increasing annually). In exchange for significant fees from sponsors seeking preapproval of DTC TV ads, FDA committed to reviewing 75 original submissions within 45 days (50% of 150) in FY 2008, 37 resubmissions (50% of 75 resubmissions); review of 60% rising to 90% of submissions by 2012. The bulk of this program is sponsor funded. It is unclear if drug manufacturers will commit to the level of payment required to ensure continuation of this program (e.g., $41,667 in FY 2008 for each ad review if 150 submissions are "reserved"). Unless the program is sufficiently subscribed to raise a minimum amount of review fees and operating reserve (at least $11.25 million in FY 2008), the program will be discontinued.

### Impact of User Fees on Rx Drug Approvals

There is no question that the enactment and implementation of PDUFA led to the dramatic restructuring of the agency and its industry relationship. Reviewers and their superiors within the FDA product centers were accountable for the pace of their work for the first time. Review time decreased from a median time in excess of 2 years or more to within 1 year for standard applications and 6 months for priority applications. Hundreds of new employees were retained to review data and to interact with the regulatory officials of constituent product sponsors. FDA has consistently reported to the Congress in its annual Performance and Financial Reports that it met and exceeded all its performance goals under PDUFA I, II, and III (for drugs but not biologics). It has noted a trend, however, of fewer original applications and efficacy supplements that pay the largest component of application fees under the act. The number of original new product applications submitted and filed each year increased steadily in the early years, from 88 in FY 1993 to 133 in FY 1997. From FY 1997 to FY 2000, the growth reportedly leveled off, and in FYs 2001 and 2002 application submissions and filings dropped substantially (21). Twenty-five percent

fewer applications were filed with FDA in 2001 than in 2000. The number of priority applications was down by more than 60% in 2001 from the previous year and was less than half the level of any year since FY 1997 (22). They then began to increase for five consecutive years from FY 2000 to FY 2005 (23), while standard applications continued to decline and manufacturing supplements remained constant.

At the same time, FDA continued to report increased productivity. However, it noted that it has been unable to meet targets for meetings and special protocol assessments. Meeting requests reportedly increased by 46% from FY 2001 to FY 2005 (1662 to 2430) and special protocol requests increased by 200% from 125 to 392 during that same period.

FDA maintains a chart, summarizing the status of the numerous notice, guidance, and rules required to implement FDAAA. That information can be accessed at http://www.fda.gov/oc/initiatives/advance/fdaaa/implementation_chart.html.

## EVALUATION OF THE PROGRAM BY THE GENERAL ACCOUNTING OFFICE

In September 2002, the GAO issued a report entitled "Effect of User Fees on Drug Approval Times, Withdrawals, and other Agency Activities" (25). The report concluded that PDUFA has been successful in providing FDA with the funding necessary to hire additional drug reviewers, thereby making new drugs available in the United States more quickly. But while the median approval time for NDAs for standard drugs dropped from 27 months to 14 months from 1993 to 2001, the new priority time for priority drugs remained stable at 6 months after 1997. The median approval times for standard new molecular entities (drugs containing active ingredients that have never been marketed in the United States in any form) increased from 1998 from about 13 months to 20 months. In contrast, median approval times for BLAs have fluctuated since 1993, ranging from a low of 12 months in 1997 to a high of about 32 months in 1995. In 2001 that time had slipped to about 22 months.

FDA reportedly had to increase the amount of its appropriated funds, outside of user fees, to drug and biologics reviews to compensate for the minimum allocation of funds required by PDUFA. FDA also reportedly used user fee proceeds to fund employee pay raises that were generally not covered by annual appropriations. PDUFA II increased reviewer workload by shortening review times and establishing new performance goals to reduce overall drug development times. This resulted in higher attrition rates for drug reviewers than comparable occupations in the federal workforce.

Finally, GAO reported that a higher percentage of drug applications had been withdrawn from the market for safety-related reasons during the most recent term of PDUFA (5.3% from 1997 to 2000) compared to 1.6% in the period immediately after PDUFA implementation (1993–1996). Using 8-year periods before and after enactment of PDUFA, the rate of postapproval drug withdrawals increased from 3.1% to 3.5%. Some drugs were withdrawn because doctors and patients did not use them according to approved labeling, while others were found to have rare side effects that were not detected in clinical trials. GAO recommended that FDA strengthen its postmarket surveillance activities. It plans to spend approximately $71 million in user fees over the next 5 years to better monitor safety and track adverse events. Under PDUFA III, FDA was given the authority for the first time to utilize user fees for these postmarket surveillance and compliance activities. The

industry had aggressively resisted the use of its own proceeds to pay for agency compliance activities.

## STRATEGIES TO USE PDUFA TO EXPEDITE REVIEW AND APPROVAL

### Evaluate Whether the Application will be Subjected to Rx Drug User Fees

These fees, and the performance standards associated with them, generally apply only to original NDAs and BLAs and supplements to those filings. Remember, these are user fees and not taxes for government services. Therefore, FDA has to justify its imposition by utilizing the services of data reviewers hired with the fee proceeds.

### Attempt to Negotiate the Lowest Possible Fee

User fees today are substantial; now almost 10 times the rate when the program was adopted originally in 1993. They include a $1,178,000 application fee in FY 2008, a $392,700 fee per manufacturing establishment, and a $65,030 fee per listed product. One half of the application fee is due on submission of the application, and one half is due within 30 days of the date of the action letter (which has become a complete response letter). If the applicant is a small business (fewer than 500 employees with no Rx or biologic product on the market), only half of the fee is owed, and not until 1 year following the date of submission (and only if the application is accepted for filing). A major manufacturer should consider allowing a smaller entity from which it is licensing the product to become the sponsor of the application. Corporate structuring might be possible to save a significant portion of this fee.

An application for fee waiver or reduction might be available under the criteria included in Section 1.5. Specifically, if the fee precludes the application because of an orphan or small market or fewer agency resources are required for a narrow review, the fee might be reduced. In the current budget climate, and with fewer applications, FDA may not give in easily in this regard, but the law might be on your side. Also remember that once a drug has generic competition, or even if a paper NDA is on the horizon, the fee might not be due.

Likewise, the definition of an establishment might be reduced for purposes of the fee. Buildings making multiple drugs might count as a single establishment if they are located within a 5-mile radius. The plant must make finished dosage forms to count. Contract manufacturers or makers of ingredients do not count. Foreign plants only count if their product is imported into the United States.

Finally, product fees can be reduced if a manufacturer limited or aggregated the product listing of multiple dosages or dosage forms of its products. These might be included in one product listing. Antibiotics do not count if they were not approved by NDAs. Once a generic competitor is approved, the innovator product no longer has the fee assessed. Finally, since a drug maker must use the product review services of the agency to owe a fee (remember the law created a user fee and not a product tax), no fee is owed unless the company has at least one application or supplement pending for agency review in the year of the fee assessment.

## Create a Priority Application

Performance goals are not legally binding on FDA, but the agency is under great pressure from industry and the Congress to review most priority applications within 6 months of filing. The review divisions have discretion about how they classify new applications. Seek priority designation wherever possible (separate and apart from fast-track review for drugs treating serious or life-threatening illness). This discussion should occur in pre-NDA/BLA meetings with the review staff. If the drug is a new chemical compound, meets an unmet medical need, or treats a debilitating disease, the sponsor should create an organized presentation to the agency to request this designation.

## Refer to Agency Performance Goals During the Product Review

The sponsor must create a complete application as quickly in the process as possible, so it is accepted for filing and the FDA clock begins to run. Experienced regulatory lawyers or professionals maintain constant contact and interaction with product reviewers so that reviews progress efficiently. FDA has preserved considerable flexibility to meet its statistical user fee goals while stopping its review clock with informational requests to the sponsor. In order to obtain an approvable letter and avoid a delaying complete response letter that requests additional information, this interaction must be maintained. The company must be responsive and anticipate the need for additional data, analyses, or clarification. The quicker and more lucidly this information is provided, the better the chance of making it under the review goal. FDA must account for meeting its PDUFA goals in annual performance reports to the Congress. Once the FDA clock has shifted back to the sponsor and the performance goal has been met in the first-review cycle, many of the benefits of PDUFA have been lost to the product sponsor. Multiple review cycles delay product approval significantly. Prepare quality applications, anticipate questions or information requests, and do not file the application until "all your ducks are in a row."

## Employ Formal Dispute Resolution or Congressional Oversight in Appropriate Circumstances

PDUFA is the product of a delicate compromise between the Congress on behalf of industry and the agency. FDA has become much more interactive in order to relieve last-minute pressures to meet tighter PDUFA performance goals. If scientific differences arise, use the formal dispute resolution guidance that FDA has provided. If policy differences arise, seek congressional oversight and support as appropriate.

## REFERENCES

1. If an Rx drug, as defined in PDUFA, was made in a foreign plant for foreign marketing under an approved NDA, the foreign establishment was subjected to establishment fees if it was owned by an NDA/BLA holder that had a pending NDA/BLA or supplement after September. 1, 1992.
2. Thus, for example, if a product is sterilized by filtration and placed into vials by a "contract manufacturer" that has no pending NDAs, BLAs, or supplements after September 1, 1992, then no establishment fee was due for either the contract manufacturer or the facility that performed the rest of the manufacturing steps. Attachment D, "Application,

Product, and Establishment Fees, Common Issues, and their Resolution," revised as of December. 16, 1994.

3. FDA has interpreted the generic exemption narrowly. Therefore, me-too products that are the same as a listed Rx product but were approved under the NDA provision of §505(b)(1) do not qualify for the exclusion. If a listed product has a competitor approved under §505(b)(2)(paper NDA) or (j)(ANDA), that drug is exempt. If the §505(b)(2) or (j) applications have been approved and not withdrawn, the first approved product is excluded from fees even if the generic product is not presently marketed. Tentative approvals of a 505(j) application are not considered approvals. Finally, according to FDA, products listed that were approved by a paper NDA before 1984 when §505(b)(2) was added to the FDCA are not eligible for exclusion from product fees.

4. FDA's interpretation of PDUFA did not allow innovator *antibiotic* drug products to become exempt from the product fee even after subsequent generic antibiotic drug products were approved, when they were approved under §507. However, since 1997 generic antibiotics have been approved under §505(j), and should therefore trigger the exemption of the innovator product. Likewise, bulk antibiotic drugs should not be subjected to product fees because they are not products in finished dosage form.

5. *Id.*

6. The date of submission, according to FDA, is the date the application is received by FDA and stamped as received in the CDER or CBER central document control center. Attachment G, "Draft Interim Guidance Document for Waivers of and Reductions in User Fees," July 16, 1993, 11. This is distinguished from "filing," which occurs after FDA determines that the application is sufficiently complete to permit a substantive review. See 21 CFR §314.101.

7. 21 USC §379h(b)(2). The act did not provide a small business exception for supplement applications.

8. *Id.*

9. *Id.* at 24–32. *This draft guidance document is available* at www.fda.gov/cder/pudfaimainpduf.htm.

10. *Id.* at 28

11. §379h(d).

12. See 5 USC §552, and FDA implementing regulations at 21 CFR Part 20. Supra note 6 at 15.

13. §379(h)(d).

14. Supra note 6 at 18–19.

15. *Id.*

16. Under §379h(a)(1)(D), FDA refunds 50% of the application fee *paid for any application and supplement refused for filing.* That amount actually represents only 25% of the total application fee since only 50% of the total fee is due upon submission. *Id.* at 19.

17. §379 h(d)(4).

18. PDUFA Reauthorization Performance Goals and Procedures; III.C., www.fda.gov/cder/news/pdufagoals.htm.

19. See www.fda.gov/oc/pdufa4/pdufa4goals.html., *September. 27, 2007.*

20. See www.fda.gov/oc/pdufaipdufaHgoals.html., April 7, 2008.

21. FY 2001 and FY 2002 Performance Reports to Congress, p. 4.

22. *Id.*

23. See www.fda.gov/ope/pdufa/report2005.html

24. Statement of FDA Deputy Commissioner before the House Appropriations Subcommittee on Agriculture Rural Development, FDA and Related Agencies, March 21, 2002, 10, www.fda.gov/o1a/2002/fy2003.htm1.

25. *Id.* at 20. GAO Report No. 02–958, Report to the Chairman of the Senate Committee on Health, Education, Labor, and Pensions, FDA -Effect of User Fees on Drug Approval Times, Withdrawals, and Other Agency Activities. September 2002.



# 9 Clinical Research Requirements for New Drug Applications

**Gary L. Yingling, Esq. and Ann M. Begley, Esq.**

*K. & L. Gates, LLP, Washington, D.C., U.S.A.*

## INTRODUCTION

As the industry is more and more successful in delivering new drugs for a wider array of medical conditions, the need to develop more drugs increases. While the public wants more drugs to cure every illness, it is not really prepared to recognize the risk factors and how difficult it is to evaluate risk, especially at the research stage. The fallout has been more drugs withdrawn from the market with greater fanfare and a Congress that is demanding with one proposed piece of legislation after another to "fix" that which is broken. In the middle of this approval process is the U.S. Food and Drug Administration (FDA) with its current legislative mandate to regulate all drugs manufactured or marketed in the United States. When the agency uses the term "drug," it includes within that definition biologics. The regulation of drugs is basically separated into two categories: those for which preapproval is not required, which includes those that are considered generally recognized as safe and effective, and those that require preapproval in the form of the submission of a new drug application (NDA) or an abbreviated new drug application (ANDA) (1). For those that fall in the category of being under review or generally recognized as safe and effective, which are those subject to the over-the-counter Monograph system, there is no preapproval requirement and, therefore, no submission of information required for the product to enter the marketplace (2). For those drugs that require the submission of a drug application, it is highly likely that the application will be dependent on the submission of clinical data or bioequivalence studies to demonstrate that the product is safe and effective. Just as the submission of the drug application is subject to various statutory, regulatory, and guideline requirements, the clinical or bioequivalence testing necessary for obtaining approval of an NDA or ANDA is covered by a number of statutory, regulatory, and guideline provisions. To fully appreciate the clinical requirements, one needs to recognize that in most cases, for a drug-seeking preapproval, it is a violation of the Federal Food, Drug, and Cosmetic Act (FFDCA) to ship an unapproved new drug in interstate commerce for the purpose of clinical research unless it is the subject of an investigational new drug (IND) application (3). The statute states that, in order to obtain approval, the sponsor or the applicant must submit a drug application under §§505(b)(1), 505(b)(2), or 505(j) of the FFDCA.

When one considers the filing of a §505(b)(1) application, one is looking at submitting an application for a new chemical entity, a novel dosage form, or a very significant labeling change that will require preclinical animal data and clinical studies. The clinical studies will probably be organized into three phases: phase one being basic toxicology studies, phase two being dose range studies, and phase three being the pivotal clinical study or studies that allows that agency to approve the application.

A 505(b)(2) application will, in all likelihood, require less clinical data and could be approved based on a single phase three study or even a bioequivalence study. This is because the 505(b)(2) application relies on the fact that the active pharmaceutical ingredient which is the subject of an approved drug application is well known to the agency so that it is not necessary to obtain the detailed data (e.g., animal studies, phase one and phase two studies) that would be required for a 505(b)(1) application.

If the application is a 505(j), or ANDA, the required data will be a bioequivalence study to demonstrate that the applicant's drug is equivalent to the product already marketed. Under the ANDA regulations, it is possible for the bioequivalence study to be a single dose, crossover, limited patient study looking at blood levels or a 500 or 600 patient clinical study comparing the referenced listed NDA to the proposed abbreviated application. Whatever the form of the application, in all likelihood there will be the necessity to do clinical research and FDA has set forth detailed regulations and guidances controlling clinical and bioequivalence studies that support new drug applications.

## SPONSORS

The firm or organization that bears the responsibility for the clinical study is called the sponsor. The sponsor is the organization that will file the drug application, whether it is a complete 505(b)(1), a 505(b)(2), or an abbreviated application. As the sponsor, the organization will be charged with obtaining the data to submit in the NDA or ANDA for the purpose of gaining FDA approval. This undertaking becomes a multistep process, from deciding what drug the firm will file an application on to gathering the supporting scientific data to submit to the agency for the purpose of obtaining approval. For a firm filing a 505(b)(1) application, usually for a new chemical entity, the initial question is what amount of basic research needs to be done before tests can be conducted in humans. This preclinical data stage involves in vitro and animal testing and is normally characterized as the pre-IND stage. The sponsor does not need to notify FDA of its interest in working on the chemical entity, and is under no obligation to update the agency on its development plan at the pre-IND stage. However, once a sponsor decides that it has obtained enough in vitro and animal data to believe there is benefit in conducting human testing, it becomes necessary for a firm to submit an IND application. The IND application is the submission that allows a firm to ship an IND drug for the purpose of conducting clinical research. As noted earlier, it is prohibited to ship a drug that has not been approved unless it is the subject of an IND application (4). The statute specifically provides that the Secretary will promulgate regulations to allow sponsors to conduct studies for the purpose of gathering data so that applications can be submitted for approval.

While the FDA's Code of Federal Regulations (CFR) sets forth the basic requirements for the submission of an IND application and the various requirements that arise from that submission, they are dated and really only provide an overview of the agency's expectations (5). In accordance with the regulations, the sponsor will need to prepare an actual IND application, which will include the animal studies that have been conducted, any data of which the sponsor may be aware concerning studies outside the United States, and the protocol (study plan) for the first studies which the sponsor intends to conduct.

Under the current user fee program, which is designed to create a cooperative working relationship between the agency and the sponsor, the sponsor will normally request a pre-IND meeting to discuss the nonclinical data that has been collected to date, the ingredients being used in the proposed product, and the clinical testing, particularly the studies involved in phase one and early phase two development. The sponsor, in preparing for the pre-IND meeting, will need to prepare a summary of the information that it intends to submit in the IND application. It is to the sponsor's great advantage to provide FDA with a very detailed summary because the first meeting really sets the stage for the drug development program and time spent at this stage can be very beneficial from every perspective, so that the agency does not require testing that may be unnecessary or fail to appreciate if there are data that will suggest an issue. If a pre-IND meeting is held, there is usually a fairly substantial level of agreement between the agency and the sponsor before the actual IND application is submitted. While it is not necessary to request a pre-IND meeting, it has become unusual for firms, particularly if they are seeking 505(b)(2) applications, not to request a pre-IND meeting. The pre-IND meeting allows a firm to obtain a better understanding of what data and information will be necessary to obtain approval.

After receiving an IND application, the agency then has 30 days to review the IND application to determine whether there is enough preclinical data to assure that the product is safe enough to allow the conduct of human clinical studies. There is also a careful review of the clinical study protocols, whether it be one or more protocols, to determine if the study design will result in data that will allow the drug development to move forward. If the proposed phase one study protocol fails to provide enough data and information in its design to move to phase two studies, there is no benefit to subjecting human patients to the drug. Therefore, the agency will carefully look at the proposed protocol. If it is not satisfied with the study design, FDA may notify the sponsor of a clinical hold. A clinical hold means that the sponsor cannot go forward with the study or studies. Clinical holds seldom occur when there have been pre-IND meetings where the agency and sponsor have discussed the study design. Again, it behooves the sponsor to be as detailed as possible regarding the first studies protocols so that the agency has a complete understanding of the preclinical data and proposed design of the studies.

For those sponsors that find themselves in a clinical hold, the agency has created a fairly elaborate review process to assure that the agency's clinical hold decision can be reviewed and that the sponsor will have an adequate opportunity to explain why the proposed protocol is adequate. However, one needs to recognize that FDA's review process is inherently slow and that every effort should be made to avoid this detour by assuring that the protocol design is one that the agency will accept.

After submitting the IND application, a sponsor must comply with a 30-day waiting period before it can initiate the study. If, at the end of the 30 days, the sponsor has not heard from the agency, in theory the sponsor may go forward with the clinical study. However, the sponsor should be very reluctant to go forward with a clinical study at the end of the 30 days if it has not heard from the agency. Under these circumstances, there is a possibility that the agency has some concern that it has not been able to articulate within the 30-day period, and that shortly after the 30-day period expires the agency will notify the sponsor that the study is on clinical hold. If the sponsor has already started the study, both the sponsor and the agency

face major problems in that the agency is unhappy with the study design and the sponsor has already enrolled patients. This can be avoided by making contact with the agency shortly after the IND application is submitted to be absolutely sure the agency has received the IND application and that it is being reviewed. Then the sponsor should make contact again, as the 30-day period is winding down, to confirm that the agency will not have problems such that will lead it to consider placing the study on a clinical hold.

While sponsors often identify the clinical investigators at the time they are preparing the study protocols, and will often have the major clinical investigator accompany them to the pre-IND meeting with the agency, it is not necessary to identify up front any or all of the clinical investigators who will participate in the clinical studies. The sponsor does bear the responsibility for the eventual selection of the clinical investigators who will actually do the studies. It is unusual in today's marketplace for a sponsor to have a medical staff capable of doing the studies, or that will even play a major role in overseeing the actual conduct of the study. What is normal for a sponsor is to have numerous contacts in the clinical community and to have identified any number of individuals that they believe are appropriate for the purpose of being clinical investigators in the study.

In today's clinical research environment, sponsors typically have a small, specialized medical staff for the purpose of assisting in study design, reviewing study results, and playing an active role in planning. The actual protocol for the study will probably be prepared by a contract research organization (CRO) or a clinical investigator working with a CRO. There are a number of very large CROs as well as a number of mid-sized and small CRO firms that specialize in clinical studies, and some highly specialized firms that conduct studies on particular organs or disease conditions or patient populations. Therefore, the sponsor often has many options from selecting either a single large CRO, which may have multiple sites at which a study can be done and can therefore increase potential enrollment, to selecting a small CRO for the purpose of going to particular parts of the country or identifying specialized practices.

The sponsor can transfer its study obligations over to a CRO. The FDA's regulations (6) specifically provide for the authority of the sponsor to transfer responsibility for any and all obligations. The transfer, however, must be in writing and as such, it is to the sponsor's advantage to delineate exactly what obligations have been transferred. While the sponsor can transfer its obligations, it is still ultimately responsible for the clinical trial. Therefore, it needs to assure itself that the selected CRO understands the importance of having good investigators, of following the protocol, and of conducting the study in a manner that FDA will find satisfactory. More than one sponsor has entered into a study and become enmeshed in FDA or Congressional oversight for failure to assure that the study is properly conducted (7).

The agency requires that the sponsor monitor the investigators to be sure that the investigators and their staff are conducting the study in accordance with the protocol and with the sponsor's and the agency's expectations. Again, the sponsor can contract with a CRO or a third party for the purpose of monitoring, or it may have monitors of its own. The monitor's role is very important in a clinical study because it is the monitor who visits the study site to determine whether or not the clinical investigator fully understands the protocol and whether the investigator and the

investigator's staff are conducting the study in accordance with the sponsor's and the agency's expectations.

In the past, it was not uncommon for the monitor to function mostly as a study promoter, making sure the investigator was actively involved in enrolling patients and in correcting record-keeping errors and oversights of the staff. While monitors today may fulfill some of those roles, FDA's heightened expectations for monitoring to assure quality of data have resulted in monitoring being much more than an important promotion activity. The monitor is the person who is able to identify investigator sites where patients are being entered who fail to meet the study criteria, to identify staff errors and/or malfeasance, and to correct staff and investigator misunderstandings with regard to the protocol and the way the study is being conducted. More and more, when the agency finds problems at a study site, it asks why monitoring did not identify and correct the problem or discontinue the investigation. As the agency becomes more resource conscious, it will turn increasingly to using its enforcement tools to ensure the sponsor compliance with all of the requirements within the IND regulations.

In addition to the monitoring activity required of the sponsor or CRO, there is an expectation that all of the information required to be reported in the case report forms (CRF) or patient medical records (source documents) will be properly recorded (i.e., written down or entered in the computer system). Only information that is actually reported can be used by FDA in its evaluation of the clinical data. The popular phrase is, "If it isn't written down, it didn't happen." The agency is extremely strict with reporting requirements. Efforts by investigators to explain a particular set of events or activities at a later date will be dismissed because there was a failure to record the information properly at the time it should have been recorded. As with all statements that appear to be absolutes, there is a certain level of flexibility in relationship to written records, as long as the reporting is done in the manner required and is corrected in a manner that is appropriate. For instance, a study nurse records the patient's blood pressure as 120/80 in the patient's chart and as 80/140 in the CRF records. Some days later, the study coordinator notes the error and corrects it by drawing a line through it. The correction is recorded, initialed and dated and explained either on the CRF or on a separate memorandum that explains what occurred and why the correction was made. While the agency will accept such corrections, there is an expectation that they will be minimal, and that they will properly be recorded, dated, and signed.

It is understood that neither the sponsor nor the CRO will be doing the actual writing in the patient records or CRF and that, in fact, most of the time the clinical investigator will not be making those recordings either. This task is normally done by study staff. Therefore, monitoring mandates a review of the site's compliance with record-keeping and record-retention requirements. Review of the record is for the purpose of catching the type of error described earlier, or to look for patterns or problems in a clinical study. The record review may be done by the clinical investigator or staff, the CRO, or, in fact, by the sponsor. Today, with many records created and transferred electronically, it is possible for the sponsor or CRO staff to do an almost instantaneous review of records for completeness and to ensure there are no apparent discrepancies. It is the agency's expectation that the records have been reviewed and monitored to assure that the required information is recorded. There is also a record-keeping requirement that the retainer of the records, whether

it be the clinical investigator, the CRO, or perhaps even the sponsor, will retain the records for a period of 2 years after the drug is approved or 2 years after the study is completed if there has been a decision that the drug will not be the subject of an application, and FDA has been notified. FDA regulations outline record-retention time frames (8). The sponsor or CRO must be extremely vigilant in relationship to the record-keeping and record-retention requirements.

In addition to the monitoring, reporting requirements, and record review, there is the need to keep track of the actual study drug. The sponsor provides the study drug for the study. Many times in addition to the drug itself, it will be necessary to provide a placebo that is indistinguishable from the drug so that the study can be blinded. To ensure that the study is properly blinded it must be coded. Coding may be the sponsor's responsibility or the CRO's. Once the drug is sent to the clinical investigator, the responsibility for keeping track of the drug falls to the investigator. That which is not dispensed at the end of the study should be sent back to the sponsor so that it can make records of the drug that was manufactured, dispensed, used, and returned. There is one quirk in the process for those manufacturers involved in ANDA Applications: even if they are biostudies that are basically clinical studies in design and length, the retention samples cannot be sent back to the sponsor but must be retained by the clinical investigator, the CRO, or independent third party (9). The failure of the retention samples for an ANDA application to be in the possession of an independent third party can and has resulted in clinical studies being called into question by the agency.

## CLINICAL INVESTIGATORS

While sponsors are responsible for the development, monitoring, and submission of clinical studies in an NDA or ANDA, the clinical investigators are responsible for the actual conduct of the study. Prior to allowing the clinical investigator to participate in the clinical study, the sponsor or CRO must obtain a signed form FDA 1572, in which the clinical investigator commits to performance of a number of study-related responsibilities. The clinical investigator is responsible for understanding and complying with the investigational plan, obtaining Institutional Review Board (IRB) approval before beginning the study, protecting the rights and welfare of the participating research subjects, and assuring that legally effective informed consent is obtained from each subject. In addition, prior to commencing the study, the clinical investigator must provide the sponsor with sufficient financial information to allow the sponsor to make complete and accurate certification or disclosure statements under 21 CFR part 54 concerning potential financial conflicts of interest. The clinical investigator must also commit to update this financial information if relevant changes occur during the course of the study and 1 year following the completion of the study.

The lead clinical investigator is usually referred to as the principle investigator (PI), and those clinical investigators who work under the PI's supervision, if any, are referred to as subinvestigators. PIs with significant research practices will likely have a clinical research team composed of a clinical research coordinator, who is generally responsible for managing the research team, one or more subinvestigators, and one or more study nurses to assist in the conduct of the research. While the PI can delegate appropriate research responsibilities to his team members, ultimately, the PI is responsible for supervising all members of the research

team, and for assuring that they understand their obligations in conducting the research.

FDA has historically used the inspectional process in part as an educational tool for educating PIs as to their obligations and responsibilities. The agency has also relied on the sponsor or CRO to undertake the educational responsibility. Finally, FDA has on a number of occasions brought criminal charges or sent a warning letter to a PI for engaging in what the agency saw as fraud. Clearly, as to pharmaceutical and device firms, the prosecution of one sends a message to the others that a particular activity is not going to be allowed.

However, with PIs, the reliance on sponsor/CRO educational programs, inspectional 483 observations, and criminal prosecution/warning letters was not working, so FDA turned to what it has done historically and issued a draft guidance in May 2007 titled "Guidance for Industry, Protecting the Rights, Safety, and Welfare of Study Subjects—Supervisory Responsibilities of Investigators" (Guidance) (10). The Guidance is only a draft, and in all likelihood it will never be finalized, but it is instructive. It is the joint effort of Center for Biologics Evaluation and Research (CBER), Center for Drug Evaluation and Research (CDER), and Center for Devices and Radiological Health (CDRH). It starts with an introduction explaining the investigator's obligations. Section II is an overview which contains a Part A for drugs and biologics and a Part B for device clinical trials. The major focus of the Guidance is Part III, which addresses first the issue of supervision of the conduct of the study. The supervision section recognizes that the PI will be delegating tasks, but that the PI remains accountable. The FDA focuses on four major issues regarding the PI delegation of tasks:

1. Individual qualifications of delegate,
2. Adequate training,
3. Adequate supervision, and
4. Oversight of third parties (labs, etc.).

With regards to qualifications, the question is education, training, or experience. The FDA poses the following questions: (*i*) Does the person have the license or certification necessary to perform the task assigned? and (*ii*) Has the PI followed the protocol if the person assigned to a task was not qualified? FDA believes that the PI should maintain a list of appropriately qualified persons to whom tasks are delegated (11).

A second concern is training. Does the PI really know the level of training that the staff has, or is the PI assuming training and experience that may not exist? Clearly, FDA is concerned when the sponsor provides training materials and the PI never assures that the staff is trained.

Of greatest importance is supervision. Many PIs, especially ones who have never done a study before, assume that clinical practice and research are one and the same, but they are not. Research requires meticulous record keeping, and a staff will only understand that if properly supervised. The Guidance recommends several things including routine meetings with staff and procedures for documenting performance. From FDA's perspective, unless a PI is personally engaged in fraud, the major problem for almost every PI who has problems with FDA (lengthy 483 or warning letter) is the actions of the staff because of lack of supervision. The staff either does not know what is expected of them or there may be a lack of motivation to perform the many tasks. The Guidance lists eight items that may adversely

impact the ability of a PI to supervise a clinical trial, including inexperienced or overburdened staff, complex clinical trial, and large patient population. The Guidance stresses the need for the PI to create a detailed plan to address these potential issues.

Another significant issue for the PI are any third parties involved in the study who are not employed by the PI. FDA has placed the total burden on the PI not only for their own staff but also for all the data and information coming from a third party. FDA recommends that the PI assure that staff not under the PI's direct employ has adequate training. The agency notes that clinical chemistry testing, radiologic assessments, and electrocardiograms all fall within the area of concern since the work is done by a central independent laboratory that has been retained. The Guidance recommends procedures to assure integrity but does not suggest how that is to be accomplished. At a minimum, the PI should give some consideration to providing test samples or double-checking results with a second laboratory. Of greatest concern is that the PI does not ignore what on first impression appear to be sloppy results.

This section of the Guidance has a second part addressing protections and rights of patients (12). However, the section only addresses the need for the PI to practice good medical care and has little to do with the role of the PI in conducting the study.

Another area that has been of major importance to FDA is that the subject be properly informed of the risk of the research. To accomplish this, one traditionally thinks of informed consent in terms of a document, signed and dated by the participant, setting forth the purpose, benefits, risks, and other study information necessary to allow the participant to make an informed and voluntary decision to participate in the clinical study. In reality, informed consent is a process that applies to each communication with the participant, commencing with the subject recruitment material and the initial telephone screening of potential subjects, through the conclusion of the study. If new information that may affect a participant's willingness to continue in the study arises during the conduct of the study, clinical investigators have a responsibility to inform the participant of the new information. As to the informed consent document itself, clinical investigators must assure that it not only complies with the content requirements set forth in 21 CFR part 50, but also that it complies with applicable state law requirements. For example, California requires, in addition to the informed consent document, that clinical investigators must provide all research participants with an Experimental Subject's Bill of Rights for signature.

The clinical investigator also has significant record-keeping and -reporting responsibilities. As discussed earlier, clinical investigators are responsible for controlling distribution of the study drug through the maintenance of adequate records identifying dates, quantity, and use by the research subjects. The PI and staff must create and maintain records to document receipt of the drug and will need to have appropriate storage facilities so the drug can be secured and not accidentally dispensed to a patient outside the study. During the study, the drug must be tracked so that records will accurately reflect how much of the drug was taken by the patient. Part of the study protocol may require questioning the subject about taking the drug. Any drug not taken by the patient should be returned to the PI. At the conclusion of the investigator's participation, unused study drug must be returned to the sponsor or disposed as directed by the sponsor.

In addition to study drug accountability records, the clinical investigator and staff must prepare and maintain adequate and accurate documentation reporting all observations and other data of significance for each research participant in the clinical study. Such documentation includes, but is not limited to, informed consent, CRFs, medical records, and laboratory results. The sponsor must collect CRFs at the conclusion of the study. However, the investigator must maintain other documentation for 2 years following the date of the application's approval, or if the application was not filed or there was no such approval, 2 years after the conclusion of the study and after FDA has been notified.

The clinical investigator should submit progress reports to the sponsor as specified in the investigational plan. In addition, the clinical investigator must report such adverse experiences to the sponsor that may reasonably be regarded as caused by, or probably caused by, the study drug. At the conclusion of the study, the investigator must issue a report to the sponsor discussing the investigator's participation in the study.

Finally, the clinical investigator has reporting responsibilities in relationship to the IRB or Board. The investigator must promptly report all changes in the research activity and all unanticipated problems involving risk to human subjects or others. Thus, the clinical investigator must provide the IRB with serious unexpected adverse experience information that occurs at the clinical investigator's site. The clinical investigator would also generally be expected to report to the IRB any adverse experience information the PI learns of that occurs at other sites in a multisite study. Changes in the study such as a change in protocol must be reported to, and approved by, the IRB before making the change unless the change is necessary to eliminate apparent immediate hazards to human subjects (13). The clinical investigator must also comply with other IRB-specific reporting requirements. These may include intermittent progress reports, continuing review reports, and study closeout reports. Failure to comply with IRB reporting requirements can and should result in termination or suspension of the IRB approval.

## INSTITUTIONAL REVIEW BOARD

In the process of setting up the clinical study and arranging for manufacture of the drug, creation of the protocol, identification of the PI, and creation of the informed consent, it will be necessary for the sponsor, CRO, or PI to seek the services and oversight of an IRB. Under 21 CFR Part 56 of the agency's regulations, five subparts set out the requirements for IRBs. In 21 CFR §56.102 of the definitions section, the agency discusses what a clinical investigation is and defines an IRB. It notes that the primary purpose of such a review by a Board is to ensure the ethical quality of the research and the protection of the rights and welfare of the human subjects. The agency specifies the composition of the IRB membership under 21 CFR §56.107, and states that each IRB shall have at least five members with various backgrounds to evaluate different aspects of the proposed study. The Board reviews the protocol for the clinical study and the informed consent to determine whether the protocol is appropriate as to gathering clinical data and whether subjects are properly informed of the risks they are being asked to undertake as part of the clinical investigation.

In theory, the IRB has a direct working relationship with the PI, and in practice that is largely true. An often-overlooked fact is that the protocol and informed consent have been created by the sponsor or CRO who has been in contact with the

IRB and therefore the relationship between the PI and the IRB occurs because of the work of the sponsor/CRO. While the agency recognizes the relationship between the IRB and the PI, it often ignores the IRB's relationship with the CRO/sponsor. Usually, a good working relationship between all of the parties needs to exist to ensure that any information the IRB needs to review will be received. In addition to approving the study initially and looking at the informed consent, all of the serious, unexpected adverse events that the clinical site identifies are supposed to be immediately reported to the IRB.

Because the IRB has as its primary mandate the protection of the human subjects, it is necessary for the IRB to recognize when assumptions made in relationship to the safety of the study turn out not to be accurate and the risk–benefit ratio changes such that the informed consent is no longer valid. A case in point would be a clinical study that envisioned the likelihood of a serious adverse event as extremely rare but when the study is performed, the study has two patient adverse events, both of them life-threatening. Suddenly the informed consent appears to be no longer accurate and all of the study sites involved in the study need to be informed of the fact that the study needs to be immediately stopped until new information can be reviewed and evaluated to determine whether the clinical study can go forward. Clearly, the PI would be reporting the information to the IRB as required by the agency's regulation and the investigator's agreement with the IRB, but also to the sponsor, because the sponsor or CRO is equally concerned about the patients involved in the clinical study.

Like the clinical site, the IRB has a record-keeping and record-reporting requirement. First of all, it must document that it has reviewed the protocol and informed consent. In the minutes of the IRB meeting, to the extent there are issues discussed, the minutes should reflect that discussion. The IRB is also required to review, at least yearly, any studies that are continuing to be sure that nothing has changed in the specified period of time that would impact continued approval. The frequency of this continuing review is based on the study risks. To make sure the IRB fully understands the status of the study, it needs a report from the clinical site. To the extent the clinical site does not provide that report, the IRB may be forced to withdraw its approval. If it withdraws its approval from the site, it must notify FDA so that the agency is aware of the fact that the IRB of record no longer approves the clinical site.

To be sure that the IRB has proper procedures in place, FDA regulations require it to develop standard operating procedures. These standard operating procedures will outline the IRB meeting procedures; preparation of the minutes; how the minutes will be developed, reviewed, and stored; the procedure for notifying sites if the IRB has questions; methods for reviewing adverse events; methods of seeking continuing review and research change information from the clinical investigational sites; procedures for doing the continuing reviews; and procedures for withdrawing approval of the IRB in relationship to a clinical investigational site (14).

Because the FDA has recognized the need for the IRB in its regulations, and to the extent that it has created the entity within the context of the regulations, it will inspect the IRB to look at its method of reviewing clinical studies to determine whether or not the Board is meeting the agency's expectations. Failure to allow the FDA to inspect or to follow FDA's regulations could result in an FDA refusal to accept the studies approved by that IRB in support of an application. As with a clinical site, this will be, for the most part, a record review looking at the IRB's

meeting minutes, correspondence with clinical sites, and whether the IRB has taken appropriate action in response to problems or issues that have arisen.

## FDA OVERSIGHT/MONITORING

The FFDCA and its implementing regulations provide FDA with the authority to inspect sponsors, CRO, clinical investigators, and IRBs (15). Where FDA identifies violations of clinical research regulations, it has a number of statutory and regulatory remedies at its disposal, from letters requiring corrective action to criminal proceedings resulting in jail time and significant fines.

FDA inspections in the clinical research area are coordinated under the bioresearch monitoring program (BIMO), which is an agency-wide program coordinated by both the FDA Commissioner's Good Clinical Practice Program and the Office of Regulatory Affairs. Under BIMO, inspectional guidances are available to assist the FDA field investigators in their inspection of sponsors, monitors, CROs, investigators, and IRBs (16). In addition, each FDA center has its own bioresearch monitoring branch, which, in cooperation with BIMO, evaluates the results of inspectional investigations of sponsors, CROs, investigators, and IRBs, and reviews data submitted in support of an application. For drug studies, CDER bioresearch division, the Division of Scientific Investigation (DSI), is responsible for directing inspection requests to the field, conducting inspections with investigators from the appropriate field office, reviewing the inspection reports, assigning classifications to the inspection reports, and initiating appropriate regulatory action, as necessary.

Following the conclusion of an inspection, a field inspector may issue the site a form FDA-483, which lists inspectional observations that the field inspector believes rise to the level of a violation of clinical research requirements. In addition, the field inspector writes a much lengthier establishment inspection report and submits this to DSI for review. DSI then assigns a final classification to the report, which is used to determine whether regulatory action must be taken against the site. There are three possible classifications:

1. No Action Indicated (NAI) means that no objectionable conditions were found during the inspection. While NAI classifications may result in an FDA letter to the site noting the objectionable conditions, it will not rise to the level of a warning letter and no response is required from the site.
2. Voluntary Action Indicated (VAI) means that the inspection disclosed objectionable conditions that departed from the regulations. A VAI classification is more likely to result in an untitled FDA letter. Unless the written response to the FDA-483 has left no matter requiring a comment, a response to such an untitled letter is generally required.
3. Official Action Indicated (OAI) means that objectionable conditions or practices that represent serious departures from the regulations were discovered. In this case, the imposition of administrative/regulatory sanctions may be required. An OAI classification is much more likely to result in an FDA warning letter, and additional enforcement action if FDA deems appropriate.

## FDA ACTIONS

FDA has a number of administrative and regulatory remedies at its disposal when it determines that a sponsor, CRO, investigator, or IRB is failing to act in accord with requirements under the FFDCA and its implementing regulations. An FDA

warning letter can be issued, demanding immediate corrective action. If the violation is serious enough, criminal prosecution can be pursued by recommending the matter to the Department of Justice for violations of the FFDCA, its implementing regulations, and possibly violations under Title 18 of the U.S. Code (USC). In addition, several remedies are specific to the parties involved.

As to sponsors, FDA can impose a clinical hold, which either delays commencement of a clinical investigation or suspends an ongoing investigation. When a clinical hold is ordered, research participants cannot be enrolled in the study or given the study drug, and patients already in the study must be taken off the study drug unless FDA specifically permits continuation of the therapy for patient safety reasons. Among other factors, FDA can impose a clinical hold whenever human subjects are or would be exposed to an unreasonable and significant risk of illness or injury. The clinical hold can be complete or partial. If all investigations under an IND are subject to the clinical hold, it is deemed a "complete clinical hold." Whereas if only specific study sites in a multisite study are subject to the clinical hold, the hold is deemed partial. Serious sponsor or CRO monitoring failures could result in a complete hold. Investigator misconduct is more likely to result in a partial hold specific to that clinical investigator's research site. A study may only resume after FDA has notified the sponsor that the study can proceed, which will only occur after FDA is satisfied that the reason for the clinical hold no longer exists.

Sponsors can also be subject to an IND termination if FDA determines that the IND is deficient or the conduct of the study is deficient. Except where FDA concludes that an immediate and substantial danger to the health of individuals exists, it must first provide the sponsor with a proposal to terminate the study, and give the sponsor an opportunity to dispute the need to terminate. Termination is only pursued by FDA if the clinical hold procedures are insufficient to address the serious deficiencies identified by FDA.

If FDA determines that sponsor or CRO failures in their oversight or monitoring duties result in the submission of new drug applications containing false data, the agency could invoke the Application Integrity Policy (AIP). The drug AIP is based on a system of trust, in that FDA will accept the truthfulness and accuracy of the data presented in a new drug application unless FDA is given reason not to have such trust. When that trust is broken, and FDA subjects a sponsor to the AIP, it treats the data and information in all new drug applications submitted by the sponsor as suspect, and thus, FDA first assesses the validity of data and information contained in a drug application prior to conducting the substantive scientific review. In addition, if FDA investigations identify deficiencies in previously approved drug applications, FDA can proceed to withdraw drug approval, require new testing, and/or seek recalls of marketed products.

An FDA invocation of the AIP can be financially crippling to a company because it brings the drug approval process for any drug under review to a stop, and may affect the marketing of approved drugs. A recent case in point concerns a medical device firm. During a 3-month inspection of the firm, FDA determined that the firm had improperly substituted reread data for original data without notification to FDA in an application to support the efficacy of its antiadhesion gel. In issuing an AIP letter, FDA suspended review of three premarket approval submissions. Further, relaunch of the firm's only U.S. product was made contingent on submission and approval of an AIP corrective action plan. After the firm submitted a corrective action plan, FDA did not accept it until a year later. In light of the AIP

and other FDA actions against the company, the firm was forced to file for chapter 11 bankruptcy.

Debarment is another enforcement option for FDA if a company or person has been convicted for misconduct related to the development or approval of a drug application (17). When a person or company is debarred, they are essentially barred from participating in the pharmaceutical industry. Debarred companies cannot submit, or assist in the submission of, an ANDA and debarred persons cannot provide services in any capacity to a person that has an approved or pending drug application. Each time a drug company applies for approval of a drug, it must submit to FDA a signed statement that no debarred persons worked on the application. Drug companies that use debarred persons can be subject to stiff civil penalties (18). As required by the FFDCA, FDA publishes a list of debarred persons on its Web site at www.fda.gov/ora/compliance_ref/debar/default.htm.

As a practical matter, FDA has never debarred a company, instead focusing its enforcement resources on debarring persons within a company who were convicted for conduct related to the development, approval, or regulation of a drug product. The statutory debarment provisions historically have been used to debar pharmaceutical industry personnel, particularly those connected with the generic drug industry. However, in recent years debarment of clinical investigators, as well as clinical research staff, has been more common. For example, a California doctor and three members of his research staff were debarred following criminal convictions associated with the fabrication of research data. The physician was president of a research company in California that, beginning in the 1990s, conducted over 200 studies for as many as 47 drug companies. FDA inspection of his research facility revealed extensive deficiencies, including the use of fictitious patients, fabrication of data by substituting laboratory specimens and manipulating laboratory instrumentation, and the prescription of prohibited medications to manipulate data.

Clinical investigator disqualification is another enforcement remedy that can be pursued by FDA if it has information that a clinical investigator has repeatedly or deliberately failed to comply with the requirements set forth in 21 CFR parts 312, 50, or 56, or has submitted to FDA or the sponsor false information in any required report (19). A disqualified investigator is ineligible to receive investigational drugs. When pursuing this remedy, FDA must provide the investigator with written notice of the basis for seeking disqualification and give the investigator an opportunity to respond in writing or, if requested by the investigator, at an informal hearing. If FDA does not accept the investigator's explanation, the investigator will be offered the opportunity to pursue an administrative hearing under 21 CFR part 16. At the conclusion of FDA's investigation, if it determines that disqualification is appropriate, it will notify the investigator and the sponsor of any investigation in which the investigator has been named as a participant that the investigator is not entitled to receive investigational drugs. FDA publishes a list of disqualified investigators on its Web site at: www.fda.gov/ora/compliance_ref/bimo/dis_res_assur.htm.

As to FDA actions against IRBs, FDA may limit an IRB's ability to continue to operate by withholding the IRBs authority to approve new studies, directing that no new subjects be added to ongoing studies subject to the IRB's review, terminating studies subject to the IRB's review, and notifying State and Federal regulatory parties and others with a direct interest in the matter about concerns with the IRB's operations. Such remedies must be presented in a letter to the IRB and to the parent institution, and a response describing corrective actions must be provided to

*Yingling and Begley*

FDA within a specified period of time. While it has never pursued this regulatory enforcement option, if the IRB fails to provide FDA with an appropriate response letter and its corrective actions are insufficient, FDA can pursue disqualification proceedings. Such proceeding will be instituted in accordance with FDA's requirements for regulatory hearings under 21 CFR part 16. The IRB can then be disqualified if FDA determines that the IRB has refused or repeatedly failed to comply with any of the regulations set forth in 21 CFR part 56, and that this noncompliance adversely affects the rights or welfare of the human subjects in a clinical investigation. FDA will notify the IRB, the parent institution, and other affected parties, such as sponsors and clinical investigators, of the disqualification. In addition, it may publish the IRB disqualification in the *Federal Register*. FDA will not approve an IND for a clinical investigation that is under the review of the disqualified IRB, and it may refuse to accept data in support of a drug application from a clinical investigation that was subject to the disqualified IRB's jurisdiction.

## OTHER OVERSITE BODIES

In addition to FDA-oversight, clinical studies may also be subject to oversight by the Department of Health and Human Services' (HHS) Office for Human Research Protections (OHRP), particularly if the studies are conducted at institutions that receive funding from the HHS. OHRP has compliance oversight authority over all institutions that conduct HHS-funded research. In order to participate in HHS-funded research, an institution must obtain an approved "Assurance" from the OHRP. The Assurance formalizes the institution's commitment to protect human subjects and generally contains a voluntary agreement that all research conducted at the site, regardless of funding, is subject to OHRP oversight and research regulations set forth at 45 CFR part 46. Thus, a drug study sponsored by a pharmaceutical company may be subject to OHRP oversight even if there is no government funding.

When OHRP initiates an investigation, it is usually in response to an allegation or indication of noncompliance. However, investigations can also occur in the absence of noncompliance. Generally, OHRP notifies the institution in writing of the investigation and provides it with an opportunity to respond. The investigation may occur completely by letter or telephone correspondence, or an on-site evaluation may be involved. At the conclusion of the investigation, no matter what the outcome, the OHRP issues a determination letter. Thus, even where full compliance is determined, the institution will receive a determination letter. If less than full compliance is found, OHRP's determination letter may cite remedies that can range from requiring improvements at the institutional site to withdrawal of the institution's Assurance. OHRP can also recommend debarment of the institution or individual investigators, rendering them ineligible to receive any government funding.

Sponsors and investigators conducting clinical research concerning recombinant DNA human gene transfer should also be aware of their responsibilities under the National Institutes of Health's Guidelines for Research Involving Recombinant DNA Molecules (NIH Guidelines) (20). The NIH Guidelines articulate standards for investigators and institutions to follow to ensure the safe handling and containment of recombinant DNA and products derived from recombinant DNA. They outline requirements for institutional oversight, including Institutional Biosafety Committees, and describe the procedures of the Recombinant DNA Advisory Committee.

Even where the study is privately funded, it may be subject to the NIH Guidelines if the site at which the research is conducted receives any NIH funding.

The sponsor, CRO, investigator, and IRB should also be aware of state laws and regulations concerning the conduct of clinical research. While most states exempt research that is subject to and in compliance with federal research requirements from state laws and regulations, several states have a number of clinical research requirements that exceed federal requirements. For example, California requires that all informed consent documents be signed by a witness. In addition, some states require state approval of research occurring with certain patient populations. Also, certain issues affecting informed consent are state specific. Age of consent varies from state to state ranging from 14 years in Alabama to 21 years in Puerto Rico. Where a patient is unable to provide informed consent due to mental or physical incapacity, legally authorized representatives must be utilized and it is imperative that the investigator understand the order of priority with regard to who can act as a legally authorized representative. Investigators must also comply with state medical record privacy requirements and sexually transmitted disease reporting requirements.

## THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996

As to medical records privacy, it is important for the sponsor, CRO, clinical investigator, and IRB to be aware of privacy requirements under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (21). HIPAA was implemented to improve the efficiency and effectiveness of the health-care system by requiring HHS to adopt national standards for electronic health-care transactions. However, to assure the continued privacy of health information, HIPAA included a provision that required HHS to adopt federal privacy protections for individually identifiable health information. Regulations adopted by HHS, which became effective on April 14, 2003, require covered entities (i.e., health plans, health-care clearinghouses, and health-care providers who conduct certain financial and administrative health-care transactions electronically) to implement standards to protect and guard against the misuse of individually identifiable health information. Individually identifiable health information (protected health information) is health information that is collected from an individual patient that either specifically identifies the patient (e.g., name, address, social security number) or which could reasonably be used to identify an individual (e.g., gender and age information in connection with an unusual disease condition) (22).

Because filing for insurance reimbursement is the type of electronic transaction that triggers the applicability of HIPAA, most health-care providers are considered covered entities and thus subject to HIPAA requirements (23). For the purpose of research, if a clinical investigator is a covered entity, the clinical investigator must:

1. Provide all patients with a written notification of the office's privacy practices and the patient's privacy rights (while not required, clinical investigators are encouraged to obtain the signature of all patients acknowledging receipt of the privacy notice) (24),

*Yingling and Begley*

2. Unless an IRB or privacy board waiver is approved, obtain written authorization from all research participants (i.e., a subcategory of patients) before disclosing information for research purposes (25), and

3. Have written agreements with all parties to whom it releases confidential information (Business Associates) that satisfactorily documents that the Business Associate will appropriately safeguard the protected health information (26).

Because it is possible that sponsors or IRBs may receive protected health information, it is likely that clinical investigators could require them to sign a Business Associate agreement. If the investigator learns that a Business Associate fails to comply with the written agreement, the investigator must take reasonable steps to cure the breach or end the violation. If such steps are unsuccessful, the clinical investigator must terminate the Business Associate contract, or if termination is not viable, report the problem to the HHS (27).

## INTERNATIONAL GOOD CLINICAL PRACTICE

Going back a number of years, FDA had as a policy that all clinical investigations that were submitted in an NDA needed to be conducted on patients in the United States. Data from sites outside the United States were not considered acceptable. The concern was that patient populations were different, and differences in the use of the drug, diet, and other environmental factors were such that information obtained on subjects outside the United States might not be a valid comparison to the U.S. population. This approach to clinical research has been set aside and clinical data from all over the world is now used to obtain approval of drugs in the United States. While the data may come from Europe, Russia, China, South America, and Africa, the standards used in obtaining the data are the same as to the need for a protocol, informed consent, and proper record keeping. Much of the international agreement on standards is the result of most of the countries in the world establishing policies that are consistent with the clinical standards recognized in the United States. While it is clearly possible to conduct a study almost anywhere in the world and submit the data for approval to the U.S. FDA based on agreements with the clinical sites in the countries in which the studies are being performed, many countries are looking to the establishment of international standards.

The leading body in creating international clinical standards is the International Conference on Harmonization (ICH). ICH was organized in April 1990 and has as its sole and primary purpose the creation of international standards for the purpose of pharmaceutical research. The main bodies participating in the creation of ICH standards are the United States, the European Union, and Japan. In addition to these countries and their government delegates, ICH is heavily supported by the pharmaceutical industry [and in particular the Pharmaceutical Research and Manufacturers of America (PhRMA)] in the United States, the European Federation of Pharmaceutical Industries and Associations (EFPIA) in Europe, and the Japan Pharmaceutical Manufacturers Association (JMPA) in Japan. Further, the World Health Organization (WHO), the European Free Trade Area (EFTA), and Canada hold observer status in the ICH. The creation of ICH is a recognition of the fact that the pharmaceutical industry is an international business and that diseases and conditions being treated in the United States are not significantly different from those being treated in other parts of the world. Although clear differences in

disease patterns exist (i.e., there are few tropical diseases in the United States), given the modern scale of human interaction through travel and commerce, the need for and use of pharmaceuticals is recognizably global. There is no practical reason to do the same clinical study on a Japanese population, a European population, and a U.S. population. If there are adequate clinical data to show that the drug works in the patient population for whom the drug can be prescribed, the quickest and most expeditious way of conducting the research will benefit the pharmaceutical industry, the governments, and the populations that they serve.

While only a small part of this chapter is devoted to international clinical research issues, the reader should understand that there has been an increasing demand for international harmonization of clinical research and drug development practices. Already, FDA has adopted a number of the ICH Guidelines as FDA Guidance documents, including the ICH Guideline for Good Clinical Practice. Thus, although we expect that FDA will maintain its deep involvement in the development of new international standards, we also expect that the future of clinical research will be largely driven by international standards and expectations, as opposed to national standards alone.

## REFERENCES AND NOTES

1. There is a set of drugs that, in FDA's view, do not qualify as GRASE, but which continue to be marketed in the absence of an NDA or an ANDA as a result of an FDA enforcement discretion policy. See Compliance Policy Guide 7132 c.02. These drugs are part of FDA's Drug Efficacy Implementation (DESI) and its Prescription Drug Wrap-up (DESI II) programs, and FDA will take appropriate action in connection with these products as it determines their status.
2. DESI and DESI II. Because a number of drugs were marketed prior to 1960 without obtaining a New Drug Application approval, there were some 5000 drugs in the marketplace and FDA, until 2007, showed little interest in removing them from the market. However, in 2007, FDA adopted a policy that all drugs need either an approved application or to comply with the OTC monograph.
3. Federal Food, Drug, and Cosmetic Act (FFDCA) §§505(a) and 505(i), 21 USC §355 (2007). FDA, by regulation, has waived the requirement to submit an IND application for certain bioequivalence studies. See 21 CFR §320.31.
4. FFDCA §505(i), 21 USC §355 (2007).
5. Investigational New Drug Application, 21 CFR part 312 (2007).
6. 21 CFR §312.52 (2007).
7. See, Sanofi-Aventis U.S. LLC, FDA Warning Letter (Oct. 23, 2007) available at http://www.fda.gov/foi/warning_letters/s6551c.htm
8. 21 CFR §§312.57 and 312.62 (2007).
9. FDA Policy on Retention Samples, available at http://www.fda.gov/cder/ogd/retention_samples.htm (last updated March 8, 2001).
10. U.S. Department of Health & Human Services, et al., Guidance for Industry, Protecting the Rights, Safety, and Welfare of Study Subjects—Supervisory Responsibilities of Investigators, Draft Guidance (May 2007).
11. *Id.*, at section III(A)(1) (citing Good Clinical Practice Guidance, section 4.1.5).
12. *Id.*, at section III(B).
13. Institutional Review Boards, 21 CFR part 56 (2007).
14. 21 CFR part 50 (2007), see also, Guidance, at section III(A)(3).
15. FFDCA §§505(i) and 505(j), 21 USC §355 (2007).
16. Bioresearch Monitoring (BIMO) Compliance Program Guidance Manual available at http://www.fda.gov/ora/cpgm/default.htm#bimo (last updated Nov. 8, 2007).

17.  FFDCA §306, 21 USC §335a (2007).
18.  FFDCA §307, 21 USC §335b (2007).
19.  21 CFR §312.70 (2007).
20.  National Institutes of Health, NIH Guidelines for Research Involving Recombinant DNA
     Molecules, available at http://www4.od.nih.gov/oba/rac/guidelines.html
21.  Health Insurance Portability and Accountability Act of 1996, Pub L No. 104–191, 110 Stat
     1936 (1996).
22.  45 CFR §164.501 (2007).
23.  45 CFR §§160.103 (defining covered entities), 164.500(a) (2007).
24.  45 CFR §164.520 (2007).
25.  45 CFR §164.512(i)(1) (2007).
26.  45 CFR §164.508(c)(3) (2007).
27.  45 CFR §164.504(e)(1) (2007).



# 10  Postapproval Marketing Practices Regarding Drug Safety and Pharmacovigilance

**Robert P. Martin**

*RP Martin Consulting, Lebanon, P.A., U.S.A.*

## INTRODUCTION

Historically, the regulation of drugs in the United States has been driven by a concern for the safety of the drug product. From the Pure Food and Drug Act of 1906, the FD&C Act of 1938, and to the present day, drug safety has been the overriding concern. During the past century, drug regulation at the Food and Drug Administration (FDA) has evolved to a large extent in terms of statutory reforms. Past changes have more often than not been a response to new challenges to the understanding of drug safety. Although the FDA is highly respected as one of the world's premier regulatory bodies, recent events have called into question FDA's regulatory decision-making and oversight processes, and caused the public to question its ability to provide an acceptable level of drug safety.

Throughout the decades of the 70s, 80s, and 90s, the emphasis of drug safety shifted from the inherent toxicity of the drug substance to a focus on the quality of the product and the risk from manufacturing standards. More recently, drug safety has resurfaced in a new form. Acute toxicity is not the driving force. The new driver is long-term toxic effects and low-probability side effects that are taking over the headlines and driving the FDA to reexamine its role in the management of drug safety.

There is a new concern for drug safety, both in the FDA and in the Congress. The process of evaluating safety as part of a marketing application has come under scrutiny. A heightened emphasis on the safety of pharmaceutical products throughout the life cycle of the drug is placing more emphasis on the safety issues that become evident after a drug is FDA approved for sale. As Sandra Kweder, M.D., Deputy Director of the Office of New Drugs (OND) in the FDA's Center for Drug Evaluation and Research (CDER) stated in 2006, "No amount of study before marketing will ever reveal everything about a new drug's effectiveness or risks. This is why post-marketing surveillance is extremely important and serves to complement the pre-marketing assessment" (1).

The issue of postapproval drug safety is now a timely issue that involves not only the FDA but the public at large and as a result the Congress of the United States. With such powerful forces working on this issue with all the associated special interests attempting to shape the future of FDA regulation, it is not surprising that this controversial issue is receiving increased attention in the press. As this issue is playing out in the public forum, contradictory viewpoints present a confusing picture for the average person. This confusing and often contradictory image of the safety of drugs after approval has resulted in some key decisions by Congress and the FDA. It is only now that the future of regulation in this area appears to be taking more definitive shape.

## THE HISTORY OF DRUG SAFETY EVALUATION

It is clear that the issue of drug safety requires a reevaluation and additional clarification. Since these more recent events associated with drug safety, the Congress, the FDA, and the press have spoken and written on the subject. It is also clear that the regulatory environment is in the process of change as a result of these events.

### Historical Perspective for Drug Safety

Historically, the primary consideration of the FDA in approving a drug for sale has been the safety profile. The initial law governing drug safety was the Food, Drug and Cosmetic Act of 1938. This law resulted from the unintentional poisoning of patients, mostly children, given sulfanilamide elixir which later proved to be toxic (2).

This law was extended by the Kefauver-Harris Amendments of 1962—also passed as a result of a drug toxicity tragedy. In this case, the problem was the toxic effects of thalidomide that was taken by pregnant women, on the unborn fetus (3).

In each of these cases, Congress was driven to act based on presence of a well publicized tragedy. We may predict the future course of some drug regulations based on this history.

### Recent Issues Concerning Drug Safety

The policy adopted by the FDA is based, not surprisingly, on an evaluation of benefit versus risk. A drug that treats a potentially life-threatening disease may be approved even with significant side effects where a drug treating a quality if life issue is not given the same latitude.

Drug safety is once again now in the headlines with the disclosure that safety data presented in marketing applications may not give an accurate picture of all of the safety concerns. More recent items include

- Clinical studies of Vioxx® indicate that there is an associated increased risk of heart attack and stroke (4,5).
- Antidepressants have been implicated in an increased risk of suicide in young people (6,7).
- Ketek®, an antibiotic indicated for the treatment of acute chronic bronchitis, acute bacterial sinusitis, and pneumonia, has been associated with rare cases of serious liver injury and liver failure (8,9).
- The safety of Avandia®, a drug used in the treatment of type 2 diabetes, was recently questioned. Safety data from controlled clinical trials indicate a potentially significant increase in the risk of heart attack and heart-related deaths (10,11).
- Recently, a popular news program reported the potential relationship between Trasylol®, a drug used for patients at high risk of bleeding, and kidney toxicity. This complication sometime resulted in kidney failure requiring dialysis and "a trend toward increased death in . . . these patients" (12).

These examples have two things in common, i.e., they are all playing out in the popular press and the perceived risk was not evident at the time of FDA approval of the drug for sale.

For the most part, these safety issues affect a small percentage of the patient population and did not offer detection during early safety studies and clinical trials. It should be noted that during the course of drug development and FDA review and

approval, many thousands of subjects are tested for any negative effects of the drug. After a drug is FDA approved, conceivably millions of patients will be treated with the drug, and safety issues that appear very infrequently may be revealed. On the other hand, safety issues and adverse events that appear postapproval of the drug, including additional clinical studies that are conducted postapproval, are to be reported to the FDA by the pharmaceutical manufacturer that has received approval to market the drug, i.e., called the drug sponsor. In this manner, drug safety issues can be written into the drug product labeling and promotional materials.

Logically, it is in the best interest of a pharmaceutical company to detect safety issues during development. Current methods, however, have limitations, and problems with the safety of a drug may not be uncovered during safety and clinical trials. Side effects with a low frequency of occurrence may only be detected after marketing of the drug. In part, some of the reasons for the failure to detect safety problems are a result of outdated tools used for toxicology and human safety testing (13).

There is, however, a strong regulatory concern behind drug safety issues. The FDA came under increased scrutiny and criticism as a result of their inability to detect and react to safety issues. At a congressional hearing, this criticism was summarized by Dr. David Graham, an FDA whistleblower. In his testimony, he stated, "Vioxx is a terrible tragedy and a profound regulatory failure. I would argue that the FDA, as currently configured, is incapable of protecting America against another Vioxx. We are virtually defenseless" (14). It was becoming clear that improvements in the technology of detecting drug safety problems would not be a sufficient solution, some fundamental changes within the FDA were necessary.

## POSTAPPROVAL DRUG SAFETY BEFORE 2003

As expected, the FDA has encountered issues of drug safety before in the history of drug regulation. As a result, several programs were already in place when the more recent set of issues surfaced. The FDA realized that drug safety could not be completely defined by data submitted in a New Drug Application. The process of understanding the safety of a drug evolves over the life of the drug. Clearly, a mechanism for tracking and evaluating adverse reactions to medication was needed.

### MedWatch Program

Reporting adverse drug reactions (ADRs) is an important component of postapproval drug safety. Initially, reporting of ADRs was accomplished through an informal network of clinical observations reported in professional journals. This system, sponsored by the American Medical Association, was the predecessor of an FDA system established in 1961 to report and track ADRs. In 1993, the then-FDA Commissioner David A. Kessler, M.D., citing confusion with the multiple forms, moved to consolidate them under a new program called MedWatch (15). (The agency also has a separate mandatory reporting system required by law for medical product manufacturers and certain health care facilities.)

The MedWatch program has four goals.

- To clarify what should and should not be reported to FDA.
- To increase awareness of serious reactions caused by drugs or medical devices.
- To make the reporting process easy.
- To give the health community regular feedback about product safety issues.

*Martin*

The FDA clarification contained in instructions for filing a MedWatch report is quoted as follows (16):

* **Death**—If an adverse reaction to a medical product is a suspected cause of a patient's death.
* **Life-threatening hazard**—If the patient was at risk of dying at the time of the adverse reaction or if it is suspected that continued use of a product would cause death (for example, pacemaker breakdown or failure of an intravenous (IV) pump that could cause excessive drug dosing).
* **Hospitalization**—If a patient is admitted or has a prolonged hospital stay because of a serious adverse reaction (for example, a serious allergic reaction to a product such as latex).
* **Disability**—If the adverse reaction caused a significant or permanent change in a patient's body function, physical activities, or quality of life (for example, strokes or nervous system disorders brought on by drug therapy).
* **Birth defects, miscarriage, stillbirth, or birth with disease**—If exposure to a medical product before conception or during pregnancy is suspected of causing an adverse outcome in the child (for example, malformation in the child caused by the acne drug Accutane, or isotretinoin).
* **Needs intervention to avoid permanent damage**—If the use of a medical product required medical or surgical treatment to prevent impairment (for example, burns from radiation equipment or breakage of a screw supporting a bone fracture).

To make a MedWatch report, a suspected association between the impairment and the drug is sufficient reason to make a report. Proof, such as a controlled study or a statistically significant finding, is not required.

While MedWatch is a valuable tool for surveillance of drug safety, there are limitations to this program. MedWatch is voluntary and relies on the vigilance of a health care provider or patient to fill out and file the MedWatch form. Also, under this program, the ability of the FDA to follow up on an indicated problem is limited.

## Reporting Requirements for Marketed Drugs

If reporting of adverse reactions by health care providers and patients is voluntary, reporting of adverse reactions by drug manufactures is not voluntary (17). These requirements in the Code of Federal Regulations (CFR) categorize an ADR by the severity of the reaction.

"Adverse drug experience. Any adverse event associated with the use of a drug in humans, whether or not considered drug related, including the following: An adverse event occurring in the course of the use of a drug product in professional practice; an adverse event occurring from drug overdose whether accidental or intentional; an adverse event occurring from drug abuse; an adverse event occurring from drug withdrawal; and any failure of expected pharmacological action."

"Disability. A substantial disruption of a person's ability to conduct normal life functions."

"Life-threatening adverse drug experience. Any adverse drug experience that places the patient, in the view of the initial reporter, at immediate risk of death from the adverse drug experience as it occurred, i.e., it does not include an adverse drug experience that, had it occurred in a more severe form, might have caused death."

"Serious adverse drug experience. Any adverse drug experience occurring at any dose that results in any of the following outcomes: Death, a life-threatening adverse drug experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect. Important medical events that may not result in death, be life-threatening, or require hospitalization may be considered a serious adverse drug experience when, based upon appropriate medical judgment, they may jeopardize the patient or subject and may require medical or surgical intervention to prevent one of the outcomes listed in this definition. Examples of such medical events include allergic bronchospasm requiring intensive treatment in an emergency room or at home, blood dyscrasias or convulsions that do not result in inpatient hospitalization, or the development of drug dependency or drug abuse."

"Unexpected adverse drug experience. Any adverse drug experience that is not listed in the current labeling for the drug product. This includes events that may be symptomatically and pathophysiologically related to an event listed in the labeling, but differ from the event because of greater severity or specificity. For example, under this definition, hepatic necrosis would be unexpected (by virtue of greater severity) if the labeling only referred to elevated hepatic enzymes or hepatitis. Similarly, cerebral thromboembolism and cerebral vasculitis would be unexpected (by virtue of greater specificity) if the labeling only listed cerebral vascular accidents. 'Unexpected,' as used in this definition, refers to an adverse drug experience that has not been previously observed (i.e., included in the labeling) rather than from the perspective of such experience not being anticipated from the pharmacological properties of the pharmaceutical product."

All adverse drug experiences must be reported to the FDA. Under the rules of the CFR, reporting is required to be made by the "person" named on the label of the drug (NDA or ANDA applicant, manufacturer, packer, distributor). If the adverse reaction is serious, there is a 15-day time limit for reporting the adverse reaction.

It should be noted that there are some differences based on the regulatory status of the drug (i.e., postmarketing, clinical study, or biological). The reader should refer to the appropriate section of the CFR (21 CFR 310.305, 314.80, 314.98, and 600.80) for the section referring to their situation.

### Reporting Requirements for Clinical Studies

Reporting of safety issues for a drug that is not yet FDA approved for sale is also required during clinical studies. This also applies to clinical studies conducted after a marketing application is approved. For clinical studies, reportable events have been defined as follows (18):

Adverse Event (or Adverse Experience): "Any untoward medical occurrence in a patient or clinical investigation subject administered a pharmaceutical product and which does not necessarily have to have a causal relationship with this treatment. An adverse event can therefore be any unfavorable and unintended sign (including an abnormal laboratory finding, for example), symptom, or disease temporally associated with the use of a medicinal product, whether or not considered related to the medicinal product."

ADR: "In the *pre-approval clinical experience* with a new medicinal product or its new usages, particularly as the therapeutic dose(s) may not be established: all noxious and unintended responses to a medicinal product related to any dose should be considered adverse drug reactions. The phrase 'responses to a medicinal

product' means that a causal relationship between a medicinal product and an adverse event is at least a reasonable possibility..."

Unexpected ADR: "An adverse reaction, the nature or severity of which is not consistent with the applicable product information (e.g., Investigator's Brochure for an unapproved investigational medicinal product)..."

Serious Adverse Event or ADR: "During clinical investigations, adverse events may occur which, if suspected to be medicinal product-related (adverse drug reactions), might be significant enough to lead to important changes in the way the medicinal product is developed (e.g., change in dose, population, needed monitoring, consent forms)."

## Organization Within the FDA

Having access to information about ADRs is not sufficient by itself; also, the agency must have the ability to manage and respond to these drug safety issues. To be effective in protecting the safety of pharmaceutical products, sufficient focus must be placed on these issues to provide for the needed actions. Sufficient focus is the degree of visibility that safety issues receive. In short, this is a fundamental issue of how the FDA is organized.

As of this writing, there are two offices within the FDA charged with the responsibility of evaluating drug safety. The evaluation of drug safety is divided based on the stage of the regulatory process. An unapproved new drug with a New Drug Application or a new indication for a marketed drug is the responsibility of the OND. A drug approved for sale becomes the responsibility of the Office of Surveillance and Epidemiology (OSE) formerly the Office of Drug Safety (ODS). Both offices are a part of the Center for Drug Evaluation and Research (CDER).

### Office of New Drugs

The OND is responsible for evaluating both safety studies and clinical studies and determining the risk associated with approving the drug for sale. The OND has the authority for making decisions about whether or not a product will be approved for sale. OND is organized into divisions that represent clinical areas of expertise, such as oncology, endocrinology, psychiatry, and pulmonary medicine. Premarket safety studies are shared across divisions to provide the greatest expertise (19).

Until recent events focused the agency's attention on drug safety, efforts within the agency were designed to shorten the review time for approval to speed the benefits to patients. During the review process, the number of patients who would use a new drug is much fewer than the number of patients receiving the drug after approval.

After approval of a new drug, OND will review safety data when the drug is submitted for a new indication. However, after approval, safety is monitored by the OSE.

### Office of Surveillance and Epidemiology

The purpose of the OSE is to evaluate the safety profiles of drugs throughout the life cycle of the drugs. Specifically, the OSE maintains for CDER a system of postmarketing surveillance and risk assessment programs to identify adverse events that did not appear during the drug development process. It is this office that receives and evaluates the MedWatch reports and the required reports from companies as described above.

The OSE staff handles a total, from each of these sources, of more than 250,000 reports annually. From these reports, drug safety issues are identified. To address these concerns, the OSE recommends actions, which may include

- updating drug labeling,
- providing more information to the community,
- implementing or revising a risk management program,
- on rare occasions, reevaluating approval or marketing decisions.

## THE FDA RESPONSE TO THE EMERGING DRUG SAFETY ISSUES

Even though the FDA had, in place, programs to handle the new wave of adverse drug experiences, there was still a need to respond to the new public concern about drug safety. To address these newest safety concerns and in response to the mounting criticism, Dr. Lester M. Crawford, Acting FDA Commissioner, authorized the Center for Drug Evaluation and Research (CDER) to take the following measures (20):

- Sponsor an Institute of Medicine (IOM) Study of the Drug Safety System.
- Implement a program for adjudicating differences of professional opinion.
- Appoint Director, Office of Drug Safety.
- Conduct drug safety/risk management consultations.
- Publish risk management guidance.

The FDA response was emphasized a few months later in congressional testimony by Sandra L. Kweder, M.D., the Deputy Director, OND, and Janet Woodcock, M.D., the FDA's Acting Deputy Commissioner for Operations, before the U.S. Senate's Committee on Health, Education, Labor And Pensions (21).

Possibly the most significant and lasting outcome of these five steps was the IOM committee that was contracted to evaluate the effectiveness of the United States drug safety system with emphasis on the postmarket phase. The study report was described in congressional testimony in November 2006 (22) and published in 2007 (23). The report contained, in addition to the evaluation of the FDA's role in drug safety, recommendations intended to improve determination of side effects and measures to enhance the confidence of Americans in the safety and effectiveness of their drugs.

In her testimony before Congress, Sheila Burke, chair of the IOM committee stated.

> The FDA has an enormous and complex mission – both to make innovative new drugs available to patients as quickly as possible and to assess the long-term risks and benefits of these products once they are on the market. We found an imbalance in the regulatory attention and resources available before and after approval. Staff and resources devoted to preapproval functions are substantially greater. Regulatory authority that is well-defined and robust before approval diminishes after a drug is introduced to the market. Few high-quality studies are conducted after approval, and the data are generally quite limited. Many of the report's recommendations are intended to bring the strengths of the pre-approval process to the postapproval process, to ensure ongoing attention to medications' risks and benefits for as long as the products are in use (24).

## FDA'S NEW DRUG SAFETY OVERSIGHT BOARD

On February 15, 2005, HHS Secretary Mike Leavitt and Acting FDA Commissioner Lester M. Crawford announced the creation of a new independent Drug Safety Oversight Board (DSB) to oversee the management of drug safety issues. The purpose of the DSB is to provide emerging information to health providers and patients about the risks and benefits of medicines (25).

This organizational change within the FDA was another step to improve the way the FDA manages drug safety information. The intention of this board is to provide focus on the management of the FDA's review and decision-making processes. The DSB will oversee the management of important drug safety issues within the Center for Drug Evaluation and Research (CDER).

The membership of the DSB is composed of representatives from the FDA and medical experts from other HHS agencies and government departments (e.g., Department of Veterans Affairs). Members are be appointed by the FDA Commissioner. The board also will consult with other medical experts and representatives of patient and consumer groups.

### Functions and Goals

The DSB has been established to provide independent oversight and advice to the center director on the management of important drug safety issues and to manage the dissemination of certain safety information through FDA's Web site to healthcare professionals and patients (26).

## FUNDING OF DRUG SAFETY

### PDUFA Fees (Prescription Drug User Fee Act)

If it is true that the FDA will extend their review of drug safety to postapproval, it is also true that the FDA has shortened the review time for new drugs. Shortened review of an NDA is a direct result of the Prescription Drug User Fee Act. Originally enacted in 1992, this law allowed the FDA to charge a fee to a pharmaceutical company for the review of a marketing application by permitting the FDA to hire additional reviewers. The intended purpose was to speed the approval process of new drugs. The law was successful in that the average review time of an NDA fell from 22 to 14 months and the review time for fast-track drugs declined from 13 to 6 months (27). It is also true that this source of revenue has become a significant source of funding for the FDA.

PDUFA came with a "sundown" provision requiring Congress to evaluate the program and reauthorize the program after 5 years. In 1997, following the success of the previous 5 years, Congress reauthorized the program for an additional 5 years. With PDUFA II came additional goals designed to reduce drug development times.

In 2002, Congress reauthorized PDUFA for a third time. PDUFA III placed greater emphasis on ensuring that user fees provided a sound financial footing for FDA's new drug and biologic review process. PDUFA also gave the FDA authority to spend PDUFA income on risk management and drug safety activities during the approval process and during the first 2 to 3 years following drug approval. This new use for PDUFA funds allowed the FDA to collect, develop, and review safety information on drugs, including adverse event reports for up to 3 years after the date of approval. Although the changes to PDUFA stopped short of granting the FDA the

additional power to require pharmaceutical companies to conduct additional safety studies, this change provided the foundation to future changes within the FDA to manage drug safety after approval of the drug for sale.

Following the enactment of PDUFA III, the FDA increased the risk assessment of newly approved drugs. From October 1, 2002, through December 31, 2004, FDA reviewed 63 risk management plans for drug and biologic products—28 for applications submitted after PDUFA III took effect (28). In addition, discussions with industry and the public were held to discuss risk management, and pharmacovigilance practices.

However, the ability to collect and analyze information on drug safety does not provide a clear mechanism to effectively manage drug safety issues. For example, a recent study by Berndt, et al. (29) of the National Bureau of Economic Research, found no significant differences in the rates of safety withdrawals for drugs approved before PDUFA compared to drugs approved during the PDUFA era.

> Given the recent safety concerns over the cyclooxygenase 2 (COX2) inhibitors rofecoxib (Vioxx®; Merck) and celecoxib (Celebrex; Pfizer), controversies concerning the issue of whether the FDA has been approving drugs too quickly and without adequate review have re-emerged ... A 2002 study conducted by the Government Accountability Office (GAO), formerly the General Accounting Office, analysed withdrawal rates prior to and during PDUFA up to 2002. The GAO found that 6 out of 193 (3.10%) NMEs [new molecular entities] approved from 1986 to 1992 (calendar year periods) were withdrawn for safety-related reasons. During the period 1993–2000 (calendar year periods), 9 out of 259 (3.47%) NMEs approved by the FDA were ultimately withdrawn.

The results of this study indicate that additional change is needed. In September 2007, the Prescription Drug User Fee Amendment of 2007 was signed into law (30) renewing the existing law for an additional 5 years. This updated PDUFA gives the FDA some new tools and powers to manage drug safety.

There are several changes to the previous acts. For example, FDA will increase the amount of user fees it collects to almost $400 million, up from approximately $300 million. The act expands the FDA authority over labeling and provides for a publicly available clinical trials database.

Perhaps the most significant change to PDUFA is a new provision to this legislation titled, "Enhanced Authorities Regarding Postmarket Safety of Drugs." Under this legislation, the FDA can require drug companies to perform postmarket safety studies and perform risk evaluation and mitigation for drugs exhibiting adverse effects. This is clearly an expansion of the FDA's authority and power to manage drug safety.

## POSTMARKETING SAFETY STUDIES AND POSSIBLE FUTURE CHANGES TO THE FD&C ACT

In 2005, the FDA asked the Institute of Medicine (IOM) to evaluate the drug safety system (31). The IOM report was released on September 22, 2006 (32). Recommendations from this report form the basis of legislative action by the U.S. Congress. As of this writing, both the Senate (33) and the House of Representatives (34) have identical bills to amend the Food, Drug and Cosmetic Act. Both bills mandate

the establishment of a Center for Postmarket Evaluation and Research for Drugs and Biologics within the FDA. The Director of the Center will report directly to the Commissioner of Food and Drugs. This new center will perform risk/benefit evaluations and will have the authority to require additional safety and effectiveness studies to be conducted. While the purpose of this proposed center is similar to the DSB, the authority to control issues of drug safety is, if enacted, greatly expanded.

## CONCLUSIONS

The initial FD&C Act was passed because of concerns about the acute toxicity of drugs; specifically, the poisoning resulting from a toxic excipient. This was reinforced in the early 60s by the experience with thalidomide that proved toxic to the unborn fetus when used by pregnant woman. The establishment of safety and efficacy for pharmaceutical products have been the driving forces for the FDA to exist. This changed in the decades of the 70s, 80s, and 90s, where the priority of the FDA was on the risk to the public of manufacturing errors. With the current climate, the focus of the FDA has come full circle.

It is now clear that the ability of the FDA to manage the risk of the toxic effects of drugs will be enormously enhanced. The power of the FDA to require action from pharmaceutical manufacturers is greatly strengthened and assuming that the current bills before Congress are passed, this increase in power will be a permanent change. In addition, the results of clinical studies are no longer the private property of the pharmaceutical companies, as this data is to be provided to the FDA and also to the public and health care professionals in the form of product labeling and promotional materials.

These changes have been supported by the information that has become available during the life cycle of a product—from product development to clinical trials to marketed products—and people would agree that these changes will have a beneficial effect on the general population. All changes, whether positive or negative, carry with them unanticipated effects. While the changes within the FDA are now clear, the effects on the pharmaceutical industry caused by these changes are not easily apparent. It is only with the passage of time that the total effect of these new powers for the FDA will be known as relating to pharmaceutical companies and the consumer public.

## REFERENCES

1. Meadows M. Keeping Up With Drug Safety Information. FDA Consumer magazine May–June 2006.
2. Ballentine C. Taste of Raspberries, Taste of Death, The 1937 Elixir Sulfanilamide Incident. FDA Consumer magazine June 1981.
3. Linda Bren. Frances Oldham Kelsey: FDA Medical Reviewer Leaves Her Mark on History. U.S. Food and Drug Administration. FDA Consumer magazine March–April 2001.
4. COX-2 Inhibitor Drug Review of adverse renal and arrhythmia risk, in JAMA 2006. Available at http://www.cox2drugreview.org/.
5. Armstrong D. How the New England Journal Missed Warning Signs on Vioxx®. Wall Street Journal May 15, 2006:A1. Available at http://online.wsj. com/article/SB114765430315252591.html.

6. Vedantam S. Antidepressants a Suicide Risk for Young Adults. Washington Post December 14, 2006:A16. Available at http://www.washingtonpost. com/wp-dyn/content/article/2006/12/13/AR2006121300452.html.

7. Elias M. Antidepressants and suicide. USA TODAY. Posted 1/21/2004 9:50PM, updated 1/25/2004 5:10 PM. Available at http://www.usatoday. com/news/health/2004-01-21-antidepressants-suicide-usat_x.htm.

8. Harris G.F.D.A. Warns of Liver Failure After Antibiotic. New York Times June 30, 2006. Available at http://www.nytimes. com/2006/06/30/health/30fda.html?_r = 1&oref = slogin.

9. FDA Completes Safety Assessment of Ketek® New Safety Information to be Added to Product Labeling. FDA News June 29, 2006. (This press release was corrected on April 11, 2007). Available at http://www.fda.gov/bbs/topics/NEWS/2006/NEW01401.html.

10. Harris G.F.D.A. Warns of Liver Failure After Antibiotic. New York Times June 30, 2006. Available at http://www.nytimes. com/2006/06/30/health/30fda.html?_r = 1&oref = slogin.

11. FDA Issues Safety Alert on Avandia®. FDA News May 21, 2007. Available at http://www.fda.gov/bbs/topics/NEWS/2007/NEW01636.html.

12. Pelley S. 60 Minutes, One Thousand Lives A Month, February 17, 2008.

13. Statement of Steven Galson, M.D., M.P.H., Acting Director, Center for Drug Evaluation and Research, Before the Committee on Government Reform, United States House of Representatives, May 5, 2005.

14. US PIRG (United States Public Interest Research Group). 2006. Drug Safety. [Online]. Available at http://uspirg.org/uspirg.asp?id2 = 17568&id3 = US& [accessed September 16, 2006].

15. Henkel J. MedWatch: FDA's 'Heads Up' on Medical Product Safety. FDA Consumer Magazine November-December 1998. Available at http://www.fda.gov/fdac/features/1998/698_med.html.

16. ibid

17. 21 CFR 310.305, 314.80, 314.98, and 600.80.

18. Guideline for Industry, Clinical Safety Data Management: Definitions and Standards for Expedited Reporting, ICH-E2A, March 1995.

19. Statement of Steven Galson, M.D, M.P.H., Acting Director, CEDER, before the Committee on Government Reform, US House of Representatives, May 5, 2005.

20. Crawford LM, FDA Acts to Strengthen the Safety Program for Marketed Drugs. November 5, 2004. Available at http://www.fda.gov/bbs/topics/news/2004/NEW01131.html.

21. Statement of Sandra L. Kweder, M.D., Deputy Director, Office Of New Drugs, and Janet Woodcock, M.D., Acting Deputy Commissioner For Operations, FDA, Dept. Of Health and Human Services, before the Committee On Health, Education, Labor And Pensions, U.S. Senate, March 1 & 3, 2005. Available at http://www.fda.gov/ola/listing.html.

22. Statement of Sheila P. Burke, Chair, Committee on Assessment of the U.S. Drug Safety System Board on Population Health and Public Health Practice, Institute of Medicine. The National Academies, Before the, Committee on Health, Education, Labor and Pensions, U.S. Senate, November 16, 2006. Available at http://www7.nationalacademies.org/ocga/testimony/Future_of_Drug_Safety.asp.

23. The Future of Drug Safety: Promoting and Protecting the Health of the Public. Committee on the Assessment of the US Drug Safety System. Baciu A, Stratton K, Burke SP., eds. National Academy of Sciences 2007. Available at http://www.nap.edu/catalog/11750.html.

24. Statement of Sheila P. Burke, Chair, Committee on Assessment of the U.S. Drug Safety System Board on Population Health and Public Health Practice, Institute of Medicine. The National Academies, Before the, Committee on Health, Education, Labor and Pensions, U.S. Senate, November 16, 2006. Available at http://www7.nationalacademies.org/ocga/testimony/Future_of_Drug_Safety.asp.

25. Manual of Policies and Procedures Center for Drug Evaluation and Research, MAPP 4151.3. Avalilable at http://www.fda.gov/cder/mapp/4151.3R.pdf.

26. ibid.

27. Brown D. Congress Seeks to Balance Drug Safety, Quick Approval. Washingtonpost.com July 5, 2007. Available at http://www.washingtonpost.com/wp-dyn/content/article/2007/07/04/AR2007070401712.html.

28. ibid (21)

29. Berndt, Ernst R, Gottschalk AHB, et al. Industry Funding of the FDA: Effects of PDUFA on Approval Times and Withdrawal Rates (PDF 412KB), Nature Reviews: Drug Discovery 2005; 4(7):545–554.

30. Food and Drug Administration Amendments Act of 2007, 110th Congress, Pub.L. No. 110–85, Sept. 27, 2007.

31. Statement of Andrew C. von Eschenback, M.D., Commissioner of the Food and Drug Administration, before the Committee on Oversight and Government Reform, US House of Representatives, May 1, 2007.

32. The Future of Drug Safety, Institute of Medicine, National Academies, Committee on the Assessment of the US Drug Safety System Board on Population Health and Public Health Practice, Baciu A, Stratton K, Burke SP, eds. 2007.

33. Food and Drug Administration Safety Act of 2007 (Introduced in Senate), S 468, 110th CONGRESS, 1st Session, January 31, 2007.

34. To amend the Federal Food, Drug, and Cosmetic Act with respect to drug safety, and for other purposes (Introduced in the House), HR 788, 110th CONGRESS, 1st Session, 1/31/2007.



# **11** Drugs Marketed Without FDA Approval

**Jane Baluss and David Rosen**
*Foley & Lardner LLP, Washington, D.C., U.S.A.*

## INTRODUCTION

It often comes as a surprise to members of the American public, medical professionals, Congress, and even legal professionals that thousands of drug products now on the market have never been reviewed and approved as safe and effective by the U.S. Food and Drug Administration (FDA), notwithstanding the comprehensive review and approval systems laid out for both prescription and over-the-counter (OTC) drugs in the Food, Drug, and Cosmetic Act (FDCA or the Act) and the FDA's implementing regulations and regulatory programs (1). FDA estimated that there were "perhaps as many as several thousand" such drug products on the market in mid-2006, and other estimates over the years have been even higher. Indeed, the FDA has conceded that the exact number of such products is not and probably cannot be known precisely (2). Historically, the visibility of such products has flared when unapproved drug products have been the cause of high-profile safety risks (3), and subsided in periods when FDA has focused primarily on other issues such as implementing the major statutory amendments of 1962 and 1984 that put into place the current regulatory scheme for both prescription and OTC drugs. Since 2006, however, the FDA has made concerted efforts to bring both individual products and broad classes of marketed unapproved drugs under the NDA approval process, or to remove them from the market. This chapter will provide an overview of the history and current regulatory status of marketed unapproved drugs in the United States, and FDA's current policy for dealing with such products.

## STATUTORY AND REGULATORY BACKGROUND

As the regulatory scheme has evolved under the FDCA, it is unlawful under section 505(a) of the act to market any new drug (4) without first obtaining an approved application in the form of either an NDA (which must be supported by extensive safety and efficacy data including reports of adequate and well-controlled clinical trials) or an ANDA (which must demonstrate that the product has the same active ingredient(s), indication(s), dosage form, dosage strength, and labeling as an NDA-approved reference drug product, and that the product is bioequivalent to and, therefore, therapeutically interchangeable with the reference drug) (5). OTC drugs likewise require an approved ANDA or NDA unless their marketing is otherwise permitted under the terms of an ongoing- or final OTC monograph proceeding, as discussed below. Marketed products that fail to satisfy applicable approval requirements are subjected to a range of FDA enforcement actions ranging from the relatively benign (i.e., the issuance of a warning letter) (6) to more serious consequences such as product seizures and/or litigation leading to civil or criminal fines and other

penalties (7). In the vast majority of cases, products targeted for such actions by the FDA are either voluntarily removed from the market or brought into compliance by their manufacturers (8).

While this framework works straightforwardly for the great majority of current drug products, for various historic reasons a very large—and largely undeterminable—number of drug products are and long have been marketed without an approved NDA/ANDA or OTC monograph status. These are largely the result of several key historic developments.

To begin with, prior to the 1962 amendments, the FDCA required only that new drugs be approved as safe, a requirement which itself had only been in effect since the 1938 amendments to the act. Furthermore, by 1962 the market was rife with products that had never been approved even for safety, for various reasons. Most notably, once FDA had approved a given active ingredient or combination for one or more indications, for many years it was agency practice not to require additional NDAs for subsequent products having the same ingredient(s)/indication(s) (9). Other products were marketed without NDAs on the marketers' belief that they were not "new drugs" as defined in the FDCA, either because they were generally recognized as safe or were pre-1938 "grandfather" drugs under section 201(p) of the act. Still others were likely marketed in sheer ignorance or disregard of FDA requirements.

The 1962 amendments to the FDCA required for the first time that new drugs be approved for efficacy as well as safety, and required FDA to evaluate the effectiveness of drugs then on the market which had previously been approved only on the basis of safety, if at all. To accomplish this mandate, FDA created a program known as the Drug Efficacy Study Implementation (DESI). The DESI program was instituted in 1963 as the procedural mechanism for evaluating the status of marketed prescription drugs under the new efficacy requirement, and for regularizing their status by establishing additional approval requirements and schedules that companies had to meet in order to continue marketing products reviewed under the DESI program.

The DESI program was organized as multiple expert reviews and rulemaking proceedings based on therapeutic classes of drugs, some of which are still ongoing. In recognition of the large number of unapproved prescription drugs then on the market, all conclusions, requirements, and compliance policies emerging from the DESI proceeding for a given class of drugs were made applicable to all other "identical, related, or similar" (IROS) drug products. This policy is embodied in FDA regulations at 21 CFR §310.6. As defined in the regulation, the term "identical, related, or similar drug includes other brands, potencies, dosage forms, salts or esters of the same drug moiety as well as of any drug moiety related in chemical structure or known pharmacological properties" (10). Thus, at the completion of a DESI proceeding, it is expected that all affected drug products, including those that were marketed as identical, similar, or related products will either have approved NDAs or ANDAs, as appropriate, or will be withdrawn from the market. Given the impracticability of identifying all IROS products, the onus of determining that a given product is IROS to a DESI-reviewed drug product (and complying accordingly) was left entirely on drug marketers.

After the DESI program was well under way, FDA established a separate program, the OTC Drug Review, for reviewing and determining safety and effectiveness for OTC drugs. Like DESI, the OTC Review is organized according to

therapeutic classes, each of which has been reviewed by an expert advisory panel. Each review proceeds through a series of administrative stages, culminating in the promulgation of an OTC monograph (in the form of a final regulation) (11). Once a final monograph becomes effective for a given therapeutic class or drugs, all OTC products having ingredients and/or indications covered by the monograph must either be marketed in compliance with the monograph, have an approved NDA or ANDA, or be withdrawn from the market. As with DESI, products subject to an ongoing review are permitted to enter and/or remain on the market until the review is completed and effective. Still other products, however, are marketed over-the-counter "outside" the monograph system and without an ANDA/NDA, and thus are unapproved new drugs.

## FDA'S CURRENT POLICY

Over time, FDA has considered or adopted various policies for dealing with marketed unapproved drugs, including case-by-case enforcement actions (in which FDA has invariably prevailed) and periodic efforts to establish an "old drug monograph" system for therapeutic classes of products, similar to the OTC review monograph system (12). FDA's current policy is embodied in a "Guidance For FDA Staff and Industry" entitled "Marketed Unapproved Drugs – Compliance Policy Guide (June 2006) (the CPG)" (13). This policy supercedes an earlier (2003) version of the guidance, which in turn evolved from still earlier efforts to organize and prioritize enforcement of completed and ongoing DESI proceedings (14).

The CPG broadly affirms that, with the sole exception of products subject to an ongoing OTC review or DESI proceeding (discussed below), *all* marketed unapproved drugs are subject to FDA enforcement action at any time, and thus are marketed at the manufacturer's risk. Moreover, states the guidance,

> FDA is not required to, and generally does not intend to, give special notice that a drug product may be subject to enforcement action, unless FDA determines that notice is necessary or appropriate to protect the public health. The issuance of this guidance is intended to provide notice that any product that is being marketed illegally is subject to enforcement action at any time (15).

With respect to OTC and DESI drugs, the CPG reiterates FDA's long-standing policy that products subject to an ongoing OTC or DESI proceeding (including IROS products) may remain on the market during the pendency of the proceeding and any additional grace period specified in the proceeding. However, once the relevant DESI or OTC proceeding is complete and effective, all noncomplying products are considered to be unapproved new drugs subject to enforcement action at any time under the CPG (16).

Notwithstanding FDA's asserted authority to take action against marketed unapproved drugs at any time, the CPG also concedes the practical impossibility of ridding the market of such products at one fell swoop. Instead, FDA's policy is to "exercise enforcement discretion" (i.e., stay its hand) with respect to "the universe of unapproved, illegally marketed drugs in all categories" (17), while reserving its resources for products that pose the greatest risks to public safety, health, or the integrity of the regulatory process (18). Specifically, the policy outlines a hierarchy of potential risks that can cause particular products or product classes to be singled out for enforcement action, including the following:

*Baluss and Rosen*

- Drugs with potential safety risks;
- Drugs that lack evidence of effectiveness;
- "Health fraud drugs," i.e., products whose promotionally-claimed benefits are not adequately supported by scientific evidence (with priority to be given to products that present direct or indirect health hazards) (19);
- "Drugs that present direct challenges to the new drug approval and OTC drug monograph systems," e.g., unapproved products that compete directly with products sold in compliance with an approved ANDA/NDA or final OTC drug monograph (20);
- Drug products that also violate the act in other ways, e.g., unapproved products whose manufacture is found by FDA inspectors to violate current Good Manufacturing Processes (cGMP), FDA labeling requirements, or other regulatory requirements; and
- Drugs that are reformulated to evade FDA enforcement action; this category may apply in rare instances when a manufacturer attempts to avoid anticipated regulatory action by changing a product's formulation without otherwise bringing it into compliance.

Once FDA has determined that regulatory action is appropriate based on the above criteria, the form that action will take can vary, again depending on the level of perceived risk. In some circumstances, FDA will proceed by regulatory action against an individual product/manufacturer, e.g., when there are product-specific safety issues, or when the lack of required approval is discovered in the course of an inspection that reveals serious cGMP violations. Increasingly, however, FDA has chosen to act on a class-wide basis as discussed below. In such cases, the agency typically provides at least 1 year for affected manufacturers to obtain approval or remove their products from the market.

## FDA ACTIONS UNDER THE CPG POLICY

FDA actions to bring unapproved marketed drugs into the drug approval system have accelerated markedly in the period from 2006 to early 2008, and there is every indication that this trend can be expected to continue barring major unforeseen regulatory developments. Following issuance of the revised CPG in mid-2006, FDA held an industry workshop in January 2007, reiterating the CPG principles and providing information on the NDA/ANDA process to encourage voluntary compliance. At the same time, FDA enforcement activities in connection with marketed unapproved drugs have greatly accelerated compared to earlier years. For example, FDA's Web site lists more than 25 selected enforcement actions involving a wide range of drug products and drug product classes (21). These include, among others, *Federal Register* notices announcing deadlines for obtaining approval of multiple products containing specified active ingredients, including injectable colchicine, hydrocodone, guaifenesin (single-ingredient and extended-release products only), and quinine sulfate, among others. In several such cases, FDA's class-wide administrative orders have followed on earlier developments such as company-specific warning letters or injunction actions, and/or the issuance of a first NDA for the class (often followed by pressure from the NDA sponsor for FDA to force other class members into compliance). Yet another source of potential pressure on continued marketing of unapproved new drugs is the prospect of denial of Medicaid

coverage and/or Medicaid enforcement actions for fraudulent billing of such products (22).

## CONCLUSION

Even though medical and legal professionals as well as the general public are often quite surprised when they learn that thousands of drug products currently on the market have never been reviewed and approved by the U.S. FDA as safe and effective, they should not be. FDA has acknowledged the existence of such products as a major enforcement priority, and has placed industry on notice that all marketed unapproved drugs are subject to FDA enforcement action at any time, and thus are marketed at the manufacturer's risk with the sole exception of products subject to an ongoing OTC review or DESI proceeding. Given limitations in resources, FDA has stated in the CPG, that higher enforcement priority will be given to products that pose potential safety risks, products that lack evidence of effectiveness, and fraudulently-promoted products. Notwithstanding FDA's efforts to encourage voluntary compliance, the process of eliminating unapproved products from the market has taken years thus far and will likely continue to be slow under the CPG. However, given the more recent safety concerns associated with a number of products that were marketed without FDA approval, e.g., carbinoxamine in pediatric patients and safety issues arising with injectable colchicine, among others, this category of products that are marketed without FDA approval has increasingly been the subject of stories in the medial and congressional interest. This trend is likely to continue until a regulatory scheme is developed and implemented to bring all such products marketed without an NDA into the new drug approval process.

## REFERENCES

1. For example, a 2006 survey by Medical Marketing Research Inc. indicated that fully 91 percent of retail pharmacists believe that all medications available for dispensing with a doctor's prescription have been FDA-approved. Thompson Healthcare Company, Drug Formulary Review (Oct. 1, 2006).

2. FDA has generally attributed its inability to identify (count specific marketed unapproved drug products to limitations of the current Drug Registration and Listing System (DRLS). See, e.g. Letter from David W. Boyer, Acting Commissioner for Legislation, to The Honorable Edward J. Markey (Dec. 11 2006) at 6.

3. For example, one landmark in the evolution of the current policy was the 1984 "E-Ferol Incident," in which the use of an unapproved intravenous vitamin E product led to numerous serious adverse effects including infant deaths. Congressional reaction to this incident spurred FDA to review the status of unapproved marketed drugs and prioritize them for appropriate enforcement action, as well as to extending adverse event reporting requirements to all prescription drugs, not just products with approved NDAs/ANDAs.

4. The regulatory definition of "new drug" in section 201(p) of the act creates narrow exceptions for drugs that were "grandfathered" under the 1938 or 1962 amendments, as well as drugs that are considered "not new" because they are generally recognized by qualified experts as safe and effective (GRAS(E) based on a material time and extent of marketing history. FDA has historically applied such provisions very narrowly and its interpretations have been widely upheld by the courts. As a practical consequence, virtually any drug product that is marketed without an approved NDA/ANDA or under an applicable OTC drug monograph will be considered illegally marketed by the FDA.

5. See FDCA §§505(a) (prohibition against marketing of unapproved new drugs), *id.* 505(b) (NDA requirements), and 505(j) (ANDA requirements).

6. FDA uses warning letters to notify drug manufacturers of asserted regulatory violations and the risk of regulatory action without further warning if the manufacturer does not promptly come into compliance. Even in the absence of further regulatory action, the receipt of a warning letter is generally viewed as a serious matter.

7. It also should be noted that, apart from applicable approval requirements, all marketed drugs are subject to other regulatory requirements, including, e.g., compliance with current Good Manufacturing Practices, establishment registration, and drug listing requirements, as well as the obligation to report adverse events.

8. The total elapsed time from FDA's opening salvo, whatever form it takes, to the ultimate submission of an ANDA/NDA or market withdrawal is typically at least a year (by FDA policy, as noted below) and can take much longer, if it is to a manufacturer's perceived advantage to maximize sales by playing out the administrative process to the fullest extent possible (e.g., by filing citizen petitions, submitting extensive commentary, and data challenging FDA's scientific conclusions, requesting advisory committee review, appealing FDA decisions to higher administrative levels, and the like.

9. See 21 CFR §310.100 (withdrawing all prior opinion letters and other advice that particular drug products were "not new."

10. 21 CFR §310.6(b)(1).

11. Earlier stages include the publication of a "call for data," followed by publication and public commentary on the advisory panel's initial report and a "tentative final monograph" (technically a proposed rule) reflecting public comments and the FDA's views.

12. The alternative of an OTC (DESI-like monograph system for unapproved "old" drugs has been repeatedly considered and rejected by the FDA over the past five decades. In 2004, FDA submitted a report to Congress noting three prior considerations of this idea and reiterating its objections, including the impossibility of conducting class-wide reviews for prescription drugs with varying formulations and manufacturing specifications, and the impracticable time and resource demands of conducting such a review. The alternative urged by FDA was continued use of the current CPG approach (with modifications as reflected in the current Draft CPG). Reasons for preferring the CPG approach included greater flexibility for prioritizing regulatory actions and proceeding against either individual products or product classes, as well as significantly lower resource demands. FDA, Congressional Report on Feasibility and Cost of a New Monograph System for Marketed Unapproved Drugs, House Report 108–93 and Senate Report 108–97 (July 2004); see also "Generic Drug Monographs: Risks and Benefits," speech by Roger L. Williams, M.D. (May 1991).

13. Available at http://www.fda.gov/cder/guidance/6911fnl.pdf. The CPG is intended to supersede an existing and more detailed CPG, Compliance Policy Guide (CPG), section 440.100 "Marketed New Drugs Without Approved NDAs or ANDAs," and carries forward essentially the same principles in a more streamlined form. Although it has not been finalized by the FDA, the authors of this chapter think, it accurately reflects the approach that FDA would take to the products that are currently marketed without FDA approval. A CPG is a guidance document and is not legally binding on the agency or the industry. It represents the agency's best judgment and current thinking at the time. A company may deviate from the guidance and still be in compliance; however, a company who deviates from the guidance does so at its own risk. Moreover, since the guidance is not legally binding, FDA could take a position that is contrary to the statements that are presented in the guidance. Though were FDA to do so, it would have to clearly explain the basis for its change in policy.

14. This earlier version of the CPG is posted on FDA's Web site at http://www.fda.gov/ora/compliance_ref/cpg/cpgdrg/cpg440–100.html.

15. CPG at 4.

16. CPG at 9.

17. *Id.* at 2.

18. While this policy is straightforward with respect to products that are already on the market, it is important to note that there is at least some potential uncertainty as to whether it would also be applied to a never-before-marketed product that is "identical, related, or similar" to one or more marketed products. While the authors of this chapter believe that reading the policy to permit the introduction of a new product identical to one or more marketed unapproved products is arguably consistent with the policies' overall language and intent as well as FDA's general approach to the class-wide treatment of identical, related, and similar drug products in the DESI review, it is possible that FDA might take a different approach.

19. Direct health hazards are adverse health effects directly caused in patients as a result of using a drug product; indirect health risk refers to the likelihood that a patient will delay or discontinue appropriate alternative medical treatment in reliance on fraudulent claims.

20. More specifically, to encourage voluntary compliance with the drug approval system, as soon as any one drug in a general class of products obtains FDA approval, FDA intends to prioritize enforcement action against companies that market competing drugs in the same product class for enforcement if they fail to follow suit within a reasonable time (generally, 1 year).

21. For details, see http://www.fda.gov/cder/drug/unapproved_drugs/default.htm.

22. See, e.g., Letter from Sen. Chuck Grassley to FDA and the Centers for Medicare and Medicaid Services (Nov. 13, 2007) (noting reports of fraudulent billing for reimbursement of unapproved drug products).

 ## 12 FDA Regulation of Foreign Drug Imports: The Need for Improvement

### Benjamin L. England

*Benjamin L. England & Associates, LLC, FDAImports.com, Inc., Columbia, Maryland, U.S.A.*

## INTRODUCTION

FDA has become quite fond of saying that all regulated products are equally subject to all of the requirements of the FDCA irrespective of their source of origin. This is a true statement, whether the articles are (1) finished drugs or drug ingredients, (2) prescription or over-the-counter (OTC) products, (3) innovator or generic, (4) of any dosage or route of administration, or (5) drugs combined with other categories of products (e.g., drug–device combinations). With this as a first principle, one might reasonably be tempted to anticipate that FDA's regulatory regime and enforcement schema would reflect substantial international activities to ensure that foreign drug manufacturers comply with drug safety provisions of the Act. However, FDA's efforts to engage in regulatory oversight of foreign drug manufacturing and distribution have been reduced as a result of budget concerns and the difficulty of performing an audit outside the United States. For the most part FDA has focused its efforts on developing and issuing guidance documents that address requirements unrelated to product safety or quality.

There is little statutory or regulatory distinction between domestic- and foreign-sourced pharmaceuticals. The only meaningful distinction rests in the mandated frequencies of inspections. Foreign drug facilities are not subjected to the frequencies of inspections that apply to domestic facilities—simply because foreign facilities are remote and simply getting to the site to cross the threshold is so expensive. FDA is required to inspect domestic registered drug facilities every 2 years. See 21 USC §360(h). No similar statutory mandate exists for foreign drug manufacturers (1). That distinction aside, drug establishments must be registered with FDA irrespective of where they are located. Similarly, all such establishments must list the drugs they intend to distribute in the United States. However, foreign facilities may list drugs that are never shipped to the United States. When a foreign facility is registered with FDA and lists its drugs, FDA conducts virtually no evaluation of the data. Without a gatekeeper on the registration and listing data systems, the agency is able to say little more about the scope of its regulated foreign industry than identify the number of unique registrations and drug listings foreign entities submit. Consequently, FDA knows very little about the actual size of its foreign inventory, much less the adequacy of conditions in or drug processing occurring at these foreign facilities (2). This applies to virtually any and all drugs being exported to the United States. In this void of regulatory oversight, over the last decade and a half, FDA has routinely been assailed by congressional committees demanding more substantive regulation of drugs originating in foreign countries.

Given the rocky relationship between congressional oversight and FDA with regard to drug imports, it is worthwhile to consider some historical perspectives

and review some case studies to lay the framework for evaluating the authorities
FDA implements at the border.

## A HISTORY OF PERFECT STORMS ADVERSE TO PUBLIC HEALTH

In the 1990s, the confluence of a few foreign FDA inspections of active pharma-
ceutical ingredient (API) manufacturers and domestic investigations of imported
bulk drugs disclosed the existence of several significant bulk drug counterfeiting
(3) operations. FDA inspectors, working in conjunction with U.S. Customs Service
(4) special agents, uncovered a number of foreign sources of counterfeit bulk drugs
shipping metric tons of counterfeit antibiotics, anticonvulsants, and other APIs into
the United States. The primary (although not exclusive) sources for the counterfeit
APIs were located in China.

 These counterfeit APIs were sold through a series of multiple fine chemicals
and API brokers in Hong Kong, followed by companies in Germany or Switzer-
land, to U.S. end users intending to use the APIs for finishing into new animal and
human drug products. Although the transactions were funneled through Europe,
the counterfeit product, for the most part, was shipped directly from China (some-
times through Hong Kong) to U.S. ports of entry.

 Throughout that decade, FDA successfully prosecuted only one of these crimi-
nal enterprises. That case involved the importation of counterfeit antibiotics for use
in the manufacture of animal drugs in the United States. The investigation, how-
ever, revealed that counterfeit bulk drugs almost certainly were used in the man-
ufacture of human finished injectable drugs. The counterfeiters were able to take
advantage of the lax oversight of FDA's registration and listing systems, its weak
foreign and border inspection programs, and its inability to correlate data obtained
from domestic drug manufacturer inspections with information available from its
foreign inspections, drug master file (DMF) submission and review processes, and
import data. These weaknesses were never corrected even after the conclusion of
the criminal case. The U.S. drug supply remained vulnerable to these risks for a
number of years, virtually unchecked since that case was closed.

 In June 2000, and in response to a number of adverse events (including deaths)
involving counterfeit bulk inactive ingredients in other countries, FDA was crit-
icized for its failure to adequately manage the influx of imported APIs during a
number of congressional hearings (5). In response to those hearings, the agency
became more interested in the APIs entering the U.S. and their purported end users.
In the meantime, the sheer volume of imported cargo under FDA jurisdiction had
continued to skyrocket as more manufacturers (drug, device, food, and cosmetic
alike) moved their processing operations off shore. The agency, however, shifted
few new resources to its foreign drug and border inspection operations. Its data
systems remained woefully inadequate and without meaningful integration. Over
time, new adverse events involving foreign APIs (deaths and other serious drug
reactions in the United States) continued to feed the congressional frenzy (and later
that of the press) regarding FDA's inability to manage the risks associated with
inadequate regulation of the foreign drug manufacturing industry.

 In 2008, FDA's persistent difficulty to effectively regulate the foreign drug
manufacturing industry and the continuing weaknesses in its information tech-
nology systems helped create the environment in which then developed the per-
fect storm. Sometime prior to 2004, a manufacturer of bulk heparin sodium

United States Pharmacopeia located in China had submitted a DMF to FDA's Center for Drug Evaluation and Research (CDER) for agency review. A major international finished heparin manufacturer operating in the United States agreed to begin sourcing some of its bulk heparin sodium from this Chinese source. When the finished heparin manufacturer submitted documents to the agency requesting permission to add the Chinese firm as an additional source for its heparin, some personnel at FDA, reportedly, confused the name of the Chinese manufacturer with that of another manufacturer in China which had been inspected by FDA. FDA, in fact, had never inspected the bulk heparin sodium manufacturer. FDA approved the bulk heparin supplier as an API source for the finished dosage manufacturer in 2004.

In January 2008, the finished dosage manufacturer began recalling lots of finished injectable heparin doses due to a spike in adverse events associated with the product, including a number of American deaths. The source of the bulk heparin used to make the finished product was identified by FDA to be uninspected Chinese heparin sodium manufacturer. FDA quickly conducted an inspection of the facility in February 2008, at the conclusion of which the agency issued an 11-item FDA-483 (6). As of the date of that inspection, FDA had still not determined the cause for the adverse events associated with the Chinese-sourced heparin sodium. The investigation continued for many months.

By March 5, 2008, FDA reported during a press conference that it had discovered a nonheparin component in the suspect heparin lots. The nonheparin component was present at concentrations ranging from 5% to 20% (7). According to FDA officials speaking on the record, the component was "heparin-like" but the agency had still not identified what the component was. The agency only knew it did not belong in the heparin sodium. By this date, even U.S. news reporters were piecing together the facts and suggesting (to the FDA during the press conference) that it appeared the product may be a "fake heparin." FDA, however, was unprepared at that point to commit that the "heparin-like", nonheparin component was even the cause for the adverse events. Eventually, FDA identified this "heparin-like" component as hypersulfated chondroitin sulfate, an ingredient used often as a dietary ingredient in dietary supplements.

By April 29, 2008, in testimony before the House Oversight and Investigations Subcommittee, FDA's Director of CDER, Dr. Janet Woodcock, explained that FDA had linked adverse heparin events to at least 12 different foreign (Chinese) bulk heparin manufacturers (8). It was again confirmed that the foreign heparin sodium API manufacturer had not been inspected by FDA prior to the February 2008 inspection. That inspection occurred after significant press and scrutiny respecting the adverse events and yet, still, FDA observed significant problems related to validation of the firm's methods, nearly any combination of which could have given rise to some contamination of the bulk heparin (9).

The preceding narrative, while troubling, helps to frame a discussion about FDA's import authorities related to foreign-made drugs. Therefore, it is at this stage we observe that FDA's foreign inspection process for drug manufacturers is primarily driven by the agency's new drug application (NDA) approval process and is primarily funded by the Prescription Drug User Fee Acts (PDUFA). When any foreign facility is identified as the manufacturer of a drug in an NDA, the agency goes through its assessment as to whether a foreign inspection should be scheduled. Ordinarily, FDA eventually schedules a foreign inspection in connection with the application to cover the specific drug or drug manufacturing process

associated with the application. This foreign inspection is called a Pre-Approval Inspection (PAI). FDA does conduct some routine good manufacturing practices (GMPs) postmarketing surveillance inspections of foreign facilities. But these occur on an extremely limited basis, primarily, due to a prioritization of resources (10). These general rules of thumb regarding foreign drug inspections apply to finished drug manufacturers and for those foreign API manufacturers presented as API sources to FDA by finished dosage applicants.

As of September 2007, FDA reportedly could identify 3249 foreign drug establishments that, according to the agency's criteria, are subject to inspection ("should be inspected"). FDA has openly acknowledged that this number is only an estimate and that the agency has no idea how many actual foreign drug facilities have been exporting drugs to the United States. Out of this number, however, FDA officials noted that they had no evidence of any FDA inspection occurring at 2133 foreign establishments. China had the largest number of foreign establishments which should be inspected at 586 as of September 2007 (11).

## CHANGING WORLDS: COMPOUNDING THE DIFFERENCES IN HOW FDA REGULATES IMPORTED AND DOMESTIC DRUGS

Foreign-sourced drugs, including APIs, must meet all the same safety, quality, and purity standards; labeling requirements; packaging standards; and manufacturing regulations that apply to domestically manufactured drugs. Drug establishment registration, drug listing, and the DMF submission requirements apply equally to both domestic and foreign APIs. FDA implementation of these requirements in the foreign industry is clearly inadequate. In the United States, this disparity has become more significant in relation to drug quality and patient safety as the "global economy" continues to evolve. As evidenced by FDA, Customs, and Census data, the number of foreign drug manufacturing facilities propagating APIs intended for the U.S. market has increased dramatically over the last 15 years. Much of this increase can be attributed to free trade agreements (FTAs); beginning with the North American Free Trade Agreement (NAFTA), which was ratified by Congress in 1993. But not all of the increase in foreign drug manufacturing must be attributed to FTAs. Economic growth and industrialization of large developing nations alone have contributed substantially to the growth of drug imports in the United States.

Over the last several decades, both the People's Republic of China and India have progressed dramatically in developing their capacities to manufacture drugs for export. These industries have advanced to the point where they represent the number one (China) and number two (India) countries with foreign drug facilities exporting drugs to the United States, even using FDA's own numbers (12). Because China's industrial expansion outpaced its development of a reliable internal regulatory infrastructure to manage its industries, most government oversight in China occurred at the local rather than the national level. In addition, China has moved millions of people from rural areas into the cities to promote economic and industrial growth (13). The central government is aware of the need to create jobs for those new city dwellers, and China is promoting manufacturing to keep them occupied and increase productivity. Although a decentralized local regulatory construct benefits entrepreneurship, new manufacturing development, and business growth, it also complicates the process of establishing and maintaining a national drug safety regime. Further, it limits the ability for the national government in China to monitor

the industry's compliance to any national or international standards and it creates an environment rife with opportunities for corruption.

In India, there is far more commonality with U.S. drug manufacturing principles. In addition, the Indian drug regulatory authorities are more centralized promoting closer collaboration with FDA. But the same cannot be said with regard to labor regulation, environmental restrictions, and enforcement of criminal statutes. For various internal policy reasons, not explored here, drug research companies and other innovators enjoy weaker intellectual property protections in India than those enjoyed in the United States. This increases risks, from FDA's perspective, that normal economic arbitrage will attract to the U.S. consumer increasing quantities of unapproved foreign versions of FDA-approved pharmaceuticals.

Although only two countries are highlighted above, the economic realities of the international drug market simply compound FDA's challenges, whether considering the impact of European Union experiment, the increase in drug manufacturing in other Asian countries, the availability of drugs on the Internet, and the advance of the industry in most Latin American countries. The transshipment of drugs through third and fourth countries for further processing, repackaging, relabeling, and consolidation prior to arrival at a U.S. ports of entry further complicates FDA's ability to identify the supply chain and source for any particular API once it arrives. FDA's antiquated data systems, reliance upon drug registration and drug listing and inability to coordinate its domestic and foreign operations, persist.

The vast majority of FDA's drug resources are still, as of 2008, spent on domestic manufacturing. A surprisingly large percentage of foreign drug manufacturers, drug packers and repackers, drug labelers, and drug distributors are never inspected by FDA—never, over several decades of production. In contrast, domestic manufacturers of prescription and application drugs are inspected and reinspected by FDA about every two to 3 years. This glaring disparity is permitted by the FDCA and represents one of the only major statutory distinctions enabling FDA's lax regulatory oversight of foreign-sourced drugs and its far more vigorous domestic regime. With this as an initial backdrop we now explore current law and agency regulation and policy relating to the importation of APIs into the United States.

## FDA'S IMPORT AUTHORITY

FDA's broadest regulatory enforcement authority is barely even regulatory. Foreign products entering the United States under the FDCA are reviewed by FDA under its "801" authority. See 21 USC §381(a) (section 801 of the FDCA). The agency has the authority under the statute to "refuse admission" to any article (e.g., a shipment of drugs) based upon the mere appearance of a violation of law. It is not necessary for FDA to establish the product that actually violates the law. Moreover, this appearance may arise by the "examination of [the product] or otherwise," enabling FDA to deny importation based upon some evidence other than what may have come from the shipment under review (14).

Irrespective of this broad authority, U.S. importers of APIs may import articles that would otherwise be subject to refusal if they are intended for further processing and export or for incorporation into another article under the FDCA's Import for Export (IFE) provisions. See 21 USC §§381(d)(3), (e) and 382 [FDCA §§801(d)(3), (e) and 802]. Under the IFE provisions, importers may bring into the U.S. drug components which would otherwise not be permitted entry, if the articles are intended

for further manufacturing or incorporation into another article, and subsequently exported. Prior to the amendments of the Public Health Security and Bioterrorism Preparedness & Response Act of 2002 (the "Bioterrorism Act"), FDA had virtually no authority to prevent the importation of articles under the IFE provisions (15). In addition, the agency knew little about the articles being imported under the provision or the foreign entities shipping the products. The Bioterrorism Act amended the FDCA to grant FDA the authority to refuse admission to articles offered for import under the IFE provisions where the agency has "credible evidence or information" indicating the article is not for further processing or incorporation into another article and eventual exportation. See 21 USC §381(d)(3)(B). The Bioterrorism Act also increased the information that importers are required to provide to FDA upon importation under the IFE provisions, the records the importer must keep regarding the imported articles, and imposed a bond requirement sufficient to cover the imported articles while in the United States for IFE purposes.

The Bioterrorism Act also added declaration requirements for importers of drug shipments. Upon importation, importers, owners, or consignees of imported drug shipments must submit to FDA a statement that identifies the drug facility registration with respect to the article. If the importer fails to provide the statement, FDA is required to refuse admission to the drug. See 21 USC §381(o) [FDCA §801(o)]. The IFE refusal and the refusal related to the failure to provide the statement respecting registration of the foreign manufacturer is different from the traditional import refusal under section 381(a) [FDCA section 801(a)]. Under the subsection (a), refused articles must be destroyed if they are not exported within 90 days. No such requirement exists under subsections (d)(3)(B) or (o). Moreover, under subsection (o), the article may be admitted entry if the importer cures the defect (by providing the statement)—even after refusal. FDA will ordinarily not permit an importer to cure the defect once an article has been refused under subsection (a) unless the importer demonstrates the refusal was in error and convinces FDA to rescind the refusal of admission. On the other hand, if an article is refused for the importer's failure to submit the drug registration statement [under subsection (o)], the FDA is not permitted to release the shipment to the importer's, owner's, or consignee's custody pending a final disposition. FDA and Customs have never implemented this custody provision to date as all FDA-regulated imported products are imported under a basic importation bond authorizing release to the importer before FDA has been given an opportunity to review the articles' admissibility. FDA never issued any regulations governing either of these Bioterrorism Act amendments, but implements them solely through agency guidance documents.

FDA has promulgated only a few regulations over the last three decades addressing how it implements its import authorities over all, and even less related to drug imports. FDA's import regulations primarily focus upon the disposition of imported articles that are subject to an FDA notice of sampling (21 CFR 1.90); the issuance of a notice (providing an opportunity for a hearing) when articles "may be subject to refusal" (21 CFR 1.94); the procedures for reconditioning or relabeling imported product subject to refusal (but not yet refused) (21 CFR 1.95, 1.96 & 1.99); and the requirement that the importer, owner, or consignee post an importation bond (implemented under Customs law) prior to obtaining custody of the merchandise or manipulating it in any manner (21 CFR 1.97). FDA has issued even fewer regulations regarding the importation of drugs. New drugs, which are subject to an FDA investigational new drug (IND) application, may be imported provided

the articles are consigned to the U.S. IND sponsor, or to a qualified investigator named in the IND, or to the domestic agent for the foreign sponsor. See 21 CFR 312.110(a). A new drug may be imported into the United States if it is subject to an approved NDA or an active IND, and bulk drug ingredients which, when further processed result in a finished new drug, may be imported subject to certain drug labeling exemption regulations (discussed later). See 21 CFR 314.410(a).

Everything else FDA does at the border is implemented by guidance, and not regulation. Most of the guidance FDA issues are in the form of:

- Chapter 9 of the *Regulatory Procedures Manual* (*RPM*) (16);
- Portions of the *Investigations Operations Manual* (*IOM*) (17);
- *Compliance Policy Guides* (*CPGs*) (18);
- *Compliance Program Guidance Manuals* (*CPGMs*) (19);
- Import Alerts (IAs) (20);
- Import Bulletins (IBs) (21); and
- Various unpublished procedures, policies, manuals, and training programs.

This administrative power, however, has its limits. Even though FDA only needs to find an apparent violation to refuse entry, the importer, owner, or consignee of the shipment (the person who takes possession of the shipment after entry) has the opportunity to provide to FDA some evidence overcoming the apparent violation. This evidence may be in the form of written or oral testimony regarding the shipment. It may consist of analytical data related to the shipment, copies of the labels affixed to the product containers, submission of registration or listing numbers, or presentation of evidence that a new drug approval or IND application is in existence with respect to the article.

Even though the amount of evidence FDA must amass to refuse admission to a shipment of drugs is very low, the remedy is also relatively mild (even if costly to smaller shippers and importers). Refused shipments may be exported (in lieu of destruction) out of the country. That is, FDA does not take possession, much less title to the goods (as in the case of civil seizure actions) (21 USC §334), the importer is not forbidden from importing drugs in the future (as may occur, for instance, in a civil injunction case) (21 USC §332), and nobody has to pay the government any money or suffer more severe criminal sanctions.

Because FDA has this broad authority at the border, and the agency's resources for regulating any of the industries under its purview has remained so limited in spite of the dramatic increase of imported shipments, FDA is inclined to find any violation it can to hold cargo and force the importer to demonstrate the article complies with U.S. requirements. The easiest violations for FDA to lodge are those that do not require the agency to expend inspectional resources, that is, failures of foreign drug manufacturers to register or list their drugs with FDA.

In the realm of APIs, this regulatory requirement is easy to meet—and so most drug manufacturers do so (22). As a result, FDA has developed other methods for charging a shipment that appears to violate the law. These new methods also do not require the agency to expend inspectional resources examining shipments.

## DRUG LABELING EXEMPTIONS—IMPORT ALERT 66–66

As mentioned earlier, in June 2000 FDA was summoned before the Subcommittee on Oversight and Investigations of the Energy and Commerce Committee in the

U.S. House of Representatives to explain itself regarding its failures in the eyes of many representatives, to prevent the importation of counterfeit APIs and APIs that originated at foreign facilities which had never been inspected by FDA, had never been identified by a finished new drug manufacturer (in a NDA of any kind), had been found previously to have imported counterfeit APIs, or whose APIs had been the subject of numerous adverse events related to apparent manufacturing defects (23). In order to prepare some new program to address congressional concerns regarding the appropriateness of imported API shipments into the United States, the agency spent several months seeking a remedy to the problems. By October 2000, FDA personnel had trudged through hundreds (if not thousands) of records involving API shipments that had been imported into the United States over the previous months (and years). CDER compliance officials found a number of foreign API manufacturers which had exported APIs that were of the sort that they should have been referenced in a NDA, but FDA could not find an NDA referencing the foreign manufacturer (24).

As a result of this, FDA issued import alert 66–66 alleging that certain APIs from specific foreign companies appeared to be of the type of APIs that require the U.S. end user (finished dosage manufacturer) to have filed an approved NDA and to have come from foreign API manufacturers that have been subject to an FDA inspection (25). The general purpose of any import alert is to provide uniform guidance to agency import personnel throughout the United States regarding FDA's review of certain evidence related to specific product/manufacturer combinations and apparent violations FDA believes the reviewed evidence will support. A foreign manufacturer's placement on an import alert is equivalent to the near guarantee of an automatic detention of that manufacturer's shipments (26).

In this case, the APIs that fell within the ambit of import alert 66–66 included all those APIs that were of a type that would be used by the importer (or its customer) to produce finished drugs which would require submission of a NDA. See 21 USC §§321(p) and 355(a). Under the theory of the alert, imported APIs are incapable of bearing "adequate directions for use" as required by the FDCA because APIs are almost never used as they imported but are subject to some further processing prior to their administration. See 21 USC §352(f)(1). Congress recognized this reality for drug components and thus expressly authorized FDA to exempt certain "drugs" (such as components) from the "adequate directions for use" requirement. Under that statutory authority, FDA promulgated exemptions from this labeling requirement for kinds of many APIs. Id.; see also 21 CFR §§201.100 (prescription drugs for human drugs); 201.105 (veterinary drugs); 201.116 (drugs having commonly known directions); 201.117 (inactive ingredients); 201.119 (in vitro diagnostic products); 201.120 (prescription compounding); 201.122 (drugs for processing, repacking, or manufacturing); & 201.125 (drugs for use in teaching, law enforcement, research, and analysis).

The effect of the import alert was to shift the assessment regarding the applicability of a drug labeling exemption from the company where the API might be put into use in the United States (under the exemption) to the border review process. Thus, FDA began requiring U.S. importers of APIs to essentially prove that an exemption applied to any particular imported API shipment or FDA would automatically detain (and eventually refuse admission to) the API.

Since the October 2000 issuance of import alert 66–66, FDA has been detaining (and refusing admission to) importations of APIs coming from *any* foreign

manufacturer unless some evidence is presented at the time of importation demonstrating a regulatory drug label exemption applies. In this regard, over time FDA expanded the applicability of the guidance contained in the import alert to *all* imported APIs, even though FDA never conducted the kind of review that it undertook to issue the alert initially and to add API/foreign manufacturer combinations to it. FDA's extension of the import alert guidance to all APIs was based upon *United States v. 9/1 kg Containers, More or Less, of an Article of Drug for Veterinary Use*, in which the United States Court of Appeals for the Third Circuit had ruled that a party claiming a drug labeling exemption bears the burden of proof that the exemption applies (27). Under FDA's theory, the agency presumes (at the point of importation) that the exemption does *not* apply and thus the guidance was extended to all imported APIs, not just those manufacturer/API combinations actually listed on the alert. Consequently, FDA deemed that all APIs "appear" to be misbranded because they lack adequate directions for use. See 21 USC §§352(f)(1) and 381(a)(3). To overcome the appearance of this violation, the importer is left with the burden of presenting the information cited in FDA's import alert 66–66 demonstrating the article enjoys the drug labeling exemption (28).

As a result of FDA's approach to imported APIs, the agency expanded the laborious review it conducted in the fall of 2000 (covering at least of a year's worth of imported API shipments) to initially populate import alert 66–66, to all APIs without any additional review of the particular APIs or foreign suppliers whatsoever. It did this, of course, by presumption and guidance and not by regulation. Although there is some logic to FDA's approach, the initial import alert never provided any guidance for any of the other drug labeling exemptions that could apply to any particular API importation (29). Consequently, FDA import officials were forced to learn about the other potential drug labeling exemptions when they detained, without physical examination, creating unexpected problems and delays for importers of legitimate API shipments.

Another result of FDA's approach is that APIs, which were well known to come from previously inspected foreign suppliers for use by an importer under an approved NDA or abbreviated new drug application (ANDA), were suddenly and unexpectedly undergoing the automatic detention process contemplated by the alert. This affected innovator and generic manufacturer alike so that foreign API facilities, owned and operated by (and at times operating under the same name as) the importer, could not gain access to their imported shipments for weeks or months at a time, while FDA field personnel struggled to understand and apply the extension of the new guidance. Finally, because FDA treats every shipment of such APIs as unique events, every shipment by one importer of the same API from the same previously inspected source was repeatedly detained by FDA as if it was the first importation subject to review under the guidance.

Over time, as the ramifications of FDA's expanded application of its published guidance became better understood, U.S. API importers began asking for clarity and uniformity regarding the documents necessary to import APIs into the United States FDA gave it; to such a degree that FDA compliance officers began detaining (and refusing) API shipments for the importer's failure to produce certain documents recommended in the new and evolving guidance *rather than* based upon evidence that the APIs appeared to violate the Act. In time, FDA compliance officers gained access to internal CDER data systems to assist them in determining whether foreign facilities were approved API sources for the specific

API/importer–manufacturer combinations; however, these data bases were notoriously incomplete and not up to date. Because the data in these databases were not initially collected to assist compliance officers at ports of entry to assess applicability with drug labeling exemptions, FDA compliance officers began detaining (and refusing) shipments because of errors in CDER's data bases—which errors were caused by FDA in entering the data into the systems or the agency's failure to keep the data up to date.

To add further insult to injury, some of the documents the agency demanded at entry to FDA compliance officers were copies of documents FDA had originally issued to the NDA or ANDA holder, for example, end user letters to NDA holders authorizing the holders to begin using a foreign API source for finishing in the United States. This development, at a minimum, begged the question whether the evidence being presented overcame anything. If, after all, FDA issued the document that overcame the evidence of the appearance of a violation, what evidence could FDA be relying upon to give rise to the apparent violation in the first place?

It remains to be seen what these "evidentiary" submissions required by FDA to overcome the appearance of these "adequate directions for use" violations will evolve into next. But this analysis demonstrates that FDA's compliance review for foreign-sourced APIs remains quite disparate from its oversight of the few remaining domestic API manufacturing sources. Moreover, it reveals how easily the agency converts statutory and regulatory requirements into administrative obstacles for industry resulting in the conversion of a statutory risk management concept (e.g., GMP requirements designed to ensure the safety and efficacy of drugs) into administrative compliance management (e.g., import-process administrative requirements designed to ensure the importer submits the right document). More to the point, though, it shows how FDA has so broadly defined the "appearance" standard in FDCA section 801(a) that it now means virtually anything FDA wants it to mean.

## Legal Registration and Listing: Present and the Future

Prior to the enactment of the Food and Drug Administration Modernization Act of 1997 (FDAMA), FDA did not require foreign drug manufacturers to be registered with the agency. FDA did require foreign drug manufacturers to list those drugs intended for distribution in the United States, which resulted in a default registration process. See 21 USC §360(j). FDAMA amended the drug registration provision of the act to require the annual registration of virtually all drug manufacturers, foreign or domestic and FDA followed with the regulatory requirement. See 21 USC §360(i); 21 CFR Part 207. The next major statutory revisions to FDA's registration authority for foreign drug facilities came through the Bioterrorism Act (30). Then Congress enacted the Food and Drug Administration Amendments Act of 2007, which required all drug registrations and listing be provided in electronic format (31). Under the Bioterrorism Act, Congress mandated that foreign drug manufacturers to provide certain new specific information at the time of registration including:

- The name and place of business of the establishment,
- The name of a U.S. agent,
- The name of each U.S. importer of the manufacturer's drugs that is known to the manufacturer, and

* The name of each person who imports or offers for import the manufacturer's drugs into the United States.

    See 21 USC §360(i)(1).

    With these amendments, Congress began to lay the statutory framework for FDA to begin to identify (and potentially regulate) the international supply chain of drugs originating in foreign countries and, at the very least, to create some improved transparency of that supply chain to FDA. FDA first issued guidance regarding the new drug registration provisions, which resulted in little change for some time. Then in August 2006, FDA issued a proposed rule to expand its drug establishment registration regulations (32). FDA took its task of creating new drug registration regulations seriously. The proposed revisions had broad implications for foreign drug establishments and drug importers. These revisions were so broad that FDA found it necessary to reopen the comment period to the proposed rule in February 2007 to grant additional time for foreign drug manufacturers to review the proposed rule and provide comments to the agency (33).

    Under the Proposed Registration Rule, the following observations are note-worthy:

* Under the current (2008) regulatory regime, foreign drug manufacturers may export to the United States a drug ingredient or drug product into a foreign trade zone (FTZ), even if the foreign drug manufacturer is not registered with the FDA or if the drug is not listed. In many circumstances, FDA-registered or non-registered manufacturing facilities in foreign countries use FTZs to stage drug shipments to other foreign countries. These articles may not be FDA approved or drug listed or may be from an unregistered manufacturing facility that is not subject to FDA GMPs. These shipments currently enter FTZs under an importation process that is entirely separate from FDA's import screening process. The facilities exporting such products to FTZs have been exempted from FDA's registration and listing requirements since Nov. 27, 2001. The Propose Rule would revoke this exemption entirely, thereby requiring all foreign facilities manufacturing, repacking, relabeling, or conducting drug product salvaging operations to register and list their drugs even if their drugs merely transit the United States through an FTZ.
* Under the current (2008) regulatory regime, foreign manufacturers may export to the United States a drug ingredient or drug product intended for further processing, packing, or labeling or intended for incorporation into another article and eventual export. See 21 USC 381(d)(3) ("Import for Export" or "IFE"). Similar to the FTZ scenario, facilities exporting such products have been exempted from FDA's registration and listing requirements since Nov. 27, 2001. IFE shipments are entered under a customs temporary import bond (TIB), permitting them to remain in the United States for up to 3 years (including all extensions) prior to exportation. Extensive record-keeping requirements reflecting the disposition (manufacture, exportation, or destruction) of drugs entered as IFE shipments are currently in place. The Proposed Rule would revoke this exemption entirely, thereby requiring all foreign facilities manufacturing, repacking, relabeling, or conducting drug product salvaging operations to register and list their drugs even if the drugs enter as an IFE shipment and are never intended for consumption (or use) in the United States.

- Under the current (2008) regulatory regime, a foreign manufacturer who is required to register and list its articles must submit information regarding the foreign manufacturer, its owners and operators, the activities which it conducts, and the drugs upon which such activities are conducted. The Proposed Rule would require foreign drug manufacturers to provide in their registrations the identity and contact information of U.S. importers known to them and for persons who import or offer for import their drugs into the United States. The former category of reported parties requires the person to be in the United States. No such distinction was made for in the proposed definition of "persons who import or offer for import," implying that foreign agents, brokers, or other entities who facilitate the importation of a foreign establishment's drugs into the United States must also be identified in that foreign establishment's registration. Although the Bioterrorism Act clearly requires foreign drug establishments to provide the names of their U.S. importers and the persons who offer their products for importation, the agency's definition is so broad that it requires identification of virtually every supply chain of a foreign drug that makes its way, eventually, to the U.S. market.

- The term "importer," under the proposed rule, includes a person in the United States, other than a consumer or patient using a drug, who is an owner, consignee, or recipient of a foreign establishment's drug, even if the person is not the initial owner, consignee, or recipient of the foreign establishment's drug. Under the proposed rule, therefore, foreign manufacturers must disclose in their FDA registrations the identity of third party (downstream purchasers) who import drugs manufactured by the foreign establishment even if the foreign manufacturer did not sell the drug to the importer.

- Any changes of all required information (including the identities and contact information of importers or third parties facilitating drug importation) must be updated in FDA's registration system. Because the "importer" and "persons who offer for import" definitions are so broad, any change in a foreign drug manufacturer supply chain would require an update be filed in FDA's registration system, creating a significant burden for foreign manufacturers.

- The new drug code (NDC) provisions in the proposed rule contemplate the development (and required management) of significant amounts of data about hundreds of thousands of entities not currently included in any FDA data record. This data must be cross-linked by the agency in order for FDA inspectors and compliance officers to be able to use it to create a drug establishment and listing inventory. In addition, companies not accustomed to providing registration and listing information will be required to do so for the first time under the proposed rule. Historically, data amendments supplied by industry to FDA for application, registration, or listing purposes are not current (or are keyed incorrectly) in FDA's own data systems. When FDA's field personnel evaluate information about imported drugs and compare that information against data in the FDA systems, the FDA official often views the discrepancy between the data sets as the "appearance of a violation" [under 21 USC §381(a)]. In these cases, an FDA compliance officer often detains the imported shipment, leaving the importer in the position of attempting to justify why FDA's data systems are incorrect. Such shipments are often refused admission. The importer is then forced to export the drugs, even though the articles do not violate the FDCA and there is no appearance of any such violation. With the addition of the new NDC requirements in

the proposed rule, the broad information relating to a "U.S. importer" or "persons who import or offer for import drugs" required in foreign establishment registrations and listings, and the revocation of the FTZ and IFE exemptions, it is foreseeable that FDA's data systems are not likely to be current resulting in even greater confusion at ports of entry.

The FDA relied upon Bioterrorism Act for its authority to make a number of the changes to the current drug registration and listing regime found in the proposed rule including:

* The revocation of the registration and listing exemptions for foreign establishments shipping their drugs into FTZs or under 21 USC §381(d)(3) (related to IFE shipments); and
* Requiring foreign establishments to include in their registrations and listing submissions the identity and contact information of known U.S. importers and persons who import or offer for import-specific drugs manufactured by the registering foreign establishments.

It is noteworthy that FDA recited other significant Bioterrorism Act provisions in the proposed rule, although these additional provisions were not directly implemented by the rule, such as:

* The requirement that drugs imported under 21 USC §381(d)(3)(A)(i)(III) (relating to IFE shipments) be accompanied by a certificate of analysis;
* The importer of any drug imported under 21 USC §381(d)(3)(A)(i)(I) (relating to IFE shipments) provides a statement to the FDA upon the drugs importation identifying virtually every person who was in possession of the drug back to the foreign manufacturer;
* The FDA's explicit authority to refuse admission to a drug imported under the IFE provisions where there is credible evidence that the drug is not intended for further processing or incorporation into another article and eventual exportation [21 USC §381(d)(3)(B)]; and
* The FDA's authority to refuse admission to any imported drugs (whether under the IFE provision, or any other provision) if the importer fails to provide a statement to FDA upon offering the drug for import identifying the registration of certain parties in the drug's foreign supply chain. See 21 USC §381(o). If refused under this authority, the FDA is prohibited from permitting the importer (owner, consignee, or designated recipient) from taking possession of the drug—requiring the refused drug be held at the port of entry.

The FDA did not proposed to implement these additional Bioterrorism Act authorities; however, it is likely that the agency would proceed toward such implementation once the registration and listing system is revised as proposed. The agency is already in the process of soliciting comments from industry regarding the electronic format of registration and listing data (34).

## EVOLVING OBSTACLES (BARRIERS) TO FOREIGN-SOURCED APIS

FDA has never had the authority to charge a registration fee for drug establishments, in contrast to recent developments in FDA's medical device authority granting to the agency such authority for medical device establishment registration (35).

*England*

However, the numerous bills have been introduced in the U.S. House of Representatives and the U.S. Senate proposing the imposition of registration fees to be paid by foreign and domestic drug establishments as well as importation fees to be paid at the port of entry for every commercial invoice line that includes a pharmaceutical. For instance, in a bill entitled Food and Drug Administration Globalization Act of 2008 (FDAGA), FDA is granted the authority to require drug establishments to pay a fee to register with FDA. Under FDAGA, as it is currently proposed, FDA is permitted to set the fee amount. The agency is also required to collect a fee from commercial drug importers under FDAGA, as proposed. In conjunction with the newly proposed user fee authority, FDAGA also proposes to mandate FDA to conduct inspections of all registered facilities, without distinguishing between foreign and domestic establishments.

It is clear that between the congressional pressure FDA is receiving and the agency's own proposed regulations and administrative guidance documents, the importation of foreign-sourced drugs will come under far stricter scrutiny far more often. Even if this increased FDA scrutiny of foreign-sourced drugs does not occur in the foreign manufacturing facility or at the border, the administrative hurdles are increasing. With the breadth of authority granted to FDA under section 801 and FDA's apparent willingness to find ways to deem drugs misbranded (through the extension of the import alert process), foreign companies seeking to sell drugs in the United States, whether they be finished dosage or APIs, will find that the importation process has become more complicated and the pathway is less clear.

## REFERENCES AND NOTES

1. FDA officials admitted to the Government Accountability Office during a review of the agency's foreign inspection program that FDA only inspects nonactive pharmaceutical ingredient manufacturers on a "for cause" basis. That is, the agency does not inspect drug excipient manufacturers even though all components of a drug fall within the definition of that term in the statute. See 21 USC §321(g)(1)(D).

2. See DRUG SAFETY, Preliminary Findings Suggest Weaknesses in FDA's Program for Inspecting Foreign Drug Manufacturers; Marcia Crosse, Director, Health Care (Government Accountability Office) in Testimony before the Subcommittee on Oversight and Investigations, Energy and Commerce Committee, U.S. House of Representatives, at 3 (http://www.gao.gov/new.items/d08224t.pdf), Nov. 1, 2007 (last viewed July 25, 2008). Note that this testimony does not prove that foreign-made drugs are unsafe. Rather, it demonstrates that FDA has little idea whether they are safe or not—except by evaluation of adverse event data which may rise above the radar, after it is too late for some.

3. The term "counterfeit drug" under the Food Drug and Cosmetic Act (FDCA) refers to a drug, or the container or labeling thereof, which falsely bears the name, imprint, mark, etc., of a company which is purported to be the manufacturer, packer, or distributor of the drug, but which company did not manufacture, pack, or distribute the drug. See 21 USC §321(g)(2).

4. The Office of Enforcement at the U.S. Customs Service is now the Immigration and Customs Enforcement (ICE), which is a part of the Bureau of Customs and Border Protection in the Department of Homeland Security.

5. See, e.g., Statement of Dennis E. Baker, FDA Associate Commissioner for Regulatory Affairs, before the Subcommittee on Oversight and Investigations, Energy and Commerce Committee, U.S. House of Representatives, at http://www.fda.gov/ola/2000/importeddrugs.html (June 8, 2000); see also, Statement of Jane E. Henney, FDA Commissioner, before the Subcommittee on Oversight and Investigations, Energy and

Commerce Committee, U.S. House of Representatives, at http://www.fda.gov/ola/2000/counterfeitdrugs.html (Oct. 3, 2000) (both last viewed July 27, 2008).

6.  See Form FDA-483, FDA Inspectional Observations for FDA inspection of Changzhou SPL Company Ltd., Changzhou City, Jiangsu Province, China, at http://www.fda.gov/ora/frequent/483s/Changzhouspl_heparin_20080226.483.pdf (redacted) Feb. 26, 2008 (last viewed July 27, 2008).

7.  See FDA Press Briefing by FDA Commissioner Dr. Andrew von Eschenbach and FDA CDER Director Dr. Janet Woodcock, at http://www.fda.gov/bbs/transcripts/2008/heparin.transcript.030508.pdf, March 5, 2008 (last viewed July 27, 2008).

8.  See Statement of Dr. Janet Woodcock, FDA Center for Drug Evaluation and Research Director, before the Subcommittee on Oversight and Investigations, Energy and Commerce Committee, U.S. House of Representatives, at http://www.fda.gov/ola/2008/heparin042908.html (Apr. 29, 2008).

9.  Dr. Woodcock maintained during her testimony (both written and oral) that had FDA inspected the firm in 2004 when the agency would ordinarily have inspected—but for the human error in assuming an inspection had already occurred—the agency still would have not discovered the contamination of the heparin and the deaths that resulted from it because it would have been nearly impossible to detect the contamination during any inspection. See *id.* This sheds an interesting light onto what the lead drug approval official at FDA thought at the time the agency was (or should be) doing during an inspection, that is finding evidence of contamination that could arise from a processing or validation deficiency in a manufacturing plant. On the one hand, FDA's good manufacturing practices (GMP) inspections are intended and designed to ensure that the facility is implementing GMPs in order to reduce the risk of placing on the U.S. market a drug that fails to meet the required strength, quality, and purity. See 21 USC §351(a)(2)(B); see also 21 CFR Parts 210 and 211. On the other hand, given the public, congressional, and governmental (U.S. and Chinese) scrutiny placed upon this particular inspection, there are few inspections this company would likely have been better prepared for. Yet FDA documented that the facility was clearly out of control in many significant respects. Consequently, a 2004 inspection might have prevented this facility from producing bulk heparin sodium contaminated with hypersulfated chondroitin sulfate. Further, if it were true that an inspection in 2004 could not have detected the contamination, one wonders why FDA inspected the facility in February 2008 before the agency knew what the contaminant even was.

10. There are those who argue, quite persuasively, that one of the political ramifications of PDUFA has been to render it far easier for appropriators to reduce the budgetary line items to FDA for its routine surveillance drug GMP inspections (which are funded from the agency's discretionary budget) because FDA inspections are already paid for by NDA applicants. There are two reasons this line of reasoning is persuasive. First, the PAI only applies to those articles subject to PDUFA and they are limited in scope to the specific drug (and manufacturing process) implicated by the application. Second, at the time of this writing, FDA lacks equivalent PDUFA authority to cover generic drug applications (abbreviated new drug applications). Thus, the impact of this lack of discretionary funding weighs more heavily on the generic drug industry.

11. The facts in this paragraph were derived from a GAO inquiry. See Crosse at 9–14, n. 2, *supra.*

12. In testimony before the Subcommittee, Dr. Janet Woodcock noted that in 2007 over 1000 foreign sites were referenced in abbreviated NDAs (for generic drugs) as the source of API for the finished products. "450 of those were in India, 407 of those were in China, for API manufacture of those generic drugs; and only 151 of them were in the United States." See Oral Testimony of Dr. Janet Woodcock, Directory, FDA CDER, at http://energycommerce.edgeboss.net/wmedia/energycommerce/subcommittee_on_oversight_and_investigations_hearing-42908.wvx (Apr. 29, 2008).

13. See, e.g., Berg, Nate, China's Rural-to-Urban Migration, The Economist, July 27, 2007.

14. The relevant portion of the statutory provision states: Secretary of the Treasury shall deliver to the Secretary of Health and Human Services, upon his request, samples of food,

drugs, devices, and cosmetics which are being imported or offered for import into the United States, giving notice thereof to the owner or consignee, who may appear before the Secretary of Health and Human Services and have the right to introduce testimony. The Secretary of Health and Human Services shall furnish to the Secretary of the Treasury a list of establishments registered pursuant to subsection (i) of section 510 [21 USC §360] and shall request that if any drugs or devices manufactured, prepared, propagated, compounded, or processed in an establishment not so registered are imported or offered for import into the United States, samples of such drugs or devices be delivered to the Secretary of Health and Human Services, with notice of such delivery to the owner or consignee, who may appear before the Secretary of Health and Human Services and have the right to introduce testimony. If it appears from the examination of such samples or otherwise that (1) such article has been manufactured, processed, or packed under insanitary conditions. . . or (2) such article is forbidden or restricted in sale in the country in which it was produced or from which it was exported, or (3) such article is adulterated, misbranded, or in violation of section 505 (21 USC §355), or prohibited from introduction or delivery for introduction into interstate commerce under section 301(ll) [21 USC §331(ll)], then such article shall be refused admission, except as provided in subsection (b) of this section. See 21 USC §381 (FDCA §801).

15. See Pub L. No. 107–188 §322 (June 12, 2002).
16. http://www.fda.gov/ora/compliance_ref/rpm/chapter9/ch9.html
17. http://www.fda.gov/ora/inspect_ref/iom/
18. http://www.fda.gov/ora/compliance_ref/cpg/default.htm
19. http://www.fda.gov/ora/cpgm/default.htm
20. http://www.fda.gov/ora/fiars/ora_import_alerts.html
21. Import Bulletins are considered deliberative internal agency documents and are, therefore, not public.
22. APIs intended for further manufacturing are exempt from certain labeling requirements. See, e.g., 21 CFR §201.122.
23. See Baker testimony, n. 5, *supra*.
24. See Henney testimony, n. 5, *supra*.
25. See Import Alert 66–66, Detention Without Physical Examination of APIs that Appear to be Misbranded Under 502(f)(1) [21 USC §352(f)(1)] Because they Do Not Meet the Requirements for the Labeling Exemptions in 21 CFR 201.122, at http://www.fda.gov/ora/fiars/ora_import.ia6666.html (Oct. 3, 2000) (last updated Jan. 9, 2008) (last viewed July 27, 2008). Note the date of the issuance of this import alert corresponds to the date of testimony of FDA Commissioner Henney before the Subcommittee on Oversight & Investigations, Energy & Commerce Committee, U.S. House of Representatives.
26. See FDA Regulatory Procedures Manual, Chapter 9, Subchap. 9–6 "Detention Without Physical Examination", at http://www.fda.gov/ora/compliance_ref/rpm/chapter9/ch9–6.html (last viewed July 28, 2008).
27. 854 F2 d 173, 179 (7th Cir 1988).
28. See Import Alert 66–66, n. 25, *supra*.
29. *Id.*
30. See Pub L. No. 107–188, §321 [amending 21 USC §360(i)].
31. See Pub L. No. 110–85 [amending 21 USC §360(p)]. In a Federal Register notice of availability, FDA solicited comments and volunteer participation in a pilot electronic registration system. See Draft Guidance for Industry on Providing Regulatory Submissions in Electronic Format—Drug Registration and Listing; Availability, 73 Fed Reg 39964 (July 11, 2008).
32. See Requirements for Foreign and Domestic Establishment Registration and Listing for Human Drugs Including Drugs that are Regulated Under a Biologics License Application and Animal Drugs, 71 Fed Reg 51276 (Aug. 29, 2006).
33. See 72 Fed Reg 5944 (Feb. 8, 2007) (reopening comment period for FDA Proposed Rule regarding requirements for foreign and domestic establishment registration and listing for human drugs, see n. 31, *supra*).

34. See Draft Guidance on Drug Registration and Listing Electronic Formats, n. 31, *supra*.
35. See Medical Device User Fee Act of 2007 (MDUFMA), which established a new user fee for medical device establishments registering with the FDA under 21 USC §360. One bright spot in MDUFMA for foreign entities appeared. Under the renewal of the legislation (for fiscal years 2008–2012), foreign medical device companies are permitted to qualify as "small businesses" enabling them to enjoy reductions in certain user fees collected by FDA.

 **Active Pharmaceutical Ingredients**

### Max S. Lazar

*FDA Regulatory Compliance Consulting, Surprise, Arizona, U.S.A.*

## INTRODUCTION

Active Pharmaceutical Ingredients (APIs) play an important role in the drug product industry. The most obvious contribution is that the API is the active ingredient that makes a drug product effective and provides the pharmacological activity of any drug product or dosage form.

Historically, many APIs used to produce drug products in the United States by the dosage form manufacturers were made in the United States either by contractors or by the owners of the drug product NDA or ANDA. However, an evolution has occurred which has caused a migration of API manufacturing to other parts of the globe. This migration may have occurred for one or more reasons. The movement could have been driven by a growing generic industry; low-cost labor and/or technology in India, China, or developing nations of the world; or other economically related reasons such as environmental and safety regulations which have been more costly to meet within the United States.

While the causes of production migration are constantly changing, the reality is that more APIs are imported into the United States (1) and Europe than ever before in recent history. This particular situation has been having a significant impact on regulators, especially the U.S. Food and Drug Administration.

The reduction in local manufacturing and the significant expansion of APIs manufactured overseas have severely strained the inspectional resources of the FDA and possibly other regulators around the world.

## API SOURCING

APIs can be manufactured using a number of different methods and techniques.

1. Naturally derived APIs are usually extracted from natural sources and purified for use in drug products;
2. Chemically synthesized compounds;
3. Compounds derived from fermentation, isolated and purified;
4. Biotechnologically produced compounds; and
5. A combination of any of the above techniques.

As the world economy continues to grow, sourcing of APIs is not predicable. Development and manufacturing of an API can be performed by small technology firms that have evolved over the past 25 years. Many of these firms have either spun off from downsized companies or were formed by scientists and business people that left the original API firms during downsizing or optimization exercises conducted by the original holders of regulatory filing and licenses.

Producing an API can take significant investments in laboratory development and manufacturing facilities. As products are discovered during original research, firms are faced with the need to make fast economic decisions. Should the compound of interest be developed and initially manufactured by a development firm to avoid the high investment costs or should this work be performed within the discovery firm where complete control of information and resources can be totally managed?

Outsourcing of API development and/or manufacturing is not a simple decision. Time to market and development work will influence the long-term effect on the API quality and cost. Today, development of an API process is being influenced by factors that did not exist a few years ago. This industry has evolved from simply finding a good manufacturing process which is capable of producing an API that meets predetermined specifications of quality using a chemical, synthetic, biological, or fermentation route that is economically feasible. In the present day, new concepts and potential expectations are entering into the mix of concepts that need to be considered by companies developing and manufacturing new APIs.

Newly identified principles and techniques are being driven in part by some regulatory initiatives and international standard setting organizations. These include ISO 9000 Quality Standards; International Conference on Harmonization (ICH) Quality Activities; American Society for Quality (ASQ) as well as FDA Initiatives, for example, Risk Management, Quality by Design, Process Analytical Technology, HAACP (Hazard Analysis Critical Control Point); and other concepts are all being considered as possible applications to API development and manufacturing and controls.

## APIs in the United States

APIs manufactured in or for use in the United States have long been expected to meet Good Manufacturing Practices (GMP). This GMP compliance expectation gains its origin in the U.S. Food Drug & Cosmetic (FD&C) Act. Unlike drug products which have regulations covering GMP (21 CFR Part 211), API has no regulations issued specifically for API GMP. However, application of GMP to API manufacturing has been a foundation of drug manufacturing and API producers used 21 CFR Part 211 as a guide in applying GMPs to API manufacturing until the issuance of Q7A (2) by the ICH in November 2000. Shortly after that date, this ICH guidance was adopted as guidance by the United States FDA for API GMP.

The U.S. FDA has performed inspections of API producers to assure their conformance with GMP practices and conformance with other regulatory filings such as NDAs or DMFs. Unlike most foreign countries, FDA also performed these inspections of foreign manufacturing sites even if the source of the materials was outside of the United States.

APIs that are incorporated into drug products covered by such filings as NDAs should follow the various guidances that are issued by the FDA. For example, the February 1987 "Guideline for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances" (3) is a historical FDA document that still exists and addresses what documentation is expected by the FDA when filing API information. Newer guidances which cover FDA ICH work on the Common Technical Document (CTD) and the M4Q guidance covering quality issues which discuss Drug Substance Dossier information (4) should be referenced to assure that current information is properly provided when submitting

API-related information. It is interesting to note that FDA continues to use "Drug Substance" when referring to "API" in their current filing guidances. API continues to be a more common GMP-related term due to its use in FDA and ICH Q7A guidances.

## API Sourcing in Other Countries

As the API industry has continued to expand in other areas of the world, other countries and regions have developed their own review and filing processes as well as compliance programs. For example, the European Union has strengthened its processes associated with APIs and now requires API GMP compliance within its directives. However, regulatory review and inspectional processes vary significantly. In some countries, APIs can gain regulatory approval simply by being published in an official compendium.

## REGULATORY FOCUS AND INITIATIVES

While innovator firms would use their IND or NDA filings to provide needed information about APIs, other companies would more likely make use of Drug Master Files (DMFs), or their equivalent, to document the necessary information covering an API. The use of a DMF allows for the submission of confidential information without making this information available to the public or other commercial firms. However, references to DMFs need to be established in filings to allow the regulators to review the DMF documents.

DMFs should contain all of the expected and detailed information that the regulators need to complete an agency review process (5–8).

While impurities and impurity profiles are of great importance (9,10) during a regulatory filing review, physical attributes of an API also need to be addressed since such characteristics can affect drug products. Physical attributes can affect mixing and flow characteristics of the API during the processing of a drug product, which crystal structure and crystal characteristics can sometimes affect the bioavailability of the drug. DMF sponsors that need additional information about impurities beyond specific FDA guidances are referred to ICH Q3A by FDA (11).

Regulatory focus in the United States has been relatively stable for a number of years. However, the FDA initiative for the 21st century has certainly started to impact API at both the design and manufacturing stages of the API Life Cycle. As ICH continues its efforts to harmonize filing and quality-related practices, regulatory attention tends to migrate. As Process Analytical Technology gains greater recognition within the drug product industry, more online controls will tend to be used for all manufacturing sectors including API.

"Process Analytical Technology is:

- a system for designing, analyzing, and controlling manufacturing through timely measurements (i.e., during processing) of critical quality and performance attributes of raw and in-process materials and processes with the goal of ensuring final product quality" (12).

Online monitoring and controls are not new to API; however, as regulators accept such technology for drug products, its spillover application to API design and development is inevitable.

Other regulatory interest lies in another concept called Quality by Design. For API, it will ultimately redirect API development from compound structure and specifications to a more complex activity that will need to be determined during development, that is, the critical parameters and specifications associated with the API so that its use in a final dosage form can be assured of its quality and effectiveness.

Compendia and regulators now both express concerns and interest in the methods used for producing a reliable and reproducible API. Methods of production can and will affect potential impurity profiles and even physical characteristics which can affect a change in the performance of an API in a dosage form.

## REGULATORY FILINGS

What is needed to get regulatory approval for drug products varies around the world. However, some form of:

1.  New Drug Application(s) (NDA),
2.  Abbreviated New Drug Application(s) (ANDA),
3.  New Animal Drug Application(s) (NADA),
4.  Dossiers (The term commonly used for the earlier terms inside the United States), and
5.  Drug Master File(s) (DMF).

DMFs are commonly used as a way to provide confidential or proprietary information about an API to a regulatory agency such as the FDA. A DMF normally includes:

1.  Information about manufacturing and control,
2.  Facility and process information used to produce or quality control an API,
3.  Synthesis descriptions or detailed process information, and
4.  Manufacturer site location and facility/equipment usage.

The DMF is required to provide sufficient details for regulators such that the information can be used to either grant or deny approval of a drug-related filing.

In the United States, API process information is included in Drug Applications or DMFs. If an NDA holder does not include API details within the application itself, a DMF must be referenced for the FDA to start the review of a submitted DMF. When a DMF or Drug Master File is sent to FDA, no active review is undertaken by FDA until the DMF is referenced within other registration documents such as an NDA. Once referenced, the DMF will be considered during a review and approval process.

It is important that firms that reference a DMF should be sure that the company that issued the DMF has had a recent satisfactory GMP inspection. If that is not the case, FDA or other agencies from other countries may indeed request an inspection of the DMF initiator's facility. Until the API producer has passed a current GMP inspection, it is highly unlikely that the applicant that references that DMF will receive approval.

Application holders need to be sure that they understand and comply with current FDA expectations before they initiate any changes to their suppliers or processes used to manufacture or control the referenced API (13).

In spite of years of pressure upon the FDA, the agency has been very slow and reluctant to allow industry to implement changes to an API without prior review (14,15).

Current expectations for DMFs, New Drug Applications, or Dossiers around the world will continue to evolve. What is certain is that changes due to harmonization efforts will continue under ICH and compendia programs and these efforts will result in greater uniformity in requirements between countries or regions of the world.

Perhaps more importantly, the current and future growth of the generic drug industry worldwide will have a definite impact upon the API industry. The continuing expansion of producers; their country of origin; and due to technological growth, changes in synthetic or biological derivation of an API will all significantly impact API regulations from both a filing and on-site inspectional perspective.

## The DMF

Since the DMF plays such an important role in the API approval process, we need to examine it more closely.

"A Drug Master File (DMF) is a submission to FDA of information concerning the chemistry, manufacturing, and controls (CMC) of a drug substance or a component of a drug product to permit the FDA to review this information in support of a third party's submission" (16). While there were originally five types of DMFs, there are currently only four that are active. FDA no longer requests a Type I DMF (that provided plant information) since plant information is easily obtained by investigators in the field.

We will focus on the Type II DMF that covers APIs and the CMC issues. According to FDA (16), of the more than 6000 active DMFs, almost 4000 are Type II. What is important to understand is that there is NO requirement in the United States for submitting a DMF to FDA. Submission of a DMF is usually done to permit review of third-party information during an NDA or ANDA review by the regulatory authorities responsible for approving drug applications. It is certainly the simplest way to provide this information in a confidential way to regulators in the United States. The DMF or an NDA will be the documents that contain the API or Drug Substance details that are reviewed by the regulatory agencies for approval. These details when in a DMF will contain information described later and are important to an approval decision from any regulatory agency. See Section "Filing Issues" of this chapter for additional details of what needs to be in a filing document whether it is a DMF or another filing.

Submission of a DMF does not mean FDA will ever review it. Such a review usually only occurs when it is referenced in other applications for drug product approval. Many over-the-counter products are not reviewed and therefore the API referenced in a DMF may never be examined under normal circumstances.

Applicants filing an NDA or ANDA will usually reference a DMF as the Authorized Party if they themselves do not produce the API. The company that submits the DMF usually is the producer of the API and will need to identify a U.S. representative for contact with the FDA. Historically, such a representative or agent was not an FDA requirement, but recent rules have now obligated foreign manufacturers to identify such a contact for the FDA.

*Lazar*

Since API manufacturers may be producing APIs for several users, the DMF provides a way for multiple applicants to reference the same DMF while keeping proprietary information confidential.

For the convenience of the reader, references (5,16,17) included at the end of this chapter can be used to obtain detailed filing information.

The DMF should contain:

1. A cover letter and
2. The expected administrative and technical information.

Two copies should be submitted to the DMF Staff at FDA. Be sure to include a clear statement of commitment as discussed in the referenced guidances. Absence of such a statement will delay acceptance by FDA. Once accepted, the DMF is entered into the agency database and the holder or its agent should receive an acknowledgment letter.

The acknowledgement letter will provide the assigned number and will remind the holder to:

– Submit changes as amendments,
– Notify FDA of changes,
  ○ In holder name/address
  ○ Agent
– Submit Letter of Authorization for each customer authorized, and
– Submit an Annual Report.

Review of the DMF will only occur once it is referenced in an official application that contains the Letter of Authorization from the DMF Holder. Reviewing chemists must request the DMF from the FDA Central Document Room unlike an NDA, ANDA, or IND that goes directly to reviewing staff. Any deficiency in a DMF that is found during a review initiated by an application is communicated to the DMF holder.

An Agent for a foreign manufacturer is currently expected since it can facilitate and improve communication with companies not located in the United States.

For postapproval changes, the Bulk Actives Post Approval Changes (BACPAC) guidance should be followed as it is issued. Currently, BACPAC only exists for intermediates. Be sure to specify, where appropriate, the API starting material(s) (APISM) as defined in ICH Q7A since it has significant future impact on GMP operations of an API facility. This does not mean that a company does not need to provide chemistry information for materials in early stages of manufacturing. It just helps identify a GMP starting point in processes.

### Importance of Impurities

Possibly the single most important and significant variable associated with the Active Pharmaceutical Ingredient's quality is impurities and the API Impurity Profile. Normally most regulatory bodies will focus on impurities and impurity profiles when examining filing information and data. Since the sources of the API and/or the synthetic or biological route for producing the API can and will all influence impurities, descriptions of the sources and or the routes of manufacturing will almost always be requested by regulatory agencies that are truly concerned about API purity and potential hazards resulting from the manufacturing process. The

other significant source of potential impurities can come from degradation products caused by stability issues or storage conditions.

Regulators from around the world will continue to expand their requests for data to support a greater understanding of the API's impurity profile and the degradation products that could develop under storage or stress conditions.

## COMPENDIA MONOGRAPHS FOR API

Government required or requested filings are only a part of the quality standards for APIs. While filings like an NDA contain quality specifications, compendia monographs can exist which actually add additional requirements to API specifications. Firms need to assure themselves that they meet not only Regulatory Agency filings but also compendia requirements if they exist for an API.

Monographs for many APIs exist in country or regional compendia around the world. The three most significant compendia include the United States Pharmacopeia, the European Pharmacopoeia, and the Japanese Pharmacopoeia. Use of APIs that meet compendia requirements are usually required to satisfy local use requirements in addition to what may be filed in individual NDAs or Dossiers.

In an international effort to gain greater uniformity, these three mentioned pharmacopoeia such as United States Pharmacopeia, European Pharmacopoeia, and Japanese Pharmacopoeia have established formal harmonization efforts to reduce the burden on manufacturers and drug product producers. However, it is very important to recognize that specifications established within a compendium can only be reliable and useable for a given API source or mode of manufacturing. Every firm must assure that the API being used in a drug product is indeed safe and free of objectionable impurities even when using official compendia requirements.

As API sources expand due to the availability of numerous producers, the critical quality criteria can be affected by subtle differences in the preparation of the API or its original source. It is the manufacturer's responsibility to assure the true quality of an API.

## REGULATORY ISSUES

Regulatory Issues are composed of several different factors. These include GMP and Filing and Approval activities or actions.

Drug product and API producers must assure that a dossier and any other regulatory filings such as NDAs or ANDAs are correctly filed and accurate. While not every regulatory agency uses the actual filing documents during an on-site inspection, they can certainly refer to such filing documents when visiting a site. Any observed deviation from what is in filed documents describing an API process will certainly lead to regulatory and approval issues for the NDA holder and, in effect, the DMF submitter.

From a regulatory perspective, the scientific issues and data surrounding the manufacturing and control processes, drug safety, and efficacy of the API are always in question and must be addressed by applicants. Following those scientific issues, the regulatory course of action expects an accurate representation of the processes used to produce and control the manufacturing of the API. These descriptions form the basis for drug compliance and this establishes the foundation of procedures and

activities that will need to be followed by applicants and their suppliers, agents, or employees.

The ICH has been working for a long time on a CTD, which will harmonize filing activities. The CTD describes the CMC or Chemistry, Manufacturing, and Control Section of these regulatory filings. API producers should take steps to assure that DMF and NDA/ANDA/Dossiers formatted with CTD information properly represent the API and its manufacturing and control.

## Filing Issues

Filed API information should always include at a minimum:

1. The name of the compound;
2. The API structure and molecular weight;
3. A detailed full description of the synthesis, biological process, or extraction process used to produce the API;
4. Facility and Process description;
5. All Raw Materials, solvents, catalysts used;
6. Identify the APISM;
7. Impurities;
8. Impurity Profile;
9. Reprocessing Steps;
10. Water Quality identified;
11. The in-process and final product controls used to assure the quality of the API;
12. A Sample Batch Record;
13. The specifications for the API, intermediates and raw materials;
14. Identification of the manufacturer of the API, its supplier of key raw materials, intermediates, or other purchased materials;
15. Address of the manufacturer of the API and all purchased intermediate;
16. Stability data; and
17. Definition of the container/closure system.

Where an API is listed within a compendium, the API is expected to meet the specifications established for its attributes. This, in addition to any additional specifications established in a Regulatory Filing document, would also need to be satisfied by the manufacturers and users of APIs.

## GMP Issues

All APIs used for the manufacturing of Drug Products are expected to be manufactured under GMP. Compliance with that expectation or requirement varies by country or region of the world. Historically, the United States has been a leader in establishing and inspecting for API GMP compliance. While there are individual countries that have also performed inspections on APIs, true enforcement of GMP on the API producers has been a rare occurrence. However, this situation has changed and it is much more common to see aggressive actions taken to enforce GMP principles upon API producers. It is no longer acceptable to only have published GMP expectations. Enforcement of these expectations has become an additional expectation.

## Good Manufacturing Practices for API

Historically, API manufacturers were audited for GMP compliance using 21 CFR Part 211 which are the Drug Product GMP. However, these regulations were not written for APIs and were used as a guide when examining Bulk Pharmaceutical Chemicals (BPC) in the past. BPC was the term historically used before API was introduced late in the 20th century. The term BPC included both active and inactive ingredients used to produce drug products. The term API was designed to narrow the scope of application by addressing only active ingredients where the term is used.

In the United States, there are no regulations issued by the Food and Drug Administration that establish specific GMP requirements for APIs. The United States has adopted and agreed to the use of the ICH Q7A guidance as the GMP guide for API. This approach differs from some other parts of the world where the Q7A guidance has been incorporated into the region's directives, such as in the European Union. In this case, one may find that law may enhance the API GMP requirement in the European Union. However, one must realize that although no specific regulation exists in the United States, the FD&C Act which establishes the Food and Drug Law in the United States does specifically provide the force of law to API GMP.

When one examines the international agreement by the European Union, Japan, and the United States to adopt ICH Q7A as the API GMP, it is easy to understand the importance of the Q7A guidance to the world. The agreement is between the three largest producers and/or consumers of pharmaceuticals in the world. It therefore establishes the Q7A guidance as a de facto requirement worldwide.

Within Q7A there exists a Table 1 which defines at what point the requirements of Q7A should be applied. This table, reproduced later, is important since it helps identify when Q7A principles would start to apply and the degree of application that may be expected.

Identifying the point within an API process that the APISM is introduced is important to define for both the API producers and the API regulators. From Table 1, both the application of Q7A and the degree of application are influenced by the identification of the APISM. It is highly suggested that applicants identify their APISM in any applications. By defining the APISM, how Q7A is applied is clearer to all parties.

## IMPORTANT ATTRIBUTES

What are the API attributes that are generally the greatest concern? Contamination, Impurity Profiles, and impurities present in the API usually gain the greatest attention followed by physical attributes and any API attribute that could affect the behavior of the API in the final dosage form. This area of concern can include bulk density and particle size and crystal structure and flow characteristics for solid dosage form uses. Practices used for reprocessing and mixing of lots can also raise concerns during compliance reviews.

As world harmonization activities continue to evolve, the ability to meet regulatory needs around the world will likely simplify. However, it is still likely that each country will continue to add local expectations to what is expected and these additional requests and expectation will continue to challenge the producers and users of API.

**TABLE 1**  Application of Q7A Guidance to API Manufacturing

| Type of manufacturing | Application of this guidance to steps (shown in gray) used in this type of manufacturing | | | | |
|---|---|---|---|---|---|
| Chemical manufacturing | Production of the APISM | Introduction of the APISM into process | Production of Intermediate(s) | Isolation and purification | Physical processing and packaging |
| API derived from animal sources | Collection of organ, fluid, or tissue | Cutting, mixing, and/or initial processing | Introduction of the API starting material into process | Isolation and purification | Physical processing and packaging |
| API extracted from plant sources | Collection of plant | Cutting and initial extraction(s) | Introduction of the APISM into process | Isolation and purification | Physical processing and packaging |
| Herbal extracts used as API | Collection of plants | Cutting and initial extraction | | Further extraction | Physical processing and packaging |
| API consisting of comminuted or powdered herbs | Collection of plants and/or cultivation and harvesting | Cutting! comminuting | | | Physical processing and packaging |
| Biotechnology: Fermentation/ cell culture | Establishment of master cell bank and working cell bank | Maintenance of working cell bank | Cell culture and/or fermentation | Isolation and purification | Physical processing and packaging |
| "Classical" fermentation to produce an API | Establishment of cell bank | Maintenance of the cell bank | Introduction of the cells into fermentation | Isolation and purification | Physical processing and packaging |

*Source:* ICH Q7A API GMP Guidance.
*Note:* Increasing GMP requirements.



## CONCLUSIONS

### API Impacting Guides, Laws, or Practices

Certainly, the single most influential document that impacts API worldwide is Q7A (2), the API GMP guidance issued originally by The International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH). This document was then adopted by each of the three regions of the world that are voting members of ICH, namely, the European Union, Japan, and the United States.

Local laws or other legally required actions that cover APIs may have existed within single countries or regions; however, true enforcement of GMP upon APIs was in reality very weak. What has truly increased attention on enforcement occurred when countries crossed boundaries and demanded compliance with another country's requirements. As soon as that started to occur, there was a relatively rapid demand for greater enforcement by the local authorities.

Even compendia have increased their interest in GMP issues. Today, one can find references to GMP in various compendia and a recognition that materials listed as official articles are expected to be produced under recognized GMP conditions.

Governments and regulators tend to enhance enforcement activities and demands when bad or defective and/or unsafe materials are found either by accident or when the population is negatively impacted by the use of a particular material. Such negative experiences tend to highlight deficiencies within API manufacturing and/or control programs and certainly should be addressed by manufacturers or users of APIs.

Whether Q7A exists within a country or regions as law, directive, or guidance, its use and application are expected by pharmaceutical producers worldwide.

## Impacts on API

As discussed, Q7A is likely the most influential document impacting API manufacturing and controls. Its application and influence upon API supplies, their quality, and reliability is significant. Q7A's legal status as a law, directive, or guidance is generally not of any significance except for enforcement or prosecution purposes. The true value of Q7A and its influence on API materials and their use is really driven by the manufacturers of drug products for direct consumer use and the regulators' application of Q7A around the world.

Manufacturers and regulators of drug products should and will expect that APIs be produced in compliance with GMP as defined in Q7A. Depending upon the country of use, GMP compliance of the API may be a legal requirement for the drug product producer, or it may be a regulatory responsibility of local government enforcement agencies. No matter what the local situation directs, it is ultimately the drug product producer that must assure that the active ingredients it uses are indeed in conformance with GMP.

Variation in compendia standards adds additional complexity in the use of monographed APIs. Due to differences in quality standards around the world, variations in the manufacturing process that may be utilized or weak process controls and poor manufacturing techniques can all contribute to significant variations in the ultimate quality and safety of an API.

Currently in the United States there are no regulations covering API GMP. API GMP is described in a guidance that was negotiated under ICH and issued as Q7A. Although this is a guidance and not regulation, GMP authority for FDA is gained from within the FD&C Act, which is the law in the United States. Whether API GMP is covered as a guidance or law around the world, API GMP remains an important requirement or expectation for APIs.

Compendia requirements can also vary from one country or region to another. It is also important to recognize that quality attributes of API are heavily dependent upon the method of manufacturing used to produce the API. Different synthetic routes, varying solvents, and varying purification techniques can all impact the quality attributes of the API. Therefore, manufacturers should be aware that simply performing compendia analysis and obtaining results that meet that compendia's requirements may not be sufficient evidence that the API is truly of good quality.

Economic, political, and cultural factors can also influence the true quality of an API. Care must be exercised to be sure that regulatory filings as well as

manufacturing and controls used to produce an API meet international standards of GMP as well as conformance to the registered conditions stated in a dossier or NDA/ANDA. A DMF must represent accurate information about a manufacturer, its facilities, synthesis or biological process used, the purification process, and the analytical and biological controls that are to control the API quality.

### Other Important Issues

The regulatory environment that exists within a country can have a significant impact upon the true quality of a finished API that can be used in a dosage form. In the United States, DMFs are not reviewed by the FDA until and unless they are referenced by a drug product applicant. It is only then, that U.S. regulators will examine a DMF. It is at that time that a request for a review of the GMP status of the firm that produces the API. API companies can expect to be examined for GMP compliance levels with Q7A being used as the GMP reference document, and they are likely to be reviewed to assure that the information that was filed in the dossiers or NDA/ANDA are indeed true and accurate. Sites that have never experienced an inspection will almost always be inspected prior to any approvals being granted to the drug product.

### Manufacturing Operations

While simple revisions to manufacturing and control procedures are sometimes possible without prior approvals, producers and users of API must be sure that appropriate regulatory requirements are met for domestic and export uses of the API. In many cases, revisions to manufacturing and control uses for APIs require prior approvals from regulators, and always a notification to the drug product manufacturer.

Appropriate Change Control procedures and documentation systems must exist. Identification of the step at which an APISM enters a manufacturing process should always be noted for both GMP and Regulatory Filing purposes.

Raw materials, their acceptance criteria, and water quality should exist as predetermined quality attributes. Suppliers including the manufacturers' names and locations should be identified. API manufacturers should not contract or obtain materials without knowing the actual producers and their manufacturing and control locations.

While memoranda of understanding exist between many countries, they do not exist for every country or region. Memoranda of understanding can help reduce repetitive inspections, audits, and filing requests. However, API firms frequently find themselves being asked for information numerous times in order to satisfy local norms or practices that are not necessarily required in their own country, but in the importing country or region.

### Final Thoughts

As the world economy grows, more companies from more countries are entering the supply chain for APIs. While the competition has many advantages such as economic growth, it also increases the complexity in obtaining quality products that can be assured to be in compliance with regulatory requirements and expectations.

Is the API made the way it is registered or filed? Is the API produced according to API GMP? Does the documentation exist that supports the answers to these and many other questions?

Can harmonization efforts truly reduce the negative impact of differing requirements? How and when will repetitive work be eliminated through effective harmonization efforts? Countries, their governments, and compendia are all working toward a truly harmonized environment for APIs. This effort will result in more efficient operations, controls, and reliable, quality API worldwide.

Indeed, APIs are the heart and soul of the drug industry. Without APIs, there is no drug industry as the API provides the active ingredient that produces the necessary medical benefit of any drug product.

## REFERENCES AND NOTES

1. Various FDA presentations by Edwin Rivera, CDER, Office of Compliance.
2. International Conference on Harmonization, Guidance for Industry, Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients, November 2000.
3. Guidance for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances; February 1987; Food and Drug Administration, Center for Drug Evaluation and Research, Office of Drug Evaluation I (HFD-100).
4. Guidance for Industry, M4Q: The CTD—Quality; August 2001; U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER).
5. EMEA Note for Guidance, European Drug Master File Procedure for Active Ingredients (III/5370/93).
6. Guideline for Drug Master Files, September 1989; Food and Drug Administration, Center for Drug Evaluation and Research, Office of Drug Evaluation I (HFD-100).
7. Guidance for Industry, Drug Master Files for Bulk Antibiotic Drug Substances, November 1999; U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER).
8. Guidance for Industry, ANDAs: Impurities in Drug Substances, November 1999; U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER).
9. Guidance for Industry, ANDAs: Impurities in Drug Substances, Draft Guidance, January 2005; U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER).
10. Guidance for Industry, NDAs: Impurities in New Drug Substances, February 2000; U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER).
11. Guidance for Industry, Impurities in New Drug Substances, January 1996; U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER). Reprint of ICH Q3 A Step 4 Document approved by ICH Steering Committee, March 1995.
12. Process Analytical Technology (PAT) Initiative; CDER Office of Pharmaceutical Science, U.S. Food and Drug Administration; web address: http://www.fda.gov/cder/OPS/PAT.htm, 2007.
13. Guidance for Industry, Changes to an Approved NDA or ANDA, Questions and Answers, January 2001; U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER).
14. Guidance for Industry, BACPAC I: Intermediates in Drug Substance Synthesis, Bulk Actives Postapproval Changes: Chemistry, Manufacturing, and Controls Documentation, February 2001; U.S. Department of Health and Human Services, Food and Drug

*Lazar*

Administration, Center for Drug Evaluation and Research (CDER), Center for Veterinary
Medicine (CVM).

15. Guidance for Industry, BACPAC I: Intermediates in Drug Substance Synthesis, Bulk
    Actives Postapproval Changes: Chemistry, Manufacturing, and Controls Documenta-
    tion, June 1, 2006; U.S. Department of Health and Human Services, Food and Drug
    Administration, Center for Veterinary Medicine (CVM).
16. DMF Workshop, Arthur Shaw of FDA, March 25, 2002.
17. DMF Presentation, Arthur Shaw of FDA, October 26, 2003, revised for web posting
    June 20, 2006; FDA.gov Web site; web address: http://www.fda.gov/cder/Offices/
    ONDQA/presentations/shaw.pdf.



# 14

# Obtaining Approval of New Drug Applications and Abbreviated New Drug Applications from a Chemistry, Manufacturing, and Controls Perspective

Dhiren N. Shah

*Aventis Pharmaceuticals, Kansas City, Missouri, U.S.A.*

## INTRODUCTION

Chemistry, Manufacturing, and Controls (CMC) is a relatively small section (approximately 15–20%) of a typical new drug application (NDA), but it often becomes a reason for delay in the approval of NDA/biologics licensing applications (BLAs). For abbreviated new drug applications (ANDAs), however, the CMC section is significant (around 80–90%). This section also becomes quite important in the postapproval life-cycle management of the products. It should be noted that the CMC section is made up of three distinctly different but overlapping disciplines/sciences: synthetic/fermentation chemistry, analytical chemistry, and formulation chemistry. Also, the CMC section continuously changes with clinical phases. Typically during clinical phase 1 trials, the CMC section is quite small and contains laboratory-scale manufacturing experience for the drug substance and the drug products with quite simple analytical methodologies. During clinical phase 2 trials, the CMC section evolves to pilot-scale manufacturing of the drug substance and the drug products, and the specifications and analytical methodologies become more sophisticated. End of phase 2 (EOP2) usually becomes a pivotal point in the drug development since at this point decisions and major commitments are made to as to whether to go forward with the phase 3 clinical development and marketing authorization application (NDA/BLA). EOP2 means for the CMC section a major shift in planning and execution. The drug substance and drug product manufacture typically need to be moved to commercial site at a commercial scale, and the specifications and the analytical methodologies need to be upgraded and finalized. So, one can see that the CMC section is a "moving target." After the completion of clinical phase 3 studies, an NDA/BLA is submitted to the U.S. Food and Drug Administration (FDA) for review and approval. The CMC section of an NDA/BLA should contain all the relevant developmental information that bridges phase 1 through 3 leading up to the NDA/BLA submission.

This chapter will systematically analyze and describe the FDA organization, its various regulations and guidances, the industry process by which CMC information is generated and submitted, and various ways to compress timelines and secure timely approvals of NDA/BLAs and ANDAs. As this chapter is being written, it is expected that the CMC review and approval process for new chemical entities and possibly biotechnologically produced drugs and generic drugs at the FDA may undergo a paradigm change. However, the basic principles behind obtaining approval of NDAs/BLAs/ANDAs in a timely manner remain the same. It is

anticipated that ICH Q8 (Development Pharmaceutics) and ICH Q9 (Risk Assessments) will reflect the paradigm shift at the agency.

## CURRENT U.S. FDA ORGANIZATION

The U.S. FDA is one of the most important customers for pharmaceutical companies. In order to understand the review and approval process for the CMC section of NDAs and ANDAs, one should be familiar with the regulatory authority and the process in the United States. The U.S. FDA is an agency within the Department of Health and Human Services, and it regulates biologics, drugs, food, devices, and veterinary products. It is made up of eight centers/offices. The biologics such as vaccines and blood products are regulated by the Center for Biologics Evaluation and Research (CBER). The Center for Drug Evaluation and Research (CDER), which is the largest of the five centers in the FDA, regulates drugs that include NDAs and ANDAs. The devices are regulated by the Center for Device and Radiological Health (CDRH). Animal products are regulated by the Center for Veterinary Medicines (CVM). The Center for Food Safety and Applied Nutrition (CFSAN) regulates foods and nutritional products. The National Center for Toxicological Research (NCTR) regulates all types of toxicological research. The Office of the Commissioner (OC) and the Office of Regulatory Affairs (ORA) provide administrative and management support.

The CDER organization consists of therapeutic area–based review divisions. Each review division has the primary responsibility of reviewing submissions and provides an action that could involve approval, approvable, nonapproval, request for more information, etc. The review divisions are staffed by the division director, medical reviewers, pharmacologists, chemists, biostatisticians, bio-pharm reviewers, project manager staff, etc. The chemistry and bio-pharm reviewers report to the Office of Pharmaceutical Sciences (OPS). The Office of Generic Drugs (OGD) also reports to OPS. The OGD has two divisions of chemistry, each made up of five teams. This division of OGD is based on major therapeutic classes. As this chapter is being written, by the middle of 2005 the chemists from review divisions will be combined into one new drug chemistry group under the Office of New Drug Chemistry. The objective behind this change is consistency in reviews and better time management. This step is a predecessor to other CMC review and approval practices changes being planned at the agency.

Various regulations as published in the 21 Code of Federal Regulations (CFR), guidances and points to consider (PTC) published by FDA, the Manual of Practices and Procedures (MaPP) published by FDA, and guidelines published by the International Committee on Harmonization (ICH) are important documents that become the foundation of scientifically and regulatorily sound CMC submission documents.

## FDA AND ICH CMC/QUALITY REGULATIONS AND GUIDANCES

FDA regulates new drugs as well as generic drugs under the Federal Food, Drug, and Cosmetic Act enacted by the U.S. Congress. The law, among other things, ensures that drugs and devices are safe and effective for their intended uses and all labeling used is truthful, accurate, informative, and not deceptive. Chapter 5 and specifically subchapter A of the act provides for Drugs and Devices. The interpretation of the act is provided in the CFR, which is published annually. There are 50

titles/sections in CFR, and title 21 specifically provides interpretation of the Federal Food, Drug, and Cosmetic Act. Typically the regulations are brief and often difficult to fully interpret for actual implementation. FDA issues guidances and PTCs, which provide further interpretation of the regulations. FDA also publishes MaPPs, which are approved detailed instructions to FDA reviewers in order to standardize reviews of submissions.

The reader is encouraged to make use of all FDA guidances and manuals. If properly used, they will ensure the quality of CMC submission, which should result in approval by FDA.

## FDA'S QUALITY BY DESIGN AND PAT INITIATIVE AS PART OF CENTURY GOOD MANUFACTURING PRACTICES

FDA, in its latest initiative for the Twenty-First Century Good Manufacturing Practices has, among other things, two initiatives named Quality-by-Design (QbD) and process analytical technologies (PAT). PAT should not be considered as "infinite testing," but it is a part of the QbD. Both of these initiatives go to the basics of product development, whether it is for a new drug or a generic product. By employing basic principles of science-based drug substance and drug product development, one can achieve QbD. The whole idea behind QbD and PAT is to build quality into the drug product from the very beginning of the manufacturing process so that testing for quality at the end may not be that critical. For example, a thorough physical, chemical, and biological (as necessary) understanding of all the components of the dosage form and a complete analysis and knowledge of all the critical manufacturing processes should result in a product in which the quality is built in and there may be limited need for final testing for quality. Properly selected in-process testing and controls should provide the basis for QbD. PATs embrace the principles of QbD and include at-line, on-line, off-line, and in-line testing of in-process materials at critical stages of manufacturing. PAT provides for continuous manufacturing and real-time release of the product and the possibility of replacing the conventional validation batches. The reader is encouraged to read and follow FDA's draft guidance on PAT. One of the ways to successfully obtain approval of NDAs is to "retro-engineer" the drug substance and drug product. Once the sponsor identifies the final characteristics of the drug product to be marketed (dose, dosage type, shape, color, marking, packaging, etc.), a development and regulatory plan should be generated that will determine what kind of CMC information needs to be generated—and when—to secure an approval by the agency. Figure 1 summarizes the QbD and PAT initiatives. Aspects of QbD and PAT will be discussed later in this chapter.

## SPONSOR COMPANY AND AGENCY PROCESSES TO SUCCESSFULLY DEVELOP THE CMC SECTION OF NDAs AND ANDAs BASED ON QBD AND ICH/FDA REGULATIONS

The activities at the sponsor company in regard to CMC development from pre-IND through various phases of INDs leading up to the NDA and, in the case of generic drugs, the process leading up to ANDA determine one's success or failure. The product one delivers to FDA is the CMC submission, and its scientific quality determines its successful approval by the agency.

*Shah*



**FIGURE 1**  Quality-by-design and process analytical technologies initiatives.

## Pre-IND Phase

In this very early phase of drug development some basic work is performed. Preliminary solubility in various solvents, stability, and other important structural elucidations and characterizations are typically determined, which become the basis for future development of the new molecular entity. Of course, limited work is done at this stage, since the failure rate for new molecular entities (NMEs) is quite high. The CMC information from this stage typically becomes the basis for development pharmaceutics, and as the drug development progresses, additional tests and information are carried out.

## IND Phase 1

This phase is still an early phase of product development and a limited and necessary effort is typically made. Since CMC is a multifunctional section, it will be highly beneficial to put together multifunctional teams consisting of scientists from drug substance synthesis, formulation, analytical, regulatory, writing group, etc. This team of people becomes responsible and accountable for putting together the CMC section of the IND and following the new drug's progress through phases 2 and 3 and making sure an NDA is filed on a quality submission. In some instances, a sponsor may want to request a pre-IND meeting, which could be in the form of a teleconference, with the agency to seek advice and/or clarification. The agency requires that a briefing document be submitted by the sponsor at least 4 to 6 weeks prior to the meeting. The briefing document should contain relevant information on the drug substance and drug product and concise questions about which the sponsor seeks advice from the agency. FDA requires limited CMC information in a phase 1 IND. The main emphasis is on the safety of the volunteers and patients, and hence the sponsor is required to make a connection between preclinical material and the proposed clinical material from impurity and bioavailability points of view. (It is conceivable that the material used in the preclinical safety studies was not as

bioavailable as the clinical material posing a safety risk to the patients.) Also, if the clinical material has any impurity with safety implications, the agency will want to know more about it. At the time of submitting an original IND, very limited stability information is required. A commitment to generate concurrent stability data during the course of a clinical trial and reporting the data in most cases should suffice. It is the sponsor's responsibility to make sure that the NME is stable in the dosage form when given to patients. During this early phase of clinical development, the analytical methods should be capable of determining the assay, impurities, etc., with specificity, accuracy, and precision. A formal validation of methods typically is not required at this early stage of development. Of course, as the drug development progresses, the analytical methods should be progressively validated so that they ensure strength, identity, purity, potency, and quality (SIPPQ) of the product. The sponsor must wait for a period of 30 days before initiating studies on human volunteers and patients. During this period, the agency determines whether the sponsor could proceed with proposed studies, and if it has any objection it will instruct the sponsor not to initiate the study (known as clinical hold) until the deficiencies are satisfactorily addressed. The agency has issued a guidance as to the format and the content of the CMC section of IND, and the reader is encouraged to read and apply it to fullest extent as possible.

## IND Phases 2 and 3

IND phases 2 and 3 are pivotal and become the basis for successfully obtaining approval of NDAs, because under these phases critical CMC information that supports SIPPQ is generated, drug substance and drug product manufacturing are optimized, bioavailability of the drug product is established, and primary stability data for the drug substance and the drug product are generated. The multifunctional team plays a critical role in advancing the NME through phases 2 and 3 leading up to NDA submission. Based on input from the clinical studies through phase 2, the safe and effective dose of the drug is chosen and various QbD parameters for the drug substance and drug product are introduced in the product development. The agency requires that during phases 2 and 3 the sponsor inform the agency of any new patient safety–related information in the form of IND amendments. These amendments to the IND typically do not require a waiting period; however, if the new information is significantly different from the original and if it affects the safety of the patients in the clinical trials, then the agency may advise the sponsor not to implement the change. The usual changes to the CMC, such as optimization to synthesis/manufacture of the drug substance, analytical methods, the drug product, new stability data, etc., could be submitted in IND annual reports to the agency. The sponsor could take advantage of the IND amendments to update the agency on the progress in the CMC and identification of critical issues and proposed/planned solutions to the issues. During phase 2, typically, the drug substance and the drug product are produced in a large laboratory to pilot scale. At this phase, the drug substance synthesis/manufacturing, drug product formulation/process, analytical test methods, etc. are fine-tuned and the principles of QbD and PAT may be introduced and implemented. The EOP2 or the beginning of phase 3 becomes a pivotal point in the overall drug development process. At this point, the NME has shown a certain threshold for safety and desired efficacy and the drug development picks up the speed with which confirmation of clinical results from phases 1 and 2 are reached in a larger patient population in phase 3. The CMC has to match the increased

*Shah*

clinical activity of phase 3 by gearing up all three disciplines: drug substance synthesis and manufacturing, drug product formulation and manufacturing, and analytical testing. Typically phase 3 clinical trials are conducted on many hundreds to thousands of patients, leading to marketing application. In this phase, the CMC section has to match the expanded clinical trials leading toward commercial distribution. In phase 3, the CMC section should focus on two important aspects of development: combining information and data from all three phases and bridging those with the future commercial product. FDA has issued a guidance for CMC information requirements for phases 2 and 3. The bridging study will be discussed in the next section.

### Successful Bridging of Pre-IND, Phase 1, Phase 2, and Phase 3 with Commercial Product

One of the secrets of obtaining approval of NDAs and BLAs from a CMC perspective is successfully bridging the CMC information and data from preclinical through the three phases of IND and the commercial product. Bridging of critical information on SIPPQ starting from the preclinical phase leading up to commercial product is of utmost importance. Some important characteristics of the drug substance and the drug product are as follows:

*Drug substance*
Structural elucidation
Impurity/Related substances
*Solubility*
Critical relevant characteristics
Critical manufacturing information
Stability (RT and accelerated)
*Drug product*
Description
Degradation products
Dissolution

All relevant drug substance and drug product characterization information from all phases of development should be bridged to come up with a complete picture of strengths and weaknesses of the drug substance and the drug product. Key characteristics such as impurity profile, solubility of the drug substance, dissolution-friability balance (DFB) for SODF, accelerated/forced degradation to understand the mechanistic aspects of degradation, design of experiments, etc. should be bridged to get a complete picture of the drug product. The aforementioned information on the drug substance and the drug product from investigational phases is bridged to the planned commercial drug product. All of this bridging information, along with design of experimental data in which the boundaries of success and failures of all critical parameters (drug substance manufacturing processing parameters, formulation components, composition, processing equipment and parameters, in-process controls, specifications, etc.) are determined, become part of developmental pharmaceutics and should be included in an NDA. It should be emphasized that bridging in the form of evolution of analytical procedures starting from preclinical phase to phase 3 and commercial product testing should be thoroughly discussed in developmental pharmaceutics.

## Developmental Pharmaceutics and Its Importance to CMC

As discussed earlier, Design of Experiments, QbD, PATs, bridging of all the phases of INDs, technology transfer, etc., become the basis for developmental pharmaceutics, which becomes the foundation of a good CMC section of NDAs and ANDAs. It provides an overview of the thoughts and rationale behind the product development and commercial product to the CMC reviewing staff at the agency and becomes an important tool in the review and approval process. The ICH CTD format also provides for a section for Development Pharmaceutics. ICH Q8 is on developmental pharmaceutics, and once this guidance (which is at early stages of its development at this time) is finalized, it should provide appropriate guidance to the industry.

## Technology Transfer to Manufacturing

It is obvious that at the EOP3 clinical trials the most critical and important step is to make sure that the drug product is "manufacturable," because without it the new drug could not be commercialized. Over the past 30 years, major pharmaceutical and generic companies have often failed to produce commercial products immediately upon approval of NDAs/ANDAs because companies failed to perform timely technology transfer. Technology transfer involves transferring of information and experience from laboratory and pilot scales to a commercial level for the drug substance, drug product, and associated analytical testing procedures. All these become the basis for seamless and sound manufacturing of the new drug on a commercial scale.

## Quality-by-Design and Process Analytical Technologies

As this chapter is being written, the OPS under CDER is in the process of redesigning and introducing a paradigm shift in the CMC reviews and compliance investigations. It is expected that by the end of 2005 the agency would have implemented the planned changes in CMC reviews and compliance investigations. The ICH through initiation of Q8 (Pharmaceutical Development) and Q9 (Risk Assessment) is also gearing up toward the same goal of OPS. Both ICH Q8 and Q9 will involve the concept of QbD. QbD, which encompasses PATs and embraces building quality in the process and product throughout the manufacturing process, may be summarized as follows:

QbD = preprocess controls (PPCs) + in-process controls (IPCs) + postprocess controls (POPCs)

PPCs: Preprocess controls (throughout the preclinical, the three phases of INDs, and for commercial production) such as thorough physical-chemical-biological characterization of the (1) drug substance and all its manufacturing/synthesis components and (2) excipients. The drug substance starting materials, its other components (catalysts, solvents, etc.), key and pivotal intermediates, etc., should be thoroughly characterized. The pharmacopoeias provide fairly good chemical characterization, but do not provide thorough functional physical characterization, and it is up to the sponsor to develop that characterization. The drug substance physical and chemical characterization is of critical importance to successful QbD. Some examples of PPCs are chemical purity of starting materials and intermediates, purification steps, drug substance particle size and specific surface area, density, excipient particle size and shape, density, etc.

IPCs: In-process controls are the heart of PATs. IPCs such as assay, purity, residual solvents, particle size, specific surface area, polymorphism, etc. are critical in the manufacturing of drug substance. For drug products, IPCs such as granulation endpoints, moisture level, content uniformity, etc. are critical. PATs could involve off-line, at-line, in-line, and on-line testing of in-process parameters for drug substance and drug product. Carefully and strategically chosen IPCs, if done in-line or on-line, may obviate final testing because of the large sample size.

PoPCs: Postprocess controls play an important role in QbD. Testing of final drug product per specifications, storage conditions, and long-term and accelerated stability studies are components of PoPCs.

## Sponsor–FDA Meetings

FDA allows several kinds of meetings with sponsors in order to assist and gather information. Meetings such as pre-IND typically are clinical oriented. For CMC section, end of phase 2 and pre-NDA meetings are important for the CMC section of NDAs and BLAs. (FDA has issued a guidance on sponsor–FDA meetings.) The sponsor should submit a briefing document to the agency at least 6 weeks prior to the requested meeting, and the briefing document should contain relevant background information and questions on which the sponsor is seeking advice. The briefing document should not be voluminous. It should be a focused document that contains specific questions/issues. The sponsor can easily enhance its NDA/BLA/ANDA submissions by taking advantage of these meetings.

## NDA Submissions

NDA submission on a new drug should follow the FDA and ICH guidance. From a technical regulatory perspective, if all the work is done properly as described in sections (a) through (h), the NDA submission should become fairly easy and result in approval in a timely manner. The submission should follow the FDA and ICH guidances, and, moreover, it should be reviewer friendly. The data should be presented in a clear-cut manner. One should remember that the product that the FDA sees from an applicant is the NDA/ANDA submission. The chemistry reviewers have a responsibility to make sure that the product they approve meets the regulatory requirements as prescribed in the CFR. Submissions to the FDA should be accurate and of high quality.

All submissions to the FDA must meet four important criteria in order to secure approval the first time:

1. Adherence to Regulations and Guidances—strict adherence to FDA CMC regulations and guidances for format and content, which include those ICH quality guidelines that have reached step 5. It is possible to adopt an approach other than that provided by the FDA guidances; however, it is the applicant's responsibility to secure approval on the alternative approach from the FDA reviewing staff (e.g., at EOP2 and/or Pre-NDA meeting). Careful and strategic implementation of guidance should be received from the reviewing staff at the FDA.
2. Introduction—submissions should have an introductory section that clearly provides the purpose, scope, and context of the submission that helps the reviewing team. This introduction should have a clear delineation of any agreement made prior to the submission. The introductory section should provide a

higher-level overview of the submission, which will lead into the next section, where the nuts and bolts of the submission are provided. This section should end with a summary of the submission.

3. Body of the submission—this part of a submission is of utmost importance since it provides the main basis for approval. The chemistry review staff has to provide a rationale for their action (approval, nonapproval, approvable, etc.) and a good introduction and summary aids them in making their decision. The information provided in submissions must be focused, relevant, precise, accurate, complete, and of quality. When it comes to quality of the submission, one should adopt the philosophy of "quality always." In this main body of the submission, one should pay special attention not to provide redundant and unrelated information, because it takes away from the reviewers' attention and wastes their precious time. The submission should have a logical flow of information and justified decisions based on scientific rationales. The logical flow of information and justified decisions along with clear objectives and findings that lead to clear conclusions provide a coherent submission. The main body of the submission should follow the time-tested organizational characteristics of a sound beginning, experimental details, organized results, discussion of results, and conclusions. Information should be provided with an appropriate combination of text, figures, tables, etc., which will provide a clear picture of the submission. The information should convey a clear message and conclusion and should follow the usual standards of quality (free of typographical and grammatical errors, clear legends, footnotes as necessary for clarity, etc.).

4. A summary and conclusion section should be provided, including any short- or long-term commitments (such as placing batch(es) of drug product on long-term stability and reporting the data to the agency at a later date, etc.).

## ANDA Submissions

The ANDA submission on a generic drug should follow the FDA guidance. FDA has provided a clear-cut format and content guidance on the organization of an ANDA. Section VII of the guidance provides for detailed CMC requirements. The applicant should provide a statement on the components and composition of the product. This should be followed by information on raw materials (active ingredient and inactive ingredients), description of manufacturing facility, information on the outside/contract firms, manufacturing process and packaging instructions, in-process information, packaging material controls, controls for finished dosage form, analytical methods for the drug substance and drug product, stability of finished dosage form, and availability of samples. If the generic product is a parenteral product, the applicant must provide sterilization assurance information and data package. The earlier CMC section is somewhat similar to the NDA requirements, and if it follows the earlier recommendations, obtaining approval for an ANDA should be easy. The CMC section should be preceded by information on the bioavailability/bioequivalence of the dosage form in relation to the reference-listed drug.

## Quick and Complete Response Team Approach to FDA Questions/Comments

Once an NDA or ANDA has been submitted by an applicant and filed (meaning accepted) by FDA, during and/or after the completion of the review, FDA might have questions/comments on the submission. The questions/comments may come verbally or in writing. In either case, it is very important for the applicant to respond

to the questions/comments in a timely, thorough, and accurate fashion. Often applicants form a team [such as quick and complete response (QCR)] that develops complete and timely responses that aid the agency's review process. The QCR team, if properly organized, could play an important role in obtaining the approval of NDAs in a timely manner.

## UNDERSTANDING THE CMC REVIEW PROCESS

The CMC review process at FDA is quite transparent. The agency publishes its most current Office of New Drug Chemistry (ONDC) organization chart and several MaPPs. The primary CMC review chemists review the submissions and share their reviews with the chemistry team leaders. Based on their reviews, they may issue information request letters. Alternatively, CMC reviews are further reviewed by CMC division directors and then ultimately by the director of ONDC. Once the reviews are finalized by the CMC reviewers and ONDC management, the review division director will issue appropriate letters (approval, nonapprovals, approvable, etc.). The CMC reviewers issue a review report, which includes their assessment and reasons for their recommendations. As stated earlier, the overall CMC review and approval processes may change in 2005 as a result of ICH Q8 and Q9. However, it should be remembered that the basics and fundamentals of CMC reviews (and compliance inspections) will focus on SIPPQ, which are surrogates of safety and efficacy of drugs. The OGD follows a similar review process. Of course, for ANDAs the final reviews stop at the OGD head level. The CMC reviewers have a legal responsibility to review and assess CMC submissions and to make sure that the submissions meet the law and regulations and the product meets the SIPPQ requirements. If for some reason a product is recalled because of SIPPQ, then the reviewing staff that approved the product is in part responsible. Thus, understanding the review process and the responsibility of the reviewing staff is important in obtaining approval of NDAs/BLAs.

As this chapter is being written, the OPS is planning for a paradigm change in the CMC reviews and compliance. The ICH through Q8 (Pharmaceutical Development) and Q9 (Risk Assessment) is also gearing up toward the same goal of OPS.

## PROBLEMS AND CHALLENGES INVOLVED IN SECURING TIMELY APPROVALS AND POTENTIAL SOLUTIONS

Most delayed approvals are due to poor science contained in the submission and poor submission strategy. The poor science may be reflected in instability of the product or unacceptable levels of impurities or poor product bioavailability as measured by tablet dissolution, etc. A good product development plan based on the principles of QbD (see earlier) should result in an approvable submission. Judicial use of contacts with the agency and maximizing various FDA–sponsor meetings should avoid delays in the approvals of applications. Agency reviewers are available to assist the industry as long as it is done in a professional manner. The Agency is pushing for science-based regulations and review practices. Applicants should take advantage of this new paradigm to secure approvals in a timely manner. As described in section "NDA Submissions" earlier, the quality of submission is critical in securing approval of applications in a timely manner.

## SUMMARY AND CONCLUSIONS

This chapter has offered some practical ways to develop a science-based, regulatory friendly application that should be approved at first submission. By focusing on the fundamental scientific principles and FDA and ICH guidances, it is quite feasible to obtain approval of NDAs and ANDAs. In order to obtain approval of NDAs/ANDAs in a timely manner, one should focus on four pillars: (1) development of CMC based on QbD/PAT, (2) application of FDA and ICH CMC regulations and guidances, (3) bridging of phases 1 through 3 to a successful NDA, and (4) preparing sound CMC scientific and regulatory submissions.

## REFERENCES

1. Fed Reg, Vol. 69, No. 68, April 8, 2004, Code of Federal Regulations, Title 21, Part 314.70.
2. FDA, Center for Drug Evaluation and Research, "Changes to an Approved NDA or ANDA," Guidance Document (Apr. 2004).
3. FDA, Center for Drug Evaluation and Research, "Immediate Release Solid Oral Dosage Forms: Scale-up And Post-Approval Changes: Chemistry, Manufacturing and Controls; In Vitro Dissolution Testing; In Vivo Bioequivalence Documentation," Guidance Document (Nov. 1995).
4. FDA, Center for Drug Evaluation and Research, "Sterilization Process Validation in Applications for Human and Veterinary Drug Products," Guidance Document (Nov. 1994).
5. FDA, Center for Drug Evaluation and Research, "SUPAC-IR Questions and Answers," Guidance Document (Feb. 1997).
6. FDA, Center for Drug Evaluation and Research, "SUPAC-SS— Nonsterile Semisolid Dosage Forms; Scale-Up and Post-approval Changes: Chemistry, Manufacturing, and Controls; In Vitro Release Testing and In Vivo Bioequivalence Documentation," Guidance Document (June 1997).
7. FDA, Center for Drug Evaluation and Research, "Dissolution Testing of Immediate Release Solid Oral Dosage Forms," Guidance Document (Aug. 1997).
8. FDA, Center for Drug Evaluation and Research, "Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations," Guidance Document (Sept. 1997).
9. FDA, Center for Drug Evaluation and Research, "SUPAC-MR: Modified Release Solid Oral Dosage Forms: Scale-Up and Post-approval Changes: Chemistry, Manufacturing, and Controls, In Vitro Dissolution Testing, and In Vivo Bioequivalence Documentation," Guidance Document (Oct. 1997).
10. FDA, Center for Drug Evaluation and Research, "PAC-ALTS: Postapproval Changes-Analytical Testing Laboratory Sites," Guidance Document (Apr. 1998).
11. FDA, Center for Drug Evaluation and Research, "Stability Testing of Drug Substances and Drug Products," Draft Guidance Document (June 1998).
12. FDA, Center for Drug Evaluation and Research, "Metered Dose Inhalers (MDI) and Dry Powder Inhalers (DPI) Drug Products: Chemistry, Manufacturing, and Controls Documentation," Draft Guidance Document (Nov. 1998).
13. FDA, Center for Drug Evaluation and Research, "SUPAC-SS: Nonsterile Semisolid Dosage Forms Manufacturing Equipment Addendum," Draft Guidance Document (Jan. 1999).
14. FDA, Center for Drug Evaluation and Research, "SUPAC IR/ MR: Immediate Release and Modified Release Solid Oral Dosage Forms, Manufacturing Equipment Addendum," Guidance Document (Feb. 1999).
15. FDA, Center for Drug Evaluation and Research, "Bioavailability and Bioequivalence Studies for Nasal Aerosols and Nasal Sprays for Local Action," Draft Guidance Document (June 1999).

16. FDA, Center for Drug Evaluation and Research, "Container Closure Systems for Packaging Human Drugs and Biologics," Guidance Document (July 1999).
17. FDA, Center for Drug Evaluation and Research, "NDAs: Impurities in Drug Substances," Guidance Document (Feb. 2000).
18. FDA, Center for Drug Evaluation and Research, "Analytical Procedures and Methods Validation: Chemistry, Manufacturing, and Controls Documentation," Draft Guidance Document (Aug. 2000).
19. FDA, Center for Drug Evaluation and Research, "Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System," Guidance Document (Aug. 2000).
20. FDA, Center for Drug Evaluation and Research, "Changes to an Approved NDA or ANDA: Questions and Answers," Guidance Document (Jan. 2001).
21. FDA, Center for Drug Evaluation and Research, "BACPAC I: Intermediates in Drug Substance Synthesis: Bulk Actives Post-approval Changes: Chemistry, Manufacturing, and Controls Documentation," Guidance Document (Feb. 2001).
22. FDA, Center for Drug Evaluation and Research, "Statistical Approaches to Establishing Bioequivalence," Guidance Document (Feb. 2001).
23. FDA, Center for Drug Evaluation and Research, "Nasal Spray and Inhalation Solution, Suspension, and Spray Drug Products—Chemistry, Manufacturing, and Controls Documentation," Guidance Document (July 2002).
24. FDA, Center for Drug Evaluation and Research, "Comparability Protocols—Chemistry, Manufacturing, and Controls Information," Guidance Document (Feb. 2003).
25. FDA, Center for Drug Evaluation and Research, "Bioavailability and Bioequivalence Studies for Orally Administered Drug Products—General Considerations," Guidance Document (Mar. 2003).
26. FDA, Center for Drug Evaluation and Research, "Requests for Expedited Review of NDA Chemistry Supplements," Manual of Policies and Procedures MAPP 5310.3 (June 1999).
27. FDA, Center for Drug Evaluation and Research, "Drug Shortage Management," Manual of Policies and Procedures MAPP 4730.1 (Nov. 1995).
28. CFR, Title 21, Part 314.81(2). Other postmarketing reports—Annual Reports.
29. CFR, Title 21, Part 211.180. Current good manufacturing practice for finished pharmaceuticals—Records and Reports—General Requirements.
30. CFR, Title 21, Part 211.100. Current good manufacturing practice for finished pharmaceuticals—Production and Process Controls—Written procedures, deviations.
31. CFR, Title 21, Part 211.160(e). Current good manufacturing practice for finished pharmaceuticals—Laboratory Controls—General Requirements.
32. CFR, Title 21, Part 314.3(b). General Provisions—Definitions.
33. FDA, Center for Drug Evaluation and Research, "Format and Content for the CMC Section of an Annual Report," Guidance Document (Sept. 1994).
34. FDA, Center for Drug Evaluation and Research and Center for Biologics Evaluation and Research, "Formal Meetings with Sponsors and Applicants for PDUFA Products," Guidance Document (Feb. 2000).
35. CFR, Title 21, Part 314.50(a)5. Content and format of an application—cc Application form.
36. Pharmaceutical Research and Manufacturers of America, 2002 Industry Profile, PhRMA, Washington, DC, 2003.
37. DiMasi JA, Hansen RW, Grabowski HG. The price of innovation: new estimates of drug development costs. J Health Econ 2003; 22:151–185.
38. Grabowski H, Vernon J, DiMasi J. Returns on research and development for 1990s new drug introductions. Pharmacoeconomics 2002; 20(suppl 3):11–29.
39. FDA, Center for Drug Evaluation and Research. "A Framework for Innovative Pharmaceutical Manufacturing and Quality Assurance," Draft Guidance Document (Aug. 2003).
40. "GSK Announces FDA Approval of Their First PAT Submission," AAPS News Magazine (Apr. 2004): 10.
41. FDA, Center for Drug Evaluation and Research, "M2 eCTD: Electronic Common Technical Document Specifications," Guidance Document (Apr. 2003).

42. FDA, Center for Drug Evaluation and Research, "M4 Organization of the CTD," Guidance Document (Aug. 2001).
43. FDA, Center for Drug Evaluation and Research, "M4 The CTD Quality," Guidance Document (Aug. 2001).
44. FDA, Center for Drug Evaluation and Research, "Providing Regulatory Submissions in Electronic Format—NDAs," Guidance Document (Jan. 1999).



# 15    Obtaining Approval of a Generic Drug, Pre-1984 to the Present

**Loren Gelber**

*RRI Consulting Inc., Lake Wylie, South Carolina, U.S.A.*

## INTRODUCTION

In order to obtain approval of a generic drug product, a sponsor must submit an abbreviated new drug application (ANDA) to the FDA's Center for Drug Evaluation and Research (CDER) Office of Generic Drugs (OGD). The sponsor can be a drug company that intends to manufacture the generic drug itself and has performed the necessary research to obtain the data required for submission, which will be described in this chapter. Alternatively, the sponsor could be some individual or group that has done the research or obtained the rights to the research performed by others, even if the sponsor does not intend to manufacture the product itself. For simplicity in this chapter, we will refer to the sponsor as the applicant.

The goal of the applicant is to receive FDA approval of the proposed product with a rating that means that FDA considers the generic product bioequivalent to the brand-name drug product produced by an innovator company. If a generic product has such a rating, pharmacists may substitute that generic product for the brand product or one bioequivalent generic product for another. In FDA language, this innovator product is called the reference listed drug. Since the generic drug is "equivalent" to the brand, the former does not have to repeat the preclinical animal studies or the clinical human studies that were performed on the brand in order to prove that the brand product is both safe and effective.

In this chapter, we will cover several aspects of getting a generic drug product approved. There are a number of essential parts of this process. First the applicant must select a product to work on. Second, a formulation and manufacturing process for the generic drug product must be developed that show promise of producing a product that will be bioequivalent to the reference listed drug. Then one or more batches of the generic product must be manufactured. In most cases, one or more human bioequivalence trials (biostudies) must be performed on the product manufactured. Various chemical and physical tests must also be performed on this product. It must be demonstrated to be stable through its labeled expiration period. When sufficient information has been obtained, an ANDA is prepared and filed with the FDA.

We will discuss some general principles related to how to decide what product to pursue, how to develop a formulation, how to perform a biostudy, and how to prepare an ANDA. The information needed to submit the application will be considered in the ANDA preparation section. We will cover both the newer, common technical document (CTD) format, and the older format traditionally used by OGD and likely to be found if the reader encounters ANDAs submitted before 2008. We will end this chapter with a short discussion of applicant activities between submission of the ANDA and its approval.

Before we proceed to the substance of this chapter, a short review of the history of the FDA generic drug approval process is in order. For a detailed discussion of this history, the reader is referred to the Rosen chapter in the First Edition of this book (1).

Prior to 1984, generic drugs were available for new drugs approved between 1938 and 1962. FDA approved these drug products based on safety data—efficacy studies were not required at that time. In 1962, with the passage of the Kefauver–Harris Amendments, there were significant changes made and requirements added to the FD&C Act of 1938. One of those requirements was that efficacy studies were required for the FDA approval of new drugs. In order to justify the approval of new drugs approved between 1938 and 1962, FDA subsequently established the drug efficacy study program that required data to be submitted through clinical trials which would demonstrate efficacy. Information was also taken from the scientific literature to justify full approval of older products.

The drug efficacy study program review required that new drug products have sufficient data to demonstrate that they are effective. FDA suggested that these new and rather extensive programs would not be necessary for generic drugs—which were intended to be the same as brand-name (or new) drugs. Further, these brand-name drugs had by that time established a marketing history of safety and with published literature. In order to provide an appropriate generic drug approval process, FDA established what was referred to as a "paper" NDA. A generic drug application to FDA was then required to contain documentation that included safety and efficacy data available in the published literature along with an in vivo study that showed the generic drug product to be bioequivalent to the brand-name product. However, that process had limited value because of the lack of sufficient published literature.

The "paper" NDA process for FDA approval of generic drug products continued until 1984, when Congress passed the Hatch–Waxman Act, after lengthy discussion between the two sectors of the pharmaceutical industry—manufacturers of brand-name and generic drug products (2). The Waxman–Hatch Act provided a reasonable pathway for approval of generic versions of products approved by FDA after 1962.

## DECIDE WHAT PRODUCT TO PRODUCE

With the earlier background and history established, the first step in obtaining approval of a generic drug is selecting the product to work on. Each generic drug product is declared by FDA to be equivalent to an innovator product that was originally approved via a full New Drug Application (NDA). Selection of the proper reference listed drug is critical to market success.

Depending on the strategy of the firm involved, one may choose the easy route or the hard route. The easy route is to work on a product for which there are already generic equivalents. One of the reasons this is the easy route is because there will be a body of information available from FDA and possibly also in the scientific literature about the product. This information can be very valuable during product development and biostudy testing. FDA will also be familiar with the product and what is required for it to be approved. The hard route is to work on a product for which there are no generic equivalents, usually because the product is still under patent or because it is difficult to formulate a product that is bioequivalent to the innovator product.

When considering which product to pursue, one of the first places to look for product information is the FDA *Orange Book* (3). Fortunately, this is available electronically on the FDA Web site: www.fda.gov. The address of the home page of the electronic *Orange Book* is http://www.fda.gov/cder/ob/default.htm. FDA also has another very useful electronic resource for information about drugs, called Drugs@FDA, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm. Using these resources, one can determine how many generic equivalents of a product are approved and the names of the holders of the approved applications. The patent numbers and expiration dates of all patents applicable to any NDA or ANDA, and listed by the owner of the brand drug application with the FDA, can be found in the electronic *Orange Book*. For many NDAs and a few ANDAs, the summary basis of approval document that indicates why FDA approved an application and describes the data on which the decision was based can be found at Drugs@FDA. Current and previous labeling can often be found at Drugs@FDA or at the NIH Daily Med website.

If generic equivalents already exist, the *Orange Book* and Drugs@FDA will indicate what their equivalence is to the innovator product. Two-letter codes are used for this purpose. If the first letter of the code is A, the product with this code is considered bioequivalent. The second letter of the code represents different situations. Product coded AA, AN, AO, AP, and AT do not require biostudies in order to be approved, because there is no evidence that they have any bioequivalence problems. These products are less expensive to pursue, but there are almost always many competitors for them. Products rated AB require biostudies that demonstrate bioequivalence of the applicant's product to the reference listed drug.

If the first letter of the code is B, the products are not bioequivalent to each other. FDA is in general unwilling to approve any new generic products with B ratings and is attempting to upgrade existing products with B ratings to AB status if possible. For further discussion of this rather complex topic, see the Preface to the *Orange Book*.

While the issue of pharmaceutical patents is covered in chapter 4, a discussion of practical aspects will be included in this chapter. The *Orange Book* listing of patent numbers is provided by the holder of the NDA for the innovator product. Patents lists were established by the Hatch–Waxman Act passed by Congress in 1984 (2). If an applicant has decided to submit an application for a product that has one or more patents listed in the *Orange Book*, the applicant needs to research the patents and decide whether it wants to, and can, challenge the validity of some or all of the patents, or develop a formulation that does not infringe on those patents that claim unique formulations. There are several ways in which an applicant can approach these patents and deal with, or certify, them in its application. A short discussion of the types of patent certifications appears later in this chapter.

One of the reasons that research is needed is that there are several different types of patents listed in the *Orange Book*. It is the opinion of this author that a patent covering the molecular structure of the drug can only rarely be successfully challenged by generic competitors. The original use for which the product was approved may be in the same patent or a different one. The applicant must usually wait for all of these patents to expire before it can receive final approval of an ANDA that refers to the reference listed drug included in the patent. It often seems to the layman that more than one patent is granted for the same purpose; this requires clarification from patent attorneys.

Patents for uses other than the one approved in the original NDA can be overcome by submitting, in the patent certification section of the ANDA, a statement that the generic drug application is not requesting approval for the other patented indication or indications. This statement is called a Section (viii) notice. In this case, all references to the patented indication or indications being certified must be removed from the proposed labeling included in the ANDA application.

Formulation patents require analysis by both chemists and attorneys, who are experts in pharmaceutical patents. Skilled formulators often devise products that are intended to "engineer around" restrictions created by formulation patents. In many cases, applications which certify that they do not infringe formulation patents result in litigation. The litigation outcome may hinge on the judge's interpretation of a few words in the patent being challenged. One must also consider the doctrine of equivalents, discussion of which is beyond the scope of this chapter.

To add to the complex situation described earlier, starting in the 1990s innovator firms began to list patents that have only a tenuous connection to the reference listed drug. These include patents for other crystal forms, isomers, and metabolites. Innovator firms maintained that they interpreted the Hatch–Waxman Act to require them to list any patent connected to the active ingredient in their product, even when the patent did not cover the final dosage form. This situation was somewhat corrected by the Greater Access to Affordable Pharmaceutical Act, which became law in 2003 (4). However, such "stretch" patents may still be encountered. See chapter 4 and a pharmaceutical patent attorney for more details.

When an ANDA contains a certification that a patent listed in the *Orange Book* is invalid or will not be infringed, there is a requirement that the ANDA applicant notify the patent holder of the filing of the ANDA and its certification. The applicant must also notify the holder to the approved NDA if different from the owner of the patent (5). There are rules for what needs to be in this notification and it is usually written by a pharmaceutical patent attorney. The applicant needs proof that the notifications were received by the required persons. That is the reason for notifications being submitted by Certified Mail, as required by FDA regulation.

In the majority of cases, the ANDA applicant will be sued for patent infringement if the application contains a certification that a patent is invalid or will not be infringed. If this occurs, FDA may not approve the ANDA for "30 months after the date of the receipt of the notice of certification by patent owner or by the exclusive licensee (or their representatives) unless the court has extended or reduced the period because of a failure of either the plaintiff or defendant to cooperate reasonably in expediting the action" (6). This provision is referred to as the 30-month stay.

One can see that filing an ANDA citing a reference listed drug that does not have any approved generic equivalents poses some risk. In an attempt to partially counterbalance this risk, the Hatch–Waxman Act provides 180-day exclusivity for the first applicant to file a substantially complete application containing the required biostudies and a Paragraph IV certification. The rules for this exclusivity have undergone a number of changes since the act was passed in 1984. The reader is referred to chapter 7 for further discussion of this complex subject.

In addition to the patents listed in the *Orange Book* at the time the ANDA is filed, the applicant must file a certification amendment if a new patent is listed in

the *Orange Book* before the ANDA is approved. The owner of the patent may choose to initiate an infringement suit against the ANDA applicant based on this patent. In the past, a patent owner who sued based on these later patents would get a new 30-month stay; however, this potential for extensive blocking of ANDA approval has now been eliminated. Only one 30-month stay is permitted.

There are also economic considerations involved in deciding whether to file an ANDA citing a reference listed drug that does not have any approved generic equivalents. When patents for a reference listed drug with high sales are due to expire, many other firms are likely to prepare and submit ANDAs. If there is a potential for 180-day exclusivity, one or a few firms may make a great deal of money during this period. At the end of this exclusivity period, or if there are no other patents to challenge and thus no potential for exclusivity, many ANDAs will probably be approved on the same day. Having 13 or more manufacturers enter the market at the same time is quite possible and has happened more than once. In this case, competition is fierce and the sales pricing drops quickly. The product becomes a commodity, and the product may not be very profitable. The lower the sales units of the reference listed drug, the less likely this is to happen. These "niche" products can paradoxically produce much better profits than "blockbusters."

Another possible strategy is to submit a citizen's petition to FDA requesting approval of one of the permitted variations from a reference listed drug. One variation is an additional strength within those supported by the safety and efficacy data pertinent to the reference listed drug. This is also a complex area, discussion of which is beyond the scope of this chapter, and appropriate experts should be consulted.

As if this situation is not complicated enough, the Hatch–Waxman Act also granted various types of exclusivity to holders of NDAs. The most important type of exclusivity is new chemical entity (NCE) exclusivity, because FDA is not allowed to accept an ANDA citing a reference listed drug with NCE exclusivity in force (7). NCE exclusivity is awarded if the active moiety of the active ingredient in the new drug product has never before been approved in the United States. NCE exclusivity is not awarded if a different salt or ester of the active ingredient is already approved. NCE exclusivity is granted for 5 years from the date the NDA is approved.

There are several other types of exclusivity. For these, FDA may accept an ANDA but may not make its approval effective until the exclusivity expires. Orphan drug exclusivity is granted for 7 years. New indication, new combination, new dosing schedule, new dosage form, new ester or salt of the active ingredient, new chemical entity, new patient population, new route, and new strength exclusivities are granted for 3 years. For most of the exclusivities listed in the previous sentence, an applicant can carefully craft the submission not to include the matter subject to the exclusivity. However, occasionally the patent owner will sue and/or submit a citizen's petition to FDA, arguing that the exclusivity should apply to the ANDA so crafted.

A newer type of exclusivity is pediatric exclusivity. This is granted if the owner of an NDA obtains certain new information about the use of the product in children via new clinical trials. Pediatric exclusivity is an extension of an earlier patent or exclusivity for 6 additional months. It is usually granted shortly before the patent or exclusivity being extended expires. The prudent applicant involved in an ANDA for a product under patent or exclusivity checks the exclusivity listing in the *Orange Book* every month, when updates and supplements are listed.

## DEVELOP A FORMULA

Once a firm has selected a candidate product to develop, the next step is to develop a formulation that can provide successful bioequivalence studies. The requirements for such studies are described in the next section of this chapter.

Patent issues aside, there are many techniques for developing a bioequivalent formulation. There are two commonly used approaches, that is, reverse engineering the reference listed drug to better understand its characteristics or building on a known formulation that for a similar product. These approaches can also be used together.

FDA regulations declare, "For certain drug products, the in vivo bioavailability or bioequivalence of the drug products may be self evident." These include liquid dosage forms that are true solutions, containing the same active and inactive ingredients in the same concentrations as the reference listed drug, and are used in parenteral, ophthalmic, or otic applications. Solution products administered by inhalation that contain the same active ingredients as the reference listed drug are also included. Topical and oral solutions (including elixirs, syrups, and tinctures) that contain the same active ingredients as the reference listed drug and do not contain any inactive ingredient that differs from those in the reference listed drug that may significantly affect drug absorption are also considered self-evidently equivalents. All of these products can be considered for a waiver that allows them to be approved without bioequivalence studies (8).

Parenteral products are required by FDA to include their qualitative and quantitative compositions in their labeling, so the formulator needs only to follow the labeling to make a product that FDA will accept. Ophthalmics or otics will list the concentration of any preservative present in the labeling and often the osmolality and/or pH, but other ingredients are listed only qualitatively.

In the reverse engineering approach, simple and sophisticated chemical and physical tests are applied to the reference drug product to determine its exact qualitative and quantitative composition. While listing of inactive ingredients in the labeling of solid dosage forms is technically voluntary, the author is not aware of any product that does not contain this list in its package insert. This can be helpful when trying to make an exact copy of a reference listed drug. However, there is a loophole. If the innovator claims that the reference listed drug contains ingredients that are trade secrets, these may be listed as "other ingredients."

In the late 1980s, just after the Hatch–Waxman Act passed, several firms tried to use reverse engineering to guide their formulators. It is interesting that solid dosage form products produced in this way failed bioequivalence studies more often than would be expected. As a result, formulators are more likely to use variations on known formulas. If the firm wishing to develop a generic drug already has a successful product that is similar, using a similar formulation for the new product is often a good starting point. Basic physical pharmacy textbooks and research articles in journals such as *Pharmaceutical Technology* can be good sources for basic formulas as well.

If the formulator chooses to be creative and use an original formulation, he or she must be aware of FDA's safety rules for generic drug formulations. FDA will not question the safety of an inactive ingredient if it has been used in an approved drug product and the level used in the proposed products is not higher than the highest level already approved for patient consumption via that route of administration. Since this information is generally part of the proprietary information in many applications, FDA published an Inactive Ingredient Guide, which may be accessed



**FIGURE 1**   Graph of a typical comparative dissolution profile, obtained by measuring the dissolution of the proposed generic product and the reference listed drug every hour for 5 hours.

from the FDA Web site. While it is not always completely accurate, this guide is a valuable resource for formulators. OGD is now requiring excipient compatibility studies, which should be performed before the final formulation is selected. These requirements are part of the Quality by Design initiative. The author is aware of several generic product applications that were rejected by FDA but may have been acceptable if such studies had been performed.

How does the formulator know when he or she has developed a promising formulation? First, the product must be suitable for manufacture on a commercial scale. Extremely fragile (friable) tablets, ingredients that are very hard to blend uniformly, blends that do not flow well in manufacturing equipment, or processes that use toxic solvents are examples that the formulator must avoid. Second, one must obtain some information on the nature of the bioequivalence requirements. Then, if a biostudy (or two) is required, an in vitro test that can serve as a surrogate is highly desirable.

The most common surrogate for bioequivalence is the in vitro comparative dissolution profile for a solid dosage form. Typical results obtained for a comparative dissolution profile are shown in Figure 1, in which the generic drug is the test and the reference listed drug is the reference. A dissolution test measures the amount of drug that dissolves in a specific time, generally using diluents and apparatus defined in the United States Pharmacopeia (USP) (9). A dissolution profile is a group of measurements on the same dosage unit at various times. Comparative dissolution profiles compare the dissolution profiles of the average of 6 or 12 units of two different products or two different lots or two different versions of the same product.

OGD lists many FDA-approved dissolution tests on its Web site: http://www.accessdata.fda.gov/scripts/cder/dissolution/index.cfm. If a dissolution method exists in the USP or European Pharmacopeia (EP), or if a test approved for the reference listed drug can be obtained from FDA via a Freedom of Information request, then dissolution profiles using these conditions are a good place to start developing a predictive test. It is not unusual to find that different conditions are more predictive, in which case profiles under both sets of conditions must be included in the

ANDA, using 12 dosage units of each of the lots used in the bioequivalence trials. If there is no established dissolution test, FDA recommends submitting data using USP media at pH 1.2, 4.5, and 6.8 (10). FDA has defined a difference factor and a similarity factor that can be calculated when comparing two dissolution profiles (11).

Unfortunately, dissolution is not always predictive of bioavailability or bioequivalence. If it were, there would be no need to ever perform bioequivalence studies.

## DO A BIOSTUDY OR TWO

Before considering even a pilot biostudy, those people involved in the design of the study protocol must evaluate all the information they can about the pharmacokinetics of the drug substance and the drug product. For example, if the drug substance has three characteristics—(i) the drug substance is highly soluble in water, (ii) biological membranes are likely to be highly permeable to the drug substance, and (iii) the dissolution of the drug product is high—then absorption of the product from the gut is unlikely to be the rate-limiting step in the distribution of the product throughout the body (12). If these conditions are met, any formulation that gives adequate dissolution should be bioequivalent to any other formulation.

While it is relatively easy to determine drug substance solubility and drug product dissolution, it is more difficult to determine membrane permeability. Methods for the latter exist and there are contractors who can do this for an applicant. Further discussion of these methods is beyond the scope of this chapter. If an applicant can determine permeability, a biostudy waiver can be requested in the ANDA. If the waiver is approved, the applicant does not need to conduct any biostudies. As of October 2007, few firms have been successful in obtaining such a waiver, usually because submitted permeability data is not adequate. If the drug substance is 100% bioavailable relative to a solution or if other information in the labeling of the reference listed drug makes it clear that membrane permeability is very high, this alone could be enough to demonstrate permeability for a waiver. In other cases, actual laboratory tests will be needed (13).

The standard design of a bioequivalence study is a two-way crossover, following an approved study protocol. The subjects are divided into two equal, randomly assigned groups. The first group receives the test product, while the second receives the reference product. Blood samples are taken at appropriate stated intervals and frozen for measurement of the concentration of drug in the sample. If there are important active metabolites, these will be measured as well. After a suitable time period following the first part of the study, called the washout period, the first group receives the reference product and the second group receives the test product. When all samples for each subject are collected, the analysis of each subject's samples from both periods is done sequentially, to minimize the effect of analytical variability. The results for each subject obtained during the two periods are compared.

In order to properly design a biostudy, one must have a good estimate of the expected time of maximum absorption $t_{max}$ and the elimination half-life, $t_{1/2}$. The maximum time is needed to make sure that enough blood samples are taken before and after $t_{max}$. Since the blood levels change most rapidly near $t_{max}$, enough samples must be taken to ensure adequate data for estimation of the maximum blood concentration achieved, $c_{max}$. The elimination half-life is needed to decide how long to take blood samples in order to get a good measurement of the area under the blood concentration curve versus time, generally referred to as AUC. A good estimate of



**FIGURE 2** Graph illustrating the results of a typical biostudy. Drug level in blood is measured at various times, and the $c_{max}$, $t_{max}$, and AUC of the test and reference products obtained are compared.

$c_{max}$ is also needed so that the method used to analyze the blood samples can be validated in the proper range. Figure 2 provides a graphic illustration of $t_{max}$, $c_{max}$, and AUC.

Values for $t_{max}$ and $t_{max}$ can sometimes be obtained from the labeling of the reference listed drug product and/or from the scientific literature. However, it is not infrequent for these values to differ from those obtained in the specific population to be used for the bioequivalence trials. Unless one has confidence in the data available, or if no data can be obtained, it is quite prudent to run a small pilot bioavailability study on the reference listed drug in about 4 subjects, representative of the population to be used for the bioequivalence studies.

Very few generic drug firms do their own biostudies, especially not the clinical portion, because it takes a very large product development program to keep an in-house biostudy clinic busy full time. Instead, these studies are done by separate firms called contract research organizations (CROs). At times the CRO may choose to perform the study needed to get an estimate of $t_{max}$, $c_{max}$, and $t_{1/2}$ in its subject population under its own auspices, rather than having a customer pay for it. Be forewarned, however, that this usually means that the CRO anticipates having many customers for its services involving this drug product.

Pilot bioequivalence studies are conducted on a small number of subjects. More subjects are used when the expected variability between subjects is higher. If an insufficient number of subjects are used, there is a large risk that the conclusions drawn from the results of the pilot study will not agree with the results of the full-sized study. The purpose of a pilot study is to obtain a relatively quick and inexpensive estimation of how close the bioavailability of the generic drug under development is to its reference listed drug.

It is advisable to perform a pilot biostudy for all but the simplest and most bioavailable products. It is imperative to perform a pilot study when there is any

possibility that the dissolution profile does not reflect the actual bioavailability of the product and for all modified release products.

There are three types of biostudies, that is, fasting single dose, food effect single dose, and multiple dose steady state. At least one fasting single-dose study is required for every ANDA, except for products that are self-evidently bioequivalent, as discussed in the earlier section of this chapter, or product whose *Orange Book* rating is AA rather than AB. An AA rating means that the product is not regarded as having any actual or potential bioequivalence issues as long as it meets the appropriate dissolution specifications. Most, if not all, AA products that are solid dosage forms refer to reference listed drugs that were originally approved before 1984.

The standard to determine whether a biostudy passes is average bioequivalence. This means that, for the fasting single-dose biostudy, the average $c_{max}$, the AUC measured to the last sample time, and the AUC extrapolated to infinity for the test and reference products are compared. These values are compared as log transforms. The 90% confidence interval (CI) of the ratio of the test to reference products for each of these three parameters must fall between 0.800 and 1.250.

Food effect bioequivalence studies are required for most oral dosage forms that require biostudies. FDA has released a guidance (14) which lists three types of immediate release oral products that are exempt from the requirement for food effect studies. The first is that products are exempt from the requirement for fasting studies based on solubility and permeability, as discussed earlier. The second is for a product for which the labeling of the reference listed drug requires that it be taken on an empty stomach. The third is for a product for which the labeling of the reference listed drug "does not make any statements about the effect of food on absorption or administration." Historically, the third reason has not, in many cases, been accepted by the OGD Division of Bioequivalence as a good reason for exempting a product from the requirements for a food effect bioequivalence trial.

There are additional complications in this area. For example, if the reference listed drug is labeled that it may be administered by sprinkling it on food, the generic applicant must demonstrate bioequivalence under these conditions in addition to all the other requirements.

The current guidance applies the same CI requirements to food effect studies that are applied to fasting studies. This was not true before 2002, and has increased the number of subjects used in food effect studies.

Multidose studies have been required for modified release products, but this is no longer the case. The FDA has determined that if a product is bioequivalent in a single dose fasting and a food effect study, it will be bioequivalent in a multidose study. Such studies are only required in special cases, the discussion of which is beyond the scope of this chapter.

Since transdermal products bypass the digestive system, their bioavailability and bioequivalence are measured without regard to food. Adhesion, skin irritation, and sensitization studies are also required for these products.

All of the above assumes that the level of the drug or its major active metabolites can be measured in plasma, serum, or urine. It also assumes that the drug product requires systemic absorption in order to be active. These assumptions are not true for topical, most nasal, and many inhalation products. For these products, a bioequivalence study with a clinical end point is almost always required. The end point must be one that can be clearly related to the function of the product under test. Its evaluation, especially if somewhat subjective, must be performed by a

clinical team that is blinded to the identification of test versus reference products and well-qualified to evaluate the end point. Both active treatments, test and reference, must demonstrate superiority over vehicle and/or placebo. In most cases, bioequivalence studies with clinical end points do not differ greatly from the types of clinical trials used to demonstrate product efficacy. The reader is referred to chapter 9 for more details.

When an ANDA is submitted for multiple dosage strengths of the same product, it is usually not necessary to do all studies for each strength. Waivers from bioequivalence testing requirements are available for some strengths of a product line. FDA regulations permit waivers to be granted if the drug product for which the waiver is being requested meets three criteria. First, the drug product must be the same dosage form as the strength on which the biostudy or biostudies were performed. In other words, a tablet cannot be granted a waiver based on studies done on a capsule and vice versa. Second, the two strengths of the product must be proportionally similar in their active and inactive ingredient levels. Third, the product whose strength for which the waiver is being requested must meet appropriate in vitro dissolution requirements (15).

The General Considerations Guidance (10) gives three ways in which two strengths of a product can be proportionally similar. The first is when the ingredients are present in exactly the same proportions. In this case, a formulation for a 20-mg dosage form would contain exactly twice the amount of all ingredients as that for a 10-mg dosage form. When two products are formulated in this way, they are called "dose proportional." The second case is when two formulations differ from dose proportionality by no more than the amounts permitted by the postapproval changes guidances up to level II (16–17). The third case is limited to low-strength drugs. In this case, the total weight of the dosage unit stays the same, and the amount of one or more inactive ingredients is decreased by the same amount as the active ingredient is increased. The change in the amount of any inactive ingredient may not be more than that permitted by the postapproval changes guidances up to level II.

There are numerous additional details that must be controlled and rules that must be followed in order to achieve an acceptable set of biostudies for an ANDA submission. Before planning a biostudy, it is also necessary to check for a bioequivalence guidances on the FDA Web site that is specific to the product under consideration.

## PREPARE A SUBMISSION

Since the First Edition of this chapter was prepared, OGD has transitioned from the older organization of an ANDA submission to the CTD format (18). The older organization of an ANDA was discussed in the earlier version of this chapter. It was formalized in a guidance dated February 1999 and was used for many years before that and is still being accepted by OGD as of the date this revised chapter is being prepared.

The CTD is a project of the International Committee on Harmonization (ICH) and applies to both NDAs and ANDAs. OGD strongly prefers that ANDAs be submitted in the CTD format. All of the information that was submitted in the older format, plus several newer items, are included in the CTD format. The discussion below will focus on the CTD format. However, the reader may well encounter older

ANDAs prepared in the earlier format. For this reason, differences between the formats will be pointed out as appropriate.

## Cover Letter

The first page of every submission to an ANDA, whether it is an original submission, an amendment, a supplement, or other correspondence, must be a cover letter. This letter must make clear to FDA who is submitting the application and what they are submitting.

Regarding who is submitting the application, that is, the ANDA sponsor, the letterhead used for the cover letter and the signature of the applicant must match the corresponding fields in the FDA 356h form described later. All subsequent submissions must use the same letterhead and be from the same firm at the same address. If the name or address of the firm changes, FDA must be provided with adequate documentation. In a merger or sale, the agency wants documentation from both parties and a clear indication of who now owns the application.

The person whose signature is on the application cover letter and the 356h form will be the one to whom FDA will address all communications regarding the application, including telephone calls. It is most useful for this to be the employee who has the primary responsibility to prepare responses to FDA communications for this application. This is often the director of regulatory affairs. Be sure to provide phone and fax numbers so that FDA communications can be received expeditiously.

## 356h Form

The signed application form goes directly after the cover letter, in the first section of the application. An electronic form is available for download from the FDA Web site.

Fill in the Applicant Information section of the form to exactly match the information in the cover letter. If the firm submitting the application is located outside the United States, it is required that the firm appoint an agent with an office in the United States. The information about this agent should be placed in the appropriate box in this section. U.S. firms should leave this box either blank or fill it in as not applicable (N/A).

The first line of the product description section is left blank for an original ANDA submission. If a previously withdrawn application is being resubmitted, the number of the withdrawn application goes in this box. The generic name(s) of the product's active ingredient(s) are placed in the box marked Established Name. If a trade name has been chosen, this name goes in the Proprietary Name box. (Trade names require clearance from FDA in order to try to minimize the chances for errors due to similar names.)

The chemical name(s) of the product's active ingredient(s) are placed in the box marked Chemical/Biochemical/Blood Product Name. FDA usually prefers the official Chemical Abstracts name. For example, USP lists three names for ibuprofen in its active ingredient monograph:

Benzeneacetic acid, α-methyl-4-(2-methylpropyl), (±)
(±)-p-Isobutylhydratropic acid
(±)-2-(p-Isobutylphenyl)propionic acid [15687-27-1]

The third name is followed by a number in brackets. This is the Chemical Abstracts number, which can be used to search *Chemical Abstracts* for information

about the compound, no matter which name is used in the publication. OGD has traditionally asked that the name before the Chemical Abstracts number in USP be the name used in the labeling and on the 356h form. If the active ingredient does not have a USP monograph, just use the chemical name in the reference listed drug labeling (RLD). OGD will tell you which name they prefer in their comments on your draft labeling.

Dosage form, strengths, and route of administration should be self-evident. The contents of the Indications for Use box should match the indication section of the labeling but may be paraphrased if it is too long to fit in this section. Be sure not to include any indications protected by exclusivity, unless you are requesting that your approval be made effective after the exclusivity expires. Refer to the *Orange Book* to be sure. If you include indications protected by a listed patent but not exclusivity, a patent certification regarding them will be required.

In the first box in the Application Information section, the box next to abbreviated new drug Application (ANDA, 21 CFR 314.94) should be checked. The next box is for NDAs only. In the next box, the trade name or brand name of the reference listed drug should be entered, as well as the name of the company that owns the approved application for this product. This entry should match the company listed in the *Orange Book* as owner of the application, regardless of who actually markets the product.

Since we are discussing a new ANDA submission, Original Application should be checked in the Type of Submission box. Partial submissions are not allowed for ANDAs, so the next box should be left blank. The box labeled If Supplement is also not applicable to original applications. The reason for submission is Original Application in this case. Proposed Marketing Status must be the same as that of the reference listed drug. Number of Volumes and Paper and/or Electronic should be self-evident.

For the last two sections on the first page of the 356h form, it is almost always necessary to attach one or more continuation sheets. In the Establishment Information section, the application must list all sites to be used to manufacture, package, and/or test both the bulk active pharmaceutical ingredient(s) and the finished product. Even an outside laboratory used to do one test must be listed here. The address, phone number, and name of a contact for FDA to call must be given. For firms in the United States that are required to be registered with FDA, the registration (CFN Central File Number or FEI Field Establishment Inventory number) number must be included. For firms that have Drug Master Files (DMFs), the DMF number must be provided. Finally for every firm listed, the applicant must state whether the firm is ready to be inspected or, if not, the date on which it will be ready.

A DMF is a separate submission made to FDA in which a firm other than the applicant can disclose information to the FDA that they do not want to disclose to the applicant because it is proprietary or a trade secret. FDA only reviews DMFs in connection with the review of an application; they are not independently reviewed.

Do not state that a firm is ready in the hope that it will be ready by the time FDA calls. It is not unheard of for the firm's District FDA Office to call to schedule a preapproval inspection shortly after the application is filed with FDA.

The last section of the first page of the 356h form is Cross References. For ANDAs, this is a list of all DMFs referenced throughout the application. In addition to the DMFs listed in the earlier section, packaging component suppliers and sometimes suppliers of inactive ingredients have DMFs. It is advisable to carefully

review the assembled submission to ensure that all DMFs mentioned anywhere in the application are listed here. For every DMF mentioned, the holder of the DMF must send a letter to FDA for filing in the DMF, authorizing FDA to refer to the DMF on behalf of the ANDA applicant. A copy of each letter must be included in the appropriate section of the ANDA application.

The second page of the 356h form contains a list of various sections that might be included in an application. An initial ANDA submission normally contains item 2; labeling, items 4.A the chemistry section and 4.C the method validation package; item 6, the bioequivalence section; item 14, the patent certification section; item 16, the debarment certification; item 17, the field copy certification; and item 19, financial information for those who conducted the biostudies. Item 19 is normally provided by those who conduct the biostudies. These items do not appear in the application in the order they are listed on the 356h form.

Original ANDAs and NDAs are submitted in special covers available from the Government Printing Office. Make sure that the original 356h with the original signature, as well as the original of the cover letter, are placed in the archival copy of the ANDA; this is the copy that is submitted in the blue plastic covers and that contains all sections of the application. Also make sure that the address and telephone number on the second page match those on the first page.

## Organization of Application

The current CTD format for ANDAs is organized into four modules. Module 1 is administrative, containing specific regulatory information required by FDA. Module 2 includes summaries of the important information in the succeeding modules. Module 3 is called the Quality module. It contains the information traditionally labeled Chemistry, Manufacturing and Controls (CMC). Module 4, Nonclinical Study Reports', is not applicable to ANDAs. Module 5 is called Clinical Study Reports and contains the biostudy reports. Each module will be discussed in some detail later. This discussion will be limited to the paper CTD; the electronic version will not be covered.

The Archival Copy goes in the blue plastic covers. It contains all modules. There are three other copies. The Chemistry copy goes in red paper covers. It contains modules 1, 2, and 3. The Bioequivalence copy goes in orange paper covers. It contains modules 1, 2, and 5. The Field copy goes in burgundy paper covers. It contains module 3, unless the firm has been told by their FDA District Office that other information should be included.

### Module 1—Administrative

Module 1 contains the 356h form, the cover letter, a table of contents, a field certification, a debarment certification, financial certifications for those who conducted the biostudies, patent and exclusivity information and certifications, copies of all DMF authorization letters, a statement of the basis for the submission, a specific comparison between the generic drug proposed and its RLD, an environmental analysis, any requests for waivers of in vivo bioavailability studies, draft labeling, and the labeling of the RLD.

The 356h form and the cover letter were covered in the earlier sections. In the CTD numbering system, these are sections 1.1.2 and 1.2. The Table of Contents should be self-evident. It does not have its own number. The Field Copy

Certification states that a copy of module 3 has been sent to the appropriate FDA District Office simultaneously with the submission of the application to OGD. This copy should be sent to the District Office whose district includes the location of the applicant. This certification is numbered 1.3.2.

The Debarment Certification has two parts, each of which requires an original signature in the archival copy of the application. In the first part, the applicant certifies that they have not and will not use in any capacity any individual who has been declared debarred as specified in section 306(k)(1) and (3) of the Generic Drug Enforcement Act. A list of these individuals is maintained by FDA and can be found on the FDA Web site at http://www.fda.gov/ora/compliance_ref/debar/. The applicant must also certify that no one responsible for the development or submission of the ANDA has been convicted of a crime as defined by section 306(k)(1) and (3) within the last 5 years. Number these certifications 1.3.3.

As explained earlier, the contract research organization that performed the biostudies will provide the financial certifications for their staff. These need to be removed from the biostudy report and placed in module 1 and numbered 1.3.4.

The Patent and Exclusivity section used to be section III in the older ANDA format. It is section 1.3.5 of the CTD. If no patents for the RLD were ever listed in the *Orange Book* and the applicant is not aware that any other patents were ever filed, then the applicant should submit a Paragraph I certification. Suitable language would be "Paragraph I Certification: Company X (the applicant) certifies that patent information for product Y has not been submitted to FDA. In the opinion and to the best knowledge of (name of applicant), there are no patents that claim the listed drug referred to in this application or that claim a use of the listed drug."

If patents were listed in the *Orange Book* but they have all expired on the date the submission is sent to FDA, then a Paragraph II Certification is required. For example, "Paragraph II Certification: Company X (the applicant) certifies that all patents submitted to FDA for Product Y have expired." If there are patents still in force on the day of submission and the applicant does not intend to market the submitted product until they expire, a Paragraph III Certification is appropriate. Typical language would be "Paragraph III Certification: Company X (the applicant) certifies that Patent No. ZZZZZ will expire on QQ-QQ-QQQQ (date). Applicant requests that final approval of this application be made effective on that date."

Paragraph IV certifications are submitted when the applicant is challenging the patent or certifying that its product does not infringe on it. FDA regulations [21 CFR § 314.94(a)(12)(4)] give the language to be used: I, (name of applicant), certify that Patent N. ZZZZZ (is invalid, unenforceable, or will not be infringed by the manufacture, use or sale of) (name of proposed drug product) for which this application is submitted. Following the certification must be a statement that the applicant will comply with the requirements under section 314.95 (a) with respect to providing a notice to each owner of the patent or their representatives and to the holder of the approved application for the listed drug, and with the requirements under section 314.95 (c) with respect to the content of the notice. This notice as well as Section vii statements that the patents cover indications for which approval is not being sought is discussed in chapter 4.

The applicant must be sure to address any and all patents or exclusivity which is listed in the *Orange Book* for the RLD. An exclusivity statement must be included even if the RLD is not entitled to any exclusivity. For other types of exclusivity,

**TABLE 1**   Guide to Preparing Table for Section IV of an ANDA

|  | NDA holder's brand name of reference listed drug | Applicant's name of proposed generic drug |
|---|---|---|
| Conditions of use | e.g., Pain (exactly as in labeling) | e.g., Pain |
| Active ingredient(s) | Generic name of active(s) | Generic name of active(s) |
| Inactive ingredients (for products required to have the same inactive ingredients only, such as parenterals) | List all ingredients included in brand labeling | List all ingredients included in proposed product |
| Route of administration | Oral, parenteral, etc. | Oral, parenteral, etc. |
| Dosage form | Tablet, capsule, injection, ointment, etc. | Tablet, capsule, injection, ointment, etc. |
| Strength | X mg | X mg |
| Labeling | See section V | See section V |

either request approval when the exclusivity expires or explain why the particular exclusivity is not applicable to the proposed product. For example, if the RLD has exclusivity for an indication which is not included in the labeling of the proposed product, it should be so stated.

The next part of module 1 is section 1.4.1, Letters of Authorization. This calls for copies of all DMF authorization letters. If the holder of the DMF is outside the United States, they are required to appoint a U.S. agent. A copy of the letter appointing this U.S. agent must also be included with each such DMF authorization letter.

The Basis for Submission, section 1.12.11 is either an RLD or a Citizen's Petition. If the basis is an RLD, the application should state that the basis is NDA number XX-XXX for product X. Use the name of the product exactly as it is stated in the *Orange Book*. If the basis for the submission is a Suitability Petition, for variations permitted by FDA law, the applicant must provide a copy of the approval letter for the Petition. If there is no RLD on the market, then a petition must be filed to have FDA declare that the RLD was not withdrawn for reasons of safety or efficacy. These petitions require legal advice.

The Comparison Between the Generic Drug and the RLD used to be section IV in the earlier format. It is now section 1.12.12. This comparison is usually submitted as a Table. Table 1 gives some guidance for preparing this item. With the exception of permitted variations in ingredients, the information for the RLD and for the proposed generic drug should be the same.

## Environmental Analysis

The next section, 1.12.14, is titled Environmental Analysis. This was section XIX in the earlier format. For most ANDAs, this section is a claim of a categorical exclusion from the requirements to submit an environmental assessment because approval of the application will not increase the use of the active moiety. The applicant should refer to 21 CFR § 25.31(a) for details. A statement that the firm is in compliance with all federal, state, and local environmental laws is also needed. This section requires a signature, but it does not have to be original.

Section 1.12.15 is Request for Waiver of In-Vivo Bioavailability Studies. This is the place to request waivers from the biostudy requirements for those strengths that do not require such studies, as discussed.

## Product Labeling

The last two sections in module 1 are for labeling. In the earlier format, labeling was section V. Section 1.14.1 includes four copies of the draft labeling for the proposed product, including insert, container labels, and any cartons. It also includes a side-by-side comparison of the proposed container labels and any carton labels with those of the RLD. In addition, all ANDAs submitted after June 8, 2004, have been required to include one electronic copy of the proposed insert labeling in Microsoft Word.

Section 1.14.3 is titled RLD. It includes the side-by-side comparison of the package and patient insert labeling with all differences highlighted and explained. It also includes one copy of each piece of labeling used by the RLD. Regarding the side-by-side comparison of the inserts, brand names in the reference labeling must always be changed to the generic name for the ANDA proposed labeling. It is not always easy to decide exactly how to do this, especially when the drug is a salt. There are two principles to keep in mind. First, the name of the product with its dosage form is used in the description of the product, in the Dosage and Administration section of the labeling, and in the How Supplied section. The second principle is that when the labeling is discussing the drug after it has been adsorbed into the circulation, any counterion is not included, since dissociation will have occurred when the drug enters the blood.

### Module 2—Summaries

Module 2 is a new requirement; summaries were not required in the earlier format. These summaries are required for CMC and biostudy information, but not for microbiology as of November 2006. The proper way to prepare these summaries is to use the Question-based Review (QbR) format. The applicant should keep in mind that these are summaries and that the reviewer will use them to prepare the summary basis of approval. It is not appropriate to just reproduce all the information in the subsequent sections. Aspects of the discussion below are taken from the OGD presentations on Preparing a Quality Overall Summary for a Question-based Review ANDA (20), in November, 2006. There are also example summaries for IR tablets and ER capsules on the OGD Web site.

It must be emphasized that the applicant must check the summaries in module 2 very carefully against the information in modules 3 and 5. If the OGD reviewer finds any differences, the ANDA will be suspect and will be reviewed with extreme caution, taking a long time and producing many deficiency comments.

The first summary is for the chemistry of the drug substance(s), the active pharmaceutical ingredient(s) used in the dosage form. This is section 2.3.S and it has seven subsections.

Subsection 2.3.S.1 is General Information. The first question in this subsection is: What are the nomenclature, molecular structure, and molecular weight? The applicant should include the recommended international nonproprietary name, the compendial name if the substance is USP (often the same as the international nonproprietary name), any other nonproprietary names (such as those listed in USP and/or the Merck Index) and the CAS registry number. If the substance is chiral, be sure to include stereochemistry in the molecular structure.

The second question in subsection 2.3.S.1 is: What are the physicochemical properties, including physical description, pKa, polymorphism, aqueous solubility (as a function of pH), hygroscopicity, melting points, and partition coefficients? The

FDA wants all physicochemical properties listed, whether or not they are critical. If a property is left out, an explanation for the omission must be provided.

The next subsection, 2.3.S.2, is Manufacture. The first question is: Who manufactures the drug substance? The applicant should provide the name and address of each manufacturer. Make sure that the address is the actual manufacturing site, not the location of the firm's headquarters that does the paperwork. Also include all contractors used by the manufacturer and make clear the role and responsibility of each one. Include the DMF number and another copy of the letter of authorization provided in module 1. Make sure the letter includes the DMF number. The second question is: How do the manufacturing process and controls ensure consistent production of drug substance? In most cases, this information is in the DMF and the summary should state please refer to DMF XXX for this information.

Subsection 2.3.S.3 is Characterization. The first question is: How was the drug substance structure elucidated and characterized? Most of the information needed to answer this question will also be found in the DMF and should be referenced. However, the FDA says that the applicant should provide a discussion when certain properties, such as polymorphic form, particle size, solubility, pKa, or stereochemistry, are known to potentially affect drug product development, manufacture, and performance. The second question is: How were the potential impurities identified and characterized? A table of all known and unknown impurities in the drug substance is quite helpful in responding to this question. Identify known impurities by name and structure. Identify unknown impurities by relative retention time in the High Performance Liquid Chromatography (HPLC) test for impurities. Label each impurity as to whether it is a degradant or a process impurity. These can be distinguished by whether the level of the impurity has been seen to increase during stability testing.

The next subsection is 2.3.S.4, Drug Substance Specification. The first question is: What is the drug substance specification? A table giving the tests, specifications, analytical procedures, and results for the lot used to make the biostudy batch is most useful here. The second question is: Does it include all the critical attributes that affect the manufacturing and quality of the drug product? The answer to this question is based on the applicant's knowledge of the nature of the drug substance(s) and product. The third question is: For each test in the specification, is the analytical method suitable for its intended use and, if necessary, validated? Summary tables for the tests and validations are expected. The third question is: What is the justification for the acceptance criteria? Compendial and ICH specification references are appropriate. However, for parameters like particle size, there is often a connection made to the product development process and report, as discussed later.

Subsection 2.3.S.5 is Reference Standard. Its question is: How were the primary reference standards (RS) certified? If the firm used a USP standard, it should be so stated. If there is no USP standard, explain where the primary standard came from and how it was qualified. It should be emphasized that primary standards are the purest material available and that they are qualified with at least one additional qualitative and quantitative test, in addition to the tests in the drug substance specifications. If the firm uses in-house working standards, these should be listed and their qualification and testing be explained.

Container and Closure for Drug Substance is subsection 2.3.S.6. Provide a brief description of the container and closure in which the drug substance was received and then reference the DMF.

The last subsection for drug substance is 2.3.S.7, Stability. Its question is: What drug substance stability studies support the retest or expiration date and storage conditions for the drug substance? Here the applicant should state what retest or expiration date and storage conditions are being used for each active pharmaceutical ingredient (API). Since the actual testing is usually done by the API manufacturer, refer to the DMF.

We are now up to the second summary, which is for the drug product. The first subsection of this summary is numbered 2.3.P.1, Description and Composition, and its first question is: What are the components and composition of the final product? The second question is: What is the function of each excipient? The information required to answer the first question used to be Section VII in the earlier format, while the second question represents information that was not specifically addressed in the older format. This question is best answered with a table that shows each ingredient of the drug product, active, inactive, and those used in processing but not present in the final product. An example of the latter is water or solvent used in a wet granulation but removed during drying. Unless the ingredient does not appear in any official compendium give the grade, such as USP, National Formulary (NF), British Pharmacopeia (BP), European Pharmacopeia (EP), or Japanese Pharmacopeia (JP) for each. If there is no official standard, then state DMF holder standard, in-house standard, or the like. Typical functions of excipients are active ingredient, diluent, disintegrant, or lubricant. Include the amount present in each strength of the dosage form in a separate column. Do not include the amount per batch here, because it belongs in subsection 2.3.P.3.

The third question in this subsection is: Do excipients exceed the Inactive Ingredient Guide (IIG) limit for this route of administration? The IIG is the FDA Inactive Ingredient Guide which is published on the FDA Web site. Include a table to demonstrate that the answer to this question is no by comparing the highest amount of each ingredient present in the maximum daily dose to the IIG maximum daily dose information. If the answer to this question is not "no," the firm will have to prove safety to FDA. In some cases, the applicant can show that this ingredient is present in a product that was approved by FDA for this route of administration at or above the level used, which means it should be listed in the IIG but is not. If not, a long and arduous toxicology process will be required.

The last question in this subsection is: Do the differences between this formulation and the RLD present potential concerns with respect to therapeutic equivalence? For oral solid dosage forms, if the response to the earlier question is no and the product meets the bioequivalence standards, the answer to this question is no, and the application should simply state this. For all other dosage forms, a table comparing the RLD and the proposed product is needed and each difference needs to be explained and justified. It is advisable to make this table for solid oral dosage forms too.

The second drug product summary subsection is Pharmaceutical Development, 2.3.P.2. This section asks for new information that was not previously included in ANDAs. It has two sub-subsections. The first is, 2.3.P.2.1, Components of the Drug Product. The first question, 2.3.P.2.1.1, is: What properties or physical chemical characteristics of the drug substance affect drug product development, manufacture, or performance? OGD wants the ANDA applicant to identify which drug substance properties were studied and to summarize the findings of these studies. A typical example for solid oral dosage forms is active ingredient particle

size. If the particle size is important to drug dissolution, the studies performed to establish the particle size range are summarized here. Question 2.3.P.2.1.2 is: What evidence supports compatibility between the excipients and the drug substance? OGD expects to see the results of various compatibility studies conducted under stress conditions summarized here.

The next sub-subsection is, 2.3.P.2.2, Drug Product. Its first question is: What attributes should the drug product possess? By this, FDA means what was the target product profile the formulator was trying to achieve? For example, an immediate release tablet might need rapid and complete dissolution to be bioequivalent to its RLD. It would also need acceptable content uniformity, stability, purity, and tablet characteristics such as friability. A pellet-filled controlled release capsule might need to have pellets of a given size, and dissolution performance as determined when developing the dissolution test and specification, as well as content uniformity, stability, and purity. A topical emulsion might need a controlled particle size, defined pH and viscosity, as well as acceptable homogeneity, stability, and purity.

The second, third, and fourth questions in this sub-subsection are: How was the drug product designed to have these attributes? Were alternative formulations or mechanisms investigated? How were excipients and their grades selected? The response to this question summarizes the thinking and experiments done by the formulators in order to achieve the target product profile in the proposed product.

The next sub-subsection in Pharmaceutical Development is 2.3.P.2.3, Manufacturing Process Development. It has four related questions: Why was the manufacturing process described in section 3.2.P.3 selected for this drug product? How are the manufacturing steps (and unit operations) related to drug product quality? How were the critical process parameters identified, monitored, and/or controlled? What is the scale-up experience with the unit operations in this process? This section may be optional for noncritical dosage forms and nonproblematic drug substances, such as oral solutions or immediate release dosage forms with highly stable active ingredients that exhibit good flow properties. Even when it is optional, it is advisable to include some justification for the proposed process, the in-process controls, and scale-up to commercial size. This is the applicant's chance to show OGD that the necessary work has been done and the product and process are well understood. An example of a study performed to justify an in-process parameter is a study of hardness versus dissolution for a tablet. At the time of submission, the applicant will probably only have scale-up experience with the proposed product from bench or experimental scale batches to the 100,000-dosage forms batch size used for the biobatch, that is, batch used for bioequivalence studies or batch whose information is to be submitted in the ANDA. However, if the applicant has other similar products, statements about experience in scaling these up might be useful.

The last sub-subsection in Pharmaceutical Development is 2.3.P.4., Container Closure System. It has one question: What specific container closure attributes are necessary to ensure product performance? The response to this question should include whether the container needs to be resistant to light transmission, how much moisture protection is needed, whether an inert atmosphere is needed and the like. For nonsolid forms, extractables, leachables, and migration of ink components from labeling need to be considered. For products with delivery devices, whether as simple as a dropper or as complex as a metered dose inhaler, delivery performance must be addressed.

The next subsection in the Drug Product Quality Overall Summary is 2.3.P.3., Manufacturing Process. Its first question is: Who manufactured the drug product? If all operations are performed in the same location, just give the name and address of the site, and state the regulatory status of its current good manufacturing practice (cGMP) certification and GDEA (Generic Drug Enforcement Act or debarment) certification. If more than one site is involved, a table should be provided for clarity. Be sure to explain the responsibility of each site. It might also be useful to state when the site was last inspected by FDA for cGMPs.

Question two for this subsection is: What are the unit operations in the drug product manufacturing process? Here OGD expects a detailed flow chart showing the unit operations, equipment, points of material entry into the process, and critical steps. There should also be a narrative summarizing the process through packaging, including the in-process controls. If the product uses a manufacturing process that the applicant suspects may be new to OGD, more detail should be provided. Do not include the actual master batch records; refer to their location in module 3.

The next question is: What is the reconciliation of the exhibit batch? OGD wants a summary of the accountability and yield of each submission batch throughout the manufacturing and packaging process. If the process has many unit operations, with a yield specification after each, a table is helpful. Explanations of deviations, investigations, or corrective actions taken because of low yield can be fully addressed in module 3.2. However, there are times when the existence of deviations in the manufacturing of an ANDA batch might mean that the process was not fully understood. In such a case, the applicant should consider correcting the problem and making a new batch.

The fourth and fifth questions are: Does the batch formula accurately reflect the drug product composition? If not, what are the differences and the justifications? The response to these questions is usually a table demonstrating that the unit composition, pivotal ANDA batch contents, and proposed commercial size batch contents are all proportional to each other. A table for each product potency is needed. Any overages used in manufacturing must be explained and justified. If the amount of active ingredient must be adjusted to account for active ingredient potency, as is done, for example, for certain antibiotics, this should be explained.

The next question is: What are the in-process tests and controls that ensure each step is successful? The answer should be a list or table giving the in-process tests, their acceptance criteria, the name or number of the analytical procedures, and the results for the ANDA batch(es). In many cases, the development of these tests and specifications will have been discussed in sub-subsection 2.3.P.2.3.

Scale-up planned from the size of the ANDA batch to the commercial batch size is covered in the last three questions of this subsection. Question seven asks: What is the difference in size between commercial scale and the exhibit batch? This question should be easy to answer by stating that the commercial batch will be *n* times the size of the exhibit batch. The number *n* should be no more than 10. Further scale-up should be delayed until some experience is gained at this size.

Question eight asks: Does the equipment use the same design and operating principles? This can be answered with a narrative or table comparing the equipment used for each unit operation in the development studies, ANDA batch, and planned commercial batch. The applicant can use the Scale Up and Post Approval Changes (SUPAC) manufacturing equipment addendum (17) to demonstrate that there is no difference in design and operating principles. Make sure that the equipment

needed to manufacture the commercial batch is actually on site when the ANDA is submitted. If any equipment cited in an ANDA is not in place and qualified at the FDA preapproval inspection, the site will fail the inspection because it is not ready to manufacture the product.

The next-to-last question in this subsection is: In the proposed scale-up plan, what operating parameters will be adjusted to ensure that the product meets all in-process and final specifications? A frequent example of such a parameter is mixing time, which may be longer for larger mixers, depending on design and scalability. Other parameters are specific to the processes used. The last question asks: What evidence supports the plan to scale-up the process to commercial scale? OGD reviewers suggest using scale-up experience from development to pilot to ANDA batch size, prior experience with similar products and processes, and/or literature references including vendor scale-up factors. They remind applicants that in the absence of experience, or if difficulties are anticipated, no scale-up from ANDA to commercial size is always an option.

The next three subsections address analytical specifications. Subsection 2.3.P.4, Control of Excipients, has one question: What are the specifications for the inactive ingredients and are they suitable for their intended use? For USP or NF excipients that require no further testing beyond the compendial monograph, simply list the excipient and its manufacturer, and state that it complies with all USP or NF tests. If further testing has been shown to be required, list the tests, specifications, and results obtained on material used to make the ANDA batch(es). Noncompendial excipients and colors require a complete list of all tests, specifications, and results. If an ingredient of animal origin, such as gelatin, is used, reference the location of the information about steps taken to prevent Bovine Spongiform Encephalitis/Transmissible Spongiform Encephalitis. Novel excipients require details about manufacture, characterization and controls, or a reference to a DMF where this information may be located.

Subsection 2.3.P.5 is Control of Drug Product. Its first two questions ask: What is the drug product specification? Does it include all critical drug product attributes? All dosage forms are required to have tests for description, identification, assay, and degradation products. One specific identification test, such as the IR spectrum, or two nonspecific identification tests, such as retention time in HPLC, is necessary. Dissolution, uniformity of dosage units, water content, and microbial limits are among the other tests applicable to other dosage forms. The applicant should include a table of all tests used on the finished product, showing the specification, analytical procedure type, and results obtained on the ANDA batches. If the product is listed in USP, all USP tests should be included or their omission be explained. If there is a proposed monograph in USP Pharmacopeial Forum, its existence should be acknowledged and applicability to the proposed product be discussed. Degradation product limits should follow ICH rules and OGD guidance (21–24).

The next question for subsection 2.3.P.5 is: For each test in the specification, is the analytical method(s) suitable for its intended use and, if necessary, validated? OGD would like to see a summary of each method. For example, a table for an HPLC method would list the mobile phase, column, flow rate, temperature, detector, injection volume, run time, retention time, sample preparation concentration, and system suitability criteria. A summary table of the results of the method validation is also required. Such a summary might be a table of the results of specificity, linearity, precision, accuracy, and forced degradation tests. Compendial methods must be demonstrated to be stability indicating by using forced degradation tests as

well as demonstrating that any known degradants do not interfere. This is required because different formulations may lead to different pathways of degradation. If the firm wants to use an in-house method when a compendial method exists, the two methods must be compared. It is acceptable for the two methods to be equivalent or for the in-house method to be superior.

The last question this subsection asks: What is the justification for the acceptance criteria? These may include compendial specifications, references to scientific literature and ICH/FDA guidance, results of the pharmaceutical development studies described in earlier subsections, or analytical data from batches produced.

The next subsection, Reference Standards or Materials, is 2.3.P.6. Its question is: How were the primary RSs certified? The response here is usually a reference to subsection 2.2.S.5, because the same RSs are usually used for drug product and drug substance. If there are any additional standards, provide the same information as that explained earlier for subsection 2.2.S.5.

Subsection 2.3.P.7 is next. It is entitled Container Closure System. Its first question asks: What container/closure system(s) is proposed for packaging and storage of the drug product? One or more tables, showing the container and closure sizes, material, and manufacturer for each package of each strength, are usually needed. Also include cap liners, desiccants, and other components of the primary package. Give a brief description of any carton or other secondary packaging.

The second question for this subsection is: Has the container closure system been qualified as safe for use with this dosage form? The response to this question is a list or table of the compendial and other appropriate tests that have been performed on the container and closure, their resins and colorants, or the system as a whole. Sections <87>, <88>, and <381> of USP are examples of tests for elastomeric closures. Sections <661> and <671> are applicable to many types of containers. 21 CFR § 174–186 deal with materials safe for food contact and may also be applicable to a drug product.

We have finally reached the last subsection of the Quality Overall Summary (QOS), Drug Product Stability, 2.3.P.8. Its first question is: What are the specifications for stability studies, including justification of acceptance criteria that differ from the drug product release specifications. A table of all stability specifications with their acceptance criteria and method types is used to respond to this question. Justify the absence of such tests as identification and content uniformity by stating that these attributes are not expected to change over time. If degradation has been observed during stability studies such that tighter limits are needed at release than those for the end of shelf life, an explanation is needed. The sample QOS on the FDA OGD Web site may provide further assistance.

The next question asks: What drug product stability studies support the proposed shelf-life and storage conditions? The response to this question should include a list or table of each batch that was placed into the stability testing program, the conditions used, and the packaging configurations involved. A summary table should also be provided for each parameter tested and whether any changes or trends were found. Indicate what expiration dating is being proposed and include the labeled storage conditions for the product.

The very last question is: What is the postapproval stability protocol? The storage conditions of the stability samples, their packaging configurations, testing intervals, and tests should be given. The minimum requirement is that the first three commercial batches, which will be used for the process validation, must be placed on room temperature stability testing and that at least one batch per year must be

added to the stability testing program. The applicant must make a commitment to submit all stability data in the annual reports required for the ANDA and to handle any observed changes or degradation as per 21 CFR § 314.70(b) (1) (ii).

In addition to the long QOS described in the preceding paragraphs, module 2 must also contain a summary of the biostudies submitted in module 5. Number this section 2.7. OGD Division of Bioequivalence suggests that this summary be formatted similar to a bioequivalence review, to contain a table of contents, a submission summary, and an appendix. There are numerous tables, which are usually prepared by the CRO doing the biostudies. However, their accuracy is ultimately the applicant's responsibility, so it behooves those preparing the submission to check them carefully. They should be submitted on paper, in Microsoft Word, and as a pdf file made by Acrobat from the Microsoft Word file. Printing and scanning to make a pdf does not work, since too much resolution is lost.

The first section of the submission summary contains Drug Product Information. This includes the identity of the test and reference products, the reference product manufacturer, its NDA number, approval date, and approved indications. The next item is Pharmacokinetic and Pharmacodynamic (PK/PD) information. Information from the RLD labeling and/or scientific literature would be appropriate here. Often suitable information can be found in the introduction to the biostudy protocols. The next item, Contents of Submission, should list the title of each biostudy, dissolution profile, waiver request, and anything else relevant to bioequivalence submitted.

Pre-Study Bioanalytical Method Validation is the next item in the table of contents of a bioequivalence review. A table with the location of the biostudy reports (volume and page numbers), the analyte(s), internal standards, brief method description, limit of quantitation, average analyte recovery, standard curve concentrations, QC controls concentration, QC intraday precision range, QC intraday accuracy range, QC interday precision range, QC interday accuracy range, bench top stability, stock stability, processed stability, freeze thaw stability cycles, long-term storage stability in days, dilution integrity, selectivity, and a list of the CRO Standard Operating Procedures (SOPs) submitted in the report is requested.

A summary of the biostudies submitted is next. FDA requests a table that shows the study number, study objective, study design, number of subjects by gender, treatments (dose, dosage form, route, and product identity), $c_{max}$, $t_{max}$, AUC0-$t$, AUC$\infty$, $t_{1/2}$, $K_e$, and study report location for each study. They also request a summary of the statistical analysis showing the test values, reference values, ratio, and 90% CIs for $c_{max}$, AUC0-$t$, and AUC$\infty$.

The next item in the reviewers' summary is formulation. It is suggested that the same information in section 2.3.P.1 be provided here. This is followed by the in vitro dissolution profile information. Be sure to include the analytical method used or the applicant will receive a phone call asking for it, or perhaps even a deficiency. The last item in the summary is the waiver requests. Reproduce section 1.12.15, Request for Waiver of In-Vivo Bioavailability Studies.

Two additional tables are requested. The first is called Additional Study Information and contains the root mean square error for $c_{max}$, AUC0-$t$, and AUC$\infty$, the number of subjects for which Kel and AUC$\infty$ could be determined, the number of subjects with measurable drug concentrations at time 0 (predose), and whether the subjects were dosed as more than one group. The second table lists all study samples reanalyzed. This information includes the reason why the assay was repeated;

the number retested for each reason, test, and reference separately; and the number repeated expressed as a percentage of all samples.

There are also a number of tables in the appendix which document the reviewer's observations. Some or all of these may also be prepared by the CRO.

### Module 3—Quality

Module 3 contains the details of, which used to be call the CMC, section of an ANDA. Similar to the summaries in module 2, it is divided into a section for the drug substance and a section for the drug product.

Section 3.2.S.1 is General Information (Drug Substance) and contains information about nomenclature, structure, and properties. Most, if not all, of this information is provided in section 2.3.S.1. This section may be reproduced and additional information, such as solubility, may be added.

The next section, 3.2.S.2, is called Manufacture (Drug Substance). This information is the same as that in section 2.3.S.2. The last drug substance section, 3.2.S.4, Control of Drug Substance, contains the testing specifications, sample spectra and chromatograms, and certificates of analysis for the drug substance manufacturer and the applicant. It also contains a statement that samples are available and will be submitted as soon as FDA requests them and instructs the applicant where to send them.

The first drug product section, 3.2.P.1, is Description and Composition of the Drug Product. This is the same information as in section 2.3.P.1. Pharmaceutical Development is section 3.2.P.2. The section contains a full report explaining the development of the formulation, manufacturing process, and container closure system. The information in section 2.3.P.2 is a summary of this report.

Section 3.2.P.3, Manufacture (Drug Product), comes next. Reproduce section 2.3.P.3 and add a full description of each firm, with its responsibility and functions. If outside contract laboratories are listed, make sure they are informed of what testing they might be required to do and that they have copies of any noncompendial methods. Each firm must provide a signed certification that they comply with all cGMP requirements for inclusion in this section.

The batch formulation (kg/batch), flow diagram of the process, and blank batch master records are part of section 3.2.P.3.2, Batch Formula (Drug Product). This section also requires a reprocessing statement. Reprocessing and rework procedures require prior approval from FDA. In general, OGD is reluctant to approve any such procedures, as they are taken as indication that the manufacturing process is not in control. The best reprocessing statement is that the applicant does not intend to perform any reprocess or rework in the course of manufacturing the product. The statement must also acknowledge that if any rework or reprocessing becomes required in the future, the applicant will submit a prior-approval supplement

The next section is 3.2.P.3.4, Controls of Critical Steps and Intermediates (Drug Product). All in-process controls should be given, with their specifications or acceptance criteria and a description of their test methods. After this section comes Process Validation and/or Evaluation (Drug Product), 3.2.3.P.5. Description, documentation, and results should be provided for any process evaluation or validation that has been conducted for the critical steps or assays used in the manufacturing process. Full-scale process validation is not required at the time of ANDA submission. It must be completed and approved by the manufacturer's Quality Unit before

any product may be shipped. However, for sterile products microbiological sterilization validation and filter validation must be submitted in the ANDA.

Section 3.2.P.4, Control of Excipients, is next. The applicant should identify the manufacturers of all inactive ingredients used. A table would probably be the best way to do this. Subsection 3.2.P.4.1 is Specifications (Inactive Ingredients). Provide the specifications for each ingredient and the manufacturer's Certificate of Analysis here. For the next subsection, 2.4.P.4.2, Analytical Procedures (Inactive Ingredients), the applicant should state which excipients are subject to USP/NF specifications only. If there are any other tests, or noncompendial ingredients such as colors, the full text of those analytical methods belongs in this section. Subsection 3.2.P.4.3, Validation of Analytical Procedures (Inactive Ingredients), is usually not applicable for ANDAs, unless the applicant has developed a special test. Subsection 3.2.P.4.4, Justification of Specifications (Inactive Ingredients), contains the applicants Certificates of Analysis for each excipient lot used in an ANDA batch. If the applicant is using an excipient not in the IIG, results of pharmacology and toxicology studies belong in this section.

Controls of Drug Product, section 3.2.P.5, is the next section. Subsection 3.2.P.5.1 contains the drug product specifications. Subsection 3.2.P.5.2 contains the Analytical Procedures. Subsection 3.2.P.5.3 contains the Method Validation Report for the procedures in the earlier subsection. Following the Certificates of Analysis for the ANDA batch(es) are included in subsection 3.2.P.5.4, Batch Analysis. The next subsection, 3.2.P.5.5, is Characterization of Impurities. The applicant should place a list or table of all impurities expected or found in the drug product, with the identification of those that are known. It would be wise to relate these impurities to those observed in the drug substance(s). The last subsection, 3.2.P.5.6, is Justification of Specifications. The applicant can cite FDA Guidances, USP, ICH, or other relevant sources. If there is an impurity whose specification must be set above the ICH limits, the pharmacology and toxicology studies that support the higher specification belong in this subsection.

The next section is 3.2.P.7, Container Closure System. This used to be section XIII in the earlier format. The summary of the containers and closures from subsection 2.3.P.7 should be reproduced first. Next should be the specifications that the packager uses to accept each component and the test data for the lots used to package the ANDA batch(es). Then the applicant should include the engineering diagrams for each component which give the exact dimensions. These are available from the component manufacturer or supplier. Reports of compendial tests for the resins, colorants, components, and the system as a whole, such as water permeation, follow. The last item is a list of the name and address of the manufacturer of each component.

Stability, section 3.2.P.8, comes next. In the earlier format, this was section XVI. Include the Stability Testing Protocol and the proposed expiration dating period in subsection 3.2.P.8.1, Stability Summary and Conclusion; include the postapproval stability commitments from subsection 2.3.P.8 in subsection 3.2.P.8.2. The actual stability data reports go in subsection 3.2.P.8.3.

After all of the above, there is a section called 3.2.R, Regional Information. This section is for information required by FDA but not included in the CTD format. Subsection 3.2.R Drug Substance is used for the executed batch records for the API, which almost always is just a reference to the DMF. If the API is not a USP substance, include three copies of the Analytical Methods and their validation, for OGD to send to the laboratory that will test the samples. If there are any Comparability Protocols

for the drug substance, discussion of which is beyond the scope of this chapter, they also go here.

Subsection 3.2.R Drug Product includes the executed batch records for each ANDA batch, including packaging records and reconciliations. FDA is also requesting information on components, including manufacturer information, function of contract facilities, and certificates of analysis, even though this information appears in other sections. Include three copies of the Analytical Methods and their validation, for OGD to send to the laboratory that will test the samples. If there are any Comparability Protocols for the drug product, discussion of which is beyond the scope of this chapter, they also go here.

### Module 5—Clinical Study Reports

Module 5 is used for the biostudy reports. It should be kept in mind that the biostudy reviewer may not have access to the other modules, so certain information is repeated here. In the beginning of section 5.3.1, Bioavailability Study Reports, include the formulation tables. This is particularly important when submitting more than one strength and requesting a waiver from biostudy requirement for some of the strengths, as the reviewer will use this table to decide if the formulations meet the proportionally similar requirements. For parenterals, ophthalmics, otics, and topicals, also include a table comparing the formulation to that of the RLD. This is needed because the bioequivalence reviewer will decide if the proposed product meets the requirements for qualitative and for some products quantitative equivalence. This is referred to as Q1Q2 by the FDA.

Subsection 5.3.1.2, Comparative BA/BE Study Reports, is the location for the biostudy report(s) from the CRO. Subsection 5.3.1.3, In-Vitro-In-Vivo Correlation Study Reports, is the place for the comparative dissolution profile data, including mean, range, and standard deviation. This data is required for all solid dosage forms, suppositories, and oral suspensions. FDA is requesting that the validation of the analytical methods used for the biostudy be placed in subsection 5.3.2.4, Reports of Bioanalytical and Analytical Methods for Human Studies. All individual case report forms and individual subject lists go in subsection 5.3.7, Case Report Forms and Individual Patient Listing.

## RESPONSE TO FDA COMMENTS

One to 3 months after the OGD receives the ANDA, the applicant can anticipate a letter indicating that the application has been accepted for filing and providing the ANDA number. If there is a relatively small matter preventing OGD from accepting the application, the usual procedure is for the Project Manager (PM) to call the person who signed the application and explain what is needed. A very quick response is required. If the application has a serious flaw, or if one does not respond quickly to the telephone call, the applicant will receive a refuse-to-file letter.

About 180 to 200 days after OGD receives the application, the applicant should anticipate receiving comment letters. Comments regarding the API, bioequivalence, drug product chemistry and labeling may be received separately or together. If the applicant has done a good job of preparing a consistent application in the CTD format, and if there are no difficult scientific issues involved, one might anticipate that the Division of Bioequivalence might have no comments other than informing the applicant of the official dissolution method and specifications, while the chemistry and labeling reviewers might require a Minor Amendment with information to respond to their concerns.

In OGD, each reviewer has a computer-generated work queue. New applications and Major Amendments go the bottom of the queue. Minor Amendments go after all other minors already in the queue but ahead of majors and new applications. As of this writing, OGD is short staffed and the difference in time between review of minor and major responses can be 6 months or more.

How an applicant responds to the FDA reviewer's observations is critical to how quickly the application can be approved. Read the comments very carefully. Make sure that your response addresses what the reviewer is asking for. Watch out for observations that require more than one item in their response. Include as much supporting data, as attachments or exhibits to your response, as is necessary to prove to the reviewer that your response is correct.

Sometimes the reviewer will ask for something that was already in the original submission. This should be less likely in the CTD format, but it is still possible. Politely point out in the response the section and page number where the information was located in the original application. It is a good idea to provide another copy as an attachment to the response for the reviewer's convenience.

## APPROVAL

At this point, the applicant who has prepared a complete and consistent application and responded carefully and completely to all FDA requests for additional information can anticipate a speedy approval. As of this writing, the median time from submission to approval has varied from about 18 to 24 months. When you are close to approval, you may inquire with the OGD Program Manager assigned to your application as to the status of the approval package for your submission. This can help in planning scale-up, validation, and commercial marketing. The latter is, of course, the objective of the entire exercise, a commercial product that can produce profits for its sponsor.

## REFERENCES AND NOTES

1. David L. Rosen. The pharmaceutical regulatory process. In: Berry, IR, ed. Drugs and the Pharmaceutical Sciences. Publisher: Informa Health Care, New York, 2005; 144:99–106.
2. The *Drug Price Competition and Patent Term Restoration Act of 1984*, United States Congress.
3. Approved Drug Products with Therapeutic Equivalence Evaluations. U.S. Food and Drug Administration, Published yearly and updated monthly.
4. The *Greater Access to Pharmaceuticals Act of 2003*, United States Congress.
5. United States Code of Federal Regulations (CFR). 21 CFR 314.95.
6. Food Drug and Cosmetic (FD&C) Act, United States Congress, section 505(2)(D)(ii).
7. United States Code of Federal Regulations (CFR). 21 CFR 314.90.
8. 21 CFR 320.22.
9. USP 30—NF 25, United States Pharmacopeial Convention,2007, section <711>.
10. Guidance for Industry; Bioavailability and Bioequivalence for Orally Administered Drug Products—General Considerations, U.S. Food and Drug Administration, March 2003.
11. Guidance for Industry; Dissolution Testing of Immediate Release Solid Oral Dosage Forms, U.S. Food and Drug Administration, August 1997.
12. Guidance for Industry; Waiver of the In Vivo Bioavailability and Bioequivalence Studies Based on a Biopharmaceutics Classification System, U.S. Food and Drug Administration, August 2000.

13. "Bioequivalence Review Issues," presentation by Dale Conner at the GPHA Fall Technical Conference, October 2007.

14. Guidance for Industry; Food-Effect Bioavailability and Fed Bioequivalence Studies, U.S. Food and Drug Administration, December 2002.

15. 21 CFR 320.22.

16. Guidance for Industry; Immediate Release Solid Oral Dosage Forms—Scale Up and Post Approval Changes; Chemistry, Manufacturing and Controls, In Vitro Dissolution Testing and In Vivo Bioequivalence Documentation (SUPAC-IR), U.S. Food and Drug Administration, November 1995.

17. Guidance for Industry; SUPAC-MR; Modified Release Solid Oral Dosage Forms—Scale and Post Approval Changes; Chemistry, Manufacturing and Controls, In Vitro Dissolution Testing and In Vivo Bioequivalence Documentation, U.S. Food and Drug Administration, October 1997.

18. Guidance for Industry; M4Q: The CTD—Quality, U.S. Food and Drug Administration, August 2001.

19. Guidance for Industry; SUPAC-IR/MR: Immediate Release and Modified Release Solid Oral Dosage Forms, Manufacturing Equipment Addendum CMC, Revision 1, U.S. Food and Drug Administration, January 1999.

20. FDA Office of Generic Drugs, Preparing a Quality Overall Summary for a Question-based Review ANDA, Rockville, MD, November 13, 2006.

21. Guidance for Industry; Q3A Impurities in New Drug Substances, U.S. Food and Drug Administration, February 2003.

22. Guidance for Industry; Q3B(R2) Impurities in New Drug Products, U.S. Food and Drug Administration, Revision 2, July 2006

23. Guidance for Industry; ANDAs: Impurities in Drug Products, Draft, Revision I, U.S. Food and Drug Administration, August 2005.

24. Guidance for Industry; ANDAs: Impurities in Drug Substances, U.S. Food and Drug Administration, November 1999.



# 16 New Developments in the Approval and Marketing of Nonprescription or OTC Drugs

**William J. Mead**

*Consultant, Rowayton, Connecticut, U.S.A.*

## INTRODUCTION

"OTC" refers to an over-the-counter or nonprescription medicine. The term is now somewhat anachronistic since most drug products are easily available to consumers on a self-serve basis from in-store shelves as opposed to being handed over a counter as was the usual way years ago. The basic concept of OTCs, however, is that they are available without the necessity of obtaining a prescription from a health-care professional. This is advantageous to consumers since it yields ready access, convenience, and usually a cost saving, although OTCs tend not to be covered by health insurance plans.

OTC products are used for self-medication, which implies that the user must be able to diagnose the condition that requires treatment, must be able to make a prudent decision on the type of product required, and then must know the appropriate dosage and the proper way to use the product. Obviously, help in reaching self-medication decisions may be provided by a physician, a pharmacist, or other competent health-care personnel. Still, the labeling must be quite clear and understandable, the user needs to read and follow the directions, and to apply common sense and seek help if the condition being treated does not improve or worsens or unpleasant side effects occur. Some people believe that all OTCs are always mild and safe and therefore can be used indiscriminately, but this belief is false. Many OTCs were originally sold as prescription-only products and are in fact "serious" medicines.

Before the passage of the current Federal Food Drug and Cosmetic Act (FDCA) in 1938, there was no clear distinction between which drugs could or could not be sold without a prescription. Even after the FDCA came into being, this was not a distinct matter, and was decided by the Food and Drug Administration (FDA) on a case-by-case basis. However, the 1951 Durham–Humphrey amendments addressed the issue of drug safety in what is now § 503(b)(1) of the act, saying that a medication requires a prescription if it is one of certain habit-forming drugs, or is not safe for use except under competent professional supervision due to its toxicity, potential side effects, or method of use, or is specifically limited to prescription status by an approved new drug application (NDA). In other words, drugs were then by default *nonprescription* unless they fall under the specific conditions cited. Under these standards, it became largely up to the FDA to decide whether a drug should be classified as nonprescription or prescription only. This, in turn, resulted in much litigation between drug manufacturers and the FDA.

In 1962, the FDCA was further modified by the Kefauver–Harris Amendments, which for the first time required that all drugs on the U.S. market must

demonstrate *effectiveness* as well as safety. This means that when a drug is properly used by consumers, the product will provide clinically significant relief of the type claimed for a significant portion of the persons using it. To comply with this new requirement meant that FDA had to consider all drugs being sold to determine whether or not they were truly effective. This meant that hundreds of thousands of existing drug products, prescription and nonprescription, had to be retroactively evaluated. This enormous undertaking caused the FDA to prioritize the order in which products would be studied. In 1968, FDA established a program for this, called the Drug Efficacy Study Implementation (DESI), to establish the effectiveness of the products originally marketed under NDAs between the passage of the 1938 FDCA and the 1962 amendments. This huge task was contracted to the National Academy of Sciences/National Research Council, to conduct the studies and make recommendations to FDA, after which FDA made the final decisions as to which products were and were not effective. Those deemed to be ineffective were ordered to be taken off the market. Many of the manufacturers of the products deemed to be ineffective disagreed with FDA, resulting in extensive litigation.

Most of the products in the DESI review were prescription drugs, but about 400 were OTCs which had approved NDAs. The DESI conclusions on these OTCs were published in the *Federal Register* of April 20, 1972.

## THE OTC REVIEW PROCESS

The OTC Review process was established to evaluate the safety and effectiveness of all OTC drug products marketed in the United States *before* May 11, 1972 that were not covered by NDAs, and all OTC drug products covered only by "safety" NDAs that were marketed before the enactment of the 1962 amendments to the FDCA.

Since most of the then-existing OTC products on the market did not have NDAs, another approach needed to establish which were and which were not effective. Since it was impractical to attempt to study each of the estimated 250,000 existing OTC drugs one-by-one on a product-by-product basis, FDA decided instead to handle this by *class* or *category* (e. g., antacids, external analgesics, etc.). The goal was to establish *monographs* for each such therapeutic class, to determine which products had to be taken off the market due to being ineffective and also for future regulation of OTCs.

Eligibility for consideration of active ingredients to be included in this monograph system was determined by showing that they had been used in products for a "material extent" and for a "material time." Manufacturers who wished to have specific ingredients in the system were asked to submit data and information in a specific format, justifying consideration of them.

The first phase of the OTC drug review was conducted by advisory panels of experts such as clinicians, toxicologists, physicians, academicians, etc., each of whom had extensive experience with the class of products assigned to the panel on which they served. The panels also included persons that represented the interests of the consuming public. The panels reviewed the ingredients used for that category of products, the claims that should and should not be allowed, appropriate labeling, dosages, and warnings to be included in the labeling. Interested parties were invited to submit data and suggestions to the panels.

The ingredients were classified into three groups: Category I being generally recognized as safe and effective (GRASE), Category II *not* GRASE and therefore unacceptable, and Category III insufficient information available to allow making a decision. These classifications proved extremely useful in the decision-making process, although these terms are no longer used.

Each panel made recommendations to the FDA, and after consideration of the medical, toxicological, legal, and other issues, the panels' conclusions and recommendations were published in the *Federal Register* as an Advance Notice of Proposed Rulemaking (ANPR) to solicit public remarks and suggestions, and to stimulate discussion, following a process that is outlined in Part 330 of Title 21 of the *Code of Federal Regulations*. In each instance, FDA considered all of the information and comments received, and then published a Proposed Rule as a Tentative Final Monograph (TFM). Again, following the requirements of the Administrative Procedure Act, FDA digested and responded to the comments received, and published a Final Rule as a Final Monograph (FM). Although this has been in progress since the 1970s, the monographs for several categories of products still not have yet been finalized.

## THE OTC MONOGRAPHS

Following the OTC Review process, there are now two separate regulatory pathways to legally marketing OTC drug products. One is following the appropriate monograph, and the second is having an NDA that yields preapproval for the product to be sold on a nonprescription basis. Neither establishes higher standards of safety and effectiveness than does the other.

Under Compliance Policy Guide 450.200, an OTC drug listed in subchapter 330 of Title 21 of the *Code of Federal Regulations* is generally recognized as safe and effective and is not misbranded *if* it meets each of the conditions listed in § 330.1, and also each of the conditions contained in the applicable FM. If an FM exists, but the product fails to fully comply with it, the product will be considered misbranded and subject to regulatory action. In other words, following the monograph regarding active ingredients, labeling, and other requirements is mandated. However, no filings nor approvals from FDA are required, other than that the producer must be registered and all drugs (including OTCs) in commercial distribution must be listed with the FDA on form FDA-2657 as required in 21 CFR 207.

There are provisions in the regulations for amending existing monographs, and also for creating new monographs.

In instances where an FM has not yet been published, a firm may continue to use ingredients that the expert panel has not recommended for inclusion in the final rule, provided that those ingredients do not pose a potential health hazard to consumers. However, there is an economic risk in doing so in that when the FM does appear, the ingredients may not be considered GRASE, which would require taking the product off the market.

FDA's OTC monograph system has worked well, and provides a straightforward way to legally bring OTC products to market. It has also worked well for sorting out and getting off the market products not considered GRASE. However, one disadvantage of the system is that it does not leave much room for innovation of exclusive new products. It is difficult to develop unique claims for what are essentially "me too" products, although some marketers have been successful through clever positioning of their OTC brands.

## THE NDA APPROACH TO OTCs

The alternative to the use of the monograph system to legally introduce an OTC drug to the market involves getting an approved NDA. As opposed to the monographs, which are by categories, NDAs are product-specific individual licenses. This involves filing an application, which may require clinical studies. The NDA requirements are in 21 CFR 314. The approach differs product-by-product, requiring discussion with the FDA before starting. In some instances, FDA may first require an IND (Investigational New Drug) for human clinical studies as described in 21 CFR 312. Although an NDA may provide marketing exclusivity for a period of time, user fees may apply.

The FDCA provides three types of NDAs. The first is covered in § 505(b)(1), which requires full reports on safety and effectiveness, while the second type is in § 505(b)(2), in which safety and effectiveness where the testing was not done by the applicant but instead reference is made to the approval of another NDA or on data in the published literature. However, in both instances "full reports" of safety and effectiveness are required. The 505(b)(2) is a result of the Waxman–Hatch Amendments of the act in 1984, intended to encourage innovation (in the form of limited changes to the pioneer drug, such as a different dosage form or strength, or a different salt or polymorph of the active ingredient, or new indications for use) without requiring costly duplication of some clinical trials. The third type of NDA is the Abbreviated NDA or ANDA, covered in § 505(j) of the act, where the application is based on the product being identical to that of a previously approved NDA. An ANDA does not require new clinical studies, but does require proof of bioequivalence to the previously approved product (called the "reference listed drug" or RLD). This is the route used to obtain approval for most generic drugs.

## THE SWITCH PROCESS

While it is possible to obtain an NDA to go directly OTC, and this is occasionally done, the most usual approach is to market a new product *first* as a prescription-only drug, then when the patent is about to expire or other business considerations come into play, apply to the FDA to switch the NDA to allow OTC sale of the product. This switch technique has been used extensively in recent years, so that products that were once prescription only can now be purchased over-the-counter without a prescription. The manufacturer must convince the FDA that the drug product is safe and effective for use by consumers without the assistance of a health-care professional. FDA usually refers switch applications to the Nonprescription Drugs Advisory Committee (NDAC) (and possibly also other advisory committees) for their opinion. FDA usually follows the advisory committee's recommendations, but they are not required to do so.

In theory, FDA can require a switch from prescription-only to OTC status, although this so-called "forced switch" mechanism is controversial.

## GOOD MANUFACTURING PRACTICE

When the Kefauver–Harris Amendments to the FDCA were signed into law in 1962, a new section, § 501(A)(2)(b), was added, requiring all drug products to be made in accordance with *current good manufacturing practice*. It is from this wording that the term "GMP" evolved. The definition of this was not given, and it was at that

time an entirely new concept, leaving it up to FDA to determine what was needed and to publish appropriate implementing regulations. FDA was less than sure just what Congress intended, so they sent representatives to meet with the various trade associations involved with the manufacture of drug products (including OTCs), to get their input. Shortly, thereafter, the first GMP regulations were published, stating broad requirements for *what* must be accomplished to be considered compliance with this requirement, but deliberately avoiding the specifics as to precisely how these goals should be met, leaving the "how to" points largely up to the discretion of each firm. These regulations have been revised several times in the intervening years, and in time, FDA expanded the GMP concept to foods, medical devices, and the other classes of products under their purview. The GMPs proved so useful that many other countries soon adopted similar systems, and even the World Health Organization has published international GMPs.

In the United States, the drug GMPs have the full force of law, and if not faithfully followed, the products made can be deemed to be adulterated and subject to regulatory actions such as recall, seizure, or even criminal charges brought against the firm and/or the responsible persons. Products made in other countries and exported for sale into the United States must also be made in compliance with the U.S. GMPs. Part of the approach to determining whether or not firms are in compliance with the GMP regulations is that FDA is empowered to, and does, send investigators into manufacturing facilities to conduct detailed inspections of the equipment, procedures, and operations.

FDA has made it clear that the GMP regulations apply to *all* drug products, both prescription and nonprescription. This is covered in Compliance Policy Guide 7132.10, entitled "CGMP Enforcement Policy— OTC vs. Rx Drugs."

## COSMETICS VS. DRUGS

The determination of whether a given product is a cosmetic or a drug is often a gray area. The FDCA, in section 201(i) defines cosmetics as "Articles intended to be rubbed, poured, sprinkled, or sprayed on, or introduced into the human body . . . for cleansing, beautifying, promoting attractiveness, or altering the appearance." In general, to be considered as a cosmetic, a product should have no active ingredients.

Drugs, on the other hand, are defined in section 201(g)(1) as "(A) Articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of a disease . . . and (B) articles (other than food) intended to affect the structure or any function of the body. . . ."

There are some products that fall under *both* of these definitions. Examples include toothpaste that contains an active ingredient (e.g., fluoride) to help prevent caries and is therefore a drug, but it also cleanses the teeth and is therefore a cosmetic. Shampoos that merely clean the hair are cosmetics, but if they contain anti-dandruff ingredients, they are also drugs. Deodorants are cosmetics while antiperspirants are drugs. Cosmetics containing sunscreen ingredients are also drugs. Such products that meet both definitions must comply with the regulatory requirements for *both* cosmetics and drugs, and are subject to the GMP regulations. Moreover, the labeling requirements differ for cosmetics and drugs, and of course the drug portion would require either an approved NDA or be in compliance with the appropriate monograph.

The intended use of a product is an important factor in the decision of whether the product is a drug, a cosmetic, or both. This intended use may be inferred from the product labeling, promotional material, advertising, and other relevant information.

Cosmetics do not require premarket approval, and are not required to comply with the GMP regulations. Drug products must be made in FDA-registered facilities and must be listed with FDA, whereas these steps are not mandatory for cosmetics.

## HOMEOPATHIC DRUGS

The practice of homeopathy is based on a concept developed in the late 1700s that disease symptoms can be relieved by using extremely small doses of substances that produce symptoms in healthy people. The dilutions are so great that some people question whether it is possible for the products to have any effect, and the suggestion has been made that any perceived benefit must come from the so-called "placebo effect" where patients not infrequently feel they get benefits from products that actually contain *no* active ingredient. However, the homeopathic drug market today is substantial and growing.

There is a publication containing standards for the source, composition, and preparation of homeopathic drugs. This publication, which is officially recognized in the FDCA, is the Homeopathic Pharmacopeia of the United States. This contains monographs of the ingredients used in homeopathic drugs, and for regulatory compliance products based on such ingredients must meet the standards of strength, quality, and purity set forth in the Homeopathic Pharmacopeia of the United States.

FDA's Compliance Policy Guide 7132.15 outlines the conditions under which homeopathic drugs may be marketed in the United States. There are both prescription and nonprescription homeopathic drugs.

## DIETARY SUPPLEMENTS

Dietary supplements, as the name implies, are products intended to provide consumers with supplemental quantities of certain ingredients to help provide a healthy lifestyle. These products are regulated under the Dietary Supplement Health and Education Act of 1994, which is now incorporated into and is a part of the FDCA. By definition, a dietary supplement is a product that contains one or more dietary ingredients such as vitamins, minerals, herbs or other botanicals, amino acids, or other components of food, or combinations of these, used to supplement the diet.

The products are for ingestion (not topical), and are legally classified and regulated as foods, *not as* OTC drugs. They are usually in the physical form of tablets, capsules, softgels, powders, or liquids. There are separate GMPs for these products, that is, the manufacturers must follow these regulations as opposed to the drug GMPs. The labeling requirements also differ from those of OTC drugs.

It is estimated that about half of Americans use dietary supplements at least some of the time, so the sales are quite substantial and growing.

## CHILD-RESISTANT AND TAMPER-EVIDENT PACKAGING

Some, but not all, OTC drug products are required to have child-resistant (CR) packaging under the Poison Prevention Packaging Act (PPPA), which was enacted in 1970. The purpose is to protect children from injury or illness from handling, using,

or ingesting hazardous materials (including but not limited to specific OTC drugs). The PPPA is administered by the Consumer Product Safety Commission (CPSC), not by the FDA. The implementing regulations appear in Parts 1700 to 1750 of Title 16 of the *Code of Federal Regulations*. The PPPA does not specify what kinds of packaging are considered to be "child resistant," but the CPSC has a specific testing protocol which must be followed, which involves testing not only with small children to ensure they cannot get access to the product within a reasonable period of time, but also testing with adults to be certain that the packaging is not too difficult to use since if it is, there is a tendency for some adults to simply leave the package open which could put children at risk.

The CPSC regulations also allow packagers of products requiring CR packages to offer one single size or shelf keeping unit in a non-CR version for the convenience of elderly or handicapped individuals that might otherwise be inconvenienced by the child-resistant features.

Tamper-evident packaging is required for all OTC human drug products except dermatologics, dentifrices, insulin, and throat lozenges. This is covered in § 211.132 of the drug GMP regulations, and by Compliance Program Guide 7132a.17. This was originally called "tamper-proof" packaging, but it was soon discovered that nothing is truly tamper proof. The packaging must use an indicator or barrier to entry that is either distinctive by design or uses an identifying characteristic such as a pattern, name, registered trademark, logo, or picture, and a labeling statement on the container to alert consumers to the specific tamper-evident feature or features used.

## MARKING SOLID DOSAGE FORMS

Part 206 of Title 21 of the *Code of Federal Regulations* requires all solid dosage forms (tablets, capsules, or similar drug products intended for oral use) to bear a distinctive identification number or symbol. This can be applied by imprinting, embossing or debossing, or engraving. Such marking, together with the product's size, shape, and color, permits the unique identification of the drug product and its manufacturer or distributor, whether prescription only or OTC.

## NATIONAL UNIFORMITY

Over the years, some state lawmakers have attempted to establish standards for OTC drugs different from those established by the FDA. This could cause both confusion and unnecessary expense if it were to be allowed. Regulatory uniformity is clearly superior to having inconsistent regulations state-to-state. Consequently, it is now established that with certain minor exceptions, the states cannot have separate regulations for OTC medicines that differ from those of the FDA, that is, there is now national uniformity, which is in section 751 of the FDCA, added at the time that the FDA Modernization Act was passed.

## LABELING OTC DRUG PRODUCTS

There are standard labeling requirements for OTC drug products, based on the "Drug Facts" format, intended to enhance consumers' understanding of OTC drug labels to help ensure safe and effective use of the products. This is described in detail in § 201.66, based on a Final Rule that was published in the *Federal Register* of March 17, 1999.

The Drug Facts box on product packaging aids consumers in selecting and correctly using OTC drug products by clearly listing important information in a standardized way. The headings within the box include the *active ingredient(s)* (the ingredient or ingredients that make the product work), the *purpose* (the type or category of the ingredient, such as an antacid or antihistamine), *use(s)* (the symptoms or illnesses for which the product should be used), *warnings* (cautions that need to be observed to avoid overdose, when a doctor or other health-care professional needs to be consulted, possible side effects, when to stop taking the product, etc.), *directions* (exactly how and when the product should be taken), *other information* (how to store the product, and any additional information required by the FDA), and *inactive ingredients* (a listing of excipients used in making the product, such as colors, fragrance, binders, etc., which is helpful to persons that may have a known allergy to certain ingredients).

In addition, the name and address of the manufacturer or distributor, a statement of net contents, a lot number, and an expiration date (if appropriate) will appear on the package.

## ADVERTISING OTC DRUGS

In general, FDA regulates the advertising of prescription drugs, but the Federal Trade Commission (FTC) has the basic responsibility for OTC drug advertising. But, the two agencies do work in harmony together, and both are committed to prevent false or deceptive claims.

Section 5 of the FTC act gives FTC broad authority to prohibit unfair or deceptive acts or practices, while sections 12 through 15 prohibit the dissemination of misleading claims for drugs, foods, and cosmetics. FTC can and does issue cease and desist orders, and can seek civil penalties in the Federal courts for violation of their orders. The courts have held that advertisers are strictly liable for violations of the FTC act.

Much of OTC drug advertising controversies are handled in ways not directly involving the FTC. This is accomplished through the Council of Better Business Bureaus' National Advertising Division (NAD), which investigates complaints about the truthfulness of national advertisements, and works toward getting corrective action when needed. If an advertiser or challenger disagrees with NAD's findings, the decisions can be appealed to the National Advertising Review Board (NARB) for further review. The NAD/NARB process generally works well, with advertisers voluntarily agreeing to change or discontinue misleading advertisements. Thus, FTC usually gets involved in only major cases.

Since consumers get much of their information about OTC drug products through advertising, it is important that advertisers present their messages to the public in a fair and honest way.

The major trade associations strongly encourage their member companies to follow existing voluntary codes of advertising practices. The media tend to have their own codes of conduct, and often require proof of claims before running advertisements.

Both the FDA and the FTC are quite aware of the fact that much advertising and promotion is now done on the Internet. These agencies have programs for monitoring the Internet to take enforcement actions to minimize health fraud and improper marketing practices.

## COMBINATION PRODUCTS

There are two separate and distinct meanings of the term "combination products" in connection with OTC drugs. The first refers to a product containing more than one active ingredient. Examples would include cough-cold products and topical first-aid antimicrobials products, both of which classes of products often have more than one active ingredient.

The second meaning refers to products composed of items regulated by different FDA centers, either when combined into a single product or sold as a kit containing two or more separate products of different regulatory categories. Examples of such combination products would include a drug and a device, a drug and a biological product, or a drug and a dietary supplement. FDA has an Office of Combination Products which oversees intercenter jurisdiction of such products as described in 21 CFR 3.7.

## ADVERSE EVENT REPORTING

Drugs often produce more than one effect, the one wanted to treat the condition or disorder, and unwanted side effects. Side effects are usually mild and perhaps unpleasant, but in extreme instances may result in injury or death.

In 2006, the Dietary Supplement and Nonprescription Drug Consumer Protection Act was signed into law as an amendment to the FDCA, requiring the manufacturer, packer, or distributor whose name appears on the label of a nonprescription drug marketed in the United States without an NDA to submit to the FDA any report of a serious adverse event within 15 business days. This also requires keeping records of OTC adverse events for 6 years, whether or not the event was serious. The law allows FDA to inspect such records.

## FDA's OFFICE OF NONPRESCRIPTION PRODUCTS

Until 2005 called the Division of Over-the-Counter Drug Products, the Office of Nonprescription Products (ONP) is the portion of FDA's Center for Drug Evaluation and Research that coordinates matters related to OTC drug products.

ONP has two divisions within it: the Division of Nonprescription Clinical Evaluation and the Division of Nonprescription Regulation Development. Division of Nonprescription Clinical Evaluation has the primary responsibility in the review management and oversight of INDs and NDAs for OTC products, while Division of Nonprescription Regulation Development is involved with the development of monographs through regulation, as part of the OTC drug review program. ONP reports to the director of the Office of New Drugs.

## NONPRESCRIPTION DRUGS ADVISORY COMMITTEE

The NDAC is one of several advisory committees within FDA that give advice. While ONP and the FDA in general tend to follow such advice, they are not *required* to do so. Such committees operate in accordance with the Federal Advisory Committee Act and 21 CFR Part 14.

The committee addresses such issues as NDAs and supplements to them the OTC monographs, postapproval risk/benefit issues, prescription-to-OTC switches,

*Mead*

and other such topics as related to OTCs. The expertise within the committee assists ONP in making timely and appropriate decisions.

Most, but not all, of their meetings are open to the public. Meeting notices are published in the *Federal Register* and on FDA's Web site. Members of the committee are selected by ONP and appointed by the FDA Commissioner, to serve 4 years as Special Government Employees. Members are usually preeminent scientists in their field, although some members are consumer representatives, and others are nominated by industry to nonvoting positions. Frequently the committee is also supplemented by consultants.

## OTC TRADE ASSOCIATION

The leading trade association of manufacturers and marketers of OTC drug products is the Consumer Healthcare Products Association (CHPA), formerly known as the Nonprescription Drug Manufacturers Association and previous to that as the Proprietary Association. CHPA was founded in 1881 and maintains offices in Washington, DC. CHPA member companies represent over 90% of the retail sales of OTCs in the United States. CHPA sponsors meetings and seminars on topics related to manufacturing, quality assurance, and marketing of OTC drug products, and has voluntary codes and guidelines covering matters of interest to the member companies.

## TRENDS IN OTC MEDICINES

There are currently more than 100,000 OTC products on the market. With the aging of the population, increasing interest in self-care, enhanced access to health-care information on the Internet, product innovations, continued switches from prescription-only to OTC, retail sales, and usage of OTC drug products will continue to grow in the years ahead.

Manufacturers of OTC drugs and their trade associations have been and will continue their efforts to inform consumers about the importance of always following label directions closely to achieve safety and efficacy from the products. Understanding product directions, what to do if the product is not working, and the ability to identify adverse effects together with what action needs to be taken when such effects occur are all crucial. Education and publicity on these aspects of self-treatment will be stressed. Similarly, efforts will continue toward educating parents about the potential abuse of OTC drug products (such as dextromethorphan-containing cough medicines) by teenagers. Due to the changing demographics in the United States, making such information available in Spanish will become more prevalent.

Self-medication is not limited to the United States, but is a global matter. Many of the manufacturers and marketers of OTC's offer their products in several countries. However, the regulatory environment and health-care systems vary country to country, making it difficult to internationalize brands. Efforts will continue toward harmonization, although this will be ongoing for many years.

There are OTC drug trade associations in many countries, and also international organizations coordinating their various efforts, including the Association of European Self-Medication Industry and the World Self-Medication Industry.

In some countries, there exists a *third* class of drug products, sometimes called a "pharmacy-only" medicine (POM), where certain nonprescription products are made physically inaccessible to consumers. To purchase such a product, the customer is required to obtain it from a pharmacist, and presumably would enter into discussion to guide the proper use of the product. This concept is periodically brought up for consideration in the United States by organizations representing retail pharmacists. However, this "third class" has been resisted by the OTC drug industry in general as negatively impacting access to nonprescription medicines. The industry strongly favors the current two-tiered system.

Although there is much interest in nanotechnology and its application in health-care products, some of which could be OTCs (including drug–cosmetics such as sunscreens), this is an area of product development that will advance.

## REFERENCES AND NOTES

1. Draft Guidance for Industry on Postmarketing Adverse Event Reporting for Nonprescription Human Drug Products Marketed Without an Approved Application, 1997, Food and Drug Association, Center for Drug Evaluation and Research, Rockville, MD.
2. Soller, R. W. OTCness. Drug Inf J 1998; 32:555–560.
3. FDA, Is It a Cosmetic, a Drug, or Both? July 2002.
4. FDA, Guidance for Industry: National Uniformity for Nonprescription Drugs, April 1999.
5. FDA, Rulemaking History for Nonprescription Products: Drug Category List, http://fda.gov/cder/otcmonographd/rulemaking_index.htm. Accessed April 2008.
6. FDA, Frequently Asked Questions on the Regulatory Process of Over-the-Counter (OTC) Drugs, http://www.fda.gov/cder/about/smallbiz/OTC_FAQ.htm. Accessed April 2008.
7. U.S. Code, Federal Advisory Committee Act, Title 5, http://www.access.gpo.gov/uscode/title5a/5a_1_.html. Accessed April 2008.
8. FDA, Office of Nonprescription Products, http://www.fda.gov/cder/offices/otc/default.htm. Accessed April 2008.



# 17 Current Good Manufacturing Practice and the Drug Approval Process*

**Ira R. Berry**

*International Regulatory Business Consultants, LLC, Freehold, New Jersey, U.S.A.*

## INTRODUCTION

Employment of current good manufacturing practice (CGMP) and approval of a new drug application (NDA) are two pillars of federal law providing support of manufacturing quality for pharmaceutical drug products offered to American consumers in the U.S. marketplace. These requirements are established in the Federal Food, Drug and Cosmetic Act (FDCA). In this chapter, we will discuss these two requirements and how they interface with each other in the FDA programs designed to execute the mandates of the law.

The CGMP requirement focuses on manufacturing quality for the purpose of assuring that each pharmaceutical drug product is as safe as the law requires it to be and that it has the identity, strength, quality, and purity characteristics by which it is defined in large part. Under FDCA section 501(a) (2)(B), activities that amount to "manufacture, processing, packing, or holding" of a drug must be performed in conformance with this current good manufacturing practice. Very explicitly, the CGMP requirement applies to the methods used in performing the above regulated activities and to the facilities and the controls used for these activities in producing a drug.

Pharmaceutical drugs resulting from manufacturing methods, facilities, and controls that are not operated or administered in conformance with CGMP are considered to be adulterated. In essence, their manufacturing quality is not assured to a legally minimum level. They are in violation of the law, and they are subject to regulatory actions by the U.S. Food and Drug Administration (FDA).

Section 505(a) of FDCA prohibits in U.S. commerce any "new drug" unless that product is the subject of a properly filed application with FDA to place it in commerce, and an FDA approval of the application is effective. An NDA filed with FDA to meet the requirement to acquire approval may be disapproved if a number of conditions are not met. The full list can be found in sections 505 (d) (3) for NDAs and 505 (j) (4) for abbreviated new drug applications (ANDAs). Both sections contain the conditions for approval that the methods used in, and the facilities and controls used for, the manufacture are adequate to preserve its identity, strength, quality, and purity. It should be noted that this is essentially the same expression as the statement of the CGMP requirement. The CGMP requirement assures that legally acceptable product attributes result from manufacturing

* Author from the First Edition, Nicholas Buhay (Food and Drug Administration, Rockville, Maryland, U.S.A.), with an update by Ira R. Berry. This chapter was written by Mr. Buhay in his private capacity. No official support or endorsement by the Food and Drug Administration is intended or should be inferred.

operations; all manufacturing-related proposals in the application for the product
must maintain these same attributes.

An NDA may not be approved if FDA finds the CGMP to be employed in
its production is inadequate. FDA programs for assessment of conformance with
the CGMP requirement use an approach that includes a number of variations in
inspection action. The variations have been devised and put into use to satisfy a
number of regulatory purposes as well as management efficiency purposes.

There is no such thing as virtual manufacturing of pharmaceutical drugs.
They are real products fashioned in a real environment with real resources. It is
a fundamental axiom of the regulatory scheme that this environment, both physical
and operational, in large part determines the quality, identity, purity, and strength
characteristics that have been established for drug products. Conditions and prac-
tices in this manufacturing venue are complex, involving many steps, sophisticated
equipment, and many people. This complexity provides the potential or the occa-
sion for variation or contamination that raises concern that the desired fundamen-
tal characteristics have been put into output products. An inspection operation
directed at evaluating the ongoing conditions and practices in the site addresses
this concern. Besides the concerns for manufacturing in an environment free from
obvious conditions like insanitation, there are additional conditions and practices
unique to the industry. Pharmaceutical drug manufacture is a part of the chemical
industry; products are applied to the living individual. Most pharmaceutical man-
ufacturing occurs in multiproduct facilities.

Manufacturing operations may create conditions resulting in cross-
contamination. An example is chemical ingredient dust, generated by equipment
operations. Many white powders are used to produce different products. Each may
have a vastly different toxicity profile and treatment application. Wrong selection of
materials and incorporation in a manufacturing process has occurred. Manufactur-
ing processes are complex, employing many steps and ordered activities to realize
the object product. Written procedures, preparation of records of actions, and train-
ing decrease or eliminate mistakes or variations that have an impact on product
attributes. To ensure against manufacturing quality problems resulting from this sit-
uation, Congress has recognized the value and importance of inspection and estab-
lished it as a required operation for the assessment of conformance with the CGMP
requirement for manufacture of pharmaceuticals.

Periodic inspection of a pharmaceutical manufacturing factory is a specific
requirement in the Food, Drug, and Cosmetic Act. Section 510(h) requires "every
such establishment engaged in the manufacture, propagation, compounding or pro-
cessing of a drug or drugs... shall be so inspected at least once in every... two-
year period." Section 704 of the law discusses some purposes of the inspection and
indicates both specific and general items of interest for the inspection. Those items
include "processes, controls, facilities, equipment, finished and unfinished materi-
als, containers, labeling and records and files."

Mandated periodic inspections are performed to assess the conformance of
the factory site to the requirement for manufacture within current good manufac-
turing practice. The inspections are performed according to instructions provided
by an FDA operating procedure called the Drug Manufacturing Inspections Com-
pliance Program. This compliance program is one of a set of such programs estab-
lished and maintained to allocate resources for, and to guide, the performance of
investigative operations for compliance assessment in identified priority regulatory

areas. The need for compliance programs is reviewed each year. Compliance programs may be established and retired in response to emerging developments in the regulated industry.

Because of the enduring priority of assurance against manufacturing error and of controlled manufacturing practice, the Drug Manufacturing Inspection Compliance Program has been and will continue to be a fixture in the overall drug regulatory program of the Center for Drug Evaluation and Research (CDER).

The outcomes of these inspections are available for use in the drug approval decision. Pharmaceutical factory sites found by the inspection to be in acceptable conformance with the CGMP requirement means that manufacturing methods, facilities, and controls are operated or administered satisfactorily in that site. This general conclusion may be applied to the case of a specific NDA pending approval, recalling that one of the approval requirements is that methods used in, and the facilities and controls used for, the manufacture are adequate to preserve its identity, strength, quality, and purity.

It is evident that some extrapolation is done in applying a CGMP inspection conformance assessment to an approval decision for an application. The inspection observes and assesses conditions and practices at a period in the past; a new drug application proposes future manufacture. The inspection evaluates manufacturing operations for products that are different from the product that is the subject of the application. The proposed product may involve for commercial production some manufacturing technology not yet in operation at the time of the CGMP inspection.

Judgments are made, indirect information is considered; a risk management approach is used. Similarities between the manufacturing experience in place and the proposed product manufacturing requirements, the complexity of the manufacturing process and the process controls, the CGMP compliance history of the factory site proposed, the physical and toxicologic properties of the materials that may be processed in a site, the completeness of information available supporting a factory site conformance with the CGMP requirement—all may be used to decide upon the use and extent of application of a CGMP inspection.

Where an existing report of CGMP inspection is judged insufficient for supporting an application approval decision, a special inspection will be scheduled. This is known as the preapproval inspection. As with CGMP conformance assessment inspections, performance of FDA preapproval inspections are organized in a compliance program. This program is called the Preapproval Inspections/Investigations Compliance Program. The program was established in August 1994, largely in response to the discovery that a number of applicant firms provided in NDAs to the FDA unreliable, misleading, and false information. In an investigation that spanned approximately 8 years, approxiamtely 20 companies and 75 individuals were prosecuted for various violations of requirements for submission of invalid, incomplete information related to NDAs. Such information is essentially worthless for the process of evaluating the safety and efficacy of a proposed new drug before it is introduced to the marketplace. The preapproval inspection (PAI) was designed to provide assurances that the data and information submitted in NDAs are reliable and that actual conditions and practices in a given manufacturing facility were adequate to incorporate the production of a new product.

Since FDA does not have the enough inspection resources to perform a PAI for every application received, risk management principles were incorporated into the program rules for selection of facilities for inspection. Considering the products,

PAIs are scheduled for applications proposing products with new chemical entities, with narrow therapeutic ranges, with the first generic version of a brand name product, and with generic versions of the most prescribed drug products. Considering producer firms, PAIs are scheduled when the application is the producer's first, and when the producer has a CGMP compliance history that has been inconsistent, trending down, or noncompliant. Any apparent discrepancy in an application may result in a PAI to investigate the matter thoroughly.

Data and information universally required to be included in an NDA document are trial manufacture of the proposed product and summarized results of various tests on samples from the trial manufacture. Trial manufacture may include one or more batches of the proposed product. Tests include those assessing conformance with the product specifications, those assessing the manufacturing process, and those assessing stability of the product in a container-closure presentation.

PAIs may be performed at any facility providing manufacturing or control services for, and associated data and information on, production of the proposed product. These facilities include not only the site where the dosage form is realized, but also at contract packagers and labelers, contract test laboratories, contract processors like sterilizers or micronizers, and at producers of the active pharmaceutical substance chemical and other ingredient chemicals.

A major objective of the PAI was to develop an assurance that application data and information are authentic and accurate. The PAI could include examination of any and all systems and records used to generate the data and information submitted to FDA. Trial manufacture is verified. Investigation of the industry has shown that trial manufacture was not done, that it was done on a much smaller scale than reported, or that it was done using different procedures than reported. The PAI will determine if resources were available at the time and place of the manufacture trial reported. The inspection will look for consistent and mutually supportive documentation of the manufacture. Reported test results are verified. The investigation of the industry has shown that reported tests were not done, the tests were not done on appropriate samples, or that results were not reported accurately. The PAI determines if test documentation supports the test results reported and if test methods had been developed, validated, and applied correctly. Application data and information from trial manufacture and tests are not all-inclusive; data showing support of the proposed product have been reported, while data not supporting the product have not been included in the application. The PAI inspection determines if development data not submitted was properly excluded. Reports of findings in a PAI are reported to the application review division.

PAI findings of data unreliability could cause review of the pending application to be suspended; findings of a pattern or practice of submission of unreliable data by an applicant could result in a broadscope evaluation of many, or even all, of the applicant's approved NDAs to determine if those also contained unreliable data. Suspension of review of any submission by the applicant could be put in place until the applicant has carried out an adequate corrective action-operating plan. Experience has shown that it can take years to clear up the concerns raised by an applicant's submission of unreliable data.

These regulatory procedures are implemented under FDA Compliance Policy Guide 7150.09 Fraud, Untrue Statements of Material Facts, Bribery and Illegal Gratuities published in the Federal Register on September 10, 1991. Also published with the policy was another document called "Points to Consider for Internal Reviews

and Corrective Action Operating Plans." This document provides detailed discussion of elements of an adequate plan.

PAI findings may result in the withholding of approval of a pending application if the findings show that preapproval batches were not made in compliance with current good manufacturing practice or that noncompliance with CGMP may adversely impact the product that is the subject of the pending application. Drug product dosage form units resulting from trial manufacture using the proposed manufacturing procedure are those tested for data and information that will be used to determine if the product is safe and effective. The data and information could be difficult or impossible to interpret if the tests are made on units that are not uniform or that include an unknown contaminant. Manufacture in compliance with CGMP assures the quality, identity, purity, and strength in the products to be tested. Trial manufacturing performed in compliance with CGMP assures that the data and information used to evaluate the safety and efficacy of the proposed product are interpreted scientifically.

Likewise, PAI findings that indicate that CGMP would be incorrectly applied to the manufacture of the proposed product after approval would have to be resolved. Again, the approval of the application may be withheld until such resolution is achieved. Manufacture in compliance with CGMP assures quality, identity, purity, and strength in the products to be distributed to the marketplace after approval. Commercial manufacturing performed in compliance with CGMP assures that the untested units of products sold and used in the marketplace perform in an equivalent manner to the products tested and evaluated for approval.

The CGMP requirement provides support for the reduction of information required to be submitted to FDA in an NDA. From the earliest days of the use of the NDA for assuring the safety and efficacy of new drugs, there has been lively debate about the type and amount of data and information needed for FDA to agree with the applicant proposer that the product may be introduced to the marketplace for use by patients. FDA reviewers of applications have before them the need to decide on product questions that will impact the life and health of patients using them, beginning with the very first dosage unit sold. Having no other data and information except that before them in an application, an FDA reviewer is encouraged to be sure that all important attributes of the proposed product are supported. The producers of the proposed product have before them, as a matter of presence and experience, vast amounts of data and information about the conditions, practices, and resources used, available, or planned for the new product. With this as background, they are encouraged to interpret differently the needs for the collection, arrangement, and presentation of data and information they regard as routine or usual.

Reducing required data and information in applications has been part of an ongoing FDA process to make the application process and the review of applications as efficient as possible while maintaining the high level of public health protection the drug approval process provides. This process has included recognition of an existing CGMP requirement as adequate regulatory oversight of an issue being considered for an application requirement.

In October 1982, FDA proposed a significant revision to the regulations that govern the approval process. A major feature of that revision, finalized in February 1985, eliminated from applications substantial information about manufacturing practices that had been included in the September 1978 revision of the current good

manufacturing practice regulations. It was recognized that the updated CGMP regulations set comprehensive standards for drug manufacturing conditions and practices that were enforced by required on-site inspections of manufacturing facilities. The CGMP regulations eliminated the need for application-by-application review of some drug manufacturing information.

The same revision eliminated NDA's record-keeping requirements for manufacturing and control data resulting from postapproval manufacturing of the application product. This was done because adequate record retention requirements are imposed on manufacturers of drug products under the CGMP regulations.

In April 1992, FDA published final regulations detailing requirements for ANDAs. During the regulation-writing process there had been a proposal for ANDA applicants to obtain samples and to retain them in their stability containers for all lots of a finished generic drug product. This proposal did not need to be accepted because manufacturers are already required to retain samples of each lot by existing CGMP regulations.

In March 1987, FDA published final regulations governing the submission and review of investigational new drug applications (INDs). That new regulation allowed a sponsor of a new drug under investigation to perform stability testing concurrently with clinical investigations of the product because concurrent testing was consistent with existing requirements for stability testing in the CGMP regulation. It was noted that permitting concurrent stability testing furthers the FDA objective of speeding up the drug development and approval process.

The application reduction program also includes a large effort in publishing guidance documents specifying the format and content of sections of applications and recommending types of data and information that will be useful in an efficient review of chemistry, manufacturing, and control issues. The latter guidances especially serve to inform the expression of CGMP requirements as they are applied to the manufacture of the application product or products using similar manufacturing processes. Most often the application requirement is the same as the CGMP requirement. Where they are different, the differences are usually in extent of use rather than in the nature of the compliance expected. An example would be that more frequent testing might be needed to meet a CGMP requirement than to meet the requirement for submission of data for the application.

Application guidances and CGMP guidances are developed using a process that includes cross-program participation. CGMP program representatives sit on work groups developing application guidance documents and attend application review coordinating committee meetings that monitor the development of guidance projects. Draft guidances are distributed to the CGMP program for review and comment at later stages of preparation. The development of CGMP guidances occurs with representatives of the application review program as participants.

The relationship between the GMP requirement and the application approval process continues to develop. In August 2002, FDA announced a formal management initiative to update the agency's approach to ensuring manufacturing quality. The initiative, titled "Pharmaceutical CGMPs for the 21st Century: A Risk-Based Approach," will examine closely the currency of both the CGMP program and the premarket review of chemistry and manufacturing issues. With a view toward the industry, goals identified include incorporation of modern concepts of risk management, quality systems, and advances in electronic technology into pharmaceutical manufacturing control. Specific attention will be given to fashioning a drug

regulatory program that will encourage innovation in manufacturing to enhance efficiency and quality management. From the FDA view, coordination of the application review program with the CGMP inspection program is to be sought for effective, efficient, and consistent application of regulatory requirements. The 2-year CGMP initiative was concluded in September 2004. A full report of findings and goals is published on the FDA/Center for Drug Evaluation and Research Web site. Many of the goals provide for closer coordination of the CGMP program operations and application review activities.

Under certain conditions, FDCA permits exportation of unapproved drug products ordinarily requiring approval for interstate commerce. One of the conditions to allow unapproved products to be shipped out of the United States is that such products are manufactured, processed, packaged, and stored under conditions and practices substantially in conformance with the current good manufacturing practice requirement. This allows manufacture in U.S. factories of products that do not meet U.S. requirements for approval but meet a foreign country's requirements. Of course, they must be intended for use only in the identified foreign country. The CGMP provision provides basic protections against low-quality products being distributed from a U.S. base and assists foreign governments in establishing a level of acceptability for the products to be used in their country without conducting expensive regulatory programs and operations of their own.

Approval of an NDA does not insulate the product that is the subject of the application from the current good manufacturing practice requirement. When the NDA requirements were being established, some holders of applications had contended that the approval process and requirements made withdrawal of the application the exclusive method available to FDA for regulating application products. FDA rejected that contention and established a specific regulation explicitly stating the full applicability of the CGMP requirement to products that are the subject of NDAs. FDA explained that the approval process was a set of additional requirements on the new products in order to make a showing of safety and efficacy.

Thousands of drugs in U.S. commerce are not the subject of an NDA. These drugs are legally marketed because they are not "new drugs" under the law and so they are not required to have an approved application covering them. This includes many prescription drugs as well as the vast majority of over-the-counter products. While the application regulatory pillar for assurance of manufacturing quality is not available to the FDA oversight program, the CGMP requirement does apply. CGMP inspections are made to assess methods, facilities, and controls used to make these products to ensure that the consuming public gets the product attributes mandated for all drugs by the law. The CGMP requirement also provides protection against adverse conditions and practices in the distribution of drugs not required to be submitted for approval in NDAs.

In the FDA Modernization Act of 1997 (FDAMA), Congress again linked CGMP with NDAs in establishing certain procedures for the regulation of the quality of a special category of drugs and in establishing an exemption from the federal regulation of quality. Section 121 recognized the special characteristics of positron emission tomography (PET) drugs. This section directed FDA to establish special procedures for the approval of applications on PET drugs and directed the preparation of a special CGMP requirement for these drugs. The agency has prepared draft rules for meeting these directions and is now conducting a public debate of the

proposed approaches. The resulting procedures and requirements will be closely coordinated as a result of their concurrent development.

A discussion of the regulation of the quality of pharmaceuticals in U.S. commerce would not be complete without a discussion of the approach and role of the official compendia. A compendium is a collection of products recognized, by the inclusion in the collection, as having medical value. Standards for each product are specified in monographs. The three compendia now recognized are the USP, the NF, and the Homeopathic Pharmacopoeia. Section 501(b) of FDCA provides that a compendium drug is adulterated if any sample is tested by the method specified, and the result falls outside the acceptance limits.

Standards for a new drug established in the FDA application review process enter the compendium monograph upon the product's acceptance into the compendium. In the application review process at FDA, standards for new generic drugs are closely coordinated with the existing standards in a compendium monograph. Compendia standards for nonapplication drugs, along with technical information on testing, are accepted as primary guidance in meeting many CGMP requirements, especially in testing procedures.

## UPDATES AND CURRENT ISSUES

The basic requirements for a pharmaceutical manufacturer to comply with—as presented above in the First Edition chapter written by Mr. Buhay—remain in effect. However, in the past three years, there have been some basic updates to the practice of GMP and regulatory issues that have taken place. We can divide this subject into four categories.

First is the issue of the import of foreign manufactured pharmaceuticals—APIs and finished products. The issue is treated in a separate chapter in this book but let it suffice to mention two occurrences here. Heparin API, as included in a finished pharmaceutical product, has been reported to contain contaminants and on investigation has been shown to be incorporated into this finished product and being manufactured from a plant in China that was not inspected or approved by FDA. Thus, the regulatory system has failed with investigations pointing to the FDA and finished product and API manufacturers.

Also, as another example of this issue, questions have been raised regarding the FDA approved ANDAs of a prominent Indian company with manufacturing operations in India and the United States. These questions relate to GMP violations and data submitted in the approved ANDAs for product stability and bioequivalence. Investigations to discover the impact of these issues, and the assignable system failures, are being stimulated by the U.S. Congress.

The second category of these updates relates to the responsibilities of pharmaceutical manufacturers—of APIs and finished products—for outsourced materials. The sponsor of an NDA or ANDA is responsible to confirm that outsourced APIs or finished products are manufactured in compliance with GMP (1, 2). The outsourced manufacturers are responsible as well and are subject to FDA inspections that lead to satisfactory results. The point is that all pharmaceutical manufacturers are responsible to comply with GMP, and to monitor their suppliers; FDA's responsibility is to audit.

The third category that relates to the practice of GMP is risk management, which has been described in an FDA guidance (3). This guidance describes the

suggested principles and process of quality risk management and the integration of quality risk management into industry and regulatory operations.

An example of risk management and risk assessment develops from the U.S. FDA CGMP regulations that stipulate the requirement to prevent product contamination by adequate separation, defined areas, and control systems in a multiproduct manufacturing facility (for dosage forms or APIs). By current standards, the FDA expects a manufacturer to conduct a process to evaluate the necessary controls, through careful analysis, to prevent product contamination through vectors such as facility, equipment, personnel, air handling, and any means deemed influential in risk analysis. The endpoint to this analysis is to evaluate how (material from) one product is possibly able to contaminate another product. Containment can be one consideration for separate or dedicated facility, equipment, equipment parts, and personnel. Cleaning procedures and cleaning validation is another consideration. There is not necessarily one answer to this question for any given compound. There is certainly regulatory support by having facilities with good physical separation and dedicated equipment parts, as practical and reasonable.

Another example of risk management is to monitor the production and cleaning operations and controls to confirm that the controls in use will prevent cross-contamination of products. For example, this can be done by testing wash samples after cleaning equipment and facilities.

The fourth category relating to the practice of GMP is updated principles of quality. FDA has published three FDA/ICH guidances (4–6) that elaborate upon the requirements for a quality system and product development. These guidances provide detail on the integration of quality system and risk management approaches into existing GMP programs. One guidance (4) describes a quality systems model that can accomplish this objective within existing GMP operations. It demonstrates that by developing a product under the principle of building quality into the product—or quality by design (QbD)—product quality will be maintained. Another guidance (5) relates the international scope of building an effective quality management system. The third guidance (6) describes the suggested program for product development and corresponding documentation for a regulatory submission.

Readers may refer to the reference section of this chapter for suggested readings in order to obtain details that are appropriate for their operations.

## REFERENCES

1. FDA Guidance for Industry—Q7A Good Manufacturing Practice for Active Pharmaceutical Ingredients, U.S. Department of Health and Human Services (Aug. 2001).
2. 21 CFR 210 and 211, U.S. Government Printing Office (2008).
3. FDA/ICH Guidance for Industry—Q9 Quality Risk Management, U.S. Department of Health and Human Services (June 2006).
4. FDA Guidance for Industry—Quality Systems Approach to Pharmaceutical CGMP Regulations, U.S. Department of Health and Human Services (Sept. 2006).
5. ICH Draft Guidance—Pharmaceutical Quality System Q10, International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use (May 9, 2007).
6. FDA/ICH Guidance for Industry—Q8 Pharmaceutical Development, U.S. Department of Health and Human Services (May 2006).



# 18 The Influence of the USP on the Drug Approval Process

## Edward M. Cohen

*EMC Consulting Services, Newtown, Connecticut, U.S.A.*

## INTRODUCTION

The objective of this chapter is to provide the reader with an overview of the United States Pharmacopeia/National Formulary (USP/NF) and its formal and legal role in the Food and Drug Administration's (FDA) drug regulatory process in the United States (1). When considering the history of the USP and NF, once separate drug standards compendia originate from two different sectors of the health care delivery system, it is interesting to note in parallel the key milestones of U.S. Food and Drug Law History (2,3). The role of the USP (inception 1820) and NF (inception 1888) has always been to establish public standards for purity, quality, and strength for medicinal articles, and compounding information. The role of the FDA formally established in 1938, and all of its predecessor organizations, starting with the Bureau of Chemistry of the Department of Agriculture in 1862, has always been involved with the enforcement of purity and potency standards for drug materials, in addition to other stipulated regulatory responsibilities (2,3). The earliest recorded interface between the USP, as a private, nongovernmental drug standards-setting organization, and the federal government regarding enforcement of public standards for strength and purity of drugs occurred in 1848. Congress passed the Drug Importation Act in 1848 to prevent the importation of adulterated and spurious drugs and medicines into the United States. The U.S. Customs Service was empowered to test or have tested drugs and determine if they were inferior in strength and purity to the "standard established in the United States Pharmacopeia, and therefore improper, unsafe, or dangerous to be used for medicinal purposes, the articles shall not pass the custom house" (4). Currently the USP/NF is recognized in Federal statutes as a drug standards setting body, which in turn mandates that all marketed medicinal articles in the United States, which are the subject of USP/NF monographs, must be fully compliant with all standards established in the monograph for the medicinal article. Noncompliance of the medicinal article with the USP/NF monograph standards makes the article adulterated. Marketing of adulterated articles is illegal and subjects the marketer to FDA compliance actions. While still the benchmark for quality and purity, the above comments regarding compliance of all compendial articles with monograph requirements, the FDA Office of New Drug Quality Assessment has recently issued guidance for new drug development submissions to FDA, MAPP 5310.7, "Acceptability of Standards from Alternative Compendia (BP/EP/JP)." The effective date for this document is November 3, 2007. The policy applies only to original NDA submissions. What the document offers NDA sponsors is the option of using standards from the alternative compendia provided that the rigor and acceptance criteria are equivalent to or better than USP/NF monograph requirements. This option applies to excipients, drug

substances, or drug products. Further, if there is no USP/NF monograph in place but there is a BP/EP/JP monograph for the article(s) employed in the drug product submission, the NDA sponsor is authorized to employ the alternative compendial procedure provided that it is equivalent to or better than the corresponding procedures stipulated in USP general chapters. Full details for the new MAPP 5310.7 can be found on the FDA Web site [www.fda.gov/cder/map/5310.7R.pdf]. In addition to the formal monographs in USP/NF, there are sections termed General Notices and Requirements and General Chapters which contain information applicable to all drug substances, inactive ingredients (excipients), drug products, and all other official articles (5).

Finally, it should be noted that the USP was operated as a private, not for profit organization without any legal status until 1900 when the United States Pharmacopeial Convention (USPC) incorporated in the District of Columbia, with a formal constitution and bylaws. The USPC has a formal elected Board of Trustees that oversees the overall operations. Currently there is a staff of approximately 600 employees and a volunteer force of more than 1200 to support USP/NF activities. The volunteers represent practitioners from virtually all sectors of the health care delivery systems industry, globally. Volunteers participating in USP activities (including participation at the 5-year-cycle conventions of the USPC, the current USPC cycle is 2005–2010) include individuals representing accredited schools of medicine and pharmacy, state medical and pharmacy associations, national and international scientific and industry trade associations, consumer organizations, public interest groups, U.S. and international governmental and pharmacopeial agencies, and other sectors of health care delivery activities. A very descriptive overview of the current USP operations base can be found in the Mission and Preface, People/Committees and Convention Members sections of the USP (1,6). At this time, USP headquarters is located in Rockville, MD. Key operations units outside USA include

Europe/Middle East/Africa located in Basel, Switzerland
USP-India located in Hyderabad, India
USP-China located in Shanghai, China

Included in the "Mission and Preface" and "People" sections of the USP is a complete break out of the USP Council of Experts, Expert Committees, Information and Standards Development organization, and a listing of all USP products and services and relationships, as well as explanations on how the reference standards system works and the evolution of compendial changes.

## BRIEF HISTORY OF THE USP AND NF

The USP traces its origin to 1820. American physicians in the post-Revolutionary War period were forced to depend on imported texts for information and counsel on the use, composition, and preparation of medicines. The need for a national pharmacopeia became apparent to key practicing physicians at the time. A number of independently developed formularies and pharmacopeias emerged, each servicing regional needs. Dr. Lyman Spalding took the lead and was instrumental in getting the medical establishment to recognize the need for a true national formulary. The process involved bringing together the major medical establishments at a national "convention" in Washington, D.C., in January of 1820 to work out the basis for a

"national formulary." His vision, diligence, and leadership finally resulted in the compilation, preparation, and publication of the first USP on December 15, 1820, under the auspices of the convention (7). The first edition of USP bears on the title page the statement that the text was issued under the authority of the Medical Societies and Colleges. The pharmacopeia included a primary list of 221 drugs and a secondary list of 71 drugs. The so-called listing of drugs was referred to as the "materia medica," and represented what the medical experts of the time determined to be the critical medicines needed to treat the population. Primary objectives of the first USP were to provide the correct Latin and English name for a medicine and a description of the material. This point of "nomenclature" remains as a critical ongoing activity of USP, through the "United States Adopted Names" (USAN) Council and the "USP Dictionary of USAN and International Drug Names" (1). At the beginning of the USP process, there were no formal standards or quality specifications included in the compendia for the official articles. There were preparations sections that gave the reader recipes to prepare specific products. The scope of formulations types included solid, semisolid, and liquid dosage forms recognized at that time. The end result of the USP would be to help physicians across the country provide defined and standardized medicines to the public, without having to depend on importation of the articles from overseas. The listing of a medicinal article in the USP was akin to that named material being an "official" medicinal agent. As the USP continued to grow in stature and public recognition, from its inception in 1820, a revision process was put in place to assure that the compendia included the most currently recognized medicines. Further, that articles no longer in common use would be removed from compendial status. Augmentation of USP monographs with tests for identification and drug quality began in 1840 (4,7). As the USP continued on its path of growth and update, the practicing pharmacists of the time become organized into a national organization, the American Pharmaceutical Association (APhA) in 1852. Their primary concerns centered on dealing with the continuing problem of inferior quality medicinal articles coming into the United States from Europe. To attack this problem, the APhA established quality standards incorporated into "official monographs," to augment the USP. Further there were concerns about giving physicians the option to forego ready-made medications and write out prescriptions for such articles that could be compounded by practicing pharmacists. Many of the ready-made medicines were not included in the USP. Thus, the impetus to establish a formal compendia of "unofficial preparations." This activity came under the leadership of Charles Rice and Joseph Remington. The first National Formulary appeared in July 1888. The formal title of the compendium was the "National Formulary of Unofficial Preparations," published under the authority of the APhA. NF I contained only recipes for preparations, 435 recipes, covering all of the oral dosage forms recognized at that time. The theme of NF I was that it was not going to be only a repository for USP discards or a proving ground for novelties, but a source of reliable preparations.

As the USP and NF evolved independently, as compendia of medicinal agents, their formats and general content became quite similar. The APhA had established a laboratory in 1936 for conducting tests to establish adequate drug standards (8). Prior to that point in time, laboratory testing, incidental to the development of NF standards, was done voluntarily or supported by an APhA subsidy at outside laboratories. The USP did not have its own testing laboratory in place, but relied on outside laboratories. In 1962, an integrated Laboratory servicing the USP, NF, and

*Cohen*

AMA, was put in place—the Drug Standards Laboratory. Key responsibilities of the laboratory were preparing and testing reference standards (9). The work of the laboratory advanced to investigations of analytical techniques. In 1975, the acquisition of the NF by the USP resulted in the combination of the USP and NF into one compendium, with two separate sections of entry for monographs. The Drug Standards Laboratory became the Drug Research and Testing Laboratory in 1978. The focal point for the laboratory was to qualify reference standards and establish standards for dissolution testing. Currently, USP maintains and operates two laboratories. One laboratory specializes in drug quality testing and the research and development of high quality reference standards. The second laboratory produces and packages those reference standards for distribution around the world. The laboratories are responsible for the validation of testing procedures developed to support the qualification and release of material to serve as USP reference standards. Currently a batch of material targeted to be a lot of a reference standard article is tested in two or more outside laboratories throughout the world plus the USP testing laboratory. Based on satisfactory testing results from the testing laboratories, the reference standards are released under the authority of the USP's Board of Trustees, on the recommendation of the USP Reference Standards Expert Committee, which approves selection and suitability of each lot (10). The USP laboratories also provide scientific support to the Expert Committees for the evaluation of analytical tests and methods proposed for inclusion in the USP.

Until 1906, there were no federal or state laws requiring adherence of medicinal articles being produced or sold in the United States, which were the subjects of USP and NF monographs, to meet the standards of the USP and NF. In 1906, the Federal Food and Drugs Act clearly and specifically acknowledged that drugs solid in interstate commerce, under names that are mentioned in the USP or NF monographs must comply with the listed standards of strength, quality, and purity for these drugs (4). Noncompliant articles would be considered as misbranded and subjected to the legal actions of the Bureau of Chemistry (part of the Department of Agriculture). Products sold under the compendial monograph name, which have differing quality attributes from those specified in the USP or NF monographs then, must declare on the product labeling the strength, purity, and quality of the article (4). In 1927, the Bureau of Chemistry was reorganized into two separate entities, one of which was the Food, Drug, and Insecticide Administration. In 1930, the unit was renamed as the Food and Drug Administration. The administrative control of the FDA was changed from the Department of Agriculture to the Federal Security Agency in 1940. In 1953, the Federal Security Agency became the Department of Health, Education, and Welfare. An excellent summary of the history of the FDA and all key milestones in the history of U.S. Food and Drug laws is provided in reference 2.

Continuing concerns about the shortfalls in the 1906 federal legislation regarding false therapeutic claims for patent medicines and food adulteration lead to efforts to revise the 1906 Food and Drugs Act. The revision efforts were accelerated by the deaths of more than 100 people in 1937 attributed to the ingestion of Massengill's Elixir of Sulfanilamide, which was formulated with highly toxic diethylene glycol. In June of 1938, Congress passed "The Federal Food, Drug, and Cosmetic Act" that now required manufacturers of drugs to submit a new drug application to the FDA, which included full reports of investigations made to show that such a drug is safe for use. The section of the law dealing with the New Drug

Application is section 505. There was no stipulation to require manufacturers to provide data to support the efficacy of new drugs or new formulations of already marketed drugs. A key element in the legislation was the retention of the recognition of the USP and NF as official public standards for medicines, including packaging and labeling requirements (11). Additionally, the new legislation extended control of the FDA to cosmetics and therapeutic devices.

In 1962, the Kefauver-Harris amendments to the 1938 Food, Drug, and Cosmetic Act (Drug Amendments) became U.S. legislation to further strengthen the role of the FDA in controlling prescription drugs, new drugs, and investigational drugs. The public standards role of the USP and NF was not materially affected by the legislation, except for the establishment of the antibiotic certification program. The compendial role in assigning official nomenclature to new drugs was not reduced (11). It is interesting to note that in the 1965 Medicare amendments to the Social Security Act regarding payments for, – "Medical and other health services, —, which cannot be self-administered and which are provided in a physician's office," such as drugs and biologics, must be included or approved for inclusion in the USP or NF (or in hospital formularies for administration in hospitals) to be eligible for Medicare coverage (12).

In 1994, the Dietary Supplement Health and Education Act, amendments to the Food, Drug, and Cosmetic Act, named the USP, NF, and the Homeopathic Pharmacopeia as official compendia for dietary supplements. If a USP/NF monograph exists for a dietary supplement, and the material in the marketplace represents that it meets "USP standards," it is considered as misbranded if it fails to comply with all monograph requirements. The program is voluntary and a dietary supplement that makes no assertion of compliance to USP cannot be held accountable to the monograph standards (12).

In 1997, the Food and Drug Administration Modernization Act (FDAMA) was passed, which included in sections 353 (a) and (c) the allowance for pharmacy compounding of drug products, outside the jurisdiction of the Food, Drug, and Cosmetic Act. The restriction on compounding in the FDAMA legislation was that compounding of drug products would not become an unregulated manufacturing sector. The role of the USP/NF in compounding matters is that compounded articles, which are the subject of USP/NF monographs must comply with all standards of the compendia (12). Currently, sections 353 (a) and (c) of the act has been ruled invalid by the U.S. Supreme Court regarding restrictions in the act to publicly advertise certain compounding services. Pharmacy compounding falls under the jurisdiction of State Boards of Pharmacy. There is no change with respect to requirements regarding compliance of compounded articles to USP monograph and general chapter standards dealing with compounding. FDA has recently issued warning letters to compounding pharmacies that sell and promote compounded menopause hormone therapy drugs for making claims for such products that are not supported by medical evidence. A detailed overview of FDA actions in this arena can be found on the FDA Web site, www.fda.gov/cder/pharmcomp/default.htm.

## BRIEF OVERVIEW OF THE CURRENT CONTENTS OF THE USP/NF

The USP 31 and NF 26 (USP/NF 2008), combined in one publication, as three volumes, are actually two separate compendia. Each compendium consists of two primary sections, "General Notices and Requirements" and "Official Monographs."