# EXHIBIT 33

Additionally, general chapters apply to both USP and NF monographs. The general chapters contain information that relates to testing procedures and practices and supporting information to aid in conducting the testing and interpretation of monograph information and requirements. Typically, each monograph will have specifications and test procedures relevant to the monograph article. Additionally, there will be references within each monograph to general chapter information for conducting certain tests as needed. As a prelude to the individual USP and NF sections of the publication, there is a general umbrella coverage of information that provides details about USP/NF terminology and clarification of practices under the banner of "General Notices and Requirements." Finally, in addition to the formal sections of the compendia identified as USP and NF, there is a section entitled "Dietary Supplements." This section contains monographs structured in similar fashion to the USP and NF monographs. Unlike the USP and NF sections there is no entry prior to the Dietary Supplements monographs of a "General Notices and Requirements" section. It should be noted that the Dietary Supplement section monographs can be considered as being included in the USP, but are distinguished from formal USP monographs.

## Official Monographs

An official substance or article is defined in a USP or NF monograph and includes an active drug entity or drug substance, a recognized dietary supplement ingredient, a pharmaceutical formulation ingredient or excipient (or inactive ingredient), or a component of a finished device. An official preparation is a drug product that contains a drug substance or a dietary supplement ingredient. It is the finished or partially finished product or preparation containing one or more official substances intended for patient use.

There are a certain number of compounding monographs that provide detailed instructions for the preparation of the finished product. Currently, the USP section of the compendium has monographs which include virtually all of the above. The NF monograph section is principally devoted to pharmaceutical formulation ingredients or excipients. The NF also has some monographs for botanical articles, including some "compounding formulations." There is a monograph section between the NF and USP sections of the compendium dedicated to Dietary Supplements.

New monograph initiatives by USP are now in place regarding drug products which have been filed with the FDA but not yet approved, termed "Pending Standards," and drug products which are not intended for sale in the United States, but are legally marketed outside the United States, termed SALMOUS. The term SALMOUS stands for "Standards for Articles Legally Marketed Outside the United States." For both categories, the monograph development process will be executed online at the USP Web site and will not appear in either the Pharmacopoeial Forum (PF) (prior to formal authorization or approval of the monograph) or in the USP (post formal authorization or approval). Full details for this new sector of USP are on the USP Web site. Formal guidelines for processing these new categories of monographs from start to finish have been issued and are on the USP Web site. The focus for the SALMOUS monographs is for drugs targeted to treat "neglected diseases." For the pending standards, the focus is to be able to initiate the monograph process at the earliest possible stage during the drug approval process at FDA. As

soon as FDA approval is reached, the monograph in principle is ready to become official. See the following Web sites for full details:

Pending Standards: www.usp.org/standards/pending/guidelines.html.
SALMOUS (International Standards): www.usp.org/standards/international/ guidelines.html.

With respect to the content of a monograph, the formal terminology employed by USP is classified as follows:

Universal tests

    Description
    Identification
    Assay
    Impurities
    Organic, Inorganic, Residual Solvents

Specific Tests

    Physicochemical Characterization and Water Content

With respect to the categories of compendial articles, the following break out is now part of the USP culture:

Noncomplex Active Drug Substances and Drug Products
Biotechnology Derived Drug Substances and Drug Products

    Excipients
    Vaccines
    Blood and Blood Products
    Gene and Cell Therapy Products
    Dietary Supplement Ingredients and Products
    Compounding Substance/Preparations/Practice

## Informational Sections of the USP/NF
### General Notices and Requirements
Applies to all sections of the USP and NF.

### General Chapters
These include general requirements for tests and assays for monograph articles. Included are sections dealing with specific chemical, microbiological, biological, physical tests, and a listing of all current USP reference standards. Currently, there are approximately 2000 reference standards sold by the USP covering drug substances, excipients, and dietary supplements. These reference standards are listed in each revision of USP and additions in the supplements. The general chapter listings start from <1> to less than <1000>. Individual monographs in the USP/NF can have specific general chapter references as part of the monograph testing protocol.

### General Information Chapters
General Information Chapters are not currently mandated in any compendial monograph but do reflect good scientific practices, these practices/procedures are provided as supplemental information. The general information chapter listings

start at <1000> and proceed upward. There is no scientific rationale for the order of chapters within the section or assignment of chapter numbers. Again one must regard these chapters as supplemental, nonbinding information, as is the case for general information chapters covering the USP and NF sections of the compendium.

As a prelude to the general chapters section in USP, there is an excellent overview of the breakout of how general chapters and general information chapters relate to the various categories of monographs in the USP. For the current USP 2008, this section is called "Guide to General Chapters" or "Chart Guide." What is provided to the reader is a break out of the terminology for the categories of official articles and defining which general chapters/general information chapters apply for the various categories of testing employed in the individual monographs.

Finally, the Chart Guide provides a clear overview of the testing categories that are required or incorporated into individual monographs.

### Reagents, Indicators, and Solutions
Covers materials required for all monograph tests and assays

### Reference Tables
Covers ancillary information that supplements the monograph content. Included within the Reference Tables are two very useful chapters about the monograph articles, "Description and Solubility" and "Solubilities."

Browsing these general information sectors of USP is valuable to assess the extraordinary scope and depth of the available information within USP. For example, there is one break out section in the beginning of the NF that categorizes the functionality of all USP and NF excipients (13).

### Pharmacopeial Harmonization
A key USP initiative is the process of harmonization of monographs and general chapters with the European Pharmacopoeia (EP) and Japanese Pharmacopoeia. Under an umbrella organization called the Pharmacopeial Discussion Group (PDG) (formed in 1989), the USP, EP, and JP work to identify monograph or general chapter candidates for harmonization. The World Health Organization is present at PDG meetings as an observer. The PDG works in "harmony" with the International Conference on Harmonization of Technical Requirements (ICH), with the focus on compendial issues. The USP general information chapter <1196> Pharmacopeial Harmonization, provides a detailed explanation of the PDG process and the current metrics for the harmonization for excipients and general chapters. To date no active ingredients have been considered for harmonization. Advantages of harmonization relates to global use of an article and the need to have only one compendial standard for testing. The degree of harmonization can range from having "identical" monographs or general chapters in the USP/EP/JP to indicating which attributes are harmonized and which ones are not harmonized within the published text.

### Revision Process for USP/NF
Both the USP and NF developed publication cycles for revisions, with interim revision announcements. The cycle times were 10 years then 5 years. In 1975 the USP and NF merged when the USP purchased the NF, and new title became the USP/NF. Starting in 2002, the USP/NF has become an annual publication with two formal supplements issued in the calendar year. For the current USP (USP 31/NF 26, 2008),

the formal release date of the publication is November 1, 2008, with an official date of May 1, 2008, which will remain official until May 1, 2009, unless superceded by supplements, IRAs (Interim Revision Announcements), or revision bulletins (hard copy or online).

Supplement 1 will be published in February 2008 with an official date of August 2008. Supplement 2 will have a release date of June 1, 2008, with an official date of December 1, 2008. The updates of USP/NF is carried out with a publication termed "Pharmacopeial Forum" (PF). It is published on a bimonthly basis and is the manner in which the USP advises the public about changes that are being considered for both monograph and nonmonograph content of the USP/NF. Public comment is invited about all content in the PF and USP. A typical issue of the PF provides the reader with potential revisions (Pharmacopeial Previews), proposed revisions (In-Process Revisions), and adopted revisions (Interim Revision Announcement). Additionally, the PF encourages public involvement in the revision process and there is a section of the PF devoted to public comments called "Stimuli to the Revision Process." Instructions for public comment are provided in the PF (14). Finally each entry in PF that concerns a proposed change in USP/NF provides the reader with a guide for the future about the revision proposal. There are defined periods for public comment before a subsequent step occurs in the revision process. It is very important for readers of the PF to understand the cycle time for events so that changes that may be untoward or possibly "errata" must be intercepted by direct communication to the specified USP staff liaison person designated in the PF entry for the item in question. The "Interim Revision Announcement (IRA)" provides the reader with the date that the revision will become official.and identifies which subsequent publication of the USP will contain the official change. This could be either a future supplement or a future revision of USP. Currently, there is a 90-day period for public comment about IRAs. It is critical that USP Stakeholders be aware of all changes in dates of implementation for proposed revisions. As noted in sections above, the formal official date of the current USP is in fact May 1, 2008. There are critical changes underway at USP for key sections, such as General Notices and Requirements and the General Chapter on Residual Solvents, that have been involved in multiple periods of delayed implementation. For regulatory purposes, it is very important to be aware of delayed implementation actions by carefully monitoring the USP Web site and carefully reading the PF. USP has established periodic "press releases" such as a quarterly newsletter for updates of USP activities. Additionally, the bimonthly USP catalog is another very useful information pool about the status of reference standards and publication dates.

## Formal and Informal Linkage of the USP and FDA

All official articles (active or inactive ingredients or preparations or drug products) dictate that the user must assure that the articles are fully compliant with all specified USP/NF monograph requirements and ancillary compendial requirements.

The submission of a drug application to the FDA that includes any article covered by a USP/NF monograph directly links the USP to the submission. The drug application sponsor must provide the FDA with data and information that demonstrate that the compendial articles or drug preparation included in the drug application is fully compliant with all compendial requirements.

Included in the information sections of the compendia are procedures for validation of compendial methods and the conduct of virtually all monograph test

procedures. The concept of compliancy is that the article or preparation will maintain compliancy to the monograph requirements throughout the labeled expiry date or use period for the article or preparation.

Following satisfaction of the FDA drug product review branch with the drug application, the second tier of demonstration of compliance with all USP/NF requirements occurs during field inspections, at the sponsor's manufacturing site. Typically, this could be a preapproval inspection or a cGMP inspection. The drug application sponsor must be prepared to show the FDA that all USP/NF requirements were met from use of the appropriate USP reference standards (or qualified house standards), equipment qualification, and assay validation. It is very important to have complete understanding of the content of the general chapters' in USP and be prepared to explain any inconsistencies that may be in internal SOPs or control documents versus the USP content.

As noted above, USP monograph requirements are not release requirements but expected quality attributes through the defined expiry period for the product. This can only be confirmed by continued stability evaluation of the product.

Some typical issues that a drug application sponsor has to deal with are continued vigilance to respond to a monograph change(s) that may occur over time. Any change must be a catalyst to upgrade all procedures and documents affecting the drug article due to monograph or general chapter change(s). It is not uncommon that a drug application sponsor may be using alternate methods for the monograph article. Any monograph change dictates that a revalidation be implemented to demonstrate that the monograph change does not alter the comparability of the alternate method to the new monograph procedure. Evaluation of proposed monograph or general chapter changes must be made on a critical path to assure that appropriate comments are conveyed to USP in a timely manner to assure that inappropriate changes do not get to the final step of approval in the USP change process.

## CURRENT ISSUES: USP INFORMATION VS. FDA REQUIREMENTS

The USP includes in the general chapters and general information topics that impact on compendial testing. Frequently, the same topics are the subject of FDA guidance or ICH guidelines. Updates occur and it is very important to always assess the currency of the information in the USP versus updated FDA guidance or ICH guidelines. Any inconsistencies or conflicts must be immediately conveyed to the USP. It is critical that stakeholders of USP products and services become cognizant of the USP change control processes. Who are the contact persons at USP for specific issues is something that should be defined and continually monitored. Participation and awareness of USP conferences and workshops can be a very important source of information about changes that USP may be considering that could impact a firm's understanding of USP defined procedures and practices. Updating internal controls and procedures and updating drug product applications based on USP changes is an eternal task that simply cannot be overlooked.

## FUTURE ROLE OF THE USP IN THE DRUG REGULATORY PROCESS

As the USP continues to evolve with the introduction of new analytical technologies into general chapters, <1000>, and general information chapters, <1000>, such as Near-IR Spectrophotometry <1119>, the impact is to encourage USP

stakeholders to consider using the newer technologies as a replacement for the current, and outmoded, USP monograph procedures. An interesting sidebar in using newer technologies is the fact that long standing specifications may have to change to reflect the accuracy and specificity of the technologies. This presents an interesting paradigm for FDA filed specifications for NDAs and ANDAs. Another interesting arena for USP is to consider what type of guidance to provide stakeholders on dealing with the global problem of counterfeiting and adulteration of drug products. Currently, the public standards provided by USP are totally focused on the purity and quality of the compendial articles. It is clear that dealing with issues of counterfeiting and adulteration will need a new focus. The FDA has been involved with counterfeiting and adulteration and there is need for greater involvement of the USP in these matters as it relates to upgrading public standards to try and deal with the issues.

There are two additional arenas for USP enhancements to public standards. One is to provide more flexibility in the execution of testing compendial articles to allow for minor differences in product characteristics, and not require specific multiple testing procedures in the monographs. Another arena is to enhance the use of performance/functionality testing of compendial articles.

The arena of Process Analytical Technology (PAT), which currently has a very strong endorsement by the FDA, dictates the need for USP to reengineer it's "mind set" about reference standards to support future drug product monographs which may have two tiers of testing. Tier 1 might be the traditional monograph portfolio of "Universal Tests" and "Specific Tests." As previously noted Universal Tests include description, identification, impurities, and assay. Specific tests include uniformity of dosage units, performance tests such as dissolution/drug release, pH, etc.

For PAT, process monitoring and control, where virtually every dosage unit can be expected to be within an acceptance boundary of critical quality attributes, end product testing may need to be totally redefined in Tier 2 testing requirements. What type of reference standards will be needed is currently unknown. With respect to USP monograph development, both the preparation of a new monograph and revision of an existing monograph, the USP has recently updated on its Web site "Submission Guidelines" for monograph development. The guideline goes across all types of articles, in the domain of "non-complex actives and excipients" and "complex actives" as well as the other monograph categories. For complete details see www.usp.org/USPNF/submiMonographs/subGuide.html

Heretofore, USP involvement in process development was very limited. With this new horizon of process monitoring/process control, a new era is upon the USP. The changing testing objectives will have a very important impact on regulatory submissions and routine quality control. PAT, at its ultimate refinement, is perceived to be an online/in-line continuous monitoring and control-based operation during routine manufacturing of a drug product (15,16). Every advance in process analytical chemistry and analytical technology introduced to the pharmaceutical industry will have an impact on compendial testing. In turn this will impact on regulatory filings.

Finally, one of the practices in place currently, aside from periodic meetings of USP Staff with FDA, which is a true attempt to link up USP and the Pharmaceutical Industry, with the presence and participation of the FDA, is the Prescription/Non-Prescription Stakeholder Forum. This brings together key players from all sectors of the industry, USP, and the FDA. Issues that have been identified, and in need

of resolution, under the umbrella of the P/N-P Stakeholder Forum, lead to the formation of project teams. The role of the project team is to bring together the key factors associated with an issue and provide closure recommendations to the P/NP stakeholder forum, which in turn is provided to USP for follow-up. The FDA has input on all matters as a participant in the P/N-P stakeholder forum. All stakeholder forum meeting minutes are made public and available on the USP Web site. Further, the membership of every project team as well as key information generated by the project teams are also made available by USP.

The key point here is that FDA is right on top of all current USP issues identified by industry.

## CONCLUSIONS

The USP/NF continues to serve the public health by providing public standards for pharmaceuticals and dietary supplements. By its current collaborative efforts on harmonization in concert with the EP and JP, the USP assures that monographs and general chapters have global recognition. Further, by continuing to upgrade the analytical technologies in the USP, the FDA will almost certainly continue to rely on the USP as an acceptable benchmark for the assessment of critical product quality attributes, suitable for regulatory submissions. The outreach activities of USP through the medium of the stakeholder forums further assures industry and the FDA that issues of concern can be brought to closure. For the future, we can envision that USP will play a role in dealing with global issues such as counterfeiting, and, providing pathways for industry employment of PAT with reduced dependence on standard analytical requirements for product release.

## REFERENCES

1. Mission Statement and Preface. United States Pharmacopeia 31-National Formulary 26 [USP/NF 2008]. The United States Pharmacopeial Convention, Rockville, MD, v–x.
2. Milestones in U.S. Food and Drug Law History. FDA, Backgrounder, http://www.cfsan.fda.gov/.mileston.html.
3. Janssen W F. The Story of the Laws Behind the Labels, Part I 1906 Food and Drugs Act., Part II, 1938 The Federal Food, Drug, and Cosmetic Act., Part III, 1962 Drug Amendments, FDA Consumer, June 1981; available on FDA Web site; Part 1 = http://www.cfsan.fda.gov/lrd/history1.html, Part 2 = history1a, Part 3 = history1b.
4. Anderson L, Higby GJ. The spirit of voluntarism, a legacy of commitment and contribution, The United States Pharmacopeia 1820–1995, United States Pharmacopeial Convention, 1995:71, 6. www.ippsr.msu.edu/documents/forums/2006.may.perlstadt.history.of.fda.pdf.
5. General Notices and Requirements and General Chapters. USP 2008, 2008:1–31 and 33–374.
6. People/Committees, "People/Convention Members", USP 2008, 2008:xi–xxii.
7. Anderson L, Higby GJ. "The Spirit of Voluntarism." Board of Trustees, United States Pharmacopeial Convention. 1995:141–144, 155–156.
8. History of the National Formulary. The National Formulary, 10th edition (N.F. X), American Pharmaceutical Association, 1955:xxii–xxiii.
9. Anderson L, Higby GJ. "The Spirit of Voluntarism—", 1995:363–365. http://www.usp.org/aboutUSP/history.html?USP.
10. USP Catalog, September–October, 2008:19.

11. Anderson L, Higby GJ. The Spirit of Voluntarism— 1995:281, 357.
12. Valentino JG. USP Admissions Policy on Approving New Drugs for Inclusion in the United States Pharmacopeia (USP) is Presented. Pharmacopeial Forum November–December, 2000; 26(6):1519.
13. Excipients. USP 2008, 2008:1057–1061.
14. Pharmacopial Forum. USPC, Bimonthly Publication.
15. Hussain A. FDA's PAT & cGMP Initiative for the 21st Century: Status Update and Challenges to be Addressed. NJPhAST 2003 Symposium, Rutgers University, Piscataway, NJ, 2003.
16. Gary Ritchie. Topic 3, Process Analytical Technology: Near-IR. Analytical Methods and General USP Topics, Philadelphia, PA, 2003.
17. Mission Statement and Preface. United States Pharmacopeia 31/ National Formulary 26, (USP/NF 2008) 2008:ix.



# 19 Ways, Means, and Evolving Trends in the U.S. Registration of Drug Products from Foreign Countries*

**Alberto Grignolo**

*PAREXEL International Corporation, Waltham, Massachusetts, U.S.A.*

## INTRODUCTION

There* is continuing interest in the development, U.S. Food and Drug Administration (FDA) approval, and importation of foreign drugs into the U.S. market—still the largest in the world. The existing FDA regulations continue to place significant challenges on both foreign and U.S. manufacturers, and are not expected to become more lenient in the foreseeable future. The drivers of FDA's position are as follows:

*Drug Safety:* FDA's appetite for approving drugs without "sufficient" safety information has been significantly diminished by safety-related withdrawals of approved drugs from the U.S. market; the degree of "data sufficiency" has become more of a moving target, as many companies have discovered in recent years.

*Political Pressure:* The U.S. Congress has expressed concern not only about drug safety, but also about perceived close ties between FDA and the pharmaceutical industry, and about a lack of industry transparency relating to the results of clinical trials.

The passage of the FDA Amendments Act of 2007 (FDAAA) reflected this congressional concern; while user fees were renewed (PDUFA IV), the new law gives FDA greater powers of enforcement with regard to drug safety surveillance after approval, and obligates pharmaceutical companies to publish the results (both negative and positive) of most clinical trials on a public Web site.

*Critical Path:* FDA's growing belief (at management levels, for the moment) that there must a better way to develop new drugs, and that scientists, regulators, and industry should find it by leveraging pharmacogenomics, adaptive trials, risk stratification, drug-diagnostic codevelopment, imaging endpoints, and more. Until then, drug development is viewed as "empirical" rather than "intelligent," and risk-benefit negotiations between industry and FDA are still characterized by a degree of arbitrariness.

*Study Designs:* Recent public (Advisory Committee) debates on noninferiority study designs for antibiotics reflect a discomfort within FDA about what

* A previous version of this chapter, published in 2005, was co-authored by Jill E. Kompa, Richard J. Schwen and David Skaninsky. A large majority of their contributions, which are gratefully acknowledged, is retained in this chapter. However, the author assumes full responsibility for its contents and can be contacted at Alberto.Grignolo@PAREXEL.com.

constitutes evidence of efficacy. No relaxation is envisioned in this matter or in the relevant regulations; companies expect to continue to have detailed negotiations with FDA on study designs, especially for Phase III development.

Foreign companies are subject to the same FDA scrutiny as U.S. companies, and are well-advised to appreciate these drivers and to work within them if they wish to be successful in the United States. The importation of foreign drugs needs to comply with regulations because FDA has become more enforcement-minded but with a twist; while in the past the agency cast a wide inspectional net, now FDA has reduced the frequency of inspections, but makes a visible and financially punitive example of those companies (foreign or domestic) that it catches in egregious violative behaviors. The agency is increasingly concerned about the GMP compliance in the manufacturing of Active Pharmaceutical Ingredients (APIs) used in the United States, a large percentage of which are imported (statement of FDA Commissioner Andrew C. von Eschenbach, before U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, on FDA's Foreign Drug Inspection Program; Nov. 1, 2007) and may increase GMP foreign inspectional activity in the coming years.

An important factor driving foreign companies' interest in obtaining FDA approval is the desire to leverage foreign data and regulatory approvals to enter the U.S. market. The economics of pharmaceutical development have a significant impact on the strategy for global marketing approval of new drugs. This is particularly true when sponsors develop and register a drug in one country, and then seek marketing approval for the new drug product from regulatory bodies in a different country or region. However, although the drug development process may be similar in different regions, differences due to culture, medical practice, demographics, and other factors can impact how and how rapidly new drugs gain access to different markets. For instance, such differences could complicate the registration process when sponsors seek FDA registration of a pharmaceutical product for the U.S. market based on data gathered outside the United States. A thorough understanding of the issues involved and careful execution of the U.S. regulatory strategy can help make the process manageable.

This chapter addresses the following topics:

- FDA requirements for registration of foreign drugs, including criteria for acceptability of foreign data, as well as the impact of the International Conference on Harmonization (ICH) guidelines.
- Challenges facing foreign drugs, including chemistry, manufacturing, and control (CMC), clinical and nonclinical issues.
- Factors that can facilitate FDA approval of foreign drugs, including a comparison of the requirements for the New Drug Application (NDA) and the Common Technical Document (CTD).
- Practices and behaviors that increase the likelihood of FDA approval of foreign drugs, including especially communications with the FDA.

## REGULATORY FRAMEWORK RELEVANT TO U.S. REGISTRATION OF FOREIGN DRUGS

Two regulatory entities have an impact on the issues surrounding U.S. registration of foreign drugs. The U.S. FDA plays the major role, as it sets the criteria for acceptance. Additionally, the International Conference on Harmonization (ICH), under

the auspices of the six founding members representing the regulatory bodies and research-based industry in the European Union, Japan, and the United States, has addressed the issue with specific Guidelines and the CTD.

## U.S. Food and Drug Administration

FDA regulations governing the approval to market a new drug are covered in the Code of Federal Regulations (CFR), Title 21, Part 314. The regulations do allow the approval of an NDA based solely on foreign clinical data, provided that the application meets three criteria outlined in 21 CFR 314.106.

The regulation states that "an application based solely on foreign clinical data meeting U.S. criteria for marketing approval may be approved if

1. "the foreign data are applicable to the U.S. population and U.S. medical practice;
2. "the studies have been performed by clinical investigators of recognized competence; and
3. "the data may be considered valid without the need for an on-site inspection or, if FDA considers such an inspection to be necessary, FDA is able to validate the data through an on-site inspection or other appropriate means. The FDA will apply this policy in a flexible manner according to the nature of the drug and the data being considered."

The regulation also encourages consultation between applicants and the FDA. It specifically suggests a "presubmission" meeting between applicants and agency officials when the sponsor intends to seek approval based solely on foreign data. For more about presubmission meetings, refer to "Communications with FDA" later in this chapter.

If the agency feels that the criteria listed above have been met, it may approve the product based on foreign studies. As Table 1 illustrates, the FDA has approved approximately 80 drugs based solely or predominantly on clinical data generated outside the United States.

## International Conference on Harmonization

Recognizing the need to eliminate redundancies in research while supporting the sovereignty of the respective regulatory bodies, ICH has examined ways to help make clinical data collected in one region acceptable to the regulatory authority of another region. One outcome of this ongoing effort is the ICH guideline E5, "Ethnic Factors in the Acceptability of Foreign Clinical Data." Developed to facilitate registration of medicines within ICH regions, the guideline suggests a framework for evaluating the impact of a wide range of ethnic factors—genetic and physiologic, as well as cultural and environmental—on the safety and efficacy of the drug for which registration is being sought.

For sponsors of foreign drugs, ICH guideline E5 complements the FDA regulations. The ICH guideline notes that all data in the clinical section should meet the standards for study design and conduct, and should satisfy the regulatory requirements of the region in which the sponsor seeks approval. Once that has been accomplished, the sponsor must be able to extrapolate the study data to the population of the new region, in this case, the United States. If the sponsor or the regulatory agency is concerned that ethnic differences could have a significant impact on the safety or efficacy of the drug in the new population, additional data may be necessary.

Grignolo

**TABLE 1**   Drugs that have Received FDA Approval Based on non-U.S. Data

| | | |
|---|---|---|
| Acutect | Genotropin | Posicor |
| | Gonal-F | Pravachol |
| Albenza | Granisetron | |
| Ambisome | Halfan | Prograf |
| Anzemet | Haloperidol | Propafenone |
| Arimadex | Hycamtin | Prosynap |
| Betaxolol | Indium IN-111 | Quinapril |
| Bravavir | Isosorbide mononitrate | Refluden |
| Buspirone | Lamictal | Rilutek |
| Calcitonin-Salmon | Lamivudine | Rivizor |
| Carboplatin | Levonorgestrel | Salmeterol |
| Cellcept | Iutamide | Seroquel |
| Crixivan | Merrem | Stromectol |
| Cysteamine | Mesna | Strontium Chloride |
| Dalteparin | Metoprolol | Sumatriptan |
| Denavir | Mifepristone | Tacrine |
| Desogestrel/ethinyl estradiol | Myotrophin | Tacrolimus |
| Diazepam emulsion | Natareline nasal solution | Tamoxifen citrate |
| Dinoprostone | Naropin | Thalidomide |
| Dostinex | Nefazodone | Ticlopidine |
| Dronabinol | Neufolie | Tranexamic acid |
| Enoxaparin | Nimodipine | Trovan |
| Exelon | Novantrone | Venlafaxine |
| Femara | Olsalazine | Vinorelbine |
| Finasteride | Omeprazole | Viramune |
| Follistim | Ondansetron | Zithromax |
| Gabapentin | Paclitaxel | Zoladex |
| | Plavix | |

The core concept of ICH guideline E5 is the "bridging study." ICH defines the bridging study as "a study performed in the new region to provide pharmacodynamic or clinical data on efficacy, safety, dosage and dose regimen in the new region that will allow extrapolation of the foreign clinical data to the population in the new region. A bridging study for efficacy could provide additional pharmacokinetic information in the population of the new region. When no bridging study is needed to provide clinical data for efficacy, a pharmacokinetic study in the new region may be considered as a bridging study."

The concept assumes that the need for any new data is based on the drug's level of sensitivity to ethnic differences between the two regions. If the bridging study results in similar data in the new population, the original efficacy and safety data should be sufficient to support approval in the new region. In such cases, the sponsor should not need to replicate the original studies in the new population. On the other hand, if the bridging study fails, the sponsor would generally need to conduct a new efficacy and safety study in the population of the target region.

In writing guideline E5, ICH suggested that increasing experience with cross-regional acceptance would diminish the need for bridging studies. To date that has not been the case. Bridging studies have become much larger than ICH intended, and many fall outside the spirit of Guideline E5. ICH is in the process of reevaluating guideline E5 in order to make the guidance more practical and useful to sponsors.

The impact of guideline E5 on FDA approval of foreign drugs can be favorable to sponsors if FDA agrees that a bridging study can help satisfy the requirements for approval of a specific new drug, consistent with 21 CFR 314.106. Sponsors should discuss this possibility well in advance with FDA and determine if in fact the agency might require additional, larger phase III confirmatory trials conducted in the United States.

## POTENTIAL OBSTACLES TO THE REGISTRATION OF FOREIGN DRUGS

Sponsors of foreign drugs face a number of challenges when attempting to persuade the FDA that a new drug is approvable. Most of these obstacles are inherent in the drug development process. They are not unique to foreign drugs; differences in culture, testing procedures, standard medical practices, demographics, and other factors can magnify the challenges. Sponsors must recognize the potential pitfalls and plan ahead in order to minimize the impact of ethnic factors on the approval of an NDA.

The issues that sponsors of foreign drugs must address fall into three broad categories—CMC, nonclinical, and clinical.

### Chemistry, Manufacturing, and Controls Issues

The FDA requires the same CMC information for foreign drugs as it does for unapproved new domestic drugs. The amount of CMC information required varies, depending on the type of submission. Specific requirements are stipulated in the various FDA guidances relevant to Investigational New Drug (IND) applications, NDAs, Abbreviated New Drug Applications (ANDAs), etc.

All drug manufacturers must comply with current Good Manufacturing Practices (cGMPs) for finished pharmaceuticals, as specified in 21 CFR 211. Manufacturers must meet United States Pharmacopeia (USP) standards for the drug substance, its excipients, or the drug product, if available. If the substance is not listed in the USP, the sponsor may reference other pharmacopoeial standards, such as the British Pharmacopoeia (BP) or European Pharmacopoeia (EP). If no pharmacopoeial standards exist, the sponsor must provide a full characterization of the new ingredient in the NDA. As is true with all drugs, sponsors of foreign drugs should follow ICH quality guidelines regarding stability, validation of analytical procedures, acceptable levels of impurities, residual solvents, etc. In addition, sponsors should follow the new ICH guideline Q7 A—Good Manufacturing Practice Guide for Active Pharmaceutical Ingredients—given FDA's emerging concern about APIs that are sourced outside the United States.

Sponsors may submit information regarding the chemistry and manufacturing of drug substances, products, excipients, or packaging in a Drug Master File, which can be referenced in ongoing submissions to the FDA. A U.S.-based agent acting on behalf of the sponsor must submit foreign drug master files.

*Importation procedures and related issues:* Foreign sponsors must comply with the same requirements for establishment, registration, and product listing that apply to U.S.-based manufacturers. Foreign manufacturers must register with the FDA's Drug Listing Branch and have a drug establishment number assigned to them. Individual drug products to be imported must also be registered with this FDA branch. In order to import a foreign drug product through U.S. customs, the importer should provide relevant documentation. This might include an IND

number, an approval letter if the drug is a marketed product, and proof that the product has been appropriately listed with the Drug Listing Branch. The import process is often best handled through an experienced import broker who can facilitate a positive outcome and avoid potential delays. Retrospectively, foreign drug establishments often cite delays in the import process as a common occurrence that they might have avoided, had they used an experienced broker.

Foreign manufacturers must also have a U.S. agent who resides in or maintains a physical place of business in the United States. The agent facilitates communication between the FDA and the foreign manufacturer. The FDA will contact the U.S. agent in regard to both facility and drug listing issues for the foreign-based manufacturer.

*FDA inspections of foreign manufacturers:* The FDA may inspect a foreign manufacturing site if, at any time, the agency determines that an inspection is warranted. Sometimes the initial act of registering an establishment with the Drug Listing Branch may prompt an inspection, particularly if the sponsor intends to import the listed drug in the very near future. The FDA is likely to consider an inspection if the facility has not been inspected previously.

If the FDA conducts an inspection and finds problems, the inspector will report his or her observations of the conditions and practices observed at the site on FDA Form 483. The firm is then required to respond to the FDA's findings and to indicate the corrective actions that they will take to resolve the issues. Depending on their nature and volume, the overall findings can be the basis of the FDA's determination as to whether the establishment is compliant with cGMPs. If the FDA does not consider a facility to be in compliance with cGMPs, it will not approve pending drug applications until the establishment resolves GMP-facility–related issues. If the findings are significant, the FDA will likely reinspect the facility to ensure adequate resolution of previous concerns.

Reinspection often takes time, and the additional lead time required for inspectors to travel to foreign sites can lead to approval delays. It is important to be aware that lack of inspection readiness on the part of the manufacturing site is a common reason why the FDA considers submissions to be nonapprovable.

## Nonclinical Issues

FDA's nonclinical testing requirements for foreign drugs are identical to the requirements for unapproved new U.S. drugs. In all cases, the data must demonstrate safety for human subjects during clinical trials and for patients when the drug is marketed.

The efforts of the ICH have resulted in the harmonization of basic requirements for nonclinical study design; however, specific requirements for nonclinical studies can be very specific to each drug and indication. The ICH guideline M3, "Timing of Pre-clinical Studies in Relation to Clinical Trials," addresses general considerations in regard to when nonclinical studies are conducted in a "prototypical" drug development program. The guideline provides a point of reference, but it is not a substitute for communication with the FDA. Consultation with the FDA is appropriate at Pre-IND, End of phase II, and Pre-NDA conferences in order to clarify specific requirements on a case-by-case basis. However, the sponsor should not necessarily expect the FDA to provide guidance and direction spontaneously. Rather, it is the responsibility of the sponsor to design and propose the nonclinical testing program for FDA's concurrence and possible modification.

A proper toxicology program is designed with consideration for the following:

- known safety data on the drug (in vitro, animals, and humans),
- results of an early risk assessment identifying data gaps that need to be addressed,
- relevant FDA and ICH guidelines,
- proposed exposure and use/indication of the drug in man, whether in clinical trials or on the market,
- direct input from FDA, and
- sound toxicology advice.

In order for the foreign nonclinical data to be acceptable to the FDA, the testing must be conducted according to Good Laboratory Practices (GLPs, found in 21 C. F.R 58). The FDA may inspect the nonclinical testing facility, the nonclinical data, or both. The FDA is most likely to select for closer scrutiny of those studies that suggest potential and significant safety issues in humans. In these cases, the FDA tries to determine whether the study was designed and conducted properly, that is to say in accordance with GLPs. References and guidance for monitoring GLPs are available on the FDA Web site at www.fda.gov/ora/compliance_ref/bimo/glp/default.htm. The agency will also address the significance of the animal data in relation to humans. Although nonclinical investigational studies, such as dose-ranging or pilot studies, are technically exempt from the GLP requirement, safety (toxicology) studies—which are critical for safety assessment—certainly are not.

Serious concerns regarding the quality of the data can trigger a "for cause" inspection of the animal facility.

The drug substance and drug product, or formulation, tested in the nonclinical studies should be relevant to the product that the sponsor intends to market in the United States. This requirement is based on the need for the data from safety studies to be relevant to the risk assessment process, particularly if the product formulation or quality are different from that to be marketed in humans. Studies of such variants do not necessarily predict response in humans. This relevance is a critical factor in FDA's acceptance of foreign data.

As is usually the case in drug development, sequential "improvements" in the drug substance and/or drug product are made as the development program progresses from preclinical to clinical stages. The sponsor may need to repeat preclinical studies if the earlier studies were conducted with a product that the FDA considers significantly different from the clinical product.

While the final safety database should reflect known safety concerns that have been observed in either animals or humans throughout drug development, the actual timing of nonclinical studies should be linked to the drug's stage of development. The nonclinical testing should generate sufficient quantity and quality of data to allow for a reliable risk/benefit analysis prior to each clinical trial in a drug development program.

The sponsor should address the safety observations made in clinical trials and should work with nonclinical models addressing relevance to humans when appropriate. Dose relationship and reversibility of observed effects are normally required in order to allow for a proper risk assessment in humans. It is important that the

sponsor conduct the nonclinical testing in a species whose absorption, distribution, metabolism, and excretion are relevant to humans.

As human data become available, the sponsor should reevaluate the selected nonclinical testing models in order to assure the program's relevance to humans. In reality, safety models and programs must be revised if the data collected indicate that different, more appropriate, studies are required to make an accurate risk assessment.

In recent years, FDA has developed a more generalized interest in assessing the potential of drugs to induce electrocardiographic changes (specifically QTc prolongation) that might lead to adverse cardiac events, including ventricular tachyarrhythmia and *torsade de pointes*. Sponsors are frequently required to conduct nonclinical studies demonstrating the presence or absence of QTc prolongation potential of new drugs; ICH has issued a safety guideline on this issue (S7B), reflecting a concern by all ICH partners. Sponsors should discuss with FDA in advance the need to conduct nonclinical studies to address this issue. ICH has also issued a companion clinical guideline (E14—The Clinical Evaluation of QT/QTc Interval Prolongation and Proarrhythmic Potential for Non-Antiarrhythmic Drugs) and sponsors are well advised to take it into account and to discuss with FDA the need to conduct clinical assessment of their investigational drugs to address the QTc prolongation potential issue in humans.

## Clinical Issues

Regulatory bodies, such as the FDA, are cautious about basing registration solely on foreign data, due to the potential impact of ethnic differences on the product labeling and selection of dose and dose regimen. By planning to address intrinsic (i.e., genetic and physiologic) and extrinsic (i.e., cultural and environmental) ethnic differences throughout the drug development process, the sponsor of a foreign drug may save time, reduce the need to replicate studies, and build a stronger case for FDA acceptance, including nearly every aspect of clinical development from study design to patient issues, to investigator selection, to study conduct.

*Investigator/site selection:* For example, in order to evaluate the quality of foreign data, the FDA must feel comfortable with the selection of investigators and sites. Selecting academic or high-visibility centers of excellence and providing standardized investigator training can help address concerns about quality of data. However, the reputation of a center is not, in and of itself, an assurance that clinical trials conducted there are GCP-compliant or relevant to the U.S. population.

Selected investigators must be familiar with conducting controlled clinical trials according to Good Clinical Practice (GCP) guidelines; they must also understand the critical nature of timely safety reporting to support labeling. Selected sites should have sufficient research training and experience in conducting trials that may eventually be audited by the FDA. In case of an audit, documentation of adherence to GCPs and timely safety reporting may be a critical determinant of whether the data will be acceptable to FDA for purposes of NDA approval.

Qualified investigators and savvy sponsors need to be aware of the differences between local and cross-border standards of diagnosis and patient care. Standardization of diagnostic criteria and treatment measures prior to initiating a foreign study intended for U.S. registration helps minimize variability across sites and provides for validation of the criteria early in the development process. Linking those criteria and measures to analogous ones known to be acceptable in the United States

may prove essential to ensuring acceptance of the trial data to the U.S. medical community and to FDA.

Control of investigational drug product and control over the conduct of the investigation are essential for U.S. registration. If the study is conducted under an IND, the FDA requires the investigator to sign FDA Form 1572, the *Statement of Investigator*. By signing this form, the investigator makes a legally binding commitment—under U.S. federal law and with federal penalties—to conduct the study according to the protocol, to personally conduct and supervise the investigation, to maintain study records and submit all materials to the Institutional Review Board (IRB) or local Ethics Committee (EC). No such commitment or enforcement mechanism exists for a non-IND study. Therefore, the sponsor must provide training and carefully document that the investigator has full control over the investigation and understands his or her ultimate responsibility for the quality of the outcome. It is important to realize that it is not necessary to conduct a foreign clinical trial under an IND for it to be acceptable to FDA, nor will its conduct under an IND make it "more acceptable" to FDA. The key success factors for clinical data acceptance are GCP compliance and relevance of the data to the appropriate U.S. patient population.

*Ethics committee/Institutional Review Board selection:* An FDA concern regarding some foreign studies is the lack of local control or inspection of studies by local ECs. It is important to be aware of how local ethical standards and review processes differ from the standards followed in the United States and how those differences may affect the credibility of the foreign data. For a successful submission of foreign data, it is critical to select sites governed by ECs with membership and rules of conduct that will be acceptable for U.S. registration. One obstacle that is common, particularly in developing countries, is inadequate or biased representation on the ECs. The EC should include sufficient representatives with the appropriate technical expertise and should provide objective evaluation by both the scientist and the patient advocate. It is also important to avoid the appearance of bias or conflict by excluding individuals from the voting process who might have a direct interest in the study, for example, the investigator or the discoverer of the drug.

Selection of sites with an EC that will be acceptable in case of an FDA audit may be a potential source of conflict for the sponsor. The sponsor must be careful to balance the needs and customs of the host country and the investigator who will conduct the study against the requirements of GCP.

*Consent process:* Inadequate study subject consent, as well as both overt and indirect coercion of patients to participate in the study, can undermine the acceptability of foreign data for U.S. registration. Providing choice of treatment and a comprehensible understanding of risk in the patient consent document is a critical test of adequate consent, governed by the Declaration of Helsinki and GCP guidelines. Lack of adequate consent can be problematic, particularly if the FDA finds that the study does not provide medically indicated treatment or conducts coercive trials in locations where sufficient medical care is not available. Additionally, local medical acceptability and cultural differences in patient beliefs may limit therapeutic choices and excessively expand what is acceptable, resulting in a biased, informed consent process that may preclude the use of foreign data to support a U.S. application.

*Choice of comparator and dose:* The relevance of foreign clinical data may also be judged by the choice of comparator, as well as relevant dose or dose range for both test and comparator drugs. Active comparators need to be chosen based on whether

the drug, dose, and dosage are approved by the FDA. Demonstrating superiority or noninferiority versus an active comparator is only meaningful if the comparator, dose, and dosage are labeled in a previously approved U.S. marketing application based on established safety and efficacy trials.

The choice of dose and dosage of a drug in a pivotal trial that is used to support a U.S. application should also be carefully considered. Differences in local medical standards of practice, as well as cultural differences, often lead to different risk/benefit ratio considerations when selecting dose and dosage for marketing. For example, some foreign countries may favor a greater safety margin over additional effectiveness.

*Concomitant medications and drug–drug interactions:* Drug–drug interaction data from foreign studies may have limited utility in the United States. A wide range of factors may complicate the extrapolation of foreign data to support labeling for the U.S. population. These include cultural, economic, genetic, and ethnic differences. Genetic and ethnic difference may lead to differences in absorption, distribution, metabolism, and excretion. Limited availability of pharmaceutical products, cultural bias toward the use of homeopathic remedies, and the wide use of certain comedications, nutritional supplements, and/or herbal remedies in some locations may play a limiting role in the FDA's ability to consider drug–drug interaction data from foreign sources. In such circumstances, the sponsor and ultimately the FDA may determine that additional drug–drug interaction trials may be necessary to support U.S. labeling.

*Contraception and reproductive toxicity:* Local practice, economic conditions, levels of education and cultural differences often drive decisions regarding contraceptive methods. The FDA is particularly concerned with the safety of a test product for trial participants, as well as with defining an appropriate level of reproductive safety for labeling. The FDA requires any study to assure the safety of female and male patients and their offspring. In the United States, animal reproductive toxicity data—including gestation and effects on the various stages of fetal development—drive inclusion criteria for pivotal trials and labeling. Nonclinical reproductive toxicity data and the potential effect that such data may have on patient selection, the product safety profile and labeling, should be considered prior to initiating pivotal clinical trials.

*Patient issues:* Study treatment compliance, or lack thereof, can also be a barrier to acceptance of foreign data. In populations with low levels of education, it can be difficult to assure patient compliance and diary retention. Under-reporting adverse events may also be common due to cultural differences. In some cultures, for example, tolerance for higher degrees of pain or simple reverence for the physician may preclude complete and accurate patient reporting of adverse events. Incomplete reporting of adverse events leads to inadequate reporting of incidence for expected adverse events needed for U.S. labeling.

## Study Design and Controls

When designing a study destined for eventual U.S. registration, it is helpful to begin with the intended labeling in mind. Pivotal trials should be designed prospectively. When studies are not conducted under an IND, little opportunity exists to obtain FDA input. In such cases, it is advisable to obtain external, expert consultations regarding regulatory strategy that incorporates consideration of the FDA's ability to label safety and activity claims. In the United States, labeling claims principally

depend on data derived from two adequate and well-controlled pivotal trials. U.S. labeling claims often are

1. limited to the specific patient population studied,
2. limited to the route of administration, dose, and dosage used in the pivotal trial, and
3. limited to the prospectively stated objectives in the pivotal trials that proved to be statistically significant.

A number of common pitfalls in foreign trials may complicate U.S. approval. Outside the United States, medical experts, rather than statisticians, often define sample size based on clinical exposure–comfort levels rather than on statistical models that are the basis of appropriate sample size calculations used to test a hypothesis. Whenever possible, the sponsor should allow an expert U.S. statistical consultant to review the statistical analysis plans in advance of the study. Targeted review can help anticipate issues that may be raised by FDA statisticians.

When selecting active comparators or permissible concomitant treatment, sponsors should consider using drugs, doses, and dosages that are approved for marketing in the United States. It will be difficult for FDA to interpret safety data or to compare drug activity, if the agency is not familiar with the active comparator, dose, route of administration, or dose regimen.

Whenever ethically possible, the sponsor should consider placebo control, rather than active control, for pivotal trials. In the United States and the European Union, it is common for regulators and researchers to hold different opinions regarding the ethics of placebo control in clinical trials. Outside the United States, the use of retrospective historical controls and active comparators has been considered to be the more ethical approach. However, the FDA still considers placebo-controlled trials to be the "gold standard" for demonstrating and labeling safety and efficacy. The exception is in the case of specific life-threatening indications, such as those in the fields of oncology and infectious diseases.

In addition to the careful consideration of a control arm, complete blinding of treatment arms is critical to limit bias and gain acceptability of foreign data. One way to achieve complete blinding is through the use of a "jury of resemblance," which is a blinded group of individuals who help confirm the integrity of the blinding process. Such a jury will examine packaging and blinded product samples in order to identify matching homogenous versus heterogeneous treatment samples. Complete blinding is achieved if the jury cannot differentiate between the two blinded treatments.

Finally, in order to maximize chances for success and to support labeling efficacy for a particular subset population, it is preferable to stratify patients prospectively based on relevant endpoints. Such endpoints may be the diagnostic criteria, as well as the criteria to determine the severity of the disease and/or treatment. Prospective stratification assures appropriate balance of patients in the subset treatment arms and provides results that are easier to interpret. Compared to retrospective analyses conducted after the trial has been completed, prospective stratification is more likely to lead to successful identification of activity in a subset population. With retrospective analyses, low numbers in any one treatment arm may prevent achievement of the statistical power to detect a difference. Prospective stratification can be accomplished by using a telephone randomization system or a variety of site-specific randomization schemes that an expert statistician can design.

### Endpoints

In addition to study design considerations, an appropriate choice of clinically relevant endpoints is key to help drive labeling and gain FDA acceptability of foreign data. Surrogate markers of activity, expert medical opinion and nonvalidated, nonstandardized endpoints (including genetic or nongenetic biomarkers) are often unacceptable to support labeling. A life-threatening condition or an orphan–drug indication might be an exception, but even in these cases, the sponsor has negotiated the strategy in advance with the FDA. Clinically relevant endpoints, such as disease activity, patient mobility, symptom control, or survival, are all preferable to endpoints, such as an obscure lab test result without a historical correlation in the clinic, that lack a clear clinical interpretation.

The sponsor should avoid choosing endpoints that lack cross-cultural applicability and validation. For example, food intake questionnaires or quality-of-life scales may contain questions that limit their use to support labeling when considered in a different cultural setting.

Even for studies with subjective endpoints that require ratings by the investigator or patient, the sponsor should provide adequate training and, whenever possible, define the limits of inter-rater variability. Inter-rater variability among a group of investigators can be assessed proactively by presenting patient case scenarios and having each investigator rate the symptoms or diagnoses based on a uniform patient case. Variability should be assessed. Raters whose results lie outside of the predefined acceptable range should be provided with additional training or excluded from trial participation.

### Local Medical Practice, Therapeutic Differences, and Unmet Medical Needs

Considering variability in local medical practice is critical to understanding the relevance of the development program and the acceptability of foreign data in the United States. Variability may be based on differences in disease prevalence, diagnostics, test-ordering practices, prescribing practices, treatment options, treatment and medical care reimbursement and standard treatment guidelines. If differences are identified, the sponsor should address these differences prospectively by planning for culturally relevant locations for conducting trials or retrospectively via a bridging study.

Equally important are subtle cultural differences that may prevent a sponsor from identifying the maximal effective dose for U.S. registration. A physician's approach to adequate dosing may be culturally driven. For example, the standard of practice in Japan is often to identify a dose that is associated with fewer adverse drug reactions. In comparison, U.S. researchers might choose a dose based on maximal activity combined with an acceptable safety profile.

Additionally, unmet medical needs, that are often the target of pharmaceutical development plans, may differ from one region of the globe to another. Health needs are often defined by socioeconomic policy, levels of education, and cultural biases. Development plans and trial designs often incorporate local standards of practice, available therapy and accessible rescue drugs. These local realities may not apply and may preclude the foreign drug sponsor's ability to collect data that will be applicable for labeling in the U.S. environment.

For example, in Africa and certain parts of Southeast Asia, standard diagnoses and treatment guidelines may be limited by a variety of factors that include the patient's level of supplemental insurance and access to testing, as well as by his or her education and ability to read. In some areas of the world, the availability

of alternative medicine and/or the reliance on traditional healers may play a role in defining medical need. Finally, in some regions, providing early access to study-associated medical care and investigational treatment may be more acceptable, and even expected. Prospective planning, a focus on cross-cultural acceptability and use of multinational advisory boards, may be the best way to design a single development program that has cross-cultural acceptability.

## Collecting Foreign Clinical Data

Since 2000 the clinical trial enterprise has entered a new era of globalization, where pharmaceutical sponsors have increasingly turned to "nontraditional" countries (e.g., Russia, India, China) for recruitment of patients into clinical studies of investigational drugs. The drivers for this trend have been the high prevalence of available and suitable patients in those countries, and the generally much lower cost of conducting clinical trials there as compared to the ICH regions. As a consequence, it is expected that in the future FDA will receive NDAs that are increasingly supported by non-U.S. clinical data—adding further urgency to the need to ensure that these data will be acceptable to FDA. The usual criteria (21 CFR 314.106) will apply, but in order to meet them sponsors must ensure full GCP compliance in the "nontraditional" countries.

One issue for sponsors of foreign drugs to consider is whether to collect foreign clinical data under an IND prospectively. Clinical studies conducted outside the United States can be sponsored under an IND, but this is not an FDA requirement.

Two common and related misconceptions exist regarding foreign studies and INDs. Many sponsors believe that the FDA will give greater weight to studies that are conducted under an IND than to studies that are not. This is not true. Nor is it true that studies conducted under an IND are more compliant with GCPs than are non-IND studies. Another common misconception is that by conducting the study under an IND, the sponsor does not need to obtain local country approval to conduct the study.

Conducting a foreign study under an IND offers both benefits and drawbacks. Among the benefits is the fact that multinational studies and investigators are documented to the IND, which then becomes a "common archive" of study information. This approach allows the sponsor to conduct a single, global protocol for a multinational study, rather than conducting separate, though identical, protocols. Although studies conducted under an IND are not automatically more GCP compliant, such compliance is likely to be higher when investigators are aware that the FDA may inspect them. In point of fact, the FDA will audit investigator sites in pivotal studies regardless of country and regardless of whether the studies were conducted under an IND.

Conducting a foreign study under an IND can also have drawbacks. For one, some non-U.S. investigators may object to signing the FDA Form 1572. The concept of an FDA-mandated investigator statement may be unpalatable to them.

Another potential drawback to conducting a foreign study under an IND can occur if the FDA places the IND on hold. In that case, all IND studies underway in all countries must stop.

After weighing the pros and cons, the sponsor may decide not to conduct the foreign clinical studies under an IND. If that is the case, the studies must nevertheless conform to the regulations in 21 CFR 312.120, which describe the criteria for foreign studies not conducted under an IND.

a) In general, FDA accepts such studies provided they are well designed, well conducted, performed by qualified investigators, and conducted in accordance with ethical principles acceptable to the world community. Studies meeting these criteria may be utilized to support clinical investigations in the United States and/or marketing approval. Marketing approval of a new drug based solely on foreign clinical data is governed by Section 314.106.

b) Data submissions. A sponsor who wishes to rely on a foreign clinical study to support an IND or to support an application for marketing approval shall submit to FDA the following information:

   (1) a description of the investigator's qualifications;
   (2) a description of the research facilities;
   (3) a detailed summary of the protocol and results of the study and, should FDA request, case records maintained by the investigator or additional background data such as hospital or other institutional records;
   (4) a description of the drug substance and drug product used in the clinical study, if available; and
   (5) if the study is intended to support the effectiveness of a drug product, information showing that the study is adequate and well controlled under section 314.126.

c) Conformance with ethical principles.

   (1) Foreign clinical research is required to have been conducted in accordance with the ethical principles stated in the "Declaration of Helsinki" or the laws and regulations of the country in which the research was conducted, whichever represents the greater protection of the individual.
   (2) For each foreign clinical study submitted under this section, the sponsor shall explain how the research conformed to the ethical principles contained in the Declaration of Helsinki or the foreign country's standards, whichever were used. If the foreign country's standards were used, the sponsor shall explain in detail how those standards differ from the Declaration of Helsinki and how they offer greater protection.
   (3) When the research has been approved by an independent review committee, the sponsor shall submit to FDA documentation of such review and approval, including the names and qualifications of the members of the committee. In this regard, a "review committee" means a committee composed of scientists and, where practicable, individuals who are otherwise qualified (e.g., other health professionals or laymen). The investigator may not vote on any aspect of the review of his or her protocol by a review committee.

## FDA Inspections of Foreign Clinical Investigators

As noted above, the FDA inspects selected foreign clinical investigator sites for studies considered pivotal for approval. Such FDA inspections of foreign clinical investigators have increased dramatically in recent years (Fig. 1) due to an increase in the number of sponsors who are submitting NDAs that contain pivotal foreign clinical data. In addition, some pivotal trials are so large, with 10,000 to 20,000 patients or more, that sufficient patients are not available for enrollment from the United States alone, therefore requiring the inclusion of foreign data.

*Evolving Trends in the U.S. Registration of Drug Products from Foreign Countries*   **363**



\* YTD 10/05

**FIGURE 1**   Total FDA inspections of foreign clinical investigators conducted annually from 1991 to 2005. *Source:* FDA.

### FDA

The violations that lead FDA to reject foreign studies include nonavailability of source documentation, inadequate record-keeping, failure to follow the protocol, unreported concomitant therapy, and unavailability of patient diaries (A. El-Hage, FDA, Presentation at Drug Information Annual Meeting, 2002).

It is interesting to note that FDA inspections of clinical investigators uncover similar type and incidence of GCP violations at both U.S. and foreign sites (Fig. 2). These findings do not argue against the use of foreign sites, but do reinforce the message that it is in sponsors' best interest to promote and verify a high degree of GCP compliance at investigator sites, anywhere in the world, to protect their ability to use worldwide data for U.S. registration.

### THE NEW DRUG APPLICATION AND THE COMMON TECHNICAL DOCUMENT

ICH has promulgated a common format for marketing approval applications in the United States, Europe, and Japan. This format is called the CTD. The CTD follows a logical and highly structured format (Fig. 3) designed to facilitate the preparation of marketing applications to multiple countries. Its common elements are intended to save time and labor by minimizing the need to reformat documentation or alter the sequence in which data is presented.

The CTD format is now compulsory in the European Union and Japan, and it has become common practice in the United States and Canada to use the CTD format for marketing applications.

In the United States, marketing applications submitted in the CTD format are still referred to as NDAs. As the FDA has received more applications in CTD format, reviewers have become familiar with using the format. Neither the FDA nor other agencies, such as the European Medicines Evaluation Agency (EMEA), report any significant difficulties in working with the new format. On the other hand,

Grignolo



**FIGURE 2**   FDA Inspection of foreign and domestic clinical sites reveals most common GCP deficiencies. *Source:* FDA.



**FIGURE 3**   A diagrammatic representation of the ICH CTDs. Module I contains documents specific to each region, such as application forms and proposed labeling. The other modules are relatively common to all submissions.

some sponsors have experienced difficulty in determining where certain information, such as the Integrated Summary of Safety and Integrated Summary of Efficacy, should be placed within the CTD modules. Communications with the FDA at pre-submission meetings (see below) can help resolve such issues.

The CTD benefits foreign drug development by streamlining the documentation process. Sponsors can submit documentation to the FDA and other authorities with relatively minor modifications to tailor the submission to local agency needs. This allows the sponsor to apply more focus on the document's scientific and medical content and less on its format. Ultimately, the need to submit a document that demonstrates quality, safety, and efficacy remains unchanged. Those requirements are driven by both FDA regulations and ICH guidelines.

*FDA expectations regarding NDA and CTD submissions:* The FDA has the same expectations for an NDA regardless of whether the data was collected in the United States or abroad. The submission must present a convincing, data-driven demonstration of quality, safety, and efficacy, and the data must be relevant to the U.S. patient population. In reality, however, the FDA may be more skeptical of data from "particular unnamed countries." When presented with extensive data from these regions, the FDA sends its inspectors to verify compliance with GCP, GLP, and GMP.

Whether the NDA is submitted to FDA in the traditional format or in CTD format, the FDA will look for the same standards, i.e.,

- clarity
- navigability
- reviewer friendliness
- completeness
- logical presentation
- data that enable FDA to make sound scientific and medical decisions, on the basis of the benefit–risk balance

## COMMUNICATIONS WITH FDA

Effective communication with the FDA is of paramount importance in the drug development and approval process. For both foreign and U.S. sponsors, the FDA can be an "arm's-length partner" in drug development. The sponsor should keep the FDA informed of drug development plans and progress so that the agency can provide the best advice throughout the process and help the sponsor prevent costly errors. Foreign-based companies must be especially diligent about communicating with the FDA throughout the drug development process. Misunderstandings regarding the agency's expectations for the NDA can destroy a drug development program. The most significant concern is the potential that the foreign clinical data will have limited applicability to the U.S. patient population. If the FDA has concerns regarding limited applicability, the sponsor must be aware of these concerns early enough in the process to be able to take appropriate action, such as conducting studies in the United States rather than abroad.

Communicating with the FDA may differ from communicating with other agencies. Some methods of communication are more effective than others, and FDA has issued precise guidance (Formal Meetings With Sponsors and Applicants for PDUFA Products, http://www.fda.gov/cder/guidance/2125fnl.pdf) regarding

communications and meetings with industry. As noted above, foreign companies that wish to communicate with FDA must do so through a U.S.-based agent.

Meetings with the FDA take place at several predetermined milestones in the drug development process.

## Pre-IND Meetings

The purpose of the pre-IND meeting is to introduce the sponsor and the drug to the FDA. (The introduction may not be necessary if the sponsor is a well-known global pharmaceutical company.) Many FDA divisions will grant pre-IND meetings to sponsors, but some may be reluctant to do so, preferring to review a submitted IND and then provide comments to the sponsor. When granted, a pre-IND meeting can help a sponsor design additional nonclinical studies or refine the clinical protocol prior to submitting the IND; in turn, this level of communication and preparation can prevent the imposition of an IND Clinical Hold based on FDA concerns about safety. It is important to note, however, that holding a pre-IND meeting is no guarantee that the FDA will not issue an IND hold on the study.

In presenting the drug at the pre-IND meeting, the sponsor generally discusses the characterization of the drug and presents manufacturing and nonclinical data. The presentation should also address the proposed clinical investigational plan in relation to the desired final labeling (prescribing information). At this time, the company should identify any foreign clinical studies that it will sponsor and indicate whether they will be conducted under an IND. The sponsor should also present and discuss the initial clinical protocol.

In discussions during the pre-IND meeting, it may be possible to agree to the details of the initial clinical protocol. Critical issues will be identified; some may be resolved at the meeting. Examples of such issues include the inclusion and exclusion criteria, the use of concomitant medications or comparators that may not be approved drugs in the United States, or the use of patient populations that are underrepresented in the United States.

## End of Phase II Meeting

This is by far the most important interaction between the sponsor and the FDA. Phase III of the drug development process represents the final path to the NDA. Phase III trials also require significant investment on the part of the sponsor. The End of phase II meeting gives the sponsor an opportunity to obtain the FDA's commitment on pivotal study designs and key endpoints. It allows the sponsor to make any necessary adjustments to the development plan regarding CMC, toxicology, and clinical or labeling claims. End of phase II meetings are especially critical for foreign sponsors because the meetings help identify "show-stopper issues" such as poor applicability of proposed phase III foreign studies to the U.S. patient population. This will help avoid large investments in misguided trials.

Several factors determine when it is most advantageous to hold End of phase II meetings. By the time the meeting is held, labeling claims should be reasonably well articulated and the apparent effective dose should have been established in phase II studies. The sponsor should be certain that the dose finding is sound, and the pharmacokinetics/pharmacodynamics (PK/PD) work is well advanced. The meeting should take place when the sponsor has designed the phase III program and is ready to present it to the FDA, and before the company makes the significant investments required for the phase III program, since agency recommendations

may drive changes to the trial plans. In recent years, sponsors have been encouraged by FDA to submit their draft phase III clinical protocols to a new process known as Special Protocol Assessment (SPA; also available for stability study protocols and carcinogenicity study protocols. http://www.fda.gov/cder/guidance/3764fnl.PDF). The agency reviews the protocol and provides written detailed comments to the sponsor, in essence "committing" to not changing its mind later about the design.

## Pre-NDA/BLA Meetings

Meetings with the FDA prior to submitting the NDA or the Biologics License Application (BLA) can be helpful. These conferences should be held when phase III studies near completion—usually about 6 months before the planned NDA submission date. One goal of these meetings is to uncover unresolved issues that might stand in the way of approval. Another goal is to identify those studies that are critical for approval and to ensure that they are adequate and well controlled to establish the drug's effectiveness and safety. In the case of a foreign drug, it is necessary to identify which of the critical studies for approval are foreign studies.

The meeting is held with the FDA division responsible for the drug's review. During the meeting, the sponsor should orient the reviewers to the technical content to be submitted in the NDA as well as the best formatting of the data. Proposed analyses and subanalyses of study data to be included in the application should also be discussed.

It is critical to understand the FDA's expectations for the NDA. As already noted, misinterpretations can derail a drug development program. Foreign sponsors may find it particularly helpful to discuss in advance the FDA's intentions to inspect the foreign studies so as to be able to alert investigators and prepare the clinical sites for FDA inspection.

## Advisory Committee Meetings

Advisory Committee meetings may be advantageous to both the FDA and the sponsor. The FDA initiates these meetings, usually when the agency needs advice from the medical and patient communities before deciding on the approval of an NDA. These meetings provide an opportunity for the FDA to obtain the advice of medical experts regarding the approvability of the NDA. At the same time, advisory committee meetings enable the sponsor to present key findings of efficacy and safety to medical experts. The advisory committee includes outside experts in the appropriate medical specialty as well as consumer and patient representatives. The meetings are open to the public.

Advisory committee members are primarily interested in the quality and persuasiveness of the data presented and in the relevance of the data to the U.S. patient population.

At the end of the meeting, the advisory committee votes on recommending approval or disapproval of the NDA. Although the vote is nonbinding, the FDA usually follows the advisory committee's advice.

Although advisory committee meetings offer the sponsor an opportunity to make its case, they have several unique characteristics that can make them especially challenging for sponsors. These formal, structured meetings are governed by the Federal Advisory Committee Act of 1972, which governs all government advisory committees, and by regulations outlined in section 120 of the Food and

Drug Administration Modernization Act. Proceedings of these face-to-face meetings are recorded on audio- and videotape and the meetings themselves are webcast; written transcripts of each meeting are prepared and published on FDA's Web site. The meetings include sponsor and FDA presentations and committee discussions, all of which are open to the public, including financial analysts and competitors of the sponsor. The sponsor may present information that it considers to be trade secrets in a closed portion of the meeting. Personal information about clinical subjects may also be presented in the closed portion of the meeting.

As noted above, the committee's vote is not binding; however, the FDA rarely contradicts an advisory committee recommendation. As a result, committee recommendations carry great weight, not only with the FDA, but also with the financial community and the pharmaceutical industry at large. A negative committee vote can effectively devastate years of development work.

Considering the potential impact of the committee's recommendation for or against NDA approval, the sponsor must be prepared to make a persuasive presentation to the Advisory Committee members. A successful Advisory Committee meeting demands extensive preparation and infrastructure. Meetings may be scheduled as long as a year in advance and committee members must be provided with materials for review several weeks prior to the meeting. The sponsor's presenters, and any external parties presenting on the sponsor's behalf, should be excellent speakers who can clearly present the sponsor's case for approval. Presentations should be well rehearsed and supported with audiovisual aids to make the strongest positive impression possible.

The new FDAAA law requires the FDA to take any New Molecular Entity NDA to the appropriate advisory committee, or to explain in writing its decision to not do so. This may result in an increased frequency of advisory committee meetings and additional pressure on sponsors.

### Labeling Meetings

Labeling meetings are held with the FDA after the sponsor has submitted the NDA. The purpose of labeling meetings is to reach agreement on the exact wording of the Package Insert for the pending application. The sponsor and the FDA may also discuss the need for any revisions to the label that might be required based on new safety information.

Reaching agreement on the exact wording for the label may require several rounds of negotiation. In contrast with most of the other FDA meetings, labeling meetings usually are teleconferences, rather than face-to-face sessions. Teleconferencing allows participants on both sides to take advantage of "muted caucusing" during the negotiation process. The foreign sponsor may wish to have its U.S. distributor participate in the negotiations regarding labeling language.

Much is at stake, because the final package insert wording will either facilitate or restrict the promotion and sale of the drug. Ideally, the labeling meeting results in package insert wording that satisfies both the sponsor and the FDA. Such agreement is a critical milestone toward the launch of a safe and effective product.

Labeling negotiations increasingly include, as a condition for NDA approval, a sponsor's commitment to conduct postapproval clinical studies to further establish the safety and/or efficacy of the approved drug after it is launched onto the market. The FDAAA law has given the agency increased powers to enforce these commitments and to conduct postmarketing surveillance of approved drugs.

Sponsors will no longer be able to "forget or ignore" such commitments after they are agreed and documented in the NDA approval letter.

## SUMMARY AND CONCLUSIONS

In many ways, development of a foreign drug for approval in the U.S. market is similar to the development of U.S. drugs. Regardless of where the drug originates, or where data were collected, sponsors must meet the same requirements—adhere to recognized standards, protect patient rights, design studies that support labeling safety and efficacy claims, ensure the quality and integrity of the data, and submit a complete and clear marketing application. The differences that do exist among countries are due to geography, culture, medical practice, local preferences and practices, and level of comfort of regulatory agencies, such as FDA, with data collected in other countries and patient populations. To minimize the impact of these differences, and to reduce the need to conduct duplicate trials in multiple regions, companies that develop foreign drugs must plan carefully and communicate with FDA "early and often."

Foreign drug sponsors can facilitate the process of obtaining U.S. approval by communicating with the FDA appropriately and frequently. They should look after the details of development work conducted outside the United States to ensure that it is in line with FDA expectations and requirements. Finally, when sufficient data have been collected, the sponsor should make a solid case for approval.

Drug development is challenging for pharmaceutical companies everywhere. The "foreign" element may complicate the process somewhat, but it is not an insurmountable obstacle. Savvy planning and sound execution make obtaining U.S. approval rather manageable. Nonetheless, a diligent understanding of the external pressures which FDA faces from the Congress, the media, and the public is a must, and should guide foreign sponsors' decisions all along the drug development path.

 **20** Impact of Government Regulation on Prescription Drug Marketing and Promotion

**Daniel Glassman and Gene Goldberg**

*Medimetriks Pharmaceuticals, Inc., Fairfield, New Jersey, U.S.A.*

**Barbara Spallitta**

*Reckitt Benckiser, Inc., Parsippany, New Jersey, U.S.A.*

## INTRODUCTION

The Food and Drug Administration (FDA) and the Federal Trade Commission (FTC) are the two governing U.S. regulatory agencies that affect the marketing and promotion of health-care industry products. The FDA primarily impacts the marketing and promotion practices of the prescription pharmaceutical, biological, medical device, and animal drug industries. The FTC primarily affects nonprescription/over-the-counter (OTC) pharmaceuticals, nutritional and cosmetic marketing, and promotional practices. A following chapter in this book will discuss the current responsibilities of the FTC and the health-care industries it regulates. Although recent legislation not currently in effect, the Non-Prescription Drug Modernization Act (November 2007) has been proposed to allow FDA to regulate OTC drug advertising, this chapter will discuss the relationship of the FDA and the health-care industries it currently regulates, with a focus on prescription drug marketing and promotion.

Strengthened in the 1980s and 1990s, the formal legislation under which the FDA operates has not changed significantly since the early 1960s. However, the way in which the FDA, particularly the Division of Drug Marketing, Advertising and Communications (DDMAC) arm, interprets the legislation has resulted in a continuous broadening of power and involvement. In addition, the empirical judgment of the FDA/DDMAC reviewer regarding the regulated industries marketing and promotion has escalated geometrically over the last 10 years. References in the Food, Drug and Cosmetic Act (FD&C Act) to regulation of promotion are brief and vague. Indeed, such references are contained in a single paragraph. Most of the promotional policies of the FDA in recent years have not been made through a formal rule-making process with the force of law, via the Code of Federal Regulations (CFR), or publishing of rules and proposed rules in the *Federal Register*. Rather, the FDA generally has used informal methods, which have de facto force of law, to control promotion. These methods of communicating with the de facto force of law include issuance of policy statements and industry guidelines, warning letters and untitled letters, and speaking at industry conferences/educational meetings.

Biologic and medical device product promotional regulation has similarly developed, however, with less review and enforcement by their respective oversight centers. This is because these centers, the Center for Biologics Evaluation and Research (CBER) and the Center for Devices and Radiological Health (CDRH), have less staff and resources. For example, from 1997 to 2001, CBER issued two warning

letters, while CDER/DDMAC issued 28 (1). CDER/DDMAC and CBER/OCBQ (Office of Compliance and Biologics Quality) intensified their efforts from 2001, issuing 26 warning letters from January 2005 through June 2006, with the great majority issued by CDER/DDMAC, of which, in 2004 alone, 13 involved direct-to-consumer (DTC) advertising (2,3). In 2007, DDMAC issued 10 warning letters for promotional materials.

The most significant promotional development affecting the FDA's involvement with industry, in recent years, is the growth of DTC advertising. DTC advertising expenditure by the pharmaceutical industry has increased from $12 million a year in 1995 to $4.1 billion a year in 2005 and is increasing more each year since then. Much of the FDA activity in recent years concerns the regulation of this increase in DTC. With few exceptions, virtually all the legislation and regulations were written at a time when print and personal/detailing promotions, primarily directed at physicians and other health-care providers, were exclusively employed by industry. The FDA has used these older positions as the basis of regulating the newer forms of electronic promotion, primarily directed at consumers/patients.

The most significant recent legislation related to marketing practices is the passage of the Prescription Drug Marketing Act (PDMA) and the subsequent Prescription Drug Amendments (PDA). These acts set guidance for distribution and accountability of trade, as well as sample sizes, of all prescription products from manufacturer through distribution to health-care professionals. These acts have been strictly enforced by the FDA and have required considerable documentation from companies, incurring significant industry costs to comply with the regulations.

## EVOLUTION OF GOVERNMENT PRESCRIPTION DRUG, BIOLOGIC, MEDICAL DEVICE, AND ANIMAL DRUGS MARKETING AND PROMOTION REGULATIONS

Prior to 1900, the pharmaceutical industry was relatively small and fragmented. Prescription drugs, biologics, and medical devices did not exist, as we know them today. Expenses for marketing and advertising/promotion were rather modest. Products were generally produced, promoted, and sold with a minimum of regulation or scrutiny.

The pharmaceutical industry now spends billions of dollars in marketing and advertising/promotion activity currently estimated at approximately $7.2 billion on physician-directed promotion and another $18 billion on drug samples (4) and does so under rigid regulations established by the U.S. Food and Drug Administration (FDA). The industry of today is heavily regulated by FDA. This encompasses proof of the effectiveness and safety of products and the manner in which products are promoted and marketed.

To understand how this dramatic change in regulation has affected the health-care-related industry's overall marketing and promotional activities, it is important to review the evolution of the government's involvement regarding pharmaceutical products.

### Prior to 1938

Only minor efforts were directed toward the classification, promotion, and marketing of medicines in the 1800s. The regulation of drug promotion started in 1905 when the American Medical Association (AMA), through the Council on Pharmacy and Chemistry, initiated a voluntary drug approval program. This program forced pharmaceutical companies to submit evidence to support their drug claims to the

AMA Council and outside experts for review in order to earn the right to advertise in AMA and related journals (5). This AMA program lasted until 1955.

In addition, in 1906 Congress passed the original Pure Food and Drug Act, which was designed to provide safe drugs to patients. However, it did not prevent false promotional claims for drugs. Also at that time, the Center for Drug Evaluation and Research (CDER) began as a one-man operation. The force of the 1906 act was challenged when the government seized a large quantity of a product promoted to fight cancer. The government found the product to be "a worthless product that bore false therapeutic claims on its label." Upon trial in 1910, the judge ruled against the government, finding that claims made for effectiveness were outside the Pure Food and Drugs Act. This triggered action that prompted Congress to enact the Shirley Amendment in 1912, which prohibited the labeling of medicines with false therapeutic claims. However, the Amendment also required the government to prove that claims were false and fraudulent before they could act. In 1916, the government established the existing Division of Drugs as the office responsible for the investigation of false and fraudulent drug claims.

Throughout the following years, it was repeatedly demonstrated that the original 1906 Pure Food and Drug Act and the Shirley Amendment were obsolete and ineffective for the regulation of promotional claims. The major weakness of the legislation was the lack of authority of the government agencies to stop distribution of unsafe products. Since the law did not require drug safety, the government's Office of Drug Control could only issue warnings. It was restricted from seizing product.

## 1938 Through 1961

Two significant drug safety events in the mid-1930s, leading to the deaths of more than 100 people, focused national attention on the shortcomings of the regulatory system at the time. As a result, in 1938, Congress passed and President Franklin Roosevelt signed the new broad-based Federal FD&C Act into law. This act required that new drugs be tested for safety prior to marketing and that new drugs have adequate labeling for safe use. At that time, all drug advertising regulations were assigned to the FTC (6,7).

During the next 20 years, the strength and scope of the FDA was substantially increased due to safety problems related to a variety of drugs tested, produced, and prescribed in the United States. Drug safety and related promotion had become a major issue for FDA. In 1951, the Durham–Humphrey Amendment established the legally defined difference between prescription and nonprescription drugs. The amendment specifically stated that dangerous drugs, defined by several parameters, could not be dispensed without a prescription, as indicated by the prescription legend: "Caution: Federal law prohibits dispensing without prescription" (8).

The year 1960 marked dramatic steps designed to further strengthen and expand FDA's powers. Senate hearings on strengthening the drug provisions of the 1938 act were chaired in June 1960 by Senator Estes Kefauver, who had an established reputation as a crime investigator. During the course of the Senate pharmaceutical hearings, the FDA received a request from a pharmaceutical company for the approval, via a new drug application (NDA), of the sedative drug thalidomide, which was found to have caused birth defects in thousands of babies in Western Europe. Although pressure had been exerted by the U.S. manufacturer hoping to introduce the product, FDA Medical Officer Dr. Frances Kelsey refused to allow the NDA to be approved because of insufficient safety documentation, thus avoiding what would have been a substantial tragedy in the United States. This striking

event gave impetus to Senator Kefauver to submit a bill tightening the regulation of all drugs in the United States, which was approved and signed into law (9).

## 1962 Through 1979

In October, 1962, President Kennedy signed the Kefauver–Harris Amendments. Basically, the 1962 Kefauver–Harris Amendments to the original 1938 Federal FD&C Act required drug manufacturers to prove that their products were both effective and safe prior to marketing and required that all antibiotics had to be certified. Most importantly from the perspective of promotional regulation, FDA was given control over all prescription drug advertising. In addition, the act provided for informed consent by subjects recruited for clinical investigation studies. Moreover, the FDA had to be provided with full information concerning clinical trials.

Although the various divisions of FDA were becoming more comprehensive and sophisticated in nature, concern about the safety of America's drug supply continued. This concern would lead to greater FDA oversight of drug marketing and advertising/promotion.

To further comply with the 1962 act, the FDA contacted the National Academy of Science/National Research Council (NAS/NRC) to evaluate drugs approved between 1938 and 1962 for efficacy claims. The Drug Efficacy Study Implementation (DESI) that resulted evaluated over 3000 separate drugs and over 16,000 therapeutic claims. The last report was submitted in 1969, but then the contract was extended. The initial report of the task force was completed in 1970 and contained a provision for the development of an Abbreviated New Drug Application (ANDA) that allowed companies to bring to market additional products or change existing labeling of prior reviewed products (10).

Pressure from the FDA on drug marketing and advertising/promotion escalated in the 1970s. In the early 1970s, the FDA started two new forums in order to increase drug communication with the public. One result was the production of the FDA Bulletin (1971) by the Bureau of Drugs, which alerted physicians and pharmacists to changes in drug use and labeling requirements (11). The other result was the National Drug Experience Reporting System (1971), which allowed FDA to collect expanded data on drug adverse reactions, drug abuse, and drug interactions and provided a mechanism for FDA to take the lead in creating and maintaining the system for health professionals. The production/publication of the FDA Bulletin became a very powerful tool for enforcing findings of the FDA. Virtually, it allowed FDA interpretation of legislation to become de facto regulation through the publishing of that interpretation.

## 1980 Through 1989

As a result of the earlier NAS/NRC review of drugs approved prior to 1962, in 1984, final action was taken for over 90% of the drugs originally studied. Of the 3443 products studied, 2225 were found to be effective, 1051 were found not effective, and 167 were pending (12). As time elapses, a number of products that have never been reviewed have come to light. This unfulfilled FDA responsibility continues to be viewed as a constant weak point by congressional and public advocate critics alike.

In the 1980s, in order to render its operations more efficient, the FDA made a number of changes, one of which was the change of the Division of Drug Advertising to that of the Division of Drug Advertising and Labeling in order to increase

the public's assurance of pharmaceutical promotional adherence to approved drug safety and efficacy.

By this time, drug advertising in professional journals and direct mail and promotion through pharmaceutical sales representatives were well-accepted practices. However, the first DTC television advertising of prescription drugs occurred in 1983, via Boots Pharmaceuticals, which encountered resistance from FDA. FDA took action because of concern that the consumer could not possibly read the long list of side effects flashing across the screen. This was promptly addressed (13) via an accurate but simplified listing of potential side effects. This area of electronic promotion would play a central role in FDA/industry interaction through the 1980s and the early part of the 2000s.

Also, in 1983, the Orphan Drug Act was passed, offering means to market and promote drugs for rare diseases. In addition, in 1984, the Drug Price Competition and Patent Term Restoration Act gave FDA the authority to accept ANDAs for generic versions of post 1962 drugs. This was the start of the rapid growth of the generic industry, as we know it today.

In October 1987, the established FDA Center for Drugs and Biologics was divided and the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER) were formed. These two centers are at the core of pharmaceutical and biologic product marketing and promotional regulation to this day.

The Prescription Drug Marketing Act (PDMA) was signed into law in 1988. This was a key piece of legislation that protected the consumer, through safeguards in the drug distribution system, from counterfeit, expired, or adulterated drugs. The PDMA of 1988 soon became the basis for further laws and regulations in the 1990s that heavily impacted industry's marketing, specifically the use and distribution of samples.

### 1990 Through 2007

With the fast growing use of generics and the race for the first to generic market entry, in the early 1990s came what is known as the FDA/generic industry scandal. Five FDA reviewers were convicted for unlawful contacts with the regulated generic industry. Moreover, several generic industry executives were convicted of falsifying documentation. As a result of the publicity, Congress passed the Generic Drug Enforcement Act in 1992. This act provided for significant penalties for illegal acts related to ANDA approvals.

The passage of the PDA of 1992 expanded upon the earlier PDMA law regarding drug distribution control. PDA established rules to control the use of drug samples and sample coupons. It made the selling, purchasing or trading of drug coupons, trade, or sample products illegal. This law made product accountability mandatory and required drug manufacturers to account for and maintain documentation of drug distribution.

PDMA of 1988 and PDA of 1992 were very far-reaching regulations that required great amounts of detailed documentation and cost for industry to comply. PDMA/PDA literally changed the way industry handled distribution of trade products and samples, documenting and verifying each step of movement from the manufacture of the product through the pharmacy or doctor's office. Through the 1990s and every year through 2006, with the exception of 2005, the FDA and industry tried to come together to define a way to best implement the acts. Finally,

during 2006, various guidelines regarding product distribution were issued by the FDA, including Compliance Policy Guide, Donation of Samples to Free Clinics, and PDMA Requirements: Questions and Answers.

Also, in 1992, as a result of a bottleneck in new product NDA review procedures within the FDA, the Prescription Drug User Fee Act (PDUFA) was passed. This is a unique piece of legislation that requires industry to make payment to the FDA to increase staff to review applications. Specifically, PDUFA requires drug and biologic producers to pay an annual company fee, and a product fee to the FDA for their evaluation of submissions such as New Drug Applications (NDAs) and supplements. Following the passage of this legislation, the number of new drug approvals increased significantly.

In 1997, the Food and Drug Administration Modernization Act (FDAMA) became law. This legislation permitted, with certain limitations, drug, biologic, and device manufacturers to disseminate information concerning safety, effectiveness, or benefits of a use that are not described in the approved labeling. This is the basis of extensive and strictly controlled "off-labeling" marketing efforts that have been frequently used since implementation of FDAMA. This will be discussed, more fully, in following sections of this chapter.

Under pressure from the FDA, AMA, and public advocates, as well as the general public, in 2002, the Pharmaceutical Research and Manufacturers of America (PhRMA) adopted a new marketing code to govern the pharmaceutical industry's relationship with physicians and other health-care professionals. Although not law or federal regulation, the PhRMA code soon took on the cloak of law. PhRMA is the largest association representing leading innovator (brand name) pharmaceutical companies. PhRMA members invested $55.2 billion in research and development in 2006, up from $30 billion in 2001. The PhRMA code defines that interaction between company sales representatives, as well as all other company agents, and health-care providers is strictly for the benefit of the patient, and for providing scientific information. It also spells out that "gifts" to health-care professionals must be of educational nature, patient related, and modest in price ($100 or less). In addition, no grants, scholarships, consulting contracts, subsidies, support, or educational or practice related items, be offered to health-care professionals in exchange for prescribing products (14,15). This voluntary industry code has been very effective. Adherence is the rule and it continues as an industry standard today.

Using PDUFA of 1992 as a model for financing and a catalyst for FDA/DDMAC staff increase, in 2007, the FDA began promoting the need for legislation to require industry to pay a fee to be used to significantly increase DDMAC staff to monitor and review DTC promotion. This underscores both the growth of DTC promotion and the broadening of FDA/DDMAC involvement in DTC promotion. Indeed, an entirely new section, Direct to Consumer Review Group II, had been added to DDMAC between November 2006 and March 2007.

## Prescription Drug Promotion Today

With continued and constant scrutiny, the landscape of prescription drug advertising and promotion continue to evolve in an abyss of regulation and law, influenced by the government, as well as the industry and individuals. Laws such as the Federal FD&C Act enacted by the FDA; Fraud and Abuse (Anti-kickback) Statutes, Medicaid Rebate Statutes and False Claims Act monitored by the Office of the Inspector General (OIG) and Department of Justice (DOJ); the Lanham Act which prohibits false advertising; various State Statutes (regarding consumer protection,

drug marketing/pricing, aggregate spending, etc.) monitored by individual State Attorney Generals or individual citizens; and product liability, privacy laws and the Health Insurance Portability and Accountability Act (HIPAA) for individuals—all do, and have, the ability to affect advertising and promotion of prescription medicines either exclusively or inclusively. And with an estimated 3500 promotional pieces anticipated for review in 2007, DDMAC and industry both have a considerable promotional chasm to navigate.

## FDA ORGANIZATION

To understand how FDA regulates pharmaceutical, biologic, medical device, and animal drug marketing and promotion, it is important to first understand how FDA is organized.

It is within the Office of the FDA Commissioner that FDA policies are established. The various centers within the FDA set the policies applicable to the products they regulate. Figure 1 illustrates the five FDA centers that regulate specific marketing and promotional areas of health-related products:

1. Center for Drug Evaluation and Research (CDER): prescription drugs, as well as significant input for nonprescription drugs (OTC) and biologics.
2. Center for Biologics Evaluation and Research (CBER): biologics, including vaccines and blood tissue products.
3. Center for Devices and Radiological Health (CDRH): medical devices and radiological equipment.
4. Center for Food Safety and Applied Nutrition (CFSAN): foods, food additives, and cosmetics.
5. Center for Veterinary Medicine (CVM): animal health products.

    Each center monitors marketing and promotion in several ways, namely:

1. Review of product materials submitted by companies.
2. Review of medical journals, trade publications, medical exhibits, electronic media, and publicly available documents that are issued by various firms.
3. Review of complaints received from competitors, or others about marketing or scientific-related practices geared toward health-care professionals, as well as DTC promotion used by companies.
4. Review of materials supplied by the product review divisions.
5. Monitoring and surveillance of promotional materials including internet sites, recently approved and high risk materials.

    CDER is the focal point of FDA's regulation of pharmaceutical drugs, and therefore, the focus of this chapter.

### Center for Drug Evaluation and Research

CDER represents the largest staff center within the FDA that regulates marketing and promotion. CDER includes over 1500 people, who are headquartered in about a half-dozen office buildings. Drug reviews have become very complex and challenging as the sophistication of drug design and manufacturing increases.

CDER is responsible for the overall regulation of pharmaceutical and biologic products, while the DDMAC is responsible for overseeing all labeling and promotional activities. Figure 2 illustrates the manner in which DDMAC is organized.

Glassman et al.





\* From FDA Web site and chart contained in the FDA
Advertising and Promotional Manual,
Thompson Publishing Group, Inc., November 2006.

**FIGURE 1** FDA centers that regulate specific marketing and promotional areas of health-related products.

DDMAC reviewers have the responsibility for reviewing prescription drug and biologic advertising and promotional labeling to make certain that the materials are not false or misleading and ensuring clear and unambiguous communication. The general regulatory requirements are the same basic practices established more than 10 years ago. At that time, industry and FDA's interpretation of the rules were relatively narrow. However, in the last decade or so, these basic rules have become only a starting point. Intense documentation and verification, including the strength and publication of source data, placement of elements within promotion, use of artwork, and presentation of models, are now being evaluated by DDMAC reviewers, often subjectively and empirically. In addition, the



**FIGURE 2**   DDMAC organization as of March 2007.

acceptance of "fair balance" has shifted from the inclusion of prescribing information (PI)/package insert and reference to its placement in the promotional piece, to a listing of risks/disclaimers/qualifiers to all positive statements, and with equal weight. In short, DDMAC reviewers use broad individual judgment in evaluating marketing and promotional practices to determine what constitutes a violation and what degree of corrective action is warranted.

The staff of DDMAC monitors drug marketing and promotion from a variety of sources. They have the power to identify violative and incorrect practices and implement corrective action directly with the companies concerned (16). Members of the DDMAC staff regularly consult with CDER and CBER medical reviewers regarding specific product labeling issues and claims and also coordinate with the review divisions when companies request preclearance of product launch materials for newly approved drugs as well as for established brands. Other DDMAC responsibilities include conducting research on marketing, advertising, and labeling activities.

In 2003, the review and monitoring function for some biologic products was also assigned to DDMAC. This is a result of the transfer of regulation of therapeutic biologic products from CBER to CDER.

## MARKETING AND PROMOTION REGULATIONS

Although the FDA regulates the marketing and promotion of prescription medicines, biological products, restricted devices, and prescription animal

products, the focus of FDA's enforcement of advertising and labeling laws has centered on prescription drugs. This is primarily because it has been actively regulating in this area the longest—since 1962. However, the FDA also has a broad regulatory scope to encompass virtually any information issued by a medical products manufacturer of drugs, biologics, veterinary medicines, or medical devices. In this chapter, we will focus more on the prescription pharmaceutical sector, where the FDA has the largest segment of its staff, by far, devoted to oversight.

What is considered to be the FDA's true "crackdown" on the enforcement of marketing and advertising/promotion activities began in the late 1980s. This was not a result of congressional legislation but, rather, FDA's expansion of its authority based on its interpreted powers, resulting from concerns of a number of sources that the agency's enforcement was not vigorous enough. Public sentiment was that FDA was not establishing rules (regulations) to keep pace with the new methods of advertising/promotion of medical products in the industry.

This so-called "crackdown" originally focused on the marketing and promotion of prescription drugs (especially nontraditional forms of promotion) and has now been shown to have far-reaching implications for all medical product marketing and promotion. This crackdown really began in the 1960s and accelerated in the 1980s, a result of a string of groundbreaking, aggressive Health, Education and Welfare (HEW) secretaries and FDA commissioners, directors, and executives, including Joseph Califano, Robert Temple, Peter Rheinstein, Carl Peck, and Janet Woodcock, to name only a few. This aggressive approach resulted in many years of antagonism between FDA, pharmaceutical companies, and representatives of the pharmaceutical industry associations, including the Pharmaceutical Manufacturers Association (PMA), later renamed the Pharmaceutical Research and Manufactures of America (PhRMA). PhRMA was led for many years by the powerful association leader C. Joseph Stetler (Executive Vice President and General Council from 1963 to 1965 and President from 1965 to 1979 and 1984 to 1985).

In recent years, relations between the FDA and the industries it regulates have become increasingly cooperative, with industry less combative and more accepting of control and compliance. It is true that various companies continue to follow legal strategies to uphold their position and opposition to specific FDA regulatory action. However, overall, the industry has quietly complied with the expanding FDA regulatory interpretation of its authority.

## FDA's AUTHORITY OVER MARKETING AND PROMOTION

The authority for FDA's regulations emanates from the Federal FD&C Act of 1962, which established FDA's control over the marketing and promotion of prescription drugs, and was the basis for regulation of restricted medical devices, prescription veterinary medicine, and biological products. With the passage of the Medical Device Amendments in 1976, FDA also received jurisdiction over the regulation of promotion for "restricted" devices. The regulations are enforceable through the imposition or recommendation of the FDA to seek civil or criminal sanctions against violators.

The FD&C Act is vague and general. It does not define advertising, promotion, or marketing. However, the FDA has defined these areas in the broadest terms possible. This is the basis on which their influence/power has grown.

It should be noted that FDA's regulations on drug promotion were written at the time in which journal advertising, direct mail, and "detailing" were the most common ways in which prescription drugs were promoted to the medical profession. As the years progressed, manufacturers' press releases, medical symposia and other medical education programs, electronic advertising, direct-to-consumer (DTC) advertising, therapeutic monographs, dinner meetings, and verbal communications between physicians and company staff or consultant representatives, as well as other modes of promotion, were added to the traditional forms of product promotion (17).

Much has changed regarding the FDA's regulation of prescription medicine marketing and promotion. As delineated earlier, after years of initial combat between the industry and the FDA expansion of regulatory power and after years of experience with the FDA, companies and industry representatives have become reluctant to challenge FDA jurisdiction. The expanded role of informal rules that FDA applies to various product communication mechanisms has made it difficult to predict what the FDA will deem as acceptable.

The FDA can use a number of enforcement tools when they perceive a violation, depending on the seriousness of the perceived violation. This is routinely a judgment call initiated by an individual reviewer. Although since 2001 FDA's warning and untitled letters to the pharmaceutical industry must first be cleared with the FDA chief counsel, the type of enforcement tool issued may be based on the track record of an individual company and the past trouble that company caused the FDA. Primary enforcement tools used by the FDA include:

1. Notices of violation (NOVs)/untitled letters: least serious action, advising a company of a violation of a routine nature that is expected to be remedied, does not greatly impact public health.
2. Warning letter: stating violations, but not in need of action of the DOJ, requiring reply within 15 days. Warning letters often require the company to immediately cease the use of the action or material in violation, destroy the material, issue a "Dear Doctor/Healthcare Professional" letter, or take other corrective action.
3. Seizures and injunctions: civil action, usually to seize a product, initiated by the FDA and brought by a federal court through a U.S. Attorney. This is a rarely invoked procedure. However, the threat is there and is used to "stimulate" negotiation between the FDA and the company. This action can and is used to control marketing of products that are in violation of regulations.
4. Criminal prosecution: the most serious action FDA can take against a company or individual(s). The FDA must present its charges to the DOJ in order to prosecute.

It should be underscored that although members of the FDA are not law officers, their warning and regulatory letters to companies have almost the same effect as issued laws. Moreover, the number of warning letters issued by DDMAC has risen recently, from an average of 5 a year to 16 for the first 10 months in 2006. The most common violations resulting in DDMAC's issuance of a warning letter for promotional materials are for omission of, or inadequate presentation of risk

information; unsubstantiated safety or efficacy claims; or comparative claims not supported by substantial evidence.

## EXTERNAL PRESSURES ON FDA REGULATION FOR MARKETING AND PROMOTION

A new intensity of regulatory enforcement, in the late 1980s, was due to the fact that the FDA staff recognized that new methods of communicating product information were becoming prevalent and were being extensively and intensely utilized by pharmaceutical companies. Also, concern had been expressed by external observers about the FDA's level of enforcement of misleading advertisements by the drug industry. This new FDA initiative coincided with increased external pressures on FDA to increase its activities in regulating the marketing and advertising/promotion not only of prescription drugs but also for other medicinal products.

In 1990, FDA's activities were further intensified by the arrival of Dr. David A. Kessler as the new Commissioner. He increased the staff in CDER, as well as other centers, and "began the process of setting forth written guidelines for certain marketing and advertising/promotional activities" (18).

Congress, the Department of Health and Human Services (HHS), competitor complaints, consumer advocacy groups, and public opinion are a constant source of external pressure for tighter regulation. As demonstrated in a recent Harris Poll, reported in 2007, 71% of adults surveyed believe it is "very important or highly important" that marketed drugs remain under close review by the FDA and drug companies. Only 9% said such review is only "somewhat or not very important" (19).

## COMPLAINTS BY COMPETITORS

Two methods are primarily used by FDA to identify potential company violations in marketing and promotion practices. The first is through FDA's monitoring activities, which, with significant additions in staff, have increased substantially. The second method of FDA scrutiny involves complaints received from competitive firms who monitor the activities of their competition, including marketing and promotion. In fact, for years, competitive complaints formed the basis of half of the regulatory actions taken by DDMAC within CDER. In addition, pressures on FDA can emanate from Congress, OIG, public press, and others, including health-care professionals.

## IMPACT OF THE U.S. CONGRESS

A significant and continuing influence over FDA policies and enforcement activities is exerted by the U.S. Congress (i.e., via Senators and members of the House of Representatives), who, periodically, send letters to FDA (receiving priority attention), hold congressional hearings with FDA officials invited to testify, conduct staff investigations, and issue subsequent reports.

A major focus of these congressional issues is the amount of money that the pharmaceutical industry spends on marketing, including marketing and advertising/promotion (20). This is a continual area of contention between Congress and the pharmaceutical industry.

## INSPECTOR GENERAL OF THE HHS

The Office of Inspector General (OIG) operates as a politically independent office that conducts investigations, frequently as the result of a complaint or external request concerning what are deemed to be illegal activities. Reports by the OIG are considered significant because of their presumed objectivity and are thus regarded as credible. As a result, OIG reports usually result in publicity with resultant pressure on FDA to take some form of regulatory action.

During the period from 1981 through 1992, OIG focused strongly on FDA regulatory matters, such as the "generic drug scandal," prescription drug advertising, and gifts or payments by firms to physicians. The OIG report noted that many of the gifts to physicians are regarded under the AMA Guidelines on Gifts to Physicians as inappropriate.

This led to the recommendation that FDA should finalize guidelines that defined what was considered to be promotional activity, including gifts, and what was considered scientific exchange. The recommendation was issued in the November 27, 1992 publication concerning proposed policy on scientific exchange and continuing medical education.

## IMPACT OF CONSUMER ADVOCACY GROUPS

Consumer advocacy groups provide an important source of external pressure on the FDA in a number of areas. The most prominent consumer advocacy group is the Public Citizen's Health Research Group (HRG), founded by Ralph Nader in 1971 and headed by Dr. Sidney Wolfe. HRG has a special interest in pharmaceutical marketing and advertising/promotion and is known for its opposition to certain marketing and advertising/promotion practices.

Although the HRG has no policy paper or quantifying data on the subject, it claims, as an empirical observation, that the medical products industries spend too much on marketing and advertising/promotion and that much of this marketing and advertising/promotion is misleading. Therefore, HRG, relying heavily on the media, attempts to pressure FDA to monitor the marketplace more closely and to take more aggressive enforcement actions (21).

HRG and other advocacy groups, such as Commercial Alert and National Woman's Health Network, have enjoyed significant success in their endeavors to pressure Congress and the FDA to action. To offset these influences, the Washington Legal Foundation (WLF) has been very successful in ensuring that First Amendment rights are protected in industries' and scientific educators' right to present factual information and findings, within or outside FDA-approved labeling.

## AUTHORITY OF THE FTC OVER MARKETING AND PROMOTION OF FDA-REGULATED PRODUCTS

A relationship pertaining to the regulation of product promotion that is often confusing is the interaction of FDA and the FTC: "Under the Federal Food, Drug, and Cosmetic Act (FD&C), the FDA regulates the safety, efficacy, functionality (when appropriate) and labeling of foods (except meat and poultry), prescription and over-the-counter drugs, biologics, veterinary medicine, cosmetics, and prescription and non-restricted medical devices" (22).

In 1938, the FTC received the authority from Congress to regulate the advertising of foods, drugs, and cosmetics. In 1962, this authority was altered by Congress to give FDA jurisdiction over most aspects of the advertising/promotion of prescription drugs but not OTC drugs. Moreover, over the years, FDA has adopted a very broad interpretation of marketing and promotion. While advertising is commonly considered to be paid advertising, FDA considers promotion to apply to any materials issued by or on behalf of a company or any event that is sponsored by or on behalf of a company that mentions one or more products.

Because of their complex working relationship over the regulation of labeling and advertising/promotion of identical products, FDA and FTC entered into what is known as the Memorandum of Understanding (MoU) in 1971, which established the working relationship and division of responsibility between FDA and FTC. As a result of this understanding, FDA and the FTC work closely on many issues that involve promotion. FDA retains full responsibility for all aspects of prescription drug labeling and promotion and the labeling of OTC products, whose advertising the FTC regulates. But with the introduction of the proposed Non-Prescription Drug Modernization Act of 2007, OTC drug advertising may eventually be regulated, to some extent, by the FDA.

## FDA REGULATION OF MARKETING AND PROMOTION OF PRESCRIPTION DRUGS: BASIC REGULATIONS AND POLICIES

CDER is responsible for most of the regulations and broad policies that apply to the marketing and advertising/promotion of FDA-regulated products, with the marketing and advertising/promotion of prescription medicinal products being the most carefully monitored product communications. Within CDER, DDMAC is responsible for these regulatory activities.

FDA subjects to regulation any advertising or promotional materials issued by a drug company for a specific product. The following general requirements apply to prescription drug marketing and advertising/promotion:

1. There should be no claims made for a product other than those that are FDA approved and are included in the product's labeling.
2. There must be "fair balance'" in the product's advertising and promotion so that the physician, other health-care professionals, or consumers will have a clear understanding of the product risks as well as benefits.
3. When a journal advertisement contains both the name of the drug and its indications, it must also include an abbreviated summary of the package insert.[1] This requirement applies to any advertisement that is direct-to-consumer, as well as directed to health-care professionals. Concerning electronic advertising, there must be a provision for easy access to the product package insert by the health-care professionals and consumers.

---

* This is an evolved interpretation by FDA and refers to FDA's requirement that risks associated with the product's use should be clearly identified, relative to the product's benefits for the patient.
[1] The product package insert contains all of the essential information about the product, including, but not limited to: pharmacology, clinical studies, indications and usage, ingredients, contraindications, warnings, precautions, dosage and administration.

4. It is illegal to make safety or efficacy claims for a product prior to its approval.
5. "The fact that an advertisement or promotional item may be completely accurate in terms of information is not an adequate defense if any of the specific rules are violated" (23).
6. The product must be accurately represented in the advertisement, even in its graphics.
7. When FDA finds an advertisement or promotional piece in violation, the corrective measures it will use will vary as to the potential impact on public health.
8. Relative to company-sponsored meetings that mention specific products, FDA then regards every aspect of the meeting as within its jurisdiction, such as the location of the meeting, those attending it, who is speaking and what is said, and the relationship that exists between the company and the organization that conducts the meeting.

## FDA DEFINITIONS OF LABEL, LABELING, MISBRANDING, AND ADVERTISEMENTS/PROMOTION

Although the Federal FD&C Act does not define "advertising," "promotion," or "marketing," FDA has chosen to define those terms in the broadest sense possible. This is especially true of "promotion," which FDA considers to be any materials that are issued on behalf of a company or any event that is sponsored by or on behalf of a company that mentions one or more products. The key to these regulations begins with labeling and extends through policies on the advertisement and promotion of drugs.

According to the FD&C Act, a label is defined as a display of written, printed, or graphic material upon the immediate container of any article. Any word, statement, or other information that also appears on the label shall not be considered as in compliance unless such word, statement, or other information also appears on the outside wrapper (if there is any) of the retail package of such article, or is easily legible through the outside wrapper or container (24).

FDA has interpreted labeling to include brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, videos, CDs, sound recordings, exhibits, literature, reprints, and similar pieces of printed, audio, or visual matter description of a drug and references published for use by medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor which are disseminated by or on behalf of its manufacturer, packer, or distributor (25). In recent years, this has been extended to include DTC advertising, investor press releases, and other public or investor relations programs mentioning a drug product, as well as other electronic/web/computer interactive materials.

Misbranding of a product is considered when the labeling or advertising/promotion is alleged to be misleading. To determine this status, FDA takes into account the representations made (or suggested) by the statement, word, design, device, or any combination of the aforementioned. The FDA also considers the extent to which the labeling or the advertising/promotion fails to reveal facts that are material in light of such representations or material with respect to the consequences that could result from the use of the article to which the labeling

or advertising/promotion relates under the conditions of use prescribed in the labeling and advertising/promotion or under such conditions of use as are customary or usual.

## CONTENT AND FORMAT REQUIREMENT FOR PRESCRIPTION DRUG PI

FDA has recently implemented new content and format for label requirements that will affect all new and recently approved prescription drugs to make it easier for health-care professionals to access, read, and use PI. These changes have been implemented to enhance ease of use and comprehension of the PI. Most notably, the new format will include a "highlights" section and a "Table of Contents." The "highlights" will contain the information that the health-care professional most frequently refers to and considers the most important. The "Table of Contents" includes section numbers for quick reference to various sections of the PI. In addition to the new content and format of the PI, sections of the PI will also be reorganized to allow easier access to the more commonly used/critical sections.

## GENERAL FDA POLICIES FOR PROMOTING DRUGS

FDA has made it clear to pharmaceutical firms that all advertising and promotional materials to be used for specific regulated categories, such as prescription drugs, must be submitted to FDA routinely at the time of first use. The materials concerned include advertisements, detailing pieces, product brochures, price lists, audio–visual materials, and all other materials that fall into the category of advertising or promotional labeling. These requirements apply to the standard forms of marketing and advertising/promotion including electronic advertising.

When these submissions occur, the firm must complete form FDA 2253, entitled "Transmittal of Advertisements and Promotional Labeling for Drugs and Biologics for Human Use." The name, title, and signature of the submitting official must be included on form FDA 2253. All such materials must be submitted to CDER's DDMAC. In order to expedite the review process, companies are required to submit referenced materials with all promotional materials in which the references are cited. DDMAC has issued notice of violation letters when firms "batch" several promotions for collective submission after some or all of the materials have been disseminated since submission to DDMAC is required upon dissemination of promotional materials.

## PRECLEARANCE OF PROMOTIONAL LAUNCH MATERIALS

Normally, the routine submission of promotional materials is not required in advance of use. This applies to all health-care professional and direct-to-consumer advertising. However, FDA does specify that if information on the product is not widely known, if the medicine may cause fatalities or serious danger to patients, or if the company has been notified by CDER of a need to publicize such information and has not yet satisfactorily complied, then FDA requires prior approval of the promotion. In addition, there are two other situations in which preclearance of marketing and promotional materials is required or strongly advisable, namely:

1. When it is believed that there has been a serious or repeated violation of FDA regulations by the firm.
2. When a major new product is being introduced, the FDA generally requests that the initial marketing and advertising/promotional materials be submitted voluntarily.

## ITEMS FOR PRECLEARANCE

Although submission of prelaunch materials to DDMAC is strictly on a voluntary basis, the FDA encourages companies to seek advisory comments on core materials that are representative of the launch campaign. Core materials include the primary detail aid, the primary journal advertisement, introductory letters, and press releases. FDA also requests that submissions for advisory comments be accompanied by hard copies of all references annotated and highlighted that support the claims of the promotional materials. If core materials are submitted to DDMAC for advisory comments before labeling is final, DDMAC will consult with the responsible review divisions to ascertain product status. If critical matters or concerns, such as safety or efficacy issues are identified, DDMAC will not review core materials. "All core materials that are submitted to DDMAC for advisory comments should be submitted in triplicate, with a cover letter specifically stating that advisory comments are being requested." It is permissible to call DDMAC to advise that materials are being submitted for advisory comments and to inquire about the current time queue. Even though DDMAC reviews preclearance materials on a first-in/first-out basis, it is helpful if the request for expedited review of core materials includes a prioritized list of the order in which the materials are needed. The length of time that a review takes is dependent upon many factors, including, but not limited to, the complexity of the promotional materials submitted, the quality of the submission, the staffing in the review division, and the overall status of the product review/approval process. In the event that DDMAC is unable to provide advisory comments in an expeditious manner, a company may decide to withdraw its request for advisory comments and disseminate promotional materials. In such instances, DDMAC should be notified immediately and materials should be submitted on form FDA 2253 upon dissemination.

## FAIR BALANCE

Every advertisement must meet FDA's "Fair Balance" requirements (26), which mean that FDA has mandated, through administrative authority, that interpretative risks associated with a product must be clearly identified to offset the product's benefits. This applies to all promotional materials, including advertisements (printed and electronic), detail aids, and public relations materials.

In April 1994, CDER indicated that fair balance applies equally to the content and the format of promotional materials. It will consider both the representations that are made for the product and the extent to which the labeling or promotion fails to reveal "material" facts about potential consequences resulting from the product's use. In other words, the benefits of the product must be in balance with the risks associated with its use.

A company's compliance with this FDA fair balance provision varies depending on the nature (type) of promotional material. It also seems to ebb and flow in

*Glassman et al.*

the extent of risk balance needed. However, the day of the inclusion of the product package insert or the brief product summary to meet the requirements of fair balance is long gone. Fair balance now requires the promotion to include risk information and qualifiers to effectiveness claims or study data to be in prominence and readability that is comparable to the effectiveness-related information that is presented. DDMAC has made it clear that risk information that is placed within the footnotes and not in the body of the text of a promotional piece does not meet the requirements for fair balance if the benefit information is included in the main body of a promotional piece. In short, fair balance, as interpreted by FDA/DDMAC, requires substantial qualification and presentation of risk and substantial, well-established, evidence of safety and effectiveness.

The following are examples of violations in which a promotional piece may be false or misleading or fair balance may not be sufficient to preclude agency notification:

1. Claims made comparing the product with another product without specific proof.
2. Making claims that the product is safer or more effective than the labeling indicates.
3. Misrepresenting a study or other information pertaining to the clinical data as it pertains to the product.
4. Using product graphics in a misleading manner.
5. Using a study that is badly (poorly) designed.
6. Misrepresenting the statistical data.
7. Misusing the graphics for the promotional material.
8. Misrepresenting what is accepted as the product's mechanism of action.
9. Failing to provide a balanced emphasis of product warnings, precautions, side effects, and contraindications.
10. When appearing on multiple pages, failing to clarify where the product's fair balance statement appears.
11. In the case of a multiple page advertisement, failing to refer readers to the product's fair balance statement if located on a different or multiple page(s).

## Black Box Warning Promotion

Drugs that are considered by the FDA to be associated with a major risk or hazard, even when the drug is used as directed, must contain a black box warning within the package insert. Such warnings are highlighted by a black box outline and appear at the beginning of the full PI and in summary form at the beginning of the highlights section of the package insert when applicable. Black box warnings contain the most significant warnings and/or contraindications associated with the drug. Because of the risks associated with these types of drugs, additional regulations are applicable for promotion. For instance, reminder ads, that call attention to the name of a drug but do not make any drug claims, are not permitted for drugs that contain black box warnings, or for drugs in the preapproval stage that may potentially include black box warnings. It is imperative that all relevant information contained within a black box warning is included to fairly balance any promotional materials.

## BRIEF SUMMARY OF PRODUCT INFORMATION

When FDA required product information (PI) for all promotional material, the practical matter of cost to include the full PI in journal advertising became an issue. Journal advertising space is sold by the page. The need to add a one-, two-, or three-page PI to a one-page promotional message obviously would double, triple, or quadruple the cost of promoting a product by advertising in medical journals. Therefore, a practical solution was agreed upon. FDA found that the labeling contained in a journal advertisement would be in compliance if it contained an abbreviated product information summary. This usually could be contained in a column or a page encompassing a true (correct) statement, or brief summary of information that relates to the product's side effects, warnings, precautions, contraindications, and adverse reactions from the approved product package insert (27).

### Wrap-Around Advertisements

DDMAC further clarified in April 1994 that "wrap-around" advertisements, those presenting advertising copy in the front of a publication with the brief summary in the back, were not in compliance with brief summary requirements. It stated that the brief summary must appear adjacent to the advertisement (28) and that an advertisement appearing in the front of a publication with the brief summary in the back of the publication that is separated by the entire contents of the publication is not compliant.

### Electronic Advertisements

The preceding requirements also apply to electronic advertisements. Such advertisements, as well as commercials, must include warnings, precautions, major side effects, and contraindications in either the audio or the audio and video portions of the presentation. A number of company violations have occurred in the establishment of rules for electronic advertisements. The companies concerned were issued a violation warning with a complete explanation of the extent to which FDA considered that the matter of fair balance was violated. The companies concerned then complied with the FDA's request to change or modify the advertisement/commercial.

### Reference to the Product Generic Name

In the 1960s, FDA regulated that the generic name of each product must be referenced in advertising/promotion for brand-name drugs. The generic name must be cited, for example, the first time, or with the most prominent placement, on each page each time the brand name is featured. Also, the type size of the generic name, except where there are combinations of active ingredients, must be at least half the type size of the brand name and must have prominence comparable to the brand name. Many in the industry consider this matter to be more political than regulatory, especially in light of the efforts that have and are continuing to be made to drive physician prescriptions and pharmacy dispensing to the usage of generic versus trademark drugs.

### Reminder and Other Advertisements Exempt from the Brief Summary Requirement

FDA has indicated that some advertisements—generally, prelaunch and reminder ads—are exempt from the brief summary requirement. These ads are designed to

*Glassman et al.*

call attention to the drug but do not include the product indications, dosage recommendations, or any beneficial claims. However, it should be noted that these ads are not permitted for products that carry, or may be anticipated to carry, a black box warning, which is imposed by FDA to highlight a particular major health issue related to the use of a product.

Reminder advertisements in the past were commonly used for a product with a well-established brand name. FDA restrictions today limit the use of reminder promotion. Note that ads for generic drugs that include representations of the bioequivalence of the products as compared to the brand-name products are not considered reminder ads and must contain prescription disclosure information. Advertisements that focus exclusively on price are technically reminder ads and thus exempt from brief summary requirements.

Help-seeking advertisements are designed to inform the consumer of the symptoms of a particular condition, encouraging the consumer to see a health-care professional in order to discuss appropriate treatment options. This type of promotion is exempt from the brief summary requirement. However, such ads must not refer to a particular prescription product, imply that the product is the preferred treatment for the condition featured, or discuss any unique properties of the drug that allow for its identification.

Bulk-sale drugs are exempt from carrying the brief summary if they are intended to be processed, manufactured, labeled, or repackaged in substantial quantities. They also must not contain any claims of safety or efficacy.

Drugs sold to pharmacists for compounding are also exempt from the brief summary requirement as long as they make no safety or efficacy claims.

## PROMOTION OF PRESCRIPTION DRUGS FOUND LESS THAN EFFECTIVE IN THE "DRUG EFFICACY STUDY"

A major effort to require that all drugs be proven not only safe (as required under the 1938 law) but also effective was put into action when Congress in 1962 amended the FD&C Act to this effect. Based on this amendment, FDA decided that all drugs approved between 1938 and 1962 on the basis of safety alone should be evaluated on the basis of efficacy claims.

This massive study was initially performed by panels of experts under the aegis of the NAS/NRC. It became known as the "Drug Efficacy Study," which placed indications for all reviewed drugs into one of the following six categories:

1. Effective
2. Probably effective
3. Possibly effective
4. Ineffective
5. Ineffective as a fixed combination
6. Effective but

As a result of this extensive review, hundreds of older medicine formulations were removed from the marketplace. Additionally, claims that were unproven were eliminated from drug labeling.

The FDA regulations provide for disclosure in both the label and promotion of the status of those drugs and indications that were found to be less than fully effective. The labeling for those drugs with indications found to be less than fully

effective should carry a box statement as to this fact. Because there are relatively few medicines remaining with "probably effective or possibly effective" indications, this section of the regulations is seldom applied.

## FDA ISSUES CONCERNING COMPANY EFFORTS TO PROMOTE PRESCRIPTION DRUGS

There is a substantial number of issues concerning the FDA regulations for company advertising/promotion of prescription products, including company efforts regarding comparative advertising, price advertising, promotion of unapproved product indications, advertising for investigational and orphan products, and promoting to formularies. In order to understand these issues, each will be reviewed separately.

### Comparative Advertising/Promotion and Claims of Superiority

In general, FDA tends to discourage company marketing and advertising/promotion that compares specific products or makes claim of superiority of one product to another. However, in April 1994 CDER released a statement that set standards for claims that "represent, suggest or imply that their product's safety or effectiveness is comparable or superior to that of a competing product or products" (29). But, with this proviso appeared the statement that such claims were then considered to be subject to the same standards of review as for efficacy and safety claims in a product's approved labeling.

A company that makes such claims must support them with substantial evidence or substantial clinical experience that supports the claims presented. CDER further stipulated that such a comparison must be derived from a well-controlled study that compares the products, head to head. The CDER statement indicated that effectiveness claims should be based on at least two adequate, well-controlled studies. Safety claims normally require direct comparisons between the products being compared. Also, there should be statistical clinical therapeutic significance between the products in the comparison.

Another significant guideline in CDER's statement is that both drugs being compared must have been approved for at least the same indications being compared and that the dosage regimens being compared must be consistent with the dosage recommendations in the approved labeling and in the same part of the dose range.

Before the claim can be used in company advertising/promotion, CDER recommends, but does not require, that the studies be reviewed by its medical reviewers. Therefore, CDER indicated that the data also could be submitted upon dissemination of the advertising/promotional claim. The matter of comparative advertising/promotion has thus been made quite clear from the FDA's regulatory perspective.

### Price Advertising/Promotion

This is an area of product advertising/promotion that is not always well understood. Thus, the FDA has certain rules that set the conditions for a company using this marketing approach, namely:

1. That the only purpose of the promotion is to advertise price.
2. That the promotion states nothing about the product's safety or efficacy.

3. That both the brand and generic names of the drug be contained in the promotion, as well as, the dosage strength for each ingredient.
4. That the promotion explains the charge for a specific product, strength, dosage form, and quantity.
5. That all product charges are included in the promoted price.

This type of promotion also may include other information, such as the identification of professional services provided by the pharmacy or pharmaceutical company, as long as it is not false or misleading.

If some pharmaceutical manufacturers advertise nationally that their drugs are less expensive than competing or similar products, but no specific price is indicated, the promotion is not considered to be traditional price advertising.

## Promotion of Unapproved Product Indications and Off-Label Claims

Unapproved product indications and off-label claims are two areas of intense FDA scrutiny. The main concern of the FDA regarding marketing and promotion is the application of traditional and nontraditional promotion and/or scientific dissemination of unapproved off-label claims for marketed drugs. It is the agency's contention that such promotion has the greatest potential to damage public health because it encourages patients to seek, and doctors to prescribe, products for indications and modes of actions that have not been approved by FDA. Another major concern to FDA is the promotion of products during the preapproval stage. This is a period during which opinions are being formed by clinicians as to the potential range of usefulness (i.e., the indication(s), mode of actions, safety, and effectiveness) for the product being evaluated.

Once the product is approved, it becomes difficult for physicians to limit their prescribing of the product only for approved indications, risks, effectiveness, or mode of action if, in fact, they are aware that the drug is useful for other purposes or has other effects due to the preapproval promotion for the product.

Therefore, the FDA has indicated that an unapproved product or use can be promoted at independent scientific symposia and scientific exhibits. But the materials developed from the symposia may not be used in preapproval promotion campaigns. After approval, these unapproved claims can be made only within a tightly defined set of circumstances, under the umbrella of scientific information disseminated through set criteria (see section "Educational and Scientific Events" of this chapter).

## Two Types of Permitted Preapproval Promotion

Safety and efficacy claims are not allowed for a drug during FDA review, or prior to FDA approval, of an indication. And, although preapproval promotion is generally not permitted, there are two exceptions to the regulations that allow institutional or coming soon promotion. Institutional promotional materials identify a drug company and state that the company is conducting research in a specific therapeutic area, but do not identify the drug. Coming soon promotional materials announce the name of a new drug, but do not include any representations regarding the intended use, safety, or efficacy of the drug. Coming soon promotional materials cannot be used for a drug that will include or is likely to include a black box warning. A company that chooses to use either institutional or coming soon promotion

must choose one type of promotion only. A company cannot use both types of promotion for the same drug.

Although regulations do not allow safety, efficacy, or mode of action claims for a drug prior to approval, scientific exchange is allowed. Scientific exhibits can include information about unapproved drugs as long as exhibits are clearly separate from commercial areas, staffed only by scientists or medical personnel, and free of commercial materials.

## Advertising for Investigational Products

FDA "specifically prohibits any claims of safety or efficacy for the product being researched, or any claims that the product is equivalent or superior to another— such claims would violate FDA regulations concerning promotion of investigational drugs" (30). An FDA policy on the subject explains that Institutional Review Boards (IRBs) are responsible for reviewing how research subjects are selected. It also indicates that the clinical investigators may use advertising to attract research subjects, but an IRB should approve such advertising. FDA considers the IRB review to be necessary in order to ensure that the request for participants is not misleading to subjects, especially in those circumstances in which a study will involve persons with acute or severe physical or mental illness or persons who are economically or educationally disadvantaged.

## Orphan Drug Act 1983

The Orphan Drug Act was passed by Congress in 1983 to stimulate development of drugs for rare diseases. The act provides for grants for research, marketing exclusivity for 7 years to the first sponsor to obtain FDA product approval, and FDA assistance including development incentives for research and marketing of drugs for serious rare diseases or conditions that affect fewer than 200,000 people. Among other incentives, such as tax benefits, FDA also provides firms with recommendations on studies required to obtain product approval and encourages sponsors to make orphan drugs available for treatment on an "open protocol" basis prior to final FDA approval for marketing. The act was passed in an effort to attract firms to develop and manufacture products that may have or may appear to have limited profitability.

## Promoting to Formularies

Due to the industry's increasing promotion to managed care groups, hospitals, and formularies, FDA presented a guidance regarding the promotion of products to drug formularies. FDA indicated that it considers all formulary informational material or kits to be promotional. As such, the formulary informational kits are considered by FDA to be any materials prepared for review by pharmaceutic and therapeutic committees, etc., that review a regulated product and are prepared for, and disseminated to hospitals, managed health-care organizations, buying groups, and other institutions. However, formulary informational material kits are exempt from the FDA submission requirement if they are prepared in response to unsolicited requests for information. In addition, "Under the FDA Modernization Act of 1997, pharmacoeconomic information provided to a formulary committee will not be considered false or misleading if the information 'directly relates to' an approved indication for the drug and is based on competent and reliable scientific evidence" (31).

In 2000, The Academy of Managed Care Pharmacy (AMCP) format for formulary submissions was established. AMCP urges plans to formally request standardized dossiers from drug companies. Such requests for an AMCP dossier made by a plan must be strictly on an unsolicited basis. AMCP recommends that all dossiers include detailed information regarding a drug's efficacy and safety, overall economic value relative to alternative therapies, published and unpublished studies, data on off-label indications, drug's place in therapy, related disease management strategies, and economic model to provide evidence of value. The AMCP may only be disseminated after product approval and must be compliant with FDA standards: provided upon a truly unsolicited request and not prompted, information must not be false or misleading; response must be specific to requestor, pharmacoeconomic models must be transparent, and model assumptions must be clearly stated. Companies must assure that the dossier is not promotional, must refrain from taking any proactive steps that may be construed as marketing and/or promotion, cannot prepare identical dossiers with the intent of soliciting plans or informing plans of the availability of a dossier, and must assure that dossier is provided peer to peer.

## DIRECT-TO-CONSUMER ADVERTISING

Direct-to-consumer (DTC) advertising has had an immense impact on the increased sales of prescription drugs. Many consider DTC advertising to be a prime mover in increasing the volume of drugs used in the United States. In a study conducted by the National Institute for Health Care Management, it was reported that the increases in sales for the 50 drugs that were most heavily advertised to consumers accounted for almost half of the multibillion-dollar increase in drug spending (32). DTC advertising seems almost like the genie that regulatory groups find a need to contain.

FDA has been opposed to DTC advertising of prescription drugs since inception, but DTC advertising remains legal as long as it fully complies with all of the FDA regulations applicable to prescription drug advertising and any relevant laws or regulations enforced by other federal authorities, such as the FTC. According to FDA, DTC advertising consists of any materials that are intended by the manufacturer to be seen or used by a consumer, including traditional product print and electronic advertisements, computer e-mails or Web sites, videotapes, cassettes, pamphlets, brochures, and other printed materials.

Because of FDA's earlier negative attitude toward DTC advertising, it was not expected that this promotional medium would thrive. However, the future of DTC advertising was changed in 1982 when FDA Commissioner Albert Hull Hayes, Jr. predicted that this country "may be on the brink of the exponential growth … of direct-to-consumer promotion of prescription products" (33).

After seeking a voluntary moratorium on DTC advertising in 1983, the moratorium was lifted by FDA in 1985. Although it did not encourage DTC advertising, FDA permitted such advertising as long as it met all the provisions of the labeling and advertising requirements.

Of interest is the fact that the initial results from an FDA 2002 consumer survey, released at the April 2002 DTC National Conference in Boston, appear to justify continued FDA support for DTC advertising. Eighty-one percent of the consumers surveyed by FDA indicated that they had seen a drug advertisement in the past

3 months (34). Even former FDA Commissioner David Kessler, who spent years at the FDA rejecting staff requests that he allow regulations to be changed to permit DTC advertising, admitted that he was wrong in adhering to that position (35).

However, U.S. physicians continue to indicate that they do not like DTC advertising by pharmaceutical companies. More than 46% of the physicians surveyed stated that DTC advertising negatively affects their impression of the drug companies that sponsor the promotion. Contrary to these findings, the sixth biennial Scott-Levin Pharmaceutical Company Image 2002 study showed that DTC-promoting companies enjoy high esteem by physicians (36). DTC advertising controversy continues to this date, particularly for the DTC promotions that highlight a condition or therapy and encourage patients to seek physician treatment.

## FDA POLICY ON DTC ADVERTISING

The following general guidelines for DTC advertising are delineated by FDA:

1. DTC advertisements that meet the requirements of reminder and/or help-seeking promotions can be sponsored by pharmaceutical companies. But such advertisements should be designed to be educational rather than promotional and deliver the basic message to "see your doctor."
2. Advertisements that mention specific products are allowed, but must meet every condition that applies to prescription drug advertising directed at physicians. This includes the appearance of information that is contained in the product package insert. A fair balance of product information is required.
3. DTC advertisements that have been defined to include materials, such as product brochures, that may also be regarded as labeling may be voluntarily submitted to FDA for clearance in advance of their use.
4. Although FDA may initially clear a DTC advertisement voluntarily submitted by a firm, the agency may later take regulatory action following the advertisement's appearance if it considers it to be misleading in some manner.
5. DTC advertisements or other promotional materials must not indicate that only physicians can prescribe prescription drugs, because there are many instances in which nurse practitioners or physician assistants may also prescribe such drugs.
6. The FDA, whose officers continue to object to DTC advertising in principle, expresses concern over broadcast DTC advertisements. Those broadcast advertisements that include a major statement of the drug's critical risk information, present all of the product's indications and contraindications in consumer-friendly language, and are not false or misleading may fulfill the FDA's adequate provision requirements (37).

The FDA guidance outlines adequate methods of information dissemination, namely:

1. A toll-free telephone number. This should provide the consumer with several options, such as the full package insert mailed to them, or read to them over the telephone, or the full package labeling sent via e-mail or accessible via the Internet. Each method should provide requested information to the consumer in a timely manner.
2. Reference to a print advertisement or brochures that are publicly available.

3. A statement that indicates that physicians and/or pharmacists may serve as another source of information.
4. An Internet Web site address that directs consumers to the approved package labeling.

The FDA mechanisms described earlier will satisfy the adequate information provision requirement, but pharmaceutical companies may use an alternative approach if it satisfies the regulatory requirements. However, regardless of the preceding, consumer groups and members of Congress continually criticize the use of DTC promotion and legislation is being proposed to curb or eliminate the promotional practice.

Additionally, with the continued wake of criticism against industry for DTC advertisements, PhRMA adopted a voluntary set of guiding principles for DTC advertising, with which the great majority of the industry members comply. The guiding principles uphold the standards required by the FDA: to be accurate and not misleading, to make claims only when supported by substantial evidence, to reflect balance between risks and benefits, and to be consistent with the FDA-approved labeling.

Since it has been well established that DTC communications about prescription drugs serve the public health by increasing awareness about disease; educating patients about treatment options; motivating patients to contact their physicians and engage in a dialogue about health concerns; increasing the likelihood that patients will receive appropriate care for conditions that are frequently underdiagnosed and undertreated; and encouraging compliance with prescription drug treatment regimens, and to demonstrate PhRMA's commitment to serve as valuable contributors to public health, a number of voluntary guiding principles were established. PhRMA Guiding Principles, in part, state the following:

* To responsibly educate the consumer about the medicine and the condition for which it may be prescribed.
* Clearly indicate that the medicine is a prescription drug.
* Foster responsible communications between patients and health-care professionals.
* Companies should:
  ○ Spend an appropriate amount of time to educate health-care professionals about a new medicine or a new therapeutic indication before commencing the first DTC campaign,
  ○ Continue to responsibly alter or discontinue a DTC advertising campaign should new and reliable information indicate a serious previously unknown safety risk, and
  ○ Submit all new DTC television advertisements to the FDA before releasing for broadcast.
* Advertising should include information about the availability of other options such as diet and lifestyle changes where appropriate for the advertised condition.
* DTC television advertising that identifies a product by name should clearly state the conditions for which the medicine is approved and the major risks associated with the medicine.
* Advertising should be designed to achieve a balanced presentation of both the benefits and the risks associated with the medicine.

- Advertising should respect the seriousness of the health conditions and the medicines being advertised.
- Advertisements should be targeted to avoid audiences that are not age appropriate for the messages.
- Companies are encouraged to:
  - Promote health and disease awareness and
  - Include information, where feasible, about help for the uninsured or under-insured (38).

## PRESCRIPTION DRUG USER FEE ACT (IV)

The PDUFA (IV) was to establish a separate user fee program for DDMAC review of DTC television advertisements. With the impetus of Congress and consumers concerned about DTC advertisements that overstate benefits but do not fully convey risks, PDUFA was to help fund expeditious review of DTC television advertisements for prescription drugs. Timely FDA advisory comments on DTC television advertisements would increase incentives for voluntary submission, which would lead to better quality advertisements.

Approximately $6.25 million were to be collected annually, from the pharmaceutical industry, which would fund 27 Full Time Staff reviewers. User fees would only be paid by firms that submitted DTC TV advertisements for advisory comments. Currently, there are approximately 30 firms that seek advisory comments on DTC prescription drug advertisements for television. However, the DTC television advertisement user fee program was abandoned in January 2008, before inception, since the necessary user fees for the program were not provided in advance by firms as required.

## ADVERTISING ON THE INTERNET

The growth of consumer interest in health-care information on the Internet has been phenomenal. Even a few years ago, some 70 million Americans searched the web for information on such subjects as diseases, nutrition, pharmaceuticals, and related topics, and this use is still growing (39). Now consumers can obtain more information from the Internet about drugs than they can get from their health-care providers. As a result, pharmaceutical companies have substantially increased their use of the Internet as a vehicle for marketing to consumers and the medical profession.

The interest of physicians for health information on the Internet seems to be moving hand-in-hand with that of consumers who view their physicians as the most valuable source of this information. A recent study indicated that physician demand for e-detailing is significant and growing: "Eighty-one percent of the physicians surveyed think it's a good idea to have access to this type of information when and where it is convenient" (40). It must also be pointed out that many companies provide physician monetary honorariums for the time spent by physicians during e-detailing.

Because of the extremely rapid growth of consumer and physician interest in health information on the Internet and the growing use of this vehicle for marketing promotion by the pharmaceutical industry, DDMAC has been designated to serve as an agency-wide working group to draft policy on marketing and advertising/

promotion on the Internet (41). Thus, FDA intends to issue a document that provides the drug companies with this guidance in the near future.

## NON-TRADITIONAL PROMOTION—FDA POLICIES

For many years, pharmaceutical firms advertised and promoted their products primarily through journal advertising, direct mail, detailing by sales representatives, sampling, and hospital exhibits. However, due to the advent of newer communication technologies, an increased level of consumers of health care, and greater competition within the industry, many new ways to promote products have been adopted (42). These newer methods of product promotion include medical symposia, public relations techniques, greater use of single-sponsor publications, an increased use of electronic media, and responses to unsolicited requests for information. As a result, FDA has adapted existing, traditional policies to cover these new communications vehicles.

Such FDA policies on nontraditional promotion are not written in a single document but, rather, are learned and understood by the regulated industry through various methods, such as warning letters, policy announcements, the issuance of guidance documents, or by similar means. Fairness in dealing with these issues has been reflective of the FDA policy. These policies are briefly explored later.

### Educational and Scientific Events

FDA's final guidance on industry-sponsored scientific and educational activities was issued in December 1997. This applies to all communications about or regarding FDA-regulated medical products, including prescription medicines, made by, or on behalf of the company. Essentially, this FDA policy states that all such activities that are controlled or substantially influenced by a company must meet all of the traditional FDA requirements for marketing and promotional labeling, including full disclosure and fair balance (43).

What has concerned the FDA about company-sponsored activities is that the companies may influence the content of educational programs by being involved in the selection of speakers and/or direct the content of the activities. FDA also indicated that it would focus intense scrutiny on any discussion of unapproved uses/claims involving marketed products.

DDMAC had previously stated that materials developed from symposia could not be used in preapproval promotion campaigns. However, DDMAC has stated that in conducting scientific exhibits, information about unapproved drugs and drug claims can be displayed in an area that is clearly separated from the commercial exhibit area; is staffed by scientific personnel only; and has no commercial materials for distribution.

DDMAC indicated that pharmaceutical companies might disseminate scientific reprints about an approved product as long as its focus is on FDA-approved labeling which is published in a reputable peer-review journal. In all instances, the companies must use promotional information in the reference text that is consistent with the product's approved labeling.

Essentially, if a product communication is made either by or on behalf of a company, all FDA promotional and advertising regulations apply except for the following exclusions:

- Response to an unsolicited medical request from a health care practitioner that is not prompted in any manner by the company or any representative of the company. Note that a response to an unsolicited request may contain information that is not included in the approved labeling if the information provided is a direct response to the unsolicited request.
- Dissemination of a peer-reviewed scientific journal reprint that includes unapproved uses of an FDA-approved drug to health-care professionals is allowed in accord with section 401 of the FDAMA.

Thus, FDA's Guidance on Industry Support of Scientific and Educational Activities "ISSEA Guidance" established recommendations to help evaluate independence of activities regarding industry-sponsored scientific and educational activities in order to adhere to compliance of guidance. The guidance addresses issues such as:

1. Control of program content;
2. Selection process of organizing firm, presenters, and moderators;
3. Disclosures regarding funding for program(s);
4. Disclosures regarding unapproved uses of product(s) presented;
5. Disclosures of relationship between company and firm organizing program, presenters, and/or moderators;
6. Educational tone of program;
7. Organizing firms standards of independence, objectivity, scientific rigor, and balance; and
8. Promotional tone or component of program, including, but not limited to audience selection, dissemination of materials, bias in manner, or presentation.

An independent scientific or educational activity that is independent (free of the influence) of the company and is not promotional adheres to the guidance. A company may provide a grant to support an educational activity even if the activity refers to an unapproved product or an unapproved use of a product as long as the activity is both nonpromotional and free of the company's influence. As is the case for peer reviewed scientific journal reprints of unapproved product uses, the FDA tightly regulates and monitors information disseminated from scientific and educational sources.

## Public Relations Materials

FDA considers product-specific public relations materials as labeling if they are included in press releases, kits, or backgrounders and used by the media. FDA thus requires that all such materials be fairly balanced, containing both the benefits and indications of the product and a fair representation of the risks associated with the product's use.

FDA has no formal requirement that public relations material for drugs be submitted to the agency for preclearance. However, if a new drug which may have a significant impact on public health is about to be approved by FDA, the agency often requests the materials for preclearance. If the pharmaceutical firm submits the materials, but decides to ignore the agency's comments on the materials, it does so at its own risk.

When a company plans to make a major public announcement about a drug, it is usually a good idea for the company to provide the press materials to the FDA

*Glassman et al.*

Office of Public Affairs and to the appropriate office within CDER for preclearance (44).

Although there is no formal policy that requires public relations materials to be submitted to DDMAC, FDA does expect product-specific public relations materials to be submitted at time of first use.

## Drug Sampling

The use of samples as an effective part of the marketing/promotion effort has become a point of contention in recent years and deserves each company's close attention relative to effective promotion versus violations of intended use in promotion. The distribution of prescription drug samples to health-care professionals by company sales representatives, through the mail, or via a common carrier is enforced by the Prescription Drug Marketing Act of 1987 (PDMA).

Under PDMA, health-care practitioners must request samples in writing and include the name, address, professional designation, and signature of the practitioner who makes the request. The identity and quantity of the samples requested must also be provided, in addition to the name of the manufacturer and the date requested (45). This law was passed in order to correct alleged abuses such as diverting the samples into channels where the samples could be sold. FDA has indicated that decades of sampling abuses have resulted in the sale of misbranded, expired, and adulterated pharmaceutical products to consumers.

The matter of sample abuse in promotion had become such an urgent issue to the FDA that in the October 3, 2002, issue of the *Federal Register*, the Office of the Inspector General (OIG), Department of Health and Human Services stated, in part: "The provision of drug samples is a widespread industry practice that can benefit patients, but can also be an area of potential risk to the pharmaceutical manufacturer. PDMA, The Prescription Drug Marketing Act of 1987 governs the distribution of samples and forbids their sale. A drug sample . . . is intended to promote the sale of the drug" (46).

A case in point was the situation in which the FDA's Office of Criminal Investigation and other law enforcement agencies charged a former pharmaceutical sales representative with "failing to comply with federal regulations governing distribution of free drug samples to physicians. The sales representative allegedly provided samples of a steroid product used in the treatment of prostate cancer to urologists who had not provided a written request for the samples as required by law. Apparently, the sales representative was instructed by the district manager and other company officials to use the samples as a tool to help obtain sales of the drug" (47).

This issue is so critical that all drug manufacturers have been urged by their trade associations to closely follow PDMA requirements including maintaining all documentation that is required. The PhRMA, in the July 1, 2002, New Marketing Code indicated that product samples should be provided for patient use in accordance with the Prescription Drug Marketing Act. It is quite clear to marketing executives that product samples are designed as an integral part of promotion to physicians, to be used as "starters" for patients being treated. The industry is in full agreement that abusive uses of product samples should never be tolerated.

However, the current distribution of samples, as mandated by FDA, has substantially increased sampling costs as part of the marketing budget for promoting each product. And yet there do not appear to be any controls on how the physicians (who request samples) actually use the product samples. It is likely that sample

distribution by pharmaceutical companies and sample dispensing to patients by doctors will be clearly monitored and new laws/guidelines to previous abuses will be passed.

The PDMA states that it is illegal to sell, trade, or profit from prescription drug samples. Federal and state laws regulate and establish civil and criminal penalties for violations of the PDMA. Penalties for violations may apply to individual Sales Representatives as well as pharmaceutical companies. An authorized distributor of drug samples must establish, maintain, and adhere to written policies and procedures that delineate the administrative systems for distributing drug samples, including, but not limited to the following: reconciliation of requests and receipts; conducting annual physical inventories; implementing a sample distribution security and audit system; and identifying and monitoring a significant loss of drug samples. The PDMA mandates the storage, handling, and record-keeping requirements for distribution of prescription drug samples and mandates verification with the appropriate state authority that the practitioner has a current license or is authorized to prescribe the sampled drug. Additional requirements for controlled drug samples must also be adhered to. Additionally, the regulations also provide for a reward for information leading to the institution of a criminal proceeding against, and conviction of, a person for the purchase, sale, or trade of a drug sample. A person who provides information that leads to a successful criminal prosecution may be entitled to one-half of the criminal fine imposed and collected for such a violation, but not more than $125,000.

One section within the PDMA established the "Pedigree" requirement for prescription drugs. A drug pedigree is a statement of origin that identifies each prior sale, purchase, or trade of a drug including the date of the transactions and the names and the addresses of the parties involved. Under the pedigree requirement, each person who is engaged in the wholesale distribution of a prescription drug into interstate commerce, who is not the manufacturer or authorized distributor of record for that drug, must provide to the person who receives that drug, a pedigree for that drug. This requirement was established to maintain a clear and accurate record of the movement of drugs and to prevent illegal diversion and unauthorized prescription drug transactions.

### Single-Sponsor Publications

"Because the FDA regulates only materials sponsored by FDA-regulated companies, there is a question about whether or not publications by independent publishers can be regulated, regardless of company influence" (48).

There has been much controversy and misunderstanding concerning single-sponsor publications financed by pharmaceutical firms because these publications often involve parties, such as organizations that sponsor continuing medical education programs, or medical journals that publish these documents as supplements.

Single-sponsor publications, including product monographs, are closely monitored by CDER because there is the potential that such publications can be clearly influenced by companies that want to promote unapproved product indications. In general, FDA regards the publication as labeling, and thus the publication must accurately portray the uses of the drug referenced and provide the traditional fair balance. In other words, FDA believes that simply because a medical journal or other commercial publication is involved in a single-sponsor publication, the sponsoring company is not relieved of regulatory responsibility.

## Company Representatives: Drug Detailing Activities

This is the most predominant form of promotion for most companies and one that is always under the scrutiny of FDA. FDA considers all of the materials utilized by drug sales representatives as subject to the advertising/promotion regulations. Therefore, during a product's preapproval stage, sales representatives may not provide physicians with materials about product indications or information that is not yet approved.

Often the question arises as to whether or not drug sales representatives are permitted to provide physicians with published clinical studies that appear in peer-reviewed medical journals. The FDA's position is that if it concerns an approved indication for the product, it can be provided to the medical profession. However, if an unapproved product indication or use/claim is discussed in the article (i.e., for a marketed product or during the preapproved stage), the article may not be given to physicians. An exception to this position would be the instance in which the physician requests (via a truly unsolicited request, not prompted by the sales representative) the article from the representative. It may then be provided, but FDA prefers that such requests be handled by the medical department of the company.

Verbal statements made by sales representatives to physicians about their products are also subject to FDA regulation but are virtually impossible for the FDA to monitor. However, a physician or other health-care practitioner may notify the agency about inappropriate statements or misrepresentations made by a sales representative, although enforcement action by the FDA against a drug company in this area has not yet occurred.

## Exhibits

Exhibits for drugs at medical meetings and conventions have become an increasingly popular part of the product's/company's overall promotion efforts. Thus, FDA considers all such materials used at these medical meetings to be subject to all of the marketing and advertising/promotion regulations for prescription drugs. Even the text of materials that are displayed at exhibits must meet FDA advertising/promotion regulations.

Because of FDA oversight, pharmaceutical companies need to pay as close attention to exhibit materials as they do to other regulated materials, such as print advertisements. Exhibits that present drugs during the preapproval stage will be considered violative by FDA if the materials mention a specific product indication. The same would apply to an exhibit that mentioned an unapproved indication or use/claim for an approved drug.

The pharmaceutical industry also has been reminded by FDA that all text for program books used at professional meetings must meet pharmaceutical advertising regulations for full disclosure if the company descriptions contain information about the drug's indications or usage.

## Responding to Requests for Information

Generally, DDMAC has assured the industry that their individual, nonpromotional responses to unsolicited requests for information will not be considered promotional labeling if each firm maintains documentation concerning the nature of the requests and shows no pattern that suggests that these requests were solicited or prompted by the sponsor (i.e., the firm). DDMAC further notes that the use of toll-free telephone numbers disclosed in promotional labeling or advertising, which

invite or somehow prompt requests for information, are considered to be forms of solicitation and thus are subject to all advertising and labeling requirements.

## FDA Policies for Broadcast Media

The informal FDA policy regarding the use of broadcast media in promotion is provided as issuance of guidance to the industry. If changes in broadcast advertising are required, FDA notifies the companies directly by letter and, subsequently, releases the changes required to the trade press.

When it was decided that all video news releases (VNRs) should be routinely submitted to FDA at the time of first use, this change in policy was communicated directly in a letter to all holders of approved New Drug Applications (NDAs) and Abbreviated New Drug Applications (ANDAs). This information was also provided to the trade press for dissemination.

## FDA Criteria for Advertising Electronically

Policies were developed by FDA, over a number of years, concerning physician-directed television advertising that is product specific. Such advertising must include the major risk statement and include access to the full PI. A toll-free telephone number, Web site address, and/or current nationwide publications are often referenced to alert viewers to the availability of additional patient information or the full PI. In addition, FDA requires that the product's generic name must be used in the advertisement and that fair balance must be included in the body of the advertisement, including major product warnings, precautions, side effects, adverse reactions, and contraindications.

Further, for products that are required to carry special warnings (i.e., black box warnings), information must be provided in the audio portion of the advertisement. The FDA was concerned that physicians not receive confusing or contradictory messages in any video broadcast advertisements that might obscure or undermine important product warning information (49).

## FDA Policy on Video News Releases

Health-related stories on television are among the most compelling subjects for TV viewers and, as such, are attractive to pharmaceutical companies via VNRs. VNRs can be used by TV stations in a manner that makes them seem to be original segments produced by the TV stations. A variant, called a "B-roll," is a video that contains raw footage that may include various segments of the manufacturing process, interviews with industry executives, health-care professionals or patients, animations, or other information related to a pharmaceutical product or the industry. These segments are distributed to news agencies that then create a finished news segment, in whole or part, based on the VNR submitted by the company.

Though specific rules for VNRs have not been set forth, FDA did issue a letter to all holders of NDAs and ANDAs that they submit the following information to the news outlet when the VNR is product oriented:

1. The VNR source or sponsor should be made clear to the TV station.
2. All product information or references should be within the approved labeling for the product.

3. When a specific product is mentioned, there should be "fair balance." In other words, the major warnings, precautions, contraindications, adverse reactions, and side effects related to the product should be included.
4. A product package insert should accompany the VNR. If the VNR is sent by satellite, a scroll of the package insert should be included.
5. For a product that is the subject of an NDA or ANDA, the VNR should be submitted to CDER when it is initially issued or disseminated. This includes accompanying information issued at the same time, that is, letters, scripts, press releases, and package inserts (50).

Although there has been some controversy over the use of VNRs, "Pharmaceutical companies . . . have become enamored with the VNR because it allows them to circumvent the usual restrictions concerning the use of television advertising to promote their prescription products directly to the consumer" (51). However, FDA has treated VNRs the same as it treats written press releases. The VNR is treated as labeling when specific products are mentioned and thus requires fair balance, discussing not just the product benefits but also the major risks of the drug.

## Infomercials

Infomercials are extended advertisements used on commercial and cable television. They may appear in the format of an entertainment or television show and have not been commonly used to promote prescription medicines to consumers.

Although the FDA does not have a specific written policy on infomercials, they are regarded as advertisements that are subject to established advertising and labeling regulations. To the extent that an infomercial mentions a drug or treatment, it must meet all disclosure and fair balance requirements.

## Radio–Television Media Tours and the Use of Celebrities

When a pharmaceutical firm sponsors a radio–television interview tour, FDA considers any product-specific content of the interview to be subject to regulations. This applies even if the spokesperson concerned is not employed by the pharmaceutical firm. FDA has been especially concerned when celebrities appear on such tours. Currently, there are no FDA regulations prohibiting either the use of celebrities to endorse prescription drugs or the use of radio–TV tours with paid spokespeople. However, it is interesting to note that one recent industry study showed that drug advertisements using celebrities are more memorable, but do not motivate patients to seek treatment.

FDA believes that firms that hire spokespersons, or use their employees in this role, must train them to keep their promotional statements in line with the product's approved labeling or to provide the perspective necessary to assure fair balance for the product.

## Guidelines for Advertising to Physicians on Radio

FDA does not object to advertising prescription drugs on the radio, as long as the product advertisements contain clear information about the product's warnings, precautions, side effects, and contraindications and provide a balanced presentation of the benefits as well as the risks of the drugs promoted.

## Telephone Advertising

Communications by telephone that discuss prescription medicines are considered by FDA to be subject to the same requirements as broadcast advertising. Those pharmaceutical firms that decide to disseminate product information to health-care professionals or consumers via a toll-free telephone number must include a major statement that provides information about product side effects, warnings, precautions, and contraindications before the listener can branch off to other segments of the telephone presentation. The full package insert should be readily available either to be read over the telephone, sent via mail, e-mail, or provided by a link via the Internet. Each method should provide the requested information in a timely manner. Just as with all prescription medicine advertisements, copies of the telephone recordings and scripts must be submitted to DDMAC at the time of initial use.

## CHANGING IMPACT OF FDA CONTROLS

Although the FDA was charged with the responsibility to regulate drug promotion throughout the years, it began to exert strong enforcement of the regulations in the late 1980s. FDA had become extremely concerned about the level of misleading promotion. This level of concern has focused on what the FDA considers exaggerations of claims, especially newly issued claims.

For example, a pharmaceutical corporation was warned by DDMAC concerning its cholesterol-lowering product DTC advertisement that appeared in major magazines and mistakenly suggested that this product lacked the side effects of other products of the same class. DDMAC stated a concern about a "continuing pattern and practice of violative behavior." The company pulled the misleading advertisement. Several other pharmaceutical companies have been forced to correct promotions considered to be misleading by DDMAC (52).

Increased pressure continues on FDA from external groups, as well as individuals, while the U.S. Congress has and continues to exert significant pressure on the FDA to strictly enforce marketing and advertising/promotion regulations.

Of added significance, the Office of Inspector General (OIG), in a HHS draft guidance published in the October 3, 2002, *Federal Register* (53), indicated that drug companies should expect prosecution or other action if they do not change some of the ways that they market prescription drugs, including the giving of gifts, grants, and scholarships to physicians and health-care providers in exchange for help in promoting their products. The OIG went to the extent of strongly recommending that pharmaceutical manufacturers should designate a compliance officer to serve as the point person to oversee these compliance activities.

Throughout all of its regulating activities over the years, FDA has expressed concern that there should always be a fair balance in a company's claims for the efficacy of its products and its indication and the potential adverse reactions associated with each product's usage. This applies to all promotional materials.

It has appeared that the FDA would like to increase its regulatory authority, but potential future trends may put some limits on its ambitions in this regard.

## POSSIBLE FUTURE FDA REGULATORY ACTIVITIES

It is doubtful that many would challenge the benefits associated with FDA's efforts over the years to determine that drug manufacturers, in their efforts to market and promote their products, present to the health profession and the consumer a fair

balance as to the efficacy and risks of their respective products. FDA controls and surveillance in this area have increased year after year, and the overall impact of FDA on drug companies' marketing and advertising/promotion activities will continue in the future. However, recent events have begun to slow the overall regulatory efforts of the FDA relative to drug marketing and advertising/promotion activities.

In November 2001, the Bush administration's new leadership in the HHS released an unprecedented directive that the FDA's "warning" and "untitled" letters to the pharmaceutical industry must first be cleared with the new FDA chief counsel, Daniel E. Troy. This was implemented because there were so many people and offices that could issue warning letters that they had lost their overall desired impact on the industry (54).

Much concern had been raised that the directive would have a chilling effect on the FDA's "watchdog" activities. The HHS, however, indicated that it was expecting the FDA, as a result of the directive, to set forth priorities and enforce those priorities with a much-improved effectiveness for their "Warning Letters."

Another development that has truly shaken the FDA is the Supreme Court Ruling in *Western States v. Shalala*, which endorsed the lower courts' criticisms of the FDA culture. Basically, it said that the FDA's DDMAC "... had no business, even with encouragement from the FDA Modernization Act of 1997, trying to curb the free speech of compounding pharmacists advertising their services" (55). Several legal decisions have indicated that the FDA has been too accustomed to getting its own way in challenging hundreds of industry advertisements and other promotional pieces and has not paid enough deference to the First Amendment.

Cognizant of these decisions, FDA has begun to seek input from the public as to how it should balance statutory responsibilities with First Amendment obligations. Some of the input sought included whether certain promotional speeches about medicines is inherently misleading unless it complies with FDA requirements, whether FDA's current DTC advertising policy is consistent with the effects of such advertisements or leads to overprescribing, whether product disclaimers should have the same type size as claims, and whether off-label promotions undermine the approval authority of the FDA. Meanwhile, FDA's "old guard" started to argue, internally, that the Supreme Court decision threatened its control over what is said about product effectiveness, thus allowing broadened product claims.

However, a positive move by FDA has already taken place. CDER released an article entitled "Think It Through: A Guide to Managing the Benefits and Risks of Medicines," which reminds consumers of the benefits and risks associated with different drugs and provides helpful tips designed to minimize the potential risk of drug use (56).

FDA is quite concerned that its authority will be undermined "... if unapproved products can be promoted, or new uses of approved products can be promoted without FDA approval" because FDA believes that neither consumers nor physicians can properly evaluate information about the extremely complex products that it regulates (57). However, the courts have ruled that, if a drug is lawfully marketed following its initial approval, physicians can legally prescribe products for off-label uses if they have access to the information on those uses. How this matter will ultimately be resolved is not at all clear.

Also, it is unclear what course of action will be taken on drug importation from foreign countries. After a hot debate in past years, concerning the value/need

for consumers to receive drugs via foreign markets, in recent years, the debate has cooled. Both in Congress and throughout the general public, the progress made through Medicare/Part D, improved generics and the debate on medical case and insurance coverage has overshadowed the discussion and call for information reform. Indeed, in a presidential election year, there is virtually no dialog concerning this issue. There is, however, a stronger call for federal negotiation of drug prices as well as increasing the FDA approval process and efficiency. These are factors that could affect industry's future marketing of products that are overseen by the FDA.

Another big factor affecting marketing is the status and future of prescription tracking market research. This provides individual doctor prescribing habit profiles, by doctor and number of prescriptions written by that doctor for all specific brands and generics. Virtually all drug companies use these data heavily, which are gathered and provided by several service organizations. These data are used to direct and focus promotional activity, including sales representative detailing and sampling, to those doctors that represent the highest potential for prescriptions, leading to sales.

Physician profiling based on prescription activity has been used for years. In general, physicians know about it and accept its use. However, a growing objection from consumer groups has led to increasing concern from Congress and state legislations regarding the practice. Thus far, New Hampshire has taken the boldest steps, passing state law limiting drug company access to doctors' prescribing habits. This legislation is currently being challenged in the courts.

If the New Hampshire law is upheld and other states follow suit, it will have a significant impact on the marketing and promotion of pharmaceuticals in the future.

DTC promotion will continue to be attacked by consumer groups and Congress. The national headlined exposures of early 2008, concerning several heavily DTC promoted cholesterol-lowering drugs, brought fuel to the fire calling for DTC limitation or elimination. Various congressional leaders have called for action ranging from removal of DTC promotion for all prescription products to not allowing DTC promotion during the first 2 to 3 years postmarketing approval. It is likely that some form of legislation will be passed to "reduce the risk to the public" attributed to DTC promotion, as well as, "reduce the cost of over $4 billion per year," that it adds to drug pricing. Where this new attention to DTC promotion ends up will greatly affect marketing and promotion, as well as, FDA action.

FDA must follow the mood of the courts and Congress, but the pharmaceutical industry has lost some of its luster due to pricing disclosures, industry related scandals, and the general public disenchantment with overall corporate ethics. FDA may relax its regulatory activities, but should some health accidents occur due to the decision of the courts, the regulatory pendulum will, undoubtedly, swing further in the agency's direction. Only time will tell if regulatory changes will occur and the degree to which FDA's regulatory controls of drug marketing and advertising/promotion will be altered.

## REFERENCES AND NOTES

1. FDA Advertising and Marketing Promotional Manual, July 2002:15
2. DDMAC Watch: The Year in Review, Washington Legal Foundation 29 (Aug. 2006).
3. Arnold Matthew, DTC Report, Medical Marketing & Media, December 2006.

4.  St. Petersburg Times, Doctor Combats Pull of Drug Reps, December 27, 2007.
5.  Chronology of Drug Regulation in the United States: US FDA, Center for Drug Evaluation and Research's, www.fda.gov/CDER/about/history.htm. 2002:1.
6.  Ibid, p. 4.
7.  Patrick W. Know Your Government—The Food and Drug Administration, Chelsea House Publishers, 1988:16.
8.  A Brief History of the Center for Drug Evaluation and Research, www.fda.gov/cder/about/history/Histext.htm, p. 5.
9.  Ibid, p. 7.
10. Ibid, p. 8.
11. Ibid, p. 10.
12. Ibid, p. 8.
13. Ibid, p. 12.
14. About PhRMA, www.phrma.org/about_phrma/, p. 1.
15. PhRMA Adopts New Marketing Code, www.phrma.org/phrma_adopts_new_marketing_code.
16. FDA Advertising and Marketing Promotion Manual, October 1999:21.
17. FDA Advertising and Marketing Promotion Manual, October 1993:15.
18. FDA Advertising and Marketing Promotion Manual, March 1997:23.
19. Dickerson J. People Want Drug Oversight. Washington Insider, Medical Marketing & Media, February 2007.
20. FDA Advertising and Marketing Promotion Manual, March 1997:25.
21. Ibid, p. 29.
22. FDA Advertising and Marketing Promotion Manual, May 1993:39.
23. Ibid, p. 7.
24. Ibid, p. 7.
25. Ibid, pp. 7–8.
26. FDA Advertising and Marketing Promotion Manual, May 1997:17.
27. FDA Advertising and Marketing Promotion Manual, September 1997:19.
28. Ibid, pp. 19–20.
29. FDA Advertising and Marketing Promotion Manual, August 1994:33.
30. FDA Advertising and Marketing Promotion Manual, August 1997:35.
31. FDA Advertising and Marketing Promotion Manual, March 1998:39.
32. Liebman M. Drug Industry is a Winner, Medical Marketing & Media, January 2002:50.
33. FDA Advertising and Marketing Promotion Manual, November 1997:46.
34. Dickinson J. DTC Report—FDA Survey Data Supports DTC, June 2002:32.
35. Ibid, p. 32.
36. Dickinson J. DTC Report—Physicians Turned Off by DTC ad, Medical Marketing & Media, September 2002:40.
37. FDA Advertising and Marketing Promotion Manual, November 1997:48.
38. PhRMA Guiding Principles: Direct to Consumer Advertisements About Prescription Medicines, November 2005.
39. Mack J. You have a brochure on the web. Now what? Pharma Exec Suppl, March 2000:16–18.
40. Dickinson J. DTC report—E-detailing gaining acceptance among physicians, Medical Marketing & Media, September 2002:10.
41. FDA Advertising and Marketing Promotion Manual, March 1998:40.
42. Ibid, p. 55.
43. Ibid, pp. 55–56.
44. FDA Advertising and Marketing Promotion Manual, December 1996:59.
45. Ibid, pp. 62–63.
46. Fed Reg, Vol. 67, No. 192, October 3, 2002, Notices, 62063.
47. FDA charges TAP sales rep., Medical Marketing & Media, September 2002, p
48. FDA Advertising and Marketing Promotion Manual, December 1996:61.
49. FDA Advertising and Marketing Promotion Manual, November 1996:72.
50. Ibid, p. 73.

51. Ibid, p. 74.
52. Liebman M. Industry update—FDA keeps up the pressure, issues repeat ad warnings, Medical Marketing & Media, October 2002:18.
53. Fed Reg, Vol. 67, No. 192, October 3, 2002, Notices, 62063.
54. Dickinson J. As I see it—Bush reviews FDA letters to industry, Medical Marketing & Media, January 2002:14.
55. Dickinson J. As I See It—Supreme Court trims DDMAC's, Medical Marketing & Media, July 2002:14.
56. FDA advises on drug benefits, risks, Medical Marketing & Media, October 2002:32.
57. Castagnoli W. Rx marketing regulations hang on first amendment debate, Medical Marketing & Media, September 2002:88.



# 21 CMC Postapproval Regulatory Affairs: Constantly Managing Change

**Leo J. Lucisano and Kevin A. Miller**

*GlaxoSmithKline, Research Triangle Park, North Carolina, U.S.A.*

**Lorien Armour**

*Armour CMC Regulatory Consulting, LLC, Durham, North Carolina, U.S.A.*

## INTRODUCTION

You arrive at work this morning feeling refreshed and unburdened. Last night was the first time in the last 6 months that you had a full and restful sleep. Late yesterday afternoon, you finally received the approval letter for the new drug application (NDA) for your company's projected blockbuster product, and you are savoring the moment. You casually saunter to the break room for your morning cup of coffee, take a few minutes to celebrate with your coworkers, and return to your office, expecting a light day by recent standards. As you wait for your computer to boot up so you can catch up on the seemingly infinite backlog of e-mail, the phone rings. You note on the caller ID display that it is the marketing director for the new product. "She's probably calling to congratulate me on the approval letter," you speculate as you reach for the receiver. The tone of her greeting immediately tells you otherwise. New market research data just arrived on her desk that morning indicating that patients preferred a blister package compared to a plastic bottle. She wants to know if a submission is required for a blister package and, if so, how long it will take for preparation and approval. She indicates that time is of the essence to maximize market penetration, as a competitor's product is anticipated to be approved imminently. While speaking with the marketing director, you receive an urgent message from your administrative assistant to call the vice president of manufacturing as soon as possible. You tell the marketing director that you will research the regulatory implications of the proposed packaging change and will call her back with an answer as soon as possible.

You phone the vice president of manufacturing, and he tells you that content uniformity failures have been encountered during process validation of the commercial batch size for the new product. To correct the problem, it appears that the blending speed and time for the bulk powder need to be modified. He wants to know if the changes have any regulatory implications and comments that any production downtime will almost certainly delay the launch. You advise that you will research the regulatory implications of the proposed manufacturing change and will call him back with an answer as soon as possible. "Well, so much for the light day," you think to yourself as you hang up the phone. What will you do?

While the above scenario is fictitious, it is an accurate depiction of the dynamic world of Chemistry, Manufacturing, and Controls (CMC) (referred to by the authors as "constantly managing change") Postapproval Regulatory Affairs. This chapter provides an overview of the scope of CMC postapproval regulatory affairs, the

recent U.S. history of CMC postapproval regulations and their current status, the different types of regulatory submissions to file CMC changes, and the relationship of Current Good Manufacturing Practice (cGMPs) regulations to CMC postapproval activities. Measurements of performance are suggested to gauge the effectiveness of the CMC postapproval regulatory function, and commentary is provided regarding the development of professionals in this field. The chapter concludes with a discussion of the forces affecting the future of this expanding arena of regulatory oversight.

## CMC POSTAPPROVAL REGULATORY AFFAIRS OVERVIEW

CMC regulatory affairs is concerned with the technical characteristics of a drug molecule and the dosage form used for its administration. The regulatory affairs professional is responsible for assuring that sufficient CMC knowledge is accumulated about the molecule to permit evaluation by the U.S. Food and Drug Administration (FDA) through the product life cycle. Table 1 depicts a typical list of CMC information required for evaluation.

In the preapproval phase of the product life cycle, CMC information is initially provided to FDA through an investigational new drug application (IND). Depending on the outcome of clinical trials conducted under the IND, an NDA may be filed with an additional level of CMC information that may result in approval of the drug product and its commercialization. The CMC section of the NDA establishes the approved conditions for manufacturing and testing the drug substance and its dosage form(s). In the postapproval phase, the regulatory affairs professional is responsible for managing changes to these conditions.

Table 2 compares the different environments encountered during the two phases of the product life cycle. Prior to approval of the NDA, the CMC regulatory professional interacts primarily with a research and development (R&D) team that is dedicated to developing the body of information required to gain FDA approval of the drug product. The sequence of steps from the application of the IND to NDA approval takes several years, and the process is well defined. Various initiatives supported by FDA, such as the International Conference on Harmonization, provide a clear road map regarding the CMC information and data that need to be accumulated to adequately characterize a new drug product and its active ingredient. (Refer to www.ich.org for additional information.)

Following the approval of the NDA, the CMC regulatory professional interacts primarily with marketing and manufacturing, whose priority is to maximize

**TABLE 1**  CMC Database for a New Drug Application

| Drug substance | Drug product |
|---|---|
| Physicochemical properties | Components and composition |
| Synthetic process | Manufacturers |
| Controls for starting materials, reagents, etc. | Method of manufacturing and packaging |
| Process controls for intermediates | Specifications and analytical methods |
| Specifications and analytical methods | |
| List of impurities | Stability information |
| Stability and life to retest | |

the commercial potential and return on the investment of the drug product. These drivers may result in a stream of requested changes to the originally approved CMC conditions in the NDA. Unlike R&D, the productivity of the manufacturing environment is measured in weeks and months, and multiple changes to the drug substance and/or drug product often need to be evaluated and implemented in a parallel time frame. Additionally, the approval of an NDA often results in a number of CMC postapproval commitments that must be fulfilled, including the statutory requirement to file Annual Reports. The regulatory professional supporting these CMC postapproval activities must be diligent in providing regulatory oversight and strategies that ensure that CMC changes are implemented in a reasonable time frame while adhering to appropriate regulations.

## CMC POSTAPPROVAL REGULATIONS AND GUIDANCE

In order to make CMC changes to the conditions of approval in the NDA, the drug manufacturer must file the changes with FDA through one of the various types of postapproval submissions described later. An appropriate level of information and data must be included in the submission to demonstrate that the changes do not adversely affect the quality attributes of the drug substance and/or drug product.

Prior to 1997, the regulation governing CMC changes to an approved NDA was 21 CFR 314.70 (Supplements and Other Changes to an Approved Application) (1). This statute was established in February 1985 as part of a comprehensive effort to improve the NDA and postapproval application process. It defined three reporting categories for postapproval changes: (*i*) prior approval supplement, (*ii*) changes being effected (CBE) supplement, and (*iii*) Annual Report.

In practice, the provisions in the original version of 21 CFR 314.70 were vague, and the interpretation and review of CMC changes by different review divisions within FDA were inconsistent. The situation led to increasing criticism by the pharmaceutical industry that the postapproval regulations stifled changes in the manufacturing environment.

On November 21, 1997, the Food and Drug Modernization Act was signed into law by the President. Section 116 of the act required that 21 CFR 314.70 be revised to streamline the regulatory process for CMC postapproval changes. Two years later 21 CFR 314.70 expired without an updated version in place. As a result, FDA issued an interim guidance document, Guidance for Industry: Changes to an

**TABLE 2**   Comparison of CMC Regulatory Environments

|  | Preapproval | Postapproval |
|---|---|---|
| Type of submissions | INDs and NDAs | Supplemental NDAs Annual Reports CMC Commitments |
| Internal customer | R&D | Manufacturing |
| Customer priority | Supporting INDs and NDAs | Manufacturing product |
| Time lines | Months and years | Weeks and months |
| Format of submission | Well defined | Less defined |
| Reference base of information | Being developed as part of the NDA | Approved conditions in NDA |

Approved NDA or ANDA (CANA), that has been the current reference for determining the appropriate regulatory submission for CMC postapproval changes (2). In April 2004, the revised 21 CFR 314.70 rule was published, and the CANA Guidance was updated accordingly. The final rule became effective on June 22, 2004.

The revised rule and both versions of the CANA Guidance retained the same reporting categories identified in the original rule but expanded the CBE supplement into two types, CBE-30 and CBE-0. They also linked the submission reporting category to the potential for a change to have an adverse effect on the identity, strength, quality, purity, or potency of a product as it relates to the safety or effectiveness of the product. By establishing this link, the revised rule and CANA Guidance integrated the quality and regulatory perspectives in evaluating CMC changes.

The revised rule and CANA Guidance provide recommended filing categories for changes to the following: (*i*) components and composition, (*ii*) manufacturing sites, (*iii*) manufacturing process, (*iv*) specifications, (*v*) packaging, (*vi*) labeling, (*vii*) miscellaneous changes, and (*viii*) multiple related changes. However, neither defines the information and data required in the application. Recommendations regarding the appropriate information and data package required to assess the impact of CMC changes are contained within the battery of guidance documents issued by FDA in recent years. The content of information and data packages may also be dependent upon historical precedence with a particular drug substance and/or drug product. Figure 1 depicts a spectrum of guidance documents that the CMC postapproval regulatory professional can consult in determining the appropriate submission category and supporting data and information package to appropriately assess and file changes.

FDA issued the first guidance document in 1995 that specifically addressed CMC postapproval changes, namely, the Guidance for Industry; Immediate Release Solid Oral Dosage Forms; Scale-Up And Post-Approval Changes, Chemistry, Manufacturing and Controls; In Vitro Dissolution Testing; and In Vivo Bioequivalence Documentation (3) (commonly known as the SUPAC-IR Guidance). Since that time the FDA's Center for Drug Evaluation and Research (CDER) has issued more than 20 additional guidance documents in draft and final form (4–23). They range from covering changes to specific dosage forms to addressing relevant scientific and technical topics in assessing change (e. g., equipment design and dissolution testing). Many concepts and the vocabulary introduced in these postapproval documents have now been embedded into the NDA process. Examples include the terminology associated with the design and operating principles of manufacturing equipment, as well as the various approaches to demonstrating dissolution similarity when changes are made to the drug product.

## CMC POSTAPPROVAL REGULATORY SUBMISSIONS

Table 3 lists the types of CMC postapproval submissions addressed in the revised rule and CANA Guidance.

## Prior Approval Supplement

A Prior Approval Supplement is required for a CMC change that has a substantial (major) potential to have an adverse effect on the identity, strength, quality, purity, or potency of the product as they may relate to its safety or effectiveness. Its title is self-defined, meaning that FDA must approve the change before drug product

CMC Postapproval Regulatory Affairs



**FIGURE 1** Regulations and guidance affecting CMC postapproval changes

incorporating the change can be distributed for patient consumption. Occasionally, a Prior Approval Supplement may need to be approved as soon as possible in the interest of the public health (e. g., drug shortage) or if a delay in implementation will cause extraordinary hardship on the drug manufacturer (24,25). When these situations arise, the applicant can request an Expedited Review of the supplement. The supplement should be clearly labeled Prior Approval Supplement—Expedited Review Requested, and a justification for the request should be provided in the accompanying cover letter (24).

## Changes Being Effected Supplement

A CBE supplement is required for a CMC change that has a moderate potential to adversely affect the drug product as it relates to its safety or effectiveness. The 1999 CANA Guidance provided for two types of CBE supplements: (*i*) Supplement–Changes Being Effected in 30 Days (CBE-30) and (*ii*) Supplement–Changes Being Effected (CBE-0). The revised 21 CFR 314.70 rule and CANA Guidance have retained these filing categories.

A CBE-30 Supplement requires that an applicant wait at least 30 days following receipt of the submission by FDA before distributing product incorporating the change. This waiting period permits FDA to conduct a cursory review of the supplement to assess if the proposed change has been filed in the proper reporting category and is supported by a sufficient data package to justify its implementation (1,2). Unlike a CBE-30 Supplement, a CBE-0 Supplement does not require a

**TABLE 3** Types of CMC Post-Approval Submissions

| Submission type | Potential impact on product quality | Implementation |
|---|---|---|
| Prior Approval Supplement | Major (substantial) | After approval of submission |
| CBE supplement—30 day | Moderate | 30 days after FDA receipt of submission |
| CBE supplement—0 day | Moderate | Immediately upon FDA receipt of submission |
| Annual Report | Minor (low) | Immediately—filed yearly within 60 days of anniversary date of NDA approval |

*Lucisano et al.*

waiting period. Drug substance/product incorporating this category of change can be distributed immediately following receipt of the submission by FDA.

## Annual Report

The Annual Report is a periodic, postmarketing submission required by 21 CFR 314.81(2) (other postmarketing reports) (26). From a CMC perspective its purpose is twofold: it provides a reporting mechanism for changes that are considered to have minimal potential to adversely affect the drug product, and it serves as a conduit for providing updates to nonsupplemental postapproval commitments (e. g., stability updates). Unlike changes requiring supplemental applications, annual reportable changes are filed after implementation has already taken place and do not undergo a formal review and approval process. However, FDA has the authority to disagree with a change filed in the Annual Report and require the submission of a supplemental application if the Annual Report filing category is deemed inappropriate for the change or additional information is requested to support the change.

## Impact of Revised 21 CFR 314.70 Rule and CANA Guidance

The Food and Drug Modernization Act in 1997 was intended to streamline the regulatory process, and the revised 21 CFR 314.70 rule and CANA Guidance that emerged has accomplished this objective in several areas of CMC changes. For example, a move to a different manufacturing site for a drug substance intermediate can now be reported in an Annual Report, whereas earlier it required the submission of a Prior Approval Supplement.

However, the revised rule and guidance also increased the regulatory burden for other types of changes. For example, a change in a packaging component that controls the dose delivered to the patient (e. g., the valve of a metered dose inhaler) now requires a Prior Approval Supplement, whereas under the original 21 CFR 314.70 rule it was possible to file this change in an Annual Report.

The revised rule and CANA Guidance (Section IV, Assessment of the Effects of the Change) also require that the effects of any CMC changes be assessed by the holder of the application regardless of the submission category required to report the change. Assessment includes evaluation of the postchange product to assure that the changes do not negatively affect the quality attributes of the drug product. This may require additional testing beyond that required by the specifications approved in the NDA. If an assessment concludes that the change has an adverse impact and the applicant still desires to implement the change, then the applicant must file a Prior Approval Supplement for the change, regardless of the recommended filing category for the change being considered.

## cGMPs AND CMC POSTAPPROVAL REGULATORY AFFAIRS

The earlier sections described the various submission mechanisms and information requirements for supporting CMC postapproval changes. However, the submission process is not conducted in isolation. Many complementary activities occur before, during, and after the submission to comply with cGMPs, and these activities are described later.

## Change Control

Change control is required by 21 CFR 211.180(e) (General Requirements) and entails proper review, assessment, implementation, and adherence to written procedures for making CMC changes (27). A drug manufacturer's change control process is frequently scrutinized by FDA during inspections and is often the subject of objectionable citations in inspection reports. An effective change control system is the foundation for successful management of CMC postapproval changes.

In providing the appropriate regulatory perspective to a change control request from manufacturing, four steps are conducted by the CMC postapproval regulatory affairs professional:

1. Define the change: This may require several iterations of discussion with the manufacturing site in order to understand the change(s) being proposed. For example, a change request may specify that the site is considering a batch size change. This type of change may require related changes to equipment and process. The full extent of the changes must be understood in order to provide comprehensive regulatory advice.

2. Establish the regulatory basis for the change: Once the true extent of the changes is elucidated, the change scenario needs to be evaluated against the context of the approved conditions in the NDA file and current FDA guidance. A small increase in batch size for an immediate-release solid dosage form, with no additional changes, is categorized as an annual report change in section VII.D.1 of the CANA Guidance. If multiple changes are required to attain the increase in scale, section XII (Multiple Related Changes) of the Guidance requires that the filing category be defined for each individual change and the most restrictive filing category applied. If the increase in scale requires adopting equipment of different design and operating principles, a Prior Approval Supplement would be required to implement the sum of the changes.

3. Determine the data and information required to assess and implement the change: This information can be obtained from the various guidance documents issued by FDA that address specific dosage forms and regulatory topics, as well as prior experience with FDA in implementing related changes. In the earlier example, the SUPAC-IR Guidance would provide the information and data package required to support the changes in scale and equipment (3). The guidance document on dissolution testing addresses the considerations in developing and evaluating comparative dissolution profiles to assess the impact of the changes on the release profile of the drug product (7).

4. Provide the appropriate regulatory advice: Once the earlier steps have been completed, a recommendation should be prepared that integrates the regulatory, quality, and commercial aspects surrounding the proposed change(s) to the drug product. It may be as straightforward as communicating the required regulatory submission and the associated data package, or it may require that the change not be progressed at this time due to mitigating circumstances. In the example of the batch size increase, the regulatory affairs professional might be aware that an alternate supplier of the drug substance is being considered. Consequently, it may be prudent to advise the manufacturing site to delay the evaluation of the batch size increase and equipment change for the drug product until a supply of the alternate source of the drug substance is available for concomitant evaluation.

*Lucisano et al.*



**FIGURE 2**  CMC regulatory change control—two-stage process.

Occasionally, the filing category cannot be defined until the information and data package required for the submission has been provided for assessment. In this case a two-stage response may be required from the regulatory affairs professional. The initial response describes the submission requirements, regardless of filing category, and includes a statement that the reporting category will be determined when the data and information package has been assembled and assessed. Upon completion of the assessment, a second (final) response is provided confirming the appropriate filing category for the proposed change. A flow diagram of a two-stage regulatory response is provided in Figure 2.

## Validation

Postapproval CMC changes that pertain to the manufacturing process or analytical method of a drug substance or drug product may have validation implications. cGMPs (21 CFR 211.100 and 211.160) require that manufacturing processes and analytical methods be appropriately validated (28,29). The implementation requirements of a CMC change may include revalidation of the manufacturing process or analytical method, even if the change does not require a submission. Regardless of whether a submission is required, validation documentation should be available for FDA inspection purposes to support the implemented change.

## FDA Inspections

FDA periodically inspects manufacturing and testing facilities for adherence to cGMPs, and inspections may require involvement by the CMC postapproval regulatory professional depending on their purpose. In a general inspection, questions about the regulatory advice provided in a change control proposal may arise, and the regulatory professional must be prepared to respond accordingly. Other

inspections may be the direct result of a CMC postapproval submission, in which case the regulatory representative is likely to be a member of the core inspection team or possibly even the inspection team leader. In either case, the regulatory affairs professional must be thoroughly knowledgeable of relevant regulations and submission information, as well as the systems and processes used by the manufacturing site for managing CMC changes. This overview is required to interact effectively with FDA inspectors and facilitate a successful outcome of the inspection.

## PERFORMANCE MEASURES FOR CMC POSTAPPROVAL REGULATORY AFFAIRS

The manufacturing environment that is the primary internal customer of the CMC postapproval regulatory affairs professional is monitored by various measurements such as the number of recalls, batch rejects, cost of goods, and utilization of manufacturing capacity. Similarly, a number of performance measures can be used to gauge the activities within CMC postapproval regulatory affairs.

### PDUFA Goals and First-Time Approvals of sNDAs

The Prescription Drug User Fee Act of 1992 (PDUFA), which was most recently reauthorized in 2007, defined FDA review targets for manufacturing supplements. Table 4 provides the action dates for supplements reviewed in the fiscal years 2008–2012. These goals are intended for FDA's Office of Pharmaceutical Sciences and provide a level of predictability regarding the timing of feedback and the acceptability of changes filed through supplemental new drug applications (sNDAs). After the review is completed, either an approval letter is issued indicating the supplement is approved or a complete response letter is issued informing applicants or changes that must be made before the supplement can be approved (30). If a complete response letter is issued subsequent to the implementation of a change filed through a CBE or CBE-30 Supplement, generally the manufacturer can continue to distribute the postchange product while addressing the deficiencies unless FDA specifically objects (1,2,19).

While the PDUFA Goals establish guidelines for timely review, a regulatory affairs group is in the business of obtaining approvals, and goals should be set with respect to achieving approval of sNDAs within the PDUFA time frame. A low percentage of first-time approvals is an indication that the sNDAs being filed do not provide a sound regulatory justification for the changes or that an insufficient information and data package is provided to support the changes. It may also signal a poor rapport with the particular FDA reviewer within the Office of Pharmaceutical Sciences that may need to be addressed.

**TABLE 4**  FDA Review Goals for Manufacturing Supplements

| Supplement category | PDUFA goal fiscal years 2008–2012[a] |
| --- | --- |
| Prior Approval Supplement | 90% reviewed and acted upon within 4 mo |
| CBE supplement—30 Day | 90% reviewed and acted upon within 6 mo |
| CBE supplement—0 Day | 90% reviewed and acted upon within 6 mo |

[a]PDUFA of 1992, reauthorized most recently in 2007, provided FDA additional resources for accelerated drug evaluation without compromising review quality.

## Submission of Annual Reports

Section 21 CFR 314.81(2) requires that Annual Reports be submitted within 60 days of the anniversary date of the approval of the NDA (26). A CMC postapproval group should strive to collaborate with the manufacturing sites to compile and submit the CMC section of the Annual Reports on time. A consistent trend of providing late Annual Reports or ones that are lacking in sufficient detail may affect the agency's review of related supplemental applications.

## CMC Commitments

Both NDAs and supplemental applications are often approved with commitments to provide additional data once the manufacturer has gained a greater level of experience with the drug product and related changes. The postapproval CMC function needs to monitor these commitments and assure that the firm appropriately fulfills its obligations according to the deadline specified by the FDA or proposed by the drug manufacturer.

## Continuity of Supply

Situations sometimes arise that may prevent the manufacture of the drug product according to the approved conditions of an NDA. For example, an accident at a packaging site may prevent it from continuing operations, or a supplier of a key component (e. g., drug substance or packaging material) may no longer be able to maintain inventory.

In these situations, the CMC postapproval regulatory affairs professional may be able to negotiate a strategy with the appropriate branch of FDA to quickly restore supply. For example, the Division of Post-Marketing Evaluation may grant Expedited Review of a Prior Approval Supplement for an alternate supplier of the drug substance if the currently approved supplier can no longer manufacture the drug substance. Successful negotiations under these circumstances reflect active engagement by the CMC postapproval regulatory affairs professional.

## NDA Conformance

Site inspections conducted by FDA may result in observations of nonconformance to the approved conditions in the NDA. The firm's quality organization may also conduct internal audits to verify site practice and correct conditions of nonconformance to the NDA. These instances typically point to a lapse in communication between the manufacturing site and the CMC regulatory affairs function. A useful measurement of the adequacy of the change control process is to track the number of NDA nonconformance observations resulting from these external and internal audits.

## Due Diligence (Divestments)

Pharmaceutical companies seeking to purchase an established product conduct a due diligence exercise prior to purchase to assess the status of the CMC aspects of the NDA file. The buyer seeks to verify that all commitments to the FDA have been met and that there are no regulatory deficiencies that may result in nonconformance or jeopardize supply following the sale. For example, the analytical testing of an older product may not meet current standards such that it may be viewed as a regulatory risk. A product that is well managed by the CMC postapproval



**FIGURE 3** Change control in a global supply chain.

regulatory function should facilitate the current application holder's efforts to divest the drug product.

## Regulatory Strategies and Cost Savings

In a complex supply chain in which multiple sites supply either the drug substance or the drug product, CMC regulatory affairs may be the only department that has a comprehensive overview of the various changes affecting the NDA. Figure 3 illustrates the number of changes that may be simultaneously affecting a drug product and its active pharmaceutical ingredient in a global supply chain. From this vantage point, the regulatory affairs professional has the opportunity and bears the responsibility to recommend that various changes be assessed concurrently or staged in a reasonable manner. The data required to support CMC postapproval changes often cost tens, sometimes hundreds of thousands of dollars, and it may be possible to evaluate several changes in an integrated set of experiments (e. g., reducing the number of stability studies to evaluate multiple changes through a matrix approach).

## DEVELOPMENT OF THE CMC POSTAPPROVAL REGULATORY AFFAIRS PROFESSIONAL

The competencies required for effectively supporting the CMC postapproval regulatory arena differ somewhat from the CMC preapproval arena due to differences in customer base and the types of submissions that are filed to the FDA. Figure 4 depicts the steps associated with the development of a postapproval regulatory affairs professional. These steps are described in greater detail later.

## Change Control

Change control is fundamental to CMC postapproval regulatory affairs and is the area in which new personnel should start in order to develop a sound foundation in the field. Addressing change control inquiries from the manufacturing sites requires

*Lucisano et al.*



**FIGURE 4**   Career development in CMC postapproval regulatory affairs.

the regulatory professional to evaluate the change, research the drug product history in the NDA file, and read the pertinent regulations and guidance. This information must then be interpreted and articulated in a succinct, clearly written response to the customer at the manufacturing site.

## CMC Conformance Guides

CMC Conformance Guides are a distillation of the conditions approved in the NDA for the drug product and its active ingredient(s). Table 5 is a representative table of contents of a CMC Conformance Guide for a tablet formulation. Compiling a CMC Conformance Guide for a product that has been marketed for several years requires researching the entire NDA file to establish the currently approved CMC conditions. Developing and maintaining CMC Conformance Guides is a worthwhile activity for the regulatory affairs professional. The guides provide a reference tool for both regulatory affairs and the manufacturing sites in determining the regulatory ramifications of proposed changes.

## Annual Reports

The compilation of Annual Reports is the next appropriate step for the CMC postapproval regulatory affairs professional. It requires a review of the data and information provided by the manufacturing sites to support the filed changes with a cross-check to the change control advice provided earlier for those changes.

Annual Reports also contain an updated stability profile of the drug substance/product that requires a critical review by the CMC postapproval regulatory affairs professional. The data reported need to be consistent with approved stability protocols and support the approved retest date/shelf life for the drug substance/product while being reported in a format consistent with current FDA guidance (31). Fulfilling this responsibility may require the CMC postapproval regulatory affairs professional to have several iterations of discussion with the manufacturing sites involved with the Annual Report.

## Simple sNDAs

Understanding the process and obligations associated with filing the CMC Section of the Annual Report leads to the ability of the postapproval CMC regulatory affairs professional to compile and submit sNDAs. Working on submissions that address

a single change (e. g., change in analytical testing site) and progressing to submissions that combine multiple changes (e. g., change in manufacturing site coupled with changes in packaging and testing) is a logical progression. Starting with the less complex type of CMC submission allows the maturing professional to gain an understanding of the review and approval process for sNDAs. Filing a supplemental NDA requires the postapproval regulatory affairs professional to understand the responsibilities associated with being a "responsible agent" for the NDA holder and to begin interacting with FDA personnel, such as project managers and members of the CMC review team.

**TABLE 5**  Contents for CMC Conformance Guide for Tablet Formulation

---

I. Product description
    A. Name, dose form
    B. NDA numbers
    C. List of approved pack configurations with NDC codes
    D. Outstanding commitments
    E. Approval date
II. Drug product
    A. Components
    B. Composition
    C. Specifications and analytical methods for inactive components
        1. Inactive components included in the USP/NF
        2. Inactive components not included in the USP/NF
        3. Quality control of inactive components
    D. Manufacturers
        1. Name and address of manufacturer(s), packager(s), tester(s), and what part is done by each
        2. List of DMF references (if any)
    E. Method of manufacture and packaging
        1. Description of the manufacturing process
        2. In-process controls
        3. Reprocessing/Rework operations
        4. Container–Closure system
            a. Bulk product container
            b. Bottles
            c. Child-resistant closures
            d. Blister pack
    F. Specifications and analytical methods
        1. Sampling plan (if any)
        2. Specifications
        3. Description of analytical methods and any alternates
    G. Stability information
        1. Stability protocols
        2. Storage conditions and expiration dating
        3. Other
            a. Commitment for ongoing studies
            b. List of batches for continued monitoring (if applicable)
            c. Analytical methods used during stability studies
III. Index of approved changes
IV. History of changes

---

## Complex sNDAs

With time and experience, the regulatory affairs professional can support very complex supplemental NDAs, such as those requiring a biostudy or biowaiver to gain approval of CMC changes. Examples include reformulation of a drug product or a manufacturing site change associated with a modified-release solid oral dosage form. These complex sNDAs often require meetings with FDA in which the regulatory affairs professional needs to submit a formal meeting request with an accompanying Information Package. The Information Package outlines the issues that need to be resolved and the supporting data that are the basis for discussion at the meeting (32). The regulatory affairs professional is expected to chair the meeting with FDA and to appropriately prepare the project team and direct the dialogue during the meeting to achieve the desired outcome.

## FDA/Industry Interactions

After gaining proficiency with complex sNDAs and chairing meetings with FDA, the CMC postapproval regulatory affairs professional likely has achieved the experience, confidence level, and stature to participate in FDA/industry interactions. Activities include giving presentations at professional meetings or assisting in workshops that address CMC regulatory issues. It typically takes several years to progress to this level of development.

## THE CMC POSTAPPROVAL REGULATORY PROFESSIONAL AS THE "RESPONSIBLE AGENT"

All regulatory submissions are accompanied by FDA Form 356h signed by the regulatory affairs professional acting as a "responsible agent" for the drug manufacturer (33). The form includes a number of certification statements that define the scope of responsibility associated with this role. They require that the regulatory professional attest to the veracity of the information provided in the supplement and assure that the application complies with all applicable laws and regulations, including adherence to cGMPs. It also includes a reminder that it is a criminal offense to willfully provide fraudulent information.

The role of acting as a responsible agent is what differentiates the CMC regulatory affairs professional from other functional groups involved with compiling and submitting a postapproval application. Although the regulatory affairs professional does not generate the data and information included in a CMC submission, specific measures need to be taken to assure the authenticity of its contents.

Such steps may include reviewing source documentation housed at the manufacturing site, which may not be included in the application. Examples include internal technical reports, supplier specifications, and batch records. The regulatory affairs professional may also conduct a submission audit at the site as a double check prior to submission. These measures provide the necessary checks and balances to assure that the regulatory affairs professional fulfills the associated requisite obligations of the responsible agent while at the same time becoming familiar with the systems utilized by the site to evaluate and support manufacturing changes.

## FUTURE OF CMC POSTAPPROVAL REGULATORY AFFAIRS

The SUPAC-IR Guidance issued in November 1995 was the first guidance document that specifically addressed CMC postapproval changes, and it marked the

beginning of a transformation in the level of sophistication in this regulatory arena (3). It provided a scientific basis for the evaluation of changes to an approved product and introduced a new vocabulary with which to discuss these changes.

The publication of the SUPAC-IR Guidance coincided with a trend toward consolidation of the pharmaceutical industry that spurred a number of mergers and acquisitions. This often resulted in an overabundance of desired manufacturing capacity for an acquiring or postmerger firm requiring the closure of a number of manufacturing sites. Drug substance/product transfers require active management by the CMC postapproval regulatory affairs function and increase the importance of this role in supporting the manufacturing environment.

A number of business and regulatory drivers will likely continue to increase the complexity and demand for specialized CMC postapproval regulatory affairs support. Developing a new medicine takes 10–15 years and was estimated in 2001 to cost approximately $800 million (34–36). Consequently, time lines are constantly being shortened in the NDA preapproval phase to reduce the time to market. These pressures may result in nonoptimized manufacturing processes or analytical specifications that require postapproval modification. Advances in manufacturing experience and technology provide opportunities to reduce production costs and increase profitability, while consumer preference is ever dynamic and satisfying this need will require continual changes in product presentation to maintain market share.

The regulatory environment also continues to evolve, and several ongoing initiatives will present new challenges for CMC postapproval regulatory affairs:

## Pharmaceutical cGMPs for the 21st Century: A Risk-Based Approach

In August, 2002 FDA launched a new initiative entitled Pharmaceutical cGMPs for the 21st Century: A Risk-Based Approach to enhance and modernize the regulation of pharmaceutical manufacturing and product quality (37). The concept is intended to encourage the pharmaceutical industry to adopt modern technological advances and risk-based quality management techniques that focus on critical areas, also known as Quality by Design (QbD). Principles of QbD include process and product knowledge, application of process analytical technologies, and the use of risk assessment and management tools (38,39).

FDA recognizes that the current postapproval regulations reflect a prescriptive approach to regulating manufacturing changes and do not incorporate the risk-based and QbD approaches. FDA is considering revising 21 CFR 314.70, which may provide for regulatory flexibility based on a manufacturer's application of QbD principles. The revised 21 CFR 314.70 may also retain aspects of the current regulations to allow applicants to continue working within the current regulatory structure (40). While current regulations may not incorporate QbD principles, the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) has published guidelines that describe tools and approaches for implementation of QbD. These include ICH Q8 Pharmaceutical Development, ICH Q9 Risk Management, and ICH Q10 Pharmaceutical Quality System (41–43).

As part of the cGMPs for the 21st Century initiative, CDER's Office of New Drug Chemistry reorganized in November 2005 to form the Office of New Drug Quality Assessment, which has dedicated pre- and postmarketing groups (44). The

Office of New Drug Quality Assessment launched a new risk-based pharmaceutical quality assessment system intended to facilitate innovation and continuous improvement throughout the product life cycle, provide regulatory flexibility for postapproval changes and streamline the submission and review processes (45).

## Globalization of the Regulatory Environment

The efforts invested in the International Conference on Harmonization and the Common Technical Dossier (CTD) continue to make progress in defining global standards for the content and format of regulatory submissions (46–48). Although these advances will initially have their greatest impact on new applications (INDs and NDAs), they will establish a new reference upon which to evaluate and file the changes made after product approval.

## Electronic Submissions

FDA has been accepting electronic submissions for a number of years. Effective from January 1, 2008, all electronic submissions to FDA's CDER for INDs, NDAs, Annual Reports, and other documents are required to be in electronic CTD (eCTD) format (49,50); however, paper submissions are still accepted. This poses a challenge to the CMC postapproval regulatory affairs professional to integrate the requirements for eCTD publishing into the manufacturing environment and to reformat existing NDA regulatory files to comply with current specifications for postapproval submissions.

## CONCLUSION

Recall that at the beginning of this chapter, the fictional CMC postapproval regulatory affairs professional faced a day of unexpected changes that required urgent attention. Continuing this story, the regulatory affairs professional had to review the CMC section of the NDA files, consult FDA guidance documents, interact with various functional groups within the company, and potentially contact the FDA to address the change scenarios posed by marketing and manufacturing. As the day concluded, the regulatory affairs professional was able to offer a variety of regulatory strategies and time lines to assure timely supply of the drug product and address marketing preferences within the boundaries of the approved conditions of the NDA and current FDA regulations and guidance. Such is a typical day in the career of the CMC postapproval regulatory affairs professional—constantly managing change.

## REFERENCES AND NOTES

1. Fed Reg, Vol. 69, No. 68, April 8, 2004, Code of Federal Regulations, Title 21, Part 314.70.
2. FDA, Center for Drug Evaluation and Research, Changes to an Approved NDA or ANDA, Guidance Document (Apr. 2004).
3. FDA, Center for Drug Evaluation and Research, Immediate Release Solid Oral Dosage Forms: Scale-Up And Post-approval Changes: Chemistry, Manufacturing and Controls; In Vitro Dissolution Testing; In Vivo Bioequivalence Documentation, Guidance Document (Nov. 1995).
4. FDA, Center for Drug Evaluation and Research, Sterilization Process Validation in Applications for Human and Veterinary Drug Products, Guidance Document (Nov. 1994).

5. FDA, Center for Drug Evaluation and Research, SUPAC-IR Questions and Answers, Guidance Document (Feb. 1997).
6. FDA, Center for Drug Evaluation and Research, SUPAC-SS—Nonsterile Semisolid Dosage Forms; Scale-Up and Post-approval Changes: Chemistry, Manufacturing, and Controls; In Vitro Release Testing and In Vivo Bioequivalence Documentation, Guidance Document (June 1997).
7. FDA, Center for Drug Evaluation and Research, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, Guidance Document (Aug. 1997).
8. FDA, Center for Drug Evaluation and Research, Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations, Guidance Document (Sept. 1997).
9. FDA, Center for Drug Evaluation and Research, SUPAC-MR: Modified Release Solid Oral Dosage Forms: Scale-Up and Post-approval Changes: Chemistry, Manufacturing, and Controls, In Vitro Dissolution Testing, and In Vivo Bioequivalence Documentation, Guidance Document (Oct. 1997).
10. FDA, Center for Drug Evaluation and Research, PAC-ALTS: Post-approval Changes-Analytical Testing Laboratory Sites, Guidance Document (Apr. 1998).
11. FDA, Center for Drug Evaluation and Research, Metered Dose Inhalers (MDI) and Dry Powder Inhalers (DPI) Drug Products: Chemistry, Manufacturing, and Controls Documentation, Draft Guidance Document (Nov. 1998).
12. FDA, Center for Drug Evaluation and Research, SUPAC-SS: Nonsterile Semisolid Dosage Forms Manufacturing Equipment Addendum, Draft Guidance Document (Jan. 1999).
13. FDA, Center for Drug Evaluation and Research, SUPAC IR/ MR: Immediate Release and Modified Release Solid Oral Dosage Forms, Manufacturing Equipment Addendum, Guidance Document (Feb. 1999).
14. FDA, Center for Drug Evaluation and Research, Bioavailability and Bioequivalence Studies for Nasal Aerosols and Nasal Sprays for Local Action, Draft Guidance Document (June 1999).
15. FDA, Center for Drug Evaluation and Research, Container Closure Systems for Packaging Human Drugs and Biologics, Guidance Document (July 1999).
16. FDA, Center for Drug Evaluation and Research, NDAs: Impurities in Drug Substances, Guidance Document (Feb. 2000).
17. FDA, Center for Drug Evaluation and Research, Analytical Procedures and Methods Validation: Chemistry, Manufacturing, and Controls Documentation Draft Guidance Document (Aug. 2000).
18. FDA, Center for Drug Evaluation and Research, Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System, Guidance Document (Aug. 2000).
19. FDA, Center for Drug Evaluation and Research, Changes to an Approved NDA or ANDA: Questions and Answers, Guidance Document (Jan. 2001).
20. FDA, Center for Drug Evaluation and Research, Statistical Approaches to Establishing Bioequivalence, Guidance Document (Feb. 2001).
21. FDA, Center for Drug Evaluation and Research, Nasal Spray and Inhalation Solution, Suspension, and Spray Drug Products—Chemistry, Manufacturing, and Controls Documentation, Guidance Document (July 2002).
22. FDA, Center for Drug Evaluation and Research, Comparability Protocols—Chemistry, Manufacturing, and Controls Information, Draft Guidance Document (Feb. 2003).
23. FDA, Center for Drug Evaluation and Research, Bioavailability and Bioequivalence Studies for Orally Administered Drug Products—General Considerations, Guidance Document (Mar. 2003).
24. FDA, Center for Drug Evaluation and Research, Requests for Expedited Review of NDA Chemistry Supplements, Manual of Policies and Procedures MAPP 5310.3 (June 1999).
25. FDA, Center for Drug Evaluation and Research, Drug Shortage Management, Manual of Policies and Procedures MAPP 4730.1 (Nov. 1995).

428                                                                                      Lucisano et al.

26. CFR, Title 21, Part 314.81(2). Other postmarketing reports—Annual Reports.
27. CFR, Title 21, Part 211.180. Current good manufacturing practice for finished pharmaceuticals—Records and Reports—General Requirements.
28. CFR, Title 21, Part 211.100. Current good manufacturing practice for finished pharmaceuticals— Production and Process Controls—Written procedures, deviations.
29. CFR, Title 21, Part 211.160(e). Current good manufacturing practice for finished pharmaceuticals—Laboratory Controls—General requirements.
30. CFR, Title 21, Part 314.3(b). General Provisions—Definitions.
31. FDA, Center for Drug Evaluation and Research, Format and Content for the CMC Section of an Annual Report, Guidance Document (Sept. 1994).
32. FDA, Center for Drug Evaluation and Research and Center for Biologics Evaluation and Research, Formal Meetings with Sponsors and Applicants for PDUFA Products, Guidance Document (Feb. 2000).
33. CFR, Title 21, Part 314.50(a)5. Content and format of an application—Application form.
34. Pharmaceutical Research and Manufacturers of America,2002 Industry Profile, PhRMA, Washington, DC, 2003.
35. DiMasi JA, Hansen RW, Grabowski HG. The Price of Innovation: New Estimates of Drug Development Costs. Health Econ 2003; 22:151–185.
36. Grabowski H, Vernon J, DiMasi J. Returns on Research and Development for 1990s New Drug Introductions. Pharmacoeconomics 2002 20(suppl. 3):11–29.
37. FDA, Pharmaceutical cGMPs for the 21st Century—A Risk-Based Approach Final Report (Sept. 2004).
38. International Conference on Harmonisation, Pharmaceutical Development Annex to Q8 (Draft Consensus Guideline), (Nov. 1, 2007).
39. FDA, Center for Drug Evaluation and Research, PAT—A Framework for Innovative Pharmaceutical Development, Manufacturing and Quality Assurance, Guidance Document (Sept. 2004).
40. Fed Reg, Vol. 72, No. 3, January 5, 2007, Notices Supplements and Other Changes to an Approved Application; Public Meeting, Docket No. 2006N-0525.
41. International Conference on Harmonisation, Pharmaceutical Development Q8, (Nov. 10, 2005).
42. International Conference on Harmonisation, Quality Risk Management Q9, (Nov. 9, 2005).
43. International Conference on Harmonisation, Pharmaceutical Quality System Q10, (May 9, 2007).
44. FDA, ONDC's New Risk-Based Pharmaceutical Quality Assessment System, http://www.fda.gov/cder/gmp/gmp2004/ONDC_reorg.pdf (accessed Feb. 2008).
45. Fed Reg, Submission of Chemistry, Manufacturing, and Controls Information in a New Drug Application Under the New Pharmaceutical Quality Assessment System; Notice of Pilot Program, Vol. 70, No. 134, July 14, 2005, 40719, Docket No. 2005N-0262.
46. FDA, Center for Drug Evaluation and Research, M2 eCTD: Electronic Common Technical Document Specifications, Guidance Document (April 2003).
47. FDA, Center for Drug Evaluation and Research, M4 Organization of the CTD, Guidance Document (Aug. 2001).
48. FDA, Center for Drug Evaluation and Research, M4 The CTD—Quality, Guidance Document (Aug. 2001).
49. Memorandum 33 to Public Docket No. 92S-0251 http://www.fda.gov/ohrms/dockets/dockets/92s0251/92s0251.htm accessed Feb. (2008).
50. FDA, Center for Drug Evaluation and Research and Center for Biologics Evaluation and Research, Providing Regulatory Submissions in Electronic Format—Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications, Guidance Document (Apr. 2006).



# 22 Living with 21 CFR Part 11 Compliance

### Richard L. Burcham
*BPI Technologies, Corp., Irving, Texas, U.S.A*

## INTRODUCTION TO FDA 21 CFR PART 11

### Introduction

This chapter provides to manufacturers, contract research organizations (CROs), data management centers, clinical investigators, and institutional review boards, recommendations regarding the use of computerized systems in regulated industries. The computerized system applies to records in electronic form that are used to create, modify, maintain, archive, retrieve, or transmit data required to be maintained or submitted to the FDA.

Because the source data are necessary for the reconstruction and evaluation to determine the safety of food and color additives and safety and effectiveness of new human and animal drugs, and medical devices, this is intended to assist in ensuring confidence in the reliability, quality, and integrity of electronic source data and source documentation (i.e., electronic records).

This guidance supersedes the guidance of the same name dated April 1999, and supplements the guidance for industry on *Part 11, Electronic Records; Electronic Signatures—Scope and Application* and the agency's international harmonization efforts when applying these guidances to source data. FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in agency guidances means that something is suggested or recommended, but not required.

### What is 21 CFR Part 11 and What Is It Not

21 CFR Part 11 is FDA's ruling on the requirements for the acceptability of records recorded and signed electronically. It covers nearly everything that is created and stored in an electronic form, and it applies to all businesses regulated by the FDA—not just pharmaceuticals.

Part 11 was first introduced in 1997 and is part of FDA's attempt to modernize the regulation and compliance of industries under their auspices. It is widely viewed by FDA as an opportunity for industry to improve business processes as opposed to just another regulatory burden.

These regulations, which apply to all FDA program areas, are intended to permit the widest possible use of electronic technology, compatible with FDA's responsibility to promote and protect public health. The use of electronic records as well as their submission to FDA is voluntary.

In short, 21 CFR Part 11 is not a mandate to replace paper or manual record-keeping systems. If a record is not generated or stored electronically, the ruling does not cover it. What is more, Part 11 is not just another IT exercise, and is not solvable with vendor-supplied software alone. Compliance also requires planning, resource, and process change.

Compliance with Part 11 will require investment in time and capital. It is estimated that the worldwide cost of compliance will range from $1billion to $5 billion. The wide range is further evidence that the FDA must strive for clearer definition of the principles and practices of Part 11.

Do not make the mistake of assuming that this is another unenforceable government regulation. The FDA is very serious about implementation and compliance, and sends out warning letters examples of which can be found on the FDA Web site. These letters are considered as public information.

## Background

There is an increasing use of computerized systems to generate and maintain source data and source documentation. Such electronic source data and source documentation must meet the same fundamental elements of data quality (e.g., attributable, legible, contemporaneous, original, and accurate) that are expected of paper records and must comply with all applicable statutory and regulatory requirements. FDA's acceptance of data for decision-making purposes depends on FDA's ability to verify the quality and integrity of the data during FDA on-site inspections and audits.

In 1991, members of the pharmaceutical industry met with the agency to determine how they could accommodate paperless record systems under the current good manufacturing practice regulations in parts 210 and 211 (21 CFR Parts 210 and 211). FDA created a Task Force on Electronic Identification/Signatures to develop a uniform approach by which the agency could accept electronic signatures and records in all program areas. In a February 24, 1992, report, a task force subgroup, the Electronic Identification/Signature Working Group, recommended publication of an advance notice of proposed rulemaking to obtain public comment on the issues involved.

FDA received 49 comments on the proposed rule. Those commenting represented a broad spectrum of interested parties: human and veterinary pharmaceutical companies as well as biological products, medical device, and food interest groups, including 11 trade associations, 25 manufacturers, and 1 Federal agency (2).

In March 1997, FDA issued 21 CFR Part 11, which provides criteria for acceptance by FDA, under certain circumstances, of electronic records, electronic signatures, and handwritten signatures executed to electronic records as equivalent to paper records and handwritten signatures executed on paper.

## Highlights of the Final Rule

The final rule provides criteria under which FDA will consider electronic records to be equivalent to paper records, and electronic signatures equivalent to traditional handwritten signatures. Part 11 (21 CFR Part 11) applies to any paper records required by statute or agency regulations and supersedes any existing paper record requirements by providing that electronic records may be used in lieu of paper

records. Electronic signatures which meet the requirements of the rule will be con-
sidered to be equivalent to full handwritten signatures, initials, and other general
signings required by agency regulations (2).

Section 11.2 provides that records may be maintained in electronic form and
electronic signatures may be used in lieu of traditional signatures. Records and sig-
natures submitted to the agency may be presented in an electronic form provided
the requirements of part 11 are met and the records have been identified in a public
docket as the type of submission the agency accepts in an electronic form. Unless
records are identified in this docket as appropriate for electronic submission, only
paper records will be regarded as official submissions.

Section 11.3 defines terms used in part 11, including the terms: biometrics,
closed system, open system, digital signature, electronic record, electronic signa-
ture, and handwritten signature.

Section 11.10 describes controls for closed systems, systems to which access
is controlled by persons responsible for the content of electronic records on that
system. These controls include measures designed to ensure the integrity of sys-
tem operations and information stored in the system. Such measures include (1)
validation; (2) the ability to generate accurate and complete copies of records; (3)
archival protection of records; (4) use of computer-generated, time-stamped audit
trails; (5) use of appropriate controls over systems documentation; and (6) a deter-
mination that persons who develop, maintain, or use electronic records and signa-
ture systems have the education, training, and experience to perform their assigned
tasks.

Section 11.10 also addresses the security of closed systems and requires that (1)
system access be limited to authorized individuals; (2) operational system checks be
used to enforce permitted sequencing of steps and events as appropriate; (3) author-
ity checks be used to ensure that only authorized individuals can use the system,
electronically sign a record, access the operation or computer system input or out-
put device, alter a record, or perform operations; (4) device (e.g., terminal) checks be
used to determine the validity of the source of data input or operation instruction;
and (5) written policies be established and adhered to holding individuals account-
able and responsible for actions initiated under their electronic signatures, so as to
deter record and signature falsification.

Those who use computerized systems must determine that individuals (e.g.,
employees, contractors) who develop, maintain, or use computerized systems have
the education, training, and experience necessary to perform their assigned tasks
[21 CFR 11.10(i)]. Training should be provided to individuals in the specific opera-
tions with regard to computerized systems that they are to perform. Training should
be conducted by qualified individuals on a continuing basis, as needed, to ensure
familiarity with the computerized system and with any changes to the system dur-
ing the course of the study. The FDA recommends that computer education, train-
ing, and experience be documented.

Section 11.30 sets forth controls for open systems, including the controls
required for closed systems in § 11.10 and additional measures such as document
encryption and use of appropriate digital signature standards to ensure record
authenticity, integrity, and confidentiality.

Section 11.50 requires signature manifestations to contain information asso-
ciated with the signing of electronic records. This information must include the
printed name of the signer, the date and time when the signature was executed,

and the meaning (such as review, approval, responsibility, and authorship) associated with the signature. In addition, this information is subject to the same controls as for electronic records and must be included in any human readable forms of the electronic record (such as electronic display or printout).

Under § 11.70, electronic signatures and handwritten signatures executed to electronic records must be linked to their respective records so that signatures cannot be excised, copied, or otherwise transferred to falsify an electronic record by ordinary means. Under the general requirements for electronic signatures, at § 11.100, each electronic signature must be unique to one individual and must not be reused by, or reassigned to, anyone else. Before an organization establishes, assigns, certifies, or otherwise sanctions an individual's electronic signature, the organization shall verify the identity of the individual.

Since Part 11 does not require that electronic records be signed using electronic signatures, e-records may be signed with handwritten signatures that are applied to electronic records or handwritten signatures that are applied to a piece of paper. If the handwritten signature is applied to a piece of paper, it must link to the electronic record. The FDA will publish guidance on how to achieve this link in the future, but for now it is suggested that you include in the paper as much information as possible to accurately identify the unique electronic record (e.g., at least file name, size in bytes, creation date, and a hash or checksum value.) However, the master record is still the electronic record. Thus, signing a printout of an electronic record does not exempt the electronic record from Part 11 compliance.

Section 11.200 provides that electronic signatures not based on biometrics must employ at least two distinct identification components such as an identification code and password. In addition, when an individual executes a series of signings during a single period of controlled system access, the first signing must be executed using all electronic signature components and the subsequent signings must be executed using at least one component designed to be used only by that individual. When an individual executes one or more signings not performed during a single period of controlled system access, each signing must be executed using all of the electronic signature components.

Electronic signatures not based on biometrics are also required to be used only by their genuine owners and administered and executed to ensure that attempted use of an individual's electronic signature by anyone else requires the collaboration of two or more individuals. This would make it more difficult for anyone to forge an electronic signature. Electronic signatures based upon biometrics must be designed to ensure that such signatures cannot be used by anyone other than the genuine owners.

Under § 11.300, electronic signatures based upon use of identification codes in combination with passwords must employ controls to ensure security and integrity. The controls must include the following provisions: (i) The uniqueness of each combined identification code and password must be maintained in such a way that no two individuals have the same combination of identification code and password; (ii) persons using identification codes and/or passwords must ensure that they are periodically recalled or revised; (iii) loss management procedures must be followed to deauthorize lost, stolen, missing, or otherwise potentially compromised tokens, cards, and other devices that bear or generate identification codes or password information; (iv) transaction safeguards must be used to prevent unauthorized use

of passwords and/or identification codes, and to detect and report any attempt to misuse such codes; (*v*) devices that bear or generate identification codes or password information, such as tokens or cards, must be tested initially and periodically to ensure that they function properly and have not been altered in an unauthorized manner.

## Goals and Expectations

The FDA has released a new Part 11 guidance on electronic copies that outlines seven key principles and practices that the agency advises industry to follow—and its inspectors to scrutinize:

1. Electronic copies of e-records provided to the FDA should be accurate and complete, but they do not necessarily have to be in the same file format and in the same media as the original e-records.
2. The process of making an electronic copy of an e-record in a file format that differs from the original should be validated.
3. Copies of hyperlinked records incorporated by reference should be included with the electronic copy of the electronic record.
4. Electronic copies of database queries should be included with electronic copies of electronic records when appropriate.
5. Electronic copies of electronic records should include, or be appended with, an authentication value.
6. Electronic copies of electronic records should be in a file format and on media that enable the FDA to read and process record data.
7. If the original electronic records were signed electronically, electronic copies of the original electronic records should have electronic signatures that are capable of being authenticated.

The FDA has done this to prevent and detect data falsification in order to ensure that electronic records are reliable. The purpose is to enable data reconstruction that can be checked and verified. Confidence in the data integrity is foremost. As a result, records must be under control of the company, not the individuals. (1)

## Implications for Regulated Businesses

FDA recognizes that it will take time for existing systems to attain compliance. This is a major undertaking for regulated industries because all systems generating GxP records are covered in the ruling. For noncompliance situations, FDA will consider the following factors when deciding appropriate corrective action.

- Extent of deviations
- Impact on product quality and data integrity
- Timeliness of planned corrective measures
- Compliance history of establishment

The extent of remediation will be determined by FDA on a case-by-case basis and may include

- acceptance of corrective action plan,
- delay of product approval, and
- halt product shipments.

434                                                                                          Burcham



**FIGURE 1**   Risk escalation. *Source:* From Ref. 4.

FDA warning letters (a. k.a Form 483) relative to electronic records are actively being issued today. Many cite computer systems validation (CSV) and security, and a growing number cite Part 11 specifically. These warning letters, of course, are and will continue to be public record! They can be accessed at www.fda.gov/foi/warning.htm.

PhRMA's response to Part 11 guidance asks for more time or a phased approach over 5 to 10 years. It also requests prioritized remediation based on risk and availability of compliant software. Unfortunately, FDA disagrees strongly and will continue to aggressively issue warnings.

The risk grows at each stage of the process where computer systems are used to manage the production process for regulated industries. An illustration of this for process manufacturing is shown in Figure 1.

Given the potential for escalating risk, most companies are scrambling to hire expertise to get systems running in the short run. In the long run, they are developing in-house expertise. Companies must change their processes and learn to "think" like a regulator while keeping in mind that compliance is a continuous process. What's more, companies must demonstrate to the FDA that they have control over all changes.

## UNDERSTANDING THE PART 11 RULING

### Archiving Data and Part 11 Compliance
As discussed earlier, Subpart B of Part 11 is broken down into three major sections.

1. 11.10 Controls for Closed Systems
2. 11.50 Signature Manifestations
3. 11.70 Signature/Record Linking

Each of these sections will be discussed in detail but first a few common definitions are needed.

## Definitions

There are several terms used in the Part 11 ruling that need to be defined and understood in order to interpret compliance requirements. Interpretation of Part 11 centers on the following terms.

### Definition—Electronic Record (ER)

"Any combination of text, graphics, data, audio, pictorial or other information representation in digital form that is created, modified, maintained, archived, retrieved, or distributed by a computer system." (2)

### Definition—Electronic Signature (ES)

"A computer data compilation of any symbol or series of symbols, executed, adopted, or authorized by an individual to be the legally binding equivalent of the individual's handwritten signature."(2)

### Definition—Biometrics and Digital Signatures

**Biometrics**

"A method of verifying an individual's identity based on the individual's physical feature(s) or repeatable action(s) where those features and/or actions are both unique to that individual and measurable."(2)

### Digital Signature

"An electronic method of signing electronic records based on cryptographic techniques of authentication that enables the verification of the identity of the signer and the integrity of the electronic record."(2)

### Definition—Closed System

"An environment in which system access is controlled by persons who are responsible for the content of the electronic records on the system."(2)

### Definition—Open System

"An environment in which system access is not controlled by persons who are responsible for the content of the electronic records on the system."(2)

### Definition—Hybrid System

A "Hybrid System" is defined as an environment consisting of both electronic and paper-based records (Frequently Characterized by Handwritten Signatures Executed on Paper). A very common example of a Hybrid System is one in which the system user generates an electronic record using a computer-based system (e-batch records, analytical instruments, etc.) and then is require to sign that record as per the Predicate Rules (GLP, GMP, and GCP). However, the system does not have an electronic signature option, so the user has to print out the report and sign the paper copy. Now he has an electronic record and a paper/handwritten signature. The "system" has an electronic and a paper component, hence the term, hybrid.

## Understanding Section 11.10 Controls for Closed Systems

According to the ruling "Persons who use closed systems to create, modify, maintain, or transmit electronic records shall employ procedures and controls designed to ensure the authenticity, integrity, and, when appropriate, the confidentiality of

electronic records, and to ensure that the signer cannot readily repudiate the signed record as not genuine."

Section 11.10 goes on to define what types of controls need to be in place for closed loop systems.

a. Systems must be validated.
b. Copies of records must be provided to the FDA.
c. Protection of records must be done throughout the retention period.
d. Limited access to the electronic records must exist.
e. All audit trails must be recorded.
f. There must be operational system checks.
g. Controls must be in place for user authority.
h. Device source controls must be in use.
i. Users must be trained on requirements.
j. Policies must exist for electronic signatures.
k. There must be controlled access to documentation.

The closed loop system must have the ability to generate and complete copies of records in both human readable and electronic form. What's more, it must be suitable for inspection, review, and copying by the agency. Records must be protected to enable their accurate and ready retrieval throughout the records retention period.

The agency agrees that providing exact copies of electronic records in the strictest meaning of the word "true" may not always be feasible. FDA, nonetheless, believes that it is vital that copies of electronic records provided to the agency be accurate and complete. Accordingly, in 11.10(b) the original language "true" has been replaced with "accurate and complete." The agency expects that this revision should obviate the potential problems noted in the draft comments. The revision should also reduce the costs of providing copies by making clear that firms need not maintain obsolete equipment in order to make copies that are "true" with respect to format and computer system.

How we store data is just as important as the information it contains. As an example, consider the 1986 BBC Doomsday Project. Text, pictures, documents, video, audio, etc. were all recorded on "state of the art" laser disks. One would expect that this would pass FDA Part 11 compliance. Unfortunately, 21 years later these electronic records are now "unreadable." What's more, who has a laser disk reader? The lesson learned is that organizations must look forward as much as possible when deciding on how they are going to manage electronic records. Obviously, the ability to perform migration as technology changes is a fundamental requirement (3).

The question arises as to just how long of a lifetime does the FDA expect an electronic record to have? Relative to regulatory compliance, is the time frame equal to the lifetime of the product + X years? Or is it the statue of limitations on intellectual property: 17 years, legal-statute of limitations? These are issues that still need to be clearly defined.

Also clouding the lifetime issue is the fact that there are many different types of electronic data. So, should the lifetime be different for each data type? Again, no clear answer. Included among the many different types of electronic data are:

| Common data types | Rich data types |
|---|---|
| 1. Images | 1. Chemical structures/reactions |
|    a. JPEG |    a. MOL |
|    b. GIF |    b. SDF |
|    c. TIF |    c. PDB |
|    d. Etc. |    d. Etc. |
| 2. ASCII text | 2. Instrument applications |
|    a. CSV |    a. Vendor equipment specific |
|    b. Etc. | |
| 3. Web pages | 3. Office applications |
|    a. HTML |    a. Documents |
|    b. ASP |    b. Spreadsheets |
|    c. PHP |    c. PDF |
|    d. DHTML |    d. Presentations |
| |    e. Etc. |

In particular, rich data types present an archiving problem because storage formats are often proprietary. Consequently, data is only accessible via specialized software applications and may be platform specific including proprietary operating systems, databases, and software versions. There are also concerns with application integration. That is, is it practical and/or possible to broadly distribute specialized applications software for accessing the data? Lastly, rich data types have more finite lifetimes than common data types—for example, will the specialized applications still be available, supported, and operational throughout the lifetime of the data?

Fortunately, FDA realizes that it must provide guidance on these issues. In a September 5, 2002, statement, FDA provided additional guidance for maintenance of electronic records. FDA defined two acceptable practices:

1. "Time Capsule" Approach
   a. Preserve exact computing environment hardware and software.
   b. FDA admits that this is only viable as a short-term solution.
2. "Data Migration" Approach
   a. Translate and migrate data forward as computer technology changes.
   b. Viable long-term strategy
   c. In the migration approach, the new computer system should enable organizations to search, sort, and process information in the migrated electronic record at least at the same level as what could be attained in the old system (even though) the new system may employ different hardware and software.

Another major requirement of section 11.10 relates to "Security and Authentication." Section 11.10 requires limited system access to authorized individuals only. Authority checks must be used to ensure that only authorized individuals can use the system, electronically sign a record, access the operation or computer system input or output device, alter a record, or perform the operation at hand. All individuals must have a unique identifier for access, creation, and modification of electronic records.

Many individual data systems already have security capabilities. However, organizations must keep in mind that data archive systems are generally

independent of other systems and there likely will be a need to integrate multiple authentication mechanisms. An example would be the need to integrate Oracle/database, MS, Networking, MS Active Directory PKI, and LDAP.

A common misconception about archives and audit trails is that a compliant system can make noncompliant instruments and applications compliant by adding security and audit trail capabilities to the process. The reality is that archiving systems can only audit trail changes made to *their own data*. What's more, archiving systems cannot track/approve specific changes made to rich data types with native applications. Reprocessing, method alteration, and data manipulations are key considerations.

FDA's guidance on archives and audit trails is to use secure, computer-generated, and time-stamped audit trails to independently record the date and time of operator entries and actions that create, modify, or delete electronic records. In short, record changes shall not obscure previously recorded information. Moreover, audit trail documentation shall be retained for a period of at least as long as that required for the subject electronic records and shall be available for agency review and copying.

## Understanding Sections 11.50, Signature Manifestations, and 11.70, Signature/Record Linking

Section 11.50 provides guidance on signed electronic records in that such records must clearly indicate:

1. the printed name of the signer,
2. the date and time when the signature was executed, and
3. the meaning (such as review, approval, responsibility, or authorship).

The above items are subject to the same controls as for electronic records. Furthermore, Part 11.70 requires that electronic signatures and handwritten signatures executed to electronic records shall be linked to their respective electronic records to ensure that the signatures cannot be excised, copied, or otherwise transferred to falsify an electronic record by ordinary means.

According to FDA, compliance can be ensured with "Closed Loop" systems where signatures and data can be linked via specific implementations. Unfortunately, current implementations are generally proprietary and there is a lack of industry standards in this area. Also, migration will be difficult with large volume of data. However, this is where we are today.

## ACHIEVING COMPLIANCE—COMPLIANCE ENABLING TECHNOLOGIES

### Compliance and Flexibility

Electronic records and/or signatures must meet several conditions in order to be acceptable as an alternative to a paper record or handwritten signature. These conditions are necessary to permit the agency to protect and promote the public health. For example, FDA must retain the ability to audit records to detect unauthorized modifications, to detect simple errors, and to deter falsification.

Whereas there are many scientific techniques to show changes in paper records (e.g., analysis of the paper, signs of erasures, and handwriting analysis), these methods do not apply to electronic records. For electronic records and

submissions to have the same integrity as paper records, they must be developed, maintained, and used under circumstances that make it difficult for them to be inappropriately modified. Without these assurances, FDA's objective of enabling electronic records and signatures to have standing equal to paper records and handwritten signatures, and to satisfy the requirements of existing statutes and regulations, cannot be met.

Within these constraints, FDA has attempted to select alternatives that provide as much flexibility as practicable without endangering the integrity of the electronic records. The agency decided not to make the required extent and stringency of controls dependent on the type of record or transactions, so that firms can decide for themselves what level of controls are worthwhile in each case.

For example, FDA chose to give firms maximum flexibility in determining: (*i*) The circumstances under which management would have to be notified of security problems, (*ii*) the means by which firms achieve the required link between an electronic signature and an electronic record, (*iii*) the circumstances under which extra security and authentication measures are warranted in open systems, (*iv*) when to use operational system checks to ensure proper event sequencing, and (*v*) when to use terminal checks to ensure that data and instructions originate from a valid source.

As a rule of thumb, for records required to be maintained but not submitted to the agency, persons may use electronic records in lieu of paper records or electronic signatures in lieu of traditional signatures, in whole or in part, provided that the requirements of Part 11 are met.

For records submitted to the agency, persons may use electronic records in lieu of paper records or electronic signatures in lieu of traditional signatures, in whole or in part, provided that:

1. The requirements of Part 11 are met, and
2. The document or parts of a document to be submitted have been identified in public docket no. 92 S—0251 as being the type of submission the agency accepts in electronic form. This docket will identify specifically what types of documents or parts of documents are acceptable for submission in electronic form without paper records and the agency receiving unit(s) (e.g., specific center, office, division, branch) to which such submissions may be made. Documents to agency receiving unit(s) not specified in the public docket will not be considered as official if they are submitted in electronic form; paper forms of such documents will be considered as official and must accompany any electronic records. Persons are expected to consult with the intended agency receiving unit for details on how (e.g., method of transmission, media, file formats, and technical protocols) and whether to proceed with the electronic submission (2).

## STANDARD OPERATING PROCEDURES

Standard operating procedures (SOPs) and documentation pertinent to the use of a computerized system should be made available for use by appropriate study personnel at the clinical site or remotely and for inspection by FDA. The SOPs should include, but are not limited to, the following processes:

• System setup/installation (including the description and specific use of software, hardware, and physical environment and the relationship);

- System operating manual;
- Validation and functionality testing;
- Data collection and handling (including data archiving, audit trails, and risk assessment);
- System maintenance (including system decommissioning);
- System security measures;
- Change control;
- Data backup, recovery, and contingency plans;
- Alternative recording methods (in the case of system unavailability);
- Computer user training; and
- Roles and responsibilities of sponsors, clinical sites, and other parties with respect to the use of computerized systems in the clinical trials.

## STRATEGIES FOR IMPLEMENTATION

We have discussed the rules and guidelines of the Part 11 ruling but the question is: How do organizations comply? Most technologies, as mentioned earlier, are proprietary, nonglobal, and lack universal standards to be an effective means for Part 11 compliance.

However, XML or extensible markup language is one exception in that industry and government worldwide as a means of compliance have embraced it.

### What Is XML and What Is the Role of Extensible Markup Language?

XML is a standardized representation for data content. It is used for text, instrumentation data, and application integration. What's more, it is not proprietary and was developed and is supported by the W3 C, a nonprofit consortium. There are several standards developed by the W3 C that relate to XML including schema definition, style sheet and transformation, and search capabilities—all of which make it easier to comply with Part 11.

Extensible Markup Language is global in scope and according to a recent survey; over 95% of Life Sciences executives responding said that they are currently planning to deploy XML as part of their R&D strategy. Nearly all said that they expect to be employing XML by 2010 (Fig. 2) (4).

What's more, XML has the support of FDA and according to Software Quality Assurance (SQA) Computer Validation Initiative Committee (CVIC) meeting 6/10/97 with Paul Motise (FDA): "The problem of system obsolescence can be solved by careful migration from one electronic file format and platform to another. E-commerce and e-government are moving toward, not away from, common e-record formats that are interoperable on many different platforms. Consider the rise of XML, for example."

Extensible Markup Language can be used to represent any type of data and it is specifically designed for strong typing of rich data—thereby solving some of the rich data problems discussed earlier in this chapter. Furthermore, XML is platform independent, which simplifies distribution and forward migration to avoid obsolescence. XML is extensible; a requirement to support future data types; and it is a public domain standard. Perhaps most importantly, it allows data models to be made available to anyone, but be "closed" to interpretation—a key Part 11 requirement.



**FIGURE 2** XML in life sciences. *Source:* "XML in the Life Sciences", 2007 BPI Research Center.

Extensible Markup Language can satisfy electronic data collection requirements of Part 11 as well. XML schemas exist for all instrument data types, and different archiving systems may be implemented for different data types such as:

1. analytical and laboratory instruments,
2. chemical structures/reactions,
3. clinical trials/studies, and
4. documents.

Application integration, internal or external to your organization, can be accomplished through the exchange of data and transaction instructions as XML. This has wide industry support in Life Sciences as well as with application vendors. Practically, everyone and everything is involved with web services making application integration, for the purposes of Part 11 compliance, both feasible and achievable. (3)

All of the major application and database vendors are committed to XML and web support including IBM, Hewlett-Packard, Sun Microsystems, Oracle, Microsoft, SAP, etc. The languages supported include Java, C, C++, Python, Perl, and Microsoft languages (VB, C#, etc.) Supporting platforms include NET, J2EE, Apache, Zope, etc; and operating systems include Unix (Solaris, Linux, etc.), Windows, MacOS X, etc.

In short, companies have a wide selection of technologies utilizing XML with which to achieve ongoing Part 11 compliance.

### Example of Part 11 Compliance

Discussed later is an example of how Part 11 compliance can be achieved even when two separate companies are working together on a common project but with different systems and technologies. In this example, a CRO is collaborating with a pharmaceutical company to research a new product (4).

The transaction: request LIMS test from Lotus Notes



**FIGURE 3**   Example from Part 11 compliance.

Assumptions:

1. A CRO based in the United Kingdom is working on a research project with a pharmaceutical company in the United States.
2. The CRO uses Lotus Notes ELN authoring application.
3. The pharmaceutical company uses Thermo LabSystems Nautilus LIMS and eRecordManager.
4. The companies worked separately over the web to develop system interfaces.

Transaction process:

Step 1: ELN user at CRO in the United Kingdom logs in and creates a sample request in the LIMS of the Pharmaceutical Company—this is done directly from the ELN and the user has no awareness that the request was sent to the LIMS.

Step 2: LIMS user logs in, sees the request, and processes the sample request—Analysis results are entered directly into LIMS, and eRM automatically captures the chromatogram. The LIMS user has no idea that the sample request came from the CRO's ELN.

Step 3: The ELN user at the CRO refreshes his screen/page and the analysis results and chromatogram automatically appears—The chromatogram can be zoomed using an XML enabled plug-in and data are pulled from LIMS and eRM systems using XML.

The set of transactions is illustrated in Figure 3.

The only thing that needs to be added to this set of transactions for Part 11 compliance is electronic signatures—that is, the electronic record criteria of Part 11 has been satisfied. There are two criterions that must be added to the electronic record of this transaction in order to be compliant with electronic signatures.

1. Identifying information for the individual and date/time.
2. Connective links to the information that was signed.

Implementation of the first criterion requires authentication of the individual. This can be satisfied in a variety of ways including passwords and digital codes of identification and the printed name of the signer; the date and time that the signature was executed and the meaning such as review, approval, responsibility, or authorship.

Implementation of the second criterion requires encrypting hash calculation of data and signature; requires strong encryption algorithm (i.e., SHA); and, at a minimum, it requires a private digital key. Public/private key mechanisms can also be used.

The technologies available for electronic signatures are largely application specific in that many Part 11 applications have internal signature-data linking. However, the proprietary nature of these applications makes forward migration of data & signature difficult, if not impossible. There are also commercial packages available including Verisign, Entrust, ValiCert, Microsoft (Passport), and Liberty Alliance. However, perhaps the best solution for all of the reasons previously discussed is to use the public domain—that is, XML Signature Encryption.

The final step to make the above example Part 11 compliant is archiving the transaction. Archiving systems must be implemented as "closed" systems. By this FDA guidance calls for:

- Record validity must not be challenged.
- Inseparability of data, audit trail, e-signatures, etc.
- Must be maintained when moving from application-specific implementations to more open technologies (e.g., XML Signature).

With respect to infrastructure, the FDA's focus is on "system security," not on "application" security. Specifically, they are interested in whether or not the records are stored so that only the "system" has access—no back doors, and, that tampering can be detected.

## BENEFITS OF 21 CFR PART 11 TO ORGANIZATIONS

Because the Part 11 affects such a broad range of industries, no data currently exist to estimate precisely the total number of entities that will potentially benefit from the rule, but the number is substantial. For example, within the medical devices industry alone, the Small Business Administration estimates that over 3221 firms are small businesses (i.e., have fewer than 500 employees). Small Business Administration also estimates that 504 pharmaceutical firms are small businesses with fewer than 500 employees. Of the approximately 2204 registered blood and plasma establishments that are neither government owned nor part of the American Red Cross, most are nonprofit establishments that are not nationally dominant and thus may be small entities as defined by the Regulatory Flexibility Act (2).

Not all submissions to FDA will immediately be acceptable electronically, even if the submission and the electronic record conform to the criteria set forth in this rule. A particular required submission will be acceptable in electronic form only after it has been identified to this effect in public docket 92 S–0251. (The agency unit that can receive that electronic submission will also be identified in the docket.)

Thus, although all entities subject to FDA regulations are potentially affected by this rule, the rule will actually only benefit those that (*i*) are required to

submit records or other documents that have been identified in the public docket as acceptable if submitted electronically, and (*ii*) choose this method of submission, instead of traditional paper record submissions. The potential range of submissions includes such records as new drug applications, medical device premarket notifications, food additive petitions, and medicated feed applications. FDA will consider these and all other required submissions as candidates for optional electronic format.

Although the benefits of making electronic submissions to FDA will be phased in over time, as the agency accepts more submissions in electronic form, firms can, upon the rule's effective date, immediately benefit from using electronic records/signatures for records they are required to keep, but not submit to FDA. Such records include, but are not limited to, pharmaceutical and medical device batch production records, complaint records, and food processing records.

What's more, as stated earlier in this chapter, the activities regulated by this rule are voluntary—no entity is required by this rule to maintain or submit records electronically if it does not wish to do so. Presumably, no firm (or other regulated entity) will implement electronic record keeping unless the benefits to that firm are expected to exceed any costs (including capital and maintenance costs). Thus, the industry will incur no net costs as a result of this rule.

Ultimately, the rule will permit regulated industry and FDA to operate with greater flexibility, in ways that will improve both the efficiency and the speed of industry's operations and the regulatory process. At the same time, it ensures that individuals will assign the same level of importance to affixing an electronic signature, and the records to which that signature attests, as they currently do to a handwritten signature.

## Benefits and Costs

Compliance is just one of the benefits. Some of the other perceived and actual benefits experienced by life sciences companies include: (2,4)

- better quality control,
- cost reduction associated with reduced product loss,
- dramatically simplifies the management processes required for compliance,
- able to search and find records in a fraction of the time,
- minimized compliance-related headcount,
- always prepared for FDA inspections,
- minimized human error,
- reductions in entry errors,
- implements a solution quickly without disrupting the organization,
- improved ability to analyze trends and problems,
- improved data integrity and accountability controls,
- increased speed of information exchange,
- reduced cost for storage and control of records,
- faster and more efficient FDA reviews and approvals of FDA-regulated product,
- reductions in system vulnerability and abuse,
- lower regulatory or compliance-driven costs,
- shorten validation time,
- reduces the costly time delays associated with lengthy approval cycles,

- reduction in costs related to record retention,
- and more.

There may be some small organizations that currently submit records on paper, but archive records electronically. These entities will need to ensure that their existing electronic systems conform to the requirements for electronic record keeping described in this rule. Once they have done so, however, they may also take advantage of all the other benefits of electronic record keeping. Therefore, no individual small entity is expected to experience direct costs that exceed benefits as a result of this rule.

Furthermore, because almost all of the rule's provisions reflect contemporary security measures and controls that respondents to the advance notice of proposed rulemaking identified, most firms should have to make few, if any, modifications to their systems.

For entities that do choose electronic record keeping, the magnitude of the costs associated with doing so will depend on several factors, such as the level of appropriate computer hardware and software already in place in a given firm, the types of conforming technologies selected, and the size and dispersion of the firm. For example, biometric signature technologies may be more expensive than nonbiometric technologies; firms that choose the former technology may encounter relatively higher costs. Large, geographically dispersed firms may need some institutional security procedures that smaller firms, with fewer persons in more geographically concentrated areas, may not need.

Firms that require wholesale technology replacements in order to adopt electronic record/signature technology may face much higher costs than those that require only minor modifications (e.g., because they already have similar technology for internal security and quality control purposes). Among the firms that must undertake major changes to implement electronic record keeping, costs will be lower for those able to undertake these changes simultaneously with other planned computer and security upgrades. New firms entering the market may have a slight advantage in implementing technologies that conform to this rule, because the technologies and associated procedures can be put in place as part of the general start-up.

There is an additional cost often overlooked that will be incurred as part of compliance—professional skills. If a firm elects electronic record keeping and submissions, it must take steps to ensure that all persons involved in developing, maintaining, and using electronic records and electronic signature systems have the education, training, and experience to perform the tasks involved.

The level of training and experience that will be required depends on the tasks that the person performs. For example, an individual whose sole involvement with electronic records is infrequent might only need sufficient training to understand and use the required procedures. On the other hand, an individual involved in developing an electronic record system for a firm wishing to convert from a paper record-keeping system would probably need more education or training in computer systems and software design and implementation. In addition, FDA expects that such a person would also have specific on-the-job training and experience related to the particular type of records kept by that firm.

The relevant education, training, and experience of each individual involved in developing, maintaining, or using electronic records/submissions must be

documented. However, no specific examinations or credentials for these individuals are required by the rule.

## COMPUTER SYSTEMS VALIDATION

### CSV Overview

FDA-regulated companies are very familiar with a variety of validation processes ranging from full process and facilities validation to that of qualifying individual utilities, equipment, instruments, and everything in between. When it comes to 21 CFR Part 11 and CSV, however, regulated companies are purchasing configurable electronic quality management systems from software manufacturers that may have little or no experience with validation. This is especially important since the vendor is responsible for managing the ongoing development and maintenance of the system.

The use of vendor-supplied "off-the-shelf" configurable software offers many challenges to validation, including supplier audits. A knowledgeable and "validation-ready" supplier can make the process much easier and faster. To this extent, regulated companies must continually educate themselves about validation of computer systems for electronic documentation management as applied in 21 CFR Part 11. FDA's expectations for Part 11 compliance and validation of computer systems were seen initially in the FDA 483 s and warning letters issued during inspections.

Now we are operating within the new FDA enforcement discretion under the September 2003 Guidance for Industry; Part 11, Electronic Records; Electronic Signatures—Scope and Application.

This chapter will provide an overview of CSV and what FDA is requiring companies to do to become and remain compliant.

### Validation Realities

FDA's interpretation of 21 CFR Part 11 for inspections of computer systems and computer validation has been refocused through the Scope and Application to emphasize predicate regulation record requirements and shift the emphasis to documented risk assessment of each company's particular circumstances. Compliance will remain a part of routine FDA inspections based on predicate regulations, including validation.

Software development methodologies, standards, and guidelines have been available for 30 to 40 years. There is no excuse for developers of configurable "off-the-shelf" software not to be capable of validation and 21 CFR Part 11 compliance. FDA has emphasized that software/engineering principles can be applied to, and are an integral part of, the system development life cycle (SDLC). Software and system development and testing are part of the SDLC.

Software and computer system life cycle principles in a GxP setting should be supported by a corporate CSV policy with supporting global SOPs for the SDLC, Validation, Supplier Assessment and Audits, Change Control, and Revalidation—along with local SOPs for specific systems.

Corporate CSV policy should be in place and empower a CSV Committee and a Systems QA Planning process.

Verification answers the question: "Was the product built right?" and Validation answers the question: "Was the right product built right?"

## Current FDA Expectations—21 CFR Part 11 and Validation

21 CFR Part 11 was developed to set standards for systems containing electronic records and electronic signatures. Inherent in 21 CFR Part 11 compliance is validation of the system used within its current operating environment.

Under the 2003 Guidance for Industry; Part 11, Electronic Records; Electronic Signatures—Scope and Application, "Persons must still comply with all applicable predicate rule requirements for validation [e.g., 21 CFR 820.70(i)]."

Also, "We recommend that you base your approach on a justified and documented risk assessment and a determination of the potential of the system to affect product quality and safety and record integrity."

Finally, "For further guidance on validation of computerized systems, see FDA's Guidance for Industry and FDA Staff CDRH "General Principles of Software Validation" and industry guidance such as the "GAMP4 Guide for Validation of Automated Systems" (6).

## FDA In-house Training and Industry Education

Training for Investigators has expanded since the promulgation of 21 CFR Part 11, focused on evaluation of CSV. Martin Browning provided input into the design of the training program prior to his retirement from FDA and conducted the training through his company, EduQuest, Inc., including Janis Halverson, a former FDA expert on CSV. The primary purpose of the course was to provide FDA personnel (across all program areas) with a greater knowledge of computer system development and validation so as to provide a more consistent and thorough approach to investigation of these systems.

FDA insists that computer systems must be validated through a development life cycle containing strict guidelines with concept, user and functional requirements and design phases, followed by the implementation and testing with qualification protocols.

Since the promulgation of 21 CFR Part 11, extensive education and training programs on software/system development and validation have been promoted in the FDA industry. Initially, Martin Browning provided the FDA compliance training to industry audiences. Now online training through FDA's Virtual University is available. International Society for Pharmaceutical Engineering's (ISPE) Good Automated Manufacturing Practice (GAMP) offers education and training (see www. ispe.org). In addition, professional organizations such as PDA and IVT offer courses along with other organizations and consultants in the field.

## GAMP: The "V" Model Framework for Specification, Design, and Testing, using IQ/OQ/PQ Qualifications

Basic FDA requirements for CSV include Installation Qualification (IQ), Operational Qualification (OQ), and Performance Qualification (PQ). The "V-Model" diagram shown in Figure 4 is one of the most commonly used methods for representing the "basic" framework for specification, design, and build qualification. This methodology particularly lays emphasis on creating and maintaining a Master Validation Plan, documenting the entire process, while generating system

*Burcham*



**FIGURE 4**  GAMP4 V-Model for validation of automated systems.

requirements, design specifications, executing IQ/OQ/PQ qualifications, and maintaining the software after it has been validated.

The "V-Model" was taken from the ISPE's GAMP4 Guide for Validation of Automated Systems, used widely in Pharmaceutical and Medical Device Manufacturing.

GAMP4 is the most widely used, internationally accepted, guideline for validation of computer systems. The GAMP4 guide is now produced by ISPE and its GAMP forum, a technical subcommittee of ISPE. Sion Wyn, GAMP founder, was part of the FDA Part 11 workgroup that developed the 2003 Guidance for Industry: Part 11, Electronic Records; Electronic Signatures—Scope and Application. It referenced industry guidance such as the "GAMP4 Guide for Validation of Automated Systems."

Paul D'Eramo, Executive Director for Worldwide Quality Policy and Compliance Management at Johnson & Johnson, and former FDA investigator, presented the "V-Model" at the ISPE annual meeting in November 2000 in his Part 11 Implementation Strategies presentation. Johnson & Johnson is utilizing the GAMP methodology as an integral part of their computer validation guidelines in their Part 11 compliance program. (For more detailed information and how to obtain a copy of the GAMP4 guide, visit: http://www.gamp.org.)

GAMP4 defines categories of software and the guidance for the CSV approach, as shown in Figure 5. "Off-the-shelf" document control systems fall in category 4—Configurable Software Packages. GAMP4 guide for validation includes a supplier audit and validation of the application and any custom code. The validation of the application is focused on specifications tied to IQ/OQ/PQ qualifications.

| Category | Type of software | Validation approach |
|---|---|---|
| 1 | Operating systems | Record version |
| 2 | Standard instruments | Record configuration |
| 3 | Standard software packages | Validate application |
| 4 | Configurable software packages | Audit supplier, validate application, and any customer code |
| 5 | Customer systems | Audit supplier and validate complete system |

**FIGURE 5** Validation approach for software systems.

In order for FDA to consider configurable software systems to be validated, the following steps in the system life cycle must be followed and documented. All these important elements of validation are presented in the GAMP4 guide in performing "full-cycle" validation services.

- Validation Master Plan
- Risk Management Plan[*]
- User Requirements Specifications
- Vendor Assessment/Audit, Qualification and Acceptance
- Functional Description and Specification
- Design Specifications
- System Installation Qualification
- System Operational Qualification
- System Performance Qualification
- Validation Summary Report
- System SOPs and Training
- Maintenance, Continuous Monitoring, Change Control, and Corrective and Preventive Action (CAPA)
- Security Measures

### Risk-Based Assessment and Risk Management Plans

As both FDA and industry have discovered over the past few years, "a one size fits all" interpretation of regulations, such as 21 CFR Part 11, is not feasible. The agency has decided to put the onus of regulatory interpretation on the organizations that it regulates. This will allow and obligate companies to use a professional "science-based" approach with documented justification through risk management plans.

[*] The Risk Management Process has been defined through the GAMP4 Appendix M3 and through the FDA-referenced ISO 14971:2000 (Application of Risk Management to Medical Devices) standard

FDA-regulated organizations must now justify their course of action based on their interpretation of the regulations as well as any risk associated with those actions. This has been discussed in the earlier GAMP section and in the guidance document itself (2003 Guidance for Industry; Part 11, Electronic Records; Electronic Signatures—Scope and Application). There are various recommendations for using a documented justification to determine the need and/or extent of implementing certain Part 11 controls or performing certain regulatory activities. At the core of such justification would typically be some form of risk-based assessment with the purpose of targeting potential risks that may adversely affect operations and to document the strategies used to manage or avoid those risks. Documentation may include a formal Risk Management Plan that would detail the risk assessment and the risk mitigation activities during system implementation and IQ/OQ/PQ testing. In regard to Part 11, where predicate rule requirements do not exist, a risk-based assessment may be used to determine the following:

* The critical risk factors
* The need for validation and the extent of testing required
* The need to implement audit trails (or an equivalent control) in the system and the form the audit will take
* The strategy for maintaining records integrity and reliability throughout their record retention period

Risk assessment methodologies are well defined and typically involve identifying hazards and risk scenarios and the consequences of those adverse events. The next step is to classify and prioritize those risks using a number of risk factors. Business and GXP "Impact" is the most critical factor. The factors often used to assess are:

Impact—The severity of the negative impact that will accompany an adverse event. This can be expressed on any scale deemed appropriate (high–low).

Likelihood/Probability—The likelihood of an adverse event occurring. This can be measured on a relative scale such as across a time period or number of operations. (high–low, 1–5)

Detection—The likelihood that a negative condition will be detected before the negative impact occurs.

The purpose of the GAMP4 Guide Appendix M3 is to describe a simple risk assessment process that may be applied to systems to enable targeting of the validation efforts to those areas and functions that most require it.

The following Figures 6(A) and 6(B) represent simple, graphical methods for assessing risk, which have been adapted from that found in the GAMP4 guide. There are many other acceptable methods for performing such assessments including FMEA (Failure Mode and Effects Analysis), FMECA (**Failure Mode, Effects, and Criticality Analysis**), FTA (**Fault Tree Analysis**), HAZOP (**Hazard and Operability Analysis**), and HACCP (**Hazard Analysis and Critical Control Point**) analysis.

Risk factors are generally rated on a scale of low, medium, or high, although a wider scale can be used to achieve a finer granularity in classifying and prioritizing the likelihood of risks. There we use a scale of 1 to 5. Once the risk factors are



**FIGURE 6(A)** Risk assessment chart.                **FIGURE 6(B)** Risk assessment chart.

determined, the impact and likelihood factors can be cross-referenced as in Figure 3 to achieve a risk classification. A final risk priority can then be determined by cross-referencing the results from Figure 3 with the detection factor in the 2003 Part 11 Guidance—Scope and Application, references ISO 14971:2000, Medical Devices—Application of Risk Management to Medical Devices as a standard for risk methodology. The schematic representation of the risk management process is shown in Figure 7.

The final risk classifications and priorities can be used to make decisions on the need for/extent of validation, the need for/extent of audit trail implementation, and the strategy for record retention. For electronic document management system applications, the risk classification is sufficient.

In determining the need for validation, the risk assessment should generally involve reviewing, at a high level, the major functionalities and usage of the system and the potential health and business risks posed by adverse events based on those functions.

For justifying the extent of validation to be performed, the risk assessment will be similar to the one for identifying the need for validation. The key difference is that this assessment will be much more detailed and includes "digging down" into the subfunctions and user requirements and identifying the potential health and business risks posed by adverse events associated with those functions.

To establish the need for and extent of audit trail functionality required by a system, the risk assessment should generally involve reviewing the potential health and business risks posed by both accidental and intentional adverse events associated with the traceability of and data integrity of the records. To determine the strategy for record retention, the risk assessment should generally involve reviewing the potential health and business risks posed by a loss in value of the records over time.

Consider an automated electronic document management system as a risk assessment example. It is used to store and revise documents; it maintains a database of all documents. Persons in different job descriptions can generate and automatically reference documents. In quality and production systems, the quality management documents include numerous predicate rule documents, such as Master Batch Records, Product Specifications, Test Methods, SOPs, Training Records, and CAPA forms.

452                                                                                    Burcham



**FIGURE 7**   Risk management process.

In an FDA-regulated industry, the system is subject to validation requirements. Validation is pertinent under the 23 CFR 820.70(i) reference.

One company that deploys this system is a small biotech pharmaceutical company. Performing risk assessment early and quickly identified that the failure of this system could lead to serious implications, for regulatory risk (inability to demonstrate the necessary control of documents required by 21 CFR 210/211/820), and more importantly, that insufficient control could possibly result in compromise of regulatory documentation and/or the adulteration of the drug. Thus, the "full cycle" of validation with IQ/OQ/PQ was undertaken, as delineated in the GAMP section.

## PROBLEMS AND CHALLENGES

The life science industry is under ever-increasing pressure to adhere to FDA rules for process compliancy. Without this critical compliance, these companies are unable to bring products to market and are subject to financial, civil, and potentially criminal sanctions.

With the increasing competition in the market for new products/drugs and the decreases in available staff, and it's clear why these companies need to look to effective methods for ensuring compliance with government policy and procedure while decreasing time-to-market and increasing competitiveness.

The following issues may impact a company in its compliance efforts:

- Improve productivity while reducing product liability.
- Maintain superior-quality performance while conforming to regulatory requirements.
- Protect the integrity of data records.
- Understand what is required for 21 CFR Part 11.
- Spend time and money trying to comply with every process.
- Expensive consulting and customization services.
- Inconvenient Part 11 policies and procedures.

All of these are significant challenges. However, the implementation of a management system helps an organization achieve continuous performance improvement.

## REFERENCES AND NOTES

1. Guidance for Industry Part 11, Electronic Records; Electronic Signatures—Scope and Application August 2003.
2. Fed Reg, Department of Health and Human Services, 21 CFR Part 11.
3. Institute of Validation Technology, **Electronic Records and Signatures: The FDA Perspective.**
4. BPI Research Centre, Validation, Compliance and Beyond Updated November 2007.

   - XML in the life sciences, Sillico Research Limited, 2001.

# Index

3-year NCE exclusivity
  for NDAs or supplemental NDAs, 87
  for optically pure enantiomers, 87
5-year NCE exclusivity, 77
  for drugs, 87
6-month pediatric exclusivity, 88
30-day waiting period after submitting IND
    application, 201–202
30-month stay, 62, 80–81
35 USC §112, 144
180-day exclusivity
  "commercial marketing of the drug under
      the previous application," 82
  commercial marketing of the generic drug by
      a first applicant, 82–83
  effect of a "court decision" on approval of an
      ANDA, 83
180-day exclusivity decisions, 83
180-day exclusivity periods, 81–82
  events for which first applicant may forfeit,
      85
180-day marketing exclusivity for ANDAs, 81
1906 Food and Drugs Act, 338
1906 Pure Food and Drug Act, 373
1912 Shirley amendment, 46
1938 act, drug provisions of, 12–13
1938 "Grandfather" Provisions and "Old
    Drug" Status, 68
1962 amendments to the drug-approval
    process, 52–54
1962 Drug Amendment Act, 134
1962 Grandfather Clause, 51
1965 Medicare amendments to the Social
    Security Act, 339
1986 BBC Doomsday Project, 436
2003 Statutory Changes, 66

Abbott-Geneva settlement agreement on
    Hytrin® private antitrust action,
    168–169

Abbreviated new drug applications, 29, 61
Absent such certifications and verifications, 151
Academy of Managed Care Pharmacy (AMCP),
    394
Acceptability of Standards from Alternative
    Compendia (BP/EP/JP), MAPP 5310.7,
    335
Accused infringer, 161
Active comparators, 357–358
Active ingredient(s), 320
  in the listed drug, and the modified drug,
      69
Active pharmaceutical ingredients, 255
  appropriate change control procedures and
      documentation systems, 266
  compendia monographs, 261
  compendia requirements, 265
  development and manufacturing, 255–256
  Q7A, 264–265
  regulatory issues, 261–263
  in the U.S., 256–257
[A] declaratory judgment plaintiff, 78
Administrative Procedures Act (APA), 82
Adulterated, 45–46
Adulteration of compendium drug, Section
    501(b) of FDCA, 332
Adverse drug experience, 220
Adverse drug reactions (ADRs), 219, 221–222
Adverse event (or adverse experience), 221
Adverse event reporting, toll-free number, 41
Advertising to physicians on radio, guidelines
    for, 404
Advisory committee referral, 36–37
Agency reviewers, 278
AIP corrective action plan, 210
Alleged infringer, 143
Allergan, 138–139
Allergan's view of the law, 139–140
Alsberg, Carl, 10
AMA Board of Trustees, 5

AMA Council on Pharmacy and Chemistry, 1905, 5
American Medical Association (AMA), 5
American Pharmaceutical Association (APA), 5
    in 1852, 337
Analytical procedures (inactive ingredients), subsection 2.4.P.4.2, 308
Analytical procedures, subsection 3.2.P.5.2, 308
ANDA. See Abbreviated new drug applications
ANDA (505b2) submissions on a generic drug, FDA guidance, 277
ANDA or 505(b)(2) application
    as an act of patent infringement, 75–79
    delays based on marketing/data exclusivities, 86
    delays in approval, 79–90
    FDA action, 70–71
"ANDA parking," 85
ANDA Patent Certifications, 63f
Andrx Pharmaceuticals Inc., 169
Animal drug study, 188–189
Animal reproductive toxicity data, 358
Antibiotic, 131
Antibiotic regulation
    history of, 131–133
Antibiotics and insulin, regulation of, 48
Anticipation under 35 USC §102, 153
Antitoxin, 108
API. See Active pharmaceutical ingredients
API development and/or manufacturing, outsourcing of, 256
API GMP compliance, 262
API impurity profile, 260–261
API manufacturing, application of Q7A guidance, 264t
API starting material(s) (APISM), 260
Apotex's generic Omeprazole, revocation of approval to market, 88
Applicants filing an NDA or ANDA, reference of a DMF, 259
Application fees, total revenue expected for an year, 187–188
Application for fee waiver or reduction, section 15, 196
Application integrity policy (AIP), 210
Application reduction program, 330
Approval of an ANDA, withdrawal or suspension, 90
Approved "assurance" from the OHRP, 212

"Approved drug products with therapeutic equivalence evaluations"/Orange Book, 62
Artificial act of infringement under 35 USC §271(e)(2), 76–77
Artificial act of infringement, 75–76
Augmentation of USP monographs with tests for identification and drug quality, 337
Aventis Pharma Deutschland GMBH v. Cobalt Pharmaceuticals, Inc., 73
Avoiding infringement, 158–159

BACPAC guidance, 260
Balance of hardships, 161
Barlett, Lee, 9
Basis for submission, section 1.12.11, 298
Batch certification requirement, 132
Batch formula (drug product), section 3.2.P.3.2, 307
Beck, Lewis Caleb, 2
"Benchmark" agreement, 172
"Benchmark" settlement, 172
Benefits of making electronic submissions to FDA, 444
Best Pharmaceuticals for Children Act (BPCA), 29
Bioequivalence study, standard design of, 290–291
Bioequivalence testing requirements, waivers from, 293
Biologic license application (BLA), 107
Biologic product vs. drug product jurisdiction, 109–110
Biologic vs. device jurisdiction, 110–111
Biological product
    regulation 21 CFR §600.3(h) of the FDA, 108
    section 351 of the PHSA, 108
Biological therapeutics
    history of, 3–5
Biologics, 103Biologics Control Act of 1902, 4, 104
Biologics innovators, 119
Biologics law, 104–105
Biometrics, 435
Bioresearch monitoring program (BIMO), 209
Biostudies, types of, 292
Biotechnology revolution and regulation of recombinant products, 106
Biotechnology stakeholders, 121–122
Bioterrorism Act, 246–247
Black box warning promotion, 388

"Blind" petitions and comments, 42
Blood Action Plan in 1997, 114–115
Branded products, life-cycle strategies for, 144–152
   citizen petitions, 149–152
   patent strategies, 144–149
Bridging study for efficacy, 352
Bulk-sale drugs, 390
Bureau of Chemistry of the Department of Agriculture, 9
Bureau of Chemistry, 1927, 338
BuSpar® antitrust action, 169

Campbell, Walter, 11
CANA Guidance, 414
Cardizem CD® a per se violation of the antitrust laws, 169
Case report forms and individual patient listing, subsection 5.3.7, 309
Case report forms (CRF) or patient medical records (source documents), 203
CBE-0 supplement, 415–416
CBE-30 supplement, 415
CBER. See Center for Biologics Evaluation and Research
CDER. See Center for Drug Evaluation and Research
CDER/CBER intercenter agreement, 107
Center for Biologics Evaluation and Research, 106, 375
Center for Devices and Radiological Health, 107
Center for Drug Evaluation and Research, 106, 375, 377–379
   therapeutic area-based review divisions, 270
Certain drugs containing single enantiomers, optional exclusivity period, 37
Certificates of analysis for the ANDA batch(es), subsection 3.2.P.5.4, 308
cGMP. See Current good manufacturing practice
cGMPs and CMC postapproval regulatory affairs, 416–419
   FDA inspections, 418–419
Change control, 21 CFR 211.180(e), 417
Change control request from manufacturing, appropriate regulatory perspective, 417
Changes being effected (CBE) supplement, 415
Characterization, subsection 2.3.S.3, 300

Chemistry, Manufacturing, and Controls (CMC), 269, 353–354
   of a drug product, 259
Child-resistant (CR) packaging under the Poison Prevention Packaging Act (PPPA), 1970, 318–319
Choice of dose and dosage of a drug, 358
Ciba Corp. v. Weinberger, 53
Citizen petitions, 90–91
Claim terms, 156
Cleaning procedures and cleaning validation, 333
Clinical hold, 201
Clinical investigator disqualification, 211
Clinical investigators, responsibility of, 204–207
   record-keeping and –reporting responsibilities, 206
   reporting all changes in the research activity and all unanticipated problems, 207
   submit progress reports to the sponsor as specified in the investigational plan, 207
Clinical studies of investigational drugs, 361
Clinical studies, reportable events, 221–222
Clinical trials registry database, 33–34
"Clinically susceptible concentrations," 36
"Closed" claims, 157
Closed system, 435
CMC database for a new drug application, 412t
CMC postapproval regulations and guidance, 413–414
CMC postapproval regulatory affairs, 412–413
   continuity of supply, 420
   due diligence (divestments), 420–421
   future of, 425–426
   NDA conformance, 420
   PDUFA goals, 419
   regulatory strategies and cost savings, 421
   section 21 CFR 314.81(2), annual reports, 420
CMC postapproval regulatory affairs professional as a "responsible agent," 424
CMC postapproval regulatory affairs professional, competency for, 421–424
   annual reports, 422
   change control, 421–422
   CMC conformance guides, 422
   complex sNDAs, 424
   FDA/industry interactions, 424
   simple sNDAs, 422–423

CMC postapproval regulatory submissions, 414–419
  annual report, 416
CMC review process, 278
CMC reviewers, 278
CMC section of an NDA/BLA, 269
CMC section of NDAs and ANDAs based on QBD and ICH/FDA regulations, 271–278
  IND phase 1, 272–273
  IND phases 2 and 3, 273–274
  pre-IND phase, 272
  QbD and process analytical technologies, 275–276
  technology transfer, 275
Coinventors, 155
Combination products
  featuring a biologic, 111
  OCP's regulations, 109
  regulation of, 34
Coming soon promotional materials, 392–393
Common technical document (CTD), 364–365
Comparative advertising/promotion and claims of superiority, 391
Comparative BA/BE study reports, subsection 5.3.1.2, 309
"Complete clinical hold," 210
Compliance policy guide 450.200, 315
Components of the drug product, section 2.3.P.2.1, 301
Computer systems validation, 446–452
  FDA in-house training for investigators, 447
Conception, 155
Concerning electronic advertising, 384
Conducting a foreign study under an IND, 361–362
Conduct of clinical trials for antibiotic drugs, 36
Construction of claims, 156–157
Consumer Healthcare Products Association (CHPA), 322
Consumer interest in health-care information on the Internet, 397
Consumer Product Safety Commission (CPSC), 319
Container and closure for drug substance, subsection 2.3.S.6., 300
Container closure system
  section 2.3.P.4., 302
  section 3.2.P.7, 308
  subsection 2.3.P.7, 305

Continuation-in-part (CIP) applications, 147–148
Continuation patent applications, 147
Contract research organizations (CROs), 291
  or a clinical investigator working with a CRO, 202
Contributory infringement, 160
Control of drug product, subsection 2.3.P.5, 304
Control of excipients
  section 3.2.P.4, 308
  subsection 2.3.P.4, 304
Controls of drug product, section 3.2.P.5, 308
Corporate CSV policy, 446
Cosmetics, 317
Council of Better Business Bureaus' National Advertising Division (NAD), 320
Court of Appeals for the Federal Circuit, 66, 158
Covered drugs, 41
Creating a priority application, 197
Critical path initiative, March 2004, 34–35
CSV. See Computer systems validation
CTD format for ANDAs
  module 1, 296–298
  module 2, 299–307
  module 3, 307–309
  module 5, 309
  organization of application, 296–309
  patent and exclusivity section, section 1.3.5 of the CTD, 297
  response to FDA comments, 309–310
Current good manufacturing practice, 316, 325–326. See also Good manufacturing practices
  mandated periodic inspections, 326
Customs temporary import bond (TIB), 247
Cyclosporine, 139

Data bank, 33
"Data migration" approach, 437
Davis, John, Senator, 2–3
DDMAC reviewers, responsibility for reviewing prescription drugs, 378–379
DDMAC's issuance of a warning letter for promotional materials, 382
Debarment, 211
Debarment certification, 297
"Declaration of Helsinki," 362
Declaratory judgments
  right of ANDA or 505(b)(2) applicants, 77
  right of patent owners, 79

Deference to NDA holders' characterizations of
    the scope of use patents," 73
Delays attributable to patent term extensions,
    79–86
Department of Health and Human Services
    (HHS), 382
  Office for Human Research Protections
    (OHRP), 212
Department of Justice Antitrust Division (DOJ),
    165
DESI. See. Drug efficacy study implementation
"DESI" Review, 52
Desire to leverage foreign data and regulatory
    approvals, 350
Determination of obviousness under §103,
    153–154
Dietary Supplement and Non-Prescription
    Drug Consumer Protection Act
    (DSNPDCPA), 30, 40
Dietary Supplement Health and Education Act
    of 1994, 318, 339
Dietary supplements, 318
Digital signature, 435
"Dilute solution," 140
Direct infringement, 159
Direct-to-consumer (DTC) advertising, 372,
    394–395
  general guidelines by the FDA, 395–397
Direct-to-consumer television advertising, 194
Disability, 220
Disqualified investigator, 211
Division of Drug Marketing, Advertising and
    Communications (DDMAC), 371
Division of Scientific Investigation (DSI), 209
Doctrine of equivalents, 157–158
Dose proportional, 293
Dose relationship and reversibility of observed
    effects, 355–356
Draft labeling for the proposed product,
    section 1.14.1, 299
Drug Abuse Control Amendments of 1965, 14
Drug application sponsor, 344
Drug approval package, public availability of,
    38–39
Drug clearance provision of the 1938 act, 19
Drug detailing activities, company
    representatives, 402
Drug effectiveness amendments of 1962,
    49–54
Drug efficacy study implementation, 1963, 134,
    230

Drug efficacy study program review, prior to
    1984, 284
Drug facts box on product packaging, 320
"Drug facts" format, 319
Drug Import Law, June 26, 1848, 2
Drug labeling exemptions-import alert 66–66,
    243–246
Drug lag, 56
Drug manufacturing inspections compliance
    program, 326–327
Drug Master Files (DMFs), 138, 257
Drug Price Competition and Patent Term
    Restoration Act of 1984/
    "Hatch-Waxman" or "Waxman-Hatch"
    Act, 61, 136
Drug–drug interaction data from foreign
    studies, 358
Drug product fees, 185–186
Drug product quality overall summary
  manufacturing process, subsection 2.3.P.3.,
    302–303
Drug Research and Testing Laboratory, 1978,
    338
Drug safety and drug efficacy, relationship
    between, 15–18
Drug safety evaluation, history of, 218–219
Drug sampling, 400–401
Drug substance and drug product, important
    characteristics, 274
Drug substance specification, subsection
    2.3.S.4, 300
Drugs and biologics, distinct application and
    review procedures, 107
Drugs marketing, statutory and regulatory
    background, 229–231
Durham-Humphrey Amendment in 1951, 14,
    373

Eaton laboratories, 16–17
Effect of user fees on drug approval times,
    withdrawals, and other agency
    activities, 195–196
Electronic advertisements, 389
Electronic Orange Book, 285
Electronic record (ER), 435
Electronic signature (ES), 435
The Eleventh Circuit, 170–171
Eligibility for consideration of active
    ingredients, 314
Elimination half-life, 290
Elixir Sulfanilamide tragedy, 12

End of phase 2 (EOP2), 269

"Enhanced Authorities Regarding Postmarket Safety of Drugs," 225

Environmental analysis, section, 1.12.14, 298

EOP3 clinical trials, 275

Estes Kefauver of Tennessee, 18

Ethics committee (EC)/Institutional Review Board (IRB) selection, 357

European Medicines Evaluation Agency (EMEA), 365

Exclusion payments or reverse payments, 166–167

"Exercise enforcement discretion," 231

Exhibits for drugs at medical meetings and conventions, 402

Export of drugs
  People's Republic of China and India, 240

Extensible markup language (XML), 440–443

Failure to obtain tentative approval (FOTA) within 30 months, 151–152

"Fair balance" in the product's advertising and promotion, 384, 387–388

False or misleading advertising or unfair balance, 388

FDA. See Food and Drug Administration

FDA 2253, Transmittal of Advertisements and Promotional Labeling for Drugs and Biologics for Human Use, 386

FDA actions under the CPG policy, 232–233

FDA approval of a generic drug. See also Generic drug approvals
  356h form, 294–296
  advisory committee meetings, 367–368
  ANDA submission the CTD format, 293–309
  communications with FDA, 365–366
  cover letter, 294
  end of phase II meeting, 366–367
  inactive ingredient guide, 288
  "paper" NDA, 284
  pre-1984 to present, 283–284
  pre-IND meetings, 366
  pre-NDA/BLA meetings, 367

FDA Bulletin (1971), 374

FDA controls, changing impact of, 405

FDA criteria for advertising electronically, 403

FDA drug safety enhancement and modernization, 193–194

FDA Form 3542a, 63

FDA inspections in the clinical research area, 209

FDA inspections of foreign clinical investigators, 362–364

FDA inspections of foreign manufacturers, 354

FDA invocation of the AIP, 210

FDA Modernization Act of 1997 (FDAMA), 331
  allowance for pharmacy compounding of drug products, sections 353 (a) and (c), 339

FDA Modernization Act of 1997 (Oct. 1, 1997 to Sept. 30, 2002) (PDUFA II), 189–190

FDA Orange Book, product information guide, 284–285

FDA policies and enforcement activities, impact of the U.S. Congress, 382

FDA policies for broadcast media, 403

FDA policies on nontraditional promotion, 398–405

FDA policy on video news releases (VNRs), 403–404

FDA questions/comments, responding in timely, thorough, and accurate fashion, 277–278

FDA regulation 21 CFR §310.6, 230

FDA regulation 21 CFR 314.106, 351

FDA regulations [21 CFR § 314.94(a)(12)(4)], 297

FDA Warning Letter, 209–210

FDA's approved drug products with therapeutic equivalence evaluations, 145

FDA's class-wide administrative orders, 232

FDA's clinical testing requirements for foreign drugs, 356–364
  clinically relevant endpoints, 360
  study design and controls, 358–364

FDA's drug listing branch, 353–354

FDA's drug safety activities/system, 5-year plan, 193

FDA's enforcement of advertising and labeling laws, 380

FDA's Form FD-1675, 134

FDA's good manufacturing practice regulations and policies, 133

FDA's guidance for review staff and industry: good review management principles and practices for PDUFA

FDA's guidance on archives and audit trails, 438

FDA's guidance on industry support of scientific and educational activities ("ISSEA guidance"), 399

FDA's investigation and approval of new drugs, shifting priorities, 55–56

FDA's level of enforcement of misleading
advertisements, 382
FDA's monitoring activities, 382
FDA's nonclinical testing requirements for
foreign drugs, 354–356
FDA's Office of Criminal Investigation, 400
FDA's regulation of blood and blood
components, 114
FDA's regulation of prescription medicine
marketing and promotion, 381
FDA's regulations on drug promotion, 381
FDA's true "crackdown" on the enforcement of
marketing and advertising/promotion
activities, 380
FDA's Vaccines and Related Biological
Products Advisory Committee, 113
FDA-approved dissolution tests, 289
FDA-approved labeling, 398
FDCA, 1962 amendments, 230
FDCA's Import for Export (IFE) provisions,
241–242
FDCA section 501(a) (2) (B), 325
FDCA section 597, 135
Federal Food, Drug, and Cosmetic Act (FDC
Act), 29, 46–48, 104, 149
*Federal Registers* of May 12, 1998, 136
Federal Trade Commission, 5, 143
reverse payment settlements, 166–167
Fee waiver or reduction, 187
Fees paid would exceed cost of FDA review,
187
Filed API information, 262
Final agency action, 151
"Financial report," 188
"Finished dosage form," 184
Five-year sunset, 188
FOBs. *See* Follow-on biologics
Follow-on biologics, 118–122
interchangeability, 120
naming of, 120
Follow-on versions of FDCA proteins, 119
Follow-on versions of PHSA-licensed biologics
only, 118
"Follow-ons of follow-ons," 118
Food, Drug and Cosmetic Act (FD&C Act) of
1938, 218
amendments to, 225–226
Food and Drug Administration
annual appropriations legislation, 188
as "arm's-length partner" in drug
development, 365–366

broadest regulatory enforcement authority,
241–143
certification process, 133–134
differences in regulating import and export
goods, 240–241
identifying violations of clinical research
regulations, 209
import regulations, 242
new drug safety oversight board, 224
organization of, 377–379
performance goals, 185–186
possible future activities, 405–407
primary enforcement tools, 381
response to the emerging drug safety issues,
223
Food and Drug Administration Amendments
Act of 2007 (FDAAA), 30
Food and Drug Administration Globalization
Act of 2008 (FDAGA), 250
Food and Drug Administration Modernization
Act (FDAMA) of 1997, 29, 107, 135, 376
Food and Drug Modernization Act of 1997, 133
Food effect on bioequivalence studies, 292
Foreign clinical research, 362
Foreign drug facilities, 237
Foreign sources of counterfeit bulk drugs,
actions by FDA, 238–240
Foreign sponsors, requirements for
establishment, registration, and product
listing, 353–354
Foreign trade zone (FTZ), 247
Foreign-sourced drugs, 240
Forfeiture of exclusivity, 84–85
Form 5 applications, 134–135
Form 6 applications, 135
Form FDA-483, 209
Formulary informational kits, 393
Formulation patents, 286
FTC. *See* Federal Trade Commission
FTC enforcement actions
180-day market exclusivity, 167
Abbott–Geneva Hytrin® and
Hoechst–Andrx Cardizem CD®
agreements, 167
Bristol-Myers Squibb agreements, 167–168
FTC scrutiny of the pharmaceutical industry,
and settlements, 165–173
history of, 165–166

GAMP4, 448
GAMP4 guide appendix M3, 450

General Accounting Office (GAO), 195–196
General considerations guidance, 293
General information, subsection 2.3.5.1, 299
Generally recognized as safe and effective
    (GRASE), 315
Generic Amlodipine, Mylan's 180-day
    exclusivity to market, 88–89
Generic drug and the RLD, comparison
    between, section 1.12.12, 298
Generic drug approvals. See also FDA approval
    of a generic drug
    citizen petitions, 41–42
    under Section 505(b)(2), 70
Generic drug, bioequivalence to a listed drug,
    68
Generic drug entry prior to patent expiration:
    An FTC Study, 165
Generic equivalents, equivalence to the
    innovator product, 285
Generic industry
    patent validity issues, 152–156
Generic name of a drug product, 389
GMP. See Good manufacturing practices
GMP inspection, 258
Good clinical practice (GCP) guidelines, 356
Good laboratory practices (GLP's), 355
Good manufacturing practices, 232, 256,
    316–317. See also Current good
    manufacturing practice
    for blood and blood components, 114
    updated principles of quality, 333
Great American Fraud, The, 8
Greater Access to Affordable Pharmaceutical
    Act, 286

H.R. 1038, 119
H.R. 1956 and S. 1505, 119
H.R. 5629, 122
Hand brand, 6–7
Harmonization of monographs and general
    chapters, 342
Hatch–Waxman Act of 1984
    180-day exclusivity, 286
    NCE exclusivity, 287
    patent lists, 285
Hatch–Waxman Amendments, 137
"Health fraud drugs," 232
Health Insurance Portability and
    Accountability Act of 1996 (HIPAA),
    213–214, 377
Help-seeking advertisements, 390

Heparin API, 332
Hoechst Marion Roussel Inc. (HMR), 169
Homeopathic drugs, 318
Homeopathic Pharmacopeia of the U. S., 318
Human cell, tissue, and cellular and
    tissue-based products (HCT/Ps), 115
Human drug applications, 183–184
Human tissue task force (HTTF), 116
Hybrid system, 435
Hygienic Laboratory for purity and potency, 5

ICH. See International Conference on
    Harmonization
ICH CTDs, 364
ICH guideline E5, "Ethnic factors in the
    acceptability of foreign clinical data,"
    351
ICH Guideline for good clinical practice,
    214–215
ICH Q3A, 257
ICH Q7A guidance as the GMP guide for API,
    263
ICH Q8, 275
"Identical, related, or similar" (IROS) drug
    products, 230
Import of foreign manufactured
    pharmaceuticals, 332
Importer," 248
Inactive ingredients, 320
Inadequate study subject consent, 357
IND application, 200
Indirect infringement, 159
Individually identifiable health information
    (protected health information), 213
Induced infringement, 159
Inequitable conduct, 162–165
    intent element of, 163
Infomercials, 404
Information dissemination, methods of,
    395–396
Information sections of the compendia, 343–344
Infringement of a patent, 156
Infringement under the doctrine of equivalents,
    157–158
Initial filing strategy, 144
Initial user fee legislation, failure to pay fees,
    188
Innovators, data exclusivity for, 121
In-process controls (IPCs), 276
Institutional Biosafety Committees, 212
Institutional promotional materials, 392

Institutional review board, 207–209
  record-keeping and record-reporting
      requirement, 208
*Integra* case, 74
Interest of physicians for health information on
      the Internet, 397
"Interim Revision Announcement (IRA)," 343
International Conference on Harmonization
      (ICH), 214
Inter-rater variability, 360
Invalid patent, 35 USC §282, 155
Invalid patent claims, 152–153
Investigational new drug applications (INDs),
      330
Investigational new drug (IND) procedures,
      21
Investigational products, advertising for, 393
In vitro comparative dissolution profile for a
      solid dosage form, 289
In-vitro/in-vivo correlation study reports,
      subsection 5.3.1.3, 309
IRB. *See* Institutional review board

*Journal of the American Medical Association*
      (*JAMA*), 6
"Jury of resemblance," 359
Justification of specifications, subsection
      3.2.P.5.6, 308

Keeping track of the actual study drug, 204
Kefauver-Harris Amendments of 1962, 218,
      313–314, 374

Label, 385
Labeling meetings, 368–369
Lead clinical investigator/ principle
      investigator (PI), responsibilities of,
      204–206
Letters of authorization, section 1.4.1, 298
Licensure of biologics, section 351 of the PHSA,
      112
Life-threatening adverse drug experience, 220
Likelihood of success on the merits, 161
Liquid dosage forms, 288
"Listed patents" or "Orange Book" patents, 65
Lititz Pharmacopeia of 1778, 1
Local and cross-border standards of diagnosis
      and patient care, differences between,
      356
Lowest possible user/product fee, negotiate
      for, 196

Mandatory pediatric assessment, 30–32
Manufacture in compliance with CGMP, 329
Manufacture, subsection, 2.3.S.2, 300
Manufacturing operations, 326
Manufacturing process development, section
      2.3.P.2.3, 302
Marketed drugs, reporting requirements,
      220–221
Marketed unapproved drugs, compliance
      policy guide (the CPG), 231
"Materia medica," 337
Maximal effective dose for U.S. registration,
      360
Medical Device Amendments in 1976, 380
Medical Device User Fee and Modernization
      Act of 2002 (MDUFMA), 34, 109
Medicare Prescription Drug, Improvement,
      and Modernization Act of 2003 (MMA),
      29, 63
*MedImmune*, 78
MedWatch program, 219–220
MedWatch report, instructions for filing, 220
Metabolite, 66
Method validation report for the procedures,
      subsection 3.2.P.5.3, 308
"Misbranded," 46
Misbranding of a product, 385–386
*Monitor*, 202–203
Multidose studies, 292
"Muted caucusing," 368

NAD/NARB process, 320
National Academy of Science/National
      Research Council (NAS/NRC), 374
National Advertising Review Board (NARB),
      320
National Center for Drugs and Biologics
      (NCDB), 106
National Drug Experience Reporting System
      (1971), 374
National Formulary, 337
National Formulary of Unofficial Preparations,
      337
National Institutes of Health (NIH), 15
  guidelines for research involving
      recombinant DNA molecules, 212
NCE. *See* New chemical entity
NDA and CTD submissions, FDA expectations,
      365
NDA approach to OTCs, 316
NDA rewrite regulations, 135

NDA submission on a new drug, FDA and ICH guidance, 276–277
New and Nonofficial Remedies (NNR), 6
New chemical entity, 37, 62
  15-year exclusivity, 86–90
  "active moiety," 87
"New drug", 46–47
New drug application (NDA), 47
  clinical research requirements, 199–200
    FDA actions, 209–212
New drug code (NDC) provisions, 248
New drug fee amounts
  PDUFA II, 189
  PDUFA III, 191
  PDUFA IV, 192
New Marketing Code, July 1, 2002, 400
New molecular entity NDA, 368
No Action Indicated (NAI), 209
Non-binding "performance goals," 182
Noncompliance of the medicinal article with the USP/NF monograph standards, 335
Non-Prescription Drug Modernization Act of 2007, 384
Non-prescription drugs, adverse event reporting for, 40–41
Non-prescription Drugs Advisory Committee (NDAC), 316
Notices of violations (NOVs)/untitled letters, 381

Objective recklessness, 160
Obviousness analysis, 153
Office of Combination Products (OCP), 109
Office of Generic Drugs (OGD), 270
Office of Inspector General (OIG), 383
Office of New Drugs (OND), 222
Office of Nonprescription Products (ONP), 321
Office of Pharmaceutical Sciences (OPS), reporting of chemistry and bio-pharm reviewers, 270
Office of Surveillance and Epidemiology (OSE), 222–223
Official Action Indicated (OAI), 209
Off-label claims, 392
"Open" claim, 157
Open system, 435
Orphan Drug Act of 1983, 55, 375, 393
Orphan drug exclusivity, 287
OTC drug review, 230–231, 314
OTC drugs, 229
OTC drug trade associations, 322

OTC monographs, 315
OTC review process, 314–315
OTC trade association, 322
Other information, 320
Over-the-counter or non-prescription medicine (OTC), 313
  adverse event reporting, 321
  combination products, 321
Ownership of a patent, 156

Paragraph I certification, 71
Paragraph III certification, 83–84
Paragraph IV certification, 64f, 71–72
  notice to patent owner and holder of NDA, 72–74
Parenteral products, 288
Part 206 of Title 21 of the Code of Federal Regulations, 319
Partial or full waivers of the pediatric assessment, 31
Party filing a suitability petition, 69
Patent certifications, 71–72
Patent claims, requirements of 35 USC §112, 154–155
Patent Cooperation Treaty (PCT) international applications, 144
Patent drafting strategy, 145–147
Patent infringement issues, 156–160
Patent infringement, safe harbor exemption from, 74–75
Patent prosecution strategy
  continuing prosecution, 147–148
  maximizing and enhancing term, 148–149
Patent term extensions, attributable delays, 79–80
Patents for a reference listed drug, 287
PCT application, 145
PDMA. See Prescription Drug Marketing Act
Pediatric exclusivity, 32, 287
Pediatric exclusivity delays, 87–88
Pediatric Research Equity Act, 29
Pediatric studies exclusivity, 32–33
"Pedigree," 39
Performance goals
  PDUFA I, 185–186
  PDUFA II, 189–190
  PDUFA III, 191
  PDUFA IV, 192–193
"Performance report," 188
Persons who import or offer for import, 248
Pfizer v. Ranbaxy, 78

"Pharmaceutical CGMPs for the 21st Century: A Risk-Based Approach," 330
Pharmaceutical development, section 2.3.P.2, 301
Pharmaceutical drug manufacture, 326
Pharmaceutical industry
  prior to 1900, 372
  prior to 1938, 372–373
  1938–1961, 373–374
  1962–1979, 374
  1980–89, 374–375
  1990–2007, 375–376
  2007–present, 376–377
Pharmaceutical Manufacturers Association (PhRMA), 182, 376
Pharmaceutical manufacturing factory, periodic inspection of, 326
Pharmaceutical patent attorney, 286
Pharmacogenomic pairings, 117
"Pharmacopeial Forum" (PF), 343
Pharmacy compounding, 43
"Pharmacy-only" medicine (POM), 323
PhRMA guiding principles, 396–397
Physician profiling based on prescription activity, 407
Physicochemical properties, subsection 2.3.S.1, 299–300
Pilot bioequivalence studies, 291
P/N-P Stakeholder Forum, 345–346
"Points to consider" draft documents, 106
Post-1938-approved applications, 52
Postapproval drug safety, 217
Postapproval stability protocol, 305–306
Postmarketing approval studies, 37–38
Postprocess controls (PoPCs), 276
Practice of GMP, risk management, 332–333
Pre-1962 drugs, DESI review and the imposition of effectiveness, 51–52
Preapproval inspection (PAI), 327–28
Preliminary injunctions, 160–162
Premarket approval applications for drugs and biologicals, 34
Preprocess controls (PPCs), 275
Prescribing information (PI), 379
  content and format requirement for prescription drugs, 386
Prescription drug establishment, 184
Prescription Drug Marketing Act, 372, 375
  drug sampling, 400–401

Prescription drug marketing and advertising/promotion, general requirements, 384–385
Prescription drug safety information for patients and providers, 38
Prescription Drug User Fee Act (PDUFA), 1992, 29, 57, 107, 224–225, 376
Prescription Drug User Fee Act of 1992 (Oct. 1, 1993 to Sept. 30, 1997) (PDUFA I), 181–189
Prescription Drug User Fee Act of 1997 (Oct. 1, 1997, to Sept. 30, 2002), (PDUFA II), 189–190
Prescription Drug User Fee Amendments of 2002 (Oct. 1, 2002 to Sept. 30, 2007) (PDUFA III), 190–192
Prescription Drug User Fee Amendments of 2007 (Oct. 1, 2007 to Sept. 30, 2012) (PDUFA IV), 192–195, 397
Prescription drugs, importation of, 40
Prescription tracking market research, status and future of, 407
Price advertising/promotion, 391
Primary CMC review chemists, 278
Prior approval supplement, 414–415
Priority countermeasures, accelerated approval of, 35–36
"Priority review" system for drugs and biological, preventing or treating a tropical disease, 36
"Priority review voucher," 36
Process analytical technologies (PAT), 257, 271, 345
Process validation and/or evaluation (drug product), section 3.2.3.P.5, 307
Product advertising/promotion, 391–392
Product information, 389
Product jurisdiction, 109–111
Product-specific public relations materials, 399–400
"Prohibited act" in section 301(ll) of the FDC Act, 42
Prohibition against food with added drugs or biological products, 42–43
Promotion of products during the preapproval stage, 392
Promotion of products to drug formularies, 393
Promotional materials, preclearance of, 386–387
Proper infringement analysis, 157
Proper toxicology program, considerations for, 355

Proposed Registration Rule, 247
Prosecution history Estoppel/prosecution
    history of the patent, 158
Prospective stratification, 359
"Protecting the public health," 53
Protect Public Health; Significant Barrier to
    Innovation, 187
Public Citizen's Health Research Group (HRG),
    383
Public docket no. 92 S—0251, 439
Public Health Security and Bioterrorism
    Preparedness and Response Act of
    2002/ Bioterrorism Act, 29, 242
Public Health Service Act (PHSA) of 1944,
    104–105

Quality overall summary (QOS), drug product
    stability, 2.3.P.8, 305
Quality-by-Design (QbD), 258, 271
Quality-by-design and process analytical
    technologies initiatives, 272f
Question-based review (QbR) format, 299

Radio–television interview tour, sponsoring by
    a pharmaceutical firm, 404
Reagan–Udall Foundation for the Food and
    Drug Administration, 35
Recombinant DNA Advisory Committee
    (RAC), 116
Record-keeping and record-retention
    requirements, 203–204
Reduction because of Paper NDA for Same
    Product, 187
Reference listed drug ("RLD"), 136
    labeling, 295
Reference standard, subsection 2.3.S.5, 300
Reference standards or materials, subsection
    2.3.P.6, 305
Refer to agency performance goals during the
    product review, 197
Regional information, section 3.2.R, 308–309
Regulation [21 USC §355(j)], patent claims,
    146–147
Regulation [21 USC §381(d)(3)(B)], 249
Regulation [35 USC §102(b)], 144
Regulation § 503(b)(1) of the FDCA, 313
Regulation §1.56, duty to disclose information
    material to patentability, 162
Regulation §271(e)(1), 75
Regulation §505(b)(1) application, filing of,
    199

Regulation 13 CFR part 21, procedures of the
    small business administration, 186
Regulation 21 CFR §56.102, 207
Regulation 21 CFR §56.107, 207
Regulation 21 CFR §600.3, 112
Regulation 21 CFR §600.80, 113
Regulation 21 CFR §610.2, 113
Regulation 21 CFR 314.70, Supplements and
    Other Changes to an Approved
    Application, 413–414
Regulation 21 CFR Part 11, 429–430
    benefits to organizations, 443–446
    compliance enabling technologies, 438–439
    controls for closed systems, section 11.10,
        435–438
    electronic signatures, 432
    FDA warning letters (Form 483), 434
    history, 430
    key principles and practices, 433
    risk assessment chart, 451f
    risk-based assessment and risk management
        plans, 449–452
    risk management process, 452f
    section 11.10, 431
    section 11.2, 431
    section 11.200, 432
    section 11.3, 431
    section 11.30, 431
    section 11.50, 431–432
    security and authentication, 437
    signature manifestations, section 11.50, 438
    signature/record linking, section 11.70, 438
    subpart B, 434–435
    XML, example of part 11 compliance,
        441–443
Regulation 21 CFR part 16, investigator's
    opportunity to pursue an administrative
    hearing, 211
Regulation 21 CFR part 312, 112
Regulation 21 CFR part 54, making complete
    and accurate certification or disclosure
    statements, 204
Regulation 21 CFR Part 56, 207
Regulation 21 CFR parts 1270, 115–116
Regulation 21 CFR parts 1271, 115–116
Regulation 21 USC §381(d)(3)(A)(i)(I), 249
Regulation 21 USC §381(d)(3)(A)(i)(III), 249
Regulation 35 USC §156, 148
Regulation 502 (x) of the FDC Act, 41
Regulation 505(b)(2) application, 200
Regulation 505(j) application, 200

Regulation 506B of the FDC Act, subsections (d) and (e), 38
Regulation § 11.100, 432
Regulation § 11.300, 432
Regulation § 11.70, 432
Regulatory approval for drug products, 258
Regulatory filings, 258–259
Regulatory uniformity, 319
Relevance of foreign clinical data, choice of comparator, 357–358
Reminder advertisements, 390
Reports of bioanalytical and analytical methods for human studies, subsection 5.3.2.4, 309
Request for waiver of in-vivo bioavailability studies, section 1.12.15, 298
Requests for information, responding by DDMAC, 402–403
Responses to a medicinal product, 221–222
Responsibilities of pharmaceutical manufacturers for outsourced materials, 332
"Responsible party," 33
Restasis®, 138
Reverse engineering approach, 288
Reverse payment settlements, 165, 166, 172
"Review committee," 362
Review goals for manufacturing supplements, 419t
Review of the DMF, 260
Review proprietary names to reduce medication errors, 193
Revised 21 CFR 314.70 rule and CANA guidance, 416
Rule 56 of the U.S. PTO, 162
Rule of construction, 40
Rx drug user fee, 184
Rx drug user fees, evaluating application, 196

S. 1505, 121
S. 1695, 121
S. 1695 and H.R. 5629, 120
S. 1695 and H.R. 5629, 120
Safe harbor exemption under §271(e)(1), 79
Safe Medical Devices Act of 1990 (SMDA), 106
SALMOUS (Standards for Articles Legally Marketed Outside the United States), 340
Sample abuse in promotion, 400
Sandimmune®, 139
Sandoz, 139

Schering-Plough settlement agreements with Upsher and ESI, 170–171
Section (viii) notice, 285–286
Section 107(c) "Transitional amendments," 51–52
Section 107(c)(4) of the 1962 amendments, 51
Section 1111 of FDAAA, 36
Section 1112 of FDAAA, 36
Section 122 of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, 35
Section 125 of Title I of the Act repealed section 507 of the FDCA, 135
Section 125(d) (2) of FDAMA, 139
Section 17 of the BPCA, 41
Section 201(p)(2) of the Act, 49
Section 306(k)(1) and (3) of the Generic Drug Enforcement Act, 297
Section 314.109(b) of the CFR, 137
Section 351(j) of the FDA, 110
Section 402(b) of FDAAA, 32
Section 402(j) of the Public Health Service Act (PHS Act), 33
Section 5 of the FTC Act, 320
Section 503(g) of the FDC Act, 34
Section 505 (q) of the FDC Act, 41
Section 505 (r) of the FDC Act, 38
Section 505 (s) of the FDC Act, 36–37
Section 505(u) of the FDC Act, 37
Section 505(a) of FDCA, 325
Section 505(a) of the FDCA, 229
Section 505(b)(2) applications, 70
Section 505(c) of the Act
  active approval scheme, 50
Section 505(j) of Hatch–Waxman, "listed" drug, 67
Section 505(j)(4)(D) of the FDC Act, 68
Section 505A of the FDC Act, 32
Section 505B (f) of the FDC Act, 30–31, 32
Section 505C of the FDC Act, 32
Section 505D of the FDC Act, 39
Section 506A of the FDC Act, 35
Section 507 of the FDC Act, batch-certification requirements for penicillin, 48–49
Section 510(h) of the FDCA, 326
Section 511 to the FDC Act, 36
Section 524 to the FDC Act, 36
Section 566 of the FDC Act, 35
Section 601 of FDAAA, 35
Section 704 of the FDCA, 326
Section 760 of the FDC Act, 40

Section 761 of the FDC Act, requirements for dietary supplements, 41
Section 771 of the FDC Act, 35
Section 772 of the FDC Act, 35
Section 801 of FDAAA, 33
Section 801(d) of FDAAA, 34
Section 804 of the FDC Act, 40
Section 910 of the FDC Act, 35
Section 918 of FDAAA, 36
Selecting active comparators or permissible concomitant treatment, 359
Selecting the product to work on, 284–287
Self-medication, 322
S. E. Massengill Company of Bristol, Tennessee, 11
"Serialization," 39
Serious adverse drug experience, 221
Serious adverse event or ADR, 40, 222
Settlement agreements
  reverse payments, 165
  under which the generic manufacturer agrees to stay off the market, 165
Side-by-side comparison of the package and patient insert labeling, section 1.14.3, 299
Single-enantiomer exclusivity, 37
Single-sponsor publications, 401
Skilled formulators, 286
Smith, James, 1
Software and computer system life cycle principles in a GxP setting, 446
Somatic cell therapy, 117
Spalding, Lyman, 1
Special characteristics of positron emission tomography (PET) drugs, Section 121 of the FDA, 331
Specifications (inactive ingredients), subsection 3.2.P.4.1, 308
SPE's GAMP4 guide for validation of automated systems, 448
Sponsor, 200–204
  requesting for pre-IND meeting to discuss the nonclinical data, 201
  summary of the information to be submitted in the IND application, 201
Sponsor–FDA meetings, 276
Stability summary and conclusion, subsection 3.2.P.8.1, 308
Stability, section 2.3.S.7, 301
Stability, section 3.2.P.8, 308
Standard operating procedures (SOPs), 439–440

Standardization of diagnostic criteria and treatment, 356–357
"Standardized numerical identifier," 39
The Statement of Investigator, FDA Form 1572, 357
Statutory debarment provisions, 211
Statutory double patenting, 155
Statutory safety test, 50
Statutory test of effectiveness, 50
St. Louis Health Department, 3
Strength, identity, purity, potency, and quality (SIPPQ) of the product, 273
  bridging of critical information, 274
Study treatment compliance, 358
Studying drug accountability records, 207
Subchapter 330 of Title 21 of the Code of Federal Regulations, 315
Submission of a DMF, 259
Submission of prelaunch materials to DDMAC, preclearance, 387
Sulfa drugs, 14
Supervisory responsibilities of investigators, 205–207
Supplemental new drug applications (sNDAs), 419

Tamoxifen settlement agreement, 171–172
Tamper-evident packaging, 319
Tamper-proof packaging, 319
Task Force on Electronic Identification/Signatures, 430
Taxol® private antitrust action, 170
Teleconferencing, 368
Telephone advertising, 405
Term extension under Section 156, 80
Therapeutic serum, 108
"Time capsule" approach, 437
Timely approvals and potential solutions, problems and challenges, 278
Timely FDA advisory comments on DTC television advertisements, 397
Timing of pre-clinical studies in relation to clinical trials," 354
Title I of Hatch–Waxman, 61
Title II of Hatch–Waxman, 61
Title 18 of the U.S. Code (USC), 210
Toxin, 108
"Track and trace," 39
Transdermal products, bioavailability and bioequivalence, 292
Transfer or waiver of exclusivity, 84

*Index*

Treatment-use INDs, 21
Tulsa County Medical Society, 11–12
Type II DMF, 259

Unapproved product indications, 392
Unexpected ADR, 222
Unexpected adverse drug experience, 221
"United States Adopted Names" (USAN)
        Council, 337
*United States v. Generix Drug Corp.*, 54
*United States v. Park*, 54
*United States v. Rutherford*, 54
Unpatentability, 163
URAA extensions, 80
USC 321(jj), 137
U.S. Court of Appeals for the Ninth Circuit, 43
User fee revenue, 193
User fees, 56
    impact on Rx drug approvals
        PDUFA III, 191–192
        PDUFA IV, 194–195
U.S. Food and Drugs Act, 8–9
U.S. Food and Drug Administration (FDA) in
        1962, 5
U.S. nonprovisional application, 145
USP 31 and NF 26 (USP/NF 2008), 339–340
USP and FDA, formal and informal linkage,
        343–344
U.S. Patent and Trademark Office (PTO), 144
"USP dictionary of USAN and international
        drug names," 337
USP enhancements to public standards, 345
U. S. Pharmacopeial Convention (USPC), 336
U. S. Pharmacopeia/National Formulary, 335
    brief history, 336–339
    informational sections of, 341–344

USP information vs. FDA requirements, 344
USP/NF. *See* U. S. Pharmacopeia/National
        Formulary
USP Reference Standards Expert Committee,
        338
U.S. registration of foreign drugs, 350–353
    potential obstacles, 353–364
USV *Pharmaceutical Corp. v. Weinberger*, 52–53

Vaccines, 113
Validation implications, 418
Validation of analytical procedures (inactive
        ingredients), subsection 3.2.P.4.3, 308
Variation in compendia standards, use of
        monographed APIs, 265
Virus, 108
Vitamins and Minerals Amendment (Proxmire
        Amendment) of 1976, 21
"V-Model," 447–448, 448f
Voluntary Action Indicated (VAI), 209
Voluntary moratorium on DTC advertising,
        1983, 394

Warnings, 320
Washington Legal Foundation (WLF), 383
*Weinberger v. Bentex Pharmaceuticals, Inc.*, 53
Wheeler-Lea Amendment of 1938, 5
"Whole blood," 114
Wiley Act, 45–46
Wiley, Harvey Washington, 8
Willful infringement, 160
William S. Merrell Company of Cincinnati,
        19
Withdrawal of approval of a listed drug,
        69
Wrap-around advertisements, 389

# Pharmaceutical Science

### about the book...

This **Second Edition** examines the mechanisms and means to establish regulatory compliance for pharmaceutical products and company practices. It focuses on major legislative revisions that impact requirements for drug safety reviews, product regulatory approvals, and marketing practices. Written by top industry professionals, practicing attorneys, and FDA regulators, it includes policies and procedures that pharmaceutical companies need to implement regulatory compliance post-approval.

New chapters cover:
- the marketing of unapproved new drugs and FDA efforts to keep them in regulatory compliance
- pharmacovigilance programs designed to prevent widespread safety issues
- legal issues surrounding the sourcing of foreign APIs
- the issues of counterfeit drugs
- updates on quality standards

### about the editors...

IRA R. BERRY is President and Founder of International Regulatory Business Consultants, L.L.C., Freehold, New Jersey, USA. Ira Berry received his M.A. in Biology from Hofstra University, Hempstead, New York, USA and his M.B.A. in Management from Adelphi University, Garden City, New York, USA. He has created a consulting business with his extensive experience in the global areas of pharmaceutical manufacturing operations, quality systems, compliance, regulatory affairs and business development—for APIs and dosage forms. He provides instructions and conducts plant audits for CGMP compliance, quality systems evaluation, SOPs, preparing and filing Drug Master Files and dosage form product registrations and personnel training. Website www.irb-c.com. His professional affiliations include his membership in the Generic Pharmaceutical Association and International Generic Pharmaceutical Association. Berry has worked extensively with Development and Task Force committees with the FDA and is a recognized health care manufacturing industry expert. He was Co-editor of Informa Healthcare's first edition of *The Pharmaceutical Regulatory Process*, as well as the titles *Pharmaceutical Process Validation* and *Validation of Active Pharmaceutical Ingredients*. Berry also contributed to several chapters in the *Encyclopedia of Pharmaceutical Technology*.

ROBERT P. MARTIN is a consultant at RPMartin Consulting, Lebanon, Pennsylvania, USA. Dr. Martin received both his M.S. and Ph.D degrees from the University of California, Riverside, California, USA. Throughout his career, he has held positions at many pharmaceutical companies, including Forest Laboratories (as Associate Director of Quality Assurance), Duramed Pharmaceuticals (as Director of Quality Services), Merck & Co. (as Senior Scientist), and Johnson & Johnson (in several positions, including Manager of Quality Services). In these positions, he led efforts to improve performance in Research and Development by developing and implementing compliance and quality systems. At his consulting firm, he currently provides an array of pharmaceutical consulting services, including, such as vendor risk analysis and management, bioanalytical and analytical laboratory qualification/validation, manufacturing qualification/validation, auditing, documentation, CMC preparation, DMF preparation, and training.

Printed in the United States of America





H7042

ISBN 978-1420070422

9 781420 070422