# EXHIBIT 34

Case 2:22-cv-00184-LCB-CWB   Document 592-34   Filed 06/24/24   Page 2 of 5

tion. Yet here, too, thoughtfully designed collaborations and comparative studies among differently resourced schools serving students from different backgrounds will yield portable scientific insights.

A comprehensive and open science of academic pathways will both enable and oblige educators to confront hard choices of organizational design. For example, to what extent should universities encourage academic breadth and exploration rather than "efficient" completion of college degrees? Should academic planners merely follow the evolving preferences of students as they enact their agency in choosing courses, or is shaping and constraining student preferences also part of their job? If students at institutions with high levels of curricular choice commit to programs in ways that sort and segregate by demographic or socioeconomic background, do educators have obligations to make informational or curricular interventions? How should ultimate responsibility for academic progress be apportioned between university administrators, classroom teachers, institutional researchers, and students themselves? Transparent empirical inquiry and thoughtful predictive modeling of academic paths can inform the deliberation of such questions. ■

REFERENCES AND NOTES

1. J. Owen-Smith, *Research Universities and the Public Good: Discovery for an Uncertain Future* (Stanford Univ. Press, 2018).
2. Y. Xie, A. Killewald, *Is American Science in Decline?* (Harvard Univ. Press, 2012).
3. E. Cech, *The Trouble with Passion: How Searching for Fulfillment at Work Fosters Inequality* (Univ. of California Press, 2021).
4. D. Jenkins, S. W. Cho, *New Dir. Community Colleges* **2013**, 27 (2013).
5. M. H. Harrison, P. A. Hernandez, M. L. Stevens, *Sociol. Educ.* **95**, 133 (2022).
6. S. Thébaud, M. Charles, *Soc. Sci. (Basel)* **7**, 111 (2018).
7. Z. A. Pardos, Z. Fan, W. Jiang, *User Model. User-adapt. Interact.* **29**, 487 (2019).
8. D. M. Grote, D. B. Knight, W. C. Lee, B. A. Watford, *Community Coll. J. Res. Pract.* **45**, 779 (2021).
9. Z. A. Pardos, H. Chau, H. Zhao, "Data-assistive course-to-course articulation using machine translation" in *Proceedings of the Sixth ACM Conference on Learning@Scale* (2019), pp. 1–10.
10. G. Angus *et al.*, "Via: Illuminating academic pathways at scale" in *Proceedings of the Sixth ACM Conference on Learning@Scale* (2019), pp. 1–10.
11. Y. Chen *et al.*, "Pathways: Exploring Academic Interests with Historical Course Enrollment Records" in *Proceedings of the Ninth ACM Conference on Learning@Scale* (2022), pp. 222–233.
12. D. F. Chambliss, C. G. Takacs, *How College Works* (Harvard Univ. Press, 2018).
13. E. Bruch, F. Feinberg, *Annu. Rev. Sociol.* **43**, 207 (2017).
14. R. Baker, G. A. Orona, *AERA Open* **6**, 2332858420937023 (2020).
15. S. Chaturapruek *et al.*, *AERA Open* **7**, 2332858421991148 (2021).

10.1126/science.adg5406



A researcher handles a *Psilocybe* mushroom at the laboratory of Numinus Bioscience in Nanaimo, British Columbia, Canada. The company specializes in psychedelic-assisted therapies.

BIOMEDICINE

# Pressing regulatory challenges for psychedelic medicine

Policy must support generation of evidence on safety and effectiveness

By **Amy L. McGuire**[1], **Holly Fernandez Lynch**[2], **Lewis A. Grossman**[3], **I. Glenn Cohen**[4]

Over the past decade, research on potential therapeutic benefits of psychedelics has demonstrated promise and generated enthusiasm. The number of psychedelic clinical trials has grown dramatically, and there has been considerable private investment and regulatory interest in psychedelic drug development around the world. But this is a complicated moment for regulators seeking to impose a traditional regime of clinical trials and pharmaceutical premarket approval to a class of drugs already used outside the medical establishment through a patchwork of state and local regulation, Indigenous use, and "underground" consumption. It is difficult to anticipate how these approaches will intersect given the challenges of studying illicit use. Meanwhile, pressure from investors and public expectations may exceed the current reality of limited evidence regarding the clinical benefit of psychedelics. Against this backdrop, we focus on pressing regulatory issues that demand attention, creativity, and collaboration to maximize psychedelics' therapeutic potential.

**REGULATING THE THERAPEUTIC CONTEXT**
Studies suggest that psychedelics facilitate neuroplasticity of the brain by activating serotonin 2A receptors, allowing the brain to form and reorganize neural networks. Several psychedelics are being studied in combination with psychotherapy, on the hypothesis that the psychedelic experience will augment the therapeutic process and accelerate healing that might otherwise take

[1]Center for Medical Ethics and Health Policy, Baylor College of Medicine, Houston, TX, USA. [2]Perelman School of Medicine Department of Medical Ethics and Health Policy and Penn Carey Law School, University of Pennsylvania, Philadelphia, PA, USA. [3]American University Washington College of Law, Washington, DC, USA. [4]Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Harvard Law School, Cambridge, MA, USA. Email: amcguire@bcm.edu

PHOTO: JAMES MACDONALD/BLOOMBERG/GETTY IMAGES

Downloaded from https://www.science.org at University of California Irvine on March 28, 2024



Downloaded from https://www.science.org at University of California Irvine on March 28, 2024

years to achieve (*1*). There is promising research on using psychedelic-assisted therapy for intractable depression, post-traumatic stress disorder, addiction, chronic pain, and existential suffering. There is also potential impact for neurological disorders, such as brain injury and Alzheimer's disease. These early studies have prompted a regulatory response in several jurisdictions. For example, Australia announced it will permit the prescription of psilocybin and MDMA by authorized psychiatrists beginning 1 July 2023. The European Medicines Agency has signaled that data on psychedelic-assisted therapies look promising, while also emphasizing that psychedelic substances must undergo the same marketing authorization process as that for any other medicines. In the United States, the US Food and Drug Administration (FDA) has designated psilocybin and MDMA "breakthrough therapies," and the Biden administration anticipates that FDA will approve the first psychedelic medicines within a few years.

It is well known that the effects of psychedelics can be influenced by the participant's mindset and the physical and sensory setting in which they are used. Notably, the same might be true for their potential therapeutic efficacy. In addition, some of the primary safety concerns relate to the use of psychedelics without proper supervision, including the risk that vulnerable patients will be exploited, and the possibility of a traumatic experience or "bad trip" (*2*). Thus, the therapeutic context is critical. Yet FDA traditionally regulates drug products and their labeling and marketing, not the circumstances of their prescription, administration, and use. These elements have been traditionally viewed as part of the practice of medicine, an area left to state regulation. This represents a challenge for FDA: How should the agency handle a drug class that may need to be consumed in a particular setting with a certain type of supervision and accompanied by nondrug therapy to safely achieve its intended—and maximal—effect?

FDA approval requires that a drug be demonstrated safe and effective for its intended use. If the benefits of a drug outweigh its risks only under certain use conditions, and those conditions cannot be guaranteed, the agency must withhold approval. However, the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to tweak the risk-benefit calculus for drugs with serious safety concerns in favor of approval by requiring Risk Evaluation and Mitigation Strategies (REMS) that specify conditions for safe use. Some REMS demand only the provision of information to clinicians and/or patients, but others go further, mandating that drugs be administered only in certain health care settings or requiring prescribers to perform various testing and monitoring before, during, and after treatment. For example, the REMS for Spravato (esketamine), a psychoactive prescription nasal spray used alongside oral antidepressants to address treatment-resistant depression, requires providers to assess the patient for resolution of sedation and dissociation for at least 2 hours after administration. The REMS for buprenorphine transmucosal products for opioid dependence requires prescribers to assess whether the patient is receiving the necessary psychosocial support.

If deemed critical for safe use, FDA may impose REMS to establish the conditions in which approved psychedelic therapeutics could be provided, perhaps covering aspects of the therapeutic setting, eligible providers, and adjunctive psychotherapy. FDA could also require postapproval studies of approved psychedelics to assess safety concerns related to both labeled uses and anticipated uses beyond the specific conditions tested in pivotal clinical trials (*3*), and the results of these studies could be used to adjust product labeling. However, FDA's REMS authority is intended to mitigate serious safety concerns, not to enhance effectiveness. Thus, although FDA may impose REMS in the psychedelic context with elements to mitigate serious adverse experiences that may be associated with these drugs, the agency lacks the power to control the specific conditions of use that may be needed to optimize efficacy. Moreover, the agency has limited authority to regulate off-label uses of any drug—that is, those beyond the approved indication.

For these reasons, it is essential that state licensing boards be brought into the regulatory ecosystem. These boards can impose further requirements, including practitioner certification standards to promote safe and effective psychedelic therapy. In addition, professional societies should develop best practices and ethical guidance to discourage unsafe and/or ineffective off-label use. This would help establish national standards of care, de-

PHOTO: MERIDITH KOHUT/THE NEW YORK TIMES/REDUX



A woman is assisted after smoking 5-MeO-DMT, a hallucinogen derived from the poison of the Sonoran desert toad, at a retreat to promote veterans' mental health.

### REGULATING AMID STATE-SANCTIONED USE

There is a growing trend among US state and local governments to decriminalize the possession and use of psychedelics for both medical and nonmedical use (*5*). In 2022, Colorado citizens approved a measure that decriminalizes the personal use of certain psychedelics and creates a state program for administering psilocybin in licensed healing centers. In 2020, Oregon voters approved a similar program for providing psilocybin services to clients by licensed facilitators and decriminalized personal possession of many controlled substances, including psychedelics. Meanwhile, several local jurisdictions across the country have decriminalized possession of at least some psychedelics or deprioritized enforcement of laws prohibiting them.

Despite these efforts, psychedelics remain illegal nationwide under federal law. The US Drug Enforcement Agency (DEA) classifies all classic psychedelics as Schedule I controlled substances under the Controlled Substances Act (CSA), a designation reserved for drugs with no currently accepted medical use and high abuse potential. Schedule I substances can legally be used only for research purposes, but research on these substances is both challenging and expensive (*6*). There is a strong push to move psychedelics off Schedule I and liberalize access through a variety of mechanisms (*7*), but there has been no official change in policy to date. In addition, psychedelics moving in interstate commerce are unapproved drugs, marketing of which violates the FDCA. Although the US attorney general has stated an intent to enforce the CSA against psilocybin (*8*), there has not been systematic enforcement of either the CSA or the FDCA against psychedelics in jurisdictions that have decriminalized them.

The emerging regulatory system for psychedelics thus resembles that in place for marijuana. Rather than a model to be emulated, however, marijuana provides a cautionary tale of widespread use without strong evidence of efficacy. Since 1996, 37 states and the District of Columbia have legalized the medical use of cannabis products, and 21 states and the District of Columbia have at least partially decriminalized or deprioritized enforcement for nonmedical use. Meanwhile, FDA has approved four cannabis-derived or synthetic cannabis drug products for specific indications, while acquiescing to state legalization of medical marijuana for a much broader range of uses. Until 2009, cannabis customers and distributors operated under the threat of federal prosecution regardless of state law. That year, the Obama administration's Justice Department issued a memorandum instructing prosecutors not to take enforcement action against individuals complying with state medical marijuana laws. This policy of enforcement discretion, combined with a congressional ban on spending funds to interfere with state medical marijuana regimes, has largely created immunity against federal criminal prosecution.

This interjurisdictional détente suggests a potential approach to psychedelic federalism, although not a desirable one. It problematically runs the risk of failing to incentivize the generation of evidence regarding safety and efficacy necessary for FDA approval and insurance reimbursement, while permitting the sale of psychedelics with unapproved, insufficiently substantiated, ambiguous claims for effectiveness against disease or promoting general wellness (*9*, *10*). FDA should mitigate these problems for psychedelics moving in interstate commerce by robustly exercising its authority over medical claims made by manufacturers, distributors, and sellers and by imposing its traditional evidentiary standards for approval. FDA should also work with state governments to clarify what constitutes medical administration of approved psychedelics and limit such administration to carefully controlled settings to ensure safe and effective use—for example, through state-certified facilities as discussed above.

Although real-world outcomes data on efficacy and adverse effects cannot replace rigorous randomized controlled trials, because of concerns about confounders and other sources of scientific bias, such evidence can nonetheless be helpful. State programs that administer psychedelics (or oversee their administration) should therefore develop high-quality systems for collecting these data while protecting privacy. This would create learning opportunities that have not fully been realized in the marijuana context, in large part because data are not systematically or rigorously collected at the state level. Allowing marijuana to be marketed without FDA approval has certain economic benefits, but patients would be better off if there was robust federal engagement aimed at generating high-quality data.

In addition, if states legalize the sale of psychedelics ostensibly for nonmedical use, they should require warnings to clearly explain the risks and challenges of unproven medical uses and avoid endorsing unproven medical claims. This may help discourage consumers from self-treating serious medical conditions with psychedelics obtained from nonmedical sources without sufficient professional oversight or appropriate clinical follow-up.

Although we argue that a highly regulated medical psychedelics regime is criti-

viation from which could serve as a basis for board-imposed disciplinary action and malpractice litigation. Yet there is a delicate balance to maintain because heightened requirements beyond drug approval alone risk impeding patient access, especially for already marginalized groups (*4*). Accordingly, restrictions should be limited only to those shown to be necessary for safe and effective use; research will be needed to determine what those are.

There is not much precedent for this type of coordination between FDA and state licensing boards. Although FDA's decisions regarding drugs sometimes intersect with state policies, these intersections tend not to be areas of cooperation but rather sources of dispute regarding the degree to which FDA approval preempts state law—litigation over FDA-approved mifepristone and state anti-abortion restrictions being a prominent recent example. Coordinating access across jurisdictions will require creativity and political will but is necessary to ensure that psychedelics safely reach their potential therapeutic value.

Downloaded from https://www.science.org at University of California Irvine on March 28, 2024

cal, it is important to preserve space for traditional and religious uses of psychedelics, recognizing that it is not always easy to distinguish these from medical uses because many Indigenous communities believe that physical and mental health are inextricably connected to the spiritual realm. Such practices have in some cases been protected by federal law (for example, the 1993 Religious Freedom Restoration Act and the American Indian Religious Freedom Act Amendments of 1994). Federal and state governments should be careful not to encroach on the traditional practices of communities that have used psychedelics for millennia and should recognize specific exceptions that protect these practices from governmental oversight.

### REGULATING SYNTHETIC AND NATURAL DRUGS

Some psychedelics, such as psilocybin and mescaline, are naturally occurring substances; others, such as LSD, are synthetic drugs developed in the laboratory. FDA has pathways to regulate both, but there are substantial economic and practical considerations that make the development of synthetic drugs more commercially attractive.

The kinds of clinical trials needed to demonstrate safety and effectiveness for FDA approval demand extensive resources, with estimated costs of bringing a new drug to market ranging from $314 million to $2.8 billion (*11*). Given the size of the potential therapeutic market for psychedelics, there are large commercial players with the resources to navigate these hurdles who hope to gain approval to market their products and exclude competitors through patent protection and regulatory exclusivity. However, unrefined psychedelics found in nature are not themselves patent eligible (*12*), and regulatory exclusivity, where available, provides more limited protection than the patent system (for example, a new drug typically receives 5 years of regulatory exclusivity, whereas the term of a new patent is currently 20 years) (*13*). In addition, the path to FDA approval for naturally occurring substances is more challenging because substances found in nature are inherently heterogeneous and harder to characterize. For example, even within a class of psychedelics such as psilocybin, there are many mushroom varieties grown in different environments and conditions, producing varying effects. This makes it difficult to study these substances in controlled clinical trials and to ensure consistency in commercial products (*14*). As a result, there is less incentive to invest in shepherding natural psychedelics through the commercially risky approval process (*12*) and more incentive to isolate their active compounds for development into synthetic products (*15*).

One concern about the prospect of a psychedelic drug market that consists only of synthetic products is that because of their robust patent protection, synthetic products would likely be more expensive than natural products and thus less accessible to patients. Moreover, it is possible that the combination of substances in botanical psychedelics may have beneficial effects unavailable from isolated active ingredients (known as the "entourage effect").

Thus, it is important to preserve a role for natural psychedelics—but how? Allowing states to permit possession, use, and sale of such products for medical use is an imperfect solution because it is unlikely to generate the critical data necessary to establish safety and efficacy. However, industry will hesitate to invest in drug research and development programs for botanical psychedelics. The uncertainties and costs of gaining FDA approval for such a product, combined with the comparatively limited opportunity to profit from it once approved because of limited patent protection, will deter private investment.

In an ideal world, public and philanthropic funders could sponsor trials and develop a commercialization strategy for medical use of naturally occurring psychedelics (while adopting safeguards against overharvesting of natural supplies to the detriment of Indigenous practices and environmental conservation). Those less expensive drugs could then compete on price, and synthetic psychedelics may offer benefits such as different modes of administration, greater predictability, and reduced hallucinogenic effects that could appeal to some populations. However, this approach is difficult, and the costs associated with running clinical trials dwarf the resources of even well-established nonprofits. For example, the Multidisciplinary Association for Psychedelic Studies has spent nearly 4 decades and millions of dollars supporting research in its quest for FDA approval of MDMA. If governments take seriously the importance of generating clinical data and ensuring a pathway to approval for naturally occurring psychedelics, as we think they should, they will need to take a much larger role in funding and supporting trials to bridge the gap toward approval. Although such steps would have few precedents in the drug development space, this is the sort of creative response needed for psychedelics.

### A PATH FORWARD

As lawmakers become more interested in psychedelic policy reform, it is critical that diverse stakeholders from professional societies and communities with vested interests in psychedelic use and regulation have a seat at the table. Broad representation is also needed to ensure collaboration across multiple federal and state agencies and legislative bodies. Although it may be challenging to achieve consensus on the best regulatory approach, it is essential to reach agreement on the underlying principles to guide future policy-making. These should include a commitment to developing a strong evidence base to support medical claims and safety measures, establishing appropriate oversight of the conditions surrounding therapeutic use to maximize benefit and safety, and ensuring equitable access. ■

### REFERENCES AND NOTES

1. M. Cavarra, A. Falzone, J. G. Ramaekers, K. P. C. Kuypers, C. Mento, *Front. Psychol.* **13**, 887255 (2022).
2. D. G. Smith, "Psychedelics are a promising therapy, but they can be dangerous for some," *New York Times*, 10 Feb 2023.
3. Public Law No. 110-85, 121 Stat. 823 (27 September 2007), codified as amended in US Code, Title 21, § 355(o)(3).
4. J. Davis, J. Lampert, (Rockingstone Group). "Expediting psychedelic-assisted therapy adoption in clinical settings," *BrainFutures*, H. McCormack, L. Raines, H. Harbin, J. Glastra, C. Gross, Eds. (Rockingstone Group, 2022); https://www.brainfutures.org/wp-content/uploads/2022/05/BrainFutures_Expediting-Psychedelic-Assisted-Therapy-Adoption-in-Clinical-Settings.pdf.
5. J. S. Siegel, J. E. Daily, D. A. Perry, G. E. Nicol, *JAMA Psychiatry* **80**, 77 (2023).
6. J. M. Mitchell, *Scientif. Am.* **326**, 56 (2022).
7. P. Booker, "Booker, Paul, Mace, Dean Introduce Bipartisan Legislation to Promote Research and Access to Potentially Life Saving Drugs" (2023); https://www.booker.senate.gov/news/press/booker-paul-mace-dean-introduce-bipartisan-legislation-to-promote-research-and-access-to-potential-life-saving-drugs.
8. US District Attorney's Office, "Denver man pleads guilty to possession with intent to distribute psilocybin mushrooms" (Department of Justice, 2020); https://www.justice.gov/usao-co/pr/denver-man-pleads-guilty-possession-intent-distribute-psilocybin-mushrooms.
9. M. Marks, "Seeking psychedelics? Check the data privacy clause," *Wired*, 2 November 2022.
10. A. Wexler, D. Sisti, *JAMA Psychiatry* **79**, 748 (2022).
11. O. J. Wouters, M. McKee, J. Luyten, *JAMA* **323**, 844 (2020).
12. I. G. Cohen, M. Marks, *Harv. Law Rev. F.* **135**, 212 (2022).
13. US Code of Federal Regulations, Title 21, vol. 5, § 314.108 (2020).
14. US Department of Health and Human Services, Food and Drug Administration Center for Drug Evaluation and Research, "Botanical Drug Development: Guidance for Industry" *Fed. Regist.* 81 FR 96018 (2016); https://www.federalregister.gov/documents/2016/12/29/2016-31627/botanical-drug-development-guidance-for-industry-availability.
15. G. M. Goodwin *et al.*, *N. Engl. J. Med.* **387**, 1637 (2022).

### ACKNOWLEDGMENTS

We thank M. Marks for review and comments on this manuscript. A.L.M. receives funding from the Ethical and Legal Implications of PSychedelics In Society (ELIPSIS) program at Baylor College of Medicine; I.G.C. receives funding from the Project on Psychedelics Law and Regulation (POPLAR) program at Harvard Law School, which receives funding from the Saisei Foundation. L.A.G. is a part-time of counsel at the law firm Covington & Burling, which represents clients in the pharmaceutical industry. The content of this article does not reflect the view of the law firm or its clients.

10.1126.science.adg1324

Downloaded from https://www.science.org at University of California Irvine on March 28, 2024