# EXHIBIT 39
# REDACTED

CONFIDENTIAL

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3                  NORTHERN DIVISION
4
5   BRIANNA BOE, et al.,            )
                                    )
6        Plaintiffs,               )
                                    )Civil Action No.
7   UNITED STATES OF AMERICA,      )2:22-cv-184-LCB
                                    )
8        Intervenor Plaintiff,     )
                                    )
9          vs.                     )
                                    )
10  HON. STEVE MARSHALL in his     )
    official capacity as           )
11  Attorney General of the State )
    of Alabama, et al.,            )
12                                  )
         Defendants.               )
13  _____)
14
15
16          VIDEO-RECORDED DEPOSITION OF
17              DAN KARASIC, M.D.
18             Tuesday, May 7, 2024
19                 Volume I
20            *** CONFIDENTIAL ***
21
22  Reported by:
    CARLA SOARES
23  CSR No. 5908
24  Job No. 6671384
25  Pages 1 - 263

CONFIDENTIAL

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3              NORTHERN DIVISION
 4
 5  BRIANNA BOE, et al.,      )
                              )
 6    Plaintiffs,             )
                              )Civil Action No.
 7  UNITED STATES OF AMERICA, )2:22-cv-184-LCB
                              )
 8    Intervenor Plaintiff,   )
                              )
 9        vs.                 )
                              )
10  HON. STEVE MARSHALL in his )
    official capacity as      )
11  Attorney General of the State )
    of Alabama, et al.,       )
12                            )
      Defendants.             )
13  _____)
14
15
16        VIDEO-RECORDED DEPOSITION OF DAN KARASIC,
17  M.D., Volume I, taken on behalf of Defendants,
18  beginning at 8:58 a.m., and ending at 5:34 p.m., on
19  Tuesday, May 7, 2024, before CARLA SOARES, Certified
20  Shorthand Reporter No. 5908.
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  For the Private Plaintiffs:
 4    NATIONAL CENTER FOR LESBIAN RIGHTS
 5    BY:  CHRISTOPHER STOLL, Attorney at Law
 6    BY:  SHANNON MINTER, Attorney at Law
 7       (via Zoom)
 8    870 Market Street, Suite 370
 9    San Francisco, California 94102
10    415.392.6257
11    cstoll@nclrights.org
12    sminter@nclrights.org
13
14
15  For the United States of America:
16    DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
17    BY:  RENEE WILLIAMS, Attorney at Law
18       (via Zoom)
19    150 M Street, NE, 8th Floor
20    Washington, DC 20004
21    205.514.2000
22    renee.williams3@usdoj.gov
23
24
25
```

Page 4

```
 1  APPEARANCES (Continued):
 2
 3  For the Defendants:
 4    COOPER & KIRK PLLC
 5    BY:  JOHN D. RAMER, Attorney at Law
 6    1523 New Hampshire Avenue, NW
 7    Washington, DC 20036
 8    202.220.9621
 9    jramer@cooperkirk.com
10
11
12  For the Witness:
13    COVINGTON & BURLING LLP
14    BY:  CORTLIN H. LANNIN, Attorney at Law
15    BY:  NOAH S. GOLDBERG, Attorney at Law
16    Salesforce Tower
17    415 Mission Street
18    San Francisco, California 94105
19    415.591.7078
20    clannin@cov.com
21    ngoldberg@cov.com
22
23
24  ALSO PRESENT:  Cassia Leet, Video Operator
25                 --o0o--
```

Page 5

```
 1              INDEX
 2  WITNESS
 3  DAN KARASIC, M.D.              EXAMINATION
    Volume I
 4
 5    BY MR. RAMER              13
 6    BY MR. STOLL             260
 7
 8            EXHIBITS
 9  NUMBER         DESCRIPTION          PAGE
10  Exhibit 1                48
11    Document entitled "Chapter 18
12    Mental health"
13
14  Exhibit 2                71
15    Document entitled "Standards of
16    Care 8," Bates JHU_000003256 - 3262
17
18  Exhibit 3                89
19    Document entitled "Appendix A
20    Methodology"
21
22  Exhibit 4                119
23    Expert Rebuttal Report of Dan H.
24    Karasic, M.D.
25
```

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1                    EXHIBITS
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 5                    140
4      Document entitled "Chapter 6
5      Adolescents"
6
7 Exhibit 6                    158
8      Document entitled "Consensus
9      Parameter:  Research Methodologies
10     to Evaluate Neurodevelopmental Effects
11     of Pubertal Suppression in
12     Transgender Youth"
13
14 Exhibit 7                    162
15     Document entitled "Gender Dysphoria
16     in Adults:  An Overview and Primer
17     for Psychiatrists"
18
19 Exhibit 8                    195
20     Facebook post, dated 2-4-17
21
22 Exhibit 9                    197
23     Email string, top email to [redacted]
24     from [redacted], dated 6-7-22,
25     Bates BOEAL_WPATH_064098 - 4099

Page 7

1                    EXHIBITS
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 10                   202
4      Video labeled "Karasic_Dep_
5      Video1.mp4"
6
7 Exhibit 11                   205
8      Video labeled "Karasic_Dep_
9      Video2.mov"
10
11 Exhibit 12                   206
12     Video labeled "Karasic_Dep_
13     Video3.mov"
14
15 Exhibit 13                   207
16     Document entitled "A message from
17     the WPATH Executive Committee"
18
19 Exhibit 14                   212
20     Email string, top email to [redacted]
21     from [redacted], dated 2-13-17,
22     Bates BOEAL_KARASIC_000008 - 0010
23
24
25

Page 8

1                    EXHIBITS
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 15                   215
4      Email string, top email to
5      WPATH EC from [redacted], dated
6      2-12-17, Bates BOEAL_WPATH_101671 - 1672
7
8 Exhibit 16                   219
9      Document containing numbered paragraphs,
10     Bates BOEAL_WPATH_143750 - 3751
11
12 Exhibit 17                   222
13     Private Plaintiffs' Supplemental
14     Rule 26 Disclosures
15
16 Exhibit 18                   224
17     Email string, top email to Walter
18     Bouman from Asa Radix, dated 6-14-22,
19     Bates BOEAL_WPATH_105494 - 5498
20
21 Exhibit 19                   226
22     Email to Melanie Bird from Emily G.
23     Gean, dated 12-29-20, Bates HHS-0153399
24
25

Page 9

1                    EXHIBITS
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 20                   227
4      Document entitled "Treatments for
5      Gender Dysphoria in Transgender
6      Youth Topic Nomination,"
7      Bates HHS-0153400 - 3402
8
9 Exhibit 21                   229
10     Email string, top email to Karen
11     Robinson from Christine Chang, dated
12     9-1-20, Bates HHS-0153484 - 3487
13
14 Exhibit 22                   243
15     Document entitled "SOC 8 Mental
16     Health chapter in Clinical Practice,"
17     Bates BOEAL_WPATH_139861 - 9873
18
19 Exhibit 23                   253
20     Document entitled "Initial Clinical
21     Guidelines for Co-Occurring Autism
22     Spectrum Disorder and Gender
23     Dysphoria or Incongruence in
24     Adolescents"
25              --o0o--

Veritext Legal Solutions
877-373-3660                                        800.808.4958

CONFIDENTIAL

Page 10

1       REFERENCED EXHIBITS
2         (None.)
3
4
5
6
7    INSTRUCTIONS NOT TO ANSWER
8         (None.)
9
10        --o0o--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1      San Francisco, California
2      Tuesday, May 7, 2024
3        8:58 a.m.
4
5     P R O C E E D I N G S
6    THE VIDEO OPERATOR:  Good morning.  We are
7 going on the record at 8:58 a.m. on May 7th, 2024.
8     Please note that the microphones are
9 sensitive and may pick up whispering and private
10 conversations.  Audio- and video-recording will
11 continue to take place unless all parties agree to
12 go off the record.
13     This is Media Unit 1 of the video-recorded
14 deposition of Dan Karasic, M.D., taken by counsel
15 for defendants, in the matter of Brianna Boe,
16 et al., Plaintiff, and United States of America,
17 Intervenor Plaintiff, vs. Honorable Steve Marshall,
18 in his official capacity of Attorney General of the
19 State of Alabama, et al., filed in the United States
20 District Court for the Middle District of Alabama,
21 Northern Division, Civil Action No. 2:22-cv-184-LCB.
22 The location of the deposition is 415 Mission
23 Street, San Francisco, California 94105.
24     My name is Cassia Leet, representing
25 Veritext Legal Solutions, and I am the videographer.

Page 12

1 The court reporter is Carla Soares, from the firm
2 Veritext Legal Solutions.
3     I am not related to any party in this
4 action, nor am I financially interested in the
5 outcome.
6     Would counsel and all present, including
7 remotely, please state your appearances and
8 affiliations for the record, beginning with the
9 noticing attorney.
10     MR. RAMER:  John Ramer, from the law firm
11 Cooper & Kirk, on behalf of defendants.
12     MR. LANNIN:  Cortlin Lannin, of Covington
13 & Burling, representing the witness, Dr. Dan
14 Karasic, in his capacity as a fact witness.  I'm
15 joined this morning by my colleague Noah Goldberg,
16 also of Covington.
17     MR. STOLL:  Christopher Stoll, of the
18 National Center for Lesbian Rights, for the private
19 plaintiffs.
20     THE VIDEO OPERATOR:  Remote counsel?
21     MR. MINTER:  Shannon Minter, also with
22 NCLR, for the private plaintiffs.
23     MS. WILLIAMS:  Good morning.  Renee
24 Williams for the United States.
25     THE VIDEO OPERATOR:  Thank you.

Page 13

1     Would the court reporter please swear in
2 the witness, and then counsel you may proceed.
3     DAN KARASIC, M.D.,
4 having been administered an oath, was examined and
5 testified as follows:
6     EXAMINATION
7 BY MR. RAMER:
8   Q  Good morning, Dr. Karasic.
9   A  Good morning.
10   Q  My name is John Ramer.  I represent the
11 defendants.  And I know you've been deposed several
12 times before.  This will be the normal drill.
13     I'll try to take a break about every hour,
14 but if at any point you need a break, just let me
15 know.  And the only request is that you would answer
16 any pending questions.
17     If you don't understand a question, just
18 let me know, and I'll try to rephrase it.
19 Otherwise, I'll assume you understand it.
20     Does that all make sense?
21   A  Yes.
22   Q  Great.
23     MR. LANNIN:  Counsel, I wonder -- before
24 you get started, as we discussed earlier,
25 Dr. Karasic is here both in a fact witness capacity

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1 and in his capacity as an expert witness in this
2 litigation.  And I'm here to represent him in his
3 fact capacity, and Mr. Stoll here is here on behalf
4 of the plaintiffs to represent Dr. Karasic in his
5 expert capacity.
6         To minimize disruptions to the record,
7 I'll endeavor to object to form when necessary.  And
8 can we agree that an objection on one party's behalf
9 is an objection for all?
10        MR. RAMER:  Yes.
11        MR. STOLL:  Agreed.
12        MR. LANNIN:  Very good.
13 BY MR. RAMER:
14    Q   Dr. Karasic, are you an expert?
15    A   Yes, on this subject matter.
16    Q   And when you say "this subject
17 matter," what do you mean by that?
18    A   I would say I'm an expert on healthcare
19 provision for transgender people.
20    Q   Any other areas in which you're an expert?
21    A   Yes.  I'm a psychiatrist, a consultation
22 liaison psychiatrist in terms of my career
23 initially, and so I think I have broader expertise
24 in psychiatry as a professor emeritus of
25 psychiatrist at UCSF.

Page 15

1    Q   Any other fields?
2    A   Other than -- I would say more broadly in
3 transgender health, and then in psychiatry.
4    Q   Are you an expert in the treatment of
5 gender dysphoria in children?
6    A   So I am a -- an expert in the care of
7 children, adolescents; adolescents in terms of my
8 clinical practice, my years as a psychiatrist for
9 the Dimensions Clinic for trans youth, where I was a
10 psychiatrist for 17 years.  And that clinic saw
11 patients from 12 to 25, and also in my own faculty
12 practice and private practice where I saw some
13 people who were younger even than 12.
14    Q   And in this field, do you agree that there
15 is a distinction between children and adolescents?
16    A   Yes.
17        MR. LANNIN:  Object to the form.
18        THE WITNESS:  Yes.
19 BY MR. RAMER:
20    Q   And what is that distinction?
21    A   So medical treatment is first contemplated
22 at the start of puberty.  And so with that,
23 diagnostically, there's a separate diagnosis for
24 gender dysphoria in prepubertal children and one
25 in -- another diagnosis for those in adolescence and

Page 16

1 adults.  So they're -- it is distinguished in
2 that -- in that way.
3    Q   Is it fair to say that the beginning of
4 puberty is often described as the beginning of
5 Tanner Stage 2?
6        MR. LANNIN:  Object to the form.
7        THE WITNESS:  So it's fair to describe
8 Tanner Stage 2 as the onset of puberty, yes.
9 BY MR. RAMER:
10    Q   And so you said there were separate
11 diagnoses for children and adolescents.  So how do
12 you determine which diagnosis is applicable to a
13 particular patient?
14    A   So that is prior to the onset of puberty
15 versus at Tanner Stage 2 or afterwards.
16    Q   And so today, if -- let me start again.
17        Unless you or I say otherwise, if we use
18 the term "children," is it fair to say we're talking
19 about prepubertal individuals?
20    A   Yes.
21    Q   And if we use the term "adolescents," is
22 it fair to say we're talking about individuals
23 between the beginning of puberty and the age of
24 majority?
25    A   Yes.  Yes.

Page 17

1    Q   And so are you -- are you an expert in the
2 treatment of gender dysphoria in children along the
3 lines we've just described?
4    A   My clinical practice does not extend to
5 prepubertal children.
6        Usually when I -- when I see patients,
7 they are at Tanner Stage 2 or older.  And -- but I
8 do have expertise more broadly as somebody who has
9 been in the field of transgender health for many
10 decades, and have been involved in conferences and
11 publications.
12        For example, on -- I edited a book about
13 questions for DSM-V that was -- that were articles
14 written early on in the stage of discussion of how
15 the gender identity diagnoses of DSM-IV might be
16 changed, and those included the diagnosis for
17 prepubertal children.
18        So I have -- I have academic expertise
19 there.  I don't have -- my clinical practice isn't
20 young children.
21    Q   And so your clinical practice involves
22 only adolescents or older patients; is that right?
23    A   Yes.
24    Q   But you have published in the field of
25 gender dysphoria in children specifically?

CONFIDENTIAL

1     A   I have -- I edited a book which included
2   discussion on the DSM diagnoses of -- for gender
3   identity disorder in children, and I was involved in
4   meetings and discussions with WPATH and the American
5   Psychiatric Association and the World Health
6   Organization about the diagnoses for children as
7   well as for adults.
8     Q   Would you say that your relationship to
9   WPATH is relevant to the expertise that you're
10   testifying about in this case?
11         MR. LANNIN:  Object to the form.
12         THE WITNESS:  Yes.
13   BY MR. RAMER:
14     Q   And I understand that your clinical
15   practice does not currently have -- let me start
16   again.
17         Your clinical practice does not currently
18   extend to children with gender dysphoria.
19         Have you ever treated a child for gender
20   dysphoria?
21         MR. LANNIN:  Object to the form.
22         THE WITNESS:  So the youngest people I've
23   treated were right at the start of Tanner Stage 2.
24         So in my faculty practice, I may have seen
25   people as young as 10 or 11.

1         My practice at Dimensions Clinic was only
2   12 to 25 years old because that was the age range
3   for people to be able to receive care at that
4   clinic.
5   BY MR. RAMER:
6     Q   And when did you first begin treating
7   adolescents for gender dysphoria?
8     A   So I was hired to be the psychiatrist for
9   the Dimensions Clinic in 2003, and -- but as early
10   as the 1990s, in my faculty practice, I was seeing
11   some adolescents with gender dysphoria.
12     Q   Were you seeing them for treatment of
13   gender dysphoria?
14     A   So I was not seeing them for medical
15   treatment of gender dysphoria, but I was seeing
16   people as their psychiatrist or for mental health
17   reasons who were being treated medically for gender
18   dysphoria.
19     Q   And when you say you weren't "seeing them
20   for medical treatment of gender dysphoria," what do
21   you mean by that?
22     A   I wasn't -- I wasn't prescribing hormones
23   or puberty blockers.  Back then it was just
24   hormones.
25         So I wasn't the person prescribing

1   hormones, but I was seeing people for mental health
2   issues that they -- that they had.
3     Q   Just to make sure I understand, is your
4   role as the psychiatrist actually prescribing the
5   medication or recommending it?
6         MR. LANNIN:  Object to the form.
7         THE WITNESS:  So I prescribe psychiatric
8   medication.  I don't prescribe puberty blockers or
9   hormones.
10   BY MR. RAMER:
11     Q   What would you describe what you do with
12   respect to puberty blockers or hormones for your
13   patients?
14         MR. LANNIN:  Object to the form.
15         THE WITNESS:  So, mostly have -- I'm
16   part of a treatment team which varies in
17   different -- over different settings.
18         So the Dimensions Clinic was a clinic in
19   faculty practice.  In private practice, it's kind of
20   a more virtual team, where most patients have a
21   psychotherapist, a psychiatrist, and a pediatrician
22   or pediatric endocrinologist or internist if they're
23   over -- 18 and over.
24   BY MR. RAMER:
25     Q   And so what do you do in the context of

1   that team?
2     A   So I am addressing mental health issues
3   with the -- with the patient, and consulting and
4   working with the team that is providing other
5   aspects of care.
6     Q   Are you ever the member of the team who is
7   recommending hormone treatment?
8         MR. LANNIN:  Object to the form.
9         THE WITNESS:  So sometimes I will have a
10   patient where there is either a mental health
11   assessment that is needed or discussion in terms of
12   psychiatric stability, or sometimes there's a letter
13   required.  It can be different in different
14   settings.
15         But I communicate to the person who's
16   providing medical care, and also communicate with
17   the psychotherapist if there's a separate
18   psychotherapist about -- about recommendations for
19   care.
20         The recommendation, you know, can come
21   from different parts of the team, but I can end up
22   assuming kind of some different roles, very often
23   about mental health stability, sometimes in terms of
24   a primary person that I've worked with in terms of
25   their eligibility per standards of care for medical

6 (Pages 18 - 21)

Page 22

1 treatment.
2 BY MR. RAMER:
3     Q   So you said the recommendation can come
4 from different parts of the team.  Does the
5 recommendation ever come from you?
6         MR. LANNIN:  Object to the form.
7         THE WITNESS:  Yes.  It's typically not
8 my -- my saying to the patient, "I recommend that
9 it's time to start hormones or puberty blocker."
10        They've often been seen, you know, in
11 therapy, and sometimes then, at some point, they
12 might get a referral to a pediatric endocrinologist.
13        And the pediatric endocrinologist might
14 want my opinion, and I might speak with a therapist,
15 and include my own experience with the patient in
16 communicating that to the pediatric endocrinologist.
17 BY MR. RAMER:
18    Q   Do you diagnose gender dysphoria in
19 adolescents?
20    A   Yes.
21    Q   And then do you ever assess the adolescent
22 patient to determine whether hormone therapy would
23 be an appropriate treatment for the gender
24 dysphoria?
25    A   Yes.

Page 23

1     Q   And then do you reach a conclusion that it
2 would be appropriate?
3         MR. LANNIN:  Object to the form.
4         You can answer.
5         THE WITNESS:  Yes.  So it would be
6 appropriate in -- right.  Yes.
7 BY MR. RAMER:
8     Q   And then who do you relay that decision
9 to?
10        MR. LANNIN:  Object to the form.
11        THE WITNESS:  So in that particular case,
12 it can be to the pediatric endocrinologist or
13 pediatrician who might be prescribing the medical
14 intervention.
15 BY MR. RAMER:
16    Q   And when was the first time that you
17 recommended hormone therapy to treat gender
18 dysphoria in an adolescent?
19    A   It would -- I would say probably in the
20 early 2000s.
21    Q   And have you ever recommended puberty
22 blockers as a treatment for gender dysphoria in a
23 patient?
24    A   Yes.
25    Q   And when was the first time you

Page 24

1 recommended puberty blockers as a treatment for
2 gender dysphoria in a patient?
3     A   So that was later.  In the early part of
4 my practice, puberty blockers weren't available, and
5 adolescents would, though, get started on hormones.
6         So I would guess that that was in the
7 late -- late 2000s.  It would have been in my
8 faculty practice, I think.
9         Typically, though I worked at various
10 times with the Child and Adolescent Gender Center at
11 UCSF, I wasn't typically the person doing the
12 evaluation for puberty blockers.  It was more often
13 for hormones, but there were instances that I did.
14    Q   When you say "late 2000s," what do you
15 mean by that?
16    A   So -- well, I'm trying to think.
17        So the Child and Adolescent Gender Center
18 didn't start until -- officially until 2012, but
19 there were pediatric endocrinologists as early as
20 maybe 2009 that were prescribing puberty blockers at
21 UCSF.
22        So it would be somewhere in that early
23 period.  I guess it could be between 2009 and 2012
24 in my -- via my faculty practice.
25        The people at the Dimensions Clinic did

Page 25

1 start cooperating or working with the Child and
2 Adolescent Gender Center, but that wasn't until a
3 little bit later.
4     Q   And so approximately sometime between 2009
5 and 2012 was the first time you recommended puberty
6 blockers as a treatment for gender dysphoria; is
7 that right?
8         MR. LANNIN:  Object to the form.
9         THE WITNESS:  Yeah, that would be my
10 recollection.
11 BY MR. RAMER:
12    Q   And for recommending hormone therapy for
13 adolescents, did I hear you correctly, you said
14 early 2000s?
15    A   Yes.  So the -- I became the psychiatrist
16 at the -- at the Dimensions Clinic for trans youth
17 that -- even though you often see, like, a history
18 of pediatric gender care, just going back to Norm
19 Spack at Boston Children's, the Dimensions Clinic
20 has been providing care for trans adolescents since
21 the 1990s, and I was hired as a psychiatrist in
22 2003.
23    Q   And so when you say "early 2000s," we're
24 talking, approximately 2003 would have been the
25 first time you recommended hormone therapy to treat

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1 gender dysphoria in an adolescent?
2     A   Well, before that, I may well have seen
3 adolescents -- I mean, I got hired from them because
4 I was already seeing adolescents in my faculty
5 practice.
6         And so -- so I can't say precisely the
7 year, but it was in that -- in that early 2000s
8 period, I would say.
9     Q   So approximately 2003 would have been the
10 first time that you recommended hormone therapy to
11 treat gender dysphoria in an adolescent, correct?
12        MR. LANNIN:  Object to the form.
13        THE WITNESS:  Certainly through the
14 Dimensions Clinic.  It's possible I -- in my faculty
15 practice, I would guess that I had made those
16 recommendations beforehand because I was already
17 kind of known when they hired me as the
18 psychiatrist.
19 BY MR. RAMER:
20     Q   And so you're saying that, if anything,
21 it's -- earlier than 2003 could have been the first
22 time?
23        MR. LANNIN:  Object to the form.
24        THE WITNESS:  It's possible.  I don't
25 recall.

Page 27

1 BY MR. RAMER:
2     Q   But it was not after 2003 that was the
3 first time that you recommended hormone therapy to
4 treat gender dysphoria in an adolescent, correct?
5        MR. LANNIN:  Object to the form.
6        THE WITNESS:  It's hard for me to remember
7 specific patients, but I started in a clinic that
8 was seeing adolescents and young adults.
9         And at that time, we did see adolescents
10 who had started hormones on their own and then moved
11 to San Francisco.  And then the pediatricians, the
12 family practitioners, started -- you know, often
13 were starting the provision of hormones in a
14 monitored way for people who had already started
15 them.
16 BY MR. RAMER:
17     Q   Approximately how many patients have you
18 had for whom you've recommended puberty blockers as
19 a treatment for gender dysphoria?
20     A   I don't know if I can say a number because
21 I've been working over so many years.
22         But I would say more commonly, I had
23 gotten involved with a patient after they were
24 already on puberty blockers, or I had patients,
25 before puberty blockers were routinely given, who

Page 28

1 were just being started on hormones as their first
2 intervention.
3     Q   I guess, just to kind of understand a
4 ballpark, I mean, are we talking -- have you
5 recommended puberty blockers as a treatment for
6 gender dysphoria in over 50 patients?
7     A   It's hard for me to say.  It may well be,
8 when we're talking about puberty blockers, fewer
9 than that.  But it would be hard for me to give a
10 number.
11         As I said, I would say more often over the
12 course of my career, people were either already on
13 puberty blockers, or we were recommending
14 recommendations before puberty blockers were widely
15 available.
16         But I did recommend people for puberty
17 blockers over the course of those years,
18 particularly in my faculty practice, and then
19 private practice.
20     Q   Would you say that you've recommended
21 puberty blockers as a treatment for gender dysphoria
22 in more than 10 patients?
23     A   Yes.
24     Q   More than 20?
25     A   Yes.

Page 29

1     Q   More than 30?
2     A   You know, then I would just -- I just
3 never really thought about how many.  And I've seen
4 so many patients over so many years.
5         There was a time when there were
6 relatively few practitioners, and -- but puberty
7 blockers weren't so -- there were many young people
8 that I saw for hormones, and then puberty blockers
9 weren't really available until UCSF pediatric
10 endocrinology started prescribing them in the late
11 2000s before the multidisciplinary clinic was set
12 up.
13         And then I was asked to be involved on the
14 steering committee to set up the Child and
15 Adolescent Gender Clinic, and that was probably
16 around in 2009 or 2010.
17         And then the clinic officially didn't have
18 its first meeting until 2012, but there were a lot
19 of meetings about the provision of puberty blockers
20 in that period, I'd say, between 2010 and 2012,
21 including Norm Spack, who had -- was the original
22 prescriber, the person who started the first clinic
23 in the U.S. at Boston Children's, came out to
24 San Francisco, and we met with him in 20- --
25 probably 2010 is my guess.

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1        And then I was involved in kind of
2  organizing a set of therapists who worked with
3  transgender -- or gender-diverse youth who -- and
4  that was -- that's a group led by Diane Ehrensaft.
5  So that was also in that period.
6        I remember doing a presentation with Diane
7  Ehrensaft in 2009.  So in that period between 2009
8  and 2012, there was a lot of discussion about
9  setting up services for people who might receive
10  puberty blockers as well as hormones.
11     Q   Why were you mentioning all that
12  background?
13        MR. LANNIN:  Object to the form.
14        THE WITNESS:  I was just -- you were
15  trying to relate, like, how -- I was trying to maybe
16  kind of talk through the -- evaluating people for
17  puberty blockers and the timeline for that, because
18  puberty blockers weren't widely available until
19  probably 2009, and then -- but there wasn't a
20  structured clinic until 2012.
21        So I was -- I've been in practice for a
22  long time, and so the years are arbitrary things.
23  So I was just kind of talking through when those
24  services were set up to provide puberty blockers in
25  San Francisco.

Page 31

1  BY MR. RAMER:
2     Q   And approximately how many minor patients
3  have you had for whom you've recommended hormone
4  therapy as a treatment for gender dysphoria?
5        MR. LANNIN:  Object to the form.
6        THE WITNESS:  So -- well, I've certainly
7  taken care of many hundreds of adolescents over the
8  years, but I don't -- I don't know if I could say
9  how many I wrote the letter for them starting
10  hormones versus their psychotherapist, because there
11  were many of them who also saw a psychotherapist,
12  and the psychotherapist wrote the letter.
13        But I was involved with the treating team,
14  as well as at the Dimensions Clinic where there was
15  a group of therapists that I would meet with and
16  where we would discuss cases, as well as with the
17  hormone prescriber.
18  BY MR. RAMER:
19     Q   And so you've treated over hundreds of
20  adolescents for gender dysphoria.  And is your point
21  that it's not always some clear distinction of
22  who's -- what individual on the team is doing the
23  recommending?  Is that --
24     A   Right.
25     Q   Okay.

Page 32

1     A   So a lot of times it's -- I would say most
2  commonly there's a psychotherapist who's doing it,
3  and the person -- it's a patient who has a
4  psychotherapist and a psychiatrist, and then there's
5  a letter that's going to the pediatrician or
6  pediatric endocrinologist, or at Dimensions there
7  was often a family practice doctor who took care of
8  kids.
9     Q   Have you ever recommended surgery as a
10  treatment for gender dysphoria in an adolescent?
11     A   I have recommended -- I have recommended
12  chest surgery, mastectomy, in adolescents.
13     Q   Any other surgeries?
14     A   No.
15     Q   What age was the youngest patient for whom
16  you've recommended surgery as a treatment for gender
17  dysphoria?
18     A   So for an adolescent, probably 13 or 14
19  was the earliest.  Typically, my patients have
20  received chest surgery later in adolescence.
21     Q   And when was the first time you
22  recommended surgery as a treatment for gender
23  dysphoria in an adolescent?
24     A   Good question.
25        We didn't have -- in the early years of

Page 33

1  the Dimensions Clinic, there wasn't wide access to
2  surgery for those who needed chest surgery, but
3  there were a few people who did get it privately.
4        I'm just trying to think of specific
5  patients.  But I'll just -- I don't remember a year.
6     Q   And when you first began recommending
7  hormone therapy as a treatment for gender dysphoria
8  in adolescents back in the early 2000s, what
9  evidence were you relying on?
10        MR. LANNIN:  Object to the form.
11        THE WITNESS:  So there -- so we obviously
12  had far less evidence, but there were many
13  adolescents who were already benefiting from
14  hormones.
15        So the circumstance I can recall the most
16  from that time was adolescents who had -- who had
17  originally self-treated or had gotten hormones on
18  their own, and then presented with -- to the clinic.
19        There was a pretty robust mental health
20  component, and so they would work with the
21  therapists.
22        And there was -- I think the initial
23  treatment was really, even before I started there,
24  from the 1990s, from the Tom Waddell Clinic, of kind
25  of harm reduction, of providing supervised hormones.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1      And then at some point, particularly
2  adolescents in later adolescence would come to the
3  clinic seeking initiation of hormones, and they
4  would meet with therapists there and then initiate
5  hormones.  And that preceded the availability of
6  puberty blockers.
7  BY MR. RAMER:
8      Q   And so in the early 2000s, in your
9  opinion, there was sufficient evidence to conclude
10  that giving adolescents hormone therapy was
11  effective for treating gender dysphoria, correct?
12      MR. LANNIN:  Object to the form.
13      THE WITNESS:  So we used the information
14  we had.  There already was a long history of people,
15  even adolescents, on hormones.
16      You know, the famous case of Agnes Torres
17  who started treating herself with her mother's
18  hormones in 1951 or '52, and then that was very
19  well-documented, although they originally thought
20  that she had -- that she was intersex because she
21  didn't tell them.  But they did -- she got
22  vaginoplasty in 1959 at UCLA.
23      And I had -- did my psychiatry residency
24  training at UCLA and was just kind of aware of the
25  long history of that care being provided.  And it

Page 35

1  was clear that there were adolescents who had
2  received hormones and benefited from it, even though
3  the evidence base obviously was much less than we
4  have now.
5  BY MR. RAMER:
6      Q   But you would not have recommended hormone
7  therapy as a treatment for gender dysphoria in
8  adolescents if you did not think there was
9  sufficient evidence to conclude that it was
10  effective, correct?
11      MR. LANNIN:  Object to the form.
12      THE WITNESS:  Correct.  Yes.
13  BY MR. RAMER:
14      Q   And when you first recommended puberty
15  blockers as a treatment for gender dysphoria in the
16  late 2000s, what evidence were you relying on?
17      MR. LANNIN:  Object to the form.
18      THE WITNESS:  So -- so the evidence at
19  that point was evidence that was being used
20  successfully in Amsterdam, and then in Boston.  And
21  then that information was shared with pediatric
22  endocrinology at UCSF.
23      And -- so it was information from the
24  Dutch clinic and their clinical experience, as well
25  as, I believe, their early publication.  Certainly

Page 36

1  by 2011, they had published.  But in 2009 at the
2  WPATH conference in Oslo, they discussed their
3  experience pretty -- the Dutch group -- pretty
4  extensively, from my recollection.
5  BY MR. RAMER:
6      Q   And when you say "information was shared
7  with pediatric endocrinology at UCSF," who are you
8  referring to as sharing information?
9      MR. LANNIN:  Object to the form.
10      You can answer.
11      THE WITNESS:  So between the Dutch group,
12  I remember Annelou de Vries coming to San Francisco,
13  who published the 2011 and 2014 publications on
14  their group, and the pediatric endocrinologist was
15  Steven Rosenthal, who had been the pediatric
16  endocrinologist for people with disorders of sexual
17  development before starting to take care of trans
18  kids, and so would provide puberty blockers for
19  people with precocious puberty before doing that
20  care for trans youth.  And so he was already
21  familiar with the provision of that care.
22      And then there was the information that
23  this was helping youth in the Netherlands.
24  BY MR. RAMER:
25      Q   And so in your opinion, in the late 2000s,

Page 37

1  there was sufficient evidence to conclude that
2  giving adolescents puberty blockers was effective
3  for treating gender dysphoria, correct?
4      MR. LANNIN:  Object to the form.
5      THE WITNESS:  Well, it was certainly true
6  that we welcomed more research as it came about, but
7  there was certainly promising research of the
8  benefits that had been going on for quite a number
9  of years in the Netherlands.  And so there was the
10  start of people getting that care in San Francisco.
11  BY MR. RAMER:
12      Q   When you say "the start of people getting
13  that care in San Francisco," what are you referring
14  to?
15      A   People getting -- youth getting puberty
16  blockers through pediatric endocrinology at UCSF in
17  the late 2000s, and then leading to the opening of a
18  formal interdisciplinary clinic in 2012.
19      Q   And you mentioned you served as the
20  psychiatrist for the Dimensions Clinic; is that
21  right?
22      A   Yes.
23      Q   And what age group did that clinic serve?
24      A   Ages 12 to 25.
25      Q   Why did the clinic provide care up to age

10 (Pages 34 - 37)

CONFIDENTIAL

1 25?

2        MR. LANNIN:  Object to the form.

3        You can answer.

4        THE WITNESS:  So, many youth clinics

5 provide care for adolescents into young adults.  So

6 I just -- I think -- I don't know why they picked

7 those specific ages, but it's not unusual to see

8 youth clinics that span between providing care to

9 adolescents and to young adults.

10 BY MR. RAMER:

11   Q  Do you think 18- to 24-year-olds should be

12 treated as adolescents rather than adults with

13 respect to gender-affirming care?

14        MR. LANNIN:  Object to the form.

15        THE WITNESS:  So there are recommendations

16 that are specific to age, but I think that there are

17 youth who are more or less mature.

18        So one has to certainly pick an age.  And

19 generally, for legal capacity to consent to care

20 generally, that age has been 18.

21        On the other hand, in the Dimensions

22 Clinic, there was a substantial provision of

23 psychotherapy and mental health care for people in,

24 you know, also 18 to 25, recognizing that there were

25 young people who needed mental health support or

1 needed to better understand themselves in terms of

2 their gender identity.

3        So there -- there are reasons both for why

4 care is separated at 18, why people go from

5 pediatricians and child and adolescent psychiatrists

6 to adult psychiatrists at 18.  That is just kind of

7 practice.  But there's certainly, as you know,

8 individual variability as well.

9        And so, you know, I think it was useful

10 that the clinic provided, you know, care for people

11 through young adulthood.

12 BY MR. RAMER:

13   Q  Doesn't the WPATH Standards of Care 8

14 provide different requirements depending on whether

15 you're treating an adolescent or an adult?

16   A  Yes.

17   Q  And how do you determine which

18 requirements apply to a particular patient?

19        MR. LANNIN:  Object to the form.

20        THE WITNESS:  So, remember, you know,

21 these are clinical guidelines, and individual

22 clinicians can use their own judgment with a

23 patient.

24        But it reflects that in younger people, it

25 is particularly important to have a comprehensive

1 bio-psychosocial -- that's how it's often

2 described -- understanding and evaluation of -- of

3 the patient.  And that there is variability as

4 people get older in terms of their own understanding

5 of themselves, such that it may well be clinically

6 advisable for young adults to -- to have more care

7 around transition.

8        But they're typically -- you know, because

9 ages are set in terms of things like legal capacity,

10 18 is -- you know, is the divider in that way, and

11 people generally, at 18, are considered to have the

12 capacity to consent on their own for medical care.

13 BY MR. RAMER:

14   Q  When you say clinicians can use their

15 individual judgment with a patient, does that mean

16 that a clinician could have a 22-year-old patient

17 and determine that the clinician is going to use the

18 requirements from the "Adolescents" chapter?

19        MR. LANNIN:  Object to the form.

20        THE WITNESS:  So, you know, again, they're

21 practice guidelines.  And so I wouldn't describe

22 them as requirements for a 22-year-old, but there

23 are 22-year olds who would benefit from more time,

24 you know, kind of understanding gender identity and,

25 you know, what they -- what course of action they

1 want to take.

2        But then there are many 22-year-olds who

3 are -- who don't have that ambiguity, and so that's

4 why an individual clinician, working with an

5 individual patient, might, you know, spend more time

6 with that patient; and even some people who were

7 middle-aged or sometimes some people who need the

8 most years of, you know, work in terms of what they

9 want to do are people in their 50s and 60s.

10        And so there are individual circumstances

11 in terms of -- particularly in the mental health

12 field in working with people, in terms of helping

13 them with the path that is best for them.

14 BY MR. RAMER:

15   Q  With respect to the clinician's individual

16 judgment, could a clinician have a particularly

17 mature 17-year-old where the clinician would decide

18 they're not going to use all the recommendations

19 from the "Adolescents" chapter?

20        MR. LANNIN:  Object to the form.

21        THE WITNESS:  So they're practice

22 guidelines, and they're not laws.

23        So it -- it certainly is, you know,

24 possible that somebody might make that

25 determination.

CONFIDENTIAL

Page 42

1    I do think that if you are making that
2 determination in an adolescent, in a way, in terms
3 of your process of making that recommendation,
4 you're utilizing the WPATH guidelines because you're
5 assessing the cognitive maturity of the adolescent
6 in order to decide, you know, what course of
7 treatment is best.
8 BY MR. RAMER:
9    Q   And switching gears just a little bit, I
10 thought I read that you helped run WPATH's global
11 education initiative; is that right?
12    A   So I wasn't the -- one of the two leaders.
13 There were two chairs.  But I was very active in it
14 from its inception until 2018.
15    Q   And can you just kind of describe what
16 that is?
17    A   Sure.
18    So there was a recognition from, really,
19 the -- around the start of my board service -- I
20 guess others had probably had that recognition
21 earlier -- that it was important for WPATH to use
22 the knowledge of its experts to train a larger
23 population of health professionals to provide
24 transgender health and to -- to come up with some
25 guidelines of how that education should work,

Page 43

1 looking at other health organizations that provided
2 education of how -- how they organized that and how
3 they did it.
4    And so providing a broader education
5 program, and then also a certification where one
6 could -- if one went through a fairly long process
7 of trainings and took an exam and got mentoring with
8 a senior clinician, one could call themselves
9 "certified."
10    So that it was similar to what other
11 organizations have done, especially in the mental
12 health field; so that clients or patients could see
13 that this was somebody who had received training,
14 received formal training in the provision of
15 transgender care.
16    Q   And how do providers access the GEI
17 programming?
18    A   So they sign up for sessions on the WPATH
19 website.
20    Q   Are they, like, videos saved somewhere
21 that people then --
22    A   So when I was on GEI, it was all live
23 trainings.  And then with the start of the pandemic,
24 they started doing both videotaped presentations
25 and, I think, live Zoom sessions.  But I haven't

Page 44

1 been involved during that period.
2    But it was a switch-over that, I think,
3 probably would have happened anyway, but like many
4 things, I think really got pushed forward by the
5 pandemic when people were switching how they take in
6 information to Zoom and watching videos.
7    Q   And when you referenced "mentoring with a
8 senior clinician," can you just kind of describe how
9 that works?
10    A   Yeah.
11    MR. LANNIN:  Object to the form.
12    THE WITNESS:  So I had left the WPATH
13 board, and with it, my involvement in GEI, in 2018,
14 just as the mentoring system was being set up.
15    The mentoring system was, I think, most
16 important for psychotherapists, but there also was a
17 mentoring program for people providing medical care.
18    So someone who had gone through all of the
19 trainings and taken the exam would be matched with a
20 mentor with whom they could discuss their cases.
21    And so it was a further step of trying to
22 improve the kind of competency of people coming into
23 the field to -- you know, in terms of their
24 abilities to provide good care.
25 ///

Page 45

1 BY MR. RAMER:
2    Q   How were the mentors for that program
3 selected?
4    A   So, much of this happened just as I was
5 leaving the board; so I am not familiar with all of
6 it.
7    But there was an application process, is
8 my recollection, where people would apply to be
9 mentors.  And they had to, I think, be certified
10 themselves and have a certain amount of experience,
11 and then they could apply to be mentors.
12    And then there were meetings of the
13 mentors before they would be matched with -- with
14 somebody needing mentoring.
15    Q   Is it fair to say the mentors are experts
16 on the topics that they're mentoring about?
17    MR. LANNIN:  Object to the form.
18    THE WITNESS:  I think it's fair to say
19 that they're very knowledgeable in that they did
20 need to be certified themselves.
21    But I have not been involved with the
22 mentoring process since its early -- you know, since
23 early on.  So I can't say -- I can't vouch for the
24 mentors or who were mentors now because I just
25 haven't -- it's been six years since I've been

CONFIDENTIAL

Page 46

1 involved with GEI.
2        MR. RAMER:  We've been going about an
3 hour.  Is this a good time to take a break?
4        THE WITNESS:  Sure.
5        MR. RAMER:  We'll go off the record.
6        THE VIDEO OPERATOR:  Going off the record,
7 the time is 9:56 a.m.
8        (Recess, 9:56 a.m. - 10:12 a.m.)
9        THE VIDEO OPERATOR:  Back on the record.
10 The time is 10:12 a.m.
11 BY MR. RAMER:
12    Q   Dr. Karasic, you are testifying both as an
13 expert witness and as a fact witness in this case,
14 correct?
15    A   Yes.
16    Q   And you've been deposed as an expert
17 witness before, correct?
18    A   Yes.
19    Q   Did you give truthful testimony during
20 those depositions?
21    A   Yes.
22    Q   And you have testified at court hearings
23 as an expert witness before, correct?
24    A   Yes.
25    Q   And did you give truthful testimony at

Page 47

1 those hearings?
2    A   Yes.
3    Q   What did you do to prepare for this
4 deposition?
5    A   I reviewed my declaration, and I reviewed
6 a little bit of literature, and I spoke with both
7 the plaintiffs' lawyers and with the Covington
8 lawyers about the deposition.
9    Q   Did you speak with anyone else about the
10 deposition?
11    A   No.
12    Q   And what literature did you review?
13    A   So I looked over just my declaration.  I
14 reread the Cass report which was, you know, recently
15 released in its final form, and some of the
16 systematic reviews that were done: Joe Taylor, I
17 believe, in association with the Cass report.
18    Q   And do you know Dr. Aron Janssen?
19    A   Yes.
20    Q   When was the last time you spoke?
21        MR. LANNIN:  Object to the form.
22        To Dr. Janssen, you mean?
23 BY MR. RAMER:
24    Q   I'm sorry.  Yes.  When was the last time
25 you spoke with Dr. Janssen?

Page 48

1    A   I would say the last time I spoke with
2 him was in Florida.  We were both experts in Doe
3 vs. LaDapo, and we went to dinner.
4    Q   Are you aware that Dr. Marci Bowers and
5 Dr. Eli Coleman were deposed last week?
6    A   Yes.
7    Q   Have you spoken with anyone other than
8 counsel about their depositions?
9    A   No.
10        (Exhibit 1 was marked for identification
11        and is attached hereto.)
12 BY MR. RAMER:
13    Q   Dr. Karasic, you've been handed what has
14 been marked as Karasic Exhibit 1.
15        Does this appear to be Chapter 18 of the
16 WPATH Standards of Care 8?
17    A   Yes.
18    Q   And if I refer to the Standards of Care 8
19 as the SOC-8, will you know what I'm talking about?
20    A   Yes.
21    Q   And you were the chapter lead for this
22 chapter, correct?
23    A   Yes.
24    Q   And am I correct that the SOC-8 revision
25 committee essentially had a three-tier structure,

Page 49

1 with co-chairs at the top, then chapter leads, and
2 then chapter authors?
3        MR. LANNIN:  Object to the form.
4        THE WITNESS:  Yes.  There was the chair
5 and co-chair as -- right, and then chapter authors,
6 and then -- I mean chapter leads, and then chapter
7 authors.  Yes.
8 BY MR. RAMER:
9    Q   Would you agree that all those people were
10 experts in the field of transgender medicine?
11        MR. LANNIN:  Object to the form.
12        THE WITNESS:  I can't speak to the people
13 outside of my chapter.  I wasn't involved in the
14 selection of all the people in all the chapters.
15 BY MR. RAMER:
16    Q   So you are unable to say that the other
17 authors outside of Chapter 18 were experts in the
18 field of transgender medicine?
19        MR. LANNIN:  Object to the form.
20        THE WITNESS:  I would assume -- I mean, I
21 know that there were many experts involved.  I can't
22 speak to every one of the 120 or however many there
23 were.
24        My experience with Standards of Care 8 was
25 limited to the tasks which, you know, I was expected

13 (Pages 46 - 49)

Page 50

1 to do.
2 BY MR. RAMER:
3    Q   And what were those tasks?
4    A   So it was being -- as chapter lead -- so
5 in terms of all my tasks with standards of care, I
6 had a little bit broader involvement when I was
7 still on the board early on in terms of the
8 selection of Eli Coleman, who had been chair of
9 Standards of Care 7, for him to carry on to
10 Standards of Care 8.
11       And then I applied for and I was made lead
12 for the "Mental Health" chapter and worked on --
13 read the resumes and applications of the people
14 applying to be on that chapter, reviewed those with
15 the editors, and we selected a committee.
16    Q   And just to go back to what we were
17 previously discussing about the authors outside of
18 Chapter 18, are you saying there's a chance that
19 some authors of the SOC-8 were not experts in the
20 field of transgender medicine?
21       MR. LANNIN:  Object to the form.
22       THE WITNESS:  No.  I'm just saying I can't
23 say under oath that they all were.  I never met many
24 of them.
25       So we were originally going to have -- our

Page 51

1 chapter met with the editors in Buenos Aires at the
2 WPATH conference in 2018.  And then we were all
3 going to meet in 2020 at WPATH Hong Kong, but there
4 was a little thing that happened in China in 2020,
5 and that meeting didn't take place.
6       So we never had the opportunity to have a
7 meeting of everyone.  The next meeting we had of a
8 WPATH meeting was 2022, which was just after the
9 publication of Standards of Care 8.
10 BY MR. RAMER:
11    Q   Would you be surprised if somebody was an
12 author of SOC-8 and was not an expert in transgender
13 medicine?
14    A   I mean, my assumption is that the other
15 authors, you know, had considerable expertise, and
16 that's why they were selected for the chapter.
17       There was -- also, each chapter had a
18 stakeholder who was appointed to the chapter,
19 including ours, and our stakeholder was a
20 psychotherapist who was trans but was not selected
21 as part of the original group, who were mostly
22 academics.
23       And so there may well be stakeholders who
24 don't have the same kind of expertise, but I just
25 don't want to vouch for everyone on as I don't even

Page 52

1 know who all of them are.
2    Q   And you mentioned the WPATH conference in
3 Buenos Aires; is that right?
4    A   Yes.
5    Q   Can you just tell me what that was?
6    A   So WPATH has a conference every two years.
7 And so 2018 was the international -- you know, every
8 two-year WPATH conference.
9       And so during that conference, they had
10 each -- the members of each chapter meet with the
11 editors.
12    Q   Did you -- were there any -- let me start
13 again.
14       At that conference, were there any
15 presentations about the drafting of the SOC-8?
16       MR. LANNIN:  Object to the form.
17       THE WITNESS:  Yes.  There was some sort of
18 update about SOC-8 at that conference, I assume by
19 the editors.  I don't remember -- I don't remember
20 what sessions there were, but I -- I'm sure that
21 there were discussions about -- you know, sessions
22 about Standards of Care 8 at the 2018 conference.
23 BY MR. RAMER:
24    Q   Would you agree that the vast majority of
25 the SOC-8 revision committee were people who were

Page 53

1 either publishing in the field of transgender health
2 or had reputations for the clinical programs they
3 led in transgender health?
4       MR. LANNIN:  Object to the form.
5       THE WITNESS:  So that was certainly the
6 experience with the people whose names I recognized,
7 and it was definitely true of the people on my
8 chapter.
9 BY MR. RAMER:
10    Q   And was a particular co-chair assigned to
11 oversee your chapter?
12    A   Yes.
13    Q   And who was that?
14    A   That was Jon Arcelus.
15    Q   And who were the other co-chairs?
16    A   Asa Radix was the other co-chair, and then
17 there was the chair, Eli Coleman.
18    Q   Can you just give me a general overview of
19 Jon Arcelus as either a clinician or an author?
20    A   Yeah.
21       MR. LANNIN:  Object to the form.
22       THE WITNESS:  So John Arcelus is a
23 psychiatrist.  He -- I was aware of him with his --
24 he had published with Cecilia Dhejne and others
25 about psychiatric illness in people who are trans,

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1  which was really the topic of our chapter.  So he
2  certainly was somebody who had -- who was well-known
3  and had expertise in that area.
4  BY MR. RAMER:
5      Q   And was he a practicing clinician in the
6  field of gender-affirming care?
7      A   Yeah.  My understanding is that he was
8  both practicing and did academic work in -- in the
9  United Kingdom.
10     Q   And similar to how you just described
11  Dr. Arcelus's background, can you provide a
12  background of Dr. Radix?
13         MR. LANNIN:  Object to the form.
14         THE WITNESS:  So Dr. Radix I knew well
15  from conferences over the years.  He was a -- a
16  clinician for health programs for trans people in
17  New York and also had a faculty appointment, and
18  taught and did research.
19  BY MR. RAMER:
20     Q   Who is Dr. Karen Robinson?
21         MR. LANNIN:  Object to the form.
22         You can answer.
23         THE WITNESS:  Dr. Karen Robinson is an
24  academic from Johns Hopkins who has been involved
25  with systematic reviews and -- and clinical

Page 55

1  guidelines.  And she was, I think, the lead of the
2  team that WPATH hired from Johns Hopkins for
3  reviewing the literature and providing guidance in
4  terms of practice guidelines.
5  BY MR. RAMER:
6      Q   Were you involved in the process of
7  helping select Dr. Robinson and her team to help
8  with SOC-8?
9      A   Yes.  I recall there was a -- I think
10  there was a request for proposals.  I think the
11  executive committee had -- after discussion with the
12  board -- had recommended Johns Hopkins, and we, as a
13  board, voted to hire the Johns Hopkins team for that
14  purpose.
15     Q   I think you described it generally, but
16  could you kind of explain what the role was for
17  Dr. Robinson and her team with respect to the SOC-8?
18     A   Yes.  So they had a responsibility for
19  doing systematic reviews, and so contacting chapter
20  leads about whether or not that was something kind
21  of possible for that chapter.
22         And then they provided -- from their own
23  kind of systematic review of the literature, they
24  provided a very large document of publications that
25  might be related to that chapter.

Page 56

1      Q   Why is it important to conduct systematic
2  reviews?
3         MR. LANNIN:  Object to the form.
4         THE WITNESS:  So systematic reviews are a
5  widely accepted way of trying to look at evidence
6  kind of broadly in a field.  It's -- I think looking
7  at systematic reviews is, you know, a common part of
8  discussing the literature in any field.
9  BY MR. RAMER:
10     Q   Would you say Dr. Robinson is an expert in
11  transgender medicine?
12         MR. LANNIN:  Object to the form.
13         THE WITNESS:  No, but I really can't -- I
14  really can't make a judgment.  I don't -- I don't
15  know her other than very kind of limited contact,
16  and I don't recall the extent of her background as
17  it might relate to transgender health, other than
18  doing the systematic review.
19  BY MR. RAMER:
20     Q   Do you know if Dr. Robinson is a clinician
21  who treats children and adolescents for gender
22  dysphoria?
23     A   That's not my understanding of what she
24  does, but I really don't know her background.
25         You know, we -- I was part of a board that

Page 57

1  made a recommendation to hire Johns Hopkins, and
2  then she was the representative from Johns Hopkins
3  who -- so my contact with her was really limited to
4  her reaching out to me as -- as chapter lead and
5  having a discussion about the literature for the
6  "Mental Health" chapter.
7      Q   Do you have any personal knowledge
8  regarding WPATH restricting Dr. Robinson's ability
9  to publish research?
10         MR. LANNIN:  Object to the form.
11         THE WITNESS:  No.
12  BY MR. RAMER:
13     Q   And I think you touched on it briefly, but
14  how did you come to be a chapter lead?
15     A   Okay.  So I'd been involved in WPATH for
16  quite a while, involved particularly with WPATH's
17  recommendations on diagnosis.
18         I had chaired, in 2003, the APA symposium
19  about the gender identity disorder and the other
20  disorders in that chapter in DSM-IV, and looking
21  ahead to DSM-V, and edited a book on that.  And then
22  I had -- was involved in WPATH recommendations
23  related to psychiatry.
24         And so then I was appointed to the
25  Standards of Care 7 committee and was actively

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 involved in Standards of Care 7, and so -- all
2 before being on the board, but then, you know, I was
3 also known, you know, being on the board.
4      And specifically, I was appointed -- I
5 applied and was appointed for this chapter because
6 that was a particular area that -- that I had done a
7 number of presentations and some publishing about
8 working with transgender people who had co-occurring
9 mental illness.
10     Q   So is it fair to say that the chapters of
11 the SOC-8 were divided up among the revision
12 committee by expertise?
13        MR. LANNIN:  Object to the form.
14        THE WITNESS:  Yeah.  So the editors came
15 up with the chapters, and then people applied to be
16 on the chapters and they were accepted onto the
17 chapters, presumably related to their expertise.
18     (Proceedings interrupted.)
19        THE WITNESS:  May I have the question
20 again, please?
21 BY MR. RAMER:
22     Q   Yeah.
23        I was just asking, is it fair to say that
24 the chapters of the SOC-8 were divided up among the
25 committee based on the authors' expertise?

Page 59

1        MR. LANNIN:  Object to the form.
2        THE WITNESS:  So the process was that the
3 editors established the chapters, and then there was
4 an application process where one could apply to be a
5 member of any of the chapters.  And some people
6 applied to multiple chapters.
7        If you were chapter lead, you were only
8 involved with one chapter because that was felt to
9 be enough work.  If you were one of the chapter
10 authors, you could be on multiple chapters.
11        But you had to apply to the chapter lead
12 to be on the chapter, and then, you know, a decision
13 was made really based on somebody's expertise of
14 whether or not they were the best people for the
15 chapter.
16 BY MR. RAMER:
17     Q   Is it fair to say that the authors of one
18 chapter may not have expertise in the subject matter
19 of a different chapter in SOC-8?
20        MR. LANNIN:  Object to the form.
21        THE WITNESS:  Yes.
22 BY MR. RAMER:
23     Q   Did you complete a conflict-of-interest
24 disclosure form for the SOC-8?
25     A   My recollection is yes.

Page 60

1     Q   Do you recall reporting any conflicts?
2     A   No.
3     Q   Did the authors of the "Mental Health"
4 chapter complete a conflict-of-interest form?
5        MR. LANNIN:  Object to the form.
6        THE WITNESS:  I assume they did.  I think
7 that was part of their -- there was an application
8 packet for each member.
9 BY MR. RAMER:
10     Q   Did you review them?
11     A   My recollection is that I reviewed, you
12 know, the whole packet that included the conflict
13 form.  But it was, you know, many years ago that
14 that happened.  But my recollection is that that was
15 part of each application.
16     Q   Do you recall any of the applicants for
17 the "Mental Health" chapter having conflicts that
18 you determined should preclude them from working on
19 the chapter?
20     A   No.
21     Q   Were there any conflicts that you elevated
22 to the co-chairs?
23        MR. LANNIN:  Object to the form.
24        THE WITNESS:  No.
25 ///

Page 61

1 BY MR. RAMER:
2     Q   Are you aware whether any of the authors
3 of the "Mental Health" chapter had conflicts?
4        MR. LANNIN:  Object to the form.
5        THE WITNESS:  No.
6 BY MR. RAMER:
7     Q   Do you recall whether anyone reviewed your
8 conflict-of-interest form?
9     A   I assume that that was reviewed by the
10 editors because that was part of the process in
11 which the editors selected me as chapter lead.
12     Q   Did anyone ever ask you any questions
13 about your conflict-of-interest form?
14        MR. LANNIN:  Object to the form.
15        THE WITNESS:  Not that I can recall.
16 BY MR. RAMER:
17     Q   Did you update your conflict-of-interest
18 form when you first began serving as an expert
19 witness?
20        MR. LANNIN:  Object to the form.
21        THE WITNESS:  Update my
22 conflict-of-interest form on Standards of Care 8?
23 BY MR. RAMER:
24     Q   Yes.
25     A   So that conflict-of-interest form was

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1 before I had served as an expert witness on any of
2 these cases.
3    Q  Right.
4        And my question is, once you began serving
5 as an expert witness after you submitted the form,
6 did you ever update the form?
7    A  No.
8    Q  After you submitted your
9 conflict-of-interest form, do you recall ever
10 discussing potential conflicts of interest again
11 while drafting the SOC-8?
12        MR. LANNIN:  Object to the form.
13        THE WITNESS:  Can you repeat the question?
14 BY MR. RAMER:
15    Q  After you submitted your
16 conflict-of-interest form, do you recall ever
17 discussing potential conflicts of interest again
18 while drafting the SOC-8?
19        MR. LANNIN:  Same objection.
20        THE WITNESS:  No.
21 BY MR. RAMER:
22    Q  Switching gears a little bit, or maybe
23 zooming out, rather, can you just describe the
24 drafting process for Chapter 18?
25    A  Yes.

Page 63

1        So we had phone meetings.  I don't
2 remember when Zoom came into wide use, but it may
3 have been -- I think it was originally phone, and
4 then Zoom meetings.  And we discussed what our
5 recommendations might be.
6        And we had discussion with the editors,
7 and they gave recommendations that our
8 recommendations for the Delphi process should be
9 ones that people can be -- that people using the
10 document could act on as opposed to just only kind
11 of good care documents.  So they provided some
12 guidance in terms of winnowing things down to fewer
13 statements.  And so we ended with ten statements.
14        And -- were you asking about -- what were
15 you asking the process?  I don't want to drag on
16 further than --
17    Q  No, I was just asking -- that was very
18 helpful -- a general overview of the process.
19    A  Yeah.
20    Q  And can you explain the timeline of what
21 you were kind of describing, the course of that
22 drafting process?
23    A  Sure.
24        MR. LANNIN:  Object to the form.
25        THE WITNESS:  So I think that the calls

Page 64

1 were in 2018.  We had our ten statements already
2 completed before Buenos Aires, which was in the fall
3 of 2018.  And so we discussed each of those, and our
4 committee discussed each of those.
5        And then we submitted those statements to
6 go to the Delphi process, and our chapter was in the
7 first set of Delphi statements, which I think was
8 2019 that went to all of the authors of
9 Standards of Care 8.
10 BY MR. RAMER:
11    Q  And how did you communicate with your
12 co-authors during the drafting process?
13    A  So we talked by phone, by -- eventually, I
14 think, by Zoom.  We had a common document on Google
15 Docs that people could edit.  And we spoke by
16 emails, which were all emails to SOC-8 mental
17 health.
18    Q  And can you explain a little more about
19 your particular role as chapter lead with respect to
20 the chapter authors and with respect to the
21 co-chairs?
22        MR. LANNIN:  Object to the form.
23        THE WITNESS:  Yes.
24        I would be in communication with the
25 co-chairs about tasks, and then would communicate

Page 65

1 those to chapter authors after we got the -- after
2 we had our statements.  Those went to Delphi, and
3 all ten were approved.
4        And then there was -- we were supposed to
5 take into account comments during Delphi.  But if
6 there were any major changes, it needed to go back
7 to Delphi, and we didn't have any major changes.
8        And then at that point, we had a task of
9 writing the explanatory text, and that task was
10 divvied up among chapter authors, and that was sent
11 to me, and I edited that.
12        And then it went to the editors, and they
13 provided feedback.  That's my recollection.
14 BY MR. RAMER:
15    Q  And when you were communicating with
16 co-chairs, were you primarily communicating with
17 Dr. Arcelus?
18        MR. LANNIN:  Object to the form.
19        THE WITNESS:  Yes, but the email chain,
20 from my recollection, always included SOC mental
21 health because we wanted the administrative staff
22 from WPATH to get the emails.  And Eli Coleman and
23 Asa Radix were also, I think, getting those -- those
24 emails, in addition to John Arcelus.
25 ///

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

BY MR. RAMER:

Q And looking at this chapter, how did you select the studies that are cited in here?

A So there was an initial selection by -- by members of the chapter committee, and then there were citations that I added and there were citations that -- that John Arcelus added.

Q Do you know how the other chapters in SOC-8 selected the studies that they cite?

MR. LANNIN: Object to the form.

THE WITNESS: No.

BY MR. RAMER:

Q Do you have any reason to think they did it differently?

MR. LANNIN: Object to the form.

THE WITNESS: I don't know the process in the other -- for the other chapters.

BY MR. RAMER:

Q Did you ever assess the risk of bias that you cite in this chapter?

A So typically with risk of bias, I think of, like, of a study where certain people might have dropped out and others might not have.

But generally, in this particular area, which is about treating people with co-occurring

Page 67

conditions, the research is maybe more limited. And so we used authors in these various areas who we were familiar with or the chapter author who had taken primary responsibility for that recommendation was familiar with.

But, you know, so there certainly was some overall assessment of a particular -- a particular reference, but I'm not quite sure how that might relate to bias.

Q What do you mean -- at the end there, what do you mean by that?

MR. LANNIN: Object to the form.

THE WITNESS: Well, different people use that term differently. So I don't know if you have -- if you're more specific about what you mean.

BY MR. RAMER:

Q What's your understanding of "bias" in the context of assessing the method used in a particular study?

MR. LANNIN: Object to the form.

You can answer.

THE WITNESS: Sure.

Well, as I said, that term is used in different ways. Sometimes it can be used in terms of the particular populations that is -- that's

Page 68

measured.

I was saying, in terms of this chapter, there was really a very wide range of kinds of papers that were -- that were cited because it's a field where, for certain questions, there are certain kinds of evidence, and for other questions, there are kind of recommendations of clinical practice that have been made, but maybe not as much in terms of -- of a study determining it.

So there were times where the consensus of the clinicians, backed up by what we knew from the literature, you know, was more of a basis.

There were other things that were maybe a little more clear-cut, like about addressing nicotine in our patients, you know, where the health effects of nicotine are well-known.

BY MR. RAMER:

Q Do you know if the authors of the other chapters in the SOC-8 ever assessed the risk of bias of the studies they cite?

MR. LANNIN: Object to the form.

THE WITNESS: So my experience was really contained to my -- the chapter that I was chapter lead on, voting for Delphi's statements, and not the process that was going on in the other chapters.

Page 69

BY MR. RAMER:

Q Did you ever assess the risk of bias of the studies you cite in your expert report in this case?

MR. LANNIN: Object to the form.

THE WITNESS: So, again, that -- "bias" is used in different ways.

And so there is bias in a clinical trial which might involve who was reported on with, for example, drop-outs, as well as the population that -- from where the data was recruited.

And so those are potential sources of bias that -- you know, that I would look at with a particular -- with a particular study.

BY MR. RAMER:

Q And did you do that for the studies you cite in your expert report in this case?

MR. LANNIN: Object to the form.

THE WITNESS: Well, for -- I think that's always an assessment in terms of looking at a particular article.

Like, I cited Cavve from Western Australia where they took everyone who had completed treatment in their clinic, and they -- because of the geographic isolation of Perth and Western Australia,

CONFIDENTIAL

1 they were able to track down almost everyone who had
2 been seen in the clinic and terminated care.
3        And so a study like that, you know, has
4 less bias because there aren't people that are loss
5 to follow-up.
6 BY MR. RAMER:
7    Q   And so "loss to follow-up" is one example
8 of a form of bias, right?
9    A   Right.
10   Q   And when you are assessing the degree of
11 bias in a study, how do you do that?
12       MR. LANNIN:  Object to the form.
13       THE WITNESS:  So I would -- I'd look at
14 the -- at the methods, at the clinical population
15 that they were studying; and if there is that
16 information, how they were recruited, how someone
17 came into a study.
18       And so there are various kind of points
19 along the way where one can try to get some
20 assessment of what particular biases could be.
21 BY MR. RAMER:
22   Q   And basically you're reading the study
23 and using your judgment to determine where there may
24 be methodological weaknesses in the study as you
25 read it; is that right?

1        MR. LANNIN:  Object to the form.
2        THE WITNESS:  Yes.
3 BY MR. RAMER:
4    Q   Have you ever used a tool to help you
5 assess the risk of bias in a study?
6        MR. LANNIN:  Object to the form.
7        THE WITNESS:  No.
8        (Exhibit 2 was marked for identification
9        and is attached hereto.)
10       THE WITNESS:  I would say, like,
11 systematic reviews are -- you know, do use --
12 include the risk of bias in their assessments.  And
13 so that is part of the use of systematic reviews and
14 that they've made an assessment or tried to make a
15 formal assessment on risk of bias.
16 BY MR. RAMER:
17   Q   And, Dr. Karasic, you've been handed
18 what's been marked as Karasic Exhibit 2.
19   A   Um-hum.
20   Q   And looking at just the cover, does this
21 appear to be a presentation from the meeting in
22 Buenos Aires we were talking about earlier?
23       MR. LANNIN:  Object to the form.
24       THE WITNESS:  Well, yeah.  I don't
25 remember the slide, but it does look like it was

1 from that meeting.
2 BY MR. RAMER:
3    Q   I'll represent to you this is an excerpt
4 of this document.
5        And I'd like to turn to page 4 -- I
6 apologize for the stapling of this -- page 4 which
7 has the Bates stamp JHU3259 in the bottom right, and
8 the slide at the top says, "Hierarchy of Evidence."
9        Do you see that?
10   A   Yes.
11   Q   Can you explain what this slide is
12 communicating?
13       MR. LANNIN:  Object to the form.
14       THE WITNESS:  Yeah.
15       So it is from another publication, and
16 that there are these kind of different levels of
17 evidence, each which can have value, but are ranked
18 in a way in systematic reviews because they are
19 looking at -- a kind of broader body of literature
20 are at the top, and randomized controlled trials are
21 also up there because that is a -- you know, an
22 important source of evidence.
23 BY MR. RAMER:
24   Q   And I think we touched on it at a general
25 level, but can you explain more about what a

1 systematic review is?
2    A   Yes.
3        So a systematic review is when one tries
4 to take the entirety of the literature in a
5 particular area, and then to have a filtering
6 protocol, essentially, that one decides upon in
7 advance, and use that to filter this very -- what
8 can be a very large literature into the papers, the
9 studies, that meet one's criteria, and then to try
10 to just analyze those studies.
11       So you're trying to take the broader
12 literature that might be quite difficult to analyze,
13 and then filter them to a smaller group that meet
14 those criteria that might be easier to kind of
15 assess and synthesize.
16   Q   Is it your understanding that as part of a
17 systematic review, researchers would assess the
18 degree of bias in the individual studies?
19       MR. LANNIN:  Object to the form.
20       THE WITNESS:  Yes.  Typically they assess
21 bias in a systematic review.
22 BY MR. RAMER:
23   Q   And are you able to explain why randomized
24 controlled trials are above cohort studies in this
25 pyramid?

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    A   Yes.  So randomization is a way of
2   reducing bias in terms of who gets a particular
3   intervention.
4        So in a -- in some other sorts of studies,
5   everyone might get -- who signs up for the study --
6   might get a particular intervention, and in a
7   randomized controlled trial, people are randomized
8   typically to either get the intervention or not get
9   it.
10   Q   And so what is a cohort study?
11       MR. LANNIN:  Object to the form.
12       THE WITNESS:  So a cohort study is when
13   you are looking at a group of people who have
14   received a particular intervention and trying to see
15   whether that intervention has an impact.
16   BY MR. RAMER:
17   Q   And so how is it -- how is it different
18   from the randomized controlled trial?
19       MR. LANNIN:  Object to the form.
20       THE WITNESS:  In a cohort study, you don't
21   have to have randomized people to the intervention
22   or not.  It could be -- you could have had -- you
23   could be looking at a group of people who have
24   received a particular intervention.
25   ///

Page 75

1   BY MR. RAMER:
2    Q   And so cohort studies represent
3   lower-quality evidence than randomized controlled
4   trials; is that right?
5       MR. LANNIN:  Object to the form.
6       THE WITNESS:  So in the -- in the
7   methodology of ranking the quality or certainty, a
8   randomized trial is valued higher.
9   BY MR. RAMER:
10   Q   Do you think that's right?
11       MR. LANNIN:  Object to the form.
12       THE WITNESS:  Yes.  I've conducted a
13   randomized controlled trial myself, and I see the
14   value there.
15       But there also are interventions, and that
16   certainly is the case with patients that we treat
17   where it's more difficult or impossible to do a
18   randomized controlled trial.
19   BY MR. RAMER:
20   Q   Do you think it's unethical to do a
21   randomized controlled trial in this context?
22       MR. LANNIN:  Object to the form.
23       THE WITNESS:  I think in certain
24   circumstances, yes.
25       If we know that one intervention has a lot

Page 76

1   more evidence of its efficacy than another
2   intervention, then it could be unethical to
3   randomize people to -- you know, if we know that
4   that randomization might cause harm to one of the
5   groups of people when there is a treatment that is
6   well established.
7   BY MR. RAMER:
8    Q   What if you don't know that a particular
9   treatment is well established?
10       MR. LANNIN:  Object to the form.
11       You can answer.
12       THE WITNESS:  There are -- there are
13   certainly a number of -- of settings in which
14   randomized controlled trials are done, but there are
15   also challenges to doing them based on the -- on the
16   intervention.
17       For example, when I was involved in a
18   study where we did randomize people, both groups got
19   an intervention that would be considered
20   efficacious.
21       We didn't do a placebo group because we
22   wouldn't consider that ethical when we knew that
23   there were interventions that might be efficacious.
24   BY MR. RAMER:
25   Q   In the context of treating adolescents for

Page 77

1   gender dysphoria, would it be unethical to create a
2   study where participants are randomized into two
3   groups, where one group receives only psychotherapy
4   and the other group receives psychotherapy and
5   hormone therapy?
6       MR. LANNIN:  Object to the form.
7       THE WITNESS:  So if you had availability
8   of hormone treatment and you had healthcare
9   providers who had determined that those people would
10   benefit from medical treatment, it would be
11   unethical to randomize them to not getting that
12   medical treatment.
13       So there are many people who can benefit
14   from psychotherapy, but there's no evidence that in
15   the subset of people who have a gender dysphoria
16   diagnosis with the clinically significant distress
17   and impairment of that, that psychotherapy
18   alleviates that gender dysphoria.
19       So under that circumstance, I don't think
20   it would be ethical to randomize that population of
21   people for whom gender-affirming medical care has
22   been indicated and recommended.
23   BY MR. RAMER:
24   Q   But doesn't that sort of assume the
25   conclusion if the question is, can the psychotherapy

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1  achieve similar results, and the answer is, well,
2  we're not going to do the study because there's no
3  evidence that the psychotherapy achieves similar
4  results?
5          MR. LANNIN:  Object to the form.
6          THE WITNESS:  So I think you can look back
7  to even a publication by Brown in 1960, who was with
8  the Air Force, but he had done some research with
9  the UCLA group that was providing care to both --
10 across age groups in the 50s, 60s, 70s.
11         And for -- so they, at that time, you
12 know, recognized that prepubertal youth might desist
13 from their gender diversity.  They didn't have a
14 diagnosis at that time.  But they recognized that
15 after puberty, that wasn't likely.
16         Anyway, in that 1960 publication, the
17 person was specifically referring to adults, but
18 saying that they had never seen someone whose gender
19 identity had changed as a result of -- of
20 psychotherapy.
21         So in another talk that Brown had given,
22 he had said that he hadn't seen it in adolescents,
23 but in younger -- basically younger people could
24 desist, and that was what they eventually published
25 out of UCLA.  Again, not people with a diagnosis,

Page 79

1  but people who were brought in, in that case the
2  young people, by their parents.
3          So my point is that we're not coming in
4  without decades of experience.  And there have been
5  multiple case reports, attempts at literature in
6  terms of psychotherapy back from the psychoanalysis
7  days to cognitive behavioral therapy.
8          And so through all of that, there just
9  hasn't been any evidence of efficacy that -- for
10 psychotherapy only for those people who need
11 medication.
12         And so taking those people who have been
13 determined to have a gender dysphoria diagnosis and
14 have -- within that diagnosis, need -- have great
15 distress about aspects of their physical body,
16 typically, to randomize people to either get an
17 intervention that we have a long experience of being
18 successful versus an intervention where we have a
19 long experience of lack of success, that that would
20 not be ethical to randomize between those two
21 choices.
22 BY MR. RAMER:
23    Q   Are you saying we don't have evidence to
24 show that psychotherapy alone is effective, or are
25 you saying that we know that psychotherapy alone is

Page 80

1  ineffective?
2          MR. LANNIN:  Object to the form.
3          THE WITNESS:  So I think we can -- when it
4  comes to adolescents and adults, I think that we
5  have -- we don't have evidence of efficacy, and we
6  have substantial clinical experience of inefficacy.
7  And that's something that's been known really for
8  decades.
9          As I said, there's been controversy on
10 prepubertal children, but not adolescents and
11 adults.
12 BY MR. RAMER:
13    Q   Do you see a distinction between
14 psychotherapy that is provided with the purpose of
15 changing an individual's gender identity and
16 psychotherapy that is provided for the purpose of
17 reducing the distress associated with gender
18 incongruence?
19         MR. LANNIN:  Object to the form.
20         THE WITNESS:  So I do work, and the
21 therapists I work with do work, in terms of reducing
22 distress or improving someone's ability to cope with
23 the distress of gender dysphoria.  But we don't see
24 that as a replacement for treating gender dysphoria
25 medically when -- in the cases where it makes sense

Page 81

1  to do so.
2  BY MR. RAMER:
3    Q   And do you think it would be unethical to
4  study whether that psychotherapy alone would be
5  effective?
6          MR. LANNIN:  Object to the form.
7          THE WITNESS:  So I think that there has
8  been -- there have been decades in which people have
9  had that opportunity.  And, you know, there have
10 been transgender people and people with gender
11 dysphoria, you know, for -- certainly for many
12 decades that have been documented.
13         And you look at someone like Robert
14 Stoller, who started the Gender Identity Research
15 Center at UCLA in 1963 and was a mentor, he was a
16 psychoanalyst.  So psychoanalysts really believe
17 that almost everyone, you know, should get therapy,
18 basically.  They're strong proponents.
19         But with this population, he supported
20 medical intervention because his experience was
21 there was a subset of the people he saw where
22 medical intervention was the only thing that helped
23 them.
24         And so -- so the reason I bring that up is
25 it's like -- it's not a new thing like, you know,

CONFIDENTIAL

1 COVID appearing and stopping our WPATH conference in
2 2020. It's not something that just arose de novo,
3 you know.
4        Clinicians have been working with these
5 folks for decades and decades and decades. And if
6 there was -- it seems like you would need to have
7 some glimmer that there was an intervention that was
8 effective given that there has been a long
9 opportunity to do interventions, and interventions
10 have been tried for decades without success.
11        And so that's why I'm saying it's not
12 ethical just like when -- the clinical trial that I
13 did, we didn't have a placebo group because we knew
14 that interventions helped, it wouldn't have been
15 ethical to give placebo to some of our patients.
16 BY MR. RAMER:
17    Q   Are you aware of a study designed along
18 the lines of the study I previously described?
19        MR. LANNIN:  Object to the form.
20        THE WITNESS:  So in terms of randomizing
21 people to psychotherapy versus a medical
22 intervention, no.
23 BY MR. RAMER:
24    Q   And you think that we should not do that
25 study because it would be unethical, correct?

1        MR. LANNIN:  Object to the form.
2        THE WITNESS:  I think if you were actually
3 doing a randomized group as opposed to selecting
4 people who -- who were -- like, a select population
5 of people who really were seeking exploration of
6 their gender identity and not seeking -- not having
7 clinicians saying that a medication was indicated,
8 you know, that there could be a clinical trial of
9 people who were gender questioning, you know, of
10 different interventions on them.
11        But for people for whom a medical
12 intervention is indicated, to randomize those people
13 to not getting that intervention and getting a
14 psychotherapeutic intervention, I don't think it's
15 ethical.
16        It's also not practical because I don't
17 think that they would -- you would be able to get
18 people to join that study.
19 BY MR. RAMER:
20    Q   In the randomized controlled trial that
21 you did that you were referencing, which I assume is
22 the one with the individuals who are HIV positive,
23 and you gave them a particular psychiatric --
24    A   Right.
25    Q   -- were they randomized?

1    A   So they were randomized to two different
2 kinds of intervention.
3        One was usual care where they would get
4 their prescription and be responsible for it
5 themselves, the way which is how most everyone gets
6 an antidepressant, how they were getting
7 antidepressants before, versus getting a weekly form
8 of an antidepressant that -- with directly observed
9 therapy, where they would come in, and it was
10 observed that they would swallow the medication.
11 And it was a medication that only needed to be given
12 once a week.
13        So we knew that there was a problem with
14 adherence in this population. And because they were
15 people with HIV, the problem with adherence was also
16 with their HIV medications. And we knew that the
17 mortality was much higher in that particular
18 population than other populations of HIV-positive
19 people with better adherence -- we were looking at
20 homeless people who had particular difficulties
21 taking their medications -- and trying to see if
22 there was a better intervention for those who were
23 depressed to treat their depression.
24    Q   So am I wrong in thinking that that study
25 divided up the individuals into the treatment arm

1 which received -- I'm going to butcher the
2 pronunciation -- fluoxetine --
3    A   Yes.
4    Q   -- and the referral arm which received
5 group therapy?
6        MR. LANNIN:  Object to the form.
7        THE WITNESS:  No. So that was a different
8 study. So that study was way earlier. That was
9 while I was still at UCLA in my residency, and --
10 when that was done. And that was a group therapy
11 focused on therapeutic interventions for depression
12 versus fluoxetine.
13        And that was a different -- a different
14 study because those were specific group therapies
15 that were known to be effective treatments for
16 depression, and those were people who were motivated
17 to get that kind of treatment as well, with or
18 without fluoxetine. So that was a different study.
19        I was referring to a study with homeless
20 HIV-positive people for whom -- and this was many
21 years later -- for whom -- the first group was
22 before there were any HIV medications; and having
23 interventions -- group interventions to treat
24 depression and to teach them to better cope with the
25 stress of having AIDS or HIV, that was the intent of

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1 the intervention.
2        The study with the second population,
3 everyone got fluoxetine. Some people got it weekly,
4 directly observed therapy. Some people got it as a
5 usual care prescription like they would if they
6 weren't in the study.
7 BY MR. RAMER:
8    Q   In the earlier study with fluoxetine and
9 group therapy, was that study ethical?
10       MR. LANNIN:  Object to the form.
11       THE WITNESS:  Yes, because we were -- in
12 that study and in that population, we were looking,
13 within this limited time period, of intervening for
14 depression with psychotherapy.
15       So unlike gender dysphoria, cognitive
16 behavioral therapy and interpersonal therapy have
17 been determined to be effective treatments for
18 depression.
19       I would say since that study, there have
20 been some systematic reviews that have shown
21 cognitive behavioral therapy to be effective, and
22 fluoxetine to be effective, but fluoxetine may be
23 more effective; so maybe that changes the balance of
24 the ethics.
25       But that -- but from the information we

Page 87

1 had then, a cognitive behavioral therapy for
2 depression and fluoxetine were both efficacious
3 treatments for depression in that population.
4 BY MR. RAMER:
5    Q   Just one more question, and maybe we'll
6 take a break.
7        But back on Exhibit 2 and that page with
8 the pyramid, do you agree that out of the types of
9 medical evidence listed on this pyramid, that
10 "expert opinion" represents the lowest form of
11 medical evidence?
12       MR. LANNIN:  Object to the form.
13       THE WITNESS:  So expert opinion on its
14 own, but I do think that clinical guidelines refer
15 heavily and with good reason to expert opinions that
16 try to synthesize -- both synthesize the data and
17 the end clinical practice as it is.
18       And so -- so all these other levels are
19 important, but consensus of experts is important as
20 well.
21 BY MR. RAMER:
22    Q   Sorry. Just clarifying, do you agree that
23 "expert opinion" on this pyramid is referring to
24 what might be referred to as clinical observations?
25       MR. LANNIN:  Object to the form.

Page 88

1        THE WITNESS:  So -- yeah. So I think
2 "expert opinion" can include based on one's clinical
3 observations. I think that, you know, might be a
4 reasonable --
5 BY MR. RAMER:
6    Q   Yeah, and I wasn't trying -- I was just --
7 you know, you can understand there could be expert
8 opinion that is informed by all the studies.
9    A   Right.
10    Q   That's one example.
11    A   Right.
12    Q   But I don't think that's what that's
13 referring to.
14    A   Right.
15    Q   And that's referring to clinical
16 observations, I assume.
17       MR. LANNIN:  Object to the form.
18       THE WITNESS:  Yeah, I would assume that
19 that's like in isolation, but all of these other
20 things should be taken into account as well.
21       MR. RAMER:  Maybe good time for a break?
22       MR. LANNIN:  Sure.
23       THE VIDEO OPERATOR:  This marks the end of
24 Media Unit 1 of the deposition of Dan Karasic, M.D.
25 The time is 11:21 a.m.  We're off the record.

Page 89

1        (Recess, 11:21 a.m. - 11:31 a.m.)
2        THE VIDEO OPERATOR:  We are back on the
3 record at 11:31 a.m.  This marks the beginning of
4 Media Unit 2 of the deposition of Dan Karasic, M.D.
5        Please continue.
6 BY MR. RAMER:
7    Q   Dr. Karasic, one question I meant to ask
8 earlier is, did you review any -- I'll start again.
9        In preparation for this deposition, did
10 you review any deposition transcripts from this
11 case?
12    A   No.
13    Q   In the context of reviewing medical
14 research, are you familiar with the term "narrative
15 review"?
16    A   I'm not sure. Can you say anything more?
17    Q   I'm just curious if you've heard that term
18 and what your understanding of that term is.
19    A   I'm not sure.
20       (Exhibit 3 was marked for identification
21    and is attached hereto.)
22 BY MR. RAMER:
23    Q   Dr. Karasic, the court reporter has handed
24 you what's been marked as Karasic Exhibit 3, and it
25 says, "Appendix A Methodology" at the top.

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1    A   Um-hum.
2    Q   And does this appear to be Appendix A to
3 the SOC-8?
4    A   Yes.
5    Q   And does this appendix discuss the
6 methodology used to create the SOC-8?
7       MR. LANNIN:  Object to the form.
8       THE WITNESS:  Yes.
9 BY MR. RAMER:
10   Q   And on this page, which has "S247" in the
11 upper right corner, I'd like to go to the left
12 column, the first paragraph, and the third sentence.
13 And I'll just read it and first ask if I read it
14 correctly.
15      It says, "Evidence-based guidelines
16 include recommendations intended to optimize patient
17 care and are informed by a systematic review of
18 evidence and an assessment of the benefits and harms
19 of alternative care options."
20      Did I read that correctly?
21   A   Yes.
22   Q   For the "Mental Health" chapter, did you
23 or your co-authors seek a systematic review of
24 evidence?
25   A   So we discussed that with Karen Robinson,

Page 91

1 and she didn't feel, based on the ten statements
2 that we had, that a systematic review would add
3 anything versus just trying to reference the
4 research.  Many of the things had not had a specific
5 systematic review.
6    Q   And when you say she explained that a
7 systematic review would not add anything, what do
8 you mean by that?
9    A   Well, it was a long time ago, but we had a
10 conversation where I said, "These were our
11 statements of recommendation.  Do you recommend or
12 do you think we could do systematic reviews on
13 this?"
14      And my recollection was that -- that she
15 said no.
16   Q   So it was Dr. Robinson's decision as to
17 whether a systematic review was conducted for the
18 "Mental Health" chapter; is that correct?
19      MR. LANNIN:  Object to the form.
20      THE WITNESS:  Well, if I felt -- if I
21 disagreed, I might have pressed the point.
22      But I asked her opinion as a -- you know,
23 our systematic review group, asked her about -- my
24 understanding is that there were -- would be
25 chapters where systematic reviews might help and

Page 92

1 other chapters in which they wouldn't add much.  And
2 I asked her about that, and that's my recollection.
3 BY MR. RAMER:
4    Q   And you agreed with her conclusion that a
5 systematic review would not add much to the "Mental
6 Health" chapter; is that right?
7       MR. LANNIN:  Object to the form.
8       THE WITNESS:  Yeah.  I didn't -- I
9 certainly didn't contest her -- her point.
10 BY MR. RAMER:
11   Q   And do you think that's true, that a
12 systematic review would not have added much to the
13 chapter?
14   A   Well, I think that -- I mean, I think it's
15 a good question.
16      I think that there -- we were treading on
17 an area where the literature, as it relates
18 specifically to transgender people, is limited, and
19 I think we were drawing on the broader literature,
20 for example, on the provision of or capacity for
21 informed consent.
22      And so I -- you know, I think it was
23 reasonable for us to just look at the specific
24 literature in -- in those specific areas, given the
25 kind of disparate nature of the recommendations

Page 93

1 where we were kind of basing them on kind of
2 different fields of medicine and mental health.
3    Q   And so is it fair to say that, in your
4 opinion, a systematic review would have confirmed
5 what you already knew, which is that the evidence in
6 this area is limited?
7       MR. LANNIN:  Object to the form.
8       THE WITNESS:  Yes, and that we often had
9 to look at the broader -- the broader research.
10 Like, whether it might be for nicotine affecting
11 surgical outcomes, we know that from the broader
12 plastic surgery literature; or whether it's about --
13 capacity to give informed consent is from the
14 broader literature, not specifically from the
15 transgender health literature.
16 BY MR. RAMER:
17   Q   And outside of just Chapter 18, can you
18 name a systematic review that supports the
19 conclusion that people receive benefit from
20 gender-affirming medical care?
21      MR. LANNIN:  Object to the form.
22      THE WITNESS:  So I think that the
23 systematic review for hormones that was done, that
24 that one, which was done by the Hopkins group and
25 published by them, provides support for people

24 (Pages 90 - 93)

Page 94

1 getting benefit from -- psychological benefit, for
2 example, from -- from gender-affirming hormones.
3 BY MR. RAMER:
4      Q   And you're referring to the systematic
5 review that was published, correct?
6      A   Yes.
7      Q   And are there any other systematic reviews
8 you're aware of that support the conclusion that
9 gender-affirming medical care will benefit people?
10        MR. LANNIN:  Object to the form.
11        THE WITNESS:  So I think that there have
12 been a range of systematic reviews showing benefit.
13 Even most recently from the Cass report, the
14 systematic review for hormones showed a moderate
15 level of support for mental health benefit.
16        I think the Cornell systematic review of
17 what we know, which reviewed the literature from
18 early on, I think early 1990s to 2017, found benefit
19 within that systematic review.  I think the Bustos
20 systematic review of regret showed that that was
21 very uncommon.
22        So I think there have been systematic
23 reviews that -- you know, that have been supportive
24 of providing gender-affirming care.
25 ///

Page 95

1 BY MR. RAMER:
2      Q   Am I right in thinking that the Cornell
3 review applied only to adults?
4        MR. LANNIN:  Object to the form.
5        THE WITNESS:  My recollection is that it
6 was the literature as a whole and not -- not
7 specific to adolescents.
8        I don't know whether there were any youth
9 included in any of the papers that they reviewed.
10 They reviewed a lot of papers.
11 BY MR. RAMER:
12      Q   Sticking with Exhibit 3, which is
13 Appendix A to the SOC-8, I'd like to go to -- stick
14 with the same page, same column, actually same
15 paragraph.  And there's, just over halfway, a
16 sentence that begins with, "The process."  And I'll
17 read it and first ask if I read it correctly.
18        It says, "The process for development of
19 the SOC-8 incorporated recommendations on clinical
20 practice guideline development from the National
21 Academies of Medicine and the World Health
22 Organization that addressed transparency, the
23 conflict-of-interest policy, committee composition
24 and group process."
25        Did I read that correctly?

Page 96

1      A   Yes.
2      Q   And then following that sentence, it cites
3 two documents.
4        Do you see that?
5      A   Yes.
6      Q   Have you ever read -- sorry.  Go ahead.
7      A   Yeah.  Okay.  Yeah, I see the two
8 documents.  Okay.
9      Q   Have you ever read either of those
10 documents?
11      A   I don't recall reading either of them, but
12 I can't say no, either.
13      Q   Are you able to say that the SOC-8
14 followed the recommendations of those documents with
15 respect to the SOC-8's conflict-of-interest policy
16 and committee composition?
17        MR. LANNIN:  Object to the form.
18        THE WITNESS:  I think that they -- they
19 had a conflict-of-interest policy, and they had a
20 transparent process for appointing the committees.
21        I can't say whether they met, you know,
22 all of the recommendations from the two papers.
23 BY MR. RAMER:
24      Q   In your answer just now, who is the
25 "they"?

Page 97

1      A   Oh.  So I would say the editors of
2 Standards of Care 8.
3      Q   And so sticking with the same Exhibit 3,
4 same column, and then skipping down two paragraphs,
5 about halfway -- a little over halfway through that
6 paragraph, there's a sentence referring to the
7 Delphi process.
8        Do you see that?
9      A   Yes.
10      Q   And you've mentioned that a little bit
11 today already.
12      A   Yes.
13      Q   Can you just -- can you just explain
14 broadly what that is?
15      A   Sure.
16        MR. LANNIN:  Object to the form.
17        THE WITNESS:  So Delphi process is a means
18 of producing a consensus recommendation in practice
19 guidelines, and particularly where consensus of
20 experts is part of the process for developing the
21 guidelines.
22        And so for Delphi, we submitted our
23 recommendations, and they needed 75 percent
24 approval; but also, each of the larger group of
25 authors of Standards of Care 8 had the opportunity

25 (Pages 94 - 97)

Page 98

1 to provide any feedback for each -- for each
2 statement.
3       And they wouldn't be included in
4 Standards of Care 8 unless they or the revised
5 version had received 75 percent support.
6 BY MR. RAMER:
7    Q  And the "they" in that answer is referring
8 to the statements?
9       MR. LANNIN:  Object to the form.
10      THE WITNESS:  Yes.  The statements
11 wouldn't be included unless the statements had
12 received 75 percent support.
13 BY MR. RAMER:
14    Q  And can you describe, just as a practical
15 matter, how the authors voted on a statement?
16    A  Yeah.
17      It was a survey program that provided a --
18 as I recall, like a Likert or modified Likert scale
19 of level of approval to disapproval.  It may have
20 been 1 to 10.  And so people could vote level of
21 approval to level of disapproval.
22      And a high level of approval was required,
23 but there was still variability that people could --
24 could report, even if they're approving.
25      And then whether approving or

Page 99

1 disapproving, there was space on the form for their
2 comments or any recommendations for changes that
3 were especially important if they were not approved
4 for Delphi.  But we were also encouraged to take
5 that into account if we needed to make modifications
6 even if a statement was approved.
7    Q  And did you say "Likert scale"?
8    A  Oh, that's just like a 1 to 5 or 1 to 10
9 from "strongly disagree" to "strongly agree" that
10 you see in polling, basically.
11   Q  And so can you explain who all voted in
12 the Delphi process?
13      MR. LANNIN:  Object to the form.
14      THE WITNESS:  So that was all of the
15 authors of Standards of Care 8; you know, over 100
16 people.
17      And I think they had to have -- I think
18 65 percent of them had to have voted in order for
19 the poll to be complete.  So there was a deadline to
20 complete the poll.  And if they didn't reach a
21 minimum, then presumably there could be more time
22 given or more urging for people to vote.
23 BY MR. RAMER:
24    Q  And so a statement, under the process as
25 you just described it, could be approved even though

Page 100

1 not all of the authors voted on the statement,
2 correct?
3       MR. LANNIN:  Object to the form.
4       THE WITNESS:  So -- right.  So all of the
5 broader authors -- a statement didn't go to Delphi
6 until there was consensus of the chapter authors.
7       So all of our statements had kind of full
8 consensus of the people in our chapter, but only
9 75 percent had to approve of all of the authors who
10 voted.
11 BY MR. RAMER:
12    Q  I guess my question was a little bit
13 different, which is that -- and maybe I'm
14 misunderstanding.
15      I thought you said that you had to hit a
16 threshold of 65 percent for the vote to count,
17 meaning that you could have up to 35 percent who did
18 not vote, yet the vote would still count; is that
19 right?
20    A  That is my recollection, but I'm not sure
21 if that was the -- there was a number threshold that
22 you wouldn't complete the poll if -- you know, if
23 enough people hadn't voted.  Knowing that you have
24 this very large group of authors and there are going
25 to be people that don't respond, that they set a

Page 101

1 threshold.
2       And then -- I also don't recall if it was
3 the 75 percent -- my assumption is it was 75 percent
4 of the people voting and not 75 percent of all the
5 authors, but I would have to look that up to see
6 what that was.
7    Q  Sorry.  I think my question was less about
8 the precise number, but just understanding that a
9 statement could be -- let me restart.
10      A statement could pass the Delphi process
11 even though some authors did not participate in the
12 vote for that statement; is that right?
13      MR. LANNIN:  Object to the form.
14      THE WITNESS:  Yes.  And so, like this
15 statement says, "was approved by 75 percent of the
16 members."
17      But I'm not sure whether that was
18 75 percent of all the people on the chapter versus
19 75 percent of the people who voted.
20 BY MR. RAMER:
21    Q  And do you recall, did you vote on every
22 statement in the SOC-8?
23    A  Yes.  To my recollection, yes.
24    Q  Okay.  So sticking with Exhibit 3, I'd
25 like to go to the fourth page, which is S250 at the

CONFIDENTIAL

Page 102

1  top. And right column, there's a bold "3.9 Grading
2  criteria for statements."
3       Do you see that?
4    A  Yes.
5    Q  And the first sentence says that "Chapter
6  members graded each statement using a process
7  adapted from the Grading of Recommendations,
8  Assessment Development and Evaluations (GRADE)
9  framework."
10      Do you see that?
11   A  Yes.
12   Q  And did you do that?
13      MR. LANNIN:  Object to the form.
14      THE WITNESS:  So we -- we did that, but
15 just in regards to classifying statements as a
16 strong recommendation if we recommend versus a weak
17 recommendation if we suggest.  And we had the
18 criteria here that was a way of -- with the
19 editors -- of making that recommendation.
20 BY MR. RAMER:
21   Q  So basically you're saying that the
22 criteria listed here in Section 3.9 is the modified
23 version of GRADE that was used for the SOC-8; is
24 that right?
25      MR. LANNIN:  Object to the form.

Page 103

1       THE WITNESS:  That's my understanding.
2  BY MR. RAMER:
3    Q  And can you just describe how you, in the
4  "Mental Health" chapter, did that process?
5       MR. LANNIN:  Object to the form.
6       THE WITNESS:  Sure.
7       So as I said, we didn't have really
8  systematic reviews to inform us, but we made
9  recommendations for which there -- for which we felt
10 there was substantial evidence and few downsides,
11 essentially, and in which there was a high degree of
12 acceptance.  All of our recommendations passed on
13 the first time with a very high percentage.
14      And so, you know, the recommendation that
15 somebody has to have capacity to consent in order to
16 consent for transgender care was something that I
17 think everyone could agree on and substantially
18 supported by the literature.
19      And I didn't view our chapter as
20 particularly controversial, and, in fact, I haven't
21 heard any -- none of the controversy that's gone on
22 about SOC-8 has been about our chapter.
23      I don't think many people object to the
24 idea that transgender people should receive good
25 mental health care, which was basically kind of our

Page 104

1  goal in our chapter.
2  BY MR. RAMER:
3    Q  Are there chapters in SOC-8 that you do
4  view as controversial?
5    A  Well, only in the sense that there's --
6  there are chapters that one, you know, sees being
7  brought up in media or in, you know, social media,
8  and really just, you know, a couple chapters that --
9  where I have seen things, certainly.
10      Certainly the "Adolescents" chapter, which
11 is the subject of -- you know, it's controversial in
12 the context of the legal actions that have been
13 taken.
14   Q  And are there any other chapters that
15 you're referring to when you say you've seen them
16 brought up in media and social media?
17   A  I've seen the "Eunuch" chapter brought up
18 in media and social media.
19   Q  Is it fair to say the grading process for
20 your chapter was a collaborative process between the
21 authors?
22      MR. LANNIN:  Object to the form.
23      THE WITNESS:  Yes.  It was a collaborative
24 process between the authors and the -- and also the
25 editors.

Page 105

1  BY MR. RAMER:
2    Q  And that was my next question.  Did they
3  then -- did the editors review the grading of the
4  chapter?
5    A  Yes.
6       MR. LANNIN:  Object to the form.
7  BY MR. RAMER:
8    Q  Did they ever -- I guess -- let me back
9  up.
10      Were there ever disputes about the
11 grading?
12      MR. LANNIN:  Object to the form.
13      THE WITNESS:  I wouldn't make -- have it
14 rise to the level of "dispute."
15      There were discussions over what's the
16 level of evidence, the strength of consensus, the
17 downsides of a given recommendation.
18      And so it was discussed, but I don't think
19 it was ever really disputed.
20 BY MR. RAMER:
21   Q  And then returning to Exhibit 1, which is
22 the "Mental Health" chapter, and the first page of
23 that chapter, which is S171, in looking at the
24 statements in the box at the bottom of that page,
25 all of those statements are listed as "We

27 (Pages 102 - 105)

CONFIDENTIAL

1 recommend," correct?
2    A   Yes.
3    Q   And so then returning to Exhibit 3,
4 Appendix A to SOC-8, same page we were on before,
5 which is S250, under the bold section, 3.9, about
6 halfway through that section, it says, "The
7 statements were classified as:  Strong
8 recommendations ('we recommend') are for those
9 interventions/therapy/strategies where," and the
10 first bullet says, "the evidence is of high
11 quality"; is that right?
12    A   Yes.
13    Q   And so did you and the chapter authors all
14 conclude that the evidence supporting the statements
15 in the "Mental Health" chapter is of high quality?
16        MR. LANNIN:  Object to the form.
17        THE WITNESS:  So, you know, not in the
18 sense of, you know, where that might be applied
19 elsewhere in terms of a -- these statements
20 weren't -- not all of them were supported certainly
21 by randomized clinical trials, for example.
22        But these were all statements that we felt
23 were strongly supported, at a minimum, by the
24 consensus of experts where there was a lack of,
25 let's say, a clinical trial.

1 BY MR. RAMER:
2    Q   And when you were talking about where that
3 term might be applied elsewhere, are you alluding to
4 the standard GRADE framework for high-quality and
5 low-quality evidence?
6        MR. LANNIN:  Object to the form.
7        THE WITNESS:  Yes.  So this, in a way, was
8 maybe more -- there were statements in which there
9 weren't that type of study, but there was strong
10 clinical consensus and a lack of controversy that
11 these recommendations should be followed, you know,
12 among clinicians.
13 BY MR. RAMER:
14    Q   And so the reference to the evidence being
15 of high quality in that bullet is different from
16 what high-quality evidence means in the traditional
17 GRADE framework; is that right?
18        MR. LANNIN:  Object to the form.
19        THE WITNESS:  Well, I think that it was
20 using the evidence that we had, and, you know, I
21 mean, I think that terminology might be used
22 differently in different contexts.
23        So, you know, I do think it was different
24 than, let's say, had we done a systematic review of
25 each of these statements and, you know, could, you

1 know, provide a label to the quality based on a
2 GRADE score of a systematic review.
3        This was more so, I think, than -- than,
4 say, a "Medical" chapter, for example, related to
5 consensus of clinical practice in some cases.
6        There were some that, you know, are
7 certainly very strongly supported by the literature,
8 and there's some that -- where there's not a lot of
9 literature, but there is a clinical consensus to
10 make a recommendation.
11 BY MR. RAMER:
12    Q   So just so I understand, so some of the
13 statements -- backing up, in the "Mental Health"
14 chapter, for some of the "We recommend" statements,
15 is it fair to say that for some of those, the
16 evidence underlying the statement would not be
17 deemed high-quality evidence under the traditional
18 GRADE framework?  Is that what you're saying?
19        MR. LANNIN:  Object to the form.
20        THE WITNESS:  Well, in that it may be
21 difficult to even do a systematic review.
22        I'm just thinking of -- you know, of just
23 some of the recommendations.  There's really a wide
24 range of how much literature there was for the
25 various recommendations that we -- you know, that we

1 made, like -- well, there's some that, you know,
2 only providing care to people with capacity to
3 consent has a vast literature.  Maintaining existing
4 hormones when somebody goes on an inpatient unit,
5 there's a fairly small literature on that, but there
6 was strong clinical consensus that that was the
7 recommendation, and it is a question that's often
8 asked.
9 BY MR. RAMER:
10    Q   So when you were applying this methodology
11 for the "Mental Health" chapter, how did you decide
12 whether the evidence is of high quality?
13        MR. LANNIN:  Object to the form.
14        THE WITNESS:  So I think I was looking at
15 these statements as a group.  And so there is a
16 variation by statement in how much literature, how
17 much research has been done, how much is just
18 clinical reporting and clinical policies.
19        But there were some where there was --
20 more had to do with consensus of experts, and there
21 were others in which there was a much larger
22 literature that one could draw on.
23 BY MR. RAMER:
24    Q   And then basically it was the judgment of
25 the authors, with all of your expertise, to

CONFIDENTIAL

1 determine whether the evidence was of high quality?
2         MR. LANNIN: Object to the form.
3         THE WITNESS: It was ultimately our
4 determination of whether to use -- the authors and
5 editors -- of whether to use "recommend" versus
6 "suggest."
7         So, again, we weren't looking at only
8 statements for which a systematic review had
9 provided high-quality research. There was kind of a
10 range in research by recommendation.
11 BY MR. RAMER:
12    Q  Do you think that there's a distinction
13 between "high-quality evidence" and the "best
14 available evidence"?
15         MR. LANNIN: Object to the form.
16         THE WITNESS: So "high-quality evidence"
17 has its definitions in context, you know, like in a
18 GRADE context. That's different from "best
19 available evidence."
20         And it certainly is important to look
21 at -- you know, at both. But there certainly are
22 times when we are just looking at best available
23 evidence where there haven't been clinical trials
24 done, and we still need to make a recommendation.
25 ///

1 BY MR. RAMER:
2    Q  In talking about the more formal GRADE
3 methodology, in the context of that methodology, do
4 you know what a "discordant recommendation" is?
5         MR. LANNIN: Object to the form.
6         THE WITNESS: Not that I can recall.
7 BY MR. RAMER:
8    Q  As a general matter, do you agree that the
9 strength of a guideline recommendation should be
10 linked to the strength of the evidence supporting
11 that recommendation?
12         MR. LANNIN: Object to the form.
13         THE WITNESS: I think that it's strength
14 of the available evidence, but there are also
15 guidelines that -- where there is strong clinical
16 consensus based on clinical practice, and I think
17 that can be important, too.
18 BY MR. RAMER:
19    Q  What do you mean by that?
20    A  Well, one can make -- one can make a
21 recommendation, you know, in the absence of a graded
22 systematic review, basically. So it's great to have
23 that. It's great to have randomized clinical
24 trials.
25         I was looking at it in the context of our

1 chapter, which is one in which -- in which clinical
2 practice, though guided by evidence, a lot of it
3 really is related to consensus of experts because,
4 you know, no one has done a clinical trial on
5 whether -- if someone is on hormones, whether to
6 stop them or continue them when someone is admitted
7 to the hospital.
8         But the experts in transgender health
9 would feel that that's very important, and that is
10 based on the clinical experience that -- of the harm
11 that can happen to people if they're stopping and
12 starting and stopping and starting hormones when,
13 let's say, going into a psychiatric institution.
14         So there are areas in which there's not a
15 lot of research, but there is a strong
16 recommendation by consensus of experts. And we just
17 happen to be a chapter where -- where there is a
18 variation in terms of amount of research that's been
19 done.
20    Q  So if there is only low-quality evidence
21 to support an intervention under the traditional
22 GRADE framework, is it unreasonable for a medical
23 provider to say, "I'm not going to provide this
24 intervention until there's better evidence
25 supporting it"?

1         MR. LANNIN: Object to the form.
2         THE WITNESS: So I think that would be
3 really problematic when you look at -- that the
4 majority of medical interventions are supported by
5 only low or very low GRADE scores, that only a
6 minority of national practice guidelines are
7 supported by high-grade evidence.
8         And so, you know, there was -- one of the
9 studies I cited, only 10 percent of clinical
10 practice and emergency medicine, critical care
11 medicine and anesthesiology was supported by
12 high-grade evidence, but people still need to go to
13 the ER and they still need to go to the ICU and they
14 still need anesthesia before surgery.
15         And so, you know, it's great to have more
16 information, and typically what systematic reviews
17 and GRADE scores have been used for are to point to
18 areas where more research might be beneficial.
19         And what is very different about what has
20 been happening in the United States is people have
21 been pointing to GRADE scores in terms of what
22 should be legal and what should be illegal.
23         And our standards of care aren't telling
24 people what care is to be legal or illegal. We are
25 trying to provide recommendations based on our

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1 understanding of the literature and our consensus of
2 expert advice so somebody can go to the standards of
3 care if they have a question, a practice question,
4 and maybe get some advice that might be helpful.
5          This standards of care was not done in the
6 context of, you know, should a doctor go to prison
7 for doing this care or not. It was to provide our
8 best advice to be helpful to people as best we could
9 in providing the care.
10 BY MR. RAMER:
11     Q   Do you think the SOC-8 should be used by
12 medical licensing boards in terms of assessing a
13 provider's medical practice?
14          MR. LANNIN: Object to the form.
15          THE WITNESS: Well, there might be
16 circumstances. Medical boards will sometimes assess
17 a -- the practice of a physician who has been
18 accused of harming patients.
19          And in that context, if somebody is acting
20 outside of kind of community standards in their
21 practice of care, that could be evidence for them to
22 act.
23          It's not our, I think, intention with
24 standards of care to -- you know, to make that kind
25 of determination, which seems to be much broader

Page 115

1 than did they follow WPATH standards of care.
2          You know, if they followed WPATH standards
3 of care but they, you know, didn't prescribe a
4 medication within a particular guideline, or if they
5 assaulted a patient, you know, one would make a
6 recommendation to the medical board.
7          I don't think, you know, that anyone has
8 ever made a complaint because, you know, 18.8 of the
9 "Mental Health" chapter wasn't, you know, followed
10 or because, you know, any other particular thing,
11 aside from gross malfeasance, wasn't -- wasn't
12 covered.
13          So anyway, so that's where I just kind of
14 draw a distinction between -- between the purpose
15 of -- what I perceived as the purpose of WPATH
16 standards of care and I think what's purported as
17 the purpose, which is to provide practice guidelines
18 that might be helpful for a practicing clinician.
19 BY MR. RAMER:
20     Q   And returning back to the formal GRADE
21 methodology, in the context of the GRADE
22 methodology, are there ever situations where strong
23 recommendations can be made based on low-quality
24 evidence?
25          MR. LANNIN: Object to the form.

Page 116

1          THE WITNESS: That's a good question.
2          There's certainly -- one can make a
3 stronger recommendation based on kind of a
4 collection of evidence, but I think it's difficult
5 to make a strong -- well, I guess I would -- maybe
6 I'll back up a little bit.
7          So there are strong recommendations that
8 are made based on low quality -- what's called low
9 quality on GRADE, and those recommendations form the
10 majority of, like, national practices guidelines.
11          Much of the practice -- you know, like,
12 I'm thinking of antidepressants and where there was
13 a well-known systematic review for antidepressants
14 in adolescents, children and adolescents, where only
15 fluoxetine separated from placebo for the treatment
16 of depression in minors, and yet fluoxetine is not
17 the only drug that is used to treat depression in
18 minors.
19          And so you don't have -- you don't have --
20 you have low-quality evidence kind of throughout our
21 practice that still is the best evidence that we
22 have and is used in practice guidelines to make
23 recommendations.
24          So I think that's where I distinguish
25 between low- -- you know, low-quality evidence and

Page 117

1 making a strong recommendation, viewing, you know,
2 what we know as a whole.
3 BY MR. RAMER:
4     Q   I guess my question is more about the
5 actual GRADE methodology rather than what happens.
6          In the grade methodology, are there
7 situations where strong recommendations can be made
8 based on low-quality evidence in accordance with the
9 methodology?
10          MR. LANNIN: Object to the form.
11          THE WITNESS: So within -- GRADE is
12 referring to a level of -- a level of evidence, you
13 know, from strong, moderate, low, very low. And I
14 think that's distinct from a recommendation for care
15 that might be made by a practice guideline.
16          So a systematic review might provide a
17 GRADE for a particular intervention, but not -- a
18 GRADE score, but not a recommendation of whether or
19 not you should do it. That seems like a realm of
20 someone else.
21 BY MR. RAMER:
22     Q   What do you mean?
23     A   So, meaning the Endocrine Society or
24 Hilary Cass or other people using systematic reviews
25 and GRADE scores and making -- making

30 (Pages 114 - 117)

CONFIDENTIAL

1 recommendations for care.
2     Q   And so the point is that ultimately
3 somebody has to make the judgment of whether to
4 provide the intervention.  And you're saying that
5 it's not just, you plug things into the GRADE
6 computer and GRADE tells you whether or not to do
7 it; is that what you're saying, basically?
8     A   Yes.
9         MR. LANNIN:  Object to the form.
10 BY MR. RAMER:
11     Q   And if I said that there were five
12 paradigmatic contexts in the GRADE methodology where
13 a strong recommendation can be made based on
14 low-quality evidence, would you be familiar with
15 what I'm referencing?
16         MR. LANNIN:  Object to the form.
17         You can answer.
18         THE WITNESS:  Yeah, I don't recall the
19 specifics of that, of kind of how theoretically one
20 might make a recommendation using -- using GRADE
21 scores.
22 BY MR. RAMER:
23     Q   And do you know if, in your view,
24 gender-affirming care falls within any of those
25 contexts, to the extent they exist?

1         MR. LANNIN:  Object to the form.
2         THE WITNESS:  GRADE context for providing
3 care?
4 BY MR. RAMER:
5     Q   Right.  The contexts in the GRADE
6 methodology where a strong recommendation can be
7 made on the basis of low-quality evidence, does
8 gender-affirming care fall into any of those
9 contexts, to your knowledge?
10         MR. LANNIN:  Same objection.
11         THE WITNESS:  I don't know.
12         (Exhibit 4 was marked for identification
13         and is attached hereto.)
14 BY MR. RAMER:
15     Q   And, Dr. Karasic, you've been handed
16 what's been marked as Karasic Exhibit 4, and it
17 says, "Expert Rebuttal Report of Dan H. Karasic,
18 M.D."
19         Does this appear to be the report you
20 submitted in this case?
21     A   Yes.
22     Q   And I'd like to go to page 30.
23         (Proceedings interrupted.)
24         MR. RAMER:  Let's go off the record.
25         THE VIDEO OPERATOR:  Going off the record,

1 the time is 12:21 p.m.
2         (Recess, 12:21 p.m. - 12:23 p.m.)
3         THE VIDEO OPERATOR:  Back on the record.
4 The time is 12:23 p.m.
5 BY MR. RAMER:
6     Q   And, Dr. Karasic, picking up on your
7 report at page 30, I'd like to look at paragraph 80.
8 And I think this is sort of what we were discussing
9 where you cite the Chong study.
10     A   Yes.
11     Q   And then on the next page, paragraph 82,
12 you cite the Conway study.
13         Do you see that?
14     A   Yes.
15     Q   I think you've already described it
16 somewhat, but can you just explain the purpose for
17 why you're citing those articles here?
18         MR. LANNIN:  Object to the form.
19         THE WITNESS:  Sure.
20         So the purpose is that systematic reviews
21 and GRADE scores can provide guidance for areas for
22 further research.  They can provide some guidance to
23 clinical decision-making.  But it's actually
24 uncommon for -- or there are many interventions that
25 are done without high GRADE scores.  The state of

1 the research for many of the interventions we make
2 everyday are not supported by high GRADE scores.  So
3 that was the purpose that I was listing that.
4         So just because a guideline for care is
5 not supported by high GRADE scores doesn't mean that
6 that care should be made illegal.  It means that
7 there may be areas in which we should be trying to
8 get more evidence.
9         And I think that is the real shift, even
10 between the Europeans in making -- those that made
11 decisions based on GRADE scores, and the U.S. where
12 care is being -- is being banned, as opposed to
13 government is supporting more research so that, you
14 know, perhaps there will be higher GRADE scores in
15 the future.
16 BY MR. RAMER:
17     Q   In your view, is the quality of the
18 evidence under GRADE irrelevant to making treatment
19 decisions?
20         MR. LANNIN:  Object to the form.
21         THE WITNESS:  No, and that's why I used
22 the example of a systematic review for
23 antidepressants in adolescents, finding, of all the
24 antidepressants, only fluoxetine separated out from
25 placebo for treating depression, I tend to use

31 (Pages 118 - 121)

CONFIDENTIAL

1  fluoxetine in minors as a first line.  But -- and
2  that's only based on a moderate GRADE score on that
3  systematic review.
4       All the other antidepressants had low or
5  very low GRADE support if there was any separation
6  from placebo; however, I and my colleagues very
7  often use other medications; people -- if someone
8  doesn't tolerate fluoxetine or they don't respond to
9  it or they need a combination of medicines.
10      So it's just not part of our practice that
11 everything has to be supported by a high GRADE
12 score.  We look at the alternatives, and we look at
13 clinical experience, you know, when we don't have
14 the best evidence.
15      I was -- like with the example -- I was
16 kind of struck -- in the Cass report, they give an
17 example of providing risks and benefits to a
18 patient, and they say, let's say you're starting
19 them on an antidepressant, presumably in an
20 adolescent, a child or adolescent, and it has an
21 85 percent response rate and a 5 percent side effect
22 rate.  That was just their example.
23      And so my reading of that is, that's the
24 most unrealistic thing in the whole Cass report.
25 Show me an antidepressant with an 85 percent

1  response rate and a 5 percent side effect rate.
2       So we work in a field where the response
3  rate for interventions often aren't that great,
4  where the evidence for some interventions don't
5  separate greatly from placebo in terms of
6  medications.
7       The number needed to treat can be high.
8  How many do you have to treat for there to be a
9  distinguishing between someone on meds and not on
10 meds?
11      And yet we don't abandon all of those
12 fields of medicine.  We keep on practicing, and
13 hopefully, you know, more research happens that can
14 better guide us, or new medicines come out that
15 separate, you know, in a greater way.
16 BY MR. RAMER:
17      Q   So how did the Cass review get it so
18 wrong, in your view?
19      MR. LANNIN:  Object to the form.
20      THE WITNESS:  I don't think the Cass
21 report got everything so wrong, but that was a place
22 where, obviously whoever wrote that part was not a
23 practicing -- I don't think -- I would be surprised
24 if Hilary Cass wrote that part because by reports,
25 she was a practicing pediatrician.  And

1  pediatricians do prescribe antidepressants.
2       And they could never -- that part of the
3  Cass report, rather than saying 85 -- as an example,
4  85 percent response, 5 percent side effect, should
5  have said, you know, there's a systematic review
6  where there's only a 10 percent difference between
7  drugs and placebo, that antidepressants have a --
8  you know, at least in the U.S. -- an FDA warning
9  that in minors, they increase the chances of
10 suicidality, not decrease.  And yet we use them all
11 the time.
12      So it -- it just speaks to kind of a level
13 of evidence and what we have, you know, how we work
14 with what we have.
15      And so I think using that example was
16 just -- it was just something that struck me as a
17 clinician, because, you know, you would never -- if
18 you're doing risks and benefits -- I know they were
19 just using that as an example -- you would never use
20 that example.  Maybe you would use an antibiotic for
21 strep throat as something that had, you know, a high
22 response rate and a low side effect rate.
23      But it was just very peculiar to me.  And
24 it just goes to show how people don't recognize --
25 and this is where it speaks to this, you know, how

1  at zero percent of all the endocrine interventions
2  under systematic review had a high grade score, that
3  we practice all the time under limited evidence, and
4  we do the best we can.
5  BY MR. RAMER:
6       Q   And earlier, we were discussing how, at
7  some point, some person is making a decision based
8  on the evidence of whether an intervention should be
9  provided or not.
10      And I take it Dr. Cass, in her report, has
11 reached a conclusion that differs from your
12 conclusion; is that fair?
13      MR. LANNIN:  Object to the form.
14      THE WITNESS:  So there definitely are
15 things that I disagree with Dr. Cass.  So -- but I'm
16 free to respond kind of more specifically to
17 recommendations.
18      I think that there's a lot in there, and
19 not everything -- there are things that are
20 contradictory between even kind of the report and
21 things she said, you know, in interviews.  And so --
22 but, you know, it's a large government report that
23 has, you know, aspects that are more interesting and
24 less interesting to me.
25 ///

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1 BY MR. RAMER:
2     Q   And I guess my question is just kind of
3 general, of, like, if Dr. Cass is looking at the
4 same body of evidence that you're looking at, and
5 Dr. Cass concludes the evidence is insufficient to
6 justify the use of puberty blockers to treat gender
7 dysphoria in adolescents, how did she get that
8 conclusion wrong?
9     A   Okay.
10        MR. LANNIN:  Object to the form.
11        You can answer.
12        THE WITNESS:  So I disagree with the
13 premise of your question in terms of my
14 interpretation of what she wrote.
15        She wrote that she found that puberty
16 blockers, as they were being used in the U.K., had
17 insufficient evidence, and she wanted it to be
18 prescribed in an investigational way where they're
19 collecting data.
20        And she's pointed out in interviews, and
21 it's alluded to in the Cass report, that the average
22 age of people in the U.K. getting puberty blockers
23 is 15, which is at Tanner Stage 5, which is beyond
24 when they're particularly useful unless in
25 combination with hormones as a bridge.

Page 127

1        At 15, usually people are prescribed
2 hormones, but it's a flaw of the system where you
3 have to wait three to five years to get an initial
4 appointment.
5        And so I can see her saying, "Okay.  Our
6 current practice, plus generally hormones are widely
7 available and will continue to be widely available
8 if you're 16 or over in the U.K."
9        So it seems like what happens in the U.K.
10 right now is people turn -- people get their
11 appointment at age 15 and get referred to pediatric
12 endocrinology.  It's just a few people in the entire
13 country that even get that referral out of thousands
14 who are waiting.
15        By the time they get on puberty blockers,
16 they're too old for them.  And it's maybe not the
17 appropriate treatment, but they can't be on hormones
18 until they're 16, so they're on puberty blockers
19 through 15, and then at 16 they get on hormones.
20        To look at that practice, because it's not
21 in accordance with the U.S. or with the German
22 language countries or with -- the Netherlands or
23 Belgium don't use that practice.
24        And so if the Cass report results in young
25 people getting puberty blockers appropriately, and

Page 128

1 that data is gathered and studied in terms of that
2 response, I don't think that's necessarily a bad
3 thing.
4        I think it could be an improvement over
5 the current situation where, if you need puberty
6 blockers, you have to wait until you no longer need
7 puberty blockers.  If you're having -- if you need
8 puberty blockers and you wait three to five years,
9 at that point, you don't need puberty blockers, you
10 might need hormones.  You've aged out of where they
11 provide the greatest benefit.
12 BY MR. RAMER:
13     Q   Well, then, I guess, why wouldn't the
14 recommendation in the U.K. from Dr. Cass, for
15 example, be not that we're going to prohibit
16 providing puberty blockers, except for research
17 trials, but we're going to say that you have to
18 provide them earlier when the patient is closer to
19 Tanner Stage 2?
20        MR. LANNIN:  Object to the form.
21        THE WITNESS:  So she has said that they're
22 planning to expand and have more access to care, and
23 perhaps when there is more access to care, that
24 people will be able to get care sooner.
25        So I'm not -- I don't want to put words

Page 129

1 into Dr. Cass's mouth, but, you know, even if we
2 have some disagreement, I do agree with -- that what
3 they appear to have been doing in the U.K. wasn't
4 appropriate care.  And if there is a path through --
5 not prohibiting care, but as Dr. Cass claims,
6 expanding care, but in an investigational setting --
7 if that actually happens, that could be better than
8 what happens now.
9        I wouldn't agree with someone who is
10 saying, you know, we shouldn't use puberty blockers.
11 And Dr. Cass, when interviewed, said -- she was
12 asked, "Do you believe puberty blockers are
13 dangerous?"  And she said no.
14        So she just wants -- she wants more data
15 and perhaps a different use -- I mean, she was the
16 one who brought up this -- in that interview, the --
17 you know, the average age, and it's also brought up
18 in the Cass report.
19        And so -- so I -- you know, I can
20 understand her wanting a more rational use of them,
21 but she hasn't said, "We're banning the use of
22 puberty blockers," or "We're stopping the use of
23 puberty blockers."  She is saying using them in an
24 investigational setting.
25        She had previously alluded to there being

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1 some other pathway -- before the final report, she
2 had alluded to there being some other pathway
3 perhaps where people could -- could get them.
4       And my belief is that people shouldn't be
5 forced into a research study.  And so even if they
6 predominantly want to do research, that there should
7 be a pathway if clinicians have said, "This person
8 really needs puberty blockers," that they could get
9 them, and that's a place of objection with -- you
10 know, if that other pathway, if people are being
11 forced to be in a study in order to get treatment.
12 BY MR. RAMER:
13    Q   And so your point there is, it still
14 wouldn't be reasonable even if you said, "We're
15 going to allow it only in a controlled study"; is
16 that what you're saying?
17       MR. LANNIN:  Object to the form.
18       THE WITNESS:  I'm saying it's good that
19 they're allowing it and collecting data, and
20 hopefully they are trying to use it appropriately.
21       But I -- my belief is that shouldn't be
22 the only pathway.  That is a disagreement I have
23 with Dr. Cass.  I don't think that should be the
24 only way that you should be able to get care.
25 ///

Page 131

1 BY MR. RAMER:
2    Q   And so earlier, you said that you
3 didn't -- you didn't think that the quality of the
4 evidence under GRADE is relevant to making a
5 treatment decision.
6       I guess my question is, how do you
7 determine when it is relevant for making a treatment
8 decision?
9       MR. LANNIN:  Object to the form.
10       THE WITNESS:  So I think it is in a
11 broader context, which includes trying to determine
12 the best treatment for someone who needs treatment.
13 And so one looks at the alternatives.
14       So if, let's say -- using the
15 antidepressant example -- if fluoxetine has a
16 moderate GRADE score, but the alternatives -- you
17 know, in that systematic review, it was more
18 effective than anything else except the combination
19 of fluoxetine and cognitive behavioral therapy was,
20 you know, similar, but that you were still getting
21 fluoxetine.  So my takeaway from that is, if someone
22 is depressed, that it does seem like the best
23 alternative supported by that study.
24       Now, it's not only that study that
25 determines how I treat somebody, but it may make a

Page 132

1 difference if one is making a -- you know, a
2 treatment decision.
3 BY MR. RAMER:
4    Q   And returning to your report, Exhibit 4,
5 and sticking on the same page, well, page 31, the
6 carryover paragraph, in the last sentence you refer
7 to "complex intervention."  And you say,
8 "Gender-affirming care certainly qualifies as a
9 complex intervention."
10       Do you see that?
11    A   Yes.
12    Q   What makes an intervention complex as
13 opposed to simple?
14    A   So a complex intervention is one where you
15 have -- you can have multiple steps in the
16 implementation of the intervention, and you can also
17 have an indirect means of assessing whether that
18 intervention was effective.
19       So an example would be, when you look at
20 puberty blockers, and your question is just, do they
21 stop puberty, that's a very direct intervention.
22 You are taking somebody, you're giving them puberty
23 blockers, and you're seeing if -- physically, if
24 puberty is stopped.
25       If you are saying you give someone -- you

Page 133

1 have someone transition, and that involves puberty
2 blockers, and then your outcome is, are they happy,
3 there are -- there may be a number of steps, you
4 know, that happen that could be -- that could
5 complicate things: the intervention of other aspects
6 of transition as well as the puberty blocker.
7       And then in determining the effect, you're
8 not just looking at did the puberty blocker stop
9 puberty, but did stopping puberty presumably affect
10 the person's self-perception, or perception of their
11 body in a way that reduced distress or improved
12 quality of life.
13       And so you have this kind of -- you have a
14 level of complexity that, when you add that into an
15 intervention, it is -- rarely, if ever, do you get
16 high GRADE scores.
17       And, in fact, NICE, N-I-C-E, the British
18 agency that did the original systematic review and
19 grading of puberty blockers, before doing that, they
20 had actually long resisted adopting GRADE because of
21 its weakness with complex interventions, and -- but
22 they did adopt it in time, certainly, to do the
23 grading of the systematic review of puberty
24 blockers.  So they ultimately did do it.
25       But there apparently, in the systematic

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 review world, has been some disagreement about its
2 utility in particular circumstances, in
3 circumstances where all the studies have low GRADE
4 scores.
5     Q   Is the use of psychotropic medication a
6 complex intervention?
7        MR. LANNIN:  Object to the form.
8        THE WITNESS:  So it's certainly a less
9 complex intervention than gender-affirming care.
10 But from my experience actually trying to do a -- a
11 clinical trial, you know, there are levels of
12 complexity there as well.  It's certainly more
13 complex than the person with strep throat.  You give
14 them medication, and you -- you get the result.
15        Just because, you know, in this case, you
16 can have a very defined intervention, but there can
17 be variation on your outcome measures that relate to
18 a lot of other kind of aspects that make it more
19 difficult than a simple, maybe perhaps, medical
20 intervention.
21        I think mental health interventions
22 generally are harder to get higher grades of
23 evidence because of the -- of that kind of
24 variability when you're trying to measure how
25 someone feels.

Page 135

1 BY MR. RAMER:
2     Q   Is there any medical intervention that you
3 think is reasonable to ban?
4        MR. LANNIN:  Object to the form.
5        THE WITNESS:  Not on the basis of a
6 systematic review.
7        I think that it might be -- it's possible,
8 but it would just be speculative.  I can't think of
9 anything off the top of my head.
10        I mean, it might be possible that there
11 could be an intervention that -- where everyone
12 dies, you know.  And so, you know, there's
13 something -- something out there, you know, that
14 happens, you know.
15        But I don't -- not things that have been,
16 like, approved treatments in recent years, at least,
17 that -- you know, that should be banned.
18 BY MR. RAMER:
19     Q   Would it be reasonable, in your view, to
20 ban the use of ketamine as a treatment for bipolar
21 disorder in adolescents?
22        MR. LANNIN:  Object to the form.
23        THE WITNESS:  No.
24        So I would say, you know, there's
25 growing -- there's growing evidence of the utility

Page 136

1 of ketamine in unipolar depression, that there
2 certainly is more caution in treating bipolar
3 people.  But I don't think it's something that
4 should be banned.
5 BY MR. RAMER:
6     Q   And apart from medical interventions that
7 kill everybody, how would you determine whether it
8 is or is not reasonable to ban a particular medical
9 intervention?
10     A   So I think that if there is a ban, it
11 should come from the great consensus of care
12 providers and experts in the field.  It shouldn't --
13 it certainly shouldn't be a ban that is done
14 top-down when the actual people providing the care
15 believe there's benefit.
16        So obviously it's a theoretical case and,
17 you know, maybe not everyone has to die.  But, you
18 know, there would have to be, I think, great
19 consensus that this is something that is -- that
20 this is something harmful.
21        There are -- there's all kinds of care
22 that's not given very often because of harm.  You
23 know, there are -- there has been the ban of, you
24 know, conversion therapy that I know you're aware
25 of, and I think that's a -- you know, certainly a

Page 137

1 subject for debate that I probably don't need to
2 wade into right now.
3        But, I mean, there are times where there
4 is, you know, kind of a great consensus that there's
5 harm being done.  But I think that by and large,
6 politicians should stay out of it because most care
7 that is -- that doesn't show benefit and is harmful
8 gets weeded out in and of itself; that interventions
9 have been tried and found, you know, not to be --
10 not to be helpful, and, you know, the field of
11 medicine moves on.
12     Q   But take the example of ketamine that we
13 were discussing.  Who would you ask to determine the
14 consensus of whether it's appropriate?  Only the
15 providers who are actually providing the ketamine to
16 adolescents?
17        MR. LANNIN:  Object to the form.
18        THE WITNESS:  No, you would look at the
19 research as well.
20        Generally, it's difficult for adolescents
21 to access ketamine as treatment, but, you know, I
22 know from my patients that there are some who
23 have -- I have patients who have benefited from, you
24 know, ketamine for treatment-resistant depression.
25 That said, it's been difficult for them to get it

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1 until they're 18.
2      I wouldn't want to see the government step
3 in and say, "You can't have that."
4      I would -- I'd want to have there be more
5 research and, you know, continue a greater
6 understanding as we need to have in terms of that,
7 you know, treatment.
8      And if anything, the government has been
9 going back on banning substances that might have
10 clinical utility like, you know, they're proposing
11 changing the schedule level for cannabis and funding
12 more research into psilocybin.
13      And so I think, you know, it should be a
14 very rare case that politicians ban a particular
15 care. I think it is something that should be left
16 up to the practice community.
17      And if somebody is, you know, practicing
18 in a way that's harmful, there are, you know, state
19 medical associations -- or medical boards that --
20 you know, that people can go to and file complaints.
21 BY MR. RAMER:
22      Q   And I just want to return to one thing in
23 Exhibit 3, which is Appendix A to the SOC-8. And
24 I'd like to go to the very last page, which has
25 "S251" in the upper right. And right column,

Page 139

1 there's a bold "3.17. Approval by the WPATH Board
2 of Directors." I just wanted to read the sentence
3 below that, and I'll just first ask if I read it
4 correctly.
5      It says, "The final document was presented
6 to the WPATH Board of Directors for approval and it
7 was approved on the 20th of June 2022."
8      Did I read that correctly?
9 A   Yeah. Where is that again?
10 Q   Sorry. So right column, 3.17, about
11 halfway down.
12 A   Okay. Yeah.
13 Q   I did read it correctly?
14 A   Yes.
15 Q   And is that true?
16      MR. LANNIN: Object to the form.
17      THE WITNESS: I assume so. I wasn't on
18 the board at the time, but I have no reason to
19 believe that that's not true.
20      MR. RAMER: Is this a good time for lunch?
21      MR. LANNIN: Sure.
22      THE VIDEO OPERATOR: This marks the end of
23 Media Unit 2 of the deposition of Dan Karasic, M.D.
24 The time is 12:55 p.m. We're off the record.
25      (Recess, 12:55 p.m. - 1:31 p.m.)

Page 140

1      THE VIDEO OPERATOR: We are back on the
2 record at 1:31 p.m. This marks the beginning of
3 Media Unit 3 of the deposition of Dan Karasic, M.D.
4      Please continue.
5      (Exhibit 5 was marked for identification
6      and is attached hereto.)
7 BY MR. RAMER:
8      Q   Dr. Karasic, you've been handed what's
9 been marked as Karasic Exhibit 5, and that is
10 "Chapter 6 Adolescents" at the top.
11      Do you see that?
12 A   Yes.
13 Q   Does this appear to be the "Adolescents"
14 chapter of the SOC-8?
15 A   Yes.
16 Q   And I'd like to go to page S61. And in
17 particular, I'd like to look at Statement 6.12.c.
18      Do you see that?
19 A   Yes.
20 Q   And do you use this statement and
21 supporting text to guide you in obtaining informed
22 consent?
23      MR. LANNIN: Object to the form.
24      THE WITNESS: Yes.
25 ///

Page 141

1 BY MR. RAMER:
2      Q   And on the same page, the left column, the
3 second full paragraph underneath "Statement 6.12.c"
4 states that, "A necessary step in the informed
5 consent/assent process for considering
6 gender-affirming medical care is a careful
7 discussion with qualified HCPs trained to assess the
8 emotional and cognitive maturity of adolescents."
9      Do you see that?
10 A   Yes.
11 Q   And do you agree that you must assess the
12 emotional and cognitive maturity of adolescents for
13 purposes of informed consent?
14      MR. LANNIN: Object to the form.
15      THE WITNESS: Yes, informed consent or
16 assent legally for adolescents.
17 BY MR. RAMER:
18      Q   Is the only difference there the age and
19 the terminology, or is there a substantive
20 difference between "informed consent" and "informed
21 assent"?
22 A   There's -- the difference is mainly that
23 in practicality, that you have to get the assent of
24 the minor and the informed consent of the parents.
25 Q   And how do you assess the emotional and

36 (Pages 138 - 141)

CONFIDENTIAL

1 cognitive maturity of an adolescent?
2        MR. LANNIN:  Object to the form.
3        You can answer.
4        THE WITNESS:  So I have -- first of all, I
5 typically do it with patients that I've known for a
6 while because as a psychiatrist, I'm often involved
7 in a patient's life for long periods of time,
8 prescribing medications, sometimes doing therapy,
9 but often they're seeing a therapist but continuing
10 to see me over time.
11        And I can assess their ability to make
12 decisions, understanding the risks, benefits, and
13 alternatives of the decision; to have some cognitive
14 flexibility about thinking about the future.
15        Would they make a different decision in
16 the future?  Should that inform the decision that's
17 being made now?  Is their decision-making really, on
18 this subject, very consistent over time?  Do they
19 have a good understanding, you know, of what would
20 be the benefits for them?  What could be the
21 potential risks as well?
22 BY MR. RAMER:
23    Q   Have you ever had an adolescent patient
24 whom you've deemed lacks the cognitive maturity to
25 provide informed assent?

1    A   Yes.
2        MR. LANNIN:  Object to the form.
3        THE WITNESS:  Yes.
4 BY MR. RAMER:
5    Q   Why?
6    A   So I was thinking of a circumstance where
7 I went -- where a patient was scheduled to see me,
8 who was seeing other providers regularly, but they
9 wanted me to see this person because of my
10 experience and expertise.
11        And in that particular case, I didn't
12 think that this person -- even though I only had
13 that kind of cross-sectional experience with them, I
14 didn't think that they had really thought through
15 this substantially; that there -- it wasn't clear to
16 me that there was kind of consistency in terms of
17 their identity over time.
18        Again, I was hindered by just seeing this
19 person once.  There didn't seem to be a maturity in
20 terms of the way they made their decisions.
21        And so I -- I'd been asked to consult, and
22 I reported that back to the people who were
23 providing ongoing care for that patient.
24        So that's a case that comes to mind.
25    Q   Do you think the patient's IQ is relevant

1 to the patient being able to provide informed
2 assent?
3        MR. LANNIN:  Object to the form.
4        THE WITNESS:  So I think it can be
5 relevant in terms of having to make sure that they
6 understand risks, benefits, and alternatives; that
7 the communication both ways is -- you know, is
8 adequate.
9        So I think potentially there could be an
10 impact.
11 BY MR. RAMER:
12    Q   Is there a point at which you would
13 conclude an individual's IQ is so low that he or she
14 cannot provide informed assent for puberty blockers?
15    A   So I'm not usually working with people
16 with that severe of a developmental disorder; so
17 that circumstance hasn't come up in my practice.
18 They probably would be working with folks who are
19 more specializing in people with severe
20 developmental disorders.
21    Q   Is that -- is the answer to that question
22 outside the scope of your expertise?
23        MR. LANNIN:  Object to the form.
24        THE WITNESS:  I would say it's not -- it's
25 not a decision I've had to make.

1 BY MR. RAMER:
2    Q   And so do you have an opinion about
3 whether an individual could have an IQ so low that
4 would preclude them receiving gender-affirming
5 medical interventions?
6        MR. LANNIN:  Object to the form.
7        THE WITNESS:  Yes.  I think that if
8 cognitively they couldn't understand sufficiently
9 the intervention to be able to -- to understand the
10 risks and benefits, I think theoretically, yes.
11 BY MR. RAMER:
12    Q   But you've never come across it in your
13 practice; is that right?
14    A   Right.  I haven't -- I haven't worked with
15 anyone like that.
16    Q   If a patient tells you, "I'm going to kill
17 myself if I don't get puberty blockers," is that
18 patient capable of providing informed assent?
19        MR. LANNIN:  Object to the form.
20        THE WITNESS:  So it's actually -- it's
21 interesting because my patients don't express it
22 that way.
23        So I do have patients with either
24 intermittent or chronic suicidality.  That's
25 extremely common in my patients; and, of course, as

37 (Pages 142 - 145)

Page 146

1 part of the assessment of anything they do and part
2 of the discussion about, you know, stressors of
3 transition, for example.
4        Just having suicidality doesn't -- because
5 it is so ubiquitous -- doesn't prevent somebody from
6 getting gender-affirming care, but it's certainly
7 something that we take seriously.
8        I just haven't -- I've never had a
9 patient, like, threaten me with suicide if I didn't
10 write a letter.  It just hasn't -- it's never come
11 up.
12 BY MR. RAMER:
13    Q  Before you recommend hormone therapy for
14 an adolescent patient, do you confirm that the
15 patient has experienced several years of persistent
16 gender diversity or incongruence?
17    A  So I take a history, and I think the
18 wording of that is maybe not the best in the sense
19 that it's including two different things: gender --
20 kind of gender diversity and having gender
21 dysphoria.
22        And when I take a -- when I've worked with
23 people, young people, sometimes they -- usually they
24 do express having aspects of gender diversity even
25 though they haven't even come out to themselves as

Page 147

1 trans.
2        But I'm not quite sure that -- of the
3 wording of that particular sentence, kind of
4 conflating one sentence, gender diversity, several
5 years of gender diversity or -- or gender
6 incongruence.
7        I certainly would want them to have had
8 gender dysphoria that has gone on for -- for quite a
9 while, you know -- DSM says six months -- but for
10 there to be evidence that goes beyond further than
11 that.  And I just -- I'm not that big of a fan of
12 the wording of that sentence.
13    Q  How would you fix it?
14    A  So I would -- where is the --
15    Q  It's not on S61.  It's actually on S60,
16 the previous page, and it's left column below
17 6.12.b, second full paragraph, and then it's about
18 the second long sentence in that paragraph.
19    A  Well, even if you look in that paragraph,
20 it says (as read), "However, in this age group of
21 younger adolescents, several years is not always
22 practical nor necessary given" -- this is for
23 puberty  blockers -- "the premise of the treatment
24 to buy time while avoiding distress from
25 irreversible pubertal changes."

Page 148

1        And so I think even within that paragraph,
2 there is some description of a range of
3 considerations that should be taken into account.
4        So -- so this is saying, "Prior to
5 initiating less reversible treatments," and that's a
6 sentence, and that might speak to if you're -- if
7 you have somebody who perhaps presented -- who
8 hadn't already been in care, receiving puberty
9 blockers before their moving on to hormones -- if
10 somebody presented in your practice in that
11 particular circumstance where they might be going
12 directly to hormones, or if somebody was presenting
13 to your practice who was having a lot of chest
14 dysphoria and wanting chest surgery, I do think that
15 more caution about the persistence, you know, is --
16 of their symptoms is advised.
17        I don't know about "several years."
18 Certainly, like, for puberty blockers, "several
19 years" doesn't make any sense.  And then also, the
20 idea of gender diversity versus gender dysphoria,
21 because not all the people with -- presenting with
22 gender dysphoria have the same childhood history.
23 There's variability in terms of how people have
24 presented in terms of gender diversity.
25        So, anyway, that's -- that was my question

Page 149

1 about saying, "gender diversity/gender
2 incongruence."
3        I would say if somebody is presenting
4 during adolescence and they hadn't -- you didn't
5 know them already from puberty blockers, you would
6 want to spend more time with them and make sure
7 they've had a careful evaluation and that they --
8 their gender identity has been using the bold
9 "marked and sustained" description, has been marked
10 and sustained, has been going on for -- you know,
11 over time.
12        But I do think that "several years" might
13 not be the best descriptor.  And even then, they
14 were using "several years" in combination with
15 saying "gender diversity" as opposed to "gender
16 dysphoria."
17        So that's just my -- my commentary on
18 that -- on that part.
19    Q  And just to sum that up --
20    A  Sorry about my verbosity.
21    Q  Not a problem at all.
22        But do you disagree with the requirement
23 that's articulated in that sentence?
24    A  I don't disagree with the sentiment that
25 if -- if they're saying someone is seeking a less

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1 reversible treatment, one would want to know that
2 their gender incongruence has been going on for a
3 while. That is one of the reasons that puberty
4 blockers are sometimes given, which doesn't really
5 fall under this part and is described kind of later
6 in that paragraph.
7        But certainly the general sentiment of
8 exhibiting caution when working with adolescents is
9 one that I would agree with.
10    Q  What do you think the phrase "several
11 years" means?
12        MR. LANNIN:  Object to the form.
13        THE WITNESS:  Well, I think that's a
14 problem because it's kind of -- it's kind of vague.
15        So, you know, the gender incongruence
16 diagnosis is six months. But I can understand why,
17 depending on the intervention, that one might, you
18 know, need more time than that with -- working with
19 an adolescent, just depending on circumstances.
20        And so, you know, adolescents can -- their
21 presentation can be so different when you're
22 actually making that assessment, that there are --
23 there are adolescents who need very careful
24 consideration, and there are adolescents who might
25 come in needing an intervention where they've been

Page 151

1 clearly very stable and living in their transgender
2 identity for a long time where it may not be as --
3 one might not have as much concern. I think that
4 really depends on the individual.
5 BY MR. RAMER:
6    Q  Do you agree that one year is not several
7 years?
8        MR. LANNIN:  Object to the form.
9        THE WITNESS:  I agree that one year is not
10 several years.
11 BY MR. RAMER:
12    Q  And so a provider who is trying to
13 faithfully follow the supporting text in this
14 statement, what are they supposed to do with that
15 sentence that we've been discussing?
16        MR. LANNIN:  Object to the form.
17        THE WITNESS:  Well, I think that -- I
18 would hope they would kind of generally get that
19 it's communicating to be cautious when you're using
20 less reversible treatments; that in younger
21 adolescents needing puberty blockers, that that
22 might not be necessary, but generally having a sense
23 of caution.
24        When they say "several years of gender
25 diversity," gender diversity is not a diagnosis, and

Page 152

1 people might not be engaged in care for being
2 gender-diverse, certainly much less so now than
3 perhaps in the past.
4        And so I don't see that as that individual
5 provider needing to have taken care of that person
6 for several years, but I think you would look in
7 their history, that there have been aspects of
8 gender diversity that have been going on certainly
9 for a while. Certainly longer than the six months
10 that they've had a gender incongruence diagnosis,
11 which is the minimum to give them a diagnosis that
12 they would be eligible for care.
13 BY MR. RAMER:
14    Q  And when you say "going on for a
15 while," you mean going on for several years?
16        MR. LANNIN:  Object to the form.
17        THE WITNESS:  Well, you know, certainly
18 that's not practical for puberty blockers.
19        Sometimes there are people who get pretty
20 strong gender incongruence at puberty where you
21 didn't know them before and, you know, you would
22 certainly look for that in the history.
23        But, again, I'm not sure that that would
24 be -- I don't like that wording of "several years"
25 because there are some people who -- some

Page 153

1 adolescents who present who clearly have a gender
2 dysphoria diagnosis who are very symptomatic and,
3 you know, who come into care at that time, and you
4 wouldn't tell them to wait several years, for
5 example, before getting care. So I think that
6 there's an individual assessment involved in those
7 cases.
8        I do agree with the sentiment that one
9 should be cautious in those circumstances.
10 BY MR. RAMER:
11    Q  So is it fair to say that you do not
12 require several years of persistent gender diversity
13 as a rule before initiating hormone therapy for an
14 adolescent?
15        MR. LANNIN:  Object to the form.
16        THE WITNESS:  So gender diversity is not a
17 diagnosis, and people aren't necessarily in clinical
18 care. I think it would be -- so I think it's
19 something that is -- it might be kind of challenging
20 as a requirement, anyway.
21        I would say, you know, exhibiting caution,
22 and, you know, if -- if you don't -- if it's not
23 somebody with onset of -- like, childhood onset
24 gender dysphoria, if it's somebody in adolescent
25 onset, I would just have caution in working with

39 (Pages 150 - 153)

CONFIDENTIAL

1 them, and having a sense that their -- of the
2 stability of their gender dysphoria.  But I wouldn't
3 put a marker of "several" years for that -- that
4 process.
5 BY MR. RAMER:
6     Q   Sticking with Exhibit 5, which is the
7 "Adolescents" chapter, I'd like to go to the next
8 page, S61.  And right column, the first long
9 paragraph, a third of the way down or so, there's a
10 sentence that begins with "Gender diverse youth."
11 and I'm just going to read that and first ask if I
12 read it correctly.
13        It says, "Gender-diverse youth should
14 fully understand the reversible, partially
15 reversible, and irreversible aspects" --
16     A   Oh, okay.  I'm sorry.  I was looking at
17 the sentence after.
18     Q   I'll just restart.  "Gender-diverse youth
19 should fully understand the reversible, partially
20 reversible, and irreversible aspects of a treatment,
21 as well as the limits of what is known about certain
22 treatments (e.g., the impact of pubertal suppression
23 on brain development...)," and then there's a
24 citation.
25        Did I read that correctly?

1     A   Yes.
2     Q   And do you ensure that your patients fully
3 understand all these enumerated items?
4        MR. LANNIN:  Object to the form.
5        THE WITNESS:  So certainly in counseling
6 both the youth and their family, we try to go
7 through each aspect.  The impact of pubertal
8 suppression on brain development is not well known,
9 but I think it's fair to, you know, say that that is
10 an unknown that, you know, could be of concern.
11        But the -- certainly understanding the
12 risks and benefits and alternatives for each aspect
13 of treatment is important.
14 BY MR. RAMER:
15     Q   When you say that the impact of pubertal
16 suppression on brain development is unknown and
17 could be a concern, what do you mean by that?
18     A   So it's an area certainly that requires
19 more research.
20        There have been papers trying to summarize
21 the research which -- of about which a lot is not
22 known, including -- many of the studies have been on
23 animal models.
24        There's not a lot of data on people, and
25 there's not a lot of data on -- you know, to guide,

1 like, how long somebody should be on puberty
2 blockers before switching to gender-affirming
3 hormones if -- you know, if an overly prolonged
4 puberty is -- is of concern.
5        But certainly with whatever treatment
6 someone gets, one is trying to weigh risks and
7 benefits.  And trying to present that to -- to a
8 family is more difficult, you know, depending
9 on kind of a level of -- you know, of knowledge.
10        There's a difference between animal
11 models, a very strong -- I mean a very small amount
12 of kind of human research on people, and then also
13 weighing that with a young person who has a lot of
14 gender dysphoria where it might be impacting their
15 ability to go to school and study and be successful
16 academically.
17        So, I think, you know, it's something that
18 one can mention, but it's -- you know, there are a
19 lot of other considerations that affect people
20 cognitively for which there's more evidence which
21 is, for example, that if somebody does have
22 prolonged depression or gender dysphoria that's
23 impairing their functioning, that they might not be
24 able to learn in the same way.
25     Q   And when you were referring to papers that

1 discuss the lack of evidence we have regarding the
2 impact of pubertal suppression on brain development,
3 are there any papers you were specifically thinking
4 of?
5     A   I have read them, but I can't cite them.
6        But I have read reviews of, you know, how
7 much of a concern this might be, and even I think a
8 systematic review of papers where most of the papers
9 in the systematic review were on animal models.  And
10 it described a few cases, including one that was
11 just a case report of one person, and came to the
12 conclusion that the evidence is still very limited.
13     Q   And what are the animal studies you're
14 referring to?
15     A   So there was one that I've seen that I saw
16 presented at a WPATH conference that was about
17 cognitive development in sheep who were given
18 puberty blockers; where that was raised as, you
19 know, could there be some -- so, like, in a sheep,
20 you can kill the sheep afterwards, basically, and
21 look histologically at the brain, and so you get a
22 certain level -- a different kind of evidence.  So
23 that's why they tried to look at that in a sheep
24 model.
25     Q   And what was the -- just generally

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1  speaking, that sheep study?  Was it a negative
2  impact on brain development?
3      MR. LANNIN:  Object to the form.
4      THE WITNESS:  I can't tell you the
5  results, but I think that there were -- it was
6  raising questions of, you know, should this be
7  something that is studied further?
8      And that study was several -- it must have
9  been several years ago because I remember seeing the
10  data presented at the WPATH conference in either
11  2009 or 2011.
12      (Exhibit 6 was marked for identification
13      and is attached hereto.)
14  BY MR. RAMER:
15      Q   And you've been handed, Dr. Karasic,
16  what's been marked as Karasic Exhibit 6.  And this
17  is an article entitled "Consensus Parameter:
18  Research Methodologies to Evaluate
19  Neurodevelopmental Effects of Pubertal Suppression
20  in Transgender Youth."
21      Do you see that?
22      A   Um-hum.
23      Q   And the lead author on this is Diane Chen,
24  correct?
25      A   Yes.

Page 159

1      Q   And have you heard of Diane Chen before?
2      A   Yes.
3      Q   And she's an expert in the field of
4  transgender medicine, correct?
5      MR. LANNIN:  Object to the form.
6      THE WITNESS:  Yes.
7  BY MR. RAMER:
8      Q   Have you seen this paper before?
9      A   I don't remember.  I may have, but I don't
10  remember.
11      Q   I'd like to just go to page 248, which I
12  think is like the third page.  And right column,
13  first full sentence up toward the top, it says, "In
14  human studies, pubertal progression has been linked
15  to developmental changes in reward, social, and
16  emotional processing as well as cognitive/emotional
17  control."
18      Do you see that?
19      A   Yes.
20      Q   And do you agree with that statement?
21      A   I have no reason to believe that those
22  references don't support that statement.  I don't
23  see a disagreement with it.
24      Q   Is the impact of pubertal suppression on
25  brain development beyond the scope of your

Page 160

1  expertise?
2      MR. LANNIN:  Object to the form.
3      THE WITNESS:  I think that it's -- that
4  it's an area in which -- in which the science is
5  still young.  So I'm not sure what -- it's not --
6  it's certainly not the focus -- a research focus of
7  mine, but it's something that -- it's, you know,
8  not, I think, something that we have definitive
9  answers on.
10      I do think that because the question has
11  been raised, that it does provide support for not
12  having a really prolonged period of time on pubertal
13  suppression before going to cross-sex hormones if
14  they're indicated, as in some European countries who
15  don't -- who don't start hormones until 16, for
16  example, kind of arbitrarily, whereas they might
17  start puberty blockers at Tanner Stage 2.
18      So I think there are reasons to have
19  people go through puberty, including cross-sex
20  hormones, in a way that doesn't linger in puberty
21  too long.
22      But we do have, you know, substantial use
23  of puberty blockers in people with precocious
24  puberty in these relatively shorter periods of time
25  where it seemed to have been done safely.

Page 161

1      And I do have patients who have -- were on
2  puberty blockers who are now attending Ivy League
3  colleges.  So I don't think that that experience on
4  puberty blockers profoundly affected them.
5      I think that -- just as a clinician, that
6  in those cases, receiving gender-affirming care
7  really allowed them to focus on school in a way to
8  excel and to -- you know, to get into a college that
9  was consistent with -- with their goals.
10      So that's how -- you know, I think it's,
11  you know, something that, you know, deserves more
12  research, but also is taken into the context of
13  people needing -- needing care.
14  BY MR. RAMER:
15      Q   And sticking with Exhibit 6, which is the
16  Chen article, I'd like to go to page 253.  And right
17  column, about three quarters of the way down,
18  there's a sentence that starts with "In addition."
19      And in that sentence, it says, "studies in
20  rodents show ovarian hormones, acting during
21  puberty, program cognitive flexibility by exerting
22  long-lasting effects on excitatory-inhibitory
23  balance in the prefrontal cortex."
24      Do you see that?
25      A   Yes.

41 (Pages 158 - 161)

CONFIDENTIAL

1    Q   And did you know that before reading it in
2 this article?
3        MR. LANNIN:  Object to the form.
4        THE WITNESS:  You know, I knew that there
5 had been studies in animals, and I didn't know
6 the -- I still don't know the applicability of that
7 to human beings.
8 BY MR. RAMER:
9    Q   Well, I guess if animal studies find
10 long-lasting effects of pubertal -- excuse me.
11 Start again.
12       If animal studies find long-lasting
13 effects of pubertal hormones on animal brain
14 development, would a reasonable scientist think
15 there could be a risk that pubertal hormones also
16 have a long-lasting effect on brain development in
17 humans?
18       MR. LANNIN:  Object to the form.
19       THE WITNESS:  So I think that animal
20 models and findings in animal models are reason to
21 do more research, you know, with people.  It raises
22 an avenue for -- for supporting doing more studies.
23       (Exhibit 7 was marked for identification
24       and is attached hereto.)
25 ///

1 BY MR. RAMER:
2    Q   Dr. Karasic, you've just been handed
3 what's been marked as Karasic Exhibit 7.
4    A   Yes.
5    Q   And it's an article entitled "Gender
6 Dysphoria in Adults:  An Overview and Primer for
7 Psychiatrists."
8    A   Yes.
9    Q   And you helped author this article,
10 correct?
11   A   Yes.
12   Q   I'd like to go to page 60.  And right
13 column, down at the very bottom, the section says,
14 "Gender Development," and then below that it says,
15 "Biological considerations."
16       Do you see that?
17   A   Yes.
18   Q   And the first sentence says, "Animal
19 research has established that sex differences in the
20 phenotype of both body and brain as well as
21 behaviors are the result of multiple, sex-biasing
22 factors."
23       Do you see that?
24   A   Yes.
25   Q   And so animal studies of brain development

1 are, therefore, relevant to understanding human
2 brain development, correct?
3        MR. LANNIN:  Object to the form.
4        THE WITNESS:  So they -- so animal studies
5 can be.  Certainly there are many studies on animals
6 for the safety of drugs and people, and sometimes
7 there's reason for concern.  Sometimes the result of
8 using that drug on people, you know, show that it's
9 safe despite concerns from an animal model.
10       So I think that it certainly -- you know,
11 animal research can lead to an interest in having,
12 you know, more research with people.
13 BY MR. RAMER:
14   Q   And sticking with this exhibit, and just a
15 sentence later, two sentences later, it says, "The
16 sensitivity of brain tissues to organizational
17 effects of sex hormones appears to be particularly
18 high at prenatal/perinatal stages of development and
19 gradually declines toward young adulthood."
20       Do you see that?
21   A   Yes.
22   Q   And the next sentence says, "The timing of
23 hormonal secretions in the course of development,
24 however, gives the impression of three discrete
25 sensitive periods: (1) pre/perinatal; (2) pubertal;

1 and (3), for females, the first pregnancy"; is that
2 right?
3    A   Yes.
4    Q   And in the first sentence where you refer
5 to the "organizational effects of sex hormones,"
6 what are you referring to?
7    A   So this was a section of the paper written
8 by Heino Meyer-Bahlburg, who is an expert on
9 intersex development.
10       And so he was referring here to how sex
11 hormones might affect development, both in intersex
12 people and potentially in -- in trans people when
13 you're talking about perinatal hormone exposure
14 which there is some belief that there can be a link
15 to gender identity with that.
16       And so I think that he was writing
17 about -- that in this section, he was writing from
18 his position of expertise on the development
19 particularly of intersex people, and also kind of
20 applying that more broadly to development of gender
21 identity in people generally.
22   Q   And so is what's written here within the
23 scope of your expertise?
24   A   So I would say that this part is not an
25 area where I've done research or -- you know,

CONFIDENTIAL

1 obviously we had, you know, read it and discussed
2 it, you know, as -- we did it as a group, but it was
3 also not -- it was written from the perspective of
4 an expert in this particular area of the impact in
5 hormones and genetics of intersex people and how
6 that might contribute to our understanding of gender
7 identity and other folks.
8      Q   Why is puberty a sensitive period, as it
9 says here?
10      MR. LANNIN:  Object to the form.
11      THE WITNESS:  So I -- again, like, our
12 discussions on this were from several years ago.  I,
13 you know, can't comment on why each particular
14 descriptive word was used.
15      Yeah, I think I'd leave it at that.
16      Clearly pre/perinatal hormone secretion,
17 you know, can have an impact, and we have some sense
18 of that.  Otherwise, I'm not quite sure what
19 Dr. Heino Bahlburg -- what he was referring to.
20 BY MR. RAMER:
21      Q   Can we refer to Exhibit 6, which is the
22 Chen "Consensus Parameter" article?  And I'd like to
23 go to page 248.  The first full paragraph -- sorry.
24 Right column, first full paragraph.
25      The first sentence also -- well, I'll just

1 read it.  It says, "The combination of animal
2 neurobehavioral research and human behavior studies
3 supports the notion that puberty may be a sensitive
4 period for brain organization."
5      So Chen is also referring to puberty as a
6 sensitive period, correct?
7      A   Yes.
8      Q   And can you explain why puberty is a
9 sensitive period?
10      MR. LANNIN:  Object to the form.
11      THE WITNESS:  Well, the rest of her
12 sentence describes to what she's referring from
13 that, in which -- that it can be a time in which
14 neural connections are shaped by both hormones and
15 experiential factors.
16      So that's -- that's what she's referring
17 to in calling it a "sensitive period."
18 BY MR. RAMER:
19      Q   And then returning to your article, which
20 is Exhibit 7, and where we were before, page 61,
21 left column, in the first full paragraph, so after
22 we were just reading, it says, "In humans,
23 statistical sex differences in brain structure are
24 well-documented."
25      Do you see that?

1      A   Um-hum.
2      Q   And you're referring to a distinction
3 between male and female brains here, correct?
4      MR. LANNIN:  Object to the form.
5      THE WITNESS:  Yes.
6      It is important, too, in that literature
7 in that they are kind of overlapping dot graphs when
8 you look at characteristics.  But they do
9 distinguish themselves statistically, like in the
10 size of particular structures.
11 BY MR. RAMER:
12      Q   And do you agree that we do not have
13 studies analyzing the lasting effect, if any, on
14 brain development caused by pubertal suppression?
15      MR. LANNIN:  Object to the form.
16      THE WITNESS:  So I think I would just
17 endorse that it's an area that could use study, but
18 other than that, I don't think I can comment.
19 BY MR. RAMER:
20      Q   Do you agree that we do not have studies
21 analyzing the long-term effect, if any, on brain
22 development caused by exposing a male brain to high
23 levels of estrogen that the brain would not
24 naturally be exposed to?
25      MR. LANNIN:  Object to the form.

1      THE WITNESS:  So I do think that we
2 have -- first of all, that -- that the goal in cross-sex
3 hormone treatment is to try to approximate the
4 hormone levels of the person assigned to the other
5 sex at birth.
6      And so -- and I know we have -- so I don't
7 think that necessarily the premise of the question
8 that -- I don't know exactly what that means in
9 terms of harm.
10      Somebody is, at least as a goal of
11 treatment, trying to have a hormonal milieu similar
12 to the gender to which they identify, and certainly
13 people assigned female at birth who are not trans,
14 you know, have those levels of hormones in their
15 brain.  I don't think that there's evidence that,
16 you know, that -- I don't think that there's any
17 further evidence of harm there.
18      Certainly any cognitive effects that
19 patients of mine experience are not getting in the
20 way of -- certainly of their academic achievement or
21 occupational achievement, and they're generally
22 living with hormones that are within physiological
23 ranges.
24 BY MR. RAMER:
25      Q   Physiological ranges of what?

43 (Pages 166 - 169)

Page 170

1    A   Of the sex -- of the -- cisgender people
2  aside, in this case, female, if we're talking about
3  female hormones.
4    Q   What were you talking about in your paper
5  about statistical sex differences in brain
6  structure?  Are you referring to differences in
7  brain structure of -- how are you using the word
8  "sex" in that sentence?  Let's start there.
9         MR. LANNIN:  Object to the form.  But you
10 can answer if you know what counsel is referring to.
11        THE WITNESS:  So in this case, when it
12 says, "In humans, statistical sex differences in
13 brain structures are well-documented," and they're
14 referring to people assigned -- it's referring to
15 assigned sex at birth in this case, there is also
16 some evidence of sex differences in trans people
17 that are different from cisgender people of the same
18 sex assigned at birth.
19        But this sentence is specifically, I
20 think, referring to cisgender people and cisgender
21 males and females and their differences in brain
22 structure; not referring to trans people
23 specifically.
24 BY MR. RAMER:
25    Q   So it's not just referring to all humans?

Page 171

1    A   So it's referring to all humans, but it's
2  not -- it's not separating out statistically
3  transgender people.
4         There have been some papers that have
5  separately looked at brain structures in transgender
6  people and have found some differences.  Some trans
7  women who have brain structures that are more
8  intermediate in size between male and female
9  structures, for example.
10   Q   So do you think that we can look at
11 individuals' brains to determine whether they are
12 transgender?
13   A   No.
14        MR. LANNIN:  Object to the form.
15        THE WITNESS:  No.  I think you need to
16 speak with them.
17 BY MR. RAMER:
18   Q   Then what was the study you were referring
19 to?
20   A   There have been some studies that have
21 looked at brains of trans people and have found that
22 their sizes of brain structures are different from
23 people of the same sex assigned at birth.
24   Q   And do you think those studies have
25 established that you can look at individuals' brains

Page 172

1  to determine --
2         MR. LANNIN:  Object to the form.
3         THE WITNESS:  So there's an overlap in the
4  size of those structures so that there are cisgender
5  men and cisgender women who are within that overlap,
6  too.  So I don't think that looking at brain
7  structures is a particularly efficient way to
8  determine someone's gender identity.
9  BY MR. RAMER:
10   Q   Do you think that clinicians should warn
11 patients about the animal studies we've been
12 discussing regarding pubertal suppression?
13        MR. LANNIN:  Object to the form.
14        THE WITNESS:  So I think it's a good
15 question.  I think it's a reasonable thing to warn
16 just that, you know, we need to do more research in
17 terms of cognitive effects.
18        I think animal studies alone are
19 interesting, but, you know, don't always -- are not
20 always reflective of the phenomenon in people.  So I
21 think there's kind of a judgment call.
22        But I think it's reasonable to include in
23 a discussion that more research may need to be done
24 in terms of any cognitive effects, and that it's
25 reasonable to limit the amount of time on a puberty

Page 173

1  blocker if somebody then is ready to go on to
2  cross-sex hormones, just because there is this
3  question.
4         But our information is still limited.
5  BY MR. RAMER:
6    Q   Do you think we have sufficient
7  information to say that the use of puberty blockers
8  to treat gender dysphoria is fully reversible?
9         MR. LANNIN:  Object to the form.
10        THE WITNESS:  So we have substantial
11 information from people with precocious puberty that
12 they -- once they're getting their -- they're on
13 hormones again, that they don't seem to have been
14 harmed by that experience of having a period of time
15 in which puberty is delayed.
16        So that's the biggest circumstance where
17 people fully reverse on puberty blockers.  There are
18 some people who go on puberty blockers and then
19 discontinue.  But certainly the larger number are
20 people who are doing that, who are on those
21 medicines just to delay puberty so that they go
22 through puberty with their peers.
23 BY MR. RAMER:
24   Q   When you're referring to individuals with
25 precocious puberty being on hormones again --

CONFIDENTIAL

Page 174

1     A  I'm sorry.  On puberty blockers.
2        Oh, going back on their own -- their own
3  natural hormones.  When they go off puberty
4  blockers, their production of their own -- you know,
5  of hormones, pubertal hormones, their own pubertal
6  hormones, starts up again.
7     Q  Are you confident that the experience of
8  an individual going through puberty with their natal
9  hormones will be the same as an individual going
10  through puberty based on cross-sex hormones?
11        MR. LANNIN:  Object to the form.
12        THE WITNESS:  So I think for someone who
13  has extreme distress because of gender dysphoria,
14  going through puberty with the hormones of the sex,
15  the gender to which they identify, that they can go
16  through puberty with much less distress and often
17  with much higher functioning, because they're not
18  impaired by the distress of gender dysphoria.
19  BY MR. RAMER:
20     Q  Right; but I thought we were discussing
21  the impact of pubertal suppression on brain
22  development.
23        And my understanding of what you were
24  saying is, you know, we have individuals who use
25  puberty blockers when they have precocious puberty.

Page 175

1  And then once they go through puberty with their
2  natal hormones, it seems there are not major
3  problems; therefore, we can conclude that when you
4  have an individual whose puberty is suppressed to
5  treat gender dysphoria, and then goes through
6  puberty on cross-sex hormones, that the result will
7  likely be the same.
8        Is that what you're saying?
9        MR. LANNIN:  Object to the form.
10        THE WITNESS:  What I'm saying is that
11  brain development is affected by a number of
12  factors, including trauma and depression.  And so
13  you also have to -- you can take into account, you
14  know, if there could be some theoretical effect from
15  puberty blockers.
16        But you also have to take into account the
17  very real effect of a -- an adolescent who is --
18  who's really suffering; and that if there is relief
19  from that suffering, whether they -- whether they
20  might have better brain development because they're
21  not depressed and anxious all the time.
22        And we know that chronic depression, for
23  example, can affect cognitive functioning.
24  BY MR. RAMER:
25     Q  You're saying they might have better brain

Page 176

1  development as compared to what?
2        MR. LANNIN:  Object to the form.
3        THE WITNESS:  As compared to if they had
4  been forced to go through a puberty that was
5  exacerbating their gender dysphoria and causing them
6  to suffer because of gender dysphoria.
7        So presumably the only people that we're
8  treating first with puberty blockers and then
9  cross-sex hormones are people who have quite a bit
10  of suffering from gender dysphoria, and that
11  suffering can often impair, or almost by definition,
12  impairs their functioning, and that can have impacts
13  in terms of development and in terms of functioning
14  at school.
15        MR. RAMER:  We've been going for a little
16  over an hour.  Maybe take a break, if that's all
17  right.
18        MR. LANNIN:  Sure.
19        THE VIDEO OPERATOR:  Going off the record,
20  the time is 2:34 p.m.
21        (Recess, 2:34 p.m. - 2:51 p.m.)
22        THE VIDEO OPERATOR:  Back on the record.
23  The time is 2:51 p.m.
24  BY MR. RAMER:
25     Q  Dr. Karasic, I'd like to discuss the 2017

Page 177

1  USPATH conference.
2        You were the conference chair for that
3  event, correct?
4     A  Yes.
5     Q  And you were also the chair of the
6  scientific committee for that event, correct?
7     A  Yes.
8     Q  And can you explain what the scientific
9  committee's role was at that conference?
10     A  Yes.
11        So the scientific committee reviewed the
12  abstracts for the conference and scored them, and
13  then each -- so that each abstract had an average
14  score.  And then there was a cutoff score, and
15  everything above that score was accepted.
16     Q  So just backing up a little bit for my own
17  sake, what is an abstract?
18     A  So an abstract is a summary of a paper or
19  presentation.  It's what you see at the top of a
20  scientific article.
21        And when you apply to present at a
22  conference, you write an abstract that summarizes
23  what you're going to talk about.
24        And then the scientific committee reviews
25  all the abstracts, gives a rating score to make a

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1 decision about who gets to present.
2    Q   And how many people were on the scientific
3 committee for the 2017 conference?
4    A   It was quite a large committee, as I
5 recall, but I can't -- it was several years ago; so
6 I can't say the exact number.
7    Q   I'm completely ignorant with respect to
8 this, so what's, like, approximate for something
9 like this?
10    A   20, 25.
11    Q   And when you are grading the abstracts,
12 how do you do that?
13    A   So we had -- we have criteria that --
14 where we're scoring presentations in regard to their
15 addition to scientific knowledge or clinical
16 practice, and also their interest to the audience.
17    Q   And is the grading process blind?
18       MR. LANNIN:  Object to the form.
19       THE WITNESS:  So sometimes it is and
20 sometimes it isn't.  And I don't remember the 2017
21 process, if -- I think we knew the names of the
22 people who were -- my recollection is that we knew
23 the names of the people that submitted the abstract
24 or who would be presenting for each one, and so that
25 it was not -- not blinded in that way.

Page 179

1 BY MR. RAMER:
2    Q   And when you say you knew the names, or
3 that your recollection is that you knew the names,
4 do you mean that when members of the committee were
5 grading the abstracts, they knew the name associated
6 with that abstract?
7    A   Yes, I believe they did.  They knew the
8 authors.
9       So it would be a spreadsheet with the
10 title, the authors, and the abstract.  And the
11 members of the scientific committee who had been
12 assigned to score that abstract would have all that
13 information.
14    Q   Do you remember anybody else who was on
15 the scientific committee with you?
16    A   I -- you know, it was so long ago, I
17 just -- I don't think I could say.
18       But undoubtedly, it was, you know, quite a
19 number of people involved in trans health who -- who
20 were -- typically who were involved in WPATH or in
21 conferences on transgender health.
22    Q   Was Dr. Jamison Green on the committee
23 with you?
24    A   Yes.  I don't remember if he was on -- he
25 may have been on the scientific committee for legal

Page 180

1 presentations.
2       He was on the -- there was an
3 organizational committee, and he may have been some
4 sort of, like, organizational co-chair.  I don't
5 remember.  But he was -- he was definitely involved,
6 and I think he may have been involved in terms of
7 presentations that were related to law or public
8 policy.
9    Q   When you say there was an organizational
10 committee, do you mean within the scientific
11 committee?
12    A   No.  Within -- so this was the first
13 USPATH conference, and future USPATH conferences
14 were organized by the USPATH board, but there wasn't
15 a board yet.
16       They were just in the process of -- we
17 were in the process, as WPATH, of creating the
18 USPATH chapter.  There already was EPATH for
19 Europeans that was associated with WPATH, and then
20 other chapters that were not associated with WPATH,
21 like the Canadian CPATH.
22       So there was a committee within WPATH of
23 people who were involved in the -- in organizing the
24 conference, and then there was the scientific
25 committee which was people to review the abstracts.

Page 181

1       And I don't remember if Jamison Green was
2 on both, but I believe he was on the committee
3 involved in organizing the -- the conference.
4    Q   And so when we were discussing you serving
5 as the conference chair, is that in reference to
6 that organizational committee?
7    A   Yes.
8    Q   And so CPATH is not affiliated with WPATH;
9 is that correct?
10    A   Right.
11    Q   How did that come about?
12       MR. LANNIN:  Object to the form.
13       THE WITNESS:  They -- they formed before
14 there was chaptering.
15       And so WPATH, under Gail Knudson, who was
16 president at the time, felt -- was particularly
17 committed to the idea of further chaptering.
18       EPATH had already formed as a chapter of
19 WPATH, and then it made sense for USPATH to also be
20 a chapter.
21       And on the off years when WPATH wasn't
22 doing their conference, USPATH and EPATH would do
23 their conferences.
24 BY MR. RAMER:
25    Q   And in addition to your role as the

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 conference chair and your role as -- I guess --
2 sorry.
3      Were you the chair of the scientific
4 committee?
5      A So I was chair of the scientific
6 committee. And my conference chair part was just
7 kind of leading the organization because there was
8 no USPATH board.
9      I found the facility, like the conference
10 center at UCLA, and dealt with some of the
11 practicalities along with the WPATH staff.
12      Q And so in addition to those roles, you
13 also presented on a panel, correct?
14      A Yes.
15      Q And do some people refer to a panel like
16 that as a "mini symposium"?
17      MR. LANNIN: Object to the form.
18      THE WITNESS: So WPATH and USPATH refers
19 to them, for some historical reason, as "mini
20 symposia." I don't know why, but I think that's
21 just a historical thing, that they called them that.
22 BY MR. RAMER:
23      Q And the mini symposium at which you
24 presented was organized and chaired by Dr. Bahlburg
25 who we were previously discussing, right?

Page 183

1      A Right, that we were just discussing.
2      I had been working with him on this paper
3 in transgender health, and -- yeah, 2018 -- and he
4 emailed me and asked if -- so Dr. Meyer-Bahlburg
5 worked with Ken Zucker on the DSM-V committee, I
6 believe, because of his expertise working with
7 intersex people.
8      And so he asked if he could put together a
9 panel with -- where both Dr. Zucker and I were
10 presenting.
11      Q And could you just give me a little bit of
12 background about Dr. Bahlburg?
13      A Yeah.
14      MR. LANNIN: Object to the form.
15      THE WITNESS: He's probably emeritus now,
16 but a professor at Columbia University. He's a
17 neuroscientist and is an expert in intersex
18 development.
19 BY MR. RAMER:
20      Q Is he a respected scientist?
21      MR. LANNIN: Object to the form.
22      THE WITNESS: Yes, I would say so.
23 BY MR. RAMER:
24      Q So you're saying Dr. Bahlburg invited both
25 you and Dr. Zucker to be on this panel, correct?

Page 184

1      A Yes.
2      Q And Dr. Bahlburg drafted the summary
3 abstract for the panel, correct?
4      A Yes.
5      Q And then who -- I guess, would you have
6 been, for lack of a better term, "recused" from the
7 scientific committee of reviewing an abstract that
8 you're on, or how does that work?
9      MR. LANNIN: Object to the form.
10      THE WITNESS: Yes. So I don't think I
11 reviewed most of the abstracts because I was busy
12 with other things. That was left to other people.
13 But I would not have reviewed my own abstract if I
14 were reviewing a batch of abstracts.
15 BY MR. RAMER:
16      Q And do you remember what you were
17 presenting on for this panel?
18      A Yes. So Dr. Meyer-Bahlburg asked me to
19 present about trans people with dissociative
20 identity disorder.
21      Q And do you recall what Dr. Bahlburg was
22 presenting about?
23      A I don't remember his presentation.
24      I believe that Dr. Zucker was talking
25 about his desistance data from when he had been at

Page 185

1 MH at University of Toronto.
2      Q For Dr. Bahlburg, would "gender variations
3 in somatic intersexuality" sound right?
4      A Yes. He was probably presenting on what
5 he was talking about in that paragraph. That was --
6 his speaking and writing is -- has tenses, one might
7 expect, from a German scientist.
8      Q And so Dr. Zucker was presenting on gender
9 variations during childhood; is that right?
10      MR. LANNIN: Object to the form.
11      THE WITNESS: Yeah. My recollection of
12 his presentation was he was talking about desistance
13 data, talking about prepubertal youth in his clinic
14 and their various presentations of gender, including
15 desistance.
16 BY MR. RAMER:
17      Q And before this panel, were you aware of
18 Dr. Zucker?
19      A Yes.
20      Q Had you ever interacted with him?
21      A Yes.
22      Q And what did you think of him as a
23 professional?
24      MR. LANNIN: Object to the form.
25      THE WITNESS: So I had interacted with him

47 (Pages 182 - 185)

Page 186

1 starting in 2003 when I chaired an APA panel on the
2 gender identity disorder and related chapters in
3 DSM-IV and what might be proposals for DSM-V. And I
4 had asked him to -- to participate in that panel,
5 and he had declined.
6       But we had other folks who were kind of
7 defending DSM-IV as it is. The purpose was to both
8 present challenges to the current chapter and
9 suggestions for revising it, as well as people who
10 were kind of defending the current chapter.
11 BY MR. RAMER:
12      Q   Did you respect Dr. Zucker as a
13 professional?
14      MR. LANNIN: Object to the form.
15      THE WITNESS: Yes.
16 BY MR. RAMER:
17      Q   Do you think he practices conversion
18 therapy?
19      MR. LANNIN: Object to the form.
20      THE WITNESS: So that is really -- what he
21 does is kind of outside of my -- you know, what
22 happened in his office.
23      We worked together on Standards of Care 7,
24 which was the first standards of care to reject
25 conversion therapy, and we all had to come to

Page 187

1 consensus on it. And he said at that time that he
2 was not practicing conversion therapy.
3       He was accused of it, and the whole
4 Provincial Parliament of Ontario, I think,
5 unanimously voted to ban conversion therapy.
6       And he was the subject of a lot of
7 controversy among accusations that he had mistreated
8 children, and his program was terminated. And he
9 became -- he was already, I think, a controversial
10 figure, but he became more controversial, you know,
11 in the wake of that whole -- you know, of all those
12 things that happened.
13      And then shortly before the conference, he
14 appeared on a British documentary, in which he
15 referred to transgender youth or gender-diverse
16 children, he compared them to dogs. He said, "If
17 your child said he were a dog, would you feed him
18 dog food?"
19      So -- this was just before the conference,
20 and so there was also kind of added attention to his
21 presence at the conference.
22 BY MR. RAMER:
23      Q   And protestors interrupted your panel with
24 Dr. Bahlburg and Dr. Zucker, correct?
25      MR. LANNIN: Object to the form.

Page 188

1      THE WITNESS: Yes. Specifically, there
2 was a protester who was not a member of WPATH and
3 didn't even know who the panelists were, because she
4 interrupted Dr. Heino Meyer-Bahlburg, and -- for a
5 few minutes, and then left.
6 BY MR. RAMER:
7      Q   And when you say this individual
8 interrupted Dr. Bahlburg, how did she do that?
9      A   She stood in front of him and spoke.
10      I don't recall what she actually said, but
11 she did, like, kind of -- he was at a podium, and
12 she just kind of stood in front of him at the
13 podium.
14      Q   Was she alone or were others also
15 protesting at that time?
16      MR. LANNIN: Object to the form.
17      THE WITNESS: So I think in the room she
18 was alone, but there were some people in the room
19 who were sympathetic, you know, to her, to the
20 objection to Dr. Zucker.
21      However, I did my presentation and
22 Dr. Zucker did his whole presentation, and I think
23 didn't get any challenges until Q&A.
24 BY MR. RAMER:
25      Q   And what happened at Q&A?

Page 189

1      A   I can't remember, but I think somebody
2 might have objected to his being there. But I can't
3 remember.
4      Q   Is it fair to say that Dr. Zucker was the
5 target of the interruptions?
6      MR. LANNIN: Object to the form.
7      THE WITNESS: So there was -- there may
8 have been more, but I just recall this one woman
9 who, even though she interrupted Heino
10 Meyer-Bahlburg, she intended to interrupt
11 Ken Zucker.
12      But clearly she wasn't somebody working in
13 WPATH or in transgender health or she would know
14 who -- you know, she would know this German-speaking
15 man was not -- that Ken Zucker wasn't German.
16 BY MR. RAMER:
17      Q   And did the protesters limit the panel's
18 ability to give the fully planned presentation?
19      MR. LANNIN: Object to the form.
20      THE WITNESS: So they -- I know they
21 interrupted Heino, Dr. Meyer-Bahlburg, but I think I
22 spoke over time, and Dr. Zucker I think went well
23 over time.
24      So I think we were able to give our
25 presentations.

CONFIDENTIAL

Page 190

BY MR. RAMER:

1 BY MR. RAMER:
2     Q   And you touched on it a little bit, but
3 how did the members of the panel -- so you,
4 Dr. Zucker, Dr. Bahlburg -- react to the
5 interruption?
6         MR. LANNIN:  Object to the form.
7         THE WITNESS:  I think we initially just
8 tried to let her say her piece, and I don't remember
9 whether we, at some point, were like, "Okay.  You've
10 said your piece.  It's time to go."
11     I can't remember specifically.
12 BY MR. RAMER:
13     Q   Did someone call security in response to
14 the interruption of the panel?
15     A   So, yes, I learned that later that
16 somebody had called security.
17     But that -- I think if there was any
18 protest needing security, it would have probably
19 been outside of the -- of the conference room that
20 we were doing the presentation in, because I think
21 we gave our presentations uninterrupted.
22     They may have been protesting out in the
23 hall.  I don't recall.
24     Q   What is the protest outside of the
25 conference room you're referring to?

Page 191

1     A   I mean, like, in the hallway of the
2 conference center.
3     We were in a room, but we were able to
4 speak.  So I'm not sure what happened outside of the
5 room that we were speaking in.
6     Q   And do you know who called security?
7     A   No.
8     Q   And Dr. Zucker was scheduled to appear on
9 another panel at the conference, correct?
10     A   Yes.
11     Q   And what happened to that panel?
12         MR. LANNIN:  Object to the form.
13         THE WITNESS:  So that session ended up
14 being canceled.
15     We realized we had held the conference on
16 this university campus, and we didn't really have
17 the capacity to keep people who weren't registered
18 for the conference from coming in.
19     And the president of WPATH at the time,
20 Gail Knudson, received some threat that the -- that
21 that session wouldn't happen, and made the decision
22 that it was for the best for us to cancel that
23 session and to try to keep the conference safe for
24 its participants.
25 ///

Page 192

1 BY MR. RAMER:
2     Q   And what do you know about that threat
3 you're mentioning?
4         MR. LANNIN:  Object to the form.
5         THE WITNESS:  I actually don't know very
6 much.  I was busy -- I mean, my conference chair
7 thing was quite an unglamorous thing of making sure
8 that all the different sessions and different things
9 that were going on were happening properly.
10     And so I wasn't there for all of the
11 discussions, but Gail Knudson told me that there had
12 been a threat, and the threat was that the session
13 wasn't going to happen, and that she thought that it
14 would be for the best for us not to do that session
15 because we couldn't guarantee people's safety,
16 especially, you know, being on this campus where
17 people could -- could come and go.
18     And so -- so a decision was made to cancel
19 that session, and I think I was in agreement.  And
20 if anyone else was in agreement, that we just needed
21 to make sure that we were putting on the conference
22 safely.
23 BY MR. RAMER:
24     Q   Do you think WPATH suppressed Dr. Zucker's
25 presentation?

Page 193

1         MR. LANNIN:  Object to the form.
2         THE WITNESS:  So I think that WPATH had
3 always been very supportive of having Dr. Zucker
4 speak, up to my agreeing to be on that presentation
5 kind of in the hopes that even with my presence, it
6 would make it more likely that everything would go
7 smoothly, which was probably a misunderstanding of
8 my importance.
9     But we were really trying to have a
10 diverse set of viewpoints at WPATH and at the
11 conference, including, for example, a session of
12 de-transitioners, who were quite anti-WPATH, having
13 the opportunity to speak at the conference as well.
14     And I think we kind of prided ourselves on
15 at least trying to provide kind of a diversity of
16 viewpoints and to allow them to be discussed in an
17 open environment.  But when we were faced with the
18 possibility that it might not be safe to do so, that
19 it made sense to -- to cancel the session.
20     I would note that, you know, there was the
21 USPATH and the EPATH conference that year, and the
22 EPATH conference took place a couple months later in
23 Belgrade, and Dr. Zucker was able to present without
24 incident, as far as I know, in Belgrade.
25 ///

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

BY MR. RAMER:

1  BY MR. RAMER:
2     Q  Did you post an apology for the panel on
3  Facebook?
4     A  Yes.
5     Q  And what were you apologizing for?
6     A  So I felt that kind of an approach of
7  humility was maybe what made the most sense in terms
8  of kind of settling things down.
9        And people had brought to my attention to
10 some degree -- I didn't realize the extent of it --
11 that having Ken Zucker there -- in the light of the
12 accusations of abusing children and the television
13 evidence of his comparing gender-diverse children to
14 dogs -- that by having him there, WPATH was making a
15 statement itself in support of those ideas.
16       And I think I'd been kind of dismissive
17 about them, in the laudable goal of, you know, free
18 expression.
19       I think that in retrospect, probably there
20 should have been an attempt at conversation with
21 people who objected before the conference, and --
22 but it wasn't something that we realized was going
23 to kind of blow up in that fashion until it did.
24    Q  And so to whom were you apologizing?
25    A  So I don't remember the Facebook -- I

Page 195

1  mean, I remember posting it.  I don't remember what
2  was in it.  That time was kind of a blur.
3        But I was apologizing to the people who
4  were upset with how things went down.
5     Q  And do you think that trans women of color
6  in particular were owed an apology?
7        MR. LANNIN:  Object to the form.
8        THE WITNESS:  I don't remember what I said
9  or what it was in response to.
10       (Exhibit 8 was marked for identification
11       and is attached hereto.)
12 BY MR. RAMER:
13    Q  Dr. Zucker, you've been handed -- I'm
14 sorry.
15       Dr. Karasic, you've been handed what's
16 been marked as Karasic Exhibit 8.
17       And does this appear to be the Facebook
18 post we were discussing?
19    A  Yes.
20    Q  And at the bottom, a few sentences up, you
21 refer specifically to "trans women of color."
22       And I'm just curious if that has to do
23 with the presence of Dr. Zucker or the fact that, as
24 you're saying here, they're the most vulnerable of
25 people.

Page 196

1        MR. LANNIN:  Object to the form.
2        THE WITNESS:  So I included a response,
3  and I don't know where that came from.  But someone
4  had communicated to me that trans people, especially
5  trans women of color, were feeling threatened by the
6  current -- in the current political environment.
7  And so while I was apologizing, I included that in.
8        It was not an apology related to
9  Dr. Zucker on behalf of that, but I was
10 acknowledging that trans women of color were
11 vulnerable.  That was a group that had -- there was
12 a group representing trans women of color who had
13 lodged a particular complaint about feeling
14 vulnerable in this environment, and WPATH not being
15 supportive of the trans community or trans women of
16 color.
17       So I think it was in response to that
18 complaint against WPATH that I included that in
19 my -- in my -- in this apology.  But it was -- that
20 wasn't, I don't think, particular to Ken Zucker, but
21 rather to complaints in the wake of the protest that
22 we got about WPATH.
23 BY MR. RAMER:
24    Q  And after the panel, did you attend a
25 meeting with the individuals who opposed

Page 197

1  Dr. Zucker's presence at the conference?
2     A  Right.  It was after the panel.  After the
3  panel, I was busy with these other sessions that
4  were going on.  I went back and I learned that Ken
5  Zucker wouldn't be -- that that session wouldn't be
6  happening.
7        And then I was asked to -- to go to that
8  session as part of an attempt to kind of diffuse
9  the -- the kind of protests that had led to that
10 threat.  We were wanting to try to calm people down.
11       (Exhibit 9 was marked for identification
12       and is attached hereto.)
13 BY MR. RAMER:
14    Q  And, Dr. Karasic, you've been handed
15 what's been marked as Karasic Exhibit 9.  And I'll
16 note that this is stamped "Confidential - Subject to
17 Protective Order," and it has Bates stamp
18 BOEAL_WPATH_064098.
19       You can see from the subject at the top,
20 the subject line says, "Re: Forward: NYTimes Mag
21 fact-checking."
22       Do you see that?
23    A  Yes.
24    Q  And as we look at this email, the first
25 one in the chain says, "My responses are integrated

CONFIDENTIAL

Page 198

1 below."
2      Do you see that?
3    A  Yes.
4    Q  Then as we move down the chain, we see the
5 previous message said, "New set of fact checks
6 below."
7      Do you see that?
8    A  I was just trying to see what this is,
9 okay?
10   Q  All I'm asking is, do you see that?  It
11 says, "New set of" --
12   A  Yes.
13   Q  And then you move down to the prior email
14 in the chain.  It is from an individual named
15 Mark de Silva, with an email address at the New York
16 Times, correct?
17   A  Yes.
18   Q  And in the first paragraph of this email
19 from Mark de Silva, which is dated June 7th, 2022,
20 the second sentence says, "In the meantime, I have
21 some further questions for WPATH."
22      Do you see that?
23   A  Yes.
24   Q  And then I'd like to go to the next page,
25 and about halfway down the paragraph above the

Page 199

1 number 6 that starts with, "We also have questions."
2      Do you see that?
3    A  Yes.
4    Q  And that paragraph says, "We also have
5 questions about a protest in February 2017," and
6 then there are brackets with a YouTube link,
7 correct?
8    A  Yes.
9    Q  And the following sentence says, "We have
10 spoken with" -- redacted -- "and he believes it is
11 generally accurate, but we would also like see [sic]
12 if WPATH sees anything inaccurate here," correct?
13   A  Yes.
14   Q  And then No. 8 -- I'm sorry.  I'll start
15 with No. 7.  It says, No, 7, "At this conference,
16 protestors interrupted and picketed a panel
17 featuring" -- redacted.
18      Do you see that?
19   A  Yes.
20   Q  And then after that, it says, "Yes,"
21 correct?
22   A  Yes.
23   Q  And then No. 8, it says, "That evening of
24 the protest at a meeting with the conference
25 leaders, a group of activists led by transgender

Page 200

1 women of color read aloud a statement in which they
2 said the 'entire institution of WPATH' was
3 'violently exclusionary' because it 'remains
4 grounded in 'cis-normativity and trans exclusion''"?
5      Do you see that?
6    A  Yes.
7    Q  And then after that, in brackets it says,
8 "Quotes are from video."
9      Do you see that?
10   A  Yes.
11   Q  And then there is a dash, and then there's
12 a redaction, and then it says, "Yes."
13      Do you see that?
14   A  Yes.
15   Q  Are those quotes referenced there
16 consistent with your recollection of that meeting?
17   A  Yes.
18   Q  Did you speak at that meeting?
19   A  Yes.
20   Q  Do you recall who else spoke at that
21 meeting?
22   A  No.
23   Q  Did Dr. Jamison Green speak at that
24 meeting?
25      MR. LANNIN:  Object to the form.

Page 201

1      THE WITNESS:  I would assume that he
2 was -- he did.  I think he would have been past
3 president of WPATH and kind of involved with the
4 conference.
5 BY MR. RAMER:
6    Q  And what did you say at the meeting?
7    A  What did I say at the meeting?
8    Q  Correct.
9    A  I don't think I could say.  I -- I'm sure
10 I apologized in some way.
11      Beyond that, I know that I was kind of
12 asked to go and to try to, you know, kind of humbly
13 calm people down, but I don't remember what I said
14 at the meeting.
15   Q  And I'd like to play a clip for you on
16 this iPad.
17      (Addressing Counsel) And I can represent
18 that I have it on here (indicating) if you want it
19 as well.
20      I'll also represent that this is a clip
21 from the YouTube video that's at the link that's
22 listed in the document we were just looking at.
23      THE REPORTER:  Do you want me to take this
24 down, or just indicate that it is played?
25      MR. RAMER:  Just indicate, please.

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1    THE REPORTER:  Thank you.
2    MR. RAMER:  I'll first just ask you just
3  to watch it, and then I'll have some questions
4  afterward.
5    THE REPORTER:  One more question.  Do you
6  want this as an exhibit?
7    MR. RAMER:  Yes, please.  And on the thumb
8  drive that I gave to counsel and to the court
9  reporter, this video is labeled
10  "Karasic_Dep_Video1."
11    (Exhibit 10 was marked for identification
12    and is attached hereto.)
13    (Video played.)
14  BY MR. RAMER:
15    Q   Dr. Karasic, is that a video from the
16  meeting we were just discussing?
17    A   Yes.
18    Q   And is that you speaking in that video?
19    A   Yes.
20    Q   And in that clip, you say that you wrote
21  an op-ed urging the Ontario legislature to pass a
22  ban on conversion therapy that contributed to
23  Dr. Zucker being fired, correct?
24    MR. LANNIN:  Object to the form.
25    THE WITNESS:  Yes.  There was an op-ed by

Page 203

1  one of the colleagues of Dr. Zucker at that program
2  in support of conversion therapy, I think, at least
3  opposing the ban on conversion therapy.
4    And then I wrote an opposing view saying
5  that conversion therapy should be banned.  And the
6  Ontario legislature did end up banning conversion
7  therapy.
8    Ken Zucker was -- had said he wasn't
9  committing conversion therapy, and there was
10  actually some litigation with him and the
11  university.
12    And -- but they had said that he -- well,
13  he had been accused of mistreating young people, and
14  I think they felt that was sufficient to -- to close
15  the program.  Whether or not that was conversion
16  therapy, I think they didn't feel it was a benefit
17  to the university.
18    So that's what had happened.  Obviously
19  there were -- you know, I wasn't the principal
20  person involved, but I did write the kind of
21  counterargument op-ed for when Ontario was
22  considering their conversion therapy ban.
23  BY MR. RAMER:
24    Q   And in that video, you say that even if
25  the abstract for the panel with Dr. Zucker was

Page 204

1  getting a high enough score, you didn't think that
2  you should have let Dr. Zucker present, correct?
3    MR. LANNIN:  Object to the form.
4    THE WITNESS:  Yes.  We couldn't -- as it
5  turns out, we couldn't do that and have the
6  conference safely go on.  And I didn't think that --
7  I mean, I think Dr. Zucker has many, many places to
8  present his views.
9    I obviously did support his being able to
10  present that at USPATH until it led to potentially a
11  threat to the safety of the participants of the
12  conference.
13    And so I didn't think -- so I was
14  supportive despite my disagreements with Dr. Zucker
15  to present them side by side.  And, you know, if
16  that is something that could have been done
17  safely -- but in retrospect, it was a mistake
18  because it couldn't be done safely in that
19  particular environment.
20    We later were in agreement, though, that
21  Dr. Zucker shouldn't be, you know, canceled in any
22  way, and he did present at the next WPATH conference
23  a couple months later in Serbia.
24  BY MR. RAMER:
25    Q   At the USPATH 2017 conference, did you

Page 205

1  attend the gala or banquet event?
2    A   Yes.
3    MR. RAMER:  I'm going to play another
4  video on the thumb drive.  It is Karasic_Dep_02.
5  It's about five minutes long.
6    THE REPORTER:  Will this be 11?
7    MR. RAMER:  Yes, please.
8    So this will be Karasic Exhibit 11.
9    (Exhibit 11 was marked for identification
10    and is attached hereto.)
11    (Video played.)
12  BY MR. RAMER:
13    Q   Dr. Karasic, I've stopped that video,
14  Exhibit 11, at the one-second mark.
15    Is that you standing in the background
16  there?
17    A   Yes.  I think that was the board of WPATH
18  and the staff of -- yeah, the board and staff of
19  WPATH who were standing up there in the background
20  before all this happened.
21    Q   And does that video depict events that
22  occurred at the 2017 USPATH gala that you attended?
23    A   Yes.
24    MR. RAMER:  I have one more video on the
25  thumb drive.  This is Karasic_dep_video3.

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1    I'll ask to mark that as Exhibit 12.
2        (Exhibit 12 was marked for identification
3    and is attached hereto.)
4        MR. RAMER:  And this is also about five
5    minutes long.
6        (Video played.)
7    BY MR. RAMER:
8    Q   Dr. Karasic, did that video depict events
9    that occurred at the 2017 USPATH gala that you
10   attended?
11   A   Yes.
12   Q   And I've paused Exhibit 12 at the
13   2:49 mark.
14       The individual on the right of the screen
15   in the purple shirt, is that Dr. Jamison Green?
16   A   Yes.
17   Q   I've now paused Exhibit 12 at the
18   55-second mark.
19       Who is the individual holding the
20   microphone?
21   A   I believe that is Danielle Castro.
22   Q   I have now paused Exhibit 12 at the
23   mark.
24       Do you know who that individual is who's
25   holding the microphone?

Page 207

1    A   I forget her name.  She is a leading
2    activist in the Los Angeles transgender community.
3    But -- I met her at that conference, but I don't
4    remember her name.
5    Q   Did the WPATH executive committee release
6    an apology regarding Dr. Zucker's presentation?
7        MR. LANNIN:  Object to the form.
8        THE WITNESS:  I think there was a
9    reference on the website about when -- basically
10   there was an agreement that was hashed out between
11   Dr. Knudson, the WPATH president, and the activists
12   who were on stage.  And with that, there was --
13   there was a statement of some sort on the website.
14       (Exhibit 13 was marked for identification
15       and is attached hereto.)
16   BY MR. RAMER:
17   Q   Dr. Karasic, the court reporter has handed
18   you what's been marked as Karasic Exhibit 13.
19   A   Yes.
20   Q   Does this appear to be the statement you
21   were just referencing?
22   A   Yes.  It's from the WPATH executive
23   committee, and I was -- I'm not -- I was not on the
24   executive committee.  But they wrote this statement.
25   Q   Did you help write it at all?

Page 208

1        MR. LANNIN:  Object to the form.
2        THE WITNESS:  I don't recall if I
3    contributed at all.  It was not a board message.  It
4    was a message from the executive committee, and I
5    was not on the executive committee.  So I don't -- I
6    don't recall if I had any input in this.
7        Again, there was -- the WPATH president
8    met with the activists, and they -- and this was
9    part of -- I guess this was kind of what they had
10   hashed out, theoretically, in executive committee
11   meeting.  An agreement would then need to be
12   approved by the board as a whole, but I don't have
13   any recollection if that -- if that happened.
14   BY MR. RAMER:
15   Q   Was this statement later removed from the
16   WPATH website?
17       MR. LANNIN:  Object to the form.
18       THE WITNESS:  I assume it was.  I don't
19   know if I -- I don't recall seeing it on the WPATH
20   website.  So -- but it was a long time ago.
21   BY MR. RAMER:
22   Q   Do you know why it was removed?
23       MR. LANNIN:  Object to the form.
24       THE WITNESS:  No, I don't recall.
25   ///

Page 209

1    BY MR. RAMER:
2    Q   Do you recall voting to remove it?
3        MR. LANNIN:  Object to the form.
4        THE WITNESS:  I don't recall.  It was a
5    long time ago.
6    BY MR. RAMER:
7    Q   What was your reaction to this statement
8    in Exhibit 13?
9        MR. LANNIN:  Object to the form.
10       THE WITNESS:  I don't recall.
11       It was a process that happened between the
12   WPATH president and the activists, and they had made
13   this agreement that, I think, preceded that -- that
14   last video that -- where they tried to create some
15   sort of settlement to essentially make sure that the
16   conference was -- could go on safely, and then
17   I'm -- I don't know what happened with it.
18       I do think that there didn't need to be,
19   for example, two seats on the SOC-8 committee for
20   trans people of color because there were at least a
21   couple of trans people of color, you know.  There
22   were a number of trans people of color who were --
23   you know, who were on the committee, not because of
24   being activists.
25       But I was not the person who developed

53 (Pages 206 - 209)

Page 210

1 this statement, and I don't recall what ended up
2 happening with it.
3 BY MR. RAMER:
4     Q  I'm going to read the first two sentences,
5 and I'll first ask if I read them correctly.
6        It says, "On February 3, 2017 a WPATH
7 member presented at the USPATH conference on a
8 clinical modality that WPATH opposes.  A conference
9 attendee disrupted the offensive session due to this
10 act of negligence."
11       Did I read that correctly?
12    A  Yes.
13    Q  Do you think those two sentences
14 accurately portray what happened at your panel?
15    A  No.
16    Q  Do you think this statement from WPATH is
17 reflective of a commitment to the open exchange of
18 ideas?
19       MR. LANNIN:  Object to the form.
20       THE WITNESS:  I think it was something
21 that was hashed out by members of the WPATH
22 executive committee and some transgender activists
23 who were kind of occupying the conference center.
24       I don't think it was -- I don't think the
25 presentation was an act of negligence.  I think, you

Page 211

1 know, we should have worked with people in advance
2 and tried to decide if this could be done safely
3 before doing it.
4       I suppose if it was negligence, it was
5 that we didn't, you know, think about the -- you
6 know, the potential for acts of violence.
7 BY MR. RAMER:
8     Q  Do you think your panel was offensive?
9       MR. LANNIN:  Object to the form.
10      THE WITNESS:  I don't think so, but it did
11 offend people.
12 BY MR. RAMER:
13    Q  Do you recall how the other members of
14 your panel reacted to this statement?
15      MR. LANNIN:  Object to the form.
16      THE WITNESS:  I think that Heino
17 Meyer-Bahlburg was unhappy with it.  I didn't -- I'm
18 not in regular communication with Ken Zucker.
19      But Heino and I were working on the paper
20 together, and so we were in communication and -- we
21 were in communication, and I know he was unhappy
22 with this session being characterized that way.
23      MR. RAMER:  We've been going for over an
24 hour.  Maybe time for a break?
25      MR. LANNIN:  Great.

Page 212

1       THE VIDEO OPERATOR:  This marks the end of
2 Media Unit 3 of the deposition of Dan Karasic, M.D.
3 The time is 3:58 p.m.  We're off the record.
4       (Recess, 3:58 p.m. - 4:12 p.m.)
5       THE VIDEO OPERATOR:  We are back on the
6 record at 4:12 p.m.  This marks the beginning of
7 Media Unit 4 of the deposition of Dan Karasic, M.D.
8       Please continue.
9       (Exhibit 14 was marked for identification
10    and is attached hereto.)
11 BY MR. RAMER:
12    Q  Dr. Karasic, you've been handed what's
13 been marked as Karasic Exhibit 14, which is stamped
14 "Confidential," and has the Bates stamp of
15 BOEAL_KARASIC_8.
16       Do you see that?
17    A  Yes.
18    Q  And about -- just a little over halfway
19 down the page, do you see that you are cc'd in this
20 email?
21    A  Yes.
22    Q  And up at the very top, the subject is
23 "Forward: A message from the WPATH Executive
24 Committee (re USPATH meeting, February 3, 2017),"
25 correct?

Page 213

1     A  Yes.
2     Q  And on the next page, the first
3 sentence -- I'll just read it first and ask if I
4 read it correctly -- says, "The Mini-Symposium
5 entitled 'Development of Gender Variations:
6 Features and Factors' that I convened and chaired
7 was interrupted twice by a small group of
8 protestors."
9       Did I read that correctly?
10    A  Yes.
11    Q  And the paragraph below that, the first
12 sentence says, "Because of the time used up by the
13 first disruption and related questions from the
14 audience later, I decided to give the first two
15 speakers" -- redacted -- "('Gender dysphoria and
16 dissociative gender identity disorder combined')
17 and" -- redacted -- "('Gender variations during
18 childhood') more time for their presentations and
19 Q&A sections and was, therefore, unable to present
20 my own lecture ('Gender Variations in Somatic
21 Intersexuality,' which also included a summary of
22 the fourth lecture by" -- redacted -- "who was
23 unable to attend)."
24       Did I read that correctly?
25    A  Yes.

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1    Q   Is it fair to say this email was written
2  by Dr. Bahlburg?
3    A   Yes.
4    Q   And next paragraph, the final sentence,
5  which is fairly long, it starts about halfway
6  through the paragraph.  I'm just going to read that
7  first and ask if I read it correctly.
8        "By misrepresenting the content of the
9  session and labeling the entire session as
10 'offensive,' 'due to this act of negligence,' (a
11 vague formulation that also needs explanation), you
12 are aligning yourselves with the small group of
13 protestors, insult the speakers involved, and
14 violate a primary condition of a scientific meeting,
15 namely the open and constructive exchange of ideas,
16 which is particularly important in an area of
17 research as emotion-laden as gender."
18       Did I read that correctly?
19   A   Yes.
20   Q   And then there's a short one-sentence
21 paragraph, and then there's a sentence below that.
22 I'm sorry -- a paragraph below that.
23       And the first sentence says, "As similar
24 incidents occurred already in two symposia I was
25 involved with at the recent WPATH meeting in

Page 215

1  Amsterdam, I think WPATH's leadership needs to
2  become more proactive in furthering a constructive
3  style of scientific exchange - rather than
4  inhibiting scientific exchange by suppressing
5  presentations as you did in L.A., when you
6  canceled" -- redacted -- Mini-Symposium on
7  February 4."
8        Did I read that correctly?
9    A   Yes.
10       (Exhibit 15 was marked for identification
11       and is attached hereto.)
12 BY MR. RAMER:
13   Q   Dr. Karasic, you've been handed what's
14 been marked Exhibit 15, and this is stamped
15 "Confidential" and has a Bates number of
16 BOEAL_WPATH_101671.
17       Do you see that?
18   A   Yes.
19       Excuse me.  Where is the -- oh, down
20 there.  101671.  Yes.
21   Q   And the subject of this email is
22 "Forward: A message from the WPATH Executive
23 Committee" at the top.
24       Do you see that?
25   A   Yes.

Page 216

1    Q   And then the -- at the top email, the
2  "From" is redacted, and the "To" is to the WPATH EC
3  Listserv.
4        Do you see that?
5    A   Yes.
6    Q   And do you see, two lines down in the
7  email, it says, "Begin forwarded message."
8        Do you see that?
9    A   Yes.
10   Q   And then "From" is redacted, and "To" is
11 redacted, correct?
12   A   Yes.
13   Q   And then below that, "Subject: A message
14 from the WPATH Executive Committee," correct?
15   A   Yes.
16   Q   And I'd like to go to the number 1 that
17 says, "The first sentence reads: 'On February 3,
18 2017 a WPATH member'" -- brackets, redacted --
19 "'presented at the USPATH conference on a clinical
20 modality that WPATH opposes.'"
21       Do you see that?
22   A   Yes.
23   Q   And that is quoting the WPATH statement
24 that we previously looked at, correct?
25   A   Yes.

Page 217

1    Q   And then below that, the comment says,
2  "Let me begin by saying that I do not know if you
3  or" -- redacted -- "were at the Symposium (organized
4  and chaired by...)" -- redacted.  "The sentence
5  simply astonishes me.  My talk was not at all about
6  any 'clinical modality' - it was a summary of
7  follow-up studies of children diagnosed with GID
8  (the diagnostic label that was in place for a number
9  of the follow-up studies) or children subthreshold
10 for the diagnosis."
11       Do you see that?
12   A   Yes.
13   Q   And moving down to the number 2 in the
14 email, it says, "The third sentence reads: 'Later
15 that day the same presenter was asked to leave by a
16 group of professionals attending the conference.'"
17   A   Yes.
18   Q   And that is quoting the WPATH statement
19 that we previously looked at, correct?
20       It's Exhibit 13 if you want to compare it.
21   A   Oh, here it is.
22   Q   And I believe it's the third sentence in
23 the Exhibit 13.
24   A   Yes.
25   Q   Going back to Exhibit 15, below where we

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1 were just reading, it says, "Comment: This sentence
2 also simply astonishes me. No one asked me to
3 leave," correct?
4    A  Yes.
5    Q  Is it fair to say this email was written
6 by Dr. Zucker?
7    A  Yes.
8    Q  Moving down to No. 3, it says, "There is,
9 of course, a broader issue at stake here. At WPATH
10 in Amsterdam last June, activists disrupted a
11 Symposium on DSDs and defaced a poster. I find it
12 remarkable that the leadership of WPATH has remained
13 silent about this. If there cannot be meaningful
14 dialogue about complex issues at WPATH or USPATH,
15 how can the organization consider itself to be
16 'professional'?"
17        Did I read that correctly?
18    A  Yes.
19    Q  Do you recall whether the opponents of
20 Dr. Zucker's presence at the conference responded to
21 either your apology or the WPATH statement we've
22 been looking at?
23        MR. LANNIN:  Object to the form.
24        THE WITNESS:  I don't recall. I wouldn't
25 be surprised if my statement on Facebook had people

Page 219

1 responding.
2        I had said I didn't -- I wasn't
3 responsible for the executive committee message or
4 the -- or those emails; so I don't -- I don't
5 recall.
6        (Exhibit 16 was marked for identification
7        and is attached hereto.)
8 BY MR. RAMER:
9    Q  Dr. Karasic, you've been handed what's
10 been marked as Karasic Exhibit 16. This is stamped
11 "Confidential," and the Bates number is
12 BOEAL_WPATH_143750, correct?
13    A  Yes.
14    Q  Have you seen this document before?
15    A  Not that I recall. I wasn't on the
16 executive committee. And I think that the
17 negotiation between the activists and the executive
18 committee took place without my participation. So I
19 don't recall all the communications involved.
20    Q  And going down to Question 2 on this
21 page -- sorry, I guess it's not a question --
22 Statement 2 on this page, it says, "This statement
23 fails to include the multiple people and range of
24 identities that were affected by the violence that
25 Zucker and WPATH allowed and perpetuated."

Page 220

1        Do you see that?
2    A  Yes.
3    Q  Do you think Dr. Zucker's presentation
4 constituted violence?
5        MR. LANNIN:  Object to the form.
6        THE WITNESS:  I don't -- that is not
7 terminology that I use; so I -- I wouldn't call it
8 that, no.
9 BY MR. RAMER:
10    Q  Do you think it would be reasonable for
11 somebody to say that Dr. Zucker's presence at the
12 conference constituted violence?
13        MR. LANNIN:  Object to the form.
14        THE WITNESS:  No.
15 BY MR. RAMER:
16    Q  Why do you think the authors of this
17 document did?
18        MR. LANNIN:  Object to the form.
19        THE WITNESS:  Can I say, "Young people
20 today"?
21        You know, people have different
22 perspectives. And you go into a world where
23 sometimes other people's perspectives surprise you
24 or are different from you or take things in a
25 different -- a very different way.

Page 221

1 BY MR. RAMER:
2    Q  And sticking with this document, going up
3 to the Statement No. 1 and the underlined response
4 below it, in the second sentence, which is fairly
5 long, it refers to "trans-positive practitioners and
6 researchers."
7        Do you see that?
8    A  In -- I'm sorry. What paragraph was that?
9    Q  So up to the Statement No. 1 that begins,
10 "This letter fails," do you see that?
11    A  Yes.
12    Q  And then going to the underlined portion
13 after that --
14    A  Oh, I see it.
15    Q  -- the second --
16    A  Yeah. Yes.
17    Q  And what are trans-positive practitioners
18 and researchers?
19        MR. LANNIN:  Object to the form.
20        THE WITNESS:  I wouldn't use that wording,
21 either.
22        From my recollection, there was a -- you
23 know, kind of a range of presenters for that
24 session. And I don't know if the -- I assume the
25 other three presenters would have a different

56 (Pages 218 - 221)

Page 222

1 perspective than Ken Zucker, but I don't think that
2 they were there simply to rebut Dr. Zucker's
3 theories. I think the point of the session was to
4 show a range of views.
5 BY MR. RAMER:
6     Q   Do you have any reason to think Dr. Zucker
7 is not a trans-positive practitioner?
8         MR. LANNIN:  Object to the form.
9         THE WITNESS:  I don't -- for any of those
10 people involved, it's not terminology that -- I
11 don't know what that means.
12        (Exhibit 17 was marked for identification
13        and is attached hereto.)
14 BY MR. RAMER:
15    Q   Dr. Karasic, you've been handed what's
16 been marked as Karasic Exhibit 17.  And on the first
17 page, it says, "Private Plaintiffs' Supplemental
18 Rule 26 Disclosures."
19        Do you see that?
20    A   Yes.
21    Q   And I'd like to go to page -- page 3.
22    A   Yes.
23    Q   And do you see you're listed there?
24    A   Yes.
25    Q   And the last sentence states, "He,"

Page 223

1 referring to you, "is also expected to testify in
2 response to claims that WPATH limited debate and
3 robust exchange of ideas across the organization and
4 at conferences hosted by affiliate organizations."
5        Do you see that?
6    A   Yes.
7    Q   Apart from what we've already discussed
8 today, are there any other claims that WPATH limited
9 debate and robust exchange of ideas across the
10 organization and at conferences hosted by affiliate
11 organizations that you intend to testify about?
12        MR. LANNIN:  Object to the form.
13        THE WITNESS:  I think that -- I think that
14 this was put in for -- about the 2017 conference,
15 because I haven't been involved with WPATH aside
16 from Standards of Care 8 since 2018.
17 BY MR. RAMER:
18    Q   Dr. Karasic, the minimum ages for
19 providing gender-affirming medical care were removed
20 from the SOC-8 to ensure greater access to care for
21 more people, correct?
22        MR. LANNIN:  Object to the form.
23        THE WITNESS:  So I think that was in the
24 editor's -- an editor remark in terms of that.  I
25 wasn't involved with any of that process.

Page 224

1 BY MR. RAMER:
2    Q   So you don't know why the minimum ages
3 were removed; is that right?
4        MR. LANNIN:  Object to the form.
5        THE WITNESS:  Not -- anything would be
6 speculation.
7        (Exhibit 18 was marked for identification
8        and is attached hereto.)
9 BY MR. RAMER:
10    Q   Dr. Karasic, you've been handed what's
11 been marked as Karasic Exhibit 18.
12    A   Yes.
13    Q   And this is stamped "Confidential" and has
14 Bates stamp BOEAL_WPATH_105494 at the bottom,
15 correct?
16    A   Yes.
17    Q   And looking at the top, the "From" line
18 first is Asa Radix, correct?
19    A   Yes.
20    Q   And the "To" is Walter Bouman?
21    A   Yes.
22    Q   Who is Walter Bouman?
23    A   Walter Bouman is a -- I think he's the
24 past president of WPATH.
25    Q   And in the "cc" line is the EC Listserv,

Page 225

1 correct?
2    A   Yes.
3    Q   And the date of this email is June 14th,
4 2022, correct?
5    A   Yes.
6    Q   Okay.  I'd like to go to page 3 in this,
7 which is Bates 105496.  And at the bottom, do you
8 see there's an email from Walter Bouman, dated
9 June 13th, 2022?
10    A   Yes.
11    Q   And the subject is "The imminent release
12 of the SOC8 - and please be so kind as to give us
13 your support or endorsement," correct?
14    A   Yes.
15    Q   On the next page, which is Bates 105497,
16 about a little over three quarters of the way down,
17 there's a paragraph that begins with, "If you agree
18 to this."
19        Do you see that?
20    A   Yes.
21    Q   I'm just going to read that first and ask
22 if I read it correctly.
23        It says, "If you agree to this, we will
24 send you a link to the SOC8 (which is currently
25 under embargo, and currently only ADM Dr. Rachel

CONFIDENTIAL



Page 226

1 Levine and her Department (HHS/OASH) in the U.S.
2 have access to the full document) and we will
3 provide access following the signing of a
4 nondisclosure document."
5      Did I read that correctly?
6   A  Yes.
7   Q  Before seeing this email, were you aware
8 that Admiral Levine and her department were provided
9 exclusive access to the completed SOC-8?
10      MR. LANNIN:  Object to the form.
11      THE WITNESS:  No.
12      (Exhibit 19 was marked for identification
13      and is attached hereto.)
14 BY MR. RAMER:

CONFIDENTIAL



Page 230

Page 231

13    Q   Now switching gears a little bit, have you
14 ever declined to list a patient's diagnosis in
15 medical records in order to ensure that insurance
16 will provide reimbursement for care?
17       MR. LANNIN:  Object to the form.
18       THE WITNESS:  I wouldn't say that I have
19 not listed a diagnosis, but there was a time when
20 there was a -- a CMS exclusion for treatment of
21 gender identity disorder.
22       So as a psychiatrist, I would be treating
23 people typically for depression, anxiety, for other
24 symptoms, and I would list as a billing diagnosis a
25 symptom that was -- you know, a diagnosis -- a

Page 232

1 different diagnosis that people also had, a
2 co-occurring condition.
3 BY MR. RAMER:
4    Q   And would you ever intentionally omit the
5 diagnosis for gender identity disorder from those
6 records?
7       MR. LANNIN:  Object to the form.
8       THE WITNESS:  I think there was just a
9 time in which it was considered kind of useless to
10 include that because it -- because it wasn't
11 covered.
12       And as a psychiatrist, I see people who
13 are seeing me because they're depressed or anxious,
14 and so I would list that as the -- you know, as the
15 billing diagnosis.
16       We're talking about before -- certainly
17 before 2013.  In 2013, California banned denying
18 reimbursement for gender -- transgender-related
19 care.
20 BY MR. RAMER:
21    Q   Do you think the distress resulting from
22 gender incongruence in children should be
23 categorized as a psychological disorder?
24       MR. LANNIN:  Object to the form.
25       THE WITNESS:  So if -- so if the -- if the

Page 233

1 child is distressed, they're -- you know, they have
2 and would have a diagnosis.
3       There was for -- there was a debate around
4 gender incongruence of children, which was a World
5 Health Organization ICD 11 diagnosis, that did not
6 include distress.  And so -- because gender
7 incongruence doesn't include distress as part of the
8 disorder.
9       And so there was a debate whether there
10 was utility of the World Health Organization even
11 having a gender-incongruence-of-children diagnosis
12 because it's a diagnosis prior to which they would
13 get specific medical treatment.
14 BY MR. RAMER:
15    Q   You do think there should be a diagnosis
16 for children, though?
17       MR. LANNIN:  Object to the form.
18       THE WITNESS:  So I think that there is
19 a -- there's a theoretical debate, I think, that
20 when there's a stronger argument for gender
21 dysphoria in children, prepubertal children, then
22 with gender incongruence, which didn't have even
23 distress as part of the diagnosis, and there was the
24 potential harm that -- of gender-diverse children
25 who are perhaps not distressed being subject to

59 (Pages 230 - 233)

CONFIDENTIAL

1  conversion practices because of their gender
2  diversity; so I think there's kind of an open debate
3  about it.
4       The World Health Organization opted to
5  include gender incongruence of children in ICD 11.
6  BY MR. RAMER:
7       Q  Do you think gender incongruence in
8  children should be included in the ICD?
9       A  So I had concerns about it during the
10  process because I didn't see what -- the purpose of
11  it for a diagnosis when you're talking about
12  prepubertal children who weren't getting specific
13  treatment for gender incongruence the way
14  adolescents and adults were.
15       And so I've had concern of -- others have
16  raised the question of what is the purpose of the
17  diagnosis, and I shared their concerns.
18       Q  What is the harm of having the diagnosis?
19       A  So the potential harm would be -- and I
20  think particularly if it were applying to
21  gender-diverse youth more generally -- is that it
22  could subject similar people who are gender-diverse,
23  whether they -- children -- whether trans or not, or
24  gay or lesbian, to conversion practices.
25       And there had been a historical precedent

1  for that which was, after homosexuality was removed
2  from the DSM and GID of children was introduced to
3  the DSM, GID of children was the diagnosis used for
4  billing for conversion practices in children.
5       So I think that there was an open question
6  there about the kind of risks versus benefits of
7  having it as a diagnosis before there was specific
8  treatment, and also whether it was maybe
9  pathologizing in a way when the interventions were
10  really about supporting the child and the family,
11  again, prepubertally.
12       Q  Do you think individuals should be
13  permitted to obtain gender-affirming medical
14  interventions even if they are not suffering from
15  debilitating distress?
16       MR. LANNIN:  Object to the form.
17       THE WITNESS:  So in my experience, people
18  who are -- who are seeking care are doing so because
19  of the distress of gender dysphoria.
20       So I think that that is, you know, kind of
21  a reasonable part of our practice as it stands now.
22  BY MR. RAMER:
23       Q  But do you think it's possible an
24  individual could conclude that they would have a
25  better quality of life as the other gender even if

1  they're not suffering from distress?
2       MR. LANNIN:  Object to the form.
3       THE WITNESS:  That seems like a
4  theoretical question.
5       The one place where I've seen the question
6  of lack of distress brought up by clinicians was
7  clinicians from the Dutch program, when there were
8  discussions about inclusion of distress in children,
9  that -- what about if you have a child who is only
10  distressed -- let's say on puberty blockers, not
11  progressing in puberty, and in that state, they're
12  not -- or it could even be before puberty starts,
13  and they're supported in their trans identity.
14       So under those circumstances, the distress
15  might be anticipatory as opposed to -- you know,
16  anticipating the -- they might be very anxious about
17  the fact that puberty is about to start as opposed
18  to puberty having started, and some debate about --
19  you know, that there has been about letting kind of
20  puberty start first versus not.  I've seen that
21  argument.
22       I don't know about -- if you had no
23  distress about your sex assigned as birth, why you
24  would go through the considerable difficulties of
25  transitioning.

1       And so I do think that distress with one's
2  sex assigned at birth is part of what I see my
3  patients experience.
4  BY MR. RAMER:
5       Q  But doesn't the ICD omit distress as a
6  requirement for the gender incongruence designation?
7       MR. LANNIN:  Object to the form.
8       THE WITNESS:  Yes, and -- but when
9  treatment is discussed, whether it's in
10  Standards of Care 8 or whether it's in European
11  guidance -- I'm thinking about reading some of this
12  German country's guidance that they've released, I
13  think that's where I read it -- but they do make the
14  point of -- in evaluating someone, they're looking
15  for gender incongruence with distress even though
16  the distress is not part of the diagnosis.
17  BY MR. RAMER:
18       Q  And what does it mean for an intervention
19  to be medically necessary?
20       MR. LANNIN:  Object to the form.
21       You can answer.
22       THE WITNESS:  A medically necessary
23  intervention is one that, based on -- a clinician
24  makes a determination that a treatment for their
25  patient is necessary based on community practice and

CONFIDENTIAL

Page 238

1 the scientific literature that's out there.
2 BY MR. RAMER:
3     Q   And what is the significance of an
4 intervention being labeled "medically necessary"?
5         MR. LANNIN:  Object to the form.
6         THE WITNESS:  So the significance is
7 that -- whether it's insurance or certain government
8 programs like the provision of healthcare in
9 prisons, generally in the provision of healthcare,
10 it's medically necessary care that's provided when
11 they make the determination of what healthcare is
12 covered or provided.
13 BY MR. RAMER:
14     Q   And so a determination of medical
15 necessity is relevant to insurance reimbursement,
16 correct?
17     A   Yes, to insurance reimbursement and kind
18 of institutional coverage.
19     Q   Is it relevant to court decisions?
20         MR. LANNIN:  Object to the form.
21         You can answer.
22         THE WITNESS:  So there have been court
23 decisions on -- that relate to the medical necessity
24 of a particular intervention because that's what's
25 covered, for example, by a state's insurance or

Page 239

1 Medicaid's insurance plan or private insurance, that
2 they are saying they are covering medically
3 necessary care.
4 BY MR. RAMER:
5     Q   Does SOC-8 contain a statement of medical
6 necessity?
7     A   Yes.
8     Q   Why?
9         MR. LANNIN:  Object to the form.
10         You can answer.
11         THE WITNESS:  So WPATH, for many years,
12 has periodically put out statements about the
13 medical necessity of -- of interventions that are
14 treatments of gender dysphoria.  And the last one
15 that they put out was in 2016.  And medical
16 necessity had been mentioned in prior standards of
17 care, but it had generally been done as a separate
18 statement.
19         In 2016 when the statement was put out as
20 a separate statement, there was conversation that
21 the next revision of that statement should happen
22 with Standards of Care 8.
23         And so it was included -- the revision of
24 that statement, which was a detailed statement about
25 medical necessity, would be included in

Page 240

1 Standards of Care 8 as opposed to a -- having a
2 revision that was really separately by the board.
3 BY MR. RAMER:
4     Q   Did you help draft the revised statement
5 of medical necessity for the SOC-8?
6     A   Yes.
7     Q   How did you determine what interventions
8 qualified as medically necessary interventions?
9         MR. LANNIN:  Object to the form.
10         THE WITNESS:  So there already -- there
11 had already been a list from 2016, and it basically
12 was a list of interventions that there was
13 scientific evidence of benefit and that the experts
14 involved believed were used as treatments for gender
15 dysphoria.
16         And I had a particular concern that I
17 didn't think the 2016 version was just very well
18 written grammatically and wanted to make sure that
19 it was clear.
20         And so I was part of the conversation that
21 the editor of Standards of Care 8 consulted with
22 several people on how -- how that should be -- how
23 that revised statement should be put in
24 Standards of Care 8.
25 ///

Page 241

1 BY MR. RAMER:
2     Q   As a general matter, not necessarily in
3 the context of gender-affirming care but medicine
4 more generally, what ordinarily happens when a
5 patient needs medically necessary care but is unable
6 to consent to that care?
7         MR. LANNIN:  Object to the form.
8         THE WITNESS:  So if the person is unable
9 to consent, there -- there is either a person with
10 legal authority to consent for them, or, for
11 example, in San Francisco, there's a public guardian
12 who can consent for people.
13         And so there's -- there may be -- in
14 emergency situations, it may just be the doctors,
15 you know.
16         I did consultation liaison psychiatry in
17 the hospital.  And, you know, if somebody needed an
18 intervention but couldn't -- you know, was
19 unresponsive, they would usually do the -- you know,
20 the intervention that was necessary to save the
21 person's life even if they didn't, you know, know
22 who the surrogate decision-maker was.
23         But then if somebody needed ongoing care,
24 then they would identify the legal documents of who
25 consents when that person lacks capacity to consent.

Page 242

1 BY MR. RAMER:
2     Q  Do those same principles apply in the
3 context of gender-affirming medical interventions?
4     A  Yes.
5         I would say in the context of -- I think
6 it may be more difficult if you're talking about
7 people with the initiation of care.
8         But if -- if there is someone who, let's
9 say, is transgender and on hormones and then loses
10 the capacity to continue to consent to care, you
11 know, it might be a surrogate decision-maker who
12 might make that decision.
13     Q  Have you ever seen a situation where a
14 surrogate decision-maker consented for the
15 initiation of gender-affirming medical
16 interventions?
17     A  I have not.
18     Q  And what happens in a situation, in the
19 context of gender-affirming medical care, when a
20 parent consents but a minor is unable to provide
21 informed assent for any reason?
22         MR. LANNIN:  Object to the form.
23         THE WITNESS:  So that might be one for an
24 ethics committee meeting.
25         I haven't -- I haven't been involved in a

Page 243

1 situation like that where the -- where a parent is
2 seeking care that the -- their child is -- lacks
3 capacity to consent for it.
4 BY MR. RAMER:
5     Q  And what is an ethics committee meeting
6 along the lines you were just describing?
7     A  So just in -- if this is happening in a
8 medical center, they have -- the medical center has
9 an ethics committee that meets whenever there's a
10 challenging case just to make sure that that
11 decision is -- is more kind of broadly thought out
12 before -- before -- you know, before the decision is
13 made.
14     (Exhibit 22 was marked for identification
15     and is attached hereto.)
16 BY MR. RAMER:
17     Q  Dr. Karasic, you've been handed what's
18 been marked as Karasic Exhibit 22.  This is stamped
19 "Confidential," and the Bates stamp in the bottom
20 right is BOEAL_WPATH_139861, correct?
21     A  Yes.
22     Q  Is this a slide deck from your
23 presentation at the WPATH convention in Montreal?
24         MR. LANNIN:  Object to the form.
25         THE WITNESS:  Yes, it looks like it.

Page 244

1 BY MR. RAMER:
2     Q  And I'd like to go to page 3.
3     A  Yes.
4     Q  And in particular, it looks like, on these
5 slides, you're describing -- I don't know if you'd
6 call them "case studies," but examples of --
7     A  Yes.
8     Q  -- situations, correct?
9     A  Yes.  Examples that either I have been
10 involved in, or have been brought to me, of when the
11 "well-controlled" term was confusing or not useful
12 to the people involved.
13     Q  And up on -- it's labeled "Slide 5," the
14 first bullet, No. 5; do you see that?
15     A  Yes.
16     Q  It refers to a "Patient in state forensic
17 hospital with DID."
18     A  Yes.
19     Q  What is DID?
20     A  That's dissociative identity disorder.
21     Q  Can you explain what that is?
22     A  So it is a DSM diagnosis where someone has
23 dissociative disorder to the extent where they -- in
24 the formal DID diagnosis, they have amnestic periods
25 between these different aspects of self, and --

Page 245

1 which are sometimes referred to as "alters."
2         In this particular case, once -- there are
3 people who do therapy with people with dissociative
4 identity disorder.  And if there's an integration of
5 alters, they no longer have DID; they have something
6 called OSDD, other specified dissociative disorder,
7 meaning they have a dissociative disorder, but
8 there's no longer amnestic periods between alters.
9         And so this was a case where there was
10 someone in a forensic hospital who was there for
11 years.  They had integration of the alters.  They
12 were permitted to transition by one treatment team,
13 and then another treatment team took over, another
14 psychiatrist, who thought that that was a mistake
15 and tried to forcibly de-transition that patient.
16         So it was -- there was an actual case
17 where -- where this happened; where, in this case,
18 the person did have a severe mental illness, but
19 they did have the capacity to consent to
20 testosterone, but were forced to de-transition
21 with -- with very negative results.
22     Q  And just to go back a little bit, when you
23 refer to an "amnestic period," I assume it's -- the
24 root is somehow related to amnesia, and so it has
25 something to do with --

CONFIDENTIAL

Page 246

1    A   Yes.  So in DID, someone has -- they may
2 have alters who -- where they are amnestic for when
3 the alters are present.  In other words, they arrive
4 somewhere and don't know how they got there.
5        And so typically we would say that many of
6 those people lack the capacity to make medical
7 decisions; however, with a lot of work in terms of
8 integrating the alters, they might get to a state
9 where they still might hold the alters in
10 co-consciousness, that they still identify them, but
11 they're no longer having amnesia.  And that is often
12 regarded as a place where -- that they've reached a
13 state where they, again, have capacity to consent.
14    Q   And what is co-consciousness in this
15 context?
16    A   Meaning without amnesia.
17    Q   And I'm not sure I -- I think you
18 explained it, but I may have missed it.
19        But what is an alter?
20    A   So an alter is when someone with
21 dissociative identity disorder has kind of split off
22 parts of their consciousness.
23        And so with an amnestic period, they might
24 be in one particular state where another mental
25 state doesn't have memory of being in that state.

Page 247

1 And those individual states are called "alters," and
2 sometimes the patient names them.
3        And so that -- that's what you would call
4 an "alter."
5    Q   When you say the patient names the
6 different parts of consciousness, what does that
7 look like in practice?
8        MR. LANNIN:  Object to the form.
9        THE WITNESS:  So it might look in practice
10 that -- so in a stage where they're having amnestic
11 periods, they might not remember these other
12 experiences.  But then with work and integration,
13 they -- they're no longer having the amnesia, but
14 they might recognize these individual states of
15 themselves without being amnestic of them.
16 BY MR. RAMER:
17    Q   So then what does it look like in practice
18 when the alters are in co-consciousness?
19    A   So that's just meaning that the person is
20 recognizing that they have these alters, but they
21 don't -- they're not amnestic between them.
22    Q   How does a person --
23    A   That's how some of those -- some of the
24 folks with OSDD would refer to the alters, that they
25 still feel that these aspects of themselves are

Page 248

1 present, and they're aware of these aspects being
2 present, but they're not losing consciousness.
3 They're not, you know, having an amnestic period
4 when that alter is present.
5    Q   And so are there situations where the
6 individual will name the alters but the alters are
7 in co-consciousness?
8    A   Yes.
9    Q   And then how does somebody describe that
10 experience?
11        MR. LANNIN:  Object to the form.
12        THE WITNESS:  So people describe it in
13 different ways.  It is -- it may be complicated even
14 these days where -- because there are people who
15 have never received a clinical diagnosis of DID but
16 kind of identify with this way that their mind
17 works.
18        That's not a clinical diagnosis, but I
19 think that's out there as well, and kind of
20 complicates it in terms of people describing their
21 experience.
22 BY MR. RAMER:
23    Q   And are there situations where an
24 individual's alters can be -- one is male and one is
25 female?

Page 249

1    A   Yes.
2    Q   And how do you address that in the context
3 of gender-affirming care?
4        MR. LANNIN:  Object to the form.
5        THE WITNESS:  So you can't -- you can't do
6 that if you're -- if there's this, like,
7 disorganized dissociative kind of state where
8 somebody is having amnestic periods because -- or,
9 you know, you -- you don't really kind of have a
10 handle on what they -- what that person wants.
11        But if they have done work in therapy and
12 there has been this integration of alters, and they
13 might still identify these different states of self
14 but they're not going in and out of these amnestic
15 periods, then -- then they -- they may be able to --
16 be able to have the capacity to consent.
17        Even acknowledging the continued presence
18 of these altered states of mind, they have this
19 consistent consciousness that is able, you know,
20 to -- that is able to make decisions about -- about
21 gender-related care as well as other medical care.
22 BY MR. RAMER:
23    Q   When you say the alters are integrated, is
24 that the same thing as saying that the alters are in
25 co-consciousness?

Veritext Legal Solutions
877-373-3660                                    800.808.4958

CONFIDENTIAL

Page 250

1    A   Yes.  Those are different ways that people
2  have -- that people describe it.
3      Q   And when you have a patient who has alters
4  that are in co-consciousness, and one alter is male
5  and one alter is female, how do you determine what
6  the appropriate medical intervention would be?
7      A   Yeah.  So -- so there was an interesting
8  web survey that was never published because it was
9  done by these people who identified as having
10  dissociative disorders.
11      And it does appear that very often people
12  will hide the fact that they have alters of
13  different genders from their clinician and, you
14  know, go ahead with -- with transition.
15      But people, when they've reached a stable
16  mental state, can also reach a state where they have
17  the capacity to understand risks and benefits of
18  treatment and how to minimize gender dysphoria.  And
19  that can be through transition, or sometimes
20  being -- having a nonbinary presentation works best.
21  It just depends on the individual.
22      Q   Can you describe how you -- so you've
23  described how it's done improperly, which is the
24  patient feels forced to hide the alter --
25      A   Yeah.

Page 251

1      Q   -- or one of the alters.
2      Can you explain how you do it properly?
3  Just because as somebody who is ignorant of this, it
4  seems like you would have this tension between a
5  male alter and a female alter.
6      And I realize that's simplistic; so I'm
7  wondering, can you just explain how you analyze that
8  and arrive at the appropriate intervention?
9      A   Yes.
10      MR. LANNIN:  Object to the form.
11      THE WITNESS:  And there are therapists who
12  particularly specialize in trauma work and are
13  looking -- typically the people who have these
14  severe -- have severe dissociation are people who
15  experience early childhood trauma.  And so they
16  often do years of work with therapists that are both
17  in terms of working on addressing trauma and how to
18  cope with trauma without dissociation, and then how
19  to kind of integrate different feeling states
20  without dissociating.
21      And so therapists -- there are therapists
22  who, like in the examples that I presented, they
23  have been in -- they are people who have been in
24  therapy for -- often for years.  The person in the
25  state forensic hospital had almost daily therapy

Page 252

1  for, like, 20 years total before they were released.
2      So -- but a skilled therapist can work on
3  integrating alters, on building the capacity to cope
4  with stressors without dissociating, and trying to
5  understand and work through some of the trauma that
6  may have led to their starting to dissociate as
7  young children.
8  BY MR. RAMER:
9      Q   Are children and adolescents diagnosed
10  with DID?
11      MR. LANNIN:  Object to the form.
12      THE WITNESS:  Yes, they can be.
13  BY MR. RAMER:
14      Q   Have you ever provided gender-affirming
15  medical -- let me backtrack.
16      Have you ever provided gender-affirming
17  care for a child or adolescent who was diagnosed
18  with DID?
19      MR. LANNIN:  Object to the form.
20      THE WITNESS:  No.
21  BY MR. RAMER:
22      Q   And am I -- with this example in No. 5
23  that you were discussing, am I correct in thinking
24  that that individual had been found not guilty by
25  reason of insanity?

Page 253

1      A   Yes.
2      Q   And sticking with this slide deck, the
3  same page, the No. 8 refers to, scare quotes,
4  "'Experts' in case over whether gender-affirming
5  care for youth should be banned recommends
6  psychotherapy to help youths accept their bodies as
7  an alternative to transition," correct?
8      A   Yes.
9      Q   And do you think that psychotherapy to
10  help youth accept their bodies as an alternative to
11  transition is conversion therapy?
12      MR. LANNIN:  Object to the form.
13      THE WITNESS:  So I think in the situation
14  where the patient has a gender dysphoria diagnosis
15  that is impairing social, occupational functioning
16  and causing clinically significant distress, that
17  recommending psychotherapy for that person is -- is
18  not indicated.
19      And so there are people -- there are young
20  people who -- who don't transition, but they're not
21  in that category of people who have severe and
22  long-standing gender dysphoria that relates to parts
23  of their body.
24      (Exhibit 23 was marked for identification
25      and is attached hereto.)

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1 BY MR. RAMER:
2    Q   Dr. Karasic, you've been handed what's
3 been marked as Karasic Exhibit 23.
4    A   Yes.
5    Q   And the title is "Initial Clinical
6 Guidelines for Co-Occurring Autism Spectrum Disorder
7 and Gender Dysphoria or Incongruence in
8 Adolescents," correct?
9    A   Yes.
10   Q   And you helped author these guidelines,
11 correct?
12   A   Yes.
13   Q   I'd like to go to page 111.  The page
14 numbers are on the inside.
15       And in the left column, second full
16 paragraph, a little over halfway down, there's a
17 sentence that begins with, "By providing concrete."
18       Do you see that?
19   A   Yes.
20   Q   And I'm just going to read those two
21 sentences and ask if I read them correctly first.
22       It says, "By providing concrete
23 psychoeducation about how gender for some people can
24 be fluid, not just binary and physical, and
25 concurrent intervention targeting flexible thinking

Page 255

1 and self-awareness, some individuals with less
2 urgent gender presentations may realize that full
3 gender transition does not fit them.  These young
4 people may become more comfortable with a less
5 binary solution, such as maintaining a female body
6 while expressing some male-typical
7 interests/behaviors."
8       Did I read that correctly?
9    A   Yes.
10   Q   Do you think this type of psychoeducation
11 and concurrent intervention that you're describing
12 here should be used with individuals who do not have
13 an ASD?
14       MR. LANNIN:  Object to the form.
15       THE WITNESS:  So I have quite a number of
16 patients who don't transition, who I've treated for
17 their psychiatric illness, who are generally
18 nonbinary, don't feel like cross-sex hormones would
19 benefit them, or occasionally there have been ones
20 who have been on them for short periods of time to
21 lower their voice, and that was kind of enough.
22       So there are people who don't -- there are
23 many people who are on some kind of spectrum, as
24 this sentence says, who might have other needs other
25 than traditional binary transition.  And so one

Page 256

1 should be respectful of those individuals as well.
2       And that's why I always refer to those
3 people who need medical intervention because of the
4 level of distress that they're having, because the
5 people described here are not having that level of
6 distress and, therefore, you know, may find that a
7 medical intervention is not for them.
8 BY MR. RAMER:
9    Q   So you don't -- sorry.
10       Is this not recommending psychotherapy to
11 help these individuals accept their bodies as an
12 alternative to transition?
13       MR. LANNIN:  Object to the form.
14       THE WITNESS:  No, it's something
15 different.
16       This is specifically referring to, as it
17 says, "people who may realize that full gender
18 transition does not fit them."
19       And so it's specifically referring to
20 nonbinary people and helping them figure out what
21 interventions they may or may not need, and that may
22 or may not be a medical intervention.
23       And there certainly are people who don't
24 need a medical intervention.  As I said, that's why
25 I refer to when -- when somebody is saying it's an

Page 257

1 alternative to providing gender-affirming care,
2 that, you know, it's okay to ban gender-affirming
3 care because you can just provide everyone with
4 psychotherapy, there's no evidence that that is
5 effective.
6       That's something different than saying
7 that there are individuals, especially nonbinary
8 individuals, who -- who should work with a therapist
9 in terms of kind of better understanding what care
10 they need and, you know, certainly that care might
11 not involve any medical care.
12 BY MR. RAMER:
13   Q   You've been saying "nonbinary."  Do you
14 mean individuals with ASDs, or do you mean --
15   A   No.
16   Q   -- nonbinary?
17       MR. LANNIN:  Object to the form.
18       THE WITNESS:  I'm talking about nonbinary
19 people because you had brought up even people
20 without ASD.  So I transitioned the conversation to
21 just people generally.
22       So that can apply to people with ASD or
23 not -- people without ASD, but that there are people
24 who -- there are people who don't need medical
25 intervention, and that's why a more involved

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

1 assessment for adolescents is important, and why
2 Standards of Care 8 separates the interventions --
3 the evaluation for adolescents from the
4 evaluations -- the evaluation for adults, because
5 that is more typically an issue in adolescents.
6        MR. RAMER:  We've been going for a while,
7 and I presume I'm probably pretty close.  Do you
8 mind if we take a short break?
9        MR. LANNIN:  Not at all.  By my count, you
10 have five minutes.
11       THE VIDEO OPERATOR:  Going off the record,
12 the time is 5:27 p.m.
13       (Recess, 5:27 p.m. - 5:32 p.m.)
14       THE VIDEO OPERATOR:  Back on the record.
15 The time is 5:32 p.m.
16 BY MR. RAMER:
17    Q  Dr. Karasic, have you ever practiced in
18 Alabama?
19    A  No.
20    Q  Are you aware of any gender clinics in
21 Alabama?
22    A  No.
23    Q  Have you -- do you have any -- did you
24 review the medical records of any of the plaintiffs
25 in this case?

Page 259

1    A  In this case, no.
2    Q  Are you a neurologist?
3    A  No.
4    Q  Are you a surgeon?
5    A  No.
6    Q  Are you an endocrinologist?
7    A  No.
8    Q  Are you a urologist?
9    A  No.
10   Q  Are you a gynecologist?
11   A  No.
12   Q  Are you a --
13   A  This is a bullet round.
14   Q  Are you a bioethicist?
15   A  No.
16   Q  Are you a social worker?
17   A  No.
18   Q  Was Cecilia Dhejne ever part of the
19 "Mental Health" chapter?
20   A  Yes.
21   Q  Why did she leave?
22   A  She had an illness.
23       MR. RAMER:  And those are all the
24 questions that I have for you, Dr. Karasic.  Thank
25 you very much for your time today.

Page 260

1        I'll turn it over to your counsel.
2        MR. LANNIN:  Any questions for the
3 plaintiffs?
4        MR. STOLL:  Just one question.
5           EXAMINATION
6 BY MR. STOLL:
7    Q  Dr. Karasic, has anything that you've seen
8 or heard today changed any of your opinions
9 expressed in your report in this matter?
10   A  No.
11       MR. STOLL:  That's it.  Thank you.
12       THE REPORTER:  Counsel, would you like a
13 copy?
14       MR. LANNIN:  Yes.
15       MR. STOLL:  Yes.
16       THE REPORTER:  For each of you?
17       MR. STOLL:  Yes.
18       THE REPORTER:  Rough drafts or just the
19 final?
20       MR. STOLL:  I'd like a rough.
21       THE REPORTER:  Okay.
22       MR. LANNIN:  I do not need a rough.
23       THE REPORTER:  Okay.
24       MR. LANNIN:  I'll follow -- can we
25 follow -- can we go off the record?

Page 261

1        But before we go off the record, may I say
2 this:  No questions on behalf of the witness.
3        I know there's a protective order in this
4 case, and we prefer to provisionally designate this
5 entire transcript as "Confidential" until we have a
6 chance to review it and make timely designations.
7        MR. RAMER:  No objection.
8        THE VIDEO OPERATOR:  This concludes
9 today's deposition of Dan Karasic, M.D.  The number
10 of media used was four and will be retained by
11 Veritext Legal Solutions.  The time is 5:34 p.m.
12 We're off the record.
13       (TIME NOTED:  5:34 p.m.)
14            --o0o--
15
16
17
18
19
20
21
22
23
24
25

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

8        I, DAN KARASIC, M.D., do hereby declare
9  under penalty of perjury that I have read the
10  foregoing transcript; that I have made any
11  corrections as appear noted, in ink, initialed by
12  me, or attached hereto; that my testimony as
13  contained herein, as corrected, is true and correct.
14        EXECUTED this _____ day of _____,
15  2024, at _____, _____.
16        (City)          (State)
17
18
19        _____
20        DAN KARASIC, M.D.
21
22
23
24
25

Page 263

1        I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4        That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12        Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [ ] was [X] was not requested.
16        I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19        IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21  Dated this 13th of may, 2024.
22
23
24        *Carla Soares*
25        CARLA SOARES
         CSR No. 5908