# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |  |
|---|---|---|
| BRIANNA BOE *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official | ) | |
| capacity as Attorney General of the | ) | **REDACTED COPY;** |
| State of Alabama, *et al.*, | ) | **ORIGINAL SUBMITTED** |
| | ) | **UNDER SEAL** |
| *Defendants*. | ) | |

# DEFENDANTS' MOTION TO EXCLUDE
# SELECTED TESTIMONY OF DR. DAN KARASIC

# TABLE OF CONTENTS

Table of Contents ............................................................. i

Table of Authorities ....................................................... iii

Introduction ................................................................ 1

Legal Standard ............................................................. 2

Argument ................................................................... 2

    I.   Several of Dr. Karasic's Proffered Opinions Should Be Excluded Because He Lacks Relevant Expertise ....................................... 2

        A.   Dr. Karasic Confesses No Knowledge About the Evidence and Methodology Underpinning the Adolescent Chapter of the WPATH Standards of Care 8 ..................................... 2

        B.   Dr. Karasic Confesses No Knowledge About Transitioning Care in Alabama ................................................... 6

        C.   Because Dr. Karasic Is Not an Endocrinologist, He May Not Opine on the Endocrinological Effect of Puberty Blockers and Cross-Sex Hormones ......................................... 8

        D.   Dr. Karasic Should Not Be Permitted to Testify About Fertility Preservation Because He Has No Expertise in the Subject Matter ............................................... 9

    II.  Dr. Karasic's Testimony Regarding The State Of Scientific Evidence Lacks A Reliable Basis And Should Thus Be Excluded ...................... 10

        A.   Dr. Karasic Cannot Say Medicalized Transition Is "Safe" When He Knows Nothing About Its Effect on Brain Development .............................................. 10

        B.   Dr. Karasic Does Not Understand the GRADE Methodology ................................................. 12

C.  Dr. Karasic's Proffered Testimony Regarding the Recent Increase and Demographic Shift of Transgender Minors Is Completely Speculative .................................................................. 13

III. Dr. Karasic's Testimony Regarding WPATH's Suppression Of Dissenting Views Is Unreliable And False Since He Admits That He Previously Supported Censorship Of Dissenting Views Within WPATH.......................................................................................... 15

Conclusion ......................................................................................... 19

Certificate of Service ........................................................................ 21

## TABLE OF AUTHORITIES

**Cases**

*Haves v. City of Miami*,
  52 F.3d 918 (11th Cir. 1995) ...................................................................8

*Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*,
  772 F.3d 1352 (11th Cir. 2014) ...........................................................9

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ................................................ 12, 15

# INTRODUCTION

Discovery in this case has revealed that proponents of medicalized transitions for minors have benefitted from years of unquestioning acquiescence. Plaintiffs' expert witnesses are no exception. Dr. Dan Karasic, a psychiatrist and longtime activist for "gender affirming care," feels free to opine on matters that lie well outside the scope of his expertise, to make assertions regarding the safety of medicalized transition while acknowledging he knows nothing about its effect on brain development, and to trade on his involvement in drafting WPATH's Standards of Care 8 even though he had no involvement in (or knowledge of) the chapter that matters most for this case—the adolescent chapter. But unlike the dissenting views of those in WPATH, Dr. Karasic cannot censor the evidence that reveals he lacks expertise or a reliable method to support many of the opinions he offers in his expert report. As explained in more detail below, the Court should preclude Dr. Karasic from offering opinions regarding (1) the evidence and methodology underpinning the adolescent chapter of the SOC-8; (2) the practices of providers in Alabama; (3) the endocrinological effect of puberty blockers and cross-sex hormones; (4) fertility preservation; (5) the "safety" of medicalized transition for minors; (6) the GRADE methodology; (7) the cause behind the shift in patient demographics to adolescent females who had no prior history of gender incongruence; and (8) WPATH's welcoming of dissenting viewpoints.

## LEGAL STANDARD

To avoid duplication, Defendants respectfully incorporate the relevant legal standards in their Motion to Exclude Selected Testimony of Dr. Ladinsky. *See* Doc. 593 at 2-8.

## ARGUMENT

I. **Several of Dr. Karasic's Proffered Opinions Should Be Excluded Because He Lacks Relevant Expertise.**

   A. **Dr. Karasic Confesses No Knowledge About the Evidence and Methodology Underpinning the Adolescent Chapter of the WPATH Standards of Care 8.**

The WPATH Standards of Care 8 (SOC-8) is an unreliable, ideologically motivated document that transgresses the principles of evidence-based medicine. ████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████ [2] They failed to apply the most basic principles of

---

[1] Defendants use two main citations form in their *Daubert* briefing. The first—*Daubert.*DX#:##— refers to exhibits Defendants submit in support of their *Daubert* motions, where the first "#" refers to the exhibit number and the second "##" refers to the page numbers within that exhibit. The second citation form—SJ.DX#:##—refers to the exhibits Defendants submitted in support of their motion for summary judgment. *See* Docs. 557-60 (public exhibits) & 564 (sealed exhibits).

[2] *See also* ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



evidence-based medicine to the development and drafting of the SOC-8. ███████

███████; *see also* █████████████████████████████ SJ.DX3:¶¶96-120

(Cantor Supp. Rep.); SJ.DX4:¶¶133-54; SJ.DX86:5 (*Clinical Guidelines*) (assessing

SOC-8 under AGREE II standard and concluding that the guideline could not be

recommended for practice because of its lack of "[r]igour of development," among

other deficiencies).[3] ████████████████████████████████████

████████████████████████████████████████████████

████████████████[4] Discovery in this case has destroyed any veneer of sci-

entific credibility regarding the SOC-8.



[3] *See also* ████████████████████████████████████████

[4] *See also* ████████████████████████████████████████

In an apparent effort to resurrect WPATH's credibility from the ashes, Dr. Karasic trades on his involvement with the drafting of the SOC-8 Guidelines throughout his expert report. *See Daubert*.DX11:¶¶8, 12, 67 (Karasic Rebuttal Rep.). But his deposition testimony reveals he knows nothing about the evidence and methodology underpinning the chapter that matters most for this case—the chapter for adolescents. When asked if the authors of the SOC-8 "were experts in the field of transgender medicine," Dr. Karasic responded: "I can't speak to the people outside of my chapter." SJ.DX24:49:9-19 (Karasic Dep.). During his deposition, after Dr. Karasic described how he and his co-authors of the mental health chapter selected the studies they cited, he was asked if he knew how the other chapters of SOC-8



found their evidence. He responded: "I don't know the process in the other—for the other chapters." *Id.* at 66:2-17. When asked if he knew whether the authors of other chapters had assessed the degree of bias in the studies they cited, Dr. Karasic emphasized again: "[M]y experience was really contained to my—the chapter that I was chapter lead on … and not the process that was going on in the other chapters." *Id.* at 68:18-25.

Because Dr. Karasic's experience concerning the drafting of SOC-8 was limited to "the chapter that [he] was chapter lead on," he has no basis to testify about SOC-8 generally or the adolescent chapter specifically. Thus, the Court should not permit him to offer testimony that purportedly stems from his understanding of the process and evidence used to arrive at the conclusions and recommendations in the adolescent chapter of the SOC-8 or, indeed, about any other part of SOC-8 that he was not directly involved in drafting and has no other knowledge concerning.

### B. Dr. Karasic Confesses No Knowledge About Transitioning Care in Alabama.

The Court should also prohibit Dr. Karasic from testifying about transitioning care in Alabama. Dr. Karasic has never practiced in Alabama. Karasic Dep. 258:17-18. He is not aware of any gender clinics in Alabama. *Id.* at 258:20-22. He has not reviewed any medical records of any of the plaintiffs in this case and has no idea whether the doctors who treated them followed the WPATH SOC-8, the Endocrine Society Guideline, or any other purported standard of care. *Id.* at 258:23–259:1. While he claims that Defendants' experts "either misunderstand the prevailing protocols or assume, without basis, that all or most gender clinics disregard them,"

Karasic Rep. ¶27, Dr. Karasic simply "assume[s], without basis, that all or most gender clinics" in Alabama follow them to a T. *But see* ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████ SJ.DX132:15

(Jarvie *Abortion Doctor*) (OB/GYN in Tuscaloosa providing transitioning hormones

to children on first visit opining: "No, I don't need a psychologist or psychiatrist to evaluate" a minor patient seeking cross-sex hormones); ███████████

███

In fact, Dr. Karasic has no idea how practitioners in Alabama operate or what standards they follow (or don't follow). Without more, his experience as a psychiatrist in California provides no foundation on which he could testify about provider practices in Alabama. And his knowledge of certain providers *elsewhere* can add nothing to Plaintiffs' and the Unites States' challenge to disprove that Alabama's law has "at least one plausible, arguably legitimate purpose." *Haves v. City of Miami*, 52 F.3d 918, 923 (11th Cir. 1995). That makes his proffered testimony not only baseless but unreliable, irrelevant, and unhelpful.[5] It should be excluded.

### C. Because Dr. Karasic Is Not an Endocrinologist, He May Not Opine on the Endocrinological Effect of Puberty Blockers and Cross-Sex Hormones.

As Defendants' expert endocrinologists have explained, administering testosterone to natal females (as medicalized transition requires) carries a series of significant health risks. For example, it could lead to cardiovascular disease and coronary heart disease. SJ.DX.7:¶¶143-47 (Laidlaw Rep.); SJ.DX5:¶¶91-92 (Hruz Rep.). And there is reason to think that the use of testosterone in natal females could lead to "mood disorders, psychosis, and psychiatric disorders," among other harms. SJ.DX.7:¶142 (Laidlaw Rep.).

---

[5] This point also differentiates Defendants' experts' testimony regarding dangerous "care" in Alabama and elsewhere. One "plausible, arguably legitimate purpose," *Haves*, 52 F.3d at 923, for the Legislature's decision to require minors to reach adulthood before undergoing medicalized gender transition is precisely the harms occurring from such "care" elsewhere. Alabama need not wait for those harms to run rampant here before acting to protect its vulnerable youth.

Dr. Karasic admits that he is "not an endocrinologist." Karasic Dep. 259:6-7. Yet, Dr. Karasic seeks to refute the testimony of Dr. Laidlaw—a board-certified endocrinologist—on matters of endocrinology. For example, Dr. Karasic opines about the "proper doses" of testosterone that natal females can receive. Karasic Rep. ¶¶100-01. But "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014). Given that Dr. Karasic does not even attempt to suggest that endocrinology lies within his field of expertise, the Court should preclude him from offering testimony regarding the endocrinological aspects of pubertal suppression and cross-sex hormones.

### D.    Dr. Karasic Should Not Be Permitted to Testify About Fertility Preservation Because He Has No Expertise in the Subject Matter.

As Dr. Thompson, an OB/GYN, explained in detail, "there are significant limitations with the technological ability to preserve fertility in pre- or early pubertal male and female children." SJ.DX.10:¶89 (Thompson Rep.). "The only 'fertility preservation' techniques for which long term data exist are those for individuals who have already matured through the pubertal transition and who have mature gametes." *Id.* ¶120. Therefore, Dr. Thompson continued, "our current ability to 'preserve fertility' in children and young adolescents in whom puberty is blocked in Tanner stage 2 are nascent, largely unavailable, and experimental." *Id.* ¶140.

Dr. Karasic has no expertise—whether academic or clinical—in fertility preservation, nor does he claim any. He nonetheless asserts that "[t]ransgender individuals who have received hormone therapy can and do have children, both

biological and nonbiological, whether or not fertility preservation occurs." Karasic Rep. ¶90. He offers no citation to support this assertion and has provided no reason to think he has any expertise that relates to the question of fertility preservation. Nor was Dr. Karasic making this assertion based on an assessment of a particular study's design or methodology; he simply asserts it. The Court should not permit Dr. Karasic to freestyle about highly complex issues for which he has no academic or clinical expertise. It should therefore prohibit Dr. Karasic from testifying about fertility preservation.

## II.     Dr. Karasic's Testimony Regarding The State Of Scientific Evidence Lacks A Reliable Basis And Should Thus Be Excluded.

### A.     Dr. Karasic Cannot Say Medicalized Transition Is "Safe" When He Knows Nothing About Its Effect on Brain Development.

Nobody knows how pubertal suppression will affect the brain development of adolescents who go through medicalized transition. As Dr. Cantor explained, many scientists "have expressed concern that blocking the process of puberty during its natural time could have a negative and potentially permanent impact on brain development." SJ.DX.2:¶213 (Cantor Rep.). For example, Dr. Cass has stressed that puberty "'may trigger the opening of a critical period for experience-dependent rewiring of neural circuits,'" which "'could have significant impact on the ability to make complex risk-laden decisions, as well as possible longer-term neuropsychological consequences.'" *Id.* ¶210 (Cantor Rep.) (quoting Cass Review Letter 2022 at 6). There is "'very limited research on the short-, medium- or longer-term impact of puberty blockers on neurocognitive development.'" *Id.* ¶210 (quoting Cass Review Letter 2022 at 6); *see also* SJ.DX154:9 (Baxendale *Impact of Suppressing Puberty*)

(concluding systematic evidence review: "Despite the broad and multidisciplinary knowledge base which indicates disruption of GnRH expression is likely to have an impact on cognitive function, and explicit calls in the literature for this to be studied that date back three decades, there have been no human studies to date that have systematically explored the impact of these treatments on neuropsychological function with an adequate baseline and follow-up").

Despite this dearth of evidence, Dr. Karasic repeatedly asserts that medicalized transitions for minors are "safe." Karasic Rep.¶¶31, 84, 98-99, 103. At the same time, however, he is forced to acknowledge what he must: he has no idea what effect pubertal suppression has on brain development. He *admits* "that the impact of pubertal suppression on brain development is not well known," that "it's an area certainly that requires more research," and that "[t]here's not a lot of data on" it. Karasic Dep. 155:7-24. There is no world in which a doctor can reliably assert that a medical intervention is "safe" when he has no idea what the long-term consequences are on the patient's brain development.

But Dr. Karasic is no stranger to taking unjustified risks with minors who have gender dysphoria. At his deposition, he testified that he first began recommending cross-sex hormones for adolescents "in the early 2000s." *Id.* at 23:16-20. And he testified that he first began recommending pubertal suppression "sometime between 2009 and 2012." *Id.* at 25:4-10. Having the audacity to start giving adolescents cross-sex hormones *nearly a quarter century ago*—and a decade before even the first (fatally flawed and irrelevant to today's patient population) Dutch study was published—reflects Dr. Karasic's sheer recklessness and willingness to experiment with

11

the lives of minors. He has provided no reliable evidence for his assertion that medicalized transition is "safe," and his admission that he has no idea what effect it has on the brain development of minors should foreclose him from offering such baseless testimony. "Proposed expert testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc) (cleaned up). "[T]he *ipse dixit* of an [otherwise] qualified expert" is insufficient to establish reliability. *Id.* Because that is all Dr. Karasic offers on the point, his opinion must be excluded.

### B. Dr. Karasic Does Not Understand the GRADE Methodology.

The evidence supporting the use of these interventions is rated as "Low" and "Very Low" in the "Grading of Recommendations, Assessment, Development and Evaluations" (GRADE) methodology. This means that researchers have "limited" or "very little confidence" that the interventions will lead to improvement. *See* SJ.DX.2:¶45 (Cantor Rep.). Under the GRADE system, an intervention for which there is "low or very low" evidence of benefit should generally lead to a strong recommendation *against* the intervention. *See* SJ.DX.3:¶¶59-65 (Cantor Supp. Rep.). There is one exception where GRADE suggests that practitioners could make a strong recommendation in favor of an intervention despite low or very low evidence—what is called a "discordant recommendation." *Id.* ¶¶59, 64-65. That lone exception is for a "life-threatening emergency," such as an illness that "so often results in death" that it is acceptable to take the risk. *Id.* ¶¶64-65. Gender dysphoria does not fall within this exception. *Id.*

12

Dr. Karasic suggests practitioners need not worry that there is "low" or "very low" evidence for these interventions. *See* Karasic Rep. ¶¶80-83 (criticizing the way "the State's experts use systematic studies" and opining that "[i]f only medical interventions with high GRADE scores were permitted by law, most medical interventions and all complex interventions[], would be banned"). But his proffered testimony is based on his total ignorance with respect to the GRADE methodology and the doctrine of discordant recommendations. Indeed, Dr. Karasic did not even know the GRADE system involved "recommendation[s] for care." Karasic Dep. 117:4-20. Nor had he ever heard of the "five paradigmatic contexts in the GRADE methodology where a strong recommendation can be made based on low-quality evidence," even though Dr. Cantor discussed them at length in his supplemental report to which Dr. Karasic was purportedly responding. *Id.* at 117:11-21; *see also* Karasic Rep. ¶22 (stating that he has "reviewed" the supplemental report of Dr. Cantor). When asked if medicalized transition falls within "[t]he contexts in the GRADE methodology where a strong recommendation can be made on the basis of low-quality evidence," Dr. Karasic responded: "I don't know." Karasic Dep. 119:5-11. Given Dr. Karasic's professed ignorance on these matters, the Court should preclude Dr. Karasic from testifying about the GRADE methodology with respect to medicalized transition. *See* Karasic Rep. ¶¶80-83.

### C.   Dr. Karasic's Proffered Testimony Regarding the Recent Increase and Demographic Shift of Transgender Minors Is Completely Speculative.

As Defendants' experts have detailed, there has been an explosion in minors identifying as transgender and a dramatic shift in the demographic makeup of

transgender minors. *See, e.g.*, SJ.DX.2:¶137 (Cantor Rep.). Specifically, while patients were previously often natal males who had identified as transgender from childhood, clinics around the globe have seen a startling shift in the patient cohort to natal females who only began to identify as transgender during adolescence. *Id.* The explosion is real and even recognized by WPATH in the SOC-8. *See* Karasic Rep. ¶52. The *reason* for the demographic change, however, is still being explored, but at least some research points to a correlation between "Rapid Onset Gender Dysphoria" (a shorthand for the particular presentation of gender dysphoria appearing in adolescent females with little-to-no prior indication) and peer relationships, social media use, and other mental health issues. *Id.* ¶137; *see also* SJ.DX84:114-22 (Cass Report). ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Obviously, to the extent social factors influence a person's felt gender dysphoria, it should also influence that person's care—and

14

indicates that non-intrusive, non-sterilizing, non-permanent psychological interventions are warranted, not puberty blockers and cross-sex hormones.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████, Dr. Karasic theorizes other possible explanations. But his purported explanations rest on pure speculation. He simply asserts, without citation, that the increase is due simply to the decrease in "stigma associated with being transgender … in recent years." Karasic Rep. ¶53. He thus theorizes that the gender ratios of gender dysphoric youth were always how they are now, but "[t]he increase in awareness in recent decades made it possible for individuals who ultimately came to identify as transgender men [*i.e.*, natal females] to come out and seek care." *Id.* ¶56. Dr. Karasic cites nothing in support of this conjecture—he just posits it, and expects the Court to accept it because he said it. But again, the "*ipse dixit* of an [otherwise] qualified expert" is not enough. *Frazier*, 387 F.3d at 1261. Dr. Karasic's intuition, creative though it may be (and perhaps based on nothing more than a desire to find an alternative explanation to ROGD), is not the stuff of expert testimony. The Court should preclude Dr. Karasic from adding this unsubstantiated testimony to the trial record.

### III. Dr. Karasic's Testimony Regarding WPATH's Suppression Of Dissenting Views Is Unreliable And False Since He Admits That He Previously Supported Censorship Of Dissenting Views Within WPATH.

Dr. Kaliebe has detailed the ways that medical organizations, including WPATH, have stifled dissenting views. *See* SJ.DX15:¶¶56-149 (Kaliebe Rep.). In particular, he explained how "renowned psychologist Kenneth Zucker had his

USPATH conference presentation drowned out by protestors because he had previously suggested that affirmation-only therapy could cause gender dysphoric children to 'persist' when they would otherwise have the gender dysphoria 'desist.'" *Id.* ¶121. "After shutting down Dr. Zucker's panel," Dr. Kaliebe continued, "the activists made demands to the USPATH board, which subsequently removed Dr. Zucker from remaining panels and apologized to the activists for allowing Zucker to attend the conference." *Id.*; *see also* Daubert.DX40:138-39 (Karasic Dep. Ex. 9) (communications from WPATH confirming that USPATH cancelled Dr. Zucker's panel and apologized to the activists); *id.* at 151 (Karasic Dep. Ex. 16) (rejection of apology from activists); *id.* at 143-44 (Karasic Dep. Ex. 13) (statement by WPATH).

Remarkably, one person who apologized *to the activists who shut down Dr. Zucker's presentation* was Dr. Karasic. *See, e.g.,* ████████████████████

████████████████████████████████

██████; *Daubert*.DX40:137 (Karasic Dep. Ex 8). Although Dr. Karasic maintains in his report that WPATH welcomes a "diversity of views," Karasic Rep. ¶62, his actions say otherwise. Most notably, when Dr. Karasic met with the very activists who shut down Dr. Zucker's talk, Dr. Karasic bragged to them that he "wrote an op-ed" that "contributed to Dr. Zucker being fired." Karasic Dep. 202:20-25. Moreover, after telling the activists that the abstracts for the conference panels, including Dr. Zucker's panel, had been objectively graded to determine which panels would be presented, Dr. Karasic said that, "even if the abstract for the panel with Dr. Zucker was getting a high enough score," he (Dr. Karasic) "didn't think that [USPATH] should have let Dr. Zucker present." *Id.* at 203:24–204:4. Dr. Karasic elaborated: "I

think Dr. Zucker has many, many places to present his views" other than USPATH. *Id.* at 204:7-8.

Certainly, Dr. Zucker did not feel as though WPATH welcomed a "diversity of views." Karasic Rep. ¶62. After his cancellation, Dr. Zucker wrote a letter to the WPATH president and board expressing his "astonish[ment]" about the inaccuracies in WPATH's public apology to the protestors and noting that what had happened at the USPATH conference was not a one-off event. *Daubert*.DX40:149 (Karasic Dep. Ex. 15); *see* Karasic Dep. 218:5-7. Rather, he noted, "[a]t WPATH in Amsterdam last June, activists disrupted a symposium on DSDs and defaced a poster." *Daubert*.DX40:149 (Karasic Dep. Ex. 15). He concluded: "I find it remarkable that the leadership of WPATH has remained silent about this. If there cannot be meaningful dialogue about complex issues at WPATH or USPATH, how can the organization consider itself to be 'Professional'?" *Id.*

Dr. Zucker was not alone in his concern. The chair of the panel on which Dr. Zucker was to appear, Dr. Heino Meyer-Bahlburg, also wrote to WPATH following the cancellation. *See* Karasic Dep. 214:1-3; *Daubert*.DX40:146-47 (Karasic Dep. Ex. 14). He wrote: "I think it is a good idea for WPATH to 'ensure participation that is representative of the diversity of providers in the trans health field.' I am concerned, however, that WPATH's commitment 'to providing a safe and welcoming environment at our scientific meetings' was not met at this month's USPATH meeting in L.A." *Daubert*.DX140:146 (Karasic Dep. Ex. 14). He explained how the panel presentation was interrupted by a group of protestors and that WPATH's public apology *to the protestors* violated scholarly norms of dialogue: "By misrepresenting the

17

content of the session and labelling the entire session as 'offensive', 'due to this act of negligence' (a vague formulation that also needs explanation), you are aligning yourselves with the small group of protesters, insult the speakers involved, and violate a primary condition of a scientific meeting, namely the open and constructive exchange of ideas, which is particularly important in an area of research as emotion-laden as gender." *Id.* at 147. Dr. Mayer-Bahlburg continued: "As similar incidents occurred already in two symposia I was involved with at the recent WPATH meeting in Amsterdam, I think WPATH's leadership needs to become more proactive in furthering a constructive style of scientific exchange—rather than inhibiting scientific exchange by suppressing presentations as you did in L.A.… [I]f WPATH intends to continue as a scientific society, it must be able to provide 'a safe and welcoming environment' for the entire 'diversity of providers'." *Id.*

That was in 2017. Since then, ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████;
WPATH and USPATH issued formal statements deriding any "debate" about "the use of puberty delay and hormone therapy for transgender and gender diverse youth" in the lay press, SJ.DX117; and ██████████████████████████████

18

███████████████████████████████████████

███████████████████████████████████████

███████; and on and on.

Yet Dr. Karasic still somehow claims—without explanation—that WPATH welcomes a "diversity of views," Karasic Dep. ¶62, while largely ignoring example after example that prove just the opposite. Whatever expertise or unstated evidentiary basis Dr. Karasic is relying on for his assertion that WPATH welcomes a diversity of views, that evidence is patently unreliable given that Dr. Karasic himself has facilitated the organization's censorship of those scientists who dare question the party line. The Court should exclude his testimony on this front.

## CONCLUSION

For these reasons, the Court should preclude Dr. Karasic from offering opinions regarding (1) the evidence and methodology underpinning the adolescent chapter of the SOC-8; (2) the practices of providers in Alabama; (3) the endocrinological effect of puberty blockers and cross-sex hormones; (4) fertility preservation; (5) the "safety" of medicalized transition for minors; (6) the GRADE methodology; (7) the cause behind the shift in patient demographics to adolescent females who had no prior history of gender incongruence; and (8) WPATH's welcoming of dissenting viewpoints.

Dated: June 24, 2024

Respectfully submitted,

Steve Marshall
 *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
 *Solicitor General*

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
 *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
 *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*