# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| and ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff-Intervenor*, ) | |
| ) | |
| v. ) | No. 2:22-cv-00184-LCB-CWB |
| ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official ) | |
| capacity as Attorney General of the ) | **REDACTED COY;** |
| State of Alabama, *et al.*, ) | **ORIGINAL SUBMITTED** |
| ) | **UNDER SEAL** |
| *Defendants*. ) | |

# DEFENDANTS' MOTION TO EXCLUDE
# SELECTED TESTIMONY OF DR. ARON JANSSEN

**TABLE OF CONTENTS**

Table of Contents ........................................................................................................ i

Table of Authorities .................................................................................................. ii

Introduction ............................................................................................................... 1

Legal Standard .......................................................................................................... 2

Argument ................................................................................................................... 2

    I.    Dr. Janssen Should Not Be Permitted To Offer Testimony Regarding Analysis of Research Studies. ............................................................. 2

    II.    Dr. Janssen Should Not Be Permitted To Offer Testimony Regarding the Evidence and Methodology Underpinning Any Part Of The WPATH SOC-8 Other Than The Childhood and Adult Mental Health Chapters. ................................................................................................. 4

    III.    Dr. Janssen Should Not Be Permitted To Testify That Gender Identity Is "Fixed" Or Has A Biological Basis. ...................................................... 8

    IV.    Dr. Janssen Should Not Be Permitted To Testify About Transitioning Care In Alabama. ................................................................................. 10

Conclusion .............................................................................................................. 12

Certificate of Service .............................................................................................. 14

**TABLE OF AUTHORITIES**

**Cases**

*Buland v. NCL (Bahamas) Ltd.*,
   992 F.3d 1143 (11th Cir. 2021) ..............................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)............................................................................... 2, 9, 10

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) (en banc) .........................................................4

*United States v. Pon*,
   963 F.3d 1207 (11th Cir. 2020) ..........................................................................9

**Other Authorities**

Am. Academy of Child & Adolescent Psychiatry, *Conversion Therapy* (Feb. 2018),
   *available at* https://www.aacap.org/AACAP/
   Policy_Statements/2018/Conversion_Therapy.aspx .............................................9

Am. Psychiatric Ass'n, *Position Statement on Conversion Therapy and LGBTQ Patients* (Dec. 2018), *available at*
   https://www.psychiatry.org/getattachment/3d23f2f4-1497-4537-b4de-
   fe32fe8761bf/Position-Conversion-Therapy.pdf..................................................8

Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts*
   (Feb. 2021), *available at* https://www.apa.org/about/policy/resolution-gender-
   identity-change-efforts.pdf ...................................................................................8

# INTRODUCTION

At his deposition, Dr. Janssen repeatedly stated that topics discussed in his expert reports were beyond either his expertise or his personal knowledge. For example, although Dr. Janssen's expert reports purport to analyze numerous scientific studies, he stated at his deposition (four times, no less) that he was not testifying as an expert in the analysis of study designs and methodologies. The Court should take Dr. Janssen at his word and prohibit him from proffering testimony that relies on anything other than his clinical experience.

In addition, Dr. Janssen suggested his expert opinion was based on his experience in authoring the WPATH Standards of Care 8 (SOC-8), but he admitted during his deposition that he had no insight beyond the two chapters he worked on—the childhood chapter and the adult mental health chapter. He thus knows nothing about the chapter that matters most here—the adolescent chapter—or, indeed, any other part of the SOC-8 other than the childhood and adult mental health chapters. Indeed, during his deposition, Dr. Janssen said he did not even have enough knowledge to say whether the authors of the adolescent chapter *were experts* in the field. The Court should thus prohibit Dr. Janssen from attempting to offer testimony based on his personal involvement in drafting the SOC-8 regarding the evidence and methodology underpinning the adolescent chapter or any other component of SOC-8 other than the childhood and adult mental health chapters.

Separately, Dr. Janssen provides no reliable basis—indeed, no evidence whatsoever—for his opinion that gender identity is "biological." Additionally, although Dr. Janssen may have experience assessing patients in his own practice, he

1

admittedly knows nothing about the practice of medicine in Alabama. The Court should thus prohibit this testimony too. In sum, the Court should preclude Dr. Janssen from testifying about (1) scientific research studies, (2) the evidence and methodology underpinning the adolescent chapter of the SOC-8, (3) the source of an individual's gender identity, and (4) the practice of medicine in Alabama.

## LEGAL STANDARD

To avoid duplication, Defendants respectfully incorporate the relevant legal standards in their Motion to Exclude Selected Testimony of Dr. Ladinsky. *See* Doc. 593 at 2-8.

## ARGUMENT

### I. Dr. Janssen Should Not Be Permitted To Offer Testimony Regarding Analysis of Research Studies.

Almost the entirety of Dr. Janssen's rebuttal report is aimed at Dr. Cantor's opinion that no reliable evidence supports the use of puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria in minors. *See Daubert*.DX13:¶¶5-29 (Janssen Supp. Rep.).[1] Dr. Cantor's analysis turns on his expertise assessing the design and methodology deployed in research studies—which, in turn, allows a researcher to assess the degree of bias in those studies. *See, e.g.*, SJ.DX.2:¶¶ 178-201 (Cantor Rep.). This type of critical assessment is necessary to understand the reliability of any particular study.

---

[1] Defendants use two main citations form in their *Daubert* briefing. The first—*Daubert*.DX#:##—refers to exhibits Defendants submit in support of their *Daubert* motions, where the first "#" refers to the exhibit number and the second "##" refers to the page numbers within that exhibit. The second citation form—SJ.DX#:##—refers to the exhibits Defendants submitted in support of their motion for summary judgment. *See* Docs. 557-60 (public exhibits) & 564 (sealed exhibits).

2

Dr. Janssen's reports repeatedly discuss the "research" behind the interventions at issue here. Indeed, his rebuttal report is almost entirely a study-by-study analysis. Janssen Rebuttal Rep. ¶¶7-22. His initial report likewise discusses "research" and studies in depth. *See, e.g.*, *Daubert*.DX12:8-10, 14 (Janssen Rep.). But during his deposition, Dr. Janssen admitted that he "would not be testifying here as an expert in study design or methodology." SJ.DX66:57:16-17 (Janssen Dep.). And this was not a drive-by misstatement; he asserted that he lacks expertise in assessing research studies several times. *See id.* at 60:10-11 ("Again, I'm not testifying as an expert in study methodology"); *id.* at 60:23 ("I'm not an expert in the study design."); *id.* at 250:14-15 ("I'm not testifying as an expert on the [GRADE] scale or on research methodology.").

Frankly, Dr. Janssen's lack of expertise in assessing study design shows. For example, when Dr. Janssen was asked if there are tools used to assess the degree of bias in individual studies, he responded: "I don't know." *Id.* at 70:19-21. And Dr. Janssen was "not familiar with" the Cochran Methods Group, *id.* at 70:22–71:1, which (as Dr. Cantor explained) is a "highly respected" institution in the field of evidence reviews, SJ.DX.2:¶85 (Cantor Rep.). Indeed, when asked, "[d]id you ever apply the [GRADE] scale to any of the studies that you cite in your expert reports," Dr. Janssen responded: "Not me personally, no." Janssen Dep. 250:18-21. Given Dr. Janssen's professed ignorance with respect to study design and his affirmative disavowal of providing expert testimony on study design, the Court should take Dr. Janssen at his word and preclude him from offering testimony that analyzes published research literature. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th

3

Cir. 2004) (en banc) (holding that to offer opinion testimony an expert must be "qualified to testify competently regarding the matters he intends to address").

II. **Dr. Janssen Should Not Be Permitted To Offer Testimony Regarding the Evidence and Methodology Underpinning Any Part Of The WPATH SOC-8 Other Than The Childhood and Adult Mental Health Chapters.**

WPATH's SOC-8 is an unreliable, ideologically motivated document that transgress the principles of evidence-based medicine. Specifically, as documents produced by WPATH have shown, ███████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████[2] They failed to apply the most basic principles of evidence-based

---

[2] *See also* ███████████████████████████████████████████████████████

medicine to the development and drafting of the SOC-8. ██████████ ██████████████████████████████ SJ.DX3:¶¶96-120 (Cantor Supp. Rep.); SJ.DX4:¶¶133-54; SJ.DX86:5 (*Clinical Guidelines*) (assessing SOC-8 under AGREE II standard and concluding that the guideline could not be recommended for practice because of its lack of "[r]igour of development," among other deficiencies).³ ██████



³ *See also* ██████

6

██████████████████████████████████████████

██████████[4] Discovery in this case has destroyed any veneer of scientific credibility regarding the SOC-8.

---

██████████████████████████████████████████

[4] *See also* ██████████████████████████████████████████

6

In his rebuttal report, Dr. Janssen attempts to rehab WPATH's image. Janssen Rebuttal Rep. ¶¶28-29. And in his main report, Dr. Janssen highlights his participation in the drafting of the SOC-8. Jassen Rep. 3, 5 ("My opinions contained in this report are based on … my work as a contributing author of the WPATH SOC"). Thus, directly after highlighting that he was "a contributing author to the Child and Adult Mental Health chapters" of SOC-8, Dr. Janssen opines: "The WPATH SOC provides clinical guidance for health professionals based on the best available science and expert professional consensus." *Id.* at 3.

At his deposition, however, Dr. Janssen admitted that his knowledge of SOC-8 was limited to the chapters he worked on—the child and adult mental health chapters. He made clear that he "was not involved in the other chapters." Janssen Dep. 46:9-17. And regarding the most pertinent chapter to this case—the adolescent chapter—Dr. Janssen unscored that he "was not involved in the drafting of the adolescent chapter." *Id.* at 76:16-20. He said he "can't" even "say with certainty that all of the authors" of "the adolescent chapter of the SOC 8 are experts." *Id.* at 48:7-17. He reiterated: "I just know the experience of my—my own [chapter]." *Id.* at 76:9-10.

Indeed, even within his *own* chapters, Dr. Janssen testified that he "lost visibility" on the process of grading the evidence behind the statements because "the

7

chapter leads, in discussion with the editors, made that final determination through some process that I was not privy to." *Id.* at 67:8-16; *see id.* at 71:9-18 ("Q. So, basically, you lost visibility on the grading process once it went up to the chapter lead? A. I would say that is accurate, yes.").

Dr. Janssen cannot testify about subjects he does not know about and is not an expert in. And by his own admission, Dr. Janssen does not know about, and is not an expert in, anything relating to the drafting of the WPATH SOC-8 *other than* limited aspects of the two chapters he was involved in: the childhood chapter and the adult mental health chapter. The Court should limit his testimony accordingly.

### III. Dr. Janssen Should Not Be Permitted To Testify That Gender Identity Is "Fixed" Or Has A Biological Basis.

In his report, Dr. Janssen opines that "[g]ender identity has a biological basis" and cannot be changed. Janssen Rep. 5. But he does not provide any data or specific studies to support his opinion—which, as a psychiatrist, he has not shown he is qualified to offer in any event.

Dr. Janssen seems to offer two theories for his opinion regarding the biological basis for a "static" gender identity. Janssen Dep. 104:19-20. The first appears to rely on sexual orientation and statements by professional organizations counseling against "conversion therapy." Janssen Rep. 6, 31-32. None of the position statements mention a biological basis for gender identity.[5] To the extent Dr. Janssen posits that

---

[5] *See See* Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts* (Feb. 2021), *available at* https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf; Am. Psychiatric Ass'n, *Position Statement on Conversion Therapy and LGBTQ Patients* (Dec. 2018), *available at* https://www.psychiatry.org/getattachment/3d23f2f4-1497-4537-b4de-fe32fe8761bf/Position-Conversion-Therapy.pdf; Am. Academy of Child &

8

research suggesting a potential biological basis for sexual orientation applies also to gender identity, he has not connected the dots and explained why he thinks that research in one area applies to another. "To be admissible under *Daubert*, an expert's opinion must be supported by good grounds for each step in the analysis." *Buland v. NCL (Bahamas) Ltd.*, 992 F.3d 1143, 1150 (11th Cir. 2021) (cleaned up). Among other disqualifications, this "analytical gap" makes Dr. Janssen's testimony on this point "unreliable." *United States v. Pon*, 963 F.3d 1207, 1221 (11th Cir. 2020).

Dr. Janssen's second theory for his opinion that gender identity is fixed and rooted in biology is based on an unfalsifiable claim regarding a purported distinction between gender identity and what he calls "gender expression." According to Dr. Janssen, "gender identity is static," "fixed," and "not a choice," whereas "gender expression" is a choice and culturally influenced. Janssen Dep. 102:15–104:24. Because Dr. Janssen assumes that gender identity cannot change, he emphasizes that the *only* aspect of gender that *can* change is gender expression—which includes one's own understanding of one's own gender identity. *Id.* at 106:12–107:4. As Dr. Janssen explained it: "I think people's understanding of gender identity and their expression of that gender identity changes over time," but "that fixed element of gender identity is not something that changes." *Id.* at 106:16-21.

Dr. Janssen thus agreed that "a natal female adolescent who identifies as a male, is diagnosed with gender dysphoria, and two years later the same individual says she now identifies as a female and does not have gender dysphoria, that person's

---

Adolescent Psychiatry, *Conversion Therapy* (Feb. 2018), *available at* https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx.

9

gender identity has not changed." *Id.* at 107:5-12. And he seemed to agree that someone's gender identity could be unknowable—including by that person. *See id.* at 109:5-16 ("Q. So in the hypothetical of the natal female adolescent who identifies as male and then subsequently identifies as female, what is the individual's gender identity? A. I could not tell you. Q. Why not? A. One, the individual patient is going to have to tell me.").

This might make for interesting academic theory, but if there is no way to determine one's "fixed" gender identity—if, as Dr. Janssen agreed, "it's not possible to predict with certainty a child's ultimate gender identity," *id.* at 109:17-21, and all we and the child have to go by is "gender expression"—then it makes little sense to extrapolate from the unprovable assumption that gender identity is "fixed" to conclude that the "fixed" gender identity (whatever it might be) has a biological basis. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993) (citation omitted). Dr. Janssen's opinion "is unfalsifiable and of no practical value in the courtroom." *Brumley v. Pfizer*, 200 F.R.D. 596, 602 (S.D. Tex. 2001). It must be excluded.

## IV. Dr. Janssen Should Not Be Permitted To Testify About Transitioning Care In Alabama.

Dr. Janssen spends much of his report discussing what he believes psychological assessments of gender dysphoric youth should look like. *See* Janssen Rep. 10-16. That's fine so far as it goes, but it can't go so far as to imply what psychological

assessments in Alabama look like. Although Dr. Janssen may have clinical experience with assessing children and adolescents with gender dysphoria in Chicago, he knows nothing about the practice of medicine in Alabama. Dr. Janssen made clear that he has never practiced in Alabama, merely "know[s] of the existence of" one gender clinic in Alabama—UAB's—but has never "been to that clinic," and does not "have any firsthand knowledge of that clinic's practices." Janssen Dep. 12:11–13:2. Nor did Dr. Janssen review any medical records of any plaintiffs in this case or otherwise become familiar with practices in Alabama. *Id.* at 304:5-7.

In short, Dr. Janssen has no idea how practitioners in Alabama operate or what standards they follow (or don't follow). He does not know what their practices may look like when assessing a child or adolescent for hormonal or surgical transitioning interventions. And given the evidence of how widely practices vary in this area and that some mental health practitioners intentionally *eschew* the kind of assessment Dr. Janssen describes in his report,[6] Dr. Janssen cannot simply assume that providers

---

[6] *E.g.*, ▮

11

across Alabama practice medicine in the same way that he does. Without more, his experience as a psychiatrist in Chicago provides no foundation on which he could testify about provider practices in Alabama or how children and adolescents are assessed for hormonal or surgical interventions in Alabama. His testimony on this point should be excluded.

## CONCLUSION

For these reasons, the Court should prohibit Dr. Janssen from offering testimony regarding (1) scientific research studies, (2) the evidence and methodology underpinning the Adolescent Chapter of the SOC-8, (3) the source of an individual's gender identity, and (4) the practice of medicine in Alabama.

---

██████████ SJ.DX132:15 (Jarvie *Abortion Doctor*) (OB/GYN in Tuscaloosa providing transitioning hormones to children on first visit opining: "No, I don't need a psychologist or psychiatrist to evaluate" a minor patient seeking cross-sex hormones); ██████████

Dated: June 24, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

13

## CERTIFICATE OF SERVICE

    I certify that on June 24, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

                                                <u>s/ A. Barrett Bowdre</u>
                                                A. Barrett Bowdre
                                                *Counsel for Defendants*