# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff-Intervenor*, | ) |
| | ) |
| v. | ) No. 2:22-cv-00184-LCB-CWB |
| | ) Hon. Liles C. Burke |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

## DEFENDANTS' MOTION TO EXCLUDE
## SELECTED TESTIMONY OF DR. DANIEL SHUMER

## TABLE OF CONTENTS

Table of Contents ............................................................................................. i

Table of Authorities ........................................................................................ ii

Introduction ..................................................................................................... 1

Legal Standard ................................................................................................ 2

Argument ......................................................................................................... 2

    I.   Dr. Shumer's Testimony About Alabama Providers Is Outside His Expertise ................................................................................................ 2

    II.  Dr. Shumer's Testimony About Suicidality And Other Harms Is Unreliable .............................................................................................. 6

    III. Dr. Shumer's Testimony About A "Strong Biological Foundation" Of Gender Identity Is Outside His Expertise, Unhelpful, and Unreliable ............................................................................................. 10

Conclusion .................................................................................................... 15

Certificate of Service .................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Haves v. City of Miami*,
  52 F.3d 918 (11th Cir. 1995) .................................................................................. 5

*Hendrix ex rel. G.P. v. Evenflo Co.*,
  609 F.3d 1183 (11th Cir. 2010) ..................................................................... 10, 15

*Lebron v. Secretary of Fla. Dep't of Children & Families*,
  772 F.3d 1352 (11th Cir. 2014) ............................................................................ 6

*Rider v. Sandoz Pharms. Corp.*,
  295 F.3d 1194 (11th Cir. 2002) ..................................................................... 13, 15

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ............................................................................ 6

**Rules**

Fed. R. Civ. P. 702) ................................................................................................. 6, 13

# INTRODUCTION

Daniel Shumer is a pediatric endocrinologist at the University of Michigan who was disclosed as an expert witness by the United States and submitted initial and rebuttal reports. *See Daubert*.DX14 (Shumer Rep.); *Daubert*.DX15 (Shumer Rebuttal Rep.).[1] Defendants do not seek to preclude him from testifying about topics within his expertise, such as how he uses puberty blockers and cross-sex hormones in patients at his clinic. Three discrete parts of his testimony, however, are outside his expertise or otherwise unreliable and unhelpful.

First, Dr. Shumer purports to speak broadly about how all medical gender transition providers practice—seemingly including those in Alabama. He offers sweeping statements about the "[u]niform" motivation and protocols of these providers. *E.g.*, Shumer Rep. 29. But he knows nothing about Alabama providers, much less their practices. At his deposition, he was not even sure how many gender clinics were in the State, and he had no familiarity with particular providers. Thus, his sweeping statements about provider practices should be excluded as outside his expertise and unreliable to the extent they are about Alabama providers, and otherwise excluded as irrelevant and unhelpful to the extent they are about providers in other parts of the country.

Second, Dr. Shumer claims that minors who do not access medical gender transition procedures "will" see "an increase in mental health problems and

---

[1] Defendants use two main citations form in their *Daubert* briefing. The first—*Daubert*.DX#:##—refers to exhibits Defendants submit in support of their *Daubert* motions, where the first "#" refers to the exhibit number and the second "##" refers to the page numbers within that exhibit. The second citation form—SJ.DX#:##—refers to the exhibits Defendants submitted in support of their motion for summary judgment. *See* Docs. 557-60 (public exhibits) & 564 (sealed exhibits).

1

suicidality." Shumer Rep. 36. This claim is also unreliable, as Dr. Shumer cannot provide any support demonstrating that treatment of gender dysphoria in minors with non-pharmaceutical interventions *will* increase suicide and other harms. Systematic reviews—including by WPATH itself—have repeatedly rejected drawing this link based on the existing evidence. Because Dr. Shumer's opinion about suicide and other harms is untethered from the evidence, it should be excluded.

Third, Dr. Shumer's reports opine that "[s]cientific research and medical literature across disciplines *demonstrates* that gender identity … has a *strong biological foundation*." Shumer Rep. 8 ¶5 (emphases added). But his own sources reject that sweeping interpretation of the meager evidence, and Dr. Shumer seemed to largely abandon this interpretation at his deposition. The most that the existing research shows is that the connection between gender identity and biology is unknown. Because this opinion too is disconnected from the evidence Dr. Shumer relies on, it should be excluded.

## LEGAL STANDARD

To avoid duplication, Defendants respectfully incorporate the relevant legal standards in their Motion to Exclude Selected Testimony of Dr. Ladinsky. *See* Doc. 593 at 2-8.

## ARGUMENT

**I.     Dr. Shumer's Testimony About Alabama Providers Is Outside His Expertise.**

First, Dr. Shumer does not have the knowledge or expertise to testify about the prescribing practices of Alabama medical providers, and his testimony on those

2

practices is unreliable. Dr. Shumer's testimony repeatedly purports to speak to provider practices in Alabama, either through broadly worded declarations or through implications directly about those providers. For instance, he asserts that:

- "Assessment for gender dysphoria in children and adolescents is performed by highly trained mental health professionals who are able to make a diagnosis based on standard criteria." Shumer Rep. 28.

- "Prior to initiation of GnRHa, providers counsel patients and their families extensively on potential benefits and risks." *Id.* at 22 ¶16.

- "Similarly to GnRHa, risks and benefits of treatment are discussed with patients and families prior to initiation of testosterone or estrogen." *Id.* at 23 ¶18.

- "Patients who initiate hormones after completing puberty are offered gamete preservation prior to hormonal initiation." *Id.* at 25 ¶2.

- "[C]oncerns about fertility are discussed with adolescent patients and their families when receiving both GnRHa as treatment and/or gender-affirming hormones." Shumer Rebuttal Rep. 34 ¶52.

- "[A]t every encounter with the care team there is a re-evaluation of the patient's gender identity and their transition goals." Shumer Rep. 23-24 ¶19.

- "Every medical decision, from use of GnRHa to use of hormones, is a decision that is made carefully, cautiously, and after a thorough review of risks and benefits with the patient and family." *Id.* at 32.

- "[P]roviders are trained to explain expected effects, risks, and benefits to patients and families in an age-appropriate and

3

culturally competent way. When a provider is unsure if a patient or family understands what has been discussed, the information is reviewed again in a manner helpful to the patient and family." *Id.* at 35.

- "[P]roviders in this field *are* using caution when prescribing GnRHa and gender-affirming hormones in adolescence, weighing potential benefits against potential risks with each individual patient, in candid communication with parents, and with the best intentions for the wellbeing of the adolescent in question." Shumer Rebuttal Rep. 28 ¶43.

- "I submit that providers across the country take the same care when describing potential risks and benefits of gender-affirming care." *Id.* at 44 ¶72.

- "Uniformly, providers in this field are motivated by a desire to promote health and well-being in adolescents." Shumer Rep. 29.

Dr. Shumer, however, is not qualified to speak to the practices of Alabama providers of medical gender transition procedures. Though he claimed to be "well-connected with others in the field" (*id.* at 44 ¶72), Dr. Shumer lacked even basic knowledge of gender transition practices *in Alabama*. Asked at his deposition whether he was "aware of any pediatric gender clinics in Alabama," he answered: "I don't—I'm not intimately familiar with any pediatric gender clinics in Alabama, although I have an awareness that there is one in Birmingham." SJ.DX39:43:2-6 (Shumer Dep.). Asked whether he is "familiar with any others?," he answered: "No." *Id.* at 43:7-8; *see id.* at 62:2-6 ("I'm not aware of others, but don't claim to know all of the gender clinics across the country."). Unsurprisingly, Dr. Shumer likewise testified that he had "no particular knowledge" of how children in Alabama are treated or how many practitioners there follow the WPATH Standards of Care 8. *Id.* at 60:4-

4

21, 61:22–62:1; *see id.* at 59:25–60:3 (testifying that he has "never conducted a survey about the parameters of gender-affirming care provided by other practitioners").

Dr. Shumer's testimony about provider practices generally should be excluded because he has no expertise about *Alabama* provider practices—and the practices of providers elsewhere add nothing to Plaintiffs' and the United States' challenge to disprove that Alabama's law has "at least one plausible, arguably legitimate purpose." *Haves v. City of Miami*, 52 F.3d 918, 923 (11th Cir. 1995). By his own admission, Dr. Shumer lacks knowledge of even the identity of Alabama providers—meaning that he could not have knowledge about those providers' practices, their adherence to particular standards, or their motivations. And in all events, Dr. Shumer does not explain how he could know the "[u]niform" motivations and procedures of even non-Alabama providers. Shumer Rep. 29. Notably, however, his descriptions bear no resemblance to documented accounts of care in Alabama. *E.g.*, SJ.DX132:15 (Jarvie *Abortion Doctor*) (OB/GYN in Tuscaloosa providing transitioning hormones to children on first visit opining: "No, I don't need a psychologist or psychiatrist to evaluate" a minor patient seeking cross-sex hormones); SJ.DX26 (Abdul-Latif Dep.). His testimony should be excluded for lack of qualification and because the testimony itself, being irrelevant, would be unhelpful to the Court.

In a similar case, the Eleventh Circuit affirmed a district court's ruling excluding the testimony of an expert witness who wished to testify about "rates of drug use in the Florida TANF population" because "he had never studied, surveyed, or collected any information on the TANF population in any context, much less TANF applicants in Florida." *Lebron v. Secretary of Fla. Dep't of Children & Families*,

5

772 F.3d 1352, 1368-69 (11th Cir. 2014). Dr. Shumer lacks the same requisite knowledge about the specific population and issue he wishes to testify about—provider practices in Alabama—so is equally unqualified.

Though Rule 702 permits an expert to "be qualified by experience," that "does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc). Dr. Shumer's experience as an endocrinologist in Boston and Michigan, without more, provides no foundation on which he could testify about provider practices in Alabama.

For related reasons, to the extent Dr. Shumer's testimony is aimed at Alabama provider practices, it is unreliable. To be reliable, "[p]roposed expert testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* (cleaned up). But Dr. Shumer has not surveyed Alabama providers, considered deposition testimony, or reviewed medical records—or any other evidence—that could provide evidence of their practices. And he points to no other foundation for his claims about Alabama provider practices. "[T]he *ipse dixit* of an [otherwise] qualified expert" is insufficient to establish reliability. *Id.*

Because Dr. Shumer's testimony about provider practices is unreliable to the extent it is about Alabama providers and unhelpful otherwise, it should be excluded.

## II. Dr. Shumer's Testimony About Suicidality And Other Harms Is Unreliable.

Next, Dr. Shumer's testimony that youth who do not access medical gender transition procedures will see an increase in mental health problems and suicidality

6

is unreliable and should be excluded. Dr. Shumer claims that "[b]anning effective treatment for gender dysphoria will not eliminate transgender youth, but unfortunately, will lead to an increase in mental health problems and suicidality in an already vulnerable population." Shumer Rep. 36; *see id.* ("Lack of access to these treatments will result in worse outcomes for countless youth in Alabama."). He does not claim that his own experience supports this claim. Instead, his only support is a reference to another paragraph in his report, which discusses three studies he claims "demonstrate improvement of gender dysphoria with associated improvement of psychological functioning" from "gender-affirming care." *Id.* at 11-12 ¶1. But as he admitted at his deposition (and as explained below), these studies do not provide a reliable foundation for his testimony that youth "will" see "an increase in mental health problems and suicidality" if not given puberty blockers and cross-sex hormones. *Id.* at 36.

Indeed, when confronted at his deposition with WPATH's systematic review commissioned for its Standards of Care Version 8, Dr. Shumer seemed to *disclaim* his opinion about an increase in suicide and mental health harm. That review found that "[i]t was impossible to draw conclusions about the effects of hormone therapy on death by suicide." SJ.DX42:54 (Shumer Dep. Ex. 30, Baker). Faced with this statement, Dr. Shumer said: "I don't dispute that the totality of literature isn't adequate in addressing that question." Shumer Dep. 203:5-6; *see id.* at 203:17-18 ("I agree that the literature can't currently answer that question."). That same review concluded—and Dr. Shumer agreed—that the strength of evidence for the effects of hormone therapy on other mental health outcomes was "low," due to "uncontrolled

7

confounding and imprecision because of small sample sizes." SJ.DX42:55 (Shumer Dep. Ex. 30, Baker); *see* Shumer Dep. 206:2-5. A low strength of evidence means, according to Dr. Shumer, "that it's more likely that the actual effect is different from what the study found." *Id.* at 206:17-23. Other systematic reviews have confirmed that "the evidence does not adequately support the claim that gender-affirming treatment reduces suicide risk." SJ.DX84:187 (Cass Review); *see* SJ.DX106:8 (Swedish systematic review); SJ.DX109:27 (Norwegian review).

    Dr. Shumer also backtracked from the studies he relied on in his report to show supposed suicidality. *See* Shumer Rep. 12 ¶1 nn.19-21. He agreed that the Turban 2022 study "cannot determine causality." Shumer Dep. 229:9-17. He agreed that the study was based on an anonymous Internet survey of individuals gleaned from "lists of active transgender LGBTQ and allied organizations." *Id.* at 222:14–223:13, 225:9-10. He agreed that "researchers [had] no way of verifying the self-reported survey responses," and that the survey did not even *ask* respondents if they had been diagnosed with gender dysphoria. *Id.* at 225:11-14, 228:21-23. He agreed with the survey's own representation that respondents "were not randomly sampled" and that it is "not appropriate to generalize the findings in this [survey] to all transgender people." *Id.* at 224:12–225:4. He agreed that the survey excluded individuals who no longer identified as transgender—the group perhaps most likely to be harmed by cross-sex hormones. *Id.* at 225:5-8. And he agreed with Turban's own explanation that "[i]t is possible that people with better mental health status at baseline are more likely to be able to access [gender affirming hormones, GAH], thus confounding associations between GAH access and adult mental health outcomes

measured." *Id.* at 229:18–230:4. On top of all that, "errors in Dr. Turban's data tables and other issues have been identified that were sufficiently serious to require the publication of a correction"—a correction that did not address the underlying deficiencies in the study design and reporting. SJ.DX3:¶¶90-91 (Cantor Supp. Rep.).

Next, Dr. Shumer claims in his report that Green's 2022 study found that "gender-affirming hormone therapy is correlated with reduced rates of depression and suicidality among transgender adolescents." Shumer Rep. 12 ¶1. In fact, according to the study itself, it identified *no* statistically significant correlation between hormone therapy and suicidality in patients under age 18. *See Daubert*.DX16:647-48 & tbl. 5 (Green). And it emphasized that "causation cannot be inferred due to the study's cross-sectional design" and that various confounders exist, including that "[i]t is possible that those who historically have higher rates of depression and suicidal thoughts and behaviors are also less able to seek or obtain [hormone therapy]." *Id.* at 648. "Additionally, [the study's] self-reported nonprobability sample may limit the generalizability of findings." *Id.*; *see* SJ.DX5:100-01 (Hruz Rep.) (describing more limitations). This study cannot support Dr. Shumer's stated opinion.

The last study Dr. Shumer relies on, de Vries 2014, was an early Dutch study. Dr. Shumer conceded that the approach he uses (from WPATH's SOC-8) "deviates from the Dutch approach used in the de Vries 2014 study because it doesn't prescribe age cutoffs." Shumer Dep. 191:1-5. He conceded that "the Dutch protocol used age cutoffs at age 16 for cross-sex hormones," meaning that minors under 16 were not given cross-sex hormones in the study. *Id.* at 191:6-8. Even then, over one percent of the study participants died "*due to gender-affirming interventions*." *Id.* at 241:15-

9

25 (emphasis added). Dr. Shumer agreed that the study involved no control group of patients with gender incongruence, and that all patients in the study had transitioning surgeries—which he claimed "are not typically performed in adolescence" in the United States. *Id.* at 241:3-14, 243:22-23; *see* Shumer Rep. ¶20. As a result, as Dr. Shumer recognized, the study "provides no evidence about the long-term outcomes of puberty blockers and cross-sex hormones without surgeries." Shumer Dep. 244:8-12. And perhaps most significantly here, the study does not appear to examine suicidality at all. *See* SJ.DX42:142 (Shumer Dep. Ex. 37, de Vries 2014). For all of these reasons, the 2014 de Vries study could not provide a sound basis for Dr. Shumer's opinion about increased suicidality.

Because Dr. Shumer's opinion that the Act "will" "increase" suicidality and other harms lacks adequate basis in the sources that Dr. Shumer relies on to offer that opinion, this testimony is unreliable and should be excluded. *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (opinion testimony that is "connected to existing data only by the *ipse dixit* of the expert" must be excluded (cleaned up)).

### III. Dr. Shumer's Testimony About A "Strong Biological Foundation" Of Gender Identity Is Outside His Expertise, Unhelpful, and Unreliable.

Last, Dr. Shumer purports to testify that "[s]cientific research and medical literature across disciplines demonstrates that gender identity … has a strong biological foundation." Shumer Rep. 8 ¶5; *see id.* at 27 ("gender identity has a biological foundation); *id.* at 10-11 ¶8 ("scientific research demonstrat[es] biological influences on gender identity" and "[g]ender identity, like other complex human

10

characteristics, is rooted in biology"); *id.* at 7 n.2 ("Diversity of gender identity … are naturally occurring sources of human biological diversity."); Shumer Rebuttal Rep. 17 ¶28 ("[G]ender identity is a real and biologically based element of sex."); *id.* at 19 ¶30 ("Gender identity is a real human characteristic rooted in biology."); *id.* at 20 ¶31 ("[T]here is ample scientific evidence that gender identity has a strong biological foundation.").

But Dr. Shumer's testimony about a "strong biological foundation" of gender identity is unreliable, by his own admissions and by the qualifications in his own articles. At deposition, Dr. Shumer was confronted with an article he co-authored in 2016, which cited the same studies he relied on in his report here. *Unlike* the report he made for this litigation, his published, peer-reviewed article concluded: "Studies have failed to firmly establish causative genes" related to the "heritability of transgender identity." SJ.DX40:5 (Shumer Dep. Ex. 1, *Advances*). His article also explained that no definitive brain correlation has been identified, either. *See id.*

When confronted with his about face, Dr. Shumer claimed that he developed a newfound "understanding of gender identity" "as having biologic underpinnings" since his 2016 article. Shumer Dep. 11:4-7. Given that the latest date on the relevant sources cited in his report is 2014—two years before his published article—that explanation made little sense. *See* Shumer Rep. 9-10 ¶¶5-7. So Dr. Shumer understandably moved away from it when he was then asked about statements from the Endocrine Society in 2021 finding that "a clear causative biological underpinning of gender identity remains to be demonstrated" and that "it is unknown if the choice to function in society in male, female or other role[s] is" "affected by biological

11

factors." SJ.DX40:38-39 (Shumer Dep. Ex. 3, *Considering Sex*). At that, Dr. Shumer abandoned his claim of a "strong biological foundation," saying: "I agree that we don't have [a] biologic variable that clearly causes a certain change in gender identity." Shumer Dep. 23:8–24:1. He agreed that he does not "know with certainty what causes gender identity." *Id.* at 24:18-20; *id.* at 13 ("there's not a clear cause"). And he agreed with other researchers that "[d]efinitive conclusions about genetic and neural correlates of gender identity remain elusive." *Id.* at 32:19–33:16; *see* SJ.DX40:118 (Shumer Dep. Ex. 7, *When Sex and Gender Collide*).

The very articles he cited in his report also make clear that there is no "demonstrate[d]" "strong biological foundation" of gender identity. Shumer Rep. 8 ¶5. Start with the brain studies. As the Endocrine Society explained—and Dr. Shumer agreed at his deposition—"[a] general issue is that the association of sex, gender or sexual orientation with specific brain structures or with other biological variables does not establish whether the biological variables are causes or consequences or noncausal correlates of the behavioral contribution or function of the individuals studied." Shumer Dep. 29:16–30:16; SJ.DX40:39 (Shumer Dep. Ex. 3, *Considering Sex*).

The studies Dr. Shumer relied on in his report (Shumer Rep. 6 ¶5 & nn.11-12) make the same point. His lead study says: "Further research needs to resolve whether the observed distinct features in the brains of transsexuals influence their gender identity or possibly are a consequence of being transsexual." *Daubert*.DX17:4 (Luders). Indeed, a commentary that Dr. Shumer relied on explains that "[a] subsequent study … did not confirm the[] findings" from the Luders study. *Daubert*.DX18:4383 (Rosenthal) (cited at Shumer Rep.10 ¶7 n.15). Plus, the Luders

12

approach of considering gray matter volumes is problematic because (per Dr. Shumer's own source) "[i]t has been demonstrated that changes in both white matter microstructure and gray matter can be induced by training/experience in healthy human adults." *Id.* at 4384. Thus, one cannot know "whether any observed brain differences between transgender and cisgender individuals are intrinsic or a consequence of experience." *Id.*

Another of Dr. Shumer's sources also appears to *undermine* his opinion, finding that "no sex-atypical features with signs of 'feminization' were detected in the [male to female] transsexual group." *Daubert*.DX19:2530 (Savic); *see generally* SJ.DX3:¶164 (Cantor Supp. Rep.). And while Dr. Shumer broadly described one study about the stria terminalis, using language nearly identical to his 2016 article, he omitted the next sentence from that article, which explained that scientists disagree with the interpretation of the study he seems to adopt now. SJ.DX40:5 (Shumer Dep. Ex. 1, *Advances*); *cf. Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (noting that a "key consideration" under Rule 702 "is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" (cleaned up)).

In addition, the very article Dr. Shumer described said it cannot rule out the contrary possibility that any difference observed is an *effect* of gender identity rather than a *cause*. *See Daubert*.DX20:1032 (Chung) (emphasizing that "it must also be taken into consideration that changes in [stria terminalis] volume in male-to-female transsexuals may be the result of a failure to develop a male-like gender identity"); *see also* SJ.DX7:¶22 (Laidlaw Rep.); Rosenthal, *supra*, at 4383 (Dr. Shumer's own

13

source explaining that "the relationship between [stria terminalis] volume and gender identity would appear to be unclear").

Dr. Shumer's claim of "genetic components of gender identity" fares no better. Shumer Rep. 9 ¶6. He cited a twin study—again, one that he had relied on in his academic work—without including his academic work's disclaimer that the study "failed to firmly establish causative genes." SJ.DX40:5 (Shumer Dep. Ex. 1, *Advances*); *see also* SJ.DX7:¶23 (Laidlaw Rep.) ("[N]o genetic studies have ever identified a transgender gene or genes."). And "if gender identity is actually determined by genes, we would expect that identical twins would profess having the same gender identity nearly 100 percent of the time"—which "is not the case" in the study cited by Dr. Shumer. *Id.*

As Dr. Shumer admitted, that single study involved a non-randomized sample of about 23 twin pairs, as well as the old diagnosis of "gender identity disorder" rather than the current DSM-V diagnosis of gender dysphoria—and only 39% of the twin pairs were found to both have gender identity disorder. Shumer Dep. 265:14–268:4. The study emphasized that "shared and nonshared environmental factors cannot be ruled out" for any correlation seen. SJ.DX42:175 (Shumer Dep. Ex. 42, Heylens). And the study controlled for *no* variables, including sexual orientation. Shumer Dep. 270:1-4; *see* SJ.DX2:¶164 (Cantor Rep.) (explaining the significance of failing to control for this confounding variable).

Dr. Shumer's remaining sources also fail to provide evidence of a "strong biological foundation." One cautioned that its results should "be interpreted with the utmost caution" "[g]iven the small number of transsexuals that were included in the

14

study"—just 29, all Caucasian male-to-female, and diagnosed by the old DSM-IV with gender identity disorder. *Daubert*.DX21:659, 663 (Henningsson). Plus, the control group may have also included transsexuals, as subjects "were not asked for their sexual orientation or their sexual identity." *Id.* at 659.

The takeaway from all this is that Dr. Shumer lacks evidentiary support to opine (as he does) that "[s]cientific research and medical literature across disciplines demonstrates that gender identity … has a strong biological foundation." Shumer Rep. 8 ¶5. What his own sources establish is that no one knows whether gender identity has any biological foundation, much less a "strong" one. "The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rider*, 295 F.3d at 1202 (cleaned up). Because Dr. Shumer's opinion "cannot be supported by" his own sources, it should be excluded as unreliable. *Hendrix*, 609 F.3d at 1194.

## CONCLUSION

For these reasons, the Court should exclude Dr. Shumer's testimony about the general practices of medical gender transition providers, particularly in Alabama; suicidality and others harms in minors who do not receive medical gender transition procedures; and a purported "strong biological foundation" of gender identity.

| | |
|---|---|
| Dated: June 24, 2024 | Respectfully submitted, |
| | Steve Marshall<br>  *Attorney General* |
| Christopher Mills (*pro hac vice*)<br>SPERO LAW LLC<br>557 East Bay Street, #22251<br>Charleston, SC 29413<br>(843) 606-0640<br>CMills@Spero.law | Edmund G. LaCour Jr. (ASB-9182-U81L)<br>  *Solicitor General*<br><br>s/ A. Barrett Bowdre<br>A. Barrett Bowdre (ASB-2087-K29V)<br>  *Principal Deputy Solicitor General* |
| David H. Thompson (*pro hac vice*)<br>Peter A. Patterson (*pro hac vice*)<br>Brian W. Barnes (*pro hac vice*)<br>John D. Ramer (*pro hac vice*)<br>COOPER & KIRK, PLLC<br>1523 New Hampshire Ave., NW<br>Washington, D.C. 20036<br>(202) 220-9600<br>dthompson@cooperkirk.com<br>ppatterson@cooperkirk.com<br>bbarnes@cooperkirk.com<br>jramer@cooperkirk.com | James W. Davis (ASB-4063-I58J)<br>  *Deputy Attorney General*<br><br>Benjamin M. Seiss (ASB-2110-O00W)<br>Charles A. McKay (ASB-7256-K18K)<br>  *Assistant Attorneys General*<br><br>OFFICE OF THE ATTORNEY GENERAL<br>STATE OF ALABAMA<br>501 Washington Avenue<br>Post Office Box 300152<br>Montgomery, Alabama 36130-0152<br>Telephone: (334) 242-7300<br>Facsimile: (334) 353-8400<br>Edmund.LaCour@AlabamaAG.gov<br>Barrett.Bowdre@AlabamaAG.gov<br>Jim.Davis@AlabamaAG.gov<br>Ben.Seiss@AlabamaAG.gov<br>Charles.McKay@AlabamaAG.gov |
| Roger G. Brooks (*pro hac vice*)<br>Henry W. Frampton, IV (*pro hac vice*)<br>Philip A. Sechler (*pro hac vice*)<br>ALLIANCE DEFENDING FREEDOM<br>15100 N. 90th Street<br>Scottsdale, AZ 85260<br>(480) 444-0200<br>rbrooks@adflegal.org<br>hframpton@adflegal.org<br>psechler@adflegal.org | *Counsel for Defendants* |

16

## CERTIFICATE OF SERVICE

I certify that on June 24, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*
