# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' COMBINED MOTIONS IN LIMINE TO EXCLUDE TESTIMONY OF DEVIN CAUGHEY AS AN IMPROPER REBUTTAL WITNESS, AS IRRELEVANT UNDER RULE 402, AND AS CONTRARY TO RULE 702**

## TABLE OF CONTENTS

Table of Contents ................................................................................. i

Table of Authorities ........................................................................... ii

Introduction ........................................................................................1

Argument..............................................................................................4

    I.   Caughey's Testimony Should Be Excluded Because, As A Non-Rebuttal Witness, His Testimony Was Not Timely Disclosed...................4

        A.   Caughey Does Not Provide Proper Rebuttal Testimony...................5

        B.   Disclosing Caughey Over a Year Late, on the Eve of the Close of Discovery, Requires Exclusion .............................................9

    II.  Caughey's Testimony Should Be Excluded Because It Is Irrelevant........13

        A.   Neither Plaintiffs Nor the United States Have Pleaded Allegations of a Discriminatory Intent Claim .................................13

        B.   Caughey Disclaimed Offering an Opinion About Legislative Intent ............................................................................................20

    III. Caughey's Testimony Should Be Excluded Because It Flunks The Requirements Of Rule 702 And *Daubert* ...................................................21

        A.   Caughey's Indices Are Unreliable and Unhelpful............................21

        B.   Caughey's Reference to Purported "Anti-LGBT Legislation" Is Based on Nothing More Than His Own *Ipse Dixit* .....................35

        C.   Caughey's Cherry-picking of the Legislative History is Error-filled and Unscientific .......................................................................38

Conclusion ..........................................................................................40

Certificate of Service .........................................................................42

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
  585 U.S. 579 (2018) ........................................................................... 7, 10, 17

*Ahmed v. Johnson & Johnson Healthcare Sys., Inc.*,
  2024 WL 693078 (S.D. Ala. Feb. 20, 2024) .......................................... 5

*Alexander v. S.C. State Conf. of the NAACP*,
  144 S. Ct. 1221 (2024) ......................................................................... 26

*Bell v. Progressive Select Ins. Co.*,
  ___ F. Supp. 3d ___, 2023 WL 5940306
  (M.D. Fla. Sept. 13, 2023) ......................................................... 5, 8, 10, 11

*Blake v. Securitas Sec. Servs., Inc.*,
  292 F.R.D. 15 (D.D.C. 2013) .............................................................. 6, 9

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ............................................................................. 40

*Burgin v. Burlington Coat Factory*,
  2013 WL 2444038 (N.D. Ala. June 4, 2013) ....................................... 19

*Cardelle v. Miami Beach Fraternal Ord. of Police*,
  2013 WL 12077496 (S.D. Fla. Sept. 30, 2013),
  *aff'd*, 593 F. App'x 898 (11th Cir. 2014) .......................................... 18

*Chavis v. Clayton County Sch. Dist.*,
  300 F.3d 1288 (11th Cir. 2002) .......................................................... 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ....................................... 1, 3, 4, 13, 21, 35, 39, 40

*Dekker v. Weida*,
  679 F. Supp. 3d 1271 (N.D. Fla. 2023) .............................................. 33

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ...................................................................................14

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ...................................................................... 17, 40

*Eknes-Tucker v. Gov. of Ala.*,
  80 F.4th 1205 (11th Cir. 2023)................................................................15

*FDA v. All. for Hippocratic Med.*,
  No. 23-235, 2024 WL 2964140 (U.S. June 13, 2024) .........................................36

*Fla. State Conf. of NAACP v. Lee*,
  576 F. Supp. 3d 974 (N.D. Fla. 2021)...................................................19

*Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*,
  710 F.3d 1221 (11th Cir. 2013)..............................................................14

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ...........................................................................36

*Geduldig v. Aiello*,
  417 U.S. 484 (1974) ...........................................................................17

*GeorgiaCarry.Org, Inc. v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012)..............................................................14

*Gilmour v. Gates, McDonald & Co.*,
  382 F.3d 1312 (11th Cir. 2004)..............................................................18

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011)..............................................................32

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
  992 F.3d 1299 (11th Cir. 2021)........................................... 14, 19, 24, 40

*Guantanamera Cigars Co. v. SMCI Holding, Inc.*,
  2023 WL 5176377 (S.D. Fla. Aug. 11, 2023)...................................10

*Hall v. Thomas*,
   753 F. Supp. 2d 1113 (N.D. Ala. 2010) ........................................................ 28, 35

*Haves v. City of Miami*,
   52 F.3d 918 (11th Cir. 1995) ............................................................................7, 15

*Henderson v. Lockheed Martin Corp.*,
   2023 WL 11108737 (M.D. Fla. Sept. 18, 2023) ..................................................27

*Hendrix v. Evenflo Co.*,
   609 F.3d 1183 (11th Cir. 2010) .........................................................................35

*Hurlbert v. St. Mary's Health Care Sys., Inc.*,
   439 F.3d 1286 (11th Cir. 2006) .........................................................................19

*In re Trasylol Prod. Liab. Litig.*,
   2010 WL 4065436 (S.D. Fla. Aug. 6, 2010) .........................................................6

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
   2021 WL 2685605 (S.D. Fla. June 30, 2021) ......................................................19

*ITT Corp. v. Xylem Grp., LLC*,
   2012 WL 12871632 (N.D. Ga. Oct. 15, 2012) .......................................................6

*Jackson v. BellSouth Telecomms.*,
   372 F.3d 1250 (11th Cir. 2004) .................................................................... 16, 18

*Joiner v. Mason*,
   2011 WL 2142768 (M.D. Ala. May 23, 2011) ....................................................18

*Kirksey v. Schindler Elevator Corp.*,
   2016 WL 5213928 (S.D. Ala. Sept. 21, 2016) .......................................................6

*Knight ex rel. Kerr v. Miami-Dade Cnty.*,
   856 F.3d 795(11th Cir. 2017) ..............................................................................9

*Lebron v. Royal Caribbean Cruises, Ltd.*,
   2018 WL 3583002 (S.D. Fla. July 26, 2018) .....................................................6, 8

*LULAC v. Perry*,
    48 U.S. 399 (2006) ..............................................................................24

*Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*
*ex rel. Univ. of S. Fla.*,
    342 F.3d 1281 (11th Cir. 2003).............................................................19

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004)............................................... 13, 23, 26

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
    No. 20-11266, 2023 WL 2733512 (11th Cir. Mar. 31, 2023)...............10

*Morgan v. Com. Union Assur. Cos.*,
    606 F.2d 554 (5th Cir. 1979) ..................................................................5

*Nelson v. Ipalco Enters., Inc.*,
    2005 WL 1924332 (S.D. Ind. Aug. 11, 2005).......................................11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ..................................................................................14

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*,
    111 F.3d 528 (7th Cir. 1997)........................................................ 28, 34

*Stallworth v. E-Z Serve Convenience Stores*,
    199 F.R.D. 366 (M.D. Ala. 2001) ...........................................................9

*Timber Pines Plaza, LLC v. Kinsale Ins. Co.*,
    192 F. Supp. 3d 1287 (M.D. Fla. 2016) ..................................................9

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ...............................................1, 2, 4, 7, 10-20, 40

*Williams v. Morgan*,
    478 F.3d 1316 (11th Cir. 2007).............................................................15

*Wu v. Thomas*,
    996 F.2d 271 (11th Cir. 1993)...............................................................10

v

*Zurich Am. Ins. Co. v. Hardin*,
  2018 WL 5270356 (N.D. Ga. Mar. 14, 2018) ........................................................5

**Statutes**

Ala. Code § 26-26-6 ........................................................................................3

**Rules**

Fed. R. Civ. P. 16(f) ........................................................................................9

Fed. R. Civ. P. 16(f)(1)(C) ..............................................................................9

Fed. R. Civ. P. 26 Advisory Comm. Note (1993) ...................................................10

Fed. R. Civ. P. 26(a) ...................................................................................6, 9

Fed. R. Civ. P. 26(a)(2)(D)(ii) .........................................................................5

Fed. R. Civ. P. 37(c)(1) ..............................................................................9, 12

Fed. R. Civ. P. 37(b)(2)(A)(ii) .........................................................................12

Fed. R. Civ. P. 702 ................................................................................ 13, 21

Fed. R. Civ. P. 702(b) ...................................................................................34

M.D. Ala. L.R. 26.1 ........................................................................................9

**Acts**

Alabama Vulnerable Child Compassion and
  Protection Act ................................................... 1, 3, 4, 8, 12, 14-17, 22

**Other Authorities**

Fisher, *Multiple Regression in Legal Proceedings*,
   80 Colum. L. Rev. 702 (1980).................................................................27

HB24 (2017), https://arc-sos.state.al.us/ucp/B17123AA.AZV.pdf.........................36

HB95 (2017), https://arc-sos.state.al.us/ucp/B17117AA.A3I.pdf..........................36

SB261 (2023), https://arc-sos.state.al.us/ucp/L1277299.AI1.pdf ..........................36

# INTRODUCTION

As Defendants have repeatedly pointed out, neither the United States nor private Plaintiffs have ever pleaded facts underlying any claim of discriminatory intent directed at the Alabama Vulnerable Child Compassion and Protection Act. *E.g.*, Docs. 158-1 at 15-17, 171 at 13-16, 200 at 15-17, and 411 at 8-19. This Court has agreed, repeatedly quashing their attempts to harass private citizens in efforts to belatedly gin up an *Arlington Heights* theory of the case. So when the parties initially disclosed their experts, it was no surprise that no party presented an expert focusing on the intent of the Alabama Legislature in passing the Act—facts were never pleaded to support a claim focused on supposed discriminatory intent.

Yet over a year later, as discovery was coming to a close, the United States suddenly disclosed as a purported "rebuttal" witness a political scientist, Devin Caughey, with opinions aimed solely at the *Arlington Heights* factors—alleged discriminatory intent by the Alabama Legislature, other Alabama legislation, and the Act's legislative history. In his report, this "rebuttal" witness conceded that "Defendants' expert reports make almost no reference to the state of Alabama or to SB184 specifically." *Daubert*.DX35:¶61 (Caughey Rebuttal Rep.).[1] That is true—because neither the United States nor private Plaintiffs pleaded facts underlying a discriminatory intent claim.

---

[1] Defendants use two main citations form in their *Daubert* briefing. The first—*Daubert*.DX#:##—refers to exhibits Defendants submit in support of their *Daubert* motions, where the first "#" refers to the exhibit number and the second "##" refers to the page numbers within that exhibit. The second citation form—SJ.DX#:##—refers to the exhibits Defendants submitted in support of their motion for summary judgment. *See* Docs. 557-60 (public exhibits) & 564 (sealed exhibits).

This belated testimony in pursuit of an unpled theory should be excluded for at least three reasons. First, it is improper rebuttal testimony. A plaintiff's discriminatory intent theory must be proved as part of its case in chief, yet none of experts for Plaintiffs or the United States opined about such a theory in their initial reports. As a result, and as Caughey conceded, neither did any of Defendants' experts. Thus, Caughey's testimony cannot be characterized as "rebuttal." And because it was disclosed well over a year late—as discovery was about to close and without any good reason by the United States for the late disclosure—it must be excluded in its entirety and the United States should be precluded from offering any evidence at trial regarding its unpled *Arlington Heights* theory.

Second, even if Caughey's testimony were somehow "rebuttal," it should be excluded because it is irrelevant under Rule 402. Not to beat a dead horse, but *no plaintiff has ever pleaded facts underlying an* Arlington Heights *claim*. That claim is thus forfeited, and Caughey's testimony—directed solely at such a claim—is irrelevant to the rational basis inquiry before the Court. What's more, at his deposition Caughey *disclaimed* offering any opinion on "the legislative intent behind passing SB184," "any individual legislator's individual motivation in passing SB184," or "the legislative findings." SJ.DX79:225:9-23 (Caughey Dep.). So whatever his opinion is about, it is not even relevant to any non-existent *Arlington Heights* claim.

Third, on top of all that, Caughey's testimony should be excluded under Rule 702 as well. Most of his testimony is an effort to show a pattern of discrimination by cherry-picking a handful of state policies to make Alabama appear to have "anti-LGBT bias" relative to other States. Beyond the dubious assumption that differences

across States *alone* could somehow prove discriminatory intent, Caughey simply assumes that each policy he picks was passed *only* (or not) because of the purpose for which he wants to use that policy. So, for example, he codes laws that classify school sports teams by biological sex as "hostile," even as he conceded that there may be many other reasons to enact (or not) such laws. Then he simply mashes the sum of the policies he picked with the existence of a law like the Act—making no attempt to control *any* other variables, though he conceded that many confounding variables may exist. This method was used solely for this litigation, has never been used elsewhere, and Caughey could not even guess as to its error rate. Such unscientific drivel is just the reason that Rule 702 and *Daubert* exist.

The remainder of Caughey's testimony is equally unsound under Rule 702. His analysis of other Alabama legislation—some never enacted—likewise ignores any legitimate reasons for each piece of legislation. And his analysis of the Act's history is perhaps the worst of all: his banner argument about the Act, listed prominently in his "Summary of Opinions," is that "the legislature explicitly declined to exempt psychotherapeutic treatments from the bill's restrictions," which he trumpeted as "consistent with a general hostility to gender nonconformity per se." Caughey Rebuttal Rep. 8. The problem? That is 100% false. As he was forced to admit at his deposition, the Act explicitly includes the very exemption that Caughey says it did not. Caughey Dep. 173:2-15; *see* SJ.DX1:8 (Ala. Code § 26-26-6). Otherwise, his "analysis" of the Act regurgitates snippets of the legislative history out of context, which simultaneously is not proper expert testimony *and* ignores every

statement that the Legislature and Governor sought to protect children through the Act—and every statement by citizens supporting the Act for the same reason.

Caughey's testimony is improper rebuttal testimony, irrelevant to any claim properly before the Court, and fundamentally unreliable and unhelpful. For any of these reasons, it should be excluded in its entirety.

## ARGUMENT

**I.    Caughey's Testimony Should Be Excluded Because, As A Non-Rebuttal Witness, His Testimony Was Not Timely Disclosed.**

The United States' effort to shoehorn a new legal theory into this case is made evident by the late disclosure of Caughey's testimony, which provides the first reason to exclude that testimony. The United States labels Caughey a rebuttal expert, presumably to justify failing to disclose him until March 8, 2024, the deadline for rebuttal expert disclosure. *Daubert*.DX22:2 (U.S. Rebuttal Expert Witness Disclosure). But Caughey's testimony is a belated effort to bolster the United States' case in chief (on an unpled theory) and does not rebut any of the Defendants' experts' testimony. As Caughey's own report concedes, "Defendants' expert reports make almost no reference to the State of Alabama or to SB184 specifically." Caughey Rebuttal Rep. ¶61. Indeed, the Defendants' experts—none of them remotely resembling a political scientist—did not offer opinions about any discriminatory intent, purpose, or history behind the Act because (as discussed in Part II, below) (1) no plaintiff pleaded an *Arlington Heights* claim, and (2) no expert for any plaintiff discussed any facts or allegations relevant to such a claim in their initial reports.

The United States disclosed Caughey's purported "rebuttal" to this non-exist-ent testimony on April 1, 2024—413 days after the initial expert disclosure deadline of February 13, 2023. *See* Docs. 225, 422. The United States' dilatory disclosure deprived Defendants of any opportunity to obtain *actual* rebuttal testimony to Caughey's opinions. His testimony should thus be excluded.

### A.     Caughey Does Not Provide Proper Rebuttal Testimony.

Rebuttal testimony must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Generally, "a rebuttal expert opinion must address new, unforeseen evidence in the other party's case or must address matters on which the opposing party bears the burden of proof, such as an affirmative defense." *Bell v. Progressive Select Ins. Co.*, ___ F. Supp. 3d ___, 2023 WL 5940306, at *3 (M.D. Fla. Sept. 13, 2023) (citing *Morgan v. Com. Union Assur. Cos.*, 606 F.2d 554, 555 (5th Cir. 1979)). "A plaintiff's rebuttal expert may not simply raise evidence that goes to the plain-tiff's prima facie case and logically belongs in his case in chief." *Id.*; *see also Zurich Am. Ins. Co. v. Hardin*, 2018 WL 5270356, at *7 (N.D. Ga. Mar. 14, 2018) ("A court may exclude evidence submitted in a rebuttal report that does not rebut the opposing party's proffered expert testimony, but instead expands the case-in-chief.").

Further, "[a] rebuttal expert, by definition, criticizes or rebuts the methodol-ogy and opinions of another expert." *Ahmed v. Johnson & Johnson Healthcare Sys., Inc.*, 2024 WL 693078, at *13 (S.D. Ala. Feb. 20, 2024) (cleaned up). "[A] rebuttal opinion should not be used to advance new arguments or present new evidence." *Lebron v. Royal Caribbean Cruises, Ltd.*, 2018 WL 3583002, at *2 (S.D. Fla. July

26, 2018); *see ITT Corp. v. Xylem Grp., LLC*, 2012 WL 12871632, at *4 (N.D. Ga. Oct. 15, 2012) ("A party also may not use a rebuttal expert to introduce new legal theories." (cleaned up)). "Rebuttal testimony is permitted only when it directly addresses an assertion raised by an opponent's experts." *In re Trasylol Prod. Liab. Litig.*, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010); *see Kirksey v. Schindler Elevator Corp.*, 2016 WL 5213928, at *17 (S.D. Ala. Sept. 21, 2016) (rebuttal experts can serve only "the limited, narrow purpose of contradicting or rebutting [the other party's] expert testimony").

"Where a party attempts to designate as a 'rebuttal' expert someone whose proposed testimony is beyond the scope of appropriate rebuttal, that witness may be viewed as an initial expert who was not timely designated and whose testimony may be struck by the Court for violating Rule 26(a) and the Court's governing scheduling order." *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 18 (D.D.C. 2013).

That is the case here with Caughey's proffered testimony. Just as in other cases where courts have excluded faux rebuttal witnesses, review of Caughey's testimony "reveals the following: 1) It does not specifically … attack the testimony of [Defendants'] experts, and 2) It does not address any new or additional material introduced by [Defendants'] experts." *Trasylol*, 2010 WL 4065436, at *2.

Caughey purports to provide testimony about Alabama's alleged "long history of hostility to LGBT rights" and "the [Alabama] legislature's understanding of the purpose of SB184." *See* Caughey Rebuttal Rep. 8 (summary of opinions); *id.* ¶¶84-88 (conclusions, opining as to "the primary purpose of the legislation"). But none of the Defendants' initial experts provided testimony on these issues because none of

the Plaintiffs' or the United States' initial experts had done so—and any assertion of discriminatory intent belongs (if anywhere) in the United States' case in chief. *See Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State.").[2] Caughey is not a proper rebuttal expert.

Caughey's report selectively quotes Defendants' experts' *own* views about medical gender transition of minors, but never identifies any defense expert as providing a view about any *Arlington Heights*-related question: why *the Alabama Legislature* enacted the law, the Legislature's purpose, the procedures followed by the Legislature, the history of similar state regulations, and the like. Caughey disclaimed offering any view opposing Defendants' experts about the propriety of medical transition of minors—nor, as a political scientist, would he be qualified to do so. *E.g.*, Caughey Dep. 270:10-13 ("I don't have an opinion on that."). After reviewing all sixteen legislative findings in SB184, Caughey testified that in his "capacity as an expert in this case," he was not "disputing the correctness of any of these findings." *Id.* at 48:9–50:4; *see also id.* at 335:19-23 (testifying that he "doesn't opine on their validity"). But because of the way the United States and Plaintiffs pleaded their case, the correctness of those findings is the focus of Defendants' experts. Thus, testimony is non-responsive to Defendants' experts' testimony.

To be sure, at places in his report, Caughey takes a word or two from a few of Defendants' experts' reports to make it appear as though those experts were

---

[2] Defendants have no burden related to legislative intent, as under the governing rational basis standard, the "actual purposes" of the law or "improper motive[s]" "are not relevant." *Haves v. City of Miami*, 52 F.3d 918, 923 (11th Cir. 1995).

discussing legislative intent. But as he conceded at his deposition, those reports provided the experts' *own* views. Caughey was unable to "identif[y] any sentences" from Defendants' experts' reports "that specifically reference Alabama providing a justification for" what Caughey called "gender affirming care bans." Caughey Dep. 27:2-12; *see also id.* at 38:10-14; *id.* at 41:2-4 ("[T]hey do not specifically opine as to the motivations of the Alabama Legislature in passing SB184.").

Caughey himself made this clear. After protracted evasion, he conceded: "I am not rebutting any opinion that specifically references SB184 or the Alabama Legislature's motivations in passing it." *Id.* at 41:5-11; *see also id.* at 16:20–17:5 (finding no "contentions in specific to the intentions of the Alabama legislature" in passing the Act from Defendants' experts); *id.* at 17:6-10 (same as to the intentions of Alabama Governor in signing the Act). He agreed that he is "not rebutting any defense opinion on the procedures Alabama followed in enacting SB184," *id.* at 27:20-23, and that he is not "rebutting any [D]efendants' expert's opinion as to the history of transgender regulations in Alabama," *id.* at 28:10-14. And he could not identify any references by Defendants' experts to any other "Alabama laws or regulations" related to transgender, LGBT, or any other issues. *Id.* at 35:6-9.

Thus, if Defendants "asked for a limiting instruction" at trial that Caughey's testimony should be considered "solely to contradict" Defendants' experts—as would be appropriate for true "rebuttal" witnesses—any fact-finder "would struggle to understand why and how" Caughey's testimony could be used for that purpose. *Bell*, 2023 WL 5940306, at *2. That is because his testimony does not "directly address an assertion raised by an opponent's experts." *Lebron*, 2018 WL 3583002, at

8

*2. Caughey's sprinkled, out-of-context quotations from Defendants' experts' reports provide no grounds for labeling him a "rebuttal" witness. *Cf. Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016) ("[A] plaintiff may not seize upon language used in a defendant's expert report as a chance to re-do their opening expert report." (cleaned up)). His testimony should be excluded.

### B. Disclosing Caughey Over a Year Late, on the Eve of the Close of Discovery, Requires Exclusion.

Particularly because Caughey's testimony could only be offered to prove the United States' case in chief, the proper remedy for the United States' very belated disclosure of non-rebuttal expert testimony is exclusion. Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a)," "the party is not allowed to use that information or witness to supply evidence … unless the failure was substantially justified or is harmless." *Accord* M.D. Ala. L.R. 26.1; Fed. R. Civ. P. 16(f)(1)(C). "[F]ailing to disclose an expert witness by a court-ordered deadline results in an automatic and mandatory exclusion of the witness, unless the nondisclosure was justified or harmless." *Timber Pines*, 192 F. Supp. 3d at 1291-92 (cleaned up). The "burden" is on the United States to "show[] a substantial justification" for its "tardiness" or harmlessness. *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 812 (11th Cir. 2017); *see Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 368 (M.D. Ala. 2001); *see also Blake*, 292 F.R.D. at 19 ("The overwhelming weight of authority is that preclusion is *required* and

*mandatory* absent some unusual or extenuating circumstances—that is, a substantial justification." (cleaned up)).[3]

The United States cannot show either harmlessness or a substantial justification. As the Advisory Committee Notes to Rule 26 explain, "effective rebuttal requires advance knowledge of the line of testimony of the other side." Fed. R. Civ. P. 26 Advisory Comm. Note (1993). Absent that knowledge, "the narrowing of issues and elimination of surprise which discovery normally produces are frustrated." *Id.* "[I]n most cases the party with the burden of proof on an issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue." *Bell*, 2023 WL 5940306, at *4 (quoting Fed. R. Civ. P. 26 Advisory Comm. Note (1993)). Allowing a plaintiff to do otherwise "would reverse the order of proof at trial," "undermine the attendant sequencing of discovery," and effectively "requir[e] the defendants to put in their evidence before the plaintiff[s] put in [theirs]." *Id.* at *3-4 (cleaned up).

As noted, "[w]henever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott*, 585 U.S. at 603. Thus, to the extent the United States meant to bring an *Arlington Heights* claim, it should have (1) sought leave to amend its complaint to

---

[3] Even outside the expert testimony context, courts grant motions *in limine* to exclude evidence about unpled factual allegations going to new legal theories when allowing such evidence would, "in effect, ambush[] [the defendant] at trial with a new theory." *Guantanamera Cigars Co. v. SMCI Holding, Inc.*, 2023 WL 5176377, at *7 (S.D. Fla. Aug. 11, 2023); *e.g.*, *Wu v. Thomas*, 996 F.2d 271, 275 (11th Cir. 1993) (holding that the lower court "properly excluded" testimony that "was irrelevant to anything pled in the complaint"); *MidAmerica C2L Inc. v. Siemens Energy Inc.*, No. 20-11266, 2023 WL 2733512, at *15-16 (11th Cir. Mar. 31, 2023) (affirming grant of motion *in limine* to exclude evidence about facts related to claims that "were not pled" because the other party had not been put "on notice").

plead such a claim[4] and (2) disclosed Caughey's testimony in its initial expert disclosures. If Defendants had then been confronted with a political scientist like Caughey offering opinions no other expert did, they could—and would—have obtained their own rebuttal testimony. Defendants also could have developed more evidence related to the *Arlington Heights* issues on which Caughey opines. The United States *knew* that Defendants did not consider any *Arlington Heights* claim properly pled. *See* Docs. 158-1 at 15-17, 171 at 13-16, and 200 at 15-17. Yet the United States waited until about two months before the close of discovery—long after Defendants' window to provide rebuttal expert testimony closed—to even *disclose* Caughey's existence. And it waited until a month before discovery closed to disclose his expert report.

This last-minute disclosure of substantial new expert opinion testimony by another witness that was not even hinted at deprived Defendants of a fair chance to develop their case appropriately. That severe prejudice requires exclusion. *See, e.g.*, *Bell*, 2023 WL 5940306, at *4 (explaining similar prejudice); *Nelson v. Ipalco Enters., Inc.*, 2005 WL 1924332, at *8 (S.D. Ind. Aug. 11, 2005) (concluding that plaintiffs' delayed expert disclosure could not "be deemed harmless because it gave the plaintiffs the opportunity to wait for defendants to show their expert cards," even though the defendants had "ample time" to take the expert's deposition before trial).

---

[4] Of course, given that the United States promised not to "expand[] proceedings," Doc. 103 at 15-16 (PI Tr.) and that it was granted leave to intervene to "travel[] under the original cause of action of the plaintiffs, as opposed to an independent one," *id.* at 34, any attempt to "expand[] proceedings" by raising an *Arlington Heights* claim would properly have been denied. That does not excuse—though it does explain—the United States' attempt to bring its *Arlington Heights* claim through the back door.

The United States had no good reason for its late disclosure. Evidence about the Act's enactment was obviously available upon passage (April 8, 2022), yet Caughey was not even *contacted* by the United States until late 2023 or early 2024—long after the United States' initial expert reports were due. Caughey Dep. 13:15–14:4. It is apparent *why* the United States tried to shoehorn Caughey in as a rebuttal witness a year after its expert disclosures were due: once the claims it actually pleaded were rejected by the Eleventh Circuit, it wanted to change its theory mid-case. Yet neither the Eleventh Circuit opinion in this case nor any other recent precedent changed the state of the law respecting discriminatory intent claims. *See* Doc. 411 at 21 n.5. But the United States did not even *attempt* to plead such a claim, and instead sought to sneak it in through the back door by designating entirely new expert opinion under the guise of "rebuttal." That dilatory and prejudicial conduct warrants excluding Caughey's testimony in its entirety. It also warrants making clear that the United States has not pleaded an *Arlington Heights* claim and is precluded from introducing any evidence relevant to such a claim at trial. As explained next, such preclusion is necessary because neither the United States nor private Plaintiffs pleaded any *Arlington Heights* claim, but it is also warranted as a sanction for the United States' improper, dilatory, and prejudicial conduct relating to its late disclosure of Caughey's not-actually-rebuttal testimony. *See* Fed. R. Civ. P. 37(c)(1) (providing that a party's failure to timely disclose a witness can be remedied by "other appropriate sanctions, including" "prohibiting the disobedient party from supporting or opposing designated claims" (referencing Fed. R. Civ. P. 37(b)(2)(A)(ii)).

## II.   Caughey's Testimony Should Be Excluded Because It Is Irrelevant.

Apart from its dilatory disclosure, Caughey's testimony should also be excluded on relevance grounds for two reasons. First, neither Plaintiffs nor the United States pleaded allegations of a discriminatory intent claim. Second, Caughey *disclaimed* offering an opinion about legislative intent, and he offers no testimony about the other *Arlington Heights* factors. For both reasons, his testimony is irrelevant and should be excluded. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); *see also McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004) (*Daubert* and Rule 702 also "require[] that the proposed testimony be relevant.").

### A.   Neither Plaintiffs Nor the United States Have Pleaded Allegations of a Discriminatory Intent Claim.

In all their complaints, Plaintiffs and the United States have never alleged facts that would put Defendants on notice that they must defend against a claim of discriminatory legislative intent. That is the only kind of claim for which Caughey's testimony, which focuses on "the primary purpose" and "motivation" of the Alabama Legislature in enacting SB184, could be relevant. Caughey Rebuttal Rep. ¶¶ 84, 86 (conclusions); *see Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Under an *Arlington Heights* claim, potentially "relevant evidentiary factors for determining whether" "discriminatory intent existed" include "'[t]he historical background of the decision,' '[t]he specific sequence of events leading up [to] the challenged decision,' '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the [Legislature], minutes of its meetings, or reports.'" *Greater Birmingham Ministries*

*v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) ("*GBM*") (quoting *Arlington Heights*, 429 U.S. at 267-68). "To plead" an *Arlington Heights* claim, "a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant" law. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (quoting *Arlington Heights*, 429 U.S. at 266).

The Eleventh Circuit has admonished district courts *not* "to ignore what the respective parties alleged in their complaint and answer." *Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227 (11th Cir. 2013). Yet here, one "searche[s] the [operative complaints] to no avail in an attempt to find factual allegations that could possibly be construed as alleging" a discriminatory legislative intent theory. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 (11th Cir. 2012), *abrogated on other grounds*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

Defendants have pointed out this fundamental flaw several times before, including each time that the United States and Plaintiffs have issued subpoenas to private citizens about their legislative communications. *See* Doc. 411 at 8-19 (providing a full background and argument about this issue); *see also* Doc. 158-1 at 15-17; Doc. 171 at 13-16; Doc. 200 at 15-17. This Court has agreed, explaining that "the requested material has little—if any—relevance" to "whether Section 4(a)(1)–(3) of the Alabama Vulnerable Child Compassion and Protection Act is constitutional." Doc. 192 at 5. When Plaintiffs recently tried to issue subpoenas to private citizens *again*, Defendants reiterated that there is no "*Arlington Heights* claim in this case" and that amending to pursue such a claim "would also be futile"—and this Court

said that counsel had "succinctly and accurately stated what the law of the case is." Doc. 451 at 16-17. The Court was understandably "amazed" that Plaintiffs continued to pursue the issue: "I don't even think this is a close call." *Id.* at 17. After Plaintiffs withdrew the subpoenas and agreed to pay attorneys' fees, the Court expressed hope that "we won't have to go down this road again." *Id.* at 19-20.

Unfortunately, the United States and Plaintiffs still will not admit that they pleaded no *Arlington Heights* claim, even though they have never been able to point to a single factual allegation of any specificity going toward discriminatory legislative intent. At first, the United States said that legislative intent may be relevant under "heightened scrutiny" "as part of" its "equal protection claim" that the Act facially "discriminat[es] on the basis of sex and transgender status." Doc. 168 at 10. But binding Eleventh Circuit precedent now rejects an equal protection application of heightened scrutiny to the Act. *See Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1230 (11th Cir. 2023) ("reject[ing] the United States' view" and holding that the Act is "subject only to rational basis review"). And Caughey's testimony about legislative purpose is irrelevant under rational basis review, for "the actual purposes of [the Act] are not relevant to a rational-basis equal protection inquiry." *Haves*, 52 F.3d at 923; *see Williams v. Morgan*, 478 F.3d 1316, 1320-21 (11th Cir. 2007) ("[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." (cleaned up)).

With those two theories out of the way, the only other basis to inquire into legislative purpose would be an *Arlington Heights* claim. But it was very late in this litigation that the United States announced for the first time that it was purportedly

pursuing an *Arlington Heights* claim—that the Act is "facially neutral" but "purposefully discriminates." Doc. 196 at 7-8. The United States could point to no factual allegations in its complaint supporting such a theory. All it could point to for an allegation that "support[s] its contention that the statute purposefully discriminates" was a section heading in the complaint, "Impact of S.B. 184." *Id.* at 9 (quoting Doc. 92 at Section B.2). Needless to say, a section heading is not a "specific factual bas[i]s" for a claim. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004). And as suggested by the United States' reliance on the section heading instead of any specific allegation, nothing that follows the section heading alleges anything about the Legislature's purpose or motive. That section alleges that "the sex a minor was assigned at birth determines the legality and availability of medically necessary treatments" (Doc. 92 ¶ 52)—in other words that the Act facially discriminates. That is not an *Arlington Heights* allegation, but an allegation about sex discrimination—and one that the Eleventh Circuit rejected.[5]

For their part, Plaintiffs remained utterly silent about any *Arlington Heights* claim for almost two years after they filed their complaint, never contesting Defendants' arguments that (1) Plaintiffs did not plead any facts underlying an *Arlington Heights* claim and (2) neither did the United States. Then, out of the blue over a year after the Court had rejected the United States' similar subpoenas on private citizens,

---

[5] Again, the United States has also not explained how its purported new *Arlington Heights* theory could be consistent with its promises that its claim would be "based on the same facts" as Plaintiffs' claim, Doc. 58-1 at 9 n.2, and that it "isn't expanding proceedings," Doc. 103 at 15-16 (PI Tr.); *see id.* at 31; *id.* at 25, 34 (this Court understanding the United States to argue "we just want to join with the plaintiffs' only existing claim" and granting intervention "traveling under the original cause of action of the plaintiffs, as opposed to an independent one").

Plaintiffs tried to justify copycat subpoenas on *Arlington Heights* grounds. Doc. 413 at 9-14. But they too could not identify any specific factual allegation in any of their complaints that would support an *Arlington Heights* theory. The extremely edited snippets they quoted from their operative complaint offered no non-conclusory factual allegation about the Alabama's Legislative purpose in enacting SB184, much less any other *Arlington Heights* factor, but were aimed at showing facial discrimination based on sex or transgender status. *See id.* at 13; *see* Doc. 159 ¶¶ 105-10. Again, that theory—facial discrimination leading to heightened scrutiny—was already rejected by the Eleventh Circuit.

Perhaps recognizing the absence of factual allegations, Plaintiffs pointed to the longstanding legal rule that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" Doc. 413 at 13 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022), in turn quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). That venerable legal rule does nothing to relieve a plaintiff of its responsibility to make factual allegations of invidious discrimination if it wants to pursue such a theory. *See Abbott*, 585 U.S. at 603.

Contrary to Plaintiffs' passing argument, the Eleventh Circuit's mention of this rule did not constitute a "changed landscape[]." Doc. 413 at 14. The rule is at least 50 years old. *See Geduldig*, 417 U.S. at 496 n.20; *see generally* Doc. 411 at 21 n.5. And Plaintiffs cannot say that the *facts* underlying the Act's passage in 2022 changed. In any event, as Defendants already explained, "if [P]laintiffs read the

Eleventh Circuit decision and said, oh, we need to prove an *Arlington Heights* claim in light of this decision, the answer would have been for them to move to amend their complaint at that time [ten] months ago." Doc. 451 at 16. They did not.

"Pleadings must be something more than an ingenious academic exercise in the conceivable," and "[t]he liberal standard of notice pleading still requires a plaintiff to provide the defendant with fair notice of the factual grounds on which the complaint rests." *Jackson*, 372 F.3d at 1271. To the extent Plaintiffs or the United States meant to bring a discriminatory intent claim, the facts and "claims set forth in the complaint" provided Defendants "no notice" of that, or of the factual grounds on which that claim would rest. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). And "[i]f Plaintiffs believed that their complaint was insufficient in stating all claims for relief, Rule 15 clearly sets forth the process of amending, which the Plaintiffs [and the United States] surely realize, as they took advantage of this process in amending their original complaint." *Cardelle v. Miami Beach Fraternal Ord. of Police*, 2013 WL 12077496, at *2 n.3 (S.D. Fla. Sept. 30, 2013), *aff'd*, 593 F. App'x 898 (11th Cir. 2014); *see* Docs. 92, 143, 159.

Because no plaintiff has offered allegations going toward an *Arlington Heights* claim, the United States cannot now introduce evidence of this unpled claim, including through Caughey. Caughey's testimony is irrelevant to any claim before the Court. *See, e.g.*, *Joiner v. Mason*, 2011 WL 2142768, at *6 n.6 (M.D. Ala. May 23, 2011) ("[T]o the extent Plaintiff presents new claims for relief or factual allegations … and/or additional theories of liability," "such claims are not properly before the court" because the Plaintiff "'did not seek to amend his complaint to add a claim

based on the asserted conduct.'" (quoting *Chavis v. Clayton County Sch. Dist.*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002))); *Burgin v. Burlington Coat Factory*, 2013 WL 2444038, at *11 (N.D. Ala. June 4, 2013) (similar).

Further, as discussed above *and* explained elsewhere (Doc. 411 at 22-23), admitting Caughey's testimony—and a new *Arlington Heights* legal theory—would substantially prejudice Defendants. "The introduction of new legal theories at a later stage of proceedings amounts to undue prejudice." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2021 WL 2685605, at *11 (S.D. Fla. June 30, 2021). Defendants had "no notice whatsoever that [Plaintiffs] believed [they] w[ere] entitled to" relief based on an *Arlington Heights* theory not pleaded in the operative complaints. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). Absent that notice, the Defendants had no reason to seek or develop evidence related to an *Arlington Heights* claim. "The *Arlington Heights* factors" often "require a fact intensive examination of the record." *GBM*, 992 F.3d at 1322 n.33. Thus, late amendment could well necessitate "more attempts at discovery" and a "delayed disposition of the case," both amounting to prejudice to Defendants. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1287 (11th Cir. 2003); *cf. Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 984 (N.D. Fla. 2021) (noting deposition evidence on a similar claim).

Because Caughey's testimony is directed at a theory not properly before the Court, it is irrelevant and should be excluded.

### B.     Caughey Disclaimed Offering an Opinion About Legislative Intent.

Even if the United States or Plaintiffs had pleaded an *Arlington Heights* claim, Caughey's testimony would be irrelevant to such a claim. Remarkably, at his deposition Caughey disclaimed offering opinions about any discriminatory legislative intent—making his testimony wholly irrelevant. After initially explaining that his testimony "offer[s] an opinion about why this bill was passed," Caughey Dep. 36:14-17, Caughey quickly began waffling: "I didn't opine on the legislative intent behind the bill." *Id.* at 60:21-23; *see id.* at 68:3-6 ("I'm not opining on the—specifically on the legislative intent of the—of the legislature."); *id.* at 81:20-22 ("I can't speak to the motivations of any of the specific legislators.").

Then he abandoned ship on re-direct. When asked by the United States' counsel, "do you opine on the legislative intent behind passing SB184," Caughey answered, "No." *Id.* at 335:9-12. He gave the same answers when asked by the United States' counsel whether he was opining "on any legislators' individual intent" or "motivation in passing SB184": "No" and "No." *Id.* at 335:13-18.

"Proof of" "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" under *Arlington Heights*, 429 U.S. at 265. So if Caughey has no opinion about such an intent—either Legislature-wide or for individual legislators—then he has nothing of relevance to offer with respect to any *Arlington Heights* theory. Again, his testimony should be excluded.[6]

---

[6] Caughey's testimony is also irrelevant in the sense that it flunks Rule 702's requirement of helpfulness to the trier of fact, as addressed below.

## III.   Caughey's Testimony Should Be Excluded Because It Flunks The Requirements Of Rule 702 And *Daubert*.

Even putting aside the above deficiencies, each part of Caughey's expert opinion flunks Rule 702's and *Daubert*'s requirements of reliability and helpfulness.[7]

### A.   Caughey's Indices Are Unreliable and Unhelpful.

The bulk of Caughey's testimony (Caughey Rebuttal Rep. ¶¶ 19-46) involves cherry picking laws or regulations to create a series of made-for-litigation indices, which he compares to States' adoptions of laws like SB184 that protect children from sterilizing gender-transition interventions, to find a purported "pattern of discrimination." *Id.* ¶19. But these indices are each fundamentally flawed: they are arbitrarily constructed, do not control for *any* relevant variables, and, perhaps worst of all, rest on Caughey's unsupported assumption that all the relevant laws were passed only for the single purpose he wants to use them for.

Caughey's first index is of "LGBT policies before *Obergefell*." *Id.* ¶¶21-27. Caughey claims that "Alabama's pattern of hostility to LGBT rights can be measured systematically using data from" a dataset that Caughey created. *Id.* ¶22. For litigation purposes, Caughey cherry-picked 13 state policies (from a dataset of 186 policies) that he claimed "relate to LGBT rights." *Id.* For each year from 1992-2014 he analyzed which States had which of the 13 policies. *Id.* ¶23. He excluded policies from a particular year if all States had the same policy, so he actually analyzed only six to 11 policies each year. *Id.* The policies range from "[s]odomy criminalization" to "LGBT credit antidiscrimination law" to "LGBT panic defense prohibition" to

---

[7] To avoid duplication, Defendants respectfully incorporate the relevant legal standards in their Motion to Exclude Selected Testimony of Dr. Ladinsky. *See* Doc. 593 at 2-8.

"[p]reemption of local LGBT antidiscrimination ordinances related to education." *Id.* ¶22. Caughey concluded that Alabama was "tied for the highest proportion of anti-LGBT policies of any state" before 2014. *Id.* ¶26.

For his next index, of post-*Obergefell* policies, Caughey completely changed his model and cherry-picked six policies that allegedly "impose restrictive regulations on gender identity and transgender persons." *Id.* ¶¶28-30. None of these policies are the same as the ones used in his pre-2014 index. For litigation, Caughey "created a 'transgender restriction index,' defined as a count of how many such policies (other than banning ['gender-affirming care'] for minors) a state has adopted" and compared it to the adoption of laws like SB184. *Id.* ¶33. In 2023, according to Caughey, Alabama scored three, and like every other State to score three (and almost every other state to score one or two), Alabama had a law like SB184. *Id.* ¶34.

Caughey's last index purports to show "healthcare paternalism," which Caughey uses to claim that "Alabama's policies exhibit low healthcare paternalism relative to other states"—which he then uses to claim that the Act "is not driven by healthcare paternalism, but rather by the hostility to transgender rights" allegedly "demonstrated" by the other indices. *Id.* ¶¶35-36. He uses two metrics for "healthcare paternalism." The first is a Cato Institute score of "health insurance freedom" from 2013, which ranks Alabama as number four—"most free." *Id.* ¶37. The second is yet another made-for-litigation index, in which Caughey "count[s] how many of" four supposedly "paternalistic policies a state has": "no right to try" law, "no personal vaccine exception," "no religious vaccine exception," and "no healthcare freedom amendment." *Id.* ¶40. "Of these four policies," Caughey finds,

"Alabama lacks only a personal vaccine exemption, giving it a score of one." *Id.* ¶41. Caughey concludes that SB184 could not "reflect[] an especially cautious attitude" because "[a]doption of a GAC ban for minors is inversely related to states' paternalism in healthcare generally." *Id.* p.8, ¶46.

This analysis is flawed overall and each step of the way. It ignores all competing reasons for adoption (or not) of these policies, it does not control for *any* variables, and the individual indices are each arbitrary and fatally flawed. And the analysis is unhelpful, as Caughey fails to reliably connect his (faulty) calculations about other policies to the factual question of discriminatory intent of the Legislature in passing SB184.

### 1. Caughey does not support his assumption that each policy was adopted for the reason he wishes to use it for.

"[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions." *McDowell*, 392 F.3d at 1300. Here, Caughey's analysis asserts that each policy he picks was enacted for the reason he wants to use it for. So when he speaks of policies that "restrict" "LGBT rights" or "transgender rights," he admitted to assuming that there is *no other reason* that a State could pass each of those laws: "I don't consider other reasons for—that they might have been [adopted]." Caughey Dep. 288:8–289:3. Nor did he consider any of the structural reasons that laws may not pass, like procedural hurdles and competing legislative priorities. *See id.* at 255:15–257:10.

Instead, the fundamental assumption of Caughey's analysis is that the *only* reason for a State to act on each policy he considers *is* the purpose he arbitrarily

assigns to the policy (hostility toward LGBT rights, restricting transgender rights, and healthcare paternalism, respectively). So if a State declines to adopt a law (unconstitutionally) forcing religious organizations to work with same-sex foster parents, his assumed reason is "hostility to LGBT rights." Caughey Rebuttal Rep. ¶22. If a State maintains school facilities or sports for biological girls, its assumed purpose according to Caughey's analysis is simply to "restrict[] transgender rights." *Id.* ¶30. If a State regulates health insurance policies, or does not provide vaccine exceptions, its purpose is simply to engage in healthcare paternalism—not, for instance, to address negative externalities, religious practices, or economic concerns. Caughey was clear: "I take them as—for example, in the case of restrictions on LGBT rights, I take [each policy] to be … a measure of a state's relative propensity to restrict those rights. Yes. I take them as a direct measure of that." Caughey Dep. 288:8–289:3.

This is nonsense: public policy decisions entail balancing of innumerable considerations. Many of the policies that Caughey uses obviously implicate other purposes and reasons. "To look for *the sole purpose* of even a single legislator is probably to look for something that does not exist." *GBM*, 992 F.3d at 1324 (cleaned up); *see LULAC v. Perry*, 548 U.S. 399, 418 (2006) ("[A]ffixing a single label to those acts can be hazardous."). Caughey admitted the point: "it is definitely possible … for there to be other motivations at play." Caughey Dep. 130:8-16.[8] He agreed that was

---

[8] He made the same admission about the policies that he cherry-picked to include. *See, e.g.*, Caughey Dep. 101:1-8 ("It is possible that someone could not have any bias against LGBT people and nevertheless" "support laws restricting marriage to between one man and one woman."); *id.* at 130:8–131:2 (referring to his 13 pre-*Obergefell* policies: "there are many [other reasons]"); *id.*

true for SB184. *Id.* at 98:7-13, 73:19–74:16 (agreeing that "a possible motivation for some" legislators voting for SB184 was "to help th[e] population of minors with gender dysphoria"); *see also id.* at 60:7-10 (agreeing that legislators "often" "balance competing interests when they vote on a bill").

But in his *analysis*, Caughey said "I didn't consider those [other] motivations." *Id.* at 131:20-21; *id.* at 140:12-21 (explaining that his analysis ignores "the motivations or the reasons why the legislature passed [a policy] in each individual case"). Caughey's analysis simply *assumes* that each policy has one purpose—"anti-LGBT bias"[9] or "healthcare paternalism"—adds up his cherry-picked policies, and uses the bare sum as proof of a State's overriding "purpose" in adopting an unrelated law. Likewise, he simply *assumes* that SB184 is in opposition to "LGBT" or "transgender rights," even though he concedes "that some individuals that are transgender might find SB184 beneficial." *Id.* at 183:7-10.

Caughey points to no scientifically sound analysis adopting his overarching assumptions, which were made for this litigation. He refused to apply a similar assumption to other policies: for instance, presented with a hypothetical law that expanded religious exercise protections and asked if opposition to that law showed "anti-religious bias," he could not answer because "there are multiple considerations at play in any given law." *Id.* at 97:14–98:2. It's no wonder that he offers no scientific support for his contrary assumption about his chosen policies. His "jaded view"

___

at 157:22–158:4 ("There could be multiple reasons" "for a state to allow agencies to refuse same-sex foster parents for religious reasons.").

[9] "Each of these 13 laws that I include are indicators of a state's relative hostility to or favorability towards LGBT rights and … the legal status of LGBT individuals," Caughey explained without support. Caughey Dep. 130:2-7.

is both unsupported and contrary to the Supreme Court's "longstanding instruction that the good faith of the state legislature must be presumed." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1251 (2024); *see id.* at 1235-36 ("This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions.").

Once one recognizes that Caughey's starting assumption—that each policy has the same overriding or singular purpose—is wrong, his analysis falls apart. His only defense of his assumption is that "combining multiple indicators" averages out "idiosyncratic" reasons that a bill might or might not pass. *Id.* at 256:14–257:6. But if each indicator had many reasons for its passage or non-passage, adding the indicators together does not eliminate those reasons. Instead, that process amplifies them and makes it even more important to isolate the many competing considerations before assuming that some core principle explains all of them—and then extending that assumption to a separate policy that might or might not be passed for a multitude of reasons too. The "only connection" that ties Caughey's indices together is his unsupported, arbitrary assumption that the motivating principle behind every policy he identifies is the one he wishes to use it for. *McDowell*, 392 F.3d at 1300. But expert testimony requires "more than subjective belief or unsupported assumptions." *Id.* at 1298. Caughey's method is unreliable and contrary to Rule 702.

### 2. Caughey's analysis cannot show meaningful correlation or causation.

Another overriding problem is that "mere correlation, association, or coincidence" is not "causation." *Henderson v. Lockheed Martin Corp.*, 2023 WL 11108737, at \*6 (M.D. Fla. Sept. 18, 2023). Caughey conceded that his indices do not control any variables or "prove causation": "It's an index. It doesn't—there's no way to control for things in an index." Caughey Dep. 222:4-6. His analysis thus makes a basic statistical error: finding two variables that move together and assuming correlation or causation. But other variables could account for any correlation observed, which is why one must consider and control other variables. *See* Fisher, *Multiple Regression in Legal Proceedings*, 80 Colum. L. Rev. 702, 721 (1980) (explaining that "raw comparison … cannot tell one anything definite" and "can be misleading in either direction").

For instance, Caughey's own academic works emphasize that "the causal effects of party control" "ha[s] grown sharply" over time"—and that "[e]valuating policy divergence" "requires isolating the policy effects of partisan composition from other determinants of state policy." Caughey Dep. 162:1-19; *see* SJ.DX80:13 (Caughey Dep. Ex. 5, *Policy Effects*); SJ.DX81:324 (Caughey Dep. Ex. 15, *Dynamic Democracy*). And in his deposition, Caughey agreed that partisan composition "is a determinant of state policy," but admitted that his analyses throughout his report "do[] not consider the effects of party composition." Caughey Dep. 165:21–166:9. Likewise, he admitted that "a state's position on LGBT issues" "could be" "a function of a state's conservatism or liberalism"—and further admitted that all his

analyses here "don't take that into account." *Id.* at 251:11–252:16; *see id.* at 222:20-22 ("It does not include any general measures of liberalism or conservatism of the state, no."); *id.* at 239:21–240:1.

Indeed, Caughey did not control for party control, ideology, or *any* other variable. Expert testimony that "purports to describe the correlation, without controlling for any of these other factors, and dub[s] that correlation causal" is fundamentally flawed because "independent factors" "might influence" the analysis. *Hall v. Thomas*, 753 F. Supp. 2d 1113, 1147 (N.D. Ala. 2010). Without controlling for those factors, "any interrelationship between trends in those statistics is highly likely to be spurious." *Id.*; *see People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1997) (Posner, J.) ("[A] statistical study that fails to correct for salient explanatory variables … has no value as causal explanation and is therefore inadmissible in a federal court.").

On top of that, even if Caughey had reliable evidence of correlation, he fails to show that a particular score on his indices informs the factual question of any discriminatory intent in enacting SB184. The indices are unreliable and unhelpful.

### 3. Each index is unreliable on its own.

Another severe problem is that Caughey's choice of policies within each index was arbitrary and inexplicable—except as gerrymandering to support his pre-ordained conclusion. Start with "healthcare paternalism." Caughey's first metric—Cato's 2013 "health insurance freedom" ranking—makes little sense for him to use because (as Caughey conceded) SB184 is "not directly related" to health insurance. Caughey Dep. 201:20-23. And Cato has updated its (non-peer reviewed) ranking

several times since 2013, with Alabama falling to the middle of the pack, but Caughey intentionally did not use those more recent rankings—which would have made the State appear much more "paternalistic" and deprived Caughey of his desired conclusion. *Id.* at 202:17–207:18; *see id.* at 202:4-6.

Caughey's alternative healthcare paternalism index fares no better. He cherry-picked four policies—right-to-try law, personal vaccine exception, religious vaccine exception, and healthcare freedom amendment—an analysis no peer-review publication has ever used. *Id.* at 208:22–210:11. By his own admission, "at least two of [the] four measures have a significant potential reason for enactment other than paternalism": vaccine exemptions implicate matters of externalities (the opposite of paternalism/individual-focused) *and* personal beliefs. *Id.* at 212:10–213:5. He excluded *reams* of policies from his own dataset (used for his other indices) that have at least as many "paternalistic" implications as the four he picked. He could not explain why he picked these and only these four policies.

For instance, Caughey "didn't consider" Alabama's permission for adults to obtain medical gender transition procedures. *Id.* at 208:11-21. He simply denied that laws requiring counseling, ultrasounds, or waiting periods before abortions were intended to protect women's own long-term mental and physical health. *Id.* at 215:15–216:23 (asserting that "I don't consider that to be the predominant motivation, no"). For many other policies—medical marijuana and physician-assisted suicide, for instance—he did not dispute their paternalistic motivations but excluded them anyway. *Id.* at 217:16–219:6. He conceded that if he had included policies like these, his "results would have changed significantly" for his paternalism index because

29

"Alabama's baseline would have been much more paternalistic." *Id.* at 217:1-15; *id.* at 219:3-6. But he did not include them, or any other policy potentially motivated by paternalism.

Even within the four "healthcare paternalism" policies he did choose, puzzles abound. He counted personal vaccine exemptions separately from religious vaccine exemptions, even though "a personal vaccine exemption encompasses a religious one"—so a State with a personal exemption would not need a separate religious one. *Id.* at 213:8-16. And none of his four cherry-picked policies are limited to *children*, where a State's "paternalism" is likely greater. *Id.* at 211:8-11. The idea that these four policies—none of which has anything to do with SB184 or children, and all of which have significant explanations other than paternalism—provide a sound basis on which to judge a State's paternalistic instincts relative to SB184 blinks reality.

Next, Caughey's pre-*Obergefell* index purports to identify "anti-LGBT bias." His analysis here assumes that certain "LGBT rights" are at stake, which he defined as the "legal claims and statuses of LGBT individuals and the protections to which they're entitled under the law." *Id.* at 102:6-9. Of course, that definition begs the question: it depends on, but does not explain, how to determine what "protections" "LGBT individuals" *should* be "entitled [to] under the law." And again, Caughey simply *assumed* that these 13 policies simplistically furthered or reduced "LGBT rights," without any reliable way of validating that assumption.

Caughey drew these 13 policies (of which no more than 11 were ever analyzed in a year) from a dataset he created of 186 policies, which he conceded was "not a

comprehensive set of all state policies" or "a random sample." *Id.* at 114:20-21, 117:18–118:9. That dataset was missing about 60% of the data. *Id.* at 118:13-20.

By Caughey's own prior account, his academic use of the dataset was much different. In the past, Caughey's "main goal" in using the dataset was "not predicting individual policies but rather aggregating many policies to estimate the general liberal-to-conservative direction of states' policymaking in a given domain." *Id.* at 123:20–124:10. Here, however, he purported to "use[] measures of states' policy orientation to predict adoption of gender-affirming care bans." *Id.* at 124:11-20. He could not identify any other scholar to use these 13 policies either in this way or "to analyze the motives of a given legislature when passing a particular law." *Id.* at 128:14-21. He could not identify an error rate. *Id.* at 129:7-19.

Caughey's index choices meant that his comparisons were *solely* relative to other States in a particular year—but he never explains how that relative positioning demonstrates "anti-LGBT bias." Caughey conceded that "as an absolute matter," Alabama's policies "[o]n LGBT issues" "have become more liberal over time." *Id.* at 159:23–160:23. To prevent that from mattering, Caughey estimated the purported "restrictiveness of states' policies in each year" only "relative to one another" and only in that year. 144:12–145:11. *And* Caughey conceded that he "remove[d] policies where Alabama has the same policies as other states" by excluding state years in which all States agreed. *Id.* at 108:21-23. This design means that the choices of

other States somehow reflect an "anti-LGBT bias" on Alabama's part—an assumption that Caughey did not justify.[10]

Next, Caughey's post-*Obergefell* index consisted of five policies that purportedly restrict "transgender rights" drawn from an unpublished manuscript by Caughey's research assistant—which, incidentally, insists that medical gender transition procedures for minors is "proper healthcare," a bias that Caughey did not bother to note. *Id.* at 233:22–234:14, 269:7–270:21.[11] No other publication has used that dataset. *Id.* at 238:17-21. Caughey did not even use the same set of policies as his assistant's manuscript, as he excluded policies that purportedly "expanded transgender rights." *Id.* at 234:15-19. No publication—including the manuscript itself—uses the set of five policies Caughey picked here. *Id.* at 236:3-22, 240:8-18.

---

[10] As with his healthcare paternalism index, Caughey's pre-*Obergefell* index has even more granular problems. Caughey did not compare the federal government's policies and did not know what it would have scored. Caughey Dep. 145:21–146:13. He defined LGBT individuals to include sexual minorities (*id.* at 99:11-21) but could not explain why he did not consider laws that, for instance, limit marriage to two human adults as showing anti-LGBT bias (*id.* at 106:4–107:1 (testifying that he would need "further context")). He did not consider binding federal judicial decisions apart from the Supreme Court—meaning, for instance, that he coded Alabama's absence of a law prohibiting employment discrimination based on LGBT status as hostile despite Eleventh Circuit precedent speaking to that issue. *Id.* at 147:14–150:5; *see Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011). Caughey admitted to treating U.S. Supreme Court decisions differently as "a practical decision," while implausibly refusing to admit that *either* choice affected his method's reliability. *Id.* at 153:16–156:12. Apart from Supreme Court decisions, his analysis did not consider "de facto versus de jure policies" at all—meaning that he did not know (and did not consider) the *actual* policy in a State on any particular issue. *Id.* at 240:19-18.

[11] Caughey assumed that regulating gender transition procedures in minors "imposes restrictions on transgender rights," though he eventually admitted that he "c[ould] imagine an argument" that such regulation promotes individuals' autonomy if, for instance, "adults know more about their desire for future fertility and sexual activity than a ten-year-old" (which he "d[idn't] have an opinion on"). Caughey Dep. 262:17–265:10. He admitted that he considered "that long-term outcomes" "for transgender persons" "could be improved under a law like SB184" but coded SB184 as restrictive of transgender rights anyway because of "the larger political context" he perceived. *Id.* at 278:2-14, 283:2-9.

Caughey conceded that "it's not a random sample" and "not a perfect measure." *Id.* at 246:13-14, 250:16-19. He again ignored any *de facto* policies in a State on the five issues he identified. *Id.* at 240:19-18. He made inexplicable exclusions—for instance, not including whether a State's Medicaid pays for medical gender transition procedures for minors.[12] And once again, the only statistical work he performed on this index "doesn't show anything about either correlation or causation between the index and adopting what [he called] a GAC ban." *Id.* at 245:7–246:5.

Last, in a passing footnote, Caughey purports to use a "[m]ultivariate regression analysis" using his two healthcare paternalism indices and his "transgender restriction index" to assess correlation with "adoption of GAC for minors." Caughey Rebuttal Rep. ¶46 & n.18. He purports to find that "only transgender restriction index has a positive and statistically significant coefficient estimate," which he says "confirms [his] conclusion" that "a state's orientation toward transgender persons, but not its degree of healthcare paternalism, strongly predicts its adopting of GAC bans for minors." *Id.*

This regression is unscientific. First, it is a classic case of garbage-in and garbage-out, for all the foregoing deficiencies in each index necessarily infect

---

[12] His "explanation" was: "Oh, that's not a—I mean, for this particular purpose, I was interested in gender—sorry, transgender-restrictive policies, so I—that wasn't—I didn't regard that as—especially for this—for the purposes of this analysis, I was interested in just describing the rise of policies that imposed new restrictive regulations on transgender persons and gender identity, so I didn't think that that counted under that definition." Caughey Dep. 242:6-22. Asked why he did not consider "a state's refusal to pay for medical gender transition for minors as restrictive," he backtracked: "In the—it's not just that there's—that there's—it's not just that it's relatively restrictive or not. These are new transgender-restrictive policies that sort of—that are diffusing across states." *Id.* at 243:10-21. He did not explain his assumption that Medicaid policies regarding gender transition were not in development all over the country. *Contra, e.g., Dekker v. Weida*, 679 F. Supp. 3d 1271, 1277 (N.D. Fla. 2023).

Caughey's regression. *See* Caughey Dep. 193:14–194:12. Second, Caughey admitted that he controlled "[j]ust the three" variables, even though he did *not* think those are "the only possible variables" "that could affect a state's adoption of a law like SB184." *Id.* at 190:10-19. He conceded that no publication has ever used that regression, failed to provide the numerical results of the regression, and claimed that the regression's error rate was not "precisely quantifiable." *Id.* at 190:20–191:13. He agreed that the regression does not "prove" causation, *id.* at 193:10-13, but it is incapable of even showing correlation in any reliable way. Again, "a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court." *Rockford*, 111 F.3d at 537-38.[13]

*   *   *

For these reasons, Caughey's testimony purportedly identifying a "pattern of discrimination" is unreliable and unhelpful. The testimony is not "based on sufficient facts or data," Fed. R. Civ. P. 702(b), but limited to a handful of irrelevant measures that Caughey cherry-picked to give him the results he wanted. It is not "the product of reliable principles and methods," *id.* 702(c), for it ignores all other explanatory variables and employs the crudest possible metric: raw comparison between a gerrymandered index and adoption of a similar law. It is based entirely on an unsupported assumption that each policy was enacted simply for the reason for which

---

[13] If anything, Caughey's regression *undermines* his other opinions, as it finds "no relationship" between his flawed "healthcare paternalism" indices and adoption of a law like SB184. Caughey Dep. 195:18–196:1; *contra* Caughey Rebuttal Rep. ¶44 (asserting that "the greater a state's healthcare paternalism, the *less* likely it is to ban GAC for minors").

Caughey wants to use it as a proxy for—contradicting Caughey's own testimony about the realities of legislative decision-making in balancing competing interests, procedures, and priorities. And Caughey fails to connect his findings to any relevant factual inquiry about SB184's intent.

The specific *Daubert* factors articulated by precedents confirm these flaws. *See Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *Hall*, 753 F. Supp. 2d at 1147. No one else has used Caughey's indices, and they have never been subjected to peer review or published. Caughey was unable to articulate any known or potential rate of error, and he identified no publication using a similar approach to divine legislative motivation or purpose. He could not justify his extrapolation from individual policies to an index that purported to "show[]" "anti-LGBT bias" or "healthcare paternalism" to SB184. Caughey developed this approach solely for litigation, and his crude modeling here looks nothing like the rigorous models that he uses in his academic works. *E.g.*, SJ.DX80:5-75 (Caughey Dep. Ex. 5, *Policy Effects*). In short, his testimony is exactly what Rule 702 and *Daubert* are designed to prevent. His opinions on a supposed "pattern of discrimination" should be excluded.

### B. Caughey's Reference to Purported "Anti-LGBT Legislation" Is Based on Nothing More Than His Own *Ipse Dixit*.

The next set of opinions offered by Caughey is about purported "[r]ecent anti-LGBT legislation in Alabama." Caughey Rebuttal Rep. ¶¶47-57. Once again, the overriding problem with this testimony is that Caughey assumes—without explanation or support—that all this legislation shows some "targeting" of "LGBT persons generally and the transgender population specifically," rather than the normal

balancing of competing interests that always accompanies legislation. *Id.* ¶47; *see* Caughey Dep. 326:1-3, 327:1-2 (conceding that "obviously, for any law, there are multiple rationales, multiple motivations"). And he provides no evidence that "targeting" was a motivation apart from his own *ipse dixit*. That is the opposite of reliable expert testimony.

Caughey's first purported example is a law that eliminated the requirement to obtain marriage licenses with a judge's signature—seemingly making it easier for all couples to be married. He does not explain how this law "targets" LGBT persons.

His next examples are "conscience laws" that do not mention sexual orientation or gender identity in any fashion, but Caughey nonetheless asserts "restrict LGBT rights." One protects the religious exercise rights of child welfare agencies— the same as federal law does.[14] Another protects the conscience rights of medical providers—the same as federal law does.[15] And the last—enacted a year after SB184—generally regulated state contracts with companies that boycott a wide range of businesses, including those engaged in timber, agriculture, firearms, mining, and much else.[16] Caughey does not explain how he extrapolated from these laws' existence to his conclusion that Alabama sought to "restrict LGBT rights."

Caughey then dwells on legislation that he concedes "ha[s] nothing to do with healthcare or children," claiming that these bills "evince clear hostility to transgender status or gender non-conformity per se." Caughey Rebuttal Rep. ¶51.

---

[14] HB24 (2017), https://arc-sos.state.al.us/ucp/B17123AA.AZV.pdf; *see generally Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).
[15] HB95 (2017), https://arc-sos.state.al.us/ucp/B17117AA.A3I.pdf; *see generally FDA v. All. for Hippocratic Med.*, No. 23-235, 2024 WL 2964140, at *10 (U.S. June 13, 2024).
[16] SB261 (2023), https://arc-sos.state.al.us/ucp/L1277299.AI1.pdf.

Again, he fails to explain how he made this determination of "clear hostility," and he concedes that "if you were viewing each [bill]," other justifications could exist. Caughey Dep. 293:2-22.

His main anecdote is about a 2024 bill and a legislator who was not in the Legislature when SB184 was enacted. Caughey Rebuttal Rep. ¶¶52-53. That 2024 bill generally prevents "classroom instruction regarding sexual orientation or gender identity in a manner that is not age appropriate." SJ.DX82:168-70 (Caughey Dep. Ex. 28, HB130). Caughey's report claims that Rep. Butler (who did not vote on SB184) sought to include the U.S. Space and Rocket Center in the bill "[m]erely upon learning of [a transgender employee's] existence." Caughey Rebuttal Rep. ¶52. That was wrong, as Caughey conceded at his deposition, admitting that he had not looked into the underlying controversy about the Center. Confronted with the shocking details of that controversy—involving a biological male with hypersexualized and inappropriate social media posts apparently monitoring girls' sleeping rooms—Caughey admitted that he "was not aware of th[e] details." Caughey Dep. 302:11–306:4; *see* SJ.DX82:179-201 (Caughey Dep. Ex. 30, Monger). Then he backtracked:

> Q. Your report on page 26 says that Representative Butler's comments came "Merely upon learning of this employee's existence." That's not true, is it?
>
> A. That is—my—I don't know whether that is—I am not as—I am not confident that that is true.

Caughey Dep. 310:6-12. Of course, Caughey had also left out all of Rep. Butler's comments explaining the bill as focused on "protect[ing] the children." *Id.* at 311:12–313:14. As we'll see next, Caughey offered his usual excuse for this editing:

"I included selected parts that I thought were sufficient to convey the meaning that I—the information *that I wished to convey*." *Id.* at 213:12-21 (emphasis added).

Again, Caughey's review of Alabama legislation is founded on his unsupported assumptions about the motivations of legislators and bills. It is unreliable.

### C.   Caughey's Cherry-picking of the Legislative History is Error-filled and Unscientific.

The last part of Caughey's report purports to review SB184's legislation history, conceding that the review "is not intended to provide a comprehensive history of SB184, but rather to highlight relevant aspects of the political context missing from the defense reports." Caughey Rebuttal Rep. ¶¶58-83. Putting aside that "the defense reports" did not address *any* political context because that context is not relevant to any claim before the Court, there are at least six problems with this part of Caughey's testimony.

First, a foundation of Caughey's opinion is that if the Legislature were actually concerned about "a specific set of 'experimental' medical procedures," it would not have "rejected an attempt to exempt psychotherapy from [SB184's] ban on GAC." *Id.* ¶¶65, 70, p.8. But as noted *supra* pp. 3-4, SB184 included the exact exemption that Caughey said it did not—as he was forced to admit at his deposition. *See* Caughey Dep. 174:23–175:1 ("I missed the inclusion of that language"). Without that cornerstone, the rest of his opinion lacks reliability.

Second, Caughey's legislative history analysis again uses the same unsupported assumptions addressed above. For instance, he suggests that it was "hateful" for Rep. Allen to say that in sports, "boys need to compete against boys, and females

need to compete against females." Caughey Rebuttal Rep. ¶67. Caughey is not qualified to make that assumption, which is unreliable and disconnected from SB184 regardless.

Third, because Caughey did not conduct a "comprehensive review," he cannot reliably draw any conclusions about "the Legislature's understanding of the purposes of SB184." *Id.* ¶¶58, 60. As he conceded, he considered *only* three hearings on SB184, and he could not even hazard a guess as to what proportion of the overall hearings or debates that constituted or whether what he reviewed was representative of that total debate. Caughey Dep. 86:23–88:13, 226:18–230:21. More generally, Caughey could not name more than two members of the Alabama Legislature who voted on SB184, did not know how many members are in the Alabama House or Senate, never spoke to any members about SB184, did not know the last time he spoke to *anyone* in Alabama, and has not been to Alabama in 15 years. *Id.* at 55:12–56:17, 80:8-19.

Fourth, Caughey's review is unreliable because he selectively edited out everything that deviated from his pre-ordained conclusion. Defendants have addressed the same editing elsewhere, Doc. 157 at 14-16, and a review of Caughey's three hearings shows that SB184's sponsors and supporters *repeatedly* emphasized their overriding interest in protecting children from unproven, sterilizing gender transition procedures. *See* Caughey Dep. 175:12–177:11 (admitting that he omitted Sen. Shelnutt's explicit "explanation" for the bill: "to protect our children"); *Daubert*.DX36:31:05–32:02 (Caughey Dep. Ex. 40, Senate Committee Hearing) (Sen. Shelnutt: "[T]his bill is strictly about just protecting children.");

*Daubert*.DX37:7:04–10:55, 26:32-40 (Caughey Dep. Ex. 41, House Committee Hearing) (Rep. Allen: "This bill is simply to protect kids and to protect children."); *see also Daubert* DX38:8:18–17:06 (Caughey Dep. Ex. 48, Capital Journal Video) (Rep. Allen: "[I]t's really about protecting children and protecting their bodies.").

Fifth, edited snippets from *two* legislators are unhelpful to the trier of fact. What matters is "the legally dispositive intent of the entire body of the Alabama legislature," *GBM*, 992 F.3d at 1325 (cleaned up), and "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it," *Dobbs*, 597 U.S. at 254 (cleaned up); *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) ("[T]he legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents.").

Sixth, Caughey's opinion that "SB184's supporters" "had good reason to anticipate the harm that that the bill's passage would cause to the transgender population" is unhelpful and irrelevant. Caughey Rebuttal Rep. ¶74. As he admitted, legislators also "had opportunity to hear about the potential benefits of the bill," and he did not know if the opponents' prediction of "harm" was correct. Caughey Dep. 181:6–182:22. So his testimony restates the obvious fact that legislators heard from many perspectives—while omitting any statement by non-legislative proponents of the bill. *Id.* at 180:13-17. His testimony is unreliable and unhelpful.

## CONCLUSION

For these reasons, the Court should exclude Caughey's testimony and any other evidence related to any unpled *Arlington Heights* theory.

Dated: June 24, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on June 24, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*