# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; *et al.*, | Case No. 2:22-cv-184-LCB-CWB |
| Plaintiffs, | Honorable Liles C. Burke |
| and | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor, | |
| v. | |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; *et al.*, | |
| Defendants. | |

**PLAINTIFF-INTERVENOR UNITED STATES' DISCLOSURE OF
REBUTTAL EXPERT TESTIMONY OF
DEVIN CAUGHEY, PHD**

**TABLE OF CONTENTS**

ANALYSES AND OPINIONS ...................................................................7

  Defendants' expert reports ..............................................................7

  Summary of opinions .....................................................................8

  Pattern of discrimination ...............................................................9

    LGBT policies before Obergefell ...............................................10

    Transgender policies since Obergefell .......................................13

    Recent anti-LGBT legislation in Alabama.................................24

  Legislative history of SB184 .........................................................29

    Origins of SB184 .......................................................................30

    Justifications for SB184 .............................................................32

    Opposition to SB184 and foreseeability of harm.......................36

CONCLUSION ....................................................................................39

REFERENCES ....................................................................................42

I, Devin Caughey, PhD, hereby declare and state as follows:

1.      I have been retained by counsel for the United States (U.S.) as an expert in connection with the above-captioned litigation.

2.      I have actual knowledge of the matters stated in this report. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

3.      I am a professor of political science at the Massachusetts Institute of Technology. I hold a B.A. in History from Yale University, an M.Phil. in Historical Studies from Cambridge University, and an M.A. and Ph.D. in Political Science from the University of California–Berkeley. My M.Phil. and Ph.D. dissertations focused on the politics of the American South in the early to mid-twentieth century.

4.      As a professor of political science at MIT, I teach undergraduate and PhD-level classes on American politics (e.g., American Political Institutions), research design (e.g., Political Science Scope and Methods), and statistics (e.g., Bayesian Measurement Models).

5.      I have published 17 peer-reviewed articles and three academic books, primarily on topics related to U.S. state and national politics as well as political methodology. My first book, *The Unsolid South* (Princeton University Press, 2018), examined public opinion, electoral competition, and congressional representation in the one-party South. My third, *Dynamic Democracy* (with

Christopher Warshaw, University of Chicago Press, 2022), analyzed the dynamic interplay between public opinion and state policymaking between the 1930s and 2020s.

6.      My work in these areas has been the recipient of numerous awards, including the American Political Science Association (APSA) awards for best dissertation on politics and history, best article on state politics and policy, and best books on state politics and policy and on political organizations and parties.

7.      I have served in various leadership positions in my field. I am a member of the executive councils of APSA's State Politics and Policy Section as well as its Politics and History Section. I serve on the advisory board of the Consortium on American Political Economy. I am also currently co-editor of *The Forum: A Journal of Applied Research in Contemporary Politics*.

8.      The information provided regarding my professional background, experiences, publications, and presentations is detailed in my curriculum vitae (CV), which is attached as **Exhibit A**.

9.      I am being compensated at an hourly rate of $350 for my work on this case. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

10.     I have previously served as an expert witness in the following cases: *Graham v. Adams*, 22-CI-47 (Ky. Cir. Ct., Franklin Cnty.); *Carter v. Chapman*,

464 MD 2021 (Pa. Cmmnwealth Ct.); and *Clarno v. Fagan*, 21-cv-40180 (Or. Cir.

Ct., Marion Cnty.).

11.     In addition, in 2022 I testified before the Pennsylvania Legislative

Reapportionment Commission regarding the Pennsylvania state senate map.

12.     I was engaged by the U.S. Department of Justice to provide an expert

rebuttal opinion in connection with the above-captioned litigation. Specifically, I

was asked to rebut Defendants' experts' claims that Alabama Senate Bill 184

(SB184) is not intended to discriminate on the basis of sex or transgender status,

but rather to protect minors from "experimental treatments" (Nangia 2023, 87) [1]

that have been subject to inappropriate "politicization" (Kaliebe 2023, 27).

13.     In preparing this rebuttal report, I reviewed the expert reports and

supplemental reports of Dr. James Cantor, Dr. Kristopher Kaliebe, and Dr. Geeta

Nangia.

14.     In preparing this rebuttal report, I have relied on my years of relevant

experience, as detailed in my CV (attached as Exhibit A), and on the materials

listed therein. I have reviewed the sources cited throughout this rebuttal report and

listed in the References section of this report, which include some of the

documents produced by the U.S. as part of discovery. The materials I have relied

---

[1] This citation refers to page 87 of Dr. Nangia's initial expert report dated 2023. Unless
otherwise noted, I use this citation format throughout this report.

upon in preparing this report are the same types of materials that experts in political science regularly rely upon when forming opinions on the subject. These materials include news reports, videos of hearings, interest-group websites, academic datasets, and information on specific bills from the Alabama Legislature and LegiScan, all of which are publicly available information.[2] In addition, I relied on research assistance from Dr. Scott Lacombe, an assistant professor of Government at Smith College, which is also typical in my field. All analyses and opinions are my own.

15.     I reserve the right to revise and supplement the opinions expressed in this rebuttal report or the bases for them if any new information becomes available in the future or in response to statements or issues that may arise in my area of expertise. I may further supplement these opinions in response to information produced in discovery or in response to additional information from Defendants' or Private Plaintiffs' experts.

16.     Based on an assessment of the political context and legislative history of SB184 as well as my expertise in political science, I offer the opinions set forth below.

_____

[2] A few sources I relied on were accessed through MIT's subscriptions to scholarly or journalistic publications, such as the online news database Factiva.

## ANALYSES AND OPINIONS

### Defendants' expert reports

17.     This rebuttal responds primarily to the reports of three experts for Defendants: Cantor (2023), Kaliebe (2023), and Nangia (2023).[3]

18.     Defendants' expert reports cover several key premises of Defendants' positions:

- that human beings are naturally "sexually dimorphic", comprising two sexes with distinct physical characteristics (Kaliebe 2023, 11);

- that rates of "rapid-onset gender dysphoria" have "sky-rocketed" over the last decade as a result of "a spread of ideology combined with technologically induced contagion effects" (Kaliebe 2023, 7, 13);[4]

- that gender dysphoria is a serious condition requiring "compassionate care" in the form of "psychosocial supports and psychotherapy" (Nangia 2023, 87; Kaliebe 2023, 52);

--------

[3] Although this rebuttal responds to these three defense experts primarily, other defense experts make similar assertions. See, for example, Hruz (2023), pages 7–8 (sex as biologically determined binary), 74–75 ("rapid onset"), 123 (GAC "experimental"), and 122 (American Academy of Pediatrics is "politically influenced"); Laidlaw (2023), pages 3 (sex as biologically determined binary), 48 (social contagion), 15 (GAC "experimental"), and 41–43 (politicization of medical associations); and Lappert (2023), page 25 (GAC "experimental").

[4] On pages 11–12, Kaliebe (2023) asserts that "Long-standing scholarly consensus exists confirming that direct social contagion…affects health such as cardiac disease (Christakis 2013)," which is presumably a reference to the Christakis and Fowler (2013) article in his bibliography. It should be noted that the central research underpinning this supposed "consensus," Christakis and Fowler's analyses of obesity contagion in the Framingham Heart Study, has recently been shown to be based on faulty statistical methods (Ogburn et al. 2024).

- that the treatments involved in gender-affirming care are prohibited because they are "experimental" (Nangia 2023, 87), "lacking causal evidence of mental health improvement" (Cantor 2023, 74); and

- that medical professional associations' endorsement of these treatments is the consequence of the efforts of "[s]mall numbers of advocate physicians" to "politicize[]" the issue and "silence [scientific] debate" (Kaliebe 2023, 7).

## Summary of opinions

- In recent years, Alabama has been on the forefront of considering and adopting newly salient policies that restrict transgender rights across many fronts. This continues the state's long history of hostility to LGBT rights.

- Adoption of a gender-affirming care (GAC) ban for minors is predicted almost perfectly by a state's hostility towards transgender rights in other domains.

- Adoption of a GAC ban for minors is inversely related to states' paternalism in healthcare generally.

- Sex, gender identity, and transgender status were central to the legislature's understanding of the purpose of SB184.

- The supporters of SB184 in the legislature viewed it as part of a multifaceted defense of essentialist understandings of sex and gender against the threat of "gender dysphoria".

- Despite SB184's nominal focus on hormone and surgical treatments, the legislature explicitly declined to exempt psychotherapeutic treatments from the bill's restrictions, which is consistent with a general hostility to gender nonconformity per se.

8

- The legislature had ample opportunity to learn of the opposition of transgender Alabamians, along with their parents, physicians, and teachers, and thus should have foreseen the harms that SB184 would cause.

**Pattern of discrimination**

19.    Defendants' expert reports emphasize that their opposition to gender-affirming care (GAC) is based on "compassion[]" (Nangia 2023, 87) rather than animus toward transgender people. While this may be true of the experts personally, the state of Alabama has a long history of restricting the rights of transgender persons and other sexual minorities, even relative to the standards of the time. This section documents Alabama's pattern of LGBT discrimination and provides evidence that anti-LGBT bias and not other factors best explain the state's adoption of SB184.

20.    The 2015 *Obergefell* decision is often seen as a dividing line in states' LGBT policymaking. "With the marriage question seemingly settled, gender identity became the next theater in the battle over LGBTQ rights" (Carlisle 2022; see also Mezey 2020, 494). Before 2015, relatively few state policies addressed transgender rights specifically, but the rights of transgender persons were subsumed under gay rights generally.[5] For this reason, this section first examines

---

[5] Historically, transgender rights and gay rights have been closely linked, not least because the sexual identity and sexual orientation have often been conflated with one another, both in the public mind and by policy makers (Chauncey 1994; Canaday 2009).

state policies on gay rights generally before 2015 and then transgender policies specifically since 2015.

**LGBT policies before *Obergefell***

21.     Across the nation, state policies towards the LGBT population have become much less restrictive over the past half century. Prohibitions such as criminalization of sodomy have been repealed or struck down by courts, and new rights, such as protections against employment discrimination, have been created and broadened. Alabama has shared in this trend towards the expansion of rights for the LGBT population. Nevertheless, at each point in time, it has consistently been among the states with the most restrictions on LGBT rights.[6]

22.     Alabama's pattern of hostility to LGBT rights can be measured systematically using data from Caughey and Warshaw (2022, 14–16), which contains yearly information on states' adoption of 186 distinct policies.[7] Of these

---

[6] This has also been true of the U.S. South generally, but even within that region Alabama is an outlier (Barth 2021).

[7] The Caughey-Warshaw dataset is the most comprehensive time-series–cross-sectional dataset of U.S. state policies. It covers 186 public policies that can be coded comparably across states. For each year between 1929 and 2020, the dataset indicates the policy choice that each state made. For example, for the policy sodomy criminalization, the dataset indicates whether or not each state criminalized sodomy in each year. If all states had the same value for a policy in a given year, as was true of sodomy criminalization after 2005, that policy-year combination is dropped from the dataset.

policies, a subset of 13 relate to LGBT rights and were in place in any state

between 1992 and 2014 (the year before *Obergefell*):

- Sodomy criminalization
- Fostering by same-sex couples
- Joint adoption by same-sex couples
- LGBT credit antidiscrimination law
- LGBT employment antidiscrimination law
- LGBT hate crimes law
- LGBT housing antidiscrimination law
- LGBT panic defense prohibition
- LGBT public accommodations antidiscrimination law
- Conversion therapy ban
- Preemption of local LGBT antidiscrimination ordinances
- Preemption of local LGBT antidiscrimination ordinances related to education
- Same-sex marriage

23.     The Caughey-Warshaw dataset pre-codes these policies to indicate

whether or to what degree the policy was in place in each state-year.[8] A policy

appears in the dataset only for years when there was cross-state variation on that

policy. Thus, for example, sodomy criminalization does not appear in the dataset

after 2003, when all such laws were invalidated by the U.S. Supreme Court,

eliminating variation across states on this policy. The number of policies available

per year ranges from six to 11.

_____

[8] Of the 13 policies, 6 encode ordinal gradations in policy positions, and the remainder are dichotomous indicators for the presence or absence of the policy in question.

24.     To summarize each state's general orientation towards LGBT rights, I code whether or not it took a relatively restrictive position on each of the above policies in each year.[9] Then, for each year, I calculated the proportion of policies on which the state took that position.

25.     For example, in 2010 Alabama took a restrictive position on all nine policies available in that year, yielding a hostility score of 100%. The next year, Alabama had restrictive positions on 10 out of 11 policies, the exception being preemption of local LGBT antidiscrimination ordinances, which appears in the Caughey-Warshaw dataset for the first time that year. Thus, Alabama's score in 2011 dropped from 100% to 90.9%.

26.     Even after this drop in hostility to LGBT rights, however, Alabama remained tied for the highest proportion of anti-LGBT policies of any state. In fact, in no year between 1992 and 2014 did another state score higher than Alabama. Only South Carolina matched Alabama's consistency of restricting LGBT rights.

---

[9] A relatively restrictive position is defined as being more restrictive than the average across state-years.



*Figure 1: Selected states' hostility to LGBT rights, based on data on 13 policies from Caughey and Warshaw (2022).*

27.     Alabama's relative restrictiveness on LGBT rights is illustrated in *Figure 1*. The figure compares Alabama to the average state (dashed line) as well as to the 10th-, 30th-, and 50th-most hostile states (Arkansas, Nevada, and New Jersey). This comparison starkly illustrates Alabama's consistent history as an outlier with respect to restrictions on LGBT rights.

**Transgender policies since *Obergefell***

28.     Since *Obergefell*, the focus of LGBT policymaking, both nationally and in Alabama, has shifted toward transgender-related issues. In some states, this shift has manifested in the expansion of rights for transgender persons, such as when gender identity protections are added to nondiscrimination laws that previously covered only sexual orientation (Taylor, Haider-Markel, and Lewis

13

2021, 584). Even more salient, however, has been the rapid emergence of state

policies that impose restrictive regulations on gender identity and transgender

persons.

29.     LaCombe (2024) has identified six transgender-restrictive policies

whose incidence can be compared systematically across states:[10]

- **Antidiscrimination Preemption**: Does the state have any sort of law preempting local antidiscrimination protections based on sexual orientation and/or gender identity?
- **Don't Say Gay**: Does the state restrict discussion of sexual orientation and/or gender identity in the classroom?
- **No Gender Change**: Does the state not allow residents to change their legal gender?
- **Bathroom Ban**: Does the state have a law that requires individuals to use the bathroom that corresponds to their assigned sex at birth?
- **Sports Ban**: Does the state have a law that blocks transgender athletes from participating in sports in the gender congruent with their gender identity?
- **GAC Ban Minor**: Has the state enacted a ban on gender-affirming care for minors?

30.     These policies were rare or unheard of before 2015, but several have

exploded in prevalence in the last few years. As such, they provide useful

indicators of the "cutting edge" of policymaking restricting transgender rights. No

---

[10] LaCombe (2024) also considers rights-expanding policies as well as policies that cover sexual orientation but not gender. The procedure used to select policies is described in the paper's appendix. The analysis in this report includes only policies that restrict transgender rights.

state has all six policies, but several states, including Alabama (which has four), are considering adopting restrictive legislation not already on their books.[11]



*Figure 2: Prevalence of six transgender-restrictive policies across states, 2015–2023. Hollow points indicate years in which Alabama did not have the policy in question.*

31.     *Figure 2* plots the number of states with each policy on its books in each year between 2015 and 2023. Only one of these policies, "don't say gay" laws, was adopted anywhere before 2005, and only by a single state (Alabama).[12]

---

[11] As is discussed below, SB92 (2024) would prohibit Alabamians from changing their legal gender.

[12] In 1991, Alabama enacted a curricular law forbidding the portrayal of homosexuality in a positive light. This law was repealed in 2022 and replaced with HB322, which censors discussions of sexual orientation or gender identity through 5th grade ("Alabama HB322" 2022).

Prohibiting gender-affirming care for minors is the most recent of these policies to arrive on the state policy agenda, but its prevalence has sky-rocketed.

32.    When a state adopts one of these transgender-restrictive policies, it also tends to adopt others.[13] In particular, the adoption of a GAC ban is strongly predicted by how many other transgender-restrictive policies a state has already adopted.

33.    To summarize a state's propensity to adopt transgender-restrictive policies, I created a "transgender restriction index," defined as a count of how many such policies (other than banning GAC for minors) a state has adopted. The index theoretically ranges from zero to five, but its maximum empirical value is four. Alabama's score is three. The proportion of states banning GAC for minors as a function of their transgender restriction score is depicted in *Figure 3*.

---

[13] In 2023, for example, the six policies had a Cronbach's alpha (a common measure of inter-item reliability ranging from 0 to 1) value of 0.82.



*Figure 3: Percentage of states banning GAC for minors at different values of the transgender restriction index, in 2023. The index is the total number of transgender-restrictive policies (other than banning GAC for minors) that have been adopted by the state.*

34.    As of 2023, 25 states had adopted none of these policies, giving them a gender-regulation score of zero. Among these 25 states, only 8% prohibited GAC for minors. The percentage rises to 70% among states with a score of one, to 83% with a score of two, and to 100% with a score of three or more. In other words, states' stance on GAC bans is almost perfectly predicted by its regulation of gender identity in other spheres. A score of three, such as Alabama's, is sufficient to ensure adoption of a GAC ban for minors, and a score of zero is nearly sufficient to guarantee non-adoption.

*Healthcare paternalism*

35.     The foregoing analysis suggests that a major, if not predominant, factor explaining a state's adoption of a GAC ban for minors is the state's aggressiveness in regulating gender identity and transgender rights. The reports of Defendants' experts, however, put forward an alternative explanation: the state's interest in protecting citizens from "experimental" and "unproven" medical treatments supported by "low-quality evidence" (Cantor 2023, 74; Nangia 2023, 79; Kaliebe 2023, 7). On this view, Alabama's GAC policy is a form of "healthcare paternalism": a limitation on a person's healthcare choices motivated by concern for that person's welfare (Schramme 2015; cf. Dworkin 1974).[14]

36.     As this section will show, Alabama's policies exhibit low healthcare paternalism relative to other states and correspondingly high healthcare freedom. That Alabama has nonetheless adopted a ban on GAC for minors while more-paternalistic states generally have not suggests that Alabama's ban is not driven by healthcare paternalism, but rather by the hostility to transgender rights demonstrated in the preceding section.

---

[14] Note that as defined here, "healthcare paternalism" is distinct from (and broader than) "medical paternalism," which is typically defined with respect to the relationship between physicians and patients.

37.     U.S. states vary in the balance they strike between protecting citizens and allowing them to make their own healthcare decisions—that is, between healthcare paternalism and healthcare freedom. One aspect of healthcare freedom is what Ruger and Sorens (2013) call "health insurance freedom." These authors measure health insurance freedom based on rate restrictions, insurance mandates, and other factors limiting the choices of health care consumers and providers. They assign a rank to each state, ranging from most free (1) to most paternalistic (50). Alabama is ranked number four, indicating a very low degree of health insurance paternalism and correspondingly high health insurance freedom (Ruger and Sorens 2013, 32–33).[15]

38.     Another aspect of healthcare paternalism that is more closely related to GAC bans are state laws restricting patients' choices about the medical treatments they receive. Arguably the most direct analogue to a ban on GAC are limits on access to experimental therapies that have not yet been approved by the FDA. According to the Goldwater Institute, 41 states have relaxed this restriction with a "right to try" law, which permits patients with life-threatening conditions to access experimental therapies ("Right to Try in Your State" 2024).

---

[15] I use the 2013 version of Ruger and Sorens's scores rather than the 2021 version because, as these authors explain, the Patient Protection and Affordable Care Act "nationalized most health insurance regulation," compressing variation across states (Ruger and Sorens 2021, 44). The 2013 scores are thus a better measure of states' orientation on this issue.

39.     Vaccination requirements involve a similar tradeoff between paternalism and freedom, and states make different choices about them as well. A total of 16 states allow exceptions from vaccine mandates for personal reasons, and 45 allow exceptions for religious reasons ("States with Religious and Philosophical Exemptions from School Immunization Requirements" 2023). Finally, five states, including Alabama, have added a "healthcare freedom amendment" to their state constitutions that protects the right of residents to make their own healthcare decisions (Dinan 2013, 2138). Together with right-to-try laws, these three policy choices provide a rough indication of a state's general stance on paternalism versus freedom in healthcare.

40.     As I did with restrictions on transgender rights, I create an index of healthcare paternalism by counting how many of these four paternalistic policies a state has:

- No right to try
- No personal vaccine exception
- No religious vaccine exception
- No healthcare freedom amendment[16]

---

[16] I used the following sources to code states' adoption of these policies: "Right to Try in Your State" (2024), "States with Religious and Philosophical Exemptions from School Immunization Requirements" (2023), Dinan (2013), and Yeargain (2023). Note that the Florida healthcare freedom provision mentioned in Yeargain (2023) is statutory, not constitutional, and thus I do not code Florida as having a healthcare freedom amendment.

41.     Of these four policies, Alabama lacks only a personal vaccine exemption, giving it a score of one. Thus, as was the case with health insurance paternalism, Alabama ranks very low on the healthcare paternalism index (i.e., very high in healthcare freedom).

42.     The strong positive relationship between the transgender restriction index and adoption of GAC bans for minors depicted in *Figure 3* is consistent with the claim that such bans in general, and SB184 in particular, are rooted in a restrictive stance towards gender identity and transgender persons. The alternative explanation, that SB184 is rooted in paternalistic concern regarding experimental treatments, does not fare nearly so well.

43.     If healthcare paternalism rather than transgender restrictionism were the primary driver of GAC bans for minors, we would expect such bans to be rare in less-paternalistic states and common in highly paternalistic ones. In fact, the reverse is true. States with a right-to-try law, for example, ban GAC for minors at a rate of 56%. By contrast, none of the (relatively paternalistic) states that lack such a law have adopted a GAC ban.[17]

44.     This negative relationship is documented more systematically in *Figure 4*, which plots the proportion of states banning GAC for minors at different

---

[17] These percentages are derived from a crosstabulation of state adoption of GAC bans and right-to-try laws, using the data sources described above.

values of the health paternalism index. As the figure shows, the greater a state's healthcare paternalism, the *less* likely it is to ban GAC for minors. States like Alabama with two or fewer paternalistic policies have well over a 50% chance of banning GAC for minors, but states with three or more restrictions have almost no chance of doing so.



*Figure 4: Percentage of states banning GAC for minors at different values of the healthcare paternalism index, in 2023. The index is the total number of policies a state has adopted restricting healthcare freedom (other than banning GAC for minors).*

45.    *Figure 5* tells a similar story with using Ruger and Sorens's health insurance freedom scale. Each point indicates the proportion of states with GAC bans for minors in a given range of health insurance freedom ranks. States such as Alabama ranked between one and 10, meaning that they score highly on health insurance freedom, have about a 50% chance of banning GAC for minors. This

proportion is roughly steady until we reach the 10 most paternalistic states (ranks 41–50), of which none have adopted such a ban.



*Figure 5: Proportion of states banning GAC by health insurance freedom rank (Rugers and Sorens 2013). Lower ranks indicate greater freedom and higher ranks greater paternalism.*

46.     In short, the national pattern of state GAC adoptions offers no support for Defendants' experts' suggestion that Alabama's GAC ban reflects an especially cautious attitude toward experimental medical treatments. While this may be Defendants' experts' own justifications, it does not accord with the statistical evidence that a state's orientation toward transgender persons, but *not* its degree of healthcare paternalism, strongly predicts its adoption of GAC bans for minors.[18]

---

[18] Multivariate regression analysis confirms these conclusions. In a cross-state logistic regression of *adoption of GAC for minors* on *transgender restriction index*, *healthcare paternalism index*,

### Recent anti-LGBT legislation in Alabama

47.     Defendants' experts present SB184 as a specific response to the "recent rise in transgender and non-binary identification among young people" and the attendant "push for 'affirmative treatment' for gender dysphoria" (Kaliebe 2023, 7, 28). This claim neglects the broader political context in Alabama, which has witnessed an explosion of proposed and enacted legislation targeting LGBT persons generally and the transgender population specifically.

#### *Conscience laws*

48.     As was the case nationally, the 2015 *Obergefell* decision prompted a flurry of policy responses in Alabama. For example, after the legalization of same-sex marriage in Alabama, about a half dozen of the state's probate judges—among them Rep. Wes Allen, who later sponsored the House version of SB184—began refusing to issue marriages licenses so they would not have to issue them to same-sex couples.[19] In 2019, the legislature responded to this situation by passing SB69, which replaces marriage licenses with certificates that do not require a judge's signature ("Alabama SB69" 2019).

---

and *Rugers-Sorens health insurance freedom rank*, only *transgender restriction index* has a positive and statistically significant coefficient estimate.

[19] Rep. Allen defended his refusal to sign marriage licenses with the statement, "I believe marriage is between a man and a woman" (Associated Press 2019).

49.     The Alabama Legislature also enacted several other "conscience laws," which allow individuals and organizations to decline to serve LGBT clients for religious, ideological, or other reasons.[20] Alabama's conscience laws include:

- HB24 (2017), which permits state-licensed child welfare agencies to refuse service to certain populations ("Alabama HB24" 2017);

- HB95 (2017), which permits medical providers to refuse to provide certain types of care or serve certain populations ("Alabama HB95" 2017); and

- SB261 (2023), which forbids the state from entering into contracts with companies that boycott other businesses based upon social standards ("Alabama SB261" 2023).

50.     The cumulative effect of these three laws is to make it easier for private individuals and organizations to discriminate against the LGBT population. Not only do HB24 and HB95 explicitly permit such discrimination, but SB261 attempts to shield discriminatory individuals and organizations from economic pressure from other firms. Thus, even in wake of *Obergefell*, Alabama continues to pass laws restricting LGBT rights.

### *Anti-transgender legislation*

51.     In particular, transgender Alabamians have been subject to a multifaceted legislative assault. These efforts have extended far beyond GAC for

---

[20] Over the past decade, conscience laws have become a major component of religious conservatives' political reaction to expansions of LGBT rights (Wilcox 2021, 61–62).

minors to include rights restrictions that have nothing to do with healthcare or

children. Rather, many evince a clear hostility to transgender status or gender non-

conformity per se. The fact that SB184 emerged in the context of a broad assault

on the transgender community reinforces the evidence in the "Pattern of

Discrimination" section that SB184 was rooted primarily in concerns about sex,

gender identity, and transgender status.

52.     The most recent episode in this legislative assault is a controversy

around a transgender employee at the U.S. Space and Rocket Center in Huntsville.

Merely upon learning of this employee's existence, state Rep. Mack Butler

announced that was planning to expand the "don't say gay" bill he was sponsoring

(HB130) to cover the Center. "[W]e've got a problem," Butler explained, "because

federal law says you can't ban people because of gender identity….But we've got

to use some common sense. We literally do this all the time in schools—doing

background checks and things like that." Transgender identification "was always a

mental defect," he continued. Transgender persons "can pretend all they

want….But I do not believe they need to be in charge of children" (Poor 2024).

53.     Rep. Mack's remarks are indicative of the breadth of Alabama's

assault on transgender rights and the degree to which they are rooted in hostility

toward transgender persons for their gender identity per se. This assault has been

manifested in a flurry of enacted and proposed legislation targeting the transgender community across multiple domains.

54.     In 2021, Alabama passed HB 391, a transgender sports ban for K–12 students. Then, in 2022, "the Legislature approved numerous pieces of legislation targeting transgender youth" (Mealins 2023). In addition to SB184, the legislature passed HB322, which defines sex as male or female as listed on one's original birth certificate; requires public school students to use facilities that correspond to their sex assigned at birth; and forbids classroom discussion or instruction of sexual orientation or gender identity in a manner that is not "age or developmentally appropriate" ("Alabama HB322" 2022). The lead sponsors of SB184 were also active supporters of HB322.[21]

55.     Alabama's flood of legislation targeting transgender community did not abate after 2022. According to the *Montgomery Advertiser*, "Alabama politicians target LGBTQ+ people" was one of the "top…political stories of 2023" as well (Lyman 2024). The new laws included HB261, which extended Alabama's transgender sports ban to college students (i.e., non-minors over the age of 18).

---

[21] Rep. Wes Allen was a sponsor of HB322 in the House, and the Senate amendment to HB322 prohibiting age-inappropriate instruction was offered by Sen. Shay Shelnutt ("Alabama HB322" 2022; Shelnutt 2022).

56.     Several additional transgender-related bills have been introduced in

the legislature in the past year:

- HB401, which would expand the definition of "sexual conduct" with
  respect to distribution of materials to minors to include "male or
  female impersonators" ("Alabama HB401" 2023);

- SB92, which defines sex as a fixed binary and requires state agencies
  collecting vital statistics to categorize transgender or non-binary
  individuals according to their sex assigned at birth ("Alabama SB92"
  2024);

- HB111, which like SB92 would define sex as a fixed binary and
  require collection of vital statistics to reflect sex assigned at birth
  ("Alabama HB111" 2024);

- SB129, which would require public universities to designate
  restrooms based on sex assigned at birth ("Alabama SB129" 2024);
  and

- HB130, which would extend Alabama's "don't say gay" ban through
  twelfth grade and makes not exemptions based on developmental
  appropriateness ("Alabama HB130" 2024).

57.     Taken together, this wave of anti-transgender activity provides

important context for the specific legislative history of SB184 discussed below.

SB184 is not an isolated piece of legislation targeted at a particular set of medical

procedures, but rather one bill among many targeting transgender persons in

multiple domains. Importantly, several of the above bills target transgender status

or gender non-conformity per se, and several, such as HB261 and SB92, have

nothing to do with minors under the age of 18. SB184 thus emerged in the context of a multifaceted legislative assault on the transgender population.

**Legislative history of SB184**

58.    This section reviews the legislative history of SB184. In political science, legislative histories are a standard means of understanding patterns of support and opposition to the legislation in question, the legislators' goals and states of mind as they considered the legislation, and the public rationales and justifications they offered in defense of their positions.[22] I have conducted analyses of legislative history in my own academic work (see, e.g., Caughey 2018, 91–101). This section is not intended to provide a comprehensive history of SB184, but rather to highlight relevant aspects of the political context missing from the defense reports.

59.    As is typical of political science analyses of this kind, my legislative history of SB184 draws on a wide variety of sources, all of which are in the public domain. These include scholarly articles, journalistic accounts and interviews, materials from interest groups and nonprofit organizations, recordings of legislative hearings, and the official records of the Alabama Legislature.[23] To

---

[22] For a classic example, see Douglas and Hackman (1938).

[23] The Alabama Legislature's official record of SB184 is limited to basic information on the bill's progression through the legislative process, which I accessed through the search engine at Alabama Legislature (2024). The Alabama Legislature does not archive recordings or transcripts

account for policy diffusion across states (Walker 1969), I consider the roots of SB184 in the activities of legislators and activists in other states. My focus, however, is on the public justifications and debate over SB184, which provide insight into both the bill's intended purposes and the information on its likely consequences available to the Legislature as it considered the bill.

60.   The legislative history of SB184 yields two primary conclusions. First, concerns about sex, gender identity, and transgender status were central to the Legislature's understanding of the purposes of SB184. Second, given the information available to it about the opposition of transgender Alabamians and those close to them, the Legislature had ample opportunity to learn about the harms SB184 would cause to the population it targeted.

**Origins of SB184**

61.   Defendants' expert reports make almost no reference to the state of Alabama or to SB184 specifically. Rather, they are couched in terms applicable to the United States generally, if not the entire "economically advanced Western world" (Kaliebe 2023, 7).[24] This broad frame of reference is in keeping with the

---

of legislative hearings and debate, so I relied on a subset of recordings that have been archived by nongovernmental entities and made available to the public.

[24] The primary exception to the national focus in the defense reports is Dr. Cantor's quotation of plaintiff expert Dr. Ladinsky's contention that SB184 "will cause serious harms to my patients as well as other transgender youth throughout Alabama" (quoted by Cantor 2023, 118). However,

nationwide scope of the coordinated movement to ban GAC for minors, of which the SB184 is only one instance among many (Astor 2023; Kirkpatrick 2023; Pauly 2023).

62.     Nationally, the first proposal to ban GAC for minors was introduced in 2019 by Rep. Fred Deutsch of the South Dakota House of Representatives. Although Deutsch's "Vulnerable Child Compassion and Protection Act" (VCAP) failed to pass, it served as a template for efforts in other states.[25] In 2021, Arkansas became the first state to successfully pass a statute banning GAC for minors, and since then 22 more states have passed one, though many have not yet been implemented due to legal challenges (Movement Advancement Project 2024).

63.     Alabama's first version of VCAP was introduced to the state House and Senate on February 20, 2020 by Rep. Wes Allen and Sen. Shay Shelnutt, respectively.[26] Consistent with his having been influenced by the example of the

---

although Dr. Ladinsky's claim refers specifically to Alabama, Dr. Cantor's response to it is, like the rest of his report, couched in general terms.

[25] As one anti-GAC activist in Alabama wrote to Rep. Deutsch: "You successfully inspired, encouraged and counseled numerous VCAP [sic] efforts around the country. You established the ideal witness list that we are all still following in our individual states…And, most importantly you connected us all to each other" (Pauly 2023).

[26] Versions of VCAP were introduced in three successive sessions of the Alabama Legislature before finally passing. The corresponding bill numbers are HB303 and SB219 (2020), HB1 and SB10 (2021), and HB266, HB150, SB5, and SB184 (2022). In 2020, Rep. Allen was the lead sponsor of HB303 and Sen. Shelnutt was the lead sponsor of SB219 ("SB219" 2020; "HB303" 2020). SB184 lists Rep. Allen and Sen. Shelnutt as the only sponsors ("SB184" 2022, 1).

2019 Deutsch bill in South Dakota, Rep. Allen stated that he only "started researching this issue [GAC] at the end of…2019" (Dailey 2020), and Sen. Shelnutt was "not aware of the issue until the bill was presented to him" (Cason 2021c).

### Justifications for SB184

64.     Like Defendants' expert reports, the justifications of SB184's supporters place heavy emphasis on the "safety" and "protect[ion]" of children—a framing often used by advocates of restricting transgender rights.[27] They also stress the "experimental" status of GAC treatments, a rhetorical strategy of playing up scientific uncertainty common in debates over such bills (Wuest and Last 2024).[28]

65.     Just as important, however, are themes of sex, gender identity, and transgender status, which were central to the legislature's understanding of the purpose of the bill. Not only were these themes prominent in supporters' justifications for SB184, but the Legislature also rejected an attempt to exempt psychotherapy from the ban on GAC ("Whatley Amendment to SB10" 2021). This the bill was not narrowly targeted at a specific set of "experimental" medical

---

[27] Re experts, see Nangia (2023, 87) and Cantor (2023, *i* and *passim*). Re SB184's supporters, see the opening sentences of Allen (2020) and Shelnutt (2020). Re the use of "safety and security" frames in other contexts, see Tadlock (2014).

[28] Re the "experimental" status of GAC for minors, see Cantor (2023, *iii*) and Dailey (2020).

procedures but rather was concerned with regulating gender identity in a broader sense.

66.    It is common for justifications of GAC bans and other restrictions on transgender rights to invoke the essentialist view that "sex and gender are identical, simplistic and dichotomous concepts" (Martin and Rahilly 2023, 740).[29] Moreover, such restrictions are sometimes framed as "means of combating the growth of gender dysphoria" or "gender variance itself" (Martin and Rahilly 2023, 745–6). In other words, restrictions on transgender rights have been justified as responses to a general social phenomenon, what some GAC ban proponents call "transgenderism" (Chait 2023).

67.    The sex- and gender-related justifications used to defend SB184 are consistent with these general patterns. First, an essentialist view of sex permeated legislative discussions of the bill. Rep. Allen, for example, stated "I have a biblical worldview that we're all made in the image of God and there are only two sexes, male and female…. [W]hen a person is born male, they're male. When a person is born female, they're female" (Cason 2021a). While denying that his GAC bill was "discriminatory and hateful," Allen said he supported a transgender sports ban as

---

[29] "Gender essentialism" is the "belief that males and females are born with distinctively different natures, determined biologically rather than culturally. This involves an equation of gender and sex" (D. Chandler and Munday 2011).

well, arguing that "boys need to compete against boys, and females need to compete against females" (Dailey 2020).

68.     Similarly, when signing the bill, Gov. Kay Ivey stated "I believe very strongly that if the Good Lord made you a boy, you are a boy, and if he made you a girl, you are a girl" (Alfonseca 2022). This is consistent with SB184's own assertion, "The Legislature finds and declares [that]…[t]he sex of a person is the biological state of being female or male…, and is genetically encoded into a person at the moment of conception, and it cannot be changed" ("SB184" 2022, 1–2). Such statements are evidence that concerns about defending a certain conception of sex were central to the bill's purpose.

69.     These concerns were closely tied to the relationship between sex and gender. Banning GAC for minors, Rep. Allen argued, is about protecting children who are "confused about their gender identity" (Allen 2020). The bill's supporters characterized discrepancies between sex and gender identity as "gender dysphoria," which Sen. Shelnutt defined as "Someone thinks they should be a girl if they're a boy or thinks they should be a boy if they're a girl." He added, "There's no medical condition that these kids have. It's just in their mind" (Cason 2021c).

70.     Rep. Allen claimed to favor "therapeutic treatment" for transgender youth in place of GAC (Allen 2020). The legislature, however, explicitly declined

to exempt psychotherapeutic counseling from SB184's restrictions. In a voice vote, the Senate rejected an amendment by Sen. Tom Whatley clarifying that the bill was not meant to limit the therapeutic discretion of psychologists or counselors ("Whatley Amendment to SB10" 2021).

71.     Sen. Shelnutt said he opposed the amendment because it would allow those counseling transgender minors to reinforce a gender identity contrary to that assigned at birth. "We don't want them affirming that, 'Hey yeah, you're right, you should be a boy if you are a born a female,'" he explained (Chandler 2021). The legislature's rejection of this amendment suggests that it viewed the targets of SB184 to extend beyond a specific set of "experimental" medical procedures to include any therapies that might validate or encourage gender nonconformity or transgender identification. This view is reflected in the final language of SB184 itself, which prohibits actions that "affirm the minor's perception of his or her gender or sex, if that perception is inconsistent with the minor's biological sex" ("SB184" 2022, 6).

72.     That SB184 was viewed as part of a larger effort to reinforce traditional categories of sex and gender is also suggested by Gov. Ivey's remarks in "Identity," a 2022 campaign advertisement. "Some things are just facts," said Ivey. "Summer's hot, the ocean's big, and gender is a question of biology, not identity." A voiceover continued: "That's why Ivey banned transgender youth

sports, banned left-wing sexual propaganda from our schools, and made it a felony for transgender surgery on children in Alabama" (Kay Ivey for Governor 2022).

**Opposition to SB184 and foreseeability of harm**

73.     This section reviews the justifications of SB184's opponents. Its coverage is necessarily selective, as the state of Alabama does not archive official transcripts or recordings of legislative hearings or debates. I have attempted to review all publicly available documentation, including video recordings and transcripts as well as journalistic summaries, on the debate over SB184 and its precursors.

74.     Throughout the debate over SB184, its legislative supporters had ample opportunity to hear objections from those it putatively aimed to help—Alabamians with a gender identity different from their assigned sex—as well as from parents, medical providers, and others with particular knowledge of and interest in the welfare of transgender youth.  SB184's supporters thus had good reason to anticipate the harm that that the bill's passage would cause to the transgender population.

75.     From the beginning of its legislative journey, SB184's sponsors were aware of the criticism of the bill from the transgender community and their allies. As noted above, in March 2020 an interviewer asked Rep. Allen to respond to the

charge that the bill was "discriminatory and hateful" to those who are transgender, which Rep. Allen denied (Dailey 2020).

76.     In legislative hearings for SB184, transgender Alabamians who had received the treatments the bill would ban expressed their gratitude for having done so. Monroe Smith, for example, praised the "slow and steady process" of GAC and asserted that if he had been denied access to it as a minor:

> I would not be the successful young man I am today. I'm grateful I'm not just another percentage point that makes up the staggering number of transgender youth who are turned away from medically necessary and affirming healthcare, fall victim to depression, social isolation, and suicide (Alabama Senate Healthcare Committee 2022).

77.     In the same hearing, Quentin Bell, another transgender man, also emphasized the harm the SB184 would cause to transgender youth (Alabama Senate Healthcare Committee 2022).

78.     Parents of transgender minors expressed similar convictions. In a 2021 hearing, police sergeant David Fuller, praised the care his transgender daughter had received from the University of Alabama at Birmingham:

> They made sure it was baby steps. It's been a five-year process now and they haven't pushed anything on us. Just the opposite. And they are angels to me. And as a police officer, you're asking me to someday put handcuffs on these people that are heroes in my life?… Please don't ask me to do that (Cason 2021b).

79.     Jeff White asserted that his transgender daughter would be "forced into psychological desolation" by SB184 (Alabama Senate Healthcare Committee 2022).

80.     Physicians who cared for transgender patients reinforced these conclusions. Dr. Nola Jean Earnest observed that:

> 86% of [transgender patients] will have think about suicide—have suicidal ideations—and over half of them will attempt it. So when parents come to me afraid of losing their child, they have something to be afraid of. If we do not affirm these patients…studies show that if you trivialize the experience of a teenager they are more likely to commit self harm (Alabama Senate Healthcare Committee 2022).

81.     Laura Stiller, a high school teacher from Montgomery who had taught more than 25 transgender students over her career, characterized a precursor to SB184 as "an attack on parental and individual rights" and Rep. Allen's justifications for it "false, manipulative, and mean-spirited" (Stiller 2020).

82.     By their own admission, Rep. Allen and Sen. Shelnutt had given little thought to the issue until shortly before they introduced their proposed ban.[30] In fact, both professed to be "shocked" to learn that gender-affirming care was being

---

[30] As noted, Allen said he started researching GAC in late 2019, and Sen. Shelnutt claimed not to have heard of it "until the bill presented to him," which was probably around the same time (Dailey 2020; Cason 2021c).

practiced in Alabama (Allen 2020; Shelnutt 2020), and Sen. Shelnutt admitted that he had never spoken to a young person who was transgender (Chandler 2021).

83.   Given their prior lack of familiarity with GAC, SB184's sponsors' initial impression that the bill would help rather than harm transgender youth may be understandable. Less plausible, however, is the notion that after two years of testimony from transgender Alabamians and those close to them, they would have remained unaware of the harm it would cause.

## CONCLUSION

84.   Defendants' experts' reports justify their support for SB184 on the grounds of protecting young people from potentially dangerous medical treatments. My report has shown that this was far from the primary purpose of the legislation. Rather, concerns about sex, gender identity and nonconformity, and transgender status were central to the legislative history and intent of SB184.

85.   Like Defendants' experts, the legislative sponsors and supporters of SB184 have defended the bill as aiming to help "gender dysphoric" minors—that is, young people whose gender identity does not conform to the sex they were assigned at birth. They present SB184's restrictions on the freedom of transgender youth, along with their parents and physicians, as serving the best interests of a population too young to make choices for themselves.

86.     Some of the support for SB184 may well stem from such paternalistic compassion for transgender youth. Alabama's long history of restricting LGBT rights, and more recently transgender rights, across many domains argues however against this as the prime motivation. So does the fact that states' hostility towards LGBT rights, and not the paternalism of their healthcare policies, near-perfectly predicts whether they ban GAC for minors. And finally so does SB184's place in the broader context of a multifaceted assault on transgender Alabamians.

87.     The justifications employed by legislative supporters of SB184 make it clear that concerns about sex, gender identity, and transgender status were central to their understanding of the bill's purpose. Moreover, they viewed it as part of a larger effort to combat "gender dysphoria" and promote essentialist notions of sex and gender.

88.     The legislative debate over SB184 gave the legislature ample opportunity to learn of the harms anticipated by the people it targets. The recipients of gender-affirming care, as well as their parents, doctors, and teachers, spoke of their gratitude for GAC and the psychological and physical harms that it averted. The legislature had all the information it needed to foresee the harms SB184 would cause.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

40

Executed: April 1, 2024

DEVIN CAUGHEY, PhD

# REFERENCES

"Alabama HB111." 2024. LegiScan. *https://legiscan.com/AL/bill/HB111/2024*.

"Alabama HB130." 2024. LegiScan. *https://legiscan.com/AL/bill/HB130/2024*.

"Alabama HB24." 2017. LegiScan. *https://legiscan.com/AL/bill/HB24/2017*.

"Alabama HB322." 2022. LegiScan. *https://legiscan.com/AL/text/HB322/2022*.

"Alabama HB401." 2023. LegiScan. *https://legiscan.com/AL/bill/HB401/2023*.

"Alabama HB95." 2017. LegiScan. *https://legiscan.com/AL/text/HB95/id/1498841*.

Alabama House Judiciary Committee. 2022. "House Judy Committee - 3/2/2022, 1:34:28 PM." Vimeo. March 2, 2022. *https://vimeo.com/683940881/4edaeefda2*.

Alabama Legislature. 2024. "BILLS - SEACH ALL SESSIONS." *https://alison.legislature.state.al.us/bill-search?tab=3*.

"Alabama SB129." 2024. LegiScan. *https://legiscan.com/AL/bill/SB129/2024*.

"Alabama SB261." 2023. LegiScan. *https://legiscan.com/AL/bill/SB261/2023*.

"Alabama SB69." 2019. LegiScan. *https://legiscan.com/AL/bill/SB69/2019*.

"Alabama SB92." 2024. LegiScan. *https://legiscan.com/AL/text/SB92/2024*.

Alabama Senate Healthcare Committee. 2022. "Committee Recording - 12 Pm - 2/9/2022, 12:00:37 PM." Vimeo. February 9, 2022. *https://vimeo.com/675565353/99cfbd4ffe*.

Alfonseca, Kiara. 2022. "Alabama Governor Signs 'Don't Say Gay,' Trans Care and Bathroom Ban Bills." ABC News. April 8, 2022. *https://perma.cc/XT7T-8RPJ*.

Allen, Wes. 2020. "Rep Wes Allen: INTRODUCES VCAP BILL." YouTube. February 26, 2020. *https://youtu.be/p0piq-5LjP0?si=3h2EnzEg79g8eeNX*.

Associated Press. 2019. "Alabama Lawmakers Pass Workaround Bill on Same-Sex Marriage." *NBC News*, May 24, 2019. *https://perma.cc/HD9X-GQU6*.

Astor, Maggie. 2023. "G.O.P. State Lawmakers Push a Growing Wave of Anti-Transgender Bills." *New York Times*, January. *https://www.nytimes.com/2023/01/25/us/politics/transgender-laws-republicans.html*.

Barth, Jay. 2021. "The American South and LGBT Politics." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:41–51. New York: Oxford University Press.

Bishin, Benjamin G., Thomas J. Hayes, Matthew B. Incantalupo, and Charles Anthony Smith. 2021. *Elite-Led Mobilization and Gay Rights: Dispelling the Myth of Mass Opinion Backlash*. University of Michigan Press.

Canaday, Margot. 2009. *The Straight State: Sexuality and Citizenship in Twentieth-Century America*. Princeton, NJ: Princeton University Press.

Cantor, James. 2023. "Expert Report of James Cantor, Ph.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Carlisle, Madeleine. 2022. "Inside the Right-Wing Movement to Ban Trans Youth from Sports." *Time*, May 16, 2022. *https://time.com/6176799/trans-sports-bans-conservative-movement/*.

Cason, Mike. 2021a. "Alabama Lawmakers Again Seek to Ban Transgender Treatments for Minors." *AL.com*, January 6, 2021. *https://www.al.com/news/2021/01/alabama-lawmakers-again-seek-to-ban-transgender-treatments-for-minors.html*.

———. 2021b. "Father of Transgender Daughter Tells Alabama Lawmakers Treatment Ban Is Misguided." *AL.com*, February 10, 2021. *https://perma.cc/ME23-C6SZ*.

———. 2021c. "Alabama Senate Passes Bill Banning Transgender Treatments for Minors." *AL.com*, March 2, 2021. *https://perma.cc/LGH3-VRNX*.

Caughey, Devin. 2018. *The Unsolid South: Mass Politics and National Representation in a One-Party Enclave*. Princeton, NJ: Princeton University Press.

Caughey, Devin, and Christopher Warshaw. 2022. *Dynamic Democracy: Public Opinion, Elections, and Policymaking in the American States*. Chicago: University of Chicago Press.

Chait, Jonathan. 2023. "CPAC Speaker Urges Eradication of Trans Rights: 'There Can Be No Middle Way in Dealing with Transgenderism. It Is All or Nothing.'" *New York Magazine*, March 6, 2023. *https://nymag.com/intelligencer/2023/03/michael-knowles-at-cpac-urges-eradication-of-trans-rights.html*.

Chandler, Daniel, and Rod Munday. 2011. "Gender Essentialism." In *A Dictionary of Media and Communication*. Oxford University Press. *https://www.oxfordreference.com/view/10.1093/acref/9780199568758.001.0001/acref-9780199568758-e-1089*.

Chandler, Kim. 2021. "Alabama Senate Approves Treatment Ban for Trans Kids." *Associated Press*, March 2, 2021. *https://apnews.com/general-news-c7645e8aaff7a769fa13b9b5aeb26cc1*.

Chauncey, George, Jr. 1994. *Gay New York: Gender, Urban Culture, and the Making of the Gay Male World, 1890–1930*. New York: Basic Books.

Dailey, Don. 2020. "Capitol Journal: Season 13, Episode 32." Alabama Public Television. *https://video.aptv.org/video/march-10-2020-dcnp7b/*.

Dinan, John. 2013. "State Constitutional Amendments and Individual Rights in the Twenty-First Century." *Albany Law Review* 76 (4): 2105–40.

Douglas, Paul H., and Joseph Hackman. 1938. "The Fair Labor Standards Act of 1938 I." *Political Science Quarterly* 53 (4): 491–515.

Dworkin, Gerald. 1974. "Paternalism." *The Monist* 56 (1): 64–84.

Haider-Markel, Donald, Jami Taylor, Andrew Flores, Daniel Lewis, Patrick Miller, and Barry Tadlock. 2019. "Morality Politics and New Research on Transgender Politics and Public Policy." *The Forum* 17 (1): 159–81.

"HB303." 2020. The Alabama Legislature. *https://alison.legislature.state.al.us/files/pdfdocs/SearchableInstruments/2020RS/PrintFiles/HB303-Int.pdf*.

Hruz, Paul W. 2023. "Expert Report of Paul W. Hruz, M.D., PH.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Kaliebe, Kristopher. 2023. "Expert Report of Kristopher Kaliebe, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Kay Ivey for Governor. 2022. "Identity." YouTube. May 12, 2022. *https://youtu.be/BRoZLk9cmYQ?si=6gr-1vH4BpupCiS1*.

Kirkpatrick, David D. 2023. "The Next Targets for the Group That Overturned Roe." *The New Yorker*, October 2, 2023.

*https://www.newyorker.com/magazine/2023/10/09/alliance-defending-freedoms-legal-crusade*.

LaCombe, Scott J. 2024. "Measuring LGBTQ Policy Environment in the US States." Paper presented at the Southern Political Science Association Annual Conference, New Orleans, LA, January 10–13, 2024. *https://www.scottlacombe.com/uploads/1/2/0/5/120596042/lacombe_measuring.pdf*.

Laidlaw, Michael K. 2023. "Expert Report of Michael K. Laidlaw, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Lappert, Patrick W. 2023. "Expert Report of Patrick W. Lappert, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Lewis, Daniel C., Jami K. Taylor, Brian DiSarro, and Mathew L. Jacobsmeier. 2014. "Is Transgender Policy Different? Policy Complexity, Policy Diffusion, and LGBT Nondiscrimination Law." *Transgender Rights and Politics: Groups, Issue Framing, and Policy Adoption*, 155–88.

Lombardi, Emilia. 2021. "The Evolution of Transgender Politics in the United States." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:522–38. New York: Oxford University Press.

Lyman, Brian. 2024. "Picks for the Top 10 Alabama Political Stories of 2023." *Montgomery Advertiser*, January 7, 2024, Factiva.

Martin, Kimberly, and Elizabeth Rahilly. 2023. "Value Frames in Discourse Supporting Transgender Athlete Bans." *Discourse & Society* 34 (6): 732–51.

Mealins, Evan. 2023. "Legislature: What to Watch for in 2023 Session: Grocery Taxes, Schools, Prisoners on Agenda." *Montgomery Advertiser*, March 6, 2023, Factiva.

Mezey, Susan Gluck. 2020. "Transgender Policymaking: The View from the States." *Publius: The Journal of Federalism* 50 (3): 494–517.

Movement Advancement Project. 2024. "Healthcare Laws and Policies: Bans on Best Practice Medical Care for Transgender Youth." March 22, 2024. *https://www.lgbtmap.org/equality-maps/healthcare/youth_medical_care_bans*.

Nangia, Geeta. 2023. "Expert Report of Geeta Nangia, M.D." *Boe et al. v. Marshall et al.*, United States District Court for the Middle District of Alabama Northern Division.

Ogburn, Elizabeth L., Oleg Sofrygin, Iván Díaz, and Mark J. van der Laan. 2024. "Causal Inference for Social Network Data." *Journal of the American Statistical Association* 119 (545): 597–611. *https://doi.org/10.1080/01621459.2022.2131557*.

Pauly, Madison. 2023. "Inside the Secret Working Group That Helped Push Anti-Trans Laws Across the Country: Leaked Emails Give a Glimpse of the Religious-Right Networks Behind Transgender Health Care Bans." *Mother Jones*, March 8, 2023. *https://www.motherjones.com/politics/2023/03/anti-trans-transgender-health-care-ban-legislation-bill-minors-children-lgbtq/*.

Poor, Jeff. 2024. "State Rep. Butler: 'We're All Pretending' Transgender Behavior Is Normal — 'Up Until Obama, It Was Always a Mental Defect, and He Kind of Popularized It'." *1819 News*, March. *https://1819news.com/news/item/state-rep-butler-were-all-pretending-transgender-behavior-is-normal-up-until-obama-it-was-always-a-mental-defect-and-he-kind-of-popularized-it*.

"Right to Try in Your State." 2024. Goldwater Institute. *http://righttotry.org/in-your-state/*.

Ruger, Wiliam P., and Jason Sorens. 2013. *Freedom in the 50 States: An Index of Personal and Economic Freedom*. Arlington, Virginia: Mercatus Center, George Mason University.

———. 2021. *Freedom in the 50 States: An Index of Personal and Economic Freedom*. 6th ed. Washington, DC: Cato Institute.

"SB184." 2022. The Alabama Legislature. *https://alison.legislature.state.al.us/files/pdfdocs/SearchableInstruments/2022RS/PrintFiles/SB184-Enr.pdf*.

"SB219." 2020. The Alabama Legislature. *https://alison.legislature.state.al.us/files/pdfdocs/SearchableInstruments/2020RS/PrintFiles/SB219-Int.pdf*.

Schramme, Thomas, ed. 2015. *New Perspectives on Paternalism and Health Care*. Springer.

Shelnutt, Shay. 2020. "Sen. Shelnutt Introduces the AL Vulnerable Child Compassion and Protection Act (VCAP)." YouTube. February 26, 2020. *https://www.youtube.com/watch?v=Xg3Gb_iS2tY&t=3s*.

————. 2022. "Shelnutt Amendment to HB322." The Alabama Legislature. *https://www.legislature.state.al.us/pdf/SearchableInstruments/2022RS/PrintFiles/2 19979-1.pdf.*

"States with Religious and Philosophical Exemptions from School Immunization Requirements." 2023. National Conference of State Legislatures. August 3, 2023. *https://www.ncsl.org/health/states-with-religious-and-philosophical-exemptions-from-school-immunization-requirements.*

Stiller, Laura. 2020. "Message to Rep. Wes Allen: HB1 Is an Attack on Transgendered Youths and Parental Rights." *Montgomery Advertiser*, October 7, 2020. *https://perma.cc/772D-ZUD5.*

Tadlock, Barry L. 2014. "Issue Framing and Transgender Politics: An Examination of Interest Group Websites and Media Coverage." In *Transgender Rights and Politics: Groups, Issue Framing, and Policy Adoption*, edited by Jami K. Taylor and Donald P. Haider-Markel, 25–48. Ann Arbor: University of Michigan Press.

Taylor, Jamie K., Donald P. Haider-Markel, and Daniel C. Lewis. 2018. *The Remarkable Rise of Transgender Rights*. Ann Arbor: University of Michigan Press.

Taylor, Jamie K., Donald P. Haider-Markel, and Daniel C. Lewis. 2020. "LGBTQ Policy and Fragmented Federalism in the US." *State and Local Government Review* 52 (4): 255–65.

Taylor, Jamie K., Donald P. Haider-Markel, and Daniel C. Lewis. 2021. "Federalism and LGBT Politics and Policy in the United States." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:577–89. New York: Oxford University Press.

Trumbull, Den. 2020. "Dr Trumbull, Pediatrician, Founder/Past President Amer. College of Pediatrics Urges Passage of VCAP." YouTube. February 26, 2020. *https://www.youtube.com/watch?v=uHdHSvXTuu0.*

Van Meter, Quentin. 2020. "Dr Van Meter, Pediatric Endocrinologist & Pediatrician Urges Passage of VCAP (Senate Hearing)." YouTube. February 26, 2020. *https://youtu.be/WNOgEY0bIS0?si=yhVqi4UPrw6tH8Uy.*

Walker, Jack L. 1969. "The Diffusion of Innovations among the American States." *American Political Science Review* 63 (3): 880–99.

"Whatley Amendment to SB10." 2021. *https://www.legislature.state.al.us/pdf/SearchableInstruments/2021RS/PrintFiles/2 11110-1.pdf.*

Wilcox, Clyde. 2021. "Anti-LGBT and Religious Right Movements in the United States." In *The Oxford Encyclopedia of LGBT Politics and Policy*, edited by Donald P. Haider-Markel, 1:51–66. New York: Oxford University Press.

League of Women Voters of Alabama. 2023. "The Alabama Channel." League of Women Voters of Alabama Education Fund. 2023. *https://www.thealabamachannel.org*.

Wuest, Joanna, and Briana S. Last. 2024. "Agents of Scientific Uncertainty: Conflicts over Evidence and Expertise in Gender-Affirming Care Bans for Minors." *Social Science & Medicine* 344: 116533.

Yeargain, Quinn. 2023. "How Attacks Against Obamacare Turned into Tools to Protect Abortion Access." *Bolts Magazine*, March 3, 2023. *https://boltsmag.org/abortion-access-and-measures-against-obamacare-ohio-wyoming/*.

EXHIBIT A

# Devin Caughey

Last updated: April 1, 2024

Massachusetts Institute of Technology
Department of Political Science
E53-463, Cambridge, MA 02139

*Email*:  devin.caughey@gmail.com
*Phone*:  (703) 999-8822
*Web*:  http://devincaughey.com

## Academic Appointments

**Massachusetts Institute of Technology,** Cambridge, MA

| | |
|---|---|
| 2023– | *Professor*, Department of Political Science |
| 2020–23 | *Associate Professor (with Tenure)*, Department of Political Science |
| 2017–20 | *Silverman Family Career Development Associate Professor (without Tenure)*, Department of Political Science |
| 2013–17 | *Assistant Professor*, Department of Political Science |
| 2012 | *Instructor*, Department of Political Science |

**Princeton University,** Princeton, NJ

| | |
|---|---|
| 2016–17 | *Visiting Associate Research Scholar*, Center for the Study of Democratic Politics, School of Public and International Affairs |

## Education

**University of California–Berkeley,** Berkeley, CA

| | |
|---|---|
| 2012 | Ph.D. in Political Science (chair: Eric Schickler) |
| | *Thesis*: "Congress, Public Opinion, and Representation in the One-Party South, 1930s–1960s" |
| 2007 | M.A. in Political Science |

**Cambridge University, Clare College,** Cambridge, UK

| | |
|---|---|
| 2006 | M.Phil. in Historical Studies (supervisor: Anthony Badger) |

**Yale University,** New Haven, CT

| | |
|---|---|
| 2004 | B.A. in History (*cum laude*, with distinction in the major) |

## Monographs

2022   Devin Caughey and Chrisopher Warshaw. 2022. *Dynamic Democracy: Public Opinion, Elections, and Policymaking in the American States*. Chicago: University of Chicago Press (248 pages)

    ∗ Virginia Gray award for best book on state politics and policy (winner)

2020   Devin Caughey, Adam J. Berinsky, Sara Chatfield, Erin Hartman, Eric Schickler, and Jasjeet J. Sekhon. 2020. *Target Estimation and Adjustment Weighting for Survey Nonresponse and Sampling Bias*. Elements in Quantitative and Computational Methods for the Social Sciences. Cambridge, UK: Cambridge University Press. https://doi.org/10.1017/9781108879217 (112 pages).

2018   Devin Caughey. 2018. *The Unsolid South: Mass Politics and National Representation in a One-Party Enclave*. Princeton, NJ: Princeton University Press (240 pages).

    ∗ Leon Epstein Award for best book on political organizations and parties (winner)
    ∗ Allan Sharlin Award for outstanding book in social science history (honorable mention)
    ∗ Reviews: *The Nation, Journal of Politics, Perspectives on Politics, Political Science Quarterly* and *Journal of Southern History*

## Refereed Articles

forth.   [17]  Devin Caughey, Allan Dafoe, Xinran Li, and Luke Miratrix. 2023. "Randomisation Inference Beyond the Sharp Null: Bounded Null Hypotheses and Quantiles of Individual Treatment Effects." Forthcoming, *Journal of the Royal Statistical Society Series B: Statistical Methodology*, https://doi.org/10.48550/arXiv.2101.09195.

2020   [16]  Devin Caughey, Michael C. Dougal, and Eric Schickler. 2020. "Policy and Performance in the New Deal Realignment: Evidence from Old Data and New Methods." *Journal of Politics* 82 (2): 494–508. https://doi.org/10.1086/707305.

2019   [15]  Devin Caughey, Tom O'Grady, and Christopher Warshaw. 2019. "Policy Ideology in European Mass Publics, 1981–2016." *American Political Science Review* 113 (3): 674–693. https://doi.org/10.1017/S0003055419000157.

[14]  Devin Caughey and Mallory Wang. 2019. "Dynamic Ecological Inference for Time-Varying Population Distributions Based on Sparse, Irregular, and Noisy Marginal Data." *Political Analysis* 27 (3): 388–396. https://doi.org/10.1017/pan.2019.4.

2018   [13]  Allan Dafoe, Baobao Zhang, and Devin Caughey. 2018. "Information Equivalence in Survey Experiments." *Political Analysis* 26 (4): 399–416. http://dx.doi.org/10.1017/pan.2018.9.

[12]  Devin Caughey, James Dunham, and Christopher Warshaw. 2018. "The Ideological Nationalization of Partisan Subconstituencies in the American States." *Public Choice* 176 (1–2): 133–151. http://dx.doi.org/10.1007/s11127-018-0543-3.

[11]  Devin Caughey and Christopher Warshaw. 2018. "Policy Preferences and Policy Change: Dynamic Responsiveness in the American States, 1936–2014." *American Political Science Review* 112 (2): 249–266. http://dx.doi.org/10.1017/S0003055417000533.

2017   [10]  Devin Caughey, Chris Tausanovitch, and Christopher Warshaw. 2017. "Partisan Gerry-mandering and the Political Process: Effects on Roll-Call Voting and State Policies." *Election Law Journal* 16, no. 4 (Symposium on Partisan Gerrymandering and the Efficiency Gap): 453–469. http://dx.doi.org/10.1089/elj.2017.0452.

   ∗ Cited by appellees' briefs in *Whitford v. Gill* (2017) and *Rucho v. Common Cause* (2018), U.S. Supreme Court

[9]  Devin Caughey, Christopher Warshaw, and Yiqing Xu. 2017. "Incremental Democracy: The Policy Effects of Partisan Control of State Government." *Journal of Politics* 79 (4): 1–17. http://dx.doi.org/10.1086/692669.

[8]  Devin Caughey, Allan Dafoe, and Jason Seawright. 2017. "Nonparametric Combination (NPC): A Framework for Testing Elaborate Theories." *Journal of Politics* 79 (2): 688–701. http://dx.doi.org/10.1086/689287.

2016   [7]  Devin Caughey and Christopher Warshaw. 2016. "The Dynamics of State Policy Liberalism, 1936–2014." *American Journal of Political Science* 60 (4): 899–913. http://dx.doi.org/10.1111/ajps.12219.

   ∗ Winner, APSA State Politics Section Best Journal Article Award

[6]  Devin Caughey and Eric Schickler. 2016. "Substance and Change in Congressional Ideology: NOMINATE and Its Alternatives." *Studies in American Political Development* 30 (2): 128–146. http://dx.doi.org/10.1017/S0898588X16000092.

[5]  Allan Dafoe and Devin Caughey. 2016. "Honor and War: Southern U.S. Presidents and the Effects of Concern for Reputation." *World Politics* 68 (2): 341–381. http://dx.doi.org/10.1017/S0043887115000416.

2015   [4]  Devin Caughey and Christopher Warshaw. 2015. "Dynamic Estimation of Latent Opinion Using a Hierarchical Group-Level IRT Model." *Political Analysis* 23 (2): 197–211. http://dx.doi.org/10.1093/pan/mpu021.

   ∗ Reprinted in Robert J. Frazese Jr., ed. 2017. *Advances in Political Methodology*. Elgar.

[3]  Rosa Arboretti, Eleonora Carrozzo, and Devin Caughey. 2015. "A Rank-based Permutation Test for Equivalence and Non-inferiority." *Italian Journal of Applied Statistics* 25 (1): 81–92. http://sa-ijas.stat.unipd.it/sites/sa-ijas.stat.unipd.it/files/05_1.pdf.

2011   [2]  Devin Caughey and Jasjeet S. Sekhon. 2011. "Elections and the Regression Discontinuity Design: Lessons from Close U.S. House Races, 1942–2008." *Political Analysis* 19 (4): 385–408. http://dx.doi.org/10.1093/pan/mpr032.

   ∗ Winner, Warren Miller Prize and *Political Analysis* Editors' Choice Award
   ∗ Reprinted in Robert J. Franzese, ed. 2015. *Quantitative Research in Political Science*. SAGE.

[1]  Eric Schickler and Devin Caughey. 2011. "Public Opinion, Organized Labor, and the Limits of New Deal Liberalism, 1936–1945." *Studies in American Political Development* 25 (2): 1–28. http://dx.doi.org/10.1017/S0898588X11000101.

## Non-Refereed Publications

2022   Devin Caughey. 2022a. Review of *A Troubled Birth: The 1930s and American Public Opinion*, by Susan Herbst. *Perspectives on Politics* 20 (3): 1102–1104. https://doi.org/10.1017/S1537592722001724.

Devin Caughey. 2022b. Review of *How the Tea Party Captured the GOP: Insurgent Factions in American Politics*, by Rachel M. Blum. *Party Politics* 28 (3): 587–588. https://doi.org/10.1177/13540688221081896.

2021  Devin Caughey and Eric Schickler. 2021. "The Democratic-CIO Alliance: The Benefits of Friendship." *Labor: Studies in Working-Class History* 18 (3): 120–125. https://doi.org/10.1215/15476715-9061521.

2020  Devin Caughey and Sara Chatfield. 2020. "Causal Inference and American Political Development: Contrasts and Complementarities." *Public Choice* 185:359–376. https://doi.org/10.1007/s11127-019-00694-4.

2019  Devin Caughey and Christopher Warshaw. 2019. "Public Opinion in Subnational Politics." *Journal of Politics* 81, no. 1 (Symposium on Subnational Policymaking): 352–363. https://doi.org/10.1086/700723.

2017  Devin Caughey and Eric Schickler. 2017. "Keith Poole, Ideology Scores, and the Study of Congressional Development." *The Legislative Scholar: The Newsletter of the Legislative Studies Section of the American Political Science Association* 2 (2): 37–42. http://legislativestudies.org/wp-content/uploads/2017/11/legislative_scholar_fall_2017.pdf.

## Software

2017  James Dunham, Devin Caughey, and Christopher Warshaw. 2017. *dgo: Dynamic Estimation of Group-Level Opinion*. R package. https://CRAN.R-project.org/package=dgo.

2015  Devin Caughey. 2015. *NPC: Nonparametric Combination of Hypothesis Tests*. R package. http://CRAN.R-project.org/package=NPC.

2014  Devin Caughey. 2014. "FisherSens and SumTestSens." In *rbounds: Perform Rosenbaum bounds sensitivity tests for matched and unmatched data*. R package. Creator and maintainer: Luke J. Keele. http://CRAN.R-project.org/package=rbounds.

## Grants and Fellowships

2016–17  Visiting Scholar Fellowship, Center for the Study of Democratic Politics, Princeton University

2015  PolMeth Thematic Methodology Meeting Grant ($14,250); with Stephen Jessee, Alex Tahk, Christopher Warshaw, and Teppei Yamamoto; for "Improving Spatial Models" conference, MIT, May 1–2

2011  Mike Synar Graduate Research Fellowship, Institute of Governmental Studies, UC-Berkeley

2010  Clogg Scholarship Award, Society for Political Methodology and ICPSR Summer Program in Quantitative Methods in Social Research

2009–11  NSF Integrated Graduate Education Research and Training (IGERT) Program Fellowship in Politics, Economics, Psychology, and Public Policy

2008  NSF Graduate Research Fellowship (honorable mention)

## Awards and Honors

| | |
|---|---|
| 2024 | APSA State Politics & Policy Section Virginia Gray Book Award, with Chris Warsaw, for *Dynamic Democracy* |
| 2019 | APSA Political Organizations and Parties Section Leon Epstein Outstanding Book Award (2017–2018), for *The Unsolid South* |
| | Social Science History Association Allan Sharlin Memorial Book Award (honorable mention), for *The Unsolid South* |
| 2017 | APSA State Politics & Policy Section Best Journal Article Award, with Chris Warshaw, for "The Dynamics of State Policy Liberalism, 1936–2014" |
| 2015 | APSA award for best paper on state politics and policy presented at the 2014 annual meeting, with Chris Warshaw, for "Dynamic Representation in the American States, 1960–2012" |
| 2014 | APSA Walter Dean Burnham Award for best dissertation in the field of Politics and History |
| 2012 | Warren Miller Prize for best article published in *Political Analysis*, with Jasjeet S. Sekhon, for "Elections and the Regression Discontinuity Design" |
| | *Political Analysis* Editors' Choice Award, with Jasjeet S. Sekhon, for "Elections and the Regression Discontinuity Design" |
| | Kenneth E. Boulding Award for best graduate student paper presented at an International Studies Association meeting, with Allan Dafoe, for "Honor and War" |
| 2008 | Outstanding Graduate Student Instructor Award, UC-Berkeley Graduate Council |

## Conference Papers

| | |
|---|---|
| 2022 | Elissa Berwick and Devin Caughey. 2022. "Multidimensional Latent Ideology in Spanish Regions." Paper presented at the Society for Political Methodology Summer Meeting, Washington University, St. Louis, MO, July 22, 2022. |
| 2019 | Devin Caughey and Sara Chatfield. 2019. "Causal Inference and American Political Development: Contrasts and Complementarities." Paper presented at the Causal Inference & American Political Development Conference, University of Southern California, Los Angeles, CA, January 10, 2019. |
| 2018 | Devin Caughey, Hiroto Katsumata, and Teppei Yamamoto. 2018b. "Item Response Theory for Conjoint Survey Experiments." Paper presented at the annual meeting of the American Political Science Association, Boston, MA, August 30, 2018. |
| | Devin Caughey, Hiroto Katsumata, and Teppei Yamamoto. 2018a. "Item Response Theory for Conjoint Experiments." Paper presented at the summer meeting of the Society for Political Methodology, Brigham Young University, Provo, UT, July 21, 2018. |
| | Elissa Berwick and Devin Caughey. 2018. "Multidimensional Latent Preferences from Sparse Survey Data: A Group-Level Dynamic IRT Model for Spanish Regions." Poster presented at the summer meeting of the Society for Political Methodology, Brigham Young University, Provo, UT, July 20, 2018. |

2017   Devin Caughey and Christopher Warshaw. 2017. "Dynamic Responsiveness in the American States, 1936–2014." Paper presented at the workshop *How Do Politicians Learn?*, Princeton University, Princeton, NJ, May 17, 2017.

Devin Caughey and Erin Hartman. 2017. "Target Selection as Variable Selection: Using the Lasso to Select Auxiliary Vectors for the Construction of Survey Weights." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Wisconsin–Madison, Madison, WI, July 13, 2017.

Allan Dafoe, Baobao Zhang, and Devin Caughey. 2017. "Confounding in Survey Experiments: Diagnostics and Solutions." Paper presented at the workshop *A Perfect Match? Comparative Political Economy and Conjoint Analysis*, University of Zurich, Zurich, Switzerland, January 9, 2017.

2016   Devin Caughey. 2016a. "Exclusion and Responsiveness: Congressional Representation in the One-Party South." Paper presented at the American-British-Canadian Political Development Workshop, University of Toronto, Toronto, Canada, September 30, 2016.

Devin Caughey, James Dunham, and Christopher Warshaw. 2016b. "The Ideological Nationalization of Mass Partisanship: Policy Preferences and Partisan Identification in State Publics, 1946–2014." Paper presented at the APSA Annual Meeting, Philadelphia, PA, September 3, 2016.

Devin Caughey and Sara Chatfield. 2016. "Creating a Constituency for New Deal Liberalism: The Policy Feedback Effects of the Tennessee Valley Authority." Paper presented at the APSA Annual Meeting, Philadelphia, PA, September 1, 2016.

Devin Caughey, Allan Dafoe, and Luke Miratrix. 2016. "Beyond the Sharp Null: Permutation Tests Actually Test Heterogeneous Effects." Paper presented at the summer meeting of the Society for Political Methodology, Rice University, Houston, TX, July 22, 2016.

Devin Caughey and Erin Hartman. 2016. "Target Selection as Variable Selection: Using the Lasso to Select Auxiliary Vectors for the Construction of Survey Weights." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 6, 2016.

Devin Caughey, James Dunham, and Christopher Warshaw. 2016a. "Polarization and Partisan Divergence in the American Public, 1946–2012." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 2, 2016.

Devin Caughey. 2016b. "Representation without Parties: Reconsidering the One-Party South, 1930–62." Paper presented at the SPSA Annual Meeting, San Juan, PR, January 8, 2016.

2015   Devin Caughey, Tom O'Grady, and Christopher Warshaw. 2015. "Ideology in the European Mass Public: A Dynamic Perspective." Paper presented at the General Conference of the European Consortium for Political Research, Montreal, Canada, August 25, 2015.

Allan Dafoe, Baobao Zhang, and Devin Caughey. 2015. "Confounding in Survey Experiments." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Rochester, Rochester, NY, July 23, 2015.

2014   Allan Dafoe, Baobao Zhang, and Devin Caughey. 2014. "Confounding in Survey Experiments." Paper presented at the APSA Annual Meeting, Washington, DC, August 29, 2014.

Devin Caughey. 2014. "Representation without Parties: Reconsidering the One-Party South, 1930–62." Paper presented at the APSA Annual Meeting, Washington, DC, August 28, 2014.

Devin Caughey and Christopher Warshaw. 2014a. "Dynamic Representation in the American States, 1960–2012." Paper presented at the APSA Annual Meeting, Washington, DC, August 28, 2014.

   ∗ Winner, APSA award for best paper on state politics and policy

Devin Caughey and Christopher Warshaw. 2014b. "The Policy Effects of Partisan Control of State Governorships." Paper presented at the Conference on State Political Institutions and the Executive Branch, Washington, DC, August 27, 2014.

Devin Caughey and Mallory Wang. 2014. "Bayesian Population Interpolation and Lasso-Based Target Selection in Survey Weighting." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Georgia, Athens, GA, July 24, 2014.

Devin Caughey and Eric Schickler. 2014. "Structure and Change in Congressional Ideology: NOMINATE and Its Alternatives." Paper presented at the Congress and History Conference, University of Maryland, College Park, June 11, 2014.

2013   Devin Caughey, Michael Dougal, and Eric Schickler. 2013. "The Policy Bases of the New Deal Realignment: Evidence from Public Opinion Polls, 1936–1952." Paper presented at the APSA Annual Meeting, Chicago, IL, August 31, 2013.

Devin Caughey, Allan Dafoe, and Jason Seawright. 2013a. "Testing Elaborate Theories in Political Science: Nonparametric Combination of Dependent Tests." Paper presented at the APSA Annual Meeting, Chicago, IL, August 29, 2013.

Devin Caughey and Christopher Warshaw. 2013. "Dynamic Estimation of Latent Opinion from Sparse Survey Data Using a Group-Level IRT Model." Paper presented at the Annual Meeting of The Society for Political Methodology, University of Virginia, Charlottesville, VA, July 20, 2013.

Devin Caughey, Allan Dafoe, and Jason Seawright. 2013b. "Testing Elaborate Theories in Political Science: Nonparametric Combination of Dependent Tests." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 20, 2013.

2012   Devin Caughey. 2012a. "Participation and Contestation in the One-Party South: Sources of Ideological Diversity in the 'Southern Bloc'." Paper presented at the MIT American Politics Conference, Cambridge, MA, September 21, 2012.

Devin Caughey. 2012b. "Participation and Contestation in the One-Party South: Sources of Ideological Diversity in the 'Southern Bloc'." Paper presented at the WPSA Annual Meeting, Portland, OR, March 22, 2012.

2011   Devin Caughey. 2011. "The Mass Basis of the 'Southern Imposition': Labor Unions, Public Opinion, and Representation, 1930s–1940s." Paper presented at the APSA Annual Meeting, Seattle, WA, September 3, 2011.

Allan Dafoe and Devin Caughey. 2011. "Honor and War: Using Southern Presidents to Identify Reputational Effects in International Conflict." Paper presented at the ISA Annual Meeting, Montreal, Quebec, March 17, 2011.

   ∗ Winner, ISA Kenneth E. Boulding Award for best graduate student paper

2010   Allan Dafoe and Devin Caughey. 2010. "Honor, Reputation, and War: Using Southern Presidents to Identify the Effect of Culture on International Conflict Behavior." Paper presented at the APSA Annual Meeting, Washington, DC, September 3, 2010.

Eric Schickler and Devin Caughey. 2010. "Public Opinion, Organized Labor, and the Limits of New Deal Liberalism, 1936–1945." Paper presented at the APSA Annual Meeting, Washington, DC, September 2, 2010.

2009   Devin Caughey. 2009. "Pro-Incumbent Bias in Close Elections: Implications for Regression Discontinuity Designs." Poster presented at the Annual Meeting of The Society for Political Methodology, Yale University, New Haven, CT, July 29, 2009.

Devin Caughey, Sara Chatfield, and Adam Cohon. 2009. "Defining, Mapping, and Measuring Bureaucratic Autonomy." Paper presented at the MPSA Annual Meeting, Chicago, IL, April 4, 2009.

2007   Devin Caughey. 2007. "Responding to the Roosevelt Reconstruction: Southern Senators, the Supreme Court, and the New Deal Coalition." Paper presented at the UC-Berkeley Political Science Graduate Student Conference, May 2, 2007.

## Invited Talks

2023   University of Massachusetts, Amherst (March 8) "Dynamic Democracy: Public Opinion, Elections, and Policymaking in the American States"

2021   Harvard Law School (February 17): "Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States"

2020   Harvard University (March 6): "Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States"

University of Rochester (February 7): "Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States"

2019   Columbia University (October 15): "Item Response Theory for Conjoint Experiments"

2018   University of California, Los Angeles (October 29): "Creating a Constituency for New Deal Liberalism: The Political Effects of the Tennessee Valley Authority, 1933–1962"

2017   Northwestern University (January 27): "Policy and Performance in the New Deal Realignment"

2016   Princeton University (November 17): "Dynamic Responsiveness in the American States"

Johns Hopkins University (March 24): "The Selectoral Connection in the One-Party South"

2015   Yale University (September 17): "Beyond the Sharp Null: Permutation Tests of Bounded Null Hypotheses"

2014   Boston University (November 14): "Representation without Parties: Reconsidering the One-Party South"

Harvard University, Applied Statistics Seminar (November 5): "Bayesian Population Interpolation and Lasso-Based Target Selection in Survey Weighting"

Dartmouth College (April 22): "The Dynamics of State Policy Liberalism, 1956–2012"

Ohio State University (April 18): "The Dynamics of State Policy Liberalism, 1956–2012"

2013   University of Chicago, Harris School (November 14): "A Dynamic Model of Public Opinion, with Applications to Realignment and Representation in the Wake of the New Deal"

Princeton University (October 24): "A Dynamic Model of Public Opinion, with Applications to Realignment and Representation in the Wake of the New Deal"

University of Illinois (September 13): "A Dynamic Model of Public Opinion, with Applications to Realignment and Representation in the Wake of the New Deal"

Yale University (January 16): "Congress, Public Opinion, and Representation in the One-Party South, 1930s–1960s"

2011   Pennsylvania State University, New Faces in Political Methodology Conference (April 30): "Regression-Discontinuity Designs and Popular Elections: Implications of Pro-Incumbent Bias in Close U.S. House Races"

# Advising

## *Graduate*

| | |
|---|---|
| 2022– | Cory Adkins, MIT (dissertation committee member) |
| 2022– | Kirsten Walters, Harvard (dissertation committee member) |
| 2022– | Angie Jo, MIT (dissertation committee member) |
| 2022– | Esteban Fernandez, MIT (dissertation committee member) |
| 2020– | Chloe Wittenberg, MIT (dissertation committee member) |
| 2019–22 | Zeyu (Chris) Peng, MIT (dissertation co-chair) |
| 2018–20 | Clara Vandeweerdt, MIT (dissertation committee member) |
| 2017–20 | Nicolas Dumas, MIT (dissertation committee member) |
| 2017–20 | Olivia Bergman, MIT (dissertation committee member) |
| 2016–20 | Baobao Zhang, Yale (external dissertation committee member) |
| 2018–19 | Sam Hoar, MIT (master's thesis committee member) |
| 2018–19 | Elissa Berwick, MIT (dissertation committee member) |
| 2016–19 | Megan Goldberg, MIT (dissertation committee member) |
| 2013–18 | James Dunham, MIT (dissertation committee member) |
| 2013–17 | James Conran, MIT (dissertation committee member) |

## *Undergraduate*

| | |
|---|---|
| 2020–21 | Darya Guettler, MIT (thesis advisor) |
| 2017–18 | Sarah Melvin, MIT (thesis advisor) |

## Teaching

| | |
|---|---|
| 2023–24 | Spring<br>    17.202: American Political Institutions (graduate)<br>    17.270: American Political Development (graduate)<br>Fall<br>    17.S950: Bayesian Measurement Models (graduate) |
| 2022–23 | Spring<br>    17.202: American Political Institutions (graduate)<br>Fall<br>    17.20: Introduction to American Politics (undergraduate)<br>    17.850: Political Science Scope and Methods (graduate) |
| 2021–22 | Spring<br>    17.270: American Political Development (graduate)<br>    17.S950: Bayesian Measurement Models (graduate)<br>Fall<br>    17.850: Political Science Scope and Methods (graduate) |
| 2020–21 | Fall<br>    17.263: Electoral Politics (undergraduate)<br>    17.830: Empirical Methods in Political Economy (graduate)<br>    17.850: Political Science Scope and Methods (graduate) |
| 2019–20 | Spring<br>    17.202: American Political Institutions (graduate)<br>Fall<br>    17.20: Introduction to American Politics (undergraduate)<br>    17.850: Political Science Scope and Methods (graduate) |
| 2018–19 | Spring<br>    17.20: Introduction to American Politics (undergraduate)<br>    17.S951: Political Representation in American Politics (graduate) |
| 2017–18 | Spring<br>    17.202: American Political Institutions (graduate)<br>Fall<br>    17.20: Introduction to American Politics (undergraduate)<br>    17.850: Political Science Scope and Methods (graduate) |
| 2015–16 | Spring<br>    17.20: Introduction to American Politics (undergraduate)<br>    17.S918: Southern Politics since 1863 (undergraduate) |
| 2014–15 | Spring<br>    17.20: Introduction to American Politics (undergraduate)<br>    17.202: American Political Institutions (graduate) |
| 2013–14 | Spring<br>    17.S918: Southern Politics since 1863 (undergraduate)<br>Fall<br>    17.150: The American Political Economy in Comparative Perspective (graduate)<br>    17.20: Introduction to American Politics (undergraduate) |
| 2012–13 | Spring<br>    17.20: Introduction to American Politics (undergraduate)<br>Fall<br>    17.263/264: Electoral Politics (undergraduate/graduate) |

# Service

### Department

| | |
|---|---|
| 2023–24 | Chair, Graduate Admissions Committee |
| 2023–24 | Chair, Politics and Computing Search Committee |
| 2022–23 | Chair, Graduate Admissions Committee |
| 2021–22 | Chair, Open-Field Senior Search Committee |
| 2020–21 | Graduate Program Committee / Diversity, Equity, and Inclusion Working Group |
| 2019–20 | Comparative Politics Search Committee |
| 2018–19 | Admissions/Financial Aid Committee |
| | American Politics Search Committee |
| 2017–18 | Political Science Concentration Advisor |
| | Undergraduate Program Committee |
| 2015–16 | Admissions/Financial Aid Committee |
| | Undergraduate Program Committee |
| 2014–15 | Undergraduate Program Committee |
| 2013–14 | American Politics Search Committee |

### University

| | |
|---|---|
| 2023–25 | Member, SHASS Education Advisory Committee |
| 2022– | SHASS representative, Committee on Nominations |
| 2020– | SHASS lead, Schwarzman College of Computing Common Ground Standing Committee |
| 2017–19 | Faculty Fellow, MIT SHASS Burchard Scholars Program |

### Professional Organizations

| | |
|---|---|
| 2023–25 | Member, executive council, APSA State Politics and Policy Section |
| 2023 | Member, selection committee, Gladys M. Kammerer Award, APSA |
| 2022–24 | Member, executive council, APSA Politics and History Section |
| 2022 | Member, selection committee, Miller Prize, Society for Political Methodology |
| 2020– | Member, advisory board, Consortium on American Political Economy |
| 2019– | Coordinator, Pioneer Valley American Political Development Reading Group |
| 2019 | Member, host committee, 36th annual meeting of the Society for Political Methodology |
| 2017 | Member, selection committee, Miller Prize, Society for Political Methodology |
| 2014 | Member, selection committee, Miller Prize, Society for Political Methodology |

| | Member, selection committee, PolMeth Graduate Student Poster Award, Society for Political Methodology |
| --- | --- |
| 2013 | Member, selection committee, Miller Prize, Society for Political Methodology |
| | Member, selection committee, V. O. Key Award, Southern Political Science Association |
| 2012 | Member, selection committee, Mary Parker Follett Award, APSA Politics and History Section |

## Journals

### Editing

| 2022– | Co-editor, *The Forum: A Journal of Applied Research in Contemporary Politics* |
| --- | --- |

### Reviewing

*American Journal of Political Science*
*American Political Science Review*
*American Politics Research*
*American Sociological Review*
*British Journal of Political Science*
*Conflict Management and Peace Science*
*Contemporary Economic Policy*
*European Journal of Political Economy*
*Journal of Conflict Resolution*
*Journal of Electoral Studies*
*Journal of Experimental Political Science*
*Journal of Health Politics, Policy and Law*
*Journal of Law, Economics, and Organization*
*Journal of Political Economy*
*Journal of Politics*
*Journal of Public Policy*

*Journal of Research on Educational Effectiveness*
*Legislative Studies Quarterly*
*Observational Studies*
*Party Politics*
*Perspectives on Politics*
*Political Analysis*
*Political Behavior*
*Political Research Quarterly*
*Political Science Research and Methods*
*Proceedings of the Nat'l Academy of Sciences*
*Quarterly Journal of Political Science*
*Regional & Federal Studies*
*State Politics & Policy Quarterly*
*Statistics and Public Policy*
*Studies in American Political Development*

## Publishers

### Reviewing

Chapman & Hall                              Oxford University Press

# Consulting

## Redistricting

| 2022 | Expert testimony re Kentucky house map, *Graham v. Adams* |
| --- | --- |
| 2022 | Expert report re Pennsylvania senate map, Legislative Reapportionment Commission hearings |
| 2022 | Expert testimony re Pennsylvania congressional map, *Carter v. Chapman* |
| 2021 | Expert testimony re Oregon congressional map, *Clarno v. Fagan* |