# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |
|---|---|
| BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; *et al.*, | Case No. 2:22-cv-184-LCB-CWB |
|  | Honorable Liles C. Burke |
| Plaintiffs, |  |
| and |  |
| UNITED STATES OF AMERICA, |  |
| Plaintiff-Intervenor, |  |
| v. |  |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; *et al.*, |  |
| Defendants. |  |

## PLAINTIFF-INTERVENOR UNITED STATES' DISCLOSURE OF REBUTTAL EXPERT TESTIMONY OF
## I. GLENN COHEN, JD

I, I. Glenn Cohen, JD, hereby declare and state as follows:

1.      I have been retained by counsel for the United States as an expert in connection with the above-captioned litigation.

2.     I have actual knowledge of the matters stated in this report. If called to testify in this matter, I would testify truthfully and based on my expert qualifications.

## I.     CREDENTIALS, MATERIALS, AND PRIOR EXPERT WITNESS WORK

3.     I am the James A. Attwood and Leslie Williams Professor of Law at Harvard Law School. I also serve as a Deputy Dean of the Law School. I am also the Faculty Director of the Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics at Harvard Law School.

4.     I joined the Harvard Law School as a fellow in health law policy, bioethics, and biotechnology in 2006 and joined the faculty as an assistant professor in 2008. Prior to joining the Harvard Law School, from 2004 to 2006 I worked as an appellate attorney at the Civil Division of the Department of Justice, where my cases included representing the U.S. Food and Drug Administration (FDA) in litigation concerning its regulation of pharmaceuticals. After graduating law school in 2003, I clerked for then-Chief Judge Michael Boudin, on the U.S. Court of Appeals for the First Circuit, from 2003 to 2004. I am licensed to practice law in the state of New York.

5.     I have been teaching subjects related to health law, bioethics, and food and drug law at the Harvard Law School for 17 years. I have also co-taught courses and guest lectured at the Harvard Medical School and guest lectured at the Harvard

T.H. Chan School of Public Health. I have also given guest lectures on these

subjects at universities across the world. I have been invited to speak as an expert

before national advisory bodies such as the National Academies of Science

Engineering and Medicine (NASEM). I have served on numerous NASEM

committees as an expert, as well as the committees of other national organizations

in the medical and scientific arena such as the Ethics Committee for the American

Congress of Obstetricians and Gynecologists (ACOG) and Organ Procurement and

Transplantation Network/United Network for Organ Sharing Ethics Committee as

well as the ethics advisory boards of companies such as Illumina and Bayer. I have

been asked to speak at meetings at the White House chaired by the Vice President

regarding the impact of the Supreme Court's decision on the constitutional

protection for abortion in *Dobbs v. Jackson Women's Health Organization*.[1]

6.     I am the author, co-author, editor, or co-editor of more than 20 books

on health law, bioethics, food and drug law and biotechnology. These include one

of the leading treatises on these subjects,[2] one of the leading casebooks on these

subjects,[3] and the books *FDA in the Twenty-First Century*[4] and *Human Subjects*

---

[1] 597 U.S. 215 (2022).

[2] THE OXFORD HANDBOOK OF U.S. HEALTH LAW (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

[3] MARK HALL, MARY ANNE BOBINSKI, DAVID ORENTLICHER, I. GLENN COHEN, NICHOLAS BAGLEY, NADIA SAWICKI, HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024).

[4] FDA IN THE TWENTY-FIRST CENTURY: THE CHALLENGES OF REGULATING DRUGS AND NEW TECHNOLOGIES (I. Glenn Cohen & Holly Fernandez Lynch, eds Columbia University Press, 2015).

*Research Regulation*.[5] I am the author or co-author of more than 200 articles in the leading peer-reviewed scientific (such as Science, Nature Genetics, Cell), medical (such as the New England Journal of Medicine, JAMA, Nature Medicine), bioethics (such as the American Journal of Bioethics, the Hastings Center Report) journals as well as leading law reviews (such as the Harvard and Stanford Law Reviews). In addition, I was named to the Greenwall Foundation Faculty Scholars Program in Bioethics, through which, over the subsequent decade, I met numerous times with a community of leading scholars in bioethics and health law. I was also named as a fellow of the Hastings Center, one of the leading bioethics think tanks in the world.

7.      This report presents my independent, expert opinions based on my study, training, and experience as a law professor and bioethicist; my review of relevant scholarly literature; and my discussions over the years with colleagues in law, medicine, and bioethics. Through this report, I do not speak herein for or otherwise represent the views of Harvard Law School nor for any other organization with which I have been affiliated.

8.      My most recent curriculum vitae, which lists my publications, is provided as **Appendix A** to this Report.

---

[5] HUMAN SUBJECTS RESEARCH REGULATION: PERSPECTIVES ON THE FUTURE (I. Glenn Cohen & Holly Fernandez Lynch, eds MIT Press, 2014).

9.     In preparing this report, I have reviewed the text of the Alabama

Senate Bill 184 (Vulnerable Child Compassion and Protection Act, VCAP), reports

from Defendants' experts, and some of the documents produced by the U.S.

Department of Health and Human Services (HHS) as part of discovery. I also relied

on my legal and bioethical education, training, and experience, my research

experience, and my knowledge of the scientific literature in the pertinent fields.

The materials I have relied upon in preparing this report are the same types of

materials that experts in my field of study regularly rely upon when forming

opinions on these subjects. The documents I reviewed and relied on throughout this

report are listed in **Appendix B**. I may wish to supplement these opinions or the

bases for them due to new research or publications or in response to statements and

issues that may arise in my area of expertise.

10.     In the past four years, I have been retained as an expert in cases and

deposed in cases unrelated to the subject matter of this one: *Brown v. John Boyd

Coates*, Case No. 2:21-cv-00157-cr·5 (D. Vt.); *Doe v. Medstar*, Case No 24-C-20-

000591 OG (Circuit Court for Baltimore City, Maryland); and *Doe v. Virginia

Mason Medical Center*, Case No. 19-2-26674-1 SEA (Superior Court of the State

of Washington in and for the County of King).

11.     I am being compensated at an hourly rate for the actual time that I

devote to this case, at the rate of $850 per hour for any review of records,

preparation of reports, declarations, and deposition and trial testimony. My compensation does not depend on the outcome of this litigation, the opinions that I express, or the testimony that I provide.

12.     I reserve the right to revise and supplement the opinions expressed in this report or on the bases for them if any new information becomes available in the future, including new scientific research or publications in response to the statements and issues that may arise in my area of expertise. I may also further supplement these opinions in response to information produced in discovery and in response to additional information from Defendants' or Private Plaintiffs' designated experts.

13.     Through this report, I am not speaking on behalf of HHS or the U.S. Food and Drug Administration (FDA). All opinions are my own.

## II.     SUMMARY OF CONCLUSIONS

14.     To briefly summarize my conclusions relevant to this litigation, the reasons for which are described in-depth below:

- Contrary to the intimations of Defendants' experts, there is nothing nefarious or unusual about the fact that drugs relevant to this case are being prescribed "off-label." Prescribing FDA-approved drugs "off-label" – that is for uses other than the ones FDA reviewed and approved – is extremely common. HHS's Agency for Health Care Research and

Quality, for example, estimates that 20% of all prescriptions in the U.S. are for off-label use.[6] In some disease and/or drug categories, an even larger share of prescribing is for off-label use.

- More specifically, off-label prescribing is very common in pediatric populations. In all the studies I have reviewed there is a significant amount of off-label prescribing in pediatric populations. Indeed, one study discussed below estimated that "sixty-two percent of outpatient pediatric visits included off-label prescribing," with the percentage even higher in some medical categories.[7]

- Defendants' experts have defended the Alabama statute in this case as essential to protect the safety of patients and ensure informed consent. In fact, the healthcare systems in all states, including Alabama, have a series of interlocking mechanisms to protect patients from these kinds of concerns. These mechanisms include physician licensure and discipline, hospital accreditation, medical malpractice liability, and liability for breach of informed consent.

---

[6] AHRQ, *Off-Label Drugs: What You Need to Know*, https://www.ahrq.gov/patients-consumers/patient-involvement/off-label-drug-usage.html (last viewed Feb 19, 2024).
[7] Alicia T. F. Bazzano et al., *Off-Label Prescribing to Children in the United States Outpatient Setting*, 9 ACAD. PEDIATR. 81 (2009).

- The use of criminal law relating to a licensed practitioner prescribing an FDA-approved drug is exceedingly rare. Indeed, with the possible exception of state attempts to criminalize the prescribing of mifepristone for abortions, I am not aware of any instance where a state has sought to criminalize a physician's prescribing of an FDA-approved drug as Alabama has done here.

## III.  FAR FROM BEING UNUSUAL, OFF-LABEL USE OF FDA APPROVED DRUGS IS GENERALLY ACCEPTED, INCLUDING IN PEDIATRIC POPULATIONS

15.     In this declaration, unless otherwise noted, when I use the term "off-label use," I refer to a licensed healthcare professional prescribing an approved prescription drug for an unapproved use for a patient under their care.

16.     In several instances, Defendants' witnesses intimate that there is something nefarious or unusual about the fact that drugs are being prescribed and used off-label to treat the minors relevant in this case, often by framing the use as "experimental" and pointing to insufficient randomized clinical trials in these populations. For example:

- Dr. Nangia emphasizes as part of her opinion that "None of the puberty blockers are currently FDA-approved for use in gender dysphoria" and that "[i]n gender dysphoria, puberty blockers are given 'off-label' to postpone the changes that occur with puberty. The clinical reasoning behind this is that proponents say that it gives youth time to decide whether to 'fully' transition, through a trajectory of cross-sex hormones

and then surgeries, while preventing changes that may cause distress. (Delemarre-van de Waal 2006)." Expert Report of Geeta Nangia, M.D., ¶¶41-42.

- In explaining why she believes that "Informed Consent Is Not Attainable" in this case for any minor, Dr. Nangia again returns to the lack of FDA approval for this indication writing: "In my opinion, due to a lack of full neurologic, psychosocial, and cognitive developmental maturation, adolescents are unable to understand, reason through, appreciate, and comprehend the impact of the shortcomings of the present data, the lack of FDA indication for puberty blockers, the long-term risks and consequences of transition, and the low-grade rating of studies that have been used to support medical and surgical transition. Hence, they lack decision-making capacity." Expert Report of Geeta Nangia, M.D., ¶ 154.

- In analyzing the medical record of a particular patient, Dr. Laidlaw makes particular note of the fact that Aygestin, a drug prescribed, "does not have an FDA indication for the diagnosis of gender dysphoria." Supplemental Confidential Expert Report of Michael K. Laidlaw, M.D., ¶ 30.

- Dr. Laidlaw writes that "In this case the condition of hypogonadotropic hypogonadism described above (a medical disease) is induced by medication and is an iatrogenic effect of treating the psychological condition of gender dysphoria. GnRH analogue medications have not been FDA approved for this use. The use of GnRH analogue medication for this purpose in adolescents is experimental as there have been no randomized controlled trials for this specific use case." Expert Report of Michael K. Laidlaw, M.D., ¶ 77.

- Dr. Laidlaw also opines: "Contrast the FDA approved use of testosterone in males versus its experimental use [sic] females. Testosterone is FDA approved for use in adult men as well as the pediatric male population aged 12 and older (Actavis, 2018). There is no FDA approved usage of testosterone for women or pediatric aged females. The prescribing indications for adult males and pediatric males are identical and are to treat the conditions of low testosterone caused by either primary hypogonadism or secondary hypogonadism (Id.). The intent of testosterone for women and pediatric aged females in GAT is to cause severe hyperandrogenism. In this case the purpose, effects, and ultimate

outcome of the FDA approved usage of testosterone for males versus the experimental use for females in GAT are very different. Therefore, the low-quality evidence guidelines of the Endocrine Society/WPATH are not an acceptable substitute for proper scientific studies including randomized controlled trials (Malone et al., 2021; Hembree et al., 2017)." Expert Report of Michael K. Laidlaw, M.D., ¶ 122.

- Dr. Cantor writes that "Dr. Antommaria's defence [sic] of using off-label, non-FDA-approved uses of drugs is entirely peripheral. Treatment safety and effectiveness do not have a one-to-one correspondence with FDA-approval. The fact that some other drugs are used widely and safely for some other off-label indications does not imply in the least that off-label use of this drug (puberty blockers) for this use (preventing normal, healthy puberty in children) is safe." Expert Report of James Cantor, Ph.D., ¶ 275.

17.     To the contrary, there is nothing nefarious or unusual about the fact that drugs are being prescribed off-label by licensed healthcare providers to treat the minors in this case. While such off-label prescribing may seem surprising, in the United States, as discussed below, within some therapeutic categories, many (or potentially, the majority) of prescriptions for approved drugs are for off-label uses. This context is helpful to assess Defendant's experts' claims about the safety and efficacy for minors of the drugs at issue in this case.

18.     Let me first briefly explain how FDA reviews drugs and what is meant by off-label prescribing of an approved drug, before discussing the data suggesting that off-label prescribing of approved drugs is widespread, including in pediatric populations. I will also discuss Congressional efforts to increase the amount of clinical trials of drugs in pediatric populations.

**A. How FDA Reviews and Approves Drugs for a Particular Use (or Uses).**

19.     FDA is charged by Congress with reviewing and potentially approving new drugs. That process follows a regimented scientifically‑rigorous process. The D.C. Circuit, sitting en banc, gave a good concise summary of that process in *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*:

> The Food, Drug, and Cosmetic Act ("FDCA" or "Act"), however, generally prohibits access to new drugs unless and until they have been approved by the Food and Drug Administration ("FDA"). *See* 21 U.S.C. § 355(a). Gaining FDA approval can be a long process. First, an experimental drug's sponsor (e.g., a drug company) must submit an application for approval. *See id.* § 355(a). Because no drug may be approved without a finding of "substantial evidence that the drug will have the effect it purports or is represented to have," *id.* § 355(d)(5), an application must contain "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use," *id.* § 355(b)(1)(A). Such reports rely in large measure on clinical trials with human subjects.[8]

Indeed, before a sponsor may even begin that human testing:

> it must submit for the FDA's approval an investigational new drug application ("IND"), *see id.* § 355(i)(1); *see also* 21 C.F.R. pt. 312, containing detailed information establishing that human testing is appropriate, *see* 21 C.F.R. § 312.23. Once the application for human testing has been approved, *see id.* § 312.20, several phases of clinical testing begin. [Plaintiff's] amended complaint alleges that this testing process is an extremely lengthy one, requiring nearly seven years for the average experimental drug.[9]

---

[8] 495 F.3d 695, 697 (D.C. Cir. 2007) (en banc).
[9] *Id.* at 697‑698.

Clinically testing a drug to ensure its safety and efficacy requires three (and occasionally four) phases:

> Phase I involves the initial introduction of a new drug into human subjects. A Phase I study usually consists of twenty to eighty subjects and is "designed to determine the metabolism and pharmacologic actions of the [new] drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." *Id.* § 312.21(a)(1). Although gathering data on effectiveness may be part of Phase I, its primary focus is to determine whether the drug is safe enough for continued human testing. *See id.* Phase II studies are "well controlled" and "closely monitored" clinical trials of no more than several hundred subjects, used to evaluate both the "effectiveness of the drug for a particular indication" and its "common short-term side effects and risks." *Id.* § 312.21(b).

> Phase III studies are expanded clinical trials of several hundred to several thousand subjects designed to "gather ... additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.* § 312.21(c).[10]

20. Drugs sponsors are required to notify FDA if, at any time during the clinical trial there is "'[a]ny adverse experience associated with the use of the drug that is both serious and unexpected,' *id.* § 312.32(c)(1)(A), and the FDA may order a 'clinical hold' halting the trials if it determines that safety concerns so warrant, *id.* § 312.42."[11] To guide this process of evaluating drugs, "Congress has directed the FDA to establish '[s]cientific advisory panels' to 'provid[e] expert scientific advice and recommendations to the Secretary regarding a clinical investigation of a

---

[10] *Id.* at 698.
[11] *Id.* at 698.

drug or the approval for marketing of a drug.' 21 U.S.C. § 355(n)(1). These panels

must include scientists from a variety of disciplines. *See id.* § 355(n)(3)."[12]

21.    For a drug sponsor to make its way through these regulatory and

scientific hurdles is extremely expensive, especially since most drugs fail

somewhere along this pathway.[13] Although the exact numbers are contested, the

"most recent estimates peg new drug development capitalized costs at between

$1,395 million and $2,558 million."[14] It is in part because of this exorbitant cost

that many pharmaceutical companies get FDA approval for a particular use

captured in its approved labeling, rather than to seek approval for multiple separate

uses for the same drug. [15] In general, this approach does not limit the ability of

physicians to prescribe the approved drug for other uses that they deem appropriate

for an individual patient based on their own medical judgment, as discussed more

below.

---

[12] *Id.* at 698.

[13] *See, e.g.*, Joseph A. DiMasi, Henry G. Grabowski & Ronald W. Hansen*, Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J HEALTH ECON. 20, 23 (2016) (estimating an 11.83% overall probability that a drug that enters clinical testing will eventually be approved).

[14] David A. Simon, *Off-Label Innovation*, 56 GA. L. REV. 701, 719 (2022).

[15] For more discussion of what is included in an approved drug labeling and thus what constitutes "off-label" promotion, see, e.g., PETER HUTT ET AL., FOOD AND DRUG LAW 225-226, 1161-1165 (5th ed. 2022).

22.     At multiple stages of the drug development and approval process, it is

common for a drug sponsor to meet with FDA to receive feedback.[16] As FDA itself

has described the purpose of such meetings in one of its guidance documents:

> FDA believes that the timely review of IND submissions with appropriate
> feedback to sponsors can result in greater efficiency of the drug development
> process. At the sponsor's request, FDA will, if possible, provide advice on
> specific matters relating to an IND. Examples include providing advice on
> the adequacy of technical data to support an investigational plan, the design
> of a clinical trial, and whether proposed investigations are likely to produce
> the data and information needed to meet requirements for a marketing
> application.[17]

23.     As FDA writes:

---

[16] 21 C.F.R. § 314.102(a) ("During the course of reviewing an application or an abbreviated
application, FDA shall communicate with applicants about scientific, medical, and procedural
issues that arise during the review process. Such communication may take the form of telephone
conversations, letters, or meetings, whichever is most appropriate to discuss the particular issue
at hand. Communications shall be appropriately documented in the application in accordance
with § 10.65 of this chapter. Further details on the procedures for communication between FDA
and applicants are contained in a staff manual guide that is publicly available."); 21 C.F.R.
§ 314.102(e) ("Other meetings between FDA and applicants may be held, with advance notice, to
discuss scientific, medical, and other issues that arise during the review process. Requests for
meetings shall be directed to the director of the division responsible for reviewing the application
or abbreviated application. FDA will make every attempt to grant requests for meetings that
involve important issues and that can be scheduled at mutually convenient times. However,
'drop-in' visits (i.e., an unannounced and unscheduled visit by a company representative) are
discouraged except for urgent matters, such as to discuss an important new safety issue."). *See*
Katharine A. Van Tassel, *Filing the New Drug Application*, 1 FOOD AND DRUG ADMIN. § 13:26
(2023-2) ("The next stage of FDA approval of the process begins with meetings preparatory to
the filing of the NDA. The FDA should meet with the drug firm and examine the IND evidence
to identify special problems and additional testing which is needed. When the FDA has a
research program in mind, it will usually negotiate with the firm at this stage for additional
testing. By the time of the pre-NDA meeting, the firm should have completed Phase I, basic
human studies, and Phase II, studies in patients for whom the drug will be expected to produce a
therapeutic result.")

[17] FDA, *Best Practices for Communication Between IND Sponsors and FDA During Drug
Development: Guidance for Industry and Review Staff: Good Review Practice*, 4 (Dec. 2017),
https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-
communication-between-ind-sponsors-and-fda-during-drug-development.

During the life cycle of drug development, sponsors routinely solicit feedback from FDA on both scientific and regulatory issues. The breadth and frequency of advice sought can vary according to the experience of the sponsor, as well as the novelty and development stage of the proposed drug. During the IND phase of drug development, sponsors often solicit advice at critical junctures in their development programs.[18]

1. **FDA Can, Where Appropriate, Place Post-Approval Restrictions on Drugs and Use Other Post-Approval Powers to Ensure Safety**

24.     Congress empowered FDA to impose risk management plans as part

of its approval process when necessary to ensure the benefits of a drug outweigh

the risks. As part of the Food and Drug Administration Amendments Act of 2007

("FDAAA"), FDA was given the authority to impose a "Risk Evaluation and

---

[18] *Id*. at 8. The Guidance further notes:
These topics include, but are not limited to the following:
- Regulatory (e.g., plans for submission of proprietary name requests, plans to defer or waive specific studies, development plans with other FDA centers (e.g., the Center for Devices and Radiological Health for combination products), applicability of an expedited program)
- Clinical/statistical (e.g., planned clinical trials to support effectiveness compared to a placebo or to demonstrate noninferiority to an active control, validity of outcomes and endpoints, trial size, enrichment designs)
- Safety (e.g., safety issues identified in nonclinical studies and early clinical trials, immunogenicity, size of the overall safety database, concerns related to particular populations, postapproval pharmacovigilance plans, risk evaluation and mitigation strategies (REMS), plans for human factors studies, issues related to evaluation of abuse potential)
- Clinical pharmacology and pharmacokinetics (e.g., dose selection and population, use in specific populations, drug-drug interactions)
- Nonclinical pharmacology, pharmacokinetics, and toxicology (e.g., genetic toxicology, reproductive and developmental toxicology, carcinogenicity, mechanism of action)
- Product quality (e.g., analytical similarity assessment, proposed shelf life and stability studies, delivery systems, characterization of drug substance/product, facility compliance with good manufacturing practices, comparability of lots used in clinical trials and commercial lots)
- Pediatrics (e.g., proposed pediatric development plan, dosing)

*Id*. at 8-9.

Mitigation Strategy" (REMS). There are currently about 60 approved REMS (some

REMS cover more than one drug) currently in place.[19] Under the statute, FDA

considers potential restrictions on the use of that drug that pertain to six factors

enumerated by the statute:

> (A) The estimated size of the population likely to use the drug involved.
> (B) The seriousness of the disease or condition that is to be treated with the drug.
> (C) The expected benefit of the drug with respect to such disease or condition.
> (D) The expected or actual duration of treatment with the drug.
> (E) The seriousness of any known or potential adverse events that may be related to the drug and the background incidence of such events in the population likely to use the drug.
> (F) Whether the drug is a new molecular entity.[20]

25.    It is up to the FDA to determine whether a REMS is necessary, at

which point the NDA-holder must propose a plan to FDA. FDA reviews that plan

and determines whether to approve it. The sponsor of the product subject to the

REMS also must "periodically" assess the REMS to ensure it is meeting its goals.[21]

A REMS can include Elements to Assure Safe Use (ETASU), which:

> shall include 1 or more goals to mitigate a specific serious risk listed in the labeling of the drug and, to mitigate such risk, may require that—

---

[19] 21 U.S.C. § 355-1; Peter Grossi & Daphne O'Connor, *FDA Preemption of Conflicting State Drug Regulation and the Looming Battle over Abortion Medications*, 10 J.L. & BIOSCIENCES 1, 6 (2023). For the most up to date list of currents REMS, s*ee* FDA, *Approved Risk Evaluation and Mitigation Strategies*, (REMS), https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm (last accessed March 27, 2024).
[20] 21 U.S.C. § 355-1(a)(1)(A-F). *See also* FDA, *REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary, Guidance for Industry* (April 2019), https://www.fda.gov/media/100307/download.
[21] 21 U.S.C. § 355-1(d), Grossi & O'Connor, *supra* note 19, at 7.

(A) health care providers who prescribe the drug have particular training or experience, or are specially certified (the opportunity to obtain such training or certification with respect to the drug shall be available to any willing provider from a frontier area in a widely available training or certification method (including an on-line course or via mail) as approved by the Secretary at reasonable cost to the provider);
(B) pharmacies, practitioners, or health care settings that dispense the drug are specially certified (the opportunity to obtain such certification shall be available to any willing provider from a frontier area);
(C) the drug be dispensed to patients only in certain health care settings, such as hospitals;
(D) the drug be dispensed to patients with evidence or other documentation of safe-use conditions, such as laboratory test results;
(E) each patient using the drug be subject to certain monitoring; or
(F) each patient using the drug be enrolled in a registry.[22]

26.     REMS restrictions can and have been changed over time to reflect the most current data. Moreover, FDA may impose a REMS on a drug post-approval "if the Secretary becomes aware of new safety information and makes a determination that such a strategy is necessary to ensure that the benefits of the drug outweigh the risks of the drug."[23]

27.     Beyond the REMS authority, FDA also has other robust post-marketing authorities including adverse event reporting, the authority to impose post-marketing studies and clinical trials to assess certain safety risks, the authority

---

[22] 21 U.S.C. §§ 355-1(f)(3)(A)-(F).
[23] 21 U.S.C. § 355-1(a)(2)(A).

to require safety labeling changes and, ultimately, the authority to withdraw a drug from the market altogether, although this power has infrequently been used.[24]

## B. What is Off-Label Prescribing?

28.    Importantly, FDA approves drugs for a particular use or uses. "Drugs can be marketed only when approved by FDA, and a drug [is] approved for a specific intended use or uses. However, once a drug is approved for a single intended use – no matter how narrow or rare – it can be prescribed freely for *any* intended use," subject to a possible REMS restriction, discussed above.[25] The result is so-called "off-label prescribing".

29.    On its own website, FDA provides the following explanation for off-label prescribing:

> From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient.

> You may be asking yourself why your healthcare provider would want to prescribe a drug to treat a disease or medical condition that the drug is not approved for.  One reason is that there might not be an approved drug to treat your disease or medical condition.  Another is that you may have tried all approved treatments without seeing any benefits.  In situations like these,

---

[24] 21 U.S.C. §§ 355(k), (o); 21 C.F.R. § 314.80; 21 C.F.R. § 314.510. *See, e.g.*, Holly Fernandez Lynch, Rachel E Sachs, Seijin Lee, et al., *Extending the US Food and Drug Administration's Postmarket Authorities*, 4 JAMA HEALTH FORUM e231313 (2023); Daniel G. Aaron, I. Glenn Cohen, Eli Y. Adashi, *The FDA Struggle to Withdraw Makena: Problems with the Accelerated Approval Process*, 328 JAMA 2394 (2022).

[25] ADAM L. MUCHMORE, FOOD AND DRUG REGULATION: A STATUTORY APPROACH 363 (2021).

you and your healthcare provider may talk about using an approved drug for an unapproved use to treat your disease or medical condition. . . .

Unapproved use of an approved drug is often called "off-label" use. This term can mean that the drug is:

- Used for a disease or medical condition that it is not approved to treat, such as when a chemotherapy is approved to treat one type of cancer, but healthcare providers use it to treat a different type of cancer.
- Given in a different way, such as when a drug is approved as a capsule, but it is given instead in an oral solution.
- Given in a different dose, such as when a drug is approved at a dose of one tablet every day, but a patient is told by their healthcare provider to take two tablets every day.[26]

30.    A different instance of off-label prescribing, and the kind that is more central to this case, is prescribing for use for a different population – including using a drug approved in an adult population for a pediatric population. As noted by authors in the *Oxford Handbook of U.S. Health Law*, far from being something nefarious or unusual, "[s]uch off-label use is older than the FDA regime itself" and "it is widespread" (more on that below).[27]

31.    Or as put by Prof. Lewis Grossman, one of the leading scholars of food and drug law and coauthor of one of the field's main casebooks:

---

[26] FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (last updated Feb 5, 2018).

[27] Peter Grossi & Keri Arnold, *Drug Product Liability at the Crossroads, in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 444, 461 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

Critically, however, the FDA does not limit the uses for which a physician may prescribe a drug, regardless of the content of the labeling. Since the early 1970s, the agency has foresworn any regulation of the practice of medicine through restrictions on off-label prescribing. [While] the FDA today occasionally shapes prescribing practices through mandatory Risk Evaluation and Mitigation Strategies (REMS) that restrict approved drugs' distribution and use (for example, by requiring that prescribing doctors have particular training or experience). Nonetheless, the fact remains that most physicians can prescribe most of the FDA-approved armamentarium for any purpose.[28]

32.     The U.S. Court of Appeals for the Eighth Circuit made a similar point

in *Weaver v. Reagen*:

In the present case, defendants argue that their reliance on the FDA's approval statement in limiting coverage of AZT to only those patients who meet certain medical criteria is a reasonable exercise of their discretion to

---

[28] Lewis A. Grossman, *Drugs, Biologics, and Devices: FDA Regulation, Intellectual Property, and Medical Products in the American Healthcare System*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 637, 641 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016) (citing Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the FDA: Notice of Proposed Rulemaking, 37 Fed. Reg. 16,503 (Aug. 15, 1972)). The U.S. Supreme Court made similar points in *Buckman Company v. Plaintiffs' Legal Committee*, although it was discussing FDA's attitude to off-label use of *medical devices* rather than of-label use of *drugs*:

> Similarly, "off-label" usage of medical devices (use of a device for some other purpose than that for which it has been approved by the FDA) is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine. See, *e.g.*, Beck & Azari, FDA, Off–Label Use, and Informed Consent: Debunking Myths and Misconceptions, 53 Food & Drug L.J. 71, 76–77 (1998) (noting that courts, several States, and the "FDA itself recogniz[e] the value and propriety of off-label use"). Indeed, a recent amendment to the FDCA expressly states in part that "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." 21 U.S.C. § 396 (1994 ed., Supp. V). Thus, the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals.

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).

place limitations on covered services based on medical necessity and utilization controls. We do not find this argument persuasive.

Contrary to defendants' assertions, FDA approved indications were not intended to limit or interfere with the practice of medicine nor to preclude physicians from using their best judgment in the interest of the patient. Instead, the FDA new drug approval process is intended to ensure that drugs meet certain statutory standards for safety and effectiveness, manufacturing and controls, and labeling, 21 C.F.R. § 314.105(c) (1988), and to ensure that manufacturers market their drugs only for those indications for which the drug sponsor has demonstrated "substantial evidence" of effectiveness. Id. at § 314.126.

. . .

Thus, the fact that FDA has not approved labeling of a drug for a particular use does not necessarily bear on those uses of the drug that are established within the medical and scientific community as medically appropriate. It would be improper for the State of Missouri to interfere with a physician's judgment of medical necessity by limiting coverage of AZT based on criteria that admittedly do not reflect current medical knowledge or practice.[29]

33.     There are a myriad of reasons why pharmaceutical companies, having received approval for a particular use of a drug, do not run clinical trials to get FDA approval of another use. The Congressional Research Service captured a good many of those reasons in a recent report:

For new drugs and new uses of already approved drugs, the sponsor receives a period of market protection, in the form of regulatory exclusivity for the sale of the drug for those uses. Payors—such as private health insurers or Medicare—benefit from FDA‑approved labeling in their evaluation of whether to pay for a drug's use.

---

[29] Weaver v. Reagen, 886 F.2d 194, 198 (8th Cir. 1989).

But use of a drug evolves as clinicians (and the manufacturer) share their experiences regarding off-label uses, which, by definition, were not part of the premarket clinical studies used to obtain FDA approval. Off-label use can benefit patients. In some instances, such as in the treatment of rare diseases, clinical practice may use drugs approved for other indications. A manufacturer may choose not to invest in trials for such a small patient group. A patient whose physician is already prescribing the drug off-label may not want to enroll in a clinical trial where there is a chance he or she may be assigned to the placebo group. Once drugs are well-established in off-label uses, manufacturers rarely design studies to determine or verify the safety and effectiveness of such uses. Individuals and groups wanting to conduct such studies may find it hard to obtain funding.[30]

34.     While, as a policy matter, some might prefer a regulatory regime that takes a different position as to at least some subset of off-label use, as the next sections show, off-label use is not only well-accepted but widespread in the U.S. Indeed, the majority of prescriptions in some therapeutic categories are for off-label uses.

## C. Off-Label Prescribing Is Widespread in the U.S.

35.     As the prior section indicates, off-label use of approved prescription drugs is widespread in the U.S. The Congressional Research Service gave some examples of "FDA-approved drugs widely prescribed for off-label uses," such as: ketamine, whose labeled use is for anesthesia, being used off-label for depression and migraines; antipsychotics like risperidone, olanzapine and quetiapine, whose

---

[30] Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs*, 6 (Feb. 23, 2021), https://sgp.fas.org/crs/misc/R45792.pdf.

labeled uses are for schizophrenia and bipolar disorder are used off-label for sleep aid, behavioral symptoms of dementia, obsessive compulsive disorder, posttraumatic stress syndrome, and anxiety disorders.[31] It is worth emphasizing that these are all quite serious drugs with significant safety risks and yet they are routinely used off-label, for uses FDA has not approved.

36.     Let me give a sense of just how pervasive off-label use under the direction of a health care professional (that is, off-label prescribing) is generally, before turning to how common it is in the pediatric context, specifically. In what is perhaps the most frequently discussed study in the literature, David Radley and co-authors "used nationally representative data from the 2001 IMS Health National Disease and Therapeutic Index (NDTI) to define prescribing patterns by diagnosis for 160 commonly prescribed drugs."[32] They found that:

> In 2001, there were an estimated 150 million (95% confidence interval, 127-173 million) off-label mentions (21% of overall use) among the sampled medications. Off-label use was most common among cardiac medications (46%, excluding antihyperlipidemic and antihypertensive agents) and anticonvulsants (46%), whereas gabapentin (83%) and amitriptyline hydrochloride (81%) had the greatest proportion of off-label use among specific medications.[33]

---

[31] *Id.* at 5.
[32] David C. Radley. Stan N. Finkelstein, Randall S. Stafford, *Off-Label Prescribing Among Office-Based Physicians*, 166 ARCH. INTERNAL MED. 1021, 1021 (2006).
[33] *Id.*

37.     In the oncology space, Pfister reports that "in 2005 the National Comprehensive Cancer Network estimated that 50% to 75% of drug or biologic therapy used to treat cancer in the United States was off label."[34]

38.     One of the leading casebooks on FDA law notes that "[s]ome studies suggest as many as 20 percent of all prescriptions are for unapproved uses . . . and in some fields (especially oncology) off-label use may be not only frequent but even the standard of care," and that "[c]linical practice guidelines prepared by medical associations or academic medical institutions, or even government agencies, may recommend off-label uses of approved drugs."[35]

39.     While my focus is on off-label use in the U.S., such off-label use is also very prevalent outside the U.S. as well.[36] I discuss some of the data regarding off-label use in pediatric populations outside the U.S. below.

### a. Off-Label Prescribing is Widespread for Pediatric Populations in the U.S.

40.     Using a drug approved for adult populations for *pediatric* populations is one of the most common types of off-label prescribing.[37] This has been a long-

---

[34] D. Pfister, *Off-Label Use of Oncology Drugs*, 30 J. CLINICAL ONCOLOGY 584 (2012).

[35] HUTT ET AL., *supra* note 15, at 1162.

[36] *See* DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4 (2015).

[37] *See, e.g.*, DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4 (2015) ("There are three main areas of therapy where off-label medicines are most widely used. The first is the use of products licensed for adults, on the basis of clinical trials in adults, for children. The second is of psychiatric medicines, and the third is in oncology treatment.")

standing reality in American health care. A 1997 U.S. Senate report captured well

both the extent of off-label use in pediatric populations in the U.S. and the reasons

why many pharmaceutical companies do not seek approval for pediatric uses,

observing at the time:

> Currently, less than 20 percent of the prescription medications on the United States market are approved for use in the pediatric population and labeled for pediatric use. Pediatricians using drugs developed with adults in mind but which may also be effective or be the only option for treating the same illnesses and diseases in children must estimate dosages from dosages found to be safe and effective in adults. Such estimates are uncertain because children, and particularly those under 2 years of age, often metabolize drugs differently than do adults. Further, some drugs have different side effects and/or toxicities in children than in adults even when appropriate doses are used.

> For these reasons, pediatricians have long had an active interest in promoting clinical studies of drugs in pediatric populations so that the drugs may be labeled for pediatric use. However, there is little incentive for drug sponsors to perform studies for medications which they intend to market primarily for adults and whose use in children is expected to generate little additional revenue. Pediatric studies pose ethical and moral issues relating to using new unapproved drugs in young patients. Second, there are substantial product liability and medical malpractice issues. Third, pediatric patients are more difficult to attract into studies. Fourth, for some drugs, pediatric use represents more difficult issues of drug administration and patient compliance than adult use.[38]

41.     In response to this reality, Congress amended the statute to contain

mechanisms (including incentives in the form of additional months of market

---

[38] S. REP. 105-43, 51 (1997).

exclusivity for drug manufacturers) to increase the number of pediatric clinical trials.[39]

42.    For example, under the Food and Drug Administration Modernization Act of 1997 (FDAMA) "[a]s a reward for conducting pediatric trials specifically requested by the FDA, drug sponsors holding approved applications and existing patents or other exclusivity were offered a six-month extension of market exclusivity for all of their drug products with the same active ingredient as the one studied," and "[d]uring this six-month period, the FDA could not approve an abbreviated new drug application for generics relying on the safety and efficacy data from the original sponsor's new drug application (NDA)," giving "a lucrative economic incentive for sponsors to perform the requested research because they could delay generic competition."[40]

43.    Congress reauthorized this statutory incentive of market exclusivity with a similar design in subsequent statutory amendments, including permanent reauthorization in the Food and Drug Administration Safety and Innovation Act of

---

[39] *See* Cong. Rsch. Serv., *supra* note 30, at 8, 15-16.

[40] Holly Fernandez Lynch, *Give Them What They Want? The Permissibility of Pediatric Placebo-Controlled Trials Under the Best Pharmaceuticals for Children Act*, 16 ANNALS HEALTH L. 79, 93 (2007).

2012 (FDASIA).[41] This incentive is commonly called the Best Pharmaceuticals for Children Act, or BPCA, after the name of one such amendment.[42]

44.    While BPCA provides a "carrot" to drug companies to do more pediatric clinical trials, the Pediatric Research Equity Act, first passed by Congress in 2003 and also made permanent in FDASIA, serves as a sort of "stick."[43] As one author described its major provisions:

> This rule "empowered the FDA to require pediatric testing of already marketed drugs and instituted a presumption favoring pediatric testing and labeling for new drugs," thus creating a non-voluntary correlate to the FDAMA/BPCA pediatric incentive. The PREA requires adequate data to assess safety and efficacy of a drug or biologic for the claimed indications of an NDA in all relevant pediatric subpopulations, even if the sponsor has not specifically claimed any pediatric uses. The statute also requires data to support dosing and administration for any pediatric subpopulations in which the drug is found to be safe and effective.
>
> The PREA is not all-inclusive and does recognize several waivers that exempt NDAs from pediatric testing when sponsors make certain showings. The requirements can be deferred if pediatric studies should be delayed until additional safety or efficacy data have been collected in adult subjects. Additionally, where evidence strongly suggests the drug would be ineffective or unsafe in all pediatric age groups, the requirements can be waived entirely. The requirements can also be waived if the drug does not represent a meaningful therapeutic benefit over existing therapies for pediatric patients and is not likely to be used in a substantial number of such patients.
>
> The FDA can also require pediatric data for drugs already approved and thus not covered by the requirements surrounding NDAs. This occurs if the drug

---

[41] Food and Drug Administration Safety and Innovation Act, Pub. L. No. 112-144, 126 Stat. 993 (2012) (codified at 21 U.S.C. § 355a).
[42] Best Pharmaceuticals for Children Act, Pub. L. No. 107-109, 115 Stat. 1408 (2002).
[43] Pediatric Research Equity Act, Pub. L. No. 108-155, 117 Stat. 1936 (2003). *See* 21 U.S.C. § 355c.

is used for a substantial number of pediatric patients for its labeled indications, or if there is reason to believe the drug would represent meaningful therapeutic benefit over existing therapies for pediatric patients. Both of these situations must be accompanied by a finding that the absence of adequate labeling could pose significant risks to pediatric patient.[44]

45.     Despite significant Congressional efforts, much of, and in some drug categories the majority or vast majority of, prescriptions for pediatric use are off-label. To illustrate let me share some studies of the phenomenon in the U.S.

46.     A 2018 systematic review study looked at the "published incidence of off-label medication use in children from the past 10 years" and conducted a "retrospective chart review to determine the incidence of off-label prescriptions for children seen in the O[klahoma University] Physicians clinics."[45] In terms of published studies, they found 31 studies that met their selection criteria, and they reported that "the rate of off-label prescriptions varied widely in the 31 reviewed studies and was reported to be between 3.2% and 95%" and that "[s]even studies in our literature review specifically evaluated the use of off-label medications in the neonate population, with off-label drug use ranging from 26% to 95%."[46] Their retrospective chart review looked at 32 "understudied" drugs administered to children and found that 22 of the 32 "drugs of interest were prescribed as a new

---

[44] Lynch, *supra* note 4040, at 95-97 (quoting Lauren Hammer Breslow, *Note, The Best Pharmaceuticals for Children Act of 2002: The Rise of the Voluntary Incentive Structure and Congressional Refusal to Require Pediatric Testing*, 40 HARV. J. ON LEGIS. 133, 160 (2003)).
[45] H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. OKLA STATE MED. ASSOC. 776 (2018).
[46] *Id.*

prescription in 2017, resulting in a total of 1,323 prescriptions for 1079 patients"
and of the "1,323 prescriptions, 504 prescriptions were off-label (38.1%) and 819
prescriptions were on-label."[47]

47.     Yoon et al. conducted a retrospective utilization study using data from
the National Ambulatory Medical Care Surveys (NAMCS, 2006–2015), which is
an annual survey that "collects anonymous, visit-level data from US office-based
physicians, including demographics, reasons for visit, diagnoses, and drugs
provided or ordered at the visit, including recommended over-the-counter (OTC)
drugs" and uses a sampling methodology that "allows researchers to produce
nationally representative estimates."[48] They found that Physicians ordered one or
more off-label systemic drug at almost 1 out of every 5 (18.5%) visits with
patients, that 74.6% of the time it was an off-label use for unapproved conditions,
and that "[o]ff-label ordering was most common proportionally in neonates (83%)
and in absolute terms among adolescents (322 orders out of 1000 visits)."[49]

48.     An earlier study by Bazzano et al. used data from the same survey, the
National Ambulatory Medical Care Surveys, looking at the time period 2001
through 2004 yielding "a sample of 7901 outpatient visits by children aged 0

---

[47] *Id.*

[48] Divya Yoon et al., *Trends in Off-Label Drug Use in Ambulatory Settings: 2006-2015*, 144
PEDIATRICS e20190896, at 2.

[49] *Id.* at 1.

through 17 years in which prescriptions were given, representative of an estimated 312 million visits" across the time period. They found that 62% "of outpatient pediatric visits included off-label prescribing," including approximately "96% of cardiovascular-renal, 86% of pain, 80% of gastrointestinal, and 67% of pulmonary and dermatologic medication prescriptions" being off-label.[50]

49.      Another study used data from the same survey and focused specifically on outpatient migraine care for pediatric populations. Looking at the 1.2 million pediatric outpatient visits for migraine that took place in 2011 and 2012, they analyzed the "approximately 800,000 patients (66.7%) [who] received at least 1 migraine drug" during a visit, and found that "off-label or age-inappropriate drugs were prescribed 1.5 times more frequently than FDA-approved medications for children (60.34% vs. 39.65%)."[51]

50.      Switching to inpatient care, a 2007 *JAMA Pediatrics* article looked at "clinical prescribing practice in major children's hospitals in the United States," and found that "[a]t least 1 drug was used off-label in 297 592 (78.7%) of 355 409 patients discharged during the study."[52]

---

[50] Alicia T.F. Bazzano AT, *Off-Label Prescribing to Children in the United States Outpatient Setting*, 9 ACAD. PEDIATR. 81, 81 (2009).
[51] L. Leanne Lai, *Off-Label Prescribing for Children with Migraines in U.S. Ambulatory Care Settings*, 23 J. MANAG. CARE SPEC PHARM. 382, 384 (2017).
[52] Samir S. Shah et al., *Off-label Drug Use in Hospitalized Children*, 161 ARCH. PEDIATR. ADOLESC. MED. 282, 282 (2007).

51.     While my focus is off-label use among U.S. pediatric populations, the

practice is also widespread outside the U.S. as well. As David Cavalla summarizes

some of the data:

> a review of international studies in ambulatory care reports rates of 13.2%
> and 29%, in paediatric wards between 18% and 60% and in neonatal units
> between 14% and 63%. Another international literature review reports that
> rates for off-label medicine use vary between 11% and 80%. A study from
> the Netherlands reports that 44% of all prescriptions in a paediatric ward are
> off-label. In Germany, around 40% of under 18s were prescribed at least one
> off-label medicine among a study of 17 000, with no significant differences
> according to region, urbanity, migrant background and social class. . . .
> Three-quarters of marketed prescription drugs have no labelling indications
> for children, although their inclusion in clinical trials is enlarging. Among
> medicines which were newly licensed by the European Medicines
> Evaluation Agency (EMA) between 1995 and 2005, only one-third was
> specifically licensed for children. Thus, off-label use is particularly
> widespread in paediatric situations, and over half of children in Europe who
> are prescribed medicines in hospital receive a medication that is either
> 'unlicensed' or 'off-label'. Other studies put the figure at 40%, 45% or 76%,
> and the area has been comprehensively reviewed.[53]

---

[53] DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4, 9 (citing J. Boos, *Off Label Use – Label Off Use?,* 14 ANN. ONCOL. 1 (2003); L. Cuzzolin, A. Atzei, and V. Fanos, *Off-Label and Unlicensed Prescribing for Newborns and Children in Different Settings: A Review of the Literature and a Consideration About Drug Safety*, 5 EXPERT OPIN. DRUG SAF. 703 (2006); C. Pandolfini and M. Bonati, *A Literature Review on Off-Label Drug Use in Children*, 164 EUR. J. PEDIATR. 522 (2005); G.W. 't Jong, I.A. Eland, M.C.J.M. Sturkenboom, et al., *Unlicensed and Off-label Prescription of Respiratory Drugs to Children*, 23 EUR. RESPIR. J. 310 (2004); H. Knopf, I-K. Wolf, G. Sarganas, et al., *Off-label Medicine Use in Children and Adolescent: Results of a Population-Based study in Germany*, 13 BMC PUBLIC HEALTH 631 (2013); T. Hampton, *Experts Weigh in on Promotion, Prescription of Off-Label Drugs*, 297 JAMA 683 (2007); A.R. Smyth, A. Barbato, N. Beydon, et al., *Respiratory Medicines for Children: Current Evidence, Unlicensed Use and Research Priorities*, 35 EUR. RESPIR. J. 247 (2010); L. Lindell-Osuagwu, M.J. Korhonen, S. Saano, et al, *Off-Label and Unlicensed Drug Prescribing in Three Paediatric Wards in Finland and Review of the International Literature*, 34 J. CLIN. PHARM. THER. 277; E. Kimland, V. Odlind, *Off-Label Drug Use in Pediatric Patients*, 91 CLIN PHARMACOL THER. 796 (2012)).

52.     Without purporting to comprehensively survey all the existing

literature, I will discuss just a few examples of studies documenting off-label

pediatric use in some of the countries that I understand have come up as

comparisons in this litigation.

53.     In their study of off-label drug use in the Netherlands, t'Jong and

colleagues note that: "Previous research by the [authors] revealed that 70% of

available respiratory drugs in the Netherlands are not fully licensed for use in

children, and many of these (80%) are registered only for specific age/weight

group."[54] They constructed a "random sample from all children aged 0–16 yrs who

were registered with a general practitioner in 1998," and in their study population

of 13,426 patients of whom "2,502 (19%) received 5,253 prescriptions for

respiratory drugs in 1999," they found that "1,947 prescriptions (37.1%), 882

(16.8%) were unlicensed for use in children, and 1,065 (20.3%) were prescribed

off-label."[55]

54.     In their study of off-label use in pediatric populations in Norway,

Teigen and colleagues conducted "a cross-sectional prospective study at two

hospitals in Norway" that included one neonatal and three pediatric wards

"covering mainly gastrointestinal disorders, endocrinology, neurology, respiratory

---

[54] G.W. 't Jong, I.A. Eland, M.C.J.M. Sturkenboom, et al., *Unlicensed and Off-label Prescription of Respiratory Drugs to Children*, 23 EUR. RESPIR. J. 310, 311 (2004).
[55] *Id.* at 310.

diseases and infections in patients 0–17 years."[56] They found that "[m]ost of the patients (91%) received" off-label or unlicensed medicines, that 83% of the patients received off-label medicines, and that "almost half of all the prescriptions," 40–47% of the prescriptions, were off-label.[57]

55.     In their study of off-label use in pediatric populations in France, Joret-Descout and colleagues conducted a "cross-sectional study lasting 1 day on new prescriptions issued over the previous 24 h by departments using electronic prescribing" at a "475 bed maternity-paediatric university hospital."[58] In the single 24 hour period they studied, a total of 315 prescription medicines were issued to 120 pediatric patients, and they found that the "majority of the medicines were prescribed as licensed (190/60.3 %), followed by off-label medicine use (115/36.5 %) and unlicensed employment (10/3.2 %)" and that "a total of 54 % of children received at least one off-label or unlicensed medicine."[59]

56.     In their study of off-label use in pediatric populations in Finland, Lindell-Osuagwu and colleagues conducted a prospective study on prescriptions provided for "all patients below 18 years of age treated in three paediatric wards;

---

[56] Arna Teigen, Siri Wang, Bich Thuy Truong, et al., *Off-label and Unlicensed Medicines to Hospitalised Children in Norway*, 69 J. PHARM. PHARMACOL. 432 (2017).
[57] *Id*. at 433.
[58] Perrine Joret-Descout, Sonia Prot-Labarthe, Françoise Brion, et al., *Off-Label and Unlicensed Utilisation of Medicines in a French Paediatric Hospital*, 37 INT. J. CLIN. PHARM. 1222, 1222 (2015).
[59] *Id.* at 1224.

neonatal intensive care unit (NICU), general paediatric ward and paediatric surgical ward of KUH during a 2-week study period" in April and May 2011.[60] Of the 119 patients that received at least one prescription during the study period, 79% (97 patients) received "at least one prescription for off-label use or for an unauthorized medicine," with 71% (87 patients) receiving at least one prescription for off-label use.[61] The authors noted that "the prescriptions were more likely to be off-label for the following reasons: outside the dosage recommendations ($n = 182$) and approved age range ($n = 104$); and in 2001: no directions for use in children ($n = 87$) and administration by an alternative route ($n = 77$[])" and that "the medicines most commonly prescribed for off-label use were fentanyl ($n = 50$), paracetamol ($n = 41$), salbutamol ($n = 35$) and midazolam (n = 31)."[62]

57.     In their study of off-label use in pediatric populations in Sweden, Kimland and colleagues looked at prescribing data over a 48-hour period in May and October 2008 from 34 pediatric hospitals in Sweden and seven non-pediatric hospitals that also treat children, resulting in data from 2947 pediatric patients.[63] They found that "41% of all authorized drugs were given off-label and the highest

---

[60] L. Lindell-Osuagwu, M. Hakkarainen, K. Sepponen, et al., *Prescribing for Off-Label Use and Unauthorized Medicines in Three Paediatric Wards in Finland, the Status Before and After the European Union Paediatric Regulation*, 39 J. CLIN. PHARM. THER. 144, 144-145 (2013).
[61] *Id*. at 146.
[62] *Id*. at 146.
[63] E. Kimland, P. Nydert, V. Odlind, et al., *Paediatric Drug Use with Focus on Off-Label Prescriptions at Swedish Hospitals – A Nationwide Study*, 101 ACTA PAEDIATRICA 772, 772-773 (2012).

proportion of off-label prescriptions occurred in neonates and infants," that "[a]t least one off-label drug was prescribed to 60% of the study population, whereas 17% received at least three, and 6% at least five off-label drug prescriptions," and that a "stated lack of paediatric data [] and indication [] were the most common reasons for off-label classification among adolescents" while "[i]n children, age [] and indication [] were among the most common reasons for off-label classification."[64]

58.     In their study of off-label use in pediatric populations in Scotland, Ekins-Daukes and colleagues assessed prescriptions made to "167,865 children aged 0–16 years during the period November 1999 to October 2000 using data from 161 general practices using the national Scottish primary care computer system."[65] They found that a "total of 17,715 (26.1% of children issued with a prescription) children aged 0–16 years were prescribed at least one off-label medicine in the study year" and that the "extent of off-label prescribing was similar in all three age bands with 5420 (24.4%) 0- to 4-year olds, 6856 (27.9%) 5- to 11-year olds and 5439 (26.0%) 12- to 16-year olds prescribed at least one off-label medicine during the study year."[66]

---

[64] *Id.* at 774-776.
[65] Suzie Ekins-Daukes, Peter J. Helms, Colin R. Simpson, et al., *Off-Label Prescribing to Children in Primary Care: Retrospective Observational Study*, 60 EUR. J. CLIN. PHARMACOL. 349, 349 (2004).
[66] *Id.* at 350.

59.     In sum, while Defendants' experts intimate that there is something nefarious or unusual about the prescribing of off-label drugs for pediatric populations in this case, to the contrary off-label prescribing is extremely common in the United States. More particularly, off-label prescribing is particularly common in pediatric populations. In all the studies I have reviewed there is a significant amount of off-label prescribing for pediatric populations. The same is true in peer countries outside the United States.

## IV.   STATES HAVE ROBUST MECHANISMS TO REIGN IN UNSAFE MEDICAL PRACTICES WITHOUT RESORTING TO THE EXTREME STEP OF CRIMINALIZING THE PRESCRIBING OF AN FDA-APPROVED DRUG

60.     Protecting patients, including pediatric patients, is a core concern in health law and its regulation. In several instances, Defendants' expert witnesses point to the need to protect pediatric patient safety as a reason to restrict the prescription of the FDA-approved drugs at issue in this case and as a core justification for the Alabama law. For example:

- Dr. Curlin writes that: "[I]t is not at all clear that meaningful informed consent for administration of MGT to minors can be obtained. There are strong reasons to doubt that minors can adequately appreciate and appropriately weigh the lifetime implications of sterilization, loss of sexual response, impaired neural development, and the other potential health and relational impacts identified in the literature, nor is it apparent that doctors possess (much less consistently disclose) adequate scientific information about these risks to enable anyone to make meaningfully informed decisions. Nor do ethical principles give parents unfettered power to provide effective consent on behalf of their children for medical

interventions that pose such severe risks of irreversible harm to the bodily health of the child (including sterilization) in the absence of a countervailing and imminent threat of bodily harm from a medical condition to be treated. No such imminent threat exists in the case of minors who experience gender dysphoria." Expert Report of Dr. Farr Curlin, M.D., ¶ 19.

- Dr. Curlin further opines that: "Doctors do not possess and are not providing information sufficient to enable children or parents to make 'informed' decisions. The absence of well-designed and controlled studies makes it impossible to give minors and their parents information sufficient to consider their consent duly informed, and the plaintiffs' experts by their own admission are misinforming patients regarding that fact. 'Caveat emptor' does not meet the bar required for consent to be duly informed within clinical medicine and clinical research. It is not enough to say 'we don't know' without doing the careful, incremental research to generate information needed for a consent to be duly informed." Expert Report of Dr. Farr Curlin, M.D., ¶ 71.

- Dr. Cantor writes: "As I have explained, any conclusion about safety requires knowledge about and balancing of both risks and benefits.

  In concluding that safety has not been established (see Section V above), national health authorities, authors of systematic reviews, and researchers have identified a number of harms which are either known to result from administration of puberty blockers and cross-sex hormones to children and adolescents, or can be reasonably anticipated but have not been sufficiently studied to reach any conclusion as to the likelihood or severity of harm." Expert Report of James Cantor, Ph.D., ¶¶ 202-203.

- Dr. Laidlaw writes: "In my opinion, there is not sufficient evidence to conclude that the use of puberty blockers to block natural puberty is safe when administered as part of gender affirming therapy. Nor is there sufficient evidence to conclude that the effects of puberty blockers when used in this manner are reversible." Expert Report of Michael K. Laidlaw, M.D., ¶¶ 81. Dr. Laidlaw also spends a significant portion of his report explaining why he believes that "[t]here are a number of serious health consequences that occur as the result of blocking normal puberty," and that "[i]n my opinion, there is insufficient evidence to conclude that any benefit of such treatment would outweigh the harm." Expert Report

of Michael K. Laidlaw, M.D., ¶¶ 90, 176. He ultimately justifies the need for the SB 184 on these beliefs, writing: "There exists insufficient evidence of benefit, but serious concerns for risk of harm. Therefore, I believe that the Alabama Vulnerable Child Compassion and Protection Act is based on sound medical principles for the protection of minors." Expert Report of Michael K. Laidlaw, M.D., ¶ 250.

- Dr. Nangia expresses her belief that "SB184 Appropriately Protects Minors." Expert Report of Geeta Nangia, M.D., p. 87. To support this belief, she opines that: "while parental consent and adolescent assent is possible for other medical interventions, it is insufficient in the matter of gender transition in minors.  First, the risks to the growing adolescent are remarkable, including infertility, irreversible changes to secondary sex characteristics, potential issues with bone density, cardiovascular risks, metabolic function, endocrine function, reproductive capacity, psychological and medical health, and brain maturation.  Second, a parent is unable to determine whether their child will realign with his or her natal sex.  This presents inherent risk.  Third, the present data supporting the benefit of transition in adolescence is rated 'very low quality.' There is no reliable long-term data on safety or efficacy of these treatments. For this reason, I believe that parental consent with adolescent assent for medical gender transition is problematic and can result in long-term detriment to the adolescent that later cannot be reversed." Expert Report of Geeta Nangia, M.D., ¶¶ 157-158.

61.     As I explain in this section, states have many regulatory mechanisms for protecting patient safety. These mechanisms include physician licensure and discipline, hospital accreditation, fraud and abuse laws, medical malpractice liability, and tort liability for breach of informed consent.

62.     While these regulatory mechanisms are commonly used to ensure patient safety, attaching criminal penalties to the actions of physicians is uncommon. The examples that come readily to mind including the sexual abuse of minor patients or unlawfully intentionally ending the life of a patient, where

physicians are not practicing medicine but acting in a way that is contrary to their

professional obligations and criminal law. When it comes to states attaching

criminal penalties to physicians *prescribing an FDA-approved drug*, it is rarer still.

Indeed, with the possible exception of states which have enacted criminal penalties

for abortion that may sweep in the FDA-approved drug mifepristone, now active in

the wake of *Dobbs v. Jackson Health Organization*,[67] I am not aware of any

instance where a state has sought to criminalize a physician's prescribing of an

FDA-approved drug as Alabama has done here. While it is possible there are

instances that exist with which I am not familiar, at the very least I can confidently

say that applying criminal state-law penalties to the prescribing and use of FDA-

approved drugs by licensed practitioners is exceedingly rare.

## A. States Have Robust Regulatory Mechanisms for Protecting Patient Safety Outside of Criminalizing the Prescribing of FDA-Approved Drugs

63.     For the past half-century, it has been common to think of health law

and health care reform as seeking to balance the "iron triangle" (a term coined by

William Kissick in 1994) of (1) access to, (2) the quality of, and (3) the costs of

medical care.[68] The conception of quality involves not only protecting patients

---

[67] 597 U.S. 215 (2022).

[68] WILLIAM L. KISSICK, MEDICINE'S DILEMMA'S: INFINITE NEEDS VERSUS FINITE RESOURCES 2-3 (1994); see, e.g., Lindsay F. Wiley et. al., *Health Reform Reconstruction*, 55 U.C. DAVIS L. REV. 657, 667 (2021).

from harm, but also providing them benefit. As with FDA's consideration of whether to approve a drug for a particular use, the key question more generally for regulating medicine is ensuring an appropriate balance of risk and benefit.

64.      In this section I will just very briefly highlight some of the regulatory tools available for states to help regulate the practice of medicine to ensure that patients' interests are protected. This list is far from exhaustive.

65.      *Licensure and Discipline of Health Care Providers*. The power to license and discipline health care providers is a key way in which the state ensures that appropriate care is provided. "All 50 states (as well as US territories) have empowered professionally run licensing boards to regulate the practice of various professionals within their borders," regulating the practice of medicine, the practice of nursing, etc.[69] Alabama is, of course, no exception. "The Alabama Board of Medical Examiners and the Medical Licensure Commission of Alabama are jointly responsible for promulgating rules to protect the health and safety of Alabama citizens as they relate to the practice of medicine by physicians and physician assistant."[70] The disciplinary authority of these boards is particularly important for rooting out health care providers who are putting patients at

---

[69] Isaac D. Buck, *Regulation of Professionals and Facilities in the United States*, *in* THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 293, 296 (David Orentlicher and Tamara K. Hervey eds 2020-2021).

[70] *E.g.*, Amber M. Parish, *A Better Guide to Prescribing, Particularly During Public Health Emergencies: Legislation & Policy Governing Prescribing to Self & Family*, 6 LOY. U. CHI. J. REG. COMPLIANCE 109, 120 (2021).

significant risk. As one author puts it in the *Oxford Handbook of Comparative Health Law*:

> Boards also are responsible for imposing disciplinary sanctions against those who violate various state statutes that govern their practice. Once a violation is alleged—which can be reported by patients—the alleged violation is investigated by the boards, and the board makes a decision. For serious allegations, the board will hold hearings before meting out a penalty against the professional.
>
> Sanctions can include a host of various penalties, from letters of concern to competency evaluations, to fines or restrictions. The most serious penalty can include suspension or revocation of the professional's license. This, for a healthcare professional, can be seen as the equivalent of a professional "death penalty" because revocation of one's license ends the professional's ability to see patients or otherwise practice medicine. And even though this regulatory regime is state-centric, professionals cannot simply relocate: at least regarding medical doctors, states communicate with one another through the Federation of State Medical Board Physician Data Center by sharing physician disciplinary actions with other states.[71]

66.     Through so-called "scope of practice" rules, the "state regulatory board for each of the licensed healthcare professions has some degree of authority to define the legitimate boundaries of that profession and to exclude others."[72]

67.     *Accreditation of Hospitals and Other Health Care Facilities*. The state power of licensure of facilities is another powerful tool in ensuring safe and effective care:

---

[71] Buck, *supra* note 69, at 296-297

[72] Sandra Johnson, Structure of Governmental Oversight of Quality in Healthcare, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 489, 506 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

Facilities must be licensed by the state in which they are located. In order to be licensed under state law, hospitals and other healthcare facilities must certify that they offer a number of services and treatments. These requirements ensure that healthcare facilities are adequately staffed and resourced to promote patient health. A state agency board, made up of a number of healthcare experts, is empowered to certify and license many different types of healthcare facilities. . . . Boards are empowered to set and enforce regulations to ensure that the healthcare facilities are safe for their patients.[73]

68.   *Health Care Fraud and Abuse Laws*. At both the federal and state levels there are a series of laws that police fraud ("activities undertaken with the intent to deceive, coupled with another's detrimental reliance on the misrepresentation") and abuse ("self‑interested behavior done without the intent to deceive, such as creative interpretation of payment rules or other instances of profligate spending on medical care that is at the margin of fraudulent practice") by health care providers.[74] The relevant laws here include the federal Civil False Claims Act (FCA), Medicare and Medicaid Anti‑Kickback Statute (AKS), Ethics in Patient Referrals Act of 1989 (often called the "Stark Law"), and state Medicaid fraud statutes.[75]

69.   *Medical Malpractice Liability*. The state law of medical malpractice also protects patient safety when faced with unreasonable physician conduct. A

---

[73] Buck, *supra* note 69, at 305 (internal quotation marks omitted).

[74] Joan H. Krause, *Fraud and Abuse Law in the United States*, *in* THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 375, 377 (David Orentlicher and Tamara K. Hervey eds 2020‑2021).

[75] *See generally* HALL ET AL., *supra* note 3, Chap. 4.

patient injured by the action of a physician, including as to provision of gender affirming care to a minor patient, may sue in medical malpractice. Proving medical malpractice follows the regular rules of tort liability, requiring proof of duty, breach, causation (proximate cause and cause in fact) and damages.[76] Traditionally, one important divergence between medical malpractice and ordinary negligence law is that under medical malpractice claims, the standard of care is determined in reference to professional custom, local or national, as opposed to the duty of reasonable care familiar in other negligence torts.[77] In fact, as it currently exists across the states we see a myriad of approaches:

> In many states, it is unclear whether professional custom determines breach or whether a broader "reasonable physician" test is used. Other states are split between one of these two tests, but the boundaries between them are blurred. States appealing to professional custom may expand the scope of evidence to be considered or allow the opposing party to prove that competent practice sometimes does, or should, depart from prevailing practice. On the other hand, almost all states following a reasonableness standard still regard it as a professionally-determined standard and thus look predominantly to expert testimony about what other medical professionals regard as reasonable.[78]

70.     Another important variation in medical malpractice law is that some jurisdictions recognize a "two schools of thought" or "respectable minority" rule,

---

[76] *E.g.,* DAN B. DOBBS, PAUL T. HAYDEN AND ELLEN M. BUBLICK, THE LAW OF TORTS § 283 (2d ed. 2023 update).
[77] *See id.*; HALL ET AL., *supra* note 3, at 198-211.
[78] HALL ET AL., *supra* note 3, at 222.

which precludes "liability if the defendant can show that physicians are divided over the appropriate treatment course and the defendant picked one of the acceptable options," with "[s]ome courts requir[ing] the plaintiff to show that a 'considerable number' of physicians have adopted the defendant's choice, while others simply require that those in the minority be regarded as 'respectable' by their peers" and still others requiring both.[79]

71.    While I am not an expert on Alabama law, my understanding is that Alabama has codified the applicable duty for physicians by statute as follows:

> In performing professional services for a patient, a physician's, surgeon's, or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill, and diligence used by hospitals generally in the community.[80]

72.    *Liability for Breach of Informed Consent*. Several of Defendants' experts express concern that the informed consent process for gender‑affirming care is inadequate and offer that in part as a justification for Alabama's approach to criminalize the prescribing of FDA‑approved drugs in the relevant cases. For example:

---

[79] Anna B. Laakmann, *When Should Physicians Be Liable for Innovation?*, 36 CARDOZO L. REV. 913, 925 (2015) and cases cited therein.
[80] ALA. CODE § 6‑5‑484.

- Dr. Curlin writes that "Doctors do not possess and are not providing information sufficient to enable children or parents to make 'informed' decisions. The absence of well-designed and controlled studies makes it impossible to give minors and their parents information sufficient to consider their consent duly informed, and the plaintiffs' experts by their own admission are misinforming patients regarding that fact. 'Caveat emptor' does not meet the bar required for consent to be duly informed within clinical medicine and clinical research. It is not enough to say 'we don't know' without doing the careful, incremental research to generate information needed for a consent to be duly informed." Expert Report of Dr. Farr Curlin, M.D., ¶ 71. He ultimately concludes that: "Doctors do not possess and are not providing information sufficient to enable children or parents to make 'informed' decisions." Expert Report of Dr. Farr Curlin, M.D., p. 18.

- Dr. Cantor states his belief that "[t]here does not exist—indeed, there cannot exist—an age-appropriate way to equip a child who has not gone through puberty to make an informed decision about age-inappropriate issues, such as their future sex life, choices of sexual partners, sex-bonded relationships including marriage, and sacrificing ever experiencing orgasm." Expert Report of James Cantor, Ph.D., ¶ 236.

- Dr. Nangia suggests her ultimate conclusion is that "Informed Consent Is Not Attainable for Medical or Surgical Transition" because "Minors lack decision-making capacity for medical and surgical transition. In my opinion, due to a lack of full neurologic, psychosocial, and cognitive developmental maturation, adolescents are unable to understand, reason through, appreciate, and comprehend the impact of the shortcomings of the present data, the lack of FDA indication for puberty blockers, the long-term risks and consequences of transition, and the low-grade rating of studies that have been used to support medical and surgical transition. Hence, they lack decision-making capacity." Expert Report of Geeta Nangia, M.D., p. 80, ¶ 154. Indeed, this impossibility of informed consent is the central claim of both her primary and supplemental expert reports. *See* Expert Report of Geeta Nangia, M.D., ¶¶71-170; Supplemental Expert Report of Geeta Nangia, M.D., pp 16-18, 21-22, 31-32, 34-35, 45-47, 50-51, 54-55.

73.     Of course, the determination of whether informed consent has been

appropriately given should always be done at the level of the particular patient (and

in this case patient and parent). For this reason, it is my opinion that, contrary to

Defendants' experts, the ethical doctrine of informed consent cannot justify a

blanket omnibus criminalization of an FDA-approved therapy for *every* potential

minor patient in Alabama.

74.     In any event, state law currently polices the quality of informed

consent by providing a tort cause of action for breach of informed consent.

Beginning in the 1960s, the law begins to attach liability in cases where a

physician did not adequately inform the patient of the risks and benefits of the

proposed treatment or nontreatment. The tort typically requires the plaintiff to

demonstrate four elements:

> (1) failure to disclose a specific risk in violation of the governing standard;
> (2) materialization of that risk; (3) "causation"--that is, if the risk been
> disclosed, the patient, or a prudent person in the patient's position, would not
> have proceeded as she did; and (4) that no exception, like emergency,
> excuses the failure to disclose.[81]

75.     My understanding is that the Supreme Court of Alabama has specified

the tort's elements under Alabama law as follows:

> The elements of a cause of action against a physician for failure to obtain
> informed consent are: (1) the physician's failure to inform the plaintiff of all

---

[81] Robin Fretwell Wilson, *The Promise of Informed Consent*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 213, 217 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

material risks associated with the procedure, and (2) a showing that a reasonably prudent patient, with all the characteristics of the plaintiff and in the position of the plaintiff, would have declined the procedure had the patient been properly informed by the physician.[82]

76.     If a patient receives gender-affirming care and later comes to regret it and feel as though the risks were inadequately conveyed to them or that the physician should have known that patient was incapable of giving consent, the patient could potentially seek a remedy under this tort. Such an approach would better distinguish patients who have and have not given informed consent than the blanket approach adopted by the state of making the care wholly unavailable.

77.     In sum, like all states Alabama has a robust set of laws that help protect patients, including pediatric patients. In this case it has taken the extremely rare step of choosing to criminalize the prescribing of an FDA-approved drug.

## V.    CONCLUSION

78.     In sum, for the reasons set forth above I conclude: (1) contrary to the suggestion of some of Defendants' experts, there is nothing unusual or nefarious that can be gleaned from the fact that the drugs relevant to this case are being prescribed for "off-label" use. In fact, off-label prescribing is extremely common,

---

[82] Phelps v. Dempsey, 656 So. 2d 377, 380 (Ala. 1995). Some states limit tort actions relating to informed consent to cases involving surgery. Without purporting to be an expert on Alabama law, in my initial review of its case law I have not seen any authority suggesting such a limitation and have seen some cases involving the tort and a non-surgical fact pattern. See Nolen v. Peterson, 544 So. 2d 863 (Ala. 1989) (psychiatric medication); Stone v. Alza Corp., No. CV-06-CO-4892-S, 2007 WL 9717749 (N.D. Ala. Mar. 15, 2007) (Duragesic patch).

particularly for pediatric populations; (2) the use of criminal law relating to prescribing an FDA-approved drug by licensed practitioners is exceedingly rare. Defendants' experts have defended Alabama's extraordinary actions in this case as essential to protect the safety of patients and ensure informed consent. In fact, the state's regulation of healthcare systems in all states, including Alabama, have a series of interlocking mechanisms to protect patients from these kinds of concerns. These mechanisms include physician licensure and discipline, hospital accreditation, medical malpractice liability, and liability for breach of informed consent. The propriety of Alabama's decision to criminalize prescribing of an FDA-approved drug should be evaluated with this background in mind.

Executed April 1, 2024

I. Glenn Cohen

# Appendix A

HARVARD LAW SCHOOL

I. GLENN COHEN
DEPUTY DEAN
JAMES A. ATTWOOD AND LESLIE WILLIAMS PROFESSOR OF LAW
FACULTY DIRECTOR, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY,
BIOTECHNOLOGY, AND BIOETHICS
Griswold Hall 503, Harvard Law School
Cambridge, MA  02138
(617) 496-2518~ igcohen@law.harvard.edu ~Twitter: @CohenProf

## CURRENT POSITION

HARVARD LAW SCHOOL,
Deputy Dean, 2020 - present
James A. Attwood and Leslie Williams Professor of Law, 2017 - present
Professor, 2013-2017
Assistant Professor, 2008-2013

HARVARD LAW SCHOOL, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY, BIOTECHNOLOGY, AND
BIOETHICS,        Faculty Co-Director, 2009 - 2014
Faculty Director, 2014 - present

THE BROAD INSTITUTE OF MIT AND HARVARD, Associate Member, 2013 - present

## EDUCATION

HARVARD LAW SCHOOL, J.D., *magna cum laude*, 2003
Sears Prize, 2001 (awarded to the two 1L students with the highest GPA)
*Harvard Law Review*, Primary Editor
Hewlett Fellow in Law and Negotiation, Harvard Law School Program on Negotiation, 2001-2003
Derek Bok Center Award of Distinction in Teaching and nominee for the Joseph R. Leven Memorial
Teaching Prize as Teaching Fellow for Michal Sandel's "Justice" course at Harvard College

UNIVERSITY OF TORONTO, Hon. B.A. Bioethics (Philosophy) and Psychology, *High Distinction* (GPA 3.99), 2000
Alumni Association Scholar (awarded to five graduating students)
Cressy Award for Student Leadership
Theses: *The Ethics of Deception in Psychological Research; The Janus Problem: Insanity, Automatism,
and the Problem of Disposition in Anglo-American Criminal Law.*

## PUBLICATIONS

### (1) REPRODUCTIVE TECHNOLOGY/REPRODUCTION/GENETICS

#### Books

CONSUMER GENETIC TECHNOLOGIES: ETHICAL AND LEGAL CONSIDERATIONS (Cambridge University Press, 2021)
(co-editor with Nita A. Farahany, Henry T. Greely, Carmel Shachar)

REPRODUCTIVE TECHNOLOGIES AND THE LAW (Carolina Academic Press, 3rd ed. 2022) (co-author with Judith
Daar, Seema Mohapatra, Sonia Suter)

#### Law Journals

*The Constitution and the Rights Not to Procreate*, 60 STANFORD L. REV. 1135 (2008) (reprinted in Brazil *in* MEI
AMBIENTE, DIREITO E BIOTECNOLOGIA (Thiago Pires Oliveira ed. 2010))

*The Right Not to Be a Genetic Parent?*, 81 S. CAL. L. REV. 1115 (2008) (selected for the 2008 Stanford-Yale Junior Faculty Forum)

*Intentional Diminishment, The Non-Identity Problem, and Legal Liability*, 60 HASTINGS L. J. 347 (2008) (Solicited) (reprinted in BIOETHICS AND THE LAW (Ramkistaiah Jillaed. 2009-2010)

*Trading-Off Reproductive Technology and Adoption: Does Subsidizing IVF Decrease Adoption Rates and Should It Matter?* 95 MINN. L. REV. 485 (2010) (co-authored with Daniel Chen) (selected for the 2010 Stanford-Yale Junior Faculty Forum)

*Regulating Reproduction: The Problem with Best Interests*, 96 MINN. L. REV. 423 (2011)

*Rethinking Sperm Donor Anonymity: Of Changed Selves, Non-Identity, and One Night Stands,* 100 GEO. L. J. 431 (2012)

*Beyond Best Interests*, 96 MINN. L. REV. 1187 (2012)

*Can you Buy Sperm Donor Identification? An Experimen*t, 10 J. EMPIRICAL LEG. STUDIES 715 (2013) (co-authored with Travis Coan)

*What (If Anything) Is Wrong with Human Enhancement? What (If Anything) Is Right with It?*, 49 TULSA L. REV. 645 (2014) (festschrift honoring Einer Elhauge)

*Complexifying Commodification, Consumption, ART, and Abortion*, 43 J. L. MED. & ETHICS 307 (2015) (solicited commentary)

*My Body, My Bank*, 93 TEXAS L. REV. 953 (2015) (Book Review) (Solicited)

*Sperm Donor Anonymity and Compensation: An Experiment with American Sperm Donors*, 3 J. L. & BIOSCIENCES 468 (2016) (co-authored with Travis Coan, Michelle Ottey, and Christina Boyd)

*Germ-Line Gene Editing and Congressional Reaction in Context: Learning from Almost 50 Years of Congressional Reactions to Biomedical Breakthroughs*, 30 J.L. & HEALTH 20 (2017) (co-authored with Russell Spivak and Eli Y. Adashi)

*Moratoria and Innovation in the Reproductive Sciences: Of Pretext, Permanence, Transparency, and Time-Limits*, 15 J. HEALTH. & BIOMED. L. 5 (2018) (co-authored with Russell Spivak and Eli Y. Adashi)

*The Lumbering Crawl Toward Human Germline Editing*, 46 J. L. MED. & ETHICS 1010 (2018) (co-authored with Eli Y. Adashi)

*Gene Editing Sperm and Egg (Not Embryos): Does it Make a Legal or Ethical Difference?*, 48 J. L. MED. & ETHICS 619 (2020) (co-authored with Eli Y. Adashi and Jacob S. Sherkow)

**Medical, Science and Bioethics Journals**

*Prohibiting Anonymous Sperm Donation and the Child Welfare Error*, 41 HASTINGS CTR. REP, Sept-Oct, 13 (2011)

*When Potential Does Not Matter: What Developments in Cellular Biology Tell Us About the Concept of Legal Personhood*, 13 AM. J. BIOETHICS 38 (2013) (co-authored with Jonathan Will and Eli Adashi)

*Of Modest Proposals and Non-Identity: A Comment on The Right to Know Your Genetic Parents*, 13 AM. J. BIOETHICS 45 (2013) (peer- reviewed)

2

*Made-to-Order Embryos for Sale – A Brave New World?*, 368 N. ENGL. J. MED. 2517 (2013) (co-authored with Eli Adashi)

*Plan B: Access to Emergency Contraception in the Legal and Political Cross Hairs*, 88 CONTRACEPTION 477 (2013) (co-authored with Eli Adashi and Lisa Sullivan)

*When Religious Freedom Clashes with Access to Care*, 370 N. ENG. J. MED. 596 (2014) (co-authored with Holly Fernandez Lynch and Gregory D. Curfman)

*Transatlantic Lessons in Regulation of Mitochondrial Replacement Therapy: prospect of disease-free children for women carriers through MRT*, 348 SCIENCE 178 (2015) (co-authored with Julian Savulescu & Eli Y. Adashi)

*Going Germline: Mitochondrial Replacement as a Guide to Genome Editing*, 164 CELL 832 (2016) (co-authored with Eli Y. Adashi)

*Preventing Mitochondrial DNA Diseases: One Step Forward, Two Steps Back*, 315 JAMA 273 (2016) (co-authored with Eli Y. Adashi)

*Embryo Disposition Disputes: Controversies and Case Law*, 46 HASTINGS CTR. REP. 13 (2016) (co-authored with Eli Y. Adashi)

*The FDA is prohibited from Going Germline,* 353 SCIENCE 545 (2016) (co-authored with Eli Y. Adashi) (peer-reviewed)

*Mitochondrial Replacement Therapy: The IOM Report and Its Aftermath*, 17 NATURE REVIEWS GENETICS 189 (2016) (co-authored with Eli Y. Adashi)

*Embryo Disposition Disputes: Controversies and Case Law*, 46 HASTINGS CTR. REP., July-Aug. 2016, at 13.

*Disruptive Reproductive Technologies,* 9 SCIENCE TRANS. MED. eaag2959 (2017) (Jan 11, 2017) (co-authored with George Q. Daley and Eli Y. Adashi)

*Preventing Mitochondrial Disease: A Path Forward*, 131 OBSTETRICS & GYNECOLOGY 553 (2018) (co-authored with Eli Y. Adashi)

*Building Capacity for a Global Genome Editing Observatory: Conceptual Challenges*, 36 TRENDS IN BIOTECHNOLOGY 639 (2018) (co-authored with Krishana Sahu et al.)

*Building Capacity for a Global Genome Editing Observatory: Institutional Design*, 36 TRENDS IN BIOTECHNOLOGY 641 (2018) (co-authored with Krishana Sahu et al.)

*Personhood and the Three Branches of Government*, 378 N. ENG. J. MED. 2453 (2018) (co-authored with Eli Y. Adashi)

*Losing Embryos, Finding Justice: Life, Liberty, and the Pursuit of Personhood*, 169 ANN. INTERN. MED. 800 (2018) (co-authored with Eli Y. Adashi and Dov Fox)

*The Ethics of Heritable Genome Editing New Considerations in a Controversial Area*, 320 JAMA 2531 (2018) (co-authored with Eli Y. Adashi)

*Commentary, The Lumbering Crawl Toward Human Germline Editing*, 46 J. LAW, MED. AND ETHICS 1010 (2019) (co-authored with Eli Y. Adashi)

*Stem Cell-Derived Human Gametes: The Public Engagement Imperative*, 25 TRENDS IN MOLEC. MED. 165 (2019) (co-authored with Eli Y. Adashi, Jacob H. Hanna, Azim M. Surani, and Katsuhiko Hayashi)

*A Troubling Court Decision for Reproductive Rights: Legal Recognition of Fetal Standing to Sue*, 322 JAMA 23 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*Heritable Genome Editing: Is a Moratorium Needed?*, 322 JAMA 104 (2019) (co-authored with Eli Y. Adashi)

*How Bans on Germline Editing Deprive Patients with Mitochondrial Disease,* 37 NATURE BIOTECH. 589 (2019) (co-authored with Eli Y. Adashi and Vardit Ravitsky)

*Genetic Testing, Insurance Discrimination, and Medical Research: What the US Can Learn from Peer Countries*, 1198 NATURE MED. 1198 (2019) (co-authored with Jean-Christophe Bélisle-Pipon, Effy Vayena and Robert C Green)

*Fertility Fraud, Legal Firsts, and Medical Ethics*, 134 OBSTETRICS & GYNECOLOGY 918 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*Heritable Genome Editing—Edited Eggs and Sperm to the Rescue?,* 322 JAMA 1754 (2019) (co-authored with Eli Y. Adashi)

*Reproduction Reimagined*, 1 F & S REPORTS 7 (2020) (co-authored with Eli Y. Adashi)

*Commentary on 'Gestation, Equality and Freedom: Ectogenesis as a Political Perspective'*, 46 J. MED. ETHICS 87 (2020) (solicited)

*Heritable Genome Editing: The International Commission Report,* 324 JAMA 1941 (2020) (co-authored with Eli Y. Adashi)

*The Regulation of Mitochondrial Replacement Techniques Around the World*, 21 ANN. REV. GENOMICS & HUM. GEN. 565 (2020) (co-authored with  Eli Y. Adashi, Sara Gerke, César Palacios-González, and Vardit Ravitsky)

*Disruptive Synergy: Melding of Human Genetics and Clinical Assisted Reproduction*, 1 CELL REP. MED. 100093 (2020) (co-authored with Eli Y. Adashi)

*Heritable Human Genome Editing: The Public Engagement Imperative*, 6 CRISPR J. 434 (2020) (co-authored with Eli Y. Adashi et al.)

*The Case for Remedial Germline Editing – the Long-Term View*, 323 JAMA 1762 (2020) (co-authored with Eli Y. Adashi)

*Therapeutic Germline Editing: Sense and Sensibility*, 36 TRENDS IN GEN. 315 (2020) (co-authored with Eli Y. Adashi)

*What Would Responsible Remedial Human Germline Editing Look Like?*, 38 NATURE BIOTECHNOLOGY 398 (2020) (co-authored with Eli Y. Adashi)

*Assisted Same-Sex Reproduction: The Promise of Haploid Stem Cells?,* 29 STEM CELLS AND DEVELOPMENT 1417 (2020) (co-authored with Eli Y. Adashi)

*Legal and Ethical Issues in the Report Heritable Human Genome Editing*, 51 HASTINGS CTR. REP. 8 (2021) (co-authored with Eli Y. Adashi)

*Governing Human Germline Editing Through Patent Law*, 326 JAMA 1149 (2021) (co-authored with Jacob S. Sherkow and Eli Y. Adashi)

*Mitochondrial Disease: Replace or Edit?*, 373 SCIENCE 1200 (2021) (co-authored with Eli Y. Adashi, Donald S. Rubenstein, Jim A. Mossman, and Eric A. Schon)

*CRISPR Immunity: A Case Study for Justified Somatic Genetic Modification?* 48 J. MED. ETHICS 83 (2022) (co-authored with Eli Y. Adashi)

*Handle with Care: The WHO Report on Human Genome Editing*, 52 HASTINGS CENTER REPORT 10 (2022) (co-authored with Eli Y. Adashi and Jake Sherkow)

*Who Will Oversee the Ethical Limits of Human Embryo Research?*, 40 NATURE BIOTECH. 463 (2022) (co-authored with Eli Y. Adashi)

*The Enduring Allure of Person-Affecting Arguments for Reproductive Technologies*, 22 AM. J. BIOETHICS 44 (2022) (co-authored with Eli Y. Adashi)

*The End of Anonymous Sperm Donation in Colorado: A Step Forward to a New Fertility Future in the US?* 328 JAMA 1903 (2022) (co-authored with Seema Mohapatra and Eli Y. Adashi)

*Borrowed Wombs: On Uterus Transplants and the "Right to Experience Pregnancy"*, 2022 U. CHI. L. F. 127 (2023)

*Maternal Mortality Crisis and Extension of Medicaid Postpartum Coverage*, 330 JAMA 911 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Assisted Reproduction Post-Dobbs: The Prospect of Legislative Protection*, 4 F & S REPORTS 128 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Misplaced Embryo: Legal Parenthood in 'Embryo Mix-Up' Cases*, _ J. MED. ETHICS _ (2023) (co-authored with Vardit Ravitsky & Shelly Simana)

*Preimplantation Sex Selection Via In Vitro Fertilization: Time for a Reappraisal*, 4 F & S REPORTS 241(2023) (co-authored with Vitaly A. Kushnir and Eli Y. Adashi)

*CRISPR Therapy of Sickle Cell Disease: The Dawning of the Gene Editing Era*, _ AM. J. MED. _ (2024) (co-authored with Eli Y. Adashi and Philip A. Gruppuso)

*Ethical and Legal Challenges in Assisted Same-Sex Conception Through In Vitro Gametogenesis*, 30 NATURE MED. 322 (2024) (co-authored with Eli Y. Adashi and Katsuhiko Hayashi)

*The Alabama Embryo Decision—The Politics and Reality of Recognizing "Extrauterine Children,"* _ JAMA _ (2024) (co-authored with Rebecca S. Feinberg and Michael S. Sinha)

## Book Chapters

*Las Recientes Controversias sobre la Tecnología Reproductiva en los Estados Unidos, in* I. GLENN COHEN & ESTER FARNOS AMORÓS, DERECHO Y TECNOLOGÍAS REPRODUCTIVAS, FUNDACIÓN COLOQUIO JURÍDICO EUROPEO, MADRID 11 (2014) (trans. Pablo de Lora).

*Sperm and Egg Donor Anonymity: Legal and Ethical Issues, in* THE OXFORD HANDBOOK OF REPRODUCTIVE ETHICS (Leslie Francis ed., 2015-2016)

*Religion and Reproductive Technology*, *in* LAW, RELIGION, AND HEALTH IN THE UNITED STATES 360 (Holly Fernandez Lynch, I. Glenn Cohen, and Elizabeth Sepper eds., Cambridge University Press, 2017)

*Gestational Surrogacy Agreements: Enforcement and Breach*, in HANDBOOK OF GESTATIONAL SURROGACY 85 (E. Scott Sills ed., Cambridge University Press, 2016) (co-authored with Katherine Kraschel)

*The Regulation of Reproduction and Best Interests Analysis*, in THE OXFORD HANDBOOK OF CHILDREN AND THE LAW 19 *(*James G. Dwyer, ed., Oxford University Press, 2019*)*

*The Right(s) to Procreate and Assisted Reproductive Technologies in the United States*, in THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 1009 (Tamara K. Hervey and David Orentlicher eds., Oxford University Press, 2021)

*MRT in the United States*, *in* REPRODUCTION REBORN 129 (Diana M. Bowman, Karinne Ludlow, and Walter G. Johnson eds., Oxford University Press, 2023) (co-authored with Priyanka Menon & Eli Y. Adashi)

*Reproductive Technologies and Embryo Destruction After Dobbs*, in ROE V. DOBBS: THE PAST, PRESENT AND FUTURE OF A CONSTITUTIONAL RIGHT OF ABORTION _ (Geoffrey R. Stone and Lee Bolinger eds., 2024)

*Bioethics, Reproduction, and Extending Life*, *in* LAW AND THE 100 YEAR LIFE _ (Abbe Gluck, Anne Alstott & Eugene Rusyn eds., 2024)

**Online Law Review Contributions**

*Trading-Off Reproductive Technology and Adoption: A Response to Appleton and Pollak*, 96 MINN. L. REV. HEADNOTES 1 (2012) (co-authored with Daniel Chen) (Responding to Susan Appleton and Robert A. Pollak, *Exploring the Connections Between Adoption and IVF: Twibling Analyses*, 95 MINN L. REV. HEADNOTES 60 (2011), responding to our earlier article)

*Burying Best Interests of the Resulting Child: A Response to Professors Crawford, Alvaré, and Mutcherson*, 97 MINN. L. REV. HEADNOTES 1 (2012) (Responding to Bridget J. Crawford, *Authentic Reproductive Regulation*, 96 MINN. L. REV. HEADNOTES 31 (2012), Helen M. Alvaré, *A Response to Professor I. Glenn Cohen's* Regulating Reproduction: The Problem with Best Interests, 96 MINN. L. REV. HEADNOTES 8 (2012), and Kimberly M. Mutcherson, *In Defense of Future Children: A Response to Cohen's* Beyond Best Interests, 96 MINN. L. REV. HEADNOTES 46 (2012)).

*The Science, Fiction, and Science Fiction of Unsexed Motherhood, Online Symposium*, HARV. J. L. & GENDER ONLINE (2012)

**(2) MEDICAL TOURISM/GLOBALIZATION OF HEALTH CARE**

**Books**
THE GLOBALIZATION OF HEALTH CARE: LEGAL AND ETHICAL CHALLENGES (Oxford University Press 2013) (editor, and contributing introduction and chapter)

PATIENTS WITH PASSPORTS: MEDICAL TOURISM, LAW, AND ETHICS (Oxford University Press, 2014)

**Law Journals**

*Protecting Patients with Passports*: *Medical Tourism, Medical Tourism and the Patient-Protective Argument*, 95 IOWA L. REV. 1467 (2010) (selected by the American Society of Law, Medicine, and Ethics for the Health Scholar Award Program)

*Medical Tourism, Access to Health Care, and Global Justice*, 52 VA J. INT'L L. 1 (2011) (reprinted with a new introduction in 1 CAN. J. COMP. & CONTEMP. L 1 (2015))

*Circumvention Tourism*, 97 CORNELL L. REV. 1309 (2012)

*Transplant Tourism: The Ethics and Regulation of International Markets for Organs,* 41 J. L. MED. & ETHICS 269 (2013) (solicited)

*Medical Tourism, Medical Migration, and Global Justice: Implications for Biosecurity in a Globalized World*, 25 MED. L. REV. 200 (2017) (solicited)

**Medical, Public Health and Bioethics Journals**

*Medical Tourism: The View from Ten Thousand Feet*, 40 HASTINGS CTR. REP., Mar.-Apr. 2010, at 11-12.

*Medical Tourism, Consumer-Driven Healthcare, and Patient Protection*, 17 LAHEY CLINIC MED. ETHICS J. 4 (Spring 2010)

*How to Regulate Medical Tourism (and Why Bioethicists Should Care?)*, 12 J. DEVELOPING WORLD BIOETHICS 9 (2012)

*S.H. and Others v. Austria and Circumvention Tourism,* REPRODUCTIVE BIOMEDICINE ONLINE (2012) (solicited) (available at http://www.sciencedirect.com/science/article/pii/S1472648312004531)

*Ethical and Legal Implications of the Risks of Medical Tourism for Patients: A Qualitative Study of Canadian Health and Safety Representatives' Perspectives,* 3 BRITISH MED. J. OPEN e002302 (2013) (co-authored with Valorie A. Crooks, Leigh Turner, Janet Bristeir, Jeremy Snyder, Vicky Casey, Rebecca Whitmore)

*Navigating Physicians' Ethical and Legal Duties to Patients Seeking Unproven Interventions Abroad*, 61 CANADIAN FAMILY PHYSICIAN 584-586 (2015) (co-authored with Jeremy Snyder, Krystyna Adams, Y.Y. Chen, Daniel Birch, Valorie A. Crooks, Judy Illes, and Amy Zarzeczny)

*Inbound Medical Tourism to Barbados: A Qualitative Examination of Local Lawyers' Prospective Legal and Regulatory Concerns*, 15 BMC HEALTH SERVICES RESEARCH 291 (2015) (co-authored with Valorie A. Crooks, Krystyna Adams, Rebecca Whitmore and Jeffrey Morgan)

*Circumvention Medical Tourism and Cutting Edge Medicine: The Case of Mitochondrial Replacement Therapy*, 25 INDIANA J. GLOB. L. STUD. 439 (2018) (Invited as the George P. Smith Lecture)

*Regulation of Stem Cell Therapy Travel*, 4 CURRENT STEM CELL REPORTS 220 (2018) (co-authored with Shelly Simana)

*Traveling Across States for Prohibited Treatments: Medical Aid in Dying and Looming Battles Over Abortion*, 38 J. GEN. INTERN. MED. 517 (2022) (co-authored with Thaddeus M. Pope and Eli Y. Adashi)

**Book Chapters**

*Medical Outlaws or Medical Refugees? An Examination of Circumvention Tourism*, *in* RISKS AND CHALLENGES IN MEDICAL TOURISM: UNDERSTANDING THE GLOBAL MARKET FOR HEALTH SERVICES CONTROVERSIES IN THE EXPLODING INDUSTRY OF GLOBAL MEDICINE 207 (Jill Hodges et al eds., Praeger, 2012).

*Las Fronteras del Derecho Sanitario: Globalización y Turismo Médico*, *in* LAS FRONTERAS DEL DERECHO BIO-SANITARIO, ANUARIO DE LA FACULTAD DE DERECHO DE LA UNIVERSIDAD AUTÓNOMA DE MADRID 21 (Pablo de Lora y Blanca Mendoza eds. 2014) (trans. Pablo de Lora).

*Medical Tourism: Bioethical and Legal Issues, in* ROUTLEDGE COMPANION TO BIOETHICS (John D. Arras et al. eds, Routledge 2014)

*Medical Tourism for Services Legal in the Home and Destination Country: Legal and Ethical Issues, in* BODIES ACROSS BORDERS: THE GLOBAL CIRCULATION OF BODY PARTS, MEDICAL TOURISTS AND PROFESSIONALS (Brownyn Parry et al. eds, Ashgate, 2015).

*Medical Tourism for Services Illegal in Patients' Home County*, *in* HANDBOOK ON MEDICAL TOURISM AND PATIENT MOBILITY (Neil Lunt et al. eds, 2015)

*Traveling for Assisted Suicide*, *in* EUTHANASIA AND ASSISTED SUICIDE: GLOBAL VIEWS ON CHOOSING TO END LIFE 373 (Michael J. Cholbi ed., Praeger 2017)

**(3) ORGAN TRANSPLANTATION**

**Law Journals**

*Regulating The Organ Market: Normative Foundations for Market Regulation*, 77 LAW AND CONTEMP. PROB. 71 (2014) (symposium)

*Organs Without Borders? Allocating Transplant Organs, Foreigners, and the Importance of the Nation State (?)*,77 LAW AND CONTEMP. PROB. 175 (2014) (symposium)

**Medical, Economics, and Bioethics Journals**

*Selling Bone Marrow – Flynn v. Holder*, 366 N. ENG. J. MED. 296 (2012)

*Can the Government Ban Organ Sale? Recent Court Challenges and Future of U.S. Law on Selling Human Organs and Other Tissue*, 12 AM. J. TRANSPLANTATION 1983 (2012)

*A Fuller Picture of Organ Markets*, 14 AJOB 19 (2014)

*On Repugnance, Distribution, and the Global Kidney Exchange*, 75 J. INST. THEOR. ECON. 20 (2019)

**(4) ABORTION, CONTRACEPTION, AND STEM CELLS**

**Law Journals**

*Fetal Pain, Abortion, Viability and the Constitution*, 39 J. L. MED. & ETHICS 235 (2011) (co-authored with Sadath Sayeed)

*Are all Abortions Equal? Should there be Exceptions to the Criminalization of Abortion for Rape and Incest?*, 43 J. L. MED. & ETHICS 87 (2015) (solicited)

*Personhood Seeking New Life with Republican Control*, 93 INDIANA L. J. 499 (2018) (co-authored with Jonathan Will and Eli Adashi)

**Medical, Philosophy, Public Health and Bioethics Journals**

*Balancing Religious Freedom and Health Care Access*, LAHEY CLINIC MED. ETHICS J. 7 (Fall 2015)

(co-authored Holly Fernandez Lynch)

*Human Embryonic Stem-Cell Research Under Siege — Battle Won but Not the War*, 364 N. ENG. J. MED. e48 (2011) (co-authored with Eli Adashi)

*Sherley v Sebelius and the Future of Stem Cell Research*, 308 JAMA 2087 (2012) (co-authored with Eli Adashi and Jeremy Feigenbaum)

*Balancing Religious Freedom and Health Care Access*, LAHEY HEALTH JOURNAL OF MEDICAL ETHICS 7 (Fall 2015) (co-authored with Holly Fernandez Lynch)

*Artificial Wombs and Abortion Rights*, 47 HASTINGS CTR. REP, July 2017, Back Cover

*The Law and Ethics of Fetal Burial Requirements for Reproductive Health Care*, 322 JAMA 1347 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*June Medical Services v Russo—The Future of Abortion Access in the U.S.*, 1 JAMA HEALTH FORUM e201107 (2020) (co-authored with Eli Y. Adashi and Dov Fox)

*The Supreme Court, the Texas Abortion Law (SB8), and the Beginning of the End of Roe v Wade?*, 326 JAMA 1473 (2021) (co-authored with Eli Y. Adashi and Lawrence O. Gostin)

*The Supreme Court Ruling on the Texas Abortion Law: Beginning to Unravel Roe v. Wade,* 327 JAMA 621 (2022) (co-authored with Rebecca Reingold and Lawrence O. Gostin)

*The Next Two Decades of Mifepristone at FDA: History as Destiny*, 109 CONTRACEPTION 1 (co-authored with Eli Y. Adashi, Rohit S. Rajan, & Daniel P. O'Mahony)

*The End of Roe v Wade and New Legal Frontiers on the Constitutional Right to Abortion*, 328 JAMA 325 (2022) (co-authored with Lawrence O. Gostin and Melissa M. Murray)

*Travel to Other States for Abortion After Dobbs*, 22 AM. J. BIOETHICS 42 (2022) (peer commentary)

*What Overturning Roe v Wade May Mean for Assisted Reproductive Technologies in the US*. 328 JAMA 15 (2022) (co-authored with Eli Y. Adashi and Judith Daar)

*EMTALA After Dobbs: Emergency Reproductive Health Care in the Balance*, 176 ANN. INTERN. MED. 268 (2022) (co-authored with Eli Y. Adashi)

*Alliance for Hippocratic Medicine v. FDA-Dobbs's Collateral Consequences for Pharmaceutical Regulation*, 388 N. ENGL J. MED. e29 (2023) (co-authored with Patti J. Zettler and Eli Y. Adashi)

*The Mifepristone Litigation: Untangling the Implications of the Fifth Circuit's Decision for Abortion Access and the U.S. Food and Drug Administration*, 176 ANN. INTERN. MED. 1666 (2023) (co-authored with Patti J. Zettler, Lewis A. Grossman, and Eli Y. Adashi)

*The New Threat to Abortion Access in the United States—The Comstock Act*, 330 JAMA 405 (2023) (co-authored with Eli Y. Adashi and Mary Ziegler)

*The FDA Declares Levonorgestrel a Nonabortifacient-A 50-Year Saga Takes a Decisive Turn*, 4 JAMA HEALTH FORUM e232257 (2023) (co-authored with Eli Y. Adashi and Allen J. Wilcox)

*The New Threat to Medical Travel for Abortion*, _ J. AM. FAM. MED. _ (2023) (co-authored with Eli Y. Adashi and Mary Ziegler)

*Paying for Over-the-Counter Contraception: The Opill Quandary*, 137 J. AM. FAM. MED. 200 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

**(5) RESEARCH ETHICS**

**Books**

HUMAN SUBJECTS RESEARCH REGULATION: PERSPECTIVES ON THE FUTURE (co-editor with Holly Fernandez Lynch) (MIT Press, 2014)

SPECIMEN SCIENCE: ETHICS AND POLICY IMPLICATIONS (MIT Press, 2017) (co-editor with Holly Fernandez Lynch, Barbara E. Bierer, and Suzanne M. Rivera)

**Medical, Philosophy, Science Public Health and Bioethics Journals**

*In the Wake of Guatemala: The Case for Voluntary Compensation and Remediation,* 102 AM. J. PUB. HEALTH e4 (2012) (co-authored with Eli Adashi)

*Streamlining Review by Accepting Equivalency*, 14 AJOB 11 (2014) (co-authored with Holly Fernandez Lynch) (peer commentary)

*Clinical Trials and the Right to Remain Silent*, 174 JAMA INTERNAL MEDICINE E1 (co-authored with Michelle Mello)

*Confronting Biospecimen Exceptionalism in Proposed Revisions to the Common Rule*, 46 HASTINGS CENTER REPORT 4 (2016) (co-authored with Holly Lynch and Barbara Bierer)

*When Clinical Trials Compete: Prioritising Study Recruitment,* 43 J. MED. ETHICS 803 (2017), (co-authored with Luke Gelinas, Holly Fernandez Lynch, and Barbara Bierer)

*Institutions as an Ethical Locus of Research Prioritisation,* 43 J. MED. ETHICS 816 (2017), (co-authored with Luke Gelinas, Holly Fernandez Lynch, and Barbara Bierer)

*Public Engagement, Notice-and-Comment Rulemaking, and the Common Rule*, 39 IRB: ETHICS & HUM. RES. (January/February 2017) (co-authored with Holly Fernandez Lynch and Barbara E. Bierer)

*Using Social Media as a Research Recruitment Tool: Ethical Issues and Recommendations,* 17 AM. J. BIOETHICS 3 (2017) (co-authored with Luke Gelinas, Robin Pierce, Sabune Winkler, Holly Fernandez Lynch, and Barbara Bierer)

*Nonexceptionalism, Research Risks, and Social Media: Response to Open Peer Commentaries on "Using Social Media as a Research Recruitment Tool: Ethical Issues and Recommendations,* 17 AM. J. BIOETHICS W1 (2017) (co-authored with Luke Gelinas, Robin Pierce, Sabune Winkler, Holly Fernandez Lynch, and Barbara Bierer)

*Stakeholder Perspectives and Ethical and Regulatory Oversight Issues in Patient-Centered Outcomes Research*, 40 IRB: ETHICS & HUMAN RES. 7 (2018) (co-authored with Emily A. Largent, Holly Fernandez Lynch, Melissa Abraham, Ronen Rozenblum, Avni Gupta, and Joel S. Weissman)

*A Framework for Ethical Payment to Research Participants*, 378 N. ENGL. J. MED. 766 (2018) (co-authored with Luke Gelinas, Emily A. Largent, Susan Kornetsky, Barbara Bierer, and Holly Fernandez Lynch)

*On Scarcity and the Value of Clinical Trials*, 4 AJOB 71 (2018) (co-authored with Luke Gelinas, Barbara Bierer, and Holly Fernandez Lynch) (peer commentary)

*Truth in Advertising: Disclosure of Participant Payment in Research Recruitment Materials*, 52 THERAP. INN. & REG. SCI 68 (2018) (co-authored with Luke Gelinas, Holly Fernandez Lynch, Emily A. Largent, Carmel Shachar, and Barbara Bierer)

*Patient-Centered Outcomes Research: Stakeholder Perspectives and Ethical and Regulatory Oversight Issues*, ETHICS AND HUM. RES. 7 (Jan/Feb 2018) (co-authored with Emily Largent, et al.,)

*IRB Oversight of Patient-Centered Outcomes Research: A National Survey of IRB Chairpersons*, 13 J. EMP. RES. ON HUM. RES. ETHICS 421 (2018) (co-authored with Joel Weissman, et al.)

*Oversight of Patient-Centered Outcomes Research: Recommendations from a Delphi Panel*, 169 ANN. INTERN. MED. 559 (2018) (co-authored with Luke Gelinas, et al.)

*Organ Donor Intervention Trials and Risk to Bystanders: An Ethical Analysis*, 16 CLIN. TRIALS 463 (2019)

*Overcoming Obstacles to Experiments in Legal Practice*, 367 SCIENCE 1078 (2020) (co-authored with Holly Fernandez Lynch and Jim Greiner)

*Observational Studies must be Reformed before the Next Pandemic*, 29 NATURE MED. 1903 (2023) (co-authored with Emily E. Ricotta, Annette Rid & Nicholas G. Evans)

*Ethically Cleared to Launch?*, 381 SCIENCE 1408 (2023) (co-authored with Vasiliki Rahimzadeh et al.)

**Book Chapters**

*From Medical Experimentation to Non-Medical Experimentation: What Can and Cannot be Learned from Medicine as to the Ethics of Legal and Other Non-Medical Experiments?, in* MEDICAL EXPERIMENTATION: PERSONAL INTEGRITY AND SOCIAL POLICY, NEW EDITION (Oxford University Press 2016) (co-authored with James D. Greiner)

**(6) BIOETHICS AND HEALTH CARE IN SPORTS**

**Reports/Law Journals**

*Protecting and Promoting the Health of NFL Players: Legal and Ethical Analysis and Recommendations* (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch) (reprinted in 7 HARV. J. SPORTS & ENT. L. 1 (2016))

*Evaluating NFL Player Health and Performance: Legal and Ethical Issues*, 165 U. PENN. L. REV. 227 (2017) (co-authored with Jessica L. Roberts, Christopher R. Deubert, and Holly Fernandez Lynch)

*Comparing Health-Related Policies and Practices in Sports: The NFL and Other Professional Leagues* (2017) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch) (reprinted in 8 HARV. J. SPORTS & ENT. L. 1 (2017))

*The NFL as a Workplace: The Prospect of Applying Occupational Health and Safety Law to Protect NFL Workers*, 60 ARIZ. L. REV. 291 (2018) (co-authored with Adam M. Finkel, Christopher R. Deubert, Orly Lobel, and Holly Fernandez)

**Bioethics, Medical, and Other Journals**

*NFL Player Health: A Proposal to Address NFL Club Doctors' Conflicts of Interest and to Promote Player Trust*, 46 HASTINGS. CTR. REP. S2 (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch)

*NFL Player Health: A Response to Commentaries*, 46 HASTINGS. CTR. REP. S45 (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch)

*The Legality of Biometric Screening of Professional Athletes*, 17 AM. J. BIOETHICS 65 (2016) (co-authored with Jessica L. Roberts, Christopher R. Deubert, and Holly Fernandez Lynch) (peer commentary)

*Life on an Emotional Roller Coaster: NFL Players and Their Family Members' Perspectives on Player Mental Health*, 12 J. CLIN. SPORTS PSYCH. 404 (2018) (co-authored with Sarah A. McGraw, Christopher R. Deubert, and Holly Fernandez Lynch, Alixandra Nozzolillo, and Lauren Taylor)

*NFL or 'Not For Long'? Transitioning Out of the NFL*, 42 J. SPORT BEHAV. 461 (2019) (co-authored with Sarah A. McGraw, Christopher R. Deubert, and Holly Fernandez Lynch, and Alixandra Nozzolillo)

## (7) HEALTH LAW, HEALTH POLICY, AND BIOETHICS GENERALLY

### Books

HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, Nicholas Bagley, and Nadia Sawicki)

COVID-19 AND THE LAW: DISRUPTION, IMPACT AND LEGACY (Cambridge University Press 2023) (co-edited with Abbe R. Gluck, Katherine Kraschel, and Carmel Shachar)

READINGS IN COMPARATIVE HEALTH LAW AND BIOETHICS (Carolina Academic Press, 3d ed. 2020) (co-author with Nathan Cortez and Tim Jost)

HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 9th ed. 2018) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, and Nicholas Bagley)

BIOETHICS AND PUBLIC HEALTH LAW (Wolters Kluwer, 4th ed. 2018) (co-author with Mary Anne Bobinski, David Orentlicher, and Mark A. Hall)

MEDICAL LIABILITY AND TREATMENT RELATIONSHIPS (Wolters Kluwer, 4th ed. 2018) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, and Nicholas Bagley)

THE OXFORD HANDBOOK OF U.S. HEALTH CARE LAW (Oxford University Press, 2015-2016) (co-editor with Bill Sage and Allison Hoffman)

NUDGING HEALTH: HEALTH LAW AND BEHAVIORAL ECONOMICS (John Hopkins University Press, 2016) (co-editor with Holly Fernandez Lynch and Christopher Robertson)

### Medical, Philosophy, Public Health and Bioethics Journals

*The Constitutionality of the ACA's Medicaid-Expansion*, 366 N. ENG. J. MED. 103 (2012) (co-authored with Jim Blumstein)

*The Taxing Power and the Public's Health*, 367 N. ENG. J. MED. 1777 (2012) (co-authored with Michelle Mello)

*Conscientious Objection, Coercion, the Affordable Care Act, and U.S. States*, 19 ETHICAL PERSPECTIVES 163 (2013) (solicited)

*Private Rights and the Public Interest in Drug and Medical Device Litigation*, 180 JAMA INT. MED. 299 (2019) (co-authored with Nicholas Bagley)

*Medical Crowdfunding for Unproven Medical Treatments: Should Gofundme Become a Gatekeeper?*, 49 HASTINGS CTR. REP. 32 (2019)

*Potential Legal Liability for Withdrawing or Withholding Ventilators During COVID-19: Assessing the Risks and Identifying Needed Reforms*, 323 JAMA 1901 (2020) (co-authored with Andrew M. Crespo and Douglas B. White)

*A Legislative Blueprint for the Next Pandemic,* 1 JAMA HEALTH FORUM e e200882 (2020) (co-authored with Eli Y. Adashi)

*Universal Masking in the United States: The Role of Mandates, Health Education, and the CDC*, 323 JAMA 837 (2020) (co-authored with Lawrence O. Gostin & Jeffrey P. Koplan)

*The Interstate Medical Licensure Compact: Attending to the Underserved*, 325 JAMA 1607 (2021) (co-authored with Eli Y. Adashi and Winston L. McCormick)

*Industry-Sponsored Speaker Programs-End of the Line?*, 325 JAMA 1835 (2021) (co-authored with Eli Y. Adashi)

*An Overdue Executive Order: Reinstating the National Bioethics Commission*, 21 AM. J. MED. S0002 (2021) (co-authored with Eli Y. Adashi)

*Legislation to Criminalize Gender-Affirming Medical Care for Transgender Youth*, 325 JAMA 2251 (2021) (co-authored with Jack L. Turban and Katherine L. Kraschel)

*The American Rescue Plan Act of 2021: A Historic if Transitory Expansion of the ACA*, 326 JAMA 27 (2021) (co-authored with Eli Y. Adashi)

*Enforcement of the Physician Payments Sunshine Act: Trust and Verify*, 326 JAMA 807 (2021) (co-authored with Eli Y. Adashi)

*Antiviral Therapeutics: Key to Curbing the COVID-19 Pandemic*, 135 AM. J. MED. 411 (2022) (co-authored with Eli Y. Adashi)

*The Biden Administration's Proposal for an Advanced Research Projects Agency for Health (ARPA-H)*, 2 JAMA HEALTH FORUM e212972 (2021) (co-authored with Eli Y. Adashi)

*When Failure Is Not an Option: The Independent Panel Pandemic Report*, 135 AM. J. MED. 131 (2021) (co-authored with Eli Y. Adashi)

*The Affordable Care Act Resurrected: Curtailing the Ranks of the Uninsured*, 326 JAMA 1797 (2021) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Pandemic Preparedness Program: Reimagining Public Health*, 327 JAMA 219 (2022) (co-authored with Eli Y. Adashi)

*Health Care Fraud: The Leading Violation of the False Claims Act*, 135 AM. J. MED. 558 (2022) (co-authored with Eli Y. Adashi)

*The CMS Vaccine Mandate at the Supreme Court: A Hippocratic Imperative*, 135 AM. J. MED. 1035 (2022) (co-authored with Eli Y. Adashi)

*Stamping Out the Medicaid Coverage Gap: An ACA Imperative*, 135 AM. J. MED. E225 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*And Then There Were Three: The Decimation of the Affordable Care Act (ACA) CO-Ops*, 35 *J. Am. Bd. Fam. Med.* 867 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Legislation Restricting Gender-Affirming Care for Transgender Youth: Politics Eclipse Healthcare,* 3 CELL REP. MED. 100719 (2022) (co-authored with Katherine L. Kraschel, Alexander Chen, Jack L. Turban)

*Criminalizing Medical Errors Will Undermine Patient Safety*, 11 NATURE MED. 2241 (2022) (co-authored with Eli Y. Adashi)

*Failing Grade: The Pandemic Legacy of HHS*, 64 AM. J. PREVENTATIVE MED. 142 (2022) (co-authored with Eli Y. Adashi)

*The Nursing Home Crisis: Prognosis Guarded*, 135 AM. J. MED 1130 (2022) (co-authored with Eli Y. Adashi)

*The PREVENT Pandemics Act: A National Road Map*, 64 AM. J. PREVENTATIVE MED. 298 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Mounting Violence in Health Care: Is It Time to Harden the Sanctuary?*, 135 AM. J. MED 1391 (2022) (co-authored with Eli Y. Adashi)

*Transparency and the Doctor-Patient Relationship - Rethinking Conflict-of-Interest Disclosures*, 386 N. ENGL. J MED. 300 (2022) (co-authored with Eli Y. Adashi and Jacob T. Elberg)

*Persistent Inpatient Harm: The Unremitting Challenge of Patient Safety*, 38 J. GEN. INTERN. MED. 1532 (2023) (co-authored with Eli Y. Adashi)

*Should the Administration for Strategic Preparedness and Response Lead the National Response to a Public Health Emergency?* 4 JAMA HEALTH F. e224824 (2023) (co-authored with with Eli Y. Adashi and Daniel P. O'Mahony)

*Persistent Inpatient Harm: The Unremitting Challenge of Patient Safety*, 38 J. GEN. INTERN. MED. 1532 (2023) (co-authored with Eli Y. Adashi)

*Workplace Violence in Health Care: Protective Federal Legislation Must not be Delayed*, 136 AM. J. MED. 611 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Inflation Reduction Act: Recasting the Medicare Prescription Drug Plans*, 64 AM. J. PREVENTATIVE MED. 936 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*State Approaches to Stopping Violence Against Health Care Workers*, 331 JAMA 825 (2024) (co-authored with Rebekah J. Ninan and Eli Y. Adashi)

*The Pregnant Workers Fairness Act—a Bipartisan Step Forward*, 5 JAMA HEALTH F. e235386 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Medicare Advantage: Growth Amidst Mounting Scrutiny*, 36 J. AM. BD. FAM. MED. 1062 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

14

**Book Chapters**

*Was the Medicaid Expansion Coercive?*, *in* THE AFFORDABLE CARE ACT DECISION: PHILOSOPHICAL AND LEGAL IMPLICATIONS 253 (Fritz Allhoff and Mark Hall, eds. 2014)

*The Relationship Between Bioethics and U.S. Health Law*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH CARE LAW (I. Glenn Cohen et al eds., 2015-2016)

*Health Law and Ethics*, in HEALTH SYSTEMS SCIENCE (Susan Skochelak, ed.; 2d edition, Elsevier 2019) (co-authored with Bill Sage and Allison Hoffman)

*Vaccine Tourism, Federalism, Nationalism*, *in* COVID-19 AND THE LAW: DISRUPTION, IMPACT AND LEGACY (I. Glenn Cohen, Abbe R. Gluck, Katherine Kraschel, and Carmel Shachar eds. 2023)

**(8) FOOD, DRUG, AND DEVICE LAW**

**Books**

DIGITAL HEALTH CARE OUTSIDE OF TRADITIONAL CLINICAL SETTINGS: ETHICAL, LEGAL, AND REGULATORY CHALLENGES AND OPPORTUNITIES (Cambridge University Press, 2024) (co-authored with Daniel B. Kramer, Julia Adler-Milstein, and Carmel Shachar)

FDA IN THE TWENTY-FIRST CENTURY: THE CHALLENGES OF REGULATING DRUGS AND NEW TECHNOLOGIES (Columbia University Press, 2015) (co-editor with Holly Fernandez Lynch)

**Law Journals**

*Make it Work! Breyer on Patents in the Life Sciences*, 128 HARV. L. REV. 481 (2014) (festschrift for Justice Breyer)

**Medical, Philosophy, Public Health, Bioethics and other Journals**

*FDA Regulation of Mobile Health Technologies* 371 N. ENG. J. MED. 372 (2014) (co-authored with Nathan Cortez and Aaron Kesselheim)

*Reconsideration of the Lifetime Ban on Blood Donation by Men Who Have Sex With Men*, 311 JAMA 337 (2014) (co-authored with Eli Y. Adashi and Jeremy Feigenbaum)

*Influence, Integrity, and the FDA: An Ethical Framework*, 357 SCIENCE 876 (2017) (co-authored with Spencer Hey, Eli Y. Adashi, and Aaron Kesselheim)

*When Science and Politics Collide: Enhancing the FDA*, 364 SCIENCE 628 (2019) (co-authored with Eli Y. Adashi and Rohit Rajan)

*Pharmaceutical Companies, Human Rights, and the Alien Tort Statute*, 49 J LAW., MED. & ETHICS 500 (2021) (co-authored with Eli Y. Adashi and Tyler Giannini)

*A Divisive Ruling on Devices — Genus Medical Technologies v. FDA*, 385 N. ENG. J. MED. 2409 (2021) (co-authored with Eli Y. Adashi and Patricia J. Zettler)

*Deadly Legacy—The 510(k) Path to Medical Device Clearance*, 157 JAMA SURG. 185 (2022) (co-authored with Eli Y. Adashi and Katina M. Robison)

*At-Home Diagnostics and Diagnostic Excellence Devices vs General Wellness Products*, 327 JAMA 523 (2022) (co-authored with David Simon and Carmel Shachar)

*SARS-CoV-2 Laboratory-Developed Tests: Integrity Restored*, 327 JAMA 1229 (2022) (co-authored with Eli Y. Adashi)

*Expanding the Blood Pool: The Limitations of the FDA's Current MSM Blood Deferral*, 97 MAYO CLINIC PROC. 1424 (2022) (co-authored with Winston McCormick & Eli Y. Adashi)

*The FDA Struggle to Withdraw Makena: Problems With the Accelerated Approval Process*, 328 JAMA 2394 (2022) (co-authored with Daniel Aaron and Eli Y. Adashi)

*Assessing—and Extending—California's Insulin Manufacturing Initiative*, 329 JAMA 533 (2023) (co-authored with Jake Sherkow and Eli Y. Adashi)

*The FDA Modernization Act 2.0: Drug Testing in Animals is Rendered Optional*, 9 AM. J. MED. 853 (2023) (co-authored with with Eli Y. Adashi and Daniel P. O'Mahony)

*The FDA Initiative to Assure Racial and Ethnic Diversity in Clinical Trials*, 36 J. AM. B. FAM. MED. 366 (2023) (co-authored with Eli Y. Adashi)

*Patient-Assistance Programs, Kickbacks, and the Courts*, 388 N. ENGL. J. MED. 2407 (2023) (co-authored with Jacob. T. Elberg and Eli Y. Adashi)

*Lawsuits Over the Price of Insulin—State Efforts for Insulin Access*. 184 JAMA INTERN MED. 9 (2024) (co-authored with Daniel G. Aaron and Eli Y. Adashi)

**(9) PSYCHEDELICS AND THE LAW**

**Law Journals**

*Patents on Psychedelics: The Next Legal Battlefront of Drug Development*, HARV. L. REV. F. (Feb 20, 2022), https://harvardlawreview.org/2022/02/patents-on-psychedelics-the-next-legal-battlefront-of-drug-development/ (co-authored with Mason Marks)

*Microdosing Psychedelics Under Local, State, and Federal Law*, 103 B.U. L. REV. 573 (forthcoming 2023) (co-authored with Mason Marks, David Angelatos, & Jonathan Perez-Reyzin)

**Medical, Philosophy, Public Health, Bioethics and other Journals**

*Psychedelic Therapy: A Roadmap for Wider Acceptance and Utilization*, 27 NATURE MED. 1669 (2021) (co-authored with Mason Marks)

*Pressing Regulatory Challenges for Psychedelic Medicine*, 380 SCIENCE 347 (2023) (co-authored with Amy L. McGuire, Holly Fernandez Lynch, and Lewis A. Grossman)

*How Should the FDA Evaluate Psychedelic Medicine?*, 389 N. ENGL. J. MED. 389 (2023) (co-authored with Mason Marks)

*Introducing Psychedelics to End-Of-Life Mental Healthcare*, 1 NATURE MENTAL HEALTH 920 (2023) (co-authored with Mason Marks, Brent Kious and Carmel Shachar)

**(10) AI/DIGITAL HEALTH/BIG DATA**

**Books**

BIG DATA, HEALTH LAW, AND BIOETHICS (Cambridge University Press, 2018) (co-edited with Holly Fernandez Lynch, Effy Vayena, and Urs Gasser)

RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW (Elgar Publishing, 2024) (co-edited with Barry Solaiman)

**Law Journals**

*Cops, Docs, and Code: A Dialogue Between Big Data in Health Care and Predictive Policing*, 51 U.C. DAVIS L. REV. 437 (2017) (co-authored with Harry Graver)

*Informed Consent and Medical Artificial Intelligence: What to Tell the Patient?*, 108 GEORGETOWN L. J. 1426 (2020) (symposium)

*The Algorithmic Explainability "Bait and Switch,"* 108 MINN L. REV. 857 (2023) (co-authored with Boris Babic)

*Locating Liability for Medical AI*, 73 DEPAUL L. REV. 339 (2024) (co-authored with W. Nicholson Price II) (invited as part of Clifford Tort Symposium 2023)

*Towards Responsible Quantum Technology: Safeguarding, Engaging and Advancing Quantum R&D*, 15 HASTINGS SCI. & TECH. L.J. 63 (2024) (co-authored with Mauritz Kop, Mateo Aboy, Eline De Jong, Urs Gasser, Timo Minssen, Mark Brongersma, Teresa Quintel, Luciano Floridi, and Raymond Laflamme)

**Medical, Bioethics and Other Journals**

*The Legal and Ethical Concerns That Arise From Using Complex Predictive Analytics In Health Care*, 33 HEALTH AFF. 1139 (2014) (co-authored with Bernard Lo, Ruben Amarasingham, and Anand Shah)

*Consensus Statement on Electronic Health Predictive Analytics: A Guiding Framework*, eGEMS Vol. 4, Issue 1 (2016) (co-authored with Ruben Amarasingham, Anne-Marie J. Audet, and many others)

*Your Money or Your Patient's Life? Ransomware and Electronic Health Records*, 167 ANNALS OF INT. MED. 587 (2017) (co-authored with Sharona Hoffman and Eli Y. Adashi)

*HIPAA and Protecting Health Information in the 21st Century*, 320 JAMA 231 (2018) (co-authored with Michelle Mello)

*The Ethics of Smart Pills and Self-Acting Devices: Autonomy, Truth-Telling, and Trust at the Dawn of Digital Medicine*, 9 AJOB 38 (2018) (co-authored with Craig M. Klugman, Laura B. Dunn, and Jack Schwartz)

*Response to Open Peer Commentaries on "The Ethics of Smart Pills and Self-Acting Devices: Autonomy, Truth-Telling, and Trust at the Dawn of Digital Medicine"*, 9 AJOB W4 (2018) (co-authored with Craig M. Klugman, Laura B. Dunn, and Jack Schwartz)

*Machine Learning in Medicine: Addressing Ethical Challenges*, 15 PLOS MED e1002689 (2018) (co-authored with Effy Vayena and Alessandro Blasimme)

*Privacy in the Age of Medical Big Data*, 25 NATURE MED. 37 (2019) (co-authored with W. Nicholson Price II)

*Big Data, Big Tech, and Protecting Patient Privacy*, 322 JAMA 1141 (2019) (co-authored with Michelle Mello)

*Ethical and Legal Issues of Ingestible Electronic Sensors*, 2 NATURE ELECTRONICS 329 (2019) (co-authored with Sara Gerke, Helen Yu & Timo Minssen)

*How Does Emerging Patent Case Law in the US and Europe Affect Precision Medicine?*, 37 NATURE BIOTECH. 1118 (2019) (co-authored with Mateo Aboy, Kathleen Liddell, Cristina Crespo, Johnathon Liddicoat, Sara Gerke & Timo Minssen)

*Potential Liability for Physicians Using Artificial Intelligence*, 322 JAMA 1765 (2019) (co-authored with W. Nicholson Price II and Sara Gerke)

*Algorithms on Regulatory Lockdown in Medicine*, 366 SCIENCE 1202 (2019) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Ethical and Legal Aspects of Ambient Intelligence in Hospitals*, 323 JAMA 601 (2020) (co-authored with Serena Yeung and Sara Gerke)

*The European Artificial Intelligence Strategy: Implications and Challenges for Digital Health*, 7 LANCET DIGITAL HEALTH e376 (2020) (co-authored with Theodoros Evgeniou, Sara Gerke, and Timo Minssen)

*Digital Smartphone Tracking for COVID-19: Public Health and Civil Liberties in Tension,* 323 JAMA 2371 (2020) (co-authored with Lawrence O. Gostin and Daniel J. Weitzner)

*The Need for a System View to Regulate Artificial Intelligence/Machine Learning-Based Software as Medical Device*, 3 NPJ DIGITAL MED. 53 (2020) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Regulatory, Safety, and Privacy Concerns of Home Monitoring Technologies During COVID-19*, 26 NATURE MED. 1176 (2020) (co-authored with Sara Gerke, Carmel Shachar, and Peter R. Chai)

*Regulatory Responses to Medical Machine Learning*, 7 J. LAW & BIOSCI. Isaa002 (2020) (co-authored with Timo Minssen, Sara Gerke, Mateo Aboy, and Nicholson Price)

*Ethical and Legal Aspects of Remote Monitoring of Medical Devices*, 98 MILBANK Q. 1257 (2020) (co-authored with Sara Gerke and Daniel B. Kramer)

*Invited Perspective: How Much Can Potential Jurors Tell Us about Liability for Medical AI?*, 62 J. NUCL. MED. 15 (2020) (co-authored with W. Nicholson Price II and Sara Gerke)

*When Machine Learning Goes Off the Rails*, HARVARD BUSINESS REVIEW (Jan-Feb 2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Artificial Intelligence and Liability in Medicine: Balancing Safety and Innovation*, 98 MILBANK Q. 629 (2021) (co-authored with Sara Gerke, George Maliha, and Ravi Parikh)

*Digital Health Passes in the Age of COVID-19: Are "Vaccine Passports" Lawful and Ethical?*, 325 JAMA 1933 (2021) (co-authored with Lawrence O. Gostin & Jana Shaw)

*Beware Explanations from AI in Health Care*, 373 SCIENCE 284 (2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Direct-to-Consumer Medical Machine Learning and Artificial Intelligence Applications*, 3 NATURE MACHINE INTELLIGENCE 283 (2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Beyond Security Patches: Fundamental Incentive Problems in Health Care Cybersecurity*, 2 JAMA HEALTH FORUM e212969 (2021) (co-authored with Genevieve P. Kanter and Jack Kufhal)

*Sharing Clinical Notes: Potential Medical-Legal Benefits and Risks*, 327 JAMA 717 (2021) (co-authored with Charlotte Blease & Sharona Hoffman)

*Emerging Ethical Considerations for the Use of Artificial Intelligence in Ophthalmology*, 2 OPHTHALMOLOGY SCI. 100141 (2022) (co-authored with Nicholas G. Evans, Danielle M. Wenner, Duncan Purves, Michael F. Chiang, Daniel S.W. Ting, and Aaron Y. Lee)

*How NFTs Could Transform Health Information Exchange*, 375 SCIENCE 500 (2022) (co-authored with Kristin Kostick-Quenet, Kenneth D. Mandl, Timo Minssen, Urs Gasser, Isaac Kohane, and Amy McGuire)

*Mitigating Racial Bias in Machine Learning*, 50 J. LAW, MED. & ETHICS 50, 92 (2022) (co-authored with Kristin M. Kostick-Quenet, Sara Gerke, Bernard Lo, James Antaki, Faezah Movahedi, Hasna Njah, Lauren Schoen, Jerry E. Estep, and J.S. Blumenthal-Barby)

*The Hospital-At-Home Presents Novel Liabilities for Physicians, Hospitals, Caregivers, and Patients*, 28 NATURE MED. 438 (2022) (co-authored with David A. Simon, Celynne Balatbat & Anaeze C. Offodile II)

*Ethics-By-Design: Efficient, Fair and Inclusive Resource Allocation Using Machine Learning*, 9 J. L. & BIOSCI. (2022) (co-authored with Theodore P Papalexopoulos, Dimitris Bertsimas, Rebecca R Goff, Darren E Stewart, and Nikolaos Trichakis)

*"I'd Feel Like Someone Was Watchin' Me… Watching for a Good Reason": Perceptions Of Data Privacy, Access, And Sharing in the Context of Real-Time Prep Adherence Monitoring Among HIV-Negative MSM with Substance Use*, 26 AIDS & BEHAV. 2981 (2022) (co-authored with Georgia R. Goodman, Anna Kikut, Maria J. Bustamante, Lizette Mendez, Yassir Mohamed, Carmel Shachar, Sara Gerke, Edward W. Boyer, Rochelle K. Rosen, Kenneth H. Mayer, Conall O'Cleirigh and Peter R. Chai)

*When Is a Change Significant? The Update Problem of Apps in Medical and Behavioral Research*, 44 ETHICS & HUM. RES. 2 (2022) (co-authored with Carmel Shachar, Sara Gerke, Walker Morrell, Aaron Kirby, and Barbara E. Bierer)

*Skating The Line Between General Wellness Products and Regulated Devices: Strategies and Implications,* 9 J. L. & BIOSCI. (2022) (co-authored with David A Simon and Carmel Shachar)

*Should Alexa Diagnose Alzheimer's?: Legal and Ethical Issues with At-Home Consumer Devices*, 3 CELL REP. MED. 100692 (2022) (co-authored with Barbara Evans, David A Simon and Carmel Shachar)

*Unsettled Liability Issues for "Prediagnostic" Wearables and Health-Related Products*, 328 JAMA 1391 (2022) (co-authored with David A Simon and Carmel Shachar)

*Hospital-at-Home: Multistakeholder Considerations for Program Dissemination and Scale*, 100 MILLBANK Q. 673 (2022) (co-authored with Kushal T. Kadakia, Celynne A. Balatbat, Albert L. Siu, Consuelo H. Wilkins, Victor J. Dzau and Anaeze C. Offodile)

*Navigating a Path Toward Routine Recording in the Operating Room*, 278 ANN. SURG. e474 (2023) (co-authored with Alexander Langerman et al.)

*HIPAA is a Misunderstood and Inadequate Tool for Protecting Medical Data*, 29 NATURE MED. 1900 (2023) (co-authored with Carmel Shachar, Romain Cadario, and Carey K. Morewedge)

*The Challenges for Regulating Medical Use of ChatGPT and Other Large Language Models*. 330 JAMA 315 (2023) (co-authored with Timo Minssen and Effy Vayena)

*How AI Can Learn from the Law: Putting Humans in the Loop Only on Appeal*, 6 NPJ DIGITAL MED. 160 (2023) (co-authored with  Boris Babic, Sara Gerke, Qiong Xia, Theodoros Evgeniou & Klaus Wertenbroch)

*AI as a Mental Health Therapist for Adolescents*, 177 JAMA PEDIATR. 1253 (2023) (co-authored with Doug J Opel & Brent M Kious)

*Navigating the New Risks and Regulatory Challenges of GenAI*, HARV. BUS. REV. (2023) (co-authored with Theodoros Evgeniou & Martin Husovec)

*Using Digital Technologies to Diagnose in the Home: Recommendations from A Delphi Panel*, 7 NPJ DIGITAL MED. _ (2024) (co-authored with David A. Simon, Sara Raza & Carmel Shachar)

**Book Chapters**

*Is There a Duty to Share Health Care Data?*, *in* BIG DATA, HEALTH LAW, AND BIOETHICS 209 (I. Glenn Cohen, Holly Fernandez Lynch, Effy Vayena, and Urs Gasser eds., Cambridge University Press 2018)

*A Doctor's Touch: What Big Data in Health Care Can Teach Us About Predictive Policing, in* POLICING AND ARTIFICIAL INTELLIGENCE (John L.M. McDaniel and Ken G. Pease eds., Routledge, 2020) (co-authored with Harry Graver)

*Ethical and Legal Challenges of Artificial Intelligence-Driven Healthcare*, *in* ARTIFICIAL INTELLIGENCE IN HEALTHCARE 295 (Adam Bohr & Kaveh Memarzadeh eds., Elsevier 2020) (co-authored with Sara Gerke and Timo Minssen)

*The Ethics and Laws of Medical Big Data*, *in* THE CAMBRIDGE HANDBOOK OF LIFE SCIENCE, INFORMATION TECHNOLOGY AND HUMAN RIGHTS 48 (Marcello Ienca et al. eds., Cambridge University Press 2021) (co-authored with Hrefna D. Gunnarsdóttir, Timo Minssen and Sara Gerke)

*Liability for Use of Artificial Intelligence in Medicine*, *in* RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW (Barry Solaiman & I. Glenn Cohen eds, forthcoming) (co-authored with W. Nicholson Price II & Sara Gerke)

*The Development, Implementation, and Oversight of Artificial Intelligence in Health Care: Legal and Ethical Issues*, *in* I HANDBOOK OF BIOETHICAL DECISIONS 441 (Erick Valdés & Juan Alberto Lecaros eds., Springer 2023) (co-authored with Sara Gerke & Jenna Becker)

*Assessing Public and Private Rights of Action to Police Health Data Sharing, in* THE LAW AND ETHICS OF DATA SHARING IN HEALTH SCIENCES 33 (Marcelo Corrales Compagnucci et al. eds 2024) (co-authored with Carmel Shachar & David Simon)

**(10) OTHER PROJECTS**

**Books**

H20 FREE CIVIL PROCEDURE TEXTBOOK, available at **http://brk.mn/cohencivpro**

IDENTIFIED V. STATISTICAL LIVES: ETHICAL, LEGAL, AND MEDICAL PERSPECTIVES (co-editor with Nir Eyal and Norman Daniels and contributing a chapter, Oxford University Press, 2015)

LAW, RELIGION, AND HEALTH IN THE UNITED STATES (co-editor with Holly Fernandez Lynch and Elizabeth Sepper, Cambridge University Press, 2017)

TRANSPARENCY IN HEALTH AND HEALTH CARE IN THE UNITED STATES (co-editor with Holly Fernandez Lynch, Carmel Shachar, Barbara J. Evans, Cambridge University Press, 2019)

DISABILITY, HEALTH, LAW, AND BIOETHICS (co-editor with Carmel Shachar, Anita Silvers, Michael Ashley Stein, Cambridge University Press, 2020)

**Law Journals**

*Making Residency Work Hour Rules Work,* 41 J. L. MED. & ETHICS 310 (2013) (co-authored with Charles A. Czeisler and Christopher P. Landrigan)

*Rationing Legal Services,* 5 J. L. ANALYSIS 221 (2013)

*This is Your Brain on Human Rights: Moral Enhancement and Human Rights*, 9 LAW AND ETHICS OF HUMAN RIGHTS 1 (2015) (symposium, Human Rights and Human Minds)

**Medical, Philosophy, Public Health and Bioethics Journals**

*Physicians, Medical Ethics, and Execution by Lethal Injection,* 311 JAMA 2375 (2014) (co-authored with Robert Truog and Mark Rockoff)

*Hospital-Based Active Shooter Incidents: Sanctuary Under Fire*, 313 JAMA 1209 (2015) (co-authored with Eli Y. Adashi and Hans Gao)

*Effect of Patient and Therapist Factors on Suicide Risk Assessment*, 39 DEATH STUD. 433 (2015) (co-authored with NC Berman, A. Stark, A. Cooperman, and S. Wilhelm)

*Clinical Decision Making Regarding Suicide Risk: Effect of Patient and Clinician Age*, 40 DEATH STUD. 269 (2016) (co-authored with NC Berman, ES Tung, N Matheny, and S. Wilhelm)

*Effect of a Legal Prime on Clinician's Assessment of Suicide Risk,* 40 DEATH STUD. 61 (2016) (co-authored with NC Berman, A Sullivan, and S. Wilhelm)

*Designing Development Programs for Non-Traditional Antibacterial Agents*, 10 NATURE COMM. 3416 (2019) (co-authored with John H. Rex, Holly Fernandez Lynch, Jonathan J. Darrow and Kevin Outterson)

*Preventing Female Genital Mutilation in the United States: The Legal Threat to Effective Action*, 110 AM. J. PUB. HEALTH 813 (2020) (co-authored with Nikolas Bowie, Megan Jones, and Eli Y. Adashi)

*Honoring the Public Trust: Curbing the Bane of Physician Sexual Misconduct*, 9 J. L. & BIOSCI. (2022) (co-authored with Kunal K. Sindhu, Adam C. Schaffer, Rebecca Haw Allensworth, and Eli Y. Adashi)

*Hospital at Home Receives a New Lease on Life: A Promising if Uncertain Future*, 136 AM. J. MED. 958 (2023) co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Affirmative Action Ruled Unconstitutional: Options for Building a Diverse Health Care Workforce*, 330 JAMA 1031 (2023) (co-authored with Eli Y. Adashi and Philip A. Gruppuso)

*Remote Patient Monitoring: A Leading Anchor of the 'Hospital-at-Home' Paradigm* 137 AM. J. MED. 81 (2024) co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

**Book Chapters**

*Litigation and the Statistical v. Identified Lives Issue: On Standing, Ripeness, and Class Actions*, in IDENTIFIED V. STATISTICAL LIVES: ETHICAL, LEGAL, AND MEDICAL PERSPECTIVES (I. Glenn Cohen, Nir Eyal, and Norman Daniels eds., 2015)

*On the Human Right to Health: Statistical Lives, Contingent Persons, and Other Difficult Questions*, in HUMAN RIGHTS, DEMOCRACY, AND LEGITIMACY IN A WORLD OF DISORDER (Silja Voeneky & Gerald Neuman eds., Cambridge University Press, 2018)

**(11) PRE-FELLOWSHIP WORK**

Case Comment, *Supreme Court of New Jersey Holds that Preembryo Disposition Agreements Are Not Binding When One Party Later Objects*, *J.B. v. M.B.*, 115 HARV. L. REV. 701 (2001)

*Note, Gore, Gibson, and Goldsmith: The Evolution of Internet Metaphors in Law and Commentary*, 16 HARV. J. L. TECH. 265 (2002) (co-authored with Jonathan Blavin)

*Note, The Price of Everything, the Value of Nothing: Reframing the Commodification Debate*, 117 HARV. L. REV. 689 (2003)

*Therapeutic Orphans, Pediatric Victims? The Best Pharmaceuticals for Children Act and Existing Pediatric Human Subject Protection*, 58 FOOD & DRUG L. J. 661 (2003)

*Negotiating Death: ADR and End of Life Decision-making*, 9 HARV. NEGOTIATION L. REV. 253 (2004) (awarded a CPR Institute for Dispute Resolution Award of Excellence)

*Negotiating in the Shadow of Death*, DISPUTE RESOLUTION MAGAZINE 12 (Fall 2004)

**OP-EDS AND WRITING FOR PUBLIC AUDIENCES**

*Mississippi's Ambiguous Personhood Amendment*, New York Times, Oct 31, 2011, available at http://www.nytimes.com/2011/10/31/opinion/mississippis-ambiguous-personhood-amendment.html (co-written with Jonathan Will)

*Guatemalans Used in Experiments Deserve Compensation,* New York Times, July 4, 2011, available at http://www.nytimes.com/2012/07/05/opinion/guatemalans-used-in-experiments-deserve-compensation.html?_r=1&adxnnl=1&adxnnlx=1345907160-K8WS0SLJalIknr/t6qtBmg (co-written with Holly Lynch)

*The Flawed Basis Behind Fetal-pain Abortion Laws*, Washington Post, Aug 1, 2012, available at http://www.washingtonpost.com/opinions/the-flawed-basis-behind-fetal-pain-abortion-laws/2012/08/01/gJQAS0w8PX_story.html?hpid=z4

*It is Time for the U.S. to Cover IVF (for Gays and Lesbians too)*, Huffington Post, March 18, 2013, available at http://www.huffingtonpost.com/dov-fox/it-is-time-for-the-us-to-_b_2900323.html

*Some Insurance Companies Ask Their Customers to Cross the Border for Care*, The New Republic, July 7, 2014 (co-authored with Adam Teicholz), available at http://www.newrepublic.com/article/118546/some-insurance-companies-ask-customers-cross-border-care

*Nudging the FDA*, The American Interest, Vol. 10, No. 2, October 17, 2014 (co-authored with William Nicholson Price II), available at http://www.the-american-interest.com/2014/10/17/nudging-the-fda/

*New Blood Donor Policy, Same Gay Stigma,* New York Times, May 21, 2015 (co-authored with Eli Y. Adashi), available at http://www.nytimes.com/2015/05/21/opinion/new-blood-donor-policy-same-gay-stigma.html?ref=opinion&_r=1)

*The Non-Spaces of Medical Tourism*, 40 Harvard Design Magazine, Spring 2015, available at http://www.harvarddesignmagazine.org/issues/40/the-non-spaces-of-medical-tourism

*How is it Even Possible For Sofia Vergara's Embryos to Sue Her? A Harvard Law Prof Weighs In*, Refinery 29, Dec. 8, 2016, available at http://www.refinery29.com/2016/12/132368/sofia-vergara-embryo-lawsuit-explained

*When NFL Calls the Doctor*, Boston Globe, Nov. 17, 2016 (co-authored with Holly Fernandez Lynch and Chris Deubert), available at https://www.bostonglobe.com/opinion/2016/11/17/when-nfl-calls-doctor/ZXmx9C3zAFBScgXGZb22gL/story.html

*Artificial Wombs are Coming. They Could Completely Change the Debate over Abortion*, Vox, Aug. 23, 2017, available at https://www.vox.com/the-big-idea/2017/8/23/16186468/artificial-wombs-radically-transform-abortion-debate

*Smart Pills Can Transmit Data to Your Doctors, But What About Privacy?*, New Scientist, Sept.19, 2018 (co-authored with Alex Pearlman), available at https://www.newscientist.com/article/2180158-smart-pills-can-transmit-data-to-your-doctors-but-what-about-privacy/

*Creating Eggs and Sperm From Stem Cells: The Next Big Thing in Assisted Reproduction?*, Stat News, June 5, 2019 (co-authored with Alex Pearlman), available at https://www.statnews.com/2019/06/05/creating-eggs-sperm-stem-cells/

*Protect the Doctors and Nurses Who Are Protecting Us,* New York Times, April 1, 2020, (co-authored with Andrew M. Crespo and Douglas B. White), available at https://www.nytimes.com/2020/04/01/opinion/coronavirus-ventilators-doctors.html

*Maximizing Use Of Claims Data To Address COVID-19: We Need To Revisit Gobeille v. Liberty Mutual,* Health Affairs Blog, Aug 8, 2020 (co-authored with Carme Shachar and Sara Gerke), available at https://www.healthaffairs.org/do/10.1377/hblog20200805.788636/full/

*Can AI Fairly Decide Who Gets an Organ Transplant?*, Harvard Business Review, December 1, 2020 (co-authored with Boris Babic, Sara Gerke, Theodoros Evgeniou, and Nikos Trichakis), available at https://hbr.org/2020/12/can-ai-fairly-decide-who-gets-an-organ-transplant

*'Authorization' Status is a Red Herring when it Comes io Mandating Covid-19 Vaccination*, STAT News, April 5, 2021 (co-authored with Dorit R. Reiss and Carmel Shachar), available at https://www.statnews.com/2021/04/05/authorization-status-covid-19-vaccine-red-herring-mandating-vaccination/

*Can Your Employer Require that You Get Vaccinated? It Depends Where You Live*, TIME, Aug 2, 2021, available at https://time.com/6086537/covid-19-vaccine-employer-required/

*Cruise Ship Vaccine Mandates are Great. The Latest Ruling for Them Wasn't*, The Washington Post, Aug 11, 2021, available at https://www.washingtonpost.com/outlook/2021/08/11/cruise-ship-vaccine-mandate-decision-first-amendment/  (co-authored with Christopher Robertson)

*The Danger of the Supreme Court Undercutting Biden's Vaccination Rules*, TIME, Jan. 10, 2022, available at https://time.com/6138247/supreme-court-bidens-vaccination-rules/ (co-authored with Carmel Shachar)

*What The Supreme Court's Abortion Reversal Means for In Vitro Fertilization*, THE BOSTON GLOBE, June 30, 2022, available at https://www.bostonglobe.com/2022/06/30/opinion/what-supreme-courts-abortion-reversal-means-vitro-fertilization/ (co-authored with Judith Daar and Eli Y. Adashi)

*The Family Glitch, Premium Stacking, and the Need to Revisit Health Care Reform*, HEALTH AFFAIRS FOREFRONT, Nov. 17, 2022, available at https://www.healthaffairs.org/content/forefront/family-glitch-premium-stacking-and-need-revisit-health-care-reform (co-authored with Carmel Shachar James René Jolin and Eli Y. Adashi)

*Beyond HIPAA: The FTC's Increasing Focus On Protecting Health Data*, HEALTH AFFAIRS FOREFRONT, Aug 31, 2023, available at https://www.healthaffairs.org/content/forefront/beyond-hipaa-ftc-s-increasing-focus-protecting-health-data (co-authored with Carmel Shachar and Eli Y. Adashi)

*With the National Uninsured Rate at a Record Low, Focus on Maintaining the Gains*, HEALTH AFFAIRS FOREFRONT, Oct 19, 2023, available at https://www.healthaffairs.org/content/forefront/national-uninsured-rate-record-low-focus-maintaining-gains (co-authored with Carmel Shachar and Eli Y. Adashi)

*Preimplantation Polygenic Risk Score Testing Is Unvalidated and Unregulated*, HEALTH AFFAIRS FOREFRONT, Oct 30, 2023, available at https://www.healthaffairs.org/content/forefront/preimplantation-polygenic-risk-score-testing-unvalidated-and-unregulated (co-authored with Daniel P. O'Mahony and Eli Y. Adashi)

*For Physician-Assisted Suicide In Massachusetts, Uncertainty Remains Post-Kligler*, HEALTH AFFAIRS FOREFRONT, Dec 20, 2023, available at https://www.healthaffairs.org/content/forefront/physician-assisted-suicide-massachusetts-uncertainty-remains-post-kligler (co-authored with Konstantin Tretyakov and Eli Y. Adashi)

*Congress' Failure To Address Violence Against Health Care Workers*, HEALTH AFFAIRS FOREFRONT, Feb 2, 2024, available at https://www.healthaffairs.org/content/forefront/health-care-violence-epidemic-and-congress-s-failure-act?utm_medium=social&utm_source=twitter&utm_campaign=forefront&utm_content=o%27mahony (co-authored with Daniel P. O'Mahony and Eli Y. Adashi)

## LAW SCHOOL COURSES

Reproductive Technology and Genetics: Legal and Ethical Issues (Spring '08, Spring '09, Spring '10, Spring '11, Spring '17, Spring '21)

Civil Procedure (Fall '08, Fall '09, Fall '10, Fall '11, Fall '13, Fall '14, Fall '15, Fall '16, Fall '17, Fall '18, Fall'19, Fall '20, Fall '21, Fall '22, Fall '23, Fall '24)

Health Law Policy, Biotechnology, and Bioethics Workshop (Fall/Spring '09-'10, '10-'11. '11-'12, '12-'13, '13-'14, '14-'15, '16-'17, Fall '17, Fall '18, Fall '19, Fall '20, Fall '21, Fall '22, Fall '23, Fall '24) (co-taught with others in some years)

Bioethics and Health Law: Selected Topics (Winter Term '19, Winter Term '20, Winter Term '21)

Writing Group: Health Law, Bioethics, FDA Law (Spring '21, Fall/Spring '21-22, Fall/Spring '22-23; Fall/Spring '23-24)

Psychedelics and the Law (Spring '24) (co-taught with Mason Marks)

Lawyers, Doctors, Ethics, and Professionalism (Spring '14, '15) (co-taught with Dr. Rebecca Brendel)

Freshman Seminar: Bioethics through Film: An Exploration of the Law and Ethics of Medicine (Fall '16)

**ASYNCHRONOUS ONLINE COURSES**

Introduction to American Civics: Presented by Zero- L, available at https://www.edx.org/course/zero-l-presents-introduction-to-american-civics (course creator for free online course launched Summer '20)

Zero- L, available at https://online.law.harvard.edu/ (course creator for online course launched wide in Summer '20 has been used at over 120 law schools)

Bioethics: The Law, Medicine, and Ethics of Reproductive Technologies and Genetics, available at https://www.edx.org/course/bioethics-law-medicine-ethics-harvardx-hls4x (free online course launched Fall '16 which has educated more than 97,000 students)

**JUDICIAL CLERKSHIP**

HON. MICHAEL BOUDIN, U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT, Law Clerk, 2003-2004

**LEGAL WORK EXPERIENCE**

HARVARD LAW SCHOOL, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY, BIOTECHNOLOGY, AND BIOETHICS, Academic Fellow & Lecturer On Law, 2006-2008
> Conducted and presented research relating to health law and bioethics. Taught a seminar at law school in the spring of 2008 on legal and ethical issues related to reproductive technology and genetics.

UNITED STATES DEPARTMENT OF JUSTICE, ATTORNEY GENERAL'S HONORS PROGRAM, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., Attorney, 2004-2006
> Briefed and argued cases in the Circuit Courts defending the United States and acts of Congress. Drafted briefs in the U.S. Supreme Court in conjunction with the Solicitor General's Office. Advised the Attorney General, the Solicitor General, and other units of the Justice Department on numerous legal matters.

DAVIS, POLK & WARDWELL, New York, Summer Associate, Summer 2002

U.N., INTERNATIONAL CRIMINAL TRIBUNAL FOR RWANDA, Tanzania & Rwanda, Legal Intern, Summer 2001

**LITIGATION EXPERIENCE**

Served as amicus counsel in:

> Whole Woman's Health v. Hellerstedt, 579 U.S. 582 (2016) (brief with Melissa Murray and Jessie B. Hill)
> Association for Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576 (2013), brief on behalf of Dr. Eric Lander (discussed extensively at oral argument by the Justices)

Served as lead counsel in the following cases before the U.S. Courts of Appeals while at the Justice Department:
> Doe v. FAA, 432 F.3d 1259 (11th Cir. 2005)
> Landes v. Tartaglione, 153 Fed. Appx. 131 (3d Cir. 2005)
> Branham v. Snow, 392 F.3d 896 (7th Cir. 2005) (rehearing petition only)
> Avalos-Galvan v. Gonzales, 170 Fed. Appx. 501 (9th Cir. 2006)
> Goodin v. U.S. Postal Inspection Service, 444 F.3d 998 (8th Cir. 2006)
> Luna Tech, Inc. v. Bureau of Alcohol, Tobacco and Firearms, 183 Fed. Appx. 863 (11th Cir. 2006)
> Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006)
> Silva v. Gonzales, 463 F.3d 68 (1st Cir. 2006)
> Strolberg, et al., v. Akal Securities, Inc., et al., 210 Fed. Appx. 683 (9th Cir. 2006)
> Wilson, et al. v. MVM, et al., 475 F.3d 166 (3d Cir. 2007)
> In re Reynoso, 477 F.3d 1117 (9th Cir. 2007)

Frahm v. United States, 492 F.3d 258 (4th Cir. 2007)

Served as counsel in the following cases before the U.S. Courts of Appeals and U.S. Supreme Court while at the Justice Department:

          City of Rancho Palos Verdes v. Abrams, 544 U.S. 113 (2005)
          Cobell v. Norton, 428 F.3d 1070 (D.C. Cir. 2005)
          In re Kempthorne, 449 F.3d 1265 (D.C. Cir. 2006)
          Cobell v. Kempthorne, 455 F.3d 301 (D.C. Cir. 2006)
          Cobell v. Kempthorne, 455 F.3d 317 (D.C. Cir. 2006)
          U.S. ex rel. Battle v. Board of Regents for Georgia, 468 F.3d 755 (11th Cir. 2006)
          Walton v. U.S. Marshals Service, et al., 476 F.3d 723 (9th Cir. 2007)
          Abigail Alliance v. Eschenbach, 495 F.3d 695 (D.C. Cir. 2007) (rehearing petition only)

I have also been a signatory to many amicus briefs and served as an expert witness or advisor in several cases.

## BAR

Admitted to the New York Bar in January 2004.  Admitted to practice in the First, Third, Fourth, Fifth, Seventh, Eighth, Ninth, and D.C. Circuits.

## FELLOWSHIPS

Radcliffe Institute for Advanced Studies Fellowship, 2012-2013 (awarded to 50 out of 950 applicants from across the world and all disciplines and professions)

Greenwall Faculty Scholar in Bioethics, 2012-2015 ($400,000 in funding to devote time to research, awarded to two leading young scholars in bioethics).

Pierre Elliot Trudeau Foundation Fellow, 2020-2023 (one of our fellows selected by one of Canada's leading foundations to act as "outstanding public educators, dynamic professors and intellectual guides to Scholars over a three-year program cycle" focused on technology and ethics)

Hastings Center, Fellow, 2016-Present (recognition of the leading bioethics scholars in the world by the Hastings Center)

## MAJOR GRANTS AND GIFTS

Project Co-Lead, Football Players Health Study at Harvard (multi-year multi-million dollar study on the health of NFL Players including concussions) (2012-2017)

Project Co-Lead, Ethics and Law, Regulatory Foundations, Ethics, and Law Program of Harvard Catalyst | The Harvard Clinical and Translational Science Center (multi-million dollar multi-year NIH funded project to improve translational research and ethically reduce barriers to research), (2013-present)

Co-Investigator, Patient-Centered Outcomes Research Oversight Study (PCOROS) (aims to understand Key ethical barriers to the oversight of patient-centered outcomes research through mixed methods empirical research with investigators, IRBs, and patient groups.) (2015-2018)

Co-Investigator, Advancing Collaborative Genetic Research: Ethical and Policy Challenges (seeks to develop appropriate ethical frameworks and regulatory parameters for research with biospecimens by publishing a book based on a conference of national thought leaders) (2015-2018)

Project Lead, Precision Medicine, Artificial Intelligence, and the Law (PMAIL) (provides a comparative analysis of the law and ethics of black-box personalized medicine, explaining the shortcomings of the current innovation

policy landscape in Europe and the US, and providing a comprehensive examination of various policy options to better harness the potential of black-box medicine, supported by a Novo Nordisk Foundation-grant for a Collaborative Research Programme grant agreement number NNF17SA027784) (2018-2023).
Work expanded to included include polygenic risk scores, advanced medical computing, quantum technology as part of International Collaborative Bioscience Innovation & Law Programme (Inter-CeBIL), supported by a Novo Nordisk Foundation-grant for a Collaborative Research Programme grant agreement number NNF23SA0087056 (2023-2028)

Project Lead, Diagnosing in the Home: The Ethical, Legal, and Regulatory Challenges and Opportunities of Digital Home Health (develop scholarship, guidelines, and proposed regulations for the ethical implementation of digital products that support clinical diagnosis in patients' homes, supported by a grant from the Gordon and Betty Moore Foundation (grant agreement number 9974) (2020-2024)

Project Lead, The Project on Psychedelics Law and Regulation (POPLAR) (Three-year project will promote safety, innovation, and equity in psychedelics research, commerce, and therapeutics, supported by a generous gift from the Saisei Foundation) (2021-present)

Project Lead, Gracias Family Psychedelics Research Initiative and Bootcamp in Ethics Regulation Fund at Harvard Law School (Three-year project to study how the therapeutic use of psychedelics interfaces with law and ethics and support training for emerging leaders in the space) (2023-2026)

## JOURNALS AND AFFILIATIONS

Co-Editor in Chief, The Journal of Law and the Biosciences, an Oxford University Press peer-reviewed journal (2013-present)

Editorial Board of the American Journal of Bioethics (2015-present)

Editorial Board of the Lancet, Digital Health (2020-present)

Peer reviewer for the American Society for Bioethics and Humanities, the New England Journal of Medicine, The Lancet, The Hastings Center Report, The American Journal of Bioethics, Law and Contemporary Problems, Law and Philosophy, the American Journal of Public Health and Bioethics

Committee Member, OPTN/UNOS Ethics Committee (2018-2023)

Committee Member, National Academies of Medicine, Committee on Emerging Science, Technology, and Innovation in health and medicine (2019-present)

Committee Member, National Academies of Science, Engineering, and Medicine, Committee on Issues in Organ Donor Intervention Research Committee on Emerging Science, Technology, and Innovation in health and medicine (2016-2017)

Committee Member, Ethics Committee for the American Congress of Obstetricians and Gynecologists (ACOG) (2016-2020)

Committee Member, Steering Committee for Ethics for the Canadian Institutes of Health Research (CIHR) (2015-2018)

Board Member of the American Association of Law Schools, Law, Medicine, and Health Care Section Executive Committee (2009-2012)

Board member of the Institutional Review Board for Fenway Community Health (2007-2010)

27

NY and Massachusetts Civil Procedure Bar Review lecturer for Themis bar review (2011-2017)

**BLOGGING, TWEETING, Etc**

I tweet @CohenProf

I have done month-long blogging stints at Prawfsblawg (http://prawfsblawg.blogs.com/ ) and Concurring Opinions (http://www.concurringopinions.com/) , and am the founder of and blogger at Bill of Health (http://blogs.law.harvard.edu/billofhealth/).  The Greenbag Publication "The Post" has selected my 2012 blogging on abortion and personhood amendments for its "exemplary legal writing" award in the blog category http://journaloflaw.us/5%20The%20Post/The%20Post%20home.html.

I gave a Tedx talk.

[This CV is current as of March 28, 2024]

# Appendix B

## Works Relied Upon in Forming My Expert Opinion

<u>Statutes and Regulations</u>

21 U.S.C. §§ 355(k), (o)

21 U.S.C. § 355

21 U.S.C. § 355-1

21 U.S.C. § 355-1(d)

21 U.S.C. § 355-1(a)(1)(A-F).

21 U.S.C. § 355-1(a)(2)(A).

21 U.S.C. §§ 355-1(f)(3)(A)-(F))

Best Pharmaceuticals for Children Act, Pub. L. No. 107-109, 115 Stat. 1408 (2002)

Food and Drug Administration Safety and Innovation Act, Pub. L. No. 112-144, 126 Stat. 993 (2012)

Pediatric Research Equity Act, Pub. L. No. 108-155, 117 Stat. 1936 (2003)

21 C.F.R. § 314.80

21 C.F.R. §§ 314.102(a), (e)

21 C.F.R. § 314.510

Ala. Code § 6-5-484

<u>Cases</u>

Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach, 495 F.3d 695 (D.C. Cir. 2007) (en banc)

Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001)

Dobbs v. Jackson Health Organization, 597 U.S. 215 (2022)

Nolen v. Peterson, 544 So. 2d 863 (Ala. 1989)

Phelps v. Dempsey, 656 So. 2d 377 (Ala. 1995)

Stone v. Alza Corp., No. CV-06-CO-4892-S, 2007 WL 9717749 (N.D. Ala. Mar. 15, 2007)

Weaver v. Reagen, 886 F.2d 194, 198 (8th Cir. 1989)

<u>Secondary Sources</u>

Daniel G. Aaron, I. Glenn Cohen, Eli Y. Adashi, *The FDA Struggle to Withdraw Makena: Problems with the Accelerated Approval Process*, 328 JAMA 2394 (2022)

H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. OKLA STATE MED. ASSOC. 776 (2018)

AHRQ, *Off-Label Drugs: What You Need to Know*, https://www.ahrq.gov/patients-consumers/patient-involvement/off-label-drug-usage.html (last viewed Feb 19, 2024)

Alicia T. F. Bazzano et al., *Off-Label Prescribing to Children in the United States Outpatient Setting*, 9 ACAD. PEDIATR. 81 (2009)

Isaac D. Buck, *Regulation of Professionals and Facilities in the United States*, *in* THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 293 (David Orentlicher and Tamara K. Hervey eds 2020-2021)

DAVID CAVALLA, OFF-LABEL PRESCRIBING: JUSTIFYING UNAPPROVED MEDICINE 4 (2015)

Cong. Rsch. Serv., Off-Label Use of Prescription Drugs 4 (Feb. 23, 2021), https://sgp.fas.org/crs/misc/R45792.pdf

Joseph A. DiMasi, Henry G. Grabowski & Ronald W. Hansen, *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J HEALTH ECON. 20, 23 (2016)

Suzie Ekins-Daukes, Peter J. Helms, Colin R. Simpson, et al., *Off-Label Prescribing to Children in Primary Care: Retrospective Observational Study*, 60 EUR. J. CLIN. PHARMACOL. 349 (2004)

FDA, *Approved Risk Evaluation and Mitigation Strategies*, (REMS), https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm (last accessed March 27, 2024)

FDA, *Best Practices for Communication Between IND Sponsors and FDA During Drug Development: Guidance for Industry and Review Staff: Good Review Practice* 4 (Dec. 2017), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-communication-between-ind-sponsors-and-fda-during-drug-development

FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (last updated Feb 5, 2018)

FDA, *REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary, Guidance for Industry* (April 2019), https://www.fda.gov/media/100307/download

Peter Grossi & Keri Arnold, *Drug Product Liability at the Crossroads*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 444 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016)

Peter Grossi & Daphne O'Connor, *FDA Preemption of Conflicting State Drug Regulation and the Looming Battle over Abortion Medications*, 10 J.L. & BIOSCIENCES 1 (2023)

Holly Fernandez Lynch, *Give Them What They Want? The Permissibility of Pediatric Placebo-Controlled Trials Under the Best Pharmaceuticals for Children Act*, 16 ANNALS HEALTH L. 79 (2007)

Holly Fernandez Lynch, Rachel E Sachs, Seijin Lee, et al., *Extending the US Food and Drug Administration's Postmarket Authorities,* 4 JAMA HEALTH FORUM e231313 (2023)

E. Kimland, P. Nydert, V. Odlind, et al., *Paediatric Drug Use with Focus on Off-Label Prescriptions at Swedish Hospitals – A Nationwide Study*, 101 ACTA PAEDIATRICA 772 (2012)

L. Leanne Lai, *Off-Label Prescribing for Children with Migraines in U.S. Ambulatory Care Settings*, 23 J. MANAG. CARE SPEC PHARM. 382 (2017)

WILLIAM L. KISSICK, MEDICINE'S DILEMMA'S: INFINITE NEEDS VERSUS FINITE RESOURCES (1994)

Lewis A. Grossman, *Drugs, Biologics, and Devices: FDA Regulation, Intellectual Property, and Medical Products in the American Healthcare System, in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 637 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016)

MARK HALL, MARY ANNE BOBINSKI, DAVID ORENTLICHER, I. GLENN COHEN, NICHOLAS BAGLEY, NADIA SAWICKI, HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024)

PETER HUTT ET AL., FOOD AND DRUG LAW (5th ed. 2022)

Sandra Johnson, *Structure of Governmental Oversight of Quality in Healthcare, in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 489 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).

Joan H. Krause, *Fraud and Abuse Law in the United States, in* THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 375 (David Orentlicher and Tamara K. Hervey eds 2020-2021)

L. Lindell-Osuagwu, M. Hakkarainen, K. Sepponen, et al., *Prescribing for Off-Label Use and Unauthorized Medicines in Three Paediatric Wards in Finland, the Status Before and After the European Union Paediatric Regulation*, 39 J. CLIN. PHARM. THER. 144 (2013)

Anna B. Laakmann, *When Should Physicians Be Liable for Innovation?*, 36 CARDOZO L. REV. 913 (2015)

Amber M. Parish, *A Better Guide to Prescribing, Particularly During Public Health Emergencies: Legislation & Policy Governing Prescribing to Self & Family*, 6 LOY. U. CHI. J. REG. COMPLIANCE 109 (2021)

Perrine Joret-Descout, Sonia Prot-Labarthe, Françoise Brion, et al., *Off-Label and Unlicensed Utilisation of Medicines in a French Paediatric Hospital,* 37 INT. J. CLIN. PHARM. 1222 (2015)

ADAM L. MUCHMORE, FOOD AND DRUG REGULATION: A STATUTORY APPROACH 363 (2021)

D. Pfister, *Off-Label Use of Oncology Drugs*, 30 J. CLINICAL ONCOLOGY 584 (2012)

David C. Radley. Stan N. Finkelstein, Randall S. Stafford, *Off-Label Prescribing Among Office-Based Physicians*, 166 ARCH. INTERNAL MED. 1021 (2006)

Samir S. Shah et al., *Off-label Drug Use in Hospitalized Children*, 161 ARCH. PEDIATR. ADOLESC. MED. 282 (2007)

David A. Simon, *Off-Label Innovation*, 56 GA. L. REV. 701, 719 (2022)

S. REP. 105-43 (1997)

Katharine A. Van Tassel, *Filing the New Drug Application*, 1 FOOD AND DRUG ADMIN. § 13:26 (2023-2)

G.W. 't Jong, I.A. Eland, M.C.J.M. Sturkenboom, et al., *Unlicensed and Off-label Prescription of Respiratory Drugs to Children*, 23 EUR. RESPIR. J. 310 (2004)

Arna Teigen, Siri Wang, Bich Thuy Truong, et al., *Off-label and Unlicensed Medicines to Hospitalised Children in Norway*, 69 J. PHARM. PHARMACOL. 432 (2017)

Lindsay F. Wiley et. al., *Health Reform Reconstruction*, 55 U.C. DAVIS L. REV. 657 (2021)

Robin Fretwell Wilson, *The Promise of Informed Consent*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH LAW 213 (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016)

Divya Yoon et al., *Trends in Off-Label Drug Use in Ambulatory Settings: 2006-2015*, 144 PEDIATRICS e20190896