# EXHIBIT 20

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D.<br><br>*Plaintiffs*,<br><br>v.<br><br>KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County.<br><br>*Defendants*. | Civil Action No.<br>_____<br><br><br><br>**DECLARATION OF RACHEL KOE, MD, IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION** |

1

I, Rachel Koe,[1] declare as follows:

1. I am a physician licensed to practice by the State of Alabama. I work in southeast Alabama.

2. I attended medical school in Alabama and, since completing my pediatrics residency, have provided care to patients in rural southeast Alabama. I have been practicing for approximately ten years.

3. As a board-certified pediatrician, I treat patients from birth to nineteen years of age. Because I provide primary medical care, my patients present with a wide range of physical and mental health conditions. That also means that I have a wide network of medical and mental health providers that I rely on to refer patients who require subspecialty care. I am very careful with my referrals, ensuring that I am referring my patients to providers who offer quality care and follow evidence-based medicine.

4. About eight years ago, I started treating my first transgender patient. I had learned about gender dysphoria during my medical residency, but had never treated a transgender patient. When the patient first came under my care, he was seeing a therapist, a psychiatrist, and pastoral counselor, but his health and wellbeing

---

[1] Because of concerns about criminal liability and my privacy and safety, I am seeking to proceed in this case under a pseudonym. *See Motion to Proceed Pseudonymously*, filed concurrently herewith. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. My attorneys have a copy of that separate declaration.

2

were not improving despite this care. His mother knew that her son, who had been assigned female at birth, was struggling with gender dysphoria, but the only answer she had been given to that point was more psychiatric medication. She came to me scared that her son's declining mental health was placing him at serious risk for self-harm or even suicide.

5. Because of my involvement in pediatrics community in Alabama, I had heard of the gender clinic at UAB and referred this patient to the clinic. The referral was life changing for my patient. After about six months, he started puberty-blocking medications and approximately eighteen months later began taking testosterone. Over that time, my patient became a totally different child. He blossomed in ways that neither I nor his mother could have anticipated.

6. Due to the distance between my patient's home and the gender clinic in Birmingham, he would come to my office for regular blood work. I would always review the test results to make sure there wasn't something urgently wrong and would then pass the results along to his medical providers at the UAB gender clinic. Once my patient started testosterone, he did not feel comfortable self-administering the medication so he came to my office every other week to have my medical staff give him his medication.

3

7. This patient has graduated from my practice, but his mother keeps me updated on his life. According to his mother, he continues to thrive as a healthy and well-adjusted adult.

8. After seeing the difference in my patient once he received care at the gender clinic, I started to learn more about medical treatments for gender dysphoria so that I would be better able to answer questions posed to me by future patients and their parents. As part of my self-study, I familiarized myself with the medical literature including publications by the World Professional Association for Transgender Health and the Endocrine Society detailing the standards of care for medical treatment for gender dysphoria.

9. Since then, I have treated four more transgender patients. When those patients first came to see me, most had just started expressing that they were transgender. Given that, I referred them to local mental health providers for support. Once the patient was diagnosed with gender dysphoria and reached an age where medical treatment may be appropriate, I referred them to the gender clinic for further evaluation and specialty care. As with my first patient eight years ago, these patients would come to me for regular blood tests and lab work, the results of which would be sent to the UAB gender clinic so their medical providers could monitor their progress.

4

10. Unfortunately, not all those patients were fortunate enough to have supportive parents to take them for treatment at the UAB gender clinic, but those who did were able to lead the happy and healthy lives that every parent wants for their child. One of those patients is still under my care to this day.

11. As a pediatrician, I see my purpose as increasing access to quality, evidence-based care for children throughout Alabama. If allowed to go into effect, the Vulnerable Child Compassion and Protection Act (the "Act") would do the opposite. My transgender patient, and every other transgender young person across Alabama, would be denied evidence-based medical treatment for gender dysphoria. As a medical provider, this situation is very concerning to me. I am certain that my transgender patient's mental health will suffer significantly if she is denied ongoing medical treatment for her gender dysphoria. If I were to comply with the Act, I would be limited to referring her to counseling and a psychiatrist. Doing so would be a violation of my professional and ethical duties as a physician for two reasons: (1) talk therapy and psychiatric medication alone will not be effective in treating her gender dysphoria; and (2) I would be refusing to provide proven effective treatments, namely puberty-blocking medications and estrogen. That course of treatment is consistent with the standards of care and is well-supported in the medical literature by data published in reputable and peer-reviewed medical journals.

5

12. This Act also would criminalize me for making appropriate referrals to providers, such as the UAB gender clinic, who can offer the specialized care that transgender young people need. The Act would prevent me from answering parent questions and educating them about the literature underpinning the current standards of care. Without primary care providers who can share that critical information with transgender youth and their parents and connect them with healthcare providers who treat gender dysphoria, families raising transgender children will experience even greater isolation and barriers to medical providers with the necessary expertise to offer quality medical care. Even my support staff are concerned that the broad language used in the Act could result in them violating the Act simply by helping to provide competent quality care.

13. The Act places me in an impossible situation on multiple fronts. If I comply with the Act to avoid criminal penalties, I am abandoning my current transgender patient by not providing medical care consistent with the accepted standard of care. Further, as a medical provider who accepts Alabama Medicaid, and thus receives federal funds, complying with the act would require me to discriminate against transgender patients, jeopardizing all of my patients' access to care by violating federal antidiscrimination laws.

14. This Act also sets a dangerous precedent for interfering with the sanctity of the doctor-patient relationship. If the Alabama legislature can criminalize

6

evidence-based medical treatment for gender dysphoria, the Act may have a chilling effect on the treatment of many other conditions where public opinion may not align with medical treatments grounded in evidence-based standards of care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of April, 2022.

*Rachel Koe, MD*
Dr. Rachel Koe, MD