# EXHIBIT 21

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| REV. PAUL A. EKNES-TUCKER; BRIANNA BOE, individually and on behalf of her minor son, MICHAEL BOE; JAMES ZOE, individually and on behalf of his minor son, ZACHARY ZOE; MEGAN POE, individually and on behalf of her minor daughter, ALLISON POE; KATHY NOE, individually and on behalf of her minor son, CHRISTOPHER NOE; JANE MOE, Ph.D.; and RACHEL KOE, M.D.<br><br>  *Plaintiffs*,<br><br>v.<br><br>KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; DARYL D. BAILEY, in his official capacity as District Attorney for Montgomery County; C. WILSON BAYLOCK, in his official capacity as District Attorney for Cullman County; JESSICA VENTIERE, in her official capacity as District Attorney for Lee County; TOM ANDERSON, in his official capacity as District Attorney for the 12th Judicial Circuit; and DANNY CARR, in his official capacity as District Attorney for Jefferson County.<br><br>  *Defendants*. | Civil Action No.<br>_____<br><br>**DECLARATION OF JANE MOE, PhD, IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION** |

1

I, Jane Moe,[1] declare as follows:

1.  I am a licensed clinical psychologist and have been practicing in Alabama for twenty years. I am licensed to practice by the State of Alabama and I work and reside in Jefferson County, Alabama.

2.  I obtained my PhD in clinical child psychology with a specialization in child development from a major university in Alabama. After completing my post-doctoral work and clinical intern hours, I received my license to practice in Alabama.

3.  Since I started my practice twenty years ago, I have worked exclusively with patients under the age of 24. Over that time, I have treated patients with a variety of mental health issues ranging from anxiety and depression to attention deficit hyperactivity disorder or "ADHD."

4.  I currently work in a hospital setting within the University of Alabama at Birmingham (UAB) system providing direct mental health care to children and adolescents as well as training other medical providers to work with young patients. For the past two years, I have dedicated part of my practice to working with transgender young people. During that time, I have treated approximately forty transgender young people, ranging in age from five to nineteen.

---

[1] Because of concerns about criminal liability and my privacy and safety, I am seeking to proceed in this case under a pseudonym. See Motion to Proceed Pseudonymously, filed concurrently herewith. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. My attorneys have a copy of that separate declaration.

2

5. My work with transgender patients is guided by the well-established standard of care developed by the World Professional Association for Transgender Health (WPATH) and a comprehensive informed-consent protocol.

6. When I start seeing a transgender patient who presents for a mental health assessment, I make clear that the assessment is a process that engages both the patient and their parents. The process requires a minimum of three to four visits, which typically take place over the course of two to three months, depending on the needs of the patient and their family. It is not uncommon for the assessment process to require more visits and take place over a longer period of time.

7. The assessment begins with gathering background information on the patient through questionnaires, rating scales, and talking with the patient and their parents. Through those methods I build a profile of the patient: their level of adjustment and overall functioning, available coping mechanisms, and an understanding of their strengths and weaknesses.

8. As the assessment proceeds, I continue to gather information from multiple sources, including the parents, that will help me determine whether the patient meets the diagnostic criteria for gender dysphoria as outlined in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5").

9. As part of the assessment, consistent with the informed-consent protocol, I review with the patient and the patient's parents the risks, benefits, and

3

ranges of medical treatment available and appropriate for treating any particular patient's condition. These discussions often happen over more than one session. Based on the needs of the patient and the patient's family, I may have separate meetings with the patient and parent(s), which gives each the opportunity to ask questions or talk about issues they may not initially feel comfortable discussing in front of the other.

10. I also encourage families to seek out other services that they may find helpful, such as talking with a religious leader, either in the hospital or the community.

11. Once I have completed the informed-consent protocol and am confident that the patient and their parents understand the risk, benefits, and range of medical treatments for gender dysphoria, I write a letter to the patient's doctor detailing the results of my assessment. In addition to the diagnosis, I discuss the patient's overall mental health and functioning as well as recommendations for continued mental health care, as needed. Although my letters detail a patient's readiness from a mental health perspective, I always recommend that the patient's medical provider undertake a further assessment of the patient before initiating any medical treatment.

12. Given that I work in a hospital setting, it is not uncommon for me to see patients again after they have already begun medical treatment for their gender dysphoria. During those sessions, we often talk about how their treatment is

4

progressing and the effects it is having on their mental health. In those discussions, we often return to our prior conversations that we had in connection with the informed-consent protocol.

13. I understand that Governor Ivey signed the Vulnerable Child Compassion and Protection Act (the "Act"). My understanding is that the Act expressly prohibits anyone from doing or saying anything that could cause a transgender young person, under the age 19 in Alabama to undergo medical treatment for gender dysphoria. I further understand that violating the Act exposes Alabama healthcare providers and others to criminal prosecution, which could result in me or others being sentenced to prison or a fine. Effectively, the Act prevents transgender young people in Alabama from obtaining medically necessary, safe, effective, and established treatments for their gender dysphoria.

14. For me, the Act means that I would have to abandon my professional and ethical obligations when treating transgender patients or risk criminal penalty for providing mental health care consistent with the prevailing standards of care. I also will be prevented from educating my patients about treatment options for gender dysphoria or referring my patients to medical providers for further evaluation and possibly prescriptions for this essential medical care. I cannot imagine doing that and, as a result, I am very afraid that I will be subject to criminal prosecution and face criminal penalties under the Act.

15. I also am deeply concerned about the effects this law will have on my patients' mental health. Before SB 184 was debated—let alone signed into law—my patients were regularly bullied and harassed in their schools and communities. Because of the dangerous message the Act sends to Alabamians about transgender young people, many of my patients are bracing for an increase in bullying and harassment from those who would feel emboldened by the Act.

16. Receiving medical treatment for gender dysphoria has also significantly improved the mental health and wellbeing of all the patients I have seen. If healthcare providers were required to comply with the Act, it would force transgender young people to put their health-related goals on hold. Their mental health would deteriorate and impair their ability to function in their day-to-day lives. That decline in mental health will cause a cascade of negative health outcomes, including exacerbating co-occurring mental health issues, increased reliance on maladaptive coping mechanisms (*e.g.* cutting, substance abuse), and suicidality. In fact, in the days following the signing of the Act, I had to work with two patients to develop safety plans to prevent them from attempting suicide, a risk that is well-documented and disproportionately affects transgender young people. Talking with them, I could see that the hope they had for the future had been replaced with distress, anxiety and sadness.

6

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of April, 2022.

*Jane Moe, PhD*
Dr. Jane Moe, PhD

7