# EXHIBIT 31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| BRIANNA BOE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Intervenor Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-184-LCB |
| | ) | |
| HON. STEVE MARSHALL, in his | ) | |
| Official capacity as Attorney General, | ) | |
| of the State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**EXPERT REPORT OF**
**KRISTOPHER KALIEBE, M.D.**

EXHIBIT

A

# TABLE OF CONTENTS

Table of Contents .................................................................................................... ii

Background and Qualifications .................................................................................. 3

Summary of Main Points ......................................................................................... 7

The Recent Rise in Transgender and Non-binary Identification Among Young People ............... 7

The Dangers of Proclaiming a False Scientific Consensus for How Best to Treat Gender
    Dysphoric Young People ................................................................................... 18

    A.    Best Practices for Scientific Dialogue ................................................... 18

    B.    How Breakdowns in Scientific Dialogue Occur ................................... 20

    C.    Historical Examples of Harmful Scientific "Consensus" and
        Overtreatment ..................................................................................... 22

The Politicization of Gender Care and Suppression of Dissenting or Questioning Voices ......... 27

    A.    American Academy of Pediatrics ......................................................... 29

    B.    American Academy of Child and Adolescent Psychiatry....................... 32

    C.    American Psychological Association ..................................................... 36

    D.    American Psychiatric Association ......................................................... 37

    E.    WPATH ............................................................................................... 38

    F.    Endocrine Society ............................................................................... 42

    G.    Medical Literature .............................................................................. 43

How Advocacy Undermines Scientific Discussion at Medical Organizations........................... 51

    A.    Psychotherapy ..................................................................................... 52

    B.    Autism................................................................................................. 58

    C.    Borderline Personality Disorder .......................................................... 59

Conclusion ............................................................................................................. 60

References ............................................................................................................. 63

Publications............................................................................................................ 83

1.      I am a medical doctor. I am trained in general psychiatry, child and adolescent psychiatry, and forensic psychiatry. My professional background, experience, and publications are detailed in my curriculum vitae, which is attached to this report.

2.      I have been retained by counsel for Defendants in the above-captioned lawsuit to provide an expert opinion concerning care of patients with gender dysphoria and the need for open, scientific dialogue regarding how best to treat gender dysphoric youth. My opinion will be based primarily on my own experience as a physician, psychiatrist, and associate professor, as well as the relevant literature in this area. I have reviewed the expert reports of Dr. Armand Antommaria, Dr. Daniel Shumer, Dr. Meredithe McNamara, Dr. Aron Janssen, and Dr. Morissa Ladinsky. I have also reviewed the initial production of the Plaintiffs' medical records in this case. I may wish to supplement my opinions or the bases for them as new evidence comes to light or new research is published.

3.      Over the past four years, I have testified at trial and/or deposition in the following cases:

    a.  <u>Civil Testimony, retained by the defense</u>:

        i.  In the Interest of RW, LL, AP Minor Children January 28, 2020 Circuit Court of the 13th judicial circuit, Juvenile Division, Judge Lisa Campbell, Tampa FL

        ii.  August Dekker et al. v. Simone Marstiller et al., Case No. 4:22-cv-00325-RH-MAF, U.S. District Court, Tallahassee FL, May 18, 2023

    b.  <u>Civil Testimony</u>:

        i.  February 28, 2020, Jeffrey Spivey, petitioner/father and Teresa Spivey N/K/A Teresa Cartwright, respondent/mother Case No.: 2016 DR0471's,

Circuit Court of the 12th judicial circuit in and for Manatee County Florida. Judge Kevin Bruning

c. <u>Civil Testimony, court appointed</u>:

    i. Re: The Marriage of Robyn Cohen McCarthy and John McCarthy, November 1, 2019 11th Judicial Circuit, Family Division, Dade County, Judge Jason Dimitris, Miami FL

d. <u>Criminal Testimony, retained by the defense</u>:

    i. The State of Florida v. Bill Paul Marquardt, December 19, 2019 5th Judicial Circuit, Sumner County, Florida, Judge William Hallman III, Bushnell Florida

    ii. The State of Florida v. Bill Paul Marquardt, August 24, 2022 5th Judicial Circuit, Sumner County, Florida, Judge Mary P. Hatcher Bushnell Florida

e. <u>Civil Depositions, retained by the defense</u>:

    i. Z.M.L., a minor, through her parents and guardians, vs. D.R. Horton, Inc., a foreign corporation authorized to do business in Florida, United States District Court, Middle Division of Florida, Tampa, May 6, 2021

    ii. The Estate of Jean Lindor, deceased minor, by and through the Personal Representative of the Estate, James Lacroix and Nouse Andree Lacroix, individually, Plaintiffs, v. Bos Transport, LLC, a Florida Limited Liability Company, and Orestes Zamora Fleites, individually, December 5th, 2022

    iii. August Dekker et al. v. Simone Marstiller et al., Case No. 4:22-cv-00325-RH-MAF, U.S. District Court, Tallahassee FL, March 20, 2023

      f.  Civil Depositions, retained by the plaintiff:

            i.  Carlton Collins, individually, and on behalf of his minor son, Connor Samuel Collins v. David R. Wallace, Sr., M.D. Louisiana's 14th judicial district, Civil Suit: 2019 – 4128 – D, March 4th, 2022

      g.  Criminal Deposition, retained by the defense:

            i.  State of Florida v. Justin Mitchell Pennell, 2020CF000159FAXWS, 6th Judicial Circuit of the State of Florida in and for Pasco County, March 11, 2022

4.    I am over the age of 19, am qualified to give this declaration, and have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion. I am being compensated at a rate of $400 per hour. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony that I provide.

## BACKGROUND AND QUALIFICATIONS

6.    I am an associate professor at the University of South Florida in Tampa Florida. I was recently promoted to full professor, active July 1, 2023. I am Board Certified in Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. My clinical work has been primarily in university-based clinics, Federally Qualified Health Centers, and juvenile corrections.

7.    I was awarded my medical degree in 1999 and subsequently completed general psychiatry, child and adolescent psychiatry, and forensic psychiatry training. This training includes education in human biology, human sexuality, development, brain functioning, normal development, and psychopathology. Gender dysphoria and gender dysphoria treatment were part of my professional training.

8.      From 2005 to 2016, I was Assistant Professor at Louisiana State University Health Science Center – New Orleans. I was the program director of the LSU Child Psychiatry Fellowship for 2 years. Since 2016, I have been Associate Professor at the University of South Florida, where my clinical roles mainly include working with juvenile corrections and supporting primary care physicians through the Florida Medicaid Psychiatric Medication hotline. I also cover on call at Tampa General Hospital and practice forensic psychiatry, working on both child and adult cases in both criminal and civil court.

9.      In addition, I work in two university-based training clinics. For my entire stay at University of South Florida I have supervised a child and adolescent psychiatry clinic, and I recently added an adult psychiatry resident clinic to my schedule.

10.     As a supervising physician at the University of South Florida's Silver Child Development Center, my role is to function as a clinical supervisor and instructor. Child psychiatry residents and general psychiatry residents serve as the primary patient evaluators and clinicians. I also evaluate new patients directly and then see patients as needed. I oversee the residents' work product and function as the physician of record. In this clinic I evaluate and treat pediatric patients with gender dysphoria. In addition to these direct clinical experiences, my duties at the Silver Child Development Center include training residents regarding the treatment of patients, including those with gender dysphoria.

11.     Similarly, at the University of South Florida's Outpatient Psychiatry Center, my duties include supervising and instructing psychiatry residents. At this clinic as well, general psychiatry residents serve as the primary patient evaluators and clinicians, and I evaluate new patients directly and see them afterward as needed. I oversee the residents' work product and function as

the physician of record. As part of my role in this clinic, I evaluate and treat patients with gender dysphoria.

12.     Within the juvenile justice system, I also evaluate and treat patients with gender dysphoria. And I have been consulted to provide a second opinion and coordinate care regarding a patient with gender dysphoria in the Louisiana juvenile correctional system.

13.     In addition to direct clinical care, I am routinely consulted by colleagues. For instance, I have provided an opinion on whether a pediatric patient was competent to assent to the administration of puberty blockers to enter on a path toward sex hormone treatment and potential surgeries. I have also been consulted regarding psychotherapeutic approaches to young adult patients who detransitioned. And I have collaborated in the care of patients with gender dysphoria as part of my work with the Florida Medicaid Psychiatric Hotline.

14.     I have extensive teaching experience, including teaching medical students, general psychiatry residents, child and adolescent psychiatry fellows, and forensic psychiatry fellows. I have years of extensive positive feedback from medical students and psychiatrist residents.

15.     I practice and support conventional medicine, and I have also strongly advocated for the expansion of Federally Qualified Health Centers, along with improved collaboration of mental health with primary care (Kaliebe 2016, Kaliebe 2017).

16.     My support of, and attempts to improve conventional medicine, are balanced by a healthy degree of caution. The history of medicine is filled with examples of the harms that can come with unproven, unnecessary, aggressive, or counterproductive interventions. As such, I've presented twice at the Preventing Overdiagnosis conference.

17.     Another clinically relevant academic interest of mine is the tradeoffs and influence of technology and mass media, especially on young people. (Kaliebe 2002, Gerwin 2018). I have

long focused on how technology and the media intersect with society and culture, including the impacts of social media, recent increases in tribalism, and the spread of misinformation. With Paul Weigle, I co-edited the Child and Adolescent Psychiatric Clinics of North America *Youth Internet Habits and Mental Health* edition in 2018. This compilation of clinical review articles included 16 chapters by invited experts on digital and mental health related issues. (Kaliebe 2018). I presented on distraction and misinformation at the 2022 conference of the American Academy of Child and Adolescent Psychiatry.

18.     I am a member of the American Academy of Child and Adolescent Psychiatry, the American Academy of Psychiatry, and the Law and the American Psychiatric Association. I have been most active in the American Academy of Child and Adolescent Psychiatry (AACAP). I was awarded status as a Distinguished Fellow at AACAP in 2016. I first presented regarding media at the 2004 AACAP annual conference, and have now presented at the annual conference 25 times. I served as co-chair of the Media Committee from 2013-2021, and was an author on the AACAP's clinical practice guidelines for telepsychiatry. I served as the Liaison from AACAP to the American Academy of Pediatrics from 2016-2022. I have also served AACAP in the state affiliates, acting as the Louisiana Council for Child Psychiatry as secretary/treasurer for 4 years and as president for 2 years.

19.     I have extensive experience in psychotherapy, and have received additional training in Cognitive Behavioral Therapy and trauma-focused therapies. I have been providing psychotherapy and teaching psychotherapy to psychiatry trainees throughout my career. I currently routinely supervise psychiatry residents at USF regarding psychotherapy. I created and taught a Cognitive Behavioral Therapy practicum for LSU residents from 2007 to 2016. I was a member of the Association for Behavioral and Cognitive Therapies from 2004 to 2016.

## SUMMARY OF MAIN POINTS

20.     While historical reports of gender dysphoria exist, they were rare until approximately the last decade. Since then, the number of youth suffering from gender dysphoria has skyrocketed across countries in the economically advanced Western world.

21.     Significant evidence points to a spread of ideology combined with technologically induced contagion effects associated with the recent increase in gender dysphoria.

22.     Small numbers of advocate physicians within medical organizations have been able to leverage moralized claims and low-quality evidence to promote medical interventions for gender dysphoria in minors.

23.     As American medical professional organizations have already endorsed the concept of so-called affirmative care as evidence-based and ethical, they are no longer neutral with regard to the science and have instead entered advocacy roles.

24.     The language and assumptions supporting affirmative care for gender dysphoria are often conjecture, opinion, or misinformation presented as established fact.

25.     Due to the highly politicized and ideological nature of the issue of gender dysphoria, and efforts by proponents to silence debate, there is limited rigorous scholarly dialogue within American professional medical organizations and medical journals.

## THE RECENT RISE IN TRANSGENDER AND NON-BINARY IDENTIFICATION AMONG YOUNG PEOPLE

26.     The discussion regarding transgender care is in the context of an unexplained and remarkable rise in minor patients reporting gender dysphoria. During my medical school experience and three residencies, I never encountered a patient reporting symptoms of gender dysphoria. For eleven years, from 2005 to 2016, I had a busy psychiatry clinic composed of roughly 80% minors and 20% adult patients. Not a single patient presented with gender dysphoria.

27.     During those eleven years, none of the hundreds of medical students or residents I supervised presented cases to me describing patients with gender dysphoria. None of my social work or psychologist colleagues ever asked for consultation or advice regarding how to clinically approach patients with gender dysphoria.

28.     By contrast, on a single day in the last year, I treated three adolescent patients who had been diagnosed with gender dysphoria.

29.     My experience is consistent with statistics indicating an abrupt rise in gender dysphoria and presentations to medical clinics for related services. While the exact number is unknown, it can be said that the incidence of gender dysphoria in youth was previously rare. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders published in 2013 rated in adults at 2-14 per 100,000 (American Psychiatric Association p. 454). Referrals at the Tavistock clinic in England increased over 50-fold in just a decade from 2009 to 2019. (Tavistock & Portman, NAHS Foundation Trust, 2020).[1]



**Child and Adolescent Referrals for Gender Dysphoria**
**United Kingdom (GIDS)**

*Referral activity to GIDS/Tavistock was sharply limited in 2020-2021 due to COVID-19.
ᵃBeginning in 2018-19, increasing numbers of referrals are not reported by sex.
ᵇBeginning July 2021, referrals made directly to GIDS are reported separately from those handled by the Arden & GEM referral management service. The Tavistock reports that Arden & GEM handled over 1500 additional referrals in 2021-22 (age and sex not reported separately).

Chart 1. Child and adolescent refers for gender dysphoria in the United Kingdom

---

[1] Chart 1 was created by the Society for Evidence Based Gender Medicine drawn from data by the Tavistock clinic in the United Kingdom. Chart 2is from Marianowicz-Szcygiel's 2022 paper "Rise of gender identity disorders among children and adolescents – data from 10 countries. Possible explanations, conclusions for parents."

30.    Similar increases have been reported across much of the Western world, many showing over 1000% rise in gender dysphoria over the last decades (Marianowicz-Szczygiel 2022).



Chart 2. Increase of the number of referrals in clinics in 10 countries in 'rapid surge years zone'.

31.    Never before has there been large cohorts of individuals seeking medical services to alter their secondary sex characteristics. There had been decades of extremely rare treatment which was at the time acknowledged as compassionate but experimental care. Yet the current patients expressing gender dysphoria represent primarily a new and distinct patient population, not a

population which has historically existed. As the independent review of the gender identity services for children and young people in the UK noted, the sudden "increase in referrals has been accompanied by a change in the case-mix from predominately birth-registered males presenting with gender incongruence from an early age, to predominately birth-registered females presenting with later onset of reported gender incongruence in early teen years." (Cass 2022).

32.     As a psychiatrist, I have encountered many patients who are uncomfortable with their bodies. This discomfort or dissatisfaction is often comingled with anxiety and depression, along with various diagnoses which involve bodily discomfort, including eating disorders or Body Dysmorphic Disorder.

33.     I have observed bodily discomfort more often in females, especially as girls enter puberty, which is consistent with the epidemiological literature. Puberty introduces significant challenges and risks to females as they receive more attention from males, including adult males, along with increased competition from peers. Puberty now comes much younger than for our ancestors, creating a greater mismatch between brain and body maturity.

34.     When a new patient population emerges, as it has with minors suffering from gender dysphoria, it creates challenges for physicians to respond. This phenomenon requires some explanation, and any complex phenomenon likely has a multifactorial line of causation. Yet multiple lines of evidence point to direct social influences and online and social media contagion as major contributors to the remarkable rise in gender dysphoria in adolescents.

35.     The influence of culture, medical theories, and ideology on symptom production is long-standing and well known. Numerous examples of how culture has intersected with psychiatric illness from the Victorian to modern era have been detailed in the literature (Shorter 1993). The

mere act of codifying a psychiatric disorder can cause a new clinical presentation among those with pre-existing mental health challenges (Gauld 2022; Horesh 2022).

36.     Humans evolved as a sexually dimorphic, ultra-social, and cultural species. Culture has comingled with our evolution because learning from others enables our very survival. Humans acquire a considerable portion of our behaviors and viewpoints "by tapping into a large body of non-genetic information that has been filtered and accumulated over generations. This process, termed cumulative cultural evolution, creates a storehouse in the form of strategies, attentional biases, motivations, tastes, and cognitive heuristics that are necessary for us to accomplish even the basics of survival." (p. 210 Henrich 2021).

37.     Humans thus cannot explain the original rationale for many of our routines, habits, and customs because they have been shaped over time. Cumulative culture constantly changes, but the recent rate of change has been exponentially faster due to the explosion of technologies. The modern world is thus experiencing perhaps the largest generation gap in history, much of which is caused by media and online experiences.

38.     In ancient evolutionary environments, copying others aided survival via the transmission of acquired knowledge about what areas were safe, how to make shelters or weapons, what berries or mushrooms were safe to eat, and what type of social behavior was acceptable within a group. Human brains are particularly adapted with exceptional abilities to notice and copy the behavior of others, and transmission of culture occurs in part via humans naturally mimicking what we observe in others.

39.     Unfortunately, these same instincts that develop helpful behavioral norms also enable social contagions that comingle with mental and behavioral disorders. Long-standing scholarly consensus exists confirming that direct social contagion not only affects health such as cardiac

disease (Christakis 2013), but interacts with technology to enable the spread of mental health problems (Haltigan 2023). For instance, in recent years technology has aided the spread of suicide contagion (Yıldız, 2019), non-suicidal self-injury (Jarvi, 2013), and contagion related to eating disorders such as anorexia (Allison 2014).

40.     Since the Covid 19 pandemic, there has been an explosive increase of young people displaying features of Dissociative Identity Disorder (Gauld 2022) and movements similar to those seen in Tic Disorders such as Tourette's (Pringsheim 2021). Similar to other examples of social contagion, these sudden onset tic presentations tend to be comorbid with pre-existing mental illnesses, and adolescent girls show themselves to be the most susceptible.

41.     The phenomenon labeled Mass Social Media Induced Illness (Giedinghagen, 2022) shows us that, at scale, users of social media can develop technology-facilitated psychosomatic illness. Psychiatrists have seen an abrupt rise in patients presenting with a social media enabled self-diagnosis (Rettew 2022, Weigle 2023).

42.     Similarly, significant evidence suggests that the dramatic rise in minors presenting with gender dysphoria may be attributable to technologically induced contagion effects. In 2018, researcher Lisa Littman conducted a survey of parents of gender dysphoric youth whose gender dysphoria began during or after puberty (Littman 2018). "Most (86.7%) of the parents reported that, along with the sudden or rapid onset of gender dysphoria, their child either had an increase in their social media/internet use, belonged to a friend group in which one or multiple friends became transgender-identified during a similar time-frame, or both." (Littman 2018 p.2) Littman thus hypothesized that, as with other social contagions such as disordered eating, aggression, bullying, and drug use, "it is plausible that the following can be initiated, magnified, spread, and maintained

via the mechanisms of social and peer contagion: (1) the *belief* that non-specific symptoms (including the symptoms associated with trauma, symptoms of psychiatric problems, and symptoms that are part of normal puberty) should be perceived as gender dysphoria and their presence as proof of being transgender; (2) the *belief* that the only path to happiness is transition; and (3) the *belief* that anyone who disagrees with the self-assessment of being transgender or the plan for transition is transphobic, abusive, and should be cut out of one's life." (Littman 2018 p. 33)

43.     As explain below, Littman's paper and her hypothesis of a "rapid-onset gender dysphoria" received remarkable blowback from advocates of "gender affirming care." The journal that published the paper retracted the initial paper, issued a "correction," and re-published the paper (with the initial data unchanged). Since then, the hypothesis of a social contagion element to adolescent gender dysphoria has only grown stronger.

44.     Clinicians working at the Tavistock clinic in London (before its closure, the world's largest adolescent gender clinic) expressed support for Dr. Littman's concept of Rapid Onset Gender Dysphoria: "While some of us have informally tended toward describing the phenomenon we witness as 'adolescent-onset' gender dysphoria, that is, without any notable symptom history prior to or during the early stages of puberty (certainly nothing of clinical significance), Littman's description resonates with our clinical experiences from within the consulting room" (Hutchinson 2019). They added: "[I]t is commonplace for clinicians to engage in conversations regarding this phenomenon. Furthermore, from speaking with international colleagues, it seems to us that this phenomenon is also being observed in North America, Australia, and the rest of Europe."

45.     Littman's research and her conclusions should not have surprised those following the literature on gender dysphoria. Three years earlier, a leading Finnish clinician (Kaltiala-Heino,

13

2015) showed that a new cohort, mostly females with significant emotional disturbance, was presenting to gender clinics: "It is important to be aware of the different groups, or developmental pathways, in gender dysphoric adolescents in order to be able to find appropriate treatment options. In the presence of severe psychopathology and developmental difficulties, medical [sex reassignment] treatments may not be currently advisable. Treatment guidelines need to be reviewed extended to appreciate the complex situations." In other words, three years *prior* to Littman's work, researchers had already identified the new cohort of patients Littman later wrote about: "In our data, most of the adolescents first presented with gender dysphoria and cross-gender identification well after the onset of puberty, and the vast majority suffered significant psychopathology and broader identity confusion than gender identity issues alone. It is important to be able to openly discuss these alternative presentations of gender dysphoria in order to find appropriate treatment options." The UK Cass Review recently came to a similar conclusion: "At present we have the least information for the largest group of patients—birth-registered females first presenting in early teen years." (Cass 2022 p.58).

46.     A recent paper (Diaz 2023) analyzed survey results of parents of children who believe their children to have Rapid Onset Gender Dysphoria. This survey found a large portion of natal males with prior onset of video game addiction (17%), and substantial numbers of these youth were reported to have internet addiction (14% for natal males and 16% for natal females) prior to gender dysphoria. The paper concluded: "Youths with a history of mental health issues were especially likely to have taken steps to socially and medically transition…. parents believed gender clinicians and clinics pressured the families toward transition. The finding is particularly concerning given that parents tended to rate their children as worse off after transition."

14

47.     Dr. Jack Turban, a psychiatrist and transgender activist, recently attempted to argue against social influences on gender dysphoria and transgender status, warning that "the notion of ROGD has been used in recent legislative debates to argue for and subsequently enact policies that prohibit gender-affirming medical care for [transgender and gender diverse] adolescents." As is often the case when activism is prioritized over scholarship, Dr. Turban's article is replete with misinformation. The article begins by asserting, for instance, that the ROGD "hypothesis was formed solely through the analysis of online parental survey data." (Turban 2022). But as shown above, clinicians had already reported the change in patient profile three years *before* Littman's article, in 2015.

48.     Even more significantly, a letter to the editor published in *Pediatrics* noted that Turban's article contained "critical theoretical and methodological concerns specific to its conceptualization of social contagion and its data analysis." (Lett 2022). Much more substantial critiques were rejected by the editors at *Pediatrics*; while not searchable or indexed as scholarly work, some of the critiques are available as comments on the article's web page. One group of authors, led by Leonora Regenstreif at McMaster University (home of evidence-based medicine), documented concerns about "the non-random sampling," "the information not solicited in the survey, the wording and possible interpretations of the questions, as well as the accuracy and completeness of the data generated… [and] the imprecise wording of several questions regarding self-identity and sexuality." (Regenstrief 2022.) This group noted how Turban "assume[d] away" the key question of how trans-identified teens will answer "What is your sex?", even though the CDC had "urg[ed] caution in interpreting the 'sex' variable" because it is known that some trans-identified teens will give their *gender* rather than their biological sex when asked for their sex. Yet Turban's entire study was based on this assumption. (Regenstreif 2022). Another researcher ran the data and found

out that, indeed, transgender respondents who identified as male were on average 2.5 cm shorter than non-transgender male respondents, indicating "that some of the transgender respondents who identified themselves as male were natal females." (Biggs 2022A) As that researcher concluded: "Given the ambiguity of the [survey's] question on sex—evidently confusing to respondents and to scientists alike—no conclusion about the sex ratio of transgender youth can be drawn from this survey. The article does, however, provide considerable insight into the editorial standards maintained by *Pediatrics*." (Biggs 2022A)

49.    Regarding social contagion and Rapid Onset Gender Dysphoria, Turban also reported in that same article that he is attempting to influence political and legislative actions and theorizes that scholarly discussion of the data supporting social influence as a causes of the rapid increases in gender dysphoria is somehow harmful. He lamented: "The deleterious effect of unfounded hypotheses stigmatizing [transgender and gender diverse] youth, particularly the ROGD hypothesis, cannot be overstated, especially in current and longstanding public policy debates." (Turban 2022). This statement alone reveals that Turban prioritizes advocacy over science and the search for the truth.

50.    Whereas "gender affirming" organizations like WPATH have been critical of the "rapid-onset gender dysphoria" hypothesis and the possibility of a social element to the rise in cases of adolescent gender dysphoria, healthcare authorities other countries have paid more attention. As already noted, the independent Cass Review in the UK has recognized the rapid change in patient profile and warned that little data exists "on the more recent case-mix of predominately birth-registered females presenting in early teens" because "[m]uch of the existing literature about natural history and treatment outcomes for gender dysphoria in childhood is based on a case-mix of predominately birth-registered males presenting in early childhood." (Cass 2022 p.19).

51.     Likewise, last February the French National Academy of Medicine noted: "Whatever the mechanisms involved in the adolescent—overuse of social networks, greater social acceptability, or example in the entourage—this epidemic-like phenomenon results in the appearance of cases or even clusters in the immediate surroundings." It recommended "[t]he vigilance of parents in response to their children's questions on transidentity or their malaise, underlining the addictive character of excessive consultation of social networks which is both harmful to the psychological development of young people and responsible, for a very important part, of the growing sense of gender incongruence."

52.     In my experience, many psychiatrists in America also believe social media has significantly contributed to the rise in gender dysphoria. Yet most child and adolescent psychiatrists I speak with admit to me they will not speak publicly on this subject due to how sensitive the topic is, expressing fears of hostilities from activists along with condemnation and retribution from others within their universities or organizations.

53.     My personal conversations align with recent polling. As part of the Social Media Institute at the October 2022 American Academy of Child and Adolescent Psychiatry annual conference, program chair Paul Weigle anonymously polled the audience was on a number of topics. When polled: "How often do you see teens who seem to be influenced by social media in regards to their sexual and/or gender identity?", 80 of 97 (82%) of the child psychiatrists in attendance indicated social media was an influence "somewhat often" or "very often." This data was recently published in *Psychiatric Times* (Weigle 2023), and to my knowledge, is the first data suggesting that the vast majority of a group of child and adolescent psychiatrists acknowledge that social contagion may be a major contributor to the rise in gender dysphoria.

54.     A similar poll was conducted by Dr. Weigle at the January 18, 2023, meeting of the Child & Adolescent Psychiatry Society of Greater Washington, where all attendees were physician members. When asked, "How often do you see teens who seem to be influenced by social media in regards to their sexual and/or gender identity?", there were 34 respondents. 47% indicated *Occasionally* and 35% indicated *Often*. So again, 82% of these child and adolescent psychiatrists reported that they see teens' gender identity being influenced by social media. These polls suggest that practicing child and adolescent psychiatrists have direct clinical experience leading them to believe social media is influencing gender identity in their patients. More research is needed into Rapid Onset Gender Dysphoria and other possible causes of the recent change in patient profile in gender dysphoric youth.

55.     In my opinion ideological and social factors underlie much of the recent increase in gender dysphoria in adolescents. While this does not rule out other factors, the ongoing research demonstrating an association between social factors and gender dysphoria in adolescents raises serious doubts about the wisdom of using transitioning treatments like puberty blockers and cross-sex hormones to treat the new population of gender dysphoric youth.

### THE DANGERS OF PROCLAIMING A FALSE SCIENTIFIC CONSENSUS FOR HOW BEST TO TREAT GENDER DYSPHORIC YOUNG PEOPLE

#### A. Best Practices for Scientific Dialogue

56.     Our highly social nature and limited rationality demand that, in medicine and science, we create conditions which foster trustworthy data and minimize the creation and spread of misinformation. In my opinion, medical organizations and journals have recently prioritized advocacy over science when it comes to considering treatments for gender dysphoric young people.

57.     Evidence based medicine requires "the development and promotion of a universal set of scientific rules that ensure accurate inferences on the basis of experience" (Djulbegovic,

2009). A prescription for open exchange and deliberate consideration regarding gender dysphoria treatments should aspire to:

    a.   Solicit a diversity of perspectives.

    b.   Discuss the argument, rather than the person making the argument.

    c.   Clarify the methods, source of data and its limitations.

    d.   Use precise language rather than broad ideologies.

    e.   Discuss potential sources of bias, including those related to group affiliation.

    f.   Quickly acknowledge and correct mistakes.

58.    This framework would depersonalize the search for truth and esteem empirical dialogue.

59.    For this reason, clinical practice guidelines and documents providing generalized medical recommendations must objectively reflect the evidence base. The *Mayo Clinic Proceedings* article, "Clinical Practice Guidelines: A Primer on Development and Dissemination," (Murad 2017) highlights that "trustworthy clinical practice guidelines require a systematic review to select the best available evidence and should explicitly evaluate the quality of evidence." The authors' criteria for trustworthy guidelines include:

    a.   "Be based on explicit and transparent process that minimizes distortions, biases and conflicts of interest."

    b.   "Provide a clear explanation of the logical relationships between alternative care options and health outcomes."

    c.   "Provide ratings of the quality of evidence and the strength of the recommendations."

### B.  How Breakdowns in Scientific Dialogue Occur

60.    Ideological homogeneity and group identity are risk factors for developing irrational beliefs and spreading misinformation. (Sun 2022; Macy 2018). This directly relates to attitudes about transgenderism and gender dysphoria treatments where ideological dogma has distorted scientific exploration. Those who dare to question the dogma, such as Littman, are treated as heretics.

61.    The dynamics of this polarization and lack of intellectual humility are understandable. Within psychiatry and medicine, practitioners face patients suffering from enormous suffering. Gender non-conforming patients at times face harassment and discrimination. Patients expressing gender dysphoria have high rates of depression, anxiety, and self-harm. All physicians and mental health professionals want to help. Those who started adolescent gender clinics hoped to relieve suffering. Yet in medicine excessive optimism regarding low quality treatments can cause rather than reduce suffering.

62.    All humans, including physicians, tend to find arguments in favor of conclusions we want to believe, and this bias is known as motivated reasoning (Peters 2020). Supporters of gender-affirming treatment want to believe they have found an ethical and evidence-based solution. This motivated reasoning explains the strong divergence between the enthusiastic support for gender-affirming treatments and their relatively weak evidence base (Brignardello-Peterson 2022).

63.    Once a group, such as a gender committee, endorses a statement of belief, such as "gender affirmative care is life-saving," other psychiatrists in their professional organization who have not reviewed the facts tend not to question it. Psychiatrists face a rapidly expanding evidence base across disorders, and we depend on specialization to lead us toward progress in our varied patient populations.

64.     Especially if the "experts" assert a strong moral claim regarding a clinical approach, other physicians would assume it is based on strong evidence. This creates a group process where the leadership responds to show support and loyalty, and others tend to follow. Support of this moral claim becomes a marker of virtue and raises status within the group. Those who are skeptical tend to self-censor (a "spiral of silence") rather than taking a risk of being called unethical (Noelle-Neumann 1974). These dynamics, especially leadership's endorsement, make opinions appear like facts within the group. Members of this group never hear counterarguments or disconfirming data and become ever more confident.

65.     Within such moralized environments, education and intelligence offer limited protection from irrational beliefs. In fact, sophisticated language skills enable virtuosity in creating and promoting false narratives. These dynamics have arisen before in medicine, and it is my assessment this has occurred again with regards to medical interventions to treat gender dysphoria in minors.

66.     Contrary to popular belief, humans' emotional programing drives much of our cognitive processes. That is, we tend to create beliefs that go along with what we feel, rather than the other way around. This usually works well, but also causes serious problems. In cognitive therapy, it is known as "emotional reasoning." Emotional reasoning helps explain opinion cascades, partisanship, and group-think, as those who identify strongly with a group tend to feel positively toward those in the group and negatively toward the out-group.

67.     The moralized framing of affirmative treatments for gender dysphoria encourages a cognitive shortcut known as attribution substitution (Sunstein 2009, p 216). Attribution substitution is the process whereby a simple, related moral judgement is substituted for various concep-

21

tually complex decisions. This common cognitive bias causes humans to intuitively believe viewpoints which appear virtuous, especially ideas which seem widely held within their social group. "Affirmative care" sounds compassionate and supportive, and these minor semantics can have a surprising influence.

68.     Physicians can be especially susceptible to manipulation. Psychiatrist Anna Lembke, in her 2016 book *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop*, explained that "[d]octors are by and large pleasers" because "[t]hey make it through the complex maze of schooling all the way to medical school by figuring out early what people want and providing it." (Lembke 2016, p. 104). In this way, physicians are susceptible to acquiesce to patient narratives and overtreat.

69.     Conditions resting on entirely subjective assessments like level of pain or gender identity have the most potential for harmful overtreatment. In both cases, patients can easily find out what symptoms to report to obtain the treatment they desire, as has been noted in the Cass Interim Review: "We have heard that some young people learn through peers and social media what they should and should not say to therapy staff in order to access hormone treatment." (Cass Review 2022) In the current political climate, physicians feel the pressure to not be assailed as a "gatekeepers," even when logic and data tell them outside social pressures should not distort medical care.

### C.  Historical Examples of Harmful Scientific "Consensus" and Overtreatment

70.     The medical system has a long history of spurts of overdiagnosis and overtreatment. Oncologist Otis Brawley laments that "our medical system fails to provide care when it is needed and fails to stop expensive, often unnecessary, and frequently harmful interventions even in situations when science proves these interventions are wrongheaded" (Bawley 2011, p. 22). Many of

our harmful interventions such as frontal lobotomies were celebrated at the time. Eventually society sees the harm, pushes back, and the medical profession eventually reforms.

71.    Hydrotherapy, sterilization, lobotomy, and clitoridectomy (removal of clitoris to treat "hysteria") were each a part of the medical establishment in the first half of the twentieth century (Braslow 1997). Prior to the age of antibiotics, neurosyphilis was a common cause of psychiatric admission, diagnosed at that time as general paralysis of the insane. The causative theory was the premature using up of cerebral vitality through excessive enjoyment of wine, women, and life. A common treatment of the time was malarial induced fever. It was thought this "treatment" saved patients from general paralysis of the insane, which had a fatal course (Shaw 1927).

72.    For decades, sterilization was legitimized by the medical establishment. Not long ago, "[t]he most important elite advocating eugenic sterilization was the medical establishment," which advocated "with near unanimity" for the procedure. "[E]very article on the subject of eugenic sterilization published in a medical journal between 1899 and 1912 endorsed the practice." (Cohen 2016).

73.    Similarly, pioneers of frontal lobotomies spun their procedure with enthusiastic endorsement of the therapeutic nature of the procedure, ignoring evidence to the contrary. Their overstatements propelled lobotomies to gain acceptance among physicians desperate for new tools to address clinically challenging patients (Afkhami 2022). When the developer of the lobotomy, António Moniz, won the Nobel Prize in 1949, it further legitimized the operation. Even in 1954, the American surgeon and proponent of the surgery Walter Freeman claimed that transorbital lobotomies had mortality and morbidity rates that were "gratifyingly and consistently low" (Afkhami 2022) . Yet by this time, medical journals were already documenting harms done (Afkhami 2022).

Afkhami et al's linguistic analysis displays how lobotomy proponents projected a sense of hero-ism. They showed confirmation bias, i.e., these advocates ignored evidence disconfirming their theories. They tracked onto social norms in order to aggrandize their treatments and create a moral imperative to use lobotomies; as Freeman argued in 1954, "it seems not only possible, but obliga-tory, to extend the program of psychosurgery into the state mental hospitals in an effort to relieve human misery" (Afkhami 2022).

74.     Medical educators teach residents and students when reviewing research to look for bias. Who initiated this research? Did they have a certain goal or outcome in mind, or are they neutral? This is because when advocates or industry fund research, multiple mechanisms cause the research to typically obtain the result desired by the funders. (Sismondo 2008). Within my career, I witnessed the pharmaceutical industries' manipulations to promote antidepressants. These ma-nipulations were aided by our professional organizations, such as the American Psychiatric Asso-ciation and American Academy of Child and Adolescent Psychiatry, who at the time were receiv-ing significant funding from industry. "It's possible for good people, in perversely designed sys-tems, to casually perpetuate acts of great harm on strangers, sometimes without ever realizing it" (Goldachre 2014, p. xi). In the 2000s, an audit found that over 90% of the psychiatrists who created the clinical practice treatment guidelines were also paid by the pharmaceutical industry (Cosgrove 2009). Not surprisingly, the treatment guidelines at the time were overly focused on medications and downplayed other approaches. At psychiatric meetings and in our medical journals, those of us whose approach went beyond medications were marginalized.

75.     It was only after being sued that pharmaceutical companies were forced to release all their data, revealing that overall antidepressants often do not beat placebo, especially when

treating children and adolescents. After this embarrassment, in the late 2000s, the American Psychiatric Association and American Academy of Child and Adolescent Psychiatry put in reforms to limit undue influence of pharmaceutical companies. In part, overtreatment occurred at scale because providers were fooled by their clinical experience, as antidepressants have such a strong placebo response. In fact, it now appears that four out of five positive responses are arguably a placebo response (McCormack 2018, Hopcroft 2018).

76.     For years, when antidepressant medications research obtained unfavorable or neutral results, these results were often never submitted for publication or buried in an obscure journal. (Turner 2008). Unfavorable results of antidepressant trials were also significantly delayed, known as time lag bias (Reyes 2011). Positive antidepressant trials were typically published quickly and in prestigious journals; thus, psychiatrists following the published literature were falsely led to believe, for many years, that medications like paroxetine (Paxil) effectively treat depression in children. We now know, after the complete set of research has been released, that for children, many medications, including paroxetine, do not beat placebo. This is all the more concerning as psychiatrists and other providers exposed thousands of youth to paroxetine's side effects, which include increased suicidality. It was quite humbling to realize how medical journals and distorted medical dialogue can lead to mass adoption of ineffective and potentially damaging treatment. It wasn't just financial incentives that led to harm, but also doctors' egos, observations of placebo effects, and desires to relieve suffering.

77.     Within psychiatry and mental health, we have seen waves of theories. Psychoanalysis no longer dominates psychiatry but serves as an example of how a non-empirical theoretical approach can gather support, become dominant, and enforce ideological hegemony within psychiatry. When I was a trainee, many psychiatric leaders were trained as psychoanalysts, and it was

clear that it was not socially acceptable for trainees to challenge the psychoanalytic orthodoxies. An anthropologist even documented our psychiatric sub-cultures and how we are "of two minds" (Luhrmann 2001). For decades psychoanalysis dominated American psychiatry. "By 1960, virtually every major psychiatry position in the U.S. was occupied by a psychoanalyst. More than half of all psychiatrists were training to become analysts or were analytically-inclined in their orientation. All of the major psychiatry departments appointed psychoanalysts as chairmen." (Rufalo 2019) Furthermore, psychiatrists "seemed more interested in becoming respected members of the establishment than in challenging it. Insular, highly competitive, and prestigious, psychoanalysis became a 'status symbol.'" Psychoanalysis rose to and maintained dominance for decades not because it was effective at treating mental illness but because it served as a marker of intellectual sophistication and membership in the leadership class. It is my opinion that these same dynamics have led to the over-enthusiastic support for affirmative treatments for gender dysphoria among psychiatrists.

78.     The repressed and false memories movement of the 1980s and 1990s is another example of wide adoption of a theory without adequate evidence. While human memory is indeed flawed, and reports of distant memories being retrieved cannot be uniformly ruled as false, we know, and should have also known at the time, that human memory is susceptible to manipulations and is frequently inaccurate. A large contingent of mental health practitioners displayed a lack of skepticism, which led to harms both to patients and those who were at times falsely accused. (Otgaar 2022)

79.     The recent opioid epidemic is medicine's most recent and deadly episode of over-treatment. Harmful and unnecessary interventions are especially likely to occur when patient de-

sires are combined with financial incentives and the best of intentions. The American opioid epidemic was ushered in by "expert" physicians who proposed physicians needed more compassion because "pain is the 5th vital sign" (Mandell 2016, Adams 2016). Advocates for this approach were able to convince administrators and hospitals to push "improvements" in clinical care which prioritize documenting and reducing pain, with the result that opioid prescriptions skyrocketed. While a small number of patients may have achieved better pain control as a result, it came at the cost of creating legions of addicts. The Veterans Health Administration launched the "Pain as the 5th Vital Sign" initiative in 1999, requiring a pain intensity rating (0 to 10) at all clinical encounters. In 2001, the Joint Commission on Accreditation of Health Care Organizations warned that it would be looking at organizations' pain assessments in their accreditation judgments, thus using government fiat to force health providers en masse into harmful medical practice.

80.     Similar to medicalization of transgender care, this government-backed proclamation regarding pain treatment came without sufficient proceeding scholarly dialogue or even evidence that the suggested approach would actually solve the problem it claimed to be addressing (Mularski 2006). Nor did those "expert" physicians promoting increased use of opioids show any consideration for the potential long-term harms. Many patients suffer from physical and emotional pain, but when patient-driven medicine is allowed, too much compassion can cause harm.

## THE POLITICIZATION OF GENDER CARE AND SUPPRESSION OF DISSENTING OR QUESTIONING VOICES

81.     With rapidly growing cohorts of patients expressing novel symptom clusters in a new area of medicine where a limited evidence base exists, differences of opinion regarding clinical care for gender dysphoria are expected. It would be remarkable if there was uniformity of opinion. Furthermore, gender care is politicized, and opinions tend to cluster in a manner consistent with an influence of political ideology (Regnerus 2022).

27

82.     Within this context of low-quality evidence and divergent opinions, there are bound to be calls for reasonable clinical safeguards. There are also serious reservations regarding the effectiveness and concerns about the risks from affirmative treatment for Gender Dysphoria (Clayton 2022A, Biggs 2022B).

83.     Much of the push for "affirmative treatment" for gender dysphoria treatment has come from professional organizations such as the World Professional Association for Transgender Health, Endocrine Society, American Academy of Pediatrics, American Psychiatric Association, and American Academy of Child and Adolescent Psychiatry.

84.     Just as with other groups, professional medical organizations are susceptible to tribal influences and politicization. Medical professional organizations are large bureaucracies that serve many functions. They are important components of our medical system, but their influence and credibility can be misused. I have directly observed over the last decade, but particularly the last 5 years, that these organizations have prioritized a politicized and narrow vision of social justice advocacy. While this has arisen from good intentions, it has contributed to the creation and spread of misinformation regarding treatment of gender dysphoria.

85.     I have directly observed that within these organizations, the members most enthusiastic about a certain type of medicine self-select into "special interest groups" or committees. For instance, the psychopharmacology committee is filled with supporters of using psychopharmacology, and the psychotherapy committee is populated by members enthusiastic about psychotherapy. Committees on gender and sexuality have been no exception. By participating in a committee, a small group of people can establish themselves as content experts within their organization.

86.     Using committees as content experts usually works well, as it did during my eight years as co-chair within AACAP's media committee. AACAP leadership utilized our input to make decisions about clinical recommendations, public education, or relevant legislation.

87.     As gender clinics spread across America in recent years, enthusiasts of "gender affirming care" self-selected into these clinics and also into gender-relevant committees. In my experience, most physicians are wary of the very concept that it can be beneficial to block puberty or give cross-sex hormones to developing minors. Thus, those who venture into medicalized gender care are already a select few who bring to this work certain viewpoints and aspirations. Just as with the psychopharmacology or psychotherapy committee members, gender committee members have strong personal and professional investments in the success of their favored type of treatment. This creates a well-intentioned but homogenous group of supporters of "gender affirming care."

88.     Without the knowledge of most members of a professional organization, as few as the dozen members in a committee can steer these organizations' leadership to advocate for treatments or policy positions. Once medical organizations have come out with policy statements, clinical practice guidelines, and press releases advocating strongly for a position, they have difficulty accepting they may have misstated evidence, advocated for unwise policy, or otherwise caused harm.

**A.  American Academy of Pediatrics**

89.     The highly influential 2018 Policy Statement from the American Academy of Pediatrics (AAP) (Rafferty 2018) contains a preamble confirming that the author[2] wanted his Policy Statement to be an advocacy document; the document begins with "As a traditionally underserved

---

[2] Dr. Rafferty alone "conceptualized the statement, drafted the initial manuscript, reviewed and revised the manuscript, [and] approved the final manuscript as submitted." (Rafferty 2018)

population that faces numerous health disparities" and ends with "while eliminating discrimination and stigma." These themes are continued in the introduction and throughout the document. This Policy Statement contained many citation errors, overstatements, and mischaracterizations of the evidence base (Cantor 2020). The policy statement unfortunately denigrated and mischaracterized the longstanding and well-regarded clinical approach of watchful waiting, which the statement called "outdated" and claimed that "Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized." In fact, watchful waiting respects fluidity and identity development to a greater degree than "gender affirming care" because it leaves room for the patient to continue to grow in his or her identity. This policy statement has been particularly detrimental to the scholarly exchange of ideas related to gender dysphoria treatments, as it used the prestige of the AAP to privilege the concept of "affirmative care" and denigrate other treatment. It also increased momentum to enshrine social transition and access to medical treatments in minors, whether or not these are prudent or evidence-based approaches.

90.     Rather than encourage scholarly debate, the American Academy of Pediatrics has gone to great length to suppress its own members concerns about gender affirming treatments (Mason 2022). When an AAP fellow explained in the *Wall Street Journal* how the AAP had quashed member resolutions to conduct a systematic evidence review and reconsider its positional stance on "gender affirming care" (Mason 2022), the AAP's President responded publicly with multiple mischaracterizations of the debate, distortions of the AAP's own advice to clinicians, and divisive rhetoric characterizing those who urge caution as "anti-trans" (Szilagyi 2022)

91.     Organizations' political activism has important ramifications and creates a false impression that gender-affirming treatment rests on strong and settled science. Two recent press releases provide examples. The September 28, 2022 American Academy of Pediatrics (AAP) press

30

release regarding the State of Oklahoma condemns any limits on gender-affirming health care. Defending scope of practice is typical for medical associations. Yet the press release frames these limits as discrimination based on gender identity, a moralized characterization of restrictions on care.

92.    American Academy of Pediatrics' opposition to Oklahoma's limits on moral grounds (discrimination) fails to acknowledge ethical concerns regarding treatment of children with gender dysphoria. Those concerns of "gender affirming care" include large-scale, potentially irreversible damage to minors and a dysfunctional informed consent process that overstates the evidence of benefits and does not offer alternative treatments—all in a context in which many providers of gender affirming treatments do not even acknowledge that the recent surge in patients expressing gender dysphoria represents a never before-studied cohort without long term outcomes (Levine 2022). This is an example of two competing moral frameworks, which both express valid concerns. As such, a more appropriate perspective from a medical organization would be a call for reasoned dialogue to evaluate the moral claims on each side and examine the logic and data behind these moral frameworks and treatments. It is ethical to seek to find more cautious ways to care for and support youth with gender dysphoria or to seek a higher level of evidence before allowing minors to make permanent decisions regarding altering their bodies.

93.    Curiously, the AAP statement invokes parental rights, but without clarifying if the AAP supports the very likely majority, who do not want hormonal or surgical treatment for their child's gender dysphoria. This AAP statement misses an opportunity to show respect for those who disagree, and would rather frame them as biased, which is an indication of how politicized the AAP organization has become.

94.     The AAP has also demonstrated its politicization by publishing statements and joining amicus briefs across a range of political issues, including immigration (American Academy of Pediatrics 2017), affirmative action (Brief for Amici Curiae Association of American Medical Colleges et al. 2022), firearms (Letter to Chairman Patrick Leahy 2022), critical race theory (Trent et al. 2019, AAP Board of Directors 2020, AAP 2022), and climate change (Council on Environmental Health et al. 2015).

95.     As the Liaison from the American Academy of Child and Adolescent Psychiatry to the American Academy of Pediatrics, I sat on the AAP's Council on Communication and Media and witnessed the organization's increased politicalization firsthand.

## B.  American Academy of Child and Adolescent Psychiatry

96.     Like other medical organizations, the American Academy of Child and Adolescent Psychiatry (AACAP) has come out strongly for affirmative care, supporting the opinion that minors have the emotional and cognitive development to consent to treatments that may have adverse lifelong consequences such as sterility. Yet when the question was mandatory life in prison in *Miller v. Alabama*, the AACAP (and the American Medical Association) Amicus Curiae (2012 p. 2-3) claimed:

> Scientists have found that adolescents as a group, even at later stages of adolescence, are more likely than adults to engage in risky, impulsive, and sensation-seeking behavior. This is, in part, because they overvalue short-term benefits and rewards, and are less capable of controlling their impulses, making them susceptible to acting in a reflexive rather than a planned voluntary manner. Adolescents are also more emotionally volatile and susceptible to stress and peer influences. In short, the average adolescent cannot be expected to act with the same control or foresight as a mature adult.

97.     Unless this organization is willing to backpedal on its well-substantiated and well-documented arguments in *Miller v. Alabama*, how can it basically argue the opposite when it

comes to consent for irreversible treatment within the context of low-quality evidence and significant risk of harm?

98.     In 2018, Lisa Littman presented her research data at American Academy of Child and Adolescent Psychiatry conference and received personal enmity which caused a colleague to remark he had never seen a presenter at a conference treated with such hostility. I did not attend live but later watched the presentation online and also heard the many demeaning and unprofessional comments directed toward Dr. Littman.

99.     Members of AACAP (and other organizations) who observe scholars being condemned in this manner will certainly think twice before voicing their concerns about gender affirming care. This polarization and moralization can create a "spiral of silence": an appearance of agreement because a small moralizing group dominates the discussion (Noelle-Neumann 1974). This is consistent with my experience. I have been told by a range of child psychiatrists, from very senior AACAP "life members" to residents in training, that they are unwilling to openly express their viewpoint, but they do not see data or logic supporting "gender-affirming" treatments.

100.     The 2022 AACAP conference featured at least six presentations related to gender dysphoria or transgender patients, none presenting new research. Yet a research symposium was rejected which was to include prominent international gender dysphoria researcher and clinician, Riittakerttu Kaltiala, MD, PhD, Dr. Littman, and detransitioners. The AACAP program committee co-chair James McGough later indicated via a May 28, 2022 email that this highly unusual rejection was in part due to "concerns" about the methods employed in several of the presentations and that detransitioners would be involved. It defies logic that the only time methods are a "concern" is when the results of the research raises questions about affirmative care. Furthermore, I am aware

of a number of presentations that have been accepted with the condition of making a small adjust-ment. The detransitioners as discussants could have easily been replaced as their only role would be to ask questions after the research was presented.

101.    Dr. McGough indicates he took these concerns seriously. He referred concerned parties to "Aron Janssen, co-chair [of] the AACAP committee charged with taking the lead on trans issues." Dr. McGough also noted that "Aron is also on the program committee." As a program committee member "taking the lead on trans issues," Dr. Janssen would have significant power to support or suppress presentations Those concerned with free exchange of scholarly ideas should notice the words Dr. Janssen chose in his 2021 "Perspectives" article (Janssen 2021), where he characterized legislative and political endeavors to limit medical care as "malicious changes" that "provide fodder to perpetuate discrimination, fear, and exclusion." He specifically states: "It is our ethical responsibility to respond to this assault".

102.    Dr. Janssen characterizes those arguing for caution regarding gender affirmative treatments as making "an effort to oppress." In his report in this case, Dr. Janssen claims that "[m]edical treatment for gender dysphoria has immense psychological benefits for youth, bringing their mental health to a level similar to non-transgender peers" (P. 16). This uncited statement does not square with the research and displays his willingness to exaggerate in a manner detached from the evidence base.

103.    For those not familiar with the proceedings of medical conferences, research sym-posiums are eagerly sought out by the medical societies. The program chair, Dr. McGough, has commented to me personally that research symposiums are by far the easiest type of presentation to be accepted. For this same conference, I also submitted, with Drs. Kaltiala and Littman, a pro-posal for a Special Interest Group presentation, which was to feature data on detransitioning. This

34

proposal would have created a space for discussion of data that raised questions about affirmative care. The proposal was also silenced.

104.    For the October 2023 Conference, I offered Dr. Janssen the opportunity to be the discussant for a Clinical Perspectives session entitled *International Perspectives on Care for Gender-Dysphoric Children & Adolescents*. This presentation was to include researchers and clinicians from England, Sweden, and Finland, as healthcare authorities in each of these nations have dramatically curbed the availability of gender affirming care for minors as a result of the systematic reviews of the evidence they conducted. Dr. Janssen not only refused to participate, but he also rejected the request to suggest another committee member to serve as discussant. As a replacement, we submitted the proposed session with the past President of the American Academy of Pediatrics serving as discussant. Again this presentation was denied.

105.    Similarly, I also submitted for the AACAP 2023 conference a research symposium with researchers from England, Sweden, and Finland: *Epidemiology, Suicidality and co-morbidities of Gender Dysphoria, New International Findings*. This presentation was similarly rejected.

106.    Even more revealing, the AACAP March 18, 2022 press release reveals the leadership's strident position by remarking on an education bill, outside psychiatrists' area of expertise. (AACAP 2022). AACAP's statement used politicized derogatory phrasing by calling Florida's legislation the "Don't Say Gay or Trans" bill. The press release quotes the current president of AACAP who demonizes supporters of the bill as unconscionable and implies that the supporters "target and harm" LGBTQ+ youth." The American Academy of Child and Adolescent Psychiatry's leadership moralizes the debate, uses polarizing language, and does not engage in forthright discussion that must include skepticism, not just affirmation. Indeed, the AACAP has taken policy positions on a wide range of political issues, including climate change (AACAP Mar. 2022), gun

control (AACAP June 2022), immigration (AACAP Oct. 2021, AACAP May 2018, AACAP Sept. 2017), affirmative action (Brief for Amici Curiae Association of American Medical Colleges et al. 2022), and critical race theory (AACAP, proposal deadline June 1, 2023; AACAP Jan. 2023).

### C.  American Psychological Association

107.    The American Psychological Association has also taken seemingly contradictory positions on brain development in the context of two political issues: transgender care and the death penalty. The 2022 American Psychological Association Resolution on the Imposition of Death as a Penalty for Persons Aged 18 Through 20, Also Known As the Late Adolescent Class goes into significant detail regarding their position on brain immaturity through at least age 21:

> WHEREAS developmental neuroscience, including research on both the structure and function of brain development, establishes that significant maturation of the brain continues through at least age 20, especially in the key brain systems implicated in a person's capacity to evaluate behavioral options, make rational decisions about behavior, meaningfully consider the consequences of acting and not acting in a particular way, and to act deliberately in stressful or highly charged emotional environments, as well as continued development of personality traits (e.g., emotional stability and conscientiousness) and what is popularly known as 'character'.

I removed the many citations for clarity, but they can be found in the original document. The APA Resolution continues:

> WHEREAS it is clear the brains of 18- to 20-year-olds are continuing to develop in key brain systems related to higher-order executive functions and self-control, such as planning ahead, weighing consequences of behavior, and emotional regulation. Their brain development cannot be distinguished reliably from that of 17-year-olds with regard to these key brain systems.

128.    It is clear the American Psychological Association understands that the entire cohort of minors submitting to irreversible hormones and surgeries have under-developed abilities to understand the risks and meaningfully consider the consequences. I agree with the American Psychological Association that these deficits maintain up until at least age 21, and the courts should take these impairments seriously in *all* contexts.

36

### D. American Psychiatric Association

108.   Political and social pressures are not new to this line of research and clinical care and do not come from only one political pole or fraction of society. Yet especially within the last decade, academia, including academic medicine has become more tribal, moralizing, and more likely to attempt to silence divergent opinions (Bindewald 2021).

109.   I witnessed these dynamics personally at the American Psychiatric Association 2022 annual conference. At the Clinical Perspective *The Management of Adolescent Onset Transgender Identity: Should "Best Practices" Change* on May 24th 2022, there was a preamble. In a practice I had never before seen at a conference, representatives from the American Psychiatric Association who were monitoring the event were asked by leadership to read a statement prior to presentation indicating the content of the presentation clashed with official proclamations of the organization. During this Clinical Perspectives, four speakers presented convincing data and opined that they questioned the evidence base and logic supporting current affirmative psycho-therapy and medicalized practice regarding the treatment of transgender youth.

110.   Most of the audience respectfully sat while enjoying the thoughtful presentation. Yet a small crowd in the audience was disruptive. There were many interruptions of the presenta-tion by a member of the crowd who repeatedly provided his input. During the question-and-answer session, a series of "questions" were rather hostile ad-hominem statements towards the presenters. Only a tiny fraction of the questions actually responded to any of the evidence or viewpoints pre-sented. I have never previously observed any comparable unprofessional behavior or hostility to-ward presenters in any medical or psychiatric conference.

111.   The politicization of the American Psychiatric Association can also be seen in the many political positions taken by the organization, including climate change (Ursano et al., n.d.),

firearms (Letter to Chairman Patrick Leahy 2022, American Psychiatric Association Aug. 2019),

affirmative action (Brief for Amici Curiae Association of American Medical Colleges et al. 2022),

immigration (American Psychiatric Association Stress & Trauma Toolkit.

### E. WPATH

112.    The World Professional Association for Transgender Health (WPATH) is an international, multidisciplinary, professional association whose reported "mission is to promote evidence-based care, education, research, public policy, and respect in transgender health."[3] WPATH Standards of Care (SOC) documents share some features with what a medical organization would call clinical practice guidelines. The 2011 edition of WPATH's SOC documents are known as SOC-7, and the 2022 version is SOC-8. The authors of SOC-8 state: "The overall goal of SOC-8 is to provide health care professionals (HCPs) with clinical guidance to assist [transgender and gender-diverse] people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment."

113.    Dahlen et al. reviewed WPATH SOC-7 as part of a systematic review and quality assessment of international clinical practice guidelines for gender minority/trans people. They noted that WPATH SOC-7 "contains no list of key recommendations nor auditable quality standards." (Dahlen et al., 2021). Among the principal findings was that WPATH SOC 7 "cannot be considered 'gold standard.'" The WPATH review scored poorly on editorial independence, applicability, and rigor of development. The review scored better on scope, stakeholder involvement,

---

[3]  World Professional Association for Transgender Health, *Mission and Vision*, https://www.wpath.org/about/mission-and-vision (last accessed May 10, 2023).

and clarity of presentation. The reviewers noted that WPATH and other international clinical practice guidelines tended to prioritize stakeholder involvement rather than methodological rigor.

114.    Among the implications were that "[c]linicians should be made aware that gender minority/trans health [clinical practice guidelines] outside of HIV-related topics are linked to a weak evidence base" and that "[o]rganizations producing guidelines and aspiring to higher-level quality could use more robust methods, handling of competing interests and quality assessment."

115.    Despite the well-known methodological weakness to SOC-7, WPATH created SOC-8 in a similar manner, only selectively using the conventions expected to create a trustworthy clinical practice guideline. WPATH SOC 8 did not clearly document what reviews were attempted, raising the possibility that reviews were stopped or buried upon unfavorable results. WPATH SOC-8 obscures the most important element required for a trustworthy clinical practice guideline: the assessment of the strength of the evidence used to make recommendations. Hiding the strength of evidence hides critical data from readers trying to evaluate the evidence base for an organization's recommendations. (Murad 2017).

116.    My analysis is supported by the British Medical Journal Investigations Unit's review of the evidence for transgender treatments, including the WPATH SOC-8. (Block 2023). The British Medical Journal (BMJ) investigators interviewed Gordan Guyatt, M.D., an internationally recognized leader on systematic reviews and, in fact, the co-developer and first author of the original GRADE guidelines. BMJ also interviewed expert Mark Helfand, professor of medical informatics and clinical epidemiology at Oregon Health and Science University. Helfand noted that "WPATH's recommendations lack a grading system to indicate the quality of the evidence—one of several deficiencies."

117.    This same BMJ article highlighted transparency issues with the guidelines: "Both Guyatt and Helfand noted that a trustworthy guideline would be transparent about all commissioned systematic reviews: how many were done and what the results were." But whereas SOC-8 claimed that the evidence was so limited regarding transitioning treatments for gender dysphoric youth that "a systematic review regarding outcomes of treatment in adolescents is not possible," as Guyatt pointed out, "systematic reviews are always possible, even if few or no studies meet the eligibility criteria." (BMJ 2023).

118.    While SOC-8 is beyond the scope of this report to review completely, I must note four major concerns as a mental health professional:

a.    SOC-8 makes no analysis for why it prioritizes affirmation of gender identity over affirmation and acceptance of the physical sexed body. For clinicians and psychotherapists, these trade-offs are complex matters in developing adolescents and fundamental to treatment, yet SOC-8 treats the question as though it had a clear answer supported by the evidence: affirmation always. That is not the case.

b.    SOC-8 suggests consumer-driven medical and surgical interventions and deems these medically necessary without adequate supporting evidence. In no other field of medicine does a life-altering intervention become medically necessary based on the desire of the patient.

c.    SOC-8 normalizes self-mutilation via inclusion of "Eunuchs" as just another non-binary category without any suggestion that these individuals require mental health assessment prior to any consideration of chemical or surgical procedures.

d.    SOC-8 downplays concerns related to de-transitioning.

119.    There have been a number of other episodes I have learned about that have caused me to conclude that I do not feel comfortable relying on WPATH or its U.S. affiliate, USPATH, to guide my care of gender dysphoric patients.

120.    For instance, it appears there are calls for ideological hegemony at USPATH. Zander Keig, a longstanding WPATH member and former chair of the USPATH advocacy committee, related on a public podcast that he received a call from Dr. Joshua Safer, a WPATH board member, former president of USPATH, and author of the 2017 Endocrine Society Guideline. (Heterodorx 2023). According to Keig, Keig had agreed to be an advisor to the Gender Dysphoria Alliance, an organization composed of transgender people, detransitioners, and researchers that is "committed to thoughtful and respectful dialogue" and hearing from multiple perspectives regarding gender dysphoria. (Lisa Littman is also on the advisory board.) Presumably because the Gender Dysphoria Alliance is not unquestioningly "affirming" in all circumstances, Dr. Safer asked Keig to resign from USPATH or threatened to remove him as chair of the USPATH advocacy committee due to advising the Gender Dysphoria Alliance. Keig also stated that Dr. Safer suggested that he (Keig) lie about the reasons for resigning. This instance is illuminating on multiple grounds. First, silencing a member of USPATH and cleansing USPATH leadership of dissenters brings into question the ethics and scientific integrity of Dr. Safer. This is made more concerning because Dr. Safer was an author of the Endocrine Society Clinical Practice Guideline and other scientific research articles promoting transgender care. Second, as in this episode Dr. Safer appears to be representing the USPATH board, this demonstrates an institutional problem. WPATH and USPATH claim to be open to scientific exchange and diversity of thought, but their leaders risk termination if they are affiliated with a less politicized and ideological transgender group, such as the Gender Dysphoria Alliance.

121.     Similarly, USPATH has clearly become an uncomfortable place for clinicians or researchers whose perspectives do not fall into a narrow ideological slice represented by USPATH (Ciszek 2021). In 2016, for instance, renowned psychologist Kenneth Zucker had his USPATH conference presentation drowned out by protestors because he had previously suggested that affirmation-only therapy could cause gender dysphoric children to "persist" when they would otherwise have their gender dysphoria "desist." After shutting down Dr. Zucker's panel, the activists made demands to the USPATH board, which subsequently removed Dr. Zucker from remaining panels and apologized to the activists for allowing Zucker to attend the conference. The board thus rewarded the activists who silenced scholarly debate.

122.     Even prominent leaders at USPATH / WPATH like Laura Edwards-Leeper and Erica Anderson have acknowledged that, as they titled their Nov. 24, 2021 Washington Post article, "*The Mental Health Establishment is Failing Trans Kids.*" (Anderson 2021). USPATH and WPATH responded to the article by releasing an Oct. 12, 2022 joint statement condemning "the use of the lay press … as a forum for the scientific debate." (WPATH/USPATH 2022). The board of USPATH then privately censured Anderson, who later resigned as president. (Bazelon 2022).

123.     Based on these and other public accounts, I conclude that USPATH and WPATH are not scientific organizations that prioritize the search for truth and the safeguarding of vulnerable children, but instead are organizations that seem to prioritize preserving their image and enforcing their advocacy positions.

### F.   Endocrine Society

124.     Similar to AACAP and AAP, it appears that the Endocrine Society also takes a polarized position and misstates the strength of the evidence regarding "gender affirming care." In particular, the April 20, 2022, press release, "Endocrine Society Opposes Florida Department of

Health Policy on Gender Dysphoria Treatment for Children and Adolescents," reveals overstatements of the strength of evidence and the false appearance of consensus in the medical community. This statement mischaracterizes puberty delaying medication as a "safe, reversible and conservative approach." This statement claims that attempts to restrict care are based on politics, rather than acknowledging legitimate concerns. It is interesting that the organization cites the Endocrine Society's own clinical practice guidelines. Endocrine Society's guidelines themselves graded the supporting evidence as low or very low quality for their clinical recommendations.

125.    Another area of concern is the relationship between WPATH and Endocrine Society. It appears that nine out of ten authors of the Endocrine Society Clinical Practice Guideline are also WPATH leaders or authors. (Hembree 2017). This shows that a small number of physicians, empowered by these organizations, can create the false impression of broad consensus through campaigns of advocacy.

126.    These professional organizations' portrayal of medical interventions for gender dysphoria as both effective and virtuous has had a chilling effect on scholarly dialogue regarding gender dysphoria in the medical community.

### G.  Medical Literature

127.    Medical and psychiatric journals editors are surely aware of their affiliated professional organization's policy statements and political advocacy. Since the Endocrine Society, American Academy of Pediatrics, American Psychiatric Association, and American Academy of Child and Adolescent Psychiatry have all been openly involved in political advocacy in support of gender-affirming care, their journals are no longer scientifically neutral. This politicization is re-

43

flected in the editors' actions as medical and psychiatric journals have recently attempted to con-solidate favorable opinion toward gender-affirming treatments for gender dysphoria rather than promote open scholarly debate.

128.   Not surprisingly, skeptical voices have been difficult to find within any of the jour-nals of the Endocrine Society, American Academy of Pediatrics, American Psychiatric Associa-tion, or American Academy of Child and Adolescent Psychiatry. Journal editors have wide discre-tion to filter topics that are covered in their journals by choosing what articles are sent for review, commentaries, clinical perspective, vetting Letters to the Editor, guiding what is included in the book review column, and setting policies. It is curious that there has been minimal dialogue ex-ploring the unanswered questions related to informed consent in medical journals associated with medical organizations. Instead, these matters are left to be discussed disputed in academic journals not affiliated with these organizations. (Latham 2022, Levine 2022).

129.   The medical journal I follow most closely, *The Journal of the American Academy of Child and Adolescent Psychi*atry, has only published articles seeking conformity of thought with gender ideology and affirmative care and has not allowed actual scholarly dialogue to be voiced. This can be seen across commentaries (Dixon 2022), clinical perspectives (Turban 2017, Turban 2018), and book reviews (Suto 2021, Chilton 2021, Kim 2021).

130.   The 2017 Turban article, for instance, provided the perspectives of transgender and gender nonconforming youth; reading that viewpoint can certainly be valuable for clinicians. Yet most striking were the youth's ideological assertions, misunderstanding of the evidence, and pleas for their physicians to believe suppositions such as that "[s]exuality and gender are two different things. TOTALLY separate" and "[p]uberty blockers and cross-sex hormones can save my life." It also contained a pressure to join the movement: "Let me know that you are on my team." These

youth somehow have gotten the impression there is no doubt regarding the safety and efficacy of hormones and surgery. They also have the belief that changing society is the solution to their mental health challenges: "If I am depressed or anxious, it's likely not because I have issues with my gender identity, but because everyone else does." More striking was that the authors expressed agreement with the youths' ideology. The authors conclude: "Likely due to a combination of minority stress and dysphoria related to being 'trapped in the wrong body,' these young people are disproportionately burdened by depression, anxiety, and suicide attempts." The authors contend depression, anxiety, and suicide attempts "likely" arise from minority stress and as a result of gender dysphoria (Turban 2017). Yet as detailed throughout this report and cited, it appears more likely that those with pre-existing psychological disturbance are more likely to later express gender dysphoria.  (Bechard 2017, Diaz 2023, Littman 2018, Kaltiala 2015, Moradini 2022).

131.    *The Journal of the American Academy of Child and Adolescent Psychiatry* even published a Commentary that pressured researchers to adopt progressive gender theories to "become allies" (Dixon 2022). It is curious but revealing that the participants seemed uninterested in core unanswered questions, such as why individuals experience themselves as nonbinary or transgender. Conversely, the youth and authors used the commentary to push researchers to adopt ideology and allyship. These pressures on scholars are antithetical to the scientific method and have been a corrupting force in much recent research and academic dialogue regarding sex and gender. This politicized, low-quality scholarship has minimal credibility and is a prime example of how medical journals have prioritized advocacy and ideology over trustworthy science.

132.    For example, with two child and adolescent psychiatric colleagues, in response to Dixon et al., we wrote a Letter to the Editor of the *Journal of the American Academy of Child and*

*Adolescent Psychiatry* discussing the problems with the article cited above; the journal editor refused to even send this letter out for review.

133.    Not only are the articles one sided, but the peer review process regarding gender medicine within medical journals has become dysfunctional. Many recent examples show how prominent medical journals ignore significant weakness in methods, allow erroneous conclusions, and overstate the strength of the evidence when articles support affirmative care or related concepts (Biggs 2020C), Deangelo 2021, Kalin 2020, Giovanelli R. 2022). A few years ago, for instance, the *Journal of the American Psychiatric Association* published a study with an erroneous positive conclusion regarding gender surgeries in Sweden. The article prompted a flurry of letters to the editor that pointed out serious problems with the methodology and resulted in significant revision, including to the study's central finding (Bränström 2020).

134.    As discussed above, in 2018, Lisa Littman published an article that revealed aspects of the rapid spread of gender dysphoria in adolescents. After this research was peer reviewed and published, the journal PLOS ONE had a re-editing of the publication with a commentary added. (Littman 2019). This showed a disregard for the typical rules of scientific discourse because, importantly, this was not a correction; there was no finding of error, misconduct, or faulty methods with Littman's original paper. As confirmed by the PLOS ONE re-review, Dr. Littman's research methods were unremarkable and comparable to other mental health research.

135.    In her report, Dr. McNamara mislabels Littman's study "discredited" and reiterates spurious criticisms, such as criticizing the use of parent reports. At the same time, Dr. McNamara does not disparage the work of Dr. Kristina Olson, but actively relies on it. But Dr. Olson used only parent reports in her 2016 research article published in *Pediatrics* (the flagship journal of the

American Academy of Pediatrics). In fact, Olson's article was widely lauded, and Dr. Olson has received a McArthur genius award for her work.

136.    Further, given that Dr. McNamara claims that Littman used a questionable recruitment sample, note that Dr. Olson's Transyouth Project also used selective recruitment. This becomes extremely clear when you examine the income level of participants: 44% of families had a household income greater than $125,000, while 36% were between $75,000-125,000. When you consider that the 80th percentile of the US starts around $100 000, Olson's convenience sample clearly pulls from a highly privileged demographic (McKean 2016). Likewise, Dr. McNamara also cites Turban (2022), who utilized the 2015 USTS, which in its own methods reports, "Transgender adults ages 18 years or older were recruited in collaboration with over 400 community organizations." (James 2016).

137.    Precisely because of the data supporting for Littman's theories of Rapid Onset Gender Dysphoria, many advocates of medicalized treatment of youth with gender dysphoria appear to have panicked in an attempt to suppress scientific exploration rather than reformulate their own deeply held beliefs. McNamara echoes various journals that published articles deriding Dr. Littman's work, which resulted in her being personally harassed by activists. Brown University also did not make any effort to defend Dr. Littman from attacks on her freedom to pursue science.

138.    This antagonism of Dr. Littman was not about her methods, but rather that her data indicated that gender dysphoria was spreading in a pattern consistent with social influence. The affidavit of whistleblower Jamie Reed (Reed 2022) shows how this worked on a direct level in a gender clinic: "Doctors at the Center would ignore and dismiss as social contagion the claims about the tics and multiple personalities; but then those doctors would uncritically accept the children's

statements about gender identity and place these children on puberty blockers and cross-sex hormones."

139. Similarly, clinicians at the Tavistock center, which before its closure was the world's biggest gender identity service, documented their own experience with similarly-named "adolescent onset" gender dysphoria. This involves gender dysphoric patients presenting without any noticeable symptom history prior to or during the early stages of puberty. (Hutchinson 2020). They further note how clinicians around the world are witnessing the phenomenon they call "adolescent onset gender dysphoria" and how unhelpful it is to suppress research or malign scholars who bring uncomfortable facts to light: "Unless we are free to discuss, explore, and research differential presentations of gender dysphoria, the range of interventions which might best serve each young person may not be available to them. We do not think that this is good enough for our patients."

140. Dr. Littman's other heresy was revealing how many parents perceive the gender-affirming approach to be dysfunctional. (Littman 2018). Now a similar controversy is brewing with another paper that provides data behind the ROGD concept, "Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases" (Diaz 2023). This research documents parent reports from a convenience, non-neutral sample. Yet it explicitly discusses the disadvantages of such an approach and the rationale for publishing the data. Like Littman's work, this data undermines theories that gender identity is primarily biologically based, a theory advocated by Dr. Janssen in his report.

141.     Research that runs counter to the prevailing orthodoxy causes panic among gender ideologues and activist scholars. Again, a mob has arrived to attempt to undermine credible research. This is an excerpt from the International Academy of Sex Research (IASR) list-serve in response to the publication of the Diaz / Bailey article:

> Dear IASR members,
> In the interest of transparency, we want to communicate to the Membership about recent concerns regarding a publication in our official journal, the Archives of Sexual Behavior. On March 29th, the journal published an article authored by Suzanna Diaz & J. Michael Bailey entitled, "Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases." Since its publication, significant concerns about the ethical conduct and integrity of the editorial process have been raised about this study. . . . [signed by] The IASR Executive Committee.

(Bailey 2023).

142.     This focus on the "editorial process" only seems to go one way on this issue, against exploration of the massive rise in gender dysphoria and against scholars like Dr. Bailey and esteemed editors like Kenneth Zucker.

143.     There are many more examples of politicization squelching scholarly research. This includes the firing and restricting of research data from Laura Favaro by City, University of London as she attempts to research the perspective of academics with regard to gender issues. Ms. Favaro appears to have found a culture of fear and suppression regarding gender issue. As a result, this data is hidden and may never be revealed. (Sales 2023).

144.     In February, UCLA researchers were forced by activists to pause or perhaps abandon their study because it aimed to expose transgender individuals to different views of themselves. The researchers "explained that 'by demonstrating that body-self incongruence was linked to brain structure and function, we aimed to help provide a biological basis and increase empathy for the life stories of transgender individuals." Yet the activists who helped shut down the research revealed their disdain for this basic research because in their minds: "It is suggestive of a search

for medical 'cure,' which can open the door for more gatekeeping and restrictive policies and practices in relation to access to gender-affirming care." (California LGBTQ HHS Network 2021).

145.    Similar dynamics are in place even in newsletters. A colleague told me about a difficult experience with editors of the American Academy of Psychiatry and the Law Newsletter. The editors would not permit him to describe in his article the actual problematic behaviors of youth who declared themselves to be transgender in his inpatient unit. This silencing of actual clinical situations undermines the exchange of ideas on how to best provide clinical care.

146.    Open inquiry is the ability to ask questions and share ideas without risk of censure. It is fundamental to medical research and scientific progress. Within medicine, the ability for constructive disagreement and the expression of divergent opinions has withered with regards to questions of biological sex, gender, and gender medicine.

147.    Complex ethical issues regarding treatment of gender dysphoria deserve attention. Yet pressures to accept affirmation treatment as being the most virtuous and only effective approach discourages good faith scholarly dialogue. Furthermore, the characterization of those who oppose gender affirming care as transphobic or hateful has been used to justify silencing scholars whose data or logic does not support the gender-affirming approach. This occurred with Lisa Littman. Former sex researchers have left the field due to the harassment and intellectual bullying they received (Soh 2021).

148.    My personal interactions with many thoughtful well-regarded psychiatrists display a full range of views. In my experience, most child and adolescent psychiatrists consider automatic affirmation inappropriate, even though many are willing to use affirmative approaches selectively. (Evans 2021). Most psychiatrists are willing to admit we don't have enough research to really know how to proceed.

149.     Within medicine and academia, we need to create space to allow input from those who hold the opinion that logic and the evidence base do not support using the "gender affirming care" model to treat gender dysphoria. We require a frank discussion of the moral issues involved, including moral hazards associated with medical treatments for gender dysphoria. Currently, I see little evidence of this sort of scholarly dialogue happening.

## HOW ADVOCACY UNDERMINES SCIENTIFIC DISCUSSION AT MEDICAL ORGANIZATIONS

150.     The major medical organizations involved with promoting "gender affirming care" have relinquished their former role of curators of neutral science with regards to gender dysphoria. They have adopted unproven theories, become advocacy organizations, and have used their prestige to support their approved opinions and ideology. They have made public statements dismissing or even demonizing scholars who raise concerns. It cannot be seen as a coincidence that whereas there is serious debate throughout society and throughout the globe, little to none is to be found at the Endocrine Society, the American Psychiatric Association, the American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, or WPATH. Even more concerning, their respective journal editors, as shown, have also chosen advocacy over science.

151.     These advocates convinced the medical leadership to support affirming care in large part by framing medicalized treatments for gender dysphoria as "rights" and "discrimination" issues rather than an examination of evidence. This moralized and tribalized gender medicine and thereby stifled open exchange and silenced skepticism within medical journals. As these medical organizations put their prestige and influence behind this type of care, those overseeing conference programs, newsletters, and press statements and the editors of journals systematically distorted scholarly dialogue by promoting medical interventions. Moralizing and advocacy silenced concerned physicians, but most didn't even know their organizations had staked out such extreme

stances. Thus, the members of these professional medical organizations have never had an opportunity to observe, or participate in, open and honest dialogue regarding the evidence for transgender care. As such, the positions of these organizations reflect mostly a tribal mentality and the politicization of gender affirming care. It does not reflect the views of members who have had a sober review of the evidence base and decided celebratory support of gender affirming care is warranted.

152.     I offer three examples of the kinds of discussions that should be occurring with frequency in the medical organizations with regard to how best to treat young people suffering from gender dysphoria, but sadly are not.

### A.  Psychotherapy

153.     Patients presenting with gender dysphoria have real symptoms, typically with other comorbid mental health disorders. These patients require validation and support. I recommend their mental health treatment start with psychosocial supports and psychotherapy (Schwartz 2021). In psychiatry, we typically refer to other providers such as social workers, psychologists, and licensed clinical therapists, who tend to provide the bulk of psychotherapy. Despite this, as noted in my background, I have extensive experience with psychotherapy and received additional training in a number of psychotherapies (talk therapies) including Cognitive Therapy, Rational Emotion Behavior Therapy, and Trauma-Focused Cognitive Behavioral Therapy. I also have training and experience in meditation and mind-body techniques including mindfulness meditation, trauma focused yoga, and Accelerated Resolution Therapy. It should also be noted I trained under and worked for over a decade with former AACAP president Martin Drell, MD, who was intimately involved in training at LSU and ensured my training emphasized psychodynamic therapy and family therapy. Doctor Drell is well known as an eminent psychotherapist among child and adolescent

psychiatrists. Not only do I have experience with psychotherapies, I have been teaching them to medical students, psychiatry resident and supervising residents' psychotherapy for years. This background and experience distinguishes me from the majority of psychiatrists.

154.    Quality psychotherapy includes the process of exploring patient life history, emotions, coping style, and thought patterns. This includes validating how patients feel, but it also includes teaching patients to not be guided solely by their feelings. Psychotherapy involves getting patients to recognize their own thought patterns, disturbed emotions, and, when appropriate, includes challenging irrational, self-defeating, and harmful beliefs.

155.    There is not an evidence base to support strictly "affirmative" psychotherapy for gender dysphoria, where therapists actively agree with a patient's self-assessment. Automatically agreeing with patient viewpoints is a radical departure from traditional mental health treatments and psychotherapy. Psychiatrists do not "affirm" hopelessness in depression, delusions in schizophrenia, or distorted body image in anorexia or body dysmorphic disorder. The similarities between body dysmorphic disorder and gender dysphoria, and the contrast in how they are approached, provide significant evidence of how ideological and political forces have influenced medical practice (Kohls 2022).

156.    Is it, for example, sensible, compassionate, or good medical practice to, for instance, soon after a sexual assault, automatically agree with a teen's new self-assigned gender label? What about when a nine-year-old girl who spontaneously says, "I feel like I am a boy"—do we immediately ask what boy name to call the child?

157.    In psychotherapy with a patient with gender dysphoria, the therapist should neither advise a patient to change a gender identity nor "agree" that a patient is the opposite sex. It is surely reasonable and compassionate for a psychotherapist to prefer a patient no longer to suffer with

gender dysphoria. It would be inappropriate for a mental health professional to prefer gender dysphoria to continue. Yet, the false binary of affirmative psychotherapy versus conversion therapy for gender dysphoria is being used to push therapists from any consideration that acceptance of one's biological sex or resolution of gender dysphoria is a positive event.

158.    This categorizing of quality psychotherapy as conversion therapy is a serious misunderstanding of the complexities of ethical and effective psychotherapy (Schwartz 2021, D'Angelo 2021). The term "conversion therapy" is often misused by the supporters of affirmative care as an attempt to devalue and pathologize approaches other than purely affirming a patient's gender self-identification (Griffin 2021, Evans 2020). The only conversion therapy which has ever been researched is the attempt to change, or convert, sexual orientation. Such conversion therapy is widely discredited, which is perhaps why lodging accusations of conversion therapy has been so effective at creating an all-or-nothing atmosphere concerning "gender affirming care."

159.    In his report Dr. Janssen claims that "[g]ender identity has a biological basis and cannot be altered through medical or psychological interventions. The evidence demonstrating that gender identity cannot be altered, either for transgender or for non-transgender individuals, underscores the innate nature of gender identity." (p. 5-6). Yet Dr. Janssen fails to provide the reference to any studies backing up this claim of innate nature or biological basis. This broad claim might be more accurate for childhood onset gender dysphoria (i.e., children who experience gender dysphoria from a young age like 3 or 4). Yet, when this cohort reaches puberty, experiencing natural puberty typically leads gender identity to change, as most go on to be same-sex attracted and cisgender. Dr. Janssen's claim is even more spurious when examining the late childhood and adolescent onset of transgender identity. This is a much larger cohort, and gender identity already did change for them, as they were not transgender from early childhood. This cohort typically had

emotional and psychological problems but no signs of transgender orientation during childhood (Holt 2016, Kaltiala 2015, Bechard 2017, Hutchinson 2020, Daiz 2023, Littman 2018). Furthermore, this later onset female cohort identity is the largest group in treatment. Data from Tavistock clinic shows that as levels of psychopathology of new intakes increased the percentage of pre-pubertal onset natal females decreased. In 2012 this natal female pre-pubertal cohort was 7.3% and declined to only 4.8% of in 2015 (Morandini 2022). For natal females from 2012 to 2015 mood problems went from 39% to 60%, anxiety increased from 23% to 44%, and autism spectrum disorders increased from 10% to 15%. This was all in a context when the same cohort actually reported less bullying and abuse. This surge in patients with higher degrees of psychopathology and later-onset presentation has also been documented elsewhere (Holt 2016, Kaltiala 2015). All these factors make the most likely reality that in our current culture we are siphoning gender non-conforming youth with emotional problems into medicalized treatments for gender dysphoria.

160.    Gender identity is often described as fluid, and as this implies, often changes over time, particularly in young people. Dr. Janssen does not explain how gender is both fluid and biologically determined, nor what studies he believe resolves this paradox. This gender fluidity is also why it is unwise to affirm a declared gender identity in a child. Psychotherapists need space to ask questions about gender identity. Exploring gender identity is not conversion therapy.

161.    Time-tested and widely effective psychotherapy approaches include supportive therapy or cognitive behavioral therapy. Cognitive behavioral therapy has proven effective for virtually every mental health condition it has been researched for, including the full range of anxiety disorders, depressive and mood disorders, disturbed anger, sleep disturbance and trauma reactions including Post Traumatic Stress Disorder. Due to the high levels of comorbidity of psychiatric disorders in patients with gender dysphoria, cognitive behavioral therapy could be extremely

55

helpful as the same approach and techniques have proven effective with so many problems including anxiety and depression and in reducing self-harm.

162.   Any psychotherapy should aim to help individuals gain a deeper understanding of themselves, develop coping skills, and provide a neutral, unbiased process. Beyond standard psychotherapies, more specific and nuanced approaches for gender dysphoria exist, such as Exploratory Therapy (https://genderexploratory.com/). This "talking therapy" allows time for exploration of mental health concerns without pushing an ideological or political agenda.

163.   Advocates of affirmative treatment and their dismissal of other approaches can be especially harmful in the cases of gender dysphoria presenting in the context of severe pre-existing psychiatric illness. Psychotherapy could lead to the resolution of these comorbid illnesses. I can provide three examples.

164.   Trauma: There is longstanding psychiatric literature showing that exposure to sexual trauma can lead to changes in gender expression (Cosentino 1993), and this has also been revealed by recent research on detransitioners (Littman 2021). A recent review on Dissociative Identity Disorder and co-occurring gender dysphoria showed frequent childhood sexual abuse (Soldati 2022). Thus, a child's gender expression can be a reaction to trauma rather than an intrinsic identity to be strictly "affirmed." This is what is termed diagnostic "overshadowing" in the Cass Interim Report of the United Kingdom's review of services for gender dysphoric youth: "Another significant issue raised with us is one of diagnostic overshadowing—many of the children and young people presenting have complex needs, but once they are identified as having gender-related distress, other important healthcare issues … can sometimes be overlooked" (Cass 2022, p. 17).

165. Thus, rather than allowing clinicians flexibility to proceed as longstanding clinical wisdom would dictate, advocates of affirmative treatment discourage discussion of the relationship between trauma and gender dysphoria. This affirmative model pressures clinicians to steer away from exploration whether a trauma reaction is the primary problem.

166. Relatedly, a core feature of Post-Traumatic Stress Disorder (PTSD) is avoidance, and in some patients, adoption of a transgender identity may be a method to avoid addressing the suffering caused by a trauma, such as a sexual assault. While this avoidance may temporarily block some negative feelings, in the long run continued avoidance can lead to terrible consequences, and a failure to resolve the trauma reaction. Repeatedly patients have described to me their physical and emotional distress when they are exposed to trauma reminders. Thus, they frequently have difficulty engaging in psychotherapy for PTSD. Even if they participate, they often actively avoid discussing their trauma. All these struggles to get patients engaged in the best treatment is unfortunate as trauma focused therapies such as Trauma Focused Cognitive Behavioral Therapy have an excellent evidence base.

167. The massive rise in expressions of gender dysphoria has been most pronounced in adolescent females. This is a population where assessment for and treatment of trauma should be a top priority. Furthermore, based on the link between sexual abuse and gender dysphoria seen in detransitioners, assessment and treatment of trauma symptoms should be prioritized. It is possible that for many patients the delivery of trauma-based psychotherapy may cause the desistence of gender dysphoria, which in some cases could be considered a co-occurring disorder related to the trauma.

**B. Autism**

168.     Autism Spectrum Disorders are neurodevelopment disorders. People with Autism Spectrum Disorder by definition have problems with social communication and interaction along with restricted or repetitive behaviors or interests. People with Autism Spectrum Disorders are consistently shown to be at increased risk for developing gender dysphoria (Cooper 2022). One review found gender dysphoria to be over four times as likely in patients with Autism Spectrum Disorders (Hisle-Gorman et al. 2019). Another review found that compared to typically developing controls, autistic adults who endorsed the wish to be the opposite sex were found to have more mental health challenges, bullying, suicidal ideation, and worse quality of life. They also had worse autism symptoms and more co-morbid disorders than autistic adults who did not report the wish to be the opposite sex.

169.     Autistic people experiencing gender dysphoria are a complex patient cohort. There is limited evidence of how best to help and support this specific population. Due to the neurocognitive limitations in patients with Autism Spectrum Disorders, they may be more suggestible. Autistic patients struggle socially and often spend large amounts of time online. Due to their rigid and obsessive thought patterns, if they develop gender dysphoria, they can become fixated and preoccupied with receiving hormonal or surgical procedures, whether or not they understand the risks. Adolescent patients with Autism Spectrum Disorder can be incredibly insistent, single minded, and determined. They also may have limited insight and minimal ability to anticipate the negative consequences of obtaining the object of their obsessions. Until more is known about the specific outcome related to this vulnerable population, caution with any clinical approach is warranted.

### C.  Borderline Personality Disorder

170.     Personality Disorders are enduring patterns of inner experience and behavior that deviate from expected and cause distress and impairment in functioning. The epidemiology of personality disorders in individuals with gender dysphoria is unknown, and estimates vary (Furlong 2022). Many estimates have the population extremely increased, such as 50% of adults, but others show smaller increases. One review of emergency room visits of transgender patients with diagnosed personality disorders at 4%, versus matched community sample of 1%. The hospitalized sample was at 5% among transgender patients versus 2% in controls (Lam 2021). Little scholarly guidance exists regarding specific approaches related to the various personality disorders with comorbid gender dysphoria.

171.     In Borderline Personality Disorder there is, by definition, an unstable sense of self, and this leads to frequent personality changes. This typically means sudden shifts in employment, relationship, sexual identity, frequent moves, and changes in types of friends. Patients with Borderline Personality Disorder often have early-life trauma and find many social environments invalidating. Patients with Borderline Personality Disorder have high levels of emotional dysregulation, self-harm, and substance use. This population is extremely difficult to treat.

172.     With an unstable sense of self being a feature of the disorder, this patient population seems an especially poor candidate for affirming treatments, especially irreversible treatments. There are two psychotherapeutic approaches that have shown significant success. The most established is Dialectical Behavioral Therapy (Gillespie 2022), but Mentalization Base Therapy (Vogt 2019) also has significant evidence as a successful approach.

173.     Especially for a young person developing signs of Borderline Personality Disorder, starting these proven approaches as early as possible is their best chance of avoiding a life course

full of emptiness, struggle, and suffering. Again, in this patient population, a focus on gender-affirming treatments as the solution to this constellation of serious mental health problems is extremely problematic, and appears likely to cause harm if it delays access to evidenced based treatments.

174.    Yet in his report, Dr. Janssen (p. 15-16) suggests "treating the underlying gender dysphoria is essential to alleviating the psychological distress associated with co-occurring conditions." Prioritizing the gender identity over other co-morbidities has no empirical basis and likely leads to other conditions being untreated—again, what Dr. Cass calls "diagnostic overshadowing." (Cass 2022, p. 17). Treating these other conditions entails minimal risk and does not require life-long alteration of one's body.

## CONCLUSION

175.    It is a scientific and medical consensus that patients with gender dysphoria typically also have a mix of anxiety, depression, self-harm, personality disorders, neurodevelopmental disorders, and trauma-related symptoms. These mental health problems generally pre-date or co-occur with the development of gender dysphoria.

176.    There is not a scientific or medical consensus that comorbid mental health disorders are due to "untreated" gender dysphoria, although this "minority stress" theory is frequently cited and goes along with the social justice ideology frequently exposed by advocates of gender affirming care. These same advocates of affirming care claim that medical transition, and only medical transition, will resolve these youth's mental health problems.

177.    Depression and anxiety in adolescents often relate to social struggles and these generally predate the emergence of gender dysphoria. Autism is primarily a social disorder. Many

child psychiatrists have expressed to me their experience that patients expressing a transgender or non-binary orientation have tended to struggle socially prior to declaring this orientation.

178.    When claims are made that there exists a scientific and medical consensus supporting gender-affirming care for gender dysphoria, this rests on the assertions of a small group of physicians who are already personally invested in this type of care. Those already providing hormones and surgeries have extremely powerful reasons to want to believe affirmative care is effective, and thus they are biased. I know psychiatrists involved in this type of care, and they are smart, compassionate physicians. I have no doubt they have received significant positive feedback from patients and families. This is consistent with multiple studies showing short-term benefit in mood and social dysphoria from affirming treatment.

179.    For many reasons, the "gender experts" are not neutral observers. When aligned with economic and ideological forces, a small group of physicians can wield disproportionate influence. The modern medical system does make serious mistakes at scale. We should be taking a cautious approach and encouraging rigorous open scholarly dialogue. Physicians who doubt the merits of affirmative gender care should be able to speak freely, without being attacked as immoral, and their warnings about medical interventions for minors should be heeded.

180.    Psychotherapy is a valid alternative mental health approach to medicalized treatments for gender dysphoria in youth. Existing psychotherapeutic approaches have already shown effectiveness at treating anxiety, depression, PTSD, Borderline Personality Disorder, which are frequent co-morbidities. These established approaches could be augmented with more recently developed techniques including mindfulness-based therapies, mind-body techniques, and specific exploratory therapies.

181.    Many young people want more ability to express themselves as they please, and it is agreed that we need to create space for all in our society. Yet the recent overall rise in depression, anxiety, and self-harm shows that we are not meeting the needs of our youth. In the debate regarding treatments for gender dysphoria, the medical system should still apply rules of evidence and proceed with caution. Whistleblowers in the United States (Reed 2022) have made anyone paying attention realize we do need "Time to Think" (Barnes 2023) and to reconsider our medicalized approach to Gender Dysphoria in youth.

Executed this 19th day of May, 2023.

_____

Kristopher E. Kaliebe, M.D.

**REFERENCES**

Abbruzzese, E., Levine, S. B., & Mason, J. W. (2022). The Myth of "Reliable Research" in Pediatric Gender Medicine: A critical evaluation of the Dutch Studies—and research that has followed. Journal of Sex & Marital Therapy, 1-27.

Adams, J., Bledsoe, G. H., & Armstrong, J. H. (2016). Are pain management questions in patient satisfaction surveys driving the opioid epidemic?. American journal of public health, 106(6), 985.

Afkhami A., et al. (2022). Spinning lobotomy: A conventional content analysis of articles by the pioneers of the procedure in the United States. Mental Health, Vol. 2, 2022, 100123.

Allison, S., Warin, M., & Bastiampillai, T. (2014). Anorexia nervosa and social contagion: clinical implications. Australian & New Zealand Journal of Psychiatry, 48(2), 116-120.

American Academy of Child & Adolescent Psychiatry, (March 18, 2022) Florida's "Don't Say Gay or Trans" Law Stigmatizes LGBTQ+ Youth and Families https://www.aacap.org/AACAP/zLatest_News/Floridas_Dont_Say_Gay_or_Trans_Law_Stigmatizes_LGBTQ_Youth_Families.aspx.

American Academy of Child & Adolescent Psychiatry and American Medical Association Amicus Curiae Miller V. Alabama. (2012) https://www.aacap.org/App_Themes/AACAP/docs/Advocacy/amicus_curiae/miller_vs_alabama_and_jackson_vs_hobbs_amici_brief.pdf.

American Academy of Child & Adolescent Psychiatry, press release (March 1, 2022). AACAP Statement Opposing Actions in Texas Threatening the Health, Mental Health and Well-Being of Transgender and Gender Diverse Youth and Their Families,

https://www.aacap.org/AACAP/zLatest_News/AACAP_Statement_Opposing_Actions_in_Texas.aspx.

American Academy of Child & Adolescent Psychiatry, AACAP Calls for Swift Congressional Passage of the "Dream Act", press release (May 21, 2018), https://www.aacap.org/aacap/Press/Press_Releases/Press-Releases-2018/Congressional-Passage-Dream-Act

American Academy of Child & Adolescent Psychiatry, AACAP Resource Library on Youth at the Border (Oct. 2021), https://www.aacap.org/AACAP/Families_and_Youth/Resource_Libraries/Youth_Border.aspx.

American Academy of Child & Adolescent Psychiatry, AACAP Statement on DACA Rescission (Sept. 2017), https://www.aacap.org/AACAP/Press/Press_Releases/2017/AACAP-Statement-on-DACA-Rescission.aspx.

American Academy of Child & Adolescent Psychiatry, Anti-Racism Resource Library (Jan. 2023), https://www.aacap.org/AACAP/Families_and_Youth/Resource_Libraries/Racism_Resource_Library.aspx.

American Academy of Child & Adolescent Psychiatry, Climate Change and Eco-Anxiety in Youth (Mar. 2022), https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Climate_Change_Eco-Anxiety_Youth-137.aspx.

American Academy of Child & Adolescent Psychiatry, Policy Statement on children and Guns (updated June. 2022), https://www.aacap-pac.com/aacap/Policy_Statements/2022/Children_and_Guns.aspx#:~:text=To%20help%20prevent%20firearm%20related,threat%20of%20personal%20violence%20exists.

American Academy of Pediatrics et al. (February 14, 2017). Leading Pediatric Medical Organizations Respond to Recent Executive Orders Impacting Immigrants and Refugees, https://www.abp.org/sites/abp/files/pdf/immigration_eo_statement.pdf.

American Academy of Pediatrics (May 2, 2022). American Academy of Pediatrics Calls for Elimination of Race-Based Medicine, https://www.aap.org/en/news-room/news-re-leases/aap/2022/American-academy-of-pediatrics-calls-for-elimination-of-race-based-medicine/.

American Academy of Pediatrics (Sept. 9, 2022). Statement from the American Academy of Pediatrics and the Oklahoma Chapter of the American Academy of Pediatrics on Gender-Af-firming Care, https://www.aap.org/en/news-room/news-releases/aap/2022/statement-from-the-american-academy-of-pediatrics-and-the-oklahoma-chapter-of-the-american-academy-of-pediat-rics-on-gender-affirming-care/.

American Academy of Pediatrics Board of Directors, (2020). Truth, Reconciliation, and Transformation: Continuing on the Path to Equity. *Pediatrics* 146 (3): e2020019794. https://doi.org/10.1542/peds.2020-019794.

American Psychiatric Association, APA Joins Call to Action to Prevent Firearm-Related Injury and Death (Aug. 6, 2019), https://www.psychiatry.org/news-room/news-releases/apa-joins-call-to-action-to-prevent-firearm-relate.

American Psychiatric Association, (last accessed May 18, 2023). Stress & Trauma Toolkit for Treating Undocumented Immigrants in a Changing Political and Social Environment, https://www.psychiatry.org/psychiatrists/diversity/education/stress-and-trauma/undocumented-immigrants.

Anderson, E. & Edwards-Leeper, L., The mental health establishment is failing trans kids, Wash. Post, Nov. 24, 2021.

Association of American Medical Colleges et al. (filed July 28, 2022). Brief for Amici Curiae in Support of Respondents, Students for Fair Admissions v. President and Fellows of Harvard College, Students for Fair Admissions v. University of North Carolina, Nos. 20-1199 & 21-707.

Bailey, J.M., Why is my gender research being cancelled? UnHerd, May 16, 2023, https://unherd.com/2023/05/why-is-my-gender-research-being-cancelled/.

Barnes, Hannah. (2023). Time to Think: The Inside Story of the Collapse of the Tavistock's Gender Service for Children.

Bazelon, E., The Battle Over Gender Therapy, N.Y. Times, June 15, 2022, https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html.

Bechard M. et al. (2017). Psychosocial and Psychological Vulnerability in Adolescents with Gender Dysphoria: A "Proof of Principle" Study. Journal of Sex & Marital Therapy, 43(7), 678–688.

Biggs 2022

   A – Biggs, M., "Turban et al.'s incredible assumptions about sex," journal contribution to *Pediatrics*, rejected, https://figshare.com/articles/journal_contribution/Turban_et_al_s_incredible_assumptions_about_sex/20436189/1.

   B – Biggs, M., Suicide by clinic-referred transgender adolescents in the United Kingdom. Archives of sexual behavior, 51(2), 685-690.

   C – Biggs, M., The Dutch protocol for Juvenile transsexuals: Origins and evidence. Journal of sex & marital therapy, 1-21.

Bindewald, B., & Hawkins, J. (2021). Speech and inquiry in public institutions of higher education: Navigating ethical and epistemological challenges. Educational Philosophy and Theory, 53(11), 1074-1085.

Block, J. (2023). Gender Dysphoria in young people is rising—and so is professional disagreement. *BMJ*, 380.

Bränström, R., & Pachankis, J. E. (2020). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. American journal of psychiatry, 177(8), 727-734.

Braslow J. Mental ills and bodily cures: Psychiatric treatment in the first half of the twentieth century. University of California Press; 1997.

Brignardello-Peterson, R., & Wiercioch, W. (2022). Effects of gender affirming therapies in people with gender dysphoria: Evaluation of the best available evidence. Agency for Health Care Administration Florida Medicaid Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria Attachment C. Retrieved Aug, 2, 2022.

California LGBTQ Health and Human Services Network (2021). Advocacy for TGI Research Participants, https://californialgbtqhealth.org/advocacy-for-tgi-research-participants/.

Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: fact-checking of AAP policy. Journal of sex & marital therapy, 46(4), 307-313.

Cass, H. (2022). Independent review of gender identity services for children and young people: Interim report. The Cass Review. https://cass.independent-review.uk/wp-content/uploads/2022/03/Cass-Review-Interim-Report-Final-Web-Accessible.pdf.

Ceci, S. J., & Friedman, R. D. (2000). The suggestibility of children: Scientific research and legal implications. Cornell L. Rev., 86, 33.

Chang, J. C., Lai, M. C., Tai, Y. M., & Gau, S. S. F. (2022). Mental health correlates and potential childhood predictors for the wish to be of the opposite sex in young autistic adults. Autism, 26(1), 146-159.

Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., ... & Olson-Kennedy, J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. New England Journal of Medicine, 388(3), 240-250.

Chilton, J. (2021) Being Trans-parent, Journal of the American Academy of Child & Adolescent Psychiatry, Vol. 60, Issue 6, 783.

Christakis NA, Fowler JH. Social contagion theory: examining dynamic social networks and human behavior. Stat Med. 2013 Feb 20;32(4):556-77. doi: 10.1002/sim.5408. Epub 2012 Jun 18. PMID: 22711416; PMCID: PMC3830455.

Ciszek, E., Mocarski, R., Price, S., & Almeida, E. (2021). Discursive stickiness: Affective institutional texts and activist resistance. Public Relations Inquiry, 10(3), 295-310.

Clayton 2022

    A – Clayton, A. (2022). The gender affirmative treatment model for youth with gender dysphoria: A medical advance or dangerous medicine?. *Archives of Sexual Behavior*, 51(2), 691-698.

    B – Clayton, A. (2022). Gender-affirming treatment of gender dysphoria in youth: A perfect storm environment for the placebo effect—the Implications for research and clinical practice. *Archives of Sexual Behavior*, 1-12.

Cohen, A. Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck 66 (2016).

Cooper, K., Mandy, W., Butler, C., & Russell, A. (2023). Phenomenology of gender dysphoria in autism: a multiperspective qualitative analysis. Journal of Child Psychology and Psychiatry, 64(2), 265-276.

Cosentino, C. E., Meyer-Bahlburg, H.F., Alpert, J. L., & Gaines, R. (1993). Cross-gender behavior and gender conflict in sexually abused girls. Journal of the American Academy of Child & Adolescent Psychiatry, 32(5), 940-947.

Cosgrove, L., Bursztajn, H. J., Krimsky, S., Anaya, M., & Walker, J. (2009). Conflicts of interest and disclosure in the American Psychiatric Association's Clinical Practice Guidelines. Psychotherapy and Psychosomatics, 78(4), 228-232.

Council on Environmental Health et al., (2015). Global Climate Change and Children's Health. Pediatrics 136 (5): 992–997. https://doi.org/10.1542/peds.2015-3232.

D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. Archives of Sexual Behavior, 50(1), 7-16.

Dahlen, S., et al. (2021). International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. BMJ open, 11(4), e048943.

Diamanti-Kandarakis, E., Bourguignon, J. P., Giudice, L. C., Hauser, R., Prins, G. S., Soto, A. M., & Gore, A. C. (2009). Endocrine-disrupting chemicals: an Endocrine Society scientific statement. Endocrine reviews, 30(4), 293-342.

Dhejne C, Lichtenstein P, Boman M, Johansson AL, Långström N, Landén M. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PLoS One. 2011;6(2):e16885.

Diaz, S., & Bailey, J. M. (2023). Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. Archives of Sexual Behavior, 1-13.

Dixon, M. et al., Let's Talk Gender: Ten Things Transgender and Nonbinary Youth Want All Researchers to Know Journal of the American Academy of Child & Adolescent Psychiatry, Vol. 61, Issue 8, 960 – 96 (2022)

Djulbegovic, B., Guyatt, G. H., & Ashcroft, R. E. (2009). Epistemologic inquiries in evidence-based medicine. Cancer control, 16(2), 158-168.

Dooley DG, Rhodes H, Bandealy A. Pandemic Recovery for Children—Beyond Reopening Schools. JAMA Pediatr. 2022;176(4):347–348. doi:10.1001/jamapediatrics.2021.3227.

Endocrine Society, press release (Apr. 2022). Endocrine Society opposes Florida Department of Health policy on gender dysphoria treatment for children and adolescents, https://www.endocrine.org/news-and-advocacy/news-room/2022/endocrine-society-opposes-florida-department-of-health-policy-on-gender-dysphoria-treatment.

Evans, M. (2021). Freedom to think: the need for thorough assessment and treatment of gender dysphoric children. BJPsych bulletin, 45(5), 285-290.

Freeman, W. (1954). Transorbital lobotomy in state mental hospitals. The Journal of the Medical Society of New Jersey, 51(4), 148-150.

French National Academy of Medicine, Press release, (Feb. 25, 2022). Medicine and gender transidentity in children and adolescents, https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

Furlong, Y., & Janca, A. (2022). Epidemiology of personality disorders in individuals with gender dysphoria. Current Opinion in Psychiatry, 35(1), 78-82.

Gauld, C., Espi, P., Revol, O., & Fourneret, P. (2022). Explanatory hypotheses of the ecology of new clinical presentations of Dissociative Identity Disorders in youth. Frontiers in Psychiatry, 13.

Gehring, D., & Knudson, G. (2005). Prevalence of childhood trauma in a clinical population of transsexual people. International Journal of Transgenderism, 8(1), 23-30.

Gerwin, R. L., Kaliebe, K., & Daigle, M. (2018). The interplay between digital media use and development. Child and Adolescent Psychiatric Clinics, 27(2), 345-355.

Gillespie, C., Murphy, M., & Joyce, M. (2022). Dialectical Behavior Therapy for Individuals With Borderline Personality Disorder: A Systematic Review of Outcomes After One Year of Follow-Up. Journal of Personality Disorders, 36(4), 431-454.

Giovanelli, L., & Quinton, R. (2022). Letter to the Editor from Giovanelli and Quinton:"Erythrocytosis in a Large Cohort of Trans Men Using Testosterone: a Long-Term Follow-up Study on Prevalence, Determinants, and Exposure Years". The Journal of Clinical Endocrinology & Metabolism, 107(1), e440-e441.

Giedinghagen, A. (2022). The tic in TikTok and (where) all systems go: Mass social media induced illness and Munchausen's by internet as explanatory models for social media associated abnormal illness behavior. Clinical child psychology and psychiatry, 13591045221098522.

Goldacre, B. (2014). Bad pharma: how drug companies mislead doctors and harm patients. Macmillan.

Goldet, G., & Howick, J. (2013). Understanding GRADE: an introduction. Journal of Evidence-Based Medicine, 6(1), 50-54.

Gonzalez, M., Pascoe, M. C., Yang, G., de Manincor, M., Grant, S., Lacey, J., ... & Sarris, J. (2021). Yoga for depression and anxiety symptoms in people with cancer: a systematic review and meta-analysis. Psycho-Oncology, 30(8), 1196-1208.

Griffin, L., Clyde, K., Byng, R., & Bewley, S. (2021). Sex, gender and gender identity: a re-evaluation of the evidence. BJPsych Bulletin, 45(5), 291-299.

Haltigan, J. D., Pringsheim, T. M., & Rajkumar, G. (2023). Social media as an incubator of personality and behavioral psychopathology: Symptom and disorder authenticity or psychosomatic social contagion?. Comprehensive Psychiatry, 121, 152362.

Hembree, W., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. The Journal of Clinical Endocrinology & Metabolism, 102(11), 3869-3903.

Henrich J & Muthukrishna M. The Origins and Psychology of Human Cooperation,; Annual Review of Psychology 2021 72:1, 207-240.

Heterodorx, Incorrigible? with Zander Keig, Apr. 21, 2023 (minute 39:40-41:00), https://podcasters.spotify.com/pod/show/heterodorx/episodes/Incorrigible--with-Zander-Keig-e22qhr3/a-a9n76p3.

Hisle-Gorman, E., Landis, C. A., Susi, A., Schvey, N. A., Gorman, G. H., Nylund, C. M., & Klein, D. A. (2019). Gender dysphoria in children with autism spectrum disorder. LGBT health, 6(3), 95-100.

Holt V, Skagerberg E, Dunsford M. Young people with features of gender dysphoria: Demographics and associated difficulties. Clinical Child Psychology and Psychiatry. 2016;21(1):108-118.

Hopcroft, K. (2018). Effectiveness of antidepressants—should we rethink treatment duration?. bmj, 361.

Horesh D, Hasson-Ohayon I, Harwood-Gross A. The Contagion of Psychopathology across Different Psychiatric Disorders: A Comparative Theoretical Analysis. Brain Sciences. 2022; 12(1):67. https://doi.org/10.3390/brainsci12010067.

Hutchinson, A., Midgen, M., & Spiliadis, A. (2020). In support of research into rapid-onset gender dysphoria. Archives of Sexual Behavior, 49(1), 79-80.

James, S.E. et al. (2016). "The Report of the 2015 U.S. Transgender Survey," National Center for Transgender Equality, https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

Janssen, A., Voss, R., & Written on behalf of the Gender Development Program at the Ann and Robert H. Lurie Children's Hospital of Chicago. (2021). Policies sanctioning discrimination against transgender patients flout scientific evidence and threaten health and safety. Transgender Health, 6(2), 61-63.

Jarvi, S., Jackson, B., Swenson, L., & Crawford, H. (2013). The impact of social contagion on non-suicidal self-injury: A review of the literature. Archives of Suicide Research, 17(1), 1-19.

Jiang, J., Ren, X., & Ferrara, E. (2021). Social media polarization and echo chambers in the context of COVID-19: Case study. JMIRx med, 2(3), e29570.

Journal of the American Academy of Child & Adolescent Pediatrics, Call for Papers on the Effects of Race, Racism, Social Justice, and Health Equity in Child and Adolescent Psychiatry (proposal deadline June 1, 2023), https://www.jaacap.org/call_for_submissions_effects_of_racism.

Kaliebe, K. E. (2016). The future of psychiatric collaboration in federally qualified health centers. Psychiatric Services, 67(8), 827-829.

Kaliebe, K. E. (2017). Expanding our reach: Integrating child and adolescent psychiatry into primary care at federally qualified health centers. Journal of the American Academy of Child & Adolescent Psychiatry.

Kaliebe, K., & Sondheimer, A. (2002). The media: relationships to psychiatry and children: a seminar. Academic Psychiatry, 26(3), 205-215.

Kaliebe, K., & Weigle, P. (2018). Child Psychiatry in the Age of the Internet. Child and Adolescent Psychiatric Clinics, 27(2), xiii-xv.

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M. et al. Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent development. Child Adolesc. Psychiatry Ment. Health 9, 9 (2015).

Kaltiala-Heino, R., Työläjärvi, M., & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. Nordic journal of psychiatry, 74(3), 213-219.

Kennedy F., (July 1942). The Problem of Social Control of the Congenital Defective, 99 The American Journal of Psychiatry 13, https://ajp.psychiatryonline.org/doi/epdf/10.1176/ajp.99.1.13.

Kerr, J., Panagopoulos, C., & van der Linden, S. (2021). Political polarization on COVID-19 pandemic response in the United States. Personality and individual differences, 179, 110892.

Kim, H (2021) Pediatric Gender Identity: Gender-affirming Care for Transgender and Gender Diverse Youth. Journal of the American Academy of Child & Adolescent Psychiatry, Vol. 60, Issue 6, 785 - 787

Kohls, G., & Roessner, V. (2022). Editorial Perspective: Medical body modification in youth with gender dysphoria or body dysmorphic disorder–is current practice coherent and evidence-based?. Journal of Child Psychology and Psychiatry.

Latham, A. (2022). Puberty blockers for children: can they consent?. The new bioethics, 28(3), 268-291.

Lemke, A (2016) Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop, Johns Hospkins University Press

Lett, E., Everhart, A., Streed, C., & Restar, A. (2022). Science and Public Health as a Tool for Social Justice Requires Methodological Rigor. Pediatrics, 150(6).

Letter to Chairman Patrick Leahy (April 28, 2022), https://higherlogicdownload.s3.amazonaws.com/AANNET/c8a8da9e-918c-4dae-b0c6-6d630c46007f/UploadedImages/GVP_Research_Funding_Letter_FY2023_Final.pdf.

Levine, S. B., Abbruzzese, E., & Mason, J. W. (2022). Reconsidering informed consent for trans-identified children, adolescents, and young adults. Journal of Sex & Marital Therapy, 48(7), 706-727.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLOS One, 13(8), e0202330.

Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLOS ONE 14(3): e0214157.

Littman, L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. Archives of Sexual Behavior, 50(8), 3353-3369.

Luhrmann, T. M. (2001). Of two minds: The growing disorder in American psychiatry. Alfred A. Knopf.

Maccoby, E. E. (1998). The two sexes: Growing up apart, coming together (Vol. 4). Harvard University Press.

Macy, M., Deri, S., Ruch, A., & Tong, N. (2019). Opinion cascades and the unpredictability of partisan polarization. Science advances, 5(8), eaax0754.

Mandell, B. F. (2016). The fifth vital sign: A complex story of politics and patient care. Cleveland Clinic journal of medicine, 83(6), 400-401.

Marianowicz-Szczygiel, A. (2022). Rise of gender identity disorders among children and adolescents-data from 10 countries. Kwartalnik Naukowy Fides et Ratio, 49(1), 122-141.

Mason, Julia and Sapir, Leor. The American Academy of Pediatrics' Dubious Transgender Science, Wall Street Journal, Aug. 17, 2022

McCormack, J., & Korownyk, C. (2018). Effectiveness of antidepressants. BMJ, 360.

Morandini J.S., Kelly A., de Graaf N.M., Carmichael P., Dar-Nimrod I. (2022). Shifts in demographics and mental health co-morbidities among gender dysphoric youth referred to a specialist gender dysphoria service. Clinical Child Psychology and Psychiatry. 27(2):480-491.

Morandini JS, Kelly A, de Graaf NM, Malouf P, Guerin E, Dar-Nimrod I, Carmichael P. (2023). Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria? Arch. Sex. Behav. 52(3):1045-1060.

Mularski R. et al. (2006). Measuring pain as the 5th vital sign does not improve quality of pain management. Journal of General Internal Medicine, 21(6), 607–12, doi: 10.1111/j.1525-1497.2006.00415.x.

Murad, M. H. (2017). Clinical practice guidelines: a primer on development and dissemination. In Mayo Clinic Proceedings, Vol. 92, No. 3, pp. 423-433.

National Board of Health and Welfare (NBHW), Care of Children and Adolescents with Gender Dysphoria, Sweden, 2022, https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf.

NICE (2020). Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria. Downloaded from https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_Gender-affirming-hormones_For-upload_Final.pdf.

Noelle-Neumann, E. (1974). "The Spiral of Silence A Theory of Public Opinion." Journal of Communication 24(2): 43-51.

Olson, K. R., Durwood, L., DeMeules, M., & McLaughlin, K. A. (2016). Mental health of transgender children who are supported in their identities. Pediatrics, 137(3).

Otgaar, H., Howe, M. L., & Patihis, L. (2022). What science tells us about false and repressed memories. Memory, 30(1), 16-21.

PALKO / COHERE, Finland, (2020). Medical treatment methods for dysphoria associated with variations in gender identity in minors – recommendation, https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474.

Peters, U. (2020). What is the function of confirmation bias?. Erkenntnis, 1-26.

Pringsheim, T., et al. (2021). Rapid onset functional tic-like behaviors in young females during the COVID-19 pandemic. Movement Disorders, 36(12), 2707.

Rafferty, J. (2018). Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents. *Pediatrics*. Vol. 142(4).

Reed (2022) Jamie Reed affidavit downloaded from:

https://ago.mo.gov/docs/default-source/press-releases/2-07-2023-reed-affidavit---signed.pdf.

Regnerus, M., & Vermurlen, B. (2022). Attitudes in the US Toward Hormonal and/or Surgical Interventions for Adolescents Experiencing Gender Dysphoria. Archives of Sexual Behavior, 1-12.

Rettew, D.C. (2022). Internet Inspired Self-Diagnosis: A New Phenomenon Calling for an Old Approach, JAACAP Connect, 35.

Reyes, M. M., Panza, K. E., Martin, A., & Bloch, M. H. (2011). Time-lag bias in trials of pediatric antidepressants: a systematic review and meta-analysis. Journal of the American Academy of Child & Adolescent Psychiatry, 50(1), 63-72.

Robertson, L. R. From Paralysis to Fatigue: A History of Psychosomatic Illness in the Modern Era by Edward Shorter New York: Free Press/Macmillan, 1992, xii+ 419 pp..

Rogers R., et al., Psychosocial Aspects of Nuclear Developments, American Psychiatric Association (1982), https://www.psychiatry.org/File Library/Psychiatrists/Directories/Library-and-Archive/task-force-reports/tfr1981_Nuclear.pdf.

Royal Australian and New Zealand College of Psychiatrists, Recognizing and addressing the mental health needs of people experiencing Gender Dysphoria / Gender Incongruence. August 2021, Position statement 103, https://www.ranzcp.org/news-policy/policy-and-advocacy/position-statements/gender-dysphoria.

Rufalo, M. (2019). The Fall of Psychoanalysis in American Psychiatry. Psychology Today, retrieved at: https://www.psychologytoday.com/us/blog/freud-fluoxetine/201912/the-fall-psychoanalysis-in-american-psychiatry.

Sales, D., "Feminist academic says university 'confiscated' her study on Britain's gender wars, banned her from publishing 'dangerous' findings and hounded her out of a job - as she brings discrimination claim against bosses," DailyMail.com, Apr. 17, 2023, https://www.dailymail.co.uk/news/article-11980541/Feminist-academic-says-university-confiscated-study-Britains-gender-wars.html?fbclid=IwAR2b9m3h6NX_QNhcZgWbYfYK_tGq-GwiAqaLbGm.

Schwartz, D. (2021). Clinical and ethical considerations in the treatment of gender dysphoric children and adolescents: When doing less is helping more. Journal of Infant, Child, and Adolescent Psychotherapy, 20(4), 439-449.

Shan, Z., Rehm, C. D., Rogers, G., Ruan, M., Wang, D. D., Hu, F. B., ... & Bhupathiraju, S. N. (2019). Trends in dietary carbohydrate, protein, and fat intake and diet quality among US adults, 1999-2016. Jama, 322(12), 1178-1187.

Shorter Edward, From Paralysis to Fatigue: A History of Psychosomatic Illness in the Modern Era, 1993.

Sievert, E. D., Schweizer, K., Barkmann, C., Fahrenkrug, S., & Becker-Hebly, I. (2021). Not social transition status, but peer relations and family functioning predict psychological functioning in a German clinical sample of children with gender dysphoria. Clinical Child Psychology and Psychiatry, 26(1), 79–95.

Sismondo S. (2008). Pharmaceutical company funding and its consequences: a qualitative systematic review. Contemporary Clinical Trials, 29(2), 109–13.

Soh, D. (2021). The end of gender: Debunking the myths about sex and identity in our society. Simon and Schuster.

Soldati, L., Hasler, R., Recordon, N., Clement, M., Köhl, J., & Perroud, N. (2022). Gender dysphoria and dissociative identity disorder: a case report and review of literature. Sexual Medicine, 10(5), 100553.

Steensma, T.D., Cohen-Kettenis, P.T. Gender Transitioning before Puberty?. Arch Sex Behav 40, 649–650 (2011).

Su, Y., Borah, P., & Xiao, X. (2022). Understanding the "infodemic": social media news use, homogeneous online discussion, self-perceived media literacy and misperceptions about COVID-19. Online Information Review.

Sun, R., Zhu, H., & Guo, F. (2022). Impact of content ideology on social media opinion polarization: The moderating role of functional affordances and symbolic expressions. Decision Support Systems, 113845.

Sunstein, Cass R. (2009). "Some Effects of Moral Indignation on Law" (PDF). Vermont Law Review. Vermont Law School. 33 (3): 405–434. Retrieved 4/28/2023 at https://web.archive.org/web/20110610021623/http://lawreview.vermontlaw.edu/articles/3/12%20Sunstein%20Book%203%2C%20Vol.%2033.pdf.

Suto D. (2021). Found in Transition: A Mother's Evolution During Her Child's Gender Change Journal of the American Academy of Child & Adolescent Psychiatry, Vol. 60, Issue 6, 783–785.

Szolin, K., Kuss, D. J., Nuyens, F. M., & Griffiths, M. D. (2023). "I am the character, the character is me": A thematic analysis of the user-avatar relationship in videogames. Computers in Human Behavior, 107694.

Szilagyi, M.D. Academy of Pediatrics Responds on Trans Treatment for Kids, Aug. 21, 2022 Wall Street Journal.

Trent M., et al. (2019). The impact of racism on child and adolescent health. Pediatrics. 2019;144(2):e20191765.

Turban, J. et al. (2018) Dynamic Gender Presentations: Understanding Transition and "De-Transition" Among Transgender Youth Vol. 57, Issue 7, 451 – 453.

Turban, J. et al. (2017). Ten Things Transgender and Gender Nonconforming Youth Want Their Doctors to Know. Journal of the American Academy of Child & Adolescent Psychiatry, Vol. 56, Issue 4, 275 – 277.

Turner E. et al. (2008). Selective Publication of Antidepressant Trials and Its Influence on Apparent Efficacy. New England Journal of Medicine, 358:252-260.

Ursano R., et al., Resource Document on Mental Health and Climate Change, American Psychiatric Assocation (n.d.), https://www.psychiatry.org/FileLibrary/Psychiatrists/Directories/Library-and-Archive/resource_documents/2017-Resource-Document-Mental-Health-Climate-Change.pdf.

USPATH & WPATH, Joint Letter from USPATH and WPATH (Oct. 12, 2021) https://www.wpath.org/media/cms/Documents/Public%20Policies/2021/Joint%20WPATH%20USPATH%20Letter%20Dated%20Oct%2012%202021.pdf.

Van der Kolk, B. A. (1994). The body keeps the score: Memory and the evolving psychobiology of posttraumatic stress. Harvard review of psychiatry, 1(5), 253-265.

Vogt, K. S., & Norman, P. (2019). Is mentalization-based therapy effective in treating the symptoms of borderline personality disorder? A systematic review. Psychology and Psychotherapy: Theory, Research and Practice, 92(4), 441-464.

Vrouenraets, L. J. J. J., Hartman, L. A., Hein, I. M., de Vries, A. L., de Vries, M. C., & Molewijk, B. A. (2020). Dealing with moral challenges in treatment of transgender children and

adolescents: evaluating the role of Moral Case Deliberation. Archives of sexual behavior, 49, 2619-2634.

Weaver, L. L., & Darragh, A. R. (2015). Systematic review of yoga interventions for anxiety reduction among children and adolescents. The American Journal of Occupational Therapy, 69(6), 6906180070p1-6906180070p9.

Weigle, Paul, Psychoeducation or Psychiatric Contagion? Social Media and Self-Diagnosis, May 8, 2023, Psychiatric Times, Vol 40, Issue 5, available online at https://www.psychiatric-times.com/view/psychoeducation-or-psychiatric-contagion-social-media-and-self-diagnosis.

Wolfe J. (Nov. 2, 2012). Medical Groups Worry That Ruling Could Threaten Physician Diversity, Psychiatric News, https://psychnews.psychia-tryonline.org/doi/full/10.1176/pn.47.21.psychnews_47_21_14-b.

Wong, W. I., van der Miesen, A. I., Li, T. G., MacMullin, L. N., & VanderLaan, D. P. (2019). Childhood social gender transition and psychosocial well-being: A comparison to cisgender gender-variant children. Clinical Practice in Pediatric Psychology, 7(3), 241–253.

Yıldız, M., Orak, U., Walker, M. H., & Solakoglu, O. (2019). Suicide contagion, gender, and suicide attempts among adolescents. Death studies, 43(6), 365-371.

Zucker, K. J. (2019). Adolescents with gender dysphoria: Reflections on some contemporary clinical and research issues. Archives of Sexual Behavior, 48(7), 1983-1992.

Zucker, K. J. (2020). Debate: Different strokes for different folks. Child and adolescent mental health, 25(1), 36-37.

# PUBLICATIONS

## Kristopher Kaliebe, M.D.

**Kaliebe, Kristopher** and Adrian Sondheimer. "The media: Relationships to psychiatry and children." *Academic Psychiatry* 26.3 (2002): 205-215.

**Kaliebe, Kristopher** "Rules of thumb: three simple ideas for overcoming the complex problem of childhood obesity." *Journal of the American Academy of Child & Adolescent Psychiatry* 53.4 (2014): 385-387.

**Kaliebe, Kristopher.** "Dr Kaliebe Replies", Journal of the American Academy of Child & Adolescent Psychiatry, (2014) 53:10 1134.

**Kaliebe, Kristopher** "The Future of Psychiatric Collaboration in Federally Qualified Health Centers." *Psychiatric Services* (2016): appi-ps.

**Kaliebe, Kristopher,** and Josh Sanderson. "A Proposal for Postmodern Stress Disorder." The American journal of medicine 129.7 (2016): e79.

Osofsky, Howard J., Anthony Speier, Tonya Cross Hansel, John H. Wells II, **Kristopher E. Kaliebe**, and Nicole J. Savage. "Collaborative Health Care and Emerging Trends in a Community-Based Psychiatry Residency Model." *Academic Psychiatry* (2016): 1-8.

Yeh, Y. Y. and **K. Kaliebe**. "Impact of Nutrition on Neurocognition." *Southern medical journal* 109.8 (2016): 454.

**K. Kaliebe** Expanding Our Reach: Integrating Child and Adolescent Psychiatry Into Primary Care at Federally Qualified Health Centers. J Am Acad Child Adolesc Psychiatry. 56.11 (2017)

Kiss, R. and **Kaliebe, K**., Stress and Inflammation: New Perspectives on Major Depressive Disorder. JAACAP Connect, p.22. Winter 2020

Tamburello, A., Penn, J., Negron-Muñoz, R., & **Kaliebe, K**. (2023). Prescribing Psychotropic Medications for Justice-Involved Juveniles. Journal of Correctional Health Care.

Books, Textbook Chapters:

Weigle, P., **Kaliebe, K**., Dalope, K., Asamoah, T., & Shafi, R. M. A. (2021). 18 Digital Media Use in Transitional-Age Youth: Challenges and Opportunities. Transition-Age Youth Mental Health Care: Bridging the Gap Between Pediatric and Adult Psychiatric Care, 357.

Invited Publications

"Telepsychiatry in Juvenile Justice Settings", **K Kaliebe**, J Heneghan, T Kim, Child and Adolescent Clinics of North America, 20 (2011) 113-123

American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Telepsychiatry and AACAP Committee on Quality Issues. Clinical Update: Telepsychiatry With Children and Adolescents. J Am Acad Child Adolesc Psychiatry. 2017 Oct; 56(10):875-893. Epub 2017 Jul 25. PMID: 28942810.

**Kaliebe, Kristopher** and Paul Weigle. "Child Psychiatry in the Age of the Internet." (2017). Child and Adolescent Psychiatric Clinics of North America, April 2018, Vol. 27, Issue 2, Pages xiii–xv

Gerwin, Roslyn L., **Kristopher Kaliebe,** and Monica Daigle. "The Interplay Between Digital Media Use and Development." Child and Adolescent Psychiatric Clinics 27.2 (2018): 345-355.

# <u>CURRICULUM VITAE</u>

## Kristopher Edward Kaliebe, MD

**Associate Professor**
**University of South Florida, Morsani College of Medicine, Tampa Florida**

**Address**

> Psychiatry and Behavioral Neurosciences
> 3515 E. Fletcher Avenue, MDC 14
> Tampa FL 33613
> Office: 813974-5460
> kkaliebe@usf.edu

**Citizenship**

> *United States*

**Education**

**Graduate/Medical:** St. George's University
School of Medicine, Grenada, West Indies
Medical Doctor                                         January 1995- June 1999

**Undergraduate:** Columbia College,
Columbia University
New York, NY,
Bachelor of Arts, Biochemistry                   September 1988-May 1992

**Postgraduate Training**

Clinical Fellowships:
Fellow, Forensic Psychiatry   (PGY6)
Louisiana State University Medical Center
1542 Tulane Ave., New Orleans, LA 70112        July 2004 to June 2005

Fellow, Child and Adolescent Psychiatry (PGY 4-5)
Louisiana State University Medical Center
1542 Tulane Ave., New Orleans, LA 70112        July 2002 to June 2004

Chief Resident in Child and Adolescent Psychiatry
- Acted as liaison between Child Psychiatry Fellows and Administration
- Coordinated with Program Director lecture and rotation schedules
                                                       July 2003 to June 2004

Residency:
Resident, Psychiatry (PGY 2-3)

University of Medicine and Dentistry-
New Jersey Medical School
185 S Orange Ave, Newark, NJ 07103                     July 2000- June 2002

Internship: (PGY 1)
University of Medicine and Dentistry-
New Jersey Medical School
185 S Orange Ave, Newark, NJ 07103                     July 1999- June 2000

Diplomate, American Board of Psychiatry and Neurology:

- Board Certification in General Psychiatry, awarded 2004, active

- Specialty Board Certification Child and Adolescent Psychiatry, awarded 2005, active

- Specialty Board Certification Forensic Psychiatry, awarded 2007, active

**Awards, Honors, Honorary Society Memberships:**

Department of Veterans Affairs Special Contribution Award for Clinical Service in Psychiatry

February 22, 2002

Outstanding Resident Award, Presented at the American Academy of Child and Adolescent Psychiatry, Miami, Florida,

October 17, 2003

Inducted into Berkeley Preparatory School Athletic Hall of Fame, Tampa, Florida,
November 7, 2003

Fellow, Louisiana State University Academy for the Advancement of Educational scholarship

October 2007 – 2016

*Best Doctors*, Louisiana in the subspecialty of Child and Adolescent Psychiatry
Awarded 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015 and 2016

*Best Doctors*, in Tampa Florida

2017, 2018, 2019, 2020, 2021, 2022

2

Awarded status as a Distinguished Fellow of the American Academy of Child and Adolescent Psychiatry

July 6, 2016

**Appointments:**

Associate Professor, University of South Florida Medical School, Department of Psychiatry.                                        September 2016 to present

- Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF General Psychiatry Residents and Child and Adolescent Psychiatry fellows who performed assessment, consultation, and treatment.
- Supervise one morning clinic of outpatient general psychiatry at the USF OPC Clinic who performed assessment, consultation, and treatment.
  - February 2023 to present

Tampa General Hospital Psychiatrist on Duty          September 2016 to present
    Manage the night, weekend and holiday clinical responsibilities of Tampa General Hospital including the over 1000 bed hospital and a 24-hour emergency room. Usually done in partnership with a psychiatric resident from the University of South Florida.

Facility Psychiatrist.  Tampa Residential Facility          September 2016 to present
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system.  Tampa Residential Facility is the most intensive level of mental health and substance abuse treatment, subcontracted to Truecore Solutions.

Facility Psychiatrist.  Les Peters Academy Residential Facility
                                        May 2017 to present
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted to Truecore Solutions.

Staff Psychiatrist, Orleans Parish Justice System          March 2018 to July 2018
- Performed telepsychiatric evaluations and treatment in Orleans Parish Prison correctional system, subcontracted to Correct Care Solutions.

Facility Psychiatrist.  Charles Britt Academy Residential Facility
                                        November 2019 to July 2022
    •Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted by Sequel.

Facility Psychiatrist. Columbus Youth Academy Residential Facility
                                        June 2020 to present
    •Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted by Sequel.

3

Louisiana State University Health Science Center Assistant Professor of Clinical
Psychiatry                                                 July 2005 to June 2017

Louisiana State University Health Science Center Associate Professor of Clinical
Psychiatry                                                 July 2016 - 2017

Mental Health Medical Director, St. Charles Community Health Center, Luling,
Louisiana                                                 July 2005 to 2016
- Evaluated and treated a primarily Medicaid and underserved population of
  adult, child and adolescent patients in a Federally Qualified Health Care
  Center.

Coordinator for Child and Adolescent Integrated Mental and Behavioral Health Services,
Louisiana Mental and Behavioral Health Capacity Project
                                                 September 2012 to July 2017
- Performed assessment, consultation, training, prevention, and education services
  to Federally Qualified Health Centers and community clinics in Coastal
  Louisiana.
- Evaluated and treat both on site and using remote video conferencing equipment
  (telehealth).

Staff Psychiatrist, Back-up coverage, Louisiana Juvenile Justice System     July 2016 to
September 2022
- Performed psychiatric evaluations and treatment in Louisiana's juvenile
  correctional system, subcontracted to Wellpath (formerly Correct Care Solutions).
- Back up on call coverage for on-site psychiatrists
- As needed evaluated and treated remote video conferencing equipment
  (telehealth).

Staff Psychiatrist, Louisiana Juvenile Justice System          July 2010 to July 2016
- Performed psychiatric evaluations and treatment in Louisiana's juvenile
  correctional system, subcontracted to Correct Care Solutions.
- Evaluated and treated both on site and using remote video conferencing
  equipment (telehealth).

Staff Psychiatrist on Duty                                 October 2011 to July 2016
Children Hospital, Calhoun Campus. New Orleans, Louisiana
- Facilitated development of protocols and supervision regarding the training of
  Medical Students, General Psychiatry Residents and Child and Adolescent
  Psychiatric Fellows who utilize the Calhoun unit as primary training site for Child
  Psychiatry.
- Manage night and weekend clinical responsibilities for Children's Hospital
  emergency room and Inpatient Psychiatric Unit, including individually assessing
  all inpatients each weekend.

Staff Psychiatrist, Louisiana State University Juvenile Justice Program

July 2005 to August 2010

- Performed psychiatric evaluations and treatment in Louisiana's juvenile correctional system at Bridge City Center for Youth and Jetson Center for Youth.
- Evaluated and treated both on site and using remote video conferencing equipment (telehealth).

Staff Psychiatrist, Florida Parish Juvenile Detention Center,

July 2007 to August 2010

- Performed psychiatric evaluations and treatment using remote video conferencing equipment (telehealth).

Medical Officer on Duty                                    July 2002 to July 2005
New Orleans Adolescent Hospital. New Orleans, Louisiana
- Managed clinical responsibilities of Crisis Intervention Services, a 24-hour emergency mental health response team serving families, children and adolescents from the Southeast Louisiana region.
- Managed two psychiatric inpatient units including a twenty bed adolescent and ten bed children's unit after hours on call.
- On call physician for Crisis Respite, a short term residential facility for children and adolescents located on hospital grounds.

Psychiatrist on Duty                                    September 2003 to July 2005
New Orleans Veterans Administration Medical Center, New Orleans, Louisiana
- Managed clinical psychiatric responsibilities of a 450 bed hospital
- Managed clinical psychiatric responsibilities of a 27 bed inpatient psychiatric unit
- Managed clinical psychiatric responsibilities of 24-hour emergency room

Psychiatrist on Duty                                    September 2001 to June 2002
New Jersey Medical Center Veterans Administration
- East Orange Medical Center, East Orange, NJ
Managed clinical psychiatric responsibilities of 24 hour emergency room along with a 295 bed hospital, 30 Nursing Home and 30 Domiciliary beds.
- Lyons Hospital, Lyons, NJ
Managed clinical psychiatric responsibilities of 356 bed hospital.

**Teaching, Lecture**

Undergraduate Medical Student

BMS6920.002, BMS6920.001 University of South Florida:  Created five session elective: "Mind Body Medicine"  Developed as part of University of South Florida medical school elective curriculum from 2017-2022.  Offered for up to 12 students as a credited elective including study guide, organizing readings, and experiential class learning.

2017 to 2022

5

At Louisiana State University Health Science Center New Orleans:

4 one-hour lectures instructing all Medical Students (MS2) in Child and Adolescent mental health during Psychiatry Basic Science block

February 2004 to February 2016

LSU Physical therapy
Annual 2 two-hour lectures on a range of mental health topics annually

2012 to 2016

LSU Public Health
Annual 2 hour lecture on psychopharmacology to incoming Masters Level students in Public Health

2012 to 2016

**Graduate Medical Teaching**

MEL 8602 C65 M:  Child and Adolescent Psychiatry

Child and Adolescent Psychiatry Resident Teaching:

Arranged and co-instructed Forensics Lecture Series, bi-annually 10 lecture hours and 4 hours of individual lectures.

2016 to present.

Teach various topics within residency training. 1 lecture per year.

2016 to present.

University of South Florida General Psychiatry Residency:

Co-Produced elective track for 2 residents per year within University of South Florida Psychiatry Residency.  Supervision of Integrative Psychiatry residents within the University of South Florida's Integrative Psychiatry Track, biweekly sessions utilizing curriculum from the Andrew Weil Center for Integrative Medicine.

July 2020- present

Forensic Psychiatry Resident Teaching:

Teach child and corrections related forensic topics within residency training. 4 lectures per year.

2018 to present.

LSUHSC New Orleans, General Psychiatry Resident Teaching

6

- Created and taught one hour weekly (44 weeks per year) Cognitive Behavioral Therapy practicum for PGY 3 residents

  2007 to 2016
- One hour lecture on evolution and mood disorder each year for PGY3 residents

  2010 to 2016

LSUHSC New Orleans Child and Adolescent Psychiatry Resident Teaching

- One-hour didactic lectures on psychopharmacology for 8 weeks and cognitive behavior therapy for 4 weeks bi-annually

  2008-2016
- Organized and taught majority of the year-long bi-weekly one hour didactic program entitled Special Topics including a wide range of topics including development, forensic psychiatry, evolution, anthropology, nutrition, effects of technology, electronic media, sleep, exercise and physical activity, wellness and systems of care.

  2008 to 2016

LSU- Kenner Family Practice Residency:
Once yearly didactic lectures for 1 to 2 hours for Kenner Family Practice Residents

2009 to 2016

Created one session Mini-Course: "Optimizing Neurocognition through Nutrition." Developed and co-facilitated a module as part of Goldring Center for Culinary Medicine curriculum for medical students and other trainees with Annie Yeh, MD).  Offered as a 1 credit elective for Tulane medical students including study guide, organizing readings, online webinar to be viewed prior to class, case studies during class and test.

2014

At Louisiana State University Health Science Center New Orleans: Core Clinical Psychiatry Rotation Lecture, 1 hour lecture presented to MS3 students every six weeks to 3rd year medical students covering Child Psychiatry Basics.

October 2003 to June 2005

At University of Medicine and Dentistry- New Jersey Medical School, Department of Psychiatry
•	Lecture: "The Media and Psychiatry" for General Psychiatry Residents, created as part of the Culture and Psychiatry Seminar

August 2001 and 2002

**Teaching, Supervisory**

At University of South Florida, Tampa Florida:

*Medical Student supervision*

7

University of South Florida -                               2017 to present
MEL 8109 L69 M
BCC 7154 002 M   Psychiatry / Neurology Clerkship.  Medical Students rotation through clinic one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic

Psychiatry Elective, 2 to 4 week Medical Student rotation through Child and Adolescent Psychiatry Silver Center Resident Clinic

*Graduate Medical Education Supervision*

Child and Adolescent Psychiatry Residency

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF Child and Adolescent Psychiatry residents who performed assessment, consultation, and treatment.
                                                              September 2016 to June 2021

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry correctional psychiatry with USF Child and Adolescent Psychiatry residents who observe clinical care in juvenile correctional facilities.
                                                              September 2016 to present

General Psychiatry Residency:

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF General Psychiatry Residents who performed assessment, consultation, and treatment.
                                                              September 2016 to present

Forensic Psychiatry Resident Teaching

Supervision of forensic psychiatry trainees within the University of South Florida forensic psychiatry training program.  This includes review of resident competency evaluations along with co-evaluation of criminal defendants as individual cases arise.
                                                              2018 to present

At Louisiana State University Health Science Center New Orleans

LSU- Kenner Family Practice Residency:
- One month, once weekly half day mental health rotation at St Charles Community Health Center for all Kenner Family Practice Residents
                                                              2008 to 2016

8

Clerkship/Residency Directorship:

Child and Adolescent Psychiatry Fellowship Training Director, Louisiana State University Medical Center.  Oversaw and supervised resident physician training Managed administrative, evaluation and scheduling issues within the training program Collaborated with Louisiana State University psychiatric faculty to develop policies and procedures at various clinical site.

July 2010 to September 2012

Teaching Awards:

Association for Academic Psychiatry Honorary Fellow

October 2001- October 2002

Louisiana State University Child and Adolescent Psychiatry Department Outstanding Teacher Award for the 2006-2007 academic year

Louisiana State University Child and Adolescent Psychiatry Department Outstanding Teacher Award for the 2015-2016 academic year

## *Peer to Peer: Institutional Grand Rounds*

 "The Minds, They are a Changin' – An Overview and Update on MDMA and Psilocybin Grand Rounds University of South Florida Psychiatry Department, Tampa Florida

January 28 2022

"3 Simple Rules for Overcoming Obesity" University of South Florida Endocrinology Department, Tampa Florida

November 9, 2021

"A hard pill to swallow: psychotropic medications in foster care", University of South Florida, Department of Public Health, Tampa Florida

November 3, 2017

"Rules of Thumb: The importance of heuristic and cognitive biases in pediatric physical and mental health" Grand Rounds Children's Hospital, New Orleans

July 30, 2014,

Grand Rounds, Louisiana State University Department of Psychiatry, "Rules of Thumb, lifestyle interventions for mental health professionals." New Orleans, Louisiana

January 23, 2014

"Just say No, the Case against Stimulant Medication" Grand Rounds Children's Hospital, New Orleans, Louisiana

May 19th, 2010

"Violence: Neurobiology, Risk Assessment and Beyond", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

August 9, 2012

"Is ADHD a Nutritional Disorder", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

July 28, 2011

"Just say No, the Case Against Stimulant Medication", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

July 29th, 2010

Grand Rounds Department of Psychiatry, Louisiana State University School of Medicine, New Orleans, Louisiana "The Application of Darwinian Principles to Child Custody Evaluations", New Orleans, Louisiana

May 26th, 2005

"Attention Deficit Hyperactivity Disorder" Grand Rounds Department of Pediatrics, Louisiana State University School of Medicine, New Orleans, Louisiana

May 25th, 2005

"The Media, Our New Social World, How Should Pediatricians Respond?" Grand Rounds, Louisiana State University School of Medicine, Children's Hospital, New Orleans, Louisiana

June 2nd, 2004

"Attention Deficit Disorder" for Louisiana State University Health Science Center Juvenile Corrections Program Continuing Medical Education Presentation via telemedicine New Orleans, Louisiana

March 16th, 2004

"The Media, Relationships to Children and Psychiatry", Grand Rounds, Department of Psychiatry, Louisiana State University School of Medicine, New Orleans, Louisiana

June 4th, 2003

"The Media, Relationships to Children and Psychiatry", Grand Rounds, New Orleans Adolescent Hospital, New Orleans, Louisiana

March 28th 2003

**Lectures by Invitation**

"The Media, Relationships to Children and Psychiatry" Grand Rounds, University of West Virginia, Charleston, West Virginia,  Department of Psychiatry and Behavioral Science

April 10th 2003

10

"The Media and Child and Adolescent Psychiatry –An Evolving Relationship" Chair and Presenter, Media Theatre, Annual Conference of the American Academy of Child and Adolescent Psychiatry

October 21st, 2004

"The Media, Our New Social World, How Should Health Care Professionals Respond?" Continuing Medical Education Presentation Snowshoe Mountain Retreat, Snowshoe Mountain, West Virginia

September 19th, 2004

"The Application of Darwinian Principles to Child Custody Evaluations" Grand Rounds Department of Psychiatry, University of South Florida, Tampa, Florida

October 31st, 2005

"The Evaluation and Treatment of Traumatized Children and Adolescents with ADHD" Web Cast Presentation and Grand Rounds sponsored by the National Center for Child Traumatic Stress Network's Rural Consortium, New Orleans, Louisiana

January 25th, 2007

"Behavioral Disorder or Traumatized Child?" Louisiana Federation of Families for Children's Mental Health, Children's Mental Health Conference, Houma Louisiana

May 9th, 2008

"Behavioral Disorder or Traumatized Child?" Grand Rounds Tulane University Department of Child Psychiatry, New Orleans, Louisiana

March 13th, 2009

"Brother's Little Helper: The Simpsons Satirizes Stimulant Medication as a Response to Childhood Behavior Problems" Media Theatre, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York  Kristopher Kaliebe MD, K. Dalope, MD

October 30, 2010

"Violence Risk Assessment" Louisiana Psychiatric Medical Association Annual Meeting, New Orleans, LA

March 2, 2013,

"Telepsychiatry in Juvenile Justice Settings" part of  "Telepsychiatry: Challenges and Successes Across Settings." Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Orlando FL

October 22, 2013

"What are they Missing, When Electronic Media Displaces Sleep, Academics and Exercise"  part of "Identifying and Treating Internet-Related Mental Health Problems:

11

An Evidence-Based Approach" Clinical Perspectives. Annual meeting of the American Academy of Child and Adolescent Psychiatry, Toronto, Canada
October 24, 2014

"The Implications of the Pharmacological Treatment of Children" Michigan Drug Court Annual Conference, Lansing, Michigan
March 12, 2014

"Three rules to prevent and treat ADHD symptoms" as part of the Louisiana ADHD Symposium, organized by the Louisiana Department of Health and Hospitals ADHD Task Force, Baton Rouge, Louisiana
December 9, 2014

"Non-Pharmaceutical Interventions for ADHD", Invited Professorship: St George's University School of Medicine Complementary and Alternative Medicine Selective, St George's, Grenada, West Indies
August 28 – Sept. 3rd, 2014

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness" Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, San Diego, California
October 30, 2014

"The Management of Childhood Obesity" and "Disordered Eating in Children and Adolescents" Oregon Psychiatric Medical Association Conference, Portland, Oregon
February 27 and 28, 2015

"Rules of Thumb: 3 Simple Rules to Optimize Physical and Mental Health" National Alliance for the Mentally Ill Louisiana Annual Conference, New Orleans, Louisiana
April 17, 2015

"ADHD overdiagnosis in Louisiana, a child and adolescent psychiatrist's perspective" Preventing Overdiagnosis Conference, National Institutes of Health (NIH), Bethesda Maryland
September 2, 2015

"An alternative to diagnosis-based practice in pediatric mental health" Preventing Overdiagnosis Conference: National Institutes of Health NIH Bethesda Maryland
September 2, 2015

"Shell Shocked: Growing up in the Murder Capital of America". Discussant for Media Theatre, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Holly Peek, MD, Kristopher Kaliebe, MD San Antonio, Texas
October 29, 2015

12

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness"  Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry,  San Antonio, Texas

October 31, 2015

"What are they (we) Missing? When Electronic Media Displaces Sleep, Academics, and Exercise" Grand Rounds University of South Florida Psychiatry Department, Tampa Florida

November 12th, 2015

ADHD overdiagnosis in Louisiana, a child and adolescent psychiatrist's perspective, Louisiana Psychological Association, New Orleans, LA

May 20, 2016

"Rules of Thumb: 3 Simple Rules to Optimize Physical and Mental Health" Crohns and Colitis Association of America Regional Conference, New Orleans, LA,

June 12, 2016

"Evaluating and Assuring the Effective and Safe Use of Psychotropic Medications in Children" Webinar: National Council of Juvenile and Family Court Judges, with Judge Constance Cohen; Janie Huddleston and Dr. Joy Osofsky, Ph.D.

June 24, 2016,

"Psychotropic Medications 101: What Judges Need to Know for Effective Decision Making" Florida Child Protection Summit, with Melinda Sczepanski, Orlando FL

September 9, 2016

"Communicating With the Media and the Public as Child and Adolescent Psychiatrists Around Disaster and Highly Traumatic Events." Workshop, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Media Training Workshop, New York, New York

October 27, 2016

"Evolutionary Biology is a Basic Science for Child and Adolescent Psychiatry" Special Interest Group, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York

October 28, 2016

"Is War Ever Really Over? War-Affected Youth From Home to Host Country", Discussant, Clinical Perspectives. Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York

October 28, 2016

"Psychotropic Medications 101: The pertinent essentials for all involved in the child welfare system" Florida Child Protection Summit, with Melinda Sczepanski, Orlando, Florida

August 30, 2017

"Safe Use of Psychotropic Medications in Children." 2017 Safe Babies Court Teams Cross Sites Meeting, Fort Lauderdale, Florida

August 17, 2017

"Health Promotion in Pediatric Mental Health" Discussant, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 23, 2017

"New Technologies, New Laws, New Childhood" as part of "Clinical Guidelines for Navigating Media Use" Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 24, 2017

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness" Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 26, 2017

"The Business of News, the Role of Child and Adolescent Psychiatrists in the Media, and Risk Communication."   Member Services Forum, Annual meeting of the American Academy of Child and Adolescent Psychiatry: Washington, DC

October 27, 2017

"Caught in the net: a child psychiatrist's guide for navigating the internet age.", Workshop, International Association for Child and Adolescent Psychiatry and Allied Professions, Prague, Czechoslovakia

July 27, 2018

Chair, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, "Caught in the Net: How Digital Media Shapes Mental Illnesses in Youth and How Psychiatrists Should Respond." Seattle, Washington

October 24, 2018

"Self-Care in the Child Welfare System" YMCA/Safe Children Coalition Conference, with Catarlyn Glenn, Sarasota Florida

April 18, 2019

"Psychotropic Medications 101: The pertinent essentials for all involved in the child welfare system" Florida Child Protection Summit, with Catarlyn Glenn, Orlando Florida

December 17, 2019

14

"Caught in the Net: How Digital Media Interacts with Mental Illness in Children and Adolescents", Annual Conference of the Florida Psychiatric Society, Tampa, Florida
September 21, 2019

"Effective Strategies for Higher Education and Beyond" Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Mastering Information Flow for Transitional-Age Youth (TAY): as part of "Promoting Digital Citizenship in Transitional-Aged Youth (TAY) and College Students", Chicago, IL
October 19, 2019

"Caught in the Net: How Digital Media Interacts with Mental Illness", virtually presented at the Andrew Weil Center for Integrative Medicine, Tucson, Arizona
April 1, 2020

"A deeper dive into child and adolescent psychopharmacology for families and professionals involved in the child welfare system" Florida Child Protection Summit, with Catarlyn Glenn. Orlando, FL
September 3, 2020

"Screenagers: Next Chapter – How Online Behaviors Affect Depression and Anxiety Disorders in Adolescents", Media Theater (virtual) Annual meeting of the American Academy of Child and Adolescent Psychiatry
October 19, 2020.

"Helping Child Psychiatrists Navigate the Internet Age", "Career Focus: Setup Your Own Telepsychiatry Practice", "COVID-19 Related Psychiatric Issues"
Oasis Child and Adolescent Psychiatry Conference, Charleston, SC
May 17, 2021

"Conversation about health information, COVID, news, and related topics", discussant and breakout group leader, Digital Media and Mental Health Research Virtual Retreat
May 24th 2021

"The Social Dilemma: Helping Families Navigate the Pull, Pulse, and Power of Social Media", Media Theater, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual
October 29, 2021

"Appealing Applications for Adolescent Mental Health: Social Media's Transformation During the COVID-19 Pandemic", Discussant, Clinical Perspective, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual
October 25, 2021

15

"Angry Young Men, Common Threads in Different Types of Extremist Groups" as part of Political Extremism & Hate Group Recruitment of Adolescents", Clinical Perspective, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual
October 26, 2021

"Angry Young Men: Boys and Adolescent Males with Disruptive and Aggressive Behavior", "Nutritional Child Psychiatry" Oasis Child and Adolescent Psychiatry Conference, Charleston, SC
May 1st / 2nd, 2022

"Sexts, Lies & Videogames: Adolescent Boys, the Internet, & Mental Health" Chair and presenter on violence and young men: Clinical Perspective, Annual Meeting of the American Academy of Psychiatry Annual Meeting, New Orleans, LA
May 25, 2022

"Assessing and Addressing Digital Distraction, Misinformation, and Disarray", part of the Social Media Institute, Annual Meeting of the American Academy of Psychiatry Annual Meeting, Toronto, CA October 19, 2022

**Licensure:**

Florida Medical License, expires January 31st, 2024

Federal DEA Controlled Substances License        12/31/2023

Certification: ECFMG Certificate 0-573-532-9

Forensic Training:

Florida Forensic Examiner Training completed through the University of South Florida Department of Mental Health Law and Policy
August 15-17, 2019

Certifications in Psychotherapy:

Basic Practicum in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY
July 13, 2003
Advanced Practicum in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY
July 20, 2003

Associate Fellowship in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY,
July 15, 2005

16

Accelerated Resolution Therapy, Basic Training

April 1-3, 2017

Accelerated Resolution Therapy, Enhanced Training

Sept 31, October 1, 2018

Accelerated Resolution Therapy, Advanced Training

October 2,3, 2018

American Association of Medical Colleges Medical Education Research Certificate

October 13th, 2010


**Scholarly Activity**

*Funded block grants*

Co-investigator on the Mental and Behavioral Health Capacity Project from September 2012 to June 2017

*Unfunded research*

Supervisor mentoring Medical Students:

University of South Florida IRB: Faculty Advisor Co Investigator May 2021

> What is the impact of coronavirus confinement on Japanese college students' mental health? STUDY002335

University of South Florida IRB: Faculty Advisor Co Investigator May 2021
> Changes in college aged students' metabolic health due to Covid-19 confinement STUDY002341


PI as student supervisor, STUDY004118, IRB approved as Exempt Status,  Palliative Care Patients' Attitudes & Openness to Psilocybin assisted Psychotherapy for Treatment of Existential Distress, Julia Wang


**Journal Publications:**

Peer Reviewed

**Kaliebe, Kristopher** and Adrian Sondheimer. "The media: Relationships to psychiatry and children." *Academic Psychiatry* 26.3 (2002): 205-215.

**Kaliebe, Kristopher** "Rules of thumb: three simple ideas for overcoming the complex problem of childhood obesity." *Journal of the American Academy of Child & Adolescent Psychiatry* 53.4 (2014): 385-387.

**Kaliebe, Kristopher.** "Dr Kaliebe Replies", Journal of the American Academy of Child & Adolescent Psychiatry, (2014) 53:10 1134.

**Kaliebe, Kristopher** "The Future of Psychiatric Collaboration in Federally Qualified Health Centers." *Psychiatric Services* (2016): appi-ps.

**Kaliebe, Kristopher,** and Josh Sanderson. "A Proposal for Postmodern Stress Disorder." The American journal of medicine 129.7 (2016): e79.

Osofsky, Howard J., Anthony Speier, Tonya Cross Hansel, John H. Wells II, **Kristopher E. Kaliebe**, and Nicole J. Savage. "Collaborative Health Care and Emerging Trends in a Community-Based Psychiatry Residency Model." *Academic Psychiatry* (2016): 1-8.

Yeh, Y. Y. and **K. Kaliebe**. "Impact of Nutrition on Neurocognition." *Southern medical journal* 109.8 (2016): 454.

**K. Kaliebe** Expanding Our Reach: Integrating Child and Adolescent Psychiatry Into Primary Care at Federally Qualified Health Centers. J Am Acad Child Adolesc Psychiatry. 56.11 (2017)

Kass, R. and **Kaliebe, K.**, Stress and Inflammation: New Perspectives on Major Depressive Disorder. JAACAP Connect, p.22. Winter 2020

Tamburello, A., Penn, J., Negron-Muñoz, R., & **Kaliebe, K**. (2023). Prescribing Psychotropic Medications for Justice-Involved Juveniles. Journal of Correctional Health Care.

Case Reports, Technical Notes, Letters

Books, Textbook Chapters:

Weigle, P., Kaliebe, K., Dalope, K., Asamoah, T., & Shafi, R. M. A. (2021). 18 Digital Media Use in Transitional-Age Youth: Challenges and Opportunities. Transition-Age Youth Mental Health Care: Bridging the Gap Between Pediatric and Adult Psychiatric Care, 357.

Invited Publications

"Telepsychiatry in Juvenile Justice Settings", **K Kaliebe**, J Heneghan, T Kim, Child and Adolescent Clinics of North America, 20 (2011) 113-123

American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Telepsychiatry and AACAP Committee on Quality Issues. Clinical Update: Telepsychiatry With Children and Adolescents. J Am Acad Child Adolesc Psychiatry. 2017 Oct; 56(10):875-893. Epub 2017 Jul 25. PMID: 28942810.

**Kaliebe, Kristopher** and Paul Weigle. "Child Psychiatry in the Age of the Internet." (2017).  Child and Adolescent Psychiatric Clinics of North America, April 2018Volume 27, Issue 2, Pages xiii–xv

Gerwin, Roslyn L., **Kristopher Kaliebe,** and Monica Daigle. "The Interplay Between Digital Media Use and Development." Child and Adolescent Psychiatric Clinics 27.2 (2018): 345-355.

**Other Research and Creative Achievements:**

Poster Presentations:

"Collaborative Child and Adolescent Psychiatry within Primary Care Clinics in Coastal Louisiana" Poster, Annual meeting of the American Academy of Child and Adolescent Psychiatry, **Kristopher Kaliebe MD**, Joy Osofsky, PhD; Howard Osofsky, MD, PhD; Lucy King, BA; Tonya Hansel, PhD,  San Antonio, TX
                                                          October 29, 2015

"Benefits of Integrating Young Child Psychiatric Services Into Primary Care Clinics in Underserved Communities" Poster, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, NY Joy Osofsky, PhD; Howard Osofsky, MD, PhD; Lucy King, BA; Tonya Hansel, PhD, **Kristopher Kaliebe MD**
                                                          October 28, 2016

 "Integrating child and adolescent psychiatry into community based primary care networks", Poster, International Association for Child and Adolescent Psychiatry and Allied Professions, Prague, Czechoslovakia **Kristopher Kaliebe MD**
                                                          July 25, 2018

" The Prevalence of the Adverse Childhood Experiences (ACE) in Florida Youth Referred to the Department of Juvenile Justice"  Poster, Annual meeting of the American Academy of Psychiatry and the Law, Greg Iannuzzi, MD, Mark Greenwald, PhD**, Kristopher Kaliebe MD**
                                                          October 25, 2018

Other articles:

"LSU's *Breakfast Club* emphasizes education and recruitment into Child and Adolescent Psychiatry", American Academy of Child and Adolescent Psychiatry News,
                                                          January 2004
"Trix are for Kids!", American Academy of Child and Adolescent Psychiatry News,
                                                          May, 2013
Expanded Psychiatric Care Can Transform Federally Qualified Health Centers, American Psychiatric Association News,
......                                                     Published online June 17, 2016

News Stories on Suicide, Fictional Content may Increase Risk for Contagion, Hansa Bhargava and **Kristopher Kaliebe**, American Academy of Pediatrics News, *Mastering the Media Column*,

Published online July 10, 2019

Webinars and creation of enduring materials:

*Rules for Optimal Health,* Webinar, University of South Florida Quality Parenting Initiative, Florida's Center for Child Welfare Information and Training Resources for Child Welfare Professionals, released

...... December 11, 2017

Florida's Center for Child Welfare Information and Training Resources, webinars series on pediatric mental health for child welfare professionals and caregivers, Kristopher Kaliebe with Catarolyn Johnson;

...... June 1, 8, 15, 22 and 29, 2020

"Don't just sit there- Adapt and Optimize in a post Covid world" University of South Florida Global Health Conversation Series, presented virtually

September 22, 2020

## Service

Membership in Professional Organizations:

Member, American Academy of Child and Adolescent Psychiatry (AACAP),
2000 to present

AACAP Media Committee member
2003 –2021

C0-Chair, AACAP Media Committee
2013-2021

Media Committee Liaison to the Complementary and Integrative Medicine Committee of the AACAP
2012 to 2019

Liaison to the Committee on Communications and Media of the American Academy of Pediatrics, from American Academy of Child and Adolescent Psychiatry (AACAP)
2015 to 2022

Member Association for Behavioral and Cognitive Therapies
2004 – 2016

Member American Academy of Psychiatry and the Law
2004 to present

Member Zero to Three
2017 to 2021

Member Louisiana Council for Child Psychiatry (LCCP)
2003 to 2016

Louisiana Council for Child Psychiatry (LCCP)

Secretary-Treasurer
March 2010-March 2014

President
March 2014- June 2016

Member, American Psychiatric Association
2000 - 2012 , 2021 to present

LSUHSC Psychiatry Interest Group Faculty advisor
2008 to 2012

University of South Florida Medical School Integrative Medicine Student Interest Group faculty advisor
January 2020 to present

University of South Florida Medical School Mindfulness and Meditation in Medicine Group faculty advisor
January 2022 to present

University of South Florida Interdisciplinary (university wide) Psychedelics Interest Group faculty advisor
March 2022 to March 2023

**Editorial Posts and Activities:**
    **Journal editorships,  Reviewer**

LSUHSC Institutional Review Board alternate reviewer 2008-2012

Safety Committee Member, Accelerated Resolution Therapy for Treatment of Complicated Grief in Senior Adults, University of South Florida
2017-19

Expert reviewer for *Adolescent Psychiatry* Thematic Special Issue: Coming of Age Online: Challenges of Treating the Internet Generation: (2), 4, 2014

Expert reviewer for *Academic Psychiatry* Media Column                June 2018

Expert Reviewer for *Pediatrics*                                              January 2021

Expert reviewer for *Academic Psychiatry* Media Column                March 2022

Expert Reviewer for *Harvard Review of Psychiatry*                    May 2021

Co-editor: Kaliebe, Kristopher, and Paul Weigle. Youth Internet Habits and Mental Health, An Issue of Child and Adolescent Psychiatric Clinics of North America, E-Book. Vol. 27. No. 2. Elsevier Health Sciences.                2018

Member, Planning Committee for the Digital Media and Mental Health Research Retreat hosted by the nonprofit Children and Screens.
                                                                                May 24th, 25th 2021.


**Revised: March 2023**

CONFIDENTIAL - ATTORNEY'S EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Intervenor Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-184-LCB |
| | ) | |
| HON. STEVE MARSHALL, in his | ) | |
| Official capacity as Attorney General, | ) | |
| of the State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## SUPPLEMENTAL EXPERT REPORT OF
## KRISTOPHER KALIEBE, M.D.

**EXHIBIT**

**B**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

## TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Introduction ................................................................................................................ 1

WPATH's History of Enforcing Ideological Conformity and Suppressing Dissent ..................... 2

    A.   USPATH cancelled Dr. Kenneth Zucker's research presentation based on the demands of transgender activists ................................................................ 3

    B.   WPATH "muzzles" clinicians who speak publicly about their concerns of "gender-affirming care" ................................................................................ 5

    C.   WPATH tries to silence researchers with whom it disagrees ............................ 12

    D.   The enforcement of ideological conformity excludes mainstream clinicians and scientists devoted to the scientific method ................................ 16

Ideology Trumps Science in WPATH's Standards of Care 8 ....................................... 17

    A.   WPATH's ideological conformity introduced bias into Standards of Care 8 ...................................................................................................... 17

    B.   WPATH's rights-based ideology transformed Standards of Care 8 from a medical guideline to a political and legal document ...................................... 26

    C.   Politics and outside pressure directly influenced Standards of Care 8 ............. 34

    D.   WPATH's public advocacy efforts have conflicted with open, scientific inquiry ........................................................................................................ 45

Political Advocacy Influences Scientific Inquiry at the U.S. Department of Health and Human Services ..................................................................................................... 52

    A.   HHS solicits the views and listens to requests of ideologically aligned political advocacy organizations that promote "gender-affirming care" ........... 53

    B.   HHS refuses to conduct a systematic evidence review of treatments it endorses ...................................................................................................... 64

References .................................................................................................................. 68

CONFIDENTIAL – ATTORNEY'S EYES ONLY

**INTRODUCTION**

1.      Since my previous report, counsel for Defendants have provided me with documents they received in discovery from the World Professional Association for Transgender Health (WPATH) (BOEAL_WPATH_000001 through BOEAL_WPATH_101726) and the U.S. Department of Health and Human Services (HHS) (HHS_130127-29, HHS_0131894-97, HHS_0132964-65, HHS_016510-22, HHS_0137394, HHS_0137648-50, and HHS_0144565 through HHS_0169992). I understand these documents are protected by a protective order. I have been asked to provide a supplemental report based on my review of those documents, as well as developments in the field since my last report.

2.      Since my last report I have served as an expert witness in the following cases:

Testimony:

   a.   State of Florida v. Benjamin Smiley, Case No. CF 15 – 004903, CF
        15 – 005388, December 11, 2023

   b.   State of Florida v. Jacob Randall Young, Case No. 2021CF001299CFAXWS-3,
        Circuit Court, Pasco County, Florida, July 6, 2023

Depositions:

   c.   K.C., et al, v. The Individual Members of the Medical Licensing Board of Indiana,
        in their official capacities, et al., Case No.  1:23-cv-00595-JHP-KMB, United States
        District Court, Indianapolis Division, June 1, 2023

   d.    State of Florida v. Jacob Randall Young, Case No. 2021CF001299CFAXWS-3,
        Circuit Court, Pasco County, Florida, June 30, 2023

   e.   Jennifer McCarthy and Shaun Byers, Case No. 2018DR – 001829, Circuit Court,
        Pinellas County, Florida, December 5, 2023.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

3.      Based on my review of the documents, my concerns in my initial report have been confirmed. These concerns include that gender medicine has become politicized, tribal, and ideological. Internal WPATH documents show that Standards of Care 8 (SOC-8) cannot be trusted to establish quality care for gender nonconforming youth. Documents from the United States Department of Health and Human Services (HHS) also show that this component of the federal government is actively promoting gender affirming treatments for youth, despite the fact that HHS has known for over 2 years that evidence does not support these treatments. HHS has also conducted itself in a politicized, irresponsible manner by failing to allow input from a full range of stakeholders.

4.      The World Health Organization (WHO) on January 15, 2024, confirmed that "the evidence base for children and adolescents is limited and variable regarding the longer-term outcomes of gender affirming care for children and adolescents." (WHO FAQ, p.3).

5.      The WHO thus has acknowledged what WPATH and HHS also know but will not admit to the public.

## WPATH'S HISTORY OF ENFORCING IDEOLOGICAL CONFORMITY AND SUPPRESSING DISSENT

6.      Since its beginnings in 1979, WPATH—then known as the Harry Benjmain International Gender Dysphoria Association—has struggled to reconcile its goals of being *both* a scientific, medical organization studying gender dysphoria *and* an organization welcoming to, and supportive of, transgender persons. The founding committee was composed of five medical doctors, one psychologist, and "one transgender activist." The medical professionals formed the committee to author the initial Standards of Care. The activist was left off the committee by one vote, but included in the authorship of Standards of Care 2. (Matte 2009 pp.44, 48).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

7.      Since that time, it appears both that the activists have gained more control of WPATH and that the line between professional and activist has blurred. Transgender activists who are not medical professionals can attend and participate in WPATH meetings, and WPATH included transgender "stakeholders in the development of the SOC-8." (SOC-8 S247). While it is important for medical organizations to listen to the concerns of the patients they care for, WPATH has included activists without holding them to the basic expectations required for scholarly exchange. As I discussed in my initial report, the underpinnings of the scientific method include tolerating others' viewpoints, respecting a researcher's freedom to present and discuss data (even if one disagrees with it), attacking ideas rather than the person presenting the idea, and deferring to the academic process of knowledge creation through constructive disagreement. From my review of the WPATH documents produced in discovery, it appears that WPATH eschews these principles.

8.      WPATH has developed dogmas, taboos, and orthodoxies that favor transitioning and oppose barriers limiting access to transitioning treatments. In this atmosphere there is an exchange of ideas, but only within a constrained ideology. Many in WPATH push for conformity of opinion, rather than emphasizing the creation of an organization that values rigorous scientific exchange and a diversity of viewpoints. As one leader put it, WPATH's discursive goal seems to be, "As long as we all stick together and sing from the same hymn sheet trans people globally will receive the care they deserve!" (BOEAL_WPATH_061094). Examples abound.

   **A.  USPATH cancelled Dr. Kenneth Zucker's research presentation based on the demands of transgender activists**

9.      As I wrote in my initial report, public reporting suggested that USPATH had caved to activists' demands by cancelling a presentation by renowned psychologist Kenneth Zucker at

CONFIDENTIAL – ATTORNEY'S EYES ONLY

the 2017 USPATH conference. (Kaliebe Report ¶ 121). The WPATH documents confirm this re-porting and shed further light on WPATH's response.

10.     As background, Dr. Zucker ran a gender clinic in Toronto for decades, and his data showed that most of the gender dysphoric youth at his clinic outgrew their dysphoria. Given that data, Dr. Zucker emphasized "watchful waiting" rather than early transition. That position was mischaracterized by activists as "conversion therapy"; Zucker was fired and his clinic closed. In 2016, Zucker filed a defamation claim against the health center and two years later won a substan-tial settlement for defamation. The health center "apologize[d] without reservation to Dr. Zucker." (Canadian Press 2018).

11.     When Zucker began his panel presentation at the 2017 USPATH conference, activ-ists interrupted and picketed, and the event had to be cancelled. (BOEAL_WPATH_064163). That evening, "a group of activists led by transgender women of color read aloud a statement in which they said the 'entire institution of WPATH' was 'violently exclusionary' because it 'remains grounded in cis-normativity and trans exclusion.'" (BOEAL_WPATH_064163). The activists made a number of demands, including that USPATH apologize for Zucker's mere presence at the conference. A video of that meeting, which WPATH appeared to confirm to the *New York Times* is authentic, is on YouTube: https://www.youtube.com/watch?v=rfgG5TaCzsk. (BOEAL_WPATH_064099).

12.     USPATH met the activists' demands, telling them: "We are very, very sorry." (BOEAL_WPATH_064099). USPATH cancelled Zucker's talk the next day (USPATH said it "could not guarantee his safety"), publicly "apologize[d] for the pain and disrespect" the "situa-tion" caused "participants, especially those who identify as trans women of color," and promised to "include trans people of color, especially trans women of color, in the ongoing work of

CONFIDENTIAL – ATTORNEY'S EYES ONLY

WPATH" and "in every aspect of the organization." (BOEAL_101663). USPATH further empha-sized that "Zucker was not 'invited' to present," but had submitted research to present and his proposal was reviewed by peers in the same discipline, and both of his applications "received very high scores." (BOEAL_WPATH_101661). USPATH promised the activists that it would "do all we can to ensure that similar events do not occur" in the future. (BOEAL_WPATH_101663).

13.     Although this event happened in 2017, it is instructive for what has come since. Rather than apologizing to the disruptive activists and meeting their every demand to cancel the presentations of a respected (if controversial-within-WPATH) scholar, a truly science-based or-ganization would uphold rules of civil scholarly discourse by removing the harassers and apolo-gizing *to Dr. Zucker*. USPATH leadership instead chose to reward the harassers with a roundtable discussion and a public apology promising not to let the same mistakes happen again—apparently meaning that it would no longer grade presentation applications by their merit but by the popularity of their positions or those of their authors. WPATH appears comfortable excluding scholars based on ideology rather than on the strength of their ideas or the evidence they bring. As Dr. Zucker wrote to the organization that cancelled him: "If there cannot be meaningful dialogue about com-plex issues at WPATH or USPATH, how can the organization consider itself to be 'Professional'?" (BEAL_WPATH_101671).

### B. WPATH "muzzles" clinicians who speak publicly about their concerns of "gender-affirming care"

14.     As I discussed in my initial report, public reporting suggested that USPATH had censured its outgoing president, the psychologist Erica Anderson, PhD, for going public with con-cerns that clinicians were fast-tracking gender dysphoric youth for hormonal and surgical treat-ments. (Kaliebe Report ¶ 122). Again, the WPATH documents have confirmed this to be true and shed further light on the episode.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

15.     In brief, on October 4, 2021, Abigail Shrier published an article called "Top Trans Doctors Blow the Whistle on 'Sloppy' Care." (Shrier 2021). In it, Shrier interviewed Anderson and Dr. Marci Bowers, a plastic surgeon who currently serves as president of WPATH. Anderson warned: "It is my considered opinion that due to some of the — let's see, how to say it? what word to choose? — due to some of the, I'll call it just 'sloppy,' sloppy healthcare work, that we're going to have more young adults who will regret having gone through this process. And that is going to earn me a lot of criticism from some colleagues, but given what I see — and I'm sorry, but it's my actual experience as a psychologist treating gender variant youth — I'm worried that decisions will be made that will later be regretted by those making them." When asked what "was sloppy about the healthcare work," Anderson elaborated: "Rushing people through the medicalization," and "failure — *abject* failure — to evaluate the mental health of someone historically in current time, and to prepare them for making such a life-changing decision." (Shrier 2021). Bowers likewise worried that administering puberty blockers to gender dysphoric youth could be dangerous given that "there's not a lot of published data, not a lot of studies, the field is in its infancy, [and] you see people sometimes selling protocols like puberty blockers in a dogmatic fashion." Bowers continued: "I'm not a fan of [pubertal] blockade at Tanner Two anymore, I really am not." "The idea all sounded good in the very beginning," she said. "Believe me, we're doing some magnificent surgeries on these kids, and they're so determined, and I'm so proud of so many of them and their parents. They've been great. But honestly, I can't sit here and tell you that they have better — or even as good — results. They're not as functional. I worry about their reproductive rights later. I worry about their sexual health later and ability to find intimacy." (Shrier 2021).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

16.    USPATH responded by formally censuring Anderson for speaking publicly about her concerns. (BOEAL_WPATH_026947-52). In a letter signed by the USPATH Board of Directors, USPATH faulted Anderson for "grant[ing] an interview in the lay press with an author with known biases regarding the care of transgender and gender diverse youth, during a period of intense politicization and when litigation is in progress in multiple US jurisdictions, where legislation aims to prohibit such care by statute." The Board concluded: "As such, the USPATH Board of Directors is serving you with this formal letter of reprimand for such actions."[1] Anderson (or someone else who received the letter – the names are redacted) complained that the Board provided "effectively no opportunity to discuss their concerns, as they met secretly and went straight to this letter which was presented to [Anderson] as fait accompli." (BOEAL_WPATH_026947-52).

17.    For Bowers's part, the WPATH president suggested to others that the "field is in its infancy—and I do think we may need a bit of a reset" (BEAL_WPATH_021908)—and encouraged WPATH leaders "not [t]o become so insular that we cannot offer meaningful discussion." (BOEAL_WPATH_021925). "We should have been covering these topics long ago as an organization because lives have been affected, not always positively," Bowers lamented. (BOEAL_WPATH_021925). Then, feeling "indelibly stained and already marginalized" within WPATH (BOEAL_WPATH_023348), Bowers drafted apology after apology to circulate to WPATH's upset members. (BOEAL_WPATH_0227150-20; BOEAL_WPATH_022898-903; BOEAL_WPATH_022920-21.) Eventually, after offering to resign, Bowers opted to "allow th[e] story to die off without any response." (BOEAL_WPATH_023348-49).

---

[1] Almost all of the documents produced by WPATH have all names redacted, including this one. It is clear from the context, however, that this letter was addressed to Anderson. Similar context suggests when a document is authored by Bowers.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

18.     An organization that prized truth and truth telling would have handled the episode differently. Rather than formally punishing Anderson and castigating Bowers for publicly raising concerns about "sloppy" care harming children, WPATH and USPATH could have praised their leaders for courageously speaking up to alert the public about harms to minors. They also could have prioritized patient care by investigating Anderson's concerns and advising doctors to focus on the mental healthcare needs of their patients. Instead, the opposite occurred.

19.     Despite USPATH's formal censure, Anderson continued to speak publicly about her concerns. In November 2021, Anderson co-authored an op-ed with another WPATH psychologist, Laura Edwards-Leeper, PhD, in the *Washington Post*: "The mental health establishment is failing trans kids." (Edwards-Leeper & Anderson 2021). That same month, Anderson gave an interview to *Medscape* raising similar concerns. Anderson emphasized that "[a]n evaluation for gender dysphoria requires a comprehensive picture of every young person, their journey, and a medical and psychological profile," and worried that many providers were "simply taking what the children say and running with it." (Ault 2021). "To simply act as if a child is a reliable reporter about this area but not nearly every other is preposterous," Anderson said.

20.     WPATH and USPATH leaders reacted negatively. One board member immediately e-mailed the other members: "Erica has now given another press interview on this topic, in which she re-affirmed her statements in the Shrier article, without notifying or consulting with the Board, even after her recent letter of reprimand. This requires action by the Board in my view. I will ask [redacted] to weigh in, but I would in the least want to consider removing her from her Past-President role and moving her to a member-at-large position. I am concerned that we have given Erica a reprimand yet she continues to speak to the press, and if we take no action then she has no dis-incentive to continue to do so." (BOEAL_WPATH_027549).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

21.     While considering whether to punish Anderson again for raising concerns publicly, the board members admitted internally they shared many of Anderson's worries. One member wrote:

> [G]oing on 'what the children say, as [redacted] put it, and on what we/parents/teachers observe in their behavior…there's no litmus test. And there's no assessment tool that captures all the ways internal signals can sometimes be misread as related to gender when they're not, or not completely, as can happen with borderline personality and other identity-related conditions, and which is occurring more often (in my observation) as trans-nonbinary identities are more visible, available and (yay) accepted. We're just beginning to see responsible, trans-led investigations on some of this, … but nothing yet to my knowledge that specifically addresses this weird moment we're in with kids/pandemic/social media.

(BOEAL_WPATH_027567) (first alteration in original).

Another member agreed: "To share my own thoughts on these subjects, I do agree with [redacted] and would go a step further to say that I do have concerns about how the door has swung away from more rigorous assessments in general over time. The reaction to restricted access and barriers has been a wave of treatment-on-demand clinics and proponents." (BOEAL_WPATH_027564). This board member also noted "that there has been a great deal of pressure placed on" the authors of the Assessment chapter of the Standards of Care 8 "and on the editors by a wing of the community who want to have everything done on demand or it is otherwise transphobic." (BOEAL_WPATH_027564).

In reply, another board member joined the chorus: "All I can say is, finally. I am glad to finally hear some sense of concern about the loosening of standards. It should be quite clear that as we have loosened standards and lost some control over the opportunistic nature of medicine in the US that we too started hearing increased concern of detransition/regret." (BOEAL_WPATH_027626). This board member was "alarmed by the call to censure [Anderson] yet again." (*Id.*) "For what, stating the concerns that [redacted] just expressed? The first step in

solving a problem is admitting you have one. Everyone, we have a problem." (*Id.*) "As a Board," this member concluded, "frank discussions need to be had." (*Id.*)

One member also admitted that "de/retransitioners have always been a part of my community, and to a lesser degree my medical practice." (BOEAL_WPATH_027628). "There's some idea that people either essentially are or are not trans that these people are running with, which is so dangerous to people who de/retransition, and not the idea that different genders fit people better at different times and those things are fluid." (*Id.*).

In response, one member called for a "USPATH task force" to "examine this issue by the numbers" by engaging "impartial experts in the field." (The member clarified that Lisa Littman—who has published studies on detransitioners and on the "Rapid-Onset Gender Dysphoria" hypothesis—would not qualify "given her recent appearance with Megyn Kelly.") The member also called for a "task force which will examine qualifications and training consideration." (BOEAL_WPATH_027550).

22.     Despite other board members agreeing with the substance of Anderson's public critique, and despite board members conveying their own concern and knowledge that harmful care was occurring, WPATH and USPATH once again failed to do the responsible thing. They never went public with their board members' concerns. They never publicly apologized to Anderson. To my knowledge, they have ignored calls to create a "task force" of impartial arbiters to investigate claims of harmful care in a rigorous and transparent manner. Instead, the organizations continued their attempt to silence whistleblowers from speaking publicly. WPATH proposed a new media policy for board members, which either Anderson or Bowers (the name is redacted) found "very troubl[ing]." (BOEAL_WPATH_027831). She wrote: "Dissent and diversity of opinion is generally considered a positive and shows the maturity of an organization, not a canned,

CONFIDENTIAL – ATTORNEY'S EYES ONLY

plastic veneer that puts out a happy face at all times." "This is a very unfortunate approach," she concluded, "and one I would not be comfortable with in its present form." (*Id.*) That was November 30, 2021. Nine days later, Anderson resigned from the USPATH Board of Directors. (BOEAL_WPATH_028313). The atmosphere didn't improve once Anderson left. After reading another public statement of concern Anderson gave in March 2023, one WPATH leader lamented: "What a lousy legacy Dr. Anderson is leaving. Casting doubt on the validity of TGD identities." (BOEAL_WPATH_092964). "Erica is a self serving slug." (*Id.*)

23.     As for Edwards-Leeper, she wrote an email to WPATH about the op-ed she and Anderson published in the *Washington Post* raising concerns of inadequate mental healthcare for adolescents suffering from gender dysphoria. She indicated that after the article was published, she received lots of feedback and that "[c]ountless providers have shared that they have been afraid to speak up about their concerns." (BOEAL_WPATH_027832). She continued: "There is a listserve I'm on (mostly pediatric trans medical doctors) and I've had medical and mental health providers from that group privately message, thanking me and telling me they are too afraid to share their feelings with the entire group. That group largely seems to be a dangerous echo chamber that is unable to engage in constructive and critical dialogue about the state of the field, which is incredibly worrisome." Edwards-Leeper contrasted that response with WPATH's: "I fear that WPATH's recent stance to shut down this conversation was a huge mistake." (BOEAL_WPATH_027832). In a follow-up email, she concluded: "My fear is that if WPATH continues to muzzle clinicians and relay the message to the public that they have no right to know about the debate, WPATH will become the bad guy and not the trusted source; it will undo all public credibility." (BOEAL_WPATH_027843).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

24.     Edwards-Leeper is right. While a few individual board members voiced their concerns internally about various aspects of "gender-affirming care"—be it inadequate mental health safeguards for gender dysphoric youth, the effect of puberty blockers on future sexual function or fertility, "sloppy" care by physicians out to make a buck, or the unexplained rise in gender dysphoric teenaged girls—WPATH and USPATH as organizations "muzzled" clinicians who let the public in on the debate. In doing so, the organizations violated the spirit of free inquiry and truth-seeking, intentionally misled the public about the safety and efficacy of transitioning treatments, and sent a clear message to its members: they may be able to whisper their concerns to one another privately, but under no circumstances should they depart from the party line in their public statements. This is antithetical to good science and puts tribalism and ideology above patient welfare.

### C.  WPATH tries to silence researchers with whom it disagrees

25.     WPATH's censorship is not only of its own members. Rather, as I explained in my initial report, it has also sought to silence researchers with whom it disagreed—perhaps no one more so than Dr. Lisa Littman. (Kaliebe Report ¶¶ 134-40). In brief, over the last decade-and-a-half, there has been an enormous increase in transgender identification, and the new population has significant mental health comorbidities and has moved to being predominately natal females. In 2018, Littman published an article examining possible social elements involved in youth without previous gender dysphoria now presenting as transgender. She used the phrase "rapid-onset gender dysphoria," or "ROGD," to describe the phenomenon. While the fact of an increased gender dysphoria population with a shift to female and increased comorbidities is not under any dispute, many in the activist community panicked over data showing a possibility of social transmission or influence of gender dysphoria. This led to attacks on Dr. Littman and frantic attempts to discredit her work.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

26.     Littman's article was published in August 2018. The next month, WPATH issued an official "position on 'Rapid-Onset Gender Dysphoria (ROGD),'" claiming that ROGD "constitutes nothing more than an acronym created to describe a *proposed* clinical phenomenon that may or may not warrant further peer-reviewed scientific investigation." (WPATH 2018). It later joined the "CAAPS Position Statement on Rapid Onset Gender Dysphoria," seeking "eliminating the use of Rapid-Onset Gender Dysphoria (ROGD) and similar concepts for clinical and diagnostic application" and claiming that "there is *no* evidence that ROGD aligns with the lived experiences of transgender children and adolescents." (CAAPS Statement, emphasis mine).

27.     Internally, a different story unfolded. WPATH was extremely concerned with controlling the language used to describe the enormous increase in transgender identifying young people; the concept of ROGD threatened to undermine WPATH's positions that gender identity is innate and biological rather than socially influenced. So publicly, ROGD had to be defeated. But privately, leaders acknowledged that ROGD is plausible. In one email chain, members (likely either board members or chapter authors of Standards of Care 8 – the redactions make it hard to tell) discuss the concept. "[I]ncreasing numbers are asking for medical affirming treatment," one wrote. "What the explanation for this increase is, is unknown and also methodologically challenging to study; social factors likely a play a role.. I do not like the word contagion, but these factors could also be recognition and increased social awareness." (BOEAL_WPATH_074672). Another member responded: "I couldn't agree with [redacted] more. We cannot outright dismiss the fact that social factors (also don't like the word contagion) impact identity development and decision making in adolescents." This member continued: the rise is "related to many things such as social factors. Some adolescents – who have certain psychological vulnerabilities – feel comfortable within a marginalized community space and come to feel it's a safe space for them. For others,

gender serves a different function, not necessarily one that is about their gender identity even though they may feel it is about their identity in the moment." (BOEAL_WPATH_074671).

28.     WPATH's public critique of ROGD continues. As I was writing my initial report, a controversy was brewing about an article published in the *Archives of Sexual Behavior* by Suzanna Diaz and J. Michael Bailey entitled "Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases." (Kaliebe Report ¶141-42). The authors surveyed over 1655 parents of gender dysphoric adolescents who answered questions about their child's gender dysphoria and gave answers that matched the ROGD hypothesis—the adolescent did not have a history of gender dysphoria in childhood, and the dysphoria was associated with social influences and/or psychological comorbidities. (Bailey & Diaz 2023). So again, many WPATH leaders attacked the article. Marci Bowers (WPATH's president), AJ Eckert (USPATH board member), Asa Radix (co-chair of SOC-8), and Colt St. Amand (SOC-8 contributing author), among others, wrote the International Academy of Sex Research (IASR) and Springer (the journal's publisher) to demand that they retract the article because "the article was published without Institutional Review Board (IRB) approval." (Open Letter 2023). Then they went a step further and threatened that they would "no longer submit to the journal, act as peer reviewers, or serve in an editorial capacity until" its editor—Dr. Ken Zucker—"is replaced with an editor who has a demonstrated record of integrity on LGBTQ+ matters and, especially, trans matters." The problems the letter writers had with Dr. Zucker appears to be as mentioned previously that data from his clinic when watchful watching and supportive therapy were provided show that the majority of patients had their gender dysphoria remit naturally. The authors considered this success "to be a form of conversion therapy." Also, as an editor Dr. Zucker upheld proper standards of discourse, rather than censoring scholarly exchange as hoped for by the letter writing activists. This desire for censorship is clear from their language as the

CONFIDENTIAL – ATTORNEY'S EYES ONLY

authors complained, Zucker had "collaborative proximity to individuals and groups who militate against access to gender-affirming care" because he allowed the Society for Evidence-Based Gender Medicine to pay "for the open access fee of numerous articles in *Archives of Sexual Behavior*." (Open Letter 2023).

29.     The critiques were unfounded, but the hostility toward Zucker is easy to understand as his clinical approach, research results, and integrity as a journal editor all directly threatened the tribal and ideological bubble of WPATH. As to the methodological critique, Bailey explained that IRB review was not needed because the primary author was not affiliated with an academic institution and Bailey had consulted his own institution's IRB and acted in accordance with its guidance. (Bailey Letter 2023). But the IRB complaint was not actually the problem—it was a ruse, an excuse to quash the paper. So when that failed, the activists, now joined by the journal's publisher due to the public controversy the paper had caused, shifted the goalposts: the authors had failed to get informed consent from the parents conducting the survey, even though they expressly told the parents that their answers would be published online. (Bailey Letter 2023). On that basis, the publisher retracted the article. (Bailey Retraction Note 2023).

30.     The Foundation Against Intolerance & Racism wrote a counter letter that espouses the principles WPATH should have embraced. (FAIR Letter 2023). As that letter noted, "[t]he appropriate action is to have an open debate about the paper—not to silence those whose views one finds disagreeable." "We fear that just like in the case of the original ROGD paper, the demands for retraction and sanctioning of Dr. Zucker, the Editor-in-Chief[,] are principally motivated by the ideological opposition to Diaz and Bailey's conclusion." "Ongoing attempts to silence any research into the explosion of teens who are now identifying as transgender only stands to hurt the very patients the activists are claiming to help—young gender nonconforming people."

CONFIDENTIAL – ATTORNEY'S EYES ONLY

> **D.  The enforcement of ideological conformity excludes mainstream clinicians and scientists devoted to the scientific method**

31.     The episodes recounted above demonstrate that WPATH is not an organization interested in publicly seeking truth or the best medical care for children and adolescents suffering from gender dysphoria. Instead, WPATH occupies a particular sliver of the medical community and it furthers that community's preferences (and financial interests). Even though members may raise concerns with one another privately, publicly they must all "sing from the same hymn sheet."

32.     This public ideological conformity has a number of downsides, and is antithetical to the operation of a scientifically guided organization. First, it excludes, by intention or default, moderate, middle-of-the-road clinicians and scientists. If Dr. Ken Zucker, who has devoted his life to caring for and studying patients with gender dysphoria, is not welcome at WPATH, then it's hard to imagine that anyone who is not already fully on board (or at least willing to parrot the party line publicly) with on-demand transitioning treatments for minors would be accepted. Any person interested in the treatment of gender non-conforming youth who observes fundamental errors in WPATH's viewpoints can see they would be treated with hostility for voicing their concerns at WPATH. This skews membership toward creating a group without constructive disagreement regarding the most critical issues of concern in youth gender medicine. (Kaliebe Report ¶¶ 56-80).

33.     Second, suppression of internal disagreement leads to the false appearance of consensus and established science. As documents from WPATH show, some of their members and leaders *agree* that the rise of gender dysphoria in adolescent females may have a social element to it. They *agree* that care in the United States can be sloppy. They *agree* that puberty blockers are often started too early and that this can have serious (and still unknown) effects for the child. They *agree* that mental health should be prioritized and that many practitioners in the United States are

CONFIDENTIAL – ATTORNEY'S EYES ONLY

not doing that. And yet WPATH will not let these clinicians speak publicly lest the public come to realize that the science is not settled.

34. Third, the self-censorship affects the composition of WPATH's leaders. If only those who unquestioningly affirm "gender-affirming care" can speak loudly and proudly—while those who raise concerns must do so quietly and, when they do, are praised (privately) for having the courage to speak out—then the leadership will, over time, necessarily consist more and more of enthusiastic advocates. Those leaders will, in turn, select other affirmative clinicians and advocates to lead committees or author publications. Thus the cycle of activism turns, leaving the thoughtful and balanced clinicians left behind.

35. None of this is good for science or medicine. And none of it is good for the youth who suffer from gender dysphoria, who need help, not activism, from medical organizations.

**IDEOLOGY TRUMPS SCIENCE IN WPATH'S STANDARDS OF CARE 8**

36. A critical element of SOC 8 is reducing medical and mental health oversight from medical transition. Members of WPATH deride medical oversight and careful assessment as gatekeeping. They continue the move toward only minimal reference to the relationship between mental health status and transgender identity. There are few voices indicating that there is not research clarifying the intermixing of mental health problems and transgender identity, despite the well documented and longstanding acknowledgement and data that these co-occur and it is unclear which causes which and in whom. Stating this appears taboo within WPATH.

**A.  WPATH's ideological conformity introduced bias into Standards of Care 8**

37. WPATH is an organization of self-selected lay people and professionals drawn to advocacy and gender medicine. This self-selection process introduces bias in the composition of

CONFIDENTIAL – ATTORNEY'S EYES ONLY

the organization. This is not acknowledged within internal documents, and members appear unaware of their own biases. A well-constructed clinical guideline would prioritize the search for truth, be open and transparent about ideological and self-selection bias, and acknowledge inconsistencies and unknowns in the science. In the following paragraphs I'll provide examples where WPATH's internal documents display the pressures exerted to loosen standards and move the SOC-8 farther away from responsible clinical practice.

### 1. "Medicine on Demand"

38.   Throughout the WPATH documents, a recurring theme is members and authors endeavoring to use "correct" language, downplay risks of harms of "gender-affirming care," and sideline scientific literature or researchers that cast doubt on WPATH's narrative that gender-affirming care is lifesaving, medically necessary, safe, and effective. In the previous version of the Standards of Care, one of the criteria to receive hormone therapy was that "significant medical or mental health concerns" "must be reasonably well-controlled" before beginning transitioning treatments. (SOC-7 34). Even this standard was poorly defined and open to interpretation by clinicians. But SOC-8 loosened this standard, recommending that mental health professionals only "address mental health symptoms that interfere with a person's capacity to consent to gender-affirming treatment before gender-affirming treatment is initiated." (SOC-8 S172). Again, as WPATH is a self-selected group of enthusiasts for medicalization, the fact that transgender identity might arise from treatable mental health concerns is unmentionable. As such, WPATH authors move to a standard whereby only if the patient is so extremely impaired that he or she cannot consent to transitioning treatment is that a patient's psychological or cognitive function a limit to access to medicalization.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

39.     This drastic reduction in mental healthcare requirements prior to transitioning appears intentional on behalf of the SOC-8 authors. Commenting on an earlier draft of SOC-8, one of the authors noted that "[t]here is a statement from the Assessment Chapter that is in conflict with the Mental Health Chapter." (BOEAL_WPATH_020179). The Assessment chapter had recommended that clinicians "ensure that any mental health conditions which could be a contraindication to, or hamper, gender affirming medical treatments" be "treated or reasonably well managed prior to the initiation of treatment." The author noted: "The 'treated or reasonably well managed' language harkens back to the 'reasonably well-controlled' language that has been so problematic in SOC 7." "The language we use in" the mental health chapter, the author explained, "makes it clearer that a condition does not have to be 'well-controlled' if the patient has capacity to consent and can participate adequately in perioperative care, with support."

40.     After the conflict was resolved (by the Assessment chapter caving to the reduced requirements of the Mental Health chapter), an author praised the result: "Thank you for your advocacy [redacted]. Here's to hoping healthcare professionals recognize it's their responsibility to facilitate all trans folx (particularly autistic and neurodivergent) to gain access via helping patients become prepared for the medical procedures rather than simply respond with a permission or restriction." (BOEAL_WPATH_021479). This comment displays that at least some WPATH authors believe it is healthcare professionals' "responsibility to facilitate all trans folx," even vulnerable individuals with neurocognitive disorders. Again, within WPATH, it too often is not a discussion of the evidence of outcomes within sub-populations but rather a viewpoint that "medicine on demand" is a civil right for those who identify as transgender. The problem is not just that "medicine on demand" contravenes historical medical ethics, but that WPATH is not honest that this is the viewpoint it promotes in practice.

41.     In another loosening of standards, the idea that a well-documented and persistent gender incongruence is needed for medicalization was debated among SOC-8 authors. After the statement had already passed the Delphi consensus process, the authors of the adult assessment chapter proposed changing the language to clarify that a mental health professional should not determine whether a patient actually experienced gender incongruence. The "controversial statement in the assessment chapter" had required that "gender-affirming care" should be recommended only "when there is well-documented (according to local contexts) persistent gender incongruence." (BOEAL_WPATH_058204). The problem, apparently, was that the statement could "be read as if the assessor needs to assess whether a person 'is Trans' or not (whether they have Gender Incongruence). This has been highly criticized." One author in favor of changing the statement explained: "We feel that as assessors we should be happy to accept that the person has Gender Incongruence, but we want to make sure that this is marked and persistent (as per the requirement in ICD-11.)" The authors thus supported a new version that made "the emphasis, not on assessing gender incongruence, but on assessing that the gender incongruence is marked and persistent." (*Id.*) That version—in which the assessor evidently does not need to determine whether the patient actually experiences gender incongruence or what might be causing the gender incongruence—now appears in SOC-8. (SOC-8 S32)

42.     The WPATH approach does not contain room for skepticism regarding the causes of gender incongruence, and it appears to assume that all gender incongruence is psychologically healthy and should be supported. This extreme philosophy would affirm and medicalize those with severe personality disorders, level 3 autism, gender identity change after sexual assault, or internalized homophobia. Under the altered recommendation, none of these scenarios would matter so long as the patient reports persistent gender incongruence. Again, as above, this "medicine on

CONFIDENTIAL – ATTORNEY'S EYES ONLY

demand" approach can be argued for, but WPATH should be honest that they are implementing this theory without data in a variety of worrisome sub-populations. But WPATH does not do that, instead asserting that medicalization can almost always be clinically appropriate if desired by the patient. This theory is especially concerning with regards to children, adolescents, and young adults who remain in the process of identity development.

43.     Another example of this ideological viewpoint infecting the Standards of Care is when it comes to informed consent. Often, it appears that informed consent is a vehicle for providers to offer "medicine on demand" even when the evidence does not support a procedure as safe and effective. For instance, after Dr. Bowers publicly lamented that puberty blockers could limit surgical options and make a transitioning vaginoplasty much less likely to be successful, authors discussed how that concern should be addressed in SOC-8. One weighed in: "There isn't much published data on this topic. I don't think there is a one size fits all. I think informed consent is the way to go in terms of weighing the risks of early pubertal blockage vs amount of surgical material needed for vaginoplasty." (BOEAL_WPATH_021975). That is what SOC-8 did. (SOC-8 S119).

44.     Part of WPATH's emphasis to de-pathologize gender incongruence and emphasize the patient's right to desired treatment—regardless whether that treatment is safe and effective at treating gender dysphoria—could come from the voices WPATH listened to when creating its guideline. Rather than soliciting a broad range of perspectives, which would include physicians and researchers like Dr. Zucker, Dr. Littman, and others with a healthy skepticism of immediate medicalization, as well as input from schools, sports networks, legal systems, and other organizations, WPATH was insular in who it heard from. To serve as a contributor to SOC-8, one had to be a member of WPATH. (SOC-8 S248). And the most active voices commenting on the proposed

CONFIDENTIAL – ATTORNEY'S EYES ONLY

standards were from transgender activists and activist organizations, not from a full range of stake-holders. For instance, Transgender Europe commented on the draft guidelines that it was "[c]oncern[ed] about a continuation of a rooted pathologizing / gatekeeping perspective" by the draft's requirement that clinicians "only recommend gender affirming medical treatment requested by the patient when there is well-documented (according to local contexts) persistent gender in-congruence." (BOEAL_WPATH_028056). According to Transgender Europe, this statement evi-denced "[p]atholigisation and its consequence, gatekeeping," by "[a]ssuming that someone's iden-tity can come and go (thus the need for 'persistence')." As discussed above, WPATH responded to these concerns by loosening the mental health requirements.

## 2. Ethics in SOC-8

45.     It is noteworthy to me how little ethics are discussed in the communications at WPATH. It appears that WPATH initially contemplated for SOC-8 to include a chapter devoted to ethical considerations, but for whatever reason that chapter never made it to the final standards. (BOEAL_WPATH_073277).

46.     As a slide presentation by Jamison Green and Paula Neira confirm, however, WPATH was aware of a number of ethical quandaries it chose not to address in SOC-8. (BOEAL_WPATH_073280-073309). These ethical challenges would include, for example, the ethical trade-offs regarding legal recognition of gender identity versus legal recognition of biolog-ical sex. Nowhere does this issue appear to be explored, even though the dismantling of legal recognition of biological sex has profound implications for societies and individuals, including children. Likewise, there seems to be little (if any) discussion of the rights of women to have single-sex spaces, or that using self-identified gender rather than sex as a legal marker would likely

CONFIDENTIAL – ATTORNEY'S EYES ONLY

disproportionately affect women the most. The profound ethical trade-offs relating to legal recognition of gender identity in children and adolescents also did not seem to be explored, even though many aspects of this conflict are listed in a slide of the presentation Green and Neira gave: "Name Changes, Gender/Sex Marker on Documents, School Records & Transcripts, Diplomas." (BOEAL_WPATH_073281).

47. When suggesting "Primary Resources," it is also notable that the presenters listed only one-sided advocacy groups:

## Primary Resources

- National Center for Transgender Equality, D.C. (www.transequality.org)

- Transgender Legal Defense and Education Fund, NYC, NY (www.tldef.org)

- ACLU – affiliates in every state + D.C. & Puerto Rico (www.aclu.org)

- National Center for Lesbian Rights , San Francisco & D.C. (www.nclrights.org)

- Lambda Legal , NY, ATL, L.A.... (www.lambdalegal.org)

- Southern Poverty Law Center, Montgomery, AL (www.splc.org)

- Transgender Law Center, Oakland, CA (www.transgenderlawcenter.org)

WPA H

It is unclear whether the ethics, including potential harms, of using only advocacy groups as primary resources on legal and ethical topics was ever explored by WPATH. An organization that considers the full range of ethical issues would include a much broader range of resources.

48. In the discussion notes for the slide, additional complexities are hinted at, asking reasonable questions such as:

CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "How do we establish standards of care and good practices with a dearth of evidence-based scientific longitudinal data on TGE children?"

- "Can a young child know their gender enough to warrant social transitions?"

- "Does a child have to experience first stages of endogenous puberty to be able to fully ascertain their authentic gender identity?"

- "Does a youth who does not yet have a fully developed myelin sheath have the capacity to make informed decisions about irreversible or only partially reversible gender-affirming medical interventions (surgeries and hormones)?"

- "Can a youth receiving puberty blockers in Tanner Stage 2 considering direct follow-up with gender-affirming hormones have the foresight to assent to the foreclosure of ability to conceive a baby later in life?"

- "In a gender affirmative approach in which gender variations are perceived as healthy phenomena rather than disorders, is there justification for a mental health gender diagnosis for children and youth?"

- "In a gender affirmative approach in which gender variations are perceived as healthy phenomena, what are the ethics of engaging children in formal psychological testing to evaluate their gender status?"

- "What are the ethics of denying treatments assessed to be in the best interests of the child, possibly even life-saving, if parents do not consent to these treatments? If medical or government policies do not allow them?"

- "How do we attend to the new influx of gender-nonbinary youth requesting medical interventions desired to consolidate their unique gender selves, neither male nor female?"

(BOEAL_WPATH_073308).

49.     In an email concerning the presentation, another contributor asks: "Making deci-sions about blockers is a major challenge to families and clinicians—how do we propose puberty blockers (presumably leading to hormones and later surgery) to parents and their child in an in-formed way that considers aspects of future life that are almost unimaginable at age 9-10-11-12? Sex, reproduction, intimacy, aging, etc." (BOEAL_WPATH_076566).

50.     These are important and reasonable ethical questions, and it is clear that there are, at present, not anywhere enough data to provide firm answers to many of them. Certainly, reason-able people of goodwill can disagree about how to answer them. Thus, what seems most strange is that internally WPATH will list these as open questions, but in SOC-8 and in WPATH's public proclamations they nonetheless push for medicalized approaches to gender variant youth as if the ethical questions are settled by the state of the science in favor of medicalized transitioning.

51.     In another slide, a number of ethical questions are asked about how WPATH mem-bers should interact with one another: "What is protected speech? What are the limits of what we can discuss? Or cover in research? Eg., Reparative theory. How can we have civil but vigorous debate? Do we want an echo chamber? Should we seek out people we disagree with? What, if any, is the role of censorship and why? … What is meant by shout-out culture within WPATH? Rapid onset of gender identity ignites a storm – why?" (BOEAL_WPATH_073304).

52.     These, too, are important questions for WPATH to consider. But again, the doctors and parents who rely on the Standards of Care (and do not have access to WPATH's internal communications) would not know that these are live questions at WPATH. Only occasionally—

as when leaders like Erica Anderson speak publicly about their concerns with the WPATH affirmative care model (and are censured for doing so)—do those outside WPATH glimpse what an insular echo chamber it can be.

53.     It is also interesting to consider the ethical questions that are not mentioned. WPATH should also consider questions such as: Is it ethical to make hostile, ad hominem attacks towards those who do not agree regarding the evidence base for youth gender care? Is it ethical to overstate evidence and downplay risk of procedures that have lifelong consequences and are undertaken prior to full development? Is it ethical to dismiss scholars such as Dr. Zucker, whose research data indicates that supportive watchful waiting leads to resolution of gender dysphoria in the majority of treated youth? Is it ethical to ignore concerns within WPATH when members report that children may be harmed by the current type of care provided? If WPATH is discussing these questions, the public has no awareness of it. All they see is WPATH's sure pronouncements of a "consensus" among professionals that gender-affirming care is safe, effective, and medically necessary.

### B. WPATH's rights-based ideology transformed Standards of Care 8 from a medical guideline to a political and legal document

54.     Though WPATH claims that SOC-8 is an "[e]vidence-based guideline[]" that "include[s] recommendations intended to optimize patient care that are informed by a thorough review of evidence," internal communications reveal that the organization had other goals in crafting the standards. (SOC-8 S8).

55.     One was to produce a document that would be useful to political and legal allies. This comports with the idea, present throughout SOC-8, that changing society at large is necessary because, according to WPATH, all gender identities are psychologically healthy and any dysphoria

CONFIDENTIAL – ATTORNEY'S EYES ONLY

associated with gender incongruence is the result of society's bigoted response. This is the "minority stress hypothesis": the theory that most or all of a trans-identified patient's psychological problems—depression, self-harm, anxiety, etc.—are caused by society, not a mental health condition associated with one's gender identity. As the SOC-8 puts it, while "[g]ender diversity is not a mental health disorder," "we know mental health can be adversely impacted for gender diverse children" "through gender minority stress." (SOC-8 S70). WPATH's mission is thus to change society to prioritize self-proclaimed gender identity over biological sex, such as by requiring schools to allow students to use sex-segregated bathrooms or play on sex-segregated sports teams based on their gender identity rather than their sex. (SOC-8 S76).

56.     In all this, there is a fundamental tension. WPATH is careful to emphasize that all gender expressions are normal and that "[g]ender incongruence is no longer seen as pathological or a mental disorder in the world health community." (SOC-8 S7). Throughout SOC-8, WPATH seeks to normalize and de-pathologize all gender identities, from cross-sex identification to non-binary to eunuch to identities "comprised of more than one gender identity simultaneously or at different times (e.g., bigender), who do not have a gender identity or have a neutral gender identity (e.g., agender or neutrois), have gender identities that encompass or blend elements of other genders (e.g., polygender, demiboy, demigirl), and/or who have a gender that changes over time (e.g., genderfluid)." (SOC-8 S80). According to WPATH, all of these identities are healthy and normal. Society can be welcoming to gender nonconforming people, reduce sex stereotypes and increase acceptance for a wider range of human sexuality without adopting WPATH's gender related theories into law or policy.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

1. **Legal Advocacy in SOC-8**

57.     Throughout the WPATH internal documents, there are references to drafting SOC-8 in a way that bolsters court cases. This goal of creating a court-advocacy document undermines the SOC-8 as a scientifically driven document. When SOC authors prioritize advocacy goals, it necessarily precludes honest portrayal of the limits of research, merits of alternative, less-invasive approaches, and the many unknowns and risks of the treatments SOC-8 recommends.

58.     One contributor to SOC-8 couldn't have been more frank: "Our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits." (BOEAL_WPATH_000991).

59.     Authors of SOC-8 made their legal and political goals explicit. As one wrote: "It is abundantly clear to me when I go to court on behalf of TGD individual[s] to secure access to medically necessary health care and other human/civil rights, as I will be doing in a class action lawsuit deposition in 2 weeks in NC[,] [t]he wording of our section for Version 7 has been critical to our successes, and I hope the same will hold for Version 8." (BOEAL_WPATH_020628). Another wrote to all SOC-8 chapters leads: "My hope with these SoC is that they land in such a way as to have serious effect in the law and policy settings that have affected us so much recently." (BOEAL_WPATH_036305).

60.     Another author was concerned "about language such as 'insufficient evidence,' 'limited data,' etc." in drafts of SOC-8, though not because the author thought that such language was inaccurate. (BOEAL_WPATH_020387). Rather, the author noted, such admissions—though true—would not be advantageous in court. The author explained: "I say this from the perspective of current legal challenges in the US. Groups in the US are trying to claim that gender-affirming

CONFIDENTIAL – ATTORNEY'S EYES ONLY

interventions are experimental and should only be performed under research protocols (this is based on two recent federal cases in which I am an expert witness). In addition, these groups already assert that research in this field is low quality (ie small series, retrospective, no controls, etc...). My specific concern is that this type of language (insufficient evidence, limited data, etc....) will empower these groups and reinforce their erroneous assertions." (BOEA_WPATH_020387).

61.     To ensure its clinical guideline for medical professionals would be legally useful, WPATH apparently sent it out for legal review (or at least planned to do so). According to the September 1, 2021, WPATH Executive Committee Agenda, possible reviewers WPATH considered included the ACLU, the Transgender Defense & Education Fund, and Lambda Legal. (BOEAL_WPATH_020327). These are all organizations that rely on WPATH's standards in court, including in this case. It would be extraordinary if those same lawyers had input into the very standards they promise courts are independently-constructed based on the best scientific evidence, not political considerations.

62.     Even authors of SOC-8 were uncomfortable with the legal review. As one wrote: "The SOC8 are clinical guidelines, based on clinical consensus and the latest evidence based medicine; I dont recall the Endocrine Guidelines going through legal review before publication, or indeed the current SOC?" (BOEAL_WPATH_019446). Another authors responded: "We had agreed long ago that we would send to the International advisory committee and for legal review." (BOEAL_WPATH_019456). A Board member weighed in: "We will discuss this in the Board and get back to you; and I will check what Rachel Levine's point of view is on these issues, when I meet with her next week." (BOEAL_WPATH_019455).

63.     These episodes are deeply concerning. In a well-constructed guideline that prioritized truth and patient welfare, political and legal considerations would not trump truth-telling or

CONFIDENTIAL – ATTORNEY'S EYES ONLY

scientific rigor. WPATH's push to create SOC-8 reflected financial, legal and even political consideration, undermining any consideration of SOC-8 as a document which should guide clinical care or which reflects the best available science.

### 2. "Medical Necessity"

64.     WPATH's rights-based ideology also transformed Standards of Care 8 from a medical guideline to a vehicle for ensuring insurance coverage by claiming medical necessity. While WPATH claims that SOC-8 is an "[e]vidence-based guideline[]" that "include[s] recommendations intended to optimize patient care that are informed by a thorough review of evidence," internal communications again reveal that the organization had other goals in crafting the standards. (SOC-8 S8). And once again, there is a fundamental tension between reporting the evidence and best practice (on the one hand) and manipulating the language and framing to justify medical interventions (on the other). WPATH recommends drastic medical interventions for adolescents, for instance, even though WPATH also assures that the adolescents have perfectly healthy and normal gender identities. That is, according to WPATH, while feeling incongruent with one's natural body is framed as healthy and normal, "historical and current stigma" creates the distress that warrant "various gender-affirming treatment options" like hormones and surgeries. (SOC-8 S7).

65.     Rather than helping a patient suffering from gender dysphoria (which, as even WPATH must admit, is a mental health disorder in the DSM-V) through standard mental health treatments, WPATH's apparent aim is to further "the individual's embodiment goals," as one author of the SOC-8 hormone chapter put it. (BOEAL_WPATH_026200). The SOC-8 itself asserts that "[t]ransgender and gender diverse (TGD) persons may require medically necessary gender-affirming hormone therapy (GAHT) to achieve changes consistent with their embodiment goals, gender identity, or both." (SOC-8 S110).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

66.    Given the goal of providing transitioning treatments to further someone's "embodiment goals," the question for WPATH is how to ensure those treatments can be paid for. The answer is to declare them medically necessary so insurance would cover them. The authors of SOC-8 thus went out of their way to claim that the treatments are "medically necessary," while simultaneously claiming that there was no underlying pathology to treat. One of the authors of SOC-8 explained the tension: "Re: the definition of medical necessity – this is a definition from the AMA. It is pathologizing in the sense that medically necessary treatment is defined in part as treatment of an illness, injury, or disease. However, a definition of medical necessity, especially as understood in the US, is important here" to "help with appealing care denials" by insurance companies. (BOEAL_WPATH_062083).

67.    It thus appears that the authors did not view transitioning treatments to be "medically necessary" in the traditional sense—to treat an "illness, injury, or disease"—but deemed the treatments "medically necessary" anyway for the express purpose of having insurance companies pay for them. Another email in the chain summed it up: "Medical necessity" is "at the center of all reimbursement for trans care in the US." (BOEAL_WPATH_061843).

68.    Authors of individual chapters were also encouraged to include statements of medical necessity for their recommendations. One author of SOC-8 wrote to the mental health chapter: "I hope SOC 8 can incorporate some language about medical necessity for insurance coverage or governmental provision of care.… I do independent medical review for people appealing their insurance denials to state regulatory bodies and clear language is important for this. The State of California at least looks to WPATH as the authority for determining medical necessity, and this is critical for facial feminization surgery especially, but coverage of any needed surgery, so the language is important. We don't want SOC 8 to take us backwards on this."

(BOEAL_WPATH_020166). The author continued: "The language we use in our chapter makes it clearer that a [comorbid psychological] condition does not have to be 'well-controlled'" for the transitioning treatments to be "medically necessary" so long as "the patient has capacity to consent and can participate adequately in perioperative quote care, with support."

69.     Another author agreed: "The concept of medical necessity is so critical for provision of healthcare to trans people in the US—prisons are required to provide medically necessary care, state laws require medically necessary care to be provided, insurance regulatory bodies and independent medical reviewers look at evidence for medical necessity in coverage decisions. There are important lawsuits happening right now in the US, one or more of which could go to the Supreme Court, on whether trans care is medically necessary vs experimental or cosmetic. I cannot overstate the importance of SOC 8 getting this right at this important time." (BOEAL_WPATH_020212).

70.     Another author, writing to the adolescent chapter: "[M]edical necessity for youth care—puberty blockers and chest surgery for trans masculine youth—is often challenged by US insurance companies. I wonder whether [redacted] and the adolescent committee might consider adding a medical necessity statement care of minors?" (BOEAL_WPATH_020214).

71.     Another author: "Establishing medical necessity is central to all healthcare provision in the US—and currently there are lawsuits in the US trying to reverse the provision of trans healthcare … the right wing in the US is trying to force us back to those years, or worse." (BOEAL_WPATH_061843). Concerningly, this author had no problem deriding as "right wing" and regressive anyone seeking evidence regarding the safety and efficacy of transitioning treatments or otherwise questioning SOC-8's claim for a massive expansion of medical necessity. As

CONFIDENTIAL – ATTORNEY'S EYES ONLY

already detailed, political demonization like this is precisely why SOC-8 is a political and ideological document rather than a reflection of science and quality clinical care.

72.     SOC-8 author comments regarding medical necessity thus make it clear that the various statements of medical necessity are primarily vehicles to justify insurance payments. They do not offer a balanced and evidence-based approach regarding long term clinical risk and benefits. At no time do the authors of SOC-8 detail a rationale or a systematic approach they utilized to determine whether any specific treatment is, or is not, medically necessary. There is no discussion of cost limitations or cost-versus-benefit comparisons of various procedures, for instance.

73.     Indeed, throughout SOC-8, there seems to be an attempt to simply declare that any medical treatment desired for transitioning is "medically necessary." The aim is clear: ensure payment for *all* transitioning treatments as medically necessary, without any justification proving the long-term value of the treatments, their costs versus their benefit, or their risks versus their harms. Over and over SOC-8 calls the transitioning treatments at issue "medically necessary." Much less time is spent showing how the recommendations actually meet that bar.

74.     The statement of medical necessity the authors landed on is staggeringly broad. It recommends a list of procedures as "medically necessary gender-affirming interventions," including, but "not limited to," "hysterectomy," "phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses," "vaginoplasty," "hair removal from the face, body, and genital areas," "gender-affirming facial surgery and body contouring," "voice therapy and/or surgery," "as well as puberty blocking medication and gender-affirming hormones." (SOC-8 S18). In essence, WPATH deemed practically any "embodiment goal" "medically necessary" so that insurance would cover them.

75.     The broadness was intentional. As an author of the statement explained: "I think it is clear as a bell that the SOC8 refers to the necessity of treatment (in its broadest sense) of TGD people who pursue treatment (in its broadest sense) for their gender dysphoria (because it refers to the symptoms of distress – which is a very very broad category and one that any 'goodwilling' clinician can use for this purpose (or in the unescapable medical lingo we, as physicians are stuck with: those who fulfill a diagnosis of Gender Dysphoria and Gender Incongruence as per APA/WHO)." (BOEAL_WPATH_06026). The authors understood that as long as it is a "goodwilling" physician, they will write SOC broad enough to justify payment.

### C. Politics and outside pressure directly influenced Standards of Care 8

76.     WPATH went through lengths to formulate a standardized process to create SOC-8. Yet the composition of the authorship of SOC-8 and the approach they used introduced significant bias into the document. As one member revealed in his or her disclosure, "Everyone involved in SOC process has a non-financial interest." (BOEAL_WPATH_001013). By requiring that all authors be members of WPATH, the organization did nothing to balance these obvious conflicts.

77.     With that said, WPATH did create a process with workgroups, stakeholder input, evidence review teams, and a predetermined methodology. There is evidence throughout the WPATH documents that the SOC-8 authors did not always follow this process, but at least they had one. Yet even after the process was complete and WPATH had published SOC-8, the organization caved to outside political pressures and deleted from the Standards the age minimums for pediatric transitioning surgeries as a direct result of advocacy by Admiral Rachel Levine, the Trevor Project, and the American Academy of Pediatrics (AAP).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

78.     WPATH claims that SOC-8 was the result of a structured process, but when WPATH deleted the age minimums based on political considerations, it showed that outside influences were more important than sticking to the "evidence-based" process it had espoused. The episode also shows how AAP and the United States government became intertwined with the creation of SOC-8.

### 1.   Admiral Levine's Influence on SOC-8

79.     Admiral Rachel Levine was appointed as the Assistant Secretary for Health at HHS in March 2021. Within months, Levine was having regular meetings with WPATH officials about the development of SOC-8 and how WPATH and HHS could work together to accomplish their shared policy priorities.

80.     An email from August 12, 2021, entitled SOC-8, shows the degree of Levine's involvement, which WPATH members took "as a charge from the United States government":

> Hi [redacted],
>
> I just got off a very productive call with Rachel Levine. The failure of WPATH to be ready with SOC 8 is proving a barrier to optimal policy progress and she was eager to learn when SOC 8 might be published.
>
> My view is that this should be taken as a charge from the United States government to do what is required to complete the project immediately.
>
> I am happy to have a quick call to discuss nuance if that would be helpful. And she would be happy to speak as well if that might move things along.

(BOEAL_WPATH_081924).

81.     A week later, an author reported: "I am meeting with Rachel Levine and her team next week, as the US Department of Health is very keen to bring the trans health agenda forward." (BOEAL_WPATH_019314).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

82.     In August 2021, the WPATH executive committee discussed collaborating with Levine, including "asking about an announcement at the White House, inviting her to be keynote in Montreal 2022, and asking for her help to help with global dissemination of the SOC8." (BOEAL_WPATH_020314). The next month's meeting minutes confirm that Levine had "offered to help WPATH in any way she could," "said if an SOC8 launch at the White House was not possible, one at the Health Department is likely," and "will make an introduction to WHO and suggest they endorse/ratify the SOC8" (before Levine had even read SOC8). (BOEAL_WPATH_020658). Another update from October: "[Redacted] and I are in regular contact with [redacted], who has taken a personal interest in ensuring that the SOC8 gets completed and published at the earliest convenience, so that the US State Department of Health can use the SOC8 for its national policies." (BOEAL_WPATH_023924).

83.     By the end of May 2022, WPATH emailed Levine's staff to "convey the message to Admiral Levine that – as of today – the SOC8 has been completed." WPATH asked Levine for help "identify[ing] funds for both dissemination and funds to create and develop a free app to download the SOC8." (BOEAL_WPATH_062943). "[W]e count on you as a US Department for Health to assist us to disseminate the SOC8 as widely as is humanly possible in North America," WPATH told Levine.

84.     On July 1, 2022, an email entitled "Some Feedback from Member of Adm Levine's Staff," was sent to WPATH asking WPATH to drop the age minimums for adolescents:

> Dear EC, SOC8 Co-Chairs, and Adolescent Chapter Leads
>
> I just got off the phone with Sarah Boetang, who is Adm. Levine's chief of staff, she has been reviewing the guidelines and wanted to convey a concern that she has, as Sarah, not as an official response/review of the office. She knows that the Adm is continuing to comb through every word.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

She is amazed at the breadth and improvement and comprehensive nature of the entire document, her biggest concern is the section below in the Adolescent Chapter that lists specific minimum ages for treatment, she is confident, based on the rhetoric she is hearing in DC, and from what we have already seen, that these specific listing of ages, under 18, will result in devastating legislation for trans care. ***She wonders if the specific ages can be taken out*** and perhaps an adjunct document could be created that is published or distributed in a way that is less visible than the SOC8, is the way to go.

I told her I would be writing to all of you, and she is happy to discuss her opinion further, if needed. Please let me know how you want to proceed/respond/discuss.

All best,

[Redacted]

(BOEAL_WPATH_071455) (emphasis mine).

85.     The email concerning the suggestion from Levine's staff set off a number of responses and conversations in the next few days:

- "My concern from a scheduling and pre authorization process is that without specific age requirements, insurers may not grant authorization. I do understand Adm. Levine's concerns—I wonder if we should/could be less aggressive in lowering the age limits on certain procedures." (BOEAL_WPATH_071457).

- "Early on, we had discussions regarding whether or not we should list age limits for surgery. We identified advantages and disadvantages of both approaches. The consensus came down to listing ages. I would be glad to re-discuss in lieu of these comments—from [a] clinical care perspective, I am comfortable with the ages we have listed." (BOEAL_WPATH_017463).

- "If we don't put ages, the insurance companies specify 18 years old, hence the main reason to list the ages. I don't see how we can simply remove something that important from the document—without going through a Delphi—at this final stage of

the game. I wish that Adm Levine's office read this when they were posted for public review in December." (BOEAL_WPATH_071466_

- "This is a global document, not solely for the US. I am a little surprised that we would be asked to do this after all the care and endless discussions by experts to reach this consensus on ages for surgeries. Is Sarah a clinician/surgeon? I wouldn't make any change unless the relevant chapters found some new evidence to support change to 18." (BOEAL_WPATH_071469).

- "The only evidence we had for establishing this was expert opinion." (BOEAL_WPATH_071500).

- "Its disappointing that politics always trumps common sense and what is best for patients." (BOEAL_WPATH_071494).

- "[J]ust read the email trail, which I found disturbing for a number of reasons.… It is not appropriate to take any feedback from a nonmedical professional seriously. nothing is going to change in the SOC8. It is done!" (BOEAL_WPATH_071476).

86.     Later in July, the SOC-8 chairs sent an email to the Adolescent chapter authors to explain the situation and to summarize a meeting WPATH leaders had with Admiral Levine:

> The issue of ages and treatment has been quite controversial (mainly for surgery) and it has come up again.
>
> We sent the document to Admiral Levine, Minister of Health for the USA, for their views. We have a meeting on Zoom last week as she wanted to give us her feed-back. She liked the SOC-8 very much but she was very concerned that having ages (mainly for surgery) will affect access to health care for trans youth and maybe adults too. Apparently the situation in the USA is terrible and she and the Biden administration worried that having ages in the document will make matters worse. **She asked us to remove them**.
>
> We have the WPATH executive committee in this meeting and we explained to her that we could not just remove at this stage. So we have been thinking of solutions.

You may remember that ages in the document were a "suggestion" not a "recommendation" as we had no evidence to recommend that, but in the document it has become a "recommendation" as it is part of the criteria.

What is clear is that we don't want to remove the ages from the whole document, in fact, I thought that we needed to have the ages for young people to have access to care in the USA...

One solution we thought will be to make the ages criteria a "suggestion" as it is in the document attached. If we do this, in the overall criteria of the appendix we could also put them as a suggestion (as in the document attached) or remove them from the criteria all together but leave them in the chapter as a "suggestion."

The chairs would like to do this but we want to have your opinion.

(BOEAL_WPATH_072114) (emphasis mine).

87.    This statement from the chairs to the adolescent committee is very concerning. It shows SOC-8 included "recommendations" even though the authors "had no evidence to recommend" a specific course of treatment. It shows that, contrary to SOC-8's promise to use GRADE analysis to pair strong recommendations ("recommend") only with high-quality evidence, in fact it paired a strong recommendation with "no evidence" because it (somehow) became "part of the criteria." And it shows that, despite the statement having gone through the Delphi process, finalized, approved by the WPATH "experts," and crafted as a result of the evidence review (which in this case apparently found "no evidence" supporting it), WPATH considered changing the statement solely to appease a political official in the United States government.

88.    The adolescent chapter authors debated the proposal. They reported that they were "largely in favor of a compromise plan" that would "[m]inimize any risk that the guidelines would lead to *more* access challenges (e.g. legislative bans in this instance)," and provided the chairs of SOC-8 a "transcription of the conversation that our workgroup members had regarding the issue." (BOEAL_WPATH_072147). Some highlights from the conversation include:

CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "I really think the main argument for ages is access/insurance. So the irony is that the fear is that ages will spark political attacks on access. ***I don't know how I feel about allowing US politics to dictate international professional clinical guidelines that went through Delphi***." (Emphasis mine).

- "I do agree that the Delphi situation is a key consideration. Could they send them through again? It is a large change, which I'm fine supporting, but it is weird because then we can never say that the adolescent chapter passed Delphi."

- "My sense is that the US, along with many other countries, is moving toward putting restrictions on youth seeking medical interventions and making the age requirement MUCH older. If our concern is with legislation (which I don't think it should be—we should be basing this on science and expert consensus if we're being ethical) wouldn't including the ages be helpful? Ie, it will be harder for states/countries to enact laws that go against the SOC. Plus, aren't the ages just a recommendation with room for adjusting in unique circumstances? I need someone to explain to me how taking out the ages will help in the fight against the conservative anti trans agenda."

- "[W]e have a very high up politician telling us that having the ages specified front and center would politically lead to more attacks and legislative efforts. I see no reason not to trust that assessment is accurate."

- "***I'm also curious how the group feels about us making changes based on current US politics***." (Emphasis mine).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

- "I think it's safe to say that we all agree and feel frustrated (at a minimum) that these political issues are even a thing and are impacting our own discussions and strategies."

- "[Y]es, it is frustrating to have to have politics in our brains as we make these decisions. But it is what it is!"

(BOEAL_WPATH_072147-49).

89. Again, this conversation is concerning. The authors of the Adolescent chapter acknowledge that politics influenced the recommendations in SOC-8, but they justified it to themselves because caving to political pressure from the federal government would "help in the fight against the conservative anti trans agenda." (BOEAL_WPATH_072148). Perhaps even more remarkable from a patient care perspective, none of the discussion concerned aspects one might hope clinicians writing a guideline involving irreversible surgeries for adolescents would consider. The authors do not discuss research concerning developmental decision making in youth or whether teenagers are generally mature enough to make decisions that would permanently and fundamentally change their bodies. Nor do they discuss the ages at which surgeries were offered in prior studies. Instead, the main consideration *for* the age recommendation was the main consideration for *downgrading* the age recommendation to a "suggestion": What position would best ensure insurance coverage and keep "conservative" legislation at bay?

90. With Admiral Levine's input, the authors determined that downgrading the age restrictions to a "suggestion" would best meet their political considerations. (BOEAL_WPATH_072150). On August 5, 2022, WPATH wrote to Admiral Levine: "[W]e heard your comments regarding the minimal age criteria for transgender healthcare adolescents," and "[c]onsequently, we have made changes to the SOC8 in this respect." (BOEAL_WPATH-072964).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

The letter continued: "Given that the recommendations for minimal ages for the various gender affirming medical and surgical intervention are consensus-based, we could not remove them from the document. Therefore, we have made changes as to how the minimal ages are presented in the document. They are not a recommendation from the SOC-8 anymore, but they have been written only as suggested minimal ages as long as the adolescent fulfills all the criteria for gender affirming medical and surgical interventions."

### 2. AAP's Influence on SOC-8

91.      Following the episode with Admiral Levine, WPATH also heard from the Trevor Project, a nonprofit advocacy for LGBTQ+ youth, which was also "extremely concerned abou the age minimums." (BOEAL_WPATH_076525-26). "If what we've seen is accurate, this could have disastrous consequences for the work to protect basic healthcare for transgender youth." SOC-8 authors and the WPATH executive board emailed each other stating that "the SOC8 has been completed and is about to be released online," set to be published on September 6, 2022 "as agreed with [the] publisher." (BOEAL_WPATH_076549-50).

92.      The day before publication, on September 5, 2022, WPATH met with the American Academy of Pediatrics at AAP's request to discuss "issues" AAP's "expert panel" had with SOC-8. (BOEAL_WPATH_077704). WPATH assured AAP that "there may have to be compromises" to its "evidence-based" guideline.

93.      On September 8, AAP sent WPATH a formal letter signed by its president, Moira A. Szilagyi. AAP wrote that SOC-8 "includes several anti-transgender arguments, such as social contagion, rapid onset gender dysphoria, desistance/persistence, and others," and AAP encouraged WPATH to drop those discussions lest they "give[] validity to them." (BOEAL_WPATH_07707-08). AAP also demanded that WPATH drop the age minimums: "SOC8 recommendations for

CONFIDENTIAL – ATTORNEY'S EYES ONLY

gender-affirming surgery do not align with AAP policy. The AAP does not recommend surgery for minors except on an individualized, case-by-case basis with parental involvement and consent. Additionally, AAP experts agree SOC 8 lacks the evidence to justify the recommended surgery ages."

94.    WPATH SOC-8 authors reacted with surprise that the AAP would ask WPATH to change its consensus-based recommendation:

- "As far as I can tell they are asking for us to remove anything that it does not fit into their narrative.… The AAP guidelines that they mentioned so many times have a very weak methodology, written by few friends who think the same. … My view is that we should not remove 'ages' they are a suggestion, they have as much background evidence as many suggested statements, and they have been approved via Delphi and approved by the WPATH board." (BOEAL_WPATH_079582-83).

- "I have also read all the comments from the AAP and struggle to find any sound evidence-based argument(s) underpinning these. I am seriously surprised that 'reputable' association as the AAP is so thin on scientific evidence." (BOEAL_WPATH_079852)

- "I don't think the AAP representatives are WPATH members and looking at their names/qualifications/accreditation, they are very very junior clinicians/academics." (BOEAL_WPATH_079982).

95.    In an email on September 9, a WPATH author wrote an email explaining the situation:

In a nutshell, you likely saw the email that the SOC8 was going to be released by the biennial meeting (next week) in Montreal, particularly since we have GEI sessions and other sessions designed to train attendees on its release. Then you saw

CONFIDENTIAL – ATTORNEY'S EYES ONLY

another email regarding an inadvertent delay in the release. I'm writing about the reason why and this is top-level confidential, as you will see.

The American Academy of Pediatrics (AAP)—a MAJOR organization in the United States that is typically very pro-transhealth/gender affirming care—voiced its *opposition* to the SOC8, specifically due to aspects of the Adolescent chapter. Not only did they say they would not endorse the SOC, they indicated that they would *actively publicly oppose it*. They had several concerns, one of which was the age of criteria for minors.… They also disagree with verbiage on social factors and adolescent identity development.…

Clearly, if AAP were to publicly oppose the SOC8, it would be a major challenge for WPATH, SOC8, and trans youth access to care in the U.S.

(BOEAL_WPATH_079974). The author explained that "WPATH leadership" had already proposed "removing of ages verbiage."

96.     On September 10, WPATH informed AAP: "We have just finished our meeting and we have agreed to remove the ages and to add the sentence we agreed. I hope that by doing this AAP will be able to endorse the SOC8 or at least to support it." (BOEAL_WPATH_080863). Later that day, word came that in exchange for WPATH removing the age requirements from SOC-8, the AAP would not publicly oppose SO-8. (BOEAL_WPATH_081390). As an email from an SOC-8 editor to the WPATH Board explained, "This [was] the only way the SOC8 was not going to be opposed by the AAP." (BOEAL_WPATH_081502).

97.     Following the removal of the age minimums, WPATH leadership promptly sought for "all [to] get on the same exact page, and PRONTO." (BOEAL_WPATH_082401). Rather than tell the public what actually caused the last-minute changes to the SOC-8 clinical guideline, leaders crafted an alternative explanation that focused on "individualized care." (BOEAL_WPATH_082453). In response to an inquiry from the *Los Angeles Times*, WPATH also said that the age requirements were removed "and replaced by strengthened criteria to help guarantee that every transgender or gender diverse adolescent is getting their appropriate needs met at

CONFIDENTIAL – ATTORNEY'S EYES ONLY

the appropriate time." (BOEAL_WPATH_082485). This was not true. In response to AAP, WPATH deleted the age minimums. It did not add anything, and it certainly did not add "strengthened criteria."

98. There are a number of important lessons from this episode. One is that WPATH caved to outside political pressures and has never told the truth about what happened to the public or to clinicians who rely on the so-called "evidence and consensus-based" SOC-8 to treat gender dysphoric youth. Another is that, apparently, the age recommendations that were deleted had "as much background evidence as many suggested statements" in SOC-8—which another author pointed out was "no evidence." (BOEAL_WPATH_072114). The implication is that other recommendations in SOC-8 were also based on "no evidence" or something similar. A third takeaway is that many authors of SOC-8 view the AAP 2018 policy statement as untrustworthy and unreliable. And a fourth lesson is that, apparently, WPATH treats it Standards of Care as legislative or political documents, designed to ensure access-to-care and insurance coverage, combat "conservative" or "right-wing" legislation that would seek to curb that coverage based on the "no evidence" supporting the treatments.

**D. WPATH's public advocacy efforts have conflicted with open, scientific inquiry**

99. WPATH and USPATH have provided a stream of narratives and talking points to activist and affirmative clinicians. Their language often expresses disdain for those who see the world of transitioning treatments differently. These press releases and public statements consistently appeal to emotion and an "us vs. them" mindset. USPATH and WPATH seem comfortable demonizing those who are not part of the ideological movement, who raise concerns with transitioning minors, or who point to scientific evidence that does not support WPATH's claims. Using activist rhetoric, WPATH press releases can be viewed as a "dog whistle" to direct the hostilities

CONFIDENTIAL – ATTORNEY'S EYES ONLY

of others who are political and ideologically aligned with WPATH. Their divisive rhetoric is inconsistent with the conduct of an organization guided by science. USPATH and WPATH also show a willingness to spread misinformation that supports their ideology.

100. One example of the USPATH / WPATH style of engagement is their April 21, 2022 joint press release: "WPATH/USPATH Denounce Florida Department of Health for Harmful Guidelines Targeting Trans Youth." (WPATH/USPATH 2022). In April 2022, the Florida Department of Health issued a statement noting that "[s]ystematic reviews on hormonal treatment for young people show a trend of low-quality evidence, small sample sizes, and medium to high risk of bias" and that evidence regarding the "psychosocial and cognitive impact" of transitioning treatments for youth "is generally lacking." (Florida Dep't of Health 2022). The Department recommended that "[a]nyone under 18 should not be prescribed puberty blockers or hormone therapy" and that "[g]ender reassignment surgery should not be a treatment option for children or adolescents" The Department stated that its "guidelines are consistent with the federal Centers for Medicare and Medicaid Services age requirement for surgical and non-surgical treatment" and "in line with the guidance, reviews, and recommendations from Sweden, Finland, the United Kingdom, and France."

101. Rather than engaging with the literature reviews the Department cited or the recommendations from other countries' health authorities, WPATH and USPATH urged its followers to dismiss the Department of Health as transphobic and acting in bad faith: "It is shameful to see yet another attack from a state that is laser-focused on targeting trans and LGBQ people for political gain." (WPATH/USPATH 2022). This divisive rhetoric from WPATH and USPATH is clearly politicized, alarmist, and tribal. Note the use of language: "Denounce," "Harmful," "Targeting," and "political gain." WPATH and USPATH ignore that people of good faith honestly

CONFIDENTIAL – ATTORNEY'S EYES ONLY

following the science could question WPATH's model of "gender-affirming care" and conclude instead, based on the systematic evidence reviews cited by the Department, that transitioning treatments should not be given to minors. To WPATH and USPATH, such a position necessarily come from prejudice and efforts to "target[] trans youth" "for political gain."

102. One WPATH leader wrote a "12-point Strategic Plan to Advance Gender Affirming Care through strengthening the WPATH SOC-8" that provides insight into how some WPATH members and leaders view the relationship between their clinical guideline document and their advocacy efforts. (BOEAL_WPATH_091213-18). Circulated on February 7, 2023 (BOEAL_WPATH_091211), the plan laid out the problem it sought to address: "Trans health care is not only under attack by politicians, but by," among other entities, "academics and scientists who are naturally skeptical," "parents of youth who are caught in the middle of this controversy," "health care systems and insurance companies looking to limit health care costs," "a burgeoning demand for transgender health care with concomitant increase in access to healthcare," "increasing number of regret cases and individuals who are vocal in their transition process who are quick to blame clinicians for allowing themselves to transition despite an informed consent process," and— perhaps most concerningly—"***continuing pressure in health care to provide evidenced-based care***." (Emphasis mine).

Trans health care is not only under attack by politicians, but by:
- an unfortunate trend in the media to sensationalize conflict
- academics and scientists who are naturally skeptical
- well-funded advocacy organizations driven by conservative sexual and gender values whose sole aim is to limit access to trans health care
- parents of youth who are caught in the middle of this controversy
- continuing pressure in health care to provide evidenced-based care
- health care systems and insurance companies looking to limit health care costs
- a burgeoning demand for transgender health care with concomitant increase in access to health care,
- increasing number of regret cases and individuals who are vocal in their retransition process who are quick to blame clinicians for allowing themselves to transition despite an informed consent process

(BOEAL_WPATH_091213).

103.    It should go without saying that asking physicians to "provide evidenced-based care" is not an "attack," but the ethical obligation of health care professionals. Labeling it as such is not the hallmark of an organization devoted to open scientific inquiry, evidence-based care, and patient well-being. Yet the author also chalked up concerns by "parents of youth who are caught in the middle of this controversy" as an "attack by conservative forces around the world." (BOEAL_WPATH_091218). (In a separate email thread, another WPATH echoed the feeling in response to an *Economist* article examining "gender-affirming care" in the United States: "Allowing these right wing skeptics to control the narrative is a mistake." (BOEAL_WPATH_026284).) This tribalism that dismisses on political grounds all those who raise concerns about transitioning treatments has no place in evidence-based care.

104.    The author's 12-point plan is worth examining. The first point is "Endorsements." (BOEAL_WPATH_091214). The author explained: "I have no idea how it was ever said that so many medical organizations have endorsed SOC 7. This statement is made in many legal briefs and court proceedings. But is that true? How did that ever come about? My suspicion is that these organizations never formally endorsed but have referenced SOC 7 in their support for trans health

and rights. We need to find out the facts here." (BOEAL_WPATH_091215). "As we are facing so many legal battles over trans health care and rights," the author continued, "the statement that the SOC has so many endorsements has been an extremely powerful argument. We need to be able to get support of these important organizations and know how to indicate their support accurately or this argument in these court cases could be challenged." The author stated that, as of February 2023, WPATH SOC-8 had received just two endorsements: one from the World Association for Sexual Health and one from the International Society for Sexual Medicine. (BOEAL_WPATH_091214).

105.    Another point in the 12-point plan concerned guideline development. The author disclosed that the methodology of SOC-8 "evolved" during the course of SOC-8 and admitted that "we were not able to be as systematic as we could have been (e.g., we did not use GRADE explicitly)." (BOEAL_WPATH_091216). "We have been attacked for our methodology and now have found ourselves in a position of defending it," the author noted. He or she stated that WPATH needed to "figure out how to respond to critics and package that in a clear and concise manner." (BOEAL_WPATH_091216). Left unsaid by the author is that if WPATH had used GRADE or another accepted methodology for creating its guideline, it would not need to think of creative ways to justify its sui generis approach.

106.    The author also lamented: "Now that we have reviewed the evidence" for SOC-8, "we are painfully aware of the gaps in the literature and the kinds of research that are needed to support our recommendations and strengthen[] the level of evidence in support of them." (BOEAL_WPATH_091216). Though the author viewed concerns about the evidentiary gaps as political "attacks," the author suggested "articula[ting] the kinds of research that needs to be done to strengthen the evidence of our recommendations." That is indeed a reasonable response to the

CONFIDENTIAL – ATTORNEY'S EYES ONLY

"gaps in the literature" unveiled by SOC-8, but it is concerning that, apparently, the authors of SOC-8 made treatment recommendations knowing that research was still needed "to support [the] recommendations" they made. And again, it does not bode well for open inquiry and patient welfare if the organization creating public treatment guidelines internally acknowledges "gaps in the literature" but vilifies clinicians and parents who discuss those gaps publicly. It also displays an unwillingness to prioritize the safety of children and adolescent patients that fall into those gaps.

107.    Another concerning point in the plan was labeled "Parents." The author explained: "There has been quite a network of parents who have been concerned about the lack of careful evaluations, lack of involvement in decision making, and perceptions of rushed decisions which they feel account for the increased number of regret cases especially among youth. Narratives of these parents have resonated with the public and professionals. The voices of many parents who are supporting their trans and gender diverse kids have been silent. How could we facilitate support for those parents and amplify their voices?" (BOEAL_WPATH_091217). The author did not dispute that there *is* an entire "network of parents" who have concerns about "the lack of careful evaluations, lack of involvement in decision making, and perceptions of rushed decisions." Nor did the author dispute that there has been an "increased number of regret cases especially among youth." Instead, the author seemed to wish that those parents would be silent and that the microphone be given instead of parents "who are supporting their trans and gender diverse kids"—implying that the parents concerned about "the lack of careful evaluations, lack of involvement in decision making" and "rushed decisions" were *not* "supporting their trans and gender diverse kids." This vilification of *parents* concerned about irreversible transitioning treatments for their own children would have no place in a scientific medical organization that prizes patient welfare over politics and ideology.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

108.    Instead, as countless examples show by now, WPATH appears to say one thing in private and another thing in public. As one leader noted in crafting a response to an inquiry from *Medscape*, making public statements for WPATH "is a balancing act between what i feel to be true and what we need to say." (BOEAL_WPATH_082675). In this case, the balancing act concerned Rapid-Onset Gender Dysphoria. What WPATH needed to say is that ROGD "is not a medical entity recognized by any major professional association" and is "nothing more than an acronym created to describe a *proposed* clinical phenomenon." (WPATH 2018). But what these members "feel to be true" is that ROGD describes a phenomenon they know all too well:

> Whenever the issue of ROGD comes up, I think it's easy to punt to the WPATH Statement on ROGD and perhaps re-state what is in that statement. I'd suggest *not* bringing up any clinical scenarios in this response (e.g. stating that every transition seems rapid-onset for parents), because it provides a one-size-fits-all response when we are always emphasizing the importance of individualized care. Some might see that as defensive when there's no reason to be defense. What Littman unfortunately did is put a name/acronym to something (after poorly studying it) that gives the right-wing a *thing* to use to justify their position that care shouldn't ever be given in adolescence. However, what is true for anyone who works with adolescents is that social factors are indeed an aspect of identity development for adolescents, and some young people are more influenced than others, which can be both positive (need to be surrounded by like-minded peers for love and support) and/or negative (can sometimes impact more vulnerable or susceptible young people to adopt an exploration process that might not be authentic for them). ***Now we don't need to say that, but I think a possible approach to ROGD questions should involve a "no duh, what else is new....of course social factors influence an adolescent's wellbeing!*** AND it is important to get treatment to those who need it" type of response.

(BOEAL_WPATH_082680) (emphasis added).

109.    This episode is just another example of WPATH members acknowledging privately the validity of concerns clinicians have about "gender-affirming care," while publicly the organization proclaims an entirely different message.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

110.    One more example. In May 2022, Fox News asked WPATH about comments Admiral Levine made "suggesting that there is 'no argument' among medical experts regarding gender-affirming care for young people." (BOEAL_WPATH_062624). In WPATH's internal discussion about how to respond, one WPATH leader acknowledged that Levine was creating a "narrative" and that "there is subtlety that they would love to hear," apparently referencing the fact that there is in fact an "argument" among medical professionals regarding gender-affirming care for young people. (BOEAL_WPATH_062623). Another leader responded: "I would definitely not engage with this reporter.… I would also not do anything to debate what Dr. Levine has said, she's our best cheerleader." (BOEAL_WPATH_062623). The first person agreed: "Absolutely not. We can regain the narrative later in other ways, not undermining her credibility." (BOEAL_WPATH_062622). This episode shows that WPATH leaders know that what Admiral Levine has said—that there is "no argument" about transitioning treatments among medical experts—is not true. Indeed, in other documents, leaders and SOC-8 authors acknowledge that "a global consensus on 'puberty blockers' does not exist." (BOEAL_WPATH_022878). Yet WPATH does not acknowledge that "subtlety" publicly because doing so would undermine their "best cheerleader." The misinformation spread by Admiral Levine helps their "narrative," so WPATH remains silent. Instances like this is precisely why WPATH is untrustworthy and shows that its ideology trumps science and patient welfare whenever the two conflict.

## POLITICAL ADVOCACY INFLUENCES SCIENTIFIC INQUIRY AT THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

111.    American citizens depend on the United States Department of Health and Human Service. According to its website, "The mission of the U.S. Department of Health and Human Services (HHS) is to enhance the health and well-being of all Americans, by providing for effective

CONFIDENTIAL – ATTORNEY'S EYES ONLY

health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services." (HHS 2023).

112.    It could reasonably be expected that HHS uses best practices when formulating policy. As with WPATH, internal HHS documents display the opposite, at least when it comes to treating gender dysphoric youth. HHS has conducted an ideologically and politically driven campaign to enshrine affirming care as clinical practice, whether or not the facts fit its narrative. In a debated sphere of legal, medical, and social policy, if HHS followed best practice to craft balanced and evidence-based policy, HHS would include a full range of stakeholders and explore varied viewpoints. This did not occur.

### A. HHS solicits the views and listens to requests of ideologically aligned political advocacy organizations that promote "gender-affirming care"

113.    Within HHS, the Sexual and Gender Minority Research Office (SGMRO) "coordinates research on populations whose sexual orientation, gender identity or expression, or reproductive development is characterized by non-binary constructs of sexual orientation, gender, and/or sex." The SGMRO has hosted various "listening sessions" to "gather comments, concerns, and suggestions about SGM-related health research and related activities at the NIH from community stakeholders, in particular, representatives from SGM-focused health and health advocacy organizations." This would include gender dysphoric youth.

114.    HHS appears to have excluded from its various listening sessions youth whose gender dysphoria naturally desisted, gender non-conforming children and adolescents harmed by medicalized transitioning interventions, detransitioners, and parents of these children. Nor did HHS include LGB groups concerned about excesses of medicalization, internalized homophobia, and harms toward LGB individuals that can accompany transgender activism. And it did not include legal or law enforcement groups, professional scientific or medical organizations such as SEGM

CONFIDENTIAL – ATTORNEY'S EYES ONLY

or FAIR that question the WPATH narrative of care, scientists or clinicians who have raised concerns, think-tanks that are not viewed with favor by the Biden Administration, parent groups, feminists groups, or others who could provide alternative viewpoints. Like WPATH, HHS has been in a bubble about whom it listens to regarding transitioning treatments for youth.

### 1. First Listening Session: Stakeholders Invited

115.    On October 22, 2019, the SGMRO hosted its first "Health Research Listening Session." According to SGMRO, the "insight and feedback provided by community stakeholders" invited to the event "helped inform the development of the NIH FY 2021–2025 Strategic Plan to Advance Research on the Health and Well-being of Sexual and Gender Minorities." (SGMRO 2019).

116.    For this event, the SGMRO invited 12 stakeholders: Advocates for Youth, Center for American Progress, Fenway Health, GLSEN, Human Rights Campaign, InterACT, National Center for Lesbian Rights, SAGE, Southern AIDS Coalition, Trevor Project, "UCSF Center for Transgender Excellence" [*sic*], and Whitman-Walker Health. (HHS-161116). These stakeholders represent just one sliver of the discussion concerning care for gender dysphoric youth.

117.    Advocates for Youth operates "youth advocacy programs" to "work with transgender, gender expansive, and cisgender youth activities fighting for transgender rights." (Advocates).

118.    The Center for American Progress (CAP) is a self-described progressive policy institute. (CAP a). The think tank characterizes "attempts to ban gender-affirming health care" as "targeting the rights of LGBTQI+ people." (CAP b).

119.    Fenway Health is an advocacy and medical organization that provides and promotes medicalized gender-affirming care for children and adolescents. Its #TransYouthMatter campaign

refers to legislative efforts "that seek to limit access to health care for transgender and gender diverse youth" as "bad faith bills"—not "created in response to a societal problem." (Fenway).

120.     The Gay, Lesbian and Straight Education Network (GLSEN) is an advocacy and research group that was founded with the aim of "creating affirming learning environments for LGBTQ youth." (GLSEN).

121.     The Human Rights Campaign (HRC) describes itself as the "nation's largest LGBTQ civil rights organization." (HHS_0136413). HRC characterizes the current debate over "gender-affirming care" in the following manner: "In a coordinated push led by national anti-LGBTQ+ groups, legislators across the country have overridden the recommendations of the American medical establishment and introduced hundreds of bills that target transgender and non-binary youth's access to age-appropriate, medically-necessary care. The attack on gender affirming care is relentless and changing every day." (HRC 2023). HRC is counsel for Plaintiffs in this lawsuit.

122.     interACT: Advocates for Intersex Youth is an advocacy organization that "uses innovative legal and other strategies to advocate for the human rights of children born with intersex traits." (interACT).

123.     The National Center for Lesbian Rights (NCLR) is a legal organization that claims to represent the interests of "the entire LGBTQ population." (HHS_0136412). "NCLR engages in a wide range of advocacy, including litigation, policy, and legislation, to improve access to and eradicate discrimination in health care, especially with respect to gender-affirming care for transgender people." (NCLR). NCLR is counsel for Plaintiffs in this lawsuit.

124.     SAGE is an "organization dedicated to serving and advocating for LGBT older adults." (HHS_136416).

125.    The Southern AIDS Coalition is an organization founded "to end the southern HIV epidemic." (Southern AIDS). Its spokesperson at the listening session was "the lead organizer for the National Trans Visibility March [NTVM]." (HHS_0136418). NTVM is a political advocacy organization that exists "to reaffirm that Trans rights are human rights and call for the abolition of anti-LGBTQ+ laws." (NTVM).

126.    The Trevor Project is an advocacy organization that "supports gender-affirming care as an evidence-based practice to support TGNB youth." (Trevor Project a). Last year, the organization published a press release calling gender-affirming hormone therapy "one of the best choices trans youth and their families can make to reduce gender dysphoria and promote well-being." (Trevor Project b).

127.    The "UCSF Center for Transgender Excellence" refers to the "UC San Francisco Center of Excellence in Transgender Health." "The Center of Excellence for Transgender Health (CoE) envisions a safe and affirming world, free from all oppressions, where trans and gender non-binary communities are healthy and thriving." (UCSF). The representative for the Center at the listening session, Dr. Maddie Deutsch, became president of USPATH in 2023.

128.    Whitman-Walker Health is "a community health center based in Washington, D.C." (HHS_136411). The representative for Whitman-Walker at the listening session, Sandy James, PhD, served on the board of directors at the health center at "FreeState Justice." (HHS_136411). FreeState Justice "is a legal advocacy organization that seeks to improve the lives of low-income lesbian, gay, bisexual, transgender, and queer ("LGBTQ") Marylanders." (Free-State).

129.    There is nothing wrong with any of these organizations being invited to share their thoughts with HHS to help inform HHS's future research agenda. HHS should hear from such

groups. The problem is that *only* those groups were invited, and *only* those groups were heard. HHS did not ask any stakeholder with a different viewpoint to come. HHS did not hear from any parents of gender dysphoric teenagers wrestling with their child's rapid onset of gender dysphoria. It did not hear from any clinicians who saw their patients do worse after transitioning treatments. It did not hear from any organizations studying the literature and concluding, as health departments in other countries have done, that the evidence for transitioning treatments in youth is low-quality. This is a problem for an organization developing a research agenda, because the insular world of its listening sessions would likely skew its understanding of what research is necessary. What these stakeholders said—discussed next—confirm these concerns.

### 2. First Listening Session: Perspectives Provided

130.    The stakeholders' remarks represented an echo chamber that asserted additional research on gender-affirming care would establish its benefits and that dissenting or skeptical perspectives arose from anti-LGBT bias. For instance, the first stakeholder to speak was the representative from Whitman-Walker Health. She described her work with "the National Center for Transgender Equality," (HHS_0136411), a group that asserts "Trans kids know who they are," "transition-related care is safe," "transition-related care is lifesaving care," and "'regret' about transition is extremely rare." (Transgender Equality).

131.    The NCLR representative, a lawyer, urged HHS to conduct research that would advance her organization's partisan litigation goals. One such goal was to help resolve parental custody disputes in favor of "affirming" parents —research "for courts to evaluate … to show that the affirming parent is actually acting in the best interest of the child." (HHS_0136412-13). The advocate continued: "if affirming parents are providing care that is the standard of care to their

CONFIDENTIAL – ATTORNEY'S EYES ONLY

kids, it's helpful have data to show that they are, in fact, doing the right thing for their children." (HHS_0136413).

132.    The Human Rights Campaign Foundation representative stated that the populations of "Bs" and "Ts" are "ignored in healthcare settings and in research all too often." (HHS_0136414). She urged HHS to study "the impact of early medical treatment for transgender youth and to reject the politically based anti-science attacks on this type of research." (HHS_0136414). Similarly, Fenway Health's representative called for research on "pro- and anti-LGBT policies." (HHS_0136416).

133.    The Trevor Project representative emphasized that there are "more than 100 different terms … used by youth to self-identify their gender and urged HHS to expand the scope of its research "beyond LGB and T" to other gender identities as well. (HHS_0136414-15). The representative also asked HHS to study "conversion therapy, asserting that "60 percent of transgender youth who had received conversion therapy will attempt suicide this year alone." (HHS_0136415). In the context of transgender identifying youth, activists often include in the moniker "conversion any counseling or psychotherapy that explores (rather than unquestioningly affirms) the patient's gender identity.

134.    The medical director at the UCSF Center gave "a strong echoing of other comments," criticizing the "non-evidence-based kind of media coverage of some people who are in opposition to" research on gender-affirming care for youth. (HHS_0136417-18).

135.    The Southern AIDS Coalition representation, a former organizer for the National Trans Visibility March, urged HHS to consider that "[m]any of the black trans population will never have opportunities to be at these particular tables"—referring to the listening session.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

(HHS_0136418). She told her "colleagues at the table to stop silencing the voices of trans people." (HHS_0136419).

136.    The SAGE representative advocated for "the NIH [to] fund more research projects which center the diverse circumstances of LGBT *older* adults and specifically assess health disparities among *older* adults of color and individuals who identify as transgender and bisexual." (HHS_0136419) (emphasis added).

137.    As the last stakeholder to speak, the representative from the Center for American Progress stated:

> So, are there ways in which the Sexual and Gender Minority Research Office can help us as advocates, in particular, know what's out there and be able to use it? The progress of science can be very slow, and the process of doing policy work can be very slow, until it is not, and I think advocates could really use pathways into knowing the great work that's already in existence at a range of institutions across the country for us to use.

She concluded, "this Office could be a way to help [CAP] combat the misuse of science to harm LBGTQ populations." (HHS_0136422).

138.    The group as a whole demonstrates the bias of motivated reasoning, which is the human tendency to interpret facts to protect valued beliefs. The group's members all appeared to believe, from the beginning, that pro-LGBT policies are good and that access to medicalization and blanket affirmation of gender identity are pro-LGBT policies. Though numerous stakeholders appeared to acknowledge the need for more research on gender diverse populations, they either implicitly assumed (in the case of the NCLR lawyer) or explicitly asserted (as with the Trevor Project) the virtue of an "affirmative" therapy model.

139.    Many advocates asserted that "B's" and "T's," older LGBT populations, or black trans females were ignored or silenced by the medical community, but gender-nonconforming

youth harmed by the gender-affirming "care" they received, such as detransitioners, were *actually* absent from the listening session and their perspectives were never presented.

140.    Likewise, the health professionals from Fenway Health and UCSF displayed the increased tribalization of academic medicine by asserting that diverging opinions on GAC (not heard in the listening session) were "anti-LGBT" or based on "non-evidence-based media coverage." Though it included concerns about "misinformation," SGMRO's first listening session suffered from the type of extreme ideological homogeneity that contributes to irrational beliefs and the spread of misinformation. (Kaliebe Report ¶ 60 et seq.).

### 3.   Excluded Stakeholder Perspectives

141.    A week prior to SGMRO's first listening session, the Kelsey Coalition emailed SGMRO to ask to participate and share its perspective "to inform the development of the FY 2021-2025 SGM Research Strategic Plan." (HHS_132964). As explained in the email to SGMRO, the organization's "mission is to promote policies and laws that protect gender nonconforming young people from medical and psychological harms." (HHS_0132964). The Coalition was formed by parents of "gender nonconforming children" who had been harmed by "gender-affirming" care. (HHS_0132965). The email also stated that the organization worked with "detransitioners — young people who have experienced tragic regret over the consequences of powerful hormones and drastic surgeries that they received well before their brains reached maturity — whose experiences of irreversible regret must be considered for future research." (HHS_0132965).

142.    An HHS official responded that SGMRO was no longer extending invitations to the event but would "be sure to keep the Kelsey Coalition in mind" if it held "listening sessions in the future." (HHS_0132964).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

143.    A detransitioner also emailed SGMRO a week before the event. (HHS_0137649). He stated that he was the founder of an online community of over 2,000 detransitioners and wanted to participate in the first listening session. (HHS_0137649-50). He explained: "We are an emergent and quickly growing population of gender-nonconformists, most of whom are also same-sex oriented, all of whom have experienced mistreatment and neglect by the status quo of gender-specializing healthcare professionals." (HHS_0137649).

144.    The Director of SGMRO responded: "We are no longer sending invitations for the Listening Session scheduled for next week." (HHS_0137649). She added that the listening session would not "have a representative from the detransitioning community." (HHS_0137649). She also promised to keep the detransitioner "[s]hould we hold listening sessions in the future." (HHS_0137649).

145.    Immediately after the first listening session, Dr. James Cantor emailed SGMRO to express his concern that not all stakeholders were represented. He suggested that the agency should "seek out explicitly the experiences of 'desisters'" who identify as transgender in childhood and desist as they grow older. He explained that, because desisters "do not seek services for transition, they are often left invisible to care providers and researchers." (HHS_0137394). This is an incredibly important population to highlight, as the vast majority of childhood onset gender dysphoria remits after puberty. These individuals often grow up to be same-sex attracted adults, and thus, Dr. Cantor is highlighting concerns about homophobia, internalized or externalized, that may be driving the early medicalization of this population.

146.    In my initial report, I mentioned attribution substitution, whereby a simple, related moral judgment, i.e. trans rights or "pro-LGBT," is substituted for various conceptually complex

decisions, i.e. evidence of outcome for medical interventions to treat gender dysphoria in adolescents. (Kaliebe Report ¶ 67). By my count, "discrimination" was mentioned 12 times in the first listening session by various advocates. The one-sided atmosphere SGMRO created supported a tribal us vs. them narrative in the participants. This allowed the participants to cling to grand theories based on discrimination rather than nuanced discussion of multifaceted issues facing gender non-conforming youth. The participation of the Kelsey Coalition, detransitioners, those who had their childhood gender dysphoria remit or a medical professional familiar with desistance would have better reflected the complexity of medicalizing "gender-affirming care" in adolescents.

### 4. Subsequent listening sessions: No Broadening of Perspectives

147.    The SGMRO held a second listening session on November 19, 2020. (SGMRO 2019). It did not involve a wider range of perspectives than the first. The invitees included the Bisexual Resource Center; GLMA: Health Professionals Advancing LGBTQ Equality; Howard Brown Health Center; Intersex Justice Project; Los Angeles LGBT Center; National Black Justice Coalition; ZAMI NOBLA-National Association of Black Lesbians on Aging; Transgender Law Center; The Houston Intersex Society; a Two-Spirit Activist & AI/AN Community Member; the Williams Institute; and WPATH.

148.    SGMRO thus heard the perspectives of, among others, two-spirit indigenous persons, Black Lesbians 40 and older, and intersex children "harmed by the medical establishment" whose surgeries were "medically unnecessary," "painful," "irreversible," and "nonconsensual." (SGMRO 2020 Tr.). The challenge of how to clinically care for intersex patients and the poor care they often receive is legitimate and important. Yet that issue only tangentially relates to gender affirming care and the political activism that is reflected in the documents I reviewed. SGMRO

did not hear the perspectives of the Kelsey Coalition or the detransitioners that had asked to participate.

149.    Unsurprisingly, then, not one of the invited "stakeholders" even alluded to concerns about desisters, detransitioners, or the known health risks of medicalized interventions for gender dysphoric youths. Rather than avoiding the "spiral of silence" that forms when a small moralizing group dominates the discussion, SGMRO appears to have embraced it. (Kaliebe Report ¶ 64). It is the obligation of health professionals and researchers to foster a diversity of perspectives. HHS intentionally failed to do that when it held its listening sessions to determine a future research agenda.

150.    The WPATH representative was the only invitee to suggest that HHS should research "the longitudinal health risks of gender-affirming therapies." (SGMRO 2020 Tr., p.16). He also asked for "the NIH to support more research on transgender and gender-diverse youth, especially on mental and medical health outcomes and fertility preservation." (*Id.*) Thus, of the two Sexual and Gender Minority Research Office listening sessions for which I have transcripts, a past-president of WPATH was the only invitee to hint at the risks of gender-affirming therapies, and he did so without specifying the risks posed to minors.

151.    The day after the second listening session, Gender Health Query requested information on how it and other LGBT organizations could have their perspectives heard. (HHS_0130129). GHQ is a "group of lesbian, gay, bisexual and transgender people, and allies, who want to ensure that all gender nonconforming youth—with or without gender dysphoria—are cared for and protected." (GHQ). GHQ's board is composed entirely of persons whose "sexual orientation" is bi, gay, or lesbian. (Id.). Without explaining how GHQ could secure an invitation,

an NIH official responded that GHQ should "reconnect" when the event was closer. (HHS_0130127).

152.    On May 17, 2021, GHQ reconnected with another remail request to participate in the listening session scheduled for the summer. (HHS_0130127-28). GHQ explained that it "doubt[ed] any other group" HHS invited would discuss concerns regarding children "undergoing experimental medical treatments that sterilize them and have other very serious health impacts." (HHS_0130128). An SGMRO official responded that "SGMRO decided to change the format" to receive public comment through a yearly "Request for Information" instead. (HHS_0130127).

153.    Through its listening sessions, SGMRO appears to have welcomed exclusively stakeholders who saw gender medicine in terms of civil rights or actively supported medicalized gender transitioning for minors. Then, when other stakeholders—indisputably sexual and gender minorities—with a different perspective sought inclusion in the discussion, SGMRO changed the format.

### B.   HHS refuses to conduct a systematic evidence review of treatments it endorses

154.    Given HHS's interest in transitioning treatments for gender dysphoric youth, one would hope that it would conduct a systematic evidence review as other countries' health systems have done to determine whether those treatments are beneficial. Yet when asked to do so, it refused.

155.    On August 18, 2020, Christine Chang, an Associate Director at the Agency for Healthcare Research and Quality at HHS, emailed Karen Robinson, the Johns Hopkins researcher whom WPATH commissioned to lead the Evidence Review Team for SOC-8 (SOC-8 S248), to inquire about the systematic evidence reviews she and her team completed for WPATH. Chang

CONFIDENTIAL – ATTORNEY'S EYES ONLY

explained that her agency had received a request from the American Academy of Family Physi-

cians to conduct a systematic review of transitioning treatments for adolescents. (HHS_0153487).

The Academy posed three research questions:

> "KQ1: For children and adolescents who identify as transgender and have not ini-
>
> tiated puberty, what are the benefits and harms of offering/prescribing pubertal sup-
>
> pression compared to not offering/prescribing pubertal suppression?"

> "KQ2: For adolescents who identify as transgender and have initiated puberty, what
>
> are the benefits and harms of prescribing medical affirmation with hormone therapy
>
> as compared to no intervention or social affirmation alone?"

> KQ3: "For adolescents who identify as transgender and have initiated puberty, what
>
> are the benefits and harms of surgical affirmation as compared to no intervention
>
> or social affirmation without or without medical affirmation?"

(Effective Health Care Program 2020).

156.    Chang wrote to Robinson "to see if there is duplication" with the review Robinson

completed for WPATH and asked about when Robinson would complete the review.

(HHS_0153487). Robinson replied that her team had "completed and submitted reports of reviews

(dozens!) to WPATH" and were working on manuscripts for publication. (HHS_0153486). Chang

followed up to see whether the systematic review by the Johns Hopkins teams for WPATH would

make it unnecessary for AHRQ to conduct a review. (HHS_0153485). Robinson replied:

> I'm sorry I failed to get back to you. I have been distracted and I am not sure what
> we will end up publishing in a timely manner as ***we have been having issues with
> this sponsor [WPATH] trying to restrict our ability to publish***.

> I don't think any of the planned manuscripts would be an overlap. This is not be-
> cause the review questions were different but ***we found little to no evidence about
> children and adolescents***.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

(HHS_0153484) (emphasis added).

157.    To this, Chang replied:

Oh wow, sorry to hear about the issues with the sponsor. It sounds like the sole way of disseminating the work is through manuscripts? The reviews will not be otherwise made available? That's disappointing.

Knowing that there is little/no evidence about children and adolescents is helpful.

(HHS_0153484).

158.    That was September 1, 2020. Four months later, AHRQ issued its determination that it would not conduct a systematic review to answer the questions posed by the Academy. (AHRQ 2021). Though the Academy of Family Physicians had asked specifically about the effect of puberty blockers, cross-sex hormones, and surgeries on children and adolescents, AHRQ found a protocol for a systematic review that had been published that stated it would conduct literature reviews to determine effect of puberty blockers on gender dysphoric adolescents and the effect of hormones and surgeries for "transgender people" generally—not adolescents specifically. The protocol AHRQ relied on was Robinson's, which was registered as her team began work for WPATH SOC-8. (Sharma et al. 2018). This was curious given that Robinson told Chang that, based on her completed literature reviews, she did not think there would be any "overlap" with an AHRQ review since her team "found little to no evidence about children and adolescents. Plus, as Robinson noted, WPATH was "trying to restrict" her team's "ability to publish," so it was not clear that those reviews would ever see the light of day.

159.    The month after AHRQ issued its determination, Robinson's team did in fact publish a systematic review: "Hormone Therapy, Mental Health, and Quality of Life Among

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Transgender People: A Systematic Review." (Baker et al. 2021).[2] That publication appeared to combine results from some undisclosed number of the "dozens" of literature reviews Robinson's team conducted for WPATH. It discussed three studies focused on puberty blockers, and otherwise generally discussed findings for adolescents as part of its findings for adults.

160.    The episode raises a number of questions and concerns. Why was WPATH "trying to restrict" its Evidence Review Team for SOC-8 from publishing the systematic reviews it conducted for SOC-8? Was WPATH successful in burying some of the reviews, such that Robinson's publication was incomplete? WPATH claims in SOC-8 that there are so "few outcome studies that follow youth into adulthood" that "a systematic review regarding outcomes of treatment in adolescents is not possible." (SOC-8 S46). Does that mean Robinson's team did not conduct a systematic literature review regarding adolescents, or (more consistent with Robinson's statement to Chang) that it conducted one and just found "found little to no evidence about children and adolescents"?

161.    What is clear is that individuals and leaders at both WPATH and HHS seem to know that evidence supporting the safety and efficacy of transitioning treatments for gender dysphoric youth is lacking.

Executed this 2nd day of February, 2024.

_Kristopher E. Kaliebe_ MD
Kristopher E. Kaliebe, M.D.

---

[2] Robinson's team also published one other systematic review from the WPATH review: "Effects of antiandrogens on prolactin levels among transgender women on estrogen therapy: A systematic review." (Wilson et al. 2020).

CONFIDENTIAL – ATTORNEY'S EYES ONLY

# REFERENCES

Advocates for Youth. Transgender Young People's Health and Rights. https://www.advocatesforyouth.org/issue/transgender-young-peoples-health-and-rights/, last accessed Feb. 1, 2024.

AHRQ 2021. Topic Brief: Treatments for Gender Dysphoria in Transgender Youth. Agency for Healthcare Research and Quality. Jan. 8, 2021. Retrieved from https://effectivehealthcare.ahrq.gov/system/files/docs/topic-brief-gender-dysphoria.pdf.

Ault, A. (2021, Nov. 18). Transgender Docs Warn About Gender-Affirmative Care for Youth. *Medscape*. Retrieved from https://www.medscape.com/viewarticle/963269#vp_2.

Bailey, J.M. & Diaz, S. (2023). Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Archives of Sexual Behavior*. 52(3):1031-1043. doi: 10.1007/s10508-023-02576-9.

Bailey Letter 2023. Retrieved from https://segm.org/sites/default/files/2023-06/Springer%20Nature%20Appeal_25%20May_MJB.pdf, last accessed Feb. 1, 2024.

Bailey Retraction Note (2023). Retraction Note: Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Springer Nature*. Retrieved from https://link.springer.com/article/10.1007/s10508-023-02576-9.

Baker, K. et al. (2021). Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review. *Journal of Endocrine Society*, Volume 5, Issue 4, April 2021, bvab011, https://doi.org/10.1210/jendso/bvab011.

CAAPS Statement. CAAPS Position Statement on Rapid Onset Gender Dysphoria (ROGD). Coalition for the Advancement & Application of Psychological Science. July 26, 2021. Retrieved from https://www.caaps.co/rogd-statement.

CAP

A – Center for American Progress. About Us. Retrieved from https://www.americanprogress.org/about-us/, last accessed Feb. 1, 2024.

B – Center for American Progress. LGBTQI+ Rights. Retrieved from https://www.americanprogress.org/topic/lgbtq-rights/, last accessed Feb. 1, 2024.

Canadian Press. (2018, Oct. 7). CAMH Reaches Settlement with Former Head of Gender Identity Clinic" *CBC News*. Retrieved from https://www.cbc.ca/news/canada/toronto/camh-settlement-former-head-gender-identity-clinic-1.4854015.

Edwards-Leeper, L. & Anderson, E. (2021, Nov. 24). The mental health establishment is failing trans kids. *The Washington Post*. Retrieved from https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Effective Health Care Program 2020. Treatments for Gender Dysphoria in Transgender Youth. July 17, 2020. Retrieved from https://effectivehealthcare.ahrq.gov/get-involved/nominated-topics/treatments-gender-dysphoria-transgender-youth.

FAIR Letter (2023). Open Letter in Support of Dr. Kenneth Zucker and the Need to Promote Robust Scientific Debate. May 5, 2023. Retrieved from https://www.fairforall.org/open-letters/archives-of-sexual-behavior/.

Fenway Health. #TransYouthMatter. Retrieved from https://fenwayhealth.org/the-fenway-institute/health-policy/transyouthmatter/, last accessed Feb. 1, 2024.

Florida Dep't of Health 2022. Treatment of Gender Dysphoria for Children and Adolescents. April 20, 2022. Retrieved from https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-guidance.pr.html.

FreeState Justice. Mission & History. Retrieved from https://freestate-justice.org/who-we-are/mission/, last accessed Feb. 1, 2024.

GLSEN. Gay, Lesbian and Straight Education Network. About Us. Retrieved from https://www.glsen.org/about-us#snt--1, last accessed Feb. 1, 2024.

GHQ. Gender Health Query. About. Retrieved from https://www.genderhq.org/about, last accessed Feb. 1, 2024.

HHS 2023. About HHS. United States Dep't of Health and Human Services. Retrieved from https://www.hhs.gov/about/index.html, last accessed Feb. 1, 2024.

HRC 2023. Human Rights Campaign Foundation, Map: Attacks on Gender Affirming Care by State, Human Right Campaign, Nov. 13, 2023, https://www.hrc.org/resources/attacks-on-gender-affirming-care-by-state-map.

interACT. interACT: Advocates for Intersex Youth. Mission and History. Retrieved from https://interactadvocates.org/about-us/mission-history/, last accessed Feb. 1, 2024.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS One 13(8):  e0202330. https://doi.org/10.1371/journal.pone.0202330.

Matte, N. et al. (2009). Nomenclature in the World Professional Association for Transgender Health's Standards of Care: Background and Recommendations. 11 International Journal of Transgenderism 42, https://onlineacademiccommunity.uvic.ca/ahdevor/wp-content/uploads/sites/2247/2016/12/Nomenclature.pdf.

NTVM. National Trans Day Visibility March. Retrieved from https://nationaltransvisibilitymarch.org/, last accessed Feb. 1, 2024.

NCLR. National Center for Lesbian Rights. Discrimination, Healthcare. Retrieved from https://www.nclrights.org/our-work/discrimination/healthcare/, last accessed Feb. 1, 2024.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

Open Letter (2023). Open Letter re: Archives of Sexual Behavior. May 5, 2023. Retrieved from https://asbopenletter.com.

SGMRO 2019. SGM Health Research LISTENING SESSION. Division of Program Coordination, Planning, and Strategic Initiatives. Retrieved from https://dpcpsi.nih.gov/sgmro/listening-session, last accessed Feb. 1, 2024.

SGMRO 2020 Tr. Sexual and Gender Minority Health Research Listening Session. Retrieved from https://dpcpsi.nih.gov/sites/default/files/SGMRO_Webinar_11-19-2020_Transcript_508.pdf, last accessed Feb. 1, 2024.

SGMRO 2023. Final Workshop Summary. Retrieved from https://dpcpsi.nih.gov/sites/default/files/2023-10/SGMRO%20GAC%20Workshop%20Summary.pdf, last accessed Feb. 1, 2024.

SGMRO 2024. About SGMRO. Division of Program Coordination, Planning, and Strategic Initiatives. Retrieved from https://dpcpsi.nih.gov/sgmro, last accessed Feb. 1, 2024.

Sharma, R. et al. (2018). Effects of hormone therapy in transgender people. National Institute for Health and Care Research. PROSPERO 2018 CRD42018115379. Retrieved from https://www.crd.york.ac.uk/prospero/display_record.php?ID=CRD42018115379.

Shrier, Abigail. (2021, Oct. 4). Top Trans Doctors Blow the Whistle on "Sloppy" Care. *The Free Press*. Retrieved from https://www.thefp.com/p/top-trans-doctors-blow-the-whistle.

SOC-8. Coleman, E., et al. (2022). Standards of care for the health of transgender and gender diverse people, version 8.  International Journal of Transgender Health, 23, S1–S258.

SOC-7. Coleman, E. et al. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. International Journal of Transgenderism, 13(4).

Southern AIDS Coalition. Retrieved from https://southernaidscoalition.org/, last accessed Feb. 1, 2024.

Transgender Equality. Get the Facts: The Truth About Transition-Related Care for Transgender Youth. Feb. 28, 2023. https://transequality.org/blog/get-the-facts-the-truth-about-transition-related-care-for-transgender-youth.

Trevor Project

A – The Trevor Project (2020, Jan. 29). Gender-Affirming Care for Youth. Retrieved from https://www.thetrevorproject.org/research-briefs/gender-affirming-care-for-youth/.

B – Sylvester, Elliot (2023, Feb. 10). The Trevor Project Opposes Proposed Rule Banning Transgender Medical Care for Youth in Florida. Retrieved from

CONFIDENTIAL – ATTORNEY'S EYES ONLY

https://www.thetrevorproject.org/blog/the-trevor-project-opposes-proposed-rule-banning-transgender-medical-care-for-youth-in-florida/.

UCSF. University of California San Francisco – Center of Excellence for Transgender Health. Retrieved from https://prevention.ucsf.edu/transhealth, last accessed Feb. 1, 2024.

Wilson, L. et al. (2020). Effects of antiandrogens on prolactin levels among transgender women on estrogen therapy: A systematic review. Int J Transgender Health. 2020; 21(4): 391–402, doi: 10.1080/15532739.2020.1819505.

WHO FAQ. (2024, Jan. 15). FAQ: WHO development of a guideline on the health of trans and gender diverse people.  World Health Organization.  Retrieved from https://cdn.who.int/media/docs/default-source/hq-hiv-hepatitis-and-stis-li-brary/tgd_faq_16012024.pdf?sfvrsn=79eaf57f_1.

WPATH (2018, Sep. 8). WPATH POSITION ON "Rapid-Onset Gender Dysphoria (ROGD)." WPATH Global Board of Directors. Retrieved from https://www.wpath.org/me-dia/cms/Documents/Public%20Policies/2018/9_Sept/WPATH%20Position%20on%20Rapid-On-set%20Gender%20Dysphoria_9-4-2018.pdf.

WPATH/USPATH 2022. WPATH/USPATH Denounce Florida Department of Health for Harmful Guidelines Targeting Trans Youth. April 21, 2022. Retrieved from https://www.wpath.org/media/cms/Documents/Newsroom/US-WPATH/WPATHUSPATH%20Statement%20re%20Flor-ida%20Apr%2021%202022.pdf?_t=1650576534.