# EXHIBIT 38

### Affidavit of Jamie Reed

Jamie Reed, being sworn, states:

1. I am an adult, I am under no mental incapacity or disability, and I know that the facts set forth in this affidavit are true because I have personal knowledge of them.

2. I hold a Bachelors of Arts in Cultural Anthropology from the University of Missouri St. Louis and a Master's of Science in Clinical Research Management from Washington University.

3. I have been working at Washington University for seven years. Initially at Washington University, I worked with HIV-positive patients, caring for many transgender individuals.

4. From 2018 until November 2022, I worked as a case manager at the Washington University Pediatric Transgender Center ("the Center") at St. Louis Children's Hospital. My duties included meeting with patients two to three days a week and completing the screening triage intake of patients who were referred to the Center.

5. I was offered and accepted the job as case manager for the Center because I had experience and expertise in working with transgender individuals and pediatric populations.

6. I took the job because I support trans rights and firmly believed I would be able to provide good care for children at the Center who are appropriate candidates to be receiving medical transition. Instead, I witnessed the Center cause permanent harm to many of the patients.

1



7.      During my time at the Center, I personally witnessed Center healthcare providers lie to the public and to parents of patients about the treatment, or lack of treatment, and the effects of treatment provided to children at the Center. I witnessed staff at the Center provide puberty blockers and cross-sex hormones to children without complete informed parental consent and without an appropriate or accurate assessment of the needs of the child. I witnessed children experience shocking injuries from the medication the Center prescribed. And I saw the Center make no attempt or effort to track adverse outcomes of patients after they left the Center.

8.      I raised concerns internally for years. But the doctors at the Center told me to stop raising these concerns. Last fall, the Center and the University Administration told me to "get with the program or get out." Because the Center was unwilling to make any changes in response to my concerns, I left the Center in November 2022 and accepted employment elsewhere within Washington University.

**The Center Misleads the Public and Parents About What Care it Provides**

9.      The Center tells the public and parents that it provides multidisciplinary care. The Center says that you can come to the clinic and get transition hormones, if that is needed, but you can also get psychological and psychiatric care.

10.     That is not true. The Center says that it has four practice areas: Endocrinology, Adolescent Medicine, Psychiatry, and Psychology. But the Center placed such strict limits on Psychiatry and Psychology that I was almost never allowed to schedule patients for those practices. Those practices were advertised as available, but most of the time they were not in fact available. Even when psychology was available, it was only to write

a letter of support for the medical transition treatments and never for ongoing therapy. And psychiatry was allowed, but only on an extremely limited basis.

11.     Instead, I was required to schedule children for Endocrinology or Adolescent Medicine. Rather than provide psychiatric or psychological therapy, these practices (Endocrinology and Adolescent Medicine) would medically transition patients' gender. Endocrinology would prescribe puberty blockers and cross-sex hormones. Adolescent Medicine, which was for children after puberty, prescribed cross-sex hormones. Children were sent to one practice or the other based on their age and stage of puberty or prepuberty. There was no continuing or ongoing mental health evaluation or treatment required or provided by the Center for patients.

12.     The Center also claims that it is a multidisciplinary team approach. The benefit of that approach is supposed to be that patients and their parents can feel more confident that all aspects of their care options have been considered and that their treatment plan has the input of all of the team. This Center did have members who would advocate for different options for the patients with concerning gender histories, concerning comorbidities, and attempt to raise the serious concerns regarding patient care. Patients and their parents, however, were never informed that the team did not have consensus on the treatment. The staff members on the team that were not universally in support of immediate cross sex hormones were not supported and were told to stop questioning the prevailing narrative of immediate cross sex hormones for all by the prescribing physicians. The administration at the university did not actively support the multidisciplinary model of care and did not provide any oversight, and instead the administration told those raising

concerns and questions to stop raising them. The public has been led to believe that a 'team' has considered their child's care and that the 'team' had ruled it best for the cross sex hormones to be initiated, but the public was not told the truth.

13.     Medical transition practice for children and adolescents is based on a study from the Netherlands. That study, the "Dutch study," excluded participants who presented underlying mental health issues.

14.     But nearly all children who came to the Center here presented with very serious mental health problems. Despite claiming to be a place where children could receive multidisciplinary care, the Center would not treat these mental health issues. Instead, children were automatically given puberty blockers or cross-sex hormones even though the Dutch study excluded persons experiencing mental health issues.

15.     One patient came to the Center identifying as a "communist, attack helicopter, human, female, maybe non binary." The child was in very poor mental health and early on reported that they had no idea their gender identity. Rather than treat the child for their serious mental health problems, the Center put the child on cross-sex hormones and ignored the child's obvious mental health problems. The child subsequently reported that their mental health actually was worsening once they started the cross-sex hormones.

16.     Most children who come into the Center were assigned female at birth. Nearly all of them have serious comorbidities including, autism, ADHD, depression, anxiety, PTSD, trauma histories, OCD, and serious eating disorders. Rather than treat these conditions, the doctors prescribe puberty blockers or cross-sex hormones. Some examples include:

a.  Patient was in a residential sex offender treatment facility in state custody. Patient had previously sexually abused animals and had stated when they were released that they would do so again. There were questions about consistency of gender history. The Center did not treat this underlying condition, but instead started the patient on hormones.

b.  Patient who has severe Obsessive Compulsive Disorder and had threatened to self-harm their genitals. The Patient did not have a trans or other incongruent gender identity. The patient was placed on hormones not even to treat any gender dysphoria but to chemically reduce libido and sexual arousal.

c.  Patient had history of sexual abuse and notified the psychologist of this. It was even documented in the letter of support that the patient had concerns about the changes that testosterone would cause to their genitals. Instead of treating the underlying trauma the patient was started on testosterone.

d.  Patient had serious mental health concerns and was prescribed mental health medications directly before being prescribed hormones, yet didn't take the mental health medications. Nevertheless, the patient was placed on hormones.

e.  Patient had significant autism with unrealistic expectations, struggled to answer questions, and wanted questions to be provided ahead of time. Yet the patient was started on feminizing hormones.

f.  Patient had a mental health history that included being violent. In addition, the parent was forcing the patient to cross dress. The patient was put on feminizing hormones.

17.  These serious comorbidities were not treated by the Center, and doctors would prescribe puberty blockers or cross-sex hormones while patients were struggling with these comorbidities.

18.  The psychiatry services were limited and could only serve patients who were 'not too severe,' which meant that many patients were being sent to the already overburdened emergency rooms for suicidal ideations, for self-harm, and for inpatient eating disorder treatment.

19.  Many patients had depression and anxiety symptoms before starting cross sex hormones but it was only after starting these medications that they became more severe and required starting mental health medications. Many patients were also suspected of having autism and were not even required to be formally assessed for this condition before starting cross sex hormones.

20.  Toward the end of my time at the Center, it became clear that many children coming to the Center had gender identities that were likely the result of social contagion. When I first started in 2018, the Center would receive between 5 and 10 calls a month. By the time I left, that number was more than 40 calls a month.

21.  Social media is at least partly responsible for this large increase in children seeking gender transition treatment from the Center. Many children themselves would say that

they learned of their gender identities from TikTok. Children would arrive at the Center identifying not only as transgender, but also as having tic disorders (Tourette Syndrome) or multiple personality disorders (dissociative identity disorder). Doctors at the Center would ignore and dismiss as social contagion the claims about the tics and multiple personalities; but then those doctors would uncritically accept the children's statements about gender identity and place these children on puberty blockers and cross-sex hormones.

22.    In one case, a child came into the Center identifying as "blind," even though the child could in fact see (after vision tests were performed). The child also identified as transgender. The Center dismissed the child's assertion about blindness as a somatization disorder but uncritically accepted the child's statement about gender and prescribed that child with drugs for medical transition without confirming the length or persistence of the condition. No concurrent mental health care was provided.

23.    The Center tells the public and parents of patients that the point of puberty blockers is to give children time to figure out their gender identity. But the Center does not use puberty blockers for this purpose. Instead, the Center uses puberty blockers just until children are old enough to be put on cross-sex hormones. Doctors at the Center *always* prescribe cross-sex hormones for children who have been taking puberty blockers.

24.    The Center also tells parents, children, and the public that puberty blockers are fully reversible. They are not. In children going through normal puberty, puberty blockers do

lasting damage. They cause children to go through menopause early, they reduce bone density, and they worsen mental health.

25.     Doctors at the Center also have publicly claimed that they do not do any gender transition surgeries on minors. For example, last year Dr. Lewis and Dr. Garwood told the Missouri legislature, "at no point are surgeries on the table for anyone under 18" and also, "surgeries are not an option for anyone under 18 years of age." This was a lie. The Center regularly refers minors for gender transition surgery. The Center routinely gives out the names and contact information of surgeons to those under the age of 18. At least one gender transition surgery was performed by Dr. Allison Snyder-Warwick at St. Louis Children's Hospital in the last few years.

26.     During medical visits with patients, I have personally heard providers report that they examined results of gender transition surgeries on minors. This includes examining the scar tissue and healing of sutures of breast surgeries.

27.     At one point, Dr Chris Lewis and Dr Sarah Garwood reported that the Endocrine division leadership didn't want us referring minors for surgery. Yet, the Center continued referring minors for surgery. We claimed that the referrals were only "for educational purposes" for when children turned 18. But these referrals were in fact referrals. And patients we referred did in fact obtain transition surgeries as minors.

### The Center Does Not Assess Children or Obtain Consent Before Placing them on Puberty Blockers and Hormones

28.     The Center has four criteria that must be met before a child is placed on puberty blockers or cross-sex hormones. Although these criteria are supposed to enable the doctors to make case-by-case decisions, in practice everybody who meets these minimum criteria are prescribed cross-sex hormones or puberty blockers.

### (1) Age

29.     First, the child must be at a certain age or stage of puberty. Puberty stages are measured according to the Tanner Stage system.

30.     The World Professional Association for Transgender Health ("WPATH") is an organization that drafts what it believes to be the best medical standard of care. WPATH is controversial. It is considered an activist organization, and its standards of care (or "guidelines") are much more lenient than the standards of care created by other organizations.

31.     During the time, I was at the clinic, the WPATH Standard of Care Version 7 stated that children be at least 16 years old to start using cross-sex hormones. The Center deviated even from this most lenient standard and routinely prescribed cross-sex hormones to children as young as 13.

### (2) Therapist Letter

32.     The second criteria for a person to receive puberty blockers or cross-sex hormones is that the child have a letter of referral from a therapist. This requirement is supposed to ensure that two independent professional clinicians agree that medical transition is appropriate

before a child is given medication that causes irreversible change. But nothing about this process at the Center involved independent judgment.

33.    The Center steered children toward therapists that the Center knew would refer these children back to the Center with a letter supporting medical transition. The Center had a list of therapists we would send children to, and a therapist could be on that list only if the Center "knew they would say yes" to medical transition. The Center had two in-house psychologists. They were Dr. Alex Maixner and Dr. Sarah Girresch-Ward as well as several outside therapists. Nobody on our list was required to be licensed in psychology or psychiatry.

34.    If we did not receive a letter from an outside therapist that would let us prescribe puberty blockers or cross-sex hormones, we would then just send the patient to the in-house therapists: Dr. Alex Maixner and Dr. Sarah Girresch-Ward.

35.    We also instructed the therapists what to say in their letters to us. I was instructed to draft and send language to the therapists for them to use in letters they then sent to us, and most therapists on the list had a template letter drafted by the Center that they could fill out to return to the Center.

36.    The WPATH guidelines require a full psychological assessment of the child before recommending puberty blockers or cross-sex hormones. A full assessment typically requires 10 to 12 hours of time with the child. Therapists on the Center's list would send us letters after just 1-2 hours with a patient.

10

### (3) Consent

37.    The third criteria was parental consent. The Center routinely issued puberty blockers or cross-sex hormones without parental consent.

38.    Doctors at the Center routinely pressured parents into "consenting" by pushing those parents, threatening them, and bullying them.

39.    A common tactic was for doctors to tell the parent of a child assigned female at birth, "You can either have a living son or a dead daughter." The clinicians would tell parents of a child assigned male at birth, "You can either have a living daughter or dead son." The clinicians would say this to parents in front of their children. That introduced the idea of suicide to the children. The suicide assertion was also based on false statistics. The clinicians would also malign any parent that was not on board with medicalizing their children. They would speak disparaging of those parents.

40.    I was present during the visits with many parents when this happened.

41.    Parents would come into the Center wanting to discuss research and ask questions. The clinicians would dismiss the research that the parents had found and speak down to the parents.

42.    When parents suggested that they wanted only therapy treatment, not cross-sex hormones or puberty blockers, doctors treated those parents as if the parents were abusive, uneducated, and willing to harm their own children.

43.     These assertions about abuse and suicide were used as tools to stop parents from asking questions and to pressure parents into consenting.

44.     The Center has a team culture of supporting the affirming parent and maligning the non-affirming parent.

45.     Parents routinely said they felt they were being pressured to consent. Often parents would give "consent" but say they were only doing so because "you guys are going to do this anyway."

46.     The Center was also intentionally blind about who had legal authority to consent. I wanted the Center to ask parents before the first visits about and request copies of custody agreements because custody agreements often spell out who among divorced parents must consent to medical procedures. I was told not to ask for custody agreements because "if we have the custody agreement, we have to follow it."

47.     At one point, a child's father said no to cross-sex hormones. The child later arrived with an adult male (step parent) who said the child could receive cross-sex hormones. The Center did not check to see if this adult male was a legal parent or guardian who had any legal right to consent to treatment.

48.     Other centers who prescribe cross-sex hormones and puberty blockers require parents to issue written consent. Several times, I asked the doctors to require written consent. They repeatedly refused. The entire time I worked there the Center had no written informed consent, and none that was provided to or signed by patients.

49.     On several occasions, the doctors have continued prescribing medical transition even when a parent stated that they were revoking consent.

50.     Before placing children on cross-sex hormones or puberty blockers, the Center also did not inform parents or children of the very serious side effects.

51.     Doctors know that cross-sex hormones (immediately after puberty blockers) make children permanently sterile. The doctors did not share this information with parents or children.

52.     For example, the Center nurse and I expressed concerns about a patient's intellectual function and ability to provide informed consent. The patient had a history of attending a school district for special education needs, couldn't identify where they lived, and couldn't explain what kind of legal documents (ID) they had. Our concerns were dismissed by the provider, and hormones were given. Patient then stated in a follow up appointment that they wanted to potentially have biological children and had not been seen by the fertility department. When the nurse and I asked the Center provider if they had covered the fertility questions, the Center provider became livid and adamantly disagreed that treatment could "potentially render the patient sterile."

53.     Doctors knew that many of our former patients had stopped taking cross-sex hormones and were detransitioning. Doctors did not share this information with parents or children.

**(4) Clinical Visit**

54.     The fourth criteria for prescribing cross-sex hormones or puberty blockers is that the child must have a one-hour consultation with Endocrinology or Adolescent Medicine.

13

55.     This is little more than a box-checking exercise. One hour is not sufficient time to fully assess these children. I witnessed doctors on several occasions' mention that they did not have time in the meeting to discuss everything they wanted to discuss. The Center decided to give these children cross-sex hormones and puberty blockers anyway.

56.     The WPATH standard of care in effect when I was at the Center required a full assessment of a child's situation. That typically cannot be done in less than 10 or 12 hours. The Center ignored this standard and gave children puberty blockers and cross-sex hormones after just two 1-hour visits (one with a therapist and one with a doctor at the Center).

**Cross-Sex Hormones and Puberty Blockers Are Automatic**

57.     The Center tells the public and parents that it makes individualized decisions. That is not true. Doctors at the Center believe that every child who meets four basic criteria—age or puberty stage, therapist letter, parental consent, and a one-hour visit with a doctor—is a good candidate for irreversible medical intervention. When a child meets these four simple criteria, the doctors always decide to move forward with puberty blockers or cross-sex hormones. There were no objective medical test or criteria or individualized assessments.

58.     The doctors do this even though many children coming to the Center are either experiencing social contagion or have very serious mental health issues that should be addressed first. The standard of care in studies says a center should resolve mental health

14

issues before sending children through medical transition. The Center is not following that standard.

59.     Children come into the clinic using pronouns of inanimate objects like "mushroom," "rock," or "helicopter." Children come into the clinic saying they want hormones because they do not want to be gay. Children come in changing their identities on a day-to-day basis. Children come in under clear pressure by a parent to identify in a way inconsistent with the child's actual identity. In all these cases, the doctors decide to issue puberty blockers or cross-sex hormones.

60.     In one case where a girl was placed on cross-sex hormones, I found out later that the girl desired cross-sex hormones only because she wanted to avoid becoming pregnant. There was no need for this girl to be prescribed cross-sex hormones. What she needed was basic sex education and maybe contraception. An adequate assessment before prescribing hormones would have revealed this fact. But because the doctors automatically prescribe cross-sex hormones or puberty blockers for children meeting the bare minimum criteria, this girl was unnecessarily placed on drugs that cause irreversible change to the body.

61.     On another occasion, a patient had their breasts removed. Although the patient had turned 18, this surgery was performed at St. Louis Children's Hospital. Three months later, the patient contacted the surgeon and asked for their breasts to be "put back on." Had a requisite and adequate assessment been performed before the procedure, the doctors could have prevented this patient from undergoing irreversible surgical change.

15

62.     In July 2022, the FDA issued a "black box warning" for puberty blockers, the strictest kind of warning the FDA can give a medication. It issued the warning following evidence in patients of brain swelling and loss of vision. Despite this warning, doctors at the Center continued their automatic practice of giving kids these drugs.

63.     In more than four years working at the clinic, I witnessed only two examples of the doctors deciding not to prescribe cross-sex hormones or puberty blockers for a child who met the four basic criteria. Both cases involved patients with severe developmental delays. And in one of those cases, the doctors in fact said that they would prescribe cross-sex hormones or puberty blockers. The only reason the doctor did not prescribe those medications was that the parents would not agree to monitor administration of the medication.

64.     In hundreds of other cases, Center doctors automatically issued puberty blockers or cross-sex hormones without considering the child's individual circumstances or mental health.

65.     In one case, a psychiatrist called the Center's endocrinologist and explained that a child, who had already tried to commit suicide by threatening to jump off a roof, should not be given cross-sex hormones because the child was struggling with serious mental health issues. I witnessed the endocrinologist yell at the psychiatrist on the phone and speak down to this provider.

66.     Because I was concerned that the doctors were giving cross-sex hormones and puberty blockers to children who should not be on them, I created a "red flag" list of children

16

where other staff and I had concerns. The doctors told me I had to stop raising these concerns. I was not allowed to maintain the red flag list after that.

67.    During the time I was creating the red flag list, noting my concern that these children were not good candidates for permanent, irreversible medication treatment, the doctors would simply send these children to our in-house therapists. Those therapists would inevitably provide letters to the doctors, and then the doctors would say there can't be any concern over these children because another therapist was fine with prescribing puberty blockers or cross-sex hormones.

**Children Are Experiencing Serious Harm, and the Center Will Not Do Any Follow Up**

68.    It is my professional opinion that cross-sex hormones and puberty blockers should only be used where the benefits outweigh the harms. These drugs have imposed and are imposing serious harms on the children who have been patients at the Center.

69.    The doctors at the Center tell the public and tell parents of patients that puberty blockers are fully reversible. They really are not. They do lasting damage to the body.

70.    I have seen puberty blockers worsen the mental health outcomes of children. Children who have not contemplated suicide before being put on puberty blockers have attempted suicide after. Puberty blockers force children to go through premature menopause. Puberty blockers decrease bone density.

71.    Cross-sex hormones (after puberty blockers) in almost all cases will permanently sterilize children. Children on cross-sex hormones also experience substantial gain in blood

pressure, cholesterol, and weight. All of these have significant negative health effects. One patient started hormones and took one dose and then started having symptoms that they believed was indicative of a blood clot.

72.  Children who take testosterone as a cross-sex hormone experience severe atrophy of vaginal tissue. One patient on cross-sex hormones called the Center after having sexual intercourse. The patient experienced vaginal lacerations so severe that the patient bled through a pad, through pants, and through a towel wrapped around their waist, and had to have the vaginal lacerations surgically treated in St. Louis Children's Hospital emergency room.

73.  Most patients who have taken cross-sex hormones have experienced near-constant abdominal pain.

74.  One doctor at the Center, Dr. Chris Lewis, is giving patients a drug called Bicalutamide. The drug has a legitimate use for treating pancreatic cancer, but it has a side effect of causing breasts to grow, and it can poison the liver. There are no clinical studies for using this drug for gender transitions, and there are no established standards of care for using this drug.

75.  Because of these risks and the lack of scientific studies, other centers that do gender transitions will not use Bicalutamide. The adult center affiliated with Washington University will not use this medication for this reason. But the Center treating children does.

76.     I know of at least one patient at the Center who was advised by the renal department to stop taking Bicalutamide because the child was experiencing liver damage. The child's parent reported this to the Center through the patient's online self-reporting medical chart (MyChart). The parent said they were not the type to sue, but "this could be a huge PR problem for you."

77.     I have heard from patients given testosterone that their clitorises have grown so large that they now constantly chafe against the child's pants, causing them pain when they walk.

78.     Despite telling the public and parents that the Center offers multidisciplinary, complete care, the Center makes no attempt to provide care after prescribing cross-sex hormones or puberty blockers. The Center does not provide mental health care or refer children for mental health care even though nearly all children who come to the Center are experiencing serious mental health issues. The Center does not require children to continue with mental health care after they prescribe cross-sex hormones or puberty blockers and even continues those medications when the patients directly report worsening mental health after initiating those medications. Some additional examples to those discussed above include:

a.   Patient was on hormones and had decompensating mental health, outlandish name changes, self-diagnosis of multiple personalities (DID). The patient was continued on hormones.

19

b.  Patient believed that they were being poisoned by the testosterone and stopped for a period. They had significant serious mental health issues, but were put back on testosterone.

c.  Patient was brought to the Center at the age of 17 by a man who was not related to them yet with whom the patient had been living. They were started on hormones as soon as they turned 18. Patient's mental health subsequently got worse and it was disclosed in an Emergency Department visit that the man that had brought them to the clinic had been sexually and physically abusing them. The medical transition treatment was not stopped and the Center provider did not require trauma therapy, mental health care or an assessment.

d.  Patient was in residential facility, in foster care. We convinced the staff that it was ok for patient to start testosterone. Patient ran away numerous times from facility and was having unprotected intercourse while on testosterone (which causes birth defects). The patient was continued on the testosterone.

e.  Patient admits that they were started on testosterone when they were very young- age 11- and only because they were moving to a state (Florida) that the parent was concerned wouldn't prescribe later. Patient has desisted in male identity to a vague non binary with their own self-diagnosis of autism. Patient has changed their name numerous times and is clearly struggling with thoughts about desistence, even saying they wanted breast development. The Center continued the testosterone.

f.  Patient who was on hormones was being evaluated for OCD and having somatization disorder with 'seizure' activity. Patient was kept on hormones.

g.  Patient who was on hormones stopped taking their schizophrenia medications without consulting a doctor. Patient was continued on hormones.

h.  Patient changed to non-binary identity, then changed preferred name and stated that their identity was shifting day to day. Patient was continued on hormones.

79.  The Center also refuses to track complications and adverse events among its patients. There is no standard protocol for tracking patients who have received treatment. And the Center actively avoids trying to learn about these adverse events.

80.  On my own initiative, I have tracked some patients on a case-by-case basis, but the Center discouraged me from doing so. I wanted to track the number of our patients who detransition. I wanted to track the number of our patients who have attempted suicide or committed suicide. The Center would not make either of these tracking systems a priority.

81.  It is my belief that the Center does not track these outcomes because they do not want to have to report them to new patients and because they do not want to discontinue cross-sex hormone prescriptions. The Center never discontinues cross-sex hormones, no matter the outcome.

21

82.     In just a two-year period from 2020 to 2022, the Center initiated medical transition for more than 600 children. About 74% of these children were assigned female at birth. These procedures were paid for mostly by private insurance, but during this time, it is my understanding that the Center also billed the cost for these procedures to state and federal publicly funded insurance programs.

83.     I have personally witnessed staff say they were uncomfortable with how the Center has told them they have to code bills sent to publicly funded insurance programs. I have witnessed staff directly ask the providers for clarification on billing questions and have providers dismiss the concerns and work to have the patients have this care covered as the priority.

84.     I have personally witnessed staff report that they were aware that patients had been coded incorrectly (coding for precocious puberty for puberty blockers when the child does not in fact have that condition).

85.     Based on my observation that the Center has prescribed puberty blockers or cross-sex hormones hundreds of times where they should not have, the Center is billing private and public insurance for unnecessary procedures.

86.     Even when it is clear that the cross-sex hormones or puberty blockers are harming the child, the Center continues that treatment and continues billing public and private insurance.

_____
Jamie Reed

2/7/2023
Date

State of Missouri      )
                       )
City of St. Louis      )

On this day, Jamie Reed personally appeared before me, a notary public in Missouri. I know her to be the individual who signed this document, and she acknowledged to me that she signed it for the purposes stated in it.

_____
Notary Public

2/7/2023
Date

KATIE R. KEEVEN
Notary Public, Notary Seal
State of Missouri
St. Louis County
Commission # 21767059
My Commission Expires 11-15-2025

23

Washington University Transgender Center Internal Review
Summary of Conclusions
April 21, 2023

OVERVIEW

On February 9, 2023, an article published in the online media outlet The Free Press outlined a
series of allegations of inappropriate conduct at the Washington University Transgender Center
(the Center). The author of the article also made similar allegations directly to the Missouri
Attorney General.

When the University became aware of these allegations on the day of the article's publication,
Chancellor Andrew D. Martin immediately initiated a comprehensive analysis of procedures
followed and care provided to patients and families at the Center.  The University, in
collaboration with St. Louis Children's Hospital, also created an Oversight Committee charged
with weekly review of Center activities. The committee was also directed to provide additional
education on consent procedures, adverse event reporting, and protection for employees,
patients, family members, and other individuals who report concerns.

The allegations concerned Center practices involving the prescription of medication to patients
under the age of 18, specifically with regard to parental consent and mental health evaluation;
patient reactions to prescription medications; and gender-related surgeries on patients under the
age of 18.

This report represents a summary of the University's conclusions.


REVIEW PROCESS

The University's focus has been on the allegations made, with a particular emphasis on
allegations of patient harm and the consenting process. The University's goal was to ensure care
provided at the Center is consistent with recognized standards of care. Specifically, the
University was committed to ensuring the policies and procedures of the Center follow standards
of care adopted by the World Professional Association for Transgender Health (WPATH) and the
Endocrine Society. Those standards have been recognized by the American Academy of
Pediatrics, American Medical Association, and American Psychological Association.

In addition to reaching the conclusions described below, the University has also produced
information and documents to state and federal officials who had opened their own inquiries into



PLAINTIFF'S
EXHIBIT

B- Reed

the Center. The University provided a large number of documents to the Missouri Attorney General in response to his ongoing review; responded specifically to the allegations made about consenting, mental health treatment, and alleged patient harm; and also gathered information in response to questions from U.S. Senator Josh Hawley. The University has reached the following conclusions, which are described below.

CONCLUSIONS

After careful consideration over the course of a more than an eight-week period, the University has concluded that allegations of substandard care causing adverse outcomes for patients at the Center are unsubstantiated.

Washington University physicians and staff at the Center follow appropriate policies and procedures and treat patients according to the currently accepted standard of care, as recommended by the American Academy of Pediatrics and other nationally recognized organizations.

While not based on deviations from accepted practice or adverse outcomes for patients, the University has determined that a more detailed and formalized approach to the Center's process for documenting parental consent and obtaining custody documentation is warranted and that the University should take a more organized approach in responding to any requests of public engagement on the matter of transgender care. The University has committed to making these adjustments.

- A total of 1,165 patients have sought care at the Center since June 2018. These interactions range from an informational phone call to medical treatment but were of sufficient depth to create a medical record for each patient. All patients seen at the Center have a medical record.

- These patients account for approximately 6,000 visits to the Center for counseling and/or medical care during that time period. Note: Many patients visited the Center more than once and additional visits were made by patients to psychologists affiliated with the Center at St. Louis Children's Hospital.

- Of the Center's 1,165 patients, 531 received cross-sex hormones, including some who were initially on puberty blockers, some who were started on these medications by Center providers, and some who had existing prescriptions for these medications from unrelated physicians when they first arrived at the Center.  An additional 67 patients were prescribed puberty blockers and not cross-sex hormones.  The remainder (567 patients) were not prescribed puberty blockers or cross-sex hormones.

- Interviews with Center providers and a review of medical records identified no patients who had adverse physical reactions caused by medications prescribed by Center providers.

- Appropriate mental health assessment and/or intervention was, and is, required for all medical treatment provided to patients under the age of 18. The Center's practice is to require a letter of support from a licensed mental health provider who has treated the patient before prescribing puberty blockers or cross-sex hormones. Letters of support provided to the Center reflect individualized review and assessment of patients. Records indicate most patients had ongoing relationships with mental health providers and the Center providers recommend resources to patients who may need ongoing treatment for mental health concerns. Mental health care and counseling is a priority at the Center.

- Care for patients under the age of 18 is provided with appropriate and well-documented parental consent, as required by the University and the state of Missouri and consistent with the general practice for prescribing medication to minors by University physicians.

- The Center's practice includes obtaining and documenting consent from parents (including in instances where court orders governed which parent had authority to consent) or, when appropriate under the circumstances, from guardians.

- Center providers have not referred patients under 18 for gender-affirming surgery since late 2018 when the Center adopted a policy prohibiting these referrals. Upon request, some families were provided with the names of surgeons (including Washington University physicians) who provided such surgeries, and the Center's providers have provided summaries of care for patients desiring surgical interventions.

- There have been a total of six surgeries identified that were performed by Washington University physicians since 2018. These were all chest surgeries for adolescents transitioning to male. These were all referrals from other medical providers or patient-initiated self-referrals, not a result of direct Center provider referrals. As noted above, Center providers would provide summaries of care for patients to their surgeons. Chest masculinization surgery for minors is within the defined standard of care when clinically and developmentally appropriate as determined by an experienced multidisciplinary team

- Washington University physicians no longer perform gender-affirming surgeries on patients under the age of 18.

- The Center engaged in a number of educational and outreach seminars, often for groups of faculty and staff of public school districts. The University recognizes the need to provide education on the topic of gender affirming care and treatment and reasonable accommodations for transgender students.  Given the sensitivity of these issues, the

University has determined that it would be helpful to introduce more internal oversight of these sessions.


RECOMMENDATIONS

While the University's review concluded that Washington University physicians adopted appropriate policies and procedures to treat patients according to the currently accepted standard of care, it also identified four areas for improvement. The University is making a commitment to the following:

- While appropriate parental consent has been obtained verbally and documented in the medical record, the additional protocols recommended by the Oversight Committee for documenting parental consent to ensure a consistent process is followed by all staff and physicians who interact with patients under age 18 should be made permanent. Specifically, the University has decided to take the additional step of requiring specific written consent prior to prescribing gender affirming medications. The University has reviewed the consenting process and made these updates to the Center's protocol.

- The Center has adopted a process of requiring a family to provide custody agreements before an initial visit at the Center by a patient under age 18. Prior practice had been to obtain the custody agreement before medical intervention in cases where decision-making authority was in question.

- The University has undertaken additional efforts to reaffirm its policy prohibiting gender-affirming surgery to the Departments of Pediatrics and Surgery.

- In addition to recommendations directly related to the allegations, the University also determined in the course of its review that there is an opportunity to be more intentional about public engagement on the topics of gender dysphoria and transgender care. The University will review its procedures for engaging with members of the community, particularly as it pertains to guidance provided to local school administrators and educators. Note: Public outreach by knowledgeable providers is within the WPATH standard of care.


*The University is analyzing the impact of the Missouri Attorney General's emergency regulation of April 13, 2023.*