# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | |
| Hon. Steve Marshall, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................1

COUNTERSTATEMENT OF FACTS ...................................................2

    I.    Response to Defendants' Statement of Undisputed Facts ...................2

        A.    S.B. 184's Legislative Findings Are Not Supported
               by Evidence. ...............................................................2

        B.    Defendants' Characterization of the Development
               of Clinical Practice Guidelines for the Treatment
               of Gender Dysphoria is False and Immaterial. .........11

        C.    The Banned Treatments Do Not Harm Minors in
               Alabama. ...................................................................43

    II.    Additional Disputed Facts ..................................................57

STANDARD OF REVIEW ..................................................................59

ARGUMENT .....................................................................................61

    I.    Defendants Are Not Entitled to Summary Judgment
        Because a Reasonable Factfinder Could Find that S.B.
        184 Fails Rational Basis Review. ........................................62

    II.    The United States Disputes Defendants' Material Facts. ..................68

    III.    Defendants Are Not Entitled to Summary Judgment
         Under Heightened Scrutiny. ...............................................73

    IV.    Defendants' Motion Suffers from Procedural and
         Evidentiary Defects. .........................................................74

CONCLUSION ..................................................................................76

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ...................................................................60

*Allen v. Bd. of Pub. Educ. for Bibb Cnty.*,
    495 F.3d 1306 (11th Cir. 2007) ...........................................60

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................... 60, 61

*Bradbury v. Wainwright*,
    718 F.2d 1538 (11th Cir. 1983) ...........................................61

*Brandt v. Rutledge*,
    677 F. Supp. 3d 877 (E.D. Ark. 2023) .............................73

*Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*,
    802 F.2d 1352 (11th Cir. 1986) ...........................................61

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................59

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ............................................... 63, 64

*City of South Miami v. DeSantis*,
    508 F. Supp. 3d 1209 (S.D. Fla. 2020)...............................61

*Clark v. Coats & Clark, Inc.*,
    929 F.2d 604 (11th Cir. 1991) ...........................................60

*Craig v. Boren*,
    429 U.S. 190 (1976) ...................................................................66

*Doe v. Ladapo*,
    No. 4:23cv114-RH-MAF, 2024 WL 2947123
    (N.D. Fla. June 11, 2024) ......................................... 65, 66, 68, 73, 74

*Eknes-Tucker v. Gov. of Ala.*,
    80 F.4th 1205 (11th Cir. 2023)...................................... 66, 73

**Cases (Cont.)**

*F.S. Royster Guano Co. v. Virginia*,

    253 U.S. 412 (1920) ........................................................................64

*Fowler v. Stitt*,

    No. 23-5080, 2024 WL 3035712 (10th Cir. June 18, 2024) ...............65

*Hickson Corp. v. N. Crossarm Co.*,

    357 F.3d 1256 (11th Cir. 2004) ......................................................60

*Jones v. UPS Ground Freight*,

    683 F.3d 1283 (11th Cir. 2012) ......................................................76

*Lawrence v. Texas*,

    539 U.S. 558 (2003) ........................................................................62

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

    475 U.S. 574 (1986) ........................................................................61

*Mullins v. Crowell*,

    228 F.3d 1305 (11th Cir. 2000) ......................................................60

*Plyler v. Doe*,

    457 U.S. 202 (1982) ........................................................................65

*Romer v. Evans*,

    517 U.S. 620 (1996) ........................................................................63

*Smith v. Marcus & Millichap, Inc.*,

    991 F.3d 1145, 1156 (11th Cir. 2021) .............................................75

*Sunday Lake Iron Co. v. Wakefield Twp.*,

    247 U.S. 350 (1918) ........................................................................64

*U.S. Dep't of Agric. v. Moreno*,

    413 U.S. 528 (1973) ............................................................ 63, 64, 67

*Univ. of Tex. v. Camenisch*,

    451 U.S. 390 (1981) ........................................................................69

*Vill. of Willowbrook v. Olech*,

    528 U.S. 562 (2000) ........................................................................64

**Cases (Cont.)**

*White v. DeJoy*,

    No. 1:22-00106-N, 2024 WL 1538428 (S.D. Ala. Apr. 9, 2024) ........................75

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................75

Fed. R. Civ. P. 56(a) ........................................................................................ 59, 73

Fed. R. Civ. P. 56(c)(1) ..........................................................................................60

Fed. R. Civ. P. 56(c)(2) ..........................................................................................75

Fed. R. Civ. P. 56(c)(3) ..........................................................................................75

**Statutes**

Ala. Code §§ 26-26-1 to -9 (2022) ................................................................. *Passim*

**EXHIBITS**

| | |
|---|---|
| Antommaria Report | U.S. Ex. 1 |
| Antommaria Rebuttal Report | U.S. Ex. 2 |
| Caughey Rebuttal Report | U.S. Ex. 3 |
| Cohen Rebuttal Report | U.S. Ex. 4 |
| Shumer Report | U.S. Ex. 5 |
| Shumer Rebuttal Report (REDACTED) | U.S. Ex. 6 |
| Goodman Rebuttal Report | U.S. Ex. 7 |
| Janssen Supplemental Report | U.S. Ex. 8 |
| Karasic Rebuttal Report | U.S. Ex. 9 |
| Ladinsky Report | U.S. Ex. 10 |
| McNamara Report | U.S. Ex. 11 |
| Weisberg Deposition Transcript (SEALED) | U.S. Ex. 12 |
| Weisberg Deposition Exhibits 1-9 | U.S. Ex. 13 |
| Weisberg Deposition Exhibit 10 (SEALED) | U.S. Ex. 14 |
| Poe Deposition Transcript (SEALED) | U.S. Ex. 15 |
| Poe Deposition Exhibits 1-6 (SEALED) | U.S. Ex. 16 |
| Poe Deposition Exhibit 7 | U.S. Ex. 17 |
| Poe Deposition Exhibits 8-9 (SEALED) | U.S. Ex. 18 |
| Poe Declaration ISO Preliminary Injunction | U.S. Ex. 19 |

**EXHIBITS (Cont.)**

| | |
|---|---|
| Koe Declaration ISO Preliminary Injunction | U.S. Ex. 20 |
| Moe Declaration ISO Preliminary Injunction | U.S. Ex. 21 |
| Zoe Declaration ISO Preliminary Injunction | U.S. Ex. 22 |
| Cantor Deposition Transcript (REDACTED) | U.S. Ex. 23 |
| Cantor Deposition Exhibits 1-9 | U.S. Ex. 24 |
| Cantor Deposition Exhibits 10-19 | U.S. Ex. 25 |
| Cantor Deposition Exhibits 20-21 (SEALED) | U.S. Ex. 26 |
| Cantor Deposition Exhibit 22 | U.S. Ex. 27 |
| Hruz Deposition Transcript | U.S. Ex. 28 |
| Hruz Deposition Exhibits 1-3 | U.S. Ex. 29 |
| Kaliebe Deposition Transcript (SEALED) | U.S. Ex. 30 |
| Kaliebe Deposition Exhibits 1-2 | U.S. Ex. 31 |
| Cohn Deposition Transcript | U.S. Ex. 32 |
| Cohn Deposition Exhibit 1 | U.S. Ex. 33 |
| Davis Deposition Transcript (SEALED) | U.S. Ex. 34 |
| Hawes Deposition Transcript (SEALED) | U.S. Ex. 35 |
| Hein Deposition Transcript (SEALED) | U.S. Ex. 36 |
| Reed Deposition Transcript (SEALED) | U.S. Ex. 37 |
| Reed Deposition Exhibits 1-2 | U.S. Ex. 38 |

**EXHIBITS (Cont.)**

| | |
|---|---|
| Children's of Alabama Combined Consent/Pay Agreement (UAB0013-30) | U.S. Ex. 39 |
| Patient Health Questionnaire and General Anxiety Disorder and Suicide Screening at UAB Medicine Ambulatory – Quick Reference (UAB0031-32) | U.S. Ex. 40 |
| American Academy of Pediatrics Policy Statement on Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents | U.S. Ex. 41 |
| Brief of Amici in Support of Plaintiff's Motion for Preliminary Injunction (ECF No. 91-1) | U.S. Ex. 42 |

## INTRODUCTION

Motions for summary judgment should be based on facts, but what Defendants have presented in their brief and throughout this litigation is a work of fiction. The world Defendants attempt to portray—one of rampant on-demand sterilization, nefarious organizations pushing unsafe treatment to serve political ends, and where transgender youth are not actually transgender—does not exist. At least, not according to the evidence. Defendants have had access to millions upon millions of pages of documents from the highest tiers of the U.S. Department of Health and Human Services (HHS), American Academy of Pediatrics (AAP), Johns Hopkins University, World Professional Association for Transgender Health (WPATH), Endocrine Society, University of Alabama Pediatrics Multidisciplinary Gender Health Clinic (UAB Clinic), Magic City Wellness Center, and sensitive medical files of individual minor patients. But to make their case, Defendants have cobbled together pieces of sentences from obscure emails, attributed quotes to the wrong people, omitted context and conflicting testimony, and misrepresented outdated studies. Their motion shows no basis to enter summary judgment.

What the evidence does show is that the Court, as a reasonable factfinder, could find for the United States under rational basis review. Defendants fail to analyze the law appropriately and thus fail to establish the absence of any genuine dispute of material fact and entitlement to judgment as a matter of law. Every

1

material fact Defendants put forward is not only disputed, but refuted. For these same reasons, Defendants cannot prevail under heightened scrutiny. The motion also suffers from procedural and evidentiary defects that underscore why summary judgment is inappropriate at this juncture. Defendants fail to meet their burden in myriad ways, and for any of those reasons summary judgment must be denied.

## COUNTERSTATEMENT OF FACTS

### I. Response to Defendants' Statement of Undisputed Facts

#### A. S.B. 184's Legislative Findings Are Not Supported by Evidence.

1.     <u>Disputed</u>. While S.B. 184 does include legislative findings, the United States disputes that those findings are supported by evidence as described below.[1]

2.     <u>Disputed and Immaterial</u>. (1)[2] S.B. 184's definition of "sex" oversimplifies a complicated biological concept that incorporates multiple components that may not be congruent with each other, including internal reproductive organs, external genitalia, chromosomes, hormones, gender identity (which has a biological foundation with neuroanatomic, genetic, and hormonal

---

[1] *Infra* I.A. ¶¶ 2-5.

[2] Defendants' Statement of Undisputed Facts consists of 33 paragraphs, nearly all of which contain multiple facts. The United States' response first notes whether the paragraph is disputed, undisputed, and/or immaterial, then responds to fact individually sentence-by-sentence, as indicated by bracketed number. For example, Paragraph 2 contains five sentences, each of which presents its own fact. The United States begins by noting Paragraph 2 is disputed and immaterial, and then responds to Paragraph 2's facts with counterstatements (1) to (5).

variation),[3] and secondary sex characteristics.[4] This definition also fails to consider the existence of intersex individuals—those born with variations in physical sex characteristics (including genitalia, gonads, chromosomes, and hormonal factors) that prevent them from fitting into either a "male" or "female" classification under the law's definition. (2) S.B. 184's definition of "gender dysphoria" differs from the Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR), which describes incongruence "between one's experience/expressed gender and assigned gender," which is associated with clinically significant distress or impairment in social, school, or other important areas of functioning.[5] (3) Gender dysphoria diagnoses are clinical diagnoses performed by highly trained mental health professionals based on a biopsychosocial assessment.[6] While clinicians must solicit an individual's self-report of symptoms to make their clinical diagnosis, this practice is common in medicine and does not make the diagnosis unreliable.[7] (4) This legislative finding makes no distinction between children exploring their gender identity, the majority of whom do not develop gender dysphoria, and

---

[3] U.S. Ex. 5 (Shumer Rep.) § I ¶¶ 5-8; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 28-31.

[4] U.S. Ex. 5 (Shumer Rep.) §§ I ¶¶ 1-8, VI at 27; U.S. Ex. 1 (Antommaria Rep.) 31-33; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 28-29, 32; Ala. Code §§ 26-26-1 to -3.

[5] Defs.' Ex. 67 (DSM-5-TR), at 35-38; U.S. Ex. 5 (Shumer Rep.) § III ¶ 1; Ala. Code § 26-26-1.

[6] U.S. Ex. 5 (Shumer Rep.) §§ IV ¶ 2, VI at 28; U.S. Ex. 10 (Ladinsky Rep.), at 9-14 (discussing extensive guidelines in making diagnoses and noting the assessment "is often extremely complex").

[7] U.S. Ex. 5 (Shumer Rep.) § VI at 28; U.S. Ex. 1 (Antommaria Rep.), at 20-21; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 31.

adolescents who are less likely to desist.[8] It also misinterprets older studies that include children who would not fulfill the diagnostic criteria for gender dysphoria.[9] Citations to Dr. Shumer's deposition do not support this contention.[10] (5) "Wait-and-see" is an approach for pre-pubertal children, not those who have begun puberty, which is the only population that can receive puberty blockers and hormone therapy.[11] "Wait-and-see" is not recommended treatment and is not supported by evidence; use of gonadotropin-releasing hormone agonists (GnRHa), commonly known as "puberty blockers," is the recommended treatment.[12] If left untreated, gender dysphoria can result in severe anxiety and depression, self-harm, and suicidality.[13] Additionally, this fact is immaterial as puberty blockers are not provided to pre-pubertal children.

    3.   <u>Disputed and Immaterial</u>. (1) Medical providers are not "aggressively pushing" gender-affirming care.[14] The precise treatment for gender dysphoria

---

[8] U.S. Ex. 5 (Shumer Rep.) §§ IV ¶ 11, VI at 29; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 36-38, 41; U.S. Ex. 11 (McNamara Rep.), at 21-23; ███████████████████████████.

[9] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 11; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 36; U.S. Ex. 1 (Antommaria Rep.), at 21-22.

[10] Defs.' Ex. 39 (Shumer Dep. Tr.), at 68:6-15. Dr. Shumer noted in his report that while an individual's understanding of their gender identity may evolve during their life, data and clinical experience show that children whose gender dysphoria persists into adolescence are highly likely to be transgender. U.S. Ex. 5 (Shumer Rep.) §§ I ¶ 4, IV ¶ 11, VI at 29; *see also* U.S. Ex. 1 (Antommaria Rep.), at 21-22.

[11] U.S. Ex. 1 (Antommaria Rep.), at 21-22.

[12] U.S. Ex. 5 (Shumer Rep.) §§ IV ¶¶ 11-13, VI at 29; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 39-41; U.S. Ex. 10 (Ladinsky Rep.), at 25-26; U.S. Ex. 11 (McNamara Rep.), at 24.

[13] U.S. Ex. 10 (Ladinsky Rep.), at 4.

[14] U.S. Ex. 1 (Antommaria Rep.), at 29; U.S. Ex. 10 (Ladinsky Rep.), at 25; U.S. Ex. 5 (Shumer Rep.) §§ IV ¶ 1, VI at 29.

depends on each patient's individualized need and "there is not an assumption that transitioning medications are appropriate for every patient."[15] Surgeries are not typically performed until adulthood and are not performed on minors in Alabama.[16] (2) There is no inevitable continuum of treatment.[17] Before puberty, treatment may include social transition, which means allowing a transgender child to live and be socially recognized in accordance with their gender identity.[18] (3) Again, there is no inevitable continuum of treatment.[19] For some adolescents, the use of GnRHa after the onset of puberty for purposes of preventing progression of pubertal development may be appropriate.[20] (4) Research studies, including longitudinal studies, establish that the use of GnRHa for gender dysphoria is safe and effective.[21] The lack of FDA approval for an off-label prescription does not imply

---

[15] U.S. Ex. 10 (Ladinsky Rep.), at 6, 11, 16, 22 (discussing ongoing re-evaluation and changes to treatment plan as appropriate); U.S. Ex. 5 (Shumer Rep.) § IV ¶ 19 ("Regardless of the treatment plan prescribed, at every encounter with the care team there is a re-evaluation of the patient's gender identity and their transition goals. Should a patient desire to discontinue a medical intervention, the intervention is discontinued.").

[16] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 20; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 58:2-8, 69:21-70:22, 71:23-72:13.

[17] *Supra* note 15; *see also* U.S. Ex. 5 (Shumer Rep.) §§ IV ¶¶ 3-9 ("The steps that make up a person's transition will depend on that individual's medical and mental health needs and decisions made between the patient, family, and multidisciplinary care team.").

[18] U.S. Ex. 10 (Ladinsky Rep.), at 8; U.S. Ex. 5 (Shumer Rep.) §§ IV ¶ 3, VI at 30 ("The decision to undergo social transition is best made after comprehensive evaluation by a mental health professional with training in gender identity in childhood" and "only after careful consideration of the best interests of the child in consultation with parents.").

[19] *Supra* note 17.

[20] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 3.

[21] U.S. Ex. 5 (Shumer Rep.) §§ II ¶ 1, IV ¶ 3, VI at 30; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 10-11, 68; U.S. Ex. 10 (Ladinsky Rep.), at 5-8, 18-19, 26-27; U.S. Ex. 1 (Antommaria Rep.), at 4-20, 22-23.

that such usage is experimental, improper, or unsafe.[22] It is common, legal, and often evidence-based for a medication developed for the treatment of one condition to be used to treat other conditions "off-label."[23] "Off-label" only means that the drug manufacturer, for several possible reasons including cost, has not applied for and received FDA approval for the particular indication.[24] GnRHa are FDA-approved for use in pediatric patients with precocious puberty, and the mechanism of action of GnRHa in suppressing progression of puberty in precocious puberty is the same in gender dysphoria.[25] Neither the citation to Dr. Shumer's deposition nor the citation to the WPATH Standards of Care, Version 8 (SOC-8), support this legislative finding. (5) Again, there is no inevitable continuum of treatment.[26] In mid-adolescence, regardless of whether a patient was prescribed puberty blockers, treatment may include hormonal interventions such as testosterone and estrogen, leading to the development of secondary sex characteristics.[27] The decision to prescribe hormones is made carefully, cautiously, and after a thorough review of risks and benefits with the patient and their parent with no assumption that a

---

[22] U.S. Ex. 5 (Shumer Rep.) § VI at 31; U.S. Ex. 1 (Antommaria Rep.), at 24-26; U.S. Ex. 4 (Cohen Rebuttal Rep.) ¶¶ 17, 59.
[23] U.S. Ex. 5 (Shumer Rep.) § VI at 31; U.S. Ex. 1 (Antommaria Rep.), at 24-26; U.S. Ex. 4 (Cohen Rebuttal Rep.) ¶¶ 17, 28-50, 59.
[24] U.S. Ex. 5 (Shumer Rep.) § VI at 31; U.S. Ex. 1 (Antommaria Rep.), at 24-25; U.S. Ex. 4 (Cohen Rebuttal Rep.) ¶¶ 19-23, 33.
[25] U.S. Ex. 5 (Shumer Rep.) § VI at 31.
[26] *Supra* note 17.
[27] U.S. Ex. 5 (Shumer Rep.) § IV ¶¶ 3, 9-10, 17.

6

patient who is prescribed puberty blockers will also desire hormone therapy.[28] (6) Again, there is no inevitable continuum of treatment.[29] There is no assumption that a patient who is prescribed puberty blockers or hormone therapy will also desire or need any surgical intervention as an adult.[30] Gender-affirming surgeries are not typically performed in adolescence and are not performed on minors in Alabama.[31] This fact is immaterial because S.B. 184's surgery provision is not challenged in this case. (7) Again, there is no inevitable continuum of treatment.[32] Defendants mistake correlation for causation.[33]

    4.    <u>Disputed and Immaterial</u>. (1) Clinical experience and research studies, including longitudinal studies, establish that gender-affirming medical care for the treatment of gender dysphoria in adolescents is safe and effective, and is not new or experimental.[34] Allegations of harmful effects and unknown risks are purely speculative, as described herein. (2) This statement is unsupported, hypothetical, and inconsistent with available evidence.[35] Risk of lower bone mineral density in

---

[28] U.S. Ex. 5 (Shumer Rep.) § VI at 32; U.S. Ex. 10 (Ladinsky Rep.), at 19-20.

[29] *Supra* note 17.

[30] U.S. Ex. 5 (Shumer Rep.) § VI at 32.

[31] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 20; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 58:2-8, 69:21-70:22, 71:23-72:13.

[32] *Supra* note 17.

[33] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 38.

[34] U.S. Ex. 5 (Shumer Rep.) §§ II ¶ 1, IV ¶ 3, VI at 30, 34; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 10-11, 68; U.S. Ex. 10 (Ladinsky Rep.), at 5-8, 18-19, 26-27; U.S. Ex. 1 (Antommaria Rep.), at 4-20, 22-23.

[35] U.S. Ex. 5 (Shumer Rep.) § VI at 33; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 5; *see also* U.S. Ex. 10 (Ladinsky Rep.), at 29 (The "suggestion that alteration of normal adolescent brain maturation

prolonged use of GnRHa can be mitigated by screening for and treating vitamin D or calcium deficiency when present, and by limiting the number of years of treatment based on a patient's clinical course.[36] After exposure to gender-affirming hormones or withdrawal of GnRHa treatment and resumption of endogenous puberty, bone density accrual will rise.[37] According to Dr. Ladinsky, more than 20 years of experience with GnRHa treatment and follow-up of patients several years after cessation of therapy reveal bone mineral accrual to be within the normal range compared with population norms.[38] (3) This statement is unsupported and incorrect.[39] (4) Risks of cardiovascular disease, thromboembolic stroke, asthma, and COPD are rare when treatment is provided and supervised by a clinician, and these same risks are present when hormone therapy is used to treat non-transgender individuals and individuals with intersex traits for other purposes.[40] Long-term use of testosterone in transgender men is not linked to an increase in cancer or osteoporosis, and while there may be an increase in cardiovascular risk, as for all patients, lifestyle modifications and pharmacological therapy are recommended for

---

may be another possible side effect of puberty blockers is not accurate" and that "I have not seen this in my practice and science does not support the statement." (internal quotation marks and citation omitted)).

[36] U.S. Ex. 5 (Shumer Rep.) §§ IV ¶ 16, VI at 33; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 57; U.S. Ex. 10 (Ladinsky Rep.), at 27.

[37] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 57; U.S. Ex. 10 (Ladinsky Rep.), at 27-28.

[38] U.S. Ex. 10 (Ladinsky Rep.), at 28.

[39] *Supra* note 34.

[40] U.S. Ex. 10 (Ladinsky Rep.), at 22.

those with the highest risk.[41] Any risk of adverse side effects from hormone therapy can be mitigated through careful monitoring of hormone levels.[42] (5) This statement is unsupported. Puberty blockers are fully reversible, and thus do not impair long-term fertility in transgender or non-transgender patients if they ultimately undergo puberty.[43] (6) This statement is unsupported and untrue as adolescent and adult patients can withdraw from hormones and allow pubertal progression, using assisted reproductive technologies if needed.[44] Potential risks to fertility are shared with the patient and their parents, who are then referred to reproductive endocrinologists for fertility preservation if desired.[45] (7) Surgical removal of reproductive organs does not occur in minors.[46] Immaterial as S.B. 184's surgery provision is not challenged in this case. (8)-(10) Clinical experience and robust research studies, including longitudinal studies, demonstrate the efficacy of hormonal interventions for gender dysphoria in adolescents.[47]

---

[41] U.S. Ex. 5 (Shumer Rep.) § VI at 33.

[42] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 60, 63; U.S. Ex. 10 (Ladinsky Rep.), at 30 ("When treating patients with hormones, the staff and physicians at the UAB Gender Clinic closely monitor dosing and circulating hormone levels to minimize any risk of adverse effects.").

[43] U.S. Ex. 5 (Shumer Rep.) §§ IV ¶¶ 15-16, V ¶¶ 1-3, VI at 35; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 50-51; U.S. Ex. 10 (Ladinsky Rep.), at 9, 21.

[44] U.S. Ex. 5 (Shumer Rep.) § V ¶¶ 1-3 ("[W]ithdrawal of hormones in adulthood often is successful in achieving fertility when it is desired."); U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 52-54.

[45] U.S. Ex. 10 (Ladinsky Rep.), at 21; U.S. Ex. 5 (Shumer Rep.) §§ IV ¶ 18, V ¶¶ 1-3; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 55.

[46] U.S. Ex. 5 (Shumer Rep.) § VI at 34.

[47] U.S. Ex. 5 (Shumer Rep.) §§ II ¶ 1, IV ¶ 3, VI at 30, 34; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 10-11, 68; U.S. Ex. 10 (Ladinsky Rep.), at 5-8, 18-19, 26-27; U.S. Ex. 1 (Antommaria Rep.), at 4-20, 22-23.

Hormonal interventions are correlated with improved emotional and behavioral outcomes and decreased suicide risk.[48] In the longest-term follow-up study, "well-being was similar to or better than the general population by adulthood after multidisciplinary gender-affirming care in adolescence."[49] Clinical experience shows that a carefully evaluated adolescent who is diagnosed with gender dysphoria, meets clinical criteria for hormonal interventions, and is provided care in the context of a holistic approach with attention to other aspects of their mental health has significantly better outcomes compared to similar patients not able to access these interventions, who often experience serious harm.[50] Defendants' contention that transgender individuals (including those who received gender-affirming care) are still at higher risk for negative mental health outcomes is based on sources that are inapt or inappropriate, and/or fail to disaggregate transgender individuals who received gender-affirming care from those who did not, and/or ignore the stigma around transgender identity.[51] Finally, gender-affirming surgeries are not typically performed in adolescence and are not performed on minors in Alabama.[52] This fact is immaterial to the extent it relies on conclusions and studies

---

[48] U.S. Ex. 5 (Shumer Rep.) §§ II, ¶ 1, VI at 34-35; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 20-25.
[49] U.S. Ex. 5 (Shumer Rep.) § VI at 35.
[50] U.S. Ex. 5 (Shumer Rep.) § VI at 34.
[51] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 19, 26.
[52] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 20; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 58:2-8, 69:21-70:22, 71:23-72:13.

regarding gender-affirming surgery as S.B. 184's surgery provision is not challenged in this case.

5.      <u>Disputed.</u> (1)-(2) Informed consent and assent for gender-affirming care is possible.[53] Parents and legal guardians are frequently asked to consent to medical treatments for minors with comparable risks, uncertainty, levels of evidence, and complexity.[54] Gender-affirming medical care requires parental consent and seeks assent from the adolescent, who generally possesses comparable medical decision-making capacity to adults.[55] Providers are trained to explain expected effects, risks (including to fertility), and benefits to patients and families in an age-appropriate and culturally competent way.[56] Defendants provide no empirical evidence to support their contention to the contrary.[57]

**B.      Defendants' Characterization of the Development of Clinical Practice Guidelines for the Treatment of Gender Dysphoria is False and Immaterial.**

6.      <u>Undisputed.</u> (1)-(2) Undisputed except to the extent Defendants suggest that S.B. 184's legislative findings are supported by the evidence, and to

---

[53] U.S. Ex. 1 (Antommaria Rep.), at 26-29; U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶¶ 45-57; U.S. Ex. 5 (Shumer Rep.) § VI at 35; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 67, 70; U.S. Ex. 10 (Ladinsky Rep.), at 14-16, 24-25; U.S. Ex. 8 (Janssen Supp. Rep.) ¶ 25; U.S. Ex. 11 (McNamara Rep.), at 5-6, 13, 25; U.S. Ex. 7 (Goodman Rebuttal Rep.) ¶¶ 26-34; U.S. Ex. 9 (Karasic Rebuttal Rep.) ¶¶ 26(d), 36, 59.
[54] U.S. Ex. 1 (Antommaria Rep.), at 26-27; U.S. Ex. 5 (Shumer Rep.) § VI at 35.
[55] U.S. Ex. 1 (Antommaria Rep.), at 27.
[56] U.S. Ex. 5 (Shumer Rep.) § VI at 35; U.S. Ex. 1 (Antommaria Rep.), at 26-29; U.S. Ex. 10 (Ladinsky Rep.), at 14-16, 24-25 (describing the extensive informed consent process at the UAB Clinic which includes outlining risks, benefits, and alternatives to treatment).
[57] U.S. Ex. 1 (Antommaria Rep.), at 26.

the extent Defendants assert the United States relies exclusively on the WPATH and Endocrine Society guidelines.

7.   <u>Disputed and Immaterial</u>. Immaterial because the purpose of the Cass Review's evaluation of clinical practice guidelines was to determine what standards to apply within the context of the National Health Service (NHS) in England, not the United States.[58] The Cass Review recommends gender-affirming care for adolescents made unlawful by S.B. 184.[59] (1) The Cass Review never states that the WPATH SOC-8 or the Endocrine Society guidelines are "unreliable."[60] At most, the Cass Review casts doubt on the reliability of current gender-affirming care guidelines and limits its recommendations to the Finnish and Swedish guidelines for use in practice.[61] In fact, the Cass Review notes that most guidelines it assessed scored poorly on "rigour of development," with the Swedish guidelines scoring a 51, just slightly above the Endocrine Society 2017 at 42, and WPATH 2022 (SOC-8) at 35.[62] And while the Cass Review faults WPATH for

[58] Defs.' Ex. 84 (Cass Review), at 128 ("The starting point for the Review was to seek an appraisal of these guidelines and determine if some components might be directly transferable to the NHS in England.").

[59] Defs.' Ex. 84 (Cass Review), at 196-97 (allowing puberty blockers under a research protocol and hormone therapy without that restriction).

[60] Defs.' Ex. 84 (Cass Review), at 129-130.

[61] Defs.' Ex. 84 (Cass Review), at 130 (Review's guideline appraisal "raises serious questions about the reliability of current guidelines" and only recommending the Finnish and Swedish guidelines for use in practice).

[62] Defs.' Ex. 84 (Cass Review), at 129. While one of the underlying systematic reviews concludes that WPATH SOC-8 and the Endocrine Society guidelines "lack developmental rigour," it also cites these as being among the six guidelines that scored over 30 for rigor. Defs.' Ex. 86 (Taylor Guidelines Review), at 5, 7.

overstating the strength of the evidence in making recommendations and for not

being clearer about its reliance on clinical expertise, it notes that "[c]linical

consensus is a valid approach to guideline recommendations where the research

evidence is inadequate."[63] (2) The Cass Review states that only the Finnish (2020)

and Swedish (2022) guidelines could be recommended for use in practice but does

not go as far as to state they are the "only reliable clinical guidelines for pediatric

gender care."[64] Further, the parameters on treatment in Sweden are unclear as the

Cass Review indicates, "the Swedish guideline recommended that medical

treatment should follow the original Dutch criteria and should only be given under

a research protocol, or in exceptional circumstances."[65] (3) The Cass Review's

recommendations are not the same as the nations cited. The Cass Review only

recommends limiting puberty blockers to a research protocol; it does not place that

restriction on gender-affirming hormones.[66] It does not appear Norway has limited

gender-affirming care to research protocols.[67] Scotland is not changing treatment

for existing patients.[68] (4) Defendants do not define the term, "WPATH model."

---

[63] Defs.' Ex. 84 (Cass Review), at 132.

[64] Defs.' Ex. 84 (Cass Review), at 130.

[65] Defs.' Ex. 84 (Cass Review), at 132; *see also* Defs.' Ex. 86 (Taylor Guidelines Review), at 5 (mentioning "exceptional cases"); Defs.' Ex. 105 (Swedish Guideline), at 40.

[66] Defs.' Ex. 84 (Cass Review), at 197 (availability of hormones from age 16); Defs.' Ex. 98 (NHS Gender Affirming Hormones), at 2.

[67] Defs.' Ex. 109 (Norway Policy), at 5 (no statement limiting care to research protocols).

[68] Defs.' Ex. 111 (Scotland Policy), at 1 ("If you are already being treated by Paediatric Endocrinology and being prescribed either of these medications, you will have been contacted and advised that there will be no change to your course of treatment.").

That other states have enacted gender-affirming care bans says nothing about these states rejecting WPATH, the Standards of Care, Version 7 (SOC-7), or SOC-8.[69]

8.    <u>Disputed and Immaterial</u>. (1) That the Endocrine Society did not conduct systematic reviews on the effects of endocrine treatment on every health outcome is not "remarkabl[e];" it is consistent with other clinical practice guidelines.[70] One Endocrine Society review "aimed to summarize the available evidence on the effect of sex steroid use in transgender individuals on lipids and cardiovascular outcomes," and the second "summarized the available evidence regarding the effect of sex steroids on bone health in transgender individuals and identified 13 studies."[71] (2) There are no "serious problems" with the Endocrine Society guidelines. Defendants fail to mention that the GRADE framework allows for strong recommendations based on low or very low-quality evidence.[72] Having strong recommendations based on low- or very low-quality evidence "is not unique to guidelines about gender-affirming medical care or by the Endocrine Society."[73]

---

[69] Defs.' Mot. for Summ. J. Br. 11, n. 42.

[70] Defs.' Ex. 43 (Antommaria Dep. Tr.), at 118:15-119:1 (noting it would be unlikely that the Endocrine Society could "commission systematic reviews on all of the patient relevant outcomes because of the way in which professional societies are resourced and that the systematic reviews that were commissioned for this clinical practice guideline are comparable to the type—the number of systematic reviews commissioned for other clinical practice guidelines").

[71] Defs.' Ex. 115 (Endocrine Society 2017 Guideline), at 3873.

[72] U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶ 36.

[73] U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶ 36 (examination by Guyatt, among others, of the World Health Organization's (WHO) clinical practice guidelines found that 55.4% of strong recommendations were based on low or very-low quality evidence); Defs.' Ex. 43 (Antommaria Dep. Tr.), at 124:16-23 (GRADE guidelines "are an ideal process and that this [Endocrine

9.   <u>Disputed</u>. (1) Undisputed. (2) Undisputed that the Cass Review makes the quoted characterization.[74] (3) The characterization that WPATH "laundered" citations is unsupported; neither of the reviews cited by Defendants use this term.[75] (4) By its own wording—"this approach may explain why"—this statement constitutes conjecture by the Cass Review and therefore is not a conclusion.[76]

10.   <u>Disputed and Immaterial</u>. (1) Defendants conflate "apparent consensus" among clinical practice guidelines discussed in the prior paragraph with organizational endorsements of the WPATH SOC-8.[77] (2) Disputed to the extent Defendants imply that Dr. Coleman had exhaustive knowledge of SOC-7's endorsements or that a lack of formal endorsement by a medical organization necessarily indicates that organization's rejection of SOC-7.[78] In the same document Defendants quote, Dr. Coleman goes on to state, "My suspicion is that these organizations never formally endorsed *but have referenced SOC 7 in their support for trans health and rights*. We need to find out the facts here."[79] In fact, medical organizations did reference SOC-7 in public statements supporting gender-

---

Society] guideline is comparable to many other clinical practice guidelines in medicine that clinicians rely on" and that guidelines may be being held to "unrealistic standards in practice").
[74] Defs.' Ex. 84 (Cass Review), at 130.
[75] Defs.' Ex. 84 (Cass Review), at 130; Defs.' Ex. 86 (Taylor Guidelines Review), at 5-7.
[76] Defs.' Ex. 84 (Cass Review), at 130.
[77] *Compare* Defs.' Mot. for Summ. J. Br. ¶ 9, *with* ¶ 10.
[78] Defs.' Ex. 21 (Coleman Dep. Tr.), at 263:17-20 (responding, "Not necessarily," when asked whether he believed he would know if medical organizations had endorsed SOC-7).
[79] Defs.' Ex. 190 (WPATH 17), at 7 (emphasis added).

affirming medical care for minors, including an amicus brief in this case.[80]

Defendants omit the context that not all organizations offer formal endorsements of

practice guidelines, or that there may be other reasons for an organization not

offering its endorsement (*e.g.*, internal processes for guideline reviews, policies

against standards of care endorsements).[81] (3) Undisputed that WPATH requested

endorsements or support for SOC-8 from other organizations.[82] (4) Undisputed

that, as of May 2024, Dr. Coleman was aware of endorsements of SOC-8 from the

World Association for Sexual Health and the International Society for Sexual

Medicine.[83] However evidence in the record indicates that Dr. Coleman's

assessment may not be comprehensive.[84] (5) Undisputed that Dr. Coleman was

unaware of an endorsement of SOC-8 by AAP.[85] Disputed to the extent that

---

[80] *See* U.S. Ex. 41 (AAP Statement), at note 35; U.S. Ex. 42 (Medical Ass'ns Am. Br. in Support of Prelim. Inj.), at 7 (American Medical Association, American College of Physicians, American Academy of Pediatrics, Alabama Chapter of the American Academy of Pediatrics, American Academy of Family Physicians, among others, joining WPATH and Endocrine Society in brief stating that "[t]he treatment protocols for gender dysphoria are laid out in established, evidence-based clinical guidelines," and citing to WPATH SOC-7); *see also* U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 12 (noting leading medical bodies support the tenets of the WPATH and Endocrine Society guidelines).

[81] *Infra* note 87.

[82] Defs.' Ex. 21 (Coleman Dep. Tr.), at 256:22-25, 257:1-4; Defs.' Ex. 18 (Bowers Dep. Tr.), at 243:22-25; Defs.' Ex. 189 (WPATH 16), at 1-22, 39.

[83] Defs.' Ex. 21 (Coleman Dep. Tr.), at 261:5-12; 262:4-8.

[84] ███████████████████████████████████████████████████████████; Defs.' Ex. 21 (Coleman Dep. Tr.), at 262:4-8 (Coleman only confirms his personal awareness of SOC-8 endorsements by significant medical organizations).

[85] Defs.' Ex. 21 (Coleman Dep. Tr.), at 261:13-24.

Defendants' citation does not show AAP "rejected" a request to endorse SOC-8.[86]

(6) Disputed as to Defendants' implication that AMA declining to endorse or support SOC-8 indicates a substantive disagreement with SOC-8. Instead, AMA informed WPATH that AMA "does not endorse or support standards of care" as that "falls outside of [AMA's] expertise."[87] The second quote is immaterial as the statement was not made by and did not represent the views of Dr. Coleman, whom as Defendants note, was the chair of SOC-7 and SOC-8, and the quoted individual's views have no bearing on this case.[88]

11.    Disputed. (1) It is unclear how Defendants define the phrase "meet these standards," as perfect adherence would be practically difficult, if not impossible. WPATH cited both the Institute of Medicine (IOM, now named the National Academy of Medicine) and World Health Organization (WHO) standards, among others.[89] SOC-8 acknowledges that its process was one "adapted

---

[86] Defs.' Ex. 21 (Coleman Dep. Tr.), at 261:5-24 (unaware of AAP endorsement of SOC-8); Defs.' Ex. 187 (WPATH 14), at 338 (expressing hope that AAP could endorse or support SOC-8); Defs.' Ex. 188 (WPATH 15), at 152 (Dr. Coleman noting that AAP did not oppose SOC-8); Defs.' Ex.190 (WPATH 17), at 6 (Dr. Coleman noting that he was not sure what happened to getting more AAP support beyond not opposing SOC-8).
[87] Defs.' Ex. 189 (WPATH 16), at 21; *see also* Defs.' Ex. 189 (WPATH 16), at 1 (American Psychiatric Association (APA) CEO & Medical Director sharing that "a statement specific to the guidelines from APA is in effect an endorsement and APA has a process for guideline reviews that we cannot circumvent," and that APA "supports access to evidence-based coverage of all gender-affirming procedures which would help the mental well-being of gender-diverse individuals"); Defs.' Ex. 190 (WPATH 17), at 6 (Dr. Coleman acknowledging that "[e]ndorsements by large organizations are oftentimes cumbersome and that word might not be the best one to use for getting support from organizations").
[88] Defs.' Ex. 21 (Coleman Dep. Tr.), at 259:11-14 (rejecting this statement's characterization).
[89] Defs.' Ex. 116 (WPATH SOC-8), at S247.

from" the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework.[90] The GRADE framework permits strong recommendations based on low- or very low-quality evidence.[91] (2) The conflicts of interest standards Defendants cite are not the baseline and are infrequently met by authors of clinical practice guidelines across subjects.[92] In reality, what is standard is that in preparing for guideline development, an institution has "a policy in place to identify and manage conflicts of interest for the drafting process of the practice guideline."[93] (3) That Dr. Cass is a pediatrician who does not have transgender patients with gender dysphoria does not make her a "good example" of someone best equipped to conduct a review of this care, in fact quite the opposite.[94]

---

[90] Defs.' Ex. 116 (WPATH SOC-8), at S250.

[91] U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶ 36; Defs.' Ex. 43 (Antommaria Dep. Tr.), at 124:16-23.

[92] U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶¶ 15-16 (Dr. Cantor characterizes the cited standards "as bare minimums when they are instead ideal standards that individuals and organizations can seek to achieve but are infrequently met in actual practice."), 17 (Professional medical organizations "us[e] their own resources to develop clinical practice guidelines in the absence of a better alternative."); U.S. Ex. 7 (Goodman Rebuttal Rep.) ¶¶ 17, 19 (Clinical practice guidelines are often published by medical associations focused in a particular field and "authored by practitioners with relevant experience in the specific field of medicine involved," as "it would be peculiar if any guideline-producing entity did not comprise experts in the field addressed by the entity's guidelines" and having "no specialized and competent practitioners on the subject matter of a guideline would subvert and undermine the very idea of a practice guideline."); Defs.' Ex. 18 (Bowers Dep. Tr.), at 185:25-186:6; 192:23-25; Defs.' Ex. 21 (Coleman Dep. Tr.), at 217:12-218:5.

[93] U.S. Ex. 7 (Goodman Rebuttal Rep.) ¶ 16 (response to financial conflicts); U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶ 17 ("[O]rganizations generally have policies and procedures to manage conflicts of interest and acknowledge remaining potential conflicts of interest in the published guidelines.").

[94] Defs.' Ex. 18 (Bowers Dep. Tr.), at 256:16-257:1 (noting that while one does not need to treat gender dysphoric youth to evaluate safety and efficacy of treatment, they need to know the population, which Dr. Cass does not).

(4) Disputed to the extent "Strategies for Managing [Conflicts of Interest]" are presented as a baseline, rather than recommendations.[95]

      12.   <u>Disputed and Immaterial</u>. Immaterial to the extent this paragraph concerns transitioning surgeries, income derived from those surgeries, and WPATH guidelines regarding transitioning surgeries, as S.B. 184's surgery provision is not challenged in this case. (1) That chapter leads and authors were required to be full WPATH members in good standing and content experts in transgender health does not equate to "r[unning] the opposite way" on conflicts of interest standards.[96] (2) Dr. Coleman did not use the phrase "for participants in the SOC-8 process to have many published articles already on topics relating to gender dysphoria," as those words are attributable to defense counsel's question.[97] (3) Dr. Bowers did not use the phrase "important for someone to be an advocate for [transitioning] treatments before the guidelines were created," as those words are attributable to defense counsel's question.[98] (4) The evidence does not establish Dr. Bowers' income from transitioning surgeries.[99] The implication that Dr. Bowers

---

[95] Defs.' Ex. 22 (Coleman Dep. Exs.), at 337-38.

[96] Defs.' Ex. 116 (WPATH SOC-8), at S248; Defs.' Ex. 166 (JHU 1), at 1 ("[T]he decision was made to adhere as much as possible to best practice for guideline development. To that end, disclosures are being collected now from SOC8 members" for review by SOC-8 chairs.); *see, e.g.*, ███████████████████████████████████████████████ .

[97] Defs.' Ex. 21 (Coleman Dep. Tr.), at 228:14-16.

[98] Defs.' Ex. 18 (Bowers Dep. Tr.), at 121:7-10.

[99] Defs.' Ex. 18 (Bowers Dep. Tr.), at 37:1-13 (question concerned net income).

had a conflict of interest is misleading.[100] (5) Clinical practice is in itself not disqualifying, and the response to any conflict is to manage it.[101] In the same document Defendants cite, Dr. Robinson provides standards from IOM that acknowledge, "In some circumstances, a [guideline development group] may not be able to perform its work without members who have [conflicts of interest], such as relevant clinical specialists who receive a substantial portion of their incomes from services pertinent to the [clinical practice guideline]."[102] Footnote 63 is misleading as Dr. Robinson's statement continues: "the decision was made to adhere as much as possible to best practice for guideline development. To that end, disclosures are being collected now from SOC-8 members. The SOC8 chairs will review all forms and, as needed, bring any issues forward to the Board."[103] (6) Dr. Coleman did not use the phrase "most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest," as those words are attributable to defense counsel's question.[104] In Footnote 64, Dr. Coleman did not say "who was actively serving as an expert witness [to] advocate for language changes [in SOC-8] to strengthen his position in court," as those words are attributable to

---

[100] Defs.' Ex. 18 (Bowers Dep. Tr.), at 185:25-186:9 (countering assertion of a conflict).
[101] *Supra* note 93.
[102] Defs.' Ex. 166 (JHU 1), at 22; *see also* U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶¶ 15-16, 17; U.S. Ex. 7 (Goodman Rebuttal Rep.) ¶¶ 17, 19; Defs.' Ex. 18 (Bowers Dep. Tr.), at 185:25-186:6, 192:23-25; Defs.' Ex. 21 (Coleman Dep. Tr.), at 217:12-218:5.
[103] Defs.' Ex. 166 (JHU 1), at 1.
[104] Defs.' Ex. 21 (Coleman Dep. Tr.), at 230:17-23.

defense counsel's question.[105] (7) Defendants' implication that WPATH was hiding information from the public is incorrect.[106] In Footnote 65, while Dr. Coleman may have been unaware of any author removed from SOC-8 for a conflict of interest, Dr. Curlin's characterization that conflicts were not managed is false.[107]

     13.   <u>Disputed</u>. (1) Defendants' characterization of "boasted" is not supported by the evidence cited.[108] (2) Undisputed that WPATH described these steps regarding the development of SOC-8.[109] (3) Undisputed that chapter members graded recommendation statements based on the evidence.[110] However, Defendants omit that this occurred after chapter leads and members drafted recommendation statements: "[e]vidence-based recommendation statements were based on the results of the systematic, and background literature reviews plus consensus-based expert opinions," then the recommendation statements entered the Delphi process, and once they passed the Delphi process ("a structured solicitation of expert judgments in three rounds"), chapter members graded each statement.[111]

---

[105] Defs.' Ex. 21 (Coleman Dep. Tr.), at 158:17-22.
[106] Defs.' Ex. 21 (Coleman Dep. Tr.), at 209:10-210:11 (describing WPATH's transparency).
[107] *Supra* notes 102-103.
[108] Defs.' Ex. 116 (WPATH SOC-8), at S250 (WPATH explanation of its process); *see also* Defs.' Ex. 2 (Cantor Rept.) ¶¶ 44-45 (providing his description of GRADE).
[109] Defs.' Ex. 116 (WPATH SOC-8), at S249-50.
[110] Defs.' Ex. 116 (WPATH SOC-8), at S249-50.
[111] Defs.' Ex. 116 (WPATH SOC-8), at S250.

14. <u>Disputed</u>. (1) Defendants' suggestion that WPATH was misleading the public is false as Defendants themselves note (*see* Defs.' Mot. for Summ. J. Br. ¶ 13), SOC-8 acknowledges that its process was "adapted from" the GRADE framework, which indicates modifications were made.[112] (2) Disputed as to any implication that SOC-8 was not systematic at all, particularly given that WPATH noted there were alternative ways of developing guidelines that helped WPATH's methodology to evolve and improve.[113] (3) The implication that there was no additional consideration for whether to rely on systematic reviews for the mental health chapter in SOC-8 is false as evidence shows that Dr. Karasic asked Dr. Robinson for her views on a systematic review for the mental health chapter.[114] It is also a misrepresentation to use this quote to generalize about the entire SOC-8.[115] (4) The implication that by "abandoned," WPATH was hiding its approach is false as Defendants themselves note,[116] SOC-8 acknowledges that its process was one that was "adapted from" the GRADE framework that suggests some

---

[112] Defs.' Ex. 116 (WPATH SOC-8), at S250.

[113] Defs.' Ex. 190 (WPATH 17), at 7 (WPATH was "able to consult with other experts and was able to learn that there were other ways of developing guidelines that were probably more appropriate for the state of our science," and that "[a]s a result our methodology evolved and was improved.").

[114] Defs.' Ex. 24 (Karasic Dep. Tr.), at 90:22-92:9 (sharing recollection that Dr. Robinson's view was that a systematic review would not add anything to the chapter).

[115] *See* Defs.' Ex. 24 (Karasic Dep. Tr.), at 66:8-9 (noting that he did not know how other chapters in SOC-8 selected cited studies), 66:13-17 (stating he does not know the process for the other chapters).

[116] *See* Defs.' Mot. for Summ. J. Br. ¶ 13.

modifications were made.[117] (5) The characterization of "controversial treatment recommendations" is incorrect as the tenets of SOC-8 and the Endocrine Society guidelines are supported by leading medical bodies.[118] Footnote 73 is misleading as, again, SOC-8 acknowledges that its process was "adapted from" the GRADE framework and Defendants cite no evidence that WPATH intended to deceive the public.[119] The citation to Defendants' Exhibit 118 (Baker *Hormone Therapy*), omits important context of risk/benefit: "No study found that hormone therapy decreased [quality of life] scores," and "[w]e conclude that hormone therapy may improve [quality of life] among transgender people," and WPATH did not hide evidence as that review is listed in the references for SOC-8.[120] (6) The full quote is: "*My understanding* is that a global consensus on 'puberty blockers' does not exist."[121] Defendants omit the response: "My point was I think all of us are (generally) in agreement regarding the value of blockers."[122] It is impossible to know what the author meant by "global consensus" considering that health care delivery systems differ across the globe. The statement is also immaterial as an

---

[117] *See, e.g.*, Defs.' Ex. 116 (WPATH SOC-8), at S46 ("Despite the slowly growing body of evidence supporting the effectiveness of early medical intervention, the number of studies is still low, and there are few outcome studies that follow youth into adulthood. Therefore, a systematic review regarding outcomes of treatment in adolescents is not possible. A short narrative review is provided instead."), S250.
[118] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 12.
[119] Defs.' Ex. 116 (WPATH SOC-8), at S250.
[120] Defs.' Ex. 116 (WPATH SOC-8), at S182.
[121] Defs.' Ex. 180 (WPATH 7), at 63 (emphasis added).
[122] Defs.' Ex. 180 (WPATH 7), at 63.

individual WPATH member's statements do not speak for the organization as a

whole. (7) This quote lacks context as part of Dr. Bowers' concern over puberty

blockade at Tanner Stage 2 appears to be that there is insufficient tissue for gender-

affirming surgery later if desired in the future.[123] (8) It is false to imply that there is

a lack of evidence supporting the use of puberty blockers when indicated to treat

gender dysphoria.[124]

15.    <u>Disputed and Immaterial</u>. Immaterial in its entirety because

Defendants describe eunuchs as "men," and medical care for adults is not at issue

in this case. (1) Defendants' characterization of the SOC-8's development as an

"unscientific" enterprise and claim that WPATH was aiming to "drive home" that

proposition are false.[125] (2) Undisputed that Dr. Coleman admitted the lack of

diagnostic criteria, classification, or medical test for determining eunuchs.[126] (3)

Disputed to the extent Defendants imply that other board members did not read the

eunuch chapter before approval; the cited portion of Dr. Bowers' deposition

transcript only refers to her actions and is silent to that of other board members.[127]

---

[123] Defs.' Ex. 18 (Bowers Dep. Tr.), at 58:11-59:24.
[124] *See, e.g.*, U.S. Ex. 5 (Shumer Rep.) § IV ¶ 5 (SOC-8 represents "expert consensus for clinicians related to medical care for transgender people, based on the best available science and clinical experience.").
[125] *See, e.g.*, U.S. Ex. 5 (Shumer Rep.) § IV ¶ 5 (describing SOC-8 as representing "expert consensus for clinicians related to medical care for transgender people, based on the best available science and clinical experience").
[126] Defs.' Ex. 21 (Coleman Dep. Tr.), at 172:19-173:25.
[127] Defs.' Ex. 18 (Bowers Dep. Tr.), at 147:9-148:4.

(4) Defendants' implication that castration is recommended based on desire alone is a misrepresentation because while Dr. Coleman did make the statement quoted in Footnote 80, he also noted the role of "careful[] evaluat[ion]" and a "persistent desire" regarding the question of medical necessity.[128]

16.   <u>Disputed and Immaterial</u>. Immaterial in its entirety because systematic reviews do not provide treatment recommendations, the statements at issue relate to evidence reviews on surgical interventions that are not at issue in this case, and WPATH's policies on seeking permission to utilize data from the SOC-8 process are not relevant to this case. (1) Disputed as Defendants appear to attribute to all SOC-8 authors the deposition testimony from a single person, Dr. Bowers, who participated but did not organize, create, or lead any part of the guidelines.[129] The only chapter of the guidelines Dr. Bowers was directly involved in was the surgery chapter,[130] which is irrelevant to this case. Dr. Bowers made clear during her deposition that she was not the correct person to answer questions about how the WPATH chapter authors utilized information from Johns Hopkins University's review or any alleged limitations placed on the use of the review, as it was the chapter leads and principal authors—not Dr. Bowers—that made decisions

---

[128] Defs.' Ex. 21 (Coleman Dep. Tr.), at 174:13-175:13.
[129] Defs.' Ex. 18 (Bowers Dep. Tr.), at 165:15-23; 172:22-173:6, 173:15-19, 177:14-19 (noting it would be speculation to ask her about how the final chapter evolved or how the methodology was designed).
[130] Defs.' Ex. 18 (Bowers Dep. Tr.), at 173:21-174:7.

regarding the review.[131] Testimony from the chapter lead for the mental health chapter also contradicts Defendants' statement: while Dr. Karasic believed that systematic reviews might be helpful for some chapters of SOC-8 and consulted with Dr. Robinson from Johns Hopkins University on its review of the literature for the mental health chapter, ultimately the Johns Hopkins University team did not recommend conducting a systematic review for the statements of recommendation in the mental health chapter.[132] Footnote 81's implication that the 2018 review was all Dr. Bowers "relied on" in forming her position is a misrepresentation.[133] (2)-(3) The email thread Defendants cite to support these broad statements is very specific in that it pertains to a question of whether there was a potential overlapping review regarding "surgical affirmation for adolescents who have initiated puberty."[134] The response that there is "little to no evidence about children and adolescents" was in the context of that review, which is unsurprising given that surgery is rare for minors for gender dysphoria. The suggestion in Footnote 83 that the WHO's statement about gender-affirming care at large is equivalent or similar to that made in the cited email exchange is thus incorrect. (4) The quote is referring to reviews on surgery.[135] (5) The United States stands by its assertion that the "overwhelming

---

[131] Defs.' Ex. 18 (Bowers Dep. Tr.), at 174:8-16, 183:16-25, 184:4-12.
[132] Defs.' Ex. 24 (Karasic Dep. Tr.), at 54:20-57:6, 90:22-94:24.
[133] Defs.' Ex. 24 (Karasic Dep. Tr.), at 292:9-1293:10.
[134] Defs.' Ex. 173 (HHS 5), at 25 (HHS-0153487).
[135] Defs.' Ex. 173 (HHS 5), at 25 (HHS-0153487).

evidence" establishes that medical gender-affirming care directly and substantially improves the physical and psychological wellbeing of transgender adolescents with gender dysphoria.[136] Again, Defendants rely on an email exchange concerning reviews on surgery.

17.   <u>Disputed and Immaterial</u>. Immaterial in its entirety because systematic reviews do not provide treatment recommendations, and because WPATH's policies on seeking permission to utilize data from the SOC-8 process are not relevant to the outcome of this case. (1) Undisputed that this is a quote from the cited email. (2) Defendants mischaracterize the cited correspondence as it did not "reject" the request for publication, but instead "request[ed] that the 2 manuscripts are put on 'on hold' for submission until [WPATH and Johns Hopkins University] are able to meet" and provided details on the process for requesting the use of WPATH data.[137] The correspondence provided that the reason for the "on hold" request was solely due to failure to adhere to WPATH's policy on using SOC-8 data and noted that WPATH's team had already discussed how to "address[] these issues in order for the two papers to be ready for submission.[138] (3) Undisputed, but for context, the requirement of involving at least one member of the transgender community in the design, drafting of the article, and the final approval of the

---

[136] *See, e.g.*, U.S. Ex. 5 (Shumer Rep.) §§ II ¶ 1, IV ¶ 1.
[137] Defs.' Ex. 167 (JHU 2), at 86-88.
[138] Defs.' Ex. 167 (JHU 2), at 86-88.

article was based on "[t]he need of patient involvement in transgender healthcare research."[139] (4) The quoted language comes from a separate letter addressed to all "SOC8 Working Group Members" regarding an update to the Policies and Procedures on WPATH SOC-8 data, not the above correspondence addressed to Johns Hopkins University about their request to publish. Footnote 89 is disputed to the extent Defendants represent, without support, that the two cited published articles corresponded to two separate "systematic reviews." Again, the United States stands by its assertion that WPATH and the Endocrine Society publish "evidence-based practice guidelines" that reflect "the consensus of the medical communities on the appropriate treatment for gender dysphoria."[140]

18.   <u>Disputed and Immaterial</u>. Immaterial in its entirety because systematic reviews do not provide treatment recommendations, and because the legal review process WPATH used is not relevant to the outcome of this case. (1) Disputed that WPATH "scuttled" the evidence reviews, *see supra* Response to Fact 16, and disputed that "advocacy concerns animated the drafting of SOC 8." Dr. Coleman, chair of the SOC-8 project for WPATH, explained that the list of co-authors for SOC-8 was longer than on any previous version due to a decision to "have a much more transparent process and to invite anyone to apply for membership in—in the

---

[139] Defs.' Ex. 167 (JHU 2), at 76-77, 82.
[140] *See, e.g.*, U.S. Ex. 5 (Shumer Rep.) § IV; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 12.

committee" and "this was an effort to really make sure that we—we had a much more wider representation of people."[141] Dr. Coleman testified that while some in this large group may have voiced preferences for a multitude of reasons, including effects on law and policy, "no one individual would be able to dictate" the outcome or "be able to be held sway in the process" because of the rigorous methodology and checks and balances, the subsequent Delphi process involving all committee members, and the public comment period.[142] He continued that "some individuals might have wanted certain things for whatever reasons, but we always stuck to the science, and stuck to a consensus process in arriving at the final recommendations," that WPATH's goal was to be apolitical, and that the guidelines were "based on the best available evidence" and "not written for U.S. courts or U.S. health care systems."[143] (2) Defendants characterize the motivations of authors without support. This entire claim—that systematic reviews were not sought because "they wouldn't have to report the result" and that the view expressed in the quote influenced or reflects SOC-8—is pure speculation and inconsistent with testimony of those who participated in SOC-8's drafting.[144] (3) This selective quotation leaves out important context, including the email author's

---

[141] Defs.' Ex. 21 (Coleman Dep. Tr.), at 31:3-31:20.
[142] Defs.' Ex. 21 (Coleman Dep. Tr.), at 155:10-156:14.
[143] Defs.' Ex. 21 (Coleman Dep. Tr.), at 156:15-157:20.
[144] Defs.' Ex. 21 (Coleman Dep. Tr.), at 155:10-157:20.

assertion that "My specific concern is that this type of language (insufficient evidence, limited data, etc . . .) will empower these groups and *reinforce their erroneous assertions*."[145] The email does not indicate whether the sender is an author of a particular guideline. Defendants' assertion that this statement influenced or reflects SOC-8 is pure speculation. (4) Disputed to the extent this statement characterizes WPATH's motivations ("WPATH seemed to have similar concerns"). Admitted that the cited document (Defs.' Ex. 116:S177) lists acknowledgements including "Legal Perspectives: Jennifer Levi and Phil Duran." Disputed that this acknowledgement supports the conclusion that "WPATH engaged a legal review team." Disputed that the second cited document (Defs.' Ex. 184:14) listed the organizations "as possibilities to review SOC8." Instead that document, an WPATH executive committee agenda, lists—without further context—an agenda item titled "Legal Review – discuss where this will go (ideas; ACLU, TLDEF, Lambda Legal, [redacted]." The email cited in Footnote 92 (which appears at page 151, not 152) does not indicate whether the email author is an SOC-8 author, nor does it state that the review would be done by "legal activists" or that such practice was "anomalous."

19.   <u>Disputed and Immaterial</u>. Immaterial in its entirety because this paragraph concerns guidelines and clinical practice on gender transitioning

---

[145] Defs.' Ex. 184 (WPATH 11), at 55 (emphasis added).

surgery, which is not at issue here and thus has no bearing on the outcome of this case. (1) Disputed as Defendants cite no evidence and the subsequent sentences do not support this contention. (2) Defendants' characterization of a "disagreement" with the underlying Report is inaccurate. In the same email confirming its endorsement of the Report, WPATH "make[s] a caveat . . . that although the responses are correct from an academic point of view," with respect to gender-affirming surgery, "real-life clinical practice" differs.[146] (3) Defendants misrepresent the email, which makes no mention or suggestion of omitting facts about gender-affirming surgeries.[147] (4) Defendants' characterization is pure speculation as Defendants and their cited expert report contain no actual knowledge of WPATH's state of mind. WPATH confirmed that the Report is "correct from an academic point of view" and "clearly points out the arguments as to why gender affirming care is vital to the lives of" transgender people.[148]

20.    <u>Disputed and Immaterial</u>. Immaterial to the extent this paragraph and evidence cited concern adults and treatments not at issue in this case and thus have no bearing on its outcome. (1) Defendants cite no evidence as to the authors' state of mind. SOC-8 does not label "embodiment goal" as "medically necessary."[149]

---

[146] Defs.' Ex. 184 (WPATH 11), at 50.
[147] Defs.' Ex. 184 (WPATH 11), at 49.
[148] Defs.' Ex. 184 (WPATH 11), at 49-52.
[149] Defs.' Ex. 116 (SOC-8), at S16-18.

SOC-8 does not itself assign "medically necessary" as that determination is based on an individualized assessment.[150] Instead it explains that the "common definition of medical necessity" is a "[h]ealth care service[] that a physician and/or health care professional, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate . . . for the patient's illness, injury, or disease; and (c) not primarily for the [patient or provider's] convenience . . . and not more costly than an alternative service . . . at least as likely to produce equivalent [results for] that patient's illness, injury or disease."[151] (2) SOC-8 does not assign "medical necessity" but instead lists interventions that would be such "as appropriate for the patient and based on a review of the patient's individual circumstances and needs."[152] (3) Disputed to the extent Defendants assert this quotation, which is a response to another comment about pathologizing gender, supports the claim that SOC-8 assigns "medical necessity," which it does not.[153]

21.     <u>Disputed and Immaterial</u>. Immaterial in its entirety because this paragraph concerns the WPATH guideline recommendations on gender

---

[150] Defs.' Ex. 116 (SOC-8), at S16-18.
[151] Defs.' Ex. 116 (SOC-8), at S16-18.
[152] Defs.' Ex. 116 (SOC-8), at S18.
[153] Defs.' Ex. 116 (SOC-8), at S16-18.

transitioning surgery, which is not at issue here and thus has no bearing on the outcome of this case. (1) Defendants cite no evidence, and it is unclear who and what "outside political actors" and "exercised influence" refer to. (2) These quotations, including in Footnote 100, are not from Admiral Levine and thus cannot be properly attributed to her. The evidence does not show Admiral Levine "met regularly" with WPATH as some citations refer to the same meetings. (3) The email cited makes no reference to Admiral Levine or "exclusive access to the near-final draft" and the Footnote 102 quotation is not from Admiral Levine and thus cannot be properly attributed to her. The inference that a recommendation to remove age minimums was related to "a barrier to optimal political progress" mischaracterizes the evidence. Dr. Bowers testified that removing age minimums was the "more conservative" approach that avoided "enabl[ing] patients to feel that they were entitled to surgery when they met a minimum threshold for age."[154] (4) Disputed to the extent Defendants suggest WPATH leaders were unified in opposing or having these concerns.[155] (5) Disputed to the extent the quote is attributed to anyone besides Dr. Bowers. Dr. Bowers also testified that she disagrees with the contention that SOC-8 was developed in a way to grant insurance coverage.[156] (6) The evidence cited does not support an inference of

---

[154] Defs.' Ex. 18 (Bowers Dep. Tr.), at 210:8-24, 305:12-306:10.
[155] Defs.' Ex. 186 (WPATH 13), at 31-33.
[156] Defs.' Ex. 18 (Bowers Dep. Tr.), at 128:7-21, 130:4-20.

disagreement with removing age minimums. In context, the quote may be read as

agreeing with one of the reasons why some members supported removing age

minimums—"politics" could refer to "political attacks" on gender-affirming care.

(7) Disputed to the extent the term "politics" is being attributed to Admiral Levine

or the United States government. The evidence cited describes "politics" as

"political attacks on access" and "laws that go against the SOC."[157] (8) The

evidence cited makes no reference to "SOC-8's consensus process" and the

parenthetical quote is inaccurate. The citation states that "the recommendations for

minimal ages . . . are consensus-based," and that the evidence was "expert

opinion."[158] (9) There is no indication the evidence cited was a communication to

Admiral Levine. Sender and recipient information on the email is redacted. (10)

Disputed as to the inference of a sequence of events. The evidence cited refers to

meetings dated one month after the email cited above, and there is no indication

the email was sent to Admiral Levine.

22.   <u>Disputed and Immaterial.</u> (1) Disputed to the extent that Defendants

frame AAP's request as unmotivated by scientific considerations.[159] More

---

[157] Defs.' Ex. 186 (WPATH 13), at 32.
[158] Defs.' Ex. 186 (WPATH 13), at 17, 57; ███████████████████████
████████████████████████████████████████████████████ .
[159] *See* Defs.' Ex. 187 (WPATH 14), at 13 ("AAP experts agree SOC 8 lacks the evidence to
justify the recommended surgery ages," noting that "there are some portions of the final version
that raise concerns for our clinical experts."), 14 (noting that "AAP and WPATH share a
common goal in ensuring that gender-affirming care is accessible and evidence-based" and

generally, a number of the specific comments that AAP offered regarding the

SOC-8 draft (about a range of topics, not just surgery) referenced the literature.[160]

Dr. Coleman did not state that AAP was "not going to support SOC-8 if it

contained minimum ages for surgeries." That language came from Defendants'

counsel. Dr. Coleman responded, "They had that concern and they had a few other

concerns."[161] This fact is also immaterial as this discussion concerns age

recommendations for gender-affirming surgeries, which are not at issue in this

litigation. (2) Disputed to the extent that Defendants are imputing individual

WPATH members' views about AAP expressed in a few select emails on the entire

WPATH organization. While WPATH members in the email exchanges expressed

unhappiness and critique of the AAP suggestions, clearly WPATH took AAP

seriously.[162] Also the quote presented in Footnote 111 is slightly inaccurate. The

email states, "As far as I can *see* they are asking for us to remove anything that it

---

requesting "the opportunity for our subject-matter experts to meet with you to discuss these important matters").

[160] ███████████████████████████████████████████████████

[161] Defs.' Ex. 21 (Coleman Dep. Tr.), at 292:3-9.

[162] Defs.' Ex. 21 (Coleman Dep. Tr.), at 290:12-20 ("What happened is that we had received communication from AAP, and that caused us to, once again, listen to – listen to people, this checks and balances, always listening to dissenting opinion and go back to our evidence and make a decision. And in some cases, based upon sound feedback, we made a – we made decisions to either change things or disagree and stick with what we had decided before.").

does not fit into their narrative, most of this is part of the introduction in the chapter."[163] The articles cited in Footnote 111 are general critiques of the AAP or AAP guidelines and are unrelated to the specific sequence of events described by Defendants.[164] The conjecture that "WPATH leaders saw the political threat" is also disputed.[165] (3) Dr. Coleman did not write the words quoted; the quoted email was authored by someone else.[166] (4) Immaterial to the extent these exchanges describe WPATH's actions regarding age recommendations for gender-affirming surgeries, which are not at issue in this case. While the changes regarding ages did not go through the Delphi process, this assertion lacks important context.[167] (5) Defendants' framing around getting on the same page leaves out context. For example, in Footnote 115, Dr. Bowers is quoted about the need to speak as a cohesive voice, but Defendants omit the rest of the quote, which illuminates the context of the situation—WPATH was fielding inquiries from the press, and WPATH was trying to respond. The entire quote reads, "[I] do think we need to speak more as a cohesive voice. [C]lamming up to the media is not a healthy

---

[163] Defs.' Ex. 187 (WPATH 14), at 100 (emphasis added).
[164] *See* Defs.' Exs. 120 (Sibarium *Hijacking*), 121 (Mason *Dubious Science*), 122 (Ghorayshi *Research Review*).
[165] *See* Defs.' Ex. 18 (Bowers Dep. Tr.), at 233:15-21 (stating, "it wasn't a threat. I didn't perceive it as a threat" when asked about the AAP's possible opposition to SOC-8 over age minimums).
[166] █████████████████████████████████████████████████
[167] *See* Defs.' Ex. 18 (Bowers Dep. Tr.), at 236:4-10 ("[B]y moving to a more conservative position rather than a more aggressive reduction of the age criteria, . . . it wouldn't have made sense to go through the Delphi process and delay the release of the SOC-8 even further.").

response and invites suspicion."[168] (6) Defendants' implication that WPATH's public explanation was deceptive is false. Dr. Bowers said, "there is no shame in our removal of the age minimums" and urged transparency—"clamming up to the media is not a healthy response and invites suspicion."[169] (7) Defendants' assertion that "the change was purely political" is pure conjecture. Evidence in the record suggests that WPATH took the feedback and decided to adopt a less aggressive position consistent with what was already established in SOC-7.[170] Whether or not AAP would have endorsed SOC-8 without the surgery age minimums removed is immaterial to the issues in this case.

23.     <u>Disputed and Immaterial</u>. (1) By its own wording ("could be because") Defendants' statement is pure conjecture. Defendants offer no evidence to support the assertion that WPATH leaders view any inquiry as an "attack," and instead only cites secondhand views of an expert witness whose own qualifications and expertise are being currently challenged in this Court.[171] In fact, despite being viewed as "controversial" at the time and despite the unhappiness of WPATH colleagues, Dr. Coleman invited Dr. Ken Zucker to be a part of SOC-8.[172] Dr. Coleman testified that he "certainly respected his input," regarding Dr. Zucker.[173]

---

[168] Defs.' Ex. 188 (WPATH 15), at 113.
[169] Defs.' Ex. 188 (WPATH 15), at 113.
[170] *See* Defs.' Ex. 18 (Bowers Dep. Tr.), at 242:7-12.
[171] *See* Br. In Support of U.S. Motion to Exclude Testimony, ECF No. 591 at VIII.
[172] Defs.' Ex. 21 (Coleman Dep. Tr.), at 130:19-133:3.
[173] Defs.' Ex. 21 (Coleman Dep. Tr.), at 132:11-133:3.

WPATH provided anti-WPATH "de-transitioners" the opportunity to speak.[174]

Disputed that there is a "lack of transparency" by WPATH.[175] (2) The statement by

Dr. Coleman is presented missing context.[176] First, these are not the only items on

Dr. Coleman's list (*e.g.*, referencing "well-funded advocacy organizations" whose

"sole aim is to limit access to trans health care" and "a burgeoning demand for

transgender health care with concomitant increase in access to health care," among

others).[177] Second, the statement also omits context from the same document that

sheds light on why WPATH views "pressure" to provide "evidence-based care" as

an attack—because it is imposing a standard on gender-affirming medical care that

is impossible to meet. Dr. Coleman states that "while we value clinical expertise,

the battle for legitimacy is being fought in controlled studies," and "yet double-

blind studies are often ethically inappropriate and never mind the costs of such

research making the gold standard evidence based medicine impossible."[178] Also,

---

[174] Defs.' Ex. 24 (Karasic Dep. Tr.), at 193:9-17 ("But we were really trying to have a diverse set of viewpoints at WPATH and at the conference, including, for example, a session of de-transitioners, who were quite anti-WPATH, having the opportunity to speak at the conference as well. And I think we kind of prided ourselves on at least trying to provide kind of a diversity of viewpoints and to allow them to be discussed in an open environment.").

[175] *But see* Defs.' Ex. 188 (WPATH 15), at 113 (Dr. Bowers stating that "clamming up to the media is not a healthy response and invites suspicion"); Defs.' Ex. 18 (Bowers Dep. Tr.), at 277:23-25 ("My inclination is always to be transparent, and I like to talk to everyone.").

[176] Defs.' Ex. 190 (WPATH 17), at 5.

[177] Defs.' Ex. 190 (WPATH 17), at 5.

[178] Defs.' Ex. 190 (WPATH 17), at 5; *see also* U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 15 ("While randomized control trials are an excellent study design in some contexts, for many complex medical problems RCTs are not feasible and/or are not ethical. If the only medicine practiced was that based on results of RCTs, the list of treatable medical conditions would be extremely short.").

what WPATH did or did not view as an "attack" is immaterial to this case. (3)

Defendants provide no evidence to support the proposition that SOC-8 rejected the

standards of "evidence-based care," nor do they provide a definition for the term.

24.   <u>Disputed and Immaterial</u>. (1) The manner in which WPATH or

USPATH wishes to govern the conduct of their members is immaterial to the

issues in this case. Disputed that WPATH sought to "prevent its own members

from raising concerns publicly." First, the censure of Dr. Anderson concerns

USPATH, which as Dr. Bowers notes in her deposition, is an independent

subsidiary of WPATH.[179] USPATH does not fall under WPATH's jurisdiction;

USPATH operates independently and there is nothing for which USPATH has to

seek WPATH approval.[180] Second, WPATH never sought to prevent members

from raising concerns publicly, it only asked for concerns to be raised in an

appropriate forum (e.g., scientific publications and conferences).[181] Additionally,

Dr. Bowers testified that the executive committee did not agree with censuring Dr.

Anderson, and that those concerns were raised with USPATH.[182] Also, despite

being viewed as "controversial" at the time and despite the unhappiness of

WPATH colleagues, Dr. Coleman invited Dr. Ken Zucker to be a part of SOC-8

---

[179] Defs.' Ex. 18 (Bowers Dep. Tr.), at 46:1-2.
[180] Defs.' Ex. 18 (Bowers Dep. Tr.), at 45:25-46:16, 46:20-25, 47:1-5.
[181] ███████████████████████
[182] Defs.' Ex. 18 (Bowers Dep. Tr.), at 280:24-281:5.

and testified that he "certainly respected [Dr. Zucker's] input."[183] (2) Immaterial as USPATH's cancellation of a panel at a conference has no bearing on the outcome of this case. Defendants omit context of the events leading up to the cancellation of a second Zucker panel. Shortly before the conference, Dr. Zucker had appeared on a documentary and compared transgender youth to dogs ("If your child said he were a dog, would you feed him dog food?").[184] The individual who interrupted the first panel Dr. Zucker was on was not a member of WPATH, and most protesters at Dr. Zucker's panel were not WPATH members.[185] Dr. Zucker did conduct his presentation at the first panel.[186] Dr. Zucker's second presentation was cancelled due to safety concerns.[187] Dr. Zucker presented at the next WPATH conference a few months later in Serbia.[188] Also, the "careful and serious researcher" quote in Footnote 120 were the words of Defendants' counsel, not Dr. Coleman.[189] (3) Debate around how or when organization members speak to the lay media is immaterial and has no bearing on the issues in this case. While USPATH did send Dr. Erica Anderson a letter of reprimand after her comments to the media, Defendants omit context. According to the letter of reprimand, the USPATH board

---

[183] Defs.' Ex. 21 (Coleman Dep. Tr.), at 130:19-133:3.
[184] Defs.' Ex. 24 (Karasic Dep. Tr.), at 186:12-187:21.
[185] Defs.' Ex. 24 (Karasic Dep. Tr.), at 187:23-188:5; Defs.' Ex. 178 (WPATH 5), at 22.
[186] Defs.' Ex. 24 (Karasic Dep. Tr.), at 188:22-23; 189:20-25.
[187] Defs.' Ex. 24 (Karasic Dep. Tr.), at 191:8-192:22 (mention of threat received).
[188] Defs.' Ex. 24 (Karasic Dep. Tr.), at 204:20-23.
[189] Defs.' Ex. 21 (Coleman Dep. Tr.), at 29:8-11.

expressed concern that at "no point" during her tenure as President-Elect or President of WPATH did she initiate a dialogue about her concerns, nor did she propose to discuss the matter at the 2021 USPATH conference.[190] The letter noted that according to a search, Dr. Anderson had not written publications or editorials in peer-reviewed literature, nor had she been an investigator or co-investigator on research regarding the care of transgender youth.[191] The letter stated that Dr. Anderson's actions "sidestep and politicize the scientific process and demonstrate poor judgment in the discharge of your role as Board President."[192] (4) USPATH and WPATH's views regarding the appropriate forum for discussions regarding gender-affirming medical care are immaterial to the issues in this case. Defendants' characterization is disputed to the extent they suggest that WPATH stated an opposition to open discourse about gender-affirming care.

---

[190] Defs.' Ex. 176 (WPATH 3), at 113-14.
[191] Defs.' Ex. 176 (WPATH 3), at 113-14.
[192] Defs.' Ex. 176 (WPATH 3), at 114.

████████████████████████████████████████████

████████████████████████████████████████████

████████ [193] Furthermore, WPATH provided anti-WPATH "de-transitioners"

the opportunity to speak at their conference.[194] (5) Dr. Bowers' thoughts on how

WPATH or scientists more broadly should engage the media is immaterial to the

issues in this case. The quote from Dr. Bowers' deposition lacks proper context.[195]

In the discussion surrounding that quote, Dr. Bowers explained that "internal

discussion leads to better recommendations because you get clarity," and that you

"get independent viewpoints," "discussion," "nuanced shifts . . . in protocols," and

"clinical information that's introduced."[196] Dr. Bowers then stated, "And the—the

public—shouldn't and—and doesn't need to sort through all of that, any more than

it needs to sort through debates and the treatment of diabetes or cancer or other

areas of medicine."[197]

---

[193] ████████████████████████

[194] Defs.' Ex. 24 (Karasic Dep. Tr.), at 193:9-17 ("But we were really trying to have a diverse set of viewpoints at WPATH and at the conference, including, for example, a session of de-transitioners, who were quite anti-WPATH, having the opportunity to speak at the conference as well. And I think we kind of prided ourselves on at least trying to provide kind of a diversity of viewpoints and to allow them to be discussed in an open environment.").

[195] Defs.' Ex. 18 (Bowers Dep. Tr.), at 287:18-19.

[196] Defs.' Ex. 18 (Bowers Dep. Tr.), at 287:13-17.

[197] Defs.' Ex. 18 (Bowers Dep. Tr.), at 287:18-22.

25. <u>Disputed</u>. (1) Defendants' statement cites no evidence and it is unclear what "result" Defendants are referring to.[198] The claim that WPATH prioritizes ideology over patient welfare is pure conjecture. (2) Disputed to the extent that Defendants attempt to use Dr. Laura Edwards-Leeper's quote to undermine SOC-8, when in fact Dr. Edwards-Leeper has expressed support for SOC-8.[199] (3) Disputed as this is not a fact; it is a claim by Defendants' expert, Dr. Nangia. The United States is currently challenging her qualifications as an expert witness in this case.[200]

### C.   The Banned Treatments Do Not Harm Minors in Alabama.

26. <u>Disputed and Immaterial</u>. (1) Immaterial because the population of gender dysphoric youth and their diagnoses of gender dysphoria have no bearing on the outcome of this case. In fact, Defendants conceded at the preliminary injunction hearing in this case that the issue is with treatment of gender dysphoria, not the diagnosis itself.[201] Undisputed to the extent that WPATH recognizes in SOC-8 that that there has been a sharp increase in the number of adolescents

---

[198] *But see* U.S. Ex. 5 (Shumer Rep.) § IV ¶ 5 ("WPATH has been recognized as the standard-setting organization for the treatment of gender dysphoria since its founding in 1979. The most recent WPATH Standards of Care (SOC version 8) were published in 2022 and represent expert consensus for clinicians related to medical care for transgender people, based on the best available science and clinical experience.").

[199] Defs.' Ex. 176 (WPATH 3), at 154 ("Given that we are both incredibly supportive of WPATH and the SOC, we were sure to make one of our main points in the [Washington Post op-ed] article be that providers should be following the WPATH SOC.").

[200] Br. In Support of U.S. Motion to Exclude Testimony, ECF No. 591 at VIII.

[201] Prelim. Inj. Hr'g Tr. Vol. II, ECF No. 105 at 292:25-293:15.

requesting gender care in recent years.[202] Disputed to the extent this fact asserts

that the actual population of gender dysphoric youth has changed. While the

population of youth *presenting for treatment* may have changed in recent years,

that does not speak to whether the characteristics of the youth gender dysphoric

population itself has changed.[203] (2) Disputed to the extent this fact makes no

distinction between children exploring their gender identity and adolescents who

are less likely to detransition.[204] As Dr. Shumer noted in his report, data and

personal experience show that children whose gender dysphoria persists into

adolescence are highly likely to be transgender.[205] S.B. 184's legislative findings

misinterpret older studies showing that a large percentage of children diagnosed

with gender identity disorder did not grow up to be transgender.[206] Those studies

include children who would not fulfill the diagnostic criteria for gender dysphoria,

and in any case, have no relevance to S.B. 184 because no medications are

prescribed to prepubertal children.[207] Immaterial because these irrelevant studies

have no bearing on the outcome of this case. (3) Disputed because the concept of

"rapid onset gender dysphoria" has been thoroughly discredited. In 2018, Dr. Lisa

---

[202] Defs.' Ex. 116 (WPATH SOC-8), at S43.
[203] Defs.' Ex. 39 (Shumer Dep. Tr.), at 250:21-251:9; *see also* U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 34-35.
[204] U.S. Ex. 11 (McNamara Rep.), at 23; ███████████████████████████████.
[205] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 11.
[206] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 11.
[207] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 11.

Littman published a now-discredited study that contended a novel pathology, "rapid-onset gender dysphoria," was leading teenagers to claim a transgender identity because of peer influence.[208] As a number of experts and researchers have noted, however, Dr. Littman's study suffers from serious methodological errors, including the use of parent reports instead of clinical data and the recruitment of its sample of parents from anti-transgender websites.[209] The journal of publication required an extensive correction of the original Littman article because of its misstatements.[210] Dr. Littman's hypothesis that rapid-onset gender dysphoria exists as a distinct condition has not been supported by studies of clinical data.[211] Neither the American Psychiatric Association nor any other reputable professional organization has recognized rapid-onset gender dysphoria as a distinct clinical condition or diagnosis.[212] Although Dr. Littman's hypothesis has been widely covered in the press, no clinical studies have found that rapid-onset gender dysphoria exists.[213] For example, an April 2022 study of 173 youth presenting at Canadian gender clinics found no evidence of rapid-onset gender dysphoria or

---

[208] U.S. Ex. 11 (McNamara Rep.), at 24.

[209] U.S. Ex. 11 (McNamara Rep.), at 24; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 35; U.S. Ex. 30 (Kaliebe Dep. Tr.), at 169:22-170:5; U.S. Ex. 28 (Hruz Dep. Tr.), at 139:19-141:8.

[210] U.S. Ex. 11 (McNamara Rep.), at 24; *see also* Defs.' Ex. 116 (WPATH SOC-8), at S45.

[211] U.S. Ex. 11 (McNamara Rep.), at 24; *see also* U.S. Ex. 9 (Karasic Rebuttal Rep.) ¶¶ 52-57; U.S. Ex. 30 (Kaliebe Dep. Tr.), at 150:4-151:8; Defs.' Ex. 116 (WPATH SOC-8), at S45.

[212] U.S. Ex. 11 (McNamara Rep.), at 24; U.S. Ex. 30 (Kaliebe Dep. Tr.), at 147:8-148:21; U.S. Ex. 23 (Cantor Dep. Tr.), at 78:11-79:19.

[213] U.S. Ex. 11 (McNamara Rep.), at 24; U.S. Ex. 23 (Cantor Dep. Tr.), at 70:5-74:22 (follow-up study to Littman was retracted by the Archives for Sexual Behavior).

social contagion.[214] No professional organization has recognized "rapid-onset gender dysphoria" as a distinct clinical condition or diagnosis.[215] Further, there is no reason why the rates of transmasculine people and transfeminine people would be equal.[216] It makes sense for those rates to change over time as cultural attitudes toward transmasculine people and transfeminine people change.[217] As Dr. Shumer noted, adolescence is a common time for transmasculine people to present to care due to the onset of breast development and menstruation.[218] Nonetheless, as one anecdotal example, Dr. Ladinsky testified in her deposition that in 2022, as in previous years, the population of patients at the UAB Clinic was approximately 50/50 in terms of sex assigned at birth.[219] Immaterial because the discredited concept of rapid-onset gender dysphoria has no bearing on the outcome of this case. (4) Undisputed that WPATH recognizes that there is an "increasing number" of adolescents seeking gender-affirming care who had not experienced or expressed gender dysphoria in childhood.[220] Disputed that the "thousands of percent" figure cited by Defendants is accurate or has been validated, particularly given that Dr. Littman's hypothesis has not been supported by studies of clinical

---

[214] U.S. Ex. 11 (McNamara Rep.), at 24.
[215] U.S. Ex. 11 (McNamara Rep.), at 24.
[216] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 35.
[217] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 35.
[218] U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 35.
[219] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 30:5-15.
[220] Defs.' Ex. 116 (WPATH SOC-8), at S45.

data and no clinical studies have found that rapid-onset gender dysphoria exists.[221]

Immaterial because the population of gender dysphoric youth and their diagnoses

have no bearing on the outcome of this case. (5) Undisputed to the extent that

WPATH recognizes in SOC-8 that "[f]or a select subgroup of young people,

susceptibility to social influence impacting gender may be an important differential

to consider."[222] Disputed to the extent the research on rapid-onset gender dysphoria

has not been validated.[223] Immaterial because the population of gender dysphoric

youth and their diagnoses have no bearing on the outcome of this case. (6)

Disputed that WPATH's description of rapid-onset gender dysphoria in SOC-8

could be characterized as an "attack."[224] Defendants' suggestion of a WPATH

member's disagreement is not supported by the full quote that they did not include

and that reflects the WPATH member did not agree with the concept of rapid-onset

gender dysphoria or social contagion: "We cannot outright dismiss the fact that

social factors (also don't like the word contagion) impact identity development and

decision making in adolescents."[225] Immaterial because the population of gender

dysphoric youth and their diagnoses have no bearing on the outcome of this case.

(7) Disputed to the extent that this fact suggests a gender dysphoria diagnosis in

---

[221] U.S. Ex. 11 (McNamara Rep.), at 24.
[222] Defs.' Ex. 116 (WPATH SOC-8), at S45.
[223] *Supra* notes 209-215.
[224] Defs.' Ex. 116 (WPATH SOC-8), at S45.
[225] Defs.' Ex. 179 (WPATH 6), at 40.

adolescence is any less valid than a diagnosis in childhood. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ [226] While there are

different treatment protocols for transgender children and transgender

adolescents,[227] and treatment protocols for transgender adolescents may vary

depending on the length of time they have had gender dysphoria,[228] there is no

justification for assuming the gender dysphoria diagnosis for a transgender minor

diagnosed in adolescence is any less valid than a diagnosis in childhood.[229]

Disputed to the extent this fact suggests that WPATH is wholesale recommending

hormones and surgeries for minors diagnosed with gender dysphoria as adolescents

without any guardrails or limitations. In fact, WPATH notes that "[g]iven the

emerging nature of knowledge regarding adolescent gender identity development,

an individualized approach to clinical care is considered both ethical and

necessary.[230] Immaterial because the population of gender dysphoric youth and

their diagnoses have no bearing on the outcome of this case.

---

[226] ████████████████████████████████████

[227] Defs.' Ex. 116 (WPATH SOC-8), at S43 (Adolescent chapter), S67 (Children chapter).

[228] Defs.' Ex. 116 (WPATH SOC-8), at S43 (Adolescent chapter), S67 (Children chapter).

[229] *See generally* Defs.' Ex. 39 (Shumer Dep. Tr.), at 250:21-251:9; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 34-35.

[230] Defs.' Ex. 116 (WPATH SOC-8), at S45.

27.  <u>Disputed</u>. (1)-(2) Undisputed that many minors suffering from gender dysphoria may also have other mental health disorders or have experienced trauma. Disputed to the extent this fact asserts that having additional conditions invalidates a gender dysphoria diagnosis, or that those suffering from gender dysphoria who also have other mental health disorders cannot receive gender-affirming care.[231] (3) Undisputed that mental health support, including through psychotherapy, is important to youth with gender dysphoria. Disputed to the extent this fact suggests that those diagnosed with gender dysphoria need mental health support more than those with other conditions. (4) Disputed to the extent Defendants contend that psychotherapy alone is an adequate treatment for transgender youth with gender dysphoria. As Dr. Shumer described in his report, outcomes for adolescents with gender dysphoria are significantly better when gender-affirming care includes both medical treatment and attention to other aspects of their mental health, compared to patients who are not able to access these interventions.[232] Disputed as to Defendants' citation of Dr. Shumer's deposition for the quote that "psychotherapy . . . does not require life-long alteration of one's body," as Dr. Shumer made no such statement.[233] (5) Disputed that gender-affirming clinicians engage in

---

[231] ███████████████████████████████

[232] U.S. Ex. 5 (Shumer Rep.) § VI at 34-35.

[233] Defs.' Ex. 39 (Shumer Dep. Tr.), at 169:6-25.

"diagnostic overshadowing."[234] Disputed to the extent that Defendants contend that psychotherapy alone is an adequate treatment for transgender youth with gender dysphoria.[235]

28.   <u>Disputed and Immaterial</u>. (1) Disputed to the extent that the *LA Times* article cited in this fact is intended to prove that clinicians in Alabama are engaging in "diagnostic overshadowing," as alleged in Fact 27.[236] Disputed that this article could be offered as evidence to prove that clinicians in Alabama do not follow established standards of care.[237] (2) The *LA Times* article does not state that Dr. Leah Torres began offering hormone therapy due to lack of revenue.[238] Immaterial because the reasoning for Dr. Torres offering transitioning treatments has no bearing on the outcome of this case. (3) The *LA Times* article does not state that the teenager's pediatrician and staff at a psychiatric hospital had "refused the teen's request," but that they "did not respect his gender identity and used his old name."[239] Disputed to the extent that this fact is being offered to support a contention that youth with gender dysphoria are not receiving treatment for mental

---

[234] U.S. Ex. 1 (Antommaria Rep.), at 29-30; U.S. Ex. 9 (Karasic Rebuttal Rep.) ¶ 36; U.S. Ex. 10 (Ladinsky Rep.), at 25.
[235] *See supra* note 232.
[236] Defs.' Ex. 132 (Jarvie *Abortion Doctor*).
[237] U.S. Ex. 10 (Ladinsky Rep.), at 14, 25; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 21:7-12, 28:12-21, 36:21-37:2, 39:1-41:11, 41:12-42:4, 42: 12-22, 44:9-14; 58:10-18, 66:18-67:15, 74:6-18; ███████████████████████████████████████████████; U.S. Ex. 39 (UAB0013-30); U.S. Ex. 40 (UAB0031-32).
[238] Defs.' Ex. 132 (Jarvie *Abortion Doctor*), at 3, 13-14.
[239] Defs.' Ex. 132 (Jarvie *Abortion Doctor*), at 15.

health issues, as the article notes that the teenager "was seeing a therapist."[240]

Disputed to the extent this fact is being offered as evidence of medical practice in

Alabama, as the article does not provide detail on the patient, their diagnosis, their

course of treatment, or any other information to validate the statements made

therein.

29.   <u>Disputed</u>. (1) Disputed as to Defendants' claim that the UAB Clinic

does not follow particular guidelines.[241] (2)-(3) Undisputed that Dr. Nangia

represented that she reviewed the minor Plaintiffs' medical records and the

deposition transcripts from the clinic's three primary providers, and that the quote

appears in Dr. Nangia's second supplemental report.[242] However Dr. Nangia's

characterization of the involvement of mental health professionals at the UAB

Clinic is incorrect.[243] Dr. Nangia's qualifications to interpret and opine on

Plaintiffs' medical treatment are currently contested.[244]

---

[240] Defs.' Ex. 132 (Jarvie *Abortion Doctor*), at 16.
[241] U.S. Ex. 10 (Ladinsky Rep.), at 14, 25; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 21:7-12, 26:20-27:2, 28:12-21, 36:21-37:2, 39:1-41:11, 41:12-42:4, 42: 12-22, 44:9-14, 58:10-18, 66:18-67:15, 74:6-18; ███████████████████████████████████████████████████
███ ; U.S. Ex. 39 (UAB0013-30); U.S. Ex. 40 (UAB0031-32).
[242] Defs.' Ex. 13 (Nangia Second Supp. Rep.).
[243] U.S. Ex. 10 (Ladinsky Rep.), at 14-16; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 22:18-23:5, 27:3-15, 28:12-21, 29:18-30:4, 40:19-41:11, 41:12-42:4, 43:15-23, 45:3-12, 46:2-9, 286:11-18;
████████████████████████████████████████████████████████
████████████████████████████ :: ████████████████████████
████████████████████████████████████████ ; U.S. Ex. 39 (UAB0013-30);
U.S. Ex. 40 (UAB0031-32).
[244] Br. In Support of U.S. Motion to Exclude Testimony, ECF No. 591 at VIII.

30.   <u>Disputed</u>. (1) The evidence shows that the UAB Clinic does have access and reviews past mental health records of their patients, and clinicians at the UAB Clinic are aware of the medical history of their patients.[245] (2) The evidence shows that clinicians at the UAB Clinic are aware of the psychological conditions of their patients.[246] (3) The evidence shows that the UAB Clinic does ensure that patients are receiving mental health support and does engage in a comprehensive mental health assessment of patients as needed.[247] The UAB Clinic psychologist meets with all new patients, either at their first visit or at another time.[248] (4) The evidence shows that UAB Clinic providers are actively involved in assessing and treating patients' psychological health.[249] (5) The evidence shows that clinicians at the UAB Clinic consider the input of mental health professionals in making gender dysphoria diagnoses.[250]

[245] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 22:1-11, 40:19-41:11, 263:9-15; ██████
[246] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 22:1-11, 40:19-41:11; ██████
[247] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 27:3-15; ██████
[248] ██████
[249] Defs.' Ex. 33 (Ladinsky Dep. Tr.) at 20:8-23-21:6, 22:1-11, 22:18-23:5, 27:3-15, 29:18-30:4, 41:12-42:4, 46:2-9; ██████ ; U.S. Ex. 40 (UAB0031-32).
[250] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 22:18-23:5, 27:3-15, 29:18-30:4; ██████

31.   <u>Disputed</u>. (1) ██████████████████████████████

████████████████████████████[251] ████████████████████

████████████████████████████████████████████████████

███████████████████████[252] (2) Disputed to the extent

Defendants suggest the lack of a requirement means a practice is not done. The

evidence shows that clinicians at the UAB Clinic do assess the psychological

wellbeing of patients.[253] (3) ████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

███████████[254] ████████████████████████████[255]

████████████████████████████████████████████

██████████████████████████████████[256] (4)

████████████████████████████████████████████

██████████████████████████████[257] ███████████

[251] ████████████████████████████████; ██████████████
[252] ████████████████████████████████; ███████████████
.
[253] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 27:3-15; ████████████████
.
[254] ████████████████████████
[255] █████████████████
[256] ████████████
[257] ████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████[258]

32.   Disputed. (1) Undisputed that informed consent is an issue that exists.

(2) Disputed that informed consent is not theoretically or actually possible.[259]

Undisputed that SOC-8 includes these discussion topics in Statement 6.12.c.

regarding the process of informed consent and assent.[260] Disputed to the extent that

the fact does not include all discussion topics for clinicians to cover and disregards

the distinction between informed consent for parents/legal guardians and assent for

minors.[261] (3) Disputed that the WPATH SOC-8 standard regarding informed

consent is not consistently met at the UAB Clinic.[262] Defendants rely on their

expert, Dr. Nangia, in support of this contention, but Dr. Nangia's ability to opine

on topics of consent and assent is contested.[263] (4) ███████████████

██████████████████████████████████████████

---

[258] ████████████████████████████

[259] U.S. Ex. 1 (Antommaria Rep.), at 26-27; U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶¶ 45-57; U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 67; U.S. Ex. 8 (Janssen Supp. Rep.) ¶ 25; U.S. Ex. 11 (McNamara Rep.), at 5, 6, 13, 25; U.S. Ex. 7 (Goodman Rebuttal Rep.) ¶¶ 26-34; U.S. Ex. 9 (Karasic Rebuttal Rep.) ¶¶ 26(d), 36, 59.

[260] Defs.' Ex. 116 (WPATH SOC-8), at S-61.

[261] Defs.' Ex. 116 (WPATH SOC-8), at S-61.

[262] U.S. Ex. 10 (Ladinsky Rep.), at 14-15; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 22:1-11, 28:12-21, 173:20-174:8, 175:1-7, 284:14-19; ████████████████████████████████

████████████████████████ ██ ████████████████; U.S. Ex. 39 (UAB0013-30).

[263] Br. In Support of U.S. Motion to Exclude Testimony, ECF No. 591 at VIII.

██████████████████████ [264] The evidence shows that the UAB Clinic does ensure that patients are receiving mental health support and the Clinic does engage in a comprehensive mental health assessment of patients as needed.[265] Disputed to the extent this fact asserts that mental health evaluation is not part of the consent and assent process, which it is.[266] (5) Disputed as the evidence shows that UAB Clinic practitioners do discuss potential long-term effects and the evidence base with patients and their parents.[267] (6) ████████████████████████████

███████████████████████████████ [268] The evidence shows that clinicians at the UAB Clinic do discuss the evidence base with their patients and parents/caregivers.[269]

33.   <u>Disputed</u>. (1) Disputed as Defendants present no evidence or citation for the proposition of "likely significant harm." (2) Undisputed that UAB asserted in its subpoena response that it does not track patients once they leave the care of

---

[264] ████████████████████████████████

[265] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 22:18-23:5, 27:3-15, 28:12-21; ███████████████████████ .

[266] U.S. Ex. 10 (Ladinsky Rep.), at 15; ███████████████████████████ ████████████████████████████████ .

[267] U.S. Ex. 10 (Ladinsky Rep.), at 15, 21; Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 173:20-174:8, 175:1-7; ███████████████████████████████ ███████████ ; U.S. Ex. 39 (UAB0013-30).

[268] ████████████████████████████

[269] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 158:15-160:12; ██████████████████████ ████████████████████████████ .

UAB.[270] Disputed that the UAB Clinic has no information about patient regret or detransition. UAB stated in its subpoena response that the UAB Pediatric Endocrinology Department had one patient discontinue transitioning treatment.[271] It also stated that none of the minor patients at the clinic had experienced desistance or detransition at the time of the response.[272] (3) The evidence shows regret rates for gender-affirming medical care are extremely low.[273] Undisputed that some transgender people may later detransition, but otherwise disputed as the evidence shows that young people who receive medical gender-affirming care during adolescence overwhelmingly continue them into early adulthood.[274] (4) Disputed as Defendants present no evidence or citation for the proposition that any transgender youth in Alabama have been impacted by regret or detransition, let alone on a wholesale basis as Defendants suggest. Defendants' fact witnesses, who no longer identify as transgender, do not live in and have never sought or received

---

[270] Defs.' Ex. 34 (Ladinsky Depo Exs.), at 34; ███████████████████████
████████.

[271] Defs.' Ex. 34 (Ladinsky Depo Exs.), at 35.

[272] Defs.' Ex. 34 (Ladinsky Depo Exs.), at 35; ████████████████████████
█.

[273] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 19; U.S. Ex. 1 (Antommaria Rep.), at 22; U.S. Ex. 11 (McNamara Rep.), at 23; U.S. Ex. 9 (Karasic Rebuttal Rep.) ¶¶ 34, 37, 93.

[274] U.S. Ex. 11 (McNamara Rep.), at 23; ████████████████████████████████
████████████████████████████████████████████████████████.

medical treatment in Alabama.[275] Nor are they aware of anyone who has

detransitioned in Alabama.[276]

## II.   Additional Disputed Facts

1.     S.B. 184 bans forms of treatments that medical providers prescribe—

based on professional standards, clinical experience and judgment, and the

patient's individual needs—to treat individual minor patients diagnosed with

gender dysphoria when deemed medically necessary.[277]

2.     The medical treatments banned by S.B. 184 have reduced the

suffering of minor patients with gender dysphoria in Alabama.[278]

3.     Denying the medical treatments banned by S.B. 184 causes harm and

suffering for minor patients with gender dysphoria in Alabama.[279]

---

[275] U.S. Ex. 32 (Cohn Dep. Tr.), at 14:17-15:10; ████████████████████████
████████████████████████████████████████████████████ .

[276] ████████████████████████████████████

[277] U.S. Ex. 5 (Shumer Rep.), §§ IV, VI at 26-36; U.S. Ex. 1 (Antommaria Rep.), at 4-6, 20-33; *see generally* U.S. Ex. 10 (Ladinsky Rep).

[278] ████████████████████████████████████████████████████████████████ ;
Prelim. Inj. Hr'g Tr. Vol. I (Test. of Dr. Rachel Koe), ECF No. 129 at 179:12-19, 180:8-11, 182:1-3; ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ ;
U.S. Ex. 19 (Poe Prelim. Inj. Decl.) ¶¶ 20-22; U.S. Ex. 22 (Zoe Prelim. Inj. Decl.) ¶¶ 10-11 ("Continued access to puberty-blockers is essential to maintain Zachary's current state of mental health.").

[279] Defs.' Ex. 33 (Ladinsky Dep. Tr.), at 49:21-50:5 (noting that three patients "relocated out of state under the pressure of this law"); ████████████████████████████ ; U.S. Ex. 21 (Moe Prelim. Inj. Decl.) ¶ 16; U.S. Ex. 20 (Koe Prelim. Inj. Decl.) ¶ 4; U.S. Ex. 19 (Poe Prelim. Inj. Decl.) ¶¶ 23-25; U.S. Ex. 22 (Zoe Prelim. Inj. Decl.) ¶¶ 11, 13.

4. The risks associated with the medical treatments banned by S.B. 184 are no greater than the risks associated with the same medical treatments that, when used for different purposes, are not prohibited by S.B. 184.[280]

5. Minor patients and their parents in Alabama are capable of comprehending and appreciating the risks associated with the medical treatments banned by S.B. 184.[281]

6. Youth whose gender dysphoria continues into adolescence are highly likely to identify as transgender as adults.[282]

---

[280] U.S. Ex. 1 (Antommaria Rep.), at 30 ("VCAP permits the use of puberty blockers to treat central precocious puberty but criminalizes the use of puberty blockers to treat gender dysphoria, even though using puberty blockers for both conditions has comparable risks and is supported by comparable types of evidence."); U.S. Ex. 5 (Shumer Rep.) §§ IV ¶ 14 ("GnRHa have been used extensively in pediatrics for several decades. Prior to their use for gender dysphoria, they were used (and still are used) to treat precocious puberty."); VI at 31 ("GnRHa are FDA approved for use in pediatric patients with precocious puberty. The mechanism of action of GnRHa in suppressing progression of puberty in precocious puberty and in gender dysphoria is the same: suppression of LH and FSH production thereby suppressing production of testosterone or estrogen.").

[281] U.S. Ex. 1 (Antommaria Rep.), at 27 ("Adolescents generally possess comparable medical decision-making capacity to adults."); U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶¶ 49 ("Claims that parents and legal guardians are inadequately informed or are coerced lack empirical evidence."), 50 ("Defendants' experts' claims that parents cannot understand the relevant information is also without foundation," and that "[u]ncertainty does not, however, preclude capacity."), 50 ("It is not always possible to know rare or long-term side-effects of medical interventions but this neither precludes their use nor does it prevent individuals from providing adequate informed consent."), 57 ("Even if the informed consent process was inadequate in an instance, which I am not conceding, this does not demonstrate that adequate informed consent is not possible or that a ban is necessary to remediate this putative problem."); U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶¶ 67-73; U.S. Ex. 5 (Shumer Rep.) § VI at 35 ("In my experience, transgender youth and their families are more than capable of making important decisions around their health.").

[282] U.S. Ex. 5 (Shumer Rep.) § IV ¶ 11 (noting that "data and personal experience show that children whose gender dysphoria persists into adolescence are highly likely to be transgender," that "VCAP's legislative findings misinterpret older studies showing that a large percentage of

7.     Criminalizing the medical treatments in the manner of S.B. 184 is highly unusual and departs from the conventional approach of rely upon existing mechanisms available to the State to protect patient safety.[283]

8.     S.B. 184's actual purpose is to express moral disapproval, i.e., to repudiate the gender identity of transgender minors.[284]

## STANDARD OF REVIEW

Summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), of showing, "by reference to materials on file, that there are no genuine issues of material fact

---

children diagnosed with gender identity disorder did not grow up to be transgender," as "[t]hose studies include children who would not fulfill the current diagnostic criteria for gender dysphoria"); U.S. Ex. 6 (Shumer Rebuttal Rep.) ¶ 38 ("Children with persisting gender dysphoria into puberty . . . are very likely to have persisting gender dysphoria into adulthood."); U.S. Ex. 1 (Antommaria Rep.), at 22 ("Studies demonstrate that individuals who fulfill the criteria for gender-affirming medical care generally continue in their gender identity.").

[283] U.S. Ex. 4 (Cohen Rebuttal Rep.) ¶¶ 60-78; U.S. Ex. 2 (Antommaria Rebuttal Rep.) ¶ 49 (noting that there are "other less restrictive means to address inadequate informed consent than banning gender-affirming medical care" including credentialing, licensing, and malpractice litigation); *see also* U.S. Ex. 3 (Caughey Rebuttal Rep.) ¶¶ 35-46 (discussing how, in his view, passage of S.B. 184 is inconsistent with the state's general lack of healthcare paternalism).

[284] Ala. Code § 26-26-1 (2022) (defining a person's sex as "genetically encoded into a person at the moment of conception, and it cannot be changed"); U.S. Ex. 3 (Caughey Rebuttal Rep.) ¶¶ 58-72; 84-87 (discussing statements made by legislators, including statement by Rep. Wes Allen that a motivation behind the legislation was "a biblical worldview that we're all made in the image of God and there are only two sexes, male and female . . . . [W]hen a person is born male, they're male. When a person is born female, they're female," and Governor Ivey stating that "I believe very strongly that if the Good Lord made you a boy, you are a boy, and if he made you a girl, you are a girl.").

that should be decided at trial," *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case," and "'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "[I]t is never enough [for the movant] simply to state that the non-moving party cannot meet its burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (alterations in original) (quoting *Clark*, 929 F.2d at 608).

"Only after the moving party has satisfied [its] burden does the burden shift to the nonmoving party to demonstrate that summary judgment would be inappropriate because there exists a material issue of fact." *Id.* This may be done by citing to materials in the record supporting a genuine factual dispute or showing that the materials cited do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In adjudicating summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007). "[T]he court

may not weigh conflicting evidence to resolve disputed factual issues; if a genuine

dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. S.

Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *Anderson*, 477 U.S. at

255 ("Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are [factfinder] functions."). Rather, the

Court's task is to discern whether "the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co.

v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v.

Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

Under these exacting requirements and due to the very nature of the claims

involved, summary judgment is rarely available in equal protection and due

process cases. *See, e.g.*, *Bradbury v. Wainwright*, 718 F.2d 1538, 1544 (11th Cir.

1983) (summary judgment reversed; question of fact whether regulation rationally

related to the state's asserted interests); *City of South Miami v. DeSantis*, 508 F.

Supp. 3d 1209, 1227 (S.D. Fla. 2020) (summary judgment denied where the "case

is rife with material disputes of fact regarding Plaintiffs' Equal Protection claims"),

*vacated on other grounds*, 65 F.4th 631 (11th Cir. 2023).

## ARGUMENT

Summary judgment on the United States' equal protection claim must be

denied. First, the Court cannot grant summary judgment for Defendants because,

as a reasonable factfinder, the Court could find for the United States under rational

basis review. Defendants fail to analyze the law appropriately and thus fail to

establish the absence of any genuine dispute of material fact and entitlement to

judgment as a matter of law. Further, every material fact Defendants put forward is

not only disputed, but refuted. For these same reasons, Defendants cannot prevail

under heightened scrutiny.[285] Finally, the motion also suffers from procedural and

evidentiary defects that underscore the inappropriateness of summary judgment at

this juncture. In light of the Court's responsibility to view the evidence and draw

all reasonable inferences in favor of the United States, summary judgment must be

denied.

I.   **Defendants Are Not Entitled to Summary Judgment Because a
     Reasonable Factfinder Could Find that S.B. 184 Fails Rational Basis
     Review.**

Rational basis review under the Equal Protection Clause is not a blank

check—particularly when the law targets a specific group of people for

unfavorable treatment, as S.B. 184 does. These circumstances require a more

"searching form" of rational basis review. *See, e.g.*, *Lawrence v. Texas*, 539 U.S.

558, 580 (2003) (O'Connor, J., concurring). Under this analysis, a reasonable

factfinder could find that S.B. 184 fails rational basis review. Yet Defendants

---

[285] The United States responds to Defendants' brief in full, which applies both rational basis
review and heightened scrutiny. However, as this Court is already aware, the Supreme Court
recently granted certiorari in *United States v. Skrmetti* and will soon consider the appropriate
standard of review to be applied in this case. ECF No. 604 (U.S. Renewed Mot. to Stay).

assume that S.B. 184 automatically passes constitutional muster without engaging in the full analysis that equal protection doctrine demands. Defendants' cursory analysis does not show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Instead, the evidence shows, viewed in the light most favorable to the United States, that a reasonable factfinder could find for the United States. Summary judgment must be denied.

Where, as here, a law targets a particular group for unfavorable treatment, the law's actual and proffered purpose must be permissible and the proffered purpose must correlate precisely with the classification targeting the group. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (striking down under rational-basis review a state law restricting local ordinances protecting gay people); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447-50 (1985) (same with regard to an ordinance requiring special use permits for group-care facilities for people with mental disabilities); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 538 (1973) (same with regard to a statute denying food stamps to members of a household with unrelated members).

Courts first examine the classification itself—i.e., whether the law "impo[ses] a broad and undifferentiated disability on a single named group." *Romer*, 517 U.S. at 632. If the law's classification is intended to target a disfavored group, that in itself violates the Equal Protection Clause. *City of Cleburne*, 473

U.S. at 447. If the law's classification is "irrational and wholly arbitrary," that in itself violates the Equal Protection Clause. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (per curiam); *see also F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). This is because laws that intentionally or arbitrarily discriminate lack any permissible purpose. *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918) ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination."). For example, in *Moreno* the Supreme Court held that the food stamp law was intended to discriminate against "hippies," a politically unpopular group, and concluded that purpose was impermissible. 413 U.S. at 534-35. The Court did the same in *City of Cleburne*, finding that the City Council's requirement of a special use permit for a group home was concerned with "negative attitudes" towards people with disabilities, which was not a permissible basis for differential treatment. 473 U.S. at 448.

Even if the purpose of the classification is permissible, the proffered justification must be precisely and rationally correlated with the classification. In *City of Cleburne*, the Court found the record did not adequately support a connection between the classification and purported justifications. *Id.* at 450. Similarly, in *Moreno*, after reviewing the wider statutory scheme and the rule in practice, the Court found the correlation to be "not only 'imprecise', it is wholly

without any rational basis." 413 U.S. at 536-38; *see also Plyler v. Doe*, 457 U.S. 202, 228-29 (1982) (noting lack of evidence supporting State's purported interest and even so, finding the law "a ludicrously ineffectual attempt" to address it (citation omitted)).

The Northern District of Florida recently used this framework to strike down a law substantially similar to S.B. 184. *Doe v. Ladapo*, No. 4:23cv114-RH-MAF, 2024 WL 2947123, at *12 (N.D. Fla. June 11, 2024). The court, applying rational basis review, focused on the lack of correlation between the statute's classification and its claimed justification, holding that "[b]anning gender-affirming care for minors across the board in all circumstances, rather than appropriately regulating such care, is not sufficiently related to the legitimate state interest in safeguarding health." *Id.* at *28. The court explained:

> This is care that, in appropriate circumstances and with appropriate screening, accords with well-established professional standards of care embraced by all reputable medical associations with relevant expertise. This is care that, when so provided, produces great benefit and avoids unnecessary suffering. Denying this care will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide.

*Id.* The opinion followed with significant analysis into the impermissibility of the State's additional proffered justifications. *Id.* at *29, *33-37; *see also Fowler v. Stitt*, No. 23-5080, 2024 WL 3035712, at *18-20 (10th Cir. June 18, 2024) (recent 10th Circuit decision finding a law targeting transgender individuals for

unfavorable treatment fails rational basis review upon assessing the State's

asserted interests and concluding none rationally related to the policy).

While Defendants here assert an interest of "safeguarding the physical and

psychological well-being of minors," Defs.' Mot. for Summ. J. Br. 29 (quoting

*Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1230 (11th Cir. 2023)), evidence

shows the actual purpose of S.B. 184 is to express moral disapproval, i.e., to

repudiate the identity of transgender minors. *Supra* II ¶ 8; *see generally Craig v.

Boren*, 429 U.S. 190 (1976) (a law that classifies based on age may also classify

based on other characteristics, such as sex). This is impermissible. And while the

Eleventh Circuit in *Eknes-Tucker* recognized that this Court did not address animus

in its preliminary injunction order, 80 F.4th at 1230; *see also Ladapo*, 2024 WL

2947123, at *11, that order was based on a limited record and the United States

intends to present evidence of animus at trial. For example, Governor Kay Ivey's

statement when signing S.B. 184 into law expressed moral disapproval of

transgender individuals, rejecting their existence:  "I believe very strongly that if

the Good Lord made you a boy, you are a boy, and if he made you a girl, you are a

girl."[286] Evidence is also found on the face of the bill itself where S.B. 184's

legislative findings assert that a person's sex "cannot be changed," and recites the

---

[286] U.S. Ex. 3 (Caughey Rebuttal Rep.) ¶ 68 (Governor Ivey stating that "I believe very strongly that if the Good Lord made you a boy, you are a boy, and if he made you a girl, you are a girl.").

debunked claim that "a substantial majority of children who experience discordance between their sex and identity . . . will eventually have an identity that aligns with their sex."[287] Because of this impermissible purpose, the law fails rational basis review. *Moreno*, 413 U.S. at 534 (moral disapproval of "a politically unpopular group cannot constitute a legitimate governmental interest.").

Further, Defendants' proffered justification for S.B. 184 and the means deployed to achieve it do not have a rational correlation. For example, puberty blockers entail equal risks when used to treat conditions like precocious puberty, yet S.B. 184 prohibits blockers only when used by transgender minors to affirm a gender inconsistent with their sex assigned at birth. *Supra* II ¶ 4. The treatments banned by S.B. 184 are forms of medical care that health providers prescribe to individual patients where appropriate and in accordance with well-established professional standards. *Supra* II ¶ 1. The banned medical treatments benefited and avoided unnecessary suffering for minor patients in Alabama. *Supra* II ¶ 2. Denying these treatments has caused minor patients in Alabama to suffer. *Supra* II ¶ 3. Criminalization is highly unusual and departs from conventional mechanisms used by states to protect patient safety. *Supra* II ¶ 7.

Taken together and drawing all inferences in favor of the United States, Defendants cannot show that this law—which is not supported by its purported

---

[287] S.B. 184, § 2(1), (4); *supra* Response to Fact 2.

legislative findings, bans medical care known to be safe and effective, and removes parents' right to make medical decisions for their children despite having full knowledge of the risks—is rationally related to a legitimate government interest.

The district court in *Ladapo* found exactly that—considering and finding unpersuasive the same arguments leveled by Defendants here. 2024 WL 2947123, at *35 ("That there are risks of the kind presented here is not a rational basis for denying properly screened patients the option to choose this treatment." "The overwhelming majority of doctors are dedicated professionals whose first goal is the safe and effective treatment of their patients. There is no reason to believe the doctors who adopted [the WPATH] standards were motivated by anything else.").

Viewing the evidence in the light most favorable to the United States, a trier of fact could, like the *Ladapo* court, find S.B. 184 fails rational basis review. Defendants fail to engage with the full equal protection doctrine, asserting instead that S.B. 184 automatically passes muster under an oversimplified presentation of rational basis review. Defendants' cursory analysis is incorrect as a matter of law and fails to satisfy their burden to show the absence of any genuine dispute of material fact. Summary judgment must be denied.

## II.   The United States Disputes Defendants' Material Facts.

Summary judgment should also be denied because Defendants fail their burden to show that there are no genuine issues of material fact. Every material

fact Defendants put forward is in dispute. As an initial matter, Defendants offer no evidence that S.B. 184 serves a legitimate state interest, instead relying exclusively on quotes from the Eleventh Circuit's order on the preliminary injunction appeal. Defs.' Mot. for Summ. J. Br. 29. But these quotes, based on a different record, are not law and are not binding at the trial court level. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."). In the absence of argument or evidence, Defendants cannot assert it is an undisputed fact that S.B. 184 serves a legitimate state interest.

Defendants' other facts are betrayed by the evidence, and are all clearly disputed. The United States provides the following summaries of the responses made above (*supra* Response to Facts 1-33):

1. **Legislative findings:** Every legislative finding is in dispute. *Supra* Response to Facts 1-5. S.B. 184 advances a definition of "sex" that fails to consider all components of sex or the possibility of incongruence between those components. *Supra* Response to Fact 1. This definition not only precludes individuals from being transgender but also precludes individuals from being intersex. *Supra* Response to Fact 1. The legislative findings misrepresent how gender dysphoria is diagnosed, which follows an extensive and complex biosocial assessment, and misinterpret outdated studies of the outcomes of children who

would not meet the diagnostic criteria for gender dysphoria. *Supra* Response to Fact 2. There is simply no evidence that medical providers are "aggressively pushing" for the banned treatments—in fact the law's surgery provision is not challenged in this case because these surgeries are not performed on minors in Alabama. There no inevitable "course of care" because treatment for gender dysphoria, like all medical conditions, is individually tailored to each individual patient. *Supra* Response to Fact 3. The banned treatments are not new and not experimental; the record shows they are safe and effective. *Supra* Response to Facts 3-4. Any risks associated with the use of puberty blockers and hormone therapy to treat gender dysphoria are no greater than the risks of using the same treatments for different conditions. *Supra* Response to Fact 4. There is no evidence that patients or their parents are categorically incapable of appreciating and making informed decisions based on the risks of treatment. *Supra* Response to Fact 5.

2.      **Clinical practice guidelines:** Defendants' claim that there is no dispute of material fact with respect to clinical practice guidelines is based wholly on mischaracterization of the evidence concerning WPATH. First, Defendants present as fact what is a straw-man representation of the United States' case. *Supra* Response to Fact 6. The United States has never relied exclusively on WPATH or Endocrine Society guidelines. The purpose of referencing these organizations is to show that S.B. 184 criminalizes medical providers for prescribing treatment that

the relevant, leading professional medical organizations recommend for patients

diagnosed with gender dysphoria. ECF No. 92 (U.S. Am. Compl.) ¶¶ 28, 34-39.

Clinical practice guidelines inform practice for medical providers in a variety of

contexts, not just for gender-affirming care. Medical providers follow clinical

practice guidelines in every practice area, every single day. In prohibiting

providers from following clinical practice guidelines, S.B. 184 disrupts the practice

of medicine. *Supra* Add'l Fact 1. While guidelines and statements from

professional medical associations are helpful in showing that those who practice in

this field agree the treatments are safe and effective, the United States' and Private

Plaintiffs' medical experts and the studies themselves are the primary sources of

evidence on safety and efficacy. *Supra* Response to Facts 3-4. As for Defendants'

criticism of the recommendations themselves, Defendants lean heavily on the Cass

Review but omit the fact that even with its criticism of WPATH, the Cass

Review's ultimate recommendations are more aligned with WPATH than they are

with S.B. 184—allowing prescription of puberty blockers and gender-affirming

hormones, not criminally banning them. *Supra* Response to Fact 7. As for

Defendants' criticism of the Endocrine Society, the organization followed a

development process comparable to other clinical practice guidelines. *Supra*

Response to Fact 8. As for Defendants' criticism of WPATH, the full evidence

speaks for itself. Defendants cherry-pick pieces of quotes and stitch together

others, cite one individual's offhand comment to conjecture on the state of mind of a global organization, and launch character attacks on individuals who are without motive to do anything beyond provide the best, most appropriate healthcare for their patients. *Supra* Response to Facts 9-25. The evidence Defendants cite thus does not support their narrative.

3. **Assertions of harm**: Defendants' assertion that there is no dispute of material fact concerning harm is wrong, as they present not one fact of a single minor patient in Alabama harmed by the medical treatments banned by S.B. 184. *Supra* Response to Fact 33. Instead, the record shows that actual minor patients in Alabama are harmed by the denial of medical care. *Supra* Add'l Fact 3. Defendants' argument of harm is premised on the belief that youth diagnosed with gender dysphoria are not in fact transgender, which they support by relying on discredited research on so-called "rapid onset gender dysphoria." *Supra* Response to Fact 26. Defendants mischaracterize the practice of providing gender-affirming medical care in Alabama—the evidence shows, among other things, that clinicians have access to and review patients' mental health records and medical histories, ensure that patients receive mental health support where appropriate, evaluate individual patients' capacity to assent, and discuss the evidence base and potential side effects with patients and their parents. *Supra* Response to Facts 27-31.

It is Defendants' burden in moving for summary judgment to establish that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Defendants fail this task, and for that reason summary judgment must be denied.

## III.   Defendants Are Not Entitled to Summary Judgment Under Heightened Scrutiny.

Because a reasonable factfinder could find the United States prevails under rational basis, the United States could also prevail under heightened scrutiny and an analysis under heightened scrutiny is unnecessary. However, the United States addresses heightened scrutiny briefly here to respond to Defendants' motion in full.

Defendants fail their burden again with the heightened scrutiny analysis. First, Defendants' analysis is fundamentally flawed by failing to identify the operable classification, without which they cannot explain how that classification substantially relates to an important government interest. The United States asserts that S.B. 184 discriminates on the basis of sex and transgender status and is prepared to present evidence of animus to establish that heightened scrutiny applies here. *Eknes-Tucker*, 80 F.4th at 1230. While that question need not be addressed in the instant motion, Defendants' failure to identify any classification is a fatal oversight. Rational triers of fact, like the courts in *Ladapo* and *Bcrandt v. Rutledge*, 677 F. Supp. 3d 877, 893-901, 918 (E.D. Ark. 2023) (en banc review pending) have found for plaintiffs under heightened scrutiny on records similar to that

here.[288] There exists ample evidence for a rational factfinder to conclude that S.B. 184's discriminatory means are not substantially related to achieving an important governmental interest. *Supra* Response to Facts 1-5; *supra* Add'l Facts 1-8. Defendants fail their burden. Summary judgment must be denied.

## IV.  Defendants' Motion Suffers from Procedural and Evidentiary Defects.

Defendants' motion[289] suffers from multiple defects in an attempt to create a purported record. First, Defendants submitted thousands of pages of exhibits that are not cited even once. For example, Defendants submitted deposition transcripts and accompanying exhibits for two experts they never rely on or reference—Dr. Lightdale (Private Plaintiffs' expert) (Defs.' Exs. 69-73) and Dr. Caughey (United States' expert) (Defs.' Exs. 79-83). Defendants also submitted at least 20 other exhibits of various publications (*e.g.*, Defs.' Exs. 94, 101), articles by advocacy organizations (*e.g.*, Defs.' Ex. 127), and other miscellaneous documents (*e.g.*, Defs.' Ex. 152) that they never once cite.[290] Defendants submitted five HHS compilation exhibits but cite only one. The Court need not consider any of these or

---

[288] Note that the court in *Ladapo* applied heightened scrutiny in the alternative. 2024 WL 2947123, at *28. The primary holding of *Ladapo* is that Florida's gender-affirming care ban fails rational basis review. *Id.* at *28-29, *35.

[289] Defendants style their single filing as a "Motion for Summary Judgment and Brief in Support," but did not submit a motion. Without a motion, the United States has had to rely on assumptions as to what relief Defendants seek. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, *identifying each claim or defense—or the part of each claim or defense—*on which summary judgment is sought." (emphasis added)).

[290] Defs.' Exs. 94, 99-102, 114, 123, 127, 142, 145, 151-153, 157, 160-161, 168, 169-172, and 177.

discern what, if any, facts are buried therein. Fed. R. Civ. P. 56(c)(3); Burke, J., Initial Order Governing All Further Proceedings 21; *White v. DeJoy*, No. 1:22-00106-N, 2024 WL 1538428, at *3 (S.D. Ala. Apr. 9, 2024) (citing, *inter alia*, *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011)).

Further, Defendants submitted exhibits representing an amalgamation of dozens of individual documents, as evident by discontinuous bates numbers. Many of these documents are never referenced and should not be considered because they do not appear to be admissible at trial, either because they constitute hearsay or because Defendants cannot authenticate them. For example, several hundreds of pages not cited in the motion include emails involving third-party organizations, such as Johns Hopkins University, WPATH, and HHS (*e.g.*, DH168-170, 172 and Defs.' Ex. 177). Much of the content of these documents does not appear to be admissible at trial because they constitute hearsay, even if Defendants could authenticate them,[291] which currently is unclear. This flaw also affects exhibits that were referenced in the motion. For instance, Defendants cite Exhibit 172 as support for Fact 21, where they purport to describe Admiral Levine's intentions and purported requests to WPATH to tailor SOC-8. The Court may not consider such hearsay evidence in reviewing Defendants' summary judgment motion. Fed.

---

[291] Although evidence need not be authenticated at the summary judgment stage, the evidence must still be capable of being presented in admissible form at trial. Fed. R. Civ. P. 56; *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 (11th Cir. 2021).

R. Civ. P. 56(c)(2) (providing for inadmissibility objection); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999))). These procedural and substantive deficiencies with Defendants' exhibits further support denying the motion.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Defendants' motion for summary judgment.

Dated: July 1, 2024                    Respectfully submitted,

JONATHAN S. ROSS                      KRISTEN CLARKE
Acting United States Attorney         Assistant Attorney General
Middle District of Alabama            Civil Rights Division

PRIM F. ESCALONA                      CHRISTINE STONEMAN
United States Attorney                Chief, Federal Coordination and Compliance
Northern District of Alabama          Section

JASON R. CHEEK                        COTY MONTAG (DC Bar No. 498357)
Chief, Civil Division                 Deputy Chief, Federal Coordination and
                                      Compliance Section

MARGARET L. MARSHALL
Assistant U.S. Attorney               */s/ Kaitlin Toyama*
U.S. Attorney's Office                RENEE WILLIAMS (CA Bar No. 284855)
Northern District of Alabama          KAITLIN TOYAMA (CA Bar No. 318993)
1801 Fourth Avenue North              Trial Attorneys
Birmingham, AL 35203                  United States Department of Justice
Tel.: (205) 244-2104                  Civil Rights Division
Margaret.Marshall@usdoj.gov           Federal Coordination and Compliance Section
                                      950 Pennsylvania Avenue NW – 4CON

STEPHEN D. WADSWORTH
Assistant United States Attorney
U.S. Attorney's Office
Middle District of Alabama
Post Office Box 197
Montgomery, AL 36101-0197
Tel.: (334) 223-7280
Stephen.Wadsworth@usdoj.gov

Washington, DC 20530
Tel.: (202) 305-2222
Renee.Williams3@usdoj.gov
Kaitlin.Toyama@usdoj.gov

JAMES V. FLETCHER (MD Bar No.
1412160273)
Trial Attorney
United States Department of Justice
Civil Rights Division
Disability Rights Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 598-0083
James.Fletcher@usdoj.gov

*Attorneys for Plaintiff-Intervenor United States of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2024, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to counsel of record.

Respectfully submitted,

*/s/ Kaitlin Toyama*
Trial Attorney, Federal Coordination
and Compliance Section
Civil Rights Division
U.S. Department of Justice

78