# **<u>EXHIBIT 8</u>**

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF ALABAMA
 2                         NORTHERN DIVISION

 3

 4     REV. PAUL A. EKNES-TUCKER,    *
       et al.,                       *
 5                                   *
                Plaintiffs,          *   2:22-cv-00184-LCB
 6                                   *   May 6, 2022
       vs.                           *   Montgomery, Alabama
 7                                   *   9:00 a.m.
       KAY IVEY, in her official     *
 8     capacity as Governor of the   *
       State of Alabama, et al.,     *
 9              Defendant.           *
       *****************************
10

11

12          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                             VOLUME II
13            BEFORE THE HONORABLE LILES C. BURKE
                    UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22
       Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
23     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
          and Procedures Vol. VI, Chapter III, D.2.  Transcript
24              produced by computerized stenotype.

25
```

<pre>
 1                              APPEARANCES

 2
         FOR THE PLAINTIFFS:
 3       Melody Eagan, Esq.
         Jeff Doss, Esq.
 4       Amie Vague, Esq.
         LIGHTFOOT, FRANKLIN & WHITE, LLC
 5       The Clark Building
         400 20th Street North
 6       Birmingham, Alabama 35203

 7       Brent Ray, Esq.
         KING & SPALDING
 8       353 N. Clark Street
         12th Floor
 9       Chicago, Illinois 60654

10       Michael Shortnacy, Esq.
         KING & SPALDING
11       633 W. Fifth Street
         Suite 1600
12       Los Angeles, California 90071

13       Jason R. Cheek, Esq.
         US ATTORNEYS OFFICE, NDAL
14       1801 Fourth Avenue North
         Birmingham, Alabama 35203
15
         John Michael Powers, Esq.
16       Coty Montag, Esq.
         DOJ-Crt
17       Civil Rights Division
         950 Pennsylvania Avenue
18       Washington, DC  20530

19

20       FOR THE DEFENDANT:
         James W. Davis, Esq.
21       Edmund LaCour, Esq.
         Barrett Bowdre, Esq.
22       Benjamin Seiss, Esq.
         Christopher Mills, Esq.
23       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Avenue
24       P.O. Box 300152
         Montgomery, Alabama 36130-0152
25       (334) 242-7300
</pre>

COURTROOM DEPUTY:  Deena Harris


COURT REPORTER:  Christina K. Decker, RMR, CRR

1                          <u>I N D E X</u>

2

3    ARMAND ANTOMMARIA                               213
     DIRECT EXAMINATION                             213
4    BY MR. POWERS
     CROSS-EXAMINATION                              225
5    BY MR. BOWDRE

6

7    JAMES CANTOR, MD                                253
     DIRECT EXAMINATION                             253
     BY MR. DAVIS
8    CROSS-EXAMINATION                              305
     BY MS. EAGAN
9    REDIRECT EXAMINATION                           332
     BY MR. DAVIS

10

11   SYDNEY WRIGHT                                   337
     DIRECT EXAMINATION                             338
12   BY MR. DAVIS
     CROSS-EXAMINATION                              355
13   BY MR. DOSS
     REDIRECT EXAMINATION                           362
14   BY MR. DAVIS

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
          1              MS. EAGAN:  No, Your Honor.

          2              THE COURT:  All right.  State's case.

          3              MR. DAVIS:  Your Honor, the State calls Dr. James

          4    Cantor when you are ready.

10:39:28  5              THE COURT:  I'm ready.

          6                        JAMES CANTOR, MD,

          7    having been first duly sworn by the courtroom deputy clerk, was

          8    examined and testified as follows:

          9                        DIRECT EXAMINATION

10:39:46 10    BY MR. DAVIS:

         11    Q     Good morning, Dr. Cantor.

         12    A     Good morning.

         13    Q     Would you state your full name?

         14    A     James Michael Cantor.

10:40:02 15    Q     What is your profession, Dr. Cantor?

         16    A     I am a clinical psychologist and neuroscientist.

         17    Q     What degrees do you have?  Academic degrees.

         18    A     Bachelor's degree in computer science and mathematics, a

         19    master's degree in applied psychology, and a Ph.D in clinical

10:40:17 20    psychology.

         21    Q     Where do you work?

         22    A     I am currently in private practice in Toronto, Canada.

         23    Q     And what is the nature -- are there any particular focuses

         24    of the counseling you provide or the research that you have

10:40:32 25    performed?
```

1    A       Human sexuality and atypical sexualities.

2    Q       Would that include studies of gender identity?

3    A       Yes, it is.  Yes, it does.

4    Q       Are you knowledgeable about the research surrounding

10:40:47 5  gender dysphoria?

6    A       Yes, I am.

7    Q       Have you analyzed research concerning the benefits and

8    harms of different ways of treating gender dysphoria?

9    A       Yes, I have.

10:40:54 10  Q       Do you have skills and expertise assessing the strengths

11   and weaknesses of scientific studies?

12   A       Yes, I do.

13   Q       And do these skills and expertise include judging what

14   those studies do and do not prove as a matter of science?

10:41:13 15  A       Yes.

16   Q       Have you treated people who presented with gender

17   dysphoria?

18   A       Yes.

19           MR. DAVIS:  Your Honor, we proffer Dr. Cantor as an

10:41:25 20  expert on psychology, human sexuality, research methodology,

21   and the state of the research literature on gender dysphoria

22   and its treatment.

23           THE COURT:  Any objection?

24           MS. EAGAN:  No, Your Honor.

10:41:37 25           THE COURT:  All right.  He will be accepted for that

1    purpose.

2    BY MR. DAVIS:

3    Q    Dr. Cantor, there is a notebook in front of you with a

4    blue cover.  Would you please turn to the second tab?

10:41:51  5    A    I'm sorry.  It just occurs to me I didn't bring my reading

6    glasses.  They're in my brief case.

7             MR. DAVIS:  Your Honor, can the witness get his

8    glasses?

9             THE COURT:  Absolutely.

10:42:43 10             THE WITNESS:  Part 2, you said?

11    BY MR. DAVIS:

12    Q    Yes.  Tab 2, which is Defendants' Exhibit 2.

13         Can you identify that document, Dr. Cantor?

14    A    Yes.  That is my report, which I submitted for these

10:42:54 15    proceedings.

16    Q    Thank you.

17         I think actually, since we just heard Dr. Antommaria, I

18    would like to begin with addressing some things that we heard

19    this morning.

10:43:02 20         Did you have the opportunity hear this morning's testimony

21    by Dr. Antommaria?

22    A    Yes, I did.

23    Q    Did you understand Dr. Antommaria to testify that randomly

24    controlled studies are not available in this area of medicine?

10:43:16 25    A    Yes.

```
 1  Q     Did he then say, if you understand -- as you understand,
 2  that because the randomly controlled trials are not available,
 3  we can rely on observational trials?
 4  A     That is roughly what I understood him to say, yes.
 5  Q     Do you have any response to that?
 6  A     Yes.  That's not -- it is true that none of the existing
 7  studies are randomized, but it is entirely untrue that we
 8  therefore can rely -- can make decisions based on the least
 9  reliable kinds of studies.
10        There is a wide, wide range of studies in between, and
11  there's a wide, wide, range of different scientific
12  methodologies that we can employ in order to minimize the laws
13  that we get from completely randomized studies.
14        It's also actually possible if we wanted to conduct such
15  studies such as by allowing people to undergo different parts
16  of a treatment at different times, so we can compare the
17  differences between them when one group has started on that
18  type of treatment and the other hadn't yet.
19  Q     Okay.  So the randomized trials would be considered like
20  the gold standard, the top-tier level of scientific research?
21  A     Randomization is one factor in determining how high
22  quality a study is.  It is not a -- it's neither an all or
23  nothing.
24  Q     I understand.  But did I understand you to say that if you
25  assume that's not available, that's no reason to drop down to
```

1   the lowest quality of evidence?

2   A    That is correct.

3   Q    I understood Dr. Antommaria to testify that the level of

4   evidence supporting the WPATH and Endocrine Society guidelines

10:45:05  5   is comparable to the level of evidence supporting other

6   treatments in pediatrics.  Can you respond to that?

7   A    I am not aware, of course, of all the other treatments in

8   pediatrics.  However, there are no studies yielding positive

9   effects of either the Endocrine Society standards or the WPATH

10:45:24 10   standards.

11       The studies which have shown effects have used the Dutch

12   model, which uses a higher set of standards than either the

13   Endocrine Society or the WPATH group.

14   Q    Speaking of the Dutch study, I also understood

10:45:42 15   Dr. Antommaria to say there is no high quality evidence

16   supporting the use of psychotherapy alone for gender dysphoria.

17   Do you agree with that?

18   A    No, I do not.

19   Q    What would you say in response?  What's the countervailing

10:45:56 20   evidence?

21   A    There exists roughly 15'ish studies following up these

22   kids at all.  All of the studies, which without exception that

23   used medical interventions also used psychological --

24   psychotherapy at the same time.  So all of the studies which

10:46:17 25   could seem to show a benefit for medical interventions are

1    unable to distinguish that it was the medical intervention

2    causing the benefit, versus the psychotherapy causing the

3    benefit.

4        Of those studies, two were designed in a way that it was

10:46:33  5    possible to peel apart the effects of psychotherapy versus

6    medicine -- the Costa study and the Achille study.  The full

7    references are in my report.

8        In the Costa study, there was a -- there were two phases.

9    There was a phase that people went through when they received

10:46:52 10   psychotherapy alone.  And then in the subsequent phase, they

11   received both psychotherapy and medical interventions.

12       There were no significant differences between the group.

13   Both groups improved, and there were no significant differences

14   between the group that received psychotherapy alone and the

10:47:08 15   group that received psychotherapy plus medical interventions.

16       The other study, the Achille study, used a statistical

17   method to control for the effects of psychotherapy.  That group

18   also improved after medical intervention, but when the effects

19   of psychotherapy were statistically controlled, there was no

10:47:28 20   additional benefit of the medical interventions after that.

21   Q    I want to break some of that down.  You mentioned studies

22   where all the participants were receiving both psychotherapy

23   and medical-affirming care at the same time, right?

24   A    Correct.

10:47:48 25   Q    Is that the Dutch -- oh, is the Dutch protocol, the Dutch

1　study an example of such a study?

2　A　　Both Dutch studies, the 2011 and the 2014, yes.

3　Q　　If, at the end of that trial, you look and see the people

4　that were receiving both psychotherapy and medical-affirming

10:48:06　5　care at the same time, improved in mental health at the end of

6　the trial, can you as a scientist tell whether the improvement

7　is the result of the pharmaceuticals or the psychotherapy?

8　A　　Not in the design of those studies, no.  That's what in

9　science is called a confound.

10:48:27　10　Q　　Confound?

11　A　　Correct.

12　Q　　What does that mean, confound?

13　A　　It describes exactly that situation.  When two things are

14　done at once, when you see the result, you can't peel apart

10:48:37　15　which -- which of those two interventions was responsible or

16　the interaction between those two interventions was

17　responsible.

18　Q　　Okay.  But the Costa and Achille study, on the other hand,

19　they do provide scientific evidence that psychotherapy alone is

10:48:53　20　helpful, did --

21　A　　That's correct.

22　Q　　Okay.

23　A　　That psychotherapy is helpful and not the medical

24　interventions.

10:49:01　25　Q　　I also understood Dr. Antommaria to say that he had not

1    read studies about detransitioning.  But if it ever became

2    relevant, he would make an effort to review such studies.

3        You are familiar with the body of the literature

4    concerning gender dysphoria, correct?

10:49:21  5    A    Yes.

6    Q    In your opinion, are the studies of detransitioning

7    relevant to someone trying to assess the benefits and harms of

8    these treatments?

9    A    Yes, of course.  It's very difficult -- detransition would

10:49:35 10    be the situation that one is trying to avoid.  The best way to

11    avoid a situation is to understand that situation.

12    Q    Dr. Antommaria said that there are prospective

13    observational trials that demonstrate the efficacy of puberty

14    blockers in gender-affirming care, and then later said the

10:49:59 15    trials he is referring to were primarily the Dutch group

16    studies.

17        Are those the studies you just mentioned, the 2011, 2014

18    studies?

19    A    Those are the Dutch studies that usually we use.  I can't

10:50:12 20    know if he is referring to some other study that I didn't make

21    a specific reference to.

22    Q    That's fair.

23        In this area of medicine, when someone's talking about the

24    Dutch studies, the Dutch group studies, is it your

10:50:25 25    understanding they're generally referring to these 2011 and

1    2014 studies from the Dutch project?

2    A    Almost always, yes.

3    Q    Okay.  And those are the studies you just mentioned that

4    have the confound problem, right?

10:50:36 5    A    Correct.

6    Q    You can't unpack whether it's the psychotherapy or -- not

7    from that study, you can't unpack whether it is the

8    psychotherapy or the pharmaceuticals that are making the

9    difference?

10:50:47 10    A    That's correct.

11    Q    Okay.  More generally, I'd like to read for you a

12    statement from the plaintiffs' brief in support of their

13    preliminary injunction motion.

14        For the record, it's Doc 8 at page 18.

10:51:07 15        Dr. Cantor, the plaintiffs wrote in that brief, For more

16    than four decades, medical organizations have studied and

17    created an evidence-based standard for the medical treatment of

18    transgender patients.  This standard confirms that transition,

19    including puberty blockers and hormone therapy where

10:51:26 20    appropriate, is the only safe and effective treatment for

21    gender dysphoria?

22        Dr. Cantor, does the research literature support that

23    statement?

24    A    No, it does not.

10:51:37 25    Q    Do you understand the plaintiffs primarily to be pointing

1  to the guidelines of medical organizations such at WPATH and

2  the Endocrine Society and the American Academy of Pediatrics to

3  support their positions that wish to continue giving these

4  treatments to children?

10:51:52  5  A    Yes.  They cited those repeatedly.

6  Q    Okay.  What observations have you had about the WPATH

7  guidelines and whether they have support in evidence?

8  A    The WPATH guidelines and the Endocrine Society guidelines

9  have been tested among the set of -- as I say, roughly 15

10:52:13  10  outcome studies, some of them have used the WPATH guidelines or

11  Endocrine Society guidelines instead of the Dutch protocol.

12  And those studies demonstrated that there was no improvement at

13  all.

14      I shouldn't say none at all.  One of them used several

10:52:36  15  kinds of measures of improvement, and I think it was all but

16  one demonstrated no differences at all.  And one small one gave

17  an indication that suggested the possibility.

18  Q    Have these organizations acknowledged anything about

19  desistance rates -- these organizations, I'm referring

10:52:57  20  specifically to WPATH and the Endocrine Society?

21  A    I can't say that they've never addressed it, but to the

22  extent if it was ever addressed, they are grossly, grossly

23  minimized.

24  Q    Can I refer you to paragraph 12 of your report on page 4?

10:53:33  25  A    I got it.

1    Q    You say in that paragraph that the plaintiffs'

2    documentation -- and I assume by documentation, you mean

3    their -- the pleadings in this case and the briefs that you had

4    seen?

10:53:50  5    A    That's correct.

6    Q    You said the plaintiffs' documentation misrepresents the

7    contents of the associations' policies themselves.

8         Which associations were you speaking of there?

9    A    They mentioned several other societies which made short

10:54:04  10    statements in general support of sexual diversity, but without

11    actually issuing specific standards about how to treat people

12    in that community with what or at what ages.

13    Q    And what inconsistencies did you see between what those

14    organizations have said and the arguments you saw in

10:54:23  15    plaintiffs' briefing?

16    A    The plaintiffs referred to the societies as if they were

17    providing very specific support for very specific policies

18    rather than general recommendations to provide, for example,

19    respect and values for diversity, but no specific guidelines.

10:54:48  20    Q    Okay.  Well, looking at paragraph 12, is one of your

21    points here looking at the bullet points that even WPATH and

22    Endocrine Society acknowledge as you write, that desistance of

23    gender dysphoria occurs in the majority of prepubescent

24    children?

10:55:04  25    A    That is correct.

1  Q     And then turning the page, were there other issues you saw

2  that the statements -- that these organizations believed and

3  plaintiffs' briefing was inconsistent with what the

4  organizations had stated?

10:55:16  5  A     That the issue of mental health and that mental illnesses

6  and similar concerns need to be resolved before considering

7  transition rather than depending on transition to be the

8  resolution of, for example, depression and anxiety.

9  Q     And have any of these organizations acknowledged that

10:55:42 10  puberty-blocking medication is an experimental not a routine

11  treatment?

12  A     Yes, they have used that phrase.

13  Q     Which organization?

14  A     Again, I would have to look up to see exactly who used

10:55:52 15  which word.  I believe it was WPATH, but I again have to go

16  back and check to make sure that it was they.

17  Q     And let's turn to the American Academy of Pediatrics.  And

18  I will refer you to your appendix.

19        And, Dr. Cantor, if you look at the top of the page, you

10:56:12 20  will see a line of blue figures.  And it's page X out of 106.

21  The appendix I am referring to is page 100 out of 106.

22  A     Got it.

23  Q     What does the American Academy of Pediatrics or AAP, what

24  do they recommend in this area of care?

10:56:42 25  A     They recommend what I can best describe as affirmation on

1  demand.

2  Q    Okay.  Did you review their recommendation when it came

3  out?

4  A    Specifically I reviewed the sources on which they based

10:56:58  5  their recommendations.

6  Q    Okay.  Did you write about that?

7  A    Yes, I did.

8  Q    And does that appear as an appendix to your report

9  beginning at page 100 of that pdf?

10:57:09 10  A    That is correct.  I summarized all of my comments.  I

11  submitted them to a journal where they underwent peer review.

12  And it's an official published peer-reviewed paper.

13  Q    This is not a letter to the editor?

14  A    That is correct.  This is part of a scientific -- now part

10:57:22 15  of the scientific literature.

16  Q    What did you comment upon?

17  A    I really just checked what the authors of the AAP policy,

18  Dr. Rafferty, what their claims were, what they said was in

19  their references versus what was actually in their references.

10:57:43 20       And not only did their sources not contain what they were

21  alleged to have obtained, they often contained the very

22  opposite of what the AAP policy said they contained.

23  Q    Did you have an agenda to disprove -- to prove or disprove

24  anybody when you undertook that review of the evidence?

10:58:01 25  A    I wouldn't say an agenda other than to set the record --

1    pardon the pun -- straight.

2         This was a situation where these sources I had known for

3    many years.  I had read them when they had first came out.

4         And when AAP came out with its policy, I was stunned by

10:58:21 5    its content.  And as I read what they were basing it on, my

6    recollection was immediately this is not what those sources

7    said.

8         So immediately I just started double checking myself.  Did

9    I misread something?  Am I misremembering something?

10:58:36 10        And as I just checked in my own files with copies of these

11   papers -- most of these papers already in it, my memory was

12   correct.  They said as -- the kinds of things I recalled them

13   to be saying.

14        Because we were now talking a major medical association

10:58:51 15   rather than an individual other scientist.  This was different

16   from just one scientist like me disagreeing with another

17   scientist.  This was now -- now had the potential to cause a

18   great deal of damage to a great number of people.

19        So because I had the ability to do it, I simply summarized

10:59:11 20   the contents of the original paper and contrasted point by

21   point the claims being made by AAP and simply quoting verbatim

22   what was in the original studies.

23        That entire thing was published, and the AAP has never

24   responded.  They were approached by the media, and they just

10:59:33 25   would refuse to talk even to the media.  They have yet to have

1    any response.

2    Q    So to date, the AAP has not responded to the criticisms

3    that you raised?

4    A    That is correct.

10:59:42 5    Q    I will refer you now to page 6 of your report.  Going by

6    the numbers at the bottom of the pages.

7    A    Yep.

8    Q    As you noted in your review of the plaintiffs' expert

9    report -- well, first off, did you review the expert reports

11:00:08 10    submitted by the plaintiffs by Dr. Hawkins and Dr. Ladinsky?

11    A    Yes, I did.

12    Q    And did you note that they studied a 2016 Olsen study

13    claiming that it proves that transition reduces the risk of

14    mental illness?  That that was their claim?

11:00:23 15    A    Correct.

16    Q    Does the Olsen study show that?

17    A    Just referring to my own report.  Ultimately, no, it did

18    not.  There was several statistical errors in the Olsen study.

19    The data were obtained then by the -- they -- upon request, and

11:00:45 20    Olsen provided their data to another author who reanalyzed -- I

21    should say, correctly analyzed the Olsen data, who demonstrated

22    that Olsen's data did not contain evidence of improvement.  In

23    fact, it contained evidence of deterioration.

24    Q    So in your opinion, does the 2016 Olsen study support

11:01:04 25    plaintiffs' position that children need these affirming --

1  these medicalized affirming treatments in order to improve

2  their mental health?

3  A    No, it does not.  Making such a claim is a half truth.  It

4  would ignore the subsequent entries in the scientific

11:01:20 5  literature.

6  Q    And what about the de Vries study that plaintiffs cited in

7  which you address on page 9 of your report?  And does it show

8  that medical transition of minors improves mental health?

9  A    No.  It contains part of the confound.  The de Vries study

11:01:43 10  as part of a Dutch group also included psychotherapy during

11  transition.  So it is not possible to differentiate which type

12  of therapy, medical or psychotherapy, is responsible for the

13  benefits reported in that study.

14  Q    I see.  So participants in that study did have improved

11:02:00 15  mental health, correct?

16  A    Yes.

17  Q    But it's just not possible scientifically to tell what

18  caused the improvement?

19  A    Correct.

11:02:06 20  Q    And what about the Greene and Turbin studies plaintiffs'

21  experts cited which you discuss in paragraph 24 of your report?

22  A    Yep.

23  Q    Do those studies show that medical transition improves

24  mental health?

11:02:25 25  A    No, they do not.  These are retrospective correlational

1    studies.  They are not able of describing any causal effect

2    coming to any causal conclusion.

3    Q    Okay.  Now, you mentioned there that -- you say this very

4    pattern is what one would predict from clinical gatekeeping.

11:02:43  5    What do you mean by clinical gatekeeping?

6    A    One of -- across the various clinical standards are to

7    prevent somebody with mental illness from undergoing

8    transition.  So such people are being held back.  They're being

9    filtered out of groups who do undergo transition.

11:03:03 10        So when a clinic then compares the people who underwent

11   transition to the people in their files who did not undergo

12   transition, they are necessarily comparing a group of people

13   from whom the mental illness was removed and comparing them to

14   a group of people from whom the mental illnesses were not

11:03:22 15   removed.

16        So when you see better mental health amongst the people

17   who had transitioned, the improvement is not because of the

18   transition, the improvement is because you have removed the

19   people with the worst mental health from the group in the first

11:03:40 20   place.

21   Q    Okay.  So is it correct, then, that one thing you might

22   see in these studies is by picking out the people with the best

23   mental health, and giving them the treatment, then comparing

24   them to the people with lower mental health, then, of course,

11:03:57 25   the people who went through the study would do better?

1   A    That is correct.

2   Q    Did you review any of the other studies that plaintiffs

3   have submitted into evidence such as the Allen study, the

4   Turban articles, the Biggs (phonetic) study, the Lopez de Lara

11:04:24 5   study, Tordoff?

6   A    Yes, I have.

7   Q    Do you have any comments on those studies and whether they

8   support plaintiffs' position?

9   A    They suffered from the same methodological problems as the

11:04:35 10   other studies.

11   Q    Did any of those studies support the position that medical

12   transition improves mental health?

13   A    No, they did not.

14   Q    In minors with gender dysphoria?

11:04:47 15   A    Correct.  No, they do not.

16   Q    Oh.  What has been called the Yale study by Brouware,

17   B-R-O-U-W-A-R-E, was the first named author.  Did you review

18   that one?

19   A    Yes, I did, but it wasn't a study.

11:05:07 20   Q    What was --

21   A    Apparently, that was a report submitted by those authors

22   for another -- or for a combined set of court cases.

23   Q    Okay.  But you would not refer to that document as a

24   scientific study?

11:05:21 25   A    From the Yale group with -- again, the name I don't -- I

1    hesitate to try to pronounce, but, no, it was not a study at
2    all.  It was those authors' report reviewing the literature and
3    providing their opinions.

4    Q    Okay.  As a matter of fact, Dr. Ladinsky was asked about
11:05:39 5    that study yesterday.  And for the record, that testimony
6    appears on page 116 of the rough transcript.

7        The question was:  In this document, do the authors also
8    cite a number of peer-reviewed studies that contradict some of
9    the supports or the principles that the State articulated as
11:06:00 10   the reasons for SB 184?  And Dr. Ladinsky responded, They do, a
11   considerable compendium of them.

12       Is she right?  Did those authors show that there are
13   studies that contradict the State's position in this case?
14   A    There was such a statement.  There was no meaningful way
11:06:21 15   to try to put together what claim went together with what
16   source.  Rather than -- what's done more typically either in
17   science or in pause, best as I understand, is here the claim
18   and here is the source justifying it.  Here is next claim, here
19   the source justifying it.

11:06:38 20       Instead, that document made a long series of unsourced
21   claims and then provided a long series -- a series of very
22   large footnotes with 20 and 30 references.  And there was just
23   no way to see what fact was alleged to have come from what
24   source.

11:06:56 25   Q    So we've talked about whether the literature the

11:07:17

1   plaintiffs' -- the studies that plaintiffs cite to support

2   their position.  Let's talk about whether the literature

3   supports the State's position.  But a little background first.

4       Could you describe from your review of the literature just

5   what's the difference between adult onset gender dysphoria,

6   child onset, and adolescent onset?  And I know this is a broad

7   question, but I just mean like age groups.

8   A   Usually we would be referring to these as a prepubescent

9   onset.  Then the literature is very, very long, but reported on

10  adult onset.  And by adult, on average, these were people in

11  their 20s and in their 30s and 40s.  It was very, very

12  distinct.  It was not, you know, a bell-shaped curve with some

13  midpoint around 18 or 19 years old.

14      It's only within the past --

15          THE COURT:  Hold on one second.

16      Go ahead.  Sorry.

17          THE WITNESS:  It's only within the past ten years or

18  so that a different profile has begun to emerge and was noticed

19  by clinicians.  And that now is being called either adolescent

20  onset or rapid onset.

21      Now, all three of these groups have in common that they're

22  complaining about the same thing.  Doc, I feel like I am in the

23  wrong body.  Doc, I am the brain of one, but in the body of the

24  other.

25      So the way that they describe it is similar.  But every

1  objective way we have of measuring these people shows that

2  these are independent phenomena.  They are not related except

3  in the way that people describe the situation, describe what

4  they're experiencing.

11:08:50 5      The best analogy I have would be if somebody came to a

6  doctor saying I have a headache.  Okay.  I got it.  Got that's

7  a symptom.  I have some more questions.  But we cannot from

8  that say that a migraine headache is the same thing as a

9  tension headache is the same thing as having just suffered a

11:09:08 10  head injury.

11      The causes are different.  How we respond to them is

12  different.  And the other characteristics about each of these

13  are different.  They only resemble each other in the most

14  superficial ways.

11:09:19 15      Childhood onset or prepubescent onset gender dysphoria

16  appears to be entirely unrelated to adult onset gender

17  dysphoria.  And the two of those appear to be entirely

18  unrelated to the rapid onset or adolescent onset gender

19  dysphoria.

11:09:40 20  BY MR. DAVIS:

21  Q    Well, let's break that down.  Adult onset, typically

22  people who present with what you're referring to adult onset

23  gender dysphoria, what age are they when they come into the

24  doctors' office and say, something's wrong?

11:09:50 25  A    On average, in their 30s and 40s.

1  Q    Okay.  Has there been research considering whether

2  those -- that universe, the adult onset universe does well

3  after transitioning?

4  A    Those who are mentally healthy by and large do, do well

11:10:08  5  after transition.

6  Q    Can you apply those studies to consider whether someone

7  with child onset gender dysphoria is going to do well after

8  transitioning?

9  A    No.  Because these are independent phenomena.  The

11:10:23  10  information from one does not -- from one group does not

11  generalize to the other.

12  Q    Comparing the adult and the child onset, what is the

13  difference that makes the studies of one, you know, it's not

14  apples to apples?

11:10:35  15  A    Correct.

16  Q    Okay.  What is the difference between those patients?

17  A    The -- they -- as I say, differed in just about every

18  objective measure we've been able to apply to them.

19       There are, of course, the ages themselves.  Something --

11:10:53  20  the sex ratios in them are different.  The adults are almost

21  100 percent biological male.  There's more of a mix amongst the

22  childhood onset.

23       The adults are almost always attracted to females.  That

24  is to say, relative to being biological male, they are almost

11:11:13  25  always heterosexual.

1    The childhood onset almost always are attracted to the

2  same biological sex.  They are almost always homosexual.

3  Q    Talking about the child onset, is that a new phenomenon,

4  child onset gender dysphoria?

11:11:31 5  A    I wouldn't say new.  It's been systematically studied for

6  20 to 30 years'ish.

7  Q    From the literature that you reviewed, do most of these

8  kids, if not socially transitioned and given hormones, will

9  they want to transition after reaching puberty?

11:11:52 10  A    Generally not.

11  Q    And page 36 -- excuse me -- paragraph 36 of your report,

12  Dr. Cantor, what statistics do you provide about the rates of

13  desistance among those presenting with childhood onset gender

14  dysphoria?

11:12:15 15  A    The exact numbers are between 61 to 88 percent of them

16  desist.  In the appendix in my report, I list all of the

17  studies that have ever been conducted with that group, all the

18  outcome studies that have been conducted with that group.

19  Q    We probably both need to slow down just a little bit

11:12:37 20  for...

21  A    I'm from New York.  It just happens.

22  Q    We'll do our best.

23    Dr. Hawkins was asked about your paragraph 36 yesterday.

24  And I will represent that on page 30 of the rough transcript,

11:12:54 25  she said that when the study such as the ones you're citing

 1  offers this elevated rate of desisters, quote, what we tend to

 2  find is that the initial cohort that was given the diagnosis of

 3  gender dysphoria is actually false.

 4       My question, Dr. Cantor, is:  Does the research literature

11:13:15  5  support Dr. Hawkins's statement?

 6  A    No.  As I say, I listed every single such study.

 7  Q    Do we have any tools today that reliably tell us which

 8  kids will desist and which kids will persist?

 9  A    No, we do not.  There have been some attempts to develop

11:13:34 10  such a test, but they have never been able to find a good

11  characteristic, a feature, a pattern, a test result in which

12  the majority continued to want to persist.

13       The best that they have ever been able to do was find a

14  tool which distinguished unlikely to want to persist versus

11:13:54 15  even less likely to want to persist.

16  Q    There's been testimony about something called the DSM-5.

17  Do you know what that is?

18  A    Yes, I do.

19  Q    What is it?

11:14:04 20  A    The full name is the Diagnostic and Statistical Manual of

21  Mental Illnesses, published by the American Psychiatric

22  Association.

23  Q    If someone were to claim that now that we have the DSM-5

24  we may be able to do a lot better with identifying who's the

11:14:24 25  desister and who is the persister, is there any research on

1  that?

2  A     No.  Nobody's ever tried to differentiating any of the

3  DSMs from DSM-I through its various versions to the current

4  one.

11:14:38  5  Q     So there have been at least five?

6  A     There was a I, a II, a III, III-R, IV, IV then had a text

7  revision.  They switched some of the commentary around the

8  diagnoses, but they didn't change any of the diagnostic

9  criteria themselves.  There was then the 5.  And there is as of

11:15:01 10  last month a 5 again with a text revision, but no changes to

11  any of the actual diagnostic criteria.

12         THE COURT:  Mr. Davis, how much longer do you think we

13  will be?

14         MR. DAVIS:  Your Honor, direct will take us up to

11:15:14 15  about noon, I would predict.  There's just a lot to cover with

16  Dr. Cantor.

17         THE COURT:  I am not rushing you.  I am just trying to

18  get a road map of that.

19      So how long do we think cross might be?

11:15:25 20         MS. EAGAN:  It's difficult to predict because I am not

21  sure what else he may say, but maybe an hour, hour or less, I

22  would think.

23         THE COURT:  All right.  I am leaning toward an earlier

24  lunch than we did yesterday.  So maybe -- if it's okay with

11:15:45 25  you, let's just go ahead and find a stopping point at your

1  leisure, and we will just pick back up after lunch.

2          MR. DAVIS:  Thank you, Your Honor.  This is as good as

3  any.

4          THE COURT:  Is it?

11:16:00  5          MR. DAVIS:  Yes.  We have just talked about DSM-5.

6  Going to watchful waiting next.  This is as good a place as

7  any.

8          THE COURT:  Okay.  Good.  Good.  With that said, then

9  are we still on target with your last witness?

11:16:17  10          MR. DAVIS:  Yes, Your Honor.  Ms. Wright is here.  I

11  don't know if she is in the courtroom yet or not, but she is in

12  Montgomery, and she will be ready to go when we finish with

13  Dr. Cantor.

14          THE COURT:  We think the length of that witness would

11:16:30  15  be what?

16          MR. DAVIS:  Oh, I would say direct would be well under

17  30 minutes, but I don't know about cross.

18          THE COURT:  Okay.  All right.  Okay.  Well, I think

19  we're on target.

11:16:38  20      Let's take a good long lunch today.  Let's see here.

21  Let's come back at 12:45.

22          MR. DAVIS:  Thank you, Judge.

23          THE COURT:  Thank you.

24          MR. DOSS:  Judge?

11:16:54  25          THE COURT:  Yes?

```
 1              MR. DOSS:  Closing, how long would you like?
 2              THE COURT:  You know, I mean, this is important.  I'm
 3    not going to, you know, jack everybody up on this, but to the
 4    extent you can hold it to around 25, I think would probably be
 5    a good thing.
 6         And in your openings, I think you really road mapped it
 7    very well, both sides did.
 8         So, you know, again, I know the arguments.  I'm really
 9    interested in, you know, some analysis with case law.  And I am
10    going to be directly asking about a few cases.  I'm very
11    interested to know parallels between the Arkansas decision and
12    that law.  And then I may give you some hypotheticals that you
13    won't like.
14         See you after lunch.
15              (Recess.)
16              THE COURT:  All yours, Mr. Davis.
17              MR. DAVIS:  Thank you, Judge.
18    BY MR. DAVIS:
19    Q    Welcome back, Dr. Cantor.
20         We spoke earlier about the Dutch protocol.  Did the
21    participants in those Dutch studies have psychotherapy before
22    beginning treatment?  Before that study?
23    A    They were receiving treatment as part of their
24    participation in the study.  I don't think they reported
25    whether anybody happened to have attempted psychotherapy before
```

1    approaching the clinic at all.

2    Q    Okay.  Forgive me if I'm mistaking which study is which.

3    I was reading about a study that described the psychotherapy

4    that was available to the participants as extensive.  And that

12:51:40 5    that extensive psychotherapy was at least two years.  Which

6    study am I thinking of?

7    A    That wouldn't have been a particular study so much as what

8    they use in their process in general.

9         And then the Dutch group was reporting the results, you

12:51:56 10    know, of -- periodically over the course of the study.

11    Q    I see.

12    A    But by the time the first set of results, their earlier

13    study, the 2011 study, the participants in it will have already

14    been through a substantial amount of therapy.

12:52:13 15    Q    Okay.

16    A    They also emphasize that in assessing the children that

17    it's a very extensive assessment, and the assessment itself was

18    also ongoing over the course of the study.

19         So even before deciding who might be eligible for

12:52:30 20    hormones, they have now many, many months to years' experience

21    with the particular case even with a particular child even

22    before making a decision.  That's very, very different from

23    just having an appointment, taking a test, and then having a

24    diagnostic decision an hour later.

12:52:46 25    Q    That is exactly what I was meaning to ask you about.  I

1  was using sloppy language.

2       So this extensive assessment that happened before some of

3  these children began treatments, they were assessed, you said,

4  over a course of a couple of years?

12:52:59  5  A    Correct.

6  Q    Okay.  So does literature support having such an extensive

7  assessment period before subjecting someone to these

8  treatments?

9  A    I don't know if I would say support it, but all of the

12:53:16 10  conclusions that come from the literature depend on it.

11  Q    Thank you.

12       Is there a way of treating gender dysphoria that some

13  practitioners refer to as a watchful waiting approach?

14  A    Yes.  Watchful waiting usually refers specifically to

12:53:40 15  withholding any decision about medical interventions until they

16  have a better idea or feel more confident for a particular case

17  about whether that kid is going to be a persister or desister.

18  It is given the knowledge that that's available that the

19  majority of these kids do desist.  Nobody wants to make a

12:54:00 20  decision upon first appointment.

21       And so -- so they tend to provide psychotherapy, whatever

22  kind of care, whatever is appropriate to the individual kid

23  until enough time has gone by to give -- to suggest is this a

24  kid whose feelings like they're feelings are slowing down and

12:54:19 25  they just need more time, are they building up, or are they

1  staying steady?

2       So the watchful waiting period would be postponing any

3  decision about medical interventions until the clinicians had

4  some confidence.

12:54:31 5  Q    While you are watching and while you are waiting, are you

6  just leaving him alone, or her?

7  A    No.  That would be the time during which one would be

8  supplying a therapy for whatever else is going on in the kid's

9  life.

12:54:42 10  Q    Okay.

11  A    Usually they're associated with -- there's a great deal of

12  what we call comorbidity.  They're also suffering from other

13  problems at the same time, either depressions, anxieties, early

14  evidence of personality disorders, for example.  And it's never

12:55:00 15  clear whether their gender dysphoria is a result of those other

16  psychological problems.

17       So by helping them develop the tools to deal with those

18  other problems, if they remain dysphoric afterwards, we know

19  that the dysphoria wasn't the result of those other problems.

12:55:17 20  So rather than just leaving them alone, they're still receiving

21  support, and the family is still receiving support over that

22  period.

23  Q    So I believe you pointed out in your report that clinical

24  guidelines suggest that mental health issues such as the

12:55:33 25  comorbidities you mentioned should be resolved before

1    transition; is that correct?

2    A    Yes.

3    Q    Okay.  Why?

4    A    Because it's never clear what's causing what.  We cannot

12:55:44 5    from a correlation conclude anything about a causation.  It's

6    very possible, and it's been frequently observed that a lot of

7    these kids are using gender issues as an explanation for the

8    unhappiness that they're experiencing elsewhere in their life.

9        So rather than developing the skills to -- for example --

12:56:04 10   better social skills.  If a person feels awkward and they're

11   withdrawing from kids their own age, we are not sure if they

12   want to transition because they're blaming gender dysphoria for

13   why they feel unpopular or uncomfortable, and we're not --

14   versus we can't tell if anxiety or depression is a result of

12:56:27 15   how they're being treated by the rest of society.

16       So it's only by helping them deal with and by giving them

17   the skills to overcome those other disorders that we can see if

18   the gender dysphoria itself resolves just as a result of that.

19   Q    So if a person is suffering from depression, or is

12:56:48 20   struggling with their own sexual identity, or some type of

21   abuse, or any of these other comorbidities, explain how this

22   psychotherapy process would work, how a psychotherapist such as

23   yourself would try to dig down into the issue and see if that

24   is something that's generating these feelings that are being

12:57:08 25   mistaken as gender dysphoria, or whether the gender dysphoria

1  is its own thing.

2  A    Just to be specific, I'm specifically an adult clinical

3  psychologist.  I see clients ages 16 and up.  So it wouldn't be

4  me personally.

12:57:23  5    What the literature shows about these kids is that they

6  can be very, very diverse.  It certainly is feasible that they

7  are experiencing, for example, depression or anxiety as a

8  result of social transphobia, but that doesn't explain the

9  other things that we're observing.

12:57:41  10    For example, a transphobia doesn't cause autism, which is

11  another very, very common disorder in that group.  Transphobia

12  wouldn't cause the development of borderline personality

13  disorder, which we're seeing in very, very, large proportions

14  among the teenagers.

12:57:58  15    So although certain symptoms like anxiety and depression

16  can feasibly be the result of social reactions to being trans,

17  but that does not explain the overall phenomenon.  What does

18  better explain the overall phenomenon is that there is some

19  thing troubling this kid, and it is resulting in both the

12:58:20  20  psychological symptoms, depression, anxiety in someone, and

21  also producing the gender dysphoria, that discomfort with being

22  their natural sex.

23  Q    I would expect this could vary wildly from patient to

24  patient, but if you -- and I recognize and thank you for

12:58:37  25  clarifying that you deal with a more adult-age group.

```
 1        But if you're helping someone, an adolescent, work through
 2   some of these issues, how often do you think a psychotherapist
 3   would want to see the patient and over what period of time?
 4   A    It does vary widely.  And the kind of disorders that
 5   they're reporting do tend to be the kinds that require very
 6   long-term interventions.
 7        As I say, autism, and related Asperger's syndrome, and
 8   also very, very high rates of borderline personality disorders,
 9   which, again, is a very, very long-term disorder to help
10   somebody deal with.
11   Q    Fair to say this would not be two or three sessions?
12   A    Correct.  This would be over the course of months or
13   years.
14   Q    Does the research literature show that there are risks
15   associated with medical transitioning?
16   A    Yes, quite substantial, including both loss of --
17   primarily loss of function, and depending on the person's point
18   of view, whatever the cosmetic effects are.
19   Q    What are the risks of the watchful waiting approach in
20   providing psychotherapy in helping the child deal with any
21   underlying emotional issues?
22   A    There don't appear to be any, at least any concrete.
23   Q    I will refer you to paragraph 68 of your report,
24   Dr. Cantor.
25        Tell me what the advantages there are to a patient, what
```

12:58:57
12:59:14
12:59:30
12:59:48
13:00:06

1 opportunities it opens up to him or her if any emotional issues
2 are dealt with before the decision to transition.
3 A    If a person fails to deal with whatever emotional issues
4 before it transition, and then transitions and discovers that
13:00:30 5 they continue with whatever psychological issues are pervading
6 them, they have gone through the entire transition process
7 entirely unnecessarily.  They haven't been helped.  They have
8 now lost whatever -- they have now been sterilized, lost
9 whatever sexual -- or other functions, but it hasn't actually
13:00:49 10 resulted in any improvement in their psychological function.

11    If you go the other way around and you help the person
12 deal with psychologically whatever it is that's going on, they
13 still retain the option for transition after that.  And it's
14 that situation that the professional societies have
13:01:05 15 repeatedly -- that the standards of care have repeatedly
16 pointed out.
17 Q    So watchful waiting approach does not eliminate a person's
18 ability to transition to the opposite sex later in life if they
19 so choose?
13:01:19 20 A    Correct.
21 Q    Does the research literature show there's any relationship
22 between children who present with gender dysphoria and those
23 who later in life turn out to identify as gay?
24 A    Yes.  The large majority of the ones who believe that they
13:01:42 25 were born the wrong sex turn out to be gay or lesbian.

1       To a prepubescent child who doesn't yet have a sex drive,

2  they have no way to interpret why they feel different from

3  other boys or other girls their age.  It's only with the onset

4  of sex drive that they start -- and start developing crushes

13:01:58  5  and physical attractions that they now have the information

6  they need to realize why they're different.  But to an eight

7  year old or to prepubescent children, the only explanation they

8  have for why they're not like other boys or not like other

9  girls is they must be the wrong sex.  They're misinterpreting

13:02:18 10  their feelings.

11       THE COURT:  Let's take a quick time out.

12       So, you know, I guess I'm wondering how both sides are

13  wanting me to use all this expert testimony.  I mean, the

14  Eleventh Circuit has said more than one time that, you know,

13:02:31 15  medical psychiatric professionals are in a far better position

16  to make decisions about medical and psychiatric issues than

17  judges are.

18       So I guess I want to know from each side real quickly, how

19  do y'all envision that I use these experts?  I mean, are you

13:02:48 20  asking me to say, well, this guy's science is junk and this

21  guy's science is perfect; or something in between?  What am

22  I -- tell me how you envision me using this.

23       MR. LACOUR:  May I?

24       THE COURT:  Perfect.  Absolutely.

13:03:05 25       MR. LACOUR:  Your Honor, as we began the opening

1  statements, when there's an area of medical uncertainty, the

2  State has wide discretion to regulate.  So if it's not so clear

3  to you as to which side's experts have it right, if you see

4  that uncertainty, then under Supreme Court precedent, the State

13:03:29  5  is allowed to regulate.

6      The State has to think about all 5 million Alabamians.  We

7  have to take all that into account when regulating in these

8  areas where it is not certain.

9      The judge has an important but a limited role in our

13:03:45 10  federal system to see whether those judgments the State has

11  reached in those areas of uncertainty somehow conflict with the

12  Constitution.

13      And we submit we have come forward with evidence to at

14  least put into question whether there is this consensus that

13:04:03 15  has been proclaimed by the plaintiffs here.

16      Again, I think the bar on the plaintiffs is quite high, to

17  show an absence of uncertainty, or to show some great

18  certainty.

19      And when you look at the international studies and the

13:04:19 20  literature reviews, when you hear from very qualified experts

21  like Dr. Cantor, who have applied great rigor to these studies

22  that are being relied upon by the plaintiffs, by their experts,

23  by the AAP, for example, then I think that is enough to create

24  that doubt to create that space for uncertainty.  And when that

13:04:45 25  is there, the State can step in.

1    So that's how we see it.  We don't think that you sit here

2    as an independent medical board to assess whether a particular

3    treatment is going to be the best for any particular

4    individual.  The role of the federal courts in our federal

13:05:01 5    system, the laboratories of democracy is to see if we have done

6    something that is somewhat inexplicable.

7        I think there is ample evidence to explain why the State

8    has done what it's done in addition to the lengthy legislative

9    findings in SB 184.

13:05:22 10       We have come forward with multiple experts from fields of

11   endocrinology, psychology, and pediatrics, and have brought

12   forward substantial amount of other peer-reviewed research and

13   literature reviews to show that this very novel area of the

14   law -- keep in mind the UAB clinic didn't open until

13:05:44 15   seven years ago.  This is a novel area of medicine, rather --

16   is just, in the State's judgment, too risky.  And if that's a

17   reasonable judgment for the State to make, then that's the end

18   of the case.

19           THE COURT:  All right.  Mr. Doss.

13:06:03 20           MR. DOSS:  Your Honor, I'm unaware of a case that

21   establishes that principle that's so long as there's

22   uncertainty and a reasonable judgment, then that alone is

23   sufficient for the State to violate constitutional protections.

24       The standard of review is what I think helps frame some of

13:06:23 25   this testimony.  So, for example, if strict scrutiny applies,

1  it is the State's burden to establish a compelling state

2  interest.  And that its infringement on the constitutional

3  protection has been narrowly tailored.

4       And I guess to preview Your Honor for closing, that is a

13:06:40 5  key focus that I plan to spend some time with in closing on why

6  this testimony we've heard yesterday and today, number one,

7  does not establish a compelling State interest.  But number

8  two, even if you assume that it does establish some interest by

9  the State, the interest that the State has identified and the

13:06:58 10  regulation that it has imposed are mismatched.  It's not

11  narrowly tailored for the very reasons offered by the State

12  through its witnesses.

13       And based on the standard of review, it is not a reasoned

14  judgment.  That's not the test for when a constitutional

13:07:13 15  violation has occurred.  The test is whether there is

16  satisfaction of this demanding standard for the law's

17  viability.

18       And so as I mentioned in opening, I don't think that Your

19  Honor's job for the purpose of this hearing is deciding

13:07:31 20  ultimately maybe even who is right.  It's to show that there is

21  scientific -- there are standards of care that exist, there are

22  approved approaches to dealing with these issues.  These are

23  real medical diagnoses.  These are real medical treatments.

24       And though the State may disagree them, that's not enough

13:07:50 25  to establish the violation of the constitutional rights, Your

```
 1  Honor.

 2          THE COURT:  And on that note, at least from what I can

 3  tell from both sides, State and government, and original

 4  plaintiffs, am I correct to say that everybody agrees that

 5  these are real diagnoses?  Or no?

 6          MR. LACOUR:  Your Honor, could you --

 7          THE COURT:  And I am going to say this one more time.

 8  I don't need head nods.  It is out of hand.  This is not

 9  entertainment.  This is the real world and the law.  So we're

10  not in a movie theater.  I don't need head nods.  I don't need

11  approval or disapproval.  If you want to do that, take it

12  outside.

13      Go ahead.

14          MR. LACOUR:  Your Honor, I think -- Your Honor, we

15  agree that gender dysphoria is a psychological diagnosis, but

16  as we have shown in both our written evidence and through

17  witness testimony from both defense witnesses and plaintiffs'

18  witnesses, we don't know whose gender dysphoria is likely to

19  persist.  And that's very important.

20      Even Dr. Antommaria this morning said that if you -- the

21  level of certainty you have --

22          THE COURT:  You are giving me more detail than I want.

23  I just need you to answer my question.

24          MR. LACOUR:  Okay.  Can I respond to something

25  Mr. Doss said before?
```

1          THE COURT:  Very quickly.

2          MR. LACOUR:  He is unaware of the standard.  We cited

3    it multiple times in our P.I. response.  It's Gonzales vs.

4    Carhart, a 2007 decision from the Supreme Court where the

13:09:32 5    federal government had regulated partial birth abortion.  That

6    was an area of medical uncertainty.

7          There were -- I will go back and I will look at the

8    filings in that case, but I would be shocked if the AMA did not

9    chime in, in favor of the plaintiffs who were challenging the

13:09:46 10   ban on partial birth abortion there saying that it was a safe

11   or necessary -- medically necessary treatment for some people.

12         It was enough that Congress found medical uncertainty

13   there.  And there were values, as well, in unborn life that

14   Congress was able to promote even though there were medical

13:10:04 15   organizations.

16         I will confirm this before closing, but I am fairly

17   certain there were medical organizations who were not fans of

18   Congress's action there.

19         Even so, and even in an area like abortion where there is

13:10:16 20   more law at least for the last 49 years in that space,

21   addressing some right to abortion, even then, that ban was

22   upheld by the Supreme Court.

23         THE COURT:  And I'm sure you can get into that on

24   closing.

13:10:31 25        Let's go back to my original question.  Just answer it

 1   succinctly for me.

 2             MR. LACOUR:  And that would be are these real

 3   diagnoses?

 4             THE COURT:  Yes.  Just answer my question in two

13:10:41  5   sentences.

 6             MR. LACOUR:  Gender dysphoria is a diagnosis.  I think

 7   the debate is how should it be treated.  And SB 184 is

 8   expressed in Section 6.

 9        There's no ban on psychotherapy whatsoever.  The ban only

13:10:58 10   applies to these novel risky potentially long-term

11   harm-inducing or causing medications.

12             THE COURT:  So no argument from the State on status,

13   diagnosis, any of that?  You are only -- your only issue is

14   treatment; is that correct?

13:11:17 15             MR. LACOUR:  Correct, Your Honor.

16             THE COURT:  Got it.  Thank you.

17        Anything else, Mr. Doss?  And I will give the government a

18   shot --

19             MR. DOSS:  No, Your Honor.

13:11:25 20             THE COURT:  -- if they want to be heard.

21             MR. CHEEK:  Nothing else to add that hasn't already

22   been said, Your Honor.  Thank you.

23             THE COURT:  Okay.  All right.

24        Mr. Davis, I have gotten right in the middle of your

13:11:34 25   witness again.  Sorry.  Pick it back up.

```
 1          MR. DAVIS:  I certainly understand, Judge.
 2   BY MR. DAVIS:
 3   Q     Okay.  Dr. Cantor, we to try to pick up where we were.
 4          Let's take two young boys, eight years old, say.  So
 5   puberty hasn't started yet.  They both have gender dysphoria,
 6   even though they may not really understand it yet.
 7          And I know I'm asking you to assume some things that an
 8   outside observer may not be able to confirm just by looking at
 9   that child.
10          And let's assume that both those young boys would, if not
11   intervened with transitioning care, would both grow up to
12   identify as gay.
13          So the boy who is left alone to go through natural
14   puberty, what does he come to understand once puberty kicks in?
15   A     Once he -- as puberty kicks in, of course, sex drive comes
16   in as a part of that, and he starts experiencing sexual
17   attractions and sexual arousal.
18          That, then, because he is experiencing it towards other
19   men, teachers, peers, whoever it is, he can now -- he now has
20   the opportunity to understand the nature of his experiences and
21   why he doesn't feel quite like other boys, why he doesn't feel
22   as masculine, and why he doesn't feel as masculine.
23          Now, in otherwise healthy circumstances, he will grow up
24   to be a healthy gay man.
25   Q     Now, the other boy is given puberty blockers.  What
```

13:11:52 (line 5)
13:12:06 (line 10)
13:12:24 (line 15)
13:12:41 (line 20)
13:12:57 (line 25)

1  happens in his case?

2  A    Such a person who does not develop sexual -- the capacity

3  for sexual arousal and sexual attractions because the very

4  biological features which produce that have been held from him,

13:13:14  5  he never experiences an orgasm.  He never experiences sexual

6  arousal, and doesn't have the opportunity to understand the

7  other potential explanations for why he feels the way he does,

8  and go from a child's understanding of why he doesn't feel like

9  other boys, to an adult's understanding of why he doesn't feel

13:13:36 10  like other boys.

11      By blocking puberty, you are blocking the very information

12  that he needs to understand his own situation.

13  Q    And you are not claiming to describe every person who is

14  experiencing gender dysphoria, I take it?

13:13:49 15  A    Correct.

16  Q    Does the evidence show that sexual orientation changes

17  after a person identifies as gay or lesbian?

18  A    No.  There is no evidence to suggest that sexual

19  orientation is unstable or changes.

13:14:05 20  Q    What does the evidence show about whether a person's

21  gender identity can change?

22  A    That shows the very opposite.  Among the children, it

23  changes in the majority of them.

24      They're even people who identify and describe themselves,

13:14:19 25  for example, as being fluid, the very definition of which is

that their gender identity changes on a constant basis.

Q    Are you familiar with the argument that if we do not allow minors to transition medically, the result will be increased suicides within these group of young people?

13:14:38  A    I've heard that said, yes.

Q    Does the research literature support the argument that denying these treatments will lead to an increase in suicidality?

A    No, it does not.

13:14:50  Q    Are you familiar with what other countries are doing, with respect to treatment of gender dysphoria?

A    Yes, I am.

Q    Are there any changes going on in recent years?

A    Very much.  In fact, things -- it's almost as if the 13:15:10 pendulum has reached its far point, and it's now coming back to a much more moderate evidence-based tone.

There was really -- sparking off of the social media age more than anything else, we're able to identify a greatly, greatly accelerated, great and greatly expanded number and type 13:15:31 of person who was potentially going to go through transition entirely, unlike the groups which we had previously studied.

Several countries, especially in Europe, permitted them with lower and lower standards.  And then once the reports started coming out that that was failing greatly, they're now 13:15:53 restricting very, very quickly and very, very greatly.

1    The two most substantial bans have been in Sweden and in
2  Finland.  And there are also now very, very strong statements
3  urging the medical field to pull things back in the UK and in
4  France.
13:16:08 5  Q    Dr. Ladinsky testified yesterday that -- I don't have her
6  exact words in front of me -- but she said that what's going on
7  in the UK and Sweden and Finland isn't as relevant here because
8  those countries have a centralized health-care system, whereas
9  we have a less centralized health-care system, and all these
13:16:35 10  experts unrelated can see the same child.
11    That's a poor paraphrase.  The record will speak for
12  itself.  But assume she made that type of testimony.  Would you
13  agree with her?
14  A    No.  I can't see the logic of it.  It's certainly
13:16:53 15  feasible, in fact, more than likely that decisions are made
16  differently when there are centralized boards and a centralized
17  authority charged specifically with reviewing the evidence that
18  will be the basis of the medical procedures of that country,
19  and the U.S. lacks that.
13:17:11 20    But there's no reason to think that that situation would
21  change the actual outcomes of the actual children getting the
22  actual interventions.
23  Q    So is it possible, then, that a more centralized
24  health-care system may provide the ability -- an even greater
13:17:24 25  ability to study and evaluate the risks and benefits of

1  gender-affirming care?

2  A    That's demonstrably true.  That is exactly the process

3  they have gone through.  They have published the results of

4  exactly their reviews, and that is how their health-care

13:17:40  5  systems -- that is what their health-care systems are

6  responding to.

7      The American professional associations have not gone

8  through such a comprehensive process.  They're merely coming up

9  with policies and citing only individual pieces of studies that

13:17:54 10  appear to support it, rather than a comprehensive review.

11  Q    I want to close a loop on adolescent onset gender

12  dysphoria.  We talked about ways different groups are

13  different.

14      What's unique about this group of adolescent onset, or you

13:18:11 15  referred to it also as rapid onset gender dysphoria?

16  A    Yeah.  It's been called both.

17      Where both the childhood onset and the adult onset are

18  primarily male, the adolescent -- the adult onset and childhood

19  onset are primarily male.  The adolescent onset is primarily is

13:18:28 20  female.  They present with a different set -- it's a different

21  epidemiological set of characteristics, and the evidence that

22  we have about both adults and children don't seem to apply to

23  that middle group.

24  Q    Does this group of people presenting with gender dysphoria

13:18:45 25  in their adolescence -- you said primarily female?

1   A     Yes.

2   Q     Do they tend to have any issues or comorbidities in common

3   with each other?

4   A     The most common one of those would be borderline

13:18:57 5   personality disorders and other difficulties with integrating

6   socially into their environments.  As I say, such as autism and

7   Asperger's syndrome.

8   Q     You are not saying that's true for everyone presenting

9   with gender dysphoria for the first time in their adolescence?

13:19:13 10  A     Correct.

11  Q     But many?

12  A     Correct.

13  Q     What does the research literature show about the

14  desistance or detransition rates of people who transition after

13:19:25 15  first presenting with gender dysphoria in their adolescence?

16  A     There has never been any such study.

17  Q     Did you review the plaintiffs' reply brief, Dr. Cantor?

18  A     Yes, I did.

19  Q     Did you see any response to your report in plaintiffs'

13:19:41 20  reply?

21  A     Not a single comment.  My name was never mentioned.  None

22  of the studies that I cited were referred to.  None of the

23  arguments were addressed.  I don't believe I was quoted

24  anywhere in it, unlike the other experts.

13:19:56 25  Q     I did note a line that the plaintiffs criticized the

1  defendants' experts in general for relying on older studies.

2  A    Yes.  I saw that claim.  I was a bit confused by it.

3      In my report, I provided a comprehensive list of every

4  single study.  There were 11 in total.  So the old studies were

13:20:18  5  listed, the new studies were listed.  It was comprehensive.

6      It was also a tangential argument.  As I said, the 11

7  studies which have been conducted were unanimous in their

8  findings.  They all found the same thing.  The majority

9  desists.

13:20:33 10      So it doesn't matter even if one did rely only on the

11  older studies, the newer studies showed exactly the same thing

12  as the older studies.

13  Q    We spoke a little bit about some of the things we heard

14  from Dr. Antommaria this morning.  I want to turn to some of

13:20:55 15  the things in his report.

16      You reviewed his written expert report, did you not?

17  A    Yes, I did.

18  Q    He -- Dr. Antommaria wrote on -- in paragraph 17 of his

19  report -- and I will find a copy if you need it, but this is

13:21:07 20  one sentence.

21      Quote, gender-affirming medical care is supported by

22  clinical studies.  Is he right?

23  A    That's true for adults, but that's not true for the other

24  groups.

13:21:21 25  Q    And Dr. Antommaria spoke about how if a drug is FDA

1  approved in one area, it's okay to use it off label in another
2  area?
3  A    That's what he said, yes.
4  Q    What does the research literature say, or what opinion do
13:21:44  5  you have about using the same drug, a puberty-blocker in the
6  case of a person who's six, seven, eight, the purpose is to --
7  precocious puberty, what about the cases of precocious puberty
8  and using puberty-blockers to help someone medically transition
9  at the beginning of normal puberty?
13:22:03  10  A    Well, the ability to use a medication off label is not a
11  blanket permission to give any drug you want for any reasons
12  you want or for any conditions you want.

13         Ultimately, it's going to depend on what the scientific
14  literature itself says, which in turn is what the various
13:22:22  15  regulatory bodies use to make their decisions to decide what's
16  off label or on label to begin with.

17         So because a medication would be useful for some people in
18  some situations and some circumstances, does not mean it's
19  automatically going to be useful for other people in other
13:22:37  20  circumstances.  Indeed it could be deleterious.

21         If you use a puberty-blocker in somebody with precocious
22  puberty, you are pushing somebody who is far below the average
23  age of puberty, and you are bringing them closer to the
24  species-typical range of puberty.

13:22:55  25         If you give that same drug to somebody who is already

```
 1  having a typical age of puberty, you are now pushing them

 2  outside of the species-typical age.

 3  Q    Thank you, Dr. Cantor.

 4       I am going to sum up.  Does the research literature

 5  support plaintiffs' claims that we need to treat children and

 6  adolescents with gender dysphoria with social transition

 7  puberty-blockers and cross-sex hormones?

 8  A    I'm sorry.  Could you say that -- I missed the first half

 9  of that sentence.

10  Q    My apologies.

11       Does the research literature support plaintiffs' claims

12  that we need to treat children and adolescents with gender

13  dysphoria with social transition, puberty-blockers, and

14  cross-sex hormones?

15  A    No.  That's terrible overstatement.

16  Q    Does the research literature support Alabama's description

17  of these treatments as experimental?

18  A    Yes.  They're fairly called experimental.

19  Q    When does a drug or a course of treatment stop being

20  experimental?

21  A    That's an excellent question.  There is no real test for

22  it.  There is no objective way to decide something is one

23  versus the other.

24       Science is never finished.  It's always possible for there

25  always to be some future piece of information that changes what
```

13:23:21 (line 5)
13:23:33 (line 10)
13:23:46 (line 15)
13:24:02 (line 20)
13:24:14 (line 25)

1   we know.

2        There are, of course, you know, different situations --

3   drugs, issues under active investigation, where it's very clear

4   that it's still experimental, and others where, you know, there

13:24:32  5   is only very little question left.

6        For this particular situation, we have a very small number

7   of studies that in certain situations might look like they

8   might be helping, but a much larger body of better performed

9   studies showing that the improvement is not actually coming

13:24:47 10   from the transition itself.

11        Indeed, there were other areas of the report that were

12   referred to already ongoing studies testing exactly these

13   interventions.  Well, that there exists ongoing tests of these

14   interventions is pretty much the definition of calling

13:25:05 15   something experimental.

16   Q    If scientists are eventually able to replicate the same

17   results under the same conditions over and over again, can you

18   then pretty much say something is established?

19   A    Yes.

13:25:17 20   Q    Has anybody been able to replicate the results of, say,

21   the Dutch study that showed at least some positive results with

22   a combination of treatments?

23   A    No.  Most of the studies have demonstrated no improvement

24   in these children from medical transition.

13:25:32 25   Q    Do you understand plaintiffs to argue that Alabama is out

```
 1  of step with groups like the American Academy of Pediatrics?
 2  A    Yes, I've heard them say that.
 3  Q    What's your response?
 4  A    Well, it's actually the American Academy of Pediatrics
 5  which is out of step with the international standards.
 6  Q    Is there a consensus, a medical consensus internationally
 7  in support of these treatments?
 8  A    There is now a very quickly developing one.  It is still
 9  ongoing debate, so I would hesitate to describe it -- describe
10  that there is a solid consensus.
11       As I say, really what we have seen is a pendulum swing
12  which is overswung and now is substantially and very quickly
13  correcting itself.
14  Q    Is the pendulum swinging in favor of medical transition
15  use of puberty-blockers and cross-sex hormones for children and
16  adolescents?
17  A    No.  It's swinging now against that.
18  Q    Is there a medical consensus in the United States for the
19  best way to treat gender dysphoria?
20  A    No, there is not.
21            MR. DAVIS:  Thank you, Dr. Cantor.
22            THE COURT:  So I do have a question myself.
23       Dr. Cantor, you said that an adult should be affirmed in
24  their transgender status.
25            THE WITNESS:  An otherwise mentally healthy adult,
```

13:25:54 (line 5)
13:26:12 (line 10)
13:26:27 (line 15)
13:26:39 (line 20)
13:26:58 (line 25)

 1   yes.

 2           THE COURT:  All right.  So make it clear to me, then,

 3   when should an adolescent or a child be affirmed in that

 4   status?

13:27:10  5           THE WITNESS:  That, to me, is an empirical question.

 6       We are not sure actually when the best time do that is.

 7   Every time we check, we keep finding that, no, that's not

 8   exactly the right way.  No, that's not exactly quite working.

 9       And when we do think we have run into a clue that gives us

13:27:26  10   an idea of when, we are not able to recreate that situation.

11           THE COURT:  Is that case by case, then?

12           THE WITNESS:  I would hesitate to say case by case

13   exactly because --

14           THE COURT:  Let me rephrase it.  Under what

13:27:44  15   circumstances would you affirm a child or an adolescent?

16           THE WITNESS:  I can't say that there's a situation --

17   all of the situations will be gray.  I can't think of any

18   evidence that would give us the kind of certainty in any case

19   that would outweigh the potential risks.

13:28:19  20           THE COURT:  So you would never affirm a child or an

21   adolescent?

22           THE WITNESS:  Not with the current evidence available,

23   no.

24           THE COURT:  Okay.  All right.  Cross?

13:28:28  25                       CROSS-EXAMINATION

BY MS. EAGAN:

1

Q      Good afternoon, Dr. Cantor.

A      Good afternoon.

Q      Dr. Cantor, you are an adult clinical psychologist, correct?

A      Yes.

Q      You are not a medical doctor?

A      Correct.

Q      Your private practice -- in your private practice in Toronto, the average age of your patients is 30 to 35 years old?

A      Average, that would be about right, yes.

Q      You've not ever provided clinical care to transgender prepubertal children?

A      Correct.

Q      You have not provided care to a transgender adolescent under the age of 16?

A      Correct.

Q      The extent of your experience, Dr. Cantor, working with transgender adolescents consists of counseling six to eight transgender patients between the ages of 16 and 18; isn't that correct?

A      Yes.

Q      So your clinical experience with gender dysphoria really lies in the counseling of adult patients?

```
 1   A     Correct.

 2   Q     And you acknowledge that gender dysphoria in children does

 3   not represent the same phenomenon as adult gender dysphoria,

 4   correct?

13:30:24  5   A     Correct.

 6   Q     And, in fact, to use your words, they differ in every

 7   known regard, from sexual interest patterns to responses to

 8   treatments?

 9   A     Correct.

13:30:36 10   Q     Dr. Cantor, you have never diagnosed a child or an

11   adolescent with gender dysphoria?

12   A     Correct.

13   Q     Never treated a child or an adolescent for gender

14   dysphoria?

13:30:48 15   A     Correct.

16   Q     You have no experience personally with monitoring patients

17   who are undergoing puberty-blocking treatment?

18   A     Correct.

19   Q     You don't know what type of monitoring is typically done

13:31:04 20   or not done on those types of patients; isn't that fair?

21   A     No.

22   Q     No, that's not fair?

23   A     Well, you -- I personally didn't do it, but I am aware of

24   the procedures that are done.

13:31:15 25   Q     Okay.  But you have no experience with that?
```

1   A    That's correct.

2   Q    Similarly, you have never monitored -- or you have not

3   monitored an adolescent or teenage patient on hormone therapy?

4   A    Correct.  Until -- well, I wouldn't be monitoring the

13:31:34 5   status in any case, so, yes, that's correct.

6   Q    I am going to switch to UAB Children's, the gender clinic

7   here in Alabama.

8        Have you ever spoken to a child or adolescent who was

9   treated at the gender clinic here in Alabama?

13:32:00 10   A    No.

11   Q    Have you ever spoken to any former patients of the clinic?

12   A    No.

13   Q    You weren't here yesterday to hear Dr. Ladinsky talk about

14   the treatment protocols they have at children's UAB, were you?

13:32:12 15   A    Correct.

16   Q    You weren't here to listen to the results of treatments

17   provided to adolescent patients at UAB's Children's in the

18   gender clinic; fair?

19   A    Yes.  They have never published them.

13:32:27 20   Q    And you weren't here to hear them?

21   A    Correct.

22   Q    Dr. Cantor, you have no personal knowledge of the

23   assessment or the treatment methodologies that are used here in

24   Alabama at UAB Children's Hospital, correct?

13:32:42 25   A    Correct.  Correct.

1  Q    You do not know the disciplines of the medical providers

2  who are part of the treatment team involved in that assessment

3  at UAB Hospital?

4  A    Correct.

13:32:56  5  Q    Now, I heard your opinion that it's important to assess

6  the mental health issues of an adolescent patient to see

7  whether that is a potentially contributing factor to gender

8  dysphoria and whether there's a need to address.  That's a fair

9  statement of your opinion?

13:33:17  10  A    I'm sorry.  Would you repeat that, please?

11  Q    Sure.  It's your belief that mental health issues need to

12  be assessed and addressed before a transition occurs?

13  A    Correct.

14  Q    Do you know what assessment protocols at UAB Children's

13:33:31  15  are to address mental health issues before a child is put on

16  any transitioning medication?

17  A    No, I do not.

18  Q    Do you have any idea or do you know what the doctors at

19  UAB Children's discuss with their adolescent patients about the

13:33:48  20  risks and the benefits of medical treatments at UAB?

21  A    No.

22  Q    Wouldn't you agree -- well, never mind.  I am going to

23  move on.

24       Dr. Cantor, I want to talk with you a minute about -- or a

13:34:18  25  little bit about your criticisms of the various studies

```
 1  regarding the efficacy of puberty blockers and hormone
 2  treatments, okay?
 3  A    Yep.
 4  Q    As I understand your report and your testimony today, one
 5  of the criticisms you have of some of those studies is that it
 6  relies on participant's self-assessment I believe is the
 7  language that you used.
 8       Essentially, it is based upon what socially transitioned
 9  youth and their family is reporting about their mental health
10  in these studies?
11  A    I would say that's incomplete.  My criticisms would be
12  relying on such subjective accounts entirely for all the
13  decision making rather than using it as one part of the
14  decision making.
15  Q    In other words, basing your study based upon what the
16  participants in the study tell you how they're feeling at
17  different points in the study?
18  A    Being limited to that is a problem, yes.
19  Q    And I believe the way that you phrased it, you said,
20  subjective self-reports about how one is doing may not be
21  reflecting reality objectively.
22  A    Correct.
23  Q    But, Dr. Cantor, self-reports about how one is doing may
24  reflect reality, fair?
25  A    That's correct.
```

1  Q    So when somebody says, I am doing well, my mental state is

2  better, that very well may be the case?

3  A    May be the case, yes.

4  Q    Another complaint that you have, I believe, is what you

13:35:58  5  call confounded data.  And I believe you referred to the de

6  Vries study for that?

7  A    The two de Vries's studies, yes.  As a matter of fact,

8  it's all but two of all papers in that set of literature.

9  Q    And by confounded data, the way that I am understanding

13:36:13  10  it, what you're saying is that you are not able to tell because

11  the data is, quote, confounded, whether one's improved mental

12  health for a minor who has socially transitioned, whether that

13  came from the actual medical services, whether it came from the

14  psychotherapy, or whether it came from the combination of both?

13:36:34  15  A    Correct.

16  Q    But one thing, Doctor, that you do have to admit is when

17  adolescents with gender dysphoria have transitioned through a

18  combination of medical services and psychotherapy, you have to

19  admit that based upon the studies, their mental health

13:36:55  20  improved, correct?

21  A    No.  There were several studies that showed no improvement

22  even though -- even though they were receiving both.  I've

23  listed them in my report.

24  Q    Can you direct me to where in your report those are,

13:37:11  25  please, sir?

1   A    Sure.

2          THE COURT:  While he is looking, did you say your

3   target is an hour; is that right?

4          MS. EAGAN:  Yes, sir.  I believe I should be able to

13:37:33 5   be done in an hour.

6          THE WITNESS:  Page 20, footnote 40.

7   BY MS. EAGAN:

8   Q    I'm sorry, sir?

9   A    Page 20, footnote 40.  The Carmichael study, the

13:37:48 10  Hisle-Gorman, et al, study, and Kaltiala.

11         My full sentence was, New studies continue to appear at an

12  accelerating rate, repeatedly reporting deteriorations or lacks

13  of improvement in mental health, footnote 40 -- or again, those

14  were the specific studies -- and then or lack of improvement

13:38:23 15  beyond psychotherapy alone, footnote 41.

16  Q    Certainly, Dr. Cantor, though, there are many study -- or

17  there are studies that indicate when adolescents with the

18  combination of medical service and psychotherapy transition,

19  their mental health has improved.  You agree with that

13:38:40 20  statement?

21  A    I would have to check to see if the number is zero or a

22  handful.  There have been reports of there having been such

23  improvement, such as the Branstom study, which once it was

24  reanalyzed, discovered to have problems, and the finding was

13:39:00 25  withdrawn.

1    So there -- again, I would have to go through and check to

2  be sure that it's not zero.  It would be fair to say that there

3  might have been a study which found such a thing.  But the

4  majority of studies are finding either no improvements or

13:39:17 5  deteriorations, or it's a situation that we call a failure to

6  replicate.

7  Q    Sir, I am a little bit confused, because I want to go to

8  two of your studies that you have actually talked about today,

9  the Costa study and the Achille study.

13:39:33 10    Now, as I understand your testimony today, in those

11  studies, there was -- the studies reported that there was an

12  improvement in mental state for adolescents who were treated

13  with medication and psychological treatment in transition that

14  there was an improvement, but in those, you said you can't tell

13:39:58 15  whether it's from the medication or from the psychological

16  treatment?

17  A    No.  The Costa study and the Achille study associated the

18  improvement specifically with the psychotherapy and ruled out

19  that the effects were due to the medical interventions.

13:40:13 20  Q    Okay.  Well, let's pull those studies, Doctor, and let's

21  look at those.

22    If you could, there should be a notebook up there that has

23  plaintiffs' exhibits in it.  Is that one plaintiff, sir?

24    If you could please, sir, turn to Plaintiffs' Exhibit 34.

13:40:55 25  A    Yes.

1  Q    All right.  Plaintiffs' Exhibit 34, is this the -- do you

2  say Costa or Costa?

3  A    I'm sorry?

4  Q    Do you say Costa?

13:41:05  5  A    My guess is Costa.  I have never met the person.

6  Q    All right.  Exhibit 34 that you have in front of you, is

7  that the Costa study?

8  A    Yes, it is.

9  Q    All right.  So, Doctor, I first want to focus in on --

13:41:18  10  well, let me ask this:  This study was aimed at assessing

11  gender dysphoric adolescents' global functioning after

12  psychological support and after puberty suppression, correct?

13  A    Yes.

14  Q    Bear with me.  I am going to take this out so I can put it

13:41:42  15  up on the Elmo, sir.

16       All right, sir.  I am going to direct your attention to

17  results that I have highlighted on my copy.  Okay?  According

18  to the abstract here, the results?

19  A    Yes.

13:42:18  20  Q    At baseline, gender dysphoric adolescents showed poor

21  functioning with -- it defines the mean scores.  So baseline

22  means at the start of the study, correct?

23  A    Usually it does.  I would have to check that that's

24  exactly how they used the term.

13:42:35  25  Q    All right.  We will get to the details of that in a

1   minute.

2        Okay.  Gender dysphoric adolescents' global functioning

3   improved significantly after six months after psychological

4   support.  And then it goes on to say, Moreover, gender

13:42:49  5   dysphoric adolescents receiving also puberty suppression had

6   significantly better psychosocial functioning after 12 months

7   of puberty suppression compared to when they had received only

8   psychological support.

9        Did I read that right, sir?

13:43:07  10   A    Yes.

11   Q    Do you remember the methodology that was used for this

12   study, sir?

13   A    Roughly.

14   Q    Pardon?

13:43:14  15   A    Yes.  Roughly.

16   Q    Sorry.  I meant to -- all right.  And do you recall that

17   the methodology was everybody started at baseline.  For the

18   first six months all of the adolescents received psychological

19   counseling.  And then for the next 12 months beyond that, one

13:43:36  20   group received puberty blockers, and one group just continued

21   to receive psychological counseling.  Do you recall that?

22   A    Yes.

23   Q    All right.  And then I am going to direct you, sir, to

24   page 2211 of the -- if you look at the blue writing on the top,

13:44:12  25   it's page 6 of 9.

1    A     Yes.

2    Q     All right.  And I am going to direct you, sir, to on the

3    CGAS on follow-up?

4    A     Yes.

13:44:32  5    Q     All right.  And I am going to start at the second

6    paragraph where it says delayed eligible.  Do you see where I

7    am talking about?

8    A     Yes.

9    Q     This is talking about there were three follow-ups, right,

13:44:43 10   at 6 months, at 12 months, and at 18 months for this study; is

11   that correct?

12   A     That sounds familiar to me, yes.

13   Q     And let's read through that together.

14         Delayed eligible gender dysphoric adolescents, who

13:44:55 15   received only -- and gender delayed, GD adolescents, is your

16   recollection that those were adolescents who were eligible to

17   receive puberty blockers, but they delayed them for six months

18   so that they had everybody at a -- doing psychological study?

19   Do you remember this is the group that gets the puberty

13:45:17 20   blockers?

21   A     Yes, that sounds correct.

22   Q     Okay.  The delayed eligible gender dysphoric adolescents

23   who received only psychological support for the entire duration

24   of the study -- excuse me -- I take that back.

13:45:29 25         This was actually the group that just got the

1  psychological -- had significantly better psychosocial

2  functioning after six months of psychological support, okay?

3      However, despite scoring better at the following

4  evaluations, they did not show any further significant

13:45:47 5  improvement in their psychosocial functioning.

6      Did I read that right?

7  A    Yes.

8  Q    Also, the delayed eligible group continued to score lower

9  than a sample of children adolescents without observed

13:46:04 10  psychological psychiatric symptoms even after 18 months of

11  being in psychological support.

12      So what that's saying is after 18 months, they were still

13  below a group that did not have psychological therapy or

14  issues, correct?

13:46:20 15  A    Yes.

16  Q    On the contrary, the immediately eligible group, who at

17  baseline had a higher, but not significantly different

18  psychosocial functioning than the delayed eligible group, did

19  not show any significant improvement after six months of

13:46:40 20  psychological support.  However -- and this is the key --

21  immediately eligible adolescents had a significantly higher

22  psychosocial functioning after 12 months of puberty suppression

23  compared to when they had received only psychological support.

24      Did I read that correctly?

13:47:03 25  A    Yes.

1   Q    Then you see at the top of this, there is a chart.  And

2   when you look at this chart, the bottom is actually the three

3   different check-ins.  Time zero is baseline, when the study

4   started, right?

13:47:18  5   A    Yes.

6   Q    Time one is the six-month check-in, correct?

7   A    Yes.

8   Q    And during that six months, both groups are getting just

9   psychotherapy, correct?

13:47:31 10   A    Yes, I believe so.

11   Q    The rest -- and just to orient us.

12        The red group, the red line is the group of adolescents

13   who only got psychotherapy or psychotherapy through the entire

14   18-month study, right?

13:47:46 15   A    Yes.

16   Q    The green line that you see that goes up -- goes up and

17   keeps going up, that is the line of adolescents who receive

18   puberty blockers; fair?

19   A    Yes.

13:47:59 20   Q    And so, Doctor, to get to the ultimate conclusion of this

21   study that you say shows that puberty blockers don't work or

22   don't give any improvement in mental condition over

23   psychotherapy, the conclusion, this study confirms the

24   effectiveness of puberty suppression for gender dysphoric

13:48:37 25   adolescents.  Recently, a long-term follow-up evaluation of

1  puberty suppression among gender dysphoric adolescents after

2  that CSHT, which is hormone therapy and GRS, which is puberty

3  blockers, has demonstrated that gender dysphoric adolescents

4  are able to maintain a good functioning into their adult years.

13:49:00 5  This present study, together with this previous research,

6  indicate that both psychological support and puberty

7  suppression enable young gender dysphoric individuals to reach

8  a psychosocial functioning comparable with their peers.

9       Did I read that conclusion correctly?

13:49:17 10  A    Yes.

11       THE COURT:  Ms. Eagan, when you reach a comfortable

12  spot, let's take a post-lunch break.

13       MS. EAGAN:  Perfect.  We're good, Judge.  We can go

14  ahead and break now.

13:49:35 15       THE COURT:  Okay.  I will see you in 15 minutes.

16       (Recess.)

17       THE COURT:  Go ahead, Ms. Eagan.

18       MS. EAGAN:  Thank you, Your Honor.

19  BY MS. EAGAN:

14:09:00 20  Q   Dr. Cantor, my understanding from paragraph 63 of your

21  declaration is that the other study that you point to in

22  support of your assertion that testing revealed that puberty

23  blockers did not improve mental health any more than mental

24  health does on its own is the Achille study you mentioned

14:09:29 25  earlier today; is that right?

```
 1   A    Yes.

 2   Q    If you, please, sir, could turn to Plaintiffs' Exhibit 42

 3   in that binder in front of you, and this would be the

 4   plaintiffs' exhibits that we were looking at earlier.

 5   A    Yep.  Got it.

 6   Q    All right.  Is Plaintiffs' Exhibit 42 the Achille study

 7   that we just mentioned?

 8   A    Yes.

 9   Q    All right.

10        MS. EAGAN:  Your Honor, do you mind if I take this off

11   of this?

12        THE COURT:  That's fine.

13   BY MS. EAGAN:

14   Q    All right.  I am going to -- so this is Plaintiffs'

15   Exhibit 42.

16        And the Achille study, again, was -- in this case if we

17   look at the abstract, the background of the study or the

18   purpose of the study was to examine the associations of

19   endocrine intervention puberty suppression and/or cross-sex

20   hormones therapy with depression and quality of life scores

21   over time in transgender youths.

22        That was the purpose of the study, correct?

23   A    Yes.

24   Q    And looking down to the results section, between 2013 and

25   2018 -- so this went over a five-year period, right?
```

1  A    Yes.

2  Q    And there were 50 participants in the study, correct?

3  A    That sounds right, yes.

4  Q    All right.  And that they received endocrine intervention

14:11:17 5  both -- some were in the form of puberty blockers, and some

6  were in the form of cross-sex hormones, but endocrine -- and

7  over that time period and completed three waves of

8  questionnaires.

9      Is that your recollection of this study?

14:11:30 10  A    Yes, roughly.

11  Q    Okay.  And when that was -- with those treatments, mean

12  depression scores and suicidal ideation decreased over time,

13  which means their depression was -- went down, or they got

14  better.  Suicidal ideation went down, which is improvement,

14:11:50 15  correct?

16  A    Yes.

17  Q    While mean quality of life scores improved over time.

18      And then it goes on to say, When controlling for

19  psychiatric medications and engagement in counseling,

14:12:03 20  regression analysis suggested improvement with endocrine

21  intervention.  And then it goes on to say that this reached

22  significance in male to female participants.  And the male to

23  female participants, those are ones that were receiving hormone

24  therapy, correct?

14:12:23 25  A    I believe they were both receiving hormone therapy.  It

1  was not significant in one group, and so they're just reporting

2  the successful in the other and not reporting the nonsuccessful

3  group.

4  Q    Well, let's talk about that.  Let me pull up paragraph 63

14:12:39 5  of your declaration.

6       When you're discussing this study, here is what you said.

7  You said that upon follow-up, some incremental improvements

8  were noted; however, after -- so, in other words, upon

9  follow-up, they saw improvements.

14:13:07 10      But after statistically adjusting for psychiatric

11  medication and engagement and counseling, quote, most

12  predictors did not reach statistical significance.

13      And that's your basis -- that statement is your basis to

14  say there was not a statistical significance of difference

14:13:26 15  between just counseling versus with meds; is that right?

16  A    I'm sorry.  Could you say that part again?

17  Q    The language that you seize onto, to say that puberty

18  blockers did not improve mental health more than mental

19  healthcare did on its own --

14:13:43 20  A    Right.

21  Q    -- was the statement in the study that most predictors did

22  not reach statistical significance.

23  A    Well, I wouldn't say that I derived that just from that

24  sentence.  It's just easier to convey that idea to readers by

14:13:56 25  using the sentence.  My evaluation of the study is by those

 1  statistics directly.

 2  Q    All right.  Let's go to the language in the study that

 3  they talk about, the regression analysis that you were just

 4  referencing there.

14:14:11 5      Okay.  And this is here in the regression analysis.

 6      Let me first say this:  The mean changes over time.  And

 7  it does say, Mean depression scores decreased.  Quality of life

 8  improved, but did not reach statistical significance.

 9      But then when you go on to the regression analysis, here

14:14:39 10  is what it says.  It says, Given our modest sample size --

11  which in this case was 50 people, right?

12  A    Yes.

13  Q    Given our modest sample size, particularly when stratified

14  by gender, most predictors did not reach statistical

14:14:57 15  significance.

16      So one of the contributing factors to that, of course, was

17  the size of the number of participants, correct?

18  A    Yes.  In statistics, that's a truism.  The precision of

19  the statistics is the direct -- direct result of the sample

14:15:20 20  size.

21  Q    Okay.  And then it goes on to say, That being said, effect

22  sizes values were notably large in many models.  In the male to

23  female participants, only puberty suppression reached a

24  significance level.  And it gives the number in one of the

14:15:43 25  sample -- one of the tests, and associations with the two other

1    scores approached significance.

2        And then it goes on to say, For female to male

3    participants, only cross-sex hormone therapy approached

4    statistical significance.

14:15:57  5        All right.  Statistical significance are not -- on all

6    planes, the numbers improved, correct?

7    A    No.  That's -- the very meaning of determining --

8    factoring in whether something is statistically significant or

9    not.

14:16:15 10   Q    Ultimately, the writers of this study stated, if you look

11   at the next paragraph -- or look on the discussion part if you

12   want -- can you see the screen up here?

13   A    Oh, I have the same thing on this screen.

14   Q    Oh.  You have got one.  Okay, good.

14:16:31 15        Our results suggest that endocrine intervention is

16   associated with improved mental health among transgender youth.

17        Did I read that right?

18   A    Yes.  Those are their words.

19   Q    Doctor, to be clear, you agree that the U.S.-based medical

14:17:15 20   association guidelines and position statements are in support

21   for the use of medical treatment combined with mental health

22   treatment for adolescents with gender dysphoria, correct?

23   A    I don't think I would phrase it quite that strongly.  Most

24   of the associations are using relatively vague terms.  And it's

14:17:35 25   not clear when they're talking about adults or children, when

1  they're talking about transition, medical services versus

2  psychotherapy, or a relatively blanket statement of

3  demonstrating respect.  I can only accept that they're

4  endorsing a particular treatment when they're endorsing a

14:17:54  5  particular treatment.

6      So is there a specific association or specific statement

7  you have in mind?

8  Q    The major medical associations that were involved in this

9  space endorse the use of medications to treat gender dysphoria

14:18:08 10  in children -- excuse me -- gender dysphoric adolescents once

11  they reach puberty when appropriate?

12  A    I can think of two medical associations, one

13  interdisciplinary association, and the other -- and all of the

14  others are, as I say relatively, vague words of support, and

14:18:44 15  it's not clear exactly what it is that they're recommending.

16  Q    Well, my understanding is what you like to look at is the

17  international standards.  That's what you're talking about

18  today in support of your opinions?

19  A    Oh, I looked at each of them, and I think I described each

14:18:59 20  of them.  I did my best not to leave any out.

21  Q    So, and according to you, the Dutch approach is

22  internationally the most widely-respected and utilized method

23  for the treatment of children who present with gender

24  dysphoria?

14:19:13 25  A    Yes.

```
 1   Q    And the Dutch approach is also, I believe, what you call
 2   that watchful waiting approach?
 3   A    No.
 4   Q    Okay.  The Dutch approach is what is accepted -- I have
 5   already said what you said.
 6        The Dutch approach says social transition can happen at
 7   age 12, puberty blockers may be prescribed at age 12, hormones
 8   at age 16, and then resolve other mental health issues before
 9   transition.  That's the Dutch method?
10   A    Yes.
11   Q    Do you know how that approach aligns with protocols that
12   are utilized at UAB Children's in Alabama?
13   A    I don't know.
14   Q    In any event, what you say is internationally the most
15   widely-respected and utilized method for treatment of children
16   who present with gender dysphoria, you would agree that that
17   approach would be a felony in Alabama with this new law,
18   correct?
19   A    Yes.  It's true that the Alabama law didn't leave an
20   exception for research purposes.
21   Q    Okay.  So let's talk about the European countries that you
22   mentioned very briefly, the UK, Finland, Sweden and France.
23        When you look at those four European countries, Doctor,
24   not one of them has enacted a ban to puberty blockers and
25   hormone treatments as Alabama has done here, correct?
```

```
 1  A     No.

 2  Q     That's not correct?

 3  A     Correct.  That is not correct.

 4  Q     UK has not fully banned puberty blockers and hormone
 5  treatments in youth 18 and younger?

 6  A     That's correct.

 7  Q     Finland has not banned -- let me ask it this way:  Has
 8  Finland banned blockers and hormone treatments in youth ages 18
 9  and under for gender dysphoria?

10  A     Yes, I believe it has.

11  Q     It has?

12  A     I believe so.

13  Q     A blanket ban?  Should I refer you to paragraph 131 of
14  your declaration, sir?

15  A     Hang on.  That's just where I am now.

16  Q     Okay.

17  A     Oh, yes, they did leave an exception for hormones.  The
18  total ban was on surgery.

19  Q     Thank you, sir.

20        Sweden, has Sweden put an absolute ban on puberty
21  blockers?

22  A     Yes.

23  Q     And bear with me.  Have they put a ban on puberty blockers
24  and hormone treatments in youth ages 18 and under for gender
25  dysphoria in Sweden?
```

```
 1  A    18 and under?

 2  Q    Yes, sir.

 3  A    No.  They allowed exceptions for 16 year olds -- 16 year

 4  olds within research circumstances.

14:22:32  5  Q    Has France banned the use of puberty blockers and hormone

 6  treatments for adolescents ages 18 and under?

 7  A    No.

 8  Q    Can you point me to a single country, Doctor, in Europe

 9  that has put a blanket ban on the use of puberty blockers or

14:22:50 10  hormone treatments for youth ages 18 and under for gender

11  dysphoria?

12  A    Blanket ban in the way you're describing it, no.

13          THE COURT:  How about any country?

14          THE WITNESS:  No, not that I know of.

14:23:04 15  BY MS. EAGAN:

16  Q    I want to turn very briefly to the subject of -- I will

17  use your word desistance.

18      If you turn to paragraph 36 of your declaration.

19  A    Yes.

14:23:36 20  Q    In that -- you state, Among prepubescent children who feel

21  gender dysphoric, the majority cease to want to be the other

22  gender over the course of puberty ranging from 61 to 80 percent

23  desistance across the large prospective studies.

24      I know that's a point that you also raised earlier today.

14:23:59 25      So I want to ask this question:  Of those that number, do
```

1    you know, Doctor, what percentage of those kids cease to want

2    to be the other gender -- that's using your words -- before or

3    as they enter puberty, in other words, before they actually get

4    into puberty?  Do you know how many of those desisters are in

14:24:27 5   that window?

6    A    I must not be understanding your question, because it

7    makes me want to say the same number that's in the report, 61

8    to 88 percent.  What's different from what I said and what

9    you're asking?

14:24:39 10  Q    The 61 to 88 percent, is that children that realign with

11   their birth sex before -- or as they're entering into puberty,

12   that's that number?

13   A    Yes.

14   Q    Okay.  All right.  So I want to focus on a different

14:25:01 15  category of youth.  Let me ask you this:  The medications in

16   the United States, puberty blockers and hormone treatments

17   cannot be given to kids for gender dysphoria until after

18   they've actually entered into puberty, correct?

19   A    Very many clinics are doing it as close to the beginning

14:25:23 20  as soon as puberty starts as they are able.

21   Q    But it's once they have entered puberty?

22   A    Yes.

23   Q    So let me ask you about that category of youth.

24        And that is adolescents who have entered into puberty,

14:25:38 25  okay, and who have been -- have suffered from gender dysphoria

1  persistently, consistently, and insistently in childhood

2  leading up to puberty, okay?

3  A    Okay.

4  Q    Do you have any data regarding what percentage of those

14:25:58  5  individuals desist after they enter into puberty?

6  A    No.  I don't think that level of follow-up has yet been

7  conducted.

8  Q    And, Doctor, in fact, it's your belief that the

9  majority -- that while the majority of prepubescent kids cease

14:26:35  10  to feel trans, you know, to puberty or during puberty, in other

11  words, as they enter into puberty, the majority of kids who

12  continue to feel trans after puberty rarely cease?

13  A    That does seem to be the case, yes.

14  Q    Okay.  Doctor, are you being paid to be here to testify

14:27:10  15  today?

16  A    Yes.

17  Q    What's your rate?

18  A    400 an hour.

19  Q    Who is paying your fees?

14:27:14  20  A    The Alabama state -- State of Alabama.

21  Q    Okay.  Dr. Cantor, have you attempted to recruit parents

22  in Alabama whose children have gender dysphoria and were

23  prescribed or referred to gender-affirmative treatments, have

24  you tried to recruit them to give a witness statement in this

14:27:38  25  case that they believe the treatments are harmful?

1  A    No.

2  Q    Do you tweet?

3  A    Yes.

4         MS. EAGAN:  Your Honor, may I approach?

14:27:49 5         THE COURT:  Yes.

6  BY MS. EAGAN:

7  Q    Doctor, I've marked as Plaintiffs' Exhibit 45 a tweet

8  Dr. James Cantor retweeted.  And it's -- let me say this:  Is

9  this a tweet that you actually did?

14:28:40 10  A    No.  I --

11  Q    You retweeted?

12  A    Retweeted, exactly.

13  Q    From a group called Genspect, or what's -- I don't tweet.

14  Would you call that a group?  I guess it's a group called

14:28:56 15  Genspect?

16  A    It's there is a group called Genspect, and this is their

17  Twitter account.

18  Q    All right.  And then you retweeted it?

19  A    Yes.

14:29:03 20  Q    And it says, Urgent.  Attention.  Alabama parents, if your

21  child experienced gender dysphoria and was prescribed or

22  referred to gender-affirmative treatments and you believe these

23  treatments are harmful, please direct message, e-mail us at

24  once.  We are looking for witness statements.  Can be anon.

14:29:26 25         By anon, I guess that means anonymous, correct?

```
 1   A    That would be my reading, yes.

 2   Q    All right.  Doctor, have you seen a sworn statement under

 3   penalty of perjury for any Alabama parent whose kid received

 4   puberty blockers or hormones and the parent said the

 5   medications hurt their kid more than they helped them?

 6   A    I'm sorry.  Did you ask have I seen such a statement?

 7   Q    Yes, sir.

 8   A    Not that I recall.

 9            MS. EAGAN:  Nothing further.

10            THE COURT:  Any redirect?

11            MR. DAVIS:  Short.

12            THE COURT:  Ms. Eagan, did you intend to offer that

13   into evidence or no?

14            MS. EAGAN:  Oh, yes.  Thank you, Judge.  I offer

15   Plaintiffs' Exhibit 45.

16            THE COURT:  It will be admitted.

17                       REDIRECT EXAMINATION

18   BY MR. DAVIS:

19   Q    Dr. Cantor?

20   A    Hi.

21   Q    Is it true as a clinician you are not treating anyone who

22   has presented with gender dysphoria as an adult or as a child?

23   A    I treat adults with gender dysphoria, not children.

24   Q    You are not treating them while they are adolescents or

25   children, you are not currently treating someone who is like
```

1    under age 16?

2    A    Correct.

3    Q    Okay.  But you are familiar with the research literature

4    on these issues, correct?

14:31:19 5    A    Yes, quite.

6    Q    And even those that are studying -- or children in

7    adolescents?

8    A    Of course.

9    Q    You're knowledgeable about the treatment they're

14:31:29 10   receiving?

11   A    Yes, very.

12   Q    And are you knowledgeable about what the research shows

13   about the efficacy of these treatments?

14   A    Yes.

14:31:35 15   Q    You had an exchange with Ms. Eagan where you admitted that

16   a fact that is self-reported by a participant may be true?

17   A    Correct.

18   Q    What's the rest of that sentence?

19   A    It is certainly not necessarily true.  We need something

14:31:53 20   objective before we can make any decisions upon it.

21   Q    Let's turn to the Costa study.  That's at Tab 38 of the

22   book of plaintiffs' exhibits.

23        MR. DAVIS:  Your Honor, I'm sorry.  I left a notebook.

24   May I step over?

14:32:40 25        THE COURT:  Certainly.

```
 1              THE WITNESS:  I'm sorry.  You said Tab 38?
 2    BY MR. DAVIS:
 3    Q     I was mistaken, Dr. Cantor.  It was 34.
 4    A     34 of the defendants'?
14:33:02  5    Q     No.  Of the plaintiffs' book.
 6    A     Yes.  Now I'm back there.
 7    Q     Okay.  Now, you have a line in your report in paragraph 57
 8    of your report that I will just read to you.
 9          It says, Both groups improved in psychological functioning
14:33:25 10   over the course of the study, but no statistically significant
11    differences between the groups was detected at any point?
12    A     Correct.
13    Q     Okay.  Are the three groups represented by the three
14    colored lines -- the three groups you're talking about, the
14:33:41 15   three groups on the three colored lines on this chart I'm
16    showing you?
17    A     Part of the information is contained in that graph, yes.
18    Q     Okay.  Does this table tell us more about the statistical
19    significance or lack thereof shown in the Costa study?
14:34:02 20   A     Yes, it does.  The results of this table, although much
21    harder to read, indicate that there was no statistical
22    significance between the groups.
23    Q     Okay.
24    A     What was changing in the groups was change over time
14:34:13 25   within the group relative to the same group previously.  But
```

 1   there were no changes -- no significant differences between the

 2   groups themselves.

 3   Q    Okay.  What does it mean in a study if a finding lacks

 4   statistical significance?

14:34:29  5   A    That there was a substantial probability of getting a

 6   pattern like that just by random chance.

 7   Q    And are there any reasons other than puberty suppression

 8   that the delayed group did not have the same change over time

 9   as the immediately eligible group?

14:34:45 10   A    It's not exactly clear if they didn't change just as much.

11   That's one of the ambiguities that, again, comes from

12   statistics.  When you look at it in different ways, you can see

13   different aspects, different aspects of it.

14   Q    And the authors actually noted statistical significance or

14:35:11 15   lack thereof, did they not, in the language that are bracketed

16   there?  It says, this difference failed to reach significance

17   possibly because of sample size?

18   A    That is correct.

19   Q    Have you said anything about the Costa study in your

14:35:24 20   report that you need to withdraw after your exchange with

21   Ms. Eagan?

22   A    No.  Everything I said is accurate.

23   Q    Okay.  Is the same true for everything that you have said

24   about the Achille study?

14:35:39 25   A    Yes.  Everything I said was accurate.  Nothing in the

```
 1  prior discussion changed it.
 2  Q    The UK is still reviewing these treatments, are they not?
 3  A    They are in the middle of deciding what to do with what
 4  they have now discovered from their comprehensive review of the
14:35:57  5  literature, which showed what they were doing was wrong.
 6  Q    What did they discover?
 7  A    They discovered that they said exactly what I said, that
 8  there is no evidence to support the medical transition of these
 9  children.
14:36:09 10  Q    And they have not yet decided how to respond to that
11  revelation, correct?
12  A    Correct.  They have now taken that report, and they're now
13  reorganizing and deciding exactly what it is that they're going
14  to do.
14:36:21 15  Q    And in France, is it not correct that they've said about
16  hormones that the greatest reserve is required for their use?
17  A    That is correct.
18  Q    And is it true that, quote, they have said that speaking
19  of hormones, they're irreversible nature must be emphasized?
14:36:38 20  A    That is correct.
21  Q    And in Sweden, is anyone under 16 getting puberty blockers
22  or hormone treatments?
23  A    No.  That is banned.
24  Q    And what about over 16?  Youth -- like --
14:36:51 25  A    Between 16 and 18, they're permitted to do it, but only
```

 1   within recognized research programs.  A regular physician
 2   can't.
 3   Q    And how many such research programs are going on at
 4   present?
 5   A    Oh, in Sweden?
 6   Q    Are you aware of any?
 7   A    I am aware of one lab that has two locations.  I don't
 8   know what its current status is with its current research
 9   program.
10   Q    Okay.  Can you say whether a single child under 18 is
11   currently receiving hormones for the purpose of transitioning
12   in Sweden?
13   A    I don't know.
14             MR. DAVIS:  Thank you, Dr. Cantor.
15             THE COURT:  Any recross?
16             MS. EAGAN:  No, Your Honor.
17             THE COURT:  May this witness be excused?
18             MR. DAVIS:  Yes, of course, Your Honor.
19             THE COURT:  All right.  You can step down, sir.
20             THE WITNESS:  Thank you.
21             THE COURT:  All right.  Call your next witness.
22             MR. DAVIS:  Your Honor, the State calls Ms. Sydney
23   Wright.
24             THE COURT:  All right.
25                      SYDNEY WRIGHT,