# **<u>EXHIBIT 10</u>**

No. 22-11707

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

PAUL EKNES-TUCKER, ET AL,
*Plaintiffs-Appellees*,

v.

GOVERNOR OF THE STATE OF ALABAMA, ET AL,
*Defendants-Appellants*

---

On Appeal from the United States District Court for the
Middle District of Alabama
Case No: 2:22-cv-00184-LCB-SRW (Hon. Liles C. Burke)

---

## BRIEF OF *AMICI CURIAE* AMERICAN ACADEMY OF PEDIATRICS
## AND ADDITIONAL NATIONAL AND STATE MEDICAL AND
## MENTAL HEALTH ORGANIZATIONS IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Barry A. Ragsdale (ASB 2958A23B)
Robert S. Vance III (ASB 9916B11Q)
DOMINICK FELD HYDE, P.C.
1130 22nd Street South Ridge Park
Suite 4000
Birmingham, AL 35205
Phone:  (205) 536-8888

D. Jean Veta (jveta@cov.com)*
Cortlin Lannin (clannin@cov.com)+
William Isasi (wisasi@cov.com) (*pro hac vice*)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
*Counsel for Amici Curiae*
**Pro Hac Vice* application pending
+Admission application forthcoming

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for the American Academy of Pediatrics ("AAP"), the Alabama Chapter of the American Academy of Pediatrics ("AL-AAP"), the Academic Pediatric Association, the American Academy of Child and Adolescent Psychiatry ("AACAP"), the American Academy of Family Physicians ("AAFP"), the American Academy of Nursing ("AAN"), the American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality ("GLMA"), the American College of Obstetricians and Gynecologists ("ACOG"), the American College of Osteopathic Pediatricians ("ACOP"), the American Medical Association ("AMA"), the American Pediatric Society ("APS"), the Association of American Medical Colleges ("AAMC"), the Endocrine Society, the National Association of Pediatric Nurse Practitioners ("NAPNAP"), the Pediatric Endocrine Society ("PES"), the Society for Adolescent Health and Medicine ("SAHM"), the Society for Pediatric Research ("SPR"), the Society of Pediatric Nurses ("SPN"), the Societies for Pediatric Urology, and the World Professional Association for Transgender Health ("WPATH") certify that:

1.     AAP, AL-AAP, the Academic Pediatric Association, AACAP, AAFP, AAN, GLMA, ACOG, ACOP, AMA, APS, AAMC, the Endocrine Society,

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

NAPNAP, PES, SAHM, SPR, SPN, SPU, and WPATH, respectively, have no parent corporation.

2.      No corporations hold any stock in AAP, AL-AAP, the Academic Pediatric Association, AACAP, AAFP, AAN, GLMA, ACOG, ACOP, AMA, APS, AAMC, the Endocrine Society, NAPNAP, PES, SAHM, SPR, SPN, SPU or WPATH.

Counsel certifies that the following persons and parties, in addition to the above-named amici, may have an interest in the outcome of this case:

1.      Abdul–Latif, Hussein – Amicus Curiae;

2.      Alstott, Anne – Amicus Curiae;

3.      Anderson, Tom – Defendant;

4.      Baia, Eizabeth – Counsel for Medical Amici;

5.      Bailey, Daryl D. – Defendant;

6.      Barday, Shireen – Counsel for Amicus Curiae The Trevor Project, Inc.

7.      Baylock, C. Wilson – Defendant;

8.      Becker, Laura – Detransitioner Amicus;

9.      Boe, Brianna – Plaintiff (pseudonym);

C-2

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

10.    Boulware, Susan D. – Amicus Curiae;

11.    Bowdre, Alexander Barrett – Counsel for the Defendants;

12.    Broyles, Vernadette R. – Counsel for Detransitioner Amici;

13.    Burke, Liles C. – U.S. District Court Judge;

14.    Burleigh, Billy – Detransitioner Amicus;

15.    Cantrell, Michael A. – Counsel for Amici States

16.    Carr, Danny – Defendant;

17.    Cheek, Jason R. – Counsel for Intervenor – Plaintiff;

18.    Davies, Andrew Rhys – Counsel for Amici Curiae Stonewall UK et al.;

19.    Davis, James William – Counsel for Defendants;

20.    Doss, Jeffrey P. – Counsel for Plaintiffs;

21.    Eagan, Melody Hurdle – Counsel for Plaintiffs;

22.    Eknes – Tucker, Paul A. – Plaintiff;

23.    Escalona, Elizabeth Prim Formby – Counsel for Intervenor – Plaintiff;

24.    G., C. (pseudonym) – Detransitioner Amicus;

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

25. Isasi, William – Counsel for Medical Amici Curiae;

26. Ivey, Kay – Defendant;

27. Kamody, Rebecca – Amicus Curiae;

28. Kerschner, Helena – Detransitioner Amicus;

29. Koe, Rachel (pseudonym) – Plaintiff;

30. Kuper, Laura – Amicus Curiae;

31. LaCour, Edmond G. – Counsel for Defendants;

32. Lannin, Cortlin H. – Counsel for Medical Amici Curiae;

33. Lanosa, Michael – Counsel for Medical Amici Curiae;

34. Lareau Alyssa C. – Counsel for Intervenor – Plaintiff;

35. Levi, Jennifer L. – Counsel for Plaintiffs;

36. Marshall, Steve – Defendant;

37. McAlister, Mary E. – Counsel for Detransitioner Amici;

38. McCoy, Scott D. – Counsel for Plaintiffs;

39. McNamara, Meredithe – Amicus Curiae;

40. Mills, Christopher E. – Counsel for Defendants;

41. Moe, Jane (pseudonym) – Plaintiff;

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

42.   Montag, Coty Rae – Counsel for Intervenor – Plaintiff;

43.   Noe, Kathy (pseudonym) – Plaintiff;

44.   Oladeinbo, Gilbert – Counsel for Plaintiffs;

45.   Olezeski, Christy – Amicus Curiae;

46.   Ormand, Justin L. – Counsel for Amici Curiae Stonewall UK et al.;

47.   Orr, Asaf – Counsel for Plaintiffs;

48.   Peterson, Misty L. – Counsel for Plaintiffs;

49.   Poe, Megan (pseudonym) – Plaintiff;

50.   Powers, John Michael – Counsel for Intervenor – Plaintiff;

51.   Pratt, James Andrew – Counsel for Plaintiffs;

52.   Ragsdale, Barry Alan – Counsel for Medical Amici;

53.   Ray, Brent P. – Counsel for Plaintiffs;

54.   Reinke, Adam – Counsel for Plaintiffs;

55.   Reynolds, Laura – Detranisitioner Amicus Curiae;

56.   Rodriguez Martinez, Michael – Counsel for Amici Curiae Stonewall UK et al.;

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

57.   Schwabauer, Barbara – Counsel for Intervenor – Plaintiff (USA);

58.   Seiss, Benjamin Matthew – Counsel for Defendants;

59.   Shortnacy, Michael B. – Counsel for Plaintiffs;

60.   Smalts, Laura Perry – Detransitioner Amicus curiae;

61.   Smith, John (pseudonym) – Detransitioner Amicus curiae;

62.   Soto, Diego Armando – Counsel for Plaintiffs;

63.   Stewart, Sandra Jean – Counsel for Intervenor – Plaintiffs;

64.   Stone, Jessica L. – Counsel for Plaintiffs;

65.   Szilagyi, Nathalie – Amicus Curiae;

66.   Terry, Abigail Hoverman – Counsel for Plaintiffs;

67.   Thornton, Joel H. – Counsel for Detransitioner Amici Curiae;

68.   Toyama, Kaitlin – Counsel for Intervenor – Plaintiff;

69.   Vague, Amie A. – Counsel for Plaintiffs;

70.   Vance, Robert S. – Counsel for Medical Amici;

71.   Ventiere, Jessica – Defendant;

72.   Veta, D. Jean – Counsel for Medical Amici;

73.   Wadsworth, Stephen D. – Counsel for Intervenor – Plaintiff;

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

74.   Walker, Susan R. – Magistrate Judge;

75.   Warbelow, Sarah – Counsel for Plaintiffs;

76.   Waver, Cynthia Cheng–Wun – Counsel for Plaintiffs;

77.   Wilkerson, Mark Douglas – Counsel for Amici States;

78.   Williams, Renee – Counsel for Intervenor – Plaintiff;

79.   Wilson, Thomas Alexander – Counsel for Defendants;

80.   Woodke, Lane Hines – Counsel for Intervenor – Plaintiff;

81.   Zoe, James (pseudonym) – Plaintiff.

82.   Academic Pediatric Association – Amicus Curiae;

83.   Alabama Ch. of the American Academy of Pediatrics – Amicus Curiae;

84.   Alaska, State of – Amicus Curiae;

85.   Am. Academy of Child and Adolescent Psychiatry – Amicus Curiae;

86.   Am. Academy of Family Physicians – Amicus Curiae;

87.   Am. Academy of Pediatrics – Amicus Curiae;

88.   Am. Academy of Nursing – Amicus Curiae;

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

89. Am. Ass'n of Physicians for Human Rights, Inc. – Amicus Curiae;

90. Am. Coll. of Obstetricians & Gynecologists – Amicus Curiae;

91. Am. Coll. of Osteopathic Pediatricians – Amicus Curiae;

92. Am. College of Physicians – Amicus Curiae

93. Am. Med. Ass'n – Amicus Curiae;

94. Am. Pediatric Soc'y – Amicus Curiae;

95. Am. Psychiatric Ass 'n – Amicus Curiae;

96. Ass 'n of Am. Med. Coll. – Amicus Curiae;

97. Ass'n of Med. School Pediatrics Dep't Chairs – Amicus Curiae;

98. Arizona, State of – Amicus Curiae;

99. Arkansas, State of – Amicus Curiae;

100. Australian Professional Ass'n for Trans Health – Amicus Curiae;

101. Bundesverband Trans* e.V. – Amicus Curiae;

102. Endocrine Society – Amicus Curiae;

103. Federación Estatal de Lesbianas, Gais, Trans, Bisexuales, Intersexuales y mas – Amicus Curiae;

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

104.   Fundación Colectivo Hombres XX, AC – Amicus Curiae;

105.   Georgia, State of – Amicus Curiae;

106.   Indiana, State of – Amicus Curiae;

107.   LGBT+ Denmark – Amicus Curiae;

108.   Louisiana, State of – Amicus Curiae;

109.   Medical Ass'n of Pediatric Nurse Practitioners – Amicus Curiae;

110.   Mississippi, State of – Amicus Curiae;

111.   Missouri, State of – Amicus Curiae;

112.   Montana, State of – Amicus Curiae;

113.   Nebraska, State of – Amicus Curiae;

114.   Norwegian Organization for Sexual and Gender Diversity – Amicus Curiae;

115.   Oklahoma, State of – Amicus Curiae;

116.   Pediatric Endocrine Soc 'y – Amicus Curiae;

117.   Professional Ass'n for Transgender Health Aotearoa New Zealand – Amicus Curiae;

118.   Seta ry / Seta rf / Seta Lgbtiq Rights in Finland – Amicus Curiae;

Appeal No. 22-11707, *Eknes-Tucker v. Governor of the State of Alabama*

119.   Societies for Pediatric Urology – Amicus Curiae;

120.   Soc'y of Adolescent Health & Medicine – Amicus Curiae;

121.   Soc'y for Pediatric Research – Amicus Curiae;

122.   Soc'y of Pediatric Nurses – Amicus Curiae;

123.   South Carolina, State of – Amicus Curiae;

124.   Stonewall UK – Amicus Curiae;

125.   Swedish Federation for Lesbian, Gay, Bisexual, Transgender Queer and Intersex Rights – Amicus Curiae

126.   Texas, State of – Amicus Curiae;

127.   Trevor Project, Inc. – Amicus Curiae

128.   United States of America – Intervenor – Plaintiff;

129.   Utah, State of – Amicus Curiae;

130.   West Virginia, State of – Amicus Curiae;

131.   World Professional Ass 'n for Transgender Health – Amicus Curiae.

## <u>TABLE OF CONTENTS</u>

Certificate of Interested Persons and Corporate Disclosure Statement ................ C-1

Table of Contents ........................................................................................................ i

Table of Citations ...................................................................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................................... 1

SUMMARY OF ARGUMENT ................................................................................. 2

ARGUMENT ............................................................................................................. 4

I.      Understanding Gender Identity and Gender Dysphoria. ................................ 5

II.     The Widely Accepted Guidelines for Treating Adolescents With
        Gender Dysphoria Provide for Medical Interventions When Indicated. ........ 6

        A.      The Guidelines for Treating Gender Dysphoria Include
                Thorough Mental Health Assessments and, for Some
                Adolescents, Medical Interventions. ..................................................... 7

                1.      A Robust Mental Health Assessment Is Required Before
                        Medical Interventions Are Provided. ......................................... 8

                2.      The Guidelines Recommend Only Non-Physical
                        Interventions for Prepubertal Children Suffering From
                        Gender Dysphoria. ..................................................................... 9

                3.      In Certain Circumstances, the Guidelines Provide for the
                        Use of Medical Interventions to Treat Adolescents
                        Suffering From Gender Dysphoria. ........................................... 9

        B.      The Guidelines for Treating Gender Dysphoria Were
                Developed Through a Robust and Transparent Process,
                Employing the Same Scientific Rigor That Underpins Other
                Medical Guidelines ............................................................................. 13

        C.      Scientific Evidence Indicates the Effectiveness of Treating
                Gender Dysphoria According to the Guidelines. ................................ 14

D.    The Legislative Findings Are Factually Inaccurate and Ignore the Recommendations of the Medical Community............................ 17

1.    The Vast Majority of Adolescents Diagnosed With Gender Dysphoria Will Persist Through Adulthood. .............. 17

2.    There Is No Accepted Protocol of "Watchful Waiting" for Adolescents With Gender Dysphoria................................ 22

3.    Claims That the Medical Community Is "Aggressively Pushing" for Medical Interventions Are False. ....................... 23

4.    The International Medical Community Has Endorsed Gender-Affirming Care, Contrary to the State's Assertions.................................................................................. 24

III.   The Healthcare Ban Would Irreparably Harm Many Adolescents With Gender Dysphoria By Denying Them the Treatment They Need................ 27

CONCLUSION ...................................................................................... 27

# <u>TABLE OF CITATIONS</u>

**Page(s)**

**Cases**

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021).................................................................17

**Statutes**

Ala. Vulnerable Child Compassion and Protection Act, S.B. 184, No.
    2022-289 (Ala. 2022).......................................................................2, 17, 18, 23

**Other Authorities**

Christal Achille, et al., *Longitudinal impact of gender-affirming*
    *endocrine intervention on the mental health and wellbeing of*
    *transgender youths: preliminary results*, 8 Int'l J Pediatric
    Endocrinology 1-5 (2020),
    https://pubmed.ncbi.nlm.nih.gov/32368216 .................................................14, 15

Stewart L. Adelson, *Practice parameter on gay, lesbian, or bisexual*
    *sexual orientation, gender non-conformity, and gender*
    *discordance in children and adolescents*, 51 J. Am. Acad. of Child
    & Adolescent Psychiatry 957, 964 (2020),
    https://www.jaacap.org/article/S0890-8567(12)00500-X/fulltext ....................20

Luke R. Allen, et al., *Well-being and suicidality among transgender*
    *youth after gender-affirming hormones*, 7(3) Clinical Prac.
    Pediatric Psych. 302 (2019), https://psycnet.apa.org/record/2019-
    52280-009 .......................................................................................................15, 16

Emmanuel Allory et al., *The Expectations of Transgender People in*
    *the Face of their Health-Care Access Difficulties and How They*
    *Can Be Overcome: A Qualitative Study in France*, 21 Primary
    Health Care Rsch. & Dev. 1, 2 (2020)
    https://www.cambridge.org/core/journals/primary-health-care-
    research-and-development/article/expectations-of-transgender-
    people-in-the-face-of-their-healthcare-access-difficulties-and-how-
    they-can-be-overcome-a-qualitative-study-in-
    france/A0A151385D44C3FB8B971956DBFB5EFF ..................................24, 25

Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts*, 4 (2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf ........................................................5

Am. Psychological Ass'n, *Guidelines for psychological practice with transgender and gender nonconforming people*, 70(9) American Psychologist 832, 862 (2015) (hereinafter, "Am. Psychological Ass'n Guidelines"), https://www.apa.org/practice/guidelines/transgender.pdf .....................................5

Greta R. Bauer et al., *Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?*, 243 J. of Pediatrics 224 (2022) https://www.jpeds.com/article/S0022-3476(21)01085-4/pdf .......................20, 21

Greta R. Bauer et al., *Transgender Youth Referred to Clinics for Gender-Affirming Medical Care in Canada*, 148 PEDIATRICS 1 (2021), https://publications.aap.org/pediatrics/article-abstract/148/5/e2020047266/181329/Transgender-Youth-Referred-to-Clinics-for-Gender?redirectedFrom=fulltext .................................................25

Susan D. Boulware et al., *Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment for Transgender Children and Adolescents Rely on Inaccurate and Misleading Scientific Claims* 1, 18 (Apr. 28, 2022) https://medicine.yale.edu/childstudy/policy/lgbtq-youth/report%20on%20the%20science%20of%20gender-affirming%20care%20final%20april%2028%202022_437080_54462_v2.pdf ........................................................19, 20, 22

Polly Carmichael, et al., *Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK*, 16(2) PloS One e0243894 (2021), https://pubmed.ncbi.nlm.nih.gov/33529227 ..........................................14

Recommendation (In Finnish), COHERE (June 2020), https://palveluvalikoima.fi/documents/1237350/22895838/Transsukupuolisuus+suositus.pdf/82b60104-291c-7d8c-9e88-1b1fc9bba527/Transsukupuolisuus+suositus.pdf?t=1592318544000 ........................................................24

iv

Rosalia Costa, et al., *Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria*, 12(11) J. Sexual Med. 2206–2214 (2015), https://pubmed.ncbi.nlm.nih.gov/26556015 ....................................................14

Annelou L.C. de Vries, et al., *Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study*, 8(8) J. Sexual Med. 2276-2283 (2011), https://pubmed.ncbi.nlm.nih.gov/20646177 ..................................................15, 19

Annelou L.C. de Vries, et al., *Young adult psychological outcome after puberty suppression and gender reassignment*, 134(4) Pediatrics 696-704 (2014), https://pubmed.ncbi.nlm.nih.gov/25201798 ...........................................14, 15, 16

Endocrine Society, *Methodology*, https://www.endocrine.org/clinical-practice-guidelines/methodology ...................................................13, 14

Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (2020) (hereinafter, "Endocrine Soc'y Position Statement"), https://www.endocrine.org/advocacy/position-statements/transgender-health .................................................................6

*Ethics Council Publishes Ad Hoc Recommendation on Transgender Identity in Children and Adolescents*, GERMAN ETHICS COUNSEL (Feb. 20, 2020), https://www.ethikrat.org/mitteilungen/mitteilungen/2020/deutscher-ethikrat-veroeffentlicht-ad-hoc-empfehlung-zu-trans-identitaet-bei-kindern-und-jugendlichen ...........................................................25

Amy E. Green, et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, J. Adolescent Health (2021), https://www.jahonline.org/article/S1054-139X(21)00568-1/fulltext ...............................................................15

Gordon Guyatt et al., *GRADE guidelines: 1. Introduction - GRADE evidence profiles and summary of findings tables*, 64 J. Clinical Epidemiology 383 (2011), https://www.who.int/alliance-hpsr/resources/publications/HSR-synthesis-Guyatt-2011.pdf............................13

Gordon H. Guyatt et al., *GRADE: an emerging consensus on rating quality of evidence and strength of recommendations*, 336 BMJ 924 (2008), https://www.who.int/hiv/topics/treatment/grade_guyatt_2008.pdf ................... 13

*Protocol for Access Without Discrimination to Health Care Services for Lesbian, Gay, Bisexual, Transsexual, Transvestite, Transgender and Intersex Persons and Specific Care Guidelines*, GOV'T OF MEX. (June 15, 2020), https://www.gob.mx/cms/uploads/attachment/file/558167/Versi_n_15_DE_JUNIO_2020_Protocolo_Comunidad_LGBTTI_DT_Versi_n_V_20.pdf ................................................................................... 25

*Gender Incongruence: National Academic Guideline*, HELSEDIREKTORATET (2020), https://www.helsedirektoratet.no/retningslinjer/kjonnsinkongruens ................ 25

*Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017) (hereinafter, "Endocrine Society Guidelines"), https://academic.oup.com/jcem/article/102/11/3869/4157558 ....... 7, 9, 10, 11, 12

Jody L. Herman et al., *Ages of Individuals Who Identify as Transgender in the United States*, Williams Inst., at 2 (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf ......................................................................... 5

Michael S. Irwig, *Detransition Among Transgender and Gender-Diverse People—An Increasing and Increasingly Complex Phenomenon*, J. of Clinical Endocrinology & Metabolism 1 (June 2022), https://academic.oup.com/jcem/advance-article/doi/10.1210/clinem/dgac356/6604653?login=true ................................. 21

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students–19 States and Large Urban School Districts, 2017*, US Dep't of Health and Human Servs., Centers for Disease Control & Prevention, 68(3) MMWR 67, 70 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf ............ 6, 22

Rittakerttu Kaltiala, et al., *Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria*, 74(3) Nordic J. Psychiatry 213 (2020) ............................................15

Brayden N. Kameg & Donna G. Nativio, *Gender dysphoria in youth: An overview for primary care providers*. 30(9) J. Am. Assoc. Nurse Pract. 493 (2018), https://pubmed.ncbi.nlm.nih.gov/30095668 ........................................................6

Laura E. Kuper, et al., *Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy*, 145(4) Pediatrics e20193006 (2020), https://pubmed.ncbi.nlm.nih.gov/32220906 ................................................14, 15

Diego Lopez de Lara, et al., *Psychosocial Assessment In Transgender Adolescents*, 93(1) Anales de Pediatria 41-48 (English ed. 2020), https://www.researchgate.net/publication/342652073_Psychosocial_assessment_in_transgender_adolescents ...........15, 25

James L. Madara, *AMA to states: Stop interfering in healthcare of transgender children*, Am. Med. Ass'n (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children; *see also* Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts*, 4 (2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf ......................................................5

Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 New Eng. J. Med. 579 (2021), https://www.nejm.org/doi/full/10.1056/NEJMp2106314 ................10, 11, 12, 14

Anna I.R. van der Miesen, *Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers*, 66(6) J. Adolescent Health 699-704 (2020)........................................................................14

M. Hassan Murad et al., H*ormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes*, 72(2) Clinical Endocrinology 214 (Feb. 2010), https://onlinelibrary.wiley.com/doi/10.1111/j.1365-2265.2009.03625.x ............................................................................20

*Transgender New Zealanders: Children and Young People*, NEW ZEALAND MINISTRY OF HEALTH (2020), https://www.health.govt.nz/your-health/healthy-living/transgender-new-zealanders/transgender-new-zealanders-children-and-young-people ...............................................................................25

*NHS Standard Contract for Gender Identity Service for Children and Adolescents*, NHS ENGLAND (Dec. 30, 2019), https://www.england.nhs.uk/wp-content/uploads/2017/04/gender-development-service-children-adolescents.pdf ............................................24, 26

*Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*, NICE (Mar. 11, 2021), https://segm.org/sites/default/files/20210323_Evidence%2Breview_Gender-affirming%2Bhormones_For%2Bupload_Final_download.pdf .......................26

Kristina R. Olson et al., *Gender Identity 5 Years After Social Transition*, 150 Pediatrics 1, 1 (August 2022), https://doi.org/10.1542/peds.2021-056082.x ......................................................23

Amit Paley, *The Trevor Project 2020 National Survey*, at 1, https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf ...............................................................................6

Ken C. Pang, et al., *Long-term Puberty Suppression for a Nonbinary Teenager*, 145(2) Pediatrics e20191606 (2019), https://watermark.silverchair.com/peds_20191606.pdf .....................................11

*Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) *Pediatrics* e20182162, at 2 (tbl. 1), 3 (2018) (hereinafter, "AAP Policy Statement"), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for ......................3, 5, 11, 12, 18

*Guidelines on Healthcare Concerning Gender Identity Matters*, RETSINFORMATION (2018), https://www.retsinformation.dk/eli/retsinfo/2019/9060 .....................................25

Stephen M. Rosenthal, *Challenges in the care of transgender and
    gender-diverse youth: an endocrinologist's view*, 17(10) Nature
    Rev. Endocrinology 581, 586 (Oct. 2021),
    https://pubmed.ncbi.nlm.nih.gov/34376826 ...........................................16, 17, 18

*Australian Standards of Care and Treatment Guidelines for Trans and
    Gender Diverse Children and Adolescents*, ROYAL
    CHILDREN'S HOSP. MELBOURNE (Oct. 2021),
    https://auspath.org.au/wp-content/uploads/2021/10/australian-
    standards-of-care-and-treatment-guidelines-for-trans-and-gender-
    diverse-children-and-adolescents_v1-3.pdf.......................................................25

*Care of Children and Adolescents with Gender Dysphoria: Summary*,
    SOCIALSTYRELSEN (2022),
    https://www.socialstyrelsen.se/globalassets/sharepoint-
    dokument/artikelkatalog/kunskap sstod/2022-3-7799.pdf ................................24

Annemieke S. Staphorsius et al., *Puberty suppression and executive
    functioning: an fMRI-study in adolescents with gender dysphoria*,
    6 Pscyhoneuroendocrinology 190 (2015),
    https://pubmed.ncbi.nlm.nih.gov/25837854 .......................................................11

Diana M. Tordoff, *Mental Health Outcomes in Transgender and
    Nonbinary Youths Receiving Gender-Affirming Care,*
    5(2) JAMA Network Open e220978 (Feb. 25, 2022).........................................15

Jack L. Turban, et al., *Access to gender-affirming hormones during
    adolescence and mental health outcomes among transgender
    adults*, J. Plos One (2022),
    https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0
    261039..............................................................................................................15

Jack L. Turban, et al., *Pubertal suppression for transgender youth and
    risk of suicidal ideation*, 145(2) Pediatrics e20191725 (2020),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7073269..............14, 15, 16, 20

Chantal M. Wiepjes et al., *The Amsterdam cohort of gender dysphoria
    study (1972-2015): trends in prevalence, treatment, and regrets*.
    15(4) J. Sexual Med. 582, 582 (Feb. 2018),
    https://www.jsm.jsexmed.org/article/S1743-6095(18)30057-
    2/fulltext...........................................................................................................19

WPATH, *Standards of Care 8: History and Purpose*,
https://www.wpath.org/soc8/history ................................................................... 14

*WPATH, *Standards of Care* (7th Version),
https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%
20V7_English.pdf (hereinafter, "WPATH Guidelines") ................. 7, 8, 9, 10, 13

Talen Wright et al., *Accessing and Utilising Gender-Affirming
Healthcare in England and Wales: Trans and Non-Binary People's
Accounts of Navigating Gender Identity Clinics*, 21 BMC HEALTH
SERVS. RSCH. 1 (2021)
https://bmchealthservres.biomedcentral.com/articles/10.1186/s129
13-021-06661-4 .................................................................................................. 26

x

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are the American Academy of Pediatrics ("AAP"), the Alabama Chapter of the American Academy of Pediatrics ("AL-AAP"), the Academic Pediatric Association, the American Academy of Child and Adolescent Psychiatry ("AACAP"), the American Academy of Family Physicians ("AAFP"), the American Academy of Nursing ("AAN"), the American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality ("GLMA"), the American College of Obstetricians and Gynecologists ("ACOG"), the American College of Osteopathic Pediatricians ("ACOP"), the American Medical Association ("AMA"), the American Pediatric Society ("APS"), the Association of American Medical Colleges ("AAMC"), the Endocrine Society, the National Association of Pediatric Nurse Practitioners ("NAPNAP"), the Pediatric Endocrine Society ("PES"), the Society for Adolescent Health and Medicine ("SAHM"), the Society for Pediatric Research ("SPR"), the Society of Pediatric Nurses ("SPN"), the Societies for Pediatric Urology, and the World Professional Association for Transgender Health ("WPATH").[1]

*Amici* are professional medical and mental health organizations seeking to ensure that all children and adolescents, including those with gender dysphoria,

---

[1] Appellees, Appellants, and Intervenor-Appellee have consented to the filing of this brief. *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

receive the optimal medical and mental healthcare they need and deserve. *Amici* represent thousands of professional healthcare providers who have specific expertise with the issues raised in this brief. The Court should consider *amici*'s brief because it provides important expertise and addresses misstatements about the treatment of transgender adolescents.

## STATEMENT OF THE ISSUES

Whether the district court correctly enjoined Defendants-Appellants from enforcing Section 4(a)(1)–(3) of the Alabama Senate Bill 184.

## SUMMARY OF ARGUMENT

Alabama Senate Bill 184 ("the Healthcare Ban") would prohibit healthcare providers from providing or even referring patients under the age of 19 for critical, evidence-based treatments for gender dysphoria. Denying such evidence-based medical care to adolescents who meet the requisite medical criteria puts them at risk of significant harm to their mental health. The legislative findings in the Healthcare Ban mischaracterize the well-accepted medical guidelines for treating gender dysphoria in adolescents and the guidelines' supporting evidence. Below, *amici* provide the Court with an accurate description of these well-accepted treatment guidelines and summarize the scientific evidence supporting the medical interventions prohibited by the Healthcare Ban.

Gender dysphoria is a clinical condition that is marked by distress due to an incongruence between the patient's gender identity (i.e., the innate sense of oneself as being a particular gender) and sex assigned at birth.  This incongruence can lead to clinically significant distress and impair functioning in many aspects of the patient's life.[2]  If not treated, or treated improperly, gender dysphoria can result in debilitating anxiety, depression, and self-harm, and is associated with higher rates of suicide.  As such, the effective treatment of gender dysphoria saves lives.

The widely accepted recommendation of the medical community, including that of the respected professional organizations participating here as *amici*, is that the standard of care for treating gender dysphoria is "gender-affirming care,"[3] which Plaintiffs-Appellees refer to as "transition."[4]  Gender-affirming care is care that supports a child or adolescent as they explore their gender identity—in contrast with efforts to change the individual's gender identity to match their sex assigned at birth, which are known to be ineffective and harmful.  For adolescents with persistent gender dysphoria that worsens with the onset of puberty, gender-affirming care may include medical interventions to align their physiology with their gender identity.  Empirical evidence indicates that gender-affirming care, including gender-

---

[2] *See* Doc. 78-32 (Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) *Pediatrics* e20182162), at 2-3, tbl. 1.

[3] *Id*. at 10.

[4] *See* Plaintiffs-Appellees' Response Br. at 3.

affirming medical interventions, can alleviate clinically significant distress and lead to significant improvements in the mental health and overall well-being of adolescents with gender dysphoria.

The Healthcare Ban disregards this medical evidence by threatening providers with a felony conviction simply for treating adolescent patients in accordance with the accepted standard of care.  In addition, the Healthcare Ban prevents healthcare providers from utilizing their medical expertise in treating these adolescent patients and profoundly intrudes on the patient-provider relationship by banning referrals for gender-affirming medical treatments. Accordingly, *amici* urge this Court to affirm the district court's preliminary injunction.

## **ARGUMENT**

This brief first provides background on gender identity and gender dysphoria.  It then describes the well-accepted medical guidelines for treating gender dysphoria as they apply to adolescents and the evidence supporting the effectiveness of this care for adolescents with gender dysphoria.  Finally, the brief explains how the Healthcare Ban would irreparably harm adolescents with gender dysphoria by denying care to those who need it.

## I.     Understanding Gender Identity and Gender Dysphoria.

A person's gender identity is a person's deep internal sense of belonging to a particular gender.[5]  Most people have a gender identity that aligns with their sex assigned at birth.[6]  However, transgender people have a gender identity that does not align with their sex assigned at birth.[7]  In the United States, it is estimated that approximately 1.4 million individuals are transgender.[8]  Of these individuals, approximately 10% are teenagers aged 13 to 17.[9]  Individuals often start to understand their gender identity during prepubertal childhood and adolescence.

While being transgender is a normal variation of human identity,[10] many transgender people suffer from gender dysphoria, a serious medical condition in which the patient experiences significant distress that can lead to "impairment in peer and/or family relationships, school performance, or other aspects of their life."[11]

---

[5] *See* Doc. 78-32 at 2 (tbl. 1).

[6] *See* Am. Psychological Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70(9) American Psychologist 832, 862 (2015) (hereinafter, "Am. Psychological Ass'n Guidelines"), https://www.apa.org/practice/guidelines/transgender.pdf.

[7] *See id.* at 863.

[8] *See* Jody L. Herman et al., *Ages of Individuals Who Identify as Transgender in the United States*, Williams Inst., at 2 (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf.

[9] *See id.* at 3.

[10] James L. Madara, *AMA to states: Stop interfering in healthcare of transgender children*, Am. Med. Ass'n (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children; *see also* Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts*, 4 (2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

[11] Doc. 78-32 at 3.

Gender dysphoria is a formal diagnosis under the American Psychiatric Association's Diagnostic and Statistical Manual (DSM-5).

If untreated or inadequately treated, gender dysphoria can cause depression, anxiety, self-harm, and suicidality.[12]  Indeed, over 60% of transgender adolescents and young adults reported having engaged in self-harm during the preceding 12 months, and over 75% reported symptoms of generalized anxiety disorder in the preceding two weeks.[13]  Even more troubling, more than 50% of this population reported having seriously considered attempting suicide,[14] and more than one in three transgender adolescents reported having attempted suicide in the preceding 12 months.[15]

## II.    The Widely Accepted Guidelines for Treating Adolescents With Gender Dysphoria Provide for Medical Interventions When Indicated.

The widely accepted view of the professional medical community is that gender-affirming care is the appropriate treatment for gender dysphoria and that, for

---

[12] *See* Brayden N. Kameg & Donna G. Nativio, *Gender dysphoria in youth: An overview for primary care providers.* 30(9) J. Am. Assoc. Nurse Pract. 493 (2018), https://pubmed.ncbi.nlm.nih.gov/30095668.

[13] *See* Amit Paley, *The Trevor Project 2020 National Survey*, at 1, https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf.

[14] *See id*. at 2.

[15] *See* Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students–19 States and Large Urban School Districts, 2017*, US Dep't of Health and Human Servs., Centers for Disease Control & Prevention, 68(3) MMWR 67, 70 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf.

some adolescents, gender-affirming medical interventions are necessary.[16]  This care greatly reduces the negative physical and mental health consequences that result when gender dysphoria is untreated.[17]

> **A.**    **The Guidelines for Treating Gender Dysphoria Include Thorough Mental Health Assessments and, for Some Adolescents, Medical Interventions.**

The treatment protocols for gender dysphoria are laid out in established, evidence-based clinical guidelines:  (i) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and (ii) the WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (together, the "Guidelines").[18]

The Guidelines provide that youth with gender dysphoria should be evaluated, diagnosed, and treated by a qualified mental health professional ("MHP").  Further, the Guidelines provide that each patient who receives gender-affirming care should receive only evidence-based, medically necessary, and appropriate interventions that are tailored to the patient's individual needs.

---

[16]  *See, e.g.*, Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (2020) (hereinafter, "Endocrine Soc'y Position Statement"), https://www.endocrine.org/ advocacy/position-statements/transgender-health.

[17] *See id.*

[18] Doc. 69-19 (Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017)); Doc. 69-18 (WPATH, *Standards of Care* (7th Version 2012).

### 1.    A Robust Mental Health Assessment Is Required Before Medical Interventions Are Provided.

According to the Guidelines, gender-affirming care begins with a thorough evaluation by a qualified mental health professional, who: (1) is trained in childhood and adolescent developmental psychopathology, (2) is competent in diagnosing and treating the ordinary problems of children and adolescents, and (3) meets the competency requirements for MHPs working with adults.[19]  These include:  (1) a master's degree or equivalent in a clinical behavioral science field, (2) competence in using the *Diagnostic Statistical Manual of Mental Disorders* and/or the *International Classification of Diseases* for diagnostic purposes, (3) the ability to recognize and diagnose coexisting mental health concerns and distinguish them from gender dysphoria, (4) documented supervised training and competence in psychotherapy or counseling, (5) being knowledgeable about gender identities and expressions and the assessment and treatment of gender dysphoria, and (6) continuing education in the assessment and treatment of gender dysphoria.[20]

When evaluating a patient with gender dysphoria, the MHP must, among other things, assess the patient's "gender identity and gender dysphoria, history and development of gender dysphoric feelings, the impact of stigma attached to gender

---

[19] *See* Doc. 69-18 at 13.

[20] *See id.* at 22.

nonconformity on mental health, and the availability of support from family, friends, and peers."[21]  The MHP also must screen for coexisting mental health concerns,[22] which "need to be optimally managed prior to, or concurrent with, treatment of gender dysphoria."[23]  If gender dysphoria is diagnosed, the Guidelines provide that the MHP should discuss treatment for gender dysphoria and any coexisting concerns, including potential risks.[24]

**2.  The Guidelines Recommend Only Non-Physical Interventions for Prepubertal Children Suffering From Gender Dysphoria.**

For prepubertal children suffering from gender dysphoria, the Guidelines provide for mental healthcare and support for the child and their family.[25]  The Guidelines do *not* recommend that any physical interventions (such as medications or surgery) be provided to prepubertal children with gender dysphoria.[26]

**3.  In Certain Circumstances, the Guidelines Provide for the Use of Medical Interventions to Treat Adolescents Suffering From Gender Dysphoria.**

For patients whose gender dysphoria continues into adolescence—after the onset of puberty—the Guidelines provide that, in addition to mental healthcare,

---

[21] *Id.* at 23-24.

[22] *Id.* at 24-25.

[23] *Id.* at 25.

[24] *Id.* at 24.

[25] *See id.* at 16-17; Doc. 69-19 at 3877-78.

[26] *See* Doc. 69-18 at 17-18, Doc. 69-19 at 3871.

medical interventions may also be indicated.  Before an adolescent may receive any medical interventions for gender dysphoria, a qualified MHP must determine that: (1) the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria, (2) the gender dysphoria emerged or worsened after the onset of puberty, (3) any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed, and (4) the adolescent and the parents or guardians have given informed consent.[27]  Further, a pediatric endocrinologist or other clinician experienced in pubertal assessment must (5) agree with the indication for treatment, (6) confirm the patient has started puberty, and (7) confirm that there are no medical contraindications.[28]

If all of the above criteria are met, the Guidelines instruct that gonadotropin-releasing hormone (GnRH) analogues, or "puberty blockers," may be offered beginning at the onset of puberty.[29]  The purpose of puberty blockers is to delay pubertal development until adolescents are old enough and have had sufficient time to make more informed decisions about whether to pursue further treatments.[30]  Puberty blockers also can make pursuing transition later in life easier, because they

---

[27] Doc. 69-18 at 19.

[28] Doc. 69-19 at 3878 (tbl. 5).

[29] Doc. 69-18 at 18; Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 New Eng. J. Med. 579 (2021), https://www.nejm.org/doi/full/10.1056/NEJMp2106314.

[30] Doc. 69-18 at 19.

prevent irreversible changes such as protrusion of the Adam's apple or breast growth.[31]

The State argues that "transitioning treatments for minors are poorly studied, unproven, and dangerous." Appellants' Brief at 40.  This assertion is incorrect and was soundly rejected by the district court, which observed that the State "fail[ed] to produce evidence showing that transitioning medications jeopardize the health and safety of minors suffering from gender dysphoria."[32] Puberty blockers have well-known efficacy and side-effect profiles.[33]  In addition, their effects are generally reversible.[34]  In fact, puberty blockers have been used by pediatric endocrinologists for more than 30 years for the treatment of precocious puberty.[35] The risks of any serious adverse effects of these treatments are exceedingly rare when provided under clinical supervision.[36]

---

[31] *See* Doc. 78-32 at 5.

[32] Doc. 107 at 19.

[33] Martin, *supra* note 29 at 2.

[34] *See id.*

[35] *See id.*

[36] *See, e.g.*, Annemieke S. Staphorsius et al., *Puberty suppression and executive functioning: an fMRI-study in adolescents with gender dysphoria*, 6 Pscyhoneuroendocrinology 190 (2015), https://pubmed.ncbi.nlm.nih.gov/25837854 (no adverse impact on executive functioning); Ken C. Pang, et al., *Long-term Puberty Suppression for a Nonbinary Teenager*, 145(2) Pediatrics e20191606 (2019), https://watermark.silverchair.com/peds_20191606.pdf (exceedingly low risk of delayed bone mineralization from hormone treatment).

Later in adolescence—and if the criteria below are met—hormone therapy may be used to initiate puberty consistent with the patient's gender identity.[37] Hormone therapy is only prescribed when a qualified MHP has confirmed the persistence of the patient's gender dysphoria, the patient's mental capacity to assent to the treatment, and that any coexisting problems have been addressed.[38] A pediatric endocrinologist or other clinician experienced in pubertal induction must also agree with the indication, the patient and their parents or guardians must be informed of the potential effects and side effects, and the patient and their parents or guardians must give their informed consent.[39] Hormone therapy involves using gender-affirming hormones to allow adolescents to develop secondary sex characteristics consistent with their gender identity.[40] Although some of these changes become irreversible after those secondary sex characteristics are fully developed, others are partially reversible if the patient discontinues use of the hormones.[41]

The Guidelines contemplate that the prescription of puberty blockers and/or hormone therapy be coupled with education on the safe use of such medications and

---

[37] Martin, *supra* note 29 at 2.

[38] Doc. 69-19 at 3878 (tbl. 5).

[39] *See id.*

[40] *See* Doc. 78-32 at 6.

[41] *See id.* at 5-6.

close monitoring to mitigate any potential risks.[42]   Decisions regarding the appropriate treatment for each patient with gender dysphoria are made in consultation with the patient, their parents or guardians, and the medical and mental healthcare team.  There is "no one-size-fits-all approach to this kind of care."[43]

### B.    The Guidelines for Treating Gender Dysphoria Were Developed Through a Robust and Transparent Process, Employing the Same Scientific Rigor That Underpins Other Medical Guidelines.

The Guidelines are the product of careful and robust deliberation following the same types of processes—and subject to the same types of rigorous requirements—as other guidelines promulgated by *amici* and other medical organizations.

For example, the Endocrine Society's Guidelines were developed following a 26-step, 26-month drafting, comment, and review process.[44]  The Endocrine Society imposes strict evidentiary requirements based on the internationally recognized Grading of Recommendations Assessment, Development and Evaluation (GRADE) system.[45]  That GRADE assessment is then reviewed, re-reviewed, and reviewed

---

[42] *See* Doc. 69-19 at 3871, 3876.

[43] Martin, *supra* note 29, at 1.

[44] *See, e.g.,* Doc. 69-19 at 3872-73 (high-level overview of methodology).

[45]  *See* Gordon Guyatt et al., *GRADE guidelines: 1. Introduction - GRADE evidence profiles and summary of findings tables*, 64 J. Clinical Epidemiology 383 (2011), https://www.who.int/alliance-hpsr/resources/publications/HSR-synthesis-Guyatt-2011.pdf; Gordon H. Guyatt et al., *GRADE: an emerging consensus on rating quality of evidence and strength of recommendations*, 336 BMJ 924 (2008), https://www.who.int/hiv/topics/treatment/grade_guyatt_2008.pdf.

again by multiple, independent groups of professionals.[46]  Further, the Endocrine Society continually reviews its own guidelines and recently determined the 2017 transgender care guidelines continue to reflect the best available evidence.

The WPATH standards are the result of a drafting, comment, and review process that took five years.[47]  The draft guidelines went through journal peer-review and were publicly available for discussion and debate, including multiple rounds of feedback from experts in the field as well as from transgender individuals.[48]  They are periodically updated to account for new developments in the research and practice, and WPATH is in the process of its eighth revision.[49]

### C.   Scientific Evidence Indicates the Effectiveness of Treating Gender Dysphoria According to the Guidelines.

The results of multiple studies indicate that adolescents suffering from gender dysphoria who receive medical interventions as part of their gender-affirming care experience improvements in their overall well-being.[50]  Nine studies have been published that investigated the use of puberty blockers on adolescents suffering from gender dysphoria,[51] and seven studies have been published that investigated the use

---

[46] Endocrine Society, *Methodology*, https://www.endocrine.org/clinical-practice-guidelines /methodology (last visited August 12, 2022).

[47] *See* Doc. 69-18 at 109-10.

[48] *See id*.

[49] WPATH, *Standards of Care 8:  History and Purpose*, https://www.wpath.org/soc8/history.

[50] *See* Martin, *supra* note 29, at 2.

[51] *See, e.g.*, Doc 78-42 (Christal Achille, et al., *Longitudinal Impact Of Gender-Affirming*

of hormone therapy to treat adolescents suffering from gender dysphoria.[52]   These

studies find positive mental health outcomes for those adolescents who received

puberty blockers or hormone therapy, including statistically significant reductions

in anxiety, depression, and suicidal ideation.

---

*Endocrine Intervention On The Mental Health And Wellbeing of Transgender Youths: Preliminary Results*, 8 Int'l J Pediatric Endocrinology 1-5 (2020)); Polly Carmichael, et al., *Short-term Outcomes Of Pubertal Suppression In A Selected Cohort Of 12 To 15 Year Old Young People With Persistent Gender Dysphoria In The UK*, 16(2) PloS One e0243894 (2021), https://pubmed.ncbi.nlm.nih.gov/33529227; Doc. 78-34 (Rosalia Costa, et al., *Psychological Support, Puberty Suppression, And Psychosocial Functioning In Adolescents With Gender Dysphoria*, 12(11) J. Sexual Med. 2206–2214 (2015)); Annelou L.C. de Vries, et al., *Puberty Suppression In Adolescents With Gender Identity Disorder: A Prospective Follow-Up Study*, 8(8) J. Sexual Med. 2276-2283 (2011), https://pubmed.ncbi.nlm.nih.gov/20646107; Doc. 78-33 (Annelou L.C. de Vries, et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134(4) Pediatrics 696-704 (2014)); Laura E. Kuper,  et al., *Body Dissatisfaction and Mental Health Outcomes of Youth On Gender-Affirming Hormone Therapy*, 145(4) Pediatrics e20193006 (2020), https://pubmed.ncbi.nlm.nih.gov/32220906; Doc. 78-36 (Jack L. Turban, et al., *Pubertal Suppression For Transgender Youth And Risk Of Suicidal Ideation*, 145(2) Pediatrics e20191725 (2020)); Anna I.R. van der Miesen, *Psychological Functioning In Transgender Adolescents Before And After Gender-Affirmative Care Compared With Cisgender General Population Peers*, 66(6) J. Adolescent Health 699-704 (2020); Doc. 78-43 (Diana M. Tordoff, *Mental Health Outcomes In Transgender And Nonbinary Youths Receiving Gender-Affirming Care*, 5(2) JAMA Network Open e220978 (Feb. 25, 2022)).

[52] *See, e.g.*, Docs. 78-33, 78-42, 78-43, & 78-37 (Jack L. Turban, et al., *Access To Gender-Affirming Hormones During Adolescence And Mental Health Outcomes Among Transgender Adults*, J. Plos One (2022)); Luke R. Allen, et al., *Well-Being And Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7(3) Clinical Prac. Pediatric Psych. 302 (2019), https://psycnet.apa.org/record/2019-52280-009; Diego Lopez de Lara, et al., *Psychosocial Assessment In Transgender Adolescents*, 93(1) Anales de Pediatria 41-48 (English ed. 2020), https://www.researchgate.net/publication/342652073_Psychosocial_assessment_in_
transgender_adolescents; Rittakerttu Kaltiala, et al., *Adolescent Development And Psychosocial Functioning After Starting Cross-Sex Hormones For Gender Dysphoria*, 74(3) Nordic J. Psychiatry 213 (2020); Laura E. Kuper, et al., *Body Dissatisfaction And Mental Health Outcomes Of Youth On Gender-Affirming Hormone Therapy*, 145(4) Pediatrics e20193006(2020), https://pubmed.ncbi.nlm.nih.gov/32220906; Amy E. Green, et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, J. Adolescent Health (2021), https://www.jahonline.org/article/S1054-139X(21)00568-1/fulltext.

For example, a 2020 study analyzed survey data from 89 transgender adults who had access to puberty blockers while adolescents and from more than 3,400 transgender adults who did not.[53]  The study found that those who received puberty blocking hormone treatment had lower odds of lifetime suicidal ideation than those who wanted puberty blocking treatment but did not receive it, even after adjusting for demographic variables and level of family support.[54]  Approximately *nine in ten* transgender adults who wanted puberty blocking treatment but did not receive it reported lifetime suicidal ideation.[55]  Additionally, a longitudinal study of nearly 50 transgender adolescents found that suicidality was decreased by a statistically-significant degree after receiving gender-affirming hormone treatment.[56]

As another example, a prospective two-year follow-up study of adolescents with gender dysphoria published in 2011 found that treatment with puberty blockers was associated with decreased depression and improved overall functioning.[57]  A six-year follow-up study of 55 individuals from the 2011 study found that subsequent treatment with hormone therapy followed by surgery in adulthood was

---

[53] *See* Doc. 78-36.

[54] *See id.*

[55] *See id.*

[56] *See* Allen et al., *supra* note 52, at 302.

[57] *See* de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, *supra* note 51, at 2276.

associated with a statistically significant decrease in depression and anxiety.[58]

"Remarkably, this study demonstrated that these transgender adolescents and young adults had a sense of well-being that was equivalent or superior to that seen in age-matched controls from the general population."[59]

As scientists and researchers, *amici* always welcome more research, including on this crucial topic. However, the available data indicate that the gender-affirming treatments prohibited by the Healthcare Ban are effective for the treatment of gender dysphoria. For these reasons, and as at least one court has recognized, the use of the gender-affirming medical interventions specified in the Guidelines is supported by all mainstream pediatric organizations, representing thousands of physicians across multiple disciplines.[60]

### D. The Legislative Findings Are Factually Inaccurate and Ignore the Recommendations of the Medical Community.

#### 1. The Vast Majority of Adolescents Diagnosed With Gender Dysphoria Will Persist Through Adulthood.

The Healthcare Ban's legislative findings claim that "a large majority" of children with signs of gender nonconformity will ultimately "resolve[] to an identity

---

[58] Doc. 78-33 at 696.

[59] Stephen M. Rosenthal, *Challenges In The Care Of Transgender And Gender-Diverse Youth: An Endocrinologist's View*, 17(10) Nature Rev. Endocrinology 581, 586 (Oct. 2021), https://pubmed.ncbi.nlm.nih.gov/34376826.

[60] *See, e.g.*, *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 890 (E.D. Ark. 2021) ("The consensus recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care.").

congruent with their sex by late adolescence."[61]  Similarly, in its attempts to argue that the Alabama Legislature had "no less-burdensome way to protect children" than a wholesale ban on providing or even referring patients under the age of 19 for critical, evidence-based treatments for gender dysphoria, the State claims "the majority of gender dysphoric youth will *not* persist."[62] These claims improperly conflate pre-pubertal children with adolescents, an important distinction recognized even in the State's own cited sources.[63] These claims are also factually inaccurate in multiple respects.

> First, research suggests that the majority of pre-pubertal children diagnosed with gender dysphoria in fact will persist in their gender identity.  A recent study of

---

[61] Ala. Vulnerable Child Compassion and Protection Act, S.B. 184, No. 2022-289, § 2(5) (Ala. 2022).

[62] State Op. Brief at 41–42.

[63] The State cites to the DSM-V, the Endocrine Society Guidelines, and the WPATH Guidelines for the proposition that "most children with gender dysphoria grow up to identify as gay or lesbian and do not suffer from gender dysphoria as adults." Appellants' Br. at 42. But these sources distinguish pre-pubertal children from adolescents. The DSM-V, for example, states that "[y]oung children are less likely than older children, adolescents, and adults to express extreme and persistent anatomic dysphoria." Doc. 69-17 at 455

In the Endocrine Society Guidelines, the State cites a passage addressing "children diagnosed with GD/gender incongruence" and persistence into adolescence. *See* Doc. 69-19 at 3879. However, the Endocrine Society Guidelines support providing medical interventions only to adolescents and adults—not pre-pubertal children—experiencing gender dysphoria, provided that they meet certain criteria. *See id.* at 3871, 3880, 3885-86.

The WPATH Guidelines state that "[a]n important difference between gender dysphoric children and adolescents" is "the proportion for whom dysphoria persists into adulthood," and that "persistence . . . appears to be much higher for adolescents." Doc. 69-18 at 11.  The guidelines also cite a follow-up study where all adolescents diagnosed with gender dysphoria and given puberty suppressing hormones continued their transition. *Id*.  Like the Endocrine Society Guidelines, the WPATH Guidelines support the prescription of medical interventions to gender-dysphoric adolescents and adults who meet the requisite criteria.  *Id*. at 18-20, 33-34.

317 transgender children who socially transitioned (i.e., adopted a name, pronouns, and gender expression, such as clothing and haircuts, that matched their gender identity) found that, an average of five years after their transition, 94% of the study participants identified as transgender, 3.5% identified as non-binary, and *only 2.5%* identified as their sex assigned at birth.[64]

Second, the State's attempt to rely on claims of purported "desistance" among pre-pubertal children [65] is misplaced, as the gender-affirming interventions prohibited by the Healthcare Ban are not offered to pre-pubertal children under the Guidelines.[66]   Rather, the Guidelines explicitly address the distinction between pre-

---

[64] Kristina R. Olson et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics 1, 1 (August 2022), https://doi.org/10.1542/peds.2021-056082. While some earlier studies reported higher rates of spontaneous resolution of gender dysphoria among children diagnosed before puberty, those studies used a broader definition of "gender dysphoria" that included "prepubertal children with gender variant behavior (e.g., boys with feminine interests or 'tomboy' girls)" along with children who met the current, more stringent definition, which requires "a deeply felt and lasting transgender identity with clinically significant distress and impaired functioning." Susan D. Boulware et al., *Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment for Transgender Children and Adolescents Rely on Inaccurate and Misleading Scientific Claims* 1, 18 (Apr. 28, 2022) https://medicine.yale.edu/childstudy/policy/lgbtq-youth/report%20on%20the%20science%20of%20gender-affirming%20care%20final%20april%2028%202022_437080_54462_v2.pdf (hereinafter "Boulware 2022").

Had those studies been limited to children who met the current diagnostic criteria for gender dysphoria, they likely would have shown much lower desistance rates. *Id.*; *see also* de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, *supra* note 56, at 2281, https://pubmed.ncbi.nlm.nih.gov/20646177 ("None of the gender dysphoric adolescents in this study renounced their wish for GR during puberty suppression. This finding supports earlier studies showing that young adolescents who had been carefully diagnosed show persisting gender dysphoria into late adolescence or young adulthood." (internal citations omitted)).

[65] State Op. Brief at 41–42.

[66] Boulware 2022, *supra* note 64, at 18.

pubertal children and adolescents, and they only endorse the prescription of gender-affirming medical interventions to adolescents, and only when the relevant criteria are met.[67]

Third, there are *no* studies to support the proposition that adolescents with gender dysphoria are likely to later identify as their sex assigned at birth, whether they receive treatment or not.[68] On the contrary, "[l]ongitudinal studies have indicated that the emergence or worsening of gender dysphoria with pubertal onset is associated with a very high likelihood of being a transgender adult."[69]

In fact, most adolescents who transition have had significant time to think about their gender identity and are not making a rash decision. While the State endorses a "contagion" theory in which one can purportedly "catch" gender dysphoria from social media use, there is no reliable evidence supporting this theory.[70] Subsequent research does "not find support within a clinical population for a new etiologic phenomenon of rapid onset gender dysphoria during

---

[67] Doc. 69-19 at 3871, 3879; Doc. 69-18 at 11.

[68] *See, e.g.*, Stewart L. Adelson, *Practice parameter on gay, lesbian, or bisexual sexual orientation, gender non-conformity, and gender discordance in children and adolescents*, 51 J. Am. Acad. of Child & Adolescent Psychiatry 957, 964 (2020), https://www.jaacap.org/article/S0890-8567(12)00500-X/fulltext ("In contrast, when gender variance with the desire to be the other sex is present in adolescence, this desire usually does persist through adulthood").

[69] Rosenthal, *supra* note 59 at 585.

[70] Boulware et al., *supra* note 60, at 21 ("Littman's hypothesis that rapid-onset gender dysphoria exists as a distinct condition has not been supported by studies of clinical data.").

adolescence."[71]  To the contrary, one recent study showed that most adolescents—nearly 70%—referred to a clinic for puberty blockers or hormone therapy had known their gender was different from the one assigned at birth for three or more years.[72] The study also showed no correlation between recent gender knowledge (defined as two years or fewer) and support from online friends.[73]

Fourth, while desistance may occur for many reasons, detransitioning is not the same as regret. The State incorrectly assumes that an individual who detransitions—the definition of which varies from study to study[74]—must do so because they have come to identify with their sex assigned at birth. This ignores the most common reported factors that contribute to a person's choice to detransition, such as pressure from parents and discrimination.[75]

Finally, while the percentage of adolescents seeking gender-affirming care

---

[71] Greta R. Bauer et al., *Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?*, 243 J. of Pediatrics 224, 225-226 (2022) ("This putative phenomenon was posited based on survey data from a convenience sample of parents recruited from websites, and may represent the perceptions or experiences of those parents, rather than of adolescents, particularly those who may enter into clinical care." (internal citations omitted)) https://www.jpeds.com/article/S0022-3476(21)01085-4/pdf.

[72] *Id.* at 225.

[73] *Id.* at 225.

[74] Michael S. Irwig, *Detransition Among Transgender and Gender-Diverse People—An Increasing and Increasingly Complex Phenomenon*, J. of Clinical Endocrinology & Metabolism 1, 1 (June 2022), https://academic.oup.com/jcem/advance-article/doi/10.1210/clinem/dgac356/6604653?login=true ("Detransition refers to the stopping or reversal of transitioning which could be social (gender presentation, pronouns), medical (hormone therapy), surgical, or legal.").

[75] *Id.* (discussing "largest study to look at detransition").

has increased, that percentage remains low—only 1.8% of high-school students identify as transgender.[76]   Further, this increase in adolescents seeking care "certainly reflects" reduced social stigma and expanded care options.[77]

>   **2.     There Is No Accepted Protocol of "Watchful Waiting" for Adolescents With Gender Dysphoria.**

Based on its unsupported claim that many children with gender dysphoria will eventually come to identify as their sex assigned at birth, the Healthcare Ban endorses a "wait-and-see" approach of withholding medically necessary gender-affirming treatments from adolescents until they reach adulthood.  In this regard, some practitioners use a "watchful waiting" approach for pre-pubertal children with gender dysphoria, which involves waiting until the patient reaches adolescence before considering social transition.[78]   However using a "watchful waiting" approach with gender-dysphoric adolescents is not recommended, as it can cause immense harm by denying them treatment that could alleviate their distress and forcing them to experience full endogenous puberty, resulting in physical changes that may be reversed—if at all—only through surgery.[79]

---

[76] Johns et al., supra note 15, at 68.

[77] Boulware et al., *supra* note 60, at 20.

[78] Doc. 78-32 at 4.

[79] Doc. 78-32 at 4; Doc. 69-18 at 21.

### 3.   Claims That the Medical Community Is "Aggressively Pushing" for Medical Interventions Are False.

The Healthcare Ban's legislative findings assert that "[s]ome in the medical community are aggressively pushing for interventions on minors."[80]  This is false—adolescents are only provided medical interventions if they meet the rigorous criteria under the Guidelines.  While it is true that the number of referrals to gender clinics has increased in recent years, this increase has coincided with a decrease in the stigma against transgender people, an increase in public awareness of the existence of gender dysphoria and the availability of gender-affirming care, and improvements in insurance coverage, all of which likely led more people with gender identity issues to seek help.  In any event, not all patients who seek care at gender clinics receive medical interventions.  In fact, a 2018 study showed that the percentage of patients who presented to a gender clinic for evaluation and received medical interventions has actually *decreased* over time.[81]

---

[80] S.B. 184 § 2(6).

[81] *See* Chantal M. Wiepjes et al., *The Amsterdam cohort of gender dysphoria study (1972-2015): trends in prevalence, treatment, and regrets*. 15(4) J. Sexual Med. 582, 582 (Feb. 2018), https://www.jsm.jsexmed.org/article/S1743-6095(18)30057-2/fulltext.

### 4. The International Medical Community Has Endorsed Gender-Affirming Care, Contrary to the State's Assertions.

The State and its *amici* attempt to justify the Healthcare Ban by claiming that there is a robust international debate about gender-affirming care.[82] These claims are unfounded. The State's *amici* rely on examples from France, Sweden, Finland, and the United Kingdom, but all of these countries provide gender-affirming care to adolescents when medically indicated.[83] Transgender youth also have access to gender-affirming care in developed nations across the world

---

[82] State Op. Brief at 23–24.

[83] Emmanuel Allory et al., *The Expectations of Transgender People in the Face of their Health-Care Access Difficulties and How They Can Be Overcome: A Qualitative Study in France*, 21 Primary Health Care Rsch. & Dev. 1, 2 (2020) https://www.cambridge.org/core/journals/primary-health-care-research-and-development/article/expectations-of-transgender-people-in-the-face-of-their-healthcare-access-difficulties-and-how-they-can-be-overcome-a-qualitative-study-in-france/A0A151385D44C3FB8B971956DBFB5EFF (France); *Care of Children and Adolescents with Gender Dysphoria: Summary*, SOCIALSTYRELSEN (2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskap sstod/2022-3-7799.pdf (Sweden); *Recommendation (In Finnish)*, COHERE (June 2020), https://palveluvalikoima.fi/documents/1237350/22895838/Transsukupuolisuus+suositus.pdf/82b 60104-291c-7d8c-9e88-1b1fc9bba527/Transsukupuolisuus+suositus.pdf?t=1592318544000 (Finland); *NHS Standard Contract for Gender Identity Service for Children and Adolescents*, NHS ENGLAND (Dec. 30, 2019), https://www.england.nhs.uk/wp-content/uploads/2017/04/gender-development-service-children-adolescents.pdf (United Kingdom).

including Australia,[84] Canada,[85] Denmark,[86] Germany,[87] Mexico,[88] New Zealand,[89] Norway,[90] and Spain,[91] among others.  Whatever debate is occurring in those countries, none have come close to banning gender-affirming care for all minors. As described below, the Healthcare Ban would make Alabama an outlier in the international medical community, not the norm.

France's health care system covers gender-affirming care for young people.[92]  Sweden offers gender-affirming care through its national health care

---

[84] *See Australian Standards of Care and Treatment Guidelines for Trans and Gender Diverse Children and Adolescents*, ROYAL CHILDREN'S HOSP. MELBOURNE (Oct. 2021), https://auspath.org.au/wp-content/uploads/2021/10/australian-standards-of-care-and-treatment-guidelines-for-trans-and-gender-diverse-children-and-adolescents_v1-3.pdf.

[85] *See* Greta R. Bauer et al., *Transgender Youth Referred to Clinics for Gender-Affirming Medical Care in Canada*, 148 PEDIATRICS 1 (2021), https://publications.aap.org/pediatrics/article-abstract/148/5/e2020047266/181329/Transgender-Youth-Referred-to-Clinics-for-Gender?redirectedFrom=fulltext.

[86] *See Guidelines on Healthcare Concerning Gender Identity Matters*, RETSINFORMATION (2018), https://www.retsinformation.dk/eli/retsinfo/2019/9060.

[87] *See Ethics Council Publishes Ad Hoc Recommendation on Transgender Identity in Children and Adolescents*, GERMAN ETHICS COUNSEL (Feb. 20, 2020), https://www.ethikrat.org/mitteilungen/mitteilungen/2020/deutscher-ethikrat-veroeffentlicht-ad-hoc-empfehlung-zu-trans-identitaet-bei-kindern-und-jugendlichen.

[88] *See Protocol for Access Without Discrimination to Health Care Services for Lesbian, Gay, Bisexual, Transsexual, Transvestite, Transgender and Intersex Persons and Specific Care Guidelines*, GOV'T OF MEX. (June 15, 2020), https://www.gob.mx/cms/uploads/attachment/file/558167/Versi_n_15_DE_JUNIO_2020_Protocolo_Comunidad_LGBTTI_DT_Versi_n_V_20.pdf.

[89] *See Transgender New Zealanders: Children and Young People*, NEW ZEALAND MINISTRY OF HEALTH (2020), https://www.health.govt.nz/your-health/healthy-living/transgender-new-zealanders/transgender-new-zealanders-children-and-young-people.

[90] *See Gender Incongruence: National Academic Guideline*, HELSEDIREKTORATET (2020), https://www.helsedirektoratet.no/retningslinjer/kjonnsinkongruens.

[91] *See* Diego Lopez de Lara, et al., *Psychosocial Assessment In Transgender Adolescents*, 93(1) Anales de Pediatria 41-48 (English ed. 2020), https://www.researchgate.net/publication/342652073_Psychosocial_assessment_in_transgender_adolescents

[92] Allory et al., *supra* note 83.

system, and youth in Sweden are able to access gender-affirming care when their providers deem it medically necessary.[93]  Finland also offers gender-affirming care to transgender adolescents through its national healthcare system.[94]  The State's *amici* emphasize Finland's use of psychosocial support as a first line of treatment, even though gender-affirming care for young people in the United States also involves extensive psychosocial support and therapy, as discussed above.[95]

The United Kingdom's approach to gender-affirming care is a collaborative process, requiring clinical, patient, and parental participation to move forward with treatment.[96] The UK's National Institute for Health and Care Excellence (NICE) recommends that providers create management plans tailored to the individual, which may include puberty blockers and hormones.[97]  Indeed, the UK's National Health Service provides gender-affirming care to adolescents free of charge.[98]

---

[93] *See Care of Children and Adolescents with Gender Dysphoria: Summary*, , *supra* note 83.

[94] *Recommendation (In Finnish), supra* note 83.

[95] *See* Doc. 69-18 at 11.

[96] *See NHS Standard Contract for Gender Identity Service for Children and Adolescents*, NHS ENGLAND (Dec. 30, 2019), https://www.england.nhs.uk/wp-content/uploads/2017/04/gender-development-service-children-adolescents.pdf.

[97] *See Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*, NICE (Mar. 11, 2021), https://segm.org/sites/default/files/20210323_Evidence%2Breview_Gender-affirming%2Bhormones_For%2Bupload_Final_download.pdf.

[98] *See* Talen Wright et al., *Accessing and Utilising Gender-Affirming Healthcare in England and Wales: Trans and Non-Binary People's Accounts of Navigating Gender Identity Clinics*, 21 BMC HEALTH SERVS. RSCH. 1, 2 (2021) https://bmchealthservres.biomedcentral.com/articles/10.1186/s12913-021-06661-4.

III.    **The Healthcare Ban Would Irreparably Harm Many Adolescents With Gender Dysphoria By Denying Them the Treatment They Need.**

The Healthcare Ban denies adolescents with gender dysphoria access to medical interventions designed to alleviate suffering, are grounded in science, and are endorsed by the medical community.  The medical treatments prohibited by the Healthcare Ban can be a crucial part of treatment for adolescents with gender dysphoria and necessary to preserve their health.  As discussed above, research shows that adolescents with gender dysphoria who receive puberty blockers and/or hormone therapy experience less depression, anxiety, and suicidal ideation.  Several studies have found that hormone therapy is associated with reductions in the rate of suicide attempts and significant improvement in quality of life.[99]  In light of the evidence supporting the connection between lack of access to gender-affirming care and lifetime suicide risk, banning such care can put patients' lives at risk.

## CONCLUSION

For the foregoing reasons, the district court's decision granting the preliminary injunction should be affirmed.

---

[99] *See* M. Hassan Murad et al., H*ormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes*, 72(2) Clinical Endocrinology 214 (Feb. 2010), https://onlinelibrary.wiley.com/doi/10.1111/j.1365-2265.2009.03625.x; *see also* Doc. 78-36.

Dated: August 17, 2022

Cortlin H. Lannin (admission application forthcoming)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105
Phone: (415) 591-6000
clannin@cov.com

Barry A. Ragsdale
DOMINICK FELD HYDE, P.C.
1130 22nd Street South Ridge Park
Suite 4000
Birmingham, AL 35205
Phone:  (205) 536-8888
BRagsdale@dfhlaw.com

Robert S. Vance, III
DOMINICK FELD HYDE, P.C.
1130 22nd Street South Ridge Park
Suite 4000
Birmingham, AL 35205
Phone:  (205) 536-8888
RVance@dfhlaw.com

Respectfully submitted,

*/s/ Barry A. Ragsdale*

D. Jean Veta (*pro hac vice* application pending)
William Isasi (*pro hac vice*)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com
wisasi@cov.com

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i).  This brief contains 6,174 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.    In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Barry A. Ragsdale*
OF COUNSEL

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s/ Barry A. Ragsdale*
OF COUNSEL