# EXHIBIT 21

Page 1

1            UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4   _____

5   BRIANNA BOE, et al.,

6           Plaintiffs,

7       v.                          Case No.

8   UNITED STATES OF AMERICA,       2:22-cv-00184-LCB

9           Intervenor Plaintiff,

10      v.

11  HON. STEVE MARSHALL, in his

12  official capacity as Attorney

13  General of the State of

14  Alabama, et al.,

15          Defendants.

16  _____

17

18

19

20

21

22      Job No. CS6629188

Page 2

1   VIDEOCONFERENCE DEPOSITION OF FARR CURLIN, M.D.

2   DATE:          Monday, April 8, 2024

3   TIME:          9:03 a.m.

4   LOCATION:      Remote Proceeding

5              Durham, NC 27710

6   REPORTED BY:   Christopher Friebe

7   JOB NO.:       6629188

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

1         A P P E A R A N C E S

2   ON BEHALF OF INTERVENOR PLAINTIFF UNITED STATES OF

3   AMERICA:

4      AMIE MURPHY, ESQUIRE (by videoconference)

5      Department of Justice Civil Rights Division,

6      Housing and Civil Enforcement Section

7      Washington, D.C. 20530

8      amie.murphy2@usdoj.gov

9      (202) 353-1285

10

11   ON BEHALF OF DEFENDANTS HON. STEVE MARSHALL, ET AL.:

12      ROGER BROOKS, ESQUIRE (by videoconference)

13      Alliance Defending Freedom

14      44180 Riverside Parkway

15      Lansdowne, VA 20176

16      rbrooks@adflegal.org

17      (202) 393-8690

18

19   ALSO PRESENT:

20      Renee Williams, U.S. DOJ (by videoconference)

21      Cynthia Weaver, Private Plaintiff's Counsel (by

22      videoconference)

Page 4

1            I N D E X

2   EXAMINATION:                        PAGE

3      By Ms. Murphy                    8

4

5          E X H I B I T S

6   NO.         DESCRIPTION             PAGE

7   Exhibit 1   Dr. Curlin's CV         15

8   Exhibit 2   Dr. Curlin's Expert Report   16

9   Exhibit 3   Book: "The Way of Medicine"    78

10  Exhibit 4   Article: "Young Adult Psychological

11              Outcome After Puberty Suppression

12              And Gender Reassignment"   119

13  Exhibit 5   Article: "Sex Reassignment:

14              Outcomes and Predictors of

15              Treatment for Adolescent and Adult

16              Transsexuals"           120

17  Exhibit 6   Article: " Association of

18              Gender-Affirming Hormone Therapy

19              With Depression, Thoughts of

20              Suicide, and Attempted Suicide

21              Among Transgender and Nonbinary

22              Youth"                  122

Page 5

1       E X H I B I T S (Cont'd)

2   NO.         DESCRIPTION             PAGE

3   Exhibit 7   Article: "Access to

4              Gender-Affirming Hormones

5              During Adolescence and Mental

6              Health Outcomes Among

7              Transgender Adults"       123

8   Exhibit 8   Reuters Article          163

9   Exhibit 9   Article: "In Vitro Fertilization

10              Outcomes in a Mouse Model of

11              Gender-Affirming Hormone Therapy

12              In Transmasculine Youth"   185

13  Exhibit 10  Article: "Puberty Suppression

14              Followed by Testosterone Therapy

15              Does Not Impair Reproductive

16              Potential in Female Mice"   187

17

18      QUESTIONS INSTRUCTED NOT TO ANSWER

19          PAGE    LINE

20          101     3

21          103     6

22

Farr Curlin                                                                      April 8, 2024

1          P R O C E E D I N G S

2          THE REPORTER:  Good morning.  My name

3  is Christopher Friebe; I am the reporter assigned by

4  Veritext to take the record of this proceeding.  We

5  are now on the record at 9:03 a.m.

6          This is the deposition of Dr. Farr

7  Curlin taken in the matter of Brianna Boe, et al., and

8  United States of America vs. Honorable Steve Marshall,

9  in his official capacity as Attorney General of the

10  State of Alabama on Monday, April 8, 2024, at Durham,

11  North Carolina.

12          I am a notary authorized to take

13  acknowledgments and administer oaths in Michigan.

14  Parties agree that I will swear in the witness

15  remotely.

16          Additionally, absent an objection on

17  the record before the witness is sworn, all parties

18  and the witness understand and agree that any

19  certified transcript produced from the recording of

20  this proceeding:

21          - is intended for all uses permitted

22                under applicable procedural and

1          evidentiary rules and laws in the

2                same manner as a deposition recorded

3                by stenographic means; and

4          - shall constitute written stipulation

5                of such.

6          At this time will the counsel please

7  identify yourselves for the record?

8          MS. MURPHY:  This is Amie Murphy,

9  representing the United States.

10          MR. BROOKS:  Roger Brooks, with the

11  Alliance Defending Freedom, representing the

12  defendants.

13          THE REPORTER:  Thank you.  Hearing no

14  objection, I will now swear in the witness.

15          Please raise your right hand.

16  WHEREUPON,

17          DR. FARR CURLIN,

18  called as a witness and having been first duly sworn

19  to tell the truth, the whole truth, and nothing but

20  the truth, was examined and testified as follows:

21          THE REPORTER:  Thank you.

22          Counsel, you may now proceed.

1          MS. MURPHY:  Thank you.

2                EXAMINATION

3  BY MS. MURPHY:

4      Q    Good morning, Dr. Farr Curlin.  As was

5  noted, my name is Amie Murphy, and I represent the

6  United States in this matter.  Have you had your

7  deposition taken before?

8      A    I have.

9      Q    How many times?

10      A    I don't know.

11      Q    More than ten?

12      A    Probably more than ten.  I'm not certain.

13      Q    That's fine.  When was the last time, just

14  approximately, that you had your deposition taken?

15      A    A couple of months ago.

16      Q    Okay.  Well, in that case, I'm going to

17  dispense with my usual spiel, where I remind you that

18  you're under oath, and I'm sure you're aware of that.

19  But the one thing I will say is that if you do need a

20  break at any time during this deposition, we will take

21  breaks, but if you need one at an unscheduled time,

22  just let me know and as long as there's no question

1  pending we can take a break and go off the record.

2  Understood?

3      A    Yes, I understand that.

4      Q    Did you bring any documents with you to your

5  deposition today?

6      A    No, I did not bring any documents, but I do

7  have from my attorney here, my CV and my report in

8  hard copy.

9      Q    And are there any notations, handwritten

10  notations, on either your CV or the copy of your

11  report that you have in front of you?

12      A    No, there are no handwritten notes.

13      Q    Okay.  And does that appear to be a true and

14  correct copy of the CV and report that you submitted

15  in this case?

16      A    Yes, it does appear to be a -- the copy of

17  the CV and the report that I submitted in this case.

18      Q    And since we're not in the same room, can

19  you just tell me if there's any other documents in

20  front of you?

21      A    No, there are no other documents in front of

22  me.

Farr Curlin                                      April 8, 2024

Page 10

1  Q  Okay.  Did you do anything to prepare for
2  today's deposition?
3  A  Yes, I did.
4  Q  What did you do?
5  A  I reviewed my report in detail, and I
6  reviewed some of the documents I cite in the report.
7  I also met with Mr. Brooks to talk about the
8  deposition process, and -- then I reviewed my
9  note -- not my notes, but my highlighted areas on my
10  report again.
11  Q  And apart from the lawyers in this case, did
12  you speak with anyone in preparation for your
13  deposition?
14  A  No, I did not.
15  Q  So before we go any further, I want to make
16  sure we have the same understanding on some terms that
17  I'm going to use throughout this deposition.  So
18  first, let's talk about gender dysphoria.  How would
19  you define gender dysphoria?
20  A  I define gender dysphoria as dysphoria
21  experienced at the perception that one's secondary sex
22  characteristics are at odds with one's own sense of

Page 11

1  gender.
2  Q  And since you used the term dysphoria in
3  your definition, can you explain what you mean by
4  dysphoria?
5  A  Dysphoria means just bad feeling.  So
6  it's -- it's some collection of sadness, anxiety,
7  being upset, feeling bad.  It -- it's a broad term.
8  Q  And when did you become familiar with the
9  term gender dysphoria?
10  A  I -- I don't recall when I first became
11  familiar with the term.
12  Q  Would you say that it was in the context of
13  your clinical practice that you became familiar with
14  the term?
15  A  No, I would not say it was in the context of
16  my clinical practice.
17  Q  So what's your recollection there?
18  A  I'm sorry, what -- what do you mean what is
19  my recollection there?
20  Q  Sorry, that was a bad question.  So what do
21  you recall about your becoming familiar with the term
22  gender dysphoria?

Page 12

1  A  What I recall is through my work as a
2  medical ethicist at some point years ago, becoming
3  aware that there was the phenomenon of gender
4  dysphoria and there were ethical questions that were
5  being raised about how to respond to that.  How to
6  understand it.
7  Q  And are you familiar with the definition in
8  the DSM-5 text revision version of gender dysphoria?
9  A  I couldn't cite it chapter and verse, but I
10  am familiar with it in the sense that I have reviewed
11  it and know the -- that there is such definition.
12  Q  And are you aware whether the condition
13  described as gender dysphoria has ever been known by
14  another term?
15        MR. BROOKS:  Objection.
16  A  I -- I am aware that terms used in this
17  context regarding self-perceived gender and -- and
18  what that perception implies have been shifting and
19  changing over time.  I do not recall what term was
20  used before gender dysphoria.
21  Q  Okay.  In that case, can we agree when I use
22  the term gender dysphoria, I'm referring to the

Page 13

1  condition that's described in the DSM-5-TR for
2  purposes of this deposition?
3  A  Since you want me to accept that that's the
4  definition you're using, would you read that
5  definition to me?
6  Q  I can, although I am actually -- what don't
7  we do this?  Why don't we go with your understanding
8  of the term gender dysphoria for purposes of this
9  deposition?  Does that make sense?
10  A  I think so, yes.
11  Q  I think so, too.  In your report, you refer
12  to medicalized gender transition treatment or NGT.
13  You use this acronym throughout your report; correct?
14  A  Yes, I use that abbreviation throughout the
15  report.
16  Q  And how do you define NGT?
17  A  As I think I said in the report, I define it
18  as -- I use the abbreviation to refer to the use of
19  puberty-blocking drugs and cross-sex hormones as
20  treatments for gender dysphoria.
21  Q  And are you aware of the term
22  gender-affirming care?

4 (Pages 10 - 13)

Farr Curlin

April 8, 2024

Page 14

1    A    Yes, I am aware of the term gender-affirming
2  care.
3    Q    And how would you define that?
4    A    Gender-affirming care is a euphemism that
5  has been used to refer, for example, in, as I recall,
6  in the Rhafferty-authored piece by the American
7  Academy of Pediatrics, to an approach that takes the
8  perception of one's secondary sex characteristics
9  being at odds with one's gender identity, so called,
10  to be rightly responded to through medicalization
11  through either -- through puberty-blocking hormones
12  and/or cross-sex hormones.
13    Q    So can you explain to me what the difference
14  is between those two terms?
15        MR. BROOKS:  Objection.
16    A    Gender-affirming care is a euphemism.  It's
17  imprecise, insofar as it does not specify whether
18  medicine is involved and it does not specify what one
19  takes the gender to be.  Medicalized gender transition
20  is an abbreviation I use in this report to not have to
21  repeat multiple times puberty-blocking hormones and
22  cross-sex hormones used in the context of perception

Page 15

1  of one's secondary sex characteristics being at odds
2  with one's perceived gender identify.
3        The key idea is that medicalized specifies
4  that you're taking that perception and treating it as
5  a medical problem, to which medical interventions,
6  namely this -- puberty-blocking drugs and cross-sex
7  hormones are -- are the appropriate responses.
8    Q    Now that we -- I'd like to start with a
9  couple questions from your CV.
10        MS. MURPHY:  So I'd like to mark as
11  Exhibit 1, a copy of Dr. Curlin's CV.
12        (Exhibit 1 was marked for
13        identification.)
14        MS. MURPHY:  I'm just marking a copy of
15  the CV.  Do I need to have Andrew pull it up in order
16  to do that?
17        THE REPORTER:  No, you can just tell me
18  you want it marked, and then it's up to you if you
19  want to show it or not.  Then basically you only need
20  to introduce it as an exhibit if you want it attached
21  to the transcript.
22        MS. MURPHY:  So I do want to introduce

Page 16

1  it as an exhibit.
2  BY MS. MURPHY:
3    Q    And, Dr. Curlin, I believe you have a copy
4  of your CV in front of you.  And you indicated that
5  it's the same as the copy that you submitted with your
6  report.  I submit to you that that's the only copy we
7  have of your CV, so that's the one that I'd like to
8  mark as Exhibit 1 in this case.
9        I have some questions on it.  If you would
10  like to refer to it to answer my questions, that's
11  fine with me.  As we sit here today, are there any
12  changes that you would make to the copy of the CV that
13  we've marked as Exhibit 1?
14    A    There are no changes as of when it was sent
15  to you that I would propose to add.
16        MS. MURPHY:  Okay.  And then now
17  similarly, I'd like to mark a copy of Dr. Curlin's
18  expert report that he submitted in this case as
19  Exhibit 2.
20        (Exhibit 2 was marked for
21        identification.)
22  //

Page 17

1  BY MS. MURPHY:
2    Q    And, you know, we don't need to pull it up
3  right now, but I ask that since it sounds like you
4  have a copy that you submitted to us in this case and
5  I submit to you that that's the copy that we'd like to
6  mark as Exhibit 2, that if you want to refer to your
7  report as I am asking questions about particular
8  paragraphs, that's fine.  I understand that you have
9  it in front of you; correct?
10    A    Yes, that's correct.
11    Q    Excellent.  Same question I asked about your
12  CV.  Are there any changes that you would make to your
13  report as we sit here today?
14    A    No, there are no changes that I would make.
15    Q    Okay.  So turning first to your CV, you
16  obtained your undergraduate degree in biology from UNC
17  Chapel Hill; correct?
18    A    Yes, I obtained my undergraduate degree in
19  biology from UNC Chapel Hill.
20    Q    And during your undergraduate studies, did
21  you complete any coursework on psychology?
22    A    I do not recall.  Let me say I do not recall

5 (Pages 14 - 17)

Farr Curlin                                                                  April 8, 2024

Page 18

1   what the coursework was.  I know I had some -- some
2   introduction to psychology, but I don't remember the
3   details.
4       Q    Do you recall whether any portion of that
5   class related to gender identity?
6       A    I do not recall whether it related to gender
7   identity.
8       Q    And do you recall whether any portion of
9   that class or classes that you took in psychology
10  related to psychology specific to adolescents?
11      A    I do not recall that in any detail.
12      Q    And during the same timeframe, did you
13  complete any coursework on psychiatry?
14      A    As an undergraduate, I had no coursework
15  specifically on psychiatry.
16      Q    So after undergrad, you attended medical
17  school at UNC Chapel Hill; is that correct?
18      A    Yes.  After undergraduate, I went to medical
19  school at the University of North Carolina at Chapel
20  Hill.
21      Q    What made you choose to go to medical
22  school?

Page 19

1       A    Well, it's complex and I don't profess to
2   fully understand why, but I was conscious of finding
3   that the work of attending to those who are sick is
4   intrinsically valuable, meaningful.  I had observed it
5   to be such in the practice of my grandfather, who was
6   a general surgeon, and my father who was an
7   obstetrician/gynecologist.
8           And I found that I enjoyed the study of the
9   sciences, particularly the sciences relevant to human
10  experience, and that I enjoy the humanities.  And that
11  medicine was a field that allowed me -- invited me to
12  commit myself to something worthwhile to something
13  that was objectively good, namely preserving and
14  restoring the health of human beings, that was
15  intellectually interesting, and my -- my interest with
16  respect to science and with respect to the humanities.
17          And for all those reasons, and I'm sure many
18  others, I chose to pursue becoming a physician.
19      Q    And you started to touch on this a bit, but
20  if you could elaborate, what is your view on the
21  purpose of medicine?
22      A    My view on the purpose of medicine is that

Page 20

1   medicine's intrinsic and constituent purpose is
2   preserving and restoring the patient's health.
3   Insofar as one reasonably can, responsive also to the
4   broader demands of morality, of ethics.
5       Q    And how long have you held that view?
6       A    Two my knowledge, I've held that view
7   throughout my life.
8       Q    Can you point to anything that influenced
9   your thinking on that subject?
10      A    Well, I watched the work of my father, as a
11  physician.  I saw family members being cared for by
12  medical professionals.  I myself, on some rare
13  occasions, was under the ministrations of medical
14  professionals.  I read stories about medical
15  professionals.  And all of that, I think, reflected
16  the reality that the thing that makes medical
17  professionals medical professionals is that they are
18  attending to those whose health is threatened or
19  diminished or injured in some way and seeking, insofar
20  as they reasonably can, to preserve and restore their
21  health.
22      Q    And as you describe that goal, would you say

Page 21

1   that that is in line with the teachings in medical
2   school?
3       A    Well, it's really too broad of a question to
4   answer.  There are lots of teachings in medical
5   school.  But generally, yes, that is consistent with
6   the teachings of medical school.  There are some
7   teachings that are made in some medical schools by
8   some medical educators that I think are not consistent
9   with that understanding.
10      Q    How so?
11          MR. BROOKS:  Objection.
12      A    Well, sometimes medical -- medical educators
13  will suggest that the goal of medicine is to do what
14  patients want.  And that if a patient wants something,
15  then the physicians have a professional obligation to
16  provide it, so long as they're not violating the law.
17  That's one example.
18      Q    And do you agree or disagree with that
19  example?
20      A    With the view I just described, I disagree.
21      Q    Going back to the coursework that you did in
22  medical school.  Did you complete any coursework on

Farr Curlin                                                    April 8, 2024

Page 22

1 psychology?

2   A   I recall that we had coursework on

3 psychology, but I don't recall the details.

4   Q   And did any of that coursework specifically

5 involve diagnosing mental health conditions?

6   A   We did have coursework, yes, on diagnosing

7 mental health conditions.

8   Q   And were these courses that were part of the

9 general path to a degree in medicine, or were they

10 so-called electives?

11   A   Well, there were both types of courses, but

12 certainly our required coursework included coursework

13 on diagnosing mental health conditions.

14   Q   And did you take any coursework on top of

15 that, like maybe some electives?

16   A   I don't recall.

17   Q   Did any of the coursework that you completed

18 involve discussion of gender identity?

19   A   I don't recall any coursework during medical

20 school talking about what you -- using the language of

21 gender identify.  I, of course, don't know what you

22 mean when you say "gender identity," but I do not

Page 23

1 recall that language being used in our coursework in

2 medical school.

3   Q   What's your understanding of the term

4 "gender identity"?

5   A   My understanding is that term is used by

6 different people in different ways.  I don't -- I

7 don't use the term if I can avoid it, because I --

8 it's so non-specific, particularly in the context like

9 this.

10   Q   Okay.  Did any of the coursework that you

11 completed in psychology involve any discussion of

12 diagnosing gender dysphoria?

13   A   I don't have any memory of the coursework in

14 medical school including coursework on diagnosis of

15 gender dysphoria.

16   Q   Did you take any courses in psychiatry?

17   A   Yes, as I said before, we had courses

18 involving psychiatry.

19   Q   Now apart from what we've already discussed,

20 did you take any other courses that included any

21 discussion of gender dysphoria?

22   A   I do not recall.

Page 24

1   Q   So at some point I assume you completed

2 clinical rotations as part of medical school.

3   A   Yes, as part of medical school I completed

4 clinical rotations.

5   Q   What did you do your rotations in?

6   A   I'm sorry, I didn't understand what you

7 said.  Can you repeat that?

8   A   Let me ask this first.  How many rotations

9 did you do?

10   A   I don't recall the number of rotations that

11 we did.

12   Q   What type of rotations did you do and in

13 what area were your rotations?

14   A   As best as I can recall, during our first

15 clinical year, third year of medical school, we did

16 rotations in internal medicine, surgery, obstetrics

17 and gynecology, psychiatry, family medicine, and

18 pediatrics.  And there may have been something else

19 that I don't remember at this moment.

20   Q   And did you choose which rotations to do?

21   A   In that first clinical year, we had very

22 little choice.  I don't recall if we had some choice

Page 25

1 on the margins, but for the most part, we did

2   Q   Okay.  And did you do a second year of

3 clinical rotations?

4   A   Yes, I did a fourth year of medical school,

5 which includes clinical rotations.

6   Q   And what were the rotations that you

7 completed that year?

8   A   Likewise, I don't recall, except I know I

9 did rotations in internal medicine, particularly.

10   Q   And do you recall whether any of the

11 patients that you saw during your rotations had a

12 diagnosis of gender dysphoria?

13   A   I don't recall seeing a patient who had what

14 today would be called gender dysphoria.  At least not

15 one that was coded as such clinically.

16   Q   And during that time did you see a patient

17 who had concerns over their gender identity?

18   A   Depends on what you mean by the term "gender

19 identity."

20   Q   Did any patients express concerns, distress,

21 over the congruence of their sense of their sex and

22 the sex that they were assigned at birth?

7 (Pages 22 - 25)

Farr Curlin                                                                                    April 8, 2024

Page 26

1    A    I -- I don't recall.

2    Q    So after medical school, you completed your
3    residency at University of Chicago; correct?

4    A    Yes.  After medical school I completed a
5    residency in internal medicine at the University of
6    Chicago.

7    Q    And what is internal medicine?

8    A    Internal medicine is a discipline of
9    clinical medicine that focuses on non-surgical
10   conditions and treatments of adults.

11   Q    So when you say "adults," is that anyone
12   over the age of 18?

13   A    With respect to the clinical practice, the
14   boundary is essentially someone who is physically
15   mature.  So we don't have a sharp boundary on the age.
16   But -- but we don't generally take care of children.

17   Q    Okay, understood.  Can it sometimes include
18   adolescents?

19   A    On rare occasions.

20   Q    What made you choose internal medicine?

21   A    I was attracted to the comprehensiveness and
22   "systematicness" of the culture of internal medicine

Page 27

1    and the way that internal medicine was characterized
2    by trying to understand all that comes into a
3    patient's experience of illness, the way that it
4    blends, psychology, and physiology, and clinical
5    judgment in areas of uncertainty.  It involves
6    longitudinal relationships with patients.

7         I was attracted by the way it -- it
8    characteristically seeks to understand root causes of
9    peoples' illnesses and to try to thoroughly
10   investigate, to try to understand the contributors to
11   complex medical experiences that patients have.  And I
12   was attracted to some of the teachers I had in
13   internal medicine who were, to me, exemplars of a good
14   physician.

15   Q    Okay.  What types of conditions did you
16   treat during your residency?

17   A    Well, I treated all manner of conditions,
18   accepting that I did not conduct any major surgery.  I
19   saw pretty much -- well, I saw all manner of other
20   conditions.

21   Q    Does that include mental health conditions?

22   A    Yes, it definitely includes mental health

Page 28

1    conditions.

2    Q    So as an internal medicine physician, do you
3    diagnose mental health conditions?

4    A    Yes.  We frequently diagnose mental health
5    conditions in internal medicine.

6    Q    During your residency, can you describe the
7    patient population that you treated?

8    A    I can only describe it in broad strokes
9    because it was so diverse.  But it was adult patients
10   who were experiencing illnesses of one form or another
11   in both the out -- I saw them in both the outpatient
12   and the inpatient context.  The conditions ranged all
13   over the map.

14   Q    And were any of the patients that you saw
15   diagnosed with gender dysphoria?

16   A    I don't recall any patient specifically that
17   carried a diagnosis of what today is called gender
18   dysphoria.

19   Q    Were there any patients who displayed
20   symptoms that you would consider similar to the
21   symptoms described by gender dysphoria?

22   A    There were certainly patients who had

Page 29

1    perceptions of their body as being unwanted.  Features
2    of their body being things they didn't want and that
3    they wished were different.

4    Q    And did you treat those patients for that
5    condition?

6    A    I would, in those cases -- and here I'm
7    speaking generally; I'm not speaking about a
8    particular case.  But I would have expressed sympathy
9    and then sought to discern first was there anything
10   wrong with their body medically and -- or whether it
11   was their perception of their body that was -- that
12   was disordered.  And if it were the latter, I would
13   seek to reassure them that their -- best I could tell,
14   there was not a problem with the health of their body
15   and help them go on as best they could, despite the
16   experience of wishing their body were different.

17   Q    And am I correct that you've never made, or
18   at least during that timeframe, you didn't make a
19   diagnosis of gender dysphoria?

20   A    To -- to the best of my recollection, I
21   never made a diagnosis of gender dysphoria.

22   Q    And as you described those symptoms in

8 (Pages 26 - 29)

Page 30

1 answering my last question, was there a diagnosis that
2 you made to describe those symptoms?
3        MR. BROOKS:  Objection, calls for
4 speculation.
5    A   Yeah, I -- I would have to think of a
6 particular case, and I don't have detailed memories of
7 particular cases from 25 years ago.
8    Q   Okay.  Moving on to the fellowships that you
9 completed after your residency.  The first was the
10 Robert Wood Johnson Clinical Scholars program;
11 correct?
12    A   Yes, that's -- the first fellowship I
13 completed after residency was the Robert Wood Johnson
14 Clinical Scholars Program.
15    Q   And how long was that program?
16    A   That program was two years.
17    Q   And can you describe what the program
18 entailed?
19    A   The Robert Wood Johnson Clinical Scholars
20 Program was a program that allowed competitive
21 applicants who were selected to spend two years
22 developing their own area of scholarship regarding

Page 31

1 health services, which is a term that encompasses,
2 effectively, all of the practice of medicine except
3 for the biomedical scientific piece.
4        So whether that's epidemiology, policy,
5 ethics, questions of how healthcare is distributed,
6 and so on.  And the -- effectively, what we did was
7 begin to study the topic we were interested in with
8 mentors, who were supported by the -- the -- the
9 program, and take coursework and gain other training
10 that would help us do the kind of scholarship that we
11 proposed to do with rigor and with methodological and
12 analytical excellence.  And basically learn how to
13 become and begin to become what in medicine are called
14 clinician investigators.
15    Q   Can you define that term for me, please?
16 Clinical -- sorry, go ahead.
17    A   The -- a clinician investigator is someone
18 trained as a clinician and generally who continues to
19 practice as a clinician, who also is trained as and
20 practices as an investigator, a researcher, a scholar
21 of some form.
22    Q   Okay.  And you said that students in this

Page 32

1 program chose an area to focus on.  What was your area
2 that you chose?
3    A   I chose to focus on what characteristics of
4 persons and characteristics of their experiences
5 result in them working in underserved communities.
6 That's how I began my -- my fellowship.  And then over
7 the course of the first year of my fellowship, I moved
8 to seeking to understand how religious commitments
9 feature in -- in decisions to work among the
10 underserved.  And then with the encouragement of my
11 mentors, to study the religious characteristics of
12 physicians and to look more broadly at how those
13 characteristics account for, empirically, differences
14 in physicians, clinical practices, and in their --
15 their beliefs regarding their practices of medicine.
16    Q   And did your work culminate in a written
17 publication?
18    A   Yes, the work culminated in a number of
19 written publications.
20    Q   And are those listed on your CV?
21    A   Yes, they are, to my knowledge.
22    Q   Can you point to them, please?

Page 33

1    A   Point to them how?
2    Q   Tell me what they are.
3    A   Oh.  Are you asking specifically the
4 publications that emerged from the work -- that
5 emerged during my fellowship or that emerged
6 eventually from the work in my fellowship?
7    Q   Start with the former.
8    A   Okay.  So my first paper, peer-reviewed
9 paper, number 1 on my CV, is one.  And I actually
10 don't recall, because I don't have the date in front
11 of me, whether number 2 came out while I was still a
12 fellow or after I had joined the faculty.
13    Q   Okay.  And these are on page 7 of your CV;
14 correct?
15    A   Page 12.
16    Q   Let me make sure.  Okay, all right, I got it
17 now.  So numbers 1 and 2 on page 12?
18    A   That's correct.  And I am checking to see if
19 any of the non-peer-reviewed publications occurred
20 during my fellowship, and I do not believe they did.
21    Q   You indicated that you did clinical work
22 related to that fellowship.  Is that listed under your

9 (Pages 30 - 33)

Farr Curlin                                                          April 8, 2024

Page 34

1  clinical practice in your CV?  Let me ask it a
2  different way.
3       Is that the Lawndale Christian Health
4  Center?
5       A   When I was -- during my time as a fellow, as
6  a Robert Wood Johnson clinical scholar, I did see
7  patients at the Lawndale Christian Health Center.
8  Federally funded community health center on the west
9  side of Chicago.
10      Q   Okay.  I'm going to ask a couple questions
11 about that in a bit, but first a couple questions
12 about the second fellowship that you did at the
13 MacLean Center for Medical Ethics.  You completed a
14 fellowship there from 2003 to 2004; is that right?
15      A   That's right.  That's the MacLean Center for
16 Clinical Medical Ethics, just to be precise.  And yes,
17 I completed that from 2003 to 2004.
18      Q   And actually, before I get more details on
19 that, when did you first become interested in the area
20 of clinical medical ethics?
21      A   I don't recall.  I think I was always
22 interested in ethics of medicine.

Page 35

1       Q   Was there a particular motivation for your
2  interest in that area?
3       A   Well, I -- I wanted to practice good
4  medicine and avoid practicing bad medicine.  I found
5  reasoning about how we ought to practice, interesting,
6  stimulating, and worthwhile.  So that was all -- I
7  don't have memory of that not being the case at any
8  point in my medical training.
9       Q   So going back to the fellowship, can you
10 describe what that was about?
11      A   The MacLean Center for Clinical Medical
12 Ethics fellowship is a premier training program,
13 primarily for physicians, started by Mark Siegler, The
14 University of Chicago.  And its focus is on -- it's a
15 part-time fellowship that I completed during my first
16 year on faculty, and its focus is on training fellows
17 in the history of medical ethics, as that field came
18 to be self-consciously and developed from the -- the
19 1960s to present, introducing them to the key
20 participants in that field, to the key arguments made,
21 concepts used, the legal cases that have had import,
22 and so on.  All with an emphasis on the kinds of

Page 36

1  issues that emerge from clinical practice of medical
2  practitioners, rather than on issues such as, let's
3  say, environmental ethics that are not -- that don't
4  emerge directly from clinical medicine.
5       Q   And during that fellowship, did you have a
6  specific area of focus?
7       A   No.  That fellowship was -- my focus was on
8  learning the field of medical ethics.
9       Q   And is the -- I'm sorry, you pronounce it
10 MacLean?
11      A   I pronounce it MacLean.
12      Q   Okay.  I apologize.  I'm from Virginia, and
13 the next town over is spelled the same but pronounced
14 MacLean.  So in my head I keep confusing the two.
15      Is the MacLean Center secular or is there a
16 religious affiliation?
17      A   The MacLean Center has no religious
18 affiliation.
19      Q   And your fellowship, did it have a religious
20 focus?
21      A   No, I completed the MacLean Center Clinical
22 Medical Ethics fellowship, and so it had no religious

Page 37

1  focus, although religious ideas were addressed insofar
2  as they were part of the ideas at stake in medical
3  ethics.
4       Q   Okay.  So then after that fellowship, you
5  participated in the Summer Institute for Survey
6  Research Methods; correct?
7       A   That's correct, yes.  I --
8       Q   And what --
9       A   -- Summer Institute for Survey Research
10 Methods at the University of Michigan.
11      Q   And what was that --
12      A   Sorry, repeat that, please?
13      Q   What was the program about?
14      A   That program is designed to equip people who
15 are using survey research methodologies in their
16 empirical research, to -- to do so expertly and using
17 the best available methods.
18      Q   And what was your purpose in completing that
19 program?
20      A   I had, at that point, begun to study
21 physicians' religious characteristics and how those
22 are associated with their clinical practices and ideas

10 (Pages 34 - 37)

Page 38

1 about their practices and was beginning to use and
2 intended to further use survey research methods.  And
3 so I went and completed that Summer program to get
4 further training on how to do that well.  That being
5 conduct well-designed surveys that can answer the
6 questions one was trying to answer.
7     Q    And then in 2008, you participated in the
8 Palliative Care Education and Practice program;
9 correct?
10     A    Yes.  I completed the Palliative Care
11 Education and Practice program at Harvard University,
12 yes.
13     Q    And can you describe that program?
14     A    That program was designed for people in
15 academic institutions who were practicing palliative
16 medicine, to give them further training and cohort
17 regarding palliative medicine and all of its various
18 dimensions, including how to teach palliative
19 medicine.
20     Q    What prompted your interest in palliative
21 medicine?
22     A    I practiced general internal medicine for

Page 39

1 the first several years out of training, and at some
2 point it dawned on me that the context of clinical
3 practice in which I most came alive was in caring for
4 very sick people, and particularly people who were
5 facing the limits of medicine or at the end of life.
6 And that I enjoyed helping them negotiate the clinical
7 ethical challenges of such situations, and I enjoyed
8 teaching students and other trainees about that,
9 and -- and then when palliative medicine as a field
10 began to mature and it first came to University of
11 Chicago, I was one of those who raised my hand, so to
12 speak, to join a group of folks who were learning that
13 practice and developing that discipline at the
14 University of Chicago.
15     Q    How would you define palliative medicine?
16     A    Palliative medicine is that subspecialty of
17 medicine that develops particular expertise regarding
18 and focuses clinically on the relief of difficult and
19 health-diminishing symptoms.
20     Q    Is palliative care the same as hospice care?
21     A    Palliative care is not the same as hospice
22 care, no.

Page 40

1     Q    How does it differ?
2     A    So palliative medicine, which is the term I
3 will use as it's more precise, again, is defined, I
4 think, in the way I described.  People experience
5 difficult symptoms with advanced illness of all sorts,
6 and that's what palliative medicine does, is address
7 those symptoms, and address the -- the challenging
8 clinical decisions that have to be made as one deals
9 with advanced illness.
10          Hospice, by contrast, is a way of
11 structuring how medicine is organized and paid for.
12 And in the case of hospice, it is for patients who
13 have, according to the judgment of at least two
14 physicians, a prognosis of six months or less to live.
15 Hospice is a way that the remaining care they receive
16 can be organized and financed.
17          So in one sense, hospice is -- is an
18 insurance benefit of Medicare that has corollaries and
19 private insurance benefits, but it's fundamentally a
20 way of organizing medical care.  And that medical care
21 includes palliative medicine, but it includes other
22 aspects of medicine also.

Page 41

1     Q    Got it.  So apart from any continuing
2 medical education that you may have completed, have we
3 discussed all the training that you have completed
4 with respect to -- let me withdraw that.  That was a
5 bad question.
6          Apart from any continuing medical education
7 that you may have completed, have we discussed all
8 medical-related training that you've received?
9     A    Well, yes and no.  Yes, that's the extent of
10 the formal education courses, other than various ad
11 hoc and continuing medical education-related courses.
12 But the training regarding clinical medicine is --
13 goes on in multiple ways that are not limited to such
14 coursework.
15     Q    Understood.  So other than what we've
16 already discussed, have you completed any specialized
17 training in psychology?
18     A    Well, I have participated in and completed
19 conferences and symposia that address psychology
20 relevant to medicine innumerable times over the course
21 of my clinical practice.  So in that respect -- so I
22 have done that.

Farr Curlin
April 8, 2024

Page 42

1    Q    And are all of the symposia and conferences
2  that you're referring to there, are they listed on
3  your CV?
4    A    No, they are not listed on my CV.  It's not
5  customary to list such things on one's CV.
6    Q    Do any of those conferences or symposia that
7  you're referring to relate to the issue of gender
8  dysphoria?
9    A    Yes.  I don't recall how many, but yes.
10   Q    And would you say that there were more
11  than -- let me ask it this way.
12       Were there any symposium or conferences that
13  were specifically about the issue of gender dysphoria?
14   A    Yes, there were.  And I likewise don't
15  recall how many.
16   Q    And you don't remember any of the names of
17  these conferences or symposia?
18   A    I -- I remember one, for example, was put on
19  by the leader of the so-called gender clinic here at
20  Duke University.
21   Q    And approximately when was that that you
22  attended that -- was it a conference or was it a

Page 43

1  symposia?
2    A    It was a -- it was a mid-day conference.
3  And I don't recall how many years ago that was.
4    Q    Can you describe the subjects that were
5  discussed during that conference?
6    A    I recall that the subject of gender
7  dysphoria was discussed, as well as the subject of
8  puberty blockade and cross-sex hormones.  I know that
9  much, but I don't recall more details.
10   Q    And was the focus of that discussion or
11  those discussions, was it aimed at achieving a certain
12  purpose?
13   A    I -- I can't speculate about what the
14  purpose was that those who put on that conference were
15  trying to achieve.
16   Q    Were the presenters opposed to prescribing
17  those types of treatments for patients with gender
18  dysphoria?
19   A    In that conference, no, they were not
20  opposed.
21   Q    Were they in favor of prescribing those
22  types of treatments for someone with gender dysphoria?

Page 44

1        MR. BROOKS:  Objection.
2    A    To the best of my recollection, they were
3  presenting why they thought such -- what they were
4  doing and why they thought such puberty blockade and
5  cross-sex hormones was a good thing to do for certain
6  patients.
7    Q    Okay.  And I know that you said that you
8  can't remember when this was, but what was your
9  employment at the time?
10   A    I was here at Duke University.
11   Q    Okay.  Have you attended any other
12  conferences or symposia related to the issue of gender
13  dysphoria?
14   A    Yes, I have.  My pause is to try -- is
15  because the -- the language of conferences is -- is
16  somewhat imprecise within the world of medicine.  We
17  are having meetings and discussions frequently about
18  the issues that arise in clinical medicine and
19  clinical ethics.  But yes, I've had other context
20  where -- that focused on the issue of gender
21  dysphoria.
22   Q    Okay.  But you're referring more to meetings

Page 45

1  or discussions, not necessarily conferences dedicated
2  to that topic?
3        MR. BROOKS:  Objection.
4    A    So I'm -- I recall -- well, right now I
5  recall one other meeting that -- well, two meetings
6  that were called specifically to focus on that
7  subject.
8    Q    And was this also while you were at Duke?
9    A    Yes, this was while I was at Duke.
10   Q    And what was the focus of those meetings?
11   A    Both of these meetings are described in my
12  expert report.  One was a meeting -- the people
13  gathered by the Greenwall Foundation Faculty Scholars
14  Program last fall and focused on ethical questions
15  that remain regarding -- I'd have to look at my report
16  to remember the precise title, but regarding
17  medicalization of -- of -- medicalized responses to
18  gender dysphoria.
19       The second was a -- a faculty conference of
20  the faculty of the Transfer for Bioethics, Humanities,
21  and History of Medicine to talk about similar
22  questions.

12 (Pages 42 - 45)

Farr Curlin

April 8, 2024

Page 46

1    Q    Okay.  And when you say that they're listed
2  in your report, are you talking about the CV portion
3  of your report or are you talking about the body of
4  your report?
5    A    I'm talking about the body of my report.
6    Q    Okay.  I know it may take you a minute to
7  look through, but could you direct me to the portion
8  of your report where you discuss these?
9          MR. BROOKS:  And Counsel, if we could
10  take a short break in the near future, that would be
11  great.
12         MS. MURPHY:  Sure.
13         THE WITNESS:  If you look at paragraph
14  49 and 50, I refer to these two meetings.
15         MS. MURPHY:  Okay.  Counsel, if you
16  want to take a short break, now is a good time.  Would
17  you say you want five minutes, ten minutes?
18         MR. BROOKS:  Every time anybody says
19  five, it takes ten.  So let's just do that.
20         MS. MURPHY:  I agree.  Okay.
21         MR. BROOKS:  All right.
22         THE REPORTER:  All right, the time is

Page 47

1  10:16 a.m.  We are now off the record.
2          (Off the record.)
3          THE REPORTER:  The time is 10:26 a.m.
4  We are now back on the record.
5  BY MS. MURPHY:
6    Q    Okay.  Dr. Curlin, I'm going to move on to
7  just a couple questions about your clinical practice.
8  It looks like you began your clinical practice in
9  2001, as a primary care internist at the Lawndale
10  Christian Health Center; is that correct?
11    A    Well, I began my clinical practice in
12  training.  We have -- had a continuity clinic.  But I
13  continued it post-training in that context.
14    Q    Got it.  So where is the Lawndale Christian
15  Health Center located?
16    A    The Lawndale Christian Health Center is
17  located on the west side of Chicago, not far from the
18  Cook County Jail, in the -- right at the juncture
19  between the North Lawndale and South Lawndale
20  neighborhoods.
21    Q    And what prompted your decision to work
22  there?

Page 48

1    A    I had been drawn to Chicago as a place to
2  train because I wanted to work among the underserved
3  and had heard about the pioneering work among the
4  undeserved led by the Lawndale Christian Health
5  Center.  And I spoke Spanish and my fiance, soon to be
6  wife, spoke Spanish, and we could live in a
7  Spanish-speaking inner-city neighborhood while
8  learning from physicians who were -- had devoted their
9  lives to practicing medicine among the underserved.
10  And so I chose to live there while training at the
11  University of Chicago, and then was able to negotiate
12  being able to see patients there during my fellowship.
13    Q    And can you tell me about the mission of
14  that center?
15    A    I don't recall the mission exactly, but I
16  know it has something to do with something like
17  showing the love of Christ through caring for patients
18  with excellence.  Something like that.
19    Q    And what role did Christianity play in the
20  care that patients received in the clinic?
21    A    Well, it -- it was the primary motivation
22  for these physicians and nurses to work with a

Page 49

1  population of patients that was marginalized with
2  respect to healthcare resources because of their
3  economic and other forms of poverty, including their
4  immigration status.  And so it was strongly motivated
5  by a Christian vision of our common humanity, that
6  everyone being made in the image of God has dignity,
7  and that those who are poor receive what in the
8  Christian condition is often called the
9  preferential -- preferential option for the poor,
10  meaning they deserve particular regard, particular
11  emphasis, particular priority.
12         And so that whole vision of caring well for
13  people who characteristically struggle to find good
14  medical care was grounded in that Christian tradition.
15    Q    And were choices in treatment options
16  influenced by Christian values?
17    A    I'm sure they were in any number of ways.
18  For example, you know, people would go the extra mile
19  to make sure the patients were able to be seen by
20  specialists that they otherwise could not be seen by
21  because of those same Christian values I just
22  described.

13 (Pages 46 - 49)

Page 50

1    They would seek to make sure that all that
2 is -- all that good medicine rightly ordered makes
3 available to us was seen as something that should be
4 made available to those -- to the least of these, to
5 use that theological language, to those who -- who
6 need it most.  And they were committed to that.
7    Q    And just before we go on, you've used the
8 term "good medicine" a couple times so far today, and
9 I'm wondering if you can give me a definition of what
10 you mean by "good medicine."
11    A    You know, for philosophical reasons, no,
12 there's -- there's no way to define the term
13 could -- good more basically.  That -- that is -- but
14 the idea just means that there are -- among those
15 things that people who put themselves forward as
16 medical practitioners and the institutions that put
17 themselves forward as medical institutions do, not all
18 is good.  And part of the challenge of being human,
19 and specifically being a medical practitioner, is to
20 discern that which is consistent with medicine rightly
21 understood and -- and with the patient's health
22 rightly understood, and with the requirements of -- of

Page 51

1 morality, of ethics rightly understood from that which
2 is not.
3        So for example, it is standard that
4 hospitals would and physicians would refuse to see
5 people who had Medicaid.  And that would be the sort
6 of things that for many people at Lawndale Christian
7 Health Center was an example of not good medicine and
8 a kind of corruption of medical institutions.
9    Q    Understood.  So what patients did the
10 Lawndale Christian Health Center serve?  Age, just in
11 general, what patients did they serve?
12    A    They served all -- all patients that showed
13 up, which included every -- every manner of patient.
14    Q    So children through adult?
15    A    Yes, children through adult.
16    Q    And did providers only treat Christians?
17    A    No.  As I said, they -- they saw everyone
18 who showed up.  They were committed to not
19 distinguishing between patients, except insofar as
20 patients needed medical care.
21    Q    And did providers treat any transgender
22 patients?

Page 52

1    A    I'm sure they did, but I -- I did not see
2 any and so I don't -- I can't say with certainty.
3    Q    But there was no policy against treating the
4 transgender patients?
5    A    No.  In fact, had there been a policy it
6 would have been that we treat anyone and everyone,
7 including anyone who shows up with a genuine medical
8 need that we can be helpful with.
9    Q    And were patients asked about their
10 religious affiliation on any forms or by the provider?
11    A    They, I'm sure, often were.  I don't
12 remember the details of how they were asked.  It's
13 customary across medicine to ask about religious
14 affiliation as part of taking a history.
15    Q    At that practice, were there any policies
16 dictating certain treatments that would not be
17 provided to patients?
18    A    There were no treatments that I'm aware of
19 that -- that were recognized as legitimate medical
20 treatments, treatments that respond to medical need,
21 that were opposed by that clinic.
22    Q    Why do you say it that way?

Page 53

1        MR. BROOKS:  Objection.
2    A    Well, you know, as I've already mentioned,
3 there are things done by people who put themselves
4 forward as medical practitioners and that are offered
5 by institutions that put themselves forward as medical
6 institutions that are not good.  And I don't remember
7 there being a policy, but there were -- it was widely
8 understood that if a patient asked for something that
9 was not something consistent with good medicine,
10 that -- that the medical practitioner would
11 respectfully decline to participate on what the
12 patient requested.
13    Q    Can you think of any examples of those types
14 of treatments?
15    A    The -- I can think of two.  One would be
16 assistance in hastening one's death or causing one's
17 death.  And another would be what we would call
18 elective abortion.
19    Q    And is the reason for not providing those
20 treatments based on Christian values?
21    A    The reason for not providing those
22 treatments are based on values that are not specific

Farr Curlin
April 8, 2024

Page 54

1 to Christianity.  Specifically, the ancient and
2 enduring, I think, when people are thinking well and
3 practicing well, commitment to not causing the death
4 of any -- any patient.
5    Q    And so would, and I'll be specific, would
6 prescribing puberty blockers or cross-sex hormones for
7 someone with gender dysphoria, would that fall under
8 the category of treatments that would not be provided?
9    A    I don't recall -- I actually don't know.  I
10 haven't been to Lawndale Christian Health Center in
11 more than 20 years, and so I don't know.
12    Q    What was your role when you practiced there?
13    A    My role was as an outpatient primary care
14 physician.
15    Q    And I know that you've said that the clinic
16 treated all patients.  At that time, did you treat
17 children and adolescents?  In addition to adults, I
18 should say.
19    A    I only saw physically mature adolescents,
20 and that was a minority of the patients that I saw.
21    Q    And were you practicing internal medicine?
22    A    Yes, I was practicing internal medicine.

Page 55

1    Q    Did you treat anyone with a diagnosis or who
2 displayed symptoms of gender dysphoria?
3        MR. BROOKS:  Objection, compound
4 question.
5    A    I don't recall.
6    Q    Did you ever diagnose anyone with that
7 condition while working at the Lawndale Christian
8 Health Center?
9    A    I have no memory of doing so.
10    Q    Did any of your patients express concerns
11 related to their gender identity?
12    A    I don't recall whether any of my patients
13 expressed concerns about how their secondary sex
14 characteristics aligned with their own perception of
15 their gender.
16    Q    The next place you practiced was at
17 University of Chicago Primary Care Group; is that
18 correct?
19    A    Yes, that's the next place I practiced
20 outpatient medicine.
21    Q    And on your CV, you list primary care
22 physician, whereas at Lawndale you described your

Page 56

1 title as primary care internist.  Is there a
2 distinction to be made there or?
3    A    There's no distinction that has substance.
4 I was a primary care physician at both places, and I
5 was an internal medicine physician at both places.
6    Q    And at the Primary Care Group, were you
7 seeing patients in a clinic setting?
8    A    Yes, I was seeing patients in an outpatient
9 clinic setting.
10    Q    And what patients did you see when you
11 worked there?
12    A    I saw all manner of patients that presented
13 to the clinic, with all manner of complaints and
14 concerns, with a focus on adults.
15    Q    And can you give me some examples of the
16 types of conditions that you treated?
17    A    I treated conditions such as chronic pain,
18 fatigue, sleeplessness, depression, anxiety, erectile
19 dysfunction, hypertension, diabetes,
20 hypercholesterolemia, thyroid disorders,
21 osteoarthritis, rheumatoid disorders, kidney disease,
22 and that's not comprehensive but that's an

Page 57

1 example -- that's a list of some examples.
2    Q    And in that setting, did you treat anyone
3 with a diagnosis of gender dysphoria?
4    A    I have no memory of treating someone in that
5 context who carried a diagnosis of gender dysphoria.
6    Q    And did you treat anyone who expressed
7 symptoms that are characteristic of gender dysphoria?
8    A    I don't recall.  I imagine I did, but I
9 don't recall specifics.
10    Q    Did you ever recommend medical treatment to
11 a patient who expressed gender dysphoria symptoms,
12 related to the gender dysphoria?
13        MR. BROOKS:  Objection, lack of
14 foundation.
15    A    I'd want to know what medical treatment you
16 have in mind, but I -- as I said, I don't recall
17 treating anyone who carried a diagnosis of gender
18 dysphoria.  And so similarly, I don't have any
19 recollection of specific treatment.
20    Q    Okay.  And am I correct that during that
21 same time period, beginning in 2003, you were also the
22 attending physician at University of Chicago Hospital?

15 (Pages 54 - 57)

Page 58

1    A   Yes, I was also an attending physician on
2  the general medicine service at the University of
3  Chicago Hospitals.
4    Q   And did you ever encounter any patients with
5  gender dysphoria in that setting?
6    A   I am confident that I did, but I don't have
7  specific memories of particular patients.
8    Q   Do you have a specific memory of prescribing
9  puberty blockers to somebody with gender dysphoria?
10   A   No, I have no memory of prescribing puberty
11  blockers to someone with a diagnosis of gender
12  dysphoria.
13   Q   And what about cross-sex hormones?
14   A   I have no memory of prescribing cross-sex
15  hormones to a patient.
16   Q   On your CV, you also describe an ethics
17  consult service.  What do you mean by that?
18   A   At the University of Chicago, I served as
19  one of the attending physicians on the clinical ethics
20  consult service.
21   Q   And is that similar to what you would call
22  the ethics committee?

Page 59

1    A   At the University of Chicago, the consult
2  service self-consciously does not call itself a
3  committee.  In part, emphasize that the goal for that
4  consult service is to help clinicians think well about
5  the issues they face and make clinical judgments that
6  are consistent with their ethical obligations, rather
7  than defer that to a committee.  But we called it
8  the -- the clinical ethics consult service.
9    Q   Got it.  And what was your role on the
10  consult service?
11   A   The months that I was the primary attending,
12  I would go -- when an ethics consult was called, I
13  would go to see those who called the consult and any
14  people involved in the situation for which the ethics
15  consult emerged.  I would often do that with one of
16  our fellows in clinical medical ethics.
17       And would gather data relevant to clinical
18  ethical reasoning about that case and then would draw
19  on what I took to be relevant sources that speak to
20  the clinical ethical questions raised by that case,
21  and put together a one to two-page description of the
22  case and then would present that case to the remainder

Page 60

1  of the faculty and trainees, usually 20 to 30 people,
2  at our weekly clinical ethics case conference to
3  invite them to reason with us and with the people
4  involved in the clinical care for which the case
5  emerged.
6        And would, based on that discussion, then --
7  and my own expertise and the resources that were
8  relevant and the facts that are relevant, we then
9  write a consultation note which would be placed in the
10  chart, which would be my opinions and my
11  recommendations to those involved regarding how they
12  might proceed and for what reasons.
13   Q   And was that note provided to the person who
14  requested the consult?
15   A   Well, it was -- became part of the medical
16  record.  So anybody who had access to the medical
17  record would have access to the note.
18   Q   And how many months were you the primary
19  attending?
20   A   Typically, one to two months per year.
21   Q   Okay.  And when you weren't serving as the
22  primary, were you still serving a role -- what was

Page 61

1  your role when you weren't serving as the primary?
2  How would you describe that?
3    A   My role with respect to the clinical ethics
4  consult service would be to go to the -- when my
5  schedule allowed, to go to the two-hour clinical
6  ethics case conference and participate in that
7  dialogue about the -- the cases that were live at that
8  time.
9    Q   And was it only physicians who could request
10  a consult, or could family or patients request
11  consults also?
12   A   Anyone could request a consult.
13   Q   And was there a particular process that they
14  had to follow to request a consult?
15   A   I don't recall the details, but there were
16  not really hoops to jump through.  It was just if
17  there was a question, whoever became aware of the
18  question was able to ask for an ethics consult, and
19  then it was well known across the hospital how to --
20  how to ask for an ethics consult, and then we would be
21  paged.
22   Q   Can you give me some examples of some of the

16 (Pages 58 - 61)

Farr Curlin                                                                      April 8, 2024

Page 62

1 types of questions that were posed?

2     A   I can give you a few examples of questions

3 that were posed, but in broad strokes as I don't

4 remember the details of any case these years later.

5 We had cases in which a patient had obviously

6 diminished capacity to reason and to think about some

7 choice for which they, under the law, had authority to

8 make a decision.  And we would be asked to weigh in on

9 whether they had sufficient capacity to make the

10 particular question or the particular judgment that

11 was facing them.

12         And if they didn't, why?  How could that be

13 restored?  And if it could not be restored, who would

14 be the property surrogates to turn to and what

15 standards would bind the decisions that a surrogate

16 would make, and are those standards different from the

17 standards that would bind a patient themselves?

18         We had questions about the care of children,

19 where either families sought some intervention that

20 the physicians did not think was consistent with good

21 medicine.  How a physician should proceed in such a

22 case.

Page 63

1         We had cases in which the physicians thought

2 that some intervention for children was important, and

3 then we would think about whether it was sufficiently

4 important or sufficiently medically necessary that the

5 physicians had authority to override the wishes of the

6 pediatric patient and/or their patients.  And if so,

7 how should they do that and what are -- what's the

8 limit of that -- the scope of that authority?

9         We had, I remember a case in which there was

10 a young woman who sought assisted reproductive

11 technologies because she had not gotten pregnant.  And

12 the question was should that be offered to her since

13 she was, in this case as I recall, 18 or 19 years old

14 and did not have a consistent partner and seemed to

15 have a life that was -- that was unstable.

16         The question was is this good medicine to

17 facilitate this young woman getting pregnant?  There

18 were questions about whether it would be unjust to not

19 permit that for her if they were permitting it for

20 other people who sought that in different

21 circumstances.  And then questions about when,

22 effectively, that kind of discrimination is justified

Page 64

1 discrimination on the basis of medical differences and

2 when it's unjustified discrimination on the basis of

3 differences that should not restrict peoples' care.

4 Those are just some examples.

5     Q   And when faced with those types of

6 questions, did you draw upon Christianity in order to

7 provide advice?

8     A   When faced with those questions, I would

9 draw on, as my colleagues would, the ethical norms and

10 values and goods and standards that are relevant to

11 that case, none of which were specifically affiliated

12 with or emerging from Christianity.  Although, many of

13 them are embraced by and, you know, endorsed by

14 Christianity, Judaism, Islam, and other religious

15 traditions.

16     Q   And did you ever provide consult on a

17 question involving gender dysphoria?

18     A   I do not recall -- I do not recall if we did

19 or not.

20     Q   I assume, from your publications, you're

21 Christian; correct?

22     A   I am a Christian, yes.

Page 65

1     Q   What denomination?

2     A   I'm a part of the Anglican Church of North

3 America.

4     Q   And how long have you been part of the

5 Anglican Church?

6     A   I have been part of the Anglican Church of

7 North America about ten years.

8     Q   And are you still practicing?

9     A   Practicing what?

10     Q   Do you still practice religion with the

11 Anglican Church of North America?

12         MR. BROOKS:  Objection to the form of

13 the question.

14     A   Yeah, I don't know what you mean by

15 practicing.  I am a Christian, and I participate

16 regularly in Christian worship services in a church

17 that's part of the Anglican Church of North America.

18     Q   With respect to your work on the consult

19 service, did you ever counsel anyone to take a course

20 of action that would not align with Christian values?

21     A   I am not aware of any -- any such case, nor

22 am I aware of -- I would need to think of a case and

17 (Pages 62 - 65)

Farr Curlin                                                                April 8, 2024

Page 66

1  I -- in which what would be recommended ethically
2  contradicts Christian teaching.
3      Q    Would you say that providing puberty
4  blockers or cross-sex hormones for the treatment of
5  gender dysphoria is against Christian values?
6      A    Medicalized gender transition, I -- I think
7  contradicts a number of ethical norms, as I've
8  described, or at least appears to, as I've described
9  in my expert report.  And insofar as Christianity, as
10  other traditions, embraces some of those values, then
11  at least that far it would contradict Christian
12  values.
13      Q    So just to wrap up the questions I have
14  about your clinical practice, have we discussed all
15  the encounters with persons displaying symptoms of
16  gender dysphoria that you've had in your clinical
17  practice that you can recall?
18          MR. BROOKS:  Objection.
19      A    No, I don't think we have.
20      Q    How many are there that come to mind?
21      A    There is -- I am -- have memory of
22  peripherally being involved in care of -- well, let me

Page 67

1  say this.  I have clear memories of one patient whom I
2  cared for as a palliative medicine physician who was a
3  male who had a perceived -- self-perceived gender of
4  female.
5      Q    And what was your treatment related to with
6  this patient?
7      A    The medical care that this patient needed as
8  he was suffering from an advanced cancer.
9      Q    Was that individual receiving cross-sex
10  hormones?
11      A    Yes.  Not -- not prescribed by me, but yes,
12  he was receiving those.
13      Q    He was still receiving a prescription from a
14  different physician; correct?
15      A    Correct.  As best I can recall.  I was
16  brought in as a specialist consultant regarding
17  palliative medicine needs, and the patient was
18  receiving those -- had been receiving those as an
19  outpatient and was continuing to receive those during
20  the hospitalization when I saw the patient.
21      Q    Are there any other encounters with patients
22  with gender dysphoria that you can recall?

Page 68

1      A    I -- I don't recall other specific patients
2  that have been under my direct clinical care.
3      Q    Switching topics.  Are you familiar with the
4  Alliance for Hippocratic Medicine?
5      A    Yes, I am somewhat familiar with the
6  Alliance for Hippocratic Medicine.
7      Q    What is that alliance?
8      A    The Alliance for Hippocratic Medicine, to
9  the best of my knowledge, is an alliance of several
10  medical organizations, including the Christian Medical
11  and Dental Association, the Catholic Medical
12  Association, the American College of Pediatricians, I
13  believe it's called, and the American Association of
14  Pro-Life Obstetrician/Gynecologists, and I believe I
15  couple of other organizations that have formed an
16  alliance to contend for what they take to be norms
17  consistent with Hippocratic medicine.
18      Q    Are you a member of that organization?
19      A    I am not a member of that organization
20  directly, although I don't know if -- if there are
21  memberships specifically to that organization.
22      Q    Are you involved in that organization in any

Page 69

1  way?
2      A    I am not.  I was a speaker, a plenary
3  speaker, for that organization's -- one of its opening
4  events.  And -- but otherwise, I have not been
5  involved with it.
6      Q    What about the Society for Hippocratic
7  Medicine?
8          MR. BROOKS:  Objection to the form of
9  the question.
10      A    I don't know what the Society for
11  Hippocratic Medicine is.  I'm not sure to what you're
12  referring.
13      Q    Do you have involvement in an organization
14  that is called by a name that includes Hippocratic
15  medicine?
16      A    I'll help you out here.  I am involved in an
17  association called the Hippocratic Society.
18      Q    Tell me about that.  What is the purpose of
19  the Hippocratic Society?
20      A    The purpose of the Hippocratic Society is to
21  form clinicians in the practice and pursuit of good
22  medicine.

18 (Pages 66 - 69)

Farr Curlin                                                April 8, 2024

Page 70

1   Q    And what is your role with that

2 organization?

3   A    I am the president of that organization.

4   Q    When was that organization formed?

5   A    It was formed, as best I recall, summer of

6 2023.

7   Q    Did you have a role in founding that

8 organization?

9   A    Yes, I was one of the founders.

10   Q    Do they have a website?

11   A    We do not yet have a website, no.

12   Q    How many members do you have?

13   A    We don't have any formal membership

14 structure at this point.

15   Q    We talked about this in another context

16 earlier, but within the context of the Hippocratic

17 Society, how do you define good medicine?

18   A    The Hippocratic Society does not define good

19 medicine, but is committed to the proposition that

20 there -- that a central responsibility of clinical

21 practitioners is to discern good medicine from that

22 which is not good, and make reasonable judgments in

Page 71

1 that respect and to follow those judgments.  And so we

2 are committed to fostering civil, open, vigorous

3 debate about all manner of questions that arise

4 regarding what medicine, our profession, properly

5 understood requires of us and what our commitments and

6 obligations to patients requires of us.

7   Q    What role does morality play in the practice

8 of good medicine?

9   A    Well, the concept "good" is the central

10 concept of ethics or morality.  So insofar as one is

11 considering, as a medical practitioner, what one ought

12 to do and what one ought not to do, what is better and

13 what is worse with respect to one's own actions or the

14 actions of others, one is addressing morality or

15 ethics.

16   Q    So in that same context, what role does

17 autonomy play?  Patient autonomy?

18   A    Patient autonomy is -- and I should say

19 here, I'm not speaking for the Hippocratic Society,

20 which has no policy on this question.  Oh, I should

21 stop there, in fact.  What was your -- what is it

22 you're asking?

Page 72

1   Q    In your view, what role does autonomy play

2 in the practice of good medicine?

3   A    In my view, autonomy is an important

4 concern, insofar as it is a concern that signals that

5 part of being human is to have -- when humans are

6 flourishing, is to have and exercise moral agency, and

7 also to indicate that whenever there's a decision to

8 be made among more than one person, as is the case

9 with virtually all clinical decisions, we have to

10 understand properly the scope and limits of the

11 authority of those involved.

12       And autonomy is characteristically raised

13 within medicine to refer specifically patient autonomy

14 and to emphasize the importance of honoring a

15 patient's authority, within its proper scope.

16   Q    And when you say "proper scope," what is the

17 property scope?

18   A    Well, the most important point is that

19 patients have authority to refuse any medical

20 proposal.  And by that I mean patients who have such

21 authority, which is typically adult patients who have

22 cognitive capacity to understand what decision they're

Page 73

1 making.  They have authority to refuse any medical

2 proposal, even ones that physicians are -- think are

3 really important.

4   Q    Do they also have the authority to receive

5 treatment that is legal to provide but the physician

6 is morally against?

7   A    So there's a few different questions packed

8 up in that, so can you re-ask it maybe with one -- one

9 at a time?

10   Q    Sure.  If a physician is morally opposed to

11 treatment, a particular type of treatment, but that

12 type of treatment is legal to provide, is a patient

13 entitled to receive that treatment?

14       MR. BROOKS:  Objection.

15   A    You still have a couple questions tied up

16 together there, but say this much.  The corollary of

17 the authority to refuse any medical proposal is

18 the -- the authority to consent to medical proposals.

19 And so we have this important concept and practice of

20 informed consent, which is very foundational to

21 medical practice and medical ethics.

22       Informed consent does not imply informed

19 (Pages 70 - 73)

Page 74

1 demand.  In other words, whether a physician is
2 obligated to provide an intervention that a patient
3 seeks is -- it depends on the situation.  But the
4 patient seeking it does not make it something the
5 physician is obliged to provide.
6     Q    And can physicians deny treatment to a
7 patient, a treatment that is legal, because they are
8 morally opposed to providing it?
9     A    What's the question?
10    Q    Can a physician ethically deny treatment to
11 a patient that is requesting the treatment, and the
12 treatment is legal, can they ethically deny providing
13 that treatment because they are morally opposed to it?
14    A    There are many cases in which a good
15 physician will refuse a request that a patient makes
16 for a legal intervention, on the basis of the judgment
17 that to provide what the patient seeks would be to
18 contradict the physician's professional obligations to
19 the patient and to the profession.
20    Q    Have you published any work on gender
21 dysphoria?
22    A    I have published a peer-reviewed book on

Page 75

1 medical ethics that includes a chapter in which we
2 address medicalized gender transition.
3     Q    And is that book "The Way of Medicine"?
4     A    Yes, that book is "The Way of Medicine."
5     Q    Any other publications regarding gender
6 dysphoria?
7     A    I can't recall if I mentioned gender
8 dysphoria in other publications.
9     Q    Have you presented at any conferences on the
10 topic of gender dysphoria?
11    A    Yes, I have presented on the topic of gender
12 dysphoria, and specifically what I -- you referred to
13 as medicalized gender transition, at a couple of
14 conferences.
15    Q    And are those conferences listed in your CV?
16    A    I have to look to see.
17    Q    Okay.
18    A    Yeah, so on page 6 of my CV, number 70 is
19 one of those presentations.  And on page 7, number
20 107, is the second.
21    Q    Okay.  The first one that you mentioned on
22 page 6, you said that was number 70.  That's "Gender

Page 76

1 Transition Services: Progress or Medical Hubris?"  Can
2 you tell me about what the focus of that presentation
3 was and what -- tell me about the focus of that
4 presentation.
5     A    I don't remember the details here seven
6 years later, but it was a talk in which I recognized
7 the rationale that was being used in public to justify
8 medicalized gender transition and then raised what I
9 took to be some important ethical concerns about such
10 practices.
11    Q    And who was the audience of that
12 presentation?
13    A    That was at the 29th Annual Dorothy J.
14 MacLean Fellows Conference on Clinical Medical Ethics,
15 at the University of Chicago.  The audience is made up
16 of primarily alumni of that fellowship, of which there
17 are, I believe, more than 200.  As well as members of
18 the University of Chicago community who are interested
19 in medical ethics.
20    Q    And then the second one that you mentioned
21 is number 107 on page 7. That one, it looks like the
22 title is "Detransitioners, civil discourse, and the

Page 77

1 silence of clinical ethics."  Can you describe that
2 presentation?
3     A    That presentation was a kind of updating of
4 where we were now six years later, and in that case,
5 again, raising some of the ethical concerns that I
6 have about this practice.  I and others have about
7 this practice.  As well as commenting on the problem
8 of the absence of civil discourse about the topic
9 because of the sort of cancel culture and the fear
10 that people have of speaking out about their concerns.
11    Q    And who was the audience for that
12 presentation?
13    A    So that was a talk within an academic
14 year-long series on medical ethics, and the people who
15 come to that are a mixture of faculty and fellows in
16 the MacLean Center for Clinical Medical Ethics, as
17 well as broader members of the medical community who
18 are interested in the topic of that particular
19 session.
20    Q    In your report, you mention that you've been
21 invited to give talks at a major medical school on the
22 ethics surrounding transgender medicine.  What medical

Page 78

1 school is that?

2    A   That's the University of Chicago.

3    Q   And is that instance listed on your CV?

4    A   Yes, that's the number 107.

5    Q   Okay.  What do you mean by "transgender

6 medicine"?

7    A   I mean what I in my report describe as

8 medicalized gender transition, plus insofar as

9 relevant, surgical interventions that likewise seek to

10 refashion human anatomy to align with some appearance

11 that's more consistent with what the patient perceives

12 as consistent with their -- their -- their gender.

13    Q   Turning to your book, "The Way of Medicine,"

14 we have a downloaded copy of that book that I would

15 like to mark as an exhibit, but I want you to take a

16 look at it as well.

17         MS. MURPHY:  So first off, I'd like to

18 mark the copy of "The Way of Medicine" that we

19 downloaded as Exhibit 3.

20         (Exhibit 3 was marked for

21         identification.)

22         MR. BROOKS:  And let me ask, Counsel,

Page 79

1 is Exhibit 3 a copy of the entire book or selected

2 portions?

3         MS. MURPHY:  It's a copy of the entire

4 book.  But I would appreciate if Dr. Curlin takes a

5 moment to look at it and tell us if he disagrees that

6 that's the entire book.

7         MR. BROOKS:  I'll have to open a folder

8 in which I have put those downloaded files.  There it

9 is.  Now it has, according to the top of the PDF, it

10 has 130 pages.  I am guessing that you'd rather make a

11 representation than ask Dr. Curlin to check 130 pages?

12         MS. MURPHY:  That's correct.  I mean,

13 all I'm asking is that he, you know, acknowledge that

14 there's a downloaded copy of the book.  We represent

15 that this is a copy that was provided to us by a

16 particular library, so it should be a true and correct copy of

17 the book.

18         THE WITNESS:  I have never seen a

19 downloaded copy of our book, and our book in print has

20 more than 130 pages.  So I can't say for certain that

21 all the pages are included in this downloaded copy,

22 but I know that sometimes downloaded books are

Page 80

1 paginated differently, so.

2 BY MS. MURPHY:

3    Q   Well, for purposes of your deposition, I'd

4 like to refer to this copy.  And if there comes an

5 issue where you believe that anything in this book is

6 inaccurate, we can deal with that at a later time.

7 Make sense?

8    A   I think so.

9    Q   Okay.  And it could very well be that the

10 page references and stuff aren't even necessary to my

11 questions.  What motivated you to write this book?

12    A   Christopher Tollefsen and I had taught for

13 several years a one-week seminar on medical ethics.

14 And through the teaching of it, over the course of

15 that time we came to the mutual conviction that it

16 would be useful to write a book together about our

17 take on medicine and medical ethics and the key

18 questions that we address in the book.

19    Q   And your book presents two models as ways to

20 look at medicine; right?

21    A   It does.  It presents -- well, it presents

22 two models as conceding that they're -- that's a

Page 81

1 simplification for the purposes of considering these

2 two different patterns of understanding medicine and

3 practicing medicine.

4    Q   Fair.  But one of these models you refer to

5 as the provider of services model; correct?

6    A   Yes, we refer to one model as the provider

7 of services model.

8    Q   And can you describe the provider of

9 services model?

10    A   The provider of services model is a way of

11 understanding and practicing medicine that takes

12 medical practitioners to be fundamentally providers of

13 services, whose obligation is to make available

14 interventions that are technologically possible and

15 that are permitted by the law relevant to that

16 particular jurisdiction, so that those interventions,

17 whatever they are, can be used according to the

18 judgment of the patient to pursue and open-ended and

19 ultimately subjective notion of patient wellbeing.

20 That is known within this way of thinking, primarily

21 by what the patient asks for and what the patient says

22 is important to them.

21 (Pages 78 - 81)

Farr Curlin                                                          April 8, 2024

Page 82

1   Q   And is this primarily how medical schools
2 train students?
3   A   In our judgment, medical schools have tended
4 to emphasize, to a problematic degree, this way of
5 understanding medicine.
6   Q   And your book also provides an alternative
7 view of looking at medicine, and you refer to that as
8 the way of medicine; right?
9   A   Yes, we refer to our account of medicine and
10 medical ethics as the way of medicine.
11   Q   How would you describe the way of medicine?
12   A   The way of medicine is an understanding and
13 practice of medicine that takes medicine to be
14 fundamentally a moral practice, in pursuit of a
15 particular good.  Namely, the human good of human
16 health.  And does so pursuing the good in particular
17 persons, and governed by the requirements of -- of
18 what can be called natural law or morality at large,
19 ethics, but also with attention to the particular
20 ethical requirements of a practice that is devoted to
21 attending to those who are sick and seeking to
22 preserve and restore their health.

Page 83

1   Q   And between those two models, is the way of
2 medicine the preferred model to practice, in your
3 view?
4   A   In my opinion, the way of medicine is a more
5 reasonable account of -- of what physicians reasonably
6 and rightfully profess.
7   Q   Why is that your preferred way of looking at
8 medicine?
9   A   Well, there's a number of reasons, but
10 it's -- prefer it because we believe it's truer and
11 more adequate to the reality of what patients
12 experience and what practitioners reasonably profess.
13 That in fact to -- that in fact it cannot follow that
14 because a patient has, as they do have, authority to
15 refuse any medical proposal and has authority to
16 consent to reasonable proposals that physicians make.
17 It cannot follow that they have a -- a right to demand
18 a medical practitioner's interventions that contradict
19 their own health or otherwise would involve the
20 practitioner in contradicting the requirements of
21 ethics, the requirements of morality at large, or the
22 requirements specific to the practice of medicine.

Page 84

1       And so the way of medicine is more adequate
2 to the reality of what makes medical practitioners
3 medical practitioners is that -- versus some other
4 kind of practitioner is that they show up to and --
5 and offer themselves in response to threats to the
6 health of or injuries to the health of -- of other
7 persons, and they seek expertly to remedy those
8 injuries and -- and to promote health of patients.
9 What makes us physicians is not that we provide stuff
10 that people want, but in fact that we are healers.
11   Q   So is it fair to say that your clinical
12 practice is guided by that model?
13   A   Yes, insofar as what we've described there
14 is -- is what we take to be a reasonable account of
15 what all medical practitioners, when they're thinking
16 well and practicing well, are guided by.  And -- and
17 yes, I -- insofar as I am aware, I try to practice
18 according to the norms we describe there, which we
19 take to be universal norms when they're properly
20 understood.
21   Q   And so does that mean that at least in part,
22 your clinical practice relies on your sense of

Page 85

1 morality?
2   A   So it -- it's not possible for any medical
3 practitioner to practice medicine without relying on
4 their sense of morality, except by making themselves
5 mercenary and just doing whatever people tell them to
6 do.  So it's -- it's I think absolutely intrinsic to
7 medicine that a medical practitioner practices
8 according to their judgments regarding what ethics
9 requires.
10   Q   And would you agree that individuals' sense
11 of what is good and what is bad differs?
12   A   Well, to some extent.  People -- well,
13 clearly, people have disagreements about what ethics
14 requires.  I'll say that much.
15   Q   And are there certain treatments that you
16 would not recommend, based on your values?
17   A   I would not recommend any treatment, except
18 insofar as I believe that treatment is a reasonable
19 medical proposal.
20   Q   If you had the training to do so, would you
21 recommend puberty blockers to an adolescent to treat
22 gender dysphoria?

22 (Pages 82 - 85)

Page 86

1          MR. BROOKS:  Objection, lack of
2    foundation.
3      A   Yeah, I -- I haven't, I believe, offered
4    opinions about what I might do in some speculative
5    future or with particular cases.  I'm not -- I'm not
6    willing to under oath try to imagine that and give an
7    opinion about that on the fly.
8          MS. MURPHY:  It's fairly typical to ask
9    hypothetical questions in this instance.  Mr. Brooks,
10   are you instructing your client not to answer?
11         MR. BROOKS:  Well, he has answered, and
12   I'm certainly not going to instruct him to offer
13   opinions under oath that he doesn't feel comfortable,
14   that he doesn't feel that he has informed opinions on.
15   He has no obligation to do so.
16   BY MS. MURPHY:
17     Q   So is it that you don't know what you would
18   do in that situation, or is it that you don't wish to
19   provide an answer for that question?
20     A   In clinical medicine, we always take into
21   account all the particularities of a given case.  In
22   my expert report, I've -- I've indicated a number of

Page 87

1    reasons why I was -- it is doubtful in any particular
2    case that I would come to the judgment that cross-sex
3    hormones or blocking -- blocking puberty on the basis
4    of dysphoria is a reasonable medical proposal.  But
5    I -- I cannot say what I would do in a particular case
6    until I know, you know, the -- the facts of the case.
7      Q   Fair enough.  When you say that it's
8    doubtful that you would do so, is that doubt based on
9    your sense of morality?
10     A   The doubtfulness is based on my
11   understanding of the ethical norms, including the
12   norms specific to the practice of medicine, and as
13   I've described in my report.
14     Q   Is it your belief that humans can only be
15   male or female?
16     A   It is my belief that humans are, as a
17   species of mammals, are male or female.  That we
18   have -- there are only two sexes that make possible
19   reproduction, and that's something we share with other
20   animals.
21     Q   And so what type of treatment, if any, would
22   you recommend to a patient who exhibited extreme

Page 88

1    distress over the congruence between their perception
2    of their gender and their anatomical assignment to a
3    particular sex?
4          MR. BROOKS:  Objection.
5      A   I -- I don't -- I don't know, as I haven't
6    been in -- I haven't had a patient with that precise
7    presentation.
8      Q   Under the provider services model, a
9    physician practicing under the provider of services
10   model, would you agree that that provider would be
11   obligated to provide puberty blockers in response to a
12   patient who is experiencing gender dysphoria and
13   wanted to stop puberty?
14         MR. BROOKS:  Objection, incomplete
15   hypothetical.
16     A   As I wrote in our book, in my judgment,
17   medicalized gender transition is strongly influenced
18   by what we call the provider of services model,
19   insofar as it takes the perception and subjective
20   account of wellbeing of the patient, namely what the
21   patient desires, to be -- to establish the goal that
22   medical practitioners are obligated to pursue.

Page 89

1          And just insofar -- in that respect, we
2    think it is emblematic of the influence of what we
3    call the provider of services model.
4      Q   And when you refer to the patient's opinion
5    on what they need as subjective, would you agree that
6    morality is also subjective?
7      A   I would not, no.
8      Q   Can you elaborate a bit on that?
9          MR. BROOKS:  Objection.
10     A   Can you ask the question again or
11   differently?
12     Q   Sure.  Is morality objective or subjective?
13     A   Well, ethics at root must be objective, it
14   must be real, or else the entire moral life of human
15   beings is a sham.  Now it also is the case that it's
16   hard to discern and there are ambiguities and
17   disagreements about what ethics requires, about what
18   morality requires, about what's good and not good.
19         And the -- one does not assess ethics in the
20   same way one assesses how much someone weighs, for
21   example.  But ethics is -- at root, must be objective
22   for there to be any point in having an argument about

23 (Pages 86 - 89)

Page 90

1 how we ought to live.

2    Q   So do you agree that under the way of
3 medicine, that it would be contrary to health to
4 provide puberty blockers to stop puberty in somebody
5 who is experiencing gender dysphoria?

6        MR. BROOKS:  Objection, lack of
7 foundation.

8    A   Can you repeat the question?

9    Q   Sure.  Under the way of medicine, would it
10 be contrary to health to provide medicalized gender
11 transition treatment?

12   A   So as -- as I noted as well in my report, it
13 appears that, and as we've noted in the book, it
14 appears that it does.  That is to say that insofar as
15 medicalized gender transition contradicts the healthy
16 development of secondary sex characteristics that go
17 along with the kind of theme the patient is a male or
18 a female human organism, it appears to contradict the
19 patient's health.

20   Q   And so is it your opinion that any attempt
21 by a physician to align an adolescent's physical
22 characteristics with their perceived gender identity

Page 91

1 is unethical?

2    A   I -- I can't speak to any intervention.
3 You'd have to give me a particular intervention to
4 consider, or a particular kind of case.

5    Q   Sure.  With respect to puberty blockers,
6 would it be unethical for a physician to prescribe
7 puberty blockers to stop puberty?

8    A   In what case?

9    Q   In an individual with gender dysphoria.

10   A   So again, I -- I can't opine to a specific
11 case and all the things that might bear on that, but
12 it -- for the reasons I outline in my report, it seems
13 doubtful that cross-sex hormones can be reasonably
14 understood as consistent with the patient's health,
15 insofar as they contradict healthy physiologic norms
16 with respect to sex hormones for a person of that
17 person's sex.

18       MR. BROOKS:  Counsel, if we could
19 sometime soon take a break for a few minutes and then
20 run one more stretch before lunch, that would be good.

21       MS. MURPHY:  You're east coast time;
22 right?

Page 92

1        MR. BROOKS:  We are.

2        MS. MURPHY:  Okay.  Why don't we just
3 break for lunch at 12:30?  How does that sound?

4        MR. BROOKS:  Well, I would appreciate a
5 short break sooner than that.

6        MS. MURPHY:  Okay.  Let me just finish
7 up --

8        MR. BROOKS:  Yes, yes.

9        MS. MURPHY:  -- and then we'll take a
10 quick break.

11       MR. BROOKS:  Okay.

12 BY MS. MURPHY:

13   Q   Would you say that it would be immoral for a
14 physician to prescribe puberty blockers to stop
15 puberty in an individual with gender dysphoria?

16       MR. BROOKS:  Objection.

17   A   As I noted before, I can't say for a
18 specific case until I know that -- all the details of
19 that case and -- to make a judgment about that.  But
20 for the reasons I outlined in my report, it seems to
21 me doubtful that -- that it can be consistent with
22 medical ethics to block the healthy sexual development

Page 93

1 of a patient on the basis of the fact that that
2 patient perceives their healthy sexual development to
3 be at odds with their -- their sense of wellbeing.

4    Q   In your book, you mentioned that you've
5 never made peace with the notion of separating
6 personal from professional.  Does that sound correct?

7    A   That sounds correct, taken in the proper
8 context.

9    Q   What do you mean by that?  What's the proper
10 context?

11   A   I mean the context of what I said in the
12 book.

13       MS. MURPHY:  I'm trying to pull it up,
14 but I think I'm going to need a minute to do so.  So
15 why don't we take a ten-minute break?  Or could we do
16 a five-minute break?

17       MR. BROOKS:  We'll try to be back
18 sooner than ten.

19       MS. MURPHY:  Okay, excellent.

20       MR. BROOKS:  It'll show up on the
21 screen when it says we're here, but five should
22 probably do it.

Farr Curlin                                                   April 8, 2024

Page 94

1         MS. MURPHY:  All right, thank you.
2         THE REPORTER:  Okay.  The time is 11:50
3  a.m.  We are now off the record.
4         (Off the record.)
5         THE REPORTER:  The time is 11:57 a.m.
6  We are now back on the record.
7         MS. MURPHY:  Thank you.
8  BY MS. MURPHY:
9     Q    Dr. Curlin, can you please turn to page 8 of
10  your book.
11         MR. BROOKS:  And you refer to the
12  online edition that you asked him to look at; correct?
13         MS. MURPHY:  Correct.
14         THE WITNESS:  I -- I have turned there.
15  BY MS. MURPHY:
16     Q    Okay.  In the last paragraph on that page,
17  it says, "I've never made peace with the notion of
18  separating the personal from the professional."
19  Correct?
20     A    I see that it says that, and it's important
21  that it says that in the context of clarifying that
22  all medical practitioners are personally obligated to

Page 95

1  make judgments about what their profession and other
2  demands of ethics require of them and to practice
3  according to that judgment.  And that what I was
4  pointing out was, spuriously, people here and there
5  have suggested that because someone, say like myself,
6  embracing a long-standing norm, for example don't kill
7  your patient, that somehow they're imposing their
8  personal values on what should be a professional
9  practice.  And I was highlighting that that is
10  logically problematic for a number of reasons.
11     Q    So is it fair to say that your own sense of
12  morality guides your professional opinions?
13         MR. BROOKS:  Objection.
14     A    My professional opinions are based upon my
15  professional education and understanding and judgment
16  about what ethics, broadly and medical ethics
17  specifically, requires of medical practitioners.
18     Q    Is there a difference between ethics and
19  morality?
20     A    There's no substantive difference between
21  the two.  Or certainly not in the way that I'm using
22  the terms and philosophers and ethicists generally

Page 96

1  have used the terms in their -- in their reasoning and
2  in their writing.
3     Q    Understood.  Turning back to your report, in
4  paragraph 5 you state that you've spent a substantial
5  portion of your time conducting and publishing
6  empirical research, including research on physicians'
7  attitudes and practices regarding controversial
8  practices; correct?
9     A    Give me a moment.
10     A    Sure.
11     A    I was taking down the image of the book.
12  Can you repeat the question?
13     Q    Sure.  It says in paragraph 5 that you've
14  spent a substantial portion of your time conducting
15  and publishing empirical research, including research
16  on physicians' attitudes and practices regarding
17  controversial practices; correct?
18     A    Yes, that's correct.
19     Q    And how do you define "controversial
20  practices"?
21     A    Practices about which there is public
22  controversy.  But public here, I mean there are

Page 97

1  arguments made in print or in public settings about
2  what one ought to do and what one ought not to do, and
3  we find that there are significant disagreements on
4  the question.
5     Q    So do you consider a diagnosis of gender
6  dysphoria to be controversial?
7     A    I do not consider a diagnosis of gender
8  dysphoria, if by that you mean a diagnosis of a person
9  experiencing distress and discomfort and bad feeling
10  relating to a perception that their secondary sex
11  characteristics are at odds with what they perceive
12  their gender, I don't consider that to be a
13  controversial diagnosis, no.
14     Q    Okay.  But do you consider the practice of
15  prescribing puberty blockers or cross-sex hormones for
16  the treatment of gender dysphoria to be controversial?
17     A    I do consider medicalized gender transition,
18  as described in my report, to be controversial.
19     Q    Do you consider it a controversial treatment
20  for patients of any age?
21     A    I -- I do consider it to be a controversial
22  treatment, period, but particularly controversial with

25 (Pages 94 - 97)

Page 98

1 respect to minors.

2    Q   Okay.  So are there instances, like for
3 particular patients, where you would not consider it
4 to be a controversial treatment?

5         MR. BROOKS:  Objection.

6    A   Yeah, I would have to -- you'd have to give
7 me a specific scenario you have in mind.

8    Q   Well, that's my question.  Are there
9 particular patients where it would be appropriate to
10 prescribe medicalized gender treatment?

11        MR. BROOKS:  Objection.

12   A   I -- I -- I don't know.  I would -- again, I
13 would have to have a particular case that you have in
14 mind, or at least you can describe in a little more
15 detail a particular kind of case.

16   Q   I think that answers my question.  Have you
17 conducted any empirical research on physicians'
18 attitudes on diagnosing gender dysphoria?

19   A   Not that I recall.

20   Q   And have you done any empirical research on
21 physicians' attitudes for providing medicalized gender
22 transition treatment?

Page 99

1    A   Not that I recall.

2    Q   Have you ever served on an institutional
3 review board?

4    A   I have not served on an institutional review
5 board.

6    Q   Have you ever provided ethical guidance to
7 an institutional review board?

8    A   I -- I don't recall specifically whether I
9 did or didn't, but I may have as part of our -- my
10 work as a faculty member in the McClean Center for
11 Clinical Medical Ethics, and likewise here at Duke.
12 I -- I can't recall if it was specifically an
13 institutional review board that was asking for input
14 on a particular case.

15   Q   How did you become involved in this case?

16   A   I believe Mr. Brooks originally reached out
17 to me to ask if we could have a conversation about
18 potentially serving as an expert witness.

19   Q   When did that conversation occur?

20   A   I don't recall exactly, but sometime -- best
21 of my recollection, sometime in the fall of 2023.

22   Q   And were you retained shortly thereafter?

Page 100

1    A   Not -- well, depends on what you mean by
2 "shortly."  I believe I was retained in December, but
3 it may have been November of 2023.

4    Q   You've been retained as an expert witness in
5 cases prior to this one; right?

6    A   Yes, I've been retained as an expert witness
7 in cases prior to this one.

8    Q   Have you ever opined on anything related to
9 gender dysphoria?

10   A   To my knowledge, I have not opined directly
11 about gender dysphoria, or more specifically, prior to
12 this case I do not believe I've been asked to address,
13 as a central question, ethical issues raised by
14 medicalized gender transition.

15   Q   Okay.  Turning to your report, paragraph 28.
16 I'm sorry, I meant page 28.  Page 28 of your report.
17 That's a list of other materials that you considered
18 with respect to preparing this report; correct?

19   A   Yes, it appears to be so, yes.

20   Q   And who provided you those materials?

21   A   Either Mr. Brooks or another of the
22 attorneys for the State of Alabama.

Page 101

1    Q   And did those attorneys ask you to consider
2 any materials that are not listed here?

3         MR. BROOKS:  Objection.  I'll instruct
4 the witness not to answer questions about
5 communications with attorneys.

6 BY MS. MURPHY:

7    Q   Are there any materials that you were asked
8 to --

9         MS. MURPHY:  I'm going to ask that
10 question again because I don't believe that's covered
11 by attorney-client privilege.  I'm not asking about
12 the substance of those communications; I'm asking
13 about the materials that were provided or asked to be
14 reviewed.

15        MR. BROOKS:  I'm going to give the same
16 instruction.

17        MS. MURPHY:  Mr. Brooks, are you
18 contending that the materials provided to the expert
19 in this case are protected by attorney-client
20 privilege?

21        MR. BROOKS:  All I'm saying is that
22 communications between the expert and myself, or other

26 (Pages 98 - 101)

Page 102

1 counsel for Alabama, are work product and he's not
2 going to answer questions about their substance. Your
3 question goes to the substance, potentially, of such
4 communications.
5        MS. MURPHY: No. I specifically said
6 that my question does not involve -- I'm not asking
7 about the substance of those communications. I'm
8 asking what he was asked to review.
9        MR. BROOKS: I disagree with your
10 characterization that that doesn't go to the substance
11 of communications. I don't propose to argue. I have
12 instructed the witness not to answer that question.
13        MS. MURPHY: I mean, I think we're
14 probably going to have to see -- in that case, I
15 reserve the right to reopen this deposition and ask
16 about the materials that were provided to the witness,
17 if a Court decides that that's not privileged, which I
18 believe that they will.
19 BY MS. MURPHY:
20   Q   Dr. Curlin, did you review anything beyond
21 what is listed on page 28 or what is listed in your
22 bibliography in order to prepare the report?

Page 103

1   A   Not that I recall.
2   Q   And I am anticipating an objection here, but
3 for the record I'd also like to ask did the defendants
4 ask you to review any materials that are not listed
5 here?
6        MR. BROOKS: Yes, the same instruction.
7 BY MS. MURPHY:
8   Q   Paragraph 20 of your report, if you could
9 turn to that for a moment. In paragraph 20, it says
10 that you were asked to assume that the descriptions of
11 the articles and studies provided by Drs. Cantor and
12 Laidlaw are accurate; is that right?
13   A   I was asked to assume that the descriptions
14 of the articles and studies that they are accurate,
15 for purposes of my opinions provided in this case.
16   Q   Got it. And who asked you to make that
17 assumption?
18   A   Mr. Brooks.
19   Q   And were you asked to assume anything else
20 for purposes of preparing this report?
21   A   Not that I recall.
22   Q   Did you make any other assumptions when

Page 104

1 preparing this report?
2   A   Not that I recall.
3   Q   Have you been hired by Mr. Brooks in the
4 past to work on any of his other cases?
5        MR. BROOKS: Objection.
6   A   I was hired by the Alabama, as I recall
7 Attorney General's Office. But I do not recall having
8 been hired by that office in any case in the past,
9 although I -- I can't be certain without looking
10 through my whole list of cases.
11   Q   And do you have a personal or professional
12 relationship with anyone involved in this case, apart
13 from your retention as an expert?
14   A   I had a collegial relationship with Dr.
15 Antomaria.
16   Q   Anyone else?
17   A   Not that I recall.
18   Q   Okay. Can you turn to paragraph 14 of your
19 report, please? It says here that, quote, "I take as
20 a premise, based on the science reviewed and the
21 opinions offered by Drs. Cantor and Laidlaw, that the
22 mental health benefits that are claimed to justify the

Page 105

1 administration of medicalized gender affirmation
2 treatments to minors are currently unproven and
3 disputed among informed observers." Is that correct?
4   A   That's what I wrote, yes.
5   Q   And are you referring to science that you
6 reviewed on your own, or is that the science that Drs.
7 Cantor and Laidlaw reviewed?
8   A   I am referring to the science that they
9 reviewed, within which I reviewed or that I refer to
10 directly in the -- or in the -- the notes and in
11 the -- the report itself.
12   Q   Okay. Are you saying that you reviewed all
13 the studies that they cited in their reports?
14   A   I am not saying that.
15   Q   You reviewed only the ones that are cited in
16 your bibliography; is that correct?
17   A   I did review the ones cited in my
18 bibliography, and I do not know of reviewing others
19 that are not cited.
20   Q   Got it. And with respect to Dr. Cantor's
21 report, what steps did you take to ensure that his
22 opinions were valid?

27 (Pages 102 - 105)

Farr Curlin                                    April 8, 2024

Page 106

1    A   I -- as I noted, I -- I was asked to take,
2  as a premise, that -- that the -- the -- the review,
3  the descriptions of the -- the science in Cantor and
4  Laidlaw's report was accurate, for the purposes of
5  forming my opinion.  I reviewed some of the -- some of
6  the documents that they referred to directly and --
7  but I did not attempt to give a professional opinion
8  or judgment on the -- the full scope of the review of
9  the literature.
10   Q   And is that the same with respect to the
11 information that was in Dr. Laidlaw's report?
12   A   Yes, the same with Dr. Laidlaw's report.
13   Q   Did you consider the credentials of Drs.
14 Cantor and Laidlaw when deciding to rely on their
15 reports?
16   A   As I said, I was asked to take as a premise
17 that these reports were accurate in their description
18 of the literature, and I did that.
19   Q   Is it customary in medical ethics to take
20 others' work as a premise, without conducting
21 independent evaluation of that work?
22   A   It is when you're asking a specific question

Page 107

1  conditional on that description being accurate.  So
2  yes, just that far, yes.
3    Q   And so just to be clear, with respect to
4  paragraph 14, you didn't conduct any independent
5  assessment of the evidence that Drs. Cantor and
6  Laidlaw relied upon to draw your conclusion; did you?
7    A   As I said, I reviewed a number of the items
8  that they reviewed in their reports, and just that
9  far.  I did my own review.  But I was not attempting
10 to give an expert opinion about the -- the whole of
11 the medical literature on these questions.
12   Q   And when you say "informed observes," what
13 do you mean by "informed observers"?
14   A   I mean that observers meaning those who are
15 paying attention to this issue, and informed meaning
16 people who are generally regarded as having the kind
17 of expertise to -- that would distinguish them from a
18 layperson in giving an opinion about this -- this
19 issue or these issues.
20   Q   So in this particular instance, who would
21 you say qualifies as an informed observer?
22   A   I can't be comprehensive right here by

Page 108

1  memory, but certainly people like the experts that are
2  involved in England and Sweden and Finland and
3  Denmark, in reviewing the data and conducting their
4  own systematic reviews of the data and making
5  judgments about what the implications of the -- the --
6  that review are.
7    Q   I noticed that you happened to leave out the
8  United States.  Would you consider experts here within
9  the United States to be informed observers?
10   A   It depends on which person you're referring
11 to, but being in the United States does not keep one
12 from becoming an informed observer.
13   Q   Is it your opinion that experts who believe
14 that medicalized gender transition treatment is
15 ethical or not informed observers?
16   A   No, that is not my position.  Otherwise,
17 they could not be disputed if there were not
18 disagreement and dispute among informed observers.
19   Q   Okay.  In paragraph 15, you say, "I also
20 take it as a premise, based on the science reviewed
21 and the opinions offered by Drs. Cantor and Laidlaw,
22 that the known or reasonably anticipated harms to

Page 109

1  children and adolescents from MGT treatments are
2  substantial and serious, threatening sterilization,
3  failure to develop healthy sexual response, impaired
4  neurological" -- or brain -- "development, and
5  multiple other harms to bodily health."  Is that
6  correct?
7    A   Yes, that's what I wrote.
8    Q   And are you referring to the science that
9  you reviewed or the science that Drs. Cantor and
10 Laidlaw reviewed?
11        MR. BROOKS:  Objection.
12   A   I'm referring to their description of the
13 science that they reviewed.
14   Q   Did you review any science beyond what Drs.
15 Cantor and Laidlaw reviewed in order to draw your
16 conclusion with respect to paragraph 15?
17   A   Not that I recall.
18   Q   And what do you mean here when you say
19 "threatening sterilization"?
20   A   Let me -- if I may, I want to make sure I
21 didn't misspeak.  I -- I have continued to review
22 science as it comes out, and I don't recall when their

Farr Curlin

April 8, 2024

Page 110

1 review stopped. So in fact, the study by Glintborg
2 and Kaltiala, those two different studies, I can't
3 recall if Laidlaw, for example, referred to those in
4 Laidlaw's report. So I -- I don't recall, beyond
5 those two, whether I reviewed further studies since
6 the scope of their report was drawn.
7     Q   Okay. But I think you testified earlier
8 that everything that you reviewed for purposes of
9 formulating the opinions in your report were either
10 listed in your bibliography or in the page that has
11 the materials considered; correct?
12     A   Correct, to the best of my recollection.
13     Q   And so you didn't review anything beyond
14 those materials for purposes of formulating your
15 opinion for paragraph 15; right?
16     A   Not to the best of my recollection.
17     Q   Okay. So going back to threatening
18 sterilization, what do you mean by that?
19         MR. BROOKS: Sorry, Counsel, your voice
20 dropped out. Just some computer issue. Just if you'd
21 restate that.
22         MS. MURPHY: Sure.

Page 111

1 BY MS. MURPHY:
2     Q   What do you mean by "threatening
3 sterilization"?
4     A   I mean threatening to render the patient
5 incapable of reproduction.
6     Q   And can you be more specific about what
7 aspect of MGT would you assert threatened
8 sterilization?
9         MR. BROOKS: Objection.
10     A   So I know as a physician that human
11 reproduction depends on sexual maturation. And so to
12 block sexual maturation, as puberty-blocking hormones
13 do intentionally, can result in infertility or
14 sterilization.
15     Q   And what do you --
16     A   And I also -- I mean, I know that as a
17 baseline, but I also know that Dr. Cantor and Dr.
18 Laidlaw cited studies that indicate that that is a
19 real risk of this treatment.
20     Q   And what do you mean when you say impaired
21 neurological brain development?
22     A   Say again?

Page 112

1     Q   What do you mean by impaired neurological or
2 brain development?
3     A   Can you point me to where you're referring?
4     Q   Sure. That's still in paragraph 15.
5     A   I'm referring there to Dr. Cantor and
6 Laidlaw's description of science that suggests that
7 brain development is itself dependent on, in certain
8 respects, on puberty and sexual maturation. And that
9 the blocking of such puberty and sexual maturation
10 blocks that aspect of neurological and brain
11 development that comes with puberty and sexual
12 maturation.
13     Q   And what aspect of MGT would threaten
14 impaired neurological development?
15     A   My understanding is that that aspect which
16 involves blocking -- particularly, which involves
17 blocking the hormones that make -- that stimulate and
18 facilitate and make possible healthy development of
19 secondary sex characteristics that come along in
20 puberty.
21     Q   And also in that paragraph, what do you mean
22 when you say "multiple other harms to bodily health"?

Page 113

1 What are those harms?
2     A   That was to include, as I list at paragraph
3 35, lifetime lack of orgasm and sexual function, an
4 adverse effect acknowledged by Marci Bowers, current
5 president of WPATH. Reduced bone development,
6 especially in male-to-female transition. Harm to
7 psychosocial development. And increased
8 cardiovascular risk, osteoporosis, and
9 hormone-dependent cancers.
10     Q   Okay. Moving to paragraph 18. Within this
11 paragraph, you refer to available science. What
12 available science are you referring to here?
13     A   As I say there, the available science
14 provided by Dr. Cantor, Dr. Laidlaw, and -- well,
15 that's the available science I'm referring to.
16     Q   And again, you didn't conduct an independent
17 assessment of science. This is the science that was
18 reviewed by Drs. Cantor and Laidlaw, and that if they
19 cited it and you listed it in your bibliography, that
20 you reviewed?
21         MR. BROOKS: Objection. Compound
22 question.

29 (Pages 110 - 113)

Farr Curlin

April 8, 2024

Page 114

1  A   Yeah, that's --

2  Q   It's a long question.

3  A   Too many questions.

4  Q   Did you review any science beyond that which

5  was reviewed by Drs. Cantor and Laidlaw?

6  A   Not to my knowledge, recollection.

7       MS. MURPHY:  Mr. Brooks, this would not

8  be a terrible breaking point if we want to break for

9  lunch, because I was going to transition to a

10 different part of the report.  Is this a good time?

11      MR. BROOKS:  Up to the witness.

12      THE WITNESS:  Sounds good to me.

13      MR. BROOKS:  He said yes.  Thumbs up

14 for lunch.

15      MS. MURPHY:  Okay, excellent.  Is a

16 half an hour enough?

17      THE WITNESS:  That's a little short.

18 Probably -- probably 40 minutes would do it.

19      MS. MURPHY:  Okay, that's fine with me.

20 So 40 minutes, let's say -- well, I have 12:32.

21      MR. BROOKS:  Quarter after?

22      THE WITNESS:  Yeah, let's do 1:15.

Page 115

1       MS. MURPHY:  That's fine.

2       THE REPORTER:  All right.  The time is

3  12:32 p.m.  We're now off the record.

4       (Off the record.)

5       THE REPORTER:  The time is 1:21 p.m.

6  We are now back on the record.

7       MS. MURPHY:  Thank you.

8  BY MS. MURPHY:

9  Q   Dr. Curlin, if you could turn to paragraph

10 20 of your report?

11 A   Okay.

12 Q   Okay.  In that paragraph it says that you've

13 "read the descriptions of the state of knowledge

14 provided in the expert reports submitted by Drs.

15 Cantor and Laidlaw."  Correct?

16 A   Yes.

17 Q   And could you describe what you mean as "the

18 state of knowledge"?

19      MR. BROOKS:  Objection.

20 A   I mean that this is a description of what is

21 known with respect to scientific evidence regarding

22 medicalized gender transition.

Page 116

1  Q   And so does that include studies that

2  suggest that medical transition is safe?  Or is it

3  only studies that say that medical transition is

4  unsafe?

5       MR. BROOKS:  Objection.

6  A   To my knowledge, it includes all medical

7  studies that are looking at the -- or intends to

8  include all studies that are looking at harms and

9  purported benefits of medicalized gender transition.

10 Q   And did Drs. Cantor and Laidlaw review all

11 such studies?

12      MR. BROOKS:  Objection.

13 A   I don't know.

14 Q   Apart from the studies that you cited in

15 your report, did you review any additional studies

16 regarding the efficacy of gender-affirming care?

17 A   Not that I recall.

18 Q   Moving onto paragraph 27.

19 A   Let me -- I want to make sure I'm correct.

20 I can't remember that if I cited Chen, et al.'s study

21 in the New England Journal of Medicine, but I have

22 that -- reviewed that at some point in this process.

Page 117

1  I remember that.

2  Q   Did you review it prior to preparing and

3  submitting your report?

4  A   I had reviewed it prior to being called as a

5  witness in this case and then again during this

6  process.

7  Q   Okay, I'm sorry.  Just to clarify.  When you

8  say being called as a witness, do you mean you

9  reviewed it prior to being retained as a witness?

10 A   Yes.

11 Q   Okay.  So in paragraph 27, you say, "Studies

12 summarized by Drs. Cantor and Laidlaw likewise

13 document serious uncertainty about the efficacy and

14 safety of MGT as a treatment for gender dysphoria."

15 Correct?

16 A   That is what I wrote, yes.

17 Q   And have you read any studies that have

18 found that gender-affirming medical care is

19 efficacious and safe?

20 A   I have read studies -- reports of studies

21 where the authors allege that medicalized gender

22 transition is efficacious and safe.

30 (Pages 114 - 117)

Page 118

1    Q   And what studies are those?

2    A   Well, the Chen study, to the best of my

3  recollection, the authors claimed at the end of their

4  report that medicalized gender transition was

5  effective, beneficial.  And I've read the Rhafferty

6  report, which was not collecting data, but is one of

7  the reports that's referred to in this case.  I know

8  that in that report, Rhafferty alleges that

9  medicalized gender transition is effective and safe,

10  or least to the best of my recollection.

11       And I -- I know I've read some other reports

12  over the years, but I don't remember the -- the

13  details at this point.

14    Q   For what reason did you not cite the Chen

15  study in your report?

16    A   Well, I -- Cantor and Laidlaw -- well, I

17  know Cantor refers to Chen's study.  I can't recall if

18  Laidlaw did as well.  And the description of Cantor

19  about that study, as best I recall, aligned with my

20  own impression of the study.  And so I didn't cite

21  that -- didn't -- I -- I don't know why further that I

22  didn't cite that particularly.

Page 119

1       MS. MURPHY:  All right.  At this point,

2  I'd like to mark Exhibit 4, and I'll just state for

3  the record that this is a study by de Vries, titled

4  "Young Adult Psychological Outcome After Puberty

5  Suppression and Gender Reassignment."

6       (Exhibit 4 was marked for

7       identification.)

8       THE WITNESS:  One moment.

9       MS. MURPHY:  Sure.  Just let me know

10  when you have it pulled up.

11       THE WITNESS:  I do.  Is the author, the

12  first author, Annelou?

13       MS. MURPHY:  Yes.  Correct, that's it.

14  BY MS. MURPHY:

15    Q   Dr. Canter, have you reviewed this study

16  before?

17    A   Dr. Curlin, you mean.

18    Q   I'm sorry.  Dr. Curlin.

19    A   I don't recall reviewing this directly.

20    Q   And do you agree that this is a longitudinal

21  study about the effectiveness of puberty blockers to

22  treat gender dysphoria in adolescents?

Page 120

1       MR. BROOKS:  Objection.  The witness

2  has just testified he hasn't seen this document.  He

3  has, you know, a quarter of a page up on a screen

4  here.

5       MS. MURPHY:  Fair enough.

6  BY MS. MURPHY:

7    Q   So just to confirm, for the sake of good

8  order, you didn't review this study prior to drafting

9  your report; correct?

10    A   Not that I recall.

11       MS. MURPHY:  At this point, I want to

12  mark Exhibit Number 5, and this is the study that was

13  by Smith, and it's called, "Sex Reassignment: Outcomes

14  and Predictors of Treatment for Adolescent and Adult

15  Transsexuals."

16       (Exhibit 5 was marked for

17       identification.)

18  BY MS. MURPHY:

19    Q   Can you pull that one up?  And just let me

20  know whenever you have it pulled up, please.

21    A   I have it pulled up.

22    Q   And, Dr. Curlin, have you reviewed this

Page 121

1  study?

2    A   I do not recall having reviewed this study.

3    Q   And so is it correct then that this is not a

4  study that you considered in preparing your report?

5    A   As I -- as I said in the report, I took the

6  description by Cantor and Laidlaw on the state of the

7  evidence.  And I don't recall offhand whether this was

8  one of the studies they reviewed.  But I took that to

9  be accurate, for the purposes of the questions I was

10  asked to consider.  And for that reason, no, I did

11  not.

12    Q   Okay.  If you don't mind just turning to

13  paragraph 29 of your report.  In paragraph 29, you

14  cite Dr. Cantor's conclusion that "No studies have

15  documented any reduction in suicide rates in minors or

16  any population as a result of medical transition."  Is

17  that correct?

18    A   Yes, I cite Dr. Cantor and -- and his

19  observation that that's a fact acknowledged by WPATH.

20    Q   And am I correct to assume that you didn't

21  do any independent research on this topic?

22    A   That's correct.  I -- as instructed, I took

31 (Pages 118 - 121)

Farr Curlin
April 8, 2024

Page 122

1 the reports of Cantor and Laidlaw to be accurate with
2 respect to their description of the science in this
3 regard.
4          MS. MURPHY:  Okay.  I would like to
5 mark as Exhibit 6, the study by Green, and that's the
6 one that's titled, "Association of Gender-Affirming
7 Hormone Therapy With Depression, Thoughts of Suicide,
8 and Attempted Suicide Among Transgender and Nonbinary
9 Youth."
10         (Exhibit 6 was marked for
11         identification.)
12         MS. MURPHY:  And if you may --
13         MR. BROOKS:  Give us a moment here.
14         THE WITNESS:  Yeah, sorry.
15         MS. MURPHY:  Yeah.
16         THE WITNESS:  Okay, I have that study
17 by Green up on the screen.
18 BY MS. MURPHY:
19    Q    And is this a study that you're familiar
20 with?
21    A    I don't have memory of reviewing this study
22 directly.

Page 123

1    Q    And what do you mean by "directly"?
2    A    Meaning I did not independently look at this
3 study.  I took the description by Cantor and Laidlaw
4 to be accurate for the purposes of describing
5 the -- the state of knowledge in this area.
6    Q    Okay.  So you've never reviewed this study?
7    A    As I said.
8          MS. MURPHY:  Okay.  Then I would like
9 to mark as Exhibit 7, a study by Turban, and this one
10 is titled, "Access to Gender-Affirming Hormones During
11 Adolescence and Mental Health Outcomes Among
12 Transgender Adults."
13         (Exhibit 7 was marked for
14         identification.)
15 BY MS. MURPHY:
16    Q    And I'd appreciate it if you can pull that
17 one up too, please.
18    A    I have the study, the first author of which
19 is Jack Turban, up on the screen.
20    Q    Okay.  And are you aware of this study?
21    A    I'm aware of this study, insofar as it was
22 referred to in the reviews by at least -- by Dr.

Page 124

1 Cantor and -- and/or Dr. Laidlaw, but I have not
2 reviewed it directly.
3    Q    Okay.  What is your understanding of the
4 outcome of this study?
5    A    I -- I don't recall.
6    Q    Turning to paragraph 30 of your report.
7 Okay.  Here you talk about a study that you reviewed
8 by Glintborg, and this is a study that is described in
9 Dr. Cantor's supplemental report; correct?
10    A    That's my -- yes, that's my recollection.
11    Q    Okay.  And just so we're all on the same
12 page, this is the study that's entitled
13 "Gender-Affirming Treatment and Mental Health
14 Diagnosis in Danish Transgender Persons: A Nationwide
15 Register-Based Cohort Study."
16    A    I need to look at the -- my endnotes to see
17 if that's the title.
18    Q    Sure.
19    A    This is the Glintborg study?
20    Q    Yes.
21    A    So I have "Gender-Affirming Treatment and
22 Mental Health Diagnosis in Danish Transgender Persons:

Page 125

1 A Nationwide Register-Based Cohort Study."
2    Q    Okay.  So just to confirm, you reviewed this
3 study yourself; correct?
4    A    That's correct.
5    Q    And in this study, how did the researchers
6 measure participants' mental health?
7    A    I -- I don't recall the details.  I'd have
8 to look back through the study.
9    Q    Okay.  And do you recall whether the
10 researchers reviewed medical files of the patients?
11    A    I -- I don't recall the details of how the
12 study were done -- was done.
13    Q    Okay.  What conclusions did you draw from
14 your review of this study?
15    A    That the study intended to include the
16 medical records of all individuals in Denmark
17 diagnosed with gender dysphoria or gender incongruence
18 from 2000 to 2021.  That included about 3,800
19 patients, among whom a little more than 2,000
20 underwent medicalized gender transition.  And that the
21 study found that prescriptions of psychoactive
22 medications increased rather than decreased after the

32 (Pages 122 - 125)

Farr Curlin
April 8, 2024

1  start of medicalized gender transition, and they
2  remained elevated across multiple years.
3        It also found that measures of negative
4  mental health compared against controls were -- "were
5  stable after initiation of gender-affirming hormone
6  treatment, without sign of decrease after date for
7  first prescription of gender-affirming hormone."  That
8  was a quote from the -- from the authors themselves.
9  Which is, in my words, that the mental health of the
10  patients who received medicalized gender transition
11  did not, on average, improve as a result of or
12  following initiation of medicalized gender transition.
13       Q   But the study did not conclude that the
14  mental health declined after initiation of treatment;
15  correct?
16       A   That's my recollection, that -- that it did
17  not, except insofar as being on more psychoactive
18  medications may be a proxy for having greater mental
19  healthcare problems.
20       Q   I'm sorry, can you point to the portion of
21  the study which says that they were on more
22  psychoactive medications?

1        MR. BROOKS:  Objection.  The witness
2  doesn't have the study in front of him.
3  BY MS. MURPHY:
4        Q   In that case -- well, let me ask you this.
5  Dr. Curlin, can you answer that question without the
6  study in front of you?
7        A   I think you asked me to point to it, and no,
8  I cannot point to it without it being in front of me.
9  I do include a page number in my citation there.
10       MS. MURPHY:  Okay.  We can pull up the
11  study.  But I'm sorry, I'm going to ask the court
12  reporter to read back my question.
13       THE WITNESS:  Sure.
14       THE REPORTER:  All right, just a
15  moment.
16       (The reporter repeated the record as
17         requested.)
18  BY MS. MURPHY:
19       Q   Dr. Curlin, when you say "more psychoactive
20  medications," do you mean more medications in number
21  or an increase in dosage?
22       A   I -- I don't recall the details, but what I

1  wrote was that prescriptions of psychoactive
2  medications increased rather than decreased after the
3  start of medicalized gender transition and remained
4  elevated across multiple years.  So that was my --
5  that was my understanding from reading the study.
6        Q   Okay.  Now in your clinical experience, when
7  a patient is undergoing treatment for a condition and
8  the treatment appears to be working, is that an
9  indication that the treatment should be stopped?
10       MR. BROOKS:  Objection.
11       A   Just -- I want to note that there seems to
12  be a hidden premise, so I just want to specify it's a
13  false premise, which is that that's what we're
14  describing in this case or that's what my opinion is
15  describing in this case.
16       So generally speaking, that a treatment is
17  working is not necessarily evidence that that
18  treatment should be stopped.  Sometimes it is, if you
19  expect that -- that treatment restores health and is
20  not required to -- to sustain health.  It would depend
21  on the case and the condition.
22       Q   This study did not conclude that patients

1  receiving gender-affirming care were worse than before
2  treatment; correct?
3        MR. BROOKS:  Objection.
4        A   My understanding was it concluded that
5  there -- they did not improve, which is -- but I
6  didn't -- but I -- and that their -- their measures of
7  negative mental health did not worsen.  They remained
8  stable "after initiation of gender-affirming hormone
9  treatment, without sign of decrease after date for
10  first prescription of gender-affirming hormone."
11  That's a quotation of the authors.
12       Q   Got it.  So in paragraph 31 of your report,
13  and I apologize, I don't know I'm going to pronounce
14  this correctly, but you mention a study by Kaltiala.
15       THE REPORTER:  Can you spell that?
16       MS. MURPHY:  K-A-L-T-I-A-L-A.
17       THE REPORTER:  Thank you.
18  BY MS. MURPHY:
19       Q   And this was a 2003 study; correct?
20       A   That's -- that's correct.
21       Q   And just to confirm once again, this is a
22  study that you reviewed; right?

Farr Curlin                                                        April 8, 2024

Page 130

1    A   I did review that, yes.

2    Q   And how do the researchers in this study

3  measure participants' mental health?

4    A   I -- I don't recall in detail.  I only

5  recall what -- what I summarized here or what I

6  specified here.

7    Q   Okay.  And this study did not conclude that

8  the patients receiving gender-affirming care were

9  worse than before treatment; right?

10    A   It did not conclude, to the best of my

11  recollection, that they were worse as measured by need

12  for psychiatric treatment.  So on that -- in that one

13  specific outcome, that it concluded that they, like

14  the Glintborg study, they did not -- following

15  medicalized gender transition, their need for

16  psychiatric treatment did not go down.

17    Q   And was that measured by the number of

18  contacts they had with mental health providers?

19    A   I don't recall how -- what -- what the

20  specific proxy was for need for psychiatric treatment.

21    Q   And can you say definitively, based on this

22  study, that because they continued to have contact

Page 131

1  with mental health providers that their mental health

2  condition stayed the same?

3    A   No, I can't say that definitively.  We can

4  only say that this proxy for need for psychiatric

5  treatment did not improved after medicalized gender

6  transition.

7    Q   Based simply on the fact that they continued

8  to see a mental health provider?

9    A   If that was -- again, as I said a moment

10  ago, I don't recall the -- how they measured that,

11  whether that was number of visits to psychiatric

12  providers or number of prescriptions or frequency of

13  visits, I don't recall what the proxy was.

14    Q   Okay.  Paragraph 33 of your report, if you

15  wouldn't mind turning to that, please.

16    A   I'm there.

17    Q   Okay.  And here you say, "All of this

18  contradicts the plaintiffs' claim that MGT is

19  medically necessary, since an intervention cannot be

20  said to be medically necessary if the benefits of the

21  intervention are unproven, or indeed are cast into

22  serious doubt by the most recent large-scale studies."

Page 132

1  Correct?

2    A   That is what I said, yes.

3    Q   Okay.  Are you aware that every major

4  medical association in the United States supports

5  gender-affirming care?

6        MR. BROOKS:  Objection, lack of

7  foundation.

8    A   I don't know about every major medical

9  association.

10    Q   Are you aware that the American Medical

11  Association supports gender-affirming care in

12  adolescents?

13        MR. BROOKS:  Same objection.  Assumes

14  facts not in evidence.

15    A   I am aware that at least some statement by

16  some arm of the American Medical Association has

17  expressed support for medicalized gender transition.

18    Q   And what about the American Academy of

19  Pediatrics?  Are you aware that they have supported

20  gender-affirming care for adolescents?

21        MR. BROOKS:  Objection.

22    A   I am aware of the -- the position statement

Page 133

1  authored by Rhafferty, which was put forward as a

2  statement of the American Academy of Pediatrics and

3  was quite enthusiastic about medicalized gender

4  transition.

5    Q   And are you aware that the American

6  Psychiatric Association supports gender-affirming

7  care?

8        MR. BROOKS:  Objection, assumes facts

9  not in evidence.

10    A   I don't recall that, but I don't have memory

11  that that's not the case.

12    Q   So going back to the portion of your report

13  that I just read, paragraph 33, how do you determine

14  whether a particular treatment is medically necessary?

15    A   It depends to some extent on the situation,

16  but by medically necessary I mean that there is

17  sufficient evidence that there's a threat to the

18  patient's health that is eminent and that the

19  intervention in question, we have reasonable certainty

20  that it is an intervention that is likely to benefit

21  the patient by preventing the threat to the patient's

22  health or resolving that threat, and there are no

34 (Pages 130 - 133)

Farr Curlin                                           April 8, 2024

Page 134

1  other confounding factors that might, you know, change
2  that judgment.
3      Q   And when you talk about threats to patient
4  health, are you including threats to their mental
5  health as well?
6      A   Toward any aspect of their health.
7      Q   And just to be clear, that includes their
8  mental health?
9      A   It would include their mental health.  Yes,
10  it would include their mental health.
11     Q   Now if a particular treatment is not
12  medically necessary, is it your opinion that that
13  treatment should be criminalized?
14         MR. BROOKS:  Objection.
15     A  I have not testified to that effect, and --
16  and no, that is not my testimony.
17     Q   Now if a particular treatment is not
18  medically necessary, should it be made unavailable to
19  patients --
20         MR. BROOKS:  Objection.
21  BY MS. MURPHY:
22     Q   -- regardless of their belief that they

Page 135

1  would benefit from it?
2      A   To clarify, my point here is that the
3  plaintiffs have not shown that this intervention is
4  medically necessary.  It does not follow that anything
5  that is not medically necessary must then be
6  criminalized.  Whether a particular intervention
7  should be prohibited and by whom is -- depends on a
8  lot of factors.
9          But the point here is -- which I take to be
10  a pretty straightforward point, is that the plaintiffs
11  have not shown that medicalized gender transition is
12  medically necessary in any reasonable understanding of
13  that term.
14     Q   You would agree that you have not reviewed
15  all available evidence on the safety and efficacy of
16  gender-affirming care; correct?
17     A   I have not attempted to review all of the
18  available evidence regarding medicalized gender
19  transition.
20     Q   And is it your opinion that there are no
21  negative health consequences of delaying or denying
22  gender-affirming treatment?

Page 136

1      A   I have not testified to that effect, and
2  that is not my opinion.  I -- I don't -- I'd have to
3  think that through and consider -- consider details
4  that I can't consider here on the fly.
5      Q   Okay.  Are you offering an opinion that
6  gender-affirming medical care is unproven?
7      A   It's my opinion that if the state of the
8  evidence is as described by Dr. Cantor and Laidlaw,
9  then medicalized gender transition is very clearly
10  unproven with respect to the hoped-for outcomes that
11  its proponents claim it brings about.
12     Q   In paragraph 33, you refer to recent
13  large-scale studies.  Which studies are you referring
14  to?
15     A   I don't recall exactly what I was referring
16  to when I wrote this, but I -- I know it included the
17  Glintborg and Kaltiala study.  I think it also
18  includes the -- the large-scale systematic reviews
19  conducted by a number of different bodies of experts.
20     Q   Moving on to paragraph 34.  And it says
21  here, "While the benefits of MGT for minors are at
22  best unproven, the evidence summarized by Drs. Cantor

Page 137

1  and Laidlaw also indicates that MGT in minors poses
2  risk of objective, often irreversible, harms to
3  health, while also requiring life-long dependence on
4  medical interventions."  Is that correct?
5      A   That's what I wrote there, yes.
6      Q   And what evidence are you referring to here?
7      A   I'm talking about the evidence summarized by
8  Drs. Cantor and Laidlaw.
9      Q   Okay.  What do you mean by "life-long
10  dependence on medical interventions"?
11     A   Well, I'm thinking here specifically of the
12  fact that cross-sex hormones principle, if someone
13  sustains a desire to suppress their ordinary healthy
14  sexual -- secondary sex characteristics, to my
15  knowledge, requires ongoing administration of those
16  hormone indefinitely.
17     Q   Is it uncommon for healthy individuals to
18  require medication for the rest of their life?
19     A   It is exceptionally uncommon, and I at the
20  moment can't think of another situation in which
21  people who are healthy, according to the standard
22  medical norms, take some kind of drug for lifelong

35 (Pages 134 - 137)

Page 138

1 that counteracts and contradicts that ordinary healthy

2 development and expression, particularly when those

3 interventions carry known significant adverse side

4 effects.

5    Q    Turning to paragraph 36 of your report.  In

6 this paragraph, you cite to the 2021 article by the

7 Karolinska Institute; is that right?

8    A    Give me a moment.

9    Q    Sure.

10    A    Okay.  And what is your question?

11    Q    Sure.  Did you read this article?

12    A    I can't recall.  I may have.

13    Q    Okay.  Then do you recall what it's about?

14    A    Just --I only recall the part that I've

15 cited here.

16    Q    And so we're on the same page, the part that

17 you cited, it says, "In light of the above, and based

18 on the precautionary principle, which should always be

19 applied, it has been decided that hormonal treatments,

20 i.e. puberty blocking and cross-sex hormones, will not

21 be initiated in gender dysphoric patients under the

22 age of 16."  Correct?

Page 139

1          MR. BROOKS:  Objection.  You've read

2 only part of the quote in the paragraph.

3    A    I did that -- what you read is a part of

4 what I quoted in this paragraph.

5    Q    Okay.  And do you know what specific studies

6 the clinic based their decision to limit care on?

7    A    I only know that they -- as best I recall,

8 they took into account -- review of the available

9 scientific evidence that was commissioned by Sweden's

10 National Board of Health, and that that review had

11 concluded that hormonal interventions in minors are

12 fraught with extensive -- I'm sorry, actually, I don't

13 know if it was that review or if it was the leading

14 clinic itself that concluded that hormonal

15 interventions in minors are fraught with extensive and

16 irreversible adverse consequences, such as

17 cardiovascular disease, osteoporosis, infertility,

18 increased cancer risk, and thrombosis.

19    Q    And are you aware that the clinic placed

20 some limitations on providing gender-affirming care

21 but they did not discontinue the use of

22 gender-affirming care in adolescents altogether?

Page 140

1          MR. BROOKS:  Objection.

2    A    I -- I am not aware of what they did.  In

3 fact, I only know what they said here, which was that

4 they would not initiate gender dysphoric patients --

5 that they would not initiate medicalized gender

6 transition in gender dysphoric patients under the age

7 of 16.

8          MR. BROOKS:  And, Counsel, let me just

9 step in.  It is the classic after lunch period, and I

10 want to encourage the witness to speak up.  Always a

11 problem at two o'clock in the afternoon.

12          MS. MURPHY:  Sure.

13 BY MS. MURPHY:

14    Q    And, Dr. Curlin, are you aware that in

15 Sweden, gender-affirming care for adults and youth is

16 fully paid for by the National Health System?

17          MR. BROOKS:  Objection, assumes facts

18 not in evidence.

19    A    I don't have any knowledge about that that I

20 recall.

21    Q    Okay.  If you could, please turn to

22 paragraph 38 of your report.

Page 141

1    A    I'm there.

2    Q    Okay.  In that paragraph you state that MGT

3 induces hormone levels that are abnormal; right?

4    A    Which paragraph is this?

5    Q    Paragraph 38.

6    A    Okay, hang on one second.

7    Q    It's the last line of that paragraph.

8    A    Okay, I've -- I see the paragraph.

9    Q    Okay.  What do you mean by "abnormal"?

10    A    I mean that it induces levels that are not

11 found in healthy persons of that sex, of the sex of

12 the patient, and which if they were found are a sign

13 of ill health, of disease, of disorder, in every

14 context -- in every other context.

15    Q    And do you agree, though, that individual

16 hormone levels vary between members of the same sex?

17    A    They vary to some extent.

18    Q    And so how would you describe normal hormone

19 levels then?

20    A    Well, I can't cite to you what the actual

21 normal range is within two standard deviations for age

22 and sex-matched groups, but a normal hormone level is

36 (Pages 138 - 141)

Farr Curlin                                                    April 8, 2024

Page 142

1 one that you characteristically find in people whose
2 health -- whose bodies are well working, who -- who
3 are healthy and don't have a disorder that affects the
4 production of hormones.  And medicalized gender
5 transition, cross-sex hormones, induces levels that
6 are not found normally.
7    Q    Okay.  So a woman who is undergoing
8 perimenopause, which is a normal, healthy transition,
9 would taking hormone replacement drugs be considered
10 inducing abnormal hormone levels?
11    A    I don't know what hormone levels are induced
12 by hormone-replacement therapy in that clinical
13 context, but I know that it's not a level of
14 testosterone that is induced by cross-sex hormones in
15 someone who's a female sex, in that context.
16    Q    And what's the basis for your opinion that
17 MGT induces hormone levels that are abnormal?
18    A    It's my knowledge, from my medical training,
19 of sex hormones in males and females, and also the
20 descriptions of medicalized gender transition by those
21 proponents of medicalized gender transition, as to
22 what they're seeking to induce.

Page 143

1    Q    Turning to page 9, if you're not already
2 there, the subheading there says, "The fact that GD is
3 listed as a disorder in the Diagnostic and Statistcal
4 Manual of Mental Disorders, DSM-5, does not imply that
5 GD marks a disorder of the body that warrants MGT in
6 minors."  Correct?
7    A    That's right.  That's what I wrote.
8    Q    Okay.  But you agree that gender dysphoria
9 is listed in the DSM-5 as a disorder?
10    A    I do understand that gender dysphoria is
11 listed in the DSM-5 as a disorder.  Specifically as a
12 mental disorder.
13    Q    Okay.  And what do you mean by "disorder of
14 the body"?
15    A    A disorder of the body.  I'm not sure how
16 much more simple to make that.
17    Q    Well, let me ask this.  Does a disorder of
18 the body include mental health disorders?
19    A    So because human beings are human animals,
20 in an important sense, all human disorders are bodily
21 disorders.  But here what I'm highlighting is that
22 gender dysphoria is recognized as a mental disorder.

Page 144

1 Having a mental disorder of, in this case, that
2 involves your perception, one's perception of their
3 secondary sex characteristics, does not imply that one
4 has a medical disorder with respect to those secondary
5 sex characteristics.  There's nothing wrong in that
6 case with the secondary sex characteristics, medically
7 speaking.
8    Q    Okay.  Who is capable of making a diagnosis
9 of gender dysphoria?
10    A    I don't have a formed opinion on that
11 question.
12    Q    Okay.  Do you have an understanding of the
13 goals of the interventions that are prescribed
14 occasionally for gender dysphoria?
15    A    It depends on which descriptions you mean.
16    Q    Let's take puberty.
17    A    Which interventions do you mean?
18    Q    Sure.  Let's take, for instance, puberty
19 blockers.  What is the goal of that intervention when
20 prescribed for gender dysphoria?
21    A    My understanding is, based on the
22 descriptions of the plaintiffs' experts and

Page 145

1 descriptions otherwise of folks who practice these
2 interventions, the goal is to prevent the -- the
3 secondary sex characteristics that are normally going
4 to develop in puberty in a person of that sex from
5 developing.
6    Q    And what is your understanding of the goals
7 of prescribing cross-sex hormones for individuals with
8 gender dysphoria?
9    A    My understanding is that the -- the goal of
10 those who are prescribing such hormones is to induce
11 development of secondary sex characteristics that are
12 more like, insofar as possible, more like the expected
13 secondary sex characteristics in a healthy person of
14 the opposite sex.
15    Q    Okay.  Moving onto paragraph 40, and there
16 you refer to gender dysphoria as a disorder of
17 perception; is that correct?
18    A    Give me a second.
19    Q    Sure.
20    A    Okay.  Can you repeat your question?
21    Q    Sure.  You refer to gender dysphoria as a
22 disorder of perception; correct?

37 (Pages 142 - 145)

Page 146

1    A   I can't recall if I specifically said it's a
2  disorder of perception, but I do describe it as a --
3  as a condition in which the person suffering it
4  perceives their secondary sex characteristics as being
5  at odds with their wellbeing.  And -- and that in this
6  case, the -- those secondary sex characteristics are,
7  at least in the typical case to my understanding, are
8  objectively healthy and expected secondary sex
9  characteristics for a person of their sex.
10   Q   And so you refer to it the sixth line up
11  from the bottom of that paragraph.  You refer to it as
12  a disordered perception; correct?
13   A   I see that, yes.  And just insofar as I've
14  described, I -- in my judgment, it is objectively
15  disordered in that respect.
16   Q   Okay.  Is disordered perception a term used
17  in the DSM-5?
18   A   I -- I can't recall.  It's certainly been
19  used in my clinical training.
20   Q   Okay.  Moving on to paragraph 42.  Just let
21  me know when you get there.
22   A   I'm there.

Page 147

1    Q   Okay.  In the second sentence you say,
2  "Indeed, the health authorities and independent bodies
3  that have systematically reviewed the scientific
4  evidence regarding MGT in minors have concluded that
5  evidence is insufficient to justify the conclusion
6  that MGT improves even mental health outcomes."
7  Correct?
8    A   That's correct.
9    Q   And what did you review to make this
10  conclusion?
11   A   The -- the reports by Cantor and Laidlaw,
12  and then I reviewed some of those reports by experts
13  in England and Finland, Denmark myself.
14   Q   Okay.  In that --
15   A   Actually, I don't recall if it was Denmark.
16  England, Sweden, Finland.
17   Q   Okay.  And in that latter category of
18  research that you just described, those are all
19  documents that you've cited in your report; correct?
20   A   I -- I cited them or they were cited by
21  Cantor and Laidlaw.
22   Q   Okay.  And what health authorities or

Page 148

1  independent bodies are you referring to?
2        MR. BROOKS:  Objection, asked and
3  answered.
4    A   Yeah.  I don't remember the exact names,
5  except the abbreviation for the English authority is
6  the -- that did the systematic review is the -- is
7  NICE.  But I -- there was also a Swedish body that did
8  a systematic review.  As I recall, also one done in
9  Finland.  And it -- it was bodies -- those bodies and
10  perhaps others that are referred to in the reports by
11  Cantor and Laidlaw.
12   Q   Okay.  Now in paragraph 43, is it fair to
13  say that you take issue with the guidelines issued by
14  the Endocrine Society?
15   A   I can't answer that question.  That's -- I
16  don't know what it means to take issue, and I don't
17  know which guidelines you're talking about.
18   Q   Do you have an opinion on the guidelines
19  issued by the Endocrine Society?
20        MR. BROOKS:  Objection.
21   A   So I took, as I was asked, to be accurate,
22  the reports by Cantor and Laidlaw and their summary,

Page 149

1  and Cantor described the Endocrine Society guidelines
2  as not relying on any systematic review of evidence of
3  efficacy of any form of treatment for gender
4  dysphoria.  I take that to be a true statement.  I
5  have not tried to go through the Endocrine Society's
6  citations and verify that.
7    Q   Okay.  And is that the same for the
8  guidelines issued by WPATH?
9    A   That's correct.  I took to be accurate, for
10  the purposes of my -- of the questions I was asked,
11  Cantor and Laidlaw's description of the review
12  conducted by WPATH.
13   Q   And what about the American Academy of
14  Pediatrics 2018 policy statement?
15   A   The same.
16   Q   Okay.  Turning now to paragraph 44, please.
17   A   I'm there.
18   Q   Okay.  It says here that your "own review of
19  SOC 8 indicates WPATH has problematically minimized
20  the doctor's responsibility to exercise independent
21  judgment and fiduciary responsibility to guide patient
22  care for minors."  Correct?

Farr Curlin                                                                April 8, 2024

Page 150

1   A   Yes, that's correct.

2   Q   And can you describe your reasoning behind

3   this conclusion?

4   A   I think I make it plain in my -- in my

5   report.

6   Q   Okay.  Well then, you know, simply for

7   purposes of this deposition, can you summarize that

8   for me, please?

9   A   Sure.  The problem is that WPATH, in its SOC

10  8, uses language of the importance of -- well, give me

11  a second and I'll tell you precisely.

12       Okay, so in paragraph 84 of my report, I

13  write, "In its Standards of Care, version 8, WPATH

14  suggests that gaps in evidence demonstrating the

15  safety and efficacy of MGT should not prevent the use

16  of MGT in adolescents" -- quote -- "given the ethics

17  of self-determination in care."

18       The new guidelines also emphasize,

19  quote -- or a, quote, "right to bodily and mental

20  integrity, autonomy, and self-determination."  And a

21  punitive need for healthcare practitioners to, quote,

22  "match the treatment approach to the specific needs of

Page 151

1   patients, particularly their goals for gender identity

2   and expression."

3        And the problem is that the medical

4   ethics -- the standard within the practice of medicine

5   and medical ethics with respect to decision making for

6   minors is self-consciously and specifically not

7   governed by self-determination.  And so the WPATH is

8   effectively appealing to a concept that has relevance

9   with respect to the autonomy of adults, but has long

10  been understood to not apply as a -- as a governing

11  concept in the care of children.

12       And -- and to appeal to that as -- to appeal

13  to that concept which doesn't apply to overcome the

14  absence of evidence for efficacy is, I think deeply

15  problematic.

16  Q   All right.  Dr. Curlin, I'm sorry, you

17  probably said this correctly, but I just want to

18  clarify for the record.  I believe you were reading

19  from paragraph 84 of your report; correct?

20  A   Yes, I was.

21  Q   Okay.  I think I heard 85, but regardless,

22  just so it's clear, it was 84.

Page 152

1   A   Well, in -- in 85 I had, "Much has been made

2   of the importance of autonomy, but the ethical

3   standard for medical decision-making with respect to

4   minors is decidedly not self-determination."  And then

5   I go on to explain the basis for that statement.

6   Q   Okay.  Can you describe, for the purposes of

7   this deposition, why it is that you believe that

8   self-determination does not apply to adolescents?

9   A   Adolescents, as minors, have long been

10  understood as among what we call, in the field of

11  medical ethics, vulnerable populations.  The -- as the

12  Belmont Report put it, respect for autonomy involves

13  effectively respecting the authority of adults, but it

14  also involves protecting those who don't have that

15  level of autonomy, which among whom have always

16  been -- included children.

17       So doctors have a fiduciary relationship to

18  children to consider what is in the best interest of

19  children, without respect in many cases to -- or

20  notwithstanding, I should say, in many cases

21  children's opinions about what is in their best

22  interest.

Page 153

1   Q   And so let me make sure I understand this

2   correctly.  Are you saying that children's opinions

3   should play no role in decisions about treatment?

4   A   I have not said that.  I've said, as I do in

5   my report, that the children -- a child's opinion that

6   a particular intervention is good for them is not

7   sufficient to -- to justify that intervention.  That

8   intervention must be reasonably understood by the

9   physician on -- on some kind of reasonable basis to

10  actually be conducive to the medical benefit to

11  the -- benefit of the health of that child.

12       That's a -- that's the fundamental

13  obligation of the physician.  And so whereas adults

14  have more degrees of freedom to ask for and to consent

15  to interventions that are not necessarily good for

16  their health, under the law and under this principle

17  of respect for autonomy, children do not have that

18  same authority.

19  Q   But in the case of MGT, it's the parents who

20  are asked to provide consent for treatment; correct?

21  A   My understanding is the parents are asked to

22  provide consent, and the children are asked formally

39 (Pages 150 - 153)

Farr Curlin

April 8, 2024

Page 154

1   to provide assent. But the language of
2   self-determination with respect to children
3   contradicts that very idea of the parents providing
4   consent and the children providing assent. If it were
5   in fact the case that the key concept here is
6   self-determination, then we would seek consent from
7   children. We don't do that in medicine, except in
8   some specific situations.
9       Q   Okay. Is that your only criticism of SOC 8
10  or are there others?
11          MR. BROOKS: Objection.
12      A   No, I would not say that is my only
13  criticism.
14      Q   Do you agree that SOC 8 is a set of clinical
15  guidelines?
16          MR. BROOKS: Objection.
17      A   Yeah, I -- I -- I don't -- I don't know if I
18  would call SOC 8 a set of clinical guidelines, as
19  opposed to a -- other things that it also purports to
20  be, including a summary of reviews of data and so on.
21      Q   Would you characterize SOC 8 as standard of
22  care?

Page 155

1       A   I would not.
2       Q   Do you agree that clinical guidelines exist
3   for treating a variety of types of conditions in
4   pediatrics?
5       A   Because I do not practice clinical
6   pediatrics, I am not often reviewing clinical
7   guidelines for pediatrics. But to my knowledge, there
8   are clinical guidelines of various forms regarding
9   healthcare for children.
10      Q   And is it your opinion that relying on
11  clinical guidelines, as you say, minimizes the
12  doctor's responsibility to exercise independent
13  judgment?
14      A   Where -- can I ask where you're pointing to?
15      Q   Sure, we're going back to paragraph 44.
16      A   Actually, no, that -- that sentence which
17  states, "My own review of SOC 8 indicates WPATH has
18  problematically minimized the doctor's responsibility
19  to exercise independent judgment and fiduciary
20  responsibility to guide patient care for minors," is
21  my interpretation of their emphasis on this importance
22  of self-determination.

Page 156

1       Q   I see, okay.
2       A   And their emphasis on according with the
3   patient's goals, for a minor.
4       Q   Okay. So I noticed that whenever you said,
5   in answer to that question, you said patient goals and
6   you put them in what's commonly referred to as air
7   quotes. Can I ask if there was any meaning that you
8   ascribe to that for -- what meaning was there when you
9   put that term in air quotes?
10      A   I, in that case, was not using those as air
11  quotes, though I concede that that is the sign for air
12  quotes. I meant that to indicate that I actually
13  quoted them as saying, as I -- as I note in my
14  paragraph 84. There's a -- there's a punitive need
15  for healthcare practitioners to, quote, "match the
16  treatment approach to the specific needs of the
17  patients" -- comma -- "particularly their goals for
18  their identity and expression."
19      Q   Okay. Thank you for that clarification.
20  Now in that same paragraph 44, you also discuss Drs.
21  Cantor and Laidlaw's conclusions about conflicts of
22  interests that they say exist among WPATH committee

Page 157

1   members; correct?
2       A   I do refer to their -- their conclusion that
3   there were substantial financial conflicts of
4   interest.
5       Q   Okay. And did you do any independent
6   research on whether there existed financial conflicts
7   of interest among the committee members of WPATH?
8       A   No, as -- no, I did not. I took -- as I
9   said, I think here explicitly, insofar as these
10  descriptions, and by that I mean these descriptions by
11  Cantor and Laidlaw, insofar as they're accurate, then
12  WPATH ignored significant conflicts of interest and
13  violated accepted principles of medical ethics. I did
14  not seek to do my own research to find if -- if Cantor
15  and Laidlaw's conclusions were accurate.
16      Q   Okay. And so it is your opinion that
17  individuals who developed SOC 8 had direct financial
18  conflicts of interest?
19      A   It is my opinion that if the descriptions by
20  Cantor and Laidlaw are true, then yes, they did.
21      Q   Is it your opinion that clinicians who
22  practice in a particular field should never be

40 (Pages 154 - 157)

Farr Curlin                                                                                    April 8, 2024

Page 158

1  involved in developing clinical guidelines for that
2  field?
3       A   No, that is not my opinion.
4       Q   In this instance, why would the
5  participation among experts in developing these
6  guidelines be a conflict of interest?
7       A   A conflict of interest exists where the
8  persons who are being looked to, to render what is
9  expected to be an impartial judgment about, in this
10  case a medical intervention, stand to benefit
11  financially if people take their description to
12  be -- to be accurate or authoritative.
13          And so that you can have conflicts of
14  interest that -- that do not disqualify someone from
15  serving as an expert.  In fact, sometimes you cannot
16  really get adequate expertise without involving some
17  people who have some conflicts of interest.
18          But it's important, when there is a conflict
19  of interest, to note it, be candid and forthcoming
20  about it, and to take measures to -- to manage or
21  compensate for that, for example by having people
22  involved who do not have that conflict of interest and

Page 159

1  subjecting the -- the judgments of those who do to
2  review by those who don't.  And so -- and there are
3  other methods to manage conflicts of interest.
4       Q   Okay.  And is it your opinion that those
5  things that you say should be done where there are
6  conflicts of interest or potential conflicts of
7  interest were not done here by WPATH?
8       A   It's my opinion that if the descriptions by
9  Cantor and Laidlaw are accurate, that they --
10  those -- those conflicts of interest were not handled
11  as they should have been.
12       Q   In what way?
13       A   Well, first, in that the conflict of
14  interest was not mentioned in the report.  That's a
15  big deal in medicine.  That's -- that's one.  Second,
16  that outside experts and perspectives on the standard
17  writing process who do not have conflicts of interest
18  were not, if Cantor and Laidlaw's description is
19  accurate, were not included.  And at least -- yeah,
20  were not included.  Those -- that's a second problem.
21       Q   Are there any others?
22       A   There may be, but for example, if it's the

Page 160

1  case that people writing the standards have been
2  taking into account how what they vote might bear on
3  whether physicians were reimbursed for medicalized
4  gender transition, that is a very problematic conflict
5  of interest.
6       Q   Just to clarify, when you talk about
7  reimbursement, are you talking about reimbursement for
8  providing care?
9       A   I'm talking about insurance reimbursement
10  for medicalized gender transition.
11       Q   Okay.  So any physician who receives
12  insurance reimbursement for providing medical
13  transition should not be involved in the development
14  of the standards?
15          MR. BROOKS:  Objection.
16       A   That's not what I said.  In fact, that
17  directly contradicts what I said.  It could be helpful
18  to include them, particularly if they are the ones
19  that have certain kinds of expertise that don't --
20  others don't have.  But that they have a conflict,
21  such conflict of interest needs to be disclosed and
22  there needs to be a plan for how to manage that, to

Page 161

1  ensure the public, who of course can't know what's
2  going on behind doors, that the conclusions are not
3  motivated by pecuniary interests of those writing the
4  guidelines.
5       Q   Thank you, Doctor.
6       A   But -- but are -- but are motivated by a
7  dispassionate assessment of the data.
8       Q   Turning now to paragraph 48 of your report.
9       A   I'm there.
10       Q   In that paragraph, you refer to a report
11  that was published by Reuters.  It was "an
12  investigative report documenting both growing concerns
13  among physicians about MGT, as well as intense
14  backlash that clinicians, experts, and patients
15  themselves have received when they voice such
16  concerns."  That's how you describe that report;
17  correct?
18       A   That is what I wrote there, as I read it
19  now.
20       Q   Okay.  You read that report; correct?
21       A   I did read that report, yes.
22       Q   Okay.  And that report also refers to

41 (Pages 158 - 161)

Page 162

1 threats of violence against providers of
2 gender-affirming care; correct?
3      A   I don't recall.
4      Q   Okay.  And the authors of that article were
5 not arguing that gender-affirming care should be
6 criminalized; were they?
7      A   I do not recall them arguing that.
8      Q   In fact, that article, the authors state
9 that understanding the reasons that some transgender
10 people quit treatment is key to improving it; correct?
11      A   I don't have the article in front of me, but
12 if you can show it to me I'm happy to read along next
13 to you.
14      Q   Sure.
15          MS. MURPHY:  Andrew, can you pull up
16 that article?  We can go ahead and mark it as an
17 exhibit.  It was not one that --
18          MR. BROOKS:  Yes.
19          MS. MURPHY:  Yeah, okay.  And I believe
20 that that would make it, I guess, Exhibit 8?
21          THE REPORTER:  Correct.
22          MS. MURPHY:  Okay.

Page 163

1      (Exhibit 8 was marked for
2      identification.)
3          MR. BROOKS:  Ruin your numbering.
4          THE REPORTER:  And what is this exhibit
5 going to be labeled as?
6          MS. MURPHY:  Well, we can label it
7 Reuters article.
8          THE REPORTER:  Did you say writer's
9 article?
10          MS. MURPHY:  You know, I never know how
11 to pronounce this.
12          THE WITNESS:  I think you pronounced it
13 correctly the first time.
14          MR. BROOKS:  Reuters, R-E-U-T-E-R-S.
15          THE REPORTER:  Thank you.
16          MS. MURPHY:  I'm originally from
17 Pennsylvania, so sometimes people dispute my
18 pronunciation of things.  It's not uncommon.
19 BY MS. MURPHY:
20      Q   Okay.  So looking at what we've now marked
21 as Exhibit 8, and actually referring to that first
22 paragraph there, it says, "Understanding the reasons

Page 164

1 some transgender people quit treatment is key to
2 improving it, especially for the rising number of
3 minors seeking to medically transition, experts say."
4 Am I reading that right?
5      A   Yes.  So experts, some experts anyway, I
6 take it are, saying that it's important to understand
7 the reason some transgender people quit, in order to,
8 in their judgment, improve treatment.
9      Q   So is it fair to say that this article was
10 not arguing that gender-affirming care should be made
11 unavailable?
12          MR. BROOKS:  Objection.
13      A   This is an investigative study by Reuters, a
14 special report.  I don't recall that they were making
15 strong recommendations one way or the other on
16 medicalized gender transition.  They were shining
17 light on, as I said, growing concerns among physicians
18 about the practice, and as well as some intense
19 backlash that those who were starting to raise such
20 questions and concerns were receiving when they voiced
21 those concerns.
22          MR. BROOKS:  And let me just be clear

Page 165

1 on the record that what is in front of the witness so
2 far is simply the headline title of this article on a
3 shared screen.
4          MS. MURPHY:  Yeah, fair enough.
5 BY MS. MURPHY:
6      Q   Okay.  So moving on.  All that fuss for just
7 one question.  Moving on to paragraph 49 of your
8 report, Dr. Curlin.
9      A   Yes.
10      Q   And actually, paragraphs 49 and 50.  You
11 mention medical ethicists and practitioners who've
12 expressed their fear about speaking up about their
13 concerns with gender-affirming care; is that right?
14      A   Yes.
15      Q   And are you talking about specific
16 colleagues of yours in this instance?
17      A   Yes, although I am not going to name those
18 who talked about this in the context who understood it
19 to be confidential.
20      Q   Understood.  Did any of these colleagues say
21 that any acts of violence were committed against them
22 for their views?

Farr Curlin
April 8, 2024

Page 166

1   A   Not that I recall, no.
2   Q   And did any of them say that they've been
3 threatened with acts of violence for their views?
4   A   Not that I recall, no.  They were --
5   Q   Did any of them --
6   A   No, they just expressed concern that you
7 can't bring this up; I'd lose my job.  That sort of
8 concern.
9   Q   And did any of them actually lose employment
10 based on their views?
11   A   To my knowledge, no, although the unifying
12 report among these meetings was that I was, I, Farr
13 Culin, was the only one who had actually spoken up
14 publicly about these concerns.  Meaning the only one
15 among those in these gatherings.
16   Q   Sure.  And what gatherings are you talking
17 about?
18   A   The gathering at the Greenwall Faculty
19 Scholars Program when we had a hot topic discussion,
20 bioethics dilemmas in the care of transgender minors.
21 And the gathering of faculty of the Trent Center for
22 Bioethics, Humanities & History of Medicine here at

Page 167

1 Duke.
2   Q   Okay.
3       MR. BROOKS:  And, Counsel,
4 notwithstanding that we got back late from lunch,
5 we're rolling up towards an hour and a half, and when
6 it's convenient for you to take a break that'd be
7 great.
8       MS. MURPHY:  Sure.  I was going to try
9 to make it another half an hour, but we can take a
10 brief break now if that's --
11       MR. BROOKS:  That'd be good.
12       MS. MURPHY:  Okay, excellent.  Let's do
13 that.  Take your time.  Ten minutes?
14       MR. BROOKS:  Or less.
15       THE WITNESS:  Less.
16       MS. MURPHY:  All right, thanks.
17       THE REPORTER:  All right.  The time is
18 2:47 p.m.  We are now off the record.
19       (Off the record.)
20       THE REPORTER:  The time is 2:54 p.m.
21 We are now back on the record.
22       MS. MURPHY:  Thank you.

Page 168

1 BY MS. MURPHY:
2   Q   Dr. Curlin, in paragraph 51, can you turn to
3 that, please?
4   A   Did you say 51?
5   Q   I did.
6   A   Okay, I'm there.
7   Q   Now in that paragraph, you mention that you
8 were cancelled from giving a talk at Michigan State
9 University; correct?
10   A   That's correct.
11   Q   And what was that talk supposed to be about?
12   A   To be about spirituality and medicine.
13   Q   But it was not about gender-affirming care
14 in any way; right?
15   A   No.
16   Q   Okay.  And who --
17   A   But I was told by the organizers, when they
18 cancelled the talk the very day of the talk as I was
19 boarding the plane, we're cancelling this because
20 students have said that you have been critical of --
21 of gender transition, and they have said they -- they
22 cannot be in a room with someone who's been critical.

Page 169

1 Something to that effect.
2   Q   And did the organizer -- well, let me ask
3 you this.  Who was the intended audience for this
4 talk?
5   A   To my knowledge, the intended audience was
6 the medical students of Michigan State University.
7   Q   Okay.  And the organizer who told you that
8 your talk had been cancelled, did she tell you in
9 specific what views the students were referring to?
10 And by that I mean not a characterization of your
11 views, but where they were expressed.  So were they
12 referring to a particular article or another talk that
13 you gave?  Anything in specific?
14       MR. BROOKS:  Objection.
15   A   As best I recall, it was that they had found
16 the YouTube video of my talk earlier at the University
17 of Chicago in 2017.
18   Q   Okay.  And then am I correct that you did
19 not get on a plane?
20   A   That's correct.  I did not get on the plane.
21   Q   And was the talk rescheduled?
22   A   It -- not initially, but after some back and

43 (Pages 166 - 169)

Farr Curlin                                                           April 8, 2024

Page 170

1  forth rescheduled for later that spring.  And then it
2  was cancelled again, and it has been rescheduled for
3  June of this year.
4      Q   Okay.  Why was it cancelled for the second
5  time?
6      A   I was told that the dean of the -- the
7  acting dean of the medical school was concerned that
8  there could be protests and so on that would distract
9  from graduation events.
10      Q   And was he specific about the type of
11  protest that he was concerned about?
12      A   Not that I recall.  I just got the
13  impression they were worried there would be some kind
14  of kerfuffle by the students that would distract from
15  graduation.
16      Q   Okay.  And did he say that he thought that
17  the protest would involve your views of
18  gender-affirming care?
19      A   I don't remember what he said exactly, but
20  it was clear that that was -- my understanding was
21  that that was clearly the concern.
22      Q   Okay.  And why is that the case?

Page 171

1      A   Because that's what the person who I was
2  speaking with, who was not the dean but the chair of
3  the department of family medicine, was what she
4  relayed to me.
5      Q   Okay.  And you said that that has been
6  rescheduled a second time?
7      A   That's correct.
8      Q   Okay.  And that date hasn't come to pass
9  yet?
10      A   That's correct.
11      Q   Okay.  Referring back to that same
12  paragraph, at the end it says, "All of this makes
13  evident that fear is muzzling open expression of
14  widespread and growing dissent within the medical
15  community regarding MGT."  Correct?
16      A   That's what I wrote, yes.
17      Q   What do you mean by "muzzling"?
18      A   By muzzling I mean it is -- a muzzle is
19  something that pins the mouth closed on a dog, so it's
20  a metaphor for the way that fear is keeping people
21  from opening their mouths and speaking what they
22  understand or raising concerns that have occurred to

Page 172

1  them.  Expressing in public what they are thinking.
2  Fear is preventing that from happening.
3      Q   Okay.  And have you felt fear about
4  expressing your views on gender-affirming care?
5      A   I have, yes.
6      Q   In what instance?
7      A   I -- I've had anxiety about writing essays
8  that I maybe should have written by now and -- and
9  attempted to publish, notwithstanding the difficulties
10  of doing so because of this -- this -- this kind of
11  ideological conformity and cancel culture of -- of
12  voicing concerns about the -- the practice and the way
13  it seems to contradict, in many cases as least,
14  important guidelines that have -- ethical guidelines
15  that have kept medicine from going too much astray.
16      Q   And what is that fear about?  What are you
17  afraid will happen if you write the essays or further
18  express your views on the subject?
19      A   Well, I'm afraid that I will be subjected to
20  vitriolic email campaigns that students will organize
21  to call for sanctioning of me in some fashion.  That
22  colleagues whom I respect, who really are just going

Page 173

1  on about their lives and working on important topics
2  not relating to this, will all of a sudden find their
3  association with me to be a -- a mark against them
4  in -- in many corners.
5          That it'll be difficult to find assistants
6  to work for me, because if they work for me early in
7  their career they might be marked as somehow not on
8  the right side of this issue, and therefore will find
9  their job prospects diminished.  That kind of -- those
10  kinds of consequences.
11      Q   When you say "students," are you talking
12  about the students at Duke?
13      A   I'm talking about students at Duke, but --
14  but elsewhere also.  I mean, I was at the University
15  of Chicago, and without naming names, I spoke with
16  people in training who have appreciated my work and
17  expressed that they would be absolutely terrified to
18  speak up about their concerns about this in medical
19  training, because if it was known they might not be
20  able to match at prestigious programs.
21          So that -- that -- that is the -- the level
22  of concern, which accords with, of course, the reports

44 (Pages 170 - 173)

Farr Curlin

April 8, 2024

Page 174

1 from Hilary Cass and Dr. Kaltiala and the Reuters
2 report. It accords with those expressed in the closed
3 doors of the Greenwall Foundation. People are
4 concerned that they would be isolated, and effectively
5 the good work that they're up to -- as happened in my
6 case with the Michigan State talk, will be rendered
7 something that can't be taken seriously because of
8 this association with an issue that's so -- so
9 carefully surveilled by those who are -- don't want
10 objections to be raised.
11    Q    And are you aware that there have been
12 threats of violence against providers of
13 gender-affirming care?
14    A    I -- I don't remember where I heard that,
15 but I'm aware that that has been reported.
16    Q    Did you have any --
17    A    I just want to say, and I obviously would
18 condemn such threats of violence.
19    Q    Sure. Did you have any reservations about
20 providing testimony in this case?
21    A    I did, yes.
22    Q    Turning now to paragraph 52.

Page 175

1    A    I'm there.
2    Q    Okay. And here you talk about Beauchamp and
3 Childress' description of clinical equipoise; correct?
4    A    Yes.
5    Q    And that definition refers to ta community
6 of reasonable physicians; right?
7    A    That's right.
8    Q    How would you define a community of
9 reasonable physicians in the case of gender-affirming
10 care?
11    A    This would include those physicians,
12 otherwise reasonable, who have taken the time to
13 consider the evidence of benefits and arms of
14 medicalized gender transition and had a chance to, in
15 light of that, make a judgment about whether
16 medicalized gender transition -- whether we reasonable
17 are uncertain as to whether the intervention itself is
18 better or worse than available treatments that do not
19 include that intervention.
20    Q    So would that include physicians who
21 prescribe those types of treatments currently?
22    A    It -- it certainly does not exclude them.

Page 176

1    Q    And what about a physician who is aware of
2 the research on gender-affirming care but doesn't
3 treat adolescents?
4    A    What about them?
5    Q    Would they be included in this discussion of
6 what's reasonable?
7    A    Yes, I think they would, so long as they
8 have the expertise sufficient to understand the kind
9 of research that's been done, the outcomes that have
10 been assessed, the character of the intervention, and
11 the evidence that's available, yes.
12    Q    Okay. What about doctors who are trained to
13 make that type of diagnosis but are philosophically
14 opposed to providing that type of treatment? Should
15 they be included in the discussion of what's
16 reasonable?
17    A    Well, here we're talking about specifically
18 the question of clinical equipoise. And so whether
19 one is philosophically opposed or not, or
20 philosophically disposed to this intervention, the key
21 question is whether one has the capacity to consider a
22 reasonable -- to a reasonable extent, the data that's

Page 177

1 available regarding purported benefits and purported
2 harms of any intervention including this one, and come
3 to a -- a judgment as to whether there is uncertainty
4 about -- reasonable uncertainty about which -- whether
5 the treatment is superior or inferior to other --
6 the -- the standard of care that does not include that
7 intervention.
8    Q    Okay, turning to paragraph 54.
9    A    I'm there.
10    Q    Okay. Now this one you say, "As the above
11 summaries make clear, the community of reasonable
12 clinicians, as well as the international community of
13 relevant experts, is at best genuinely uncertain about
14 whether MGT is to be preferred to standard" --
15 physiotherapeutic -- "treatment without MGT."
16 Correct?
17        MR. BROOKS: Objection. You said
18 physiotherapeutic when I think the term is
19 psychotherapeutic, and in this case maybe the
20 difference matters.
21        MS. MURPHY: Absolutely. Thank you for
22 making that correction.

45 (Pages 174 - 177)

Page 178

BY MS. MURPHY:

2    Q    Same question, substituting the word
3 psychotherapeutic for the word that I used,
4 physiotherapeutic.

5    A    That is what I write there, yes.

6    Q    Okay.  Now you've conducted empirical
7 research on physicians' attitudes and practices
8 regarding controversial practices; correct?

9    A    I have, yes.

10    Q    And you consider administering
11 gender-affirming care to be controversial; correct?

12    A    I do, yes.

13    Q    And so to support your opinion in paragraph
14 54, did you conduct any empirical research on
15 physicians' attitudes and practices regarding
16 gender-affirming care?

17    A    I did not.  It was unnecessary to do so, but
18 I did not.

19    Q    And what do you mean that it was
20 unnecessary?

21    A    So I already know and am in dialogue with
22 the community of reasonable clinicians, or at least

Page 179

1 reasonable representatives of that community, enough
2 to know that it is, at best, genuinely uncertain about
3 whether MGT is to be preferred to standard
4 psychotherapeutic treatment without MGT, particularly
5 for minors.

6        And I know from the reports of Cantor and
7 Laidlaw, as well as the reports of -- from England and
8 Sweden and Finland and elsewhere of these expert
9 bodies that it is, at best, genuinely uncertain
10 whether MGT is to be preferred to standard
11 psychotherapeutic treatment without MGT.  So it
12 wouldn't -- there was no need to try to do a survey to
13 understand the answer to that question.

14    Q    Okay.  In paragraph 55, you say there that
15 "IRBs do not defer to clinicians' judgment about
16 equipoise."  Correct?

17    A    I do, yes.

18    Q    What's the basis for that opinion?

19    A    The basis for that is my training regarding
20 IRBs, my experience submitting proposals to IRBs, and
21 having arguments with IRBs, and my experience as part
22 of the faculty of ethics at the University of Chicago

Page 180

1 and Duke, where -- as well as many conferences on
2 research ethics in which it has been apparent and
3 obvious that IRBs don't take clinicians' judgment for
4 granted, they want to see the evidence that justifies
5 that judgment, because of course often the physicians
6 or investigators studying some intervention are the
7 most enthusiastic about the -- you know, what they
8 hope for from that intervention.

9    Q    Okay.  So is it fair to say that an IRB will
10 make an independent assessment of whether or not there
11 is clinical equipoise?

12    A    It is certain that they should, and in my
13 experience they do.

14        MS. MURPHY:  Okay.  Now it is
15 approximately 3:15, and I would appreciate taking a
16 short break and going off the record for just
17 approximately 15 minutes.

18        THE WITNESS:  Sure.  Come back at 3:30?
19 That sound right?

20        MS. MURPHY:  3:30 sounds good.  Thank
21 you.

22        THE REPORTER:  The time is 3:14 p.m.

Page 181

1 We are now off the record.

2        (Off the record.)

3        THE REPORTER:  The time is 3:30 p.m.
4 We are now back on the record.

5 BY MS. MURPHY:

6    Q    Okay.  Dr. Curlin, if you can turn to page
7 15 of your report, if you're not there already.

8    A    I'm there.

9    Q    Okay.  And on page 15 you state that, "An
10 institutional review board that approved the expanded
11 clinical trial apparently advocated by the FDA would
12 likely be  violating its ethical obligations."
13 Correct?

14    A    That's what I wrote, yes.

15    Q    Okay.  And what clinical trial are you
16 referred to here?

17    A    I am referring to a proposed clinical trial
18 about which the FDA wrote a letter in response to the
19 investigator's questions and which is listed as
20 production documents HHS01699732-0619991.

21    Q    Okay.  And can you describe the documents
22 within that production that you reviewed?

Farr Curlin                                                    April 8, 2024

Page 182

1        MR. BROOKS:  And, Counsel, I have been
2  told, and I can check this myself, but one of my
3  colleagues going to get this document recently said
4  there's a typo in the Bates range.  Let me read into
5  the record the Bates range of the document to make
6  sure there is no unclarity on that.
7        That is HHS-0169973 through 991.
8        MS. MURPHY:  Okay.
9        THE WITNESS:  Could you repeat your
10  question?
11  BY MS. MURPHY:
12    Q    Sure.  Can you describe the documents that
13  you reviewed that fall within that now narrowed
14  document production?
15    A    I can in general terms.  I would have to
16  look at it to -- to recall the details.  But it was a
17  response by the FDA, or at least some branch of the
18  FDA, to inquiries made by investigators regarding a
19  proposed clinical research plan that involved using
20  estrogen as a cross-sex hormone as a part of
21  medicalized gender transition.  And they had put a few
22  questions to the FDA and asked for preliminary

Page 183

1  guidance on those, and the FDA was responding to those
2  questions.
3    Q    Okay.  Just to clarify, you read a document
4  that was drafted by the FDA?
5    A    That was my understanding from the document.
6    Q    Okay.  And after reviewing that document, is
7  it still your belief that the FDA was advocating for
8  the expansion of the proposed clinical trial?
9    A    It -- it was -- I use the term apparently
10  advocated, because it was not crystal clear what the
11  FDA was ultimately suggesting.  But insofar as it
12  appeared to -- the FDA's response appeared to suggest
13  that the FDA would see as appropriate, not including
14  an active control arm in testing estrogen for
15  adolescents.  It seemed to me that that was -- would
16  be required by ethical obligations, for the reasons laid
17  out in my report.
18    Q    Got it.  And you've never participated in an
19  IRB considering an expanded clinical trial such as the
20  one proposed in that instance; correct?
21    A    I have never served on an IRB, as I said at
22  the outset.  I have been invited to, but thankfully

Page 184

1  have succeeded in declining the invitation to this
2  point.
3    Q    And are there any other documents that you
4  relied on for your conclusion that the FDA was
5  considering expanding the clinical trial?
6    A    No.  Except that there was an initial news
7  report that suggested an interpretation of this
8  document, but I -- my opinion is based on the document
9  itself.
10    Q    Okay.  Turning now to paragraph 67 of your
11  report.
12    A    I'm there.
13    Q    Okay.  Here you note that animal study is
14  relevant to the safety of gender-affirming care -- now
15  I'm paraphrasing -- that can be done have not been
16  done.  Is that a fair representation of what you
17  assert?
18    A    That's -- the evidence that I've seen so far
19  suggests they have not been done.  And the -- the
20  plaintiffs have not indicated that they have been
21  done.
22    Q    Are you aware that two groups of researchers

Page 185

1  have developed mouse models to examine
2  gender-affirming medical care?
3    A    I am not aware of that.
4    Q    So you're not aware that both of those
5  studies showed that female mice are capable of
6  fertility following treatment with puberty blockers
7  and testosterone?
8        MR. BROOKS:  Objection, assumes facts
9  not in evidence.
10    A    I -- I -- I don't recall reading these
11  studies at all, so I can't comment further about them
12  unless you want me to look at them.
13        MS. MURPHY:  Sure.  So why don't we
14  mark as Exhibit 9, the study that we -- I think we
15  have this as the document descriptor, "In Vitro
16  Fertilization Outcomes in a Mouse Model of
17  Gender-Affirming Hormone Therapy in Transmasculine
18  Youth."
19        (Exhibit 9 was marked for
20        identification.)
21        THE WITNESS:  You already sent that one
22  in the email?

47 (Pages 182 - 185)

Page 186

1    MS. MURPHY:  We did.
2    THE WITNESS:  Okay, one moment.  The
3  first author is Cynthia Dela Cruz?
4    MS. MURPHY:  Let me be sure of that.
5  Yes, that's the one I'm referring to.  I'd like to
6  mark that one as Exhibit 9.
7  BY MS. MURPHY:
8    Q   Dr. Curlin, have you seen this study prior
9  to today?
10    A   Not -- not to the best of my recollection.
11    Q   Okay.  So it's fair to say that you didn't
12  consider this when drafting your report?
13    A   Except insofar as this was reviewed by Drs.
14  Cantor and Laidlaw, I did not.  If -- if they reviewed
15  it, then I read their review and considered that
16  summary, but I otherwise did not review this.
17    MS. MURPHY:  Okay.  And then I'd like
18  to turn now to an exhibit that I'd like to mark as
19  Exhibit 10, and this one, the title of the study is,
20  "Puberty Suppression Followed by Testosterone Therapy
21  Does Not Impair Reproductive Potential in Female
22  Mice."

Page 187

1    (Exhibit 10 was marked for
2    identification.)
3  BY MS. MURPHY:
4    Q   Just let me know if you've located it.
5    A   I've located it.  I, of course, can only
6  read the title at this point.  I mean, I could read
7  more if you give me time to, but I've -- I've only
8  read the title at this point.
9    Q   Okay.  So you've never reviewed this study
10  prior to today; correct?
11    A   I have not reviewed it directly, and my only
12  knowledge of it would be if it was reviewed by Drs.
13  Cantor and/or Dr. Laidlaw.
14    Q   Okay.  You can set that aside at this point
15  if you'd like.  Moving on to paragraph 71 of your
16  report.
17    A   I'm there.
18    Q   Okay.  And here you say that, "The absence
19  of well-designed and controlled studies makes it
20  impossible to give minors and their parents
21  information sufficient to consider their consent duly
22  informed."  Correct?

Page 188

1    A   That's right.
2    Q   And are you aware that there's a lack of
3  randomized controlled studies in many areas of
4  pediatrics?
5    A   I am aware of that, yes.
6    Q   And for instance, are you aware that there
7  have been no randomized controlled studies regarding
8  when a child can return to sports after a spinal cord
9  injury?
10    A   I -- I was not aware of that, but I don't
11  know anything to contradict that.
12    Q   So assuming that that's true, is it your
13  opinion that parents cannot make an informed choice
14  regarding when their child can return to sports after
15  a spinal cord injury?
16    A   No, that is not my opinion.
17    Q   In what instance can parents make an
18  informed choice on their children's care when there
19  have not been randomized controlled studies?
20    A   Each -- each particular kind of intervention
21  in each particular clinical scenario has to be
22  considered.  And so for example, it may well be that

Page 189

1  there have not been randomized controlled trials of
2  whether we should set broken bones that are --
3  comminuted fractures, let's just say.  And that does
4  not mean that we don't have sufficient knowledge of --
5  of bones, how they heal, and -- what can be
6  expected from setting the bone and what the
7  implications would be of not setting it in order to
8  know enough to give consent to having the bone set, in
9  my judgment.
10    The challenge with medicalized gender
11  transition, as with any kind of, as the Belmont Report
12  puts it -- I think it's the Belmont Report or
13  Beauchamp and Childress, a kind of radical, new
14  procedure is that it -- it is different in many
15  respects from the ordinary situations in which parents
16  are asked to give consent.
17    Q   How so?  How is it different?
18    A   Well, it's different insofar as we're asking
19  parental consent and patient assent to something which
20  the patients in this case cannot reasonably imagine or
21  understand, by virtue of specifically the fact that
22  they've not gone through puberty, and that the

48 (Pages 186 - 189)

Page 190

1  intervention is going to block features of human life
2  that are dependent on going through puberty.
3        So unlike most conditions, in this case the
4  intervention itself blocks the development of the
5  cognitive and emotional maturation which makes someone
6  capable of giving their own consent when they're an
7  adult, for example.
8        Second one is that in most cases we have
9  good reason to believe that the information, or at
10 least absent countervailing evidence, we have -- we
11 can expect that the information given by the
12 practitioners is -- has a reasonable basis.  Whereas
13 by their own concession and description, the
14 plaintiffs in this case and those promoting
15 gender -- medicalized gender transition, are not
16 acknowledging to family members what all of these
17 experts who disagree with them, like those in -- in
18 multiple other countries, have the conclusions they've
19 come to with respect to the evidence.
20       So that in itself gives an unusual situation
21 in which we now, based on their own testimony, their
22 own writing, we now have reason to believe that

Page 191

1  patients and their parents will not receive a true
2  accounting of the state of the evidence with respect
3  to this intervention from those who offer this
4  intervention.
5        Third, in this case, unlike most cases where
6  parents are giving consent, the intervention itself
7  contradicts the -- the norms of health that guide
8  physicians' actions and fiduciary responsibilities in
9  other cases.
10       So if a doctor was saying what we're going
11 to do is we're going to break your child's leg out of
12 an experiment we have, an idea that's going to help
13 them all on the whole better in some way, then we'd
14 want -- we'd have a much higher bar for requiring
15 that -- that practitioner to show that breaking the
16 leg was going to have the hoped-for benefit and was
17 going to not impose disproportionate harms.
18       I think that's something parallel here,
19 insofar as what the intervention does is contradict
20 the healthy sexual development -- or the healthy
21 development of secondary sex characteristics for a
22 child of that sex.

Page 192

1        So those are just -- those are some of the
2  problems that make this practice particularly
3  ethically problematic, and which raise the bar for
4  or -- or put greater onus on those who would -- who
5  would offer this treatment to -- to have a reasonable
6  basis for coming to the conclusion that this
7  intervention will bring about benefits that are at
8  least proportionate to the foreseen harms.
9        And since, as is this case, they have not
10 shown that the hoped-for benefits, namely benefits
11 with respect to mental health, are achieved.  And we
12 do know with great certainty that the intervention
13 brings a whole host of adverse side effects.  I don't
14 believe they've met -- they've met the requirement
15 of -- of -- of getting -- of there being -- being able
16 to give children information and their parents
17 information sufficient to -- to -- to give duly
18 informed consent.
19 Q    To clarify one of things that you said, what
20 is the basis for your opinion that parents are not
21 informed of any research where you may assert that the
22 research concluded that there were no benefits or that

Page 193

1  gender-affirming care was harmful?
2  A    So the -- the -- as I understand them, the
3  plaintiffs themselves and those whom they're referring
4  to in the publications like that of Rhafferty and
5  others, say explicitly these interventions are safe
6  and they're beneficial.
7        And that seems to me, on the basis of the
8  state of the evidence, if Cantor and Laidlaw's reports
9  are accurate, is not a true description of -- of these
10 interventions.  They cannot reasonably be described as
11 safe without a lot of other qualification and
12 description.  The kinds of adverse side effects they
13 have.  And they cannot be described as beneficial, it
14 seems to me, with respect to outcomes that are -- the
15 hoped-for outcomes, yet anyway.
16 Q    And what is the basis for your belief that
17 parents are not given information about the health
18 risks of gender-affirming care?
19 A    I'm not testifying that they're not given
20 any information about health risks.  I'm just saying
21 that it seems to me, from what the plaintiffs
22 themselves have said, that they represent to patients

Page 194

1 and their families that this is a safe intervention
2 and that it is likely to benefit.  And they couldn't
3 do it in good conscious and ethically if they did
4 not -- if they weren't persuaded that was the case.
5         But the -- the state of the evidence, if
6 described accurately by Cantor and Laidlaw, suggests
7 that they are mistaken in their -- in their
8 conclusions regarding the state of the evidence.  And
9 that is the conclusion, of course, that multiple
10 international bodies of experts have come to.  That in
11 fact it's not safe, or not safe enough to justify
12 doing it except perhaps in certain conditions of
13 research.
14     Q    Okay.  Moving to page 18.  On page 18 you
15 state it's not been shown that minors are able to
16 comprehend and reasonably evaluate the risks and
17 lifelong implications of MGT.  Correct?
18     A    I do, yes.
19     Q    Is it your opinion that a minor can never
20 assent to gender-affirming medical care?
21     A    It's not my opinion about any particular
22 case.  It is my opinion that the plaintiffs have not

Page 195

1 shown that -- based on what they've shown, based on
2 the evidence available, it is doubtful that a minor
3 can have sufficient understanding and intellectual
4 maturity to give informed assent to this particular
5 practice.
6     Q    Under what conditions could a minor assent
7 to gender-affirming care?  What is necessary for that
8 to be possible?
9         MR. BROOKS:  Objection, calls for
10 speculation.
11     A    Yeah.  I'm not sure that it is possible.
12 I'm not sure that it is possible.
13     Q    Have you read the SOC 8's criteria for how
14 providers obtain assent and consent from parents?
15     A    I read the SOC 8 guidelines.  I don't recall
16 the details about that particular issue.
17     Q    Are you aware that the guidelines state that
18 it's important for healthcare providers to assess the
19 cognitive and emotional maturity of adolescents?
20     A    That sounds familiar.  I -- I believe I
21 mentioned that in my report somewhere.
22     Q    Is it your opinion that healthcare providers

Page 196

1 are unable to make that assessment?
2     A    What assessment?
3     Q    An assessment of the emotional capacity --
4 emotional maturity and cognitive maturity of an
5 adolescent who is deciding on treatment with respect
6 to gender-affirming care.
7     A    It's my opinion that the plaintiffs have not
8 shown good reason to be confident that minors can have
9 such maturity.  Sufficient maturity to -- to
10 comprehend medicalized gender transition.
11     Q    And have you conducted any research on
12 obtaining informed consent from parents regarding
13 treatment of minors?
14     A    Empirical research?
15     Q    Any type of research.
16     A    Sure, I've -- I've conducted research, for
17 example for this report, regarding what -- what are
18 the characteristic standards within the -- the field
19 of pediatrics regarding informed consent for minors.
20     Q    Apart from that, have you done any research
21 in that area?
22     A    I've not conducted empirical research in

Page 197

1 that area.  I have, over the years, conducted research
2 within the fields of medical ethics, writing on
3 informed consent, which included -- included
4 scholarship regarding consent for minors.
5     Q    Is that something that's listed in your CV?
6     A    No.  By research here I mean I have studied
7 it, I have looked up authorities, I've read books,
8 I've gone to lectures, and talked to colleagues, and
9 so on.
10     Q    Got it.  I should have been more clear.  So
11 have you drafted any peer-reviewed studies in this
12 area?
13     A    I have not written any peer-reviewed papers
14 on informed consent among children, to my
15 knowledge -- to my recollection.
16     Q    Turning to paragraph 84.  Just let me know
17 when you're there.
18     A    I'm there.
19     Q    And here you're referring to the SOC 8 when
20 you say, "The new guidelines also emphasize a right to
21 bodily and mental integrity, autonomy, and
22 self-determination."  Is that right?

50 (Pages 194 - 197)

Page 198

1    A    That's right.

2    Q    And we talked a bit about this earlier, but
3 I just have a couple additional questions on it.  How
4 would you define autonomy in medicine?

5    A    So I have a chapter on this in my book.
6 Autonomy is a term that's been used in a number of
7 different ways.  And the word autonomy means
8 self-rule.  Autonomous is rule by the self.  That was
9 particularly popularized by Immanuel Kant, to refer to
10 the -- the person who is genuinely reasonable, is a
11 person who is a law to themselves.  They act only
12 insofar as they believe morality require -- ethics
13 requires them to act.

14         Autonomy has come to be used in modern times
15 because of the influence of what we describe as the
16 provider of services model.  Often, it's come to be
17 understood as emphasizing a person's right to have --
18 to live life according to their own terms.  Not so
19 much -- whereas the original understanding was to be
20 autonomous is to follow the moral law, now in many
21 corners people use the term to mean you follow your
22 own -- your own desires.

Page 199

1         So to my -- to my -- in my view, my
2 judgment, autonomy rightly understood is a word --
3 within medicine, is a word that's used to indicate a
4 person's authority to make judgments about what is
5 going to happen to them.

6         And that's particularly expressed in the
7 principal of informed consent, where respect for
8 autonomy requires only acting on a patient insofar as
9 one has their consent, their -- their informed
10 consent.  So that's how I would describe autonomy.

11    Q    And to clarify the testimony that you gave
12 earlier, is it your belief that children do not have
13 the right to autonomy or that it is impossible for
14 them to have autonomy with respect to medical
15 decisions?

16    A    So the way you phrased that question shows
17 the confusion in the way the term is used.  Autonomy
18 is not something -- properly understood, it's not
19 something you talk about as something to which you
20 have a right.  It is an ethical value which calls for
21 respect from others.

22         It is my testimony that children do not have

Page 200

1 authority to make clinical decisions for themselves,
2 except in -- in certain situations.  But generally
3 speaking, they do not have authority.  And that means
4 respect for their autonomy does not require -- or does
5 not imply that you treat them as having authority to
6 tell you what should be done and should not be done
7 for them medically.

8    Q    Okay.  So in your opinion, what role should,
9 if any, an adolescent or child's view play in making a
10 medical decision?

11    A    It depends very much on the situation, on
12 the medical decision that's at stake, on how grave the
13 threat to health is that the child faces, on how
14 likely it is that medicine holds some intervention
15 that can resolve that threat.  And -- and what it is
16 in fact that the patient -- that the child wants.

17         So insofar as possible, pediatricians can
18 and do, and family doctors, those who take care of
19 children, can and do seek to respectfully interact
20 with a child so that they gain their assent to what is
21 medically necessary.

22         But it -- they don't -- there's no medically

Page 201

1 necessary intervention that I can think of for which
2 physicians proceed by asking the child what do you
3 want.  Rather, they would say this is what we need to
4 do and here's why, and how can we negotiate a way
5 forward that involves your assent and cooperation.

6    Q    Now in that same paragraph, paragraph 84.
7 You also state that "The language in SOC 8 ignores the
8 potential conflict between the needs of the patient
9 and their goals."  Correct?

10    A    I do, yes.

11    Q    Can you elaborate a bit on that?  Tell me
12 what you mean?

13    A    What I mean is just that the physician's
14 proper concern, particularly with respect to children,
15 is the medical needs of the patient.  The
16 health-related needs, not the child's goals.  And the
17 needs have preeminence and priority.

18         Ideally, one can pursue addressing the
19 child's health needs and medical needs in a way that
20 doesn't contradict the child's goals, but the goals
21 are not the point for physicians.

22    Q    Okay.  Turning now to paragraph 94.

51 (Pages 198 - 201)

Page 202

1    A    I'm there.

2    Q    And actually, if you wouldn't mind, just
3 taking a brief look.  What I'm referring to is
4 actually paragraphs 94 through 96.

5    A    Okay.  Give me a second.  Okay, I'm ready.

6    Q    I want to focus on the portion of your
7 opinion that refers to eminent bodily harm.  And in
8 your medical practice, do you draw a distinction
9 between mental and physical health?

10    A    I -- I -- I do, insofar as that's helpful
11 for clarifying what a person is -- what kind of
12 diminishment or defect or injury to a person's health
13 they're experiencing, yes.

14    Q    Would you agree that individuals routinely
15 accept risks to their physical health in order to
16 improve their mental health?

17    A    I don't -- I -- I would want to know more
18 about what you have in mind before agreeing or
19 disagreeing with that.

20    Q    So for instance, certain mental health
21 medications come with risks to physical health; would
22 you agree?

Page 203

1    A    Yes, I agree with that.

2    Q    But there are certain instances where
3 individuals are experiencing mental distress and it's
4 determined that a medical for their mental health is
5 worth the risks to their physical health; correct?

6    A    Yes, that's correct.

7    Q    So it's not your assertion that medication
8 should never be prescribed when there's risks to
9 physical health; correct?

10    A    No, of course not.  You could -- you could
11 hardly prescribe anything if that were the standard.
12 What's so strikingly different about medicalized
13 gender transition is that it does not address the
14 mental health issue.  Rather, it turns its attention
15 to manipulating the body in ways that contradict
16 health, in hopes that that will have a side effect of
17 or an effect of improving mental health outcomes.  So
18 it -- it acts actually here as well, directly in
19 contradiction to the ordinary way that mental health
20 is treated.

21    Q    And when you say that it has been shown that
22 there are no improvements to mental health, you're

Page 204

1 referring to the studies that are cited in your report
2 and the ones that were summarized by Drs. Cantor and
3 Laidlaw?

4    A    Well, here what I mean is puberty blocking
5 drugs have no indication for mental health.  They have
6 no physiological rationale.  They are not directed
7 directly at mental health.  They're not directed at
8 dysphoria.  No one who has dysphoria generally takes
9 puberty blockers to treat their dysphoria, and lots of
10 people have dysphoria of all different kinds.

11         So the point here is that they don't treat
12 dysphoria directly; they treat the body to change its
13 characteristics, in hopes that that will result in
14 improvements in dysphoria.  That's not the way
15 psychoactive medications characteristically are used.

16    Q    Understood.  Turning to paragraph 97 of your
17 report.  Here you state that "Plaintiffs' experts do
18 not remotely establish that the necessary conditions
19 justifying such procedures exist in the case of GD and
20 MGT, especially for minors."  Correct?

21    A    That's correct.

22    Q    And which experts are you specifically

Page 205

1 referring to?

2    A    I'm referring to all of them together.  None
3 of them has established this, either individually or
4 as a group.

5    Q    Okay.  And which of Plaintiffs' experts
6 reports have you reviewed?

7    A    I read the report of -- I read the second
8 amended complaint, and I read the report of Meredithe
9 McNamara, and I --

10         THE REPORTER:  Sorry, could you repeat
11 that?  You cut out for a second.

12         THE WITNESS:  So I first read the
13 second amended complaint, and then I read the report
14 of Meredithe McNamara, dated February 8, 2023.  I also
15 read the report of Armand Antomaria, dated February
16 13, 2023.  And I read one other report.  Those are the
17 only two, apparently, I wrote down, so -- and I don't
18 recall another.

19 BY MS. MURPHY:

20    Q    Okay.  So is your opinion on what
21 Plaintiffs' experts have or have not established based
22 on only those either two or three reports that you

Page 206

1 reviewed?

2    A    It is based on the reports that I reviewed,

3 yes.

4    Q    One clarifying question before we move on.

5    A    Oh, actually, hang on.  I also reviewed

6 the -- wait, I may be confusing this case with

7 another.  I think I am.  So that --

8    Q    Okay.  Going back to, this is something we

9 talked about this morning, the Hippocratic Society.

10 Can you tell me when you founded the Hippocratic

11 Society?

12    A    To the best of my recollection, it was in

13 summer of 2023.

14    Q    And is the founding of the Hippocratic

15 Society in any way motivated by the work that you've

16 done with respect to gender-affirming care?

17    A    No, not self-consciously anyway.

18         MS. MURPHY:  I am nearly finished.  And

19 so what I'd like to do is just take a couple minutes

20 off the record to review my notes.  So why don't we

21 say five minutes?

22         MR. BROOKS:  That's fine.

Page 207

1         THE REPORTER:  The time is 4:14 p.m.

2 We are now off the record.

3         (Off the record.)

4         THE REPORTER:  The time is 4:21 p.m.

5 We are now back on the record.

6         MS. MURPHY:  Thank you.

7 BY MS. MURPHY:

8    Q    Dr. Curlin, I just have some concluding

9 questions.  If you were called to testify in this

10 case, does Exhibit 2, which we marked as your report,

11 represent your complete opinion that you were asked to

12 provide in this case?

13         MR. BROOKS:  Objection.

14    A    I'm not certain what you mean by "complete

15 opinion," but it does represent my opinion in this

16 case.

17    Q    Is there anything that you would add that is

18 not currently written in your report?

19         MR. BROOKS:  Objection.

20    A    Not that I'm aware of at the moment.

21    Q    And have you completed all the work

22 necessary, in your point of view, in order to draw the

Page 208

1 conclusions that you made in this case?

2         MR. BROOKS:  Objection.

3    A    I have -- yes, I believe I have.

4    Q    Are there any portions of your report that

5 you would like to amend or retract at this moment in

6 time?

7    A    No, there -- there are not any portions I

8 would like to amend or retract.

9         MS. MURPHY:  Okay.  Dr. Curlin, I want

10 to thank you for your time today.  That concludes my

11 portion of the questioning.  I'm not sure if anyone

12 else has any questions for Dr. Curlin, but I'm

13 finished.

14         MR. BROOKS:  Anybody else from the

15 plaintiffs' side?

16         MS. WILLIAMS:  No questions on my end.

17 Thank you.

18         MR. BROOKS:  And I have no questions

19 for the witness.

20         THE REPORTER:  All right.  Before we go

21 off the record, I'd just like to go over transcript

22 orders.

Page 209

1         MS. MURPHY:  Sure.

2         MR. BROOKS:  On behalf of the defense,

3 I believe that the State of Alabama has a standing

4 order through Veritext, and I don't propose to modify

5 that.

6         THE REPORTER:  Do you have any

7 preference on delivery method?

8         MR. BROOKS:  Like I say, I don't

9 actually know the details of the standing order, and I

10 don't propose to modify it.

11         THE REPORTER:  Okay.  And then, Amie,

12 would you like to order a copy of the transcript?

13         MS. MURPHY:  So similarly, I believe we

14 have a standing order as well, and I'm just going

15 to -- if Andrew knows of anything different, he can

16 chime in and tell me, but just an emailed copy

17 directed to me is fine.

18         THE REPORTER:  In that case, the time

19 is 4:23 p.m.  We are now off the record.

20         (Signature waived.)

21         (Whereupon, at 4:23 p.m., the

22         proceeding was concluded.)

Page 210

1        CERTIFICATE OF DEPOSITION OFFICER

2        I, CHRISTOPHER FRIEBE, the officer before

3   whom the foregoing proceedings were taken, do hereby

4   certify that any witness(es) in the foregoing

5   proceedings, prior to testifying, were duly sworn;

6   that the proceedings were recorded by me and

7   thereafter reduced to typewriting by a qualified

8   transcriptionist; that said digital audio recording of

9   said proceedings are a true and accurate record to the

10  best of my knowledge, skills, and ability; that I am

11  neither counsel for, related to, nor employed by any

12  of the parties to the action in which this was taken;

13  and, further, that I am not a relative or employee of

14  any counsel or attorney employed by the parties

15  hereto, nor financially or otherwise interested in the

16  outcome of this action.

17  Dated:

18  April 19, 2024

19  

20              CHRISTOPHER FRIEBE

21              Notary Public in and for the

22              State of Michigan

Page 211

1        CERTIFICATE OF TRANSCRIBER

2        I, NICHOLE RYAN, do hereby certify that this

3   transcript was prepared from the digital audio

4   recording of the foregoing proceeding, that said

5   transcript is a true and accurate record of the

6   proceedings to the best of my knowledge, skills, and

7   ability; that I am neither counsel for, related to,

8   nor employed by any of the parties to the action in

9   which this was taken; and, further, that I am not a

10  relative or employee of any counsel or attorney

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of this action.

13  Dated:

14  April 19, 2024

15

16

17              NICHOLE RYAN

18

19

20

21

22

Farr Curlin

April 8, 2024

[& - 67]

Page 1

| & | | |
|---|---|---|
| **&** 166:22 | | |

**0**

**00184** 1:8
**0169973** 182:7

**1**

**1** 4:7 15:11,12
16:8,13 33:9
33:17
**10** 5:13 186:19
187:1
**101** 5:20
**103** 5:21
**107** 75:20
76:21 78:4
**10:16** 47:1
**10:26** 47:3
**119** 4:12
**11:57** 94:5
**12** 33:15,17
**120** 4:16
**122** 4:22
**123** 5:7
**12:30** 92:3
**12:32** 114:20
115:3
**13** 205:16
**130** 79:10,11
79:20
**14** 104:18
107:4
**15** 4:7 108:19
109:16 110:15
112:4 180:17
181:7,9

**16** 4:8 138:22
140:7
**163** 5:8
**18** 26:12 63:13
113:10 194:14
194:14
**185** 5:12
**187** 5:16
**19** 63:13
210:18 211:14
**1960s** 35:19
**1:15** 114:22
**1:21** 115:5

**2**

**2** 4:8 16:19,20
17:6 33:11,17
207:10
**2,000** 125:19
**20** 54:11 60:1
103:8,9 115:10
**200** 76:17
**2000** 125:18
**2001** 47:9
**2003** 34:14,17
57:21 129:19
**2004** 34:14,17
**2008** 38:7
**2017** 169:17
**20176** 3:15
**2018** 149:14
**202** 3:9,17
**2021** 125:18
138:6
**2023** 70:6
99:21 100:3
205:14,16
206:13

**2024** 2:2 6:10
210:18 211:14
**20530** 3:7
**22822** 211:16
**25** 30:7
**27** 116:18
117:11
**27710** 2:5
**28** 100:15,16
100:16 102:21
**29** 121:13,13
**29th** 76:13
**2:22** 1:8
**2:47** 167:18
**2:54** 167:20

**3**

**3** 4:9 5:20
78:19,20 79:1
**3,800** 125:18
**30** 60:1 124:6
**31** 129:12
**32793** 210:19
**33** 131:14
133:13 136:12
**34** 136:20
**35** 113:3
**353-1285** 3:9
**36** 138:5
**38** 140:22
141:5
**393-8690** 3:17
**3:14** 180:22
**3:15** 180:15
**3:30** 180:18,20
181:3

**4**

**4** 4:10 119:2,6
**40** 114:18,20
145:15
**42** 146:20
**43** 148:12
**44** 149:16
155:15 156:20
**44180** 3:14
**48** 161:8
**49** 46:14 165:7
165:10
**4:14** 207:1
**4:21** 207:4
**4:23** 209:19,21

**5**

**5** 4:13 12:8
13:1 96:4,13
120:12,16
143:4,9,11
146:17
**50** 46:14
165:10
**51** 168:2,4
**52** 174:22
**54** 177:8
178:14
**55** 179:14

**6**

**6** 4:17 5:21
75:18,22 122:5
122:10
**6629188** 2:7
**67** 184:10

| 7 | a | | |
|---|---|---|---|
| **7** 5:3 33:13 75:19 76:21 123:9,13 | **a.m.** 2:3 6:5 47:1,3 94:3,5 | 123:10 | **action** 65:20 210:12,16 211:8,12 |
| **70** 75:18,22 | **abbreviation** 13:14,18 14:20 148:5 | **accords** 173:22 174:2 | **actions** 71:13 71:14 191:8 |
| **71** 187:15 | **ability** 210:10 211:7 | **account** 32:13 82:9 83:5 84:14 86:21 88:20 139:8 160:2 | **active** 183:14 |
| **78** 4:9 | **able** 48:11,12 49:19 61:18 173:20 192:15 194:15 | | **acts** 165:21 166:3 203:18 |
| **8** | | **accounting** 191:2 | **actual** 141:20 |
| **8** 2:2 4:3 5:8 6:10 94:9 149:19 150:10 150:13 154:9 154:14,18,21 155:17 157:17 162:20 163:1 163:21 195:15 197:19 201:7 205:14 | **abnormal** 141:3,9 142:10 142:17 | **accurate** 103:12,14 106:4,17 107:1 121:9 122:1 123:4 148:21 149:9 157:11 157:15 158:12 159:9,19 193:9 210:9 211:5 | **actually** 13:6 33:9 34:18 54:9 139:12 147:15 153:10 155:16 156:12 163:21 165:10 166:9,13 202:2 202:4 203:18 206:5 209:9 |
| | **abortion** 53:18 | | |
| | **above** 138:17 177:10 | | |
| | **absence** 77:8 151:14 187:18 | | **ad** 41:10 |
| | | | **add** 16:15 207:17 |
| **8's** 195:13 | **absent** 6:16 190:10 | **accurately** 194:6 | **addition** 54:17 |
| **84** 150:12 151:19,22 156:14 197:16 201:6 | **absolutely** 85:6 173:17 177:21 | **achieve** 43:15 | **additional** 116:15 198:3 |
| | | **achieved** 192:11 | **additionally** 6:16 |
| **85** 151:21 152:1 | **academic** 38:15 77:13 | **achieving** 43:11 | **address** 40:6,7 41:19 75:2 80:18 100:12 203:13 |
| **9** | **academy** 14:7 132:18 133:2 149:13 | **acknowledge** 79:13 | |
| **9** 5:9 143:1 185:14,19 186:6 | | **acknowledged** 113:4 121:19 | **addressed** 37:1 |
| | **accept** 13:3 202:15 | **acknowledging** 190:16 | **addressing** 71:14 201:18 |
| **94** 201:22 202:4 | **accepted** 157:13 | **acknowledg...** 6:13 | **adequate** 83:11 84:1 158:16 |
| **96** 202:4 | **accepting** 27:18 | **acronym** 13:13 | **adflegal.org** 3:16 |
| **97** 204:16 | | **act** 198:11,13 | |
| **991** 182:7 | **access** 5:3 60:16,17 | **acting** 170:7 199:8 | |
| **9:03** 2:3 6:5 | | | |

administer
  6:13
administering
  178:10
administration
  105:1 137:15
adolescence
  5:5 123:11
adolescent  4:15
  85:21 120:14
  196:5 200:9
adolescent's
  90:21
adolescents
  18:10 26:18
  54:17,19 109:1
  119:22 132:12
  132:20 139:22
  150:16 152:8,9
  176:3 183:15
  195:19
adult  4:10,15
  28:9 51:14,15
  72:21 119:4
  120:14 190:7
adults  5:7
  26:10,11 54:17
  56:14 123:12
  140:15 151:9
  152:13 153:13
advanced  40:5
  40:9 67:8
adverse  113:4
  138:3 139:16
  192:13 193:12
advice  64:7
advocated
  181:11 183:10

advocating
  183:7
affects  142:3
affiliated  64:11
affiliation
  36:16,18 52:10
  52:14
affirmation
  105:1
affirming  4:18
  5:4,11 13:22
  14:1,4,16
  116:16 117:18
  122:6 123:10
  124:13,21
  126:5,7 129:1
  129:8,10 130:8
  132:5,11,20
  133:6 135:16
  135:22 136:6
  139:20,22
  140:15 162:2,5
  164:10 165:13
  168:13 170:18
  172:4 174:13
  175:9 176:2
  178:11,16
  184:14 185:2
  185:17 193:1
  193:18 194:20
  195:7 196:6
  206:16
afraid  172:17
  172:19
afternoon
  140:11
age  26:12,15
  51:10 97:20

138:22 140:6
  141:21
agency  72:6
ago  8:15 12:2
  30:7 43:3
  131:10
agree  6:14,18
  12:21 21:18
  46:20 85:10
  88:10 89:5
  90:2 119:20
  135:14 141:15
  143:8 154:14
  155:2 202:14
  202:22 203:1
agreeing
  202:18
ahead  31:16
  162:16
aimed  43:11
air  156:6,9,10
  156:11
al  1:5,14 3:11
  6:7
al.'s  116:20
alabama  1:2,14
  6:10 100:22
  102:1 104:6
  209:3
align  65:20
  78:10 90:21
aligned  55:14
  118:19
alive  39:3
allege  117:21
alleges  118:8
alliance  3:13
  7:11 68:4,6,7,8

68:9,16
allowed  19:11
  30:20 61:5
alternative
  82:6
altogether
  139:22
alumni  76:16
ambiguities
  89:16
amend  208:5,8
amended  205:8
  205:13
america  1:8 3:3
  6:8 65:3,7,11
  65:17
american  14:6
  68:12,13
  132:10,16,18
  133:2,5 149:13
amie  3:4 7:8
  8:5 209:11
amie.murphy2
  3:8
analytical
  31:12
anatomical
  88:2
anatomy  78:10
ancient  54:1
andrew  15:15
  162:15 209:15
anglican  65:2,5
  65:6,11,17
animal  184:13
animals  87:20
  143:19

annelou  119:12
annual  76:13
answer  5:18
  16:10 21:4
  38:5,6 86:10
  86:19 101:4
  102:2,12 127:5
  148:15 156:5
  179:13
answered
  86:11 148:3
answering  30:1
answers  98:16
anticipated
  108:22
anticipating
  103:2
antomaria
  104:15 205:15
anxiety  11:6
  56:18 172:7
anybody  46:18
  60:16 208:14
anyway  164:5
  193:15 206:17
apart  10:11
  23:19 41:1,6
  104:12 116:14
  196:20
apologize
  36:12 129:13
apparent  180:2
apparently
  181:11 183:9
  205:17
appeal  151:12
  151:12

appealing
  151:8
appear  9:13,16
appearance
  78:10
appeared
  183:12,12
appears  66:8
  90:13,14,18
  100:19 128:8
applicable  6:22
applicants
  30:21
applied  138:19
apply  151:10
  151:13 152:8
appreciate
  79:4 92:4
  123:16 180:15
appreciated
  173:16
approach  14:7
  150:22 156:16
appropriate
  15:7 98:9
  183:13
approved
  181:10
approximately
  8:14 42:21
  180:15,17
april  2:2 6:10
  210:18 211:14
area  24:13
  30:22 32:1,1
  34:19 35:2
  36:6 123:5
  196:21 197:1

197:12
areas  10:9 27:5
  188:3
argue  102:11
arguing  162:5
  162:7 164:10
argument
  89:22
arguments
  35:20 97:1
  179:21
arm  132:16
  183:14
armand  205:15
arms  175:13
article  4:10,13
  4:17 5:3,8,9,13
  138:6,11 162:4
  162:8,11,16
  163:7,9 164:9
  165:2 169:12
articles  103:11
  103:14
ascribe  156:8
aside  187:14
asked  17:11
  52:9,12 53:8
  62:8 94:12
  100:12 101:7
  101:13 102:8
  103:10,13,16
  103:19 106:1
  106:16 121:10
  127:7 148:2,21
  149:10 153:20
  153:21,22
  182:22 189:16
  207:11

asking  17:7
  33:3 71:22
  79:13 99:13
  101:11,12
  102:6,8 106:22
  189:18 201:2
asks  81:21
aspect  111:7
  112:10,13,15
  134:6
aspects  40:22
assent  154:1,4
  189:19 194:20
  195:4,6,14
  200:20 201:5
assert  111:7
  184:17 192:21
assertion  203:7
assess  89:19
  195:18
assessed
  176:10
assesses  89:20
assessment
  107:5 113:17
  161:7 180:10
  196:1,2,3
assigned  6:3
  25:22
assignment
  88:2
assistance
  53:16
assistants
  173:5
assisted  63:10
associated
  37:22

**association**
4:17 68:11,12
68:13 69:17
122:6 132:4,9
132:11,16
133:6 173:3
174:8

**assume** 24:1
64:20 103:10
103:13,19
121:20

**assumes**
132:13 133:8
140:17 185:8

**assuming**
188:12

**assumption**
103:17

**assumptions**
103:22

**astray** 172:15

**attached** 15:20

**attempt** 90:20
106:7

**attempted** 4:20
122:8 135:17
172:9

**attempting**
107:9

**attended** 18:16
42:22 44:11

**attending** 19:3
20:18 57:22
58:1,19 59:11
60:19 82:21

**attention** 82:19
107:15 203:14

**attitudes** 96:7
96:16 98:18,21
178:7,15

**attorney** 1:12
6:9 9:7 101:11
101:19 104:7
210:14 211:10

**attorneys**
100:22 101:1,5

**attracted** 26:21
27:7,12

**audience** 76:11
76:15 77:11
169:3,5

**audio** 210:8
211:3

**author** 119:11
119:12 123:18
186:3

**authored** 14:6
133:1

**authoritative**
158:12

**authorities**
147:2,22 197:7

**authority** 62:7
63:5,8 72:11
72:15,19,21
73:1,4,17,18
83:14,15 148:5
152:13 153:18
199:4 200:1,3
200:5

**authorized**
6:12

**authors** 117:21
118:3 126:8
129:11 162:4,8

**autonomous**
198:8,20

**autonomy**
71:17,17,18
72:1,3,12,13
150:20 151:9
152:2,12,15
153:17 197:21
198:4,6,7,14
199:2,8,10,13
199:14,17
200:4

**available** 37:17
50:3,4 81:13
113:11,12,13
113:15 135:15
135:18 139:8
175:18 176:11
177:1 195:2

**average** 126:11

**avoid** 23:7 35:4

**aware** 8:18
12:3,12,16
13:21 14:1
52:18 61:17
65:21,22 84:17
123:20,21
132:3,10,15,19
132:22 133:5
139:19 140:2
140:14 174:11
174:15 176:1
184:22 185:3,4
188:2,5,6,10
195:17 207:20

**b**

**b** 4:5 5:1

**back** 21:21
35:9 47:4
93:17 94:6
96:3 110:17
115:6 125:8
127:12 133:12
155:15 167:4
167:21 169:22
171:11 180:18
181:4 206:8
207:5

**backlash**
161:14 164:19

**bad** 11:5,7,20
35:4 41:5
85:11 97:9

**bar** 191:14
192:3

**based** 53:20,22
60:6 85:16
87:8,10 95:14
104:20 108:20
124:15 125:1
130:21 131:7
138:17 139:6
144:21 166:10
184:8 190:21
195:1,1 205:21
206:2

**baseline** 111:17

**basically** 15:19
31:12 50:13

**basis** 64:1,2
74:16 87:3
93:1 142:16

152:5 153:9
179:18,19
190:12 192:6
192:20 193:7
193:16
**bates** 182:4,5
**bear** 91:11
160:2
**beauchamp**
175:2 189:13
**becoming**
11:21 12:2
19:18 108:12
**began** 32:6
39:10 47:8,11
**beginning** 38:1
57:21
**begun** 37:20
**behalf** 3:2,11
209:2
**beings** 19:14
89:15 143:19
**belief** 87:14,16
134:22 183:7
193:16 199:12
**beliefs** 32:15
**believe** 16:3
33:20 68:13,14
76:17 80:5
83:10 85:18
86:3 99:16
100:2,12
101:10 102:18
108:13 151:18
152:7 162:19
190:9,22
192:14 195:20
198:12 208:3

209:3,13
**belmont**
152:12 189:11
189:12
**beneficial**
118:5 193:6,13
**benefit** 40:18
133:20 135:1
153:10,11
158:10 191:16
194:2
**benefits** 40:19
104:22 116:9
131:20 136:21
175:13 177:1
192:7,10,10,22
**best** 24:14
29:13,15,20
37:17 44:2
67:15 68:9
70:5 99:20
110:12,16
118:2,10,19
130:10 136:22
139:7 152:18
152:21 169:15
177:13 179:2,9
186:10 206:12
210:10 211:6
**better** 71:12
175:18 191:13
**beyond** 102:20
109:14 110:4
110:13 114:4
**bibliography**
102:22 105:16
105:18 110:10
113:19

**big** 159:15
**bind** 62:15,17
**bioethics** 45:20
166:20,22
**biology** 17:16
17:19
**biomedical**
31:3
**birth** 25:22
**bit** 19:19 34:11
89:8 198:2
201:11
**blends** 27:4
**block** 92:22
111:12 190:1
**blockade** 43:8
44:4
**blockers** 54:6
58:9,11 66:4
85:21 88:11
90:4 91:5,7
92:14 97:15
119:21 144:19
185:6 204:9
**blocking** 13:19
14:11,21 15:6
87:3,3 111:12
112:9,16,17
138:20 204:4
**blocks** 112:10
190:4
**board** 99:3,5,7
99:13 139:10
181:10
**boarding**
168:19
**bodies** 136:19
142:2 147:2

148:1,9,9
179:9 194:10
**bodily** 109:5
112:22 143:20
150:19 197:21
202:7
**body** 29:1,2,10
29:11,14,16
46:3,5 143:5
143:14,15,18
148:7 203:15
204:12
**boe** 1:5 6:7
**bone** 113:5
189:6,8
**bones** 189:2,5
**book** 4:9 74:22
75:3,4 78:13
78:14 79:1,4,6
79:14,17,19,19
80:5,11,16,18
80:19 82:6
88:16 90:13
93:4,12 94:10
96:11 198:5
**books** 79:22
197:7
**bottom** 146:11
**boundary**
26:14,15
**bowers** 113:4
**brain** 109:4
111:21 112:2,7
112:10
**branch** 182:17
**break** 8:20 9:1
46:10,16 91:19
92:3,5,10

93:15,16 114:8
167:6,10
180:16 191:11
**breaking** 114:8
191:15
**breaks** 8:21
**brianna** 1:5 6:7
**brief** 167:10
202:3
**bring** 9:4,6
166:7 192:7
**brings** 136:11
192:13
**broad** 11:7
21:3 28:8 62:3
**broader** 20:4
77:17
**broadly** 32:12
95:16
**broken** 189:2
**brooks** 3:12
7:10,10 10:7
12:15 14:15
21:11 30:3
44:1 45:3 46:9
46:18,21 53:1
55:3 57:13
65:12 66:18
69:8 73:14
78:22 79:7
86:1,9,11 88:4
88:14 89:9
90:6 91:18
92:1,4,8,11,16
93:17,20 94:11
95:13 98:5,11
99:16 100:21
101:3,15,17,21

102:9 103:6,18
104:3,5 109:11
110:19 111:9
113:21 114:7
114:11,13,21
115:19 116:5
116:12 120:1
122:13 127:1
128:10 129:3
132:6,13,21
133:8 134:14
134:20 139:1
140:1,8,17
148:2,20
154:11,16
160:15 162:18
163:3,14
164:12,22
167:3,11,14
169:14 177:17
182:1 185:8
195:9 206:22
207:13,19
208:2,14,18
209:2,8
**brought** 67:16

**c**

**c** 3:1 6:1
**call** 53:17
58:21 59:2
88:18 89:3
152:10 154:18
172:21
**called** 7:18
14:9 22:10
25:14 28:17
31:13 42:19

45:6 49:8 59:7
59:12,13 68:13
69:14,17 82:18
117:4,8 120:13
207:9
**calls** 30:3 195:9
199:20
**campaigns**
172:20
**cancel** 77:9
172:11
**cancelled** 168:8
168:18 169:8
170:2,4
**cancelling**
168:19
**cancer** 67:8
139:18
**cancers** 113:9
**candid** 158:19
**canter** 119:15
**cantor** 103:11
104:21 105:7
106:3,14 107:5
108:21 109:9
109:15 111:17
112:5 113:14
113:18 114:5
115:15 116:10
117:12 118:16
118:17,18
121:6,18 122:1
123:3 124:1
136:8,22 137:8
147:11,21
148:11,22
149:1,11
156:21 157:11

157:14,20
159:9,18 179:6
186:14 187:13
193:8 194:6
204:2
**cantor's** 105:20
121:14 124:9
**capable** 144:8
185:5 190:6
**capacity** 1:12
6:9 62:6,9
72:22 176:21
196:3
**cardiovascular**
113:8 139:17
**care** 13:22 14:2
14:4,16 26:16
38:8,10 39:20
39:20,21,22
40:15,20,20
47:9 48:20
49:14 51:20
54:13 55:17,21
56:1,4,6 60:4
62:18 64:3
66:22 67:7
68:2 116:16
117:18 129:1
130:8 132:5,11
132:20 133:7
135:16 136:6
139:6,20,22
140:15 149:22
150:13,17
151:11 154:22
155:20 160:8
162:2,5 164:10
165:13 166:20

168:13 170:18
172:4 174:13
175:10 176:2
177:6 178:11
178:16 184:14
185:2 188:18
193:1,18
194:20 195:7
196:6 200:18
206:16
**cared** 20:11
67:2
**career** 173:7
**carefully** 174:9
**caring** 39:3
48:17 49:12
**carolina** 6:11
18:19
**carried** 28:17
57:5,17
**carry** 138:3
**case** 1:7 8:16
9:15,17 10:11
12:21 16:8,18
17:4 29:8 30:6
35:7 40:12
59:18,20,22,22
60:2,4 61:6
62:4,22 63:9
63:13 64:11
65:21,22 72:8
77:4 86:21
87:2,5,6 89:15
91:4,8,11
92:18,19 98:13
98:15 99:14,15
100:12 101:19
102:14 103:15

104:8,12 117:5
118:7 127:4
128:14,15,21
133:11 144:1,6
146:6,7 153:19
154:5 156:10
158:10 160:1
170:22 174:6
174:20 175:9
177:19 189:20
190:3,14 191:5
192:9 194:4,22
204:19 206:6
207:10,12,16
208:1 209:18
**cases** 29:6 30:7
35:21 61:7
62:5 63:1
74:14 86:5
100:5,7 104:4
104:10 152:19
152:20 172:13
190:8 191:5,9
**cass** 174:1
**cast** 131:21
**category** 54:8
147:17
**catholic** 68:11
**causes** 27:8
**causing** 53:16
54:3
**center** 34:4,7,8
34:13,15 35:11
36:15,17,21
47:10,15,16
48:5,14 51:7
51:10 54:10
55:8 77:16

99:10 166:21
**central** 70:20
71:9 100:13
**certain** 8:12
43:11 44:5
52:16 79:20
85:15 104:9
112:7 160:19
180:12 194:12
200:2 202:20
203:2 207:14
**certainly** 22:12
28:22 86:12
95:21 108:1
146:18 175:22
**certainty** 52:2
133:19 192:12
**certificate**
210:1 211:1
**certified** 6:19
**certify** 210:4
211:2
**chair** 171:2
**challenge**
50:18 189:10
**challenges** 39:7
**challenging**
40:7
**chance** 175:14
**change** 134:1
204:12
**changes** 16:12
16:14 17:12,14
**changing** 12:19
**chapel** 17:17
17:19 18:17,19
**chapter** 12:9
75:1 198:5

**character**
176:10
**characteristic**
57:7 196:18
**characteristic...**
27:8 49:13
72:12 142:1
204:15
**characteristics**
10:22 14:8
15:1 32:3,4,11
32:13 37:21
55:14 90:16,22
97:11 112:19
137:14 144:3,5
144:6 145:3,11
145:13 146:4,6
146:9 191:21
204:13
**characterizati...**
102:10 169:10
**characterize**
154:21
**characterized**
27:1
**chart** 60:10
**check** 79:11
182:2
**checking** 33:18
**chen** 116:20
118:2,14
**chen's** 118:17
**chicago** 26:3,6
34:9 35:14
39:11,14 47:17
48:1,11 55:17
57:22 58:3,18
59:1 76:15,18

78:2 169:17
173:15 179:22
**child** 153:11
188:8,14
191:22 200:13
200:16,20
201:2
**child's** 153:5
191:11 200:9
201:16,19,20
**children** 26:16
51:14,15 54:17
62:18 63:2
109:1 151:11
152:16,18,19
153:5,17,22
154:2,4,7
155:9 192:16
197:14 199:12
199:22 200:19
201:14
**children's**
152:21 153:2
188:18
**childress** 175:3
189:13
**chime** 209:16
**choice** 24:22,22
62:7 188:13,18
**choices** 49:15
**choose** 18:21
24:20 26:20
**chose** 19:18
32:1,2,3 48:10
**christ** 48:17
**christian** 34:3
34:7 47:10,14
47:16 48:4

49:5,8,14,16
49:21 51:6,10
53:20 54:10
55:7 64:21,22
65:15,16,20
66:2,5,11
68:10
**christianity**
48:19 54:1
64:6,12,14
66:9
**christians**
51:16
**christopher** 2:6
6:3 80:12
210:2,20
**chronic** 56:17
**church** 65:2,5
65:6,11,16,17
**circumstances**
63:21
**citation** 127:9
**citations** 149:6
**cite** 10:6 12:9
118:14,20,22
121:14,18
138:6 141:20
**cited** 105:13,15
105:17,19
111:18 113:19
116:14,20
138:15,17
147:19,20,20
204:1
**city** 48:7
**civil** 3:5,6 71:2
76:22 77:8

**claim** 131:18
136:11
**claimed** 104:22
118:3
**clarification**
156:19
**clarify** 117:7
135:2 151:18
160:6 183:3
192:19 199:11
**clarifying**
94:21 202:11
206:4
**class** 18:5,9
**classes** 18:9
**classic** 140:9
**clear** 67:1
107:3 134:7
151:22 164:22
170:20 177:11
183:10 197:10
**clearly** 85:13
136:9 170:21
**client** 86:10
101:11,19
**clinic** 42:19
47:12 48:20
52:21 54:15
56:7,9,13
139:6,14,19
**clinical** 11:13
11:16 24:2,4
24:15,21 25:3
25:5 26:9,13
27:4 30:10,14
30:19 31:16
32:14 33:21
34:1,6,16,20

35:11 36:1,4
36:21 37:22
39:2,6 40:8
41:12,21 44:18
44:19 47:7,8
47:11 58:19
59:5,8,16,17
59:20 60:2,4
61:3,5 66:14
66:16 68:2
70:20 72:9
76:14 77:1,16
84:11,22 86:20
99:11 128:6
142:12 146:19
154:14,18
155:2,5,6,8,11
158:1 175:3
176:18 180:11
181:11,15,17
182:19 183:8
183:19 184:5
188:21 200:1
**clinically** 25:15
39:18
**clinician** 31:14
31:17,18,19
**clinicians** 59:4
69:21 157:21
161:14 177:12
178:22 179:15
180:3
**closed** 171:19
174:2
**coast** 91:21
**coded** 25:15
**cognitive** 72:22
190:5 195:19

196:4
cohort   38:16
124:15 125:1
colleagues   64:9
165:16,20
172:22 182:3
197:8
collecting
118:6
collection   11:6
college   68:12
collegial
104:14
come   66:20
77:15 87:2
112:19 171:8
177:2 180:18
190:19 194:10
198:14,16
202:21
comes   27:2
80:4 109:22
112:11
comfortable
86:13
coming   192:6
comma   156:17
comment
185:11
commenting
77:7
comminuted
189:3
commissioned
139:9
commit   19:12
commitment
54:3

commitments
32:8 71:5
committed
50:6 51:18
70:19 71:2
165:21
committee
58:22 59:3,7
156:22 157:7
common   49:5
commonly
156:6
communicati...
101:5,12,22
102:4,7,11
communities
32:5
community
34:8 76:18
77:17 171:15
175:5,8 177:11
177:12 178:22
179:1
compared
126:4
compensate
158:21
competitive
30:20
complaint
205:8,13
complaints
56:13
complete   17:21
18:13 21:22
207:11,14
completed
22:17 23:11

24:1,3 25:7
26:2,4 30:9,13
34:13,17 35:15
36:21 38:3,10
41:2,3,7,16,18
207:21
completing
37:18
complex   19:1
27:11
compound
55:3 113:21
comprehend
194:16 196:10
comprehensive
56:22 107:22
comprehensi...
26:21
computer
110:20
concede   156:11
conceding
80:22
concept   71:9
71:10 73:19
151:8,11,13
154:5
concepts   35:21
concern   72:4,4
166:6,8 170:21
173:22 201:14
concerned
170:7,11 174:4
concerns   25:17
25:20 55:10,13
56:14 76:9
77:5,10 161:12
161:16 164:17

164:20,21
165:13 166:14
171:22 172:12
173:18
concession
190:13
conclude
126:13 128:22
130:7,10
concluded
129:4 130:13
139:11,14
147:4 192:22
209:22
concludes
208:10
concluding
207:8
conclusion
107:6 109:16
121:14 147:5
147:10 150:3
157:2 184:4
192:6 194:9
conclusions
125:13 156:21
157:15 161:2
190:18 194:8
208:1
condemn
174:18
condition
12:12 13:1
29:5 49:8 55:7
128:7,21 131:2
146:3
conditional
107:1

| | | | |
|---|---|---|---|
| **conditions** 22:5 | **conflict** 158:6,7 | 173:10 | **consults** 61:11 |
| 22:7,13 26:10 | 158:18,22 | **consider** 28:20 | **cont'd** 5:1 |
| 27:15,17,20,21 | 159:13 160:4 | 91:4 97:5,7,12 | **contact** 130:22 |
| 28:1,3,5,12 | 160:20,21 | 97:14,17,19,21 | **contacts** |
| 56:16,17 155:3 | 201:8 | 98:3 101:1 | 130:18 |
| 190:3 194:12 | **conflicts** | 106:13 108:8 | **contend** 68:16 |
| 195:6 204:18 | 156:21 157:3,6 | 121:10 136:3,3 | **contending** |
| **conducive** | 157:12,18 | 136:4 152:18 | 101:18 |
| 153:10 | 158:13,17 | 175:13 176:21 | **context** 11:12 |
| **conduct** 27:18 | 159:3,6,6,10 | 178:10 186:12 | 11:15 12:17 |
| 38:5 107:4 | 159:17 | 187:21 | 14:22 23:8 |
| 113:16 178:14 | **conformity** | **considered** | 28:12 39:2 |
| **conducted** | 172:11 | 100:17 110:11 | 44:19 47:13 |
| 98:17 136:19 | **confounding** | 121:4 142:9 | 57:5 70:15,16 |
| 149:12 178:6 | 134:1 | 186:15 188:22 | 71:16 93:8,10 |
| 196:11,16,22 | **confusing** | **considering** | 93:11 94:21 |
| 197:1 | 36:14 206:6 | 71:11 81:1 | 141:14,14 |
| **conducting** | **confusion** | 183:19 184:5 | 142:13,15 |
| 96:5,14 106:20 | 199:17 | **consistent** 21:5 | 165:18 |
| 108:3 | **congruence** | 21:8 50:20 | **continued** |
| **conference** | 25:21 88:1 | 53:9 59:6 | 47:13 109:21 |
| 42:22 43:2,5 | **conscious** 19:2 | 62:20 63:14 | 130:22 131:7 |
| 43:14,19 45:19 | 194:3 | 68:17 78:11,12 | **continues** |
| 60:2 61:6 | **consciously** | 91:14 92:21 | 31:18 |
| 76:14 | 35:18 59:2 | **constituent** | **continuing** |
| **conferences** | 151:6 206:17 | 20:1 | 41:1,6,11 |
| 41:19 42:1,6 | **consent** 73:18 | **constitute** 7:4 | 67:19 |
| 42:12,17 44:12 | 73:20,22 83:16 | **consult** 58:17 | **continuity** |
| 44:15 45:1 | 153:14,20,22 | 58:20 59:1,4,8 | 47:12 |
| 75:9,14,15 | 154:4,6 187:21 | 59:10,12,13,15 | **contradict** |
| 180:1 | 189:8,16,19 | 60:14 61:4,10 | 66:11 74:18 |
| **confident** 58:6 | 190:6 191:6 | 61:12,14,18,20 | 83:18 90:18 |
| 196:8 | 192:18 195:14 | 64:16 65:18 | 91:15 172:13 |
| **confidential** | 196:12,19 | **consultant** | 188:11 191:19 |
| 165:19 | 197:3,4,14 | 67:16 | 201:20 203:15 |
| **confirm** 120:7 | 199:7,9,10 | **consultation** | **contradicting** |
| 125:2 129:21 | **consequences** | 60:9 | 83:20 |
| | 135:21 139:16 | | |

**contradiction**
203:19
**contradicts**
66:2,7 90:15
131:18 138:1
154:3 160:17
191:7
**contrary** 90:3
90:10
**contrast** 40:10
**contributors**
27:10
**control** 183:14
**controlled**
187:19 188:3,7
188:19 189:1
**controls** 126:4
**controversial**
96:7,17,19
97:6,13,16,18
97:19,21,22
98:4 178:8,11
**controversy**
96:22
**convenient**
167:6
**conversation**
99:17,19
**conviction**
80:15
**cook** 47:18
**cooperation**
201:5
**copy** 9:8,10,14
9:16 15:11,14
16:3,5,6,12,17
17:4,5 78:14
78:18 79:1,3

79:14,15,16,19
79:21 80:4
209:12,16
**cord** 188:8,15
**corners** 173:4
198:21
**corollaries**
40:18
**corollary** 73:16
**correct** 9:14
13:13 17:9,10
17:17 18:17
26:3 29:17
30:11 33:14,18
37:6,7 38:9
47:10 55:18
57:20 64:21
67:14,15 79:12
79:16 81:5
93:6,7 94:12
94:13,19 96:8
96:17,18
100:18 105:3
105:16 109:6
110:11,12
115:15 116:19
117:15 119:13
120:9 121:3,17
121:20,22
124:9 125:3,4
126:15 129:2
129:19,20
132:1 135:16
137:4 138:22
143:6 145:17
145:22 146:12
147:7,8,19
149:9,22 150:1

151:19 153:20
157:1 161:17
161:20 162:2
162:10,21
168:9,10
169:18,20
171:7,10,15
175:3 177:16
178:8,11
179:16 181:13
183:20 187:10
187:22 194:17
201:9 203:5,6
203:9 204:20
204:21
**correction**
177:22
**correctly**
129:14 151:17
153:2 163:13
**corruption**
51:8
**counsel** 3:21
7:6,22 46:9,15
65:19 78:22
91:18 102:1
110:19 140:8
167:3 182:1
210:11,14
211:7,10
**counteracts**
138:1
**countervailing**
190:10
**countries**
190:18
**county** 47:18

**couple** 8:15
15:9 34:10,11
47:7 50:8
68:15 73:15
75:13 198:3
206:19
**course** 22:21
32:7 41:20
65:19 80:14
161:1 173:22
180:5 187:5
194:9 203:10
**courses** 22:8,11
23:16,17,20
41:10,11
**coursework**
17:21 18:1,13
18:14 21:21,22
22:2,4,6,12,12
22:14,17,19
23:1,10,13,14
31:9 41:14
**court** 1:1
102:17 127:11
**covered** 101:10
**credentials**
106:13
**criminalized**
134:13 135:6
162:6
**criteria** 195:13
**critical** 168:20
168:22
**criticism** 154:9
154:13
**cross** 13:19
14:12,22 15:6
43:8 44:5 54:6

58:13,14 66:4
67:9 87:2
91:13 97:15
137:12 138:20
142:5,14 145:7
182:20
**cruz**  186:3
**crystal**  183:10
**cs6629188**  1:22
**culin**  166:13
**culminate**
32:16
**culminated**
32:18
**culture**  26:22
77:9 172:11
**curlin**  2:1 6:7
7:17 8:4 16:3
47:6 79:4,11
94:9 102:20
115:9 119:17
119:18 120:22
127:5,19
140:14 151:16
165:8 168:2
181:6 186:8
207:8 208:9,12
**curlin's**  4:7,8
15:11 16:17
**current**  113:4
**currently**
105:2 175:21
207:18
**customary**
42:5 52:13
106:19
**cut**  205:11

**cv**  1:8 4:7 9:7
9:10,14,17
15:9,11,15
16:4,7,12
17:12,15 32:20
33:9,13 34:1
42:3,4,5 46:2
55:21 58:16
75:15,18 78:3
197:5
**cynthia**  3:21
186:3

**d**

**d**  4:1 6:1
**d.c.**  3:7
**danish**  124:14
124:22
**data**  59:17
108:3,4 118:6
154:20 161:7
176:22
**date**  2:2 33:10
126:6 129:9
171:8
**dated**  205:14
205:15 210:17
211:13
**dawned**  39:2
**day**  43:2
168:18
**de**  119:3
**deal**  80:6
159:15
**deals**  40:8
**dean**  170:6,7
171:2

**death**  53:16,17
54:3
**debate**  71:3
**december**
100:2
**decided**  138:19
**decidedly**
152:4
**decides**  102:17
**deciding**
106:14 196:5
**decision**  47:21
62:8 72:7,22
139:6 151:5
152:3 200:10
200:12
**decisions**  32:9
40:8 62:15
72:9 153:3
199:15 200:1
**decline**  53:11
**declined**
126:14
**declining**  184:1
**decrease**  126:6
129:9
**decreased**
125:22 128:2
**dedicated**  45:1
**deeply**  151:14
**defect**  202:12
**defendants**
1:15 3:11 7:12
103:3
**defending**  3:13
7:11
**defense**  209:2

**defer**  59:7
179:15
**define**  10:19,20
13:16,17 14:3
31:15 39:15
50:12 70:17,18
96:19 175:8
198:4
**defined**  40:3
**definitely**
27:22
**definition**  11:3
12:7,11 13:4,5
50:9 175:5
**definitively**
130:21 131:3
**degree**  17:16
17:18 22:9
82:4
**degrees**  153:14
**dela**  186:3
**delaying**
135:21
**delivery**  209:7
**demand**  74:1
83:17
**demands**  20:4
95:2
**demonstrating**
150:14
**denmark**  108:3
125:16 147:13
147:15
**denomination**
65:1
**dental**  68:11
**deny**  74:6,10
74:12

denying   135:21
department
  3:5 171:3
depend   128:20
dependence
  137:3,10
dependent
  112:7 113:9
  190:2
depends   25:18
  74:3 100:1
  108:10 111:11
  133:15 135:7
  144:15 200:11
deposition   2:1
  6:6 7:2 8:7,14
  8:20 9:5 10:2,8
  10:13,17 13:2
  13:9 80:3
  102:15 150:7
  152:7 210:1
depression
  4:19 56:18
  122:7
describe   20:22
  28:6,8 30:2,17
  35:10 38:13
  43:4 58:16
  61:2 77:1 78:7
  81:8 82:11
  84:18 98:14
  115:17 141:18
  146:2 150:2
  152:6 161:16
  181:21 182:12
  198:15 199:10
described
  12:13 13:1

21:20 28:21
29:22 40:4
45:11 49:22
55:22 66:8,8
84:13 87:13
97:18 124:8
136:8 146:14
147:18 149:1
193:10,13
194:6
describing
  123:4 128:14
  128:15
description   4:6
  5:2 59:21
  106:17 107:1
  109:12 112:6
  115:20 118:18
  121:6 122:2
  123:3 149:11
  158:11 159:18
  175:3 190:13
  193:9,12
descriptions
  103:10,13
  106:3 115:13
  142:20 144:15
  144:22 145:1
  157:10,10,19
  159:8
descriptor
  185:15
deserve   49:10
designed   37:14
  38:5,14 187:19
desire   137:13
desires   88:21
  198:22

despite   29:15
detail   10:5
  18:11 98:15
  130:4
detailed   30:6
details   18:3
  22:3 34:18
  43:9 52:12
  61:15 62:4
  76:5 92:18
  118:13 125:7
  125:11 127:22
  136:3 182:16
  195:16 209:9
determination
  150:17,20
  151:7 152:4,8
  154:2,6 155:22
  197:22
determine
  133:13
determined
  203:4
detransitioners
  76:22
develop   109:3
  145:4
developed
  35:18 157:17
  185:1
developing
  30:22 39:13
  145:5 158:1,5
development
  90:16 92:22
  93:2 109:4
  111:21 112:2,7
  112:11,14,18

113:5,7 138:2
145:11 160:13
190:4 191:20
191:21
develops   39:17
deviations
  141:21
devoted   48:8
  82:20
diabetes   56:19
diagnose   28:3
  28:4 55:6
diagnosed
  28:15 125:17
diagnosing
  22:5,6,13
  23:12 98:18
diagnosis   23:14
  25:12 28:17
  29:19,21 30:1
  55:1 57:3,5,17
  58:11 97:5,7,8
  97:13 124:14
  124:22 144:8
  176:13
diagnostic
  143:3
dialogue   61:7
  178:21
dictating   52:16
differ   40:1
difference
  14:13 95:18,20
  177:20
differences
  32:13 64:1,3
different   23:6,6
  29:3,16 34:2

62:16 63:20 67:14 73:7 81:2 110:2 114:10 136:19 189:14,17,18 198:7 203:12 204:10 209:15

**differently** 80:1 89:11

**differs** 85:11

**difficult** 39:18 40:5 173:5

**difficulties** 172:9

**digital** 210:8 211:3

**dignity** 49:6

**dilemmas** 166:20

**dimensions** 38:18

**diminished** 20:19 62:6 173:9

**diminishing** 39:19

**diminishment** 202:12

**direct** 46:7 68:2 157:17

**directed** 204:6 204:7 209:17

**directly** 36:4 68:20 100:10 105:10 106:6 119:19 122:22 123:1 124:2 160:17 187:11

203:18 204:7 204:12

**disagree** 21:18 21:20 102:9 190:17

**disagreeing** 202:19

**disagreement** 108:18

**disagreements** 85:13 89:17 97:3

**disagrees** 79:5

**discern** 29:9 50:20 70:21 89:16

**discipline** 26:8 39:13

**disclosed** 160:21

**discomfort** 97:9

**discontinue** 139:21

**discourse** 76:22 77:8

**discrimination** 63:22 64:1,2

**discuss** 46:8 156:20

**discussed** 23:19 41:3,7 41:16 43:5,7 66:14

**discussion** 22:18 23:11,21 43:10 60:6 166:19 176:5

176:15

**discussions** 43:11 44:17 45:1

**disease** 56:21 139:17 141:13

**disorder** 141:13 142:3 143:3,5,9,11 143:12,13,15 143:17,22 144:1,4 145:16 145:22 146:2

**disordered** 29:12 146:12 146:15,16

**disorders** 56:20,21 143:4 143:18,20,21

**dispassionate** 161:7

**dispense** 8:17

**displayed** 28:19 55:2

**displaying** 66:15

**disposed** 176:20

**disproportio...** 191:17

**dispute** 108:18 163:17

**disputed** 105:3 108:17

**disqualify** 158:14

**dissent** 171:14

**distinction** 56:2,3 202:8

**distinguish** 107:17

**distinguishing** 51:19

**distract** 170:8 170:14

**distress** 25:20 88:1 97:9 203:3

**distributed** 31:5

**district** 1:1,2

**diverse** 28:9

**division** 1:3 3:5

**doctor** 161:5 191:10

**doctor's** 149:20 155:12,18

**doctors** 152:17 176:12 200:18

**document** 117:13 120:2 182:3,5,14 183:3,5,6 184:8,8 185:15

**documented** 121:15

**documenting** 161:12

**documents** 9:4 9:6,19,21 10:6 106:6 147:19 181:20,21 182:12 184:3

**dog** 171:19

| | | | **e** |
|---|---|---|---|
| **doing** 44:4 55:9 | **drafted** 183:4 | **durham** 2:5 | **e** 3:1,1 4:1,5 |

**doing** 44:4 55:9
85:5 172:10
194:12
**doj** 3:20
**doors** 161:2
174:3
**dorothy** 76:13
**dosage** 127:21
**doubt** 87:8
131:22
**doubtful** 87:1,8
91:13 92:21
195:2
**doubtfulness**
87:10
**downloaded**
78:14,19 79:8
79:14,19,21,22
**dr** 4:7,8 6:6
7:17 8:4 15:11
16:3,17 47:6
79:4,11 94:9
102:20 104:14
105:20 106:11
106:12 111:17
111:17 112:5
113:14,14
115:9 119:15
119:17,18
120:22 121:14
121:18 123:22
124:1,9 127:5
127:19 136:8
140:14 151:16
165:8 168:2
174:1 181:6
186:8 187:13
207:8 208:9,12

**drafted** 183:4
197:11
**drafting** 120:8
186:12
**draw** 59:18
64:6,9 107:6
109:15 125:13
202:8 207:22
**drawn** 48:1
110:6
**dropped**
110:20
**drs** 103:11
104:21 105:6
106:13 107:5
108:21 109:9
109:14 113:18
114:5 115:14
116:10 117:12
136:22 137:8
156:20 186:13
187:12 204:2
**drug** 137:22
**drugs** 13:19
15:6 142:9
204:5
**dsm** 12:8 13:1
143:4,9,11
146:17
**duke** 42:20
44:10 45:8,9
99:11 167:1
173:12,13
180:1
**duly** 7:18
187:21 192:17
210:5

**durham** 2:5
6:10
**dysfunction**
56:19
**dysphoria**
10:18,19,20,20
11:2,4,5,9,22
12:4,8,13,20
12:22 13:8,20
23:12,15,21
25:12,14 28:15
28:18,21 29:19
29:21 42:8,13
43:7,18,22
44:13,21 45:18
54:7 55:2 57:3
57:5,7,11,12
57:18 58:5,9
58:12 64:17
66:5,16 67:22
74:21 75:6,8
75:10,12 85:22
87:4 88:12
90:5 91:9
92:15 97:6,8
97:16 98:18
100:9,11
117:14 119:22
125:17 143:8
143:10,22
144:9,14,20
145:8,16,21
149:4 204:8,8
204:9,10,12,14
**dysphoric**
138:21 140:4,6

**e** 3:1,1 4:1,5
5:1 6:1,1
163:14,14
**earlier** 70:16
110:7 169:16
198:2 199:12
**early** 173:6
**east** 91:21
**economic** 49:3
**edition** 94:12
**education** 38:8
38:11 41:2,6
41:10,11 95:15
**educators** 21:8
21:12
**effect** 113:4
134:15 136:1
169:1 203:16
203:17
**effective** 118:5
118:9
**effectively** 31:2
31:6 63:22
151:8 152:13
174:4
**effectiveness**
119:21
**effects** 138:4
192:13 193:12
**efficacious**
117:19,22
**efficacy** 116:16
117:13 135:15
149:3 150:15
151:14

Farr Curlin

April 8, 2024

either   9:10
14:11 62:19
100:21 110:9
205:3,22
elaborate
19:20 89:8
201:11
elective   53:18
electives   22:10
22:15
elevated   126:2
128:4
email   172:20
185:22
emailed   209:16
emblematic
89:2
embraced
64:13
embraces
66:10
embracing
95:6
emerge   36:1,4
emerged   33:4,5
33:5 59:15
60:5
emerging
64:12
eminent   133:18
202:7
emotional
190:5 195:19
196:3,4
emphasis   35:22
49:11 155:21
156:2

emphasize   59:3
72:14 82:4
150:18 197:20
emphasizing
198:17
empirical
37:16 96:6,15
98:17,20 178:6
178:14 196:14
196:22
empirically
32:13
employed
210:11,14
211:8,11
employee
210:13 211:10
employment
44:9 166:9
encompasses
31:1
encounter   58:4
encounters
66:15 67:21
encourage
140:10
encouragement
32:10
ended   81:18
endnotes
124:16
endocrine
148:14,19
149:1,5
endorsed   64:13
enduring   54:2
enforcement
3:6

england   108:2
116:21 147:13
147:16 179:7
english   148:5
enjoy   19:10
enjoyed   19:8
39:6,7
ensure   105:21
161:1
entailed   30:18
enthusiastic
133:3 180:7
entire   79:1,3,6
89:14
entitled   73:13
124:12
environmental
36:3
epidemiology
31:4
equip   37:14
equipoise
175:3 176:18
179:16 180:11
erectile   56:18
es   210:4
especially
113:6 164:2
204:20
esquire   3:4,12
essays   172:7,17
essentially
26:14
establish   88:21
204:18
established
205:3,21

estrogen
182:20 183:14
et   1:5,14 3:11
6:7 116:20
ethical   12:4
39:7 45:14
59:6,18,20
64:9 66:7 76:9
77:5 82:20
87:11 99:6
100:13 108:15
152:2 172:14
181:12 183:16
199:20
ethically   66:1
74:10,12 192:3
194:3
ethicist   12:2
ethicists   95:22
165:11
ethics   20:4
31:5 34:13,16
34:20,22 35:12
35:17 36:3,8
36:22 37:3
44:19 51:1
58:16,19,22
59:8,12,14,16
60:2 61:3,6,18
61:20 71:10,15
73:21 75:1
76:14,19 77:1
77:14,16,22
80:13,17 82:10
82:19 83:21
85:8,13 89:13
89:17,19,21
92:22 95:2,16

Farr Curlin                                                                    April 8, 2024

[ethics - expressed]                                                              Page 18

95:16,18 99:11
106:19 150:16
151:4,5 152:11
157:13 179:22
180:2 197:2
198:12
**euphemism**
14:4,16
**evaluate**
194:16
**evaluation**
106:21
**events** 69:4
170:9
**eventually** 33:6
**evidence** 107:5
115:21 121:7
128:17 132:14
133:9,17
135:15,18
136:8,22 137:6
137:7 139:9
140:18 147:4,5
149:2 150:14
151:14 175:13
176:11 180:4
184:18 185:9
190:10,19
191:2 193:8
194:5,8 195:2
**evident** 171:13
**evidentiary** 7:1
**exact** 148:4
**exactly** 48:15
99:20 136:15
170:19
**examination**
4:2 8:2

**examine** 185:1
**examined** 7:20
**example** 14:5
21:17,19 42:18
49:18 51:3,7
57:1 89:21
95:6 110:3
158:21 159:22
188:22 190:7
196:17
**examples** 53:13
56:15 57:1
61:22 62:2
64:4
**excellence**
31:12 48:18
**excellent** 17:11
93:19 114:15
167:12
**except** 25:8
31:2 51:19
85:4,17 126:17
148:5 154:7
184:6 186:13
194:12 200:2
**exceptionally**
137:19
**exclude** 175:22
**exemplars**
27:13
**exercise** 72:6
149:20 155:12
155:19
**exhibit** 4:7,8,9
4:10,13,17 5:3
5:8,9,13 15:11
15:12,20 16:1
16:8,13,19,20

17:6 78:15,19
78:20 79:1
119:2,6 120:12
120:16 122:5
122:10 123:9
123:13 162:17
162:20 163:1,4
163:21 185:14
185:19 186:6
186:18,19
187:1 207:10
**exhibited** 87:22
**exist** 155:2
156:22 204:19
**existed** 157:6
**exists** 158:7
**expanded**
181:10 183:19
**expanding**
184:5
**expansion**
183:8
**expect** 128:19
190:11
**expected**
145:12 146:8
158:9 189:6
**experience**
19:10 27:3
29:16 40:4
83:12 128:6
179:20,21
180:13
**experienced**
10:21
**experiences**
27:11 32:4

**experiencing**
28:10 88:12
90:5 97:9
202:13 203:3
**experiment**
191:12
**expert** 4:8
16:18 45:12
66:9 86:22
99:18 100:4,6
101:18,22
104:13 107:10
115:14 158:15
179:8
**expertise** 39:17
60:7 107:17
158:16 160:19
176:8
**expertly** 37:16
84:7
**experts** 108:1,8
108:13 136:19
144:22 147:12
158:5 159:16
161:14 164:3,5
164:5 177:13
190:17 194:10
204:17,22
205:5,21
**explain** 11:3
14:13 152:5
**explicitly** 157:9
193:5
**express** 25:20
55:10 172:18
**expressed** 29:8
55:13 57:6,11
132:17 165:12

Farr Curlin

April 8, 2024

166:6 169:11
173:17 174:2
199:6
**expressing**
172:1,4
**expression**
138:2 151:2
156:18 171:13
**extensive**
139:12,15
**extent**  41:9
85:12 133:15
141:17 176:22
**extra**  49:18
**extreme**  87:22

**f**

**face**  59:5
**faced**  64:5,8
**faces**  200:13
**facilitate**  63:17
112:18
**facing**  39:5
62:11
**fact**  52:5 71:21
83:13,13 84:10
93:1 110:1
121:19 131:7
137:12 140:3
143:2 154:5
158:15 160:16
162:8 189:21
194:11 200:16
**factors**  134:1
135:8
**facts**  60:8 87:6
132:14 133:8
140:17 185:8

**faculty**  33:12
35:16 45:13,19
45:20 60:1
77:15 99:10
166:18,21
179:22
**failure**  109:3
**fair**  81:4 84:11
87:7 95:11
120:5 148:12
164:9 165:4
180:9 184:16
186:11
**fairly**  86:8
**fall**  45:14 54:7
99:21 182:13
**false**  128:13
**familiar**  11:8
11:11,13,21
12:7,10 68:3,5
122:19 195:20
**families**  62:19
194:1
**family**  20:11
24:17 61:10
171:3 190:16
200:18
**far**  47:17 50:8
66:11 107:2,9
165:2 184:18
**farr**  2:1 6:6
7:17 8:4
166:12
**fashion**  172:21
**father**  19:6
20:10
**fatigue**  56:18

**favor**  43:21
**fda**  181:11,18
182:17,18,22
183:1,4,7,11
183:13 184:4
**fda's**  183:12
**fear**  77:9
165:12 171:13
171:20 172:2,3
172:16
**feature**  32:9
**features**  29:1
190:1
**february**
205:14,15
**federally**  34:8
**feel**  86:13,14
**feeling**  11:5,7
97:9
**fellow**  33:12
34:5
**fellows**  35:16
59:16 76:14
77:15
**fellowship**
30:12 32:6,7
33:5,6,20,22
34:12,14 35:9
35:12,15 36:5
36:7,19,22
37:4 48:12
76:16
**fellowships**
30:8
**felt**  172:3
**female**  5:16
67:4 87:15,17
90:18 113:6

142:15 185:5
186:21
**females**  142:19
**fertility**  185:6
**fertilization**
5:9 185:16
**fiance**  48:5
**fiduciary**
149:21 152:17
155:19 191:8
**field**  19:11
35:17,20 36:8
39:9 152:10
157:22 158:2
196:18
**fields**  197:2
**files**  79:8
125:10
**financed**  40:16
**financial**  157:3
157:6,17
**financially**
158:11 210:15
211:11
**find**  49:13 97:3
142:1 157:14
173:2,5,8
**finding**  19:2
**fine**  8:13 16:11
17:8 114:19
115:1 206:22
209:17
**finish**  92:6
**finished**  206:18
208:13
**finland**  108:2
147:13,16
148:9 179:8

**first**  7:18 10:18
  11:10 17:15
  24:8,14,21
  29:9 30:9,12
  32:7 33:8
  34:11,19 35:15
  39:1,10 75:21
  78:17 119:12
  123:18 126:7
  129:10 159:13
  163:13,21
  186:3 205:12
**five**  46:17,19
  93:16,21
  206:21
**flourishing**
  72:6
**fly**  86:7 136:4
**focus**  32:1,3
  35:14,16 36:6
  36:7,20 37:1
  43:10 45:6,10
  56:14 76:2,3
  202:6
**focused**  44:20
  45:14
**focuses**  26:9
  39:18
**folder**  79:7
**folks**  39:12
  145:1
**follow**  61:14
  71:1 83:13,17
  135:4 198:20
  198:21
**followed**  5:14
  186:20

**following**
  126:12 130:14
  185:6
**follows**  7:20
**foregoing**
  210:3,4 211:4
**foreseen**  192:8
**form**  28:10
  31:21 65:12
  69:8,21 149:3
**formal**  41:10
  70:13
**formally**
  153:22
**formed**  68:15
  70:4,5 144:10
**former**  33:7
**forming**  106:5
**forms**  49:3
  52:10 155:8
**formulating**
  110:9,14
**forth**  170:1
**forthcoming**
  158:19
**forward**  50:15
  50:17 53:4,5
  133:1 201:5
**fostering**  71:2
**found**  19:8
  35:4 117:18
  125:21 126:3
  141:11,12
  142:6 169:15
**foundation**
  45:13 57:14
  86:2 90:7
  132:7 174:3

**foundational**
  73:20
**founded**
  206:10
**founders**  70:9
**founding**  70:7
  206:14
**fourth**  25:4
**fractures**  189:3
**fraught**  139:12
  139:15
**freedom**  3:13
  7:11 153:14
**frequency**
  131:12
**frequently**  28:4
  44:17
**friebe**  2:6 6:3
  210:2,20
**front**  9:11,20
  9:21 16:4 17:9
  33:10 127:2,6
  127:8 162:11
  165:1
**full**  106:8
**fully**  19:2
  140:16
**function**  113:3
**fundamental**
  153:12
**fundamentally**
  40:19 81:12
  82:14
**funded**  34:8
**further**  10:15
  38:2,4,16
  110:5 118:21
  172:17 185:11

  210:13 211:9
**fuss**  165:6
**future**  46:10
  86:5

### g

**g**  6:1
**gain**  31:9
  200:20
**gaps**  150:14
**gather**  59:17
**gathered**  45:13
**gathering**
  166:18,21
**gatherings**
  166:15,16
**gd**  143:2,5
  204:19
**gender**  4:12,18
  5:4,11 10:18
  10:19,20 11:1
  11:9,22 12:3,8
  12:13,17,20,22
  13:8,12,20,22
  14:1,4,9,16,19
  14:19 15:2
  18:5,6 22:18
  22:21,22 23:4
  23:12,15,21
  25:12,14,17,18
  28:15,17,21
  29:19,21 42:7
  42:13,19 43:6
  43:17,22 44:12
  44:20 45:18
  54:7 55:2,11
  55:15 57:3,5,7
  57:11,12,17

58:5,9,11
64:17 66:5,6
66:16 67:3,22
74:20 75:2,5,7
75:10,11,13,22
76:8 78:8,12
85:22 88:2,12
88:17 90:5,10
90:15,22 91:9
92:15 97:5,7
97:12,16,17
98:10,18,21
100:9,11,14
105:1 108:14
115:22 116:9
116:16 117:14
117:18,21
118:4,9 119:5
119:22 122:6
123:10 124:13
124:21 125:17
125:17,20
126:1,5,7,10
126:12 128:3
129:1,8,10
130:8,15 131:5
132:5,11,17,20
133:3,6 135:11
135:16,18,22
136:6,9 138:21
139:20,22
140:4,5,6,15
142:4,20,21
143:8,10,22
144:9,14,20
145:8,16,21
149:3 151:1
160:4,10 162:2

162:5 164:10
164:16 165:13
168:13,21
170:18 172:4
174:13 175:9
175:14,16
176:2 178:11
178:16 182:21
184:14 185:2
185:17 189:10
190:15,15
193:1,18
194:20 195:7
196:6,10
203:13 206:16
**general**   1:13
6:9 19:6 22:9
38:22 51:11
58:2 182:15
**general's**   104:7
**generally**   21:5
26:16 29:7
31:18 95:22
107:16 128:16
200:2 204:8
**genuine**   52:7
**genuinely**
177:13 179:2,9
198:10
**getting**   63:17
192:15
**give**   38:16 50:9
56:15 61:22
62:2 77:21
86:6 91:3 96:9
98:6 101:15
106:7 107:10
122:13 138:8

145:18 150:10
187:7,20 189:8
189:16 192:16
192:17 195:4
202:5
**given**   86:21
150:16 190:11
193:17,19
**gives**   190:20
**giving**   107:18
168:8 190:6
191:6
**glintborg**   110:1
124:8,19
130:14 136:17
**go**   9:1 10:15
13:7 18:21
29:15 31:16
49:18 50:7
59:12,13 61:4
61:5 90:16
102:10 130:16
149:5 152:5
162:16 208:20
208:21
**goal**   20:22
21:13 59:3
88:21 144:19
145:2,9
**goals**   144:13
145:6 151:1
156:3,5,17
201:9,16,20,20
**god**   49:6
**goes**   41:13
102:3
**going**   8:16
10:17 21:21

34:10 35:9
47:6 86:12
93:14 101:9,15
102:2,14
110:17 114:9
127:11 129:13
133:12 145:3
155:15 161:2
163:5 165:17
167:8 172:15
172:22 180:16
182:3 190:1,2
191:10,11,12
191:16,17
199:5 206:8
209:14
**good**   6:2 8:4
19:13 27:13
35:3 44:5
46:16 49:13
50:2,8,10,13
50:18 51:7
53:6,9 62:20
63:16 69:21
70:17,18,21,22
71:8,9 72:2
74:14 82:15,15
82:16 85:11
89:18,18 91:20
114:10,12
120:7 153:6,15
167:11 174:5
180:20 190:9
194:3 196:8
**goods**   64:10
**gotten**   63:11
**governed**   82:17
151:7

governing
151:10
graduation
170:9,15
grandfather
19:5
granted  180:4
grave  200:12
great  46:11
167:7 192:12
greater  126:18
192:4
green  122:5,17
greenwall
45:13 166:18
174:3
grounded
49:14
group  39:12
55:17 56:6
205:4
groups  141:22
184:22
growing
161:12 164:17
171:14
guess  162:20
guessing  79:10
guidance  99:6
183:1
guide  149:21
155:20 191:7
guided  84:12
84:16
guidelines
148:13,17,18
149:1,8 150:18
154:15,18

155:2,7,8,11
158:1,6 161:4
172:14,14
195:15,17
197:20
guides  95:12
gynecologist
19:7
gynecologists
68:14
gynecology
24:17

**h**

h  4:5 5:1
half  114:16
167:5,9
hand  7:15
39:11
handled  159:10
handwritten
9:9,12
hang  141:6
206:5
happen  172:17
199:5
happened
108:7 174:5
happening
172:2
happy  162:12
hard  9:8 89:16
harm  113:6
202:7
harmful  193:1
harms  108:22
109:5 112:22
113:1 116:8

137:2 177:2
191:17 192:8
harvard  38:11
hastening
53:16
head  36:14
headline  165:2
heal  189:5
healers  84:10
health  5:6
19:14 20:2,18
20:21 22:5,7
22:13 27:21,22
28:3,4 29:14
31:1 34:3,7,8
39:19 47:10,15
47:16 48:4
50:21 51:7,10
54:10 55:8
82:16,22 83:19
84:6,6,8 90:3
90:10,19 91:14
104:22 109:5
112:22 123:11
124:13,22
125:6 126:4,9
126:14 128:19
128:20 129:7
130:3,18 131:1
131:1,8 133:18
133:22 134:4,5
134:6,8,9,10
135:21 137:3
139:10 140:16
141:13 142:2
143:18 147:2,6
147:22 153:11
153:16 191:7

192:11 193:17
193:20 200:13
201:16,19
202:9,12,15,16
202:20,21
203:4,5,9,14
203:16,17,19
203:22 204:5,7
healthcare
31:5 49:2
126:19 150:21
155:9 156:15
195:18,22
healthy  90:15
91:15 92:22
93:2 109:3
112:18 137:13
137:17,21
138:1 141:11
142:3,8 145:13
146:8 191:20
191:20
heard  48:3
151:21 174:14
hearing  7:13
held  20:5,6
help  29:15
31:10 59:4
69:16 191:12
helpful  52:8
160:17 202:10
helping  39:6
hereto  210:15
211:11
hhs  182:7
hhs0169973...
181:20

Farr Curlin

[hidden - important]

**hidden** 128:12
**higher** 191:14
**highlighted**
10:9
**highlighting**
95:9 143:21
**hilary** 174:1
**hill** 17:17,19
18:17,20
**hippocratic**
68:4,6,8,17
69:6,11,14,17
69:19,20 70:16
70:18 71:19
206:9,10,14
**hired** 104:3,6,8
**history** 35:17
45:21 52:14
166:22
**hoc** 41:11
**holds** 200:14
**hon** 1:11 3:11
**honorable** 6:8
**honoring** 72:14
**hoops** 61:16
**hope** 180:8
**hoped** 136:10
191:16 192:10
193:15
**hopes** 203:16
204:13
**hormonal**
138:19 139:11
139:14
**hormone** 4:18
5:11 113:9
122:7 126:5,7
129:8,10

137:16 141:3
141:16,18,22
142:9,10,11,12
142:17 182:20
185:17
**hormones** 5:4
13:19 14:11,12
14:21,22 15:7
43:8 44:5 54:6
58:13,15 66:4
67:10 87:3
91:13,16 97:15
111:12 112:17
123:10 137:12
138:20 142:4,5
142:14,19
145:7,10
**hospice** 39:20
39:21 40:10,12
40:15,17
**hospital** 57:22
61:19
**hospitalization**
67:20
**hospitals** 51:4
58:3
**host** 192:13
**hot** 166:19
**hour** 61:5
114:16 167:5,9
**housing** 3:6
**hubris** 76:1
**human** 19:9,14
50:18 72:5
78:10 82:15,15
89:14 90:18
111:10 143:19
143:19,20

190:1
**humanities**
19:10,16 45:20
166:22
**humanity** 49:5
**humans** 72:5
87:14,16
**hypercholest...**
56:20
**hypertension**
56:19
**hypothetical**
86:9 88:15

**i**

**i.e.** 138:20
**idea** 15:3 50:14
154:3 191:12
**ideally** 201:18
**ideas** 37:1,2,22
**identification**
15:13 16:21
78:21 119:7
120:17 122:11
123:14 163:2
185:20 187:2
**identify** 7:7
15:2 22:21
**identity** 14:9
18:5,7 22:18
22:22 23:4
25:17,19 55:11
90:22 151:1
156:18
**ideological**
172:11
**ignored** 157:12

**ignores** 201:7
**illness** 27:3
40:5,9
**illnesses** 27:9
28:10
**image** 49:6
96:11
**imagine** 57:8
86:6 189:20
**immanuel**
198:9
**immigration**
49:4
**immoral** 92:13
**impair** 5:15
186:21
**impaired** 109:3
111:20 112:1
112:14
**impartial**
158:9
**implications**
108:5 189:7
194:17
**implies** 12:18
**imply** 73:22
143:4 144:3
200:5
**import** 35:21
**importance**
72:14 150:10
152:2 155:21
**important** 63:2
63:4 72:3,18
73:3,19 76:9
81:22 94:20
143:20 158:18
164:6 172:14

Farr Curlin
April 8, 2024

173:1 195:18
**impose** 191:17
**imposing** 95:7
**impossible**
187:20 199:13
**imprecise**
14:17 44:16
**impression**
118:20 170:13
**improve**
126:11 129:5
164:8 202:16
**improved**
131:5
**improvements**
203:22 204:14
**improves** 147:6
**improving**
162:10 164:2
203:17
**inaccurate**
80:6
**incapable**
111:5
**include** 26:17
27:21 113:2
116:1,8 125:15
127:9 134:9,10
143:18 160:18
175:11,19,20
177:6
**included** 22:12
23:20 51:13
79:21 125:18
136:16 152:16
159:19,20
176:5,15 197:3
197:3

**includes** 25:5
27:22 40:21,21
69:14 75:1
116:6 134:7
136:18
**including**
23:14 38:18
49:3 52:7
68:10 87:11
96:6,15 134:4
154:20 177:2
183:13
**incomplete**
88:14
**incongruence**
125:17
**increase**
127:21
**increased**
113:7 125:22
128:2 139:18
**indefinitely**
137:16
**independent**
106:21 107:4
113:16 121:21
147:2 148:1
149:20 155:12
155:19 157:5
180:10
**independently**
123:2
**indicate** 72:7
111:18 156:12
199:3
**indicated** 16:4
33:21 86:22
184:20

**indicates** 137:1
149:19 155:17
**indication**
128:9 204:5
**individual** 67:9
91:9 92:15
141:15
**individually**
205:3
**individuals**
85:10 125:16
137:17 145:7
157:17 202:14
203:3
**induce** 142:22
145:10
**induced** 142:11
142:14
**induces** 141:3
141:10 142:5
142:17
**inducing**
142:10
**inferior** 177:5
**infertility**
111:13 139:17
**influence** 89:2
198:15
**influenced** 20:8
49:16 88:17
**information**
106:11 187:21
190:9,11
192:16,17
193:17,20
**informed** 73:20
73:22,22 86:14
105:3 107:12

107:13,15,21
108:9,12,15,18
187:22 188:13
188:18 192:18
192:21 195:4
196:12,19
197:3,14 199:7
199:9
**initial** 184:6
**initially** 169:22
**initiate** 140:4,5
**initiated**
138:21
**initiation** 126:5
126:12,14
129:8
**injured** 20:19
**injuries** 84:6,8
**injury** 188:9,15
202:12
**inner** 48:7
**innumerable**
41:20
**inpatient** 28:12
**input** 99:13
**inquiries**
182:18
**insofar** 14:17
20:3,19 37:1
51:19 66:9
71:10 72:4
78:8 84:13,17
85:18 88:19
89:1 90:14
91:15 123:21
126:17 145:12
146:13 157:9
157:11 183:11

186:13 189:18
191:19 198:12
199:8 200:17
202:10
**instance** 78:3
86:9 107:20
144:18 158:4
165:16 172:6
183:20 188:6
188:17 202:20
**instances** 98:2
203:2
**institute** 37:5,9
138:7
**institutional**
99:2,4,7,13
181:10
**institutions**
38:15 50:16,17
51:8 53:5,6
**instruct** 86:12
101:3
**instructed** 5:18
102:12 121:22
**instructing**
86:10
**instruction**
101:16 103:6
**insufficient**
147:5
**insurance**
40:18,19 160:9
160:12
**integrity**
150:20 197:21
**intellectual**
195:3

**intellectually**
19:15
**intended** 6:21
38:2 125:15
169:3,5
**intends** 116:7
**intense** 161:13
164:18
**intentionally**
111:13
**interact** 200:19
**interest** 19:15
35:2 38:20
152:18,22
157:4,7,12,18
158:6,7,14,17
158:19,22
159:3,6,7,10
159:14,17
160:5,21
**interested** 31:7
34:19,22 76:18
77:18 210:15
211:12
**interesting**
19:15 35:5
**interests**
156:22 161:3
**internal** 24:16
25:9 26:5,7,8
26:20,22 27:1
27:13 28:2,5
38:22 54:21,22
56:5
**international**
177:12 194:10
**internist** 47:9
56:1

**interpretation**
155:21 184:7
**intervenor** 1:9
3:2
**intervention**
62:19 63:2
74:2,16 91:2,3
131:19,21
133:19,20
135:3,6 144:19
153:6,7,8
158:10 175:17
175:19 176:10
176:20 177:2,7
180:6,8 188:20
190:1,4 191:3
191:4,6,19
192:7,12 194:1
200:14 201:1
**interventions**
15:5 78:9
81:14,16 83:18
137:4,10 138:3
139:11,15
144:13,17
145:2 153:15
193:5,10
**intrinsic** 20:1
85:6
**intrinsically**
19:4
**introduce**
15:20,22
**introducing**
35:19
**introduction**
18:2

**investigate**
27:10
**investigative**
161:12 164:13
**investigator**
31:17,20
**investigator's**
181:19
**investigators**
31:14 180:6
182:18
**invitation**
184:1
**invite** 60:3
**invited** 19:11
77:21 183:22
**involve** 22:5,18
23:11 83:19
102:6 170:17
**involved** 14:18
59:14 60:4,11
66:22 68:22
69:5,16 72:11
99:15 104:12
108:2 158:1,22
160:13 182:19
**involvement**
69:13
**involves** 27:5
112:16,16
144:2 152:12
152:14 201:5
**involving** 23:18
64:17 158:16
**irb** 180:9
183:19,21
**irbs** 179:15,20
179:20,21

180:3
**irreversible**
137:2 139:16
**islam** 64:14
**isolated** 174:4
**issue** 42:7,13
44:12,20 80:5
107:15,19
110:20 148:13
148:16 173:8
174:8 195:16
203:14
**issued** 148:13
148:19 149:8
**issues** 36:1,2
44:18 59:5
100:13 107:19
**it'll** 93:20
173:5
**items** 107:7

**j**

**j** 76:13
**jack** 123:19
**jail** 47:18
**job** 1:22 2:7
166:7 173:9
**johnson** 30:10
30:13,19 34:6
**join** 39:12
**joined** 33:12
**journal** 116:21
**judaism** 64:14
**judgment** 27:5
40:13 62:10
74:16 81:18
82:3 87:2
88:16 92:19

95:3,15 106:8
134:2 146:14
149:21 155:13
155:19 158:9
164:8 175:15
177:3 179:15
180:3,5 189:9
199:2
**judgments**
59:5 70:22
71:1 85:8 95:1
108:5 159:1
199:4
**jump** 61:16
**juncture** 47:18
**june** 170:3
**jurisdiction**
81:16
**justice** 3:5
**justified** 63:22
**justifies** 180:4
**justify** 76:7
104:22 147:5
153:7 194:11
**justifying**
204:19

**k**

**k** 129:16
**kaltiala** 110:2
129:14 136:17
174:1
**kant** 198:9
**karolinska**
138:7
**keep** 36:14
108:11

**keeping** 171:20
**kept** 172:15
**kerfuffle**
170:14
**key** 15:3 35:19
35:20 80:17
154:5 162:10
164:1 176:20
**kidney** 56:21
**kill** 95:6
**kind** 31:10
51:8 63:22
77:3 84:4
90:17 91:4
98:15 107:16
137:22 153:9
170:13 172:10
173:9 176:8
188:20 189:11
189:13 202:11
**kinds** 35:22
160:19 173:10
193:12 204:10
**know** 8:10,22
12:11 17:2
18:1 22:21
25:8 43:8 44:7
46:6 48:16
49:18 50:11
53:2 54:9,11
54:15 57:15
64:13 65:14
68:20 69:10
79:13,22 86:17
87:6,6 88:5
92:18 98:12
105:18 111:10
111:16,17

116:13 118:7
118:11,17,21
119:9 120:3,20
129:13 132:8
134:1 136:16
139:5,7,13
140:3 142:11
142:13 146:21
148:16,17
150:6 154:17
161:1 163:10
163:10 178:21
179:2,6 180:7
187:4 188:11
189:8 192:12
197:16 202:17
209:9
**knowledge**
20:6 32:21
68:9 100:10
114:6 115:13
115:18 116:6
123:5 137:15
140:19 142:18
155:7 166:11
169:5 187:12
189:4 197:15
210:10 211:6
**known** 12:13
61:19 81:20
108:22 115:21
138:3 173:19
**knows** 209:15

**l**

**l** 129:16,16
**label** 163:6

labeled   163:5
lack   57:13 86:1
   90:6 113:3
   132:6 188:2
laid   183:16
laidlaw   103:12
   104:21 105:7
   106:14 107:6
   108:21 109:10
   109:15 110:3
   111:18 113:14
   113:18 114:5
   115:15 116:10
   117:12 118:16
   118:18 121:6
   122:1 123:3
   124:1 136:8
   137:1,8 147:11
   147:21 148:11
   148:22 157:11
   157:20 159:9
   179:7 186:14
   187:13 194:6
   204:3
laidlaw's   106:4
   106:11,12
   110:4 112:6
   149:11 156:21
   157:15 159:18
   193:8
language   22:20
   23:1 44:15
   50:5 150:10
   154:1 201:7
lansdowne
   3:15
large   82:18
   83:21 131:22

136:13,18
late   167:4
law   21:16 62:7
   81:15 82:18
   153:16 198:11
   198:20
lawndale   34:3
   34:7 47:9,14
   47:16,19,19
   48:4 51:6,10
   54:10 55:7,22
laws   7:1
lawyers   10:11
layperson
   107:18
lcb   1:8
leader   42:19
leading   139:13
learn   31:12
learning   36:8
   39:12 48:8
leave   108:7
lectures   197:8
led   48:4
leg   191:11,16
legal   35:21
   73:5,12 74:7
   74:12,16
legitimate
   52:19
letter   181:18
level   141:22
   142:13 152:15
   173:21
levels   141:3,10
   141:16,19
   142:5,10,11,17

library   79:16
life   20:7 39:5
   63:15 68:14
   89:14 137:3,9
   137:18 190:1
   198:18
lifelong   137:22
   194:17
lifetime   113:3
light   138:17
   164:17 175:15
likely   133:20
   181:12 194:2
   200:14
likewise   25:8
   42:14 78:9
   99:11 117:12
limit   63:8
   139:6
limitations
   139:20
limited   41:13
limits   39:5
   72:10
line   5:19 21:1
   141:7 146:10
list   42:5 55:21
   57:1 100:17
   104:10 113:2
listed   32:20
   33:22 42:2,4
   46:1 75:15
   78:3 101:2
   102:21,21
   103:4 110:10
   113:19 143:3,9
   143:11 181:19
   197:5

literature
   106:9,18
   107:11
little   24:22
   98:14 114:17
   125:19
live   40:14 48:6
   48:10 61:7
   90:1 198:18
lives   48:9 173:1
located   47:15
   47:17 187:4,5
location   2:4
logically   95:10
long   8:22 20:5
   21:16 30:15
   65:4 77:14
   95:6 114:2
   137:3,9 151:9
   152:9 176:7
longitudinal
   27:6 119:20
look   32:12
   45:15 46:7,13
   75:16 78:16
   79:5 80:20
   94:12 123:2
   124:16 125:8
   182:16 185:12
   202:3
looked   158:8
   197:7
looking   82:7
   83:7 104:9
   116:7,8 163:20
looks   47:8
   76:21

Farr Curlin                                                        April 8, 2024

lose   166:7,9
lot   135:8
   193:11
lots   21:4 204:9
love   48:17
lunch   91:20
   92:3 114:9,14
   140:9 167:4

**m**

m.d.   2:1
maclean   34:13
   34:15 35:11
   36:10,11,14,15
   36:17,21 76:14
   77:16
made   18:21
   21:7 26:20
   29:17,21 30:2
   35:20 40:8
   49:6 50:4 56:2
   72:8 76:15
   93:5 94:17
   97:1 134:18
   152:1 164:10
   182:18 208:1
major   27:18
   77:21 132:3,8
make   10:15
   13:9 16:12
   17:12,14 29:18
   33:16 49:19
   50:1 59:5 62:8
   62:9,16 70:22
   74:4 79:10
   80:7 81:13
   83:16 87:18
   92:19 95:1

103:16,22
109:20 112:17
112:18 116:19
143:16 147:9
150:4 153:1
162:20 167:9
175:15 176:13
177:11 180:10
182:5 188:13
188:17 192:2
196:1 199:4
200:1
makes   20:16
   50:2 74:15
   84:2,9 171:12
   187:19 190:5
making   73:1
   85:4 108:4
   144:8 151:5
   152:3 164:14
   177:22 200:9
male   67:3
   87:15,17 90:17
   113:6
males   142:19
mammals
   87:17
manage   158:20
   159:3 160:22
manipulating
   203:15
manner   7:2
   27:17,19 51:13
   56:12,13 71:3
manual   143:4
map   28:13
marci   113:4

marginalized
   49:1
margins   25:1
mark   15:10
   16:8,17 17:6
   35:13 78:15,18
   119:2 120:12
   122:5 123:9
   162:16 173:3
   185:14 186:6
   186:18
marked   15:12
   15:18 16:13,20
   78:20 119:6
   120:16 122:10
   123:13 163:1
   163:20 173:7
   185:19 187:1
   207:10
marking   15:14
marks   143:5
marshall   1:11
   3:11 6:8
match   150:22
   156:15 173:20
matched
   141:22
materials
   100:17,20
   101:2,7,13,18
   102:16 103:4
   110:11,14
matter   6:7 8:6
matters   177:20
maturation
   111:11,12
   112:8,9,12
   190:5

mature   26:15
   39:10 54:19
maturity   195:4
   195:19 196:4,4
   196:9,9
mcclean   99:10
mcnamara
   205:9,14
mean   11:3,18
   22:22 25:18
   50:10 58:17
   65:14 72:20
   78:5,7 79:12
   84:21 93:9,11
   96:22 97:8
   100:1 102:13
   107:13,14
   109:18 110:18
   111:2,4,16,20
   112:1,21
   115:17,20
   117:8 119:17
   123:1 127:20
   133:16 137:9
   141:9,10
   143:13 144:15
   144:17 157:10
   169:10 171:17
   171:18 173:14
   178:19 187:6
   189:4 197:6
   198:21 201:12
   201:13 204:4
   207:14
meaning   49:10
   107:14,15
   123:2 156:7,8
   166:14

Farr Curlin

April 8, 2024

| | | | |
|---|---|---|---|
| **meaningful** | 72:19 73:1,17 | 76:8 78:8 | 22:9 24:16,17 |
| 19:4 | 73:18,21,21 | 88:17 90:10,15 | 25:9 26:5,7,8,9 |
| **means**   7:3 11:5 | 75:1 76:1,14 | 97:17 98:10,21 | 26:20,22 27:1 |
| 50:14 148:16 | 76:19 77:14,16 | 100:14 105:1 | 27:13 28:2,5 |
| 198:7 200:3 | 77:17,21,22 | 108:14 115:22 | 31:2,13 32:15 |
| **meant**   100:16 | 80:13,17 81:12 | 116:9 117:21 | 34:22 35:4,4 |
| 156:12 | 82:1,3,10 | 118:4,9 125:20 | 36:4 38:16,17 |
| **measure**   125:6 | 83:15,18 84:2 | 126:1,10,12 | 38:19,21,22 |
| 130:3 | 84:3,15 85:2,7 | 128:3 130:15 | 39:5,9,15,16 |
| **measured** | 85:19 87:4 | 131:5 132:17 | 39:17 40:2,6 |
| 130:11,17 | 88:22 92:22 | 133:3 135:11 | 40:11,21,22 |
| 131:10 | 94:22 95:16,17 | 135:18 136:9 | 41:12,20 44:16 |
| **measures** | 99:11 106:19 | 140:5 142:4,20 | 44:18 45:21 |
| 126:3 129:6 | 107:11 116:2,3 | 142:21 160:3 | 48:9 50:2,8,10 |
| 158:20 | 116:6 117:18 | 160:10 164:16 | 50:20 51:7 |
| **medicaid**   51:5 | 121:16 125:10 | 175:14,16 | 52:13 53:9 |
| **medical**   12:2 | 125:16 132:4,8 | 182:21 189:10 | 54:21,22 55:20 |
| 15:5,5 18:16 | 132:10,16 | 190:15 196:10 | 56:5 58:2 |
| 18:18,21 20:12 | 136:6 137:4,10 | 203:12 | 62:21 63:16 |
| 20:13,14,16,17 | 137:22 142:18 | **medically** | 67:2,17 68:4,6 |
| 21:1,4,6,7,8,12 | 144:4 151:3,5 | 29:10 63:4 | 68:8,17 69:7 |
| 21:12,22 22:19 | 152:3,11 | 131:19,20 | 69:11,15,22 |
| 23:2,14 24:2,3 | 153:10 157:13 | 133:14,16 | 70:17,19,21 |
| 24:15 25:4 | 158:10 160:12 | 134:12,18 | 71:4,8 72:2,13 |
| 26:2,4 27:11 | 165:11 169:6 | 135:4,5,12 | 75:3,4 77:22 |
| 34:13,16,20 | 170:7 171:14 | 144:6 164:3 | 78:6,13,18 |
| 35:8,11,17 | 173:18 185:2 | 200:7,21,22 | 80:17,20 81:2 |
| 36:1,8,22 37:2 | 194:20 197:2 | **medicare**   40:18 | 81:3,11 82:5,7 |
| 40:20,20 41:2 | 199:14 200:10 | **medication** | 82:8,9,10,11 |
| 41:6,8,11 | 200:12 201:15 | 137:18 203:7 | 82:12,13,13 |
| 49:14 50:16,17 | 201:19 202:8 | **medications** | 83:2,4,8,22 |
| 50:19 51:8,20 | 203:4 | 125:22 126:18 | 84:1 85:3,7 |
| 52:7,19,20 | **medicalization** | 126:22 127:20 | 86:20 87:12 |
| 53:4,5,10 | 14:10 45:17 | 127:20 128:2 | 90:3,9 116:21 |
| 57:10,15 59:16 | **medicalized** | 202:21 204:15 | 151:4 154:7 |
| 60:15,16 64:1 | 13:12 14:19 | **medicine**   4:9 | 159:15 166:22 |
| 67:7 68:10,10 | 15:3 45:17 | 14:18 19:11,21 | 168:12 171:3 |
| 68:11 71:11 | 66:6 75:2,13 | 19:22 21:13 | 172:15 198:4 |

199:3 200:14
**medicine's**
20:1
**meeting** 45:5
45:12
**meetings** 44:17
44:22 45:5,10
45:11 46:14
166:12
**member** 68:18
68:19 99:10
**members** 20:11
70:12 76:17
77:17 141:16
157:1,7 190:16
**membership**
70:13
**memberships**
68:21
**memories** 30:6
58:7 67:1
**memory** 23:13
35:7 55:9 57:4
58:8,10,14
66:21 108:1
122:21 133:10
**mental** 5:5 22:5
22:7,13 27:21
27:22 28:3,4
104:22 123:11
124:13,22
125:6 126:4,9
126:14,18
129:7 130:3,18
131:1,1,8
134:4,8,9,10
143:4,12,18,22
144:1 147:6

150:19 192:11
197:21 202:9
202:16,20
203:3,4,14,17
203:19,22
204:5,7
**mention** 77:20
129:14 165:11
168:7
**mentioned**
53:2 75:7,21
76:20 93:4
159:14 195:21
**mentors** 31:8
32:11
**mercenary**
85:5
**meredithe**
205:8,14
**met** 10:7
192:14,14
**metaphor**
171:20
**method** 209:7
**methodologi...**
31:11
**methodologies**
37:15
**methods** 37:6
37:10,17 38:2
159:3
**mgt** 109:1
111:7 112:13
117:14 131:18
136:21 137:1
141:2 142:17
143:5 147:4,6
150:15,16

153:19 161:13
171:15 177:14
177:15 179:3,4
179:10,11
194:17 204:20
**mice** 5:16
185:5 186:22
**michigan** 6:13
37:10 168:8
169:6 174:6
210:22
**mid** 43:2
**middle** 1:2
**mile** 49:18
**mind** 57:16
66:20 98:7,14
121:12 131:15
202:2,18
**minimized**
149:19 155:18
**minimizes**
155:11
**ministrations**
20:13
**minor** 156:3
194:19 195:2,6
**minority** 54:20
**minors** 98:1
105:2 121:15
136:21 137:1
139:11,15
143:6 147:4
149:22 151:6
152:4,9 155:20
164:3 166:20
179:5 187:20
194:15 196:8
196:13,19

197:4 204:20
**minute** 46:6
93:14,15,16
**minutes** 46:17
46:17 91:19
114:18,20
167:13 180:17
206:19,21
**mission** 48:13
48:15
**misspeak**
109:21
**mistaken** 194:7
**mixture** 77:15
**model** 5:10
81:5,6,7,9,10
83:2 84:12
88:8,10,18
89:3 185:16
198:16
**models** 80:19
80:22 81:4
83:1 185:1
**modern** 198:14
**modify** 209:4
209:10
**moment** 24:19
79:5 96:9
103:9 119:8
122:13 127:15
131:9 137:20
138:8 186:2
207:20 208:5
**monday** 2:2
6:10
**months** 8:15
40:14 59:11
60:18,20

moral 72:6 82:14 89:14 198:20
morality 20:4 51:1 71:7,10 71:14 82:18 83:21 85:1,4 87:9 89:6,12 89:18 95:12,19 198:12
morally 73:6 73:10 74:8,13
morning 6:2 8:4 206:9
motivated 49:4 80:11 161:3,6 206:15
motivation 35:1 48:21
mouse 5:10 185:1,16
mouth 171:19
mouths 171:21
move 47:6 206:4
moved 32:7
moving 30:8 113:10 116:18 136:20 145:15 146:20 165:6,7 187:15 194:14
multiple 14:21 41:13 109:5 112:22 126:2 128:4 190:18 194:9
murphy 3:4 4:3 7:8,8 8:1,3,5

15:10,14,22 16:2,16 17:1 46:12,15,20 47:5 78:17 79:3,12 80:2 86:8,16 91:21 92:2,6,9,12 93:13,19 94:1 94:7,8,13,15 101:6,9,17 102:5,13,19 103:7 110:22 111:1 114:7,15 114:19 115:1,7 115:8 119:1,9 119:13,14 120:5,6,11,18 122:4,12,15,18 123:8,15 127:3 127:10,18 129:16,18 134:21 140:12 140:13 162:15 162:19,22 163:6,10,16,19 165:4,5 167:8 167:12,16,22 168:1 177:21 178:1 180:14 180:20 181:5 182:8,11 185:13 186:1,4 186:7,17 187:3 205:19 206:18 207:6,7 208:9 209:1,13
mutual 80:15

muzzle 171:18
muzzling 171:13,17,18

**n**

n 3:1 4:1 6:1
name 6:2 8:5 69:14 165:17
names 42:16 148:4 173:15
naming 173:15
narrowed 182:13
national 139:10 140:16
nationwide 124:14 125:1
natural 82:18
nc 2:5
near 46:10
nearly 206:18
necessarily 45:1 128:17 153:15
necessary 63:4 80:10 131:19 131:20 133:14 133:16 134:12 134:18 135:4,5 135:12 195:7 200:21 201:1 204:18 207:22
need 8:19,21 15:15,19 17:2 50:6 52:8,20 65:22 89:5 93:14 124:16 130:11,15,20

131:4 150:21 156:14 179:12 201:3
needed 51:20 67:7
needs 67:17 150:22 156:16 160:21,22 201:8,15,16,17 201:19,19
negative 126:3 129:7 135:21
negotiate 39:6 48:11 201:4
neighborhood 48:7
neighborhoods 47:20
neither 210:11 211:7
neurological 109:4 111:21 112:1,10,14
never 29:17,21 79:18 93:5 94:17 123:6 157:22 163:10 183:18,21 187:9 194:19 203:8
new 116:21 150:18 189:13 197:20
news 184:6
ngt 13:12,16
nice 148:7
nichole 211:2 211:17

non   23:8 26:9
  33:19
nonbinary   4:21
  122:8
norm   95:6
normal   141:18
  141:21,22
  142:8
normally   142:6
  145:3
norms   64:9
  66:7 68:16
  84:18,19 87:11
  87:12 91:15
  137:22 191:7
north   6:11
  18:19 47:19
  65:2,7,11,17
northern   1:3
notary   6:12
  210:21
notations   9:9
  9:10
note   10:9 60:9
  60:13,17
  128:11 156:13
  158:19 184:13
noted   8:5 90:12
  90:13 92:17
  106:1
notes   9:12 10:9
  105:10 206:20
noticed   108:7
  156:4
notion   81:19
  93:5 94:17
notwithstand...
  152:20 167:4

172:9
november
  100:3
number   24:10
  32:18 33:9,11
  49:17 66:7
  75:18,19,22
  76:21 78:4
  83:9 86:22
  95:10 107:7
  120:12 127:9
  127:20 130:17
  131:11,12
  136:19 164:2
  198:6
numbering
  163:3
numbers   33:17
nurses   48:22

o

o   6:1
o'clock   140:11
oath   8:18 86:6
  86:13
oaths   6:13
objection   6:16
  7:14 12:15
  14:15 21:11
  30:3 44:1 45:3
  53:1 55:3
  57:13 65:12
  66:18 69:8
  73:14 86:1
  88:4,14 89:9
  90:6 92:16
  95:13 98:5,11
  101:3 103:2

104:5 109:11
  111:9 113:21
  115:19 116:5
  116:12 120:1
  127:1 128:10
  129:3 132:6,13
  132:21 133:8
  134:14,20
  139:1 140:1,17
  148:2,20
  154:11,16
  160:15 164:12
  169:14 177:17
  185:8 195:9
  207:13,19
  208:2
objections
  174:10
objective   89:12
  89:13,21 137:2
objectively
  19:13 146:8,14
obligated   74:2
  88:11,22 94:22
obligation
  21:15 81:13
  86:15 153:13
obligations
  59:6 71:6
  74:18 181:12
  183:16
obliged   74:5
observation
  121:19
observed   19:4
observer
  107:21 108:12

observers
  105:3 107:13
  107:14 108:9
  108:15,18
observes
  107:12
obstetrician
  19:7 68:14
obstetrics
  24:16
obtain   195:14
obtained   17:16
  17:18
obtaining
  196:12
obvious   180:3
obviously   62:5
  174:17
occasionally
  144:14
occasions
  20:13 26:19
occur   99:19
occurred   33:19
  171:22
odds   10:22
  14:9 15:1 93:3
  97:11 146:5
offer   84:5
  86:12 191:3
  192:5
offered   53:4
  63:12 86:3
  104:21 108:21
offering   136:5
offhand   121:7
office   104:7,8

| | | | |
|---|---|---|---|
| **officer**  210:1,2 | 141:2,6,8,9 | **once**  129:21 | **opinions**  60:10 |
| **official**  1:12 | 142:7 143:8,13 | **one's**  10:21,22 | 86:4,13,14 |
| 6:9 | 144:8,12 | 14:8,9 15:1,2 | 95:12,14 |
| **oh**  33:3 71:20 | 145:15,20 | 42:5 53:16,16 | 103:15 104:21 |
| 206:5 | 146:16,20 | 71:13 144:2 | 105:22 108:21 |
| **okay**  8:16 9:13 | 147:1,14,17,22 | **ones**  73:2 | 110:9 152:21 |
| 10:1 12:21 | 148:12 149:7 | 105:15,17 | 153:2 |
| 16:16 17:15 | 149:16,18 | 160:18 204:2 | **opposed**  43:16 |
| 23:10 25:2 | 150:6,12 | **ongoing**  137:15 | 43:20 52:21 |
| 26:17 27:15 | 151:21 152:6 | **online**  94:12 | 73:10 74:8,13 |
| 30:8 31:22 | 154:9 156:1,4 | **onus**  192:4 | 154:19 176:14 |
| 33:8,13,16 | 156:19 157:5 | **open**  71:2 79:7 | 176:19 |
| 34:10 36:12 | 157:16 159:4 | 81:18 171:13 | **opposite** |
| 37:4 44:7,11 | 160:11 161:20 | **opening**  69:3 | 145:14 |
| 44:22 46:1,6 | 161:22 162:4 | 171:21 | **option**  49:9 |
| 46:15,20 47:6 | 162:19,22 | **opine**  91:10 | **options**  49:15 |
| 57:20 60:21 | 163:20 165:6 | **opined**  100:8 | **order**  15:15 |
| 75:17,21 78:5 | 167:2,12 168:6 | 100:10 | 64:6 102:22 |
| 80:9 92:2,6,11 | 168:16 169:7 | **opinion**  83:4 | 109:15 120:8 |
| 93:19 94:2,16 | 169:18 170:4 | 86:7 89:4 | 164:7 189:7 |
| 97:14 98:2 | 170:16,22 | 90:20 106:5,7 | 202:15 207:22 |
| 100:15 104:18 | 171:5,8,11 | 107:10,18 | 209:4,9,12,14 |
| 105:12 108:19 | 172:3 175:2 | 108:13 110:15 | **ordered**  50:2 |
| 110:7,17 | 176:12 177:8 | 128:14 134:12 | **orders**  208:22 |
| 113:10 114:15 | 177:10 178:6 | 135:20 136:2,5 | **ordinary** |
| 114:19 115:11 | 179:14 180:9 | 136:7 142:16 | 137:13 138:1 |
| 115:12 117:7 | 180:14 181:6,9 | 144:10 148:18 | 189:15 203:19 |
| 117:11 121:12 | 181:15,21 | 153:5 155:10 | **organism** |
| 122:4,16 123:6 | 182:8 183:3,6 | 157:16,19,21 | 90:18 |
| 123:8,20 124:3 | 184:10,13 | 158:3 159:4,8 | **organization** |
| 124:7,11 125:2 | 186:2,11,17 | 178:13 179:18 | 68:18,19,21,22 |
| 125:9,13 | 187:9,14,18 | 184:8 188:13 | 69:13 70:2,3,4 |
| 127:10 128:6 | 194:14 200:8 | 188:16 192:20 | 70:8 |
| 130:7 131:14 | 201:22 202:5,5 | 194:19,21,22 | **organization's** |
| 131:17 132:3 | 205:5,20 206:8 | 195:22 196:7 | 69:3 |
| 136:5 137:9 | 208:9 209:11 | 200:8 202:7 | **organizations** |
| 138:10,13 | **old**  63:13 | 205:20 207:11 | 68:10,15 |
| 139:5 140:21 | | 207:15,15 | |

organize
172:20
organized
40:11,16
organizer
169:2,7
organizers
168:17
organizing
40:20
orgasm 113:3
original 198:19
originally
99:16 163:16
osteoarthritis
56:21
osteoporosis
113:8 139:17
ought 35:5
71:11,12 90:1
97:2,2
outcome 4:11
119:4 124:4
130:13 210:16
211:12
outcomes 4:14
5:6,10 120:13
123:11 136:10
147:6 176:9
185:16 193:14
193:15 203:17
outline 91:12
outlined 92:20
outpatient
28:11 54:13
55:20 56:8
67:19

outset 183:22
outside 159:16
overcome
151:13
override 63:5
own 10:22
30:22 55:14
60:7 71:13
83:19 95:11
105:6 107:9
108:4 118:20
149:18 155:17
157:14 190:6
190:13,21,22
198:18,22,22

**p**

p 3:1,1 6:1
p.m. 115:3,5
167:18,20
180:22 181:3
207:1,4 209:19
209:21
packed 73:7
page 4:2,6 5:2
5:19 33:13,15
33:17 59:21
75:18,19,22
76:21 80:10
94:9,16 100:16
100:16 102:21
110:10 120:3
124:12 127:9
138:16 143:1
181:6,9 194:14
194:14
paged 61:21

pages 79:10,11
79:20,21
paginated 80:1
paid 40:11
140:16
pain 56:17
palliative 38:8
38:10,15,17,18
38:20 39:9,15
39:16,20,21
40:2,6,21 67:2
67:17
paper 33:8,9
papers 197:13
paragraph
46:13 94:16
96:4,13 100:15
103:8,9 104:18
107:4 108:19
109:16 110:15
112:4,21 113:2
113:10,11
115:9,12
116:18 117:11
121:13,13
124:6 129:12
131:14 133:13
136:12,20
138:5,6 139:2
139:4 140:22
141:2,4,5,7,8
145:15 146:11
146:20 148:12
149:16 150:12
151:19 155:15
156:14,20
161:8,10
163:22 165:7

168:2,7 171:12
174:22 177:8
178:13 179:14
184:10 187:15
197:16 201:6,6
201:22 204:16
paragraphs
17:8 165:10
202:4
parallel 191:18
paraphrasing
184:15
parental
189:19
parents 153:19
153:21 154:3
187:20 188:13
188:17 189:15
191:1,6 192:16
192:20 193:17
195:14 196:12
parkway 3:14
part 22:8 24:2
24:3 25:1
35:15 37:2
50:18 52:14
59:3 60:15
65:2,4,6,17
72:5 84:21
99:9 114:10
138:14,16
139:2,3 179:21
182:20
participants
35:20 125:6
130:3
participate
53:11 61:6

65:15
**participated**
37:5 38:7
41:18 183:18
**participation**
158:5
**particular** 17:7
29:8 30:6,7
35:1 39:17
49:10,10,11
58:7 61:13
62:10,10 73:11
77:18 81:16
82:15,16,19
86:5 87:1,5
88:3 91:3,4
98:3,9,13,15
99:14 107:20
133:14 134:11
134:17 135:6
153:6 157:22
169:12 188:20
188:21 194:21
195:4,16
**particularities**
86:21
**particularly**
19:9 23:8 25:9
39:4 97:22
112:16 118:22
138:2 151:1
156:17 160:18
179:4 192:2
198:9 199:6
201:14
**parties** 6:14,17
210:12,14
211:8,11

**partner** 63:14
**pass** 171:8
**past** 104:4,8
**path** 22:9
**patient** 21:14
25:13,16 28:7
28:16 51:13
53:8,12 54:4
57:11 58:15
62:5,17 63:6
67:1,6,7,17,20
71:17,18 72:13
73:12 74:2,4,7
74:11,15,17,19
78:11 81:18,19
81:21,21 83:14
87:22 88:6,12
88:20,21 90:17
93:1,2 95:7
111:4 128:7
133:21 134:3
141:12 149:21
155:20 156:5
189:19 199:8
200:16 201:8
201:15
**patient's** 20:2
27:3 50:21
72:15 89:4
90:19 91:14
133:18,21
156:3
**patients** 21:14
25:11,20 27:6
27:11 28:9,14
28:19,22 29:4
34:7 40:12
43:17 44:6

48:12,17,20
49:1,19 51:9
51:11,12,19,20
51:22 52:4,9
52:17 54:16,20
55:10,12 56:7
56:8,10,12
58:4,7 61:10
63:6 67:21
68:1 71:6
72:19,20,21
83:11 84:8
97:20 98:3,9
125:10,19
126:10 128:22
130:8 134:19
138:21 140:4,6
151:1 156:17
161:14 189:20
191:1 193:22
**patterns** 81:2
**pause** 44:14
**paying** 107:15
**pdf** 79:9
**peace** 93:5
94:17
**pecuniary**
161:3
**pediatric** 63:6
**pediatricians**
68:12 200:17
**pediatrics** 14:7
24:18 132:19
133:2 149:14
155:4,6,7
188:4 196:19
**peer** 33:8,19
74:22 197:11

197:13
**pending** 9:1
**pennsylvania**
163:17
**people** 23:6
37:14 38:14
39:4,4 40:4
45:12 49:13,18
50:15 51:5,6
53:3 54:2
59:14 60:1,3
63:20 77:10,14
84:10 85:5,12
85:13 95:4
107:16 108:1
137:21 142:1
158:11,17,21
160:1 162:10
163:17 164:1,7
171:20 173:16
174:3 198:21
204:10
**peoples** 27:9
64:3
**perceive** 97:11
**perceived**
12:17 15:2
67:3,3 90:22
**perceives** 78:11
93:2 146:4
**perception**
10:21 12:18
14:8,22 15:4
29:11 55:14
88:1,19 97:10
144:2,2 145:17
145:22 146:2
146:12,16

perceptions
  29:1
perimenopause
  142:8
period  57:21
  97:22 140:9
peripherally
  66:22
permit  63:19
permitted  6:21
  81:15
permitting
  63:19
person  60:13
  72:8 91:16
  97:8 108:10
  145:4,13 146:3
  146:9 171:1
  198:10,11
  202:11
person's  91:17
  198:17 199:4
  202:12
personal  93:6
  94:18 95:8
  104:11
personally
  94:22
persons  32:4
  66:15 82:17
  84:7 124:14,22
  141:11 158:8
perspectives
  159:16
persuaded
  194:4
phenomenon
  12:3

philosophers
  95:22
philosophical
  50:11
philosophical...
  176:13,19,20
phrased  199:16
physical  90:21
  202:9,15,21
  203:5,9
physically
  26:14 54:19
physician
  19:18 20:11
  27:14 28:2
  54:14 55:22
  56:4,5 57:22
  58:1 62:21
  67:2,14 73:5
  73:10 74:1,5
  74:10,15 88:9
  90:21 91:6
  92:14 111:10
  153:9,13
  160:11 176:1
physician's
  74:18 201:13
physicians
  21:15 32:12,14
  35:13 37:21
  40:14 48:8,22
  51:4 58:19
  61:9 62:20
  63:1,5 73:2
  74:6 83:5,16
  84:9 96:6,16
  98:17,21 160:3
  161:13 164:17

175:6,9,11,20
  178:7,15 180:5
  191:8 201:2,21
physiologic
  91:15
physiological
  204:6
physiology
  27:4
physiotherap...
  177:15,18
  178:4
piece  14:6 31:3
pins  171:19
pioneering
  48:3
place  48:1
  55:16,19
placed  60:9
  139:19
places  56:4,5
plain  150:4
plaintiff  1:9
  3:2
plaintiff's  3:21
plaintiffs  1:6
  131:18 135:3
  135:10 144:22
  184:20 190:14
  193:3,21
  194:22 196:7
  204:17 205:5
  205:21 208:15
plan  160:22
  182:19
plane  168:19
  169:19,20

play  48:19 71:7
  71:17 72:1
  153:3 200:9
please  7:6,15
  31:15 32:22
  37:12 94:9
  104:19 120:20
  123:17 131:15
  140:21 149:16
  150:8 168:3
plenary  69:2
plus  78:8
point  12:2 20:8
  24:1 32:22
  33:1 35:8
  37:20 39:2
  70:14 72:18
  89:22 112:3
  114:8 116:22
  118:13 119:1
  120:11 126:20
  127:7,8 135:2
  135:9,10 184:2
  187:6,8,14
  201:21 204:11
  207:22
pointing  95:4
  155:14
policies  52:15
policy  31:4
  52:3,5 53:7
  71:20 149:14
poor  49:7,9
popularized
  198:9
population
  28:7 49:1
  121:16

populations
152:11
portion 18:4,8
46:2,7 96:5,14
126:20 133:12
202:6 208:11
portions 79:2
208:4,7
posed 62:1,3
poses 137:1
position 108:16
132:22
possible 81:14
85:2 87:18
112:18 145:12
195:8,11,12
200:17
post 47:13
potential 5:16
159:6 186:21
201:8
potentially
99:18 102:3
poverty 49:3
practice 11:13
11:16 19:5
26:13 31:2,19
34:1 35:3,5
36:1 38:8,11
39:3,13 41:21
47:7,8,11
52:15 65:10
66:14,17 69:21
71:7 72:2
73:19,21 77:6
77:7 82:13,14
82:20 83:2,22
84:12,17,22

85:3 87:12
95:2,9 97:14
145:1 151:4
155:5 157:22
164:18 172:12
192:2 195:5
202:8
practiced
38:22 54:12
55:16,19
practices 31:20
32:14,15 37:22
38:1 76:10
85:7 96:7,8,16
96:17,20,21
178:7,8,15
practicing 35:4
38:15 48:9
54:3,21,22
65:8,9,15 81:3
81:11 84:16
88:9
practitioner
50:19 53:10
71:11 83:20
84:4 85:3,7
191:15
practitioner's
83:18
practitioners
36:2 50:16
53:4 70:21
81:12 83:12
84:2,3,15
88:22 94:22
95:17 150:21
156:15 165:11
190:12

precautionary
138:18
precise 34:16
40:3 45:16
88:6
precisely
150:11
predictors 4:14
120:14
preeminence
201:17
prefer 83:10
preference
209:7
preferential
49:9,9
preferred 83:2
83:7 177:14
179:3,10
pregnant 63:11
63:17
preliminary
182:22
premier 35:12
premise 104:20
106:2,16,20
108:20 128:12
128:13
preparation
10:12
prepare 10:1
102:22
prepared 211:3
preparing
100:18 103:20
104:1 117:2
121:4

prescribe 91:6
92:14 98:10
175:21 203:11
prescribed
67:11 144:13
144:20 203:8
prescribing
43:16,21 54:6
58:8,10,14
97:15 145:7,10
prescription
67:13 126:7
129:10
prescriptions
125:21 128:1
131:12
present 3:19
35:19 59:22
presentation
76:2,4,12 77:2
77:3,12 88:7
presentations
75:19
presented
56:12 75:9,11
presenters
43:16
presenting
44:3
presents 80:19
80:21,21
preserve 20:20
82:22
preserving
19:13 20:2
president 70:3
113:5

prestigious
173:20
pretty  27:19
135:10
prevent  145:2
150:15
preventing
133:21 172:2
primarily
35:13 76:16
81:20 82:1
primary  47:9
48:21 54:13
55:17,21 56:1
56:4,6 59:11
60:18,22 61:1
principal  199:7
principle
137:12 138:18
153:16
principles
157:13
print  79:19
97:1
prior  100:5,7
100:11 117:2,4
117:9 120:8
186:8 187:10
210:5
priority  49:11
201:17
private  3:21
40:19
privilege
101:11,20
privileged
102:17

pro  68:14
probably  8:12
93:22 102:14
114:18,18
151:17
problem  15:5
29:14 77:7
140:11 150:9
151:3 159:20
problematic
82:4 95:10
151:15 160:4
192:3
problematica...
149:19 155:18
problems
126:19 192:2
procedural
6:22
procedure
189:14
procedures
204:19
proceed  7:22
60:12 62:21
201:2
proceeding  2:4
6:4,20 209:22
211:4
proceedings
210:3,5,6,9
211:6
process  10:8
61:13 116:22
117:6 159:17
produced  6:19
product  102:1

production
142:4 181:20
181:22 182:14
profess  19:1
83:6,12
profession  71:4
74:19 95:1
professional
21:15 74:18
93:6 94:18
95:8,12,14,15
104:11 106:7
professionals
20:12,14,15,17
20:17
prognosis
40:14
program  30:10
30:14,15,16,17
30:20,20 31:9
32:1 35:12
37:13,14,19
38:3,8,11,13
38:14 45:14
166:19
programs
173:20
progress  76:1
prohibited
135:7
promote  84:8
promoting
190:14
prompted
38:20 47:21
pronounce
36:9,11 129:13
163:11

pronounced
36:13 163:12
pronunciation
163:18
proper  72:15
72:16 93:7,9
201:14
properly  71:4
72:10 84:19
199:18
property  62:14
72:17
proponents
136:11 142:21
proportionate
192:8
proposal  72:20
73:2,17 83:15
85:19 87:4
proposals
73:18 83:16
179:20
propose  16:15
102:11 209:4
209:10
proposed  31:11
181:17 182:19
183:8,20
proposition
70:19
prospects
173:9
protected
101:19
protecting
152:14
protest  170:11
170:17

Farr Curlin

April 8, 2024

protests   170:8

provide   21:16
64:7,16 73:5
73:12 74:2,5
74:17 84:9
86:19 88:11
90:4,10 153:20
153:22 154:1
207:12

provided   52:17
54:8 60:13
79:15 99:6
100:20 101:13
101:18 102:16
103:11,15
113:14 115:14

provider   52:10
81:5,6,8,10
88:8,9,10,18
89:3 131:8
198:16

providers
51:16,21 81:12
130:18 131:1
131:12 162:1
174:12 195:14
195:18,22

provides   82:6

providing
53:19,21 66:3
74:8,12 98:21
139:20 154:3,4
160:8,12
174:20 176:14

proxy   126:18
130:20 131:4
131:13

psychiatric
130:12,16,20
131:4,11 133:6

psychiatry
18:13,15 23:16
23:18 24:17

psychoactive
125:21 126:17
126:22 127:19
128:1 204:15

psychological
4:10 119:4

psychology
17:21 18:2,9
18:10 22:1,3
23:11 27:4
41:17,19

psychosocial
113:7

psychotherap...
177:19 178:3
179:4,11

puberty   4:11
5:13 13:19
14:11,21 15:6
43:8 44:4 54:6
58:9,10 66:3
85:21 87:3
88:11,13 90:4
90:4 91:5,7,7
92:14,15 97:15
111:12 112:8,9
112:11,20
119:4,21
138:20 144:16
144:18 145:4
185:6 186:20
189:22 190:2

204:4,9

public   76:7
96:21,22 97:1
161:1 172:1
210:21

publication
32:17

publications
32:19 33:4,19
64:20 75:5,8
193:4

publicly   166:14

publish   172:9

published
74:20,22
161:11

publishing
96:5,15

pull   15:15 17:2
93:13 120:19
123:16 127:10
162:15

pulled   119:10
120:20,21

punitive
150:21 156:14

purported
116:9 177:1,1

purports
154:19

purpose   19:21
19:22 20:1
37:18 43:12,14
69:18,20

purposes   13:2
13:8 80:3 81:1
103:15,20
106:4 110:8,14

121:9 123:4
149:10 150:7
152:6

pursue   19:18
81:18 88:22
201:18

pursuing   82:16

pursuit   69:21
82:14

put   42:18
43:14 50:15,16
53:3,5 59:21
79:8 133:1
152:12 156:6,9
182:21 192:4

puts   189:12

**q**

qualification
193:11

qualified   210:7

qualifies
107:21

quarter   114:21
120:3

question   8:22
11:20 17:11
21:3 30:1 41:5
55:4 61:17,18
62:10 63:12,16
64:17 65:13
69:9 71:20
74:9 86:19
89:10 90:8
96:12 97:4
98:8,16 100:13
101:10 102:3,6
102:12 106:22

113:22 114:2
127:5,12
133:19 138:10
144:11 145:20
148:15 156:5
165:7 176:18
176:21 178:2
179:13 182:10
199:16 206:4
**questioning**
208:11
**questions**  5:18
12:4 15:9 16:9
16:10 17:7
31:5 34:10,11
38:6 45:14,22
47:7 59:20
62:1,2,18
63:18,21 64:6
64:8 66:13
71:3 73:7,15
80:11,18 86:9
101:4 102:2
107:11 114:3
121:9 149:10
164:20 181:19
182:22 183:2
198:3 207:9
208:12,16,18
**quick**  92:10
**quit**  162:10
164:1,7
**quite**  133:3
**quotation**
129:11
**quote**  104:19
126:8 139:2
150:16,19,19

150:21 156:15
**quoted**  139:4
156:13
**quotes**  156:7,9
156:11,12

**r**

**r**  3:1 6:1
163:14,14
**radical**  189:13
**raise**  7:15
164:19 192:3
**raised**  12:5
39:11 59:20
72:12 76:8
100:13 174:10
**raising**  77:5
171:22
**randomized**
188:3,7,19
189:1
**range**  141:21
182:4,5
**ranged**  28:12
**rare**  20:12
26:19
**rates**  121:15
**rather**  36:2
59:6 79:10
125:22 128:2
201:3 203:14
**rationale**  76:7
204:6
**rbrooks**  3:16
**reached**  99:16
**read**  13:4
20:14 115:13
117:17,20

118:5,11
127:12 133:13
138:11 139:1,3
161:18,20,21
162:12 182:4
183:3 186:15
187:6,6,8
195:13,15
197:7 205:7,7
205:8,12,13,15
205:16
**reading**  128:5
151:18 164:4
185:10
**ready**  202:5
**real**  89:14
111:19
**reality**  20:16
83:11 84:2
**really**  21:3
61:16 73:3
158:16 172:22
**reason**  53:19
53:21 60:3
62:6 118:14
121:10 164:7
190:9,22 196:8
**reasonable**
70:22 83:5,16
84:14 85:18
87:4 133:19
135:12 153:9
175:6,9,12,16
176:6,16,22,22
177:4,11
178:22 179:1
190:12 192:5
198:10

**reasonably**
20:3,20 83:5
83:12 91:13
108:22 153:8
189:20 193:10
194:16
**reasoning**  35:5
59:18 96:1
150:2
**reasons**  19:17
50:11 60:12
83:9 87:1
91:12 92:20
95:10 162:9
163:22 183:16
**reassignment**
4:12,13 119:5
120:13
**reassure**  29:13
**recall**  11:10,21
12:1,19 14:5
17:22,22 18:4
18:6,8,11 22:2
22:3,16,19
23:1,22 24:10
24:14,22 25:8
25:10,13 26:1
28:16 33:10
34:21 42:9,15
43:3,6,9 45:4,5
48:15 54:9
55:5,12 57:8,9
57:16 61:15
63:13 64:18,18
66:17 67:15,22
68:1 70:5 75:7
98:19 99:1,8
99:12,20 103:1

Farr Curlin

April 8, 2024

103:21 104:2,6
104:7,17
109:17,22
110:3,4 116:17
118:17,19
119:19 120:10
121:2,7 124:5
125:7,9,11
127:22 130:4,5
130:19 131:10
131:13 133:10
136:15 138:12
138:13,14
139:7 140:20
146:1,18
147:15 148:8
162:3,7 164:14
166:1,4 169:15
170:12 182:16
185:10 195:15
205:18
**receive**  40:15
49:7 67:19
73:4,13 191:1
**received**  41:8
48:20 126:10
161:15
**receives**  160:11
**receiving**  67:9
67:12,13,18,18
129:1 130:8
164:20
**recent**  131:22
136:12
**recently**  182:3
**recognized**
52:19 76:6
143:22

**recollection**
11:17,19 29:20
44:2 57:19
99:21 110:12
110:16 114:6
118:3,10
124:10 126:16
130:11 186:10
197:15 206:12
**recommend**
57:10 85:16,17
85:21 87:22
**recommenda...**
60:11 164:15
**recommended**
66:1
**record**  6:4,5,17
7:7 9:1 47:1,2
47:4 60:16,17
94:3,4,6 103:3
115:3,4,6
119:3 127:16
151:18 165:1
167:18,19,21
180:16 181:1,2
181:4 182:5
206:20 207:2,3
207:5 208:21
209:19 210:9
211:5
**recorded**  7:2
210:6
**recording**  6:19
210:8 211:4
**records**  125:16
**reduced**  113:5
210:7

**reduction**
121:15
**refashion**
78:10
**refer**  13:11,18
14:5 16:10
17:6 46:14
72:13 80:4
81:4,6 82:7,9
89:4 94:11
105:9 113:11
136:12 145:16
145:21 146:10
146:11 157:2
161:10 198:9
**references**
80:10
**referred**  75:12
106:6 110:3
118:7 123:22
148:10 156:6
181:16
**referring**  12:22
42:2,7 44:22
69:12 105:5,8
108:10 109:8
109:12 112:3,5
113:12,15
136:13,15
137:6 148:1
163:21 169:9
169:12 171:11
181:17 186:5
193:3 197:19
202:3 204:1
205:1,2
**refers**  118:17
161:22 175:5

202:7
**reflected**  20:15
**refuse**  51:4
72:19 73:1,17
74:15 83:15
**regard**  49:10
122:3
**regarded**
107:16
**regarding**
12:17 30:22
32:15 38:17
39:17 41:12
45:15,16 60:11
67:16 71:4
75:5 85:8 96:7
96:16 115:21
116:16 135:18
147:4 155:8
171:15 177:1
178:8,15
179:19 182:18
188:7,14 194:8
196:12,17,19
197:4
**regardless**
134:22 151:21
**register**  124:15
125:1
**regularly**  65:16
**reimbursed**
160:3
**reimbursement**
160:7,9,12
**relate**  42:7
**related**  18:5,6
18:10 33:22
41:8,11 44:12

55:11 57:12
67:5 100:8
201:16 210:11
211:7
**relating** 97:10
173:2
**relationship**
104:12,14
152:17
**relationships**
27:6
**relative** 210:13
211:10
**relayed** 171:4
**relevance**
151:8
**relevant** 19:9
41:20 59:17,19
60:8,8 64:10
78:9 81:15
177:13 184:14
**relied** 107:6
184:4
**relief** 39:18
**relies** 84:22
**religion** 65:10
**religious** 32:8
32:11 36:16,17
36:19,22 37:1
37:21 52:10,13
64:14
**rely** 106:14
**relying** 85:3
149:2 155:10
**remain** 45:15
**remainder**
59:22

**remained**
126:2 128:3
129:7
**remaining**
40:15
**remedy** 84:7
**remember** 18:2
24:19 42:16,18
44:8 45:16
52:12 53:6
62:4 63:9 76:5
116:20 117:1
118:12 148:4
170:19 174:14
**remind** 8:17
**remote** 2:4
**remotely** 6:15
204:18
**render** 111:4
158:8
**rendered** 174:6
**renee** 3:20
**reopen** 102:15
**repeat** 14:21
24:7 37:12
90:8 96:12
145:20 182:9
205:10
**repeated**
127:16
**replacement**
142:9,12
**report** 4:8 9:7
9:11,14,17
10:5,6,10
13:11,13,15,17
14:20 16:6,18
17:7,13 45:12

45:15 46:2,3,4
46:5,8 66:9
77:20 78:7
86:22 87:13
90:12 91:12
92:20 96:3
97:18 100:15
100:16,18
102:22 103:8
103:20 104:1
104:19 105:11
105:21 106:4
106:11,12
110:4,6,9
114:10 115:10
116:15 117:3
118:4,6,8,15
120:9 121:4,5
121:13 124:6,9
129:12 131:14
133:12 138:5
140:22 147:19
150:5,12
151:19 152:12
153:5 159:14
161:8,10,12,16
161:20,21,22
164:14 165:8
166:12 174:2
181:7 183:17
184:7,11
186:12 187:16
189:11,12
195:21 196:17
204:1,17 205:7
205:8,13,15,16
207:10,18
208:4

**reported** 2:6
174:15
**reporter** 6:2,3
7:13,21 15:17
46:22 47:3
94:2,5 115:2,5
127:12,14,16
129:15,17
162:21 163:4,8
163:15 167:17
167:20 180:22
181:3 205:10
207:1,4 208:20
209:6,11,18
**reports** 105:13
106:15,17
107:8 115:14
117:20 118:7
118:11 122:1
147:11,12
148:10,22
173:22 179:6,7
193:8 205:6,22
206:2
**represent** 8:5
79:14 193:22
207:11,15
**representation**
79:11 184:16
**representatives**
179:1
**representing**
7:9,11
**reproduction**
87:19 111:5,11
**reproductive**
5:15 63:10
186:21

request  61:9,10
61:12,14 74:15
requested
53:12 60:14
127:17
requesting
74:11
require  95:2
137:18 198:12
200:4
required  22:12
128:20
requirement
192:14
requirements
50:22 82:17,20
83:20,21,22
requires  71:5,6
85:9,14 89:17
89:18 95:17
137:15 198:13
199:8
requiring
137:3 191:14
rescheduled
169:21 170:1,2
171:6
research  37:6,9
37:15,16 38:2
96:6,6,15,15
98:17,20
121:21 147:18
157:6,14 176:2
176:9 178:7,14
180:2 182:19
192:21,22
194:13 196:11
196:14,15,16

196:20,22
197:1,6
researcher
31:20
researchers
125:5,10 130:2
184:22
reservations
174:19
reserve  102:15
residency  26:3
26:5 27:16
28:6 30:9,13
resolve  200:15
resolving
133:22
resources  49:2
60:7
respect  19:16
19:16 26:13
41:4,21 49:2
61:3 65:18
71:1,13 89:1
91:5,16 98:1
100:18 105:20
106:10 107:3
109:16 115:21
122:2 136:10
144:4 146:15
151:5,9 152:3
152:12,19
153:17 154:2
172:22 190:19
191:2 192:11
193:14 196:5
199:7,14,21
200:4 201:14
206:16

respectfully
53:11 200:19
respecting
152:13
respects  112:8
189:15
respond  12:5
52:20
responded
14:10
responding
183:1
response  84:5
88:11 109:3
181:18 182:17
183:12
responses  15:7
45:17
responsibilities
191:8
responsibility
70:20 149:20
149:21 155:12
155:18,20
responsive
20:3
rest  137:18
restate  110:21
restore  20:20
82:22
restored  62:13
62:13
restores  128:19
restoring  19:14
20:2
restrict  64:3
result  32:5
111:13 121:16

126:11 204:13
retained  99:22
100:2,4,6
117:9
retention
104:13
retract  208:5,8
return  188:8
188:14
reuters  5:8
161:11 163:7
163:14 164:13
174:1
review  99:3,4,7
99:13 102:8,20
103:4 105:17
106:2,8 107:9
108:6 109:14
109:21 110:1
110:13 114:4
116:10,15
117:2 120:8
125:14 130:1
135:17 139:8
139:10,13
147:9 148:6,8
149:2,11,18
155:17 159:2
181:10 186:15
186:16 206:20
reviewed  10:5
10:6,8 12:10
33:8,19 74:22
101:14 104:20
105:6,7,9,9,12
105:15 106:5
107:7,8 108:20
109:9,10,13,15

110:5,8 113:18
113:20 114:5
116:22 117:4,9
119:15 120:22
121:2,8 123:6
124:2,7 125:2
125:10 129:22
135:14 147:3
147:12 181:22
182:13 186:13
186:14 187:9
187:11,12
197:11,13
205:6 206:1,2
206:5

**reviewing**
105:18 108:3
119:19 122:21
155:6 183:6

**reviews** 108:4
123:22 136:18
154:20

**revision** 12:8

**rhafferty** 14:6
118:5,8 133:1
193:4

**rheumatoid**
56:21

**right** 7:15 17:3
33:16 34:14,15
45:4 46:21,22
47:18 80:20
82:8 83:17
91:22 94:1
100:5 102:15
103:12 107:22
110:15 115:2
119:1 127:14

129:22 130:9
138:7 141:3
143:7 150:19
151:16 164:4
165:13 167:16
167:17 168:14
173:8 175:6,7
180:19 188:1
197:20,22
198:1,17
199:13,20
208:20

**rightfully** 83:6

**rightly** 14:10
50:2,20,22
51:1 199:2

**rights** 3:5

**rigor** 31:11

**rising** 164:2

**risk** 111:19
113:8 137:2
139:18

**risks** 193:18,20
194:16 202:15
202:21 203:5,8

**riverside** 3:14

**robert** 30:10,13
30:19 34:6

**roger** 3:12 7:10

**role** 48:19
54:12,13 59:9
60:22 61:1,3
70:1,7 71:7,16
72:1 153:3
200:8

**rolling** 167:5

**room** 9:18
168:22

**root** 27:8 89:13
89:21

**rotations** 24:2
24:4,5,8,10,12
24:13,16,20
25:3,5,6,9,11

**routinely**
202:14

**ruin** 163:3

**rule** 198:8,8

**rules** 7:1

**run** 91:20

**ryan** 211:2,17

**s**

**s** 3:1 4:5 5:1
6:1 163:14

**sadness** 11:6

**safe** 116:2
117:19,22
118:9 193:5,11
194:1,11,11

**safety** 117:14
135:15 150:15
184:14

**sake** 120:7

**sanctioning**
172:21

**saw** 20:11
25:11 27:19,19
28:11,14 51:17
54:19,20 56:12
67:20

**saying** 101:21
105:12,14
153:2 156:13
164:6 191:10
193:20

**says** 46:18
81:21 93:21
94:17,20,21
96:13 103:9
104:19 115:12
126:21 136:20
138:17 143:2
149:18 163:22
171:12

**scale** 131:22
136:13,18

**scenario** 98:7
188:21

**schedule** 61:5

**scholar** 31:20
34:6

**scholars** 30:10
30:14,19 45:13
166:19

**scholarship**
30:22 31:10
197:4

**school** 18:17,19
18:22 21:2,5,6
21:22 22:20
23:2,14 24:2,3
24:15 25:4
26:2,4 77:21
78:1 170:7

**schools** 21:7
82:1,3

**science** 19:16
104:20 105:5,6
105:8 106:3
108:20 109:8,9
109:13,14,22
112:6 113:11
113:12,13,15

113:17,17
114:4 122:2
**sciences** 19:9,9
**scientific** 31:3
115:21 139:9
147:3
**scope** 63:8
72:10,15,16,17
106:8 110:6
**screen** 93:21
120:3 122:17
123:19 165:3
**second** 25:2
34:12 45:19
75:20 76:20
141:6 145:18
147:1 150:11
159:15,20
170:4 171:6
190:8 202:5
205:7,11,13
**secondary**
10:21 14:8
15:1 55:13
90:16 97:10
112:19 137:14
144:3,4,6
145:3,11,13
146:4,6,8
191:21
**section** 3:6
**secular** 36:15
**see** 25:16 33:18
34:6 48:12
51:4 52:1
56:10 59:13
75:16 94:20
102:14 124:16

131:8 141:8
146:13 156:1
180:4 183:13
**seeing** 25:13
56:7,8
**seek** 29:13 50:1
78:9 84:7
154:6 157:14
200:19
**seeking** 20:19
32:8 74:4
82:21 142:22
164:3
**seeks** 27:8 74:3
74:17
**seemed** 63:14
183:15
**seems** 91:12
92:20 128:11
172:13 193:7
193:14,21
**seen** 49:19,20
50:3 79:18
120:2 184:18
186:8
**selected** 30:21
79:1
**self** 12:17
35:18 59:2
67:3 150:17,20
151:6,7 152:4
152:8 154:2,6
155:22 197:22
198:8,8 206:17
**seminar** 80:13
**sense** 10:22
12:10 13:9
25:21 40:17

80:7 84:22
85:4,10 87:9
93:3 95:11
143:20
**sent** 16:14
185:21
**sentence** 147:1
155:16
**separating**
93:5 94:18
**series** 77:14
**serious** 109:2
117:13 131:22
**seriously** 174:7
**serve** 51:10,11
**served** 51:12
58:18 99:2,4
183:21
**service** 58:2,17
58:20 59:2,4,8
59:10 61:4
65:19
**services** 31:1
65:16 76:1
81:5,7,9,10,13
88:8,9,18 89:3
198:16
**serving** 60:21
60:22 61:1
99:18 158:15
**session** 77:19
**set** 154:14,18
187:14 189:2,8
**setting** 56:7,9
57:2 58:5
189:6,7
**settings** 97:1

**seven** 76:5
**several** 39:1
68:9 80:13
**sex** 4:13 10:21
13:19 14:8,12
14:22 15:1,6
25:21,22 43:8
44:5 54:6
55:13 58:13,14
66:4 67:9 87:2
88:3 90:16
91:13,16,17
97:10,15
112:19 120:13
137:12,14
138:20 141:11
141:11,16,22
142:5,14,15,19
144:3,5,6
145:3,4,7,11
145:13,14
146:4,6,8,9
182:20 191:21
191:22
**sexes** 87:18
**sexual** 92:22
93:2 109:3
111:11,12
112:8,9,11
113:3 137:14
191:20
**sham** 89:15
**share** 87:19
**shared** 165:3
**sharp** 26:15
**shifting** 12:18
**shining** 164:16

Farr Curfin

April 8, 2024

**short** 46:10,16
92:5 114:17
180:16
**shortly** 99:22
100:2
**show** 15:19
84:4 93:20
162:12 191:15
**showed** 51:12
51:18 185:5
**showing** 48:17
**shown** 135:3
135:11 192:10
194:15 195:1,1
196:8 203:21
**shows** 52:7
199:16
**sick** 19:3 39:4
82:21
**side** 34:9 47:17
138:3 173:8
192:13 193:12
203:16 208:15
**siegler** 35:13
**sign** 126:6
129:9 141:12
156:11
**signals** 72:4
**signature**
209:20 210:19
211:16
**significant** 97:3
138:3 157:12
**silence** 77:1
**similar** 28:20
45:21 58:21
**similarly** 16:17
57:18 209:13

**simple** 143:16
**simplification**
81:1
**simply** 131:7
150:6 165:2
**sit** 16:11 17:13
**situation** 59:14
74:3 86:18
133:15 137:20
190:20 200:11
**situations** 39:7
154:8 189:15
200:2
**six** 40:14 77:4
**sixth** 146:10
**skills** 210:10
211:6
**sleeplessness**
56:18
**smith** 120:13
**soc** 149:19
150:9 154:9,14
154:18,21
155:17 157:17
195:13,15
197:19 201:7
**society** 69:6,10
69:17,19,20
70:17,18 71:19
148:14,19
149:1 206:9,11
206:15
**society's** 149:5
**somebody** 58:9
90:4
**somewhat**
44:16 68:5

**soon** 48:5
91:19
**sooner** 92:5
93:18
**sorry** 11:18,20
24:6 31:16
36:9 37:12
100:16 110:19
117:7 119:18
122:14 126:20
127:11 139:12
151:16 205:10
**sort** 51:5 77:9
166:7
**sorts** 40:5
**sought** 29:9
62:19 63:10,20
**sound** 92:3
93:6 180:19
**sounds** 17:3
93:7 114:12
180:20 195:20
**sources** 59:19
**south** 47:19
**spanish** 48:5,6
48:7
**speak** 10:12
39:12 59:19
91:2 140:10
173:18
**speaker** 69:2,3
**speaking** 29:7
29:7 48:7
71:19 77:10
128:16 144:7
165:12 171:2
171:21 200:3

**special** 164:14
**specialist** 67:16
**specialists**
49:20
**specialized**
41:16
**species** 87:17
**specific** 18:10
23:8 36:6
53:22 54:5
57:19 58:7,8
68:1 83:22
87:12 91:10
92:18 98:7
106:22 111:6
130:13,20
139:5 150:22
154:8 156:16
165:15 169:9
169:13 170:10
**specifically**
18:15 22:4
28:16 33:3
42:13 45:6
50:19 54:1
64:11 68:21
72:13 75:12
95:17 99:8,12
100:11 102:5
137:11 143:11
146:1 151:6
176:17 189:21
204:22
**specifics** 57:9
**specified** 130:6
**specifies** 15:3
**specify** 14:17
14:18 128:12

speculate   43:13
speculation
   30:4 195:10
speculative
   86:4
spell   129:15
spelled   36:13
spend   30:21
spent   96:4,14
spiel   8:17
spinal   188:8,15
spirituality
   168:12
spoke   48:5,6
   173:15
spoken   166:13
sports   188:8,14
spring   170:1
spuriously   95:4
stable   126:5
   129:8
stake   37:2
   200:12
stand   158:10
standard   51:3
   137:21 141:21
   151:4 152:3
   154:21 159:16
   177:6,14 179:3
   179:10 203:11
standards
   62:15,16,17
   64:10 150:13
   160:1,14
   196:18
standing   95:6
   209:3,9,14

start   15:8 33:7
   126:1 128:3
started   19:19
   35:13
starting   164:19
state   1:13 6:10
   96:4 100:22
   115:13,18
   119:2 121:6
   123:5 136:7
   141:2 162:8
   168:8 169:6
   174:6 181:9
   191:2 193:8
   194:5,8,15
   195:17 201:7
   204:17 209:3
   210:22
statement
   132:15,22
   133:2 149:4,14
   152:5
states   1:1,8 3:2
   6:8 7:9 8:6
   108:8,9,11
   132:4 155:17
statistcal   143:3
status   49:4
stayed   131:2
stenographic
   7:3
step   140:9
steps   105:21
sterilization
   109:2,19
   110:18 111:3,8
   111:14

steve   1:11 3:11
   6:8
stimulate
   112:17
stimulating
   35:6
stipulation   7:4
stop   71:21
   88:13 90:4
   91:7 92:14
stopped   110:1
   128:9,18
stories   20:14
straightforwa...
   135:10
stretch   91:20
strikingly
   203:12
strokes   28:8
   62:3
strong   164:15
strongly   49:4
   88:17
structure   70:14
structuring
   40:11
struggle   49:13
students   31:22
   39:8 82:2
   168:20 169:6,9
   170:14 172:20
   173:11,12,13
studied   197:6
studies   17:20
   103:11,14
   105:13 110:2,5
   111:18 116:1,3
   116:7,8,11,14

116:15 117:11
117:17,20,20
118:1 121:8,14
131:22 136:13
136:13 139:5
185:5,11
187:19 188:3,7
188:19 197:11
204:1
study   19:8 31:7
32:11 37:20
110:1 116:20
118:2,15,17,19
118:20 119:3
119:15,21
120:8,12 121:1
121:2,4 122:5
122:16,19,21
123:3,6,9,18
123:20,21
124:4,7,8,12
124:15,19
125:1,3,5,8,12
125:14,15,21
126:13,21
127:2,6,11
128:5,22
129:14,19,22
130:2,7,14,22
136:17 164:13
184:13 185:14
186:8,19 187:9
studying   180:6
stuff   80:10
84:9
subheading
143:2

Farr Curfin

April 8, 2024

subject   20:9
43:6,7 45:7
172:18
subjected
172:19
subjecting
159:1
subjective
81:19 88:19
89:5,6,12
subjects   43:4
submit   16:6
17:5
submitted   9:14
9:17 16:5,18
17:4 115:14
submitting
117:3 179:20
subspecialty
39:16
substance   56:3
101:12 102:2,3
102:7,10
substantial
96:4,14 109:2
157:3
substantive
95:20
substituting
178:2
succeeded
184:1
sudden   173:2
suffering   67:8
146:3
sufficient   62:9
133:17 153:7
176:8 187:21

189:4 192:17
195:3 196:9
sufficiently
63:3,4
suggest   21:13
116:2 183:12
suggested   95:5
184:7
suggesting
183:11
suggests   112:6
150:14 184:19
194:6
suicide   4:20,20
121:15 122:7,8
summaries
177:11
summarize
150:7
summarized
117:12 130:5
136:22 137:7
204:2
summary
148:22 154:20
186:16
summer   37:5,9
38:3 70:5
206:13
superior   177:5
supplemental
124:9
support   132:17
178:13
supported   31:8
132:19
supports   132:4
132:11 133:6

supposed
168:11
suppress
137:13
suppression
4:11 5:13
119:5 186:20
sure   8:18 10:16
19:17 33:16
46:12 49:17,19
50:1 52:1,11
69:11 73:10
89:12 90:9
91:5 96:10,13
109:20 110:22
112:4 116:19
119:9 124:18
127:13 138:9
138:11 140:12
143:15 144:18
145:19,21
150:9 153:1
155:15 162:14
166:16 167:8
174:19 180:18
182:6,12
185:13 186:4
195:11,12
196:16 208:11
209:1
surgeon   19:6
surgery   24:16
27:18
surgical   26:9
78:9
surrogate
62:15

surrogates
62:14
surrounding
77:22
surveilled
174:9
survey   37:5,9
37:15 38:2
179:12
surveys   38:5
sustain   128:20
sustains   137:13
swear   6:14
7:14
sweden   108:2
140:15 147:16
179:8
sweden's   139:9
swedish   148:7
switching   68:3
sworn   6:17
7:18 210:5
sympathy   29:8
symposia   41:19
42:1,6,17 43:1
44:12
symposium
42:12
symptoms
28:20,21 29:22
30:2 39:19
40:5,7 55:2
57:7,11 66:15
system   140:16
systematic
108:4 136:18
148:6,8 149:2

Farr Curtin
April 8, 2024

[systematically - think]                                                              Page 49

| | | | |
|---|---|---|---|
| **systematically** 147:3 | 77:13 124:7 134:3 160:6 | 167:13 | 156:19 161:5 163:15 167:22 |
| **systematicness** 26:22 | 168:8,11,18,18 169:4,8,12,16 | **tended** 82:3 **term** 11:2,7,9 | 177:21 180:20 207:6 208:10 |
| **t** | 169:21 174:6 175:2 199:19 | 11:11,14,21 12:14,19,22 | 208:17 **thankfully** |
| **t** 4:5 5:1 129:16 163:14 | **talked** 70:15 165:18 197:8 | 13:8,21 14:1 23:3,5,7 25:18 | 183:22 **thanks** 167:16 |
| **ta** 175:5 | 198:2 206:9 | 31:1,15 40:2 50:8,12 135:13 | **that'd** 167:6,11 |
| **take** 6:4,12 8:20 9:1 22:14 | **talking** 22:20 46:2,3,5 137:7 | 146:16 156:9 177:18 183:9 | **theme** 90:17 **theological** |
| 23:16,20 26:16 31:9 46:6,10 | 148:17 160:7,9 165:15 166:16 | 198:6,21 199:17 | 50:5 **therapy** 4:18 |
| 46:16 65:19 68:16 78:15 | 173:11,13 176:17 | **terms** 10:16 12:16 14:14 | 5:11,14 122:7 142:12 185:17 |
| 80:17 84:14,19 86:20 91:19 | **talks** 77:21 **taught** 80:12 | 95:22 96:1 182:15 198:18 | 186:20 **thing** 8:19 |
| 92:9 93:15 104:19 105:21 | **teach** 38:18 **teachers** 27:12 | **terrible** 114:8 **terrified** | 20:16 44:5 **things** 29:2 |
| 106:1,16,19 108:20 135:9 | **teaching** 39:8 66:2 80:14 | 173:17 **testified** 7:20 | 42:5 50:15 51:6 53:3 |
| 137:22 144:16 144:18 148:13 | **teachings** 21:1 21:4,6,7 | 110:7 120:2 134:15 136:1 | 91:11 154:19 159:5 163:18 |
| 148:16 149:4 158:11,20 | **technological...** 81:14 | **testify** 207:9 **testifying** | 192:19 **think** 13:10,11 |
| 164:6 167:6,9 167:13 180:3 | **technologies** 63:11 | 193:19 210:5 **testimony** | 13:17 20:15 21:8 30:5 |
| 200:18 206:19 | **tell** 7:19 9:19 | 134:16 174:20 | 34:21 40:4 |
| **taken** 6:7 8:7 8:14 93:7 | 15:17 29:13 33:2 48:13 | 190:21 199:11 199:22 | 53:13,15 54:2 59:4 62:6,20 |
| 174:7 175:12 210:3,12 211:9 | 69:18 76:2,3 79:5 85:5 | **testing** 183:14 **testosterone** | 63:3 65:22 66:6,19 73:2 |
| **takes** 14:7,19 46:19 79:4 | 150:11 169:8 200:6 201:11 | 5:14 142:14 185:7 186:20 | 80:8 85:6 89:2 93:14 98:16 |
| 81:11 82:13 88:19 204:8 | 206:10 209:16 | **text** 12:8 | 102:13 110:7 |
| **talk** 10:7,18 45:21 76:6 | **ten** 8:11,12 46:17,19 65:7 | **thank** 7:13,21 8:1 94:1,7 | 127:7 136:3,17 137:20 150:4 |
| | 93:15,18 | 115:7 129:17 | 151:14,21 |

157:9 163:12
176:7 177:18
185:14 189:12
191:18 201:1
206:7
**thinking**   20:9
54:2 81:20
84:15 137:11
172:1
**third**   24:15
191:5
**thoroughly**
27:9
**thought**   44:3,4
63:1 170:16
**thoughts**   4:19
122:7
**threat**   133:17
133:21,22
200:13,15
**threaten**
112:13
**threatened**
20:18 111:7
166:3
**threatening**
109:2,19
110:17 111:2,4
**threats**   84:5
134:3,4 162:1
174:12,18
**three**   205:22
**thrombosis**
139:18
**thumbs**   114:13
**thyroid**   56:20
**tied**   73:15

**time**   2:3 7:6
8:13,20,21
12:19 25:16
34:5 35:15
44:9 46:16,18
46:22 47:3
54:16 57:21
61:8 73:9 80:6
80:15 91:21
94:2,5 96:5,14
114:10 115:2,5
163:13 167:13
167:17,20
170:5 171:6
175:12 180:22
181:3 187:7
207:1,4 208:6
208:10 209:18
**timeframe**
18:12 29:18
**times**   8:9 14:21
41:20 50:8
198:14
**title**   45:16 56:1
76:22 124:17
165:2 186:19
187:6,8
**titled**   119:3
122:6 123:10
**today**   9:5 16:11
17:13 25:14
28:17 50:8
186:9 187:10
208:10
**today's**   10:2
**together**   59:21
73:16 80:16
205:2

**told**   168:17
169:7 170:6
182:2
**tollefsen**   80:12
**took**   18:9 59:19
76:9 121:5,8
121:22 123:3
139:8 148:21
149:9 157:8
**top**   22:14 79:9
**topic**   31:7 45:2
75:10,11 77:8
77:18 121:21
166:19
**topics**   68:3
173:1
**touch**   19:19
**toward**   134:6
**towards**   167:5
**town**   36:13
**tr**   13:1
**tradition**   49:14
**traditions**
64:15 66:10
**train**   48:2 82:2
**trained**   31:18
31:19 176:12
**trainees**   39:8
60:1
**training**   31:9
35:8,12,16
38:4,16 39:1
41:3,8,12,17
47:12,13 48:10
85:20 142:18
146:19 173:16
173:19 179:19

**transcriber**
211:1
**transcript**   6:19
15:21 208:21
209:12 211:3,5
**transcriptionist**
210:8
**transfer**   45:20
**transgender**
4:21 5:7 51:21
52:4 77:22
78:5 122:8
123:12 124:14
124:22 162:9
164:1,7 166:20
**transition**
13:12 14:19
66:6 75:2,13
76:1,8 78:8
88:17 90:11,15
97:17 98:22
100:14 108:14
113:6 114:9
115:22 116:2,3
116:9 117:22
118:4,9 121:16
125:20 126:1
126:10,12
128:3 130:15
131:6 132:17
133:4 135:11
135:19 136:9
140:6 142:5,8
142:20,21
160:4,10,13
164:3,16
168:21 175:14
175:16 182:21

Farr Curlin                                                    April 8, 2024

[transition - under]                                                Page 51

189:11 190:15
196:10 203:13
**transmasculine**
5:12 185:17
**transsexuals**
4:16 120:15
**treat** 27:16
29:4 51:16,21
52:6 54:16
55:1 57:2,6
85:21 119:22
176:3 200:5
204:9,11,12
**treated** 27:17
28:7 54:16
56:16,17
203:20
**treating** 15:4
52:3 57:4,17
155:3
**treatment** 4:15
13:12 49:15
57:10,15,19
66:4 67:5 73:5
73:11,11,12,13
74:6,7,10,11
74:12,13 85:17
85:18 87:21
90:11 97:16,19
97:22 98:4,10
98:22 108:14
111:19 117:14
120:14 124:13
124:21 126:6
126:14 128:7,8
128:9,16,18,19
129:2,9 130:9
130:12,16,20

131:5 133:14
134:11,13,17
135:22 149:3
150:22 153:3
153:20 156:16
162:10 164:1,8
176:14 177:5
177:15 179:4
179:11 185:6
192:5 196:5,13
**treatments**
13:20 26:10
43:17,22 52:16
52:18,20,20
53:14,20,22
54:8 85:15
105:2 109:1
138:19 175:18
175:21
**trent** 166:21
**trial** 181:11,15
181:17 183:8
183:19 184:5
**trials** 189:1
**tried** 149:5
**true** 9:13 79:16
149:4 157:20
188:12 191:1
193:9 210:9
211:5
**truer** 83:10
**truth** 7:19,19
7:20
**try** 27:9,10
44:14 84:17
86:6 93:17
167:8 179:12

**trying** 27:2
38:6 43:15
93:13
**turban** 123:9
123:19
**turn** 62:14 94:9
103:9 104:18
115:9 140:21
168:2 181:6
186:18
**turned** 94:14
**turning** 17:15
78:13 96:3
100:15 121:12
124:6 131:15
138:5 143:1
149:16 161:8
174:22 177:8
184:10 197:16
201:22 204:16
**turns** 203:14
**two** 14:14 20:6
30:16,21 36:14
40:13 45:5
46:14 53:15
59:21 60:20
61:5 80:19,22
81:2 83:1
87:18 95:21
110:2,5 140:11
141:21 184:22
205:17,22
**type** 24:12
73:11,12 87:21
170:10 176:13
176:14 196:15
**types** 22:11
27:15 43:17,22

53:13 56:16
62:1 64:5
155:3 175:21
**typewriting**
210:7
**typical** 86:8
146:7
**typically** 60:20
72:21
**typo** 182:4

---

**u**

**u** 163:14
**u.s.** 3:20
**ultimately**
81:19 183:11
**unable** 196:1
**unavailable**
134:18 164:11
**unc** 17:16,19
18:17
**uncertain**
175:17 177:13
179:2,9
**uncertainty**
27:5 117:13
177:3,4
**unclarity** 182:6
**uncommon**
137:17,19
163:18
**under** 6:22
8:18 20:13
33:22 54:7
62:7 68:2 86:6
86:13 88:8,9
90:2,9 138:21
140:6 153:16

undergoing
128:7 142:7
undergrad
18:16
undergraduate
17:16,18,20
18:14,18
underserved
32:5,10 48:2,9
understand
6:18 9:3 12:6
17:8 19:2 24:6
27:2,8,10 32:8
72:10,22
143:10 153:1
164:6 171:22
176:8 179:13
189:21 193:2
understanding
10:16 13:7
21:9 23:3,5
81:2,11 82:5
82:12 87:11
95:15 112:15
124:3 128:5
129:4 135:12
144:12,21
145:6,9 146:7
153:21 162:9
163:22 170:20
183:5 195:3
198:19
understood 9:2
26:17 41:15
50:21,22 51:1
51:9 53:8 71:5
84:20 91:14

96:3 151:10
152:10 153:8
165:18,20
198:17 199:2
199:18 204:16
underwent
125:20
undeserved
48:4
unethical 91:1
91:6
unifying
166:11
united 1:1,8
3:2 6:8 7:9 8:6
108:8,9,11
132:4
universal 84:19
university
18:19 26:3,5
35:14 37:10
38:11 39:10,14
42:20 44:10
48:11 55:17
57:22 58:2,18
59:1 76:15,18
78:2 168:9
169:6,16
173:14 179:22
unjust 63:18
unjustified
64:2
unnecessary
178:17,20
unproven
105:2 131:21
136:6,10,22

unsafe 116:4
unscheduled
8:21
unstable 63:15
unusual 190:20
unwanted 29:1
updating 77:3
upset 11:7
usdoj.gov 3:8
use 10:17 12:21
13:13,14,18,18
14:20 23:7
38:1,2 40:3
50:5 139:21
150:15 183:9
198:21
used 11:2
12:16,20 14:5
14:22 23:1,5
35:21 50:7
76:7 81:17
96:1 146:16,19
178:3 198:6,14
199:3,17
204:15
useful 80:16
uses 6:21
150:10
using 13:4
22:20 37:15,16
95:21 156:10
182:19
usual 8:17
usually 60:1

**v**

v 1:7,10

va 3:15
valid 105:22
valuable 19:4
value 199:20
values 49:16,21
53:20,22 64:10
65:20 66:5,10
66:12 85:16
95:8
variety 155:3
various 38:17
41:10 155:8
vary 141:16,17
verify 149:6
veritext 6:4
209:4
verse 12:9
version 12:8
150:13
versus 84:3
video 169:16
videoconfere...
2:1 3:4,12,20
3:22
view 19:20,22
20:5,6 21:20
72:1,3 82:7
83:3 199:1
200:9 207:22
views 165:22
166:3,10 169:9
169:11 170:17
172:4,18
vigorous 71:2
violated 157:13
violating 21:16
181:12 183:16

violence 162:1
165:21 166:3
174:12,18
virginia 36:12
virtually 72:9
virtue 189:21
vision 49:5,12
visits 131:11,13
vitriolic 172:20
vitro 5:9
185:15
voice 110:19
161:15
voiced 164:20
voicing 172:12
vote 160:2
vries 119:3
vs 6:8
vulnerable
152:11

w

wait 206:6
waived 209:20
want 10:15
13:3 15:18,19
15:20,22 17:6
21:14 29:2
46:16,17 57:15
78:15 84:10
109:20 114:8
116:19 120:11
128:11,12
140:10 151:17
174:9,17 180:4
185:12 191:14
201:3 202:6,17
208:9

wanted 35:3
48:2 88:13
wants 21:14
200:16
warrants 143:5
washington 3:7
watched 20:10
way 4:9 20:19
27:1,3,7 34:2
40:4,10,15,20
42:11 50:12
52:22 69:1
75:3,4 78:13
78:18 81:10,20
82:4,8,10,11
82:12 83:1,4,7
84:1 89:20
90:2,9 95:21
159:12 164:15
168:14 171:20
172:12 191:13
199:16,17
201:4,19
203:19 204:14
206:15
ways 23:6
41:13 49:17
80:19 198:7
203:15
we've 16:13
23:19 41:15
84:13 90:13
163:20
weaver 3:21
website 70:10
70:11
week 80:13

weekly 60:2
weigh 62:8
weighs 89:20
wellbeing
81:19 88:20
93:3 146:5
went 18:18
38:3
west 34:8 47:17
who've 165:11
widely 53:7
widespread
171:14
wife 48:6
williams 3:20
208:16
willing 86:6
wish 86:18
wished 29:3
wishes 63:5
wishing 29:16
withdraw 41:4
witness 6:14,17
6:18 7:14,18
46:13 79:18
94:14 99:18
100:4,6 101:4
102:12,16
114:11,12,17
114:22 117:5,8
117:9 119:8,11
120:1 122:14
122:16 127:1
127:13 140:10
163:12 165:1
167:15 180:18
182:9 185:21
186:2 205:12

208:19 210:4
woman 63:10
63:17 142:7
wondering
50:9
wood 30:10,13
30:19 34:6
word 178:2,3
198:7 199:2,3
words 74:1
126:9
work 12:1 19:3
20:10 32:9,16
32:18 33:4,6
33:21 47:21
48:2,3,22
65:18 74:20
99:10 102:1
104:4 106:20
106:21 173:6,6
173:16 174:5
206:15 207:21
worked 56:11
working 32:5
55:7 128:8,17
142:2 173:1
world 44:16
worried 170:13
worse 71:13
129:1 130:9,11
175:18
worsen 129:7
worship 65:16
worth 203:5
worthwhile
19:12 35:6
wpath 113:5
121:19 149:8

Farr Curtin

**[wpath - youtube]**

149:12,19
150:9,13 151:7
155:17 156:22
157:7,12 159:7
**wrap**   66:13
**write**   60:9
80:11,16
150:13 172:17
178:5
**writer's**   163:8
**writing**   96:2
159:17 160:1
161:3 172:7
190:22 197:2
**written**   7:4
32:16,19 172:8
197:13 207:18
**wrong**   29:10
144:5
**wrote**   88:16
105:4 109:7
117:16 128:1
136:16 137:5
143:7 161:18
171:16 181:14
181:18 205:17

**x**

**x**   4:1,5 5:1

**y**

**yeah**   30:5
65:14 75:18
86:3 98:6
114:1,22
122:14,15
148:4 154:17
159:19 162:19
165:4 195:11

**year**   24:15,15
24:21 25:2,4,7
32:7 35:16
60:20 77:14
170:3
**years**   12:2 30:7
30:16,21 39:1
43:3 54:11
62:4 63:13
65:7 76:6 77:4
80:13 118:12
126:2 128:4
197:1
**young**   4:10
63:10,17 119:4
**youth**   4:22
5:12 122:9
140:15 185:18
**youtube**   169:16

Federal Rules of Civil Procedure

Rule 30


(e)  Review  By  the  Witness;  Changes.

(1)  Review;  Statement  of  Changes.  On  request  by  the
deponent  or  a  party  before  the  deposition  is
completed,  the  deponent  must  be  allowed  30  days
after  being  notified  by  the  officer  that  the
transcript  or  recording  is  available  in  which:

(A)  to  review  the  transcript  or  recording;  and

(B)  if  there  are  changes  in  form  or  substance,  to
sign  a  statement  listing  the  changes  and  the
reasons  for  making  them.

(2)  Changes  Indicated  in  the  Officer's  Certificate.
The  officer  must  note  in  the  certificate  prescribed
by  Rule  30(f)(1)  whether  a  review  was  requested
and,  if  so,  must  attach  any  changes  the  deponent
makes  during  the  30-day  period.


DISCLAIMER:  THE  FOREGOING  FEDERAL  PROCEDURE  RULES
ARE  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
THE  ABOVE  RULES  ARE  CURRENT  AS  OF  APRIL  1,
2019.  PLEASE  REFER  TO  THE  APPLICABLE  FEDERAL  RULES
OF  CIVIL  PROCEDURE  FOR  UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

January 2024

## CURRICULUM VITAE

### Farr A. Curlin, MD

**EDUCATION AND TRAINING**
College:  University of North Carolina at Chapel Hill, BA with distinction, Biology, 1992
Medical School:  University of North Carolina School of Medicine, MD, 1998
Residency:  University of Chicago Hospitals in Internal Medicine, 1998 – 2001
Fellowship: Robert Wood Johnson Clinical Scholar, The University of Chicago, 2001-2003
Fellowship: MacLean Center for Clinical Medical Ethics, University of Chicago 2003-2004
Summer Institute for Survey Research Methods, University of Michigan – 2006
Program in Palliative Care Education and Practice, Harvard University – 2008

**BOARD CERTIFICATION**
Diplomate American Board of Internal Medicine 204781, 2001, 2011, 2022
Hospice and Palliative Medicine Certification (ABIM), 2010, 2022

**MEDICAL LICENSURE**
North Carolina License No: 2013-01944

**MEMBERSHIPS**
American Medical Association
American Society for Bioethics and Humanities

**ACADEMIC APPOINTMENTS:**
Duke University
2014 -           Josiah C. Trent Professor of Medical Humanities, Trent Center for Bioethics,
                 Humanities & History of Medicine
2014 -           Professor of Medicine, Center for Palliative Care, Section of General Internal
                 Medicine, Department of Medicine
2014 -           Professor and Co-Director, Theology, Medicine, and Culture Initiative, Duke
                 Divinity School (tmc.divinity.duke.edu)
2017 -           Senior Fellow, Kenan Institute for Ethics

The University of Chicago:
2003 – 2005      Instructor of Medicine, Section of General Internal Medicine
2003 – 2006      Associate Faculty, Robert Wood Johnson Foundation Clinical Scholars Program
2004 – 2013      Faculty, the MacLean Center for Clinical Medical Ethics
2005 – 2010      Assistant Professor of Medicine, Section of General Internal Medicine
2009 – 2013      Co-Director, Program on Medicine and Religion (pmr.uchicago.edu)
2010 – 2013      Associate Professor of Medicine, Section of General Internal Medicine

**HONORS, AWARDS, SCHOLARSHIPS (selected)**
1989    Valedictorian, Jackson Central Merry High School, Jackson, TN
1989    William Richardson Davie Scholar, University of North Carolina
1992    Phi Beta Kappa, University of North Carolina – Chapel Hill
1995    Herbert H. Fritz special merit award for scholastic excellence, UNC School of Medicine
1995    North Carolina Albert Schweitzer Fellowship Award
1995    Foreign Fellowship Award, UNC School of Medicine

EXHIBIT
1

**Farr A. Curlin, MD**

| | |
|---|---|
| 1997 | Alpha Omega Alpha Honor Medical Society, UNC School of Medicine |
| 1998 | Heusner Pupil Award, for showing "a great capacity to grasp the principles of science, to heal the sick, to comfort the troubled, to be humble before God." UNC School of Medicine |
| 1998 | Cecil G. Sheps Award in Social Medicine – chosen by the Department of Social Medicine as the graduating student who most embodies the department's ideals, UNC School of Medicine |
| 1998 | Terri Brenneman Award - for "the graduating student who has most demonstrated a commitment to the underserved." UNC School of Medicine |
| 1998 | Merck Award – chosen by the UNC faculty as one of four graduating students to be honored for their contributions to the medical school community, UNC School of Medicine |
| 2000 | Norris L. Brookens Award – chosen by the state chapter of the American College of Physicians as the Most Outstanding Internal Medicine Resident in Illinois |
| 2003 | John A. Oremus Memorial Scholar – MacLean Center for Clinical Medical Ethics, The University of Chicago |
| 2006 | Greenwall Foundation Faculty Scholar in Bioethics (2006-2009) |
| 2007 | Outstanding Physician Scientist Award. Central Society of Clinical Research and the Midwestern Section of the American Federation for Medical Research |
| 2008 | Early Career Development Award. Central Society for Clinical Research |
| 2011 | Arnold P. Gold Foundation Humanism in Medicine Award Nominee. Pritzker School of Medicine student body |
| 2012 | David B. Larson Fellowship in Health and Spirituality, The Library of Congress |
| 2012 | White Coat Ceremony Keynote Speaker, Pritzker School of Medicine, August 5 |
| 2014 | Gold Humanism Honor Society Induction Ceremony Keynote Speaker, Pritzker School of Medicine, Chicago, IL. March 13 |
| 2017 | Inaugural Robert D. Orr, MD, Lecture in Medical Ethics, University of Vermont, October 27 |
| 2018 | The Steve Thorney Career Award for Spiritual Care, MD Anderson Cancer Center |
| 2018 | Paul Ramsey Award for Excellence in Bioethics, Paul Ramsey Institute |
| 2019 | Pellegrino Medal for Healthcare Ethics, Samford University |
| 2021 | Inaugural Lisio Family Lecture (medical ethics). Columbia University |
| 2022 | Educator of the Year, Christian Medical and Dental Associations |
| 2023 | Englehardt Award (bioethics), The Ohio State University Center for Bioethics and Medical Humanities |

**REVIEW AND EDITORIAL EXPERIENCE**

**Ad hoc journal and book review**

Academic Medicine, American Journal of Bioethics, AJOB – Empirical Bioethics, American Journal of Hospice and Palliative Medicine, American Journal of Law and Medicine, American Journal of Psychiatry, Annals of Family Medicine, Annals of Internal Medicine, Archives of Internal Medicine, British Medical Journal, BMC Medical Education, Cancer, CHEST, CMAJ, Elsevier, Explore, Georgetown University Press, Harvard University Press, Health Affairs, International Journal of Psychiatry in Medicine, Johns Hopkins University Press, Journal of Christian Bioethics, Journal of Clinical Oncology, Journal of General Internal Medicine, Journal of Medical Ethics, Journal of Medicine and Philosophy, Journal of Oncology Practice, Journal of Pain and Symptom Management, Journal of Religion and Health, Journal of the Scientific Study of Religion, Lancet, Medical Care, Mayo Clinic Proceedings, Medical Journal of Australia, New England Journal of Medicine, Oxford University Press, Pediatrics, Perspectives in Biology and Medicine, Plos One, Social Science & Medicine, Southern Medical Journal, Stanford University Press, Theoretical Medicine and Bioethics, Zygon

**Farr A. Curlin, MD**

**Editorial experience**

| | |
|---|---|
| 2008 | Guest editor of special issue of *Theoretical Medicine and Bioethics*, focused on conscience and clinical practice, published 2008 |
| 2014 - | Editorial Board, *Perspectives in Biology and Medicine* |
| 2016 | Guest editor of special issue of *Christian Bioethics*, focused on setting the medicine in the context of a good and faithful life |
| 2019 | Guest editor of special issue of *Theoretical Medicine and Bioethics*, focused on defining and measuring death |
| 2019 | Guest editor of special issue of *Perspectives in Biology and Medicine*, focused on disputes about conscience in medicine |
| 2023 | Guest editor of special issue of *Christian Bioethics*, focused on moral and theological questions raised by medicalizing risk |

**CLINICAL PRACTICE**

| | |
|---|---|
| 2001 – 2003 | Primary Care Internist, Lawndale Christian Health Center |
| 2003 – 2008 | Primary Care Physician, University of Chicago Primary Care Group |
| 2003 – 2013 | General Internal Medicine attending physician. University of Chicago Hospitals. |
| 2004 – 2013 | Ethics consult service, University of Chicago |
| 2008 – 2013 | Associate Medical Director – Horizon Hospice Care, Chicago, IL |
| 2008 – 2013 | Palliative Medicine Consult Service. University of Chicago Hospital |
| 2014 – | Attending physician. Duke Hospice and Palliative Care |

**ADMINISTRATIVE LEADERSHIP / COMMITTEE WORK (selected)**

| | |
|---|---|
| 2000 – 2003 | Best Practices Project Steering Committee. The US Bureau of Primary Health Care and the Christian Community Health Fellowship |
| 2003 | Working group on the ethics of spirituality in medicine. George Washington Institute for Spirituality and Health and the Association of American Medical Colleges |
| 2006 – 2008 | Ethics Research Group. Division of Standards and Survey Methods. Joint Commission on Accreditation of Healthcare Organization |
| 2008 – 2013 | Founding Co-Director (with Daniel Sulmasy, MD, PhD), Program on Medicine and Religion, The University of Chicago. https://pmr.uchicago.edu |
| 2010 – 2015 | The Witherspoon Council on Ethics and the Integrity of Science. Member. |
| 2012 – 2015 | Bioethics and Christian Theology Affinity Group, Founding Co-Director (with Jeffrey Bishop). American Society for Bioethics and Humanities |
| 2014 – | Co-Director (with Warren Kinghorn, MD, ThD), Theology, Medicine, and Culture Initiative (TMC), Duke Divinity School. https://tmc.divinity.duke.edu |
| 2017 – 2020 | Founding Director, Arete Initiative, Kenan Institute for Ethics, Duke University |
| 2018 – 2021 | Provost's Advisory Committee for Online Education, Duke University |
| 2021 – 2023 | President's Advisory Committee on Institutional History, Duke University |

**INVITED EXTRAMURAL PRESENTATIONS (selected)**

1. Wabash College.  February 23, 2004. Crawfordsville, IN
2. Loyola University School of Law. March 21, 2004. Chicago, IL
3. Christian Community Health Fellowship Conference (keynote). Atlanta, GA, May 21, 2004.
4. Spirituality and Healthcare Dialogue. The University of Texas Medical Branch. March 30, 2005. Galveston, TX.
5. God in the clinic: Religion, medicine, and the dilemmas of "patient-centered care." Lee University, Cleveland, TN, October 4, 2005.

**Farr A. Curlin, MD**

6. Getting below the surface: The ethics of religious/spiritual interaction in the clinical encounter. Duke University, Durham, NC. October 6, 2005.
7. Program in Genetic Counseling. Northwestern University, February 6, 2006.
8. Duke University Center for Theology and Medicine, Durham, NC, June 22, 2006.
9. Annual Faith in Medicine Conference, (keynote) The Faith and Medicine Institute, Boston, MA, September 2, 2006.
10. Spirituality/Medicine Interface Conference (keynote). Southern Medical Association. Atlanta, GA, September 14-16, 2006.
11. Sr. Alice Potts Endowed Lectureship for Spirituality and Medicine, MD Anderson Cancer Center, Houston, TX, October 30, 2006.
12. 4th Annual Vincent C. DeStefano Memorial Conference. Memorial Hospital. South Bend, Indiana. June 13, 2007.
13. University of Michigan Ethics Conference, Ann Arbor, March 11, 2008.
14. Louise Kingston Endowed Lectureship in Spirituality and Medicine. Princeton University Medical Center, Princeton, NJ. April 1, 2008.
15. American Medical Association, Division of Medical Ethics. Chicago. May 30, 2008.
16. Christian Medical and Dental Associations National Conference (keynote). Bloomingdale, IL. June 19, 2008.
17. Patient Rights vs. Doctor Conscience. DeVos Medical Ethics Colloquy. (keynote, along with R. Alta Charo). Grand Rapids, MI. September 8, 2008.
18. Conscience and clinical practice. President's Council on Bioethics. September 11, 2008. https://bioethicsarchive.georgetown.edu/pcbe/transcripts/sept08/session3.html
19. The Role of Conscience in Medicine. (keynote) Center for Law, Health & Society, Georgia State University. Atlanta, GA. October 9, 2008
20. Religion, Science, and the Moral Life of Medicine. (keynote) Sentara 2008 Ethics Conference. Williamsburg, VA. November 7, 2008.
21. Controversial Bodies: How to View and Think about Plastinated Corpses. (keynote) University of Kansas Medical School and Center for Practical Bioethics. Kansas City, MO. December 5, 2008.
22. Medicine Grand Rounds, University of Saskatchewan College of Medicine, Saskatoon, CA. January 9, 2009.
23. David Larson, MD, Memorial Lecture, Society for Spirituality, Theology and Medicine Annual Conference. Durham, NC. June 5, 2009.
24. Veritas Forum. Mayo Clinic, Rochester, MN. September 23, 2009.
25. 8th Annual Contemporary Catholic Healthcare Ethics Conference. Stritch School of Medicine at Loyola University. October 9, 2009. Chicago, IL
26. Florida Hospital Annual Conference on Spirituality and Medicine. March 25, 2010. Orlando, FL
27. Spirituality and Medicine Conference. Brody School of Medicine. April 1, 2010. Greenville, NC
28. The Lupina Centre for Spirituality, Healthcare and Ethics at Regis College, University of Toronto. October 15/16, 2010
29. Children's of Minnesota Westgate Pediatric Ethics Forum, Minneapolis, MN. November 12, 2010
30. Grand Rounds. Methodist Hospital, and Lecture in the Religion and Public Life Program. James Baker Institute for Public Policy. Houston, TX. December 3, 2010.
31. International Institute of Restorative Reproductive Medicine (IIRRM). Dublin, Ireland. March 26, 2011.
32. Terminal Sedation and Active Euthanasia: What are the Boundaries? 3rd Annual Bioethics Symposium. (keynote) University of Wisconsin. Madison, WI. April 7, 2011

Farr A. Curlin, MD

33.    Where Religion, Policy, and Bioethics Meet: An Interdisciplinary Conference on Islamic
       Bioethics and End-of-Life Care. (keynote) University of Michigan. Ann Arbor, April 10, 2011
34.    Religion, Spirituality, and Mental Health (keynote). Loyola University Chicago. April 12, 2012
35.    Kluge Center, United States Library of Congress, Washington, DC. June 28, 2012
36.    26th Annual A. Kurt Weiss Lecture in Biomedical Ethics, University of Oklahoma Health
       Sciences Center. September 27, 2012
37.    Turner Conference on Faith and Medicine (keynote), Muncie, IN. October 10, 2012
38.    Allen M. Boyden, M.D, Memorial Lecture. Providence St. Vincent Medical Center. Portland,
       OR. November 8, 2012
39.    Speaking About the End of Life, Spiritual, Religious and Community Conversations (keynote).
       Mount Sinai Medical Center & Greater Miami Jewish Federation. December 4, 2012
40.    Ethics Grand Rounds. Loyola University Medical Center. January 8, 2013
41.    Workshop on Comparative Studies of Religion and Values among Healthcare Professionals.
       Freiburg Institute of Advanced Studies. Germany. February 20-22, 2013
42.    28th Annual Notre Dame Medical Ethics Conference. Notre Dame, IN. March 8-10, 2013
43.    Trent Center Lecture on Medical Humanities, Duke University. Durham, NC, April 17, 2013
44.    Reverend Edward J. Drummond, S.J. Lecture, Medicine Grand Rounds, Saint Louis University.
       May 10, 2013
45.    Association of Professional Chaplains national webinar journal club. May 14, 2013
46.    Institute of Medicine. Committee on Approaching Death: Addressing Key End of Life Issues.
       Houston. July 22, 2013
47.    Spirituality and Ethics in Health Care (keynote speaker). Catholic Health Partners. Cincinnati,
       OH. October 3, 2013
48.    Institute for Ethics and Culture Annual Conference. Notre Dame University. November 9, 2013
49.    Loyola University Annual Medical Ethics Conference. March 13, 2014
50.    Notre Dame Annual Medical Ethics Conference. March 21-23, 2014
51.    Physician Well-Being Conference. Adventist Health Care. Jacksonville, FL. April 11, 2014
52.    4th European Conference on Religion, Spirituality and Health (Keynote). Malta. May 23, 2014
53.    Harvard Lecture Series on Spirituality and Medicine, Harvard University. November 17-18,
       2014
54.    Medicine Grand Rounds. Medical College of Virginia. Richmond, VA, February 19, 2015
55.    Institute for Faith and Learning. Baylor University. Waco, TX. September 11, 2015
56.    Annual Conference. MacLean Center for Clinical Medical Ethics. November 14, 2015
57.    2016 Conference on Medicine and Religion. Houston, TX. March 4, 2016.
58.    Reimagining Medicine Conference. Denver Institute for Faith and Work. April 6, 2016
59.    Hagop S. Mekhjian Lecture. The Ohio State University. Columbus, OH. September 15, 2016
60.    Ohio State University Center for Bioethics Annual Conference. September 16-17, 2016
61.    The Basil Society. UT Southwestern. Dallas, TX. September 24, 2016
62.    What is the place of sedation in care at the end of life? (symposium). The University of
       Chicago. October 14, 2016
63.    2016 MedConference. Florham Park, NJ. October 15, 2016
64.    Medical Ethics Grand Rounds. UNC School of Medicine. Chapel Hill, NC. November 3, 2016
65.    Schiltz Lecturer in the Medical Humanities, University of Kansas School of Medicine. Wichita,
       KS. January 12-13, 2017
66.    Weston Lecture. Augustine College. Ottowa, ON. March 16, 2017
67.    35th Annual MacLean Center Interdisciplinary Seminar Series on Reproductive Ethics. The
       University of Chicago. April 26, 2017
68.    Z. Stanley Stys Memorial Lecture. Princeton University Medical Center. May 23, 2017
69.    Robert D. Orr, MD, Lectureship. University of Vermont. October 27, 2017

Farr A. Curlin, MD

70.  Gender Transition Services: Progress or Medical Hubris? The 29th Annual Dorothy J. MacLean Fellows Conference on Clinical Medical Ethics, University of Chicago. November 10, 2017

71.  Grand Rounds, Department of Pediatrics. University of Illinois. Chicago, January 5, 2018

72.  Grand Rounds, Department of Medicine, Medical College of Georgia. January 9, 2018

73.  The Steve Thorney Life Career Award and Lecture in Spiritual Care, MD Anderson Cancer Center, Houston, TX, February 9, 2018

74.  Provonsha Lecture. Loma Linda University. March 2, 2018

75.  Thomistic Institute. Harvard University. April 23, 2018

76.  Grand Rounds, Department of Obstetrics and Gynecology, Vanderbilt University. May 5, 2018

77.  Holy Friendship Summit, Bristol, TN. May 18-19, 2018

78.  Commencement Address. Trinity Academy of Raleigh. Raleigh, NC. May 26, 2018

79.  Grand Rounds, Department of Medicine, Texas Tech University. November 8, 2018

80.  Physician Assisted Suicide and Euthanasia: Theological and Ethical Responses (symposium): Georgetown University. November 9, 2018

81.  Affirming Ethical Options for the Terminally Ill. Heritage Foundation. Washington, DC. March 11, 2019

82.  Bioethics Grand Rounds. National Institutes of Health. April 3, 2019

83.  Grand Rounds. Biomedical Ethics Research Program. Mayo Clinic. April 30, 2019

84.  Center for Ethics and Culture, Notre Dame University. May 13, 2019

85.  HEAL Institute, Samford University Center for Faith and Culture, September 6, 2019

86.  King Institute for Faith and Culture, King University, Bristol, TN, September 16-17, 2019

87.  88th Annual Educational Conference. Catholic Medical Association. Nashville, TN. September 26, 2019

88.  Thomistic Institute. Queen's University School of Medicine. Kingston, Ontario. October 9, 2019

89.  Lehman Lecture in Medical Ethics. Allegheny College, Meadville, PA. February 18, 2020

90.  Carol Carfang Nursing & Healthcare Ethics Conference. Tampa, FL. February 28, 2020

91.  School of Civic and Economic Thought and Leadership. Arizona State University. June 15, 2020

92.  McDonald Centre for Theology, Ethics & Public Life. Oxford University, UK. September 4, 2020

93.  Hoover Lecture, York Hospital. York, PA. September 17, 2020

94.  Program in Medical Ethics, Humanities, and Law. Western Michigan University Homer Stryker M.D. School of Medicine. October 7, 2020

95.  2021 Scholar in Residence. Union University. March 8-12.

96.  Character and the Professions Conference (panelist). Wake Forest University. March 13, 2021

97.  Inaugural Lisio Family Endowed Lectureship. Columbia University School of Medicine. September 20, 2021

98.  Thomistic Institute, Yale University. November 3, 2021

99.  MacLean Conference on Clinical Medical Ethics, University of Chicago, November 13, 2021

100.  Thomistic Institute, Johns Hopkins Medical Institute, November 15, 2021

101.  Maurice B. Siegel, M.D., Lecturer in Humanism and Medicine. Cedar's Sinai. January 19, 2022

102.  John Collins Harvey Lecture, Pellegrino Center for Clinical Ethics, Georgetown University, February 25, 2022

103.  Foglio Lecturer, Michigan State University School of Medicine. March 22-23, 2022 (rescheduled—now pending new date)

104.  Veritas Forum at Harvard Medical School, May 23, 2022

105.  Celebrating and Defending the Freedom to Care, Christian Medical and Dental Associations, Washington, D.C. January 2023

Farr A. Curlin, MD

106.  Conditions for corrosion: how are just healthcare practitioners made and lost? University of
      Oxford McDonald Centre for Theology, Ethics and Public Life, Oxford, UK. June 27-29, 2023
107.  Detransitioners, civil discourse, and the silence of clinical ethics. Annual Interdisciplinary
      Lecture Series, MacLean Center for Clinical Medical Ethics, University of Chicago. November
      14, 2023


**PEER-REVIEWED PRESENTATIONS AT SCHOLARLY MEETINGS**
1.  Holism or Evangelism? A consideration of religion in medicine. [Special session].  Robert Wood
    Johnson Clinical Scholars Program National Conference. Ft Lauderdale, FL, November 22, 2003.
2.  Religion and Health: Theological Limits and Concerns. [Panel presentation] American Society
    for Bioethics and Humanities. National Conference. Denver, CO. October 27, 2006.
3.  Religion, Conscience, and Controversial Clinical Practices. Central Society for Clinical
    Research/Midwestern Section American Federation for Medical Research. [Chosen as the top
    observational science abstract.] April 13, 2007. Chicago, IL.
4.  Does Conscience Have a Place in the Healthcare Encounter? [Panel presentation] American
    Society for Bioethics and Humanities. National Conference. Washington, DC. October 19. 2007
5.  Social and Ethical Implications of Supporting or Limiting a Right of Conscientious Refusal for
    Health Care Providers. [Panel presentation] American Society for Bioethics and Humanities.
    National Conference. October 15, 2009. Washington, DC.
6.  Whose outcomes? Which notion of health? Ethical issues in the measurement of religious
    experience and its relation to health. [Panel presentation] American Society for Bioethics and
    Humanities. National Conference. Washington, DC. October 18, 2009.
7.  Empirical research in bioethics: A toolkit for beginners. Pre-conference workshop. American
    Society for Bioethics and Humanities. National Conference. San Diego, CA. October 21, 2010
8.  Serving two masters? [Panel presentation] American Association for Hospice and Palliative
    Medicine Annual Assembly. February 11,2011
9.  Representing death, anticipating the corpse [Panel presentation]. American Society for Bioethics
    and Humanities. National Conference. Washington, DC. October 19, 2012
10. Towards a new art of dying [Panel session]. 2013 Conference on Medicine and Religion.
    Chicago, IL. May 29, 2013
11. Is traditional inpatient bioethics suited to outpatient settings? [panel] American Society for
    Bioethics and Humanities. National Conference. Atlanta, GA. October 26, 2013.
12. Among all physicians, is there a physician? Irony and the practice of medicine. American Society
    for Bioethics and Humanities. National Conference. Atlanta, GA. October 26, 2013.
13. "Do not be anxious ... about your body." Assessing contemporary primary care in light of the
    Sermon on the Mount. 2014 Conference on Medicine and Religion. Chicago, IL. March 8, 2014
14. Pharmacist on the execution team [panel]. American Society for Bioethics and Humanities.
    National Conference. San Diego. October 18, 2014.
15. Project on the Good Physician: Relevance of the Rationalist-Intuitionist Debate for Ethics and
    Professionalism in Medical Education. American Society for Bioethics and Humanities. National
    Conference. San Diego. October 18, 2014.
16. Can Religion Find Its Voice at a Secular Deathbed? [panel] 2016 Conference on Medicine and
    Religion. Houston, TX. March 4-6.
17. Doctor's Beliefs and Medical Practices: Transatlantic Comparisons. [panel] 2016 Conference on
    Medicine and Religion. Houston, TX. March 4-6.
18. The Religion and Medicine of the Future:  An Orthodox Critique of Scientific Theology and
    Ecumenism. [panel] 2016 Conference on Medicine and Religion. Houston, TX. March 4-6.
19. Reimagining Medicine: Theological Formation for Those with Vocations to Health Care. [panel]
    2017 Conference on Medicine and Religion. Houston, TX. March 25.
20. Solidarity with the suffering: Why physicians, *as physicians*, must oppose assisted suicide.
    International Congress on Law and Mental Health. Prague, Czech Republic. July 11, 2017

7

**Farr A. Curlin, MD**

21. Searching for a Foundation for Medicine that Christians Share with those who are not Christians [panel]. 2018 Conference on Medicine and Religion. St. Louis, MO. April 14.
22. Remembrance, Resilience, and Religious Formation in Medical Education: Two Case Studies [panel]. American Society for Bioethics and Humanities. National Conference. Pittsburgh. October 27, 2019
23. Improving Palliative and End-of-Life Care for African Americans: Remembering Dr. Richard Payne. [panel]. American Society for Bioethics and Humanities. National Conference. Pittsburgh. October 25, 2019
24. Is there a future for Hippocratic medicine? (panel) 2021 Conference on Medicine and Religion. March 23
25. Healing and Economy: The Question of Charity in a Secular Age (panel). 2021 Conference on Medicine and Religion. March 22
26. "Sufficient for the day is its own trouble": Medicalizing risk and the way of Jesus. 2022 Conference on Medicine and Religion. March 22
27. Secular medicine in the saeculum: An honored but humble servant. 2023 Conference on Medicine and Religion. March 13
28. Still Searching for Moral Certainty? The Physician-Patient Accommodation after 40 Years. 2023 Conference on Medicine and Religion. March 15


**CONFERENCES DIRECTED**

2008    Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy. Hosted at the University of Chicago, March 18

2011    Practice and Profession: Setting Medicine in the Context of a Good and Faithful Life. University of Chicago, November 10.

2012    Responding to the Call of the Sick: Inaugural Conference on Medicine and Religion. May 23-25. Chicago. (with Daniel Sulmasy, MD, PhD)

2012    Judaism, Medicine, and the Formation of Clinicians. September 10, 2012. The University of Chicago (with Daniel Sulmasy, MD, PhD)

2013    What Does it Mean to *Care*? 2013 Conference on Medicine and Religion. Chicago. May 28-30. (with Daniel Sulmasy, MD, PhD)

2014    Responding to the limits and possibilities of the body. 2014 Conference on Medicine and Religion. Chicago. March 7-9. (with Daniel Sulmasy, MD, PhD)

2015    Spiritual Dimensions of Illness and Healing. 2015 Conference on Medicine and Religion. Cambridge, MA, March 6-8. (with Daniel Sulmasy, MD, PhD, and Michael Balboni, PhD)

2016    Approaching the Sacred: Science, Health, and Practices of Care. 2016 Conference on Medicine and Religion. Houston, TX. March 4-6. (with Michael Balboni, PhD)

2016 -  Practice and Presence: A Gathering for Christians in Health Care. Duke Divinity School. Durham, NC. (annual three day conference, with Warren Kinghorn, MD, PhD)

2017    Re-Enchanting Medicine. 2017 Conference on Medicine and Religion. Houston, TX. March 24-26. (with Michael Balboni, PhD)

2019    Theological Approaches to Persons in Pain. J.B. Duke Hotel & Conference Center. Durham, NC. March 28.

2019    "My pain is always with me"; Medicine & Faithful Responses to Suffering. 2019 Conference on Medicine and Religion. JB Duke Hotel & Conference Center. Durham, NC. March 29-31.

2021    2021 Conference on Medicine and Religion (Virtual). March 22-24.

2022    2022 Conference on Medicine and Religion, The Nines Hotel, Portland, OR. March 13-15.

**Farr A. Curlin, MD**

2022    Questioning Preventive Medicine: Is a Pound of Prevention Worth an Ounce of Cure? Duke University. May 17.


**TEACHING EXPERIENCE AND CURRICULUM DEVELOPMENT (selected)**

**Undergraduates**

| | |
|---|---|
| 2006 | Things, bodies, persons: Human goods in the technological era. Big Problems Course, The University of Chicago. (faculty, with J Lantos and D Brudney) |
| 2022 - | Medicine and Human Flourishing. Course for sophomores in "Transformative Ideas" series. Worked with primary instructor, Jose Gonzalez, to design course. |

**Medical Students**

| | |
|---|---|
| 2002, 2003 | Medicine and Spirituality Course. University of Chicago. (guest lecture) |
| 2002, 2003 | National *Wit* Education Initiative. Discussion group facilitator. |
| 2003 – 2013 | Cultural competence in medicine. Preceptor |
| 2004 – 2006 | Committee for Medical Student Retreats, Co-created and co-directed sessions on humanism and medicine (90 students/session). |
| 2004 | Essentials of Physicianship. MS1 course. Small Group facilitator/instructor |
| 2004, 2005 | Spirituality and Healing in Medicine. medical student elective (course co-director). |
| 2004, 2006 | Clinical Skills 1C course. (lecture: Religion and the doctor-patient relationship). |
| 2005 – 2013 | Summer Research Program. (faculty mentor to 10 medical students) |
| 2005 – 2013 | Death, dissection, and doctor formation. (Annual lecture before MS1 cadaver lab) |
| 2005 – 2013 | Doctor-Patient Relationship course. (Core faculty and lecturer) |
| 2010 – 2013 | Physician Development and Formation. (Co-director of required small group discussion component of MS1 Gross Anatomy course) |
| 2015 – 2019 | MS2 Practice Course. Teach session(s) on the ethics of clinical decision-making, and on religion, spirituality, and medicine |
| 2019 – | Clinical Medical Ethics: What Would a Good Physician Do? (annual 8-week elective, now co-taught with Dr. Josh Briscoe) |

**Residents**

| | |
|---|---|
| 2004 – 2013 | Internal Medicine Residency Morning Report. (Faculty discussant for 55 total sessions over 9 years, focused on cases with clinical ethical complexity) |

**Fellows**

| | |
|---|---|
| 2004-5, 2007 | Research Proposal Design Workshop. Co-directed summer workshop for fellows in health services research and ethics. |
| 2004 – 2013 | MacLean Center for Clinical Medical Ethics Fellowship. Taught three sessions/year |
| 2006 – 2013 | Religious Traditions and Clinical Ethical Decisions. (director of annual, quarter-long seminar for fellows in clinical medical ethics and interested medical students) |
| 2010 – 2013 | Summer Program in Outcomes Research Training. Teach 90-minute session for clinical research fellows on Practical Survey Development and Design. |

**Divinity Students**

| | |
|---|---|
| 2014 | Healing Arts: Suffering, Illness, and the Witness of the Church. Duke Divinity School. (course co-director, with Kinghorn and Barfield) |
| 2016 – | Health Care in Theological Context II (formerly *Theological Bioethics*). Semester-length course. Duke Divinity School |


**GRANT FUNDING**
**Current:**

**Farr A. Curlin, MD**

1. Forming Distinguished Scholars for Christ across Academic Medicine
PI: Kinghorn (Curlin Co-Investigator)          Agency: McDonald Agape Fund
                                               Period: 1/1/23 – 12/31/26
This project gathers, mentors, and resources a network of outstanding colleagues from other major
academic medical centers seeking to renew medicine through attention to its theological dimensions.

**Past:**
1. The integration of religion and spirituality in patient care among US physicians
PI: Curlin and Chin          Agency: The Greenwall Foundation
                             Period: 07/01/02 – 06/30/04
Project conducted the first comprehensive national study of physician's religious characteristics and how
those characteristics are associated with physicians' clinical practices.

2. Religious commitments and clinical engagements
PI: Curlin          Agency: NCCAM
Type: K23 AT002749-01A1          Period: 10/01/05 – 09/30/10
Project developed a mixed-methods framework for assessing the religion-associated variations in
physicians' self-reported and self-predicted practices in different clinical domains.

3. Variance on the margins of religion and medicine
PI: Curlin          Agency: The Greenwall Foundation
                    Period: 07/01/06 – 06/30/09
[Greenwall Foundation Faculty Scholar in Bioethics] Project refined a methodology for assessing
religion-associated variance in physicians' self-reported and self-predicted practices, and applied that
methodology to assess variations in physicians' approaches to sexual and reproductive health care.

4. Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy
PI: Curlin          Agency: The Greenwall Foundation
                    Period: 01/01/08 – 06/30/09
Grant supported a conference on the place of the clinician's conscience in ethical practice, held at the
University of Chicago on March 18, 2008.

5. The Chicago Program on Spirituality, Theology and Clinical Decision-Making
PI: Curlin          Agency: The John Templeton Foundation
                    Period: 10/01/08 – 09/30/12
This project established the Program on Medicine and Religion at the University of Chicago and
supported four national physician surveys to assess religion-associated variations in physicians' practices
related to 1) sexual and reproductive health care, 2) primary care mental and behavioral health care, 3)
decision-making in advanced illness and end of life care, and 4) the doctor patient relationship and
meaning in medicine.

6. Project on the Good Physician: A New Science of Virtues
PI: Curlin          Agency: Arete Initiative, The University of Chicago
                    Period: 3/1/10 – 2/28/12

**Farr A. Curlin, MD**

This grant supported a national longitudinal study of the moral and professional formation of American physicians over the course of medical training

7. Physician Heal Thyself: The University of Chicago Medicine and Religion Faculty Scholars Program
PI: Sulmasy (Curlin Co-PI)              Agency: The John Templeton Foundation
                                        Period: 7/1/12-6/30/15
Project established a Faculty Scholars Program in Medicine and Religion, funding eight junior faculty nationwide at 50% effort for two year tenures.

8. Toward Policies that Accommodate the Concerns of African Americans in Resolving Disputes about the Use of Life-Sustaining Technology
PI: Johnson (Curlin Co-I)              Agency: Greenwall Foundation
                                        Period: 3/1/2015 – 2/29/2017
This project examined the attitudes of African Americans toward futile treatments and futility policies.

9. Training Research-Literate Chaplains as Ambassadors for Spirituality and Health
PI: Fitchett and Cadge (Curlin Co-I)     Agency: John Templeton Foundation
                                        Period: 7/1/2015 - 6/30/19
This project advanced research literacy among the nation's health care chaplains.

10. Toward Effective Cooperation between Clinical and Other Community Stakeholders Committed to Stemming the Opioid Epidemic
PI: Curlin (McCarty Co-PI)              Agency: The Greenwall Foundation
                                        Period: 7/1/2019 – 6/30/2022
This project aims to 1) describe the barriers to institutional collaboration among those responding to the opioid epidemic; and 2) create policy recommendations for effective collaboration in efforts to stem the opioid epidemic.

11. The Arete Initiative at Duke University's Kenan Institute for Ethics
PI: Curlin                             Agency: Foundation for Excellence in Higher Education
                                        Period: 7/1/17 – 6/30/21
The Arete Initiative sponsors scholarship and learning opportunities focused on recovering and sustaining the virtues in contemporary life, especially in the workplace, the university, and the public square.

12. Fellowship in Theology, Medicine, and Culture
PI: Kinghorn (Curlin Co-Investigator)    Agency: The Issachar Fund
                                        Period: 7/1/15 – 12/31/22
Project invites students and practitioners in health professions, as well as others with full-time vocations to health-related contexts, to participate in a program of theological formation that will equip them for faithful, disciplined, and creative engagement with contemporary practices of health care.

13. Out of Our Meds? Building a Theological and Moral Framework for the Use of Medications
PI: Kinghorn (Curlin Co-Investigator)    Agency: McDonald Agape Fund
                                        Period: 2016 – 2022
This project conducts a series of five annual symposia on theological, ethical, and clinical questions raised by pharmaceutical prescribing.

**PUBLICATIONS**
**Original peer-reviewed scholarship**

**Farr A. Curlin, MD**

<u>Books</u>
Curlin FA, Tollefsen C. *The Way of Medicine: Ethics and the Healing Profession*. Notre Dame University Press; 2021.

<u>Papers</u>
1. Iwashyna TJ, Curlin FA, Christakis NA. Racial, ethnic and affluence differences in elderly patients' use of teaching hospitals. *J Gen Int Med*. 2002;17(9):696-703.

2. Hall DE, Curlin F, Koenig HG. When clinical medicine collides with religion. *Lancet*. 2003;362:S28-S29

3. Hall DE, Curlin FA.  Can physicians' care be neutral regarding religion? *Academic Medicine*. 2004;79:677-679.

4. Curlin FA and Moschovis PP. Is religious devotion relevant to the doctor-patient relationship? *Journal of Family Practice*. 2004;53(8):632-640.

5. Curlin FA, Roach CJ, Gorawara-Bhat R, Lantos JD, Chin MH. When patients choose faith over medicine: Physician perspectives on religiously related conflict in the medical encounter.  *Archives of Internal Medicine*. 2005;165(1):88-91

6. Curlin FA, Hall DE. Strangers or friends? A proposal for a new spirituality-in-medicine ethic. *J Gen Intern Med*. 2005;20(4):370-374.

      Editorial: Scheurich N. Spirituality, Medicine, and the Possibility of Wisdom. *J Gen Intern Med*. 2005;20(4):379-380.

7. Curlin FA, Lantos JD, Roach CJ, Sellergren SA, Chin MH. Religious characteristics of U.S physicians: A national survey. *J Gen Intern Med*. 2005;20(7):629-634.

8. Curlin FA, Roach CJ, Gorawara-Bhat R, Lantos JD, Chin MH. How are religion and spirituality related to health? A study of physicians' perspectives. *South Med J*. 2005; 98(8):761-6.

      Editorial: Daly CC. Religion and the attending physician's point-of-view. *South Med J*. 2005; 98(8):759

9. Gee L, Smucker D, Chin M, Curlin FA. Partnering together? A study of current relationships between faith-based community health centers and local religious congregations. *South Med J*. 2005; 98(12):1245-50

      Editorial: Flannelly KJ, Weaver AJ, Tannenbaum HP. What do we know about the effectiveness of faith-based health programs? *South Med J*. 2005; 98(12):1243-4.

10. Curlin FA, Hall DE. Regarding Plan B: Science and politics cannot be separated. *Obstet Gynecol.* 2005;105(5):1148-50

11. Curlin FA, Chin MH, Sellergren SA, Roach CJ, Lantos JD. The association of physicians' religious characteristics with their attitudes and self-reported behaviors regarding religion and spirituality in the clinical encounter. *Med Care*. 2006;44:446-53

12. Curlin FA. Spirituality and lifestyle: what clinicians need to know. *South Med J*. 2006;99:1170-1.

13. Curlin FA, Serrano K, Baker M, Carricaburu S, Smucker D, Chin MH. Following the call: How providers make sense of their decisions to work in faith-based and secular urban community health centers. *J Health Care Poor Underserved*. 2006;17(4):944-957

14. Curlin FA, Lawrence RE, Chin MH, Lantos JD. Religion, conscience, and controversial clinical practices. *New England Journal of Medicine*. 2007;356(6):593-600

12

**Farr A. Curlin, MD**

Curlin FA, Lawrence RE, Lantos JD. Letters and author reply. Religion, conscience, and controversial clinical practices. *N Engl J Med*. 2007;356(18):1889-92

15. Curlin FA, Sellergren SA, Lantos JD, Chin MH. Physicians' observations and interpretations of the influence of religion and spirituality on health. *Arch Intern Med*. 2007;167(7):649-54

16. Curlin FA, Dugdale LS, Lantos JD, Chin MH. Do religious physicians disproportionately care for the underserved? *Annals of Family Medicine*. 2007;5(4):353-60.

17. Curlin FA, Odell S, Lawrence RE, Chin MH, Lantos JD, Meador KG, Koenig HG. The relationship between psychiatry and religion among US physicians. *Psychiatr Serv* 2007;58(9):1193-1198.

Curlin FA, Meador KG, Koenig HG. Psychiatrists and religious belief: reply. *Psychiatr Serv*. 2007;58(11):1500-1

18. Curlin FA, Lawrence RE, Odell S, Chin MH, Lantos JD, Koenig HG, Meador KG. Religion, spirituality, and medicine: psychiatrists' and other physicians' differing observations, interpretations, and clinical approaches. *Am J Psychiatry*. 2007;164(12):1825-31.

Editorial: Eichelman B. Religion, spirituality, and medicine. Am J Psychiatry 2007;164: 1774-1775

19. Lawrence RE, Curlin FA. Clash of definitions: Controversies about conscience in medicine. *American Journal of Bioethics*. 2007;7(12):10-4.

Lawrence RE, Curlin FA. Response to eleven peer commentaries regarding "Clash of Definitions: Controversies about Conscience in Medicine". *Am J Bioeth*. 2007;7(12):1-2.

20. Curlin FA, Nwodim C, Vance JL, Chin MH, Lantos JD. To die, to sleep: US physicians' religious and other objections to physician assisted suicide, terminal sedation, and withdrawal of life support. *Am J Hosp Palliat Care*. 2008;25(2):112-20.

21. Lantos JD, Curlin FA. Religion, conscience, and clinical decisions. *Acta Paediatr*. 2008;97(3):265-6.

22. Curlin FA, Dinner SN, Lindau ST. Of more than one mind: obstetrician-gynecologists' approaches to morally controversial decisions in sexual and reproductive healthcare. *J Clin Ethics*. 2008;19(1):11-21; discussion 22-3

Published as Feature article with the following editorials: 1) Howe EG. When, if ever, should caregivers provide moral advice? 2) Pellegrino ED. Commentary on 'Of More than One Mind.' 3) Chervenak FA, McCullough LB. Professional responsibility and individual conscience, and 4) Kozishek D, Bogdan-Lovis E. Beliefs, boundaries, and self-knowledge in professional practice.

23. Ishibashi KL, Koopmans J, Curlin FA, Alexander K, Ross LF. Paediatricians' attitudes and practices towards HPV vaccination. *Acta Paediatr*. 2008;97(11):1550-6

24. Tilburt JC, Kaptchuk TJ, Curlin FA, Emanuel EJ, Miller FG. Prescribing "placebo treatments": results of national survey of US internists and rheumatologists. *BMJ*. 2008;337:a1938

25. Ishibashi KL, Curlin FA, Alexander K, Koopmans J, Ross LF. Pediatricians are more supportive of HPV vaccination than are members of the general public. *South Med J*. 2008;101(12):1216-21.

26. Tilburt JC, Curlin FA, Kaptchuk TJ, Clarridge B, Bolcic-Jankovic D, Emanuel EJ, Miller FG. Alternative medicine research in clinical practice: a US national survey. *Arch Intern Med*. 2009;169(7):670-7.

27. Lawrence RE, Curlin FA. Autonomy, religion and clinical decisions: findings from a national physician survey. *J Med Ethics*. 2009;35(4):214-8.

**Farr A. Curlin, MD**

28. Curlin FA, Lawrence RE, Fredrickson J. An ethical façade? Medical students' miscomprehensions of substituted judgment. PLoS ONE. 2009;4(2):e4374.

29. Lawrence RE, Curlin FA. Physicians' beliefs about conscience in medicine: a national survey. *Acad Med*. 2009;84(9):1276-82.

30. Antiel RM, Curlin FA, James KM, Tilburt JC. Physicians' beliefs and U.S. health care reform—A national survey. *New England Journal of Medicine*. 2009 Oct 1;361(14):e23. Epub 2009 Sep.

31. Curlin FA, Rasinski KA, Kaptchuk TJ, Emanuel EJ, Miller FG, Tilburt JC. Religion, clinicians, and the integration of complementary and alternative medicines. *J Altern Complement Med*. 2009;15(9):987-94.

32. Fitchett G, Rasinski K, Cadge W, Curlin FA. Physicians' experience and satisfaction with chaplains: a national survey. Arch Intern Med. 2009;169(19):1808-10.

33. Manek NJ, Crowson CS, Ottenberg AL, Curlin FA, Kaptchuk TJ, Tilburt JC. What rheumatologists in the United States think of complementary and alternative medicine: Results of a national survey. *BMC Complement Altern Med*. 201028;10:5.

34. Bekelman DB, Curlin FA, Parry C, Yamashita T, Fairclough D, Wamboldt FS. A comparison of two spirituality instruments and their relationship to depression and quality of life in chronic heart failure *J Pain Symptom Manage*. 2010;39(3):515-2.

35. Tilburt JC, Miller FG, Jenkins S, Kaptchuk TJ, Clarridge B, Bolcic-Jankovic D, Emanuel EJ, Curlin FA. Factors that influence practitioners' interpretations of evidence from alternative medicine trials: a factorial vignette experiment embedded in a national survey. *Med Care*. 2010; 48(4):341-8.

36. Stulberg D, Lawrence RE, Schattuck J, Curlin FA. Religious hospitals and primary care physicians: Conflicts over policies for patient care. *J Gen Intern Med.* 2010;25(7):725-30.

37. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologists' beliefs about assisted reproductive technologies. *Obstetrics and Gynecology*. 2010;116(1):127-35.

38. Yoon JD, Rasinski K, Curlin FA. Moral controversy, directive counsel, and the doctor's role: Findings from a national survey of obstetrician-gynecologists. *Acad Med.* 2010;85(9):1475-81.

39. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologist physicians' beliefs about emergency contraception: A national survey. *Contraception*. 2010;82(4):324-30.

40. Yoon JD, Rasinski KA, Curlin FA. Conflict and emotional exhaustion in obstetrician-gynecologists: A national survey. *J Med Ethics*. 2010;36(12):731-5.

41. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologist physicians' views on contraception and natural family planning. *Am J Obstet Gynecol*. 2011;204:124.e1-7.

42. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Factors influencing physicians' advice about female sterilization: a national survey. *Human Reproduction*. 2011;26(1):106-11.

43. Antiel RM, Curlin FA, Hook CC, Tilburt JC. The impact of medical school oaths and other professional codes of ethics: results of a national physician survey. *Arch Intern Med*. 2011;171(5):469-71.

44. Lawrence RE, Curlin FA. The rise of empirical research in medical ethics: a MacIntyrean critique and proposal. *J Med Philos.* 2011;36(2):206-16.

45. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Adolescents, contraception, and confidentiality: a national survey of obstetrician-gynecologists. *Contraception*. 2011;84(3):259-65.

Farr A. Curlin, MD

46. Combs MP, Antiel RM, Tilburt JC, Mueller PS, Curlin FA. Conscientious refusals to refer: findings from a national physician survey. *J Med Ethics*. 2011;37(7):397-401.

47. Rasinski KA, Yoon JD, Kalad YG, Curlin FA. Obstetrician-gynecologists' opinions about conscientious refusal of a request for abortion: Results from a national vignette experiment. *J Med Ethics*. 2011;37(12):711-4.

48. Rasinski KA, Kalad YG, Yoon JD, Curlin FA. An assessment of US physicians' training in religion, spirituality and medicine. *Medical Teacher*. 2011;33(11):944-5.

49. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Obstetrician-gynecologists' beliefs about safe-sex and abstinence counseling. *Int J Gynaecol Obstet.* 2011;114(3):281-5.

50. Chung GS, Lawrence RE, Curlin FA, Arora V, Meltzer DO. Predictors of hospitalised patients' preferences for physician-directed medical decision-making. *J Med Ethics*. 2012;38(2):77-82.

51. Williams JA, Meltzer DO, Arora V, Chung G, Curlin FA. Attention to inpatients' religious and spiritual concerns: Predictors and association with patient satisfaction. *J Gen Int Med*. 2011;26(11):1265-71

52. Stern RM, Rasinski KA, Curlin FA. Jewish physicians' beliefs and practices regarding religion/spirituality in the clinical encounter. *J Relig Health.* 2011;50(4):806-17.

53. Stulberg DB. Dude AM, Dahlquist I, Curlin FA. Abortion provision among practicing obstetrician-gynecologists. *Obstet Gynecol.* 2011;118(3):609-14.

54. Harris L, Cooper A, Rasinski KA, Curlin FA, Lyerly AD. Obstetrician-gynecologists' objections to and willingness to help patients obtain an abortion. *Obstet Gynecol.* 2011;118(4):905-912.

55. Chung GS, Lawrence RE, Yoon JD, Rasinski KA, Curlin FA. Obstetrician-gynecologists' beliefs about when pregnancy begins. *Am J Obstet Gynecol.* 2012;206(2):132.e1-7

> Letter Reply: Chung GS, Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Am J Obstet Gynecol. 2012;207(5):e9-e10.

56. Lawrence RE, Rasinski KA, Yoon JD, Koenig HG, Meador KG, Curlin FA. Physicians' beliefs about faith-based treatments for alcoholism. *Psychiatric Serv*. 2012;63(6):597-604.

57. Sobecki JN, Curlin FA, Rasinski KA, and Lindau ST. What we don't talk about when we don't talk about sex: Results of a national survey of U.S. obstetrician/gynecologists. *J Sex Med* 2012;9:1285–94

58. Karches KE, Chung G, Arora V, Meltzer DO, Curlin FA. Religiosity, spirituality, and end of life planning: A single-site survey of medical inpatients. *J Pain Symptom Manage*. 2012;44(6):843-51

59. Antiel RM, Curlin FA, James KM, Sulmasy DP, Tilburt JC. Dignity in end of life care: results of a national survey of US physicians. *Journal of Pain and Symptom Management*. 2012;44(3):331-9

60. Stulberg DB, Dude AM, Dahlquist I, Curlin FA. Obstetrician–gynecologists, religious institutions, and conflicts regarding patient care policies. *Am J Obstet Gynecol*. 2012;207(1):73.e1-5

61. Lawrence RE, Rasinski KA, Yoon JD, Meador KG, Koenig HG, Curlin FA. Primary care physicians' and psychiatrists' approaches to treating mild depression. *Acta Psychiatr Scand*. 2012;126(5):385-392

62. Rasinski KA, Lawrence RE, Yoon JD, Curlin FA. A sense of calling and primary care physicians' satisfaction in treating smoking, alcoholism and obesity. *Arch Intern Med.* 2012;172(18):1423-4.

63. Shin JH, Yoon, JD, Rasinski KA, Koenig HG, Meador KG, Curlin FA. A spiritual problem? Primary care physicians' and psychiatrists' interpretations of medically unexplained symptoms. *J Gen Intern Med*. 2013;28(3):392-8

**Farr A. Curlin, MD**

64. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Physicians' beliefs about the nature of addiction: a survey of primary care physicians and psychiatrists. *Am J Addict*. 2013;22(3):255-60

65. Putman MS, Yoon JD, Rasinski KA, Curlin FA. Intentional sedation to unconsciousness at the end of life: Findings from a national physician survey. *J Pain Symptom Manage.* 2013;46(3):326-34.

> Authors' reply to Dirksen et al. Putman MS, Curlin FA. J Pain Symptom Manage. 2013;45(5):e2-3.

66. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Religion and anxiety treatments in primary care patients. *Anxiety Stress Coping.* 2013;26(5):526-38.

67. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Religion and beliefs about treating medically unexplained symptoms: a survey of primary care physicians and psychiatrists. *Int J Psych Med*. 45(1); 2013: 31-44.

68. Sheppe A, Nicholson R, Rasinski KA, Yoon JD, Curlin FA. Providing guidance to patients: physicians' views about the relative responsibilities of doctors and religious communities. *South Med J.* 2013;106(7):399-406

> Commentary: Perkins HS. South Med J. 2013;106(7):407-8

69. Combs MP, Rasinski KA, Yoon JD, Curlin FA. Substituted judgment in principle and practice: A national physician survey. *Mayo Clinic Proceedings*. 2013;88(7):666-73.

70. Tilburt JC, James K, Jenkins SM, Antiel RM, Curlin FA, Rasinski KA. "Righteous Minds" in health care: Measurement and explanatory value of social intuitionism in accounting for the moral judgments of U.S. physicians. *PLoS One*. 2013;8(9):e73379.

71. Antiel RM, Curlin FA. The moral psychology of rationing among physicians: The role of harm and fairness intuitions in physician objections to cost-effectiveness and cost-containment. *Philos Ethics Humanit Med.* 2013;8(1):13.

72. Padela AI, Curlin FA. Religion and disparities: Considering the influences of Islam on the health of American Muslims. *J Relig Health*. 2013;52(4):1333-45.

73. Wolenberg KM, Yoon JD, Rasinski KA, Curlin FA. Religion and United States physicians' opinions and self-predicted practices concerning artificial nutrition and hydration. *J Relig Health.* 2013;52(4):1051-65.

74. Putman MS, Yoon JD, Rasinski KA, Curlin FA. Directive counsel and morally controversial medical decision-making: Findings from two national surveys of primary care physicians. *J Gen Int Med.* 2014; 29(2):335-340.

> Commentary: Zehnder NG. J Gen Intern Med. 2013 Nov 6

75. Antiel RM, O'Donnell EP, James KM, Hardt JJ, Curlin FA, Tilburt JC. Physician opinion and the HHS contraceptive mandate. *AJOB Empirical Bioethics*. 2014;5(1):56-60

76. Cook AF, Arora VM, Rasinski KA, Curlin FA, Yoon JD. The prevalence of medical student mistreatment and its association with burnout. *Academic Medicine*. 2014;89(5):749-54

77. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Physician race and treatment preferences for depression, anxiety, and medically unexplained symptoms. *Ethn Health.* 2014;29:1-11.

78. Kim DT, Curlin FA, Wolenberg KM, Sulmasy DP. Religion in organized medicine: The Committee and Department of Medicine and Religion of the American Medical Association, 1961-1974. *Perspect Biol Med.* 2014;57(3):393-414

**Farr A. Curlin, MD**

79. Shim JM, Schneider J, Curlin FA. Patterns of user disclosure of complementary and alternative medicine (CAM) use. *Med Care*. 2014;52(8):704-8

80. Padela AI, Peek M, Johnson-Agbakwu CE, Hosseinian Z, Curlin F. Associations between religion-related factors and cervical cancer screening among Muslims in greater Chicago. *J Low Genit Tract Dis*. 2014;18(4):326-32.

81. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA. Primary care physicians' and psychiatrists' willingness to refer to religious mental health providers. *International Journal of Social Psychiatry*. 2014;60(7):627-36.

82. Lee RT, Barbo A, Lopez G, Melhem A, Lin H, Olopade OI, Curlin FA. National survey of US oncologists' knowledge, attitudes, and practice patterns regarding herb and supplement use by patients with cancer. *Journal of Clinical Oncology.* 2014;32(36):4095-101

83. Kim DT, Curlin FA, Wolenberg KM, Sulmasy DP. Back to the Future: The AMA and Religion, 1961-1974. *Academic Medicine*. 2014;89(12):1603-9.

    Wolenberg K, Kim D, Curlin F, Sulmasy D. In reply to Cayley. Acad Med. 2015;90(5):547

84. Lewis-Newby M, Wicclair M, Pope T, Rushton C, Curlin F, Diekema D, Durrer D, Ehlenbach W, Gibson-Scipio W, Glavan B, Langer RL, Manthous C, Rose C, Scardella A, Shanawani H, Siegel MD, Halpern SD, Truog RD, White DB. An official American Thoracic Society policy statement: managing conscientious objections in intensive care medicine. ATS Ethics and Conflict of Interest Committee. *Am J Respir Crit Care Med*. 2015;191(2):219-27.

85. Ravella KC, Curlin FA, Yoon JD. Medical school ranking and medical student vocational identity. *Teach Learn Med.* 2015; 27(2): 123-129

86. Lawrence RE, Rasinski KA, Yoon JD, Curlin FA Psychiatrists' and primary care physicians' beliefs about overtreatment of depression and anxiety. *J Nerv Ment Dis*. 2015;203(2):120-5.

87. Smyre CL, Yoon JD, Rasinski KA, Curlin FA. Limits and responsibilities of physicians addressing spiritual suffering in terminally ill patients. *J Pain Symptom Manage.* 2015;49(3):562-9

88. Yoon JD, Shin JH, Nian AL, Curlin FA. Religion, sense of calling and the practice of medicine: Findings from a national survey of primary care physicians and psychiatrists. *Southern Medical Journal.* South Med J. 2015;108(3):189-95

89. Padela AI, Malik AY, Curlin FA, De Vries R. [Re]considering respect for persons in a globalizing world. *Developing World Bioethics*. 2015; 108(2):98–106

90. Padela AI, Murrar S, Adviento B, Liao C, Hosseinian Z, Peek M, Curlin FA. Associations between religion-related factors and breast cancer screening among American Muslims. *J Immigr Minor Health.* 2015;17(3):660-9.

91. Carey GB, Curlin FA, Yoon JD. Medical student opinions on character development in medical education: A national survey. *BMC Res Notes*. 2015;8:455.

92. Choi PJ, Curlin FA, Cox CE. "The patient is dying, please call the chaplain": The activities of chaplains in one medical center's intensive care units. *J Pain Symptom Manage.* 2015;50(4):501-6

93. Ernecoff NC, Curlin FA, Buddadhumaruk P, White DB. Health care professionals' responses to religious or spiritual statements by surrogate decision makers during goals-of-care discussions. *JAMA Intern Med.* 2015;175(10):1662-9

    Ernecoff NC, Curlin FA, White DB. Spiritual Care Providers and Goals-of-Care Discussions--Reply. *JAMA Intern Med*. 2016;176(2):279.

**Farr A. Curlin, MD**

94. Leffel GM, Oakes RA, Curlin FA, Yoon JD. Relevance of the rationalist-intuitionist debate for ethics and professionalism in medical education. *Adv Health Sci Educ Theory Pract.* 2015;20(5):1371-83

95. Yang YT, Curlin FA. Why physicians should oppose assisted suicide. *JAMA*. 2016;315(3):247-8

96. Curlin FA. What does *any* of this have to do with being a physician? Kierkegaardian irony and the practice of medicine. *Christian Bioethics*. 2016;22(1):62–79

97. Yoon JD, Daley BM, Curlin FA. The association between a sense of calling and physician well-being: A national study of primary care physicians and psychiatrists. *Acad Psychiatry*. 2017;41(2):167-173

98. Brauer SG, Yoon JD, Curlin FA. US Primary care physicians' opinions about conscientious refusal: A national vignette experiment. *J Med Ethics*. 2016;42(2):80-4.

99. Salmoirago-Blotcher E, Fitchett G, Leung K, Volturo G, Boudreaux E, Crawford S, Ockene I, Curlin F. An exploration of the role of religion/spirituality in the promotion of physicians' wellbeing in Emergency Medicine. *Prev Med Rep.* 2016;3:189-95.

100. Hodges LE, Tak HJ, Curlin FA, Yoon JD. Whistleblowing in medical school: A national survey on professionalism and peer accountability in medical students. *Acad Psychiatry*. 2016;40(3):530-3.

101. Ayeh DD, Tak HJ, Yoon JD, Curlin FA. US physicians' opinions about accommodating religiously based requests for continued life-sustaining treatment. *J Pain Symptom Manage*. 2016;51(6):971-8.

102. Padela AI, Huda A, Ahmed M, Hosseinian Z, Curlin F. Religious identity & workplace discrimination: A national survey of American Muslim physicians. *AJOB Empirical Bioethics*. 2016;7(3):149-159

103. Chung GS, Yoon JD, Rasinski KA, Curlin FA. US physicians' opinions about distinctions between withdrawing and withholding life-sustaining treatment. *J Relig Health*. 2016;55(5):1596-606

104. Prochaska MT, Putman MS, Tak HJ, Yoon JD, Curlin FA. US physicians overwhelmingly endorse hospice as the better option for most patients at the end of life. *Am J Hosp Palliat Care.* 2017;34(6):556-558

105. Putman MS, Tak HJ, Yoon JD, Curlin FA. Quality of life and recommendations for further care. *Crit Care Med*. 2016;44(11):1996-2002

106. Chung GS, Diaz MJ, Arora V, Meltzer DO, Curlin FA. Changes in health status and frequency of attending religious services among medical inpatients with repeat admissions. *Journal of Religion, Spirituality & Aging*. 2016;28(4):349-358

107. Hvidt NC, Kørup AK, Curlin FA, Baumann K, Frick E, Søndergaard J et al. The NERSH International Collaboration on Values, Spirituality and Religion in Medicine: Development of Questionnaire, Description of Data Pool, and Overview of Pool Publications. *Religions*. 2016;7(8): 107. Available from DOI: 10.3390/rel7080107

108. Lee BM, Curlin FA, Choi PJ. Documenting presence: A descriptive study of chaplain notes in the intensive care unit. *Palliat Support Care.* 2017;15(2):190-196

109. Leffel BM, Oakes RA, Ham SA, Curlin FA, Yoon JD. Project on the Good Physician: A proposal for a moral intuitionist model of virtuous caring. *Teach Learn Med.* 2017;29(1):75-84

110. Yoon JD, Hunt NB, Ravella K, Jun C, Curlin FA. Physician burnout and the calling to care for the dying: A national survey. *Am J Hosp Palliat Care*. 2017;34(10):931-937

111. Tak HJ, Curlin FA, Yoon JD. Association of intrinsic motivating factors and markers of physician well-being: A national physician survey. *J Gen Intern Med*. 2017 Jul;32(7):739-746

**Farr A. Curlin, MD**

112. Brauer SG, Yoon JD, Curlin FA. Physician satisfaction in treating medically unexplained symptoms. *South Med J*. 2017;110(5):386-91

113. Hawking M, Curlin FA, Yoon JD. Courage and compassion: Virtues in caring for so-called "difficult" patients. *AMA Journal of Ethics*. 2017;19(4): 357-63

114. Putman MS, D'Alessandro A, Curlin FA, Yoon JD. Unilateral do not resuscitate orders: Physician attitudes and practices. *Chest*. 2017;152(1):224-225

115. Antiel R, Collura C, Flake A, Johnson M, Rintoul N, Lantos J, Curlin F, Tilburt J, Brown S, Feudtner C. Physician views regarding the benefits and burdens of prenatal surgery for myelomeningocele. *J Perinatol*. 2017;37(9):994-998

116. Hines H, Avile CJ, Rudakevych T, Curlin FA, Yoon JD. Physician perspectives on long-term relationships and friendships with patients: A national assessment. *South Med J*. 2017;110(11):679-684

117. Antiel RM, Flake AW, Johnson MP, Khalek N, Rintoul NE, Lantos JD, Curlin FA, Tilburt JC, Feudtner C. Specialty-based variation in applying maternal-fetal surgery trial evidence. *Fetal Diagn Ther*. 2017;42(3):210-217

118. Antiel RM, Flake AW, Collura C, Johnson M, Rintoul N, Lantos J, Curlin FA, Tilburt J, Brown SD, Feudtner C. Weighing the social and ethical considerations of maternal-fetal surgery. *Pediatrics*. 2017;140(6).

119. O'Connell TF, Ham S, Hart T, Curlin FA, Yoon JD. A national longitudinal survey of medical students' intentions to practice among the underserved. *Acad Med*. 2018;93(1):90-97

120. Smyre CL, Tak HJ, Dang A, Yoon JD, Curlin FA. Physicians' opinions on engaging patients' religious and spiritual concerns: A national survey. *J Pain Symptom Manage*. 2018;55(3):897-905

121. Frush B, Brauer SG, Yoon JD, Curlin FA. Physician decision-making in the setting of advanced illness: An examination of patient disposition and physician religiousness. *J Pain Symptom Manage*. 2018;55(3):906-912

122. Antiel RM, Curlin FA, Lantos JD, Collura CA, Flake AW, Johnson MP, Rintoul NE, Tilburt JC, Brown SD, Feudtner C. Attitudes of paediatric and obstetric specialists toward prenatal surgery for lethal and non-lethal conditions. *J Med Ethics*. 2018;44(4):234-238

123. Yoon JD, Ham SA, Reddy ST, Curlin FA. Role models' influence on specialty choice for residency training: A national longitudinal study. *J Grad Med Educ*. 2018;10(2):149-154

124. Sobowale K, Ham S, Curlin FA, Yoon JD. Personality traits are associated with academic achievement in medical school: A nationally representative study. *Acad Psychiatry*. 2018;42(3):338-345

125. Leffel GM, Oakes Mueller RA, Ham SA, Karches KE, Curlin FA, Yoon JD. Project on the Good Physician: Further Evidence for the Validity of a Moral Intuitionist Model of Virtuous Caring. *Teach Learn Med*. 2018;30(3):303-316

126. Frush B, Eberly JB, Curlin FA. What should physicians and chaplains do when a patient believes God wants him to suffer? *AMA J Ethics*. 2018;20(7):E613-620

127. Choi PJ, Curlin FA, Cox CE. Addressing religion and spirituality in the intensive care unit: A survey of clinicians. *Palliat Support Care*. 2018 Apr 30:1-6.

128. Stavig A, Yoon JD, Curlin FA. Taking societal cost into clinical consideration: US physicians' views. *AJOB Empirical Bioethics*. 2018 Jul-Sep;9(3):173-180

**Farr A. Curlin, MD**

129. Curlin FA. Palliative sedation: clinical context and ethical questions. *Theor Med Bioeth*. 2018 Jun;39(3):197-209

130. Blythe JA, Curlin FA. "Just do your job": technology, bureaucracy, and the eclipse of conscience in contemporary medicine. *Theor Med Bioeth*. 2018 Dec;39(6):431-452

131. Choi PJ, Chow V, Curlin FA, Cox CE. Intensive care clinicians' views on the role of chaplains. *J Health Care Chaplain*. 2018 Dec 5:1-10

132. Curlin FA, Tollefsen C. Conscience and the way of medicine. *Perspect Biol Med*. 2019;62(3):560-575

133. Blythe JA, Curlin FA. How Should Physicians Respond to Patient Requests for Religious Concordance? *AMA J Ethics.* 2019;21(6): E485-492

134. Antiel RM, Curlin FA, Persad G, White DB, Zhang C, Glickman A, Emanuel EJ, Lantos JD. Should pediatric patients be prioritized when rationing life-saving treatments during COVID-19 pandemic. *Pediatrics*. 2020;146(3):e2020012542.

135. Tollefsen C, Curlin FA. Solidarity, trust, and Christian faith in the doctor–patient relationship. *Christian Bioethics.* 2021; 27(1):14–29

136. Curlin FA, Tollefsen C. Medicine against suicide: Sustaining solidarity with those diminished by illness and debility. *Christian Bioethics*. 2021; 27(3): 250–263

138. Frush BW, Curlin FA. POINT: Is it ethically appropriate for physicians to offer to pray with patients in the ICU? Yes. Chest. 2022 Apr;161(4):882-884.

       Frush BW, Curlin FA. Rebuttal From Drs Frush and Curlin. Chest. 2022 Apr;161(4):886-887.

137. Hvidt NC, Curlin F, Büssing A, Baumann K, Frick E, Søndergaard J, Nielsen JB, Lawrence R, Lucchetti G, Ramakrishnan P, Wermuth I, Hefti R, Lee E, Kørup AK. The NERSH Questionnaire and Pool of Data from 12 Countries: Development and Description. *J Relig Health*. 2022 Jun;61(3):2605-2630

139. Curlin F. "Sufficient for the day is its own trouble": Medicalizing risk and the way of Jesus. *Christian Bioethics.* 2023, 29(2):110-119.

140. Curlin FA. Responding wisely to persistent pain: Insights from patristic theology and clinical experience. *Christian Bioethics.* 2023 (in press)

141. Nicholson CP, Bodd MH, Sarosi E, Carlough MC, Lysaught MT, Curlin FA. The power of proximity: Toward an ethic of accompaniment in surgical care. *Hastings Center Report*. (in press, 2024)

Book chapters
1. Curlin FA. Social brains, spiritual medicine? In: The Chicago Social Brain Network. *Invisible Forces and Powerful Beliefs: Gravity, Gods, and Minds*. Upper Saddle River, New Jersey: FT Press; 2011
2. Curlin FA. Detachment has consequences: A note of caution from medical students' experiences of cadaver dissection. In: Lantos JD, ed. *Controversial Bodies: Ethical Issues in the Public Display of Plastinated Corpses*. Baltimore, MD: The Johns Hopkins University Press; 2011
3. Curlin FA. Hospice and palliative medicine's attempt at an art of dying. In Dugdale L, ed. *Dying in the Twenty-First Century: Toward a New Ethical Framework for the Art of Dying Well (Basic Bioethics)*. Cambridge MA: MIT Press; 2015

**Farr A. Curlin, MD**

4.  Curlin FA. Religion and spirituality in medical ethics. In: Balboni M and Peteet J, eds. *Spirituality and Religion Within the Culture of Medicine: From Evidence to Practice.* New York: Oxford University Press; 2017

**Commentaries, Editorials, and Reviews**
1.  Curlin FA. After harm: Medical error and the ethics of forgiveness. [book review] *BMJ*. 2005;331:1343
2.  Curlin F, Burck RR. Patient counseling and matters of conscience. *Virtual Mentor*. 2005;7(5)
3.  Curlin FA. Caution: Conscience is the limb on which medical ethics sits. *American Journal of Bioethics*. 2007;7(6): 30-32
4.  Curlin FA, Roach CR. By intuitions differently formed: How doctors address spiritual issues in the clinical encounter. *American Journal of Bioethics*. 2007;7(7): 19-20
5.  Lawrence RE, Curlin FA. Misplaced flexibility: Revise policies but cling to principles. *Am J Bioeth*. 2008;8(4):36-7.
6.  Curlin FA. Conscience and clinical practice: Medical ethics in the face of moral controversy. *Theor Med Bioeth*. 2008;29(3):129-33.
7.  Curlin FA. Commentary: A case for studying the relationship between religion and the practice of medicine. *Acad Med*. 2008;83(12):1118-20.
8.  Curlin FA. Medicine's dance with death. [book review] *Public Discourse*. November 16, 2012. Available at: http://www.thepublicdiscourse.com/2012/11/6761/
9.  Curlin FA. Holy transgressions: Breaching the wall between public religion and patient care. *Narrative Inquiry in Bioethics*. 2014;4(3):221-6.
10. Curlin FA, Meador KG. Setting medicine in the context of a faithful Christian life. *Christian Bioethics*. 2016;22(1): 1–4
11. Curlin FA, Powell K. Editors' Introduction: Examining deeper questions posed by disputes about conscience in medicine. *Perspect Biol Med*. 2019;62(3):379-382
12. Curlin F. Brain death: new questions and fresh perspectives. *Theor Med Bioeth*. 2019;40(5), 355-358
13. Curlin FA. On the opinions of US adults regarding religiously affiliated health care facilities. *JAMA Network Open*. 2019;2(12):e1919013
14. Curlin F, Scherz P. Theological and ethical problems with medicalizing risk. *Christian Bioethics*. 2023;29(2):105–109

**Letters to the editor, other**
1.  Curlin FA. Euthanasia in severely ill newborns. *New England Journal of Medicine.* Jun 2 2005;352(22):2353-2355; author reply 2353-2355 [PMID 15938015]
2.  Curlin FA. Talking through your epistemological hat. *Hastings Center Report*. 2006; 36(4):7-8; author reply 8
3.  Lawrence R, Curlin F. Faith matters—but how? *Stillpoint* [Gordon College]. Fall 2007. 18-19
3.  Sulmasy DP, Curlin F, Brungardt GS, Cavanaugh T. Justifying different levels of palliative sedation. *Ann Intern Med*. 2010 Mar 2;152(5):332-3; author reply 333

**Testimony as an expert witness in the previous four years**
1.  *Whole Woman's Health v. Todd Rokita*, No. 1:18-cv-01904 (S.D. Ind.)
2.  *Planned Parenthood v. Joseph Minor*, No. 2:19-cv-00238 (D. Utah)
3.  *Bernard v. Indiana Licensing Board*, No. 1:19-cv-1660 (S.D. Ind.)
4.  *All Options v. Attorney General of Indiana*, No 1:21-cv-1231 (S.D. Ind.)
5.  *Estabrook v. Scott & White Hospital*, No. 18-002323-cv-272 (272nd D. Texas)
6.  *PetitHomme v. Fairfax Neonatal Associates*, No. CL2020-07881 (Virginia)
7.  *Sistersong v. State of Georgia,* No. 2022-CV-367796 (Superior Ct., Fulton County, GA)

**Farr A. Curlin, MD**

8. *Planned Parenthood v. Medical Licensing Board,* No. 53C06-2208-PL-001756 (Monroe County Circuit Ct, IN)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

BRIANNA BOE, *et al.*,                              )
                                                    )
    *Plaintiffs*,                           )
                                                    )
UNITED STATES OF AMERICA,                           )
                                                    )
    *Intervenor Plaintiff*,                 )
                                                    )
v.                                                  )   Civil Action No. 2:22-cv-184-LCB
                                                    )
HON. STEVE MARSHALL, in his                         )
Official capacity as Attorney General,              )
of the State of Alabama, *et al.*,                  )
                                                    )
    *Defendants*.                           )

**SUPPLEMENTAL EXPERT REPORT OF**
**DR. FARR CURLIN, M.D.**

EXHIBIT
2

## Table of Contents

I.  CREDENTIALS ............................................................................................................. 1

II.  MATERIALS REVIEWED ............................................................................................... 2

III.  QUESTIONS ADDRESSED .......................................................................................... 2

IV.  SUMMARY OF OPINIONS ............................................................................................ 3

V.  THE SCIENTIFIC CONTEXT RELEVANT TO ETHICAL ANALYSIS. ................................. 5

    A.  The hoped-for benefits from MGT are unproven. ............................................... 5

    B.  The risks of harm from MGT are substantial and serious. .................................. 7

    C.  The fact that a particular intervention is medically indicated for one condition in one population does not imply that it is medically or ethically defensible for a different condition in a different population. ........................................................................................... 8

    D.  The fact that GD is listed as a disorder in the Diagnostic and Statistical Manual of Mental Disorders (DSM 5) does not imply that GD marks a disorder of the body that warrants MGT in minors. ................................................................................................................. 9

    E.  Statements by U.S. medical and advocacy organizations do not establish that MGT is medically necessary. ............................................................................................... 10

    F.  If WPATH allowed the SOC 8 development process to be influenced by financial and other non-medical considerations, then WPATH's Standards of Care report is unreliable not only because it is contradicted by the evidentiary base, but also because it is the product of ethical misconduct. ................................................................................................... 11

    G.  The problematic influence of fear and intimidation on the scientific discourse relating to responses to gender dysphoria. ........................................................................... 12

VI.  APPLICATION OF PRINCIPLES OF MEDICAL ETHICS TO THE STATE OF SCIENTIFIC KNOWLEDGE CONCERNING THE BENEFITS, HARMS, AND RISKS OF MGT. ................ 13

    A.  The state of evidence does not support the conclusion that the ethical principle of equipoise forbids withholding MGT from minors, including in studies in which a control group does not receive MGT. ......................................................................................... 13

    B.  An Institutional Review Board that approved the expanded clinical trial apparently advocated by the FDA would likely be violating its ethical obligations. .................... 15

    C.  Large and well-resourced medical systems have violated ethical principles by engaging in large-scale prescription of unproven therapies without undertaking well-designed research to evaluate safety and efficacy. ............................................................................ 17

VII.  THE POSSIBILITY OF MEANINGFUL INFORMED CONSENT TO MGT FOR MINORS IS DOUBTFUL. ................................................................................................................. 18

    A.  Doctors do not possess and are not providing information sufficient to enable children or parents to make "informed" decisions. ............................................................... 18

B.   It has not been shown that minors are able to comprehend and reasonably evaluate the risks and lifelong implications of MGT. ................................................................................. 18

C.   There is evidence that many minors who are subjected to MGT cannot meet the informed consent requirement of "voluntariness." ................................................................. 20

D.   The fact that MGT is *wanted* by minors and their parents is not sufficient to justify MGT, medically or ethically. .................................................................................................... 21

E.   Parental consent cannot satisfy the doctor's ethical obligation to obtain informed, comprehending, voluntary consent. ......................................................................................... 22

Appendix A: Bibliography and Other Materials Considered ......................................................... 26

Appendix B: Curriculum Vitae of Dr. Farr Curlin, MD ................................................................ 29

## I.    CREDENTIALS

1.    I am the Josiah C. Trent Professor of Medical Humanities in the Trent Center for Bioethics, Humanities, and History of Medicine, and Professor in the Department of Medicine, at Duke University. I am also Co-Director of the Theology, Medicine, and Culture Initiative at Duke Divinity School and Senior Fellow in Duke University's Kenan Institute for Ethics. Prior to joining the Duke University faculty in January 2014, I served on the faculty of the University of Chicago.

2.    I am licensed to practice medicine and maintain medical licensure in the State of North Carolina. I am an internist with board certification in Internal Medicine, as well as subspecialty board certification in Hospice and Palliative Medicine. From 2001 to 2013, I practiced general internal medicine, maintaining an outpatient primary care clinic from 2001 to 2008, and attending on the inpatient wards at the University of Chicago Hospitals from 2003 until I moved to Duke University at the end of 2013. Since January 2014, I have served as a palliative medicine consultant and hospice physician at Duke University.

3.    I completed a fellowship in clinical medical ethics at the University of Chicago, and I have served on the medical ethics faculties of the University of Chicago and Duke University for 19 years, providing clinical ethics consultations (at the University of Chicago), attending regular ethics case conferences, teaching medical ethics, and completing research studies and other scholarly work regarding medical ethics. In addition, I was named to the Greenwall Foundation Faculty Scholars Program in Bioethics, through which, over the subsequent decade, I met numerous times with a community of leading scholars in bioethics.

4.    My work on medical ethics has included peer-reviewed publications, invitations to lecture at universities nationwide and internationally, and being asked to speak as an expert before national advisory bodies. I have received awards in bioethics. My training, research, and experience give me familiarity with professional ethical norms regarding clinical medicine—their content, history, and application to clinical contexts, including the context of "gender affirmation." As reflected in my CV, I have published an academic book that addresses, and have given invited talks at a major medical school concerning, ethical issues surrounding transgender medicine.

5.    In addition, I completed a two-year postdoctoral fellowship in health services research at the University of Chicago, and I have spent a substantial portion of my time since then conducting and publishing empirical research, including research on physicians' attitudes and practices regarding controversial practices. This training and experience give me added expertise in interpreting and applying scientific data to clinical contexts. My credentials and experience are

documented in further detail in my curriculum vitae, which I attach as Appendix B to this Report.

6.      This report presents my independent, expert opinions based on my study, training, and experience as a physician, biomedical ethicist, and health services researcher; my review of relevant scholarly literature; and my discussions over the years with colleagues in medicine and bioethics. I do not speak herein for Duke University, nor is the affidavit intended to represent the opinions or policies of Duke University. I am being compensated for my time spent on this matter at a rate of $500 per hour, and $250 per hour for time spent on travel required to give testimony.

7.      My most recent curriculum vitae, which lists my publications and my testimony provided within the last four years, is provided as Appendix B to this Report.

## II.      MATERIALS REVIEWED

8.      As part of my preparation of this report, I have reviewed the materials listed in Appendix A to this Report.

## III.     QUESTIONS ADDRESSED

9.       Dr. McNamara has asserted that "no institutional review board would approve a research protocol on a randomized control trial in essential medical treatment for gender dysphoria because of the established science which demonstrates the efficacy of treatment with transitioning medications." (McNamara Report 20-21.) Similarly, Dr. Antommaria states that "For randomized trials to be ethical, clinical equipoise must exist; that is, there must be uncertainty about whether the efficacy of the intervention or the control is greater." He asserts that a randomized trial in which the control group does not receive puberty blockers or cross-sex hormones would be unethical. (Antommaria Report 15-16.)

10.     More recently, the Intervenor United States, through its agency the FDA, has issued a letter stating that it would be "reasonable" to include males down to age 13 in a clinical trial of cross-sex administration of estradiol as a medicalized gender transition ("MGT") treatment,[1] while suggesting that such a trial need not include a placebo control.[2] Meanwhile, the American Academy of Pediatrics (AAP), which has submitted an amicus brief in this case and which issued the 2018 "Policy Statement" which Plaintiffs and their experts have cited to this Court, recently

---

[1] In this report I use the term "medicalized gender affirmation" to refer to the use of puberty blockers and cross-sex hormones in patients experiencing gender dysphoria.
[2] https://www.statnews.com/2023/11/28/fda-gender-affirming-care-estrogen-approval/.

submitted a brief in another litigation addressing restrictions on MGT for minors in which the AAP asserted:

> '[I]n transgender clinical research individual randomized controlled trials (RCTs) may not always be feasible or ethically acceptable.' Sari L. Reisner et al., Advancing Methods for U.S. Transgender Health Research, 23(2) Curr. Opin. Endocrinal Diabetes Obes. 198, 199 (2016). With preexisting guidelines that recommend gender-affirming care for those with gender dysphoria, randomized controlled trials would violate the principle of equipoise, which safeguards the rights of individual trial participants. Richard J. Lilford & Jennifer Jackson, Equipoise and the Ethics of Randomization, 88 J. R. Soc. Med. 552, 552 (1995).[3]

11.     Plaintiffs will likely claim that this letter from the FDA and this statement from the AAP support their experts' contention that it is unethical to withhold medical transition from minors.

12.     I have been asked to give my expert opinion regarding whether withholding medicalized "gender affirmation" or "gender transition" treatments (MGT) from minors, whether to provide a control arm in a clinical experiment, or out of concern for potential harm to the patients, is consistent with the principle of equipoise in clinical research and other well-established principles of medical ethics.

## IV.    SUMMARY OF OPINIONS

13.     While I set out my opinions throughout this report, I summarize here key aspects of those opinions.

14.     I take as a premise, based on the science reviewed and the opinions offered by Drs. Cantor and Laidlaw, that the mental health benefits that are claimed to justify the administration of medicalized gender affirmation treatments to minors are currently unproven and disputed among informed observers. Position statements from professional associations cannot substitute for scientific evidence.

15.     I also take it as a premise, based on the science reviewed and the opinions offered by Drs. Cantor and Laidlaw, that the known or reasonably anticipated harms to children and adolescents from MGT treatments are substantial and serious, threatening sterilization, failure to develop healthy sexual

---

[3] Brief of Amicus Curiae American Academy of Pediatrics submitted to the Supreme Court in *Williams et al. v. Skrmetti* (No. 23-466) on Petition for a Writ of Certiorari, dated December 4, 2023, at 22 n. 72.

response, impaired neurological (brain) development, and multiple other harms to bodily health.

16.     There is not a consensus among medical professionals that MGT is beneficial or suitable for minors. This is amply supported by the published literature and the evaluations and position statements of a number of national health authorities of respected jurisdictions. Further, I know from my own experience and that of professional peers that both what is said and what is published in this field is severely distorted by what is sometimes referred to as a "cancel culture," with professionals fearing for their reputations and even their employment and livelihoods if they criticize or raise concerns about administration of MGT to minors, whether in scientific publications or in public discussion.

17.     It is not possible to conclude that it is known beyond "equipoise" that MGT is on the whole beneficial for minors who suffer from gender dysphoria. Therefore, the ethical principle of equipoise does not prohibit including control groups that receive only psychological counseling but not MGT in studies to evaluate the benefits and harms of MGT. Nor is there a basis to assert that it is unethical to withhold MGT from minors in a clinical setting *outside* the context of formal clinical experimentation.

18.     On the contrary, for multiple reasons there is a serious question whether it is allowable, under accepted principles of medical ethics, to administer MGT to minors. Based on the descriptions of the available science provided by Dr. Cantor, Dr. Laidlaw, and position statements from national health authorities, it appears that animal studies that could give meaningful information about potential harms of MGT (including sterilization, brain development, bone development, and cardiovascular health) have not yet been done; that well-designed studies to evaluate both harms and efficacy have not been conducted; and that plans for careful long-term monitoring and management of reasonably anticipated risks of such disruptions of natural hormone levels and bodily maturation and function have not been identified and followed.

19.     Further, it is not at all clear that meaningful informed consent for administration of MGT to minors can be obtained. There are strong reasons to doubt that minors can adequately appreciate and appropriately weigh the lifetime implications of sterilization, loss of sexual response, impaired neural development, and the other potential health and relational impacts identified in the literature, nor is it apparent that doctors possess (much less consistently disclose) adequate scientific information about these risks to enable anyone to make meaningfully informed decisions. Nor do ethical principles give parents unfettered power to provide effective consent on behalf of their children for medical interventions that pose such severe risks of irreversible harm to the bodily health of the child (including sterilization) in the absence of a countervailing and imminent threat of

bodily harm from a medical condition to be treated. No such imminent threat exists in the case of minors who experience gender dysphoria.

**V.     THE SCIENTIFIC CONTEXT RELEVANT TO ETHICAL ANALYSIS.**

    **A.     <u>The hoped-for benefits from MGT are unproven.</u>**

    20.     I have read the descriptions of the state of knowledge provided in the expert reports submitted by Drs. Cantor and Laidlaw. I have been asked to and do assume that the descriptions of the articles and studies that they provide are accurate for purposes of forming my opinions provided in this case. On that basis, it is evident that multiple respected health authorities and sources have recently opined that the safety and efficacy of hormonal interventions to treat gender dysphoria in minors remain uncertain and unproven. While I rely on Dr. Cantor's and Dr. Laidlaw's descriptions of the scientific literature, I have myself also reviewed the illustrative examples that I summarize below.

    21.     An extensive review commissioned by England's National Health Service and chaired by eminent pediatrician Dr. Hilary Cass concluded that there has been "very limited research on the sexual, cognitive, or broader developmental outcomes" from the use of puberty blockers for gender dysphoria (Cass 2022 at 19), that it is an unanswered question "whether the evidence for the use and safety of [puberty blockers] is strong enough as judged by reasonable clinical standards" (Cass 2022 at 37), and that "the available evidence was not strong enough to form the basis of a policy position" with regard to use of both puberty blockers and cross-sex hormones in minors (Cass 2022 at 35).

    22.     Systematic reviews of the safety and efficacy of puberty blockers and cross-sex hormones as treatment for gender dysphoria in minors have been conducted by the England National Institute for Health & Care Excellence (NICE). These reviews concluded that available clinical evidence of efficacy and safety in the relevant population is uniformly of "very low quality." (Cantor ¶¶ 79-84.) "Very low quality" within the GRADE system of evaluation of medical information means: "We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect." (GRADE Handbook at 13 (Section 5).)

    23.     In 2022, the Swedish National Board of Health commissioned its own systematic review and concluded that "the evidence on treatment efficacy and safety is still insufficient and inconclusive for all reported outcomes," and that "[f]or adolescents with gender incongruence, the . . . risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." (Cantor ¶¶ 28, 86; Swedish Socialstyrelsen Support 2022 at 10-12.)

24.     In 2022, Norway's Healthcare Investigation Board (Ukom) concluded that "The knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient and the long-term effects are little known" and that "This applies particularly to the teenage population." (Cantor ¶ 30-31; Ukom 2023, Summary and Section 7.)

25.     In 2020, the Finnish Council for Choices in Health Care in Finland concluded that medical transition of minors "is an experimental practice." (Cantor ¶ 169, quoting COHERE Recommendation (2020) translation.) Dr. Riittakerttu Kaltiala, Chief Psychiatrist in the Department of Adolescent Psychiatry at Finland's Tampere University Hospital, has recently stated that young people who received MGT were "deteriorating" rather than "thriving," that her clinic has observed gender dysphoria spreading like a "social contagion" among teenage girls, and that increasing numbers of patients have begun returning to their clinic saying that they now regret their transition. (Kaltiala 2023b [Free Press Interview].)

26.     Even the WPATH organization, which strongly advocates for medical transition of minors, repeatedly acknowledges the absence of vital science in its recently released and self-designated "Standard of Care" version 8 (SOC 8). The SOC 8 notes that a 2014 Dutch study "is the only study that followed youth from early adolescence... through young adulthood" (SOC 8 at S46) and "It is not clear if deviations from [the age and mental and social health screening requirements of the Dutch study approach] would lead to the same or different outcomes" (at S65). It also acknowledges that, "Despite the slowly growing body of evidence supporting the effectiveness of early medical intervention, the number of studies is still low, and there are few outcome studies that follow youth into adulthood." It adds, "A key challenge in adolescent transgender care is the quality of evidence evaluating the effectiveness of medically necessary gender-affirming medical and surgical treatments." (at S45-46.)

27.     Studies summarized by Drs. Cantor and Laidlaw likewise document serious uncertainty about the efficacy and safety of MGT as a treatment for gender dysphoria. (Cantor ¶¶ 148-154, 178-201; Laidlaw ¶¶ 90-175.)

28.     For example, a study from the Tavistock and Portman clinic in the UK found, "Relative to the time point before beginning puberty suppression, there were no significant changes in any psychological measure, from either the patients' or their parents' perspective." (Cantor ¶ 186.)

29.     Multiple other studies have found persistently high suicide rates after MGT. (Cantor ¶ 149.) A cohort study of minors by Kuper et al. found that suicidal ideation, suicidal attempts, and non-suicidal self-injury all went up after starting MGT (Cantor ¶ 1521), and, "No studies have documented any reduction in suicide rates in minors (or any population) as a result of medical transition" (Cantor ¶ 148), a fact acknowledged by WPATH (Cantor ¶ 150).

30.     I also reviewed two large and very recent studies discussed in Dr. Cantor's supplemental report dated February 2, 2024. The first (Glintborg 2023) examined the medical records of all individuals in Denmark diagnosed with gender dysphoria or gender incongruence from 2000 through 2021 (3812 patients, among whom 2089 underwent MGT). That study found that prescriptions of psychoactive medications increased rather than decreased after the start of MGT and remained elevated across multiple years. (Glintborg 2023 at. 341.) It also found that measures of negative mental health, compared against controls, "were stable after initiation of gender-affirming hormone treatment, without sign of decrease after date for first prescription of gender-affirming hormone." (at 342:2.) That is, the mental health of the patients who received MGT did not improve on average.

31.     The second study (Kaltiala 2023) examined the medical records of persons who had contacted the national gender identity service of Finland between 1996 and 2019 (3665 persons) and compared them to age and sex-matched controls. That study found that the need for psychiatric treatment did not go down after MGT interventions. (Kaltiala 2023 at 2:1.) The authors referenced similar findings from an earlier study and noted, "Their findings and ours do not suggest that medical GR interventions resolve psychiatric morbidity among people experiencing gender distress." (at 6:1.)

32.     Finally, I have reviewed the expert reports of Drs. McNamara, Antommaria, and Ladinsky and note that none of those reports cite any study that has found that medical transition reduced suicides in any population.

33.     All of this contradicts the plaintiffs' claim that MGT is medically necessary, since an intervention cannot be said to be medically necessary if the benefits of the intervention are unproven, or indeed are cast into serious doubt by the most recent large-scale studies.

**B.      The risks of harm from MGT are substantial and serious.**

34.     While the benefits of MGT for minors are at best unproven, the evidence summarized by Drs. Cantor and Laidlaw also indicates that MGT in minors poses risk of objective, often irreversible, harms to health, while also requiring life-long dependence on medical interventions.[4]

---

[4] McNamara writes, "The overwhelming majority of adolescents who receive transitioning medications continue to do so as adults." (McNamara at 23.)

35.   Risks of harm recognized in the literature include:

a.  Sterilization (Cantor ¶¶ 206-207; Laidlaw ¶¶ 90-98, 157-159);

b.  Lifetime lack of orgasm and sexual function (Cantor ¶ 208)—an adverse effect acknowledged by Marci Bowers, current president of WPATH (Cantor ¶ 209; Laidlaw ¶¶ 99-100);

c.  Potential adverse effects on neurological and cognitive development (Cass Review Letter 2022 at 6; Cantor ¶¶ 210-214);

d.  Reduced bone development, especially in male to female transition (Cantor ¶¶ 217 – 220; Laidlaw ¶¶ 101-112), the long-term effects of which have not been studied;

e.  Harm to psychosocial development (Laidlaw ¶¶ 114-117); and

f.  "Increased cardiovascular risk, osteoporosis, and hormone dependent cancers." (Cass 2022 at 36; Cantor ¶ 224; Laidlaw ¶¶ 126-129.)

36.   The leading Swedish pediatric gender clinic, following a systematic review of the available scientific evidence commissioned by Sweden's National Board of Health, concluded that hormonal interventions in minors are "fraught with extensive and irreversible adverse consequences such as cardiovascular disease, osteoporosis, infertility, increased cancer risk, and thrombosis," and that "In light of the above, and based on the precautionary principle, which should always be applied, it has been decided that hormonal treatments (i.e., puberty blocking and cross-sex hormones) will not be initiated in gender dysphoric patients under the age of 16." (Karolinska 2021, cited in Cantor ¶ 27.)

### C.   The fact that a particular intervention is medically indicated for one condition in one population does not imply that it is medically or ethically defensible for a different condition in a different population.

37.   The plaintiffs' experts have suggested that because the drugs used in MGT have been used to treat conditions such as precocious puberty and complete androgen insensitivity syndrome, it is unjust to prevent their use in minors with GD. But the plaintiffs' experts are comparing apples and oranges.

38.   While treatments for precocious puberty and complete androgen insensitivity syndrome aim to preserve and restore healthy development of secondary sex characteristics, MGT intentionally blocks healthy development of those characteristics. As Dr. Cantor notes, the former aim "to bring the patient within healthy norms", while the latter "is applied precisely to take the patient outside of healthy norms." (Cantor ¶ 276.) Similarly, while the Court noted that

"Doctors have also long used hormone therapies for patients whose natural hormone levels are below normal" (Opinion and Order dated 05/13/22, at 18), MGT contradicts this medical pattern; rather than correcting hormone levels that are abnormal, it induces hormone levels that are abnormal.

39.     Dr. McNamara asserts that MGT in minors is safe, because puberty blockers have long been prescribed "in adolescents with cancer who need menstrual suppression as they undergo marrow-ablative chemotherapy." (McNamara at 13.) But as Dr. McNamara concedes, "puberty blockers are used in these patients to protect their gonads from toxicity induced by chemotherapy as a means of fertility preservation", whereas, by contrast, MGT directly hinders and suppresses healthy gonadal development and function, harming fertility. In one case, the drugs have medicinal effects; in the case of MGT, the drugs have toxic effects. As a result, the ethical analysis is entirely different and opposite.

**D.     The fact that GD is listed as a disorder in the Diagnostic and Statistical Manual of Mental Disorders (DSM 5) does not imply that GD marks a disorder of the body that warrants MGT in minors.**

40.     McNamara notes that the DSM 5 identifies GD as a disorder. (McNamara at 15.) But the DSM is a manual specifically of what it terms "*mental* disorders" created by the American Psychiatric Association; it does not identify or provide diagnostic criteria for medical illnesses. The Plaintiffs have not identified any other "mental disorder" for which the indicated treatment is to block or damage the development of healthy organs and functions. On the contrary, MGT in minors contradicts ordinary medical standards with respect to disorders of perception. The person suffering GD perceives their objectively healthy secondary sex characteristics as not compatible with their mental self-perception and therefore needing to be suppressed. MGT problematically takes the minor's mental perception as sufficient reason to treat healthy anatomy and physiology as if it were diseased, thereby contradicting medicine's ordinary regard for the healthy body as its standard. To my knowledge, in no other case do we treat a disordered perception by treating normal physiology and anatomy as diseased. We do not, for example, prescribe hand soap to children who, because of obsessive compulsive disorder, misperceive their hands as needing to be washed repeatedly. We do not lock children indoors who, because of agoraphobia, fear going outside. We do not encourage fasting in patients with anorexia nervosa.

41.     Indeed, there is one historical precedent where doctors have removed or damaged healthy tissue attempting to treat mental disorders—that is, performing lobotomies on patients who suffered from mental illnesses, including schizophrenia, depression, melancholy, and obsessive-compulsive disorder. As with MGT, "The treatment was introduced … despite the fact that little research had been carried out on its effects." (Torkildsen 2022.) As with MGT, in the absence of adequate scientific data, many people "were convinced that lobotomy reduced

suffering." As with MGT, "those who promoted the method, were driven by idealism and a strongly held belief that their treatment alleviated suffering," and they "gave overwhelmingly positive reviews of the efficacy of the treatment, while grossly under-communicating its adverse effects." Lobotomy has come to be seen "as one of the greatest mistakes in modern medicine" (Torkildsen 2022)—a prominent example of a collective scientific and ethical misstep by the medical profession that harmed many patients. In my opinion, MGT is likely to be judged the same, not least because it treats a disorder of perception as if it were a disorder of the body, harming the healthy body in efforts to reduce mental suffering.

> **E.      Statements by U.S. medical and advocacy organizations do not establish that MGT is medically necessary.**

42.      As already summarized above, ample objective evidence demonstrates dissensus regarding MGT across the community of experts and clinicians. Indeed, the health authorities and independent bodies that have systematically reviewed the scientific evidence regarding MGT in minors have concluded that evidence is insufficient to justify the conclusion that MGT improves even mental health outcomes. Indeed, the recent large studies from Denmark and Finland have found that mental and behavioral disorders do not decrease after MGT. (Glintborg 2023 at 341, Kaltiala 2023 at 1.)

43.      In contrast to these reviews of evidence, "The Endocrine Society guidelines do not rely on any systematic review of evidence of efficacy of any form of treatment for gender dysphoria." (Cantor ¶ 256.) The AAP's 2018 policy statement, "unique among the major medical associations in being the only one to endorse an affirmation-on-demand policy" (Cantor ¶ 257), was authored by one physician and likewise was not based on a systematic review of available evidence. The policy statement cited no new evidence to justify offering MGT rather than therapy and watchful waiting, and the statement is contradicted by the very reports it cited. (Cantor ¶ 257.) Meanwhile, "the systematic review on which WPATH based its standards for minors included exactly one study on puberty blockers and three studies on cross-sex hormones. All other references represent cherry-picked citations of studies rejected by its own systematic process. Moreover, even among the four studies in WPATH's review, three were rejected by the Swedish review, due to the low quality of the science they contained." (Cantor ¶ 250.) WPATH likewise cited no reference or rationale to justify removing minimum age restrictions for MGT.

**F.      If WPATH allowed the SOC 8 development process to be influenced by financial and other non-medical considerations, then WPATH's Standards of Care report is unreliable not only because it is contradicted by the evidentiary base, but also because it is the product of ethical misconduct.**

44.     My own review of SOC 8 indicates WPATH has problematically minimized the doctor's responsibility to exercise independent judgment and fiduciary responsibility to guide patient care for minors. In addition, Cantor and Laidlaw conclude that the WPATH committee members who participated in creating SOC 8 were subject to direct financial conflicts of interest as the guidelines would likely impact their own income (more procedures permitted, and increased insurance coverage, and their liability risk. (Laidlaw ¶ 187; Cantor Supp. ¶ 102-115, 119.) Insofar as these descriptions are accurate, then WPATH ignored significant conflicts of interest and violated accepted principles of medical ethics.

45.     Beauchamp and Childress note:

> A conflict of interest exists when an impartial observer would determine that a professional's judgments, decisions, or actions are at risk of being unduly influenced by his or her personal interests, such as financial interests … The risk is that the professional's personal interests will create temptations, biases, and the like that will lead to a breach of role responsibilities through judgments, decisions, and actions other than those reasonably expected in the role. The reasonable expectation is that clinicians will seek the patient's welfare and respect his or her rights, that researchers will pursue objective and valid results, and so forth. A conflict of interest poses a risk that the professional in question will compromise these expectations and thereby damage patients' interests and rights, distort research, or teach trainees in a biased way. (Beauchamp and Childress at 328.)

46.     As this explanation makes plain, it is beyond dispute that clinicians who practice (and are paid for) MGT have a conflict of interest in assessing whether MGT is supported by the evidence. It is problematic that this conflict of interest was neither mentioned in the SOC 8 report nor managed by including outside experts and perspectives in the standard-writing process. Insofar as changes in the recommendations were motivated not by dispassionate assessment of the data but by concern to protect clinicians' financial interests or professional reputations, or to further political or litigation agendas, that clearly "damage[s] patients' interests and rights, distort[s] research" and promulgates standards "in a biased way." All of this contradicts professional ethical norms and undermines trust in the medical profession. As Beauchamp and Childress also write, "Health care professions specify and enforce obligations for their members, thereby seeking to ensure that persons

who enter into relationships with these professionals will find them competent and trustworthy." (Beauchamp and Childress at 7.)  If WPATH permitted its standard-development process to be dominated by individuals with a direct financial interest in providing the services covered by that document, without disclosing those conflicts of interest, then WPATH is neither competent nor trustworthy regarding its evaluations or advocacy of MGT.

      **G.**      **The problematic influence of fear and intimidation on the scientific discourse relating to responses to gender dysphoria.**

47.      When confronted with claims of "medical consensus," the Court needs to be aware that social pressure and fear of censure within the United States medical and academic communities is affecting both what is published about MGT and the willingness of doctors to voice concerns about MGT.

48.      Reuters recently published an investigative report documenting both growing concerns among physicians about MGT as well as intense backlash that clinicians, experts, and patients themselves have received when they voice such concerns. (Respaut 2022.)

49.      I know from personal conversations with many medical ethicists and practitioners that doctors are afraid to speak up for fear of both social and employment repercussions, a problem also described by colleagues in Europe (Cass 28, Kaltiala 2023b).[5] I recently participated in a meeting of the Greenwall Faculty Scholars Program in Bioethics, which brings together a community of leading bioethicists nationwide. The meeting included a closed-door session titled, "Hot Topic: Bioethics Dilemmas in the Care of Transgender Minors." In that session, several colleagues voiced concerns, including a number of the ethical concerns I have raised in this report. Colleagues also expressed reservations about raising these concerns in public, for fear of being treated as a bigot or someone who is insensitive to the needs of people experiencing GD. This pattern reflects what the Cass report also reported in the UK, that clinicians there "are afraid of the consequences of ['taking a mental health approach to formulating a differential diagnosis'] in relation to gender distress because of the pressure to take a purely affirmative approach." (Cass 48.)

50.      In December 2023 I participated in a meeting of the faculty of Duke University's Trent Center for Bioethics, Humanities & History of Medicine focused on this topic. In that meeting several faculty members voiced similar concerns about MGT and similar fears about speaking up. In November 2023 I gave an invited

---

[5] Kaltiala writes: "… health providers were failing to speak up. I understood this silence. Anyone, including physicians, researchers, academics, and writers, who raised concerns about the growing power of gender activists, and about the effects of medically transitioning young people, were subjected to organized campaigns of vilification and threats to their careers." (Kaltiala 2023b.)

lecture on this topic at the University of Chicago's MacLean Center for Clinical Medical Ethics, and there more than one colleague told me that they feared speaking up about their concerns regarding MGT, and that they had observed that other colleagues at the University, when they learned of the topic, had sought to have me disinvited prior to the lecture. After the lecture an undergraduate student waited until everyone who wanted to talk to me had left, and then came up and quietly thanked me for speaking up about the ethical problems with MGT for minors. She said that she had been on the pathway to MGT a few years before, but as she had gone through puberty she slowly had come to grips with being a woman and now calls herself a desister.

51.    Both medical students and faculty at Duke University, where I am employed, have told me that they fear voicing concerns about MGT, and I probably would not have felt able to voice my own concerns were I not tenured. Having voiced my concerns, I was cancelled from giving a talk on an unrelated topic at Michigan State University spring of 2022, because students alleged that they would not feel safe listening to me lecture on that topic due to the concerns I had expressed elsewhere about MGT. I have found resistance to hosting public dialogue and debate about the topic even among colleagues that agree that MGT is ethically problematic. All of this makes evident that fear is muzzling open expression of widespread and growing dissent within the medical community regarding MGT.

## VI.    APPLICATION OF PRINCIPLES OF MEDICAL ETHICS TO THE STATE OF SCIENTIFIC KNOWLEDGE CONCERNING THE BENEFITS, HARMS, AND RISKS OF MGT.

### A.    The state of evidence does not support the conclusion that the ethical principle of equipoise forbids withholding MGT from minors, including in studies in which a control group does not receive MGT.

52.    Benjamin Freedman, the bioethicist who first promoted the concept of equipoise in clinical research, has written, "The ethics of clinical research requires equipoise — a state of genuine uncertainty on the part of the clinical investigator regarding the comparative therapeutic merits of each arm in a trial." (Freedman 1987.) In their respected textbook, *Principles of Biomedical Ethics*, Beauchamp and Childress note that "[t]he community of reasonable physicians is … in a state of 'clinical equipoise'" when "No one knows, prior to conducting the research, whether it is more advantageous to be in the control group or in the experimental group … No patient, then, will receive something known to be less effective or to have a higher risk than an available alternative." (Beauchamp and Childress 2012 at 335.) Notably, clinical equipoise depends on both foreseen benefits and foreseen harms.

53.    To conclude that the principle of equipoise <u>forbids</u> an "untreated" "active control" arm in a clinical study of MGT, one would have to conclude that it is known as a matter of medical science that MGT brings about benefits that outweigh known or foreseeable but unstudied harms, and that those benefits cannot be

achieved by some other "established effective intervention" which could be included in the "active control." (Beauchamp and Childress at 336.) In the case of GD, such an active control (also called the "active comparator" (Cantor ¶ 265)) could include any customary psychotherapeutic interventions. Since large studies find that MGT does not lead to improved mental health outcomes, it is incorrect to assert that *not* offering MGT is contradicted by the principle of equipoise.

54.     Importantly—and contrary to what Dr. Antommaria suggests (Antommaria at 10)—whether clinical equipoise exists is not determined by what any one clinician or group of clinicians or investigators believes. Nor, contrary to the American Academy of Pediatrics, can the physician's ethical obligation to determine the existence (or absence) of clinical equipoise based on the available science be obviated by "preexisting guidelines that recommend gender-affirming care." (AAP amicus brief, *Williams v. Skrmetti*, supra n. 3.) Rather, clinical equipoise exists when, "[o]n the basis of the available evidence" (Beauchamp and Childress at 335), "there is genuine uncertainty within the expert medical community—not necessarily on the part of the individual investigator—about the preferred treatment" (Freedman 1987). As the above summaries make clear, the community of reasonable clinicians, as well as the international community of relevant experts, is at best genuinely uncertain about whether MGT is to be preferred to standard psychotherapeutic treatment without MGT. This is confirmed by the fact that multiple international bodies of experts have described MGT as "experimental." (Cantor ¶ 168-172.)[6]

55.     Plaintiffs' assertions that it would be unethical to do clinical research with an arm that does not receive MGT are thus unsupported. I see assertions but no science cited by Plaintiffs' experts that should cause an Institutional Review Board (IRB) to reject a clinical trial in which the active control does not include MGT. IRBs do not defer to clinicians' judgment about equipoise, much less to those who are most enthusiastic about some intervention. When IRBs are fulfilling their role, they require clinicians and researchers to show sufficient evidence to justify their beliefs.

56.     Moreover, that such studies can be ethical is evidenced by the fact that multiple countries, including the United Kingdom, have now announced policy changes to provide MGT only as part of formal research protocols. (Cantor ¶¶ 168, 170, 266.) Even pioneers of MGT have called for such research, with Dr. de Vries writing recently that "rigorous longitudinal outcomes studies that provide evidence about whether this approach [MGT in minors] is effective and safe are needed" and

---

[6] See also a 2023 article published in one of the world's most prestigious medical journals, the *British Journal of Medicine*, that was entitled, "Gender dysphoria in young people is rising and so is professional disagreement." (Block 2023.)

that "Future studies that *compare outcomes with different care models are needed.*" (de Vries 2023 at 276; cited Cantor ¶ 283 (italics added).)

57.     Thus, even if a trial cannot be randomized or blinded as a practical matter, the principles of medical ethics do not preclude a carefully constructed trial that includes an arm comprised of patients with GD who undergo psychotherapeutic care but do not undergo hormonal intervention.

**B.     An Institutional Review Board that approved the expanded clinical trial apparently advocated by the FDA would likely be violating its ethical obligations.**

58.     As I have summarized above, multiple international reviews of the available evidence have concluded that MGT has not been shown to improve mental health outcomes. Without reliable evidence of better mental health outcomes than achieved by psychotherapy alone, the known or reasonably foreseeable harms of MGT cannot be reasonably accepted. That is to say, the condition of equipoise not only does not forbid *withholding* MGT, it likely forbids *offering* MGT until and unless appropriately conducted research generates evidence that MGT is likely to generate health benefits that are at least proportionate to its known harms. Based on the reviews of the published evidence provided by Drs. Cantor and Laidlaw, such reliable evidence is lacking at present.

59.     A clinical trial of MGT on minors would likely violate other accepted principles of medical ethics as well.

60.     The Nuremberg Code, adopted after World War II in response to the human experimentation performed by medical doctors under the Nazi regime, is one of the foundational and internationally accepted statements of key principles of medical ethics pertaining to experimentation on humans. Paragraph 3 of the Nuremberg Code states:

> "The experiment should be so designed and <u>based on the results of animal experimentation</u> and a knowledge of the natural history of the disease or other problem under study, that the anticipated results will justify the performance of the experiment."

61.     One point of this principle is that if a proposed treatment poses potential risks that could be explored through experiments on animals, then those animal experiments should be done before the treatment is tested on humans.

62.     Animal experiments would be possible with respect to many widely recognized risks of puberty blockers and cross-sex hormones. For example, Chen (2020) validates the ability to do useful animal studies of effects of hormones on brain development, writing, "studies in rodents show ovarian hormones, acting during puberty, program cognitive flexibility by exerting long-lasting effects on

excitatory-inhibitory balance in the pre-frontal cortex . . . [and] testosterone, acting during puberty, programs the ability to adapt behavior as a function of social experience." (Chen 2020 at 253:2a.) Animal studies might also help to clarify whether and under what conditions MGT-induced sterilization is reversible; whether suppressed bone development leads to later fractures or other complications; and how MGT impacts cardiovascular health over time. To my knowledge, such studies have not been undertaken. A responsible IRB recalling the Nuremberg Code would want to know what animal studies were feasible, which had been done, and (if true) why feasible studies had not been done, before approving clinical trials of MGT on humans.

63.     Another universally respected statement of principles of medical ethics is the Declaration of Helsinki, first adopted by the World Medical Association in 1964, and periodically updated since then. Paragraphs 17 and 18 of the Helsinki Declaration state that it is unethical to undertake any human experiments without first conducting a "careful assessment of predictable risks" and reaching a well-grounded conclusion that all of those risks "can be satisfactorily managed." (Helsinki Declaration ¶¶ 17, 18.)

64.     A trial that subjects adolescents to MGT does not meet these standards insofar as the available science does not enable a conclusion that "predictable risks" of MGT in adolescents—including sterilization, negative impact on neurodevelopment, and negative impact on bone and cardiovascular strength—can be "satisfactorily managed."

65.     A third respected statement of principles of medical ethics is the Belmont Report, published in 1979 by the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, authorized by the National Research Act of 1974. The Belmont Report states that prior to administration of experimental treatments to humans:

> "there should first be a determination of the validity of the presuppositions of the research; then the nature, probability and magnitude of risk should be distinguished with as much clarity as possible. … It should also be determined whether an investigator's estimates of the probability of harm or benefits are reasonable, as judged by known facts or other available studies."

> "When research involves significant risk of serious impairment, review committees should be extraordinarily insistent on the justification of the risk (looking usually to the likelihood of benefit to the subject . . . .)" (Belmont Report § C.2.)

66.     There can be no doubt that the known or potential harms of MGT discussed in the literature by knowledgeable observers—including sterilization, impairment of brain development, permanent deprivation of sexual response, and impaired bone development—constitute "risk of serious impairment." Further, the known facts and available studies as reviewed by Drs. Cantor and Laidlaw indicate that assertions that the benefits of MGT outweigh the potential harms are not empirically justified given the existing scientific record.

67.     In my opinion, the plaintiffs have not met the bar of justifying the risk associated with MGT insofar as: the evidence to date does not support the claim that MGT brings mental health benefits; animal studies relevant to safety that can be done have not been done; there has not been "careful assessment of predictable risks," and no plan for how all the known risks "can be satisfactorily managed" has been identified.

**C.     Large and well-resourced medical systems have violated ethical principles by engaging in large-scale prescription of unproven therapies without undertaking well-designed research to evaluate safety and efficacy.**

68.     As the Helsinki Declaration states, a physician, in certain circumstances, may reasonably use an unproven intervention in the treatment of an individual patient, but "This intervention should subsequently be made the object of research, designed to evaluate its safety and efficacy. In all cases, new information must be recorded and, where appropriate, made publicly available." (Helsinki Declaration ¶ 37.) The Belmont Report likewise states, "in order to determine whether ['radically new procedures'] are safe and effective it is the responsibility of medical practices committees . . . to insist that a major innovation be incorporated into a formal research project at an early stage." (Belmont Report Part A.)

69.     It follows that well-resourced academic medical centers with affiliated clinics where unproven MGT interventions are being clinically deployed bear a responsibility under these respected codes of medical ethics to sponsor research capable of investigating the harms and benefits of those interventions. Of course, such research must itself satisfy ethical principles. For example, thorough animal experimentation might be the only ethically justified experimentation given the present state of knowledge. (See above.) At the very least, academic medical centers are obligated to undertake long-term follow-up—into adulthood—of minors undergoing these unproven and "radically new" interventions. This they have not done (or at least, have not yet published), as evidenced by numerous systematic reviews concluding that there is very little evidence regarding the long-term effects of these interventions, and the evidence that exists is of very low quality.

## VII.     THE POSSIBILITY OF MEANINGFUL INFORMED CONSENT TO MGT FOR MINORS IS DOUBTFUL.

70.     The Belmont Report further states that respect for persons requires that research can only be conducted ethically if the subjects have given *informed consent*. In 1982, soon after the Belmont Report was published, the principle of informed consent was applied to clinical medicine in another landmark government report, *Making Health Care Decisions*. Since then, the principle and practice of informed consent has been uniformly established across the domains both of clinical research and clinical medicine. Beauchamp and Childress write, "Virtually all prominent medical and research codes and institutional rules of ethics now hold that physicians and investigators must obtain the informed consent of patients and subjects prior to a substantial intervention." (Health Care Decisions at 121.) The Belmont Report notes "widespread agreement" that informed consent requires the presence of sufficient "information, comprehension and voluntariness." (Belmont Report § C:1.) In my opinion, minors cannot give duly informed consent to MGT, because it is doubtful that any of these three conditions of informed consent can be met.

### A.     Doctors do not possess and are not providing information sufficient to enable children or parents to make "informed" decisions.

71.     The absence of well-designed and controlled studies makes it impossible to give minors and their parents information sufficient to consider their consent duly informed, and the plaintiffs' experts by their own admission are misinforming patients regarding that fact. "*Caveat emptor*" does not meet the bar required for consent to be duly informed within clinical medicine and clinical research. It is not enough to say "we don't know" without doing the careful, incremental research to generate information needed for a consent to be duly informed. Moreover, by their own admission the plaintiffs' experts do not disclose to minor patients and their parents that the evidence base does not support their claims of benefit from MGT. As such, by their own admission, they are misinforming minors and their parents who are considering MGT, and therefore contradicting the first condition on which informed consent depends.

### B.     It has not been shown that minors are able to comprehend and reasonably evaluate the risks and lifelong implications of MGT.

72.     It is doubtful that minors have the intellectual maturity to sufficiently *comprehend* the decision to undergo MGT and the potentially life-long consequences that decision will bring.

73.     It is well recognized that the ability to evaluate and balance risk and reward, to consider long-term as well as short-term implications, and to make prudent and well-considered decisions is not well developed in children and

adolescents. WPATH's recently published SOC 8 acknowledges problems with minors' immature capacity for judgment, noting, "adolescence is . . . often associated with increased risk-taking behaviors" (SOC 8 at S44), and "Adolescents often experience a sense of urgency that stems from hypersensitivity to reward, and their sense of timing has been shown to be different from that of older individuals" (SOC 8 at S44). Beauchamp and Childress likewise note that immaturity hinders adequate understanding. (Beauchamp and Childress 2012 at 131.) For this reason among others, with few exceptions minors are *not* considered capable of granting informed consent to medical interventions. (Katz 2016 at e1, e9.)

74.   Minors seem particularly incapable of comprehending the long-term implications of MGT, insofar as those implications involve relationships and experiences that come only with adulthood. As I have noted above, MGT brings lifetime physical and social implications including risks of impaired brain development, sterilization, and loss of sexual response. These risks cannot be adequately comprehended by children insofar as these risks relate specifically to aspects of human life that go with being an adult and are outside the life experience of children.

75.   Moreover, one form of MGT—puberty blockers—*by design* blocks the mental, physical, and emotional maturation of puberty which may be essential for a child to come in time to comprehend decisions of this magnitude. (Cantor ¶ 214.) Dr. Cantor notes that "Blocking puberty blocks the awareness of sexuality and sexual orientation that can play an important role in the individual's understanding of gender identity" (Cantor ¶ 234), and "for all children, blocking puberty necessarily blocks the onset of adult sexual interest, sexual arousal, and sexual response which are part of 'the usual process of sexual orientation and gender identity development'" (Cantor ¶ 235, quoting Cass 2022 at 38).

76.   In connection with the comprehensive review commissioned by the English National Health Service, Dr. Cass wrote, "We do not fully understand the role of adolescent sex hormones in driving the development of both sexuality and gender identity through the early teen years, so by extension we cannot be sure about the impact of stopping these hormone surges on psychosexual and gender maturation. We therefore have no way of knowing whether, rather than buying time to make a decision, puberty blockers may disrupt that decision-making process." (Cass Review Letter 2022 at 5.)

77.   It is ethically problematic when the treatment in question—puberty blockers—not only cannot be comprehended adequately by minors, but also prevents the otherwise healthy development of their capacity to comprehend such decisions. This is all the more true for younger children, "[g]iven the highly reliable, repeatedly replicated finding that childhood-onset gender dysphoria resolves with puberty for the large majority of children," and that "the evidence indicates that

blocking a child's puberty blocks the child's natural maturation that itself would resolve the dysphoria." (Cantor ¶ 159.)

78.    With respect to adolescents, WPATH's SOC 8 states that "decision-making regarding gender affirming medical treatments that have life-long consequences requires thoughtful, future-oriented thinking by the adolescent." (SOC 8 at S63.) However, neither WPATH nor any other source referenced by plaintiffs' experts establishes that minors, whether pre-pubertal or adolescent, are *able* to meaningfully comprehend and reasonably evaluate the risks and lifelong implications of MGT.

**C.    There is evidence that many minors who are subjected to MGT cannot meet the informed consent requirement of "voluntariness."**

79.    The opening statement of the Nuremberg Code declares,

> The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved, as to enable him to make an understanding and enlightened decision.

80.    As the Nuremberg Code indicates, voluntariness depends on adequate information and comprehension ("*sufficient knowledge and comprehension of the elements of the subject matter involved*"), both of which, as already noted, are doubtful in the case of minors considering MGT. But voluntariness also depends on freedom from controlling influences, both external and internal.

81.    With respect to external influences, minors obviously are commonly under the controlling influence of parents, which I will address below. In addition, a number of international experts have indicated concern that the rapid increase in prevalence of GD, especially among adolescent females, reflects undue influence of social pressure. WPATH's recently published SOC 8 itself acknowledges, "For a select subgroup of young people, susceptibility to social influence impacting gender may be an important differential to consider." (SOC 8 at S45.)

82.    Beauchamp and Childress note that in addition to external controlling influences, "no less important to autonomy are internal influences on the person, such as those caused by mental illness. All of these conditions can limit voluntariness." (Beauchamp and Childress 2012 at 105; see also id. at 138.) Dr. Cantor documents ample evidence that a high proportion of minors experiencing GD suffer from mental illnesses. (Cantor ¶ 160-162.) These mental illnesses constitute

an internal controlling influence that can prevent genuine voluntariness. As WPATH itself recognizes, "A young person's mental health challenges may impact their conceptualization of their gender development history and gender identity-related needs, the adolescent's capacity to consent, and the ability of the young person to engage in or receive medical treatment," and "The adolescent's mental health concerns . . . may interfere with diagnostic clarity [and] capacity to consent . . .". (SOC 8 at S62.) WPATH also recently admitted that "autistic/neurodivergent transgender youth represent a substantial minority subpopulation" of those seeking medical transition. (SOC 8 at S50.)

83.    Despite the serious obstacle posed by mental health conditions to genuine voluntariness in decision-making by a minor, WPATH's SOC 8 is problematically unclear as to how these conditions will be addressed prerequisite to any MGT. Instead, it refers to an undefined "biopsychosocial assessment" (SOC 8 at S50), and only calls for known mental health concerns to be "addressed" rather than resolved before accepting consent (or assent) as voluntary (SOC 8 at S62). SOC 8 provides no guidance grounded on empirical evidence as to how or when consent/assent given by a minor who suffers from a mental health condition could be determined to be voluntary.

   **D.   The fact that MGT is *wanted* by minors and their parents is not sufficient to justify MGT, medically or ethically.**

84.    WPATH's revisions of guidelines to eliminate or minimize the doctor's responsibility regarding decision-making with respect to MGT violate accepted principles of medical ethics. In its Standards of Care, version 8, WPATH suggests that gaps in evidence demonstrating the safety and efficacy of MGT should not prevent the use of MGT in adolescents "given the ethics of self-determination in care." (SOC 8 at S45.) The new guidelines also emphasize a "right to bodily and mental integrity, autonomy, and self-determination,"[7] and a putative need for healthcare practitioners to "[m]atch the treatment approach to the specific needs of patients, particularly their goals for gender identity and expression." (SOC 8 at S21.) This language ignores the potential conflict with MGT between "bodily integrity" and "self-determination," as well the conflict between the "needs of patients" and "their goals."

85.    Much has been made of the importance of autonomy, but the ethical standard for medical decision-making with respect to minors is decidedly not "self-determination." Rather, as noted in the AAP Committee on Bioethics Report, "Informed Consent in Decision- Making in Pediatric Practice" (Katz 2016), the

---

[7] Among the "General Principles" asserted by WPATH are: "Respect universal human rights including the right to bodily and mental integrity, autonomy and self-determination; freedom from discrimination, and the right to the highest attainable standard of health." (SOC 8 at S21.)

physician acts in a fiduciary relationship with the child, governed by "the duties to protect and promote health-related interests of the child and adolescent … [, and] these duties may conflict with the parent's or patient's wishes." (Katz 2016 at e2.) Parents likewise have "an ethically parallel fiduciary obligation" (e2) to promote the child's best interests, whether or not that corresponds with what the child wants. "Historically and legally," the AAP report continues, "medical decision-making in children has centered on the best-interest standard, which directs the surrogate to maximize benefits and minimize harms to the minor." (e6) "A reliance on individual liberties and autonomy in the pediatric patient", the AAP report notes, "is not realistic or legally accepted." (e2)

86.    By appealing to self-determination to justify MGT for minors, WPATH is putting the onus on children to make clinical decisions that they haven't information, comprehension, or authority to make, and thereby retreating from physicians' ethical obligations to protect children—a class of vulnerable subjects—from interventions that subject children to risks and harms without clear evidence of proportionate medical benefit.

87.    For all of these reasons, it is doubtful that minors experiencing GD have sufficient information, comprehension, or voluntariness to make possible informed consent to MGT. If any minors do possess the level of comprehension and voluntariness required by ethical principles for a choice as momentous as undergoing MGT, I am aware of no evidence-based criteria for identifying those specific minors, and plaintiffs' experts cite none.

   **E.    Parental consent cannot satisfy the doctor's ethical obligation to obtain informed, comprehending, voluntary consent.**

88.    In many medical contexts, medical ethicists speak of obtaining "assent" from minors, while obtaining "consent" from the child's parents. (Katz 2016, e8) This combination of adolescent assent and parental consent, however, cannot cure the problems with informed consent to MGT.

89.    Children have long been considered a category of vulnerable subjects and therefore as deserving more protections. (Beauchamp and Childress at 63.)[8] For example, the Declaration of Helsinki requires that where a clinical trial or experiment involves "vulnerable groups and individuals", those patients must "receive specifically considered protection." (Helsinki Declaration ¶ 19.)

90.    In the clinical domain, the vulnerability of children is addressed in part by requiring both parents and physicians to act in ways that are reasonably consistent with the child's medical best interest. (Katz 2016 at e2, e12.) That is to

---

[8] See also HHS policy statement, "Vulnerable and Other Populations Requiring Additional Protections," available at https://grants.nih.gov/policy/humansubjects/policies-and-regulations/vulnerable-populations.htm.

say that whereas adults are given greater latitude to refuse even medically indicated and life-saving treatments, children and their parents generally are not.[9] In parallel, parents have much more latitude to accept experimental interventions and even interventions that contradict bodily health (e.g. cosmetic procedures, physician-assisted suicide) for themselves than they have latitude to accept such interventions for their children. (Katz 2016 at e5.)

91.    Because of the vulnerability of children, it is widely accepted that both physicians and the state are obligated to act as fiduciaries of children's best interests with respect to health, and if necessary to act *en loco parentis*. Just as parents are ethically obligated to prioritize the child's good over their own wishes, medical professionals are obligated to prioritize the child's best interest (where that involves the child's health) over the wishes of the parents. Beauchamp and Childress (at 221) describe such "paternalistic" actions as justified by the ethical principle of beneficence—the obligation to do good and promote the health of individuals, while protecting them from harm. The AAP report on informed consent comments:

> This parental responsibility for medical decision-making in caring for their child or young adult is not an absolute right, however, because the state also has a societal interest in protecting the child or young adult from harm and can challenge parental authority in situations in which the child or young adult is put at risk (the doctrine of *parens patriae*). Pediatric health care providers have legal and ethical duties to provide a standard of care that meets the pediatric patient's needs and not necessarily what the parents desire or request. (Katz 2016 at e5.)

92.    By definition, minors experiencing GD are vulnerable subjects, and all the more so in light of the already noted high prevalence of mental illness and other comorbidities among this population. As such, minors experiencing GD are owed protection from interventions that contradict their medical best interest—their health. Because MGT disrupts and contradicts bodily health in several ways, it is doubtful that physicians have ethical warrant to offer, or that parents have ethical authority to consent to, MGT in minors.

---

[9] Beauchamp and Childress note, "Courts have often allowed adult Jehovah's Witnesses, for example, to reject blood transfusions for themselves, while disallowing parental rejections of medically necessary blood transfusions for their children. Parents are also sometimes appropriately charged with child neglect when they fail to seek or permit potentially beneficial medical treatment recommended by physicians." (at 325)

93.     In addition, for the same reasons I have reviewed above, it is not possible to say that parents are receiving information about the implications of MGT sufficient to make any consent they might provide "informed."

94.     If persons suffering GD faced imminent bodily harm from their condition, and if there were no other way to respond but to deploy MGT, and if evidence from animal studies and carefully controlled human trials gave reason to anticipate benefits from MGT proportionate to known harms, then an adult could potentially give valid consent to MGT in knowledge of the absence of otherwise necessary information. But none of these conditions in fact have been met, and that makes it doubtful that the principle of informed consent within clinical medicine and clinical research can be met at all with respect to MGT, much less with MGT for minors.

95.     The fact that MGT creates a material risk (or even expectation) of sterilization and failure to develop healthy sexual response raises special ethical problems with accepting parental "consent" on behalf of the child.  With respect to loss of healthy sexual response, I note that our society strongly disapproves of clitoral mutilation of girls (denying them sexual response in their future adult lives) despite parental consent. Indeed, such "medical" procedures have been prohibited by law as a felony subject to imprisonment.[10]

96.     Sterilization has likewise long been recognized to raise special ethical issues. One systematic review found that a significant percentage of women who consent to sterilization at relatively young ages (under 30, in that study) later deeply regret that decision. (Curtis 2006; see also Burgart 2017; Hillis 1999.)  Given the possibility of regret and deprivation of what is considered a basic human right in other contexts, it is generally accepted that sterilizing procedures should only be performed on a minor when necessary to save his or her life. And even then, "The validity of parental consent to a sterilizing procedure can be challenged when the procedure could be safely postponed until the child can consent [i.e., when the child reaches adulthood], or where less-invasive alternatives are available." (Burgart 2017; Tamar-Mattis 2009.)

---

[10] https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/fact-sheet-on-female-genital-mutilation-or-cutting.html#:~:text=Violation%20of%20the%20law%20is,are%20prohibited%20under%20U.S.%20law.

97.     While medical procedures that impose substantial risk of serious harm are ethical in some settings, plaintiffs' experts do not remotely establish that the necessary conditions justifying such procedures exist in the case of GD and MGT, especially for minors.

98.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

        This declaration was executed on February 2, 2024.

                                        Farr A. Curlin, MD

## Appendix A: Bibliography and Other Materials Considered

Beauchamp, T.L.  and Childress, J.S., Principles of Biomedical Ethics, 7th edition (2013). Oxford University Press.

Block, J. (2023). Gender dysphoria in young people is rising and so is professional disagreement. *British Journal of Medicine,*2023: 380, 382.

Burgart, A.M., Strickland, J. et al. (2017). Ethical controversy about hysterectomy for a minor, *Pediatrics* 139:6, e20163992.

Cass, H. (2022, February). The Cass Review: Independent review of gender identity services for children and young people Interim report. National Health Service (NHS), UK.

Cass, H. (19 July 2022). Independent review of gender identity services for children and young people – further advice. Letter from H. Cass to J. Stewart, NHS England. *The Cass Review*.

Chen, D., Strang, J. F., Kulbuck, V. D., Rosenthal, S. M., Wallen, K., Waber, D. P., …Garofalo, R. (2020). Consensus parameter: Research methodologies to evaluate neurodevelopmental effects of pubertal suppression in transgender youth. *Transgender Health, 5,* 246–257.

COHERE Finland (Council for Choices in Health Care in Finland) (2020, June 16). Medical treatment methods for dysphoria associated with variations in gender identity in minors— Summary of a recommendation. [Translated] Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

Coleman, E.,et al. (2022). WPATH standards of care for the health of transgender and gender diverse people, version 8 ("SOC 8")*. International Journal of Transgender Health* 2022, Vol.. 23, No. S1.

Curtis, K.M., Mohllajee, A.P.  et al. (2006). Regret following female sterilization at a young age: A Systematic Review, *Contraception* 73:205.

Freedman, B. (1987, July 16). Equipoise and the ethics of clinical research. *New England Journal of Medicine*, 317, 141–145.

Glintborg, D., Moller, J-J., Rubin, K. et al. (2023). Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. *Eur. J. Endocrinology* 189:336-345.

GRADE Handbook, Quality of evidence definitions table. https://gdt.gradepro.org/app/handbook/handbook.html#h.wsfivfhuxv4r at Section 5.

Hillis, S.D., Marchbanks, P.A. et al. (1999). Poststerilization regret:  findings from the United States Collaborative Review of Sterilization, 93:6 *Obstetrics. & Gyn*. 93(6):889.

Kaltiala, R., Holttinen, T., Tuisku, K. (2023). Have the psychiatric needs of people seeking gender reassignment changed as their numbers increase? A register study in Finland. European Psychiatry.  doi.org/10.1192/j.eurpsy.2023.2471.

Kaltiala, R. (2023b). Gender-affirming care is dangerous. I know because I helped pioneer it. *The Free Press*.  https://www.thefp.com/p/gender-affirming-care-dangerous-finland-doctor, Oct. 20, 2023.

Karolinska Institute (March 2021). Policy change regarding hormonal treatment of minors with gender dysphoria at Tema Barn – Astrid Lindgren Children's Hospital.

Katz A., Webb S. (2016) AAP Committee on Bioethics: Informed Consent in Decision-Making in Pediatric Practice. *Pediatrics*. 2016;138(2):e20161485.

Nuremberg Code (1947).

Respaut, R., Terhune, C., Conlin, M. (2022). Why transitioners are crucial to the science of gender care. Reuters. https://www.reuters.com/investigates/special-report/usa-transyouth-outcomes/Reuters.

Swedish Socialstyrelsen (2022, Feb. 22). Uppdaterade rekommendationer för hormonbehandling vid könsdysfori hos unga. [*Updated recommendations for hormone therapy for gender dysphoria in young people.*] Retrieved from https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdaterade-rekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/.

Swedish Socialstyrelsen (2020). The evolution of the diagnosis of gender dysphoria: prevalence, co-occurring psychiatric diagnoses and mortality from suicide. www.socialstyrelsen.se Article number 2020-2-6600.

Swedish Socialstyrelsen  (2022, February). Stöd, utredning och hormonbehandling vid könsinkongruens hos barn och ungdomar Delvis uppdatering av kunskapsstöd. [*Support, investigation and hormone treatment at gender incongruity in children and young people.*]  Available from https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-2-7774.pdf

Tamar-Mattis, A. (2009). Exploring gray areas in the law about DSD and sterilization, *Endocrine Today*, 2009 October ed., https://bit.ly/2YdAHNU).

Torkildsen, Ø. (2022). Lessons to be learnt from the history of lobotomy. Tidsskr Nor Legeforen. Available at: https://tidsskriftet.no/en/2022/12/essay/lessons-be-learnt-history-lobotomy

Ukom Norway (March 9, 2023). Patient safety for children and adolescents with gender incongruence. Unofficial translation.

U.S. Department of Health, Education, and Welfare (1979, Apr. 18).  Belmont Report: ethical principles and guidelines for the protection of human subjects of research, 44 *Fed. Reg.* 76, 21392–97 (Apr. 18, 1979). ("Belmont Report")

U.S. President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (1982). Making health care decisions: the ethical and legal implications of informed consent in the patient-practitioner relationship. U.S. Gov't Printing Office. ("Health Care Decisions")

World Medical Association (1964). Declaration of Helsinki: Ethical principles for medical research involving human subjects. ("Helsinki Declaration")

## Other Materials Considered

1.  Vulnerable Child Compassion and Protection Act (the "Act").

2.  Opinion and order granting preliminary injunction dated May 13, 2022 ("Order granting PI")

3.  Second Amended Complaint dated September 19, 2022.

4.  Expert Report of Meredithe McNamara, dated Feb 8, 2023

5.  Expert Report of Armand Antommaria, dated Feb 13, 2023

6.  Expert report of James Cantor, dated May 19, 2023

7.  Supplementary Expert Report of James Cantor, dated February 1, 2024 (Nonconfidential portions)

8.  Expert Report of Michael Laidlaw, dated May 19, 2023

9.  Supplementary Expert report of Michael Laidlaw, dated May 19, 2023

10.  Eleventh Circuit Court Opinion dated August 21, 2023

11.  Production documents HHS-0169973 to -0619991



# THE WAY OF MEDICINE

## ETHICS *and the* HEALING PROFESSION

**FARR CURLIN** *and*

**CHRISTOPHER TOLLEFSEN**

Copyright 2021. University of Notre Dame Press.
All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

EBSCO Publishing : eBook Collection (EBSCOhost) - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE
AN: 2711368 ; Farr Curlin, Christopher Tollefsen.; The Way of Medicine : Ethics and the Healing Profession
Account: s2691052.main.ehost

1

EXHIBIT
3

The Way of Medicine

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

NOTRE DAME STUDIES IN MEDICAL ETHICS AND BIOETHICS

*O. Carter Snead, series editor*



*The purpose of the Notre Dame Studies in Medical Ethics and Bioethics series, sponsored by the de Nicola Center for Ethics and Culture, is to publish works that explore the ethical, cultural, and public questions arising from advances in biomedical technology, the practice of medicine, and the biosciences.*

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

3

# The Way of Medicine

*Ethics and the Healing Profession*

FARR CURLIN

*and*

CHRISTOPHER TOLLEFSEN

*University of Notre Dame Press*
*Notre Dame, Indiana*

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

4

Copyright © 2021 by the University of Notre Dame
Notre Dame, Indiana 46556
undpress.nd.edu
All Rights Reserved

Published in the United States of America

Library of Congress Control Number: 2021942665

ISBN: 978-0-268-20085-5 (Hardback)
ISBN: 978-0-268-20086-2 (Paperback)
ISBN: 978-0-268-20084-8 (WebPDF)
ISBN: 978-0-268-20087-9 (Epub)

This e-Book was converted from the original source file by a third-party vendor. Readers who notice any formatting, textual, or readability issues are encouraged to contact the publisher at undpress@nd.edu

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

To our spouses, Kimberly Curlin and Laurie Tollefsen,
who merit more thanks and praise
than we can possibly give here

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CONTENTS

*Preface: A Perplexed Physician*
*Acknowledgments*

Introduction: A Profession in Crisis

ONE       The Way of Medicine

TWO       The Requirements of Practical Reason

THREE     The Doctor-Patient Relationship

FOUR      Autonomy and Authority

FIVE      The Rule of Double Effect

SIX       Sexuality and Reproduction

SEVEN     Abortion and Unborn Human Life

EIGHT     Medicine at the End of Life

NINE      Last-Resort Options

TEN       Conscientious Medicine

*Notes*
*Index*

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

PREFACE

*A Perplexed Physician*

I sensed early in my medical training that something had gone wrong at the heart of our profession. I came to medical training confident that caring for those who are sick would readily fit into my vocation as a Christian, not because Christians have a lock on healing—by no means. Rather, because everyone—whether Jew, Christian, Muslim, atheist, or other—knows that healing is good work, even "God's work." I knew that modern physicians had gotten involved in a few practices—elective abortion and assisted suicide in particular—opposed both by traditional Christianity and by traditional medical ethics. But these practices were on the margins, I thought, exceptions to medicine's otherwise consistent orientation toward healing. It did not take long for me to realize that I was mistaken—that these overtly controversial practices expressed deeper changes at the heart of the medical profession. Having come over the second half of the twentieth century to "provide" all kinds of interventions that were not so obviously a part of healing those who are sick, physicians could no longer say what it meant to heal. In seven years of medical school and residency training, I do not recall a medical educator ever encouraging me or my fellow trainees to consider what medicine is *for*
.

How could we clinicians-in-training find our way if our teachers could not tell us where that way leads? We learned to take our bearings by setting aside the question of what medicine is for and instead focusing on getting where we were asked to go as efficiently and effectively as possible. Those were the heady days of evidence-based medicine. Medical educators advocated "the conscientious, explicit, and judicious use of current best evidence in making decisions about the care of individual patients."[1] Unfortunately, our teachers had much less to say about what norms we should conscientiously uphold and by what standards we should evaluate whether our use of evidence had been judicious. The resulting vacuum was filled with the default norm of contemporary medicine: support the autonomous choices of patients as long as doing so is not illegal, infeasible, or unequivocally harmful.

Indeed, the language of conscience and judgment proved to be the residue of a tradition of practice that the profession of medicine seemed determined to leave behind—a tradition associated with paternalism, patriarchy, and other specters of a repressive past. To avoid recapitulating the injustices of that past, we learned to ask not what ought to be done but *who decides* what ought to be done. After all, what would give a physician the authority to judge what is good for someone else? Shouldn't patients decide what happens to their bodies? We were taught various ethical principles we might invoke to describe a clinical decision, but we also learned that in the end only the patient could decide which of these principles should govern in their particular case. Being "patient-centered," we discovered, meant respecting patients' right to judge what is good for them. So we made patient preferences our guide, and we resisted the temptation to impose our own values under the pretense of conscience and clinical judgment. The safest route was to separate the personal from the professional, keeping the former from intruding on the latter.

I have never made peace with this notion of separating the personal from the professional. I had set out to practice medicine because caring for the sick seemed to fit into the Christian vocation to love God and one's neighbor. In training, however, Christian commitments largely were construed as "personal values" that must

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

8

be kept from interfering with my professional obligations. While I puzzled over how that could be so, I observed that separating the personal from the professional reified the sterility and detachment of clinical encounters that left patients dissatisfied and physicians dispirited.

How did we end up with this idea that medicine requires compartmentalizing the personal away from the professional? How did medical educators end up teaching that good physicians must be willing to be bad Christians, Jews, or Muslims?

I did not find satisfying answers to these questions, but who was I to challenge the status quo? This ancient profession went on before me and will go on after me, whether I like it or not. Perhaps in time I would see that by keeping my personal and professional lives separate, focusing on scientific data, and deferring to others to tell me what to pursue, I would become a better physician than I had imagined. I would find that to love my neighbors means to do what they ask me to do even when that goes against my better judgment. And if I could not reconcile my personal moral sensibilities with the standards of the profession, I could find a different line of work. I had not been conscripted, after all.

But further experience only confirmed my misgivings that the medical profession had lost its way. Indeed, in the name of respect for patient autonomy, the profession seemed to have given up any claim to know where that way should lead. The medical profession trains its members to defer to patients regarding what goals physicians are to pursue, reserving to the clinician the authority only to insist that those ends be pursued in a scientifically informed and effective manner. So, for example, a physician cannot know whether he should sterilize a patient or offer her assisted reproductive technologies until and unless the patient tells him what she wants. The physician can decide, however, which surgical technique is most effective for sterilization and which exogenous hormones will effectively hyperstimulate the ovaries. Many medical ethicists likewise have abandoned any claim to know what medicine is for. As a member of the clinical ethics faculty at a premier academic medical center, I joined colleagues in spirited debates about who was authorized to make a particular clinical decision, but we almost never discussed what that person should decide, or why. We had learned to police ourselves to avoid the presumption of claiming to know what good medicine required for this or that patient.

Meanwhile, in the hospital I watched countless physicians bend over backward to give patients and their family members all the options for their cases and to avoid "imposing" any judgment regarding what was best for the patients. Physicians routinely would tell family members of critically ill patients that the decision to continue or discontinue life-sustaining technology was not the physicians' to make, or even the family's to make. Rather, all were obligated to set aside their judgment about what would be good for the patient and instead choose what the patient would choose if the patient could choose for himself. When families did not choose as the physicians hoped they would, the physicians would retreat to their workrooms to grumble about unrealistic family members who were in denial. Doctors resent continuing unreasonable efforts to keep patients alive, but they do not see any other option. They have internalized the axiom that only patients, or their surrogates, can say what is good for them.

The same demoralized ethos carried over into the outpatient setting, where, for example, physicians were long taught that the patient's pain was what the patient said it was, and the physician was obligated to treat that pain until the patient said it was relieved. Those of us who practice hospice and palliative medicine have been taught that relieving pain and other symptoms is not enough; we are also to maximize quality of life and to minimize suffering. No one but the patient can say whether we have achieved that goal, so we must follow patients' preferences closely, including their preferences regarding how and when to die.

Physicians have become particularly reticent to say what medicine is for in the domain of sexuality and reproduction. A patient once asked me to prescribe Viagra because he was having difficulty sustaining an erection when having sex with his wife, though he had no such problems when with his mistress. My colleagues were ambivalent as to how I should respond. On one hand, it seemed strange to facilitate this man's infidelity to his wife. On the other, the drug was safe, legal, and permitted by the profession; who was I to judge? A homosexual man whom I had treated for high blood pressure asked me to help him and his partner figure out how to get a baby through in vitro fertilization (IVF) using an anonymous egg donor and a gestational surrogate. My colleagues were agreed that I should accommodate his request, at least by referring the patient to the assisted reproductive technology clinic. For a few years, I took night calls for my

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

university's student health service, and some nights more students called to ask for prescriptions for "emergency contraceptives" than called because they were sick. I found myself asking, "What does giving people all of these things they want have to do with practicing medicine?"

One might think that deferring to patients about the goals of medicine would lead to greater patient satisfaction, but that is not what I have observed. Instead, by relinquishing their professional authority, physicians seem to have given third parties a free hand to intrude on and govern the physicians' experiences and their patients', to the chagrin of both. Today, patients and clinicians alike are harried by impersonal forces along paths they hardly understand. Patients ask for whatever the latest pharmaceutical commercial, or the latest social fashion or anxiety, recommends. Meanwhile, doctors submit to the demands of Medicare and other insurers, bean counters tracking relative value units (RVUs), and, most of all, the electronic medical record. Practitioners may start by asking a patient, "How can I help you today?," but they soon turn their attention to the invisible social engineer standing in the corner of every exam room, armed with a checklist the doctor must follow in order to ensure that she provides quality care that is safe and "value-based." Neither patients nor physicians call the shots, and both feel helpless to change the system.

Helplessness leads both to demoralization and to detachment. Why would anyone want to practice medicine if doing so meant setting aside their religious aspirations, their ethical judgment, and their longing to connect with patients on a human level? Why would anyone aspire to serve as an efficient cog in a vast, bureaucratically structured healthcare industry? In this situation, physicians and other healthcare practitioners give up the quest to find—much less pursue—what medicine is *for*. The work to which medical practitioners thought they were called becomes a job to tolerate. Their patients present them not with the privilege of cooperating in pursuit of healing but with the burden of satisfying demands that clinicians frequently resent. Medical practitioners, then, need self-care and work-life balance to mitigate the threat of medicine to their integrity and their flourishing and to keep them from walking away from the practice of medicine altogether. That, at least, is how it has seemed to me.

If you are a physician and this account resonates at all with your own experience, this book is for you. Moreover, if you long to recover a way of practicing medicine that can truly be seen as a "calling," intrinsically rewarding work to which you can happily commit the best of your time, attention, and energy, then read on. We hope you will learn to better see and to say what you know, and so be equipped to continue the worthy adventure of practicing medicine.


THIS BOOK HAS been written by a practicing physician, Farr Curlin, and a philosophy professor, Christopher Tollefsen. It grew out of a seminar we have taught together for almost ten years, but it is inspired by what I have experienced and observed in my training and practice as a clinician and medical ethicist. Some readers may recognize in my account their own unease and uncertainty about what medicine has become.

Farr Curlin, MD

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

ACKNOWLEDGMENTS

This book originated in an annual week-long seminar in medical ethics that we have taught since 2011, initially sponsored by the Witherspoon Institute in Princeton, New Jersey, and now by the Arete Initiative at Duke University. We are indebted to those whose vision and leadership have made the seminar possible, especially Robby George and Luis Tellez, as well as those who have given hospitality to the scores of clinician trainees who have joined us over the years, including Patrick Hough, Felix Miller, Phil Braun, and John Rose. And we are indebted to our students in those seminars, who have committed their lives to the practice of medicine and whose sincere questions, contentions, and arguments made invaluable contributions to this book.

Medicine, as we argue here, is a *practice*, as is the doing and teaching of philosophy. We could never have gotten started in understanding either practice without the help of our teachers, among whom Farr notes particularly Drs. Carl Kraus, Mark Siegler, Daniel Sulmasy, and Leon Kass; Chris acknowledges with gratitude three philosophers who have died since our work on this book began: Joseph Boyle, Germain Grisez, and H. Tristram Engelhardt.

As this book has taken shape over the past several years, a number of colleagues have gifted us with their critiques of our arguments. We thank Jason Amaral, Ryan Anderson, Jeff Baker, Jeffrey Bishop, Chip Denton, Lydia Dugdale, H. Tristram Engelhardt, Nick Epley, Margaret Houck, Ana Iltis, Lauris Kaldjian, Daniel Kim, Scott Kim, Warren Kinghorn, Brett McCarty, Abraham Nussbaum, Brian Quaranta, Jon Tilburt, John Yoon, and anonymous reviewers of the University of Notre Dame Press. None of these agree with us on every point, and some disagree with us on major points. The deficiencies of the book are our own, but these share credit for any of the book's merits, as do those who have helped us in the editing process, including Judith Heyhoe, Luke Olsen, and Bob Land.

Farr is particularly grateful to colleagues at the Trent Center for Bioethics, Humanities, and History of Medicine at Duke University and those in Duke Divinity School's Initiative on Theology, Medicine, and Culture (TMC). Both of these institutional spaces foster unusually fertile environments for inquiring about the moral and theological dimensions of the practice of medicine. Chris thanks the James Madison Program at Princeton University, the Eudaimonia Institute at Wake Forest University, and his own University of South Carolina. Each has been home to some of the drafting of this book, and colleagues and friends at each deserve much thanks.

We have written about many of the ideas in this book in other places. A number of the arguments and examples appear elsewhere, in particular the following, which are listed in the order in which they were published:

Farr Curlin, "Hospice and Palliative Medicine's Attempt at an Art of Dying," in Lydia S. Dudgale, ed., *Dying in the Twenty-First Century: Toward a New Ethical Framework for the Art of Dying Well* (Cambridge, MA: MIT Press, 2015), 47–66.

Y. Tony Yang and Farr A. Curlin, "Why Physicians Should Oppose Assisted Suicide," *Journal of the American Medical Association* 315, no. 3 (2016): 247–248.

Christopher Tollefsen, "Abortion," in Bob Fisher, *Ethics, Left and Right: The Moral Issues that Divide Us* (New York: Oxford University Press, 2020), 340–48.

Farr A. Curlin and Christopher O. Tollefsen, "Medicine against Suicide: Sustaining Solidarity with those Diminished by Illness and Debility," in *Christian Bioethics*, forthcoming.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Christopher Tollefsen and Farr Curlin, "Solidarity, Trust, and Christian Faith in the Doctor-Patient Relationship," *Christian Bioethics*, forthcoming.

In addition, an earlier version of chapter 10 was published as

Farr A. Curlin and Christopher O. Tollefsen, "Conscience and the Way of Medicine," *Perspectives in Biology and Medicine* 62, no. 3 (2019): 560–75, reprinted with permission.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

# Introduction

## A Profession in Crisis

Medical practitioners and those who want to become such practitioners face basic questions: What is medicine? What is medicine *for*? What does it mean to be a good doctor? Their answers seem essential to the practice of medicine and to understanding its moral norms. The absence of answers to these questions—or incoherent or incorrect answers—would seem to prefigure a crisis for both medicine and medical ethics. For without correct and coherent answers, practitioners of medicine cannot properly orient themselves within their profession, nor even think of their practice as a profession at all. And without some account of what the medical profession *professes*—without an account of medicine's purpose or end—ethicists rely on norms that bear only contingent relationships to the activities of medical professionals. Ethicists fail, in other words, to articulate an *ethics of medicine* in the proper sense.

We believe that medicine, and hence medical ethics, is in precisely this sort of crisis. Medicine has lost its way because it lacks clarity about where the way should lead. We no longer have a shared public understanding of what medicine is for, of what the *end of medicine* is or should be. Rather, medicine has substituted for its once clearly recognized purpose something amorphous, subjective, and shadowy. As a consequence, the norms that medical professionals and professional ethicists bring to medical practice are devoid of objective content and radically deficient for guiding doctors and protecting patients.

## THE PROVIDER OF SERVICES MODEL FOR MEDICINE

In answer to the question "What is medicine?," according to the *provider of services model*, medicine comprises a set of technical skills that are to be put to work to satisfy patient-client preferences. Healthcare workers are providers of services, and these services are undertaken for the sake of patient well-being, understood principally in terms of satisfying the patient's wishes.[1]

Every culture gets the medical practice it deserves, and in our culture medical practice is dominated by a consumerist understanding, where well-being is understood in terms of the patient's desires being satisfied. Efforts to identify an ethical framework capable of guiding practitioners and patients in our time have resulted in consequentialism, contractarianism, and, most prominently, principlism—the framework that gives us the familiar "four principles" of medical ethics.[2] In the context of an individualist and consumerist environment, however, these efforts all tend to default to three norms: what the law permits, what is technologically possible, and what the patient wants.

Thus, according to the provider of services model, if an intervention is permitted by law, is technologically possible, and is autonomously desired by the patient, medical practitioners should provide the intervention. Indeed, they may be professionally obligated to do so.[3] After all, these norms fit our expectations of other providers of services. The good folks who provide us with Wi-Fi or who make our double soy lattes do not bring further considerations to bear on whether to give us what we want. They do not consider the appropriateness of our desire for a double soy latte; they do not ask what websites we'll be visiting. We expect them to obey ordinary norms of law and not defraud or deceive, but beyond that we

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

expect them to do as we wish (provided that they can perform the service, and we can pay). There is no distinctive professional ethic for these practices because there is no profession, no deep orientation to a good or set of goods, that gives meaning and purpose to what they do.

Thus, in the provider of services model, the work of physicians becomes demoralized, and its ethic becomes what the philosopher H. Tristram Engelhardt has identified as a "morality of strangers."[4] One does not knowingly do violence to the unconsenting innocent, to be sure. But within the boundaries of law and consent, what is technically possible is ethically permissible. That which is permissible and also desired may even be ethically obligatory. Medical ethics reduces to a set of procedures for negotiating noninterference with patients' wishes to the greatest possible extent. Medicine itself devolves into a powerful set of means to be used to satisfy the preferences and desires of those who are authorized, legally and procedurally, to *choose*.

Among the many consequences of the provider of services model, the following three loom. First, professional authority has steadily eroded. If there is no objective standard or *end* for medicine, physician expertise is merely technical. Thus, instead of exercising the authority of expertise within a sphere constituted by their professional commitments, physicians become increasingly subject to the exercise of power by lobbyists and political advocacy groups. Medical professionals come to work in a highly regulated domain in which the exercise of clinical judgment and prudence is neither possible nor desirable.

It's no surprise, then, that declining professional authority is followed by a second consequence: a crisis of medical morale. Insofar as medicine merely provides desired services, its pretense of moral seriousness is a charade, and its attempts at professionalism are a façade. The practice of medicine is characteristically grueling, with long hours spent under taxing circumstances. Is it surprising that physicians who experience themselves largely as mere functionaries—asked to set aside traditional medical norms, religious convictions, and their best judgment—suffer high rates of burnout?[5]

Finally, when medicine is understood as the provision of healthcare services, the physician's judgment—and particularly the physician's claims of conscience—come to be seen in competition with the fundamental, but minimal, norms of the profession. The exercise of physician conscience is treated as the intrusion of "private" or "personal" concerns into transactions that should be governed by physicians' professional commitment to provide legally permitted services to patients who request those services. Michael and Tracy Balboni note that this artificial separation of the personal and professional leads patients and clinicians to suppress and ignore their moral and spiritual concerns, to the detriments of both.[6] As a result, the medical profession and society at large appear increasingly ready to abandon the idea of the conscientious physician and to use the coercive powers of the profession and the state to compel physicians to participate in practices that violate norms that have guided medical practitioners for millennia.

THE WAY OF MEDICINE

What is our alternative vision for medicine? We call it the *Way of Medicine*. The Way of Medicine offers physicians both a path out of the provider of services model (PSM) and the resources necessary to resist the various political, institutional, and cultural forces that constantly push practitioners and patients to think of their relationship in terms of an economic exchange. We attempt in this book to articulate and defend this Way of Medicine.

Medicine as a Practice

We begin by arguing that medicine is a paradigmatic practice, elevated to a profession because of its social importance, that aims at human health. Health is an objective natural norm for any organism: the well-functioning of that organism as a whole. Human health is also an objective human good: *our* organic well-functioning is an aspect of our human flourishing. Understood in this twofold way, health gives singular purpose to the practice of medicine.

The PSM also concerns itself with health; no one, to our knowledge, denies the importance of health to

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

the practice of medicine. But under the PSM, health is only a subjective and socially constructed concept. Therefore, the norm of "health" is sufficiently malleable to justify pursuing almost any desired bodily condition. In addition, many see health, however defined, as only one among a number of goals toward which medicine might reasonably be aimed. For the PSM, pursuing health is optional.[7]

In contrast, in the Way of Medicine, the good physician orients her practice centrally around the good of health. Physicians need only pursue those aims related to health, and the profession as a whole should, to the extent possible, avoid entanglement with goods other than health—except when necessary to understand and address patients' health-related needs. In detaching from the objective demands of health in favor of a broader and more subjective mandate, the medical profession makes a grave mistake of prudence. Such detachment erodes the grounds for treating medicine as a profession rather than as a technical trade; the professional commitments of medicine are watered down, and physicians find themselves lacking the excellence that is made possible by sustained focus on a single good.

Physicians and other members of the medical profession must also, according to the practice of medicine, resist inducements to act in ways that contradict the good of health. This commitment dates back to Hippocrates and the promise the physician makes in the Hippocratic Oath to "give no deadly potion" nor "cause an abortion" no matter how much the physician is implored to do so.[8] In the Way of Medicine, physicians are always justified in refusing to intentionally damage or destroy the good of health. But this is very different from saying that physicians should avoid any action that even indirectly injures health; the rule of double effect has for centuries helped clinicians practicing the Way of Medicine to discern when they can accept as side effects of health-oriented interventions harms that they should never intend.[9]

The Way of Medicine obviously requires that physicians do more than refuse to damage the good of health. Physicians must devote themselves to that good, not in the abstract but as it bears on their patients' concrete needs. Medical practice is neither a pastime nor merely a career; it is a *profession*, whose members make life-shaping commitments to care for particular vulnerable persons. The patient necessarily occupies a privileged position in the physician's life, as a focal point of his concern and care. At the same time, the physician who practices the Way of Medicine pursues the health of his particular patients while mindful that health is not the only good, nor are his patients the only ones in need.

The Requirements of Practical Reason

The Way of Medicine starts with attention to the kind of practice medicine is and the good toward which medicine aims, but it does not stop there. People who pursue the health of patients must do so in ways that respect the broader demands of ethics. (We use the terms "ethics," "morality," and "practical reason" interchangeably.) Put differently, the practice of medicine has its own integrity, but that integrity depends on and is accountable to the requirements of practical reason.

The requirements of practical reason have been known under a number of names. One is *natural law*. Natural law is not law inscribed in the heavens but rather the practical reason that directs persons to act. C. S. Lewis identified another name, *the Tao*, as a synonym for practical reason and natural law, which he describes as the "source of all value judgments."[10] These various names point to the same reality: practical reason's identification of that which is genuinely good for human beings—that is, conducive to human flourishing—and the corollary implications as to what we should do and how we should live.

What goods contribute to human flourishing? Practical reason identifies several goods as giving human persons fundamental and basic reasons for action: friendship, knowledge, and play are three examples. Human life and health constitute another such good: we are better off, as individuals and in community, if we are alive and healthy. Health is not good only in order to achieve some other purpose; its goodness is what philosophers call *basic*. We can reasonably preserve a life for its own sake; we can reasonably pursue health simply in order to be healthy.

So practical reason gives us the principle that health should be valued and pursued. What are the implications of that principle for the Way of Medicine? Here we find that the internal norms of the practice of medicine are strongly confirmed by what practical reason requires, unlike, say, the internal norms of the practice of torture. Practical reason forbids us to intentionally damage or destroy any basic human goods, including the good of health. Practical reason thus adds to and deepens the norms internal to medical practice,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

but it does not contradict those norms. In the Way of Medicine, a practitioner focuses on the patient's health but does so while respecting and being guided by the fuller requirements of practical reason.

AN OPEN INVITATION

In this book we invite the reader to join us on a quest to investigate the Way of Medicine. While we write primarily for those who are dissatisfied with the PSM, we welcome any readers with an interest in contemporary healthcare.

We do not intend to divide the medical profession into two starkly distinct camps. We recognize that our description of the PSM may seem like a caricature to some practitioners, who find themselves agreeing fully neither with the PSM nor with our account of the Way of Medicine. These readers may call themselves "providers," but they are devoted to providing quality healthcare and they take seriously the duty to do no harm to their patients' health. Yet they also see much value in respecting patients' choices and providing healthcare services that align with what the patient believes is good for him or her.

In fact, the PSM and the Way of Medicine both operate in the practices of most clinicians—to different extents in different contexts. Few physicians practice consistently within only one or the other, and the two accounts coexist amicably so long as what patients want is for their practitioners to use their best judgment to pursue the patients' health. Most patients do want just that most of the time. But ultimately, as we will show, the two accounts are irreconcilable and the future of medicine will be determined by which one governs the profession.

What might readers who deeply value what the PSM offers gain from learning about the Way of Medicine? At a minimum, they will come to understand what still attracts some of their colleagues to this once regnant, but now contested, vision of medicine as an honorable profession. Even if we fail to win over such readers, we can at least contribute to the promotion of civility and mutual respect among those who disagree.

Still, in this book we speak primarily to those who are disposed to recognize and affirm that human health is a good that medical practitioners can know objectively and pursue conscientiously. The book is primarily for people convinced that some real moral boundaries should never be traversed—for example, physicians should never kill or deliberately harm their patients, even when patients request it. These convictions still run deep in the medical community, but those so convinced inhabit a culture and a profession that have lost the language (and the arguments) to make sense of these eminently reasonable propositions. Without such language, it can be hard for physicians, ethicists, and even patients to find their way. In this state of affairs, for example, we observe physicians who know that they should never kill their patients and are deeply unsettled by medical and societal pressures to the contrary but who have lost the language to talk about how that commitment to life and health is integral to medicine. With respect to such physicians and others, our task is to reintroduce a more fitting vocabulary to make sense of what they already know.

If we succeed, our physician readers will leave this book with tools, concepts, and arguments that help them practice medicine well while enabling them to account for what they are up to *as physicians*. If our argument is sound, such readers' practice of medicine will have a coherence and goodness that others will both admire and want to emulate. Professional bioethicists and healthcare policymakers will also find resources to address some of the most contested ethical issues of our day. Finally, those whom the profession of medicine serves have something to gain, for our book helps identify what *patients* can reasonably expect of medicine.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

## The Provider of Services Model in Historical Context

A full history of what we call the provider of services model goes beyond the scope of this book, but Gerald McKenney, in his book *To Relieve the Human Condition*, traces the PSM's roots to the writings of René Descartes and Francis Bacon. Bacon saw in modern science the means to "relieve and benefit the condition of man" by reducing suffering and expanding the realm of human choice, ostensibly noble goals.[11] Unfortunately, as McKenney observes, this imperative to relieve suffering and expand choice finds in contemporary culture no larger framework of meaning in which to discern which suffering should be relieved and which choices should be accommodated. In the resulting moral vacuum, medicine comes to relieve any condition that an individual experiences as a burden; maximizing choice becomes the default.

What McKenney calls "the Baconian project" takes the human body to be without any given purpose or end (telos)—without what Aristotle called a *final cause*. Jeffrey Bishop, in *The Anticipatory Corpse*, traces out how modern medicine was birthed historically and argues that the loss of a teleological understanding of the body produced a medicine that treats the body as so much matter in motion and death as simply the terminus of that motion.[12] In Bishop's account, contemporary medicine has come to have no purpose except that which is given to it, post hoc, through the choices of those socially empowered to do so—in our era, autonomous individuals. If an individual chooses to use medicine in a certain way—to manipulate their body in some way or even to cause their own death—the choosing itself is taken to make that use of medical technology ethical.

Although McKenney, Bishop, and other critics of contemporary medicine such as H. T. Englehardt and Stanley Hauerwas all have different points of emphasis, each finds this turn toward maximizing choice and minimizing suffering according to the wishes of the patient to impoverish medicine. All urge, in different ways, the restoration of final causality (purpose) to our understanding of life, death, and medical practice. All call for medicine to be situated within an ethical framework in which illness and suffering, and the practices of medicine, are understood against a vision of humans flourishing as the mortal, rational animals that they are. The arguments we make in this book intersect with, diverge from, and are indebted to the work of these and other critics of contemporary medicine. However, our primary task is to articulate and defend our own account, and so we do not trace these intersections, divergences, or debts here at any length.

## The Way of Medicine as a Tradition

We have suggested that what we call the "the Way of Medicine" constitutes the practice of medicine, deepened, corrected, and shaped by the requirements of practical reason. Some readers may be suspicious of this language because they doubt the existence of *the* Way of Medicine. Such skepticism is likely to be heightened insofar as our account invokes the Hippocratic "tradition" of medicine. As Bishop puts the point, "It is indeed odd to think that there has been real continuity between Hippocrates and the medicine of today."[13]

The objection can be extended. Has not medicine always—the skeptic might ask—encompassed arguments, exceptions, contradictions, and confusions? When, if ever, has medicine been characterized by sufficient uniformity—"hegemony," the dubious might say—to justify speaking of *the* Way of Medicine? We take this objection seriously, as uniformity rarely exists with regard to any human activity. Consider a parallel problem with designating something as "traditional." Traditional marriage—for example, a man and woman joined in a permanent and exclusive union—is found at least as often in the breach as in the observance.

Nevertheless, just as the phrase "traditional marriage" identifies a core set of beliefs and practices, adopted by many and constituting a "social imaginary" that could be found deeply embedded within Western culture,[14] so does the "Way of Medicine" designate a core set of beliefs and practices adopted by many and

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

constituting a social imaginary within which doctors and patients have understood much of what has been expected of medicine and its practitioners.

So while the Way of Medicine (like "Hippocratic Medicine") has a somewhat idealized quality to it, it identifies a discernible tradition with characteristic practices along with ideas that make sense of those practices. More important, this tradition gives rise to what thinkers such as Edmund Pellegrino have called the "internal morality of medicine,"[15] whereby the norms that govern physicians *as physicians* emerge from the particular needs to which the practice of medicine responds and the goods toward which the practice aims. The Way of Medicine identifies the "traditional practice" that, as McKenney writes, emphasized health as a "standard of bodily excellence."[16]

Moreover, we do not claim that the internal morality of medicine is self-vindicating. As the example of torture reveals, practices can be unreasonable in themselves—intrinsically contrary to human good and human flourishing. Or, as we observe with respect to medicine, an otherwise reasonable practice can grow corrupt, unreflective, or shallow. So one must engage in critical reflection to discern whether, to what extent, and in what dimensions a practice is in fact reasonable. Such reflection, however, is simply a form of attending to the requirements of practical reason, the natural law, or the Tao.

This task, albeit difficult, is incumbent on us all. We need not, however, attempt the task on our own. Just as the practice of medicine has been deeply shaped by healers such as Hippocrates, Jesus, Maimonides, Avicenna, Hildegard von Bingen, Galen, Thomas Percival, and Dame Cicely Saunders, so have a host of philosophers, theologians, legal scholars, and clinicians given deep consideration to the requirements of practical reason in the medical context. The list would begin with Plato, Aristotle, Augustine, Aquinas, and several of the healers mentioned above, but it would include, and not end with, twentieth-century thinkers such as Edmund Pellegrino, Leon Kass, Alasdair MacIntyre, and John Finnis.[17]

The Way of Medicine does identify a tradition, not understood as an unbroken continuity between the past and the present, but in the sense articulated by MacIntyre, as a "historically extended, socially embodied argument."[18] To our own development of that argument we now turn.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER ONE

# The Way of Medicine

To help us investigate the Way of Medicine and to clarify how it differs from the provider of services model, we now introduce three patients whose clinical cases we follow throughout the remainder of the book:

*Cindy Parker is a twenty-year-old undergraduate student who presents to the student health clinic.*

*Abe Anderson is a fifty-year-old carpenter who makes an appointment to see a local primary care physician.*

*Nora Garcia is an eighty-year-old widow with multiple chronic diseases who presents for her quarterly appointment with her geriatrician.*

With these patients in mind, we return to our fundamental questions: What is medicine, and what is it for? What can Cindy Parker, Abe Anderson, and Nora Garcia reasonably expect of their physicians? What goods or ends give purpose to the practice of medicine? What does it mean to call medicine a "profession," and how should its nature as a profession structure the life of the one who enters it? Oddly enough, physicians rarely ask themselves these questions, nor do medical educators ask them of their students. But the answers to these questions are central to the Way of Medicine.

By contrast, the provider of services model (PSM) either ignores these questions or denies that they can be answered. The PSM denies that medicine has an end or a purpose that can be known. In the absence of a rational purpose for medicine, the "morality of strangers" stands in: physicians must at least gain consent before intervening upon the body of another. But the morality of strangers declines to take up the question that the Way of Medicine poses as central: what actions are, and what actions are not, essential to, acceptable for, or incompatible with the fundamental purposes of medicine and hence with the profession of the physician?

Principlism, the most prominent ethical framework guiding the PSM, explicitly circumvents the question of what medicine is for. Tom Beauchamp and James Childress chose four principles—beneficence, nonmaleficence, justice, and autonomy—that seemed relevant to the kinds of practices in which medical practitioners typically engage, yet their framework neither specifies nor depends on an account of what those practices are supposed to do. Principlism encourages medical practitioners to apply the principles, and one principle, *beneficence*, tells practitioners to do what benefits their patients. But principlism does not specify what, in fact, benefits patients and so leaves open what benefits medicine should seek.

The PSM seems to lack something that should be at the root of medical practice and ethics. We can hardly ask medical practitioners to make an open-ended commitment to use the powers at their disposal to achieve whatever their patients want, much less whatever the state or another third party demands. In so doing we would ask medical practitioners to divest themselves of their moral agency and responsibility. To practice good medicine, one must first understand what kind of practice medicine is, what it is for, and what difference that makes.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

## MEDICINE IS A PRACTICE

Medicine, we propose, is a practice. A *practice*, Alasdair MacIntyre writes, is "any coherent and complex form of socially established cooperative human activity through which goods internal to that form of activity are realized in the course of trying to achieve those standards of excellence which are appropriate to, and partially definitive of, that form of activity, with the result that human powers to achieve excellence, and human conceptions of the ends and goods involved, are systematically extended."[1] A practice is found wherever human persons cooperate in the pursuit of a good, grow in excellence at that pursuit over time, and extend their shared wisdom of the good and excellence in pursuing that good across generations. So described, medicine seems like a paradigmatic practice.

To identify which goods are realized internal to this practice, consider MacIntyre's distinction between internal and external goods. MacIntyre gives the example of a child learning to play chess. He notes that we might encourage a child to play chess by offering the child money, and more money if the child wins. In this way, the child might learn to play chess with some skill. But that would not mean that chess could be described adequately as a skilled activity of a particular sort through which one obtains money. Money is external to chess—it has nothing intrinsically to do with it. Indeed, insofar as the child plays for money (or other goods external to chess), the child, MacIntyre notes, will be motivated to cheat—to contradict "those standards of excellence which are appropriate to, and partially definitive of" chess. In contrast, insofar as the child comes to appreciate and pursue the goods internal to chess, the child will both be motivated to respect those standards and realize the goods found in playing chess to an extent otherwise impossible.

The same is true for many human practices, including farming, music, and medicine. Those who practice medicine can do so with a variety of goods in view, but many of these goods—for example, money and social prestige—have nothing *intrinsically* to do with the practice. One can readily imagine a physician practicing medicine without pay and in a context in which she gains no social prestige. Moreover, insofar as a physician practices medicine for money or prestige, the physician is motivated to ignore medicine's "standards of excellence" if by doing so he gains more of these external benefits. We see this whenever a physician recommends medical interventions because those interventions increase the physician's income. In contrast, insofar as a physician comes to appreciate and pursue the goods internal to medicine, the physician will respect the standards, rules, and norms that make medicine possible, and he will also join other practitioners in developing and extending the practice to realize its internal goods to an ever greater depth. In this way, the practice of medicine has been dramatically developed and extended over time.

The distinction between internal and external goods helps to explain why so many physicians and nurses today are dissatisfied with their work.[2] A physician who practices medicine merely as a job does so for its external, extrinsic benefits. If he can obtain such benefits in a different, less burdensome way, he will. In contrast, the physician who practices medicine as a *calling* works for the benefits or goods that are realized in the work itself—its internal or intrinsic rewards. We suggest that physicians today are burning out and becoming alienated from their work in substantial part because they do not experience their activity as sufficiently aligned with and successful in bringing about the goods internal to medicine.

Several features of medicine follow from the fact that it involves active pursuit of genuine human goods in a cooperative manner through time. For example, medicine requires extensive effort and sustained focus from its practitioners. As a parallel, consider the good realized in professional soccer (football, for our non-American readers). To have any prospect of playing professional soccer, players must train and discipline themselves for many years. Similarly, to have any prospect of becoming an excellent physician, medical trainees must study, train, and discipline themselves for many years. Professional soccer players and physicians both pursue the goods instantiated in their practices with such all-in commitment that they must inevitably forgo other opportunities for human goods. This is not because they believe soccer or medicine is the only activity worth pursuing but because pursuing soccer or medicine is central to their particular vocations.

In soccer and medicine alike, sustained effort and commitment make possible constellations and expressions of the goods that would otherwise remain out of reach—those available to a master but not to a

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

dilettante (and those available to a tradition, but not to a here-todaybut-gone-tomorrow pastime). Most of us can enjoy the delights of recreational soccer with a few cooperating friends, a patch of lawn, a ball, and a small window of time. Little commitment is required. But the beautiful game of professional soccer is achieved only because numerous people make extensive commitments in cooperation with one another. Similarly, most of us can bandage a minor wound or nurse a cold, but the commitments of those who cooperate to bring about the practice of medicine make possible entirely different levels of healing. No one who is sick wants a physician who plays at medicine in the way that a physician might play at soccer with his children.

Medicine requires commitments to particular goods, and also to particular persons. Medicine requires, first, commitments to that community of persons whose cooperation makes this social practice possible. The comparison with professional soccer may help again: players, coaches, trainers, owners, managers, referees, and fans all cooperate to bring about professional soccer. They form a community constituted around a shared good and a shared will or commitment toward that good. The members of this community cooperate to mobilize diverse resources and to create structures and institutions that facilitate their further cooperation—FIFA (Fédération Internationale de Football Association), the World Cup, and so on—so that the particular instances of goods brought about by professional soccer might be realized.

Similarly, medicine requires a great deal of cooperation among physicians, nurses, pharmacists, other healthcare practitioners, administrators, educators, and of course, patients. Together they form a community constituted around the goods that medicine seeks and a shared commitment to pursue those goods together. The members of the community of medicine cooperate to mobilize resources and to create structures and institutions that facilitate their further cooperation—through hospitals, clinics, operating rooms, professional schools, and so forth—so that the particular goods brought about by medicine might be realized. Even a minor surgery, to succeed, requires major commitments and cooperation.

Of course, anyone familiar with the institutions of soccer such as FIFA also knows that those institutions can become corrupt, focused on the external rather than the internal goods of the game. When that happens, the institutions become not aids but threats to the practice.

Similarly, the institutions of medicine, from medical schools and hospitals to insurance companies and regulatory bodies, can become obstacles to the practice of medicine and its internal goods. Many of the pressures pushing clinicians to embrace the PSM come from these institutions, which threaten to withhold external goods and even to inflict institutional sanctions against those practitioners who, for example, refuse to cooperate in interventions that they believe contradict the purposes of medicine. We investigate the Way of Medicine not least because doing so is an essential first step toward revitalizing medicine's institutional world.

Within the community of persons whose cooperation makes medicine possible, patients occupy the place of honor, and the most fundamental commitment of practitioners *as practitioners* is to their particular patients. Although the term "profession" is now used widely to refer to any specialized practice requiring study and training, classically the term referred to medicine, the law, and the clergy. Each of these practices responds to a profound human vulnerability, and each entails a singular commitment to and solidarity with those who experience that vulnerability. In the case of the clergy, the vulnerability is that of being estranged or separated from God and the community of the faithful. In the case of the law, the vulnerability is that of being exposed to threats posed by adversaries and the power of the state. And in the case of medicine, the vulnerability is that of being at risk for disease, injury, and death.

In the grip of such vulnerabilities, people need trustworthy advocates to whom they can turn for help. These advocates must be trustworthy, first, because the stakes are high. If a soccer player makes a mistake, his team may lose the game. But if an attorney makes a mistake, his client may spend years behind bars. And if a doctor makes a mistake, her patient may die. Because the stakes are high, those who aspire to the clergy, the law, or medicine typically must undergo long periods of training and apprenticeship before they are authorized as practitioners of their profession.

These advocates must be trustworthy, too, because in order to receive their help, the one in need must entrust himself to the advocate's care, and doing so makes the one in need profoundly vulnerable to the professional herself. The supplicant must entrust herself to the priest by confessing truthfully and submitting to the priest's ministrations. She makes herself vulnerable to the possibility that the priest will divulge what she confesses or use her information for personal gain. The accused must entrust himself to the attorney by

permitting her to represent him before the power of the state. He makes himself vulnerable to the possibility that the attorney will collude with the prosecutor to settle the case in a way that minimizes the attorney's work while miscarrying justice. The patient must entrust himself to the physician by submitting to interventions with substantial side effects and risks. He makes himself vulnerable to the possibility that the physician will recommend the intervention that fattens the physician's wallet rather than the one most likely to bring healing to the patient. In all of these cases, the one in need stands in an acute relationship of vulnerability with respect to the professional.

Because of this vulnerability, those who practice one of these three professions must internalize and reliably display the moral commitments that govern their profession. These commitments become, in MacIntyre's terms, rules and standards of excellence without which the practice cannot long continue. The word "profession" initially referred to taking religious vows or otherwise publicly declaring particular beliefs or commitments. At the heart of the professions of the clergy, the law, and medicine is a commitment to the good of the vulnerable. In medicine, this entails a particular kind of solidarity with one's patients—a commitment to them that prescinds from all judgments about a patient's merit and engenders distinctive and substantial obligations toward the patient.

To the question of what kind of activity medicine is, we can now say that it is a paradigmatic *practice* —and to the question of what kind of practice it is, we can say that medicine is a paradigmatic *profession*. Medicine arises not from a need to bring about the greatest good for the greatest number nor in order to satisfy an array of desires, but rather in response to the threats that disease, injury, and death pose to the flourishing of every human being. Medicine's practitioners devote sustained effort and commitment to preserve and restore those goods that are threatened. They do so in cooperation with and commitment to a community of others who also are concerned to preserve and restore these goods and in solidarity with those individuals who need the goods that medicine exists to seek, preserve, and restore.

This gives us a starting place on the Way of Medicine, but we need more. To know what Cindy Parker, Abe Anderson, and Nora Garcia can reasonably expect from their physicians, we still need to know *which* goods medicine is for.

### Medicine Is for Health

Accordingly, we now make a modest proposal: medicine is for *health*. That health is a human good we consider evident; health gives all human beings a reason for action because it offers all human beings something that contributes to their flourishing. So health is *an end* for everyone in their day-to-day life, a point to which we return in chapter 2.

We acknowledge disagreements regarding both what health is and whether health is *the* end of medicine, and we will address these disagreements below. Nevertheless, we take the claim that medicine is for health to be modest because it is so strongly supported by the evidence of authority, is so implicitly affirmed by the practices and commitments of physicians and patients across moral communities, and so aptly addresses the vulnerability that patients experience, thereby undergirding the solidarity and trust that make medicine possible. Let us address each of these points in turn; in so doing, we identify and describe the Way of Medicine.

First, that health is the end of medicine is a proposal supported by the evidence of authority—the considered opinions of wise practitioners of the art for thousands of years. Though not himself a physician, Aristotle thought it axiomatic that medicine is for health. He wrote, "Now, as there are many actions, arts, and sciences, their ends also are many; the end of the medical art is health, that of shipbuilding a vessel, that of strategy victory, that of economics wealth."[3] Aristotle took these claims as starting points for practical reason, as things known immediately by both "the many and the wise." Similarly, the Hippocratic Oath includes a promise to enter homes only "on behalf of the sick," implying that medicine's fundamental aim is to restore the health that is imperiled in the sick. Countless practitioners of medicine, before and after, have made the patients' health their goal.

Second, the proposal is implicitly affirmed by the practices and commitments of physicians and patients across diverse moral communities, including those who might deny that medicine has any intrinsic purpose.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Indeed, implicit agreement that medicine is (at least) for health seems to be a necessary condition for the practice's existence. One could not mobilize the massive social cooperation necessary to sustain a coherent medical profession in the absence of some shared end. Today, medical technologies can be applied toward many different goals—something we consider in more detail throughout the book. For the moment, we note that with respect to many of these goals (e.g., family planning or a timely death), different religious and other moral traditions have long disagreed. If medicine were understood as a practice of pursuing such goals, there would be no shared medical profession any more than there is a shared clergy profession. Different moral communities simply would not cooperate to bring such a profession about.

Virtually everyone agrees, however, that it is good to care for the sick so as to preserve and restore their health. That commitment is central to Judaism, Christianity, Islam, and other world religions, and it is championed equally by those who do not consider themselves religious at all. That commitment resonates with and makes sense of students' longing to be physicians and of physicians' longing to become more fully the physicians they are not yet. Indeed, though physicians, patients, and bioethicists disagree about many things, we have yet to meet colleagues who challenge the notion that one of physicians' central concerns is their patients' health.

Third, the proposal responds aptly to the particular vulnerability that patients face and evokes the specific form of solidarity and commitment that makes medicine the profession it is. Put another way, medicine as oriented toward patients' health addresses a real and significant need of human persons. Edmund Pellegrino and David Thomasma, among others, have argued that the particular form of vulnerability that sickness brings gives us clear direction regarding the *internal morality* of medicine,[4] or what we are calling the Way of Medicine. If we pay attention to the experiences of those who are sick, we find that they need a skilled helper habituated by a resolute commitment to their good insofar as that good involves health. The commitment to seek their patients' health, and to do so in solidarity with the patient as a person, allows those who are sick to entrust themselves to their physicians. Without such trust, physicians cannot do their work. The ethic of medicine—the Way of Medicine—is grounded in these truths.

## "Why Only Health?"

Health may be good, and there may be good reasons to make health a primary focus of medicine, but why *only* health? Why not also direct medicine toward any number of other goals, to bring about other states that otherwise reasonable people also desire? It may seem nothing more than incantation to say that medicine by its nature aims at health. Surely medicine, a social construct, has no nature in any deep sense.

We concede a limited point: there is nothing magical about medicine as a social practice that gives it a lock on the good of health and only that good. The particular way in which goods are realized in a practice depends on the structure and history of that practice. Had medicine been organized and pursued in a different fashion, had its history and traditions been different, it might have become a different practice with a different internal good. However, a certain practice did develop whose primary, and even singular, internal good was health. The question now is this: is there a reason to maintain that traditional practice, the practice identified by the Way of Medicine?

We think the answer is Yes but make a further concession: our argument is, in certain respects, a prudential one. We could imagine, in theory, a profession in which physicians aimed at all kinds of goods while also maintaining excellence in preserving and restoring health, and did so while respecting the further requirements of practical reason. We have not, however, seen such a profession realized in fact. Indeed, bringing one about seems prohibitively difficult.

The first problem is one we have already described: without a clear focus on a common recognized good, it is not possible to engender the social commitments and cooperation necessary for an appropriately capacious practice of medicine. Suppose that doctors were thought to be merely powerful wielders of technology, serving the desires of the highest bidder or the demands of the most powerful institution. What reason could we have for trusting such doctors? Indeed, would it not be more reasonable for those who are

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

sick to hold back from entrusting themselves to such "physicians"? Without trust spread broadly across a variety of moral communities, a public profession of medicine will steadily disintegrate into rival camps that use the powers at their disposal to pursue different and ultimately irreconcilable goals.

That is not to say that the Way of Medicine is monolithic; it allows for diverse practices as long as those practices share the pursuit of health. The good of health allows for complexities and ambiguities, and different moral communities will disagree about how and how much to pursue health relative to other goods. They may even disagree on the margins about what health is. A focus on their patients' health, however, allows clinicians and patients even from diverse moral communities to trust one another in pursuing this limited but crucially important shared goal.

Another problem is that of focus and differentiation. Consider again a professional soccer player. If he begins to use his remarkable foot dexterity to kick field goals in US football, and then to dance rumba, and then to compete in mixed martial arts, at some point he becomes not a professional soccer player but a highly skilled user of his feet. As the scope of his footwork expands, the excellence of his soccer playing will likely diminish, and some uses of foot dexterity may come to contradict his commitment to soccer. (For example, kicking another player would conflict with the internal norms of soccer, and kickboxing might result in injuries that cripple his soccer play.) As a result, professional soccer players generally focus on soccer, not on making things happen with their feet. Similarly, insofar as physicians use the technological powers at their disposal to pursue a wide array of outcomes, they necessarily become less expert and skilled at pursuing their patients' health.

Moreover, as we further consider throughout the book, some uses of medical technology not only distract practitioners from their pursuit of their patients' health but come to contradict that pursuit or otherwise violate the requirements of practical reason. Some alleged healthcare services directly destroy health or other basic human goods. Some satisfy wishes for that which is not good. Some undermine the conditions necessary for patients to entrust themselves to clinicians when they are sick. Some services are simply unfair. By detaching from medicine's orientation to health, the PSM sets aside the internal resources practitioners need in order to resist temptations to abuse their medical powers.

History is punctuated with episodes in which medical powers were abused. Tellingly, in each case the commitment to the patient's health was either set aside or directly transgressed. Many readers are familiar with the Tuskegee experiments, in which physicians tracked African American men suffering from syphilis for years without treating them. In that case, doctors set aside concern for the health of their patients in order to use the patients to pursue scientific knowledge. We could similarly consider the medicine of National Socialist Germany, which was in its time the most scientifically accomplished medical system in the world. There, by trading the health of the patient for the "health" of the "Volk" (the nation), German medicine became the instrument of mass torture and murder.[5] Or again, we could look at the eugenics movement in the United States, in which physicians forcibly sterilized thousands of women to realize a dubious vision of "population health."[6] Wherever medicine as a social institution has gone badly wrong, it has ignored or abandoned its commitment to the patient's health in order to harness medicine's powers to achieve other social goals. Keeping the health of the patient as the end of medicine shores up a wall of defense against such abuses.

## What Is Health?

Even if you agree that medicine has a purpose and that the purpose is health, it remains necessary to define "health" further, which poses difficulties. Health is a reality of such breadth and depth that it cannot be known with the same precision as mathematical algorithms. Any definition of health will necessarily be incomplete and will allow, at least on the margins, for uncertainty and ambiguity. For some, perhaps particularly for those conditioned to regard scientific knowledge as the highest form of understanding, that health cannot be defined with precision will be deeply unsatisfying. If health cannot be defined with clear margins, of what use is the concept in specifying the purposes of medicine?

We can still know much about health, because it and its absence are intrinsic to human experience, as they are also to the lives of nonhuman animals. Indeed, the fact that diverse and plural cultures all give rise to

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

healing professions testifies to the way health and the absence of health make themselves known as facts of human experience and are accessible to the inquiry of reasonable people. However, in light of the kind of reality health is, we do well to heed Aristotle's admonition that we not demand of a subject matter more certainty than it allows.[7] In that spirit, we start with what seems obvious regarding health, and we draw distinctions where necessary for clarity.

In this task we are deeply indebted to the work of Leon Kass. In the following paragraphs, we articulate and extend certain aspects of Kass's inquiry into the nature of health.[8] Throughout the rest of the book, we consider further what health is by examining health in particular clinical contexts, and we show that the way one defines health dramatically shapes the way one understands physicians' responsibilities.

The Way of Medicine makes two claims about health and *objectivity*. First, health is an objective bodily norm for all living organisms. "Norm" here does not mean a moral norm; rather, living beings have characteristic bodily activities and tendencies, and these activities and tendencies determine what is appropriate—the norm—for them in regard to the well-working of their organic bodies. Hence, there are objective facts about what health is for any organism, and being right or wrong is possible with respect to questions about an organism's health. When organisms display the health-related norm(s) for members of their kind, we can say that they are healthy.

Second, *human* health is an objective *human* good; health is grasped by human agents as worth pursuing. Likewise, such agents grasp that not valuing health would be unreasonable and that states of ill health are to be avoided. Health as a *bodily norm* and health as *good* are related, of course: health could not be objectively good if there were no facts about what health is. But the two forms of objectivity differ: the health of nonhuman organisms is, like human health, an objective bodily norm for those organisms, yet it is not a human good.

The Way of Medicine takes human health to be objective in both senses: knowable in fact and genuinely good. Denial of either claim leads directly to the PSM, for if health either is not real or is not good, patients have no intrinsic reason to choose health rather than other desired states; nor do physicians have any intrinsic reason to make health central to their practice and profession.

Our claim here should not be misunderstood by reference to a particular dispute that characterizes the current philosophy of medicine. Philosophers disagree about whether health is an objective or an evaluative concept; philosophers advocating the former are attracted to naturalistic accounts of health, often based on the notion of statistically normal function.[9] Those who advocate for the latter hold that what we value determines what we consider to be healthy.[10]

Our view differs from both accounts. Against the former, we hold that living beings are genuinely teleologically ordered. As we will discuss below, organisms have characteristic activities that serve their biological life form, and that life form establishes the objective norm for the organisms' healthy functioning, not mere statistical regularities. Against the evaluative view of health, we distinguish between health's being an objective bodily norm and health's being objectively desirable or valuable. Whether an organism is healthy does not depend on whether health is desired or valued. Hence, one can recognize a squirrel's health, as we do below, without incorporating any judgment that the squirrel's health should be pursued or protected.

What, then, does it mean to say that a living being is healthy? What is the health that the medical profession serves? Here we make four points about what health is, then clarify in certain respects what health is not.

First, the domain of health, in its primary meaning, is not that of parts but of *wholes*. When people speak analogically of healthy marriages or healthy communities, they are concerned with those realities as wholes, and the same is true of health in its paradigmatic sense. Health is a matter of what is true of an organism, the living biological whole that in fact precedes, metaphysically and temporally, the healthy differentiation, growth, and development of its parts.

The term "health" can obviously also be applied to parts of the organism, as to a "healthy liver" or a "healthy heart." But such descriptions are still clearly dependent on our understanding of the health of the whole. A liver or heart is recognized as healthy when it is in a state that serves the health of the whole organism. Likewise, the health of the whole organism is more than the sum of the health of its parts. An organism may have all its parts in apparent working order and yet be in ill health. We see this in patients with syndromes of medically unexplained symptoms.[11] Or an organism may have a deficient or absent part and

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

still be in good health, as we see in many patients who have lost a kidney or spleen, even a limb or an eye. Finally, we know from experience that physicians readily sacrifice a part for the health of the whole, as they do when removing a crushed finger or an infected gallbladder. All these truths testify to the primacy of the organism as a whole in thinking about health.

Second, health is associated importantly with *activity*. Kass describes health aptly as the "well-working" of the organism as a whole. This emphasis on activity militates against the forms of reductionism that equate health with static conditions and abstractions, such as lab values in the expected range, clear radiographic studies, and unremarkable physical exams. In being characterized by activity, health resembles courage or strength, which would not exist unless manifest in action—and it is unlike beauty or stature. Activity does not imply constant movement, of course; thinking, resting, and sleeping are all activities that require and display health. For humans, each is an essential aspect of the well-working of the whole.

Third, the health of an organism and its health activity must be judged, to a certain extent, with sensitivity to the organism's context and state of development. The health of a thirty-year-old woman differs from the health of a thirty-year-old man, and the health of both differs from the health of a ten-year-old of either sex. A healthy ninety-year-old experiences extensive diminishments of health relative to a typical twenty-year-old, yet we can still distinguish between a healthy and an unhealthy ninety-year-old. Similarly, what it means for a person who has a conspicuous disability to be healthy differs from the perception of health of a person who does not.[12]

These differences, present within the population of a species, are more pronounced between species. Hence, our fourth point is that health is species-specific. The health of a dolphin differs markedly from that of a squirrel. The health of both is manifest in the activities they perform *as the sorts of organisms they are.* Being different kinds of organisms, with different natures, their health is different, but in each case we can still speak of the well-working of the organism as a whole. Thus, no one would suspect a squirrel to be in ill health simply because it cannot swim at high speeds under water. And no one would suspect that a dolphin is ill because it cannot climb trees. The signs, expressions, and realizations of health vary from species to species. Human health is more complex because the characteristic activities of healthy human beings are more varied and diverse than those of other organisms. This complexity makes it difficult in some cases to make judgments about health and how to pursue it, as subsequent chapters show.

Do all of these complexities indicate that health is merely a subjective notion, merely a socially constructed concept? They do not. Something can be relative in certain respects while still being objective. Health is objective if there are matters of fact concerning whether some individual organism is healthy, but to discern such matters of fact, one must recognize truths that are relative to that organism's species, stage of life, and particular circumstances. Indeed, health can be subjective in certain respects while still being objective: a clinician may be unable to find anything objectively wrong, but we believe (with Kass) that if the individual sincerely believes she is unhealthy, then to that extent she is. More investigation may be called for in order to determine, if possible, what has gone wrong, but individuals do have a certain epistemic authority in determining whether they are unhealthy.

Health can easily be confused with proximate or related concepts. Health is not the same, for example, as having the least possible risk of future injury, illness, or death. Playing soccer professionally requires a high degree of health but also risks injuries that could be avoided by refusing to play soccer. It does not follow that standing on the sidelines displays greater health than does playing in the game. Similarly, health makes pregnancy possible, while pregnancy also poses risks to health. One who is sterile does not display greater health, however, than one who is capable of pregnancy.

Nor is health the absence of suffering. It is true that physicians have always prioritized relief of suffering. "To cure sometimes, to relieve often, to comfort always," the maxim goes. Poor health is, of course, suffered, and many conditions that diminish health also induce pain and other symptoms that elicit suffering. Yet we also could draw up a long list of conditions people suffer that may affect their health but are not themselves signs of the absence of health. Those who are poor suffer want of finances, and those who lose loved ones suffer heartbreak, to give just two examples. Distinguishing suffering from health has decisive implications for medical ethics, as we note throughout the book. To foreshadow a bit, we observe that some people today, insofar as their experience goes, *suffer* the conditions of having male genitals, small breasts, or short height,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

or even being alive. If physicians equate health with the absence of suffering, they will try to relieve these and other conditions. This hubristic aspiration leads physicians, in the words of McKenny, "to relieve the human condition."[13]

The distinction between suffering and ill health raises an important question: what about mental health?[14] The challenge is to define "mental health" so that it includes the well-working of an organism's mental and psychological capacities, but it does not expand to require the absence of suffering we just described, nor happiness, nor the satisfaction of every desire. On one end of a spectrum are conditions that seem clearly to represent deficits in mental health: schizophrenia or catatonic depression, to give two examples. On the other end of this spectrum we find sadness, anxiety, grief, or rambunctiousness that are often described as mental and behavioral illnesses but do not clearly display a deficiency of one's health. Often it is not possible to draw a bright line between conditions that display ill health and those that do not. Making these distinctions requires both good clinical judgment and the humility to recognize the limits of such judgment. What medicine should pursue is the mental capacity that makes it possible to experience happiness, sadness, and other emotions in the way that humans experience them when they are well-working, and to make choices and behave in ways that humans are capable of when they are well-working. Medicine oriented to health will not seek to bring about a particular emotional state or a particular set of choices and behaviors as such. By analogy, medicine would seek to preserve or restore the capacity that makes it possible to play a musical instrument, not to determine which notes are played or to ensure that the music remains in a major key.

Finally, although we have noted that the state of health is also objectively desirable, and hence an aspect of human flourishing, the state of being healthy does not encompass all that goes into human flourishing. The World Health Organization errs when it defines health as "a state of complete physical, mental, and social well-being."[15] A related error is made by the agrarian poet and social critic Wendell Berry, whose work emphasizes that human beings flourish only in community. Berry defines health as *membership* and argues that the smallest unit of health should be the community; thus, "to speak of the health of an isolated individual is a contradiction in terms."[16] Such accounts, though admirable as critiques of reductionism and individualism, problematically raise health above other human goods, making health not merely one human good but the state of human flourishing that encapsulates all human goods. If the end of medicine is health so understood—if medicine's purpose is to bring about the fullness of life, the Hebrew concept of "shalom,"[17] the World Health Organization's vision of complete well-being, or even Berry's vision of membership—it seems that physicians have a wide-open mandate. All is their responsibility, all their domain.

Health so understood is not useful for guiding medical practice. Imagine a man who says that he is going to see his physician because he recognizes that he has an unhealthy relationship with his neighbor or he wants to work on getting his finances into better shape. When terms for health are expanded to encompass all aspects of human well-being, the term may inspire but it no longer proves useful, especially not for naming the thing that medicine is for.

According to the Way of Medicine, health is the end or purpose of medicine, the principal goal that medicine seeks, the principal good that is realized internal to medicine's practice. But "health" here is meant in a limited, circumscribed, and embodied sense: what Kass describes as "the well-working of the organism as a whole," realized and manifested in the characteristic activities of the living body in accordance with its species-specific life-form.[18] We believe this account captures the primary meaning of health. Health so understood is also a good that can be pursued for its own sake as one—but only one—constitutive aspect of human flourishing. It is additionally, of course, a condition for the possibility of pursuing other human goods. According to the Way of Medicine, human health understood in these two dimensions—as an objective bodily norm and as an objective human good—grounds medical practice and the medical profession: it is *the* end that takes precedence over others in the practice of medicine, one that is not to be abandoned or violated by those who profess a vocational commitment to it.

Their health, therefore, is what Cindy, Abe, and Nora can reasonably expect will form the center of their relationships with all healthcare professionals through all stages of their lives.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER TWO

# The Requirements of Practical Reason

Having argued that medicine is for a patient's health, we now consider how medicine's pursuit of the patient's health depends on and is accountable to ethics: the broader requirements of practical reason. The questions that concern us throughout this book are *practical*. They concern action—not action considered impersonally from a spectator's point of view but action considered personally from the standpoint of one who must decide what to do. Practical reason considers questions about particular actions as well as lives as a whole. Humans rightly ask not only "What should I do?" but also "How should I live?" And "What *kind of person* should I be?"

Members of the medical profession clearly need to ask both kinds of practical questions. With respect to particular *actions*, the questions include the following:

- Should I inform this patient of the terminal condition she has, even though it might seem to do no good and might even distress her and cause her suffering?
- Is it permissible to counsel or provide contraceptives or abortion to those who seek to avoid or end unwanted pregnancies?
- Must I respect this patient's wishes that I not provide further nutrition or hydration, that I provide sedation to the point of unconsciousness to alleviate her anxiety, or . . . ?

The medical professional's life is filled with such questions, and the medical practitioner needs an adequate framework for thinking about how best to answer them.

With respect to questions about lives as a whole, the questions include these:

- What sort of doctor [or nurse or therapist] should I be?
- What are the fundamental commitments of my profession around which I must orient my life?
- What sorts of virtues must I have, and how must I discipline my mind, will, and emotions in order to become and remain a good practitioner of medicine?
- How does being a health-care practitioner fit into my other life-shaping commitments, including my commitments to family, to neighbor, and to God? Are these parts of my life walled off from one another? If not, which should take priority, and how should conflicts be negotiated when they arise?

These questions involve how a person should live, and they cannot be answered solely by thinking about the practice of medicine and its internal good, for they concern the relationship of that practice and its good to the other practices, goods, and values in a person's life.

The practice of thinking critically about all of these questions and subjecting the possible answers to reflection and scrutiny is that part of philosophy that can be called ethics, or *practical ethics*. Aristotle kept the practical nature of ethics squarely in focus when he composed his *Nicomachean Ethics*.[1] Engaging in ethics, he wrote, is for the sake of taking action. Some philosophers focus primarily on theoretical questions regarding ethics—for example, questions about the meaning of moral language—but in this book we approach ethics practically, as Aristotle did.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Our understanding of practical ethics is deeply shaped by the tradition of natural law ethics. There are many distortions and abuses of natural law reasoning, particularly those that have defended an unjust arrangement of institutional and social power as "natural" or as expressing the "law of nature." These are not what we mean by a natural law ethics. Rather, a natural law ethics is an attempt to discover the deepest practical principles of human flourishing and to work out the implications of those principles in norms for concrete action. These principles and norms are what we identify as the requirements of practical reason—that which practical reason prescribes when functioning properly. We will argue that this natural law approach to ethics is superior to consequentialist, deontological, and principlist approaches with respect to both moral decision-making in general and medical decision-making in particular.

HUMAN ACTION AND HUMAN GOODS

Let us start with questions about action: Why do we ever act at all? Why not simply *be*, resting in our own personal existence without strain or effort? Surely part of the answer is that human beings in many important respects exist as beings who are "not yet fully formed," who can and must shape themselves by choice and action in order to become more fully what they are capable of being.

No one comes into existence already married, for example, and no one comes into existence already a doctor. Even upon reaching these states, no one is "all done" being either married or a doctor. Rather, being married or being a doctor requires choices and actions that build up our existence as married persons or doctors, fulfilling potentials that we had. But potentials for what? To what does reason direct us? Practical reason's most fundamental principles direct us toward *human flourishing*.

What does "flourishing" mean? Sometimes people talk about "happiness" or "joy" as synonyms for flourishing, but these words can mislead: happiness can be taken as a state of simply feeling good, and joy can be thought of as experienced only momentarily (even if frequently). In contrast, by "*flourishing*" we mean a state of being truly well off as human beings, and sometimes what feels good does *not* makes us truly well off. Moreover, being well off as a human being is something that characterizes a life over time, not just isolated moments. So neither "happiness" nor "joy" captures fully the notion of flourishing, though happiness and joy accompany flourishing in some measure.

Nor is flourishing a self-centered notion, as happiness sometimes is. Human beings are well off and flourish only in community, in relationships with one another, as Wendell Berry reminds us. This point is central in considering the doctor-patient relationship and the importance of patients' relationships to their families. In this way and others, the conception of flourishing we advance differs significantly from what some thinkers have called the self-expressive individualist model of happiness. At its worst, the latter model urges, "If it feels good, do it," reducing human action to expressions of undisciplined self-interest.

In contrast, practical reason begins with human goods. Human action is always oriented toward something perceived as beneficial or good, even when that perception is mistaken. We act for the sake of bringing about something that promises us or others like us some benefit, and this is where we find the foundations of all practical thought: in basic goods that are intrinsic aspects of human well-being or flourishing.

By using "basic" and "intrinsic," we are distinguishing the goods at the foundations of ethics from others that are only instrumental and derivative. Consider the goods of money and medicine. These goods are good only insofar as they promise to bring about something else that is desired. But practical reason starts with those goods that are desirable in themselves for their own sake, because they themselves make all human beings better off and contribute to their flourishing. Basic goods include life and health,[2] knowledge, aesthetic experience, friendship, integrity, religion, and marriage.[3] Each of these particular goods benefits people in unique and irreducible ways. The way we flourish as human beings in attaining knowledge differs from the way we flourish in attaining health. Human flourishing is not reducible to one of these goods, and so, as we will see, a life characterized by flourishing requires some ordering principle within it.

Even bad decisions and lives guided by evil are typically directed at real and basic human goods. Consider again the Tuskegee scandal. This decades-long experiment was a terrible failure of medical morality, yet it was driven by interest in two goods we consider basic: knowledge and health. This presents

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

an essential concern of ethics: how do we get from awareness of the basic goods of human action to making moral decisions in pursuing those goods?

CONSEQUENTIALISM

One answer that many philosophers have defended is that we should maximize goods when making moral decisions.[4] In maximizing, one accounts for all the beings who will be affected by an action, and, as Jeremy Bentham asserted, one promotes the greatest good for the greatest number. Bentham was the founder of the view called *utilitarianism*; utilitarians thought that the good to be maximized was pleasure. Other utilitarian thinkers take different views of what is to be maximized, but we refer to all views of this sort as *consequentialist*, for they all take the goodness or badness of consequences as the primary consideration in making moral judgments.

We have argued elsewhere, at greater length, against consequentialism, and so a few remarks will suffice here.[5] First, consequentialism has at least surface problems with the concepts of justice and rights. Justice and rights seem to be "trumps" against attempts to maximize goodness when that maximization would be unfair to some or would violate basic human rights—for example, threatening persons with enslavement or torture. Second, consequentialism presents significant problems in its demand that we consider all of the consequences that follow from our actions. Our knowledge of such consequences is limited, and that which would fail to maximize consequences in the short term might bear unforeseen but beneficial fruits over time.

The third and most important point to make about consequentialism, and specifically about maximization, is that it cannot work even if consequences could be foreseen reliably, because instances of the goods that are fundamental aspects of human well-being and flourishing cannot themselves be weighed against one another rationally. For example, what do person A's long-term health and person B's longterm knowledge have in common that would provide a metric by which we could say that there is *greater goodness* in A's health or B's knowledge? Health and knowledge are different goods, and these persons are different persons. The options at stake in a decision to, for example, pursue an experiment at the cost of A's health or desist at the cost of B's knowledge seem *incommensurable*—they do not have a common measure of goodness between them that would make maximization possible. Nor are the values of persons' lives commensurable: each person's life is uniquely and immeasurably valuable. We cannot say without qualification, therefore, that this one person should be sacrificed in order to save those two, three, or twelve.

Indeed, even options that a single good generates do not seem genuinely commensurable. Medical professionals and patients regularly face options in which different health benefits are offered, usually accompanied by differing health burdens. A proposed course of surgery plus radiation treatment might offer a patient hope of a longer life, albeit with considerable side effects such as nausea, pain, and reduced energy. A proposed watchful waiting approach might offer hope of preserved energy, appetite, and freedom from disabling pain, albeit with considerable risk of dying sooner. Does one of these options offer all the good of the other plus more? If it did, there would be no need for choice; we would be irrational not to take the greater good. But choice is required. The benefits and burdens of each option differ, and they allow for no common scale of goodness or value through which to resolve one's deliberation.

THE FIRST MORAL PRINCIPLE

What, then, should characterize our relationship to those goods that are basic aspects of all human beings' flourishing? How can we make upright choices when faced with options that involve incommensurable goods and persons? The basic norm would seem to be as follows: *in acting and willing, always be fully open to the goodness of the goods and to the persons for whom those goods are good*. This seems to be a demand of reason, and hence a requirement of practical reason. Practical reason orients us to the goods as we consider what to do, and reason recognizes those goods as giving a point to what we do. Reason, then, requires that we not close ourselves off to goods and persons.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

First, let's consider how emotion or prejudice might lead us to be less than fully open to human goods or persons. Consider a situation in which we very much want to experience the benefits of a particular good. This good especially appeals to us or plays an important role in our own or our loved ones' lives. All humans respond more immediately, on some occasions, to some goods rather than others. For example, a particular opportunity to obtain knowledge (say, by reading a book) may seem tedious by comparison with a desirable opportunity for play. On some occasions, options are not merely tedious but painful—going through surgery, working through a difficult rehabilitation, or telling a patient an unpleasant truth. On still other occasions, the good at stake seems of overwhelming importance because it is under threat: our life, for instance—or our career, our family, our religion, and so on.

These responses are understandable, but under the influence of emotion, we sometimes make choices that are not fully open to all goods but instead privilege one or another in an unreasonable way. We might simply choose directly against one good for the sake of another: we deliberately inflict harm on one person for the sake of benefiting someone else, or we deliberately damage one instance of a basic good for the sake of another. Such actions make sense only if goods and good options are weighable. Harming or destroying a good for the sake of some other good makes sense only if that other good is a greater good. Yet the notion of "greater good" is out of place in speaking of basic goods.

Thus, a norm emerges from consideration of the rational requirement of openness to all goods: one should never directly damage or destroy one instance of a basic good for the sake of some other or "greater" good. Of course, one should not damage or destroy an instance of a basic good out of hostility, either, whether hostility toward that good or toward the person experiencing the good. So this norm can be broadened: *one should never, for any reason, directly damage or destroy an instance of a basic human good*. This norm is echoed in the Way of Medicine's millennia-old commitment to do no (intentional) harm. We might say that practitioners of the Way have seen in the domain of medicine and the basic good of human health a genuine requirement of practical reason, and they have sought to respect that requirement in the norms of their practice.

Another requirement of reason has a justification similar to the previous one. Suppose we are attached not just to some good but to some person. Such attachment is often quite reasonable: we have attachments to our children, spouse, and parents, as well as to our neighborhood, workplace, and church. These attachments play a legitimate role in our moral deliberations. Sometimes, however, our emotions lead us to privilege some persons over others in ways that are unreasonable. For example, we allow our daughter to take a greater share of something than the other children, because she is ours; maybe we cheat in our effort to get into medical school, thus privileging ourselves over others who are more qualified. How can we test for this kind of arbitrary privileging in our personal attachments?

One traditional test is the Golden Rule: do unto others as you would have them do unto you. When our privileging diminishes others in such a way that we would resent such privileging were we on the receiving end, we have reason to think that we are acting unreasonably, arbitrarily, and unfairly. Similarly, when we treat others less well than we would expect our loved ones to be treated, we are again acting unfairly. A norm of fairness, clearly violated in the Tuskegee experiments, emerges from the requirement to be open to the goods in all persons.

Of course, sometimes our commitments require that we give some people special treatment: physicians' commitments to their patients, for example, create a special space in their lives for those patients and their needs. But this seems clearly fair: everyone has reason to accept the possibility of such special commitments, for without them, there could be no medical profession, no doctor-patient relationships, none of the benefits that come from a doctor's special knowledge and even her friendship with her patients.

At the same time, the Golden Rule—the norm of fairness—does chasten even such commitments to patients. Physicians will find some patients more pleasant or attractive than others, as does any teacher with respect to her students. When those feelings are allowed to unduly shape medical practice or teaching, a key requirement of practical reason has been violated. To choose one visible example, consider the case of Jahi McMath, an African American teenager in Oakland who was diagnosed as brain dead following a terrible complication of a minor surgery. As described in the *New Yorker*, biases of race and class appear to have affected how medical professionals and professional ethicists treated Jahi and her family.[6] Insofar as that is true, such treatment was unfair and did not adequately meet the requirements of practical reason.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

PRINCIPLISM AND KANTIAN ETHICS

Medical ethics as a field emerged in the twentieth century partially in response to abuses and scandals in the medical profession and partially because the profession seemed insufficiently self-critical with respect to its ethical commitments. The emergence of new medical technologies added fuel to the fire by generating dilemmas that seemed to call for new forms of deliberation. "The Belmont Report," issued by the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, identified three principles to govern moral action in biomedical research: respect for persons, beneficence, and justice.[7] Within a few years, Thomas Beauchamp, a philosopher and original member of the commission, and James Childress, a theologian, had revised and expanded these to four principles to govern the practice of medicine: autonomy, beneficence, nonmaleficence, and justice.[8]

Beauchamp argued that what has come to be called *principlism* marked an important advance in bioethics. Doctors, he explained, had been attending only to beneficence and nonmaleficence—to doing good and avoiding evil—and so had come to overlook abuses of patient autonomy, as when patients were treated without their consent, and abuses of justice, as when vulnerable populations such as disabled children or poor black sharecroppers were exploited as research subjects. Principlism not only responded to insufficient self-reflection, expanding medical technologies, and abuses of medical ethics; it also seemed to overcome an intractable dispute between two competing schools of ethical thought: consequentialism (discussed above) and Kantian deontology (discussed below). Consequentialists and Kantians espouse different and irreconcilable first principles, but Beauchamp and Childress discovered that even persons with radically different moral foundations could agree on so-called mid-level principles. Principlism appeared to advance bioethics by providing a common approach, even if it eschewed moral foundations.

Interestingly, a number of competing approaches arising in response to principlism also avoided first principles. Bernard Gert and K. Danner Clouser put forward a rule-based approach similar in many respects to principlism, and Albert Jonsen and Stephen Toulmin advocated an approach based on casuistry that looked at paradigm cases and worked by analogy from there to uncertain cases. Theorists including Edmund Pellegrino and David Thomasma defended approaches centered on the virtues that medical professionals should have.[9]

These approaches have varying strengths and weaknesses, but all (with the possible exception of Pellegrino and Thomasma's) share an opposition to foundationalism, to beginning from first principles from which norms (or rules, principles, or even virtues) are derived. Instead, these approaches typically work with the concept of *reflective equilibrium*, which involves moving back and forth between general and abstract norms and concepts, on the one hand, and the features of particular cases, on the other. Many people, especially those engaging in actual clinical practice and not operating "by theory," have found these reflective equilibrium-based approaches refreshingly practical. Notwithstanding their flexibility and practicality, in our view these approaches fail insofar as they lack moral absolutes.

*Note that we are not claiming that one right answer always exists for everyone and everybody*. In very many circumstances, various options are *all* morally permissible. In many other circumstances, one cannot determine what should be done without taking into account the personal character, choices, commitments, and features of the agents in the situation. No impersonal algorithm can churn out the right answer for everyone in a similar situation. Accordingly, one needs the virtue of prudence, along with a willingness and ability to reflect on one's particular situation, in order to arrive at reasonable decisions.

So in speaking of moral absolutes, we do not claim that some onesize-fits-all model should settle all moral questions, but we do claim that some actions *never* should be performed, regardless of the circumstances. Historically, the medical profession has acknowledged such moral absolutes. The Hippocratic tradition, for example, held that physicians should never kill, and this norm that arose in a pagan society has been affirmed in Jewish, Christian, and Muslim cultures. It is hard to see how ethical approaches that have no foundations can support this or other absolute norms. Rather, nonfoundationalist approaches, particularly principlism, commit to balancing or weighing competing principles in different circumstances based on the features of each individual case. But if all principles (or rules, cases, or virtues) may be weighed against one

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

another, and if all are subject to possible revision in light of a particular circumstance, none are absolute. Nothing, that is, can be ruled out altogether before considering the circumstances.[10] Thus the seemingly absolute demands of human rights—against acts such as rape, torture, and killing the innocent—cannot be absolute after all within a framework like principlism. In contrast, our approach leaves room for these and other moral absolutes.

A related difficulty with principlism and many of its descendants is that they give no account of what is *good*.[11] Consider autonomy, the first of the four principles. Respect for autonomy is essential in medicine, but why? What good or goods does respect for autonomy serve? Similar questions arise with respect to beneficence and nonmaleficence. If we are to do good and avoid doing evil, we must know what is good. Even justice requires an account of what is good, insofar as justice often involves rightly distributing goods and is premised on concern for the good of others.

In this light, we need to unearth the foundations of ethics and seek an account of what is truly good. In our proposal regarding the basic goods, we attempt to provide the deeper content necessary to make sense of Beauchamp's and Childress's midlevel principles, the casuistry of Jonsen and Toulmin, and so on. Moreover, these basic goods allow us to identify moral absolutes, actions that should never be taken precisely because they involve acting contrary to a basic good. Such actions violate the principles of beneficence and nonmaleficence by contradicting genuine goods and thereby human flourishing. They violate justice because they disregard the good of another.

Similar points can be made about Kantian ethics. In his attempt to drill down to the foundations of morality, Immanuel Kant held that a "categorical imperative" was an absolute prescription of reason and that *the* categorical imperative could be formulated as follows: "Act in such a way that you treat humanity, whether in your own person or in the person of another, always at the same time as an end and never simply as a means."[12] Put another way, Kant saw the foundation of ethics as resting on a principle of respect for persons. Human beings are never to be treated as mere things—disposable or usable for others' purposes—but rather must be treated as beings of noncontingent, immeasurable worth. Kant's approach has obvious merits when we consider experiments performed on the unconsenting and unsuspecting not for their own benefit but to serve others' interests. But Kant also left out of consideration, quite deliberately, concern for human good. In Kant we find a prototype of what later came to be described as prioritizing the right over the good, a feature of Kantianism that prevents one from determining the content of what respect for persons requires.

This content-thin feature of Kantianism is especially conspicuous in the work of thinkers who reduce respect for persons to respect for persons' autonomy. What does respect for another as a person mean? It means, on one account, respecting another's capacity to respond to human reasons. In that construal, we violate the categorical imperative when we act toward another without giving reasons and obtaining acquiescence in those reasons—in other words, when we act without the other's informed consent.

But this account of respect also seems thin, reduced to respecting what the other happens to want. Without an account of what is genuinely good for human beings, we have no objective standard against which to judge whether a reason is good—whether, for example, what a patient wants aligns with or contradicts her genuine welfare or flourishing. We are not here advocating overriding a patient's refusal; there are good reasons to respect and insist on patient consent. Nevertheless, if the doctor is to give good reasons, and if the patient is to consider and make an autonomous decision on the basis of those reasons, both parties must have access to some standard for good reason. That standard, we argue, is found in the basic goods and in openness to all such goods in all persons.

The inheritors of the right-is-prior-to-the-good maxim have played another important role in the emergence of the provider of services model (PSM), specifically in its development as a matter of politics. Followers of the political philosopher John Rawls have used that maxim, as well as Kantian thought about reasons and respect for persons more broadly, to argue that only "public" reasons are legitimate for public deliberations and debate.[13] That view has radical consequences for the role of religion in bioethics, especially in bioethics as it plays itself out in political debate, deliberation, legislation, and adjudication. The Rawlsian emphasis on public reason threatens to push religious considerations out of the public sphere—with respect not only to politics but also to the public practice of medicine. Medical professionals, in a Rawlsian model, must resist the influence of religious reasons on their professional deliberations and clinical practices. We

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

assess and criticize this claim in our final chapter, when we take up conscience and medical ethics. But in this chapter the topic of religion raises a somewhat different though ultimately related issue. Religion clearly plays an ordering role in some agents' lives, a role that could be described as vocational; medicine also seems to play such a role.

## VOCATION

At the foundation of ethics we find basic human goods that are never to be violated. But any ethic concerned with human flourishing needs more than prohibitions; it also needs an ethic of *pursuing* human goods.

According to practical reason, how should this pursuit of human goods be organized? Why organize at all? Why not simply pursue human goods serially, acting for the sake of this good now, of that good then, in accordance with whatever seems appropriate and desirable in each situation? This question almost answers itself. A life characterized by pursuing goods in such a serial manner, without organization or structure, will inevitably be shallow and chaotic in ways detrimental to human flourishing.

Consider, for example, the following sorts of difficulties. First, such a life could not achieve excellence at anything. Many instances of basic goods can be realized only through sustained effort and commitment. Although one can learn new things from social media and play at the guitar in one's spare time, one cannot realize the good of knowledge available to a first-rate scholar without years of study or the goods of play and aesthetic experience available to a professional guitarist without years of practice. Similarly, a physician cannot bring about her patients' health without first committing to decades of study, practice, and work. Sustained commitments are necessary to realize basic goods in any depth.

Second, achieving basic goods often requires making commitments to other persons. In many cases, pursuit of a good is best organized socially. One cannot become a doctor or a philosopher, for example, without cooperating with other persons. Moreover, some goods are social by nature: no one flourishes, for example, without the good of friendship, yet friendship involves committed relationships with other persons. Achieving basic goods requires a settled will to work with and for others.

Third, once one starts to make commitments—to a profession, a spouse, a church, and so on—one quickly encounters apparent conflicts between these commitments. Therefore, one must put one's commitments in order to be genuinely oriented to human flourishing. We need something like a rational life plan for our actions and lives.

Even so, the idea of a rational life plan fails to capture adequately what we are addressing. First, the language "rational life plan" seems to suggest that we have the power, through a firm will and expert planning, to author our lives as we see fit, but this surely is an error. In some sense, humans are the authors of their own lives through their choices, commitments, and actions. Yet people face in life much more than what we choose or will. Things happen to us, and a good life depends on responding well to such happenings and integrating what has happened *into* the order of our lives. Rarely can we do so without revising our assumptions about that order.

The notion of a rational life plan is less than satisfying for a second reason: it fails to capture the way in which many people believe themselves to have been called to the particular shape of their lives in a manner beyond their control. The concept of calling—a synonym of "vocation"—has roots in traditional Christianity, in which God calls human persons to various and distinct lives of good works, marking out their good deeds in advance for them. In this understanding, one may be called to be a doctor, rather than simply deciding to be one, and in accepting the call, one is constituting oneself in the deepest way not simply as a doctor but also as a person responsive to and responsible before God.

Interestingly, although the concept of calling has roots in Christianity, today most US physicians, regardless of their religious affiliations, use the term to describe their practice of medicine. Indeed, even among physicians who say they have no religion, and among those who say they never attend religious services, more than half agree with the statement "For me, the practice of medicine is a calling."[14]

This result should not surprise us in light of the kind of good that health is. Like knowledge or friendship, health transcends any one person's desires or capacities. Health is good for all human beings, regardless of whether they want it. Moreover, health is a good of such breadth and depth that one can pursue it in countless

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

different ways and explore its meaning and potential for all time. What's more, while it is incommensurable with all other goods, health nevertheless serves as a necessary condition for the pursuit of all other goods. And so, faced with such a good, even nonreligious persons may find that this good calls out to them, inviting them to a lifetime of service. In this sense, physicians might rightly describe their practice of medicine as part of their calling or vocation.

Vocations shape the lives of individuals in at least two important ways. First, vocational commitments generate new obligations. When spouses marry, they commit to one another and to a form of life that generates new obligations for each of them: toward one another as well as toward any children who might result from their marriage. When a student freely makes a vocational commitment to practice medicine rather than teaching philosophy, that commitment requires an array of further commitments and obligations (e.g., to complete premedical courses, take the MCAT, and apply to medical school). A vocational commitment serves in some ways as a promissory obligation, binding an agent voluntarily in a way that she would not otherwise have been bound.

But vocational commitments also free agents from other obligations. A person's vocational commitments to his own children create obligations to care for them that result in having lesser obligations to care for other people's children. A physician's obligations to her profession and to the persons to whom she has obligations within that profession (especially her patients) similarly require her to dedicate her time and effort to meet the needs of those persons, not just any person or every person. Here again, vocational commitments are like promises that, by creating specific obligations, free persons up from more general and unspecified demands that might have been placed on them.

How does one discern one's vocation? Obviously, many people are drawn to the prospect of being a doctor. Equally obvious, however, is that among these many are not "called" per se. How should a person think about whether she is called to this profession or not?

In one way, the answer to this question depends on everything we say through the rest of this book. If we correctly assess what being a doctor means, what the practice of medicine is for, and what moral norms healthcare professionals should abide by, a person should not commit to the medical profession unless she can willingly and enthusiastically embrace and internalize the Way of Medicine. More specifically, she shouldn't become a doctor unless she is willing to embrace the norm of never intending to damage the health of any person. In our approach, one who thinks of her mission as primarily to minimize suffering, even by killing if necessary, does not understand the vocation of medicine and so cannot be called to it in this case.

More generally, though, one can say that vocational commitments should be guided by ability, interest, opportunity, and need. Ability is obvious. No one can become a good surgeon without developing some requisite skills, and some lack the capacity, realistically, to develop those skills. Moreover, "skills" are not enough; they must be joined to dispositions that some people will struggle to develop. A physician in training who dislikes people is in the wrong line of work. The same is true of a pediatrician who finds children tedious, an aspiring surgeon who recoils at the sight of blood, or any medical student or physician motivated primarily by money. The medical profession rightly plays gatekeeper with regard to these skills and dispositions, rejecting many applications to medical school or residency training. But the profession's gatekeeping role cannot substitute entirely for the scrutiny that an individual should give to her own deliberations about whether she has the ability to fulfill the requirements of particular line of work. If she does not, she has reason to believe that she is not called to that line of work.

What about interest? Is it possible to devote one's life to a practice or profession in which one has little interest? Yes, clearly. Some have no option but to do work in which they have little interest. But other things being equal, one's interests and passions serve as helpful guides as to what one is called to do. Suppose an individual has gifts that make him capable of becoming either a fine surgeon or a fine musician, and he is passionate about music but indifferent to medicine. Then, it seems to us, despite some obvious economic trade-offs, that a life in music might be more appropriate for that individual. Passion, however, is not enough. In our culture we frequently hear outrageously talented athletes or other performers say, "You can do anything you put your mind to." No, you cannot. That caveat notwithstanding, human beings are not simply rational; we are also emotional, and the basic good of integrity is enriched in our lives when reason, choice, action, and emotion all harmonize with one another. So attending to one's emotions, passions, likes, and dislikes is an important part of discerning one's vocation.

Third comes opportunity. Recall that the order of our life is never entirely of our own making. Rather, our

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

lives are structured to a great extent by what happens to us, most of which we cannot control. Similarly, the call to be a doctor depends on many circumstances beyond one's control. Many people around the world would make terrific physicians but never have the opportunity to even consider that possibility. Many others, despite ability and interest, will never be offered a spot in a medical school. Such persons, upon realizing that an opportunity to become a physician will not open up for them, must acknowledge that they are not called to the work. They must then think creatively and act energetically to discern a new course—one that may or may not intersect with the world of medicine.

Finally there is need. As is perhaps obvious with respect to medicine, our vocational commitments should respond to needs that we can meet. A life of pursuing human goods is not a self-serving life but a life of self-giving. Here again, we find helpful confirmation in the reflections of some religious traditions. Consider, for example, this claim of the Second Vatican Council: "It follows, then, that if human beings are the only creatures on earth that God has wanted for their own sake, they can fully discover their true selves only in sincere self-giving."[15] In discerning vocation, a person must give special attention to the question of what needs he can address through his ability, opportunity, and interest.

The domain of vocation illustrates a claim we made earlier in this chapter. Although our natural law approach to understanding the requirements of practical reason asserts moral absolutes, it does not assert a one-size-fits-all picture of the moral life. Vocations are personal, requiring that an individual discern both that to which she is called and also that which is therefore required of her (and no longer required of her) in terms of her vocation.[16] The need for such discernment highlights the importance of autonomy in the moral life, including the moral lives of patients and physicians.

CONCLUSION

In chapter 1 we began to articulate the Way of Medicine's understanding of the practice of medicine. In this chapter we have supplemented that inquiry with reflection on the broader requirements of practical reason, which arise from recognizing basic human goods that give us reasons to act for the sake of human flourishing. Recognizing the nature of those goods has led, in turn, to the articulation of three requirements of practical reason: (1) basic goods should never be intentionally damaged or destroyed, (2) we should be fair in our distribution of benefits and burdens as regards other persons, and (3) we should organize our lives around vocational commitments. How does all of this bear on the clinical encounter and the doctor-patient relationship? We now turn to that question.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER THREE

# The Doctor-Patient Relationship

Let's return to the patients we introduced you to in chapter 1, presenting a bit more information about their specific health concerns:

*Cindy Parker goes to student health seeking a prescription for contraceptives.*

*Abe Anderson asks his physician for antibiotics to treat a respiratory infection.*

*Nora Garcia wonders if she should have a do-not-resuscitate order.*

How should a clinician respond in each of these clinical encounters? What norms guide good medical practice? What kind of relationship should physicians cultivate with their patients, and for what virtues should they strive? The above cases reflect routine encounters between patients and their clinicians, and here in the everyday practice of medicine, we begin to see how the Way of Medicine makes a difference for clinicians in understanding their professional ethical obligations.

Clinicians' approach to their obligations to patients has shifted over the past half-century, contemporaneous with the rise and subsequent evolution of the provider of services model (PSM). Modern bioethics emerged in part because of physicians' abusing their power, both by conducting unethical research on patients and by paying insufficient regard to patients' proper authority to decide how medicine would be deployed on their behalf. In the 1960s and early 1970s, the patients' rights movement contended that traditional medicine gave physicians too much authority, making patients unjustifiably vulnerable to their physicians' whims.

From many quarters came critiques of what came to be called *paternalism* (*pater* is Latin for father), a model of the doctor-patient relationship in which the physician, like a parent, has the authority to tell the patient what to do. The physician orders; the patient obeys. In *strong paternalism*, the good physician would tell Cindy Parker whether to use birth control and which birth control technology to use. He (prior to 1970, almost all physicians were men) would also tell Abe Anderson what to do about his upper respiratory infection and decide whether Nora Garcia would be resuscitated. The physician would make all of these decisions and give the relevant orders based on his superior knowledge of medical science and health. Cindy, Abe, and Nora, as good patients, would obey the physician's orders.

This image of the doctor-patient relationship in bygone days is something of a caricature, of course. Physicians would not stay in business long without cultivating patients' trust and accommodating their concerns. But this image of strong paternalism helpfully marks one end of an ideological spectrum regarding the doctor-patient relationship and the distribution of authority and responsibility within it. It provides a view of what the modern medical ethics movement reacted against: unchecked power, unexamined professional authority, male privilege, and unjustified control over patients.

We do not defend strong paternalism. But we note that shortly after the patients' rights movement successfully established patient autonomy as the driving principle of medical practice, prominent

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

practitioners and critics began to worry that in its retreat from paternalism, the pendulum had swung too far,[1] toward a normative vision of the doctor-patient relationship in which the good patient *chooses* and the good physician *provides*. We see here the essence of the PSM.

The shift from strong physician paternalism to strong patient autonomy depended on and contributed to the growing moral confusion regarding the ends of medicine that Kass described in 1974.[2] That confusion also was described in a seminal 1981 paper written by physician and ethicist Mark Siegler: "Searching for Moral Certainty in Medicine: A Proposal for a New Model of the Doctor-Patient Encounter."[3] As the title suggests, Dr. Siegler was searching for a solid ethical foundation for clinical decisions that doctors and patients would make, and he was doing so at a time in which all such foundations appeared suspect. "What duties, obligations, and responsibilities," he asks, "does the physician incur, voluntarily and autonomously, when he chooses to become a physician?"[4]

Siegler's paper was cited extensively in a 1982 report by the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research. The Commission wrote:

> The role of the health care professional . . . appears to be in a "phase of incomplete redefinition," . . . "judgments of conscientious persons have become divergent and perplexed" and societal consensus does not exist. No longer are the proper ends and limits of health care commonly understood and broadly accepted; a new concept of health care, characterized by changing expectations and uncertain understanding between patient and practitioner, is evolving. The need to find an appropriate balance of the rights and responsibilities of patients and health care professionals in this time of change has been called "the critical challenge facing medicine in the coming decades.[5]

Almost four decades later, judgments of conscientious persons remain divergent regarding a number of clinical practices, and societal consensus regarding the ends of medicine remains elusive. As we noted with respect to balancing principles, clinicians and ethicists have no way to balance different moral claims without a shared standard regarding the purpose of medicine. What one party (e.g., the patient) judges to be morally and medically necessary, another party (e.g., the physician) may judge to be illicit and unprofessional; benefits and harms depend on perspective. Without a shared standard, then, beneficence defaults to providing what the patient values, and nonmaleficence defaults to refraining from actions the patient does not value. Justice defaults to requiring the clinician to accommodate the patient's right to choose. As a result, bioethics reduces to a proceduralist approach in which being ethical means determining who has the authority to make a choice and facilitating that choice insofar as possible.

Moreover, the notion of balancing rights and responsibilities suggests that clinicians and patients relate to one another as rivals expecting conflict. The language of balance reflects a focus on defending the rights of one party against those of another rather than on cultivating trust and cooperation around a shared pursuit. In the absence of some objective standard to guide medicine, our culture understandably situates authority with the more vulnerable individual: the patient whose rights are threatened by the physician's power. The responsibility of the physician, then, is not to pursue the patient's health according to the physician's best judgment. Rather, the physician's responsibility is to respect the patient's right to make informed choices regarding which healthcare services the patient will receive, as long as the patient does not request something that breaks the law. By default and prescription, autonomy becomes the overarching principle.

As we noted in the introduction to this book, few physicians consistently follow the PSM. Few physicians would agree, for example, to prescribe antibiotics just because a patient really wants them or to prescribe Adderall for a patient who simply wants to study more effectively. In medical practice, autonomy does not do the work that PSM theory suggests it should. Many physicians implicitly adhere, at least partially, to the Way of Medicine.

We return to our clinical cases to see the difference it makes to understand medicine as the PSM does versus understanding medicine as the Way of Medicine does—as a practice oriented toward the patient's health as one basic human good.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CINDY'S CHOICE

*Cindy Parker is a twenty-year-old undergraduate student. She presents to the student health clinic to see a family medicine physician. The physician asks, "What brings you to see me today?" Cindy responds, "I just need a prescription for birth control."*

How should the physician in this case respond? Under the PSM, the answer is obvious: prescribe what the patient requests. Why? Because the intervention is lawful and the patient has autonomously requested it. Respect for Ms. Parker's autonomy requires the physician to prescribe the medication unless some unusual condition is present. Moreover, Ms. Parker, like millions of other women, values contraceptives. So prescribing contraceptives satisfies the principle of beneficence—it provides something good for her from her perspective. In addition, contraceptives are relatively safe; they increase the risks of some injuries to a woman's health, such as blood clots in patients who smoke, but such risks remain relatively small and can be mitigated with proper education and triage. Nonmaleficence, therefore, is satisfied. Finally, this is also a matter of justice. Women who take contraceptives are thereby empowered to complete their educational and vocational trajectories and to bear children at times that align with their personal and family needs. It would be arbitrary and unjust for Ms. Parker's physician to refuse to prescribe contraceptives, given that physicians prescribe all kinds of medications that are riskier and achieve goals that patients value much less.

In contrast, the Way of Medicine urges us to ask a different set of questions. The first question is: What do contraceptives have to do with health? In this case, how is prescribing contraceptives consistent with the physician's vocational commitment to preserve and restore the health of Cindy Parker? As we'll see in chapter 6, the answers to these questions are not as straightforward as physicians' customary practices suggest. For the moment, though, suffice it to note that the Way of Medicine suggests it would not be arbitrary for Ms. Parker's physician to decline to prescribe contraceptives if, in the physician's reasoned judgment, the contraceptives either contradict or are beside the point with respect to the patient's health.

ABE'S REQUEST

*Abe Anderson is a fifty-year-old carpenter. He has smoked two packs of cigarettes each day for thirty years. Mr. Anderson has a particularly bothersome respiratory infection, with fever, fatigue, and a hacking cough that is productive of thick yellow sputum. His wife has persuaded him to see a physician. Mr. Anderson asks for antibiotics.*

This seemingly anodyne case of routine primary care medicine exposes inconsistencies in how physicians understand their obligations, and it opens up critical distinctions between the Way of Medicine and the PSM. Should Abe's physician prescribe the requested antibiotics? If so, why? If not, how can she justify the refusal?

To experienced clinicians it may seem obvious that the physician should judge whether she thinks the respiratory infection is viral rather than bacterial and, if it is viral, she should refuse to prescribe antibiotics. This refusal would be justified because physicians are not obligated to prescribe treatments that do not work (e.g., antibiotics for viral infections), because the principle of justice requires considering the downstream effects of antibiotics on future patients (namely, greater bacterial resistance to antibiotics in the community), and because the principle of nonmaleficence would encourage the physician to avoid the adverse side effects of the antibiotics for Abe, including potential allergic reactions and loose stools. In this case, it might be argued, the physician has strong medical reasons for refusing what the patient requests.

But reality is more complicated. The risk of significant harm to Mr. Anderson from a course of antibiotics is quite low, likely lower than the risk of harm to Ms. Parker posed by long-term use of hormonal contraceptives. Moreover, there is some nonzero probability that Mr. Anderson's physician will mistake the

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

diagnosis, failing to see that Mr. Anderson does in fact have a bacterial infection and would recover more quickly with antibiotic treatment. Doesn't Mr. Anderson have a right to accept the risks of the antibiotics and make an informed choice about whether to take them? Doesn't respect for his autonomy require accommodating his choice?

Apart from the ambiguities posed by probability and uncertainty, we have already noted that the PSM eschews any shared standard against which to judge requirements for beneficence and nonmaleficence. Mr. Anderson might say, "Doc, I value having the antibiotic, even if you do not think it is likely to benefit me. I think it will be good for me, and after all, it is my body and my health we are talking about, right?" He might note that the remote possibility of harm caused by the antibiotics is outweighed by the certain harm of him worrying for days that he might develop bacterial pneumonia, not to mention the cost (another harm) of having to come back to see the physician again if he does.

It turns out that in the PSM, even the claim of having medical reasons to refuse Mr. Anderson's request starts to break down in light of the fact that the profession allows physicians to prescribe antibiotics in such cases, and many physicians do. In the absence of a reasonable standard—say, *health* objectively defined—the physician's medical reasons appear to be arbitrary impositions of power over the patient, unjustly curtailing the patient's right to make informed autonomous choices regarding his medical care.

As both Abe's and Cindy's cases display, invoking midlevel principles does not lead to moral clarity without an account of what medicine is for that might help to specify those principles. Principles can be balanced ad nauseam, but the balancing itself appears arbitrary and determined by power relations unless we presume that medicine is oriented toward a real good that can be known and to which the clinician is reasonably committed.

For the Way of Medicine, Mr. Anderson's case remains complex, but the complexities shift. The physician begins with a commitment to the good of Mr. Anderson's health. Her actions are reasonable insofar as they are conducive to Mr. Anderson's health, and they are unreasonable insofar as they contradict his health. This does not mean that Abe's request has only one ethical response. Medicine is beset by uncertainties and probabilities, after all, and one physician might judge that antibiotics are worth prescribing despite the low probability of benefiting Mr. Anderson's health, because the corollary risk of harm is so low. Another might judge that antibiotics should be avoided despite the low risk of harm because the likelihood of benefiting Mr. Anderson is also low.

According to the Way of Medicine, the physician has the authority to decide which interventions to offer, based on her threshold judgment regarding whether the interventions in question will preserve or restore the patient's health (and there is proportionate reason to accept their side effects; more on that in chapter 5). A good physician will not insist that a patient follow the one route the physician believes is best. The physician may advocate one strategy, but she will allow the patient to choose a different course as long as she determines that the patient-suggested course sufficiently addresses a health-related need and does not violate other moral requirements. Making such determinations is ultimately the work of *clinical judgment*. Physicians attain clinical judgment, which in turn should be guided by the virtue of prudence, only through a combination of experience, reflection, and commitment to the true end of medicine.

### Nora's Limits

*Nora Garcia is an eighty-year-old widow who in recent years has grown frail. Mrs. Garcia comes for her usual quarterly appointment with her geriatrician. She notes, "I feel like I don't have long to live. I am getting tired. I don't want to be put on all of those machines my husband was put on. Should I have a do-not-resuscitate order?"*

What is the doctor's role with respect to Nora? Should he encourage her to make the decision that he believes is best or simply give her the facts? What would characterize good counsel about limiting the use of medical interventions that might otherwise extend Mrs. Garcia's life?

Once again, under the PSM, Mrs. Garcia's physician should seek to help her make the decision that fits what Mrs. Garcia values. The physician should ask her what she cares about and offer her strategies that align

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

with her values, including, perhaps, a do-not-resuscitate order.

The PSM does not encourage the physician to ask what would be a good decision for Mrs. Garcia to make. As long as Mrs. Garcia's choice is permitted by current law and policy, her choosing alone makes the choice ethical. The physician's role is to give accurate information to help her make an informed choice.

By contrast, in the Way of Medicine the physician encounters Mrs. Garcia with a preestablished orientation toward her health. That does not mean that the physician is determined to do everything possible to preserve any measure of health. Indeed, the wise physician acknowledges that health is a good that can be possessed only in part, and only for a time. The wise physician also recognizes that health is not the only good the patient should consider. The physician, then, respects Mrs. Garcia's authority to make judgments about the extent to which efforts to preserve her health fit her vocation, all things considered.

Unlike under the PSM, however, a physician practicing according to the Way of Medicine does not seek a decision that aligns with Mrs. Garcia's *wishes*. Rather, he seeks a decision that makes wise use of medicine (including by putting some limits on medical interventions) to preserve and restore Mrs. Garcia's health, given her vocation and what she will consent to. The physician takes into account the fact that Mrs. Garcia's health is limited, her mortality bears down on her, and other goods might be more important to her than her health. He counsels her to make the decision that, all things considered, he believes is best, and he respects her authority to decline his recommendations. He might readily encourage the patient to have a do-not-resuscitate order. He might encourage her not to. But through it all, he remains committed to serving the health needs of his patient, Mrs. Garcia.

## SOLIDARITY AND TRUST

A particular virtue is essential for manifesting and maintaining the commitment to serving patients' health needs: the virtue of solidarity. The relationship between the physician and Mrs. Garcia must be characterized by trust and trustworthiness. In the remainder of this chapter, we address the roles of solidarity and trust in the Way of Medicine.

Solidarity and trust are features of any flourishing community, and also of the community formed between doctor and patient. Recall that physicians' constitutive vocational commitment—the commitment that distinguishes them from philosophers, priests, and dancers—is to health. But physicians do not commit to health in the abstract or even to the health of populations; rather, they commit to the health of *their patients*—that is, health as instantiated in the *particular* persons to whom they attend.

Put another way, a doctor is vocationally committed to a specific kind of community with a particular kind of common good. A *common good* is a good mutually willed by participants in a cooperative, mutually giving relationship. The common good of friends is their friendship, plus whatever other goods they pursue together as friends. The friendship example highlights something that applies universally: one cannot will the common good of a community without also willing the good of the community members. Some group members may be in it for themselves, and if so, they frustrate the possibility of the group's forming a genuine community. Humans can reach their fulfillment only in community, and genuine community, including that formed between a doctor and her patient, requires its members to will and act for each other's good.

### Solidarity

*Solidarity* is the name for this stance without which there can be no common good, no genuine community, and ultimately no human fulfillment. Solidarity is a firm and enduring commitment to the good of other persons and thus to the common goods of one's communities. Solidarity is not simply a concern for the collective, humanity in the abstract, or goods in the abstract. It requires concrete relationships in particular communities, including the relationships that form communities between physicians and patients. The Way of Medicine requires physicians to show solidarity with their individual patients—to be firmly and concretely committed to their patients' good.

But how can a *patient* have solidarity with his doctor, since the purpose of the doctor-patient relationship is to pursue the patient's good? Do doctors and patients not have a rather one-sided community? The answer

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

is simple but important: patients should will the doctor's good in the way that patients can, which is to will their doctor to be a good doctor in all the relevant and necessary ways. The patient wills this not simply so that she will be cured (she might not be, even with the best doctoring) but also because being a good doctor is good for the doctor; through practicing good medicine the doctor flourishes and finds fulfillment as a person. Thus, when a patient treats the doctor as a functionary or lies to or seeks to manipulate the doctor, the patient fails to show solidarity. Such failures of solidarity rupture the community of the doctor-patient relationship as much as do failures of solidarity on the part of the physician.

Physicians can and do fail in solidarity toward their patients. Some doctors are in medicine for themselves, regularly putting a patient's good behind other concerns, such as financial gain, time at the golf course, or the demands of an insurance company. These failures are obvious, but physicians are also prone to two less obvious failures of solidarity.

(1) Physicians can be concerned with medicine and health without being concerned for their patients. Perhaps a physician sees health as a goal and treats his patients as opportunities to achieve health. This detached approach makes some methodological sense. In the surgical operating room, efficiency and effectiveness are often served by treating the patient as an object subject to scientific investigation and technical control. The problem emerges when such treatment is not governed by an overarching commitment to this patient's good. Such patients often report that they were treated "like an object." Insofar as a surgeon sees a patient as a technical problem, for example, he fails to see that patient as a person. Medical subspecialization exacerbates this tendency, habituating physicians to focus only on the diseased or defective parts of a patient rather than on the patient as a whole. Patients also often report that they were treated "like a number," reflecting a tendency for physicians to service as many bodies as possible in the allotted time, often in order to maximize efficiency and profit. Physicians with each of these tendencies, while overtly pursuing health, fail to show the solidarity physicians owe to their patients.[6]

Perhaps a physician is concerned with his professional integrity, but that concern is detached from an orientation toward the good of the patient's health. The doctor may be drawn to an ascetic, unsullied lifestyle as a physician who practices with professional integrity and purity, but his desire to remain above the fray also leads him to detach from human concern for his patients. This condition may seem unusual, but describing it makes the point that a physician's concern for his integrity can become self-centered if that concern is divorced from the patient's health as the end of medicine and if it is not accompanied by the virtue of solidarity. Further, it isn't adequate for a physician to participate only in the community of physicians; in such cases a doctor's allegiance to the guild becomes primary. Allegiance to one's guild can be important, but such allegiance contradicts itself when it displaces the solidarity with patients to which the guild professes and on which the guild's practice depends.

(2) The second failing of physicians is that which most characterizes the PSM: being concerned for the patient's good while denying the possibility of knowing what that good is and what concern for it requires. Such concern reduces to providing patients with what they desire and autonomously choose. In such an approach, there can be no solidarity, for no actual common good exists between the physician and the patient. In practice, many—perhaps even most—physicians and patients break through the constraints of the PSM to form genuine communities with one another, but in doing so they run against and expose the inadequacies of the PSM's logic. Ideas have consequences: if there is no genuine good, there is no good in common; if patients and physicians have no good in common, no genuine solidarity and community are created between them. The logic of the PSM undermines the doctor-patient relationship.

This portrait of the doctor-patient relationship as a community, however, raises a different worry: that the portrait fails to respect boundaries appropriate to the kind of relationship that physicians and patients share. Yes, physicians are concerned for and have solidarity with their patients as whole persons, not as objects or as collections of parts, but surely the whole person includes much that is not the doctor's concern and perhaps none of the doctor's business. Indeed, on the Way of Medicine, the physician's concern is the patient's health, not the entire array of goods that have a place in the patient's life.

We think a middle path exists between the detached posture that treats the patient as an object with whom the physician has no solidarity and the enmeshed mode that, in service to being *holistic*, makes it the physician's business to care about everything that matters to the patient. Patients are living bodily beings, and so the physician who attends to a patient's health—a characteristic of the body as a whole—thereby attends to the patient as a person, even if the physician focuses only on this one dimension of the patient's personal

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

existence. The same is true in other social contexts. Teachers' concern for their students, for example, does not typically extend to the students' home lives, but good teachers nonetheless are concerned for the good of their students as persons. (Think of how odd it would be for a teacher to simply want there to be more knowledge in the world, and to think of students as the objects in which this knowledge was to be realized.) The challenge for physicians and for teachers is to be concerned in the right way.

The right way displays the hallmarks of solidarity. Think, for example, about the importance of listening and communicating in relations between persons. Think also of the virtues that go with listening and communicating well: honesty, tact, patience, and silence, as well as politeness, respect, and humility. These virtues all manifest solidarity: goodwill toward another as a person for whom one has a special care and concern. Such solidarity also requires acknowledging and respecting the patient's authority. The doctor is concerned for the whole person but not by seeking to influence all aspects of the person's life. Rather, respecting the patient's authority, the physician enables the patient to make decisions in the domain of health that fit the patient's vocation as a whole person.

Because the physician ultimately cares for the patient, occasionally that care cannot be confined merely to the good of health (a parallel statement can be made regarding teachers and the good of knowledge). Sometimes physicians can reasonably meet a patient's request for prayer, marital advice, or urgent assistance in some other domain. Physicians need prudence in discerning when such actions complement the physician's vocational purpose—seeking the patient's health—and when they might interfere with or problematically distract from that purpose. The PSM, interestingly, has no way of distinguishing between and ordering the two kinds of actions because it does not distinguish actions oriented toward health from actions oriented toward other aspects of patient well-being.[7]

Trust

Classically the professions respond to particular vulnerabilities that individuals face; such vulnerabilities call for trust on the part of the vulnerable and trustworthiness on the part of those caring for them. Solidarity is so important for the practice of medicine because in order for physicians to help patients, patients and physicians must be able to trust each other.

Patients often seemingly have no choice but to rely on their physicians. Patients do not control when and how they come under their physicians' care, and often they lack the knowledge or wherewithal to evaluate whether the physician is doing a good job. But trust and reliance are different. We rely on something when we simply count on it, and sometimes we count on something when we have no other choice in the matter. Moreover, reliance does not require a personal relationship: you probably rely on your car, but you don't trust it. You don't feel betrayed when it conks out, although you might feel other unpleasant emotions.

Trust, by contrast, entails having faith in some*one*, having confidence that the person will act toward you in ways governed by genuine concern. Children trust their parents once they become old enough to understand the nature of their parents' relationship to them. When older children merely rely on their parents—as providers of food, clothes, and shelter—that evidences a breakdown in the child-parent relationship. Patients certainly rely on doctors—on their technical skills, their showing up during clinic hours, and their billing tools. Yet doctors can prove reliable in all of these and other respects without ever caring about their patients as persons. Such doctors cannot be called trustworthy, as they have no genuine community with their patients. Absence of trust undermines the doctor-patient relationship. The practice of medicine requires a relationship of solidarity, at least according to the Way of Medicine.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER FOUR

# Autonomy and Authority

In our effort to identify a more adequate framework for medicine, we return to the crucial concept of autonomy. The provider of services model (PSM), in its opposition to the overly paternalistic bioethics of the first half of the twentieth century, has made autonomy its cornerstone concept, overemphasizing it, we believe, to a detrimental degree. That being said, the Way of Medicine also values autonomy, properly understood. In the present chapter, we aim to clarify what good autonomy is and how it relates to the practice of medicine. We also introduce another concept, *authority*, that is essential to understanding the Way of Medicine.

### AUTONOMY

Medical practice is shaped by the philosophies of the age. If nothing else, the philosophies of our age emphasize the importance of individuals' directing their own authentic self-expression and self-development. This cultural emphasis has profoundly shaped public expectations of medicine, making autonomy the central feature of contemporary medical ethics. Unfortunately, medical practitioners have come to misunderstand autonomy along the way, and medical ethicists have come to overstate its importance greatly, leading to distortions in contemporary medicine and medical ethics.

Contemporary medical ethics came to focus on autonomy in response to what were obviously violations of autonomy, particularly cases in which medical researchers and practitioners withheld or subjected patients to interventions without the patients' consent. The Tuskegee syphilis experiments are among the most infamous of such cases. Apart from infamous cases, however, physicians often failed to adequately inform patients about their conditions and the courses of action available to them. Physicians also failed at times to obtain consent from patients before enacting the treatment that the physician deemed best. This pattern came to be described as *medical paternalism*, by which physicians assume they know what is best for patients and presume that they have the obligation or right to act for that presumed best. As the Tuskegee experiments show, assuming physicians' benevolence leaves patients unprotected when medical researchers are more interested in societal benefits than in benefits to individual patients. Even when physicians genuinely care about their patients, something important is missing if the patient does not have the opportunity to understand and at least implicitly consent to the physician-proposed treatment.

A move toward autonomy-based medical ethics sought to correct the errors of medical paternalism, but it also dovetailed with intellectual currents that date back to the origins of contemporary liberalism. These intellectual currents hold that our social and political life should recognize and foster people's freedom, equality, and independence. How, people reasonably asked, are freedom and independence upheld when researchers or physicians act on patients without their knowledge or consent? Where is the equality between patient and doctor when the doctor can decide on a course of action unilaterally? Drawing on classical liberal sources such as Immanuel Kant and John Stuart Mill, twentieth-century ethicists argued that the virtues of liberal society could be realized in medicine only through the practice of obtaining informed consent whenever a physician or researcher proposed to do something with, to, or on a patient.[1]

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

## Misunderstandings about Autonomy

Twentieth-century ethicists understandably emphasized informed consent, but on the heels of this emphasis two misunderstandings regarding autonomy have come to distort medical practice.

*Misunderstanding 1: An autonomous choice is a right choice.* In one view, autonomy is singularly important because what makes a choice right is the autonomy itself. We call this the *radical autonomy* view. By "radical" we do not mean that its advocates operate outside the political mainstream; rather, we mean that in this view the exercise of autonomy itself fundamentally (radical means "at root") affects the nature of the choice, making the choice right.

The radical autonomy view has its origins in the work of Immanuel Kant, for whom autonomy was present only in a choice made in accordance with the categorical imperative: *act only according to that maxim whereby you can at the same time will that it should become a universal law.*[2] A will acting in accordance with such a maxim, argued Kant, was not determined by any incentive such as might be provided by a mere desire; that will was, accordingly, free and autonomous.[3]

More recently, the idea that an autonomous choice is an ethical choice has become detached from the categorical imperative and transformed into something that Kant would not recognize but that some thinkers have dubbed "expressive individualism."[4] According to expressive individualism, the rightness of a choice is a function of its *authenticity*,[5] a conceptual cousin of autonomy. One is authentic if one is one's own person—that is, self-governing and autonomous. A famous expression of this view is found in Supreme Court Justice Anthony Kennedy's decision in *Planned Parenthood v. Casey*, a case involving abortion rights. Kennedy wrote, "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."[6]

In Kantian ethical theory, respect for another person's autonomy can lead directly to an obligation to obtain that person's consent before engaging in any medical intervention. But as cultural assumptions about autonomy have drifted further from Kant, the view that respect for autonomy requires obtaining informed consent has been supplanted by the view that we owe positive respect to any way in which others "define [their] own concept of existence, of meaning, of the universe, and of the mystery of human life." Stephen Darwall has called this sort of respect "appraisal respect."[7] In the domain of medicine, the radical autonomy view expects medical practitioners not merely to tolerate autonomous choices with which they may disagree; increasingly, this view expects physicians to honor and facilitate such choices.

This expectation of radical autonomy, and the underlying influence of expressive individualism, pop up around many of medicine's most vexing issues. For example, in the realm of death and dying, much of our culture, including important parts of our medical culture, has moved from requiring physicians to respect a dying patient's refusal of further life-sustaining interventions to the view that the dying patient has a positive right to a physician's assistance in dying. Brittany Maynard put it plainly in her online manifesto: "I want to die on my own terms. . . . My question is: Who has the right to tell me that I don't deserve this choice?"[8] Following Ms. Maynard's view, undergirded implicitly by expressive individualism, doctors who care for patients like her must provide death, or the means to death, if that is what the patient autonomously chooses.

For a second example, consider the emphasis on choice that pervades discussions of abortion, contraception, and reproductive questions more generally. As with dying, those who invoke the importance of autonomy increasingly claim not merely that practitioners must abstain from interfering with patients' choices in reproductive matters but also that practitioners must positively respect those choices and help patients carry them out. In this way, medical practitioners' objections to providing abortion or contraception are overruled in favor of what a person has autonomously chosen.

To take up a final issue receiving attention currently, consider the growing movement for transgender rights and equality. We hold that all human persons are equal and equally deserving of basic human rights, whether they are trans- or cisgendered. But many in the transgender movement also hold that an individual's autonomous desire to change gender should be normative for the medical profession. In some states practitioners are legally prohibited from counseling practices that seek to help adolescents sustain a gender identity that matches their biological sex.[9] Medical practitioners are increasingly expected to support and

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

assist those wishing to have their secondary sex characteristics changed through medical and surgical interventions. We discuss the medicalization of gender identity and expression at length in chapter 6.

In these areas and others, the radical autonomy view expects patient autonomy to set the template for what physicians and other medical professionals may, must, and must not do. This misconstrual of autonomy and what it requires, however, undermines the practice of medicine and proves inherently unstable. First, the radical autonomy view reduces the medical practitioner to a kind of functionary whose job is to provide desired services to the patient, regardless of the practitioner's considered judgment about the wisdom or morality of doing so. What matters is patient choice, the central concern of the provider of services model (PSM). This reduction contradicts the Way of Medicine's understanding of medicine as a profession in which practitioners are characterized both by a commitment to the good of health for the patient and by a practical wisdom or clinical expertise related to that good. Under the PSM, practitioners are distinguished not by their wisdom but by technical skills that allow them to accomplish what few others can, and perhaps also by participation in a social contract according to which they may exercise those skills on others if in service to these others' authentic wishes. Lost here is any sense of the physician's calling to serve persons by seeking an authentic and objective good for them.

The radical autonomy view similarly reduces the doctor-patient relationship. In the Way of Medicine, doctor and patient work together to understand, pursue, and achieve what is genuinely good for the patient. Their relationship forms a community of solidarity and trust. The doctor serves the patient, but not in a way disjoined from her own good; indeed, in pursuing the patient's good, the doctor achieves her own good as a doctor. In contrast, if the physician must be in thrall to the patient's desires and choices even when those choices contradict the physician's best judgment, the physician loses the basis for thinking that the practice of medicine coheres with a good life, and the patient loses the basis for trusting the physician to act only for the patient's good.

Moreover, the radical autonomy view proves inherently unstable, for in granting radical autonomy rights to patients, the view unjustifiably eliminates physicians' autonomy. Consider the physician who conscientiously objects to participating in assisted suicide, believing that the practice contradicts the physician's profession to heal and never to harm. In the face of a patient's autonomous demand, the radical autonomy view expects the physician to set her convictions aside or leave the medical profession altogether. [10] But how does this expectation respect the autonomy of the physician? What warrants such an incursion on the physician's capacity for self-government? The radical autonomy position has no good answer.

*Misunderstanding 2: Autonomy is the greatest human good.* Aside from the claim that an autonomous choice by its nature is a correct choice, a related but different view treats autonomy as the greatest of the human goods—the one that is singularly important for making our lives go well. We call this the *autonomy -first* view.

Those who emphasize autonomy recognize correctly that autonomy and human flourishing are connected, but the autonomy-first view misunderstands the connection. Unlike goods such as health, knowledge, friendship, or religion, which in themselves make a person better off, autonomy makes a person better off only insofar as it is directed toward instances of these and other basic goods.[11] Put differently, an autonomous choice is a good choice only when it is a choice for a good; this can be seen whenever someone makes a self-destructive choice.

Indeed, even a choice for a good can go wrong if the choice is not guided fully by reason. For example, a person who pursues her own health (a genuine good) but does so in a way that disregards foreseeable downstream effects on others (thereby failing to be fair to those others) not only makes a bad choice but also contradicts her own good insofar as her flourishing depends on acting with integrity.

The Importance of Autonomy

Still, autonomy is important to a good and upright life. In the most intuitive sense, autonomy involves a person's freedom to be *self-governing*. This intuitive understanding reflects the etymology of the word: *nomos* is Greek for "law," and *auto* means "self." So an autonomous person is in some way a law unto himself, or self-governing.

But why should people care about being self-governing—deciding for themselves how to live and act?

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Recall that a good life is lived in pursuit of basic goods, individually and socially. Moreover, a good life is shaped by concern for that life as a whole. We suggested understanding this concern in the sense of a rational life plan, and even more adequately in the sense of vocation: a life of pursuing basic goods for human persons to which one is called and in which one makes good use of one's talents, interests, sympathies, and opportunities.

Such a life clearly requires commitments to goods as well as persons, for at least two reasons. First, some goods—such as friendship, marriage, and religion—are fully realized only by persons who have made commitments, such as to a friend, a spouse, or God. Moreover, these commitments are real only if they are a person's *own* commitments, if she has really made them for herself. This insight, central to arguments for religious liberty, brings into view an initial reason for the importance of autonomy: some human goods cannot be realized at all unless individuals are free to make and follow through on their own commitments.

A flourishing life requires commitments for a second reason that bears even on those goods that can be realized without commitment. Consider, for example, the good of human life. Every baby participates in this good despite not yet making any commitments. But many babies could not enjoy this good were it not for commitments many other people make: doctors and nurses to care for them, researchers who discover new ways of maintaining and fostering human life under adverse circumstances, and family members on whose love and concern the babies depend from the outset of their existence. Commitments help human beings in community realize goods to a greater degree, in themselves and one another.

Such commitments are often social: researchers in any field collaborate and engage with predecessors and successors in pursuing the knowledge they seek. They inherit a body of knowledge and skill with which to work, and they pass new and improved knowledge and skill to future generations. The Way of Medicine itself has built up over centuries through this kind of collaboration.

These commitments, in turn, go better if they are the agents' *own* commitments. Imagine a world in which people are chosen to be doctors and have little say in the matter. In such a world, doctors' flourishing would be stunted by their failure to do what *they* are called to do, and patients would suffer insofar as their physicians fail to be intrinsically motivated for and invested in their work.

Moreover, not everyone is cut out to be a physician, just as not everyone is meant to be a philosopher. Judiciously discerning whether one should commit to one line of work or the other (or both or neither) seems to require taking honest account of one's abilities, dispositions, and opportunities. And who is best situated to take all of these into account if not the person himself, the one who must eventually make the commitment? Again, we need autonomy to deliberate practically about what commitments we should make.

What is true in making commitments is mirrored in their upshot: the obligations that commitments generate. Marital commitments bring marital obligations. The commitment to practice surgery brings obligations for the surgeon. An individual who is best situated to know to what she has committed is likewise best situated to know what obligations follow from that commitment. Individuals aren't free, of course, to make up the obligations that follow from their commitments. A married person cannot reasonably say, "Well, for me, the marriage commitment includes openness to other sexual partners." A surgeon cannot reasonably say, "Well, for me, a commitment to surgery means I get to recommend the surgery for which I get paid the most." Our argument does imply, however, that married persons and surgeons both need the space to make judgments about what their vocational commitments require. Does my marriage commitment mean quitting the job I enjoy so that my wife can pursue the job for which she seems particularly well suited? Does my commitment to surgery mean operating on a patient who is dying even though the odds of success are small? Giving people the space to engage in such discernment and to act on their judgments seems reasonable—more reasonable than deciding for another person what she must do.

For all of these reasons, autonomy, properly understood, contributes a great deal to human flourishing,[12] and physicians go astray if they treat it as unimportant.

AUTHORITY

By deploying the concept of *authority*, practitioners and ethicists can affirm what is true and important about autonomy while avoiding the false implications of the radical autonomy and autonomy-first views.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Medical decisions are made in a social space that includes multiple parties: the patient, the patient's family and friends, the medical professionals involved, and others, such as institutional decision-makers, insurance providers, and clergy. All decisions involving more than one party have a similar problem: given that the various persons involved have different reasons for acting, how do they reach a final decision?

John Finnis has pointed out that there are only two possible ways: unanimity or authority.[13] No further options are available, for unless there is unanimity, every way of making a decision involves some form of authority. Even a vote in which the majority wins substitutes the authority of the majority for the decision of all.

At least two different forms of authority at work in the medical context must be distinguished in order to respect their nature and limits. The doctor typically has the *authority of expertise*. She knows what health is and what interventions will preserve or restore health, as well as in what ways and with what costs and side effects. She also may have the authority of expertise with regard to what the healthiest outcome would be. Sometimes there is clearly such an outcome, and the doctor will speak authoritatively about that outcome to the patient.

But the authority of expertise has its limits. The physician must recognize that the best health outcome (the one most congruent with the patient's medical best interests) is not always the best outcome overall and that often no best health outcome exists anyway. This second, more limited claim implies the first, so let's consider it up front.

In his essay "Searching for Moral Certainty in Medicine," Mark Siegler writes of a professional dancer with asthma.[14] When she begins to seek treatment, the dancer first finds a doctor whose treatment plan allows her to dance but also allows her to suffer some breathing problems, and then a doctor who refuses to offer any treatment plan that does not maximally alleviate her impaired breathing, which requires that she not dance. What seems best to the first doctor—and, importantly, to the patient—is that the dancer be able to dance, even if the treatment that secures that outcome carries risks of impaired breathing. What seems best to the second doctor is that the dancer be able to breathe freely, even though the side effects of effective treatment will leave her no longer able to dance. Is one of these doctors obviously right about the best health outcome? On the contrary: we submit that *no* doctor can say for sure which outcome is the more healthy. Each outcome preserves certain aspects of the dancer's health while leaving other aspects untouched or even impaired.

Moving now to the stronger claim, no doctor can say how important these aspects of health should be relative to the other goods that the patient might seek given her vocation. Being able to dance and being able to breathe seem genuinely incommensurable. So do the risk of death brought on by incompletely controlled asthma and the certainty of not being able to dance brought on by effective asthma medications. The overall outcomes—the health-related outcomes plus the various other benefits and burdens incurred in pursuing those outcomes—are likewise incommensurable. No authority of expertise can discern the best course of action for this dancer in her particular context.

We need a second form of authority. Consider again the claim that even if we focus just on health considerations, sometimes there is no best medical course of action. All medical interventions offer not only benefits but also burdens—side effects that are not chosen but that inevitably accompany the benefits promised. Sometimes, different interventions present very different health benefits, and to pursue one set of benefits often means forgoing the other. In such cases, not achieving one set of benefits is a side effect of seeking to achieve another set. Because the options are incommensurable, the patient may not have the option of choosing a best health-related outcome.

As the dancer's story indicates, health outcomes are not the only ones implicated in medical decisions: medical decisions have consequences for other goods, basic and instrumental. One intervention might keep a patient alive longer but also keep him from fulfilling certain responsibilities. For example, a patient might be offered a special lung transplant that is available only if the patient relocates across the country, away from all family and friends. The patient must factor in such burdens in order to make a wise choice about pursuing the intervention. More generally, an intervention might involve procedures repugnant or immensely painful to the patient, or the intervention might be time-consuming and expensive. In such cases, even where a best possible health outcome seems apparent, the patient still faces a decision about whether, all things considered, pursuing the best health outcome makes sense given the burdens that will follow.

The question is, Who should decide and why? Our answer here plays an important role throughout the

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

rest of this book. The provider of services model (PSM) of medicine, with its singular emphasis on autonomy, sees the answer as straightforward: the patient should decide. The patient should decide either because the right decision is de facto the decision the patient makes (radical autonomy) or because freedom to decide is the most important aspect of human flourishing (autonomy-first). We agree that the patient should decide, but for different reasons. From the perspective of the Way of Medicine, the patient should decide because the patient possesses the *authority* to decide.

Let's step back. Someone or some group must have authority to make that decision. The decision-makers should take into account the various benefits and burdens that follow from different courses of action, but those benefits and burdens are often incommensurable. What standards, then, can be brought to bear to discern a reasonable medical decision?[15] One obvious standard is the patient's health. What can be done that offers a reasonable hope of benefiting the patient's health? The physician, as we suggested above, has the authority of expertise regarding this standard, and therefore the physician has authority with respect to what medical interventions the physician will offer. This genuine form of authority should not be abused or disrespected—not by the physician, who might try to extend this authority beyond its reasonable limits, and not by the patient, who might demand from the physician something the physician believes does not offer reasonable hope of benefiting the patient's health. The physician's authority, which derives from his vocational commitments, thus establishes an initial framework for the choices that the patient must make.

But once courses of action that the physician believes reasonably pursue the patient's health are in view, what standard can be brought to bear to discern the best overall option? This standard should be the patient's vocation.

Think again of Siegler's dancer. The dancer clearly has shaped and will continue to shape her life in terms of those basic goods to which she has made vocational commitments. She pursues her art, and the goods of aesthetic experience and work, with devotion and craft. Perhaps, as for many persons, these commitments are ordered and integrated by other commitments, such as marital or religious commitments. All of these vocational commitments provide a framework within which the dancer reasonably considers the various burdens and benefits her physician offers, and these burdens and benefits together determine what decisions are reasonable for the dancer in this situation.

Note how differently thinking about one's vocation works compared to a bare appeal to autonomy. In the Way of Medicine, the patient can make an apparently autonomous choice and still go wrong. She must be courageous, not allowing unreasonable fear to sway her; she must be prudent, not allowing unreflective desires to lead her away from a reasoned assessment; and she must be just, taking account of her responsibilities and the way that different choices will impact her ability to fulfill her obligations. If our dancer has a small child, for example, it might be both unjust and imprudent for her to pursue dance at the cost of a higher risk of dying. Alternatively, if the risk of death is very low even with suboptimal management of her asthma, she might be cowardly to give up her work and art for the sake of reducing a risk that is already so small.

The patient can go wrong in assessing what her vocational commitments require, but still she has the best epistemic access to what those commitments are and what they imply for this medical decision. The dancer's personal vocation provides the necessary standard for her to reasonably weigh the various incommensurable benefits and burdens of each option and decide which to pursue.[16] She might need advice from someone else to help her consider her options, but even such advice serves primarily to help her take the measure of her own vocation and its implications for her life.

The concept of authority has another feature that autonomy lacks. It helps medical practitioners discern how to respond when a patient chooses a course of action that the physician believes is foolish or even unethical. As everyone knows, authority is no guarantee of its own wise exercise, yet lack of wisdom does not vitiate legitimate authority. Sometimes physicians have good reasons to follow the courses of action that patients choose, even when the physicians are convinced that their patients should have made better choices.

In such cases a physician might reason with a patient and attempt to persuade him that he is exercising his authority in a less than fully reasonable way. Quill and Brody, in a critique of the PSM's tendency to set physicians at odds with their patients, argue that such efforts by physicians to counsel and persuade patients, rather than violating autonomy, actually support "enhanced autonomy."[17] Such efforts do so by giving patients more information to consider in making their decisions. Quill and Brody's critique shines light on deficiencies in autonomy as popularly understood, and we believe their critique would be expressed more

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

adequately in terms of patient authority. After all, if an autonomous choice is self-ratifying, a physician has no reason to argue with or even give more information to someone who has made an autonomous decision. By contrast, prudent exercise of authority often requires consultation with others. Parents have authority over their children, but to exercise that authority wisely they often need to take account of their children's judgments and preferences. Similarly, patients have authority to decide which medical proposals to follow, but to exercise that authority wisely they often need to take account of their physicians' recommendations as well as the input of family and friends and even other healthcare practitioners.

Unlike in the case of autonomy, the concept of authority carries with it limits to that authority. Everyone knows that when political authority is exceeded, the governed have reason to resist illegitimate directives. For example, we commend US Army physicians who have refused to participate in waterboarding and other forms of torture. Their refusals have been justified insofar as orders to participate in torture exceeded the legitimate authority of the ones ordering. Note that we would not commend the same physicians for refusing to obey an order to take care of those prisoners' health needs or even for refusing an order to march into danger with other soldiers, because such orders are within the scope of the legitimate authority of military commanders. Those in power always exceed the scope of their legitimate authority when they pressure the governed to do something that is always and everywhere wrong.

This point about the limits of authority proves important in the medical context. Recall that one complaint against the PSM, with its overemphasis on autonomy, is that it reduces doctors to functionaries who must provide whatever a patient requests. The motto of the PSM is not simply that patients decide (choose), but also that physicians provide (obey). In contrast, focusing on authority makes it clear that sometimes patients will decide, autonomously, that they want something they do not have the authority to demand. This situation arises whenever patients demand that physicians act in ways that contradict physicians' professional commitments.

According to the Way of Medicine, a doctor's professional commitments and expertise give her the authority to decide what she is willing to do within the framework set by her own vocation as a healer. The patient's authority is limited to requesting and then consenting to or rejecting the options made available by the doctor; it does not extend to positive entitlements justified by autonomous choices. Thus, if a patient requests assistance in dying from a physician who, because of moral—including professional—objections, does not offer that option, the patient is well within her authority to seek another physician; but she is well outside the scope of her authority to insist that her doctor provide assistance in dying in the face of the doctor's principled objections.

CONCLUSION

Autonomy matters for human flourishing and to the Way of Medicine. No doubt in the past many physicians claimed a greater scope of authority than was warranted. "The physician decides, the patient obeys" is not an appropriate ethos for the doctor-patient relationship. Respect for autonomy, however, does not mean embracing the radical autonomy and autonomy-first views that undergird the PSM. "The patient chooses, the physician provides" likewise fails as an ethos for the doctor-patient relationship. The Way of Medicine respects the space practitioners and patients need to exercise autonomy, but it recognizes that they have reasonable grounds to do so only within the scope of their proper authority.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER FIVE

# The Rule of Double Effect

In this chapter we address a final foundational issue before turning to explore the difference the Way of Medicine makes with respect to a number of ethically disputed clinical practices. Our purpose here is to articulate and defend the so-called rule of double effect. This rule plays an essential role in the Way of Medicine. Indeed, as we will show, abandoning the rule of double effect leads directly toward the provider of services model (PSM).

Our framework is robustly pluralistic about basic goods and about the diverse ways that good lives can pursue these many goods. We have argued, however, that some actions are never permissible for anyone. Moral absolutes typically flow from the general norm: basic goods are never to be directly (that is, *intentionally*) damaged or destroyed, whether out of hostility or for the sake of some further good. That norm makes sense, recall, because the basic goods are always good; therefore, hostility toward them is always unreasonable. Basic goods are also incommensurable; it can never be reasonable to destroy one good as a means to achieve a greater good.

The Way of Medicine internalizes this requirement of practical reason, particularly in its understanding of the physician's central vocational norm: never directly (that is, *intentionally*—as end or means) damage or destroy a patient's health and life. This norm starkly distinguishes the Way of Medicine from the PSM, and it has obvious implications where issues such as abortion and euthanasia are concerned, as we discuss in later chapters. But the norm also raises a question: why are moral absolutes, including those of the Way of Medicine, framed in terms of intention?

To explore this question, consider the options that patients typically face: one set of health benefits is linked to one set of health burdens, and another set of health benefits is linked to a different set of health burdens. The options exclude one another. For example, a patient who chooses chemotherapy may have prospects of longer life but will also face significant burdens, including nausea, fatigue, mouth sores, and anemia, all of which diminish the patient's health. Similarly, a patient who declines chemotherapy can expect to avoid these burdens but faces the prospect of dying sooner, a result obviously contrary to the good of life and health. Patients typically cannot avoid making choices that have negative consequences for their health. Insofar as that is true, medicine's chief norm cannot be that physicians must avoid anything that causes damage or destruction to the patient's health. In many situations, physicians cannot possibly comply with such a norm.

Note, however, that in the situation just described, the patient's relationship to the benefits sought or the burdens avoided differs from the patient's relationship to the benefits lost or burdens accepted. A patient who chooses chemotherapy selects a set of health-related benefits and accepts a set of health-related burdens as side effects. Such choices clearly differ from intentionally choosing to damage one's health or choosing to die.

Although a patient cannot always avoid choices that will result in damage to her health, she can, always and everywhere, avoid *choosing to* damage or destroy her health. She can avoid the latter choices even if in no other way than by simply doing nothing. For even if she suffers injury to her health by doing nothing, the injury is, again, a side effect of her (in)action. Thus, moral absolutes speak to what one must never do *intentionally*. This focus on intention is important to *just warfare*—where injury to civilians may be accepted under some circumstances, but never intended. It is also important to the risking of one's life in pursuit of

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

good ends—for example, in fighting forest fires or seeking to rescue someone drowning, and, of course, to the practice of medicine, which inescapably involves accepting the adverse side effects of treatments. Thus, the norm is formulated: never *intend* damage or destruction to a basic good.

## ASSESSING SIDE EFFECTS

The rule of double effect can be put quite simply: sometimes an effect that one should never intend can be accepted as a side effect as long as there are *proportionate* reasons for doing so. (More traditional formulations of the rule are more complex; we address them below when discussing intention.)

What is proportionate is one of the most important practical questions in medicine. The answer provides the standard by which to judge many of the most difficult questions physicians and patients face: whether to withdraw or remove treatment when death is not intended but will follow as a consequence, when the death of an unborn child can be accepted as a consequence of actions taken to preserve the mother's life, and many more. Here we provide two general answers to the question about proportionate reason, and we amplify those answers in context in subsequent chapters.

Before saying what a proportionate reason is, however, we should say what it is not. It is not a reason that follows from weighing different goods to find if the "greatest good" will be achieved as a result of the proposed action. If it were possible to take the goods and harms of a proposed clinical intervention and identify which proportion will bring about the greatest good, consequentialism would seem to be a reasonable response. We would want to maximize goods. But if, as we argue, such maximization is not possible, "proportionate reason" cannot refer simply to the balance of good over bad in an option.

Rather, proportionate reason must be understood by considering the goods and harms of an option against a reasonable standard. Two standards are of special importance: fairness and vocation.[1]

### Fairness

Recall that emotions and preferences, if not integrated by reason, can distort our choices and blind us to the fact that the basic goods are good for *all* human beings. Thus, a student might lie on his medical school application, knowing that by doing so he is improving his chances of being selected while hurting the chances of other, more highly qualified, applicants. He might think, "I do not know those other applicants, and anyway I need to look out for me." Such thinking, like his act of lying, is manifestly unfair, as the Golden Rule suggests. If six months later we told the student that he did not get into the school of his choice because another student lied on her application, this student would resent the other student's lie.

In this example the effect of one student's lie on another applicant is a side effect. The student does not lie in order to hurt the other's chances of admission. He lies in order to gain admission for himself. He probably recognizes that his action will disadvantage someone else, but that is not his purpose. What makes his action recognizably unfair is that he seeks benefits to which there are burdens attached, and he knowingly takes the benefits entirely for himself while unjustifiably allowing the burdens to fall entirely on someone else. This unfairness is a separate wrong from the wrong of lying.

Similarly, in the case of the Tuskegee experiments, in all likelihood the researchers did not intend the negative effects caused by not treating the subjects in their study. Indeed, they may have rationalized their actions by insisting that, unlike the researchers running some Nazi experiments, they did not directly make their subjects sick. Nevertheless, we can see, and the researchers should have seen, that in not treating their subjects, the researchers sought the benefits of their scientific research and medical knowledge for themselves and others while allowing the attached burdens of the research—sickness and death—to fall entirely on those subjects. The Tuskegee study was therefore manifestly unfair.

Principlists would say that the Tuskegee experiments were failures of justice. Indeed they were, precisely because they were unfair. In general, when principlists and others have drawn attention to abuses of

vulnerable populations as subjects of human research, they have pointed out that it is manifestly unfair (and therefore unjust) to take advantage of such populations in order to pursue benefits that those subjects likely will never see while imposing burdens that the eventual beneficiaries will never experience.

Fairness thus provides one standard for judging whether there is a proportionate reason to accept negative side effects. The benefits of an action might be quite significant and the burdens relatively minor, but the action may still fail the test of proportionality precisely because the benefits are distributed to one person or group and the burdens to another. Such an action is unfair unless the person or group receiving all or most of the burdens consents to do so, perhaps out of charity for others whom they wish to benefit, as we see in the case of living organ donors.

As the Tuskegee case illustrates, the standard of fairness in accepting side effects is especially important for the ethical conduct of human subjects research. (Although this book does not focus on it, the norms of the Way of Medicine clearly bear on human subjects research.) Fairness is important for the ethical practice of clinical medicine as well. Physicians can unfairly benefit some patients at the expense of others, can unfairly seek resources for their patients at the expense of their colleagues' patients, or can unfairly privilege their own good over their patients' good. Physicians who begrudge the time they give to a patient because of prejudice, distaste, or dislike for the patient are being unfair, even if they intend no harm.

Fairness does not prohibit physicians from privileging their patients in certain ways. Physicians' commitments to their patients release them from some obligations toward others. In attending to their particular patients, physicians do not attend to those who are not their patients. Indeed, medical practitioners could genuinely care for patients only by privileging their patients in this way. Therefore, this kind of privileging seems to meet the standard of fairness even if, at a given moment, someone is being disadvantaged by it—for example, when a physician sees regularly scheduled patients before patients who arrive without appointments. This kind of privileging seems consistent with the Golden Rule.

## Vocation

As we have seen, individuals have good reasons to bring order into their lives by making commitments that orient them toward some goods rather than others. Because human goods are typically sought and obtained in cooperation with other persons, an individual must make commitments to particular persons. Because the goods cannot be sought all at once or all in the same measure, the individual must give priority to some commitments over others.[2]

The individual's vocation names the overall shape of his life—the order brought about by his most important commitments. As we have seen, vocations also generate obligations that require further action. So, for example, a person whose vocation includes a marriage commitment will typically eventually have children, and when that happens his vocational obligations expand to encompass care and concern not just for his spouse but for his children also.

We have made use of this account of vocation to argue for patient authority in healthcare decision-making. Patients have the authority to accept or refuse proposed interventions because they are in the best position to judge whether the benefits and burdens being offered to them are proportionate for them in light of their particular vocational commitments. The patient's vocation provides the standard against which proportionality is judged.

We can see how vocation bears as much on our assessment of side effects as it does on our assessment of what is chosen. Patients make healthcare decisions with benefits and burdens in view, and typically the consequences of their decisions ramify beyond the scope of health. On the one hand, a patient may choose an intervention in hopes of staying alive to spend more time with his family, but as a consequence of the intervention he may experience discomfort, insomnia, and irritability that make it hard for him to be present to his family, do his work, or pray. On the other hand, the patient may choose to decline treatment to avoid the associated burdens, knowing that, as a consequence, he is likely to cut short the time he has to be with his family or engage in other worthy activities. Either decision results in a range of negative side effects, and the patient must judge whether the negative effects to be accepted are proportionate to the goods to be pursued. Vocation provides the standard for that judgment.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

DETERMINING WHAT IS INTENDED AND WHAT IS A SIDE EFFECT

Now we return to an overarching question: on what grounds do we discriminate between what is intended and what is merely a side effect?

All action aims at some good. More precisely, all action aims at some state of affairs in which one expects to realize a good. Consider the request for antibiotics by Abe, whom we met in chapter 3. He did not wish merely to possess antibiotics, nor even merely to ingest them. He aimed at a state of affairs in which, the antibiotics having done their work, his health would be restored. So we may say that Abe had a goal or end in mind, and that he hoped to realize the basic good of health in achieving that goal.

To reach this end, of course, Abe had to avail himself of means to that end. He needed a plan, as is true of most of our pursuits of ends. Abe wanted to be healthy; in order to achieve that, he aimed first to take antibiotics; in order to take antibiotics, he first had to obtain a prescription; in order to obtain a prescription, he first had to see a physician; and so on. Put differently, Abe saw a physician *in order to* receive a prescription, *in order to* obtain antibiotics, *in order to* ingest the antibiotics, *in order to* restore his health. In thinking about Abe and each step in this series of actions, we could describe his thinking and his choosing in terms of his plan or proposal for action.

Abe might have considered other proposals; indeed, his physician encouraged him to do so. In the physician's judgment, antibiotics were not a sound means toward health; rest and a tincture of time would be more conducive to health. But at the end of the day, Abe made a choice, adopting one proposal rather than another. The proposal included the end sought—in his case, that state of affairs in which his respiratory infection was healed—and the means to be pursued toward that end. All of this made up Abe's proposal for action, and so all of it was part of Abe's intention.

In contrast, whatever was not part of this proposal—not, that is, either the end Abe sought or the means he chose to achieve that end—can be described as a side effect; it was not part of Abe's intention. Perhaps Abe knew that antibiotics typically upset his stomach and gave him diarrhea. He was not terribly happy about that fact, but he went about seeking and taking the antibiotics anyway. He foresaw that he would feel queasy and have diarrhea for several days, but neither of these consequences was part of his proposal; neither was intended. Although foreseen (more on that below), an upset stomach and diarrhea were neither his goals nor the means he chose to achieve his goal. Falling outside the scope of his proposal, these bad consequences were side effects only.

Even though they were side effects, Abe still bore responsibility for them. He could have chosen a different plan, such as the one his physician recommended, and avoided these side effects altogether. Insofar as Abe was able to choose between different proposals for action, he was responsible for what he accepted as side effects. This is why it was necessary to identify standards—fairness and vocation—by which Abe and others could judge whether there was a proportionate reason for him to accept a particular set of side effects in a particular situation. If we supposed that Abe would in fact benefit from antibiotics and that the digestive issues would not seriously incapacitate him, from the point of vocation, taking antibiotics seems reasonable. But insofar as Abe's expectation of benefit decreased (e.g., as his physician explained that his infection was probably caused by a virus), and his expectation of burdens increased (e.g., if he learned that he was prone to more problematic forms of antibiotics-associated diarrhea), Abe's reasons for accepting these side effects diminished. If they diminished enough, Abe should not have chosen to take antibiotics, even if his doctor was willing to prescribe them. In addition, the doctor in this case had her own decisions to make and her own judgments about proportionality. The doctor had to judge whether the health benefits to be obtained by writing the prescription were proportionate to the side effects of doing so, and she had to consider whether it was unfair to other patients to contribute to antibiotic resistance in the community while pursuing only minor expected benefits for her patient.

Let's return to the question of what Abe intended and a matter of some controversy among philosophers of human action. We have claimed that Abe's intention encompassed all that was included in his proposal or plan—his end as well as all the means he adopted to bring about that end.[3] This claim is controversial insofar as it identifies what was intended from the agent's perspective or point of view. What did Abe seek to obtain,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

and what means did he choose to bring that about? Abe could choose only by his own lights, but many thinkers, who agree about the importance of intention and the rule of double effect, think that the agent's perspective is too subjective. Motivated in part by some hard cases, they are inclined to argue that one must take a more objective view and that, in some cases, doing so will lead to different conclusions about what Abe chose and whether he chose rightly.

What hard cases do they have in mind, and how do those cases bear on how we think about intention? The body of writing about intention is enormous, but here we focus on a case famously presented by philosopher Philippa Foot. Foot described a case involving cave explorers trapped by a landslide that had left one of their number blocking the only way out of the cave. Water in the cave was rising fast, and the only way to move the man and the rocks that were pinning him was to use a single stick of dynamite to blow open a hole through which the explorers could escape—all the explorers except, of course, the one who was stuck, whom the explosion would kill.

Would it be homicide to blow open the hole? Would those who blew open the hole necessarily intend the man's death? By our account, as described above, it does not seem that the explorers' proposal included the man's death. Their end was to save their lives. The means they chose included blowing open a hole in order to escape. On our account of their intention, the explorers would not be guilty of intentionally killing the man stuck in the hole. (Whether it would be permissible to accept his death as a side effect is a separate question, which would clearly require a consideration of fairness and vocation.[4])

But many find this conclusion appalling. Surely one cannot blow a hole open by setting off a stick of dynamite right next to a living human being and not intend that person's death! The action of setting off the dynamite and causing the death of the trapped explorer seems, as philosophers say, "too close." Thus, on some theorists' account, if the bad effect is too close to the action, it should be considered part of what is intended, even if the bad effect is not part of the agents' proposal. The challenge in such accounts is not only to distinguish that which is part of a person's proposal from that which is not, but also to discern whether bad effects are sufficiently close to the action to be considered part of what is intended, thus making the action unreasonable.

One of the authors of this book has addressed the problem of closeness at great length elsewhere,[5] and we do not propose to wade further into that topic here. But we mention these different accounts of intention here because they return in chapter 7 when we discuss some disputed questions related to the beginning of life.

### ARTICULATING THE RULE OF DOUBLE EFFECT

We are now in a position to compare our formulation of the rule of double effect with the more common and somewhat more complicated formulations.

Above we presented the rule as follows: sometimes an effect that one should never intend can be accepted as a side effect as long as there are *proportionate* reasons for doing so. This formulation is relatively simple, and it leads to a relatively simple way of applying the rule: only intend (i.e., will or choose) the good, and only accept the bad side effects of an action when there are proportionate reasons for doing so (with proportionality judged against the standards of fairness and vocation).

A more traditional formulation of the rule is somewhat more complicated. According to that formulation, one may accept the bad effects of an action if the following four conditions are met:

1. The act is good in itself (sometimes stated as *the act is not intrinsically wrong*).
2. The bad effect is not intended.
3. The good effect is not achieved by means of the bad effect.
4. There is proportionate reason for accepting the bad effect.[6]

We prefer our simpler formulation, because we believe it encompasses these four conditions. *Only intend the good* encompasses conditions 1 through 3. An action that intends only the good is good in itself. Because,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

on our account, one's intention includes both the end one seeks and the means one chooses to bring about that end, conditions 2 and 3 are redundant and can be stated simply as *never intend the bad* (the logical corollary of *only intend the good*). Finally, our formulation includes the requirement of proportionality (condition 4).

RECOGNIZING THE CLINICAL IMPORTANCE OF THE RULE OF DOUBLE EFFECT

We conclude this chapter by pointing to the pervasive role that the rule of double effect plays in medicine and medical ethics. Physicians lean on the rule of double effect in their everyday reasoning about whether the adverse side effects (the language physicians have long used) of a treatment should be accepted in light of the benefits that the treatment promises. Physicians cannot possibly honor the ancient medical commitment to do no harm except by either doing nothing, and so failing to be physicians, or by deploying the rule of double effect—intending only the good to be brought about by an intervention and accepting the bad side effects only when there is proportionate reason to do so. Physicians thus tacitly deploy the rule of double effect whether or not they explicitly embrace it or the Way of Medicine. Therefore, we might say that those who critique the rule of double effect find themselves critiquing their own everyday clinical practices.

The rule plays a more visible and equally foundational role when we turn from every-day, uncontroversial practices to ethically controversial interventions. Without the rule, one cannot, in many cases, respect all persons by not violating their goods—goods that moral absolutes protect—and still act to preserve and restore the health of one's patients. Application of the rule of double effect is essential, for example, in showing how an intervention to save the life of a pregnant woman need not violate the norm against intentional killing, even when the intervention will result in the death of an unborn human person. The rule is equally essential for understanding the difference between the practices of withholding or withdrawing medical treatment and the practices of assisted suicide and euthanasia.

Finally, the rule of double effect plays a critical role in the question of cooperation, a central question wherever physicians are pressured to act against their conscience. Medical practitioners cooperate in unethical practices whenever they do something that makes it easier for another person to do something bad. For example, suppose a patient asks for a referral to an unscrupulous pain physician because the patient intends to get opioid medications in order to abuse them. If the practitioner intends to make the bad action easier to take—that is, makes the referral so that the patient will be able to abuse opioid medications—the practitioner formally cooperates, and formal cooperation is always unethical; it is always wrong to intend what is bad. But if the practitioner does not intend to make the bad action easier, the physician only *materially* cooperates, and the question then becomes, Is there a proportionate reason to accept the unintended bad as a side effect? So put, the question of cooperation clearly requires application of the rule of double effect.

CONCLUSION

The rule of double effect plays a pervasive and foundational role in the Way of Medicine. The rule undergirds physicians' routine practices of assessing side effects, and it protects them from violating the moral commitments that have guided physicians for centuries in the Way of Medicine. Therefore, we encourage the reader to be wary of those who dismiss the rule because it was first articulated formally in a religious community (Roman Catholic, to be precise) or because intentions are often hard to judge from the vantage point of a third party (they are indeed sometimes hard to judge, but that does not make intentions less important) or because the rule seems to limit the scope of a patient's right to self-determination (it does, which is why medicine requires the concept of authority).[7] The profession of medicine detaches from the rule of double effect to its peril.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER SIX

# Sexuality and Reproduction

The clinical terrain involving sexuality and reproduction includes an expansive array of ethically controversial topics. With respect to sexuality, these topics range from gender and sex transition to sexual performance to the prevention of pregnancy. With respect to reproduction, they range from genetic counseling and assisted reproductive technologies prior to pregnancy to prenatal genetic diagnosis and abortion during pregnancy to resuscitation of neonates and surgical sterilization after pregnancy.

In no other domain do the provider of services model (PSM) and the Way of Medicine diverge more starkly. According to the Way of Medicine, the constitutive end or purpose of medicine is the patient's health. No one should intentionally damage or destroy basic goods, and health and other goods should be pursued by physicians only in ways that are fair to others and that respect one's vocational commitments. The domain of sexuality and reproduction gives a clear picture of what the practice of medicine looks like when it abandons these principles in favor of elevating patient autonomy, choice, and subjective *well-being*.

To organize our approach to this domain, in this chapter we follow two of our previous cases and add another in order to focus on three prominent topics: contraception, assisted reproduction, and gender and sex transition. In chapter 7 we turn to the issue of abortion.

Before going further, we note a looming difficulty. Clinical ethical controversies regarding sexuality and reproduction disproportionately focus on and have consequences for women. Moreover, the approach we advance, in which medicine is oriented to health as one among several basic human goods, leads to conclusions that many will see as contradicting women's "reproductive rights and freedoms" and women's well-being more broadly conceived. If that were not enough, both of us are men, a fact that to some readers makes us unqualified to address questions that bear more heavily on women. For all of these reasons, we proceed with caution, but we proceed nonetheless.

## The Pill and the New Medicine

Whether the advent and subsequent dissemination of contraceptives should be celebrated or lamented (a topic we address below), "the pill" profoundly altered what patients expect of physicians and what physicians expect of themselves. We noted earlier that as biomedical science has expanded, it has made possible many uses of medical technology that are not obviously directed toward preserving and restoring health. The paradigmatic example of such interventions, and perhaps the most consequential for medical ethics, is the contraceptive.

In 1979, roughly twenty years after the US Food and Drug Administration (FDA) approved the first oral contraceptive,[1] Mark Siegler and Anne Dudley Goldblatt wrote,

> The oral contraceptive medication was the first prescription drug that was (and is) in effect, a self-prescribed "treatment." Patients—i.e., medical consumers desiring elective medication—demanded that physicians prescribe the contraceptive pill. Other popularly self-prescribed medications soon

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

followed . . . [and] came to be seen as appropriate solutions or treatments for problems previously considered individual or social concerns, but in any case not biological abnormalities or specific diseases. [2]

Siegler and Goldblatt, neither of whom had any moral objections to contraceptives as such, nevertheless worried that the widespread prescription of contraceptives by physicians established a problematic pattern in which patients pursue and receive interventions that have biological and physiological consequences—and so are sought from physicians who are licensed under US law to "provide" such interventions—and yet are not clearly required by physicians' traditional orientation to the health of their patients. They worried that this widespread pattern was leading to the phenomenon of the "demanding patient" and was teaching patients and physicians alike to think of the physician as a mere provider of healthcare resources.

Public perceptions and expectations regarding physicians have continued to shift in the directions Siegler and Goldblatt worried they would. As we discuss below, prescribing contraceptives is not obviously congruent with an orientation to the patient's health, yet prescribing contraceptives has come to be seen as obviously part of a physician's task. To support this shift, *health*, objectively defined, has steadily been displaced by a much more expansive notion of *women's health* (a version of *well-being*) that includes sexual and reproductive autonomy and reliable family planning. This shift leads physicians to detach from practicing medicine under the Way of Medicine's orientation to their patients' health in favor of "providing healthcare services" according to the wishes of their patients. In the former, the physicians' judgment is essential. In the latter, that judgment is either irrelevant or an impediment to their patients' achieving well-being.

There is a logical progression to these shifts:

1. People desire a state of affairs (e.g., temporary sterility) that doctors can bring about.
2. The desired state of affairs is not obviously related to health.
3. The aims of medicine, therefore, are broadened, either by adding to health other aims (e.g., reproductive autonomy) or by expanding the definition of health (e.g., to well-being) so that it includes these additional aims.
4. Physicians cannot, as a result, have the authority that comes with expertise regarding the aims of medicine since they have no authority of expertise regarding this expanded set of concerns (e.g., whether and when women should be open to pregnancy).
5. Physicians should be nondirective in their counsel to patients, giving accurate information but letting patients decide how and when their physicians will cooperate to bring about the states of affairs that the patients desire (whether sterility, pregnancy, or something else altogether).

These shifts in public and professional understandings put pressure on physicians to either go along or leave the profession, and they underpin the swing of the pendulum from paternalistic medicine to the patient-as-client model undergirding the PSM. The pendulum received a decisive push when family planning was incorporated into the domain of medicine.

CONTRACEPTIVES IN THE CLINICAL SETTING

*Cindy Parker, the twenty-year-old undergraduate student we met in chapter 1, presents to the student health clinic to see a physician. The physician asks, "What brings you to see me today?" She responds, "I just need a prescription for birth control."*

In the context of the PSM, it is hard to see anything ethically interesting about this interaction. Ms. Parker requests contraceptives, as the great majority of American women do at some point in their lives. Indeed, prescribing contraceptives is one of the most common and routine practices of obstetrician-gynecologists, family physicians, and others who care for women of child-bearing age.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

## The Provider of Services Model

According to the PSM, prescribing the pill to Ms. Parker is uncontroversial, if not ethically obligatory. First, contraceptives meet the criteria of being legal, technically feasible, and readily available in the present context. The physician needs only to write a few words on a prescription pad, something that physicians are eminently competent and qualified to do. Meeting these criteria implies that the intervention (contraception) is among those options that a physician must offer to a patient in order to duly respect the patient's autonomy. The physician might ask Ms. Parker questions and share information with her about the actions and side effects of different contraceptives in order to make sure her request is free and informed, but after doing so the physician must honor Ms. Parker's choice.

Notably, in the principlist framework favored by the PSM, the principle of beneficence also moves the physician to prescribe the contraceptive, insofar as only Ms. Parker is in a position to decide what is good for her—that is, whether a contraceptive will contribute to her well-being or not. Only she is in a position to consider the various states of affairs that she values, such as finishing her degree and advancing in her career, as well as enjoying sexual intimacy when that seems right to her. She may hope to have children one day, but pregnancy now would substantially disrupt her life plan. Contraceptive technology allows her to pursue her goals without the fear of becoming pregnant.

To this basic structure of reasoning, PSM proponents may add other considerations. They may note that contraceptives are relatively safe. Although the PSM is often willing to set aside the health of the patient in order to achieve other patient goals, to date most ethicists have supported physicians who declined to provide interventions that threaten imminent substantial bodily harm to the patient (some exceptions are addressed below). So, for example, surgeons are supported in refusing operations that will cause significant harm and have little prospect of restoring health. Contraceptives, by contrast, do not seem to reach that threshold. Contraception-associated risks of major harms such as blood clots and stroke remain small. Moreover, pregnancy brings its own health-related risks, so that a harms-reduction model appears to support using contraceptives to minimize bad health outcomes downstream.

Then there is the question of justice. Access to effective contraception has made it possible for millions of women like Ms. Parker to pursue vocational pathways that early motherhood might foreclose. As such, many would argue that Ms. Parker has a justice claim that the physician must respect.

Ultimately, only Ms. Parker is in a position to weigh all of the desired and undesired consequences of using or not using contraceptives in order to make an informed choice about whether a contraceptive is right for her. In light of all this, it seems obvious under the PSM that the physician should prescribe what Ms. Parker requests.

## The Way of Medicine

On the Way of Medicine, this same case becomes problematic. Our framework starts not with the question of whether prescribing contraceptives is legal, feasible, and available but instead with the question of whether prescribing a contraceptive is congruent with the physician's commitment to her patient's health. The answer to that question is not obvious in this most common of cases, insofar as being capable of pregnancy is a sign of health for a woman of Ms. Parker's age. Prescribing a contraceptive thus fits awkwardly with a commitment to health, if it does not indeed contradict that commitment.

We can imagine cases in which our framework might straightforwardly affirm the prescription of drugs that in most cases are used as contraceptives. For example, hormonal contraceptives are often prescribed to treat medical conditions such as endometriosis or bleeding fibroids, or even to restore healthy menstrual patterns. In such cases, the physician who prescribes the drug seems to do so for the patient's health. Temporary sterility is foreseen as a side effect in such cases, but it need not be and often is not intended, and there is often a proportionate reason to accept the side effect.

In the usual case, however, as in Ms. Parker's, physicians prescribe contraceptives not to preserve and restore health but rather to make the patient temporarily sterile. That action not only departs from the physician's commitment to patient health but also seems to contradict that commitment. Pregnancy is a sign

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

of health for a young woman who engages regularly in sexual intercourse. Indeed, if Ms. Parker were to tell her physician that over the previous three years, she and her boyfriend have had sex regularly without using condoms or other contraceptives, the physician then would have good reason to think that something is wrong with the health of Ms. Parker or her boyfriend. So when a physician directly diminishes a patient's fertility—by prescribing a contraceptive or conducting a sterilization procedure—she thereby directly diminishes her patient's health.

Does this argument define *health* too narrowly? Contraceptives may diminish one dimension of health, but what about the proper working of the organism as a whole? How can the health of Ms. Parker on a contraceptive be considered deficient relative to the health she would have if she were thirty-six weeks pregnant, with swollen legs, elevated heart rate, and a reduced capacity for exercise? Moreover, what about those risks of injuries to health that pregnancy brings: bleeding, infections, a ruptured uterus, even death? These questions have force, particularly when a woman has a condition, such as a congenital heart defect, that puts her at markedly elevated risk of harms to health during pregnancy. Within the framework we propose, it is along such lines—orientation to a patient's health—that a physician should ask himself whether prescribing a contraceptive in a particular case coheres with or contradicts his profession.

In this respect, the case of being called on to prescribe a contraceptive might seem similar to other instances in which a physician seems to engage negatively with one dimension of a patient's health for the sake of others. Thus, amputation of a limb removes a part of the organism for the sake of the whole; surgery involves cutting into healthy tissue to get at the unhealthy. Is the provision of a contraceptive similar to either of these instances?

We think not. Effecting temporary sterility is at least a suppression of a patient's healthy functioning in a way that removal of a gangrenous limb is not. Once a limb or organ is gangrenous, there is no state of health available to the organism except one in which the diseased part is removed. That new state—without the diseased part—is clearly a state of improved health relative to the state in which the diseased part remains intact. A parallel situation occurs when a dying patient is suffering terminal agitated delirium; then "cutting off" the diseased state of consciousness using sedatives may restore the only measure of health available to a person in that condition—one clearly reduced relative to a healthy organism but improved relative to that particular state of agitated delirium. We discuss this further in chapter 9. Intentionally causing temporary sterility in a case like Ms. Parker's differs from these cases. Fertility is not like gangrene or delirium; rather, causing temporary sterility in this case seems to involve reducing the health of the whole for the sake of preserving some dimension of health, or at least being hostile toward one dimension of health (that dimension which makes reproduction possible) for the sake of other dimensions.

Contracepting also differs from accepting the incidental damage to health that inevitably occurs as a side effect of medical interventions. In *Hippocrates' Oath and Asclepius' Snake*, Thomas Cavanaugh notes that these "wounds of treatment" inevitably accompany all medical efforts to restore order to a dis-ordered body, but the wounds are not intended. Indeed, medical progress is measured in part by mitigating the wounds that accompany medical interventions. In the case of contraception, however, the physician intentionally suppresses healthy function as a means to some other goal—even a health-related goal. Doing so seems to contradict the physician's professed and fundamental orientation to health and thus to be an instance of what Cavanaugh calls "role-conflation" harm—harm that is intended by the physician contrary to the demands of her profession.[3]

To summarize, prescribing contraceptives, at least in Ms. Parker's representative case, contradicts the physician's commitment to the patient's health; contracepting is not, to put the point more strongly, *medicine* at all, even if it has many of the trappings of medicine.

This verdict of the Way of Medicine is supported by reflection on the requirements of practical reason. Practical reason converges with the Way of Medicine in an argument against contraception that turns on the way that using a contraceptive seems sometimes to involve hostility toward the child who might otherwise come into existence as the fulfillment of sexual intercourse. We argued in chapter 5 that one intends what one adopts in one's proposal for action, encompassing both the end one is pursuing and the means one chooses to bring about that end. In contraception, one anticipates an action—engaging in sexual intercourse—that could result in a child as a consequence, and one wishes to prevent that consequence. So one chooses a contraceptive as the means to prevent a child's coming into existence. This action seems contrary to the good of human life.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Some thinkers have gone as far as to argue that the choice to contracept is structurally similar to the choice to abort. Contraception and abortion are not the same wrongs, for there is no actual child in the case of contraception, but a culture in which the great majority of people intentionally prevent the existence of innumerable possible children would not surprisingly extend its efforts to prevent children from being born by also supporting the practice of abortion. Indeed, if children are expected to follow from sexual intercourse only when their existence is wanted, abortion becomes a critical backup strategy for dealing with unwanted pregnancy. In the Supreme Court case *Planned Parenthood vs. Casey*, the Court noted, "For two decades of economic and social developments, people have organized intimate relationships and made choices that define their views of themselves and their places in society, in reliance on the availability of abortion in the event that contraception should fail."[4] Contraception turns out to be not so much a bulwark against abortion as a gateway to it.[5] Of course, if abortion is not morally problematic, this suggestion will bring no disquiet. As we will show in chapter 7, however, abortion itself gravely violates the good of human life.

ASSISTED REPRODUCTION

*Abe Anderson remarried three years ago. His wife is now forty-three years old and has not gotten pregnant despite their deep hopes to have children. Mr. Anderson and his wife present to her ob/gyn asking for help in achieving pregnancy*

The Provider of Services Model

The PSM approach to this clinical moment can be summarized briefly, as prior themes are repeated here. Respect for patient autonomy gives us a reason to do what the Andersons ask. In contrast to Ms. Parker, Ms. Anderson wants to be pregnant, so the state of pregnancy is good *for her*; beneficence compels clinicians to pursue that goal. The law, particularly in the United States, where regulations are few, permits quite a range of technological interventions to bring about pregnancy, and many physicians make those interventions available; physicians are also compelled by what is customary and standard. Moreover, most assisted reproductive technologies involve pharmaceuticals or surgical interventions that only physicians are licensed to provide, so Ms. Anderson seems to have a justice claim—that her physician should make available that which is legal, which others readily obtain, and to which she has access only with a physician's help.

The principle of nonmaleficence seems to countervail these imperatives to some extent, insofar as many assisted reproductive technologies pose risks to the woman's health. For example, in vitro fertilization (IVF) involves the risks posed by ovarian hyperstimulation and surgical retrieval of oocytes. As noted above, the state of pregnancy itself brings risks to health that tend to increase with age. But unless these risks reach the threshold of directly and imminently causing major bodily injury, physicians must defer to their patients to weigh the risks and benefits, broadly construed, and make the choice that is best for each individual patient—that is, the choice that maximizes all of the goods, as she defines them, available to her.

Curiously, in the domain of sexual and reproductive healthcare, the PSM leads us to treat the same state of affairs as good and to be sought for one patient and as bad and to be avoided for another patient; the only difference is whether the patient wants the state of affairs. Unlike the Way of Medicine, which focuses consistently on objective human goods, the PSM detaches from the question of whether a possible state of affairs brings about genuine good, considering only whether that state of affairs is wanted.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

The Way of Medicine

Assisted reproduction becomes problematic on the Way of Medicine. The physician again asks, in the first instance, what accommodating the Andersons' request has to do with her commitment to preserve and restore Ms. Anderson's health, but here the answer is a bit more complicated. If Ms. Parker had regular sexual intercourse without contraceptive measures from ages eighteen to twenty-one and did not become pregnant, that would be evidence of something wrong with her health or the health of the man with whom she had regular intercourse. Is the same not true for Ms. Anderson?

Yes, it is, although Ms. Anderson's case highlights that health is always relative to a person's sex and age. To state the obvious, no physician to our knowledge would consider it a medical problem that *Mr*. Anderson has not achieved pregnancy, because the health of men does not include child-bearing capacity. Similarly, physicians would not at this time consider it a medical problem that Ms. Anderson had not achieved pregnancy if Ms. Anderson were eighty years old. The health of eighty-year-old women simply does not include the capacity to bear children. Ms. Anderson, forty-three years old and premenopausal, is at a point in life in which the capacity for pregnancy is characteristically diminished relative to, say, that of a twenty-three-year-old woman, but some healthy forty-three-year-old women do become pregnant. Therefore, in the Way of Medicine, the fact that Ms. Anderson has not become pregnant does give the physician a reason to get involved—but in what manner, and why?

First, what is the physician's goal in this case? The initial reaction might be, "A baby, of course." After all, the only reason Ms. Anderson wants to be pregnant is that she wants a baby—presumably a baby that is genetically hers and her husband's. If the physician had a reliable way to bring about pregnancies, but such pregnancies would inevitably end in spontaneous abortion, Ms. Anderson would not be interested in the physician's help. Yet we have already said that health is the proper goal of medicine, and a baby is not health, so although the physician might reasonably join the Andersons in hoping that their sexual union will result in a baby's being conceived and born to them, the baby—however good and however strongly desired by the Andersons—lies outside the proper scope of the physician's practice.

To give a parallel example, Ms. Anderson might suffer from minor arthritis that many people would ignore but that keeps her from an activity that she highly values—say, a form of dance to which she has devoted much of her life. In such a case, as the physician attends to her arthritis, the physician might join her in hoping that she will dance again and might readily understand why this condition that others consider trivial concerns her so much. Yet the physician's goal is not dance but the health that makes dance possible. Similarly, the physician's aim with respect to Ms. Anderson's desire to have a child is the health that makes pregnancy and subsequent childbirth possible.

Within the Way of Medicine's approach to Ms. Anderson's health, much can be done. Physicians might seek to restore healthy patterns of ovulation, sometimes through attention to nutrition and exercise and sometimes through pharmacological interventions—including medications typically used as contraceptives—such as exogenous hormones to replace or return to normal levels those that are disrupted in one way or another. Physicians might intervene via hysteroscopy or laparoscopic surgery to restore patency to the woman's fallopian tubes. In parallel, a physician might work to improve any deficiencies in Mr. Anderson's capacity to produce healthy semen, including viable sperm; to achieve and sustain an erection; and to reach ejaculation. All of these interventions might be reasonably carried out on the Way of Medicine. These practices are standard for doctors who focus on responding to infertility, and today a minority of such physicians explicitly limit themselves to such practices. The latter include those who put themselves forward as practitioners of NaPro Technology (natural procreative technology).[6] These physicians aim at health, hoping that such health will be followed by pregnancy and childbirth, much as physicians treating arthritis aim at health, hoping that such health will enable dancing and other activities that display health.

As we have noted, the PSM is willing to circumvent health altogether in order to produce a baby. Indeed, this willingness characterizes the entire terrain of contemporary reproductive medicine in the United States, rightly characterized by many as a kind of Wild West in which all things are permitted. Physicians practicing

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

in this area engage in artificial insemination, in vitro fertilization, surrogacy, and other interventions intended not to restore or preserve health but instead to use technology and the remaining health-related capacities available to bring about the birth of a wanted baby.

PSM-focused physicians will readily subject a woman to substantial risks to her health if she is willing to undergo such risks in order to conceive a baby. Gonadal hyperstimulation, for example, is known to cause ovarian hyperstimulation syndrome, which brings an array of health problems and in severe cases can be life-threatening.[7] In the case of oocyte donors, physicians subject the women to these risks while also treating them instrumentally, as means to satisfy someone else's desires. In gestational surrogacy, physicians likewise treat the surrogate mothers as instruments to satisfy another's desires while they impose on the gestating woman all of the risks that accompany pregnancy. The problem is not so much that physicians tolerate side effects but that they tolerate side effects that damage health in order to obtain states of affairs that have nothing to do with the physicians' commitment to this good. For these reasons, simply on the basis of their constitutive commitment to the patients' health, physicians have reasons to avoid many assisted reproductive technologies.

As with contraception, the requirements of practical reason converge with the Way of Medicine's judgments on these types of interventions. Consider the argument against those assisted reproductive technologies that separate procreation from sexual intercourse. In brief, interventions such as IVF seek to *make* a baby, exerting mastery over the raw materials of nature (gametes) by using the technologies available to bring into being a desired product, in this case, a living human being. As with other instances of making, the product comes into existence at the pleasure of the makers, who accept the product on the condition that it satisfies the desires that led them to engage in the productive process. This feature of conditional acceptance is manifested in the widespread practices of grading embryos, discarding suboptimal embryos, selectively reducing embryos when an undesired number have implanted, and cryopreserving, and perhaps donating to science, "spare" embryos.

We develop the argument further in chapter 7, but here we note that human beings at the embryonic stage are still human beings and therefore deserve the basic respect that we accord to other human beings—especially the respect of not being killed. Nor should we treat any human being, including a human embryo, as merely a product or a thing to be brought into existence at will, for doing so radically contradicts the demands of equality that are central to the good of friendship even in its thinnest and most extended sense.

In this sense, human beings are called to a kind of friendship with all other human beings, in virtue of recognizing that all other human beings also are fulfilled by basic human goods. This minimal friendship requires us to treat all human beings with equal respect. Thicker forms of friendship build on this basic form: even when children cannot yet reciprocate, parents act for the good of their children as part of their good as parents. In the full paradigmatic form of friendship, each friend treats the good of the other as his own good.

IVF and related practices undermine the good of friendship by treating another human being as a product—as some*thing* whose existence is subject to one's own will and mastery. These practices undermine friendship even in its thinnest form, for no human being wishes to be treated as a thing by another. Moreover, these practices are deeply at odds with the form of friendship parents characteristically demonstrate toward their children, in which they neither make their children the objects of their will nor make their love contingent on the childrens' satisfying the parents' desires. One who accepts you only on the condition that you satisfy their desires cannot be called your friend. With respect to conjugal intercourse, the attitude appropriate to friendship is fully open to, if not also hopeful for, that act's finding its fullest realization in a new life over which the woman and the man ultimately have little control.

Thus, in vitro fertilization, human cloning (if and when it arrives), and even more limited technologies such as artificial insemination all seem morally impermissible. Once again, we have only sketched the argument, which has been presented elsewhere at greater length and with attention to objections.[8] But our overall aim here has been to show that the Way of Medicine and the requirements of practical reason converge in their conclusion that the Wild West of assisted reproductive technology needs reform. At present, its modes of practice are deeply at odds with the purposes of medicine and the demands of practical reason.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

SEX AND GENDER IN TRANSITION

*Jules Baker, an otherwise healthy thirteen-year-old boy we haven't introduced you to before, suffers from gender dysphoria. He identifies as female and wishes to take hormone-blocking supplements that will delay puberty until he is old enough to undergo a full sexual transition: sexual reassignment surgery to remove his male sex organs and provide female facsimiles by means of plastic surgery.*

## The Provider of Services Model

The cases of Ms. Parker and Ms. Anderson make plain that physicians practicing in accordance with the PSM will often set aside the norm of the healthy organism if doing so accommodates the autonomous choices of patients. So, under the PSM, whether the physician works to induce sterility or enhance fertility, to get rid of pregnancy or produce it, often depends entirely on the patient's choice. Physicians respectfully refrain from drawing conclusions about the signs of a "healthy" human organism until they know what a particular human being wants with respect to his or her body.

The case of Jules indicates how far this logic extends in contemporary medicine. If the signs of health with respect to sexual intercourse and pregnancy depend on the wishes of the patient, why not also the signs of health with respect to secondary sex characteristics? If the goals of medicine are rightly determined by the informed choices of autonomous patients—by what patients determine is good for them—perhaps the form of "healthy" secondary sex characteristics should also be determined by the informed choices of patients—by what patients decide are the right secondary sex characteristics for them.

We now see a burgeoning practice of what have come to be called *gender transition* and *gender-affirming* services—the use of exogenous hormones and surgical treatments to block puberty and to fashion, as closely as possible, secondary sex characteristics that appear to match patients' "gender identity" or "gender preference."

Changing the secondary sex characteristics of people like Jules takes the PSM's rationale one step further, treating the patients' sexual organs and underlying sexual physiology as either a good to be preserved or a harm to be remedied, strictly on the basis of the patient's self-perception. In the PSM framework, in the case of Jules, who does not want male secondary sex characteristics, those characteristics are harms to him, which the physician has an obligation to remedy insofar as possible. Might the case of Jules present an opportunity to see the PSM's inadequacies? If our language and our framework of analysis lead us to think that we should block a thirteen-year-old boy's sexual maturation—often rendering the boy permanently sterile in the process—perhaps we need a new language and a new framework.

## The Way of Medicine

The Way of Medicine starts with a claim that has been implicated in much of our discussion thus far. Put simply, humans, like all other animals, are organisms. Indeed, this fact makes it possible for us to recognize that bodily health is a real human good rather than an ethereal aspiration.

A corollary claim immediately follows: our existence as human animals is sexed. We are male or female organisms by virtue of having a root capacity for reproductive function, even if that capacity is immature or damaged. As with countless other species, the human reproductive function is performed jointly by two organisms of opposite sexes; no individual human being suffices for the performance of reproduction. The two sexes reflect root capacities for the general structural and behavioral patterns involved in human reproduction. In male humans, this capacity comprises the structures necessary for the production of male gametes and the performance of the male sex act, insemination. In females, the capacity comprises the structures necessary for the production of oocytes and the performance of the female sex act, reception of semen in a manner disposed to conception.

Some individuals, due to disorders of sex development, present genuine sex ambiguity. For example,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

females with congenital adrenal hyperplasia can be born with male-appearing external genitalia. To give another example, disorders with respect to the production and metabolism of testosterone can cause babies with male chromosomes (X, Y) to develop characteristically female external genitalia. Some sex and gender theorists have made much of these and other intersex cases in arguing that the simple binary of male and female fails to do justice to the diversity of possible sexes. And of course, opening up the number of "possible sexes" does a certain amount of work in opening up the possibility of changing one's secondary sex characteristics, which is precisely Jules's desire.[9]

Yet those who deny the sexual binary on the grounds of intersex cases ignore the distinction between paradigm cases and cases that decline from the paradigm. This distinction, recognized since Aristotle, applies to many kinds, including many kinds within the natural order.[10] Organisms, for example, come in ones: that is part of what it is to be an organism in the paradigm case. But the Hensel conjoined twins, possessing two arms and two legs but also two heads between them, are neither precisely one nor two.[11] This distinction between paradigm cases and cases that decline from the paradigm is necessary to make sense of what physicians do when they recognize congenital abnormalities, including ambiguous genitalia. Indeed, the distinction is necessary to make sense of the concept of "intersex"—that is, not clearly conforming to either the male or the female paradigm. In the same way that conjoined twins do not refute the claim that organisms are one, neither do instances of sex ambiguity refute the claim that human organisms are either male or female.

The Way of Medicine, in its orientation to patients' health, resists inducements to interfere with, interrupt, or otherwise revise the healthy development, maturation, and function of male and female sexual organs and capacities. Note that the Way of Medicine's resistance to such interventions does not depend on conclusions about normative gender expression, much less about normative sexual practices. Rather, its resistance follows directly from its orientation to health as an objective bodily good for and in human animals, male and female. Medicine operates within the boundaries required by pursuit of this good.

That being said, those who seek to change a person's sex not only contradict medicine's orientation to health but also always and necessarily fail in what they attempt. Indeed, here the logic of the PSM leads to absurd contradictions in which some justify changing secondary sex characteristics by claiming that one's phenotypic (or genetic) properties can be at odds with one's *real* sex—a feature of some disembodied reality to which only the individual has access—while others justify such interventions by claiming that there is no such thing as one's real sex.

From these mutually incompatible claims, further contradictions follow. To affirm who Jules is, we are told, physicians must reject Jules's current form and refashion his body to look very different from the body of Jules as he is. Because gender is socially constructed—not dependent on biology and anatomy—we are to change that biology and anatomy on which gender does not depend. In order to get beyond the constraints of the sexual binary, we are to reify it by seeking to produce secondary sex characteristics determined by that binary. The contradictions in such reasoning would be comical if they did not result in such tragic consequences for people like Jules.

Moreover, changes to secondary sex characteristics fall far short of bringing about a change in sex. The latter would make a male organism capable of engaging in the female sex act, or vice versa. Sex change ("gender transition") interventions do nothing of the sort. Rather, they culminate in surgeries to remove sexual organs—for example, a penis or a vagina—and to refashion simulacra of the organs that members of the opposite sex characteristically possess. But one can neither make a vagina by creating an orifice nor make a penis by creating something that becomes enlarged on stimulation. One could genuinely make a penis or a vagina only by re-creating the entire biological economy of the human being, whose development as a male or female began at conception.

Within that primordially sexed biological economy, the functions of the penis and the vagina are discernible in relation to the sexual act to which they contribute, which culminates when sperm are deposited in the vagina, where these sperm are capable of processing toward and penetrating the oocyte. Moreover, the penis and the vagina are linked intrinsically not only forward to these functions that they might eventually perform but also backward to processes, such as the production of gametes (all oocytes are produced in utero), which began many years before sexual intercourse is even possible. The biological development of male and female human organisms involves the working out through time of capacities that were present at the beginning.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Physicians can transplant a penis to a male or fashion a vagina in a female so that the organ becomes truly part of the person's biological life.[12] The situation is similar to that of a heart transplant. The organ is integrated into an organism whose biological matrix is fundamentally oriented toward that organ's presence and for whom the absence of the organ represents a significant diminishment of health. Redressing such diminishments is entirely within the scope of medicine's mandate, even if the redress does not fully restore the diminished function. For example, if a transplanted penis allows normal urination but does not result in full erectile function, it still restores a dimension of health. No surgery, however, can integrate a male sex organ into the biological life of a being whose root capacities are female (and vice versa).[13]

Unfortunately, the PSM seems increasingly committed to ignoring the antinomies and contradictions posed by granting patients the gender transition or gender affirmation interventions they seek. In doing so, the PSM makes patients' wishes and choices determinative of both sex and the purpose of medicine. Some physicians today use exogenous hormones and surgical interventions to bring about changes in patients like Jules. These changes, were they brought about in the absence of the patient's asking that they be done (or, in pediatric patients like Jules, the patient's parent asking that they be done), would be considered profound mutilations of a healthy body. So the contradictions in the PSM lead to tragic consequences, as these interventions irreversibly damage the health of the patient.[14] Yet, because these interventions are *patient-chosen*, the PSM and its surrounding social and legal culture not only permit physicians to conduct these interventions but also increasingly charge physicians who refuse to participate in them with abandoning their professional obligations to "put the patient first."[15]

The Way of Medicine cannot but dissent from these increasingly common judgments. Because the Way takes its bearings from the health of the patient as a member of the human species, the Way of Medicine sees that every surgical attempt to change an individual's sex damages or destroys some secondary sex characteristic that otherwise displays health and is necessary for reproductive function, itself a constitutive dimension of human health. This judgment of the Way of Medicine is only strengthened by the requirements of practical reason, which add a corollary concern: since sexual capacities make possible the one-flesh union of marriage, interventions that damage or destroy those capacities also prevent the realization of the basic good of marriage.

Thus, the Way of Medicine cannot countenance doing to Jules what he asks, not because of bigotry or phobia but because, in solidarity with patients like Jules, medical practitioners should act only in ways that are congruent with the patient's health and only in ways that are open to other basic goods, including marriage and child-bearing. When a young woman with anorexia sees herself as overweight, she manifests a disorder of perception. The good physician shows no disrespect to the patient when he refuses to facilitate further weight loss through surgery or medications. Rather, such refusals are part and parcel of the physician's commitment as a physician to care for the patient. Similarly, Jules deserves our care and attention, but his problem is not the presence of male secondary sex characteristics. Rather, he suffers a disorder of perception regarding his nature as a human being, one who is irrevocably and irreducibly male. The physical harm of bodily mutilation should not compound the harms of that illusory perception.

To our minds, the willingness of contemporary medicine and society to embrace such solutions manifests one of the fullest culminations to date of the PSM to abandon concern for objective goods, to treat medicine as if it were merely technique, and to put medical technologies in service of autonomous desire. That culmination is continuous with the PSM's approach to contraception, assisted reproduction, and many other questions surrounding sexuality and reproduction that we cannot address here. It's no surprise, then, that our treatment of these issues runs radically counter to current medical orthodoxy.

Nevertheless, the Way of Medicine's approach to these issues preserves the possibility of medicine's being a profession and of medical professionals' being more than mere functionaries. The Way of Medicine also—as we show in the next chapter, on abortion—acknowledges the moral demands that a common humanity places on all of us, physicians and nonphysicians alike.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER SEVEN

# Abortion and Unborn Human Life

Let's return to the story of Cindy Parker.

> *Cindy received a prescription for birth control pills and took the pills consistently until she broke up with her boyfriend. She was not sure when or if she might have sex again, and one of the nurses at the student health clinic had told her that if she had unprotected sex, she could buy emergency contraception at the pharmacy without a prescription. Three months later she did have sex again, and the following morning she purchased and took emergency contraception pills. Three weeks after that, she returned to student health, having noticed that she had missed her period. A pregnancy test confirmed that she was pregnant. With tears in her eyes but determination, she asked, "Where can I get an abortion?"*

No issue in medical ethics is more consequential and politically divisive than abortion, and though the legal and ethical lines have been clearly drawn for decades, political leaders, medical ethicists, clinicians, and the public alike continue to contest those lines, pushing for or against abortion restrictions.

Our goal here is not so much to trace out all of the arguments for or against abortion as to show the differences it makes if we consider Cindy's request for an abortion within the framework of the provider of services model (PSM) versus the Way of Medicine.

## THE PROVIDER OF SERVICES MODEL

The PSM approaches a request for abortion more or less as it does a request for contraception, assisted reproduction, or gender transition. To start, the fact that abortion is constitutionally protected and is endorsed by the American College of Obstetricians and Gynecologists (ACOG) as an essential healthcare service gives Ms. Parker's request the force of law and custom.[1] In addition, autonomy again looms large in the ubiquitous language of *choice*, while beneficence again asks us to consider all of the different outcomes that Ms. Parker might have valued, with deference to Ms. Parker to decide whether abortion was the choice that would bring about the greatest good for her. The condition of nonmaleficence was satisfied in that early abortion is safe, arguably carrying less risk to Ms. Parker's health than continuing her pregnancy to term. And, once more, justice asked us to consider whether it was fair for Ms. Parker to be forced to carry to term a pregnancy that she did not want.

The language of justice has become particularly prominent among those who advocate for legal abortion. Medical students and obstetriciangynecology residents today often receive training in "reproductive justice," a concept that makes access to the full range of family planning options an essential part of broader social justice for women and girls. If Ms. Parker was to have the same prospects that she would otherwise have had if she were male, she could not be asked to shoulder consequences that did not fall on the man with whom she had sex. Unlike him, Ms. Parker would have her life plans radically disrupted if she did not have access to abortion.

So while the PSM might acknowledge genuine moral concerns regarding abortion, it will consistently bracket them off as a matter of personal values that intrude on the clinician's professional obligation to

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

accommodate, at least by referral, the patient's request for abortion. As long as Ms. Parker was making an apparently free and informed choice of the healthcare service she believed was best for her, her physician had to either perform the abortion or direct Ms. Parker to someone who would.

THE WAY OF MEDICINE

The question of abortion is dramatically recast in the Way of Medicine. Right up front, the Way of Medicine has us ask: what does abortion have to do with the physician's commitment to preserve and restore Ms. Parker's health? There are cases—for example, of severe preeclampsia or significant heart conditions—in which the condition of continued pregnancy gravely threatens the woman's health, and we return to such cases below. But in the great majority of cases, as in Ms. Parker's, abortion is sought not for the sake of health but for the sake of not having a baby. Abortion is a means of preserving current and future possibilities for the woman that appear to be threatened by carrying the pregnancy to term. That abortion concerns choice, not health, is shown by the fact that a physician will treat two otherwise identical patients differently based simply on whether their pregnancies are wanted. With one patient, the physician will celebrate the fact that she has achieved pregnancy and even promise to use all manner of medical resources to see that her pregnancy continues to term. With the other, the physician will perform or refer the patient for an abortion.

So far, then, in the Way of Medicine, physicians have good reason to decline to participate in elective abortions, quite apart from the question of what abortions do to the fetuses. In Ms. Parker's case, the physician might decline her request simply because his commitment to her as a physician does not include bringing about a state of affairs in which she is no longer pregnant.

When the life and health of the fetus are taken into account, however, the physician's refusal becomes imperative. From the time that the Hippocratic Oath was formulated until shifts in some quarters starting in the 1960s, medical oaths and codes in the West consistently condemned elective abortion as contradicting physicians' constitutive professional commitment to never intentionally damage or destroy the health and life of patients. The Hippocratic Oath stated, "I will not give to a woman an abortive remedy."[2] The "Hippocratic Oath Insofar as a Christian May Swear It," which had much wider circulation in the early centuries of the Christian era, expanded this prohibition by stating, "I will not give treatment to women to cause abortion, treatment neither from above nor from below."[3] The World Medical Association's 1948 Declaration of Geneva included the promise "I will maintain the utmost respect for human life from the time of conception, even under threat."[4]

Notably, in 1983 the words "from the time of conception, even under threat" were revised to "from its beginning, even under threat," and in 2005 these words were removed from the Declaration of Geneva altogether. These revisions were mirrored by changes in the codes of other professional associations,[5] and they reflect the fact that abortion was legalized in many countries in the later decades of the twentieth century. They also reflect, however, growing disputes about what the fetus is and whether respect for human life really rules out abortion.

Surely a fetus is not a human being, some have objected, but instead only a clump of cells. Or, even if the fetus *is* a human being, surely we do not owe to it the same kinds of treatment we owe to the human beings reading and writing this book. Moreover, what about the hard cases, in which a woman's life is in significant jeopardy? What authority do physicians, much less the state, have to tell women they should not be free to make such personal, indeed private, choices? We look at each question on the Way of Medicine.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

ANIMAL ORGANISMS

Throughout this book we have presupposed that we are all animal organisms of a certain sort: human beings. The practice of medicine is founded on this truth. The vocation of the healing profession starts with a recognition that, as animal organisms, humans are susceptible to illness, disability, decline, and death. We would not need medicine if we were only disembodied souls or minds.

For complicated historical and philosophical reasons, however, modern human beings have come to think and talk about themselves as if they were souls or minds who happen to possess, for a time, a living body. Moderns are accustomed to say, for just one example, that a person suffering dementia is "not there anymore." In part, this way of talking reflects the cultural elevation of humans' singular capacity for thinking and choosing—that mindedness that seems to distinguish humans from the other animals.

Notwithstanding its popularity, this form of dualism is misguided. Pay attention to your direct experience. Right now, as you read these words, you are engaged in a sensory act, making use of your eyes and your hands, and you are oriented in space toward the physical realities of words on a page (paper or electronic); perhaps you are listening with your ears to sound vibrations in the air as the recorded book is read to you. These acts are those of a *bodily* being, specifically the organism who is sitting, reclining, or walking (with earbuds) here and now. But you are also following an argument, a train of thought, that makes use of abstract terms such as "organism" and "abstract" and "thought." These acts are those of a *minded* being, a being capable of intellection. You are both of those beings, as evidenced by your use of the word "I": "I am seeing these words on the page, and I am understanding them." Thus, the minded being you are is the same being as your physical, bodily being. One and the same being reads and understands, sees and cognizes, moves and abstracts. *You* are that human being, that living organism.

THE BEGINNING OF THE HUMAN BEING

If we accept the discussion so far as true, you came into existence whenever the living organism reading this book came into existence. You were not preceded by another living human organism, as might be possible if you were a mind (or even a brain); rather, your existence commenced with the existence of the human animal reading or listening to this book right now.

When did you begin? The answer, if you are not an identical twin or a human clone, is simple: you began at fertilization, when a human sperm penetrated an oocyte and both sperm and oocyte ceased to exist, giving rise instead to a single-celled zygote. This zygote was itself a single, whole, individual member of the species *Homo sapiens*, genetically distinct from its parents and possessed of a developmental program by which it was able to execute its own growth and development to the next stages of human existence: the embryonic stage, then the fetal stage, then the infant stage, and so on.

The best evidence for this claim comes directly from the science of embryology and the authority of those who study human development and the development of other organisms, such as mice. Consider the following representative passage from K. L. Moore, T.V.N. Persaud, and Mark G. Torchia's textbook *The Developing Human: Clinically Oriented Embryology*:

> Human development begins at fertilization when a sperm fuses with an oocyte to form a single cell, the zygote. This highly specialized, totipotent cell (capable of giving rise to any cell type) marks the beginning of each of us as a unique individual. The zygote, just visible to the unaided eye, contains chromosomes and genes that are derived from the mother and father. The zygote divides many times and becomes progressively transformed into a multicellular human being through cell division, migration, growth, and differentiation.[6]

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Two primary arguments are made against the claim that a human organism comes into existence at fertilization, but neither argument can be sustained. First, some claim that because the early embryo is capable of twinning, it therefore cannot be considered *one* individual organism. What shall we make of this? Does the possibility of some one thing becoming two mean that it once was not one thing? No one who has ever snapped a stick in half could believe that. Nor, in the domain of living things, are microbiologists tempted to believe that amoebae, which reproduce precisely by splitting, were not individual organisms prior to splitting. Similarly, the phenomenon of twinning does not suggest that the zygote or embryo was not a human organism prior to twinning. Rather, it indicates that some human beings came to exist later than fertilization—namely, when their embryo divided, resulting in two embryos where once there was only one.

The second argument holds that the zygote or early embryo does not have sufficient unity, within itself, to be considered a living whole. This line of argument sees the early embryo as merely an aggregate (a "clump") of cells. Several problems arise with this claim. What could cause this mere aggregate to become one thing? Indeed, the transition of numerous cells into a single organism several days later than fertilization must be seen as an extremely implausible, inexplicable event. Moreover, embryologists find an enormous amount of activity, much of it coordinated, among the various parts of the developing embryo, activity oriented toward ensuring the embryo's survival and growth. Nor is this coordinated activity the same in all cells. Rather, embryologists observe division of labor among the cells of even the very early embryo, and from the first cell division the roles of some cells can be distinguished from the roles of others. That is, the embryo does not appear to biologists as a mere clump or aggregate of undifferentiated cells.[7]

The two claims just made—that humans are animal organisms and that human organisms begin at fertilization—concern only the way things are. They are not yet claims about ethics, about how we ought to act in light of the way things are. Yet we have said enough to demonstrate a foundational fact: abortions destroy human lives, where "human lives" means precisely the lives of actual living human beings. If medicine is committed to the health of human beings, this fact is of the greatest significance. It leads directly to the ethical claim that medical practitioners should not perform or facilitate abortions.

## FULL MORAL WORTH AND RESPECT

Our discussion should also appeal to the full resources of practical reason and its requirements. In addressing abortion, we are concerned with whether killing certain human beings—namely, the unborn—is morally permissible. Could it be that as a class the unborn are excluded from the moral protection owed to other human beings? Three brief arguments can respond to this question; all have been offered in expanded form elsewhere.[8]

First, the basic human goods, including the goods of health and life, are not to be damaged or destroyed in unborn human beings any more than in born human beings. Recall our claim about basic goods: as intrinsically good, they give us reasons to act, and intending their damage or destruction can never be reasonable. Therefore, abortion, when it involves intentionally destroying the life of an unborn human being, is always wrong, ruled out by the same principle that governs other moral absolutes. (We address below whether abortion could be something other than intentional killing.)

Next, because the basic goods of human beings are good for all, intentionally killing the unborn is unfair. As the second general requirement of practical reason, fairness was formulated with the awareness that all human beings benefit from realization of the basic goods. Full reasonableness requires, then, that we not consider the goods to be less important, or less good, in some persons than they are in others (including ourselves). Nor should we, in our pursuit of particular instances of these goods, prioritize some and neglect others on the basis of arbitrary or contingent motivations. Both of these patterns violate the Golden Rule, doing to others what we would not have them do to us.

The proponent of elective abortion who acknowledges the humanity of the unborn—who is not so self-deceived as to think of unborn human beings as mere clumps of cells—is proposing to treat the good of life and health as of lesser importance in some human beings, the unborn, than in others, and to do so on the grounds that the life of the unborn is inconvenient, unwanted, small, or an obstacle to a woman's authentic development. None of the grounds for sacrificing the lives of the unborn to privilege the lives of the born

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

seem to us any more cogent than the grounds for privileging white lives over black, male over female, or native-born over immigrant. Fairness thus forbids us to exclude the unborn from the class of human beings who have the right not to be killed.

Finally, the right not to be killed intentionally is reasonably considered a basic or absolute right. We can distinguish between rights and protections we possess that are based on our particular contingent and sometimes changing status, condition, or circumstances, and rights we think of as absolute. The former include rights to vote, to have one's work graded on time, to be given a share in the benefits paid into in a pension system, and so on. The latter include rights not to be enslaved, raped, tortured, or killed.

The second set of rights are thought to be held always and equally by all who hold them, whomever that class includes. These rights should thus be predicated on some truth that is likewise not passing and is true equally of all who hold such rights and protections. That truth is their common humanity; being human is the characteristic that all beings who have such rights possess always and possess equally with all others who have those same rights. If that is true, the rights not to be enslaved, raped, tortured, or killed should be respected equally and always, with regard to every human being, including all unborn human beings, who are no less human than they will be once they are gestated and born.

These three arguments lead to the conclusion that what is true for medical professionals is true for all: no one should ever intentionally damage or destroy the life and health of an unborn human being. Abortion, understood as the intentional killing of an unborn human being, is always and everywhere morally impermissible.


### ABORTION AND PRIVACY

These arguments also make clear that abortion is not merely a private matter. The last recourse of those who would defend abortion is to claim that arguments against it are a matter of personal, often religious, beliefs, not public or professional concern. This claim is almost never argued, but it has a kind of axiomatic quality in contemporary culture, characterized as that culture is by its emphasis on what philosopher Charles Taylor calls "the ethics of authenticity"—the notion that what is most important in life is for each person to become the self that that person authentically chooses to become, based on each individual's own lights and without the censure or imposition of external standards. This culture gives rise to the PSM.

The key premises that we have drawn upon to assess the practice of abortion, however—that human beings begin at fertilization and that all human beings have the right not to be killed at will—are neither esoteric nor a matter of religious revelation. Rather, these are claims of human reason that are accessible to all. The first is a claim of science, the second a claim of the moral law known by practical reason (natural law, the Tao). That moral law makes it possible for the public to recognize and defend human rights and to evaluate particular practices, as well as explicit policies and laws, as to whether they are just or unjust.[9]

Abortion is a public matter in a further crucial sense. When medical practitioners exclude from the scope of their concern the lives and health of some human beings, that damages the practitioners' publicly expressed commitment to patients' health. Similarly, when a polity excludes from the scope of its legal concern the lives of some human beings within its legal boundaries, that damages any publicly expressed commitment to justice and equality. These commitments are the foundations of the medical and political communities, respectively; to damage them is to damage public trust in these communities. The widespread permission, acceptance, and practice of abortion are thus public wrongs in the sense that they erode the fabric of a public, whether that public is the profession of medicine or a political state pursuing justice.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

ABORTION AND INTENTION

We argued in the previous section that abortion, insofar as it involves intentional killing, is morally wrong. But must abortion always involve *intentional* killing? In chapter 5 we explained that it can be permissible to allow a bad effect if that effect is not intended, provided that proportionate reason exists for allowing it. This claim is essential for thinking about several issues surrounding abortion.

In what follows, we briefly address a famous attempt by Judith Jarvis Thomson to justify abortion by arguing that it need not involve intentional killing. We argue that in most cases abortion does involve intentional killing and that abortion for the sorts of reasons Thomson envisaged would be wrongful even if the death of the unborn were not intended.

We then turn to discuss vital conflict cases, those in which one or both of the lives of the mother and child are at mortal risk and in which one or both will surely die unless a medical intervention is performed that results in the loss of the unborn human being's life.[10] We look first at some cases in which natural law theorists exhibit wide agreement, then consider cases in which the judgment that the child's death is a side effect remains controverted.


THOMSON'S VIOLINIST

Philosopher Judith Jarvis Thomson has advanced perhaps the most famous argument in defense of abortion.[11] Thomson begins by noting that much of the debate surrounding abortion concerns whether the unborn human being is a *person*. Those who oppose abortion, she writes, typically "spend most of their time establishing that the fetus is a person, and hardly any time explaining the step from there to the impermissibility of abortion."[12] Meanwhile, "those who defend abortion rely on the premise that the fetus is not a person, but only a bit of tissue that will become a person at birth."[13] In contrast, for the purposes of her argument, Thomson grants that the fetus is a person, then asks whether abortion is indeed impermissible on that assumption. This is one of the great innovations of her article, and one reason it has gained such acclaim.

At this point, readers might note that we spent time not on the question of personhood but rather on the question of whether the fetus is a human being (a question elided in Thomson's contrast of "person" with "bit of tissue"). That the fetus is a human being we take to be a matter of settled science, but one that also can be defended philosophically. Pro-choice thinkers such as Peter Singer agree with us on this point, conceding that it is obscurantist to deny that the fetus is a human being (What else would it be?). Unlike Singer, however, we hold that it is wrong to intend the death of any human being, whereas Singer and many others hold that those human beings who do not possess certain qualities—the qualities of personhood—may be killed justifiably.

Note, then, that with respect to bioethics, and particularly the question of abortion, the language of personhood is typically invoked in order to distinguish which, among all human beings, are those who do not deserve (because they are not persons) the respect we generally owe to other human beings, including the respect of not killing them. Our argument, then, unlike those Thomson was aware of, does not start with the idea of "person" but, in a sense, ends with it, for it follows from our conclusion that embryos and fetuses are persons, meaning beings whose lives should not be intentionally damaged or destroyed.

Thomson presents an argument for abortion that concedes this claim—that fetuses, as human beings, should not be killed *intentionally*. To do so, she presents the reader with the following scenario: You wake up to find you have been abducted by the Society of Music Lovers and medically attached to a famous violinist who is unconscious and ill. He needs the use of your kidneys for nine months to survive his disease; if you detach yourself from him, he will certainly die.

Thomson believes that the average reader will intuit that it would still be permissible to detach yourself, and in the situation as described, we agree. Thomson's scenario is one in which the rule of double effect

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

applies. Must you, by detaching yourself, intend the death of the violinist? It seems not. Rather, you might reasonably intend to avoid the burdens of attachment. Is detaching yourself unfair? Not necessarily. In Thomson's scenario, the violinist has no real moral claim on you—you were abducted, after all—and so it does not seem unfair for you to detach yourself, thus avoiding a nine-month involuntary confinement forced on you by someone with no connection to you.

But the great majority of elective abortions do not resemble this situation at all. Like Ms. Parker, most women who seek abortions do so because they do not want, or do not feel ready, to be mothers. However understandable these desires are, in such cases the woman's intention clearly includes the death, not merely the "disconnection," of the fetus, as the fetus must die in order to prevent it from developing into a baby to whom the woman is the mother. Indeed, while Thomson believes that her argument supports only disconnection from (or, more realistically, expulsion of) the fetus, others have argued that the constitutional right to abortion in the United States entails a right to the death of the fetus lest the right to abortion be whittled away by improvements in technology that make it possible to sustain fetuses outside the womb at earlier and earlier stages of pregnancy or the right be forfeited in cases of botched abortions that produce live births.[14]

Suppose, however, that some abortions are not like this. Imagine a woman who would, if it were possible, readily permit her fetus to be removed to an external form of life support and seeks detachment merely to avoid the burdens of providing the fetus further "womb room" or sustenance. In such a case, however uncommon, detaching the fetus would not involve intentional killing, and the death of the unborn child would be a side effect. Could such an abortion be morally permissible?

Not, we suggest, in the kinds of cases Thomson has in mind. Note first the differences in the kind of relationship the reader has to the violinist compared with the relationship Ms. Parker has to the fetus inside her. In the former it may make sense to talk only of "the woman" and "the violinist," but in the latter it also makes sense to talk of "the mother" and "her child." The mother-child relationship is quite unlike the relationship between the reader and the violinist in Thomson's example, even when the mother did not desire the relationship and even, as in the tragic cases of sexual violence, when the relationship has been forced on her through another person's criminal actions. We are animal organisms, and mother and child share a real biological relationship; because those biological beings are also persons, the relationship is also personal, even if it is not desired.

We recognize that this claim will strike some as extreme, even offensive, and we readily concede that a woman who seeks an abortion after suffering sexual violence is less blameworthy than one who seeks an abortion after sexual intercourse in which she freely engaged. We also concede that when abortion is chosen to end a pregnancy that follows consensual sex, the man often bears as much responsibility for the abortion as the woman—and, in some cases, more.

The point here is not to assign blame but to clarify that, contrary to what Thomson's hypothetical would suggest, biological relationships can create obligations, even if those obligations have not been accepted voluntarily. If a young baby turns up on a man's doorstep and he realizes the baby is his biological daughter—perhaps the man had had a one-night stand and the mother has abandoned the baby—biological paternity and the child's vulnerability create a real obligation to provide assistance to the baby, one extending well beyond nine months. If the man knows that his biological daughter will surely die without the food and shelter he is able to provide, it seems to us profoundly unjust for him to refuse. The same would hold true if an elderly man showed up on the doorstep of a young woman and identified himself as her father, perhaps separated from her years before by war or another circumstance for which he was not responsible. Children never choose their biological parents, and yet it seems that children nevertheless have obligations to their parents that they do not have to others. Biological relations matter morally, even though they are not chosen. Indeed, if Thomson's violinist scenario were changed only a little—if, say, the reader learns that the violinist is the woman's long-lost child or long-lost sibling, we doubt that the reader's intuitions would be so solidly in favor of her detaching from him; indeed, they might become solidly in favor of the opposite.

In a moment, we will consider cases that differ further from Thomson's example because in them the mother's life is in danger. But we conclude here that, apart from such cases, it is typically *unjust* because unfair to refuse life-sustaining aid to one who is closely related to us, particularly when we can provide such aid and others cannot; and this unfairness is particularly at odds with a mother's unchosen vocational responsibilities. If we would help our child in the doorstep scenario or in the violinist scenario but not in the

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

abortion scenario, it seems that our refusal to help in the abortion case is unfair—motivated by an unreasonable prejudice against the unborn. Thomson's article, then, does not in fact grant the personhood of the fetus, for it fails to treat the unborn with the respect we accord to all those whose deaths we would neither intend nor accept as a side effect without proportionate reason.


## DOUBLE EFFECT AND LIFE-SAVING ABORTION


Having gone so far to critique the vast majority of abortions, we here argue that in rare cases in which a mother's life and health are gravely threatened, medical practitioners sometimes can reasonably intervene to preserve the mother's life even when their intervention will inevitably cause the death of the unborn child as a side effect. Such interventions, as we explain, neither contradict a physician's commitment to the patient's health nor are they ruled out by practical reason.

One paradigmatic such case concerns a pregnant woman with a cancerous uterus, whose cancer must be addressed before delivery or the woman will die and the child also will die. Is it permissible to perform a hysterectomy on the woman, removing the cancerous uterus and with it the unborn, pre-viable child, even though this inevitably will result in the child's death? The rule of double effect indicates that the answer is yes: the end of the surgery is preserving the mother's life; the means is the removal of her diseased uterus. The bad effect, which it would be immoral to intend, is the death of the unborn human being. Is there a proportionately good reason to accept that effect? In this case, yes, clearly: both mother and child will die if the operation is not performed. Thus no one is being privileged, much less arbitrarily privileged, over another. The mother's life is not judged more important than the child's; rather, her life is the only life that can be saved. In this case, the Way of Medicine would approve of the hysterectomy.

What if the life of the mother could be preserved, or that of the child, but not both? Some argue that the mother's life should be preserved over the child's because the mother is the physician's primary patient. To us this conclusion does not seem obvious. A physician charged with caring for a pregnant woman has, whether he recognizes it or not, two patients—two vulnerable persons under his care whose health is at stake. Those persons stand in somewhat different relationships to the physician, for only one can communicate her wishes and decisions, agree to be the physician's patient, and so on. But, as in the case of a traffic accident that a doctor happens upon, we think that the proximity of the vulnerable child and the exigency of the child's health-related needs—not to mention the child's relatedness to the physician's obvious patient—both contribute, in conjunction with the physician's vocation, to the physician's having obligations directly to the child in addition to the child's mother.

That being said, the woman, as the child's mother, has substantial authority to make decisions both for herself and for her child. She is the one in the position to evaluate the options in light of her own vocation. Although in principle either decision could be fair, her vocational commitments and obligations give her reasons in light of which she can determine which choice to make in this awful situation.[15] In our view, therefore, the decision as to whether the physician should strive to preserve her life or the life of her child is the mother's to make.

A salpingectomy for an ectopic pregnancy is another paradigmatic scenario in which the Way of Medicine permits a lethal intervention. In such a case, the embryo has implanted in the woman's fallopian tube. Continued pregnancy will inevitably lead to the death of the embryo, and it also can threaten the life of the mother if the fallopian tube ruptures. In a salpingectomy, the surgeon removes the portion of the fallopian tube that contains the embryo. Again, the physician's end is to preserve the mother's life and health; the means is removing the compromised segment of the fallopian tube. Negative effects of this intervention include not only the embryo's death but also the risk of future infertility in the woman. This case seems to straightforwardly satisfy the rule of double effect, along the same lines as the case of the woman with a gravid but cancerous uterus.

Before turning to more contentious cases, let's consider the definition of "abortion." Earlier we argued that it is always impermissible to intentionally kill an unborn human being. We then, in response to Judith Jarvis Thomson's line of reasoning, argued that in the great majority of cases it is also impermissible, because unfair, to accept the death of the unborn child as a side effect of an intervention to end the state of

pregnancy. However, the two cases we have just described—those of the pregnant woman with cancer in her uterus and the woman with an ectopic pregnancy—both indicate that in some cases a physician can intervene to preserve the mother's life and health even when doing so will inevitably cause the death of an unborn human being.

So we propose to define "abortion" not as any medical intervention that results in the death of an unborn human being but rather as *any act that either intentionally or unjustly ends the life of an unborn human being* . All abortion so defined is morally impermissible, and likewise, no act is an abortion that accepts the death of an unborn human being as the justifiable side effect of an attempt to preserve the mother's life.

CONTROVERSIAL CONFLICT CASES

In this section we briefly discuss three cases that continue to be controversial among proponents of the Way of Medicine. Although we cannot settle these cases definitively, we show how the controversy surrounding them illustrates the two different approaches to intention that we described in chapter 5. In each case, the debate concerns whether the death of the unborn human being is intended or is a side effect.

The Phoenix Case

In 2009 a dispute arose concerning whether an attempt to save a mother's life was an abortion or a justified application of the rule of double effect. The case occurred in Phoenix, Arizona, and the hospital in question described it thus:

> A woman in her 20s with a history of moderate but well-controlled pulmonary hypertension found out she was pregnant. There was concern for her health, because pregnancy with pulmonary hypertension carries a serious risk of mortality. Because of the severity of her disease, the woman's risk of mortality was close to 50 percent. In November 2009, the woman was admitted to St. Joseph's Hospital and Medical Center with worsening symptoms. Tests revealed that she now had life-threatening pulmonary hypertension. The chart notes that she had been informed that her risk of mortality was close to 100% if she continued the pregnancy. The medical team contacted the Ethics Consult team for review. The consultation team talked to several physicians and nurses as well as reviewed the patient's record. The patient and her family, her doctors, and the Ethics Consult team agreed that the pregnancy could be terminated and that it was appropriate since the goal was not to end the pregnancy but to save the mother's life.[16]

How does one analyze this case with respect to the intention of the mother and her doctors? In chapter 5 we distinguished between two accounts of intention. For one, what matters primarily is what is proposed and undertaken from the standpoint of the agent who is acting. For the other, external factors such as closeness bear on what an agent intends. In the first account, from the standpoint of the mother and the physicians, the fetus's death is not the means by which the strain on her heart may be relieved; the means, rather, is removal of the connection between her child and her body. The placental connection to the fetus is putting inordinate strain on her heart, thus gravely threatening her health and life, and removing that connection is itself the action necessary to preserve her life. So, in this first account, the death of the fetus is not intended. We still need to consider whether there was proportionate reason to allow the death of the fetus as a side effect and, in particular, whether allowing that death was fair given that the child was going to die no matter what was done. We return to this question shortly.

But first, consider the following analysis advanced by Fr. Nicanor Austriaco, which is emblematic of the alternative account of intention:

> When the doctors chose to remove the child's placenta to save his mother's life, they necessarily also

chose to kill him, because they were choosing to remove a vital organ of an innocent human being in a manner that would end his life. They chose to kill him in the same way that a Mayan priest who chooses to remove a beating heart from a sacrificial victim to placate the gods also chooses to kill him. Evil was done (the killing of the child) for the sake of obtaining a good (the restoration of the health of the mother).[17]

On Austriaco's understanding of intention, to choose to "remove a vital organ" (the placenta) is choosing to kill, regardless of how things are understood from the agent's perspective. Accordingly, the question is settled immediately: intentional killing is always wrong, so the doctors' actions in the Phoenix case were unethical.

We disagree with Fr. Austriaco's analysis. The death of the fetus accomplished nothing for the mother or the physicians. Rather it was entirely the detachment of the placenta that was sought, and then the subsequent removal of the placental and fetal remains. We do not think it accurate to say that "they necessarily also chose to kill [the fetus]." Rather, they chose to detach the placenta, foreseeing and accepting that the fetus would be killed as a side effect.

There remains the question of whether this decision was fair, and here we think the answer is clear. If the death was not intended, the decision to end the pregnancy was certainly fair, as otherwise both lives would have been lost. The intervention did not privilege one life over another but merely preserved one life instead of sacrificing both. We think it evident that the intervention honored the Golden Rule—that a reasonable person, faced with a scenario in which both the child and his mother would die soon if nothing were done, but in which his mother's life might be preserved by a procedure that would result in his death, would affirm the intervention to preserve his mother's life. This is not unlike an awful scenario in which one rock climber who has fallen is hanging tethered to another, and both will die unless the tether is cut. If the agent-centered account of intention is correct, and if neither the mother nor her doctors intended her baby's death, the placentectomy was not an abortion and was instead a properly health-motivated intervention, albeit one with a tragic consequence.

Ectopic Complications

Among proponents of the Way of Medicine, similar disagreements have persisted about how to address ectopic pregnancies. As we noted, salpingectomy is universally supported, but questions have been raised about two alternate interventions, salpingotomy and administration of the drug methotrexate.

In a salpingotomy, a longitudinal incision is made in the fallopian tube, and the embryo is flushed out using a suction-irrigator. Obstetricians have generally preferred salpingotomy over salpingectomy because it has been thought that salpingotomy would better preserve the woman's fertility, though that intuition has not been born out in clinical studies.[18] Meanwhile, the direct physical connection between the intervention and the embryo's death has convinced some that the latter must be intended as part of the former. Certainly, the connection to the embryo's death is not as indirect as it is in a salpingectomy.

Directness or indirectness, however, has no necessary bearing on whether an effect is intended or not. Indeed, in the first philosophical treatment of double effect, Thomas Aquinas argued that lethal force could sometimes be used in self-defense. To us, the use of a sword to fend off an attacker has a similarly direct connection to the resulting injury or death the attacker suffers.

Moreover, it seems clear that the embryo's death is generally not part of the mother's or the physicians' proposals. Rather, their proposals are to preserve the mother's health and life by removing the embryo from a place where it threatens grave danger to the mother. While the embryo's death is indeed an inevitable consequence, it is not needed as a means; presumably, if the physicians could move the embryo to the uterus without harm, they would. If that is true, as long as there is a proportionate reason to accept the death of the embryo, as there seems clearly to be on the same grounds we discussed with respect to salpingectomy, a salpingotomy is permissible.

Finally, there is the question of treating an ectopic pregnancy with the drug methotrexate. This drug inhibits cell division in the trophoblast, which is the precursor to the placenta. In an ectopic pregnancy, the trophoblast cells burrow into the cells of the fallopian tube, as they would into the endometrial lining of the

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

uterus in a healthy pregnancy. By preventing cell division in the trophoblast, methotrexate prevents the embryo from remaining attached to the fallopian tube; without maintaining this attachment, the embryo dies.

Again one can see why proponents of a less agent-centered account of intention conclude that the use of methotrexate involves intentional killing: the drug inhibits cell division not only in the trophoblast but also in the embryo as a whole. Moreover, the trophoblast is part of the embryo, so it seems again that the intervention directly attacks the embryo even if the agent aims to affect only the trophoblast.

On the other hand, from the agent's perspective, it seems that the aim is to preserve the mother's health and the means is detachment, which is achieved by inhibiting the trophoblast cells specifically. The overall lethal effect is not part of the proposal and thus not intended.

We may seem to be splitting hairs, but a question looms here that is hard to settle: when an intended effect is part of a larger whole that is caused in order to bring about the effect, is that whole itself intended? Elizabeth Anscombe raised this question in relation to a case in which the Allies bombed Dutch dikes to flood the Zeelands and thereby kill German soldiers. Many Zeelanders were also killed, and the question Anscombe raised is this: were they killed as side effects of an effort that targeted only the Germans, or were the Germans killed as part of an effort to kill *everyone* by means of the flooding? With respect to the use of methotrexate for ectopic pregnancy, is the loss of cell division throughout the embryo a side effect of an effort to block such division only in the trophoblast, or does the agent intend to inhibit the cell division of the embryo as a whole in order to inhibit cell division in the trophoblast? If the latter, the agent seems to make the embryo's death the means to the embryo's detachment rather than accepting it as a side effect of that detachment. Then the use of methotrexate appears to be an instance of a chemical rather than a surgical abortion.[19]

CONCLUSION

As we noted at the outset of this chapter, we cannot do justice here to all of the arguments for and against abortion. Instead, we have aimed to show, first, that abortion not only falls outside the proper scope of the medical profession but that it contradicts that profession's commitment to never intentionally damage or destroy the life and health of any human being. In addition, we gave reasons for thinking that a stronger conclusion is true: that no one should ever intend the death of an unborn human being, nor should they accept such a death as the foreseen side effect of unjustly refusing to give aid to an unborn human being. Finally, we showed that the rule of double effect is essential to practical reasoning about hard cases: cases in which one or both of the lives of a mother and her child will be lost in the absence of an intervention that itself has lethal effects.

This concludes our treatment of medical ethics at the beginning of life. We turn now to the practice of medicine and medical ethics at life's end.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER EIGHT

# Medicine at the End of Life

Now let's return to the story of Abe Anderson and look further into that of Nora Garcia.

*Abe has been found to have advanced cancer.*

*Nora has suffered a devastating stroke.*

In this chapter we will examine the ethical questions that arise in caring for patients with advanced illness or those who are at the end of life. Most clinical ethics consultations are called to address such questions, which is natural enough, given the two kinds of limits we face. First, we face the limits imposed by human mortality. Aging happens; health declines irrevocably. The health that can be restored is less than it once was. Losses abound; death looms. These limits raise this question: how does one appropriately pursue health when health is irreversibly diminishing?

Second, we face the related limits of medicine. Medicine cannot reverse aging. It cannot overcome the fact that all of us will die, relatively soon. So medicine's efforts become more strenuous and burdensome in exchange for less substantial gains. More is wagered, but less is accomplished. Leon Kass memorably wrote, "Health is a mortal good, and . . . we are fragile beings that must snap sooner or later, medicine or no medicine. To keep the strings in tune, not to stretch them out of shape attempting to make them last forever, is the doctor's primary and proper goal."[1]

Since the advent of the mechanical ventilator, however, physicians, patients, and family members have come to experience the default pathway for dying in American healthcare precisely as a process of being stretched out of shape by life-sustaining technology in a vain attempt to postpone death as long as possible. Unfortunately, out of otherwise reasonable desires that death and the suffering that accompanies it not be unreasonably prolonged, some have moved to embrace death itself as one of the ends of medicine, as if destroying the instrument were the best means of tuning the strings.

What would it look like merely to keep the strings in tune or at least in such tune as is available? And why is destroying the life of a patient not a solution to the problem of the patient's strings being stretched out of shape? In this chapter we address the first of these questions, and in chapter 9 the second.

## SEEKING THE HEALTH THAT IS POSSIBLE

*Abe Anderson and his wife undergo in vitro fertilization, and two years later they are the proud parents of twin girls. One day Abe's wife notices that his eyes look yellow. Abe returns to his doctor. Radiographic imaging reveals a tumor in his pancreas, with multiple lesions in his liver. A procedure is done to place a stent in Abe's bile duct, and biopsies confirm what everyone fears: he has metastatic pancreatic cancer.*

What should the doctor suggest in the face of Abe's diagnosis? How should Abe discern a reasonable way

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

forward? We have proposed that the end of medicine is health; what could it mean to pursue the health of a patient whose disease is incurable? What health-related options are available to someone in Abe's tragic but not uncommon situation?

For simplicity's sake, suppose that Abe's physician believes she can present Abe with two options. We want to ask, first, are these options genuinely permissible for a doctor vocationally committed to health, and second, how should Abe deliberate about these options practically?

Option 1 is to undergo a regimen of chemotherapy. Clinical studies indicate that patients like Abe who receive this regimen live only a month longer, on average, and many die sooner than they otherwise would have, but about one in five patients survive at least a year. Major side effects of this regimen include nausea, vomiting, fatigue, anemia, and immune suppression.

Option 2 is to focus on palliation—treating Abe's pain and other symptoms as they arise and working to sustain his remaining health and function using interventions that are not particularly burdensome, but forgoing further cancer-directed treatment. Often a palliative approach is structured under hospice care. Clinical studies indicate that patients like Abe who choose Option 2 will live about as long, on average, as those who receive chemotherapy. However, almost all such patients die within a year.

Consider how this decision would be framed under the provider of services model (PSM). First, physicians and patients would consider the universe of options that are technically possible, permitted by current law and professional standards, and available in the patient's context. The conventional approach would not hold these options up against a specific end or norm, such as the patient's health. The patient and the clinician would thus not be accountable to an objective standard, although they would still have resources for discernment. They could apply the four principles of bioethics—autonomy, beneficence, nonmaleficence, and justice. Alternatively, they could try to put the known benefits and harms of the two approaches onto some kind of scale to determine which course of action would bring about the greatest good for the greatest number, or at least bring about the greatest good for Abe.

Under the PSM, the resolution of the matter ultimately defaults to the patient's wishes. No one but the patient, after all, is in a position to weigh all of these considerations against the subjective norm of the patient's well-being—the state of affairs that the patient judges to be most desirable, that most aligns with the way the patient authentically chooses to live. In this light, Abe might reasonably choose Option 1 because it would maximize the likelihood of his being alive in a year, a state of affairs he highly values, and because it would align with his identity as a "fighter"—someone who is not going to roll over and surrender to cancer. His physician might go along because she believes that treating the cancer aligns with the principle of beneficence and that doing what Abe requests respects his autonomy.

Abe might choose Option 2 because he believes it would maximize the likelihood that he could avoid pain and other symptoms or at least they could be adequately treated. Being without pain is another state of affairs he highly values, ensuring that he would have a decent quality of life and could continue for as long as possible to do the things that make him who he is. His physician might support this approach because it seems to align with the principle of nonmaleficence and, again, to honor Abe's autonomy. Either way, the goal is for Abe to make a choice that is free, informed, and authentic to his self-perception. A choice that meets these criteria would be made ethically, irrespective of what is chosen.

To summarize, under the PSM the physician offers the range of legally permitted and medically available options, and the patient autonomously chooses the options that comport with his or her own subjective sense of *well-being*.

Interestingly, the Way of Medicine offers guidance that seems to overlap considerably with the PSM approach, although crucial differences distinguish the two. In the first place, options and choices that seem unmotivated by anything other than conventional expectations and subjective preferences under the PSM are given objective guidance in the Way of Medicine. Second, the objective norms that practitioners of the Way of Medicine apply here, where the two approaches overlap, result in very different guidance further down the line when patients are reaching for last-resort options.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

THE PHYSICIAN'S OPTIONS

The Way of Medicine begins with health and with the physician's orientation toward the health that still can be preserved and restored in the patient. Abe's dire situation calls for some reminders about what health is and what it is not; practitioners must not lose this orientation. Health is not the absence of disease. If it were, the good of health would no longer be available to Abe, and his physician would have nothing more to do. Nor is health a matter of black-and-white. Clearly Abe's health will be forever diminished by pancreatic cancer; speaking colloquially, we might say that Abe will never again be healthy. Yet much health remains for Abe, and until his last breath he will enjoy some measure of it, however diminished and unsatisfactory.

Further, health is complex in its dimensions. Abe's physician rightly has in mind Abe's health as a whole organism, given our definition of health as "the well-working of the whole." But the complexity of the whole means that different dimensions of health are at stake in clinical decisions, and pursuit of one dimension often has adverse consequences for another dimension. In addition, health is a basic human good but not the only or even the highest good. As such, at the outset we know that ignoring health or certain dimensions of health makes sense under some conditions. Abe's physician needs to be mindful of these conditions.

The threshold question for a physician—the one that sets out the universe of options to consider—is which, among the technically feasible courses of action, are those plausibly conducive to the patient's health? In this framework, Option 1, the regimen of chemotherapy, can reasonably be offered only insofar as it aims at and has some probability of preserving or restoring the patient's health. Does it?

With Option 1, there is no clear answer. If the chemotherapy would increase by only 1 percent Abe's probability of living for one year, the answer would more obviously be no. If it increased that probability to 50 percent, that answer might obviously be yes. But in the case as it is, Abe's physician must make use of her prudential medical judgment: does this regimen offer a sufficiently realistic possibility of benefit that pursuing it would not be pointless? If Abe's physician believes a regimen is pointless, she does her patient no real service by offering the option. The offer would waste her patient's time, money, and energy and would subject him to other negative effects.

We think Abe's physician could reasonably judge Option 1 a live option in terms of its potential health benefits, but what about its harms: anemia and immune suppression, not to mention nausea, vomiting, and fatigue? How can Abe's physician reasonably inflict these harms on Abe? How can she cause harm to Abe's health without contradicting her profession, and what would give her sufficient reason for doing so?

According to the Way of Medicine, the physician should never intentionally harm or destroy Abe's health. Certain options are simply off the table. But the rule of double effect teaches that Abe and his physician might reasonably accept injuries to health or other goods when those injuries are foreseen but unintended side effects of pursuing Abe's health. As such, Option 1 could be reasonable from the physician's standpoint insofar as the anemia, nausea, and so on were not part of her intention. Some observers would argue that we dissimulate here, that it is nonsense to say that the physician does not intend the immune suppression, nausea, and so on when she knows with certainty that such harms result from a course of chemotherapy. But a good physician might administer Option 1 with the intention of destroying cancer cells and thereby improving the patient's health, not intending to cause nausea or anemia. That the latter are not part of the physician's intention is made clear by the observation that, for example, if the patient does not experience nausea, the physician would not consider herself to have failed (although she might wonder whether the drug was administered correctly).

What about Option 2? How could it be reasonable for a physician—whose commitment is to her patient's health—to offer or participate in a palliative approach to illness that seems to be detached from the pursuit of Abe's health? How could it be reasonable to forgo treatments that might extend Abe's life or, in other cases, even cure the patient? How can one hold, as does the Way of Medicine, that palliative medicine is oriented toward rather than abandoning patients' health?

Thinking of palliation as oriented to health can certainly seem strange. Isn't palliative care pursued, after all, precisely when health can no longer be restored, as in Abe's case? This way of thinking, however, misidentifies health as the absence of disease. One cannot capture all the dimensions of Abe's health by

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

focusing only on his cancer. Nor is health the only good that Abe has in view. So while Abe might, as we will see below, reasonably choose not to pursue aggressive treatment of his cancer—perhaps because of commitments to other basic goods—his physician can still maintain a commitment to his health in dimensions other than the fact of his cancer. Put another way, palliative medicine is indeed good medicine for a patient like Abe, as we will address in greater detail below.

Authority manifests in Abe's situation as follows: Under the PSM, authority is vested, in the guise of patient autonomy, almost exclusively in the patient. Abe has the authority to choose among the universe of options that are technically feasible, legal (and not prohibited by professional policy), and available in his context. The physician's authority is rather limited. She is authorized to refuse interventions that are technically infeasible, illegal, or unavailable, and she retains the authority to refuse interventions that are futile in relation to the patient's goals. For example, the physician might refuse a chemotherapy regimen that clinical trials do not support. By habit and residual convention, at least to this point, physicians also generally retain the authority to refuse to participate in interventions that cause major direct harm to their patients' health, particularly when the prospects of a proportionate health benefit are doubtful. If Abe begins to suffer severe immune suppression, the physician might stop his chemotherapy regimen, even if Abe wants to continue. Although this authority of refusal continues at present as a matter of convention, such refusals may not make sense within the PSM insofar as they suggest an objective standard for harms and benefits that the framework denies. Physicians' refusals appear rather to be a holdover—one of many—from the Way of Medicine that will increasingly come to seem an arbitrary imposition of the physician's judgment regarding what the patient should value.

In the Way of Medicine the physician retains the authority to decide which courses of action sufficiently conduce to the patient's health and thereby cohere with the medical profession. Perhaps Abe has read about an experimental treatment that his physician believes poses too much risk to health with too little prospect of benefit. She exercises her authority justly when she refuses to offer such treatment. Recall, however, that the Way of Medicine does not limit physicians to one course of action that maximizes health. Among the options plausibly conducive to the patient's health, the physician has good reason to recommend the one that she believes is best, all things considered, while taking into account the patient's input. Typically no one "best" option is available, however, even in terms of health outcomes, so the patient has the authority to decide among the physician's proposals. A physician can be both too accommodating, cooperating in medical practices that are not congruent with her commitment to health, and too scrupulous, mandating the course of action that the physician believes is best rather than offering patients a choice among reasonable options.

THE PATIENT'S OPTIONS

We can't forget the patient's perspective. How should Abe think of the options his physician has presented? Our answer consolidates much that we have already discussed and introduces two terms that help us to further explain the Way of Medicine.

The starting point for Abe's deliberations is that he should not intentionally damage or destroy any basic good, including the good of life and health. Any choice he makes among the options presented to him, however, will result in some damage to the basic good of health. Option 1 risks an earlier death and will cause Abe to suffer the negative side effects of chemotherapy. Option 2 will forego the opportunity to potentially prolong his life and advance his health, even if only temporarily.

In light of the information available to him, Abe must determine whether he can reasonably pursue the associated benefits and accept the associated burdens of these options. He must ask, in other words, whether the benefits he would seek are proportionate to the burdens he must accept, or, alternatively, whether the harms he would avoid are proportionate to the benefits he must forego. This familiar practical scenario requires Abe to apply the rule of double effect. If Abe chooses uprightly, the negative consequences of his choices will always be side effects.

In making clinical choices, patients like Abe face burdens that extend beyond negative effects on health, including losses of time and money, as well as losses of other opportunities. The patient also may experience emotional aversions and repugnances toward an intervention, if, for example, it leads to hair loss, fatigue,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

incontinence, or impotence. Abe must consider all of these factors as he weighs his options, but by what standard is he to evaluate them?

The fitting standard in our view is his vocation. Abe is a husband and a parent of two small girls. His life situation is considerably different from, say, that of Mrs. Garcia, an elderly woman whose situation we consider later in the chapter. Abe has work obligations and debts. Perhaps he is alienated from certain friends or family members. Maybe he is a religious man, or perhaps he has let his religious life drift and feels estranged from God. All these considerations must be brought to bear on his options to determine which best fit his range of vocational commitments and responsibilities.

Sometimes a patient will judge all of the treatment options compatible with his or her station in life. In that case, in a sense, not much hangs on the patient's choice. But in many cases, some treatment options are ruled out as incompatible with the patient's vocation. Abe might, for example, judge that for him the benefits of Option 1 are simply not proportionate to its burdens. If so, we could say, using language traditional to the Way of Medicine, that for him Option 1 is *extraordinary*. Those options that he judges acceptable, in contrast, we can call *ordinary*. An extraordinary treatment should not be chosen; an ordinary treatment may be and sometimes must be chosen—if, for example, it is required by his vocation.

Some proponents of the Way of Medicine might object that our view here seems like a version of the PSM, with its emphasis on patient choice, well-being, and authenticity. We disagree. Although patient vocation is a relative standard, it is not subjective. Presuming that he is clear-thinking and reasonable, Abe uniquely understands his own vocation, and he forms his judgments of what is ordinary and extraordinary in relation to that vocation. Moreover, judging in accordance with one's vocation is judging authentically and autonomously, but Abe's judging autonomously is not sufficient for moral rightness, for Abe can judge wrongly that some option is consistent with, called for by, or incompatible with his vocation.

Consider, for example, that the palliative option offers him the most quality time with his family and the clearest mind with which to face his impending death. Perhaps it will also be too financially and emotionally taxing for his young family to accompany Abe on the path of chemotherapy, especially when the benefits are so tenuous. So let us suppose that Abe, consistent with his vocation, chooses the palliative care option. Making such a choice requires some real virtues: wisdom, to recognize that it is the right choice, and courage, to face the hard truth that he will likely be dead within a short period of time. Virtue being always in short supply, Abe will face abundant temptations to choose something that (we are stipulating) offers only a false hope and only the appearance of fighting. That Abe has the authority to make such a choice does not make his choice right. Even here, despite apparent similarities, the Way of Medicine differs fundamentally from the PSM.

## THE RELIEF OF SUFFERING

Before going further, let's return to a question raised by Option 2, the prospect of a palliative approach to Abe's illness. Palliative medicine treats pain and other symptoms, thereby reducing suffering. What does reducing suffering have to do with medicine—that is, with the patient's health?

As mentioned earlier, by forgoing medical interventions that are burdensome and time-consuming, a palliative approach leaves more room for a patient to pursue other worthy goods—whether work, play, worship, or simply putting one's affairs in order before dying. In this sense, a palliative approach is justified insofar as it avoids the mistake of treating health as if it were the only or the highest good. Palliative medicine goes further, of course, by treating pain and other causes of suffering.

But this key objection remains: the notion that palliative medicine aims at health seems counterintuitive, because it seems that we deploy palliative medicine when health can no longer be restored, when diseases are incurable. This intuitive way of thinking, we propose, misunderstands health as well as the practices of palliative medicine. Again, health is not merely the absence of disease. It is, as Leon Kass put it, the "well-working of the organism as a whole," manifest in the activity of the body "in accordance with its specific excellences." Kass pointed to a squirrel to illustrate health. A squirrel's health is displayed in its characteristic activities of well-working, such as burying nuts, chattering, and climbing trees. The characteristic activities of humans are more varied, of course, and so therefore are their expressions of health,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

but such expressions certainly include the capacity to eat and digest food without vomiting it up, to move one's bowels, to sit or lie or walk without wracking pain, and to stay awake and fall asleep at the proper times. Palliative medicine cannot return Abe to the state of health he had before his diagnosis, but if it helps him go from a state of nausea, constipation, insomnia, and wracking pain to one in which he is able to tolerate food, move his bowels, sleep six hours at night, and move around free of debilitating pain, palliative medicine will have contributed to Abe's health. These sorts of contributions to health make it possible for Abe to pursue other goods still available to him.

Here the distinction between the PSM and the Way of Medicine begins to have practical and not just theoretical consequences. Palliating disabling symptoms with an eye to preserving and restoring a measure of health differs fundamentally from palliating symptoms without respect to whether doing so will restore health. Physicians should respect this distinction, embracing the former practices of palliation and resisting the latter.

The PSM, however, treats this distinction as clinically and ethically insignificant, urging pursuit only of that state of affairs that the patient values or desires. By this standard, only coldhearted and unreasonable doctors would refuse interventions that would end a patient's suffering simply because those interventions might contradict medicine's traditional orientation to health. What good does this narrow focus on health do for a patient dying of cancer?

In the environment of the PSM, "palliative care" has come to be cast as a broader, more holistic, more comprehensive form of professionalized care than mere medicine can offer. In effect, rather than being an essential practice within medicine, palliative care becomes an alternative and rival to medicine, with more expansive goals. For example, the World Health Organization defines "palliative care" as "an approach that improves the quality of life of patients and their families facing the problems associated with life-threatening illness through the prevention and relief of suffering by means of early identification and impeccable assessment and treatment of pain and other problems, physical, psychosocial, and spiritual."[2]

This formulation gives palliative care a seemingly boundless scope of activity. What problems, after all, are excluded from the categories of physical, psychosocial, and spiritual? In this formulation, the goal is not restoring health per se, but rather relieving suffering and improving a patient's quality of life. That goal is to be achieved through assessment and treatment—concepts that resonate with the vocabulary of medicine—yet neither suffering nor quality of life is necessarily related to health.

When efforts to relieve suffering and improve quality of life become unhinged from the goals of preserving and restoring health, palliative practitioners begin to see all forms of suffering as conditions that call for treatment, including existential suffering. Furthermore, because palliative care is committed to maximizing patient control, and because only the sufferer can authoritatively assess suffering and quality of life, palliative care practitioners trade clinical judgment oriented to the patient's health for the direction given by patient preferences. Indeed, palliative professionals are often encouraged to relieve conditions on the basis of the patient's considering the condition "unacceptable" or "intolerable," setting aside the physician's judgment regarding how the condition or its treatment is health-related.[3]

Ultimately, in order to minimize suffering and maximize quality of life, and to do so according to patients' values, physicians come to consider death itself, albeit a "good death," as one of their goals. The National Hospice and Palliative Care Organization describes "hospice" as follows: "Hospice affirms the concept of palliative care as an intensive program that enhances comfort and promotes the quality of life for individuals and their families. When cure is no longer possible, hospice recognizes that a peaceful and comfortable death is an essential goal of health care."[4] In this formulation, palliative care shifts from relieving disabling symptoms so that patients can live as well as possible in the face of death to treating unwanted symptoms so that patients can die comfortably. It shifts from helping patients who are dying to helping patients to die.

No wonder that recent years have witnessed a groundswell of support for "last-resort options" in palliative care, including physicians' helping their patients to die via suicide and euthanasia. These last-resort options are the focus of chapter 9.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

THE LOSS OF DECISION-MAKING CAPACITY

*Nora Garcia is an eighty-year-old woman with a history of diabetes, high blood pressure, and coronary artery disease. At the encouragement of her geriatrician, Mrs. Garcia wrote a living will in which she stated that if she were in an irreversible coma, she would not want to be kept alive. She also told her physician in a conversation that she documented that she never wanted to be stuck on a breathing machine. "Just let me go," she said. One day Mrs. Garcia develops a fever, chills, cough, breathlessness, and confusion. By the time an ambulance delivers her to the local emergency room, she is found to be on the brink of respiratory failure from pneumonia.*

Mrs. Garcia's case brings to light the common phenomenon of patients who are not able to make medical decisions for themselves. Young children do not have the capacity to make their own medical decisions, and even older children, for the most part, lack authority under the law to make medical decisions. Adults, however, are expected to be self-determining, and as people age many fear that they will be treated in ways they do not want—either receiving more medical interventions than they desire in the default pathway for technological medicine or receiving less medical support than they believe they deserve. In his best-selling book *Being Mortal*, physician-author Atul Gawande lamented the fact that despite handwringing all around, patients continue to suffer and die in ways that depart from what they say they would want, and contemporary medicine bears much of the blame.[5]

The problem is not that patients are receiving medical interventions that they actively refuse. Rather, the default pathway moves people inexorably toward life-sustaining technology that, when people are in better health, many would not imagine wanting. When people lose the capacity to make decisions for themselves, they often remain on that default pathway, continuing to receive interventions that they did not desire when healthy, and still would not desire.

The PSM has sought to address this problem by shoring up patients' autonomy, ensuring that medical care at the end of life accords more fully with patients' wishes. The primary mechanism for bolstering patients' autonomy, and the one that has received the most public attention and encouragement, is advance directives. *Advance directives* permit patients to specify, in writing, what kinds of medical treatment they would want if they were to suffer injuries or other health losses in the future. A living will (which Mrs. Garcia had) sets out in writing what kind of medical treatments one would want. Increasingly, physician orders for life-sustaining treatment (POLST) are used to specify these wishes and give them authority within health care. A durable power of attorney for health care (DPOAHC) specifies who is authorized to make health care decisions for the patient if the patient cannot make decisions for himself. Different advance directives carry different levels of legal authority, depending partly on where the patient lives, but all of them become active when a patient loses decisional capacity. In theory, advance directives ensure that patients' autonomy is respected when patients cannot exercise that autonomy. In practice, advance directives help to mitigate the pattern that Gawande and others have observed, in which patients who lose decisional capacity cannot get off the train that leads to unwanted and unhelpful medical interventions.

A number of criticisms have been raised regarding advance directives. The first is that they do not genuinely protect or further autonomy. Mrs. Garcia, when she wrote her living will, could not have anticipated the particular situation in which she is now, and now that she is in this situation, she does not have any autonomy. She still deserves respect, but her autonomy cannot command our respect when her illness has removed that autonomy.

The emergency room physicians face an urgent question: should they intubate Ms. Garcia to support her breathing while they give her fluids, antibiotics, and other ministrations in hopes of restoring her to the health she had before this infection? Or should they forgo the ventilator in light of her statement that she would not want to be kept alive on a breathing machine, knowing that without the ventilator she likely will not survive the next twenty-four hours?

The PSM emphasizes the subjective norm: what would she have wanted? The problem is that her physicians cannot know, because Mrs. Garcia herself could not know, what she would want in this particular

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

situation. She certainly didn't envisage this scenario when she wrote her living will. With an unclear advance directive—and most living wills are similarly unclear—physicians typically turn to duly authorized surrogate decision-makers. While we address surrogates in a moment, let's assume at this point in the story that no such surrogates are available. In the conventional approach, in light of uncertainty about what the patient would have wanted, the physicians might do what most people want them to do in such cases—that is, what people who have the capacity to choose typically choose: they would intubate Mrs. Garcia to see if they could turn her illness around. Such decisions are sometimes justified on the grounds that they restore the patient to a state in which she can make a more considered, authentically autonomous, choice. Dying, of course, cuts off all possibilities of future autonomy.

On the Way of Medicine, Mrs. Garcia's physicians have good reason to act expeditiously to maintain the health that can be preserved using reasonable means. This aligns with the constitutive purpose of medicine—a predisposition to preserve health when possible. This disposition reasonably accepts that health is a basic good for an eightyyear-old, just as for a twenty-five-year-old; age can limit what health is possible but not the goodness of health itself.

As we have stressed, health is not the only good, and actions available to restore health have limits. Therefore, physicians need not do everything possible to keep Mrs. Garcia alive, as if there were no other goods at stake, and they need not do anything that is clearly either excessively burdensome or unlikely to preserve or restore a significant measure of health. These judgments are always context-dependent and require the physicians' prudence. What would be reasonable in an average US city may not be reasonable in a remote part of a developing country. And age matters insofar as the health of an eighty-year-old is more tenuous and attenuated, all else being equal, than that of a twenty-five-year-old.

We are not claiming that patients lose the authority to refuse medical interventions—even those interventions that have great promise for restoring health. If Mrs. Garcia had stated clearly that she was never to be intubated, period, her physicians should decline to intubate her as a matter of respect for the patient's authority to make such decisions prospectively; her decision-making authority can be respected, even if she has no autonomy to respect. The patient's authority is all the more in view if he or she has taken some legal step to give that refusal force and indicate that the decision is a considered one.

Because patients cannot anticipate every contingency, however, living wills are generally less useful than are DPOAHCs. Unlike living wills, DPOAHCs allow a patient to delegate authority for future decision-making to a person the patient trusts. Even if the objective is to secure decisions that the patient would have made if she were able to make them for herself, the DPOAHC is preferable insofar as the patient can have in-depth discussions with her authorized surrogate and give the surrogate the flexibility to fit a future decision to the complexity of the patient's story and the details of the specific clinical situation. In any case, if an advance directive does not unambiguously address the clinical question at stake, physicians are taught to use the second procedural mechanism: surrogate decision-makers.

SURROGATE DECISION-MAKING

*The physicians intubate Nora Garcia. After a rocky course of three days, she is taken off the ventilator. She is very weak but improving slowly. The next morning, she is found unresponsive in bed. An urgent CT scan of her head finds a large hemorrhagic stroke. The doctors go to Mrs. Garcia's three grown children, who have now gathered, in order to have an urgent family conference and decide what to do next.*

When a patient is incapacitated, someone must have the authority to make medical decisions for her. It seems reasonable that such authority resides with the one to whom the patient has explicitly granted it if the patient has a durable power of attorney for healthcare or, in the absence of such explicit declaration, to those closest to the patient: her spouse, adult children, and so on. But what standard should these surrogate decision-makers use in exercising their authority on Mrs. Garcia's behalf?

With its singular emphasis on patient autonomy, the PSM has come to affirm what is called the *substituted judgment* standard. Out of respect for patient autonomy, physicians are taught to approach the legal surrogate or surrogates—in this case, Mrs. Garcia's children—to explain the situation accurately,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

including the options that are technically feasible, legal, and available, and to encourage the surrogates to make the choice that the patient would make if she were able to choose. The physician might say, "The question is not what you think is best or what we might think is best. The question is this: what would she have wanted?"

The substituted judgment standard has several problems. First, substituted judgment, in such cases, seems to sustain a façade of respecting autonomy that both hides and distracts clinicians and surrogates away from the actual question faced: all things considered, what is a fitting way to care for this patient? One cannot respect what does not exist, and Mrs. Garcia does not possess autonomy in her state. Rather, she is utterly dependent on those who would care for her. Moreover, to divine what she would have chosen if she could have chosen for herself is an exercise fraught with uncertainty. Researchers have found that close family members, including spouses, are notoriously inaccurate in predicting what their loved ones would want in prospective clinical situations.[6]

A final problem with the substituted judgment standard is that it divests physicians of a responsibility that they are obligated to exercise. Because of the subjectivity of what the patient would have chosen if she could have chosen for herself, the substituted judgment standard puts physicians in a passive role of merely giving information and options, deferring to the surrogates to make an informed choice. The physicians' primary aim as healthcare professionals, however, is not to find what the patient would choose if she could do so. Rather, the physicians' aim is to find a way to preserve and restore the health of the patient that still can be reasonably preserved or restored and to do so in a way that respects the patient's authority to give consent only to those proposals that fit her vocation.

Although the patient's authority has moved to surrogate decisionmakers, the physicians ought not assume a passive posture. They should listen to and consider the surrogates' statements about the patient's vocation—how she lived, what her obligations are, what she loved, what they think she would encourage them to choose if she could—and, as we will see, the surrogates' statements about their own vocations. The physicians listen in order to propose courses of action that they believe align with the patient's health and vocation in light of this information.

The physicians should not by default encourage the family to "do everything." Indeed, in many cases the physicians can state, as the Hippocratic tradition suggested long ago,[7] that medicine has little left to offer other than solidarity and basic care. Health is a good that cannot be preserved forever, and in Mrs. Garcia's representative case, the patient's surrogates might reasonably focus on other goods. The primary point is that when a patient cannot exercise her authority to give consent for medical interventions, that authority shifts to the patient's surrogates, but the structure of the physician's discernment remains the same: the goal is to find a course of action that aligns with the physicians' orientation to the patient's health while remaining open to other basic human goods and the relevant truths about the patient's vocation.

Yet another question arises here: whose vocation is to guide the surrogate(s)' decision-making? The answer is that the surrogates' vocations now provide the relevant standard. Thus our view not only differs sharply from the substituted judgment standard but also differs somewhat from the *best-interest* standard. According to the latter, surrogates should judge and act in accordance with what is objectively best (often identified as in the "medical best interest") for the patient. That standard is superior to the substituted judgment standard insofar as it reflects the truth that surrogate decision-makers are charged to care for the ill and incapacitated patient, making the patient's welfare central to their consideration.

But surrogates have other concerns and other vocational commitments. They may have children or spouses who depend on them. They may have jobs to do and bills to pay. Surrogates can't abandon these. Accordingly, the terms discussed earlier—*extraordinary* and *ordinary* burdens and treatments—become apt for the surrogates' consideration. They are faced with options whose benefits and burdens bear not only on the patient but also on the surrogates themselves. Which interventions are ordinary and which are extraordinary now has to be determined in light of the surrogates' vocations—vocations that include but are not limited to obligations to care for the loved one in question.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

INTENTION AND PROPORTIONALITY: A CASE STUDY

*Abe Anderson opts for chemotherapy, planning to receive an infusion biweekly for three months. Six weeks into this plan, repeat radiographic imaging reveals that his tumors have grown despite treatment. Meanwhile, he has lost thirty pounds and is starting to have severe abdominal and back pain. Vicodin no longer relieves the pain, and Abe's doctor recommends scheduled doses of morphine. Abe's wife worries about his being sedated and about addiction to opioids.*

How can Abe's physician reasonably prescribe morphine in this case, when she knows that doing so likely will lead to her patient's physiological dependence on morphine? Once again, we must advert to the rule of double effect. Administering morphine has good effects—relief of pain—and bad effects: constipation, sedation, dependence, and more. What makes the physician's action reasonable, according to that rule, is that she intends only the good effects—in this case, the relief of Abe's health-diminishing pain—and that proportionality rests between the expected goods and harms. This judgment of proportionality is not a matter of looking for one choice that maximizes the net goods; no such choice can be known due to the goods' incommensurability. It is a matter of considering the gravity of the goods and harms at stake.

For example, if Mr. Anderson's pain were minor, the physician would have less reason to administer morphine. Proportionality also governs dosing: physicians need not be squeamish about giving adequate pain relief, but they are prevented from giving dosages that far exceed what one might reasonably expect to relieve Mr. Anderson's pain.

In this case, however, Abe's pain is serious. Given that he has relatively little time left to live, the risk of dependency does not seem as significant as it might otherwise. So it seems reasonable to prescribe him morphine to address his pain, provided that the side effects of constipation and sedation are acceptable to him.

*Over the next two weeks, Abe Anderson grows steadily weaker and sleepier, often remaining in a state of somnolence. His wife wonders if the doctors are overmedicating him.*

Mrs. Anderson's question points to the difference the Way of Medicine makes. In the PSM, her concern prompts a question: what does Mr. Anderson really want, or what would he choose if he could choose for himself? If Abe's current experience suggests that the morphine dosing is not hitting the right balance, his doctors can adjust the medication according to his desires. In the PSM, whether the physicians are disposed to increase or decrease the dosing in this case depends entirely on the patient's wishes. Indeed, family members often ask that medication doses be increased to preclude any possibility of the patient's suffering.

The Way of Medicine, in contrast, returns once more to the norm of Mr. Anderson's health, with the rule of double effect helping the physicians stay on track. Is the morphine achieving the relief of health-diminishing pain, and is it doing so in a way that is proportionate to the adverse side effects? Can the former be achieved in a way that does not bring as much of the latter? These questions require the physicians' clinical judgment, which changes when circumstances change. For example, the effects of sedation that seemed minor when accepted as a consequence of relieving severe pain may seem more consequential when they are the consequence of moving from adequately relieved to completely relieved pain. Accepting some level of discomfort might be reasonable in order for Abe to maintain some degree of consciousness, if doing so allows him to interact with his family and to prepare himself for death. On the other hand, the sedation that was a heavy burden when it kept Mr. Anderson from putting his affairs in order may become a minor burden when he is actively dying.

Critically, Abe's physician rightly limits herself to those actions that are congruent with her commitment to her patient's health. She would be reticent, for example, to push the morphine dose high enough to render Mr. Anderson unconscious, even though by so doing she could prevent any further suffering. But she would also be reticent to watch her patient writhe in agony while abstemiously titrating up the dosing in tiny

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

intervals out of concern for going too high. Finding the right practice here requires judgment, which is gained through long years of experience in pursuing patients' health while respecting the requirements of practical reason.

> *Nora Garcia's children were conflicted when her physicians asked them to decide whether she should be intubated or not. In the context of their uncertainty, the physicians intubated Mrs. Garcia. Three weeks later, she coughs when her airway is suctioned, but she still has not recovered enough to respond meaningfully to voice or touch. She receives ventilator support via a tracheostomy and nutrition via a feeding tube inserted through her abdominal wall. At this point, her three children together come to the physicians, saying, "We had hoped she would recover, but she has not. She would never have wanted to continue like this." The children ask that the ventilator be discontinued. "Just keep her comfortable," they say.*

In the PSM, the physician's obligations in regard to removing the ventilator are straightforward. The law allows life-sustaining technology to be discontinued; the duly appointed surrogates are requesting that it be discontinued; and, moreover, they are doing so according to the substituted judgment standard—they are making the request that they believe Mrs. Garcia would make if she were able. To make sure the surrogates' choice is informed, the physicians should tell the surrogates what they expect will happen as a result of discontinuing the ventilator, but then the physicians must do what is requested.

An additional issue arises: how to keep Mrs. Garcia comfortable when and after the ventilator is removed. Should narcotics and sedatives be given prospectively to reduce the chance that she will experience breathlessness and subsequent distress in the short time she is expected to live after life support is withdrawn? If so, what norms guide the dosing of such medications? Again, the answer is easy in the PSM: the norm is to minimize suffering and maximize quality of life according to the wishes of the patient or her surrogates. Therefore, after explaining to the family how the drugs work, the physicians are obligated to give a dosage that meets the family's expectations for their loved one's comfort. That dosage may be quite disproportionate to the discomfort the physicians expect their patient to experience if the surrogate decision-makers' primary concern is minimizing the possibility of any suffering.

Here the PSM and the Way of Medicine again overlap somewhat, despite their different starting points. In the Way of Medicine, the first question is how can removal of the ventilator be consistent with the physician's commitment to the patient's health? The second is how is removal of the ventilator consistent with the requirements of practical reason?

Mrs. Garcia's physicians are confident that she will die shortly after the ventilator is removed. How can anyone, much less a physician, remove the ventilator knowing that the patient will die as a result? Once more, guidance comes from the rule of double effect. The physician's commitment is to seek to preserve and restore his patient's health using reasonable means, insofar as the patient grants the physician the authority to do so. Keeping Mrs. Garcia on the ventilator provides at least a modicum of her health insofar as it maintains her life, and maintaining her life allows for further steps to be taken to improve her health, even if such steps do not hold much promise in her case. Thus keeping Mrs. Garcia on the ventilator can be reasonable as medicine.

But the ventilator's contribution to Mrs. Garcia's health, while real, is also relatively minor. In her case, use of the ventilator does not make possible further interventions to recover her lost health. Indeed, while medical technology can keep her alive indefinitely, little to no prospect remains for further healing. Moreover, the ventilator brings significant burdens: it is expensive; it requires Mrs. Garcia to stay in an intensive care unit; and it is relatively intrusive to her body, obstructing certain natural pathways of human interaction between her caregivers and her.

While Mrs. Garcia's physicians have some reason to maintain ventilator support, they should also respect the health-related limits of doing so, and the fact that her surrogates might reasonably judge that the burdens of continuing ventilator support are disproportionate to the benefits. Those surrogates can consistently treat Mrs. Garcia's life and health as goods while also judging that the ventilator should be removed in order to avoid the burdens associated with it—expense, intrusiveness, and so on. They can and should make that

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

judgment in light of their own vocational commitments, which might include honoring what they believe their mother would have wanted—to end her days in the personal company of her loved ones rather than in the impersonal company of machines.

In choosing to discontinue the ventilator, neither the surrogates nor the physicians need to aim at the patient's death. The surrogates can choose to avoid certain burdens and to pursue a certain kind of human and personal environment for their remaining time with Mrs. Garcia, aware that death will likely be hastened as a side effect of seeking those benefits (including avoiding those burdens). The physicians can accommodate the surrogates' choice either because they share their intentions or if for some reason they disagree with the surrogates' judgment, because they intend to honor the surrogates' legitimate authority. In neither case do the physicians intend Mrs. Garcia's death either as a means or as an end. The surrogates and the physicians can act reasonably here in discontinuing the use of Mrs. Garcia's ventilator.

Of course, different circumstances would affect our judgment. Imagine, for example, that with two weeks more mechanical ventilation, Mrs. Garcia would likely return to the health she enjoyed before she fell ill. Then the burdens of mechanical ventilation for two weeks would not appear disproportionate to its anticipated benefits. The ventilator would be seen as ordinary treatment, and discontinuing it would be unethical. But even these judgments depend on considerations over which the surrogates have authority. The Way of Medicine respects that authority, allowing the physician to cooperate with an action that the physician would not choose herself.

Furthermore, what is true of the physicians relative to the surrogates is true of both relative to the patient. If Mrs. Garcia were to recover decisional capacity, she would have authority to ask that the ventilator be discontinued even if it was thought that only two weeks more of ventilation were needed to bridge her movement to a promising new treatment. That decision might be wrongful, and her family and physicians should voice their concerns, but the competent patient's authority to refuse medical interventions is almost absolute. Surrogates and physicians can intend to honor that authority while accepting as side effects the consequences of a patient's wrongful choice.

Surrogates' authority is more constrained than patients' authority. Traditionally, surrogates' decisions have been required to meet what has been called a *reasonable person standard*. If a surrogate makes a request that no reasonable person would choose (for example, removal of a ventilator right after a major surgery, before the patient has had a chance for anesthesia to wear off), the request will exceed the surrogates' authority and physicians may refuse it.

Let's now return to the question of Mrs. Garcia's comfort when the ventilator is withdrawn. The physicians' goals must remain tethered to the norm of the patient's health and subject to the questions of intention and proportionality. That the patient will die soon does not justify setting these considerations aside, though neither does the physicians' commitment to health mean that they must be tentative in administering medications to relieve breathlessness. Patients who die of respiratory failure often appear to experience profound distress from breathlessness, gasping for air as if drowning. Such a state is not one of health. Relieving such a state would seem to be an act required of healthcare professionals.

So a physician administers medication to mitigate breathlessness. Here we note a story from the clinical experience of one of the authors. Dr. Curlin was caring for a patient on a general medical service during training. The patient, an elderly woman, had suffered a devastating stroke, very much like the one Mrs. Garcia suffered, but instead of placing a tracheostomy, the family asked that the ventilator be withdrawn, recognizing that the patient would die. The patient was moved to a private room on the general medical floor, where her family could be present while the ventilator was withdrawn. When evaluating the patient, Dr. Curlin observed no spontaneous respirations and no response to painful stimuli. He asked the nurse to have a couple of doses of morphine available should the patient appear to be suffering breathlessness or distress as she died. After the ventilator was withdrawn, the patient did not breathe for more than a minute. Then she began to gasp. She grimaced, and sweat broke out on her brow. Her chest heaved, as if she was struggling to breathe but could not. Dr. Curlin called for the morphine to be administered, but in the five minutes it took for the nurse to access the IV and deliver the medication, the patient had died.

This was poor medicine. Dr. Curlin should have anticipated the possibility, even probability, that the patient would have a residual drive to breathe. Knowing that she would likely not be able to breathe sufficiently to survive, he should have given a dose of medication in advance that would have relieved her air hunger, and then had medicine available to be administered immediately, titrated to signs of such distress.

Such an act would have been medicine truly in service of mercy. An important part of the physician's vocational commitment is to be concerned with patient health even in life's final moments, and the relief of breathlessness when a ventilator has been removed is a genuine manifestation of this commitment.

Poor medicine can also involve setting aside proportionality or embracing impermissible intentions. Physicians sometimes start a morphine infusion simply because a patient is expected to die, and then the infusion is titrated for no reason other than that the patient has not died yet. To give an example, palliative medicine colleagues of Dr. Curlin once were asked to see a patient in the ICU who had not recovered from a major surgery. The family asked that life-sustaining technology be withdrawn. The palliative medicine team left recommendations for medication to relieve distress, with dosing proportionate to what they expected would be needed. They returned hours later to find the patient profoundly sedated on doses of narcotics and sedatives much higher than they had recommended. When they asked about such high dosing, the surgical team said that the family was distressed that it was taking so long for the patient to die. This case and others like it demonstrate physicians detaching from the norm of the patient's health, instead beginning to aim at the patient's death. When medication dosing becomes disproportionate to what is needed to relieve disabling symptoms, something has gone wrong.

Unfortunately, the PSM conditions physicians to ignore, or even to welcome, these departures from proportionality and an orientation to the patient's health. After all, the point of the PSM is to relieve, using the tools at hand, the conditions that the patient or her surrogate suffers. When being alive comes to be experienced as a burden, the physician's tools can quickly become death-dealing, opening the patient up to the expanding domain of so-called last-resort options.

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER NINE

# Last-Resort Options

In this chapter we meet patients who are not only at the end of life but seemingly at the end of hope. What should physicians do when patients are dying and have nothing left to look forward to except pain and misery? We have already established that physicians have good reasons to treat pain and other symptoms effectively, and at times to accept substantial side effects of such treatment, including even the effect of hastening death. But some patients want more. They want to die on their own terms, not wait for their illnesses to bring about their death in unwanted ways. In particular, they experience a state of profound and irreversible debility and dependence as one that is worse than being dead. What can be done for such patients?

In the provider of services model (PSM), physicians facing such cases are urged to consider what their proponents call "last-resort options" for palliative care. These include encouraging the patient to voluntarily stop eating and drinking, administering palliative sedation to unconsciousness, and, most prominently, offering assisted suicide and euthanasia. What makes all of these practices controversial is the question of intention: is the patient's death intended in these practices? If so, on the Way of Medicine, such practices are ruled out from the start.

Not so under the PSM. Rather, clinicians pursue the goals of minimizing suffering and maximizing quality of life without any absolute prohibitions, not even the prohibition against killing one's patient. At the time of this writing, assisted suicide and euthanasia remain illegal in most US jurisdictions; for the moment, in most jurisdictions such practices are not in the universe of options that physicians must offer patients. But when that changes—as it has changed in several US states, all of Canada, and several European nations—the PSM not only permits assisted suicide and euthanasia; it can require physicians to accommodate patients' requests for these options, at least by referring them to someone who will provide them. The PSM approach centers on its commitment to use medical technologies to bring about *well-being*. After all, how can a patient be said to have well-being if he lives when he wants to die, particularly when he obviously suffers a degraded and steadily diminishing quality of life?

When the goal of medicine shifts from helping patients who are dying to helping patients to die, practices that hasten death no longer seem like last-resort options. Indeed, such practices seem to follow ineluctably from making the relief of suffering—an alternate formulation of *well-being*—medicine's first principle. Medicine aims to minimize suffering and maximize quality of life according to the patient's judgment and values. The patient is suffering and experiences a poor quality of life. The clinician has the tools to make the suffering go away by making the condition of being alive and conscious—which makes suffering possible—go away. Although intentionally bringing about the patient's death would seem to contradict the goal of preserving and restoring health, medicine is no longer constrained by such goals. Therefore, the clinician may, and is perhaps morally obligated to, offer the patient various means by which the patient can bring about the end of his life.

Before we get too far ahead of ourselves in discussing "last-resort options," let's consider cases that involve continuing or withdrawing nutrition and hydration. How would the Way of Medicine approach these practices?

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

ARTIFICIAL NUTRITION AND HYDRATION

*Nora Garcia is moved to a private room for her use of the ventilator to be discontinued. When that is done, despite the physicians' expectations, Mrs. Garcia breathes on her own, so a few days after that she is moved to a long-term nursing facility. Six weeks later she has developed a bedsore but is otherwise clinically stable. Her family now asks that tube feeding be discontinued.*

The laws of most nations allow tube feeding, or artificial nutrition and hydration (ANH) to be discontinued at the request of a patient or the patient's surrogates. The reasonable-person standard applies to the latter, but that standard would allow physicians to remove the feeding tube in Mrs. Garcia's case, just as many otherwise reasonable persons elect to discontinue tube feeding in similar cases.

According to the PSM, the physician's obligation here is straightforward: inform the surrogates of what can be expected with continuing or discontinuing the tube feedings, ask them to imagine what Mrs. Garcia would choose if she could, and then accommodate the surrogates' choice. In such situations, surrogates and clinicians often talk about choosing quality of life and comfort over degradation and suffering. They might talk about allowing the patient to die with dignity. The application of such concepts, along with the four principles guiding the practice of medicine (autonomy, beneficence, nonmaleficence, and justice), tends to hinge on the ideal of authentic choice: choosing what the patient would have chosen if she were able.

Thus, for example, if the surrogates say that Mrs. Garcia would never have wanted to live like this, they or Mrs. Garcia's physicians might conclude that continuing the tube feeding violates the duty not to harm because it forces her to endure a degraded condition, or poor quality of life. If, alternatively, the surrogates decide that the patient would have chosen to continue the tube feeding (believing, perhaps, "She would have wanted everything done"), discontinuing the feeding would seem to violate the same duty not to harm, or at least fail to fulfill the principle of beneficence by withholding something from which the patient benefits. Again, everything turns on what the patient would have wanted.

Of course, when the patient clearly has refused ANH prospectively, or at present still has the capacity to refuse, the case is even clearer: the physicians must accommodate the refusal. But what is notable, and notably different from the Way of Medicine, is just what surrogates and clinicians are respecting when accommodating such refusals. If the patient refuses nutrition and hydration in order to die, then proponents of the PSM generally suggest that the decision itself is to be honored out of respect for patient autonomy. The thinking here is straightforward: the patient decides whether his life is worth living. If he decides it is not, that settles the question of what should be done, despite what seems a clearly suicidal intention.

By contrast, the Way of Medicine holds that life is always a good, and the complex good of life and health is the object of medical commitment. Accordingly, a patient cannot reasonably refuse artificial nutrition and hydration—whether by advance directive or in the moment—if his goal in doing so is to bring about his death. Likewise, a clinician or surrogate who cooperates in that decision in order to bring about the patient's death is doing something wrong—contrary both to practical reason and to the norms of medicine.

Having said that, cooperation with the patient's request is not entirely ruled out. While the Way of Medicine does not ask clinicians to respect an unreasonable choice, it does ask them to respect patients' authority to make such a choice. Thus, doctors are not to refuse a patient's request to discontinue ANH, even if the patient's choice is unreasonable. The doctors cooperate in order to honor the patient's legitimate authority, however, not to bring about the patient's death.

Moreover, patients can refuse ANH uprightly. A patient might, for example, decide in advance not to ask certain forms of care of their future caregivers, out of concern for those caregivers. Or, sensitive to the limits both of health and of medicine, the very elderly might ask not to be encumbered with tubes when their time is already short. Both of these reasons for setting limits to medical interventions are legitimate, and generally where the possibility of an upright refusal exists, the patient's legitimate exercise of authority is to be respected even if one strongly suspects that that authority is being misused in a particular case.

Thus, when it comes to refusing artificial nutrition and hydration, the Way of Medicine overlaps with the PSM in acknowledging a patient's authority to refuse medical interventions, including ANH, and it

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

contradicts the PSM in rejecting suicide and any intentional cooperation with it.

Mrs. Garcia's case differs from the cases just described, however, insofar as she did not request prospectively that she not receive artificial nutrition and hydration. What should the physicians do? They and Mrs. Garcia's surrogates should deliberate in the same way that they deliberated about removing the ventilator. The rule of double effect still applies, though among proponents of the Way of Medicine, some disagree with the notion that tube feeding in a case like Mrs. Garcia's can reasonably be considered to have a burden that is disproportionate to the benefits it provides. Further, some worry that under the pretense of removing a burdensome intervention, those who want to discontinue ANH for Mrs. Garcia are actually making the removal a means of bringing about her death.

Recall that the tube feeding may be discontinued if it is disproportionately burdensome—that is, extraordinary. This presupposes that real benefits accrue to continued feeding, for if feeding becomes strictly futile (e.g., if the patient develops a bowel obstruction), it would be unreasonable for physicians to even offer to continue it. But in Mrs. Garcia's case ANH helps to maintain her life and health (if there is no life, there is no health, and vice versa). These are genuine goods for all human beings, and Mrs. Garcia remains a human being.

Of course, some people object that Mrs. Garcia's life and health are of value only insofar as they make it possible for Mrs. Garcia to pursue other goods. If that is true, ANH is no benefit to her, because her life and health are of no further instrumental value. This claim is incompatible with the requirements of practical reason, however, for all the basic goods are intrinsically good for all human beings. It is also incompatible with a straightforward inference from a basic claim. If we consider ourselves as having intrinsic value and acknowledge that we are living animal organisms, our biological lives must be of intrinsic value, for that which constitutes the existence of a being with intrinsic value must itself have intrinsic value. So we take this objection to be misconceived: Mrs. Garcia's life and health remains good in itself, even if she can realize that good only to a minimal degree.

Feeding Mrs. Garcia also realizes the good of solidarity—a form of friendship, of being humanly and personally connected to another, willing his or her good for its own sake, and engaging in care for them when they are in need. Some actions clearly would violate such solidarity: dressing Mrs. Garcia up like a clown for the amusement of others, violating her physical integrity, and the like. Caring for her—and feeding is a primordial form of caring—realizes the good of friendship even if Mrs. Garcia does not consciously experience it.[1]

Does ANH bring burdens? Yes. Tube feeding brings costs as well as risks of infection, aspiration, and other clinical complications. Whether Mrs. Garcia suffers as a result of her feeding tubes is hard to say. The burdens ANH imposes on her seem relatively light, if not trivial. However, some patients who are not in Mrs. Garcia's circumstances face further burdens. Patients with Alzheimer's disease, for example, are sometimes distressed by feeding tubes and tear them out; preventing their doing so can require chemical or physical restraints, which impose significant burdens of their own. Such burdens could warrant withdrawing the tubes to avoid these (disproportionate) burdens. Likewise, if a patient is actively dying or is otherwise unable to assimilate nutrition, the benefits of feeding will not be proportionate to the burdens, and feeding may be discontinued. But in Mrs. Garcia's case, it seems less clear that continuing ANH brings disproportionate burdens.

ANH should not be discontinued with the intention of bringing about Mrs. Garcia's death, and this principle raises a particular difficulty for one response to the question of proportionality. In that response, the surrogates or physicians might note that the burdens of care for Mrs. Garcia are quite significant: she is in a nursing facility, which is expensive, and watching and visiting her in this state is emotionally and physically taxing for her family, while her wound care is tedious for the nurses. Surely these burdens, one might argue, are disproportionate to the minor benefit of continued life in a state of radically diminished health.

The practical reasoning advocated in the Way of Medicine looks to the burdens and benefits of a particular intervention to ask whether there is proportionality or disproportionality between the good and bad effects of that intervention. But here, for Mrs. Garcia, the intervention in question is tube feeding. We have identified the benefits (life and health) and burdens (cost, risk of infection) of that intervention. Discontinuing tube feeding removes, in itself, precisely those burdens; it does not, as such, remove the overall costs of

hospital care or the overall emotional and physical burdens of caring for Mrs. Garcia. What removes *those* burdens is Mrs. Garcia's death. So the choice to withdraw ANH in order to end those burdens seems to involve intending Mrs. Garcia's death. Such a choice is impermissible on the Way of Medicine.

Deliberating reasonably in this case requires focusing on the benefits and burdens of the tube feeding itself. If the benefits of ANH are proportionate to the burdens of ANH, the burdens should be accepted. That said, it remains the case that one of us (Tollefsen) thinks that Mrs. Garcia should certainly be fed in this case (though she might be brought home if that would alleviate the other burdens of her care), while the other (Curlin) believes that the vocational shape of Mrs. Garcia's life may in some cases be better honored by keeping her as free from technological interventions, including feeding tubes, as possible. So Curlin believes one might reasonably judge that ANH, in Mrs. Garcia's case, no longer promises benefits proportionate to the burdens of ANH itself (however minor those appear to be). Disagreement is not impossible for those committed to the Way of Medicine.

We return now to the last-resort options, the first of which also involves nutrition and hydration.

## Last-Resort Options

*Abe Anderson is declining. His oncologists stop his chemotherapy. He elects to receive hospice care at home. His pain worsens, requiring steadily increasing doses of morphine. He manages to stay awake most of the time. The hospice physician comes to see him at home a few weeks later. In their conversation, Mr. Anderson notes, "I don't want to languish, doc. I want to go out on my own terms. What can I do if I don't want to go on any longer?"*

### Voluntary Cessation of Eating

Abe's question invites his physician to offer last-resort options. The first such option is for Abe to voluntarily stop eating (and/or drinking). In that case, Abe's remaining days would be few, and with adequate morphine those days could be made relatively painless. But as we already noted, this choice includes a lethal intention: Abe would forgo nutrition and hydration in order to hasten his death, an intention ruled out by the demands of practical reason. The Way of Medicine likewise rules out recommending or suggesting such an approach, even if it would be wrong to force nutrition and hydration on a patient who had given up on eating. So the physician should not offer Abe the opportunity to starve himself to death, as if that were a legitimate medical option.

This case must be distinguished from an otherwise similar scenario. Patients who are dying often begin to withdraw from food and water. As we have noted, in the final days of a terminal illness, nutrition often cannot be assimilated, but even somewhat before this point, patients with advanced illness can find themselves with no desire to eat and even with revulsion at the thought of food. Turning away from food under such circumstances does not seem to us a suicidal choice, but rather a choice to avoid something that no longer seems enjoyable or meaningful in the way it once did. If death is hastened by this choice, that is a proportionate and morally permissible side effect.

### Sedation to Unconsciousness

A second "last resort option" would be to sedate Abe so that he lives out his last days free of any conscious suffering. In what has come to be called *palliative sedation to unconsciousness*, formerly known as *terminal sedation*,[2] physicians intentionally sedate patients to the point of unconsciousness and keep them unconscious until they die. This differs from what is called *proportionate palliative sedation*, in which sedatives are used for the purpose of relieving anxiety, agitation, breathlessness, or other symptoms, and diminished consciousness is foreseen as a side effect but not intended.

We have written at length elsewhere about the ethics of palliative sedation,[3] but we first want to

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

emphasize that the Way of Medicine supports proportionate palliative sedation. As long as the clinician aims only to relieve health-diminishing symptoms and has proportionate reason to accept unconsciousness as a side effect (thus satisfying the rule of double effect), the sedation is morally permissible, even in cases in which it is expected that sedation will continue until the patient dies. Indeed, physicians cannot act to relieve health-diminishing symptoms except by accepting some level of sedation as a side effect of their efforts. Almost all of the medications used to relieve pain and other symptoms cause sedation as a side effect. This is true of narcotics, of course, but also of medications to relieve anxiety, seizures, delirium, nausea, and itching. To treat sedation as a side effect aligns with the fact that patients and their families generally do not want their sensoriums clouded or their capacities to think, talk, and pursue the goods available to them blunted, but most will accept these losses if they are side effects of efforts to relieve disabling symptoms, particularly at the end of life.

We also note that proportionate palliative sedation can relieve disabling and distressing symptoms in nearly all if not all clinical circumstances. In his book *Dying Well: Peace and Possibilities at the End of Life*, Ira Byock, a seasoned hospice physician, describes a case in which he came finally to intentionally sedate a dying patient to unconsciousness because the patient's severe pain had proven refractory to every other treatment modality.[4] Those who advocate for sedation to unconsciousness as a form of physician aid-in-dying often invoke cases like the one Dr. Byock described, just as advocates for physician-assisted suicide and euthanasia invoke cases of excruciating and untreatable pain. But these appeals are red herrings. Dr. Byock noted that the case he described was the only such case he had experienced in more than fifteen years of caring for dying patients.[5] One of the authors of this book (Curlin) has practiced hospice and palliative medicine for more than ten years and has never encountered a patient whose pain or other disabling symptoms could not be relieved under the norms of proportionate palliative sedation. Last-resort options in general, and palliative sedation to unconsciousness in particular, are used much more commonly to relieve a type of suffering that is quite distinct from the pain experienced by Dr. Byock's patient. They are used to relieve *existential suffering*.

Sedation to unconsciousness to relieve existential suffering contradicts the norms of the Way of Medicine. Consider first the character of existential suffering, and then how the capacity for wakefulness relates to human health. Suffering is, to some extent, inevitable in dying, for dying is in its nature an evil—not a moral evil, but a privation of something always and everywhere good: namely, human life and, more specifically, the life of a person. While death is not to be feared above all things, and while we believe that hope in eternal life should accompany death, nevertheless, death is not good, and *suffering itself is the experience of that which is not as it should be*.[6] So the experience of illness and the prospect of imminent death usually bring suffering, whether or not the patient experiences pain or other symptoms. Pain and other symptoms heighten suffering in their direct, noxious effects on conscious experience and also insofar as they disrupt our ability to do what humans otherwise do when they are healthy. Moreover, patients who are dying often experience alienation from themselves, their friends and family, and even God. All of these bring suffering.

Existential suffering is the cognitive awareness of that which is not as it should be. At the end of life, a patient may experience such suffering through revulsion at the threat of death, regret at missed opportunities and botched choices, sorrow over failed or ruptured relationships, or fear of the divine. These are real problems and real forms of suffering. As such, they require choices, attempts to maintain or restore what harmony is possible at the end of life: acceptance of death, repentance of sin, reconciliation with loved ones, and peace with God.

Sedation to unconsciousness cuts short all of these possible responses to existential suffering. While perhaps not a choice for death as such, it is a choice for a kind of *moral* death, putting oneself existentially out of reach of these and all other possibilities. Such possibilities can be dramatic: those who have read the novel *Brideshead Revisited* (or seen the miniseries) can call to mind Lord Marchmain's literal deathbed conversion, which restored him both to his religion and, in various ways, to his family.[7] Thus he was restored to the forms of harmony and integrity available to him even at the very end of life. But integrity and harmony (with reality, with one's self, with others, with God) are basic goods, and the opportunity to pursue them

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

should not be discarded without exceptionally strong reason. Sedation to unconsciousness to avoid existential suffering, rather than to treat refractory and crippling pain or other symptoms, thus seems to us incompatible with being fully open to human goods.

Consider now how the capacity for wakefulness relates to human health. Making a patient permanently unconscious diminishes the patient's health; that seems an uncontroversial point insofar as the capacity for wakefulness is an expression of health. Here we must distinguish the state of suppressed consciousness from the state of sleep, in which the individual is capable of arousal. We also must distinguish keeping a person unconscious until he dies from sedating him temporarily, as physicians often do as part of their efforts (e.g., surgery) to preserve or restore health. It seems that in most cases, and certainly in the case of existential suffering, physicians who intentionally and permanently sedate patients to unconsciousness thereby contradict the purposes of medicine.

In a very rare case, however, palliative sedation to unconsciousness would be permissible. In that scenario, the patient would suffer, or be expected to imminently suffer, such a severe form of altered—diseased, unhealthy, disabling—consciousness that it would make sense to cut off this unhealthy consciousness in the same way it makes sense sometimes to cut off a severely diseased (say, gangrenous) limb. In such a case, we can say that the patient's health is diminished by virtue of losing consciousness or a limb, but his health is less diminished without the consciousness or the limb than with it. A part can be sacrificed for the health of a whole. Put differently, to the extent that suppressing consciousness allows the organism to relax from a state of high physical and psychic stress, such unconsciousness might be an expression of health, albeit of a radically diminished sort. Such sedation could continue until death if a return to consciousness is expected to bring a return to high levels of distress refractory to proportionate palliative sedation.

While such cases are exceedingly rare, Dr. Byock's patient may have met this criterion, and in Dr. Curlin's experience, some cases of agitated delirium (often called *terminal delirium*) at the end of life also may meet this criterion. Still, we caution against the tendency to amputate consciousness too readily, even in such cases. That tendency seems driven by pressures and temptations—since patients who are unconscious require less of the physician's attention—to make the appearance of suffering go away.[8]

## Physician-Assisted Suicide and Voluntary Euthanasia

In the final last-resort options, a physician might prescribe a lethal dose of some medication in order to help Abe take his own life (*physician-assisted suicide*) or, alternatively, perhaps because Abe is too weak to do so himself, the physician might administer the lethal dose himself (*voluntary euthanasia*). We refer to both of these options as *physician aid-in-dying*.

Let us begin our discussion of physician-assisted suicide and voluntary euthanasia not with our fictional case studies involving Mr. Anderson or Mrs. Garcia but with a real case, one of the most influential in making the public argument for physician aid-in-dying in our time.

Brittany Maynard was diagnosed with brain cancer in January 2014; she was twenty-nine years old. In the remaining eight months of her life, she became a prominent public advocate for legalization of physician-assisted suicide. She moved from California to Oregon and, according to a plan she had specified in advance, died on November 1 of that year after ingesting a lethal physician-prescribed drug cocktail. Unquestionably, as a young, attractive, and tragic face of the right-to-die movement, Ms. Maynard, as Arthur Caplan put it, "shifted the optics of the debate."[9]

Ms. Maynard's story illustrates a pattern: those who seek physician aid-in-dying are rarely driven by the direct experience of refractory pain or other symptoms.[10] At the time she committed suicide, Ms. Maynard was not experiencing symptoms beyond the reach of conventional palliative medicine, nor are such symptoms expected from a brain tumor. Rather, as she said, she chose to end her life on her own terms in order to avoid the prospect of further debility and decline, in which she might "suffer personality changes and verbal, cognitive and motor loss of virtually any kind."[11]

Ms. Maynard's desire to avoid debility and dependence reflects the pattern found in official reports from Oregon and Washington State, where nine out of ten patients requesting assisted suicide have reported being concerned about "losing autonomy" (91.5 percent) and being "less able to engage in activities making life

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All rights reserved. All use subject to https://www.ebsco.com/terms-of-use

enjoyable" (88.7 percent).[12]

The problem to which assisted suicide and euthanasia pose solutions, then, is not uncontrolled pain. In Oregon, only one in four patients (24.7 percent) have reported even "concern about" inadequate pain control,[13] and at no time in history have physicians and patients had greater access to effective tools for treating pain and other distressing symptoms, tools that can be deployed aggressively under ethical norms that have guided medicine for ages.

Rather, the problem to which aid-in-dying poses a solution is loss of control—the desire to sustain self-determination and autonomy in the face of debilitating illness. In a piece in the *Journal of the American Medical Association*, Dr. Timothy Quill and colleagues wrote, "Patients with serious illness wish to have control over their own bodies, their own lives, and concern about future physical and psychosocial distress."[14] Brittany Maynard put the point bluntly in her online manifesto: "I want to die on my own terms." Seen in this light, the movement toward physician aid-in-dying is the culmination of the PSM approach to medicine and medical ethics.

Ms. Maynard then added, "My question is who has the right to tell me that I don't deserve this choice?" That is a powerful question in our day. The former Hemlock Society is now called "Compassion and *Choices*" (emphasis ours).[15] The California law legalizing assisted suicide was called the End of Life *Option* Act (again, our emphasis).[16] When Governor Jerry Brown signed it, he said he did not know if he would avail himself of assisted suicide, but "I wouldn't deny that right to others."[17] Choice looms large.

But what kind of choice is Ms. Maynard and others like her being denied if physicians refuse to hasten their deaths? Ms. Maynard already had the right to refuse life-sustaining treatment. She had the right to proportionate palliation of her symptoms even if death were hastened as a side effect. She had the means and capacity to cause her death by numerous methods that do not involve physicians and that are equally if not more efficient and effective than ingesting an overdose of pharmaceuticals. Why is it so essential that she and others have physicians, in particular, cooperate in helping them kill themselves?

That physicians are being asked, or even required, to cooperate shows that "the right to choose" is, as the late Robert Burt noted, "radically incomplete as a justification for physician assisted suicide."[18] The right to choose has been transformed into a positive entitlement to have others help bring about what has been chosen—and not just any others, but medical professionals specifically. The physician aid-in-dying movement portends large-scale changes for the medical profession that will mark the definitive end of the Way of Medicine and the advent of a more authoritarian form of the PSM.

We discuss the PSM's exclusivist and authoritarian tendencies in chapter 10. Here we consider three questions that are central to evaluating the proposals for physician aid-in-dying. First, and most generally, how do the requirements of practical reason bear upon the practice of physician aid-in-dying? Second, how is physician aid-in dying related to the ends of medicine? And third, what will physician aid-in-dying do to patient trust?

### The Requirements of Practical Reason and Killing at the End of Life

Practical reason's judgment on the question of physician aid-in-dying is in one sense quite straightforward. All the suggested forms of this practice, including physician-assisted suicide and voluntary euthanasia, involve intentional killing: the patient's death is the means to relieve her suffering or is the satisfaction of her desire to maintain control. But it is always wrong to intend the death of an innocent person. So one may not reasonably kill oneself, kill another, or help another to kill him- or herself. So far, then, the various forms of aid-in-dying seem little different morally from elective abortion.

But killing at the end of life differs from abortion in an important way. No abortion ever takes place with the consent of the unborn child, so except in vital conflict cases, such killing not only violates the moral norm that basic goods are not to be intentionally damaged or destroyed, but also the norm of fairness. (As our discussion of Judith Jarvis Thomson showed, the latter norm is usually violated even when the former norm is not.) In contrast—and the aid-in-dying movement makes much of this fact—those who seek physician

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

assistance in death generally actively want and choose to die. While physician aid-indying clearly violates the norm against intentional killing, physician aid-in-dying for competent adults does not obviously violate the norm requiring fairness.

As a matter of clinical ethics, the norm requiring fairness is irrelevant insofar as killing the innocent is always wrong, and no morally upright physician or patient would participate in such killing. But fairness is a central part of justice, and justice is the paradigmatic social virtue. Political states and professional institutions are structured around the demands of justice. Even though an act might be morally wrong, if it is not a matter of injustice, the state is unlikely to show much concern. People arguing that the state and the medical profession should forbid physician aid-in-dying make a stronger case if they show the practice to be not only wrong but substantively unjust.

We believe this challenge can be met. Legalizing physician aidin-dying is rightly a matter of political concern and concern for the medical profession, especially if it threatens to reshape medical practice in ways that portend harms to many unconsenting patients. Insofar as physician aid-in-dying poses such a threat, strong reasons persist to maintain vigorous legal and professional restrictions on the practice and to refuse to give physicians a right that no other citizen possesses: the right to intentionally cause the death of an innocent person.

### The End of Medicine and Aid-in-Dying

The Way of Medicine also returns a quick answer to the question of physician aid-in-dying. The end of medicine is health, and the physician professes to seek health in patients. Physician-assisted suicide and voluntary euthanasia involve actions that intend the death of the patient, the first by means of cooperation with the patient's suicidal intention, the second by a direct action of the physician intended to end the patient's life. Few acts seem more distinctly contrary to the end and the vocational commitment of medicine, and for this reason alone, they have no place in the profession. Nor should physicians be expected, much less required, to aid or facilitate such actions, even by providing referrals.

For a profession in good order, this point would suffice. But the question remains: how are concerns of justice and fairness implicated here? To address this question, we turn to a further, deeply related, objection to physician aid-in-dying: these practices threaten to erode trust and trustworthiness—central virtues of the physician-patient relationship, without which the profession cannot long continue.

### Trust

Robert Burt, quoted earlier, also noted, "The confident assertion of the self-determination right leaves unacknowledged and unanswered a crucial background question: who can be trusted to care for me when I am too vulnerable and fearful to care for myself?"[19]

His point is well taken. For every Abe Anderson and Brittany Maynard who wants a physician to help them end their lives, physicians are called to care for numerous other radically diminished patients who, along with their families, count on physicians to care for them, seeking to preserve and restore the health that remains insofar as reasonably possible. An example from Curlin's practice makes the point:

*Dr. Curlin was asked to see a patient in the emergency room.[20] The patient, Mr. Roberts, had advanced dementia; he had not spoken in three years. He was brought to the hospital by his brother and his niece, who for several years had cared for him at home. The emergency physician's initial evaluation made clear that Mr. Roberts had a serious pneumonia and was beginning to suffer septic shock and respiratory failure. After Dr. Curlin spoke briefly with Mr. Roberts's family members, they agreed with his proposal to give the patient antibiotics, oxygen, and other supportive therapy but to forgo mechanical ventilation, even if Mr. Roberts came to the point of not being able to breathe on his own. Dr. Curlin then asked the patient's brother and niece if they had ever considered hospice care for Mr. Roberts. Both shook their heads and said adamantly, "We are not interested in hospice." "Why is that?" Dr. Curlin asked. They responded that what they had seen indicated that hospice too often forgoes any effort to provide medical*

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

*care for patients, instead focusing only on giving potent drugs like morphine and sedatives, and thereby hastening patients' death.*

Mr. Roberts's family members' concern is one that Dr. Curlin has heard voiced by numerous other patients and family members in Durham, North Carolina, and on the South Side of Chicago, and it highlights a question that physicians must consider: with respect to physician aidin-dying, which of the following should physicians care about most: maintaining the trust of those who, like Mr. Roberts and his family, already experience the debility, dependence, and suffering that advanced illness brings or empowering those who, like Brittany Maynard, seek through assisted suicide to avoid such debility, dependence, and suffering?

That was not a rhetorical question for Mr. Roberts's family. Indeed, like too many others, they had come to the conclusion that some physicians who wield the tools of palliative medicine are not to be trusted because such physicians have so prioritized relieving suffering that they fail to do what patients count on physicians to do: use reasonable means to preserve the health and lives of the patients. How much less likely would Mr. Roberts's family be to entrust him to a physician or group of physicians that is in the habit of practicing assisted suicide or euthanasia or encouraging people to stop eating or to stop feeding their loved ones? We doubt their worries would be assuaged upon hearing that the physicians do so "only for those who choose" these options.

Physicians cannot practice hastening or causing the deaths of their patients without undermining the trust on which the practice of medicine depends. This insight is not new. Physicians who care for patients with advanced illness have long known that everyone will at times be tempted to do away with suffering by doing away with the patient. To militate against that temptation, physicians have for more than two millennia sworn in the Hippocratic Oath, "I will neither give a deadly drug to anybody who asks for it, nor will I make a suggestion to this effect."[21] The American Medical Association has maintained since its founding, "Physician assisted suicide is fundamentally inconsistent with the physician's professional role."[22] The World Medical Association has opposed assisted suicide and euthanasia since the association was formed and issued the Declaration of Geneva just after the Second World War. Indeed, insofar as physicians enjoy the trust of patients made vulnerable by illness, it is because, since Hippocrates, at least, they have maintained solidarity with those who are sick and disabled, seeking only to heal and refusing to use their skills and powers to do harm. That is why physicians have refused to participate in capital punishment, to be active combatants, or to help patients commit suicide.

Importantly, this boundary against intentionally causing a patient's death not only gives patients a reason to trust physicians but also gives physicians the freedom they need to do their work. For example, Dr. Curlin was able to tell Mr. Roberts's family members that as a physician he is committed to *never* hasten or cause a patient's death intentionally. This boundary creates a space in which he and other physicians can act decisively to palliate distressing symptoms—for example, by using morphine to alleviate the apparent breathlessness that Mr. Roberts was experiencing or sedatives to relieve a state of restlessness and agitation in Abe Anderson. Without this boundary, Mr. Roberts's family has good reasons to worry that the morphine that leads to sedation is dosed not in proportion to the pain or breathlessness of their loved one but in an effort to hurry along the dying process.

To return to the question we posed above: which should be most important to physicians—maintaining the trust of those who, like Mr. Roberts and his family, already experience the debility, dependence, and suffering that advanced illness brings or empowering those who, like Brittany Maynard, seek through physician aid-in-dying to avoid such debility, dependence, and suffering? The witness of physicians and patients through the centuries and into the present has affirmed that we cannot have it both ways. But the question is central to determining the practice of medicine into the future.

At the heart of medicine is solidarity with those who are diminished in health, disabled in body, and therefore most dependent on trustworthy professionals devoted to their care. Physicians maintain solidarity with those who, to borrow Ms. Maynard's terms, suffer "verbal, cognitive and motor loss of virtually [every] kind," whether from developmental disabilities, traumatic injuries, dementia, or other debilitating chronic conditions. The countless patients who live with such conditions display a truth that Brittany Maynard could not see and that those suffering advanced illness may struggle to keep in view: debility and dependence do not render lives not worth living; human dignity does not require living or dying on one's own terms.

In a culture that emphasizes success and productivity, youthfulness and beauty, autonomy and control,

EBSCOhost - printed on 2/16/2024 10:27 AM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

such trust becomes obscured. The public images of Ms. Maynard made it conspicuously obvious that she possessed all of those when her disease struck, and her statements made it clear that she saw a condition in which these were lost as one worse than death. Not incidentally, those who advocate for and avail themselves of assisted suicide are overwhelmingly white, well-off, and accustomed to being able-bodied. According to official reports, of the 1,083 people who died in Oregon by assisted suicide prior to January 19, 2018, only 1 was African American (statistically, one would have expected at least 20, as 2.1 percent of Oregon's population is African American, according to the US Census).[23] In Washington State's March 2018 report, fewer than 4 percent of deaths by assisted suicide (from 2015 to 2017) were nonwhites, whereas 20 percent of the population was nonwhite.[24] Mr. Roberts's family, like most of Dr. Curlin's patients in Chicago and Durham, was African American. A population that already has experienced itself as vulnerable is more likely to see the practice of physician aid-in-dying not as a boon but as a threat.[25]

If "verbal, cognitive, and motor loss" renders life not worth living, you might think that disability groups would welcome physicians hastening or causing the deaths of those who so choose. But the opposite is the case. Disability groups overwhelmingly oppose assisted death. The prominent advocacy group Not Dead Yet speaks for many in arguing that "it cannot be seriously maintained" that legalization of assisted suicide will not lead to "inappropriate pressures from family or society" for people to end their lives. The group contends that "assisted suicide laws ensure legal immunity for physicians who already devalue the lives of older and disabled people and have significant economic incentives to at least agree with their suicides, if not encourage them, or worse."[26]

To summarize, under the approach we propose, assisted death is impermissible, first because it is never reasonable for anyone to kill the innocent or to help the innocent kill themselves. Assisted death is impermissible for physicians a fortiori, because killing contradicts the very nature of the practice of medicine and its orientation to the patient's health. If anyone is to help people take their lives, let it not be physicians. But even if these time-tested reasons have lost their grasp on our moral imaginations, it should be clear that it is unjust to purchase yet another choice for those accustomed to living life on their own terms at the cost of betraying physicians' distinctive solidarity with, and thereby undermining the trust of, those who live under the terms of illness and disability that they have not chosen, but with respect to which they should be able to count on physicians' care.

The question of trust points to the importance—not just for the medical profession, but also for society and law—of maintaining with strictest fidelity the norm against permitting doctors intentionally to kill their patients. The profession of medicine is socially of great value: it ensures that the good of those whose health is compromised will be pursued based on the solidarity of the healer and the patient. But that relationship remains unequal, and that inequality contributes to the patient's vulnerability. Clinical ethicist Richard Zaner has gone so far as to wonder what keeps physicians from acting like Plato's Gyges. When Gyges discovered a ring that made him invisible, he immediately killed the king and seduced his wife, taking advantage of his power in the assurance that he would not be caught.[27]

Zaner points to the importance of trust as a constitutive virtue for the medical profession, one without which there simply would be no such profession. Given the deep and abiding importance of medicine—we will *all* be sick, we will *all* be vulnerable, and we will *all* die—it is imperative that this fundamental virtue be maintained. And that requires, we might say, a medical-moral ecology that upholds the virtue and makes its continued existence possible. Such an ecology requires that the norm against intentionally harming or killing be maintained in the medical profession with all the strictness suggested by the Way of Medicine. That norm is the touchstone of medicine.

CHAPTER TEN

# Conscientious Medicine

Doctors often refuse patients' requests—a fact about the practice of medicine so familiar that it is easy to overlook—even when patients request interventions that are legal and permitted by the medical profession.

Doctors' refusals are neither new nor infrequent, and only a small minority occasion any controversy. Surgeons refuse to operate when they believe a surgery is unlikely to succeed. Physicians refuse medications when they believe the medications are unlikely to be helpful. Clinicians refuse requested interventions because of concerns about safety or efficacy, and they refuse because of less tangible concerns that are no less real. Some pediatricians refuse to supplement the growth hormones of boys who are short because of concerns about crossing a line between treatment and enhancement. Some primary care physicians at times refuse costly workups for what they believe are psychosomatic syndromes out of concern for their colleagues' time and other medical resources. Obstetrician-gynecologists who will abort fetuses with lethal congenital anomalies may refuse to abort those with Down syndrome or cleft palates out of concern about societal attitudes toward those with disabilities or those who are female out of concern about sexism. Physicians refuse patients' requests even when such requests are informed, even when patients meet some published criteria for the intervention in question, and even when physicians are aware that some or even most of their colleagues would disagree with their refusals.

In recent years, however, controversy has erupted over the issue of physicians' refusing to provide or facilitate patients' access to certain morally contested interventions, such as abortions, physician-assisted suicides, or surgical modifications of secondary sex characteristics (gender transition services). When physicians refuse such interventions, many now argue, they are letting their personal values interfere with their professional obligations.[1] A recent essay in the *New England Journal of Medicine* by Ronit Stahl and Ezekiel Emanuel illustrates the point: Stahl and Emanuel assert that patients have a right to choose the healthcare services they need for their own *well-being*, and physicians have a corollary obligation to accommodate the patients' choices, either by providing the requested interventions directly or by referring the patients to doctors who will.[2]

Such claims are starting to gain the force of policy in some jurisdictions. Historically, the medical profession has given wide latitude to physicians' discretion in areas of disagreement. Professional codes have consistently stated that physicians are not obligated to satisfy patients' requests for interventions that the physicians believe are not in the interest of the patients' health. In 2015, however, Ontario's College of Physicians and Surgeons issued a rule requiring physicians to "take positive steps" to make "effective referrals" for all legal interventions that a patient might request, including euthanasia. The college's working group concluded that there is "no qualitative difference" between euthanasia and other "health care services."[3] In 2016, the Illinois General Assembly revised a decades-old law that previously had prevented employers from discriminating against healthcare workers who refused to engage in practices to which they had principled objections. The new version requires employees to at least make referrals.[4] In 2017 Sweden's Labor Court ruled that clinics can lawfully refuse work to nurse midwives who refuse to perform abortions.[5] If physicians have personal objections to some interventions, the reasoning goes, they must avoid areas of medicine in which those interventions are likely to be requested.

Something is right about all of this. After all, as Stahl and Emanuel put it, physicians are not conscripts. No one is compelled to become a physician, and in becoming a physician, one willingly takes on

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

responsibilities that go with the role. Surely the profession and the public can hold physicians to fulfill their professional responsibilities or, as Stahl and Emanuel put it, their "role morality."[6] We would not countenance teachers who refuse to grade their students' work or attorneys who refuse to represent their clients before the justice system. Why would we allow physicians to refuse what patients request?

Yet the boundaries of what we accept and what we reject where professional refusals are concerned clearly center on answers to the following questions: what is the profession for, and what are the obligations that come with one's profession? Teachers are allowed and even expected to refuse requests of students if those requests are irrelevant or run contrary to the purposes of teaching. The same is true for lawyers and their clients.

The same is also true for medicine, yet medicine is, as we have argued throughout this book, in the grip of a conflict between two radically different ways of answering these questions, and debates about conscientious refusals indicate that the profession of medicine cannot continue indefinitely with these two contradictory construals of its purpose. The issue of conscientious refusals brings the rivalry and tension between the PSM and the Way of Medicine to a head. Physicians face a choice, and the stakes are high. Insofar as their profession embraces the PSM, physicians' consciences threaten their patients' well-being and must be suppressed. Unfortunately, by suppressing conscientious practice, the PSM reduces medicine to a demoralized job and augurs the end of medicine as a profession. Therefore, we encourage physicians to reject the PSM and recover the profession's orientation to their patients' health as a genuine good. This commitment to their patients' health gives physicians a reasonable standard for discerning which requests should be accommodated and which refused.

### The Provider of Services Model and Physicians' Refusal

*Abe Anderson's physician refuses to prescribe antibiotics.*

*Cindy Parker's physician refuses to refer her for an abortion.*

In the PSM, informed consent gives way to informed choice: patients choose, physicians provide. A physician may refuse to perform interventions that are technically infeasible, illegal, or unavailable and may refuse interventions that are futile with respect to the reason for which the patient seeks the intervention. But if these threshold conditions are met, the patients' choices are to be accommodated. Principles can be brought to bear, of course, and utilities can be measured in an effort to maximize them. The physician can also advert to "accepted clinical and professional norms." Only the patient, however, is in a position to balance and specify the relevant principles or to weigh the relevant utilities in order to determine what the patient's well-being requires. Moreover, according to the PSM, the central clinical and professional norm is putting patient well-being first; personal scruples cannot get in the way of a patient's receiving what she genuinely believes she needs.

This idea of patient well-being plays a central role in the PSM. When proponents of the PSM criticize conscientious refusals, they consistently refer to the patient's well-being rather than to the patient's health. "Health care *providers*," write Stahl and Emanuel, "have a primary interest: to promote the well-being of patients."[7] And again: according to the American Congress of Obstetrics and Gynecology (ACOG), "Providers" have a "fundamental duty to enable patients to make decisions for themselves."[8] Under the PSM, medical professionals are providers whose goal is to do what is conducive to patients' well-being. This defines what Stahl and Emanuel call the physician's "role morality." Adhering to that morality "means offering and providing accepted medical interventions in accordance with patients' reasoned decisions."[9]

Given all of this, we might expect proponents of the PSM to condemn both of the above refusals. Curiously, that is not what happens. True, Mr. Anderson and Ms. Parker both request interventions that are feasible, legal, and available, and neither intervention is futile with respect to the patient's goals. Moreover, Abe and Cindy both believe their well-being requires the interventions they request. Abe understands why the physician does not recommend antibiotics, but he wants the prescription in order to satisfy his wife and to

reduce the (albeit small) risk of his missing more days of work. Cindy understands why many find abortion morally problematic, but she wants the abortion in order to preserve the future that she believes she will lose if she carries the pregnancy to term. Despite these similarities, only the physician's refusal of Cindy's request typically raises the ire of those who criticize conscientious refusals.

How can this be? On the Way of Medicine, each refusal may be justified insofar as it is grounded in a judgment that what is requested does not serve, or indeed is contrary to, the end of patient health. How, though, can the PSM distinguish between the two cases? It does so by introducing and leaning heavily on a new distinction: between refusals based on professional reasons and refusals based on personal reasons. According to the PSM, the physician who refuses Abe's request for antibiotics is justified because the physician refuses for *medical* or *professional* reasons and thereby upholds the physician's "role morality." In contrast, the physician who refuses Cindy's request is condemned for allowing *personal* and *private* concerns to intrude on what should be a strictly professional consideration.

It is difficult to overstate the importance to the PSM of the distinction between the personal and the professional, whether posed as personal moral values versus professional ethical obligations, personal conscience versus professional conscience,[10] personal integrity versus professional integrity,[11] or simply personal reasons versus medical reasons. Physicians may believe what they will "in their private lives," write Stahl and Emanuel, "but in their role as health care professionals, they must provide the appropriate interventions as specified by the medical profession."[12]

It perhaps goes without saying that judgments of conscience are, for the PSM, the apotheosis of the personal. To refuse on the basis of conscience is to allow personal biases to interfere with professional obligations, particularly with the obligation to respect patients' *autonomy*. It may be difficult, the reasoning goes, but sometimes clinicians have professional obligations to do what their personal consciences object to doing.

Yet even advocates of the PSM concede that clinicians may refuse patients' requests when they have strong medical reasons to do so, as presumably Mr. Anderson's physician did, judging that antibiotics are not medically indicated for a viral infection. How does one know whether one's reasons are sufficiently medical? The PSM fails to provide any nonarbitrary standard to guide such judgments (a problem to which we return below), but proponents of the PSM are clear that medical reasons simply cannot include traditional norms such as the injunction to never intentionally damage or destroy the patient's health. They are equally clear that physicians who allow personal concerns to influence their professional practices thereby abuse their power and threaten harm to their patients—not harm to the patients' health per se, but harm to "well-being as the patient perceives it."[13]

Here we see the final conceptual novelty of the PSM: its standard for harm emerges from its standard for benefit—patient well-being. In the end, if the patient desires something in accordance with her conception of her own well-being, the PSM calls on the physician to provide what the patient requests or at least refer her to someone who will. To do otherwise is to fail to obey the principle of nonmaleficence.

This position comes with deep political and professional implications. From the standpoint of social authorities, including the state and professional licensing organizations, the PSM implies that a physician is obligated via an implicit social contract to provide health-care services according to the patient's informed choices. Dan Brock, in arguing that physicians are at least obligated to refer patients for any legal intervention, takes for granted that the medical profession is obligated by social contract to make available all legal interventions.[14] Therefore, authorities must scrutinize physicians' refusals carefully; the burden of proof is on physicians to justify their refusals and to show that they are not based on personal values.

ACOG proposes further scrutiny to make sure that physicians' refusals are not based on prejudice and that they are based on sound science.[15] Physicians may not, for example, refuse to prescribe contraceptives based on concern about preventing implantation of an embryo, because studies suggest that the incidence of such effects is low (there is no need to consider whether the incidence is low enough to make the moral difference, as long as there is "scientific support" for treating the incidence as trivial). Some proponents of the PSM ask policymakers to mandate such scrutiny, to demand alternative service from those who refuse patients' requests,[16] and to threaten sanctions that would make conscientious refusals costly.[17]

But such demands appear to be merely stopgap measures in anticipation of the desired end state: the elimination of conscientious refusals from the professional lives of physicians. As Julian Savulescu put it

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

more than a decade ago in an essay that seems increasingly prophetic, "If people are not prepared to offer legally permitted, efficient, and beneficial care to a patient because it conflicts with their values, they should not be doctors."[18]

## The Way of Medicine and Physician Refusal

The Way of Medicine casts physicians' refusals in a very different light, asking first whether a refusal is consistent with, or contradicts, the physicians' commitment to the patients' health. Rather than a prima facie obligation to provide whatever a patient seeks, the physician instead has an obligation to pursue what the patient's health requires (understanding that there may be several possible avenues of pursuit) and to refuse to act in ways that are contrary to the patient's health. Such refusals, rather than abusing power, properly exercise the physician's authority.

Note how differently the Way of Medicine treats the categories of *personal* and *professional*. Because the PSM eschews any objective end for medicine, the professional obligations of the physician must come from outside the practice of medicine. Those obligations cannot be generated and justified by commitments to an objective good that provides the purpose for the profession. Hence the importance of what is legal, what is technically possible, and what is desired by the patient, none of which is intrinsically related to an essential purpose of medicine. Thus also, professional obligations are potentially at odds with the physician's personal commitments, which must be left behind or overcome when they conflict with the "professional."

By contrast, the Way of Medicine calls on the physician, as a member of the profession, to personally deepen and specify a commitment that the physician already has made: attending to those who are sick so as to preserve and restore their health—to raise that commitment to the level appropriate to a vocation-defining profession. For practitioners of medicine, then, the central obligation in each of the above cases is clear: to act reasonably to preserve and restore the patient's health, and to refuse to act otherwise.

As we see from a slightly more philosophical perspective in the next section, physicians can succeed in this task only if they practice according to conscience. A physician's conscience is clinical judgment in action. It is the capacity used when judging whether an inclination to refuse Abe's or Cindy's request is based on good reason, unreasonable desire, or unjustified prejudice. Practicing conscientiously may be difficult, but it can never be reasonable for a clinician to do otherwise.

The Way of Medicine also has implications for those with professional and political authority. It teaches them that if physicians are to attend to those who are sick using reasonable means to preserve and restore their health, they need professional space in which to exercise judgment and to practice conscientiously. Although the state has grounds to hold physicians accountable to general norms of justice and the licensing and accrediting authorities have grounds to hold physicians accountable to meet their professional obligations, neither the state nor any other authority has grounds to compel physicians to contradict their professional responsibilities.

Thus, neither the state nor the profession should be in the business of coercing physicians into meeting unscrutinized patient demands, any more than they should coerce patients to accept this rather than that physician proposal. Patients must be protected from the unscrupulous and the incompetent, which a profession's best efforts will never entirely succeed in weeding out, and a profession must ensure that all its professionals carry out the constitutive commitments of the profession to seek healing for those who are sick. But professional responsibility encompasses the obligation, and hence the right, to make conscientious judgments about what is required in light of one's guiding professional and vocational commitments. This is no less true for physicians than for other professionals.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Virtues of the Way of Medicine

One's approach to conscientious refusals turns on how one defines the substance of physicians' professional commitments and obligations, and we have argued throughout the book that the Way of Medicine specifies those commitments and obligations more reasonably. The Way of Medicine has additional virtues that the PSM lacks.

## A Better Understanding of Conscience

What makes a refusal *conscientious*? A judgment of conscience is, in the paradigm case, a person's final determination of what is permitted, not permitted, or obligatory in a particular circumstance. What faculty is responsible for these judgments? The traditional view is that of Aquinas: it is *practical reason*, which knows the first principles of the moral law, and *practical reason*, which applies those principles to situations and circumstances so as to lead to particular moral judgments about how one ought to act. Thus, the faculty that is responsible for judgments of conscience, as well as the more general normative judgments presupposed by conscience, is human reason, which is why we have spoken throughout this book of the requirements of practical reason.[19]

Three points are worth noting here. First, conscience judges a person's *own* actions or motives, not those of others. Second, conscience is not a set of considerations that a person might weigh in making a moral judgment; rather, conscience is exercised in the *judgment* about how one should act in light of all such considerations. Third, as an act of human reason, conscience is necessarily limited and fallible; no person sees with absolute clarity, and no person judges his or her own actions with perfect accuracy.

In light of these three points, we can see that although conscientiousness—following one's judgments of conscience—is necessary for ethical action, it is not sufficient. A malformed or misinformed conscience will err. For example, a conscientious physician may fail in his duties to relieve a patient's debilitating pain because he has not been trained to pay close attention to or seek to relieve pain. Alternatively, he may fail because he mistakenly interprets the patients' behavior as drug-seeking and malingering. So every physician is obligated to seek to inform his or her conscience with the best available information, including true moral principles. Every physician must consider arguments made by patients or colleagues that call the physician's initial judgment into question, and physicians must be willing to change their judgment when they can see that it was mistaken.

Nevertheless, in the end physicians must act, and however fallible, physicians can act ethically only if they act according to their consciences. Errors with respect to conscience obscure this fact. According to ACOG, "An appeal to conscience would express a sentiment such as 'If I were to do "*x*," I could not live with myself / I would hate myself / I wouldn't be able to sleep at night.'"[20] In fact, rarely are conscientious practices so emotionally momentous. Rather, to practice conscientiously is simply to act according to one's best judgment about how one ought to act from situation to situation, patient to patient.

Others allege that appeals to conscience are disingenuous and hide unspoken prejudices.[21] It goes without saying that physicians who act disingenuously are not acting conscientiously. To act conscientiously is to act according to what one understands to be the demands of reason. Even where agreement exists about the purposes of medicine, physicians still must consider innumerable different factors in order to discern how best to seek the health of a particular patient in a particular context. This task is almost always attended by ambiguity and uncertainty, requiring what Aristotle called *phronesis* or practical wisdom, the manifestation of which in the practice of medicine has been called good clinical judgment.[22] If physicians are to exercise clinical judgment in seeking their patients' health, they will necessarily refuse some patient requests.

These points illustrate another virtue of the Way of Medicine: its understanding of conscience is much more adequate than that of the PSM. The PSM asks us to treat conscience not as a faculty of reason but as a set of arbitrary and idiosyncratic personal values. Stahl and Emanuel equate conscience with appeal to "personal religious or moral beliefs."[23] With conscience so construed, the physician who acts conscientiously

105

is focused on himself and his own needs rather than on the good and what is required of him. ACOG similarly associates conscientiousness with a need to be able to sleep at night and a defense against moral disintegration. These personal needs, however important, are in tension with one's professional commitments: "By virtue of entering the profession of medicine, physicians accept a set of moral values—and duties—that are central to medical practice. Thus, with professional privileges come *professional responsibilities* to patients, which must precede a provider's *personal interests.*"[24] Stahl and Emanuel similarly aver that, "physicians' personal commitments cannot outweigh the interests of patients," and they contend that to follow conscience in refusing a patient's request "violates the central tenet of professional role morality in the field of medicine: the patient comes first."[25]

These misconstruals of what the conscience is lead critics to make unsupportable and contradictory claims. Critics claim that a clinician who refuses a patient's request thereby allows the clinician's conscience to trump the patient's conscience, when in fact no conscience can trump another conscience, since conscience judges only one's own actions. Critics claim that physicians should distinguish "personal conscience" from "professional conscience," or that physicians should balance one or both against other considerations in deciding what to do in a given case.[26] Some critics also suggest that a physician occasionally has an obligation to act against conscience.

Such claims can make sense only if the conscience is a set of values. Then one could have a professional conscience, a personal conscience, and perhaps others as well. One could weigh up the conscience against other considerations, or one conscience against another. One might even have reason to act against conscience. But none of these construals makes sense in light of what the conscience is: the faculty of reason that renders the final judgment as regards what one ought to do, all things considered. So understood, an individual has but one conscience and integrity requires that her conscience cannot be split into components. She cannot take up her judgment of conscience as one consideration among others. While a physician might well have reason to reconsider an initial judgment in light of new information, it can never be right to act against conscience, for in doing so one is acting contrary to one's final judgment about how one ought to act. That is a paradigm case of acting unreasonably.

### A Better Understanding of "Professional Responsibility"

The Way of Medicine not only has a more adequate construal of conscience and its place in the practice of medicine than the PSM; it also possesses a nonarbitrary standard for distinguishing refusals that align with the physician's vocation from those that contradict that vocation. Unless we are to say that physicians may never refuse anything patients request, physicians must have some criteria by which to distinguish between justified and unjustified refusals.

The PSM turns, for such criterion, to the putative distinction between the personal and the professional. As we show here, the problem with this putative distinction is that the term "*personal*" has no meaning in these debates except "not professional," and "*not professional*" has no meaning unless one can specify the content of the physician's profession. As Abe's case demonstrates, without an objective standard for the medical profession, saying that a concern is merely personal is not possible. Anything that relates to the patient's well-being can be considered a professional concern.

In the end, the category of "personal" distracts from and cloaks the fact that the PSM cannot say what the physician's profession requires beyond accommodating patients' considered, informed requests for legal and technically feasible interventions. Without any objective standard to look to, proponents of the PSM draw idiosyncratic and arbitrary lines between the personal and the professional. For example, ACOG contends that physicians must refuse policies that require them to report undocumented patients to immigration authorities, because such policies conflict with other professional norms, including the "primary principle of nonmaleficence."[27] In the same piece, however, ACOG takes it for granted that physicians must refer patients for abortion, ignoring altogether arguments that abortion violates the same principle of nonmaleficence. Stahl and Emanuel claim that physicians might justifiably refuse assisted suicide—a practice Emanuel has publicly opposed for decades—because the practice is "currently controversial and subject to debate about whether [it is] medically appropriate."[28] However, they cannot bring themselves to imagine that abortion and gender transition surgery are similarly controversial and subject to similar debate.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

"Professional" responsibilities thus emerge as sufficiently malleable to rule out what a writer dislikes and to require what the writer affirms.

In seeking to say more about the "professional," proponents of the PSM often look to public and professional opinion in arbitrary and self-contradictory ways or appeal to straw men to critique moral judgments in medicine. On the one hand, they will refer to a "standard of care" and a "consensus" as establishing the scope of what physicians must do. But in the next breath they refer to the absence of consensus as the reason physicians cannot justifiably refuse some intervention (because many people disagree with the physician's "personal" opinion). In a particularly curious turn, Stahl and Emanuel claim that "health care professionals voluntarily choose their roles and thus become obligated to provide, perform, and refer patients for interventions according to the standards of the profession." Yet they then lament that the organizations that most authoritatively establish the standards of the profession "all tend to accept rather than question conscientious objection in health care."[29] ACOG as well as Stahl and Emanuel acknowledges deep societal disagreement about whether abortion is permissible, yet both claim that abortion is standard medical practice. "Although abortion is politically and culturally contested," Stahl and Emanuel write, "it is not medically controversial."[30] So again, in the absence of clarity about the professional commitments of medicine, proponents sometimes rely on and sometimes disavow claims of consensus and controversy, adopting a whatever-works strategy in an attempt to force their desired shape of conformity onto the profession.

The Way of Medicine, by contrast, distinguishes not between the professional and the personal but between that which fulfills the physician's profession and that which departs from or contradicts that profession. In an important sense, this merely distinguishes the reasonable from the unreasonable, with attention to the particular vocation of practitioners of medicine.

Critics worry that physicians' refusals hide invidious discrimination under the guise of conscience. Stahl and Emanuel say that to refuse to participate in "gender reassignment surgery, or the use of contraception . . . is to allow personal moral judgment to masquerade as medical practice."[31] ACOG contends, "Finally, conscientious refusals should be evaluated on the basis of their potential for discrimination."[32] But the Way of Medicine can coherently condemn refusals that involve invidious discrimination without abandoning either the notion of conscience or the physicians' commitment to the patient's health.

The physician who refuses to care for patients with HIV because of antipathy toward homosexuals or for patients of another race because of racial prejudice or for criminals because of revulsion at their crimes violates the constitutive professional obligation to seek the health of patients precisely because they are sick, without regard to their other characteristics. After all, the good of health is good for all persons. The professional obligation to seek the health of patients is to be contrasted not with conscience or with personal obligations but instead with failures of reason. The solution to such failures is, in fact, sound exercise of conscience.

## A Greater Respect for Pluralism

In contrast with the PSM, the Way of Medicine presents a workable, peaceable approach to living with disagreement—with the pluralism that defines our current age. Stahl and Emanuel, speaking for the PSM, write, "Health care professionals who are unwilling to accept these limits [to conscientious refusals] have two choices: select an area of medicine, such as radiology, that will not put them in situations that conflict with their personal morality or, if there is no such area, leave the profession."[33]

If the profession followed this logic to its conclusion, it would have to drum out those who have the audacity to refuse interventions because they are not required by or conducive to the patients' health. This is a recipe for a homogenous and authoritarian healthcare profession, one held together by the forcible imposition of external norms: the norms of the legally permitted, the technologically feasible, and what patients desire. Physicians unwilling to work within these constraints would have to go.

Perhaps paradoxically, the Way of Medicine has much more flexibility. Let us grant the "fact of reasonable pluralism."[34] There is, we concede, no way to recover (or forge anew) full agreement on the part of all physicians regarding the moral obligations of medical practitioners. Nevertheless, if we imagine a

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

profession structured even minimally on a commitment to patients' health, the profession should allow conscientious refusals where reasoned dispute exists about whether an intervention is consistent with that goal.

In such circumstances, patients may face clinicians who make clear, in so many words, that they do not believe what the patient seeks is what the clinician should be doing. Patients in some areas, particularly rural areas, may struggle to find clinicians who will provide interventions that are available elsewhere. The profession will sustain in its ranks an ongoing contention about what good medicine requires. The presence of differences will push people to consider why they are making the choices they make rather than taking practices for granted. Physicians will represent the diversity of moral communities found in a society, and the range of choices among philosophies of care will reflect the ongoing moral disagreements among those communities. When people like Stahl and Emanuel insist that physicians put their professional obligations first, we will insist that they make an argument to show how physicians' commitment to their patients' health, objectively construed, requires them to participate in the interventions in question.

We are optimistic that such a profession would come to recognize again that certain practices are simply incompatible with physicians' commitment to patients' health. Abortion, euthanasia, and sex reassignment surgeries, for example, would be seen as simply not the business of physicians, though treatment of pregnant mothers and their infant children, the dying, and those suffering from gender dysphoria would be. There would still be considerable room for disagreement, given the complexity of health and the vagueness and indeterminacy around its boundaries—and that is to say nothing of the scope for disagreement over how best to address the health of a particular patient, given the inevitable limitations of medical knowledge and technology.

The Way of Medicine recognizes that a profession must have something that its practitioners *profess* in common; that something, for medicine, is the patient's health. The PSM gives, by contrast, a merely formal shared end: the satisfaction of patients' desires within what the law and medical science allow, a goal that will frequently lead physicians to pursue contradictory ends—for example, the life of this fetus, the death of that one. But within the pursuit of health, the Way of Medicine sees room for professional comity and amity: comity when the conscientious judgments of other physicians are respected and amity when the profession is willing to tolerate diverse moral and religious views if those are not essentially unjust. That is a far cry from the PSM's increasingly aggressive intolerance of disagreement.

THE FUTURE OF MEDICINE

Elevating the PSM over the Way of Medicine will lead to three logical if unintended consequences. First, any policy that constrains the scope of conscientious refusals will thereby erode the possibility of conscientious practice. It seems obvious that patients want their physicians to be conscientious insofar as possible. Who wants a physician who is in the habit of doing what he knows he should not do? Fortunately, individuals from virtually all moral traditions and communities can conscientiously commit themselves to caring for the sick. That is one reason the profession of medicine has been able to maintain prestige and a measure of unity in a society comprising many different moral communities. Yet efforts to reduce the scope of conscientious refusals will gradually squeeze out or block from entry all but those who are willing to make available to patients the full range of legal technological interventions and to set aside their judgments about which interventions are congruent with patients' health.

Consider obstetrics and gynecology. If the PSM prevails, the obstetrics and gynecology practice of the future will be hospitable only to those willing to engage in elective abortion, sterilization, contraception, IVF, prenatal genetic diagnosis, surrogate pregnancy, artificial insemination, cosmetic genital surgery, gender transition surgery, and whatever comes next. Only a minority of American physicians can cooperate conscientiously in all of these legal, feasible, and yet morally controversial practices. Paradoxically, patients' choices will be reduced insofar as they will not be able to seek out trained clinicians who share their judgment that such practices contradict the purposes of medicine. So the process will go. Every time the scope of conscientious refusal is narrowed, the pool of people who can be conscientious physicians is reduced.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

The second consequence is that by requiring physicians to do what patients request, policies that constrain the scope of physician refusals will put physicians and patients at odds with one another. The PSM already treats the physician's judgment as a threat to the patient. If physicians cannot refuse patient requests, they will wonder when their patients might, with the backing of legal sanction, ask them to act against their own understanding and do that which they believe is unethical. By making physicians obey patients, we will make patients a moral threat to their physicians.

The third consequence of reducing the scope of conscientious refusals is that patients will lose the basis for trusting that their physicians are committed to their good. Under the old model of paternalism, patients could trust that physicians had committed themselves to their patients' best interests, albeit in a limited way—only insofar as those interests included restoring and preserving health. The patients' rights movement and the doctrine of informed consent rightly qualified and delimited physicians' commitment to pursue health. Out of respect for the persons they serve, physicians are to act only with the permission of their patients. Because health is neither the only nor the highest good, patients are authorized to situate that good in relation to other concerns such as not being overburdened by medical technology.

The PSM differs fundamentally: in it, patients not only qualify how their health will be pursued but also decide what outcomes and states of affairs their physicians will seek. Patients gain technicians committed to cooperation and lose healers committed to their good. They gain control over physicians but thereby divest physicians of responsibility. As a result, patients will "often navigate treacherous medical terrain without adequate medical guidance."[35] Physicians can wash their hands of patients' decisions, as long as they give their patients accurate information and provide technically proficient "healthcare services."

By asking physicians to set aside their consciences and detach from their historical commitment to their patients' health, the PSM contributes to a crisis of medical morale, because the PSM quite literally demoralizes medicine. If medicine merely provides desired services to maximize patients' vision of well-being, medicine's pretense to moral seriousness will be a charade and its attempts at professionalism a façade. Is it surprising that today's physicians, conditioned to think of themselves largely as mere functionaries, suffer high rates of burnout?[36]

There is a better way. That way involves conscientiousness and candor on the part of physicians. Where there is ambiguity or a dispute arises about whether a particular practice belongs in medicine, physicians and patients can do their best to negotiate an accommodation that does not require either to do what they believe is unethical. Rather than feign moral neutrality, physicians will tell their patients frankly what their options are, which ones the physician is willing to offer, and why the physician recommends one over another. The scope of permissible accommodations will have to be set through the political process, but we echo the conclusion reached by the President's Commission way back in 1982: "Considerable flexibility should be accorded to patients and professionals to define the terms of their own relationships."[37]

In conclusion, unless and until consensus is forged regarding the ends of medicine, refusals of controversial practices cannot be shown to violate physicians' professional obligations. In the meantime, the practice of medicine should be open to anyone who is willing to unreservedly commit him- or herself to caring for the sick so as to preserve and restore their health.

WORKING FOR HEALTH, CONTENDING FOR MEDICINE

We close by calling for healthcare professionals to strive conscientiously for their patients' health and in so doing to contend conscientiously for good medicine. In some contexts, practicing the Way of Medicine will require courage, even great courage. Trailblazers must sometimes walk alone. As Martin Luther King Jr. said, "There comes a time when one must take a position that is neither safe, nor politic, nor popular, but he must take it because conscience tells him it is right."[38]

We do not suggest that everyone who finds the Way of Medicine compelling should immediately set out to persuade every proponent of the PSM that they are in error. Some are called to that task, but certainly not all are. Nor do we recommend that physicians contend for their "rights"; we are not advocating the antagonism of "rights talk" or pitting physicians' rights against those of patients.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Rather, our suggestion is to practice medicine according to reason and to be prepared to give an account of why you do what you do. Be committed to the central good of medicine: patient health. Do nothing contrary to that good, and align your practice to be in harmony with that good. Cultivate the virtues of good medicine. Be a physician and a healer, not merely a technician or a provider.

In short, be a *good* physician, practicing good medicine. Doing so will function to the good of your patients and to your good as a doctor. It may also persuade your colleagues and patients. As Leon Kass has noted, the most basic truths often are better demonstrated in practice than in argument.[39] By pursuing their patients' health in time-tested ways that respect the moral law, clinicians show others a better way of caring for their patients—a way that has an integrity and even a beauty that may win over those who at present are captive to the PSM.

Clinicians are not alone in this endeavor. This has been a book of medical ethics, and medical ethicists and policymakers also must discern the shape of the true practice of medicine and recognize its counterfeits. In providing resources for that task, we hope to have made a modest contribution to the renewal of medicine—a moral project that is ever worthy and ever incomplete.

NOTES

Preface

1. David L. Sackett, William M. C. Rosenberg, J. A. Muir Gray, R. Brian Haynes, and W. Scott Richardson, "Evidence-Based Medicine: What It Is and What It Isn't," *British Medical Journal* 312, no. 7023 (1996): 71–72.

Introduction

1. It is important for us to clarify our use of "well-being" here. Our own moral theory has a substantive account of human flourishing at its foundations, and such flourishing could equally be designated as a form of well-being. However, throughout this book, when we use the expression in *italics—well-being—*we mean to designate the thin, preference- and desire-satisfaction model that many medical ethicists presently use. We typically italicize the first use of the expression in a chapter, and then rely on context to make it clear which sense of "well-being" we mean.

2. As we discuss further in chapter 1, Beauchamp and Childress's enormously influential framework focuses on four principles: beneficence, nonmaleficence, justice, and autonomy. See Tom L. Beauchamp and James F. Childress, *Principles of Biomedical Ethics*, 7th ed. (New York: Oxford University Press, 2013), 13–14.

3. See Ronit Y. Stahl and Ezekiel J. Emanuel, "Physicians, Not Conscripts—Conscientious Objection in Health Care," *New England Journal of Medicine* 376, no. 14 (2017): 1380–85.

4. H. Tristram Engelhardt, *The Foundations of Bioethics*, 2nd ed. (New York: Oxford University Press, 1996), 7.

5. A 2016 *U.S. News & World Report* article showed that "nearly half of U.S. physicians—49 percent—meet the definition for overall burnout." In addition, physicians' "satisfaction with work-life balance is far lower than that of others: 36 percent versus 61 percent." See Steve Sternberg, "Diagnosis: Burnout," *U.S. News & World Report*, September 8, 2016. See also Tait D. Shanafelt, Omar Hasan, Lotte N. Dyrbye, Christine Sinsky, Daniel Satele, Jeff Sloan, and Colin P. West, "Changes in Burnout and Satisfaction with Work-Life Balance in Physicians and the General US Working Population between 2011 and 2014," *Mayo Clinic Proceedings* 90, no. 12 (2015): 1600–1613.

6. Michael J. Balboni and Tracy A. Balboni, *Hostility to Hospitality: Spirituality and Professional Socialization within Medicine* (New York: Oxford University Press, 2019).

7. As will become clear, we see two interrelated disagreements about medicine: one over whether health should be the primary and largely exclusive purpose of medicine and one over what health is.

8. Edelstein's translation renders the Greek well: "I will neither give a deadly drug to anybody if asked for it, nor will I make a suggestion to this effect. Similarly I will not give to a woman an abortive remedy" (                ). Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* (Baltimore, MD: Johns Hopkins University Press, 1943), 2–3.

9. For discussion of this claim in relation to the oath itself, see T. A. Cavanaugh, *Hippocrates' Oath and Asclepius' Snake* (New York: Oxford University Press, 2018).

10. C. S. Lewis, *The Abolition of Man, or, Reflections on Education with Special Reference to the Teaching of English in the Upper Forms of Schools* (San Francisco: HarperSanFrancisco, 2001), 43.

11. Gerald P. McKenney, *To Relieve the Human Condition: Bioethics, Technology, and the Body* (Albany, NY: State University of New York [SUNY] Press, 1997), 16. McKenney himself engages dialectically with a number of previous critics, such as Hans Jonas Leon Kass and Stanley Hauerwas, from whom we have also learned much.

12. Jeffrey P. Bishop, *The Anticipatory Corpse: Medicine, Power, and the Care of the Dying* (Notre Dame, IN: University of Notre Dame Press, 2011).

13. Ibid., 9.

14. "Social imaginary" is a term that Charles Taylor explores in depth in his *Modern Social Imaginaries* (Durham, NC: Duke University Press, 2004), 23.

15. Edmund D. Pellegrino, "The Internal Morality of Clinical Medicine: A Paradigm for the Ethics of the Helping and Healing Professions," *Journal of Medicine and Philosophy* 26, no. 6 (2001): 559–79.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

111

16. McKenney, *To Relieve the Human Condition: Bioethics*, 16.

17. See Edmund D. Pellegrino, *The Philosophy of Medicine Reborn: A Pellegrino Reader*, ed. H. Tristram Engelhardt Jr. and Fabrice Jotterand (Notre Dame, IN: University of Notre Dame Press, 2008); Leon R. Kass, "Regarding the End of Medicine and the Pursuit of Health," *Public Interest* 4 (1975): 11– 42; Alasdair MacIntyre, *After Virtue: A Study in Moral Theology*, 3rd ed. (Notre Dame, IN: University of Notre Dame Press, 2007), 194. See also John Keown's assessment of John Finnis: "A New Father for the Law and Ethics of Medicine," in Robert P. George and John Keown, *Reason, Morality, and Law: The Philosophy of John Finnis* (Oxford: Oxford University Press, 2014), 290–307.

18. See MacIntyre, *After Virtue*, 222.

CHAPTER ONE   The Way of Medicine

1. Alasdair MacIntyre, *After Virtue: A Study in Moral Theory*, 3rd ed. (Notre Dame, IN: University of Notre Dame Press, 2007), 187.

2. For more on the difference between experiencing one's work as a job versus as a calling, see Robert N. Bellah, William M. Sullivan, Richard Madsen, Ann Swindler, and Steven M. Tipton, *Habits of the Heart: Individualism and Commitment in American Life* (Berkeley: University of California Press, 1985); Amy Wrzesniewski, Clark McCauler, Paul Rozin, and Barry Schwartz, "Jobs, Careers, and Callings: People's Relations to Their Work," *Journal of Research in Personality* 31, no. 1 (1997): 21–33; and Douglas T. Hall and Dawn E. Chandler, "Psychological Success: When the Career Is a Calling," *Journal of Organizational Behavior* 26, no. 2 (2005): 155–76.

3. Aristotle, *Nicomachean Ethics*, trans. David Ross (New York: Oxford University Press, 2009), 1094a10.

4. For an introduction to debates about whether medicine has an intrinsic telos and an internal morality, see the collection of papers on the subject in the *Journal of Medicine and Philosophy* 26, no. 6 (2001).

5. See Jean Bethke Elshtain, "Why Science Cannot Stand Alone," *Theoretical Medicine and Bioethics* 29, no. 3 (2008): 161–69.

6. See Paul A. Lombardo, *Three Generations, No Imbeciles: Eugenics, the Supreme Court, and* Buck v. Bell (Baltimore, MD: Johns Hopkins University Press, 2010).

7. Aristotle, *Nicomachean Ethics*, 1094b25.

8. See, particularly, Leon Kass, "Regarding the End of Medicine and the Pursuit of Health," *Public Interest* 40 (1975): 11–42. See also Luke Gormally, "The Good of Health and the Ends of Medicine," in Holder Zaborowski, *Natural Moral Law in Contemporary Society* (Washington, DC: Catholic University of America Press, 2010), 264–84. Gormally argues for views of both health and medicine very similar to ours.

9. See Christopher Boorse, "Health as a Theoretical Concept," *Philosophy of Science* 44 (1977): 542–73. Some proponents of an objective account, such as Boorse, further understand health as merely the absence of disease. In contrast, we claim that health is a positive quality and is, in this important sense, prior to disease. Disease is knowable because it causes a diminishment of health, but health is knowable apart from any disease. What's more, health can be diminished even in the absence of disease, as when a person becomes unhealthy as a consequence of inactivity. Therefore, the opposite of health is not disease but ill health—the privation or absence of health.

10. For a discussion of evaluative concepts of health and disease see Jacob Stegenga, *Care and Cure: An Introduction to Philosophy of Medicine* (Chicago: University of Chicago Press, 2018), chaps. 1 and 2.

11. These syndromes include conditions such as chronic fatigue and fibromyalgia. See Jiwon Helen Shin, John D. Yoon, Kenneth A. Rasinski, Harold G. Koenig, Keith G. Meador, and Farr A. Curlin, "A Spiritual Problem? Primary Care Physicians' and Psychiatrists' Interpretations of Medically Unexplained Symptoms," *Journal of General Internal Medicine* 28, no. 3 (2013): 392–98.

12. Because humans are ever incomplete, to be human is to be disabled and dependent in significant measure, even if that dependence and disability are not socially conspicuous.

13. Gerald P. McKenny, *To Relieve the Human Condition: Bioethics, Technology, and the Body* (Albany, NY: State University of New York [SUNY] Press, 1997).

14. Some have interpreted Kass as disregarding mental health. He was at pains to distinguish pursuit of happiness from pursuit of health, but in our view, his account of the well-working of the organism as a whole includes mental health in the way we offer here.

15. Kass, "Regarding the End of Medicine," 14; "Constitution of WHO: Principles," World Health Organization, April 7, 1948, https://www.who.int/about/mission/en/.

16. Wendell Berry, "Health Is Membership," in M. Therese Lysaught, Joseph Kotva, Stephen E. Lammers, and Allen Verhey, ed. *On Moral Medicine* (Grand Rapids, MI: Eerdmans, 2012), 420.

17. "Shalom" translates as "peace," but, much like the term "health," "shalom" can be used analogically to refer to wholeness, completeness, and blessedness. We find it notable that Jewish tradition requires Jews to live in a community that has a physician, and although rabbis can also be physicians—and often have been—Jewish tradition distinguishes the

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

two roles. See Immanuel Jakovovitz, *Jewish Medical Ethics: A Comparative and Historical Study of the Jewish Religious Attitude to Medicine and Its Practice* (New York: Block Publishing, 1975), 204–13.

18. Or, as Kass puts it, "in accordance with its specific excellences," in "Regarding the End of Medicine," 29.


CHAPTER TWO    The Requirements of Practical Reason


1. Aristotle, *Nicomachean Ethics*, trans. David Ross (New York: Oxford University Press, 2009).

2. We think of life and health as constituting one (complex) good. When health is gone, no life remains. When life is present, some health remains. In this book, wherever we use the term "health," we mean this complex basic good of life and health.

3. A commitment to human goods and human flourishing characterizes much natural law theory, yet different theorists identify different goods as basic or fundamental. Our list of basic goods is largely drawn from Germain Grisez, Joseph Boyle, and John Finnis, "Practical Principles, Moral Truth, and Ultimate Ends," *American Journal of Jurisprudence* 32 (1987): 106–8, which, however, omits marriage. That good is present in Aquinas's list in *Summa Theologiae*, 1–2, q. 94, a.2.

4. For a consequentialist approach to some important questions of medical ethics, see Helga Kuhse and Peter Singer, *Should the Baby Live? The Problem of Handicapped Infants* (Oxford: Oxford University Press, 1985). John Harris is an important defender of a broadly libertarian-consequentialist approach to bioethics. See, e.g., Harris, *The Value of Life* (New York: Routledge, 1995).

5. For further discussion, see Robert P. George and Christopher Tollefsen, *Embryo: A Defense of Human Life* (New York: Doubleday, 2008), chap. 4: "Moral Philosophy and the Early Human Being," 83–111.

6. See Rachel Aviv, "What Does It Mean to Die?" *New Yorker*, February 5, 2018, www.newyorker.com.

7. National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, "The Belmont Report," Department of Health, Education, and Welfare, April 18, 1979, www.hhs.gov.

8. Beauchamp and Childress's first edition of *Principles of Biomedical Ethics* was published in 1979. The book is now in its seventh edition and has for decades been the most widely used medical ethics textbook in the world.

9. Beauchamp refers to all of these as "alleged competitors" of principlism in "Principlism and Its Alleged Competitors," *Kennedy Institute of Ethics Journal* 5, no. 3 (1995).

10. Beauchamp is quite explicit that there are no absolutes and that the prohibition against killing is just the sort of prohibition an ethics needs to be able to overcome (e.g., through compassionate aid-in-dying). See Beauchamp, "Principlism and Its Alleged Competitors."

11. Alfonso Gomez-Lobo also makes, and extends, a similar criticism of principlism in his (with John Keown), *Bioethics and the Human Goods: An Introduction to Natural Law Bioethics* (Washington, DC: Georgetown University Press, 2015).

12. Immanuel Kant, *Grounding for the Metaphysics of Morals*., trans. James W. Ellington, 3rd ed. (Indianapolis: Hackett, 1993 [1785]), 36.

13. John Rawls, "The Idea of Public Reason Revisited," *University of Chicago Law Review* 60, no. 3 (1997): 765–807.

14. A 2003 survey of US physicians from all specialties found that 71 percent agreed (32 percent strongly) with the statement "For me, the practice of medicine is a calling." See Farr A. Curlin, Lydia S. Dugdale, John D. Lantos, and Marshall H. Chin, "Do Religious Physicians Disproportionately Care for the Underserved?" *Annals of Family Medicine* 5, no. 4 (2007): 353–60. Among those who indicated that they have no religion, 52 percent agreed (20 percent strongly), and among those who indicated that they never attend religious services, 56 percent agreed (22 percent strongly) (data unpublished). A 2010 survey of U.S. primary care physicians and psychiatrists found that more than 80 percent of both groups agreed (about 40 percent strongly) with the same statement. See John D. Yoon, Jiwon H. Shin, Andy L. Nian, and Farr A. Curlin, "Religion, Sense of Calling, and the Practice of Medicine: Findings from a National Survey of Primary Care Physicians and Psychiatrists," *Southern Medical Journal* 108, no. 3 (2015): 189–95. Again, substantial majorities of the unreligious agreed (more than 65 percent of physicians who report no religious affiliation, indicate that they have no religion, and/or indicate that they never attend religious services) (data unpublished).

15. *Gaudium et spes*, no. 24. See *Vatican Council II: The Basic Sixteen Documents; Constitutions, Decrees, Declarations*, rev. ed., ed. Austin Flannery (Northport, NY: Costello Publishing, 1996), 190.

16. For an accessible introduction to the idea of personal vocation, see Germain Grisez and Russell Shaw, *Personal Vocation: God Calls Everyone* (Huntington, IN: Our Sunday Visitor, 2003).

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

CHAPTER THREE    The Doctor-Patient Relationship

1. Here we focus on the contributions of Mark Siegler as well as Timothy E. Quill and Howard Brody, but there have been many critiques of making patient autonomy the regulative principle for medical ethics. Prominent contributions to this literature include Carl Schneider, *The Practice of Autonomy: Patients, Doctors, and Medical Decisions* (New York: Oxford University Press, 1998); Ezekiel J. Emanuel and Linda L. Emanuel, "Four Models of the Physician-Patient Relationship," *Journal of the American Medical Association* 267, no. 16 (1992): 2221–26; and David Thomasma, "Beyond Medical Paternalism and Patient Autonomy: A Model of Physician Conscience for the Physician-Patient Relationship," *Annals of Internal Medicine* 98, no. 2 (1983): 243–48.

2. Leon R. Kass, "Regarding the End of Medicine and the Pursuit of Health," *Public Interest* 4 (1975): 11–42.

3. Mark Siegler, "Searching for Moral Certainty in Medicine: A Proposal for a New Model of the Doctor-Patient Encounter," *Bulletin of the New York Academy of Medicine* 57, no. 1 (1981): 56–69.

4. Ibid., 58.

5. President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, "Making Health Care Decisions: The Ethical and Legal Implications of Informed Consent in the Patient-Practitioner Relationship," October 1982, 35, https://repository.library.georgetown.edu.

6. Some physicians can fail in this way for a long time and still be quite useful to patients with respect to health, particularly subspecialists whose work is more reducible to technique and technological production. One thinks, for example, of the brain surgeon who is exquisitely committed to doing a technically proficient job—even a job that deserves to be called "beautiful," but who could not care less about his patients' flourishing. A patient might reasonably seek out such a surgeon, even over the surgeon who fasts and prays for the healing of the patients he carries in his heart, if the latter surgeon is not as technically gifted.

7. Somewhat paradoxically, while the PSM embraces physicians' engaging in practices that violate traditional boundaries by damaging health, it also opposes physicians engaging in practices such as praying with patients, because these practices, while not injuring health, putatively cross professional boundaries. See Farr A. Curlin and Daniel E. Hall, "Strangers or Friends? A Proposal for a New Spirituality-in-Medicine Ethic," *Journal of General Internal Medicine* 20, no. 4 (2005): 370–74, for a deeper analysis of debates about physicians paying attention to the spiritual concerns of patients.

CHAPTER FOUR    Autonomy and Authority

1. The 1979 Belmont Report and the 1982 "Making Health Care Decisions" report both focused on the importance of informed consent—the former with respect to the research context, the latter with respect to clinical practice. See National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, "The Belmont Report," Department of Health, Education, and Welfare, April 18, 1979, www.hhs.gov. See also President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, "Making Health Care Decisions: The Ethical and Legal Implications of Informed Consent in the Patient-Practitioner Relationship," October 1982, 35, https://repository.library.georgetown.edu.

2. Immanuel Kant, *Grounding for the Metaphysics of Morals*, trans. James W. Ellington, 3rd ed. (Indianapolis: Hackett, 1993 [1785]), 30.

3. A different formulation of the categorical imperative was cited in chapter 2; Kant believed them to be equivalent despite their apparent differences.

4. For the term "expressive individualism," see Robert N. Bellah, William M. Sullivan, Richard Madsen, Ann Swindler, and Steven M. Tipton, *Habits of the Heart: Individualism and Commitment in American Life* (Berkeley: University of California Press, 1985), 27.

5. For an accessible philosophical history of this cultural emphasis on authentic self-expression and self-development, see Charles Taylor, *The Ethics of Authenticity* (Cambridge, MA: Harvard University Press, 1991).

6. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (SCOTUS, 1992), 861.

7. Stephen Darwall, "Two Kinds of Respect," *Ethics* 88, no. 1 (1977): 36–49.

8. Ms. Maynard was a young woman from California who moved to Oregon to die by physician-assisted suicide. We discuss her case further in chapter 9. See Britanny Maynard, "My Right to Death with Dignity at 29," CNN, November 2, 2014, www.cnn.com.

9. See, for example, Health Occupations—Conversion Therapy for Minors—Prohibition (Youth Mental Health

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Protection Act), Annotated Code of Maryland, Article—Health Occupations, Section 1–212.1.

10. See Ronit Y. Stahl, and Ezekiel J. Emanuel, "Physicians, Not Conscripts—Conscientious Objection in Health Care," *New England Journal of Medicine* 376, no. 14 (2017): 1380–85.

11. For further discussion of this point, see Robert P. George, *Making Men Moral: Civil Liberties and Public Morality* (Oxford: Oxford University Press, 1995), chap. 6.

12. Of course, patients' medical conditions frequently impair their autonomy, sometimes to the point that they cannot be said to be self-governing. How physicians should respond to and care for such patients is a topic we return to in chapter 8.

13. John Finnis, *Natural Law and Natural Rights* (Oxford: Oxford University Press, 2011), 232.

14. Mark Siegler, "Searching for Moral Certainty in Medicine: A Proposal for a New Model of the Doctor-Patient Encounter," *Bulletin of the New York Academy of Medicine* 57, no. 1 (1981): 56–69.

15. For further discussion of this question, see Joseph Boyle, "Personal Responsibility and Freedom in Health Care: A Natural Law Perspective," in *Persons and Their Bodies: Rights, Responsibilities, Relationships*, ed. Mark Cherry (Dordrecht, Netherlands: Springer, 1999): 111–41.

16. We return to these ideas in our discussion of medical decisions at the end of life in chapters 8 and 9.

17. See Timothy E. Quill and Howard Brody, "Physician Recommendations and Patient Autonomy: Finding a Balance between Physician Power and Patient Choice," *Annals of Internal Medicine* 125, no. 9 (1996): 763–69.


CHAPTER FIVE    The Rule of Double Effect


1. Are there other standards? We think that there are, but that many standards are in one way or another reducible to fairness or vocation. So, for example, one's having promised something bears on what is and is not a proportionate reason for doing that thing; but the importance of promising clearly is related to both fairness and vocation.

2. In some cases, prioritizing is built into a good's nature. Marriage, for example, requires prioritizing marriage above some other goods, and the good of religion, as we argue, requires that religion be put before all other commitments.

3. This way of understanding intention is simpler than that put forth by some philosophers, who, with Thomas Aquinas, identify an "interior object" and an "exterior object" of the human act roughly, where we talk only about "ends" and "means." Nevertheless, we think that our concept largely tracks traditional natural law discussions of intention. Aquinas himself frequently speaks as we do: intention encompasses the end and the means. This simplicity bears fruit, as we discuss below, in our simple formulation of the rule of double effect.

4. Fairness may seem obvious. But vocation? We think so, as it may be that the explorers, recognizing the need for teamwork and trust, have solemnly promised to one another to "leave no man behind" even if by keeping this promise they will all die. Our point is not that such a commitment is wise but that commitments can specify obligations that reasonably prevent us from doing what we would do if we had not made such commitments.

5. Christopher Tollefsen, "Is a Purely First Person Account of Human Action Defensible?" *Ethical Theory and Moral Practice* 9, no. 4 (2006): 441–60, and Tollefsen, "Double Effect and Two Hard Cases in Medical Ethics," *American Catholic Philosophical Quarterly* 89, no. 3 (2015): 407–20.

6. Sulmasy and Pellegrino describe these four conditions in the following way: "The traditional rule of double effect specifies that an action with 2 possible effects, one good and one bad, is morally permitted if the action: (1) is not in itself immoral, (2) is undertaken only with the intention of achieving the possible good effect, without intending the possible bad effect even though it may be foreseen, (3) does not bring about the possible good effect by means of the possible bad effect, and (4) is undertaken for a proportionately grave reason." Daniel P. Sulmasy and Edmund D. Pellegrino, "The Rule of Double Effect: Clearing Up the Double Talk," *Archives of Internal Medicine* 159, no. 6 (1999): 545–50.

7. See, for example, Timothy E. Quill, Rebecca Dresser, and Dan W. Brock, "The Rule of Double Effect—A Critique of Its Role in End-of-Life Decision Making," *New England Journal of Medicine* 337, no. 24 (1997): 1768–71.


CHAPTER SIX    Sexuality and Reproduction


1. The FDA approved the first oral contraceptive in 1960. For a history of the oral contraceptive, see Bernard Asbell, *The Pill: A Biography of the Drug That Changed the World* (New York: Random House, 1995).

2. Mark Siegler and Dudley Goldblatt, "Clinical Intuition: A Procedure for Balancing the Rights of Patients and the Responsibilities of Physicians," in *The Law—Medicine Relation: A Philosophical Exploration*, ed. S. F. Spicker, J. M. Healey, and H. T. Engelhardt (Dordrecht, Netherlands: Springer, 1981), 25–26.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

3. See T. A. Cavanaugh, *Hippocrates' Oath and Asclepius' Snake* (New York: Oxford University Press, 2018), chap. 1.

4. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (SCOTUS, 1992), 856.

5. Part of the argument for contraception is that it will reduce the number of abortions by reducing the number of unplanned pregnancies. That seems intuitive enough, but evidence suggests that abortion rates decline only among users of contraception methods that have very low failure rates and make few demands on users (e.g., intrauterine devices and implantable contraceptives). More common methods, including the oral contraceptive pill, do not seem to reduce abortion rates, and in some cases are associated with higher abortion rates. See William Saletan, "Does Contraception Reduce Abortions?" *Slate*, September 1, 2015, www.slate.com.

6. A prominent website for these practitioners states, "Unlike common suppressive or destructive approaches, NaProTECHNOLOGY works cooperatively with the procreative and gynecologic systems. When these systems function abnormally, NaProTECHNOLOGY *identifies the problems and cooperates* with the menstrual and fertility cycles that correct the condition, maintain the human ecology, and sustain the procreative potential" (emphasis in original). See "NaProTECHNOLOGY," Pope Paul VI Institute for the Study of Human Reproduction, www.naprotechnology.com/.

7. Oliver O'Donovan, Ali Al Chami, and Melanie Davies, "Ovarian Hyperstimulation Syndrome," *Obstetrics, Gynaecology, and Reproductive Medicine* 25, no. 2 (2015): 43–48.

8. See Christopher Tollefsen, "In Vitro Fertilization Should Not Be an Option for a Woman," in *Contemporary Debates in Bioethics*, ed. Arthur L. Caplan and Robert Arp (Chichester, UK: John Wiley & Sons, 2014), 451–59.

9. What Jules and patients like him hope for must be distinguished, of course, from medical attempts to repair damaged secondary sex characteristics and sexual capacities, including attempts to resolve sex ambiguity. More on that below.

10. This distinction has applications outside the natural order also. For example, Thomas Aquinas gives us an account of law as an ordinance of reason, given by one with authority, for the common good, and promulgated. This is the paradigm case, law in good working order. But it is easy to find examples of law that do not share all these features of the paradigm. To pick an obvious example, Jim Crow laws that enforced segregation in the American South did not display these features and as such do not stand as evidence of the diversity of law, properly understood, as much as one among many sordid examples of the distortion of law into something that has the appearance of law but contradicts its purpose. Our capacity to recognize this distinction makes it possible for us to see how unjust laws can, in many circumstances, be justly broken.

11. Kenneth Miller, "Together Forever," *LIFE*, April 1, 1996, 44–54.

12. Congenital vaginal agenesis is a rare condition (experienced by about 1 in 4,000 females) in which a vagina does not form properly before birth. Reconstructive surgeries can be performed to fashion a vagina. See G. Creatsas and E. Deligeoroglou, "Vaginal Aplasia and Reconstruction," *Best Practice and Research: Clinical Obstetrics and Gynaecology* 24, no. 2 (2010): 185–91. In addition, penis transplant patients have successfully recovered urinary and sexual function. See https://www.reuters.com/article/us-safrica-transplant/worlds-first-penis-transplant-patient-to-father-a-child-idUSKBN0OS1HW20150612.

13. For this reason, we believe, with Paul McHugh, that it was an error for physicians at institutions such as Johns Hopkins to attempt to help males born with abnormal genitalia by constructing female "genitalia" and treating these young boys like girls. Such surgeries did not correct a deficiency in physical health and arguably generated significant mental health problems for their subjects. See Paul R. McHugh, "Surgical Sex," *First Things* 147 (2004): 34–38.

14. Obviously sex-change surgeries irreversibly damage the reproductive capacities of patients, but even administering hormones to delay or block puberty can lead to irreversible damage to patients like Jules. Indeed, at present there is no reliable way to suppress pubertal development in males without the risk of rendering the patients permanently sterile.

15. A paradigmatic example of this charge among practitioners of the new medicine is found in Ronit Y. Stahl and Ezekiel J. Emanuel, "Physicians, Not Conscripts: Conscientious Objection in Health Care," *New England Journal of Medicine* 376, no. 14 (2017): 1382. We discuss Stahl and Emanuel at length in chapter 10. For the Obama administration's Health and Human Services mandate asserting that it is unlawful to categorically refuse to participate in gender transition services, see Department of Health and Human Services, "Nondiscrimination in Health Programs and Activities," *Federal Register* 81, no. 96 (2016): 31376–473.


CHAPTER SEVEN   Abortion and Unborn Human Life


1. The American College of Obstetricians and Gynecologists' official policy on abortion says that "induced abortion is an essential component of women's health care." See "Abortion Policy," July 2011, www.acog.org.

2. Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* (Baltimore, MD: Johns Hopkins University Press, 1943), 3.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

3. W. H. S. Jones. *The Doctor's Oath: An Essay in the History of Medicine* (New York: Cambridge University Press, 1924), 23.

4. On human rights and the 1948 Geneva Declaration, see Andreas Frewer, "Human Rights from the Nuremberg Doctors Trial to the Geneva Declaration: Persons and Institutions in Medical Ethics and History," *Medical Health Care and Philosophy* 13 (2010): 259–68. For a discussion of the changes made in the most recent revision of the declaration, see Ramin Walter Parsa-Parsi, "The Revised Declaration of Geneva: A Modern-Day Physician's Pledge," *Journal of the American Medical Association* 318, no. 20 (2017): 1971–72. For past versions of the declaration, see World Medical Association, "Declaration of Geneva," www.wma.net.

5. The American Medical Association's current position on abortion is terse and noncommittal: "The issue of support of or opposition to abortion is a matter for members of the AMA to decide individually, based on personal values or beliefs. The AMA will take no action which may be construed as an attempt to alter or influence the personal views of individual physicians regarding abortion procedures." American Medical Association, "Abortion H-5.990," last modified 2009, https://policysearch.ama-assn.org.

6. Keith L. Moore, T. V. N. Persaud, and Mark G. Torchia, *The Developing Human: Clinically Oriented Embryology*, 10th ed. (Philadelphia: Elsevier, 2016), 11.

7. For interesting evidence regarding this point, see Helen Pearson, "Your Destiny, from Day One," *Nature* 418, no. 6893 (2002): 14–15.

8. See, in particular, Robert P. George and Christopher Tollefsen, *Embryo: A Defense of Human Life*, 2nd ed. (Princeton, NJ: Witherspoon Institute, 2011).

9. On December 10, 1948, the United Nations ratified the Universal Declaration of Human Rights. See United Nations, "Universal Declaration of Human Rights," www.ohchr.org.

10. See Martin Rhonheimer, *Vital Conflicts in Medical Ethics: A Virtue Approach to Craniotomy and Tubal Pregnancies*, ed. William F. Murphy (Washington, DC: Catholic University of America Press, 2009).

11. Judith Jarvis Thomson, "A Defense of Abortion" *Philosophy & Public Affairs* 1, no. 1 (1971): 47–66.

12. Ibid., 48.

13. Ibid.

14. See Jeffrey Reiman's discussion of the constitutional right to abortion in *Critical Moral Liberalism: Theory and Practice* (Lanham, MD: Rowman and Littlefield, 1996). John Finnis criticizes Reiman's position in "Public Reason, Abortion, and Cloning," *Valparaiso University Law Review* 32 (1998): 361–82.

15. Consider, for example, a mother with no other children, who has a loving husband, strong family support, and a strong devotion to unborn human life; she works, let us suppose, for a pro-life counseling group. Such a mother (but not only such a one) could, we think, reasonably choose in favor of saving the baby's life. She would be assured the child would be loved and well cared for, and her calling to pro-life witness could lead her reasonably to this choice. But another mother, equally devoted to the unborn but with several other children in need of maternal care, might, in her circumstances, choose in favor of saving her own life. The decision, we stress, is up to her, and she is not without resources for guidance in making that decision. But we think there are limited external grounds on which a third party could criticize one or the other choice.

16. St. Joseph's Hospital and Medical Center, "Bishop Olmsted Announcement: Frequently Asked Questions," accessed May 7, 2018, www.dignityhealth.org.

17. Nicanor Pier Giorgio Austriaco, "Abortion in a Case of Pulmonary Arterial Hypertension," *National Catholic Bioethics Quarterly* 11, no. 3 (2011): 514.

18. For a comparison of the effects on fertility of salpingotomy and salpingectomy, see Femke Mol, Norah M. van Mello, Annika Strandell, Karin Strandell, and Davor Jurkovic, "Salpingotomy versus Salpingectomy in Women with Tubal Pregnancy," *Lancet* 383, no. 9927 (2014): 1483–89, and Xiaolin Cheng, Xiaoyu Tian, Zhen Yan, Mengmeng Jia, Jie Deng, Ying Wang, and Dongmei Fan, "Comparison of the Fertility Outcome of Salpingotomy and Salpingectomy in Women with Tubal Pregnancy: A Systematic Review and Meta-Analysis," *PLoS One* 11, no. 3 (2016): e0152343. For the American College of Obstetricians and Gynecologists' recommendations, see "ACOG Practice Bulletin: Clinical Management Guidelines for Obstetrician-Gynecologists, no. 193," *Obstetrics and Gynecology* 131 (2018): 91–103, www.acog.org.

19. For an argument, which seems sound to us, that the use of methotrexate does *not* necessarily involve intentional killing, see Christopher Kaczor, "The Ethics of Ectopic Pregnancy: A Critical Reconsideration of Salpingotomy and Methotrexate," *Linacre Quarterly: A Journal of the Philosophy and Ethics of Medical Practice* 76 (2009): 265–82.


CHAPTER EIGHT   Medicine at the End of Life


1. Leon R. Kass, "Regarding the End of Medicine and the Pursuit of Health," *Public Interest* 4 (1975): 18.

2. World Health Organization, "WHO Definition of Palliative Care," www.who.int.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

3. See Timothy E. Quill, Bernard Lo, and Dan W. Brock, "Palliative Options of Last Resort: A Comparison of Voluntarily Stopping Eating and Drinking, Terminal Sedation, Physician-Assisted Suicide, and Voluntary Active Euthanasia," *Journal of the American Medical Association* 278, no. 23 (1997): 2099–104; Pieter J. J. Sauer and Eduard Verhagen, "The Groningen Protocol—Euthanasia in Severely Ill Newborns," *New England Journal of Medicine* 352, no. 10 (2005): 959–62.

4. National Hospice and Palliative Care Organization, "Preamble to NHPCO Standards of Practice," www.nhpco.org.

5. Atul Gawande, *Being Mortal: Medicine and What Matters in the End* (New York: Metropolitan Books, 2014).

6. A 2006 study found that "on average, patient-designated and next-ofkin surrogates incorrectly predict patients' end-of-life treatment preferences in one third of cases" (David I. Shalowitz, Elizabeth Garrett-Mayer, and David Wendler, "The Accuracy of Surrogate Decision Makers," *Archives of Internal Medicine* 166, no. 5 (2006): 497. In addition, Sharma et al. found that family members are also highly inaccurate in predicting how their loved ones want decisions to be made. See Rashmi K. Sharma, Mark T. Hughes, Mari T. Nolan, Carrie Tudor, Joan Kub, Peter B. Terry, and Daniel P. Sulmasy, "Family Understanding of Seriously Ill Patient Preferences for Family Involvement in Healthcare Decision Making," *Journal of General Internal Medicine* 26, no. 8 (2011): 881–86.

7. The Hippocratic tradition affirmed that the physician should acknowledge and respect the limits of medicine. Consider this statement attributed to Hippocrates in "The Art": "For if a man demand from an art a power over what does not belong to the art, or from nature a power over what does not belong to nature, his ignorance is more allied to madness than to lack of knowledge. For in cases where we may have the mastery through the means afforded by a natural constitution or by an art, there we may be craftsmen, but nowhere else. Whenever therefore a man suffers from an ill which is too strong for the means at the disposal of medicine, he surely must not even expect that it can be overcome by medicine." Hippocrates, "The Art," in *Hippocrates*, vol. 2, trans.W. H. S. Jones (Cambridge, MA: Harvard University Press, 1923), 204–5.


CHAPTER NINE   Last-Resort Options

1. For a discussion of the good of solidarity in this context, see Joseph Boyle, "A Case for Sometimes Tube-Feeding Patients in Persistent Vegetative State," in *Euthanasia Examined: Ethical, Clinical, and Legal Perspectives*, ed. John Keown (Cambridge: Cambridge University Press, 1995), 189–99.

2. See Alan Meisel, Bernard Lo, Timothy E. Quill, and Dan W. Brock, "Last-Resort Options for Palliative Sedation," *Annals of Internal Medicine* 151, no. 6 (2009): 421–24, and, from earlier, Timothy E. Quill, Bernard Lo, and Dan W. Brock, "Palliative Options of Last Resort: A Comparison of Voluntarily Stopping Eating and Drinking, Terminal Sedation, Physician-Assisted Suicide, and Voluntary Active Euthanasia," *Journal of the American Medical Association* 278, no. 23 (1997): 2099–104.

3. See Farr A. Curlin, "Palliative Sedation: Clinical Context and Ethical Questions," *Theoretical Medicine and Bioethics* 39, no. 3 (2018): 197–209.

4. Ira Byock, *Dying Well: Peace and Possibilities at the End of Life* (New York: Riverhead Books, 1998), 193–216.

5. Ibid., 215.

6. For an elaboration of this account of suffering, see Christopher Tollefsen, "Suffering, Enhancement, and Human Goods," *Quaestiones Disputatae* 5 (2015): 104–17.

7. Lord Marchmain's conversion occurs in the final chapter of Evelyn Waugh's *Brideshead Revisited* (New York: Back Bay Books, 1999). The miniseries, directed by Charles Sturridge, was produced by Granada Television and released in 1981.

8. See Curlin, "Palliative Sedation."

9. Arthur Caplan, "Bioethicist Caplan: Brittany Maynard Did Nothing Unethical," *USA Today*, November 4, 2014, www.usatoday.com.

10. See Oregon Public Health Division, "Oregon's Death with Dignity Act—2014," Oregon Health Authority, www.oregon.gov.

11. Brittany Maynard, "My Right to Death with Dignity at 29," CNN, November 2, 2014, www.cnn.com.

12. Oregon Public Health Division, "Oregon's Death with Dignity Act—2014."

13. Ibid.

14. Anthony L. Back, Timothy E. Quill, and Susan D. Block, "Responding to Patients Requesting Physician-Assisted Death: Physician Involvement at the Very End of Life," *Journal of the American Medical Association* 315, no. 3 (2016): 245–46.

15. See www.compassionandchoices.org.

16. Center for Health Statistics and Informatics, "End of Life Option Act," California Department of Public Health, www.cdph.ca.gov.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

17. Ian Lovett and Richard Pérez-Peña, "California Governor Signs Assisted Suicide Bill into Law," *New York Times*, October 5, 2015, www.nytimes.com.

18. Robert A. Burt, "The Suppressed Legacy of Nuremberg," *Hastings Center Report* 26, no. 5 (1996): 33.

19. Ibid.

20. The patient's name and some details have been altered to preserve confidentiality.

21. Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* (Baltimore, MD: Johns Hopkins University Press, 1943, 3.

22. American Medical Association, "Physician Assisted Suicide H-140.952," last modified 2009, https://policysearch.ama-assn.org.

23. Public Health Division, "Oregon Death with Dignity Act, 2017, Data Summary," Oregon Health Authority, February 9, 2018, www.oregon.gov.

24. Disease Control and Health Statistics Division, "Washington State Death with Dignity Act Report," Washington State Department of Health, March 2018, www.doh.wa.gov.

25. Black Americans are significantly less likely to use hospice services. The 2016 "Facts and Figures" published by the National Hospice and Palliative Care Organization and revised in 2018 shows that 8.2 percent of Medicare hospice patients were African American, compared to 86.8 percent who were white. See "Facts and Figures: Hospice Care in America," National Hospice and Palliative Care Organization, revised April 2018, www.nhpco.org. See also Kimberly S. Johnson, Maragatha Kuchibhatla, and James A. Tulsky, "What Explains Racial Differences in the Use of Advance Directives and Attitudes toward Hospice Care?," *Journal of the American Geriatrics Society* 56, no. 10 (2008): 1953–58.

26. Diane Coleman, "Assisted Suicide Laws Create Discriminatory Double Standard for Who Gets Suicide Prevention and Who Gets Suicide Assistance: Not Dead Yet Responds to Autonomy, Inc.," *Disability and Health Journal* 3 no. 1 (2010): 39–50.

27. Richard M. Zaner, *A Critical Examination of Ethics in Health Care and Biomedical Research* (Dordrecht, Netherlands: Springer, 2015), 30–32.

CHAPTER TEN   Conscientious Medicine

1. These arguments lean heavily on a moral distinction and tension between the personal and the professional, whether posed as personal moral values versus professional ethical obligations, personal conscience versus professional conscience, or duties related to personal versus professional integrity. For prominent examples of such arguments, see Julian Savulescu, "Conscientious Objection in Medicine," *British Medical Journal* 332 (2006): 294–97; Julian Savulescu and Udo Schuklenk, "Doctors Have No Right to Refuse Medical Assistance in Dying, Abortion or Contraception," *Bioethics* 31, no. 3 (2017): 162–70; Udo Schuklenk and Ricardo Smalling, "Why Medical Professionals Have No Moral Claim to Conscientious Objection Accommodation in Liberal Democracies," in *Journal of Medical Ethics* 43, no. 4 (2017): 234–40; Robert F. Card, "Reasonability and Conscientious Objection in Medicine: A Reply to Marsh and an Elaboration of the Reason-Giving Requirement," *Bioethics* 28, no. 6 (2014): 320–26; Eva LaFollette and Hugh LaFollette, "Private Conscience, Public Acts," *Journal of Medical Ethics* 33, no. 5 (2007): 249–54; Howard Brody and Susan S. Night, "The Pharmacist's Personal and Professional Integrity," *American Journal of Bioethics* 7, no. 6 (2007): 16–17.

2. Ronit Y. Stahl and Ezekiel J. Emanuel, "Physicians, Not Conscripts—Conscientious Objection in Health Care," *New England Journal of Medicine* 376, no. 14 (2017): 1380–85.

3. The Professional Obligations and Human Rights policy was issued by the College of Physicians and Surgeons of Ontario, which has state-sanctioned authority over medical practitioners. The college published a fact sheet to explain the policy, www.cpso.on.ca. See *The Christian Medical and Dental Society of Canada v. College of Physicians and Surgeons of Ontario*, 2018 ONSC 579, www.canlii.org.

4. Illinois General Assembly, Public Act 099-0690, SB 1564, July 29, 2016, www.ilga.gov.

5. "Swedish Anti-Abortion Midwife Loses Court Case," BBC, April 13, 2017.

6. Stahl and Emanuel, "Physicians, Not Conscripts," 1382.

7. Ibid., emphasis added.

8. American College of Obstetricians and Gynecologists, "ACOG Committee Opinion No. 385: The Limits of Conscientious Refusal in Reproductive Medicine," *Obstetrics & Gynecology* 110, no. 5 (2007): 1205, emphasis added.

9. Stahl and Emanuel, "Physicians, Not Conscripts," 1383.

10. Eva LaFollette and Hugh LaFollette, "Private Conscience, Public Acts," *Journal of Medical Ethics* 33, no. 5 (2007): 249–54.

11. Howard Brody and Susan S. Night, "The Pharmacist's Personal and Professional Integrity," *American Journal of Bioethics* 7, no. 6 (2007): 16–17.

12. Stahl and Emanuel, "Physicians, Not Conscripts," 1383.

13. American College of Obstetricians and Gynecologists, "ACOG Committee Opinion No. 385," 1205.

14. Dan W. Brock, "Conscientious Refusal by Physicians and Pharmacists: Who Is Obligated to Do What, and Why?," *Theoretical Medicine and Bioethics* 29, no. 3 (2008): 187–200.

15. On page 1205 of the "ACOG Committee Opinion No. 385," they write, "The third criterion for evaluating authentic conscientious refusal is the scientific integrity of the facts supporting the objector's claim. Core to the practice of medicine is a commitment to science and evidence-based practice."

16. Stahl and Emanuel argue that those who refuse patient requests should be treated like conscientious objectors to military service, who "are required to perform alternative service." Stahl and Emanuel, "Physicians, Not Conscripts," 1383.

17. "The military conscientious objector faced real penalties—fines, imprisonment, or alternative service—for resisting conscription." Stahl and Emanuel, "Physicians, Not Conscripts," 1384.

18. Julian Savulescu, "Conscientious Objection in Medicine," *British Medical Journal* 332 (2006): 294.

19. Thomas Aquinas, *Summa Theologiae*, 1-1, q.79, aa12, 13.

20. American College of Obstetricians and Gynecologists, "ACOG Committee Opinion No. 385," 1204.

21. In response to pharmacists who refused to fill prescriptions for emergency contraception, before the FDA made the drug available over the counter, Brody and Night wrote that they "suspect that what the 'conscientious' pharmacist actually objects to, but does not have the nerve to say outright, is the possibility that a woman can engage in sexual activity without having to face the 'moral' consequences of her potentially illicit act." Brody and Night, "Pharmacist's Personal and Professional Integrity," 17.

22. Thomasma defines the conscience of the physician as prudential judgment, adding, "Prudential judgment encompassing medical and value factors in the physician-patient relation is a hallmark of professional conduct." David Thomasma, "Beyond Medical Paternalism and Patient Autonomy: A Model of Physician Conscience for the Physician-Patient Relationship," *Annals of Internal Medicine* 98, no. 2 (1983): 244.

23. Stahl and Emanuel, "Physicians, Not Conscripts," 1380.

24. American College of Obstetricians and Gynecologists, "ACOG Committee Opinion No. 385," 1205, emphasis added.

25. Stahl and Emanuel, "Physicians, Not Conscripts," 1384.

26. Consider this statement in "ACOG Committee Opinion No. 385": "Although respect for conscience is a value, it is only a prima facie value, which means it can and should be overridden in the interest of other moral obligations that outweigh it in a given circumstance" (1207).

27. American College of Obstetricians and Gynecologists, "ACOG Committee Opinion No. 385," 1204.

28. Stahl and Emanuel, "Physicians, Not Conscripts," 1382.

29. Ibid., 1380–81.

30. Ibid, 1383.

31. Ibid.

32. American College of Obstetricians and Gynecologists, "ACOG Committee Opinion No. 385," 1206.

33. Stahl and Emanuel, "Physicians, Not Conscripts," 1383.

34. See John Rawls, *Political Liberalism* (New York: Columbia University Press, 1993).

35. Timothy E. Quill and Howard Brody, "Physician Recommendations and Patient Autonomy: Finding a Balance between Physician Power and Patient Choice," *Annals of Internal Medicine* 125, no. 9 (1996): 765.

36. See Steve Sternberg, "Diagnosis: Burnout," *U.S. News & World Report*, September 8, 2016. See also Tait D. Shanafelt, Omar Hasan, Lotte N. Dyrbye, Christine Sinsky, Daniel Satele, Jeff Sloan, and Colin P. West, "Changes in Burnout and Satisfaction with Work-Life Balance in Physicians and the General US Working Population between 2011 and 2014," *Mayo Clinic Proceedings* 90, no. 12 (2015): 1600–1613.

37. President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, "Making Health Care Decisions: The Ethical and Legal Implications of Informed Consent in the Patient-Practitioner Relationship," October 1982, 38, https://repository.library.georgetown.edu.

38. Martin Luther King Jr., "A Proper Sense of Priorities" (speech), February 6, 1968, Washington, DC, text available at http://www.aavw.org/special_features/speeches_speech_king04.html.

39. This was said to one of the authors (Curlin) in conversation.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

INDEX

ability, 48–49

abortion

    American Medical Association on, 211n5

    autonomy and, 67

    beginning of human being's existence and, 115–17

    consent and, 172

    contraception and, 208n5

    contraception vs., 98–99

    defining, 126

    in ectopic pregnancy, 126, 129–31

    embryology and, 116–17

    end-of-life killing vs., 172–73

    Golden Rule and, 118

    Hippocratic Oath and, 113–14

    intention and, 120–21, 128, 130

    justice and, 112

    life-saving, 124–29

    personhood and, 121–24

    privacy and, 119–20

    in provider of services model, 112, 119

    as public matter, 119–20

    rule of double effect and, 124–29

    as self-defense, 129

    in Way of Medicine, 113–14

    *See also* contraception

advance directives, 58–59, 146–47. *See also* end-of-life medicine; last-resort options

ANH. *See* artificial nutrition and hydration (ANH)

anorexia, 110

antibiotics, 56–58, 85–87

*Anticipatory Corpse, The* (Bishop), 9

Aquinas, Thomas, 129, 187, 203n3, 207n3, 209n10

Aristotle, 8, 20–21, 25, 34, 107, 188

artificial nutrition and hydration (ANH), 160–65

assisted reproduction, 99–104

assisted suicide, 69–70, 170–72. *See also* end-of-life medicine; last-resort options

Austriaco, Nicanor, 128

authenticity, 67, 119, 141

authority

    autonomy vs., 72–73, 76–77

    end-of-life medicine and, 139, 150

    of expertise, 73

    limits of, 77–78

    in provider of services model, 3, 75

    solidarity and, 63

    vocation and, 75–76

    in Way of Medicine, 78

autonomy, 205n1

    assisted suicide and, 69–70, 170–71

    authority vs., 72–73, 76–77

    commitments and, 71–72

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

end-of-life medicine and, 141
as greatest human good, 70
importance of, 70–72
in Kant, 67
in medical ethics, 65–66
misunderstandings about, 66–70
paternalism and, 52
principlism and, 14, 41, 43
in provider of services model, 2, 69
radical, 67–70
respect vs., 44
solidarity and, 62
in Way of Medicine, 69

Bacon, Francis, 8
Beauchamp, Thomas, 14, 41, 43, 199n2, 204nn8–10
Belmont Report, 41, 206n1
beneficence, 14, 41, 43, 55
Bentham, Jeremy, 37
Berry, Wendell, 30
Bishop, Jeffrey, 8–9
Boorse, Christopher, 202n9
Brody, Howard, 77, 205n1, 217n21
Brown, Jerry, 171
Burt, Robert, 171–72, 174
Byock, Ira, 167

calling, 46–47, 204n14
categorical imperative, 43–44, 67, 206n3
Cavanaugh, Thomas, 98
cessation of eating, 165–66
Childress, James, 14, 41, 43, 199n2, 204nn8–9
clinicians. *See* physician(s)
closeness, intention and, 87–88
Clouser, K. Danner, 42
commitment, 17–20, 46–48, 71–72, 83–84, 89–91, 96, 138–41, 153–57, 185–89
conscience, 3–4, 89, 181, 187–89, 217n22
conscientious medicine
    professional responsibility and, 189–92
    in provider of services model, 181–85
    and refusal of patient requests, 179–87
    in Way of Medicine, 185–94
consent, 14, 44, 66, 172, 181, 195, 206n1
consequentialism, 37–38
consumerism, 2
contraception
    abortion and, 208n5
    abortion vs., 98–99
    autonomy and, 54–55
    in clinical setting, 94–99
    health and, 96–98
    justice and, 95
    in provider of services model, 55, 94–95
    refusal to fill prescriptions for, 217n21
    refusal to prescribe, 184
    as self-prescribed, 92–93
    in Way of Medicine, 96–99
    *See also* abortion

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Darwall, Stephen, 67
death. *See* advance directives; end-of-life medicine
delirium, 97, 167, 169
demoralization, 2–3, 181, 195
Descartes, René, 8
doctor-patient relationship
    balance in, 53–54
    as community, 62
    paternalism in, 52–53
    solidarity in, 60–63
    trust and, 64
doctors. *See* physician(s)
do-not-resuscitate (DNR), 58–59. *See also* advance directives; end-oflife medicine; last-resort options
double effect. *See* rule of double effect
DPOAHC. *See* durable power of attorney for health care (DPOAHC)
durable power of attorney for health care (DPOAHC), 146, 148
dying, autonomy and, 68–70, 206n1. *See also* end-of-life medicine; last-resort options

eating, voluntary cessation of, 165–66
ectopic pregnancy, 126, 129–31
Edelstein, Ludwig, 200n8
Emanuel, Ezekiel, 180, 182–83, 190–91, 217n16
embryology, 116–17. *See also* abortion
end-of-life medicine
    advance directives, 58–59
    assisted suicide, 69–70
    authority and, 139, 150
    autonomy and, 141
    case study, 151–58
    decision-making capacity and, 145–51
    health and, 134–36, 142–43
    intention and, 151–58
    patient options and, 140–42
    physician options and, 136–40
    proportionality and, 151–58
    in provider of services model, 135–36, 143–44, 147, 152
    substituted judgment and, 149–50
    suffering and, 142–45
    in Way of Medicine, 136, 138–40, 147, 152–53, 155–56
    *See also* last-resort options
Engelhardt, H. Tristram, 2, 9
equilibrium, reflective, 42
ethics. *See* Kantian ethics; medical ethics; practical ethics; practical reason
eugenics, 24
euthanasia, voluntary, 170–72. *See also* end-of-life medicine; last-resort options
expertise, authority of, 73
expressive individualism, 67–68

fairness, 40–41, 81–83, 173–74, 207n1
feeding tube. *See* artificial nutrition and hydration (ANH)
fertility. *See* contraception; reproduction
Finnis, John, 73
flourishing, 6, 35–36, 71, 199n1, 203n3

Gawande, Atul, 145
gender
    autonomy and, 68
    transition, 104–10

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

Gert, Bernard, 42
gestational surrogacy, 102–3
Goldblatt, Anne Dudley, 92–93
Golden Rule, 40–41, 82–83, 118
Gomez-Lobo, Alfonso, 204n11
good(s)
    abortion and, 117–18
    action and, 35–36
    autonomy as, 70
    basic, 36, 43, 45
    commitments and, 46
    common, 60
    consequentialism and, 37–38
    destruction of, for "greater," 39–40
    in first moral principle, 38–41
    internal vs. external, 15–18
    practical reason and, 36, 79–80
    in provider of services model, 62
    rule of double effect and, 79–80
    that medicine is for, 20–24
    vocation and, 45–50

Hauerwas, Stanely, 9, 200n11
health
    absence of suffering vs., 29
    activity and, 27
    in Aristotle, 20–21
    consciousness and, 169
    in context of organism, 27–28
    contraception and, 96–98
    defining, 24–31
    end-of-life medicine and, 134–36, 142–43
    ethics and, 5–6
    as good for which medicine exists, 20–22
    as holistic, 26–27
    inducements and, 5
    mental, 29–30
    objectivity and, 25
    in provider of services model, 4
    risk vs., 28–29
    rule of double effect and, 80
    wakefulness and, 169
    in Way of Medicine, 4–5
    women's, 93
Hippocrates, 213n7
Hippocratic Oath, 5, 21, 42–43, 113–14
holism, 62–63, 143
hospice, 144–45, 215n25. *See also* end-of-life medicine
humility, 29, 63
hydration, artificial, 160–65

individualism, expressive, 67–68
inducements, 5
informed consent, 181, 195, 206n1
integrity, 61–62
intention, 79–80, 84–88, 120–21, 128, 130, 151–58, 207n3, 208n6
intersex, 106–7
in vitro fertilization (IVF), 100, 103–4

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

IVF. *See* in vitro fertilization (IVF)

Jonsen, Albert, 42–43
judgment
    in provider of services model, 3–4
    substituted, 149–50
justice, 14
    abortion and, 112
    contraception and, 95
    doctor-patient relationship and, 54–55
    last-resort options and, 173–74
    principlism and, 41

Kant, Immanuel, 66–67
Kantian ethics, 43–45. *See also* categorical imperative
Kass, Leon, 25, 27, 52, 133–34, 200n11, 202n14
Kennedy, Anthony, 67
King, Martin Luther, Jr., 196

last-resort options
    abortion vs., 172–73
    and artificial nutrition and hydration, 160–65
    fairness and, 173–74
    justice, 173–74
    physician-assisted suicide, 170–72
    practical reason and, 172–73
    in provider of services model, 159–60
    sedation to unconsciousness, 166–69
    solidarity and, 176
    trust and, 174–78
    voluntary cessation of eating, 165–66
    in Way of Medicine, 159
law, natural, 6, 34–35, 119–20, 203n3, 207n3
Lewis, C. S., 6
life plan, rational, 46–47
living will, 146. *See also* end-of-life medicine

MacIntyre, Alasdair, 14–15, 19
marriage, 207n2
maximization, 37–38
Maynard, Brittany, 68, 170–71, 176–77, 206n1
McHugh, Paul, 210n13
McKenney, Gerald, 8–9, 200n11, 201n16
McMath, Jahi, 40–41
medical ethics
    autonomy in, 65–66
    "four principles" of, 2
    health and, 5–6
    *See also* practical reason
medicine
    as calling, 46–47, 204n14
    defined, 2
    future of, 194–96
    goods for which it exists, 20–24
    health as goal of, 20–22
    as practice, 4–5, 14–20
    provider of services model for, 2–4
    Way of Medicine, 4–6

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

mental health, 29–30, 202n14, 210n13
Mill, John Stuart, 66
Moore, K. L., 116
moral principle, first, 38–41
moral worth, 117–19

NaPro technology, 102
natural law, 6, 34–35, 119–20, 203n3, 207n3
Nazi Germany, 24
*Nicomachean Ethics* (Aristotle), 34
Night, Susan S., 217n21
nonmaleficence, 14, 41, 43, 53–56, 100, 112, 135–36, 161, 184, 190, 199n2
nutrition, artificial, 160–65

objectivity, 25–26, 202n9
opioids, 89–90, 151

pain medications, 89–90
palliative care, 143–44, 166. *See also* end-of-life medicine
paternalism, 52–53, 65–66, 94, 195
patients
    commitment to, 18
    solidarity with, 19, 60–63
    vulnerability of, 21–22
    *See also* autonomy; doctor-patient relationship
patients' rights movement, 51–52
Pellegrino, Edmund, 21, 42, 208n6
Persaud, T. V. N., 116
personhood, 121–24
physician(s)
    abortion and, 113–14
    authority of, 73
    as calling, 47
    in end-of-life medicine, 136–40
    Golden Rule and, 40
    goods received by, for practice, 15–16
    paternalism of, 52–53
    patients' rights movement and, 51–52
    refusal of patient requests by, 179–87
    satisfaction of, with work, 16
    solidarity with, 60–63
    suffering and, 29
    trust of, 22, 64
    *See also* doctor-patient relationship
physician-assisted suicide, 68–70, 170–72, 206n1. *See also* end-oflife medicine; last-resort options
physician orders for life-sustaining treatment (POLST), 146
*Planned Parenthood v. Casey,* 67, 99
pluralism, 79, 192–94
POLST. *See* physician orders for life-sustaining treatment (POLST)
practical ethics, 34–35
practical reason
    conscience and, 187
    consequentialism and, 37–38
    goods and, 36, 79–80
    Kantian ethics and, 43–45
    last-resort options and, 172–73
    principlism and, 41–45
    requirements of, 5–6, 33–50

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

vocation and, 45–50
practice
    defined, 14–15
    and internal vs. external goods, 15–18
    medicine as, 4–5, 14–20
prayer, 63, 205n7
pregnancy. *See* abortion; contraception; ectopic pregnancy; reproduction
President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, 53, 196
principlism, 14, 41–45, 82, 95
proceduralism, 54
professional responsibility, 180–81, 186, 188–92
proportionality, 88, 151–58, 208n6
provider of services model (PSM), 2–4
    abortion in, 112, 119
    advance directives in, 58
    antibiotics in, 56–57
    artificial nutrition and hydration in, 161
    assisted reproduction in, 99–100, 102–3
    authority in, 75
    autonomy in, 69
    conscience and, 188–89
    contraception in, 55, 94–95
    end-of-life medicine in, 135–36, 143–44, 147, 152
    goods in, 62
    health in, 4
    in historical context, 8–9
    last-resort options in, 159–60
    paternalism and, 52–53
    prayer in, 205n7
    principlism in, 14
    professional responsibility in, 190
    and refusal of patient requests, 181–85
    right-is-prior-to-the-good maxim and, 44–45
    transgender in, 105–6, 109
    Way of Medicine vs., 13–14
PSM. *See* provider of services model (PSM)

Quill, Timothy E., 77, 171, 205n1

race, hospice use and, 215n25
rational life plan, 46–47
Rawls, John, 44–45
reflective equilibrium, 42
reproduction
    assisted, 99–104
    topics in, 91
    transgender and, 210n14
    *See also* contraception
respect, 44, 63, 67, 117–19
responsibility, professional, 180–81, 186, 188–92
right-is-prior-to-the-good, 44–45
role-conflation harm, 98
rule of double effect
    abortion and, 124–29
    articulation of, 88
    clinical importance of, 89–90
    closeness and, 87–88
    fairness and, 81–83

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

goods and, 79–80
health and, 80
intention and, 79–80, 84–88, 207n3, 208n6
principlism and, 82
proportionality and, 88, 208n6
side effects and, 81–88
vocation and, 83–84

Second Vatican Council, 50
sedation to unconsciousness, 166–69
self-defense, 129
shalom, 30, 203n17
side effects, 81–88
Siegler, Mark, 53, 73–74, 92–93, 205n1
solidarity, 19, 59–63, 163, 176
Stahl, Ronit, 180, 182–83, 190–91, 217n16
subspecialization, 61, 205n6
substituted judgment, 149–50
suffering
    end-of-life medicine and, 142–45
    health vs. absence of, 29
    last-resort options and, 167–68
suicide, assisted, 68–70, 170–72, 206n1. *See also* end-of-life medicine; last-resort options
Sulmasy, Daniel P., 208n6
surrogacy, gestational, 102–3
surrogate decision-making, 148–51

Tao, 6, 10
Thomasma, David, 21, 42, 217n22
Thomson, Judith Jarvis, 120–21
Torchia, Mark, 116
*To Relieve the Human Condition* (McKenney), 8–9
Toulmin, Stephen, 42–43
transgender, 68, 210nn13–14
transgender rights, 104–10
trust, 22, 52, 59–60, 64, 174–78
trustworthiness, 18–19
Tuskegee experiments, 24, 36, 40, 82–83

unconsciousness, sedation to, 166–69
utilitarianism, 37

vocation, 45–50, 75–76, 83–84, 141, 204n14, 207n1, 207n4
vulnerability, 21–22, 64, 125, 178

Way of Medicine, 4–6
    abortion in, 113–14
    advance directives in, 59
    antibiotics in, 56–57
    artificial nutrition and hydration in, 161–62
    assisted reproduction in, 100–104
    authority in, 78
    autonomy in, 69
    contraception in, 55, 96–99
    end-of-life medicine in, 136, 138–40, 147, 152–53, 155–56
    last-resort options in, 159
    pluralism and, 192–94

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

provider of services model vs., 13–14
reason and, 5–6
refusal of patient requests in, 183, 185–87
sedation to unconsciousness in, 167–68
as tradition, 9–11
transgender in, 106–10
virtues of, 186–94
voluntary cessation of eating in, 166
well-being, 2, 37, 91, 93, 160, 180, 199n1. *See also* flourishing
will, living, 146. *See also* end-of-life medicine
women, 92. *See also* abortion; contraception; reproduction
women's health, 93

Zaner, Richard, 178

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

FARR CURLIN is Josiah C. Trent Professor of Medical Humanities at Duke University. He holds appointments in the School of Medicine; the Trent Center for Bioethics, Humanities and History of Medicine; the Divinity School; and the Kenan Institute for Ethics. Curlin has authored more than one hundred and thirty articles and book chapters on medicine and bioethics.

CHRISTOPHER TOLLEFSEN is the College of Arts and Sciences Distinguished Professor of Philosophy at the University of South Carolina. He is the author and editor of numerous books, including *Embryo: A Defense of Human Life and Lying and Christian Ethics*.

EBSCOhost - printed on 2/16/2024 1:13 PM via DEPARTMENT OF JUSTICE. All use subject to https://www.ebsco.com/terms-of-use

# Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment



**WHAT'S KNOWN ON THIS SUBJECT:** Puberty suppression has rapidly become part of the standard clinical management protocols for transgender adolescents. To date, there is only limited evidence for the long-term effectiveness of this approach after gender reassignment (cross-sex hormones and surgery).



**WHAT THIS STUDY ADDS:** In young adulthood, gender dysphoria had resolved, psychological functioning had steadily improved, and well-being was comparable to same-age peers. The clinical protocol including puberty suppression had provided these formerly gender-dysphoric youth the opportunity to develop into well-functioning young adults.

## abstract

**BACKGROUND:** In recent years, puberty suppression by means of gonadotropin-releasing hormone analogs has become accepted in clinical management of adolescents who have gender dysphoria (GD). The current study is the first longer-term longitudinal evaluation of the effectiveness of this approach.

**METHODS:** A total of 55 young transgender adults (22 transwomen and 33 transmen) who had received puberty suppression during adolescence were assessed 3 times: before the start of puberty suppression (mean age, 13.6 years), when cross-sex hormones were introduced (mean age, 16.7 years), and at least 1 year after gender reassignment surgery (mean age, 20.7 years). Psychological functioning (GD, body image, global functioning, depression, anxiety, emotional and behavioral problems) and objective (social and educational/professional functioning) and subjective (quality of life, satisfaction with life and happiness) well-being were investigated.

**RESULTS:** After gender reassignment, in young adulthood, the GD was alleviated and psychological functioning had steadily improved. Well-being was similar to or better than same-age young adults from the general population. Improvements in psychological functioning were positively correlated with postsurgical subjective well-being.

**CONCLUSIONS:** A clinical protocol of a multidisciplinary team with mental health professionals, physicians, and surgeons, including puberty suppression, followed by cross-sex hormones and gender reassignment surgery, provides gender dysphoric youth who seek gender reassignment from early puberty on, the opportunity to develop into well-functioning young adults. *Pediatrics* 2014;134:696–704

**AUTHORS:** Annelou L.C. de Vries, MD, PhD,[a] Jenifer K. McGuire, PhD, MPH,[b] Thomas D. Steensma, PhD,[a] Eva C.F. Wagenaar, MD,[a] Theo A.H. Doreleijers, MD, PhD,[a] and Peggy T. Cohen-Kettenis, PhD[a]

[a]*Center of Expertise on Gender Dysphoria, VU University Medical Center, Amsterdam, Netherlands; and* [b]*Department of Human Development, Washington State University, Pullman, Washington*

**KEY WORDS**
gender dysphoria, transgenderism, adolescents, psychological functioning, puberty suppression, longitudinal outcomes

**ABBREVIATIONS**
ABCL—Adult Behavior Checklist
ASR—Adult Self-Report
BDI—Beck Depression Inventory
BIS—Body Image Scale
CBCL—Child Behavior Checklist
CGAS—Children's Global Assessment Scale
CSH—cross-sex hormones
GD—gender dysphoria
GnRHa—gonadotropin-releasing hormone analogs
GRS—gender reassignment surgery
SHS—Subjective Happiness Scale
STAI—Spielberger's Trait Anxiety Scale
SWLS—Satisfaction With Life Scale
TPI—Spielberger's Trait Anger Scale
UGDS—Utrecht Gender Dysphoria Scale
YSR—Youth Self-Report

Dr de Vries conceptualized the study, clinically assessed the participants, drafted the initial manuscript, and reviewed and revised the manuscript; Dr McGuire conceptualized the study, planned and carried out the analyses, assisted in drafting the initial manuscript, and reviewed and revised the manuscript; Dr Steensma conceptualized the study, coordinated and supervised data collection, and reviewed and revised the manuscript; Dr Wagenaar coordinated and invited participants for assessments and reviewed and revised the manuscript; Drs Doreleijers and Cohen-Kettenis conceptualized the study and reviewed and revised the manuscript; and all authors approved the final manuscript as submitted.

Dr McGuire's current affiliation is Department of Family Social Science, College of Education and Human Development, St Paul, Minnesota.

www.pediatrics.org/cgi/doi/10.1542/peds.2013-2958

doi:10.1542/peds.2013-2958

Accepted for publication Jul 7, 2014

Address correspondence to Annelou L.C. de Vries, MD, PhD, Child and Adolescent Psychiatrist, Center of Expertise on Gender Dysphoria, VU University Medical Center, PO Box 7057, 1007 MB Amsterdam, Netherlands. E-mail: alc.devries@vumc.nl

*(Continued on last page)*

**EXHIBIT**

**4**

Transgender adolescents experience an incongruence between their assigned gender and their experienced gender and may meet the Diagnostic and Statistical Manual of Mental Disorders 5 criteria for gender dysphoria (GD).[1] Fifteen years ago, pubertal delay was introduced as an aid in the treatment of a gender dysphoric adolescent.[2] Although not without debate, blocking pubertal development has rapidly become more widely available[3–7] and is now part of the clinical management guidelines for GD.[8–12]

Gonadotropin-releasing hormone analogs (GnRHa) are a putatively fully reversible[13] medical intervention intended to relieve distress that gender dysphoric adolescents experience when their secondary sex characteristics develop. A protocol designed by Cohen-Kettenis and Delemarre-van de Waal[14] (sometimes referred to as "the Dutch model")[4,7] considers adolescents, after a comprehensive psychological evaluation with many sessions over a longer period of time, eligible for puberty suppression, cross-sex hormones (CSH), and gender reassignment surgery (GRS) at the respective ages of 12, 16, and 18 years when there is a history of GD; no psychosocial problems interfering with assessment or treatment, for example, treatment might be postponed because of continuous moving from 1 institution to another or repeated psychiatric crises; adequate family or other support; and good comprehension of the impact of medical interventions.[12] Puberty suppression is only started after the adolescent actually enters the first stages of puberty (Tanner stages 2–3), because although in most prepubertal children GD will desist, onset of puberty serves as a critical diagnostic stage, because the likelihood that GD will persist into adulthood is much higher in adolescence than in the case of childhood GD.[15,16]

Despite the apparent usefulness of puberty suppression, there is only limited evidence available about the effectiveness of this approach. In the first cohort of adolescents who received GnRHa, we demonstrated an improvement in several domains of psychological functioning after, on average, 2 years of puberty suppression while GD remained unchanged.[16] The current study is a longer-term evaluation of the same cohort, on average, 6 years after their initial presentation at the gender identity clinic. This time, we were not only interested in psychological functioning and GD, but added as important outcome measures objective and subjective well-being (often referred to as "quality of life"), that is, the individuals' social life circumstances and their perceptions of satisfaction with life and happiness.[17–19] After all, treatment cannot be considered a success if GD resolves without young adults reporting they are healthy, content with their lives, and in a position to make a good start with their adult professional and personal lives.[20] Because various studies show that transgender youth may present with psychosocial problems,[21,22] a clinical approach that includes both medical (puberty suppression) and mental health support (regular sessions, treatment when necessary, see Cohen-Kettenis et al[12]) aims to improve long-term well-being in all respects.

In the present longitudinal study, 3 primary research questions are addressed. Do gender dysphoric youth improve over time with medical intervention consisting of GnRHa, CSH, and GRS? After gender reassignment, how satisfied are young adults with their treatment and how do they evaluate their objective and subjective well-being? Finally, do young people who report relatively greater gains in psychological functioning also report a higher subjective well-being after gender reassignment?

## METHODS

### Participants and Procedure

Participants included 55 young adults (22 transwomen [natal males who have a female gender identity] and 33 transmen [natal females who have a male gender identity]) of the first cohort of 70 adolescents who had GD who were prescribed puberty suppression at the Center of Expertise on Gender Dysphoria of the VU University Medical Center and continued with GRS between 2004 and 2011. These adolescents belonged to a group of 196 consecutively referred adolescents between 2000 and 2008, of whom 140 had been considered eligible for medical intervention and 111 were prescribed puberty suppression (see de Vries et al[16]). The young adults were invited between 2008 and 2012, when they were at least 1 year past their GRS (vaginoplasty for transwomen, mastectomy and hysterectomy with ovariectomy for transmen; many transmen chose not to undergo a phalloplasty or were on a long waiting list). Nonparticipation (n = 15, 11 transwomen and 4 transmen) was attributable to not being 1 year postsurgical yet (n = 6), refusal (n = 2), failure to return questionnaires (n = 2), being medically not eligible (eg, uncontrolled diabetes, morbid obesity) for surgery (n = 3), dropping out of care (n = 1), and 1 transfemale died after her vaginoplasty owing to a postsurgical necrotizing fasciitis. Between the 55 participants and the 15 nonparticipating individuals, Student's t tests revealed no significant differences on any of the pretreatment variables. A similar lack of differences was found between the 40 participants who had complete data and the 15 who were missing some data.

Participants were assessed 3 times: pre-treatment (T0, at intake), during treatment (T1, at initiation of CSH), and post-treatment (T2, 1 year after GRS). See Table 1 for age at the different time points. The VU University Medical Center medical ethics committee approved the study, and all participants gave informed consent.

**TABLE 1** Age at Different Treatment Milestones and Intelligence by Gender

| Variable | All Participants[a] ($N = 55$) | | Transwomen (Natal Males) ($N = 22$) | Transmen (Natal Females) ($N = 33$) |
|---|---|---|---|---|
| | Mean (SD) | Range | Mean (SD) | Mean (SD) |
| Age, y | | | | |
| At assessment PreT | 13.6 (1.9) | 11.1–17.0 | 13.6 (1.8) | 13.7 (2.0) |
| At start of GnRHa | 14.8 (1.8) | 11.5–18.5 | 14.8 (2.0) | 14.9 (1.9) |
| At start of CSH | 16.7 (1.1) | 13.9–19.0 | 16.5 (1.3) | 16.8 (1.0) |
| At GRS | 19.2 (0.9) | 18.0–21.3 | 19.6 (0.9) | 19.0 (0.8) |
| At assessment PostT | 20.7 (1.0) | 19.5–22.8 | 21.0 (1.1) | 20.5 (0.8) |
| Full-scale intelligence[b] | 99.0 (14.3) | 70–128 | 97.8 (14.2) | 100.4 (14.3) |

PostT, post-treatment; PreT, pre-treatment.

[a] Comparisons between those who had complete data ($n = 40$) and those who had missing data on the CBCL/ABCL ($n = 15$) reveal no significant differences between the groups in age at any point in the study or in natal sex.

[b] WISC-R, the WISC-III, or the WAIS-III at first assessment, depending on age and time.[45–47]

## Measures

Time was the predominate independent variable. Other demographic characteristics were incorporated in some models, including, age, natal sex, Full Scale Intelligence, and parent marital status; where significantly different they are reported.

### Gender Dysphoria/Body Image

There was 1 indicator measuring GD (Utrecht Gender Dysphoria Scale [UGDS]) and 3 indicators measuring body image (Body Image Scale [BIS] with primary, secondary, and neutral subscales). Higher UGDS (12 items, 1–5 range, total score ranging from 12–60) total scores indicate higher levels of GD, for example, "I feel a continuous desire to be treated as a man/woman."[23] There are separate versions of the UGDS for males and females with mostly different items, permitting no gender difference analyses. BIS (30 items, 1–5 range) higher scores indicate more dissatisfaction with primary sex characteristics (important gender-defining body characteristics, eg, genitals, breasts), secondary sex characteristics (less obvious gender-defining features, eg, hips, body hair), and neutral (hormonally unresponsive) body characteristics (eg, face, height).[24] The male and the female BIS are identical except for the sexual body parts. The UGDS and the BIS of the natal gender were administered at T0 and T1. At T1, we chose the UGDS of the assigned gender, because no physical changes had occurred yet and some were still

treated as their assigned gender. This way, however, decreased GD caused by social transitioning was not measured. At T2 young adults filled out the versions of their affirmed gender.

### Psychological Functioning

There were 10 indicators assessing psychological functioning. To assess global functioning, the Children's Global Assessment Scale (CGAS) was used.[25] The Beck Depression Inventory (BDI; 21 items, 0–3 range) indicates presence and severity of depressive symptoms.[26] Spielberger's Trait Anger (TPI) and Spielberger's Trait Anxiety (STAI; 10 and 20 items, respectively, 1–4 range) scales of the State-Trait Personality Inventory were administered to assess the tendency to respond with anxiety or anger, respectively, to a threatening or annoying situation.[27,28]

Behavioral and emotional problems were assessed by the total, internalizing, and externalizing T scores as well as clinical range scores for these 3 indices (T score $>63$) of the Child/Adult Behavior Checklist (CBCL at T0 and T1, ABCL at T2), the Youth/Adult Self-Report (YSR at T0 and T1, ASR at T2).[29–31] Items referring to GD in the CBCL/YSR and ABCL/ASR were scored as 0 (for more explanation, see Cohen-Kettenis et al[32]).

### Objective and Subjective Well-Being (T2 Only)

A self-constructed questionnaire was used to ask the young adults about their current life circumstances, such

as living conditions, school and employment, and social support (objective well-being), and satisfaction with treatment (subjective well-being). Three instruments further assessed subjective well-being. To measure quality of life, the WHOQOL-BREF (quality of life measure developed by the World Health Organization) was administered (24 items, 4 domains: Physical Health, Psychological Health, Social Relationships, and Environment, 1–5 range with higher scores indicating better quality of life).[17] The Satisfaction With Life Scale (SWLS, 5 items, 5–35 range, 20 being neutral) was used to assess life satisfaction.[18] Higher scores on the Subjective Happiness Scale (SHS, 4 items, 7-point Likert scale, average score 1–7) reflect greater happiness.[19]

## Data Analyses

General Linear Models examined the repeated measures with an analysis of variance–based model, incorporating continuous and categorical predictors, and correcting for the unbalanced cell sizes. Linear and quadratic effects of the 14 indicators across 3 time points, with time as the within-subjects factor, and sex as a between-subjects factor in a second set of analyses are reported in Tables 2 and 3 and Fig 1. A linear effect signifies an overall change across T0 to T2. A quadratic effect signifies that the change was not continuous, such as when an indicator does not improve from T0 to T1 but improves from T1 to T2. It is possible to have both a significant linear and quadratic effect on the same

**TABLE 2** Gender Dysphoria and Body Image of Adolescents at Intake (T0), While on Puberty Suppression (T1), and After Gender Reassignment (T2)

| | $N^a$ | T0 Mean (SD) | T1 Mean (SD) | T2 Mean (SD) | T0–T2 t test P | Time Linear Effect P | Time Quadratic Effect P | Time × Sex Linear Effect P | Time × Sex Quadratic Effect P |
|---|---|---|---|---|---|---|---|---|---|
| UGDS | 33 | 53.51 (8.29) | 54.39 (7.70) | 15.81 (2.78) | <.001 | | | | |
| MtF | 11 | 47.07 (11.05) | 48.95 (10.80) | 17.27 (2.57) | <.001 | <.001 | <.001 | n/a | |
| FtM | 22 | 56.74 (3.74) | 57.11 (3.40) | 15.08 (2.64) | <.001 | <.001 | <.001 | n/a | |
| Body Image (BIS) | | | | | | | | | |
| Primary sex characteristics | 45 | 4.13 (0.59) | 4.05 (0.60) | 2.59 (0.82) | <.001 | <.001 | <.001 | .01 | .45 |
| MtF | 17 | 4.03 (0.68) | 3.82 (0.56) | 2.07 (0.74) | <.001 | | | | |
| FtM | 28 | 4.18 (0.53) | 4.13 (0.60) | 2.89 (0.71) | <.001 | | | | |
| Secondary sex characteristics | 45 | 2.73 (0.72) | 2.86 (0.67) | 2.27 (0.56) | <.001 | <.001 | <.001 | .10 | <.001 |
| MtF | 17 | 2.63 (0.60) | 2.34 (0.68) | 1.93 (0.63) | <.001 | | | | |
| FtM | 28 | 2.80 (0.72) | 3.18 (0.43) | 2.48 (0.40) | .05 | | | | |
| Neutral body characteristics | 45 | 2.35 (0.68) | 2.49 (0.53) | 2.23 (0.49) | .29 | .29 | .01 | .007 | .01 |
| MtF | 17 | 2.57 (0.70) | 2.29 (0.50) | 2.09 (0.56) | .014 | | | | |
| FtM | 28 | 2.21 (0.64) | 2.61 (0.52) | 2.32 (0.44) | .40 | | | | |

FtM, female to male transgender; MtF, male to female transgender; n/a, not applicable.
[a] Participants who had complete data at all 3 waves were included. Some assessments were added to the study later, yielding fewer total participants for those scales.

indicator. Other potential between-subjects factors (age, total IQ, parental marital status) were examined but excluded owing to a lack of relationship with the 14 indicators at T0. The 1 exception, age predicting secondary sex characteristics, is described below in the findings. We compared T2 sample means to population norms for subjective well-being using 1-sample t tests from previously published validation studies. Finally, we examined T2 subjective well-being correlations with residual change scores from T0 to T2 on the 14 indicators (an indicator of who improved relatively more or less over time).

All measures used were self-reported, except the CGAS (attending clinician) and the CBCL/ASR (parents). Each participant was given all measures at each of 3 assessments. Numbers varied across indicators owing to the later inclusion of the YSR, CGAS, BDI, TPI, and STAI, yielding 8 persons who had missing data at T0 and a clinician error yielding missing data at T1 for 10 participants on the UGDS. Dutch versions were used (see de Vries et al[16]).

## RESULTS

### Gender Dysphoria and Body Satisfaction

Figure 1 and Table 2 show that GD and body image difficulties persisted through puberty suppression (at T0 and T1) and remitted after the administration of CSH and GRS (at T2) (significant linear effects in 3 of 4 indicators, and significant quadratic effects in all indicators). Time by sex interactions revealed that transwomen reported more satisfaction over time with primary sex characteristics than transmen and a continuous improvement in satisfaction with secondary and neutral sex characteristics. Transmen reported more dissatisfaction with secondary and neutral sex characteristics at T1 than T0, but improvement in both from T1 to T2. Age was a significant covariate with secondary sex characteristics (the only significant demographic covariate with any outcome indicator in the study), indicating that older individuals were more dissatisfied at T0, but the age gap in body satisfaction narrowed over time (F(1, 42) = 8.18; P < .01).

### Psychological Functioning

As presented in Table 3, significant linear effects showed improvement over time in global functioning (CGAS), CBCL/ASR total, internalizing and externalizing T scores, and YSR/ASR total and internalizing T scores. Quadratic effects revealed decreases from T0 to T1 followed by increases from T1 to T2 in depression and YSR/ASR internalizing T scores. Quadratic trends revealed decreases from T0 to T1, followed by increases from T1 to T2 in depression and YSR/ASR internalizing T scores. For all CBCL/ASR and YSR/ASR indicators except YSR/ASR externalizing, the percentage in the clinical range dropped significantly (McNemar's test, P value <0.05) from T0 to T1, from T0 to T2, or from T1 to T2.

Over time, transmen showed reduced anger, anxiety, and CBCL/ASR externalizing T scores, whereas transwomen showed stable or slightly more symptomatology on these measures. Transwomen improved in CBCL/ASR total T scores in a quadratic fashion (all the improvement between T1 and T2),

**TABLE 3** Psychological Functioning of Adolescents at Intake (T0), While on Puberty Suppression (T1), and After Gender Reassignment (T2)

| | $N^a$ | T0 | T1 | T2 | T0–T2 | Time | | Time × Sex | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | t test | Linear Effect | Quadratic Effect | Linear Effect | Quadratic Effect |
| | | Mean (SD) | Mean (SD) | Mean (SD) | P | P | | P | |
| Global functioning (CGAS) | 32 | 71.13 (10.46) | 74.81 (9.86) | 79.94 (11.56) | <.001 | <.001 | | .89 | |
| | | | | | | | .61 | | .68 |
| MtF | 15 | 74.33 (7.53) | 78.20 (9.56) | 82.40 (8.28) | <.001 | | | | |
| FtM | 17 | 67.65 (11.87) | 70.65 (9.89) | 76.29 (14.48) | .02 | | | | |
| Depression (BDI) | 32 | 7.89 (7.52) | 4.10 (6.17) | 5.44 (8.40) | .21 | .23 | | .66 | |
| | | | | | | | .04 | | .49 |
| MtF | 12 | 4.73 (4.20) | 2.25 (3.54) | 3.38 (4.40) | .12 | | | | |
| FtM | 20 | 10.09 (8.34) | 5.05 (7.08) | 6.95 (9.83) | .32 | | | | |
| Anger (TPI) | 32 | 17.55 (5.72) | 17.22 (5.61) | 16.01 (5.28) | .20 | .15 | | .04 | |
| | | | | | | | .52 | | .12 |
| MtF | 12 | 14.17 (3.01) | 14.00 (3.36) | 5.58 (3.92) | .18 | | | | |
| FtM | 20 | 19.55 (5.96) | 19.25 (5.69) | 16.56 (6.06) | .05 | | | | |
| Anxiety (STAI) | 32 | 39.57 (10.53) | 37.52 (9.87) | 37.61 (10.39) | .45 | .42 | | .05 | |
| | | | | | | | .47 | | .52 |
| MtF | 12 | 31.87 (7.42) | 31.71 (8.36) | 35.83 (10.22) | .14 | | | | |
| FtM | 20 | 44.41 (9.06) | 41.59 (9.03) | 39.20 (10.53) | .12 | | | | |
| CBCL–ABCL | | | | | | | | | |
| Total T score | 40 | 60.20 (12.66) | 54.70 (11.58) | 48.10 (9.30) | <.001 | <.001 | | .25 | |
| % Clinical | | $38_x$ | $20_y$ | $5_y$ | | | .68 | | .03 |
| MtF | 15 | 57.40 (12.76) | 49.67 (12.29) | 48.13 (12.58) | .002 | | | | |
| FtM | 25 | 61.88 (12.56) | 57.72 (10.23) | 48.08 (6.95) | <.001 | | | | |
| Int T score | 40 | 60.83 (12.36) | 54.42 (10.58) | 50.45 (10.04) | <.001 | <.001 | | .91 | |
| % Clinical | | $30_x$ | $12.5_y$ | $10_y$ | | | .42 | | .33 |
| MtF | 15 | 59.40 (10.03) | 50.93 (11.15) | 48.73 (12.61) | <.001 | | | | |
| FtM | 25 | 61.68 (13.70) | 56.52 (9.86) | 51.48 (8.25) | <.001 | | | | |
| Ext T score | 40 | 57.85 (13.73) | 53.85 (12.77) | 47.85 (8.59) | <.001 | <.001 | | .19 | |
| % Clinical | | $40_x$ | $25_x$ | $2.5_y$ | | | .43 | | .12 |
| MtF | 15 | 52.53 (14.11) | 47.87 (12.07) | 46.33 (10.95) | .10 | | | | |
| FtM | 25 | 61.04 (12.71) | 57.44 (12.01) | 48.76 (6.89) | <.001 | | | | |
| YSR-ASR | | | | | | | | | |
| Total T score | 43 | 54.72 (12.08) | 49.16 (11.16) | 48.53 (9.46) | .005 | .005 | | .28 | |
| % Clinical | | $30_x$ | $14_{xy}$ | $7_y$ | | | .07 | | .75 |
| MtF | 17 | 50.65 (12.19) | 45.94 (12.24) | 47.24 (12.28) | .28 | | | | |
| FtM | 26 | 57.38 (11.47) | 51.27 (10.08) | 49.38 (7.21) | .01 | | | | |
| Int T score | 43 | 55.47 (13.08) | 48.65 (12.33) | 50.07 (11.15) | .03 | .03 | | .87 | |
| % Clinical | | $30_x$ | $9.3_y$ | $11.6_{xy}$ | | | .008 | | .73 |
| MtF | 17 | 54.00 (12.31) | 47.59 (14.26) | 48.12 (12.54) | .04 | | | | |
| FtM | 26 | 56.42 (13.86) | 49.35 (11.13) | 51.35 (10.19) | .17 | | | | |
| Ext T score | 43 | 52.77 (12.47) | 49.44 (9.59) | 49.44 (9.37) | .14 | .14 | | .005 | |
| % Clinical | | $21_x$ | $11.6_x$ | $7_x$ | | | .09 | | .14 |
| MtF | 17 | 46.00 (11.58) | 44.71 (9.53) | 50.24 (11.18) | .17 | | | | |
| FtM | 26 | 57.16 (11.14) | 52.54 (8.43) | 48.92 (8.18) | .006 | | | | |

FtM, female to male transgender; MtF, male to female transgender.

$_{xy}$ Percent clinical range, shared subscripts indicate no significant difference in values. In no case was an increase in percent in the clinical range significant from 1 time point to any other time point, indicating an overall decline or stability of clinical symptoms over time.

$^a$ Participants who had complete data at all 3 waves were included. Some assessments were added to the study later, yielding fewer total participants for those scales.

whereas transmen improved steadily across the 3 time points (linear effect only).

### Objective Well-Being

At T2, the participants were vocationally similar to the Dutch population except they were slightly more likely to live with parents (67% vs 63%), and more likely, when studying, to be pursuing higher education (58% vs 31%).[33]

Families were supportive of the transitioning process: 95% of mothers, 80% of fathers, and 87% of siblings. Most (79%) young adults reported having 3 or more friends, were satisfied with their male (82%) and female peers (88%), and almost all (95%) had received support

from friends regarding their gender reassignment. After their GRS, many participants (89%) reported having been never or seldom called names or harassed. The majority (71%) had experienced social transitioning as easy.

### Subjective Well-Being

None of the participants reported regret during puberty suppression, CSH

ARTICLE

Transwomen (n = 17)          Transmen (n = 28)



Eta Squared for Linear and Quadratic Effects
(a) Primary sex characteristics
Time: .79 ($P < .001$), .66 ($P < .001$),
Time × sex: .14 ($P = .01$), .01 ($P = .45$),
(b) Secondary sex characteristics
Time: .31($P < .001$), .30 ($P < .001$),
Time × sex: .06 ($P = .10$), .22 ($P < .001$)
(c) Neutral body characteristics
Time: .07($P < .001$), .09 ($P = .29$)
Time × sex: .16 ($P = .007$), .15 ($P = .01$)

**FIGURE 1**
BIS[23] for transwomen and transmen at T0 (pretreatment, at intake), T1 (during treatment, at initiation of cross-gender hormones), and T2 (post-treatment, 1 year after GRS).

treatment, or after GRS. Satisfaction with appearance in the new gender was high, and at T2 no one reported being treated by others as someone of their assigned gender. All young adults reported they were very or fairly satisfied with their surgeries.

Mean scores on WHOQOL-BREF, the SWLS, and the SHS are presented in Table 4, together with scores from large validation and reliability studies of these measures,[17,19,34] revealing similar scores in all areas except WHOQOL-Environment subdomain, which was higher for the participants than the norm. There were some differences across gender; transwomen scored higher than transmen on the SWLS (mean = 27.7; SD = 5.0 vs mean = 23.2; SD = 6.0; $t$ (52)

= 2.82; $P < .01$) and on the psychological subdomain of the WHOQOL (mean = 15.77; SD = 2.0 vs mean = 13.92; SD = 2.5; $t$ (53) = 2.95; $P < .01$).

*Correlations With Residual Change Scores*

The residual change scores of secondary sex characteristics, global functioning, depression, anger, anxiety, and YSR total, internalizing and externalizing from T0 to T2, were significantly correlated with the 6 T2 quality of life indicators. Most correlation coefficients were within the moderate to large magnitude (eg, 0.30–0.60), except depression, which was highly correlated (0.60–0.80) (see Table 5).

**DISCUSSION**

Results of this first long-term evaluation of puberty suppression among transgender adolescents after CSH treatment and GRS indicate that not only was GD resolved, but well-being was in many respects comparable to peers.

The effectiveness of CSH and GRS for the treatment of GD in adolescents is in line with findings in adult transsexuals.[35,36] Whereas some studies show that poor surgical results are a determinant of postoperative psychopathology and of dissatisfaction and regret,[37,38] all young adults in this study were generally satisfied with their physical appearance and none regretted treatment. Puberty suppression had caused their bodies to

**TABLE 4** Subjective Well-Being: Quality of Life, Satisfaction With Life, and Subjective Happiness Mean Scores With Scores From Validation Studies

| | N | Mean (SD) | Range | Validation Studies Scores Mean (SD) | Comparison P |
|---|---|---|---|---|---|
| WHOQOL[a] Physical | 55 | 15.22 (2.49) | 8.6–20.0 | 15.0 (2.9)[b] | .56 |
| WHOQOL Psychological | 55 | 14.66 (2.44) | 6.67–20.0 | 14.3 (2.8)[b] | .24 |
| WHOQOL Social Relations | 55 | 14.91 (2.35) | 9.3–20.00 | 14.5 (3.4)[b] | .18 |
| WHOQOL Environment | 55 | 15.47 (2.06) | 10.5–20.00 | 13.7 (2.6)[b] | <.001 |
| SWLS | 54 | 24.98 (6.0) | 9.0–35.0 | 26.18 (5.7)[c] | .16 |
| SHS | 54 | 4.73 (0.77) | 2.75–6.0 | 4.89 (1.1)[d] | .17 |

[a] WHOQOL, Bref, Skevington et al.[16]

[b] International field trial, ages 21 to 30 years, Skevington et al.[16]

[c] Dutch young adults, Arindell et al.[55]

[d] US Public College Students, Lyubomirsky.[18]

not (further) develop contrary to their experienced gender.

Psychological functioning improved steadily over time, resulting in rates of clinical problems that are indistinguishable from general population samples (eg, percent in the clinical range dropped from 30% to 7% on the YSR/ASR[30]) and quality of life, satisfaction with life, and subjective happiness comparable to same-age peers.[17,19,34] Apparently the clinical protocol of a multidisciplinary team with mental health professionals, physicians, and surgeons gave these formerly gender dysphoric youth the opportunity to develop into well-functioning young adults. These individuals, of whom an even higher percentage than the general population were pursuing higher education, seem different from the transgender youth in community samples with high rates of mental health disorders, suicidality and self-harming behavior, and poor access to health services.[21,22,39,40]

In this study, young adults who experienced relatively greater improvements in psychological functioning were more likely to also report higher levels of subjective postsurgical well-being. This finding suggests value to the protocol that involves monitoring the adolescents' functioning, physically and psychologically, over many years, and providing more support whenever necessary.

This clinic-referred sample perceived the Environmental subdomain (with items like "access to health and social care" and "physical safety and secu-rity") of the WHOQOL-BREF as even better than the Dutch standardization sample.[17] Whereas in some other contexts transgender youth may experience gender-related abuse and victimization,[22,41,42] the positive results may also be attributable to supportive parents, open-minded peers, and the social and financial support (treatment is covered by health insurance) that gender dysphoric individuals can receive in the Netherlands.

Both genders benefitted from the clinical approach, although transwomen showed more improvement in body image satisfaction (secondary sex characteristics) and in psychological functioning (anger and anxiety). None of the transmen in this study had yet had a phalloplasty because of waiting lists or

**TABLE 5** Correlations Between Residual Change in Psychological Functioning Over Time and Young Adult Subjective Well-Being

| | WHOQOL BREF | | | | SWLS | SHS |
|---|---|---|---|---|---|---|
| | Physical | Psychological | Social | Environment | | |
| Gender dysphoria (UGDS) | 0.01 (.97) | 0.05 (.75) | −0.09 (.57) | −0.02 (.89) | 0.06 (.71) | 0.30 (.04) |
| Body image subscales (BIS) | | | | | | |
| Primary sex characteristics | −0.22 (.14) | −0.25 (.09) | −0.35 (.02) | −0.04 (.78) | −0.22 (.14) | −0.21 (.17) |
| Secondary sex characteristics | −0.39 (.006) | −0.45 (<.001) | −0.47 (<.001) | −0.34 (.02) | −0.35 (.02) | −0.26 (.08) |
| Neutral body characteristics | −0.21 (.16) | −0.27 (.07) | −0.15 (.32) | −0.28 (.06) | −0.26 (.08) | −0.16 (.28) |
| Psychological functioning | | | | | | |
| Global functioning (CGAS) | 0.60 (<.001) | 0.52 (.002) | 0.52 (.002) | 0.27 (.14) | 0.58 (<.001) | 0.50 (.004) |
| Depression (BDI) | −0.76 (<.001) | −0.72 (<.001) | −0.51 (.002) | −0.49 (.003) | −0.61 (<.001) | −0.77 (<.001) |
| Trait anger (TPI) | −0.37 (.03) | −0.18 (.31) | −0.22 (.20) | −0.29 (.09) | −0.33 (.07) | −0.35 (.05) |
| Trait anxiety (STAI) | −0.58 (<.001) | −0.64 (<.001) | −0.38 (.03) | −0.44 (.01) | −0.49 (.004) | −0.57 (<.001) |
| CBCL–ABCL | | | | | | |
| Total T score | −0.20 (.20) | −0.12 (.45) | −0.07 (.65) | −0.14 (.35) | −0.32 (.03) | −0.16 (.29) |
| Internalizing T score | −0.29 (.06) | −0.29 (.06) | −0.23 (.14) | −0.12 (.44) | −0.48 (<.001) | −0.36 (.02) |
| Externalizing T score | −0.13 (.40) | −0.05 (.75) | 0.16 (.29) | −0.20 (.19) | −0.15 (.36) | 0.00 (.99) |
| Youth Self Report (YSR–ASR) | | | | | | |
| Total T score | −0.53 (<.001) | −0.45 (.002) | −0.33 (.03) | −0.42 (.005) | −0.52 (<.001) | −0.55 (<.001) |
| Internalizing T score | −0.62 (<.001) | −0.61 (<.001) | −0.47 (<.001) | −0.40 (.007) | −0.66 (<.001) | −0.60 (<.001) |
| Externalizing T score | −0.23 (.13) | −0.10 (.53) | −0.07 (.67) | −0.37 (.02) | −0.22 (.15) | −0.35 (.02) |

P values are in parentheses.

a desire for improved surgery techniques. This finding warrants further study of the specific concerns of young transmen.

Despite promising findings, there were various limitations. First, the study sample was small and came from only 1 clinic. Second, this study did not focus on physical side effects of treatment. Publications on physical parameters of the same cohort of adolescents are submitted or in preparation. A concurring finding exists in the 22-year follow-up of the well-functioning first case now at age 35 years who has no clinical signs of a negative impact of earlier puberty suppression on brain development, metabolic and endocrine parameters, or bone mineral density.[43] Third, despite the absence of pretreatment differences on measured indicators, a selection bias could exist between adolescents of the original cohort that participated in this study compared with nonparticipants.

Age criteria for puberty suppression and CSH are under debate, although they worked well for adolescents in the current study. Especially in natal females, puberty will often start before the age of 12 years. Despite the fact that developing evidence suggests that cognitive and affective cross-gender identification, social role transition, and age at assessment are related to persistence of childhood GD into adolescence, predicting individual persistence at a young age will always remain difficult.[44] The age criterion of 16 years for the start of CSH may be problematic especially for transwomen, as growth in height continues as long as cross-sex steroids are not provided (causing the growth plates to close). Therefore, psychological maturity and the capacity to give full informed consent may surface as the required criteria for puberty suppression and CSH[45] in cases that meet other eligibility criteria.

## CONCLUSIONS

Results of this study provide first evidence that, after CSH and GRS, a treatment protocol including puberty suppression leads to improved psychological functioning of transgender adolescents. While enabling them to make important age-appropriate developmental transitions, it contributes to a satisfactory objective and subjective well-being in young adulthood. Clinicians should realize that it is not only early medical intervention that determines this success, but also a comprehensive multidisciplinary approach that attends to the adolescents' GD as well as their further well-being and a supportive environment.

## ACKNOWLEDGMENTS

The authors thank the young adults and their parents for their repeated participation in this study over the years.

## REFERENCES

1. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. 5th ed. Washington, DC: American Psychiatric Association; 2013

2. Cohen-Kettenis PT, van Goozen SH. Pubertal delay as an aid in diagnosis and treatment of a transsexual adolescent. *Eur Child Adolesc Psychiatry.* 1998;7(4):246–248

3. Nakatsuka M. [Adolescents with gender identity disorder: reconsideration of the age limits for endocrine treatment and surgery.] *Seishin Shinkeigaku Zasshi.* 2012; 114(6):647–653

4. Zucker KJ, Bradley SJ, Owen-Anderson A, Singh D, Blanchard R, Bain J. Puberty-blocking hormonal therapy for adolescents with gender identity disorder: a descriptive clinical study. *J Gay Lesbian Ment Health.* 2010;15(1):58–82

5. Hewitt JK, Paul C, Kasiannan P, Grover SR, Newman LK, Warne GL. Hormone treatment of gender identity disorder in a cohort of children and adolescents. *Med J Aust.* 2012; 196(9):578–581

6. Olson J, Forbes C, Belzer M. Management of the transgender adolescent. *Arch Pediatr Adolesc Med.* 2011;165(2):171–176

7. Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics.* 2012;129(3): 418–425

8. Byne W, Bradley SJ, Coleman E, et al. Treatment of gender identity disorder. *Am J Psychiatry.* 2012;169(8):875–876

9. Adelson SL. Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9): 957–974

10. Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, et al. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2009;94(9):3132–3154

11. Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism.* 2012;13(4): 165–232

12. Cohen-Kettenis PT, Steensma TD, de Vries AL. Treatment of adolescents with gender dysphoria in the Netherlands. *Child Adolesc Psychiatr Clin N Am.* 2011;20(4):689–700

13. Thornton P, Silverman LA, Geffner ME, Neely EK, Gould E, Danoff TM. Review of outcomes after cessation of gonadotropin-releasing hormone agonist treatment of girls with precocious puberty. *Pediatr Endocrinol Rev Mar.* 2014;11(3):306–317

14. Delemarre-van de Waal HA, Cohen-Kettenis PT. Clinical management of gender identity disorder in adolescents: a protocol on psychological and paediatric endocrinology aspects. *Eur J Endocrinol.* 2006;155(suppl 1):S131–S137

15. Steensma TD, Biemond R, Boer FD, Cohen-Kettenis PT. Desisting and persisting gender dysphoria after childhood: a qualitative follow-up study. *Clin Child Psychol Psychiatry.* 2011;16(4):499–516

16. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med.* 2011;8(8):2276–2283

17. Skevington SM, Lotfy M, O'Connell KA. The World Health Organization's WHOQOL-BREF

quality of life assessment: psychometric properties and results of the international field trial. A report from the WHOQOL group. *Qual Life Res.* 2004;13(2):299–310

18. Diener E, Emmons RA, Larsen RJ, Griffin S. The Satisfaction With Life Scale. *J Pers Assess.* 1985;49(1):71–75

19. Lyubomirsky S, Lepper HS. A measure of subjective happiness: preliminary reliability and construct validation. *Soc Indic Res.* 1999;46(2):137–155

20. Koot HM. The study of quality of life: concepts and methods. In: Koot HM, Wallander JL, eds. *Quality of Life in Child and Adolescent Illness: Concepts, Methods and Findings.* London, UK: Harwood Academic Publishers; 2001:3–20

21. Carver PR, Yunger JL, Perry DG. Gender identity and adjustment in middle childhood. *Sex Roles.* 2003;49(3–4):95–109

22. Grossman AH, D'Augelli AR. Transgender youth: invisible and vulnerable. *J Homosex.* 2006;51(1):111–128

23. Steensma TD, Kreukels BP, Jurgensen M, Thyen U, De Vries AL, Cohen-Kettenis PT. The Urecht Gender Dysphoria Scale: a validation study. *Arch Sex Behav.* provisionally accepted

24. Lindgren TW, Pauly IB. A body image scale for evaluating transsexuals. *Arch Sex Behav.* 1975;4:639–656

25. Shaffer D, Gould MS, Brasic J, et al. A children's global assessment scale (CGAS). *Arch Gen Psychiatry.* 1983;40(11):1228–1231

26. Beck AT, Steer RA, Brown GK. *Manual for the Beck Depression Inventory-II.* San Antonio, TX: Psychological Corporation; 1996

27. Spielberger CD. *Manual for the State-Trait Anger Expression Inventory (STAXI).* Odessa, FL: Psychological Assessment Resources; 1988

28. Spielberger CD, Gorsuch RL, Lushene PR, Vagg PR, Jacobs GA. *Manual for the State-Trait Anxiety Inventory.* Palo Alto, CA: Consulting Psychologists Press, Inc; 1983

29. Achenbach TM. *Manual for the Youth Self-Report.* Burlington, VT: University of Vermont, Department of Psychiatry; 1991

30. Achenbach TM, Rescorla LA. Manual for the ASEBA Adult Forms & Profiles. Burlington, VT: University of Vermont, Research Center for Children, Youth, & Families; 2003

31. Achenbach TM, Edelbrock CS. *Manual for the Child Behavior Checklist and Revised Child Behavior Profile.* Burlington, VT: University of Vermont, Department of Psychiatry; 1983

32. Cohen-Kettenis PT, Owen A, Kaijser VG, Bradley SJ, Zucker KJ. Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: a cross-national, cross-clinic comparative analysis. *J Abnorm Child Psychol.* 2003;31(1):41–53

33. Statistics Netherlands. Landelijke Jeugdmonitor. In: Ministerie van Volksgezondheid, Wetenschap en Sport, ed. Den Haag, Heerlen: Tuijtel, Hardinxveld-Giessendam; 2012

34. Arrindell WA, Heesink J, Feij JA. The Satisfaction With Life Scale (SWLS): appraisal with 1700 healthy young adults in The Netherlands. *Pers Individ Dif.* 1999;26(5):815–826

35. Murad MH, Elamin MB, Garcia MZ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clin Endocrinol (Oxf).* 2010;72(2):214–231

36. Smith YL, Van Goozen SH, Kuiper AJ, Cohen-Kettenis PT. Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychol Med.* 2005;35(1):89–99

37. Ross MW, Need JA. Effects of adequacy of gender reassignment surgery on psychological adjustment: a follow-up of fourteen male-to-female patients. *Arch Sex Behav.* 1989;18(2):145–153

38. Lawrence AA. Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Arch Sex Behav.* 2003;32(4):299–315

39. Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. *Suicide Life Threat Behav.* 2007;37(5):527–537

40. Garofalo R, Deleon J, Osmer E, Doll M, Harper GW. Overlooked, misunderstood and at-risk: exploring the lives and HIV risk of ethnic minority male-to-female transgender youth. *J Adolesc Health.* 2006;38(3):230–236

41. Toomey RB, Ryan C, Diaz RM, Card NA, Russell ST. Gender-nonconforming lesbian, gay, bisexual, and transgender youth: school victimization and young adult psychosocial adjustment. *Dev Psychol.* 2010;46(6):1580–1589

42. McGuire JK, Anderson CR, Toomey RB, Russell ST. School climate for transgender youth: a mixed method investigation of student experiences and school responses. *J Youth Adolesc.* 2010;39(10):1175–1188

43. Cohen-Kettenis PT, Schagen SE, Steensma TD, de Vries AL, Delemarre-van de Waal HA. Puberty suppression in a gender-dysphoric adolescent: a 22-year follow-up. *Arch Sex Behav.* 2011;40(4):843–847

44. Steensma TD, McGuire JK, Kreukels BP, Beekman AJ, Cohen-Kettenis PT. Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study. *J Am Acad Child Adolesc Psychiatry.* 2013;52(6):582–590

45. Kreukels BP, Cohen-Kettenis PT. Puberty suppression in gender identity disorder: the Amsterdam experience. *Nat Rev Endocrinol.* 2011;7(8):466–472

46. Wechsler D. *Wechsler Intelligence Scale for Children: Manual.* 3rd ed. San Antonio, TX: The Psychological Corporation; 1997

47. Wechsler D. *Wechsler Adult Intelligence Scale (WAIS-III).* 3rd ed. Dutch version. Lisse, Netherlands: Swets and Zetlinger; 1997

48. Wechsler D, Kort W, Compaan EL, Bleichrodt N, Resing WCM, Schittkatte M. *Wechsler Intelligence Scale for Children (WISC-III).* 3rd ed. Lisse, Netherlands: Swets and Zettlinger; 2002

---

*(Continued from first page)*

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2014 by the American Academy of Pediatrics

**FINANCIAL DISCLOSURE:** The authors have indicated they have no financial relationships relevant to this article to disclose.

**FUNDING:** Supported by a personal grant awarded to the first author by the Netherlands Organization for Health Research and Development (ZonMw 100002028).

**POTENTIAL CONFLICT OF INTEREST:** The authors have indicated they have no potential conflicts of interest to disclose.

*Psychological Medicine*, 2005, **35**, 89–99.   © 2004 Cambridge University Press
DOI: 10.1017/S0033291704002776   Printed in the United Kingdom

# Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals

YOLANDA L. S. SMITH*, STEPHANIE H. M. VAN GOOZEN, ABRAHAM J. KUIPER
AND PEGGY T. COHEN-KETTENIS

*Department of Child and Adolescent Psychiatry, University Medical Centre Utrecht, The Netherlands;
Department of Medical Psychology, VU University Medical Centre, Amsterdam, The Netherlands*

**ABSTRACT**

**Background.** We prospectively studied outcomes of sex reassignment, potential differences between subgroups of transsexuals, and predictors of treatment course and outcome.

**Method.** Altogether 325 consecutive adolescent and adult applicants for sex reassignment participated: 222 started hormone treatment, 103 did not; 188 completed and 34 dropped out of treatment. Only data of the 162 adults were used to evaluate treatment. Results between subgroups were compared to determine post-operative differences. Adults and adolescents were included to study predictors of treatment course and outcome. Results were statistically analysed with logistic regression and multiple linear regression analyses.

**Results.** After treatment the group was no longer gender dysphoric. The vast majority functioned quite well psychologically, socially and sexually. Two non-homosexual male-to-female transsexuals expressed regrets. Post-operatively, female-to-male and homosexual transsexuals functioned better in many respects than male-to-female and non-homosexual transsexuals. Eligibility for treatment was largely based upon gender dysphoria, psychological stability, and physical appearance. Male-to-female transsexuals with more psychopathology and cross-gender symptoms in childhood, yet less gender dysphoria at application, were more likely to drop out prematurely. Non-homosexual applicants with much psychopathology and body dissatisfaction reported the worst post-operative outcomes.

**Conclusions.** The results substantiate previous conclusions that sex reassignment is effective. Still, clinicians need to be alert for non-homosexual male-to-females with unfavourable psychological functioning and physical appearance and inconsistent gender dysphoria reports, as these are risk factors for dropping out and poor post-operative results. If they are considered eligible, they may require additional therapeutic guidance during or even *after* treatment.

## INTRODUCTION

The phenomenon of transsexualism refers to individuals who are born with the normal sexual characteristics of one sex, but have the irrefutable conviction of belonging to the other.

Nowadays, many professionals who specialize in the treatment of transsexuals regard the conviction of transsexuals as belonging to someone of the other sex as authentic and, consequently, their wish for a sex change to be justified. The recommended procedure of the Harry Benjamin International Gender Dysphoria Association (Meyer *et al.* 2001), an international professional organization regarding transsexualism, is to approach the referral for sex reassignment (SR) in two phases. In the first phase, a DSM-IV diagnosis (APA, 1994) is made. In addition, the eligibility of the patient to move on to the second phase, the Real-life

* Address for correspondence: Prof. Dr P. T. Cohen-Kettenis, VU University Medical Centre, Department of Medical Psychology, P.O. Box 7057, 1007 MB Amsterdam, The Netherlands.
(Email: pt.cohen-kettenis@vumc.nl)

**EXHIBIT**

**5**

*Y. Smith et al.*

Table 1.  *Progression in the SR procedure and matching sample sizes used in analyses*

| SR procedure | Diagnostic 1st phase[a] (Applicants) | Not referred for 2nd phase[b] (Non-starters) | Referred for, started, continued 2nd phase[b] (Starters) | Referred for, started, dropped out 2nd phase[b] (Drop-outs) | Referred for, completed SR surgery (Completers) | 1–4 years after SR surgery (Follow-up) |
|---|---|---|---|---|---|---|
| MFs | 220 | 74 | 146 | 29 | 117 | 94 |
| FMs | 105 | 29 | 76 | 5 | 71 | 64 |
| Included | 325 | 103 | 222 | 34 | 188 | 158 |

[a] In the first phase a DSM diagnosis is made and eligibility is assessed for starting hormone treatment and the Real-life Experience.
[b] In the second phase hormone treatment and the Real-life Experience is started.

Experience (RLE), is assessed. In this phase the applicant's ability to live in the desired role and its consequences, and the strength of the desire for SR are evaluated. If the social role change during the RLE, which is usually supported by hormonal therapy, results in a satisfactory outcome, the applicant will be referred for surgery (see Table 1).

Although SR is presently regarded as effective in treating transsexualism, the most extreme end of Gender Identity Disorder (GID) (Pfäfflin & Junge, 1992, 1998; Eldh *et al.* 1997; Cohen-Kettenis & Gooren, 1999; Rehman *et al.* 1999; Meyer *et al.* 2001; Smith *et al.* 2001, 2002; Day, 2002; Lawrence, 2003), prospective studies are needed to enhance knowledge about the benefits and limitations of SR. In spite of strict prior selection and counselling during treatment, an estimated 1–2% of those treated express regrets about SR (Pfäfflin, 1992; Pfäfflin & Junge, 1992, 1998; Kuiper & Cohen-Kettenis, 1998). Considering the invasive and irreversible treatment of SR, it is imperative to try and prevent post-operative regret. This requires the identification of predictors of regret or poor post-operative functioning. In some follow-up studies different factors are proposed as influencing the outcomes of SR negatively (e.g. Wålinder *et al.* 1978; Spengler, 1980; Lothstein, 1982; Lundström *et al.* 1984; Blanchard, 1985; Lindemalm *et al.* 1987; Blanchard *et al.* 1989; Ross & Need, 1989; Pfäfflin, 1992; Pfäfflin & Junge, 1992; Kuiper & Cohen-Kettenis, 1998; Landén *et al.* 1998). These factors lie in the area of psychological functioning, sexual orientation, age at assessment, onset age of gender dysphoria, family history and support, professional support during SR, and surgical outcomes. However, the quality of the few existing follow-up studies is rather poor given their mostly retrospective nature. Sound prospective studies are needed to identify predictors of post-operative functioning more consistently and reliably.

In the present large-scale prospective follow-up study, we investigated two separate though related topics: the outcomes of SR and the prediction of favourable or poor outcomes. Therefore, we first evaluated whether transsexuals actually improve in important areas after SR, and confirm some of the beneficial effects of SR previously established in the mostly retrospective follow-up studies (e.g. Mate-Kole *et al.* 1990; Day, 2002; Lawrence, 2003). Secondly, we studied differences between sexes [male-to-females (MFs) and female-to-males (FMs)] and subtypes (homosexuals and non-homosexuals) in various areas of functioning (e.g. gender dysphoria, body dissatisfaction, physical appearance, psychological functioning) after SR. To our knowledge, subtype differences have not yet been prospectively studied. These research questions were, however, only studied in *adult* transsexuals, because the adolescent results have been published previously (Smith *et al.* 2001, 2002). Post-operatively, feelings of regret, evaluation of treatment, satisfaction with surgical results, social and sexual functioning were evaluated.

The other topic concerned predictors of the course and outcomes of SR. We examined which factors clinicians based their referral on for SR. The factors were age, sex, sexual orientation, onset age of gender dysphoria, gender dysphoria in childhood and at application, social support, body dissatisfaction, physical appearance and psychological functioning. Finally, we examined which factors predicted treatment course (i.e. dropping out), post-operative functioning, and treatment satisfaction.

## METHOD

### Subjects

A total of 325 consecutive adolescents and adults, who applied for SR at VU University Medical Centre in Amsterdam (VUmc) or University Medical Centre Utrecht (UMCU), participated. Of these, 222 (146 MFs, 76 FMs) started hormone treatment: the 'starter' group. Twenty-nine MFs and 5 FMs stopped hormone treatment: the 'drop-out' group. The group who completed SR consisted of 188 patients (117 MFs, 71 FMs): the 'completer' group. The group who never started hormone treatment consisted of 103 patients (74 MFs, 29 FMs). Pre-test data from this 'no-starter' group varied from 89 to 103. At follow-up, some participants had moved abroad, while others were untraceable, which resulted in 158 (94 MFs, 64 FMs) participants who were interviewed. Follow-up data ranged between 136 and 158 because not all participants were willing or able to take part in both an interview and a questionnaire session (Table 1).

To examine the outcome issue we used data of 162 adults. Pre-test data were obtained from all adults (104 MFs, 58 FMs; 94 homosexuals, 68 non-homosexuals). Follow-up interview data were gathered from 126 adults (i.e. 78%; 77 MFs, 49 FMs; 71 homosexuals, 55 non-homosexuals). Questionnaire data for different measures fluctuated from 101 to 126. Since SR patients do not undergo all possible operations, data on breast augmentation were gathered from 52 MFs (21 homosexuals, 31 non-homosexuals), and on metaidoioplasty or phalloplasty from 10 FMs (4 homosexuals, 6 non-homosexuals). Scores on the Appraisal of Appearance Inventory were obtained from 57 adults.

### Instruments

#### Biographical data

The Biographical Questionnaire for Transsexuals, a semi-structured interview, contains 211 items on variables, such as cross-gender feelings and behaviour, social and sexual contacts (Verschoor & Poortinga, 1988; Doorn *et al.* 1994). The following items were used: sex (MF or FM), onset age of cross-gender feelings, childhood GID symptoms (11 items, see below), age at application, and sexual orientation.

Concerning this last item, participants who exclusively reported a homosexual preference (MFs sexually attracted to biological males; FMs to biological females) were included in the homosexual group. Participants with an asexual, heterosexual, and/or bisexual preference were included in the non-homosexual group. Age at the start of hormone therapy and surgery were obtained from medical files.

*The GID in Childhood Scale* was constructed from the Biographical Questionnaire for Transsexuals (Verschoor & Poortinga, 1988; Doorn *et al.* 1994) to measure the self-reported presence of GID symptoms in childhood. There are 11 items (Cronbach's $\alpha = 0.81$) concerning the strong wish to be of the opposite sex in early childhood, cross-gender appearance of the child, cross-dressing, play and peer preference, and cross-gender behaviour. Because of differences in the numbers and types (i.e. quantitative *versus* qualitative) of response categories, answers were dichotomized, resulting in a total score ranging between 0 and 11, with the higher scores indicating more childhood GID symptoms.

*The Social Support Scale.* This scale has 10 items enquiring about the patient's eight closest acquaintances (Van Tilburg, 1988). Scalability coefficient $H$, calculated by means of a Mokken analysis (Molenaar, 1982) and calculated for all relationships together, was 0·38. Sumscores range from 0 to 160, with the higher scores indicating more support.

*Gender dysphoria.* This was measured with the Utrecht Gender Dysphoria Scale, containing 12 items on which the subject rated agreement on a 5-point scale. Scores range from 12 to 60. Higher scores indicate more gender dysphoria (Cohen-Kettenis & van Goozen, 1997).

*Body dissatisfaction.* A Body Image Scale (Lindgren & Pauly, 1975), adapted for a Dutch sample (Kuiper, 1991), was used. There are 30 items divided into three subscales: primary and secondary sex characteristics, and neutral body parts, with higher scores representing more dissatisfaction.

*Physical appearance.* On the Appraisal of Appearance Inventory three independent observers

(the diagnostician, a nurse, the researcher) rated the subject's appearance on 14 five-point scales of gender compatibility. The characteristics were: hair, facial hair, larynx, voice, figure, height, skin, hands/feet, muscularity, chin, nose, jaw, speech, and gestures/movement. Lower scores reflect a better appearance in matching the new gender. Intra-class correlation coefficients between observers for each of the 14 items ranged from 0·68 to 0·79.

*Psychological functioning*. The Dutch Short MMPI (Luteyn *et al.* 1980) contains 83 items measuring Negativism, Somatization, Shyness, Psychopathology, and Extroversion. Higher scores indicate more dysfunction on the first four scales but less on Extroversion.

The Dutch version of the Symptom Check List (Derogatis *et al.* 1973; Arrindell & Ettema, 1986) has 90 items enquiring about recent complaints. Subscales are: Agoraphobia, Anxiety, Depression, Somatization, Obsession/ Compulsion, Suspicion, Hostility, and Sleeping problems. The total score for Psychoneuroticism ranges from 90 to 450. Higher scores indicate more psychological instability.

*Treatment evaluation and post-treatment functioning*. To evaluate post-operative functioning 13 items measured post-operative functioning and (dis)satisfaction (e.g. with questions about treatment, regret, social and sexual functioning, and social experiences) (Doorn *et al.* 1996). Patients also completed a questionnaire about the functioning of vagina/penis and breasts (augmentation or removal), and surgical satisfaction (Cohen-Kettenis & van Goozen, 1997).

*Post-operative Functioning Scale*. Twenty-one items (Cronbach's $\alpha = 0·87$) measured post-operative functioning and satisfaction with SR (Doorn *et al.* 1996) and resulted in a single score with higher scores reflecting worse functioning and more dissatisfaction. (See Journal's website for Appendix with specific items.)

## Procedure

The GID in Childhood Scale and the Social Support Scale were used at pre-test. Gender dysphoria, body dissatisfaction, physical appearance and psychological functioning were assessed before and after SR to measure change. The remaining instruments were administered at follow-up.

Except for the GID in Childhood Scale, the Social Support Scale, and the Post-operative Functioning Scale, all instruments were used to examine the issue of outcome. All instruments administered at pre-test were used to investigate predictors of eligibility for and drop-outs of SR. Follow-up data of the 'completer' group were used to develop the Post-operative Functioning Scale, investigating predictors of outcomes of SR.

Pre-test data were gathered during the first diagnostic procedure after the first interview. Follow-up data were gathered at least 1 year after surgery. Sessions took between 2 and 3 hours. The Ethics Committees of the UMCU and VUmc approved the study.

## Statistical analyses

Changes over time in treated adults were analysed with univariate paired-sample *t* tests, applying the Bonferroni correction [dividing the number of tests (19) by 5%] and using a significance level of 0·003 for these results (Table 2). Post-operative Sex (MF *v*. FM) and Subtype (homosexual *v*. non-homosexual) differences were studied with univariate or multivariate analyses of variance [(M)ANOVAs] (Table 3). Nominal or ordinal data were analysed per item with the $\chi^2$ test or Mann–Whitney *U* test respectively.

To identify which factors predicted eligibility for hormone treatment and premature drop-out, logistic regression analyses were performed with group membership as the criterion variable (no-starter and starter, completer and drop-out respectively). Since we had no *a priori* hypotheses about group prediction, the first (stepwise) analysis included all 17 factors: age, sex, sexual orientation, onset age of gender dysphoria, GID symptoms in childhood, gender dysphoria at assessment, social support, body dissatisfaction (3 scales), physical appearance, and psychological functioning (2 tests: 1 and 5 scales). Next, we conducted a (simultaneous) logistic regression analysis using the significant predictors. In case of unequal sample sizes cut values were reset to achieve the highest sensitivity and specificity.

Table 2.   *Pre-test and post-test scores of the adult follow-up sample*

| | Pre-test | | Post-test | | Paired | Two-tailed |
|---|---|---|---|---|---|---|
| | Mean | S.D. | Mean | S.D. | $t$ | $p$ |
| Gender dysphoria | 54·3 | 7·1 | 14·8 | 3·0 | 49·5 | <0·001 |
| Physical appearance | 44·7 | 9·6 | 33·8 | 10·2 | 10·9 | <0·001 |
| Body dissatisfaction | | | | | | |
|   Primary sex characteristics | 18·1 | 2·7 | 6·6 | 3·2 | 25·5 | <0·001 |
|   Secondary sex characteristics | 34·8 | 6·9 | 25·2 | 6·8 | 13·7 | <0·001 |
|   Neutral body characteristics | 46·8 | 9·6 | 36·5 | 8·0 | 11·3 | <0·001 |
| Psychological functioning | | | | | | |
|   Negativism | 22·6 | 7·7 | 17·1 | 7·8 | 6·8 | <0·001 |
|   Somatization | 9·1 | 7·6 | 6·6 | 5·3 | 3·1 | 0·003 |
|   Shyness | 14·7 | 9·3 | 10·0 | 7·3 | 5·8 | <0·001 |
|   Psychopathology | 3·2 | 3·0 | 2·4 | 2·6 | 2·8 | 0·006 |
|   Extraversion | 13·8 | 6·5 | 15·5 | 5·6 | 2·9 | 0·005 |
|   Psychoneuroticism | 143·0 | 40·7 | 120·3 | 31·4 | 5·5 | <0·001 |
|   Anxiety | 15·2 | 5·3 | 13·0 | 4·5 | 4·0 | <0·001 |
|   Agoraphobia | 9·4 | 3·6 | 8·6 | 3·2 | 2·1 | 0·040 |
|   Depression | 29·3 | 11·3 | 22·5 | 8·4 | 5·3 | <0·001 |
|   Somatization | 18·2 | 7·0 | 16·7 | 4·4 | 2·3 | 0·024 |
|   Inadequacy | 15·8 | 5·8 | 13·5 | 4·5 | 4·1 | <0·001 |
|   Sensitivity | 28·2 | 9·1 | 24·4 | 6·5 | 4·4 | <0·001 |
|   Hostility | 7·8 | 2·4 | 7·4 | 2·1 | 1·5 | 0·147 |
|   Sleeping problems | 5·4 | 2·9 | 4·6 | 2·2 | 2·3 | 0·024 |

Table 3.   *Differences between the adult sexes and subtypes at follow-up*

| | MFs [mean (S.D.)] | FMs [mean (S.D.)] | HOs [mean (S.D.)] | NHs [mean (S.D.)] | Sex $F(p)$ | Subtype $F(p)$ |
|---|---|---|---|---|---|---|
| Age | 38·6 (12·3) | 29·6 (8·3) | 31·7 (10·7) | 39·6 (11·7) | 16·0 (<0·001) | 6·4 (0·01) |
| Gender dysphoria | 15·4 (3·1) | 13·9 (2·8) | | | 6·6 (0·01) | 1·3 (0·27) |
| Physical appearance | 38·2 (9·3) | 26·0 (6·9) | | | 28·3 (<0·001) | 2·0 (0·16) |
| Body dissatisfaction | | | | | 3·1 (0·03) | 1·2 (0·33) |
|   Primary sex characteristics | 6·0 (2·2) | 7·6 (4·2) | | | 7·0 (0·01) | |
| Dutch Short MMPI | | | | | 2·1 (0·07) | 2·2 (0·06) |
|   Somatization | | | 5·6 (4·8) | 7·9 (5·5) | | 4·0 (0·047) |
|   Extraversion | 13·8 (5·4) | 18·0 (5·0) | 17·1 (5·3) | 13·6 (5·4) | 9·2 (0·003) | 6·9 (0·01) |
| Symptom Check List | | | | | 2·4 (0·02) | 2·6 (0·009) |
|   Depression | 24·6 (9·8) | 19·7 (4·7) | | | 6·5 (0·01) | |
|   Somatization | | | 15·2 (3·7) | 18·2 (4·7) | | 11·0 (0·001) |
|   Sleeping problems | | | 4·3 (2·0) | 5·0 (2·3) | | 5·2 (0·02) |

MFs, male-to-female transsexuals; FMs, female-to-male transsexuals; HOs, homosexual transsexuals; HNs, non-homosexual transsexuals.

Predictors of post-operative functioning were identified with a multiple linear regression analysis with the Post-operative Functioning Scale as the dependent variable. Seven of the 17 factors were relatively independent and included as predictors in the first (stepwise) analysis: sex, sexual orientation, physical appearance, secondary sex characteristics, extroversion, psychopathology, and psychoneuroticism. Patients with missing values were deleted listwise. Significant predictors were analysed in a second (simultaneous) multiple linear regression.

## RESULTS

### Outcomes of the adult transsexuals

*Biographical data*

The mean age of the transsexuals who completed SR was 30·9 years (range 17·7–68·1 years) at application and 35·2 years (range 21·3–71·9 years) at follow-up. Cross-sex hormone treatment started at the mean age of 31·6 years (range 17·9–68·3 years). The average duration between starting hormone treatment and surgery was 20·4 months (range 12–73 months). The

*Y. Smith et al.*

average duration between surgery and follow-up was 21·3 months (range 12–47 months).

At follow-up, main effects for Sex and Subtype were found for age. FMs and homosexuals were younger than MFs and non-homosexuals respectively (Table 3).

At follow-up 5 subjects (4·9 %) were students, 38 (36·9 %) had jobs, 3 (1·9 %) had retired, and 58 (56·3 %) were unemployed. The majority ($n=59$) lived independently (56·2 %), 27 subjects (25·7 %) each lived together with another adult with or without children, 9 (8·6 %) were living with (one of) their parents, 2 (1·9 %) were head of an incomplete family, and the remaining 8 (7·6 %) lived in a guest house or boarding house.

*Gender dysphoria.* At follow-up there was less gender dysphoria; the low post-test scores represent a virtual absence of gender dysphoria after SR (Table 2). A main effect of Sex was found with FMs feeling less gender dysphoric. No Subtype difference in post-operative gender dysphoria was found (Table 3).

*Body dissatisfaction.* The majority ($n=98$, 91·6 %) were (very) satisfied with their overall appearance; 9 (8·4 %) were neutral; no one was dissatisfied. Satisfaction with primary sex, secondary sex, and neutral characteristics had increased after SR (Table 2). A MANOVA showed that FMs were more dissatisfied with their primary sex characteristics at post-test than MFs. No Subtype differences were found (Table 3).

*Physical appearance.* The group scored lower on the Appraisal of Appearance Inventory at post-test (Table 2), indicating that their appearance better matched the new gender. The physical appearance of FMs was more compatible than that of the MFs, but there was no Subtype difference (Table 3).

*Psychological functioning.* At follow-up the group functioned psychologically better. Scores on Negativism and Shyness had improved. Scores on Somatization, Psychopathology, and Extroversion showed a tendency towards improvement ($p \leqslant 0.006$). In general, follow-up scores indicated fewer psychological problems

(Table 2). Comparing pre- and post-test group means with Dutch normative data, most scores remained within the average range at follow-up, although Extroversion scores were below average. Somatization scores were high at pre-test.

The mean Psychoneuroticism score was lower after SR [see Table 2 for lower scores on four of the eight subscales ($p < 0.001$)]. These scores can only be compared with Dutch normative data for males and females separately. Both the MF ($p = 0.001$) and FM ($p < 0.001$) group showed improvement in mean scores. The MFs went from above average at pre-test (mean = 143, S.D. = 38·0) to average at post-test (mean = 123, S.D. = 36·0); the FMs went from high (mean = 143, S.D. = 44·8) to above average at follow-up (mean = 116, S.D. = 22·8).

The Dutch Short MMPI showed a marginally significant Sex effect, with FMs being more extrovert. The Sex effect on the Symptom Check List showed MFs as being more depressed than FMs (Table 3). There was also a marginally significant Subtype effect on the Dutch Short MMPI, with homosexuals scoring more favourably on Somatization and Extroversion. The Symptom Check List showed a Subtype effect with homosexuals scoring lower on Sleeping Problems and Somatization (Table 3).

Thus, although the group as a whole functioned psychologically rather well at application, their psychological stability had improved after SR. In addition, and post-operatively, FMs and homosexuals functioned psychologically better than MFs and non-homosexuals respectively.

*Treatment evaluation and post-treatment functioning.* The vast majority (98·4 %) expressed no regrets about SR. One non-homosexual MF had experienced such strong regrets during and after treatment that she would not elect for SR again, if given a second opportunity. In contrast, a second non-homosexual MF, who expressed some regrets, reported she would choose SR again. Five non-homosexuals (4 MFs, 1 FM) reported some regrets during treatment only, but expressed no desire or intention to resume their original gender role. No differences were found between the sexes in reported regret during ($Z = -1.4$, $p = 0.2$) or after SR ($Z = -1.1$, $p = 0.3$). During treatment more non-homosexuals reported feelings of regret ($Z = -3.1$, $p = 0.002$).

*Social life and social contacts.* The majority ($n = 90$, 89·1%) felt accepted by most people, 8 (7·9%) by some, 3 (3%) by no one. Altogether 84 individuals (83·2%) felt supported in their new gender role by (almost) everyone they knew, whereas 11 (10·9%) felt supported by some people. Despite the fact that 6 subjects (5·9%) did not feel supported, they were able to rely on some individuals during difficult times. Four subjects (3·9%) had no one to turn to when times got hard. Still, the vast majority (99, 96·1%) could rely on at least some others during difficult times. In total, 18 individuals (17·3%) sometimes felt they were being laughed at, 2 (1·9%) had experienced being ridiculed by strangers; 84 (80·8%) had never experienced any such adverse reactions. Over 98% ($n = 102$) felt they were completely taken seriously by most people. Two (1·9%) only felt taken seriously by a few close friends. No one reported not being taken seriously by anyone.

MFs and FMs felt equally accepted ($Z = -0·8$, $p = 0·4$). However, FMs had more support in the new gender role ($Z = -2·5$, $p = 0·01$) and were more able to rely on significant others during difficult times ($Z = -2·2$, $p = 0·03$). Although MFs were more often laughed at or ridiculed ($Z = -3·5$, $p < 0·001$), they reported feeling taken equally seriously by (almost) all people ($Z = -1·7$, $p = 0·08$). Homosexuals felt more supported ($Z = -2·0$, $p = 0·04$) and taken more seriously than non-homosexuals ($Z = -2·5$, $p = 0·01$).

*Relationships and sexuality.* The majority ($n = 46$, 88·5%) of the 50 subjects who had a steady sexual partner were satisfied with their sex life, 3 (5·8%) expressed a neutral view, and 3 (5·8%) were dissatisfied. Of the 84 subjects (82·4% of the follow-up sample) who were sexually active, the majority (53, 63·1%) achieved orgasm always or regularly, 16 (19%) sometimes, and 15 (17·9%) never.

A larger percentage ($\chi^2 = 4·2$, $p = 0·04$) reported a homosexual (94, 58·0%) than a non-homosexual orientation (68, 42·0%). Within the FMs a greater proportion ($\chi^2 = 5·9$, $p = 0·015$) had a homosexual orientation (70·7%) than the MFs (51·0%). More of the sexually active FMs (81·6%) than of the MFs (42·1%) achieved orgasm always or regularly ($Z = -2·4$, $p = 0·01$).

Yet, both sexes reported equal satisfaction with their sex life ($Z = -0·6$, $p = 0·5$). No Subtype differences were found.

*Satisfaction with surgery.* For FMs breast removal is emotionally the most important surgery. They are advised to postpone metaidoioplasty (transformation of the hypertrophic clitoris into a micropenis) or phalloplasty in view of the fact that surgical techniques are steadily improving. Eleven FMs (28·9%) were satisfied with their breast removal, 5 (13·2%) were dissatisfied due to the visibility of the scars, and 22 (57·9%) were not completely satisfied. Four FMs were satisfied with their metaidoioplasty or phalloplasty. One FM was dissatisfied because of urinary problems, while four were not completely satisfied.

For the MFs vaginoplasty is the most important surgical intervention. The majority of MFs (47, 70·1%) were satisfied; 15 (22·4%) were not completely satisfied, mostly because they considered their vagina not deep or feminine enough. Five MFs (7·5%) were dissatisfied, because they were unable to achieve sexual arousal or orgasm, or because corrective surgery was needed. The majority (34, 65·4%) were satisfied with their breast augmentation; 15 (28·8%) were not completely satisfied, and three felt uneasy about their breasts being too far apart.

## Predictors of the course and outcomes of adolescent and adult transsexuals

### Prediction of eligibility criteria

Eligibility for SR was largely based upon the factors gender dysphoria, psychoneuroticism, and physical appearance. For the precise weight of each predictor variable and the constant in this equation model, see Table 4. Stronger gender dysphoria (higher scores), more psychological stability (lower scores on Psychoneuroticism), and a feminine look for MFs and a masculine look for FMs (lower scores on physical appearance), increased the probability of the clinician referring the applicant to start hormone treatment. With these three predictor variables 78% of the applicants were correctly assigned to the 'no-starter' (52%) or the 'starter' (88%) group (cut value = 0·63).

Table 4.   *B coefficients and constants of the factors predicting group membership*

| Predictor variables | Starter group | | Drop-out group | |
|---|---|---|---|---|
| | B | p value | B | p value |
| Sex | | | −1·82 | 0·006 |
| Sexual orientation | | | | |
| Onset age of gender dysphoria | | | | |
| Age at application | | | | |
| GID symptoms in childhood | | | 0·18 | 0·026 |
| Gender dysphoria | 0·08 | <0·001 | −0·05 | 0·030 |
| Social support | | | | |
| Primary sex characteristics | | | | |
| Secondary sex characteristics | | | | |
| Neutral sex characteristics | | | | |
| Physical appearance | −0·05 | 0·003 | | |
| Psychoneuroticism | −0·01 | <0·001 | | |
| Negativism | | | | |
| Somatization | | | | |
| Shyness | | | | |
| Psychopathology | | | 0·12 | 0·024 |
| Extroversion | | | | |
| Constant | 1·00 | 0·442 | −0·04 | 0·972 |

Table 5.   *Factors predicting post-operative functioning*

| Model | B | Beta | p value |
|---|---|---|---|
| Sexual orientation | −3·70 | −0·24 | 0·002 |
| Psychopathology | 0·43 | 0·17 | 0·028 |
| Dissatisfaction secondary sex characteristics | 0·31 | 0·28 | <0·001 |
| Constant | 16·80 | | <0·001 |

orientation, more psychopathology and dissatisfaction with secondary sex characteristics at assessment.

## DISCUSSION

One aim of this prospective study was to investigate which areas of functioning improve as a consequence of SR. The main symptom for which the patients had requested treatment, gender dysphoria, had decreased to such a degree that it had disappeared. Satisfaction of the patients with their sex characteristics had improved to the point of content, confirming previous results (Green & Fleming, 1990; Pfäfflin & Junge, 1998), and according to observers, their appearance better matched the new gender. Psychological functioning had also improved (see Mate-Kole *et al.* 1990). Thus, it seems safe to conclude that the transsexuals had improved in important areas of functioning and that 1–4 years after surgery, SR appeared therapeutic and beneficial. Furthermore, the vast majority expressed no regrets about their SR.

Post-operative evaluation showed that the majority functioned quite well socially. A small minority, however, lacked support and acceptance, and were ridiculed. Surprisingly, 98 % felt taken seriously. This somewhat rose-coloured view may be explained by the fact that the social support received and the relief about the new situation may have put adverse reactions into perspective, whereas disappointing experiences may have been played down to reduce cognitive dissonance after undergoing such invasive and irreversible interventions.

At follow-up, the majority were content with their sex life, and those who were sexually active, reported achieving orgasm. This has been reported previously (e.g. Rakic *et al.* 1996; Rehman *et al.* 1999), but in MFs the capacity

### Prediction of the course of treatment

The probability that a transsexual discontinued hormone treatment depended on sex, psychopathology, childhood GID symptoms, and gender dysphoria (Table 4). A negative coefficient means that a factor contributes negatively to the probability of being a drop-out. The relatively high beta value of the factor sex reflects being a FM. Thus, the combination of being a MF with more psychopathology and childhood GID symptoms, yet less gender dysphoria at assessment, increased the likelihood of premature drop-out. Together these four predictors correctly assigned 68 % of the transsexuals to the 'completer' (68 %) or the 'drop-out' (69 %) group (cut value = 0·15).

### Prediction of post-operative functioning

The level of post-operative functioning could be predicted by the patient's sexual orientation, psychological stability, and dissatisfaction with secondary sex characteristics at assessment. The beta weights (see Beta column in Table 5) show the relative importance of the variables contributing to the predictability of the quality of post-operative functioning ($R^2 = 0·17$). As higher scores on the Post-operative Functioning Scale reflect more dysfunction and dissatisfaction, the predicted score of an applicant on this scale increased with a non-homosexual

for orgasm has been reported to decrease post-surgically (Lief & Hubschman, 1993).

The findings support the conclusion that after SR most transsexuals functioned socially and sexually well. One MF expressed deep regrets. She indicated that professional guidance regarding adverse consequences (i.e. intolerance of society, family and her own children), would have made the transition more endurable. This stresses the need for good aftercare.

Comparing the sexes, the FMs showed better results, supporting the results of earlier studies (see Introduction). This might be due to their more convincing gender role behaviour and looks and their 'type' of transsexualism, implying an earlier age at application. More FMs than MFs were capable of achieving orgasm. This can be attributed to hormonal effects (van Goozen *et al.* 1995) or to the fact that most FMs lived with their enlarged clitoris. Then again, it may also portray different meanings of sexuality in males and females, since both sexes reported equal satisfaction with their sex life. Contrasting most of the more favourable FM findings are the greater reported satisfaction of the MFs with surgical results. This is understandable given that most FMs did not (yet) have a penis. For the FMs the ability to live in the new gender and sexual role clearly awaits the advancement of surgical techniques.

With respect to subtype differences, homosexuals were younger and functioned psychologically better than non-homosexuals. No differences were found in gender dysphoria, body dissatisfaction, or physical appearance. Only non-homosexuals reported some regrets *during* treatment, and two during *and* after SR, which they all related to a lack of acceptance and support from others. The better functioning of homosexuals may also be explained by their sexual orientation. Subtype differences could reflect different aetiological backgrounds. Because the onset age and age at application have been found to be earlier in homosexuals, it is likely that non-homosexuals encounter more problems in life before applying for SR. Also, post-surgically, 'homosexuals' will have opposite gender partners, thus forming heterosexual couples. This still is socially more acceptable.

The less favourable outcomes of the non-homosexuals carry significant implications for clinical practice. If considered eligible for SR, non-homosexuals should be able to receive additional guidance in coping with adverse consequences, such as a more troubled psychological functioning, or a more critical environment.

In conclusion, our data substantiate findings from mostly retrospective follow-up studies that SR is effective. Some individuals probably need a more thorough diagnostic procedure and more therapeutic support, sometimes even after treatment, than is currently the case. For most transsexuals in this study, the strict eligibility criteria and professional guidance as currently provided appears to be sufficient, as reflected by the overall favourable outcomes of SR. However, alleviation of the gender problem is not equivalent with an easy life. Apparently, clinicians need to be alert for signs that a transsexual applicant will not be able to cope with adversities during treatment.

Another goal was to identify predictors of the course and outcomes of SR. We found that clinicians assessed applicants to be eligible for hormone treatment when they were more gender dysphoric, psychologically more stable, and when the physical appearance better matched the new gender role. Given the nature of the problem, it is not surprising that strong gender dysphoria was one of the main predictors. Since an unfavourable physical appearance could be a risk factor for post-operative regret (Wålinder *et al.* 1978), it is interesting to observe that the clinicians also took this factor into account when deciding upon referral. Furthermore, clinicians greatly valued the applicant's psychological functioning (see also Kuiper & Cohen-Kettenis, 1998). These factors predicted 88 % of the starter group. Clearly, clinicians must have had other reasons for referring the remaining 12 %, the most likely factor being the diagnosis. They might also have appraised certain risk factors as relatively harmless in view of existing protective factors (e.g. strong social support, adequate coping skills).

We found transsexuals to be more at risk for dropping out of treatment when they were MFs, showed more psychopathology, more GID symptoms in childhood, yet less gender dysphoria at application. The greater vulnerability of MFs to drop out is understandable given that FMs fare better post-operatively.

*Y. Smith et al.*

Unfortunately, our data do not permit us to distinguish during treatment between the impact of psychopathology, on the one hand, and of interactive effects of psychopathology with external forces, on the other. We cannot rule out the possibility that it is not psychopathology *per se* that increases the probability to drop out, but rather a combination of psychological vulnerability and personal circumstances, such as abandonment by a partner. One should also bear in mind that the drop-outs stopped hormone treatment during our data collection; it is possible, however, that they will reapply later in life.

Our finding of an association between more childhood GID symptoms and greater drop out seems puzzling. It is in contrast with the literature on SR risk factors and clinically counter-intuitive. Early gender dysphoria has been associated with early-onset transsexualism and favourable SR outcome (see Lothstein, 1982; Blanchard, 1985; Lindemalm *et al.* 1987; Blanchard *et al.* 1989; Pfäfflin, 1992). Here, it is the combination of factors that is crucial. Still, the contradicting presence of more gender dysphoria in childhood but less at application should alert the clinician when assessing eligibility. This inconsistency may reflect confusion about development, an (unconscious) exaggeration of history if current feelings are not clear-cut, or a conscious effort to mislead the clinician.

Finally, we investigated which assessment factors predicted post-operative functioning. It is important to bear in mind that we applied a continuous scale from good to bad, as opposed to the dichotomy 'no regret'–'regret', because hardly any transsexuals reported regret. A non-homosexual orientation, with more psychopathology and dissatisfaction with secondary sex characteristics predicted unfavourable post-operative functioning. The finding that non-homosexuals and those with more psychological instability are at risk for unfavourable functioning and more dissatisfaction after SR fits with earlier studies (see Introduction; Blanchard *et al.* 1989; Landén *et al.* 1998). We found that two non-homosexuals expressed regret about SR. Finally, dissatisfaction with appearance predicted poor post-operative functioning, either because it directly and adversely affected psychological stability or mood, or it indirectly affected the way they were socially treated (or a combination of both).

Taking all the findings into account, our 'sample' of clinicians appropriately assessed some risk factors that predict the course and outcomes of SR, yet they underestimated others. They particularly recognized the impact of the applicant's psychological functioning and physical appearance on post-operative functioning. However, clinicians might want to take special notice of MFs who report inconsistencies in past and present gender dysphoria, in the presence of psychopathology, and of non-homosexuals with strong dissatisfaction about their appearance and clear psychopathology. They may benefit from additional guidance after SR, while adjusting to their new lives and coping with unexpected or adverse consequences.

The results of this study subscribe to the significance of some of the risk factors described in the literature with more conclusive data. Furthermore, factors were found that could assist clinicians in identifying individuals who might be at risk for poor outcome.

## ACKNOWLEDGEMENTS

The authors thank Mrs W. Harmsen and Mr Jos Megens in particular for their invaluable help in the data collection process and appreciate the contribution of Dr Anton M. Verschoor in the setting up of this research project. This work was financially supported by the Stichting Fondsenwervingsacties, the Ziekenfondsraad, and the Stichting Nederlands Gender Centrum.

## DECLARATION OF INTEREST

None.

## NOTE

An Appendix accompanies this paper on the Journal's website (http//journals.cambridge.org).

## REFERENCES

**APA** (1994). *Diagnostic and Statistical Manual of Mental Disorders* (4th edn). American Psychiatric Association: Washington, DC.
**Arrindell, W. A. & Ettema, J. H. M.** (1986). *SCL-90: Handleiding bij een multidimensionele psychopathologie-indicator* [*SCL-90, Manual*

*of a multidimensional psychopathology-indicator*]. Swets en Zeitlinger: Lisse, The Netherlands.

**Blanchard, R.** (1985). Typology of male-to-female transsexualism. *Archives of Sexual Behavior* **14**, 247–261.

**Blanchard, R., Steiner, B. W., Clemmensen, L. H. & Dickey, R.** (1989). Prediction of regrets in postoperative transsexuals. *Canadian Journal of Psychiatry* **34**, 43–45.

**Cohen-Kettenis, P. T. & Gooren, L. J. G.** (1999). Transsexualism: a review of etiology, diagnosis and treatment. *Journal of Psychosomatic Research* **46**, 315–333.

**Cohen-Kettenis, P. T. & van Goozen, S. H. M.** (1997). Sex reassignment of adolescent transsexuals: a follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry* **36**, 263–271.

**Day, P.** (2002). Tech Brief Series: trans-gender reassignment surgery. *New Zealand Health Technology Assessment Report* **1**, 1–38.

**Derogatis, L. R., Lipman, R. S. & Covi, L.** (1973). SCL-90: an outpatient psychiatric rating scale – preliminary report. *Psychopharmacology Bulletin* **9**, 13–27.

**Doorn, C. D., Kuiper, A. J., Verschoor, A. M. & Cohen-Kettenis, P. T.** (1996). *Het verloop van de geslachtsaanpassing: Een 5-jarige prospectieve studie* [*The course of sex reassignment: A 5-year prospective study*]. Report for the Dutch National Health Council.

**Doorn, C. D., Poortinga, J. & Verschoor, A. M.** (1994). Cross-gender identity in transvestites and male transsexuals. *Archives of Sexual Behavior* **23**, 185–201.

**Eldh, J., Berg, A. & Gustafsson, M.** (1997). Long-term follow up after sex reassignment surgery. *Scandinavian Journal of Plastic and Reconstructive Surgery and Hand Surgery* **31**, 39–45.

**Green, R. & Fleming, D.** (1990). Transsexual surgery follow-up: status in the 1990s. *Annual Review of Sex Research* **1**, 163–174.

**Kuiper, A. J.** (1991). *Transseksualiteit: Evaluatie van de geslachtsaanpassende behandeling* [*Transsexualism: An evaluation of sex reassignment*]. Elinkwijk: Utrecht, The Netherlands.

**Kuiper, A. J. & Cohen-Kettenis, P. T.** (1998). Gender role reversal among postoperative transsexuals. *International Journal of Transgenderism* **2** (http://www.symposion.com/ijt/ijtc0502.htm).

**Landén, M., Wålinder, J., Hambert, G. & Lundström, B.** (1998). Factors predictive of regret in sex reassignment. *Acta Psychiatrica Scandinavica* **97**, 284–289.

**Lawrence, A. A.** (2003). Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Archives of Sexual Behavior* **32**, 299–315.

**Lief, H. & Hubschman, L.** (1993). Orgasm in the postoperative transsexual. *Archives of Sexual Behavior* **22**, 145–155.

**Lindemalm, G., Körlin, D. & Uddenberg, N.** (1987). Prognostic factors vs. outcome in male-to-female transsexualism: a follow up of 13 cases. *Acta Psychiatrica Scandinavica* **74**, 268–274.

**Lindgren, T. & Pauly, I.** (1975). A body image scale for evaluating transsexuals. *Archives of Sexual Behavior* **4**, 639–656.

**Lothstein, L. M.** (1982). Sex reassignment surgery: historical, bioethical, clinical and theoretical issues. *American Journal of Psychiatry* **139**, 417–426.

**Lundström, B., Pauly, I. & Wålinder, J.** (1984). Outcome of sex reassignment surgery. *Acta Psychiatrica Scandinavica* **70**, 289–294.

**Luteyn, F., Kok, A. R. & van der Ploeg, F. A. E.** (1980). *NVM, Nederlandse verkorte MMPI, Handleiding* [*Dutch short version of the Minnesota Multiphasic Personality Inventory, Manual*]. Swets en Zeitlinger: Lisse, The Netherlands.

**Mate-Kole, C., Freschi, M. & Robin, A.** (1990). A controlled study of psychological and social change after surgical gender reassignment in selected male transsexuals. *British Journal of Psychiatry* **157**, 261–264.

**Meyer III, W., Bockting, W. O., Cohen-Kettenis, P. T., Coleman, E., DiCeglie, D., Devor, H., Gooren, L. J. G., Hage, J. J., Kirk, S., Kuiper, A. J., Laub, D., Lawrence, A., Menard, Y., Patton, J., Schaefer, L., Webb, A. & Wheeler, C. C.** (2001). The standards of care for gender identity disorders (6th Version). *International Journal of Transgenderism* **5** (http://www.symposion.com/ijt/soc/index.htm).

**Molenaar, I. W.** (1982). Mokken scaling revisited. *Kwantitatieve methoden* **3**, 145–164.

**Pfäfflin, F.** (1992). Regrets after sex reassignment surgery. *Journal of Psychology & Human Sexuality* **5**, 69–85.

**Pfäfflin, F. & Junge, A.** (1992). *Geschlechtsumwandlung: Abhandlungen zur Transsexualität*. Schattauer: Stuttgart, Germany.

**Pfäfflin, F. & Junge, A.** (1998). *Sex Reassignment: Thirty years of international follow-up studies SRS: A Comprehensive Review, 1961–1991* (English edn). Symposion Publishing: Düsseldorf, Germany (http://www.symposion.com/ijt/pfaefflin/1000.htm).

**Rakic, Z., Starcevic, V., Maric, J. & Kelin, K.** (1996). The outcome of sex reassignment surgery in Belgrade: 32 patients of both sexes. *Archives of Sexual Behavior* **25**, 515–525.

**Rehman, J., Lazer, S., Benet, A., Schaefer, L. & Melman, A.** (1999). The reported sex and surgery satisfactions of 28 postoperative male-to-female transsexual patients. *Archives of Sexual Behavior* **28**, 71–89.

**Ross, M. W. & Need, J. A.** (1989). Effects of adequacy of gender reassignment surgery on psychological adjustment: a follow-up of fourteen male-to-female patients. *Archives of Sexual Behavior* **18**, 145–153.

**Spengler, A.** (1980). Kompromisse statt stigma und unsicherheit. Transsexuelle nach der operation [Compromises instead of stigma and doubts. Transsexuals after surgery]. *Sexualmedizin* **9**, 98–103.

**Smith, Y. L. S., Cohen, L. & Cohen-Kettenis, P. T.** (2002). Postoperative psychological functioning of adolescent transsexuals: a Rorschach study. *Archives of Sexual Behavior* **31**, 255–261.

**Smith, Y. L. S., van Goozen, S. H. M. & Cohen-Kettenis, P. T.** (2001). Adolescents with gender identity disorder who were accepted or rejected for sex reassignment surgery: a prospective follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry* **40**, 472–481.

**van Goozen, S. H. M., Cohen-Kettenis, P. T., Gooren, L. J. G., Frijda, N. H. & van de Poll, N. E.** (1995). Gender differences in behavior: activating effects of cross sex hormones. *Psychoneuroendocrinology* **20**, 343–363.

**Van Tilburg, T.** (1988). *Verkregen en gewenste ondersteuning in het licht van eenzaamheidservaringen* [*Received and desired support related to the experience of loneliness*]. Elinkwijk: Utrecht, The Netherlands.

**Verschoor, A. M. & Poortinga, J.** (1988). Psychosocial differences between Dutch male and female transsexuals. *Archives of Sexual Behavior* **17**, 173–178.

**Wålinder, J., Lundström, B. & Thuwe, I.** (1978). Prognostic factors in the assessment of male transsexuals for sex reassignment. *British Journal of Psychiatry* **132**, 16–20.

View publication stats

Journal of Adolescent Health 70 (2022) 643–649



JOURNAL OF
ADOLESCENT
HEALTH

www.jahonline.org

Original article

# Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth



Amy E. Green, Ph.D. [*], Jonah P. DeChants, Ph.D., Myeshia N. Price, Ph.D., and Carrie K. Davis, M.S.W.

*The Trevor Project, West Hollywood, California*

*Article history:* Received July 26, 2021; Accepted October 28, 2021
*Keywords:* Transgender; Nonbinary; Gender-affirming care; Suicide; Depression; LGBTQ

A B S T R A C T

**Purpose:** There are no large-scale studies examining mental health among transgender and nonbinary youth who receive gender-affirming hormone therapy (GAHT). The purpose of this study is to examine associations among access to GAHT with depression, thoughts of suicide, and attempted suicide among a large sample of transgender and nonbinary youth.
**Methods:** Data were collected as part of a 2020 survey of 34,759 lesbian, gay, bisexual, transgender, queer, and questioning youth aged 13–24, including 11,914 transgender or nonbinary youth. Adjusted logistic regression assessed whether receipt of GAHT was associated with lower levels of depression, thoughts of suicide, and attempted suicide among those who wanted to receive GAHT.
**Results:** Half of transgender and nonbinary youth said they were not using GAHT but would like to, 36% were not interested in receiving GAHT, and 14% were receiving GAHT. Parent support for their child's gender identity had a strong relationship with receipt of GAHT, with nearly 80% of those who received GAHT reporting they had at least one parent who supported their gender identity. Use of GAHT was associated with lower odds of recent depression (adjusted odds ratio [aOR] = .73, $p < .001$) and seriously considering suicide (aOR = .74, $p < .001$) compared to those who wanted GAHT but did not receive it. For youth under age 18, GAHT was associated with lower odds of recent depression (aOR = .61, $p < .01$) and of a past-year suicide attempt (aOR = .62, $p < .05$).
**Conclusions:** Findings support a relationship between access to GAHT and lower rates of depression and suicidality among transgender and nonbinary youth.

© 2021 Society for Adolescent Health and Medicine. Published by Elsevier Inc. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

**IMPLICATIONS AND CONTRIBUTION**

Transgender and nonbinary youth have high risk of depression and suicide. Gender-affirming healthcare is associated with lower risk using adult samples. This large-scale study examines GAHT among transgender and nonbinary youth. Findings demonstrate that GAHT is significantly related to lower rates of depression and suicidality among transgender and nonbinary youth.

Transgender and nonbinary youth are at elevated risk for depression, thoughts of suicide, and attempted suicide compared to youth who are cisgender and heterosexual, as well as cisgender members of the lesbian, gay, bisexual, transgender, queer, and questioning (LGBTQ) community [1–3]. Mental health

**Conflicts of interest:** The authors have no conflicts of interest relevant to this article to disclose.
* Address correspondence to: Amy E. Green, Ph.D., The Trevor Project, PO Box 69232, West Hollywood, CA 90069.
*E-mail address:* Amy.Green@TheTrevorProject.org (A.E. Green).

disparities among transgender and nonbinary youth stem from minority stress based on the harmful ways transgender and nonbinary youth are treated by others [4]. Feelings of gender dysphoria associated with incongruence between one's physical traits and gender identity are also associated with mental health challenges for transgender and nonbinary youth [5]. As such, both the treatment of gender dysphoria and the reduction of minority stress offer pathways toward reducing disparities in depression and suicidality found among transgender and nonbinary youth.

1054-139X/© 2021 Society for Adolescent Health and Medicine. Published by Elsevier Inc. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).
https://doi.org/10.1016/j.jadohealth.2021.10.036

EXHIBIT

6

644                                    A.E. Green et al. / Journal of Adolescent Health 70 (2022) 643−649

The Minority Stress Model details how chronic stressful events such as gender identity−based stigma and rejection produce proximal processes such as internalized stigma and shame, which result in mental health challenges [6]. Although minority stress is associated with greater risk of anxiety, depression, and suicidality among transgender and nonbinary individuals [2,5], gender-affirming medical care has been associated with lower risk [7,8]. Gender-affirming medical care is one component of the larger process of gender affirmation, which may include social, legal, and medical changes. Social transition is the primary and most common component of gender affirmation for prepubertal youth and involves allowing them to present in the way that feels most authentic to them. Medical-affirming care can include treatments that postpone physical changes associated with puberty, as well as treatments that lead to changes that would affirm one's gender identity. Gonadotropin-releasing hormone analogs, commonly known as "puberty blockers," are used to delay the onset of puberty, while gender-affirming hormone therapy (GAHT) is used to promote gender-affirming physical changes. GAHT allows transgender and nonbinary youth to develop physical characteristics that align with their gender identity and is appropriate for those who have begun puberty or following the use of puberty blockers. Access to GAHT is especially important during adolescence because some effects of puberty are not easily reversed by GAHT in adulthood (e.g., testosterone's effects on voice) [9]. Qualitative data highlight ways transgender individuals have experienced distress due to the delay in GAHT, which results in them undergoing puberty associated with their sex assigned at birth [10,11]. Access to GAHT is an ongoing issue for transgender youth and their families, both due to a lack of competent providers in many communities and due to recent legislative efforts to criminalize medical providers and parents who provide GAHT to youth under the age of 18 [12,13]. Barriers to care are often greater for transgender and nonbinary youth of color who are unrepresented in gender specialty clinics and have more difficulties accessing gender-affirming care compared to White transgender and nonbinary youth [9].

A recent study based on the 2015 U.S. Transgender Survey found that transgender adults who received pubertal blockers as adolescents had significantly lower lifetime suicidal ideation compared to those who desired but did not receive it [8]. However, thus far, there are no large-scale studies comparing mental health and suicidality among transgender and nonbinary youth who wanted GAHT and received it to those who wanted it but did not receive it [14]. Three small clinical studies have examined GAHT in relation to mental health and suicidality among transgender and nonbinary youth. However, these clinical studies were not able to randomize youth to receive GAHT or include a control group. The first study followed 47 transgender youth and found that mean levels of suicidality significantly decreased from 1.11 before starting GAHT to .27 when assessed approximately 1 year after beginning GAHT [7]. The second study of 128 transgender youth found small to moderate improvements in self-reported depressive symptoms ($d = .44$) [15]. The third study examined 50 transgender youth at two 6-month intervals following the start of GAHT and found significant decreases in depression as measured by the Center for Epidemiologic Studies Depression Scale [16]. Each of these studies noted limitations related to not being able to control for the role of parental support, as each youth had at least one parent who supported their receipt of GAHT.

The present study draws from a large sample of transgender and nonbinary youth between the ages of 13−24 to examine the association between receipt of GAHT with self-reported depression, thoughts of suicide, and attempted suicide. Furthermore, because many current concerns around GAHT relate to their use in youth under the age of 18, these associations will also be examined separately for those under age 18.

## Methods

### Procedure

Data were from an online nonprobability sample collected between October and December 2020 of 34,759 youth aged 13−24 who resided in the U.S. and identified as LGBTQ. Youth were recruited via targeted ads on Facebook, Instagram, and Snapchat. Those who reported residing outside of the U.S., having an age below 13 or above 24, or being both heterosexual and cisgender were excluded from the sample. To approach a more representative sample, targeted recruitment was conducted to ensure adequate sample sizes with respect to geography and race/ethnicity. Qualified respondents completed a secure online questionnaire that included a maximum of 142 questions. The survey employed two validity checks. The first was an item that required youth to select a specific response from the provided list. The second validity check screened for youth who responded inconsistently to the same item placed at two separate points in the survey. Each question related to mental health and suicidality was preceded by a message stating: "If at any time you need to talk to someone about your mental health or thoughts of suicide, please call The Trevor Project at 1-866-488-7386." Youth were able to select "decline to answer" for any questions in the survey that they did not want to answer. Respondents were eligible to be entered into a drawing for one of 100 gift cards worth $50 each by providing their email address after being routed to a separate survey. The research proposal was reviewed and approved by an independent Institutional Review Board, Solutions IRB. Youth participation was voluntary, and informed consent was obtained. We obtained a waiver of parental consent for youth aged 13−17 years as the research posed a minimal risk and could have presented potential harm for youth who were not out to their parents about their LGBTQ identity. No names or personal details were included to ensure confidentiality and privacy.

### Measures

*Gender-affirming hormone therapy use.* Youth who indicated they were transgender or nonbinary were asked, "Are you currently taking gender-affirming hormones?" with response options that included, (1) "No, and I do not want to take them," (2) "No, but I would like to take them," and (3) "Yes." In logistic regression analyses, youth responses are coded as (0) "No, but I would like to take them" and (1) "Yes."

*Depression.* Current levels of depression were measured using the Patient Health Questionnaire-2 [17]. The Patient Health Questionnaire-2 was designed as a two-item screening tool for major depressive disorder in the past 2 weeks. Scores were dichotomized based on recommended guidelines for a total score of three or more being indicative of depression.

*Suicidal thoughts and behaviors.* Youth were first presented with a question on whether they had seriously considered suicide in the past year. Those that answered, "yes" were subsequently asked how many times they had attempted suicide in the past year, with answers dichotomized into zero compared to one or more attempts. Both items are from the Centers for Disease Control and Prevention's Youth Risk Behavior Survey [18].

*Demographic covariates.* The following sociodemographic covariates were examined based on their potential relationships with suicidality and access to GAHT: age, socioeconomic status (just able to meet basic needs or less, more than able to meet basic needs), race (Alaska Native/American Indian, Asian/Pacific Islander, Black/African American, Latinx, multiracial, or White), and census region (Northeast, South, Midwest, West). Gender identity was measured using a two-stage question that first asked, "What sex were youth assigned at birth, on your original birth certificate," with response options of male or female. The second question asked, "Which of the following terms best describes your gender identity. We understand that there are many different ways youth identify, please pick the one that best describes you," with response options of boy/man, girl/woman, and nonbinary/genderfluid/gender nonconforming, as well as options to indicate the youth did not understand the question or were not sure of their gender identity. For those who indicated a known gender identity, the measures were combined to create categories of transgender girl/woman, transgender boy/man, and nonbinary. A single item was used to measure sexual orientation stating, "Which of these options best describes your sexual orientation. We understand that there are many different sexual identities please pick the one that best describes you," with response options of gay, lesbian, bisexual, pansexual, queer, questioning, or straight/heterosexual [19].

*Additional covariates.* Four additional covariates were included based on their potential relationships with both access to GAHT and risk of depression and suicidality among transgender and nonbinary youth. Parent support for a youth's gender identity was assessed by asking youth, "Do you have at least one parent who is supportive of your gender identity?" with answers of (1) "No," (2) "Yes," and (3) "I am not 'out' about my gender to any of my parents." Youth's report of victimization based on their gender identity was assessed by asking, "Have you ever felt physically threatened or been physically abused because of your gender identity?" Response options were (0) "No" and (1) "Yes." Receipt of puberty blockers was assessed by an item placed immediately prior to the question on GAHT that asked, "Did you take medication designed to prevent or delay puberty (also known as puberty blockers)?" Response options were codes as (0) "No" and (1) "Yes." Exposure to gender identity conversion efforts (GICE) was assessed by asking, "Did you ever receive treatment from someone who tried to change your sexual orientation or gender identity (such as trying to make you straight or cisgender)?" Youth who did not undergo conversion efforts or who reported that they underwent conversion efforts related to only their sexual orientation were coded as (0) "No," while youth who reported undergoing GICE were coded as (1) "Yes."

*Data analysis*

SPSS version 28 was used in conducting all analyses [20]. Chi-squared tests of independence were used to examine the

proportion of young people who used GAHT compared to those who wanted GAHT but did not receive it. A *t*-test was used to examine mean age differences. After adjustment for the aforementioned covariates, logistic regression was used to determine the odds of depression, past-year thoughts of suicide, and a past-year suicide attempt among those who received GAHT in comparison with those who wanted GAHT but did not receive it. To address the lack of research focused on gender-affirming medical care among transgender and nonbinary youth who are minors, analyses were also conducted separately among youth aged 13–17.

*Participants*

A total of 11,914 youth from unique IP address indicated that they were transgender or nonbinary. Our question on GAHT was placed toward the end of the survey, and as such 2,895 youth had missing data. Chi-squared tests of independence were used to compare the 9,019 youth who had GAHT data to the 2,895 who did not. There were no significant differences within sexual identity, socioeconomic status, census region, gender identity support from parents, gender identity-based victimization, or GICE. The proportion of transgender boys/men and nonbinary youth were comparable. There were slightly higher rates of transgender women in the sample with data on GAHT compared to those with missing data (8% vs. 6%, $\chi^2(2) = 13.21$, $p = .001$). The sample with data on GAHT had higher rates of multiracial youth (21% vs. 17%) and lower rates of White youth (55% vs. 60%) ($\chi^2(5) = 34.32$, $p < .001$). Age was examined using *t*-test analyses with the average age of the subset of youth with data on GAHT slightly greater (17.62) than those without (17.30), $t(11,912 = 4.60)$, $p < .001$.

**Results**

The majority of youth were nonbinary (63%), followed by transgender boy/man (29%) and transgender girl/woman (8%). The average age was 17.62 (standard deviation = 3.21), and 27% reported that they were either just able to financially meet basic needs or struggled to meet basic needs. Most youth resided in the South (36%), followed by West (27%), Midwest (22%), and Northeast (15%). Overall, 29% identified as bisexual, 26% as pansexual, 20% as gay or lesbian, 20% as queer, 4% as questioning, and 2% as heterosexual. The majority of the sample was non-Hispanic White (55%), followed by multiracial (21%), Latinx (12%), Asian/Pacific Islander (5%), Black (4%), and American Indian/Alaskan Native (2%).

Half of transgender and nonbinary respondents said they were not using GAHT but would like to receive it, 36% said they were not interested in receiving GAHT, and 14% said they were receiving GAHT. In bivariate analyses (Table 1), those who received GAHT were on average older, and a greater proportion reported that they struggled to meet basic needs or were just able to meet them, compared to those who wanted GAHT but did not receive it. Those who lived in the South were underrepresented among those who received GAHT when they desired it. Transgender girls/women and transgender boys/men were represented in greater proportions among those who received GAHT, while a greater proportion of those who were nonbinary reported wanting GAHT but not receiving it. White youth were the only race/ethnicity group that were represented in a greater proportion among those who received GAHT compared to those who wanted it but did not receive it. Transgender and nonbinary

*A.E. Green et al. / Journal of Adolescent Health 70 (2022) 643–649*

**Table 1**
Sample characteristics of transgender and nonbinary youth aged 13–24 based on receipt of GAHT

| | Received GAHT (n = 1,216) Mean (SD) or % (n) | Wanted but did not receive GAHT (n = 4,537) Mean (SD) or % (n) | |
|---|---|---|---|
| Age | 19.95 (2.80) | 16.91 (2.97) | $t(15,751) = 33.26, p < .001$ |
| Socioeconomic status | | | $\chi^2(1) = 17.11, p < .001$ |
| More than meets basic needs | 67.3 (794) | 73.5 (2,947) | |
| Just meets basic needs or less | 32.7 (385) | 26.5 (1,063) | |
| Census region | | | $\chi^2(3) = 32.25, p < .001$ |
| Northeast | 17.2 (209) | 14.0 (634) | |
| South | 28.7 (349) | 36.9 (1,676) | |
| Midwest | 23.4 (285) | 22.8 (1,035) | |
| West | 30.7 (373) | 26.3 (1,192) | |
| Gender identity | | | $\chi^2(2) = 374.88, p < .001$ |
| Nonbinary | 21.3 (259) | 49.5 (2,245) | |
| Transgender boy/man | 55.3 (673) | 41.3 (1,874) | |
| Transgender girl/woman | 23.4 (284) | 9.2 (418) | |
| Sexual identity | | | $\chi^2(5) = 113.49, p < .001$ |
| Gay/lesbian | 25.6 (310) | 17.9 (807) | |
| Heterosexual | 4.5 (53) | 1.8 (80) | |
| Bisexual | 30.5 (369) | 29.4 (1,325) | |
| Pansexual | 16.4 (198) | 27.8 (1,250) | |
| Queer | 20.2 (244) | 19.0 (845) | |
| Questioning | 2.9 (35) | 4.4 (196) | |
| Race/ethnicity | | | $\chi^2(5) = 63.34, p < .001$ |
| American Indian/Alaskan Native | 1.4 (16) | 2.2 (98) | |
| Asian/Pacific Islander | 3.1 (36) | 4.6 (202) | |
| Black | 1.7 (20) | 3.4 (150) | |
| Latinx | 8.8 (104) | 12.4 (543) | |
| White | 68.3 (805) | 55.8 (2,441) | |
| Multiracial | 16.7 (197) | 21.5 (940) | |

GAHT = gender-affirming hormone therapy; SD = standard deviation.

youth who identified as gay, lesbian, or heterosexual were represented in higher proportions among those who received GAHT compared to those who wanted it but did not receive it.

Pansexual youth were underrepresented among those who wanted GAHT but did not receive it. Table 2 presents the characteristics of transgender and nonbinary youth among the

**Table 2**
Sample characteristics of transgender and nonbinary youth aged 13–17 based on receipt of GAHT

| | Received GAHT (n = 274) Mean (SD) or % (n) | Wanted but did not receive GAHT (n = 2,961) Mean (SD) or % (n) | |
|---|---|---|---|
| Age | 16.00 (1.03) | 15.09 (1.36) | $t(13,233) = 10.81, p < .001$ |
| Socioeconomic status | | | $\chi^2(1) = 3.77, p = .05$ |
| More than meets basic needs | 86.3 (220) | 81.3 (2,019) | |
| Just meets basic needs or less | 13.7 (35) | 18.7 (463) | |
| Census region | | | $\chi^2(3) = 14.50, p < .01$ |
| Northeast | 14.6 (40) | 13.7 (405) | |
| South | 26.3 (72) | 37.4 (1,107) | |
| Midwest | 24.8 (68) | 22.0 (652) | |
| West | 34.3 (94) | 26.9 (797) | |
| Gender identity | | | $\chi^2(2) = 100.35, p < .001$ |
| Nonbinary | 15.3 (42) | 46.7 (1,382) | |
| Transgender boy/man | 74.8 (205) | 46.5 (1,377) | |
| Transgender girl/woman | 9.9 (27) | 6.8 (202) | |
| Sexual identity | | | $\chi^2(5) = 52.85, p < .001$ |
| Gay/lesbian | 32.2 (88) | 18.5 (544) | |
| Heterosexual | 4.0 (11) | 1.6 (46) | |
| Bisexual | 33.0 (90) | 31.3 (921) | |
| Pansexual | 13.9 (38) | 16.5 (486) | |
| Queer | 13.6 (37) | 27.0 (795) | |
| Questioning | 3.3 (9) | 5.0 (148) | |
| Race/ethnicity | | | $\chi^2(5) = 14.31, p = .01$ |
| American Indian/Alaskan Native | 1.9 (5) | 2.5 (71) | |
| Asian/Pacific Islander | 4.2 (11) | 5.4 (152) | |
| Black | 1.5 (4) | 3.9 (111) | |
| Latinx | 8.1 (21) | 14.0 (396) | |
| White | 58.8 (153) | 50.2 (1,424) | |
| Multiracial | 25.4 (66) | 24.1 (683) | |

GAHT-gender-affirming hormone therapy; SD = standard deviation.

A.E. Green et al. / Journal of Adolescent Health 70 (2022) 643–649 647

**Table 3**
Challenges among transgender and nonbinary youth aged 13–24 based on receipt of GAHT

|  | Received GAHT (n = 1,216) % (n) | Wanted but did not receive GAHT (n = 4,537) % (n) |  |
|---|---|---|---|
| Gender support from parents |  |  | $\chi^2(2) = 695.98, p < .001$ |
| No | 17.6 (210) | 33.6 (1,451) |  |
| Yes | 79.8 (955) | 38.2 (1,648) |  |
| Not "out" to parents | 2.6 (31) | 28.2 (1,218) |  |
| Gender identity-based victimization | 61.9 (734) | 49.2 (2,125) | $\chi^2(1) = 59.56, p < .001$ |
| Gender identity conversion efforts | 14.7 (172) | 13.9 (581) | $\chi^2(1) = 0.42, p = .52$ |
| History of puberty blocker use | 11.0 (132) | 1.0 (44) | $\chi^2(1) = 315.80, p < .001$ |
| Depression | 60.8 (738) | 75.0 (3,385) | $\chi^2(1) = 95.38, p < .001$ |
| Seriously considered suicide | 43.9 (521) | 57.1 (2,409) | $\chi^2(1) = 65.89, p < .001$ |
| Attempted suicide | 14.6 (173) | 23.2 (956) | $\chi^2(1) = 40.24, p < .001$ |

GAHT = gender-affirming hormone therapy.

subsample aged 13–17 based on whether they were able to obtain desired GAHT.

Those who had parental support for their gender identity comprised nearly 80% of youth who received GAHT. Among those who wanted GAHT but did not receive it, 38% had parental support (Table 3). Among those who received GAHT, 11% reported that they had ever used puberty blockers compared to only 1% of those who wanted GAHT but did not receive it. Less than 1% (.6%) of youth who reported not wanting GAHT had ever used puberty blockers. A higher percentage of youth who received GAHT experienced gender identity–based victimization compared to those who wanted GAHT but did not receive it. In bivariate analysis, a smaller percentage of transgender and nonbinary youth who received GAHT reported recent depression (61% vs. 75%), seriously considering suicide in the past year (44% vs. 57%) and attempting suicide in the past year (15% vs. 23%) compared to those who wanted GAHT but did not receive it. Similar patterns emerged among youth aged 13–17 compared to the full sample (Table 4); however, 94% of those 13–17 who received GAHT had parental support compared to 80% among the full sample. Additionally, a larger proportion of those aged 13–17 who received GAHT had used puberty blockers (24%) compared to the overall sample (11%).

In adjusted logistic regression models (Table 5), receipt of GAHT was associated with lower odds of recent depression (adjusted odds ratio [aOR] = .73, $p < .001$) and seriously considering suicide in the past year (aOR = .74, $p < .001$). The aOR for attempted suicide among the overall sample of transgender and nonbinary youth aged 13–24 did not reach significance (aOR = .84, $p = .16$). Among those aged 13–17, receipt of GAHT was associated with nearly 40% lower odds of

recent depression (aOR = .61, $p < .01$) and attempting suicide in the past year (aOR = .62, $p < .05$). For youth under age 18, the aOR for seriously considering suicide in the past year did not reach statistical significance (aOR = .74, $p = .08$).

**Discussion**

These findings extend previous cross-sectional research conducted with transgender and nonbinary adults and provide support for a significant relationship between access to GAHT and lower depression and suicidality among transgender and nonbinary youth. Among the full sample and those under age 18, receipt of GAHT was associated with significantly lower odds of experiencing symptoms of depression in the previous 2 weeks. Although our study is not able to determine temporal patterns, it is unlikely that many transgender and nonbinary youth began GAHT subsequent to this 2-week time frame. The pattern of statistical significance for findings related to past-year suicidality was less consistent, which may indicate challenges related to statistical power when examining fairly infrequent outcomes such as suicidal thoughts and behaviors, particularly among smaller subgroups of individuals [21]. However, overall, our results indicate significant relationships between receipt of GAHT and lower suicidality among transgender and nonbinary youth.

Bivariate findings point to disparities in receipt of GAHT among subgroups of transgender and nonbinary youth. In particular, transgender and nonbinary youth living in the South had lower rates of accessing GAHT when they wanted it. This is also the region where the majority of bills to restrict access to gender-affirming care for transgender youth have been introduced subsequent to the collection of these data [22]. Overall youth who were able to

**Table 4**
Challenges among transgender and nonbinary youth aged 13–17 based on receipt of GAHT

|  | Received GAHT (n = 274) % (n) | Wanted but did not receive GAHT (n = 2,961) % (n) |  |
|---|---|---|---|
| Gender support from parents |  |  | $\chi^2(2) = 323.26, p < .001$ |
| No | 3.7 (10) | 33.3 (933) |  |
| Yes | 93.7 (254) | 37.2 (1,043) |  |
| Not "out" to parents | 2.6 (7) | 29.5 (825) |  |
| Gender identity-based victimization | 57.5 (734) | 48.6 (2,125) | $\chi^2(1) = 7.66, p < .01$ |
| Gender identity conversion efforts | 13.1 (34) | 13.6 (364) | $\chi^2(1) = 0.05, p = .82$ |
| History of puberty blocker use | 24.4 (66) | 1.3 (37) | $\chi^2(1) = 422.86, p < .001$ |
| Depression | 60.9 (167) | 77.9 (2,294) | $\chi^2(1) = 39.83, p < .001$ |
| Seriously considered suicide | 51.1 (135) | 61.6 (1,674) | $\chi^2(1) = 10.97, p < .001$ |
| Attempted suicide | 16.0 (42) | 27.7 (733) | $\chi^2(1) = 16.67, p < .001$ |

GAHT = gender-affirming hormone therapy.

**Table 5**
Multivariate adjusted logistic regression of gender-affirming hormone therapy on depression and suicidality among transgender and nonbinary youth

|  | Overall sample | | Ages 13–17 | |
| --- | --- | --- | --- | --- |
|  | aOR (95% CI) | *p*-value | aOR (95% CI) | *p*-value |
| Depression | 0.73 (0.61–0.88) | <.001 | 0.61 (0.43–0.86) | <.01 |
| Seriously considered suicide | 0.74 (0.62–0.88) | <.001 | 0.74 (0.52–1.03) | .08 |
| Attempted suicide | 0.84 (0.66–1.07) | .16 | 0.62 (0.40–0.97) | .04 |

Adjusted for age, socioeconomic status, census region, gender identity, sexual orientation, race/ethnicity, parent support for gender identity, gender identity-based victimization, gender identity conversion efforts, and history of puberty blocker use.
aOR = adjusted odds ratio; CI = confidence interval.

access GAHT reported greater rates of financial struggles; however, this was not true for the subsample aged 13–17. Our measure of socioeconomic status was based on household finances, which often look different from those 18 and older who may no longer be able to rely on their family's resources. As expected, youth over age 18 had higher rates of being able to access GAHT when they desired it. Among transgender and nonbinary youth, those who primarily reported a binary identity (i.e., transgender man or transgender woman) had higher rates of accessing GAHT compared to those who were nonbinary. Pansexual youth were also underrepresented among those who received GAHT; however, this relationship may also be related to nonbinary identities as pansexual was the most frequently reported sexual orientation among nonbinary youth. There were also disparities in access to GAHT across race/ethnicity. White youth represented 68% of those who received GAHT compared to 56% among those who wanted it but did not receive it, with LGBTQ youth of color reporting lower rates of obtaining GAHT. Furthermore, parental support for their child's gender identity had a strong relationship with receipt of GAHT, with nearly 80% of those who received GAHT reporting they had at least one parent who supported their gender identity, including 94% of those aged 13–17. Together, these findings indicate that youth receipt of gender-affirming care is based not only on their presenting concerns but also on their parent's level of support, geography, and their social identities, which relate to barriers to care among the broader population of youth as well [23–26]. To reduce disparities in youth access to GAHT there is a need to focus on increasing awareness and education around gender-affirming care for parents as well as among healthcare providers and others in positions to support youth health and well-being.

Some of the hesitance regarding gender-affirming care for transgender and nonbinary youth may be due to a misunderstanding of the causes of mental health challenges in transgender and nonbinary individuals, such as a failure to recognize ways incongruence between physical traits and one's gender identity can produce psychological distress marked by depression. High rates of depression, suicidal ideation, and suicide attempts among transgender youth are sometimes used by antitransgender politicians and activists to erroneously suggest that transgender identity is a mental health condition that can be treated through counseling and conversion efforts [27]. These individuals ignore the impacts of gender dysphoria and minority stress [28] and suggest that GAHT is not necessary if transgender youth can be counseled into accepting their sex assigned at birth. The findings of this study demonstrate that GAHT could be a potential mechanism by which mental health and suicide

disparities among transgender and nonbinary youth may begin to decrease. Furthermore, existing evidence suggests that regret is low for gender-affirming care interventions, with one study of 55 transgender adults who had received gender-affirming care as adolescents finding that not one experienced regret [29].

There remains a critical need for mental health outcomes data among transgender and nonbinary youth receiving GAHT, including through longitudinal studies. Large-scale longitudinal data collection will better elucidate the risks and benefits of individual treatment options so that youth and their families can make evidence-informed decisions regarding care.

*Limitations*

This study boasts a large, diverse sample of transgender and nonbinary youth across the U.S.; however, some limitations should also be noted. First, causation cannot be inferred due to the study's cross-sectional design. It is possible that those who historically have higher rates of depression and suicidal thoughts and behaviors are also less able to seek or obtain GAHT. However, combined with repeated measures designs of other studies [7,15] it appears likely that receipt of GAHT may lead to reduced levels of depression and suicidality. Given existing research, it is unlikely that randomized controlled trials of GAHT for youth would be ethically appropriate. To better understand directionality, prospective longitudinal designs are needed. Additionally, our self-reported nonprobability sample may limit the generalizability of findings and suggest the need for the inclusion of gender identity-specific measures in larger probability samples. Finally, our study did not include variables to assess at what age began puberty blockers or GAHT or the duration for which they had been receiving them. Because younger transgender and nonbinary youth in our sample may have been eligible for either puberty blockers or GAHT, there may have been youth who were currently receiving the puberty blockers and not yet ready to start GAHT. However, this is a small part of our sample as only 20 youth aged 13–14 indicated that they had taken puberty blockers but had not accessed desired GAHT. Data on age and duration of access should be included in future studies to better understand the relationship between GAHT and mental health.

Unfortunately, efforts to legally restrict gender-affirming care for transgender and nonbinary youth may negatively impact mental health through two separate but linked pathways. The first is by directly prohibiting medication that many of these youth rely on to reduce feelings of gender dysphoria. The second is by increasing minority stress through negative public attention and harmful rhetoric debating the rights of transgender and nonbinary youth to live their lives authentically. As such, efforts to address the mental health of transgender and nonbinary youth must also acknowledge and address the cumulative risk that antitransgender political statements and legislative efforts may have on their well-being.

As the evidence for gender-affirming care grows, medical and mental health organizations are increasingly expressing support for it. Many major medical and mental health organizations have guidelines for working with transgender individuals centered around respect for the patient and shared decision-making [30,31], with some organizations releasing statements explicitly opposing any efforts to prevent access to gender-affirming care [32,33]. Given the well-documented risks of negative mental health and suicide among transgender and nonbinary youth, it is necessary that those serving these youth provide care that is patient-centered, affirming, and evidence-based.

A.E. Green et al. / Journal of Adolescent Health 70 (2022) 643–649                                                        649

## Funding Sources

This research did not receive any specific grant from funding agencies in the public, commercial, or not-for-profit sectors.

## References

[1] Johns MM, Lowry R, Andrzejewski J, et al. Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students — 19 states and large urban school districts, 2017. MMWR Morb Mortal Wkly Rep 2019;68:67–71.

[2] Price-Feeney M, Green AE, Dorison S. Understanding the mental health of transgender and nonbinary youth. J Adolesc Health 2020;66:684–90.

[3] Toomey RB, Syvertsen AK, Shramko M. Transgender adolescent suicide behavior. Pediatrics 2018;142:e20174218.

[4] Meyer IH. Resilience in the study of minority stress and health of sexual and gender minorities. Psychol Sex Orientat Gend Divers 2015;2:209–13.

[5] Chodzen G, Hidalgo MA, Chen D, Garofalo R. Minority stress factors associated with depression and anxiety among transgender and gender-nonconforming youth. J Adolesc Health 2019;64:467–71.

[6] Hendricks M, Testa R. A conceptual framework for clinical work with transgender and gender nonconforming clients: An adaptation of the minority stress model. Prof Psychol Res Pract 2012;43:460–7.

[7] Allen L, Watson L, Egan A, Moser C. Well-being and suicidality among transgender youth after gender-affirming hormones. Clin Pract Pediatr Psychol 2019;7:302–11.

[8] Turban JL, King D, Carswell JM, Keuroghlian AS. Pubertal suppression for transgender youth and risk of suicidal ideation. Pediatrics 2020;145:e20191725.

[9] Call DC, Challa M, Telingator CJ. Providing affirmative care to transgender and gender diverse youth: Disparities, interventions, and outcomes. Curr Psychiatry Rep 2021;23:1–10.

[10] Raj S. Alleviating anxiety and cultivating care: Young trans people in the family court of Australia. Aust Fem L J 2019;45:111–30.

[11] Riggs DW, Bartholomaeus C, Sansfacon AP. 'If they didn't support me, I most likely wouldn't be here': Transgender young people and their parents negotiating medical treatment in Australia. Int J Transgend Health 2020;21:3–15.

[12] Gridley SJ, Crouch JM, Evans Y, et al. Youth and caregiver perspectives on barriers to gender-affirming health care for transgender youth. J Adolesc Health 2016;59:254–61.

[13] Kremen J, Williams C, Barrera EP, et al. Addressing legislation that restricts access to care for transgender youth. Pediatrics 2021;147:e2021049940.

[14] Chew D, Anderson J, Williams K, et al. Hormonal treatment in young people with gender dysphoria: A systematic review. Pediatrics 2018;141:e20173742.

[15] Kuper LE, Stewart S, Preston S, et al. Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy. Pediatrics 2020;145:e20193006.

[16] Achille C, Taggart T, Eaton NR, et al. Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results. Int J Pediatr Endocrinol 2020;2020:1–5.

[17] Richardson LP, Rockhill C, Russo JE, et al. Evaluation of the PHQ-2 as a brief screen for detecting major depression among adolescents. Pediatrics 2010;125:e1097–103.

[18] Johns MM, Lowry RR, Haderxhanaj LT, et al. Trends in violence victimization and suicide risk by sexual identity among high school students — youth risk behavior survey, United States, 2015–2019. MMWR Morb Mortal Wkly Rep 2020;79:19–27.

[19] DeChants J, Green AE, Price MN, Davis C. Measuring youth sexual orientation and gender identity. The Trevor Project. 2021. Available at: https://www.thetrevorproject.org/2021/07/28/measuring-youth-sexual-orientation-and-gender-identity/. Accessed August 20, 2021.

[20] IBM Corp. IBM SPSS Statistics for Macintosh, version 26.0. Armonk, NY: IBM Corp; 2019.

[21] O'Connor RC, Portzky G. Looking to the future: A synthesis of new developments and challenges in suicide research and prevention. Front Psychol 2018;9:2139.

[22] Conron KJ, O'Neill K, Vasquez LA. Prohibiting gender-affirming medical care for youth. The Williams Institute UCLA School of Law. 2021. Available at: https://williamsinstitute.law.ucla.edu/publications/bans-trans-youth-health-care/. Accessed August 20, 2021.

[23] Alegría M, Alvarez K, Ishikawa RZ, et al. Removing obstacles to eliminating racial and ethnic disparities in behavioral health care. Health Aff (Millwood) 2016;35:991–9.

[24] Clark BA, Marshall SK, Saewyc EM. Hormone therapy decision-making processes: Transgender youth and parents. J Adolesc 2020;79:136–47.

[25] Schnyder N, Lawrence D, Panczak R, et al. Perceived need and barriers to adolescent mental health care: Agreement between adolescents and their parents. Epidemiol Psychiatr Sci 2019;29:1–9.

[26] Hodgkinson S, Godoy L, Beers LS, Lewin A. Improving mental health access for low-income children and families in the primary care setting. Pediatrics 2017;139:e20151175.

[27] American Psychological Association. APA Resolution on gender identity change efforts. 2021. Available at: https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf. Accessed June 9 2021.

[28] Olson KR, Durwood L, DeMeules M, McLaughlin KA. Mental health of transgender children who are supported in their identities. Pediatrics 2016;137:e20153223.

[29] De Vries AL, McGuire JK, Steensma TD, et al. Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics 2014;134:696–704.

[30] American Psychiatric Association. Position statement on access to care for transgender and gender diverse individuals. 2018. Available at: https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf. Accessed May 14, 2021.

[31] Rafferty J, Committee on Psychosocial Aspects of Child and Family Health. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. Pediatrics 2018;142:e20182162.

[32] Beers LS. American Academy of Pediatrics Speaks out against bills harming transgender youth. 2021. Available at: https://services.aap.org/en/news-room/news-releases/aap/2021/american-academy-of-pediatrics-speaks-out-against-bills-harming-transgender-youth/. Accessed May 14, 2021.

[33] American Academy of Child & Adolescent Psychiatry. Policy statement on conversion therapy. 2018. Available at: https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx. Accessed August 26, 2019.

# PLOS ONE

RESEARCH ARTICLE

# Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults

Jack L. Turban[1]*, Dana King[2], Julia Kobe[2], Sari L. Reisner[2,3,4,5], Alex S. Keuroghlian[2,6,7]

1 Division of Child & Adolescent Psychiatry, Stanford University School of Medicine, Stanford, California, United States of America, 2 The Fenway Institute, Boston, Massachusetts, United States of America, 3 Division of Endocrinology, Diabetes, and Hypertension, Brigham and Women's Hospital, Boston, Massachusetts, United States of America, 4 Department of Medicine, Harvard Medical School, Boston, Massachusetts, United States of America, 5 Department of Epidemiology, Harvard T.H. Chan School of Public Health, Boston, Massachusetts, United States of America, 6 Department of Psychiatry, Harvard Medical School, Boston, Massachusetts, United States of America, 7 Department of Psychiatry, Massachusetts General Hospital, Boston, Massachusetts, United States of America

* jturban@stanford.edu



🔓 OPEN ACCESS

**Citation:** Turban JL, King D, Kobe J, Reisner SL, Keuroghlian AS (2022) Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS ONE 17(1): e0261039. https://doi.org/10.1371/journal.pone.0261039

**Editor:** Asa E. Radix, Callen-Lorde Community Health Center, UNITED STATES

**Received:** August 20, 2021

**Accepted:** November 16, 2021

**Published:** January 12, 2022

**Copyright:** © 2022 Turban et al. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Data Availability Statement:** Data for this study were obtained via data sharing agreement from The National Center for Transgender Equality. Data requests may be submitted to them online via https://www.ustranssurvey.org/data-requests-general.

**Funding:** JLT received a pilot research award for general psychiatry residents from The American Academy of Child & Adolescent Psychiatry, supported by Industry Sponsors (Arbor and Pfizer), an award from the National Institute of

## Abstract

### Objective

To examine associations between recalled access to gender-affirming hormones (GAH) during adolescence and mental health outcomes among transgender adults in the U.S.

### Methods

We conducted a secondary analysis of the 2015 U.S. Transgender Survey, a cross-sectional non-probability sample of 27,715 transgender adults in the U.S. Using multivariable logistic regression adjusting for potential confounders, we examined associations between access to GAH during early adolescence (age 14–15), late adolescence (age 16–17), or adulthood (age ≥18) and adult mental health outcomes, with participants who desired but never accessed GAH as the reference group.

### Results

21,598 participants (77.9%) reported ever desiring GAH. Of these, 8,860 (41.0%) never accessed GAH, 119 (0.6%) accessed GAH in early adolescence, 362 (1.7%) accessed GAH in late adolescence, and 12,257 (56.8%) accessed GAH in adulthood. After adjusting for potential confounders, accessing GAH during early adolescence (aOR = 0.4, 95% CI = 0.2–0.6, p < .0001), late adolescence (aOR = 0.5, 95% CI = 0.4–0.7, p < .0001), or adulthood (aOR = 0.8, 95% CI = 0.7–0.8, p < .0001) was associated with lower odds of past-year suicidal ideation when compared to desiring but never accessing GAH. In post hoc analyses, access to GAH during adolescence (ages 14–17) was associated with lower odds of past-year suicidal ideation (aOR = 0.7, 95% CI = 0.6–0.9, p = .0007) when compared to accessing GAH during adulthood.

EXHIBIT
7

Mental Health (MH094612), and a fellowship from The Sorensen Foundation. ASK received a grant from Health Resources and Services Administration Bureau of Primary Health Care (U30CS22742). The sponsors of this research did not play any role in the study design, data collection and analysis, decision to publish, or preparation of the manuscript. AACAP: https://www.aacap.org/AACAP/Press/Press_Releases/2019/Jack_Turban_Receives_AACAP_Pilot_Research_Award_for_General_Psychiatry_Residents_Supported_b.aspx#:~:text=Washington%2C%20DC%2C%20September%2030%2C,2019%2Pilot%20Research%20Award%20for NIMH: nimh.nih.gov Sorensen Foundation: https://sorensenfellowship.org/ Health Resources and Services Administration Bureau of Primary Health Care: https://bphc.hrsa.gov/ The funding sources of this study played no role in study design, data collection, data analysis, or data interpretation.

Competing interests: I have read the journal's policy and the authors of this manuscript have the following competing interests: Dr. Turban reports receiving textbook royalties from Springer Nature and Dr. Keuroghlian reports receiving textbook royalties from McGraw Hill. Dr. Turban has received expert witness payments from the ACLU.

## Conclusion

Access to GAH during adolescence and adulthood is associated with favorable mental health outcomes compared to desiring but not accessing GAH.

## Introduction

A recent representative sample of adolescents in the United States (U.S.) found that 1.8% identified as transgender [1]. Unfortunately, these young people face a range of mental health disparities, including elevated rates of anxiety, depression, and suicide attempts [2]. Suicide attempt prevalence among transgender young adults has been estimated to be as high as 40% [3]. These disparities are generally thought to be due to two processes: gender minority stress and dysphoria related to one's body developing in ways that are incongruent with one's gender identity (i.e., a person's psychological sense of their own gender) [2].

Gender minority stress refers to the ways in which society's mistreatment of transgender people results in worse mental and physical health outcomes. This includes distal factors (gender-related discrimination, gender-related rejection, gender-related victimization, and non-affirmation of gender identity), as well as subsequent proximal factors (internalized transphobia, negative expectations, and concealment) [4]. Creating safe and affirming social environments for transgender adolescents is thus considered paramount in preventing adverse mental health outcomes [5].

In addition to creating safe and affirming environments, care for transgender people often involves the provision of gender-affirming medical interventions to alleviate the psychological distress related to one's body developing in ways that do not align with one's gender identity [6, 7]. This may include pubertal suppression for younger adolescents and gender-affirming hormones (GAH, e.g., estrogen and testosterone) from adolescence onward to induce physical changes that match the person's gender identity [6–8]. Some adolescents may undergo gender-affirming surgery to reduce psychological distress [9, 10]. Of note, past Endocrine Society guidelines recommended that GAH not be considered until an adolescent reaches age 16 [11]. More recent guidelines state that initiation of GAH can be considered as early as age 14, to allow transgender adolescents to undergo puberty at ages more comparable to their peers, and to reduce the risk of delayed bone development due to prolonged pubertal suppression [7]. In this article, we therefore consider two age groups of adolescents who initiated GAH: those who started GAH during late adolescence (i.e., between their 16th and 18th birthdays) and those who started GAH during early adolescence (i.e., between their 14th and 16th birthdays).

To date, there have been six longitudinal cohort studies examining the impact of GAH initiation during adolescence on mental health [12–17]. These studies have generally found improvement in mental health following adolescent GAH initiation, including decreases in internalizing psychopathology, improved general wellbeing, and decreased suicidality. Of note, these studies did not include a comparison group of adolescents who did not access GAH. Furthermore, these studies did not examine separately those who initiated GAH during early or late adolescence, nor did they compare initiation of GAH during adolescence with initiation of GAH during adulthood.

The impact of GAH initiated in adolescence on the mental health of transgender adults is of particular policy relevance today, as several U.S. states have introduced legislation to limit access to GAH for transgender adolescents, despite opposition from major medical organizations including The American Medical Association, The American Academy of Pediatrics,

The American Psychiatric Association, The American Academy of Child & Adolescent Psychiatry, The Endocrine Society, The Pediatric Endocrine Society, and others [18]. This is an area of active policy debate where additional quantitative data are needed to guide policy decisions. Parents of transgender youth have been particularly concerned about these restrictive legislative efforts, with a parent in one recent qualitative sudy noting, "this could mean death for my child" [19].

The current study uses the largest survey of transgender people conducted to date to examine associations between recalled access to GAH during early adolescence (ages 14–15), late adolescence (ages 16–17), or adulthood (age ≥18), and adult mental health outcomes including measures of suicidality. It is the first study of GAH initiation during adolescence that includes a comparison group of those who desired but never accessed GAH. It is also the first to compare access to GAH during adolescence with access to GAH during adulthood. Given the large sample size, we were able to adjust for a wide range of potential confounding variables known to be associated with mental health outcomes for transgender people. We hypothesized that access to GAH during both early and late adolescence would be associated with more favorable mental health outcomes reported in adulthood, when compared to desiring but never accessing GAH.

## Methods

### Study population

The 2015 U.S. Transgender Survey (USTS) is the largest existing dataset of transgender people to date [3]. The cross-sectional non-probability survey was conducted between August and September of 2015. Transgender adults ages 18 years or older were recruited in collaboration with over 400 community organizations and completed measures online. The final survey had 27,715 participants from all 50 U.S. states, as well as Washington D.C., Puerto Rico, and U.S. territories abroad. Because not all transgender people necessarily desire GAH, we restricted the current study to participants who reported ever desiring GAH for gender affirmation, as this is a more clinically relevant group. This was assessed by choosing "hormone therapy/HRT (an acronym for 'Hormone Replacement Therapy')" in response to the question, "Have you ever wanted any of the health care listed below for your gender identity or gender transition? (Mark all that apply)." Options included "counseling/therapy," "hormone treatment/HRT," "puberty blocking hormones (usually used by youth ages 9–16)," and "none of the above." This resulted in inclusion of 21,598 participants.

### Ethical considerations

The protocol for the USTS was approved by the University of California Los Angeles Institutional Review Board. The protocol for the current study was reviewed by The Fenway Institute Institutional Review Board. All participants provided informed consent for study participation.

### Age of initiation of GAH

Participants were divided into four categories. The first group, "wanted but never accessed GAH" (No GAH), reported never accessing GAH despite desiring these medications. The second group consisted of participants who reported they first accessed GAH during early adolescence, defined as the period between their 14th and 16th birthdays (GAH 14–15), which corresponds to the age group most recently added to the Endocrine Society Guidelines [7]. The third group consisted of participants who reported they first accessed GAH during late

adolescence, defined as the period between their 16th and 18th birthdays (GAH 16–17), corresponding to the narrower age group in the prior, 2009 Endocrine Society Guidelines [11]. The fourth group consisted of participants who reported they first accessed GAH after their 18th birthday (GAH ≥ 18).

## Outcomes

Severe psychological distress in the month prior to the survey was defined as a score ≥ 13 on the Kessler-6 Psychological Distress Scale [20]. Binge drinking in the month prior to the survey was defined as drinking 5 or more standard alcoholic drinks on a single occasion, a threshold for use in research with transgender adults that has been discussed in prior reports [21]. Lifetime illicit drug use (excluding marijuana) was also assessed as a binary "yes" or "no" self-report outcome. Measures of suicidality were examined, including suicidal ideation during the year prior to the survey, suicidal ideation with plan during the prior year, suicide attempt during the prior year, and suicide attempt requiring hospitalization during the prior year [8]. All suicidality measures were binary outcome variables in which participants reported "yes" or "no."

## Demographic and other potential confounding variables

Demographic and other potential confounding variables that are known to be associated with adverse mental health outcomes among transgender people were collected for participants and included age at time of survey completion (U.S. census categories), gender identity, sex assigned at birth, sexual orientation, race/ethnicity (U.S. census categories), level of family support for gender identity (unsupportive, neutral, supportive, or not asked because participant had not disclosed being transgender to their family) [22], relationship status, level of education, employment status, household income, having ever received pubertal suppression (e.g., treatment with gonadotropin-releasing hormone agonists) [8], having ever been exposed to gender identity conversion efforts [23], and having experienced any harassment based on gender identity in K-12 (verbal, physical, or sexual) [5].

## Statistical analyses

All statistical analyses were performed with SAS 9.4. The data in the analytic sample had minimal missing data for both exposure and outcome variables. Each control variable had under 8% missing data within all comparison groups. Therefore no imputation was performed, since listwise deletion with missingness as high as 10% can be acceptable under particular assumptions of missingness [24].

Analyses were performed for the three age groups of participants who accessed GAH and participants who desired but never accessed GAH, on demographic variables listed above. Variables were analyzed with Rao-Scott $\chi^2$ tests. Logistic regression tests were used to identify demographics and other potential confounding variables associated with each outcome.

Multivariable logistic regression was then performed, comparing mental health outcomes for participants who reported access to GAH during early adolescence, late adolescence, or adulthood with those for participants who desired but never accessed GAH. Models were fit to test associations with mental health outcomes, after adjusting for demographic and potential confounding variables that were found to be associated with each outcome. All hypothesis tests were 2-sided. The percentage decrease in adjusted odds for the outcomes was calculated from the model coefficients for each age group.

In order to account for multiple comparisons, a modified Bonferroni correction was applied for the approximately 50 comparisons performed. A significance threshold of 0.001 (.05/50) was used for our analyses.

After all aforementioned analyses were completed, we identified further analyses of interest that were not included in the original study design, and therefore not included in the Bonferroni correction. In these post hoc analyses, we compared access to GAH during adolescence (ages 14–17) to access during adulthood (ages ≥18), and access to GAH during early adolescence (ages 14–15) to access during late adolescence (ages 16–17).

## Results

### Demographic differences & potential confounding variables

In total, 21,598 participants (77.9%) reported ever desiring GAH. Of these, 8,860 (41.0%) never accessed GAH, 119 (0.6%) reported access to GAH in early adolescence, 362 (1.7%) reported access to GAH in late adolescence, and 12,257 (56.8%) reported access to GAH in adulthood. Significant differences were found based on age at time of study participation, gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, relationship status, level of education, employment status, household income, having ever received pubertal suppression, having ever been exposed to gender identity conversion efforts, and having experienced verbal, physical, or sexual harassment based on gender identity in K-12 (Table 1).

### GAH during early adolescence

The median age of participants who reported accessing GAH during early adolescence was 21.0 (IQR 18.0–35.0). After adjusting for demographic and potential confounding variables, recalled access to GAH during early adolescence was associated with lower odds of past-month severe psychological distress (aOR = 0.3, 95% CI = 0.2–0.4, p < .0001) and past-year suicidal ideation (aOR = 0.4, 95% CI = 0.2–0.6, p < .001) when compared to desiring GAH but never accessed them. For participants who recalled GAH access in early adolescence, these results represent a 222% decrease in adjusted odds for past-month severe psychological distress and a 135% decrease for past-year suicidal ideation. We detected no difference for other mental health variables measured (Table 2).

### GAH during late adolescence

The median age of participants who reported accessing GAH during late adolescence was 19.0 (IQR 18.0–22.0). After adjusting for demographic and potential confounding variables, recalled access to GAH during late adolescence was associated with lower odds of past-month severe psychological distress (aOR = 0.3, 95% CI = 0.3–0.4, p < .0001) and past-year suicidal ideation (aOR = 0.5, 95% CI = 0.4–0.7, p < .0001) when compared to desiring GAH but never accessing them. These results represent a 153% decrease in the adjusted odds for past-month severe psychological distress and a 62% decrease for past-year suicide ideation. We detected no difference for other mental health variables measured (Table 2).

### GAH during adulthood

The median age of participants who reported accessing GAH during adulthood was 31.0 (IQR 25.0–45.0). After adjusting for demographic and potential confounding variables, participants who recalled access to GAH during adulthood had lower odds of past-month severe psychological distress (aOR = 0.6, 95% CI = 0.5–0.6, p < .0001) and past-year suicidal ideation

PLOS ONE

GAH during adolescence & adult mental health

**Table 1. Sample demographics.**

| Total N = 21,598 | | No GAH | GAH 14–15 | GAH 16–17 | GAH ≥ 18 | |
|---|---|---|---|---|---|---|
| | | n = 8860 | n = 119 | n = 362 | n = 12257 | |
| | | n (%) | n (%) | n (%) | n (%) | p |
| Age (Census) | | | | | | **<0.001** |
| | 18–24 | 5315 (60.0) | 75 (63.03) | 297 (82.04) | 2856 (23.30) | |
| | 25–44 | 2653 (29.9) | 23 (19.33) | 54 (14.92) | 6285 (51.28) | |
| | 45–64 | 753 (8.5) | 19 (15.97) | 11 (3.04) | 2660 (21.70) | |
| | 65+ | 139 (1.57) | 2 (1.68) | 0 (0.00) | 456 (3.72) | |
| Gender Identity | | | | | | **<0.001** |
| | Trans man / male | 02620 (29.57) | 00048 (40.34) | 00214 (59.12) | 04713 (38.45) | |
| | Trans woman / female | 02324 (26.23) | 00054 (45.38) | 00109 (30.11) | 06340 (51.73) | |
| | AFAB GQ/NB | 02829 (31.93) | 00013 (10.92) | 00035 (9.67) | 00834 (6.80) | |
| | AMAB GQ/NB | 00766 (8.65) | 00004 (3.36) | 00004 (1.10) | 00330 (2.69) | |
| | Other | 00321 (3.62) | 00000 (0.00) | 00000 (0.00) | 00040 (0.33) | |
| Sex Assigned at Birth | | | | | | **<0.001** |
| | Female | 05475 (61.79) | 00061 (51.26) | 00249 (68.78) | 05561 (45.37) | |
| | Male | 03385 (38.21) | 00058 (48.74) | 00113 (31.22) | 06696 (54.63) | |
| Sexual Orientation | | | | | | **<0.001** |
| | Asexual | 01220 (13.77) | 00006 (5.04) | 00022 (6.08) | 00771 (06.29) | |
| | Bisexual | 01391 (15.70) | 00007 (5.88) | 00056 (15.47) | 01900 (15.50) | |
| | Gay/Lesbian/Same Gender Loving | 01337 (15.09) | 00022 (18.49) | 00064 (17.68) | 02535 (20.68) | |
| | Heterosexual/Straight | 00743 (8.39) | 00031 (26.05) | 00071 (19.61) | 02019 (16.47) | |
| | Pansexual | 01875 (21.16) | 00021 (17.65) | 00066 (18.23) | 01877 (15.31) | |
| | Queer | 01573 (17.75) | 00019 (15.97) | 00058 (16.02) | 02525 (20.60) | |
| | Other | 00721 (08.14) | 00013 (10.92) | 00025 (6.91) | 00630 (5.14) | |
| Race / Ethnicity | | | | | | **<0.001** |
| | Alaska Native/American Indian | 00105 (1.19) | 00002 (1.68) | 00003 (0.83) | 00149 (1.22) | |
| | Asian/Native Hawaiian/Pacific Islander | 00273 (3.08) | 00008 (6.72) | 00010 (2.76) | 00292 (2.38) | |
| | Biracial/Multiracial | 00475 (5.36) | 00009 (7.56) | 00027 (7.46) | 00571 (4.66) | |
| | Black/African American | 00210 (2.37) | 00011 (9.24) | 00016 (4.42) | 00378 (3.08) | |
| | Latin/Hispanic | 00499 (5.63) | 00008 (6.72) | 00025 (6.91) | 00572 (4.67) | |
| | White/Middle Eastern/North African | 07298 (82.37) | 00081 (68.07) | 00281 (77.62) | 10295 (83.99) | |
| Family Support of Gender Identity | | | | | | **<0.001** |
| | Not Asked (Not Out to Family as Transgender) | 03067 (34.64) | 00003 (2.52) | 00015 (4.14) | 00901 (7.36) | |
| | Neutral | 01564 (17.66) | 00012 (10.08) | 00032 (8.84) | 01980 (16.16) | |
| | Supportive | 02904 (32.80) | 00091 (76.47) | 00291 (80.39) | 07321 (59.77) | |

*(Continued)*

**PLOS ONE**

GAH during adolescence & adult mental health

---

**Table 1.** (Continued)

| | Total N = 21,598 | No GAH | GAH 14–15 | GAH 16–17 | GAH ≥ 18 | |
|---|---|---|---|---|---|---|
| | | n = 8860 | n = 119 | n = 362 | n = 12257 | |
| | | n (%) | n (%) | n (%) | n (%) | p |
| | Unsupportive | 01319 (14.90) | 00013 (10.92) | 00024 (6.63) | 02047 (16.71) | |
| | Missing | 6 (0.07) | 0 (0.00) | 0 (00.00) | 8 (0.08) | |
| Relationship Status | | | | | | <0.001 |
| | Partnered | 04028 (46.90) | 00049 (43.36) | 00135 (38.03) | 06257 (52.99) | |
| | Unpartnered | 04560 (53.10) | 00064 (56.64) | 00220 (61.97) | 05551 (47.01) | |
| | Other | 272 (3.07) | 6 (5.04) | 7 (1.93) | 449 (3.66) | |
| Education | | | | | | <0.001 |
| | Bachelor's degree or higher | 02219 (25.05) | 00023 (19.33) | 00048 (13.26) | 05911 (48.23) | |
| | Some college (no degree)/Associate's | 04555 (51.41) | 00061 (51.26) | 00171 (47.24) | 05199 (42.42) | |
| | High school grad (including GED) | 01617 (18.25) | 00023 (19.33) | 00099 (27.35) | 00975 (7.95) | |
| | Less than high school | 00469 (5.29) | 00012 (10.08) | 00044 (12.15) | 00172 (1.40) | |
| Employment Status | | | | | | <0.001 |
| | Employed | 05213 (59.10) | 00060 (50.85) | 00189 (52.50) | 08788 (72.01) | |
| | Out of the labor force | 02038 (23.10) | 00039 (33.05) | 00108 (30.00) | 02283 (18.71) | |
| | Unemployed | 01570 (17.80) | 00019 (16.10) | 00063 (17.50) | 01133 (9.28) | |
| | Excluded (status unclear) | 4 (0.05) | 0 (0) | 2 (00.55) | 2 (0.02) | |
| | Missing | 35 (0.40) | 1 (0.48) | 0 (0) | 51 (0.42) | |
| Household Income | | | | | | <0.001 |
| | $1 to $9,999 | 01163 (14.75) | 00016 (14.81) | 00041 (12.65) | 01160 (10.10) | |
| | $10,000 to $24,999 | 01714 (21.73) | 00013 (12.04) | 00053 (16.36) | 02252 (19.62) | |
| | $100,000 or more | 01136 (14.40) | 00023 (21.30) | 00079 (24.38) | 02064 (17.98) | |
| | $25,000 to $49,999 | 01717 (21.77) | 00028 (25.93) | 00059 (18.21) | 02652 (23.10) | |
| | $50,000 to $100,000 | 01772 (22.47) | 00024 (22.22) | 00071 (21.91) | 03035 (26.44) | |
| | No income | 00385 (4.88) | 00004 (3.70) | 00021 (6.48) | 00317 (2.76) | |
| | Excluded | 275 (3.10) | 7 (5.88) | 11 (3.04) | 313 (2.55) | |
| | Missing | 698 (7.88) | 4 (3.36) | 27 (7.46) | 464 (3.79) | |
| Ever Received Pubertal Suppression | | | | | | <0.001 |
| | Yes | 00031 (0.36) | 00041 (34.45) | 00044 (12.15) | 00221 (01.80) | |
| | No | 08659 (99.64) | 00078 (65.55) | 00318 (87.85) | 12036 (98.20) | |
| | Missing | 00170 (1.92) | 0 (0.00)) | 0 (0.00)) | 0 (0.00)) | |
| Ever Experienced Gender Identity Conversion Efforts | | | | | | <0.001 |

*(Continued)*

PLOS ONE

GAH during adolescence & adult mental health

**Table 1.** (Continued)

| | | No GAH | GAH 14–15 | GAH 16–17 | GAH ≥ 18 | |
|---|---|---|---|---|---|---|
| Total N = 21,598 | | n = 8860 | n = 119 | n = 362 | n = 12257 | |
| | | n (%) | n (%) | n (%) | n (%) | p |
| | Yes | 00998 (11.28) | 00031 (26.27) | 00092 (25.48) | 02208 (18.03) | |
| | No | 07852 (88.72) | 00087 (73.73) | 00269 (74.52) | 10037 (81.97) | |
| | Missing | 10 (0.11) | 1 (0.84) | 1 (0.28) | 12 (0.10) | |
| K-12 Harassment | | | | | | <**0.001** |
| | Verbal, physical or sexual | 2026 (22.9) | 80 (67.2) | 226 (62.4) | 2612 (21.3) | |
| | None | 6834 (77.1) | 39 (32.8) | 136 (37.6) | 9645 (78.7) | |

Descriptive statistics for transgender adults in the U.S. who ever desired gender-affirming hormones (GAH) for their gender identity or gender transition, comparing those who never accessed this treatment (No GAH), those who accessed GAH between their 14th and 16th birthdays (GAH 14–15), those who accessed GAH after their 16th birthday and before their 18th birthday (GAH 16–18) and those who accessed GAH after their18th birthday (GAH ≥ 18).

Abbreviations: AFAB (assigned female at birth), AMAB (assigned male at birth), GQ/NB (gender queer or non-binary).

https://doi.org/10.1371/journal.pone.0261039.t001

(aOR = 0.8, 95% CI = 0.7–0.8, p < .0001) when compared to those who desired GAH but never accessed them. Access to GAH during adulthood was associated with an 81% decrease in adjusted odds of past-month severe psychological distress and a 21% decrease in past-year suicidal ideation. Access to GAH during adulthood was also associated with greater odds of past-month binge drinking (aOR = 1.2, 95% CI = 1.1–1.3, p < .0001) and lifetime illicit drug use (aOR = 1.7, 95% CI = 1.6–1.8, p < .0001) when compared to desiring but never accessing GAH. Results indicated an adjusted odds increase of 20% for past-month binge drinking and 70% increase for lifetime illicit drug use. We detected no difference for other mental health variables measured (Table 2).

### Raw frequencies of outcome variables

Raw frequencies for outcome variables are shown in Table 3.

### Post hoc analyses

**GAH during adolescence vs. GAH during adulthood.** After adjusting for demographic and potential confounding variables, access to GAH during adolescence (ages 14–17) was associated with lower odds of past-month severe psychological distress (aOR = 0.6, 95% CI = 0.5–0.8, p < .0001), past-year suicidal ideation (aOR = 0.7, 95% CI = 0.6–0.9, p = .0007), past-month binge drinking (aOR = 0.7, 95% CI = 0.5–0.9, p = .001), and lifetime illicit drug use (aOR = 0.7, 95% CI = 0.5–0.8, p = .0003) when compared to access to GAH during adulthood. We detected no difference for other mental health variables measured (Table 4).

**Access to GAH during early vs. late adolescence.** After adjusting for demographic and potential confounding variables, we detected no difference in odds of any mental health variables measured when comparing access to GAH during early adolescence with access to GAH during late adolescence (Table 4).

**Lifetime but no past year suicidality.** Due to the cross-sectional nature of the study, it was possible that we detected an association between favorable mental health outcomes and access to GAH because people with better mental health were more likely to be able to access GAH. Given that baseline mental health status could confound associations between access to GAH and mental health outcomes, in post hoc analyses we examined two outcome measures

**Table 2. Outcomes for participants who accessed gender-affirming hormones (estrogen or testosterone).**

| | Participants who Accessed GAH | | | | | | | | | | | |
| | N = 12,598 | | | | | | | | | | | |
| | Accessed GAH at Age 14 or 15 | | | | Accessed GAH at Age 16 or 17 | | | | Accessed GAH at Age ≥ 18 | | | |
| | n = 119 | | | | n = 362 | | | | n = 12257 | | | |
| | OR (95% CI) | p | aOR (95% CI) | p | OR (95% CI) | p | aOR (95% CI) | p | OR (95% CI) | p | aOR (95% CI) | p |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Suicidality (Past 12 months)** | | | | | | | | | | | | |
| Past-year suicidal ideation [a] | 0.5 (0.3–0.7) | .0001 | 0.4 (0.2–0.6) | **<.0001** | 1.0 (0.8–1.2) | .73 | 0.5 (0.4–0.7) | **<.0001** | 0.5 (0.5–0.6) | <.0001 | 0.8 (0.7–0.8) | **<.0001** |
| Past-year suicidal ideation with plan [b] | 1.3 (0.8–2.4) | .31 | 0.8 (0.4–1.6) | .58 | 1.1 (0.9–1.5) | .41 | 0.9 (0.7–1.2) | .49 | 0.8 (0.8–0.9) | <.0001 | 0.9 (0.8–1.0) | .09 |
| Past-year suicide attempt [c] | 1.0 (0.5–2.2) | .99 | 0.4 (0.2–1.1) | .08 | 1.4 (1.0–2.0) | .04 | 0.9 (0.6–1.4) | .79 | 0.8 (0.8–0.9) | .002 | 1.0 (0.9–1.1) | .89 |
| Past-year suicide attempt requiring inpatient hospitalization [d] | –– | –– | –– | –– | 2.2 (1.2–4.0) | .01 | 2.2 (1.2–4.2) | .01 | 1.4 (1.1–1.7) | .002 | 1.2 (0.9–1.5) | .26 |
| **Mental Health & Substance Use** | | | | | | | | | | | | |
| Past-month severe psychological distress (K6 ≥ 13) [c] | 0.5 (0.3–0.7) | .0004 | 0.3 (0.2–0.4) | **<.0001** | 0.6 (0.5–0.8) | <.0001 | 0.3 (0.3–0.4) | **<.0001** | 0.4 (0.3–0.4) | <.0001 | 0.6 (0.5–0.6) | **<.0001** |
| Past-month binge drinking [e] | 1.6 (1.1–2.3) | .02 | 1.6 (1.0–2.4) | .04 | 0.8 (0.6–1.1) | .17 | 0.9 (0.6–1.1) | .27 | 1.2 (1.1–1.2) | <.0001 | 1.2 (1.1–1.3) | **<.0001** |
| Lifetime illicit drug use [f] | 1.8 (1.2–2.6) | .003 | 1.5 (1.0–2.2) | .08 | 1.2 (1.0–1.6) | .08 | 1.3 (1.0–1.6) | .07 | 2.1 (1.9–2.2) | <.0001 | 1.7 (1.6–1.8) | **<.0001** |

Mental health outcomes of transgender adults who recalled access to gender-affirming hormones (GAH) during various age groups. Reference group for all analyses is participants who desired GAH but did not access them. All models adjusted for age, partnership status, employment status, K-12 harassment, and having experienced gender identity conversion efforts.

Abbreviations: OR (odds ratio), aOR (adjusted odds ratio), 95% CI (95% confidence interval).

[a] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, educational attainment, and total household income.

[b] Model also adjusted for sexual orientation, race/ethnicity, educational attainment, and total household income.

[c] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, educational attainment, total household income, and having received pubertal suppression.

[d] Model also adjusted for family support of gender identity. Only one participant in the GAH < 16 group endorsed a past-year suicide attempt requiring inpatient hospitalization, precluding calculation of an aOR for this outcome.

[e] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, family support of gender identity, educational attainment, and total household income.

[f] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, and educational attainment.

https://doi.org/10.1371/journal.pone.0261039.t002

relevant to this question of temporality: lifetime but no past-year suicidal ideation, and lifetime but no past-year suicide attempt. We found that access to GAH in adulthood was associated with greater odds of lifetime but no past-year suicidal ideation (aOR = 1.4, 95% CI = 1.3–1.5, p < .0001) when compared to desiring but not accessing GAH (Table 5). The association of access to GAH during late adolescence with lifetime but no past year suicidal ideation (aOR = 1.4, 95% CI = 1.1–1.8, p = .005) was no longer significant after Bonferroni correction, though some have noted that Bonferroni adjustment may be overly conservative, suggesting that this finding may be considered significant [25].

## Discussion

In this large national cross-sectional non-probability study, transgender people who accessed GAH during early adolescence, late adolescence, or adulthood had better mental health

**Table 3. Raw outcome frequencies of mental health outcomes.**

| Total N = 21,598 | No GAH | GAH 14–15 | GAH 16–17 | GAH ≥ 18 |
|---|---|---|---|---|
| | n = 8860 | n = 119 | n = 362 | n = 12257 |
| | n (%) | n (%) | n (%) | n (%) |
| **Suicidality (Past 12 months)** | | | | |
| Past-year suicidal ideation | 5144 (58.1) | 48 (40.3) | 40 (33.6) | 5237 (42.7) |
| Past-year suicidal ideation with plan | 2731 (30.8) | 29 (24.3) | 39 (32.8) | 02537 (20.7) |
| Past-year suicide attempt | 853 (9.6) | 8 (6.7) | 40 (33.6) | 756 (6.2) |
| Past-year suicide attempt requiring inpatient hospitalization | 220 (2.5) | 1 (0.8) | 40 (33.6) | 247 (2.0) |
| **Mental Health & Substance Use** | | | | |
| Past-month severe psychological distress (K6 ≥ 13) | 4545 (51.3) | 40 (33.6) | 145 (40.1) | 3419 (27.9) |
| Past-month binge drinking | 2083 (23.5) | 39 (32.8) | 74 (20.4) | 3214 (26.2) |
| Lifetime illicit drug use | 1918 (21.6) | 40 (33.6) | 93 (25.7) | 4455 (36.3) |

https://doi.org/10.1371/journal.pone.0261039.t003

outcomes when compared to those who desired but were unable to access GAH. Given the substantial mental health disparities faced by transgender people, these results are of particular importance [26].

For each time period of GAH initiation examined (early adolescence, late adolescence, and adulthood), access to GAH was associated with lower odds of past-year suicidal ideation and past-month severe psychological distress. When we compared participants who accessed GAH during adolescence (ages 14–17) with those who accessed GAH during adulthood (18+),

**Table 4. Outcomes for participants who accessed gender-affirming hormones (estrogen or testosterone).**

| | Accessed GAH at Age 14–17 | | | | Accessed GAH at Age 14 or 15 | | | |
|---|---|---|---|---|---|---|---|---|
| | (compared to GAH access at age ≥ 18) | | | | (compared to GAH access at age 16 or 17) | | | |
| | n = 481 | | | | n = 119 | | | |
| | OR (95% CI) | p | aOR (95% CI) | p | OR (95% CI) | p | aOR (95% CI) | p |
| **Suicidality (Past 12 months)** | | | | | | | | |
| Past-year suicidal ideation [a] | 1.5 (1.3–1.8) | < .0001 | 0.7 (0.6–0.9) | **.0007** | 0.5 (0.3–0.8) | .002 | 0.7 (0.4–1.2) | .16 |
| Past-year suicidal ideation with plan [b] | 1.4 (1.1–1.8) | .009 | 1.1 (0.8–1.5) | .51 | 1.2 (0.6–2.3) | .58 | 1.0 (0.5–1.9) | .88 |
| Past-year suicide attempt [c] | 1.6 (1.2–2.2) | .003 | 1.0 (0.7–1.4) | .82 | 0.7 (0.3–1.6) | .40 | 0.4 (0.1–1.3) | .12 |
| Past-year suicide attempt requiring inpatient hospitalization [d] | 1.3 (0.7–2.3) | .35 | 1.7 (0.9–3.2) | .08 | 0.2 (0.0–1.6) | .13 | 0.2 (0.0–2.1) | .19 |
| **Mental Health & Substance Use** | | | | | | | | |
| Past-month severe psychological distress (K6 ≥ 13) [c] | 1.7 (1.4–2.0) | < .0001 | 0.6 (0.5–0.8) | **< .0001** | 0.8 (0.5–1.2) | .26 | 0.7 (0.4–1.3) | .30 |
| Past-month binge drinking [e] | 0.9 (0.7–1.1) | .17 | 0.7 (0.5–0.9) | **.001** | 1.9 (1.2–3.0) | .006 | 2.0 (1.2–3.5) | .01 |
| Lifetime illicit drug use [f] | 0.7 (0.5–0.8) | < .001 | 0.7 (0.5–0.8) | **.0003** | 1.4 (0.9–2.3) | .10 | 1.0 (0.6–1.7) | .98 |

All models adjusted for age, partnership status, employment status, K-12 harassment, and having experienced gender identity conversion efforts.

Abbreviations: OR (odds ratio), aOR (adjusted odds ratio), 95% CI (95% confidence interval).

[a] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, educational attainment, and total household income.

[b] Model also adjusted for sexual orientation, race/ethnicity, educational attainment, and total household income.

[c] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, educational attainment, total household income, and having received pubertal suppression.

[d] Model also adjusted for family support of gender identity.

[e] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, family support of gender identity, educational attainment, and total household income.

[f] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, and educational attainment.

https://doi.org/10.1371/journal.pone.0261039.t004

**Table 5. Lifetime but no past-year suicide ideation and attempts for participants who accessed gender-affirming hormones (estrogen or testosterone).**

| | Participants who Accessed GAH | | | | | |
|---|---|---|---|---|---|---|
| | N = 12,598 | | | | | |
| | Accessed GAH at Age 14 or 15 | | Accessed GAH at Age 16 or 17 | | Accessed GAH at Age $\geq$ 18 | |
| | n = 119 | | n = 362 | | n = 12,257 | |
| | aOR (95% CI) | p | aOR (95% CI) | p | aOR (95% CI) | p |
| Lifetime suicidal ideation and no past-year ideation [a] | 1.3 (0.8–2.0) | .28 | 1.4 (1.1–1.8) | .005 | 1.4 (1.3–1.5) | < .0001 |
| Lifetime suicide attempt and no past-year attempt [b] | 0.8 (0.5–1.2) | .24 | 0.7 (0.6–1.0) | .03 | 1.0 (0.9–1.1) | .67 |

Mental health outcomes of transgender adults who recalled access to gender-affirming hormones (GAH) during various age groups. Reference group for all analyses is participants who desired GAH but did not access them. Both models adjusted for age, partnership status, employment status, K-12 harassment, and having experienced gender identity conversion efforts.

[a] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, educational attainment, and total household income.

[b] Model also adjusted for gender identity, sex assigned at birth, sexual orientation, race/ethnicity, family support of gender identity, educational attainment, total household income, and having received pubertal suppression.

https://doi.org/10.1371/journal.pone.0261039.t005

participants who accessed GAH earlier had better mental health outcomes, including lower odds of past-year suicidal ideation, past-month severe psychological distress, past-month binge drinking, and lifetime illicit drug use. These results argue against waiting until adulthood to offer GAH to transgender adolescents and suggest that doing so may put patients at greater mental health risk.

The current study has a few advantages over past published studies in this area. While past studies have not included a comparison group of people who did not access GAH and were also underpowered to adjust for potential coundfounders, this large sample size enabled comparison of participants who reported access to GAH to those who desired but did not access GAH, while adjusting for a wide range of potential confounding variables known to be associated with mental health outcomes for transgender people.

One unexpected finding was that participants who initiated GAH during adulthood, compared to those who desired but never accessed GAH, had greater odds of past-month binge drinking and lifetime illicit substance use. Transgender people often become more socially engaged following the increased confidence that results from gender affirmation, which may partly explain these results [27]. Given the high prevalence of substance use disorders in this population, clinicians ought to routinely screen for substance use disorders among transgender people, and researchers ought to focus on development of culturally responsive substance use disorder prevention and treatment interventions with transgender communities [27].

Notably, even participants who recalled access to GAH had high rates of past-year suicidal ideation. Though access to GAH during adolescence appears to be related to more favorable mental health outcomes, transgender people face a range of other psychosocial stressors that contribute to chronic minority stress, including but not limited to employment discrimination, lack of safe access to public facilities, and physical violence [4]. Future epidemiological and interventional research is needed to understand and address chronic minority stress among transgender people who access GAH as well as those who do not. For transgender adolescents, creating safe and affirming school environments appears to be of particular importance [28], in addition to providing gender-affirming medical care, as well as psychological, legal and surgical gender affirmation as needed [6].

This study also suggests that a large proportion of transgender people desire but never access GAH. Though prevalence in a non-probability sample should be interpreted with

caution, 41% of those who desired GAH in this study reported that they were unable to access them. Barriers to accessing prescribed GAH, in addition to leaving many without treatment, may also drive use of non-prescribed GAH, which is highly prevalent and associated with stigmatizing healthcare policies [29]. Future studies ought to examine if non-prescribed GAH use, when compared to prescribed GAH, is linked to worse mental health outcomes or adverse physical health outcomes (e.g., blood clot risk from estradiol use without standard medical monitoring).

## Strengths and limitations

Strengths of this study include its large sample size and broad geographic representation within the U.S. The large sample size enabled adjustment for a wide range of potential confounding variables. Limitations include its non-probability cross-sectional design, which reduces generalizability and limits determination of causality. It is possible that people with better mental health status at baseline are more likely to be able to access GAH, thus confounding associations between GAH access and adult mental health outcomes measured: we therefore examined lifetime but no past-year suicidal ideation as an outcome, with results suggesting a lack of reverse causation due to such confounding. Nonetheless, this method is imperfect for investigating mental health changes following GAH, and future longitudinal studies are needed. Longitudinal waitlist control studies would be of particular value. Though a randomized controlled trial would help determine causality, many have noted that such a trial design is unethical in this context [2]. Age of GAH initiation reported by participants at time of data collection is vulnerable to recall bias. It is possible that participants in older age cohorts (45–65; 65+) were more vulnerable to recall bias; in our clinical experience, however, starting GAH is a major event in one's life, making it less susceptible to recall bias than more routine events [30]. It was unexpected that the median age at time of survey completion for participants who recalled accessing GAH in early adolescence was older than for those in the late adolescence group, which may be indicative of recall bias. Of note, though it is often presumed that GAH were not offered to adolescents in the U.S. until the past three decades, recent historical analyses have pointed out that adolescents have been receiving GAH as early as the 1970s [31]. The 2015 USTS sample is younger, with fewer racial minorities, fewer heterosexual participants, and higher educational attainment when compared with probability samples of TGD people in the U.S [32]. Because all participants identified as non-cisgender, those who initiated GAH and subsequently identified as cisgender would not necessarily be represented in this study; existing literature, however, suggests that this is a rare occurrence [2, 33].

## Conclusion

This study found that transgender people who accessed GAH during early or late adolescence had a lower odds of past-month suicidal ideation and past-month severe psychological distress in adulthood, when compared to those who desired but did not access GAH, after adjusting for a range of potential confounding variables. The findings support updated 2017 recomendations from The Endocrine Society [7] and WPATH [6] that these medical interventions be made available for transgender adolescents. The results also provide additional evidence to suggest that legislation restricting transgender adolescents' access to gender-affirming medical care would result in adverse mental health outcomes [18].

## Acknowledgments

The authors would like to thank The National Center for Transgender Equality for sharing data from the 2015 USTS.

## Author Contributions

**Conceptualization:** Jack L. Turban, Dana King, Sari L. Reisner, Alex S. Keuroghlian.

**Data curation:** Julia Kobe.

**Formal analysis:** Dana King, Julia Kobe.

**Funding acquisition:** Jack L. Turban, Alex S. Keuroghlian.

**Investigation:** Jack L. Turban, Dana King.

**Methodology:** Jack L. Turban, Dana King, Julia Kobe, Sari L. Reisner, Alex S. Keuroghlian.

**Project administration:** Jack L. Turban, Alex S. Keuroghlian.

**Resources:** Alex S. Keuroghlian.

**Supervision:** Sari L. Reisner, Alex S. Keuroghlian.

**Writing – original draft:** Jack L. Turban.

**Writing – review & editing:** Jack L. Turban, Dana King, Julia Kobe, Sari L. Reisner, Alex S. Keuroghlian.

## References

1. Johns MM, Lowry R, Andrzejewski J, Barrios LC, Demissie Z, McManus T, et al. Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students—19 states and large urban school districts, 2017. Morbidity and Mortality Weekly Report. 2019; 68(3):67. https://doi.org/10.15585/mmwr.mm6803a3 PMID: 30677012

2. Turban JL, Ehrensaft D. Research Review: Gender identity in youth: treatment paradigms and controversies. Journal of Child Psychology and Psychiatry. 2018; 59(12):1228–43. https://doi.org/10.1111/jcpp.12833 PMID: 29071722

3. James S., Herman J., Rankin S., Keisling M., Mottet L., & Anaf M. (2016). The report of the 2015 US Transgender Survey. Washington, DC: National Center for Transgender Equality

4. Hendricks ML, Testa RJ. A conceptual framework for clinical work with transgender and gender nonconforming clients: An adaptation of the Minority Stress Model. Professional Psychology: Research and Practice. 2012; 43(5):460.

5. Hatchel T, Valido A, De Pedro KT, Huang Y, Espelage DL. Minority stress among transgender adolescents: The role of peer victimization, school belonging, and ethnicity. Journal of Child and Family Studies. 2019; 28(9):2467–76.

6. Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. International Journal of Transgenderism. 2012; 13(4):165–232.

7. Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. ?2017; 102(11):3869–903. https://doi.org/10.1210/jc.2017-01658 PMID: 28945902

8. Turban JL, King D, Carswell JM, Keuroghlian AS. Pubertal suppression for transgender youth and risk of suicidal ideation. Pediatrics. 2020; 145(2). https://doi.org/10.1542/peds.2019-1725 PMID: 31974216

9. Mehringer JE, Harrison JB, Quain KM, Shea JA, Hawkins LA, Dowshen NL. Experience of chest dysphoria and masculinizing chest surgery in transmasculine youth. Pediatrics. 2021; 147(3). https://doi.org/10.1542/peds.2020-013300 PMID: 33536330

10. Olson-Kennedy J, Warus J, Okonta V, Belzer M, Clark LF. Chest reconstruction and chest dysphoria in transmasculine minors and young adults: comparisons of nonsurgical and postsurgical cohorts. JAMA Pediatrics. 2018; 172(5):431–6. https://doi.org/10.1001/jamapediatrics.2017.5440 PMID: 29507933

11. Hembree WC, Cohen-Kettenis P, Delemarre-Van De Waal HA, Gooren LJ, Meyer WJ III, Spack NP, et al. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. The Journal of Clinical Endocrinology & Metabolism. 2009; 94(9):3132–54. https://doi.org/10.1210/jc.2009-0345 PMID: 19509099

12. Achille C, Taggart T, Eaton NR, Osipoff J, Tafuri K, Lane A, et al. Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary

results. International Journal of Pediatric Endocrinology. 2020; 2020(1):1–5. https://doi.org/10.1186/s13633-020-00078-2 PMID: 32368216

13.  Allen LR, Watson LB, Egan AM, Moser CN. Well-being and suicidality among transgender youth after gender-affirming hormones. Clinical Practice in Pediatric Psychology. 2019; 7(3):302.

14.  de Lara DL, Rodríguez OP, Flores IC, Masa JLP, Campos-Muñoz L, Hernández MC, et al. Psychosocial assessment in transgender adolescents. Anales de Pediatría (English Edition). 2020; 93(1):41–8.

15.  De Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics. 2014; 134 (4):696–704. https://doi.org/10.1542/peds.2013-2958 PMID: 25201798

16.  Kaltiala R, Heino E, Työläjärvi M, Suomalainen L. Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. Nordic journal of psychiatry. 2020; 74 (3):213–9. https://doi.org/10.1080/08039488.2019.1691260 PMID: 31762394

17.  Kuper LE, Stewart S, Preston S, Lau M, Lopez X. Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy. Pediatrics. 2020; 145(4). https://doi.org/10.1542/peds.2019-3006 PMID: 32220906

18.  Turban JL, Kraschel KL, Cohen IG. Legislation to Criminalize Gender-Affirming Medical Care for Transgender Youth. JAMA. 2021; 325(22):2251–2252. https://doi.org/10.1001/jama.2021.7764 PMID: 34028489

19.  Kidd KM, Sequeira GM, Paglisotti T, Katz-Wise SL, Kazmerski TM, Hillier A, et al. "This Could Mean Death for My Child": Parent Perspectives on Laws Banning Gender-Affirming Care for Transgender Adolescents. Journal of Adolescent Health. 2021; 68(6):1082–8. https://doi.org/10.1016/j.jadohealth.2020.09.010 PMID: 33067153

20.  Kessler RC, Green JG, Gruber MJ, Sampson NA, Bromet E, Cuitan M, et al. Screening for serious mental illness in the general population with the K6 screening scale: results from the WHO World Mental Health (WMH) survey initiative. International journal of methods in psychiatric research. 2010; 19(0 1):4. https://doi.org/10.1002/mpr.310 PMID: 20527002

21.  Gilbert PA, Pass LE, Keuroghlian AS, Greenfield TK, Reisner SL. Alcohol research with transgender populations: A systematic review and recommendations to strengthen future studies. Drug and Alcohol Dependence. 2018. https://doi.org/10.1016/j.drugalcdep.2018.01.016 PMID: 29571076

22.  Klein A, Golub SA. Family rejection as a predictor of suicide attempts and substance misuse among transgender and gender nonconforming adults. LGBT Health. 2016; 3(3):193–9. https://doi.org/10.1089/lgbt.2015.0111 PMID: 27046450

23.  Turban JL, Beckwith N, Reisner SL, Keuroghlian AS. Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. JAMA Psychiatry. 2020; 77(1):68–76. https://doi.org/10.1001/jamapsychiatry.2019.2285 PMID: 31509158

24.  Bennett DA. How can I deal with missing data in my study? Australian and New Zealand Journal of Public Health. 2001; 25(5):464–9. PMID: 11688629

25.  Nakagawa S. A farewell to Bonferroni: the problems of low statistical power and publication bias. Behavioral Ecology. 2004; 15(6):1044–5.

26.  Reisner SL, Poteat T, Keatley J, Cabral M, Mothopeng T, Dunham E, et al. Global health burden and needs of transgender populations: a review. The Lancet. 2016; 388(10042):412–36. https://doi.org/10.1016/S0140-6736(16)00684-X PMID: 27323919

27.  Keuroghlian AS, Reisner SL, White JM, Weiss RD. Substance use and treatment of substance use disorders in a community sample of transgender adults. Drug and Alcohol Dependence. 2015; 152:139–46. https://doi.org/10.1016/j.drugalcdep.2015.04.008 PMID: 25953644

28.  Turban JL, King D, Li JJ, Keuroghlian AS. Timing of social transition for transgender and gender diverse youth, K-12 harassment, and adult mental health outcomes. Journal of Adolescent Health. 2021.

29.  Hughes LD, Gamarel KE, King WM, Goldenberg T, Jaccard J, Geronimus AT. State-Level Policy Stigma and Non-Prescribed Hormones Use among Trans Populations in the United States: A Mediational Analysis of Insurance and Anticipated Stigma. Annals of Behavioral Medicine. 2021. https://doi.org/10.1093/abm/kaab063 PMID: 34390573

30.  Althubaiti A. Information bias in health research: definition, pitfalls, and adjustment methods. Journal of Multidisciplinary Healthcare. 2016; 9:211. https://doi.org/10.2147/JMDH.S104807 PMID: 27217764

31.  Gill-Peterson J. Histories of The Transgender Child. Minneapolis: University of Minnesota Press; 2018.

32.  Turban JL, King D, Reisner SL, Keuroghlian AS. Psychological attempts to change a person's gender identity from transgender to cisgender: estimated prevalence across US States, 2015. American

Journal of Public Health. 2019; 109(10):1452–4. https://doi.org/10.2105/AJPH.2019.305237 PMID: 31415210

33. Wiepjes CM, Nota NM, de Blok CJM, Klaver M, de Vries ALC, Wensing-Kruger SA, et al. The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets. J Sex Med. 2018; 15(4):582–90. https://doi.org/10.1016/j.jsxm.2018.01.016 PMID: 29463477

A REUTERS SPECIAL REPORT

## Why detransitioners are crucial to the science of gender care

UNDONE: Max Lazzara lived as a transgender man for eight years before detransitioning in 2020. She says she now realizes that gender-affirming medical treatment was not appropriate for her and that it took a toll on her physical and mental health. REUTERS/Matt Mills McKnight

Understanding the reasons some transgender people quit treatment is key to improving it, especially for the rising number of minors seeking to medically transition, experts say. But for many researchers, detransitioning and regret have long been untouchable subjects.

By ROBIN RESPAUT, CHAD TERHUNE and MICHELLE CONLIN │ Filed Dec. 22, 2022, noon GMT

TORONTO

For years, Dr Kinnon MacKinnon, like many people in the transgender community, considered the word "regret" to be taboo.

MacKinnon, a 37-year-old transgender man and assistant professor of social work at York University here, thought it was offensive to talk about people who transitioned, later regretted their decision, and detransitioned. They were too few in number, he figured, and any attention they got reinforced to the public the false impression that transgender people were incapable of making sound decisions about their treatment.

EXHIBIT
8

"This doesn't even really happen," MacKinnon recalled thinking as he listened to an academic presentation on detransitioners in 2017. "We're not supposed to be talking about this."

MacKinnon, whose academic career has focused on sexual and gender minority health, assumed that nearly everyone who detransitioned did so because they lacked family support or couldn't bear the discrimination and hostility they encountered – nothing to do with their own regret. To learn more about this group for a new study, he started interviewing people.

In the past year, MacKinnon and his team of researchers have talked to 40 detransitioners in the United States, Canada and Europe, many of them having first received gender-affirming medical treatment in their 20s or younger. Their stories have upended his assumptions.



POWERFUL STORIES: Kinnon MacKinnon, an assistant professor of social work at Toronto's York University, used to think regret among detransitioners was a nonissue. Then he started interviewing detransitioners, and what he heard changed his mind. REUTERS/Chris Helgren

Many have said their gender identity remained fluid well after the start of treatment, and a third of them expressed regret about their decision to transition from the gender they were assigned at birth. Some said they avoided telling their doctors about detransitioning out of embarrassment or shame. Others said their doctors were ill-equipped to help them with the process. Most often, they talked about how transitioning did not address their mental health problems.

In his continuing search for detransitioners, MacKinnon spent hours scrolling through TikTok and sifting through online forums where people shared their experiences and found comfort from each other. These forays opened his eyes to the online abuse detransitioners receive – not just the usual anti-transgender attacks, but members of the transgender community telling them to "shut up" and even sending death threats.

"I can't think of any other examples where you're not allowed to speak about your own healthcare experiences if you didn't have a good outcome," MacKinnon told Reuters.

The stories he heard convinced him that doctors need to provide detransitioners the same supportive care they give to young people to transition, and that they need to inform their patients, especially minors, that detransitioning can occur because gender identity may change. A few months ago, he decided to organize a symposium to share his findings and new perspective with other researchers, clinicians, and patients and their families.

Not everyone was willing to join the discussion. A Canadian health provider said it couldn't participate, citing recent threats to hospitals offering youth gender care. An LGBTQ advocacy group refused to promote the event. MacKinnon declined to identify either, telling Reuters he didn't want to single them out. Later, after he shared his findings on Twitter, a transgender person denounced his work as "transphobia."

He expected his research would be a hard sell even to many of the 100 or so people from Canada, the United States and elsewhere who accepted his invitation. "I need your help," he told the crowd that assembled in November in a York University conference room for the daylong session. "My perspectives have changed significantly. But I recognize that for many of you, you may find yourselves feeling much like I did back in 2017 – challenged, apprehensive, maybe fearful."

## Fighting words

In the world of gender-affirming care, as well as in the broader transgender community, few words cause more discomfort and outright anger than "detransition" and "regret." That's particularly true among medical practitioners in the United States and other countries who provide treatment to rising numbers of minors seeking to transition.

They insist, as MacKinnon once did, that detransitioning is too rare to warrant much attention, citing their own experiences with patients and extant research to support their view. When someone does detransition, they say, it's almost never because of regret, but rather, a response to the hardship of living in a society where transphobia still runs rampant.



UNCOMMON: Dr Marci Bowers, president of the World Professional Association for Transgender Health, is among the many gender-affirming clinicians who say detransitioning with regret remains extremely rare. Marci Bowers/Handout via REUTERS

"These patients are not returning in droves" to detransition, said Dr Marci Bowers, a transgender woman, gender surgeon and president of the World Professional Association for Transgender Health (WPATH), an international group that sets guidelines for transgender care. Patients with regret "are very rare," she told Reuters. "Highest you'll find is 1% or 1.5% of any kind of regret."

Doctors and many transgender people say that focusing on isolated cases of detransitioning and regret endangers hard-won gains for broader recognition of transgender identity and a rapid increase in the availability of gender care that has helped thousands of minors. They argue that as youth gender care has become highly politicized in the United States and other countries, opponents of that care are able to weaponize rare cases of detransition in their efforts to limit or end it altogether, even though major medical groups deem it safe and potentially life-saving.

"Stories with people who have a lot of anger and regret" about transitioning are over-represented in the media, and they don't reflect "what we are seeing in the clinics," said Dr Jason Rafferty, a pediatrician and child psychiatrist at Hasbro Children's Hospital in Providence, Rhode Island. He also helped write the American Academy of Pediatrics' policy statement in support of gender-affirming care. Detransitioning is a "very invalidating term for a lot of people who are trans and gender-diverse," Rafferty said.

Some people do detransition, however, and some do so because of regret. The incidence of regret could be as low as clinicians like Bowers say, or it could be much higher. But as Reuters found, hard evidence on long-term outcomes for the rising numbers of people who received gender treatment as minors is very weak.

Dr Laura Edwards-Leeper, a clinical psychologist in Oregon who treats transgender youths and a co-author of WPATH's new Standards of Care for adolescents and children, said MacKinnon's work represents some of the most extensive research to date on the reasons for detransitioning and the obstacles patients face. She said the vitriol he has encountered illustrates one reason so few clinicians and researchers are willing to broach the subject.

"People are terrified to do this research," she said.

For this article, Reuters spoke to 17 people who began medical transition as minors and said they now regretted some or all of their transition. Many said they realized only after transitioning that they were homosexual, or they always knew they were lesbian or gay but felt, as adolescents, that it was safer or more desirable to transition to a gender that made them heterosexual. Others said sexual abuse or assault made them want to leave the gender associated with that trauma. Many also said they had autism or mental health issues such as bipolar disorder that complicated their search for identity as teenagers.

Echoing what MacKinnon has found in his work, nearly all of these young people told Reuters that they wished their doctors or therapists had more fully discussed these complicating factors before allowing them to medically transition.

No large-scale studies have tracked people who received gender care as adolescents to determine how many remained satisfied with their treatment as they aged and how many eventually regretted transitioning. The studies that have been done have yielded a wide range of findings, and even the most rigorous of them have severe limitations. Some focus on people who began treatment as adults, not adolescents. Some follow patients for only a short period of time, while others lose track of a significant number of patients.

"There's a real need for more long-term studies that track patients for five years or longer," MacKinnon said. "Many detransitioners talk about feeling good during the first few years of their transition. After that, they may experience regret."

In October, Dutch researchers reported results of what they billed as the largest study to date of continuation of care among transgender youths. In a review of prescription drug records, they found 704, or 98%, of 720 adolescents who started on puberty blockers before taking hormones had continued with treatment after four years on average. The researchers couldn't tell from the records why the 16 had discontinued treatment.

Gender-care professionals and transgender-rights advocates hailed the 98% figure as evidence that regret is rare. However, the authors cautioned that the result may not be replicated elsewhere because the adolescents studied had undergone comprehensive assessments, lasting a year on average, before being recommended for treatment. This slower, methodical approach is uncommon at many U.S. gender clinics, where patient evaluations are typically done much faster and any delay in treatment, or "gatekeeping," is often believed to put youth at risk of self-harm because of their distress from gender dysphoria.

Dr Marianne van der Loos, the Dutch study's lead author, is a physician at Amsterdam University Medical Center's Center for Expertise on Gender Dysphoria, a pioneer in gender care for adolescents. "It's important to have evidence-based medicine instead of expert opinion or just opinion at all," van der Loos said.

Reliable evidence of the frequency of detransition and regret is important because, as MacKinnon, van der Loos and other researchers say, it could be used to help ensure that adolescent patients receive the best possible care.

"We cannot carry on in this field that involves permanently changing young people's bodies if we don't fully understand what we're doing and learn from those we fail."

Dr Laura Edwards-Leeper, clinical psychologist and co-author of WPATH treatment guidelines for adolescents

A basic tenet of modern medical science is to examine outcomes, identify potential mistakes, and, when deemed necessary, adjust treatment protocols to improve results for patients. For example, only after large international studies analyzing outcomes for thousands of patients did researchers establish that implanted coronary artery stents were no better than medication for treating most cases of heart disease.

Stronger data on outcomes, including the circumstances that make regret more likely, would also help transgender teens and their parents make better-informed decisions as they weigh the benefits and risks of treatments with potentially irreversible effects.



FEAR FACTOR: Dr Laura Edwards-Leeper says the backlash researchers risk is one reason they are reluctant to examine the reasons for detransitioning. Laura Edwards-Leeper/Handout via REUTERS

"We cannot carry on in this field that involves permanently changing young people's bodies if we don't fully understand what we're doing and learn from those we fail," said Edwards-Leeper, the clinical psychologist and WPATH member. "We need to take responsibility as a medical and mental-health community to see all the outcomes," she said in an interview.

As Reuters reported in October, thousands of families in the U.S. have been weighing these difficult choices amid soaring numbers of children diagnosed with gender dysphoria, the distress experienced when a person's gender identity doesn't align with their gender assigned at birth. They have had to do so based on scant scientific evidence of the long-term safety and efficacy of gender-affirming treatment for minors.

Concern about how to cope with the growing waiting lists at gender clinics that treat minors has divided experts. Some urge caution to ensure that only adolescents deemed well-suited to treatment after thorough evaluation receive it. Others argue that any delay in treatment prolongs a child's distress and puts them at risk of self-harm.

## Detransition defined

Detransitioning can mean many things. For those who transitioned socially, it may entail another change in name, preferred pronouns, and dress and other forms of identity expression. For those who also received medical treatment, detransitioning typically includes halting the hormone therapy they otherwise would receive for years.

Nor do all people who stop treatment regret transitioning, according to interviews with detransitioners, doctors and researchers. Some end hormone therapy when they have achieved physical changes with which they are comfortable. Some are unhappy with the side effects of hormones, such as male pattern baldness, acne or weight gain. And some are unable to cope with the longstanding social stigma and discrimination of being transgender.

Doctors and detransitioners also described the challenging physical and emotional consequences of the process. For example, patients who had their ovaries or testes removed no longer produce the hormones that match their gender assigned at birth, risking bone-density loss and other effects unless they take those hormones the rest of their lives. Some may undergo years of painful and expensive procedures to undo changes to their bodies caused by the hormones they took to transition. Those who had mastectomies may later undergo breast reconstruction surgery. As parents, they may regret losing the ability to lactate. Detransitioners also may need counseling to cope with the process and any lingering regret.

The impact can be social, too. In a study published last year in the Journal of Homosexuality, a researcher in Germany surveyed 237 people who had socially or medically transitioned and later detransitioned, half of them having transitioned as minors. Many respondents reported a loss of support from the LGBTQ community and friends, negative experiences with medical professionals, difficulty in finding a therapist familiar with detransition and the overall isolation after detransition.

RELATED CONTENT


As more transgender children seek medical care, families confront many unknowns


A gender imbalance emerges among trans teens seeking treatment


England's trans teens, lost in limbo, face mounting barriers to care


Numbers on the rise in children seeking gender care


Beyond pronouns: How languages are reshaping to include nonbinary and gender-nonconforming people

"Many respondents described experiences of outright rejection from LGBT+ spaces due to their decision to detransition," wrote Elie Vandenbussche, the study's author, a detransitioner and at the time a student at Rhine-Waal University of Applied Sciences. "It seems reasonable to suspect that this loss of support experienced by detransitioners must have serious implications on their psychological well-being."

In its new Standards of Care, released in September, WPATH cited Vandenbussche's paper and a few others on detransitioning and continuation of care among younger patients. "Some adolescents may regret the steps they have taken," the WPATH guidelines say. "Therefore, it is important to present the full range of possible outcomes when assisting transgender adolescents."

However, Bowers, WPATH's president, is among several gender-care specialists who say patients are ultimately responsible for choices they make about treatment, even as minors. They should not be "blaming the clinician or the people who helped guide them," she said. "They need to own that final step."

WPATH's guidelines acknowledge the lack of research on long-term outcomes for youth who didn't undergo comprehensive assessments, saying that the "emerging evidence base indicates a general improvement in the lives of transgender adolescents" who receive treatment after careful evaluation. "Further, rates of reported regret during the study monitoring periods are low," the guidelines say.

Specific treatment protocols for detransitioning are hard to find. WPATH's guidelines don't provide detailed advice to clinicians on treating patients who detransition. The Endocrine Society's guidelines for gender-affirming care, published in 2017, don't address the issue, either. The "question of discontinuing hormone treatment is beyond the scope covered by the current guideline," an Endocrine Society spokeswoman said.

Some doctors think they – and patients – would benefit from more guidance. "We have guidelines to guide us in providing transition-related care, initiating hormones and managing them long-term. Equally as important would be having guidelines in deprescribing hormones in the safest way possible," said Dr Mari-Lynne Sinnott, a doctor who attended MacKinnon's symposium. She runs one of the only family medical practices in Newfoundland focused on gender-diverse people, who make up about half of her 1,500 patients.



ULTIMATE GOALS: Kinnon MacKinnon says he hopes his research on detransitioning will help improve gender-affirming care and lead to better support for detransitioners. REUTERS/Chris Helgren

## "Sure of my identity"

Max Lazzara's childhood in Minneapolis, Minnesota, was chaotic, with divorce, "moving around a lot, some emotionally abusive stuff at home," she said. Her mother worked full-time, so Lazzara did most of the cooking, cleaning and caring for her little brother. She began to cut and burn herself as a means of coping and had tried to commit suicide three times before she entered high school, according to Lazzara and her medical records, which cite a history of bipolar disorder.

"The life of a woman was bleak to me," Lazzara told Reuters. "I worried that I would have to get married to a man someday and have a baby. I wanted to run far away from that."

In early 2011, when Lazzara was 14, she started questioning her gender identity. After discovering forums on Tumblr where young people described their transitions, she felt like something snapped into place. "I thought, 'Wow, this could explain why my whole life felt wrong.'"

During the summer of that year, Lazzara changed her name and began experimenting with presenting as more masculine. It felt good to cut her hair and wear gender-neutral or men's clothing. She took medications and received therapy to treat bipolar disorder. But it wasn't enough to alleviate her distress. In April 2012, Lazzara was admitted to the hospital at the University of Minnesota after a fourth suicide attempt.

> ## "I felt so strongly. I thought nothing would change my mind."
>
> Max Lazzara, on her decision to medically transition at age 16

Three weeks later, she sought care at the university's Center for Sexual Health, where she was diagnosed with gender identity disorder. Lazzara told the clinic she was "sure of my identity," according to her medical records. She wanted hormones and surgeries, the records show, including a mastectomy, a hysterectomy, and liposuction to slim her legs and hips. She was horrified at her body, could not look down in the shower and felt "absolute dread at the time of menstrual cycle," the records note.

"I felt so strongly. I thought nothing would change my mind," Lazzara told Reuters.

Clinicians at the university warned families that their children were suicidal "because they are born in the wrong bodies," Lazzara's mother, Lisa Lind, told Reuters. "I thought, 'I'll do whatever it takes, so she doesn't kill herself.'"



LITTLE RELIEF: Max Lazzara was initially pleased with her transition, she says, but her mental health continued to deteriorate, and eventually, she no longer believed in her gender identity. REUTERS/Matt Mills McKnight

Lazzara started taking testosterone in the fall of 2012, at age 16. She was still binding her breasts – so tightly, she said, that her ribs deformed. After a man groped her on the street, she decided to have breast-removal surgery, tapping the college fund her grandmother had left for her to cover the nearly $10,000 cost.

Initially, Lazzara was happy with her transition. She liked the changes from taking testosterone – the redistribution of fat away from her hips, the lower voice, the facial hair – and she was spared the sexist cat-calling that her female friends endured. "I felt like I was growing into something I wanted to be," Lazzara said.

But her mental health continued to deteriorate. She attempted suicide twice more, at ages 17 and 20, landing in the hospital both times. Her depression worsened after a friend sexually abused her. She became dependent on prescription anti-anxiety medication and developed a severe eating disorder.

During the summer of 2020, Lazzara was spiraling. She realized she no longer believed in her gender identity, but "I didn't see a way forward."

That October, Lazzara was working as a janitor in an office building in the Seattle area when she caught her reflection in a bathroom mirror. For the first time, she said, she saw herself as a woman. "I had not allowed myself to have that thought before," she said. It was shocking but also clarifying, she said, and "a peaceful feeling came over me."

Then she began to ponder her sexuality. In middle school, she had crushes on girls. After her transition, she identified as a transgender man who was bisexual. Now, she realized, she was a lesbian.

Lazzara stopped taking testosterone. She later asked her doctor in the Seattle area for advice, but he seemed unsure about how to proceed. She found a new doctor and recently sought laser hair removal on her face.

Lazzara told Reuters she now realizes that gender treatment was not appropriate for her and that it took a toll on her physical and mental health. "I do wish my doctors had said to me, 'It's OK to feel disconnected from your body. It's OK to like girls. It's OK to be gender non-conforming.'"

> Since Max Lazzara detransitioned, many in the online transgender community who embraced her a decade ago have distanced themselves from her, and she has received hateful messages on social media.

Her original gender-care providers at the University of Minnesota declined to comment. In a statement, the university's medical school said "gender-affirming care involves a carefully thought-out care plan between a patient and their multidisciplinary team of providers."

Lazzara recently found the before-and-after pictures of her torso on the website of the surgeon who performed her mastectomy in 2013. She had given him permission to post the images because he was proud of the outcome. Seeing her body as it once was stunned her. "I saw my breasts before I got them removed. That's my 16-year-old body," she said. "I had no ability at that age to be in my own body in my own way."

Since revealing she detransitioned, Lazzara said, many in the online transgender community who embraced her a decade ago have distanced themselves from her, and she has received hateful messages on social media. Now, when she sees someone come out online as detransitioned, she sends them a private message of support. "I know how lonely and alienating it can be," she said.

## "Shut up," detransitioner

Transgender people are frequently subjected to harassment, abuse and threats online. And as Lazzara's experience shows, so are detransitioners. In recent posts on TikTok, users took turns telling detransitioners to "shut up," and mocked, attacked and blamed them for perpetuating harm on the transgender community.

Diana Salameh, a transgender woman, film director and comedian from Mississippi, posted a TikTok video on Oct. 1 to "all the so-called transgender detransitioners out there." Detransitioners "are just giving fuel to the fire to the people who think that no trans person should exist," she said in the video. "You people who jumped the gun, made wrong decisions that you should actually feel embarrassed for, but you want to blame somebody else." In closing, she said, "I think you all need to sit down and shut the fuck up!"

Salameh told Reuters she posted the video because detransitioners spread the false idea "that nobody can be happy after transition," and right-wing opponents of youth gender care are using their stories "to fuel their agendas."

Earlier this year, K.C. Miller, a 22-year-old in Pennsylvania who was assigned female at birth, began wrestling with how she felt about her medical transition.

Miller initially sought treatment for gender dysphoria when she was 16 from the adolescent gender clinic at Children's Hospital of Philadelphia. In September 2017, Miller met with Dr Linda Hawkins, a counselor and co-founder of the hospital's gender clinic, for the first of two 90-minute visits. During that session, Miller told Hawkins she had wanted to be a Boy Scout as a kid and "always felt like a tomboy," according to Hawkins' notes in Miller's medical records, reviewed by Reuters. Miller also told Reuters that as a young girl she was attracted to other girls, but didn't feel she could pursue those relationships because her family's church didn't accept homosexuality.

Miller's case had further complications. Hawkins noted that Miller had an extensive history of sexual abuse by a family member starting at age 4, and that as a result, Miller had already been diagnosed with anxiety and post-traumatic stress disorder. Miller had been admitted to a psychiatric hospital for 10 days because of suicidal thoughts in late 2016.

While in the hospital, Miller told her mother she wished she wasn't a girl "because then the abuse would not have happened," Hawkins wrote. Elsewhere in the records, Hawkins noted that "Mom expresses concern that the desire to be male and not female may be a trauma response."

Miller, her mother and Hawkins met again seven weeks later. Miller had continued to have suicidal thoughts. She had taken medication for depression and anxiety and was working with a therapist, Hawkins noted. By the end of that second visit, Hawkins concluded that, "in spite of" Miller's trauma from abuse, the 16-year-old "has been insistent, persistent and consistent" in thinking of herself as male.

Hawkins referred Miller to a local gender clinic to receive testosterone. Miller got a mastectomy about six months later.

But medical treatment didn't offer the relief she sought. Her body started to change due to the hormones, yet Miller didn't feel better. Instead, she cycled through bouts of depression. She passed as a young man, but "something felt off. It felt like I was putting on an act."

Then Miller began reading the stories posted online by young detransitioners. Parts of their experiences resonated with her. "I absolutely would not have done this if I could go back and do it again," Miller told Reuters. "I would have worked through therapy and would be living my life as a lesbian."

Miller said Hawkins should have done a more thorough evaluation of all of Miller's mental health issues and shouldn't have recommended treatment so quickly.

Her mother, who asked not to be identified to protect her privacy, told Reuters that providers assured her that Miller's distress was related to her gender identity and that gender-affirming care would reduce the risk of suicide.

A spokesman for Children's Hospital of Philadelphia declined to comment, citing patient privacy.

Sitting in her car in early October, Miller let out years of frustration in a video posted on Twitter. She told viewers she felt she looked too masculine to detransition. She described how testosterone thinned her hair. "I don't see me personally being able to come back from what's happened," she said in the video.



VENTING: When K.C. Miller posted a video to Twitter in which she expressed frustration with her transition, it provoked a swift, severe backlash.

The video went viral, registering nearly four million views within days and igniting an avalanche of comments. Two days after Miller's post, Alejandra Caraballo, a transgender woman, LGBTQ-rights advocate and clinical instructor at Harvard Law School's Cyberlaw Clinic, wrote on Twitter: "The detransion grift where you complain about transitioning not making you look like a greek god but you also aren't actually detransitioning yet because you don't feel like your birth gender and you follow a bunch of anti-trans reactionaries that want all trans people gone."

Caraballo told Reuters she reacted to Miller's video because those types of detransition stories are "outlier examples being used by many on the anti-trans side to undermine access to gender-affirming care. They aren't representative of detransitioners on the whole."

In other posts and direct messages, some transgender people Miller had once idolized made fun of her appearance and criticized her decisions. One person made a death threat.

A few weeks later, Miller said she stopped taking testosterone, began to feel suicidal and sought psychiatric care. She uses female pronouns among friends, but still presents as a man in public.

In its Standards of Care, WPATH says many detransitioners "expressed difficulties finding help during their detransition process and reported their detransition was an isolating experience during which they did not receive either sufficient or appropriate support."

In May, Dr Jamison Green, a transgender man, author and former president of WPATH, said he was encouraged when about 30 medical professionals attended an online WPATH seminar he and other gender-care specialists helped lead. The session was intended to help providers better serve detransitioners and other patients with an evolving gender identity.

"I wish people in the transgender community would be less judgmental about people who change their mind," Green said. "Transgender people, especially when they are newer to the community, can be really brutal to people for not conforming. I really think it's harmful for everybody."



HOPEFUL SIGN: Dr Jamison Green, a transgender man and former WPATH president, says he was encouraged when about 30 clinicians showed up for a seminar to discuss ways to improve support for detransitioners. Jamison Green/Handout via REUTERS

## Word search pitfalls

Ever since the first clinic to offer gender care to minors in the United States opened in Boston 15 years ago, none of the leading providers have published any systematic, long-term studies tracking outcomes for all patients.

In 2015, the National Institutes of Health funded a study to examine outcomes for about 400 transgender youth treated at four U.S. children's hospitals, including the gender clinic at Boston Children's Hospital. Researchers have said they are looking at "continuation of care." However, long-term results are years away.

That has left a small assortment of studies to guide clinicians in this emerging field of medicine. The results of these studies suggest a wide range of possibilities for rates of detransitioning, from less than 1% to 25%. The research provides even less certainty about the incidence of regret among patients who received medical treatment as minors. And the studies have serious drawbacks.

Two of the largest ones, which found that 2% or less of people who transitioned experienced regret, focused on Europeans who primarily initiated treatment as adults. Experts caution that the results, because of the differences in maturity and life experiences between adults and adolescents, may have limited relevance as an indicator of outcomes for minors.

Researchers acknowledge that studies that follow patients for only a short time may underestimate detransition and regret because evidence indicates some people may not reach that point until as long as a decade after treatment began. Some studies also lose track of patients – a recurring challenge as minors age out of pediatric clinics and have to seek care elsewhere.

Even the choice of search terms can trip up researchers, as apparently happened in a study published in May by Kaiser Permanente, a large integrated health system based in Oakland, California.



OVERSIGHT? A recent study by giant health system Kaiser Permanente found that less than 1% of patients who received gender-affirming mastectomies later experienced regret, but Reuters found two other detransitioners the researchers apparently missed. REUTERS/Mike Blake

That study examined 209 patients who underwent gender-affirming mastectomies as minors between 2013 and 2020 in Kaiser's northern California region. Its authors searched the patients' medical records for words such as "regret," "dissatisfaction," "unsatisfied" and "unhappy" as indicators of regret. They didn't look for the term "detransition," according to the study.

Their search yielded two patients who had expressed regret, or less than 1% of the group studied. The two patients, identified as nonbinary, had top surgery at age 16, and expressed regret within a year and a half.

Reuters found two other patients in the region covered by the study who don't match those characteristics and whom the Kaiser researchers apparently missed. Both have been outspoken about their detransitions.

One is Max Robinson, who was 16 when she sought gender care at Kaiser in 2012. Her pediatric endocrinologist prescribed a puberty blocker and later testosterone.

The doctor monitored Robinson's hormone levels, wrote numerous letters to help Robinson change her legal gender from female to male, and recommended a plastic surgeon in San Francisco, Robinson's medical records show. "I have no reservations recommending Max as a well adjusted candidate for breast reduction," the Kaiser endocrinologist wrote to the surgeon in May 2013. Max had the surgery six weeks later, when she was 17.

After the surgery, Robinson felt better. But within a year, her mental health issues, including anxiety and depression, had escalated, medical records show.

In November 2015, three years after starting testosterone and two years after her surgery, Robinson told the Kaiser physician she was now seeing that she wasn't interested in taking hormones any longer. "I'm no longer going to be using testosterone, so I don't need further appointments or for those prescriptions to be active," she wrote to the doctor. Two months later, she asked Kaiser to provide a letter confirming her detransition so she could change her legal records back to female. Kaiser obliged.



REVERSAL: Max Robinson, who detransitioned three years after starting her medical transition, says the experience "alienated me from my doctors." Max Robinson/Handout via REUTERS

"The whole experience alienated me from my doctors," she told Reuters.

Robinson began to speak publicly about her decision to detransition and in 2021 published "Detransition: Beyond Before and After," a book in which she details her own process of medical transition and detransition.

The other patient was Chloe Cole. According to a letter of intent to sue that her lawyers sent to Kaiser in November, Cole was 13 when a Kaiser doctor in 2018 put her on a puberty blocker, followed a few weeks later by testosterone, for her gender-affirming treatment.

At 15, Cole told Reuters, she also wanted top surgery. In an interview, she and her father said the doctors at Kaiser readily agreed, though he wanted to wait until she was older.

"They were so adamant," he said. He recalled the doctors telling him: "'At this age, they definitely know what their gender is.'" The father asked not to be named out of concern that speaking publicly might jeopardize his employment. Detransition, he said, "wasn't really discussed as a possibility."

In June 2020, a Kaiser surgeon performed a mastectomy on Cole, according to the letter of intent to sue. That was a month before her 16th birthday. Less than a year later, Cole said, she began to realize she regretted her surgery and medically transitioning in general after a discussion in school about breastfeeding and pregnancy.

Cole said that when she discussed her decision to detransition with her gender-care specialist at Kaiser, "I could tell that I made her upset that I was so regretful," Cole said in an interview. Eventually, the doctor offered to recommend a surgeon for breast reconstruction, Cole said, "but that's something I've decided to not go through with."

Cole has begun speaking out publicly in support of measures to end gender-affirming care for minors, appearing often on conservative media and with politicians who back such bans.

In the letter of intent, Cole's lawyers said Kaiser's treatment "represents gross negligence and an egregious breach of the standard of care."

Steve Shivinsky, a spokesman for Kaiser Permanente, declined to comment on the care provided to Cole and Robinson or whether they were included in the study, citing patient privacy.

In a statement, he said Kaiser's "clinicians are deeply interested in the outcomes of the care we provide and the individual's state of health and wellbeing before, during and beyond their gender transition." For adolescents seeking gender-affirming care, he said, "the decision always rests with the patient and their parents and, in every case, we respect the patients' and their families' informed decision to choose one form of care over another."

The Kaiser researchers followed up with patients in their study an average of 2.1 years after surgery. "The time to develop postoperative regret and/or dissatisfaction remains unknown and may be difficult to discern given that regret is quite rare," the researchers wrote.

## A change of perspective

MacKinnon, the assistant professor of social work, grew up as what he calls "a gender-nonconforming tomboy" in a small Nova Scotia town. After getting his degree in social work, he medically transitioned at 24 when he started taking testosterone. "It was a very slow build," MacKinnon said of his transition. He didn't identify as transgender as a child.

As a young researcher in Toronto, MacKinnon was drawn to work that exposed the barriers transgender people face in getting medical care and navigating daily life, interviewing clinicians and patients about their experiences. More recently, he turned his attention to detransition and regret.

In August 2021, MacKinnon published a paper in which he and his co-authors wrote that there was "scant evidence that detransition is a negative phenomenon" for patients that would justify limiting access to gender-affirming treatment. That conclusion angered many of the detransitioners he would later need to win over.

Michelle Alleva, a 34-year-old detransitioner in Canada, criticized MacKinnon's study in a blog post as another effort by gender-care supporters to whitewash the pain of regret and assuage clinicians' fears of malpractice lawsuits. Another detransitioner complained on Twitter that the word "regret" was put in quotes in the paper, undermining its legitimacy in her opinion.

Still skeptical that regret was a significant issue, MacKinnon in the autumn of 2021 embarked on his latest study and began talking to more people about their decisions to detransition. In July, he published a paper based on formal interviews with 28 of the more than 200 detransitioners he and his colleagues have found.

A third expressed either strong or partial regret about their transition. Some said their transitions should have proceeded more slowly, with more therapy. Others expressed regret about the lasting impact on their bodies. Some said their mental health needs weren't adequately addressed before transitioning. "They felt like their consent wasn't informed because they didn't initially understand what was going on that might have explained their feelings and suffering," MacKinnon told Reuters.





0:00 / 1:31

The patients' stories brought MacKinnon round to the view that the gender-care community needs to address regret, adjust treatment to reduce its incidence, and provide better support for detransitioners. "Some of what I've learned about detransitioners is identifying cracks in the gender-affirming care system, particularly for young people," he said.

In September, MacKinnon presented his findings to a small but attentive crowd at WPATH's annual conference in Montreal. A few weeks later, he shared his research more widely on Twitter. "We need to listen to and learn from the experiences of

LEARNING PROCESS: Kinnon MacKinnon described in a recent TikTok video how his research has changed his views on detransitioners.

detransitioners, not silence them," he wrote.

Some people applauded his work. Others criticized it. Robyn D., who identified as "quietly trans," replied on Twitter: "Transphobia disguised as academic opinion is the most poisonous of them all." She didn't respond to requests for comment from Reuters.

At his November symposium, MacKinnon didn't encounter the blowback from clinicians that he had expected. In fact, he accepted an invitation from one to speak about detransition at her medical practice.

Alleva, who had criticized MacKinnon's earlier study, was also there, one of the scores of detransitioners MacKinnon and his colleagues have talked to. She medically transitioned 12 years ago and then detransitioned in 2020 after a mastectomy, a hysterectomy and years of testosterone. She had refused to participate in his research because she didn't trust MacKinnon, but over the summer, they began talking.

"He reminded me of my old trans friends who I don't speak with anymore," Alleva said. "He actually listened to me."

## Few answers: A survey of the science on gender-care outcomes for youths

No large-scale, long-term studies have tracked the incidence of detransition and regret among patients who received gender-affirming treatment as minors. Studies that are available yield a wide range of results for various definitions of detransition, regret or continuation of care. Due to their limitations, the studies lack definitive answers. Here is an overview of frequently cited research:



2.2%

| COUNTRY | Sweden |
| --- | --- |
| RESEARCH INSTITUTIONS | Karolinska Institute, Karolinska University Hospital, Sahlgrenska University Hospital |
| PUBLISHED | May 2014 |

| RESULTS | The study's authors said they found a **2.2% regret rate** among patients who had gender reassignment surgeries in Sweden from 1960 to 2010. The researchers found 681 people who filed a government application for a legal change in gender and received surgery, which was available only to patients 18 and older. Among that group, 15 people later reversed their decisions and filed a "regret application" with a national health board. |
| --- | --- |
| LIMITATIONS | The authors said the regret rate for patients in the last decade reviewed, from 2001 to 2010, may have increased over time. "The last period is still undecided since the median time lag until applying for a reversal was 8 years," according to the study. |
| | Far fewer adolescents received gender-affirming medical care prior to 2010. Also, the assessment phase for patients in the study was much longer than what Reuters found most youth gender clinics in the U.S. offer today. The gender-care specialists in Sweden did approximately one year of evaluation before recommending any treatment, according to the study. |
| LINK | 10.1007/s10508-014-0300-8 |

<1%

| COUNTRY | Netherlands |
| --- | --- |
| RESEARCH INSTITUTION | Amsterdam University Medical Center |
| PUBLISHED | February 2018 |
| RESULTS | This study found a **rate of regret of less than 1%** among transgender men and women "who underwent gonadectomy," or removal of the testes or ovaries, from 1972 to 2015 in the Netherlands. |
| | The authors found 14 cases of regret out of 2,627 patient cases reviewed. The earliest any of the 14 started hormone treatment was 25. Until 2014, transgender people in the Netherlands had to undergo gonadectomy to change the gender on their birth certificate. For surgery, patients were required to be at least 18 and on hormone therapy for at least a year. |
| LIMITATIONS | The study didn't report regret among patients who didn't undergo surgery. Thirty-six percent of patients overall didn't return to the clinic after several years of treatment and were lost to follow-up. |
| | People treated in the last decade of the study may report regret later. "In our population the average time to regret was 130 months, so it might be too early to examine regret rates in people who started with (hormone therapy) in the past 10 years," the authors wrote. |
| LINK | https://www.jsm.jsexmed.org/article/S1743-6095(18)30057-2/fulltext |

2%

| COUNTRY | Netherlands |
| --- | --- |
| RESEARCH INSTITUTION | Amsterdam University Medical Center |

| PUBLISHED | October 2022 |
|---|---|
| RESULTS | Researchers found that 98% of 720 adolescents who started on puberty blockers before taking hormones had continued with treatment after four years on average. The authors used a nationwide prescription drug registry in the Netherlands to track whether patients were still taking hormones. |
| LIMITATIONS | The researchers didn't identify the reasons why **2% of patients had stopped treatment**. The adolescents in the Netherlands also went through a lengthy assessment process, a year on average, before being recommended for medical treatment. For that reason, the Dutch researchers say, their results may not be applicable more broadly.<br><br>"There might be a difference because of that diagnostic phase," said Dr Marianne van der Loos, the study's lead author and a physician at Amsterdam University Medical Center's Center for Expertise on Gender Dysphoria. "If you don't have that, maybe more people will start treatment and reconsider it later on because they didn't get help during that phase by a mental health professional." |
| LINK | https://www.thelancet.com/journals/lanchi/article/PIIS2352-4642(22)00254-1/fulltext |



| COUNTRY | United States |
|---|---|
| RESEARCH INSTITUTIONS | Children's Mercy Kansas City, Uniformed Services University, U.S. Department of Defense |
| PUBLISHED | May 2022 |
| RESULTS | The authors said that **more than a quarter of patients** who started gender-affirming hormones before age 18 **stopped getting refills** for their medication within four years. The study examined 372 children of active duty and retired service members in the U.S. military insurance system, known as TRICARE. |
| LIMITATIONS | It's unclear why patients stopped their medication because the study only examined pharmacy records. The researchers said the number of patients who stopped hormones is likely an overestimate because they couldn't rule out that some patients got hormones outside of the military system, perhaps at college or with different health insurance.<br><br>The follow-up period for many patients was relatively short. The researchers examined patients enrolled from 2009 to 2018, but 58% of the patients started hormones in the last 22 months of the study. |
| LINK | https://doi.org/10.1210/clinem/dgac251 |



| COUNTRY | United Kingdom |
|---|---|

| RESEARCH INSTITUTIONS | University College London Hospitals, Leeds Teaching Hospitals, Tavistock and Portman clinic – National Health Service Trust |
|---|---|
| PUBLISHED | July 2022 |
| RESULTS | Researchers found that 90 patients, or **8.3%**, of 1,089 adolescents referred for gender-affirming care at endocrinology clinics **no longer identified as gender-diverse**, either before or after starting on puberty blockers or hormones. The review spanned patients who were treated from 2008 through 2021. |
| LIMITATIONS | The authors noted the 8.3% figure may be an underestimate because 62 additional patients, or 5.4% of all participants, moved away or didn't follow up with the clinics. |
| LINK | https://adc.bmj.com/content/107/11/1018 |



13.1%

| COUNTRY | United States |
|---|---|
| RESEARCH INSTITUTIONS | Fenway Institute, Massachusetts General Hospital |
| PUBLISHED | March 2021 |
| RESULTS | Drawing on the 2015 U.S. Transgender Survey, the authors found that **13.1%** of 17,151 respondents **had detransitioned** for some period of time.<br><br>Some of the common reasons respondents provided were pressure from a parent (35.6%), pressure from their community or societal stigma (32.5%), or difficulty finding a job (26.9%). Nearly 16% of respondents cited at least one "internal driving factor, including fluctuations in or uncertainty regarding gender identity," according to the study. Half of the people who reported detransitioning had taken gender-affirming hormones. |
| LIMITATIONS | By design, the authors said, all respondents identified as transgender at the time of survey completion, and the survey wasn't intended to capture people who detransitioned and no longer identified as transgender. |
| LINK | https://www.liebertpub.com/doi/10.1089/lgbt.2020.0437 |

REUTERS INVESTIGATES

  More Reuters investigations and long-form narratives

  Got a confidential news tip? Reuters Investigates offers several ways to securely contact our reporters

**Youth in Transition**
By Robin Respaut, Chad Terhune and Michelle Conlin
Photo editing: Corinne Perkins
Art direction: John Emerson
Edited by Michele Gershberg and John Blanton



Follow Reuters Investigates 

OTHER REUTERS INVESTIGATIONS



### Putin's war

Reuters traced one Russian officer class through training to the Ukraine battlefield, where some died and some were decorated.



### Ukraine's lost children

How Russia's removal of children from Ukraine is supported by a vast machinery to deport, house and re-educate. Reuters traces the journeys of two groups of kids.



### Death in Darfur

The Masalit people are being driven from Sudan's Darfur region in a campaign of bombing and massacres. Reuters has identified 6 key commanders in the violence.



### Stunning Truths

Axon CEO Rick Smith says his Taser business was inspired by the shooting deaths of two friends – a misrepresentation that fits a company pattern.



# In vitro fertilization outcomes in a mouse model of gender-affirming hormone therapy in transmasculine youth

Cynthia Dela Cruz, Ph.D.,[a,b] Abigail Wandoff, B.S.,[c] Margaret Brunette, M.S.,[c] Vasantha Padmanabhan, Ph.D.,[a,d] Ariella Shikanov, Ph.D.,[a,c] and Molly B. Moravek, M.D., M.P.H.[a,e]

[a] Department of Obstetrics and Gynecology, University of Michigan, Ann Arbor, Michigan; [b] Postdoctoral Translational Scholar Program, Michigan Institute for Clinical and Health Research, University of Michigan, Ann Arbor, Michigan; [c] Department of Biomedical Engineering, University of Michigan, Ann Arbor, Michigan; [d] Department of Pediatrics and Communicable Diseases, University of Michigan, Ann Arbor, Michigan; [e] Department of Urology, University of Michigan, Ann Arbor, Michigan

**Objective:** To investigate in vitro fertilization (IVF) outcomes in an adolescent transmasculine mouse model mimicking gender-affirming hormone therapy in prepubertal youth, both on testosterone (T) and after T washout.
**Design:** Experimental laboratory study using a validated mouse model.
**Setting:** University-based basic science research laboratory.
**Animal(s):** A total of 80 prepubertal 26-day-old C57BL/6N female mice were used in this study.
**Intervention(s):** Animals (n = 10/group) were implanted subcutaneously with gonadotropin-releasing hormone agonist at 3.6 mg or received sham surgery. After 21 days, they were implanted with silastic tubing containing either T 10 mg or placebo for 6 weeks. After 6 weeks, a group of animals were superovulated for immediate IVF, and another group had the implant removed and went through superovulation for IVF after 2 weeks (washout IVF). The total number of oocytes yielded, oocyte maturity rate, fertilization rate, and numbers of 2-cell embryos, 4–8-cell embryos, morula, blastocysts, and hatching blastocysts were recorded.
**Result(s):** Testosterone treatment negatively impacted IVF outcomes in animals stimulated when receiving T, but not after T washout. Pretreatment with gonadotropin-releasing hormone agonist did not affect IVF outcomes.
**Conclusion(s):** Although current T had a negative impact on IVF outcomes compared with controls, animals were still able to produce viable oocytes for fertilization and develop into blastocysts. Future efforts to study the impact of long-term T exposure on oocyte quality, especially aneuploidy rates, pregnancy outcomes, and live birth rates, are necessary. (Fertil Steril Sci® 2023;4:302–10. ©2023 by American Society for Reproductive Medicine.)
**Key Words:** Mouse model, GnRH agonist, testosterone, transmasculine youth, fertility outcomes

**G**ender-affirming hormone therapy (GAHT) in peripubertal transmasculine youth may comprise gonadotropin-releasing hormone agonist (GnRH-a) treatment to suppress puberty and block the development of secondary sexual characteristics (1–4), followed later by testosterone (T) treatment to align physical characteristics with their gender identity (5–7).

The number of adolescents seeking GAHT has been increasing, and recent guidelines recommend the use of hormone therapy as early as 14 years old (7, 8). Given the possibility of fertility impairment, the World Professional Association for Transgender Health, Endocrine Society, and American Society of Reproduction recommend discussing fertility preservation and family planning before initiating GAHT (7, 9–12). Despite this, a recent study showed that only 2.8% of transgender youth chose fertility preservation before starting to transition (13).

Received April 28, 2023; revised and accepted August 8, 2023.
Supported by the Michigan Institute for Clinical and Health Research grants KL2 TR 002241 and UL1 TR 002240 (to C.D.C.); University of Michigan Office of Research funding U058227 (to A.S.); American Society for Reproductive Medicine and Society for Reproductive Endocrinology and Infertility Grant (to M.B.M.); and National Institutes of Health R01-HD098233 (to M.B.M.). The University of Virginia Center for Research in Reproduction, Ligand Assay and Analysis Core Facility was supported by the Eunice Kennedy Shriver NICHD/NIH grants P50-HD028934 and R24-HD102061.
The data underlying this article are available in the article.
Correspondence: Molly B. Moravek, M.D., M.P.H., Department of Obstetrics and Gynecology, University of Michigan, 1500 E. Medical Center Dr., L4000 University Hospital South, Ann Arbor, Michigan 48109 (E-mail: mpenderg@med.umich.edu).

Fertil Steril Sci® Vol. 4, No. 4, November 2023 2666-335X/$36.00
© 2023 American Society for Reproductive Medicine. Published by Elsevier Inc. All rights reserved.
https://doi.org/10.1016/j.xfss.2023.08.001

EXHIBIT

9

Barriers to fertility preservation include the desire to move forward with medical transition without delay, cost, invasiveness of procedures, discrimination, lack of awareness, and concern for worsening gender dysphoria (14–17).

Significant gaps exist in the literature regarding the fertility potential of transmasculine people who underwent treatment with GnRH-a-T as adolescents (13, 14). Although there are case reports of successful oocyte cryopreservation for fertility preservation in transmasculine youth, these studies were performed before starting GAHT and did not evaluate later in vitro fertilization (IVF) outcomes (5, 18). Additional studies evaluating fertility preservation potential in adults varied in terms of whether it was before or after T cessation, the nature of T formulation, the regimen of T treatment, and the duration of prestimulation T cessation, as well as the fact that none of the cases received pretreatment with GnRH-a as an adolescent (19, 20), thus precluding an accurate assessment of fertility outcomes in this population.

We recently developed a translational mouse model mimicking GAHT in peripubertal transmasculine youth. We found that GnRH-a halted puberty, and subsequent T treatment arrested cyclicity, sustained elevated T levels, and lowered luteinizing hormone (LH) levels without affecting ovarian reserve (21), similar to reports in humans (10, 22). Using this model, we investigated reproductive potential and IVF outcomes both during and after cessation of T treatment.

## MATERIALS AND METHODS
### Animals

This study used 80 prepubertal 26-day-old C57BL/6N female mice (Envigo, Indianapolis, IN, USA). Animals were housed in groups of 3 to 5 in ventilated cages under standard housing conditions (ad libitum access to food and water, photoperiod of 12 hours light and 12 hours dark) at the University of Michigan, Ann Arbor. All procedures involving mice were performed according to the Guide for the Care and Use of Laboratory Animals approved by the University of Michigan Institutional Animal Care and Use Committee (PRO00009635).

### Experimental design

**Gonadotropin-releasing hormone agonist treatment** Forty peripubertal C57BL/6N females, 26 days old, were implanted subcutaneously with GnRH-a (Goserelin acetate implant, 3.6 mg [Zoladex, AstraZeneca, UK]). Forty control animals received sham implants. To assess whether the GnRH-a treatment was able to suppress the hypothalamic-pituitary-gonadal (HPG) axis, we recorded the timing of vaginal opening, the first physical change in the external genitalia indicating the activation of the HPG axis in rats and mice that corresponds with the beginning of breast development in humans (23). Daily vaginal cytology was performed to monitor cyclicity for 3 weeks. To confirm that the HPG axis was suppressed, follicle-stimulating hormone (FSH) and LH levels were measured in blood samples taken at weekly intervals (Fig. 1A). We previously established that this model of

GnRH-a treatment halts puberty in C57BL/6N female mice for at least 21 days when the implant is left in situ (21).

**Testosterone treatment** On postnatal day (PND), 47 (21 days after sham or GnRH-a implantation) animals were assigned to one of the following 4 treatment groups: control; GnRH-a-only; T only; or GnRH-a plus T. Half of the animals from each of the above 4 groups underwent IVF immediately after 6 weeks of T treatment (immediate IVF), and the other half underwent IVF 2 weeks after cessation of T treatment (washout IVF). Sham and T implantations were performed under isoflurane anesthesia. All animals were implanted subcutaneously with a 16-mm silastic implant in the back (Dow Corning, Hayward, CA, USA; inner diameter: 1.98 mm, outer diameter: 3.17 mm). Control implants were filled with 25 $\mu$L (8 mm) of ethanol (200 proof ethanol, Decon Laboratories, King of Prussia, PA, USA) and sealed with 4 mm of adhesive (Factor II, Incorporated, Lakeside, AZ, USA) at both ends. Testosterone implants were filled with 10 mg of crystalline T dissolved in 25 $\mu$L of ethanol and similarly sealed. All implants were prepared one day before surgery to ensure the ethanol was evaporated entirely. On the day of surgical implantation, implants were soaked in ethanol for 3 minutes and allowed to air dry before being inserted into animals (24). Implants were left in place for 6 weeks. Vaginal cytology was performed for 2 weeks after T implantation to ensure T-only-treated animals stopped cycling and GnRH-a+T-treated mice continued to remain acyclic during the T treatment period (Fig. 1A).

At 6 weeks, immediate IVF animals (PND 89) were superovulated for IVF with the implants in place. Washout IVF animals underwent an implant removal to ensure a well-defined timing of T washout (PND 103) and were superovulated 2 weeks later for IVF (Fig. 1A). On the day of sacrifice, body weight and ovarian weight from one ovary were recorded, and the other ovary was saved for future transcriptome analysis. Terminal blood was collected to assess hormone levels.

**Assessment of the timing of vaginal opening and estrous cyclicity** Mice were assessed daily for vaginal opening, and starting one day after vaginal opening, vaginal cytology was performed to assess estrous cyclicity. The estrous cycle was staged using light microscopy analysis of the vaginal epithelial cellular distribution and characterized using cornified, nucleated epithelial cells, and leukocytes (25).

**Weekly blood collection and serum hormone analysis** Blood was collected weekly from the lateral tail vein, up to 0.5% of body weight. At the time of sacrifice, terminal blood was collected via decapitation. Samples were kept at 4 °C overnight, centrifuged at 9,200 × g for 10 minutes, and serum was stored at -20 °C until analysis. Peptide hormone measurements of FSH and steroid hormone measurements of T, estradiol ($E_2$), progesterone, and antimüllerian hormone (AMH) were performed at the Ligand Assay and Analysis Core Facility, University of Virginia Center for Research in Reproduction.

The reportable dose range for FSH mouse and rat in-house protocol radioimmunoassay was 3–75 ng/mL, 10.0–1,600.00 ng/dL for T mouse and rat IBL ELISA, 0.15–40.0 ng/mL and 0.30–80.0 ng/mL with a 2x dilution for

ORIGINAL ARTICLE: GONADAL BIOLOGY

FIGURE 1



Experimental design and methodology. (A) Experimental design showing the implantation day of gonadotropin-releasing hormone agonist (GnRH-a) followed by testosterone (T), showing the time of interventions. (B) Schematic showing the in vitro fertilization (IVF) protocol used in this study. (C) Representative images of embryonic development. hCG = Human chorionic gonadotropin; PND = postnatal day.

*Dela Cruz. Fertility in a GAHT mouse model. Fertil Steril Sci 2023.*

progesterone mouse and rat IBL ELISA, and 5.0–3200.0 pg/mL and 10.0–6,400.0 pg/mL with a 2x dilution for mouse and rat $E_2$ ALPCO ELISA. The reportable dose range for AMH was 4.0–260 ng/mL. The reportable ranges were established with a coefficient of variation of 1%–10% for T, 0.2%–4.4% for $E_2$, <20% for progesterone and FSH, and 0.8%–3.7% for AMH. All immunoassays were performed in singlets.

**Superovulation** Animals received 7.5 IU of pregnant mare serum gonadotropin (Bioworld, Dublin, OH, USA) intraperitoneally between 5 PM and 6 PM. Forty-eight hours postpregnant mare serum gonadotropin, they were injected intraperitoneally with 7.5 IU of human chorionic gonadotropin (Sigma, CG5, St. Louis, MO, USA).

**Preparing culture and IVF dishes** All culture dishes were prepared a day before the IVF procedure and placed in an incubator supplied with mixed gas (4.5% $CO_2$ and 5% $O_2$) to maintain the temperature (37 °C) and pH (7.2–7.4) of the culture medium during the IVF procedure.

Each sperm dish was made by adding 500 $\mu$L of Human Tubal Fluid media (Millipore Sigma, Burlington, MA, USA) to a 4-well plate. Each cumulus-oocyte complex (COC) collection dish was made by adding 300 $\mu$L of M2 media (Millipore Sigma, Burlington, MA, USA) in a 4-well plate. In vitro fertilization dishes were made by adding 1 mL of Human Tubal Fluid media (Millipore Sigma, Burlington, MA, USA), and the washing and embryo culture dishes were made by adding 4 drops of 75 $\mu$L of potassium simplex optimized medium

media (Millipore Sigma, Burlington, MA, USA) covered with OVOIL, a 100% paraffin oil (Vitrolife, San Diego, CA, USA) in a 35 mm petri dish.

*In vitro fertilization.* In vitro fertilization was performed using a modified version of the method described by Sztein et al. ([26]) (2001), Byers et al. ([27]) (2006), and Takahashi et al. ([28]) (2010).

Male mice, 8–10 weeks old, were euthanized and killed using decapitation. The bilateral cauda epididymis and distal vas deferens were removed and placed into a previously prepared sperm collection dish. Using forceps, the sperm of the vas deferens was expressed, and using a 26-gauge syringe, the epididymis was sliced 10 times. The sperm dish was then returned to the incubator for 10 minutes to allow motile spermatozoa to exit the tissue. After 10 minutes, the dish was removed from the incubator, and 10 $\mu$L of the sperm-containing media was applied to a Makler counting chamber (New York Microscopy Company, Hicksville, NY, USA) to calculate the total sperm concentration. A total of $1 \times 10^6$ sperm per milliliter were added to each IVF dish and then returned to the incubator to allow sperm capacitation for 40 minutes. In the meantime, experimental females were euthanized and killed by decapitation 14–16 hours posthuman chorionic gonadotropin administration, and the oviducts were immediately placed into COC's collection dish. The COCs were removed from the ampulla using microdissecting

forceps and combined with sperm in the IVF dish for fertilization (adapted from Byers et al. (27) (2006)) (Fig. 1B).

Four hours later, the oocytes were removed from the IVF dish and transferred to the washing and embryo culture dish. During the washing procedure, the total number of oocytes yielded, as well as the number of immature and mature oocytes, were recorded. The maturity rate was calculated by dividing the total number of mature oocytes by the total number of oocytes yielded. Approximately 18 hours after the washing procedure, 2-cell embryos were counted, and the fertilization rate was calculated by dividing the total number of 2-cell embryos by the total number of mature oocytes. Embryo development was followed for 5 days, and the number of 4–8-cell embryos, morula, blastocysts, and hatching blastocysts was recorded from each mouse (Fig. 1C).

### Statistical analysis

Statistical analysis was performed using GraphPad Prism 9. The results were analyzed using descriptive statistics to determine the normality of the data distribution. A two-way analysis of variance followed by Tukey's honestly significant difference post hoc test was performed. All data were presented as mean $\pm$ SD. The level of significance was defined as $P<.05$. For analysis purposes, hormone levels above and below the detection level were treated as the value set for the maximum or lower limit of quantification.

### RESULTS

#### GnRH-a+T treatment suppressed the HPG axis, but the axis was reactivated after T washout

Gonadotropin-releasing hormone agonist treatment resulted in earlier vaginal opening ($P<.001$) compared with controls (Fig. 2A). Control animals cycled regularly throughout the study period (Fig. 2D). Gonadotropin-releasing hormone agonist and GnRH-a+T-treated mice exhibited persistent diestrus that was maintained for at least 21 days after GnRH-a implantation day, supportive of pubertal arrest. Follicle-stimulating hormone levels were suppressed in GnRH-a and GnRH-a+T-treated animals when compared with controls and T-only-treated animals ($P<.0001$) (Fig. 2B). Treatment with T increased weekly serum T levels in T-only and GnRH-a+T-treated animals compared with controls and GnRH-a-only animals ($P<.0001$) (Fig. 2C). When the T implant was removed after 6 weeks of treatment, animals in the T-only and GnRH-a+T groups resumed cycling $6.2 \pm 1.13$ days after the explantation day (Fig. 2D). At this time, T levels had returned to levels comparable to those of controls and GnRH-a-only treated animals (control = $0.3 \pm 0.086$; GnRH-a = $0.4 \pm 0.19$; T = $0.36 \pm 0.16$; GnRH-a+T = $0.33 \pm 0.10$, $P=.5698$) (Fig. 2C).

#### T treatment reduced ovarian weight in the T and GnRH-a+T groups, which persisted even after T washout

Testosterone treatment caused a decrease in terminal ovarian weight in the T-only and GnRH-a+T groups (immediate IVF group – control = $7.3 \pm 1.2$; GnRH-a-only = $6.1 \pm 0.99$;

T-only = $3.4 \pm 0.46$; GnRH-a+T = $3.2 \pm 0.98$, $P<.0001$) (Fig. 3B) in the absence of any change in body weight (Fig. 3A). This difference persisted after T washout (washout IVF group – control = $7.2 \pm 1.4$; GnRH-a-only = $7.2 \pm 1.2$; T-only = $5.0 \pm 1.2$; GnRH-a+T = $5.1 \pm 0.98$, $P<.0169$) (Fig. 3B).

#### Immediate IVF in T-treated animals compromised IVF outcomes, but outcomes recovered after T washout

Testosterone-only and GnRH-a+T animals on T treatment (immediate IVF group) (Fig. 4) had reduced oocyte yield (control = $21 \pm 4.5$; GnRH-a = $22 \pm 3.4$; T = $12 \pm 3.6$; GnRH-a+T = $11 \pm 4.7$, $P<.0001$), fertilization rate (control = $90\% \pm 15\%$; GnRH-a = $84\% \pm 17\%$; T = $49\% \pm 15\%$; GnRH-a+T = $42\% \pm 17\%$, $P<.0001$), maturity rate (control = $23\% \pm 8.1\%$; GnRH-a = $31\% \pm 6.9\%$; T = $11\% \pm 3.8\%$; GnRH-a+T = $15\% \pm 6.7\%$, $P<.0001$), number of 2-cell embryos (control = $4.8 \pm 2.2$; GnRH-a = $5.6 \pm 1.9$; T = $2.1 \pm 1.5$; GnRH-a+T = $1.8 \pm 0.71$, $P=.0004$), number of the 4–8-cell embryos (control = $4.8 \pm 2.2$; GnRH-a = $5.6 \pm 1.9$; T = $1.9 \pm 1.2$; GnRH-a+T = $1.5 \pm 0.76$, $P<.0013$), number of morulae (control = $4.5 \pm 2.1$; GnRH-a = $5.6 \pm 1.9$; T = $1.9 \pm 1.2$; GnRH-a+T = $1.4 \pm 0.52$, $P<.0044$), and number of blastocysts (control = $4.4 \pm 1.8$; GnRH-a = $4.8 \pm 2.0$; T = $1.4 \pm 0.53$; GnRH-a+T = $1.4 \pm 0.52$, $P<.005$) when compared with controls and GnRH-a-only animals. GnRH-a+T on T treatment (immediate IVF) showed elevated levels of $E_2$ when compared with the control group ($P=.0302$). Progesterone levels were decreased in T and GnRH-a+T animals on T treatment ($P=.0035$ and $P=.0094$, respectively). No difference was found in AMH levels among groups ($P>.05$) (Fig. 5)

For groups with IVF performed 2 weeks after cessation of T treatment (washout IVF) (Fig. 4), T-only and GnRH-a+T-treated mice had similar oocyte yields ($P=.0780$), fertilization rate ($P=0.1844$), maturity rate ($P=.3277$), number of 2-cell embryos ($P=.3326$), number of 4–8-cell embryos ($P=.3820$), number of morula ($P=.5192$), and number of blastocysts ($P=.331$), when compared with controls and GnRH-a-only animals. Additionally, no alteration in $E_2$, progesterone, and AMH levels was found among groups after the cessation of T (Fig. 5).

### DISCUSSION

Because of the currently limited available data about the effects of gender-affirming testosterone exposure on fertility outcomes, several medical organizations advise fertility preservation counseling before initiating T treatment. For patients already on T, many clinics discontinue T therapy for 1–6 months before stimulation or until the resumption of menses (29, 30). In this study, the total number of oocytes yielded was significantly reduced in animals currently on T treatment (immediate IVF: T and GnRH-a+T groups) in relation to controls and GnRH-a-only treated animals. These differences resolved when IVF was performed after a T washout period, and IVF outcomes did not appear to be affected by GnRH-a pretreatment. The reduced ovarian weight in T and

## FIGURE 2



Characterization of the transmasculine mouse model. (A) Vaginal opening. (B) Weekly follicle-stimulating hormone (FSH) levels on days 26, 33, and 40. (C) Testosterone (T) levels over 6 weeks of treatment and after cessation of T. (D) Estrous (E) cyclicity. Control animals went through all phases of the E cycle. E; P, proestrus; D, diestrus; and M, metestrus. Gonadotropin-releasing hormone agonist (GnRH-a)-treated mice showed a flare and subsequent persistent D and resumed cyclicity after GnRH-a clearance. Testosterone-treated animals presented persistent D after initiating T treatment and resumed cycling after T cessation. Gonadotropin-releasing hormone agonist+T-treated animals showed persistent D during GnRH-a and T treatment and resumed cyclicity after T washout. PND = postnatal day.

*Dela Cruz. Fertility in a GAHT mouse model. Fertil Steril Sci 2023.*

GnRH-a+T-treated animals in the immediate group is likely related to fewer corpora lutea, and it is consistent with the total number of oocytes retrieved after ovarian stimulation treatment. Fertilization and maturity rates were impaired also by T treatment, as were embryo development outcomes (2-cell to blastocyst) in the immediate IVF group. After T washout, these parameters also recovered and were comparable to controls and GnRH-a animals. The persistently low ovarian weights in T and GnRH-a+T animals after T cessation might be related to a morphological alteration of the ovary. Although we did not perform ovarian morphological analysis in this study, we recently showed that female mice treated with 0.9 mg of T injected weekly for 6 weeks showed aberrant ovarian stroma alterations after T cessation (31). There were no significant differences in terminal $E_2$ among the washout IVF groups or AMH levels among the immediate IVF and washout IVF animals. The increase in $E_2$ levels in T-treated animals compared with the control group in the immediate

## FIGURE 3



Body measurements. (A) Body weight. (B) Ovary weight. Data are expressed as mean ± SD, analysis of variance followed by Tukey test; letters (a, b) denote significance. GnRH-a = gonadotropin-releasing hormone agonist; T = testosterone.

*Dela Cruz. Fertility in a GAHT mouse model. Fertil Steril Sci 2023.*

IVF arm is likely because both the controls and T-only groups reached puberty in the absence of HPG axis suppression with GnRH-a. As such, although controls continued to undergo cyclic ovarian changes, T treatment in the T-only group led to the arrest of follicle growth and atresia, leading to the persistence of a larger number of follicles. Indeed, physiological levels of T in females are essential for normal follicular development, enhancing follicle recruitment and promoting follicular growth as well as development. Conversely, supraphysiological T levels in females induce follicle development

arrest and maintain premature follicles in the ovary (32–35). In this way, when the ovarian stimulation treatment was initiated, these arrested follicles resumed steroidogenesis and growth, resulting in higher $E_2$ levels. The decreased progesterone levels in T and GnRH-a+T-treated animals in the immediate IVF cohort may be related to the lower numbers of oocytes yielded. After ovulation, the rise in progesterone levels is maintained by the corpora lutea. Because T and GnRH-a+T animals in the immediate IVF cohort showed a lower number of oocytes retrieved, it was expected to see

## FIGURE 4



In vitro fertilization (IVF) outcomes. (A) Numbers of oocytes yielded. (B) Fertilization rate. C) Maturity rate. (D) Numbers of 2-cell embryo. (E) Numbers of 4–8-cell embryo. (F) Numbers of morula. (G) Numbers of blastocysts. (H) Numbers of hatching blastocyst. Data are expressed as mean ± SD, ANOVA followed by Tukey test; letters (a, b) denote significance. GnRH-a = gonadotropin-releasing hormone agonist; T = testosterone.

*Dela Cruz. Fertility in a GAHT mouse model. Fertil Steril Sci 2023.*

ORIGINAL ARTICLE: GONADAL BIOLOGY

**FIGURE 5**



Terminal hormones levels. (A) Testosterone (T) levels. (B) Estradiol levels. (C) Progesterone levels. (D) Antimüllerian hormone (AMH) levels. Data are expressed as mean ± SD, analysis of variance followed by Tukey test. GnRH-a = gonadotropin-releasing hormone agonist; IVF = in vitro fertilization.

*Dela Cruz. Fertility in a GAHT mouse model. Fertil Steril Sci 2023.*

also lower numbers of corpora lutea, which was reflected in progesterone levels (36, 37).

Concerns related to stopping or delaying hormonal treatment have been investigated in previous studies (17, 38, 39), and some transmasculine individuals may prefer to proceed with IVF without T cessation because of distress and worsening gender dysphoria (40, 41), although off of GAHT. The negative impact caused by T treatment in animals from the immediate IVF arm may relate to disruption of the follicular steroidal milieu (healthy follicles have a higher estrogen to androgen ratio) and its consequent negative impact on oocyte and embryo quality. Treatment of in vitro-grown follicles with T was shown to have a negative impact on meiosis resumption, reflected in a lower potential to reinitiate meiosis and the presence of chromosomes outside the metaphase plate in MII oocytes, which could affect the fertilization rate and their ability to undergo normal embryonic development (42, 43). In the present study, we did not perform any molecular or morphological analysis on the retrieved oocytes and embryos, which could better address the negative outcomes on embryonic development (44). Other studies have shown that female mice treated with T responded to ovarian stimulation

by ovulating similar numbers of oocytes as controls that were fertilized and cleaved in vitro (45). In this study, animals were injected with T suspended in oil as opposed to T implanted in our study, and their weekly serum T levels were lower than in our study, which may have affected the fertility outcomes. Currently, no clinical studies address the fertility potential of transmasculine youth pretreated with GnRH-a followed immediately by T, thus never completing natal puberty. However, there are currently 2 case reports in the literature demonstrating successful oocyte cryopreservation in transmasculine youth treated with GnRH-a who had not yet started T (46, 47). Additionally, researchers showed for the first time a live birth from an oocyte retrieved from a transgender man on T during stimulation, indicating that this outcome is possible without T cessation (41). Despite a negative impact on oocyte and blastocyst quantity in animals currently on T (immediate IVF: T and GnRH-a+T groups), we showed these animals could produce mature oocytes, which were fertilized and cleaved from the 2-cell stage until blastocyst. These findings are comparable with our previous study that showed the blockage of puberty and T treatment affected the pool of primary follicles, which can be used for

in vitro maturation ([21]). Additionally, the results found in this present study regarding IVF outcomes after T cessation mirror the findings in humans, which demonstrated the number of retrieved oocytes and maturity rate among transgender adolescents are comparable with those of adolescent cisgender females ([48], [49]).

Moreover, our data showed that pretreatment with GnRH-a did not affect IVF outcomes, positively or negatively. Indeed, pubertal suppression via GnRH-a is reversible, with the commencement of normal puberty on cessation ([50]). However, it is important to consider the age of the animals and the experimental design used in this study when interpreting the results because the animals' ages and different ovarian stimulation protocols and medications could interfere with the IVF outcomes. The limitations of this study include the nonoptimization of the dose of gonadotropins used for ovarian stimulation, which could improve IVF outcomes, particularly in the immediate IVF group. Additionally, we only worked with one time point of T exposure (6 weeks) and washout (2 weeks). These timepoints were chosen on the basis of the timing when animals resumed cyclicity, an approach similar to that used by clinicians to decide when the ovarian stimulation treatment should start in humans. Our findings are limited to a short-term T exposure and clearance paradigm of T.

## CONCLUSION

In conclusion, this study demonstrated that besides the negative impact on IVF outcomes, female mice pretreated with GnRH-a followed by T for 6 weeks could produce viable oocytes, which reached the blastocyst stage after fertilization. We also showed that after T washout, reproductive outcomes were comparable to controls and GnRH-a-treated animals. Significant gaps exist in the literature regarding the consequences of T-GAHT in transmasculine youth, and our study attempts to address some of these unknowns, although the findings we show here must be taken cautiously because a mouse model does not always translate directly to humans. Future efforts are needed to comprehensively understand long-term T's impacts on oocyte quality, especially aneuploidy rates, pregnancy outcomes, and live birth rates.

**Declaration of interests:**  C.D.C. has nothing to disclose. A.W. has nothing to disclose. M.B. has nothing to disclose. V.P. has nothing to disclose. A.S. has nothing to disclose. M.B.M. has nothing to disclose.

## REFERENCES

1. Mejia-Otero JD, White P, Lopez X. Effectiveness of puberty suppression with gonadotropin-releasing hormone agonists in transgender youth. Transgend Health 2021;6:31–5.
2. Bangalore Krishna K, Fuqua JS, Rogol AD, Klein KO, Popovic J, Houk CP, et al. Use of gonadotropin-releasing hormone analogs in children: update by an international consortium. Horm Res Paediatr 2019;91:357–72.
3. Clayton A. Gender-affirming treatment of gender dysphoria in youth: a perfect storm environment for the placebo effect-the implications for research and clinical practice. Arch Sex Behav 2023;52:483–94.
4. Bungener SL, de Vries ALC, Popma A, Steensma TD. Sexual experiences of young transgender persons during and after gender-affirmative treatment. Pediatrics 2020;146:e20191411.
5. Chen D, Bernardi LA, Pavone ME, Feinberg EC, Moravek MB. Oocyte cryopreservation among transmasculine youth: a case series. J Assist Reprod Genet 2018;35:2057–61.
6. Safer JD, Tangpricha V. Care of the transgender patient. Ann Intern Med 2019;171:775–6.
7. Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. J Clin Endocrinol Metab 2017;102:3869–903.
8. Chen M, Fuqua J, Eugster EA. Characteristics of referrals for gender dysphoria over a 13-year period. J Adolesc Health 2016;58:369–71.
9. Walton E, Abhari S, Tangpricha V, Futral C, Mehta A. Family planning and fertility counseling perspectives of gender diverse adults and youth pursuing or receiving gender affirming hormone therapy. Urology 2023;171:244–50.
10. Schwartz AR, Moravek MB. Reproductive potential and fertility preservation in transgender and nonbinary individuals. Curr Opin Obstet Gynecol 2021; 33:327–34.
11. Borrás A, Manau MD, Fabregues F, Casals G, Saco A, Halperin I, et al. Endocrinological and ovarian histological investigations in assigned female at birth transgender people undergoing testosterone therapy. Reprod Biomed Online 2021;43:289–97.
12. De Roo C, Lierman S, Tilleman K, Peynshaert K, Braeckmans K, Caanen M, et al. Ovarian tissue cryopreservation in female-to-male transgender people: insights into ovarian histology and physiology after prolonged androgen treatment. Reprod Biomed Online 2017;34:557–66.
13. Nahata L, Chen D, Moravek MB, Quinn GP, Sutter ME, Taylor J, et al. Understudied and under-reported: fertility issues in transgender youth-a narrative review. J Pediatr 2019;205:265–71.
14. Kelley CE, Davidge-Pitts CJ. Breaking down barriers to reproductive care for transgender people. AACE Clin Case Rep 2022;8:96–8.
15. Murad MH, Elamin MB, Garcia MZ, Mullan RJ, Murad A, Erwin PJ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. Clin Endocrinol (Oxf) 2010;72: 214–31.
16. Chen D, Simons L, Johnson EK, Lockart BA, Finlayson C. Fertility preservation for transgender adolescents. J Adolesc Health 2017;61:120–3.
17. Chiniara LN, Viner C, Palmert M, Bonifacio H. Perspectives on fertility preservation and parenthood among transgender youth and their parents. Arch Dis Child 2019;104:739–44.
18. Amir H, Oren A, Klochendler Frishman E, Sapir O, Shufaro Y, Segev Becker A, et al. Oocyte retrieval outcomes among adolescent transgender males. J Assist Reprod Genet 2020;37:1737–44.
19. Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ, Spack NP, et al. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab 2009;94:3132–54.
20. Eisenberg ME, Gower AL, McMorris BJ, Rider GN, Shea G, Coleman E. Risk and protective factors in the lives of transgender/gender nonconforming adolescents. J Adolesc Health 2017;61:521–6.
21. Dela Cruz C, Kinnear HM, Hashim PH, Wandoff A, Nimmagadda L, Chang FL, et al. A mouse model mimicking gender-affirming treatment with pubertal suppression followed by testosterone in transmasculine youth. Hum Reprod 2023;38:256–65.
22. Yaish I, Tordjman K, Amir H, Malinger G, Salemnick Y, Shefer G, et al. Functional ovarian reserve in transgender men receiving testosterone therapy: evidence for preserved anti-Müllerian hormone and antral follicle count under prolonged treatment. Hum Reprod 2021;36:2753–60.
23. Laffan SB, Posobiec LM, Uhl JE, Vidal JD. Species Comparison of postnatal development of the female reproductive system. Birth Defects Res 2018; 110:163–89.
24. Hashim PH, Kinnear HM, Cruz CD, Padmanabhan V, Moravek MB, Shikanov A. Pharmacokinetic comparison of three delivery systems for subcutaneous testosterone administration in female mice. Gen Comp Endocrinol 2022;327:114090.

25. Cora MC, Kooistra L, Travlos G. Vaginal cytology of the laboratory rat and mouse: review and criteria for the staging of the estrous cycle using stained vaginal smears. Toxicol Pathol 2015;43:776–93.

26. Sztein JM, Noble K, Farley JS, Mobraaten LE. Comparison of permeating and nonpermeating cryoprotectants for mouse sperm cryopreservation. Cryobiology 2001;42:28–39.

27. Byers SL, Payson SJ, Taft RA. Performance of ten inbred mouse strains following assisted reproductive technologies (ARTs). Theriogenology 2006;65:1716–26.

28. Takahashi H, Liu C. Archiving and distributing mouse lines by sperm cryopreservation, IVF, and embryo transfer. Methods Enzymol 2010;476:53–69.

29. Deutsch MB, Feldman JL. Updated recommendations from the world professional association for transgender health standards of care. Am Fam Phys 2013;87:89–93.

30. Ethics Committee of the American Society for Reproductive Medicine. Access to fertility services by transgender and nonbinary persons: an Ethics Committee opinion. Fertil Steril 2021;115:874–8.

31. Kinnear HM, Hashim PH, Dela Cruz C, Chang FL, Rubenstein G, Nimmagadda L, et al. Presence of ovarian stromal aberrations after cessation of testosterone therapy in a transgender mouse model. Biol Reprod 2023;8:802–13.

32. Vendola K, Zhou J, Wang J, Bondy CA. Androgens promote insulin-like growth factor-I and insulin-like growth factor-I receptor gene expression in the primate ovary. Hum Reprod 1999;14:2328–32.

33. Vendola K, Zhou J, Wang J, Famuyiwa OA, Bievre M, Bondy CA. Androgens promote oocyte insulin-like growth factor I expression and initiation of follicle development in the primate ovary. Biol Reprod 1999;61:353–7.

34. Steckler T, Wang J, Bartol FF, Roy SK, Padmanabhan V. Fetal programming: prenatal testosterone treatment causes intrauterine growth retardation, reduces ovarian reserve and increases ovarian follicular recruitment. Endocrinology 2005;146:3185–93.

35. Yoo M, Tanaka T, Konishi H, Tanabe A, Taniguchi K, Komura K, et al. The protective effect of testosterone on the ovarian reserve during cyclophosphamide treatment. Onco Targets Ther 2020;13:2987–95.

36. Sanchez EG, Giviziez CR, Sanchez HM, Agostinho PL, Barros PS, Approbato MS. Low progesterone levels and ovulation by ultrasound assessment in infertile patients. JBRA Assist Reprod 2016;20:13–6.

37. Dozortsev DI, Diamond MP. Luteinizing hormone-independent rise of progesterone as the physiological trigger of the ovulatory gonadotropins surge in the human. Fertil Steril 2020;114:191–9.

38. Armuand G, Dhejne C, Olofsson JI, Stefenson M, Rodriguez-Wallberg KA. Attitudes and experiences of health care professionals when caring for transgender men undergoing fertility preservation by egg freezing: a qualitative study. Ther Adv Reprod Health 2020;14:2633494120911036.

39. Nahata L, Tishelman AC, Caltabellotta NM, Quinn GP. Low fertility preservation utilization among transgender youth. J Adolesc Health 2017;61:40–4.

40. Stark BA, Mok-Lin E. Fertility preservation in transgender men without discontinuation of testosterone. F S Rep 2022;3:153–6.

41. Greenwald P, Dubois B, Lekovich J, Pang JH, Safer J. Successful in vitro fertilization in a cisgender female carrier using oocytes retrieved from a transgender man maintained on testosterone. AACE Clin Case Rep 2022;8:19–21.

42. Anderiesz C, Trounson AO. The effect of testosterone on the maturation and developmental capacity of murine oocytes in vitro. Hum Reprod 1995;10:2377–81.

43. Romero S, Smitz J. Exposing cultured mouse ovarian follicles under increased gonadotropin tonus to aromatizable androgens influences the steroid balance and reduces oocyte meiotic capacity. Endocrine 2010;38:243–53.

44. Anesetti G, Chávez-Genaro R. Neonatal androgenization in rats affects oocyte maturation. Reprod Sci 2021;28:2799–806.

45. Bartels CB, Uliasz TF, Lestz L, Mehlmann LM. Short-term testosterone use in female mice does not impair fertilizability of eggs: implications for the fertility care of transgender males. Hum Reprod 2021;36:189–98.

46. Martin CE, Lewis C, Omurtag K. Successful oocyte cryopreservation using letrozole as an adjunct to stimulation in a transgender adolescent after GnRH agonist suppression. Fertil Steril 2021;116:522–7.

47. Rothenberg SS, Witchel SF, Menke MN. Oocyte Cryopreservation in a Transgender Male Adolescent. N Engl J Med 2019;380:886–7.

48. Adeleye AJ, Cedars MI, Smith J, Mok-Lin E. Ovarian stimulation for fertility preservation or family building in a cohort of transgender men. J Assist Reprod Genet 2019;36:2155–61.

49. Leung A, Sakkas D, Pang S, Thornton K, Resetkova N. Assisted reproductive technology outcomes in female-to-male transgender patients compared with cisgender patients: a new frontier in reproductive medicine. Fertil Steril 2019;112:858–65.

50. Manasco PK, Pescovitz OH, Feuillan PP, Hench KD, Barnes KM, Jones J, et al. Resumption of puberty after long term luteinizing hormone-releasing hormone agonist treatment of central precocious puberty. J Clin Endocrinol Metab 1988;67:368–72.

*Endocrinology*, 2023, 164, 1–10
https://doi.org/10.1210/endocr/bqad145
Advance access publication 28 September 2023
**Research Article**




# Puberty Suppression Followed by Testosterone Therapy Does Not Impair Reproductive Potential in Female Mice

Prachi Godiwala,[1,2] Tracy F. Uliasz,[1] Katie M. Lowther,[1] Deborah Kaback,[1] and Lisa M. Mehlmann[1]

[1]Department of Cell Biology, UConn Health, Farmington, CT 06030, USA
[2]Center for Advanced Reproductive Services, Division of Reproductive Endocrinology and Infertility, Department of Obstetrics and Gynecology, UConn Health, Farmington, CT 06030, USA
**Correspondence:** Lisa Mehlmann, PhD, Department of Cell Biology, UConn Health, 263 Farmington Ave, Farmington, CT 06030, USA. Email: lmehlman@uchc.edu.

## Abstract

More adolescents are coming out as transgender each year and are put on puberty blockers to suppress natal puberty, which is then followed by cross-hormone treatment to achieve puberty of the desired gender. Studies to examine the effects of puberty suppression and virilizing therapy on future reproductive potential among transgender males are lacking. This study used a translational murine in vitro fertilization model to examine the effects of female puberty suppression with depot leuprolide acetate (LA), followed by virilizing therapy with testosterone cypionate (T), on embryologic and pregnancy outcomes. LA effectively inhibited puberty when mice were treated beginning at 3 weeks of age. LA treatment was associated with higher mouse weight but lower ovarian weight. LA-treated mice ovulated developmentally competent eggs in response to gonadotropin administration, albeit at a higher dose than controls. Ovaries from mice treated with LA and T produced oocytes that had morphologically normal meiotic spindles after in vitro maturation and responded to gonadotropin stimulation. Eggs from mice treated with LA and T were fertilizable and produced developmentally competent embryos that led to births of fertile pups. These results suggest that fertility may not be impaired after puberty suppression and cross-hormone therapy for transgender males.

**Key Words:** transgender, fertility, leuprolide acetate, testosterone, mouse model, ovary

Individuals who are transgender identify with the gender opposite of the sex they were assigned at birth [1-3]. Among adolescents, a recent study of almost 81 000 students in grades 9 to 11 found that 2.7% identify as transgender or gender nonconforming [4]. Sixty-eight percent of these individuals were assigned female at birth and are referred to as transgender males [5].

Many transgender males opt to undergo some form of gender-affirming treatment [3, 6]. This often involves administration of testosterone, which provides desired secondary sex characteristics such as lowered voice and facial hair growth and also has positive effects on mood and behavioral health [2, 7]. Prepubertal transgender males have the option of using puberty blockers to avoid the development of incongruous female secondary sex characteristics [8, 9]. Puberty blockers such as the gonadotropin releasing hormone (GnRH) agonist leuprolide acetate inhibit the pulsatile secretion of GnRH that heralds puberty and has the effect of blocking estrogen production, which leads to unwanted secondary sex characteristics such as breast development [10]. When ready to begin the physical transition to male, the patient begins testosterone therapy to develop male secondary sex characteristics.

A possible negative consequence of prolonged hormone therapy, however, is a decrease in fertility potential. Human studies have noted changes in the structure of ovarian tissue, including follicular atresia as well as stromal and cortical hyperplasia, among transgender men utilizing testosterone therapy [11, 12]. At the follicular level, high levels of endogenous or exogenous androgens can inhibit follicular growth, especially among mature antral follicles [13, 14]. Ovaries in female mice treated with testosterone weigh significantly less than those of control mice [15], though they contain normal complements of follicles at all stages [15, 16].

It has been estimated that approximately half of transgender adults desire biological children [17, 18], although they may not desire to carry a baby themselves but rather to obtain eggs that will be fertilized and carried by a partner or surrogate [19]. The long-term consequences of testosterone on fertility in transgender males are still unclear, and both the World Professional Association for Transgender Health and the Endocrine Society recommend that all transgender and gender-nonconforming patients be counseled regarding options for fertility preservation before initiating transition [1, 2]. However, use of fertility preservation techniques among young transgender individuals is low [20], reflecting the fact that among transgender youth, beginning their gender transition with hormones typically takes priority over the costly, invasive, and time-consuming process of fertility preservation [21]. Therefore, the problem of fertility preservation in transgender males on hormone therapy warrants more investigation, given that few large studies have investigated outcomes of these individuals desiring to cryopreserve oocytes

Received: 14 December 2022. Editorial Decision: 21 September 2023. **Corrected and Typeset:** 3 October 2023
© The Author(s) 2023. Published by Oxford University Press on behalf of the Endocrine Society. All rights reserved. For permissions, please e-mail: journals.permissions@oup.com

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH – Health Services Research Library user on 04 April 2024

EXHIBIT
10

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH – Health Services Research Library user on 04 April 2024



**Figure 1.** Overview of experimental design. (A) Mice injected with PBS; (B) mice injected with eCG only; (C) mice injected with eCG and hCG. Abbreviations: eCG, equine chorionic gonadotropin; hCG, human chorionic gonadotropin; IVM, in vitro maturation.

after years of exposure to hormones. Particularly, the impact on future fertility potential of administering drugs to block puberty followed by testosterone therapy, which bypasses female puberty altogether, is completely unknown.

In this study, we utilized a mouse model to investigate the effects of bypassing female puberty using puberty blockers followed by the induction of virilization with testosterone on ovarian function and embryologic outcomes.

## Materials and Methods

### Ethical Approval

Animal studies were performed in accordance with the Guide for the Care and Use of Laboratory Animals (National Academy of Sciences 1996) and were approved by the Institutional Animal Care and Use Committee at UConn Health (protocol number 101977-0122).

### Media and Reagents

All chemicals were purchased from Millipore Sigma (St. Louis, MO, USA) unless otherwise indicated. Leuprolide acetate (LA; 3.75 mg 1-month depot suspension) was from AbbVie Inc. (North Chicago, IL, USA) [22]. Depot LA was reconstituted as directed, aliquoted, frozen on liquid nitrogen, and stored at −80°C. LA was thawed on the day of use and diluted further with PBS. Testosterone cypionate (T; Steraloids, Newport, RI, USA) was prepared as a low-dose (4 mg/mL; 200 µg dose) and a high-dose (8 mg/mL; 400 µg dose) solution in sesame oil. Equine chorionic gonadotropin (eCG) was from Calbiochem (San Diego, CA, USA) or from ProSpec (East Brunswick, NJ, USA).

### Experimental Design

Female CF1 (Envigo, Indianapolis, IN, USA) and male B6SJLF1 mice (Jackson Labs, Bar Harbor, ME, USA) were used for experiments, and female CD-1 mice (Charles River, Raleigh, NC, USA) were used as surrogates for embryo transfers. These strains are commonly used for studies of fertilization. Up to 5 female CF1 mice were housed per cage in a temperature- and light-controlled room on a 12 light:12 dark light cycle. Male mice were housed in pairs. CD-1 female surrogates were housed individually.

An outline of the experimental design is shown in Fig. 1. Three-week-old female mice were injected intraperitoneally with either depot LA (100 µg in 100 µL PBS) or vehicle for pubertal suppression. This dose is approximately 3 times higher by weight than that given to prepubertal transgender children to suppress puberty [9] and in preliminary experiments was determined to suppress puberty for extended periods in mice (data not shown).

Mice were injected with LA or PBS every 4 weeks for a total of 3 doses. Concurrently with the third dose of LA or PBS, low-dose T (200 µg) or vehicle (sesame oil) were injected weekly for 4 weeks, followed by 4 weekly injections of high-dose T (400 µg) or vehicle to simulate virilizing therapy. The concentrations and doses of T administered were chosen based on previously published studies utilizing transgender mouse models [15, 16]. For the T injections, mice were lightly sedated with isoflurane and injected subcutaneously using 27-gauge needles. For mice receiving LA therapy only, a fourth injection of LA was given 4 weeks after the third dose of LA to continue pubertal suppression; these mice were not exposed to T and therefore could undergo puberty while other mice were undergoing 8 weeks of T therapy without continued pubertal suppression with LA. This protocol was implemented to simulate conditions under which transgender males generally are treated with puberty-suppressing agents and subsequent virilizing agents. To compare our results with previous reports [15, 16], 1 group of mice was injected weekly with testosterone only (no LA), beginning when the mice were 11 weeks old.

Superovulation and in vitro fertilization (IVF) were performed approximately 5 days after the last injection of high-dose T, when these mice were ~19 weeks old. Mice were then subdivided into 3 more groups: mice that were not stimulated with gonadotropins, mice that were stimulated with eCG only, and mice that were stimulated with eCG followed by human chorionic gonadotropin (hCG) to induce ovulation (Fig. 1).

All mice were euthanized by isoflurane overdose followed by cervical dislocation. The following markers of response to treatment and ovarian function were analyzed: serum testosterone and estradiol-17β (E2) levels, ovary weights and histology, structure of the meiotic spindle following in vitro oocyte maturation, total numbers of ovulated eggs, cleavage

*Endocrinology*, 2023, Vol. 164, No. 11   3

rates, live birth rates, and fertility of the pups. Here "oocytes" are defined as prophase-arrested immature cells, while "eggs" are defined as mature cells at the metaphase II stage that had extruded a polar body.

## Vaginal Cytology

Daily vaginal smears were performed to evaluate whether mice were undergoing estrous cycles. Smears were conducted on a subset of mice after the first week of high-dose T and were continued for 3 weeks. Vaginal smears were performed using standard methods [23, 24].

## Blood Collection and Hormone Analysis

After the mice were sacrificed, they were weighed and terminal blood was collected by cardiac puncture using heparinized 25-gauge needles and syringes. For comparison to male levels of T, blood was also collected from mature male mice that were used for IVF (see later discussion). These males had been acclimated to the animal care facility for at least 1 week prior to the experiment, were housed in pairs, and were not exposed to females prior to blood collection. Blood samples were kept on ice. Within 30 minutes of collection, samples were centrifuged at 4°C for 15 minutes (1000 × g) and supernatants were stored at −80°C. Extraction of steroids was carried out with methanol as directed by Cayman Chemical's technical support, and extracted samples were stored at −80°C in ELISA buffer.

Total testosterone was measured using an ELISA kit from Cayman Chemical (Ann Arbor, MI, USA; catalog no. 582701, RRID:AB_2895148) according to the manufacturer's instructions. Samples were analyzed twice in 2 separate batches, and the mean of each value was reported. This assay is selective for testosterone but also interacts with high affinity to 19-nortestosterone (140%) and with less affinity to other testosterone derivatives (27% with $5\alpha$-dihydrotestosterone, 19% with $5\beta$-dihydrotestosterone, 5% with methyl testosterone, 4% with androstenedione, and 2% with 11-keto testosterone, as well as trace amounts with other testosterone metabolites). Importantly, there is <0.01% cross-reactivity with E2 (manufacturer's product information sheet). The sensitivity was 6 pg/mL, and intra- and inter-assay coefficients of variation at the midpoint concentration were 6%, and 7.2%, respectively.

E2 was measured using an ELISA kit from Cayman Chemical (catalog no. 501890, RRID:AB_2832924) according to the manufacturer's instructions. This assay is selective for E2 with less cross-reactivity to metabolites [2.5% methoxyestradiol, 2.3% estradiol 3-(β-D-glucuronide); 1.4% estrone, 1.3% 2-hydroxyestradiol, 1% estriol, and <1% of others, and 0.03% cross-reactivity to testosterone; manufacturer's product information sheet]. The sensitivity was 20 pg/mL, and intra- and inter-assay coefficients of variation at the midpoint concentration were 12% and 7%, respectively.

## Ovarian Histology

Ovaries from unstimulated and eCG-primed mice were collected; the adipose and oviducts were removed by dissection under a stereoscope and weighed. The smaller ovary from each mouse was used for ovarian histology while the larger ovary was used for oocyte collection. The ovary for histology was fixed in 10% formalin for 24 to 48 hours, washed in PBS,

dehydrated in 70% ethanol, and embedded in paraffin. Serial 5 μm-thick sections through the entire ovary were stained with hematoxylin and eosin and were imaged using either an Aperio GT 450 slide scanner (Leica Biosystems, Danvers, MA, USA) or a 3DHISTECH Pannoramic MIDI II Automatic Digital Slide Scanner. Histology was performed by the Histology Core at UConn Health or by Ichor Life Sciences, Inc. (Lafayette, NY, USA). Figures were prepared using Adobe Photoshop.

Total numbers of corpora lutea (CL) were counted independently by 2 investigators and these counts were averaged together. Counts were similar for the 2 investigators. CL were defined as discrete eosinophilic round structures. CL were numbered as the sections were serially assessed through the entire ovary to prevent duplicate counting.

## Oocyte Collection and Immunofluorescence Staining

The ovary for oocyte collection was placed in HEPES-buffered MEMα [Gibco 12000022, Thermo Fisher Scientific, Waltham, MA, USA [25]] containing 10 μM milrinone to prevent spontaneous oocyte maturation and was punctured using a 30-gauge needle. Oocytes were collected, and cumulus cells were mechanically stripped using a small-bore glass pipet. For in vitro maturation, oocytes were washed into bicarbonate-buffered MEMα [25] containing 5% fetal bovine serum (Invitrogen, Carlsbad, CA, USA) and were incubated overnight at 37°C in a humidified incubator containing 5% $CO_2/95\%$ air. Completion of oocyte maturation was confirmed by the disappearance of the nuclear envelope and the formation of first polar bodies using a stereoscope. For immunofluorescence, in vitro-matured eggs were fixed, extracted, and stained as previously described [15]. Eggs were imaged with a Zeiss Pascal confocal microscope with a 40x, 1.2 NA water immersion objective (C-Apochromat; Carl Zeiss MicroImaging, Inc., Thornwood, NY, USA).

## IVF and Embryo Transfer

Mice were superovulated by priming with 5 to 10 IU eCG, followed 48 hours later with 5 to 10 IU hCG. Approximately 13 to 15 hours later, cumulus masses were obtained from the oviducts by puncturing the swollen ampullae. Cumulus masses were incubated in 200 μL drops of human tubal fluid (Cook Medical Inc., no. K-RVFE) containing 250 μM reduced glutathione for ~30 minutes prior to adding sperm. Sperm were collected from the epididymides of a single male mouse by gently snipping with fine scissors into a 100 μL drop of IVF medium [26] containing 15 mg/mL Fraction V BSA (Calbiochem) and were capacitated for 1 to 2 hours before adding 2 to 3 μL of the sperm suspension to the drops containing the eggs. The sperm and eggs were incubated together for 4 hours, then were washed into 200 μL drops of human tubal fluid without glutathione. Eggs that were fragmented were discarded and were not counted in the total number of eggs per mouse. Fertilized eggs were cultured overnight in a humidified incubator at 37°C with 5% $CO_2$, and $O_2$ adjusted to 5%. The next day, 2-cell embryos were counted, transferred to KSOM medium (MR-101-D, Sigma), and cultured for 3 days in the low (5%) $O_2$ incubator. On day 4 after IVF, blastocysts were noted. Blastocysts were defined as embryos with a distinct cavity, inner cell mass, and trophectoderm. Cleavage rates were calculated as the number of 2-cell embryos divided by the total number of ovulated eggs × 100.

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH - Health Services Research Library user on 04 April 2024

4

*Endocrinology*, 2023, Vol. 164, No. 11

In a total of 3 experiments, cleavage-stage embryos were transferred to pseudopregnant females. Up to 15 2-cell embryos were transferred into each oviduct of pseudopregnant CD-1 females for up to 30 embryos total per surrogate dam. Dams were examined to confirm pregnancy 2 weeks after embryo transfer, and dams delivered 3 weeks after embryo transfer. Live birth rate, calculated as the number of live born pups divided by the number of embryos transferred × 100, as well as male to female ratios, were calculated. The pups were housed with the surrogate dam for approximately 3 weeks until they were weaned and then were transferred to cages in which up to 5 mice were housed per cage. To evaluate the fertility of the pups, siblings were mated and live births were counted.

### Statistical Analysis

Statistical analyses were performed using Prism 6.0 software for Windows (GraphPad Software, La Jolla, CA, USA; www.graphpad.com). All data were continuous, and error bars represent the SEM. One-way ANOVA was used to determine differences between 3 or more groups, with multiple comparisons analyzed using Tukey's multiple comparisons test. $P < .05$ was considered to be statistically significant.

### Results

#### LA Suppresses Puberty in Female Mice

We first confirmed that LA at a dose of 100 μg every 4 weeks inhibits puberty in female mice by analyzing daily vaginal smears initiated after the second LA dose was given, when mice were 9 weeks old. Mice started on LA at 3 weeks of age displayed persistent cornified cells and/or leukocytes in the vaginal epithelium at 7 to 8 weeks of age, indicating that these mice were not cycling (data not shown) [27]. Ovaries from 9-week-old mice treated with 2 monthly doses of LA also lacked CL as determined by ovarian histology [Supplementary Fig. S1A [28]]. The ovaries from LA-treated mice appeared similar to the ovaries of untreated 9-week-old female control mice [Supplementary Fig. S1B [28]]. Vaginal smears indicated that control mice were cycling, and CL were also observed in histological sections [Supplementary Fig. S1C [28]]. As CL typically remain for up to 8 days after ovulation in the mouse [24], these results suggest that LA-injected mice were not cycling for at least 8 days prior to evaluation.

Mice treated with T using a low-dose/high-dose regimen (see *Methods* and Fig. 1) had elevated T levels compared to controls at the termination of the experiment, with levels typically between 0 and 1 ng/mL among untreated mice and between 1 and 6 ng/mL among treated mice. These T levels were within the normal range measured in male mice in our study, 0 to 20 ng/mL, which is consistent with previous reports in the literature (Fig. 2) [29]. It should be noted that because we measured T levels at the termination of the experiment, and ~1 week after the last dose of T was injected, these values are in the trough phase, assuming that testosterone is gradually metabolized. In transgender males, the peak T concentration occurs 1 to 3 days after T injection, and many clinicians prefer to test T levels at the trough when making clinical decisions due to more consistent measurements [30].

Control mice that were not treated with LA or T had estrous cycles based on vaginal cytology, and their ovaries contained



**Figure 2.** Testosterone levels in untreated mice, mice treated with testosterone cypionate, and males.

numerous CL (Fig. 3A, 3B, and 3F). Mice treated with LA or LA + T did not appear to cycle as determined by the lack of proestrus/estrus on vaginal smears (Fig. 3A). However, 2 out of 3 of the ovaries from LA-only mice and 5 out of 9 of the ovaries from LA + T-treated mice that were examined histologically showed the presence of a few CL (Fig. 3C and 3F). Mice injected with T but not LA showed a persistent mix of cornified cells and leukocytes on vaginal smears, consistent with previous findings [15, 16]. However, 25% (2/8) of these mice showed the presence of large, nucleated cells indicative of proestrus, suggesting they could be cycling. Correspondingly, the ovaries from mice showing nucleated cells on vaginal smears had high numbers of CL on histology, which is not in accordance with previous reports (Fig. 3D and 3F; see *Discussion*). Overall, our results clearly demonstrate that LA significantly inhibits ovary growth and suggest that LA effectively suppresses puberty in female mice.

#### Pubertally Suppressed Female Mice Weigh More, But Ovaries are Smaller, Than Control Mice

Mice treated with LA weighed slightly but significantly more than control mice of the same age (Fig. 4A), which is consistent with previous reports of mice treated with GnRH agonists [31]. This higher mouse weight was maintained regardless of T exposure (Fig. 4A). Despite the larger size of the mice exposed to LA, ovaries from LA-treated mice were significantly smaller than ovaries from controls. This discrepancy in ovarian weight associated with LA exposure was true regardless of concomitant exposure to T (Fig. 4B). Ovaries from LA- and LA + T-treated mice weighed approximately 2 to 3 times less than that of control mice (Fig. 4B). Mice treated with T only had ovaries comparable in size to controls [Fig. 4B(i)]. However, when the mice were stimulated with eCG, their ovarian weight did not increase as much as controls [Fig. 4B(ii)]. Ovaries from LA- and LA + T-treated mice approximately doubled in weight when mice were stimulated with eCG (Fig. 4B). Similar results were obtained when presenting the data as a ratio of ovarian weight to body weight (Fig. 4C). The ovaries from LA-treated mice were subjectively more fragile and prone to deterioration with manipulation in all groups.

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH – Health Services Research Library user on 04 April 2024

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH - Health Services Research Library user on 04 April 2024



**Figure 3.** Mice treated with LA and T ovulate significantly less than mice treated with T alone. (A) Sample estrous cycles from a control (circles), LA-only (squares), and LA + T (triangles) mouse. Note the absence of a proestrus surge in the LA-treated mice. (B)-(E) Ovarian histology from 19-week-old mice that were (B) untreated, (C) treated with LA only, (D) treated with T only, and (E) treated with LA + T. Examples of CL are indicated by asterisks. (F) Mean number of CL within ovaries. Bars with different letters are significantly different ($P < 0.05$).
Abbreviations: CL, corpora lutea; LA, leuprolide acetate; T, testosterone cypionate.

## Ovaries From Mice Treated With LA and T Produce Oocytes That Have Morphologically Normal Meiotic Spindles After In Vitro Maturation and Respond to Gonadotropin Stimulation

To examine if ovaries from T- or LA + T-treated mice produce viable oocytes, we examined their ability to mature in vitro. Oocytes from mice that were treated with T or with LA + T produced mature metaphase II eggs that formed morphologically normal spindles after in vitro maturation (Fig. 5A). Normal spindles were defined as being bipolar with chromosomes aligned on a metaphase plate, whereas abnormal spindles lacked a bipolar structure or had misaligned chromosomes (Fig. 5B). Unstimulated, LA + T-treated mice had a significantly lower normal meiotic spindle rate compared to eCG-stimulated mice exposed to LA

and T, suggesting that eCG may rescue follicles that would otherwise be atretic.

To examine ovarian responsiveness to gonadotropin stimulation in LA-treated mice, we measured E2 levels and the ability to ovulate. In preliminary experiments using 9-week-old control and LA-only mice, E2 levels in both unstimulated, LA-treated, and control mice were similar and approximately doubled in response to stimulation with 5 IU eCG (Fig. 6A), demonstrating that ovaries from LA-treated mice can respond to gonadotropins. To examine ovulation, we first tried stimulating these 9-week-old mice with 5 IU eCG and 5 IU hCG. We found that while LA-treated mice ovulated similar numbers of mature eggs as controls when stimulated with 5 IU eCG/5 IU hCG, only 10 out of 16 mice were responders (62.5%). When mice were injected with 10 IU eCG/10 IU hCG, 83% (5/6) responded

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH - Health Services Research Library user on 04 April 2024



**Figure 4.** LA-treated mice weigh more but have smaller ovaries than age-matched controls. (A) Mouse weights. (B) Ovarian weights from mice (i) unstimulated or (ii) stimulated with eCG and hCG. (C) Ratio of ovary:mouse weights in mice that were (i) unstimulated or (ii) stimulated with eCG and hCG. Each data point represents 1 mouse or ovary. Bars with different letters are significantly different (*P* < 0.05). Abbreviations: eCG, equine chorionic gonadotropin; hCG, human chorionic gonadotropin; LA, leuprolide acetate.

(Fig. 6B). The number of eggs ovulated was variable, but there was no difference between LA-treated mice and controls.

Basal E2 levels in 19-week-old, control or LA-only mice were similar to those in 9-week-old mice. However, there were no statistically significant increases in E2 levels when these mice were stimulated with 10 IU eCG (Fig. 6C). E2 levels in the unstimulated, T-treated mice were similar to those of LA-only mice that were stimulated with eCG (Fig. 6C). All LA-only and T-only mice ovulated, while 86% (12/14) of mice treated with both LA and T ovulated in response to

10 IU eCG/10 IU hCG. The absolute number of eggs retrieved per mouse was highly variable, but there were no significant differences in egg yield between control, LA only, T only, and LA + T groups (Fig. 6D).

## Eggs From Female Mice Treated With LA and T Are Fertilizable and Produce Developmentally Competent Embryos and Fertile Pups

To examine if eggs obtained from LA + T-treated mice were developmentally competent, superovulated eggs were inseminated

**A**



**B**

**Figure 5.** Oocytes from mice treated with LA and T undergo IVM normally. (A) Mean rates of normal meiotic spindle formation among unstimulated and stimulated mice that were treated with T only or with LA + T. Each data point represents spindle counts from a single mouse. Bars with different letters are significantly different (*P* < 0.05). (B) Representative normal (top panel) meiotic spindle and abnormal (bottom panel) meiotic spindle from IVM with visible polar bodies. DNA = orange, and α-tubulin = green. Bar = 10 μm.
Abbreviations: IVM, in vitro maturation; LA, leuprolide acetate; T, testosterone cypionate.

and embryo formation and development rates were assessed. Eggs from LA-only, T-only, and LA + T-treated mice had similar cleavage rates as controls (Fig 7A), produced normal-appearing blastocysts capable of hatching (Fig. 7B), and had similar live birth rates when embryos were transferred into pseudopregnant hosts (Fig. 7C). The male to female ratios of the pups derived from these experiments were similar (Fig. 7D). When sibling pups were mated, all of the mating pairs reproduced with comparable numbers of pups (Fig. 7E); therefore, offspring from mice whose female parent was exposed to LA, T, or both LA and T were found to be fertile without any reproductive issues.

## Discussion

As more adolescent transgender males seek to bypass normal female puberty, it is important to have a thorough understanding of possible ramifications for future fertility. There have been essentially no human studies on the effects of puberty suppression followed by testosterone administration. In this study, we found that administration of the puberty-blocking agent, LA, followed by T, to female mice did not impair subsequent reproduction. Indeed, ovarian function and embryologic outcomes were similar among female mice treated with LA in combination with T compared to controls. This is the first prospective study to our knowledge to report fertility outcomes after treatment with pubertal suppression and testosterone therapy among female mice. Our results also extend previous studies [15, 16] examining the effects of T on reproduction in adult female mice.

LA treatment by itself effectively suppressed puberty for at least 3 months when administered to 3-week-old mice. Mice did not cycle as assessed by vaginal cytology, and their ovaries contained very few corpora lutea. Unexpectedly, mice treated with T but not LA had a substantial number of CL in their ovaries. Two recent studies reported the use of mouse models to study the effects of T treatment on female mice [15, 16]. These studies showed that postpubertal female mice treated with T stopped cycling, as determined by persistent diestrus on vaginal smears. One of these prior studies showed a

complete absence of CL in mice treated with T [16], whereas the other study showed a greatly reduced number of CL in the T-treated groups [15]. Differences in the current study are that (1) our mice were not treated with T until they were 11 weeks old, and (2) they were only given a low dose of T for the first 4 weeks. The mice were most likely cycling by the time T administration began. It is also possible that mice treated with T alone were able to cycle during the first 4 weeks of T treatment, when the dose of T administered was relatively low. Previous studies have reported that mouse CL disappear after 8 days [24]. However, multiple studies have shown that androgens administered to rodents prevent the decline in serum progesterone implicated in luteal cell apoptosis, and androgens themselves may directly inhibit apoptosis of luteal cells as well [32]. Given these observations, our results may reflect one of two possible scenarios: administration of T in our mice may not have caused ovulation to cease, or it may have caused cessation of ovulation while also preventing CL regression.

Regardless, the presence of CL in the T-treated mice reinforces the fact that T administration in humans, while causing vaginal and endometrial atrophy, may not necessarily be an effective contraceptive, and transgender males on T therapy can continue to ovulate, which is supported by multiple reports in the literature [33–35]. Much of the existing data regarding infrequent ovulation associated with excess testosterone is from patients with polycystic ovarian syndrome (PCOS) or other causes of hirsutism or virilization. However, some of the conclusions drawn from PCOS-related data can be applied to those taking exogenous T despite the differences between these populations, including the higher androgen levels among individuals on exogenous hormones and more complex metabolic changes among those with PCOS [36, 37].

Although vaginal cytology observations suggested that LA-treated mice did not cycle, their ovaries were responsive to gonadotropins. Mice treated with LA only had elevated E2 levels in response to eCG and ovulated eggs after a subsequent injection of hCG. These mice appeared to be less sensitive to gonadotropins, as fewer mice responded to 5 IU eCG/5 IU hCG than to 10 IU eCG/10 IU hCG, but most mice responded to 10 IU of gonadotropins. This is similar to the response in humans, as prepubertal children and adolescents undergoing stimulation have been reported to have a higher response to stimulation with higher doses of gonadotropins for a longer period of time [38, 39].

Vaginal cytology also suggested that LA- and T-treated mice did not cycle. However, 2 out of 3 of LA-only ovaries and 6 out of 9 LA + T ovaries that were examined histologically showed the presence of CL, indicating that these mice did ovulate. The average number of CL that were observed from these ovulating mice (2.5 for LA only and 7 for LA + T) was significantly lower than the average number of CL that were counted in the control (43) and T-only-treated ovaries (32). The most likely explanation for the higher number of CL in the LA + T group compared to LA only is that higher levels of circulating E2 as a result of peripheral conversion of T were sufficient to trigger an LH surge in some of the mice. The E2 levels that were measured at the end of the experiment in all T-treated mice were above the threshold at which E2 levels become stimulatory for LH [40, 41]. It should be noted that LA downregulates GnRH receptors that are required to stimulate an LH surge. However, the mice utilized in these experiments were started on low-dose T at the same time they were given their last injection of LA. It is likely

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH - Health Services Research Library user on 04 April 2024

*Endocrinology*, 2023, Vol. 164, No. 11



Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH - Health Services Research Library user on 04 April 2024

**Figure 6.** Mice exposed to LA and T respond to gonadotropins. (A) Estradiol-17β levels in response to 5 IU eCG in control and LA-treated 9-week-old mice. Bars with different letters are significantly different ($P < 0.05$). (B) Number of ovulated eggs retrieved per mouse by dose of eCG and hCG among 9-week-old control and LA-treated mice. Bars with different letters are significantly different ($P < 0.05$). (C) Estradiol-17β levels in 19-week-old control, LA-treated, T-treated, or LA- and T-treated mice before or after stimulation with 10 IU each of eCG and hCG. (D) Number of ovulated eggs retrieved per mouse among 19-week-old mice primed with 10 IU eCG and 10 IU hCG. There were no significant differences among any groups. In all cases, each data point represents a single mouse.
Abbreviations: eCG, equine chorionic gonadotropin; hCG, human chorionic gonadotropin; LA, leuprolide acetate; NS, not significant; T, testosterone cypionate.

that GnRH receptors slowly returned as the effects of LA diminished, such that the elevated levels of E2 were able to stimulate an LH surge that resulted in ovulation. The ovaries of the mice that ovulated weighed the same as anovulatory ovaries, and the observation that they produced fewer CLs than controls suggested that puberty in these mice was indeed suppressed.

LA and T treatment did not seem to affect the development of meiotically competent oocytes. Oocytes collected from the ovaries of LA- and T-treated mice matured to the metaphase II stage in vitro, producing morphologically normal meiotic spindles. While the overall rate of normal spindle production was high among all groups examined, spindle development in mice treated with LA, T, and eCG was significantly higher than LA- and T-treated mice that were not given eCG. This could be due to a higher proportion of atretic follicles in the unstimulated group. A higher rate of atretic follicles among T-treated individuals has been previously reported in both humans and mice [11, 16]. The

atresia and low rate of normal spindles in the mice exposed to LA and T may be overcome by stimulation with eCG, which allows for recruitment of a larger number of follicles including those that would have become atretic without eCG rescue. Previous studies have shown that despite the atresia of follicles exposed to T, the size of the ovarian follicular pool is not significantly diminished based on the numbers of antral follicles seen in all groups [15, 16, 42, 43].

The ultimate test of egg quality after puberty suppression and cross-hormone therapy is the ability to produce viable offspring. LA- and T-treated mice ovulated eggs that were fertilizable, developed to blastocysts in culture, and completed gestation comparable to control mice after embryo transfer to foster females. The offspring that resulted from IVF were fertile after mating with siblings, demonstrating no fertility defects in either male or female pups.

In conclusion, LA, which is routinely used for puberty suppression in adolescent transgender males, effectively inhibits puberty in female mice. Pubertally suppressed mice treated

*Endocrinology*, 2023, Vol. 164, No. 11                                                                                                9



**Figure 7.** Eggs from mice treated with LA and T are fertilizable and developmentally competent. (A) Mean cleavage rate per mouse. (B) Representative image of a hatching blastocyst surrounded by other blastocysts from a mouse treated with both LA and T. Imaged at 400× magnification. (C) Mean live birth rate per mouse, defined as the number of pups divided by the number of embryos transferred × 100. (D) Ratios of male and female pups resulting from IVF. Total number of pups is indicated above each bar. (E) Number of pups resulting from sibling matings. In all cases, each data point represents a single mouse.

Abbreviations: IVF, in vitro fertilization; LA, leuprolide acetate; NS, not significant ($P < 0.05$); T, testosterone cypionate.

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH - Health Services Research Library user on 04 April 2024

with T stop cycling, but their ovaries remain sensitive to gonadotropins and produce meiotically and developmentally competent eggs capable of producing fertile offspring. These results are the first to demonstrate that fertility is not impaired in mice after puberty suppression and cross-hormone therapy, in which natal puberty is avoided entirely. Though this study is an exciting first step, it must be noted that some aspects of the mouse model may not translate well to humans, in which many transgender males use hormone therapy for several years prior to seeking fertility treatment. Therefore, more long-term studies are warranted. Regardless, the results provide an optimistic outlook for fertility preservation in transgender adolescents who may not decide until years after hormone therapy has begun whether they would like to have biological children.

## Acknowledgments

The authors thank Drs. Daniel Grow, Chantal Bartels, and Laurinda Jaffe for their support, advice, and thoughtful suggestions on the manuscript. The authors would like to acknowledge the Center for Advanced Reproductive Services and Village Fertility Pharmacy for their generous donation of depot leuprolide acetate for this study. We also thank Zhifang Hao at the histology core at UConn Health and Hanna Colegrove at Ichor Life Sciences, Inc. for their help with ovarian histology and Drs. Melinda Sanders and Mingfu Yu in the pathology department at UConn Health for their collaboration on taking photographs for this manuscript.

## Funding

This study was funded by the Reproductive Endocrinology and Infertility fellowship program through UConn Health Graduate Medical Education.

## Disclosures

The authors have no competing interests to disclose.

## Data Availability Statement

*Some or all datasets generated during and/or analyzed during the current study are not publicly available but are available from the corresponding author on reasonable request.*

## References

1. Hembree WC, Cohen-Kettenis PT, Gooren L, *et al*. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.
2. Coleman E, Bockting W, Botzer M, *et al*. Standards of care for the health of transsexual, transgender, and gender-nonconforming people. WPATH guidelines version 7. *Int J Transgend*. 2012;13(4):165-232.
3. T'Sjoen G, Arcelus J, Gooren L, Klink DT, Tangpricha V. Endocrinology of transgender medicine. *Endocr Rev*. 2019;40(1):97-117.
4. Rider GN, Mcmorris BJ, Gower AL, Coleman E, Eisenberg ME. Health and care utilization of transgender and gender nonconforming youth: A population-based study. *Pediatrics*. 2018;141(3):e20171683.

*Endocrinology*, 2023, Vol. 164, No. 11

Downloaded from https://academic.oup.com/endo/article/164/11/bqad145/7285260 by NIH – Health Services Research Library user on 04 April 2024

5. Flores AR, Herman JL, Gates GJ, Brown TNT. How many adults identify as transgender in the United States? *Williams Inst*. 2016:1-13.

6. Quinn VP, Nash R, Hunkeler E, *et al*. Cohort profile: Study of Transition, Outcomes and Gender (STRONG) to assess health status of transgender people. *BMJ Open*. 2017;7(12):e018121.

7. Defreyne J, T'Sjoen G. Transmasculine hormone therapy. *Endocrinol Metab Clin North Am* 2019;48(2):357-375.

8. Ramos GGF, Mengai ACS, Daltro CAT, Cutrim PT, Zlotnik E, Beck APA. Systematic review: puberty suppression with GnRH analogues in adolescents with gender incongruity. *J Endocrinol Invest*. 2021;44(6):1151-1158.

9. Panagiotakopoulos L. Transgender medicine—puberty suppression. *Rev Endocr Metab Disord*. 2018;19(3):221-225.

10. Mahfouda S, Moore JK, Siafarikas A, Zepf FD, Lin A. Puberty suppression in transgender children and adolescents. *Lancet Diabetes Endocrinol*. 2017;5(10):816-826.

11. Ikeda K, Baba T, Noguchi H, *et al*. Excessive androgen exposure in female-to-male transsexual persons of reproductive age induces hyperplasia of the ovarian cortex and stroma but not polycystic ovary morphology. *Hum Reprod*. 2013;28(2):453-461.

12. DeRoo C, Lierman S, Tilleman K, *et al*. Ovarian tissue cryopreservation in female-to-male transgender people: insights into ovarian histology and physiology after prolonged androgen treatment. *Reprod Biomed Online*. 2017;34(6):557-566.

13. Lebbe M, Taylor AE, Visser JA, Kirkman-Brown JC, Woodruff TK, Arlt W. The steroid metabolome in the isolated ovarian follicle and its response to androgen exposure and antagonism. *Endocrinology*. 2017;158(5):1474-1485.

14. Franks S, Hardy K. Androgen action in the ovary. *Front Endocrinol (Lausanne)*. 2018;9:452.

15. Bartels CB, Uliasz TF, Lestz L, Mehlmann LM. Short-term testosterone use in female mice does not impair fertilizability of eggs: implications for the fertility care of transgender males. *Hum Reprod*. 2021;36(1):189-198.

16. Kinnear H, Constance E, David A, *et al*. A mouse model to investigate the impact of testosterone therapy on reproduction in transgender men. *Hum Reprod*. 2019;34(10):2009-2017.

17. Moravek MB. Fertility preservation options for transgender and gender-nonconforming individuals. *Curr Opin Obstet Gynecol*. 2019;31(3):170-176.

18. Wierckx K, Van Caenegem E, Pennings G, *et al*. Reproductive wish in transsexual men. *Hum Reprod*. 2012;27(2):483-487.

19. Broughton D, Omurtag K. Care of the transgender or gender-nonconforming patient undergoing in vitro fertilization. *Int J Transgend*. 2017;18(4):372-375.

20. Nahata L, Tishelman AC, Caltabellotta NM, Quinn GP. Low fertility preservation utilization among transgender youth. *J Adolesc Health*. 2017;61(1):40-44.

21. Armuand G, Dhejne C, Olofsson JI, Rodriguez-Wallberg KA. Transgender men's Experiences of fertility preservation: a qualitative study. *Hum Reprod*. 2017;32(2):383-390.

22. Periti P, Mazzei T, Mini E. Clinical pharmacokinetics of depot leuprorelin. *Clin Pharmacokinet*. 2002;41(7):485-504.

23. Goldman JM, Murr AS, Cooper RL. The rodent estrous cycle: characterization of vaginal cytology and its utility in toxicological studies. *Birth Defects Res B Dev Reprod Toxicol*. 2007;80(2):84-97.

24. Gaytan F, Morales C, Leon S, *et al*. Development and validation of a method for precise dating of female puberty in laboratory rodents: the puberty ovarian maturation score (pub-score). *Sci Rep*. 2017;7:46381.

25. Mehlmann LM, Uliasz TF, Lowther KM. SNAP23 is required for constitutive and regulated exocytosis in mouse oocytes. *Biol Reprod*. 2019;101(2):338-346.

26. Mehlmann LM, Kline D. Regulation of intracellular calcium in the mouse egg: calcium release in response to sperm or inositol trisphosphate is enhanced after meiotic maturation. *Biol Reprod*. 1994;51(6):1088-1098.

27. Byers SL, Wiles M V, Dunn SL, Taft RA. Mouse estrous cycle identification tool and images. *PLoS One*. 2012;7(4):e35538.

28. Godiwala P, Uliasz TF, Lowther KM, Kaback D, Mehlmann LM. Supplementary figure: Puberty suppression followed by testosterone therapy does not impair reproductive potential in female mice. FigShare Repos. Available at: https://figshare.com/articles/figure/Supplementary_Figure_docx/24155982. Accessed September 18, 2023.

29. Coquelin A, Desjardins C. Luteinizing hormone and testosterone secretion in young and old male mice. *Am J Physiol*. 1982;243(3):E257-E263.

30. Wilson DM, Kiang TKL, Ensom MHH. Pharmacokinetics, safety, and patient acceptability of subcutaneous versus intramuscular testosterone injection for gender-affirming therapy: A pilot study. *Am J Health Syst Pharm*. 2018;75(6):351-358.

31. Hopmans SN, Duivenvoorden WCM, Werstuck GH, Klotz L, Pinthus JH. GnRH antagonist associates with less adiposity and reduced characteristics of metabolic syndrome and atherosclerosis compared with orchiectomy and GnRH agonist in a preclinical mouse. *Urol Oncol*. 2014;32(8):1126-1134.

32. Stocco C, Telleria C, Gibori G. The molecular control of corpus Luteum formation, function, and regression. *Endocr Rev*. 2007;28(1):117-149.

33. Krempasky C, Harris M, Abern L, Grimstad F. Contraception across the transmasculine spectrum. *Am J Obstet Gynecol*. 2020;222(2):134-143.

34. Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstet Gynecol*. 2014;124(6):1120-1127.

35. Amato P. Fertility options for transgender persons. UCSF Transgender Care Navig. Progr. 2016. Available at: https://transcare.ucsf.edu/guidelines/fertility.

36. Escobar-Morreale HF, Carmina E, Dewailly D, *et al*. Epidemiology, diagnosis and management of hirsutism: a consensus statement by the androgen excess and polycystic ovary syndrome society. *Hum Reprod Update*. 2012;18(2):146-170.

37. West S, Vähäsarja M, Bloigu A, *et al*. The impact of self-reported oligo-amenorrhea and hirsutism on fertility and lifetime reproductive success: results from the Northern Finland Birth Cohort 1966. *Hum Reprod*. 2014;29(3):628-633.

38. Martin CE, Lewis C, Omurtag K. Successful oocyte cryopreservation using letrozole as an adjunct to stimulation in a transgender adolescent after GnRH agonist suppression. *Fertil Steril*. 2021;116(2):522-527.

39. Rothenberg SS, Witchel SF, Menke MN. Oocyte cryopreservation in a transgender male adolescent. *N Engl J Med*. 2019;380(9):886-887.

40. Wood GA, Fata JE, Watson KLM, Khokha R. Circulating hormones and estrous stage predict cellular and stromal remodeling in murine uterus. *Reproduction*. 2007;133(5):1035-1044.

41. Nilsson ME, Vandenput L, Tivesten Å, *et al*. Measurement of a comprehensive sex steroid profile in rodent serum by high-sensitive gas chromatography-tandem mass spectrometry. *Endocrinology*. 2015;156(7):2492-2502.

42. Van Den Broecke R, Van der Elst J, Liu J, Hovatta O, Dhont M. The female-to-male transsexual patient: a source of human ovarian cortical tissue for experimental use. *Hum Reprod*. 2001;16(1):145-147.

43. DeRoo C, Tilleman K, Tsjoen G, De Sutter P. Fertility options in transgender people. *Int Rev Psychiatry*. 2016;28(1):112-119.