# EXHIBIT 21

Farr Curlin                                                        April 8, 2024

Page 1

1                 UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                        NORTHERN DIVISION

4    _____

5    BRIANNA BOE, et al.,

6              Plaintiffs,

7        v.                              Case No.

8    UNITED STATES OF AMERICA,           2:22-cv-00184-LCB

9              Intervenor Plaintiff,

10       v.

11   HON. STEVE MARSHALL, in his

12   official capacity as Attorney

13   General of the State of

14   Alabama, et al.,

15             Defendants.

16   _____

17

18

19

20

21

22       Job No. CS6629188

Farr Curlin                                                              April 8, 2024

Page 2

1   VIDEOCONFERENCE DEPOSITION OF FARR CURLIN, M.D.
2   DATE:        Monday, April 8, 2024
3   TIME:        9:03 a.m.
4   LOCATION:    Remote Proceeding
5            Durham, NC 27710
6   REPORTED BY:   Christopher Friebe
7   JOB NO.:     6629188
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 3

1         A P P E A R A N C E S
2   ON BEHALF OF INTERVENOR PLAINTIFF UNITED STATES OF
3   AMERICA:
4      AMIE MURPHY, ESQUIRE (by videoconference)
5      Department of Justice Civil Rights Division,
6      Housing and Civil Enforcement Section
7      Washington, D.C. 20530
8      amie.murphy2@usdoj.gov
9      (202) 353-1285
10
11   ON BEHALF OF DEFENDANTS HON. STEVE MARSHALL, ET AL.:
12      ROGER BROOKS, ESQUIRE (by videoconference)
13      Alliance Defending Freedom
14      44180 Riverside Parkway
15      Lansdowne, VA 20176
16      rbrooks@adflegal.org
17      (202) 393-8690
18
19   ALSO PRESENT:
20      Renee Williams, U.S. DOJ (by videoconference)
21      Cynthia Weaver, Private Plaintiff's Counsel (by
22      videoconference)

Page 4

1             I N D E X
2   EXAMINATION:                        PAGE
3      By Ms. Murphy                     8
4
5             E X H I B I T S
6   NO.        DESCRIPTION              PAGE
7   Exhibit 1    Dr. Curlin's CV          15
8   Exhibit 2    Dr. Curlin's Expert Report   16
9   Exhibit 3    Book: "The Way of Medicine"   78
10  Exhibit 4    Article: "Young Adult Psychological
11           Outcome After Puberty Suppression
12           And Gender Reassignment"       119
13  Exhibit 5    Article: "Sex Reassignment:
14           Outcomes and Predictors of
15           Treatment for Adolescent and Adult
16           Transsexuals"          120
17  Exhibit 6    Article: " Association of
18           Gender-Affirming Hormone Therapy
19           With Depression, Thoughts of
20           Suicide, and Attempted Suicide
21           Among Transgender and Nonbinary
22           Youth"             122

Page 5

1         E X H I B I T S (Cont'd)
2   NO.        DESCRIPTION             PAGE
3   Exhibit 7    Article: "Access to
4           Gender-Affirming Hormones
5           During Adolescence and Mental
6           Health Outcomes Among
7           Transgender Adults"        123
8   Exhibit 8    Reuters Article         163
9   Exhibit 9    Article: "In Vitro Fertilization
10           Outcomes in a Mouse Model of
11           Gender-Affirming Hormone Therapy
12           In Transmasculine Youth"      185
13  Exhibit 10   Article: "Puberty Suppression
14           Followed by Testosterone Therapy
15           Does Not Impair Reproductive
16           Potential in Female Mice"      187
17
18        QUESTIONS INSTRUCTED NOT TO ANSWER
19           PAGE    LINE
20           101     3
21           103     6
22

Farr Curlin                                                        April 8, 2024

Page 6

1          P R O C E E D I N G S

2          THE REPORTER:  Good morning.  My name

3   is Christopher Friebe; I am the reporter assigned by

4   Veritext to take the record of this proceeding.  We

5   are now on the record at 9:03 a.m.

6          This is the deposition of Dr. Farr

7   Curlin taken in the matter of Brianna Boe, et al., and

8   United States of America vs. Honorable Steve Marshall,

9   in his official capacity as Attorney General of the

10  State of Alabama on Monday, April 8, 2024, at Durham,

11  North Carolina.

12         I am a notary authorized to take

13  acknowledgments and administer oaths in Michigan.

14  Parties agree that I will swear in the witness

15  remotely.

16         Additionally, absent an objection on

17  the record before the witness is sworn, all parties

18  and the witness understand and agree that any

19  certified transcript produced from the recording of

20  this proceeding:

21         - is intended for all uses permitted

22              under applicable procedural and

Page 7

1              evidentiary rules and laws in the

2              same manner as a deposition recorded

3              by stenographic means; and

4         - shall constitute written stipulation

5              of such.

6         At this time will the counsel please

7   identify yourselves for the record?

8          MS. MURPHY:  This is Amie Murphy,

9   representing the United States.

10         MR. BROOKS:  Roger Brooks, with the

11  Alliance Defending Freedom, representing the

12  defendants.

13         THE REPORTER:  Thank you.  Hearing no

14  objection, I will now swear in the witness.

15         Please raise your right hand.

16  WHEREUPON,

17         DR. FARR CURLIN,

18  called as a witness and having been first duly sworn

19  to tell the truth, the whole truth, and nothing but

20  the truth, was examined and testified as follows:

21         THE REPORTER:  Thank you.

22         Counsel, you may now proceed.

Page 8

1          MS. MURPHY:  Thank you.

2               EXAMINATION

3   BY MS. MURPHY:

4     Q    Good morning, Dr. Farr Curlin.  As was

5   noted, my name is Amie Murphy, and I represent the

6   United States in this matter.  Have you had your

7   deposition taken before?

8     A    I have.

9     Q    How many times?

10    A    I don't know.

11    Q    More than ten?

12    A    Probably more than ten.  I'm not certain.

13    Q    That's fine.  When was the last time, just

14  approximately, that you had your deposition taken?

15    A    A couple of months ago.

16    Q    Okay.  Well, in that case, I'm going to

17  dispense with my usual spiel, where I remind you that

18  you're under oath, and I'm sure you're aware of that.

19  But the one thing I will say is that if you do need a

20  break at any time during this deposition, we will take

21  breaks, but if you need one at an unscheduled time,

22  just let me know and as long as there's no question

Page 9

1   pending we can take a break and go off the record.

2   Understood?

3     A    Yes, I understand that.

4     Q    Did you bring any documents with you to your

5   deposition today?

6     A    No, I did not bring any documents, but I do

7   have from my attorney here, my CV and my report in

8   hard copy.

9     Q    And are there any notations, handwritten

10  notations, on either your CV or the copy of your

11  report that you have in front of you?

12    A    No, there are no handwritten notes.

13    Q    Okay.  And does that appear to be a true and

14  correct copy of the CV and report that you submitted

15  in this case?

16    A    Yes, it does appear to be a -- the copy of

17  the CV and the report that I submitted in this case.

18    Q    And since we're not in the same room, can

19  you just tell me if there's any other documents in

20  front of you?

21    A    No, there are no other documents in front of

22  me.

Farr Curlin                                                                April 8, 2024

Page 10

1   Q   Okay.  Did you do anything to prepare for
2   today's deposition?
3   A   Yes, I did.
4   Q   What did you do?
5   A   I reviewed my report in detail, and I
6   reviewed some of the documents I cite in the report.
7   I also met with Mr. Brooks to talk about the
8   deposition process, and -- then I reviewed my
9   note -- not my notes, but my highlighted areas on my
10  report again.
11  Q   And apart from the lawyers in this case, did
12  you speak with anyone in preparation for your
13  deposition?
14  A   No, I did not.
15  Q   So before we go any further, I want to make
16  sure we have the same understanding on some terms that
17  I'm going to use throughout this deposition.  So
18  first, let's talk about gender dysphoria.  How would
19  you define gender dysphoria?
20  A   I define gender dysphoria as dysphoria
21  experienced at the perception that one's secondary sex
22  characteristics are at odds with one's own sense of

Page 11

1   gender.
2   Q   And since you used the term dysphoria in
3   your definition, can you explain what you mean by
4   dysphoria?
5   A   Dysphoria means just bad feeling.  So
6   it's -- it's some collection of sadness, anxiety,
7   being upset, feeling bad.  It -- it's a broad term.
8   Q   And when did you become familiar with the
9   term gender dysphoria?
10  A   I -- I don't recall when I first became
11  familiar with the term.
12  Q   Would you say that it was in the context of
13  your clinical practice that you became familiar with
14  the term?
15  A   No, I would not say it was in the context of
16  my clinical practice.
17  Q   So what's your recollection there?
18  A   I'm sorry, what -- what do you mean what is
19  my recollection there?
20  Q   Sorry, that was a bad question.  So what do
21  you recall about your becoming familiar with the term
22  gender dysphoria?

Page 12

1   A   What I recall is through my work as a
2   medical ethicist at some point years ago, becoming
3   aware that there was the phenomenon of gender
4   dysphoria and there were ethical questions that were
5   being raised about how to respond to that.  How to
6   understand it.
7   Q   And are you familiar with the definition in
8   the DSM-5 text revision version of gender dysphoria?
9   A   I couldn't cite it chapter and verse, but I
10  am familiar with it in the sense that I have reviewed
11  it and know the -- that there is such definition.
12  Q   And are you aware whether the condition
13  described as gender dysphoria has ever been known by
14  another term?
15      MR. BROOKS:  Objection.
16  A   I -- I am aware that terms used in this
17  context regarding self-perceived gender and -- and
18  what that perception implies have been shifting and
19  changing over time.  I do not recall what term was
20  used before gender dysphoria.
21  Q   Okay.  In that case, can we agree when I use
22  the term gender dysphoria, I'm referring to the

Page 13

1   condition that's described in the DSM-5-TR for
2   purposes of this deposition?
3   A   Since you want me to accept that that's the
4   definition you're using, would you read that
5   definition to me?
6   Q   I can, although I am actually -- what don't
7   we do this?  Why don't we go with your understanding
8   of the term gender dysphoria for purposes of this
9   deposition?  Does that make sense?
10  A   I think so, yes.
11  Q   I think so, too.  In your report, you refer
12  to medicalized gender transition treatment or NGT.
13  You use this acronym throughout your report; correct?
14  A   Yes, I use that abbreviation throughout the
15  report.
16  Q   And how do you define NGT?
17  A   As I think I said in the report, I define it
18  as -- I use the abbreviation to refer to the use of
19  puberty-blocking drugs and cross-sex hormones as
20  treatments for gender dysphoria.
21  Q   And are you aware of the term
22  gender-affirming care?

4 (Pages 10 - 13)

Page 14

1   A   Yes, I am aware of the term gender-affirming
2  care.
3   Q   And how would you define that?
4   A   Gender-affirming care is a euphemism that
5  has been used to refer, for example, in, as I recall,
6  in the Rhafferty-authored piece by the American
7  Academy of Pediatrics, to an approach that takes the
8  perception of one's secondary sex characteristics
9  being at odds with one's gender identity, so called,
10 to be rightly responded to through medicalization
11 through either -- through puberty-blocking hormones
12 and/or cross-sex hormones.
13  Q   So can you explain to me what the difference
14 is between those two terms?
15       MR. BROOKS:  Objection.
16  A   Gender-affirming care is a euphemism.  It's
17 imprecise, insofar as it does not specify whether
18 medicine is involved and it does not specify what one
19 takes the gender to be.  Medicalized gender transition
20 is an abbreviation I use in this report to not have to
21 repeat multiple times puberty-blocking hormones and
22 cross-sex hormones used in the context of perception

Page 15

1  of one's secondary sex characteristics being at odds
2  with one's perceived gender identify.
3       The key idea is that medicalized specifies
4  that you're taking that perception and treating it as
5  a medical problem, to which medical interventions,
6  namely this -- puberty-blocking drugs and cross-sex
7  hormones are -- are the appropriate responses.
8   Q   Now that we -- I'd like to start with a
9  couple questions from your CV.
10       MS. MURPHY:  So I'd like to mark as
11 Exhibit 1, a copy of Dr. Curlin's CV.
12       (Exhibit 1 was marked for
13        identification.)
14       MS. MURPHY:  I'm just marking a copy of
15 the CV.  Do I need to have Andrew pull it up in order
16 to do that?
17       THE REPORTER:  No, you can just tell me
18 you want it marked, and then it's up to you if you
19 want to show it or not.  Then basically you only need
20 to introduce it as an exhibit if you want it attached
21 to the transcript.
22       MS. MURPHY:  So I do want to introduce

Page 16

1  it as an exhibit.
2  BY MS. MURPHY:
3   Q   And, Dr. Curlin, I believe you have a copy
4  of your CV in front of you.  And you indicated that
5  it's the same as the copy that you submitted with your
6  report.  I submit to you that that's the only copy we
7  have of your CV, so that's the one that I'd like to
8  mark as Exhibit 1 in this case.
9       I have some questions on it.  If you would
10 like to refer to it to answer my questions, that's
11 fine with me.  As we sit here today, are there any
12 changes that you would make to the copy of the CV that
13 we've marked as Exhibit 1?
14  A   There are no changes as of when it was sent
15 to you that I would propose to add.
16       MS. MURPHY:  Okay.  And then now
17 similarly, I'd like to mark a copy of Dr. Curlin's
18 expert report that he submitted in this case as
19 Exhibit 2.
20       (Exhibit 2 was marked for
21        identification.)
22 //

Page 17

1  BY MS. MURPHY:
2   Q   And, you know, we don't need to pull it up
3  right now, but I ask that since it sounds like you
4  have a copy that you submitted to us in this case and
5  I submit to you that that's the copy that we'd like to
6  mark as Exhibit 2, that if you want to refer to your
7  report as I am asking questions about particular
8  paragraphs, that's fine.  I understand that you have
9  it in front of you; correct?
10  A   Yes, that's correct.
11  Q   Excellent.  Same question I asked about your
12 CV.  Are there any changes that you would make to your
13 report as we sit here today?
14  A   No, there are no changes that I would make.
15  Q   Okay.  So turning first to your CV, you
16 obtained your undergraduate degree in biology from UNC
17 Chapel Hill; correct?
18  A   Yes, I obtained my undergraduate degree in
19 biology from UNC Chapel Hill.
20  Q   And during your undergraduate studies, did
21 you complete any coursework on psychology?
22  A   I do not recall.  Let me say I do not recall

Farr Curlin                                                          April 8, 2024

Page 18

1  what the coursework was.  I know I had some -- some
2  introduction to psychology, but I don't remember the
3  details.
4      Q   Do you recall whether any portion of that
5  class related to gender identity?
6      A   I do not recall whether it related to gender
7  identity.
8      Q   And do you recall whether any portion of
9  that class or classes that you took in psychology
10 related to psychology specific to adolescents?
11     A   I do not recall that in any detail.
12     Q   And during the same timeframe, did you
13 complete any coursework on psychiatry?
14     A   As an undergraduate, I had no coursework
15 specifically on psychiatry.
16     Q   So after undergrad, you attended medical
17 school at UNC Chapel Hill; is that correct?
18     A   Yes.  After undergraduate, I went to medical
19 school at the University of North Carolina at Chapel
20 Hill.
21     Q   What made you choose to go to medical
22 school?

Page 19

1      A   Well, it's complex and I don't profess to
2  fully understand why, but I was conscious of finding
3  that the work of attending to those who are sick is
4  intrinsically valuable, meaningful.  I had observed it
5  to be such in the practice of my grandfather, who was
6  a general surgeon, and my father who was an
7  obstetrician/gynecologist.
8          And I found that I enjoyed the study of the
9  sciences, particularly the sciences relevant to human
10 experience, and that I enjoy the humanities.  And that
11 medicine was a field that allowed me -- invited me to
12 commit myself to something worthwhile to something
13 that was objectively good, namely preserving and
14 restoring the health of human beings, that was
15 intellectually interesting, and my -- my interest with
16 respect to science and with respect to the humanities.
17         And for all those reasons, and I'm sure many
18 others, I chose to pursue becoming a physician.
19     Q   And you started to touch on this a bit, but
20 if you could elaborate, what is your view on the
21 purpose of medicine?
22     A   My view on the purpose of medicine is that

Page 20

1  medicine's intrinsic and constituent purpose is
2  preserving and restoring the patient's health.
3  Insofar as one reasonably can, responsive also to the
4  broader demands of morality, of ethics.
5      Q   And how long have you held that view?
6      A   Two my knowledge, I've held that view
7  throughout my life.
8      Q   Can you point to anything that influenced
9  your thinking on that subject?
10     A   Well, I watched the work of my father, as a
11 physician.  I saw family members being cared for by
12 medical professionals.  I myself, on some rare
13 occasions, was under the ministrations of medical
14 professionals.  I read stories about medical
15 professionals.  And all of that, I think, reflected
16 the reality that the thing that makes medical
17 professionals medical professionals is that they are
18 attending to those whose health is threatened or
19 diminished or injured in some way and seeking, insofar
20 as they reasonably can, to preserve and restore their
21 health.
22     Q   And as you describe that goal, would you say

Page 21

1  that that is in line with the teachings in medical
2  school?
3      A   Well, it's really too broad of a question to
4  answer.  There are lots of teachings in medical
5  school.  But generally, yes, that is consistent with
6  the teachings of medical school.  There are some
7  teachings that are made in some medical schools by
8  some medical educators that I think are not consistent
9  with that understanding.
10     Q   How so?
11         MR. BROOKS:  Objection.
12     A   Well, sometimes medical -- medical educators
13 will suggest that the goal of medicine is to do what
14 patients want.  And that if a patient wants something,
15 then the physicians have a professional obligation to
16 provide it, so long as they're not violating the law.
17 That's one example.
18     Q   And do you agree or disagree with that
19 example?
20     A   With the view I just described, I disagree.
21     Q   Going back to the coursework that you did in
22 medical school.  Did you complete any coursework on

Farr Curlin                                                                                April 8, 2024

Page 22

1  psychology?

2      A   I recall that we had coursework on

3  psychology, but I don't recall the details.

4      Q   And did any of that coursework specifically

5  involve diagnosing mental health conditions?

6      A   We did have coursework, yes, on diagnosing

7  mental health conditions.

8      Q   And were these courses that were part of the

9  general path to a degree in medicine, or were they

10 so-called electives?

11     A   Well, there were both types of courses, but

12 certainly our required coursework included coursework

13 on diagnosing mental health conditions.

14     Q   And did you take any coursework on top of

15 that, like maybe some electives?

16     A   I don't recall.

17     Q   Did any of the coursework that you completed

18 involve discussion of gender identity?

19     A   I don't recall any coursework during medical

20 school talking about what you -- using the language of

21 gender identify.  I, of course, don't know what you

22 mean when you say "gender identity," but I do not

Page 23

1  recall that language being used in our coursework in

2  medical school.

3      Q   What's your understanding of the term

4  "gender identity"?

5      A   My understanding is that term is used by

6  different people in different ways.  I don't -- I

7  don't use the term if I can avoid it, because I --

8  it's so non-specific, particularly in the context like

9  this.

10     Q   Okay.  Did any of the coursework that you

11 completed in psychology involve any discussion of

12 diagnosing gender dysphoria?

13     A   I don't have any memory of the coursework in

14 medical school including coursework on diagnosis of

15 gender dysphoria.

16     Q   Did you take any courses in psychiatry?

17     A   Yes, as I said before, we had courses

18 involving psychiatry.

19     Q   Now apart from what we've already discussed,

20 did you take any other courses that included any

21 discussion of gender dysphoria?

22     A   I do not recall.

Page 24

1      Q   So at some point I assume you completed

2  clinical rotations as part of medical school?

3      A   Yes, as part of medical school I completed

4  clinical rotations.

5      Q   What did you do your rotations in?

6      A   I'm sorry, I didn't understand what you

7  said.  Can you repeat that?

8      A   Let me ask this first.  How many rotations

9  did you do?

10     A   I don't recall the number of rotations that

11 we did.

12     Q   What type of rotations did you do and in

13 what area were your rotations?

14     A   As best as I can recall, during our first

15 clinical year, third year of medical school, we did

16 rotations in internal medicine, surgery, obstetrics

17 and gynecology, psychiatry, family medicine, and

18 pediatrics.  And there may have been something else

19 that I don't remember at this moment.

20     Q   And did you choose which rotations to do?

21     A   In that first clinical year, we had very

22 little choice.  I don't recall if we had some choice

Page 25

1  on the margins, but for the most part, we did.

2      Q   Okay.  And did you do a second year of

3  clinical rotations?

4      A   Yes, I did a fourth year of medical school,

5  which includes clinical rotations.

6      Q   And what were the rotations that you

7  completed that year?

8      A   Likewise, I don't recall, except I know I

9  did rotations in internal medicine, particularly.

10     Q   And do you recall whether any of the

11 patients that you saw during your rotations had a

12 diagnosis of gender dysphoria?

13     A   I don't recall seeing a patient who had what

14 today would be called gender dysphoria.  At least not

15 one that was coded as such clinically.

16     Q   And during that time did you see a patient

17 who had concerns over their gender identity?

18     A   Depends on what you mean by the term "gender

19 identity."

20     Q   Did any patients express concerns, distress,

21 over the congruence of their sense of their sex and

22 the sex that they were assigned at birth?

7 (Pages 22 - 25)

Farr Curlin                                                          April 8, 2024

Page 26

1    A   I -- I don't recall.

2    Q   So after medical school, you completed your
3  residency at University of Chicago; correct?

4    A   Yes.  After medical school I completed a
5  residency in internal medicine at the University of
6  Chicago.

7    Q   And what is internal medicine?

8    A   Internal medicine is a discipline of
9  clinical medicine that focuses on non-surgical
10 conditions and treatments of adults.

11   Q   So when you say "adults," is that anyone
12 over the age of 18?

13   A   With respect to the clinical practice, the
14 boundary is essentially someone who is physically
15 mature.  So we don't have a sharp boundary on the age.
16 But -- but we don't generally take care of children.

17   Q   Okay, understood.  Can it sometimes include
18 adolescents?

19   A   On rare occasions.

20   Q   What made you choose internal medicine?

21   A   I was attracted to the comprehensiveness and
22 "systematicness" of the culture of internal medicine

Page 27

1  and the way that internal medicine was characterized
2  by trying to understand all that comes into a
3  patient's experience of illness, the way that it
4  blends, psychology, and physiology, and clinical
5  judgment in areas of uncertainty.  It involves
6  longitudinal relationships with patients.

7        I was attracted by the way it -- it
8  characteristically seeks to understand root causes of
9  peoples' illnesses and to try to thoroughly
10 investigate, to try to understand the contributors to
11 complex medical experiences that patients have.  And I
12 was attracted to some of the teachers I had in
13 internal medicine who were, to me, exemplars of a good
14 physician.

15   Q   Okay.  What types of conditions did you
16 treat during your residency?

17   A   Well, I treated all manner of conditions,
18 accepting that I did not conduct any major surgery.  I
19 saw pretty much -- well, I saw all manner of other
20 conditions.

21   Q   Does that include mental health conditions?

22   A   Yes, it definitely includes mental health

Page 28

1  conditions.

2    Q   So as an internal medicine physician, do you
3  diagnose mental health conditions?

4    A   Yes.  We frequently diagnose mental health
5  conditions in internal medicine.

6    Q   During your residency, can you describe the
7  patient population that you treated?

8    A   I can only describe it in broad strokes
9  because it was so diverse.  But it was adult patients
10 who were experiencing illnesses of one form or another
11 in both the out -- I saw them in both the outpatient
12 and the inpatient context.  The conditions ranged all
13 over the map.

14   Q   And were any of the patients that you saw
15 diagnosed with gender dysphoria?

16   A   I don't recall any patient specifically that
17 carried a diagnosis of what today is called gender
18 dysphoria.

19   Q   Were there any patients who displayed
20 symptoms that you would consider similar to the
21 symptoms described by gender dysphoria?

22   A   There were certainly patients who had

Page 29

1  perceptions of their body as being unwanted.  Features
2  of their body being things they didn't want and that
3  they wished were different.

4    Q   And did you treat those patients for that
5  condition?

6    A   I would, in those cases -- and here I'm
7  speaking generally; I'm not speaking about a
8  particular case.  But I would have expressed sympathy
9  and then sought to discern first was there anything
10 wrong with their body medically and -- or whether it
11 was their perception of their body that was -- that
12 was disordered.  And if it were the latter, I would
13 seek to reassure them that their -- best I could tell,
14 there was not a problem with the health of their body
15 and help them go on as best they could, despite the
16 experience of wishing their body were different.

17   Q   And am I correct that you've never made, or
18 at least during that timeframe, you didn't make a
19 diagnosis of gender dysphoria?

20   A   To -- to the best of my recollection, I
21 never made a diagnosis of gender dysphoria.

22   Q   And as you described those symptoms in

8 (Pages 26 - 29)

Farr Curlin                                                                    April 8, 2024

Page 30

1  answering my last question, was there a diagnosis that
2  you made to describe those symptoms?
3          MR. BROOKS:  Objection, calls for
4  speculation.
5      A   Yeah, I -- I would have to think of a
6  particular case, and I don't have detailed memories of
7  particular cases from 25 years ago.
8      Q   Okay.  Moving on to the fellowships that you
9  completed after your residency.  The first was the
10  Robert Wood Johnson Clinical Scholars program;
11  correct?
12     A   Yes, that's -- the first fellowship I
13  completed after residency was the Robert Wood Johnson
14  Clinical Scholars Program.
15     Q   And how long was that program?
16     A   That program was two years.
17     Q   And can you describe what the program
18  entailed?
19     A   The Robert Wood Johnson Clinical Scholars
20  Program was a program that allowed competitive
21  applicants who were selected to spend two years
22  developing their own area of scholarship regarding

Page 31

1  health services, which is a term that encompasses,
2  effectively, all of the practice of medicine except
3  for the biomedical scientific piece.
4          So whether that's epidemiology, policy,
5  ethics, questions of how healthcare is distributed,
6  and so on.  And the -- effectively, what we did was
7  begin to study the topic we were interested in with
8  mentors, who were supported by the -- the -- the
9  program, and take coursework and gain other training
10  that would help us do the kind of scholarship that we
11  proposed to do with rigor and with methodological and
12  analytical excellence.  And basically learn how to
13  become and begin to become what in medicine are called
14  clinician investigators.
15     Q   Can you define that term for me, please?
16  Clinical -- sorry, go ahead.
17     A   The -- a clinician investigator is someone
18  trained as a clinician and generally who continues to
19  practice as a clinician, who also is trained as and
20  practices as an investigator, a researcher, a scholar
21  of some form.
22     Q   Okay.  And you said that students in this

Page 32

1  program chose an area to focus on.  What was your area
2  that you chose?
3      A   I chose to focus on what characteristics of
4  persons and characteristics of their experiences
5  result in them working in underserved communities.
6  That's how I began my -- my fellowship.  And then over
7  the course of the first year of my fellowship, I moved
8  to seeking to understand how religious commitments
9  feature in -- in decisions to work among the
10  underserved.  And then with the encouragement of my
11  mentors, to study the religious characteristics of
12  physicians and to look more broadly at how those
13  characteristics account for, empirically, differences
14  in physicians, clinical practices, and in their --
15  their beliefs regarding their practices of medicine.
16     Q   And did your work culminate in a written
17  publication?
18     A   Yes, the work culminated in a number of
19  written publications.
20     Q   And are those listed on your CV?
21     A   Yes, they are, to my knowledge.
22     Q   Can you point to them, please?

Page 33

1      A   Point to them how?
2      Q   Tell me what they are.
3      A   Oh.  Are you asking specifically the
4  publications that emerged from the work -- that
5  emerged during my fellowship or that emerged
6  eventually from the work in my fellowship?
7      Q   Start with the former.
8      A   Okay.  So my first paper, peer-reviewed
9  paper, number 1 on my CV, is one.  And I actually
10  don't recall, because I don't have the date in front
11  of me, whether number 2 came out while I was still a
12  fellow or after I had joined the faculty.
13     Q   Okay.  And these are on page 7 of your CV;
14  correct?
15     A   Page 12.
16     Q   Let me make sure.  Okay, all right, I got it
17  now.  So numbers 1 and 2 on page 12?
18     A   That's correct.  And I am checking to see if
19  any of the non-peer-reviewed publications occurred
20  during my fellowship, and I do not believe they did.
21     Q   You indicated that you did clinical work
22  related to that fellowship.  Is that listed under your

9 (Pages 30 - 33)

Farr Curlin

April 8, 2024

Page 34

1 clinical practice in your CV?  Let me ask it a
2 different way.
3        Is that the Lawndale Christian Health
4 Center?
5    A   When I was -- during my time as a fellow, as
6 a Robert Wood Johnson clinical scholar, I did see
7 patients at the Lawndale Christian Health Center.
8 Federally funded community health center on the west
9 side of Chicago.
10    Q   Okay.  I'm going to ask a couple questions
11 about that in a bit, but first a couple questions
12 about the second fellowship that you did at the
13 MacLean Center for Medical Ethics.  You completed a
14 fellowship there from 2003 to 2004; is that right?
15    A   That's right.  That's the MacLean Center for
16 Clinical Medical Ethics, just to be precise.  And yes,
17 I completed that from 2003 to 2004.
18    Q   And actually, before I get more details on
19 that, when did you first become interested in the area
20 of clinical medical ethics?
21    A   I don't recall.  I think I was always
22 interested in ethics of medicine.

Page 35

1    Q   Was there a particular motivation for your
2 interest in that area?
3    A   Well, I -- I wanted to practice good
4 medicine and avoid practicing bad medicine.  I found
5 reasoning about how we ought to practice, interesting,
6 stimulating, and worthwhile.  So that was all -- I
7 don't have memory of that not being the case at any
8 point in my medical training.
9    Q   So going back to the fellowship, can you
10 describe what that was about?
11    A   The MacLean Center for Clinical Medical
12 Ethics fellowship is a premier training program,
13 primarily for physicians, started by Mark Siegler, The
14 University of Chicago.  And its focus is on -- it's a
15 part-time fellowship that I completed during my first
16 year on faculty, and its focus is on training fellows
17 in the history of medical ethics, as that field came
18 to be self-consciously and developed from the -- the
19 1960s to present, introducing them to the key
20 participants in that field, to the key arguments made,
21 concepts used, the legal cases that have had import,
22 and so on.  All with an emphasis on the kinds of

Page 36

1 issues that emerge from clinical practice of medical
2 practitioners, rather than on issues such as, let's
3 say, environmental ethics that are not -- that don't
4 emerge directly from clinical medicine.
5    Q   And during that fellowship, did you have a
6 specific area of focus?
7    A   No.  That fellowship was -- my focus was on
8 learning the field of medical ethics.
9    Q   And is the -- I'm sorry, you pronounce it
10 MacLean?
11    A   I pronounce it MacLean.
12    Q   Okay.  I apologize.  I'm from Virginia, and
13 the next town over is spelled the same but pronounced
14 MacLane.  So in my head I keep confusing the two.
15        Is the MacLean Center secular or is there a
16 religious affiliation?
17    A   The MacLean Center has no religious
18 affiliation.
19    Q   And your fellowship, did it have a religious
20 focus?
21    A   No, I completed the MacLean Center Clinical
22 Medical Ethics fellowship, and so it had no religious

Page 37

1 focus, although religious ideas were addressed insofar
2 as they were part of the ideas at stake in medical
3 ethics.
4    Q   Okay.  So then after that fellowship, you
5 participated in the Summer Institute for Survey
6 Research Methods; correct?
7    A   That's correct, yes.  I --
8    Q   And what --
9    A   -- Summer Institute for Survey Research
10 Methods at the University of Michigan.
11    Q   And what was that --
12    A   Sorry, repeat that, please?
13    Q   What was the program about?
14    A   That program is designed to equip people who
15 are using survey research methodologies in their
16 empirical research, to -- to do so expertly and using
17 the best available methods.
18    Q   And what was your purpose in completing that
19 program?
20    A   I had, at that point, begun to study
21 physicians' religious characteristics and how those
22 are associated with their clinical practices and ideas

10 (Pages 34 - 37)

Page 38

1  about their practices and was beginning to use and
2  intended to further use survey research methods.  And
3  so I went and completed that Summer program to get
4  further training on how to do that well.  That being
5  conduct well-designed surveys that can answer the
6  questions one was trying to answer.
7      Q    And then in 2008, you participated in the
8  Palliative Care Education and Practice program;
9  correct?
10     A    Yes.  I completed the Palliative Care
11  Education and Practice program at Harvard University,
12  yes.
13     Q    And can you describe that program?
14     A    That program was designed for people in
15  academic institutions who were practicing palliative
16  medicine, to give them further training and cohort
17  regarding palliative medicine and all of its various
18  dimensions, including how to teach palliative
19  medicine.
20     Q    What prompted your interest in palliative
21  medicine?
22     A    I practiced general internal medicine for

Page 39

1  the first several years out of training, and at some
2  point it dawned on me that the context of clinical
3  practice in which I most came alive was in caring for
4  very sick people, and particularly people who were
5  facing the limits of medicine or at the end of life.
6  And that I enjoyed helping them negotiate the clinical
7  ethical challenges of such situations, and I enjoyed
8  teaching students and other trainees about that,
9  and -- and then when palliative medicine as a field
10 began to mature and it first came to University of
11 Chicago, I was one of those who raised my hand, so to
12 speak, to join a group of folks who were learning that
13 practice and developing that discipline at the
14 University of Chicago.
15     Q    How would you define palliative medicine?
16     A    Palliative medicine is that subspecialty of
17 medicine that develops particular expertise regarding
18 and focuses clinically on the relief of difficult and
19 health-diminishing symptoms.
20     Q    Is palliative care the same as hospice care?
21     A    Palliative care is not the same as hospice
22 care, no.

Page 40

1      Q    How does it differ?
2      A    So palliative medicine, which is the term I
3  will use as it's more precise, again, is defined, I
4  think, in the way I described.  People experience
5  difficult symptoms with advanced illness of all sorts,
6  and that's what palliative medicine does, is address
7  those symptoms, and address the -- the challenging
8  clinical decisions that have to be made as one deals
9  with advanced illness.
10         Hospice, by contrast, is a way of
11 structuring how medicine is organized and paid for.
12 And in the case of hospice, it is for patients who
13 have, according to the judgment of at least two
14 physicians, a prognosis of six months or less to live.
15 Hospice is a way that the remaining care they receive
16 can be organized and financed.
17         So in one sense, hospice is -- is an
18 insurance benefit of Medicare that has corollaries and
19 private insurance benefits, but it's fundamentally a
20 way of organizing medical care.  And that medical care
21 includes palliative medicine, but it includes other
22 aspects of medicine also.

Page 41

1      Q    Got it.  So apart from any continuing
2  medical education that you may have completed, have we
3  discussed all the training that you have completed
4  with respect to -- let me withdraw that.  That was a
5  bad question.
6          Apart from any continuing medical education
7  that you may have completed, have we discussed all
8  medical-related training that you've received?
9      A    Well, yes and no.  Yes, that's the extent of
10 the formal education courses, other than various ad
11 hoc and continuing medical education-related courses.
12 But the training regarding clinical medicine is --
13 goes on in multiple ways that are not limited to such
14 coursework.
15     Q    Understood.  So other than what we've
16 already discussed, have you completed any specialized
17 training in psychology?
18     A    Well, I have participated in and completed
19 conferences and symposia that address psychology
20 relevant to medicine innumerable times over the course
21 of my clinical practice.  So in that respect -- so I
22 have done that.

11 (Pages 38 - 41)

1    Q    And are all of the symposia and conferences
2  that you're referring to there, are they listed on
3  your CV?
4    A    No, they are not listed on my CV.  It's not
5  customary to list such things on one's CV.
6    Q    Do any of those conferences or symposia that
7  you're referring to relate to the issue of gender
8  dysphoria?
9    A    Yes.  I don't recall how many, but yes.
10   Q    And would you say that there were more
11 than -- let me ask it this way.
12       Were there any symposium or conferences that
13 were specifically about the issue of gender dysphoria?
14   A    Yes, there were.  And I likewise don't
15 recall how many.
16   Q    And you don't remember any of the names of
17 these conferences or symposia?
18   A    I -- I remember one, for example, was put on
19 by the leader of the so-called gender clinic here at
20 Duke University.
21   Q    And approximately when was that that you
22 attended that -- was it a conference or was it a

1  symposia?
2    A    It was a -- it was a mid-day conference.
3  And I don't recall how many years ago that was.
4    Q    Can you describe the subjects that were
5  discussed during that conference?
6    A    I recall that the subject of gender
7  dysphoria was discussed, as well as the subject of
8  puberty blockade and cross-sex hormones.  I know that
9  much, but I don't recall more details.
10   Q    And was the focus of that discussion or
11 those discussions, was it aimed at achieving a certain
12 purpose?
13   A    I -- I can't speculate about what the
14 purpose was that those who put on that conference were
15 trying to achieve.
16   Q    Were the presenters opposed to prescribing
17 those types of treatments for patients with gender
18 dysphoria?
19   A    In that conference, no, they were not
20 opposed.
21   Q    Were they in favor of prescribing those
22 types of treatments for someone with gender dysphoria?

1        MR. BROOKS:  Objection.
2    A    To the best of my recollection, they were
3  presenting why they thought such -- what they were
4  doing and why they thought such puberty blockade and
5  cross-sex hormones was a good thing to do for certain
6  patients.
7    Q    Okay.  And I know that you said that you
8  can't remember when this was, but what was your
9  employment at the time?
10   A    I was here at Duke University.
11   Q    Okay.  Have you attended any other
12 conferences or symposia related to the issue of gender
13 dysphoria?
14   A    Yes, I have.  My pause is to try -- is
15 because the -- the language of conferences is -- is
16 somewhat imprecise within the world of medicine.  We
17 are having meetings and discussions frequently about
18 the issues that arise in clinical medicine and
19 clinical ethics.  But yes, I've had other context
20 where -- that focused on the issue of gender
21 dysphoria.
22   Q    Okay.  But you're referring more to meetings

1  or discussions, not necessarily conferences dedicated
2  to that topic?
3        MR. BROOKS:  Objection.
4    A    So I'm -- I recall -- well, right now I
5  recall one other meeting that -- well, two meetings
6  that were called specifically to focus on that
7  subject.
8    Q    And was this also while you were at Duke?
9    A    Yes, this was while I was at Duke.
10   Q    And what was the focus of those meetings?
11   A    Both of these meetings are described in my
12 expert report.  One was a meeting -- the people
13 gathered by the Greenwall Foundation Faculty Scholars
14 Program last fall and focused on ethical questions
15 that remain regarding -- I'd have to look at my report
16 to remember the precise title, but regarding
17 medicalization of -- of -- medicalized responses to
18 gender dysphoria.
19       The second was a -- a faculty conference of
20 the faculty of the Transfer for Bioethics, Humanities,
21 and History of Medicine to talk about similar
22 questions.

Page 46

1  Q   Okay.  And when you say that they're listed
2  in your report, are you talking about the CV portion
3  of your report or are you talking about the body of
4  your report?
5  A   I'm talking about the body of my report.
6  Q   Okay.  I know it may take you a minute to
7  look through, but could you direct me to the portion
8  of your report where you discuss these?
9         MR. BROOKS:  And Counsel, if we could
10 take a short break in the near future, that would be
11 great.
12        MS. MURPHY:  Sure.
13        THE WITNESS:  If you look at paragraph
14 49 and 50, I refer to these two meetings.
15        MS. MURPHY:  Okay.  Counsel, if you
16 want to take a short break, now is a good time.  Would
17 you say you want five minutes, ten minutes?
18        MR. BROOKS:  Every time anybody says
19 five, it takes ten.  So let's just do that.
20        MS. MURPHY:  I agree.  Okay.
21        MR. BROOKS:  All right.
22        THE REPORTER:  All right, the time is

Page 47

1  10:16 a.m.  We are now off the record.
2         (Off the record.)
3         THE REPORTER:  The time is 10:26 a.m.
4  We are now back on the record.
5  BY MS. MURPHY:
6  Q   Okay.  Dr. Curlin, I'm going to move on to
7  just a couple questions about your clinical practice.
8  It looks like you began your clinical practice in
9  2001, as a primary care internist at the Lawndale
10 Christian Health Center; is that correct?
11 A   Well, I began my clinical practice in
12 training.  We have -- had a continuity clinic.  But I
13 continued it post-training in that context.
14 Q   Got it.  So where is the Lawndale Christian
15 Health Center located?
16 A   The Lawndale Christian Health Center is
17 located on the west side of Chicago, not far from the
18 Cook County Jail, in the -- right at the juncture
19 between the North Lawndale and South Lawndale
20 neighborhoods.
21 Q   And what prompted your decision to work
22 there?

Page 48

1  A   I had been drawn to Chicago as a place to
2  train because I wanted to work among the underserved
3  and had heard about the pioneering work among the
4  undeserved led by the Lawndale Christian Health
5  Center.  And I spoke Spanish and my fiance, soon to be
6  wife, spoke Spanish, and we could live in a
7  Spanish-speaking inner-city neighborhood while
8  learning from physicians who were -- had devoted their
9  lives to practicing medicine among the underserved.
10 And so I chose to live there while training at the
11 University of Chicago, and then was able to negotiate
12 being able to see patients there during my fellowship.
13 Q   And can you tell me about the mission of
14 that center?
15 A   I don't recall the mission exactly, but I
16 know it has something to do with something like
17 showing the love of Christ through caring for patients
18 with excellence.  Something like that.
19 Q   And what role did Christianity play in the
20 care that patients received in the clinic?
21 A   Well, it -- it was the primary motivation
22 for these physicians and nurses to work with a

Page 49

1  population of patients that was marginalized with
2  respect to healthcare resources because of their
3  economic and other forms of poverty, including their
4  immigration status.  And so it was strongly motivated
5  by a Christian vision of our common humanity, that
6  everyone being made in the image of God has dignity,
7  and that those who are poor receive what in the
8  Christian condition is often called the
9  preferential -- preferential option for the poor,
10 meaning they deserve particular regard, particular
11 emphasis, particular priority.
12        And so that whole vision of caring well for
13 people who characteristically struggle to find good
14 medical care was grounded in that Christian tradition.
15 Q   And were choices in treatment options
16 influenced by Christian values?
17 A   I'm sure they were in any number of ways.
18 For example, you know, people would go the extra mile
19 to make sure the patients were able to be seen by
20 specialists that they otherwise could not be seen by
21 because of those same Christian values I just
22 described.

13 (Pages 46 - 49)

Page 50

1      They would seek to make sure that all that
2 is -- all that good medicine rightly ordered makes
3 available to us was seen as something that should be
4 made available to those -- to the least of these, to
5 use that theological language, to those who -- who
6 need it most.  And they were committed to that.
7      Q    And just before we go on, you've used the
8 term "good medicine" a couple times so far today, and
9 I'm wondering if you can give me a definition of what
10 you mean by "good medicine."
11     A    You know, for philosophical reasons, no,
12 there's -- there's no way to define the term
13 could -- good more basically.  That -- that is -- but
14 the idea just means that there are -- among those
15 things that people who put themselves forward as
16 medical practitioners and the institutions that put
17 themselves forward as medical institutions do, not all
18 is good.  And part of the challenge of being human,
19 and specifically being a medical practitioner, is to
20 discern that which is consistent with medicine rightly
21 understood and -- and with the patient's health
22 rightly understood, and with the requirements of -- of

Page 51

1 morality, of ethics rightly understood from that which
2 is not.
3      So for example, it is standard that
4 hospitals would and physicians would refuse to see
5 people who had Medicaid.  And that would be the sort
6 of things that for many people at Lawndale Christian
7 Health Center was an example of not good medicine and
8 a kind of corruption of medical institutions.
9      Q    Understood.  So what patients did the
10 Lawndale Christian Health Center serve?  Age, just in
11 general, what patients did they serve?
12     A    They served all -- all patients that showed
13 up, which included every -- every manner of patient.
14     Q    So children through adult?
15     A    Yes, children through adult.
16     Q    And did providers only treat Christians?
17     A    No.  As I said, they -- they saw everyone
18 who showed up.  They were committed to not
19 distinguishing between patients, except insofar as
20 patients needed medical care.
21     Q    And did providers treat any transgender
22 patients?

Page 52

1      A    I'm sure they did, but I -- I did not see
2 any and so I don't -- I can't say with certainty.
3      Q    But there was no policy against treating the
4 transgender patients?
5      A    No.  In fact, had there been a policy it
6 would have been that we treat anyone and everyone,
7 including anyone who shows up with a genuine medical
8 need that we can be helpful with.
9      Q    And were patients asked about their
10 religious affiliation on any forms or by the provider?
11     A    They, I'm sure, often were.  I don't
12 remember the details of how they were asked.  It's
13 customary across medicine to ask about religious
14 affiliation as part of taking a history.
15     Q    At that practice, were there any policies
16 dictating certain treatments that would not be
17 provided to patients?
18     A    There were no treatments that I'm aware of
19 that -- that were recognized as legitimate medical
20 treatments, treatments that respond to medical need,
21 that were opposed by that clinic.
22     Q    Why do you say it that way?

Page 53

1      MR. BROOKS:  Objection.
2      A    Well, you know, as I've already mentioned,
3 there are things done by people who put themselves
4 forward as medical practitioners and that are offered
5 by institutions that put themselves forward as medical
6 institutions that are not good.  And I don't remember
7 there being a policy, but there were -- it was widely
8 understood that if a patient asked for something that
9 was not something consistent with good medicine,
10 that -- that the medical practitioner would
11 respectfully decline to participate on what the
12 patient requested.
13     Q    Can you think of any examples of those types
14 of treatments?
15     A    The -- I can think of two.  One would be
16 assistance in hastening one's death or causing one's
17 death.  And another would be what we would call
18 elective abortion.
19     Q    And is the reason for not providing those
20 treatments based on Christian values?
21     A    The reason for not providing those
22 treatments are based on values that are not specific

Page 54

1 to Christianity.  Specifically, the ancient and
2 enduring, I think, when people are thinking well and
3 practicing well, commitment to not causing the death
4 of any -- any patient.
5     Q    And so would, and I'll be specific, would
6 prescribing puberty blockers or cross-sex hormones for
7 someone with gender dysphoria, would that fall under
8 the category of treatments that would not be provided?
9     A    I don't recall -- I actually don't know.  I
10 haven't been to Lawndale Christian Health Center in
11 more than 20 years, and so I don't know.
12     Q    What was your role when you practiced there?
13     A    My role was as an outpatient primary care
14 physician.
15     Q    And I know that you've said that the clinic
16 treated all patients.  At that time, did you treat
17 children and adolescents?  In addition to adults, I
18 should say.
19     A    I only saw physically mature adolescents,
20 and that was a minority of the patients that I saw.
21     Q    And were you practicing internal medicine?
22     A    Yes, I was practicing internal medicine.

Page 55

1     Q    Did you treat anyone with a diagnosis or who
2 displayed symptoms of gender dysphoria?
3          MR. BROOKS:  Objection, compound
4 question.
5     A    I don't recall.
6     Q    Did you ever diagnose anyone with that
7 condition while working at the Lawndale Christian
8 Health Center?
9     A    I have no memory of doing so.
10     Q    Did any of your patients express concerns
11 related to their gender identity?
12     A    I don't recall whether any of my patients
13 expressed concerns about how their secondary sex
14 characteristics aligned with their own perception of
15 their gender.
16     Q    The next place you practiced was at
17 University of Chicago Primary Care Group; is that
18 correct?
19     A    Yes, that's the next place I practiced
20 outpatient medicine.
21     Q    And on your CV, you list primary care
22 physician, whereas at Lawndale you described your

Page 56

1 title as primary care internist.  Is there a
2 distinction to be made there or?
3     A    There's no distinction that has substance.
4 I was a primary care physician at both places, and I
5 was an internal medicine physician at both places.
6     Q    And at the Primary Care Group, were you
7 seeing patients in a clinic setting?
8     A    Yes, I was seeing patients in an outpatient
9 clinic setting.
10     Q    And what patients did you see when you
11 worked there?
12     A    I saw all manner of patients that presented
13 to the clinic, with all manner of complaints and
14 concerns, with a focus on adults.
15     Q    And can you give me some examples of the
16 types of conditions that you treated?
17     A    I treated conditions such as chronic pain,
18 fatigue, sleeplessness, depression, anxiety, erectile
19 dysfunction, hypertension, diabetes,
20 hypercholesterolemia, thyroid disorders,
21 osteoarthritis, rheumatoid disorders, kidney disease,
22 and that's not comprehensive but that's an

Page 57

1 example -- that's a list of some examples.
2     Q    And in that setting, did you treat anyone
3 with a diagnosis of gender dysphoria?
4     A    I have no memory of treating someone in that
5 context who carried a diagnosis of gender dysphoria.
6     Q    And did you treat anyone who expressed
7 symptoms that are characteristic of gender dysphoria?
8     A    I don't recall.  I imagine I did, but I
9 don't recall specifics.
10     Q    Did you ever recommend medical treatment to
11 a patient who expressed gender dysphoria symptoms,
12 related to the gender dysphoria?
13          MR. BROOKS:  Objection, lack of
14 foundation.
15     A    I'd want to know what medical treatment you
16 have in mind, but I -- as I said, I don't recall
17 treating anyone who carried a diagnosis of gender
18 dysphoria.  And so similarly, I don't have any
19 recollection of specific treatment.
20     Q    Okay.  And am I correct that during that
21 same time period, beginning in 2003, you were also the
22 attending physician at University of Chicago Hospital?

15 (Pages 54 - 57)

Farr Curlin                                                                  April 8, 2024

Page 58

1    A   Yes, I was also an attending physician on
2  the general medicine service at the University of
3  Chicago Hospitals.
4    Q   And did you ever encounter any patients with
5  gender dysphoria in that setting?
6    A   I am confident that I did, but I don't have
7  specific memories of particular patients.
8    Q   Do you have a specific memory of prescribing
9  puberty blockers to somebody with gender dysphoria?
10   A   No, I have no memory of prescribing puberty
11 blockers to someone with a diagnosis of gender
12 dysphoria.
13   Q   And what about cross-sex hormones?
14   A   I have no memory of prescribing cross-sex
15 hormones to a patient.
16   Q   On your CV, you also describe an ethics
17 consult service.  What do you mean by that?
18   A   At the University of Chicago, I served as
19 one of the attending physicians on the clinical ethics
20 consult service.
21   Q   And is that similar to what you would call
22 the ethics committee?

Page 59

1    A   At the University of Chicago, the consult
2  service self-consciously does not call itself a
3  committee.  In part, emphasize that the goal for that
4  consult service is to help clinicians think well about
5  the issues they face and make clinical judgments that
6  are consistent with their ethical obligations, rather
7  than defer that to a committee.  But we called it
8  the -- the clinical ethics consult service.
9    Q   Got it.  And what was your role on the
10 consult service?
11   A   The months that I was the primary attending,
12 I would go -- when an ethics consult was called, I
13 would go to see those who called the consult and any
14 people involved in the situation for which the ethics
15 consult emerged.  I would often do that with one of
16 our fellows in clinical medical ethics.
17       And would gather data relevant to clinical
18 ethical reasoning about that case and then would draw
19 on what I took to be relevant sources that speak to
20 the clinical ethical questions raised by that case,
21 and put together a one to two-page description of the
22 case and then would present that case to the remainder

Page 60

1  of the faculty and trainees, usually 20 to 30 people,
2  at our weekly clinical ethics case conference to
3  invite them to reason with us and with the people
4  involved in the clinical care for which the case
5  emerged.
6        And would, based on that discussion, then --
7  and my own expertise and the resources that were
8  relevant and the facts that are relevant, we then
9  write a consultation note which would be placed in the
10 chart, which would be my opinions and my
11 recommendations to those involved regarding how they
12 might proceed and for what reasons.
13   Q   And was that note provided to the person who
14 requested the consult?
15   A   Well, it was -- became part of the medical
16 record.  So anybody who had access to the medical
17 record would have access to the note.
18   Q   And how many months were you the primary
19 attending?
20   A   Typically, one to two months per year.
21   Q   Okay.  And when you weren't serving as the
22 primary, were you still serving a role -- what was

Page 61

1  your role when you weren't serving as the primary?
2  How would you describe that?
3    A   My role with respect to the clinical ethics
4  consult service would be to go to the -- when my
5  schedule allowed, to go to the two-hour clinical
6  ethics case conference and participate in that
7  dialogue about the -- the cases that were live at that
8  time.
9    Q   And was it only physicians who could request
10 a consult, or could family or patients request
11 consults also?
12   A   Anyone could request a consult.
13   Q   And was there a particular process that they
14 had to follow to request a consult?
15   A   I don't recall the details, but there were
16 not really hoops to jump through.  It was just if
17 there was a question, whoever became aware of the
18 question was able to ask for an ethics consult, and
19 then it was well known across the hospital how to --
20 how to ask for an ethics consult, and then we would be
21 paged.
22   Q   Can you give me some examples of some of the

16 (Pages 58 - 61)

Page 62

1 types of questions that were posed?

2     A   I can give you a few examples of questions

3 that were posed, but in broad strokes as I don't

4 remember the details of any case these years later.

5 We had cases in which a patient had obviously

6 diminished capacity to reason and to think about some

7 choice for which they, under the law, had authority to

8 make a decision.  And we would be asked to weigh in on

9 whether they had sufficient capacity to make the

10 particular question or the particular judgment that

11 was facing them.

12         And if they didn't, why?  How could that be

13 restored?  And if it could not be restored, who would

14 be the property surrogates to turn to and what

15 standards would bind the decisions that a surrogate

16 would make, and are those standards different from the

17 standards that would bind a patient themselves?

18         We had questions about the care of children,

19 where either families sought some intervention that

20 the physicians did not think was consistent with good

21 medicine.  How a physician should proceed in such a

22 case.

Page 63

1         We had cases in which the physicians thought

2 that some intervention for children was important, and

3 then we would think about whether it was sufficiently

4 important or sufficiently medically necessary that the

5 physicians had authority to override the wishes of the

6 pediatric patient and/or their patients.  And if so,

7 how should they do that and what are -- what's the

8 limit of that -- the scope of that authority?

9         We had, I remember a case in which there was

10 a young woman who sought assisted reproductive

11 technologies because she had not gotten pregnant.  And

12 the question was should that be offered to her since

13 she was, in this case as I recall, 18 or 19 years old

14 and did not have a consistent partner and seemed to

15 have a life that was -- that was unstable.

16         The question was is this good medicine to

17 facilitate this young woman getting pregnant?  There

18 were questions about whether it would be unjust to not

19 permit that for her if they were permitting it for

20 other people who sought that in different

21 circumstances.  And then questions about when,

22 effectively, that kind of discrimination is justified

Page 64

1 discrimination on the basis of medical differences and

2 when it's unjustified discrimination on the basis of

3 differences that should not restrict peoples' care.

4 Those are just some examples.

5     Q   And when faced with those types of

6 questions, did you draw upon Christianity in order to

7 provide advice?

8     A   When faced with those questions, I would

9 draw on, as my colleagues would, the ethical norms and

10 values and goods and standards that are relevant to

11 that case, none of which were specifically affiliated

12 with or emerging from Christianity.  Although, many of

13 them are embraced by and, you know, endorsed by

14 Christianity, Judaism, Islam, and other religious

15 traditions.

16     Q   And did you ever provide consult on a

17 question involving gender dysphoria?

18     A   I do not recall -- I do not recall if we did

19 or not.

20     Q   I assume, from your publications, you're

21 Christian; correct?

22     A   I am a Christian, yes.

Page 65

1     Q   What denomination?

2     A   I'm a part of the Anglican Church of North

3 America.

4     Q   And how long have you been part of the

5 Anglican Church?

6     A   I have been part of the Anglican Church of

7 North America about ten years.

8     Q   And are you still practicing?

9     A   Practicing what?

10     Q   Do you still practice religion with the

11 Anglican Church of North America?

12         MR. BROOKS:  Objection to the form of

13 the question.

14     A   Yeah, I don't know what you mean by

15 practicing.  I am a Christian, and I participate

16 regularly in Christian worship services in a church

17 that's part of the Anglican Church of North America.

18     Q   With respect to your work on the consult

19 service, did you ever counsel anyone to take a course

20 of action that would not align with Christian values?

21     A   I am not aware of any -- any such case, nor

22 am I aware of -- I would need to think of a case and

17 (Pages 62 - 65)

Page 66

1  I -- in which what would be recommended ethically
2  contradicts Christian teaching.
3      Q    Would you say that providing puberty
4  blockers or cross-sex hormones for the treatment of
5  gender dysphoria is against Christian values?
6      A    Medicalized gender transition, I -- I think
7  contradicts a number of ethical norms, as I've
8  described, or at least appears to, as I've described
9  in my expert report.  And insofar as Christianity, as
10 other traditions, embraces some of those values, then
11 at least that far it would contradict Christian
12 values.
13     Q    So just to wrap up the questions I have
14 about your clinical practice, have we discussed all
15 the encounters with persons displaying symptoms of
16 gender dysphoria that you've had in your clinical
17 practice that you can recall?
18         MR. BROOKS:  Objection.
19     A   No, I don't think we have.
20     Q   How many are there that come to mind?
21     A   There is -- I am -- have memory of
22 peripherally being involved in care of -- well, let me

Page 67

1  say this.  I have clear memories of one patient whom I
2  cared for as a palliative medicine physician who was a
3  male who had a perceived -- self-perceived gender of
4  female.
5      Q   And what was your treatment related to with
6  this patient?
7      A   The medical care that this patient needed as
8  he was suffering from an advanced cancer.
9      Q   Was that individual receiving cross-sex
10 hormones?
11     A   Yes.  Not -- not prescribed by me, but yes,
12 he was receiving those.
13     Q   He was still receiving a prescription from a
14 different physician; correct?
15     A   Correct.  As best I can recall.  I was
16 brought in as a specialist consultant regarding
17 palliative medicine needs, and the patient was
18 receiving those -- had been receiving those as an
19 outpatient and was continuing to receive those during
20 the hospitalization when I saw the patient.
21     Q    Are there any other encounters with patients
22 with gender dysphoria that you can recall?

Page 68

1      A   I -- I don't recall other specific patients
2  that have been under my direct clinical care.
3      Q    Switching topics.  Are you familiar with the
4  Alliance for Hippocratic Medicine?
5      A   Yes, I am somewhat familiar with the
6  Alliance for Hippocratic Medicine.
7      Q    What is that alliance?
8      A   The Alliance for Hippocratic Medicine, to
9  the best of my knowledge, is an alliance of several
10 medical organizations, including the Christian Medical
11 and Dental Association, the Catholic Medical
12 Association, the American College of Pediatricians, I
13 believe it's called, and the American Association of
14 Pro-Life Obstetrician/Gynecologists, and I believe I
15 couple of other organizations that have formed an
16 alliance to contend for what they take to be norms
17 consistent with Hippocratic medicine.
18     Q    Are you a member of that organization?
19     A   I am not a member of that organization
20 directly, although I don't know if -- if there are
21 memberships specifically to that organization.
22     Q    Are you involved in that organization in any

Page 69

1  way?
2      A   I am not.  I was a speaker, a plenary
3  speaker, for that organization's -- one of its opening
4  events.  And -- but otherwise, I have not been
5  involved with it.
6      Q    What about the Society for Hippocratic
7  Medicine?
8         MR. BROOKS:  Objection to the form of
9  the question.
10     A   I don't know what the Society for
11 Hippocratic Medicine is.  I'm not sure to what you're
12 referring.
13     Q    Do you have involvement in an organization
14 that is called by a name that includes Hippocratic
15 medicine?
16     A   I'll help you out here.  I am involved in an
17 association called the Hippocratic Society.
18     Q    Tell me about that.  What is the purpose of
19 the Hippocratic Society?
20     A   The purpose of the Hippocratic Society is to
21 form clinicians in the practice and pursuit of good
22 medicine.

18 (Pages 66 - 69)

Farr Curlin                                                April 8, 2024

Page 70

1    Q   And what is your role with that
2 organization?
3    A   I am the president of that organization.
4    Q   When was that organization formed?
5    A   It was formed, as best I recall, summer of
6 2023.
7    Q   Did you have a role in founding that
8 organization?
9    A   Yes, I was one of the founders.
10    Q   Do they have a website?
11    A   We do not yet have a website, no.
12    Q   How many members do you have?
13    A   We don't have any formal membership
14 structure at this point.
15    Q   We talked about this in another context
16 earlier, but within the context of the Hippocratic
17 Society, how do you define good medicine?
18    A   The Hippocratic Society does not define good
19 medicine, but is committed to the proposition that
20 there -- that a central responsibility of clinical
21 practitioners is to discern good medicine from that
22 which is not good, and make reasonable judgments in

Page 71

1 that respect and to follow those judgments.  And so we
2 are committed to fostering civil, open, vigorous
3 debate about all manner of questions that arise
4 regarding what medicine, our profession, properly
5 understood requires of us and what our commitments and
6 obligations to patients requires of us.
7    Q   What role does morality play in the practice
8 of good medicine?
9    A   Well, the concept "good" is the central
10 concept of ethics or morality.  So insofar as one is
11 considering, as a medical practitioner, what one ought
12 to do and what one ought not to do, what is better and
13 what is worse with respect to one's own actions or the
14 actions of others, one is addressing morality or
15 ethics.
16    Q   So in that same context, what role does
17 autonomy play?  Patient autonomy?
18    A   Patient autonomy is -- and I should say
19 here, I'm not speaking for the Hippocratic Society,
20 which has no policy on this question.  Oh, I should
21 stop there, in fact.  What was your -- what is it
22 you're asking?

Page 72

1    Q   In your view, what role does autonomy play
2 in the practice of good medicine?
3    A   In my view, autonomy is an important
4 concern, insofar as it is a concern that signals that
5 part of being human is to have -- when humans are
6 flourishing, is to have and exercise moral agency, and
7 also to indicate that whenever there's a decision to
8 be made among more than one person, as is the case
9 with virtually all clinical decisions, we have to
10 understand properly the scope and limits of the
11 authority of those involved.
12       And autonomy is characteristically raised
13 within medicine to refer specifically patient autonomy
14 and to emphasize the importance of honoring a
15 patient's authority, within its proper scope.
16    Q   And when you say "proper scope," what is the
17 property scope?
18    A   Well, the most important point is that
19 patients have authority to refuse any medical
20 proposal.  And by that I mean patients who have such
21 authority, which is typically adult patients who have
22 cognitive capacity to understand what decision they're

Page 73

1 making.  They have authority to refuse any medical
2 proposal, even ones that physicians are -- think are
3 really important.
4    Q   Do they also have the authority to receive
5 treatment that is legal to provide but the physician
6 is morally against?
7    A   So there's a few different questions packed
8 up in that, so can you re-ask it maybe with one -- one
9 at a time?
10    Q   Sure.  If a physician is morally opposed to
11 treatment, a particular type of treatment, but that
12 type of treatment is legal to provide, is a patient
13 entitled to receive that treatment?
14       MR. BROOKS:  Objection.
15    A   You still have a couple questions tied up
16 together there, but say this much.  The corollary of
17 the authority to refuse any medical proposal is
18 the -- the authority to consent to medical proposals.
19 And so we have this important concept and practice of
20 informed consent, which is very foundational to
21 medical practice and medical ethics.
22       Informed consent does not imply informed

19 (Pages 70 - 73)

Page 74

1  demand.  In other words, whether a physician is
2  obligated to provide an intervention that a patient
3  seeks is -- it depends on the situation.  But the
4  patient seeking it does not make it something the
5  physician is obliged to provide.
6      Q    And can physicians deny treatment to a
7  patient, a treatment that is legal, because they are
8  morally opposed to providing it?
9      A    What's the question?
10     Q    Can a physician ethically deny treatment to
11 a patient that is requesting the treatment, and the
12 treatment is legal, can they ethically deny providing
13 that treatment because they are morally opposed to it?
14     A    There are many cases in which a good
15 physician will refuse a request that a patient makes
16 for a legal intervention, on the basis of the judgment
17 that to provide what the patient seeks would be to
18 contradict the physician's professional obligations to
19 the patient and to the profession.
20     Q    Have you published any work on gender
21 dysphoria?
22     A    I have published a peer-reviewed book on

Page 75

1  medical ethics that includes a chapter in which we
2  address medicalized gender transition.
3      Q    And is that book "The Way of Medicine"?
4      A    Yes, that book is "The Way of Medicine."
5      Q    Any other publications regarding gender
6  dysphoria?
7      A    I can't recall if I mentioned gender
8  dysphoria in other publications.
9      Q    Have you presented at any conferences on the
10 topic of gender dysphoria?
11     A    Yes, I have presented on the topic of gender
12 dysphoria, and specifically what I -- you referred to
13 as medicalized gender transition, at a couple of
14 conferences.
15     Q    And are those conferences listed in your CV?
16     A    I have to look to see.
17     Q    Okay.
18     A    Yeah, so on page 6 of my CV, number 70 is
19 one of those presentations.  And on page 7, number
20 107, is the second.
21     Q    Okay.  The first one that you mentioned on
22 page 6, you said that was number 70.  That's "Gender

Page 76

1  Transition Services: Progress or Medical Hubris?"  Can
2  you tell me about what the focus of that presentation
3  was and what -- tell me about the focus of that
4  presentation.
5      A    I don't remember the details here seven
6  years later, but it was a talk in which I recognized
7  the rationale that was being used in public to justify
8  medicalized gender transition and then raised what I
9  took to be some important ethical concerns about such
10 practices.
11     Q    And who was the audience of that
12 presentation?
13     A    That was at the 29th Annual Dorothy J.
14 MacLean Fellows Conference on Clinical Medical Ethics,
15 at the University of Chicago.  The audience is made up
16 of primarily alumni of that fellowship, of which there
17 are, I believe, more than 200.  As well as members of
18 the University of Chicago community who are interested
19 in medical ethics.
20     Q    And then the second one that you mentioned
21 is number 107 on page 7. That one, it looks like the
22 title is "Detransitioners, civil discourse, and the

Page 77

1  silence of clinical ethics."  Can you describe that
2  presentation?
3      A    That presentation was a kind of updating of
4  where we were now six years later, and in that case,
5  again, raising some of the ethical concerns that I
6  have about this practice.  I and others have about
7  this practice.  As well as commenting on the problem
8  of the absence of civil discourse about the topic
9  because of the sort of cancel culture and the fear
10 that people have of speaking out about their concerns.
11     Q    And who was the audience for that
12 presentation?
13     A    So that was a talk within an academic
14 year-long series on medical ethics, and the people who
15 come to that are a mixture of faculty and fellows in
16 the MacLean Center for Clinical Medical Ethics, as
17 well as broader members of the medical community who
18 are interested in the topic of that particular
19 session.
20     Q    In your report, you mention that you've been
21 invited to give talks at a major medical school on the
22 ethics surrounding transgender medicine.  What medical

Page 78

1 school is that?

2    A   That's the University of Chicago.

3    Q   And is that instance listed on your CV?

4    A   Yes, that's the number 107.

5    Q   Okay.  What do you mean by "transgender

6 medicine"?

7    A   I mean what I in my report describe as

8 medicalized gender transition, plus insofar as

9 relevant, surgical interventions that likewise seek to

10 refashion human anatomy to align with some appearance

11 that's more consistent with what the patient perceives

12 as consistent with their -- their -- their gender.

13    Q   Turning to your book, "The Way of Medicine,"

14 we have a downloaded copy of that book that I would

15 like to mark as an exhibit, but I want you to take a

16 look at it as well.

17        MS. MURPHY:  So first off, I'd like to

18 mark the copy of "The Way of Medicine" that we

19 downloaded as Exhibit 3.

20        (Exhibit 3 was marked for

21        identification.)

22        MR. BROOKS:  And let me ask, Counsel,

Page 79

1 is Exhibit 3 a copy of the entire book or selected

2 portions?

3        MS. MURPHY:  It's a copy of the entire

4 book.  But I would appreciate if Dr. Curlin takes a

5 moment to look at it and tell us if he disagrees that

6 that's the entire book.

7        MR. BROOKS:  I'll have to open a folder

8 in which I have put those downloaded files.  There it

9 is.  Now it has, according to the top of the PDF, it

10 has 130 pages.  I am guessing that you'd rather make a

11 representation than ask Dr. Curlin to check 130 pages?

12        MS. MURPHY:  That's correct.  I mean,

13 all I'm asking is that he, you know, acknowledge that

14 there's a downloaded copy of the book.  We represent

15 that this is a copy that was provided to us by a

16 particular library, so it should be a true and correct copy of

17 the book.

18        THE WITNESS:  I have never seen a

19 downloaded copy of our book, and our book in print has

20 more than 130 pages.  So I can't say for certain that

21 all the pages are included in this downloaded copy,

22 but I know that sometimes downloaded books are

Page 80

1 paginated differently, so.

2 BY MS. MURPHY:

3    Q   Well, for purposes of your deposition, I'd

4 like to refer to this copy.  And if there comes an

5 issue where you believe that anything in this book is

6 inaccurate, we can deal with that at a later time.

7 Make sense?

8    A   I think so.

9    Q   Okay.  And it could very well be that the

10 page references and stuff aren't even necessary to my

11 questions.  What motivated you to write this book?

12    A   Christopher Tollefsen and I had taught for

13 several years a one-week seminar on medical ethics.

14 And through the teaching of it, over the course of

15 that time we came to the mutual conviction that it

16 would be useful to write a book together about our

17 take on medicine and medical ethics and the key

18 questions that we address in the book.

19    Q   And your book presents two models as ways to

20 look at medicine; right?

21    A   It does.  It presents -- well, it presents

22 two models as conceding that they're -- that's a

Page 81

1 simplification for the purposes of considering these

2 two different patterns of understanding medicine and

3 practicing medicine.

4    Q   Fair.  But one of these models you refer to

5 as the provider of services model; correct?

6    A   Yes, we refer to one model as the provider

7 of services model.

8    Q   And can you describe the provider of

9 services model?

10    A   The provider of services model is a way of

11 understanding and practicing medicine that takes

12 medical practitioners to be fundamentally providers of

13 services, whose obligation is to make available

14 interventions that are technologically possible and

15 that are permitted by the law relevant to that

16 particular jurisdiction, so that those interventions,

17 whatever they are, can be used according to the

18 judgment of the patient to pursue and open-ended and

19 ultimately subjective notion of patient wellbeing.

20 That is known within this way of thinking, primarily

21 by what the patient asks for and what the patient says

22 is important to them.

21 (Pages 78 - 81)

Farr Curlin                                                              April 8, 2024

Page 82

1    Q    And is this primarily how medical schools
2  train students?
3    A    In our judgment, medical schools have tended
4  to emphasize, to a problematic degree, this way of
5  understanding medicine.
6    Q    And your book also provides an alternative
7  view of looking at medicine, and you refer to that as
8  the way of medicine; right?
9    A    Yes, we refer to our account of medicine and
10 medical ethics as the way of medicine.
11   Q    How would you describe the way of medicine?
12   A    The way of medicine is an understanding and
13 practice of medicine that takes medicine to be
14 fundamentally a moral practice, in pursuit of a
15 particular good.  Namely, the human good of human
16 health.  And does so pursuing that good in particular
17 persons, and governed by the requirements of -- of
18 what can be called natural law or morality at large,
19 ethics, but also with attention to the particular
20 ethical requirements of a practice that is devoted to
21 attending to those who are sick and seeking to
22 preserve and restore their health.

Page 83

1    Q    And between those two models, is the way of
2  medicine the preferred model to practice, in your
3  view?
4    A    In my opinion, the way of medicine is a more
5  reasonable account of -- of what physicians reasonably
6  and rightfully profess.
7    Q    Why is that your preferred way of looking at
8  medicine?
9    A    Well, there's a number of reasons, but
10 it's -- prefer it because we believe it's truer and
11 more adequate to the reality of what patients
12 experience and what practitioners reasonably profess.
13 That in fact to -- that in fact it cannot follow that
14 because a patient has, as they do have, authority to
15 refuse any medical proposal and has authority to
16 consent to reasonable proposals that physicians make.
17 It cannot follow that they have a -- a right to demand
18 a medical practitioner's interventions that contradict
19 their own health or otherwise would involve the
20 practitioner in contradicting the requirements of
21 ethics, the requirements of morality at large, or the
22 requirements specific to the practice of medicine.

Page 84

1        And so the way of medicine is more adequate
2  to the reality of what makes medical practitioners
3  medical practitioners is that -- versus some other
4  kind of practitioner is that they show up to and --
5  and offer themselves in response to threats to the
6  health of or injuries to the health of -- of other
7  persons, and they seek expertly to remedy those
8  injuries and -- and to promote health of patients.
9  What makes us physicians is not that we provide stuff
10 that people want, but in fact that we are healers.
11   Q    So is it fair to say that your clinical
12 practice is guided by that model?
13   A    Yes, insofar as what we've described there
14 is -- is what we take to be a reasonable account of
15 what all medical practitioners, when they're thinking
16 well and practicing well, are guided by.  And -- and
17 yes, I -- insofar as I am aware, I try to practice
18 according to the norms we describe there, which we
19 take to be universal norms when they're properly
20 understood.
21   Q    And so does that mean that at least in part,
22 your clinical practice relies on your sense of

Page 85

1  morality?
2    A    So it -- it's not possible for any medical
3  practitioner to practice medicine without relying on
4  their sense of morality, except by making themselves
5  mercenary and just doing whatever people tell them to
6  do.  So it's -- it's I think absolutely intrinsic to
7  medicine that a medical practitioner practices
8  according to their judgments regarding what ethics
9  requires.
10   Q    And would you agree that individuals' sense
11 of what is good and what is bad differs?
12   A    Well, to some extent.  People -- well,
13 clearly, people have disagreements about what ethics
14 requires.  I'll say that much.
15   Q    And are there certain treatments that you
16 would not recommend, based on your values?
17   A    I would not recommend any treatment, except
18 insofar as I believe that treatment is a reasonable
19 medical proposal.
20   Q    If you had the training to do so, would you
21 recommend puberty blockers to an adolescent to treat
22 gender dysphoria?

22 (Pages 82 - 85)

Page 86

1   MR. BROOKS:  Objection, lack of
2  foundation.
3      A   Yeah, I -- I haven't, I believe, offered
4  opinions about what I might do in some speculative
5  future or with particular cases.  I'm not -- I'm not
6  willing to under oath try to imagine that and give an
7  opinion about that on the fly.
8      MS. MURPHY:  It's fairly typical to ask
9  hypothetical questions in this instance.  Mr. Brooks,
10 are you instructing your client not to answer?
11     MR. BROOKS:  Well, he has answered, and
12 I'm certainly not going to instruct him to offer
13 opinions under oath that he doesn't feel comfortable,
14 that he doesn't feel that he has informed opinions on.
15 He has no obligation to do so.
16 BY MS. MURPHY:
17     Q   So is it that you don't know what you would
18 do in that situation, or is it that you don't wish to
19 provide an answer for that question?
20     A   In clinical medicine, we always take into
21 account all the particularities of a given case.  In
22 my expert report, I've -- I've indicated a number of

Page 87

1  reasons why I was -- it is doubtful in any particular
2  case that I would come to the judgment that cross-sex
3  hormones or blocking -- blocking puberty on the basis
4  of dysphoria is a reasonable medical proposal.  But
5  I -- I cannot say what I would do in a particular case
6  until I know, you know, the -- the facts of the case.
7      Q   Fair enough.  When you say that it's
8  doubtful that you would do so, is that doubt based on
9  your sense of morality?
10     A   The doubtfulness is based on my
11 understanding of the ethical norms, including the
12 norms specific to the practice of medicine, and as
13 I've described in my report.
14     Q   Is it your belief that humans can only be
15 male or female?
16     A   It is my belief that humans are, as a
17 species of mammals, are male or female.  That we
18 have -- there are only two sexes that make possible
19 reproduction, and that's something we share with other
20 animals.
21     Q   And so what type of treatment, if any, would
22 you recommend to a patient who exhibited extreme

Page 88

1  distress over the congruence between their perception
2  of their gender and their anatomical assignment to a
3  particular sex?
4      MR. BROOKS:  Objection.
5      A   I -- I don't -- I don't know, as I haven't
6  been in -- I haven't had a patient with that precise
7  presentation.
8      Q   Under the provider services model, a
9  physician practicing under the provider of services
10 model, would you agree that that provider would be
11 obligated to provide puberty blockers in response to a
12 patient who is experiencing gender dysphoria and
13 wanted to stop puberty?
14     MR. BROOKS:  Objection, incomplete
15 hypothetical.
16     A   As I wrote in our book, in my judgment,
17 medicalized gender transition is strongly influenced
18 by what we call the provider of services model,
19 insofar as it takes the perception and subjective
20 account of wellbeing of the patient, namely what the
21 patient desires, to be -- to establish the goal that
22 medical practitioners are obligated to pursue.

Page 89

1      And just insofar -- in that respect, we
2  think it is emblematic of the influence of what we
3  call the provider of services model.
4      Q   And when you refer to the patient's opinion
5  on what they need as subjective, would you agree that
6  morality is also subjective?
7      A   I would not, no.
8      Q   Can you elaborate a bit on that?
9      MR. BROOKS:  Objection.
10     A   Can you ask the question again or
11 differently?
12     Q   Sure.  Is morality objective or subjective?
13     A   Well, ethics at root must be objective, it
14 must be real, or else the entire moral life of human
15 beings is a sham.  Now it also is the case that it's
16 hard to discern and there are ambiguities and
17 disagreements about what ethics requires, about what
18 morality requires, about what's good and not good.
19     And the -- one does not assess ethics in the
20 same way one assesses how much someone weighs, for
21 example.  But ethics is -- at root, must be objective
22 for there to be any point in having an argument about

23 (Pages 86 - 89)

Page 90

1  how we ought to live.

2    Q   So do you agree that under the way of

3  medicine, that it would be contrary to health to

4  provide puberty blockers to stop puberty in somebody

5  who is experiencing gender dysphoria?

6        MR. BROOKS:  Objection, lack of

7  foundation.

8    A   Can you repeat the question?

9    Q   Sure.  Under the way of medicine, would it

10 be contrary to health to provide medicalized gender

11 transition treatment?

12   A   So as -- as I noted as well in my report, it

13 appears that, and as we've noted in the book, it

14 appears that it does.  That is to say that insofar as

15 medicalized gender transition contradicts the healthy

16 development of secondary sex characteristics that go

17 along with the kind of theme the patient is a male or

18 a female human organism, it appears to contradict the

19 patient's health.

20   Q   And so is it your opinion that any attempt

21 by a physician to align an adolescent's physical

22 characteristics with their perceived gender identity

Page 91

1  is unethical?

2    A   I -- I can't speak to any intervention.

3  You'd have to give me a particular intervention to

4  consider, or a particular kind of case.

5    Q   Sure.  With respect to puberty blockers,

6  would it be unethical for a physician to prescribe

7  puberty blockers to stop puberty?

8    A   In what case?

9    Q   In an individual with gender dysphoria.

10   A   So again, I -- I can't opine to a specific

11 case and all the things that might bear on that, but

12 it -- for the reasons I outline in my report, it seems

13 doubtful that cross-sex hormones can be reasonably

14 understood as consistent with the patient's health,

15 insofar as they contradict healthy physiologic norms

16 with respect to sex hormones for a person of that

17 person's sex.

18       MR. BROOKS:  Counsel, if we could

19 sometime soon take a break for a few minutes and then

20 run one more stretch before lunch, that would be good.

21       MS. MURPHY:  You're east coast time;

22 right?

Page 92

1        MR. BROOKS:  We are.

2        MS. MURPHY:  Okay.  Why don't we just

3  break for lunch at 12:30?  How does that sound?

4        MR. BROOKS:  Well, I would appreciate a

5  short break sooner than that.

6        MS. MURPHY:  Okay.  Let me just finish

7  up --

8        MR. BROOKS:  Yes, yes.

9        MS. MURPHY:  -- and then we'll take a

10 quick break.

11       MR. BROOKS:  Okay.

12 BY MS. MURPHY:

13   Q   Would you say that it would be immoral for a

14 physician to prescribe puberty blockers to stop

15 puberty in an individual with gender dysphoria?

16       MR. BROOKS:  Objection.

17   A   As I noted before, I can't say for a

18 specific case until I know that -- all the details of

19 that case and -- to make a judgment about that.  But

20 for the reasons I outlined in my report, it seems to

21 me doubtful that -- that it can be consistent with

22 medical ethics to block the healthy sexual development

Page 93

1  of a patient on the basis of the fact that that

2  patient perceives their healthy sexual development to

3  be at odds with their -- their sense of wellbeing.

4    Q   In your book, you mentioned that you've

5  never made peace with the notion of separating

6  personal from professional.  Does that sound correct?

7    A   That sounds correct, taken in the proper

8  context.

9    Q   What do you mean by that?  What's the proper

10 context?

11   A   I mean the context of what I said in the

12 book.

13       MS. MURPHY:  I'm trying to pull it up,

14 but I think I'm going to need a minute to do so.  So

15 why don't we take a ten-minute break?  Or could we do

16 a five-minute break?

17       MR. BROOKS:  We'll try to be back

18 sooner than ten.

19       MS. MURPHY:  Okay, excellent.

20       MR. BROOKS:  It'll show up on the

21 screen when it says we're here, but five should

22 probably do it.

24 (Pages 90 - 93)

Farr Curlin

April 8, 2024

Page 94

1        MS. MURPHY:  All right, thank you.

2        THE REPORTER:  Okay.  The time is 11:50

3   a.m.  We are now off the record.

4        (Off the record.)

5        THE REPORTER:  The time is 11:57 a.m.

6   We are now back on the record.

7        MS. MURPHY:  Thank you.

8   BY MS. MURPHY:

9        Q    Dr. Curlin, can you please turn to page 8 of

10  your book?

11        MR. BROOKS:  And you refer to the

12  online edition that you asked him to look at; correct?

13        MS. MURPHY:  Correct.

14        THE WITNESS:  I -- I have turned there.

15  BY MS. MURPHY:

16        Q    Okay.  In the last paragraph on that page,

17  it says, "I've never made peace with the notion of

18  separating the personal from the professional."

19  Correct?

20        A    I see that it says that, and it's important

21  that it says that in the context of clarifying that

22  all medical practitioners are personally obligated to

Page 95

1   make judgments about what their profession and other

2   demands of ethics require of them and to practice

3   according to that judgment.  And that what I was

4   pointing out was, spuriously, people here and there

5   have suggested that because someone, say like myself,

6   embracing a long-standing norm, for example don't kill

7   your patient, that somehow they're imposing their

8   personal values on what should be a professional

9   practice.  And I was highlighting that that is

10  logically problematic for a number of reasons.

11        Q    So is it fair to say that your own sense of

12  morality guides your professional opinions?

13        MR. BROOKS:  Objection.

14        A    My professional opinions are based upon my

15  professional education and understanding and judgment

16  about what ethics, broadly and medical ethics

17  specifically, requires of medical practitioners.

18        Q    Is there a difference between ethics and

19  morality?

20        A    There's no substantive difference between

21  the two.  Or certainly not in the way that I'm using

22  the terms and philosophers and ethicists generally

Page 96

1   have used the terms in their -- in their reasoning and

2   in their writing.

3        Q    Understood.  Turning back to your report, in

4   paragraph 5 you state that you've spent a substantial

5   portion of your time conducting and publishing

6   empirical research, including research on physicians'

7   attitudes and practices regarding controversial

8   practices; correct?

9        A    Give me a moment.

10        A    Sure.

11        A    I was taking down the image of the book.

12  Can you repeat the question?

13        Q    Sure.  It says in paragraph 5 that you've

14  spent a substantial portion of your time conducting

15  and publishing empirical research, including research

16  on physicians' attitudes and practices regarding

17  controversial practices; correct?

18        A    Yes, that's correct.

19        Q    And how do you define "controversial

20  practices"?

21        A    Practices about which there is public

22  controversy.  But public here, I mean there are

Page 97

1   arguments made in print or in public settings about

2   what one ought to do and what one ought not to do, and

3   we find that there are significant disagreements on

4   the question.

5        Q    So do you consider a diagnosis of gender

6   dysphoria to be controversial?

7        A    I do not consider a diagnosis of gender

8   dysphoria, if by that you mean a diagnosis of a person

9   experiencing distress and discomfort and bad feeling

10  relating to a perception that their secondary sex

11  characteristics are at odds with what they perceive

12  their gender, I don't consider that to be a

13  controversial diagnosis, no.

14        Q    Okay.  But do you consider the practice of

15  prescribing puberty blockers or cross-sex hormones for

16  the treatment of gender dysphoria to be controversial?

17        A    I do consider medicalized gender transition,

18  as described in my report, to be controversial.

19        Q    Do you consider it a controversial treatment

20  for patients of any age?

21        A    I -- I do consider it to be a controversial

22  treatment, period, but particularly controversial with

25 (Pages 94 - 97)

Page 98

1 respect to minors.

2    Q   Okay.  So are there instances, like for

3 particular patients, where you would not consider it

4 to be a controversial treatment?

5        MR. BROOKS:  Objection.

6    A   Yeah, I would have to -- you'd have to give

7 me a specific scenario you have in mind.

8    Q   Well, that's my question.  Are there

9 particular patients where it would be appropriate to

10 prescribe medicalized gender treatment?

11        MR. BROOKS:  Objection.

12    A   I -- I -- I don't know.  I would -- again, I

13 would have to have a particular case that you have in

14 mind, or at least you can describe in a little more

15 detail a particular kind of case.

16    Q   I think that answers my question.  Have you

17 conducted any empirical research on physicians'

18 attitudes on diagnosing gender dysphoria?

19    A   Not that I recall.

20    Q   And have you done any empirical research on

21 physicians' attitudes for providing medicalized gender

22 transition treatment?

Page 99

1    A   Not that I recall.

2    Q   Have you ever served on an institutional

3 review board?

4    A   I have not served on an institutional review

5 board.

6    Q   Have you ever provided ethical guidance to

7 an institutional review board?

8    A   I -- I don't recall specifically whether I

9 did or didn't, but I may have as part of our -- my

10 work as a faculty member in the McClean Center for

11 Clinical Medical Ethics, and likewise here at Duke.

12 I -- I can't recall if it was specifically an

13 institutional review board that was asking for input

14 on a particular case.

15    Q   How did you become involved in this case?

16    A   I believe Mr. Brooks originally reached out

17 to me to ask if we could have a conversation about

18 potentially serving as an expert witness.

19    Q   When did that conversation occur?

20    A   I don't recall exactly, but sometime -- best

21 of my recollection, sometime in the fall of 2023.

22    Q   And were you retained shortly thereafter?

Page 100

1    A   Not -- well, depends on what you mean by

2 "shortly."  I believe I was retained in December, but

3 it may have been November of 2023.

4    Q   You've been retained as an expert witness in

5 cases prior to this one; right?

6    A   Yes, I've been retained as an expert witness

7 in cases prior to this one.

8    Q   Have you ever opined on anything related to

9 gender dysphoria?

10    A   To my knowledge, I have not opined directly

11 about gender dysphoria, or more specifically, prior to

12 this case I do not believe I've been asked to address,

13 as a central question, ethical issues raised by

14 medicalized gender transition.

15    Q   Okay.  Turning to your report, paragraph 28.

16 I'm sorry, I meant page 28.  Page 28 of your report.

17 That's a list of other materials that you considered

18 with respect to preparing this report; correct?

19    A   Yes, it appears to be so, yes.

20    Q   And who provided you those materials?

21    A   Either Mr. Brooks or another of the

22 attorneys for the State of Alabama.

Page 101

1    Q   And did those attorneys ask you to consider

2 any materials that are not listed here?

3        MR. BROOKS:  Objection.  I'll instruct

4 the witness not to answer questions about

5 communications with attorneys.

6 BY MS. MURPHY:

7    Q   Are there any materials that you were asked

8 to --

9        MS. MURPHY:  I'm going to ask that

10 question again because I don't believe that's covered

11 by attorney-client privilege.  I'm not asking about

12 the substance of those communications; I'm asking

13 about the materials that were provided or asked to be

14 reviewed.

15        MR. BROOKS:  I'm going to give the same

16 instruction.

17        MS. MURPHY:  Mr. Brooks, are you

18 contending that the materials provided to the expert

19 in this case are protected by attorney-client

20 privilege?

21        MR. BROOKS:  All I'm saying is that

22 communications between the expert and myself, or other

Page 102

1 counsel for Alabama, are work product and he's not
2 going to answer questions about their substance. Your
3 question goes to the substance, potentially, of such
4 communications.
5         MS. MURPHY: No. I specifically said
6 that my question does not involve -- I'm not asking
7 about the substance of those communications. I'm
8 asking what he was asked to review.
9         MR. BROOKS: I disagree with your
10 characterization that that doesn't go to the substance
11 of communications. I don't propose to argue. I have
12 instructed the witness not to answer that question.
13        MS. MURPHY: I mean, I think we're
14 probably going to have to see -- in that case, I
15 reserve the right to reopen this deposition and ask
16 about the materials that were provided to the witness,
17 if a Court decides that that's not privileged, which I
18 believe that they will.
19 BY MS. MURPHY:
20    Q   Dr. Curlin, did you review anything beyond
21 what is listed on page 28 or what is listed in your
22 bibliography in order to prepare the report?

Page 103

1    A   Not that I recall.
2    Q   And I am anticipating an objection here, but
3 for the record I'd also like to ask did the defendants
4 ask you to review any materials that are not listed
5 here?
6         MR. BROOKS: Yes, the same instruction.
7 BY MS. MURPHY:
8    Q   Paragraph 20 of your report, if you could
9 turn to that for a moment. In paragraph 20, it says
10 that you were asked to assume that the descriptions of
11 the articles and studies provided by Drs. Cantor and
12 Laidlaw are accurate; is that right?
13   A   I was asked to assume that the descriptions
14 of the articles and studies that they are accurate,
15 for purposes of my opinions provided in this case.
16   Q   Got it. And who asked you to make that
17 assumption?
18   A   Mr. Brooks.
19   Q   And were you asked to assume anything else
20 for purposes of preparing this report?
21   A   Not that I recall.
22   Q   Did you make any other assumptions when

Page 104

1 preparing this report?
2    A   Not that I recall.
3    Q   Have you been hired by Mr. Brooks in the
4 past to work on any of his other cases?
5         MR. BROOKS: Objection.
6    A   I was hired by the Alabama, as I recall
7 Attorney General's Office. But I do not recall having
8 been hired by that office in any case in the past,
9 although I -- I can't be certain without looking
10 through my whole list of cases.
11   Q   And do you have a personal or professional
12 relationship with anyone involved in this case, apart
13 from your retention as an expert?
14   A   I had a collegial relationship with Dr.
15 Antomaria.
16   Q   Anyone else?
17   A   Not that I recall.
18   Q   Okay. Can you turn to paragraph 14 of your
19 report, please? It says here that, quote, "I take as
20 a premise, based on the science reviewed and the
21 opinions offered by Drs. Cantor and Laidlaw, that the
22 mental health benefits that are claimed to justify the

Page 105

1 administration of medicalized gender affirmation
2 treatments to minors are currently unproven and
3 disputed among informed observers." Is that correct?
4    A   That's what I wrote, yes.
5    Q   And are you referring to science that you
6 reviewed on your own, or is that the science that Drs.
7 Cantor and Laidlaw reviewed?
8    A   I am referring to the science that they
9 reviewed, within which I reviewed or that I refer to
10 directly in the -- or in the -- notes and in
11 the -- the report itself.
12   Q   Okay. Are you saying that you reviewed all
13 the studies that they cited in their reports?
14   A   I am not saying that.
15   Q   You reviewed only the ones that are cited in
16 your bibliography; is that correct?
17   A   I did review the ones cited in my
18 bibliography, and I do not know of reviewing others
19 that are not cited.
20   Q   Got it. And with respect to Dr. Cantor's
21 report, what steps did you take to ensure that his
22 opinions were valid?

27 (Pages 102 - 105)

Farr Curlin
April 8, 2024

Page 106

1    A    I -- as I noted, I -- I was asked to take,
2  as a premise, that -- that the -- the -- the review,
3  the descriptions of the -- the science in Cantor and
4  Laidlaw's report was accurate, for the purposes of
5  forming my opinion.  I reviewed some of the -- some of
6  the documents that they referred to directly and --
7  but I did not attempt to give a professional opinion
8  or judgment on the -- the full scope of the review of
9  the literature.
10    Q    And is that the same with respect to the
11  information that was in Dr. Laidlaw's report?
12    A    Yes, the same with Dr. Laidlaw's report.
13    Q    Did you consider the credentials of Drs.
14  Cantor and Laidlaw when deciding to rely on their
15  reports?
16    A    As I said, I was asked to take as a premise
17  that these reports were accurate in their description
18  of the literature, and I did that.
19    Q    Is it customary in medical ethics to take
20  others' work as a premise, without conducting
21  independent evaluation of that work?
22    A    It is when you're asking a specific question

Page 107

1  conditional on that description being accurate.  So
2  yes, just that far, yes.
3    Q    And so just to be clear, with respect to
4  paragraph 14, you didn't conduct any independent
5  assessment of the evidence that Drs. Cantor and
6  Laidlaw relied upon to draw your conclusion; did you?
7    A    As I said, I reviewed a number of the items
8  that they reviewed in their reports, and just that
9  far.  I did my own review.  But I was not attempting
10  to give an expert opinion about the -- the whole of
11  the medical literature on these questions.
12    Q    And when you say "informed observes," what
13  do you mean by "informed observers"?
14    A    I mean that observers meaning those who are
15  paying attention to this issue, and informed meaning
16  people who are generally regarded as having the kind
17  of expertise to -- that would distinguish them from a
18  layperson in giving an opinion about this -- this
19  issue or these issues.
20    Q    So in this particular instance, who would
21  you say qualifies as an informed observer?
22    A    I can't be comprehensive right here by

Page 108

1  memory, but certainly people like the experts that are
2  involved in England and Sweden and Finland and
3  Denmark, in reviewing the data and conducting their
4  own systematic reviews of the data and making
5  judgments about what the implications of the -- the --
6  that review are.
7    Q    I noticed that you happened to leave out the
8  United States.  Would you consider experts here within
9  the United States to be informed observers?
10    A    It depends on which person you're referring
11  to, but being in the United States does not keep one
12  from becoming an informed observer.
13    Q    Is it your opinion that experts who believe
14  that medicalized gender transition treatment is
15  ethical or not informed observers?
16    A    No, that is not my position.  Otherwise,
17  they could not be disputed if there were not
18  disagreement and dispute among informed observers.
19    Q    Okay.  In paragraph 15, you say, "I also
20  take it as a premise, based on the science reviewed
21  and the opinions offered by Drs. Cantor and Laidlaw,
22  that the known or reasonably anticipated harms to

Page 109

1  children and adolescents from MGT treatments are
2  substantial and serious, threatening sterilization,
3  failure to develop healthy sexual response, impaired
4  neurological" -- or brain -- "development, and
5  multiple other harms to bodily health."  Is that
6  correct?
7    A    Yes, that's what I wrote.
8    Q    And are you referring to the science that
9  you reviewed or the science that Drs. Cantor and
10  Laidlaw reviewed?
11        MR. BROOKS:  Objection.
12    A    I'm referring to their description of the
13  science that they reviewed.
14    Q    Did you review any science beyond what Drs.
15  Cantor and Laidlaw reviewed in order to draw your
16  conclusion with respect to paragraph 15?
17    A    Not that I recall.
18    Q    And what do you mean here when you say
19  "threatening sterilization"?
20    A    Let me -- if I may, I want to make sure I
21  didn't misspeak.  I -- I have continued to review
22  science as it comes out, and I don't recall when their

Farr Curlin

April 8, 2024

Page 110

1  review stopped.  So in fact, the study by Glintborg
2  and Kaltiala, those two different studies, I can't
3  recall if Laidlaw, for example, referred to those in
4  Laidlaw's report.  So I -- I don't recall, beyond
5  those two, whether I reviewed further studies since
6  the scope of their report was drawn.
7      Q    Okay.  But I think you testified earlier
8  that everything that you reviewed for purposes of
9  formulating the opinions in your report were either
10  listed in your bibliography or in the page that has
11  the materials considered; correct?
12      A    Correct, to the best of my recollection.
13      Q    And so you didn't review anything beyond
14  those materials for purposes of formulating your
15  opinion for paragraph 15; right?
16      A    Not to the best of my recollection.
17      Q    Okay.  So going back to threatening
18  sterilization, what do you mean by that?
19          MR. BROOKS:  Sorry, Counsel, your voice
20  dropped out.  Just some computer issue.  Just if you'd
21  restate that.
22          MS. MURPHY:  Sure.

Page 111

1  BY MS. MURPHY:
2      Q    What do you mean by "threatening
3  sterilization"?
4      A    I mean threatening to render the patient
5  incapable of reproduction.
6      Q    And can you be more specific about what
7  aspect of MGT would you assert threatened
8  sterilization?
9          MR. BROOKS:  Objection.
10      A    So I know as a physician that human
11  reproduction depends on sexual maturation.  And so to
12  block sexual maturation, as puberty-blocking hormones
13  do intentionally, can result in infertility or
14  sterilization.
15      Q    And what do you --
16      A    And I also -- I mean, I know that as a
17  baseline, but I also know that Dr. Cantor and Dr.
18  Laidlaw cited studies that indicate that that is a
19  real risk of this treatment.
20      Q    And what do you mean when you say impaired
21  neurological brain development?
22      A    Say again?

Page 112

1      Q    What do you mean by impaired neurological or
2  brain development?
3      A    Can you point me to where you're referring?
4      Q    Sure.  That's still in paragraph 15.
5      A    I'm referring there to Dr. Cantor and
6  Laidlaw's description of science that suggests that
7  brain development is itself dependent on, in certain
8  respects, on puberty and sexual maturation.  And that
9  the blocking of such puberty and sexual maturation
10  blocks that aspect of neurological and brain
11  development that comes with puberty and sexual
12  maturation.
13      Q    And what aspect of MGT would threaten
14  impaired neurological development?
15      A    My understanding is that that aspect which
16  involves blocking -- particularly, which involves
17  blocking the hormones that make -- that stimulate and
18  facilitate and make possible healthy development of
19  secondary sex characteristics that come along in
20  puberty.
21      Q    And also in that paragraph, what do you mean
22  when you say "multiple other harms to bodily health"?

Page 113

1  What are those harms?
2      A    That was to include, as I list at paragraph
3  35, lifetime lack of orgasm and sexual function, an
4  adverse effect acknowledged by Marci Bowers, current
5  president of WPATH.  Reduced bone development,
6  especially in male-to-female transition.  Harm to
7  psychosocial development.  And increased
8  cardiovascular risk, osteoporosis, and
9  hormone-dependent cancers.
10      Q    Okay.  Moving to paragraph 18.  Within this
11  paragraph, you refer to available science.  What
12  available science are you referring to here?
13      A    As I say there, the available science
14  provided by Dr. Cantor, Dr. Laidlaw, and -- well,
15  that's the available science I'm referring to.
16      Q    And again, you didn't conduct an independent
17  assessment of science.  This is the science that was
18  reviewed by Drs. Cantor and Laidlaw, and that if they
19  cited it and you listed it in your bibliography, that
20  you reviewed?
21          MR. BROOKS:  Objection.  Compound
22  question.

Page 114

1    A   Yeah, that's --
2    Q   It's a long question.
3    A   Too many questions.
4    Q   Did you review any science beyond that which
5    was reviewed by Drs. Cantor and Laidlaw?
6    A   Not to my knowledge, recollection.
7        MS. MURPHY:  Mr. Brooks, this would not
8    be a terrible breaking point if we want to break for
9    lunch, because I was going to transition to a
10   different part of the report.  Is this a good time?
11       MR. BROOKS:  Up to the witness.
12       THE WITNESS:  Sounds good to me.
13       MR. BROOKS:  He said yes.  Thumbs up
14   for lunch.
15       MS. MURPHY:  Okay, excellent.  Is a
16   half an hour enough?
17       THE WITNESS:  That's a little short.
18   Probably -- probably 40 minutes would do it.
19       MS. MURPHY:  Okay, that's fine with me.
20   So 40 minutes, let's say -- well, I have 12:32.
21       MR. BROOKS:  Quarter after?
22       THE WITNESS:  Yeah, let's do 1:15.

Page 115

1        MS. MURPHY:  That's fine.
2        THE REPORTER:  All right.  The time is
3    12:32 p.m.  We're now off the record.
4        (Off the record.)
5        THE REPORTER:  The time is 1:21 p.m.
6    We are now back on the record.
7        MS. MURPHY:  Thank you.
8    BY MS. MURPHY:
9    Q   Dr. Curlin, if you could turn to paragraph
10   20 of your report?
11   A   Okay.
12   Q   Okay.  In that paragraph it says that you've
13   "read the descriptions of the state of knowledge
14   provided in the expert reports submitted by Drs.
15   Cantor and Laidlaw."  Correct?
16   A   Yes.
17   Q   And could you describe what you mean as "the
18   state of knowledge"?
19       MR. BROOKS:  Objection.
20   A   I mean that this is a description of what is
21   known with respect to scientific evidence regarding
22   medicalized gender transition.

Page 116

1    Q   And so does that include studies that
2    suggest that medical transition is safe?  Or is it
3    only studies that say that medical transition is
4    unsafe?
5        MR. BROOKS:  Objection.
6    A   To my knowledge, it includes all medical
7    studies that are looking at the -- or intends to
8    include all studies that are looking at harms and
9    purported benefits of medicalized gender transition.
10   Q   And did Drs. Cantor and Laidlaw review all
11   such studies?
12       MR. BROOKS:  Objection.
13   A   I don't know.
14   Q   Apart from the studies that you cited in
15   your report, did you review any additional studies
16   regarding the efficacy of gender-affirming care?
17   A   Not that I recall.
18   Q   Moving onto paragraph 27.
19   A   Let me -- I want to make sure I'm correct.
20   I can't remember that if I cited Chen, et al.'s study
21   in the New England Journal of Medicine, but I have
22   that -- reviewed that at some point in this process.

Page 117

1    I remember that.
2    Q   Did you review it prior to preparing and
3    submitting your report?
4    A   I had reviewed it prior to being called as a
5    witness in this case and then again during this
6    process.
7    Q   Okay, I'm sorry.  Just to clarify.  When you
8    say being called as a witness, do you mean you
9    reviewed it prior to being retained as a witness?
10   A   Yes.
11   Q   Okay.  So in paragraph 27, you say, "Studies
12   summarized by Drs. Cantor and Laidlaw likewise
13   document serious uncertainty about the efficacy and
14   safety of MGT as a treatment for gender dysphoria."
15   Correct?
16   A   That is what I wrote, yes.
17   Q   And have you read any studies that have
18   found that gender-affirming medical care is
19   efficacious and safe?
20   A   I have read studies -- reports of studies
21   where the authors allege that medicalized gender
22   transition is efficacious and safe.

30 (Pages 114 - 117)

Page 118

1  Q   And what studies are those?
2  A   Well, the Chen study, to the best of my
3  recollection, the authors claimed at the end of their
4  report that medicalized gender transition was
5  effective, beneficial.  And I've read the Rhafferty
6  report, which was not collecting data, but is one of
7  the reports that's referred to in this case.  I know
8  that in that report, Rhafferty alleges that
9  medicalized gender transition is effective and safe,
10  or least to the best of my recollection.
11      And I -- I know I've read some other reports
12  over the years, but I don't remember the -- the
13  details at this point.
14  Q   For what reason did you not cite the Chen
15  study in your report?
16  A   Well, I -- Cantor and Laidlaw -- well, I
17  know Cantor refers to Chen's study.  I can't recall if
18  Laidlaw did as well.  And the description of Cantor
19  about that study, as best I recall, aligned with my
20  own impression of the study.  And so I didn't cite
21  that -- didn't -- I -- I don't know why further that I
22  didn't cite that particularly.

Page 119

1      MS. MURPHY:  All right.  At this point,
2  I'd like to mark Exhibit 4, and I'll just state for
3  the record that this is a study by de Vries, titled
4  "Young Adult Psychological Outcome After Puberty
5  Suppression and Gender Reassignment."
6      (Exhibit 4 was marked for
7      identification.)
8      THE WITNESS:  One moment.
9      MS. MURPHY:  Sure.  Just let me know
10  when you have it pulled up.
11      THE WITNESS:  I do.  Is the author, the
12  first author, Annelou?
13      MS. MURPHY:  Yes.  Correct, that's it.
14  BY MS. MURPHY:
15  Q   Dr. Canter, have you reviewed this study
16  before?
17  A   Dr. Curlin, you mean.
18  Q   I'm sorry.  Dr. Curlin.
19  A   I don't recall reviewing this directly.
20  Q   And do you agree that this is a longitudinal
21  study about the effectiveness of puberty blockers to
22  treat gender dysphoria in adolescents?

Page 120

1      MR. BROOKS:  Objection.  The witness
2  has just testified he hasn't seen this document.  He
3  has, you know, a quarter of a page up on a screen
4  here.
5      MS. MURPHY:  Fair enough.
6  BY MS. MURPHY:
7  Q   So just to confirm, for the sake of good
8  order, you didn't review this study prior to drafting
9  your report; correct?
10  A   Not that I recall.
11      MS. MURPHY:  At this point, I want to
12  mark Exhibit Number 5, and this is the study that was
13  by Smith, and it's called, "Sex Reassignment: Outcomes
14  and Predictors of Treatment for Adolescent and Adult
15  Transsexuals."
16      (Exhibit 5 was marked for
17      identification.)
18  BY MS. MURPHY:
19  Q   Can you pull that one up?  And just let me
20  know whenever you have it pulled up, please.
21  A   I have it pulled up.
22  Q   And, Dr. Curlin, have you reviewed this

Page 121

1  study?
2  A   I do not recall having reviewed this study.
3  Q   And so is it correct then that this is not a
4  study that you considered in preparing your report?
5  A   As I -- as I said in the report, I took the
6  description by Cantor and Laidlaw on the state of the
7  evidence.  And I don't recall offhand whether this was
8  one of the studies they reviewed.  But I took that to
9  be accurate, for the purposes of the questions I was
10  asked to consider.  And for that reason, no, I did
11  not.
12  Q   Okay.  If you don't mind just turning to
13  paragraph 29 of your report.  In paragraph 29, you
14  cite Dr. Cantor's conclusion that "No studies have
15  documented any reduction in suicide rates in minors or
16  any population as a result of medical transition."  Is
17  that correct?
18  A   Yes, I cite Dr. Cantor and -- and his
19  observation that that's a fact acknowledged by WPATH.
20  Q   And am I correct to assume that you didn't
21  do any independent research on this topic?
22  A   That's correct.  I -- as instructed, I took

Farr Curlin

April 8, 2024

Page 122

1 the reports of Cantor and Laidlaw to be accurate with
2 respect to their description of the science in this
3 regard.
4          MS. MURPHY:  Okay.  I would like to
5 mark as Exhibit 6, the study by Green, and that's the
6 one that's titled, "Association of Gender-Affirming
7 Hormone Therapy With Depression, Thoughts of Suicide,
8 and Attempted Suicide Among Transgender and Nonbinary
9 Youth."
10          (Exhibit 6 was marked for
11          identification.)
12          MS. MURPHY:  And if you may --
13          MR. BROOKS:  Give us a moment here.
14          THE WITNESS:  Yeah, sorry.
15          MS. MURPHY:  Yeah.
16          THE WITNESS:  Okay, I have that study
17 by Green up on the screen.
18 BY MS. MURPHY:
19     Q    And is this a study that you're familiar
20 with?
21     A    I don't have memory of reviewing this study
22 directly.

Page 123

1     Q    And what do you mean by "directly"?
2     A    Meaning I did not independently look at this
3 study.  I took the description by Cantor and Laidlaw
4 to be accurate for the purposes of describing
5 the -- the state of knowledge in this area.
6     Q    Okay.  So you've never reviewed this study?
7     A    As I said.
8          MS. MURPHY:  Okay.  Then I would like
9 to mark as Exhibit 7, a study by Turban, and this one
10 is titled, "Access to Gender-Affirming Hormones During
11 Adolescence and Mental Health Outcomes Among
12 Transgender Adults."
13          (Exhibit 7 was marked for
14          identification.)
15 BY MS. MURPHY:
16     Q    And I'd appreciate it if you can pull that
17 one up too, please.
18     A    I have the study, the first author of which
19 is Jack Turban, up on the screen.
20     Q    Okay.  And are you aware of this study?
21     A    I'm aware of this study, insofar as it was
22 referred to in the reviews by at least -- by Dr.

Page 124

1 Cantor and -- and/or Dr. Laidlaw, but I have not
2 reviewed it directly.
3     Q    Okay.  What is your understanding of the
4 outcome of this study?
5     A    I -- I don't recall.
6     Q    Turning to paragraph 30 of your report.
7 Okay.  Here you talk about a study that you reviewed
8 by Glintborg, and this is a study that is described in
9 Dr. Cantor's supplemental report; correct?
10     A    That's my -- yes, that's my recollection.
11     Q    Okay.  And just so we're all on the same
12 page, this is the study that's entitled
13 "Gender-Affirming Treatment and Mental Health
14 Diagnosis in Danish Transgender Persons: A Nationwide
15 Register-Based Cohort Study."
16     A    I need to look at the -- my endnotes to see
17 if that's the title.
18     Q    Sure.
19     A    This is the Glintborg study?
20     Q    Yes.
21     A    So I have "Gender-Affirming Treatment and
22 Mental Health Diagnosis in Danish Transgender Persons:

Page 125

1 A Nationwide Register-Based Cohort Study."
2     Q    Okay.  So just to confirm, you reviewed this
3 study yourself; correct?
4     A    That's correct.
5     Q    And in this study, how did the researchers
6 measure participants' mental health?
7     A    I -- I don't recall the details.  I'd have
8 to look back through the study.
9     Q    Okay.  And do you recall whether the
10 researchers reviewed medical files of the patients?
11     A    I -- I don't recall the details of how the
12 study were done -- was done.
13     Q    Okay.  What conclusions did you draw from
14 your review of this study?
15     A    That the study intended to include the
16 medical records of all individuals in Denmark
17 diagnosed with gender dysphoria or gender incongruence
18 from 2000 to 2021.  That included about 3,800
19 patients, among whom a little more than 2,000
20 underwent medicalized gender transition.  And that the
21 study found that prescriptions of psychoactive
22 medications increased rather than decreased after the

32 (Pages 122 - 125)

Page 126

1 start of medicalized gender transition, and they
2 remained elevated across multiple years.
3       It also found that measures of negative
4 mental health compared against controls were -- "were
5 stable after initiation of gender-affirming hormone
6 treatment, without sign of decrease after date for
7 first prescription of gender-affirming hormone." That
8 was a quote from the -- from the authors themselves.
9 Which is, in my words, that the mental health of the
10 patients who received medicalized gender transition
11 did not, on average, improve as a result of or
12 following initiation of medicalized gender transition.
13       Q   But the study did not conclude that the
14 mental health declined after initiation of treatment;
15 correct?
16       A   That's my recollection, that -- that it did
17 not, except insofar as being on more psychoactive
18 medications may be a proxy for having greater mental
19 healthcare problems.
20       Q   I'm sorry, can you point to the portion of
21 the study which says that they were on more
22 psychoactive medications?

Page 127

1       MR. BROOKS:  Objection.  The witness
2 doesn't have the study in front of him.
3 BY MS. MURPHY:
4       Q   In that case -- well, let me ask you this.
5 Dr. Curlin, can you answer that question without the
6 study in front of you?
7       A   I think you asked me to point to it, and no,
8 I cannot point to it without it being in front of me.
9 I do include a page number in my citation there.
10       MS. MURPHY:  Okay.  We can pull up the
11 study.  But I'm sorry, I'm going to ask the court
12 reporter to read back my question.
13       THE WITNESS:  Sure.
14       THE REPORTER:  All right, just a
15 moment.
16       (The reporter repeated the record as
17       requested.)
18 BY MS. MURPHY:
19       Q   Dr. Curlin, when you say "more psychoactive
20 medications," do you mean more medications in number
21 or an increase in dosage?
22       A   I -- I don't recall the details, but what I

Page 128

1 wrote was that prescriptions of psychoactive
2 medications increased rather than decreased after the
3 start of medicalized gender transition and remained
4 elevated across multiple years.  So that was my --
5 that was my understanding from reading the study.
6       Q   Okay.  Now in your clinical experience, when
7 a patient is undergoing treatment for a condition and
8 the treatment appears to be working, is that an
9 indication that the treatment should be stopped?
10       MR. BROOKS:  Objection.
11       A   Just -- I want to note that there seems to
12 be a hidden premise, so I just want to specify it's a
13 false premise, which is that that's what we're
14 describing in this case or that's what my opinion is
15 describing in this case.
16       So generally speaking, that a treatment is
17 working is not necessarily evidence that that
18 treatment should be stopped.  Sometimes it is, if you
19 expect that -- that treatment restores health and is
20 not required to -- to sustain health.  It would depend
21 on the case and the condition.
22       Q   This study did not conclude that patients

Page 129

1 receiving gender-affirming care were worse than before
2 treatment; correct?
3       MR. BROOKS:  Objection.
4       A   My understanding was it concluded that
5 there -- they did not improve, which is -- but I
6 didn't -- but I -- and that their -- their measures of
7 negative mental health did not worsen.  They remained
8 stable "after initiation of gender-affirming hormone
9 treatment, without sign of decrease after date for
10 first prescription of gender-affirming hormone."
11 That's a quotation of the authors.
12       Q   Got it.  So in paragraph 31 of your report,
13 and I apologize, I don't know I'm going to pronounce
14 this correctly, but you mention a study by Kaltiala.
15       THE REPORTER:  Can you spell that?
16       MS. MURPHY:  K-A-L-T-I-A-L-A.
17       THE REPORTER:  Thank you.
18 BY MS. MURPHY:
19       Q   And this was a 2003 study; correct?
20       A   That's -- that's correct.
21       Q   And just to confirm once again, this is a
22 study that you reviewed; right?

33 (Pages 126 - 129)

Page 130

1   A   I did review that, yes.

2   Q   And how do the researchers in this study

3 measure participants' mental health?

4   A   I -- I don't recall in detail.  I only

5 recall what -- what I summarized here or what I

6 specified here.

7   Q   Okay.  And this study did not conclude that

8 the patients receiving gender-affirming care were

9 worse than before treatment; right?

10   A   It did not conclude, to the best of my

11 recollection, that they were worse as measured by need

12 for psychiatric treatment.  So on that -- in that one

13 specific outcome, that it concluded that they, like

14 the Glintborg study, they did not -- following

15 medicalized gender transition, their need for

16 psychiatric treatment did not go down.

17   Q   And was that measured by the number of

18 contacts they had with mental health providers?

19   A   I don't recall how -- what -- what the

20 specific proxy was for need for psychiatric treatment.

21   Q   And can you say definitively, based on this

22 study, that because they continued to have contact

Page 131

1 with mental health providers that their mental health

2 condition stayed the same?

3   A   No, I can't say that definitively.  We can

4 only say that this proxy for need for psychiatric

5 treatment did not improved after medicalized gender

6 transition.

7   Q   Based simply on the fact that they continued

8 to see a mental health provider?

9   A   If that was -- again, as I said a moment

10 ago, I don't recall the -- how they measured that,

11 whether that was number of visits to psychiatric

12 providers or number of prescriptions or frequency of

13 visits, I don't recall what the proxy was.

14   Q   Okay.  Paragraph 33 of your report, if you

15 wouldn't mind turning to that, please.

16   A   I'm there.

17   Q   Okay.  And here you say, "All of this

18 contradicts the plaintiffs' claim that MGT is

19 medically necessary, since an intervention cannot be

20 said to be medically necessary if the benefits of the

21 intervention are unproven, or indeed are cast into

22 serious doubt by the most recent large-scale studies."

Page 132

1 Correct?

2   A   That is what I said, yes.

3   Q   Okay.  Are you aware that every major

4 medical association in the United States supports

5 gender-affirming care?

6        MR. BROOKS:  Objection, lack of

7 foundation.

8   A   I don't know about every major medical

9 association.

10   Q   Are you aware that the American Medical

11 Association supports gender-affirming care in

12 adolescents?

13        MR. BROOKS:  Same objection.  Assumes

14 facts not in evidence.

15   A   I am aware that at least some statement by

16 some arm of the American Medical Association has

17 expressed support for medicalized gender transition.

18   Q   And what about the American Academy of

19 Pediatrics?  Are you aware that they have supported

20 gender-affirming care for adolescents?

21        MR. BROOKS:  Objection.

22   A   I am aware of the -- the position statement

Page 133

1 authored by Rhafferty, which was put forward as a

2 statement of the American Academy of Pediatrics and

3 was quite enthusiastic about medicalized gender

4 transition.

5   Q   And are you aware that the American

6 Psychiatric Association supports gender-affirming

7 care?

8        MR. BROOKS:  Objection, assumes facts

9 not in evidence.

10   A   I don't recall that, but I don't have memory

11 that that's not the case.

12   Q   So going back to the portion of your report

13 that I just read, paragraph 33, how do you determine

14 whether a particular treatment is medically necessary?

15   A   It depends to some extent on the situation,

16 but by medically necessary I mean that there is

17 sufficient evidence that there's a threat to the

18 patient's health that is eminent and that the

19 intervention in question, we have reasonable certainty

20 that it is an intervention that is likely to benefit

21 the patient by preventing the threat to the patient's

22 health or resolving that threat, and there are no

Page 134

1 other confounding factors that might, you know, change
2 that judgment.
3    Q    And when you talk about threats to patient
4 health, are you including threats to their mental
5 health as well?
6    A    Toward any aspect of their health.
7    Q    And just to be clear, that includes their
8 mental health?
9    A    It would include their mental health.  Yes,
10 it would include their mental health.
11    Q    Now if a particular treatment is not
12 medically necessary, is it your opinion that that
13 treatment should be criminalized?
14        MR. BROOKS:  Objection.
15    A   I have not testified to that effect, and --
16 and no, that is not my testimony.
17    Q    Now if a particular treatment is not
18 medically necessary, should it be made unavailable to
19 patients --
20        MR. BROOKS:  Objection.
21 BY MS. MURPHY:
22    Q    -- regardless of their belief that they

Page 135

1 would benefit from it?
2    A    To clarify, my point here is that the
3 plaintiffs have not shown that this intervention is
4 medically necessary.  It does not follow that anything
5 that is not medically necessary must then be
6 criminalized.  Whether a particular intervention
7 should be prohibited and by whom is -- depends on a
8 lot of factors.
9        But the point here is -- which I take to be
10 a pretty straightforward point, is that the plaintiffs
11 have not shown that medicalized gender transition is
12 medically necessary in any reasonable understanding of
13 that term.
14    Q    You would agree that you have not reviewed
15 all available evidence on the safety and efficacy of
16 gender-affirming care; correct?
17    A    I have not attempted to review all of the
18 available evidence regarding medicalized gender
19 transition.
20    Q    And is it your opinion that there are no
21 negative health consequences of delaying or denying
22 gender-affirming treatment?

Page 136

1    A    I have not testified to that effect, and
2 that is not my opinion.  I -- I don't -- I'd have to
3 think that through and consider -- consider details
4 that I can't consider here on the fly.
5    Q    Okay.  Are you offering an opinion that
6 gender-affirming medical care is unproven?
7    A    It's my opinion that if the state of the
8 evidence is as described by Dr. Cantor and Laidlaw,
9 then medicalized gender transition is very clearly
10 unproven with respect to the hoped-for outcomes that
11 its proponents claim it brings about.
12    Q    In paragraph 33, you refer to recent
13 large-scale studies.  Which studies are you referring
14 to?
15    A    I don't recall exactly what I was referring
16 to when I wrote this, but I -- I know it included the
17 Glintborg and Kaltiala study.  I think it also
18 includes the -- the large-scale systematic reviews
19 conducted by a number of different bodies of experts.
20    Q    Moving on to paragraph 34.  And it says
21 here, "While the benefits of MGT for minors are at
22 best unproven, the evidence summarized by Drs. Cantor

Page 137

1 and Laidlaw also indicates that MGT in minors poses
2 risk of objective, often irreversible, harms to
3 health, while also requiring life-long dependence on
4 medical interventions."  Is that correct?
5    A    That's what I wrote there, yes.
6    Q    And what evidence are you referring to here?
7    A    I'm talking about the evidence summarized by
8 Drs. Cantor and Laidlaw.
9    Q    Okay.  What do you mean by "life-long
10 dependence on medical interventions"?
11    A    Well, I'm thinking here specifically of the
12 fact that cross-sex hormones principle, if someone
13 sustains a desire to suppress their ordinary healthy
14 sexual -- secondary sex characteristics, to my
15 knowledge, requires ongoing administration of those
16 hormone indefinitely.
17    Q    Is it uncommon for healthy individuals to
18 require medication for the rest of their life?
19    A    It is exceptionally uncommon, and I at the
20 moment can't think of another situation in which
21 people who are healthy, according to the standard
22 medical norms, take some kind of drug for lifelong

35 (Pages 134 - 137)

Farr Curlin
April 8, 2024

Page 138

1 that counteracts and contradicts that ordinary healthy

2 development and expression, particularly when those

3 interventions carry known significant adverse side

4 effects.

5    Q   Turning to paragraph 36 of your report.  In

6 this paragraph, you cite to the 2021 article by the

7 Karolinska Institute; is that right?

8    A   Give me a moment.

9    Q   Sure.

10    A   Okay.  And what is your question?

11    Q   Sure.  Did you read this article?

12    A   I can't recall.  I may have.

13    Q   Okay.  Then do you recall what it's about?

14    A   Just --I only recall the part that I've

15 cited here.

16    Q   And so we're on the same page, the part that

17 you cited, it says, "In light of the above, and based

18 on the precautionary principle, which should always be

19 applied, it has been decided that hormonal treatments,

20 i.e. puberty blocking and cross-sex hormones, will not

21 be initiated in gender dysphoric patients under the

22 age of 16."  Correct?

Page 139

1       MR. BROOKS:  Objection.  You've read

2 only part of the quote in the paragraph.

3    A   I did that -- what you read is a part of

4 what I quoted in this paragraph.

5    Q   Okay.  And do you know what specific studies

6 the clinic based their decision to limit care on?

7    A   I only know that they -- as best I recall,

8 they took into account -- review of the available

9 scientific evidence that was commissioned by Sweden's

10 National Board of Health, and that that review had

11 concluded that hormonal interventions in minors are

12 fraught with extensive -- I'm sorry, actually, I don't

13 know if it was that review or if it was the leading

14 clinic itself that concluded that hormonal

15 interventions in minors are fraught with extensive and

16 irreversible adverse consequences, such as

17 cardiovascular disease, osteoporosis, infertility,

18 increased cancer risk, and thrombosis.

19    Q   And are you aware that the clinic placed

20 some limitations on providing gender-affirming care

21 but they did not discontinue the use of

22 gender-affirming care in adolescents altogether?

Page 140

1       MR. BROOKS:  Objection.

2    A   I -- I am not aware of what they did.  In

3 fact, I only know what they said here, which was that

4 they would not initiate gender dysphoric patients --

5 that they would not initiate medicalized gender

6 transition in gender dysphoric patients under the age

7 of 16.

8       MR. BROOKS:  And, Counsel, let me just

9 step in.  It is the classic after lunch period, and I

10 want to encourage the witness to speak up.  Always a

11 problem at two o'clock in the afternoon.

12       MS. MURPHY:  Sure.

13 BY MS. MURPHY:

14    Q   And, Dr. Curlin, are you aware that in

15 Sweden, gender-affirming care for adults and youth is

16 fully paid for by the National Health System?

17       MR. BROOKS:  Objection, assumes facts

18 not in evidence.

19    A   I don't have any knowledge about that that I

20 recall.

21    Q   Okay.  If you could, please turn to

22 paragraph 38 of your report.

Page 141

1    A   I'm there.

2    Q   Okay.  In that paragraph you state that MGT

3 induces hormone levels that are abnormal; right?

4    A   Which paragraph is this?

5    Q   Paragraph 38.

6    A   Okay, hang on one second.

7    Q   It's the last line of that paragraph.

8    A   Okay, I've -- I see the paragraph.

9    Q   Okay.  What do you mean by "abnormal"?

10    A   I mean that it induces levels that are not

11 found in healthy persons of that sex, of the sex of

12 the patient, and which if they were found are a sign

13 of ill health, of disease, of disorder, in every

14 context -- in every other context.

15    Q   And do you agree, though, that individual

16 hormone levels vary between members of the same sex?

17    A   They vary to some extent.

18    Q   And so how would you describe normal hormone

19 levels then?

20    A   Well, I can't cite to you what the actual

21 normal range is within two standard deviations for age

22 and sex-matched groups, but a normal hormone level is

36 (Pages 138 - 141)

Farr Curlin

April 8, 2024

Page 142

1 one that you characteristically find in people whose
2 health -- whose bodies are well working, who -- who
3 are healthy and don't have a disorder that affects the
4 production of hormones.  And medicalized gender
5 transition, cross-sex hormones, induces levels that
6 are not found normally.
7    Q    Okay.  So a woman who is undergoing
8 perimenopause, which is a normal, healthy transition,
9 would taking hormone replacement drugs be considered
10 inducing abnormal hormone levels?
11    A    I don't know what hormone levels are induced
12 by hormone-replacement therapy in that clinical
13 context, but I know that it's not a level of
14 testosterone that is induced by cross-sex hormones in
15 someone who's a female sex, in that context.
16    Q    And what's the basis for your opinion that
17 MGT induces hormone levels that are abnormal?
18    A    It's my knowledge, from my medical training,
19 of sex hormones in males and females, and also the
20 descriptions of medicalized gender transition by those
21 proponents of medicalized gender transition, as to
22 what they're seeking to induce.

Page 143

1    Q    Turning to page 9, if you're not already
2 there, the subheading there says, "The fact that GD is
3 listed as a disorder in the Diagnostic and Statistcal
4 Manual of Mental Disorders, DSM-5, does not imply that
5 GD marks a disorder of the body that warrants MGT in
6 minors."  Correct?
7    A    That's right.  That's what I wrote.
8    Q    Okay.  But you agree that gender dysphoria
9 is listed in the DSM-5 as a disorder?
10    A    I do understand that gender dysphoria is
11 listed in the DSM-5 as a disorder.  Specifically as a
12 mental disorder.
13    Q    Okay.  And what do you mean by "disorder of
14 the body"?
15    A    A disorder of the body.  I'm not sure how
16 much more simple to make that.
17    Q    Well, let me ask this.  Does a disorder of
18 the body include mental health disorders?
19    A    So because human beings are human animals,
20 in an important sense, all human disorders are bodily
21 disorders.  But here what I'm highlighting is that
22 gender dysphoria is recognized as a mental disorder.

Page 144

1 Having a mental disorder of, in this case, that
2 involves your perception, one's perception of their
3 secondary sex characteristics, does not imply that one
4 has a medical disorder with respect to those secondary
5 sex characteristics.  There's nothing wrong in that
6 case with the secondary sex characteristics, medically
7 speaking.
8    Q    Okay.  Who is capable of making a diagnosis
9 of gender dysphoria?
10    A    I don't have a formed opinion on that
11 question.
12    Q    Okay.  Do you have an understanding of the
13 goals of the interventions that are prescribed
14 occasionally for gender dysphoria?
15    A    It depends on which descriptions you mean.
16    Q    Let's take puberty.
17    A    Which interventions do you mean?
18    Q    Sure.  Let's take, for instance, puberty
19 blockers.  What is the goal of that intervention when
20 prescribed for gender dysphoria?
21    A    My understanding is, based on the
22 descriptions of the plaintiffs' experts and

Page 145

1 descriptions otherwise of folks who practice these
2 interventions, the goal is to prevent the -- the
3 secondary sex characteristics that are normally going
4 to develop in puberty in a person of that sex from
5 developing.
6    Q    And what is your understanding of the goals
7 of prescribing cross-sex hormones for individuals with
8 gender dysphoria?
9    A    My understanding is that the -- the goal of
10 those who are prescribing such hormones is to induce
11 development of secondary sex characteristics that are
12 more like, insofar as possible, more like the expected
13 secondary sex characteristics in a healthy person of
14 the opposite sex.
15    Q    Okay.  Moving onto paragraph 40, and there
16 you refer to gender dysphoria as a disorder of
17 perception; is that correct?
18    A    Give me a second.
19    Q    Sure.
20    A    Okay.  Can you repeat your question?
21    Q    Sure.  You refer to gender dysphoria as a
22 disorder of perception; correct?

37 (Pages 142 - 145)

Page 146

1    A   I can't recall if I specifically said it's a
2  disorder of perception, but I do describe it as a --
3  as a condition in which the person suffering it
4  perceives their secondary sex characteristics as being
5  at odds with their wellbeing.  And -- and that in this
6  case, the -- those secondary sex characteristics are,
7  at least in the typical case to my understanding, are
8  objectively healthy and expected secondary sex
9  characteristics for a person of their sex.
10   Q   And so you refer to it the sixth line up
11  from the bottom of that paragraph.  You refer to it as
12  a disordered perception; correct?
13   A   I see that, yes.  And just insofar as I've
14  described, I -- in my judgment, it is objectively
15  disordered in that respect.
16   Q   Okay.  Is disordered perception a term used
17  in the DSM-5?
18   A   I -- I can't recall.  It's certainly been
19  used in my clinical training.
20   Q   Okay.  Moving on to paragraph 42.  Just let
21  me know when you get there.
22   A   I'm there.

Page 147

1    Q   Okay.  In the second sentence you say,
2  "Indeed, the health authorities and independent bodies
3  that have systematically reviewed the scientific
4  evidence regarding MGT in minors have concluded that
5  evidence is insufficient to justify the conclusion
6  that MGT improves even mental health outcomes."
7  Correct?
8    A   That's correct.
9    Q   And what did you review to make this
10  conclusion?
11   A   The -- the reports by Cantor and Laidlaw,
12  and then I reviewed some of those reports by experts
13  in England and Finland, Denmark myself.
14   Q   Okay.  In that --
15   A   Actually, I don't recall if it was Denmark.
16  England, Sweden, Finland.
17   Q   Okay.  And in that latter category of
18  research that you just described, those are all
19  documents that you've cited in your report; correct?
20   A   I -- I cited them or they were cited by
21  Cantor and Laidlaw.
22   Q   Okay.  And what health authorities or

Page 148

1  independent bodies are you referring to?
2        MR. BROOKS:  Objection, asked and
3  answered.
4    A   Yeah.  I don't remember the exact names,
5  except the abbreviation for the English authority is
6  the -- that did the systematic review is the -- is
7  NICE.  But I -- there was also a Swedish body that did
8  a systematic review.  As I recall, also one done in
9  Finland.  And it -- it was bodies -- those bodies and
10  perhaps others that are referred to in the reports by
11  Cantor and Laidlaw.
12   Q   Okay.  Now in paragraph 43, is it fair to
13  say that you take issue with the guidelines issued by
14  the Endocrine Society?
15   A   I can't answer that question.  That's -- I
16  don't know what it means to take issue, and I don't
17  know which guidelines you're talking about.
18   Q   Do you have an opinion on the guidelines
19  issued by the Endocrine Society?
20        MR. BROOKS:  Objection.
21   A   So I took, as I was asked, to be accurate,
22  the reports by Cantor and Laidlaw and their summary,

Page 149

1  and Cantor described the Endocrine Society guidelines
2  as not relying on any systematic review of evidence of
3  efficacy of any form of treatment for gender
4  dysphoria.  I take that to be a true statement.  I
5  have not tried to go through the Endocrine Society's
6  citations and verify that.
7    Q   Okay.  And is that the same for the
8  guidelines issued by WPATH?
9    A   That's correct.  I took to be accurate, for
10  the purposes of my -- of the questions I was asked,
11  Cantor and Laidlaw's description of the review
12  conducted by WPATH.
13   Q   And what about the American Academy of
14  Pediatrics 2018 policy statement?
15   A   The same.
16   Q   Okay.  Turning now to paragraph 44, please.
17   A   I'm there.
18   Q   Okay.  It says here that your "own review of
19  SOC 8 indicates WPATH has problematically minimized
20  the doctor's responsibility to exercise independent
21  judgment and fiduciary responsibility to guide patient
22  care for minors."  Correct?

Page 150

1     A    Yes, that's correct.

2     Q    And can you describe your reasoning behind

3 this conclusion?

4     A    I think I make it plain in my -- in my

5 report.

6     Q    Okay.  Well then, you know, simply for

7 purposes of this deposition, can you summarize that

8 for me, please?

9     A    Sure.  The problem is that WPATH, in its SOC

10 8, uses language of the importance of -- well, give me

11 a second and I'll tell you precisely.

12        Okay, so in paragraph 84 of my report, I

13 write, "In its Standards of Care, version 8, WPATH

14 suggests that gaps in evidence demonstrating the

15 safety and efficacy of MGT should not prevent the use

16 of MGT in adolescents" -- quote -- "given the ethics

17 of self-determination in care."

18        The new guidelines also emphasize,

19 quote -- or a, quote, "right to bodily and mental

20 integrity, autonomy, and self-determination."  And a

21 punitive need for healthcare practitioners to, quote,

22 "match the treatment approach to the specific needs of

Page 151

1 patients, particularly their goals for gender identity

2 and expression."

3        And the problem is that the medical

4 ethics -- the standard within the practice of medicine

5 and medical ethics with respect to decision making for

6 minors is self-consciously and specifically not

7 governed by self-determination.  And so the WPATH is

8 effectively appealing to a concept that has relevance

9 with respect to the autonomy of adults, but has long

10 been understood to not apply as a -- as a governing

11 concept in the care of children.

12        And -- and to appeal to that as -- to appeal

13 to that concept which doesn't apply to overcome the

14 absence of evidence for efficacy is, I think deeply

15 problematic.

16     Q    All right.  Dr. Curlin, I'm sorry, you

17 probably said this correctly, but I just want to

18 clarify for the record.  I believe you were reading

19 from paragraph 84 of your report; correct?

20     A    Yes, I was.

21     Q    Okay.  I think I heard 85, but regardless,

22 just so it's clear, it was 84.

Page 152

1     A    Well, in -- in 85 I had, "Much has been made

2 of the importance of autonomy, but the ethical

3 standard for medical decision-making with respect to

4 minors is decidedly not self-determination."  And then

5 I go on to explain the basis for that statement.

6     Q    Okay.  Can you describe, for the purposes of

7 this deposition, why it is that you believe that

8 self-determination does not apply to adolescents?

9     A    Adolescents, as minors, have long been

10 understood as among what we call, in the field of

11 medical ethics, vulnerable populations.  The -- as the

12 Belmont Report put it, respect for autonomy involves

13 effectively respecting the authority of adults, but it

14 also involves protecting those who don't have that

15 level of autonomy, which among whom have always

16 been -- included children.

17        So doctors have a fiduciary relationship to

18 children to consider what is in the best interest of

19 children, without respect in many cases to -- or

20 notwithstanding, I should say, in many cases

21 children's opinions about what is in their best

22 interest.

Page 153

1     Q    And so let me make sure I understand this

2 correctly.  Are you saying that children's opinions

3 should play no role in decisions about treatment?

4     A    I have not said that.  I've said, as I do in

5 my report, that the children -- a child's opinion that

6 a particular intervention is good for them is not

7 sufficient to -- to justify that intervention.  That

8 intervention must be reasonably understood by the

9 physician on -- on some kind of reasonable basis to

10 actually be conducive to the medical benefit to

11 the -- benefit of the health of that child.

12        That's a -- that's the fundamental

13 obligation of the physician.  And so whereas adults

14 have more degrees of freedom to ask for and to consent

15 to interventions that are not necessarily good for

16 their health, under the law and under this principle

17 of respect for autonomy, children do not have that

18 same authority.

19     Q    But in the case of MGT, it's the parents who

20 are asked to provide consent for treatment; correct?

21     A    My understanding is the parents are asked to

22 provide consent, and the children are asked formally

Farr Curlin

April 8, 2024

Page 154

1 to provide assent. But the language of
2 self-determination with respect to children
3 contradicts that very idea of the parents providing
4 consent and the children providing assent. If it were
5 in fact the case that the key concept here is
6 self-determination, then we would seek consent from
7 children. We don't do that in medicine, except in
8 some specific situations.
9    Q    Okay. Is that your only criticism of SOC 8
10 or are there others?
11         MR. BROOKS: Objection.
12    A    No, I would not say that is my only
13 criticism.
14    Q    Do you agree that SOC 8 is a set of clinical
15 guidelines?
16         MR. BROOKS: Objection.
17    A    Yeah, I -- I -- I don't -- I don't know if I
18 would call SOC 8 a set of clinical guidelines, as
19 opposed to a -- other things that it also purports to
20 be, including a summary of reviews of data and so on.
21    Q    Would you characterize SOC 8 as standard of
22 care?

Page 155

1    A    I would not.
2    Q    Do you agree that clinical guidelines exist
3 for treating a variety of types of conditions in
4 pediatrics?
5    A    Because I do not practice clinical
6 pediatrics, I am not often reviewing clinical
7 guidelines for pediatrics. But to my knowledge, there
8 are clinical guidelines of various forms regarding
9 healthcare for children.
10    Q    And is it your opinion that relying on
11 clinical guidelines, as you say, minimizes the
12 doctor's responsibility to exercise independent
13 judgment?
14    A    Where -- can I ask where you're pointing to?
15    Q    Sure, we're going back to paragraph 44.
16    A    Actually, no, that -- that sentence which
17 states, "My own review of SOC 8 indicates WPATH has
18 problematically minimized the doctor's responsibility
19 to exercise independent judgment and fiduciary
20 responsibility to guide patient care for minors," is
21 my interpretation of their emphasis on this importance
22 of self-determination.

Page 156

1    Q    I see, okay.
2    A    And their emphasis on according with the
3 patient's goals, for a minor.
4    Q    Okay. So I noticed that whenever you said,
5 in answer to that question, you said patient goals and
6 you put them in what's commonly referred to as air
7 quotes. Can I ask if there was any meaning that you
8 ascribe to that for -- what meaning was there when you
9 put that term in air quotes?
10    A    I, in that case, was not using those as air
11 quotes, though I concede that that is the sign for air
12 quotes. I meant that to indicate that I actually
13 quoted them as saying, as I -- as I note in my
14 paragraph 84. There's a -- there's a punitive need
15 for healthcare practitioners to, quote, "match the
16 treatment approach to the specific needs of the
17 patients" -- comma -- "particularly their goals for
18 their identity and expression."
19    Q    Okay. Thank you for that clarification.
20 Now in that same paragraph 44, you also discuss Drs.
21 Cantor and Laidlaw's conclusions about conflicts of
22 interests that they say exist among WPATH committee

Page 157

1 members; correct?
2    A    I do refer to their -- their conclusion that
3 there were substantial financial conflicts of
4 interest.
5    Q    Okay. And did you do any independent
6 research on whether there existed financial conflicts
7 of interest among the committee members of WPATH?
8    A    No, as -- no, I did not. I took -- as I
9 said, I think here explicitly, insofar as these
10 descriptions, and by that I mean these descriptions by
11 Cantor and Laidlaw, insofar as they're accurate, then
12 WPATH ignored significant conflicts of interest and
13 violated accepted principles of medical ethics. I did
14 not seek to do my own research to find if -- if Cantor
15 and Laidlaw's conclusions were accurate.
16    Q    Okay. And so it is your opinion that
17 individuals who developed SOC 8 had direct financial
18 conflicts of interest?
19    A    It is my opinion that if the descriptions by
20 Cantor and Laidlaw are true, then yes, they did.
21    Q    Is it your opinion that clinicians who
22 practice in a particular field should never be

Page 158

1 involved in developing clinical guidelines for that
2 field?
3    A   No, that is not my opinion.
4    Q   In this instance, why would the
5 participation among experts in developing these
6 guidelines be a conflict of interest?
7    A   A conflict of interest exists where the
8 persons who are being looked to, to render what is
9 expected to be an impartial judgment about, in this
10 case a medical intervention, stand to benefit
11 financially if people take their description to
12 be -- to be accurate or authoritative.
13       And so that you can have conflicts of
14 interest that -- that do not disqualify someone from
15 serving as an expert.  In fact, sometimes you cannot
16 really get adequate expertise without involving some
17 people who have some conflicts of interest.
18       But it's important, when there is a conflict
19 of interest, to note it, be candid and forthcoming
20 about it, and to take measures to -- to manage or
21 compensate for that, for example by having people
22 involved who do not have that conflict of interest and

Page 159

1 subjecting the -- the judgments of those who do to
2 review by those who don't.  And so -- and there are
3 other methods to manage conflicts of interest.
4    Q   Okay.  And is it your opinion that those
5 things that you say should be done where there are
6 conflicts of interest or potential conflicts of
7 interest were not done here by WPATH?
8    A   It's my opinion that if the descriptions by
9 Cantor and Laidlaw are accurate, that they --
10 those -- those conflicts of interest were not handled
11 as they should have been.
12    Q   In what way?
13    A   Well, first, in that the conflict of
14 interest was not mentioned in the report.  That's a
15 big deal in medicine.  That's -- that's one.  Second,
16 that outside experts and perspectives on the standard
17 writing process who do not have conflicts of interest
18 were not, if Cantor and Laidlaw's description is
19 accurate, were not included.  And at least -- yeah,
20 were not included.  Those -- that's a second problem.
21    Q   Are there any others?
22    A   There may be, but for example, if it's the

Page 160

1 case that people writing the standards have been
2 taking into account how what they vote might bear on
3 whether physicians were reimbursed for medicalized
4 gender transition, that is a very problematic conflict
5 of interest.
6    Q   Just to clarify, when you talk about
7 reimbursement, are you talking about reimbursement for
8 providing care?
9    A   I'm talking about insurance reimbursement
10 for medicalized gender transition.
11    Q   Okay.  So any physician who receives
12 insurance reimbursement for providing medical
13 transition should not be involved in the development
14 of the standards?
15       MR. BROOKS:  Objection.
16    A   That's not what I said.  In fact, that
17 directly contradicts what I said.  It could be helpful
18 to include them, particularly if they are the ones
19 that have certain kinds of expertise that don't --
20 others don't have.  But that they have a conflict,
21 such conflict of interest needs to be disclosed and
22 there needs to be a plan for how to manage that, to

Page 161

1 ensure the public, who of course can't know what's
2 going on behind doors, that the conclusions are not
3 motivated by pecuniary interests of those writing the
4 guidelines.
5    Q   Thank you, Doctor.
6    A   But -- but are -- but are motivated by a
7 dispassionate assessment of the data.
8    Q   Turning now to paragraph 48 of your report.
9    A   I'm there.
10    Q   In that paragraph, you refer to a report
11 that was published by Reuters.  It was "an
12 investigative report documenting both growing concerns
13 among physicians about MGT, as well as intense
14 backlash that clinicians, experts, and patients
15 themselves have received when they voice such
16 concerns."  That's how you describe that report;
17 correct?
18    A   That is what I wrote there, as I read it
19 now.
20    Q   Okay.  You read that report; correct?
21    A   I did read that report, yes.
22    Q   Okay.  And that report also refers to

41 (Pages 158 - 161)

Page 162

1  threats of violence against providers of
2  gender-affirming care; correct?
3      A   I don't recall.
4      Q   Okay.  And the authors of that article were
5  not arguing that gender-affirming care should be
6  criminalized; were they?
7      A   I do not recall them arguing that.
8      Q   In fact, that article, the authors state
9  that understanding the reasons that some transgender
10 people quit treatment is key to improving it; correct?
11     A   I don't have the article in front of me, but
12 if you can show it to me I'm happy to read along next
13 to you.
14     Q   Sure.
15         MS. MURPHY:  Andrew, can you pull up
16 that article?  We can go ahead and mark it as an
17 exhibit.  It was not one that --
18         MR. BROOKS:  Yes.
19         MS. MURPHY:  Yeah, okay.  And I believe
20 that that would make it, I guess, Exhibit 8?
21         THE REPORTER:  Correct.
22         MS. MURPHY:  Okay.

Page 163

1      (Exhibit 8 was marked for
2      identification.)
3         MR. BROOKS:  Ruin your numbering.
4         THE REPORTER:  And what is this exhibit
5  going to be labeled as?
6         MS. MURPHY:  Well, we can label it
7  Reuters article.
8         THE REPORTER:  Did you say writer's
9  article?
10        MS. MURPHY:  You know, I never know how
11 to pronounce this.
12        THE WITNESS:  I think you pronounced it
13 correctly the first time.
14        MR. BROOKS:  Reuters, R-E-U-T-E-R-S.
15        THE REPORTER:  Thank you.
16        MS. MURPHY:  I'm originally from
17 Pennsylvania, so sometimes people dispute my
18 pronunciation of things.  It's not uncommon.
19 BY MS. MURPHY:
20     Q   Okay.  So looking at what we've now marked
21 as Exhibit 8, and actually referring to that first
22 paragraph there, it says, "Understanding the reasons

Page 164

1  some transgender people quit treatment is key to
2  improving it, especially for the rising number of
3  minors seeking to medically transition, experts say."
4  Am I reading that right?
5      A   Yes.  So experts, some experts anyway, I
6  take it are, saying that it's important to understand
7  the reason some transgender people quit, in order to,
8  in their judgment, improve treatment.
9      Q   So is it fair to say that this article was
10 not arguing gender-affirming care should be made
11 unavailable?
12         MR. BROOKS:  Objection.
13     A   This is an investigative study by Reuters, a
14 special report.  I don't recall that they were making
15 strong recommendations one way or the other on
16 medicalized gender transition.  They were shining
17 light on, as I said, growing concerns among physicians
18 about the practice, and as well as some intense
19 backlash that those who were starting to raise such
20 questions and concerns were receiving when they voiced
21 those concerns.
22         MR. BROOKS:  And let me just be clear

Page 165

1  on the record that what is in front of the witness so
2  far is simply the headline title of this article on a
3  shared screen.
4         MS. MURPHY:  Yeah, fair enough.
5  BY MS. MURPHY:
6      Q   Okay.  So moving on.  All that fuss for just
7  one question.  Moving on to paragraph 49 of your
8  report, Dr. Curlin.
9      A   Yes.
10     Q   And actually, paragraphs 49 and 50.  You
11 mention medical ethicists and practitioners who've
12 expressed their fear about speaking up about their
13 concerns with gender-affirming care; is that right?
14     A   Yes.
15     Q   And are you talking about specific
16 colleagues of yours in this instance?
17     A   Yes, although I am not going to name those
18 who talked about this in the context who understood it
19 to be confidential.
20     Q   Understood.  Did any of these colleagues say
21 that any acts of violence were committed against them
22 for their views?

Farr Curlin

April 8, 2024

Page 166

1    A    Not that I recall, no.

2    Q    And did any of them say that they've been
3    threatened with acts of violence for their views?

4    A    Not that I recall, no.  They were --

5    Q    Did any of them --

6    A    No, they just expressed concern that you
7    can't bring this up; I'd lose my job.  That sort of
8    concern.

9    Q    And did any of them actually lose employment
10   based on their views?

11   A    To my knowledge, no, although the unifying
12   report among these meetings was that I was, I, Farr
13   Culin, was the only one who had actually spoken up
14   publicly about these concerns.  Meaning the only one
15   among those in these gatherings.

16   Q    Sure.  And what gatherings are you talking
17   about?

18   A    The gathering at the Greenwall Faculty
19   Scholars Program when we had a hot topic discussion,
20   bioethics dilemmas in the care of transgender minors.
21   And the gathering of faculty of the Trent Center for
22   Bioethics, Humanities & History of Medicine here at

Page 167

1    Duke.

2    Q    Okay.

3         MR. BROOKS:  And, Counsel,
4    notwithstanding that we got back late from lunch,
5    we're rolling up towards an hour and a half, and when
6    it's convenient for you to take a break that'd be
7    great.

8         MS. MURPHY:  Sure.  I was going to try
9    to make it another half an hour, but we can take a
10   brief break now if that's --

11        MR. BROOKS:  That'd be good.

12        MS. MURPHY:  Okay, excellent.  Let's do
13   that.  Take your time.  Ten minutes?

14        MR. BROOKS:  Or less.

15        THE WITNESS:  Less.

16        MS. MURPHY:  All right, thanks.

17        THE REPORTER:  All right.  The time is
18   2:47 p.m.  We are now off the record.

19        (Off the record.)

20        THE REPORTER:  The time is 2:54 p.m.
21   We are now back on the record.

22        MS. MURPHY:  Thank you.

Page 168

1    BY MS. MURPHY:

2    Q    Dr. Curlin, in paragraph 51, can you turn to
3    that, please?

4    A    Did you say 51?

5    Q    I did.

6    A    Okay, I'm there.

7    Q    Now in that paragraph, you mention that you
8    were cancelled from giving a talk at Michigan State
9    University; correct?

10   A    That's correct.

11   Q    And what was that talk supposed to be about?

12   A    To be about spirituality and medicine.

13   Q    But it was not about gender-affirming care
14   in any way; right?

15   A    No.

16   Q    Okay.  And who --

17   A    But I was told by the organizers, when they
18   cancelled the talk the very day of the talk as I was
19   boarding the plane, we're cancelling this because
20   students have said that you have been critical of --
21   of gender transition, and they have said they -- they
22   cannot be in a room with someone who's been critical.

Page 169

1    Something to that effect.

2    Q    And did the organizer -- well, let me ask
3    you this.  Who was the intended audience for this
4    talk?

5    A    To my knowledge, the intended audience was
6    the medical students of Michigan State University.

7    Q    Okay.  And the organizer who told you that
8    your talk had been cancelled, did she tell you in
9    specific what views the students were referring to?
10   And by that I mean not a characterization of your
11   views, but where they were expressed.  So were they
12   referring to a particular article or another talk that
13   you gave?  Anything in specific?

14        MR. BROOKS:  Objection.

15   A    As best I recall, it was that they had found
16   the YouTube video of my talk earlier at the University
17   of Chicago in 2017.

18   Q    Okay.  And then am I correct that you did
19   not get on a plane?

20   A    That's correct.  I did not get on the plane.

21   Q    And was the talk rescheduled?

22   A    It -- not initially, but after some back and

43 (Pages 166 - 169)

Page 170

1 forth rescheduled for later that spring. And then it
2 was cancelled again, and it has been rescheduled for
3 June of this year.
4   Q  Okay. Why was it cancelled for the second
5 time?
6   A  I was told that the dean of the -- the
7 acting dean of the medical school was concerned that
8 there could be protests and so on that would distract
9 from graduation events.
10   Q  And was he specific about the type of
11 protest that he was concerned about?
12   A  Not that I recall. I just got the
13 impression they were worried there would be some kind
14 of kerfuffle by the students that would distract from
15 graduation.
16   Q  Okay. And did he say that he thought that
17 the protest would involve your views of
18 gender-affirming care?
19   A  I don't remember what he said exactly, but
20 it was clear that that was -- my understanding was
21 that that was clearly the concern.
22   Q  Okay. And why is that the case?

Page 171

1   A  Because that's what the person who I was
2 speaking with, who was not the dean but the chair of
3 the department of family medicine, was what she
4 relayed to me.
5   Q  Okay. And you said that that has been
6 rescheduled a second time?
7   A  That's correct.
8   Q  Okay. And that date hasn't come to pass
9 yet?
10   A  That's correct.
11   Q  Okay. Referring back to that same
12 paragraph, at the end it says, "All of this makes
13 evident that fear is muzzling open expression of
14 widespread and growing dissent within the medical
15 community regarding MGT." Correct?
16   A  That's what I wrote, yes.
17   Q  What do you mean by "muzzling"?
18   A  By muzzling I mean it is -- a muzzle is
19 something that pins the mouth closed on a dog, so it's
20 a metaphor for the way that fear is keeping people
21 from opening their mouths and speaking what they
22 understand or raising concerns that have occurred to

Page 172

1 them. Expressing in public what they are thinking.
2 Fear is preventing that from happening.
3   Q  Okay. And have you felt fear about
4 expressing your views on gender-affirming care?
5   A  I have, yes.
6   Q  In what instance?
7   A  I -- I've had anxiety about writing essays
8 that I maybe should have written by now and -- and
9 attempted to publish, notwithstanding the difficulties
10 of doing so because of this -- this -- this kind of
11 ideological conformity and cancel culture of -- of
12 voicing concerns about the -- the practice and the way
13 it seems to contradict, in many cases as least,
14 important guidelines that have -- ethical guidelines
15 that have kept medicine from going too much astray.
16   Q  And what is that fear about? What are you
17 afraid will happen if you write the essays or further
18 express your views on the subject?
19   A  Well, I'm afraid that I will be subjected to
20 vitriolic email campaigns that students will organize
21 to call for sanctioning of me in some fashion. That
22 colleagues whom I respect, who really are just going

Page 173

1 on about their lives and working on important topics
2 not relating to this, will all of a sudden find their
3 association with me to be a -- a mark against them
4 in -- in many corners.
5     That it'll be difficult to find assistants
6 to work for me, because if they work for me early in
7 their career they might be marked as somehow not on
8 the right side of this issue, and therefore will find
9 their job prospects diminished. That kind of -- those
10 kinds of consequences.
11   Q  When you say "students," are you talking
12 about the students at Duke?
13   A  I'm talking about students at Duke, but --
14 but elsewhere also. I mean, I was at the University
15 of Chicago, and without naming names, I spoke with
16 people in training who have appreciated my work and
17 expressed that they would be absolutely terrified to
18 speak up about their concerns about this in medical
19 training, because if it was known they might not be
20 able to match at prestigious programs.
21     So that -- that -- that is the -- the level
22 of concern, which accords with, of course, the reports

44 (Pages 170 - 173)

Farr Curlin                                                            April 8, 2024

Page 174

1  from Hilary Cass and Dr. Kaltiala and the Reuters
2  report.  It accords with those expressed in the closed
3  doors of the Greenwall Foundation.  People are
4  concerned that they would be isolated, and effectively
5  the good work that they're up to -- as happened in my
6  case with the Michigan State talk, will be rendered
7  something that can't be taken seriously because of
8  this association with an issue that's so -- so
9  carefully surveilled by those who are -- don't want
10 objections to be raised.
11     Q    And are you aware that there have been
12 threats of violence against providers of
13 gender-affirming care?
14     A    I -- I don't remember where I heard that,
15 but I'm aware that that has been reported.
16     Q    Did you have any --
17     A    I just want to say, and I obviously would
18 condemn such threats of violence.
19     Q    Sure.  Did you have any reservations about
20 providing testimony in this case?
21     A    I did, yes.
22     Q    Turning now to paragraph 52.

Page 175

1      A    I'm there.
2      Q    Okay.  And here you talk about Beauchamp and
3  Childress' description of clinical equipoise; correct?
4      A    Yes.
5      Q    And that definition refers to ta community
6  of reasonable physicians; right?
7      A    That's right.
8      Q    How would you define a community of
9  reasonable physicians in the case of gender-affirming
10 care?
11     A    This would include those physicians,
12 otherwise reasonable, who have taken the time to
13 consider the evidence of benefits and arms of
14 medicalized gender transition and had a chance to, in
15 light of that, make a judgment about whether
16 medicalized gender transition -- whether we reasonable
17 are uncertain as to whether the intervention itself is
18 better or worse than available treatments that do not
19 include that intervention.
20     Q    So would that include physicians who
21 prescribe those types of treatments currently?
22     A    It -- it certainly does not exclude them.

Page 176

1      Q    And what about a physician who is aware of
2  the research on gender-affirming care but doesn't
3  treat adolescents?
4      A    What about them?
5      Q    Would they be included in this discussion of
6  what's reasonable?
7      A    Yes, I think they would, so long as they
8  have the expertise sufficient to understand the kind
9  of research that's been done, the outcomes that have
10 been assessed, the character of the intervention, and
11 the evidence that's available, yes.
12     Q    Okay.  What about doctors who are trained to
13 make that type of diagnosis but are philosophically
14 opposed to providing that type of treatment?  Should
15 they be included in the discussion of what's
16 reasonable?
17     A    Well, here we're talking about specifically
18 the question of clinical equipoise.  And so whether
19 one is philosophically opposed or not, or
20 philosophically disposed to this intervention, the key
21 question is whether one has the capacity to consider a
22 reasonable -- to a reasonable extent, the data that's

Page 177

1  available regarding purported benefits and purported
2  harms of any intervention including this one, and come
3  to a -- a judgment as to whether there is uncertainty
4  about -- reasonable uncertainty about which -- whether
5  the treatment is superior or inferior to other --
6  the -- the standard of care that does not include that
7  intervention.
8      Q    Okay, turning to paragraph 54.
9      A    I'm there.
10     Q    Okay.  Now this one you say, "As the above
11 summaries make clear, the community of reasonable
12 clinicians, as well as the international community of
13 relevant experts, is at best genuinely uncertain about
14 whether MGT is to be preferred to standard" --
15 physiotherapeutic -- "treatment without MGT."
16 Correct?
17           MR. BROOKS:  Objection.  You said
18 physiotherapeutic when I think the term is
19 psychotherapeutic, and in this case maybe the
20 difference matters.
21           MS. MURPHY:  Absolutely.  Thank you for
22 making that correction.

45 (Pages 174 - 177)

Page 178

BY MS. MURPHY:

1
2     Q   Same question, substituting the word
3 psychotherapeutic for the word that I used,
4 physiotherapeutic.
5     A   That is what I write there, yes.
6     Q   Okay.  Now you've conducted empirical
7 research on physicians' attitudes and practices
8 regarding controversial practices; correct?
9     A   I have, yes.
10     Q   And you consider administering
11 gender-affirming care to be controversial; correct?
12     A   I do, yes.
13     Q   And so to support your opinion in paragraph
14 54, did you conduct any empirical research on
15 physicians' attitudes and practices regarding
16 gender-affirming care?
17     A   I did not.  It was unnecessary to do so, but
18 I did not.
19     Q   And what do you mean that it was
20 unnecessary?
21     A   So I already know and am in dialogue with
22 the community of reasonable clinicians, or at least

Page 179

1 reasonable representatives of that community, enough
2 to know that it is, at best, genuinely uncertain about
3 whether MGT is to be preferred to standard
4 psychotherapeutic treatment without MGT, particularly
5 for minors.
6     And I know from the reports of Cantor and
7 Laidlaw, as well as the reports of -- from England and
8 Sweden and Finland and elsewhere of these expert
9 bodies that it is, at best, genuinely uncertain
10 whether MGT is to be preferred to standard
11 psychotherapeutic treatment without MGT.  So it
12 wouldn't -- there was no need to try to do a survey to
13 understand the answer to that question.
14     Q   Okay.  In paragraph 55, you say there that
15 "IRBs do not defer to clinicians' judgment about
16 equipoise."  Correct?
17     A   I do, yes.
18     Q   What's the basis for that opinion?
19     A   The basis for that is my training regarding
20 IRBs, my experience submitting proposals to IRBs, and
21 having arguments with IRBs, and my experience as part
22 of the faculty of ethics at the University of Chicago

Page 180

1 and Duke, where -- as well as many conferences on
2 research ethics in which it has been apparent and
3 obvious that IRBs don't take clinicians' judgment for
4 granted, they want to see the evidence that justifies
5 that judgment, because of course often the physicians
6 or investigators studying some intervention are the
7 most enthusiastic about the -- you know, what they
8 hope for from that intervention.
9     Q   Okay.  So is it fair to say that an IRB will
10 make an independent assessment of whether or not there
11 is clinical equipoise?
12     A   It is certain that they should, and in my
13 experience they do.
14         MS. MURPHY:  Okay.  Now it is
15 approximately 3:15, and I would appreciate taking a
16 short break and going off the record for just
17 approximately 15 minutes.
18         THE WITNESS:  Sure.  Come back at 3:30?
19 That sound right?
20         MS. MURPHY:  3:30 sounds good.  Thank
21 you.
22         THE REPORTER:  The time is 3:14 p.m.

Page 181

1 We are now off the record.
2         (Off the record.)
3         THE REPORTER:  The time is 3:30 p.m.
4 We are now back on the record.
5 BY MS. MURPHY:
6     Q   Okay.  Dr. Curlin, if you can turn to page
7 15 of your report, if you're not there already.
8     A   I'm there.
9     Q   Okay.  And on page 15 you state that, "An
10 institutional review board that approved the expanded
11 clinical trial apparently advocated by the FDA would
12 likely be  violating its ethical obligations."
13 Correct?
14     A   That's what I wrote, yes.
15     Q   Okay.  And what clinical trial are you
16 referred to here?
17     A   I am referring to a proposed clinical trial
18 about which the FDA wrote a letter in response to the
19 investigator's questions and which is listed as
20 production documents HHS01699732-0619991.
21     Q   Okay.  And can you describe the documents
22 within that production that you reviewed?

46 (Pages 178 - 181)

Farr Curlin
April 8, 2024

Page 182

1       MR. BROOKS:  And, Counsel, I have been
2  told, and I can check this myself, but one of my
3  colleagues going to get this document recently said
4  there's a typo in the Bates range.  Let me read into
5  the record the Bates range of the document to make
6  sure there is no unclarity on that.
7       That is HHS-0169973 through 991.
8       MS. MURPHY:  Okay.
9       THE WITNESS:  Could you repeat your
10 question?
11 BY MS. MURPHY:
12   Q   Sure.  Can you describe the documents that
13 you reviewed that fall within that now narrowed
14 document production?
15   A   I can in general terms.  I would have to
16 look at it to -- to recall the details.  But it was a
17 response by the FDA, or at least some branch of the
18 FDA, to inquiries made by investigators regarding a
19 proposed clinical research plan that involved using
20 estrogen as a cross-sex hormone as a part of
21 medicalized gender transition.  And they had put a few
22 questions to the FDA and asked for preliminary

Page 183

1  guidance on those, and the FDA was responding to those
2  questions.
3    Q   Okay.  Just to clarify, you read a document
4  that was drafted by the FDA?
5    A   That was my understanding from the document.
6    Q   Okay.  And after reviewing that document, is
7  it still your belief that the FDA was advocating for
8  the expansion of the proposed clinical trial?
9    A   It -- it was -- I use the term apparently
10 advocated, because it was not crystal clear what the
11 FDA was ultimately suggesting.  But insofar as it
12 appeared to -- the FDA's response appeared to suggest
13 that the FDA would see as appropriate, not including
14 an active control arm in testing estrogen for
15 adolescents.  It seemed to me that that was -- would
16 be violating ethical obligations, for the reasons laid
17 out in my report.
18   Q   Got it.  And you've never participated in an
19 IRB considering an expanded clinical trial such as the
20 one proposed in that instance; correct?
21   A   I have never served on an IRB, as I said at
22 the outset.  I have been invited to, but thankfully

Page 184

1  have succeeded in declining the invitation to this
2  point.
3    Q   And are there any other documents that you
4  relied on for your conclusion that the FDA was
5  considering expanding the clinical trial?
6    A   No.  Except that there was an initial news
7  report that suggested an interpretation of this
8  document, but I -- my opinion is based on the document
9  itself.
10   Q   Okay.  Turning now to paragraph 67 of your
11 report.
12   A   I'm there.
13   Q   Okay.  Here you note that animal study is
14 relevant to the safety of gender-affirming care -- now
15 I'm paraphrasing -- that can be done have not been
16 done.  Is that a fair representation of what you
17 assert?
18   A   That's -- the evidence that I've seen so far
19 suggests they have not been done.  And the -- the
20 plaintiffs have not indicated that they have been
21 done.
22   Q   Are you aware that two groups of researchers

Page 185

1  have developed mouse models to examine
2  gender-affirming medical care?
3    A   I am not aware of that.
4    Q   So you're not aware that both of those
5  studies showed that female mice are capable of
6  fertility following treatment with puberty blockers
7  and testosterone?
8       MR. BROOKS:  Objection, assumes facts
9  not in evidence.
10   A   I -- I -- I don't recall reading these
11 studies at all, so I can't comment further about them
12 unless you want me to look at them.
13      MS. MURPHY:  Sure.  So why don't we
14 mark as Exhibit 9, the study that we -- I think we
15 have this as the document descriptor, "In Vitro
16 Fertilization Outcomes in a Mouse Model of
17 Gender-Affirming Hormone Therapy in Transmasculine
18 Youth."
19      (Exhibit 9 was marked for
20      identification.)
21      THE WITNESS:  You already sent that one
22 in the email?

47 (Pages 182 - 185)

Page 186

1    MS. MURPHY:  We did.
2        THE WITNESS:  Okay, one moment.  The
3  first author is Cynthia Dela Cruz?
4        MS. MURPHY:  Let me be sure of that.
5  Yes, that's the one I'm referring to.  I'd like to
6  mark that one as Exhibit 9.
7  BY MS. MURPHY:
8    Q   Dr. Curlin, have you seen this study prior
9  to today?
10   A   Not -- not to the best of my recollection.
11   Q   Okay.  So it's fair to say that you didn't
12  consider this when drafting your report?
13   A   Except insofar as this was reviewed by Drs.
14  Cantor and Laidlaw, I did not.  If -- if they reviewed
15  it, then I read their review and considered that
16  summary, but I otherwise did not review this.
17       MS. MURPHY:  Okay.  And then I'd like
18  to turn now to an exhibit that I'd like to mark as
19  Exhibit 10, and this one, the title of the study is,
20  "Puberty Suppression Followed by Testosterone Therapy
21  Does Not Impair Reproductive Potential in Female
22  Mice."

Page 187

1        (Exhibit 10 was marked for
2        identification.)
3  BY MS. MURPHY:
4    Q   Just let me know if you've located it.
5    A   I've located it.  I, of course, can only
6  read the title at this point.  I mean, I could read
7  more if you give me time to, but I've -- I've only
8  read the title at this point.
9    Q   Okay.  So you've never reviewed this study
10  prior to today; correct?
11   A   I have not reviewed it directly, and my only
12  knowledge of it would be if it was reviewed by Drs.
13  Cantor and/or Dr. Laidlaw.
14   Q   Okay.  You can set that aside at this point
15  if you'd like.  Moving on to paragraph 71 of your
16  report.
17   A   I'm there.
18   Q   Okay.  And here you say that, "The absence
19  of well-designed and controlled studies makes it
20  impossible to give minors and their parents
21  information sufficient to consider their consent duly
22  informed."  Correct?

Page 188

1    A   That's right.
2    Q   And are you aware that there's a lack of
3  randomized controlled studies in many areas of
4  pediatrics?
5    A   I am aware of that, yes.
6    Q   And for instance, are you aware that there
7  have been no randomized controlled studies regarding
8  when a child can return to sports after a spinal cord
9  injury?
10   A   I -- I was not aware of that, but I don't
11  know anything to contradict that.
12   Q   So assuming that that's true, is it your
13  opinion that parents cannot make an informed choice
14  regarding when their child can return to sports after
15  a spinal cord injury?
16   A   No, that is not my opinion.
17   Q   In what instance can parents make an
18  informed choice on their children's care when there
19  have not been randomized controlled studies?
20   A   Each -- each particular kind of intervention
21  in each particular clinical scenario has to be
22  considered.  And so for example, it may well be that

Page 189

1  there have not been randomized controlled trials of
2  whether we should set broken bones that are --
3  comminuted fractures, let's just say.  And that does
4  not mean that we don't have sufficient knowledge of --
5  of bones, how they heal, and -- what can be
6  expected from setting the bone and what the
7  implications would be of not setting it in order to
8  know enough to give consent to having the bone set, in
9  my judgment.
10       The challenge with medicalized gender
11  transition, as with any kind of, as the Belmont Report
12  puts it -- I think it's the Belmont Report or
13  Beauchamp and Childress, a kind of radical, new
14  procedure is that it -- it is different in many
15  respects from the ordinary situations in which parents
16  are asked to give consent.
17   Q   How so?  How is it different?
18   A   Well, it's different insofar as we're asking
19  parental consent and patient assent to something which
20  the patients in this case cannot reasonably imagine or
21  understand, by virtue of specifically the fact that
22  they've not gone through puberty, and that the

48 (Pages 186 - 189)

Farr Curlin                                                    April 8, 2024

Page 190

1  intervention is going to block features of human life
2  that are dependent on going through puberty.
3        So unlike most conditions, in this case the
4  intervention itself blocks the development of the
5  cognitive and emotional maturation which makes someone
6  capable of giving their own consent when they're an
7  adult, for example.
8        Second one is that in most cases we have
9  good reason to believe that the information, or at
10 least absent countervailing evidence, we have -- we
11 can expect that the information given by the
12 practitioners is -- has a reasonable basis.  Whereas
13 by their own concession and description, the
14 plaintiffs in this case and those promoting
15 gender -- medicalized gender transition, are not
16 acknowledging to family members what all of these
17 experts who disagree with them, like those in -- in
18 multiple other countries, have the conclusions they've
19 come to with respect to the evidence.
20       So that in itself gives an unusual situation
21 in which we now, based on their own testimony, their
22 own writing, we now have reason to believe that

Page 191

1  patients and their parents will not receive a true
2  accounting of the state of the evidence with respect
3  to this intervention from those who offer this
4  intervention.
5        Third, in this case, unlike most cases where
6  parents are giving consent, the intervention itself
7  contradicts the -- the norms of health that guide
8  physicians' actions and fiduciary responsibilities in
9  other cases.
10       So if a doctor was saying what we're going
11 to do is we're going to break your child's leg out of
12 an experiment we have, an idea that's going to help
13 them all on the whole better in some way, then we'd
14 want -- we'd have a much higher bar for requiring
15 that -- that practitioner to show that breaking the
16 leg was going to have the hoped-for benefit and was
17 going to not impose disproportionate harms.
18       I think that's something parallel here,
19 insofar as what the intervention does is contradict
20 the healthy sexual development -- or the healthy
21 development of secondary sex characteristics for a
22 child of that sex.

Page 192

1        So those are just -- those are some of the
2  problems that make this practice particularly
3  ethically problematic, and which raise the bar for
4  or -- or put greater onus on those who would -- who
5  would offer this treatment to -- to have a reasonable
6  basis for coming to the conclusion that this
7  intervention will bring about benefits that are at
8  least proportionate to the foreseen harms.
9        And since, as is this case, they have not
10 shown that the hoped-for benefits, namely benefits
11 with respect to mental health, are achieved.  And we
12 do know with great certainty that the intervention
13 brings a whole host of adverse side effects.  I don't
14 believe they've met -- they've met the requirement
15 of -- of -- of getting -- of there being -- being able
16 to give children information and their parents
17 information sufficient to -- to -- to give duly
18 informed consent.
19    Q   To clarify one of things that you said, what
20 is the basis for your opinion that parents are not
21 informed of any research where you may assert that the
22 research concluded that there were no benefits or that

Page 193

1  gender-affirming care was harmful?
2     A   So the -- the -- as I understand them, the
3  plaintiffs themselves and those whom they're referring
4  to in the publications like that of Rhafferty and
5  others, say explicitly these interventions are safe
6  and they're beneficial.
7        And that seems to me, on the basis of the
8  state of the evidence, if Cantor and Laidlaw's reports
9  are accurate, is not a true description of -- of these
10 interventions.  They cannot reasonably be described as
11 safe without a lot of other qualification and
12 description.  The kinds of adverse side effects they
13 have.  And they cannot be described as beneficial, it
14 seems to me, with respect to outcomes that are -- the
15 hoped-for outcomes, yet anyway.
16    Q   And what is the basis for your belief that
17 parents are not given information about the health
18 risks of gender-affirming care?
19    A   I'm not testifying that they're not given
20 any information about health risks.  I'm just saying
21 that it seems to me, from what the plaintiffs
22 themselves have said, that they represent to patients

49 (Pages 190 - 193)

Farr Curlin                                                    April 8, 2024

Page 194

1 and their families that this is a safe intervention
2 and that it is likely to benefit.  And they couldn't
3 do it in good conscious and ethically if they did
4 not -- if they weren't persuaded that was the case.
5       But the -- the state of the evidence, if
6 described accurately by Cantor and Laidlaw, suggests
7 that they are mistaken in their -- in their
8 conclusions regarding the state of the evidence.  And
9 that is the conclusion, of course, that multiple
10 international bodies of experts have come to.  That in
11 fact it's not safe, or not safe enough to justify
12 doing it except perhaps in certain conditions of
13 research.
14     Q    Okay.  Moving to page 18.  On page 18 you
15 state it's not been shown that minors are able to
16 comprehend and reasonably evaluate the risks and
17 lifelong implications of MGT.  Correct?
18     A    I do, yes.
19     Q    Is it your opinion that a minor can never
20 assent to gender-affirming medical care?
21     A    It's not my opinion about any particular
22 case.  It is my opinion that the plaintiffs have not

Page 195

1 shown that -- based on what they've shown, based on
2 the evidence available, it is doubtful that a minor
3 can have sufficient understanding and intellectual
4 maturity to give informed assent to this particular
5 practice.
6     Q    Under what conditions could a minor assent
7 to gender-affirming care?  What is necessary for that
8 to be possible?
9         MR. BROOKS:  Objection, calls for
10 speculation.
11     A    Yeah.  I'm not sure that it is possible.
12 I'm not sure that it is possible.
13     Q    Have you read the SOC 8's criteria for how
14 providers obtain assent and consent from parents?
15     A    I read the SOC 8 guidelines.  I don't recall
16 the details about that particular issue.
17     Q    Are you aware that the guidelines state that
18 it's important for healthcare providers to assess the
19 cognitive and emotional maturity of adolescents?
20     A    That sounds familiar.  I -- I believe I
21 mentioned that in my report somewhere.
22     Q    Is it your opinion that healthcare providers

Page 196

1 are unable to make that assessment?
2     A    What assessment?
3     Q    An assessment of the emotional capacity --
4 emotional maturity and cognitive maturity of an
5 adolescent who is deciding on treatment with respect
6 to gender-affirming care.
7     A    It's my opinion that the plaintiffs have not
8 shown good reason to be confident that minors can have
9 such maturity.  Sufficient maturity to -- to
10 comprehend medicalized gender transition.
11     Q    And have you conducted any research on
12 obtaining informed consent from parents regarding
13 treatment of minors?
14     A    Empirical research?
15     Q    Any type of research.
16     A    Sure, I've -- I've conducted research, for
17 example for this report, regarding what -- what are
18 the characteristic standards within the -- the field
19 of pediatrics regarding informed consent for minors.
20     Q    Apart from that, have you done any research
21 in that area?
22     A    I've not conducted empirical research in

Page 197

1 that area.  I have, over the years, conducted research
2 within the fields of medical ethics, writing on
3 informed consent, which included -- included
4 scholarship regarding consent for minors.
5     Q    Is that something that's listed in your CV?
6     A    No.  By research here I mean I have studied
7 it, I have looked up authorities, I've read books,
8 I've gone to lectures, and talked to colleagues, and
9 so on.
10     Q    Got it.  I should have been more clear.  So
11 have you drafted any peer-reviewed studies in this
12 area?
13     A    I have not written any peer-reviewed papers
14 on informed consent among children, to my
15 knowledge -- to my recollection.
16     Q    Turning to paragraph 84.  Just let me know
17 when you're there.
18     A    I'm there.
19     Q    And here you're referring to the SOC 8 when
20 you say, "The new guidelines also emphasize a right to
21 bodily and mental integrity, autonomy, and
22 self-determination."  Is that right?

50 (Pages 194 - 197)

Farr Curlin                                                                    April 8, 2024

Page 198

1    A   That's right.

2    Q   And we talked a bit about this earlier, but
3  I just have a couple additional questions on it.  How
4  would you define autonomy in medicine?

5    A   So I have a chapter on this in my book.
6  Autonomy is a term that's been used in a number of
7  different ways.  And the word autonomy means
8  self-rule.  Autonomous is rule by the self.  That was
9  particularly popularized by Immanuel Kant, to refer to
10  the -- the person who is genuinely reasonable, is a
11  person who is a law to themselves.  They act only
12  insofar as they believe morality require -- ethics
13  requires them to act.

14       Autonomy has come to be used in modern times
15  because of the influence of what we describe as the
16  provider of services model.  Often, it's come to be
17  understood as emphasizing a person's right to have --
18  to live life according to their own terms.  Not so
19  much -- whereas the original understanding was to be
20  autonomous is to follow the moral law, now in many
21  corners people use the term to mean you follow your
22  own -- your own desires.

Page 199

1       So to my -- to my -- in my view, my
2  judgment, autonomy rightly understood is a word --
3  within medicine, is a word that's used to indicate a
4  person's authority to make judgments about what is
5  going to happen to them.

6       And that's particularly expressed in the
7  principal of informed consent, where respect for
8  autonomy requires only acting on a patient insofar as
9  one has their consent, their -- their informed
10  consent.  So that's how I would describe autonomy.

11    Q   And to clarify the testimony that you gave
12  earlier, is it your belief that children do not have
13  the right to autonomy or that it is impossible for
14  them to have autonomy with respect to medical
15  decisions?

16    A   So the way you phrased that question shows
17  the confusion in the way the term is used.  Autonomy
18  is not something -- properly understood, it's not
19  something you talk about as something to which you
20  have a right.  It is an ethical value which calls for
21  respect from others.

22       It is my testimony that children do not have

Page 200

1  authority to make clinical decisions for themselves,
2  except in -- in certain situations.  But generally
3  speaking, they do not have authority.  And that means
4  respect for their autonomy does not require -- or does
5  not imply that you treat them as having authority to
6  tell you what should be done and should not be done
7  for them medically.

8    Q   Okay.  So in your opinion, what role should,
9  if any, an adolescent or child's view play in making a
10  medical decision?

11    A   It depends very much on the situation, on
12  the medical decision that's at stake, on how grave the
13  threat to health is that the child faces, on how
14  likely it is that medicine holds some intervention
15  that can resolve that threat.  And -- and what it is
16  in fact that the patient -- that the child wants.

17       So insofar as possible, pediatricians can
18  and do, and family doctors, those who take care of
19  children, can and do seek to respectfully interact
20  with a child so that they gain their assent to what is
21  medically necessary.

22       But it -- they don't -- there's no medically

Page 201

1  necessary intervention that I can think of for which
2  physicians proceed by asking the child what do you
3  want.  Rather, they would say this is what we need to
4  do and here's why, and how can we negotiate a way
5  forward that involves your assent and cooperation.

6    Q   Now in that same paragraph, paragraph 84.
7  You also state that "The language in SOC 8 ignores the
8  potential conflict between the needs of the patient
9  and their goals."  Correct?

10    A   I do, yes.

11    Q   Can you elaborate a bit on that?  Tell me
12  what you mean?

13    A   What I mean is just that the physician's
14  proper concern, particularly with respect to children,
15  is the medical needs of the patient.  The
16  health-related needs, not the child's goals.  And the
17  needs have preeminence and priority.

18       Ideally, one can pursue addressing the
19  child's health needs and medical needs in a way that
20  doesn't contradict the child's goals, but the goals
21  are not the point for physicians.

22    Q   Okay.  Turning now to paragraph 94.

51 (Pages 198 - 201)

Farr Curlin                                                                      April 8, 2024

Page 202

1    A    I'm there.

2    Q    And actually, if you wouldn't mind, just

3    taking a brief look.  What I'm referring to is

4    actually paragraphs 94 through 96.

5    A    Okay.  Give me a second.  Okay, I'm ready.

6    Q    I want to focus on the portion of your

7    opinion that refers to eminent bodily harm.  And in

8    your medical practice, do you draw a distinction

9    between mental and physical health?

10    A    I -- I -- I do, insofar as that's helpful

11    for clarifying what a person is -- what kind of

12    diminishment or defect or injury to a person's health

13    they're experiencing, yes.

14    Q    Would you agree that individuals routinely

15    accept risks to their physical health in order to

16    improve their mental health?

17    A    I don't -- I -- I would want to know more

18    about what you have in mind before agreeing or

19    disagreeing with that.

20    Q    So for instance, certain mental health

21    medications come with risks to physical health; would

22    you agree?

Page 203

1    A    Yes, I agree with that.

2    Q    But there are certain instances where

3    individuals are experiencing mental distress and it's

4    determined that a medical for their mental health is

5    worth the risks to their physical health; correct?

6    A    Yes, that's correct.

7    Q    So it's not your assertion that medication

8    should never be prescribed when there's risks to

9    physical health; correct?

10    A    No, of course not.  You could -- you could

11    hardly prescribe anything if that were the standard.

12    What's so strikingly different about medicalized

13    gender transition is that it does not address the

14    mental health issue.  Rather, it turns its attention

15    to manipulating the body in ways that contradict

16    health, in hopes that that will have a side effect of

17    or an effect of improving mental health outcomes.  So

18    it -- it acts actually here as well, directly in

19    contradiction to the ordinary way that mental health

20    is treated.

21    Q    And when you say that it has been shown that

22    there are no improvements to mental health, you're

Page 204

1    referring to the studies that are cited in your report

2    and the ones that were summarized by Drs. Cantor and

3    Laidlaw?

4    A    Well, here what I mean is puberty blocking

5    drugs have no indication for mental health.  They have

6    no physiological rationale.  They are not directed

7    directly at mental health.  They're not directed at

8    dysphoria.  No one who has dysphoria generally takes

9    puberty blockers to treat their dysphoria, and lots of

10    people have dysphoria of all different kinds.

11        So the point here is that they don't treat

12    dysphoria directly; they treat the body to change its

13    characteristics, in hopes that that will result in

14    improvements in dysphoria.  That's not the way

15    psychoactive medications characteristically are used.

16    Q    Understood.  Turning to paragraph 97 of your

17    report.  Here you state that "Plaintiffs' experts do

18    not remotely establish that the necessary conditions

19    justifying such procedures exist in the case of GD and

20    MGT, especially for minors."  Correct?

21    A    That's correct.

22    Q    And which experts are you specifically

Page 205

1    referring to?

2    A    I'm referring to all of them together.  None

3    of them has established this, either individually or

4    as a group.

5    Q    Okay.  And which of Plaintiffs' experts

6    reports have you reviewed?

7    A    I read the report of -- I read the second

8    amended complaint, and I read the report of Meredithe

9    McNamara, and I --

10        THE REPORTER:  Sorry, could you repeat

11    that?  You cut out for a second.

12        THE WITNESS:  So I first read the

13    second amended complaint, and then I read the report

14    of Meredithe McNamara, dated February 8, 2023.  I also

15    read the report of Armand Antomaria, dated February

16    13, 2023.  And I read one other report.  Those are the

17    only two, apparently, I wrote down, so -- and I don't

18    recall another.

19    BY MS. MURPHY:

20    Q    Okay.  So is your opinion on what

21    Plaintiffs' experts have or have not established based

22    on only those either two or three reports that you

Page 206

1 reviewed?

2    A   It is based on the reports that I reviewed,

3 yes.

4    Q   One clarifying question before we move on.

5    A   Oh, actually, hang on.  I also reviewed

6 the -- wait, I may be confusing this case with

7 another.  I think I am.  So that --

8    Q   Okay.  Going back to, this is something we

9 talked about this morning, the Hippocratic Society.

10 Can you tell me when you founded the Hippocratic

11 Society?

12    A   To the best of my recollection, it was in

13 summer of 2023.

14    Q   And is the founding of the Hippocratic

15 Society in any way motivated by the work that you've

16 done with respect to gender-affirming care?

17    A   No, not self-consciously anyway.

18        MS. MURPHY:  I am nearly finished.  And

19 so what I'd like to do is just take a couple minutes

20 off the record to review my notes.  So why don't we

21 say five minutes?

22        MR. BROOKS:  That's fine.

Page 207

1        THE REPORTER:  The time is 4:14 p.m.

2 We are now off the record.

3        (Off the record.)

4        THE REPORTER:  The time is 4:21 p.m.

5 We are now back on the record.

6        MS. MURPHY:  Thank you.

7 BY MS. MURPHY:

8    Q   Dr. Curlin, I just have some concluding

9 questions.  If you were called to testify in this

10 case, does Exhibit 2, which we marked as your report,

11 represent your complete opinion that you were asked to

12 provide in this case?

13        MR. BROOKS:  Objection.

14    A   I'm not certain what you mean by "complete

15 opinion," but it does represent my opinion in this

16 case.

17    Q   Is there anything that you would add that is

18 not currently written in your report?

19        MR. BROOKS:  Objection.

20    A   Not that I'm aware of at the moment.

21    Q   And have you completed all the work

22 necessary, in your point of view, in order to draw the

Page 208

1 conclusions that you made in this case?

2        MR. BROOKS:  Objection.

3    A   I have -- yes, I believe I have.

4    Q   Are there any portions of your report that

5 you would like to amend or retract at this moment in

6 time?

7    A   No, there -- there are not any portions I

8 would like to amend or retract.

9        MS. MURPHY:  Okay.  Dr. Curlin, I want

10 to thank you for your time today.  That concludes my

11 portion of the questioning.  I'm not sure if anyone

12 else has any questions for Dr. Curlin, but I'm

13 finished.

14        MR. BROOKS:  Anybody else from the

15 plaintiffs' side?

16        MS. WILLIAMS:  No questions on my end.

17 Thank you.

18        MR. BROOKS:  And I have no questions

19 for the witness.

20        THE REPORTER:  All right.  Before we go

21 off the record, I'd just like to go over transcript

22 orders.

Page 209

1        MS. MURPHY:  Sure.

2        MR. BROOKS:  On behalf of the defense,

3 I believe that the State of Alabama has a standing

4 order through Veritext, and I don't propose to modify

5 that.

6        THE REPORTER:  Do you have any

7 preference on delivery method?

8        MR. BROOKS:  Like I say, I don't

9 actually know the details of the standing order, and I

10 don't propose to modify it.

11        THE REPORTER:  Okay.  And then, Amie,

12 would you like to order a copy of the transcript?

13        MS. MURPHY:  So similarly, I believe we

14 have a standing order as well, and I'm just going

15 to -- if Andrew knows of anything different, he can

16 chime in and tell me, but just an emailed copy

17 directed to me is fine.

18        THE REPORTER:  In that case, the time

19 is 4:23 p.m.  We are now off the record.

20        (Signature waived.)

21        (Whereupon, at 4:23 p.m., the

22        proceeding was concluded.)

53 (Pages 206 - 209)

Farr Curlin                                                April 8, 2024

Page 210

1          CERTIFICATE OF DEPOSITION OFFICER

2          I, CHRISTOPHER FRIEBE, the officer before

3    whom the foregoing proceedings were taken, do hereby

4    certify that any witness(es) in the foregoing

5    proceedings, prior to testifying, were duly sworn;

6    that the proceedings were recorded by me and

7    thereafter reduced to typewriting by a qualified

8    transcriptionist; that said digital audio recording of

9    said proceedings are a true and accurate record to the

10   best of my knowledge, skills, and ability; that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to the action in which this was taken;

13   and, further, that I am not a relative or employee of

14   any counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in the

16   outcome of this action.

17   Dated:

18   April 19, 2024

19



20                   CHRISTOPHER FRIEBE

21                Notary Public in and for the

22                   State of Michigan

Page 211

1          CERTIFICATE OF TRANSCRIBER

2          I, NICHOLE RYAN, do hereby certify that this

3    transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13   Dated:

14   April 19, 2024

15

16

17                   NICHOLE RYAN

18

19

20

21

22

54 (Pages 210 - 211)

Farr Curlin

April 8, 2024

[& - 67]

Page 1

| & | | | |
|---|---|---|---|

**&**   166:22

**0**

**00184**   1:8
**0169973**   182:7

**1**

**1**   4:7 15:11,12
16:8,13 33:9
33:17
**10**   5:13 186:19
187:1
**101**   5:20
**103**   5:21
**107**   75:20
76:21 78:4
**10:16**   47:1
**10:26**   47:3
**119**   4:12
**11:57**   94:5
**12**   33:15,17
**120**   4:16
**122**   4:22
**123**   5:7
**12:30**   92:3
**12:32**   114:20
115:3
**13**   205:16
**130**   79:10,11
79:20
**14**   104:18
107:4
**15**   4:7 108:19
109:16 110:15
112:4 180:17
181:7,9

**16**   4:8 138:22
140:7
**163**   5:8
**18**   26:12 63:13
113:10 194:14
194:14
**185**   5:12
**187**   5:16
**19**   63:13
210:18 211:14
**1960s**   35:19
**1:15**   114:22
**1:21**   115:5

**2**

**2**   4:8 16:19,20
17:6 33:11,17
207:10
**2,000**   125:19
**20**   54:11 60:1
103:8,9 115:10
**200**   76:17
**2000**   125:18
**2001**   47:9
**2003**   34:14,17
57:21 129:19
**2004**   34:14,17
**2008**   38:7
**2017**   169:17
**20176**   3:15
**2018**   149:14
**202**   3:9,17
**2021**   125:18
138:6
**2023**   70:6
99:21 100:3
205:14,16
206:13

**2024**   2:2 6:10
210:18 211:14
**20530**   3:7
**22822**   211:16
**25**   30:7
**27**   116:18
117:11
**27710**   2:5
**28**   100:15,16
100:16 102:21
**29**   121:13,13
**29th**   76:13
**2:22**   1:8
**2:47**   167:18
**2:54**   167:20

**3**

**3**   4:9 5:20
78:19,20 79:1
**3,800**   125:18
**30**   60:1 124:6
**31**   129:12
**32793**   210:19
**33**   131:14
133:13 136:12
**34**   136:20
**35**   113:3
**353-1285**   3:9
**36**   138:5
**38**   140:22
141:5
**393-8690**   3:17
**3:14**   180:22
**3:15**   180:15
**3:30**   180:18,20
181:3

**4**

**4**   4:10 119:2,6
**40**   114:18,20
145:15
**42**   146:20
**43**   148:12
**44**   149:16
155:15 156:20
**44180**   3:14
**48**   161:8
**49**   46:14 165:7
165:10
**4:14**   207:1
**4:21**   207:4
**4:23**   209:19,21

**5**

**5**   4:13 12:8
13:1 96:4,13
120:12,16
143:4,9,11
146:17
**50**   46:14
165:10
**51**   168:2,4
**52**   174:22
**54**   177:8
178:14
**55**   179:14

**6**

**6**   4:17 5:21
75:18,22 122:5
122:10
**6629188**   2:7
**67**   184:10

| 7 | a |
|---|---|

**7**   5:3 33:13
75:19 76:21
123:9,13
**70**   75:18,22
**71**   187:15
**78**   4:9

| 8 |
|---|

**8**   2:2 4:3 5:8
6:10 94:9
149:19 150:10
150:13 154:9
154:14,18,21
155:17 157:17
162:20 163:1
163:21 195:15
197:19 201:7
205:14
**8's**   195:13
**84**   150:12
151:19,22
156:14 197:16
201:6
**85**   151:21
152:1

| 9 |
|---|

**9**   5:9 143:1
185:14,19
186:6
**94**   201:22
202:4
**96**   202:4
**97**   204:16
**991**   182:7
**9:03**   2:3 6:5

**a.m.**   2:3 6:5
47:1,3 94:3,5
**abbreviation**
13:14,18 14:20
148:5
**ability**   210:10
211:7
**able**   48:11,12
49:19 61:18
173:20 192:15
194:15
**abnormal**
141:3,9 142:10
142:17
**abortion**   53:18
**above**   138:17
177:10
**absence**   77:8
151:14 187:18
**absent**   6:16
190:10
**absolutely**   85:6
173:17 177:21
**academic**
38:15 77:13
**academy**   14:7
132:18 133:2
149:13
**accept**   13:3
202:15
**accepted**
157:13
**accepting**
27:18
**access**   5:3
60:16,17

123:10
**accords**   173:22
174:2
**account**   32:13
82:9 83:5
84:14 86:21
88:20 139:8
160:2
**accounting**
191:2
**accurate**
103:12,14
106:4,17 107:1
121:9 122:1
123:4 148:21
149:9 157:11
157:15 158:12
159:9,19 193:9
210:9 211:5
**accurately**
194:6
**achieve**   43:15
**achieved**
192:11
**achieving**
43:11
**acknowledge**
79:13
**acknowledged**
113:4 121:19
**acknowledging**
190:16
**acknowledg...**
6:13
**acronym**   13:13
**act**   198:11,13
**acting**   170:7
199:8

**action**   65:20
210:12,16
211:8,12
**actions**   71:13
71:14 191:8
**active**   183:14
**acts**   165:21
166:3 203:18
**actual**   141:20
**actually**   13:6
33:9 34:18
54:9 139:12
147:15 153:10
155:16 156:12
163:21 165:10
166:9,13 202:2
202:4 203:18
206:5 209:9
**ad**   41:10
**add**   16:15
207:17
**addition**   54:17
**additional**
116:15 198:3
**additionally**
6:16
**address**   40:6,7
41:19 75:2
80:18 100:12
203:13
**addressed**   37:1
**addressing**
71:14 201:18
**adequate**   83:11
84:1 158:16
**adflegal.org**
3:16

administer
  6:13
administering
  178:10
administration
  105:1 137:15
adolescence
  5:5 123:11
adolescent  4:15
  85:21 120:14
  196:5 200:9
adolescent's
  90:21
adolescents
  18:10 26:18
  54:17,19 109:1
  119:22 132:12
  132:20 139:22
  150:16 152:8,9
  176:3 183:15
  195:19
adult  4:10,15
  28:9 51:14,15
  72:21 119:4
  120:14 190:7
adults  5:7
  26:10,11 54:17
  56:14 123:12
  140:15 151:9
  152:13 153:13
advanced  40:5
  40:9 67:8
adverse  113:4
  138:3 139:16
  192:13 193:12
advice  64:7
advocated
  181:11 183:10

advocating
  183:7
affects  142:3
affiliated  64:11
affiliation
  36:16,18 52:10
  52:14
affirmation
  105:1
affirming  4:18
  5:4,11 13:22
  14:1,4,16
  116:16 117:18
  122:6 123:10
  124:13,21
  126:5,7 129:1
  129:8,10 130:8
  132:5,11,20
  133:6 135:16
  135:22 136:6
  139:20,22
  140:15 162:2,5
  164:10 165:13
  168:13 170:18
  172:4 174:13
  175:9 176:2
  178:11,16
  184:14 185:2
  185:17 193:1
  193:18 194:20
  195:7 196:6
  206:16
afraid  172:17
  172:19
afternoon
  140:11
age  26:12,15
  51:10 97:20

138:22 140:6
  141:21
agency  72:6
ago  8:15 12:2
  30:7 43:3
  131:10
agree  6:14,18
  12:21 21:18
  46:20 85:10
  88:10 89:5
  90:2 119:20
  135:14 141:15
  143:8 154:14
  155:2 202:14
  202:22 203:1
agreeing
  202:18
ahead  31:16
  162:16
aimed  43:11
air  156:6,9,10
  156:11
al  1:5,14 3:11
  6:7
al.'s  116:20
alabama  1:2,14
  6:10 100:22
  102:1 104:6
  209:3
align  65:20
  78:10 90:21
aligned  55:14
  118:19
alive  39:3
allege  117:21
alleges  118:8
alliance  3:13
  7:11 68:4,6,7,8

68:9,16
allowed  19:11
  30:20 61:5
alternative
  82:6
altogether
  139:22
alumni  76:16
ambiguities
  89:16
amend  208:5,8
amended  205:8
  205:13
america  1:8 3:3
  6:8 65:3,7,11
  65:17
american  14:6
  68:12,13
  132:10,16,18
  133:2,5 149:13
amie  3:4 7:8
  8:5 209:11
amie.murphy2
  3:8
analytical
  31:12
anatomical
  88:2
anatomy  78:10
ancient  54:1
andrew  15:15
  162:15 209:15
anglican  65:2,5
  65:6,11,17
animal  184:13
animals  87:20
  143:19

annelou  119:12
annual  76:13
answer  5:18
    16:10 21:4
    38:5,6 86:10
    86:19 101:4
    102:2,12 127:5
    148:15 156:5
    179:13
answered
    86:11 148:3
answering  30:1
answers  98:16
anticipated
    108:22
anticipating
    103:2
antomaria
    104:15 205:15
anxiety  11:6
    56:18 172:7
anybody  46:18
    60:16 208:14
anyway  164:5
    193:15 206:17
apart  10:11
    23:19 41:1,6
    104:12 116:14
    196:20
apologize
    36:12 129:13
apparent  180:2
apparently
    181:11 183:9
    205:17
appeal  151:12
    151:12

appealing
    151:8
appear  9:13,16
appearance
    78:10
appeared
    183:12,12
appears  66:8
    90:13,14,18
    100:19 128:8
applicable  6:22
applicants
    30:21
applied  138:19
apply  151:10
    151:13 152:8
appreciate
    79:4 92:4
    123:16 180:15
appreciated
    173:16
approach  14:7
    150:22 156:16
appropriate
    15:7 98:9
    183:13
approved
    181:10
approximately
    8:14 42:21
    180:15,17
april  2:2 6:10
    210:18 211:14
area  24:13
    30:22 32:1,1
    34:19 35:2
    36:6 123:5
    196:21 197:1

197:12
areas  10:9 27:5
    188:3
argue  102:11
arguing  162:5
    162:7 164:10
argument
    89:22
arguments
    35:20 97:1
    179:21
arm  132:16
    183:14
armand  205:15
arms  175:13
article  4:10,13
    4:17 5:3,8,9,13
    138:6,11 162:4
    162:8,11,16
    163:7,9 164:9
    165:2 169:12
articles  103:11
    103:14
ascribe  156:8
aside  187:14
asked  17:11
    52:9,12 53:8
    62:8 94:12
    100:12 101:7
    101:13 102:8
    103:10,13,16
    103:19 106:1
    106:16 121:10
    127:7 148:2,21
    149:10 153:20
    153:21,22
    182:22 189:16
    207:11

asking  17:7
    33:3 71:22
    79:13 99:13
    101:11,12
    102:6,8 106:22
    189:18 201:2
asks  81:21
aspect  111:7
    112:10,13,15
    134:6
aspects  40:22
assent  154:1,4
    189:19 194:20
    195:4,6,14
    200:20 201:5
assert  111:7
    184:17 192:21
assertion  203:7
assess  89:19
    195:18
assessed
    176:10
assesses  89:20
assessment
    107:5 113:17
    161:7 180:10
    196:1,2,3
assigned  6:3
    25:22
assignment
    88:2
assistance
    53:16
assistants
    173:5
assisted  63:10
associated
    37:22

Farr Curlin

April 8, 2024

**association**
4:17 68:11,12
68:13 69:17
122:6 132:4,9
132:11,16
133:6 173:3
174:8

**assume** 24:1
64:20 103:10
103:13,19
121:20

**assumes**
132:13 133:8
140:17 185:8

**assuming**
188:12

**assumption**
103:17

**assumptions**
103:22

**astray** 172:15

**attached** 15:20

**attempt** 90:20
106:7

**attempted** 4:20
122:8 135:17
172:9

**attempting**
107:9

**attended** 18:16
42:22 44:11

**attending** 19:3
20:18 57:22
58:1,19 59:11
60:19 82:21

**attention** 82:19
107:15 203:14

**attitudes** 96:7
96:16 98:18,21
178:7,15

**attorney** 1:12
6:9 9:7 101:11
101:19 104:7
210:14 211:10

**attorneys**
100:22 101:1,5

**attracted** 26:21
27:7,12

**audience** 76:11
76:15 77:11
169:3,5

**audio** 210:8
211:3

**author** 119:11
119:12 123:18
186:3

**authored** 14:6
133:1

**authoritative**
158:12

**authorities**
147:2,22 197:7

**authority** 62:7
63:5,8 72:11
72:15,19,21
73:1,4,17,18
83:14,15 148:5
152:13 153:18
199:4 200:1,3
200:5

**authorized**
6:12

**authors** 117:21
118:3 126:8
129:11 162:4,8

**autonomous**
198:8,20

**autonomy**
71:17,17,18
72:1,3,12,13
150:20 151:9
152:2,12,15
153:17 197:21
198:4,6,7,14
199:2,8,10,13
199:14,17
200:4

**available** 37:17
50:3,4 81:13
113:11,12,13
113:15 135:15
135:18 139:8
175:18 176:11
177:1 195:2

**average** 126:11

**avoid** 23:7 35:4

**aware** 8:18
12:3,12,16
13:21 14:1
52:18 61:17
65:21,22 84:17
123:20,21
132:3,10,15,19
132:22 133:5
139:19 140:2
140:14 174:11
174:15 176:1
184:22 185:3,4
188:2,5,6,10
195:17 207:20

**b**

**b** 4:5 5:1

**back** 21:21
35:9 47:4
93:17 94:6
96:3 110:17
115:6 125:8
127:12 133:12
155:15 167:4
167:21 169:22
171:11 180:18
181:4 206:8
207:5

**backlash**
161:14 164:19

**bad** 11:5,7,20
35:4 41:5
85:11 97:9

**bar** 191:14
192:3

**based** 53:20,22
60:6 85:16
87:8,10 95:14
104:20 108:20
124:15 125:1
130:21 131:7
138:17 139:6
144:21 166:10
184:8 190:21
195:1,1 205:21
206:2

**baseline** 111:17

**basically** 15:19
31:12 50:13

**basis** 64:1,2
74:16 87:3
93:1 142:16

152:5 153:9
179:18,19
190:12 192:6
192:20 193:7
193:16
**bates** 182:4,5
**bear** 91:11
160:2
**beauchamp**
175:2 189:13
**becoming**
11:21 12:2
19:18 108:12
**began** 32:6
39:10 47:8,11
**beginning** 38:1
57:21
**begun** 37:20
**behalf** 3:2,11
209:2
**beings** 19:14
89:15 143:19
**belief** 87:14,16
134:22 183:7
193:16 199:12
**beliefs** 32:15
**believe** 16:3
33:20 68:13,14
76:17 80:5
83:10 85:18
86:3 99:16
100:2,12
101:10 102:18
108:13 151:18
152:7 162:19
190:9,22
192:14 195:20
198:12 208:3

209:3,13
**belmont**
152:12 189:11
189:12
**beneficial**
118:5 193:6,13
**benefit** 40:18
133:20 135:1
153:10,11
158:10 191:16
194:2
**benefits** 40:19
104:22 116:9
131:20 136:21
175:13 177:1
192:7,10,10,22
**best** 24:14
29:13,15,20
37:17 44:2
67:15 68:9
70:5 99:20
110:12,16
118:2,10,19
130:10 136:22
139:7 152:18
152:21 169:15
177:13 179:2,9
186:10 206:12
210:10 211:6
**better** 71:12
175:18 191:13
**beyond** 102:20
109:14 110:4
110:13 114:4
**bibliography**
102:22 105:16
105:18 110:10
113:19

**big** 159:15
**bind** 62:15,17
**bioethics** 45:20
166:20,22
**biology** 17:16
17:19
**biomedical**
31:3
**birth** 25:22
**bit** 19:19 34:11
89:8 198:2
201:11
**blends** 27:4
**block** 92:22
111:12 190:1
**blockade** 43:8
44:4
**blockers** 54:6
58:9,11 66:4
85:21 88:11
90:4 91:5,7
92:14 97:15
119:21 144:19
185:6 204:9
**blocking** 13:19
14:11,21 15:6
87:3,3 111:12
112:9,16,17
138:20 204:4
**blocks** 112:10
190:4
**board** 99:3,5,7
99:13 139:10
181:10
**boarding**
168:19
**bodies** 136:19
142:2 147:2

148:1,9,9
179:9 194:10
**bodily** 109:5
112:22 143:20
150:19 197:21
202:7
**body** 29:1,2,10
29:11,14,16
46:3,5 143:5
143:14,15,18
148:7 203:15
204:12
**boe** 1:5 6:7
**bone** 113:5
189:6,8
**bones** 189:2,5
**book** 4:9 74:22
75:3,4 78:13
78:14 79:1,4,6
79:14,17,19,19
80:5,11,16,18
80:19 82:6
88:16 90:13
93:4,12 94:10
96:11 198:5
**books** 79:22
197:7
**bottom** 146:11
**boundary**
26:14,15
**bowers** 113:4
**brain** 109:4
111:21 112:2,7
112:10
**branch** 182:17
**break** 8:20 9:1
46:10,16 91:19
92:3,5,10

93:15,16 114:8
167:6,10
180:16 191:11
**breaking** 114:8
191:15
**breaks** 8:21
**brianna** 1:5 6:7
**brief** 167:10
202:3
**bring** 9:4,6
166:7 192:7
**brings** 136:11
192:13
**broad** 11:7
21:3 28:8 62:3
**broader** 20:4
77:17
**broadly** 32:12
95:16
**broken** 189:2
**brooks** 3:12
7:10,10 10:7
12:15 14:15
21:11 30:3
44:1 45:3 46:9
46:18,21 53:1
55:3 57:13
65:12 66:18
69:8 73:14
78:22 79:7
86:1,9,11 88:4
88:14 89:9
90:6 91:18
92:1,4,8,11,16
93:17,20 94:11
95:13 98:5,11
99:16 100:21
101:3,15,17,21

102:9 103:6,18
104:3,5 109:11
110:19 111:9
113:21 114:7
114:11,13,21
115:19 116:5
116:12 120:1
122:13 127:1
128:10 129:3
132:6,13,21
133:8 134:14
134:20 139:1
140:1,8,17
148:2,20
154:11,16
160:15 162:18
163:3,14
164:12,22
167:3,11,14
169:14 177:17
182:1 185:8
195:9 206:22
207:13,19
208:2,14,18
209:2,8
**brought** 67:16

**c**

**c** 3:1 6:1
**call** 53:17
58:21 59:2
88:18 89:3
152:10 154:18
172:21
**called** 7:18
14:9 22:10
25:14 28:17
31:13 42:19

45:6 49:8 59:7
59:12,13 68:13
69:14,17 82:18
117:4,8 120:13
207:9
**calls** 30:3 195:9
199:20
**campaigns**
172:20
**cancel** 77:9
172:11
**cancelled** 168:8
168:18 169:8
170:2,4
**cancelling**
168:19
**cancer** 67:8
139:18
**cancers** 113:9
**candid** 158:19
**canter** 119:15
**cantor** 103:11
104:21 105:7
106:3,14 107:5
108:21 109:9
109:15 111:17
112:5 113:14
113:18 114:5
115:15 116:10
117:12 118:16
118:17,18
121:6,18 122:1
123:3 124:1
136:8,22 137:8
147:11,21
148:11,22
149:1,11
156:21 157:11

157:14,20
159:9,18 179:6
186:14 187:13
193:8 194:6
204:2
**cantor's** 105:20
121:14 124:9
**capable** 144:8
185:5 190:6
**capacity** 1:12
6:9 62:6,9
72:22 176:21
196:3
**cardiovascular**
113:8 139:17
**care** 13:22 14:2
14:4,16 26:16
38:8,10 39:20
39:20,21,22
40:15,20,20
47:9 48:20
49:14 51:20
54:13 55:17,21
56:1,4,6 60:4
62:18 64:3
66:22 67:7
68:2 116:16
117:18 129:1
130:8 132:5,11
132:20 133:7
135:16 136:6
139:6,20,22
140:15 149:22
150:13,17
151:11 154:22
155:20 160:8
162:2,5 164:10
165:13 166:20

168:13 170:18
172:4 174:13
175:10 176:2
177:6 178:11
178:16 184:14
185:2 188:18
193:1,18
194:20 195:7
196:6 200:18
206:16
**cared** 20:11
67:2
**career** 173:7
**carefully** 174:9
**caring** 39:3
48:17 49:12
**carolina** 6:11
18:19
**carried** 28:17
57:5,17
**carry** 138:3
**case** 1:7 8:16
9:15,17 10:11
12:21 16:8,18
17:4 29:8 30:6
35:7 40:12
59:18,20,22,22
60:2,4 61:6
62:4,22 63:9
63:13 64:11
65:21,22 72:8
77:4 86:21
87:2,5,6 89:15
91:4,8,11
92:18,19 98:13
98:15 99:14,15
100:12 101:19
102:14 103:15

104:8,12 117:5
118:7 127:4
128:14,15,21
133:11 144:1,6
146:6,7 153:19
154:5 156:10
158:10 160:1
170:22 174:6
174:20 175:9
177:19 189:20
190:3,14 191:5
192:9 194:4,22
204:19 206:6
207:10,12,16
208:1 209:18
**cases** 29:6 30:7
35:21 61:7
62:5 63:1
74:14 86:5
100:5,7 104:4
104:10 152:19
152:20 172:13
190:8 191:5,9
**cass** 174:1
**cast** 131:21
**category** 54:8
147:17
**catholic** 68:11
**causes** 27:8
**causing** 53:16
54:3
**center** 34:4,7,8
34:13,15 35:11
36:15,17,21
47:10,15,16
48:5,14 51:7
51:10 54:10
55:8 77:16

99:10 166:21
**central** 70:20
71:9 100:13
**certain** 8:12
43:11 44:5
52:16 79:20
85:15 104:9
112:7 160:19
180:12 194:12
200:2 202:20
203:2 207:14
**certainly** 22:12
28:22 86:12
95:21 108:1
146:18 175:22
**certainty** 52:2
133:19 192:12
**certificate**
210:1 211:1
**certified** 6:19
**certify** 210:4
211:2
**chair** 171:2
**challenge**
50:18 189:10
**challenges** 39:7
**challenging**
40:7
**chance** 175:14
**change** 134:1
204:12
**changes** 16:12
16:14 17:12,14
**changing** 12:19
**chapel** 17:17
17:19 18:17,19
**chapter** 12:9
75:1 198:5

**character**
176:10
**characteristic**
57:7 196:18
**characteristic...**
27:8 49:13
72:12 142:1
204:15
**characteristics**
10:22 14:8
15:1 32:3,4,11
32:13 37:21
55:14 90:16,22
97:11 112:19
137:14 144:3,5
144:6 145:3,11
145:13 146:4,6
146:9 191:21
204:13
**characterizati...**
102:10 169:10
**characterize**
154:21
**characterized**
27:1
**chart** 60:10
**check** 79:11
182:2
**checking** 33:18
**chen** 116:20
118:2,14
**chen's** 118:17
**chicago** 26:3,6
34:9 35:14
39:11,14 47:17
48:1,11 55:17
57:22 58:3,18
59:1 76:15,18

78:2 169:17
173:15 179:22
**child** 153:11
188:8,14
191:22 200:13
200:16,20
201:2
**child's** 153:5
191:11 200:9
201:16,19,20
**children** 26:16
51:14,15 54:17
62:18 63:2
109:1 151:11
152:16,18,19
153:5,17,22
154:2,4,7
155:9 192:16
197:14 199:12
199:22 200:19
201:14
**children's**
152:21 153:2
188:18
**childress** 175:3
189:13
**chime** 209:16
**choice** 24:22,22
62:7 188:13,18
**choices** 49:15
**choose** 18:21
24:20 26:20
**chose** 19:18
32:1,2,3 48:10
**christ** 48:17
**christian** 34:3
34:7 47:10,14
47:16 48:4

49:5,8,14,16
49:21 51:6,10
53:20 54:10
55:7 64:21,22
65:15,16,20
66:2,5,11
68:10
**christianity**
48:19 54:1
64:6,12,14
66:9
**christians**
51:16
**christopher** 2:6
6:3 80:12
210:2,20
**chronic** 56:17
**church** 65:2,5
65:6,11,16,17
**circumstances**
63:21
**citation** 127:9
**citations** 149:6
**cite** 10:6 12:9
118:14,20,22
121:14,18
138:6 141:20
**cited** 105:13,15
105:17,19
111:18 113:19
116:14,20
138:15,17
147:19,20,20
204:1
**city** 48:7
**civil** 3:5,6 71:2
76:22 77:8

**claim** 131:18
136:11
**claimed** 104:22
118:3
**clarification**
156:19
**clarify** 117:7
135:2 151:18
160:6 183:3
192:19 199:11
**clarifying**
94:21 202:11
206:4
**class** 18:5,9
**classes** 18:9
**classic** 140:9
**clear** 67:1
107:3 134:7
151:22 164:22
170:20 177:11
183:10 197:10
**clearly** 85:13
136:9 170:21
**client** 86:10
101:11,19
**clinic** 42:19
47:12 48:20
52:21 54:15
56:7,9,13
139:6,14,19
**clinical** 11:13
11:16 24:2,4
24:15,21 25:3
25:5 26:9,13
27:4 30:10,14
30:19 31:16
32:14 33:21
34:1,6,16,20

35:11 36:1,4
36:21 37:22
39:2,6 40:8
41:12,21 44:18
44:19 47:7,8
47:11 58:19
59:5,8,16,17
59:20 60:2,4
61:3,5 66:14
66:16 68:2
70:20 72:9
76:14 77:1,16
84:11,22 86:20
99:11 128:6
142:12 146:19
154:14,18
155:2,5,6,8,11
158:1 175:3
176:18 180:11
181:11,15,17
182:19 183:8
183:19 184:5
188:21 200:1
**clinically** 25:15
39:18
**clinician** 31:14
31:17,18,19
**clinicians** 59:4
69:21 157:21
161:14 177:12
178:22 179:15
180:3
**closed** 171:19
174:2
**coast** 91:21
**coded** 25:15
**cognitive** 72:22
190:5 195:19

196:4
cohort 38:16
  124:15 125:1
colleagues 64:9
  165:16,20
  172:22 182:3
  197:8
collecting
  118:6
collection 11:6
college 68:12
collegial
  104:14
come 66:20
  77:15 87:2
  112:19 171:8
  177:2 180:18
  190:19 194:10
  198:14,16
  202:21
comes 27:2
  80:4 109:22
  112:11
comfortable
  86:13
coming 192:6
comma 156:17
comment
  185:11
commenting
  77:7
comminuted
  189:3
commissioned
  139:9
commit 19:12
commitment
  54:3

commitments
  32:8 71:5
committed
  50:6 51:18
  70:19 71:2
  165:21
committee
  58:22 59:3,7
  156:22 157:7
common 49:5
commonly
  156:6
communicati...
  101:5,12,22
  102:4,7,11
communities
  32:5
community
  34:8 76:18
  77:17 171:15
  175:5,8 177:11
  177:12 178:22
  179:1
compared
  126:4
compensate
  158:21
competitive
  30:20
complaint
  205:8,13
complaints
  56:13
complete 17:21
  18:13 21:22
  207:11,14
completed
  22:17 23:11

24:1,3 25:7
  26:2,4 30:9,13
  34:13,17 35:15
  36:21 38:3,10
  41:2,3,7,16,18
  207:21
completing
  37:18
complex 19:1
  27:11
compound
  55:3 113:21
comprehend
  194:16 196:10
comprehensive
  56:22 107:22
comprehensi...
  26:21
computer
  110:20
concede 156:11
conceding
  80:22
concept 71:9
  71:10 73:19
  151:8,11,13
  154:5
concepts 35:21
concern 72:4,4
  166:6,8 170:21
  173:22 201:14
concerned
  170:7,11 174:4
concerns 25:17
  25:20 55:10,13
  56:14 76:9
  77:5,10 161:12
  161:16 164:17

164:20,21
  165:13 166:14
  171:22 172:12
  173:18
concession
  190:13
conclude
  126:13 128:22
  130:7,10
concluded
  129:4 130:13
  139:11,14
  147:4 192:22
  209:22
concludes
  208:10
concluding
  207:8
conclusion
  107:6 109:16
  121:14 147:5
  147:10 150:3
  157:2 184:4
  192:6 194:9
conclusions
  125:13 156:21
  157:15 161:2
  190:18 194:8
  208:1
condemn
  174:18
condition
  12:12 13:1
  29:5 49:8 55:7
  128:7,21 131:2
  146:3
conditional
  107:1

conditions   22:5
22:7,13 26:10
27:15,17,20,21
28:1,3,5,12
56:16,17 155:3
190:3 194:12
195:6 204:18
conducive
153:10
conduct   27:18
38:5 107:4
113:16 178:14
conducted
98:17 136:19
149:12 178:6
196:11,16,22
197:1
conducting
96:5,14 106:20
108:3
conference
42:22 43:2,5
43:14,19 45:19
60:2 61:6
76:14
conferences
41:19 42:1,6
42:12,17 44:12
44:15 45:1
75:9,14,15
180:1
confident   58:6
196:8
confidential
165:19
confirm   120:7
125:2 129:21

conflict   158:6,7
158:18,22
159:13 160:4
160:20,21
201:8
conflicts
156:21 157:3,6
157:12,18
158:13,17
159:3,6,6,10
159:17
conformity
172:11
confounding
134:1
confusing
36:14 206:6
confusion
199:17
congruence
25:21 88:1
conscious   19:2
194:3
consciously
35:18 59:2
151:6 206:17
consent   73:18
73:20,22 83:16
153:14,20,22
154:4,6 187:21
189:8,16,19
190:6 191:6
192:18 195:14
196:12,19
197:3,4,14
199:7,9,10
consequences
135:21 139:16

173:10
consider   28:20
91:4 97:5,7,12
97:14,17,19,21
98:3 101:1
106:13 108:8
121:10 136:3,3
136:4 152:18
175:13 176:21
178:10 186:12
187:21
considered
100:17 110:11
121:4 142:9
186:15 188:22
considering
71:11 81:1
183:19 184:5
consistent   21:5
21:8 50:20
53:9 59:6
62:20 63:14
68:17 78:11,12
91:14 92:21
constituent
20:1
constitute   7:4
consult   58:17
58:20 59:1,4,8
59:10,12,13,15
60:14 61:4,10
61:12,14,18,20
64:16 65:18
consultant
67:16
consultation
60:9

consults   61:11
cont'd   5:1
contact   130:22
contacts
130:18
contend   68:16
contending
101:18
context   11:12
11:15 12:17
14:22 23:8
28:12 39:2
44:19 47:13
57:5 70:15,16
71:16 93:8,10
93:11 94:21
141:14,14
142:13,15
165:18
continued
47:13 109:21
130:22 131:7
continues
31:18
continuing
41:1,6,11
67:19
continuity
47:12
contradict
66:11 74:18
83:18 90:18
91:15 172:13
188:11 191:19
201:20 203:15
contradicting
83:20

**contradiction**
203:19
**contradicts**
66:2,7 90:15
131:18 138:1
154:3 160:17
191:7
**contrary** 90:3
90:10
**contrast** 40:10
**contributors**
27:10
**control** 183:14
**controlled**
187:19 188:3,7
188:19 189:1
**controls** 126:4
**controversial**
96:7,17,19
97:6,13,16,18
97:19,21,22
98:4 178:8,11
**controversy**
96:22
**convenient**
167:6
**conversation**
99:17,19
**conviction**
80:15
**cook** 47:18
**cooperation**
201:5
**copy** 9:8,10,14
9:16 15:11,14
16:3,5,6,12,17
17:4,5 78:14
78:18 79:1,3

79:14,15,16,19
79:21 80:4
209:12,16
**cord** 188:8,15
**corners** 173:4
198:21
**corollaries**
40:18
**corollary** 73:16
**correct** 9:14
13:13 17:9,10
17:17 18:17
26:3 29:17
30:11 33:14,18
37:6,7 38:9
47:10 55:18
57:20 64:21
67:14,15 79:12
79:16 81:5
93:6,7 94:12
94:13,19 96:8
96:17,18
100:18 105:3
105:16 109:6
110:11,12
115:15 116:19
117:15 119:13
120:9 121:3,17
121:20,22
124:9 125:3,4
126:15 129:2
129:19,20
132:1 135:16
137:4 138:22
143:6 145:17
145:22 146:12
147:7,8,19
149:9,22 150:1

151:19 153:20
157:1 161:17
161:20 162:2
162:10,21
168:9,10
169:18,20
171:7,10,15
175:3 177:16
178:8,11
179:16 181:13
183:20 187:10
187:22 194:17
201:9 203:5,6
203:9 204:20
204:21
**correction**
177:22
**correctly**
129:14 151:17
153:2 163:13
**corruption**
51:8
**counsel** 3:21
7:6,22 46:9,15
65:19 78:22
91:18 102:1
110:19 140:8
167:3 182:1
210:11,14
211:7,10
**counteracts**
138:1
**countervailing**
190:10
**countries**
190:18
**county** 47:18

**couple** 8:15
15:9 34:10,11
47:7 50:8
68:15 73:15
75:13 198:3
206:19
**course** 22:21
32:7 41:20
65:19 80:14
161:1 173:22
180:5 187:5
194:9 203:10
**courses** 22:8,11
23:16,17,20
41:10,11
**coursework**
17:21 18:1,13
18:14 21:21,22
22:2,4,6,12,12
22:14,17,19
23:1,10,13,14
31:9 41:14
**court** 1:1
102:17 127:11
**covered** 101:10
**credentials**
106:13
**criminalized**
134:13 135:6
162:6
**criteria** 195:13
**critical** 168:20
168:22
**criticism** 154:9
154:13
**cross** 13:19
14:12,22 15:6
43:8 44:5 54:6

Farr Curlin

April 8, 2024

58:13,14 66:4 67:9 87:2 91:13 97:15 137:12 138:20 142:5,14 145:7 182:20
**cruz** 186:3
**crystal** 183:10
**cs6629188** 1:22
**culin** 166:13
**culminate** 32:16
**culminated** 32:18
**culture** 26:22 77:9 172:11
**curlin** 2:1 6:7 7:17 8:4 16:3 47:6 79:4,11 94:9 102:20 115:9 119:17 119:18 120:22 127:5,19 140:14 151:16 165:8 168:2 181:6 186:8 207:8 208:9,12
**curlin's** 4:7,8 15:11 16:17
**current** 113:4
**currently** 105:2 175:21 207:18
**customary** 42:5 52:13 106:19
**cut** 205:11

**cv** 1:8 4:7 9:7 9:10,14,17 15:9,11,15 16:4,7,12 17:12,15 32:20 33:9,13 34:1 42:3,4,5 46:2 55:21 58:16 75:15,18 78:3 197:5
**cynthia** 3:21 186:3

### d

**d** 4:1 6:1
**d.c.** 3:7
**danish** 124:14 124:22
**data** 59:17 108:3,4 118:6 154:20 161:7 176:22
**date** 2:2 33:10 126:6 129:9 171:8
**dated** 205:14 205:15 210:17 211:13
**dawned** 39:2
**day** 43:2 168:18
**de** 119:3
**deal** 80:6 159:15
**deals** 40:8
**dean** 170:6,7 171:2

**death** 53:16,17 54:3
**debate** 71:3
**december** 100:2
**decided** 138:19
**decidedly** 152:4
**decides** 102:17
**deciding** 106:14 196:5
**decision** 47:21 62:8 72:7,22 139:6 151:5 152:3 200:10 200:12
**decisions** 32:9 40:8 62:15 72:9 153:3 199:15 200:1
**decline** 53:11
**declined** 126:14
**declining** 184:1
**decrease** 126:6 129:9
**decreased** 125:22 128:2
**dedicated** 45:1
**deeply** 151:14
**defect** 202:12
**defendants** 1:15 3:11 7:12 103:3
**defending** 3:13 7:11
**defense** 209:2

**defer** 59:7 179:15
**define** 10:19,20 13:16,17 14:3 31:15 39:15 50:12 70:17,18 96:19 175:8 198:4
**defined** 40:3
**definitely** 27:22
**definition** 11:3 12:7,11 13:4,5 50:9 175:5
**definitively** 130:21 131:3
**degree** 17:16 17:18 22:9 82:4
**degrees** 153:14
**dela** 186:3
**delaying** 135:21
**delivery** 209:7
**demand** 74:1 83:17
**demands** 20:4 95:2
**demonstrating** 150:14
**denmark** 108:3 125:16 147:13 147:15
**denomination** 65:1
**dental** 68:11
**deny** 74:6,10 74:12

denying 135:21
department
  3:5 171:3
depend 128:20
dependence
  137:3,10
dependent
  112:7 113:9
  190:2
depends 25:18
  74:3 100:1
  108:10 111:11
  133:15 135:7
  144:15 200:11
deposition 2:1
  6:6 7:2 8:7,14
  8:20 9:5 10:2,8
  10:13,17 13:2
  13:9 80:3
  102:15 150:7
  152:7 210:1
depression
  4:19 56:18
  122:7
describe 20:22
  28:6,8 30:2,17
  35:10 38:13
  43:4 58:16
  61:2 77:1 78:7
  81:8 82:11
  84:18 98:14
  115:17 141:18
  146:2 150:2
  152:6 161:16
  181:21 182:12
  198:15 199:10
described
  12:13 13:1

21:20 28:21
29:22 40:4
45:11 49:22
55:22 66:8,8
84:13 87:13
97:18 124:8
136:8 146:14
147:18 149:1
193:10,13
194:6
describing
  123:4 128:14
  128:15
description 4:6
  5:2 59:21
  106:17 107:1
  109:12 112:6
  115:20 118:18
  121:6 122:2
  123:3 149:11
  158:11 159:18
  175:3 190:13
  193:9,12
descriptions
  103:10,13
  106:3 115:13
  142:20 144:15
  144:22 145:1
  157:10,10,19
  159:8
descriptor
  185:15
deserve 49:10
designed 37:14
  38:5,14 187:19
desire 137:13
desires 88:21
  198:22

despite 29:15
detail 10:5
  18:11 98:15
  130:4
detailed 30:6
details 18:3
  22:3 34:18
  43:9 52:12
  61:15 62:4
  76:5 92:18
  118:13 125:7
  125:11 127:22
  136:3 182:16
  195:16 209:9
determination
  150:17,20
  151:7 152:4,8
  154:2,6 155:22
  197:22
determine
  133:13
determined
  203:4
detransitioners
  76:22
develop 109:3
  145:4
developed
  35:18 157:17
  185:1
developing
  30:22 39:13
  145:5 158:1,5
development
  90:16 92:22
  93:2 109:4
  111:21 112:2,7
  112:11,14,18

113:5,7 138:2
145:11 160:13
190:4 191:20
191:21
develops 39:17
deviations
  141:21
devoted 48:8
  82:20
diabetes 56:19
diagnose 28:3
  28:4 55:6
diagnosed
  28:15 125:17
diagnosing
  22:5,6,13
  23:12 98:18
diagnosis 23:14
  25:12 28:17
  29:19,21 30:1
  55:1 57:3,5,17
  58:11 97:5,7,8
  97:13 124:14
  124:22 144:8
  176:13
diagnostic
  143:3
dialogue 61:7
  178:21
dictating 52:16
differ 40:1
difference
  14:13 95:18,20
  177:20
differences
  32:13 64:1,3
different 23:6,6
  29:3,16 34:2

62:16 63:20
67:14 73:7
81:2 110:2
114:10 136:19
189:14,17,18
198:7 203:12
204:10 209:15
**differently**
80:1 89:11
**differs** 85:11
**difficult** 39:18
40:5 173:5
**difficulties**
172:9
**digital** 210:8
211:3
**dignity** 49:6
**dilemmas**
166:20
**dimensions**
38:18
**diminished**
20:19 62:6
173:9
**diminishing**
39:19
**diminishment**
202:12
**direct** 46:7
68:2 157:17
**directed** 204:6
204:7 209:17
**directly** 36:4
68:20 100:10
105:10 106:6
119:19 122:22
123:1 124:2
160:17 187:11

203:18 204:7
204:12
**disagree** 21:18
21:20 102:9
190:17
**disagreeing**
202:19
**disagreement**
108:18
**disagreements**
85:13 89:17
97:3
**disagrees** 79:5
**discern** 29:9
50:20 70:21
89:16
**discipline** 26:8
39:13
**disclosed**
160:21
**discomfort**
97:9
**discontinue**
139:21
**discourse**
76:22 77:8
**discrimination**
63:22 64:1,2
**discuss** 46:8
156:20
**discussed**
23:19 41:3,7
41:16 43:5,7
66:14
**discussion**
22:18 23:11,21
43:10 60:6
166:19 176:5

176:15
**discussions**
43:11 44:17
45:1
**disease** 56:21
139:17 141:13
**disorder**
141:13 142:3
143:3,5,9,11
143:12,13,15
143:17,22
144:1,4 145:16
145:22 146:2
**disordered**
29:12 146:12
146:15,16
**disorders**
56:20,21 143:4
143:18,20,21
**dispassionate**
161:7
**dispense** 8:17
**displayed**
28:19 55:2
**displaying**
66:15
**disposed**
176:20
**disproportio...**
191:17
**dispute** 108:18
163:17
**disputed** 105:3
108:17
**disqualify**
158:14
**dissent** 171:14

**distinction**
56:2,3 202:8
**distinguish**
107:17
**distinguishing**
51:19
**distract** 170:8
170:14
**distress** 25:20
88:1 97:9
203:3
**distributed**
31:5
**district** 1:1,2
**diverse** 28:9
**division** 1:3 3:5
**doctor** 161:5
191:10
**doctor's** 149:20
155:12,18
**doctors** 152:17
176:12 200:18
**document**
117:13 120:2
182:3,5,14
183:3,5,6
184:8,8 185:15
**documented**
121:15
**documenting**
161:12
**documents** 9:4
9:6,19,21 10:6
106:6 147:19
181:20,21
182:12 184:3
**dog** 171:19

Farr Curlin                                                                    April 8, 2024

| | | | **e** |
|---|---|---|---|
| **doing** 44:4 55:9 85:5 172:10 194:12 | **drafted** 183:4 197:11 | **durham** 2:5 6:10 | **e** 3:1,1 4:1,5 5:1 6:1,1 163:14,14 |
| **doj** 3:20 | **drafting** 120:8 186:12 | **dysfunction** 56:19 | **earlier** 70:16 110:7 169:16 198:2 199:12 |
| **doors** 161:2 174:3 | **draw** 59:18 64:6,9 107:6 109:15 125:13 202:8 207:22 | **dysphoria** 10:18,19,20,20 11:2,4,5,9,22 12:4,8,13,20 12:22 13:8,20 23:12,15,21 25:12,14 28:15 28:18,21 29:19 29:21 42:8,13 43:7,18,22 44:13,21 45:18 54:7 55:2 57:3 57:5,7,11,12 57:18 58:5,9 58:12 64:17 66:5,16 67:22 74:21 75:6,8 75:10,12 85:22 87:4 88:12 90:5 91:9 92:15 97:6,8 97:16 98:18 100:9,11 117:14 119:22 125:17 143:8 143:10,22 144:9,14,20 145:8,16,21 149:4 204:8,8 204:9,10,12,14 | **early** 173:6 |
| **dorothy** 76:13 | | | **east** 91:21 |
| **dosage** 127:21 | **drawn** 48:1 110:6 | | **economic** 49:3 |
| **doubt** 87:8 131:22 | **dropped** 110:20 | | **edition** 94:12 |
| **doubtful** 87:1,8 91:13 92:21 195:2 | **drs** 103:11 104:21 105:6 106:13 107:5 108:21 109:9 109:14 113:18 114:5 115:14 116:10 117:12 136:22 137:8 156:20 186:13 187:12 204:2 | | **education** 38:8 38:11 41:2,6 41:10,11 95:15 |
| **doubtfulness** 87:10 | | | **educators** 21:8 21:12 |
| **downloaded** 78:14,19 79:8 79:14,19,21,22 | | | **effect** 113:4 134:15 136:1 169:1 203:16 203:17 |
| **dr** 4:7,8 6:6 7:17 8:4 15:11 16:3,17 47:6 79:4,11 94:9 102:20 104:14 105:20 106:11 106:12 111:17 111:17 112:5 113:14,14 115:9 119:15 119:17,18 120:22 121:14 121:18 123:22 124:1,9 127:5 127:19 136:8 140:14 151:16 165:8 168:2 174:1 181:6 186:8 187:13 207:8 208:9,12 | **drug** 137:22 | | **effective** 118:5 118:9 |
| | **drugs** 13:19 15:6 142:9 204:5 | | **effectively** 31:2 31:6 63:22 151:8 152:13 174:4 |
| | **dsm** 12:8 13:1 143:4,9,11 146:17 | | **effectiveness** 119:21 |
| | **duke** 42:20 44:10 45:8,9 99:11 167:1 173:12,13 180:1 | | **effects** 138:4 192:13 193:12 |
| | | **dysphoric** 138:21 140:4,6 | **efficacious** 117:19,22 |
| | **duly** 7:18 187:21 192:17 210:5 | | **efficacy** 116:16 117:13 135:15 149:3 150:15 151:14 |

either   9:10
   14:11 62:19
   100:21 110:9
   205:3,22
elaborate
   19:20 89:8
   201:11
elective   53:18
electives   22:10
   22:15
elevated   126:2
   128:4
email   172:20
   185:22
emailed   209:16
emblematic
   89:2
embraced
   64:13
embraces
   66:10
embracing
   95:6
emerge   36:1,4
emerged   33:4,5
   33:5 59:15
   60:5
emerging
   64:12
eminent   133:18
   202:7
emotional
   190:5 195:19
   196:3,4
emphasis   35:22
   49:11 155:21
   156:2

emphasize   59:3
   72:14 82:4
   150:18 197:20
emphasizing
   198:17
empirical
   37:16 96:6,15
   98:17,20 178:6
   178:14 196:14
   196:22
empirically
   32:13
employed
   210:11,14
   211:8,11
employee
   210:13 211:10
employment
   44:9 166:9
encompasses
   31:1
encounter   58:4
encounters
   66:15 67:21
encourage
   140:10
encouragement
   32:10
ended   81:18
endnotes
   124:16
endocrine
   148:14,19
   149:1,5
endorsed   64:13
enduring   54:2
enforcement
   3:6

england   108:2
   116:21 147:13
   147:16 179:7
english   148:5
enjoy   19:10
enjoyed   19:8
   39:6,7
ensure   105:21
   161:1
entailed   30:18
enthusiastic
   133:3 180:7
entire   79:1,3,6
   89:14
entitled   73:13
   124:12
environmental
   36:3
epidemiology
   31:4
equip   37:14
equipoise
   175:3 176:18
   179:16 180:11
erectile   56:18
es   210:4
especially
   113:6 164:2
   204:20
esquire   3:4,12
essays   172:7,17
essentially
   26:14
establish   88:21
   204:18
established
   205:3,21

estrogen
   182:20 183:14
et   1:5,14 3:11
   6:7 116:20
ethical   12:4
   39:7 45:14
   59:6,18,20
   64:9 66:7 76:9
   77:5 82:20
   87:11 99:6
   100:13 108:15
   152:2 172:14
   181:12 183:16
   199:20
ethically   66:1
   74:10,12 192:3
   194:3
ethicist   12:2
ethicists   95:22
   165:11
ethics   20:4
   31:5 34:13,16
   34:20,22 35:12
   35:17 36:3,8
   36:22 37:3
   44:19 51:1
   58:16,19,22
   59:8,12,14,16
   60:2 61:3,6,18
   61:20 71:10,15
   73:21 75:1
   76:14,19 77:1
   77:14,16,22
   80:13,17 82:10
   82:19 83:21
   85:8,13 89:13
   89:17,19,21
   92:22 95:2,16

95:16,18 99:11
106:19 150:16
151:4,5 152:11
157:13 179:22
180:2 197:2
198:12
**euphemism**
14:4,16
**evaluate**
194:16
**evaluation**
106:21
**events**   69:4
170:9
**eventually**   33:6
**evidence**   107:5
115:21 121:7
128:17 132:14
133:9,17
135:15,18
136:8,22 137:6
137:7 139:9
140:18 147:4,5
149:2 150:14
151:14 175:13
176:11 180:4
184:18 185:9
190:10,19
191:2 193:8
194:5,8 195:2
**evident**   171:13
**evidentiary**   7:1
**exact**   148:4
**exactly**   48:15
99:20 136:15
170:19
**examination**
4:2 8:2

**examine**   185:1
**examined**   7:20
**example**   14:5
21:17,19 42:18
49:18 51:3,7
57:1 89:21
95:6 110:3
158:21 159:22
188:22 190:7
196:17
**examples**   53:13
56:15 57:1
61:22 62:2
64:4
**excellence**
31:12 48:18
**excellent**   17:11
93:19 114:15
167:12
**except**   25:8
31:2 51:19
85:4,17 126:17
148:5 154:7
184:6 186:13
194:12 200:2
**exceptionally**
137:19
**exclude**   175:22
**exemplars**
27:13
**exercise**   72:6
149:20 155:12
155:19
**exhibit**   4:7,8,9
4:10,13,17 5:3
5:8,9,13 15:11
15:12,20 16:1
16:8,13,19,20

17:6 78:15,19
78:20 79:1
119:2,6 120:12
120:16 122:5
122:10 123:9
123:13 162:17
162:20 163:1,4
163:21 185:14
185:19 186:6
186:18,19
187:1 207:10
**exhibited**   87:22
**exist**   155:2
156:22 204:19
**existed**   157:6
**exists**   158:7
**expanded**
181:10 183:19
**expanding**
184:5
**expansion**
183:8
**expect**   128:19
190:11
**expected**
145:12 146:8
158:9 189:6
**experience**
19:10 27:3
29:16 40:4
83:12 128:6
179:20,21
180:13
**experienced**
10:21
**experiences**
27:11 32:4

**experiencing**
28:10 88:12
90:5 97:9
202:13 203:3
**experiment**
191:12
**expert**   4:8
16:18 45:12
66:9 86:22
99:18 100:4,6
101:18,22
104:13 107:10
115:14 158:15
179:8
**expertise**   39:17
60:7 107:17
158:16 160:19
176:8
**expertly**   37:16
84:7
**experts**   108:1,8
108:13 136:19
144:22 147:12
158:5 159:16
161:14 164:3,5
164:5 177:13
190:17 194:10
204:17,22
205:5,21
**explain**   11:3
14:13 152:5
**explicitly**   157:9
193:5
**express**   25:20
55:10 172:18
**expressed**   29:8
55:13 57:6,11
132:17 165:12

166:6 169:11
173:17 174:2
199:6
**expressing**
172:1,4
**expression**
138:2 151:2
156:18 171:13
**extensive**
139:12,15
**extent** 41:9
85:12 133:15
141:17 176:22
**extra** 49:18
**extreme** 87:22

**f**

**face** 59:5
**faced** 64:5,8
**faces** 200:13
**facilitate** 63:17
112:18
**facing** 39:5
62:11
**fact** 52:5 71:21
83:13,13 84:10
93:1 110:1
121:19 131:7
137:12 140:3
143:2 154:5
158:15 160:16
162:8 189:21
194:11 200:16
**factors** 134:1
135:8
**facts** 60:8 87:6
132:14 133:8
140:17 185:8

**faculty** 33:12
35:16 45:13,19
45:20 60:1
77:15 99:10
166:18,21
179:22
**failure** 109:3
**fair** 81:4 84:11
87:7 95:11
120:5 148:12
164:9 165:4
180:9 184:16
186:11
**fairly** 86:8
**fall** 45:14 54:7
99:21 182:13
**false** 128:13
**familiar** 11:8
11:11,13,21
12:7,10 68:3,5
122:19 195:20
**families** 62:19
194:1
**family** 20:11
24:17 61:10
171:3 190:16
200:18
**far** 47:17 50:8
66:11 107:2,9
165:2 184:18
**farr** 2:1 6:6
7:17 8:4
166:12
**fashion** 172:21
**father** 19:6
20:10
**fatigue** 56:18

**favor** 43:21
**fda** 181:11,18
182:17,18,22
183:1,4,7,11
183:13 184:4
**fda's** 183:12
**fear** 77:9
165:12 171:13
171:20 172:2,3
172:16
**feature** 32:9
**features** 29:1
190:1
**february**
205:14,15
**federally** 34:8
**feel** 86:13,14
**feeling** 11:5,7
97:9
**fellow** 33:12
34:5
**fellows** 35:16
59:16 76:14
77:15
**fellowship**
30:12 32:6,7
33:5,6,20,22
34:12,14 35:9
35:12,15 36:5
36:7,19,22
37:4 48:12
76:16
**fellowships**
30:8
**felt** 172:3
**female** 5:16
67:4 87:15,17
90:18 113:6

142:15 185:5
186:21
**females** 142:19
**fertility** 185:6
**fertilization**
5:9 185:16
**fiance** 48:5
**fiduciary**
149:21 152:17
155:19 191:8
**field** 19:11
35:17,20 36:8
39:9 152:10
157:22 158:2
196:18
**fields** 197:2
**files** 79:8
125:10
**financed** 40:16
**financial** 157:3
157:6,17
**financially**
158:11 210:15
211:11
**find** 49:13 97:3
142:1 157:14
173:2,5,8
**finding** 19:2
**fine** 8:13 16:11
17:8 114:19
115:1 206:22
209:17
**finish** 92:6
**finished** 206:18
208:13
**finland** 108:2
147:13,16
148:9 179:8

Farr Curlin

April 8, 2024

**first** 7:18 10:18
11:10 17:15
24:8,14,21
29:9 30:9,12
32:7 33:8
34:11,19 35:15
39:1,10 75:21
78:17 119:12
123:18 126:7
129:10 159:13
163:13,21
186:3 205:12
**five** 46:17,19
93:16,21
206:21
**flourishing**
72:6
**fly** 86:7 136:4
**focus** 32:1,3
35:14,16 36:6
36:7,20 37:1
43:10 45:6,10
56:14 76:2,3
202:6
**focused** 44:20
45:14
**focuses** 26:9
39:18
**folder** 79:7
**folks** 39:12
145:1
**follow** 61:14
71:1 83:13,17
135:4 198:20
198:21
**followed** 5:14
186:20

**following** 12:18
126:12 130:14
185:6
**follows** 7:20
**foregoing**
210:3,4 211:4
**foreseen** 192:8
**form** 28:10
31:21 65:12
69:8,21 149:3
**formal** 41:10
70:13
**formally**
153:22
**formed** 68:15
70:4,5 144:10
**former** 33:7
**forming** 106:5
**forms** 49:3
52:10 155:8
**formulating**
110:9,14
**forth** 170:1
**forthcoming**
158:19
**forward** 50:15
50:17 53:4,5
133:1 201:5
**fostering** 71:2
**found** 19:8
35:4 117:18
125:21 126:3
141:11,12
142:6 169:15
**foundation**
45:13 57:14
86:2 90:7
132:7 174:3

**foundational**
73:20
**founded**
206:10
**founders** 70:9
**founding** 70:7
206:14
**fourth** 25:4
**fractures** 189:3
**fraught** 139:12
139:15
**freedom** 3:13
7:11 153:14
**frequency**
131:12
**frequently** 28:4
44:17
**friebe** 2:6 6:3
210:2,20
**front** 9:11,20
9:21 16:4 17:9
33:10 127:2,6
127:8 162:11
165:1
**full** 106:8
**fully** 19:2
140:16
**function** 113:3
**fundamental**
153:12
**fundamentally**
40:19 81:12
82:14
**funded** 34:8
**further** 10:15
38:2,4,16
110:5 118:21
172:17 185:11

210:13 211:9
**fuss** 165:6
**future** 46:10
86:5

**g**

**g** 6:1
**gain** 31:9
200:20
**gaps** 150:14
**gather** 59:17
**gathered** 45:13
**gathering**
166:18,21
**gatherings**
166:15,16
**gd** 143:2,5
204:19
**gender** 4:12,18
5:4,11 10:18
10:19,20 11:1
11:9,22 12:3,8
12:13,17,20,22
13:8,12,20,22
14:1,4,9,16,19
14:19 15:2
18:5,6 22:18
22:21,22 23:4
23:12,15,21
25:12,14,17,18
28:15,17,21
29:19,21 42:7
42:13,19 43:6
43:17,22 44:12
44:20 45:18
54:7 55:2,11
55:15 57:3,5,7
57:11,12,17

58:5,9,11
64:17 66:5,6
66:16 67:3,22
74:20 75:2,5,7
75:10,11,13,22
76:8 78:8,12
85:22 88:2,12
88:17 90:5,10
90:15,22 91:9
92:15 97:5,7
97:12,16,17
98:10,18,21
100:9,11,14
105:1 108:14
115:22 116:9
116:16 117:14
117:18,21
118:4,9 119:5
119:22 122:6
123:10 124:13
124:21 125:17
125:17,20
126:1,5,7,10
126:12 128:3
129:1,8,10
130:8,15 131:5
132:5,11,17,20
133:3,6 135:11
135:16,18,22
136:6,9 138:21
139:20,22
140:4,5,6,15
142:4,20,21
143:8,10,22
144:9,14,20
145:8,16,21
149:3 151:1
160:4,10 162:2

162:5 164:10
164:16 165:13
168:13,21
170:18 172:4
174:13 175:9
175:14,16
176:2 178:11
178:16 182:21
184:14 185:2
185:17 189:10
190:15,15
193:1,18
194:20 195:7
196:6,10
203:13 206:16
**general**   1:13
6:9 19:6 22:9
38:22 51:11
58:2 182:15
**general's**   104:7
**generally**   21:5
26:16 29:7
31:18 95:22
107:16 128:16
200:2 204:8
**genuine**   52:7
**genuinely**
177:13 179:2,9
198:10
**getting**   63:17
192:15
**give**   38:16 50:9
56:15 61:22
62:2 77:21
86:6 91:3 96:9
98:6 101:15
106:7 107:10
122:13 138:8

145:18 150:10
187:7,20 189:8
189:16 192:16
192:17 195:4
202:5
**given**   86:21
150:16 190:11
193:17,19
**gives**   190:20
**giving**   107:18
168:8 190:6
191:6
**glintborg**   110:1
124:8,19
130:14 136:17
**go**   9:1 10:15
13:7 18:21
29:15 31:16
49:18 50:7
59:12,13 61:4
61:5 90:16
102:10 130:16
149:5 152:5
162:16 208:20
208:21
**goal**   20:22
21:13 59:3
88:21 144:19
145:2,9
**goals**   144:13
145:6 151:1
156:3,5,17
201:9,16,20,20
**god**   49:6
**goes**   41:13
102:3
**going**   8:16
10:17 21:21

34:10 35:9
47:6 86:12
93:14 101:9,15
102:2,14
110:17 114:9
127:11 129:13
133:12 145:3
155:15 161:2
163:5 165:17
167:8 172:15
172:22 180:16
182:3 190:1,2
191:10,11,12
191:16,17
199:5 206:8
209:14
**good**   6:2 8:4
19:13 27:13
35:3 44:5
46:16 49:13
50:2,8,10,13
50:18 51:7
53:6,9 62:20
63:16 69:21
70:17,18,21,22
71:8,9 72:2
74:14 82:15,15
82:16 85:11
89:18,18 91:20
114:10,12
120:7 153:6,15
167:11 174:5
180:20 190:9
194:3 196:8
**goods**   64:10
**gotten**   63:11
**governed**   82:17
151:7

**governing**
151:10
**graduation**
170:9,15
**grandfather**
19:5
**granted** 180:4
**grave** 200:12
**great** 46:11
167:7 192:12
**greater** 126:18
192:4
**green** 122:5,17
**greenwall**
45:13 166:18
174:3
**grounded**
49:14
**group** 39:12
55:17 56:6
205:4
**groups** 141:22
184:22
**growing**
161:12 164:17
171:14
**guess** 162:20
**guessing** 79:10
**guidance** 99:6
183:1
**guide** 149:21
155:20 191:7
**guided** 84:12
84:16
**guidelines**
148:13,17,18
149:1,8 150:18
154:15,18

155:2,7,8,11
158:1,6 161:4
172:14,14
195:15,17
197:20
**guides** 95:12
**gynecologist**
19:7
**gynecologists**
68:14
**gynecology**
24:17

**h**

**h** 4:5 5:1
**half** 114:16
167:5,9
**hand** 7:15
39:11
**handled** 159:10
**handwritten**
9:9,12
**hang** 141:6
206:5
**happen** 172:17
199:5
**happened**
108:7 174:5
**happening**
172:2
**happy** 162:12
**hard** 9:8 89:16
**harm** 113:6
202:7
**harmful** 193:1
**harms** 108:22
109:5 112:22
113:1 116:8

137:2 177:2
191:17 192:8
**harvard** 38:11
**hastening**
53:16
**head** 36:14
**headline** 165:2
**heal** 189:5
**healers** 84:10
**health** 5:6
19:14 20:2,18
20:21 22:5,7
22:13 27:21,22
28:3,4 29:14
31:1 34:3,7,8
39:19 47:10,15
47:16 48:4
50:21 51:7,10
54:10 55:8
82:16,22 83:19
84:6,6,8 90:3
90:10,19 91:14
104:22 109:5
112:22 123:11
124:13,22
125:6 126:4,9
126:14 128:19
128:20 129:7
130:3,18 131:1
131:1,8 133:18
133:22 134:4,5
134:6,8,9,10
135:21 137:3
139:10 140:16
141:13 142:2
143:18 147:2,6
147:22 153:11
153:16 191:7

192:11 193:17
193:20 200:13
201:16,19
202:9,12,15,16
202:20,21
203:4,5,9,14
203:16,17,19
203:22 204:5,7
**healthcare**
31:5 49:2
126:19 150:21
155:9 156:15
195:18,22
**healthy** 90:15
91:15 92:22
93:2 109:3
112:18 137:13
137:17,21
138:1 141:11
142:3,8 145:13
146:8 191:20
191:20
**heard** 48:3
151:21 174:14
**hearing** 7:13
**held** 20:5,6
**help** 29:15
31:10 59:4
69:16 191:12
**helpful** 52:8
160:17 202:10
**helping** 39:6
**hereto** 210:15
211:11
**hhs** 182:7
**hhs0169973...**
181:20

hidden 128:12
higher 191:14
highlighted
10:9
highlighting
95:9 143:21
hilary 174:1
hill 17:17,19
18:17,20
hippocratic
68:4,6,8,17
69:6,11,14,17
69:19,20 70:16
70:18 71:19
206:9,10,14
hired 104:3,6,8
history 35:17
45:21 52:14
166:22
hoc 41:11
holds 200:14
hon 1:11 3:11
honorable 6:8
honoring 72:14
hoops 61:16
hope 180:8
hoped 136:10
191:16 192:10
193:15
hopes 203:16
204:13
hormonal
138:19 139:11
139:14
hormone 4:18
5:11 113:9
122:7 126:5,7
129:8,10

137:16 141:3
141:16,18,22
142:9,10,11,12
142:17 182:20
185:17
hormones 5:4
13:19 14:11,12
14:21,22 15:7
43:8 44:5 54:6
58:13,15 66:4
67:10 87:3
91:13,16 97:15
111:12 112:17
123:10 137:12
138:20 142:4,5
142:14,19
145:7,10
hospice 39:20
39:21 40:10,12
40:15,17
hospital 57:22
61:19
hospitalization
67:20
hospitals 51:4
58:3
host 192:13
hot 166:19
hour 61:5
114:16 167:5,9
housing 3:6
hubris 76:1
human 19:9,14
50:18 72:5
78:10 82:15,15
89:14 90:18
111:10 143:19
143:19,20

190:1
humanities
19:10,16 45:20
166:22
humanity 49:5
humans 72:5
87:14,16
hypercholest...
56:20
hypertension
56:19
hypothetical
86:9 88:15

**i**

i.e. 138:20
idea 15:3 50:14
154:3 191:12
ideally 201:18
ideas 37:1,2,22
identification
15:13 16:21
78:21 119:7
120:17 122:11
123:14 163:2
185:20 187:2
identify 7:7
15:2 22:21
identity 14:9
18:5,7 22:18
22:22 23:4
25:17,19 55:11
90:22 151:1
156:18
ideological
172:11
ignored 157:12

ignores 201:7
illness 27:3
40:5,9
illnesses 27:9
28:10
image 49:6
96:11
imagine 57:8
86:6 189:20
immanuel
198:9
immigration
49:4
immoral 92:13
impair 5:15
186:21
impaired 109:3
111:20 112:1
112:14
impartial
158:9
implications
108:5 189:7
194:17
implies 12:18
imply 73:22
143:4 144:3
200:5
import 35:21
importance
72:14 150:10
152:2 155:21
important 63:2
63:4 72:3,18
73:3,19 76:9
81:22 94:20
143:20 158:18
164:6 172:14

173:1 195:18
**impose** 191:17
**imposing** 95:7
**impossible**
187:20 199:13
**imprecise**
14:17 44:16
**impression**
118:20 170:13
**improve**
126:11 129:5
164:8 202:16
**improved**
131:5
**improvements**
203:22 204:14
**improves** 147:6
**improving**
162:10 164:2
203:17
**inaccurate**
80:6
**incapable**
111:5
**include** 26:17
27:21 113:2
116:1,8 125:15
127:9 134:9,10
143:18 160:18
175:11,19,20
177:6
**included** 22:12
23:20 51:13
79:21 125:18
136:16 152:16
159:19,20
176:5,15 197:3
197:3

**includes** 25:5
27:22 40:21,21
69:14 75:1
116:6 134:7
136:18
**including**
23:14 38:18
49:3 52:7
68:10 87:11
96:6,15 134:4
154:20 177:2
183:13
**incomplete**
88:14
**incongruence**
125:17
**increase**
127:21
**increased**
113:7 125:22
128:2 139:18
**indefinitely**
137:16
**independent**
106:21 107:4
113:16 121:21
147:2 148:1
149:20 155:12
155:19 157:5
180:10
**independently**
123:2
**indicate** 72:7
111:18 156:12
199:3
**indicated** 16:4
33:21 86:22
184:20

**indicates** 137:1
149:19 155:17
**indication**
128:9 204:5
**individual** 67:9
91:9 92:15
141:15
**individually**
205:3
**individuals**
85:10 125:16
137:17 145:7
157:17 202:14
203:3
**induce** 142:22
145:10
**induced** 142:11
142:14
**induces** 141:3
141:10 142:5
142:17
**inducing**
142:10
**inferior** 177:5
**infertility**
111:13 139:17
**influence** 89:2
198:15
**influenced** 20:8
49:16 88:17
**information**
106:11 187:21
190:9,11
192:16,17
193:17,20
**informed** 73:20
73:22,22 86:14
105:3 107:12

107:13,15,21
108:9,12,15,18
187:22 188:13
188:18 192:18
192:21 195:4
196:12,19
197:3,14 199:7
199:9
**initial** 184:6
**initially** 169:22
**initiate** 140:4,5
**initiated**
138:21
**initiation** 126:5
126:12,14
129:8
**injured** 20:19
**injuries** 84:6,8
**injury** 188:9,15
202:12
**inner** 48:7
**innumerable**
41:20
**inpatient** 28:12
**input** 99:13
**inquiries**
182:18
**insofar** 14:17
20:3,19 37:1
51:19 66:9
71:10 72:4
78:8 84:13,17
85:18 88:19
89:1 90:14
91:15 123:21
126:17 145:12
146:13 157:9
157:11 183:11

186:13 189:18
191:19 198:12
199:8 200:17
202:10
**instance** 78:3
86:9 107:20
144:18 158:4
165:16 172:6
183:20 188:6
188:17 202:20
**instances** 98:2
203:2
**institute** 37:5,9
138:7
**institutional**
99:2,4,7,13
181:10
**institutions**
38:15 50:16,17
51:8 53:5,6
**instruct** 86:12
101:3
**instructed** 5:18
102:12 121:22
**instructing**
86:10
**instruction**
101:16 103:6
**insufficient**
147:5
**insurance**
40:18,19 160:9
160:12
**integrity**
150:20 197:21
**intellectual**
195:3

**intellectually**
19:15
**intended** 6:21
38:2 125:15
169:3,5
**intends** 116:7
**intense** 161:13
164:18
**intentionally**
111:13
**interact** 200:19
**interest** 19:15
35:2 38:20
152:18,22
157:4,7,12,18
158:6,7,14,17
158:19,22
159:3,6,7,10
159:14,17
160:5,21
**interested** 31:7
34:19,22 76:18
77:18 210:15
211:12
**interesting**
19:15 35:5
**interests**
156:22 161:3
**internal** 24:16
25:9 26:5,7,8
26:20,22 27:1
27:13 28:2,5
38:22 54:21,22
56:5
**international**
177:12 194:10
**internist** 47:9
56:1

**interpretation**
155:21 184:7
**intervenor** 1:9
3:2
**intervention**
62:19 63:2
74:2,16 91:2,3
131:19,21
133:19,20
135:3,6 144:19
153:6,7,8
158:10 175:17
175:19 176:10
176:20 177:2,7
180:6,8 188:20
190:1,4 191:3
191:4,6,19
192:7,12 194:1
200:14 201:1
**interventions**
15:5 78:9
81:14,16 83:18
137:4,10 138:3
139:11,15
144:13,17
145:2 153:15
193:5,10
**intrinsic** 20:1
85:6
**intrinsically**
19:4
**introduce**
15:20,22
**introducing**
35:19
**introduction**
18:2

**investigate**
27:10
**investigative**
161:12 164:13
**investigator**
31:17,20
**investigator's**
181:19
**investigators**
31:14 180:6
182:18
**invitation**
184:1
**invite** 60:3
**invited** 19:11
77:21 183:22
**involve** 22:5,18
23:11 83:19
102:6 170:17
**involved** 14:18
59:14 60:4,11
66:22 68:22
69:5,16 72:11
99:15 104:12
108:2 158:1,22
160:13 182:19
**involvement**
69:13
**involves** 27:5
112:16,16
144:2 152:12
152:14 201:5
**involving** 23:18
64:17 158:16
**irb** 180:9
183:19,21
**irbs** 179:15,20
179:20,21

180:3
**irreversible**
137:2 139:16
**islam**  64:14
**isolated**  174:4
**issue**  42:7,13
44:12,20 80:5
107:15,19
110:20 148:13
148:16 173:8
174:8 195:16
203:14
**issued**  148:13
148:19 149:8
**issues**  36:1,2
44:18 59:5
100:13 107:19
**it'll**  93:20
173:5
**items**  107:7

**j**

**j**  76:13
**jack**  123:19
**jail**  47:18
**job**  1:22 2:7
166:7 173:9
**johnson**  30:10
30:13,19 34:6
**join**  39:12
**joined**  33:12
**journal**  116:21
**judaism**  64:14
**judgment**  27:5
40:13 62:10
74:16 81:18
82:3 87:2
88:16 92:19

95:3,15 106:8
134:2 146:14
149:21 155:13
155:19 158:9
164:8 175:15
177:3 179:15
180:3,5 189:9
199:2
**judgments**
59:5 70:22
71:1 85:8 95:1
108:5 159:1
199:4
**jump**  61:16
**juncture**  47:18
**june**  170:3
**jurisdiction**
81:16
**justice**  3:5
**justified**  63:22
**justifies**  180:4
**justify**  76:7
104:22 147:5
153:7 194:11
**justifying**
204:19

**k**

**k**  129:16
**kaltiala**  110:2
129:14 136:17
174:1
**kant**  198:9
**karolinska**
138:7
**keep**  36:14
108:11

**keeping**  171:20
**kept**  172:15
**kerfuffle**
170:14
**key**  15:3 35:19
35:20 80:17
154:5 162:10
164:1 176:20
**kidney**  56:21
**kill**  95:6
**kind**  31:10
51:8 63:22
77:3 84:4
90:17 91:4
98:15 107:16
137:22 153:9
170:13 172:10
173:9 176:8
188:20 189:11
189:13 202:11
**kinds**  35:22
160:19 173:10
193:12 204:10
**know**  8:10,22
12:11 17:2
18:1 22:21
25:8 43:8 44:7
46:6 48:16
49:18 50:11
53:2 54:9,11
54:15 57:15
64:13 65:14
68:20 69:10
79:13,22 86:17
87:6,6 88:5
92:18 98:12
105:18 111:10
111:16,17

116:13 118:7
118:11,17,21
119:9 120:3,20
129:13 132:8
134:1 136:16
139:5,7,13
140:3 142:11
142:13 146:21
148:16,17
150:6 154:17
161:1 163:10
163:10 178:21
179:2,6 180:7
187:4 188:11
189:8 192:12
197:16 202:17
209:9
**knowledge**
20:6 32:21
68:9 100:10
114:6 115:13
115:18 116:6
123:5 137:15
140:19 142:18
155:7 166:11
169:5 187:12
189:4 197:15
210:10 211:6
**known**  12:13
61:19 81:20
108:22 115:21
138:3 173:19
**knows**  209:15

**l**

**l**  129:16,16
**label**  163:6

labeled 163:5
lack 57:13 86:1
 90:6 113:3
 132:6 188:2
laid 183:16
laidlaw 103:12
 104:21 105:7
 106:14 107:6
 108:21 109:10
 109:15 110:3
 111:18 113:14
 113:18 114:5
 115:15 116:10
 117:12 118:16
 118:18 121:6
 122:1 123:3
 124:1 136:8
 137:1,8 147:11
 147:21 148:11
 148:22 157:11
 157:20 159:9
 179:7 186:14
 187:13 194:6
 204:3
laidlaw's 106:4
 106:11,12
 110:4 112:6
 149:11 156:21
 157:15 159:18
 193:8
language 22:20
 23:1 44:15
 50:5 150:10
 154:1 201:7
lansdowne
 3:15
large 82:18
 83:21 131:22

136:13,18
late 167:4
law 21:16 62:7
 81:15 82:18
 153:16 198:11
 198:20
lawndale 34:3
 34:7 47:9,14
 47:16,19,19
 48:4 51:6,10
 54:10 55:7,22
laws 7:1
lawyers 10:11
layperson
 107:18
lcb 1:8
leader 42:19
leading 139:13
learn 31:12
learning 36:8
 39:12 48:8
leave 108:7
lectures 197:8
led 48:4
leg 191:11,16
legal 35:21
 73:5,12 74:7
 74:12,16
legitimate
 52:19
letter 181:18
level 141:22
 142:13 152:15
 173:21
levels 141:3,10
 141:16,19
 142:5,10,11,17

library 79:16
life 20:7 39:5
 63:15 68:14
 89:14 137:3,9
 137:18 190:1
 198:18
lifelong 137:22
 194:17
lifetime 113:3
light 138:17
 164:17 175:15
likely 133:20
 181:12 194:2
 200:14
likewise 25:8
 42:14 78:9
 99:11 117:12
limit 63:8
 139:6
limitations
 139:20
limited 41:13
limits 39:5
 72:10
line 5:19 21:1
 141:7 146:10
list 42:5 55:21
 57:1 100:17
 104:10 113:2
listed 32:20
 33:22 42:2,4
 46:1 75:15
 78:3 101:2
 102:21,21
 103:4 110:10
 113:19 143:3,9
 143:11 181:19
 197:5

literature
 106:9,18
 107:11
little 24:22
 98:14 114:17
 125:19
live 40:14 48:6
 48:10 61:7
 90:1 198:18
lives 48:9 173:1
located 47:15
 47:17 187:4,5
location 2:4
logically 95:10
long 8:22 20:5
 21:16 30:15
 65:4 77:14
 95:6 114:2
 137:3,9 151:9
 152:9 176:7
longitudinal
 27:6 119:20
look 32:12
 45:15 46:7,13
 75:16 78:16
 79:5 80:20
 94:12 123:2
 124:16 125:8
 182:16 185:12
 202:3
looked 158:8
 197:7
looking 82:7
 83:7 104:9
 116:7,8 163:20
looks 47:8
 76:21

Farr Curlin

April 8, 2024

**lose** 166:7,9
**lot** 135:8
193:11
**lots** 21:4 204:9
**love** 48:17
**lunch** 91:20
92:3 114:9,14
140:9 167:4

**m**

**m.d.** 2:1
**maclean** 34:13
34:15 35:11
36:10,11,14,15
36:17,21 76:14
77:16
**made** 18:21
21:7 26:20
29:17,21 30:2
35:20 40:8
49:6 50:4 56:2
72:8 76:15
93:5 94:17
97:1 134:18
152:1 164:10
182:18 208:1
**major** 27:18
77:21 132:3,8
**make** 10:15
13:9 16:12
17:12,14 29:18
33:16 49:19
50:1 59:5 62:8
62:9,16 70:22
74:4 79:10
80:7 81:13
83:16 87:18
92:19 95:1

103:16,22
109:20 112:17
112:18 116:19
143:16 147:9
150:4 153:1
162:20 167:9
175:15 176:13
177:11 180:10
182:5 188:13
188:17 192:2
196:1 199:4
200:1
**makes** 20:16
50:2 74:15
84:2,9 171:12
187:19 190:5
**making** 73:1
85:4 108:4
144:8 151:5
152:3 164:14
177:22 200:9
**male** 67:3
87:15,17 90:17
113:6
**males** 142:19
**mammals**
87:17
**manage** 158:20
159:3 160:22
**manipulating**
203:15
**manner** 7:2
27:17,19 51:13
56:12,13 71:3
**manual** 143:4
**map** 28:13
**marci** 113:4

**marginalized**
49:1
**margins** 25:1
**mark** 15:10
16:8,17 17:6
35:13 78:15,18
119:2 120:12
122:5 123:9
162:16 173:3
185:14 186:6
186:18
**marked** 15:12
15:18 16:13,20
78:20 119:6
120:16 122:10
123:13 163:1
163:20 173:7
185:19 187:1
207:10
**marking** 15:14
**marks** 143:5
**marshall** 1:11
3:11 6:8
**match** 150:22
156:15 173:20
**matched**
141:22
**materials**
100:17,20
101:2,7,13,18
102:16 103:4
110:11,14
**matter** 6:7 8:6
**matters** 177:20
**maturation**
111:11,12
112:8,9,12
190:5

**mature** 26:15
39:10 54:19
**maturity** 195:4
195:19 196:4,4
196:9,9
**mcclean** 99:10
**mcnamara**
205:9,14
**mean** 11:3,18
22:22 25:18
50:10 58:17
65:14 72:20
78:5,7 79:12
84:21 93:9,11
96:22 97:8
100:1 102:13
107:13,14
109:18 110:18
111:2,4,16,20
112:1,21
115:17,20
117:8 119:17
123:1 127:20
133:16 137:9
141:9,10
143:13 144:15
144:17 157:10
169:10 171:17
171:18 173:14
178:19 187:6
189:4 197:6
198:21 201:12
201:13 204:4
207:14
**meaning** 49:10
107:14,15
123:2 156:7,8
166:14

**meaningful**
  19:4
**means**   7:3 11:5
  50:14 148:16
  198:7 200:3
**meant**   100:16
  156:12
**measure**   125:6
  130:3
**measured**
  130:11,17
  131:10
**measures**
  126:3 129:6
  158:20
**medicaid**   51:5
**medical**   12:2
  15:5,5 18:16
  18:18,21 20:12
  20:13,14,16,17
  21:1,4,6,7,8,12
  21:12,22 22:19
  23:2,14 24:2,3
  24:15 25:4
  26:2,4 27:11
  34:13,16,20
  35:8,11,17
  36:1,8,22 37:2
  40:20,20 41:2
  41:6,8,11
  49:14 50:16,17
  50:19 51:8,20
  52:7,19,20
  53:4,5,10
  57:10,15 59:16
  60:15,16 64:1
  67:7 68:10,10
  68:11 71:11

72:19 73:1,17
73:18,21,21
75:1 76:1,14
76:19 77:14,16
77:17,21,22
80:13,17 81:12
82:1,3,10
83:15,18 84:2
84:3,15 85:2,7
85:19 87:4
88:22 92:22
94:22 95:16,17
99:11 106:19
107:11 116:2,3
116:6 117:18
121:16 125:10
125:16 132:4,8
132:10,16
136:6 137:4,10
137:22 142:18
144:4 151:3,5
152:3,11
153:10 157:13
158:10 160:12
165:11 169:6
170:7 171:14
173:18 185:2
194:20 197:2
199:14 200:10
200:12 201:15
201:19 202:8
203:4
**medicalization**
  14:10 45:17
**medicalized**
  13:12 14:19
  15:3 45:17
  66:6 75:2,13

76:8 78:8
88:17 90:10,15
97:17 98:10,21
100:14 105:1
108:14 115:22
116:9 117:21
118:4,9 125:20
126:1,10,12
128:3 130:15
131:5 132:17
133:3 135:11
135:18 136:9
140:5 142:4,20
142:21 160:3
160:10 164:16
175:14,16
182:21 189:10
190:15 196:10
203:12
**medically**
  29:10 63:4
  131:19,20
  133:14,16
  134:12,18
  135:4,5,12
  144:6 164:3
  200:7,21,22
**medicare**   40:18
**medication**
  137:18 203:7
**medications**
  125:22 126:18
  126:22 127:20
  127:20 128:2
  202:21 204:15
**medicine**   4:9
  14:18 19:11,21
  19:22 21:13

22:9 24:16,17
25:9 26:5,7,8,9
26:20,22 27:1
27:13 28:2,5
31:2,13 32:15
34:22 35:4,4
36:4 38:16,17
38:19,21,22
39:5,9,15,16
39:17 40:2,6
40:11,21,22
41:12,20 44:16
44:18 45:21
48:9 50:2,8,10
50:20 51:7
52:13 53:9
54:21,22 55:20
56:5 58:2
62:21 63:16
67:2,17 68:4,6
68:8,17 69:7
69:11,15,22
70:17,19,21
71:4,8 72:2,13
75:3,4 77:22
78:6,13,18
80:17,20 81:2
81:3,11 82:5,7
82:8,9,10,11
82:12,13,13
83:2,4,8,22
84:1 85:3,7
86:20 87:12
90:3,9 116:21
151:4 154:7
159:15 166:22
168:12 171:3
172:15 198:4

199:3 200:14
**medicine's**
20:1
**meeting** 45:5
45:12
**meetings** 44:17
44:22 45:5,10
45:11 46:14
166:12
**member** 68:18
68:19 99:10
**members** 20:11
70:12 76:17
77:17 141:16
157:1,7 190:16
**membership**
70:13
**memberships**
68:21
**memories** 30:6
58:7 67:1
**memory** 23:13
35:7 55:9 57:4
58:8,10,14
66:21 108:1
122:21 133:10
**mental** 5:5 22:5
22:7,13 27:21
27:22 28:3,4
104:22 123:11
124:13,22
125:6 126:4,9
126:14,18
129:7 130:3,18
131:1,1,8
134:4,8,9,10
143:4,12,18,22
144:1 147:6

150:19 192:11
197:21 202:9
202:16,20
203:3,4,14,17
203:19,22
204:5,7
**mention** 77:20
129:14 165:11
168:7
**mentioned**
53:2 75:7,21
76:20 93:4
159:14 195:21
**mentors** 31:8
32:11
**mercenary**
85:5
**meredithe**
205:8,14
**met** 10:7
192:14,14
**metaphor**
171:20
**method** 209:7
**methodologi...**
31:11
**methodologies**
37:15
**methods** 37:6
37:10,17 38:2
159:3
**mgt** 109:1
111:7 112:13
117:14 131:18
136:21 137:1
141:2 142:17
143:5 147:4,6
150:15,16

153:19 161:13
171:15 177:14
177:15 179:3,4
179:10,11
194:17 204:20
**mice** 5:16
185:5 186:22
**michigan** 6:13
37:10 168:8
169:6 174:6
210:22
**mid** 43:2
**middle** 1:2
**mile** 49:18
**mind** 57:16
66:20 98:7,14
121:12 131:15
202:2,18
**minimized**
149:19 155:18
**minimizes**
155:11
**ministrations**
20:13
**minor** 156:3
194:19 195:2,6
**minority** 54:20
**minors** 98:1
105:2 121:15
136:21 137:1
139:11,15
143:6 147:4
149:22 151:6
152:4,9 155:20
164:3 166:20
179:5 187:20
194:15 196:8
196:13,19

197:4 204:20
**minute** 46:6
93:14,15,16
**minutes** 46:17
46:17 91:19
114:18,20
167:13 180:17
206:19,21
**mission** 48:13
48:15
**misspeak**
109:21
**mistaken** 194:7
**mixture** 77:15
**model** 5:10
81:5,6,7,9,10
83:2 84:12
88:8,10,18
89:3 185:16
198:16
**models** 80:19
80:22 81:4
83:1 185:1
**modern** 198:14
**modify** 209:4
209:10
**moment** 24:19
79:5 96:9
103:9 119:8
122:13 127:15
131:9 137:20
138:8 186:2
207:20 208:5
**monday** 2:2
6:10
**months** 8:15
40:14 59:11
60:18,20

**moral** 72:6
82:14 89:14
198:20
**morality** 20:4
51:1 71:7,10
71:14 82:18
83:21 85:1,4
87:9 89:6,12
89:18 95:12,19
198:12
**morally** 73:6
73:10 74:8,13
**morning** 6:2
8:4 206:9
**motivated** 49:4
80:11 161:3,6
206:15
**motivation**
35:1 48:21
**mouse** 5:10
185:1,16
**mouth** 171:19
**mouths** 171:21
**move** 47:6
206:4
**moved** 32:7
**moving** 30:8
113:10 116:18
136:20 145:15
146:20 165:6,7
187:15 194:14
**multiple** 14:21
41:13 109:5
112:22 126:2
128:4 190:18
194:9
**murphy** 3:4 4:3
7:8,8 8:1,3,5

15:10,14,22
16:2,16 17:1
46:12,15,20
47:5 78:17
79:3,12 80:2
86:8,16 91:21
92:2,6,9,12
93:13,19 94:1
94:7,8,13,15
101:6,9,17
102:5,13,19
103:7 110:22
111:1 114:7,15
114:19 115:1,7
115:8 119:1,9
119:13,14
120:5,6,11,18
122:4,12,15,18
123:8,15 127:3
127:10,18
129:16,18
134:21 140:12
140:13 162:15
162:19,22
163:6,10,16,19
165:4,5 167:8
167:12,16,22
168:1 177:21
178:1 180:14
180:20 181:5
182:8,11
185:13 186:1,4
186:7,17 187:3
205:19 206:18
207:6,7 208:9
209:1,13
**mutual** 80:15

**muzzle** 171:18
**muzzling**
171:13,17,18

**n**

**n** 3:1 4:1 6:1
**name** 6:2 8:5
69:14 165:17
**names** 42:16
148:4 173:15
**naming** 173:15
**narrowed**
182:13
**national**
139:10 140:16
**nationwide**
124:14 125:1
**natural** 82:18
**nc** 2:5
**near** 46:10
**nearly** 206:18
**necessarily**
45:1 128:17
153:15
**necessary** 63:4
80:10 131:19
131:20 133:14
133:16 134:12
134:18 135:4,5
135:12 195:7
200:21 201:1
204:18 207:22
**need** 8:19,21
15:15,19 17:2
50:6 52:8,20
65:22 89:5
93:14 124:16
130:11,15,20

131:4 150:21
156:14 179:12
201:3
**needed** 51:20
67:7
**needs** 67:17
150:22 156:16
160:21,22
201:8,15,16,17
201:19,19
**negative** 126:3
129:7 135:21
**negotiate** 39:6
48:11 201:4
**neighborhood**
48:7
**neighborhoods**
47:20
**neither** 210:11
211:7
**neurological**
109:4 111:21
112:1,10,14
**never** 29:17,21
79:18 93:5
94:17 123:6
157:22 163:10
183:18,21
187:9 194:19
203:8
**new** 116:21
150:18 189:13
197:20
**news** 184:6
**ngt** 13:12,16
**nice** 148:7
**nichole** 211:2
211:17

non  23:8 26:9
  33:19
nonbinary  4:21
  122:8
norm  95:6
normal  141:18
  141:21,22
  142:8
normally  142:6
  145:3
norms  64:9
  66:7 68:16
  84:18,19 87:11
  87:12 91:15
  137:22 191:7
north  6:11
  18:19 47:19
  65:2,7,11,17
northern  1:3
notary  6:12
  210:21
notations  9:9
  9:10
note  10:9 60:9
  60:13,17
  128:11 156:13
  158:19 184:13
noted  8:5 90:12
  90:13 92:17
  106:1
notes  9:12 10:9
  105:10 206:20
noticed  108:7
  156:4
notion  81:19
  93:5 94:17
notwithstand...
  152:20 167:4

172:9
november
  100:3
number  24:10
  32:18 33:9,11
  49:17 66:7
  75:18,19,22
  76:21 78:4
  83:9 86:22
  95:10 107:7
  120:12 127:9
  127:20 130:17
  131:11,12
  136:19 164:2
  198:6
numbering
  163:3
numbers  33:17
nurses  48:22

**o**

o  6:1
o'clock  140:11
oath  8:18 86:6
  86:13
oaths  6:13
objection  6:16
  7:14 12:15
  14:15 21:11
  30:3 44:1 45:3
  53:1 55:3
  57:13 65:12
  66:18 69:8
  73:14 86:1
  88:4,14 89:9
  90:6 92:16
  95:13 98:5,11
  101:3 103:2

104:5 109:11
  111:9 113:21
  115:19 116:5
  116:12 120:1
  127:1 128:10
  129:3 132:6,13
  132:21 133:8
  134:14,20
  139:1 140:1,17
  148:2,20
  154:11,16
  160:15 164:12
  169:14 177:17
  185:8 195:9
  207:13,19
  208:2
objections
  174:10
objective  89:12
  89:13,21 137:2
objectively
  19:13 146:8,14
obligated  74:2
  88:11,22 94:22
obligation
  21:15 81:13
  86:15 153:13
obligations
  59:6 71:6
  74:18 181:12
  183:16
obliged  74:5
observation
  121:19
observed  19:4
observer
  107:21 108:12

observers
  105:3 107:13
  107:14 108:9
  108:15,18
observes
  107:12
obstetrician
  19:7 68:14
obstetrics
  24:16
obtain  195:14
obtained  17:16
  17:18
obtaining
  196:12
obvious  180:3
obviously  62:5
  174:17
occasionally
  144:14
occasions
  20:13 26:19
occur  99:19
occurred  33:19
  171:22
odds  10:22
  14:9 15:1 93:3
  97:11 146:5
offer  84:5
  86:12 191:3
  192:5
offered  53:4
  63:12 86:3
  104:21 108:21
offering  136:5
offhand  121:7
office  104:7,8

Farr Curlin

April 8, 2024

| | | | |
|---|---|---|---|
| **officer**  210:1,2 | 141:2,6,8,9 | **once**  129:21 | **opinions**  60:10 |
| **official**  1:12 | 142:7 143:8,13 | **one's**  10:21,22 | 86:4,13,14 |
| 6:9 | 144:8,12 | 14:8,9 15:1,2 | 95:12,14 |
| **oh**  33:3 71:20 | 145:15,20 | 42:5 53:16,16 | 103:15 104:21 |
| 206:5 | 146:16,20 | 71:13 144:2 | 105:22 108:21 |
| **okay**  8:16 9:13 | 147:1,14,17,22 | **ones**  73:2 | 110:9 152:21 |
| 10:1 12:21 | 148:12 149:7 | 105:15,17 | 153:2 |
| 16:16 17:15 | 149:16,18 | 160:18 204:2 | **opposed**  43:16 |
| 23:10 25:2 | 150:6,12 | **ongoing**  137:15 | 43:20 52:21 |
| 26:17 27:15 | 151:21 152:6 | **online**  94:12 | 73:10 74:8,13 |
| 30:8 31:22 | 154:9 156:1,4 | **onus**  192:4 | 154:19 176:14 |
| 33:8,13,16 | 156:19 157:5 | **open**  71:2 79:7 | 176:19 |
| 34:10 36:12 | 157:16 159:4 | 81:18 171:13 | **opposite** |
| 37:4 44:7,11 | 160:11 161:20 | **opening**  69:3 | 145:14 |
| 44:22 46:1,6 | 161:22 162:4 | 171:21 | **option**  49:9 |
| 46:15,20 47:6 | 162:19,22 | **opine**  91:10 | **options**  49:15 |
| 57:20 60:21 | 163:20 165:6 | **opined**  100:8 | **order**  15:15 |
| 75:17,21 78:5 | 167:2,12 168:6 | 100:10 | 64:6 102:22 |
| 80:9 92:2,6,11 | 168:16 169:7 | **opinion**  83:4 | 109:15 120:8 |
| 93:19 94:2,16 | 169:18 170:4 | 86:7 89:4 | 164:7 189:7 |
| 97:14 98:2 | 170:16,22 | 90:20 106:5,7 | 202:15 207:22 |
| 100:15 104:18 | 171:5,8,11 | 107:10,18 | 209:4,9,12,14 |
| 105:12 108:19 | 172:3 175:2 | 108:13 110:15 | **ordered**  50:2 |
| 110:7,17 | 176:12 177:8 | 128:14 134:12 | **orders**  208:22 |
| 113:10 114:15 | 177:10 178:6 | 135:20 136:2,5 | **ordinary** |
| 114:19 115:11 | 179:14 180:9 | 136:7 142:16 | 137:13 138:1 |
| 115:12 117:7 | 180:14 181:6,9 | 144:10 148:18 | 189:15 203:19 |
| 117:11 121:12 | 181:15,21 | 153:5 155:10 | **organism** |
| 122:4,16 123:6 | 182:8 183:3,6 | 157:16,19,21 | 90:18 |
| 123:8,20 124:3 | 184:10,13 | 158:3 159:4,8 | **organization** |
| 124:7,11 125:2 | 186:2,11,17 | 178:13 179:18 | 68:18,19,21,22 |
| 125:9,13 | 187:9,14,18 | 184:8 188:13 | 69:13 70:2,3,4 |
| 127:10 128:6 | 194:14 200:8 | 188:16 192:20 | 70:8 |
| 130:7 131:14 | 201:22 202:5,5 | 194:19,21,22 | **organization's** |
| 131:17 132:3 | 205:5,20 206:8 | 195:22 196:7 | 69:3 |
| 136:5 137:9 | 208:9 209:11 | 200:8 202:7 | **organizations** |
| 138:10,13 | **old**  63:13 | 205:20 207:11 | 68:10,15 |
| 139:5 140:21 | | 207:15,15 | |

**organize**
172:20
**organized**
40:11,16
**organizer**
169:2,7
**organizers**
168:17
**organizing**
40:20
**orgasm** 113:3
**original** 198:19
**originally**
99:16 163:16
**osteoarthritis**
56:21
**osteoporosis**
113:8 139:17
**ought** 35:5
71:11,12 90:1
97:2,2
**outcome** 4:11
119:4 124:4
130:13 210:16
211:12
**outcomes** 4:14
5:6,10 120:13
123:11 136:10
147:6 176:9
185:16 193:14
193:15 203:17
**outline** 91:12
**outlined** 92:20
**outpatient**
28:11 54:13
55:20 56:8
67:19

**outset** 183:22
**outside** 159:16
**overcome**
151:13
**override** 63:5
**own** 10:22
30:22 55:14
60:7 71:13
83:19 95:11
105:6 107:9
108:4 118:20
149:18 155:17
157:14 190:6
190:13,21,22
198:18,22,22

**p**

**p** 3:1,1 6:1
**p.m.** 115:3,5
167:18,20
180:22 181:3
207:1,4 209:19
209:21
**packed** 73:7
**page** 4:2,6 5:2
5:19 33:13,15
33:17 59:21
75:18,19,22
76:21 80:10
94:9,16 100:16
100:16 102:21
110:10 120:3
124:12 127:9
138:16 143:1
181:6,9 194:14
194:14
**paged** 61:21

**pages** 79:10,11
79:20,21
**paginated** 80:1
**paid** 40:11
140:16
**pain** 56:17
**palliative** 38:8
38:10,15,17,18
38:20 39:9,15
39:16,20,21
40:2,6,21 67:2
67:17
**paper** 33:8,9
**papers** 197:13
**paragraph**
46:13 94:16
96:4,13 100:15
103:8,9 104:18
107:4 108:19
109:16 110:15
112:4,21 113:2
113:10,11
115:9,12
116:18 117:11
121:13,13
124:6 129:12
131:14 133:13
136:12,20
138:5,6 139:2
139:4 140:22
141:2,4,5,7,8
145:15 146:11
146:20 148:12
149:16 150:12
151:19 155:15
156:14,20
161:8,10
163:22 165:7

168:2,7 171:12
174:22 177:8
178:13 179:14
184:10 187:15
197:16 201:6,6
201:22 204:16
**paragraphs**
17:8 165:10
202:4
**parallel** 191:18
**paraphrasing**
184:15
**parental**
189:19
**parents** 153:19
153:21 154:3
187:20 188:13
188:17 189:15
191:1,6 192:16
192:20 193:17
195:14 196:12
**parkway** 3:14
**part** 22:8 24:2
24:3 25:1
35:15 37:2
50:18 52:14
59:3 60:15
65:2,4,6,17
72:5 84:21
99:9 114:10
138:14,16
139:2,3 179:21
182:20
**participants**
35:20 125:6
130:3
**participate**
53:11 61:6

Farr Curlin

April 8, 2024

65:15
**participated**
37:5 38:7
41:18 183:18
**participation**
158:5
**particular**  17:7
29:8 30:6,7
35:1 39:17
49:10,10,11
58:7 61:13
62:10,10 73:11
77:18 81:16
82:15,16,19
86:5 87:1,5
88:3 91:3,4
98:3,9,13,15
99:14 107:20
133:14 134:11
134:17 135:6
153:6 157:22
169:12 188:20
188:21 194:21
195:4,16
**particularities**
86:21
**particularly**
19:9 23:8 25:9
39:4 97:22
112:16 118:22
138:2 151:1
156:17 160:18
179:4 192:2
198:9 199:6
201:14
**parties**  6:14,17
210:12,14
211:8,11

**partner**  63:14
**pass**  171:8
**past**  104:4,8
**path**  22:9
**patient**  21:14
25:13,16 28:7
28:16 51:13
53:8,12 54:4
57:11 58:15
62:5,17 63:6
67:1,6,7,17,20
71:17,18 72:13
73:12 74:2,4,7
74:11,15,17,19
78:11 81:18,19
81:21,21 83:14
87:22 88:6,12
88:20,21 90:17
93:1,2 95:7
111:4 128:7
133:21 134:3
141:12 149:21
155:20 156:5
189:19 199:8
200:16 201:8
201:15
**patient's**  20:2
27:3 50:21
72:15 89:4
90:19 91:14
133:18,21
156:3
**patients**  21:14
25:11,20 27:6
27:11 28:9,14
28:19,22 29:4
34:7 40:12
43:17 44:6

48:12,17,20
49:1,19 51:9
51:11,12,19,20
51:22 52:4,9
52:17 54:16,20
55:10,12 56:7
56:8,10,12
58:4,7 61:10
63:6 67:21
68:1 71:6
72:19,20,21
83:11 84:8
97:20 98:3,9
125:10,19
126:10 128:22
130:8 134:19
138:21 140:4,6
151:1 156:17
161:14 189:20
191:1 193:22
**patterns**  81:2
**pause**  44:14
**paying**  107:15
**pdf**  79:9
**peace**  93:5
94:17
**pecuniary**
161:3
**pediatric**  63:6
**pediatricians**
68:12 200:17
**pediatrics**  14:7
24:18 132:19
133:2 149:14
155:4,6,7
188:4 196:19
**peer**  33:8,19
74:22 197:11

197:13
**pending**  9:1
**pennsylvania**
163:17
**people**  23:6
37:14 38:14
39:4,4 40:4
45:12 49:13,18
50:15 51:5,6
53:3 54:2
59:14 60:1,3
63:20 77:10,14
84:10 85:5,12
85:13 95:4
107:16 108:1
137:21 142:1
158:11,17,21
160:1 162:10
163:17 164:1,7
171:20 173:16
174:3 198:21
204:10
**peoples**  27:9
64:3
**perceive**  97:11
**perceived**
12:17 15:2
67:3,3 90:22
**perceives**  78:11
93:2 146:4
**perception**
10:21 12:18
14:8,22 15:4
29:11 55:14
88:1,19 97:10
144:2,2 145:17
145:22 146:2
146:12,16

**perceptions**
29:1
**perimenopause**
142:8
**period** 57:21
97:22 140:9
**peripherally**
66:22
**permit** 63:19
**permitted** 6:21
81:15
**permitting**
63:19
**person** 60:13
72:8 91:16
97:8 108:10
145:4,13 146:3
146:9 171:1
198:10,11
202:11
**person's** 91:17
198:17 199:4
202:12
**personal** 93:6
94:18 95:8
104:11
**personally**
94:22
**persons** 32:4
66:15 82:17
84:7 124:14,22
141:11 158:8
**perspectives**
159:16
**persuaded**
194:4
**phenomenon**
12:3

**philosophers**
95:22
**philosophical**
50:11
**philosophical...**
176:13,19,20
**phrased** 199:16
**physical** 90:21
202:9,15,21
203:5,9
**physically**
26:14 54:19
**physician**
19:18 20:11
27:14 28:2
54:14 55:22
56:4,5 57:22
58:1 62:21
67:2,14 73:5
73:10 74:1,5
74:10,15 88:9
90:21 91:6
92:14 111:10
153:9,13
160:11 176:1
**physician's**
74:18 201:13
**physicians**
21:15 32:12,14
35:13 37:21
40:14 48:8,22
51:4 58:19
61:9 62:20
63:1,5 73:2
74:6 83:5,16
84:9 96:6,16
98:17,21 160:3
161:13 164:17

175:6,9,11,20
178:7,15 180:5
191:8 201:2,21
**physiologic**
91:15
**physiological**
204:6
**physiology**
27:4
**physiotherap...**
177:15,18
178:4
**piece** 14:6 31:3
**pins** 171:19
**pioneering**
48:3
**place** 48:1
55:16,19
**placed** 60:9
139:19
**places** 56:4,5
**plain** 150:4
**plaintiff** 1:9
3:2
**plaintiff's** 3:21
**plaintiffs** 1:6
131:18 135:3
135:10 144:22
184:20 190:14
193:3,21
194:22 196:7
204:17 205:5
205:21 208:15
**plan** 160:22
182:19
**plane** 168:19
169:19,20

**play** 48:19 71:7
71:17 72:1
153:3 200:9
**please** 7:6,15
31:15 32:22
37:12 94:9
104:19 120:20
123:17 131:15
140:21 149:16
150:8 168:3
**plenary** 69:2
**plus** 78:8
**point** 12:2 20:8
24:1 32:22
33:1 35:8
37:20 39:2
70:14 72:18
89:22 112:3
114:8 116:22
118:13 119:1
120:11 126:20
127:7,8 135:2
135:9,10 184:2
187:6,8,14
201:21 204:11
207:22
**pointing** 95:4
155:14
**policies** 52:15
**policy** 31:4
52:3,5 53:7
71:20 149:14
**poor** 49:7,9
**popularized**
198:9
**population**
28:7 49:1
121:16

populations
152:11
portion  18:4,8
46:2,7 96:5,14
126:20 133:12
202:6 208:11
portions  79:2
208:4,7
posed  62:1,3
poses  137:1
position  108:16
132:22
possible  81:14
85:2 87:18
112:18 145:12
195:8,11,12
200:17
post  47:13
potential  5:16
159:6 186:21
201:8
potentially
99:18 102:3
poverty  49:3
practice  11:13
11:16 19:5
26:13 31:2,19
34:1 35:3,5
36:1 38:8,11
39:3,13 41:21
47:7,8,11
52:15 65:10
66:14,17 69:21
71:7 72:2
73:19,21 77:6
77:7 82:13,14
82:20 83:2,22
84:12,17,22

85:3 87:12
95:2,9 97:14
145:1 151:4
155:5 157:22
164:18 172:12
192:2 195:5
202:8
practiced
38:22 54:12
55:16,19
practices  31:20
32:14,15 37:22
38:1 76:10
85:7 96:7,8,16
96:17,20,21
178:7,8,15
practicing  35:4
38:15 48:9
54:3,21,22
65:8,9,15 81:3
81:11 84:16
88:9
practitioner
50:19 53:10
71:11 83:20
84:4 85:3,7
191:15
practitioner's
83:18
practitioners
36:2 50:16
53:4 70:21
81:12 83:12
84:2,3,15
88:22 94:22
95:17 150:21
156:15 165:11
190:12

precautionary
138:18
precise  34:16
40:3 45:16
88:6
precisely
150:11
predictors  4:14
120:14
preeminence
201:17
prefer  83:10
preference
209:7
preferential
49:9,9
preferred  83:2
83:7 177:14
179:3,10
pregnant  63:11
63:17
preliminary
182:22
premier  35:12
premise  104:20
106:2,16,20
108:20 128:12
128:13
preparation
10:12
prepare  10:1
102:22
prepared  211:3
preparing
100:18 103:20
104:1 117:2
121:4

prescribe  91:6
92:14 98:10
175:21 203:11
prescribed
67:11 144:13
144:20 203:8
prescribing
43:16,21 54:6
58:8,10,14
97:15 145:7,10
prescription
67:13 126:7
129:10
prescriptions
125:21 128:1
131:12
present  3:19
35:19 59:22
presentation
76:2,4,12 77:2
77:3,12 88:7
presentations
75:19
presented
56:12 75:9,11
presenters
43:16
presenting
44:3
presents  80:19
80:21,21
preserve  20:20
82:22
preserving
19:13 20:2
president  70:3
113:5

**prestigious**
173:20
**pretty** 27:19
135:10
**prevent** 145:2
150:15
**preventing**
133:21 172:2
**primarily**
35:13 76:16
81:20 82:1
**primary** 47:9
48:21 54:13
55:17,21 56:1
56:4,6 59:11
60:18,22 61:1
**principal** 199:7
**principle**
137:12 138:18
153:16
**principles**
157:13
**print** 79:19
97:1
**prior** 100:5,7
100:11 117:2,4
117:9 120:8
186:8 187:10
210:5
**priority** 49:11
201:17
**private** 3:21
40:19
**privilege**
101:11,20
**privileged**
102:17

**pro** 68:14
**probably** 8:12
93:22 102:14
114:18,18
151:17
**problem** 15:5
29:14 77:7
140:11 150:9
151:3 159:20
**problematic**
82:4 95:10
151:15 160:4
192:3
**problematica...**
149:19 155:18
**problems**
126:19 192:2
**procedural**
6:22
**procedure**
189:14
**procedures**
204:19
**proceed** 7:22
60:12 62:21
201:2
**proceeding** 2:4
6:4,20 209:22
211:4
**proceedings**
210:3,5,6,9
211:6
**process** 10:8
61:13 116:22
117:6 159:17
**produced** 6:19
**product** 102:1

**production**
142:4 181:20
181:22 182:14
**profess** 19:1
83:6,12
**profession** 71:4
74:19 95:1
**professional**
21:15 74:18
93:6 94:18
95:8,12,14,15
104:11 106:7
**professionals**
20:12,14,15,17
20:17
**prognosis**
40:14
**program** 30:10
30:14,15,16,17
30:20,20 31:9
32:1 35:12
37:13,14,19
38:3,8,11,13
38:14 45:14
166:19
**programs**
173:20
**progress** 76:1
**prohibited**
135:7
**promote** 84:8
**promoting**
190:14
**prompted**
38:20 47:21
**pronounce**
36:9,11 129:13
163:11

**pronounced**
36:13 163:12
**pronunciation**
163:18
**proper** 72:15
72:16 93:7,9
201:14
**properly** 71:4
72:10 84:19
199:18
**property** 62:14
72:17
**proponents**
136:11 142:21
**proportionate**
192:8
**proposal** 72:20
73:2,17 83:15
85:19 87:4
**proposals**
73:18 83:16
179:20
**propose** 16:15
102:11 209:4
209:10
**proposed** 31:11
181:17 182:19
183:8,20
**proposition**
70:19
**prospects**
173:9
**protected**
101:19
**protecting**
152:14
**protest** 170:11
170:17

protests  170:8
provide  21:16
  64:7,16 73:5
  73:12 74:2,5
  74:17 84:9
  86:19 88:11
  90:4,10 153:20
  153:22 154:1
  207:12
provided  52:17
  54:8 60:13
  79:15 99:6
  100:20 101:13
  101:18 102:16
  103:11,15
  113:14 115:14
provider  52:10
  81:5,6,8,10
  88:8,9,10,18
  89:3 131:8
  198:16
providers
  51:16,21 81:12
  130:18 131:1
  131:12 162:1
  174:12 195:14
  195:18,22
provides  82:6
providing
  53:19,21 66:3
  74:8,12 98:21
  139:20 154:3,4
  160:8,12
  174:20 176:14
proxy  126:18
  130:20 131:4
  131:13

psychiatric
  130:12,16,20
  131:4,11 133:6
psychiatry
  18:13,15 23:16
  23:18 24:17
psychoactive
  125:21 126:17
  126:22 127:19
  128:1 204:15
psychological
  4:10 119:4
psychology
  17:21 18:2,9
  18:10 22:1,3
  23:11 27:4
  41:17,19
psychosocial
  113:7
psychotherap...
  177:19 178:3
  179:4,11
puberty  4:11
  5:13 13:19
  14:11,21 15:6
  43:8 44:4 54:6
  58:9,10 66:3
  85:21 87:3
  88:11,13 90:4
  90:4 91:5,7,7
  92:14,15 97:15
  111:12 112:8,9
  112:11,20
  119:4,21
  138:20 144:16
  144:18 145:4
  185:6 186:20
  189:22 190:2

204:4,9
public  76:7
  96:21,22 97:1
  161:1 172:1
  210:21
publication
  32:17
publications
  32:19 33:4,19
  64:20 75:5,8
  193:4
publicly  166:14
publish  172:9
published
  74:20,22
  161:11
publishing
  96:5,15
pull  15:15 17:2
  93:13 120:19
  123:16 127:10
  162:15
pulled  119:10
  120:20,21
punitive
  150:21 156:14
purported
  116:9 177:1,1
purports
  154:19
purpose  19:21
  19:22 20:1
  37:18 43:12,14
  69:18,20
purposes  13:2
  13:8 80:3 81:1
  103:15,20
  106:4 110:8,14

121:9 123:4
  149:10 150:7
  152:6
pursue  19:18
  81:18 88:22
  201:18
pursuing  82:16
pursuit  69:21
  82:14
put  42:18
  43:14 50:15,16
  53:3,5 59:21
  79:8 133:1
  152:12 156:6,9
  182:21 192:4
puts  189:12

q

qualification
  193:11
qualified  210:7
qualifies
  107:21
quarter  114:21
  120:3
question  8:22
  11:20 17:11
  21:3 30:1 41:5
  55:4 61:17,18
  62:10 63:12,16
  64:17 65:13
  69:9 71:20
  74:9 86:19
  89:10 90:8
  96:12 97:4
  98:8,16 100:13
  101:10 102:3,6
  102:12 106:22

Farr Curlin

April 8, 2024

113:22 114:2
127:5,12
133:19 138:10
144:11 145:20
148:15 156:5
165:7 176:18
176:21 178:2
179:13 182:10
199:16 206:4
**questioning**
208:11
**questions**   5:18
12:4 15:9 16:9
16:10 17:7
31:5 34:10,11
38:6 45:14,22
47:7 59:20
62:1,2,18
63:18,21 64:6
64:8 66:13
71:3 73:7,15
80:11,18 86:9
101:4 102:2
107:11 114:3
121:9 149:10
164:20 181:19
182:22 183:2
198:3 207:9
208:12,16,18
**quick**   92:10
**quit**   162:10
164:1,7
**quite**   133:3
**quotation**
129:11
**quote**   104:19
126:8 139:2
150:16,19,19

150:21 156:15
**quoted**   139:4
156:13
**quotes**   156:7,9
156:11,12

**r**

**r**   3:1 6:1
163:14,14
**radical**   189:13
**raise**   7:15
164:19 192:3
**raised**   12:5
39:11 59:20
72:12 76:8
100:13 174:10
**raising**   77:5
171:22
**randomized**
188:3,7,19
189:1
**range**   141:21
182:4,5
**ranged**   28:12
**rare**   20:12
26:19
**rates**   121:15
**rather**   36:2
59:6 79:10
125:22 128:2
201:3 203:14
**rationale**   76:7
204:6
**rbrooks**   3:16
**reached**   99:16
**read**   13:4
20:14 115:13
117:17,20

118:5,11
127:12 133:13
138:11 139:1,3
161:18,20,21
162:12 182:4
183:3 186:15
187:6,6,8
195:13,15
197:7 205:7,7
205:8,12,13,15
205:16
**reading**   128:5
151:18 164:4
185:10
**ready**   202:5
**real**   89:14
111:19
**reality**   20:16
83:11 84:2
**really**   21:3
61:16 73:3
158:16 172:22
**reason**   53:19
53:21 60:3
62:6 118:14
121:10 164:7
190:9,22 196:8
**reasonable**
70:22 83:5,16
84:14 85:18
87:4 133:19
135:12 153:9
175:6,9,12,16
176:6,16,22,22
177:4,11
178:22 179:1
190:12 192:5
198:10

**reasonably**
20:3,20 83:5
83:12 91:13
108:22 153:8
189:20 193:10
194:16
**reasoning**   35:5
59:18 96:1
150:2
**reasons**   19:17
50:11 60:12
83:9 87:1
91:12 92:20
95:10 162:9
163:22 183:16
**reassignment**
4:12,13 119:5
120:13
**reassure**   29:13
**recall**   11:10,21
12:1,19 14:5
17:22,22 18:4
18:6,8,11 22:2
22:3,16,19
23:1,22 24:10
24:14,22 25:8
25:10,13 26:1
28:16 33:10
34:21 42:9,15
43:3,6,9 45:4,5
48:15 54:9
55:5,12 57:8,9
57:16 61:15
63:13 64:18,18
66:17 67:15,22
68:1 70:5 75:7
98:19 99:1,8
99:12,20 103:1

103:21 104:2,6
104:7,17
109:17,22
110:3,4 116:17
118:17,19
119:19 120:10
121:2,7 124:5
125:7,9,11
127:22 130:4,5
130:19 131:10
131:13 133:10
136:15 138:12
138:13,14
139:7 140:20
146:1,18
147:15 148:8
162:3,7 164:14
166:1,4 169:15
170:12 182:16
185:10 195:15
205:18
**receive** 40:15
49:7 67:19
73:4,13 191:1
**received** 41:8
48:20 126:10
161:15
**receives** 160:11
**receiving** 67:9
67:12,13,18,18
129:1 130:8
164:20
**recent** 131:22
136:12
**recently** 182:3
**recognized**
52:19 76:6
143:22

**recollection**
11:17,19 29:20
44:2 57:19
99:21 110:12
110:16 114:6
118:3,10
124:10 126:16
130:11 186:10
197:15 206:12
**recommend**
57:10 85:16,17
85:21 87:22
**recommenda...**
60:11 164:15
**recommended**
66:1
**record** 6:4,5,17
7:7 9:1 47:1,2
47:4 60:16,17
94:3,4,6 103:3
115:3,4,6
119:3 127:16
151:18 165:1
167:18,19,21
180:16 181:1,2
181:4 182:5
206:20 207:2,3
207:5 208:21
209:19 210:9
211:5
**recorded** 7:2
210:6
**recording** 6:19
210:8 211:4
**records** 125:16
**reduced** 113:5
210:7

**reduction**
121:15
**refashion**
78:10
**refer** 13:11,18
14:5 16:10
17:6 46:14
72:13 80:4
81:4,6 82:7,9
89:4 94:11
105:9 113:11
136:12 145:16
145:21 146:10
146:11 157:2
161:10 198:9
**references**
80:10
**referred** 75:12
106:6 110:3
118:7 123:22
148:10 156:6
181:16
**referring** 12:22
42:2,7 44:22
69:12 105:5,8
108:10 109:8
109:12 112:3,5
113:12,15
136:13,15
137:6 148:1
163:21 169:9
169:12 171:11
181:17 186:5
193:3 197:19
202:3 204:1
205:1,2
**refers** 118:17
161:22 175:5

202:7
**reflected** 20:15
**refuse** 51:4
72:19 73:1,17
74:15 83:15
**regard** 49:10
122:3
**regarded**
107:16
**regarding**
12:17 30:22
32:15 38:17
39:17 41:12
45:15,16 60:11
67:16 71:4
75:5 85:8 96:7
96:16 115:21
116:16 135:18
147:4 155:8
171:15 177:1
178:8,15
179:19 182:18
188:7,14 194:8
196:12,17,19
197:4
**regardless**
134:22 151:21
**register** 124:15
125:1
**regularly** 65:16
**reimbursed**
160:3
**reimbursement**
160:7,9,12
**relate** 42:7
**related** 18:5,6
18:10 33:22
41:8,11 44:12

55:11 57:12
67:5 100:8
201:16 210:11
211:7
**relating** 97:10
173:2
**relationship**
104:12,14
152:17
**relationships**
27:6
**relative** 210:13
211:10
**relayed** 171:4
**relevance**
151:8
**relevant** 19:9
41:20 59:17,19
60:8,8 64:10
78:9 81:15
177:13 184:14
**relied** 107:6
184:4
**relief** 39:18
**relies** 84:22
**religion** 65:10
**religious** 32:8
32:11 36:16,17
36:19,22 37:1
37:21 52:10,13
64:14
**rely** 106:14
**relying** 85:3
149:2 155:10
**remain** 45:15
**remainder**
59:22

**remained**
126:2 128:3
129:7
**remaining**
40:15
**remedy** 84:7
**remember** 18:2
24:19 42:16,18
44:8 45:16
52:12 53:6
62:4 63:9 76:5
116:20 117:1
118:12 148:4
170:19 174:14
**remind** 8:17
**remote** 2:4
**remotely** 6:15
204:18
**render** 111:4
158:8
**rendered** 174:6
**renee** 3:20
**reopen** 102:15
**repeat** 14:21
24:7 37:12
90:8 96:12
145:20 182:9
205:10
**repeated**
127:16
**replacement**
142:9,12
**report** 4:8 9:7
9:11,14,17
10:5,6,10
13:11,13,15,17
14:20 16:6,18
17:7,13 45:12

45:15 46:2,3,4
46:5,8 66:9
77:20 78:7
86:22 87:13
90:12 91:12
92:20 96:3
97:18 100:15
100:16,18
102:22 103:8
103:20 104:1
104:19 105:11
105:21 106:4
106:11,12
110:4,6,9
114:10 115:10
116:15 117:3
118:4,6,8,15
120:9 121:4,5
121:13 124:6,9
129:12 131:14
133:12 138:5
140:22 147:19
150:5,12
151:19 152:12
153:5 159:14
161:8,10,12,16
161:20,21,22
164:14 165:8
166:12 174:2
181:7 183:17
184:7,11
186:12 187:16
189:11,12
195:21 196:17
204:1,17 205:7
205:8,13,15,16
207:10,18
208:4

**reported** 2:6
174:15
**reporter** 6:2,3
7:13,21 15:17
46:22 47:3
94:2,5 115:2,5
127:12,14,16
129:15,17
162:21 163:4,8
163:15 167:17
167:20 180:22
181:3 205:10
207:1,4 208:20
209:6,11,18
**reports** 105:13
106:15,17
107:8 115:14
117:20 118:7
118:11 122:1
147:11,12
148:10,22
173:22 179:6,7
193:8 205:6,22
206:2
**represent** 8:5
79:14 193:22
207:11,15
**representation**
79:11 184:16
**representatives**
179:1
**representing**
7:9,11
**reproduction**
87:19 111:5,11
**reproductive**
5:15 63:10
186:21

request  61:9,10
61:12,14 74:15
requested
53:12 60:14
127:17
requesting
74:11
require  95:2
137:18 198:12
200:4
required  22:12
128:20
requirement
192:14
requirements
50:22 82:17,20
83:20,21,22
requires  71:5,6
85:9,14 89:17
89:18 95:17
137:15 198:13
199:8
requiring
137:3 191:14
rescheduled
169:21 170:1,2
171:6
research  37:6,9
37:15,16 38:2
96:6,6,15,15
98:17,20
121:21 147:18
157:6,14 176:2
176:9 178:7,14
180:2 182:19
192:21,22
194:13 196:11
196:14,15,16

196:20,22
197:1,6
researcher
31:20
researchers
125:5,10 130:2
184:22
reservations
174:19
reserve  102:15
residency  26:3
26:5 27:16
28:6 30:9,13
resolve  200:15
resolving
133:22
resources  49:2
60:7
respect  19:16
19:16 26:13
41:4,21 49:2
61:3 65:18
71:1,13 89:1
91:5,16 98:1
100:18 105:20
106:10 107:3
109:16 115:21
122:2 136:10
144:4 146:15
151:5,9 152:3
152:12,19
153:17 154:2
172:22 190:19
191:2 192:11
193:14 196:5
199:7,14,21
200:4 201:14
206:16

respectfully
53:11 200:19
respecting
152:13
respects  112:8
189:15
respond  12:5
52:20
responded
14:10
responding
183:1
response  84:5
88:11 109:3
181:18 182:17
183:12
responses  15:7
45:17
responsibilities
191:8
responsibility
70:20 149:20
149:21 155:12
155:18,20
responsive
20:3
rest  137:18
restate  110:21
restore  20:20
82:22
restored  62:13
62:13
restores  128:19
restoring  19:14
20:2
restrict  64:3
result  32:5
111:13 121:16

126:11 204:13
retained  99:22
100:2,4,6
117:9
retention
104:13
retract  208:5,8
return  188:8
188:14
reuters  5:8
161:11 163:7
163:14 164:13
174:1
review  99:3,4,7
99:13 102:8,20
103:4 105:17
106:2,8 107:9
108:6 109:14
109:21 110:1
110:13 114:4
116:10,15
117:2 120:8
125:14 130:1
135:17 139:8
139:10,13
147:9 148:6,8
149:2,11,18
155:17 159:2
181:10 186:15
186:16 206:20
reviewed  10:5
10:6,8 12:10
33:8,19 74:22
101:14 104:20
105:6,7,9,9,12
105:15 106:5
107:7,8 108:20
109:9,10,13,15

110:5,8 113:18
113:20 114:5
116:22 117:4,9
119:15 120:22
121:2,8 123:6
124:2,7 125:2
125:10 129:22
135:14 147:3
147:12 181:22
182:13 186:13
186:14 187:9
187:11,12
197:11,13
205:6 206:1,2
206:5
**reviewing**
105:18 108:3
119:19 122:21
155:6 183:6
**reviews** 108:4
123:22 136:18
154:20
**revision** 12:8
**rhafferty** 14:6
118:5,8 133:1
193:4
**rheumatoid**
56:21
**right** 7:15 17:3
33:16 34:14,15
45:4 46:21,22
47:18 80:20
82:8 83:17
91:22 94:1
100:5 102:15
103:12 107:22
110:15 115:2
119:1 127:14

129:22 130:9
138:7 141:3
143:7 150:19
151:16 164:4
165:13 167:16
167:17 168:14
173:8 175:6,7
180:19 188:1
197:20,22
198:1,17
199:13,20
208:20
**rightfully** 83:6
**rightly** 14:10
50:2,20,22
51:1 199:2
**rights** 3:5
**rigor** 31:11
**rising** 164:2
**risk** 111:19
113:8 137:2
139:18
**risks** 193:18,20
194:16 202:15
202:21 203:5,8
**riverside** 3:14
**robert** 30:10,13
30:19 34:6
**roger** 3:12 7:10
**role** 48:19
54:12,13 59:9
60:22 61:1,3
70:1,7 71:7,16
72:1 153:3
200:8
**rolling** 167:5
**room** 9:18
168:22

**root** 27:8 89:13
89:21
**rotations** 24:2
24:4,5,8,10,12
24:13,16,20
25:3,5,6,9,11
**routinely**
202:14
**ruin** 163:3
**rule** 198:8,8
**rules** 7:1
**run** 91:20
**ryan** 211:2,17

**s**

**s** 3:1 4:5 5:1
6:1 163:14
**sadness** 11:6
**safe** 116:2
117:19,22
118:9 193:5,11
194:1,11,11
**safety** 117:14
135:15 150:15
184:14
**sake** 120:7
**sanctioning**
172:21
**saw** 20:11
25:11 27:19,19
28:11,14 51:17
54:19,20 56:12
67:20
**saying** 101:21
105:12,14
153:2 156:13
164:6 191:10
193:20

**says** 46:18
81:21 93:21
94:17,20,21
96:13 103:9
104:19 115:12
126:21 136:20
138:17 143:2
149:18 163:22
171:12
**scale** 131:22
136:13,18
**scenario** 98:7
188:21
**schedule** 61:5
**scholar** 31:20
34:6
**scholars** 30:10
30:14,19 45:13
166:19
**scholarship**
30:22 31:10
197:4
**school** 18:17,19
18:22 21:2,5,6
21:22 22:20
23:2,14 24:2,3
24:15 25:4
26:2,4 77:21
78:1 170:7
**schools** 21:7
82:1,3
**science** 19:16
104:20 105:5,6
105:8 106:3
108:20 109:8,9
109:13,14,22
112:6 113:11
113:12,13,15

113:17,17
114:4 122:2
**sciences** 19:9,9
**scientific** 31:3
115:21 139:9
147:3
**scope** 63:8
72:10,15,16,17
106:8 110:6
**screen** 93:21
120:3 122:17
123:19 165:3
**second** 25:2
34:12 45:19
75:20 76:20
141:6 145:18
147:1 150:11
159:15,20
170:4 171:6
190:8 202:5
205:7,11,13
**secondary**
10:21 14:8
15:1 55:13
90:16 97:10
112:19 137:14
144:3,4,6
145:3,11,13
146:4,6,8
191:21
**section** 3:6
**secular** 36:15
**see** 25:16 33:18
34:6 48:12
51:4 52:1
56:10 59:13
75:16 94:20
102:14 124:16

131:8 141:8
146:13 156:1
180:4 183:13
**seeing** 25:13
56:7,8
**seek** 29:13 50:1
78:9 84:7
154:6 157:14
200:19
**seeking** 20:19
32:8 74:4
82:21 142:22
164:3
**seeks** 27:8 74:3
74:17
**seemed** 63:14
183:15
**seems** 91:12
92:20 128:11
172:13 193:7
193:14,21
**seen** 49:19,20
50:3 79:18
120:2 184:18
186:8
**selected** 30:21
79:1
**self** 12:17
35:18 59:2
67:3 150:17,20
151:6,7 152:4
152:8 154:2,6
155:22 197:22
198:8,8 206:17
**seminar** 80:13
**sense** 10:22
12:10 13:9
25:21 40:17

80:7 84:22
85:4,10 87:9
93:3 95:11
143:20
**sent** 16:14
185:21
**sentence** 147:1
155:16
**separating**
93:5 94:18
**series** 77:14
**serious** 109:2
117:13 131:22
**seriously** 174:7
**serve** 51:10,11
**served** 51:12
58:18 99:2,4
183:21
**service** 58:2,17
58:20 59:2,4,8
59:10 61:4
65:19
**services** 31:1
65:16 76:1
81:5,7,9,10,13
88:8,9,18 89:3
198:16
**serving** 60:21
60:22 61:1
99:18 158:15
**session** 77:19
**set** 154:14,18
187:14 189:2,8
**setting** 56:7,9
57:2 58:5
189:6,7
**settings** 97:1

**seven** 76:5
**several** 39:1
68:9 80:13
**sex** 4:13 10:21
13:19 14:8,12
14:22 15:1,6
25:21,22 43:8
44:5 54:6
55:13 58:13,14
66:4 67:9 87:2
88:3 90:16
91:13,16,17
97:10,15
112:19 120:13
137:12,14
138:20 141:11
141:11,16,22
142:5,14,15,19
144:3,5,6
145:3,4,7,11
145:13,14
146:4,6,8,9
182:20 191:21
191:22
**sexes** 87:18
**sexual** 92:22
93:2 109:3
111:11,12
112:8,9,11
113:3 137:14
191:20
**sham** 89:15
**share** 87:19
**shared** 165:3
**sharp** 26:15
**shifting** 12:18
**shining** 164:16

**short** 46:10,16
92:5 114:17
180:16
**shortly** 99:22
100:2
**show** 15:19
84:4 93:20
162:12 191:15
**showed** 51:12
51:18 185:5
**showing** 48:17
**shown** 135:3
135:11 192:10
194:15 195:1,1
196:8 203:21
**shows** 52:7
199:16
**sick** 19:3 39:4
82:21
**side** 34:9 47:17
138:3 173:8
192:13 193:12
203:16 208:15
**siegler** 35:13
**sign** 126:6
129:9 141:12
156:11
**signals** 72:4
**signature**
209:20 210:19
211:16
**significant** 97:3
138:3 157:12
**silence** 77:1
**similar** 28:20
45:21 58:21
**similarly** 16:17
57:18 209:13

**simple** 143:16
**simplification**
81:1
**simply** 131:7
150:6 165:2
**sit** 16:11 17:13
**situation** 59:14
74:3 86:18
133:15 137:20
190:20 200:11
**situations** 39:7
154:8 189:15
200:2
**six** 40:14 77:4
**sixth** 146:10
**skills** 210:10
211:6
**sleeplessness**
56:18
**smith** 120:13
**soc** 149:19
150:9 154:9,14
154:18,21
155:17 157:17
195:13,15
197:19 201:7
**society** 69:6,10
69:17,19,20
70:17,18 71:19
148:14,19
149:1 206:9,11
206:15
**society's** 149:5
**somebody** 58:9
90:4
**somewhat**
44:16 68:5

**soon** 48:5
91:19
**sooner** 92:5
93:18
**sorry** 11:18,20
24:6 31:16
36:9 37:12
100:16 110:19
117:7 119:18
122:14 126:20
127:11 139:12
151:16 205:10
**sort** 51:5 77:9
166:7
**sorts** 40:5
**sought** 29:9
62:19 63:10,20
**sound** 92:3
93:6 180:19
**sounds** 17:3
93:7 114:12
180:20 195:20
**sources** 59:19
**south** 47:19
**spanish** 48:5,6
48:7
**speak** 10:12
39:12 59:19
91:2 140:10
173:18
**speaker** 69:2,3
**speaking** 29:7
29:7 48:7
71:19 77:10
128:16 144:7
165:12 171:2
171:21 200:3

**special** 164:14
**specialist** 67:16
**specialists**
49:20
**specialized**
41:16
**species** 87:17
**specific** 18:10
23:8 36:6
53:22 54:5
57:19 58:7,8
68:1 83:22
87:12 91:10
92:18 98:7
106:22 111:6
130:13,20
139:5 150:22
154:8 156:16
165:15 169:9
169:13 170:10
**specifically**
18:15 22:4
28:16 33:3
42:13 45:6
50:19 54:1
64:11 68:21
72:13 75:12
95:17 99:8,12
100:11 102:5
137:11 143:11
146:1 151:6
176:17 189:21
204:22
**specifics** 57:9
**specified** 130:6
**specifies** 15:3
**specify** 14:17
14:18 128:12

Farr Curfin

April 8, 2024

| | | | |
|---|---|---|---|
| **speculate** 43:13 | **start** 15:8 33:7 | **steve** 1:11 3:11 | 116:15 117:11 |
| **speculation** | 126:1 128:3 | 6:8 | 117:17,20,20 |
| 30:4 195:10 | **started** 19:19 | **stimulate** | 118:1 121:8,14 |
| **speculative** | 35:13 | 112:17 | 131:22 136:13 |
| 86:4 | **starting** 164:19 | **stimulating** | 136:13 139:5 |
| **spell** 129:15 | **state** 1:13 6:10 | 35:6 | 185:5,11 |
| **spelled** 36:13 | 96:4 100:22 | **stipulation** 7:4 | 187:19 188:3,7 |
| **spend** 30:21 | 115:13,18 | **stop** 71:21 | 188:19 197:11 |
| **spent** 96:4,14 | 119:2 121:6 | 88:13 90:4 | 204:1 |
| **spiel** 8:17 | 123:5 136:7 | 91:7 92:14 | **study** 19:8 31:7 |
| **spinal** 188:8,15 | 141:2 162:8 | **stopped** 110:1 | 32:11 37:20 |
| **spirituality** | 168:8 169:6 | 128:9,18 | 110:1 116:20 |
| 168:12 | 174:6 181:9 | **stories** 20:14 | 118:2,15,17,19 |
| **spoke** 48:5,6 | 191:2 193:8 | **straightforwa...** | 118:20 119:3 |
| 173:15 | 194:5,8,15 | 135:10 | 119:15,21 |
| **spoken** 166:13 | 195:17 201:7 | **stretch** 91:20 | 120:8,12 121:1 |
| **sports** 188:8,14 | 204:17 209:3 | **strikingly** | 121:2,4 122:5 |
| **spring** 170:1 | 210:22 | 203:12 | 122:16,19,21 |
| **spuriously** 95:4 | **statement** | **strokes** 28:8 | 123:3,6,9,18 |
| **stable** 126:5 | 132:15,22 | 62:3 | 123:20,21 |
| 129:8 | 133:2 149:4,14 | **strong** 164:15 | 124:4,7,8,12 |
| **stake** 37:2 | 152:5 | **strongly** 49:4 | 124:15,19 |
| 200:12 | **states** 1:1,8 3:2 | 88:17 | 125:1,3,5,8,12 |
| **stand** 158:10 | 6:8 7:9 8:6 | **structure** 70:14 | 125:14,15,21 |
| **standard** 51:3 | 108:8,9,11 | **structuring** | 126:13,21 |
| 137:21 141:21 | 132:4 155:17 | 40:11 | 127:2,6,11 |
| 151:4 152:3 | **statistcal** 143:3 | **struggle** 49:13 | 128:5,22 |
| 154:21 159:16 | **status** 49:4 | **students** 31:22 | 129:14,19,22 |
| 177:6,14 179:3 | **stayed** 131:2 | 39:8 82:2 | 130:2,7,14,22 |
| 179:10 203:11 | **stenographic** | 168:20 169:6,9 | 136:17 164:13 |
| **standards** | 7:3 | 170:14 172:20 | 184:13 185:14 |
| 62:15,16,17 | **step** 140:9 | 173:11,12,13 | 186:8,19 187:9 |
| 64:10 150:13 | **steps** 105:21 | **studied** 197:6 | **studying** 180:6 |
| 160:1,14 | **sterilization** | **studies** 17:20 | **stuff** 80:10 |
| 196:18 | 109:2,19 | 103:11,14 | 84:9 |
| **standing** 95:6 | 110:18 111:3,8 | 105:13 110:2,5 | **subheading** |
| 209:3,9,14 | 111:14 | 111:18 116:1,3 | 143:2 |
| | | 116:7,8,11,14 | |

subject   20:9
   43:6,7 45:7
   172:18
subjected
   172:19
subjecting
   159:1
subjective
   81:19 88:19
   89:5,6,12
subjects   43:4
submit   16:6
   17:5
submitted   9:14
   9:17 16:5,18
   17:4 115:14
submitting
   117:3 179:20
subspecialty
   39:16
substance   56:3
   101:12 102:2,3
   102:7,10
substantial
   96:4,14 109:2
   157:3
substantive
   95:20
substituting
   178:2
succeeded
   184:1
sudden   173:2
suffering   67:8
   146:3
sufficient   62:9
   133:17 153:7
   176:8 187:21

189:4 192:17
   195:3 196:9
sufficiently
   63:3,4
suggest   21:13
   116:2 183:12
suggested   95:5
   184:7
suggesting
   183:11
suggests   112:6
   150:14 184:19
   194:6
suicide   4:20,20
   121:15 122:7,8
summaries
   177:11
summarize
   150:7
summarized
   117:12 130:5
   136:22 137:7
   204:2
summary
   148:22 154:20
   186:16
summer   37:5,9
   38:3 70:5
   206:13
superior   177:5
supplemental
   124:9
support   132:17
   178:13
supported   31:8
   132:19
supports   132:4
   132:11 133:6

supposed
   168:11
suppress
   137:13
suppression
   4:11 5:13
   119:5 186:20
sure   8:18 10:16
   19:17 33:16
   46:12 49:17,19
   50:1 52:1,11
   69:11 73:10
   89:12 90:9
   91:5 96:10,13
   109:20 110:22
   112:4 116:19
   119:9 124:18
   127:13 138:9
   138:11 140:12
   143:15 144:18
   145:19,21
   150:9 153:1
   155:15 162:14
   166:16 167:8
   174:19 180:18
   182:6,12
   185:13 186:4
   195:11,12
   196:16 208:11
   209:1
surgeon   19:6
surgery   24:16
   27:18
surgical   26:9
   78:9
surrogate
   62:15

surrogates
   62:14
surrounding
   77:22
surveilled
   174:9
survey   37:5,9
   37:15 38:2
   179:12
surveys   38:5
sustain   128:20
sustains   137:13
swear   6:14
   7:14
sweden   108:2
   140:15 147:16
   179:8
sweden's   139:9
swedish   148:7
switching   68:3
sworn   6:17
   7:18 210:5
sympathy   29:8
symposia   41:19
   42:1,6,17 43:1
   44:12
symposium
   42:12
symptoms
   28:20,21 29:22
   30:2 39:19
   40:5,7 55:2
   57:7,11 66:15
system   140:16
systematic
   108:4 136:18
   148:6,8 149:2

Case 2:22-cv-00184-LCB-CWB   Document 629-22   Filed 07/01/24   Page 104 of 125
Farr Curfin                                                    April 8, 2024
[systematically - think]                                      Page 49

**systematically**
147:3
**systematicness**
26:22

**t**

**t**  4:5 5:1 129:16
163:14
**ta**  175:5
**take**  6:4,12
8:20 9:1 22:14
23:16,20 26:16
31:9 46:6,10
46:16 65:19
68:16 78:15
80:17 84:14,19
86:20 91:19
92:9 93:15
104:19 105:21
106:1,16,19
108:20 135:9
137:22 144:16
144:18 148:13
148:16 149:4
158:11,20
164:6 167:6,9
167:13 180:3
200:18 206:19
**taken**  6:7 8:7
8:14 93:7
174:7 175:12
210:3,12 211:9
**takes**  14:7,19
46:19 79:4
81:11 82:13
88:19 204:8
**talk**  10:7,18
45:21 76:6

77:13 124:7
134:3 160:6
168:8,11,18,18
169:4,8,12,16
169:21 174:6
175:2 199:19
**talked**  70:15
165:18 197:8
198:2 206:9
**talking**  22:20
46:2,3,5 137:7
148:17 160:7,9
165:15 166:16
173:11,13
176:17
**talks**  77:21
**taught**  80:12
**teach**  38:18
**teachers**  27:12
**teaching**  39:8
66:2 80:14
**teachings**  21:1
21:4,6,7
**technological...**
81:14
**technologies**
63:11
**tell**  7:19 9:19
15:17 29:13
33:2 48:13
69:18 76:2,3
79:5 85:5
150:11 169:8
200:6 201:11
206:10 209:16
**ten**  8:11,12
46:17,19 65:7
93:15,18

167:13
**tended**  82:3
**term**  11:2,7,9
11:11,14,21
12:14,19,22
13:8,21 14:1
23:3,5,7 25:18
31:1,15 40:2
50:8,12 135:13
146:16 156:9
177:18 183:9
198:6,21
199:17
**terms**  10:16
12:16 14:14
95:22 96:1
182:15 198:18
**terrible**  114:8
**terrified**
173:17
**testified**  7:20
110:7 120:2
134:15 136:1
**testify**  207:9
**testifying**
193:19 210:5
**testimony**
134:16 174:20
190:21 199:11
199:22
**testing**  183:14
**testosterone**
5:14 142:14
185:7 186:20
**text**  12:8
**thank**  7:13,21
8:1 94:1,7
115:7 129:17

156:19 161:5
163:15 167:22
177:21 180:20
207:6 208:10
208:17
**thankfully**
183:22
**thanks**  167:16
**that'd**  167:6,11
**theme**  90:17
**theological**
50:5
**therapy**  4:18
5:11,14 122:7
142:12 185:17
186:20
**thing**  8:19
20:16 44:5
**things**  29:2
42:5 50:15
51:6 53:3
91:11 154:19
159:5 163:18
192:19
**think**  13:10,11
13:17 20:15
21:8 30:5
34:21 40:4
53:13,15 54:2
59:4 62:6,20
63:3 65:22
66:6,19 73:2
80:8 85:6 89:2
93:14 98:16
102:13 110:7
127:7 136:3,17
137:20 150:4
151:14,21

157:9 163:12
176:7 177:18
185:14 189:12
191:18 201:1
206:7
**thinking** 20:9
54:2 81:20
84:15 137:11
172:1
**third** 24:15
191:5
**thoroughly**
27:9
**thought** 44:3,4
63:1 170:16
**thoughts** 4:19
122:7
**threat** 133:17
133:21,22
200:13,15
**threaten**
112:13
**threatened**
20:18 111:7
166:3
**threatening**
109:2,19
110:17 111:2,4
**threats** 84:5
134:3,4 162:1
174:12,18
**three** 205:22
**thrombosis**
139:18
**thumbs** 114:13
**thyroid** 56:20
**tied** 73:15

**time** 2:3 7:6
8:13,20,21
12:19 25:16
34:5 35:15
44:9 46:16,18
46:22 47:3
54:16 57:21
61:8 73:9 80:6
80:15 91:21
94:2,5 96:5,14
114:10 115:2,5
163:13 167:13
167:17,20
170:5 171:6
175:12 180:22
181:3 187:7
207:1,4 208:6
208:10 209:18
**timeframe**
18:12 29:18
**times** 8:9 14:21
41:20 50:8
198:14
**title** 45:16 56:1
76:22 124:17
165:2 186:19
187:6,8
**titled** 119:3
122:6 123:10
**today** 9:5 16:11
17:13 25:14
28:17 50:8
186:9 187:10
208:10
**today's** 10:2
**together** 59:21
73:16 80:16
205:2

**told** 168:17
169:7 170:6
182:2
**tollefsen** 80:12
**took** 18:9 59:19
76:9 121:5,8
121:22 123:3
139:8 148:21
149:9 157:8
**top** 22:14 79:9
**topic** 31:7 45:2
75:10,11 77:8
77:18 121:21
166:19
**topics** 68:3
173:1
**touch** 19:19
**toward** 134:6
**towards** 167:5
**town** 36:13
**tr** 13:1
**tradition** 49:14
**traditions**
64:15 66:10
**train** 48:2 82:2
**trained** 31:18
31:19 176:12
**trainees** 39:8
60:1
**training** 31:9
35:8,12,16
38:4,16 39:1
41:3,8,12,17
47:12,13 48:10
85:20 142:18
146:19 173:16
173:19 179:19

**transcriber**
211:1
**transcript** 6:19
15:21 208:21
209:12 211:3,5
**transcriptionist**
210:8
**transfer** 45:20
**transgender**
4:21 5:7 51:21
52:4 77:22
78:5 122:8
123:12 124:14
124:22 162:9
164:1,7 166:20
**transition**
13:12 14:19
66:6 75:2,13
76:1,8 78:8
88:17 90:11,15
97:17 98:22
100:14 108:14
113:6 114:9
115:22 116:2,3
116:9 117:22
118:4,9 121:16
125:20 126:1
126:10,12
128:3 130:15
131:6 132:17
133:4 135:11
135:19 136:9
140:6 142:5,8
142:20,21
160:4,10,13
164:3,16
168:21 175:14
175:16 182:21

189:11 190:15
196:10 203:13
**transmasculine**
5:12 185:17
**transsexuals**
4:16 120:15
**treat** 27:16
29:4 51:16,21
52:6 54:16
55:1 57:2,6
85:21 119:22
176:3 200:5
204:9,11,12
**treated** 27:17
28:7 54:16
56:16,17
203:20
**treating** 15:4
52:3 57:4,17
155:3
**treatment** 4:15
13:12 49:15
57:10,15,19
66:4 67:5 73:5
73:11,11,12,13
74:6,7,10,11
74:12,13 85:17
85:18 87:21
90:11 97:16,19
97:22 98:4,10
98:22 108:14
111:19 117:14
120:14 124:13
124:21 126:6
126:14 128:7,8
128:9,16,18,19
129:2,9 130:9
130:12,16,20

131:5 133:14
134:11,13,17
135:22 149:3
150:22 153:3
153:20 156:16
162:10 164:1,8
176:14 177:5
177:15 179:4
179:11 185:6
192:5 196:5,13
**treatments**
13:20 26:10
43:17,22 52:16
52:18,20,20
53:14,20,22
54:8 85:15
105:2 109:1
138:19 175:18
175:21
**trent** 166:21
**trial** 181:11,15
181:17 183:8
183:19 184:5
**trials** 189:1
**tried** 149:5
**true** 9:13 79:16
149:4 157:20
188:12 191:1
193:9 210:9
211:5
**truer** 83:10
**truth** 7:19,19
7:20
**try** 27:9,10
44:14 84:17
86:6 93:17
167:8 179:12

**trying** 27:2
38:6 43:15
93:13
**turban** 123:9
123:19
**turn** 62:14 94:9
103:9 104:18
115:9 140:21
168:2 181:6
186:18
**turned** 94:14
**turning** 17:15
78:13 96:3
100:15 121:12
124:6 131:15
138:5 143:1
149:16 161:8
174:22 177:8
184:10 197:16
201:22 204:16
**turns** 203:14
**two** 14:14 20:6
30:16,21 36:14
40:13 45:5
46:14 53:15
59:21 60:20
61:5 80:19,22
81:2 83:1
87:18 95:21
110:2,5 140:11
141:21 184:22
205:17,22
**type** 24:12
73:11,12 87:21
170:10 176:13
176:14 196:15
**types** 22:11
27:15 43:17,22

53:13 56:16
62:1 64:5
155:3 175:21
**typewriting**
210:7
**typical** 86:8
146:7
**typically** 60:20
72:21
**typo** 182:4

**u**

**u** 163:14
**u.s.** 3:20
**ultimately**
81:19 183:11
**unable** 196:1
**unavailable**
134:18 164:11
**unc** 17:16,19
18:17
**uncertain**
175:17 177:13
179:2,9
**uncertainty**
27:5 117:13
177:3,4
**unclarity** 182:6
**uncommon**
137:17,19
163:18
**under** 6:22
8:18 20:13
33:22 54:7
62:7 68:2 86:6
86:13 88:8,9
90:2,9 138:21
140:6 153:16

153:16 195:6
**undergoing**
128:7 142:7
**undergrad**
18:16
**undergraduate**
17:16,18,20
18:14,18
**underserved**
32:5,10 48:2,9
**understand**
6:18 9:3 12:6
17:8 19:2 24:6
27:2,8,10 32:8
72:10,22
143:10 153:1
164:6 171:22
176:8 179:13
189:21 193:2
**understanding**
10:16 13:7
21:9 23:3,5
81:2,11 82:5
82:12 87:11
95:15 112:15
124:3 128:5
129:4 135:12
144:12,21
145:6,9 146:7
153:21 162:9
163:22 170:20
183:5 195:3
198:19
**understood** 9:2
26:17 41:15
50:21,22 51:1
51:9 53:8 71:5
84:20 91:14

96:3 151:10
152:10 153:8
165:18,20
198:17 199:2
199:18 204:16
**underwent**
125:20
**undeserved**
48:4
**unethical** 91:1
91:6
**unifying**
166:11
**united** 1:1,8
3:2 6:8 7:9 8:6
108:8,9,11
132:4
**universal** 84:19
**university**
18:19 26:3,5
35:14 37:10
38:11 39:10,14
42:20 44:10
48:11 55:17
57:22 58:2,18
59:1 76:15,18
78:2 168:9
169:6,16
173:14 179:22
**unjust** 63:18
**unjustified**
64:2
**unnecessary**
178:17,20
**unproven**
105:2 131:21
136:6,10,22

**unsafe** 116:4
**unscheduled**
8:21
**unstable** 63:15
**unusual** 190:20
**unwanted** 29:1
**updating** 77:3
**upset** 11:7
**usdoj.gov** 3:8
**use** 10:17 12:21
13:13,14,18,18
14:20 23:7
38:1,2 40:3
50:5 139:21
150:15 183:9
198:21
**used** 11:2
12:16,20 14:5
14:22 23:1,5
35:21 50:7
76:7 81:17
96:1 146:16,19
178:3 198:6,14
199:3,17
204:15
**useful** 80:16
**uses** 6:21
150:10
**using** 13:4
22:20 37:15,16
95:21 156:10
182:19
**usual** 8:17
**usually** 60:1

| **v** |
|---|

**v** 1:7,10

**va** 3:15
**valid** 105:22
**valuable** 19:4
**value** 199:20
**values** 49:16,21
53:20,22 64:10
65:20 66:5,10
66:12 85:16
95:8
**variety** 155:3
**various** 38:17
41:10 155:8
**vary** 141:16,17
**verify** 149:6
**veritext** 6:4
209:4
**verse** 12:9
**version** 12:8
150:13
**versus** 84:3
**video** 169:16
**videoconfere...**
2:1 3:4,12,20
3:22
**view** 19:20,22
20:5,6 21:20
72:1,3 82:7
83:3 199:1
200:9 207:22
**views** 165:22
166:3,10 169:9
169:11 170:17
172:4,18
**vigorous** 71:2
**violated** 157:13
**violating** 21:16
181:12 183:16

violence 162:1
165:21 166:3
174:12,18
virginia 36:12
virtually 72:9
virtue 189:21
vision 49:5,12
visits 131:11,13
vitriolic 172:20
vitro 5:9
185:15
voice 110:19
161:15
voiced 164:20
voicing 172:12
vote 160:2
vries 119:3
vs 6:8
vulnerable
152:11

w

wait 206:6
waived 209:20
want 10:15
13:3 15:18,19
15:20,22 17:6
21:14 29:2
46:16,17 57:15
78:15 84:10
109:20 114:8
116:19 120:11
128:11,12
140:10 151:17
174:9,17 180:4
185:12 191:14
201:3 202:6,17
208:9

wanted 35:3
48:2 88:13
wants 21:14
200:16
warrants 143:5
washington 3:7
watched 20:10
way 4:9 20:19
27:1,3,7 34:2
40:4,10,15,20
42:11 50:12
52:22 69:1
75:3,4 78:13
78:18 81:10,20
82:4,8,10,11
82:12 83:1,4,7
84:1 89:20
90:2,9 95:21
159:12 164:15
168:14 171:20
172:12 191:13
199:16,17
201:4,19
203:19 204:14
206:15
ways 23:6
41:13 49:17
80:19 198:7
203:15
we've 16:13
23:19 41:15
84:13 90:13
163:20
weaver 3:21
website 70:10
70:11
week 80:13

weekly 60:2
weigh 62:8
weighs 89:20
wellbeing
81:19 88:20
93:3 146:5
went 18:18
38:3
west 34:8 47:17
who've 165:11
widely 53:7
widespread
171:14
wife 48:6
williams 3:20
208:16
willing 86:6
wish 86:18
wished 29:3
wishes 63:5
wishing 29:16
withdraw 41:4
witness 6:14,17
6:18 7:14,18
46:13 79:18
94:14 99:18
100:4,6 101:4
102:12,16
114:11,12,17
114:22 117:5,8
117:9 119:8,11
120:1 122:14
122:16 127:1
127:13 140:10
163:12 165:1
167:15 180:18
182:9 185:21
186:2 205:12

208:19 210:4
woman 63:10
63:17 142:7
wondering
50:9
wood 30:10,13
30:19 34:6
word 178:2,3
198:7 199:2,3
words 74:1
126:9
work 12:1 19:3
20:10 32:9,16
32:18 33:4,6
33:21 47:21
48:2,3,22
65:18 74:20
99:10 102:1
104:4 106:20
106:21 173:6,6
173:16 174:5
206:15 207:21
worked 56:11
working 32:5
55:7 128:8,17
142:2 173:1
world 44:16
worried 170:13
worse 71:13
129:1 130:9,11
175:18
worsen 129:7
worship 65:16
worth 203:5
worthwhile
19:12 35:6
wpath 113:5
121:19 149:8

**[wpath - youtube]**

149:12,19
150:9,13 151:7
155:17 156:22
157:7,12 159:7
**wrap**   66:13
**write**   60:9
80:11,16
150:13 172:17
178:5
**writer's**   163:8
**writing**   96:2
159:17 160:1
161:3 172:7
190:22 197:2
**written**   7:4
32:16,19 172:8
197:13 207:18
**wrong**   29:10
144:5
**wrote**   88:16
105:4 109:7
117:16 128:1
136:16 137:5
143:7 161:18
171:16 181:14
181:18 205:17

**x**

**x**   4:1,5 5:1

**y**

**yeah**   30:5
65:14 75:18
86:3 98:6
114:1,22
122:14,15
148:4 154:17
159:19 162:19
165:4 195:11

**year**   24:15,15
24:21 25:2,4,7
32:7 35:16
60:20 77:14
170:3
**years**   12:2 30:7
30:16,21 39:1
43:3 54:11
62:4 63:13
65:7 76:6 77:4
80:13 118:12
126:2 128:4
197:1
**young**   4:10
63:10,17 119:4
**youth**   4:22
5:12 122:9
140:15 185:18
**youtube**   169:16

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

January 2024

## CURRICULUM VITAE

### Farr A. Curlin, MD

**EDUCATION AND TRAINING**
College:  University of North Carolina at Chapel Hill, BA with distinction, Biology, 1992
Medical School:  University of North Carolina School of Medicine, MD, 1998
Residency:  University of Chicago Hospitals in Internal Medicine, 1998 – 2001
Fellowship: Robert Wood Johnson Clinical Scholar, The University of Chicago, 2001-2003
Fellowship: MacLean Center for Clinical Medical Ethics, University of Chicago 2003-2004
Summer Institute for Survey Research Methods, University of Michigan – 2006
Program in Palliative Care Education and Practice, Harvard University – 2008

**BOARD CERTIFICATION**
Diplomate American Board of Internal Medicine 204781, 2001, 2011, 2022
Hospice and Palliative Medicine Certification (ABIM), 2010, 2022

**MEDICAL LICENSURE**
North Carolina License No: 2013-01944

**MEMBERSHIPS**
American Medical Association
American Society for Bioethics and Humanities

**ACADEMIC APPOINTMENTS:**
Duke University
| | |
|---|---|
| 2014 - | Josiah C. Trent Professor of Medical Humanities, Trent Center for Bioethics, Humanities & History of Medicine |
| 2014 - | Professor of Medicine, Center for Palliative Care, Section of General Internal Medicine, Department of Medicine |
| 2014 - | Professor and Co-Director, Theology, Medicine, and Culture Initiative, Duke Divinity School (tmc.divinity.duke.edu) |
| 2017 - | Senior Fellow, Kenan Institute for Ethics |

The University of Chicago:
| | |
|---|---|
| 2003 – 2005 | Instructor of Medicine, Section of General Internal Medicine |
| 2003 – 2006 | Associate Faculty, Robert Wood Johnson Foundation Clinical Scholars Program |
| 2004 – 2013 | Faculty, the MacLean Center for Clinical Medical Ethics |
| 2005 – 2010 | Assistant Professor of Medicine, Section of General Internal Medicine |
| 2009 – 2013 | Co-Director, Program on Medicine and Religion (pmr.uchicago.edu) |
| 2010 – 2013 | Associate Professor of Medicine, Section of General Internal Medicine |

**HONORS, AWARDS, SCHOLARSHIPS (selected)**
| | |
|---|---|
| 1989 | Valedictorian, Jackson Central Merry High School, Jackson, TN |
| 1989 | William Richardson Davie Scholar, University of North Carolina |
| 1992 | Phi Beta Kappa, University of North Carolina – Chapel Hill |
| 1995 | Herbert H. Fritz special merit award for scholastic excellence, UNC School of Medicine |
| 1995 | North Carolina Albert Schweitzer Fellowship Award |
| 1995 | Foreign Fellowship Award, UNC School of Medicine |

EXHIBIT

1

**Farr A. Curlin, MD**

| | |
|---|---|
| 1997 | Alpha Omega Alpha Honor Medical Society, UNC School of Medicine |
| 1998 | Heusner Pupil Award, for showing "a great capacity to grasp the principles of science, to heal the sick, to comfort the troubled, to be humble before God." UNC School of Medicine |
| 1998 | Cecil G. Sheps Award in Social Medicine – chosen by the Department of Social Medicine as the graduating student who most embodies the department's ideals, UNC School of Medicine |
| 1998 | Terri Brenneman Award - for "the graduating student who has most demonstrated a commitment to the underserved." UNC School of Medicine |
| 1998 | Merck Award – chosen by the UNC faculty as one of four graduating students to be honored for their contributions to the medical school community, UNC School of Medicine |
| 2000 | Norris L. Brookens Award – chosen by the state chapter of the American College of Physicians as the Most Outstanding Internal Medicine Resident in Illinois |
| 2003 | John A. Oremus Memorial Scholar – MacLean Center for Clinical Medical Ethics, The University of Chicago |
| 2006 | Greenwall Foundation Faculty Scholar in Bioethics (2006-2009) |
| 2007 | Outstanding Physician Scientist Award. Central Society of Clinical Research and the Midwestern Section of the American Federation for Medical Research |
| 2008 | Early Career Development Award. Central Society for Clinical Research |
| 2011 | Arnold P. Gold Foundation Humanism in Medicine Award Nominee. Pritzker School of Medicine student body |
| 2012 | David B. Larson Fellowship in Health and Spirituality, The Library of Congress |
| 2012 | White Coat Ceremony Keynote Speaker, Pritzker School of Medicine, August 5 |
| 2014 | Gold Humanism Honor Society Induction Ceremony Keynote Speaker, Pritzker School of Medicine, Chicago, IL. March 13 |
| 2017 | Inaugural Robert D. Orr, MD, Lecture in Medical Ethics, University of Vermont, October 27 |
| 2018 | The Steve Thorney Career Award for Spiritual Care, MD Anderson Cancer Center |
| 2018 | Paul Ramsey Award for Excellence in Bioethics, Paul Ramsey Institute |
| 2019 | Pellegrino Medal for Healthcare Ethics, Samford University |
| 2021 | Inaugural Lisio Family Lecture (medical ethics). Columbia University |
| 2022 | Educator of the Year, Christian Medical and Dental Associations |
| 2023 | Englehardt Award (bioethics), The Ohio State University Center for Bioethics and Medical Humanities |

**REVIEW AND EDITORIAL EXPERIENCE**

**Ad hoc journal and book review**

Academic Medicine, American Journal of Bioethics, AJOB – Empirical Bioethics, American Journal of Hospice and Palliative Medicine, American Journal of Law and Medicine, American Journal of Psychiatry, Annals of Family Medicine, Annals of Internal Medicine, Archives of Internal Medicine, British Medical Journal, BMC Medical Education, Cancer, CHEST, CMAJ, Elsevier, Explore, Georgetown University Press, Harvard University Press, Health Affairs, International Journal of Psychiatry in Medicine, Johns Hopkins University Press, Journal of Christian Bioethics, Journal of Clinical Oncology, Journal of General Internal Medicine, Journal of Medical Ethics, Journal of Medicine and Philosophy, Journal of Oncology Practice, Journal of Pain and Symptom Management, Journal of Religion and Health, Journal of the Scientific Study of Religion, Lancet, Medical Care, Mayo Clinic Proceedings, Medical Journal of Australia, New England Journal of Medicine, Oxford University Press, Pediatrics, Perspectives in Biology and Medicine, Plos One, Social Science & Medicine, Southern Medical Journal, Stanford University Press, Theoretical Medicine and Bioethics, Zygon

**Farr A. Curlin, MD**

**Editorial experience**

| | |
|---|---|
| 2008 | Guest editor of special issue of *Theoretical Medicine and Bioethics*, focused on conscience and clinical practice, published 2008 |
| 2014 - | Editorial Board, *Perspectives in Biology and Medicine* |
| 2016 | Guest editor of special issue of *Christian Bioethics*, focused on setting the medicine in the context of a good and faithful life |
| 2019 | Guest editor of special issue of *Theoretical Medicine and Bioethics*, focused on defining and measuring death |
| 2019 | Guest editor of special issue of *Perspectives in Biology and Medicine*, focused on disputes about conscience in medicine |
| 2023 | Guest editor of special issue of *Christian Bioethics*, focused on moral and theological questions raised by medicalizing risk |

**CLINICAL PRACTICE**

| | |
|---|---|
| 2001 – 2003 | Primary Care Internist, Lawndale Christian Health Center |
| 2003 – 2008 | Primary Care Physician, University of Chicago Primary Care Group |
| 2003 – 2013 | General Internal Medicine attending physician. University of Chicago Hospitals. |
| 2004 – 2013 | Ethics consult service, University of Chicago |
| 2008 – 2013 | Associate Medical Director – Horizon Hospice Care, Chicago, IL |
| 2008 – 2013 | Palliative Medicine Consult Service. University of Chicago Hospital |
| 2014 – | Attending physician. Duke Hospice and Palliative Care |

**ADMINISTRATIVE LEADERSHIP / COMMITTEE WORK (selected)**

| | |
|---|---|
| 2000 – 2003 | Best Practices Project Steering Committee. The US Bureau of Primary Health Care and the Christian Community Health Fellowship |
| 2003 | Working group on the ethics of spirituality in medicine. George Washington Institute for Spirituality and Health and the Association of American Medical Colleges |
| 2006 – 2008 | Ethics Research Group. Division of Standards and Survey Methods. Joint Commission on Accreditation of Healthcare Organization |
| 2008 – 2013 | Founding Co-Director (with Daniel Sulmasy, MD, PhD), Program on Medicine and Religion, The University of Chicago. https://pmr.uchicago.edu |
| 2010 – 2015 | The Witherspoon Council on Ethics and the Integrity of Science. Member. |
| 2012 – 2015 | Bioethics and Christian Theology Affinity Group, Founding Co-Director (with Jeffrey Bishop). American Society for Bioethics and Humanities |
| 2014 – | Co-Director (with Warren Kinghorn, MD, ThD), Theology, Medicine, and Culture Initiative (TMC), Duke Divinity School. https://tmc.divinity.duke.edu |
| 2017 – 2020 | Founding Director, Arete Initiative, Kenan Institute for Ethics, Duke University |
| 2018 – 2021 | Provost's Advisory Committee for Online Education, Duke University |
| 2021 – 2023 | President's Advisory Committee on Institutional History, Duke University |

**INVITED EXTRAMURAL PRESENTATIONS (selected)**

1. Wabash College.  February 23, 2004. Crawfordsville, IN
2. Loyola University School of Law. March 21, 2004. Chicago, IL
3. Christian Community Health Fellowship Conference (keynote). Atlanta, GA, May 21, 2004.
4. Spirituality and Healthcare Dialogue. The University of Texas Medical Branch. March 30, 2005. Galveston, TX.
5. God in the clinic: Religion, medicine, and the dilemmas of "patient-centered care." Lee University, Cleveland, TN, October 4, 2005.

**Farr A. Curlin, MD**

6.  Getting below the surface: The ethics of religious/spiritual interaction in the clinical encounter. Duke University, Durham, NC. October 6, 2005.
7.  Program in Genetic Counseling. Northwestern University, February 6, 2006.
8.  Duke University Center for Theology and Medicine, Durham, NC, June 22, 2006.
9.  Annual Faith in Medicine Conference, (keynote) The Faith and Medicine Institute, Boston, MA, September 2, 2006.
10. Spirituality/Medicine Interface Conference (keynote). Southern Medical Association. Atlanta, GA, September 14-16, 2006.
11. Sr. Alice Potts Endowed Lectureship for Spirituality and Medicine, MD Anderson Cancer Center, Houston, TX, October 30, 2006.
12. 4th Annual Vincent C. DeStefano Memorial Conference. Memorial Hospital. South Bend, Indiana. June 13, 2007.
13. University of Michigan Ethics Conference, Ann Arbor, March 11, 2008.
14. Louise Kingston Endowed Lectureship in Spirituality and Medicine. Princeton University Medical Center, Princeton, NJ. April 1, 2008.
15. American Medical Association, Division of Medical Ethics. Chicago. May 30, 2008.
16. Christian Medical and Dental Associations National Conference (keynote). Bloomingdale, IL. June 19, 2008.
17. Patient Rights vs. Doctor Conscience. DeVos Medical Ethics Colloquy. (keynote, along with R. Alta Charo). Grand Rapids, MI. September 8, 2008.
18. Conscience and clinical practice. President's Council on Bioethics. September 11, 2008. https://bioethicsarchive.georgetown.edu/pcbe/transcripts/sept08/session3.html
19. The Role of Conscience in Medicine. (keynote) Center for Law, Health & Society, Georgia State University. Atlanta, GA. October 9, 2008
20. Religion, Science, and the Moral Life of Medicine. (keynote) Sentara 2008 Ethics Conference. Williamsburg, VA. November 7, 2008.
21. Controversial Bodies: How to View and Think about Plastinated Corpses. (keynote) University of Kansas Medical School and Center for Practical Bioethics. Kansas City, MO. December 5, 2008.
22. Medicine Grand Rounds, University of Saskatchewan College of Medicine, Saskatoon, CA. January 9, 2009.
23. David Larson, MD, Memorial Lecture, Society for Spirituality, Theology and Medicine Annual Conference. Durham, NC. June 5, 2009.
24. Veritas Forum. Mayo Clinic, Rochester, MN. September 23, 2009.
25. 8th Annual Contemporary Catholic Healthcare Ethics Conference. Stritch School of Medicine at Loyola University. October 9, 2009. Chicago, IL
26. Florida Hospital Annual Conference on Spirituality and Medicine. March 25, 2010. Orlando, FL
27. Spirituality and Medicine Conference. Brody School of Medicine. April 1, 2010. Greenville, NC
28. The Lupina Centre for Spirituality, Healthcare and Ethics at Regis College, University of Toronto. October 15/16, 2010
29. Children's of Minnesota Westgate Pediatric Ethics Forum, Minneapolis, MN. November 12, 2010
30. Grand Rounds. Methodist Hospital, and Lecture in the Religion and Public Life Program. James Baker Institute for Public Policy. Houston, TX. December 3, 2010.
31. International Institute of Restorative Reproductive Medicine (IIRRM). Dublin, Ireland. March 26, 2011.
32. Terminal Sedation and Active Euthanasia: What are the Boundaries? 3rd Annual Bioethics Symposium. (keynote) University of Wisconsin. Madison, WI. April 7, 2011

Farr A. Curlin, MD

33.  Where Religion, Policy, and Bioethics Meet: An Interdisciplinary Conference on Islamic Bioethics and End-of-Life Care. (keynote) University of Michigan. Ann Arbor, April 10, 2011

34.  Religion, Spirituality, and Mental Health (keynote). Loyola University Chicago. April 12, 2012

35.  Kluge Center, United States Library of Congress, Washington, DC. June 28, 2012

36.  26th Annual A. Kurt Weiss Lecture in Biomedical Ethics, University of Oklahoma Health Sciences Center. September 27, 2012

37.  Turner Conference on Faith and Medicine (keynote), Muncie, IN. October 10, 2012

38.  Allen M. Boyden, M.D, Memorial Lecture. Providence St. Vincent Medical Center. Portland, OR. November 8, 2012

39.  Speaking About the End of Life, Spiritual, Religious and Community Conversations (keynote). Mount Sinai Medical Center & Greater Miami Jewish Federation. December 4, 2012

40.  Ethics Grand Rounds. Loyola University Medical Center. January 8, 2013

41.  Workshop on Comparative Studies of Religion and Values among Healthcare Professionals. Freiburg Institute of Advanced Studies. Germany. February 20-22, 2013

42.  28th Annual Notre Dame Medical Ethics Conference. Notre Dame, IN. March 8-10, 2013

43.  Trent Center Lecture on Medical Humanities, Duke University. Durham, NC, April 17, 2013

44.  Reverend Edward J. Drummond, S.J. Lecture, Medicine Grand Rounds, Saint Louis University. May 10, 2013

45.  Association of Professional Chaplains national webinar journal club. May 14, 2013

46.  Institute of Medicine. Committee on Approaching Death: Addressing Key End of Life Issues. Houston. July 22, 2013

47.  Spirituality and Ethics in Health Care (keynote speaker). Catholic Health Partners. Cincinnati, OH. October 3, 2013

48.  Institute for Ethics and Culture Annual Conference. Notre Dame University. November 9, 2013

49.  Loyola University Annual Medical Ethics Conference. March 13, 2014

50.  Notre Dame Annual Medical Ethics Conference. March 21-23, 2014

51.  Physician Well-Being Conference. Adventist Health Care. Jacksonville, FL. April 11, 2014

52.  4th European Conference on Religion, Spirituality and Health (Keynote). Malta. May 23, 2014

53.  Harvard Lecture Series on Spirituality and Medicine, Harvard University. November 17-18, 2014

54.  Medicine Grand Rounds. Medical College of Virginia. Richmond, VA, February 19, 2015

55.  Institute for Faith and Learning. Baylor University. Waco, TX. September 11, 2015

56.  Annual Conference. MacLean Center for Clinical Medical Ethics. November 14, 2015

57.  2016 Conference on Medicine and Religion. Houston, TX. March 4, 2016.

58.  Reimagining Medicine Conference. Denver Institute for Faith and Work. April 6, 2016

59.  Hagop S. Mekhjian Lecture. The Ohio State University. Columbus, OH. September 15, 2016

60.  Ohio State University Center for Bioethics Annual Conference. September 16-17, 2016

61.  The Basil Society. UT Southwestern. Dallas, TX. September 24, 2016

62.  What is the place of sedation in care at the end of life? (symposium). The University of Chicago. October 14, 2016

63.  2016 MedConference. Florham Park, NJ. October 15, 2016

64.  Medical Ethics Grand Rounds. UNC School of Medicine. Chapel Hill, NC. November 3, 2016

65.  Schiltz Lecturer in the Medical Humanities, University of Kansas School of Medicine. Wichita, KS. January 12-13, 2017

66.  Weston Lecture. Augustine College. Ottawa, ON. March 16, 2017

67.  35th Annual MacLean Center Interdisciplinary Seminar Series on Reproductive Ethics. The University of Chicago. April 26, 2017

68.  Z. Stanley Stys Memorial Lecture. Princeton University Medical Center. May 23, 2017

69.  Robert D. Orr, MD, Lectureship. University of Vermont. October 27, 2017

**Farr A. Curlin, MD**

70.   Gender Transition Services: Progress or Medical Hubris? The 29th Annual Dorothy J. MacLean Fellows Conference on Clinical Medical Ethics, University of Chicago. November 10, 2017

71.   Grand Rounds, Department of Pediatrics. University of Illinois. Chicago, January 5, 2018

72.   Grand Rounds, Department of Medicine, Medical College of Georgia. January 9, 2018

73.   The Steve Thorney Life Career Award and Lecture in Spiritual Care, MD Anderson Cancer Center, Houston, TX, February 9, 2018

74.   Provonsha Lecture. Loma Linda University. March 2, 2018

75.   Thomistic Institute. Harvard University. April 23, 2018

76.   Grand Rounds, Department of Obstetrics and Gynecology, Vanderbilt University. May 5, 2018

77.   Holy Friendship Summit, Bristol, TN. May 18-19, 2018

78.   Commencement Address. Trinity Academy of Raleigh. Raleigh, NC. May 26, 2018

79.   Grand Rounds, Department of Medicine, Texas Tech University. November 8, 2018

80.   Physician Assisted Suicide and Euthanasia: Theological and Ethical Responses (symposium): Georgetown University. November 9, 2018

81.   Affirming Ethical Options for the Terminally Ill. Heritage Foundation. Washington, DC. March 11, 2019

82.   Bioethics Grand Rounds. National Institutes of Health. April 3, 2019

83.   Grand Rounds. Biomedical Ethics Research Program. Mayo Clinic. April 30, 2019

84.   Center for Ethics and Culture, Notre Dame University. May 13, 2019

85.   HEAL Institute, Samford University Center for Faith and Culture, September 6, 2019

86.   King Institute for Faith and Culture, King University, Bristol, TN, September 16-17, 2019

87.   88th Annual Educational Conference. Catholic Medical Association. Nashville, TN. September 26, 2019

88.   Thomistic Institute. Queen's University School of Medicine. Kingston, Ontario. October 9, 2019

89.   Lehman Lecture in Medical Ethics. Allegheny College, Meadville, PA. February 18, 2020

90.   Carol Carfang Nursing & Healthcare Ethics Conference. Tampa, FL. February 28, 2020

91.   School of Civic and Economic Thought and Leadership. Arizona State University. June 15, 2020

92.   McDonald Centre for Theology, Ethics & Public Life. Oxford University, UK. September 4, 2020

93.   Hoover Lecture, York Hospital. York, PA. September 17, 2020

94.   Program in Medical Ethics, Humanities, and Law. Western Michigan University Homer Stryker M.D. School of Medicine. October 7, 2020

95.   2021 Scholar in Residence. Union University. March 8-12.

96.   Character and the Professions Conference (panelist). Wake Forest University. March 13, 2021

97.   Inaugural Lisio Family Endowed Lectureship. Columbia University School of Medicine. September 20, 2021

98.   Thomistic Institute, Yale University. November 3, 2021

99.   MacLean Conference on Clinical Medical Ethics, University of Chicago, November 13, 2021

100.  Thomistic Institute, Johns Hopkins Medical Institute, November 15, 2021

101.  Maurice B. Siegel, M.D., Lecturer in Humanism and Medicine. Cedar's Sinai. January 19, 2022

102.  John Collins Harvey Lecture, Pellegrino Center for Clinical Ethics, Georgetown University, February 25, 2022

103.  Foglio Lecturer, Michigan State University School of Medicine. March 22-23, 2022 (rescheduled—now pending new date)

104.  Veritas Forum at Harvard Medical School, May 23, 2022

105.  Celebrating and Defending the Freedom to Care, Christian Medical and Dental Associations, Washington, D.C. January 2023

**Farr A. Curlin, MD**

106. Conditions for corrosion: how are just healthcare practitioners made and lost? University of Oxford McDonald Centre for Theology, Ethics and Public Life, Oxford, UK. June 27-29, 2023
107. Detransitioners, civil discourse, and the silence of clinical ethics. Annual Interdisciplinary Lecture Series, MacLean Center for Clinical Medical Ethics, University of Chicago. November 14, 2023

## PEER-REVIEWED PRESENTATIONS AT SCHOLARLY MEETINGS

1. Holism or Evangelism? A consideration of religion in medicine. [Special session]. Robert Wood Johnson Clinical Scholars Program National Conference. Ft Lauderdale, FL, November 22, 2003.
2. Religion and Health: Theological Limits and Concerns. [Panel presentation] American Society for Bioethics and Humanities. National Conference. Denver, CO. October 27, 2006.
3. Religion, Conscience, and Controversial Clinical Practices. Central Society for Clinical Research/Midwestern Section American Federation for Medical Research. [Chosen as the top observational science abstract.] April 13, 2007. Chicago, IL.
4. Does Conscience Have a Place in the Healthcare Encounter? [Panel presentation] American Society for Bioethics and Humanities. National Conference. Washington, DC. October 19. 2007
5. Social and Ethical Implications of Supporting or Limiting a Right of Conscientious Refusal for Health Care Providers. [Panel presentation] American Society for Bioethics and Humanities. National Conference. October 15, 2009. Washington, DC.
6. Whose outcomes? Which notion of health? Ethical issues in the measurement of religious experience and its relation to health. [Panel presentation] American Society for Bioethics and Humanities. National Conference. Washington, DC. October 18, 2009.
7. Empirical research in bioethics: A toolkit for beginners. Pre-conference workshop. American Society for Bioethics and Humanities. National Conference. San Diego, CA. October 21, 2010
8. Serving two masters? [Panel presentation] American Association for Hospice and Palliative Medicine Annual Assembly. February 11,2011
9. Representing death, anticipating the corpse [Panel presentation]. American Society for Bioethics and Humanities. National Conference. Washington, DC. October 19, 2012
10. Towards a new art of dying [Panel session]. 2013 Conference on Medicine and Religion. Chicago, IL. May 29, 2013
11. Is traditional inpatient bioethics suited to outpatient settings? [panel] American Society for Bioethics and Humanities. National Conference. Atlanta, GA. October 26, 2013.
12. Among all physicians, is there a physician? Irony and the practice of medicine. American Society for Bioethics and Humanities. National Conference. Atlanta, GA. October 26, 2013.
13. "Do not be anxious ... about your body." Assessing contemporary primary care in light of the Sermon on the Mount. 2014 Conference on Medicine and Religion. Chicago, IL. March 8, 2014
14. Pharmacist on the execution team [panel]. American Society for Bioethics and Humanities. National Conference. San Diego. October 18, 2014.
15. Project on the Good Physician: Relevance of the Rationalist-Intuitionist Debate for Ethics and Professionalism in Medical Education. American Society for Bioethics and Humanities. National Conference. San Diego. October 18, 2014.
16. Can Religion Find Its Voice at a Secular Deathbed? [panel] 2016 Conference on Medicine and Religion. Houston, TX. March 4-6.
17. Doctor's Beliefs and Medical Practices: Transatlantic Comparisons. [panel] 2016 Conference on Medicine and Religion. Houston, TX. March 4-6.
18. The Religion and Medicine of the Future:  An Orthodox Critique of Scientific Theology and Ecumenism. [panel] 2016 Conference on Medicine and Religion. Houston, TX. March 4-6.
19. Reimagining Medicine: Theological Formation for Those with Vocations to Health Care. [panel] 2017 Conference on Medicine and Religion. Houston, TX. March 25.
20. Solidarity with the suffering: Why physicians, *as physicians*, must oppose assisted suicide. International Congress on Law and Mental Health. Prague, Czech Republic. July 11, 2017

**Farr A. Curlin, MD**

21. Searching for a Foundation for Medicine that Christians Share with those who are not Christians [panel]. 2018 Conference on Medicine and Religion. St. Louis, MO. April 14.
22. Remembrance, Resilience, and Religious Formation in Medical Education: Two Case Studies [panel]. American Society for Bioethics and Humanities. National Conference. Pittsburgh. October 27, 2019
23. Improving Palliative and End-of-Life Care for African Americans: Remembering Dr. Richard Payne. [panel]. American Society for Bioethics and Humanities. National Conference. Pittsburgh. October 25, 2019
24. Is there a future for Hippocratic medicine? (panel) 2021 Conference on Medicine and Religion. March 23
25. Healing and Economy: The Question of Charity in a Secular Age (panel). 2021 Conference on Medicine and Religion. March 22
26. "Sufficient for the day is its own trouble": Medicalizing risk and the way of Jesus. 2022 Conference on Medicine and Religion. March 22
27. Secular medicine in the saeculum: An honored but humble servant. 2023 Conference on Medicine and Religion. March 13
28. Still Searching for Moral Certainty? The Physician-Patient Accommodation after 40 Years. 2023 Conference on Medicine and Religion. March 15


**CONFERENCES DIRECTED**

2008 Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy. Hosted at the University of Chicago, March 18

2011 Practice and Profession: Setting Medicine in the Context of a Good and Faithful Life. University of Chicago, November 10.

2012 Responding to the Call of the Sick: Inaugural Conference on Medicine and Religion. May 23-25. Chicago. (with Daniel Sulmasy, MD, PhD)

2012 Judaism, Medicine, and the Formation of Clinicians. September 10, 2012. The University of Chicago (with Daniel Sulmasy, MD, PhD)

2013 What Does it Mean to *Care*? 2013 Conference on Medicine and Religion. Chicago. May 28-30. (with Daniel Sulmasy, MD, PhD)

2014 Responding to the limits and possibilities of the body. 2014 Conference on Medicine and Religion. Chicago. March 7-9. (with Daniel Sulmasy, MD, PhD)

2015 Spiritual Dimensions of Illness and Healing. 2015 Conference on Medicine and Religion. Cambridge, MA, March 6-8. (with Daniel Sulmasy, MD, PhD, and Michael Balboni, PhD)

2016 Approaching the Sacred: Science, Health, and Practices of Care. 2016 Conference on Medicine and Religion. Houston, TX. March 4-6. (with Michael Balboni, PhD)

2016 - Practice and Presence: A Gathering for Christians in Health Care. Duke Divinity School. Durham, NC. (annual three day conference, with Warren Kinghorn, MD, PhD)

2017 Re-Enchanting Medicine. 2017 Conference on Medicine and Religion. Houston, TX. March 24-26. (with Michael Balboni, PhD)

2019 Theological Approaches to Persons in Pain. J.B. Duke Hotel & Conference Center. Durham, NC. March 28.

2019 "My pain is always with me"; Medicine & Faithful Responses to Suffering. 2019 Conference on Medicine and Religion. JB Duke Hotel & Conference Center. Durham, NC. March 29-31.

2021 2021 Conference on Medicine and Religion (Virtual). March 22-24.

2022 2022 Conference on Medicine and Religion, The Nines Hotel, Portland, OR. March 13-15.

**Farr A. Curlin, MD**

2022    Questioning Preventive Medicine: Is a Pound of Prevention Worth an Ounce of Cure? Duke University. May 17.

**TEACHING EXPERIENCE AND CURRICULUM DEVELOPMENT (selected)**

**Undergraduates**

| | |
|---|---|
| 2006 | Things, bodies, persons: Human goods in the technological era. Big Problems Course, The University of Chicago. (faculty, with J Lantos and D Brudney) |
| 2022 - | Medicine and Human Flourishing. Course for sophomores in "Transformative Ideas" series. Worked with primary instructor, Jose Gonzalez, to design course. |

**Medical Students**

| | |
|---|---|
| 2002, 2003 | Medicine and Spirituality Course. University of Chicago. (guest lecture) |
| 2002, 2003 | National *Wit* Education Initiative. Discussion group facilitator. |
| 2003 – 2013 | Cultural competence in medicine. Preceptor |
| 2004 – 2006 | Committee for Medical Student Retreats, Co-created and co-directed sessions on humanism and medicine (90 students/session). |
| 2004 | Essentials of Physicianship. MS1 course. Small Group facilitator/instructor |
| 2004, 2005 | Spirituality and Healing in Medicine. medical student elective (course co-director). |
| 2004, 2006 | Clinical Skills 1C course. (lecture: Religion and the doctor-patient relationship). |
| 2005 – 2013 | Summer Research Program. (faculty mentor to 10 medical students) |
| 2005 – 2013 | Death, dissection, and doctor formation. (Annual lecture before MS1 cadaver lab) |
| 2005 – 2013 | Doctor-Patient Relationship course. (Core faculty and lecturer) |
| 2010 – 2013 | Physician Development and Formation. (Co-director of required small group discussion component of MS1 Gross Anatomy course) |
| 2015 – 2019 | MS2 Practice Course. Teach session(s) on the ethics of clinical decision-making, and on religion, spirituality, and medicine |
| 2019 – | Clinical Medical Ethics: What Would a Good Physician Do? (annual 8-week elective, now co-taught with Dr. Josh Briscoe) |

**Residents**

| | |
|---|---|
| 2004 – 2013 | Internal Medicine Residency Morning Report. (Faculty discussant for 55 total sessions over 9 years, focused on cases with clinical ethical complexity) |

**Fellows**

| | |
|---|---|
| 2004-5, 2007 | Research Proposal Design Workshop. Co-directed summer workshop for fellows in health services research and ethics. |
| 2004 – 2013 | MacLean Center for Clinical Medical Ethics Fellowship. Taught three sessions/year |
| 2006 – 2013 | Religious Traditions and Clinical Ethical Decisions. (director of annual, quarter-long seminar for fellows in clinical medical ethics and interested medical students) |
| 2010 – 2013 | Summer Program in Outcomes Research Training. Teach 90-minute session for clinical research fellows on Practical Survey Development and Design. |

**Divinity Students**

| | |
|---|---|
| 2014 | Healing Arts: Suffering, Illness, and the Witness of the Church. Duke Divinity School. (course co-director, with Kinghorn and Barfield) |
| 2016 – | Health Care in Theological Context II (formerly *Theological Bioethics*). Semester-length course. Duke Divinity School |

**GRANT FUNDING**
**Current:**

9

**Farr A. Curlin, MD**

1. Forming Distinguished Scholars for Christ across Academic Medicine
PI: Kinghorn (Curlin Co-Investigator)          Agency: McDonald Agape Fund
                                                Period: 1/1/23 – 12/31/26
This project gathers, mentors, and resources a network of outstanding colleagues from other major academic medical centers seeking to renew medicine through attention to its theological dimensions.


**Past:**
1. The integration of religion and spirituality in patient care among US physicians
PI: Curlin and Chin          Agency: The Greenwall Foundation
                              Period: 07/01/02 – 06/30/04
Project conducted the first comprehensive national study of physician's religious characteristics and how those characteristics are associated with physicians' clinical practices.


2. Religious commitments and clinical engagements
PI: Curlin          Agency: NCCAM
Type: K23 AT002749-01A1          Period: 10/01/05 – 09/30/10
Project developed a mixed-methods framework for assessing the religion-associated variations in physicians' self-reported and self-predicted practices in different clinical domains.


3. Variance on the margins of religion and medicine
PI: Curlin          Agency: The Greenwall Foundation
                    Period: 07/01/06 – 06/30/09
[Greenwall Foundation Faculty Scholar in Bioethics] Project refined a methodology for assessing religion-associated variance in physicians' self-reported and self-predicted practices, and applied that methodology to assess variations in physicians' approaches to sexual and reproductive health care.


4. Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy
PI: Curlin          Agency: The Greenwall Foundation
                    Period: 01/01/08 – 06/30/09
Grant supported a conference on the place of the clinician's conscience in ethical practice, held at the University of Chicago on March 18, 2008.


5. The Chicago Program on Spirituality, Theology and Clinical Decision-Making
PI: Curlin          Agency: The John Templeton Foundation
                    Period: 10/01/08 – 09/30/12
This project established the Program on Medicine and Religion at the University of Chicago and supported four national physician surveys to assess religion-associated variations in physicians' practices related to 1) sexual and reproductive health care, 2) primary care mental and behavioral health care, 3) decision-making in advanced illness and end of life care, and 4) the doctor patient relationship and meaning in medicine.


6. Project on the Good Physician: A New Science of Virtues
PI: Curlin          Agency: Arete Initiative, The University of Chicago
                    Period: 3/1/10 – 2/28/12

10

**Farr A. Curlin, MD**

This grant supported a national longitudinal study of the moral and professional formation of American physicians over the course of medical training

7. Physician Heal Thyself: The University of Chicago Medicine and Religion Faculty Scholars Program
PI: Sulmasy (Curlin Co-PI)            Agency: The John Templeton Foundation
                                      Period: 7/1/12-6/30/15
Project established a Faculty Scholars Program in Medicine and Religion, funding eight junior faculty nationwide at 50% effort for two year tenures.

8. Toward Policies that Accommodate the Concerns of African Americans in Resolving Disputes about the Use of Life-Sustaining Technology
PI: Johnson (Curlin Co-I)             Agency: Greenwall Foundation
                                      Period: 3/1/2015 – 2/29/2017
This project examined the attitudes of African Americans toward futile treatments and futility policies.

9. Training Research-Literate Chaplains as Ambassadors for Spirituality and Health
PI: Fitchett and Cadge (Curlin Co-I)     Agency: John Templeton Foundation
                                      Period: 7/1/2015 - 6/30/19
This project advanced research literacy among the nation's health care chaplains.

10. Toward Effective Cooperation between Clinical and Other Community Stakeholders Committed to Stemming the Opioid Epidemic
PI: Curlin (McCarty Co-PI)                Agency: The Greenwall Foundation
                                      Period: 7/1/2019 – 6/30/2022
This project aims to 1) describe the barriers to institutional collaboration among those responding to the opioid epidemic; and 2) create policy recommendations for effective collaboration in efforts to stem the opioid epidemic.

11. The Arete Initiative at Duke University's Kenan Institute for Ethics
PI: Curlin                                Agency: Foundation for Excellence in Higher Education
                                      Period: 7/1/17 – 6/30/21
The Arete Initiative sponsors scholarship and learning opportunities focused on recovering and sustaining the virtues in contemporary life, especially in the workplace, the university, and the public square.

12. Fellowship in Theology, Medicine, and Culture
PI: Kinghorn (Curlin Co-Investigator)      Agency: The Issachar Fund
                                      Period: 7/1/15 – 12/31/22
Project invites students and practitioners in health professions, as well as others with full-time vocations to health-related contexts, to participate in a program of theological formation that will equip them for faithful, disciplined, and creative engagement with contemporary practices of health care.

13. Out of Our Meds? Building a Theological and Moral Framework for the Use of Medications
PI: Kinghorn (Curlin Co-Investigator)      Agency: McDonald Agape Fund
                                      Period: 2016 – 2022
This project conducts a series of five annual symposia on theological, ethical, and clinical questions raised by pharmaceutical prescribing.

**PUBLICATIONS**
**Original peer-reviewed scholarship**

11

**Farr A. Curlin, MD**

<u>Books</u>
Curlin FA, Tollefsen C. *The Way of Medicine: Ethics and the Healing Profession*. Notre Dame University Press; 2021.

<u>Papers</u>

1.  Iwashyna TJ, Curlin FA, Christakis NA. Racial, ethnic and affluence differences in elderly patients' use of teaching hospitals. *J Gen Int Med*. 2002;17(9):696-703.

2.  Hall DE, Curlin F, Koenig HG. When clinical medicine collides with religion. *Lancet*. 2003;362:S28-S29

3.  Hall DE, Curlin FA.  Can physicians' care be neutral regarding religion? *Academic Medicine*. 2004;79:677-679.

4.  Curlin FA and Moschovis PP. Is religious devotion relevant to the doctor-patient relationship? *Journal of Family Practice*. 2004;53(8):632-640.

5.  Curlin FA, Roach CJ, Gorawara-Bhat R, Lantos JD, Chin MH. When patients choose faith over medicine: Physician perspectives on religiously related conflict in the medical encounter.  *Archives of Internal Medicine*. 2005;165(1):88-91

6.  Curlin FA, Hall DE. Strangers or friends? A proposal for a new spirituality-in-medicine ethic. *J Gen Intern Med*. 2005;20(4):370-374.

    > Editorial: Scheurich N. Spirituality, Medicine, and the Possibility of Wisdom. *J Gen Intern Med*. 2005;20(4):379-380.

7.  Curlin FA, Lantos JD, Roach CJ, Sellergren SA, Chin MH. Religious characteristics of U.S physicians: A national survey. *J Gen Intern Med*. 2005;20(7):629-634.

8.  Curlin FA, Roach CJ, Gorawara-Bhat R, Lantos JD, Chin MH. How are religion and spirituality related to health? A study of physicians' perspectives. *South Med J*. 2005; 98(8):761-6.

    > Editorial: Daly CC. Religion and the attending physician's point-of-view. *South Med J*. 2005; 98(8):759

9.  Gee L, Smucker D, Chin M, Curlin FA. Partnering together? A study of current relationships between faith-based community health centers and local religious congregations. *South Med J*. 2005; 98(12):1245-50

    > Editorial: Flannelly KJ, Weaver AJ, Tannenbaum HP. What do we know about the effectiveness of faith-based health programs? *South Med J*. 2005; 98(12):1243-4.

10. Curlin FA, Hall DE. Regarding Plan B: Science and politics cannot be separated. *Obstet Gynecol.* 2005;105(5):1148-50

11. Curlin FA, Chin MH, Sellergren SA, Roach CJ, Lantos JD. The association of physicians' religious characteristics with their attitudes and self-reported behaviors regarding religion and spirituality in the clinical encounter. *Med Care*. 2006;44:446-53

12. Curlin FA. Spirituality and lifestyle: what clinicians need to know. *South Med J*. 2006;99:1170-1.

13. Curlin FA, Serrano K, Baker M, Carricaburu S, Smucker D, Chin MH. Following the call: How providers make sense of their decisions to work in faith-based and secular urban community health centers. *J Health Care Poor Underserved*. 2006;17(4):944-957

14. Curlin FA, Lawrence RE, Chin MH, Lantos JD. Religion, conscience, and controversial clinical practices. *New England Journal of Medicine*. 2007;356(6):593-600

Farr A. Curlin, MD

Curlin FA, Lawrence RE, Lantos JD. Letters and author reply. Religion, conscience, and controversial clinical practices. *N Engl J Med*. 2007;356(18):1889-92

15. Curlin FA, Sellergren SA, Lantos JD, Chin MH. Physicians' observations and interpretations of the influence of religion and spirituality on health. *Arch Intern Med*. 2007;167(7):649-54

16. Curlin FA, Dugdale LS, Lantos JD, Chin MH. Do religious physicians disproportionately care for the underserved? *Annals of Family Medicine.* 2007;5(4):353-60.

17. Curlin FA, Odell S, Lawrence RE, Chin MH, Lantos JD, Meador KG, Koenig HG. The relationship between psychiatry and religion among US physicians. *Psychiatr Serv* 2007;58(9):1193-1198.

Curlin FA, Meador KG, Koenig HG. Psychiatrists and religious belief: reply. *Psychiatr Serv*. 2007;58(11):1500-1

18. Curlin FA, Lawrence RE, Odell S, Chin MH, Lantos JD, Koenig HG, Meador KG. Religion, spirituality, and medicine: psychiatrists' and other physicians' differing observations, interpretations, and clinical approaches. *Am J Psychiatry*. 2007;164(12):1825-31.

Editorial: Eichelman B. Religion, spirituality, and medicine. Am J Psychiatry 2007;164: 1774-1775

19. Lawrence RE, Curlin FA. Clash of definitions: Controversies about conscience in medicine. *American Journal of Bioethics*. 2007;7(12):10-4.

Lawrence RE, Curlin FA. Response to eleven peer commentaries regarding "Clash of Definitions: Controversies about Conscience in Medicine". *Am J Bioeth*. 2007;7(12):1-2.

20. Curlin FA, Nwodim C, Vance JL, Chin MH, Lantos JD. To die, to sleep: US physicians' religious and other objections to physician assisted suicide, terminal sedation, and withdrawal of life support. *Am J Hosp Palliat Care*. 2008;25(2):112-20.

21. Lantos JD, Curlin FA. Religion, conscience, and clinical decisions. *Acta Paediatr*. 2008;97(3):265-6.

22. Curlin FA, Dinner SN, Lindau ST. Of more than one mind: obstetrician-gynecologists' approaches to morally controversial decisions in sexual and reproductive healthcare. *J Clin Ethics*. 2008;19(1):11-21; discussion 22-3

Published as Feature article with the following editorials: 1) Howe EG. When, if ever, should caregivers provide moral advice? 2) Pellegrino ED. Commentary on 'Of More than One Mind.' 3) Chervenak FA, McCullough LB. Professional responsibility and individual conscience, and 4) Kozishek D, Bogdan-Lovis E. Beliefs, boundaries, and self-knowledge in professional practice.

23. Ishibashi KL, Koopmans J, Curlin FA, Alexander K, Ross LF. Paediatricians' attitudes and practices towards HPV vaccination. *Acta Paediatr.* 2008;97(11):1550-6

24. Tilburt JC, Kaptchuk TJ, Curlin FA, Emanuel EJ, Miller FG. Prescribing "placebo treatments": results of national survey of US internists and rheumatologists. *BMJ*. 2008;337:a1938

25. Ishibashi KL, Curlin FA, Alexander K, Koopmans J, Ross LF. Pediatricians are more supportive of HPV vaccination than are members of the general public. *South Med J*. 2008;101(12):1216-21.

26. Tilburt JC, Curlin FA, Kaptchuk TJ, Clarridge B, Bolcic-Jankovic D, Emanuel EJ, Miller FG. Alternative medicine research in clinical practice: a US national survey. *Arch Intern Med*. 2009;169(7):670-7.

27. Lawrence RE, Curlin FA. Autonomy, religion and clinical decisions: findings from a national physician survey. *J Med Ethics*. 2009;35(4):214-8.