# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | |
| Hon. Steve Marshall, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

## PRIVATE PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................1

STATEMENT OF FACTS...............................................2

    A. Response to Defendants' Statement of Facts ......................2

    B. Evidentiary Objections to Defendants' Statement of Facts.............37

    C. Additional Facts ...........................................43

ARGUMENT ......................................................44

    I. SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE ALL OF
    DEFENDANTS' ASSERTIONS REST ON DISPUTED FACTS ........45

    II. SUMMARY JUDGMENT SHOULD ALSO BE DENIED BECAUSE
    HEIGHTENED SCRUTINY APPLIES .................................45

CONCLUSION ....................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams by & through Kasper v. Sch. Bd.*,
   57 F.4th 791 (11th Cir. 2022)..................................................46, 48, 50

*Ala. Aircraft Indus. v. Boeing Co.*,
   No. 2:11-cv-03577-RDP, 2019 WL 13172372 (N.D. Ala. July 1,
   2019) ...........................................................................................41

*Bd. of Trs. of Univ. of Alabama v. Garrett*,
   531 U.S. 356 (2001) (Kennedy, J., concurring) .................................47

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ..................................................................47, 48

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
   47 F.4th 1278 (11th Cir. 2022).........................................................39

*Doe v. Ladapo*,
   No. 4:23cv114-RH-MAF, 2024 WL 2947123 (N.D. Fla. June 11,
   2024) ....................................................................................*passim*

*Eknes-Tucker v. Governor of Alabama*,
   80 F.4th 1205 (11th Cir. 2023)................................................2, 46, 50

*Eknes-Tucker v. Governor*,
   No. 22-11707................................................................................7, 8, 12

*Favors v. City of Atlanta*,
   849 F. App'x 813 (11th Cir. 2021) ....................................................44

*Gomillion v. Lightfoot*,
   364 U.S. 339 (1960)........................................................................48

*Hardigree v. Lofton*,
   992 F.3d 1216 (11th Cir. 2021).....................................................1, 44

*Heller v. Doe*,
   509 U.S. 312 (1993) ........................................................................1

*Hibiscus Assocs. v. Bd. of Trs. of the Policemen & Firemen Ret. Sys.*,
  50 F.3d 908 (11th Cir. 1995) .................................................................. 41

*Jackson v. Johnson & Johnson*,
  No.1:11-CV-3903-TWT, 2022 WL 110422 (N.D. Ga. Jan. 12,
  2022) ........................................................................................................ 39

*Jones v. UPS Ground Freight*,
  683 F.3d 1283 (11th Cir. 2012) .............................................................. 38

*League of Women Voters v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023) ........................................................... 47, 50

*Macuba v. Deboer*,
  193 F.3d 1316 (11th Cir.1999) ............................................................... 38

*Pers. Adm'r v. Feeney*,
  442 U.S. 256 (1979) ................................................................................ 46

*Prosper v. Martin*,
  989 F.3d 1242 (11th Cir. 2021) ......................................................... 40, 42

*In re Rezulin Prods. Liab. Litig.*,
  309 F.Supp.2d 531 (S.D.N.Y. 2004) ...................................................... 41

*Schoen v. State Farm Fire & Cas. Co.*,
  638 F. Supp. 3d 1323 (S.D. Ala. 2022) .................................................. 39

*Skop v. City of Atlanta*,
  485 F.3d 1130 (11th Cir. 2007) .............................................................. 44

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) .............................................................. 41

*United States v. Hawkins*,
  934 F.3d 1251 (11th Cir. 2019) ......................................................... 41, 43

*United States v. Scrima*,
  819 F.2d 996 (11th Cir. 1987) ................................................................ 39

*United States v. Skrmetti*,
  No. 23-477, 2024 WL 3089532 (June 24, 2024) ..................................... 1

*United States v. Virginia*,
  518 U.S. 515 (1996) ........................................................................44

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ...................................................................*passim*

**Statutes**

Ala. Code § 16-1-52 ........................................................................49

Ala. Code § 16-1-54 ........................................................................49

Ala. Code § 16-40A-5 ......................................................................49

2021 Ala. Laws, Act 2021-285 .........................................................49

2022 Ala. Laws, Act 2022-290 ....................................................48, 49

**Other Authorities**

Fed. R. Civ. P. 56(a) ........................................................................44

Fed. R. Evid. 702 ................................................................39, 40, 43

Fed. R. Evid. 801(c), 802 .................................................................38

Fed. R. Evid. 901(a) .........................................................................38

# EXHIBITS

| | Exhibit |
|---|---|
| Deposition of ██ Hawes (Submitted Under Seal) | 1 |
| Deposition of ██ Cohn (Submitted Under Seal) | 2 |
| Deposition of ██ Davis (Submitted Under Seal) | 3 |
| Plaintiff-Intervenor United States' Disclosure of Expert Testimony of Daniel Shumer, MD, MPH | 4 |
| Plaintiff-Intervenor United States' Disclosure of Rebuttal Expert Testimony of Daniel Shumer, MD, MPH (Submitted Under Seal) | 5 |
| Plaintiff-Intervenor United States' Disclosure of Rebuttal Expert Testimony of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C | 6 |
| Affidavit of Meredithe McNamara, MD, MSc, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment | 7 |
| Testimony of Dr. James Cantor in Transcript of Preliminary Injunction Hearing, Volume II (ECF No. 105) | 8 |
| Brief of Amici Curiae American Academy of Pediatrics et al. in Support of Plaintiffs' Motion for Preliminary Injunction, *Doe v. Surgeon Gen., St. of Fla.,* No. 23-12159 (11th Cir. Oct. 13, 2023) | 9 |
| Brief of Amici Curiae American Academy of Pediatrics et al. in Support of Plaintiffs-Appellees and Affirmance, *Eknes-Tucker v. Governor*, 80 F.4th 1205 (11th Cir. 2023) (No. 22-11707) | 10 |

| | |
|---|---|
| Transgender Health: Supporting Gender Diverse Youth to Improve their Health, Well-Being, and Safety (Pediatric Endocrine Society), Plaintiffs' Preliminary Injunction Exhibit 25, ECF No. 78-25 | 11 |
| NAPNAP Strongly Opposes Alabama Law Criminalizing Transgender Health Care (National Association of Pediatric Nurse Practitioners), Plaintiffs' Preliminary Injunction Exhibit 28, ECF No. 78-28 | 12 |
| American Academy of Pediatrics Speaks Out Against Bills Harming Transgender Youth, Plaintiffs' Preliminary Injunction Exhibit 22, ECF No. 78-22 | 13 |
| American Academy of Pediatrics and Its Alabama Chapter Oppose Bill Threatening Health of Transgender Youth, Plaintiffs' Preliminary Injunction Exhibit 30, ECF No. 78-30 | 14 |
| American Academy of Pediatrics Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents, Plaintiffs' Preliminary Injunction Exhibit 32, ECF No. 78-32 | 15 |
| American Psychological Association Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth, Plaintiffs' Preliminary Injunction Exhibit 23, ECF No. 78-23 | 16 |
| Frontline Physicians Oppose Legislation that Interferes in or Criminalizes Patient Care (American Psychiatric Association), Plaintiffs' Preliminary Injunction Exhibit 20, ECF No. 78-20 | 17 |
| Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment for Transgender Children and Adolescents Rely on Inaccurate and Misleading Scientific Claims, Plaintiffs' Preliminary Injunction Exhibit 19, ECF No. 78-19 | 18 |
| Supplemental Expert Report of Meredithe McNamara, MD, MSc | 19 |
| Declaration of Eli Coleman, PhD, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment | 20 |

| | |
|---|---|
| Deposition of Farr Curlin, M.D. | 21 |
| Deposition of Geeta Nangia, M.D. (Submitted Under Seal) | 22 |
| Deposition of Michael Laidlaw, M.D. (Submitted Under Seal) | 23 |

## INTRODUCTION

Defendants' motion for summary judgment should be denied because it rests on disputed facts and serves only to illustrate why a trial is necessary. Under well-settled law, this Court must view all evidence and inferences, and resolve all reasonable doubts about the facts, in favor of the Plaintiffs. *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021). Here, every material fact on which Defendants rely is either unsupported by admissible evidence, contradicted by record evidence, or both. Even under rational basis review, Defendants' proffered justifications must have some "footing in . . . realit[y]." *Heller v. Doe*, 509 U.S. 312, 321 (1993). Defendants have demonstrated no such footing here, where overwhelming record evidence contradicts their asserted justifications for this sweeping criminal ban.

In addition, while Defendants' motion fails under any standard of equal protection review, Defendants are wrong that only rational basis scrutiny applies. The Supreme Court has agreed to hear a virtually identical case, *see United States v. Skrmetti*, No. 23-477, 2024 WL 3089532 (June 24, 2024) (order granting certiorari), and Plaintiffs' petition for rehearing en banc is still pending. The resolution of those cases will provide guidance on the standard applicable to this case. In the meantime, under the Eleventh Circuit's opinion on the preliminary-injunction appeal in this case, heightened scrutiny applies if the Ban "is a pretext for invidious discrimination

against [transgender] individuals," *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1230 (11th Cir. 2023), which the record here plainly shows.

Regardless of which equal protection standard applies, Defendants cannot meet their burden of showing entitlement to relief as a matter of law based on the record in this case. Far from showing that there are *no* undisputed material facts, Defendants have failed to show that there are *any*. If ever there were a case in which summary judgment is inappropriate, this is it.

## STATEMENT OF FACTS

### A.      Response to Defendants' Statement of Facts

Private Plaintiffs dispute each of the facts on which Defendants rely:

**1.      RESPONSE: Disputed that the legislative findings are supported by credible evidence.** See responses to ¶¶ 2-6, below.

**2.      RESPONSE: Disputed.** According to endocrine specialist Dr. Daniel Shumer, "The description of *sex* outlined in the law is a gross oversimplification of a complicated biological concept. [It] fails to include gender identity, which is an essential medical component of sex for every person . . ."[1] "[G]ender identity has a biological foundation, just as other elements of sex such as anatomy, hormones, and chromosomes."[2]

---

[1] PX4:27 (Shumer Rep.).
[2] PX4:27 (Shumer Rep.).

"Gender dysphoria is one of many health conditions for which the diagnosis is made via clinical diagnosis by experts rather than by diagnostic testing. . . . Assessment for gender dysphoria in children and adolescents is performed by highly trained mental health professionals who are able to make a diagnosis based on standard criteria."[3]

"Children with persisting gender dysphoria into puberty are highly likely to be transgender . . . ."[4] "Studies demonstrate that individuals who fulfill the criteria for gender-affirming medical care generally continue in their gender identity."[5] Even Defendants' expert Dr. Cantor concedes that the majority of adolescents experiencing gender dysphoria will persist in their gender identity into adulthood.[6] A "'wait and see approach' or 'watchful waiting' is an approach to the treatment of pre-pubertal children," not adolescents who have begun puberty.[7]

   **3.**     **RESPONSE: Disputed.** Alabama medical providers, including the UAB Clinic, follow the established WPATH Standards of Care in treating transgender adolescents.[8]

---

[3] PX4:28 (Shumer Rep.).

[4] PX4:29 (Shumer Rep.) (internal citation omitted).

[5] DX56:22 (Antommaria Rep.) (internal citations omitted).

[6] PX8:330:8–13 (Prelim. Inj. Hrg. Trans., testimony of Dr. Cantor); *see also* DX60:92–94 (McNamara Rep.); DX25:35–36 ¶ 48 (Karasic Rebuttal Rep.) (sealed).

[7] DX56:22 (Antommaria Rep.) (internal citations omitted); *see also* DX25:36 ¶ 49 (Karasic Rebuttal Rep.) (sealed).

[8] DX34:51 (Ladinsky Rep.) ("Our clinic follows the process outlined in the Endocrine Society Guideline and the WPATH SOC before beginning any treatment for gender dysphoria."); DX33:21:7–14 (Ladinsky Dep.).

The use of puberty blockers and hormone therapy for treatment of gender dysphoria in adolescents is well-established and safe. Safety of puberty blockers is established by "longitudinal research" and they "are not experimental"; their use "can significantly improve gender dysphoria."[9] For transgender adolescents who continue on to hormone therapy, studies show their long-term health profiles "are similar to those of the general population."[10]

"Once the FDA has approved a medication for one indication, thereby agreeing that it is safe . . . prescribers are generally free to prescribe it for other indications."[11] Off-label use "does not imply that its use for [a different] indication is ineffective, dangerous, or experimental, but rather that the drug manufacturer has not applied for and received FDA approval for this indication."[12]

**4.     RESPONSE: Disputed.** The benefits of puberty blockers and hormone therapy when indicated, taking into account any risks associated with their use, outweigh the risks of failing to treat gender dysphoria.[13] "When determining whether to prescribe medication for any disorder, a clinician, patient, and family review risks and benefits and decide on the course of treatment using the best available evidence. GnRHa is used when it is determined that the progression of puberty would cause

---

[9] PX4:30–31(Shumer Rep.) (internal citations omitted).
[10] DX60:83 (McNamara Rep.).
[11] DX56:24–25 (Antommaria Rep.) (internal citations omitted).
[12] PX4:31 (Shumer Rep.); *see also* DX56:24–25 (Antommaria Rep.).
[13] PX6:37:¶48 (Antommaria Rebuttal Rep.); PX5:40–41:¶65 (Shumer Rebuttal Rep.) (sealed); DX25:56:¶104 (Karasic Rebuttal Rep.) (sealed); DX60:87 (McNamara Rep.).

significant harm to the adolescent. The benefit of treatment is not unproven or poorly studied []."[14]

Puberty blockers and hormone therapy are a safe, effective treatment for gender dysphoria in adolescents,[15] and the risks are misstated or overstated by Defendants or can be mitigated.[16] For example, suggestions that GnRHA interfere with brain development are not supported by the evidence, and there is likewise no evidence that long term use of testosterone in transgender men is linked to an increase in cancer or osteoporosis.[17] Risks that are present, like reduced bone density or increased cardiovascular risks, are mitigated by lifestyle changes and pharmacological therapy.[18] "On the balance, the potential benefit of improved mental health needs to be weighed against risks of treatment for gender dysphoria by each patient and family according to their unique and specific circumstance."[19]

5.    **RESPONSE: Disputed.** Parents regularly consent to treatment of their minor children and can do so when provided with medical recommendations for treatment of gender dysphoria. "As is the case with all medical decision-making involving adolescents, providers are trained to explain expected effects, risks, and

---

[14] PX4:33 (Shumer Rep.) (internal citation omitted).
[15] DX52:4–15 (Antommaria Rep.); PX4:11–12, 13–24 (Shumer Rep.); DX60:73–86 (McNamara Rep.); DX25:25:¶24–33:¶41 (Karasic Rebuttal Rep.) (sealed); DX34:23–24 (Ladinsky Rep.).
[16] PX5:40–41:¶65 (Shumer Rebuttal Rep.) (sealed).
[17] PX4:33–34 (Shumer Rep.) (internal citations omitted).
[18] PX4:33–34 (Shumer Rep.) (internal citations omitted).
[19] PX4:33–34 (Shumer Rep.) (internal citations omitted).

benefits to patients and families in an age-appropriate and culturally competent way."[20] "Parents or legal guardians are frequently asked to consent to medical treatments for minors with comparable risks, uncertainty, or levels of evidence."[21]

Medical treatment of minors requires informed consent from parents and assent from the minor.[22] "There is evidence that most adolescents with gender dysphoria have sufficient medical decision-making capacity to make decisions regarding puberty blockers."[23] In sum, the legislative findings do not support "the assertion that parents . . . are unable to comprehend and fully appreciate the implications of gender-affirming medical care."[24]

**6.      RESPONSE: Disputed in part.** Guidelines by WPATH and the Endocrine Society are *among* the medical evidence upon which Plaintiffs rely. These clinical guidelines have been endorsed by 22 major medical and health associations, including the American Medical Association and the American Academy of Pediatrics,[25] all of which agree that the WPATH SOC8 and the Endocrine Society

---

[20] PX4:35 (Shumer Rep.).

[21] DX56:26–27 (Antommaria Rep.).

[22] DX75:13:¶ 30 (Goodman Rebuttal Rep.) (sealed).

[23] DX56:37 (Antommaria Rep.) (internal citation omitted).

[24] DX56:36 (Antommaria Rep.).

[25] PX9:10 (Br. of Amici Curiae Am. Acad. Pediatrics et al., *Doe v. Ladapo*, No. 23-12159, Doc. 43); *see also* PX10:7 (Br. Of Amici Curiae Am. Acad. Pediatrics et al., *Eknes-Tucker v. Governor*, No. 22-11707) (endorsing the Endocrine Society Guidelines and WPATH SOC7, then the most current version of the WPATH Standards of Care); DX60:73–74 (McNamara Rep.); PX11 (Prelim. Inj. Hrg. Pl. Ex. 25, ECF No. 78-25) (statement of Pediatric Endocrine Society that "[w]hen puberty begins, gender affirming medical treatment with puberty blockade followed in late adolescence by hormone therapy, is standard of care" and citing the Endocrine Society Guideline);

Guidelines establish "evidence-based clinical guidelines" that set out a generally accepted "treatment protocol" for gender dysphoria.[26]

In addition to SOC8 and the Endocrine Society Guidelines, Plaintiffs rely on the "widely accepted view of the professional medical community" that "gender-affirming care is the appropriate treatment for gender dysphoria and that, for some adolescents, gender-affirming medical interventions are necessary," and that "[t]his care greatly reduces the negative physical and mental health consequences that result when gender dysphoria is untreated."[27]

---

PX12 (Prelim. Inj. Hrg. Pl. Ex. 28, ECF No. 78-28) (statement of National Association of Pediatric Nurse Practitioners that gender-affirming care is "evidence-based" and supported by "leading organizations" including the AAP and American Psychological Association); DX86:6 (Taylor *Guidelines Review*) (noting that "the American Psychological Association . . . recommends using their guideline in tandem with WPATH and Endocrine Society guidelines"); DX59 180:5–182:13 (McNamara Dep.) (explaining that AAP endorsed WPATH SOC and Endocrine Society Guidelines by citing each throughout its own policy statement).

[26] PX9:10 (Br. of Amici Curiae Am. Acad. Pediatrics et al., *Doe v. Ladapo*, No. 23-12159, Doc. 43); *see also* PX10:7 (Br. Of Amici Curiae Am. Acad. Pediatrics et al., *Eknes-Tucker v. Governor*, No. 22-11707) (endorsing the Endocrine Society Guidelines and WPATH SOC7, then the most current version of the WPATH Standards of Care).

[27] PX9:10 (Br. of Amici Curiae Am. Acad. Pediatrics et al., *Doe v. Ladapo*, No. 23-12159, Doc. 43); PX10:6–7 (Br. Of Amici Curiae Am. Acad. Pediatrics et al., *Eknes-Tucker v. Governor*, No. 22-11707); *see also* PX21:132:10–133:4 (Curlin Dep.) (admitting that the AMA and AAP support gender-affirming medical treatment for adolescents); DX33:236:3–237:3 (Ladinsky Dep.) (same for AMA, AAP, and  AACAP); DX34:44 (Ladinsky Rep.) (same); DX60:74 (McNamara Rep.) (same for AAP, American Psychological Association, AACAP); DX18:244:16–245:1 (Bowers Dep.) (same for AAP and American Psychological Association); DX25:29:¶ 31 (Karasic Rebuttal Rep.) (sealed) (same for AAP, AMA, Endocrine Society, Pediatric Endocrine Society, American Psychiatric Association, American Psychological Association, American College of Obstetricians and Gynecologists, and American Academy of Family Physicians); PX13 (Prelim. Inj. Hrg. Pl. Ex. 22, ECF No. 78-22) ("The American Academy of Pediatrics recommends that youth who identify as transgender have access to comprehensive, gender-affirming, and developmentally appropriate health care … ."); PX14 (Prelim. Inj. Hrg. Pl. Ex. 30, ECF No. 78-30) (similar); PX15 (Prelim. Inj. Hrg. Pl. Ex. 32, ECF No. 78-32) (American Academy of Pediatrics policy statement supporting gender-affirming care); PX16 (Prelim. Inj. Hrg. Pl. Ex. 23, ECF No. 78-23) (similar

7.      **RESPONSE: Disputed.** The Cass Report is itself unreliable because it is methodologically unsound and makes unsupported claims.[28] In any event, the Cass Report does not conclude that either the Endocrine Society Guidelines or SOC8 are unreliable. In fact, both sets of guidelines scored relatively high in their assessments by three reviewers engaged by Cass. The Cass Report evaluated 23 clinical practice guidelines using a common appraisal tool entitled AGREE II.[29] Both SOC 8 and the 2017 Endocrine Society Guidelines received among the highest assessments.[30]

For example, looking solely at the "rigour of development" axis [sic], only three current guidelines received a higher evaluation than the 2017 Endocrine Society Guidelines.[31] Only four current guidelines received a higher evaluation than the WPATH SOC8.[32]

Defendants are incorrect that the Cass Report found the only reliable clinical guidelines for pediatric gender care were those issued by the Swedish and Finnish health agencies. No such statement appears in the Cass report. In any event, neither

---

statement by American Psychological Association); *cf.* DX25:33:¶ 40 (Karasic Rebuttal Rep.) (sealed) (listing additional organizations that oppose the denial of this medically necessary healthcare); PX17 (Prelim. Inj. Hrg. Pl. Ex. 20, ECF No. 78-20) (statement of American Psychiatric Association, American Academy of Family Physicians, American Academy of Pediatrics, American College of Physicians, American College of Obstetricians and Gynecologists, and American Osteopathic Association opposing legislative interference with the provision of evidence-based gender-affirming care for children and adolescents).

[28] PX7 (McNamara Affidavit).

[29] DX84:127-128 (Cass Review); DX86:3, 5 (Taylor *Guidelines Review*).

[30] DX84:130 (Cass Review); DX86:5–6 (Taylor *Guidelines Review*).

[31] DX84:130 (Cass Review); DX86:6 (Taylor *Guidelines Review*).

[32] DX84:130 (Cass Review).

Sweden nor Finland, nor any of the countries to which Defendants point, ban the use of puberty blockers or hormones for treatment of gender dysphoria in adolescents.[33]

**8.     RESPONSE: Disputed. Objection: Inadmissible hearsay, improper expert opinion.** Plaintiffs dispute that the Endocrine Society's approach to conducting systematic literature reviews in developing the 2017 Guidelines was "remarkabl[e]." The scope and focus of those systematic reviews are consistent with the development of clinical guidelines by many professional medical organizations.[34] In practice, not every aspect of a clinical practice guideline is ordinarily supported by a systematic review.[35] The Endocrine Society Guidelines cite sufficient evidence—namely, scientific studies and expert consensus—showing the effectiveness of the banned treatments on gender dysphoria.[36]

Plaintiffs dispute that there is any "incongruence" or "serious problem" with the Endocrine Society Guidelines. The Endocrine Society Guidelines are based on

---

[33] DX25:43:¶ 63, 44:¶ 66 (Karasic Rebuttal Rep.) (sealed); DX103:3–4 (Swedish research reviews and recommendation that providers follow the Dutch protocol); DX107:2–3 (Finland Summary); DX108:11–12 (Finnish recommendations); DX2:¶29 (Cantor Rep.) (noting that France has not restricted access to these medications); DX109:10–11 (Norway Recommendation) (indicating that Norway's national guidelines allow for the use of puberty blockers and cross-sex hormones for some minors);DX25:43:¶ 64 (Karasic Rebuttal Rep.) (sealed) (England); DX18:247:10–12, 248:1–3, 248:8, 248:12–19, 250:3–19 (Bowers Dep.) (England); PX6:¶38 (Antommaria Rebuttal Rep.) (England); USX23:197:22–198:3 (Cantor Dep.) (sealed) (England). Defendants purport to identify Scotland as a sixth country restricting the banned treatments, but hormone therapy remains available for minors age 16 or older, and puberty blockers remain available in clinical trials. *See* DX111 (Scotland Policy); DX112 (Ghorayshi *Scotland*).
[34] DX43:118:15–119:1 (Antommaria Dep.).
[35] DX43:118:15–119:1, 135:8–15, 138:20–139:5 (Antommaria Dep.); PX6:¶44 (Antommaria Rebuttal Rep.).
[36] DX43:132:15–133:19 (Antommaria Dep.); DX33:121:19–23 (Ladinsky Dep.).

the best available evidence in the field.[37] They were developed through a rigorous review of scientific and medical research.[38] They "followed the approach recommended by the Grading of Recommendations, Assessment, Development, and Evaluation [GRADE] group, an international group with expertise in the development and implementation of evidence-based guidelines."[39] The quality of the evidence is consistent with the evidence used for other clinical practice guidelines.[40]

9.      **RESPONSE: Disputed.** SOC8 and the 2017 Endocrine Guidelines were independently developed, and the medical consensus built around them is not the result of "laundered" use of earlier works. According to a review of clinical guidelines cited by Defendants, the 2009 Endocrine Society Guidelines scored above average in the category of editorial independence, and the 2017 Endocrine Society Guidelines scored the highest of any guideline for editorial independence.[41] In addition, the 2017 Endocrine Society Guidelines are independent of SOC8 with their own authors, funders, methodology, research, and recommendations.[42]

---

[37] DX60:76 (McNamara Rep.).
[38] DX60:74 (McNamara Rep.); DX34:42, 44 (Ladinsky Rep.); PX5:¶12 (Shumer Rebuttal Rep.) (sealed); PX6:¶23 (Antommaria Rebuttal Rep.); DX59:211:5–20 (McNamara Dep.).
[39] DX34:44–45 (Ladinsky Rep.).
[40] PX6:¶ 36 (Antommaria Rebuttal Rep.); DX60:75 (McNamara Rep.); *see also* PX5:¶¶14–16 (Shumer Rebuttal Rep.) (sealed); PX6:¶44 (Antommaria Rebuttal Rep.) ("None of the documents cited by Defendants' experts meet the standards to which they hold the Endocrine Society's and WPATH's clinical practice guidelines.").
[41] DX84:130 (Cass Review); DX86:6 (Taylor *Guidelines Review*).
[42] *Compare* DX115:2–6 (Endocrine Society 2017 Guideline) *with* DX116:S2, S43-79 (SOC-8).

In developing SOC8, WPATH: worked with a professional methodologist; contracted with a professional Evidence Review Team at Johns Hopkins University to conduct a robust review of all available scientific evidence, including by conducting systematic literature reviews where direct evidence was available; engaged in a rigorous Delphi process; and solicited and reviewed comments from international advisors and the public.[43] A consensus of at least 75 percent of voting members was required to approve a recommendation.[44]

**10.    RESPONSE: Disputed.** Twenty-two major medical and mental health associations, including the American Medical Association and the American Academy of Pediatrics, filed an amicus brief in the Eleventh Circuit in 2023 supporting SOC8 and the Endocrine Society Guidelines as "established, evidence-based clinical guidelines" that set out a generally accepted "treatment protocol" for gender dysphoria.[45] In addition, many medical associations directly cite the WPATH

---

[43] DX116:S249–51 (SOC-8); DX21:125:24–126:4, 156:3–14, 266:17–267:7, 271:9–18 (Coleman Dep.).

[44] DX116:S250 (SOC-8).

[45] PX9:10 (Br. of Amici Curiae Am. Acad. Pediatrics et al., *Doe v. Ladapo*, No. 23-12159, Doc. 43). In 2022, many of the same medical associations filed an amicus brief on appeal in this case, endorsing the Endocrine Society Guidelines and the WPATH SOC7, which was the most current version of the WPATH standards at that time. *See* PX10:7 (Br. Of Amici Curiae Am. Acad. Pediatrics et al., *Eknes-Tucker v. Governor*, No. 22-11707); *see id.* at 1 (listing medical associations joining the brief).

Standards of Care in their own guidelines and public statements on transgender health care, including for adolescents.[46]

**11.     RESPONSE**: **Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** WPATH followed international standards in guideline development, and Defendants do not offer any evidence from witnesses with first-hand knowledge to dispute this fact.

As Dr. Coleman explained, WPATH rigorously followed the guideline development designed by Johns Hopkins University, including screening for conflicts of interest among committee members.[47] "[I]t is very customary that the committee members or those involved in developing the guidelines are involved in that care and that treatment."[48] That view is corroborated by experts in both ethics and in the development of clinical practice guidelines. Ethicist Dr. Goodman explained, "it would be peculiar if any guideline-producing entity did not comprise

---

[46] *See, e.g.*, DX86:6 (Taylor *Guidelines Review*) (noting that "the American Psychological Association . . . recommends using their guideline in tandem with WPATH and Endocrine Society guidelines"); DX59:180:5–182:13 (McNamara Dep.) (explaining that AAP cites the WPATH and Endocrine Society Guidelines throughout their own policy statement on gender-affirming care); DX60:73–74 (McNamara Rep.); *see also* DX34:42-43 (Ladinsky Rep.) (stating that the AMA, AAP, and Society for Adolescent Health and Medicine recognize the WPATH Standards as the prevailing standard of care); DX25:26:¶ 25 (Karasic Rebuttal Rep.) (sealed) (stating that the use of WPATH SOC is supported or adopted by American Psychiatric Association, American Psychological Association, AMA, AAP, and Federal Bureau of Prisons); PX5:¶12 (Shumer Rebuttal Rep.) (sealed); DX18:240:8–15 (Bowers Dep.) (testifying that AAP uses the WPATH SOC "as a benchmark, as a guidepost in forming their own conclusions").

[47] DX21:201:1-18; 209:16-25; 210:2-11; 217:12-24; 230:4-14; 233:7-24 (Coleman Dep.).

[48] DX21:217:20–23 (Coleman Dep.).

experts in the field addressed by the entity's guidelines."[49] "Being a treating physician of gender dysphoria cannot ... create a conflict of interest while serving on such a committee. Indeed, it is illegitimate and contradictory to assert that medical expertise in any field renders one inappropriate to contribute to the production of practice guidelines for that field."[50] "Having no specialized and competent practitioners on the subject matter of a guideline would subvert and undermine the very idea of a practice guideline."[51] Dr. Lightdale corroborated this view.[52]

Plaintiffs also dispute that Dr. Cass is a good example of someone well-suited to develop clinical practice guidelines, which the Cass Report does not purport to be. As Dr. Bowers explained, it is Dr. Cass, a retired pediatrician who does not treat transgender adolescents, who is the anomaly.[53]

**12.   RESPONSE**: **Disputed**. **Objection: Inadmissible hearsay, lack of foundation.**  As set forth above in response to Paragraph 11, involving content experts in the development of a clinical practice guideline is common and does not undermine its credibility. "[I]t is extremely common for professional medical

---

[49] DX75:7:¶17 (Goodman Rebuttal Rep.) (sealed).

[50] DX75:7–8:¶19 (Goodman Rebuttal Rep.) (sealed).

[51] DX75:7:¶17 (Goodman Rebuttal Rep.) (sealed).

[52] DX70:92:¶31 (Lightdale Rebuttal Rep.).("It would make no sense—and jeopardize patient health and safety—for such treatment guidelines to be developed by 'outsiders' with no subject matter expertise."); DX69:174:1–4 (Lightdale Dep.) (sealed) ("[W]e know we need experts in guidelines and that those experts have to really be doing the medicine in order to be able to be a part of that process."); *id*. at 176:18–20 ("There's no point in being in a guideline-writing process if you don't actually practice the medicine.").

[53] DX18:254:22–24 (Bowers Dep.).

organizations to limit participation in the development of professional treatment guidelines to members of the organization."[54] "[WPATH SOC8] committee members completed conflict of interest declarations,"[55] and WPATH scrupulously engaged a process to mitigate any conflicts that could have arisen.[56] None of Defendants' witnesses purport to have first-hand knowledge regarding how SOC8 was developed or how disclosed conflicts, if any, were managed during the process.

Excluding subject matter experts or providers of the reviewed medical care from participating in the development of guidelines "has no basis in medical ethics or science."[57] "It would make no sense—and jeopardize patient health and safety—for such treatment guidelines to be developed by 'outsiders' with no subject matter expertise."[58] According to Dr. Lightdale, "there are no established or accepted methods of developing medical guidelines that do not rely on subject matter experts."[59] Any actual or apparent conflicts relating to SOC8 drafters' provision of care for gender dysphoria were managed through disclosure and transparency because as is typical such conflicts "cannot be avoided."[60] WPATH developed a "rigorous process … transparently [] selecting committee members, reviewing

---

[54] DX70:92:¶30 (Lightdale Rebuttal Rep.) (internal citation omitted).
[55] DX116:S8 (SOC-8).
[56] See footnote 47, *supra*.
[57] DX70:92:¶31 (Lightdale Rebuttal Rep.).
[58] DX70:92:¶31 (Lightdale Rebuttal Rep.).
[59] DX70:92:¶31 (Lightdale Rebuttal Rep.).
[60] DX21:218:4–5 (Coleman Dep.).

conflict of interests, and [employing a] very rigorous methodology with all of its checks and balances."[61] Once committees were formed, "those names were displayed on the Web site, pictures where they worked, ... and in the publication of the Standards of Care, ... all authors are listed and their affiliations so that there was a very transparent process."[62]

13. **RESPONSE: Disputed in part.** Undisputed that Defendants' assertion describes the process used by WPATH. Disputed that WPATH's transparent description of its process is a "boast" or of any negative legal import.

14. **RESPONSE**: **Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** The process for developing the SOC8 matched what is described in the guidelines, including using both the Delphi process for developing recommendations and an adaptation of GRADE to assess the strength of the recommendations.[63] The email cited by Defendants confirms that WPATH relied on the GRADE framework.[64] GRADE is "a methodology. So [how] you apply it, and what it looks like can [be] very different."[65]

---

[61] DX21:209:17–20 (Coleman Dep.).
[62] DX21:209:21–25 (Coleman Dep.).
[63] *See* DX116:S250 at ¶ 3.9 (SOC-8) ("Once the statements passed the Delphi process, chapter members graded each statement using a process *adapted* from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework.") (emphasis added).
[64] DX190:8.
[65] DX69:59:7–9 (Lightdale Dep.) (sealed).

The development of SOC8 relied in part on systematic reviews commissioned by WPATH by Johns Hopkins University, as the Cass Report acknowledges.[66] Systematic reviews were not the sole basis for the SOC8 recommendations, and they need not be to ensure their reliability.[67] As methodologist Dr. Karen Robinson explained, there were some chapter recommendations to which no "systematic review would add anything."[68] Consistent with Delphi, some recommendations rested on "the literature and [the] consensus of expert advice."[69] Delphi "has been used to develop consensus around recommendations in guidelines for treating many other medical conditions."[70] Minority voices do not undermine the consensus behind Delphi-adopted recommendations.[71]

Defendants' citation to a news account reporting in 2021 that Dr. Marci Bowers' was "not a fan" of puberty blockers carries no legal weight. At her deposition in May 2024, Dr. Bowers put her comment in context and testified that,

---

[66] DX84:130, at ¶ 9.18 (Cass Review) ("Only five guidelines described using a systematic approach to searching for and/or selecting evidence (AACAP 2012, Endocrine Society 2017, Finland 2020, Sweden 2022 and WPATH 2022).").

[67] *See* DX70:91:¶28 (Lightdale Rebuttal Rep.) ("Experts using a Delphi process draw on various sources of information and evidence to make their judgments, including personal expertise, systematic reviews, qualitative studies, and any other relevant evidence.").

[68] DX24:90:25–91:5 (Karasic Dep.); *see also id.* at 92:11–93:2 (Karasic Dep.).

[69] DX24:113:24–114:4 (Karasic Dep.).

[70] DX70:89:¶25 (Lightdale Rebuttal Rep.).

[71] DX25:26:¶25 (Karasic Rebuttal Rep.) (sealed); *see* DX21:156:6–14 (Coleman Dep.).

based on decades of research, her current view is puberty blockers are safe, and that earlier safety concerns have "been asked and answered."[72]

**15.    RESPONSE**: **Disputed. Objection: Inadmissible hearsay, lack of foundation.**  Plaintiffs dispute that the development of SOC8 was "unscientific" because of its inclusion of a guideline recommendation relating to Eunuchs. As Dr. Coleman explained, "there's always a category of ... not otherwise specified variations of gender identity disorders" that exist while at the same time not being "clearly defined or clearly researched" due to low numbers of individuals who identify as such.[73] The Eunuchs chapter was developed to ensure that proper medical and mental health care is provided to the small population of individuals unable to obtain appropriate medical care for gender dysphoria and who "go to quite serious lengths to self-castrate themselves."[74] WPATH felt it important to "outline some guidelines of how to manage these individuals that heretofore have really been neglected ... by the medical system."[75]

**16.    RESPONSE**: **Disputed. Objection: Inadmissible hearsay.** Record evidence contradicts Defendants' assertions that the SOC8 authors had no "use" for systematic reviews. WPATH heavily relied on the Johns Hopkins evidence review

---

[72] DX18:264:14–17 (Bowers Dep.).
[73] DX21:173:3–10 (Coleman Dep.).
[74] DX21:177:15–18 (Coleman Dep.).
[75] DX21:177:19–22 (Coleman Dep.).

team, chaired by Dr. Karen Robinson, Director of the JHU Evidence-Based Practice Center, to conduct systematic reviews where direct evidence was available.[76] This process was designed to ensure that the recommendations set forth in the WPATH guidelines were supported by all available evidence.[77] Of course, systematic reviews are not necessary or expected for every recommendation in a clinical practice guideline.[78]

Record evidence also refutes that the results of the systematic reviews were "concerning." Systematic reviews confirm that hormone therapy alleviates gender dysphoria in transgender adolescents.[79] In addition to this literature, decades of clinical experience show that the banned treatments improve psychosocial functioning and reduce negative outcomes, including substance use and suicidality.[80]

**17.   RESPONSE: Disputed. Objection: Lack of foundation, inadmissible hearsay.** Plaintiffs dispute that WPATH tried to prevent the evidence reviews performed by Johns Hopkins (JHU) from being published. Contrary to Defendants' assertions, documents produced by JHU show that WPATH worked diligently to develop a protocol for JHU to be able to publish the research.[81] The

---

[76] DX18:124:17–125:11(Bowers Dep.); DX116:S249, ¶ 3.4 (SOC-8).
[77] DX18: 125:5-11 (Bowers Dep.).
[78] DX43:135:8–15 (Antommaria Dep.); *see also id.*, at 118:15–119:1.
[79] DX24:94:7–24 (Karasic Dep.); PX19:16, 18–19 (McNamara Supp. Rep.).
[80] DX18:131:4–132:5 (sealed); DX39:203:5–18 (Shumer Dep.) (sealed).
[81] DX167:86 (JHU 2) ("In order to guaranty a quicker process for the development of future publications that use the WPATH SOCv8 data, the Policy has been adapted in order to include an approval process at an earlier stage.").

comments expressing frustration by methodologist Karen Robinson merely show a disagreement between WPATH and JHU about the timing of publication.[82] WPATH wanted to be sure it could be first to publish the data produced by JHU.[83] JHU wanted unfettered authority to use the data commissioned by WPATH.[84] Nothing about this disagreement about the timing for release of the research and who would be the first to feature it reflects any desire to suppress the research.

**18.    RESPONSE: Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** Defendants' assertions that WPATH "scuttl[ed] the evidence reviews" and that "advocacy concerns . . . animated the drafting of SOC-8" are unsupported and contradicted by the record. SOC8 were developed as "global guidelines" and were not "written for U.S. courts or U.S. health care systems."[85] The SOC8 authors followed a rigorous methodology that included checks and balances to ensure that the SOC8 recommendations were based on the best available scientific evidence and not on advocacy concerns.[86] WPATH authors voiced opinions during the course of development for the SOC8 guidelines, but no single author dictated the development process or guideline outcomes.[87]

---

[82] PX20 (Coleman Declaration).
[83] PX20 (Coleman Declaration).
[84] DX173:22 (HHS 5).
[85] DX21:157:7–20 (Coleman Dep.).
[86] DX21:157:7–20, 159:13–160:9 (Coleman Dep.); *see* DX116:S247–251 (SOC-8).
[87] DX21:156:6–14 (Coleman Dep.); DX25:26:¶25 (Karasic Rebuttal Rep.) (sealed).

**19.   RESPONSE: Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** Plaintiffs dispute that ideological or political goals influenced WPATH's public policy statements about medical issues. The email chain upon which Defendants' assertion rests does not reflect a "disagreement" with Yale's critique of the law at issue here. Rather, the email states that WPATH was "happy to endorse" the report authored by Yale and other medical experts.[88] While one of the authors on the email chain noted that WPATH spent time reflecting on "how to discuss the issue of age for genital surgery," the email chain also affirmed that the Report was "correct from an academic point of view."[89] The email also refutes the assertion that WPATH endorsed the critique knowing that it was misleading. To the contrary, the email confirms the importance to WPATH of highlighting the "reality" of clinical practice.[90] In any event, the assertions in this paragraph are immaterial as this lawsuit does not challenge the Act's surgical ban.

**20.   RESPONSE: Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** Plaintiffs dispute that SOC8 departs from a traditional framework for determining medical need. The SOC8 list of *medically necessary gender-affirming interventions* are based on "decades of clinical experience and research" and are established as "safe and effective at reducing

---

[88] DX184:50 (WPATH 11).
[89] DX184:49–50 (WPATH 11).
[90] DX184:50 (WPATH 11).

gender incongruence and gender dysphoria."[91] A treatment is deemed "medically necessary" when it may improve or alleviate a patient's diagnosis.[92] This determination must be based on the judgment of the treating physician upon clinical assessment.[93] In other words, doctors—not patients—determine whether a given intervention is medically necessary.[94]

The inclusion of recommendations for medical treatments in SOC8 is supported by scientific literature and accepted clinical practices.[95] These interventions are not elective or cosmetic,[96] and they are only prescribed once a clinician has reached the medically-supported determination that they will lessen the distress that a minor patient is suffering.[97] Because gender dysphoria may manifest differently among patients, the best course of treatment requires patient involvement and interventions tailored to each individual's circumstances.[98]

**21.    RESPONSE: Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** WPATH did not depart from its evidence-based process in developing SOC8, and record evidence demonstrates that outside

---

[91] DX116:S18 (SOC-8).
[92] DX18:140:1–5 (Bowers Dep.).
[93] DX18:141:15–18 (Bowers Dep.); *see also* DX39:40:7–22 (Shumer Dep.) (sealed).
[94] DX18:141:15–18 (Bowers Dep.).
[95] DX39:180:21–181:10, 186:6–8 (Shumer Dep.) (sealed).
[96] DX21:168:6–17 (Coleman Dep.).
[97] DX33:44:9–14 (Ladinsky Dep.).
[98] DX39:201:5–12 (Shumer Dep.) (sealed); DX33:135:17–136:14 (Ladinsky Dep.); *see also* DX39:183:19–184:6 (Shumer Dep.) (sealed).

actors did not inappropriately sway its course. Dr. Bowers testified that she spoke with Assistant Secretary for the United States Department of Health and Human Services Admiral Levine on two occasions about SOC8 prior to its publication, at which time Admiral Levine raised concerns regarding the proposed minimum age recommendations in SOC8.[99]  Specifically, Admiral Levine expressed concerned that the minimum age criteria in SOC8 "would have lowered the bar for people" seeking surgical intervention,[100] and could "be misconstrued and . . . instead of protecting patients by setting minimal standards, . . . this could inadvertently put the onus on the . . . clinician to provide these services and effectively entitle patients to expect this kind of treatment as soon as they'd reached a certain age."[101] Admiral Levine encouraged WPATH to take a more conservative approach consistent with SOC7 and revert to the age of majority as the default for surgical interventions, recognizing that there could be exceptions in rare cases.[102]  Admiral Levine was "by no means . . . the only voice" expressing this concern,[103] and the authors of SOC8 "considered it . . . from many angles" and ultimately decided to revert to a more conservative approach regarding age criteria.[104]

---

[99] DX18:193:19–194:7 (Bowers Dep.).
[100] DX18:212:23–213:5 (Bowers Dep.).
[101] DX18:210:4–16 (Bowers Dep.).
[102] DX18:211:1–213:5 (Bowers Dep.).
[103] DX18:212:22–213:5 (Bowers Dep.).
[104] DX18:226:22–227:18 (Bowers Dep.).

22.    **RESPONSE: Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** WPATH sought input from a wide variety of sources in the development of SOC8.[105] As part of its feedback, the AAP expressed concern regarding the proposed minimum age criteria in SOC8 because the "AAP does not recommend surgery for minors except on an individualized, case-by-case basis with parental involvement and consent."[106] Dr. Bowers acknowledged that AAP might oppose SOC8 if the age minimums were not removed but testified that "it wasn't a threat."[107] WPATH leadership ultimately decided to "f[all] back to a more conservative position" with respect to minimum age requirements, consistent with its prior recommendations in SOC7.[108]  Because the change "mov[ed] to a more conservative position rather than a more aggressive reduction of the age criteria," WPATH leadership determined it was not necessary to go through the Delphi process again, which would have delayed release of SOC8.[109] The decision was not a political one and not based solely on the AAP's position: It was based on "a lot of feedback, including an open public comment period" and "input from many organizations."[110] The decision "puts the emphasis back on individual patient care

---

[105] DX18:234:3–10 (Bowers Dep.) ("[W]e seek input from a wide variety of sources, AAP being one of them.").
[106] DX187:13 (WPATH 14).
[107] DX18:233:15–21 (Bowers Dep.).
[108] DX18:235:11–24 (Bowers Dep.); *id*, at 115:12–16.
[109] DX18:235:25–237:10 (Bowers Dep.).
[110] DX18:242:3–12 (Bowers Dep.).

rather than some sort of minimal final hurdle that could encourage superficial evaluations and treatments outside of the thorough and comprehensive pathway recommended by WPATH standards."[111]

**23.    RESPONSE: Disputed. Objection: Improper expert opinion.** Plaintiffs dispute the assertions in Paragraph 23 which do not even purport to be a statement of fact, much less a material one. As set forth above, the drafting of SOC8 was pursuant to a rigorous, methodologically sound, and transparent process.[112]

**24.    RESPONSE: Disputed. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** Plaintiffs dispute that WPATH seeks to silence disagreements or dissent. As an initial matter, USPATH operates independent of WPATH's direction; therefore, Defendants' assertions regarding USPATH cannot be ascribed to WPATH.[113] And, in any event, Defendants distort history regarding a presentation by Dr. Ken Zucker at the 2017 USPATH conference. Dr. Zucker presented during a morning session at the 2017 USPATH Conference, discussing his

---

[111] DX188:113 (WPATH 15).

[112] DX116:S8 (SOC-8) ("This version of the Standards of Care (SOC-8) is based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion."); DX21:237:2–5 (Coleman Dep.); DX70:87–88:¶19 (Lightdale Rebuttal Rep.) (sealed) ("WPATH's process for developing SOC8 . . . is transparent, rigorous, and methodologically sound. It is comparable or superior to the methodology that has been used by many other medical societies to develop clinical practice guidelines for the treatment of many other medical conditions, both pediatric and adult, and is in line with best clinical practice guideline practices as outlined by the National Academy of Sciences.").

[113] DX18:46:1–25 (Bowers Dep.) ("We operate independently.").

criticisms of SOC8 and his divergence from the generally accepted views of the relevant medical community.[114] USPATH scheduled him as a speaker;[115] it did not try to silence him. While USPATH did cancel the afternoon panel presentation during which Dr. Zucker had planned to present, it did so out of safety concerns and because it had not arranged to prevent protesters "who weren't registered for the conference from coming in."[116]

**25.    RESPONSE: Disputed. Objection: Inadmissible hearsay, improper expert opinion.** Plaintiffs vigorously dispute that WPATH prioritized ideology over truth or patient welfare.[117] One statement misleadingly taken out of context from an email exchange about which no Defendant witness purports to have personal knowledge does not diminish the reliability of SOC8, the methodology through which it was developed, or the transparency or openness of the organization.[118] Moreover, in the same email thread cited by Defendants, the author states she is

---

[114] DX24:188:21–23 (Karasic Dep.) ("Dr. Zucker did his whole presentation…."); *id.*, at 193:2–24 ("[W]e were really trying to have a diverse set of viewpoints at WPATH and at the conference.").

[115] DX24:182:18–183:10 (Karasic Dep.).

[116] DX24:191:8–24 (Karasic Dep.) ("[T]he president of WPATH . . . received [a] threat . . . and made the decision that it was for the best for us to cancel that session and to try to keep the conference safe for its participants.").

[117] DX18:95:9–14, 96:2–6 (Bowers Dep.); DX21:157:7–20, 159:13–160:9 (Coleman Dep.); *see also* PX9:10 (Br. of Amici Curiae Am. Acad. Pediatrics et al., *Doe v. Ladapo*, No. 23-12159, Doc. 43) (recognizing that WPATH SOC8 are "evidence-based").

[118] *See* DX21:56:11–57:18, 68:4–18, 107:21–108:13, 125:3–126:4, 131:15–132:10, 143:21–144:25; (Coleman Dep.); *see* DX70:89:¶24, 91:¶29 (Lightdale Rebuttal Rep.) (explaining how WPATH's Delphi approach ensured any dissenting and conflicting opinions were heard and incorporated into the development of SOC8).

"incredibly supportive of WPATH and the SOC" and "providers should be following the WPATH SOC."[119]

**26.     RESPONSE: Disputed. Objection: Inadmissible hearsay, improper expert opinion.** Plaintiffs dispute that there has been a "radical[] change[]" in the minor patient population. The growth in the number of referrals—both in general and for adolescents assigned female at birth—does not necessarily reflect an increase in gender dysphoria diagnoses.[120] And while that growth might seem significant when viewed as a percentage, the increase in raw numbers is small and readily understood as the natural result of increased awareness and access to care.[121]

Further, there is no reliable evidence that the "average minor patient" is or ever was a "prepubescent boy whose gender dysphoria was likely to 'desist.'"[122] The number of transgender girls and transgender boys presenting at the UAB Gender Clinic is roughly equal,[123] and desistance is rare.[124] The decades-old research cited by Defendants' experts focused on gender nonconforming children who were not

---

[119] DX176:154 (WPATH 3).

[120] PX18:19–20 (Boulware et al., *Biased Science*); DX25:39:¶ 55 (Karasic Rebuttal Rep.) (sealed).

[121] DX25:37–38:¶ 53, 39:¶ 56 (Karasic Rebuttal Rep.) (sealed); PX18:19–20 (Boulware et al., *Biased Science*); PX5:22–23:¶ 34 (Shumer Rebuttal Rep.) (sealed).

[122] DX:25: 39:¶ 56, 47:¶ 75 (Karasic Rebuttal Rep.) (sealed); PX5:¶ 36 (Shumer Rebuttal Rep.) (sealed); DX60:93 (McNamara Rep.).

[123] DX33:30:5–15 (Ladinsky Dep.).

[124] DX25:31–32:¶ 37, 47:¶ 75 (Karasic Rebuttal Rep.) (sealed); DX60:93–94 (McNamara Rep.); *see also* DX33:290:7–18 (Ladinsky Dep.); DX37:169:4–6 (Austin Dep.) (sealed).

necessarily transgender and who did not meet the criteria for gender dysphoria.[125] That research does not speak to the average natal sex of gender dysphoric youth, nor to rates of persistence of gender dysphoria for transgender youth.[126]

There also is no medical basis for the claim that social media or peer influences cause any kind of "rapid onset" gender dysphoria.[127]

**27.     RESPONSE: Disputed in part. Objection: Inadmissible hearsay, lack of foundation, improper expert opinion.** No evidence shows that psychotherapy alone is an effective treatment for gender dysphoria.[128] Denying a transgender adolescent medical treatment for gender dysphoria where indicated is harmful and causes suffering.[129]

**28.     RESPONSE: Disputed. Objection: Inadmissible hearsay, improper expert opinion.** Defendants cite no admissible evidence in support of this paragraph. Plaintiffs dispute that Alabama clinicians have a "single focus on gender" causing

---

[125] DX25:39:¶ 56, 47:¶ 75 (Karasic Rebuttal Rep.) (sealed); PX5:¶ 36 (Shumer Rebuttal Rep.) (sealed); DX60:93 (McNamara Rep.).

[126] DX25:39:¶ 56, 47:¶ 75 (Karasic Rebuttal Rep.) (sealed); PX5:¶ 36 (Shumer Rebuttal Rep.) (sealed); DX60:93 (McNamara Rep.).

[127] DX60:95 (McNamara Rep.); DX25:40:¶ 57 (Karasic Rebuttal Rep.); PX5:23:¶ 35 (Shumer Rebuttal Rep.) (sealed).

[128] DX60:87–91 (McNamara Rep.); PX22:84:16–85:6, 194:9–13 (Nangia Dep.) (sealed); DX33:288:14–17 (Ladinsky Dep.); DX39:170:15–17 (Shumer Dep.) (sealed); USX23:99:3–4 (Cantor Dep.) (sealed).

[129] DX25:32:¶ 38 (Karasic Rebuttal Rep.) (sealed); PX19:21 (McNamara Supp. Rep.); DX34:54, 60–61 (Ladinsky Rep.); DX33:287:19–20, 289:6–11, 291:15–18 (Ladinsky Dep.); DX37:127:14–22 (Austin Dep.) (sealed); PX4:36 (Shumer Rep.); PX5:¶ 68 (Shumer Rebuttal Rep.) (sealed).

"diagnostic overshadowing." ██████████████████████████████

████████████████████████████████████████████████[130]

**29.    RESPONSE: Disputed.  Objection: Improper  expert  opinion.**
Providers at the UAB pediatric gender clinic generally follow SOC8 guidelines
while applying their clinical judgment in treating patients.[131] "[E]very patient
presents their own peculiar and unique experience, and therefore, [one has] to decide
[the treatment] on a case-by-case basis."[132] Further, treatment for gender dysphoria
at UAB is team-based, and the clinic psychologist's input "weighs heavily."[133]

**30.    RESPONSE: Disputed.  Objection: Improper  expert  opinion.**
Plaintiffs dispute that UAB doctors diagnose gender dysphoria without input from a
mental health professional. Prior to a new patient's first appointment, all clinical
staff (including the on-site psychologist, pediatrician, and endocrinologist) and the
pastoral care team meet to discuss the patient's records and establish future clinical

---

[130]  PX22:67:21–68:1 (Nangia Dep.) (sealed).
[131]  DX34:51 (Ladinsky Rep.); DX33:21:7–12 (Ladinsky Dep.).
[132]   DX26:51:18–22 (Abdul-Latif Dep.) (sealed); DX116:S45 (SOC-8) ("[A]n individualized
approach to clinical care is considered both ethical and necessary."); DX34:43 (Ladinsky Rep.);
*see also* DX33:37:7–8 (Ladinsky Dep.) ("[E]ach young person is an individual and is looked at in
an individual way."); DX39:183:19–184:6 (Shumer Dep.) (sealed) ("[G]ender medicine is very
nuanced because everyone is an individual with individual goals and needs . . . . [Y]ou use the
tenets of the standards of care and clinical practice guidelines in practicing medicine with . . .
actual real live people every day, using those tools in your toolkit to understand what is potentially
the best next step for each person.").
[133]  DX33:21:17–23:5 (Ladinsky Dep.); DX34:51–53 (Ladinsky Rep.); DX37:41:21–42:1, 73:5–
73:15 (Austin Dep.) (sealed).

assessment goals.[134] A patient can be diagnosed with gender dysphoria at this initial meeting if all three clinical staff members—including the psychologist—have discussed internally and are in agreement.[135] If a new patient has already been diagnosed with gender dysphoria by an outside mental health professional, the clinic psychologist independently assesses the patient to confirm the diagnosis.[136] Patients are not prescribed puberty blockers or cross-sex hormones during the first visit and generally cannot receive those treatments unless the clinic psychologist has affirmed a diagnosis of gender dysphoria.[137]

Defendants' assertion ███████████████████████████████████ ██████████████████████████████████████████ is not supported by the record. UAB clinicians are apprised of their patient's mental health and any comorbidities that might impact the course of treatment, either through (1) in-clinic mental health assessments by a psychologist, (2) coordinated care with outside mental health professionals, or (3) regular mental health screening, as described in detail below.

---

[134] DX37:73:5–15 (Austin Dep.) (sealed); *see also* DX33:22:1–11 (Ladinsky Dep.) (discussing review of medical records from the patient's referring primary care physician and treating mental health professional).
[135] DX26:57:12–18 (Abdul-Latif Dep.) (sealed); DX33:22:18–23:5 (Ladinsky Dep.).
[136] DX37:76:11–16 (Austin Dep.) (sealed).
[137] DX26:57:12–58:22, 65:10–21 (Abdul-Latif Dep.) (sealed); DX34:52–53 (Ladinsky Rep.).

First, at a patient's first appointment, UAB clinicians conduct an intensive initial clinical assessment over two hours in length.[138] The psychologist meets with new patients in most cases as part of this initial assessment.[139] If the psychologist is not available, a referral to the psychologist is ordered.[140]

Depending on patients' needs, the clinic psychologist also provides comprehensive assessments of patients' developmental progression, consistent and persistent gender dysphoria, cognitive status, emotional wellbeing, and other mental health diagnoses.[141] These assessments occur over the span of three to six months and involve meetings with the patient, the patient's caregivers, outside mental health providers, and sometimes school counselors who may have been involved in their care.[142] The clinic psychologist administers broadband behavior rating scales that assess common clinical concerns like depression, anxiety, impulsivity, hyperactivity, and adaptive functioning.[143] If the patient is ready for hormone therapy, the clinic psychologist provides a letter recommending the patient for treatment and summarizing this extended mental health assessment.[144] The letter

---

[138] DX37:73:16–20 (Austin Dep.) (sealed).
[139] DX37:72:4–7 (Austin Dep.) (sealed).
[140] DX26:54:13–21 (Abdul-Latif Dep.) (sealed).
[141] DX37:88:7–89:11, 122:9–123:11 (Austin Dep.) (sealed).
[142] DX37:112:21–115:15 (Austin Dep.) (sealed).
[143] DX37:115:16–116:3 (Austin Dep.) (sealed).
[144] DX37:83:12–15, 122:9–123:23 (Austin Dep.) (sealed).

reflects all known psychological comorbidities and relevant mental health history.[145] This recommendation is independently evaluated by medical staff.[146]

Second, the clinic makes an effort to ensure that all minors receiving puberty blockers and hormones are also receiving supportive counseling and psychotherapy.[147] The clinic often refers patients to mental health professionals to provide ongoing care.[148] Some patients are already receiving mental health care before their first appointment.[149] At times, these outside providers recommend an evaluation by UAB providers for a patient to initiate hormone therapy.[150] In instances where the outside mental health professional does not provide a mental health assessment, the UAB psychologist makes a recommendation after consulting with the outside provider regarding the patient's mental health, progress in therapy, and any concerns the outside provider may have.[151] Medical staff consult the findings of the clinic psychologist and outside mental health providers.[152] Third, the UAB clinic screens for common mental health comorbidities like depression and anxiety at every clinic visit.[153]

---

[145] DX37:155:22–156:6 (Austin Dep.) (sealed).
[146] DX26:266:20–267:19 (Abdul-Latif Dep.) (sealed); *see also* DX37:123:22–23 (Austin Dep.) (sealed).
[147] DX33:27:11–15 (Ladinsky Dep.).
[148] DX37:54:22–55:3, 109:18–111:2 (Austin Dep.) (sealed).
[149] DX34:52 (Ladinsky Rep.).
[150] DX37:55:4–11 (Austin Dep.) (sealed); DX34:52 (Ladinsky Rep.).
[151] DX37:55:17–56:1 (Austin Dep.) (sealed).
[152] DX26:88:1–17, 90:21–91:8 (Abdul-Latif Dep.) (sealed); DX34:52–53 (Ladinsky Rep.).
[153] DX26:89:21–90:4, 293:11–15 (Abdul-Latif Dep.) (sealed).

Unsurprisingly, given the thorough mental health assessment framework in place at the UAB clinic, Defendants have not identified and cannot identify a single instance of misdiagnosis at the UAB clinic or even in the state of Alabama.[154]



**31.    RESPONSE: Disputed. Objection: Improper expert opinion.** Contrary to Defendants' assertions, the UAB clinic's assessment is rigorous and has multiple guardrails including psychological assessment and review. Consistent with WPATH SOC8 recommendation in favor of biopsychosocial assessments, the UAB clinic's psychologist conducts comprehensive mental health assessments for some patients, meeting with them and their caregivers together and separately over a span of three to six months.[157] The psychologist also meets with any mental health providers and school counselors who may have been involved in the patient's care,[158]

---

[154] *See, e.g.*, PX22:67:21–68:1 (Nangia Dep.) (sealed); USX23:65:8–13 (Cantor Dep.) (sealed); *see also* USX30:190:13–191:9 (Kaliebe Dep.) (sealed); PX1:185:21–186:8 (Hawes Dep.) (sealed); PX2:136:2–11 (Cohn Dep.).
[155] DX26:264:9–23 (Abdul-Latif Dep.) (sealed).
[156] DX26:209:15–211:3 (Abdul-Latif Dep.) (sealed).
[157] DX37:112:21–115:15 (Austin Dep.) (sealed).
[158] DX37:112:21–115:15 (Austin Dep.) (sealed).

and conducts psychological testing to assess common clinical concerns like depression, anxiety, impulsivity, hyperactivity, and adaptive functioning.[159]

Some patients' mental health assessments are completed by outside mental health professionals who have an existing relationship with the patient.[160] That is consistent with SOC8, which does not require that providers practice under the same roof.[161] UAB clinicians also do not uncritically defer to outside mental health providers' assessments. The UAB clinic psychologist independently assesses new patients for gender dysphoria, even if they have already been diagnosed by an outside provider.[162]

UAB medical providers also review outside mental health providers' letters in evaluating whether to prescribe hormone therapy.[163] And they independently assess each patient prior to medical intervention, even if an outside mental health provider has already written a letter recommending treatment.[164] UAB medical staff have disagreed with letter recommendations in the past.[165] The fact that

---

[159] DX37:115:16–116:3 (Austin Dep.) (sealed).

[160] DX34:52 (Ladinsky Rep.).

[161] DX116:S56 (SOC8) ("An ongoing clinical relationship can take place across settings, whether that be within a multidisciplinary team or with providers in different locations who collaborate with one another."); *see also id.* at S51 ("designing a particular assessment process to adapt existing resources is often necessary"); DX39:47:18–22 (Shumer Dep.) (sealed).

[162] DX37:76:11–16 (Austin Dep.) (sealed).

[163] DX37:96:15–17 (Austin Dep.) (sealed); DX26:87:23–88:17 (Abdul-Latif Dep.) (sealed).

[164] DX34:52–53 (Ladinsky Rep.); DX26:266:9–267:3 (Abdul-Latif Dep.) (sealed); *see also id.* at 69:3–70:13 (explaining that new patients do not receive a prescription for hormone therapy during their first visit even if they already have a letter recommending treatment from their mental health provider); DX37:101:9–103:19 (Austin Dep.) (sealed) (similar).

[165] DX26:267:4–14 (Abdul-Latif Dep.) (sealed).

disagreement is rare is understandable: Mental health providers are particularly well-suited to provide the comprehensive biopsychosocial assessment recommended by WPATH.[166] Moreover, when a patient is ill-suited for hormone therapy, a mental health provider would not write a recommendation letter but instead may discuss with the medical team why treatment may be inappropriate at that time.[167]

**32.    RESPONSE: Disputed. Objection: Improper expert opinion.**
Transgender adolescents generally have the capacity to assent to treatment, and their caregivers can provide informed consent, just as with other medical treatments.[168] The Endocrine Society and WPATH guidelines are "consistent with general ethical principles instantiated in the practices of informed consent."[169]

The UAB clinic adheres to or exceeds the standards for informed consent and assent set forth in SOC8.[170] UAB medical providers evaluate each patient's maturity in determining whether to prescribe puberty blockers or cross-sex hormones.[171] They also review outside mental health professionals' recommendation letters to confirm that the patient has discussed potential benefits and side effects of treatment and has

---

[166] DX116:S50 (SOC8).

[167] *See, e.g.*, DX37:125:3–20 (Austin Dep.) (sealed).

[168] DX55:36:¶ 39–40:¶ 45 (Antommaria Rep.); DX75:13:¶ 31–14:¶ 34 (Goodman Rebuttal Rep.) (sealed); DX37:171:9–12 (Austin Dep.) (sealed).

[169] DX55:37:¶ 42 (Antommaria Rep.).

[170] *See* DX116:S61–64 (SOC8).

[171] DX34:51–53 (Ladinsky Rep.); *see, e.g.*, DX26:185:14–186:1, 218:3–7, 278:11–19, 280:20–281:5, 288:23–289:8 (Abdul-Latif Dep.) (sealed).

no red flags to starting medications.[172] Although no formal psychological evaluation of maturity and comprehension is required,[173] the clinic psychologist provides such an evaluation when conducting a comprehensive mental health assessment.[174]

When treating patients, the UAB prescribing doctor discusses the treatment's risks and potential benefits, as well as scientific evidence for the treatment and the doctor's clinical observations of patient outcomes.[175] In addition, the prescribing doctor provides an informed consent form or letter detailing known risks and long-term side effects of treatment, including any impact on fertility.[176] The clinic psychologist also reviews the informed consent form and summarizes research for his or her patients and their families.[177]

**33.    RESPONSE: Disputed. Objection: Inadmissible hearsay, lack of foundation.** Transitioning medications are effective treatments for gender dysphoria, including in transgender adolescent patients.[178] It is rare for adolescent patients receiving medical treatment for gender dysphoria to later halt medical

---

[172] DX26:87:23–88:17, 235:23–236:8 (Abdul-Latif Dep.) (sealed); DX34:52 (Ladinsky Rep.).

[173] DX116:S61–64; DX26:217:22–218:2 (Abdul-Latif Dep.) (sealed).

[174] DX37:122:5–123:9, 171:4–17, 172:7–11 (Austin Dep.) (sealed).

[175] DX34:51–53 (Ladinsky Rep.); DX26:166:12–167:10 (Abdul-Latif Dep.) (sealed); *see also id.*, at 72:14–73:12, 143:14–144:15, 175:1–178:9, 183:4–9, 278:20–279:14.

[176] DX38:312–25 (Austin Dep. Ex. 5) (sealed); DX27:283 (Abdul-Latif Dep. Ex. 4) (sealed); DX34:52–53 (Ladinsky Rep.); DX37:160:1–161:16, 163:3–6 (Austin Dep.) (sealed); DX26:115:13–116:11, 122:6–15, 126:22–127:10 (Abdul-Latif Dep.) (sealed).

[177] DX37:148:9–11, 160:1–161:16 (Austin Dep.) (sealed).

[178] *E.g.*, DX60:77–80 (McNamara Rep.); PX4:¶ 12 (Shumer Rep.); DX34:43–44, 54, 60 (Ladinsky Rep.); PX9:10 (Br. of Amici Curiae Am. Acad. Pediatrics et al., *Doe v. Ladapo*, No. 23-12159, Doc. 43).

transition.[179] When they do, it is often not because of regret or detransition.[180] This holds true in Alabama: UAB staff have yet to treat a patient who underwent gender-transition related care and later regretted that decision,[181] and Defendants fail to identify any Alabama minor who has expressed regret following treatment for gender dysphoria.

### B.    Evidentiary Objections to Defendants' Statement of Facts

Many of Defendants' statements of purportedly undisputed facts rely in whole or in part on inadmissible evidence as noted above where applicable. Briefly summarized, those objections are:

**Hearsay and Lack of Foundation.** Throughout their statement of facts, Defendants repeatedly cite statements from news articles, opinion pieces, and editorials;[182] internal documents produced by WPATH, HHS, and Johns Hopkins

---

[179] DX25:31–32:¶ 37 (Karasic Rebuttal Rep.) (sealed); DX60: 94 (McNamara Rep.); *see also* DX39:173:8–12 (Shumer Dep.) (sealed) (noting a high rate of continuation of treatment).

[180] DX25:32:¶ 37 (Karasic Rebuttal Rep.) (sealed); DX39:174:22–175:4 (Shumer Dep.) (sealed).

[181] DX33:290:7–18 (Ladinsky Dep.); DX37:169:4–6 (Austin Dep.) (sealed).

[182] Defs.' Statement of Facts (DSF) ¶ 2 n.24 (citing DX40:113–22), 3 nn.27, 30 (citing DX140; DX132; DX131; DX144; DX137; DX134; DX133; DX130; DX119; DX141); *id.* ¶ 4 nn.32, 35 (citing DX110; DX141); *id.* ¶ 7 n.41 (citing DX112); *id.* ¶ 8 nn.43, 44 (citing DX119); *id.* ¶ 14 n.75 (citing DX133); *id.* ¶ 22 n.111 (citing DX122; DX121; DX120); *id.* ¶ 24 n.121 (citing DX133); *id.* ¶ 25 n.124 (citing DX133); *id.* ¶ 26 nn.128–31 (citing DX139; DX137; DX119; DX135; DX133; DX124); *id.* ¶ 27 n.138 (citing DX131; DX130; DX136); *id.* ¶ 28 n.139 (citing DX132); *id.* ¶ 33 n.160 (citing DX147; DX144; DX140; DX137); *see also* Defs.' Mot. for Summary Judgment (DMSJ) at 2 nn.4–5 (citing DX85); *id.* at 3 n.14 (citing DX147); *id.* at 5 n.21 (citing DX112).

University;[183] and other unreliable sources.[184] These statements are inadmissible hearsay that cannot be considered on summary judgment. *See* Fed. R. Evid. 801(c), 802; *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir.1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."). Further, many of these statements are independently inadmissible because the declarants are anonymous,[185] which makes the documents impossible to authenticate. *See* Fed. R. Evid. 901(a); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (refusing to consider hearsay statements on

---

[183] DSF ¶ 2 n.24 (citing DX179:15); *id.* ¶ 3 n.27 (citing DX179:12, 39); *id.* ¶ 4 n.35 (citing DX180:72); *id.* ¶ 11 n.55 (citing DX166; DX174; DX175 (sealed)); *id.* ¶ 12 nn.63, 64 (citing DX166:1; DX174:7); *id.* ¶ 14 nn.69, 71, 73, 74 (citing DX190:8; DX182:157–58; DX182:62; DX183:14–16, 61, 93; DX180:63); *id.* ¶ 15 n.78 (citing DX182:96); *id.* ¶ 16 nn. 82, 83 (citing DX173:22–25); *id.* ¶ 17 nn. 86–89 (citing DX173:22; DX167:75–81, 86–88, 91); *id.* ¶ 18 nn.90–92 (citing DX184:14, 24, 55; DX174:1–2; DX182:151); *id.* ¶ 19 nn.94–96 (citing DX184:49–53); *id.* ¶ 20 nn.97, 99 (citing DX180:11; DX181:36); *id.* ¶ 21 nn.100–109 (citing DX184:54; DX185:1, 10, 25; DX189:13; DX186:11, 17, 25, 31, 50, 57, 73, 88–91); *id.* ¶ 22 nn.110–13, 115–17 (citing DX187:13–14, 100, 107, 109, 188, 191, 338; DX188:113, 116, 120, 152); *id.* ¶ 24 nn.120–21 (citing DX178:5, 22, 82–85; DX176:107, 113–14); *id.* ¶ 25 n.124 (citing DX176:152); *id.* ¶ 26 n.132 (citing DX179:40–41); *id.* ¶ 27 n.138 (citing DX179:15); *id.* ¶ 33 n.160 (citing DX179:14); *see also* DMSJ at 3 n.12 (citing DX179:15); *id.* at 4 n.16 (same).

[184] DSF ¶ 26 n.129 (citing DX143, a report prepared by a commercial healthcare consulting firm that was not subject to peer review); *id.* ¶ 24 n.120 (citing DX125, a public relations journal article); *id.* ¶ 7 n.41 (citing DX111, an undated printout that contains multiple formatting errors but purports to be taken from a foreign government health service website); *see also* DMSJ at 5 n.21 (same); *id.* at 3 n.15 (citing DX128, a document that itself identifies no author or source, which purports to set forth unverified transcripts of certain clips of audio recordings of WPATH panel discussions).

[185] DSF ¶ 2 n.24 (citing DX179:15); *id.* ¶ 11 n.55 (citing DX174; DX175 (sealed)); *id.* ¶ 12 n.64 (citing DX174:7); *id.* ¶ 14 nn.69, 71, 73, 74 (citing DX182:157–58; DX182:62; DX183:14–16, 61, 93; DX180:63); *id.* ¶ 15 n.78 (citing DX182:96); *id.* ¶ 18 nn.90–91 (citing DX184:24; DX174:1–2); *id.* ¶ 19 nn.94–96 (citing DX184:49–53); *id.* ¶ 20 nn.97, 99 (citing DX180:11; DX181:36); *id.* ¶ 21 nn.100, 102, 106, 108 (citing DX184:54; DX185:1, 10; DX186:11, 17, 50); *id.* ¶ 22 nn.110, 112, 113, 115, 116 (citing DX187:188, 191, 338; DX188:116, 120); *id.* ¶ 24 nn.120–21 (citing DX178:22, 82–85; DX176: 113–14); *id.* ¶ 27 n.138 (citing DX179:15); *id.* ¶ 33 n.160 (citing DX179:14); *see also* DMSJ at 3 n.12 (citing DX179:15); *id.* at 4 n.16 (same).

summary judgment because the record contained no indication of any witness who could testify at trial to the truth of the matter asserted).

**Improper Expert Testimony.** Defendants attempt to convert much of this inadmissible hearsay, plus more from social media posts,[186] into admissible evidence through the reports of their retained experts Drs. Cantor, Laidlaw, Kaliebe, Hruz, and Nangia.[187] But a party "cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1323, 1334 (S.D. Ala. 2022). "Although experts are sometimes allowed to refer to hearsay evidence as a basis for their testimony [under Rule 703], such hearsay must be the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987). News articles, social media posts, and internal corporate documents are not sources on which medical, psychological, or scientific experts reasonably rely. *See Jackson v. Johnson & Johnson*, No.1:11-CV-3903-TWT, 2022 WL 110422, *6 (N.D. Ga. Jan. 12, 2022) ("[R]eferences to . . . internal documents are not

---

[186] DSF ¶ 8 n.44 (citing DX3:¶¶ 83–84, which rely on statements allegedly posted on Twitter); *id.* ¶ 24 n.120 (citing DX16:¶ 11, which relies on a YouTube video).

[187] DSF ¶ 8 nn.43–44 (citing DX2:¶92; DX3:¶¶83–85; DX5:¶99–100; DX7:¶200); *id.* ¶ 11 n.55–56 (citing DX2:¶102); *id.* ¶¶ 14 nn.71 & 74 (sealed), 18 n.92 (sealed) (citing DX9:¶¶ 31–32, 44–45, 47, 127–33 (sealed)); *id.* ¶¶ 18 nn.90–92, 20 nn.97 & 99, 21 n.100, 22 nn.110–112 & 115, 23 n.118, 24 nn.120–21 & 23, 25 n.124 (citing DX16 (sealed)); *id.* ¶ 26 n.132 (citing DX4:¶126); *id.* ¶ 28 n.139 (citing DX12:¶54 (sealed)).

sufficiently reliable under *Daubert*"). Parroting statements from these sources does not involve the application of "extensive experience" or any "reliable methodology." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1323–24 (11th Cir. 2022). Thus, to the extent Defendants' experts repeat or rely on such inadmissible hearsay, their opinions are unreliable and inadmissible. *See* Fed. R. Evid. 702(b)–(c), 703.

Defendants also rely heavily on reports by Drs. Cantor, Laidlaw, Kaliebe, Hruz, and Nangia to criticize the development of SOC8 recommendations, including by incorrectly claiming that WPATH failed to manage conflicts of interest,[188] disregarded the results of its systematic reviews,[189] and prioritized politics and insurance coverage goals over scientific evidence[190] and inquiry.[191] But none of these witnesses has personal knowledge regarding the development of SOC8.[192] Instead, Defendants' experts rely on pure conjecture and personal interpretations of news articles and internal communications to construct factual narratives and form opinions about WPATH's state of mind during the development process.[193] In

---

[188] DSF ¶¶ 11–12.

[189] DSF ¶¶ 14, 16–17.

[190] DSF ¶¶ 18–22.

[191] DSF ¶¶ 23–25.

[192] *See* USX23:169:4–6 (Cantor Dep.) (sealed); PX23:89:18–20, 135:21–24 (Laidlaw Dep.) (sealed); USX30:202:23–203:5 (Kaliebe Dep.) (sealed); DX5:130 (Hruz C.V.) (not including WPATH in list of professional societies and organizations); PX22:198:15–18 (Nangia Dep.) (sealed).

[193] *See* DSF ¶ 11 n.55–56 (citing DX2:¶¶ 100–01); *id.* ¶¶ 14 nn.71 & 74, 18 nn.90–92 & 96, 22 n.113 (citing DX9:¶¶ 31–34, 36, 44–47, 127–33, 160–61 (sealed)); *id.* ¶¶ 18 nn.90–92 & 96, 19 n.96, 20 nn.97 & 99, 21 n.100, 22 n.110–113 & 115, 23 n.118, 24 nn.120–121 & 123, 25 n.124 (citing DX16 (sealed)); *id.* ¶ 18 n.90 (citing DX5:¶104, which cites nothing for the proposition

addition to being unreliable, these opinions are speculative, conclusory, and devoid of specialized knowledge or expertise. In other words, they are unhelpful to the trier of fact and inadmissible on that basis. *See* Fed. R. 702(a); *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (expert testimony is not helpful if it "offers nothing more than what lawyers for the parties can argue in closing arguments" (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)); *United States v. Hawkins*, 934 F.3d 1251, 1263, 1265–66 (11th Cir. 2019) (an expert witness provides improper testimony by "speculat[ing]," "summarizing evidence, interpreting plain language, and drawing inferences from the evidence that the [factfinder] must draw (or not draw) for itself.").

Facts regarding the development of SOC8 may only be introduced through percipient witnesses or documents in evidence. *See Hibiscus Assocs. v. Bd. of Trs. of the Policemen & Firemen Ret. Sys.*, 50 F.3d 908, 917 (11th Cir. 1995) (upholding exclusion of expert testimony because "if the Fund had desired to prove that [a loan document] was not received, it could have evoked testimony from one of the participants in the loan transaction")); *Ala. Aircraft Indus. v. Boeing Co.*, No. 2:11-cv-03577-RDP, 2019 WL 13172372, at *6 (N.D. Ala. July 1, 2019) (quoting *In re*

---

that "many of the recommendations made reflect" WPATH's "agenda as an advocacy group," and cites only a news article for the proposition that the recommendations "represent ideological positions"—a conclusion not drawn by the article)); *id.* ¶ 25 n.125 (citing DX3:¶25); *id.* ¶ 26 n.132 (citing DX4:¶126).

*Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 551 (S.D.N.Y. 2004)). The task of interpreting those facts is reserved for the Court as the trier of fact. *Hawkins,* 934 F.2d at 1265–66.

Defendants' expert opinions regarding the UAB clinic also are unreliable.[194] Defendants rely primarily on speculative opinions by Dr. Nangia,[195] who admits her supplemental reports are largely based on her own conjecture by cabining almost every opinion with qualifiers like "it appears," "seems," "may," "likely," "would indicate," "can be inferred," "implies," "suggests," "cast doubt," and "call into question."[196] Dr. Nangia also admitted that because she only reviewed Plaintiffs' medical records, she would not know if certain information was disclosed to patients and their families during the informed consent and assent process.[197] By the same

---

[194] DSF ¶¶ 29–32 nn.140–53 & 155–57 (sealed) ███████████████████████████████
███████████████████████.

[195] DSF ¶ 29 (sealed); *id.* ¶¶ 29–32 nn.140–53 & 155–57 (sealed) ███████████████
███████████.

[196] *See* DX13:¶¶8–11, 13–17, 19–27, 30, 36–37, 40–41, 44–45, 51, 55–56, 59, 61, 66–67, 76, 82–84, 87, 90, 92, 93, 109, 126, 128, 136–37 (sealed); DX12:¶¶ 6, 10, 12–13, 20, 28–30, 38, 40, 47, 49 (sealed); DSF ¶¶ 29–32 nn. 140–52 & 155–57 (sealed) (citing many of these same paragraphs from DX13 (sealed) and DX12 (sealed)). Much of the rest of Dr. Nangia's second supplemental report merely quotes or paraphrases deposition testimony or documents, which is improper. *See Prosper*, 989 F.3d at 1249 (Expert testimony is not helpful if it "offers nothing more than what lawyers for the parties can argue in closing arguments" (quoting *Frazier*, 387 F.3d at 1260)).

[197] PX22:154:19–155:3, 156:2–5 (Nangia Dep.) (sealed); *see also id.*, at 156:6–157:8 (sealed) ████████████████████████████████████████████████████████████████
████████████████; PX6:¶ 57 (Antommaria Rebuttal Rep.) ("Studies show that individuals have difficulty recalling elements of the informed consent process and this difficulty does not mean that the consent process was inadequate."). *But see* DSF ¶ 32 (sealed) ███
███████████████████████████████████

token, she could not know the nature or frequency of interactions between patients'

medical providers and mental health providers, or what UAB medical providers

know about each patient's comorbidities.[198] Accordingly, Dr. Nangia's opinions are

unreliable and should be disregarded. *See* Fed. R. Evid. 702(b)–(d); *United States v.*

*Hawkins*, 934 F.3d 1251, 1265–66 (11th Cir. 2019) (experts are not permitted to

speculate).[199]

### C.   Additional Facts

1.     Gender dysphoria is a real, serious, and recognized medical

condition.[200]

2.     The banned treatments are the established course of care for gender

dysphoria, known to be safe and effective, and essential to the well-being of

transgender adolescents.[201]

---

[198] *See* DSF ¶¶ 29–31 (sealed) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[199] Further, Dr. Nangia admitted that she has no relevant experience and has never published or presented on the topic of how fertility risks affect informed consent by adults or assent by minors. PX22:153:19–154:18 (Nangia Dep.) (sealed). As such, she lacks the requisite qualifications to offer opinions on that topic. *See* Fed. R. Evid. 702.

[200] PX4:12–13 (Shumer Rep.); DX60:86–87 (McNamara Rep.); DX25:40–41:¶ 58 (Karasic Rebuttal Rep.).

[201] PX4:11–12, 13–20 (Shumer Rep.); DX60:73–80, 83–87 (McNamara Rep.); DX25:25–33, ¶¶24–41 (Karasic Rebuttal Rep.) (sealed); DX34:23–24, 26 (Ladinsky Rep.); DX33:288:5–14 (Ladinsky Dep.); DX21:82:22–83:9 (Coleman Dep.).

3.      Psychotherapy as a purported alternative to medical treatment for gender dysphoria in adolescents is ineffective, insufficient, and unethical.[202]

4.      Transgender adolescents will suffer irreparable harms without access to the banned treatments.[203]

## **ARGUMENT**

To obtain summary judgment, Defendants must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." *Hardigree*, 992 F.3d at 1223 (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007)). Summary judgment is inappropriate where it would require the Court to "discount[] [the nonmoving party's] expert's opinions and mak[e] adverse credibility determinations." *See, e.g., Favors v. City of Atlanta,* 849 F. App'x 813, 816, 821–22 (11th Cir. 2021).

---

[202] DX60:87–91 (McNamara Rep.); DX25:33–34:¶¶42–44 (Karasic Rebuttal Rep.) (sealed); DX33:288:14–17 (Ladinsky Dep.); DX24:77:13–22, 80:3–11 (Karasic Dep.); DX39:170:15–17 (Shumer Dep.).
[203] DX25:32:¶ 38 (Karasic Rebuttal Rep.); PX19:21 (McNamara Supp. Rep.); PX4:36 (Shumer Rep.); DX34:26, 54, 60–61 (Ladinsky Rep.); DX33:180:17–23, 289:6–11, 291:10–18 (Ladinsky Dep.); DX37:16:1–4, 127:14–22 (Austin Dep.) (sealed); PX5:¶ 68 (Shumer Rebuttal Rep.) (sealed).

Defendants have not carried their burden. Each of Defendants' proffered justifications is based on disputed facts. Additionally, the record shows that purposeful discrimination played a role in the Ban's enactment, requiring application of heightened scrutiny, and Defendants cannot show an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 531 (1996).

## I.  SUMMARY JUGDMENT SHOULD BE DENIED BECAUSE ALL OF DEFENDANTS' ASSERTIONS REST ON DISPUTED FACTS

Defendants' assertions rest on disputes of fact that can only be resolved at trial. Specifically, there is no undisputed credible evidence that supports (1) the legislative findings; (2) the alleged untrustworthiness of the WPATH Standards of Care; or (3) the alleged harmfulness of the banned care. In addition, overwhelming record evidence shows that (1) gender dysphoria is a real and serious medical condition, (2) adolescents with untreated gender dysphoria will suffer, (3) gender transition, including medical treatment where indicated, is the recognized standard of care for treatment of gender dysphoria in adolescence, (4) gender transition treatments for transgender adolescents include puberty blockers and hormones, and (5) there is no alternative, effective treatment, whether through psychotherapy alone or through any other method. This evidence creates genuine disputes of material fact that require denial of Defendants' motion. *See Doe v. Ladapo*, No. 4:23cv114-RH-MAF, 2024 WL 2947123, at *33–*37 (N.D. Fla. June 11, 2024) (finding, after trial on the merits, that a similar Florida ban failed constitutional review); *Bradbury v.*

44

*Wainwright*, 718 F.2d 1538, 1544 (11th Cir. 1983) (reversing summary judgment where evidence that rule was rationally related to state's interests was disputed).

## II.   SUMMARY JUDGMENT SHOULD ALSO BE DENIED BECAUSE HEIGHTENED SCRUTINY APPLIES

Defendants cite the Eleventh Circuit's panel decision vacating the preliminary injunction and assume that rational basis scrutiny applies to Plaintiffs' equal protection claims.[204] To be clear, summary judgment is unwarranted even under rational basis review, as the evidence described above demonstrates. But the Eleventh Circuit's panel decision also made clear that although it was applying rational basis scrutiny based on the arguments and record at that stage, heightened scrutiny would apply to Plaintiffs' equal protection claim if Alabama's Ban "is a pretext for invidious discrimination against [transgender] individuals." *Eknes-Tucker*, 80 F.4th at 1230.[205] The record demonstrates that it is. The obvious disparate impact of the Ban, the circumstances surrounding its enactment, and its sweeping character reveal that a discriminatory purpose was at work, requiring application of heightened scrutiny.

---

[204] DMSJ at 28. Plaintiffs' petition for rehearing en banc remains pending before the Eleventh Circuit. In addition, the United States Supreme Court recently granted the United States' petition for certiorari in its challenge to Tennessee's ban on health care for transgender adolescents.
[205] At the preliminary injunction stage, it was not necessary for this Court to consider the issue of invidious discrimination because Plaintiffs' motion for preliminary relief was based on their argument that the Ban facially classifies based on transgender identity.

"[A] disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by 'purposeful discrimination.'" *Adams by & through Kasper v. Sch. Bd.*, 57 F.4th 791, 810 (11th Cir. 2022) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 274 (1979)). A discriminatory purpose need not be the sole or even primary motivation to warrant heightened scrutiny. "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern[.]" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Thus, "[w]hen there is a proof that a discriminatory purpose has been *a* motivating factor in the decision, . . . judicial deference is no longer justified." *Id*. at 265–66 (emphasis added).

Proving a "discriminatory purpose" does not require a showing of subjective hatred, malice, or a self-conscious desire to harm. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–70 (1993). "Prejudice . . . may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Where, as here, a

"clear" and "stark" pattern of disparate impact "emerges from the effect" of the challenged legislation, "[t]he evidentiary inquiry is . . . relatively easy," and "impact alone" may be "determinative." *Id.* Courts also look to other factors, including "the foreseeability of the disparate impact," legislators' "knowledge of that impact," "the historical background" of the law, "the specific sequence of events leading up to its passage," and "the availability of less discriminatory alternatives." *League of Women Voters v. Fla. Sec'y of State,* 66 F.4th 905, 922 (11th Cir. 2023).

Alabama's Ban was enacted at least in part based on purposeful discrimination. First, its disparate impact is both obvious and severe: it bans medical care only for transgender adolescents. This starkly disparate impact was plainly foreseeable. Indeed, it was certain to occur and known by the Legislature.[206] *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed."); *Gomillion v. Lightfoot,* 364 U.S. 339, 342 (1960) (plaintiffs stated a claim of "obvious" discrimination by establishing the challenged law had the "inevitable

---

[206] *Contra Adams*, 57 F.4th at 810 (finding insufficient basis to infer discriminatory intent where defendant "did not even have transgender students in mind" and any disparate impact was "unforeseen when the bathroom policy was implemented").

effect" of excluding only Black residents); *Arlington Heights*, 429 U.S. at 266 (citing

*Gomillion*).

Second, surrounding circumstances indicate that purposeful discrimination

played a role in the Ban's enactment. The Ban was adopted amidst a wave of

legislation targeting transgender people. "Perhaps the best evidence" of animus is

other legislation the Alabama Legislature "passed on the very same day" as the Ban,

*Ladapo,* 2024 WL 2947123, at *20, including: (1) restricting classroom instruction

or discussion about gender identity, *see* 2022 Ala. Laws, Act 2022-290, *codified at*

Ala. Code § 16-40A-5 (approved Apr. 8, 2022); and (2) barring transgender people

from restrooms and locker rooms in public schools, *see* 2022 Ala. Laws, Act 2022-

290, *codified at* Ala. Code § 16-1-54 (approved Apr. 8, 2022). Just one year earlier,

Alabama banned transgender students from participating in school sports. *See* 2021

Ala. Laws, Act 2021-285, *codified at* Ala. Code § 16-1-52 (approved Apr. 23, 2021).

Alabama was not alone in rapidly enacting such laws. Before 2021, no state

banned medical care for transgender adolescents.[207] By April 2023, 22 states had

passed such bans.[208] Other legislation has sought to restrict medical care for

transgender adults, prevent transgender people from obtaining identity documents,

---

[207] See https://www.mapresearch.org/file/MAP-2023-Under-Fire-Report-5.pdf.
[208] *See id.* at 3–4.

ban transgender people from bathrooms, and restrict even *social* transition.[209] The purpose of the Ban must be understood in this extraordinary context.[210]

Third, the Ban is highly restrictive. It is sweeping in nature, prohibiting all medical treatments for minors with gender dysphoria across the board, regardless of medical necessity. Unlike the recommendations in the European countries Defendants point to, the Ban contains no safe harbor for medical research. And the Ban imposes extraordinarily severe penalties—up to 10 years in prison—for violations. The Legislature's refusal to consider less restrictive alternatives only reinforces the conclusion the Ban was motivated in part by a discriminatory purpose. *Cf. League of Women Voters*, 66 F.4th at 922 ("the availability of less discriminatory alternatives" is relevant to discriminatory purpose).

In sum, this case falls squarely in the category of cases in which the degree and foreseeability of a "clear pattern" of disparate impact are at a maximum, and in which both "circumstantial and direct evidence" undermine the credibility of Defendants' asserted justifications and support a finding of discriminatory purpose. *Arlington Heights*, 429 U.S. at 266. Considering the larger pattern of exclusionary legislation directed at transgender people, these factors show that

---

[209] *See id.* at 4–6.
[210] *Cf. Arlington Heights*, 429 U.S. at 267 (a sudden change in law in response to integration suggests a discriminatory purpose); *Ladapo*, 2024 WL 2947123, at *25 ("Had there been no animus, gender-affirming care probably would not have come before the Legislature at all.").

purposeful discrimination played a role in the Ban's enactment. *See Ladapo*, 2024 WL 2947123, at *25. For all these reasons, application of heightened scrutiny is appropriate. *See Adams*, 57 F.4th at 810; *Eknes-Tucker*, 80 F.4th at 1229–30.

Defendants have not shown that their justifications for the Ban satisfy rational basis review, much less heightened scrutiny, and each of their asserted justifications depends on disputed facts. Summary judgment is therefore inappropriate. *See Ladapo*, 2024 WL 2947123, at *25.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment.

Respectfully submitted this 1st day of July 2024.

*/s/ Amie A. Vague*

Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT, FRANKLIN &
WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt
Adam Reinke
Misty L. Peterson

Sarah Warbelow
Cynthia Weaver
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

Jennifer L. Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108

KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite
1600
Atlanta, GA 30309
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com

Brent P. Ray
Abigail Hoverman Terry
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
bray@kslaw.com
aterry@kslaw.com

Abby Parsons
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002
aparsons@kslaw.com

Scott D. McCoy
SOUTHERN POVERTY LAW
CENTER
P.O. Box 12463
Miami, FL 33101
scott.mccoy@splcenter.org

Diego A. Soto
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
diego.soto@splcenter.org

*Counsel for Private Plaintiffs*

jlevi@glad.org

Jessica L. Stone
SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
jessica.stone@splcenter.org

Christopher F. Stoll
Amy E. Whelan
Rachel H. Berg
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of July, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this case.

*/s/ Amie A. Vague*
*Counsel for Private Plaintiffs*
