# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official | ) | |
| capacity as Attorney General of the | ) | **REDACTED COPY;** |
| State of Alabama, *et al.*, | ) | **ORIGINAL SUBMITTED** |
| | ) | **UNDER SEAL** |
| *Defendants*. | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (DOC. 564)

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................ i

TABLE OF AUTHORITIES ...................................................... iii

INTRODUCTION ................................................................. 1

REPLY IN SUPPORT OF STATEMENT OF FACTS .......................................... 7

    A.   The Legislative Findings Are Supported By Evidence ............................ 8

    B.   Plaintiffs' Preferred Medical Interest Groups Are Untrustworthy ................ 20

    C.   Minors in Alabama Are Harmed by Transitioning Treatments .................... 75

RESPONSE TO PLAINTIFFS' EVIDENTIARY OBJECTIONS AND "ADDITIONAL FACTS" ............. 89

    A.   Plaintiffs' and the United States' "Additional Facts" ....................... 90

    B.   The Plaintiffs' Evidentiary Objections ...................................... 96

ARGUMENT ................................................................... 98

    I.   The Act Passes Rational Basis Review. ...................................... 98

        A.   Plaintiffs Point to No Dispute Material to Rational Basis ................. 99

        B.   The United States' Effort to Redefine Rational Basis Review Is Unprecedented and Fails On Its Own Terms ......................... 104

            1.   The United States' rational basis plus theory contradicts precedent ....................................................... 104

            2.   The United States' rational basis arguments fail on their own terms ....................................................... 111

a. Alabama has a legitimate government interest .................. 111

b. The Act has a rational relationship with Alabama's interests ................................................................................ 119

3. *Doe v. Ladapo* acknowledged that rational basis review is required ........................................................................... 121

II. Heightened Scrutiny Does Not Apply ...................................................... 122

A. Neither Plaintiffs Nor the United States Pleaded an *Arlington Heights* Claim. .............................................................. 123

B. Neither Plaintiffs Nor the United States Offers a Viable *Arlington Heights* Claim. ............................................................ 124

C. Neither Plaintiffs Nor the United States Offered Sufficient Evidence to Avoid Summary Judgment on an *Arlington Heights* Claim. .............................................................. 125

III. The Act Would Satisfy Heightened Scrutiny. ...................................... 135

CONCLUSION ................................................................................................ 137

CERTIFICATE OF SERVICE ...................................................................... 140

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
    585 U.S. 579 (2018)............................................................... 5, 126, 129

*Adams v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) ..........................................114, 125, 127-129, 137

*Alexander v. S.C. State Conf. of the NAACP*,
    144 S. Ct. 1221 (2024)........................................ 1, 5, 6, 122, 126, 135

*Armour v. City of Indianapolis*,
    566 U.S. 673 (2012)................................................................112

*Bankers Life & Cas. Co. v. Crenshaw*,
    486 U.S. 71 (1988)................................................................119

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001)................................................................108

*Blue Martini Kendall, LLC v. Miami Dade Cnty.*,
    816 F.3d 1343 (11th Cir. 2016) ................................................103

*Bostock v. Clayton County*,
    590 U.S. 644 (2020)................................................................131

*Bradbury v. Wainwright*,
    718 F.2d 1538 (11th Cir. 1983) ........................................... 103, 104

*Brnovich v. Democratic Nat'l Comm.*,
    594 U.S. 647 (2021)................................................... 12, 89, 113, 134

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)........................................................... 6, 135

*Calderon v. Thompson*,
    523 U.S. 538 (1998)................................................................113

*Califano v. Webster*,
430 U.S. 313 (1977).............................................................135

*Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*,
193 F.3d 1285 (11th Cir. 1999) ...........................................127

*Cleburne v. Cleburne Living Center, Inc.*,
473 U.S. 432 (1985).............................. 105-108, 110, 125

*Cook v. Bennett*,
792 F.3d 1294 (11th Cir. 2015) ........................... 7, 103, 120

*Copeland v. Ga. Dep't of Corr.*,
97 F.4th 766 (11th Cir. 2024) ............................................126

*Cordoba v. Dillard's, Inc.*,
419 F.3d 1169 (11th Cir. 2005) ........................... 11, 17, 29

*Craig v. Boren*,
429 U.S. 190 (1976).............................................................135

*Danskine v. Miami Dade Fire Dep't*,
253 F.3d 1288 (11th Cir. 2001) ........................................135

*Deen v. Egleston*,
597 F.3d 1223 (11th Cir. 2010) ..................... 106, 108, 110

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)................................................................128

*Dep't of Agriculture v. Moreno*,
413 U.S. 528 (1973)................................................ 105, 108

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022)............................................ 100, 130-132

*Doe v. Ladapo*,
No. 4:23-cv-114-RH-MAF, 2024 WL 2947123
(N.D. Fla. June 11, 2024)................................. 117, 121, 122

*Dukes v. Deaton*,
852 F.3d 1035 (11th Cir. 2017) ..........................................................124

*Eknes-Tucker v. Governor of Ala.*,
80 F.4th 1205 (11th Cir. 2023) ...........................................4, 6, 98-104, 112, 114,
116, 121-123, 128, 133, 135, 137, 138

*Engquist v. Or. Dep't of Agriculture*,
No. 07-474, 2008 WL 859357 (U.S. Mar. 26, 2008) ..................... 108, 109, 112

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)........................................................................89

*Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*,
710 F.3d 1221 (11th Cir. 2013) ..........................................................124

*Fresenius Medical Care Holdings, Inc. v. Tucker*,
704 F.3d 935 (11th Cir. 2013) ...........................................................104

*Frontiero v. Richardson*,
411 U.S. 677 (1973)........................................................................114

*Gary v. City of Warner Robins*,
311 F.3d 1334 (11th Cir. 2002) ..........................................................103

*Gilmour v. Gates, McDonald & Co.*,
382 F.3d 1312 (11th Cir. 2004) ..........................................................124

*Glasscox v. City of Argo*,
903 F.3d 1207 (11th Cir. 2018) ..............................................................8

*Gonzales v. Carhart*,
550 U.S. 124 (2007)............................................... 1, 7, 99, 113, 135, 136

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*,
992 F.3d 12995 (11th Cir. 2021) ............................... 96, 113, 127, 128, 130, 132

*Haves v. City of Miami*,
52 F.3d 918 (11th Cir. 1995) ........................................4, 98, 99, 105, 110-112

*Heller v. Doe,*
    509 U.S. 312 (1993)........................................................ 108, 119, 120

*In re Int'l Mgmt. Assocs., LLC,*
    781 F.3d 1262 (11th Cir. 2015) ...............................................97

*Jones v. Governor of Fla.,*
    975 F.3d 1016 (11th Cir. 2020) ...................................... 106, 108, 111

*Jones v. Mississippi,*
    593 U.S. 98 (2021)........................................................117

*Jones v. White,*
    992 F.2d 1548 (11th Cir. 1993) ..............................................128

*Kentner v. City of Sanibel,*
    750 F.3d 1274 (11th Cir. 2014) ..............................................100

*Knight through Kerr v. Miami-Dade Cnty.,*
    856 F.3d 795 (11th Cir. 2017) ................................................98

*L.W. v. Skrmetti,*
    83 F.4th 460 (6th Cir.) .............................................. 103, 130

*Law v. Tillman,*
    2001 WL 103304 (S.D. Ala. 2001)............................................96

*Lawrence v. Texas,*
    539 U.S. 558 (2003).......................................... 5, 104, 105, 108, 110

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State,*
    32 F.4th 1363 (11th Cir. 2022) ........................................ 5, 126, 130

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n,*
    558 F.3d 1301 (11th Cir. 2009) ...................................... 3, 90, 100

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.,*
    358 F.3d 804 (11th Cir. 2004) ...................................... 107, 108, 113

*Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*,
    377 F.3d 1275 (11th Cir. 2004) .........................................................110

*Lyng v. Int'l Union*,
    485 U.S. 360 (1988).........................................................................108

*Marshall v. United States*,
    414 U.S. 417 (1927)................................................................... 1, 126

*Miller v. Johnson*,
    515 U.S. 900 (1995) ...........................................................................5

*Milner v. Apfel*,
    148 F.3d 812 (7th Cir. 1998) ............................................................110

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981)........................................................ 99, 100, 120

*Nat'l Parks Conservation Ass'n v. Norton*,
    324 F.3d 1229 (11th Cir. 2003) ............................................ 104, 107

*Nguyen v. INS*,
    533 U.S. 53 (2001) ...........................................................................136

*Nisbet v. George*,
    No. 1:05-CV-570-WKW, 2006 WL 2345884 (M.D. Ala. Aug. 11, 2006)........96

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)..............................................................................125

*Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*,
    50 F.4th 1126 (11th Cir. 2022) ........................................ 110, 112, 120

*Obergefell v. Hodges*,
    576 U.S. 644 (2015).........................................................................131

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) .........................................................135

*PBT Real Estate, LLC v. Town of Palm Beach*,
    988 F.3d 1274 (11th Cir. 2021) ........................................................103

*Pers. Adm'r of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ........................................................................109

*Pierre v. RBC Liberty Life Ins.*,
    No. 5-1042-C, 2007 WL 2071829 (M.D. La. July 13, 2007) ............97

*Powers v. Harris*,
    379 F.3d 1208 (10th Cir. 2004) ......................................................110

*Rast v. Van Deman & Lewis Co.*,
    240 U.S. 342 (1916) ..........................................................................89

*Rodriguez ex rel. Rodriguez v. United States*,
    169 F.3d 1342 (11th Cir. 1999) ......................................................128

*Romer v. Evans*,
    517 U.S. 620 (1996) ........................................................ 105-108, 110

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) ..........................................................................135

*Scalone v. Home Depot USA, Inc.*,
    280 F. App'x 905 (11th Cir. 2008) .....................................................8

*Smith v. Marcus & Millichap, Inc.*,
    991 F.3d 1145 (11th Cir. 2021) ........................................................96

*Stanley v. City of Sanford*,
    83 F.4th 1333 (11th Cir. 2023) ......................................................103

*Stardust, 3007 LLC v. City of Brookhaven*,
    899 F.3d 1164 (11th Cir. 2018) ......................................................103

*State v. Loe*,
    No. 23-0697, 2024 WL 3219030 (Tex. June 28, 2024) ...................132

*Tiwari v. Friedlander*,
   26 F.4th 355 (6th Cir. 2022) ...............................................................89

*Transpacific Steel LLC v. United States*,
   No. 2020-2157 (Fed. Cir. Oct. 30, 2020)........................................109

*Trump v. Hawaii*,
   585 U.S. 667 (2018)............................................................... 99, 106

*United States R.R. Ret. Bd. v. Fritz*,
   449 U.S. 166 (1980)..........................................................................112

*United States v. Byse*,
   28 F.3d 1165 (11th Cir. 1994) ........................................................127

*United States v. Scrima*,
   819 F.2d 996 (11th Cir. 1987) ..........................................................98

*United States v. Virginia*,
   518 U.S. 515 (1996)............................................................... 114, 135

*Vacco v. Quill*,
   521 U.S. 793 (1997)..........................................................................109

*Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*,
   736 F.2d 656 (11th Cir. 1984) ..........................................................63

*Vance v. Bradley*,
   440 U.S. 93 (1979)......................................................... 5, 89, 138

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977)...........................................5, 95, 96, 122-128, 130

*Williams v. Morgan*,
   478 F.3d 1316 (11th Cir. 2007) ............................................. 112, 113

*Williams v. Pryor*,
   240 F.3d 944 (11th Cir. 2001) ........................................... 106-108, 120

**Statutes**

18 U.S.C. § 116 ................................................................................94

21 U.S.C. § 841(a) ...........................................................................94

Ala. Code § 16-1-52 ......................................................................129

Ala. Code § 16-1-54 ......................................................................129

Ala. Code § 26-26-1 ................................................................. 95, 99

Ala. Code § 26-26-2 ..................................................................4, 90

Ala. Code § 26-26-2(1) ....................................................... 8, 115, 131

Ala. Code § 26-26-2(2) .....................................................................9

Ala. Code § 26-26-2(3) .....................................................................9

Ala. Code § 26-26-2(6) ...................................................................11

Ala. Code § 26-26-2(7) ...................................................................12

Ala. Code § 26-26-2(8) ...................................................................12

Ala. Code § 26-26-2(9) ...................................................................12

Ala. Code § 26-26-2(12) .................................................................15

Ala. Code § 26-26-2(15) ...............................................................7, 19

Ala. Code § 26-26-2(16) ............................................................ 19, 95

Ala. Code §§ 26-26-4 ............................................................... 132, 136

Ala. Code § 26-26-6 ................................................................. 132, 136

Ala. Code § 28-1-5(a) .....................................................................19

Ala. Code § 32-6-7(1) ...................................................................................................19

**Rules**

Fed. R. Civ. P. 56(c) ...............................................................................................131

Fed. R. Civ. P. 56(c)(2) ...........................................................................................96

Fed. R. Evid. 703 ....................................................................................................98

Fed. R. Evid 803(6) ......................................................................................... 97, 98

Fed. R. Evid. 803(18) ..............................................................................................97

Fed. R. Evid. 901 ....................................................................................................97

Fed. R. Evid. 902 ....................................................................................................97

Fed. R. Evid. 902(11) ..............................................................................................97

**Regulations**

21 C.F.R. § 1308.13(f) ...........................................................................................94

Ala. Admin. Code r. 560-X-14-.04 .........................................................................19

**Acts**

2022 Ala. Acts 222 (enacted Apr. 4, 2022) ..........................................................129

2022 Ala. Acts 248 (enacted Apr. 5, 2022) ..........................................................129

2022 Ala. Acts 270 (enacted Apr. 7, 2022) ..........................................................129

## Other Authorities

Eugene Volokh,
*Is It Unconstitutional for Laws to Be Based on Their Supporters' Religiously Founded Moral Beliefs*, The Volokh Conspiracy (May 10, 2022)..................118

L. Wilson et al.,
*Effects of Antiandrogens on Prolactin Levels Among Transgender Women*,
21 INT'L J. OF TRANSGENDER HEALTH 391 (2020) ..................................... 46, 47

M. McNamara et al.,
*Combating Scientific Disinformation on Gender-Affirming Care*,
152 PEDIATRICS (Sept. 2023) .............................................................................51

Mike Cason,
*Alabama lawmakers again seek to ban transgender treatments for minors*,
AL.com (Jan. 6, 2021), https://www.al.com/news/2021/01/alabama-lawmakers-again-seek-to-ban-transgender-treatments-for-minors.html...........................133

*Puberty blockers ban is lawful, says High Court*,
BBC NEWS (Jul. 29, 2024), https://perma.cc/EMV9-887R ...............................25

Roni Caryn Rabin et al.,
*Biden Administration Opposes Surgery for Transgender Minors*,
N.Y. TIMES (June 28, 2024), https://
www.nytimes.com/2024/06/28/health/transgender-surgery-biden.html ..... 2, 136

Thomas B. Nachbar,
*Rational Basis "Plus"*, 32 CONST. COMMENT. 449 (2017) ..............................110

*Transactual CIC et al. v. Sec'y of State for Health and Social Care et al.*,
[2024] EWHC 1936 (Admin), No. AC-2024-LON-002062
(High Court of Justice K.B. Div., Admin. Ct. Jul. 29, 2024),
*available at* https://perma.cc/X5DN-NTD6 ......................................................25

U.K. Department of Health and Social Care,
*New restrictions on puberty blockers* (May 29, 2024),
https://perma.cc/Y4VY-TB4C.........................................................................136

U.S. Dep't of Justice,
*Opioid Manufacturer Endo Health Solutions Inc. Ordered to Pay $1.536B in Criminal Fines and Forfeiture for Distributing Misbranded Opioid Medication* (May 3, 2024), https://perma.cc/7Q5L-EK9F ....................................................94

## INTRODUCTION

Until a few years ago, the notion of providing sex-change treatments to minors was practically unthinkable. So was the idea that the judiciary is the proper branch to sort through the evidence and declare once and for all that kids suffering from psychological distress caused by an incongruence between their "gender identity" and their sex must be allowed to take powerful hormones that risk permanently changing their bodies and leaving them sterilized.

Yet here we are. Defendants moved for summary judgment because this is a political dispute, not a legal one. The Alabama Legislature, like the governing bodies of 24 other States, determined that children should wait until they reach adulthood to undergo sex-change procedures. Plaintiffs disagree. Fine. They and the many organizations supporting them can seek to persuade Alabama's elected representatives to repeal or amend the law. Not every dispute is for the courts to resolve. As the Supreme Court has explained, "even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices," "in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1927). Federal courts should not serve as a State's "*ex officio* medical board." *Gonzales v. Carhart*, 550 U.S. 124, 164 (2007).

The Supreme Court also recently advised judges to be "wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024) (quotation marks and citation omitted). Given

what discovery has uncovered in this case, that admonition could not be more prescient. Reams of evidence reveal that evidence-based medicine and patient welfare took a backseat to political, legal, and ideological goals in everything from the WPATH Standards of Care 8 (SOC-8) to the United States' flip-flopping on age restrictions[1] to the plaintiffs' *and WPATH's* current tack of avoiding mention of transitioning surgeries for minors *even though SOC-8 itself deems such surgeries "medically necessary"* (and even though the hormonal interventions both sets of plaintiffs still advocate also leave minors sterilized, just chemically rather than surgically).[2]

Indeed, it should be shocking to learn that some SOC-8 authors, acting on the advice of "social justice lawyers we spoke with," intentionally chose *not* to seek systematic evidence reviews before making treatment recommendations because, as one author put it, "evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits."[3] Or that

---

[1] *Compare* U.S. Am. Compl., Doc. 92 ¶39 ("[W]hile some transgender individuals find comfort with their gender identity without surgery, for others surgery is essential and medically necessary to alleviate gender dysphoria."), *with* Roni Caryn Rabin et al., *Biden Administration Opposes Surgery for Transgender Minors*, N.Y. TIMES (June 28, 2024), https://www.ny-times.com/2024/06/28/health/transgender-surgery-biden.html ("The Biden Administration said this week that it opposed gender-affirming surgery for minors….").

[2] *Compare* DX116:S48 (SOC-8) (recommending transitioning surgery when, among other things, "[t]he adolescent had at least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment unless hormone therapy is either not desired or is medically contraindicated"), *with* DX18:115:15-16 (Bowers Dep.) (asserting that WPATH "opted to remove" the age minimums from SOC-8 "and fall back to the more conservative SOC-7 language" that expressly prohibited most surgeries for adolescents).

"DX" refers to the exhibits Defendants supported in support of their summary judgment motion. *See* Docs. 557 through 560. "*Daubert.*DX" refers to the exhibits Defendants submitted in support of their *Daubert* motions. *See* Doc. 592.

[3] DX174:1-2 (WPATH 1).

WPATH restricted the publication of the limited reviews that *were* conducted because, rather than allowing the evidence to drive treatment recommendations, the organization wanted "to ensure that publication does not negatively affect the provision of transgender healthcare in the broadest sense."[4] Or that the chair of SOC-8, Dr. Eli Coleman, considered "pressure in health care to provide evidence-based care" to be evidence that "[tr]ans health care" is "under attack."[5] Or that SOC-8 authors lamented that WPATH was "allowing US politics to dictate international professional clinical guidelines."[6]

Kids suffering from gender dysphoria deserve better. WPATH cannot be trusted when it promises that puberty blockers, cross-sex hormones, and (yes) surgeries are the only viable treatments for teenaged girls experiencing gender-related distress. A growing number of European healthcare authorities agree, which is why they have restricted such treatments and are setting up research protocols to *conduct* the experiments WPATH saw no need for.

And still Private Plaintiffs and the United States ask this Court to deny summary judgment. Their theory? That no one could possibly come up with a rational reason to limit sex-change treatments to adults. They don't quite say it that way, of course, but that is what they must prove. The caselaw is clear. "[T]he burden is on the one attacking the law to negate every conceivable basis that might support it, even if that basis has no foundation in the record." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (cleaned up). Alabama's

---

[4] DX167:91 (JHU 2).
[5] DX190:5 (WPATH 17).
[6] DX186:32 (WPATH 13).

law is "afforded a strong presumption of validity," and the question is simply whether it is "rationally related to a legitimate state interest." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1224-25 (11th Cir. 2023) (cleaned up).

The law easily passes that standard. Defendants and the Alabama Legislature provided many rational reasons for the restriction. *See* Defs' Mot. 1-29; Ala. Code § 26-26-2. Safeguarding the physical and psychological well-being of minors is a legitimate interest. Prohibiting doctors from administering sterilizing transitioning treatments to minors is rationally related to that interest. Summary judgment is appropriate.

Notably, this is true *even if* Plaintiffs and the United States were right that every factual assertion in the case is disputed—indeed, even if Defendants did not offer a single piece of evidence to support their motion. Though they did so, Defendants did not have to support the law's many rational bases with "evidence or empirical data." *Eknes-Tucker*, 80 F.4th at 1225 (cleaned up). "As long as [Defendants] can present at least one plausible, arguably legitimate purpose for the [law], summary judgment for [Defendants] is appropriate unless [Plaintiffs] can demonstrate that the legislature could not possibly have relied on that purpose." *Haves v. City of Miami*, 52 F.3d 918, 923 (11th Cir. 1995). Plaintiffs and the United States are simply wrong to suggest that their purported factual disputes, even if credited as genuine, prevent summary judgment. *Cf.* Plfs' Resp. 44; U.S. Resp. 68-73. A rational basis need not be (usually is not) an undisputed basis. On the contrary, the existence of disputed issues of fact demonstrates the existence of evidence on both sides, almost by definition leaving it "rational" for the legislature to act in reliance on the evidence

on either side. Indeed, "it is the very admission that the facts are arguable that immunizes from constitutional attack the [legislative] judgment." *Vance v. Bradley*, 440 U.S. 93, 112 (1979). Any disputes of fact are not material under Rule 56.

Understandably, neither set of plaintiffs spends much time discussing the governing standard. Instead, the United States (at 62) relies on a solo opinion in *Lawrence v. Texas*, 539 U.S. 558, 580 (2003), to argue for a more "searching form" of rational basis review, while the Private Plaintiffs (at 45-46) jump straight to intermediate scrutiny by way of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Both try to escape rational basis review by claiming that Alabama's law "is a pretext for invidious discrimination against transgender individuals." Plfs' Resp. 45 (cleaned up); *see* U.S. Resp. 66.

Their escape attempt fails. As Defendants have noted several times before, neither Plaintiffs nor the United States has ever "offered allegations suggesting that the law is unconstitutional because the Alabama legislature had a supposedly discriminatory intent." Doc. 411 at 1. It is too late for them to spring such a claim now.

More fundamentally, "when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam) (quoting *Abbott v. Perez*, 585 U.S. 579, 603 (2018)). The presumption applies at every "stage[] of litigation," *Miller v. Johnson*, 515 U.S. 900, 916-17 (1995), and "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions," *Alexander*, 144 S. Ct. at 1235-36. Thus, even

crediting the United States' remarkable claim that the Legislature's finding that "a person's sex 'cannot be changed'" could plausibly be construed as "evidence of animus," U.S. Resp. 66, it is far more likely that the finding simply reflects the Legislature's (accurate) understanding of biological reality and its concern that attempts to change that reality can harm minors. "In light of the presumption of legislative good faith, that possibility is dispositive." *Alexander*, 144 S. Ct. at 1241. Nor do the out-of-context statements by a few legislators and the governor help the plaintiffs' cause. Even if those statements were evidence of animus (which they aren't), they cannot raise a material dispute about the legislative *body's* intent, which is what matters under the plaintiffs' new theory.

Last, summary judgment is appropriate even if heightened scrutiny applied. To the extent Alabama's law "involves a sex-based classification, it does so because there is no other way to regulate treatments for a discordance between an individual's sex and their sense of identity without drawing such a distinction." *Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) (cleaned up). And Alabama has an important state interest—indeed a "compelling" one—"in protecting children from drugs, particularly those for which there is uncertainty regarding benefits, recent surges in use, and irreversible effects." *Id.* at 1225 (opinion of the court). Even with the plaintiffs' purported factual disputes, "[i]ntermediate scrutiny permits 'the legislature [to] make a predictive judgment' based on competing evidence." *Id.* at 1235 (Brasher, J., concurring) (alteration in original) (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799-800 (2011)). The Legislature's predictive judgment, based on facts that are *not* genuinely disputed, was that "[m]inors, and often

6

their parents, are unable to comprehend and fully appreciate the risk and life impli-

cations, including permanent sterility, that result from the use of puberty blockers,

cross-sex hormones, and surgical procedures." Ala. Code § 26-26-2(15). Even under

intermediate scrutiny, that judgment is due deference. *See Gonzales*, 550 U.S. at 163

(stating "traditional rule" "consistent with" intermediate scrutiny that States exercise

"wide discretion" "in areas where there is medical and scientific uncertainty"). Sum-

mary judgment is appropriate.

## REPLY IN SUPPORT OF STATEMENT OF FACTS

Both Private Plaintiffs and the United States try their best, often to the point

of absurdity, to dispute every single fact offered by Defendants. As explained below,

*see infra* Part I, their attempts, even if credited, cannot raise a genuine dispute of

*material* fact that would bar summary judgment under rational basis review. If "a

state has no obligation to produce evidence to sustain the rationality of a statutory

classification" and can successfully defend its law "based on rational speculation

unsupported by evidence or empirical data," *Cook v. Bennett*, 792 F.3d 1294, 1300

(11th Cir. 2015) (cleaned up), then it does not matter whether plaintiffs dispute or

otherwise challenge the "evidence or empirical data" the state chooses to submit. All

that matters is whether the challenged provision is "rationally related to a legitimate

governmental purpose." *Id.* That question can be resolved irrespective of any pur-

ported factual disputes. Any dispute that does exist thus simply confirms that the

Legislature had a rational basis to act, and so is immaterial under Rule 56. As also

explained below, *see infra* Part III, even if heightened scrutiny applied, there are still

sufficient undisputed material facts to grant summary judgment to Defendants.

Here, Defendants respond on a paragraph-by-paragraph basis to the plaintiffs' "disputes" of Defendants' facts to provide additional context for the many rational bases Defendants offered and to show why many purported factual disputes are not genuine, and none are material. After that, Defendants address the additional factual assertions made by Plaintiffs and the United States.

### A. The Legislative Findings Are Supported By Evidence.

1. To Defendants' statement that the legislative findings "are supported by evidence," the United States simply replies: "While S.B. 184 does include legislative findings, the United States disputes that those findings are supported by evidence." U.S. Resp. 2. "Such 'naked assertions' are not enough to place in dispute a genuine issue of material fact." *Scalone v. Home Depot USA, Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008) (unpublished); *see Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018). While the United States may not like the evidence supporting the Legislature's findings, there *is* evidence. This is not a genuine dispute.

2. The plaintiffs' purported dispute of the legislative findings concerning the definition of sex and the diagnosis and treatment of gender dysphoria is also not genuine. The Legislature found that "[t]he sex of a person is the biological state of being female or male, based on sex organs, chromosomes, and endogenous hormone profiles, and is genetically encoded into a person at the moment of conception, and it cannot be changed." Ala. Code § 26-26-2(1). Both the United States and Plaintiffs purport to dispute this finding by asserting that "gender identity … is an essential medical component of sex." Plfs' Resp. 2; *see* U.S. Resp. 2 (the "complicated bio-logical concept" of "sex" "incorporates" "gender identity"). But in their operative

8

complaints, both sets of plaintiffs alleged that "gender identity" is *separate from* sex. And under plaintiffs' theory of the case, how could it not be? That is, after all, how they assert that "[t]ransgender people … have a gender identity that *differs* from their birth sex" and that "[g]ender dysphoria is the clinical diagnosis for the distress that arises when a person's gender identity does not match their birth sex." Plfs' 2nd Am. Compl., Doc. 159 ¶¶24-25 (emphasis added); *see* U.S. Am. Compl., Doc. 92 ¶22. That is also why the Private Plaintiffs do not dispute the Legislature's finding that "[s]ome individuals, including minors, may experience discordance *between* their sex and their internal sense of identity, and individuals who experience severe psychological distress as a result of this discordance may be diagnosed with gender dysphoria." Ala. Code § 26-26-2(2) (emphasis added). (The United States "disputes" this finding because the Legislature paraphrased rather than quoted directly from the DSM-5. U.S. Resp. 3.) If gender identity is "an essential medical component *of* sex," Plfs' Resp. 2 (emphasis added), it makes no sense to talk about a discordance *between* one's sex and … one's sex.

Nor do the plaintiffs genuinely dispute the Legislature's finding that a diagnosis of gender dysphoria "is based exclusively on the individual's self report of feelings and beliefs." Ala. Code § 26-26-2(3). They simply assert that "this practice is common in medicine." U.S. Resp. 3; *see* Plfs' Resp. 3 ("Gender dysphoria is one of many health conditions for which the diagnosis is made via clinical diagnosis by experts rather than by diagnostic testing."). Both things can be true (though notably Plaintiffs do not invoke another diagnosis based exclusively on a child's self-report that is "treated" with drugs carrying a similar risk profile to those at issue here).

As for the Legislature's finding that "numerous studies have shown that a substantial majority of children who experience discordance between their sex and identity will outgrow the discordance once they go through puberty," the United States and Plaintiffs respond that these studies are wrong. U.S. Resp. 3-4; Plfs' Resp. 3. That's news to the Endocrine Society guideline on which the plaintiffs rely, which agrees with the Legislature that "the large majority (about 85%) of prepubertal children with a childhood diagnosis did not remain GD/gender incongruence in adolescence."[7] In any event, this "dispute" doesn't matter, either: Neither set of plaintiffs disputes that there *are* "numerous studies" showing just what the Legislature said they did. Plaintiffs just wish the Legislature had relied on their favored studies instead. That is not enough.

Turning to "watchful waiting"—providing a gender dysphoric patient with psychological and other help, but not yet hormones or surgeries[8]—Plaintiffs' expert Dr. Ladinsky testified that the UAB pediatric gender clinic typically refrains from "initiating medical treatment for gender dysphoria" until an adolescent has been in its care for "one to three years" "to ensure … that mental health is optimized, that the youth sustains that dysphoria over a longer period of time."[9] During that time, the clinic tries to help the patient in ways other than providing hormonal interventions. Contrary to Plaintiffs' assertion, then, it's not the case that "watchful waiting" is never used for "adolescents who have begun puberty." Plfs' Resp. 3; U.S. Resp.

---

[7] DX115:3879 (Endocrine Society Guideline); *see* DX2:¶¶155-20 (Cantor Rep.) (discussing every available study on the matter).
[8] DX2:¶¶246, 273 (Cantor Rep.).
[9] DX33:36-14–38:6 (Ladinsky Dep.).

4. The disagreement is simply about the Legislature's ultimate judgement about how *long* to watchfully wait.

3. The Legislature found that "[s]ome in the medical community are aggressively pushing for interventions in minors that medically alter the child's hormonal balance and remove healthy external and internal sex organs when the child expresses a desire to appear as a sex different from his or her own." Ala. Code § 26-26-2(6). Plaintiffs "dispute" the finding by relying on Dr. Ladinsky to omnisciently assure that "Alabama medical providers, including the UAB Clinic, follow the established WPATH Standards of Care in treating transgender adolescents." Plfs' Resp. 3. Such "[s]peculation" about the practices of all Alabama medical providers "does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). And even assuming Dr. Ladinsky's statement is true of UAB's clinic—████████████████████████████[10] ████████████████████████████████████████████████████ ████████████████████████████████████[11]—there exists plenty of evidence that it is *not* true elsewhere. There's Dr. Torres, the OB/GYN in Tuscaloosa who told the *LA Times* that "she didn't require" an adolescent patient to "see[] a therapist" before prescribing the teen cross-sex hormones at the very first visit (via telehealth).[12] And there's Jamie Reed, the whistleblower from the Washington University Pediatric Transgender Center at St. Louis Children's

---

[10] *See* ████████████████████████████████████████████

[11] ██████████████████████

[12] DX132:15-16 (Jarvie *Abortion Doctor*); DX12:¶54 (Nangia Supp. Rep.).

Hospital who described seeing "staff at the Center provide puberty blockers and cross-sex hormones to children without complete informed parental consent and without an appropriate or accurate assessment of the needs of the child" and "witnessed children experience shocking injuries from the medication the Center prescribed."[13] Neither Plaintiffs nor the United States dispute that. And to the extent they discount Reed's testimony because it describes care at *another* State's premier academic pediatric gender clinic, "it should go without saying that a State may take action to prevent [harm] without waiting for it to occur be detected within its own borders." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

The remainder of the plaintiffs' "disputes" are also not genuine. The legislative findings at issue simply describe the course of treatment recommended by WPATH and pushed by plaintiffs: social transition, then puberty blockers, then cross-sex hormones, and then, for at least some patients, surgeries. *See* Ala. Code § 26-26-2(7)-(9); Plfs' 2nd Am. Compl., Doc. 159 ¶32 ("There are several components to the transition process: social, legal, medical, and surgical."); U.S. Am. Compl., Doc. 92 ¶38 ("Under WPATH's clinical guidelines, adolescents who are transgender may receive medically necessary chest reconstructive surgeries [read: double mastectomy for natal female] prior to the age of majority...."), ¶39 ("According to WPATH, while some transgender individuals find comfort with their gender identity without surgery, for others surgery is essential and medically necessary to alleviate gender dysphoria."). The Private Plaintiffs generally agree with the description, simply adding that they think the treatments are safe and that the lack of

---

[13] DX129:¶7 (Reed Affidavit).

FDA approval does not show otherwise. Plfs' Resp. 4. The United States purports to "dispute" the findings by generally restating them in different words or adding commentary to them, which also doesn't make a dispute genuine. *Compare* Defs' Mot. 7-8 *with* U.S. Resp. 4-7. The United States also assures that "there is no inevitable continuum of treatment," U.S. Resp. 4-7, but as Plaintiffs' expert Dr. McNamara admits, "puberty-pausing medications … are nearly always part of a staged process that includes other treatments."[14] In any event, the United States does not otherwise contest the Legislature's finding that "[f]or minors who are placed on puberty blockers that inhibit their bodies from experiencing the natural process of sexual development, the overwhelming majority will continue down a path toward cross-sex hormones and cosmetic surgery." Defs' Mot. 8.

The United States does take the opportunity here to distance itself once again from the surgical procedures WPATH recommends[15] (and which the United States once sought to defend[16]): "Surgeries," it says, "are not typically performed until

---

[14] PX7:App. A:15 (McNamara Affidavit).

[15] *See* DX116:S66 (SOC-8) ("suggest[ing] there may be a benefit for some adolescents to having [transitioning surgeries] performed before the age of 18," with the sole exception of "phalloplasty," which WPATH states is "not recommended … in youth under 18 at this time"); *cf. id.* S257 (providing general criteria "for adolescents" to be recommended for "gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty and facial surgery").

[16] *See* U.S. Am. Compl., Doc. 92 ¶ 38 ("Under WPATH's clinical guidelines, adolescents who are transgender may receive medically necessary chest reconstructive surgeries [read: double mastectomy for a natal female] prior to the age of majority if they have severe gender dysphoria…."), ¶39 ("According to WPATH, while some transgender individuals find comfort with their gender identity without surgery, for others surgery is essential and medically necessary to alleviate gender dysphoria."), ¶51 ("With respect to surgical procedures, for example, the law permits a cisgender girl to undergo a voluntary non-cancer related breast augmentation procedure to make her feel more accepting of her body, but forbids a transgender girl from receiving the same procedure even when recommended as medically appropriate by her physician. The law also permits a cisgender

adulthood and are not performed on minors in Alabama." U.S. Resp. 5. For that statement, the United States primarily relies on Dr. Ladinsky, the pediatrician at the UAB clinic. *Id.* at 5 n.31. (The other cited author, Dr. Shumer, admitted he was "not intimately familiar with any pediatric gender clinics in Alabama."[17]) But Dr. Ladinsky (1) agreed that she was not "aware of any guideline that [she] consider[s] to be respected in [her] field that do[es] *not* approve mastectomies for natal females younger than 18,"[18] and (2) admitted that had been unaware that UAB *had* "conducted one transitioning surgery" on a minor since July 2020.[19]

While the United States asserts (at 7) that the Legislature's findings regarding pediatric surgeries are "immaterial" since the plaintiffs have dropped their challenge to the State's restriction on surgeries, surgeries remain relevant because the plaintiffs have made the WPATH and similar standards the cornerstone of their case—and those same standards, using much of the same evidence plaintiffs rely on, recommend transitioning surgeries for minors.[20] If those standards are not trustworthy

---

boy with gynecomastia to have excess breast tissue surgically removed to give him a more 'male' physique, but does not permit a transgender boy to obtain the same treatment."), ¶61 (asking the Court to "[e]nter a judgment declaring that Section 4 of S.B. 184"—including its prohibition on surgeries—"violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."); *see also* Antommaria Decl., Doc. 80-7 ¶¶16, 42, 44-45, 47 (United States' expert Dr. Antommaria defending transitioning surgeries for minors in his expert report for the preliminary injunction hearing).

[17] DX39:43:2-6 (Shumer Dep.).

[18] DX33:69:16-20 (Ladinsky Dep.) (emphasis added).

[19] DX33:54:2-18 (Ladinsky Dep.) (emphasis added); *see* DX34:33 (UAB Responses and Objections).

[20] *See* DX116:S66 (SOC-8) ("suggest[ing] there may be a benefit for some adolescents to having [transitioning surgeries] performed before the age of 18," with the sole exception of "phalloplasty," which WPATH states is "not recommended … in youth under 18 at this time"); *cf. id.* S48 (providing general criteria "for adolescents" to be recommended for "gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty,

when it comes to surgeries, that is relevant evidence. Plus, at least *some* minors receiving transitioning hormones will undergo surgical procedures (and are more likely to do so if they have already transitioned using hormones)[21], so the prospect of surgery—and how puberty blockers and hormones will affect those prospects—is therefore part of the informed consent process under SOC-8 (even if the doctors at UAB don't follow that standard, either).[22]

4. It is hard to understand how Plaintiffs and the United States purport to "dispute" many of the risks the Legislature recognized are associated with transitioning treatments when the UAB informed consent forms, which Plaintiffs use as evidence of informed consent, list much of the same. The Legislature listed "risks of cardio-vascular disease, thromboembolic stroke, asthma, COPD, and cancer" as risks of cross-sex hormones. Ala. Code § 26-26-2(12); Defs' Mot. 9. The UAB form lists "heart attack, pulmonary embolism, stroke," "[b]lood clots (thrombophlebitis)," "[h]igh blood pressure, "[i]ncreased red-blood-cell-count," "[i]nfertility," "[m]ore risk of heart disease," "risks of cancers of the breast, the ovaries, or the uterus," and "long-term risks that are not yet known."[23] Perhaps this is why the plaintiffs don't

---

metoidioplasty and facial surgery"); DX115:3894 (Endocrine Society Guideline) (recommending mastectomy "before age 18 years").

[21] DX17:¶¶28-33 (Lappert Rep.).

[22] *See* DX116:S64 (SOC-8) (recommending before a patient begins puberty blockers that the clinician "address[] other risks and benefits of pubertal suppression," including the "surgical implications" of "proceed[ing] with pubertal suppression" and "engaging in discussions with families about the future unknowns related to surgical and sexual health outcomes");

[23] DX36:212, 217-20 (UAB Informed Consent Forms).

actually dispute the Legislature's findings so much as attempt to qualify them. *E.g.*, U.S. Resp. 8 ("Risks of cardiovascular disease, thromboembolic stroke, asthma, and COPD are rare"); *id.* at 7-8 ("Risk of lower bone mineral density … can be mitigated"); Plfs' Resp. 5 ("Risks that are present, like reduced bone density or increased cardiovascular risks, are mitigated by lifestyle changes and pharmacological therapy.").[24] As for risks that the UAB doctors *don't* tell their patients about, such as the potential harms to brain development caused by puberty blockers, both SOC-8 and Plaintiffs' experts recognize them.[25] So while the plaintiffs may dispute the Legislature's *judgment* about how to balance these risks, they have not placed the risks themselves in genuine dispute.

For similar reasons the United States' "dispute" of the Legislature's finding regarding fertility is also not genuine. (The Private Plaintiffs do not dispute this finding. *See* Plfs' Resp. 4-5.) The Legislature found: "Puberty blockers prevent gonadal maturation and thus render patients taking these drugs infertile. Introducing cross-sex hormones to children with immature gonads as a direct result of pubertal

---

[24] The United States also relies on Dr. Ladinsky's "more than 20 years of experience with GnRHa treatment" to argue that "bone density accrual will rise … to be within the normal range" after puberty blockers are stopped. U.S. Resp. 8. But Dr. Ladinsky admitted that she does not "routinely measure the bone density of young people in [her] practice before and after they take cross-sex hormones or puberty blockers" and that she has not "compiled quantitative data about bone density." DX33:279:3-19 (Ladinsky Dep.).

[25] DX24:155:7-10 (Karasic Dep.) ("So certainly in counseling both the youth and their family, we try to go through each aspect. The impact of pubertal suppression on brain development is not well known but I think it's fair to, you know, say that that is an unknown that, you know, could be of concern."); DX116:S61 (SOC-8) ("Gender-diverse youth should fully understand the reversible, partially reversible, and irreversible aspects of a treatment, as well as limits of what is known about certain treatments (e.g., the impact of pubertal suppression on brain development…)"). *But see*

blockade is expected to cause irreversible sterility." Defs' Mot. 9. That is true. *See id.* n.34. As the United States acknowledges, a patient would have to *stop* the transitioning treatments and "ultimately undergo puberty" to have any hope of becoming fertile. U.S. Resp. 9. Why? Because "[p]uberty blockers prevent gonadal maturation and thus render patients taking these drugs infertile"—just as the Legislature said. The United States also overstates the claim that an adult on these hormones, having never gone through natural puberty, could simply stop taking hormones and pick up where she left off as a twelve-year-old, undergoing natural puberty and becoming fertile in the process. *See* U.S. Resp. 9. The United States relies on Dr. Shumer for that proposition, but Dr. Shumer agreed that "there are no proven methods to preserve fertility in early pubertal transgender adolescents"[26] and that "future fertility could be compromised by prolonged use of gender-affirming hormones."[27] He also admitted that there are no "long-term outcome studies examining patients who started puberty blockers at Tanner stage 2 then progressed to hormonal therapy and then wanted to become fertile"—or any literature studying that issue *at all*.[28]

The United States also purports to dispute the Legislature's finding that "[s]terilization is also permanent for those who undergo surgery to remove reproductive organs" by categorically stating that "[s]urgical removal of reproductive organs does not occur in minors." U.S. Resp. 9. That "unsupported speculation," *Cordoba*, 419 F.3d at 1181 (citation omitted), does not actually dispute the Legislature's

---

[26] DX39:121:17-20 (Shumer Dep.).
[27] DX39:151:14-17 (Shumer Dep.).
[28] DX39:156:15–157:10 (Shumer Dep.).

finding. It's also flatly false.[29] WPATH's president, Dr. Marci Bowers—who conducted a transitioning vaginoplasty on then 17-year-old Jazz Jennings as part of the national reality television show *I Am Jazz*[30]—admitted to first performing a "transfeminine vaginoplasty" "on a patient younger than 18" in "the late 2000s."[31] ████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ [32] And Bowers is not alone. According to a 2017 paper published by another of Plaintiffs' witnesses, Dr. Dan Karasic, over half of the WPATH-affiliated surgeons surveyed said they "[p]erformed vaginoplasty on [a] transgender minor" in the United States.[33]

Next, the Legislature found that "[s]everal studies demonstrate that hormonal and surgical interventions often do not resolve the underlying psychological issues affecting the individual." Defs' Mot. 9. Once again, while Plaintiffs and the United States prefer their own readings of their own studies (plus a significant emphasis on "[c]linical experience,"[34] the least reliable form of evidence in evidence-based

---

[29] The United States' citation to Dr. Shumer's report is to a lone sentence, supported by nothing, flatly declaring the same—which he then walked back in his deposition. *E.g.*, DX39:263:20-25 (Shumer Dep.) (recognizing that there could be instances in which he would recommend a "gonadectomy surger[y]" to a minor, but "as a general matter" he encourages his patients to wait).
[30] *See* DX133:5-6 (Shrier *Top Trans Doctors*).
[31] DX18:34:19-24 (Bowers Dep.). Notably, Dr. Bowers performed this surgery on a minor before the seminal Dutch Studies were even *published*—indeed, before Bowers knew of any medical literature *at all* discussing clinical outcomes of transitioning surgeries for minors. *Id.* at 34:19–36:25. Bowers explained that it was a "chicken and the egg question" about whether "evidence from adult populations" applied to minors—so someone would have to do the surgery on a minor to find out if it was a good idea to do the surgery. *Id.* Yet Bowers did not perform the surgery as part of a formal research protocol and never published any findings about how the patient fared. *Id.*
[32] ███████████████████
[33] DX19:7 (Karasic, *Age is Just a Number*).
[34] U.S. Resp. 9.

medicine[35]), neither disputes that there *are* "several" studies that show just what the Legislature said they show.[36] Here again, the plaintiffs' "dispute" is not genuine.

5. Given its previous findings, the Legislature determined that "[m]inors, and often their parents, are unable to comprehend and fully appreciate the risks and life implications, including permanent sterility, that result from the use of puberty blockers, cross-sex hormones, and surgical procedures" and that, therefore, "the decision to pursue" medicalized transitioning treatments "should not be presented to or determined for minors." Defs' Mot. 10; Ala. Code § 26-26-2(15), (16). Setting age limits on potentially risky endeavors—be it driving a car,[37] buying a beer,[38] consenting to a hysterectomy,[39] or undergoing sex-change procedures—is a quintessential legislative judgment that is supported both by evidence and common sense.[40] And the plaintiffs do not argue that minors and their parents *are* able to "comprehend and fully appreciate the risks and life implications" of transitioning treatments, only that parents consent to normal medical treatments for their kids. But as Dr. Shumer agreed, there is no dispute that "as a child gets older, the child is more likely to have

---

[35] DX43:45:9-20 (Antommaria Dep.).

[36] *See* DX2:¶¶152, 194-95, 295-96 (Cantor Rep.); DX156:1-2 (Biggs *Suicidality*); DX84:195 (Cass Review) ("no evidence that gender-affirmative treatments reduce" "deaths by suicide in trans people");  DX5:¶115, 124 (Hruz Rep.); DX7:¶¶207-19 (Laidlaw Rep.); DX159:4-7 (Dhejne *Long-Term Follow-Up*); DX164:8-9 (Levine *Reconsidering Informed Consent*).

[37] Ala. Code § 32-6-7(1).

[38] Ala. Code § 28-1-5(a).

[39] Ala. Admin. Code r. 560-X-14-.04 (Medicaid rule requiring that the patient be at least 21 years old to consent to surgical sterilization as a method of birth control).

[40] *E.g.*, DX14:¶¶74 (Curlin Rep.) ("Minors seem particularly incapable of comprehending the long-term implications of [transitioning treatments], insofar as those implications involve relationships and experiences that come only with adulthood."); *id.* ¶77 ("It is ethically problematic when the treatment in question—puberty blockers—not only cannot be comprehended adequately by minors, but also prevents the otherwise healthy development of their capacity to comprehend such decisions.").

a better understanding of complex topics like gender identity"[41]; that minors "are seldom concerned about the impact of medical interventions on fertility"[42]; and that the average 19-year-old is "able to discuss fertility in a more complex way than a 10-year-old would."[43]



Dr. Coleman agreed: "[A]t their age – they would not know what they want."[44]

### B. Plaintiffs' Preferred Medical Interest Groups Are Untrustworthy.

6. Plaintiffs and the United States both admit that they rely on guidelines by WPATH and the Endocrine Society to contest the Legislature's balancing of the risks and purported benefits of providing sex-change treatments to minors. U.S. Resp. 11; Plfs' Resp. 6. Plaintiffs go on to argue that these "clinical guidelines have

---

[41] DX39:231:23–232:1 (Shumer Dep.).
[42] DX30:235:4-12 (Shumer Dep.).
[43] DX39:233:15-20 (Shumer Dep.).
[44] DX180:59 (WPATH 7).

been endorsed by 22 major medical and health associations, including the American Medical Association and the American Academy of Pediatrics." Plfs' Resp. 6. The evidence they cite does not support the claim, as press releases and amicus briefs generally supporting "gender affirming care" do not equate to formal endorsements of a particular clinical guideline. Hence the American Medical Association's express refusal to endorse SOC-8 when WPATH asked it to. As the email from the AMA to WPATH's then-president explained: "While we appreciate your efforts on the SOC-8, the AMA does not endorse or support standards of care—that falls outside of our expertise."[45] (Given that admission, one wonders why the AMA nonetheless filed an amicus brief promising this Court that it possessed "specific expertise" in this area. *See* Doc. 91-1 at 2.) Neither has the American Academy of Pediatrics formally endorsed the WPATH Standards of Care, as the below exchange between the chair of SOC-8 and another WPATH leader makes clear:[46]



Dr. Coleman confirmed in his recent deposition that, as far as he knew, "the

---

[45] DX189:15 (WPATH 16).
[46] DX188:152 (WPATH 15).

American Academy of Pediatrics has never endorsed SOC-8."[47]

Plaintiffs also assert that they "rely on the widely accepted view of the professional medical community" that transitioning interventions are appropriate for gender dysphoric minors. Plfs' Resp. 7. The citations all relate to *American* medical interest groups. *Id.* at 7 n.27. Though happy to rely on the foundational Dutch studies and other European research when it suits them, Plaintiffs now conveniently exclude healthcare authorities and scientists in Europe from the "professional medical community"—perhaps because these authorities disagree with the zeitgeist infecting American organizations. *E.g.*, DX113:3 (World Health Org. FAQ) (explaining decision not to create guideline for gender dysphoric children or adolescents "because on review, the evidence base for children and adolescents is limited and variable regarding the longer-term outcomes of gender affirming care for children and adolescents"); DX85:1-2 (Abbasi *Cass Review*) (editor in chief of the *British Medical Journal* opining that "[w]ithout doubt, the advocacy and clinical practice for medical treatment of gender dysphoria ha[s] moved ahead of the evidence—a recipe for harm"); DX103:3 (Sweden Summary) (Sweden's National Board of Health and Welfare concluding that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments"); DX108:8 (Finnish Report) (Council for Choices in Health Care in Finland reporting that "[i]n light of available evidence, gender reassignment of minors is an experimental practice"); DX109:4 (Norwegian Report) (Norwegian Healthcare Investigation Board concluding that "[t]he evidence base, especially research-based knowledge for

---

[47] DX21:261:20-23 (Coleman Dep.).

gender-affirming treatment (hormonal and surgical), is insufficient and the long-term effects are not well known"); *see also* DX114:1 (AHRQ Topic Brief) (U.S. Agency for Healthcare Research and Quality concluding that "[t]here is a lack of current evidence-based guidance for the care of children and adolescents who identify as transgender, particularly regarding the benefits and harms of pubertal suppression, medical affirmation with hormone therapy, and surgical affirmation").

7. In response to Defendants' reporting that the Cass Review determined that both the WPATH Standards and the Endocrine Society Guideline were "unreliable and methodologically unrigorous," Defs' Mot. 10 (emphasis omitted), Plaintiffs and the United States retort that the same could be said of most other guidelines relating to treatment of gender dysphoria. U.S. Resp. 12 ("the Cass Review notes that most guidelines it assessed scored poorly on 'rigour of development'"); Plfs' Resp. 8 ("only four current guidelines received a higher evaluation than the WPATH SOC8"). It's unclear why the plaintiffs think this fact falls in their favor, much less how it could create a genuine dispute with Defendants' assertion. If most guidelines received failing grades (which they did), that doesn't make the guidelines that came closest to passing reliable. It simply confirms that most guidelines in this area lack rigorous development. The only two exceptions, per the Cass Review, were the guidelines promulgated by the Swedish and Finnish health agencies, which were the

only guidelines to receive a score over 50 in rigor or development:[48]

| Guideline ID | Scope and Purpose | Stakeholder involvement | Rigour of development | Clarity of presentation | Applicability | Editorial Independence |
|---|---|---|---|---|---|---|
| AACAP 2012 | 65 | 39 | 44 | 63 | 7 | 31 |
| American Academy of Paediatrics 2018 | 70 | 26 | 12 | 30 | 6 | 69 |
| American Psychological Association 2015 | 74 | 74 | 24 | 50 | 18 | 14 |
| Council for Choices in Healthcare Finland 2020 | 91 | 69 | 51 | 72 | 56 | 0 |
| de Vries 2006 | 63 | 31 | 10 | 74 | 17 | 6 |
| Endocrine Society 2009 | 65 | 33 | 44 | 70 | 22 | 31 |
| Endocrine Society 2017 | 63 | 33 | 42 | 72 | 21 | 92 |
| European Society for Sexual Medicine 2020 | 63 | 52 | 39 | 70 | 7 | 58 |
| Fisher 2014 | 65 | 20 | 12 | 35 | 17 | 44 |
| Health Policy Project 2015 | 63 | 63 | 16 | 24 | 33 | 6 |
| Norwegian Directorate of Health 2020 | 76 | 81 | 30 | 57 | 47 | 17 |
| Oliphant 2018 | 44 | 39 | 12 | 33 | 21 | 0 |
| Pan American Health Organisation 2014 | 52 | 44 | 13 | 31 | 21 | 0 |
| Royal Children's Hospital Melbourne 2018 | 81 | 59 | 19 | 41 | 19 | 14 |
| Society for Adolescent Health and Medicine 2018 | 41 | 24 | 17 | 41 | 7 | 0 |
| South African HIV Clinicians Society 2021 | 59 | 59 | 21 | 43 | 24 | 69 |
| Strang 2018 | 87 | 31 | 18 | 37 | 15 | 19 |
| Swedish National Board of Health & Welfare 2022 | 91 | 87 | 71 | 83 | 25 | 36 |
| UCSF 2016 | 70 | 41 | 23 | 37 | 26 | 0 |
| WPATH 2012 | 85 | 61 | 26 | 56 | 17 | 17 |
| WPATH 2022 | 83 | 63 | 35 | 56 | 24 | 39 |

≥70%, 31%-69%, ≤30%
AACAP, American Academy of Child & Adolescent Psychiatry; UCSF, University of California, San Francisco; WPATH, World Professional Association for Transgender Health

The Cass Review thus concluded that "only the Finnish (2020) and the Swedish (2022) guidelines could be recommended for use in practice."[49]

Plaintiffs and the United States next assert that none "of the countries to which Defendants point[] ban the use of puberty blockers or hormones for treatment of gender dysphoria in adolescents." Plfs' Resp. 9; *see* U.S. Resp. 13-14. Defendants didn't say they had, *see* Defs' Mot. 10-11 (discussing recommendations to "restricting transitioning treatments to research protocols"), though some countries have in

---

[48] DX84:129 (Cass Review).

[49] DX84:130 (Cass Review). Both Plaintiffs and the United States purport to "dispute" Defendants' characterization that the Cass Review concluded that the Finnish and Swedish guidelines were the "only reliable clinical guidelines for pediatric gender care." U.S. Resp. 13; Plfs' Resp. 8. But the United States agrees that the Cass Review found that "only the Finnish (2020) and the Swedish (2022) guidelines could be recommended for use in practice," U.S. Resp. 13, so it's unclear what material difference the plaintiffs are trying to point to, much less what other conclusion could be drawn by the Cass Review's finding. In any event, critiques of word choice do not place a fact in genuine dispute.

fact done just that. Scotland's National Health Service bans the treatments for patients under 18, with a narrow grandfathering exception for minors prescribed hormones before the ban took effect.[50] Save for (future) clinical trials, England's National Health Service forbids its physicians from prescribing puberty blockers as a treatment for pediatric gender dysphoria.[51] More recently, the British health secretary instituted—and the U.K. High Court of Justice upheld—an even broader ban on puberty blockers "being prescribed by private and European prescribers."[52] NHS England also generally bans transitioning cross-sex hormones for minors under 16.[53]

Other countries restrict the treatments in other ways. Sweden's "National Board of Health and Welfare currently assesses that the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments" and thus recommends the treatments be administered only "in exceptional cases" and in strict conformance with the original Dutch protocol. Contra the WPATH Standards, that requires a strict cross-sex identification "since childhood" and "the absence of factors that complicate the diagnostic assessment."[54] The

---

[50] DX111 (Scotland Policy). The United States admits as much: "Scotland is not changing treatment for existing patients." U.S. Resp. 13; *see also* DX112 (Ghorayshi *Scotland Pauses*) ("Scotland's National Health Service has stopped all new prescriptions of puberty-blocking drugs and other hormone treatments for minors, citing a sweeping review of youth gender services released in England.… It is the sixth country in Europe to limit such treatments….").

[51] DX97:1 (NHS *Puberty Suppressing Hormones*) ("Puberty suppressing hormones (PSH) are not available as a routine commissioning treatment option for treatment of children and young people who have gender incongruence / gender dysphoria.").

[52] *Puberty blockers ban is lawful, says High Court*, BBC NEWS (Jul. 29, 2024), https://perma.cc/EMV9-887R; *see Transactual CIC et al. v. Sec'y of State for Health and Social Care et al.*, [2024] EWHC 1936 (Admin), No. AC-2024-LON-002062 (High Court of Justice K.B. Div., Admin. Ct. Jul. 29, 2024), *available at* https://perma.cc/X5DN-NTD6.

[53] DX98:1 (NHS *Gender Affirming Hormones*).

[54] DX103:4 (Sweden *Care of Children* summary).

Finnish guideline "reached similar conclusions on the uncertainty of the evidence and proposed extreme caution,"[55] prohibiting clinicians from administering hormones until "after [any] other psychiatric symptoms have ceased" and requiring the child to be sent to a research clinic "for extensive gender identity studies" before hormones could be prescribed.[56] Given its finding that "gender reassignment of minors is an experimental practice," Finland's health authority also concluded that "[i]t is critical to obtain information on the benefits and risks of these treatments in rigorous research settings" and thus recommended tracking all patients to determine whether the treatments are safe or effective.[57]

These recommendations, even if not constituting an outright "ban," conflict mightily with the WPATH Standards, which impose no age restrictions (save for a suggestion that phalloplasty surgery not be performed on "youth under age 18 at this time"[58]), recommend hormonal and surgical interventions on minors even if other mental health comorbidities have not fully been resolved,[59] recommend medicalized transitioning as a matter of course (i.e., not just in exceptional cases or as part of experimental protocols), and make no distinction between childhood-onset versus adolescent-onset gender dysphoria[60] or patients with a cross-sex gender identification versus those who identify as non-binary, gender fluid, or some other identity

---

[55] DX84:132 (Cass Review).
[56] DX108:9 (Finnish Guideline).
[57] DX108:8, 10 (Finnish Guideline).
[58] DX116:S66 (SOC-8).
[59] DX116:S63 (SOC-8) ("[W]hile addressing mental health concerns is important during the course of medical treatment, it does not mean all mental health challenges can or should be resolved completely.").
[60] DX116:S60 (SOC-8).

neither traditionally seen nor studied.[61] These differences are likely why WPATH leaders have so vociferously opposed the reforms instituted by the European healthcare authorities.[62] Those reforms, like those enacted by Alabama and 24 other States, constitute a rejection of WPATH's model of care. And while some European countries are planning to conduct experiments on the treatments, the existence *vel non* of such an exception in Alabama would be purely academic: None of the clinicians at the UAB pediatric clinic conduct research, much less clinical trials, on the safety or effectiveness of pediatric gender transition treatments.[63]

8. Both the United States and Plaintiffs agree with Defendants that the two literature reviews the Endocrine Society conducted for its 2017 Guideline failed even to examine the effect of transitioning treatments on gender dysphoria. As the United States explains, "[o]ne Endocrine Society review aimed to summarize the available evidence on the effect of sex steroid use in transgender individuals on lipids and cardiovascular outcomes, and the second summarized the available evidence regarding the effect of sex steroids on bone health in transgender individuals." U.S. Resp. 14 (quotation marks omitted). That is the point—and the problem. One would hope that the clinical guideline Plaintiffs and the United States rely on to

---

[61] DX116:S80 (SOC-8) ("The term nonbinary includes people whose genders are comprised of more than one gender identity simultaneously or at different times (e.g., bigender), who do not have a gender identity or have a neutral gender identity (e.g., agender or neutrois), have gender identities that encompass or blend elements of other genders (e.g., polygender, demiboy, demigirl), and/or who have a gender that changes over time (e.g., genderfluid).").

[62] *E.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; DX190:9 (WPATH 17) (Dr. Coleman characterizing the European reforms as "regressive policies which are more and more out of step with WPATH SOC 8" and a "threat [to] our assertion that the WPATH SOC 8 are the Gold Standard used around the world").

[63] *See* DX33:77:4–78:15, 81:4-9 (Ladinsky Dep.); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

support their claim that hormonal interventions are the only effective treatment *for gender dysphoria* would be based on a systematic examination of whether those drugs are effective at *treating gender dysphoria*. It was not.[64]

The United States' defense is to claim "that the GRADE framework allows for strong recommendations based on low or very low-quality evidence," purportedly to explain why the Endocrine Society's Guideline recommends the treatments anyway. U.S. Resp. 14. GRADE does recognize five specific situations where a "discordant recommendation" (pairing a strong recommendation with low-quality evidence) could be appropriate, almost always to avoid certain or catastrophic harm.[65] The problem is that no one has explained which of these situations purports to apply to the Endocrine Society Guideline—even though under GRADE "the rationale should be made explicit."[66] As Dr. Antommaria admitted, the Endocrine Society did not explain which of the exceptions it purported to apply, and Dr. Antommaria himself has not even ventured a guess about which of the exceptions he thinks could apply.[67]

9. It's unclear if Plaintiffs purport to dispute Defendants' assertion that "WPATH co-sponsored the Endocrine Society guidelines both in 2009 and 2017." Defs' Mot. 11. Plaintiffs state that "SOC8 and the 2017 Endocrine Guidelines were independently developed." Plfs' Resp. 10. To the extent that statement is meant to imply that WPATH did *not* co-sponsor the Endocrine Guideline, Plaintiffs provide

---

[64] *See* DX43:118:8–119:5 (Antommaria Dep.).
[65] DX3:¶¶59-65 (Cantor Supp. Rep.).
[66] DX119:3 (Block *Professional Disagreement*).
[67] DX43:124:11–125:3 (Antommaria Dep.).

no support for that assertion, and the Endocrine Guideline itself disproves it: It lists WPATH on the first page as a "Cosponsoring Association."[68]

Also without citation, Plaintiffs assert that the SOC-8 and the 2017 Endocrine Guideline, "and the medical consensus built around them[,] is not the result of 'laundered' use of earlier works." Plfs' Resp. 10. Such a flat denial is insufficient to create a genuine dispute. *Cordoba*, 419 F.3d at 1181. And as one of the systematic reviews conducted for the Cass Review explains, WPATH SOC-8 "identifies numerous national and regional guidelines published as early as 2012 as potentially valuable resources and cites the APA, Australian, New Zealand[,] and University of California, San Francisco guidelines multiple times to support recommendations, *all of which were themselves influenced considerably by WPATH V.7.*"[69] Hence the Review's conclusion: "The circularity of this approach may explain why there has been an apparent consensus on key areas of practice despite the evidence being poor."[70]

10. Nothing in the plaintiffs' responses raises a genuine dispute of the facts asserted in this paragraph. The United States makes that clear ("Disputed to the extent...", "Undisputed…", "Undisputed…", "Undisputed…", "Disputed to the extent…", U.S. Resp. 15-16), while the Plaintiffs just lob in additional assertions about amicus briefs and policy statements (Plfs' Resp. 11-12). In any event, and as explained above, amicus briefs and press releases from medical interest groups

---

[68] DX115:1 (Endocrine Society 2017 Guideline).
[69] DX86:6 (Taylor *Guidelines Review*); *see also* DX183:2 (WPATH 10) (earlier draft of SOC-8 adolescent chapter noting that its "[d]raft statements were refinements of earlier versions of the SOC and also draw from the more recent Endocrine Society Clinical Practice Guideline (Hembree et al., 2017)").
[70] DX84:130 (Cass Review).

generally supporting "gender affirming care" are not formal endorsements of particular guidelines. Dr. Coleman, the chair of SOC-8, understood that. That was his point in noting his "suspicion … that these organizations never formerly [sic] endorsed but have referenced SOC 7 in their support for trans health and rights."[71] He continued: "As we are facing so many legal battles over trans health care and rights, the statement that the SOC has so many endorsements has been an extremely powerful argument. We need to be able to get support of these important organizations and know how to indicate their support accurately or this argument in these court cases could be challenged."[72] Dr. Coleman then emphasized his desire for WPATH to receive endorsements—real endorsements—of SOC-8 from medical interest groups and lamented that the American Academy of Pediatrics had *not* endorsed SOC-8.[73] If he viewed a statement from a press officer or an amicus brief as equivalent to an organization's formal endorsement of a clinical guideline, WPATH would have no need to seek endorsements from AAP or AMA. But WPATH *did* seek those endorsements—and failed to receive them.[74]

---

[71] DX190:7 (WPATH 17).

[72] DX190:7 (WPATH 17).

[73] DX190:7 (WPATH 17) ("I don't know what happened to our efforts to get more support from the American Academy of Pediatrics. We seemed to dodge a denouncement from them when we released SOC 8, but we have not seemed to have moved beyond that and received some public words of support or possible endorsement.").

[74] *E.g.,* ████████████████████████████████████████████████████████ DX18:243:22-25 (Bowers Dep.) (WPATH president acknowledging that "WPATH has requested formal endorsement of SOC-8 from" medical organizations); DX21:262:1-3 (Coleman Dep.) (Dr. Coleman acknowledging that AMA did not endorse SOC-8); DX184:101 (WPATH 11) (WPATH leader setting priorities: "Let's focus on (1) translation of the SOC8; (2) endorsement of the SOC8; and (3) dissemination of the SOC8 into the highest governmental structures of independent countries/States"); ████████████████

11. The plaintiffs do not dispute that WPATH claimed to follow international standards, including (to quote from SOC-8) "recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process."[75] They do not dispute that WPATH failed to meet or follow these standards. They do not dispute that these standards "recognize that the experts best equipped for creating practice guidelines are those at arm's length from the services at issue—sufficiently familiar with the topic, but *not* professionally engaged in performing, researching, or advocating for the practices under review." Defs' Mot. 12; *see, e.g.*, DX22:336 (*Clinical Practice Guidelines We Can Trust*). And they do not dispute that these standards—the ones WPATH cites and claimed to follow—"suggest ways for guideline committees to benefit from clinicians with financial or intellectual conflicts while being transparent about the conflicts and limiting those clinicians' involvement." Defs' Mot. 12-13; DX22:338 (explaining that, "[i]n some circumstances, a [guideline development group] may not be able to perform its work without members who have [conflicts of interest], such as relevant clinical specialists who receive a substantial portion of

_____

██████████████████████████████████; DX188:152 (WPATH 15) (Question to Dr. Coleman: "I thought that removing the age criteria led to AAP's endorsement. Did they take their endorsement back? I also am under the impression that this is highly, highly confidential." Dr. Coleman's response: "It led to them formally not opposing the SOC. Yes this is highly confidential.").

   One other note: The United States says that it is "immaterial" and "ha[s] no bearing on this case" that the then-president of WPATH, Dr. Walter Bouman, complained that the AMA is run by "white cisgender heterosexual hillbillies from nowhere" when the AMA refused to endorse SOC-8. U.S. Resp. 17; *see* Defs' Mot. 12. But at the least the quotation sheds light on how important it was to WPATH's leaders to receive formal endorsements of SOC-8.

[75] DX116:S247 (SOC-8).

their incomes form services pertinent to the [clinical practice guidelines," and that in such circumstances, "[m]embers with [conflicts of interest] should represent not more than a minority of the [guideline development group]").[76]

Instead, Plaintiffs and the United States simply state that lots of organizations don't follow the standards WPATH told the world it followed. U.S. Resp. 18 ("The conflicts of interest standards Defendants cite are not the baseline and are infrequently met by authors of clinical practice guidelines across subjects."); *see* Plfs' Resp. 12. Even assuming that's true, that doesn't present a genuine dispute about Defendants' assertions (nor resurrect WPATH's credibility). And though both the United States and Plaintiffs contend that Dr. Cass is not a "good example" of "someone best equipped to conduct a review of this care" (U.S. Resp. 18; Plfs' Resp. 13), they do not dispute that Dr. Cass is a good example *under the guidelines WPATH said it used* based on her well-respected stature as a pediatrician who is not financially dependent on providing the interventions she was tasked with reviewing. The plaintiffs just disagree with those guidelines' recommendation that the chair of a practice guideline or similar publication "should not be a person[] with [conflicts of interest]."[77] That's plaintiffs' prerogative, but it doesn't raise a factual dispute.

12. The United States "disputes" the assertions in this paragraph by accusing Defendants of misrepresenting the testimony of Dr. Coleman and Dr. Bowers. U.S. Resp. 19-20 ("Dr. Coleman did not use the phrase 'most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest,' as those words are

---

[76] *See also* DX3:¶¶98-12, 107, 111-17 (Cantor Supp. Rep).
[77] DX22:338 (National Academies of Medicine *Clinical Practice Guidelines We Can Trust*).

attributable to defense counsel's question"; "Dr. Bowers did not use the phrase 'important for someone to be an advocate for [transitioning] treatments before the guidelines were created,' as those words are attributable to defense counsel's question" (alteration in original)).

There was no misrepresentation. Dr. Coleman's testimony was in fact that he understood that most participants in the SOC-8 process had conflicts of interest. *See* Defs' Mot. 13 & 14 n.64. Here is the exchange:

> Q. "At any rate, it was your – given the criteria that were used for recruiting or accepting members, it was your understanding at the time that at least most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest. Correct?"
>
> A. "Yes."

DX21:230:17-23 (Coleman Dep.).[78]

The same is true of Dr. Bowers's testimony. As Defendants wrote, "Dr.

---

[78] The United States made similar claims regarding Defendants' other characterizations of Dr. Coleman's testimony, asserting that "Dr. Coleman did not use the phrase 'for participants in the SOC-8 process to have many published articles already on topics relating to gender dysphoria,'" and "Dr. Coleman did not say 'who was actively serving as an expert witness [to] advocate for language changes [in SOC-8] to strengthen his position in court.'" U.S. Resp. 19-20. Here are those exchanges:

> Q. "Was it unusual for participants in the SOC-8 process to have many published articles already on topics relating to gender dysphoria"?
>
> A. "It was not unusual at all. It was actually – I mean, we looked for people that had peer-reviewed publications…."

DX21:228:14-19 (Coleman Dep.).

> Q. "Does that mean it is your view that, yes, it was consistent with ethical principles and conflict-of-interest principles to have a committee member who was actively serving as an expert witness advocate for language changes to strengthen his position in court?"
>
> A. "I think – I think it would be ethically justifiable."

*Id.* at 158:17-25.

33

Bowers agreed that it was 'absolutely' 'important for someone to be an advocate for [transitioning treatments] before the guidelines were created.'" Defs' Mot. 13. Here's that exchange:

> Q. "And you think it was important for someone to be an advocate for those treatments before the guidelines were created?"
>
> A. "Well, absolutely, because this would be – in any field, this would be important.…"

DX18:121:7-11 (Bowers Dep.).

The United States also "disputes" Defendants' statement concerning the amount of income Dr. Bowers made from transitioning surgeries and the implication that Dr. Bowers had a financial conflict of interest in serving on the surgery chapter of SOC-8 tasked with evaluating and recommending those same surgeries. U.S. Resp. 19-20. Here's the deposition exchange on that point:

> Q. For this past year, what percentage of your income was derived from providing transitioning surgeries?
>
> A. I mean, we don't charge for our – the restorative work we do for the clitoris, and I do quite a bit of pro – pro bono work. So the vast majority of my income would be related to – to the surgical work that I do.
>
> Q. Okay. And what was your income last year?
>
> A. I actually don't recall, but I – I don't really do my own taxes, so... But it was – it was more than a million dollars in terms of the – of my net income.

DX18:37:1-13 (Bowers Dep.).[79]

---

[79] Dr. Bowers made clear that the reference to "the surgical work that I do" meant transitioning surgeries. *See* DX18:26:3-24 (Bowers Dep.) (testifying that "providing gender-affirming

And here are the definitions of "conflict of interest" in the National Academies of Medicine guidelines WPATH said it used:

- "A set of circumstances that creates a risk that professional judgment or actions regarding a primary interest will be unduly influenced by a secondary interest"

- "A divergence between an individual's private interests and his or her professional obligations such that an independent observer might reasonably question whether the individual's professional actions or decisions are motivated by personal gain, such as financial, academic advancement, clinical revenue streams, or community standing"

- "A financial or intellectual relationship that may impact an individual's ability to approach a scientific question with an open mind"

DX22:336 (*Clinical Practice Guidelines We Can Trust*). There was nothing "misleading" about the suggestion that Dr. Bowers's financial dependence on providing the very surgeries Bowers evaluated as a member of the surgical chapter of SOC-8 raised a conflict of interest *according to the guideline document WPATH said it used*. The United States does not raise a genuine dispute of fact.

For their part, Plaintiffs do not actually respond to the statements Defendants offered, so they do not dispute them. Instead, they create a straw man and respond to him. Thus, they argue that "[e]xcluding subject matter experts or providers of the reviewed medical care from participating in the development of guidelines has no basis in medical ethics or science." Plfs' Resp. 14 (quotation marks and footnote omitted). But the problem Defendants identified isn't that WPATH failed to totally

_____

surgeries" is "85 percent of my practice," while "10 percent is related to the sensory restoration of the clitoris after female genital mutilation" and "5 percent is devoted to the care and management of the clitoral and vulvar injuries in cisgender women").

exclude all authors with financial or intellectual conflicts due to their close proximity to the treatments at issue; the problem is that it excluded most *everyone else* and included *only* authors with conflicts (or nearly so). As one author noted on his or her (internal) conflict disclosure form: "Everyone involved in the SOC process has a non-financial interest."[80] Dr. Robinson, the chair of the Johns Hopkins evidence review team, agreed: "We would expect many, if not most, SOC-8 members to have competing interests."[81] Yet the standard WPATH—not Defendants—chose to proclaim that it followed clearly states that if conflicts cannot be avoided entirely, members with conflicts "should represent not more than a minority of the [guideline development group]."[82] WPATH did not follow that guidance in managing the conflicts of interest for SOC-8, while falsely telling the world that it did.

13. The statements in this paragraph are undisputed by Plaintiffs and the United States, except to the extent that both "dispute" Defendants' use of the word "boasted." That does not create a genuine dispute of material fact.

14. The United States and Plaintiffs do not contest that WPATH failed to follow GRADE. Plaintiffs broadly assert that "[t]he process for developing the SOC8 matched what is described in the guidelines," but their citation is to a statement in SOC-8 itself, which isn't very useful if the question is whether WPATH did what it said it did. Plfs' Resp. 15 & n.63. It's also not even internally consistent: WPATH *itself* said in SOC-8 that it was reserving "[s]trong recommendations"—"we

---

[80] DX174:7 (WPATH 1); *see also* DX174 (WPATH 1) (conflict disclosure forms); DX175 (WPATH 2) (same).
[81] DX166:1 (JHU 1).
[82] DX22:338 (National Academies of Medicine *Clinical Practice Guidelines We Can Trust*).

recommend"—"for those interventions … where the evidence is of high quality" and "there are few downsides" to the intervention.[83] Yet all of its recommendations in the adolescent chapter (including those involving hormonal and surgical interventions) were "strong" recommendations—"we recommend"—even though SOC-8 itself made it very clear that the evidence supporting those statements was not high quality.[84] A similar story occurred with the child chapter, except that one of the SOC-8 co-chairs initially pointed out the discrepancy: "We don't agree that some statements in your chapter should be 'recommend', they should be 'suggest' as the text does not provide enough strong evidence."[85] But one of the chapter authors (presumably the lead) was "opposed to switching the recommendations to suggestions"[86]—she didn't say why—so they stayed recommendations.[87]

The United States picks up here and suggests that Defendants' statement that "SOC-8 abandoned the GRADE notations disclosing the quality of evidence for each treatment recommendation" "is false" to the extent it implies that "WPATH was hiding its approach." U.S. Resp. 22; *see* Defs' Mot. 14. The citation? The portion of SOC-8 generally discussing in narrative terms the poor quality of evidence related

---

[83] DX116:S250 (SOC-8).

[84] DX116:S48 (SOC-8) (statements of recommendations), S45 (noting "[a] key challenge in adolescent transgender care is the quality of evidence"), S46 ("the number of studies is still low, and there are few outcome studies that follow youth into adulthood"), S46 ("a systematic review regarding outcomes of treatment in adolescents is not possible"), S47 (discussing "emerging evidence base" that, "[t]aken as a whole," "show early medical intervention … *can* be effective and helpful for many transgender adolescents seeking these treatments" (emphasis added)).

[85] DX183:61

[86] DX183:93 (WPATH 10).

[87] *Compare* ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████ *with* DX116:S69 (SOC-8) (all but one treatment recommendation is a "strong recommendation").

to adolescent transitioning treatments. U.S. Resp. 23 n.117. "Abandoned" is the proper term. As discussed in the citations Defendants provided, with which neither the United States nor Plaintiffs engage, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[88] The authors were told to remove those notations because WPATH decided not to differentiate "between statements based on [literature reviews] and the rest."[89] An earlier draft had thus made a ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[90]



WPATH later *abandoned* those notations—and upgraded the treatment recommendation to a "strong recommendation" in the final version.

15. The plaintiffs also do not genuinely dispute any facts regarding SOC-8's "Eunuch" chapter. They disagree with Defendants' characterization that the chapter was included "[a]s if to drive home how unscientific the enterprise was"—the United

[88] *See* ████████████████████████████████████████████████████████████████
[89] DX182:62 (WPATH 9); *see* ██████████████████████
[90] ████████████████████████████████████████

States helpfully assures that any "claim that WPATH was *aiming* to 'drive home' that proposition [is] false," U.S. Resp. 24 (emphasis added)—but that does not reflect disagreement about a factual assertion.[91] The United States does point out one minor correction worth acknowledging: Defendants described eunuchs as "men who 'wish to eliminate masculine physical features, masculine genitals, or genital functioning,'"[92] but the SOC-8's definition does not restrict the definition to adults: "Eunuch individuals are those assigned male at birth (AMAB) and wish to eliminate masculine physical features, masculine genitals, or genital functioning."[93] Presumably, then, its recommendations regarding castration apply to minors, too.

16. In August 2020, Dr. Karen Robinson, the head of the Johns Hopkins evidence review team for SOC-8, told the Agency for Healthcare Research and Quality at HHS the findings from the "dozens" of systematic reviews the team had completed: "[W]e found little to no evidence about children and adolescents."[94] The United States accuses Defendants of mispresenting this exchange because, the United States says, "[t]he quote is referring to reviews on surgery" only. U.S. Resp. 26; *see id.* ("the email thread … is very specific in that it pertains to a question … regarding 'surgical affirmation for adolescents who have initiated puberty'"); *id.* at 25 ("the statements at issue relate to evidence reviews on surgical interventions"). Then, having mentioned the word "surgery," the United States tries to escape the exchange by claiming that it's irrelevant. U.S. Resp. 25-26.

---

[91] Defendants are not alone in their dim view of the Eunuch chapter: WPATH leaders also raised concerns internally. *See* DX182:91-97 (WPATH 9).
[92] Defs' Mot. 15 (quoting SOC-8 at S88).
[93] DX116:S88 (SOC-8).
[94] DX173:22, 24 (HHS 5).

Once again, there was no misrepresentation. On August 18, 2020, the AHRQ wrote to Dr. Robinson with a request: The American Academy of Family Physicians had asked AHRQ to conduct a systematic review "on treatment for gender dysphoria in children and adolescents," and one of the key questions requested research regarding "the benefits and harms of surgical affirmation as compared to no intervention or social affirmation with[] or without medical affirmation" "[f]or adolescents who identify as transgender and have initiated puberty."[95] Knowing that Robinson's team was conducting a review "on gender-affirming surgeries for transgender people," AHRQ asked Robinson whether she believed there would be "duplication with this review" and whether Robinson was "including non-surgical interventions" as a comparator in her review.[96] Robinson responded:

> We completed and submitted reports of reviews (dozens!) to WPATH earlier this year. We are currently working on some manuscripts from that work.
>
> I will check in with the team regarding possible overlap with the proposed question from AAFP with one or more of the questions we addressed. Depending on the question, we had no limits regarding age and questions including multiple types of interventions (surgical, hormone, voice therapy...).

DX173:24 (HHS 5)

At the start, then, the United States' interpretation is wrong twice over: first because the request itself was not limited to surgeries (the AFP asked for comparisons with other medical interventions), and second because Robinson explained that

---

[95] DX173:24-25 (HHS 5).
[96] DX173:25 (HHS 5).

her team conducted reviews concerning "multiple types of interventions (surgical, hormone, voice therapy...)." AHRQ responded to Robinson to confirm that very point: "Thanks for letting us know. It sounds like you did quite a few reviews for WPATH, and not just the one on surgical interventions. Did you also look at hormone therapy? *Id.* at 24. Robinson replied: "Yes, we addressed 13 questions regarding hormone therapy, including questions regarding puberty suppression." *Id.* at 23.

Soon after, in response to AHRQ's question about whether the Johns Hopkins reviews would "duplicate the scope of the nomination on gender dysphoria from AAFP," Robinson stated:

> I'm sorry I failed to get back to you. I have been distracted and I am not sure what we will end up publishing in a timely manner as we have been having issues with this sponsor [WPATH] trying to restrict our ability to publish.
>
> I don't think any of the planned manuscripts would be an overlap. *This is not because the review questions were different but we found little to no evidence about children and adolescents*.

*Id.* at 22-23 (emphasis added). Given the context, following a discussion regarding other questions she looked at (including "hormone therapy"), Robinson's statement about "little to no evidence about children and adolescents" was obviously not confined to surgical interventions in isolation. Nor was the AHRQ's response:

> Oh wow, sorry to hear about the issues with the sponsor. It sounds like the sole way of disseminating the work is through manuscripts? The reviews will not be otherwise made available? That's disappointing.
>
> Knowing that there is little/no evidence about children and adolescents is helpful.

*Id.* at 22. The United States cries wolf.

Plaintiffs try a different tack, purporting to rely on testimony by Dr. Bowers to claim that "WPATH heavily relied on the Johns Hopkins evidence review team to conduct systematic reviews." Plfs' Resp. 17-18.[97] That's an interesting choice because, as the United States points out, "Dr. Bowers made clear during her deposition that she was not the correct person to answer questions about how the WPATH

_____

[97] Here is the deposition testimony from Dr. Bowers that Plaintiffs rely on (plus a few lines directly following the portion Plaintiffs cite):

> Q. Okay. And on the next page, there's a Section 2.1.6 'Selection of the evidence review team.' And it says that 'The Board received four completed proposals in response to the RFP.'… Do you know who, other than Johns Hopkins, submitted proposals to be the evidence review team for SOC-8?
> A. I'm sorry, I don't – I don't know that.
> Q. Did you have interactions with the Johns Hopkins team that was chosen?
> A. Not personally, no.
> Q. Do you know what that team was hired to do?
> A. The – the Hopkins team was assigned the task of reviewing the – the evidence and the references that were included in the documents so that – to see – to assure that the recommendations were supported by available evidence.
> Q. And is it your understanding that Dr. Karen Robinson and her team at Johns Hopkins conducted systematic-evidence reviews for SOC-8?
> A. I don't know the nature of the review, but it was an evidence review, yes.
> Q. Has WPATH published those reviews?
> A. I mean, I don't know what you mean.
> Q. Has –
> A. I mean, the SOC-8 is a – the SOC-8 is a product of that review process.
> Q. So did Dr. Robinson and her team provide evidence tables to the authors of SOC-8?
> A. I'm not really sure.
> Q. And do you know if Dr. Robinson provided the systematic evidence reviews to the members of SOC-8?
> A. I am not certain.
> Q. And outside of SOC-8, am I correct that WPATH has not made any of the systematic reviews or evidence tables publicly available?
> A. I'm not aware of anything.

DX18:124:17–126:10 (Bowers Dep.); *cf.* Plfs' Resp. 18 n.76 (citing DX18:124:17–125:11). At most, Dr. Bowers's testimony shows knowledge that Dr. Robinson's team was hired to conduct some sort of evidence review for WPATH, which is undisputed; the testimony sheds no light on whether "WPATH heavily relied" on the work Johns Hopkins did.

chapter authors utilized information from Johns Hopkins University's review." U.S. Resp. 25. Still, Plaintiffs' impulse is understandable: One would hope that an author of SOC-8 and a leader of the WPATH Board of Directors charged with final review of SOC-8—Dr. Bowers was both—would have at least *looked at* the evidence reviews from Johns Hopkins. But Bowers did not. DX18:185:4-6 (Bowers Dep.) ("Q. Have you seen the systematic evidence review? A. I have not.").[98]

Plaintiffs also purport to dispute Defendants' characterization that the results

---

[98] Once again, the United States accuses Defendants of a "misrepresentation" on this point. In footnote 81 of their motion, Defendants stated: "WPATH's president never even saw the reviews and thus relied on a much older, non-systematic review of the effects of transitioning treatments on *adults* to publicly advocate for the safety and efficacy of transitioning treatments for *minors*." Defs' Mot. 16 n.81. The United States argues: "Footnote 81's implication that the 2018 review was all Dr. Bowers 'relied on' in forming her position is a misrepresentation." U.S. Resp. 26. (The United States cites "Defs.' Ex. 24 (Karasic Dep. Tr.), at 292:9–[]293:10," but since Dr. Karasic's deposition doesn't have 292 pages, Defendants assume the United States meant to cite Dr. Bowers's deposition (which would make more sense anyway).) Here's the exchange (Defendants think) the United States purports to rely on:

> Q. The New York Times op-ed that you just mentioned, do you recall that?
> A. Yes.
> Q. Do you recall citing to the Cornell University literature review in that op-ed?
> A. Probably so, yes.
> Q. And that literature review was from 2018; is that right?
> A. Yes.
> Q. Okay. And I – am I correct that that literature review looked only at adults. It does not look at minors?
> A. That's correct.
> Q. And at this time, Johns Hopkins had completed a number of literature reviews for WPATH SOC-8; right?
> A. As part of the – the – the SOC-8 –
> Q. Yes.
> A. – review, yes. Presumably so, yes.
> Q. So why did you not cite to one of those more current reviews rather than the 2018 review looking only at adults?
> A. I wasn't – I – I never saw anything actually written that – that – from Hopkins that – that was usable. I certainly would have done so, had I had access to it. I didn't see anything.

DX18:292:9–293:10 (Bowers Dep.). Once again, there was no misrepresentation.

of the Johns Hopkins evidence reviews for SOC-8 were "concerning," which they do by … citing discussions of reviews that were *not* conducted by Johns Hopkins for SOC-8. *See* Plfs' Resp. 18 & n.79. That impulse, too, is understandable since WPATH has generally hidden its reviews from the public, but it can't raise a genuine dispute of fact.

17. Defendants next explained the WPATH policy and actions that could account for Dr. Robinson's complaint to HHS that WPATH was "trying to restrict our ability to publish." Defs' Mot. 16-17. The United States claims the episode is "[i]mmaterial in its entirety because systematic reviews do not provide treatment recommendations," U.S. Resp. 27, which is a bit like saying that the facts and law relevant to a judicial decision are immaterial because they are not the decision itself. The entire point is that systematic evidence reviews should *inform* treatment recommendations whenever possible, and that it sure looks like organizations like WPATH and the Endocrine Society failed to either conduct or consider relevant systematic reviews when making treatment recommendations for minors suffering from gender dysphoria. That failure is relevant to this case.

The United States next plays its other card, accusing Defendants of "mischaracteriz[ing]" the evidence. U.S. Resp. 27. Defendants stated that just days before Robinson wrote to AHRQ, "WPATH had rejected the team's request to publish two manuscripts based on the reviews because the team failed to comply with WPATH's policy for using SOC-8 data." Defs' Mot. 17. The United States prefers WPATH's softer characterization: "not 'reject'" but "put 'on hold." U.S. Resp. 27 (citing WPATH's letter to Dr. Robinson). The effect was the same: WPATH told the Johns

Hopkins team it could not publish the manuscript when and how the team wanted to because it hadn't jumped through all of WPATH's hoops.

The specific hoop at issue was that the Johns Hopkins team had not "involve[d] the Work Group Leader of the Chapter or, alternatively, a designated representative of that specific SOC8 Chapter, or alternatively the Chair of Co-Chairs of the SOC8 in the design, drafting of the article, and the final approval of the article."[99] This requirement was just one of many WPATH imposed "to ensure that any manuscripts developed from the systematic literature reviews commissioned by WPATH benefit transgender healthcare."[100] Others included that any author seeking to publish SOC-8 evidence "ha[ve] the intention to use the Data for the benefit of advancing transgender health in a positive manner" and "involve[] at least one member of the transgender community in the design, drafting of the article, and the final approval of the article."[101] Once those boxes were checked, the WPATH Board of Directors reviewed the manuscript and voted on whether to permit the author to have the manuscript published.[102]

This is an alarming amount of editorial control for a systematic review, the entire purpose of which is to provide an objective and neutral review of the evidence. But to make the process *appear* neutral, WPATH imposed one last check to hide its oversight from the public: It required authors to "acknowledge[]" in the published manuscript that they "are solely responsible for the content of the manuscript, and

---

[99] DX167:86 (JHU 2).
[100] DX167:37 (JHU 2).
[101] DX167:37 (JHU 2).
[102] DX167:38 (JHU 2).

the manuscript does not necessarily reflect the view of WPATH."[103]

For their part, Plaintiffs rely on a new declaration from Dr. Coleman claiming that WPATH's disagreement with the Johns Hopkins' team was solely about timing, not substance or procedure: "WPATH did not want Johns Hopkins University to publish its research prior to WPATH's opportunity to release SOC8." PX20:¶8 (Coleman Decl.); *id.* ("WPATH wanted to ensure that its release of SOC8 would be the first publication of the research."); Plfs' Resp. 18-19. The new statement doesn't do much to rehabilitate WPATH. For one, as just explained, it directly contradicts the reason WPATH gave Johns Hopkins for putting the manuscripts "on hold," [104] so if the new statement is true, the prior one must have been false. For another, for Dr. Coleman's statement to be true, it must have been true only briefly. WPATH wrote to Dr. Robinson on August 26, 2020, denying her request to publish because (WPATH said) Robinson's team had not included an SOC-8 chapter author to have "final approval" of the manuscript.[105] The first manuscript was published later that year in WPATH's journal, the *International Journal of Transgender Health*.[106] The

---

[103] DX167:38 (JHU 2). After jumping through the other hoops, Dr. Robinson and her team dutifully complied with this one as well. DX118:3 (Baker *Hormone Therapy*); L. Wilson et al., *Effects of Antiandrogens on Prolactin Levels Among Transgender Women*, 21 INT'L J. OF TRANSGENDER HEALTH 391, 392 (2020).

[104] DX167:86 (JHU 2) ("In essence, the 2 manuscripts were evaluated on as per our Policy & Procedures Regarding the Use of WPATH SOC8 Data and the outcome of this evaluation was that the 2 manuscripts do not adhere to our Policy & Procedures Regarding the Use of WPATH SOC8 Data. This was due to point c of the Aim section: "*involves the Work Group Leader of the Chapter or, alternatively, a designated representative of that specific SOC8 Chapter, or alternatively the Chair or Co-Chairs of the SOC8 in the design, drafting of the article, and the final approval of the article.*" (emphasis in original)).

[105] DX167:86 (JHU 2).

[106] *See* L. Wilson et al., *Effects of Antiandrogens on Prolactin Levels Among Transgender Women*, 21 INT'L J. OF TRANSGENDER HEALTH 391, 392 (2020).

second manuscript was published in the *Journal of the Endocrine Society* in February 2021.[107] (It's unknown what happened to the third paper that WPATH mentioned Johns Hopkins wanted to publish.[108]) WPATH published SOC-8 in September 2022 and included references to both published manuscripts.[109] Thus, if "WPATH wanted to ensure that its release of SOC8 would be the first publication of the research," as Dr. Coleman now claims, it must have abandoned that quest early on.

18. The most shocking part about WPATH's approach to evidence reviews for SOC-8 was not that it hindered some reviews from being made available to the public and other clinicians and researchers, but that at least some authors chose *not* to seek evidence reviews in the first place so they wouldn't have to tell the public what they found. "Our concerns," wrote one author, "echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits."[110] Another author (and WPATH board member) drew on his experience as an expert witness in "recent federal cases" to raise "concern[] about language such as

---

[107] DX118:3 (Baker *Hormone Therapy*).

[108] DX167:91 (JHU 2) ("We were caught on the wrong foot when the Johns Hopkins University Team informed us of wanting to publish 3 papers based on the SOC8 data.… One paper from the Johns Hopkins University Team has recently been published online in the International Journal of Transgender Health, whilst two papers have not received the green light to be published. It is paramount that any publication based on the WPATH SOC8 data is thoroughly scrutinized and reviewed to ensure that publication does not negatively affect the provision of transgender healthcare in the broadest sense."). Dr. Coleman doesn't seem to know what happened to the third manuscript, either. *See* PX20 (Coleman Decl.) (reasoning that "WPATH did not suppress publication of any of the systematic reviews developed by Johns Hopkins University" because "at least two of the articles that Johns Hopkins wanted to publish, were published").

[109] DX116:2 (SOC-8) ("Published online: 06 Sep 2022"); *id.* at S18, S182, S243 (citing Baker et al. review), S123, S243 (citing Wilson et al. review).

[110] DX174:1-2 (WPATH 1); *see* DX16:¶¶67-75 (Kaliebe Supp. Rep.).

'insufficient evidence,' 'limited data,' etc." that would "empower" groups "trying to claim that gender-affirming interventions are experimental."[111]

Neither the United States nor Plaintiffs dispute the accuracy of these quotations. Instead, the United States argues that it would be "pure speculation" to think that these quotations from SOC-8 authors could shed light on the SOC-8 process.[112] But it's not speculation to take internal communications, sent by SOC-8 authors and WPATH leaders to other SOC-8 authors and WPATH leaders, during the drafting of SOC-8, at face value. And such admissions about the low-quality evidence supporting transitioning treatments and the dangers of admitting that fact publicly were not one-off events; they were a recurring theme.[113]

---

[111] DX184:55 (WPATH 11).

[112] The United States argues that "[t]he email" about "language such as 'insufficient evidence,' 'limited data,' etc" "does not indicate whether the sender is an author of a particular guideline." U.S. Resp. 30. But it does: The email shows that it is from Dr. Loren Schechter, who served as an author of SOC-8 and who, as a member of the WPATH Board of Directors, exercised final approval of SOC-8. *See* DX184:55 (WPATH 11); DX116 (SOC-8).

[113] *E.g.,*

<div style="background:black; color:white; text-align:center">DX180:21 (WPATH 7)</div>

*id.* at 63 (WPATH leader admitting: "My understanding is that a global consensus on 'puberty blockers' does not exist"); *id.* at 72 (Dr. Bowers discussing puberty blockers: "Interesting but highlights the difficulty in picking an endpoint for therapeutic efficacy and use of early puberty blockade—is it… A. Reduction in suicidality? Difficult to prove B. Improvement in psychosocial functioning? Easier to prove but at what cost…. As we learn more about the difficulties associated with confirming surgeries, adulthood and longterm happiness"); DX182:2 (WPATH 9)

*id.* at 62 (email about intentionally removing from SOC-8 notations of the quality of evidence underpinning recommendations);

Defendants also noted in a footnote that in SOC-8 WPATH thanked one of the lead attorneys for Plaintiffs, Jennifer Levi, for offering "Legal Perspectives" on the guideline. Defs' Mot. 18 n.92; DX116:S177 (SOC-8). The United States contends that "the legal review process WPATH used is not relevant to the outcome of this case." U.S. Resp. 28. But the reliability of the WPATH SOC-8 is obviously relevant because Plaintiffs and the United States rely on the guideline to claim that Alabama could have no rational reason for departing from it. Evidence shedding light on whether SOC-8 authors—or the SOC-8 process itself—considered political, ideological, and legal goals when drafting the guideline is thus relevant.

One SOC-8 author and former WPATH president, Jamison Green, noted just such a tension: "[A] US legal (broad) review [of SOC-8] will be necessary because sometimes a human rights approach conflicts with the civil rights available to trans people and providers in the US."[114] He continued: "We should at least be aware of any conflicts in that area, even if the SOC content doesn't change to accommodate it, because we will have to argue it in court at some point."[115] Dr. Bouman, the WPATH president at the time, agreed—"My thoughts are to ask for a legal (broad) review regarding basic human rights"—though then admitted: "The SOC8 are clinical guidelines, based on clinical consensus and the latest evidence based medicine; i don't recall the Endocrine Guidelines going through legal reviews before

[114] DX182:152 (WPATH 9).
[115] DX182:152 (WPATH 9).

publication, or indeed the current SOC?"[116] When informed by Dr. Coleman that "[w]e had agreed long ago that we would send [the SOC-8 draft] to the International advisory committee and for legal review," Dr. Bouman replied: "We will discuss this in the Board and get back to you; and i will check what Rachel Levine's point of view is on these issues, when I meet with her next week."[117]

Given that SOC-8 authors expected from the get-go that they would "have to argue it in court at some point," perhaps it is unsurprising that Dr. Coleman thought "it would be ethically justifiable" "to have a committee member [of SOC-8] who was actively serving as an expert witness advocate for language changes to strengthen his position in court"[118] and that WPATH did not restrict authors from serving "on a chapter committee that dealt with the subject matter of their then on-going expert engagement."[119] As another author put it: "My hope with these SoC is that they land in such a way as to have serious effect in the law and policy settings that have affected us so much recently; even if the wording isn't quite correct for people who have the background you and I have."[120]

---

[116] DX182:151 (WPATH 9).

[117] DX182:150-51 (WPATH 9).

[118] DX21:158:17-25 (Coleman Dep.).

[119] DX21:160:11-20 (Coleman Dep.). Plaintiffs purport to dispute Defendants' paragraph 18 by relying on SOC-8 and Dr. Coleman's generalized claim that SOC-8 was not "written for U.S. courts or U.S. health systems." Plfs' Resp. 19-20. But Plaintiffs do not dispute the specific factual assertions Defendants made. And in any event, Plaintiffs do not raise a genuine dispute about a material fact necessary for summary judgment.

[120] DX184:24 (WPATH 11); *see also id.* ("I do a fair bit of forensic and governmental work and unfortunately they are not known for understanding nuance (or indeed science!).… Judges and law-makers will dismiss *estimates* in a way they will not *research*, even though we understand that – while there are common understandings of these words – the scientific meanings of these words are more nuanced.");

19. Plaintiffs and the United States attempt to provide their own interpretation of the email exchange concerning WPATH's endorsement of Dr. McNamara's letter, but the emails speak for themselves. Days before the preliminary injunction hearing in this case, Dr. McNamara and six colleagues released a 30-page, non-peer-reviewed public statement—the so-called "Yale article"—accusing Alabama and Texas of relying on "inaccurate and misleading scientific claims."[121] (Dr. McNamara has since become an expert witness for Plaintiffs and has written widely on medical "disinformation."[122]) When asked by the Court for their "best evidence," Plaintiffs cited the article. *See* Doc. 103 at 46 ("In terms of the best evidence, Plaintiffs' Exhibit 19 we think is very helpful on this point, Your Honor. It's a recently released Yale article that goes point by point…..").

In the article, Dr. McNamara and her colleagues repeatedly implied that genital transitioning surgeries are *not* conducted on minors and that, therefore, "the Alabama Law make[s] exaggerated and unsupported claims about the course of treatment for gender dysphoria" by referencing and restricting transitioning surgeries. Doc. 78-19 at 2. (The article notably did not address so-called "top surgeries." *Id.* at 7 n.7.). It made the point repeatedly:

- "The [Texas] AG Opinion and the Alabama Law make exaggerated and unsupported claims about the course of treatment for gender dysphoria, specifically claiming that standard medical care for pediatric patients

---

[121] *See* Doc. 78-19; PX18 (*Biased Science*).

[122] *E.g.*, M. McNamara et al., *Combating Scientific Disinformation on Gender-Affirming Care*, 152 PEDIATRICS (Sept. 2023).

includes surgery on genitals and reproductive organs. In fact, the authoritative protocols for medical care for transgender children and adolescents, which define what we term 'gender-affirming care,' specifically state that individuals must be over the age of majority before they can undergo such surgery." *Id.* at 2; *see id.* at 4.

- "Current medical protocols … specifically state that genital surgery should not be carried out before patients reach the legal age of majority." *Id.* at 4.

- "The AG Opinion also cites one study for the position that 'hysterectomy, oophorectomy, and orchiectomy result in permanent sterility.'… [C]urrent medical protocols do not authorize surgery on genitals or reproductive organs for anyone under the age of majority, and so the reference is irrelevant to the treatment of minors." *Id.* at 4 n.6.

- "The AG Opinion asserts that the medical treatments for transgender children include a list of surgical procedures including 'sterilization through castration, vasectomy, hysterectomy, oophorectomy, metoidioplasty, orchiectomy, penectomy, phalloplasty, and vaginoplasty.'… The Alabama Law contains similar statements. These statements are incorrect. Current medical protocols state that genital surgery should not be carried out before the patients reach the legal age of majority.…." *Id.* at 7.

- "Hormonal transition is an established practice in older adolescents experiencing gender dysphoria, but current standards for gender-affirming care set the age of majority as the threshold for considering surgery on genitals and reproductive organs." *Id.* at 8.

The clear implication from these statements is that Alabama and Texas were horribly misinformed and had nothing to worry about because *of course* genital transitioning surgeries are not performed on minors. Such surgeries, the authors promised, were "*irrelevant* to the treatment of minors." *Id.* at 4 n.6 (emphasis added).

But that was not true. While WPATH's Standards of Care 7 suggested that surgeons wait until the child reached the age of majority to perform a genital

transitioning surgery, many surgeons in America did not abide by that suggestion. As noted above, Dr. Bowers, the current president of WPATH, did not (and did not on national television).[123] Indeed, over *half* of the WPATH-affiliated surgeons who responded to a WPATH-affiliated survey published in 2017 did not either.[124]

Accordingly, when WPATH was asked to endorse Dr. McNamara's article, at least some in the organization raised concern. WPATH wrote:

> Further to your previous communications with [redacted,] WPATH's Executive Committee has met today and is happy to endorse your Report. We do want to make a caveat though, which is that although the responses are correct from an academic point of view, from a clinical point of view gender affirming surgeries (genital and otherwise) are currently taking place for TGD people under the age of 18 years tailored to the needs of the individual (in the US, Europe, and elsewhere). We believe it is important to stress this reality. Often, real-life clinical practice precedes the publication of evidence-based guidelines and research data.

DX184:50 (WPATH 11).

WPATH's response is clear: Though Dr. McNamara's letter was "correct from an academic point of view," it was false as a description of the real world because it did not explain that "gender affirming surgeries (genital and otherwise) are currently taking place for TGD people under the age of 18 years" in the United States—a reality WPATH thought was "important to stress."[125]

The authors' response to WPATH's concern? "We did spend time reflecting on how to discuss the issue of age for genital surgery as we understand and agree

---

[123] DX18:34:19-24 (Bowers Dep.).
[124] DX19:7 (Karasic, *Age is Just a Number*).
[125] *See also* ███████████████████████████████████████████████

with the need to tailor to the individual. After consultation with those involved in the Alabama lawsuit, the consensus appeared to be that quoting the standards of care and remaining as close to this as possible would be most helpful for the case at this time." *Id.* at 49. WPATH endorsed the statement. *Id.* The student of medical "disinformation" had learned the art all too well.

20. Turning to WPATH's statement of medical necessity, the United States contends that "SOC-8 does not itself assign 'medically necessary' as that determination is based on an individualized assessment." U.S. Resp. 32. But SOC-8 is abundantly clear that WPATH considers a staggeringly broad list of treatments can be "medically necessary":

> Medically necessary gender-affirming interventions are discussed in SOC-8. These include but are not limited to hysterectomy +/- bilateral salpingo-oophorectomy; bilateral mastectomy, chest reconstruction or feminizing mammoplasty, nipple resizing or placement of breast prostheses; genital reconstruction, for example, phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses, penectomy, orchiectomy, vaginoplasty, and vulvoplasty; hair removal from the face, body, and genital areas for gender affirmation or as part of a preoperative preparation process; gender-affirming facial surgery and body contouring; voice therapy and/or surgery; as well as puberty blocking medication and gender-affirming hormones; counseling or psychotherapeutic treatment as appropriate for the patient and based on a review of the patient's individual circumstances and needs.

DX116:S18 (SOC-8). And lest anyone forget, WPATH takes pains to refer to these treatments as "medically necessary" throughout the SOC-8, even when doing so puts the cart before the horse. *E.g.*, *id.* at S45-46 ("A key challenge in adolescent transgender care is the quality of evidence evaluating the effectiveness of medically necessary gender-affirming medical and surgical treatments.").

Regardless, neither Plaintiffs nor the United States disputes that SOC-8 authors sought to use the guideline to ensure financial and legal coverage for transitioning treatments by describing them as "medically necessary." *See* U.S. Resp. 31-32; Plfs' 20-21. Nor could they: The evidence for that assertion is overwhelming.

██████████████████████████████[126]

21. Plaintiffs do not dispute that outside political actors like Admiral Rachel Levine exercised influence on the development of SOC-8. *See* Plfs' Resp. 21-22. Instead, Plaintiffs assure that those "actors did not inappropriately sway its course." *Id.* at 22. Specifically, they make the astounding claim, based on a comment by Dr. Bowers, that by deleting the age restrictions, WPATH was "revert[ing] to a more conservative approach regarding age criteria." Plfs' Resp. 22.

The problem with this explanation is that it is not "a more conservative approach" to go from age limits to no age limits. Recall that Standards of Care 7

---

[126] *See also, e.g.,* DX181:1 (WPATH 8) ███████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ ; *id.* at 36 ("I think it is clear as a bell that the SOC8 refers to the necessity of treatment (in its broadest sense) for their gender dysphoria (small 'd'; because it refers to the symptom of distress—which is a very very very broad category and one that any 'goodwilling' clinician can use for this purpose (or: in the unescapable medical ingo we, as physicians are stuck with: those who fulfil a diagnosis of Gender Dysphoria and Gender Incongruence as per APA/WHO).");

imposed age limits: A patient had to reach the "[a]ge of majority in a given country" to receive any transitioning surgery except so-called "top surgeries" (mastectomy and breast augmentation).[127]

The draft SOC-8 likewise imposed age limits, just less restrictive ones.



---

[127] DX19:25-27 (SOC-7).

[128] *See*

[129]

[130]



After reviewing the draft, Admiral Levine's office contacted WPATH at the beginning of July with a political concern: that the listing of "specific minimum ages for treatment," "under 18, will result in devastating legislation for trans care."[131] Admiral Levine's chief of staff thus suggested that WPATH hide the recommendations by removing the age limits from SOC-8 and creating an "adjunct document" that could be "published or distributed in a way that is less visible than the SOC8."[132]

---

[131] DX186:28 (WPATH 13).
[132] DX186:29 (WPATH 13).

Later that month, WPATH leaders met with Admiral Levine and HHS to discuss the age recommendations.[133] According to a WPATH participant, Levine "was very concerned that having ages (mainly for surgery) will affect access to health care for trans youth … and she and the Biden administration worried that having ages in the document will make matters worse."[134] "She asked us to remove them."[135]

The authors of the adolescent chapter wrestled with how to respond to the Admiral's request, and they provided WPATH leadership "with a transcription of the conversation that our workgroup members had regarding the issue."[136] Notably, not one author discussed "reverting to a more conservative approach," instituting additional guardrails, or urging caution. Rather, they recognized the request for what it was: a political one.

- "I really think the main argument for ages is access/insurance. So the irony is that the fear is that ages will spark political attacks on access. I don't know how I feel about allowing US politics to dictate international professional clinical guidelines that went through Delphi."[137]

- "I need someone to explain to me how taking out the ages will help in the fight against the conservative anti trans agenda."[138]

---

[133] DX186:17 (WPATH 13) ("It was a pleasure to meet with you and your staff on Tuesday 27 July to discuss the SOC8…."). Although the names in this document are redacted, Dr. Coleman testified that this was a message from WPATH's president, Dr. Bouman, to Admiral Levine. DX21:287:5–288:6 (Coleman Dep.). *See also* DX186:11 (WPATH 13) ("We sent the document to Admiral Levine, Minister of Health for the USA, for their views. We had a meeting on Zoom last week as she wanted to give us her feedback.").
[134] DX186:11 (WPATH 13).
[135] DX186:11 (WPATH 13). In this email, the WPATH leader also explains that the ages "in the document [had been] a 'suggestion' not a 'recommendation' as we had no evidence to recommend that, but in the document it has become a 'recommendation' as it is part of the criteria." *Id.*
[136] DX186:31 (WPATH 13).
[137] DX186:32 (WPATH 13).
[138] DX186:32 (WPATH 13).

- "[W]e have a very high up politician telling us that having the ages specified front and center would politically lead to more attacks and legislative efforts. I see no reason not to trust that assessment is accurate."[139]

- "I do see your point about the headlines though, [redacted,] I see how it could cause more uproar among the general public. However I'm not sure how much that actually matters when the laws are being made. I'm also curious how the group feels about us making changes based on current US politics. Not trying to be difficult here! Just want to be sure we're thinking this through carefully. I agree about listening to Levine."[140]

- "I think it's safe to say that we all agree and feel frustrated (at minimum) that these political issues are even a thing and are impacting our own discussions and strategies."[141]

- "I agree that changing to 'suggest' is a good compromise. And yes, it is frustrating to have to have politics in our brains as we make these decisions. But it is what it is!"[142]

Nor did WPATH discuss "reverting to a more conservative position" when it responded to Admiral Levine. Rather, the organization was clear about Levine's request: "[W]e heard your comments regarding the minimal age criteria for transgender healthcare adolescents; and the potential negative outcome of these minimal ages as recommendations in the US; and we have taken this very seriously."[143] WPATH told Levine that it "could not remove [the age minimums] from the document" because the recommendations were "consensus-based," but that as a "[c]onsequen[ce]" of Levine's request, WPATH "made changes as to how the minimal

---

[139] DX186:32 (WPATH 13).
[140] DX186:32 (WPATH 13).
[141] DX186:33 (WPATH 13).
[142] DX186:33 (WPATH 13).
[143] DX186:17 (WPATH 13).

ages are presented in the document": "They are now not a recommendation from the SOC-8 anymore, but they have been written only as suggested minimal ages."[144] As discussed next, WPATH then removed the age minimums entirely when the AAP threatened to publicly oppose SOC-8 if it didn't.

Plaintiffs' claim that WPATH deleted the age minimums from SOC-8 so that it could "revert to a more conservative standard" thus makes no sense and is contradicted by the record evidence. And notably, Plaintiffs make that claim *without* disputing any of the specific factual assertions Defendants made demonstrating that (1) Admiral Levine asked WPATH to remove the age minimums from SOC-8, and (2) WPATH responded to by changing SOC-8 without going through the Delphi process. That Plaintiffs somehow put a different gloss on those events than the evidence requires does not make a genuine dispute of material fact.[145]

---

[144] DX186:17 (WPATH 13).

[145] For its part, the United States "disputes" Defendants' factual assertions by nitpicking them. So, after first claiming that the entire exchange is irrelevant—obviously false, since it is relevant indeed to the reliability of SOC-8 if WPATH "allow[ed] US politics to dictate international professional clinical guidelines that went through Delphi," DX186:32 (WPATH 13)—the United States asserts that "[t]he evidence does not show Admiral Levine 'met regularly' with WPATH." U.S. Resp. 32-33. But there is evidence indicating that Admiral Levine met or otherwise communicated with WPATH leaders about SOC-8 on ███████████████████████████████

████████████████████████████████████████████; July 1, 2022 (at least Admiral Levine's chief of staff) (DX186:28-29 (WPATH 13)); July 26, 2022 (DX186:17 (WPATH 13)); August 5, 2022 (DX186:17 (WPATH 13)); August 8, 2022 (DX19:172 (Bowers Ex.)); and September 3, 2022 (DX19:173 (Bowers Ex.)).

The United States also purports to dispute that Admiral Levine had "exclusive access to the near-final draft" of SOC-8. U.S. Resp. 33. ███████████████████████████████

████████████████████████████████████ As for the United States' complaints about WPATH's quotations *about* its leaders' conversations with Admiral Levine, U.S. Resp. 32-33, the United States is right that the quotations are not Levine's directly, nor do they purport to be. What matters, in any

22. Pressure from the AAP tipped the scale, finally convincing WPATH to remove the age minimums from SOC-8.[146] AAP did so by threatening to oppose SOC-8 if WPATH did not cave on the eve of publication.[147] And despite telling the world in SOC-8 that "formal consensus for all statements was obtained using the Delphi process (a structured solicitation of expert judgments in three rounds),"[148] WPATH did *not* send this change through Delphi.[149] These facts are undisputed.

Plaintiffs and the United States try to massage the import of these facts by repeating the mantra that there is nothing to see, that removing the age minimums was just part of WPATH's process of receiving "input from many organizations," and that "[b]ecause the change moved to a more conservative position rather than a more aggressive reduction of the age criteria, WPATH leadership determined it was not necessary to go through the Delphi process again." Plfs' Resp. 23 (cleaned up); U.S. Resp. 37 ("Evidence in the record suggests that WPATH took the feedback and decided to adopt a less aggressive position consistent with what was already

---

event, is the effect the interactions had on WPATH and what WPATH thought the Admiral requested of WPATH—and the quotations and references show that clearly.

Last, the United States suggests that "[t]here is no indication" that the email from WPATH to Admiral Levine was, in fact, an email from WPATH to Admiral Levine because WPATH redacted the sender and recipient information. U.S. Resp. 34. Context makes it clear, however, as does Dr. Coleman's testimony. *See* DX21:287:5–288:6 (Coleman Dep.).

[146] Or nearly so—there is one age suggestion left in the text: "Given the complexity of phalloplasty, and current high rates of complications in comparison to other gender-affirming surgical treatments, it is not recommended this surgery be considered in youth under 18 at this time." DX116:S66 (SOC-8).

[147] *See* DX16:42-45 (Kaliebe Supp. Rep.).

[148] DX116:S250 (SOC-8).

[149] DX21:293:25–295:16 (Coleman Dep.); *see also*

established in SOC-7.").[150]

None of that is consistent with the evidence.[151] The last-minute scramble from Admiral Levine and AAP (and other organizations like the Trevor Project[152]) to amend SOC-8 based on political calculations took place well outside the timeframe for public comments— ███████████████████████████████████████

---

[150] The United States does offer one factual correction: In their motion, Defendants misattributed the quotation about AAP being "a MAJOR organization" that, "if AAP were to publicly oppose the SOC8, it would be a major challenge for WPATH," to Dr. Coleman. Defs' Mot. 21 & n.112. As the United States correctly points out, ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ De-fendants regret the misattribution, though the import of the quotation remains.

[151] Dr. Coleman offered a similar gloss in his declaration created for Plaintiffs' response. *See* PX20:¶¶5-6 (Coleman Decl.). But "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). And Dr. Coleman was clear on the sequence of events in his deposition:

> Q. Let me ask you this, Dr. Coleman. After receiving the news that the AAP would not support SOC-8 unless minimum ages for hormones and surgery were removed, in fact, the SOC team did remove those minimum ages from the final version. Correct?
> A. That is correct.
> Q. And it did that without repassing that statement through a Delphi process. Correct?
> A. That's correct.
> Q. And it did that, so far as you recall, without being presented any new science of which the committee was previously unaware?…
> A. That is correct.…
> Q. Dr. Coleman, the representation in the methodology statement that we looked at earlier that said formal consensus for all statement was obtained using the Delphi process was just false with respect to removing all minimum age limits from WPATH's recommendations regarding performing sterilizing surgeries on minors. Correct?…
> The Witness: I'm not sure whether I'm tired. I'm not following it completely, but we did not submit that change to Delphi at the end.

DX21:293:25–295:16 (Coleman Dep.).

[152] DX186: 73-76 (WPATH 14).

███████████ [153] As for the "more conservative position" line, again, SOC-7 *imposed* age minimums for most transitioning surgeries while SOC-8 *removed* them. That is not "reverting to a more conservative position." And lest there be any doubt that SOC-8 recommends the very surgeries SOC-7 forbade, the adolescent chapter of SOC-8 notes that "studies suggest that there may be a benefit for some adolescents to having [vaginoplasty] procedures performed before the age of 18," and that, "[g]iven the complexity of and irreversibility of these procedures, an assessment of the adolescent's ability to adhere to post-surgical care recommendations and to comprehend the long-term impacts of these procedures on reproductive and sexual function is crucial."[154] That is not the language of a "more conservative position," much less the age-of-majority minimum imposed by SOC-7.

Even so, Plaintiffs' confusion is perhaps understandable: WPATH took pains to be ambiguous in public about what surgeries its standards recommend for minors.

███████████████████████████████████████████

███████████████████████████████████████████

---

[153] *E.g.,*



[154] DX116:S66 (SOC-8).



Plaintiffs also highlight Dr. Bowers's after-the-fact attempt to explain to the press why WPATH ditched the age minimums at the last minute. *See* Plfs' Resp. 23-24. Dr. Bowers tried this gloss: "[S]ince the open comment period, a great deal of input has been received and continued to be received until the final release. i feel the final document puts the emphasis back on individualized patient care rather than some sort of minimal final hurdle that could encourage superficial evaluations and treatments outside of the thorough and comprehensive pathway recommended by

155

156

WPATH standards."[157] Another WPATH leader immediately responded: "I like this. Exactly—individualized care is the best care—that's a positive message and a strong rationale for the age change."[158] ██████████████████████████████

███████████████████████████████████████████████████████

████████████ █

█████████████████████████████████████

██████ and however "strong" a "rationale" Dr. Bowers's public comment appeared to provide, the post-hoc explanation did not accurately reflect why WPATH removed the age criteria from SOC-8 at the last minute. ████████████████

███████████████████████████████████



---

[157] DX188:113 (WPATH 15); *see also* DX177: 115-26 (WPATH 4) ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

[158] DX188:113 (WPATH 15).

[159] ████████████████████



Yet WPATH treated the *actual* reason for the change as "highly confidential,"[160] and went instead with Dr. Bowers's re-framing.

23. Plaintiffs and the United States do not dispute that Dr. Coleman wrote an internal memo to WPATH in which he set out his view that "[t]rans health care is not only under attack by politicians, but by"—among other things—"academics and scientists who are naturally skeptical," "parents of youth who are caught in the middle of this controversy," "continuing pressure in health care to provide evidence-based care," and "increasing number of regret cases and individuals who are vocal in their retransition process who are quick to blame clinicians for allowing themselves to transition despite an informed consent process."[161] The United States asserts that these quotations "omit[] context," U.S. Resp. 38, so it is worth stating what else Dr. Coleman said in that memo:

- "All of us are painfully aware that there are many gaps in research to back up our recommendations."[162]

- "I have no idea how it was ever said that so many medical organizations have endorsed SOC 7. This statement is made in many legal briefs and court proceedings. But is that true? How did that ever come about? My

---

[160] DX188:152 (WPATH 15).
[161] DX190:5 (WPATH 17).
[162] DX190:5 (WPATH 17).

suspicion is that these organizations never formerly endorsed but have referenced SOC 7 in their support for trans health and rights. We need to find out the facts here. As we are facing so many legal battles over trans health care and rights, the statement that the SOC has so many endorsements has been an extremely powerful argument. We need to be able to get support of these important organizations and know how to indicate their support accurately or this argument in these court cases could be challenged."[163]

- "As we faced challenges of developing and revising the methodology of SOC 8, we had to rely on Johns Hopkins which while some degree helpful, was very constraining. We were able to consult with other experts and was able to learn that there were other ways of developing guidelines that were probably more appropriate for the state of our science. As a result our methodology evolved and was improved—however, we were not able to be as systematic as we could have been (e.g., we did not use GRADE explicitly). We have been attacked for our methodology and now have found ourselves in a position of defending it."[164]

24. Plaintiffs and the United States do not dispute that USPATH cancelled a panel presentation by Dr. Ken Zucker because of trans-activist protestors. They do not dispute that USPATH formally censured its outgoing president, Dr. Erica Anderson, for raising concerns publicly about rushing gender dysphoric youth into medicalized transitioning treatments. They do not dispute that WPATH issued a formal statement opposing use of the lay press "as a forum for the scientific debate" about "the use of puberty delay and hormone therapy for transgender and gender diverse youth." They do not dispute that Dr. Bowers, WPATH's current president, said that the public "doesn't need to sort through all of that." *See* Defs' Mot. 22; Plfs' Resp. 24-25; U.S. Resp. 39-42. There are no genuine disputes here.

---

[163] DX190:7 (WPATH 17).
[164] DX190:7-8 (WPATH 17).

Instead, Plaintiffs and the United States both try to add "context," so it is worth providing some more. To start, Dr. Zucker presented research at the 2017 USPATH conference showing that most children with gender dysphoria have the dysphoria "desist" by adulthood.[165] At the conference, "protesters interrupted and picketed a panel featuring" Dr. Zucker.[166] "That evening of the protest, at a meeting with the conference leaders, a group of activists led by transgender women of color read aloud a statement in which they said the entire institution of WPATH was violently exclusionary because it remains grounded in cis-normativity and trans exclusion."[167] The activists "asked for cancellation of [Zucker's] appearance on a second upcoming panel."[168] USPATH complied—and then apologized *to the protestors*: "We are very,

---

[165] Plaintiffs claim, without relevant citation, that Dr. Zucker's presentation concerned "his criticisms of SOC8 and his divergence from the generally accepted views of the relevant medical community," Plfs' Resp. 24-25, but this makes little sense given that the presentation took place five years before SOC-8 was published. Additionally, while WPATH claimed in its public statement after the event that Dr. Zucker "presented at the USPATH conference on a clinical modality that WPATH opposes," DX25:143 (Karasic Dep. Ex. 13), Dr. Zucker wrote to WPATH to correct the statement: "My talk was not at all about any 'clinical modality'—it was a summary of follow-up studies of children diagnosed with GID (the diagnostic label that was in place for a number of the follow-up studies) or children subthreshold for the diagnosis. I also presented data on predictors of follow-up status (persistence vs. desistance), including new data that I presented for the first time during this talk." *Daubert*.DX40:149 (Karasic Dep. Ex. 15); DX178:28 (WPATH 5). ████████████ ████████████████████████████████ DX178:30-75 (WAPTH 5). Plaintiffs' expert Dr. Karasic agrees with Dr. Zucker's characterization: "I believe that Dr. Zucker was talking about his desistance data from when he had been at MH at University of Toronto." DX24:184:24–185:1 (Karasic Dep.).

For its part, the United States asserts that "the 'careful and serious researcher' quote in Footnote 120 [of Defendants' motion] were the words of Defendants' counsel, not Dr. Coleman." U.S. Resp. 40. That's true, but—once again—there was no misrepresentation because Dr. Coleman agreed with the characterization. *See* DX21:29:8-11 (Coleman Dep.) ("Q. Among others, you did at the time and do respect Ken Zucker as a careful and serious researcher? A. Yes.").

[166] DX24:187:23–188:5 (Karasic Dep.); DX178:5 (WPATH 5).

[167] DX178:5 (WPATH 5); DX24:197:14–200:17 (Karasic Dep.).

[168] DX178:5 (WPATH 5); *see* ████████████████████

very sorry."[169] WPATH also posted an apology on its website:

> On February 03, 2017 a WPATH member presented at the USPATH conference on a clinical modality that WPATH opposes. A conference attendee disrupted the offensive session due to this act of negligence. Later that day the same presenter was asked to leave by a group of professionals attending the conference. Campus security responded by asking the registered participants to leave and threatened to call the police. This group included trans women of color and gender non-binary persons of color all of which are already consistently policed in society. WPATH regrets that this incident occurred, and our staff and the USPATH conference organizers are deeply sorry for the distress, anxiety, and discomfort this unfortunate incident created for our colleagues and especially those that are trans and gender non-binary people.

DX25:143 (Karasic Dep. Ex. 13).[170]

Remarkably, one person who apologized *to the activists* was Dr. Karasic—Plaintiffs' expert on whom they rely to assure that WPATH provides a welcoming environment to dissenters.[171] *See* Plfs' Resp. 24-25; U.S. Resp. 42. When he met with the activists who demanded the cancellation of Dr. Zucker's talk, Dr. Karasic bragged that he "wrote an op-ed" that "contributed to Dr. Zucker being fired."[172] Then, after explaining that the abstracts for the conference panels, including Dr. Zucker's panel, had been objectively graded to determine which panels would be presented, Dr. Karasic said that, "even if the abstract for the panel with Dr. Zucker

---

[169] DX178:5 (WPATH 5); *see also id.* at 82-85 (rejection of apology from activists); DX25:143-44 (Karasic Dep. Ex. 13); ▮▮▮▮▮▮▮▮▮▮

[170] *See also Daubert*.DX40:143 (Karasic Dep. Ex. 13). The fact that WPATH itself—not just USPATH—apologized to the activists offended by Dr. Zucker's presentation on desistance rates of children resolves Plaintiffs' claim that "Defendants' assertions [in this episode] regarding USPATH cannot be ascribed to WPATH." Plfs' Resp. 24. At least here the parent and subsidiary organizations worked in tandem.

[171] *See, e.g.*, DX178:84 (WPATH 5) ("Our scientific chair, Dr. Dan Karasic, has posted an apology on the SOC7 Facebook page…."); DX25:137 (Karasic Dep. Ex 8).

[172] DX24:202:20-25 (Karasic Dep.).

was getting a high enough score," he "didn't think that [USPATH] should have let Dr. Zucker present."[173] Dr. Karasic elaborated: "I think Dr. Zucker has many, many places to present his views" other than USPATH.[174]

After his cancellation, Dr. Zucker wrote a letter to the WPATH president and board expressing his "astonish[ment]" about the inaccuracies in WPATH's public apology to the protestors and noting that what happened at the USPATH conference was not a one-off event.[175] He explained that "[a]t WPATH in Amsterdam last June, activists disrupted a symposium on DSDs and defaced a poster."[176] He concluded: "I find it remarkable that the leadership of WPATH has remained silent about this. If there cannot be meaningful dialogue about complex issues at WPATH or USPATH, how can the organization consider itself to be 'Professional'?"[177]

The chair of the panel on which Dr. Zucker was to appear, Dr. Heino Meyer-Bahlburg, also wrote to WPATH following the cancellation: "I think it is a good idea for WPATH to 'ensure participation that is representative of the diversity of providers in the trans health field.' I am concerned, however, that WPATH's commitment 'to providing a safe and welcoming environment at our scientific meetings' was not met at this month's USPATH meeting in L.A."[178] Dr. Meyer-Bahlburg explained how the panel presentation was interrupted by a group of protestors and that

---

[173] DX24:203:24–204:4 (Karasic Dep.).
[174] DX24:204:7-8 (Karasic Dep.).
[175] DX25:149 (Karasic Dep. Ex. 15); *see* DX24:218:5-7 (Karasic Dep.); ███████████

[176] DX25:149 (Karasic Dep. Ex. 15); *see* ████████████
[177] DX25:149 (Karasic Dep. Ex. 15); *see* ████████████
[178] DX25:146-47 (Karasic Dep. Ex. 14); *see* DX24:214:1-3 (Karasic Dep.); ████████████

WPATH's public apology *to the protestors* violated scholarly norms of dialogue: "By misrepresenting the content of the session and labelling the entire session as 'offensive', 'due to this act of negligence' (a vague formulation that also needs explanation), you are aligning yourselves with the small group of protesters, insult the speakers involved, and violate a primary condition of a scientific meeting, namely the open and constructive exchange of ideas, which is particularly important in an area of research as emotion-laden as gender."[179] He continued: "As similar incidents occurred already in two symposia I was involved with at the recent WPATH meeting in Amsterdam, I think WPATH's leadership needs to become more proactive in furthering a constructive style of scientific exchange—rather than inhibiting scientific exchange by suppressing presentations as you did in L.A.… [I]f WPATH intends to continue as a scientific society, it must be able to provide 'a safe and welcoming environment' for the entire 'diversity of providers'."[180]

The next episode needing "context" is USPATH's censure of its outgoing president, Dr. Erica Anderson. While Dr. Kaliebe provides a more fulsome account in his report,[181] the short version is this. In the fall of 2021, Dr. Anderson, a psychologist who treats patients with gender dysphoria, warned in an interview:

> It is my considered opinion that due to some of the—let's see, how to say it? what word to choose?—due to some of the, I'll call it just 'sloppy,' sloppy healthcare work, that we're going to have more young adults who will regret having gone through this process. And that is going to earn me a lot of criticism from some colleagues, but given what I see—and I'm sorry, but it's my actual experience as a psychologist

---

[179] DX25:147 (Karasic Dep. Ex. 14);
[180] DX25:147 (Karasic Dep. Ex. 14);
[181] *See* DX16:¶¶25-35 (Kaliebe Supp.).

> treating gender variant youth—I'm worried that decisions will be made
> that will later be regretted by those making them.[182]

When asked what "was sloppy about the healthcare work," Anderson replied: "Rushing people through the medicalization," and "failure—*abject* failure—to evaluate the mental health of someone historically in current time, and to prepare them for making such a life-changing decision."[183]

That November, the USPATH Board of Directors sent Anderson a "formal letter of reprimand" for "grant[ing] an interview in the lay press with an author with known biases regarding the care of transgender and gender diverse youth, during a period of intense politicization and when litigation is in progress in multiple US jurisdictions, where legislation aims to prohibit such care by statute."[184] Anderson continued to raise concerns in public, writing opinion pieces in the *Washington Post* and *San Francisco Examiner*.[185] And USPATH board members continued to try to silence their former president.[186] ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[182] DX16:¶15 (Kaliebe Supp.); DX133: Shrier, *Top Trans Doctors*.
[183] DX16:¶15 (Kaliebe Supp.); DX133: Shrier, *Top Trans Doctors*.
[184] DX175:113-14 (WPATH 2).
[185] DX136 (Anderson & Edwards Leeper, *The Mental Health Establishment is Failing Trans Kids*); DX134 (Anderson, *The health establishment is failing young adults*); DX135 (Anderson, *When it comes to trans youth, we're in danger of losing our way*).
[186] *See* DX16:¶20-22 (Kaliebe Supp.); ███████████████████████████████████



25. Plaintiffs and the United States do not dispute that Defendants' accurately quoted Dr. Edwards-Leeper, one of the authors of the adolescent chapter of SOC-8, when she said: "My fear is that if WPATH continues to muzzle clinicians and relay the message to the public that they have no right to know about the debate, WPATH will become the bad guy and not the trusted source."[189] They just come to different conclusions about what this episode shows. Plaintiffs also say that the quote was "taken out of context," though they provide no explanation or support for that accusation. Plfs' Resp. 25. In any event, the context only heightens its import: Dr. Edwards-Leeper was Dr. Anderson's co-author of the *Washington Post* op-ed that was published after USPATH censured Anderson.[190] Edwards-Leeper wrote the email to WPATH leadership after Dr. Anderson's censure but before Anderson resigned. She wrote "to let the WPATH leadership know" that she and Anderson "received tremendous support for taking a stand," and that "[c]ountless providers have shared that they have been afraid to speak up about their concerns."[191] She continued: "I

---

[187] ███████████████████████████████████

[188] ███████████████████████████

[189] DX176:152 (WPATH 3).

[190] DX136 (Anderson & Edwards Leeper, *The Mental Health Establishment is Failing Trans Kids*).

[191] DX176:154 (WPATH 3). Notably, the appreciation Edwards-Leeper recounts were *private* notes of thanks for saying publicly what many other doctors had experienced—e.g., that they found "evidence every single day, from our peers across the country and concerned parents who reach out, that the field has moved from a more nuanced, individualized and developmentally appropriate

fear that WPATH's recent stance to shut down this conversation was a huge mistake and is resulting in very bad PR for the organization. If there is anything that people will fight to the end for, it's their kids. It would be one thing if these were simply right-wing, religious conservatives, but these parents are highly educated, liberal, and left-leaning. The majority report that they will fully support their child if medical transition is in their best interest, but they are furious that they cannot find providers who are following the SOC, and they are in disbelief that WPATH is trying to censor the conversation."[192]

## C.   Minors in Alabama Are Harmed by Transitioning Treatments.

26. WPATH recognizes "the exponential growth in adolescent referral rates," "a pattern of uneven ratios by assigned sex … in gender clinics, with adolescents assigned female at birth (AFAB) initiating care 2.5–7.1 times more frequently as compared to adolescents who are assigned male at birth (AMAB)."[193] It acknowledges "the increased number of adolescents seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years."[194] And it admits that, at least for *some* "young people,

---

assessment process to one where every problem looks like a medical one that can be solved quickly with medication or, ultimately, surgery." DX136:2 (Anderson & Edwards Leeper, *The Mental Health Establishment is Failing Trans Kids*). This is unsurprising, since many WPATH emails say *privately* what the organization and its members will censor leaders for saying *publicly*. *See, e.g.*, DX16:¶¶21 (Kaliebe Supp.); DX4:¶121-26 (Cantor Supp. Rep. App. A); ███████████████████████████████████████████████████████████████████ .

[192] DX176:154 (WPATH 3).
[193] DX116:S43 (SOC-8).
[194] DX116:S45 (SOC-8).

susceptibility to social influence impacting gender may be an important differential to consider."[195] The Cass Review noted similar changes:



**Figure 14: Incidence of recorded prevalence of gender dysphoria by registred gender**

Source: Epidemiology and Outcomes for Children and Young People with Gender Dysphoria: Retrospective Cohort Study Using Electronic Primary Care Records

NB: Shaded areas on prevalence graph denote 95% confidence intervals. Patients can request to have their recorded gender changed on their clinical records without undergoing gender reassignment treatment, and CPRD reports the latest recorded gender only.

DX84:87 (Cass Review).



**Figure 13: Incidence of recorded prevalence of gender dysphoria by age group**

Source: Epidemiology and Outcomes for Children and Young People with Gender Dysphoria: Retrospective Cohort Study Using Electronic Primary Care Records

NB: Shaded areas on prevalence graph denote 95% confidence intervals.

*Id.*

---

[195] DX116:45 (SOC-8).

76



**Figure 2**   The number of referrals over time by country.

DX93:3 (Taylor *Characteristics*); DX84:87 (Cass Review).[196]

Defendants noted in their motion that "[n]o one knows why" these and other changes have occurred. Defs' Mot. 23. And they noted that some researchers "are concerned that the increase appears to be associated with very high rates of social media use, among youth with other mental health issues, and in association with peers expressing gender dysphoria issues." Defs' Mot. 23 (quotation marks omitted). The Cass Review, for instance, found that "peer and socio-cultural influences" could play a role, reporting that "gender-questioning young people and their parents have spoken to the Review about online information that describes normal adolescent discomfort as a possible sign of being trans."[197]

At least some WPATH members raised similar concerns internally. For instance, ███████████████████████████████████████████████████

---

[196] *See also* DX3:¶¶38-54 (Cantor Supp. Rep.).
[197] DX84:120 (Cass Review).



Nor do Plaintiffs and the United States disagree that there has been a dramatic "growth in the number of referrals—both in general and for adolescents assigned female at birth," Plfs' Resp. 26—or with the other changes WPATH has highlighted. U.S. Resp. 43-44 ("Undisputed to the extent that WPATH recognizes in SOC-8 that … there has been a sharp increase in the number of adolescents requesting gender care in recent years."). To be sure, Plaintiffs and the United States offer their own (unpersuasive) theories for the dramatic changes that have taken place,[200] and the

---

[198]

[199]                                            *see also*

          DX179:41 (WPATH 6) (          co-lead of adolescent chapter admitting that while it is "[f]or sure" "that increasing numbers are asking for medical affirming treatment," "[w]hat the explanation for this increase is unknown and also methodologically challenging to study" but "social factors likely play a role").

[200] Plaintiffs rely on (1) Dr. McNamara's infamous (first) "Yale article" that claims, without citation or anything other than the authors' *ipse dixit*, that any increase in referrals "certainly reflects the reduction in social stigma over the past decade and the expansion of care options," and (2) Dr. Karasic's report that speculates, also without citation or reasoning, that "these changes may reflect

United States spends many pages rehashing its well-worn attacks on a strawman of Dr. Littman's "Rapid-Onset Gender Dysphoria" paper, as if critiquing a hypothesis for *why* we see dramatic changes in the patient population is sufficient to hide the phenomenon itself, U.S. Resp. 44-46.[201] But these disputes are not material to the motion at hand: What the parties agree on, in combination with the other undisputed facts, was more than enough for the Legislature to act as it did.[202]

---

changes in referral patterns to clinics rather than changes in the number of people identifying as transgender." Plfs' Resp. 26 & n.120.

Though not material for present purposes, these theories do not make much sense. As the Cass Review explained, while reduction in social stigma "may account for some of the increase in numbers," it "is not an adequate explanation for the overall phenomenon." DX84:118 (Cass Review). Among other reasons, this is because: (1) "the exponential increase in numbers within a 5-year timeframe is very much faster than would be expected for the normal evolution of acceptance of a minority group;" (2) "the rapid increase in numbers presenting to gender services across Western populations"; (3) "the change in prevalence from birth-registered males to birth-registered females. The current profile of transgender presentation is unlike that in any prior historical period"; (4) "the sharp differences in the numbers identifying as transgender and non-binary and presenting to gender services in Generation Z and younger Millennials compared to those over the age of 25-30. It would be expected that older adults would also show some signal of distress regarding their gender, even if they felt unable to 'come out'"; and (5) "the failure to explain the increase in complex presentations." *Id.*

[201] Defendants' experts have long responded to these arguments. *See, e.g.*, DX3:¶¶32-54 (Cantor Supp. Rep.); DX11:¶¶16-36 (Nangia Rep.); DX15:¶¶32-55 (Kaliebe Rep.); *see also* DX16:¶¶25-30 (Kaliebe Supp. Rep.).

[202] The United States also argues that "the population of gender dysphoric youth and their diagnoses of gender dysphoria have no bearing on the outcome of this case" and that "Defendants conceded at the preliminary injunction hearing in this case that the issue is with treatment of gender dysphoria, not the diagnosis itself." U.S. Resp. 43. It's hard to make much sense of this assertion. In the citation the United States provides, Defendants stated that "Gender dysphoria is a diagnosis" and that the "debate" at the preliminary injunction hearing was "how should it be treated." Doc. 105:293:6-8 (PI Tr.). But, as Defendants have always argued, one of the many problems with using the treatments at issue on adolescents is that "there is no way to accurately predict persistence," and, given the rates of persistence and desistence, "it is more likely that a clinician will guess *wrong* and provide transitioning interventions to a child whose dysphoria would otherwise desist than that she will guess *right* and correctly pick out the persister from the crowd of desisters." Defs' PI Resp., Doc. 74 at 97. ████████████████████████████████

████████████████████████████████████████████████████████

27. Plaintiffs and the United States generally do not dispute the facts in this paragraph. *See* U.S. Resp. 49; Plfs' Resp. 27. They agree that many minors suffering from gender dysphoria have psychological co-morbidities and that psychotherapy is particularly important for these patients. U.S. Resp. 49. And they do not dispute that, unlike transitioning treatments, psychotherapy "entails minimal risk and does not require life-long alteration of one's body."[203] Of course, they go on to note their support for providing transitioning treatments to minors anyway, but that does not create a genuine dispute of the facts Defendants asserted.

---

████████████████████████████████████████████████████████████  That problem is amplified given the changing nature of the patient population.
[203] The United States purports to "dispute" this statement from Defendants' motion on the basis that "Dr. Shumer made no such statement." U.S. Resp. 49. That is true—the quotation is from Dr. Kaliebe's report, which was the first source cited in the footnote. *See* Defs' Mot. 24 n.137 (citing DX15:¶174 (Kaliebe Rep.) and DX39:169:6-25 (Shumer Dep.). Defendants admittedly should have included a "see" signal for the next citation to Dr. Shumer's deposition, but Dr. Shumer's testimony was similar:

> Q. Psychotherapy poses no risk to fertility; is that right?
> A. Correct.
> Q. It poses no risk to ability to attain an orgasm?
> A. I wouldn't think so.
> Q. Psychotherapy poses no risk to breastfeeding capability?
> A. No.
> Q. It poses no risk to stature development?
> A. No.
> Q. It poses no risk to bone density?
> A. No.
> Q. It poses no risk to heart disease?
> A. No.
> Q. It poses no risk of blood clots?
> A. No.
> Q. It poses no risk of stroke?
> A. No.
> Q. It poses no risk of underdeveloped penile tissue?
> A. No.

DX39:169:6-25 (Shumer Dep.).

28. Neither the United States nor Plaintiffs defend the care provided by Dr. Torres in Tuscaloosa as described by the *LA Times*. Plfs' Resp. 27-28; U.S. Resp. 50-51. That's understandable. Dr. Torres's position of "not believe[ing] adolescents seeking hormones require mental health evaluations" and providing transitioning hormones to teenagers on their first visit so obviously conflicts with even the WPATH Standards that it would be hard for the plaintiffs to mount a defense.[204] ████

████████████████████████████████████████████████████████

████████████████ [205]

Instead, Plaintiffs and the United States primarily raise evidentiary objections.[206] But among other reasons, newspaper coverage of an OB/GYN in Tuscaloosa providing testosterone to a mentally ill adolescent with "a history of depression and anxiety" at their first meeting can serve as a rational basis for the Legislature to act. So, too, can it serve as a basis for expert testimony. Plaintiffs and the United States cannot raise a genuine dispute of material fact here.

29. Despite alleging in their complaint that "[h]ealthcare providers who specialize in the treatment of gender dysphoria *follow* a well-established standard of care" developed by WPATH, Plfs' 2nd Am. Compl., Doc. 159 ¶¶28-29 (emphasis added), Plaintiffs now hedge and say that "[p]roviders at the UAB pediatric gender clinic *generally* follow SOC8 guidelines," Plfs' Resp. 28 (emphasis added). The

---

[204] *See* DX132:14-16 (Jarvie *Abortion Doctor*).
[205] ████████████████████████████████████████████████████
████████████████████████████████

[206] Plaintiffs also note that "Defendants' expert Dr. Nangia, who reviewed Plaintiffs' medical records, agreed that they were properly diagnosed" with gender dysphoria. Plfs' Resp. 28. It's not clear what fact this statement purports to dispute.

reason for the gap? Their beloved mantra "individualized care." *See* Plfs' Resp. 28 & n.131.[207] Though Dr. McNamara promised in her Yale article that the WPATH Standards are "authoritative,"[208] the doctors at UAB don't view them that way.



When asked how he "determine[s] when to follow the WPATH suggestions," Dr. Abdul-Latif replied:

> One would be if we can understand what their suggestion is. Because I

---

[207] Plaintiffs note that the Standards of Care themselves emphasize that "an individualized approach to clinical care is considered both ethical and necessary." Plfs' Resp. 28 n.132 (alteration omitted) (quoting DX116:S45 (SOC-8). To the extent this statement implies that clinicians can depart from the so-called evidence-and-consensus based guideline recommendations (on a "case-by-case," "individualized" basis, of course), then the Standards are not so much "authoritative" as they are a get-out-of-jail free card for clinicians to choose their own adventure and claim that whatever path they chose is "medically necessary." Which might be the point.

[208] DOC. 78-19 at 2, 7.

[209]

[210]

[211]



*Compare, e.g.*, DX116:S48 (SOC-8) ("We recommend health care professionals working with gender diverse adolescents undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care…."), *with*

Perhaps that is why Plaintiffs admit that she and the other clinicians only "generally follow" them.[214]

---

212

213

[214] The United States purports to dispute Dr. Abdul-Latif's statement that the UAB clinic does not follow particular guidelines. U.S. Resp. 51. They rely on general statements from Dr. Ladinsky assuring that the clinic follows the WPATH and Endocrine Society guidelines, but Dr. Ladinsky

30. Plaintiffs paint a picture of the care at the UAB clinic that does not match the deposition testimony Defendants cited in their motion and discussed by Dr. Nangia in her report, nor does it comport with the Private Plaintiffs' medical records and discussed by Dr. Nangia, Dr. Laidlaw, and Dr. Hruz in their reports. *See* Defs' Mot. 25 nn.143-47. These disputes should not matter for purposes of summary judgment, though, because what Defendants discussed provides more-than-sufficient reason for the Legislature to act as it did. There is not a genuine dispute of *material* fact.

With that said, some clarifications are in order. At the outset, it's important to understand what UAB's pediatric gender "clinic" is.



If a patient arrives at the clinic without a diagnosis of gender dysphoria, "any of the providers" at the clinic can make that diagnosis, "in that initial visit,"

---

herself then provided examples of how the clinic does *not* follow the guidelines. For instance, Dr. Ladinsky admitted that both the Endocrine Society guideline and WPATH SOC-8 approve mastectomies for natal females younger than 18, but her clinic does not. DX33:69:16–70:1 (Ladinsky Dep.). Defendants concur in the clinic's departure from the WPATH standards in this instance, but it's still a departure—an example of the clinic not following the guidelines. As for the United States' other citations, they generally record instances that could be construed as the clinic providing some aspect of care in accordance with the WPATH standards. *See* U.S. Resp. 51 n.241. That does not put Defendants' statement in dispute. Defendants' assertion is not that the UAB clinic always does the *opposite* of WPATH says; it's just that the clinic does not always follow the standards—just as Dr. Abdul-Latif said.

215
216
217





███████████████████████████████████████

███████████████████████████████████████

██ 225 ████████████████████████████████

████████████████████████ 226 ████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ 227

    █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████ 228 ██████████████████████

███████████████.229 It is *this* assessment, for these few patients, that Plaintiffs

discuss in their response. Plfs' Resp. 30.

    The upshot of this process is what Defendants described in their motion.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

225 ████████████████████████
226 ████████████████████████████
227 ████████████████████████████████
228 ██████████████████████████████
229 ███████████████████████████

86



31. As explained above, the rosy picture Plaintiffs paint of the care at the UAB pediatric gender clinic does not create a genuine dispute of material fact because what Defendants discussed provides more-than-sufficient reason for the Legislature to act as it did. The additional clarifications to Plaintiffs' and the United States' assertions are also discussed above.

32. Though once again the assertions by Plaintiffs and the United States do not create a genuine dispute of *material* fact, a few more clarifications are in order. When Plaintiffs talk about "recommendation letters" and "informed consent

230 ████████████████
231 ████████████
232 *See* Defs' Mot. 26 nn.143-44.
233 ████████████████
234 ████████████████

form[s]," Plfs' Resp. 35, they are referring to the clinic's practice for cross-sex hormones only, not puberty blockers.[235] And when Plaintiffs talk about "the clinic psychologist provid[ing]" a "formal psychological evaluation of maturity and comprehension" "when conducting a comprehensive mental health assessment," Plfs' Resp. 35, they are referring to ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████[236] As for Plaintiffs' broad assurance that the "prescribing doctor discusses the treatment's risk and potential benefits" with patients, Plfs' Resp. 35, ████████ ████████████████████████████████████████ ████████████████████████████████[237]

33. Plaintiffs and the United States do not dispute that the UAB clinic does not track its patients, so it follows that the clinic's doctors generally do not know, and certainly not in a systematic way, how their former patients are doing. Nor do

---

[235] *See* DX33:284:2-13 (Ladinsky) ("So we actually do not use a written informed consent form for puberty blockers….").

[236] ██████████████████████████████

[237] *Compare, e.g.,* ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ *with* DX116:S61 (SOC-8) ("Gender-diverse youth should fully understand the reversible, partially reversible, and irreversible aspects of a treatment, as well as limits of what is known about certain treatments (e.g., the impact of pubertal suppression on brain development…)"); *and id.* at S64 (recommending before a patient begins puberty blockers that the clinician "address[] other risks and benefits of pubertal suppression," including the "surgical implications" of "proceed[ing] with pubertal suppression" and "engaging in discussions with families about the future unknowns related to surgical and sexual health outcomes").

the plaintiffs dispute that some patients in the United States detransition and regret the "care" they received. And though both Plaintiffs and the United States argue that Defendants cannot rely on harms occurring to minors in other States and across the globe from the exact treatments at issue here, U.S. Resp. 56-57; Plfs' Resp. 36, once again, "it should go without saying that a State may take action to prevent [harm] without waiting for it to occur be detected within its own borders." *Brnovich*, 594 U.S. at 686. The plaintiffs have not raised a *genuine* dispute of *material* fact.

## RESPONSE TO PLAINTIFFS' EVIDENTIARY OBJECTIONS AND "ADDITIONAL FACTS"

Neither the United States nor Plaintiffs acknowledge the context of this case when they offer their additional statements of fact and evidentiary objections. The context is that rational basis review governs. Under that standard, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). It thus "makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength." *Vance*, 440 U.S. at 112 (quoting *Rast v. Van Deman & Lewis Co.*, 240 U.S. 342, 35 (1916)). In fact, "it is the very admission that" there *is* a dispute—"that the facts are arguable"— "that immunizes from constitutional attack the [legislative] judgment." *Id.*

This rule is precisely why "[s]ummary judgment is an apt vehicle for resolving rational-basis claims." *Tiwari v. Friedlander*, 26 F.4th 355, 369 (6th Cir. 2022). Because the "question is not whether a law in fact is rational," but "whether a legislator could plausibly think so," "a trial over whether the evidence shows that, at day's

end, this or that legislator was in fact wrong is beside the point." *Id.* It simply does not matter what additional facts or evidentiary objections the plaintiffs raise at this point. Even if they are right on all of them, because they cannot "negate every conceivable basis that might support [Alabama's law]," summary judgment for Defendants is appropriate. *Leib*, 558 F.3d at 1306 (cleaned up).

With that said, Defendants will briefly address the plaintiffs' additional facts and explain why none of them affects the standard of review or precludes summary judgment. Defendants will then address the plaintiffs' evidentiary objections.

## A.   Plaintiffs' and the United States' "Additional Facts"

Plfs' ¶1. Plaintiffs assert that "[g]ender dysphoria is a real, serious, and recognized medical condition." That is consistent with the Legislature's decision to safeguard children diagnosed with gender dysphoria from harmful sex-change procedures, at least until they reach the age of majority and are better able to appreciate the risks of such interventions. *See* Ala. Code § 26-26-2.

Plfs' ¶2, U.S. ¶1. Plaintiffs assert that "[t]he banned treatments are the established course of care for gender dysphoria," and the United States asserts that the law "bans forms of treatments that medical providers prescribe" "based on professional standards, clinical experience and judgment, and the patient's individual needs." As explained exhaustively above (*supra* ¶¶6-25) and in Defendants' motion (same), while it may be true that groups like WPATH establish "professional standards" establishing sex-change procedures for minors as the "established course of care," that does *not* mean the interventions are safe for children or that the

organizations pushing them are reliable. Indeed, is it precisely *because* the medical profession was not properly regulating itself that the Legislature had to act.

Plfs' ¶3. Plaintiffs assert that "[p]sychotherapy as a purported alternative to medical treatment for gender dysphoria in adolescents is ineffective, insufficient, and unethical." This is quite the claim when Plaintiffs' proposed treatment is life-altering and can result in the adolescent's sterilization, which psychotherapy does not.[238] Fortunately, it is not true.[239] And even if the evidence were up in the air, the question of what treatment is "ethical" or "unethical" is for the Legislature to answer.

Plfs' ¶4, U.S. ¶¶2-3. While the plaintiffs claim that some patients will be harmed by Alabama's law, the Legislature could rationally determine that any harms caused by having a child wait until adulthood to undergo sex-change procedures are far outweighed by the known, significant harms caused by the interventions.

U.S. ¶4. The United States makes the farcical claim that the risks of pediatric sex-change procedures "are no greater than the risks associated with the same medical treatments that, when used for different purposes, are not prohibited by S.B. 184." At the outset, the comparison fails because the "same medical treatments" language implies similarity when there is none. Testosterone replacement for an adolescent boy with hypogonadism aims to restore healthy biological functioning by maintaining the boy's testosterone levels at a normal range for his age. Using testosterone to transition an adolescent girl is altogether different, requiring

---

[238] *See* DX39:169:6-25 (Shumer Dep.).
[239] *See, e.g.*, DX11:¶¶46-60 (Nangia Rep.); *see also* DX33:36-14–38:6 (Ladinsky Dep.) (admitting that UAB's clinic relies on psychotherapy without medical interventions for a time with its patients); DX14:¶¶52-57 (Curlin Rep.).

supraphysiologic levels of the powerful hormone to push the girl's testosterone lev-els far outside the healthy biological range and creating the diseased state of hyper-androgenism in order to induce the development of the physical sex characteristics of males.[240] These are not the "same medical treatments."

Perhaps for this reason, none of the United States' own citations discuss cross-sex hormones (much less surgeries). Instead, they discuss only puberty blockers, and only puberty blockers used in isolation. But as Plaintiffs' expert Dr. McNamara ad-mits, "puberty-pausing medications … are nearly always part of a staged process that includes other treatments": cross-sex hormones and surgeries.[241] That combina-tion—puberty blockers at Tanner Stage 2, followed by cross-sex hormones—will almost certainly leave the patient sterilized.[242] Not so for patients temporarily receiv-ing puberty blockers to treat central precocious puberty.

U.S. ¶5. The United States asserts that "[m]inor patients and their parents" are "capable of comprehending and appreciating the risks associated with the medical treatments banned by S.B. 184," but as noted above this claim is also belied by the United States' expert, who agreed that "as a child gets older, the child is more likely to have a better understanding of complex topics like gender identity,"[243] that minors

---

[240] *E.g.*, DX7:¶¶120-47, 205 (Laidlaw Rep.); DX5:¶¶48-52 (Hruz. Rep.).

[241] PX7:App. A:15 (McNamara Affidavit).

[242] DX10:¶11 (Thompson Rep.) (noting that "the GAC regimen at early pubertal development (Tanner stage 2) will almost certainly result in sterilization (there are no data providing any evi-dence to the contrary)" and that "the 'fertility preservation' options for these children are inacces-sible, experimental, and speculative"); DX7:¶¶92-93 (Laidlaw Rep.) ("If the patient remains blocked in an early pubertal stage, then even the addition of opposite sex hormones will not allow for the development of fertility.").

[243] DX39:169:6-25 (Shumer Dep.)

"are seldom concerned about the impact of medical interventions on fertility,"[244] and that the average 19-year-old would "be able to discuss fertility in a more complex way than a 10-year-old would."[245] And as Dr. Farr Curlin, a medical ethicist at Duke University, opined: "There are strong reasons to doubt that minors can adequately appreciate and appropriately weigh the lifetime implications of sterilization, loss of sexual response, impaired neural development, and the other potential health and relational impacts identified in the literature," "[n]or do ethical principles give parents unfettered power to provide effective consent on behalf of their children for medical interventions that pose such severe risks … in the absence of a countervailing and imminent threat of bodily harm."[246] "No such imminent threat exists in the case of minors who experience gender dysphoria."[247]

U.S. ¶6. The United asserts that "[y]outh whose gender dysphoria continues into adolescents are highly likely to identify as transgender as adults," but the historical data does not support this,[248] and even they did, the United States' citations refer only to children who were diagnosed with gender dysphoria before puberty, not the mine-run of patients who present with gender dysphoria as adolescents. And in any event, even if the United States' claim about persistence were true and

---

[244] DX39:235:4-12 (Shumer Dep.).

[245] DX39:233:15-20 (Shumer Dep.).

[246] DX14:¶19 (Curlin Rep.).

[247] *Id.*

[248] *See* DX115:3879 (Endocrine Society Guideline); DX2:¶¶155-20 (Cantor Rep.); DX38:306 (DSM-5) ("Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%."); DX40:102 (Shumer Dep. Ex. 6, *Adolescent Care*) ("Estimates for the likelihood of gender dysphoria persisting from childhood into adulthood range from 2-27% depending on the study."); DX39:171:2-24, 172:23–173:1 (Shumer Dep.) (admitting that "that range sounds accurate" and that he is "not aware of any updated studies").

generalizable to today's patient population, the Legislature could still rationally restrict the interventions because they have not been shown to be safe and effective and at least *some* patients will be significantly harmed by them.

U.S. ¶7. The United States asserts that the criminalization of harmful medical treatments is "highly unusual." This is a highly unusual claim for the United States to make. The federal government regularly uses criminal law to regulate medical interventions, be it genital surgery,[249] opioids,[250] or hormones like testosterone.[251] And Professor Cohen, the United States' expert on this, agreed that the United States also imposes criminal penalties for violations of the Federal Food, Drug, and Cosmetic Act.[252] And he agreed that States regularly use criminal-law provisions to regulate the practice of medicine and protect patients from harm.[253] These examples not only show that the United States is wrong factually, but that its claim is not so much a factual assertion as it is a disagreement with the Legislature's judgment about how best to regulate medicine. That is perhaps something the United States can challenge as a matter of law, but it can't stack the deck by claiming it as "fact."

U.S. ¶8. The United States asserts that "S.B. 184's actual purpose is to express moral disapproval, i.e., to repudiate the gender identity of transgender minors." There are many problems with this "factual" assertion. To begin, the evidence the

---

[249] *See* 18 U.S.C. § 116.

[250] *See* U.S. Dep't of Justice, *Opioid Manufacturer Endo Health Solutions Inc. Ordered to Pay $1.536B in Criminal Fines and Forfeiture for Distributing Misbranded Opioid Medication* (May 3, 2024), https://perma.cc/7Q5L-EK9F.

[251] *See* 21 U.S.C. § 841(a) (criminalizing the knowing or intentional distribution of a control substance); 21 C.F.R. § 1308.13(f) (listing testosterone as a Schedule III drug).

[252] *See Daubert*.DX24:229:18-21 (Cohen Dep.) ("So you'd agree that the FDCA imposes criminal punishments for certain violations? A. I think that is correct.").

[253] *See Daubert*.DX24:231:4-238:5.

United States cites is woefully insufficient to support it, which is contradicted by the Legislature's express statement of its actual purpose.[254] Why does the United States think the Legislature's finding that a person's sex is "genetically encoded into a person at the moment of conception" and "cannot be changed" is evidence of animus? U.S. Resp. 59 n.284 (citing Ala. Code § 26-26-1). It does not say, but it cannot be the case that simply recognizing biological reality is evidence of "moral disapproval," much less intentional discrimination (which is what matters).

The United States' other citation does not help, either. It relies on its expert Dr. Caughey to purportedly sleuth out the Legislature's "actual purpose," but Dr. Caughey expressly testified that he was not opining on the legislative intent behind Alabama's law.[255] And as discussed below (*see infra* II.C), the only two examples Dr. Caughey mentions—one out-of-context statement made by the Governor, and one out-of-context statement made by a state Representative—do not even show that these *individuals* were motivated by bias, much less that the Legislature as a whole was. Not even the United States' sly anti-religious bigotry can change that.

More fundamentally, even if the United States had brought an *Arlington Heights* claim, it cannot evade summary judgment by using a "[c]onclusory statement[] of ultimate fact[]" to leapfrog its heavy burden of overcoming the presumption of legislative good faith. *Nisbet v. George*, No. 1:05-CV-570-WKW, 2006 WL

---

[254] *See* Ala. Code § 26-26-2(16) ("For these reasons, the decision to pursue a course of hormonal and surgical interventions to address a discordance between the individual's sex and sense of identity should not be presented to or determined for minors who are incapable of comprehending the negative implications and life-course difficulties attending to these interventions.").

[255] *See* DX79:335:9-18 (Caughey Dep.) ("[D]o you opine on the legislative intent behind passing SB184? A. No. Q. Do you opine on any legislators' individual intent in passing SB184? A. No. Q. Do you opine on any legislator's individual motivation in passing SB184? A. No.").

2345884, at *3 (M.D. Ala. Aug. 11, 2006) (quoting *Law v. Tillman*, 2001 WL 103304, *7 (S.D. Ala. 2001)). That would make the presumption meaningless at summary judgment: Every case in which a plaintiff cries "animus" and lobs in a vaguely supportive expert declaration would be sent to trial. That doesn't happen because the plaintiff's burden under *Arlington Heights* is to prove that the *entire* legislative body acted with a discriminatory purpose, so evidence that does not show such animus is insufficient as a matter of law to defeat summary judgment. *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1322-25 (11th Cir. 2021) ("*GBM*") (affirming summary judgment in favor of Alabama on plaintiffs' intentional discrimination claim because plaintiffs' invocation of isolated statements by several Alabama legislators was insufficient to show the intent of the entire legislative body and overcome the presumption of legislative good faith). Such is the case here.

### B.    The Plaintiffs' Evidentiary Objections

"[E]vidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form." *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) (cleaned up); *see* Fed. R. Civ. P. 56(c)(2).

This rule takes care of the Plaintiffs' and United States' concerns about authentication. *See* Plfs' Resp. 37; U.S. Resp. 75. At this stage of the proceedings, "the evidence need not be authenticated to be considered—instead, it need only be capable of authentication." *Smith*, 991 F.3d at 1156 n.2. And "[t]he authentication burden

… is a light one." *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015); *see* Fed. R. Evid. 901 & 902 (rules governing authentication of evidence). For documents that were produced in discovery by HHS, Johns Hopkins, and WPATH, Defendants expect that the organizations will provide a custodial affidavit, as is usual in these circumstances. *See* Fed. R. Evid. 902(11). And to the extent Plaintiffs object to the redactions in WPATH's production that hide the declarant's identity (Plfs' Resp. 37), the answer is for WPATH, at the Court's order if necessary, to remove the redactions. All this can easily be resolved prior to trial.

As for the plaintiffs' hearsay objections, Defendants expect that the newspaper and journal articles Plaintiffs complain about (at 36) will be discussed by their experts at trial. These include evidence reviews, statements by European healthcare authorities, academic journal articles, and clinical guidelines (DX84, 86–100, 103–09, 111, 114–16, 126, 138, 148–50, and 153–65), as well as news articles and other periodicals in reputable publications concerning gender dysphoria and public statements from relevant organizations like WPATH (DX85, 101–02, 110, 112–13, 116–25, 127–28, 130–45, 147, and 151). Defendants expect that their experts will explain that these publications are reliable, or the Court can take judicial notice of that fact. *See* Fed. R. Evid. 803(18).

For the documents received in discovery from HHS, Johns Hopkins, and WPATH, Defendants expect that many of these communications comprise regularly conducted business activity that would be admissible as business records. *See* Fed. R. Evid 803(6); *Pierre v. RBC Liberty Life Ins.*, No. 5-1042-C, 2007 WL 2071829, at *2 (M.D. La. July 13, 2007) (holding that when an employee prepares emails

"during the ordinary course of business" the emails "fall within the exception to the hearsay rule provided in Fed. R. Evid. 803(6)"). And even if a specific hearsay exception did not apply, "hearsay evidence [can form] part of the foundation for [an expert's] opinion so long as the hearsay evidence is 'the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.'" *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 809 (11th Cir. 2017) (quoting *United States v. Scrima*, 819 F.2d 996, 1001 (11th Cir. 1987)); *see* Fed. R. Evid. 703. As Defendants experts will explain, that is the case here.

That leaves the plaintiffs' *Daubert* objections, which Defendants will address in their separate responses to the plaintiffs' motions. *See* Docs. 590 & 605.

## ARGUMENT

### I.     The Act Passes Rational Basis Review.

The Eleventh Circuit already held that the Act is "subject only to rational basis review" on both equal protection and substantive due process. *Eknes-Tucker*, 80 F.4th at 1224, 1230 (cleaned up). Neither Plaintiffs nor the United States dispute the Eleventh Circuit's explanation that a rational "relationship may merely be based on rational speculation and need not be supported by evidence or empirical data." *Id.* at 1225 (cleaned up). Under Eleventh Circuit precedent, "[a]s long as [Defendants] can present at least one plausible, arguably legitimate purpose for the [law], summary judgment for [Defendants] is appropriate unless [Plaintiffs] can demonstrate that the legislature could not *possibly* have relied on that purpose." *Haves*, 52 F.3d at 923 (emphasis added).

The Eleventh Circuit practically answered this question, too. It held that the

Act "is exceedingly likely to satisfy" rational basis review, since "it seems abundantly clear that [it] classifies on the basis of age in a way that is rationally related to a legitimate state interest" in protecting children. *Eknes-Tucker*, 80 F.4th at 1230. In addition, "[t]here can be no doubt the government has an interest in protecting the integrity and ethics of the medical profession." *Gonzales*, 550 U.S. at 157.

The only remaining question, then, is whether the Plaintiffs or the United States "can demonstrate that the legislature could not possibly have relied on th[ese] purpose[s]." *Haves*, 52 F.3d at 923. They cannot, and their responses barely contend otherwise. The Eleventh Circuit already held that the Act could be justified "on the rational understanding that many minors may not be finished forming their identities and may not fully appreciate the associated risks" of the regulated procedures. *Eknes-Tucker*, 80 F.4th at 1230. The purpose of protecting children is stated in the Act itself (and its title) so obviously could "possibly have [been] relied on." Ala. Code §§ 26-26-1, -2; *Haves*, 52 F.3d at 923. That should be the end of rational basis review—and this case. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 706 (2018) (emphasizing under rational basis review that the challenged act "is expressly premised on legitimate purposes"); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (admonishing courts in rational basis review to "assume that the objectives articulated by the legislature are actual purposes of the statute"). The Plaintiffs' and United States' responses do not change this conclusion.

### A.    Plaintiffs Point to No Dispute Material to Rational Basis.

Plaintiffs say almost nothing about the rational basis standard, merely reiterating their claim that certain "evidence creates genuine disputes of material fact that

require denial of" summary judgment. Plfs' Resp. 44. But they do not and cannot explain how any dispute is *material* to rational basis review, under which the Act "need not be supported by evidence." *Eknes-Tucker*, 80 F.4th at 1226 (cleaned up). Instead, "the burden is on the one attacking the law to negate every conceivable basis that might support it, even if that basis has no foundation in the record." *Leib*, 558 F.3d at 1306 (cleaned up). And there is no genuine dispute that at least one conceivable basis exists for the law. The Eleventh Circuit already explained one conceivable basis—protecting children from irreversible procedures—and similar laws exist in half the States. "[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1281 (11th Cir. 2014). "Are we to believe that the hundreds of lawmakers whose votes were needed to enact these laws" in half the States *all* acted irrationally? *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 254 (2022).

What's more, Plaintiffs' purported disputes pertain to the "*empirical* connection" between medical gender transition procedures and the harms (and lack of benefits) addressed by the Act. *Clover Leaf Creamery*, 449 U.S. at 463. But they "have not challenged" that at least a "*theoretical* connection" between the Act "and the purposes articulated by the legislature" exists, so their empirical challenges are irrelevant on rational basis review. *Id.* "Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Id.* at 464. In short, Defendants need *no* "evidence or empirical data" to

prevail. *Eknes-Tucker*, 80 F.4th at 1225.

In any event, there isn't even a genuine dispute that at least one basis exists *in the evidence* for the Act. As the Eleventh Circuit explained, "[a]lthough rational speculation is itself sufficient to survive rational basis review, here Alabama relies on both record evidence and rational speculation to establish that [the Act] is rationally related to" its interest in protecting children. *Eknes-Tucker*, 80 F.4th at 1225. Plaintiffs, for instance, agree that "[r]isks … are present" for minors using these procedures, including "reduced bone density [and] increased cardiovascular risks." Plfs' Resp. 5; *see id.* at 45 (conceding that "impact[s] on fertility" are a "known risk[]"); U.S. Resp. 7-9 (United States conceding "[r]isk of lower bone mineral density in prolonged use of GnRHa" and "[p]otential risks to fertility"); *accord Eknes-Tucker*, 80 F.4th at 1225 ("the record evidence is undisputed that the medications at issue present *some* risks"). There is no dispute that "[t]he impact of pubertal suppression on brain development is not well known" and "could be of concern."[256] There is no dispute that puberty blockers and cross-sex hormones have other risks.[257] There is no dispute that "GnRHa therapy prevents maturation of primary oocytes and spermatogonia" "and may preclude gamete maturation"; that "there are no proven methods to preserve fertility in early pubertal transgender adolescents"; or that there are no "long-term outcome studies examining patients who started puberty blockers at Tanner stage 2 then progressed to hormonal therapy and then wanted to become fertile."[258] There is no dispute that, in SOC8's words, "[t]he long-term effects of

---

[256] DX24:155:7-10 (Karasic Dep.).
[257] DX39:143:12-145:7, 147:4-23 (Shumer Dep.).
[258] DX39:121:5-20, 156:15-20 (Shumer Dep.).

gender-affirming treatments initiated in adolescence are not fully known."[259] In what the United States concedes is "the longest-term follow-up study" (U.S. Resp. 10), the mean age of patients at follow-up was only 20.7 years old and, according to the study's lead author, its findings may not be relevant to the "new developmental pathway" of older adolescents presenting with gender dysphoria—a pathway about which the United States' expert knew of no "similar long-term outcome study."[260] Plaintiffs too concede a "growth in the number of referrals" for transitioning procedures and that "desistance" occurs in at least *some* children. Plfs' Resp. 26; *see* U.S. Resp. 56 ("Undisputed that some transgender people may later detransition."); *accord Eknes-Tucker*, 80 F.4th at 1225 ("there is at least rational speculation that some families will not fully appreciate those risks and that some minors experiencing gender dysphoria ultimately will desist and identify with their biological sex"). The list could go on and on: no dispute that psychotherapy poses none of the risks that puberty blockers and cross-sex hormones do[261]; no dispute that "as a child gets older, the child is more likely to have a better understanding of complex topics like gender identity"[262]; no dispute that minors "are seldom concerned about the impact of medical interventions on fertility" or that the average 19-year-old can "discuss fertility in a more complex way than a 10-year-old."[263]

Thus, even if the "evidence" were relevant to rational basis review, the

---

[259] DX39:187:9-25 (Shumer Dep.); DX116:S65 (SOC-8).
[260] DX39:238:1-6, 250:3–251:24 (Shumer Dep.); *see* U.S. Resp. 44 (United States conceding that "the population of youth presenting for treatment may have changed in recent years" (cleaned up)).
[261] DX39:169:6-25 (Shumer Dep.).
[262] DX39:231:23–232:1 (Shumer Dep.).
[263] DX39:233:15-20, 235:4-12 (Shumer Dep.).

undisputed evidence shows that "the rational relationship between the means adopted and the legislation's purpose" is "at least debatable"—requiring judgment for Defendants. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1339 (11th Cir. 2002). "Plenty of rational bases exist for [this law], with or without evidence." *L.W. v. Skrmetti*, 83 F.4th 460, 489 (6th Cir.), *cert. granted sub nom. United States v. Skrmetti*, No. 23-477, 2024 WL 3089532 (U.S. June 24, 2024).

Plaintiffs' only *legal* response on rational basis review is to trot out a citation sentence with a 1983 Eleventh Circuit case that they describe in a parenthetical as "reversing summary judgment where evidence that rule was rationally related to state's interests was disputed." Plfs' Resp. 44-45 (citing *Bradbury v. Wainwright*, 718 F.2d 1538, 1544 (11th Cir. 1983)). Unsurprisingly, given that Eleventh Circuit precedent in 2023 holds that no "evidence" is needed on rational basis review, *Eknes-Tucker*, 80 F.4th at 1226, Plaintiffs' description of that case is incorrect. *Bradbury* did not apply rational basis review, but instead "a two-part standard for evaluating prison regulations regarding inmate marriages," which required that "the prison regulation must further a substantial governmental interest" and "be no greater than necessary to protect the governmental interest involved." 718 F.2d at 1543.[264] That heightened scrutiny—which required "evidence in the record" to

---

[264] The United States misrelies on *Bradbury* too, presumably because it could find no better case in the last 40 years to support its bald assertion that "summary judgment is rarely available in equal protection and due process cases"—*when rational basis review applies*. U.S. Resp. 61. In fact, summary judgment is routine in such cases. *See, e.g.*, *Stanley v. City of Sanford*, 83 F.4th 1333, 1337 (11th Cir. 2023); *PBT Real Estate, LLC v. Town of Palm Beach*, 988 F.3d 1274, 1283-85 (11th Cir. 2021); *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176-77 (11th Cir. 2018); *Blue Martini Kendall, LLC v. Miami Dade Cnty.*, 816 F.3d 1343, 1346 (11th Cir. 2016); *Cook v. Bennett*, 792 F.3d 1294, 1296-98 (11th Cir. 2015); *Fresenius Medical Care Holdings, Inc.*

support the regulation (*id.* at 1544)—has no similarity to "the question that" the Eleventh Circuit said must be "ask[ed]" in this case: "simply whether the challenged legislation is rationally related to a legitimate state interest." *Eknes-Tucker*, 80 F.4th at 1225. It is, so summary judgment is required.

### B.    The United States' Effort to Redefine Rational Basis Review Is Unprecedented and Fails On Its Own Terms.

As for the United States, it mainly tries to redefine rational basis review, contradicting binding precedent. It is telling that not once in the entire Part I of the United States' argument is a *single* Eleventh Circuit precedent used to support its argument that some "more 'searching form' of rational basis review" applies here (or anywhere else). U.S. Resp. 62. Instead, the United States' statement of its unprecedented legal standard depends on a two-word quotation from a one-Justice separate opinion that has been rejected in this Circuit. The United States' remaining rational basis review arguments fail to negate every conceivable legitimate purpose of the Act. Summary judgment is warranted.

### 1.    The United States' rational basis plus theory contradicts precedent.

The United States' overarching theory is that in some undefined set of cases, rational basis review does *not* mean what the Eleventh Circuit has said it means but requires "a more 'searching form'" of review. U.S. Resp. 62 (quoting *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring in the judgment)). The United States asserts that this standard requires that "the law's *actual and proffered*

_____

*v. Tucker*, 704 F.3d 935, 944-45 (11th Cir. 2013); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1246 (11th Cir. 2003) (all affirming summary judgment on rational basis).

*purpose* must be permissible and the proffered purpose must correlate *precisely* with the classification." *Id.* at 63 (emphases added); *contra, e.g.*, *Haves*, 52 F.3d at 922-23 ("actual purposes" "are not relevant," and "the relationship between the classification and the goal" simply cannot be "arbitrary or irrational" (cleaned up)).

The United States' standard does not come from any decision (or even a separate opinion). It is simply an expression of the United States' own desire for what it wishes rational basis review were (at least sometimes). What follows the United States' desired standard is a string-cite of three cases in which the Supreme Court expressly said it applied *normal* rational basis review. None of these cases, or any other precedent cited by the United States, calls for an application of some heightened rational basis test.

Unsurprisingly, then, the United States' theory has been rejected often. In *Lawrence*, Justice O'Connor proposed "a more searching form of rational basis review" on equal protection grounds. 539 U.S. at 580 (opinion concurring in the judgment). The majority declined that proposal, applying rational basis review under the Due Process Clause. *See id.* at 579; *id.* at 564, 578 (majority opinion). And three Justices explained why Justice O'Connor's "decree[]" of heighted rational basis review was wrong:

> The cases she cites do not recognize such a standard, and reach their conclusions only after finding, as required by conventional rational-basis analysis, that no conceivable legitimate state interest supports the classification at issue. *See Romer v. Evans*, 517 U.S. [620][,] 635 [(1996)]; *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 448–450 (1985); *Department of Agriculture v. Moreno*, 413 U.S. 528, 534–538 (1973).

*Id.* at 601 (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.).

These are the same three cases rustled up by the United States here, albeit without quotation suggesting that they applied any higher rational basis standard. They did not, as the Supreme Court has made clear. Just a few years ago, the Supreme Court cited those three cases as examples of standard "rational basis scrutiny," criticizing the dissent for using them to "refus[e] to apply anything resembling rational basis review." *Hawaii*, 585 U.S. at 705-06. The Eleventh Circuit agreed, citing these three cases as examples of the "extremely narrow" rational basis review. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1034 (11th Cir. 2020).

Beyond that, the Eleventh Circuit has squarely rejected the United States' "more searching" rational basis standard. In *Deen v. Egleston*, the Eleventh Circuit considered a district court opinion that "in some instances … professed to apply rational basis review" but "at other times … seemed to require something more." 597 F.3d 1223, 1231 (11th Cir. 2010). The "something more" was exactly what the United States wants here: Relying on *Cleburne*, the district court in *Deen* had said that "courts should undertake a robust, searching form of rational basis review where the challenged law discriminates against" certain groups. *Id.* The Eleventh Circuit rejected that reading, noting that "*Cleburne* itself disavowed any heightened standard." *Id.* Thus, the Eleventh Circuit held that it would "apply rational basis review" only, and "to the extent that the district court applied scrutiny in excess of that standard, it was error." *Id.* And *Deen* is not the only case in which the Eleventh Circuit has had to reverse intensive "application[s] of rational basis scrutiny" based on *Romer* and *Cleburne*. *E.g.*, *Williams v. Pryor*, 240 F.3d 944, 950 (11th Cir. 2001).

This Court should reject the United States' invitation to commit the same error.

Though this rejection by binding circuit precedent is enough to dispose of the United States' rational basis plus theory, an examination of the United States' cases confirms that its theory has no support. Each of its three cases—and the Supreme Court's and Eleventh Circuit's subsequent treatment—shows that no "rational basis plus" standard was applied.

*Romer* held that under rational basis review, courts "will uphold the legislative classification so long as it bears a rational relation to some legitimate end," proceeding to hold that the challenged law "fails" "this conventional inquiry." 517 U.S. at 631-32. The Supreme Court (as noted) and the Eleventh Circuit have repeatedly cited *Romer* for the usual, deferential rational basis standard. *See, e.g.*, *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 818 (11th Cir. 2004) (quoting *Romer* for the point that "this deferential standard" applies "even if the law seems unwise or works to the disadvantage of a particular group"); *Norton*, 324 F.3d at 1245; *Williams*, 240 F.3d at 948.[265]

Likewise, *Cleburne* applied only "[t]he general rule" "that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." 473 U.S. at 440. It held that the lower court "erred" in applying "a more exacting standard of judicial review." *Id.* at 442. The Supreme Court has confirmed that *Cleburne* applied "only the minimum 'rational-basis' review," under which "the State need not articulate its reasoning" and

---

[265] *Accord* Br. for the United States 14 n.3, *Windsor v. United States*, Nos. 12-2335, 12-2435, 2012 WL 3548007 (U.S. Aug. 10, 2012) ("*Romer* found that the legislation failed rational basis review," a "permissive level of scrutiny.").

"the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001) (cleaned up); *see also Heller v. Doe*, 509 U.S. 312, 321 (1993) (explaining that *Cleburne* did not "purport to apply a different standard of rational-basis review"). The Eleventh Circuit too has rejected expansive readings of *Cleburne* as "unwarranted" and "overstated." *Lofton*, 358 F.3d at 821; *see Deen*, 597 F.3d at 1231 ("*Cleburne* itself disavowed any heightened standard"); *Williams*, 240 F.3d at 952; *see also Jones*, 975 F.3d at 1034-35.

Last, *Moreno* applied "traditional equal protection analysis," under which "a legislative classification must be sustained[] if the classification itself is rationally related to a legitimate governmental interest." 413 U.S. at 533. It nowhere applied a different test, as the Supreme Court has reiterated: *Moreno* "is merely an application of the usual rational-basis test." *Lyng v. Int'l Union*, 485 U.S. 360, 370 n.8 (1988). The Eleventh Circuit agrees. *See, e.g.*, *Jones*, 975 F.3d at 1034. Thus, none of the United States' precedents supports its rational basis plus theory. To the contrary, binding precedent rejects it.[266]

---

[266] Not to pile on, but even the United States itself has repeatedly rejected its own theory, telling the Supreme Court that "[p]ermitting a plaintiff to establish an equal protection violation by proving that a difference in treatment was actually motivated by ill-will cannot be reconciled with the decisions of this Court … holding that, unless a classification is suspect or affects a fundamental right, the sole equal protection inquiry is whether there is a plausible basis for the classification." Br. for the United States as *Amicus Curiae* 28, *Enquist v. Oregon Dep't of Agriculture*, No. 07-474, 2008 WL 859357 (U.S. Mar. 26, 2008) (hereinafter "U.S. *Enquist* Brief"). Though "[s]ome have understood a line of this Court's decisions … to apply rational-basis review with added focus in certain circumstances" (citing Justice O'Connor in *Lawrence*, *Romer*, *Cleburne*, and *Moreno*), "those considerations are best taken into account through the established framework of heightened scrutiny" applicable to suspect classifications. Br. for the United States 52, *United States v. Windsor*, No. 12-307, 2013 WL 683048 (U.S. Feb. 22, 2013). That is because, as the United States

Last, the United States' inability to articulate *when* its rational basis plus test should apply underscores that test's unsoundness. Using slightly different phrases—all without quoting anything—the United States says that its test applies "when the law targets a specific group of people for unfavorable treatment." U.S. Resp. 62; *id.* at 63 (where "a law targets a particular group for unfavorable treatment"); *id.* ("[i]f the law's classification is intended to target a disfavored group").

This trigger is inexplicable. If the United States simply means that a law "targets" in the sense that it contains a classification, that is true of every law to which rational basis review applies under the Equal Protection Clause. As the Supreme Court explained in *Romer*, under rational basis, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise *or works to the disadvantage of a particular group*." 517 U.S. at 632 (emphasis added). Heightened scrutiny applies only when a law facially "targets *a suspect class*," *id.* at 631 (emphasis added), not when it "targets" (in the sense of putting some individuals on one side of a classification) others. And here, the Act protects all *minors*—regardless of their sex or gender identity—from transitioning procedures until they reach adulthood. *See Vacco v. Quill*, 521 U.S. 793, 801 (1997) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." (quoting *Pers. Adm'r of Massachusetts*

explained, "the Supreme Court has not explicitly sanctioned [any] 'second order' form of rational-basis review," and "[t]here is no justification for applying a more 'searching form' of rational basis review." Br. of Defendants-Appellants 38-39, *Transpacific Steel LLC v. United States*, No. 2020-2157 (Fed. Cir. Oct. 30, 2020). Altering this framework, the United States said, "threatens to open up breathtaking vistas of liability." U.S. *Enquist* Brief, *supra*, at 32 (cleaned up). The United States does not explain (or even acknowledge) its changed position here, and the Eleventh Circuit has already held that rational basis review applies.

*v. Feeney*, 442 U.S. 256, 272 (1979)).

If, on the other hand, the United States' trigger means something about *actual* intent, that is "not relevant" under rational basis. *Haves*, 52 F.3d at 923; *see Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1147 (11th Cir. 2022) ("[W]e do not assess whether the State's justifications are illusory."). That the United States cannot explain what conditions trigger its heightened test further disqualifies it.

\*       \*       \*

In sum, the United States' theory is nothing new (for other litigants, anyway), but remains as unprecedented and unsound as ever. Litigants trying to get out of proper rational basis review have been trying it for decades. But neither the Eleventh Circuit nor the Supreme Court has ever adopted a "rational basis plus" form of review. Instead, binding precedents have consistently held that absent a suspect classification or fundamental right, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest"—a standing that "is easily met." *Deen*, 597 F.3d at 1229-30. Many courts and scholars agree that the United States' theory is unprecedented.[267]

---

[267] *See, e.g.*, *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 377 F.3d 1275, 1279 (11th Cir. 2004) (Birch, J., concurring in the denial of rehearing en banc) ("Aside from Justice O'Connor's *Lawrence* concurrence, I have found in the Supreme Court's language no explicit support for the theory that rational-basis review should examine the actual motivation behind legislation (assuming that such a thing can be divined with any accuracy)."); *id.* at 1279-82 (thoroughly refuting an argument like the United States'); *Powers v. Harris*, 379 F.3d 1208, 1223-24 (10th Cir. 2004) ("[N]o majority of the [Supreme] Court has stated that the rational-basis review found in *Cleburne* and *Romer* … differs from the traditional variety."); *Milner v. Apfel*, 148 F.3d 812, 816-17 (7th Cir. 1998) (similar, and rejecting "an overreading of the *City of Cleburne* and *Romer* cases"); *accord* Thomas B. Nachbar, *Rational Basis "Plus"*, 32 CONST. COMMENT. 449, 450 (2017) ("We

This Court should not adopt the United States' unprecedented theory. As shown next, a proper application of rational basis review requires summary judgment for Defendants.

**2.    The United States' rational basis arguments fail on their own terms.**

The United States never addresses real rational basis review and instead applies its make-believe rational basis plus test, insisting on a "precise[]" correlation and speculating as to the "actual purpose of S.B. 184." U.S. Resp. 56-58. As noted, this is not rational basis review. *See Haves*, 52 F.3d at 923 ("actual purposes" are "not relevant"); *Jones*, 975 F.3d at 1035 ("The Constitution requires only a rational line." (cleaned up)). Because the United States fails to respond based on this Circuit's rational basis test, summary judgment is warranted. Again, the critical question on summary judgment applying rational basis review is whether Defendants have "present[ed] at least one plausible, arguably legitimate purpose for the" Act, *Haves*, 52 F.3d at 923, and as shown above, they have. None of the United States' arguments change that conclusion.

**a.    Alabama has a legitimate government interest.**

On a legitimate government interest, the United States contends that "the actual purpose of S.B. 184 is to express moral disapproval, i.e., to repudiate the identity of transgender minors," and "[t]his is impermissible." U.S. Resp. 66. This is wrong five times over.

First, the United States' response fails to negate every conceivable

---

should be deeply suspicious of a doctrine the [Supreme] Court has not acknowledged applying, none more so than rational basis plus.").

explanation for the Act, and is non-responsive to Defendants' showing of "at least one plausible, arguably legitimate purpose." *Haves*, 52 F.3d at 923. Put another way, there is no genuine dispute of material fact that the Act has arguably legitimate purposes, as explained above (and by *Eknes-Tucker*).

A classification fails rational basis review only in "the rare case where the facts preclude *any* rational basis for" it. *Armour v. City of Indianapolis*, 566 U.S. 673, 687 (2012) (emphasis added). So, as the United States has elsewhere explained, a plaintiff cannot "bypass rational basis review merely by producing evidence that a decision was in fact motivated by a malicious intent." Br. for the United States as Amicus Curiae 19, *Village of Willowbrook v. Olech*, No. 98-1288 (U.S. Dec. 13, 1999). Rather, only a law "that is not supported by a rational basis, and therefore can *only* be understood as resting on an impermissible motive, violates equal protection." *Id.* (emphasis added). "[O]nce a conceivable rational basis supporting a difference in treatment is identified, judicial inquiry 'is at an end.' It is 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.'" U.S. *Engquist* Brief, *supra*, at 25 (cleaned up) (quoting *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). As explained above, the Act has a rational basis, so the United States' accusation is irrelevant.

Second, "[a]ctual purposes" are "not relevant" on rational basis review. *Haves*, 52 F.3d at 923; *see also Norwegian Cruise*, 50 F.4th at 1147; *Williams v. Morgan*, 478 F.3d 1316, 1320-21 (11th Cir. 2007) ("[I]t is entirely irrelevant … whether the conceived reason for the challenged distinction actually motivated the legislature." (cleaned up)). The United States has no response to this basic premise

of rational basis review, though Defendants pointed it out. Doc. 619 at 48.

Third, "public morality remains a legitimate rational basis," *Morgan*, 478 F.3d at 1318, and if the Act reflects moral disapproval of anyone, it disapproves of ideologically motivated, unscientific doctors who push unproven sterilizing interventions on youth who cannot understand the ramifications of or meaningfully consent to these permanent interventions. The law expresses only the same moral disapproval of them as it does others who harm children. *See id.* at 1323 ("[T]he law is constantly based on notions of morality." (cleaned up)); *see also Gonzales*, 550 U.S. at 158 (explaining that "ethical and moral concerns" may "justify" a "specific regulation"); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (noting a "powerful and legitimate interest" in executing a "moral judgment"); *Lofton*, 358 F.3d at 819 n.17. Put another way, there is no law that is *not* founded on society's moral views, and there is nothing wrong with advancing the moral goal of protecting children.

Fourth, the United States proffers no evidence to suggest that the Alabama Legislature "as a whole" passed the Act *solely* for moral disapproval. *Brnovich*, 594 U.S. at 689; *see GBM*, 992 F.3d at 1324-25 (focusing on the "legally dispositive intent of the entire body of the Alabama legislature" and noting that determining subjective intent apart from the law is "near-impossible"); *cf.* U.S. Resp. 72 (criticizing a supposed citation of "one individual's offhand comment to conjecture on the state of mind of a [large] organization").

Fifth, the United States has no evidence to show that *anyone* who voted for or signed into law SB184 "expressed moral disapproval of transgender individuals," "reject[ed] their existence," or "repudiate[d] the[ir] identity." U.S. Resp. 66. The

United States' primary bit of evidence—Governor Ivey's statement of her belief that God made boys and girls—does none of these things, but instead contains two express propositions (both commonly held) and one implied one: (1) that biological sex is unchangeable, (2) that God created people, and (3) that most children with gender discordance come to realign with their natal sex.

None of this evidences moral disapproval of those who have a different gender identity, but instead raises the question (which the Governor then emphasized) of the best approach to help minors with gender dysphoria: "We should especially protect our children from these radical, life-altering drugs and surgeries when they are at such a vulnerable stage in life." DX82:244 (Caughey Dep. Ex. 49).

Taking each of the Governor's propositions in turn and starting with the immutability of biological sex, the United States believes that the Governor's statement *and* the legislative finding "that a person's sex 'cannot be changed'" are so obviously incorrect that they betray impermissible moral disapproval. U.S. Resp. 66. The notion that the *only* explanation for thinking that sex "cannot be changed" is moral animus is ludicrous. The Supreme Court—including its female Justices—has always shared this belief. *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) ("Physical differences between men and women, however, are enduring" and "[i]nherent."); *see Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). So does the Eleventh Circuit. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807-08 (11th Cir. 2022) (en banc) (emphasizing the "immutable characteristic of biological sex"); *Eknes-Tucker*, 80 F.4th at 1221, 1225,

114

1228, 1230 (referring to "biological sex").

The Endocrine Society thinks that biological sex is determined before birth. *See* DX40.57 (Shumer Dep. Ex. 3, *Considering Sex*) (explaining that "sex differences" "are innate" and "exist at molecular and cellular levels"); DX115:3875 (2017 Endocrine Society Guidelines defining "sex" as "attributes that characterize *biological* maleness or femaleness" (emphasis added)). The American Psychiatric Association's DSM-5—used to diagnose gender dysphoria—agrees. DX38:302 (sex "refer[s] to the biological indicators of male and female (understood in the context of reproductive capacity)"). The United States' own experts thought so, at least until this litigation. DX40:111 (Shumer Dep. Ex. 6, *Adolescent Care*) (defining sex as "[b]iological indicators of male and female"). *Even during this litigation*, the United States' expert conceded that "chromosomal sex" "is determined in the fertilized zygote," so the legislative finding—which, though omitted by the United States, refers to "chromosomes" and "endogenous hormone profiles" (Ala. Code § 26-26-2(1))— is correct by his own admission. DX39:13:2-14 (Shumer Dep.); *see id.* at 17:17– 19:15 (agreeing that one's endogenous hormones levels "are manifestations of the person's biological sex").

What's more, unchanging biological sex is how the gender transition providers decide which cross-sex hormone to prescribe, and why those hormones must be "continued indefinitely" "to promote the development and maintenance of those secondary sex characteristics" of the opposite sex. *Id.* at 95:9-23, 94:1-8; *see* DX115:3887 (2017 Endocrine Society Guidelines listing hormones by sex). It is precisely for that reason that the Act "discusses sex insofar as it generally addresses

treatment for discordance between biological sex and gender identity"—and also why the Act's (and some supporters') definition of "biological sex" is not gratuitous hate but central to a comprehensible regulation. *Eknes-Tucker*, 80 F.4th at 1228. As the Eleventh Circuit explained, the Act "simply reflects *real, biological differences between males and females*," and "refers to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based." *Id.* at 1228, 1231 (emphasis added); *accord Skrmetti*, 83 F.4th at 481-82. And according to the United States' expert, these transitioning procedures "do not change the chromosomal sex," "genetic sex," or "gonadal sex"—once again confirming the legislative finding and Governor's statement. DX39:81:13-20 (Shumer Dep.).

On top of all that, by the United States' own ideological phrasing—"sex assigned at birth," *e.g.*, U.S. Resp. 67—how could that "assigned" sex change? And how could defining sex as biological "preclude[] individuals from being transgender," *id.* at 69, unless the United States thinks that sex is the same as gender identity—seemingly contradicting everyone in this litigation? The United States has no answers—no explanation of how one's chromosomes can be changed, no explanation of how one's endogenous hormones profile can be changed, no explanation of how one's sex gametes can be changed, no explanation of how a generic definition of sex "precludes" (*id.*) anyone's gender identity, not even an explanation of how surgical fabrication of a neopenis or neovagina means that one's sex organs have actually been changed to the other sex's. Only in the topsy-turvy world of the United States' ideological ("moral," one might say) fervor is sex *mutable* and gender

116

identity *immutable*[268]—and the two simultaneously equivalent to each other.

In all events, even if there is some question about that mutability of biological sex, surely there is at least room for rational people to believe that biological sex cannot be changed without being smeared by the United States government as irrational hate-mongers.

Turning to the Governor's second proposition—that God created people—the United States does not suggest that one's views about how people came to exist has anything to do with moral disapproval. Someone who did not believe that God created people could still believe that sex is immutable, given the necessity for reproduction of the species. *E.g.*, DX38:302 (DSM-5 defining sex based on "the context of reproductive capacity"). So the United States' coy, three-time repetition of the Governor's passing reference to the "Good Lord" (U.S. Resp. 59 n.284, 66, 66 n.286) should be recognized for what it is: anti-religious bigotry.

This debate—like the Governor's own statement—has focused on the scientific evidence and the best way to protect children. Moral views on all sides inevitably play a role in debates like this, as they do in debates about *every* law, from murder laws to environmental laws to tax laws. *See, e.g., Jones v. Mississippi*, 593 U.S. 98, 120 (2021) (noting that States properly make "broad moral and policy judgments" "when enacting" laws). Whether "the arc of the moral universe … bends toward" sterilizing children with gender dysphoria, as one district court recently suggested,[269]

---

[268] *E.g.*, DX66:110:19-21 (Janssen Dep.) ("gender identity cannot evolve"); DX39:22:16-21 (Shumer Dep.) (gender identity is "likely" "innate").

[269] *Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF, 2024 WL 2947123, at *4 (N.D. Fla. June 11, 2024), *appeal filed sub nom. Doe v. Surgeon Gen., State of Fla.*, No. 24-11996 (11th Cir.).

or instead protecting their long-term autonomy, moral considerations are inescapable. And "[r]eligious people have moral views just like secular people do, and they're just as entitled as secular people to use the political process to enact their views into law." Eugene Volokh, *Is It Unconstitutional for Laws to Be Based on Their Supporters' Religiously Founded Moral Beliefs*, The Volokh Conspiracy (May 10, 2022), https://perma.cc/6NAQ-HE3H (emphasis omitted). "To say that religious arguments must be excluded from public debate, while equally unprovable secular moral arguments may continue to be made, would be to turn into second-class citizens those people whose basic moral views come from their religion." *Id.*

Finally, the United States calls the Governor's last proposition about desistance from childhood gender discordance "debunked," U.S. Resp. 59, but it is both true[270] and at minimum a contestable empirical question on which a rational legislator could reach this conclusion. *See id.* at 52 (acknowledging "studies showing that a large percentage of children diagnosed with gender identity disorder did not grow up to be transgender"). In any event, the Legislature's and the Governor's consideration of the desistance studies to come to the (correct) conclusion that most children desist is no more an expression of "morality" than the United States' competing understanding of those studies.

In sum, the United States' smears do nothing to change Alabama's legitimate

---

[270] *See, e.g.*, DX38:306 (DSM-5) ("Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%."); DX40:102 (Shumer Dep. Ex. 6, *Adolescent Care*) ("Estimates for the likelihood of gender dysphoria persisting from childhood into adulthood range from 2-27% depending on the study."); DX39:171:2-24, 172:23–173:1 (Shumer Dep.) (admitting that "that range sounds accurate" and that he is "not aware of any updated studies").

purpose in protecting children and regulating the practice of medicine.

###### b.     The Act has a rational relationship with Alabama's interests.

The United States' next broad contention is that the Act's justification of pro-tecting children is not "precisely and rationally correlated with [its] classification." U.S. Resp. 64; *see id.* at 67. As already explained, a "precise" correlation is foreign to rational basis review, and the United States quotes no case—at any level—adopt-ing the self-contradictory formulation of "precisely and rationally correlated." *See Heller*, 509 U.S. at 321 (explaining that the correlation may be "rough," "illogical," and "unscientific"—and still pass rational basis review); *see also Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 85 (1988) (emphasizing that it is irrelevant on rational basis review that a State "might have enacted a statute that more precisely serves [its] goals"). And the United States' arguments fall far short of disproving a *rational* connection between the Act and the goal of protecting children.

First, the United States complains that "puberty blockers entail equal risks when used to treat conditions like precocious puberty." U.S. Resp. 67. That's wrong,[271] but more importantly irrelevant. "[A] legislature need not strike at all evils at the same time, and [its] reform may take one step at a time, addressing itself to the phase of the problem which seems most acute." *Norwegian Cruise*, 50 F.4th at

---

[271] Even WPATH recognizes that "[w]hile GnRH analogs have been shown to be safe when used for the treatment of precocious puberty, there are concerns delaying exposure to sex hormones (endogenous or exogenous) at a time of peak bone mineralization may lead to decreased bone mineral density" and that "[t]he potential negative psychosocial implications of not initiating pu-berty with peers may place additional stress on gender diverse youth." DX116:S65-66 (SOC-8); *see also* DX39:85:1-4 (Shumer Dep.) (agreeing that "the[] goals of using puberty blockers to treat gender dysphoria are different from the goals of using puberty blockers to treat precocious pu-berty").

1138 (cleaned up); *see Clover Leaf Creamery*, 449 U.S. at 466.

Second, the United States says that "[t]he treatments banned by S.B. 184 are forms of medical care that health providers prescribe to individual patients where appropriate," that these treatments have "benefited" some patients, and that denying them "has caused minor patients in Alabama to suffer." U.S. Resp. 67. Again, all this is irrelevant even if true, given the undisputed facts that, for instance, these procedures entail *some* risks and that *some* children will seek to realign with their natal sex. *See supra* Part I.A. Even if "Alabama's statute is contrary to a wide spectrum of public and professional opinions" or "misguided," it "is not constitutionally irrational under rational basis scrutiny because it is rationally related to the State's legitimate power to protect" children. *Williams*, 240 F.3d at 952.

Third, the United States says that "[c]riminalization is highly unusual and departs from conventional mechanisms used by states to protect patient safety." U.S. Resp. 67. The United States identifies no rational basis case in which the type of sanction mattered one whit, which is unsurprising given that it "is irrelevant in rational-basis review" whether a State "could have chosen a less restrictive means." *Heller*, 509 U.S. at 313. The Legislature may seek to address perceived problems as it sees fit, as long as it is "rational to think that the challenged [law] would advance the government's stated purpose." *Cook*, 792 F.3d at 1301. And as the United States' own witness agreed, criminalizing conduct often better deters it—so better serves the State's compelling interest in protecting children.[272] Under the undisputed facts, the Act has a rational relationship to its goal of protecting children from risky

---

[272] *Daubert*.DX24:256:10-17 (Cohen Dep.).

medical interventions.

### 3. *Doe v. Ladapo* acknowledged that rational basis review is required.

Both Plaintiffs' and the United States' responses cite *Doe v. Ladapo*, in which the Northern District of Florida invalidated a similar Florida statute and certain medical regulations. That decision, which has been appealed, does not help them. First, even while citing the United States' troika of purported "rational basis plus" cases, the court contradicted the United States' theory: "[m]easures that are rationally related to achieving [a legitimate state interest]—even without evidence that they will actually achieve the intended result—survive rational-basis scrutiny." 2024 WL 2947123, at *28.

Second, in an extraordinary error, the United States claims that *Ladapo*, "applying rational basis review," "used this framework to strike down [the] law." U.S. Resp. 65; *id.* at 74 n.288 (asserting that the "primary holding of *Ladapo* is that Florida's gender-affirming care ban fails rational basis review").

That is incorrect. The United States repeatedly cites a passage purporting to take this route, *id.*, but just a few sentences later in a portion somehow missed by the United States, the court in *Ladapo* acknowledged that *Eknes-Tucker* precluded it:

> The order granting a preliminary injunction in this case concluded that the ban on care for minors also fails rational-basis scrutiny. ECF No. 90 at 12, 27. But *Eknes-Tucker* said, based on a different record, that Alabama's analogous ban survived rational-basis scrutiny. This strongly suggests—if it does not mandate a holding—that the Florida ban also survives rational-basis scrutiny. Absent *Eknes-Tucker*, this order would hold to the contrary.

2024 WL 2947123, at *28. The court thus *refused* to do what the United States says

it did; it did *not* "strike down" Florida's law on rational basis. That refusal makes sense, given that its view that the "risks of the kind presented here is not a rational basis" (*id.* at *35) is contrary to binding circuit precedent. *See Eknes-Tucker*, 80 F.4th at 1225 (holding that the "undisputed" "record evidence" "that the medications at issue present *some* risks" suffices "to establish" a rational basis); *contra* U.S. Resp. 65, 68 (United States repeatedly citing and quoting *Doe*'s rejection of "risks" as "a rational basis" without acknowledging this conflict with binding precedent).

Third, *Ladapo*'s actual holding was that heightened scrutiny applies based on supposed animus under *Arlington Heights*. *See* 2024 WL 2947123, at *15-28. That holding is highly suspect for many reasons, including that it disregards the "presumption of legislative good faith [that] directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 144 S. Ct. at 1235-36; *see* Br. of Alabama and 21 Other States as *Amici Curiae* Supp. Appellants' Mot. for Stay, *Doe v. Surgeon General*, No. 24-11996, Doc. 36-2 (11th Cir. July 19, 2024). In any event, as shown next, neither Plaintiffs nor the United States here pleaded facts underlying a similar claim, and even if they had, the purported actions of the Florida Legislature are irrelevant here. So *Ladapo* does not help the Plaintiffs or the United States.

In sum, the Act is subject only to rational basis review, as the Eleventh Circuit has held. And it easily passes that deferential standard. Because no purported factual dispute is material to that conclusion, this case is at an end.

## II.     Heightened Scrutiny Does Not Apply.

Plaintiffs and the United States try to avoid the Eleventh Circuit's *Eknes-*

*Tucker* precedent by introducing a new legal theory under *Arlington Heights* based on animus. But their operative complaints did not plead facts underlying such a theory, so that theory cannot be raised for the first time at summary judgment. Even if it could, Plaintiffs and the United States do not offer a cognizable heightened scrutiny theory, for they do not invoke a suspect classification that would implicate heightened scrutiny. And even if they did, they do not offer sufficient evidence to avoid summary judgment. Their belated effort to avoid summary judgment fails.

### A.   Neither Plaintiffs Nor the United States Pleaded an Arlington Heights Claim.

Defendants have pointed out at least five times that neither Plaintiffs nor the United States offered any factual allegations underlying a supposed *Arlington Heights* animus theory in their complaints. Doc. 601 at 21-27; Doc. 411 at 8-19 (providing a full background and argument about this issue); Doc. 200 at 15-17; Doc. 171 at 13-16; Doc. 158-1 at 15-17. The parties argued about this when the United States and then Plaintiffs sought third-party discovery from Eagle Forum and other private organizations, which could *only* be relevant if the plaintiffs had brought an *Arlington Heights* claim. E.g., Doc. 467 at 16-17 (hearing on Plaintiffs' Eagle Forum subpoena ). The Court rightly quashed those subpoenas. Docs. 192 & 469.

Indeed, the Eleventh Circuit has admonished district courts at the summary judgment stage *not* "to ignore what the respective parties alleged in their complaint and answer." *Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227 (11th Cir. 2013). "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald &*

*Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017).

Neither Plaintiffs nor the United States in their summary judgment responses address Defendants' repeated showings that no *Arlington Heights* claim has been pleaded. The United States hints that it recognizes the problem by carefully omitting "*Arlington Heights*" from its response, instead referring to a generic "animus" discriminatory intent theory. *See* U.S. Resp. 73. That is the same thing as *Arlington Heights*, and it is unpleaded for all the same reasons. Rather than repeat the points the Court already knows too well, Defendants simply refer the Court to their unrefuted showings that no discriminatory intent/*Arlington Heights* claim is before the Court. *E.g.*, Doc. 411 at 8-19; Doc. 601 at 21-27. Neither Plaintiffs nor the United States provide any *other* reason that heightened scrutiny would apply now, so rational basis review governs.

### B.   Neither Plaintiffs Nor the United States Offers a Viable *Arlington Heights* Claim.

Even if Plaintiffs and the United States had pleaded a claim of intentional discrimination, that claim could not get off the ground because they fail to identify a suspect classification. Plaintiffs and the United States say that the Legislature intended to discriminate against "transgender individuals." Plfs' Resp. 45; U.S. Resp. 66. But heightened scrutiny is required only when intentional discrimination is based on a suspect classification. The Supreme Court's "cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an *inherently suspect*

*characteristic*, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added) (citing examples). Absent a suspect classification, even cases of supposed "invidious discrimination" do not trigger heightened scrutiny. *Cleburne*, 473 U.S. at 446.

Plaintiffs and the United States do not invoke a suspect classification underlying their new intentional discrimination theory. The Eleventh Circuit has expressed "grave doubt that transgender persons constitute a quasi-suspect class," *Adams*, 57 F.4th 803 n.5 (cleaned up), and neither Plaintiffs nor the United States put forth any facts in their summary judgment papers suggesting otherwise. They also present no facts suggesting intentional discrimination against males or females. And age "is not a suspect classification," *id.* (citation omitted), so the only classification that *is* at work is no help to the plaintiffs. Because Plaintiffs and the United States have not suggested intentional discrimination against a suspect class, their theory would fail even if it had been pleaded.

> **C.   Neither Plaintiffs Nor the United States Offered Sufficient Evidence to Avoid Summary Judgment on an *Arlington Heights* Claim.**

Even if anyone had pleaded an *Arlington Heights* claim or identified a suspect classification, Defendants would be entitled to summary judgment on that claim. To avoid summary judgment, the nonmoving party must offer evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Copeland v. Ga. Dep't of Corr.*, 97 F.4th

766, 782 (11th Cir. 2024) (cleaned up). "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 585 U.S. 579, 603 (2018). "[W]hen a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters*, 32 F.4th at 1373 (quoting *Abbott*, 585 U.S. at 603). If Plaintiffs' evidence fails to "rule[] out" the "possibility" that the legislature acted for a permissible purpose, "that possibility is dispositive," *Alexander*, 144 S. Ct. at 1241, and the presumptively lawful act is deemed lawful. This presumption of legislative good faith "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* at 1235-36 (citing *Abbott*, 585 U.S. at 610-12). Particularly "in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall*, 414 U.S. at 427.

Here, Plaintiffs and the United States have not provided evidence that would plausibly support an *Arlington Heights* claim. To establish discriminatory intent, plaintiffs must address factors like "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures;" "(5) the contemporary statements and actions of key legislators," "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1317. "In this summary judgment context, when the defendant has pointed to the absence of evidence of discriminatory intent, it becomes

the plaintiffs' job to produce such evidence." *Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty.*, 193 F.3d 1285, 1294-95 (11th Cir. 1999).

Plaintiffs try out their new *Arlington Heights* claim by asserting that the Act disparately impacts transgender individuals, that other legislation points to discriminatory intent, and that the Act is "sweeping in nature." Plfs' Resp. 47-49. But they assert no evidence supporting this theory (*see id.* at 42-43)—as they must to avoid summary judgment—and none of their legal arguments would work to show discriminatory intent anyway.

First, discriminatory *impact*, while one of the *Arlington Heights* factors, is not enough to establish discriminatory *intent*. "[T]he Supreme Court has long held that 'discriminatory purpose implies more than intent as volition or intent as awareness of consequences.'" *Adams*, 57 F.4th at 810 (cleaned up). "Discriminatory impact alone is insufficient to show discriminatory purpose unless 'a clear pattern, *unexplainable on grounds other than [the suspect classification]*, emerges from the effect of the [legislative] action.'" *United States v. Byse*, 28 F.3d 1165, 1170 n.8 (11th Cir. 1994) (quoting *Vill. of Arlington Heights*, 429 U.S. at 266); *see also GBM*, 992 F.3d at 1322.

As shown, the State has abundant legitimate grounds for the Act that have nothing to do with sex or transgender status. The State has not, as Plaintiffs claim, "ban[ned] medical care only for transgender adolescents." Plfs' Resp. 47. It has instead restricted certain types of procedures for minors, regardless of the patient's sex or status, and allowed other care. *See Eknes-Tucker*, 80 F.4th at 1228. "[M]ost legislation" inevitably affects "various groups or persons" more than others, *Romer*,

517 U.S. at 631, but that does not demonstrate that the legislature acted "because of" any "adverse effects." *Adams*, 57 F.4th at 810.

For example, the Supreme Court recently rejected an *Arlington Heights* claim premised on the fact that an immigration policy would disproportionately affect a certain group: "[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (citation omitted). "It is a settled rule that the Fourteenth Amendment guarantees equal laws, not equal results." *Jones v. White*, 992 F.2d 1548, 1573 (11th Cir. 1993) (cleaned up); *see also Rodriguez ex rel. Rodriguez v. United States*, 169 F.3d 1342, 1353 (11th Cir. 1999) (that the law "treats some [individuals] differently" is "insufficient" to show "animus-based or 'invidious' discrimination").

Plaintiffs do not provide facts supporting any of the other *Arlington Heights* factors, either. Instead, they invoke a supposed "wave of legislation targeting transgender people" that they say shows discriminatory intent. Plfs' Resp. 48. While the historical background and sequence of events leading to a particular law may be used to show ulterior motives, *GBM*, 992 F.3d at 1317, Plaintiffs have not pointed to any link between the development of SB184 and any other legislation. In fact, Plaintiffs' "wave" consists of a single law enacted the same day as SB184—one of

almost 50 wide-ranging laws enacted that week[273]—and another law passed a year earlier. Neither of these laws has been declared discriminatory, Plaintiffs do not explain how they were enacted with discriminatory intent, and even the United States' putative expert agreed that there are many valid reasons for a State to, for instance, "prohibit boys from playing in girls' sports." DX79:287:1-21 (Caughey Dep.).[274] Plaintiffs never explain how other laws that also do not discriminate could be "the best evidence" that SB184 was enacted due to "animus." Plfs' Resp. 48. Regardless, even a finding of past discrimination does not change "the presumption of legislative good faith." *Abbott*, 585 U.S. at 603.

Aside from these, Plaintiffs point only to legislation passed by other states, Plfs' Resp. 48-49, without bothering to connect them to the intentions of Alabama's Legislature. And again, to the extent that half the country has passed similar laws, "[a]re we to believe that the hundreds of lawmakers whose votes were needed to enact these laws" *all* acted out of animus? *Dobbs*, 597 U.S. at 254. And what about all the European countries that have restricted these interventions—bigots all?

---

[273] *E.g.*, 2022 Ala. Acts 222 (enacted Apr. 4, 2022) (benefits for retired public school teachers); 2022 Ala. Acts 248 (enacted Apr. 5, 2022) (support for small businesses started by ex-offenders); 2022 Ala. Acts 270 (enacted Apr. 7, 2022) (appropriations for all branches of state government).

[274] Plaintiffs' summary of other laws—without context or elaboration—is egregiously wrong. *See* Plfs' Resp. 48. Ala. Code § 16-40A-5 is not focused on transgender identity, but prohibits "classroom instruction regarding sexual orientation or gender identity in a manner that is not age appropriate or developmentally appropriate for students in accordance with state standards." Ala. Code § 16-1-54 does not "bar[] transgender people from restrooms," Plfs' Resp. 48, but provides for sex-separated bathrooms, just like policies that the en banc Eleventh Circuit has recently held do not intentionally discriminate based on transgender status. *See Adams*, 57 F.4th at 810-11. It is not possible to have two bathrooms that are both sex- and gender identity-separated, and Alabama's law does not refer to gender identity or transgender status. Last, Ala. Code § 16-1-52 does not "ban[] transgender students from participating in school sports," Plfs' Resp. 48, but sets out sex-based rules to determine which sports teams schoolchildren may play on (again without reference to gender identity or transgender status).

Plaintiffs' last claim is that the Act must be born of discrimination simply because it is "highly restrictive." Plfs' Resp. 49. The first "key problem" with this claim "is that a law premised only on animus toward the transgender community would not be limited to [minors]"—"[t]he legislature plainly had other legitimate concerns in mind." *Skrmetti*, 83 F.4th at 487. And while the "the availability of less discriminatory alternatives" may be relevant to the *Arlington Heights* inquiry, *GBM*, 992 F.3d at 1317, Plaintiffs have not offered any such alternatives that would adequately cover Defendants' compelling interest in protecting children. For instance, Plaintiffs suggest that they want a "safe harbor for medical research," Plfs' Resp. 49, but Alabama is not required to volunteer its children as guinea pigs for sterilizing interventions.[275] As Plaintiffs' own case explains, "the fact that 'the [legislature] did not include the alternative options that Plaintiffs would have preferred' is not evidence of discriminatory intent." *League of Women Voters*, 66 F.4th at 940 (quoting *GBM*, 992 F.3d at 1327). "The legislative branch is not hamstrung by judicial review to adopt any amendment that a bill's opponents claim would improve it." *Id.*

As for the United States, it offers a single purported fact: that "S.B. 184's actual purpose is to express moral disapproval, i.e., to repudiate the gender identity of transgender minors." U.S. Resp. 59 & n.284. The United States does not explain the connection between "express[ing] moral disapproval" and intentional discrimination, much less pretend that this asserted fact—whatever it might mean—would

---

[275] Nor, in any event, would such a harbor be helpful to Plaintiffs because no one at the UAB pediatric clinic conducts research, much less clinical trials, regarding the safety or effectiveness of pediatric gender transition treatments. *See* DX33:77:4–78:15, 81:4-9 (Ladinsky Dep.);

suffice to prove any intentional discrimination claim. Instead, the United States says that it "is prepared to present evidence of animus to establish that heightened scrutiny applies here." *Id.* at 73. That promise, detached from any evidence *now*, cannot defeat summary judgment. Fed. R. Civ. P. 56(c). The time to offer facts demonstrating (or even alleging!) discriminatory intent is long past. *See supra* Part II.A.

The United States' single "fact" is grossly deficient regardless. The United States first (mis)cites the legislative finding that "[t]he sex of a person is the biological state of being female or male, based on sex organs, chromosomes, and endogenous hormone profiles, and is genetically encoded into a person at the moment of conception, and it cannot be changed." Ala. Code § 26-26-2(1). As discussed exhaustively, this definition of sex accords with reality and is, at minimum, a reasonable view of the evidence—even the United States' experts view sex and gender identity differently. *See generally supra* Part I.B.2. The idea that "sex" "refer[s] only to biological distinctions between male and female" was assumed by the Supreme Court in *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020), and "long has been held—and continues to be held—in good faith by reasonable and sincere people here and throughout the world," *Obergefell v. Hodges*, 576 U.S. 644, 657 (2015). "One may disagree with this belief," but it is incredible to "question the good faith of" those who (correctly) think that genes and endogenous hormones cannot be changed. *Dobbs*, 597 U.S. at 254. "Sincere disagreement on a disputed philosophical question about human nature does not entail hostility or hatred toward those who disagree." *State v. Loe*, No. 23-0697, 2024 WL 3219030, at *18 (Tex. June 28, 2024) (Blacklock, J., concurring). And this Court could not adopt the United States' argument

that those who disagree must be infected with animus without "impos[ing] on the people a particular theory about" human psychology and biology and thereby "substitut[ing] [a litigant's] social … beliefs for the judgment of legislative bodies." *Dobbs*, 597 U.S. at 263, 300; *see Loe*, 2024 WL 3219030, at *20-22 (Blacklock, J., concurring).

Otherwise, the United States simply quotes its own (belatedly disclosed, Doc. 601 at 12-20) expert's report "discussing statements" from *one* legislator and the Governor. U.S. Resp. 59 n.284.[276] "As a general matter, determining the intent of the legislature is a problematic and near-impossible challenge." *GBM*, 992 F.3d at 1324. Thus, the Supreme Court "has long disfavored arguments based on alleged legislative motives," "recogniz[ing] that inquiries into legislative motives "are a hazardous matter." *Dobbs*, 597 U.S. at 253 (collecting cases). "Even when an argument about legislative motive is backed by statements made by legislators who voted for a law," courts are "reluctant to attribute those motives to the legislative body as a whole." *Id.* at 253-54. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 254.

The Governor's statement—and the United States' motivations in selectively quoting it thrice—is addressed *supra* Part I.B.2.a. As for the statement from Rep.

---

[276] Strangely, the United States includes within its citation a centerpiece of its expert's claim—that "the Legislature" "rejected an attempt to exempt psychotherapy"—that the expert admitted was wrong. *See* Doc. 601 at 11-12, 46; *Daubert*.DX35:¶65 (Caughey Rebuttal Rep.); DX79:174:23–175:1 (Caughey Dep.) ("I missed the inclusion of that language"); *see also* Ala. Code § 26-26-6 ("Except as provided for in Section 26-26-4, nothing in this chapter shall be construed as limiting or preventing psychologists, psychological technicians, and master's level licensed mental health professionals from rendering the services for which they are qualified by training or experience involving the application of recognized principles, methods, and procedures of the science and profession of psychology and counseling.").

Allen about his own "biblical worldview" that "there are only two sexes," he did not say—as the United States wrongly states—that was "a motivation behind the legislation." U.S. Resp. 59 n.284. Rep. Allen was not even discussing SB184, but a predecessor bill in 2021. In any event, regardless of where his worldview came from, and regardless if it was a motivation for him as an individual legislator to support the Act, it would not matter: Rep. Allen's (correct) view that sex is genetic is not animus, and a proper understanding of biological sex is central to transitioning treatments and thus the Act's regulations. *See Eknes-Tucker*, 80 F.4th at 1228. What's more, the source relied on by the United States' expert provides Rep. Allen's *actual* motivation—"we need to treat those patients and those kids and try to help them and not give them these powerful drugs"[277]—but the United States left that part out. Rep. Allen also "said minors with gender dysphoria should receive counseling from mental health professionals but not medications that could have permanent effects."[278] The three hearings cited by the United States' expert share that theme, showing that SB184's sponsors repeatedly emphasized their overriding interest in protecting children from unproven, sterilizing gender transition procedures.[279]

     Thus, even the United States' cherry-picked statements focus on concern for

---

[277] Mike Cason, *Alabama lawmakers again seek to ban transgender treatments for minors*, AL.com (Jan. 6, 2021), https://www.al.com/news/2021/01/alabama-lawmakers-again-seek-to-ban-transgender-treatments-for-minors.html.

[278] *Id.*

[279] *See* DX79:175:12–177:11 (Caughey Dep.) (expert admitting that he omitted Sen. Shelnutt's explicit "explanation" for the bill: "to protect our children"); *Daubert*.DX36:31:05–32:02 (Caughey Dep. Ex. 40, Senate Committee Hearing) (Sen. Shelnutt: "[T]his bill is strictly about just protecting children."); *Daubert*.DX37:7:04–10:55, 26:32-40 (Caughey Dep. Ex. 41, House Committee Hearing) (Rep. Allen: "This bill is simply to protect kids and to protect children."); *see also Daubert* DX38:8:18–17:06 (Caughey Dep. Ex. 48, Capital Journal Video) (Rep. Allen: "[I]t's really about protecting children and protecting their bodies.").

the well-being of children. Those statements are *far* from enough to show, as the United States must, "that the legislature as a whole was imbued with [improper] motives." *Brnovich*, 594 U.S. at 689. Plaintiffs and the United States point to no evidence obtained in discovery or otherwise that would support imputing animus to these two legislators and the Governor, much less extrapolating animus from these individuals to the Legislature as a whole. Not even their expert on the subject tried to make that leap. *See* DX79:60:21-23 (Caughey Dep.) ("I didn't opine on the legislative intent behind the bill."); *id.* at 68:3-6 ("I'm not opining on the—specifically on the legislative intent of the—of the legislature."); *id.* at 81:20-22 ("I can't speak to the motivations of any of the specific legislators."); *id.* at 335:9-12 (responding, "No," when asked "do you opine on the legislative intent behind passing SB184[?]"); *id.* 335:13-18 (responding, "No," when asked whether he was opining "on any legislators' individual intent" or "motivation in passing SB184"). He "could not name more than two members of the Alabama Legislature who voted on SB184, did not know how many members are in the Alabama House or Senate, never spoke to any members about SB184, did not know the last time he spoke to *anyone* in Alabama, and has not been to Alabama in 15 years." Doc. 601 at 47. And Plaintiffs and the United States have no other evidence—much less any that they properly present here, as they must to avoid summary judgment.

In sum, even if Plaintiffs or the United States had pleaded facts underlying an intentional discrimination claim or identified a legally coherent claim, they have not presented evidence to avoid summary judgment. Because they cannot overcome the "presumption that the legislature acted in good faith," their unpled claim would fail.

*Alexander*, 144 S. Ct. at 1235. Heightened scrutiny does not apply.

### III.   The Act Would Satisfy Heightened Scrutiny.

Even if heightened scrutiny applied, the Act would satisfy it. There is no question that the State's interest in protecting children is "compelling," *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020), as is the State's interest in regulating the practice of medicine, *Gonzales*, 550 U.S. at 157. And the Act is "substantially related" to these objectives. *Virginia*, 518 U.S. at 533. A "substantial relation" "does not demand a perfect fit between means and ends," *Eknes-Tucker*, 80 F.4th at 1226, but merely "sufficient probative evidence" showing a relationship, *Danskine v. Miami Dade Fire Dep't*, 253 F.3d 1288, 1294 (11th Cir. 2001).[280] And "[i]ntermediate scrutiny permits 'the legislature to make a predictive judgment' based on competing evidence." *Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) (brackets omitted) (quoting *Brown*, 564 U.S. at 799-800).

Many underlying facts here are undisputed: the interventions have risks, some unknown; they negatively affect fertility; minors are reticent to discuss fertility, and less capable of doing so; some children desist; practically no long-term studies exist; and psychotherapy has no similar risks. *See supra* Part I.A. The Act covers these and only these interventions, permitting similar interventions for adults and excepting disorders of sex development. Ala. Code §§ 26-26-4, -6. Especially given the "wide

---

[280] For instance, while "a correlation of 2%" between the classification and the relevant conduct is "an unduly tenuous 'fit,'" "a legitimate, accurate proxy" is constitutionally acceptable. *Craig v. Boren*, 429 U.S. 190, 202 (1976); *see, e.g.*, *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981) (upholding the exclusion of women from selective-service registration even though "a small number of women could be drafted for noncombat roles"); *Califano v. Webster*, 430 U.S. 313, 318 n.5 (1977) (per curiam) (upholding a statute providing higher Social Security benefits for women than for men because "women on the average received lower retirement benefits than men.").

discretion" States have "to pass legislation in areas where there is medical and scientific uncertainty," *Gonzales*, 550 U.S. at 163, these undisputed facts establish a substantial relationship between limiting these interventions to adults and the purpose of protecting children. The Act need not "be capable of achieving its ultimate objective in every instance," and it may leave some areas for future regulation. *Nguyen v. INS*, 533 U.S. 53, 70 (2001). Other jurisdictions are responding to this issue in similar ways—the United Kingdom has banned puberty blockers for minors by private providers,[281] and the Biden Administration responded to the public outcry that followed disclosure of evidence produced by HHS and WPATH in this case by announcing that it now agrees with Alabama that transitioning surgeries for minors are improper.[282] As other countries have found, "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits."[283] Alabama's Act has a substantial relation to its interest in protecting children.

Plaintiffs have no response. The United States' only response is to complain that Defendants "fail[ed] to identify the operable classification." U.S. Resp. 73. That's because there is no suspect classification—as the Eleventh Circuit already held. In any event, one could pretend that the "operable classification" is either one that the United States invokes—"sex and transgender status" (*id.*)—and the Act would still satisfy heightened scrutiny for the same reasons. "If Alabama's statute

---

[281] U.K. Department of Health and Social Care, *New restrictions on puberty blockers* (May 29, 2024), https://perma.cc/Y4VY-TB4C; *see also* DX83:88-90 (Caughey Dep. Ex. 54, *England Bans Puberty Blockers For Minors*).

[282] *See* Roni Caryn Rabin et al., *Biden Administration Opposes Surgery for Transgender Minors*, N.Y. TIMES (June 28, 2024), https://www.nytimes.com/2024/06/28/health/transgender-surgery-biden.html.

[283] DX103:3 (Swedish Summary).

involves a sex-based classification that triggers heightened scrutiny, it does so because it is otherwise impossible to regulate these drugs differently when they are prescribed as a treatment for gender dysphoria than when they are prescribed for other purposes." *Eknes-Tucker*, 80 F.4th at 1232 (Brasher, J., concurring). And if Alabama's statute (somehow) involved a transgender-status-based classification on the (incorrect and irrelevant[284]) assumption that only transgender individuals might seek the regulated procedures, and that classification (despite *Adams* and *Eknes-Tucker*, 80 F.4th at 1230) triggered heightened scrutiny, again it would be "impossible to regulate these" specific treatments any other way. *Id.*

Of course, this is all academic because only rational basis review applies. But the Act would survive even heightened scrutiny.

## CONCLUSION

For over two years, the State of Alabama has been forced to defend itself from unwarranted accusations of animus and bias simply for acting to protect vulnerable children suffering from gender dysphoria. Defendants want to ensure that the Court—and the public—understands that the Alabama Legislature acted in good faith when it passed the Vulnerable Child Compassion and Protection Act in April 2022, and that given all that has been uncovered in discovery, its judgment was not only rational, but right.

But the complexity of the underlying issues, and the parties' disagreement about what is best for Alabama's children, should not mask the simplicity of the legal issue before the Court. "[T]hese types of issues are quintessentially the sort

---

[284] *See* Doc. 74 at 93-97.

that our system of government reserves to legislative, not judicial, action." *Eknes-Tucker*, 80 F.4th at 1231. And under the governing standard, it "makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength." *Vance*, 440 U.S. at 112 (citation omitted). Indeed, that some facts *are* disputed simply confirms that the choice was the Legislature's to make.

Alabama acted to protect children from procedures it determined are harmful and unproven. The constitutional guarantees of equal protection and due process do not forbid this effort. The Court should grant Defendants summary judgment.

Dated: August 5, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 5, 2024, I electronically filed this document using the

Court's CM/ECF system, which will serve counsel of record.


s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for State Defendants*