# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | |
| Hon. Steve Marshall, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## PLAINTIFF-INTERVENOR UNITED STATES OF AMERICA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. DANIEL SHUMER, COMBINED MOTIONS IN LIMINE TO EXCLUDE TESTIMONY OF I. GLENN COHEN AS AN IMPROPER REBUTTAL WITNESS AND AS CONTRARY TO RULE 702, AND COMBINED MOTIONS IN LIMINE TO EXCLUDE TESTIMONY OF DEVIN CAUGHEY AS AN IMPROPER REBUTTAL WITNESS, AS IRRELEVANT UNDER RULE 402, AND AS CONTRARY TO RULE 702

## Table of Contents

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

ARGUMENT ....................................................................................5

    I.     Profs. Cohen and Caughey Are Proper Rebuttal Witnesses
           Because They Offer Testimony Solely to Rebut Defendants'
           Expert Evidence. ...................................................................5

           A. Prof. Cohen's Testimony About the Off-Label Prescription
              of Medication and the Criminalization of Medical Care
              Appropriately Rebuts Testimony by Defendants' Experts. .............6

                 1.  Prof. Cohen's Testimony Properly Rebuts Defendant
                      Experts' Assertions About FDA Off-Label Prescribing. ......6

                 2.  Prof. Cohen's Testimony Properly Rebuts Defense Experts'
                      Assertions that S.B. 184 Appropriately Protects Minors. ...11

           B. Prof. Caughey's Testimony Rebuts Defendants' Experts'
               Opinions that the Purpose of S.B. 184 Is to Protect Minors..........16

           C. Even If This Court Concludes that Profs. Cohen and
              Caughey's Reports Are Not Rebuttal, the Court Should Not
              Exclude Their Testimony Because the Timing of the
              Disclosures Is Substantially Justified and Harmless to
              Defendants..............................................................21

    II.    The Court Should Deny Defendants' Motions to Exclude the
           United States' Experts Because They Are Qualified, Employ
           Reliable Methods, Are Helpful to This Court, and Offer
           Relevant Testimony....................................................27

           A. Prof. Caughey's Testimony Is Admissible Because It Is
              Relevant to Understanding Legislative Intent and Is Based
              on the Same Methodologies Prof. Caughey Uses in His
              Scholarship. ..........................................................29

                 1.  Prof. Caughey's Testimony Is Relevant to the United States'
                      Equal Protection Claim Because He Opines on Facts
                      Relevant to the Arlington Heights Factors Used to Evaluate
                    Legislative Intent. .............................................29

i.      Prof. Caughey's Testimony Is Relevant to Several *Arlington Heights* Factors. ...................................30

ii.     Courts Use the *Arlington Heights* Factors to Evaluate Intent, Which Is Relevant to Any Equal Protection Claim, Regardless of the Applicable Standard of Review. .............................................34

iii.    The United States Adequately Pleaded an Equal Protection Claim, and This Court Has Already Rejected Defendants' Attempt to Dispose of a Portion of That Claim..........................................37

iv.     Prof. Caughey Appropriately Disclaimed Any Opinion About the Ultimate Legal Question of Intent or Any Legislator's State of Mind. ...........40

2.  Prof. Caughey's Opinions Are the Product of Reliable Methodologies That He Uses as a Professor and Researcher. ................................................................................41

i.      Prof. Caughey's Indices Are Reliable and Helpful. .................................................................42

ii.     Prof. Caughey's Discussion of Recent Legislative Action Hostile to LGBT Rights Is Reliable. ........48

iii.    Prof. Caughey's Discussion of S.B. 184 Is Reliable Even Though He Does Not Recite Every Fact Involved in the Legislative History of S.B. 184 Because He Includes Sufficient Facts.................50

B. Prof. Cohen's Testimony About Off-Label Prescribing Being Widespread and the Availability of Government Interventions Besides Criminalization to Address Patient Safety Concerns Is Admissible. .....................................................52

1.  Prof. Cohen Is Qualified to Testify About the Frequency of Off-Label Prescribing.................................................53

2.  Prof. Cohen's Opinions Regarding Off-Label Prescribing and Criminal Sanctions for Unlawful Prescription are Sufficiently Reliable. ....................................................56

3.  Prof. Cohen's Testimony Is Relevant and Helpful Because it Rebuts Defendants' Experts Opinions and Relates to Whether Patient Safety Concerns Are a Rational Basis for Criminalizing the Medical Care at Issue. ..............................................................................60

C. This Court Should Admit Dr. Shumer's Testimony. .....................62

1.  Dr. Shumer's Testimony About the Provision of Gender-Affirming Medical Care to Youth Is Admissible Because He Is Qualified to Opine on This Topic and His Testimony Is Reliable and Helpful. ................................ 64

2.  Dr. Shumer's Testimony About Increased Mental Health Problems and Suicidality as Consequences of Being Denied Gender-Affirming Medical Care Is Reliable. .... 70

3.  Dr. Shumer's Testimony About the Biological Foundation of Gender Identity Is Admissible. ............... 77

CONCLUSION ................................................................................. 83

# Table of Authorities

## Cases

*Abbott v. Perez*,
  585 U.S. 579 (2018) ............................................................32

*Adacel, Inc. v. Adsync Techs.*,
  No. 6:18-cv-1176-Orl-78EJK, 2020 WL 4588415
  (M.D. Fla. July 9, 2020) ..................................... 7, 10, 15

*Ahmed v. Johnson & Johnson Healthcare Sys.*,
  No. 1:22-00190-KD-N, 2024 WL 693078
  (S.D. Ala. Feb. 20, 2024)......................................................5

*Allison v. McGhan Med.*ַ
  184 F.3d 1300 (11th Cir. 1999)............................................28

*Allstate Ins. v. Hugh Cole Builder, Inc.*,
  137 F. Supp. 2d 1283 (M.D. Ala. 2001)..............................81

*Am. Gen. Life Ins. v. Schoenthal Family, LLC*,
  555 F.3d 1331 (11th Cir. 2009)............................. 57, 58, 59

*Atl. Rim Equities v. Slutzky, Wolfe & Bailey, LLP*,
  No. 1:04-cv-2647-WSD, 2006 WL 5159598
  (N.D. Ga. Nov. 21, 2006)....................................................28

*City of S. Miami v. Desantis*,
  No. 19-cv-22927-BLOOM/Louis, 2020 WL 7074644
  (S.D. Fla. Dec. 3, 2020).....................................................41

*Clena Invs. v. XL Specialty Ins.*,
  280 F.R.D. 653 (S.D. Fla. 2012) ............................ 54, 65, 68

*Columbus Bd. of Educ. v. Penick*,
  443 U.S. 449 (1979) .............................................. 31, 49

*Commodores Entm't Corp. v. McClary*,
  879 F.3d 1114 (11th Cir. 2018)............................................40

**Cases (Cont.)**

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993) ................................................................. 28, 57, 67

*Dep't of Ag. v. Moreno*,
  413 U.S. 528 (1973) .................................................................36

*Doe v. Ladapo*,
  Case No. 4:23cv114-RH-MAF, 2024 WL 2947123
  (N.D. Fla. June 11, 2024) ......................................................... 33, 73

*Easterwood v. Husqvarna Prof'l Prods.*,
  576 F. Supp. 3d 950 (M.D. Ala. 2021)..........................................81

*Edwards v. Fla. Dep't of Corr.*,
  No. 1:15cv17-MW/GRJ, 2015 WL 11109376
  (N.D. Fla. Nov. 18, 2015)................................................... passim

*Eknes-Tucker v. Gov. of Ala.*,
  80 F.4th 1205 (11th Cir. 2023)............................................. 3, 4, 24, 36

*Eknes-Tucker v. Marshall*,
  603 F. Supp. 3d 1131 (M.D. Ala. 2022)........................................3, 23

*Fla. State Conf. of Branches v. Byrd*,
  No. 4:23cv215-MW/MAF, 2024 WL 1349099
  (N.D. Fla. Mar. 4, 2024)..........................................................41

*Fuller v. SunTrust Banks*,
  No. 1:11-CV-784-ODE, 2019 WL 5448206
  (N.D. Ga. Oct. 3, 2019) ..................................................... passim

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
  992 F.3d 1299 (11th Cir. 2021)................................................ 32, 35

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  638 F. Supp. 3d 227 (E.D.N.Y. 2022)..........................................54

**Cases (Cont.)**

*Jabil Circuit v. Speedline Techs.*,

    No. 8:09-cv-1596-T-27EAJ, 2010 WL 11629048
    (M.D. Fla. Nov. 19, 2010) ...................................................................25

*Johnson v. City of Shelby*,

    574 U.S. 10 (2014) ...........................................................................37

*Kamakahi v. Am. Soc'y for Reprod. Med.*,

    305 F.R.D. 164 (N.D. Cal. 2015) ........................................................54

*Koger v. Dart*,

    950 F.3d 971 (7th Cir. 2020) ...............................................................38

*Kumho Tire Co. v. Carmichael*,

    526 U.S. 137 (1999) ............................................... 43, 51, 57, 74

*Lamonica v. Hartford Ins. Co.*,

    336 F.R.D. 682 (N.D. Fla. 2020)................................................ 23, 25

*League of Women Voters of Fla. v. Fla. Sec'y of State*,

    66 F.4th 905 (11th Cir. 2023).................................................. 30, 32, 35

*Lebron v. Royal Caribbean Cruises*,

    Case No. 16-24687-CIV-WILLIAMS/SIMONTON,
    2018 WL 3583002 (S.D. Fla. July 26, 2018) .................................. 15, 17, 67, 68

*Lee-Bolton v. Koppers, Inc.*,

    Case No. 1:10-cv-253-MCR-GRJ, 2015 WL 11110547
    (N.D. Fla. July 28, 2015)...................................................................23

*Long v. E. Coast Waffles*,

    762 F. App'x 869 (11th Cir. 2019)........................................................22

*Maier v. Green Eyes USA, Inc.*,

    Case No. CV409-172, 2011 WL 13153114
    (S.D. Ga. Mar. 2, 2011) .......................................................... 24, 25, 26

**Cases (Cont.)**

*Mighty v. Miami-Dade Cnty.*,

No. 14-23285-CIV-MORENO/MCALILEY,
2019 WL 4306942 (S.D. Fla. Aug. 9, 2019) ................................................ 10, 15

*Miss. Univ. for Women v. Hogan*,

458 U.S. 718 (1982) .................................................................................37

*Moore v. Intuitive Surgical, Inc.*,

995 F.3d 839 (11th Cir. 2021) .................................................................54

*Morrison v. Mann*,

244 F.R.D. 668 (N.D. Ga. 2007) .............................................................23

*Ohio State Troopers Ass'n v. Point Blank Enters.*,

No. 18-CV-63130-RUIZ/STRAUSS, 2020 WL 1666763
(S.D. Fla. Apr. 3, 2020) ...................................................................... 12, 14, 17

*Pandya v. Marriott Hotel Servs.*,

552 F. Supp. 3d 1364 (N.D. Ga. 2021) .......................................... 6, 8, 11

*Pitts v. HP Pelzer Auto. Sys.*,

331 F.R.D. 688 (S.D. Ga. 2019) ..............................................................22

*Reese v. CSX Transp.*,

No. 118-215, 2020 WL 5740253
(S.D. Ga. Sept. 24, 2020) .........................................................................8

*Rider v. Sandoz Pharms.*,

295 F.3d 1194 (11th Cir. 2002) ........................................................ 43, 57

*Romer v. Evans*,

517 U.S. 620 (1996) .................................................................................36

*Suarez v. City of Hollywood*,

No. 116-62215-CIV-DIMITROULEAS,
2018 WL 11351533 (S.D. Fla. Nov. 9, 2018) .............................. 57, 58

**Cases (Cont.)**

*Teledyne Instruments, Inc. v. Cairns*,

    No. 6:12-cv-854-Orl-28TBS, 2013 WL 5781274
    (M.D. Fla. Oct. 25, 2013) ............................................................ 10, 15

*Trump v. Hawaii*,

    585 U.S. 667 (2018) ...............................................................36

*United States v. Brown*,

    415 F.3d 1257 (11th Cir. 2005).................................................29

*United States v. Frazier*,

    387 F.3d 1244 (11th Cir. 2004)............................................. passim

*United States v. Gold*,

    743 F.2d 800 (11th Cir. 1984) ....................................................5

*United States v. Marengo Cnty. Comm'n*,

    731 F.2d 1546 (11th Cir. 1984)............................................. 31, 50

*United States v. Sanchez-Garcia*,

    98 F.4th 90 (4th Cir. 2024) ......................................................32

*United States v. Virginia*,

    518 U.S. 515 (1996) ...............................................................37

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

    429 U.S. 252 (1977) ....................................... 31, 32, 35, 38

*Williams ex rel. Breaseale v. Coleman Co.*,

    No. 4:11–cv–02384–KOB, 2015 WL 4077272
    (N.D. Ala. July 6, 2015) ..................................................... 65, 67

*Wright v. Hyundai Motor Mfg. Ala.*,

    Civil Action No. 2:08CV61-SRW, 2010 WL 4739486
    (M.D. Ala. Nov. 16, 2010) .................................................. 22, 23

**Statutes**

Alabama Vulnerable Child Compassion and Protection Act,

  Ala. Code §§ 26-26-1 to -9 (2022) ...................................................................3, 10

**Rules**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ................................................... 5, 7, 12, 16

Fed. R. Civ. P. 37(c)(1) ................................................................ 6, 21, 22

Fed. R. Evid. 401(a) ................................................................................61

Fed. R. Evid. 702 ............................................................................ passim

Fed. R. Evid. 702 (b) ..............................................................................51

Fed. R. Evid. 704 ...................................................................................40

# INTRODUCTION

This Court should deny Defendants' motions to limit or exclude the testimony of three of the United States' expert witnesses.[1] Reflecting the complex factual issues before this Court, these witnesses offer testimony in a variety of disciplines: pediatric endocrinology, political science, and the law of healthcare regulation. Each expert is qualified to offer their opinions, which are sufficiently reliable and will help this Court understand why Defendants' supposed justifications do not provide a rational basis for criminalizing the medical care at issue and the legislature's actual intent in passing the law. Defendants' arguments for limiting or foreclosing the United States' expert testimony are unpersuasive and, at best, go to the weight and not the admissibility of the experts' opinions.

First, relying on an unjustifiably narrow view of rebuttal testimony, Defendants try to exclude the testimony of Prof. I. Glenn Cohen and Prof. Devin Caughey as improper rebuttal witnesses. Yet Profs. Cohen and Caughey offer their testimony solely for the purpose of contradicting the assertions of Defendants'

---

[1] The United States understands Defendants' three filings to be five motions, such that the United States is permitted to file a response not exceeding 100 pages. *See* Initial Order Governing All Further Proceedings, at 10 (Aug. 25, 2022) ("responses shall be limited to twenty pages"). In addition to the motion seeking to exclude the testimony of Dr. Shumer (ECF No. 599), Defendants offer multiple motions to exclude the testimony of Prof. Cohen and Prof. Caughey. *see* Defendants' Combined Motions in Limine to Exclude Testimony of I. Glenn Cohen as an Improper Rebuttal Witness and as Contrary to Rule 702, ECF No. 600; Defendants' Combined Motions in Limine to Exclude Testimony of Devin Caughey as an Improper Rebuttal Witness, as Irrelevant Under Rule 402, and as Contrary to Rule 702, ECF No. 601. However, out of an abundance of caution, the United States has submitted a motion for excess pages for this brief.

1

experts. In fact, both rebuttal reports specifically cite Defendants' experts' assertions as the basis of their rebuttal opinions. This Court should reject Defendants' overly restrictive approach to rebuttal testimony and consider the professors' opinions. Alternatively, this Court should exercise its discretion to accept Profs. Cohen and Caughey's testimony as late-filed initial reports if it disagrees that the United States experts' rebuttal was proper because the timing of the expert disclosures was substantially justified and harmless to Defendants.

Second, Defendants argue that each expert's testimony is inadmissible because of supposed flaws in their methodologies or the relevance of their opinions. To oppose Prof. Caughey's testimony, for example, Defendants renew an argument this Court previously disposed of in considering Defendants' partial motion for judgment on the pleadings. For Prof. Cohen, Defendants assert he is unqualified to opine on the regulation of off-label drugs because he is not a physician, even though he is an expert in health law and bioethics. And for Dr. Shumer, Defendants attack the admissibility of opinion testimony that he is not even purporting to provide: the specific practices of Alabama providers. Defendants offer a range of other minor criticisms that do not undermine the fundamental reliability of the experts' opinions. Each United States expert challenged by Defendants meets the Rule 702 admissibility requirements because

they have expertise, offer reliable testimony, and have helpful opinions to offer the Court. This Court should reject Defendants' motions in their entirety.

## BACKGROUND

The United States filed a complaint in intervention in this case asserting that the Alabama Vulnerable Child Compassion and Protection Act, Ala. Code §§ 26-26-1 to -9 (2022) ("S.B. 184") violates the Equal Protection Clause of the Fourteenth Amendment. Am. Compl. Intervention, ECF No. 92. S.B. 184 makes it a felony to "engage in or cause" certain gender-affirming procedures and treatments for transgender minors, while allowing other minors to receive the same procedures and treatments. Ala. Code §§ 26-26-4.

This Court previously granted Private Plaintiffs' and the United States' motions for a preliminary injunction barring the enforcement of S.B. 184. *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022), *vacated sub nom. Eknes-Tucker v. Gov. of Ala*., 80 F.4th 1205, 1229-30 (11th Cir. 2023). In granting the preliminary injunction, this Court found that S.B. 184 makes a sex-based classification, and that the State did not offer an "exceedingly persuasive justification for the classification" needed to survive a heightened standard of review. *Eknes-Tucker*, 603 F. Supp. 3d at 1146-48, 1151. The Eleventh Circuit vacated that decision, holding that the law should instead be judged under a rational basis standard "unless the regulation were a pretext for invidious

3

discrimination against" transgender individuals. *Eknes-Tucker*, 80 F.4th at 1229-30. This Court stayed the trial in this matter after the Supreme Court granted certiorari in another case regarding the appropriate standard of review to apply to a similar law banning the provision of gender-affirming care. ECF No. 633.

The United States disclosed four experts to provide testimony at trial. In its initial expert disclosures on February 13, 2023, the United States identified Dr. Armand Antommaria, M.D., Ph.D., and Dr. Daniel Shumer, M.D., M.P.H. On March 8, 2024, the United States' rebuttal disclosures identified Profs. I. Glenn Cohen, J.D., and Devin Caughey, Ph.D. ECF No. 592-22. Defendants have moved to exclude testimony by three of the United States' experts, Dr. Shumer, Prof. Cohen, and Prof. Caughey. *See* Defs.' Mot. Exclude Selected Testimony of Dr. Daniel Shumer ("Shumer Mot."), ECF No. 599; Defs.' Combined Mots. in Limine to Exclude Testimony of I. Glenn Cohen as an Improper Rebuttal Witness and as Contrary to Rule 702 ("Cohen Mots."), ECF No. 600; Defs.' Combined Mots. in Limine to Exclude Testimony of Devin Caughey as an Improper Rebuttal Witness, as Irrelevant Under Rule 402, and as Contrary to Rule 702 ("Caughey Mots."), ECF No. 601.

# ARGUMENT

## I. Profs. Cohen and Caughey Are Proper Rebuttal Witnesses Because They Offer Testimony Solely to Rebut Defendants' Expert Evidence.

Profs. Cohen and Caughey are proper rebuttal witnesses because they offer testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). This Court has broad discretion to permit rebuttal testimony because binding circuit precedent holds that such a decision "resides in the sound discretion of the trial judge." *United States v. Gold*, 743 F.2d 800, 818 (11th Cir. 1984).

Persuasive district court decisions have construed the phrase "same subject matter" broadly when assessing whether expert opinion is proper rebuttal. *E.g.*, *Fuller v. SunTrust Banks*, No. 1:11-CV-784-ODE, 2019 WL 5448206, at *22 (N.D. Ga. Oct. 3, 2019). When a rebuttal expert's report "responds to the opposing expert's opinions and controverts those opinions by reaching contrary conclusions, the rebuttal expert's report falls within the permissible scope of rebuttal evidence." *Ahmed v. Johnson & Johnson Healthcare Sys.*, No. 1:22-00190-KD-N, 2024 WL 693078, at *13 (S.D. Ala. Feb. 20, 2024). Even if Profs. Cohen and Caughey's testimony is also relevant to the United States' case-in-chief, as Defendants argue, that would not "preclude the testimony if it is proper both in the case-in-chief and

in rebuttal." *Pandya v. Marriott Hotel Servs.*, 552 F. Supp. 3d 1364, 1375 (N.D. Ga. 2021).

Alternatively, even if this Court concludes that Profs. Cohen and Caughey are improper rebuttal witnesses, this Court should use its discretion to admit their testimony as late-disclosed initial experts. As explained in Part I.C., *infra*, the timing of their disclosures was substantially justified and does not prejudice Defendants. *See* Fed. R. Civ. P. 37(c)(1) (allowing for use of witness if the failure to disclose was "substantially justified or is harmless").

### A. Prof. Cohen's Testimony About the Off-Label Prescription of Medication and the Criminalization of Medical Care Appropriately Rebuts Testimony by Defendants' Experts.

#### 1. Prof. Cohen's Testimony Properly Rebuts Defendant Experts' Assertions About FDA Off-Label Prescribing.

The purpose of rebuttal evidence in general is to "explain, repel, counteract, or disprove the evidence of the adverse party." *United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004). Prof. Cohen's testimony regarding off-label prescription of FDA-approved medications explains, repels, counteracts, and disproves suggestions by Defendants' experts that there is something "nefarious or unusual about the fact that drugs relevant to this case are being prescribed 'off-label.'" Defs.' *Daubert* Ex. 23 (Cohen Rebuttal Rep.) ¶ 14, ECF No. 592-23; *see also id*. at ¶ 16 (identifying specific statements by Drs. Nangia, Laidlaw, and Cantor); ¶ 17. Moreover, because he offers testimony "intended solely to contradict

6

or rebut evidence on the same subject matter" offered by Defendants, Fed. R. Civ.

P. 26(a)(2)(D)(ii), Prof. Cohen's testimony about off-label prescribing is

appropriate rebuttal, and Defendants' arguments to the contrary are unavailing.

Rebuttal expert testimony must rebut evidence "on the same subject matter"

offered by the opposing party. *Id*. Although the Eleventh Circuit has not defined

the phrase "same subject matter," district courts in this Circuit "construe it

broadly." *E.g.*, *Fuller*, 2019 WL 5448206, at *22 (refusing to exclude rebuttal

report, based in part on the "Court's view that Rule 26's 'same subject matter'

standard should be broadly construed"); *Edwards v. Fla. Dep't of Corr.*, No.

1:15cv17-MW/GRJ, 2015 WL 11109376, at *1 (N.D. Fla. Nov. 18, 2015) (noting

that many district courts addressing the issue "have construed the term broadly").

For example, when plaintiffs in one case offered a damages expert who performed

specific calculations at plaintiffs' request, the defense expert's opinion attacking

the "assumption underlying" those calculations was considered permissible

rebuttal even though it apparently did not challenge the calculations themselves.

*Fuller*, 2019 WL 5448206, at *22. Furthermore, "rebuttal is not limited to the exact

terms discussed and addressed by the initial expert." *Adacel, Inc. v. Adsync Techs.*,

No. 6:18-cv-1176-Orl-78EJK, 2020 WL 4588415, at *3 (M.D. Fla. July 9, 2020).

These district court decisions are persuasive because they implement the plain

language requirements of Rule 26 without imposing additional limitations on a

party's presentation of evidence. This Court should follow their guidance and avoid Defendants' attempt to impose additional requirements on expert testimony beyond the language of Rule 26.

That rebuttal expert testimony is also relevant to a party's case in chief "does not preclude the testimony if it is proper both in the case-in-chief and in rebuttal." *Pandya*, 552 F. Supp. 3d at 1375 (quotation omitted); *Reese v. CSX Transp.*, No. 118-215, 2020 WL 5740253, at *13-15 (S.D. Ga. Sept. 24, 2020). For example, in *Reese*, an engineering expert wrote an initial report and then submitted a rebuttal in which he "performed his own modeling" of a particular situation to critique the modeling of an opposing party's expert. 2020 WL 5740253, at *15. The court recognized that the expert "could have performed this modeling at an earlier point" but allowed the rebuttal opinion because it "addressed the same subject matter and intended to repel [the opposing expert's] new analysis." *Id*.

Prof. Cohen's testimony regarding off-label prescriptions rebuts Defendants' experts' opinions on the same subject matter—whether the off-label nature of certain prescriptions is problematic. Prof. Cohen notes that "[i]n several instances, Defendants' witnesses intimate that there is something nefarious or unusual about the fact that drugs are being prescribed and used off-label to treat the minors relevant in this case, often by framing the use as 'experimental' and pointing to insufficient randomized clinical trials in these populations." Cohen Rebuttal Rep. ¶

8

16. Prof. Cohen identifies those statements with specificity and refutes them, explaining that there is "nothing nefarious or unusual about the fact that drugs are being prescribed off-label by licensed healthcare providers to treat the minors in this case." *Id.* ¶¶ 16-17. For example, Dr. Nangia's conclusion that "informed consent is not attainable" relies in part on the "lack of FDA" approval. U.S. *Daubert* Ex. 18 (Nangia Rep.) ¶¶ 153-154, ECF No. 591-18; *see also id.* ¶¶ 41-42 (noting that puberty blockers are not FDA-approved for treating gender dysphoria and given off-label, in a section entitled "Medical Interventions and Associated Risks"). Prof. Cohen refutes that conclusion by explaining the "context" of "how FDA reviews drugs and what is meant by off-label prescribing of an approved drug." Cohen Rebuttal Rep. ¶¶ 17-18.

Defendants' argument that Prof. Cohen does not offer proper rebuttal relies on an unjustifiably narrow view of rebuttal opinion. Defendants assert that Prof. Cohen's testimony is improper because none of Defendants' experts opine on the "purported generalized frequency of off-label prescribing, including within pediatrics." Cohen Mots. 5. As in *Fuller*, Prof. Cohen is attacking a central premise underlying the defense expert's opinions—the suggestion that off-label prescribing is inherently suspect, 2019 WL 5448206, at *22. His rebuttal opinion need not be "limited to the exact terms discussed and addressed by the initial expert." *Adacel*,

2020 WL 4588415, at *3. It is sufficient that Prof. Cohen's testimony contradicts the Defendants' experts' testimony on the same subject.[2]

Defendants' argument that any "attack on the connection between off-label prescribing and the Act belongs in the United States' case in chief," Cohen Mots. 6, misconstrues the role of Prof. Cohen's testimony and attempts to falsely portray the United States' affirmative case. The United States' position that the banned treatments are safe and effective does not hinge on the FDA-approval status of these medications for any particular indication. Defendants assert that protecting minors from treatments that supposedly lack safety and efficacy is a justification for S.B. 184. *See* Defs' Mot. for Summ. J. 30, ECF No. 561 (stating that S.B. 184 is "at a minimum, substantially related to protecting children from these unproven drug uses"). In support of that argument, Defendants' experts repeatedly point to the fact that the banned treatments are not FDA-approved for the treatment of gender dysphoria. *See, e.g.*, Nangia Rep. ¶¶ 41-42, 157; U.S. *Daubert* Ex. 12

---

[2] Defendants also argue that because S.B. 184's findings reference the "off-label" use of the medications at issue, that topic was not "unforeseen" and is therefore not a proper subject for rebuttal. Cohen Mots. at 6; Ala. Code § 26-26-2(7). But the rules do not require parties or their experts "to anticipate all foreseeable opposing arguments and meet those arguments in their initial reports." *Teledyne Instruments, Inc. v. Cairns*, No. 6:12-cv-854-Orl-28TBS, 2013 WL 5781274 at *17 (M.D. Fla. Oct. 25, 2013); *see also Mighty v. Miami-Dade Cnty.*, No. 14-23285-CIV-MORENO/MCALILEY, 2019 WL 4306942 at *8 (S.D. Fla. Aug. 9, 2019) (rejecting argument that that rebuttal expert opinion must address an unanticipated issue). All that is required "is for the information to repel other expert testimony." *Teledyne*, 2013 WL 5781274 at *17 (quotation marks omitted). Because Prof. Cohen's testimony on this topic rebuts another expert's testimony, the foreseeability of the topic is irrelevant.

(Laidlaw Rep.) ¶ 122, ECF No. 591-12; U.S. *Daubert* Ex. 1 (Cantor Rep.) ¶ 275, ECF No. 591-1. Prof. Cohen's rebuttal testimony about off-label prescriptions counters that point by filling in missing information and providing a full explanation of what FDA approval and off-label prescribing means.

Though true that Prof. Cohen's testimony on the subject could be relevant to the United States' case in chief, that "does not preclude the testimony if it is proper both in the case-in-chief and in rebuttal," and here it is rebuttal for the reasons stated previously. *Pandya*, 552 F. Supp. 3d at 1375.

Because Prof. Cohen's testimony about off-label prescribing is intended solely to contradict testimony by the Defendants' experts, it is proper rebuttal testimony. Under persuasive district court authorities, Prof. Cohen's testimony need not be limited to the *exact* terms and issues addressed by Defendants' experts when he clearly counteracts a contention of their reports. And, it is irrelevant that Prof. Cohen's testimony could also support the United States' affirmative case because it is proper rebuttal countering the opinions of Defendants' experts.

### 2. Prof. Cohen's Testimony Properly Rebuts Defense Experts' Assertions that S.B. 184 Appropriately Protects Minors.

Prof. Cohen's testimony that "states have robust mechanisms to reign in unsafe medical practices without resorting to the extreme step of criminalizing the prescribing of an FDA-approved drug" appropriately rebuts testimony by the Defendants' experts. Cohen Rebuttal Rep. at 36. As Prof. Cohen notes, Drs. Curlin,

Cantor, Laidlaw, and Nangia opine on the appropriateness of S.B. 184 as a response to concerns about patient safety. *Id*. ¶ 60. As such, his testimony about other potential policy responses to patient safety is appropriate rebuttal testimony offered "solely to contradict or rebut evidence on the same subject matter" offered by Defendants' experts, as required by Fed. R. Civ. P. 26(a)(2)(D)(ii).

When assessing whether expert opinion is rebutting evidence "on the same subject matter" offered by the opposing party as required by Rule 26, courts construe the phrase "same subject matter" broadly. *See, e.g.*, *Fuller*, 2019 WL 5448206, at *22; *Edwards*, 2015 WL 11109376, at *1; *Ohio State Troopers Ass'n v. Point Blank Enters.*, No. 18-CV-63130-RUIZ/STRAUSS, 2020 WL 1666763, at *3 (S.D. Fla. Apr. 3, 2020). For example, in *Ohio State Troopers*, the court considered the rebuttal expert to be addressing the same subject as an initial expert when the rebuttal expert refuted "various assumptions underlying [the first expert's] report," 2020 WL 1666763, at *9. In that class action, the initial expert offered a damages assessment, and the rebuttal expert did not rebut the methodology or calculation but instead challenged underlying assumptions, including that the class members had been harmed in a uniform manner. *Id.* In *Edwards*, an employment discrimination case, the initial expert opined that the plaintiff's colleague "was justified" in reporting the plaintiff's failure to comply with an employee assistance program for employees with substance abuse issues,

2015 WL 11109376, at *1-2. The court characterized the first expert's opinion that the action was "justified" as "extremely broad" and found that the rebuttal expert's opinion about issues like whether the colleague "acted professionally" rebutted the contention that the colleague's actions were justified. *Id.*

Prof. Cohen's testimony about ways in which states regulate medical treatments refutes a central premise of Defendants' experts—that criminalizing the treatments at issue in this case was justified by safety concerns they identify. His report lists specific examples of where Defendants' experts "point to the need to protect pediatric patient safety as a reason to restrict the prescription of the FDA-approved drugs at issue in this case and as a core justification for the Alabama law." Cohen Rebuttal Rep. ¶ 60. In particular, he cites statements by Drs. Curlin, Cantor, Laidlaw, and Nangia related to patient safety.[3] *Id.* For example, Dr.

---

[3] In addition to the passages that Prof. Cohen quotes in his report, Defendants' experts offer additional opinions in their reports regarding the State's role in regulating gender-affirming medical care. *See* Nangia Rep. ¶ 114 ("There are exceptions to parents' ability to provide consent for the minor . . . . Likewise, a state may determine that a medical procedure is not in a child's best interest, even if parents attempt to give consent – an example being parents seeking to permit sterilization of their children."); U.S. *Daubert* Ex. 22 (Thompson Rep.) ¶ 142, ECF No. 591-22 ("For these reasons, I conclude that the Alabama Vulnerable Child Compassion and Protection Act is based on medical facts and serves to protect minors from unethical experimentation. The medical profession has not only failed to regulate itself, but is actively promoting such experimentation despite the known harms to vulnerable minors."). Furthermore, the United States' expert Dr. Antommaria (whose testimony Defendants are not challenging) rebuts testimony by Dr. Hruz regarding means of addressing informed consent by also referencing alternatives to banning gender-affirming care. U.S. Opp'n to Defs.' Mot. Summ. J. Ex. 2 (Antommaria Rebuttal Rep. ¶ 49), ECF No. 626-2 (noting that there are "other less restrictive means to address inadequate informed consent than banning gender-affirming medical care" including credentialing, licensing, and malpractice litigation).

Laidlaw opines that S.B. 184 "is based on sound medical principles for the protection of minors" because there exist "serious concerns for risk of harm." Cohen Rebuttal Rep. ¶ 60 (citing Laidlaw Rep. ¶ 250). Again, Prof. Cohen's testimony provides key context missing from Defendants' experts' opinions. Inherent in these statements is the premise that criminalizing the care at issue, as S.B. 184 does, is an appropriate policy response to the safety concerns the experts discuss. Prof. Cohen rebuts these suggestions that S.B. 184 is an appropriate response by providing the full context of healthcare policy and regulatory schemes that already exist to protect patient safety. Prof. Cohen explains that "states have many regulatory mechanisms for protecting patient safety" and that "attaching criminal penalties to the actions of physicians is uncommon." Cohen Rebuttal Rep. ¶¶ 61, 62. Thus, like the rebuttal experts in *Fuller* and *Ohio State Troopers*, Prof. Cohen here appropriately rebuts a central assumption of the opposing experts' statements. And like the initial expert in *Edwards*, Defendants' experts' opinions that S.B. 184 is justified by particular concerns are broad. Those broad opinions open the door to rebuttal testimony refuting the supposed connection between the concerns articulated by the Defendants' experts and the criminalization of medical care.

Defendants' argument that Prof. "Cohen cites no defense expert who addresses [the] specific issue" of whether criminal sanctions are necessary is

unavailing when, as previously discussed, Prof. Cohen attacks a premise of the Defendants' experts. Cohen Mots. 6-7. Defendants argue that because "[n]o defense expert addresses criminal sanctions versus other regulatory mechanisms," *id*. at 7, Prof. Cohen should not be allowed to offer testimony about different policy responses to refute Defendants' experts. Again, Defendants' view of rebuttal is unjustifiably narrow, and their description of the United States' position and the function of Prof. Cohen's expertise is incorrect. Prof. Cohen's testimony on the existing regulatory schemes protecting patient safety is critical and necessary context for evaluating Defendants' experts' opinions justifying the criminalization of gender-affirming care. Rebuttal need not be limited to "the exact terms discussed and addressed by the initial expert." *Adacel*, 2020 WL 4588415, at *3. And an opinion may be proper rebuttal even when it does not "expressly mention[ ]" the expert being rebutted, *Lebron v. Royal Caribbean Cruises*, Case No. 16-24687-CIV-WILLIAMS/SIMONTON, 2018 WL 3583002, at *5 (S.D. Fla. July 26, 2018), although Prof. Cohen did so here, *see* Cohen Rebuttal Rep. ¶ 60.[4]

---

[4] Defendants also argue that because S.B. 184 makes it a felony to provide the medical treatments at issue, the topic was not "unforeseen" and is therefore not a proper rebuttal subject. Cohen Mots. 7. But, as noted *supra* at note 2, the rules do not require parties "to anticipate all foreseeable opposing arguments and meet those arguments in their initial reports." *Teledyne Instruments*, 2013 WL 5781274, at *17; *see also Mighty*, 2019 WL 4306942, at *8. Because Prof. Cohen's testimony on this topic rebuts another expert's testimony, the foreseeability of the topic is irrelevant.

Prof. Cohen's testimony about the regulatory mechanisms available to states to address patient safety concerns appropriately rebuts Defendants' experts' opinions that S.B. 184 was justified by patient safety concerns. Defendants' experts attempt to draw a connection between the safety concerns they discuss and the specific law at issue, and Prof. Cohen refutes those opinions by undermining that connection with missing context. It is not relevant to the analysis of what constitutes proper rebuttal that Defendants' experts failed to consider whether other regulatory responses would address their supposed safety concerns. Defendants' experts chose to opine that those purported concerns warranted the specific response of criminalization, and Prof. Cohen rebuts that conclusion.

### B. Prof. Caughey's Testimony Rebuts Defendants' Experts' Opinions that the Purpose of S.B. 184 Is to Protect Minors.

Prof. Caughey offers proper rebuttal testimony to "rebut Defendants' experts' claims that [S.B. 184] is not intended to discriminate on the basis of sex or transgender status." Defs.' *Daubert* Ex. 35 (Caughey Rebuttal Rep.) ¶ 12, ECF No. 592-35. Defendants' experts put forward a supposed paternalistic rationale for legislation prohibiting gender-affirming care and Prof. Caughey rebuts their justifications by opining on facts relevant to the discriminatory purpose of the law. As such, Prof. Caughey's testimony is "intended solely to contradict or rebut evidence on the same subject matter" that is encompassed within Defendants' expert reports as required by Fed. R. Civ. P. 26(a)(2)(D)(ii).

16

When assessing whether expert opinion is rebutting evidence "on the same subject matter" offered by the opposing party, courts construe the phrase "same subject matter" broadly. *E.g.*, *Fuller*, 2019 WL 5448206, at *22. Rebuttal expert testimony is valid when it attacks assumptions or premises of an initial expert. *See, e.g.*, *id*. at *22 (rebuttal expert refuted a premise underlying another expert's opinion); *Ohio State Troopers*, 2020 WL 1666763 at *9 (rebuttal expert properly refuted "various assumptions underlying [the first expert's] report"). The rebuttal report need not even "expressly mention" the expert being rebutted, so long as it challenges the "factual underpinnings" of the opponent's expert, *Lebron*, 2018 WL 3583002, at *5, although Prof. Caughey did denote which experts he was rebutting, *see* Caughey Rebuttal Rep. ¶ 17.

In their reports, Drs. Cantor, Kaliebe, and Nangia rely on a central premise that the prohibitions of S.B. 184 are warranted because gender-affirming care is "experimental" and lacking in evidence. Dr. Cantor opines that gender-affirming care is "experimental" and then ties the treatment's "experimental" nature to more restrictive policies regarding the treatment and the recognition that the "experimental" status "will preclude coverage." Caughey Rebuttal Rep. ¶ 18 (citing Cantor Rep. at 74); Cantor Rep. ¶¶ 168-172, 173. Dr. Kaliebe opines that gender dysphoria should be treated by "psychosocial supports and psychotherapy" and that medical associations' endorsement of gender-affirming care is the result of

17

politicization. Caughey Rebuttal Rep. ¶ 18 (citing Kaliebe Rep. at 52, 7). Dr.

Kaliebe ties these attacks on gender-affirming care to the question of the

appropriate policy treatment of such care. *E.g.*, U.S. Ex. 9 (Kaliebe Rep.) ¶ 50,

ECF No. 591-9 (discussing the responses of "healthcare authorities [in] other

countries"). Dr. Kaliebe also argues that individuals who seek to prevent the

prohibition of gender-affirming care prioritize activism over scholarship, *id*. ¶¶ 47,

49, with the obvious implication being that prohibiting gender-affirming care is the

appropriate response. Finally, Prof. Caughey also notes that Dr. Nangia similarly

identifies gender-affirming care as "experimental." Caughey Rebuttal Rep. ¶ 18

(citing Nangia Rep. at 87). Dr. Nangia ties the "experimental" nature of the

treatment to her broader opinion that "SB 184 appropriately protects minors."

Nangia Rep. at 87.

Prof. Caughey was "focused on rebutting [the Defendants' experts']

contention that S.B. 184 and gender-affirming care bans for minors in general are

motivated . . . exclusively by a desire to protect minors from experimental or

potentially dangerous medical treatments." Defs.' Mot. for Summ. J. Ex. 79

(Caughey Dep. Tr.) 14:18-15:1, ECF No. 558-29; *see also id*. 23:16-24:3 (the

reports opine that prohibitions are warranted because gender-affirming care is

"experimental"); 24:13-18 (the "whole purpose" of the reports is to present a

justification for why gender-affirming care should be prohibited). Prof. Caughey's

18

rebuttal report discusses how the "justifications put forward by the defense experts provide a partial . . . presentation of the motivations and . . . purposes of the bill" and to provide information missing from their opinions—the "broader context" for the bill's passage. *Id*. 38:4-14.

Prof. Caughey's report offers opinions refuting the premise that the law's purpose is to protect minors from experimental treatment. Directly contrary to Defendants' experts' suggestion that gender-affirming care bans like S.B. 184 are to protect minors from the results of their healthcare choices, Prof. Caughey found that a state's degree of healthcare paternalism[5] was inversely related with adoption of such a ban. Caughey Rebuttal Rep. ¶¶ 43-46. Following standard methodology used by political scientists, Prof. Caughey found that states with a higher level of healthcare paternalism are less likely to adopt gender-affirming care bans. *Id*. Prof. Caughey also found that this conclusion was supported by the legislative history, as discussed more in Section II(A), *infra*. His report discusses Alabama's long history of hostility toward transgender rights to illustrate that S.B. 184 "is not an isolated piece of legislation targeted at a particular set of medical procedures, but rather one bill among many targeting transgender persons in multiple domains."

---

[5] In his report, Prof. Caughey uses the following definition for "healthcare paternalism": a "limitation on a person's healthcare choices motivated by concern for that person's welfare." Caughey Rebuttal Rep. ¶ 35. This differs from "medical paternalism," which "is typically defined with respect to the relationship between physicians and patients." *Id*. at 18 n.14.

Caughey Rebuttal Rep. ¶¶ 51-57. He also discusses public statements by the law's sponsors suggesting that gender dysphoria is not a real condition, *id.* ¶¶ 69, 71, and the legislature's ability to foresee how the law would harm transgender people specifically, *id.* ¶¶ 73-83. Together, Prof. Caughey's testimony rebuts Defendants' experts' conclusions regarding the supposed paternalistic purpose of the law.

It is irrelevant that the experts Prof. Caughey rebuts do not exclusively focus their opinions on Alabama or S.B. 184 when their opinions encompass Alabama's prohibition of gender-affirming care. Defendants argue that Prof. Caughey is not offering proper rebuttal testimony because he is not rebutting any opinion that "specifically references S.B. 184 or the Alabama Legislature's motivation in passing it." Caughey Mots. 8 (quoting Prof. Caughey in deposition). But as Prof. Caughey explained, "the defendants' experts are putting forward a general justification for bans on gender-affirming care for minors that applies at least to all states . . . and that that justification and implicit contention as to the motivations for such bans includes Alabama." Caughey Dep. Tr. 18:15-19:3. In other words, the three experts "advanced a justification for S.B. 184." *Id.* 19:7-9. Though they do not "explicitly reference the State of Alabama" they are "meant to include it." *Id.* 20:9-16; *see also id.* 30:11-21 ("the defense experts' claims are cast in general terms that in many cases . . . should be read as applying to . . . Alabama."); *id.* 36:22-37:3 ("arguments put forward by the defense experts for the passage of these

laws in general apply in the specific case of Alabama"). Accordingly, Prof. Caughey provided proper rebuttal testimony.

Because Prof. Caughey offers testimony on the "same subject" addressed by Defendants' experts—evidence of the purpose and motivation for S.B. 184—he offers proper rebuttal testimony. Defendants' experts offer testimony supporting a supposed paternalistic purpose for the law, and Prof. Caughey offers conflicting evidence and opinion. His testimony is appropriate rebuttal.

### C. Even If This Court Concludes that Profs. Cohen and Caughey's Reports Are Not Rebuttal, the Court Should Not Exclude Their Testimony Because the Timing of the Disclosures Is Substantially Justified and Harmless to Defendants.

Should the Court conclude that Profs. Cohen and Caughey's testimony is not proper rebuttal, the Court should accept their reports as late-filed initial reports because the timing of their submissions is both substantially justified and harmless to Defendants. *See* Fed. R. Civ. P. 37(c)(1) (allowing for use of witness if the failure to timely disclose was "substantially justified or is harmless"). The timing of their reports is substantially justified given the Eleventh Circuit's decision to apply rational basis review in evaluating whether S.B. 184 violates the Equal Protection Clause, and because the ambiguity in the law of whether their testimony is proper rebuttal justifies the delay in disclosure. And Defendants were not harmed by the timing of Prof. Cohen and Caughey's disclosures—the United States disclosed the anticipated substance of their rebuttal on March 8, 2024, ECF

No. 592-22, and Defendants received both reports on April 1, 2024, Cohen
Rebuttal Rep. 48; Caughey Rebuttal Rep. 41. Defendants deposed Prof. Cohen on
May 2, 2024, Cohen Dep. Tr. 1, and Prof. Caughey on May 1, 2024, Caughey Dep.
Tr. 1.

The district court has discretion to allow a party to use a late-disclosed
expert if the late disclosure was "substantially justified or is harmless." Fed. R.
Civ. P. 37(c)(1); *see also Pitts v. HP Pelzer Auto. Sys.*, 331 F.R.D. 688, 692 (S.D.
Ga. 2019) (noting a district court's broad discretion to determine justification or
harmlessness under Rule 37). When a rebuttal report is challenged as being
improper rebuttal, the court may elect to accept the rebuttal report as late-filed
initial reports. *E.g.*, *Edwards*, 2015 WL 11109376, at *2; *Long v. E. Coast Waffles*,
762 F. App'x 869, 871 (11th Cir. 2019) ("[D]istrict courts are entitled to broad
discretion in managing pretrial discovery matters," including whether to exclude
expert testimony under Rule 37).

Substantial justification is "justification to a degree that could satisfy a
reasonable person that parties could differ as to whether the party was required to"
disclose Prof. Cohen as an initial expert. *Wright v. Hyundai Motor Mfg. Ala.*, Civil
Action No. 2:08CV61-SRW, 2010 WL 4739486, at *4 (M.D. Ala. Nov. 16, 2010).
The party asserting the justification must have a reasonable basis in law and fact,
and the test is met if there exists a "genuine dispute" regarding compliance. *Id*.

Harmlessness involves "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Wright*, at *4 (quotations and citations omitted). Because striking an expert report is "an extreme sanction," it "should be avoided when the opposing party is not prejudiced by the deficiencies in disclosure." *Lee-Bolton v. Koppers, Inc*., Case No. 1:10-cv-253-MCR-GRJ, 2015 WL 11110547, at *4 (N.D. Fla. July 28, 2015). "When a party has 'ample time to depose' a witness . . . any tardiness in disclosing the witness typically is harmless." *Lamonica v. Hartford Ins. Co.*, 336 F.R.D. 682, 687 (N.D. Fla. 2020); *see also Morrison v. Mann*, 244 F.R.D. 668, 673 (N.D. Ga. 2007) ("Most commonly, the harm associated with untimely expert witness disclosures is the non-disclosing party's inability to adequately prepare its case by deposing the witness during the discovery period.").

The timing of Profs. Cohen and Caughey's disclosure was substantially justified for two reasons: the procedural posture of the case and the ambiguity in the law regarding the scope of proper rebuttal. First, when the United States disclosed its initial expert witnesses in February 2023, the United States was proceeding under an intermediate scrutiny standard of review, consistent with this Court's May 2022 opinion, *Eknes-Tucker*, 603 F. Supp. 3d 1131. It was not until August 2023 that the Eleventh Circuit issued its opinion, concluding that rational basis review applied absent "pretext for invidious discrimination." *Eknes-Tucker*,

23

80 F.4th at 1230. This significant change in circumstances is sufficient to constitute a "substantial justification" that supports accepting Profs. Cohen and Caughey's testimony as a late-filed initial report. *See, e.g.*, *Maier v. Green Eyes USA, Inc.*, Case No. CV409-172, 2011 WL 13153114, at *2 (S.D. Ga. Mar. 2, 2011) (noting that "[e]ven if the report contains non-rebuttal opinions, there is no reason to think that plaintiff's delay was willful or in bad faith"). As a result of that change, the subjects covered by Profs. Cohen and Caughey's rebuttals became more important because certain issues, particularly surrounding the bill's purpose and the connection between that purpose and the means deployed to achieve it, are evaluated differently depending on the ultimate standard of review. Second, as explained above, the United States believes that Profs. Cohen and Caughey are offering proper rebuttal opinion. As such, "the ambiguity in the law defining the scope of rebuttal reports" substantially justifies the failure to disclose him earlier. *E.g.*, *Edwards*, 2015 WL 11109376, at *2.

The timing of Prof. Cohen and Caughey's disclosures was also harmless to Defendants because Defendants deposed both experts, and thus the reports should not be excluded on grounds of prejudice to Defendants. The United States first disclosed the rebuttal reports on the deadline for the disclosure of rebuttal witnesses, March 8, 2024, ECF No. 592-22, placing Defendants on notice about

the anticipated substance of the rebuttal.[6] Defendants received the reports on April

1, 2024—over a month before the close of discovery. Cohen Rebuttal Rep. 48,

Caughey Rebuttal Rep. 41. And, most importantly, Defendants deposed the

professors a month later, on May 1 and 2, 2024. Caughey Dep. Tr. 1; Cohen Dep.

Tr. 1. That Defendants were able to depose the experts weighs strongly against any

assertion of prejudice. *See, e.g.*, *Lamonica*, 336 F.R.D. at 686-87 (finding late

disclosure harmless when opposing party had opportunity to depose expert); *Jabil*

*Circuit v. Speedline Techs.*, No. 8:09-cv-1596-T-27EAJ, 2010 WL 11629048, at *1

(M.D. Fla. Nov. 19, 2010) (same).

   While Defendants argue prejudice arising from the timing of Prof. Cohen's

disclosure, the harm they assert is purely speculative. Defendants assert that if they

had learned of Prof. Cohen's testimony earlier, Defendants "could have obtained

their own rebuttal testimony—and would have, if the testimony were relevant."

Cohen Mots. 8-9. Defendants fail to specify the points in Prof. Cohen's testimony

they would have gathered additional evidence to rebut. *See Maier*, 2011 WL

13153114, at *2 (noting that party challenging rebuttal witness failed to counter

---

[6] With respect to Prof. Cohen, the disclosure stated, "It is anticipated that Professor Cohen's rebuttal expert report will address the safety and efficacy of gender-affirming medical care for transgender youth and the regulation of healthcare, including Food and Drug Administration processes and the practice of off-label use of medicine." Defs.' *Daubert* Ex. 22, ECF No. 592-22 at 2. For Prof. Caughey, the disclosure stated, "It is anticipated that Professor Caughey's rebuttal expert report will address the emergence of gender-affirming care as a political issue and the legislative findings and purpose of Senate Bill 184." *Id.*

showing of harmlessness with "any examples of actual prejudice, only some vague possibility of prejudice"). Defendants state that they *could have* obtained "their own rebuttal testimony" and "developed more evidence related to the issues on which Cohen opines" *if the testimony were relevant.* Cohen Mots. 8. But Defendants' position that Prof. Cohen's testimony is irrelevant appears to concede that they would not have developed additional evidence to rebut his testimony, even if he had been disclosed in February 2023. The timing, therefore, of Prof. Cohen's disclosure is not prejudicial.

Defendants' arguments that they are prejudiced by the timing of Prof. Caughey's disclosure are also too vague and speculative. Defendants assert that if they had earlier "been confronted with a political scientist like Caughey offering opinions no other expert did, they could—and would—have obtained their own rebuttal testimony." Caughey Mots. 11. Again, as with Prof. Cohen, this suggestion is not persuasive in light of Defendants' assertion that Prof. Caughey's testimony is irrelevant, *id*. at 13-20, discussed *infra*. If Defendants believe Prof. Caughey offers no relevant testimony then there would be nothing worth rebutting, and in fact Defendants do not identify with any specificity what their hypothetical rebuttal would address. *See Maier*, 2011 WL 13153114, at *2 (party challenging rebuttal witness failed to identify "any examples of actual prejudice, only some vague possibility of prejudice"). Furthermore, Defendants' assertion that they are

prejudiced because they did not consider an *Arlington Heights* legal theory to be part of the United States' case, Caughey Mots. 11, is undermined by Defendants' acknowledgement that they had notice of the *Arlington Heights* theory as early as September 2022. *See* Mot. for Partial J., ECF No. 157 (challenging the United States' "*Arlington Heights* claim").

Accordingly, even if this Court concludes that Profs. Cohen and Caughey are not proper rebuttal witnesses, this Court should still accept their expert testimony as late-filed initial expert testimony. The United States was substantially justified in filing the report when it did because the intervening Eleventh Circuit decision materially changed the nature of the case and because of ambiguity in the law regarding the scope of proper rebuttal. Defendants were not harmed by the timing of the disclosures because they were able to depose both experts. Defendants also failed to identify any particular issues that they would have further developed through other discovery or expert testimony. This Court should admit Prof. Cohen and Caughey's testimony.

## II.   The Court Should Deny Defendants' Motions to Exclude the United States' Experts Because They Are Qualified, Employ Reliable Methods, Are Helpful to This Court, and Offer Relevant Testimony.

Each of the United States' experts challenged by Defendants offers admissible testimony. Experts who are qualified by "knowledge, skill, experience, training, or education" may offer opinion testimony if they meet specific criteria.

Fed. R. Evid. 702. To analyze admissibility under Rule 702, courts require that an expert: (1) be qualified "to testify competently" regarding the matters addressed; (2) use a "sufficiently reliable" methodology under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), to reach their conclusions; and (3) provide testimony that "assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260 (internal quotations omitted).

Regarding the reliability requirement, courts assess "illustrative" factors, including: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id*. at 1262. Not every reliability factor applies in every case. *Id*. Furthermore, expert testimony, "like all evidence, is subject to Rule 402's relevance requirement." *Atl. Rim Equities v. Slutzky, Wolfe & Bailey, LLP*, No. 1:04-cv-2647-WSD, 2006 WL 5159598, at *2 (N.D. Ga. Nov. 21, 2006); *see also Allison v. McGhan Med.*¸184 F.3d 1300, 1309-10 (11th Cir. 1999) (noting that expert testimony "is also subject to other rules of evidence" and evaluating such testimony under Rules 401, 402, and 403).

Prof. Caughey, Prof. Cohen, and Dr. Shumer all offer testimony rooted in their substantial education, scholarship, and experience that speaks to the key issues in this litigation. This Court should reject Defendants' efforts to exclude the United States' experts.[7]

### A. Prof. Caughey's Testimony Is Admissible Because It Is Relevant to Understanding Legislative Intent and Is Based on the Same Methodologies Prof. Caughey Uses in His Scholarship.

Prof. Caughey's testimony relates to the *Arlington Heights* factors courts use to assess legislative intent, which is relevant to the United States' equal protection claim. His opinions are reliable because he uses sources and methodologies similar to what he relies on in his academic work as a scholar of political science. Defendant's criticisms of the minor details of his methodology do not affect the admissibility of his opinions.

### 1. Prof. Caughey's Testimony Is Relevant to the United States' Equal Protection Claim Because He Opines on Facts Relevant to the Arlington Heights Factors Used to Evaluate Legislative Intent.

Prof. Caughey's testimony is relevant to the United States' equal protection claim, which adequately pleaded discriminatory intent. Defendants erroneously argue that Prof. Caughey's testimony is irrelevant because the United States

---

[7] A bench trial relaxes (without eliminating) the court's gatekeeping role, a fact that further favors admission of each of the United States' challenged experts. *See United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

"pleaded no *Arlington Heights* claim" and because, they assert, intent evidence is irrelevant under a rational basis standard. Caughey Mots. 15. But, there is no "*Arlington Heights* claim" as Defendants describe it. Rather, the *Arlington Heights* factors provide an analytical tool for courts to evaluate whether a law has discriminatory intent and effect. *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023). All equal protection claims, including the United States' properly pleaded claim, ultimately require proof of discriminatory intent regardless of the applicable standard of review. Prof. Caughey's testimony on factors that may prove such intent is thus relevant to the United States' equal protection claim. Furthermore, Prof. Caughey *appropriately* disclaimed any intention to opine on individual legislators' motives or the ultimate legal question of intent because it would be improper for an expert witness to do so. And so, following the law does not make his testimony irrelevant.

> i.  **Prof. Caughey's Testimony Is Relevant to Several *Arlington Heights* Factors.**

Prof. Caughey's testimony is relevant to several of the *Arlington Heights* factors that courts use to evaluate discriminatory intent. In particular, he addresses: Alabama's pattern of discrimination, the legislative history of S.B. 184, substantive departures, and the legislature's ability to foresee how S.B. 184 would harm transgender people.

30

*Arlington Heights* and subsequent caselaw recognize these factors to be relevant to understanding intent. The Supreme Court has held that "historical background of [a] decision is one evidentiary source [of intent evidence], particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). In other words, a "history of pervasive purposeful discrimination may provide strong circumstantial evidence that the present-day acts of elected officials are motivated by the same purpose." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984). With regard to the legislative history, the Supreme Court has recognized that evidence about "[t]he specific sequence of events leading up to the challenged decision . . . may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. Finally, pursuing a policy "with full knowledge of the predictable effects" of the policy is another factor relevant to assessing intent. *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464-65 (1979).

First, Prof. Caughey's report outlines Alabama's pattern of discrimination against transgender people specifically and as members of the LGBT community, which he illustrates through statistical and historical analyses. Caughey Rebuttal Rep. ¶¶ 19-57. Prof. Caughey details the Alabama legislature's recent "wave of anti-transgender activity" that "provides important context for the specific legislative history" of S.B. 184. *Id.* ¶ 57. Although the Eleventh Circuit has

31

cautioned against "allowing the old, outdated intentions of previous generations" to taint the legislature "forevermore," *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021), "recent history" is still relevant to assessing legislative intent. *See League of Women Voters*, 66 F.4th at 923 (dismissing district court's consideration of "well over a century" of racial discrimination before evaluating whether "Florida's more recent history" "support[s] a finding of discriminatory intent."); *Abbott v. Perez*, 585 U.S. 579, 607 (2018) (disclaiming any suggestion that the intent of the legislature in 2011 was irrelevant to understanding the intent of the legislature in 2013); *United States v. Sanchez-Garcia*, 98 F.4th 90, 99 (4th Cir. 2024) ("A prior legislature's discriminatory intent is appropriately considered as part of the *Arlington Heights* 'historical background' factor.").

Second, Prof. Caughey opines on the legislative history of S.B. 184. Caughey Rebuttal Rep. ¶¶ 58-83. The Supreme Court has recognized that the "legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 268. In his report, Prof. Caughey discusses public statements by the sponsors of S.B. 184, who claim that gender dysphoria is not a real condition. *E.g.*, Caughey Rebuttal Rep. ¶¶ 69 (Rep. Allen denied that persons with gender dysphoria have a "medical condition"), 71 (Sen. Shelnutt stated, "We

don't want them affirming [a transgender person's gender identity]"). As another district court found in a case with similar claims, such statements to the effect that "there is no such thing as transgender identity—that transgender identity is just ideological or made up or wokeism" are evidence of the legislative purpose to "prevent individuals from pursuing their transgender identities." *Doe v. Ladapo*, Case No. 4:23cv114-RH-MAF, 2024 WL 2947123, at *17 (N.D. Fla. June 11, 2024). The court's analysis in *Ladapo* is persuasive here because of just how similar the statements are in both cases and because of how closely those statements relate to the "admittedly impermissible purpose of preventing or impeding transgender individuals from adhering to their transgender identities." *See id.* at *17-19 (discussing legislator's statements asserting that gender dysphoria "is not a medical issue" and that the "you don't get to play 'choose your own adventure' and change [your identity].").

Third, Prof. Caughey offers opinions on how S.B. 184 results in substantive departures from the State's approach to healthcare regulation—meaning passing laws that expand healthcare freedom rather than restrict it. Caughey Rebuttal Rep. ¶¶ 35-46. In his report, Prof. Caughey discusses how Alabama is ranked high compared to other states in terms of healthcare freedom and notes that the State has taken actions like adding a healthcare freedom amendment to the state constitution that protects the right of residents to make their own healthcare decisions. *Id.* ¶ 41.

In addition to a healthcare freedom amendment, Alabama has a "right to try" law, which permits patients with life-threatening conditions to access experimental therapies, and a religious vaccine exception. *Id*. ¶¶ 40-41. S.B. 184 departs substantively from the State's stance on healthcare freedom by banning access to gender-affirming medical care for transgender youth, thus removing patients and their parents' ability to make that decision.

Finally, Prof. Caughey discusses the legislature's ability to foresee how the legislation would harm transgender people based on testimony available to them at legislative hearings. *Id*. ¶¶ 73-83. The legislature heard testimony from a law enforcement officer and parent of a transgender girl who described the individuals who provided care to his daughter as "heroes in [his] life" and expressed anguish at the thought of being asked to arrest them. *Id*. ¶ 78. The legislature also heard from another parent who stated that his daughter would be "forced into psychological desolation" by S.B. 184. *Id*. ¶ 79. Prof. Caughey's opinion about these factors is relevant and will help the factfinder evaluate Alabama's intent in passing S.B. 184.

   ii. **Courts Use the *Arlington Heights* Factors to Evaluate Intent, Which Is Relevant to Any Equal Protection Claim, Regardless of the Applicable Standard of Review.**

The factors developed in *Arlington Heights* and subsequent caselaw are "guidance" to help a court determine whether a law has the kind of discriminatory

intent and effect that would subject it to review under the Equal Protection Clause. *League of Women Voters*, 66 F.4th at 922. There is no discrete "*Arlington Heights* claim" as Defendants frame it, but rather an *Arlington Heights* framework for evaluating intent and effect in different types of claims, including those under the Fourteenth Amendment. *See, e.g.*, *Greater Birmingham*, 992 F.3d at 1321 (the "*Arlington Heights* analysis" applies to Fourteenth Amendment claims). This Court has already rejected this line of argument in denying Defendants' motion for partial judgment on the pleadings. *See* Order Denying Mot. for Partial J. U.S. Pleadings 3, ECF No. 278 (concluding that because Defendants' motion attacked Plaintiffs' equal protection claim "only in part," Defendants' motion was "improper on its face"). Indeed, any "successful equal protection claim under the Fourteenth Amendment requires proof of both an intent to discriminate and actual discriminatory effect." *Greater Birmingham*, 992 F.3d at 1321; *Arlington Heights*, 429 U.S. at 265 ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). The *Arlington Heights* factors merely identify a non-exhaustive list of "subjects of proper inquiry in determining whether . . . discriminatory intent existed," as is required for any alleged violation of the Equal Protection Clause. 429 U.S. at 268.

Intent is thus relevant to an equal protection claim alleging that a statute fails rational basis review, as it would be under any standard. Under rational basis

review, when a law targets a particular group for unfavorable treatment, the law's actual and proffered purpose must be permissible and the proffered purpose must correlate with the classification targeting the group. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (striking down under rational basis review a state law restricting local ordinances protecting gay people); *Dep't of Ag. v. Moreno*, 413 U.S. 528, 538 (1973) (same with regard to statute denying food stamps to members of household with unrelated members). Indeed, when the Supreme Court has struck down a policy as illegitimate under rational basis scrutiny, "a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Trump v. Hawaii*, 585 U.S. 667, 705 (2018).

Intent is also relevant under heightened scrutiny, which applies if S.B. 184 "is a pretext for invidious discrimination against [transgender] individuals." *Eknes-Tucker*, 80 F.4th at 1230. Should the Supreme Court conclude that state laws banning gender-affirming medical care for transgender minors are not sex-based classifications subject to a higher standard of review, the United States would seek to present evidence at trial to establish the type of invidious discrimination referenced in the Eleventh Circuit's decision. Then, under heightened scrutiny, courts must assess whether the identified classification serves "important governmental objectives" and whether the discriminatory classifications are substantially related to those objectives. *United States v. Virginia*, 518 U.S. 515,

524 (1996). Further, the law's justification must also be genuine, not hypothetical or invented *post hoc*. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982). Evidence of S.B. 184's purpose would then be relevant to determining whether the State's proffered objectives are genuine and assessing whether the law's classifications are substantially related to those objectives.

> ### iii. The United States Adequately Pleaded an Equal Protection Claim, and This Court Has Already Rejected Defendants' Attempt to Dispose of a Portion of That Claim.

The United States adequately pleaded an equal protection claim that included alleged intentional discrimination. Am. Compl. Intervention § B.2 ("Impact of S.B. 184"). Generally, pleadings need not explicitly state the plaintiff's legal theory as Defendants suggest. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (pleading rules did not countenance dismissal of a complaint "for imperfect statement of the legal theory supporting the claim asserted"). Here, the Complaint included sufficient factual allegations to support the United States' theory of intentional discrimination. Defendants attempt to repackage arguments from their failed motion for partial judgment on the pleadings. The Court should reject those contentions once again.

The United States was not required to plead an explicit intentional discrimination theory in its complaint. *See id*. at 11. As the Seventh Circuit has

recognized, the "fact that the complaint omits a legal theory cannot block a plaintiff from invoking that theory." *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020). This reasoning is persuasive because "[c]omplaints plead *grievances*, not legal theories," and it is sufficient that the complaint includes enough factual allegations to support the plaintiff's theory. *Id.*

The United States' complaint included sufficient allegations to support its theory. The "impact of the official action whether it 'bears more heavily on one [class] than another,'" is relevant to "whether invidious discriminatory purpose was a motivating factor." *Arlington Heights*, 429 U.S. at 266-68. Here, the United States' Amended Complaint identified how S.B. 184 exclusively impacted transgender youth, alleging that the ban "prohibits transgender minors" from accessing care that non-transgender minors can access. Am. Compl. Intervention ¶¶ 47-48, 53. For example, transgender males are unable to access the same testosterone that a non-transgender male may be prescribed. *Id.* ¶ 50. The law thus blocks transgender youth from receiving what is "widely recognized within the medical community as the only effective treatment" for their condition. *Id.* ¶ 54. Such allegations about the impact of S.B. 184 on transgender youth support the United States' theory of intentional discrimination regarding its equal protection claim.

Moreover, as noted *supra*, this Court already rejected Defendants'

arguments that the United States "pleaded no *Arlington Heights* claim," Caughey

Mots. 15, or failed to allege discriminatory intent. *See* Order Denying Mot. for

Partial J. U.S. Pleadings 3. Defendants unsuccessfully moved for partial judgment

on the pleadings "to the extent any claim in the federal government's complaint

attempts to allege intentional discrimination." Mot. for Partial J. Pleadings 18, ECF

No. 171. This Court correctly characterized Defendants' motion as an attempt to

preclude the United States from alleging or proving intent as challenging a

"portion" of the United States' equal protection claim. Order Denying Mot. for

Partial J. U.S. Pleadings 2-3. Because the Court has already recognized that an

intentional discrimination theory is subsumed within the United States' existing

claim, it should reject Defendants' argument that the United States is not allowed

to pursue such a theory.[8]

---

[8] Defendants' arguments also misconstrue this Court's ruling quashing previous subpoenas. Defendants characterize that ruling and subsequent statements at hearings as "agree[ing]" that issues of intent have no relevance at all, Caughey Mots. 14, but the Court's ruling was focused on balancing relevance with burden of complying with specific subpoenas. *See* Opinion and Order 5, ECF No. 192 (holding that "the burden of the requested material greatly outweighs any slight relevance it may have."). The Court's previous ruling about the burden of a particular subpoena outweighing its relevance, and statements at hearings regarding attorneys' characterizations of those subpoenas, was not a categorical holding that intent evidence is irrelevant. *See* Tr. Mot. to Quash Hr'g. 17, ECF No. 467 ("[B]ut I think these three attorneys have very succinctly and accurately stated what the law of the case is, what my previous orders are.").

iv. **Prof. Caughey Appropriately Disclaimed Any Opinion About the Ultimate Legal Question of Intent or Any Legislator's State of Mind.**

It is proper when experts opine on issues relevant to the *Arlington Heights* factors to disclaim any intention to opine on the ultimate legal question of intent or any individual legislator's state of mind as Prof. Caughey did here.

Experts may not offer legal conclusions. *E.g.*, *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018). They may, however, offer opinions on factual issues relevant to legal conclusions. *See* Fed. R. Evid. 704 Adv. Comm. Notes (an expert may not answer whether an individual had "capacity to make a will" but could answer whether the individual had "sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution").

In the context of discrimination cases, courts may preclude testimony about the ultimate legal question of intent while allowing testimony relevant to understanding intent. For example, in one case in this Circuit, the court allowed an expert to "testify about his own analysis of historical facts and statistics with respect to the *Arlington Heights* factors" when he "expressly disclaim[ed] any attempt to encroach on [the district court's] purview with respect to deciding the ultimate legal question as to the legislative intent with respect to the passage" of a

law. *Fla. State Conf. of Branches v. Byrd*, No. 4:23cv215-MW/MAF, 2024 WL
1349099, at *1 (N.D. Fla. Mar. 4, 2024). In another case raising an Equal
Protection Clause challenge to a Florida law, the district court similarly precluded
a history professor from "offering any opinions at trial as to the ultimate issue of
discriminatory legislative intent," but allowed the professor to testify about his
"analyses on the historical and statistical circumstances" surrounding the law's
passage. *City of S. Miami v. Desantis*, No. 19-cv-22927-BLOOM/Louis, 2020 WL
7074644, at *13-14 (S.D. Fla. Dec. 3, 2020).

Here, Prof. Caughey properly avoided addressing the ultimate legal question
of intent. Caughey Dep. Tr. 335:9-12 (did not opine on the question of legislative
intent itself), 335:13-18 (did not opine "on any legislators' individual intent" or
"motivation"). Defendants' arguments that he therefore has "nothing of relevance
to offer," Caughey Mots. 20, ignores the distinction between an ultimate legal issue
(which Prof. Caughey avoids) and the factual questions relevant to assessing that
issue (which Prof. Caughey addresses). That he appropriately limited his testimony
to facts relevant to understanding intent does not undermine the admissibility of his
testimony.

### 2. Prof. Caughey's Opinions Are the Product of Reliable Methodologies That He Uses as a Professor and Researcher.

Prof. Caughey's opinions are the product of reliable political science
methodologies he uses as a professor and researcher in his peer-reviewed academic

work, including the construction of indices to estimate a state's policy orientation and analysis of legislative history. Defendants offer criticisms of his methodologies that, at most, identify ways to improve his methodologies but do not undermine their fundamental reliability.

      i.    **Prof. Caughey's Indices Are Reliable and Helpful.**

Prof. Caughey developed three indices for his report using the same political science methodologies of statistical and historical analysis to evaluate state policy choices that he uses in his published peer-reviewed academic work as a political scientist. In his own work, he "aggregate[s] many policies" of states to estimate the states' general policy orientation "in a given domain." Caughey Dep. Tr. 123:20-124:10. Here, he created three such indices aggregating state policies to assess state policies in particular domains. Defendants' criticisms that each index allegedly assumes that policies were enacted for a single purpose, Caughey Mots. 23-26, and that the indices are not able to "prove causation," *id*. at 27-28, misconstrue Prof. Caughey's methodology. Defendants' critique of each index for not including different policies that supposedly would have made the indices even more robust, *id*. at 28-34, at best go to the weight of Prof. Caughey's opinion and not its admissibility.

An expert's opinion must be "reliable." *Frazier*, 387 F.3d at 1260; Fed. R. Evid. 702. Courts consider various factors to assess an opinion's reliability,

including the error rate of a particular scientific technique and "whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1262. Ultimately, the goal of assessing reliability is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Rider v. Sandoz Pharms.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (referring to this as the "key consideration").

In his own academic work in the field of political science, Prof. Caughey develops datasets to estimate states' general policy orientation "in a given domain." Caughey Dep. Tr. 123:20-124:10. Along with a colleague, he developed the "most comprehensive time-series—cross-sectional dataset of U.S. state policies." Caughey Rebuttal Rep. ¶ 22 n.7. This Caughey-Warshaw dataset shows whether each state had particular policies in place for each year and covered 186 different public policies that could be compared across states. *Id.* The methodology used to develop this dataset is widely accepted in the field of political science. For example, an article describing the dataset, *The Dynamics of State Policy Liberalism, 1936-2014*, and a book relying on the dataset, *Dynamic Democracy: Public Opinion, Elections, and Policymaking in the American States*, both earned awards from his colleagues in the American Political Science Association

(APSA)—the leading professional association of political scientists in the country.[9] *Id*. at 43, 54-55. His works use such data to evaluate the relationships between certain factors and policy outcomes.

In this case, Prof. Caughey created three indices based on whether states had particular policies in place each year over a period of time. Each index used the same methodologies used in his academic work.

First, Prof. Caughey created an index of a state's "general orientation towards LGBT rights," which revealed that Alabama "has consistently been among the states with the most restrictions on LGBT rights." *Id*. ¶¶ 21-27. To do this he used a subset of 13 policies related to LGBT rights drawn from the Caughey-Warshaw dataset he uses in his award-winning and peer-reviewed academic work, including sodomy criminalization, the presence of LGBT hate crimes laws, etc. A policy was only included for years when there was cross-state variation on that policy. *Id*. ¶ 23. "To summarize each state's general orientation towards LGBT rights, [Prof. Caughey] code[d] whether or not it took a relatively restrictive position on each of the above policies in each year." *Id*. ¶ 24. The number of restrictive positions was then divided by the available policies to reach a percentage, such that a state with nine restrictive positions regarding 10 policies

---

[9] American Political Science Association, *About APSA*, https://perma.cc/K93C-L9T6 (last visited Aug. 7, 2024).

with any cross-state variation that year would have a score of 90%. *Id.* ¶ 25. This analysis illustrated "Alabama's consistent history as an outlier with respect to restrictions on LGBT rights." *Id.* ¶ 27.

Next, his "transgender restriction index" summarizes a "state's propensity to adopt transgender-restrictive policies," and revealed Alabama's high propensity to regulate the rights of transgender people in multiple fields. *Id.* ¶¶ 28-34. For this index, he relied on the presence or absence of five transgender-restrictive policies identified in published academic literature,[10] including whether the state restricts discussion of sexual orientation or gender identity in the classroom. *Id.* ¶ 29. To create the index, he counted how many such policies a state has adopted in a year. *Id.* ¶ 33. Prof. Caughey then analyzed the relationship between this index and the adoption of laws banning gender-affirming care for minors. *Id.* ¶¶ 33-34. States with a higher score on the transgender restriction index were more likely to ban the provision of gender affirming care. *Id.*

Finally, Prof. Caughey created a "healthcare paternalism index," which revealed that Alabama "ranks very low on the healthcare paternalism" and "very high in healthcare freedom." *Id.* ¶¶ 35-46. The purpose of the healthcare paternalism index was to measure where different states stand "in the balance they

_____

[10] The literature Prof. Caughey references used six policies, including the presence of a law banning gender-affirming care for minors. In his analysis, Prof. Caughey included the five policies besides the ban on gender-affirming care for minors.

strike between protecting citizens and allowing them to make their own healthcare decisions." *Id.* ¶ 37. This index counted how many of four policies that involve a "tradeoff between paternalism and freedom" a state had, including the presence or absence of a personal vaccine exception. *Id.* ¶¶ 38-40. States with a lower level of healthcare paternalism are more likely to ban the provision of gender-affirming care for minors. *Id.* ¶¶ 42-46.

Defendants' criticism that each index allegedly assumes that policies were enacted for a single purpose, Caughey Mots. 23-26, misconstrues what his indices measure. Prof. Caughey did not need to assume that the laws in those indices were exclusively motivated by healthcare paternalism or hostility toward LGBT rights for each index to validly measure the relevant domain of policymaking. Prof. Caughey testified that he was "not assuming" that each policy in his transgender restriction index, for example, was "only adopted" based on hostility toward transgender rights. Caughey Dep. Tr. 284:19-285:5. Rather, that index is "an indicator of a state's . . . relative propensity to . . . restrict those rights." *Id.* 288:20-289:3. Similarly, his healthcare paternalism index measures "states' relative weight they put on medical paternalism versus medical freedom." *Id.* 337:11-338:8. And his LGBT rights index measures a "state's general propensity to restrict or expand LGBT rights . . . ." *Id.* 131:13-132:2, 132:15-133:22. Prof. Caughey's methodology to develop these indices is not only accepted and used within peer-

reviewed political science research but they have also been celebrated for their outstanding contributions to the field.

Defendants' criticism that the indices are not able to "prove causation," Caughey Mots. 27-28, misinterprets the role of the indices. Prof. Caughey explained in his deposition that his indices do not prove "causation." Caughey Dep. Tr. 221:20-222:1 (testifying about the healthcare paternalism index specifically). For example, his transgender restriction index is "not capable of proving that SB 184 is rooted in a restrictive stance toward gender identity," but it can "inform[] our inferences about the relative credibility of competing explanations" for a policy. *Id*. 224:3-14.

Defendants' other minor critiques of each index, Caughey Mots. 28-34, go to the weight of Prof. Caughey's opinion rather than its admissibility. For example, Defendants' suggestions of other paternalistic policies to include in the healthcare paternalism index, *see id*. at 28-30, do not undermine the fundamental reliability of that index. *See* Caughey Dep. Tr. 337:11-338:8 (Prof. Caughey explained that the index is a "reliable indicator of the state's healthcare paternalism" despite Defendants' critiques because the four indicators cover the range of different levels of paternalism). That the Caughey-Warshaw dataset he used to compose his LGBT rights index is neither a "comprehensive set of all state policies" nor a "random sample" of state policies, Caughey Mots. 31, does not undermine the usefulness of

that data when Prof. Caughey explained that "it is the most representative and expansive policy dataset of its sort." Caughey Dep. Tr. 113:17-19. Such minor criticisms of Prof. Caughey's methodology go to the weight and not the admissibility of his opinions.

> ii.   **Prof. Caughey's Discussion of Recent Legislative Action Hostile to LGBT Rights Is Reliable.**

Prof. Caughey's discussion of recent anti-LGBT legislation in Alabama is sufficiently reliable. Prof. Caughey's report details Alabama's recent history of passing "conscience laws" that allow organizations to discriminate against LGBT persons, laws that bar transgender people from playing on certain sports teams that match their gender identity, and proposed laws that would, among other things, require state agencies to use an individual's sex assigned at birth. Caughey Rebuttal Rep. ¶¶ 47-57. Prof. Caughey uses these examples to support his opinion that Alabama has "witnessed an explosion of proposed and enacted legislation targeting LGBT persons generally and the transgender population specifically." *Id.* ¶ 47.

An expert's opinion must be "reliable." *Frazier*, 387 F.3d at 1260; Fed. R. Evid. 702. Courts need not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Frazier*, 387 F.3d at 1296. "A court may

conclude that there is simply too great an analytical gap between the data and the opinion offered." *Id.*

Prof. Caughey catalogues a series of legislative actions that evince hostility toward LGBT rights and transgender people. Caughey Rebuttal Rep. ¶¶ 47-57. For example, conscience laws that allow individuals to refuse service to LGBT clients necessarily limit LGBT people's access to services that other citizens can receive. *Id.* ¶ 49. Rep. Mack Butler's statements that transgender identity is a "mental defect" and that transgender people are "pretend[ing]" demonstrates contempt for transgender people. *Id.* ¶ 52. Laws that prevent transgender people from using facilities that do not correspond to their assigned sex at birth obviously limit the rights of those persons to use facilities that correspond to their identity. *Id.* ¶ 54. Laws that require state agencies to categorize transgender people according to their assigned sex at birth will limit their ability to engage with the state according to their identity in the same way non-transgender people do. *Id.* ¶ 56. Prof. Caughey's descriptions of these actions illustrate how these legislative actions are hostile to the rights of transgender people and predictably harm them. *See Penick*, 443 U.S. at 464-65 (pursuing a policy "with full knowledge of the predictable effects" of policy is probative of intent to discriminate). Such a "history of pervasive purposeful discrimination may provide strong circumstantial evidence that the

present-day acts of elected officials are motivated by the same purpose." *Marengo Cnty. Comm'n*, 731 F.2d at 1567.

Defendants' arguments that these laws restricting the rights of transgender people are the product of "balancing . . . competing interests," Caughey Mots. 36, do not undermine Prof. Caughey's conclusion that Alabama sought to "restrict[ ] LGBT rights," Caughey Rebuttal Rep. ¶ 86. That the legislature may have been motivated by religious interests in passing "conscience laws" for example, *id.*, does not negate the fact that such laws restrict the rights of LGBT people.

      **iii.**  **Prof. Caughey's Discussion of S.B. 184 Is Reliable Even Though He Does Not Recite Every Fact Involved in the Legislative History of S.B. 184 Because He Includes Sufficient Facts.**

Prof. Caughey's legislative history of S.B. 184 is reliable, and the fact that it does not include every potentially relevant fact does not undermine its reliability. Using sources including public reporting and video of legislative hearings, Prof. Caughey catalogues the origins of S.B. 184, legislators' public justifications for the law, and hearing testimony that provided legislators with notice of S.B. 184's foreseeable harms. Caughey Rebuttal Rep. ¶¶ 58-83. Prof. Caughey includes sufficient detail for his opinions to be reliable, and any criticism for omitting further details goes only to the weight to be afforded his opinion and not its admissibility.

An expert's opinion must be "reliable." *Frazier*, 387 F.3d at 1260 (11th Cir. 2004); Fed. R. Evid. 702. To be reliable, the opinion must be "based on sufficient facts or data." Fed. R. Evid. 702 (b). Ultimately, the expert must apply "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co*., 526 U.S. at 152.

Prof. Caughey's legislative history uses sufficient facts to be reliable. He relies on "scholarly articles, journalistic accounts and interviews, materials from interest groups and nonprofit organizations, recordings of legislative hearings, and the official records of the Alabama Legislature." Caughey Rebuttal Rep. ¶ 59. Prof. Caughey has conducted legislative history analyses in his academic work, and reliance on such materials is "typical of political science analyses of this kind." *Id.* ¶¶ 58-59. That he uses the same methods and sources—the "same level of intellectual rigor"—that he would in his award-winning and peer-reviewed academic work itself strongly supports the reliability of his methodology. *Kumho Tire Co*., 526 U.S. at 152. His opinion rests on numerous publications about similar prohibitions, Caughey Rebuttal Rep. ¶¶ 61, 62, numerous statements by legislators, *id.* ¶¶ 67-72, and the testimony of multiple Alabama residents who would be affected by the bill, *id.* ¶¶ 76-81.

Defendants' criticism that Prof. Caughey "cherry-pick[s]" the legislative history ignores the reality that publicly available data regarding the development of

the legislation is necessarily limited. *See generally* Caughey Mots. Defendants take

issue with his failure to conduct a "comprehensive review," noting that he

considered only three hearings on the bill. *Id*. at 39. But Prof. Caughey explained

that the Alabama legislature does not archive recordings or transcripts of hearings,

Caughey Rebuttal Rep. ¶¶ 73, 59 n.23, and thus he was forced to rely on publicly

available videos of hearings. Defendants also assert that his review of the hearings

omitted testimony from supporters of the bill, Caughey Mots. 39, but that should

be unsurprising when the purpose of that discussion was to illustrate that the

legislators had knowledge of the foreseeable harm that the law would cause.

Defendant's arguments that other pieces of evidence may be probative of a non-

discriminatory intent of the bill do not negate the reliability of his opinion.

### B. Prof. Cohen's Testimony About Off-Label Prescribing Being Widespread and the Availability of Government Interventions Besides Criminalization to Address Patient Safety Concerns Is Admissible.

Prof. Cohen's testimony about off-label prescribing being widespread and

the availability of other government interventions besides criminalization are

admissible. The discussion about off-label prescribing is, at its core, a discussion

about the regulatory and legal regimes around prescription drugs. Prof. Cohen is

qualified to offer his opinions on this topic because of his expertise in health law,

bioethics, and food and drug law, and because he is not offering a medical opinion

about the safety of any particular off-label prescriptions. His opinions are

sufficiently reliable because he supports them with reliable sources of information and his own experience as a legal scholar in the fields of health law, bioethics, and food and drug law. The opinions are helpful because they rebut Defendants' experts' opinions, and because they are probative of the fact that S.B. 184's criminalization of the medical treatment at issue in this case cannot be justified.

### 1. Prof. Cohen Is Qualified to Testify About the Frequency of Off-Label Prescribing.

As an expert in health law, bioethics, and food and drug law, Prof. Cohen is qualified to testify to his conclusion that "there is nothing nefarious or unusual about the fact that drugs relevant to this case are being prescribed 'off label.'" Cohen Rebuttal Rep. ¶ 14. That opinion relies on a range of data regarding how common it is for physicians to prescribe medication for off-label uses. *Id.* ¶¶ 35-59. Prof. Cohen need not be a physician, nor an expert specifically in "off-label prescribing *safety*" as Defendants suggest, Cohen Mots. 11 (emphasis added), to use reliable information about the frequency of off-label prescriptions to support his opinion that off-label prescriptions are not nefarious or unusual.

This Court should evaluate Defendants' argument against the relevant legal standard, in which experts may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. As "long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Clena Invs. v. XL Specialty Ins.*, 280 F.R.D. 653, 661

(S.D. Fla. 2012) (quotation omitted); *see also Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 857 (11th Cir. 2021) (criticizing district court's exclusion of expert who was familiar with analysis at issue but not the medical instrument at issue as imposing burden that was "too high" and conflating reliability with qualifications). An expert in one field may opine on issues that relate to another subject if the expert's opinions is within their area of expertise. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 246 (E.D.N.Y. 2022) (statistician qualified to opine on statistical issues related to economist's statistical model, but not on economic theories); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 178 (N.D. Cal. 2015) (bioethicist permitted to discuss factors physicians consider when setting prices but could not discuss economic effects of physician's decisions).

Prof. Cohen is qualified to testify to his conclusion that "there is nothing nefarious or unusual about the fact that drugs relevant to this case are being prescribed 'off label,'" Cohen Rebuttal Rep. ¶ 14, by virtue of his expertise in health law, bioethics, and food and drug law. Prof. Cohen need not be a physician or medical expert to offer his opinion on the widespread usage of off-label prescribing because this topic is about the regulations and legal regimes around prescription drugs. Prof. Cohen is an expert in health law, bioethics, and food and drug law who has taught these subjects for over 17 years at Harvard Law School.

*Id.* ¶ 5. He is the author, co-author, editor, or co-editor of over 20 books, and the author or co-author of over 200 articles on health law, bioethics, food and drug law and biotechnology. *Id.* ¶ 6. He has published in both law reviews and scientific, medical, and bioethics academic journals. *Id.* In sum, Prof. Cohen is well-qualified to provide the opinion that there is nothing nefarious about the off-label use of prescriptions.

Opining that many prescriptions are used for off-label purposes, *id.* ¶ 17, is within the scope of his expertise in bioethics and health law. His opinion is supported in part by a discussion of the legal regime governing off-label prescriptions, something squarely within his expertise in health law. *Id.* ¶¶ 19-34. This discussion reveals that although FDA approves drugs for specific uses, FDA approval also allows the drug to be "prescribed freely for any intended use," and that practical limitations may discourage a drug manufacturer from seeking approval for additional uses once they are approved for one use. *Id.* ¶¶ 28, 33. The opinion is also supported by reference to legal and policy sources noting that drugs are "widely prescribed for off-label uses"—sources he is well-equipped to assess as an expert in health law. *E.g.*, *Id.* ¶¶ 35, 38, 40, 42. The opinion is also supported by medical studies, which Prof. Cohen is capable of interpreting and relying on to the extent they relate to his areas of expertise in health law and bioethics, which they do. *E.g.*, *Id.* ¶¶ 46-50, 53-58.

Defendants attack Prof. Cohen's qualifications because he has never prescribed a drug and has never conducted studies on medical issues related to off-label prescribing. Cohen Mots. 10-11. But he is not offering a medical opinion about the standard of care or the safety of particular off-label prescribing practices. He is offering an opinion about regulatory and legal regimes around prescription drugs rooted in his expertise in health law, bioethics, and food and drug law that, naturally, relates to medicine. That even peer-reviewed medical journals like the New England Journal of Medicine and JAMA have published his work confirms that he is qualified to opine on issues that *relate* to medicine and health, such as his opinions here. Cohen Rebuttal Rep. ¶ 6.

### 2. Prof. Cohen's Opinions Regarding Off-Label Prescribing and Criminal Sanctions for Unlawful Prescription are Sufficiently Reliable.

Prof. Cohen's opinions about off-label prescribing and criminal sanctions for unlawful prescriptions are reliable and admissible. Opinions do not need to be the product of a particular scientific analysis to be reliable. Any critiques of Prof. Cohen's opinions would, if anything, affect the weight to be given his testimony but they do not undermine the fundamental reliability and admissibility of the opinions.

An expert's opinion must be "reliable." *Frazier*, 387 F.3d at 1260; Fed. R. Evid. 702. Courts have identified various non-exhaustive factors to assess an

56

opinion's reliability, including the error rate of the particular scientific technique or whether the technique has been peer reviewed. *Frazier*, 387 F.3d at 1262. But the reliability inquiry is "a flexible one." *Id.* at 1297 (quoting *Daubert*, 509 U.S. at 594). And standards "such as testability and peer review" do not "apply to all forms of expert testimony." *Am. Gen. Life Ins. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009). Ultimately, the goal of assessing reliability is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152; *see also Rider*, 295 F.3d at 1197 (referring to this as the "key consideration"). Even opinions that do not rely on published studies may be reliable if the information is commonplace in the field. *Frazier*, 387 F.3d at 1299-1300. Accordingly, expert opinions "derived from literature review . . . are not automatically rendered unreliable by their non-susceptibility to empirical verification." *E.g.*, *Suarez v. City of Hollywood*, No. 116-62215-CIV-DIMITROULEAS, 2018 WL 11351533, at *2-3 (S.D. Fla. Nov. 9, 2018) (opinion formed after considering medical and scientific literature was sufficiently reliable).

Prof. Cohen's opinion about off-label prescribing is reliable. As discussed *supra*, his opinion that there is nothing nefarious about the off-label use of prescriptions is supported by a discussion of the legal regime allowing off-label prescriptions, legal and policy sources noting that drugs are "widely prescribed for

off-label uses," and some medical studies documenting how common off-label prescriptions are. Cohen Rebuttal Rep. ¶¶ 19-34, 35, 38, 40, 42, 46-50, 53-58. He uses reliable sources of data, including legal publications, government documents, and peer-reviewed articles. And he applied his expertise to summarize, gather, and interpret these materials.

It is irrelevant that, as Defendants argue, his opinions about off-label prescribing being widespread cannot be peer reviewed or given an error rate. Cohen Mots. 13. The Eleventh Circuit has acknowledged that standards "such as testability and peer review" do not "apply to all forms of expert testimony." *Am. Gen.*, 555 F.3d at 1338. Prof. Cohen's opinion formed on the basis of a literature review is sufficiently reliable. *E.g.*, *Suarez*, 2018 WL 11351533, at *2-3.

Prof. Cohen's opinion that "[t]he use of criminal law relating to a licensed practitioner prescribing an FDA-approved drug is exceedingly rare," and that states have other mechanisms to prevent unsafe medical practices, Cohen Rebuttal Rep. ¶¶ 14, 60-77, is also sufficiently reliable. He supports his opinion with a survey of the legal tools available for states to regulate the practice of medicine and ensure that patients' interests are protected, based on a review of the kinds of academic literature and legal sources he relies on as an expert in health law. *Id*. ¶¶ 64-76. It is worth noting that his particular opinion that criminal law is rarely used to penalize the prescription of FDA-approved drugs is only a small piece of his overall opinion

about the range of mechanisms available to states. *Id.* ¶¶ 14, 62. Nonetheless, that opinion is also sufficiently reliable, as it is based on his experience as an academic with years of experience in health law. *See id.* ¶ 62 ("I am not aware of any instance where a state has sought to criminalize a physician's prescribing of an FDA-approved drug as Alabama has done here."). Experience alone may provide a sufficient foundation for expert testimony when the expert explains how that experience leads to their conclusion, Fed. R. Evid. 702 Adv. Comm. Notes, as Prof. Cohen does here. Prof. Cohen also appropriately limited the scope of this conclusion so as to not exceed his experience that is the basis for the conclusion. *See* Cohen Rebuttal Rep. ¶ 62 ("While it is possible there are instances that exist with which I am not familiar, at the very least I can confidently say that applying criminal state-law penalties to the prescribing and use of FDA-approved drugs by licensed practitioners is exceedingly rare").

Defendants' arguments that his "methodology" for opining on the rarity of criminalizing the off-label prescription of drugs is insufficient because he does not define "rare" or rely on a "metanalysis of the relevant criminal statutes that apply to physicians," Cohen Mots. 16, rely on an unjustifiably narrow view of reliability. Not every question on which an expert might form an admissible opinion is susceptible to the kinds of scientific methodologies Defendants apparently contemplate. *See, e.g.*, *Am. Gen.*, 555 F.3d at 1338 ("Standards of scientific

59

reliability, such as testability and peer review, do not apply to all forms of expert testimony."). Prof. Cohen explained that the basis of the opinion was his experience, a basis that the Federal Rules of Evidence recognize as valid. *See* Fed. R. Evid. 702 advisory committee's note (reliance on "experience alone" may be sufficient for some opinions). Whether Prof. Cohen's experience fails to account for additional facts and how those additional facts would affect his conclusions are appropriate areas for cross-examination, but his opinion is sufficiently reliable to be admissible.

### 3. Prof. Cohen's Testimony Is Relevant and Helpful Because it Rebuts Defendants' Experts Opinions and Relates to Whether Patient Safety Concerns Are a Rational Basis for Criminalizing the Medical Care at Issue.

Prof. Cohen's opinions about off-label prescribing being widespread and criminalizing off-label prescribing being rare are helpful to the factfinder because they rebut contentions by the Defendant's experts. As discussed *supra*, in Section I(A), Defendants' experts opine on the appropriateness of S.B. 184 as a policy response to their supposed concerns about patient safety. Prof. Cohen's opinions about off-label prescribing being widespread rebut the notion that the off-label nature of medications prescribed for gender-affirming care is inherently problematic such that it necessitates a regulatory response. And Prof. Cohen's opinions about the rarity of using criminal law to punish a licensed practitioner

prescribing an FDA-approved drug and the availability of other mechanisms to regulate medicine rebut the contention that S.B. 184 is an appropriate response to any patient safety concerns.

Expert testimony must be helpful—it must "assist[] the trier of fact . . . to understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260. Relatedly, expert opinion, like all evidence, must have a "tendency to make a fact [that is of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401(a).

Opinions about the widespread nature of off-label prescribing are relevant to whether patient safety concerns are a rational basis for criminalizing the provision of the medical care at issue in this case. Defendants attempt to use the fact that gender-affirming care is an off-label use of medications to justify the need for S.B. 184. *See* Section I(A), *supra* (discussing Defendants' experts' statements about the off-label nature of the prescriptions). For example, in their summary judgment briefing, Defendants rely on a quote from Dr. Laidlaw saying that the "use of puberty blockers for gender non-conforming children is experimental and not FDA-approved." Defs' Mot. for Summ. J. 7. By clarifying that the off-label nature of the prescriptions itself is not particularly problematic and that many uses of medications are off-label, Prof. Cohen will help the Court, as factfinder, understand that the off-label nature of the prescriptions is not a rational basis for

concluding that physicians should be criminally prosecuted for providing gender-affirming care.

Prof. Cohen's opinions about the rarity of criminalizing physicians' prescriptions of FDA-approved drugs and the availability of other regulatory mechanisms to protect patient safety are also relevant to understanding that patient safety concerns are not a rational basis for prosecuting physicians providing gender-affirming care. Defendants identify patient safety concerns as a justification for S.B. 184. *See id.* at 8 (alleging that gender-affirming care "results in numerous harmful effects"). Even if one credits these patient safety concerns, Prof. Cohen's testimony about the availability of other regulatory mechanisms and the rarity of criminalizing medicine is relevant to understanding that the patient safety concerns Defendants identify are not a rational basis for the draconian government action that S.B. 184 authorizes.

### C. This Court Should Admit Dr. Shumer's Testimony.

The Court should admit Dr. Shumer's testimony in its entirety. As noted above, courts evaluate qualifications, reliability, and helpfulness to determine admissibility of expert witness testimony under Fed. R. Evid. 702. *Frazier*, 387 F.3d at 1260. Dr. Shumer clears this three-part test. Dr. Shumer has extensive clinical experience overseeing clinical practice at a pediatric gender clinic. Defs.' *Daubert* Ex. 14 (Shumer Rep.) at 4, ECF No. 592-14. A "major focus" of his

"clinical, teaching, and research work" has pertained "to the assessment and management of transgender adolescents." *Id*. at 2-3. His scholarship includes "numerous peer-reviewed articles on various topics related to treatment of transgender youth." *Id*. at 4. Dr. Shumer has "personally evaluated and treated" hundreds of patients with gender dysphoria and has "been invited to speak at numerous hospitals, clinics, and conferences on topics related to clinical care and standards for treating transgender children and youth." *Id*.

Given his background, Dr. Shumer is highly qualified to offer his testimony; his testimony is reliable; and his testimony will assist the Court in understanding gender-affirming medical care for youth from both clinical and academic perspectives. His testimony is also relevant to important issues in this case, including: the safety and efficacy of gender-affirming medical care to treat gender dysphoria in transgender youth; the lack of scientific basis for S.B. 184; and how prevailing medical guidelines are applied in practice to treat gender dysphoria in transgender youth. Defendants' arguments to exclude parts of Dr. Shumer's testimony are not persuasive because they incorrectly characterize the scope and substance of Dr. Shumer's opinions. For the reasons discussed *infra*, the Court should deny Defendants' motion to exclude portions of Dr. Shumer's testimony.

1. **Dr. Shumer's Testimony About the Provision of Gender-Affirming Medical Care to Youth Is Admissible Because He Is Qualified to Opine on This Topic and His Testimony Is Reliable and Helpful.**

This Court should deny Defendants' attempt to exclude any portion of Dr. Shumer's testimony about the provision of gender-affirming medical care to treat gender dysphoria in minors. His testimony is rooted in deep expertise, is reliable, and will help this Court understand the medical and scientific issues in this case.

Regarding his expertise, Dr. Shumer has years of clinical experience treating hundreds of patients with gender dysphoria and has published academic work regarding the treatment of gender dysphoria. This experience qualifies him to opine on the provision of such treatment. Defendants' argument that Dr. Shumer's testimony exceeds his expertise because he opines specifically on the practices of Alabama providers misconstrues his opinions. He does not, as Defendants argue, seek to offer factual testimony about the practices of specific providers in Alabama. Accordingly, the Court should reject Defendants' efforts to exclude Dr. Shumer's testimony regarding the provision of gender-affirming medical care for youth under prevailing medical guidelines.

According to the relevant legal standard, experts may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. An expert "'is not necessarily unqualified simply because [his] experience does not

precisely match the matter at hand.'" *Williams ex rel. Breaseale v. Coleman Co.*,
No. 4:11–cv–02384–KOB, 2015 WL 4077272, at *5 (N.D. Ala. July 6, 2015). As
"long as the expert is minimally qualified, objections to the level of the expert's
expertise go to credibility and weight, not admissibility." *Clena Invs.*, 280 F.R.D.
at 661.

Dr. Shumer is well qualified by his education and experience to testify as an
expert on issues regarding the provision of gender-affirming care. A practicing
pediatric endocrinologist, Dr. Shumer founded a pediatric gender clinic nearly a
decade ago. Shumer Rep. 2-4. He currently serves as clinical director of that clinic,
overseeing clinical practice. *Id*. at 4. As of February 2023, Dr. Shumer had
personally evaluated and treated over 400 patients with gender dysphoria. *Id*. In
addition to his considerable clinical experience, Dr. Shumer has also made
scholarly contributions regarding gender-affirming medical care, as he has
"published extensively on the topic of gender identity in pediatrics and treatment
of gender dysphoria;" has authored "numerous peer-reviewed articles on various
topics related to treatment of transgender youth;" and has co-authored textbook
chapters "related to medical management of transgender patients." *Id*. at 3-4.
Defendants even concede that Dr. Shumer has expertise in using puberty blockers
and cross-sex hormones at his clinic. Shumer Mot. 1.

Defendants' arguments that Dr. Shumer "purports to speak to provider practices in Alabama," and that such opinions are beyond the scope of his expertise or are not reliable, misconstrue his testimony. *Id.* at 2-3. Dr. Shumer's testimony does not opine on how gender-affirming care is provided in Alabama specifically. *See* Shumer Rep. at 6 (stating his opinions are based "solely on [his] extensive background and experience treating transgender patients"); Defs.' *Daubert* Ex. 15 (Shumer Rebuttal Rep.) ¶ 3, ECF No. 592-15 (same).[11] Defendants strain to identify opinions Dr. Shumer supposedly provides about Alabama practitioners. *See* Shumer Mot. 1 (claiming that he "purports to speak broadly about how medical gender transition providers practice – *seemingly* including those in Alabama") (emphasis added); *id.* at 3-4 (listing examples of where Defendants say Dr. Shumer's testimony "repeatedly purports to speak to provider practices in Alabama, either through *broadly worded declarations* or through *implications* directly about those providers") (emphasis added). In fact, Dr. Shumer

---

[11] Dr. Shumer did respond in his rebuttal report to Dr. Nangia's critique of an Alabama provider. Shumer Rebuttal Rep. ¶ 73. But Dr. Shumer was, at most, underscoring that the critique itself, as well as Dr. Nangia's suggestions regarding how providers share information with patients, are unfair given how informed consent works practically by, again, drawing upon his own experience as a practitioner. *See* Fed. R. Evid. 702 (listing experience as a permissible basis for expert witness qualification). He never makes any specific, affirmative evaluation or assessment of the provider Dr. Nangia critiques. *See* Shumer Rebuttal Rep. ¶ 73. Nothing about his rebuttal required Alabama-specific, firsthand knowledge.

appropriately disclaims firsthand knowledge of specific Alabama clinical and prescriber practices.[12]

Dr. Shumer's lack of firsthand knowledge of Alabama providers does not make him an unqualified expert in this case because he does not need to practice in Alabama (or know the specifics of Alabama gender clinics) to opine more broadly on the medical treatment of adolescents for gender dysphoria under prevailing medical guidelines. *See Coleman,* 2015 WL 4077272, at \*5 (an expert "'is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand'"); *see also Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"); *Frazier*, 387 F.3d at 1260 (noting that expert witnesses are the only witnesses "free to opine about a complicated matter without any firsthand knowledge of the facts in the case").

Further, despite Defendants citing it as a "similar case," Shumer Mot. 5, *Lebron* is inapposite here. In *Lebron*, the expert purportedly attempted to opine on drug use rates among TANF recipients in Florida, but had never studied TANF populations in *any context*, much less in Florida. 772 F.3d at 1368. In contrast, as

---

[12] Defendants asked Dr. Shumer at deposition to opine on a physician's practices in Alabama based on nothing more than select passages from a news article that Dr. Shumer had not previously read. Shumer Dep. Tr. 255:1-260:7, ECF No. 557-39. In response, Dr. Shumer appropriately demurred, stating that he wished to "reserve concern" until he actually "knew more about how she actually structures her visits and sees patients." *Id*. 259:17-19.

discussed *supra*, Dr. Shumer has extensive experience in providing gender-affirming medical care to youth with gender dysphoria. He has also published extensively on this topic, whereas the excluded expert in Florida had never conducted prior research related to TANF. *See id*. at 1369. That Dr. Shumer has not conducted research regarding Alabama specifically has no bearing on his ability to opine on the provision of gender-affirming care for adolescents with gender dysphoria. And Defendants provide no reason why the underlying scientific support for gender-affirming medical care would differ based on location. However, even if this Court agreed that Dr. Shumer's geographic location impacted his opinions in this case, that would be a determination of weight, not admissibility. *See Clena Invs.*, 280 F.R.D. at 661 (As "long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.").

Dr. Shumer's opinions regarding the provision of gender-affirming medical care generally are also reliable. He relied upon both his own experience as a pediatric endocrinologist, as well as the scientific literature, to draft his expert report. Shumer Rep. at 4-5 (noting reliance on his "scientific education, training, and experience, [his] research experience, and [his] knowledge of the scientific literature in the pertinent fields"). In writing his expert report, he relied upon "the same types of materials that experts in [his] field of study regularly rely upon when

68

forming opinions on these subjects). *Id*. at 5 (citing WPATH SOC-8, the Endocrine Society Clinical Practice Guideline, the DSM-V-TR, and works cited in the report). Defendants critique Dr. Shumer's reliability regarding Alabama provider practices. But as discussed *supra*, Dr. Shumer never purports to opine about the practices of Alabama providers specifically. The Court should reject Defendants' reliability argument.

Additionally, Dr. Shumer's opinions about the provision of gender-affirming medical treatment for youth generally will be helpful to this Court. His testimony regarding how gender-affirming medical care is provided to treat minors with gender dysphoria "concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. Defendants seem to assert that, because Dr. Shumer offers "testimony about provider practices generally," who are located outside of Alabama, his opinions are irrelevant. Shumer Mot. 5 (asserting that such testimony "add[s] nothing"). However, while the testimony he provides is not specific to Alabama providers, it is still relevant to one of Defendants' proffered justifications for the law: that gender-affirming medical care for minors is not safe and effective. Dr. Shumer opines on the treatments youth receive for gender dysphoria consistent with prevailing medical guidelines. This issue of the safety and efficacy of gender-affirming care will inform the Court's equal protection analysis, regardless of the standard of review. Accordingly, Dr.

Shumer's opinions on the provision of gender-affirming medical care to treat gender dysphoria in youth, consistent with prevailing medical guidelines, will be useful to the Court.

Dr. Shumer's opinions regarding the provision of gender-affirming medical care for minors to treat gender dysphoria are admissible. Dr. Shumer's testimony draws upon his expertise, is reliable, and is useful to the Court. Despite Defendants' assertions, Dr. Shumer does not offer testimony regarding provider practices in Alabama specifically. The Court should deny Defendants' motion to exclude Dr. Shumer's testimony on providing gender-affirming medical care.

### 2. Dr. Shumer's Testimony About Increased Mental Health Problems and Suicidality as Consequences of Being Denied Gender-Affirming Medical Care Is Reliable.

Dr. Shumer's opinion that denying minors access to gender-affirming medical care will result in increased mental health problems and suicidality is reliable. His conclusions are supported by both the scientific literature and his own clinical experience. The Court should reject Defendants' attack on the reliability of Dr. Shumer's testimony on this issue.

Courts assess various factors to evaluate reliability, such as whether the expert's theory "can be and has been tested," "whether the theory has been subjected to peer review and publication," and "whether the technique is generally

accepted in the scientific community." *Frazier*, 387 F.3d at 1262. Experts can also

rely upon their experience. *Id*.

In drafting his report, Dr. Shumer relied upon both the scientific literature

and his experience. Shumer Rep. at 4-5 (stating he relied in part upon his

"scientific education, training, and experience, [his] research experience, and [his]

knowledge of the scientific literature in the pertinent fields"). Both offer support

for his conclusion that denying transgender youth access to gender-affirming

medical care will result in increased mental health problems and suicidality.

First, Dr. Shumer supports his opinion with scientific literature.

He cites to published studies, including one peer-reviewed study that describes

gender-affirming hormone therapy as being "correlated with reduced rates of

depression and suicidality among transgender adolescents." *Id*. at 12 (citing a 2022

study by Green, et al., published in the *Journal of Adolescent Health*); *see also*

Defs.' *Daubert* Ex. 16 (Green 2022) at 647, ECF No. 592-16 (Green study finding

that among those aged 13-17, receipt of gender-affirming hormones "was

associated with nearly 40% lower odds of recent depression . . . and attempting

suicide in the past year"). Another peer-reviewed, published study cited by Dr.

Shumer "documented that access to gender-affirming hormone therapy in

adolescence is associated with favorable mental health outcomes in adulthood,

when compared to individuals who desired but could not access hormonal

interventions." Shumer Rep. at 12 (citing a 2022 study by Turban, et al., published in *PLOS ONE*). The Turban 2022 study[13] specifically noted that the "results also provide additional evidence to suggest that legislation restricting transgender adolescents' access to gender-affirming medical care would result in adverse mental health outcomes," Ex. 1 at 12, which is consistent with Dr. Shumer's stated opinion that banning effective treatment for gender dysphoria "will lead to an increase in mental health problems and suicidality in an already vulnerable population." Shumer Rep. at 36.

Second, Dr. Shumer relies upon his experience to support his opinions regarding adverse mental health outcomes for transgender youth who are denied gender-affirming medical care. He notes that he has seen "many patients" with gender dysphoria who persisted in their gender dysphoria absent access to gender-affirming care. Shumer Dep. Tr. 174:25-175:4. He also notes his firsthand experience as a clinician with patients who arrived at his clinic struggling with

---

[13] Defendants note that this study had an associated correction published. Shumer Mot. 9. As the published Correction by the authors notes, the errors "do not affect the results of the primary analyses or conclusions reported in the article." Ex. 2 at 1. The Correction also notes that a "member of *PLOS ONE's* Editorial Board confirmed that the new results support the results and conclusions of the published article." *Id*. Further, the Correction explained that, in response to concerns about common publications shared between an editor and authors, a *PLOS One* Editorial Board member "reevaluated the manuscript and reviews, and has confirmed that the article is scientifically sound and meets *PLOS ONE*'s Publication Criteria." *Id*. The "underlying deficiencies" Defendants reference, Shumer Mot. 9, speak to the lack of definitive causation and limitations of study design, topics discussed *infra*.

severe gender dysphoria and who leave his clinic as "well-adjusted, confident, successful young adults." Shumer Rep. at 34-35.

Defendants' critiques of the underlying support for Dr. Shumer's opinion on this topic at most go to the weight and not the admissibility of his opinions. In their motion, Defendants point out that the studies Dr. Shumer cites do not definitely establish a causal link between gender-affirming care and mental health outcomes, or that the studies have other limitations. Shumer Mot. 6-10. But relying on scientific studies with methodological limitations is inherently a generally accepted approach, as all scientific studies have limitations. *See* Shumer Rebuttal Rep. ¶ 21; *see also* Shumer Dep Tr. 225:11-14 (noting self-reported survey responses had same limitation "just like many similar surveys that are used in research"). That Dr. Shumer relies on evidence with limitations does not, without more, make it unreliable. Defendants also incorrectly imply evidence that cannot demonstrate causation, known as "low" quality evidence, is unreliable evidence. Shumer Mot. 7-8. Again, reliance on low quality evidence in medicine is "commonplace." *Ladapo*, 2024 WL 2947123, at *33 (citing unrebutted testimony that "only about 13.5% of accepted medical treatments across all disciplines are supported by 'high' quality evidence"); *see also* Shumer Dep. Tr. 206:6-8 ("I would also just warn that when you hear something like the strength of evidence is low, that doesn't mean that the evidence is bad or poor or incorrect."). And while the perfect research

study design does not exist, Dr. Shumer bases his opinion, in part, upon the body of evidence that published studies *do* provide. As noted above, medical treatment recommendations do not (and cannot) rely on high-quality evidence alone; neither does Dr. Shumer in formulating his opinions. *See also* Shumer Rebuttal Rep. ¶ 15 ("Note that the majority of the Endocrine Society Clinical Practice Guidelines for conditions *other* than gender dysphoria *also* rely on 'low' or 'very-low-quality evidence' according to the G.R.A.D.E. framework."); *accord Kumho Tire Co*., 526 U.S. at 152 (requiring experts to apply "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Furthermore, while Dr. Shumer appropriately acknowledges the limitations of the scientific literature, he does not "disclaim" his opinion or "backtrack" from the studies he cites, nor does he "admit" an unreliable foundation for his opinions. *Compare* Shumer Mot. 7-8, 14, *with* Shumer Dep. Tr. 230:10-14 (while agreeing that limitations were noted in Turban article, also noting study had strengths).

Other attacks by Defendants on the underlying support Dr. Shumer provides for his opinion are imprecise or omit context. In discussing one study, Defendants state that "over one percent of the study participants died '*due to gender-affirming interventions*.'" Shumer Mot. 9 (emphasis in original). What Defendants omit is that the "over one percent" figure references a single individual who unfortunately succumbed to complications from gender-affirming *surgery,* Defs.' Mot. Summ. J.

Ex. 42 (Shumer Dep. Ex. 37) at 139, ECF No. 557-42 (noting death occurred after vaginoplasty due to postsurgical necrotizing fasciitis). This fact does not speak to the reliability of Dr. Shumer's testimony about mental health outcomes. At another point, Defendants quote a systematic review (Baker) in discussing death by suicide. Shumer Mot. 7. However, the conclusion in Dr. Shumer's report that Defendants cite at the outset of Section II (Shumer Mot. 7) referenced *suicidality*, not suicide. Shumer Rep. at 36 (stating that banning treatment for gender dysphoria "will lead to an increase in mental health problems and *suicidality*") (emphasis added). Suicide and suicidality are distinct concepts.[14] Defendants citing to the Baker systematic review's conclusion about suicide, Shumer Mot. 7, does not undermine the reliability of Dr. Shumer's testimony regarding suicidality. Defendants also state there was no statistically significant correlation between hormone therapy and suicidality in patients under age 18 in the Green study. *Id*. at 9. However, Defendants fail to acknowledge, as noted above, that the same study did find that among those aged 13-17, receipt of gender-affirming hormones "was associated with nearly 40% lower odds of recent depression" and "attempting suicide in the past year." Green 2022, at 647. These findings were statistically significant.

---

[14] *See* Defs' Mot. Summ. J. Ex. 84 (Cass Review) § 5.53, ECF No. 558-34 ("Suicide is the act of taking one's own life voluntarily and intentionally, whilst suicidality encompasses suicidal thoughts (sometimes called suicidal ideation), suicide plans and suicide attempts.").

Defendants' assertion that Dr. Shumer does not base his opinion regarding the mental health consequences of being denied gender-affirming care on his experience, Shumer Mot. 7, is incorrect. As noted above, Dr. Shumer cites his experience as one of the overarching bases for the opinions cited in his report. Shumer Rep. at 5, 6. He need not support every single proposition with a reference to his experience treating transgender youth in order to connect that extensive experience to his opinion regarding the impact of receiving (and being denied) gender-affirming care. *Compare id*. at 14 ("Based on longitudinal data, and [his] own clinical experience, when transgender adolescents are provided with appropriate medical treatment and have parental and social support, they are more likely to thrive and grow into healthy adults."), 35 (describing when patients who arrive to care "as struggling adolescents with severe gender dysphoria" become "well-adjusted, confident, successful young adults"), *with* Shumer Dep. Tr. 174:25-175:4 (noting he has seen "many patients" with gender dysphoria who persisted in the gender dysphoria absent access to gender-affirming care).

In sum, Dr. Shumer's opinion regarding the negative mental health consequences, including suicidality, of being denied gender-affirming medical care is reliable. His experience and the scientific literature offer support to his opinion. This Court should therefore reject Defendants' attempt to exclude this portion of Dr. Shumer's testimony.

### 3. Dr. Shumer's Testimony About the Biological Foundation of Gender Identity Is Admissible.

Dr. Shumer's testimony regarding the biological underpinnings of gender identity is admissible. This Court should reject Defendants' attempt to exclude Dr. Shumer's opinion regarding the biological underpinnings of gender identity, including his opinion that gender identity has a "strong biological foundation." Shumer Mot. 10-15. Dr. Shumer's testimony on this topic is admissible, as he is qualified to offer it; his testimony is reliable; and his testimony will assist the Court. *See Frazier*, 387 F.3d at 1260.[15]

In evaluating reliability, courts consider whether the expert's theory has been tested and is the subject of peer-reviewed scientific publications, among other factors. *See id.* at 1262. Under this analysis, Dr. Shumer's testimony is reliable. The connection between gender identity and biology has been the subject of scientific research and peer-reviewed publication. *See* Shumer Rep. 9-11 (citing, among other things, "studies highlighting the genetic components of gender identity"). One peer-reviewed article, published in 2014 in the *Journal of Clinical*

---

[15] Defendants use the heading "Dr. Shumer's Testimony About A 'Strong Biological Foundation' Of Gender Identity Is Outside His Expertise, Unhelpful, and Unreliable." Shumer Mot. 10. However, Defendants' section offers no arguments regarding helpfulness or expertise. Qualifications, reliability, and helpfulness are "distinct concepts" not to be conflated. *Frazier*, 387 F.3d at 1260. Defendants have thus waived meaningful objections on helpfulness and expertise regarding the biological underpinnings of gender identity. Still, as outlined in this section, Dr. Shumer's testimony regarding this issue is admissible, meeting all three Rule 702 requirements: expertise; reliability; and helpfulness. But, this response focuses on reliability.

*Endocrinology & Metabolism*, noted that "[n]umerous studies from a variety of biomedical disciplines—endocrine, genetic, and neuroanatomical—have begun to shed light on the biological underpinnings of gender identity." Defs.' *Daubert* Ex. 18 (Rosenthal 2014) at 4381, ECF No. 592-18. The same article stated, "Results of these studies support the concept that gender identity is not simply a psychosocial construct, but likely reflects a complex interplay of biological, environmental, and cultural factors." *Id*. Even the Cass Review, which Defendants repeatedly cite in support of their summary judgment motion, acknowledges support for the proposition that gender identity is informed by biological factors, among other factors. *See* Cass Review, Defs' Mot. Summ. J. Ex. 84, at Summary & Recommendations § 34, ECF No. 558-34 ("There is *broad agreement* that gender incongruence, like many other human characteristics, *arises from* a combination of *biological*, psychological, social and cultural factors.") (emphasis added); § 6.7 ("It is thought that all three of these [sex differences, including gender role behaviors, gender identity, and sexual orientation] *can be influenced* by biological and social factors, and this is an evolving area of research.") (emphasis added).[16]

---

[16] The Cass Review notes that studies of individuals with differences of sexual development suggest a connection between gender identity and biology. *See* Cass Review § 6.31, ECF No. 558-34 (noting that studies of children with differences of sexual development (DSD) "suggest that a complex interplay between testosterone levels, external genitalia, sex of rearing and socio-cultural environment all play a part in eventual gender identity"); § 8.9 (noting that, in studies discussing people with DSD, "evidence suggests that prenatal hormones have . . . a small effect on gender identity").

Defendants attack the reliability of Dr. Shumer's testimony by focusing on the lack of an identified biological cause of gender identity. Shumer Mot. 11 (referencing failure to establish "'causative genes'" or identify "definitive brain correlation"). In doing so, Defendants overstate Dr. Shumer's opinion, as he does not claim that science has identified a definitive, specific biological *cause* of gender identity. *See, e.g.*, Shumer Dep. Tr. 33:16-23 (explaining that by bringing study data in his report, he is "certainly not purporting a causative link to a certain size nuclei equals a certain gender identity"); 24:3-8 ("That the associations that [he has] presented are not intended to demonstrate that a certain gene is causing a change in gender identity or a particular exposure, a particular hormonal exposure is causing gender identity, but simply that there's relationship between these biologic variables and gender identity."). Instead, Dr. Shumer's opinion is that gender identity is rooted in biology. *See* Shumer Rep. 9 ("Scientific research and medical literature across disciplines demonstrates that gender identity, like other components of sex, has a strong biological foundation."); Shumer Rebuttal Rep. ¶ 32 (stating that he "presents evidence of biological underpinnings of gender identity"). Dr. Shumer has acknowledged that "like all complex human characteristics, gender identity is not neatly explained by a single gene; biological inputs *are not completely understood*." Shumer Rebuttal Rep. ¶ 32 (emphasis added). He does not, as Defendants assert, "abandon[] his claim of a 'strong

biological foundation,'" Shumer Mot. 12, because he does not equate recognizing

biological underpinnings of gender identity with identifying a single, specific

cause, *see* Shumer Dep. Tr. 24:3-8. Defendants' argument fails.

Additional, related critiques are also unpersuasive. Defendants criticize Dr.

Shumer because his understanding of gender identity has evolved. Shumer Mot.

11. But Dr. Shumer explains the basis for the developments in his thinking. *See*

Shumer Dep. Tr. 11:10-15 (citing "research outlining the biologic underpinnings of

gender identity, including twin studies, studies related to children with disorders of

sex development, studies related to population-based brain anatomic differences");

*see also* Shumer Dep. Tr. 11:19-23. Further, while Defendants attempt to refute the

findings of individual studies Dr. Shumer cites, nothing Defendants cite to

disproves the proposition that there is evidence of a biological foundation of

gender identity, even if that foundation is not completely understood.[17]

Defendants' focus on uncertainty regarding causation of gender identity is

unavailing, as *Daubert* does not require certainty; it only requires reliability. *See*

---

[17] For example, although, as Defendants note, the Luders article results on gray matter were not confirmed in a subsequent article, Rosenthal did cite another article for the proposition that the examination of white matter "found that patterns in [transgender] individuals were closer to individuals who had the same gender identity rather than the same physical sex." Rosenthal 2014, at 4383-84. In addition, in countering Dr. Shumer's citation to a twin study, Defendants assert that because identical twins do not share the same gender identity 100 percent of the time, gender identity is not actually determined by genes. Shumer Mot. 14 (citing Laidlaw Rep. ¶ 23). But, "the fact that more identical twins are concordant for gender identity than fraternal twins does in fact suggest a genetic contribution." Shumer Rebuttal Rep. ¶ 32.

*Easterwood v. Husqvarna Prof'l Prods.*, 576 F. Supp. 3d 950, 958 (M.D. Ala. 2021). That the exact relationship between biology and gender identity is not fully known would, at most, go to the weight and not the admissibility of Dr. Shumer's opinions on this topic.

Defendants also posit that there are other potential causes of gender identity, or that gender identity is causing, not the result of, certain biological phenomena. However, the existence of alternative explanations for the specific cause of a person's gender identity, and Dr. Shumer's failure to eliminate them, does not mean the testimony is unreliable. *See Allstate Ins. v. Hugh Cole Builder, Inc.*, 137 F. Supp. 2d 1283, 1290-91 (M.D. Ala. 2001) (noting that other uneliminated causes go to weight rather than admissibility of expert testimony). Further, as noted above, even the Cass Review acknowledges the possibility that biology plays a role in gender identity formation. That Dr. Shumer uses evidence to reach a conclusion Defendants disagree with is not grounds for finding his testimony unreliable. For these reasons, Defendants' attacks on Dr. Shumer's reliability on this issue fail.

Dr. Shumer is also qualified to offer his opinion on the biological underpinnings of gender identity. He has published work discussing this very subject, as Defendants note in their motion. Shumer Mot. 11 (discussing "published, peer-reviewed" article Dr. Shumer co-authored). As noted above, Dr.

Shumer has more generally "published extensively on the topic of gender identity in pediatrics and treatment of gender dysphoria." Shumer Rep. at 3.

Dr. Shumer's testimony will also assist the Court. Defendants' experts offer purported explanations for the incidence of gender dysphoria. *See, e.g.*, Nangia Rep. ¶ 20 (proffering the creation of social media and "social contagion" as two of the "contributing factors to the rise of gender dysphoria" that Dr. Nangia reports seeing in her patient population); Kaliebe Rep. ¶ 42 (claiming that "significant evidence suggests that the dramatic rise in minors presenting with gender dysphoria may be attributable to technologically induced contagion effects"). Understanding the biological underpinnings of gender identity will assist the Court in evaluating the necessity of gender-affirming medical care, as compared to other types of interventions. Dr. Shumer's evaluation of and resulting conclusions from the scientific literature in this area concerns matters "beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. Thus, Dr. Shumer's testimony will be useful to the Court.

Accordingly, Dr. Shumer's testimony regarding the biological foundation of gender identity is admissible. His testimony is reliable, as well as the result of expertise and will be helpful to the Court. The Court should therefore reject Defendants' motion to exclude Dr. Shumer's testimony on this issue.

## **CONCLUSION**

For these reasons, the United States respectfully requests that the Court deny

Defendants' motions to exclude testimony by Prof. Caughey, ECF No. 601, Prof.

Cohen, ECF No. 600, and Dr. Shumer, ECF No. 599.

Dated: August 12, 2024                   Respectfully submitted,

JONATHAN S. ROSS                    KRISTEN CLARKE
Acting United States Attorney          Assistant Attorney General
Middle District of Alabama             Civil Rights Division

PRIM F. ESCALONA                    CHRISTINE STONEMAN
United States Attorney                 Chief, Federal Coordination and Compliance
Northern District of Alabama           Section

JASON R. CHEEK                      COTY MONTAG (DC Bar No. 498357)
Chief, Civil Division                  Deputy Chief, Federal Coordination and
                                     Compliance Section
MARGARET L. MARSHALL
Assistant U.S. Attorney                RENEE WILLIAMS (CA Bar No. 284855)
U.S. Attorney's Office                 KAITLIN TOYAMA (CA Bar No. 318993)
Northern District of Alabama           Trial Attorneys
1801 Fourth Avenue North              United States Department of Justice
Birmingham, AL 35203                  Civil Rights Division
Tel.: (205) 244-2104                  Federal Coordination and Compliance Section
Margaret.Marshall@usdoj.gov          950 Pennsylvania Avenue NW – 4CON
                                     Washington, DC 20530
STEPHEN D. WADSWORTH              Tel.: (202) 305-2222
Assistant United States Attorney       Renee.Williams3@usdoj.gov
U.S. Attorney's Office                 Kaitlin.Toyama@usdoj.gov
Middle District of Alabama
Post Office Box 197
Montgomery, AL 36101-0197
Tel.: (334) 223-7280
Stephen.Wadsworth@usdoj.gov

/s/ James Fletcher
JAMES V. FLETCHER (MD Bar No.
1412160273)
Trial Attorney
United States Department of Justice
Civil Rights Division
Disability Rights Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel. (202) 598-0083
James.Fletcher@usdoj.gov

*Attorneys for Plaintiff-Intervenor United States of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to counsel of record.

Respectfully submitted,

*/s/ James Fletcher*
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice

85