# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

BRIANNA BOE *et al.*,                              )
                                                  )
     *Plaintiffs*,                                )
                                                  )
and                                               )
                                                  )
UNITED STATES OF AMERICA,                         )
                                                  )
     *Plaintiff-Intervenor*,                      )
                                                  )
v.                                                )   No. 2:22-cv-00184-LCB-CWB
                                                  )   Hon. Liles C. Burke
STEVE MARSHALL, in his official                   )
capacity as Attorney General of the               )   **REDACTED COPY;**
State of Alabama, *et al.*,                        )   **ORIGINAL SUBMITTED**
                                                  )   **UNDER SEAL**
     *Defendants*.                                )

## DEFENDANTS' RESPONSE TO PLAINTIFFS' AND THE UNITED STATES' MOTIONS TO EXCLUDE CERTAIN TESTIMONY OF PAUL HRUZ, M.D. (DOCS. 590, 602, 605)

# TABLE OF CONTENTS

Table of Contents ................................................................................. i

Table of Authorities .............................................................................. ii

Introduction ......................................................................................... 1

Background .......................................................................................... 2

Argument ............................................................................................. 5

   I.   Dr. Hruz Is Qualified By Knowledge, Training, Experience, and
       Education To Opine On The Diagnosis And Treatment Of Gender
       Dysphoria ..................................................................................... 5

   II.  Dr. Hruz's Testimony About Plaintiffs' Interventions Is Based On
       Sufficient Facts ........................................................................... 13

   III. Plaintiffs' Attack On Seven Words In Dr. Hruz's Opinion Is
       Meritless ..................................................................................... 18

Conclusion .......................................................................................... 20

Certificate of Service ........................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Laboratory Corp. of America*,
  760 F.3d 1322 (11th Cir. 2014) ......................................................... 8, 13, 14, 15

*Brandt v. Rutledge*,
  677 F. Supp. 3d 877 (E.D. Ark. 2023).................................................12

*Burton v. R.J. Reynolds Tobacco Co.*,
  183 F. Supp. 2d 1308 (D. Kan. 2002).................................................15

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) ............................................................20

*Cobb v. Dawon*,
  2007 WL 4373255 (M.D. Ga. Dec. 12, 2007)......................................9

*Cooper v. Smith & Nephew, Inc.*,
  259 F.3d 194 (4th Cir. 2001) ..............................................................16

*Dekker v. Weida*,
  No. 22-cv-325, (N.D. Fla. Apr. 7, 2023) ............................................12

*Doe v. Ladapo*,
  2024 WL 2947123 (N.D. Fla. June 11, 2024) .....................................12

*Doe v. Ladapo*,
  676 F. Supp. 3d 1205 (N.D. Fla. 2023) ........................................ 11, 12

*EEOC v. Modern Group, Ltd.*,
  2024 WL 1290450 (E.D. Tex. Mar. 25, 2024) ......................................9

*Eghnayem v. Bos. Sci. Corp.*,
  57 F. Supp. 3d 658 (S.D.W. Va. 2014)................................................15

*Geyer v. NCL (Bahamas) Ltd.*,
  203 F. Supp. 3d 1212 (S.D. Fla. 2016)................................................15

*Gideon v. Camus*,
   2024 WL 1701975 (M.D. Ala. Apr. 19, 2024) ...................................................19

*Gov't Emps. Ins. Co. v. Seco*,
   658 F. Supp. 3d 1162 (S.D. Fla. 2023) .............................................................15

*Haller v. AstraZeneca Pharms. LP*,
   598 F. Supp. 2d 1271 (M.D. Fla. 2009) .............................................................16

*Hamilton v. Louisville Cartage Co.*,
   2024 WL 2303889 (M.D. Ga. May 21, 2024) ...................................................16

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
   2021 WL 765019 (N.D. Fla. Feb. 28, 2021) ......................................................19

*In re C.R. Bard, Inc.*,
   2018 WL 605891 (S.D. W. Va. Jan. 29, 2018) ....................................................9

*In re Trasylol Prod. Liab. Litig.*,
   709 F. Supp. 2d 1323 (S.D. Fla. 2010) .............................................................20

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) ...........................................................................11

*Kadel v. Folwell*,
   620 F. Supp. 3d 339 (M.D.N.C. 2022) ....................................................... 10, 11

*Kannankeril v. Terminix Int'l, Inc.*,
   128 F.3d 802 (3d Cir. 1997) .............................................................................15

*Koe v. Noggle*,
   688 F. Supp. 3d 1321 (N.D. Ga. 2023) ............................................................12

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .........................................................................................20

*LaRocco v. Royal Caribbean Cruises, Ltd.*,
   2024 WL 2292814 (S.D. Fla. Mar. 4, 2024) ....................................................15

*Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*,
  772 F.3d 1352 (11th Cir. 2014) ............................................................................7

*Maples v. Dunn*,
  582 F. Supp. 3d 1040 (N.D. Ala. 2022)...........................................................15

*McDowell v. Brown*,
  392 F.3d 1283 (11th Cir. 2004) ............................................................................8

*Moore v. Intuitive Surgical, Inc.*,
  995 F.3d 839 (11th Cir. 2021) ..........................................................................7, 8

*Newton v. Roche Lab'ys, Inc.*,
  243 F. Supp. 2d 672 (W.D. Tex. 2002) ...............................................................9

*Parks v. Ethicon, Inc.*,
  2022 WL 1812299 (S.D. Cal. June 2, 2022) ......................................................9

*Peteet v. Dow Chem. Co.*,
  868 F.2d 1428 (5th Cir. 1989) ...........................................................................15

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ............................................................................8

*Rheinfrank v. Abbott Lab'ys*,
  2015 WL 13022172 (S.D. Ohio Oct. 2, 2015) ...................................................9

*St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.*,
  5 F.4th 1235 (11th Cir. 2021) ...........................................................................14

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir. 1997) ..................................................................................9

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
  2019 WL 3207803 (W.D. Tex. July 16, 2019)..................................................19

*United States v. Brown*,
  415 F.3d 1257 (11th Cir. 2005) .........................................................................15

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) .........................................................5, 6

*United States v. Viglia*,
549 F.2d 335 (5th Cir. 1977) ..............................................................9

*Vaughn v. Hyster Co.*,
2010 WL 9936530 (N.D. Ala. Dec. 3, 2010) ......................................9

*Vaughn v. Nacco Materials Handling Grp.*,
440 F. App'x 821 (11th Cir. 2011) ......................................................9

*Walker v. Soo Line R. Co.*,
208 F.3d 581 (7th Cir. 2000) ...........................................................15

**Rules**

Fed. R. Evid. 610 ...............................................................................12

Fed. R. Evid. 702 ............................................... 5, 8, 9, 13, 14, 19, 20

Fed. R. Evid. 702(b)............................................................................14

Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments)............................7

**Other Authorities**

29 Wright & Miller, *Federal Practice and Procedure*, § 6264.1 .............................5

29 Wright & Miller, *Federal Practice & Procedure*, § 6264.2...........................9, 10

29 Wright & Miller, *Federal Practice & Procedure*, § 6268.................................14

*Day of Silence Q+A with Meredithe McNamara*, Yale School of Public Health
(June 7, 2023), https://ysph.yale.edu/news-article/day-of-silence-q-and-a/.......13

*Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*,
87 LINACRE Q. 34 (2020)....................................................................19

*Growing Pains: Problems with Pubertal Suppression in Treating Gender Dysphoria*, 52 NEW ATLANTIS 3 (2017) ...........................................................19

## INTRODUCTION

Dr. Paul Hruz is a professor of pediatric endocrinology and has been practicing medicine for more than 20 years. He prescribes the same drugs at issue—puberty blockers and sex hormones—day-in and day-out. And for the last 13 years, much of his scholarly attention has focused on gender dysphoria, including how it is diagnosed and treated. He has published articles, served as an advisor on clinical trials, and conducted reviews of the relevant literature.

Yet the United States and Plaintiffs move to exclude much of his testimony, primarily because he does not prescribe puberty blockers and cross-sex hormones *for gender transitioning minors*. Their reasoning is both unprecedented and illogical. The Eleventh Circuit has repeatedly rejected similar arguments that an expert must "use" the specific item (or drug) at issue before having the knowledge or experience to testify. Neither the United States nor Plaintiffs offer any precedent adopting their theory, which would have wide-ranging and absurd implications—no physician, for instance, could testify about drugs used in the death penalty unless they have used them to execute someone. And their argument is especially silly here because, as they have emphasized, the drugs that they want for gender transitioning are the same drugs that Dr. Hruz prescribes and studies in his pediatric endocrinology practice.

The United States and Plaintiffs also say that Dr. Hruz cannot offer opinions connecting his broader testimony to the individual Plaintiffs' treatments based on his review of their medical records. But his narrow opinions on that issue are expressly limited to the medical records, and courts routinely permit medical experts to testify based on medical records. Relying on medical records is standard in the

field of medicine, and those records provided "sufficient facts" for his opinions.

Next, Plaintiffs seek to exclude seven words from Dr. Hruz's testimony explaining that certain medical organizations' guidelines stem in part from their "agenda." But even if excluding seven words were a proper use of a *Daubert* motion, these words are based on Dr. Hruz's specialized knowledge and experience as a member of the Endocrine Society and researcher in the field. And they are geared toward a critical question here—the integrity of the guidelines that, as this Court said, are "around the very heart of" Plaintiffs' case. Doc. 246 at 64.

Last, the United States and Plaintiffs seek to exclude one paragraph from Dr. Hruz's testimony about gender transition surgeries as irrelevant. The relevance of that testimony is explained in—and Defendants incorporate here—pp. 6-11 of Defendants' response to the plaintiffs' motions to exclude Dr. Lappert's testimony.

## BACKGROUND

Dr. Paul Hruz is an Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes at Washington University School of Medicine. He has been practicing pediatric endocrinology for more than 20 years. SJ.DX5:¶¶1, 7-8, 11 (Hruz Rep.). During that time, he has "participated in the care of hundreds of infants and children, including adolescents, with disorders of sexual development." *Id.* ¶11. More broadly, he has "cared for children from birth to the completion of college in their early twenties who have a variety of hormone-related diseases," including disorders of growth, precocious puberty, and other hormone problems. *Id.* ¶13. He has published 62 scholarly articles—many in recent years about gender dysphoria and its treatments—and is a member of the Pediatric Endocrine Society and

the Endocrine Society. *Id.* ¶¶8-9; Curriculum Vitae. He has served as a peer reviewer for science journals in endocrinology and has evaluated trials. *Id.* ¶10.

During his career, Dr. Hruz "acquired expertise in the understanding and management of associated difficulties in gender identification and gender transitioning treatment issues." *Id.* ¶11. And "[i]n [his] role as a scientist and as the Director of the Division of Pediatric Endocrinology at Washington University," he "extensively studied the existing scientific research literature related to the incidence, potential etiology, and treatment of gender dysphoria as efforts were made to develop a Transgender Medicine Clinic at Saint Louis Children's Hospital." *Id.* ¶12. He has "participated in local, national, and international meetings where the endocrine care of children with gender dysphoria has been discussed in detail and debated in depth." *Id.* He has "consulted with, met with, and had detailed discussions with dozens of parents of children with gender dysphoria," and he "continue[s] to evaluate the ongoing experimental investigation of this condition." *Id.*

Dr. Hruz's opinions here are based on his "knowledge, training, and clinical experience in caring for thousands of patients"; "detailed methodological reviews of hundreds of relevant peer-reviewed science publications"; "consults discussions, and team analyses with colleagues and other experts in the field"; and his own peer-reviewed publications. *Id.* ¶5.

Dr. Hruz offers several opinions. He explains that for humans and "virtually all mammals," "sex is normatively aligned in a binary fashion." *Id.* ¶16. He explains puberty in human development (*id.* ¶¶ 22-34) and discusses pediatric endocrine disorders and their treatments—including treatments using drugs that have also been

proposed to treat gender dysphoria (*id.* ¶¶ 35-54). He explains that males and females react differently to the same sex hormones. *Id.* ¶¶48, 84.

Dr. Hruz then discusses gender dysphoria and its current treatments, contrasting the use of puberty blockers and sex hormones in pediatric endocrinologic contexts with their use as a novel, unproven, and risky treatment for gender dysphoria. *Id.* ¶¶55-93. He addresses the prominent industry guidelines from the Endocrine Society and WPATH and explains their shortcomings. *Id.* ¶¶94-105. And he addresses the existing literature in the field, again explaining its limitations. *Id.* ¶¶119-33. He discusses recent international responses to the poor evidence base for medical gender transition interventions. *Id.* ¶¶134-37. He concludes that "[t]here are no long-term, peer-reviewed, published, reliable, and valid research studies documenting the number or percentage of patients receiving gender affirming medical interventions who are helped by" or "harmed by" "such procedures." *Id.* ¶¶143-44.

Finally, Dr. Hruz addresses informed consent. *Id.* ¶¶106-118. Ultimately, he opines, "[a]dministering hormones to a child whose gender dysphoria is highly likely to resolve is risky, unscientific, and unethical." *Id.* ¶153. He explains that "[b]ecause of these concerns about the safety, efficacy, and scientific validity of controversial, unproven, and experimental treatment paradigms, I have not personally engaged in the delivery of gender-affirming medical interventions to children." *Id.* ¶154.

In his supplemental report, he analyzes Plaintiffs' medical records to discuss how their experiences align with his opinions. SJ.DX6 (Hruz Supp. Rep.).

The United States seeks exclusion of Dr. Hruz's opinions about gender dysphoria and the Plaintiffs. Doc. 591 at 14-17 (U.S. Mot.). Plaintiffs' move to exclude

seven words about medical organizations. Doc. 605 at 13 (Plfs' Mot.).

## ARGUMENT

### I.   Dr. Hruz Is Qualified By Knowledge, Training, Experience, and Education To Opine On The Diagnosis And Treatment Of Gender Dysphoria.

Dr. Hruz is qualified to opine about all facets of gender dysphoria and its treatments in children. As the Eleventh Circuit has explained, under "the plain language of Rule 702," "experts may be qualified in various ways," including "based on 'knowledge, skill, experience, training, *or* education.'" *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (emphasis altered) (quoting Fed. R. Evid. 702). "[A] background in just one of these five may be sufficient." 29 Wright & Miller, *Federal Practice and Procedure* § 6264.1 (2d ed.). Dr. Hruz is a pediatrics professor specializing in endocrinology who has cared "for thousands of patients" in that specialty. Hruz Rep. ¶¶2, 5. He has "participated in the care of hundreds of infants and children, including adolescents, with disorders of sexual development," and has "acquired expertise in the understanding and management of associated difficulties in gender identification and gender transitioning treatment issues." *Id.* ¶11. He has extensive experience prescribing and managing care using puberty blockers and sex hormones. *Id.* ¶¶13, 35-36, 47, 49, 53; Doc. 591-7 (Hruz Dep.), at 80:12-14.

Beyond this direct experience, as described above, Dr. Hruz has conducted "detailed methodological reviews of hundreds of relevant peer-reviewed science publications" related to gender dysphoria and its treatments, published in this area, and participated in peer-review processes and conferences about it. *Id.* ¶5. "[M]uch of [his] scholarly time" over the last 13 years "has been devoted to th[e] question of

gender dysphoria," and "currently the majority of the papers that [he is] publishing are on the area of gender dysphoria." Hruz Dep. 28:11-17, 55:17-18. He has published based on his original research about "the causes of gender dysphoria," and has published peer-reviewed articles about "gender-affirming care." *Id.* at 42:7-10, 43:8-11. He has served as an advisor for clinical trials related to medical gender transition interventions. *Id.* at 41:1-6, 43:4-7, 46:1-4. And he has "conducted a systematic review of the evidence base." *Id.* at 47:19–48:1.

Given this background, Dr. Hruz "is qualified to testify competently regarding" the diagnosis and treatment of gender dysphoria. *Frazier*, 387 F.3d at 1260. First, Dr. Hruz is qualified to discuss these issues based on his experience. He is a pediatric endocrinologist (and member of the Pediatric Endocrine Society), the exact specialty that is most knowledgeable about the drugs at issue. He has treated hundreds of patients with puberty blockers or sex hormones. Though he has not prescribed these drugs *for gender dysphoria*, that is because he considers that course of treatment unsafe and unethical. Hruz Rep. ¶154. That makes no difference to his experience and understanding. As discussed, Dr. Hruz has extensive, real-world experience as a pediatric endocrinologist with these drugs—puberty blockers, estrogen, and testosterone—which qualifies him to opine about their usage.[1]

Dr. Hruz is also qualified to discuss issues related to the diagnosis and treatment of gender dysphoria based on his knowledge and education. He has studied

---

[1] The United States itself says that "the mechanism of action of GnRHa in suppressing progression of puberty in precocious puberty is the same in gender dysphoria" and that the risks of "hormone therapy" are the "same" as when such therapy "is used to treat non-transgender individuals and individuals with intersex traits for other purposes." Doc. 627 at 14-16.

those issues for at least 13 years, since the earliest days that these issues appeared in the United States. During that time, *most* of his scholarly attention was devoted to these issues. He has conducted reviews of the literature pertaining to these issues and published peer-review articles about them. His knowledge "grow[s] naturally and directly out of" his experience as a pediatric endocrinologist "independent of the litigation." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (quoting Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments)). Dr. Hruz is qualified as an expert here.

The thrust of the United States' objection to Dr. Hruz's gender dysphoria testimony is that because he "has never provided gender-affirming care," he cannot opine about it. U.S. Mot. 15. Hogwash. Putting aside that the United States fails to address Dr. Hruz's knowledge and education—independent bases for his qualifications—the United States does not dispute that Dr. Hruz is experienced prescribing and managing the same drugs to treat other conditions. And the Eleventh Circuit has squarely said that "[o]ur caselaw does not support a bright line rule that an expert witness is qualified to testify" "only if he personally has used the" device at issue. *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021). To the contrary, the Eleventh Circuit "has explicitly disclaimed such a rule." *Id.*

In *Moore*, for instance, the Court held that a district court abused its discretion by excluding a witness as unqualified simply because he had not used the medical instrument before: "Dr. Hall is qualified to perform a differential etiology on a patient who suffered a thermal injury during a hysterectomy performed with a *da Vinci* robot not because of his familiarity with the robot, but because of his familiarity with

differential etiologies in the context of gynecological procedures." *Id.* at 853.

The *Moore* court relied on *Adams v. Laboratory Corp. of America*, in which the Eleventh Circuit reversed a district court's exclusion on similar grounds. As the Court of Appeals explained, such "reasoning seemingly would bar all expert medical testimony unless the expert has somehow recreated the same conditions that the [patient] was under," and "Rule 702 does not impose such a requirement." 760 F.3d 1322, 1335-36 (11th Cir. 2014).

The Eleventh Circuit in *Moore* also relied on *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, where the Court explained that a criticism of a "lack of specific expertise" failed as a challenge to an expert's qualifications. 326 F.3d 1333, 1342 (11th Cir. 2003). The Court found it "evident" that the expert was qualified "by virtue of his extensive education, training and experience," and explained that attacks on the specificity of his expertise "ignored the conceptual distinction between an expert's qualifications and the reliability of his proffered opinion." *Id.* at 1343.

And in *McDowell v. Brown*, the Eleventh Circuit again held that "[t]he proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." 392 F.3d 1283, 1297 (11th Cir. 2004). The Court explained that "[a]n expert … is one who qualifies as such by reason of special knowledge and experience, whether or not he" practices in the "special field" at issue. *Id.* (cleaned up). The Court thus considered a neurologist qualified to testify about the standard of care for jail nurses. *See id.*

Many decisions are to the same effect, supporting the obvious notion that Dr. Hruz can be an expert in gender dysphoria without personally prescribing the drugs

that he has determined would be unethical for him to prescribe.[2]

Indeed, the United States' and Plaintiffs' arguments is a transparent effort to exclude *all* potential expert witnesses who disagree with their approach to transitioning minors. As the Second Circuit has explained in rejecting this type of effort:

> If the only experts permitted to testify inevitably represent the same side of a civil case, those who possess these experts can, for all practical purposes, set their own standards. And allowing an industry to do this is improper because it is very similar to what has long since been held inappropriate, namely, letting the custom of an industry or trade define what is reasonable in that trade.

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997); *accord* 29 *Federal*

---

[2] *See, e.g.*, *United States v. Viglia*, 549 F.2d 335, 336-37 (5th Cir. 1977) (pediatrician may testify about drug's effect on obese persons despite no experience treating obese patients); *Vaughn v. Hyster Co.*, 2010 WL 9936530, at *8 (N.D. Ala. Dec. 3, 2010) ("[I]t is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render an opinion because the witness lacks expertise in specialized areas that are directly pertinent to the issues in question, if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question."), *aff'd sub nom. Vaughn v. Nacco Materials Handling Grp.*, 440 F. App'x 821 (11th Cir. 2011); *Cobb v. Dawon*, 2007 WL 4373255, at *3 (M.D. Ga. Dec. 12, 2007) ("General knowledge in a field, however, is normally sufficient to qualify a witness as an expert in that field's specialties as well. For example, most courts conclude that a general practitioner can offer expert testimony concerning medical conditions routinely treated by specialists."); *In re C.R. Bard, Inc.*, 2018 WL 605891, at *4 (S.D. W. Va. Jan. 29, 2018) (an "absence of [direct] clinical experience" did not "call into doubt [the expert's] knowledge or experience" about the issue); *Parks v. Ethicon, Inc.*, 2022 WL 1812299, *4 (S.D. Cal. June 2, 2022) (holding that the expert "does not need to have personal experience with the alternative design"); *EEOC v. Modern Group, Ltd.*, 2024 WL 1290450, at *15 (E.D. Tex. Mar. 25, 2024) ("[W]hile [the expert] does not practice addiction medicine, he demonstrates sufficient familiarity with various issues in addiction medicine."); *Newton v. Roche Lab'ys, Inc.*, 243 F. Supp. 2d 672, 681 (W.D. Tex. 2002) (finding clinical psychiatrist qualified to testify about whether Accutane had played a role in plaintiff's schizophrenia, even though he had never prescribed the drug); *Rheinfrank v. Abbott Lab'ys*, 2015 WL 13022172, at *5 (S.D. Ohio Oct. 2, 2015) (finding that doctor expert was qualified to compare medical data in case with information in the drug label, even though he "d[id] not treat patients with epilepsy or prescribe" the types of drugs in question); 29 *Federal Practice & Procedure*, *supra*, § 6264.2 ("Most courts conclude that general knowledge can be sufficient in such a case to qualify the witness as an expert" "because the issue under Rule 702 is simply whether the testimony of a witness with only a general background is reasonably likely to help the trier of fact.").

*Practice & Procedure*, *supra*, § 6264.2.

The United States' and Plaintiffs' argument also defies logic and common sense. As noted, that argument would seemingly require, for instance, exclusion of any medical expert in a death penalty case who had not used the drugs to execute someone. And the United States' reasoning is bizarre in this context, given that the reason that Dr. Hruz does not prescribe these drugs to transition gender is that he—like many others in his field—has determined that the drugs are not safe to prescribe for that purpose. Can no physician testify about lobotomies without conducting them? Can no one testify about eugenics without trying it first? How would the United States' rule work for new treatments—can only those few who have performed them (and, presumably, think they are good) be qualified to opine? And how can the United States' and Plaintiffs' own witnesses be "qualified" to discuss the gender dysphoria treatments *they* refuse to provide, like watchful waiting or psychotherapy alone? The United States' cursory argument has no answers, much less any Eleventh Circuit precedent supporting it.

All the United States has is a single out-of-circuit district court opinion that adopted a similar argument and excluded part of Dr. Hruz's testimony—which was, it should be noted, not the same as what he submitted in this case. *See Kadel v. Folwell*, 620 F. Supp. 3d 339, 364 (M.D.N.C. 2022). Parts of that opinion's reasoning no longer apply; as discussed, Dr. Hruz *has* "conducted … original research about gender dysphoria diagnosis or its causes" and *has* published "scientific, peer-reviewed literature on gender dysphoria." *Id.* at 364. And he *has* "treated a transgender patient" (*id.*)—many, actually. Hruz Dep. 79:19-21. Other parts of that

opinion's reasoning are wrong: the court acknowledged Dr. Hruz's "long career treating patients and conducting academic research on the effects of hormone treatments," 620 F. Supp. 3d at 364, which should have sufficed for his expert qualification. As Judge Quattlebaum explained, Dr. Hruz's treatment of "hundreds of juveniles diagnosed with sexual development disorders and many transgender patients that have experienced side effects related to hormone treatment," his "extensive[] study[]" of "scientific literature on gender dysphoria treatments," his "consult[ations] with professionals specializing in this area," and his "present[ations] on gender dysphoria at medical universities," easily provides "the necessary knowledge to qualify him to testify on the subject of gender dysphoria." *Kadel v. Folwell*, 100 F.4th 122, 199 (4th Cir. 2024) (cleaned up) (dissenting opinion); *see id.* at 200-01 (collecting similar experts qualified by the courts).

The United States cites several other cases in support of its attack on Dr. Hruz, but none of those cases excluded Dr. Hruz's testimony or even tangentially supports the United States' argument here. The United States cites a footnote from Judge Hinkle's preliminary injunction opinion in *Doe v. Ladapo*, which expressed concern that "Dr. Hruz fended and parried questions and generally testified as a deeply biased advocate," so "I do not credit his testimony." 676 F. Supp. 3d 1205, 1211 n.8 (N.D. Fla. 2023). This perception would go to weight, not admissibility. *See United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) ("The credibility of a witness is in the province of the factfinder." (cleaned up)). Plus, Judge Hinkle's perception is irrelevant to the foundation of the opinions expressed in Dr. Hruz's report here. Most significantly, the United States omits that Judge Hinkle *denied* the plaintiffs'

*Daubert* motion to exclude Dr. Hruz's testimony—a motion making the same argument as the United States, that Dr. Hruz should be excluded because "he has never provided gender-affirming care."[3]

As for the United States' next citation, the district court in *Brandt v. Rutledge* believed that "it is clear from listening to the testimony that" Dr. Hruz was "testifying more from a religious doctrinal standpoint." 677 F. Supp. 3d 877, 914 (E.D. Ark. 2023). The United States does not make a similar argument here, and rightly so—any smear of Dr. Hruz's opinions as primarily religious would be belied by his extensive report here. *See also* Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."). The court in *Brandt* asserted that Dr. Hruz was "unqualified to offer relevant expert testimony and offered unreliable testimony," without identifying any specific testimony—and even as the court responded to Dr. Hruz's opinions on their merits and *relied on* Dr. Hruz for certain findings. *See* 677 F. Supp. 3d at 902-04, 915-16.

Last, the United States cites a district court opinion that expressed concern about supposed "inflammatory rhetoric" "in a brief submitted to the Supreme Court" by Dr. Hruz and others seven years ago and used this concern as a reason to "doubt" his "objectivity." *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1336 n.11 (N.D. Ga. 2023); *see* U.S. Mot. 15. The United States makes no similar argument here and does not attack Dr. Hruz's objectivity. And the court in *Noggle* did not exclude Dr. Hruz's

---

[3] Motion to Exclude, *Dekker v. Weida*, No. 22-cv-325, Doc. 136, at 3 (N.D. Fla. Apr. 7, 2023); *see* Pretrial Order, *id.*, Doc. 212, at 3 (N.D. Fla. May 4, 2023) (denying this motion). The parties' evidence from *Dekker* was used for *Ladapo*. *Doe v. Ladapo*, 2024 WL 2947123, at *1 & n.3 (N.D. Fla. June 11, 2024).

testimony, which makes sense: purported "[b]ias in an expert witness's testimony is usually a credibility issue for the" factfinder anyway. *Adams*, 760 F.3d at 1332. Rule 702 "requires courts to determine that the expert's method is reliable, not that it is free of any possibility of bias." *Id.* at 1333. (No one could pretend that the United States' and Plaintiffs' own self-interested witnesses who have expressed "inflammatory rhetoric" *against* Alabama's law are "objective."[4]) And Dr. Hruz explained in his deposition that before he joined that old brief, he "made it clear that much of the wording in that document was not words that I would use." Hruz Dep. 196:5-9.

In sum, Dr. Hruz is qualified by knowledge, training, skill, *and* education to opine about the diagnosis and treatment of gender dysphoria in minors.

## II.    Dr. Hruz's Testimony About Plaintiffs' Interventions Is Based On Sufficient Facts.

The United States and Plaintiffs also seek exclusion of Dr. Hruz's opinions about the treatment of individual Plaintiffs "because he never spoke with plaintiffs or their healthcare providers." U.S. Mot. 15-16. They note only one opinion as the subject of their attack: that the "relative paucity of documented discussion of known and potential medical complications … further substantiates my opinions related to relative risk." *Id.* at 16 (quoting Hruz Supp. Rep. ¶9). That opinion, and the handful of others offered in Dr. Hruz's supplemental report, meet Rule 702's reliability standard because they are based on "sufficient" facts.

---

[4] *E.g.*, *Day of Silence Q+A with Meredithe McNamara*, Yale School of Public Health (June 7, 2023), https://ysph.yale.edu/news-article/day-of-silence-q-and-a/ (Dr. McNamara claiming that "legislative attacks have been launched against LGBTQ people in the United States" because of "hatred" by "US evangelical leaders," which she suggests is "the true source that harms this community"; also claiming that this legislation "gives tacit approval for violence and harassment").

"[U]nder Rule 702, the evidence an expert relies on simply must be 'based on sufficient facts or data.'" *St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, 5 F.4th 1235, 1245 n.8 (11th Cir. 2021) (quoting Fed. R. Evid. 702(b)). "The word 'sufficient' signifies that the expert may properly base her opinion on something less than all the pertinent facts or data." 29 *Federal Practice & Procedure*, *supra*, § 6268. Sufficiency "is a function of the nature and scope of the opinion offered, the quantity of data both available and pertinent to the issue at hand, and what is deemed sufficient by experts in the pertinent field when working outside the courtroom." *Id.*

On all these aspects, Dr. Hruz's narrow opinions about the individual Plaintiffs are supported by sufficient facts. The United States' overarching objection is that a physician cannot testify about medical treatments without speaking to all the individuals involved. There are at least two problems with this objection. First, Rule 702(b) requires only "sufficient facts," and courts routinely allow medical experts to testify based on medical record reviews. According to the United States, "[a] physician's review of medical records without examining a patient, interviewing that patient, or speaking with the patient's treating physician may be an insufficient basis for the specific opinion the physician offers." U.S. Mot. 16. As evident by the United States' slippery use of "may be an insufficient basis," there is no such *per se* rule, and any rule about personal examinations in determining individual causation of medical problems in a patient would not apply to Dr. Hruz's opinions.

The Eleventh Circuit has explained that "Rule 702 does not impose" "a requirement" that "expert witnesses 'stand in the shoes'" of those they opine about. *Adams*, 760 F.3d at 1335-36. For that reason, the Court has favorably cited cases

"allowing an expert witness in a medical malpractice case to rely on her review of the plaintiff's medical records in testifying that the nurse midwife breached the standard of care." *Id.* at 1335. Many decisions are in accord.[5]

This permission for medical experts to rely on medical records makes particularly good sense because doctors often rely on medical records when treating patients. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ As Dr. Hruz explained, "[t]he materials that I have relied upon are the same types of materials that other experts in my field of clinical practice rely upon when forming opinions on the subject." Hruz Rep. ¶5. The medical records provide a sufficient basis for Dr. Hruz's opinions.

The United States' cases are not to the contrary. They all involve experts trying to offer a differential diagnosis or causation analysis of the medical problem of

---

[5] *See, e.g., Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212, 1217 (S.D. Fla. 2016) (collecting and agreeing with many cases generally holding that a "medical expert's testimony was admissible because he was a qualified physician, with years of experience, and his opinion was based on reviewing medical records, which was acceptable under *Daubert*."); *LaRocco v. Royal Caribbean Cruises, Ltd.*, 2024 WL 2292814, at *4 (S.D. Fla. Mar. 4, 2024) ("Case law has made it clear that an expert medical witness may provide an opinion even if they rely solely on medical records."); *Maples v. Dunn*, 582 F. Supp. 3d 1040, 1080 (N.D. Ala. 2022) (explaining that "courts in this district have held that a physician need not necessarily examine a patient, interview that patient, or speak with the patient's treating physician(s) to render opinions regarding diagnosis" (cleaned up)); *Gov't Emps. Ins. Co. v. Seco*, 658 F. Supp. 3d 1162, 1176 (S.D. Fla. 2023) ("[A]n expert need not examine or interview a patient to render opinions about diagnosis and the course of treatment."); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) ("A doctor needs only one reliable source of information showing that a plaintiff is ill; either a physical test or medical records will suffice for this."); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (similar); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir. 1989) (similar); *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 703 (S.D.W. Va. 2014) (similar); *Burton v. R.J. Reynolds Tobacco Co.*, 183 F. Supp. 2d 1308, 1313 (D. Kan. 2002) (similar).

a particular plaintiff in circumstances where the experts would have, in the real world, needed to directly examine the patient or talk to their doctors personally.[6] And the United States' cases agree that even in *those* contexts—which are irrelevant here—a medical record review could be sufficient.[7]

The second fundamental problem with the United States' objection is that it fails to articulate why or how speaking to individual plaintiffs or providers could have affected Dr. Hruz's expressed opinions at all. Dr. Hruz, unlike the experts in the United States' cases, is not opining about causation of a medical issue in a particular patient. Instead, he is offering broader opinions about the association of gender dysphoria and its treatments with certain markers he addressed in his primary report. Taking those opinions one at a time—unlike the United States, which ignores all but one—underscores the point:



---

[6] *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 196-97, 202-03 (4th Cir. 2001) (acknowledging that "a physician may reach a reliable differential diagnosis without personally performing a physical examination," but concluding that on the facts presented—including the witness's effort to contradict the medical records—a "failure to conduct a physical examination" was some "support" for exclusion); *Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1275, 1295 (M.D. Fla. 2009) (focusing on whether "Seroquel was the specific cause of [the Plaintiff's] injury," and emphasizing that the expert's review of medical records was "incomplete"); *see also Hamilton v. Louisville Cartage Co.*, 2024 WL 2303889, at *5 (M.D. Ga. May 21, 2024) (ruling based on reliability—not "sufficient facts"—that a purported life care expert who was "not qualified to determine if her own patients need the kind of surgeries she believes are necessary for Plaintiff" could not offer testimony without discussing that issue with other physicians).

[7] *See Cooper*, 259 F.3d at 203 ("In certain circumstances, a physician may reach a reliable differential diagnosis without personally performing a physical examination."); *Haller*, 598 F. Supp. 2d at 1294 ("[A] physician need not necessarily examine a patient, interview that patient, or speak with the patient's treating physician(s) in order to render opinions regarding diagnosis, prognosis, course of treatment and perhaps even causation.").

This opinion is expressly limited to "medical records that I was able to re-view," so its scope is tailored to the facts Dr. Hruz reviewed. And Dr. Hruz explained that "I have not met with, or personally interviewed, anyone in this case," and that his opinion is "subject to the limitations of documentary and related evidence, the impossibility of absolute predictions, and the limitations of social, biological, and medical science." Hruz Rep. ¶6; *see also* Hruz Supp. Rep. ¶1 ███████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ His opinions reflect those limitations, taking the records as they are. And talking to individual plaintiffs or providers at this point could not affect *documented* ██████████████████████████████████████ (*id.* ¶9) and thus could not affect this opinion.



Again, the only part of this opinion that focuses on the individual Plaintiffs is their documented diagnoses. Otherwise, the opinion speaks to studies of contributing factors to gender dysphoria in the overall population, a question which obviously requires no individual physical examinations or discussions with patients.

This opinion about "documented discussion" is the only one that the United States mentions, but it too is precisely tailored to the documentation that Dr. Hruz

reviewed, so he reviewed the *complete* facts underlying this opinion.



Yet again, Dr. Hruz's opinion about what "the medical records document" is equivalent in scope to his review of the medical records. And the United States presents no reason to think that the medical records are lying about ███████████ ██████████████████████████████████████████████████[8]

Dr. Hruz's opinions in his supplemental report are based on sufficient facts.

## III.   Plaintiffs' Attack On Seven Words In Dr. Hruz's Opinion Is Meritless.

Last, Plaintiffs offer their own, conclusory attack on seven words in Dr. Hruz's testimony. Plfs' Mot. 13. Though Plaintiffs do not bother to even describe Dr. Hruz's testimony connected with these seven words (bolded below), the complete sentences are as follows:

1. "Many of the recommendations made reflect WPATH's acknowledged **agenda** as an advocacy group," followed by a sentence from WPATH's Standards of Care 8 explaining that "WPATH is committed to advocacy for" "advanc[ing] tolerance and equity for gender diversity" and "eliminat[ing] prejudice, discrimination, and stigma." Hruz Rep. ¶104.

2. "Despite the claim that the SOC-8 guidelines are based upon solid scientific evidence, such recommendations represent **ideological positions** devoid of rigorous scientific evidence," followed by a citation to an article in the BMJ (formerly British Medical Journal) with an explanation. *Id.*

---

[8] The United States' suggestion, directed only at other experts, that the medical records might not be "complete" (U.S. Mot. 26) is addressed in Defendants' response to the plaintiffs' motions to exclude testimony by Dr. Nangia at 18-19.

3. "The treatment protocols and recommendations of **politically influenced, non-science associations** like WPATH and the American Academy of Pediatrics that engage in consensus-seeking methodologies by vote rather than science are not based on competent, credible, methodologically sound science, and have no known or published error rate." *Id.* ¶151.

Plaintiffs claim that these seven words "are inadmissible because they are not based on specialized knowledge or capable of assisting the trier of fact." Plfs' Mot. 14.

First, Plaintiffs offer no analysis of Dr. Hruz's testimony beyond a passing citation. Plaintiffs' failure to "develop[] this argument" waives it. *Gideon v. Camus*, 2024 WL 1701975, at *4 (M.D. Ala. Apr. 19, 2024). And "[b]ecause a motion regarding what words an expert … may use at trial is not properly raised in a Rule 702 motion," Plaintiffs' attack on Dr. Hruz's seven words can be rejected "across the board." *UMG Recordings, Inc. v. Grande Commc'ns Networks*, LLC, 2019 WL 3207803, at *2 (W.D. Tex. July 16, 2019).[9]

In any event, Dr. Hruz's seven words are based on his specialized knowledge, including over a decade of researching gender dysphoria and how major medical industry groups and guidelines approach it. *E.g.*, Hruz Rep. ¶12. He is a member of the Pediatric Endocrine Society and Endocrine Society and has knowledge of how their guidelines are adopted—and about "[t]he panel that drafted the Endocrine Society guidelines." *Id.* ¶¶8, 102-03. He has published articles that consider this issue.[10] Plaintiffs do not dispute that Dr. Hruz's opinion about these industry groups is based

---

[9] *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 765019, at *41 (N.D. Fla. Feb. 28, 2021) (Plaintiffs' own case explaining that "passing reference[s]" need not be excluded)

[10] *See, e.g.*, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*, 87 Linacre Q. 34, 37 (2020); *Growing Pains: Problems with Pubertal Suppression in Treating Gender Dysphoria*, 52 New Atlantis 3, 13-14 (2017) (co-authored).

on "sufficient facts or data," instead contending that his knowledge is not "specialized." But as a member of relevant industry groups and a professor who has studied and published about their guidelines, Dr. Hruz has specialized knowledge that a layperson would not. Because his "expert testimony focuses upon specialized observations" (and "the specialized translation of those observations into theory") different from an ordinary factfinder's "own," this testimony satisfies Rule 702's "specialized knowledge" requirement. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

For similar reasons, Dr. Hruz's testimony is capable of assisting the trier of fact because it "constitute[s] one piece of the puzzle that the [Defendants] endeavor to assemble before the" factfinder. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998). Unlike the experts in Plaintiffs' cases, Dr. Hruz's testimony does not merely "describe[] lay matters" and is not geared toward imputing liability based on any subjective state of mind. *E.g.*, *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1338 (S.D. Fla. 2010). Instead, he has used his expertise to explain why the guidelines of groups like WPATH, the Endocrine Society, and the American Academy of Pediatrics—guidelines that this Court has recognized are "around the very heart of what plaintiffs think is the core of their case"—are deficient. Doc. 246 at 64; *see* Doc. 263 at 7-8; *see generally* Defs' Kaliebe Resp. at 16-19. Dr. Hruz's specialized, helpful testimony should not be excluded.

## CONCLUSION

The Court should deny the United States' and Plaintiffs' motions to exclude certain testimony of Dr. Paul Hruz.

Dated: August 12, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

<u>s/ A. Barrett Bowdre</u>
A. Barrett Bowdre
*Counsel for Defendants*