# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE *et al*., | ) |
| | ) |
|     *Plaintiffs*, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     *Plaintiff-Intervenor*, | ) |
| | ) |
| v. | )   No. 2:22-cv-00184-LCB-CWB |
| | )   Hon. Liles C. Burke |
| STEVE MARSHALL, in his official | ) |
| capacity as Attorney General of the | ) |
| State of Alabama, *et al.*, | ) |
| | ) |
|     *Defendants*. | ) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' AND THE UNITED STATES' MOTIONS TO EXCLUDE CERTAIN TESTIMONY OF KRISTOPHER KALIEBE, M.D. (DOCS. 590, 602, 605)

# TABLE OF CONTENTS

Table of Contents ............................................................................................... i

Table of Authorities ........................................................................................... ii

Introduction ........................................................................................................1

Background .........................................................................................................2

Argument.............................................................................................................5

    I.    Dr. Kaliebe Reliably Applies His Psychiatric Expertise To Opine About The Potential Impact of Social Elements On Gender Dysphoria..................................................................................................5

        A.    As a Clinician And Professor in Child and Adolescent Psychiatry, Dr. Kaliebe is Qualified by Experience, Training, and Knowledge to Opine About Social Influences on Gender Dysphoria...............................................................................6

        B.    Dr. Kaliebe Reliably Opines That a Spread of Ideology Combined With Technologically Induced Contagion Effects May Have Contributed to the Increase in Gender Dysphoria ...........8

    II.    Dr. Kaliebe Reliably Applies His Clinical And Academic Expertise To Opine About The Politicization Of Gender Medicine And Suppression Of Evidence-Based Discourse Within Medical Associations And Journals ........................................................................11

        A.    Dr. Kaliebe Is Qualified to Opine About Medical Organizations' Advocacy for Medicalized Transition ....................11

        B.    Dr. Kaliebe Reliably Applies His Expertise to Opine About Health Associations' Advocacy for Medicalized Transition for Minors...............................................................................13

        C.    Dr. Kaliebe's Opinion is Helpful to the Trier of Fact ....................16

Conclusion ........................................................................................................20

Certificate of Service ........................................................................................22

i

# TABLE OF AUTHORITIES

**Cases**

*Broussard-Wadkins v. Maples*,
  895 F. Supp. 2d 1159 (N.D. Ala. 2012)...............................................................15

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
  47 F.4th 1278 (11th Cir. 2022) ................................................... 13, 16

*FNB Bank v. Park Nat. Corp.*,
  996 F. Supp. 2d 1187 (S.D. Ala. 2014) ..............................................................17

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..............................................................................14

*Henderson v. Goodyear Dunlop Tires N. Am., Ltd.*,
  2013 WL 5729377 (M.D. Ala. Oct. 22, 2013) ......................................................8

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
  2021 WL 765019 (N.D. Fla. Feb. 28, 2021) ......................................................17

*In re Disposable Contact Lens Antitrust*,
  329 F.R.D. 336 (M.D. Fla. 2018) ........................................................................15

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
  609 F. Supp. 3d 942 (N.D. Cal. 2022)..............................................................20

*In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*,
  711 F. Supp. 2d 1348 (M.D. Ga. 2010) ..............................................................15

*In re Seroquel Prods. Liab. Litig.*,
  2009 WL 3806436 (M.D. Fla. July 20, 2009) ......................................................15

*In re Takata Airbag Prod. Liab. Litig.*,
  2022 WL 4594123 (S.D. Fla. July 19, 2022) ......................................................17

*Johnson v. ABF Freight Sys., Inc.*,
  2020 WL 7320994 (N.D. Ala. Dec. 11, 2020) ......................................................17

*Kadel v. Folwell*,
    620 F. Supp. 3d 339 (M.D.N.C. 2022) ..................................................... 2, 19, 20

*Kirksey v. Schindler Elevator Corp.*,
    2016 WL 5239874 (S.D. Ala. Sept. 21, 2016) ...................................................8

*Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
    323 F. Supp. 3d 837 (S.D. W. Va. 2018)..........................................................15

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ........................................................................7

*Planned Parenthood Se., Inc. v. Strange*,
    33 F. Supp. 3d 1381 (M.D. Ala. 2014) ..............................................................8

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)........................................................................................20

*Robinson v. Jacksonville Shipyards, Inc.*,
    760 F. Supp. 1486 (M.D. Fla. 1991)................................................................20

*Smith v. Pfizer Inc.*,
    714 F. Supp. 2d 845 (M.D. Tenn. 2010) ..........................................................15

*Southwire Co. v. J.P. Morgan Chase & Co.*,
    528 F. Supp. 2d 908 (W.D. Wis. 2007) ...........................................................15

*United States v. Amuso*,
    21 F.3d 1251 (2d Cir. 1994) ............................................................................20

*United States v. Daly*,
    842 F.2d 1380 (2d Cir. 1988) ..........................................................................20

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ............................................................ 6, 14, 19

*United States v. Locascio*,
    6 F.3d 924 (2d Cir. 1993) ....................................................................... 16, 20

*United States v. Paracha*,
   2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ..........................................................20

*United States v. Van Dorn*,
   925 F.2d 1331 (11th Cir. 1991) .........................................................................19

*United States v. Williams*,
   865 F.3d 1328 (11th Cir. 2017) ...........................................................................8

## Rules

Fed. R. Civ. P. 26(a)(2)(B)(i)....................................................................................17

Fed. R. Civ. P. 26(a)(2)(B)(ii)............................................................................2, 17

Fed. R. Evid. 702 ................................................................ 5, 6, 8, 16, 19

Fed. R. Evid. 702(b).................................................................................................17

Fed. R. Evid. 703 ...............................................................................................2, 16

## INTRODUCTION

Dr. Kristopher Kaliebe is a professor of psychiatry with decades of relevant experience, including treating some patients with gender dysphoria and publishing many articles on the influence of social factors on mental health conditions. His expert testimony discusses potential social influences on gender dysphoria, the organizational biases that have led to the politicization of gender transition medicine, and the limitations that politicization has put on scholarly dialogue within American medical organizations and journals. In his supplemental report, he examines documents produced in discovery and assesses his original opinions in light of them.

Plaintiffs and the United States launch two primary challenges to Dr. Kaliebe's testimony. First, they move to exclude his discussion of social influences on gender dysphoria on the grounds that he does not personally diagnose it and because they dislike one of the peer-reviewed studies he relies on. But physicians like Dr. Kaliebe need not specifically engage in some practice to be qualified as an expert, and Dr. Kaliebe reliably applies his extensive experience studying social influences on mental health to the issue of gender dysphoria. Likewise, citing a wide range of peer-reviewed studies and data, he reliably opines that there has been a massive increase in youths presenting with gender dysphoria and that social contagion may play a role in that increase. As much as Plaintiffs and the United States are triggered by any reference to Dr. Lisa Littman's work on rapid-onset gender dysphoria, that work is merely a piece of Dr. Kaliebe's testimony. In any event, quibbles with one study are not a matter of admissibility.

Second, Plaintiffs and the United States object to Dr. Kaliebe's references to

1

documents obtained from WPATH and HHS, which he used to verify his initial opinions. But they (mostly) do not object to those opinions, so it is unclear why Dr. Kaliebe cannot explain that direct evidence pertaining to the organizations he discusses confirms those opinions. Regardless of whether those materials are otherwise admissible, experts regularly rely on inadmissible material (Fed. R. Evid. 703) and are *required* to disclose them (Fed. R. Civ. P. 26(a)(2)(B)(ii)). So the plaintiffs' caterwauling about this testimony being a "hearsay conduit" is nonsensical.

Dr. Kaliebe's opinions, expressed initially in his original report and confirmed in his supplemental report, are also helpful to the trier of fact. Dr. Kaliebe uses his expertise as a longtime member and coordinator between American medical groups to analyze the evidence and opine on issues pertinent to the case—the soundness and validity of the guidelines and consensus that this Court has repeatedly recognized constitute the core of the plaintiffs' case. How American medical organizations operate, including with respect to the creation and exchange of clinical guidelines, is not a matter of lay knowledge, so Dr. Kaliebe's testimony on those issues is helpful. District courts have admitted similar testimony in other cases "to provide background and critique the WPATH Standards of Care." *Kadel v. Folwell*, 620 F. Supp. 3d 339, 371-72 (M.D.N.C. 2022).

The motions to partially exclude Dr. Kaliebe's testimony should be denied.

## BACKGROUND

Dr. Kristopher Kaliebe is a board-certified physician in Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. SJ.DX15:¶6 (Kaliebe Rep.). He has training in human biology, sexuality, development, brain functioning, and gender

dysphoria. *Id.* ¶7. He has "extensive experience in psychotherapy, and [has] received additional training in Cognitive Behavioral Therapy and trauma-focused therapies." *Id.* ¶19. Dr. Kaliebe is a professor at the University of South Florida. *Id.* ¶6. And as a supervising physician at its Silver Child Development Center and Outpatient Psychiatry Center, he has treated about a dozen patients with gender dysphoria. *Id.* ¶¶10-11; *see* Doc. 591-10 at 131:1-3 (Kaliebe Dep.); *id.* at 134:19-22 (additional patients at prior positions). He also provides consultations to other clinicians regarding treatment of gender dysphoria. Kaliebe Rep. ¶¶12-13.

He has authored ten articles, many of which relate to gender dysphoria or psychiatry; written one textbook chapter; and been invited to participate in four publications. *Id.* at 83-84; *see* Kaliebe Dep. 20:13–22:3. He has given over fifty lectures on issues in psychiatry, many about social media. Kaliebe Rep. Curriculum Vitae 10-16. And he has served as an expert reviewer for peer-reviewed journals, including *Adolescent Psychiatry*, *Academic Psychiatry*, *Pediatrics*, and *Harvard Review of Psychiatry*. *Id.* at 21-22.

Dr. Kaliebe is "a member of the American Academy of Child and Adolescent Psychiatry [AACAP], the American Academy of Psychiatry, and the Law and the American Psychiatric Association." Kaliebe Rep. ¶18. He was co-chair of AACP's media committee for eight years. *Id.* ¶86. And he was "the Liaison from the American Academy of Child and Adolescent Psychiatry to the American Academy of Pediatrics" and "sat on the AAP's Council of Communication and Media." *Id.* ¶95.

Dr. Kaliebe's opinions are "based primarily on [his] own experience as a physician, psychiatrist, and associate professor, as well as the relevant literature in this

area." *Id.* ¶2. First, he opines that within the last decade, "the number of youth suffering from gender dysphoria has sky-rocketed across countries in the economically advanced Western world." *Id.* ¶20; *see id.* ¶¶26-33. He opines that "[s]ignificant evidence points to a spread of ideology combined with technologically induced contagion effects." *Id.* ¶21; *see id.* ¶¶34-55.

Next, in Dr. Kaliebe's view, "[s]mall numbers of advocate physicians within medical organizations have been able to leverage moralized claims and low-quality evidence to promote medical interventions for gender dysphoria in minors." *Id.* ¶22. According to Dr. Kaliebe, "[m]any medical professional organizations have entered advocacy roles to endorse the concept of so-called 'affirmative' care as evidence-based and ethical, and they no longer remain neutral arbiters of the available science." *Id.* ¶23; *see id.* ¶¶81-149. And "[b]ecause of the politicization and ideological nature of affirmative treatments for gender dysphoria and efforts by proponents to silence debate," Dr. Kaliebe opines, "there is limited rigorous scholarly dialogue within American professional medical organizations and medical journals." *Id.* ¶25; *see id.* ¶¶150-74.

In his supplemental report, Dr. Kaliebe examines documents produced in discovery in this case and explains how they "confirm[]" the opinions "in [his] initial report." SJ.DX16:¶3 (Kaliebe Supp. Rep.). For instance, he finds that the documents confirm his opinion that "WPATH occupies a particular sliver of the medical community and it furthers that community's preferences (and financial interests)." *Id.* ¶31. Analyzing the development of the WPATH guidelines, he opines that

WPATH's "self-selection process"—"not acknowledged within the internal documents"—introduces bias in the composition of the organization." *Id.* ¶37.

Plaintiffs and the United States move to exclude certain of Dr. Kaliebe's opinions on social influences on gender dysphoria and the politicization of medical organizations.

## ARGUMENT

### I.   Dr. Kaliebe Reliably Applies His Psychiatric Expertise To Opine About The Potential Impact of Social Elements On Gender Dysphoria.

Dr. Kaliebe opines that "the dramatic rise in minors presenting with gender dysphoria may be attributable to technologically induced contagion effects." Kaliebe Rep. ¶42; *see id.* ¶¶26-55. The United States (joined by Plaintiffs) first attack Dr. Kaliebe's qualifications to opine on the social elements of gender dysphoria in adolescents on the ground that he has "insufficient relevant experience" because he has not diagnosed gender dysphoria often or conducted original research on the link between social elements and gender dysphoria. U.S. Mot. 18. But these two specific experiences are not necessary for Dr. Kaliebe to meet the broad definition of expert qualification under Rule 702, which encompasses "knowledge, skill, experience, training, or education." Presumably recognizing that fact, the United States quickly pivots to arguing instead that Dr. Kaliebe did not "develop[] that opinion in a reliable way"—attacking the methodology of the studies he relied on. U.S. Mot. 19.

Both these arguments fail. Dr. Kaliebe's opinion about social influence on gender dysphoria flows from his clinical background, academic experience, professional training, and knowledge, and is supported by independent, reputable sources.

Dr. Kaliebe is thus qualified to offer his opinion on that issue, and his opinion is sufficiently reliable. Plaintiffs' and the United States' objections to his opinion and efforts to discredit research they dislike go to weight, not admissibility.

### A. As a Clinician And Professor in Child and Adolescent Psychiatry, Dr. Kaliebe is Qualified by Experience, Training, and Knowledge to Opine About Social Influences on Gender Dysphoria.

Dr. Kaliebe is qualified to opine on the social influences on gender dysphoria, no matter how often he personally diagnoses it or has directly published on that specific topic. Under "the plain language of Rule 702," "experts may be qualified in various ways," including "based on 'knowledge, skill, experience, training, *or* education.'" *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (emphasis altered). Here, Dr. Kaliebe has the requisite experience, training, and knowledge to opine on social influences on mental health conditions like gender dysphoria.

First, Dr. Kaliebe's extensive academic and professional experience examining the intersection between media and youth mental health establishes his qualification as an expert here. Dr. Kaliebe is a preeminent authority on technology's impact on youth mental health. He co-edited the academic book *Youth Internet Habits and Mental Health*, an issue of Child and Adolescent Psychiatric Clinics of North America. Kaliebe Rep. ¶17. Dr. Kaliebe is also an author for the psychiatric care textbook, *Digital Media Use in Transitional-Age Youth: Challenges and Opportunities*. *Id.* Curriculum Vitae 18. He has published two articles in *Child & Adolescent Psychiatric Clinics* on technology's impact on youth mental health. *Id.* at 19.

Further, Dr. Kaliebe was "the co-chair of the media committee at the American Academy of Child Adolescent and Psychiatry from 2013 to 2021." Kaliebe Dep.

154:20-23. This professional experience gave him knowledge "on the impact of media and how strong it is and how much it affects children and youth." *Id.* at 154:23–155:1. Thus, his opinions here about the relationship between social media and mental health are "a continuation of a theme" that he has been studying and publishing about for 20 years. *Id.* at 154:25–155:4. In fact, 2004 was when Dr. Kaliebe first instructed his colleagues on media's impact on adolescent mental health at an AACAP conference. Kaliebe Rep. ¶18. Among many lectures related to technology and psychiatric disorders, two given in 2020 were titled "Screenagers: Next Chapter—How Online Behaviors Affect Depression and Anxiety Disorders in Adolescents" and "Helping Child Psychiatrists Navigate the Internet Age." *Id.* Curriculum Vitae 15. For decades, Dr. Kaliebe has been a knowledgeable and qualified authority on technology's impact on the mental health of children and adolescents.

The United States misapplies *Daubert*'s qualifications prong by arguing that Dr. Kaliebe must specialize in personally diagnosing gender dysphoria and recommending medicalized interventions for minors with gender dysphoria to be qualified to opine about social influences and gender dysphoria's presentation in minors. U.S. Mot. 18. But even if gender dysphoria were considered a distinct discipline from mental health (despite its inclusion in the *Diagnostic and Statistical Manual of Mental Disorders*), a "proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004). "[A]n expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case." *Henderson v. Goodyear Dunlop Tires N. Am., Ltd.*, 2013 WL 5729377, at *6 (M.D.

Ala. Oct. 22, 2013). Rather, "an expert with the education or background to permit him to analyze a given set of circumstances … can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in regard to the particular [issue] even [if] he has not had actual experience with the issue." *Kirksey v. Schindler Elevator Corp.*, 2016 WL 5239874, at *4 n.5 (S.D. Ala. Sept. 21, 2016) (cleaned up); *see also* Defs' Hruz Resp. at 7-11 & n.2 (collecting many precedents and otherwise responding to a similar argument). Because Dr. Kaliebe qualifies as an expert on social influences on minor mental health, he qualifies as an expert on social influences on gender dysphoria.

The United States' assertion that Dr. Kaliebe has not conducted "original research" specifically on gender dysphoria (U.S. Mot. 18) fails for similar reasons. As shown, Dr. Kaliebe is an expert in the link between social media influences and mental health disorders, of which gender dysphoria is one. Just as a physician need not be a specialist in the area to testify, an otherwise-qualified academic may testify without doing specific research in a narrowly defined field. Nor is "original" research into the narrowly defined field a prerequisite of an expert under Rule 702. *E.g.*, *United States v. Williams*, 865 F.3d 1328, 1339-40 (11th Cir. 2017); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1391 (M.D. Ala. 2014); *see* Defs' Nangia Resp. 13-14 (collecting cases and responding to a similar argument).

> **B.     Dr. Kaliebe Reliably Opines That a Spread of Ideology Combined With Technologically Induced Contagion Effects May Have Contributed to the Increase in Gender Dysphoria.**

The United States also asserts that "[i]n the absence of experience, Dr. Kaliebe does not otherwise support his social contagion opinion." U.S. Mot. 19. But as just

explained, Dr. Kaliebe's social influences testimony is within the scope of his experiential qualifications as an expert, so the United States' argument is irrelevant. The United States' quibbles with the literature cited by Dr. Kaliebe are also irrelevant.

The United States asserts that "much of the research" Dr. Kaliebe relies on "has been discredited," but attacks only one of the authors he cites—Dr. Lisa Littman. U.S. Mot. 19. The United States ignores Dr. Kaliebe's rebuttal of the canard that Dr. Littman's research was "discredited"—and his explanation that such claims reveal the ideological bent within American medical organizations. *E.g.,* Kaliebe Rep. ¶¶134-49. Dr. Littman's research has *not* been "discredited,"[1] but even if it had been, it would make no difference to Dr. Kaliebe's expert qualifications.

The United States does not even try to address Dr. Kaliebe's reliance on data illustrating (1) the recent dramatic rise in adolescent females presenting with gender dysphoria symptoms along with other psychiatric comorbidities, *id.* ¶29; (2) documented cultural influences on psychiatric illness, *id.* ¶35; (3) phenomena like "Mass Social Media Induced Illness," *id.* ¶40; and (4) increases in "social media enabled

---

[1] To claim that Dr. Littman's research "has been discredited," the United States cites its or Plaintiffs' counsel's questions to Dr. Kaliebe and Dr. Hruz. U.S. Mot. 19. As these experts explained, the "research methodology" used by Dr. Littman—convenience sampling—has "potential for recruiting bias," and is the same methodology used by *many* studies relied on by the United States. Doc. 591-7:137:4-16, 140:2–141:8 (Hruz Dep.); Kaliebe Dep. 169:22–170:12; *see* SJ.DX5:¶131 (Hruz Rep.) (pointing out studies relying on the 2015 U.S. Transgender Survey); *see* Kaliebe Rep. ¶¶135-36 (similar). Those rational explanations do not "discredit" Dr. Littman's research. As Defendants' experts also explained to the United States' counsel, "the corrections that were made [in Littman's article] did not in any way change the conclusions of the study." Hruz Dep. 139:3-5. So when the United States now invokes "an extensive correction because of its misstatements," it's not too surprising that its only cited source (U.S. Mot. 19-20) says *nothing* about *any* correction. As Dr. Kaliebe explains, "there was no finding of error, misconduct or faulty methods with Littman's paper." Kaliebe Rep. ¶134. And the correction only confirmed that "Dr. Littman's research methods were unremarkable and comparable to other mental health research." *Id.*

self-diagnos[es]" for a variety of psychiatric disorders, *id.* ¶41. And the United States ignores that Dr. Littman's writings concerning rapid-onset gender dysphoria in adolescent populations mirror previous and subsequent studies. *Id.* ¶¶45-46; *see* Kaliebe Dep. 148:15-19 (explaining that "even before Littman's article came out, [Europeans] had articles out describing the same phenomena that arise in mostly natal females with lots of psychiatric comorbidities who were expressing gender dysphoria"). The replication of Dr. Littman's findings in other literature reinforces the sound scientific basis for Dr. Kaliebe's "reasonable explanation" for how a social component could be driving at least part of the increase of gender dysphoria in adolescents. The United States does not even nominally challenge the reliability of that literature, so cannot challenge Dr. Kaliebe's reliance on it.

Last, that the United States' preferred American "professional organizations" have not recognized "rapid-onset gender dysphoria" as a "diagnosis" (U.S. Mot. 20) is irrelevant to Dr. Kaliebe's reliance on valid studies to arrive at his expert opinion. That's especially true given that a focus here has been the dubious reliability of those organizations.[2] And the United States' point is doubly irrelevant since, as Dr. Kaliebe explained, "rapid onset gender dysphoria" is "not a diagnosis," but "a description of a clinical phenomenon." Kaliebe Dep. 148:7-21.

In a one-sentence footnote, the United States asserts that it "is not helpful" for

---

[2] Of note, WPATH's SOC-8 agrees that "[f]or a select subgroup of young people, susceptibility to social influence impacting gender may be an important differential to consider," citing other studies. SJ.DX116:S45. Privately, WPATH leaders agree too. *E.g.*, SJ.DX179:41 (WPATH 6) (co-lead of adolescent chapter admitting that while it is "[f]or sure" "that increasing numbers are asking for medical affirming treatment," "[w]hat the explanation for this increase is unknown and also methodologically challenging to study" but "social factors likely play a role").

Dr. Kaliebe to explain how gender dysphoria may be influenced by social factors. U.S. Mot. 20 n.4. Even if this argument were sufficiently presented, the causes of gender dysphoria are at least potentially relevant to the appropriate therapeutic response. To the extent that media and social factors induce gender dysphoria symptoms, pharmacological interventions may not address those underlying causes, as Dr. Kaliebe explained. *E.g.*, Kaliebe Rep. ¶¶55, 161.

Because Dr. Kaliebe is a recognized authority on technology's impact on psychiatric disorders in adolescents and reliably applies his expertise on that topic to adolescents presenting with gender dysphoria, the Court should reject the plaintiffs' motion to exclude these parts of his testimony.

## II.   Dr. Kaliebe Reliably Applies His Clinical And Academic Expertise To Opine About The Politicization Of Gender Medicine And Suppression Of Evidence-Based Discourse Within Medical Associations And Journals.

The United States and Plaintiffs also attack Dr. Kaliebe's opinions about the politicization of gender medicine; the United States limits its challenge to his supplemental report, while Plaintiffs include portions of his initial report. But once again, Dr. Kaliebe has the qualifications to opine as an expert on this topic. His testimony is reliably based on his own experience and expertise, and it is helpful to the trier of fact in that it sheds light on evidence that is at the heart of the plaintiffs' case.

### A.   Dr. Kaliebe Is Qualified to Opine About Medical Organizations' Advocacy for Medicalized Transition.

Dr. Kaliebe's extensive professional experiences as a clinical and academic child psychiatrist involved with medical organization leadership qualify him to opine about how medical associations and journals have eschewed evidence-based

11

principles on the subject of treating gender dysphoria in youth. Dr. Kaliebe "was the liaison between the American Academy of Pediatrics [AAP] and the American Academy of Child and Adolescent Psychiatry" (AACAP) for seven years. Kaliebe Dep. 70:17-19. From 2004 to 2022, he was invited to present scores of scholarly lectures to the American Academy of Child and Adolescent Psychiatry and other psychiatric associations. *Id.* at 9:22-25; Kaliebe Rep. Curriculum Vitae 13-16. He remains a distinguished fellow at AACAP, and just two years ago was invited to give a scholarly presentation on misinformation at AACAP's annual meeting. Kaliebe Dep. 9:22–10:5. He has long been a member of the American Psychiatric Association, where he experienced the distorting "influence[] by pharma" on his own medical association, *id.* at 213:22, facilitating advocacy for overtreatment "with the result that opioid prescriptions skyrocketed." Kaliebe Rep. ¶79.

Dr. Kaliebe has also co-authored psychiatric clinical practice guidelines. *Id.* ¶18. As a professor of psychiatry (in addition to his clinical practice), he often reviews "clinical practice guidelines with the medical residents or the child psychiatry fellows or psychiatry fellows because that's a part of teaching psychiatry." Kaliebe Dep. 237:4-14. And his expertise in evaluating studies is evidenced by his appointments as an expert reviewer for several scholarly journals, including *Adolescent Psychiatry* and *Harvard Review of Psychiatry*. Kaliebe Rep. Curriculum Vitae 22.

Without pointing to specific opinions, the United States generally argues that Dr. Kaliebe is unqualified to opine "on the substance of [WPATH] guidelines beyond his area of practice"—in areas like "surgery and endocrinology"—or "opine on issues related to the development of clinical guidelines." U.S. Mot. 20. But as

explained above, a general expert is not required to specialize in a narrowly defined field. And Dr. Kaliebe's expertise as a practicing clinician and professor in child and adolescent psychiatry who has contributed to clinical guidelines qualifies him as an expert in assessing the evidence base and clinical guidelines for gender dysphoria.

### B.   Dr. Kaliebe Reliably Applies His Expertise to Opine About Health Associations' Advocacy for Medicalized Transition for Minors.

Dr. Kaliebe draws on his expertise to reliably analyze how ideological and political factors compromise scientific inquiry at major health organizations, including WPATH and HHS. "Where 'ideal experimental conditions and controls' are precluded, 'other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations.'" *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1318 (11th Cir. 2022). Dr. Kaliebe draws on his medical experience, education, training, observations, and reputable sources to opine about the American medical establishment's approach to gender dysphoria.

Starting with opinions in Dr. Kaliebe's initial report, the United States contends that "in the absence of adequate relevant experience," they "rel[y] on insufficient support." U.S. Mot. 21. But as just shown, Dr. Kaliebe *has* sufficient experience, and in any event, the United States is wrong about his support. Its argument relies on largely ignoring Dr. Kaliebe's underlying methodology. Specifically, Dr. Kaliebe applies (1) fundamental tenets of evidence-based medicine, Kaliebe Rep. ¶57, (2) recognized criteria for trustworthy clinical practice guidelines, *id.* ¶59, and (3) cognitive principles, such as "motivated reasoning," "self-censorship" within a moralized environment, "emotional reasoning," and "attribution substitution," *id.*

¶¶62-67. He also relies on historical examples of "non-empirical theoretical approach[es]" that attained widespread medical acceptance and caused harm. *E.g.*, *id.* ¶77. He discusses his own experiences in AACAP. *Id.* ¶¶99-110. He relies on systematic reviews to identify the weaknesses in WPATH's SOC-7 that carried into SOC-8. *Id.* ¶¶113-19. And he contrasts his professional observations of the actions and statements by medical associations and academic journals with the evidence-based model. *Id.* ¶¶81-149.

Though the United States ignores most of this and dismisses other parts as "anecdotes" (U.S. Mot. 21), there is no rule—or even presumption—against the reliability of "non-scientific, experience-based testimony." *Frazier*, 387 F.3d at 1262. These are not mere anecdotes, anyway: Dr. Kaliebe relies on a broad swath of probative data points, including organizations' public criticism of dissenting members, political statements, systematic reviews, leadership overlap between organizations, and censorship and politicized discourse in journals. Kaliebe Rep. ¶¶89-95 (AAP), ¶¶96-106 (AACAP), ¶¶107-08 (Am. Psychol. Assoc.), ¶¶108-11 (American Psychiatric Assoc.), ¶¶112-23 (WPATH), ¶¶124-26 (Endocrine Society). The United States does not try to explain how there is "too great an analytical gap between" *any* of this "data and the opinion proffered" by Dr. Kaliebe that the medical associations and journals have limited scholarly discourse on gender dysphoria. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

Turning to his supplemental report, Dr. Kaliebe used the additional sources available after discovery—including WPATH and HHS documents—to support the opinions he provided in his initial report. The United States' and Plaintiffs' primary

attack on the reliability of Dr. Kaliebe's supplemental report is that it "applies no scientific methodology" apart from reviewing the documents. U.S. Mot. 22; *see* Plfs' Mot. 10-11; *but see id.* at 8 (conceding that Dr. Kaliebe uses "concepts about political bias and ideological homogeneity … to interpret the" documents).

The United States and the Plaintiffs err in artificially separating the supplemental report from Dr. Kaliebe's initial report, which reliably applied the expert principles discussed above. As Dr. Kaliebe's supplemental report explains, he uses a "review of the documents" to assess his "concerns in [his] initial report." Kaliebe Supp. Rep. ¶3. Properly understood, Dr. Kaliebe's supplemental report is an extension of his initial report, and reviewing additional relevant evidence does not somehow become "unscientific" (Plfs' Mot. 3) simply because that review primarily involves reading primary sources. Expert testimony is often based partly on an expert's review of documents uncovered in discovery.[3] If the United States or Plaintiffs believes Dr. Kaliebe's review of this evidence is lopsided, that is a matter for cross-

---

[3] *See, e.g.*, *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 374 (M.D. Fla. 2018) ("One function of an expert … where tens of thousands of documents have been exchanged through discovery[] is to review the documentation and highlight and interpret those pieces of evidence …."); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007) ("[E]xperts may rely on data and other information supplied by third parties"); *In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*, 711 F. Supp. 2d 1348, 1374-75 (M.D. Ga. 2010) (finding expert methodology reliably used opposing party's "own internal documents" to "confirm" product's dangerousness); *Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 323 F. Supp. 3d 837, 852 (S.D. W. Va. 2018) (finding "the doctors' opinions regarding what [pharmaceutical company] knew and communicated to the FDA w[ould] provide helpful insight"); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009) (holding that expert witnesses may "rely on and discuss [the defendant's] internal corporate documents"); *Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 857 (M.D. Tenn. 2010) (similar); *see also Broussard-Wadkins v. Maples*, 895 F. Supp. 2d 1159, 1172 (N.D. Ala. 2012) (finding expert's "reliance solely on documentary evidence," "rather than interviews," did "not undermine the reliability of his method").

examination, not a question of admissibility. *See Carrizosa*, 47 F.4th at 1323 ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." (cleaned up)). Reviewing primary sources about medical organizations' operations is not an *unreliable* method of confirming an opinion on that topic.

In sum, *Daubert* does not bar an experienced adolescent psychiatrist from using a medical association's internal communications as an additional factual basis to opine about that association's unscientific approach to treating a mental health condition in adolescents. Dr. Kaliebe's testimony is sufficiently reliable under Rule 702.

### C.   Dr. Kaliebe's Opinion is Helpful to the Trier of Fact.

The United States' and Plaintiffs' primary objection to Dr. Kaliebe's testimony seems to be that certain opinions, largely in his supplemental report, are "unhelpful opinions about intent or motive" and "serve as a mere conduit for introducing hearsay." U.S. Mot. 23; *see* Plfs' Mot. 8-18. This criticism is unfounded. Starting with the latter point—and putting aside the unsupported assumption that the documents Dr. Kaliebe relies on would be otherwise inadmissible—"an expert may rely on inadmissible evidence in forming his opinion." *Carrizosa*, 47 F.4th at 1322-23 (quoting Fed. R. Evid. 703). "[T]hat [the expert] relied upon inadmissible evidence is therefore less an issue of admissibility for the court than an issue of credibility for the [fact-finder]." *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993).

The United States and Plaintiffs do not argue that Dr. Kaliebe's reliance on these materials is unreasonable in the field. *See* Fed. R. Evid. 703. The United States' and Plaintiffs' problem—that Dr. Kaliebe had the temerity to quote the documents

he relied on—is even harder to understand. Experts are *required* to provide "a complete statement of all opinions" and "the basis and reasons for them"—including "the facts or data considered." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii).[4] Unlike testimony with an unadorned "narrative," Dr. Kaliebe "relies on his professional experience and factual testimony to lay the groundwork to provide his own expert opinion—entirely permissible under *Daubert*." *In re Takata Airbag Prod. Liab. Litig.*, 2022 WL 4594123, at *4 (S.D. Fla. July 19, 2022); *see also In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 765019, at *41 (N.D. Fla. Feb. 28, 2021) (Plaintiffs' own case "declin[ing] to parse the experts' reports and depositions for statements that may cross the line into improper factual narration"); *contra* Plfs' Mot. 9-10, 13 (parsing individual words and phrases, *e.g.*, "second half of sentence after 'but'"); U.S. Mot. 22 (similar).

So the only real objection here is that Dr. Kaliebe's opinions are "within the scope of lay knowledge" so are "unhelpful." U.S. Mot. 23. "The helpfulness requirement turns on" "'the common sense inquiry of whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved.'" *Johnson v. ABF Freight Sys., Inc.*, 2020 WL 7320994, at *4 (N.D. Ala. Dec. 11, 2020) (cleaned up). To ask whether the "untrained layman" knows about the inner workings of WPATH and the other medical organizations—

---

[4] *See FNB Bank v. Park Nat. Corp.*, 996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014) (explaining that an expert may "provide the necessary factual underpinning for his opinions, without which his report would be subject to attack as noncompliant with Rule 26(a)(2)(B)"); *accord* Fed. R. Evid. 702(b) (requiring a showing that "the testimony is based on sufficient facts").

and how they produce guidelines—is to answer it. Neither the United States nor Plaintiffs show that any foundation of lay knowledge exists about the complex organizational themes at the center of Dr. Kaliebe's opinion—how clinical practice guidelines are created, the role of systematic reviews in that creation, how medical organizations are constituted, what role they play in guideline creation, how organizations can be interrelated and subject to biases, and how guidelines can flunk principles of evidence-based medicine. Even Plaintiffs concede that Dr. Kaliebe applies "concepts about political bias and ideological homogeneity"; though Plaintiffs contend that these concepts are "commonly understood," they offer no evidence that a lay observer has any familiarity with them, particularly as applied to assess the reliability of clinical guidelines. Plfs' Mot. 8. Indeed, they do not even show that lay observers would know how gender transitioning guidelines have been developed or the organizational forces behind those guidelines.

Unlike in the standard "motive or intent" cases relied on by the United States and Plaintiffs, the point of Dr. Kaliebe's testimony is not to impute scienter or motive for civil or criminal liability against WPATH or other organizations that are not even parties here. Instead, Dr. Kaliebe's opinions shed light on the scientific soundness of the guidelines and purported consensus about their use and certain treatments— issues that this Court agreed "go to 'the very heart' of this case.'" Doc. 263 at 5-7. Indeed, Plaintiffs and the United States continue to rely on these supposedly "'evidence-based practice guidelines' that reflect 'the consensus of the medical communities on the appropriate treatment for gender dysphoria.'" Doc. 627 at 28; *see* Doc. 630 at 6-7. To the extent that Dr. Kaliebe's explanations touch on motives or intent,

they are merely background for his primary opinions about the existing American guidelines and "consensus." And any passing references to motive, intent, or knowledge simply reflect the language in the documents themselves and are minor pieces of his overall opinion.[5] Whatever WPATH's knowledge or motives may have been, the point is that the resulting *guidelines* (and the purported consensus) are suspect. The thrust of Dr. Kaliebe's testimony is on these issues, not personal motive or intent: the governance and culture of relevant medical organizations, scientific dialogue in the United States on these issues, the development of clinical guidelines, and the role of advocacy in that development. None of this is within "the understanding of the average lay person," making Dr. Kaliebe's testimony helpful under Rule 702. *Fraizer*, 387 F.3d at 1262. A layperson does not study the interworkings of the scientific community and the process by which WPATH and HHS formulate guidelines or how others in the medical community assess those guidelines.

The Eleventh Circuit "has long allowed the admission of 'structural evidence' for the purpose of providing the jury with a complete understanding of" the relevant issues. *United States v. Van Dorn*, 925 F.2d 1331, 1338 (11th Cir. 1991). It and many other courts have applied this rule in many contexts, including admitting expert testimony. For instance, the district court in a case relied on by the United States admitted expert testimony "'provid[ing] some context concerning' WPATH," which the expert opined is "a 'private, activist, non-science, organization.'" *Kadel*, 620 F. Supp. 3d at 371. The court said that this testimony was admissible "to provide background and critique the WPATH Standards of Care" and "to rebut Plaintiffs' experts

---

[5] At most, then, any exclusion would be of passing words, not Dr. Kaliebe's testimony writ large.

who appear to use and rely in part on" those Standards. *Id.* at 372.

And in other cases where litigants have challenged expert testimony about organizations as "simply a conduit allowing inadmissible evidence," courts have rejected this challenge, upholding "the use of expert testimony to help explain the operation, structure, membership, and terminology of" the organization. *Locascio*, 6 F.3d at 936. Their reasoning applies fully here: It is "a reasonable assumption that [fact-finders] are not well versed in the structure and methods of" specific organizations. *Id.* at 937.[6] That is true of the inner workings of American medical organizations as well, particularly as they related to the creation of clinical guidelines. Thus, Dr. Kaliebe's opinion testimony about American medical organizations and their advocacy, guidelines, and biases is helpful and admissible.

## CONCLUSION

For these reasons, the United States' and Plaintiffs' motions to exclude certain testimony of Dr. Kaliebe should be denied.

---

[6] *Accord, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235-36 (1989) (relying on expert testimony on "the partnership selection process at Price Waterhouse" based on internal documents, even though the expert did not "m[eet] any of the people involved"); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1503 (M.D. Fla. 1991) (similar); *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 1007 (N.D. Cal. 2022) (collecting cases allowing "expert testimony about the actions and motivations of a party when based on industry experience and the review of record evidence"); *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) (organizational testimony helpful "to provide background"); *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994) (similar); *United States v. Paracha*, 2006 WL 12768, at *21 (S.D.N.Y. Jan. 3, 2006) (allowing "expert testimony regarding al Qaeda's origin, leadership, and operational structure, as such testimony will aid the jury in understanding how al Qaeda came to be and the manner in which it currently functions"), *aff'd*, 313 F. App'x 347 (2d Cir. 2008).

Dated: August 12, 2024

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*