# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' AND THE UNITED STATES' MOTIONS TO EXCLUDE CERTAIN TESTIMONY OF PATRICK LAPPERT, M.D. (DOCS. 590, 602, 605)**

# TABLE OF CONTENTS

Table of Contents ............................................................................. i

Table of Authorities ........................................................................ ii

Introduction .....................................................................................1

Background .......................................................................................3

Argument...........................................................................................6

    I.   Dr. Lappert's Opinions On Transitioning Surgeries Are Relevant. ...........6

    II.  Dr. Lappert Is Qualified To Opine On All Aspects Of Transitioning Surgeries...........................................................................................11

Conclusion ......................................................................................17

Certificate of Service .......................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Brandt v. Rutledge*,
    677 F. Supp. 3d 877 (E.D. Ark. 2023).................................................16

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993).......................................................................7

*Kadel v. Folwell*,
    620 F. Supp. 3d 339 (M.D.N.C. 2022) ............................................16

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ......................................................13

*Moore v. Intuitive Surgical, Inc.*,
    995 F.3d 839 (11th Cir. 2021) ........................................................13

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ......................................................13

*Stagl v. Delta Air Lines, Inc.*,
    117 F.3d 76 (2d Cir. 1997) .............................................................15

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005) ......................................................16

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ......................................................12

**Rules**

Fed. R. Evid. 401(a) .............................................................................11

Fed. R. Evid. 702 .............................................................................6, 7

**Other Authorities**

29 Wright & Miller, *Federal Practice and Procedure* § 6264.1 (2d ed.) ...............12

Roni Caryn Rabin et al.,
   *Biden Administration Opposes Surgery for Transgender Minors*, N.Y. TIMES
   (June 28, 2024), https://www.nytimes.com/2024/06/28/health/transgender-sur-
   gery-biden.html ................................................................................................10

## INTRODUCTION

Dr. Patrick Lappert has been a physician for four decades and a plastic and reconstructive surgeon for three. He is intimately familiar with the surgeries that the WPATH standards recommend for minors with gender dysphoria. His report discusses those surgeries as part of the continuum of care the plaintiffs and their experts say that the Constitution guarantees a right to access. He thus explains what the surgeries are, what the evidence base is for their use, how the administration of puberty blockers and cross-sex hormones affects both the likelihood that patients will choose to have transitioning surgery and the surgical options available for those patients, and how the "informed consent" process for hormonal interventions must account for the prospect of surgeries—and how that process is woefully inadequate to do so.

The United States and Plaintiffs move to exclude Dr. Lappert's testimony for two reasons: one, because they would prefer not to talk about transitioning surgeries and thus claim that surgeries are irrelevant to this case; and, two, because Dr. Lappert has never himself surgically castrated a minor suffering from gender dysphoria and so (the argument goes) is unqualified to discuss what transitioning surgeries entail or how those surgeries fit into the transitioning procedures the plaintiffs do want to discuss. U.S. Mot. 29.[1]

The Court should deny their motion. Surgeries are obviously relevant. The WPATH standards recommend surgeries for minors, and the plaintiffs have made

---

[1] Although the Private Plaintiffs include Dr. Lappert in the title of their motion to exclude and in their listing of witnesses whose testimony they are seeking to exclude or limit, they do not otherwise discuss Dr. Lappert's report, explain what aspects of his report they are challenging, or even mention Dr. Lappert again. *See* Doc. 605. Plaintiffs have thus waived any argument that the United States did not make in its motion, which the Plaintiffs have sought to join. *See* Doc. 602.

1

those standards the cornerstone of their case. If those standards are not trustworthy when it comes to surgeries, that is relevant to know. Plus, at least *some* minors receiving transitioning hormones will undergo surgical procedures—and, as Dr. Lappert explains, are more likely to do so if they have already begun to transition using hormones. Accordingly, and as the WPATH Standards of Care recognize, the prospect of surgery—and how puberty blockers and hormones affect those prospects—must be part of the informed consent process for puberty blockers and cross-sex hormones.[2] That makes Dr. Lappert's testimony relevant.

As for Dr. Lappert's qualifications, it is of course true that Dr. Lappert has not performed any transitioning surgeries. That is because his expert opinion is that the surgeries are unethical to perform. But as he explained in his report, "[a]ll of the specific procedures, from mastectomy to breast enhancement to genital reconstruction to complex sensate microvascular flap surgeries, are within the scope of [his] experience," and he has "instructed resident surgeons on these procedures." SJ.DX17:¶24 (Lappert Rep.). "To claim that [he] ha[s] no expertise to offer an onion about gender-affirmation care would be akin to excluding a board-certified neurosurgeon from opining on the merits of frontal lobotomy, which are too harmful to ethically perform." *Id.*

---

[2] *See* SJ.DX116:S64 (SOC-8) (recommending before a patient begins puberty blockers that the clinician "address[] other risks and benefits of pubertal suppression," including the "surgical implications" of "proceed[ing] with pubertal suppression" and "engaging in discussions with families about the future unknowns related to surgical and sexual health outcomes").

# BACKGROUND

Dr. Lappert has been a physician for four decades and is a retired plastic surgeon and Naval medical officer. Lappert Rep. ¶1. He received his medical degree from the Uniformed Services University of the Health Sciences in 1983; he followed that with a surgical internship and more surgical training. *Id.* ¶9-10. He also trained in plastic and reconstructive surgery, graduating from the University of Tennessee, Memphis in 1994. *Id.* ¶13.

Dr. Lappert has received board certification in both General Surgery and Plastic and Reconstructive Surgery. *Id.* ¶14. He served as chairman of plastic surgery at Naval Hospital in Portsmouth, Virginia, and established a wound care center where he oversaw limb and pelvic reconstructions. *Id.* ¶15. He also served as the Specialty Leader of Plastic and Reconstructive Surgery for the Navy's Office of the Surgeon General. *Id.* ¶16. He published the first case report detailing a technique for repairing a fronto-facial fracture. *Id.* He also co-authored a textbook chapter on the management of combat injuries. *Id.* ¶16. Dr. Lappert has been active in training medical students and surgical residents throughout his career. *Id.* ¶¶12, 16, 19.

After retiring from the Navy in 2002, Dr. Lappert provided comprehensive breast reconstructions to women suffering from breast cancer, first in Nebraska and then in Alabama. *Id.* ¶17-18. He also co-authored a groundbreaking article on pre-operative plastic surgery planning for women undergoing these procedures. *Id.* ¶18. Along with providing breast reconstructions, Dr. Lappert was very active in aesthetic/cosmetic surgery, offering facial rejuvenation and body contouring procedures. He retired from active practice in 2020. *Id.* ¶20.

Dr. Lappert has "a meaningful breadth of experience in the advanced surgical care of trauma, cancer, head/neck disease, and cranial and facial birth defects." *Id.* ¶22. That surgical care involves the same techniques that today's gender surgeons use when conducting a transitioning surgery. *Id.* Thus, while Dr. Lappert has never performed a gender transitioning surgery—because his expert opinion is that such surgeries are unethical to perform—he has extensive experience with the procedures involved in those surgeries. *Id.* ¶24. And since 2014 Dr. Lappert has kept abreast of the "medical literature pertaining to the care of self-identified transgender persons, including children and adults." *Id.* ¶23. He has made many public presentations to teachers, counselors, and administrators on the medical and scientific evidence that informs transgender care. *Id.*

Here, Dr. Lappert offers his expert opinion regarding transitioning surgeries, including how the prospect of such surgeries must be understood when considering hormonal interventions in minors. He explains that surgical transitioning is part of the gender-affirming model of care that the plaintiffs and their experts support. *Id.* ¶¶25-26. According to Dr. Lappert, the goal of such care is to treat gender dysphoria "by modification of the appearance of the child's body." *Id.* ¶27. Transitioning thus takes place within a continuum of care consisting of social, medical, and surgical transition. *Id.* ¶26-27; *accord* Plfs' 2nd Am. Compl., Doc. 159 ¶32 ("There are several components to the transition process: social, legal, medical, and surgical."). The rate of patients continuing from one phase to the next is "very high." Lappert Rep. ¶29. And evidence suggests that administering cross-sex hormones increases the likelihood of surgical intervention. *Id.* ¶¶30-33.

4

Dr. Lappert also offers his opinions on the safety and efficacy of transitioning surgeries for minors as recommended by the WPATH Standards of Care. *Id.* ¶34; *see* SJ.DX116:S66 (SOC-8). He opines that WPATH's recommendation of both breast and genital surgeries for minors is problematic, unethical, and poses significant risks. He explains, for instance, that breast removal surgery leads to "broad and life-long scars," in addition to "the minor patient los[ing] the ability to breastfeed" in the future. Lappert Rep. ¶35. Genital surgeries are even more dangerous, involving "castration—the removal of the testicles and mutilation of the penis in natal males" and removal of "ovaries, fallopian tubes, uterus, and vagina" in natal females—leading to "reproductive sterility and life-long dependance on prescribed hormones with their associated risk." *Id.* ¶36. These surgeries frequently result in complications in the urinary tract and bowel. And if, as WPATH recommends, the patient began puberty blockers at the very beginning of puberty and proceeded directly to cross-sex hormones, then, according to Dr. Lappert, orgasmic capacity is also likely negatively impacted. *Id.* ¶37.

Dr. Lappert classifies transitioning surgery as "properly understood to be cosmetic in nature." *Id.* ¶43. As Dr. Lappert explains, reconstructive surgery "aims at the structural and functional restoration of what has been lost," while cosmetic surgery has no corresponding physical criteria for diagnosis. *Id.* ¶¶44-45. Patients seeking cosmetic surgery instead have "subjective complaint[s] ranging in severity from annoyance to profound sorrow." *Id.* According to Dr. Lappert, "[i]t is axiomatic in plastic surgery that the more profound the sorrow the patient associates with their

appearance, the less likely it is that the patient will obtain happiness … from surgery." *Id.*

Last, Dr. Lappert addresses the scant evidence base underpinning WPATH's recommendations for transitioning surgeries for minors and explains why it is inadequate to support the recommendations. *Id.* ¶¶ 50-62. And he explains why WPATH's proposed informed consent process is inadequate, too—and why that process even for hormonal interventions should include discussions of potential surgeries, the options for which can be affected by the administration of puberty blockers and cross-sex hormones. *Id.* ¶¶32, 42. Dr. Lappert concludes: "The social, medical, and surgical transitioning of self-identified transgender minors is a treatment model that has no basis in scientific evidence to support efficacy, and it results in well-known severe and life-long harms to the minor." *Id.* ¶63.

The United States moves to exclude Dr. Lappert's opinions in their entirety, U.S. Mot. 29-30, and the Private Plaintiffs join that motion, Doc. 602. The United States argues that "Dr. Lappert's opinions on surgery are irrelevant" and that he is not qualified to opine on the related issues he discusses in his report, such as the continuum of care involved and problems with informed consent. The United States also argues that Dr. Lappert is not qualified to discuss transitioning surgeries because he has not "performed any gender affirmation surgery." U.S. Mot. 30.

## ARGUMENT

## I.    Dr. Lappert's Opinions On Transitioning Surgeries Are Relevant.

Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes

primarily to relevance." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993) (quoting Fed. R. Evid. 702). The basic standard for relevance is a "liberal one." *Id.* at 587.

The United States objects to Dr. Lappert's testimony in its entirety on the theory that "issues related to surgery are irrelevant given that Plaintiffs are not challenging S.B. 184's prohibition on surgical interventions." U.S. Mot. 29-30. But WPATH's recommendation for transitioning surgeries for minors is relevant for at least three reasons.

*First*, as Dr. Lappert explains (and Plaintiffs and the United States agree), surgeries exist as part of the "continuum of care" that WPATH recommends. *See* Lappert Rep. ¶¶25-34. As Plaintiffs put it in their operative complaint: "There are several components to the transition process: social, legal, medical, and surgical," and "[e]ach of these components is part of the medically approved process for transition." Plfs' 2nd Am. Compl., Doc. 159 ¶32. According to Plaintiffs, "surgical treatment may in some cases be part of essential medical care for a transgender individual." *Id.* ¶35. The United States concurs: "[W]hile some transgender individuals find comfort with their gender identity without surgery, for others surgery is essential and medically necessary to alleviate gender dysphoria." U.S. Am. Compl., Doc. 92 ¶39; *see also* Antommaria Decl., Doc. 80-7 ¶¶16, 42, 44-45, 47 (United States' expert defending pediatric transitioning surgeries).

Importantly, transitioning surgeries do not stand in isolation from the other "components to the transition process." Plfs' 2nd Am. Compl., Doc. 159 ¶32. Instead, they are interrelated. For instance, Plaintiffs allege, and their experts opine,

that the use of puberty blockers and cross-sex hormones can decrease the likelihood of "otherwise avoidable surgeries in the future." *Id.* ¶56; *see* Lappert Decl. ¶30 (responding to claims by Plaintiffs' experts Dr. Shumer, Dr. McNamara, and Dr. Ladinsky "that puberty blockade and cross-sex hormones reduce the likelihood that patients will seek surgery later in life"). Dr. Lappert disputes the claim, but the claim itself shows that surgeries are *relevant* when considering the safety and efficacy of hormonal interventions. Why else would Plaintiffs put it in their Complaint?

In addition, it is undisputed that the hormonal "component[s]" of the "transition process" can increase the likelihood that a patient continues down the transitioning pathway. As Plaintiffs' expert Dr. McNamara recently admitted, "puberty-pausing medications … are nearly always part of a staged process that includes other treatments," so it makes sense to view their safety and efficacy in combination with the other interventions being "staged." SJ.PX7:App. A:15 (McNamara Affidavit). As Dr. Lappert explained, "[y]oung children started on social affirmation and transition have a very high likelihood of continuing on to puberty blockade," and "the medical literature consistently shows approximately 96.5% to 98% of children who are started on puberty blockers will continue on to cross-sex hormones." Lappert Rep. ¶¶29, 31.

Surgeries form part of this same continuum. For instance, according to Dr. Lappert, "[t]he use of high-dose testosterone in natal females seeking to present as men has been clearly demonstrated to increase the likelihood of surgical removal of ovaries, uterus, and vagina because it produces the conditions of polycystic ovary syndrome, uterine atrophy, and vaginal atrophy." *Id.* ¶30. Likewise, at least one

study has shown that testosterone use in natal females "result[s] in an increase in 'chest dysphoria,' which in turn present[s] a *greater* motivation for surgery as the result of hormone treatment." *Id.* ¶33. As for "young males hoping to present as adult females," Dr. Lappert notes that "the well-known additional effect" of administering puberty blockers at Tanner Stage 2 directly followed by cross-sex hormones "is to exclude the possibility of one surgery (penile inversion vaginoplasty, which would normally be an available method in adult males), necessitating other risky surgeries, such as proximal thigh flap and large bowel interposition flap vaginoplasty." *Id.* ¶30.

*Second*, for these same reasons, the prospects of surgery, and the effects that hormonal interventions can have on those prospects, should be part of the informed-consent process for puberty blockers and cross-sex hormones. As the WPATH Standards of Care explain, before starting a patient on puberty blockers, clinicians should "address[]" the "surgical implications" of "proceed[ing] with pubertal suppression" and "engag[e] in discussions with families about the future unknowns related to surgical and sexual health outcomes." SJ.DX116:S64 (SOC-8). Presumably that includes informing the patient that one of the subjects from the seminal Dutch studies "died because puberty suppression dictated a riskier vaginoplasty"[3]—important information for the patient to know when considering whether to follow in that subject's footsteps.

WPATH's recommendation here thus makes perfect sense. If at least *some* patients proceed from puberty blockers to cross-sex hormones to surgeries, and if the hormonal interventions can influence both the likelihood of surgery and the

---

[3] SJ.DX158:2 (Biggs, *The Dutch Protocol*).

surgical options that are available, that is relevant to the 11-year-old patients considering whether to start puberty blockers. The fact that "at their age – they would not know what they want" (as the chair of SOC-8 put it[4]) is also relevant to determining whether informed consent for hormonal interventions is possible. *See* Lappert Rep. ¶42.

*Third*, while the United States has evidently gone from supporting pediatric transitioning surgeries to opposing them in light of the public outcry that followed disclosure of evidence produced by HHS and WPATH in this case,[5] surgeries are still relevant here because the WPATH Standards of Care still recommend them for minors. *See* SJ.DX116:S48 (SOC-8) (recommending transitioning surgery when, among other things, "[t]he adolescent had at least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment"). And the foundational Dutch studies that WPATH relies on for its recommendations for puberty blockers and cross-sex hormones included surgical interventions for *all* the reported subjects who received cross-sex hormones, inextricably intertwining the evidence base for hormonal interventions with that for surgical interventions. *See id.* at S46.

---

[4] SJ.DX180:59 (WPATH 7).

[5] *Compare* U.S. Am. Compl., Doc. 92 ¶39 ("[W]hile some transgender individuals find comfort with their gender identity without surgery, for others surgery is essential and medically necessary to alleviate gender dysphoria."), *with* Roni Caryn Rabin et al., *Biden Administration Opposes Surgery for Transgender Minors*, N.Y. TIMES (June 28, 2024), https://www.ny-times.com/2024/06/28/health/transgender-surgery-biden.html ("The Biden Administration said this week that it opposed gender-affirming surgery for minors….").

WPATH's support for pediatric gender transitioning surgeries is thus relevant because the reliability of the WPATH Standards is relevant. As the Court found, WPATH's reliability "go[es] to 'the very heart' of this case." Doc. 263 at 5-7. So if WPATH is wrong to support transitioning surgeries for kids (as the United States' latest public statements seem to indicate), that is relevant—it makes it more probable "than it would be without the evidence" that other components of SOC-8 are also unreliable. Fed. R. Evid. 401(a). Thus, Dr. Lappert's discussion of the evidence used by SOC-8 to recommend surgeries and other interventions for minors is relevant to this case. *See* Lappert Rep. ¶¶49-62. So, too, is his discussion of the theory of care animating the WPATH Standards. *See id.* ¶¶27-33.

As much as the United States seeks to avoid talking about them, surgeries are relevant to this case. They are part of the treatment protocol Plaintiffs' experts and preferred medical interest groups recommend. Minors across the country are subjected to them. They should form part of the informed-consent process for pediatric patients considering puberty blockers and/or cross-sex hormones. And they are relevant to determining the reliability of the WPATH Standards.

## II.    Dr. Lappert Is Qualified To Opine On All Aspects Of Transitioning Surgeries.

Dr. Lappert is qualified to opine on all relevant aspects of transitioning surgeries, including what they are, how they fit into the WPATH continuum of care, the prospects of surgeries that should be part of the informed consent process for patients considering puberty blockers and/or cross-sex hormones, what the evidence

says about their safety and efficacy, and how they compare to other invasive surgeries.

"[E]xperts can be qualified in various ways," including "based on 'knowledge, skill, experience, training, *or* education.'" *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (emphasis altered). "[A] background in just one of these five may be sufficient." 29 Wright & Miller, *Federal Practice and Procedure* § 6264.1 (2d ed.). And the United States admits that Dr. Lappert has "expertise in surgery." U.S. Mot. 30. That understates things. Dr. Lappert has undeniable expertise in plastic surgery—from "limb and pelvic reconstruction" to repairing "congenital pediatric deformities" to providing "comprehensive reconstructive surgery for women suffering breast cancer" to offering "comprehensive wound care services." Lappert Rep. ¶¶15-19. He has trained others in advanced surgical techniques. *Id.* ¶12. He has published in the field. *Id.* ¶¶16, 18. He has significant "experience in the evaluation of research publications." *Id.* ¶8. Indeed, as Specialty Leader of Plastic and Reconstructive Surgery for the Office of the Surgeon General, he was "responsible for Navy Medical Department policy concerning coverage for services and medical evaluation." *Id.* ¶16.

The United States faults Dr. Lappert for having "never prescribed puberty-blockers or cross-sex hormones for the treatment of gender dysphoria, or even performed any gender affirmation surgery." U.S. Resp. 30 (citations omitted). As discussed at length elsewhere (and incorporated here), there are two serious problems with this line of attack. *See* Defs' Hruz Resp. 7-10.

The first problem is that a "proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (citation omitted). "An expert … is one who qualifies as such by reason of special knowledge and experience, whether or not he" practices in the "special field" at issue. *Id.* (cleaned up); *see Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) ("Our caselaw does not support a bright line rule that an expert witness is qualified to testify" "only if he personally has used the" device at issue); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342-43 (11th Cir. 2003) (finding it "evident" that the expert was qualified "by virtue of his extensive education, training and experience," and explaining that attacks on the specificity of witness's expertise "ignored the conceptual distinction between an expert's qualifications and the reliability of his proffered opinion"); *see also* Defs' Hruz Resp. 9 n.2 (collecting cases).

Dr. Lappert has just such general knowledge and experience. He is a plastic surgeon. He is familiar with the surgeries at issue. Indeed, Dr. Lappert explained that "[a]ll of the specific procedures" used in transitioning surgeries, "from mastectomy to breast enhancement to genital reconstruction to complex sensate microvascular flap surgeries, are within the scope of [his] experience." Lappert Rep. ¶24. "In fact, [he] instructed resident surgeons on these procedures." *Id.* And "[s]ince 2014," Dr. Lappert "ha[s] made a concerted effort to examine the medical literature pertaining to the care of self-identified transgender persons, including children and adults." *Id.* ¶23.

13

In his report, Dr. Lappert gave an example that draws home just how familiar the techniques involved in transitioning surgeries are to him. In explaining some of the possible side effects of transitioning surgeries and the difference between "reconstructive" versus "cosmetic" surgery, Dr. Lappert explained:

> Comparable issues in transgender versus reconstructive surgery can be seen by comparing identical operations. On several occasions I have performed the reconstructive surgery called "sensate radial-forearm microvascular free flap hypopharyngeal reconstruction." I operated to reconstruct the tongue and throat of patients who had suffered a grievous wound of the mouth and throat that resulted from removal of an aggressive cancer. We selected an area of skin on the inside of the forearm that has regular and robust blood flow, is thin and durable, and has an easily dissected sensory nerve that can be attached to the nerves in the wound. The forearm flap satisfied all the requirements. An operation of this complexity, duration, and technical requirements has many issues, big and small, that can diminish or destroy the result.

> That throat reconstruction operation is in almost every way identical to the second most commonly performed female-to-male genital surgery, the "sensate radial forearm microvascular free flap phalloplasty." In that operation, the identical flap is raised and transferred. It also must be resistant to abrasion, water tight, pliant, sensate, and of correct volume. Through a process of incision, plication, and suturing, a tubular phallus is constructed within which is placed a skin lined tube which will serve as the urethra. The suture closures in both flaps are where most things go wrong because the skin edges that define the suture line can lose sufficient blood supply. When this happens in the phalloplasty the patient suffers from delayed healing, urine leakage, varying degrees tissue death, and scarring. All those problems can happen with either the throat flap or phallus flap. When the phallus flap fails, the patient suffers due to varying degrees of tissue loss, chronic urinary leakage, or urinary obstruction due to scarring that can cause kidney injury if left untreated. When the throat flap fails, bacteria laden saliva will leak into the neck where it can cause fulminant infections or erode into a major artery and cause the patient to bleed to death in a matter of moments. A singularly terrible event.

14

Lappert Rep. ¶¶38-39.

He concludes:

> Notably, in the case of the throat operation, if the removal of the cancer had not been performed, there was a known and significant probability that the cancer would have eroded into the tissues of the neck and caused a fulminant infection, or eroded into a large blood vessel, as described above. In contrast, if the phallus flap operation had not been performed, the patient would have remained fully functional in every human capacity, though suffering from an inner subjective disturbance called gender dysphoria, which had not yet been adequately addressed with psychiatric care.

*Id.* ¶40.

This example also demonstrates how Dr. Lappert's expertise extends beyond the mechanics of how to perform a specific surgery to other aspects of medical care that a surgeon must consider. Is a particular intervention ethical to perform under the circumstances? What are the goals of the surgery and its risks and benefits? *See id.* ¶¶43-48. What are factors that lead a patient to need or want the surgery? What does the evidence say about the surgery? *See id.* ¶¶49-62. And how do these factors interact when it comes to informed consent? *See id.* ¶42. As an experienced plastic surgeon—particularly one who was "responsible for Navy Medical Department policy concerning coverage for services," *id.* ¶16—Dr. Lappert has expertise in all these related areas.

The second problem for the United States' no-true-Scotsman objection is that "[i]f the only experts permitted to testify inevitably represent the same side of a civil case, those who possess these experts can, for all practical purposes, set their own standards." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997). In other words, the only surgeons performing gender transitioning surgeries are those who

think it's ethical to do so (or who just enjoy the significant remunerative benefits such operations bring). But when the question is whether the surgeries are safe or ethical to perform, then it makes no sense to exclude all physicians who have determined that the answer is "no" and hear *only* from those physicians whose livelihoods depend on the answer being "yes." Dr. Lappert summed it up well in his report:

> In 30 years of active practice as a plastic and reconstructive surgeon, I have never performed any gender affirmation surgery. That is because, while I recognize gender dysphoria to be a serious psychiatric condition, in my opinion it is unethical to attempt to treat that psychiatric condition with surgery, just as it is unethical to attempt to treat body dysmorphic disorder with surgery.… This fact should not exclude me from offering my expert opinion on the validity and ethics of gender affirmation surgery. All of the specific procedures, from mastectomy to breast enhancement to genital reconstruction to complex sensate microvascular flap surgeries, are within the scope of my experience. In fact, I instructed resident surgeons on these procedures. To claim that I have no expertise to offer an opinion about gender affirmation care would be akin to excluding a board-certified neurosurgeon from opining on the merits of frontal lobotomy, which are too harmful to ethically perform.

Lappert Rep. ¶24.

Last, the United States' reliance (at 29) on out-of-circuit district court decisions in *Kadel v. Folwell*, 620 F. Supp. 3d 339, 368 (M.D.N.C. 2022), and *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 914-15 (E.D. Ark. 2023), is unavailing. Neither court excluded Dr. Lappert's testimony in toto, as the United States demands here, and the credibility determinations those courts made go to weight, not admissibility. *See United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) ("The credibility of a witness is in the province of the factfinder." (cleaned up)). And the United States' inclusion of the *Brandt* court's comment concerning Dr. Lappert's

"religious doctrinal standpoint" is particularly off point given that Federal Rule of Evidence 610 explicitly states that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." If the United States thinks that Dr. Lappert's religious beliefs have clouded his scientific judgment, it can raise that on cross-examination. Otherwise, it should drop the smear.

## CONCLUSION

The Court should deny the United States' and Plaintiffs' motions to exclude the expert testimony of Dr. Patrick Lappert.

Dated: August 12, 2024

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*