## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official | ) | |
| capacity as Attorney General of the | ) | **REDACTED COPY;** |
| State of Alabama, *et al.*, | ) | **ORIGINAL SUBMITTED** |
| | ) | **UNDER SEAL** |
| *Defendants*. | ) | |

## DEFENDANTS' RESPONSE TO THE UNITED STATES' AND PLAINTIFFS' MOTION TO EXCLUDE CERTAIN TESTIMONY OF GEETA NANGIA, M.D. (DOCS. 590, 602)

# TABLE OF CONTENTS

Table of Contents ................................................................................. i

Table of Authorities .............................................................................. ii

Introduction .........................................................................................1

Background ...........................................................................................2

Argument...............................................................................................7

    I.    Dr. Nangia Is Qualified By Knowledge, Training, Experience, And Education To Opine On The Medical Treatment Of Gender Dysphoria And The Ability Of Minors To Consent To Transitioning Procedures ...............................................................................7

        A.   Dr. Nangia Is Qualified to Opine on the Medical Treatment of Gender Dysphoria .........................................................7

        B.   Dr. Nangia is Also Qualified to Testify About Informed Consent ...............................................................................11

        C.   Qualified Experts Need Not Have Peer-Reviewed Publications............................................................................13

    II.   Dr. Nangia's Testimony About Plaintiffs' Interventions Is Based On Sufficient Facts ...................................................................14

Conclusion ..........................................................................................20

Certificate of Service ..........................................................................21

# TABLE OF AUTHORITIES

## Cases

*Adams v. Lab. Corp. of Am.*,
760 F.3d 1322 (11th Cir. 2014) ..........................................................................15

*Burton v. R.J. Reynolds Tobacco Co.*,
183 F. Supp. 2d 1308 (D. Kan. 2002)....................................................................16

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001) ................................................................................17

*Cordes v. Ctrs. for Reprod. Med. & Wellness, LLC*,
2023 WL 6362750 (S.D. Ill. Sept. 29, 2023)........................................................12

*Eghnayem v. Bos. Sci. Corp.*,
57 F. Supp. 3d 658 (S.D. W. Va. 2014).................................................................16

*Geyer v. NCL (Bahamas) Ltd.*,
203 F. Supp. 3d 1212 (S.D. Fla. 2016)..................................................................15

*Giusto v. Int'l Paper Co.*,
571 F. Supp. 3d 1346 (N.D. Ga. 2021)..................................................................19

*Gov't Emps. Ins. Co. v. Seco*,
658 F. Supp. 3d 1162 (S.D. Fla. 2023)..................................................................16

*Haller v. AstraZeneca Pharms. LP*,
598 F. Supp. 2d 1271 (M.D. Fla. 2009).................................................................17

*Hamilton v. Louisville Cartage Co.*,
2024 WL 2303889 (M.D. Ga. May 21, 2024)........................................................17

*Kannankeril v. Terminix Int'l, Inc.*,
128 F.3d 802 (3d Cir. 1997) ..................................................................................16

*Karr v. Celadon Trucking Servs., Inc.*,
2017 WL 10942181 (N.D. Ga. Dec. 21, 2017) ......................................................19

*Kumho Tire Co. v. Carmichael*,
　526 U.S. 137 (1999)........................................................................13

*LaRocco v. Royal Caribbean Cruises, Ltd.*,
　2024 WL 2292814 (S.D. Fla. Mar. 4, 2024) ...................................15

*Maples v. Dunn*,
　582 F. Supp. 3d 1040 (N.D. Ala. 2022)............................................15

*McDowell v. Brown*,
　392 F.3d 1283 (11th Cir. 2004) .........................................................9

*Peteet v. Dow Chem. Co.*,
　868 F.2d 1428 (5th Cir. 1989) .........................................................16

*Planned Parenthood Se., Inc. v. Strange*,
　33 F. Supp. 1381 (M.D. Ala. 2014)..................................................14

*St. Louis Condo. Ass'n, Inc. v. Rockhill Ins.*,
　5 F.4th 1235 (11th Cir. 2021) ..........................................................14

*State Farm Mut. Auto. Ins. Co.*,
　2017 WL 2959060 (M.D. Fla. July 11, 2017) ..................................19

*United States v. Esformes*,
　60 F.4th 621 (11th Cir. 2023) ..........................................................13

*United States v. Frazier*,
　387 F.3d 1244 (11th Cir. 2004) ...................................... 7, 8, 12, 13

*United States v. Williams*,
　865 F.3d 1328 (11th Cir. 2017) .......................................................13

*Walker v. Soo Line R. Co.*,
　208 F.3d 581 (7th Cir. 2000) ...........................................................16

*Whole Woman's Health All. v. Rokita*,
　2021 WL 665937 (S.D. Ind. Feb. 19, 2021).....................................13

**Rules**

Fed. R. Evid. Rule 702 ............................................................. 7, 14, 15, 19

Fed. R. Evid. 702(b) ..................................................................14

**Other Authorities**

29 Wright & Miller, *Federal Practice and Procedure* § 6264.1 (2d ed.) .... 7, 14, 15

## INTRODUCTION

Dr. Geeta Nangia has been practicing and teaching in the field of child and adolescent psychiatry for over fifteen years. Her practice revolves around an understanding of child development, and she has treated almost 200 minor patients meeting the criteria for gender dysphoria. As a psychiatrist, she is responsible for understanding all of the ramifications—including risks and benefits—of potential treatments before determining whether to recommend or prescribe them to her patients.

Yet the United States seeks to exclude her testimony because, it claims, she is not an expert in the medical treatment of gender dysphoria. And because she is not an expert in this kind of treatment, it says, she cannot opine on minors' ability to consent to it. But Eleventh Circuit precedent holds that a physician need not be a specialist to offer expert testimony in a particular field. And Dr. Nangia has extensive experience as a psychiatrist in familiarizing herself with the risks and benefits of available treatments for her patients, including those with gender dysphoria. The plaintiffs' own witnesses here agree that mental health professionals should be able to discuss the appropriateness of medical treatments with their patients experiencing gender dysphoria. Dr. Nangia is amply qualified by experience and knowledge to testify about medical gender transition procedure.

For similar reasons, Dr. Nangia is well positioned to testify about minors' ability (or inability) to provide informed consent for these procedures. Her education and significant experience working with children and adolescents qualify her to speak about their brain development and ability to understand and appreciate the potential benefits and drawbacks associated with particular medical options. Her

1

treatment of minors meeting the criteria for gender dysphoria has led her to develop expertise in the extent of informed consent possible for the associated medical procedures.

The United States also argues that Dr. Nangia's opinions about the ability of individual Plaintiffs to consent should be excluded because they are based on a review of medical records alone. But courts routinely allow the testimony of medical experts relying on medical records—a standard practice in the field of medicine—and those records provide sufficient facts for the narrow opinions Dr. Nangia offers. Along with the medical records, she reviewed depositions from Plaintiffs' parents and medical providers, and her testimony is limited to what that evidence supports.

Last, the United States seeks to exclude as irrelevant passing references in a few paragraphs to gender transition surgeries from Dr. Nangia's testimony about informed consent. U.S. Mot. 8. The relevance of testimony about surgeries—the natural endpoint of the standard course of treatment that the United States and Plaintiffs advance—is explained in, and Defendants incorporate here, pp. 6-11 of Defendants' response to the plaintiffs' motion to exclude Dr. Lappert's testimony.

## BACKGROUND

Dr. Geeta Nangia is a Board-Certified Child and Adolescent Psychiatrist. SJ.DX11:¶3 (Nangia Rep.). She completed her fellowship in Child and Adolescent Psychiatry in 2007 and has worked in that field since. *Id.* ¶¶3-4. She has "provided psychiatric evaluations, psychotherapy, and medication management for children and adolescents, as well as family therapy" in a wide variety of settings, including "rural, urban, and suburban areas, and in outpatient, inpatient, partial, as well as

residential care settings." *Id.* ¶5. She regularly works with children and "their families, schools, and outside support systems" to develop "interventions that produce the best outcomes for their overall wellbeing." *Id.* ¶9. She has also lectured on child and adolescent development to medical students and residents and was awarded the Circle of Excellence in Teaching at the Medical University of South Carolina. *Id.* ¶4. She has given testimony as an expert witness "regarding abuse and trauma, and interventions for children struggling with mental health disorders" and has submitted written reports in several cases. *Id.* ¶11; SJ.DX13:¶1 n.1 (Nangia 2d Supp. Rep.).

Dr. Nangia has treated "many patients with active gender dysphoria or a history of gender dysphoria"—over 500 minors. Nangia Rep. ¶¶8, 48. Close to 200 of those patients met the criteria for gender dysphoria or presented with gender dysphoria while she was working with them. *Id.* ¶¶49, 52. Her treatment of those patients has included "supportive and exploratory (psychodynamic) therapy, family therapy, and psychopharmacology." *Id.* ¶¶8, 55. She has also "treated approximately 25 children/adolescents during their social and/or medical transition" that had been prescribed by other doctors, supporting them through psychotherapy and maintaining their other medications. *Id.* ¶56.

Dr. Nangia's opinions here are based on her "training and clinical experience as a Child and Adolescent Psychiatrist," her "knowledge of child development," and her "review of the literature (including standards) on this subject." *Id.* ¶10. She has also reviewed "the available medical histories of the five minor plaintiffs," depositions given by the parents of those plaintiffs, SJ.DX12 at 1 (Nangia Supp. Rep.), and

the deposition testimony of several of the plaintiffs' expert witnesses,  Nangia 2d Supp. Rep. ¶1.

Based on her knowledge and experience as a child and adolescent psychiatrist, Dr. Nangia offers several opinions here. She discusses the diagnostic criteria for gender dysphoria, Nangia Rep. ¶¶13-15, and opines that the number of adolescents identifying as transgender is rising for several reasons she has observed in her own practice. Those reasons include "an increase in 'pathologizing' of what" is "a normal part of childhood development," "shifts in cultural norms having to do with gender exploration in adolescence," "the advent of social media," "heightened vulnerability in youth," and "what some call 'social contagion.'" *Id.* ¶20.

Dr. Nangia then discusses the types of medical interventions that have been used for gender transition, including puberty blockers, cross-sex hormones, and surgery, and describes the risks associated with those treatments, including "the long-term effects of these medications on the endocrine system, reproductive system, bone growth, brain maturation, psychological functioning, and metabolic functioning." *Id.* ¶¶38-45. She explains her approach to evaluating and treating children and adolescents with gender dysphoria, noting that in every case she has observed, "children grow out of such 'gender dysphoria' and become comfortable with their natal sex." *Id.* ¶50. She also discusses her experience with adolescents, mostly female, who "have presented with gender dysphoria that has been more abrupt in onset" and offers common qualities or experiences she has observed in those patients. *Id.* ¶¶52-54.

Dr. Nangia then discusses standards of informed consent, particularly in relation to the treatment of minors. "[C]ognitive development and experience" are "pivotal" to decision-making capacity in children, Dr. Nangia explains. *Id.* ¶73. She discusses the means of assessing decision-making capacity—through neurodevelopment, psychosocial development, and cognitive development. *Id.* ¶¶78 *et seq.* She also discusses the role of parents in giving consent, with child assent, when adolescents lack the capacity and competency to give informed consent. According to Dr. Nangia, whether a minor has the capacity to give informed consent depends on several factors, but "informed consent requires that a patient have decisionmaking capacity, which includes the ability to understand, reason, appreciate, and comprehend the information presented in a full disclosure of a diagnosis, its prevalence, available treatments, and the treatments' risks and benefits." *Id.* ¶115.

Dr. Nangia opines that minors are unable to give informed consent for medical treatments for gender dysphoria because it is difficult for them to understand both the influence of "co-occurring issues" on treatment options and the likelihood that gender dysphoria may be "transient and remit[]"because "impulse-prone adolescent[s]" are likely to value immediate validation over long-term consequences (such as "hypothetical life events like the desire to have children and potentially breastfeed"). *Id.* ¶¶116-119. Dr. Nangia also opines that parents are unable to provide truly informed consent because (among other reasons) "there is debate as to the long-term outcomes of such treatments," and those outcomes could "affect the quality of life of the minor, in multiple arenas such as romantic relationships, marriage, sexual intimacy, childbirth, child rearing, self-concept, social and workplace relationships,

potential adversity due to discrimination, and long-term psychological and medical health." *Id.* ¶135. Parental "consent" to such outcomes, Dr. Nangia opines, "violates the minor's future right to autonomy." *Id.*

Dr. Nangia also discusses how prior trauma may make it even harder for children and adolescents to "appreciat[e] and weigh[] the various treatment options for gender dysphoria." *Id.* ¶136. Not only can trauma affect minors' ability to provide informed consent, Dr. Nangia explains, but it can also "contribute to gender dysphoria" itself. *Id.* ¶143. Dr. Nangia offers, from her experience, that identifying and treating a history of trauma often either results in "gender dysphoria … remit[ting] or resolv[ing]" or provides minors with clarity and "the ability to make mindful decisions surrounding gender dysphoria treatments" as adults. *Id.* ¶146.

In Dr. Nangia's first supplemental report, she relies on the Minor Plaintiffs' medical records to discuss how the Plaintiffs' experiences align with her primary opinions. *See* Nangia Supp. Rep. In her second supplemental report, she opines on the adequacy of the informed consent procedures offered by the Alabama gender transition providers that the Plaintiffs see. *See* Nangia 2d Supp. Rep.

The United States, joined by Plaintiffs (Doc. 602), argues for exclusion of two of Dr. Nangia's opinions. First, it argues that Dr. Nangia "is not qualified to offer expert testimony on non-psychiatric treatments for gender dysphoria" because she is "a psychiatrist without relevant expertise in the treatment of gender dysphoria." U.S. Mot. 31-32. Second, it argues that her opinions on the Minor Plaintiffs' medical treatments should be excluded because "she never examined or spoke with the

Private Plaintiffs." *Id.* at 31-33. The Plaintiffs do not separately move to exclude any of Dr. Nangia's testimony.

## ARGUMENT

### I. Dr. Nangia Is Qualified By Knowledge, Training, Experience, And Education To Opine On The Medical Treatment Of Gender Dysphoria And The Ability Of Minors To Consent To Transitioning Procedures.

Dr. Nangia has extensive qualifications to opine about the treatment of gender dysphoria and the ability of minors to consent to transition procedures. As the Eleventh Circuit has explained, under "the plain language of Rule 702," "experts may be qualified in various ways," including "based on 'knowledge, skill, experience, training, *or* education.'" *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (emphasis altered). "[A] background in just one of these five may be sufficient." 29 Wright & Miller, *Federal Practice and Procedure* § 6264.1 (2d ed.).

### A. Dr. Nangia Is Qualified to Opine on the Medical Treatment of Gender Dysphoria.

Dr. Nangia has extensive training in child and adolescent psychiatry, has taught the subject repeatedly, and has practiced in the field of child and adolescent psychiatry for many years. Nangia Rep. ¶¶3-5. She has treated hundreds of patients "with active gender dysphoria or a history of gender dysphoria," including over 500 minors. *Id.* ¶8. She has also treated several children and adolescents who were actively engaged in social or medical transition, supporting them "through psychotherapy and medication management." *Id.* ¶56. Her treatment of minor patients with gender dysphoria has included various types of therapy as well as psychopharmacology. *Id.* ¶8. And prescribing medication is a regular part of her practice. *See, e.g.*,

*id.* ¶¶149-51 (discussing the conditions under which she would prescribe medication to patients); Doc. 591-19 at 75:25-76:2 (Nangia Dep.) (discussing medical disclosures for medications she uses). Dr. Nangia has also extensively reviewed the literature on the subject. Nangia Rep. ¶10. Her knowledge of the research on treatments for gender dysphoria and her own experience working with patients have informed her decisions about what treatments are safe and effective. Because of the concerns her report outlines regarding medical transitions, she has chosen to "provide[] exploratory therapy, supportive therapy, and family therapy" along with "medication management where needed for other mental health issues." *Id.* ¶55. Her experience has similarly led her to reject other forms of therapy—in particular, conversion therapy—as detrimental to a child's wellbeing. *Id.* ¶58.

Given this background, Dr. Nangia "is qualified to testify competently regarding" the medical treatment of gender dysphoria. *Frazier*, 387 F.3d at 1260. Gender dysphoria is a mental health condition defined by the *Diagnostic and Statistical Manual of Mental Disorders*—a diagnostic tool published by the American Psychiatric Association for the use of mental health professionals. *See* SJ.DX67:35-38 (DSM-5 TR). Far from being "beyond her area of specialization," U.S. Mot. 31, as the United States claims, it is hard to imagine anyone more qualified to opine on these matters than a practicing child psychiatrist who has treated children exhibiting symptoms of gender dysphoria.

The United States claims that Dr. Nangia "is not an expert in endocrinology and has never been involved in the development of clinical guidelines," *id.*, so is supposedly not qualified "to opine on cross-sex hormones, puberty blockers, or

more intensive surgical treatments," *id.* at 32. But a "proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (citation omitted). This principle has been repeated by many courts, supporting the notion that a physician can be an expert qualified to discuss gender dysphoria without specializing in that field, much less providing the exact treatments supported by the United States and Plaintiffs. *See generally* Defs' Hruz Resp. at 7-10.

Psychiatrists are physicians, and they have the authority to prescribe or recommend medical treatments. To make informed treatment recommendations, Dr. Nangia must herself understand how various treatments work and the benefits and risks associated with them. *See* Nangia Rep. ¶149 ("I employ parental consent with minor assent in the process of prescribing treatments minors … *only after weighing the risk/benefit ratio of treatment interventions and providing full disclosure*." (emphasis added)); *id.* ¶150 ("If there are insufficient evidence-based benefits to treatment, and if benefits do not substantially outweigh risks of treatment, I do not prescribe medication."); Nangia Dep. 78:13-18 (explaining that she does not "prescribe medications to young people if [she] determine[s] that medication's risks outweigh the benefits"). Thus, part of her job is to understand the risks and benefits of the interventions here.

Plaintiffs' own witnesses agree. Dr. Abdul-Latif, for instance, explained that the role of a mental health professional involves assessing the risks and benefits of potential interventions. ████████████████████████████████

████████████████████████████████████████████████



And Dr. Janssen, the Plaintiffs' expert psychiatrist, says that the pretreatment mental health assessment explores "the risks, benefits, and alternatives to treatment with transgender young people and their parents." SJ.DX67:50-51 (Janssen Rep.); *see also id.* at 51 (noting that mental health providers should be involved in determining "the appropriateness of any medical treatment"); *id.* at 54 (opining that his "own experience" as a psychiatrist "confirms" the purported benefits of medical interventions for transgender youth).

WPATH has also affirmed the need for mental health professionals to be involved in treatment decisions for gender dysphoria: "We recommend health care professionals involve relevant disciplines, including *mental health* and medical professionals, *to reach a decision about whether puberty suppression, hormone initiation, or gender-related surgery* for gender diverse and transgender adolescents are appropriate and remain indicated throughout the course of treatment until the transition is made to adult care." SJ.DX116:S48 (SOC-8) (emphasis added). The guidelines also make clear that mental health challenges, "such as obsessions and compulsions, special interests in autism, rigid thinking, broader identity problems, parent/child interaction difficulties, severe developmental anxieties (e.g., fear of

growing up and pubertal changes unrelated to gender identity), trauma, or psychotic thoughts" should be "differentiate[d] [from] gender incongruence"—and that such challenges "should be prioritized and addressed" to avoid "interfere[nce] with the clarity of identity development and gender-related decision-making." *Id.* at S63.

These statements accord with Dr. Nangia's understanding of her role as a psychiatrist in treating gender dysphoria in minors: to ensure that any contributing or co-occurring mental health concerns are identified and treated first and to assess the relative risks and benefits of the treatments she may recommend. Based on her experience and knowledge, Dr. Nangia is qualified to testify about treatments for gender dysphoria—no matter that she declines to prescribe or recommend the plaintiffs' desired treatments that she has determined are dangerous and would be unethical to provide to minors.

### B.   Dr. Nangia is Also Qualified to Testify About Informed Consent.

The United States does not contest Dr. Nangia's qualifications to opine about informed consent in minors as a general matter. Instead, in a half-sentence argument, the United States suggests that she is not qualified to testify about "the ability of minors and their parents to consent or assent" to the "treatment[s] of gender dysphoria" that she does not prescribe. U.S. Mot. 31. That argument fails, for the same reasons discussed above: a general expert may testify on specific treatments. And Dr. Nangia's knowledge, experience, and education easily qualify her to testify about informed consent and children.

Dr. Nangia's education and practice have focused on child and adolescent psychiatry and development. Nangia Rep. ¶¶3-9. She is an award-winning educator

in this field. *Id.* ¶4. She has reviewed the literature on the subject. *Id.* ¶10. She knows the ethical standards for informed consent, *id.* ¶¶62-70, and how those standards apply when dealing with minors, *id.* ¶¶71-114. She helped develop informed consent practices for her practice. Nangia Dep. 74:15-25, 75:12–76:8. Her decades of experience working with children and adolescents has given her special insight into that population's ability to "understand, appreciate, and comprehend" various types of treatments and their accompanying risks. Nangia Rep. ¶152. Dr. Nangia has spent her career working with minor patients, and the treatments she pursued with any patient required either the informed consent or assent of that individual. Her training and experience have informed her conclusion that informed consent is always "remarkably difficult with minors," *id.* ¶148, and, in the context of medical gender transition, "[n]ot [a]ttainable" at all, *id.* at 80.[1]

This background qualifies Dr. Nangia "to testify competently regarding" minors' ability to consent to medical treatment of gender dysphoria. *Frazier*, 387 F.3d at 1260; *see, e.g.*, *Cordes v. Ctrs. for Reprod. Med. & Wellness, LLC*, 2023 WL 6362750, at *4-5 (S.D. Ill. Sept. 29, 2023) (finding that a doctor was qualified to testify about informed consent when he "testified to having dealt with issues of

---

[1] The United States itself notes that "the assessment of emotional and cognitive maturity necessary to assess an individual's capacity to consent" is a matter for mental health professionals. U.S. Mot. 33. ███████████████████████████████████████████████████████████ ██████████████████████████████ WPATH also agrees that determining a minor's capacity to give informed consent lies squarely in the realm of mental health: "A young person's mental health challenges may impact … the adolescent's capacity to consent, and the ability of the young person to engage in or receive medical treatment." SJ.DX116:S62 (SOC-8); *see also id.* at S172 ("[Mental health professionals] obtain informed consent for mental health treatment and may consult on a patient's capacity to give informed consent when this is in question.").

informed consent" and "discussed his experiences as a lab director and how issues of informed consent were typically handled"); *Whole Woman's Health All. v. Rokita*, 2021 WL 665937, at *4 (S.D. Ind. Feb. 19, 2021) (admitting testimony from physician about "the issue of appropriately securing informed consent from [a] population" with whom the physician has "significant clinical experience in obtaining informed consent"). As a mental health professional with a long history of treating children and adolescents, including those experiencing gender dysphoria, Dr. Nangia is qualified to opine on the standards of informed consent for minors.

C.     **Qualified Experts Need Not Have Peer-Reviewed Publications.**

On both the topics of gender dysphoria and informed consent, the United States argues that a lack of publications or presentations on these issues renders Dr. Nangia unqualified to testify. U.S. Mot. 31. This is wrong. Publication has never been a prerequisite for expert qualification. *See Frazier*, 387 F.3d at 1260-61 (experts can be qualified by "'knowledge, skill, experience, training, *or* education'"). The Eleventh Circuit is clear that training and experience can suffice to qualify an expert, making it irrelevant that an expert's "work in the field has never been peer reviewed." *United States v. Williams*, 865 F.3d 1328, 1339-40 (11th Cir. 2017). Experience may independently form an adequate basis for expert testimony. *See United States v. Esformes*, 60 F.4th 621, 637 (11th Cir. 2023) (*Daubert* "allows for admitting experts" who "testif[y] primarily based on experience" (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999))). The United States does not dispute that Dr. Nangia "has an extensive background in" the areas of child and adolescent development and gender dysphoria. *Planned Parenthood Se., Inc. v. Strange*, 33 F.

13

Supp. 1381, 1391 (M.D. Ala. 2014). "The fact that she has not produced peer-reviewed research on the subject does not invalidate her experiential expertise." *Id.*

\*     \*     \*

In sum, Dr. Nangia is qualified by knowledge, training, experience, *and* education to opine on the medical treatment of gender dysphoria and the ability of minors to assent or consent to medical gender transition procedures.

## II. Dr. Nangia's Testimony About Plaintiffs' Interventions Is Based On Sufficient Facts.

The United States also seeks exclusion of Dr. Nangia's opinions in her supplemental report about the individual Plaintiffs because "she never examined or spoke with the Private Plaintiffs." U.S. Mot. 31. The United States claims that the "limited set of medical records" Dr. Nangia reviewed is an insufficient basis for her opinion that Private Plaintiffs are "not able to provide informed consent or assent to medical transition." *Id.* at 32-33.

To the contrary, Dr. Nangia's opinions in her supplemental report meet Rule 702's reliability standard because they are based on "sufficient" facts. "[U]nder Rule 702, the evidence an expert relies on simply must be 'based on sufficient facts or data.'" *St. Louis Condo. Ass'n, Inc. v. Rockhill Ins.*, 5 F.4th 1235, 1245 n.8 (11th Cir. 2021) (quoting Fed. R. Evid. 702(b)). "The word 'sufficient' signifies that the expert may properly base her opinion on something less than all the pertinent facts or data." 29 *Federal Practice & Procedure*, *supra*, § 6268. "[S]ufficiency [of facts] is a function of the nature and scope of the opinion offered, the quantity of data both

available and pertinent to the issue at hand, and what is deemed sufficient by experts in the pertinent field when working outside the courtroom." *Id.*

On all these aspects, Dr. Nangia's opinions about the individual Plaintiffs are supported by sufficient facts. The United States insists that "the review of medical records alone is an insufficient basis for the opinions she offers." U.S. Mot. 33. But Dr. Nangia's supplemental report makes clear that her opinions are based on her review of "the available medical histories" (and depositions), Nangia Supp. Rep. 1, so those opinions necessarily draw on "sufficient facts" for her to form an opinion *about those histories*.

In any event, no rule excludes medical opinions based on medical records. Courts routinely allow medical experts to testify based on their review of medical records. The Eleventh Circuit has explained that "Rule 702 does not impose" "a requirement" that "expert witnesses 'stand in the shoes'" of those they opine about. *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1335-36 (11th Cir. 2014). For that reason, for example, the Court has favorably cited cases "allowing an expert witness in a medical malpractice case to rely on her review of the plaintiff's medical records in testifying that the nurse midwife breached the standard of care." *Id.* at 1335. Many decisions are in accord.[2]

_____

[2] *See, e.g.*, *Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212, 1217 (S.D. Fla. 2016) (collecting and agreeing with many cases generally holding that a "medical expert's testimony was admissible because he was a qualified physician, with years of experience, and his opinion was based on reviewing medical records, which was acceptable under *Daubert*"); *LaRocco v. Royal Caribbean Cruises, Ltd.*, 2024 WL 2292814, at *4 (S.D. Fla. Mar. 4, 2024) ("Case law has made it clear that an expert medical witness may provide an opinion even if they rely solely on medical records."); *Maples v. Dunn*, 582 F. Supp. 3d 1040, 1080 (N.D. Ala. 2022) (explaining that "courts in this district have held that a physician need not necessarily examine a patient, interview that patient,

This permission for medical experts to rely on medical records makes particularly good sense given that doctors in the real world often rely on medical records when treating patients. Take it from the plaintiffs' own witnesses: ███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Dr. Janssen noted that the mental health assessment of "a child or adolescent who appears to be experiencing gender dysphoria" typically includes "gather[ing] and review[ing] information from the patient's primary care provider, prior mental health providers, and other adult professionals who are part of the patient's care team." Janssen Rep. at 48-49; *see also* SJ.DX33:22:1-11 (Ladinsky Dep.) (Dr. Ladinsky asserting that the "process of diagnosing whether a young person … suffers from gender dysphoria" includes "review[ing] all records that come to us from the referring primary care doctor as well as mental health professionals that youth may be seeing"); *id.* at 40:19–41:11 (same). Thus, the medical records here provide a sufficient basis for Dr. Nangia's opinions.

The United States' cases are not to the contrary. Unlike here, they all involve experts trying to offer a differential diagnosis or causation analysis of the medical

---

or speak with the patient's treating physician(s) to render opinions regarding diagnosis" (cleaned up)); *Gov't Emps. Ins. Co. v. Seco*, 658 F. Supp. 3d 1162, 1176 (S.D. Fla. 2023) ("[A]n expert need not examine or interview a patient to render opinions about diagnosis and the course of treatment."); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) ("A doctor needs only one reliable source of information showing that a plaintiff is ill; either a physical test or medical records will suffice for this."); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (similar); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir. 1989) (similar); *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 703 (S.D. W. Va. 2014) (similar); *Burton v. R.J. Reynolds Tobacco Co.*, 183 F. Supp. 2d 1308, 1313 (D. Kan. 2002) (similar).

problem face by a particular plaintiff in circumstances where the experts would have, in the real world, needed to directly examine the patient or talk to her doctors personally.[3] Dr. Nangia disclaims any attempt to assess "the veracity of psychiatric diagnoses" in these Plaintiffs. Nangia Supp. Rep. at 1. And the United States' cases agree that even in their specific contexts—which are irrelevant here—a medical record review *could* be sufficient.[4]

The United States also objects that a physician cannot opine on an individual's capacity to give informed consent or assent to medical transition without speaking to the individual. It is true, as Dr. Nangia explains, that an assessment of the capacity to give informed consent requires "a mental health professional who has taken the appropriate time and steps to provide a full biopsychosocial diagnostic evaluation as well as adequate follow up." U.S. Mot. 33 (quoting Nangia Supp. Rep. ¶12). But Dr. Nangia, a qualified mental health professional, is well situated to review the procedures undertaken by Plaintiffs' doctors to try to obtain informed consent, and the

---

[3] *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 196-97, 202-03 (4th Cir. 2001) (acknowledging that "a physician may reach a reliable differential diagnosis without personally performing a physical examination," but concluding that on the facts presented—including the witness's effort to contradict the medical records—a "failure to conduct a physical examination" was some "support" for exclusion); *Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1275, 1295 (M.D. Fla. 2009) (focusing on whether "Seroquel was the specific cause of [the Plaintiff's] injury," and emphasizing that the expert's review of medical records was "incomplete"); *see also Hamilton v. Louisville Cartage Co.*, 2024 WL 2303889, at *5 (M.D. Ga. May 21, 2024) (ruling based on reliability—not insufficient facts—that a purported life-care expert who was "not qualified to determine if her own patients need the kind of surgeries she believes are necessary for Plaintiff" could not offer testimony without discussing that issue with physicians).

[4] *See Cooper*, 259 F.3d at 203 ("In certain circumstances, a physician may reach a reliable differential diagnosis without personally performing a physical examination."); *Haller*, 598 F. Supp. 2d at 1294 ("[A] physician need not necessarily examine a patient, interview that patient, or speak with the patient's treating physician(s) in order to render opinions regarding diagnosis, prognosis, course of treatment and perhaps even causation.").

medical history of each Plaintiff provides "sufficient facts" for Dr. Nangia to opine whether the child could, in fact, provide informed consent.

What's more, besides the medical records, Dr. Nangia has also reviewed the deposition testimony of Plaintiffs' parents and treating medical providers. *See* Nangia Supp Rep. 1; Nangia 2d Supp. Rep. 1. If the impression the medical records gave about those providers' informed consent practices was incorrect, the plaintiffs or their providers have had ample opportunity to correct the record. Instead, the providers' own deposition testimony confirms the inadequacy of the procedures involved, supporting Dr. Nangia's conclusion that ███████████████████████

███████████████████████████████████

████████████████ *Id.* ¶27. There is more than enough information in the record for Dr. Nangia to reliably assess the procedures undertaken and the explanations offered by Plaintiffs' physicians before they determined that informed consent had been given.

In all events, the focus of Dr. Nangia's opinion is the inadequacy of the informed consent process for gender transitioning procedures in minors, including at UAB. ████████████████████████████████

████████████████████████████████████

██████████████████████████████, her overarching expert opinion is that "informed consent is not attainable for medical or surgical transition in minors"—period, in *any* minor. Nangia Rep. at 80 (cleaned up).

Last, the United States makes vague noises about "a limited set of medical records," suggesting that the Plaintiffs' records here are not "complete." U.S. Mot.

26, 32. Perhaps most surprisingly, Plaintiffs join this argument. *See* Doc. 602. That is extraordinary because this Court specifically ordered the Plaintiffs to turn over "[a]ll medical records" and other documents related to medical or mental health treatments for gender dysphoria or a related condition. Doc. 260 at 1-2, 8. Plaintiffs even demanded that Defendants refrain from third-party subpoena requests and instead ask Plaintiffs for any records directly, which Defendants did—though Defendants still had to subpoena certain third-party medical records in the interest of completeness. So if Plaintiffs are now saying that the records they provided were not "complete," U.S. Mot. 26; Doc. 602, the proper course would be to turn over any withheld records *now*—not seek to exclude Defendants' experts who relied on their good faith. Regardless, the United States provides no evidence that the Plaintiffs (or their providers) have improperly withheld relevant records or that other records exist that were disregarded, much less that any absent records would have affected Dr. Nangia's testimony. The United States' suggestion of medical records lurking in the ether is a question for cross-examination—and perhaps a discovery hearing—not one of admissibility.[5]

> Dr. Nangia's opinions in her supplemental report are based on "sufficient facts or data" and satisfy Rule 702.

---

[5] *See, e.g.*, *State Farm Mut. Auto. Ins. Co.*, 2017 WL 2959060, at *3 (M.D. Fla. July 11, 2017) (calling challenge that the expert did not "review[] every available medical record in making his determination" an issue of "cross-examination"); *Giusto v. Int'l Paper Co.*, 571 F. Supp. 3d 1346, 1363 (N.D. Ga. 2021) ("If [the expert's] review of the [medical records] is somehow insufficient, it is [Defendant's] prerogative to point that out during cross-examination."); *Karr v. Celadon Trucking Servs., Inc.*, 2017 WL 10942181, *6 (N.D. Ga. Dec. 21, 2017) (finding that a party's arguments that the opposing expert's testimony was based on insufficient information were "better explored through cross examination as opposed to wholesale exclusion," even though the expert had "prepared his opinion before properly reviewing [a relevant individual's] medical records").

## CONCLUSION

The Court should deny the United States' motion to exclude certain testimony of Dr. Geeta Nangia.

Dated: August 12, 2024

Respectfully submitted,

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*