## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' AND THE UNITED STATES' MOTIONS TO EXCLUDE CERTAIN TESTIMONY OF ANGELA THOMPSON, M.D., MPH, FACOG (DOCS. 590 & 602)

# TABLE OF CONTENTS

Table of Contents ................................................................................ i

Table of Authorities ............................................................................ ii

Introduction ........................................................................................1

Background .........................................................................................2

Argument.............................................................................................5

    I.    Dr. Thompson Is Qualified To Opine About The Impact Of Puberty Blockers And Cross-sex Hormones On Fertility.......................................6

    II.   Dr. Thompson Is Qualified To Opine About The Experimental Nature Of Fertility Preservation Options For Patients Who Receive Transitioning Treatments As Minors. .......................................................9

Conclusion .......................................................................................11

Certificate of Service .........................................................................13

# TABLE OF AUTHORITIES

## Cases

*Easterwood v. Husqvarna Professional Products, Inc.*,
    576 F. Supp. 3d 950 (M.D. Ala. 2021)...................................................................6

*Harvey v. Novartis Pharmaceutical Corp.*,
    895 F. Supp. 2d 1206 (N.A. Ala. 2012)................................................................9

*Higgins v. Koch Development Corp.*,
    794 F.3d 697 (7th Cir. 2015) ...............................................................................9

*M.S.C. v. Garland*,
    85 F.4th 582 (1st Cir. 2023)..................................................................................6

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ............................................................................8

*Moore v. Intuitive Surgical, Inc.*,
    995 F.3d 839 (11th Cir. 2021) ............................................................... 5, 6, 8, 11

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ............................................................................5

## Rules

Fed. R. Evid. 702 .......................................................................................................5

Fed. R. Evid. 702 (b)..................................................................................................1

Fed. R. Evid. 702 (c)..................................................................................................1

Fed. R. Evid. 702 (d)..................................................................................................1

## Other Authorities

29 Wright & Miller, *Federal Practice and Procedure* § 6264.1 (2d ed.) .................5

# INTRODUCTION

Dr. Angela Thompson is a board-certified obstetrician and gynecologist. She has treated and studied fertility and infertility her entire career. Here, she offers her expert opinion "on the fertility considerations of administering to minors gonadotropin releasing hormone agonists (GnRHa), colloquially known as 'puberty blockers,' followed by supraphysiological doses of cross-sex hormones." SJ.DX10:¶2 (Thompson Rep.).

The United States and Plaintiffs do not challenge the reliability of Dr. Thompson's opinions. They do not contend that her opinions are based on insufficient facts or data, or that they are not the product of reliable principles and methods, or that they do not reflect a reliable application of the principles and methods to the facts of the case. *See* Fed. R. Evid. 702 (b)-(d). Nor do they claim that Dr. Thompson is not an expert in fertility and reproductive health generally, or that she is not a well-qualified OB/GYN. This is all understandable. A quick glance at Dr. Thompson's extremely thorough report confirms that any of these challenges would be meritless.

Instead, continuing their no-true-Scotsman line of objections to Defendants' experts, the United States and Plaintiffs argue that Dr. Thompson is not qualified to opine about the fertility considerations of administering puberty blockers and cross-sex hormones to minors because she herself does not administer puberty blockers and cross-sex hormones to minors. *See* Doc. 591 at 33-34 (U.S. Mot.); Doc. 602 (Plfs' Joinder).[1] As Defendants have explained at length elsewhere (and incorporate

---

[1] Private Plaintiffs moved to join the United States' motion to exclude, Doc. 602, but do not mention Dr. Thompson in their own motion to exclude Defendants' experts, *see* Doc. 605. They are thus limited to the United States' objections to Dr. Thompson's qualifications.

here), *see* Defs' Hruz Resp. at 5-10, this argument is both illogical and legally wrong. It makes no sense to think that Dr. Thompson's knowledge of how high levels of testosterone affect the female body's reproductive system—something Dr. Thompson encounters all the time in women afflicted by polycystic ovarian syndrome, for instance—would somehow not apply to understanding how high levels affect the female body's reproductive system as a result of taking testosterone as a transitioning treatment. No wonder the Eleventh Circuit has repeatedly rejected similar arguments that an expert must "use" the specific item at issue before having the knowledge or experience to testify, and neither the United States nor Plaintiffs offer any precedent adopting their theory.

Because Dr. Thompson is qualified as an expert in fertility and reproductive health, and the reliability and helpfulness of her opinions are uncontested, the plaintiffs' motion should be denied.

## BACKGROUND

Dr. Thompson is a practicing, board-certified physician of obstetrics and gynecology and a fellow of the American College of Obstetricians and Gynecologists (ACOG). Thompson Rep. ¶13. She received her medical degree in 2004 from the University of Utah and completed her residency at the University of Minnesota's Department of Obstetrics, Gynecology, and Women's Health. Thompson Rep. Curriculum Vitae 1. She also has a master's degree in public health and epidemiology from Yale University School of Medicine and, while completing her coursework, served as a teaching assistant in the Yale University Department of Molecular, Cellular, and Developmental Biology, teaching undergraduate students developmental

2

biology. *Id.* Curriculum Vitae 5. She is currently an associate member of the Royal College of Obstetricians and Gynecologists (RCOG) in London. *Id*. Curriculum Vitae 4. She has conducted clinical research and published peer-reviewed articles on obstetric and gynecological care, including pregnancy complications. *Id*. Curriculum Vitae 5-6.

Dr. Thompson serves as an attending physician with the OB Hospitalist Group and as a consultant to the Mayo Clinic Department of Obstetrics and Gynecology in Rochester. *Id*. Curriculum Vitae 1. As a clinician, Dr. Thompson has cared for patients throughout "the reproductive life span, from early puberty to post-menopausal." *Id*. ¶14. The care she has provided includes: "monitoring for gynecologic malignancies, endometriosis, painful menses (dysmenorrhea), abnormal uterine bleeding, uterine fibroids, endometrial polyps, pre-cancerous lesions of the cervix, menopausal symptoms, ovarian cysts, ovarian masses, infertility, polycystic ovary syndrome, sexually transmitted infections, females with differences in sex development, and all aspects of pregnancy, birth, and postpartum care, including surgical care for gynecologic or obstetric emergencies." *Id.* ¶14. Dr. Thompson currently concentrates her practice on female patients in the hospitalized setting, providing care in the antepartum, intrapartum, and postpartum periods. *Id*. She also performs surgeries for gynecologic or obstetrical emergencies. *Id*. About a quarter of her patients are under 18. Doc. 591-23 at 12:23–13:7 (Thompson Dep.).

In addition to her clinical work, Dr. Thompson teaches medical students and residents in obstetrics and gynecology, family medicine, and emergency medicine. Thompson Rep. ¶13. She was an instructor in obstetrics and gynecology at the Mayo

Clinic Alix School of Medicine and Science from 2014 to 2021, where she was awarded the National Teaching Award, the Teacher of the Year Award (Mayo Clinic), and numerous other honors for her academic work. *Id*. Curriculum Vitae 1-2.

Here, Dr. Thompson provides her "expert opinion on the fertility considerations of administering to minors gonadotropin releasing hormone agonists (GnRHa), colloquially known as 'puberty blockers,' followed by supraphysiological doses of cross-sex hormones." *Id.* ¶2. Her report thus discusses "(a) the medical evidence regarding the risks such treatment poses to healthy biological function; (b) whether children in early puberty can assent to such treatment; and (c) the prospects of experimental fertility preservation techniques in early pubertal children who undergo such treatment." *Id.*

Dr. Thompson begins by explaining concepts of biological development that are needed to understand how fertility develops and how fertility preservation techniques work. *See id.* ¶¶25-58. She then discusses the effects of puberty blockers on developing children and adolescents, particularly as they relate to fertility, *id.* ¶¶59-67, and the effects of supraphysiologic doses of testosterone on developing females, also as they relate to fertility, *id.* ¶¶68-87. Last, she examines fertility preservation techniques as they exist—or, in fact, don't exist—for individuals who began puberty blockers at Tanner Stager 2 directly followed by cross-sex hormones. *Id.* ¶¶88-120.

Dr. Thompson arrives at two main conclusions. First, "if a child begins puberty blockers at Tanner stage 2, as recommended by WPATH and the Endocrine

Society, and then moves on to cross-sex hormones without a gap in 'care,' he or she can risk permanent sterility." *Id.* ¶65. And second, fertility preservation options for patients whose puberty is halted at Tanner Stage 2 are "inaccessible, experimental, and speculative." *Id.* ¶11; *see also id.* ¶¶88-89, 120.

The United States, joined by Plaintiffs, seeks to exclude Dr. Thompson's testimony on only one ground: "Dr. Thompson is not qualified to opine on the effects of hormonal treatments on pediatric patients or the topic of fertility preservation for minors who receive gender-affirming care because she has no experience providing such treatment." U.S. Mot. 33.

## ARGUMENT

Dr. Thompson is qualified to opine about how puberty blockers and cross-sex hormones affect fertility and on the availability—or lack thereof—of fertility options for patients who take puberty blockers and cross-sex hormones as transitioning treatments. The Eleventh Circuit has made clear that, under "the plain language of Rule 702," "experts may be qualified in various ways," including "based on 'knowledge, skill, experience, training, *or* education.'" *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (quoting Fed. R. Evid. 702) (emphasis altered). "[A] background in just one of these five may be sufficient." 29 Wright & Miller, *Federal Practice and Procedure* § 6264.1 (2d ed.).

In determining whether a witness is qualified to opine about a particular topic, the question is simply whether the expert "is the type of person who should be testifying on the matter at hand." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 852 (11th Cir. 2021). This is a less "exacting analysis" than courts apply in evaluating

an expert's methodology. *Id.* An expert must be "minimally qualified," but "gaps in his qualifications generally will not preclude admission of his testimony." *Easterwood v. Husqvarna Professional Products, Inc.*, 576 F. Supp. 3d 950, 598 (M.D. Ala. 2021).

While there may be other specialties who also have expertise in fertility, it's hard to imagine how a board-certified OB/GYN with a background in developmental biology would not be "the type of person who should be testifying" about the effects of hormonal interventions on fertility and the state of fertility preservation techniques for patients who underwent such interventions. If the United States wants to cross-examine Dr. Thompson on why she doesn't prescribe transitioning treatments herself, it is free to do so. But its motion to exclude Dr. Thompson's testimony in its entirety based on her expertise as an OB/GYN should be denied.

## I.  Dr. Thompson Is Qualified To Opine About The Impact Of Puberty Blockers And Cross-sex Hormones On Fertility.

It is almost tautological to say that a board-certified OB/GYN and Fellow of the American College of Obstetricians and Gynecologists who has treated and studied infertility and deals daily with the effects of hormones on fertility is the "type of person who should be testifying" about the effects of puberty blockers and cross-sex hormones on fertility. *Moore*, 995 F.3d at 852. Dr. Thompson is exactly the type of doctor patients see to discuss their fertility. *See M.S.C. v. Garland*, 85 F.4th 582, 587 (1st Cir. 2023) (petitioner "testified about consulting with an obstetrics and gynecology ('OB/GYN') doctor about her fertility options"). Indeed, as an OB/GYN, and as thoroughly detailed in her report, Dr. Thompson has extensive knowledge,

education, and training in the areas of human biology, hormones and hormonal treatments—including puberty blockers, testosterone, and estrogen—and reproductive systems and health. It would be hard to read Dr. Thompson's report and *not* conclude that she is an expert in these subjects.

In addition to her extensive knowledge, education, and training, Dr. Thompson has direct clinical experience with the drugs and hormones used as transitioning treatments; the process of human sexual development; and issues of fertility and reproductive health. Most important, of course, is her direct clinical experience treating patients suffering from infertility. *See* Thompson Rep. ¶14. In addition, Dr. Thompson prescribes GnRH analogs (puberty blockers) as a treatment for "certain conditions of the female reproductive tract" like "endometriosis and uterine myomas." Thompson Dep. at 10:23-25; *see* Thompson Rep. ¶62. She treats patients with differences in sex development, which requires an extensive understanding of sexual development. *See* Thompson Rep. ¶¶14, 25. And she treats women suffering from ovarian cysts, ovarian masses, and polycystic ovary syndrome, among other complications, providing her with extensive experience dealing with hormones such as testosterone and estrogen that affect reproductive systems. *Id*. ¶14. Dr. Thompson has treated patients in early puberty, *id*., and about a quarter of her current patients are under 18, Thompson Dep. 12:25-13:7. Combined with her knowledge, skill, training, and education, Dr. Thompson's experience as a practice OB/GYN confirm that she is well qualified to opine about the impact of puberty blockers and cross-sex hormones on fertility and reproductive health.

The United States and Plaintiffs nonetheless argue that "Dr. Thompson is not qualified to opine on the effects of hormonal treatments on pediatric patients or the topic of fertility preservation for minors who receive gender-affirming care because she has no experience providing such treatment." U.S. Mot. 33. Defendants have responded to this same argument before and incorporate that response here. *See* Defs' Hruz Resp. at 5-10. Specific to Dr. Thompson, the point is simply that her expertise in reproductive health and fertility does not vanish because the hormone at issue was prescribed in a way that she does not prescribe it. Her expertise in how testosterone affects the female reproductive system is the same regardless of the cause of the excess testosterone—be it polycystic ovarian syndrome or transitioning treatments. The biology remains the same.

This commonsense understanding accords with Eleventh Circuit precedent, which has repeatedly held that a "proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004). Indeed, the Eleventh Circuit has made clear that "[o]ur caselaw does not support a bright line rule that an expert witness is qualified to testify" "only if he personally has used the" device— or drug—at issue, and has in fact "explicitly disclaimed such a rule." *Moore*, 995 F.3d at 854.

The United States musters no authority to the contrary. It leads with *Higgins v. Koch Development Corp.*, where the Seventh Circuit affirmed a district court's exclusion of *unreliable* causation testimony by a pulmonologist who had never before treated the condition about which he opined and had received no training in the

field of toxicology. 794 F.3d 697, 705 (7th Cir. 2015). By contrast, Dr. Thompson is an OB/GYN with clinical experience treating infertility. Rather than opining on the specific cause of a condition outside of her field, Dr. Thompson explains how medications and hormones involved in her practice (puberty blockers and testosterone) can generally *cause* a condition she has treated (infertility).

The United States also relies on *Harvey v. Novartis Pharmaceutical Corp.*, where a district court excluded the *unreliable* causation testimony of a surgeon who "did not form his opinion based on his education, training, and experience regarding the causes of osteonecrosis of the jaw." 895 F. Supp. 2d 1206, 1211‐12 (N.D. Ala. 2012). In contrast, Dr. Thompson derives her opinion on the sterilizing effects of transitioning treatments from her knowledge, education, training, skill, and experience with reproductive development, infertility, and hormones. Her report methodically refers to literature in the field of reproductive medicine, including embryology, gynecology, and obstetrics, and the United States does not challenge the reliability of her opinions.

In sum, Dr. Thompson is qualified by her knowledge, training, skill, experience, and education as an academic and clinical OB/GYN to opine about the sterilizing effect of puberty blockers followed by supraphysiologic doses of cross-sex hormones.

## II.     Dr. Thompson Is Qualified To Opine About The Experimental Nature Of Fertility Preservation Options For Patients Who Receive Transitioning Treatments As Minors.

According to Dr. Thompson, "if a child begins puberty blockers at Tanner stage 2, as recommended by WPATH and the Endocrine Society, and then moves

on to cross-sex hormones without a gap in 'care,'" "there is no way for the gametes to ever mature," making the patient "risk permanent sterility." Thompson Rep. ¶65. Thus, the question becomes what fertility preservation techniques, if any, are available for this cohort who begin transitioning in early adolescence.

Dr. Thompson outlines the theoretical options. *See id.* ¶¶88-120. She explains that "[t]he only 'fertility preservation' techniques for which long term data exist are those for individuals who have already matured through the pubertal transition and who have mature gametes." *Id.* ¶120. For the cohort of patients who have *not* matured through pubertal transition—i.e., those who begin puberty blockers at Tanner Stage 2—"fertility preservation" is largely an experimental or theoretical matter. The "options" for natal females in this cohort are ovarian tissue cryopreservation (OTC) and oocyte in vitro maturation (IVM). ¶¶ 90, 98. OTC for pre-pubertal/early pubertal females has produced a total of *three* known births in the entire world. *Id.* ¶101. IVM has produced *none*. *Id*. For pre- or early pubertal males, "the ability to generate mature spermatozoa" in humans does not currently exist; experimental techniques are being conducted in "animal studies." *Id.* ¶106. This means no live births for any natal males in this cohort.

So, when the United States attacks Dr. Thompson for having never "attempted to preserve the fertility of a child in early puberty seeking gender-affirming care," U.S. Mot. 34, it buries the lede: *No* doctor has done so successfully.[2]  Dr. Thompson explains this in her report. *Id.*  ¶130 ("There has never been a live birth using sperm

---

[2] The patients in the studies Dr. Thompson's discusses underwent OTC in an attempt to preserve their fertility before undergoing gonadotoxic cancer treatments, not "gender affirming care." Thompson Rep. ¶95.

from a male who was administered [gender-affirming care] at Tanner Stage 2, and there are no current data by which these young patients and their families can be assured their fertility and reproductive goals will *ever* be possible."); *id*. ¶131 ("There are no data that a female young person who was administered [puberty blockers] at Tanner stage 2 followed directly in succession by testosterone … has ever had a live birth in adulthood.").

Under the United States' theory, then, *no* expert would be qualified to opine about the lack of fertility options for youth undergoing transitioning treatments starting at Tanner Stage 2 of puberty because no expert successfully provides such treatments. That is silly. Dr. Thompson is qualified to opine about fertility preservation for pre- or early pubertal adolescents for many of the same reasons she is qualified to opine about the sterilizing effect of transitioning treatments on pre- or early pubertal adolescents. She is an expert in *fertility*—precisely "the type of person who should be testifying on the matter at hand." *Moore*, 995 F.3d at 852.

## CONCLUSION

The Court should deny the United States' and Plaintiffs' motions to exclude Dr. Thompson's expert testimony.

Dated: August 12, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*

13