## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| BRIANNA BOE *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' AND THE UNITED STATES' MOTIONS TO EXCLUDE CERTAIN TESTIMONY OF JAMES CANTOR, PH.D. (DOCS. 590, 602, 605).

# TABLE OF CONTENTS

Table of Contents ................................................................................. i

Table of Authorities ........................................................................... iii

Introduction ......................................................................................... 1

Background ........................................................................................... 4

Argument .............................................................................................. 7

I.    Dr. Cantor Has The Qualifications Appropriate To The Opinions He Offers ........................................................................................ 7

    A.    Dr. Cantor Is Well Qualified to Offer Opinions About the Methodology, Quality, and Reliability of Clinical Research Studies ................................................................. 7

    B.    Dr. Cantor's Clinical Experience Adds Further Strength to His Expert Opinions ............................................................. 10

    C.    Dr. Cantor Is Well Qualified to Offer Opinions on Conflict-of-Interest Principles ................................................ 11

II.    Dr. Cantor Has Applied An Appropriate Methodology .................... 12

    A.    Dr. Cantor Provides Careful Methodological Critique of Studies on Both Sides of the Contested Issues ................................................................. 12

    B.    Dr. Cantor Double-checks His Own Evaluation of the Literature by Considering the Results of Multiple Independent Systematic Reviews of the Safety and Efficacy of Medicalized Transitions .................... 12

    C.    Dr. Cantor Contrasts the Scientific Evidence with Claims That So-called Guidelines Relied On By Plaintiffs Are "Evidence-based." ............................... 13

III.  Dr. Cantor's Review Of Internal WPATH Communications
Provides Additional Basis And Validation Of His Expert
Opinions. ............................................................................................... 14

Conclusion ................................................................................................. 19

Certificate of Service ................................................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*Broussard-Wadkins v. Maples*,
    895 F. Supp. 2d 1159 (N.D. Ala. 2012)..............................................................15

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
    47 F.4th 1278 (11th Cir. 2022) .................................................. 15, 17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).................................................. 3, 4, 10, 16, 17

*FNB Bank v. Park Nat. Corp.*,
    996 F. Supp. 2d 1187 (S.D. Ala. 2014) ...............................................17

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
    2021 WL 765019 (N.D. Fla. Feb. 28, 2021) ......................................17

*In re Disposable Contact Lens Antitrust*,
    329 F.R.D. 336 (M.D. Fla. 2018) ........................................................15

*In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*,
    711 F. Supp. 2d 1348 (M.D. Ga. 2010) ..............................................15

*In re Seroquel Prods. Liab. Litig.,*
    2009 WL 3806436 (M.D. Fla. July 20, 2009) ....................................15

*In re Takata Airbag Prod. Liab. Litig.*,
    2022 WL 4594123 (S.D. Fla. July 19, 2022) ......................................17

*Johnson v. ABF Freight Sys., Inc.*,
    2020 WL 7320994 (N.D. Ala. Dec. 11, 2020) ....................................18

*Josephson v. Ganzel*,
    2023 WL 2432024 (W.D. Ky, March 9, 2023) .....................................4

*Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
    323 F. Supp. 3d 837 (S.D. W. Va. 2018)..............................................15

*Koe v. Noggle*,
    688 F. Supp. 3d 1321 (N.D. Ga. 2023)..................................................................4

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ...........................................................................9

*Moore v. Intuitive Surgical, Inc.*,
    995 F.3d 839 (11th Cir. 2021) ...........................................................................10

*Smith v. Pfizer Inc.*,
    714 F. Supp. 2d 845 (M.D. Tenn. 2010) ............................................................15

*Southwire Co. v. J.P. Morgan Chase & Co.*,
    528 F. Supp. 2d 908 (W.D. Wis. 2007) .............................................................15

*Stagl v. Delta Air Lines, Inc.*,
    117 F.3d 76 (2d Cir. 1997) ...................................................................................9

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ...........................................................................7

*United States v. Locascio*,
    6 F.3d 924 (2d Cir. 1993) ...................................................................................17

## Rules

Fed. R. Civ. Rule 26(a)(2)(B) ....................................................................................17

Fed. R. Civ. P. 26(a)(2)(B)(i).....................................................................................17

Fed. R. Civ. P. 26(a)(2)(B)(ii)...............................................................................3, 17

Fed. R. Evid. 702 .........................................................................................................7

Fed. R. Evid. 702(b).....................................................................................................17

Fed. R. Evid. 703 ....................................................................................................3, 17

## INTRODUCTION

Dr. James Cantor is a clinical psychologist and "sexual behavior scientist, with an internationally recognized record studying the development of human sexualities, and an expert in research methodology of sexuality." SJ.DX2:¶¶1-2 (Cantor Rep.). He is "regularly consulted to evaluate the research methods, analyses, and proposals from sexual behavior scientists throughout the world." *Id.* He has served as Head of Research for the Centre for Addiction and Mental Health's Sexual Behavior Clinic; was the editor-in-chief of the peer reviewed journal *Sexual Abuse*; served on the editorial boards of multiple other peer-reviewed journals; and is the author of over 50 peer-reviewed articles, "spanning the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities." *Id.* ¶¶2-3.

In his expert testimony for this case, Dr. Cantor does not offer any opinions about the diagnosis or clinical treatment of any individual. He does not opine on the technical intricacies of transitioning surgeries or how endocrinologists determine the correct dosage of testosterone for a transitioning adolescent female. And though his experience as a psychologist treating individuals with gender dysphoria bolsters his opinions, his testimony is not about that experience.

Instead, Dr. Cantor does what one would expect a research scientist to do. He explains and evaluates the evidence for the treatments at issue. He serves as a guide to the ins and outs of evidence-based medicine. He walks through the "pyramid of evidence" and explains the importance of systematic evidence reviews and the GRADE criteria. And then he applies those principles to evaluate the evidence base for the treatments at hand. What do the studies say, and how can we assess them

1

properly? What are the results of the systematic evidence reviews that have been conducted on the safety and efficacy of transitioning treatments for minors? How are guideline documents typically created, and what generally accepted rules govern their creation? And how do the Endocrine Society and WPATH guidelines fare under those rules? Dr. Cantor walks through these questions that are at the heart of this case and, drawing on his expertise as a research scientist, offers answers that are helpful to the trier of fact.

Plaintiffs and the United States move to exclude portions of Dr. Cantor's testimony on two grounds. *See* Docs. 590 & 591 (U.S. Mot.), 602 (Plfs' Joinder), 605 (Plfs' Mot.). First, they move to exclude Dr. Cantor's testimony concerning "child psychiatry" and "endocrinology," arguing that he is "not qualified to opine on these subjects because "he is a clinical psychologist who primarily treats adults" and should not be permitted to "opine on medical care that he has never provided." U.S. Mot. 8-9. This objection misunderstands both the nature and the basis of Dr. Cantor's testimony. He does not offer testimony concerning "child psychiatry" and "endocrinology" except insofar as those subjects relate to the research studies and guideline documents he evaluates. As an expert in evaluating the methodology, strengths, and limitations of clinical studies, Dr. Cantor's task is to assist the Court in understanding "what is known [and] what is not known" to science about the benefits and risks of alternative responses to gender dysphoria in children and adolescents. Doc. 591-2 at 37:17-25 (Cantor Dep.). He does not need to be a psychiatrist or endocrinologist to evaluate and opine on research studies and

guidelines. His knowledge and experience as a research scientist equip him to do just that.

Second, the United States and Plaintiffs move to prevent Dr. Cantor from testifying about the contents of internal WPATH emails that he has reviewed on the grounds that he "does not identify any particular methodology that [he] applies to these documents," U.S. Mot. 10, or is simply "stating facts," Plfs' Mot. 5. Again, this objection misunderstands or mischaracterizes the function of Dr. Cantor's review of the WPATH leadership emails surrounding the development of Standards of Care Version 8 (SOC-8). Dr. Cantor's Supplemental Appendix A does not deliver new expert opinions, but discloses additional and powerful grounds supporting Dr. Cantor's already-disclosed opinions that the WPATH guidelines do not represent "evidence-based medicine" but are instead a magnum opus of ideology, guesswork, and politics, tarred by extensive but undisclosed conflicts of interest. Cantor Rep. ¶¶249-50; SJ.DX3:¶¶96-120 (Cantor Supp. Rep.) Regardless of whether those materials are otherwise admissible, experts regularly rely on inadmissible material (Fed. R. Evid. 703) and are *required* to disclose them (Fed. R. Civ. P. 26(a)(2)(B)(ii)). Plaintiffs' attempt to paint providing a factual basis for his opinions as a vice rather than a virtue is meritless.

Other courts have denied similar *Daubert* motions to exclude similar expert testimony from Dr. Cantor. *See, e.g.*, *Josephson v. Ganzel*, 2023 WL 2432024, at

*10-12 (W.D. Ky, March 9, 2023). No court has excluded his testimony on these topics.[1] No aspect of Dr. Cantor's proffered testimony should be excluded here.

## BACKGROUND

As noted, Dr. Cantor appears here as an expert research scientist. He has a master's degree in psychology from Boston University, where he studied neuropsychology, and a doctoral degree in psychology from McGill University. His dissertation was on "the effects of psychiatric medication and neurochemical changes on sexual behavior." Cantor Rep. ¶4. Dr. Cantor has served as "Senior Scientist and Psychologist at the Centre for Addition and Mental Health (CAMH), and Head of Research for CAMH's Sexual Behavior Clinic." *Id.* ¶3. He was "on the Faculty of Medicine of the University of Toronto for 15 years" and "served as Editor-in-Chief of the peer reviewed journal[] *Sexual Abuse*"—one of the "top-impact, peer-reviewed journals in sexual behavior science." *Id.* "In that appointment [he] was charged to be the final arbiter for impartially deciding which contributions from other scientists in [his] field merited publication." *Id.* He has also "served on the Editorial Boards of *The Journal of Sex Research*, the *Archives of Sexual Behavior*, and *Journal of Sexual Aggression*." *Id.* He is currently the Director of the Toronto Sexuality Centre in Canada, *id.*, and is the "author of over 50 peer-reviewed articles," "spanning the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities." *Id.* ¶2.

---

[1] The United States' citation (at 1) to *Koe v. Noggle*, 688 F. Supp. 3d 1321 (N.D. Ga. 2023), in which the court gave "less weight" to certain testimony provided by Dr. Cantor cuts against the plaintiffs' arguments. That court evaluated "weight" after hearing the evidence and cross-examination; it did not exclude Dr. Cantor's testimony under *Daubert*, as the plaintiffs ask this Court to do.

In his initial report, Dr. Cantor explains that there are "two kinds of expertise" in clinical science. *Id.* ¶9. "Clinicians' expertise regards applying general principles to the care of an individual patient and the unique features of that case," while a "scientist's expertise is the reverse, accumulating information about many individual cases and identifying the generalizable principles that may be applied to all cases." *Id.* "Thus," Dr. Cantor notes, "different types of decisions may require different kinds of experts, such that questions about whether a specific patient represents an exception to the general rule might be better posed to a physician's expertise, whereas questions about establishing the general rules themselves might be better posed to a scientist's." *Id.* For instance, he says, while "clinicians who practice in [a] field" may "be best equipped" to opine on "whether a given clinician correctly employed relevant clinical standards," "[w]hen it is the clinical standards that are themselves in question … it is the experts in the assessment of scientific studies who are the relevant experts." *Id.* ¶10.

Indeed, Dr. Cantor explains that "such evaluations" are typically "conducted by objective assessors with expertise in the science of assessment, and not by those with an investment in the procedure being assessed" precisely to avoid the "conflict of interest" that would be present by "people engaged in providing clinical services … claiming that their services are effective." *Id.* Dr. Cantor's "extensive background in the assessment of sexuality research and in the development of human sexuality places [him] in exactly the position of objectivity and freedom from conflict-of-interest required by the universal standards of medical research science." *Id.* ¶14.

Consistent with his expertise as a research scientists, Dr. Cantor discusses in his report principles of evidence-based medicine both generally (*id.* ¶¶38-70) and as applied to the transitioning interventions at issue. He discusses the systematic evidence reviews that have examined the safety and efficacy of medicalized transition in minors (and unanimously found the evidence to be low quality). *Id.* ¶¶71-88. He discusses and evaluates the guideline documents or policy statements by the Endocrine Society, WPATH, and the American Academy of Pediatrics using principles of evidence-based medicine. *Id.* ¶¶89-105, 239-258. And he discusses and evaluates the primary studies on childhood and adolescent gender dysphoria and how to treat it. *Id.* ¶¶106-238.

In his supplemental report, Dr. Cantor updates his evaluations of the research to account for new research. *See* Cantor Supp. Rep. ¶¶3-95. And, based on his review of documents WPATH produced in discovery regarding the development of SOC-8, Dr. Cantor discusses how those documents confirmed his opinion about the untrustworthiness of the WPATH Standards. *Id.* ¶¶96-120 & App. A.

The United States and Plaintiffs seek to limit Dr. Cantor's testimony on two grounds. First, they argue that he is "not qualified to opine on pediatrics, endocrinology, or the development of clinical guidelines because he is a clinical psychologist who primarily treats adults." U.S. Mot. 9 (cleaned up). Second, they argue that "Dr. Cantor's opinions about WPATH include improper motive opinion and are not the product of any reliable methodology." *Id.* at 10; *see* Plfs' Mot. 12-16.

## ARGUMENT

### I.  Dr. Cantor Has The Qualifications Appropriate To The Opinions He Offers.

#### A.  Dr. Cantor Is Well Qualified to Offer Opinions About the Methodology, Quality, and Reliability of Clinical Research Studies.

Dr. Cantor proffers opinions not about diagnosis or the best clinical treatment for any individual, but about research methodology and the quality of the scientific evidence that is being relied on by both advocates and critics of medicalized transition of minors, and by organizations such as WPATH that have published what they claim to be "evidence-based" guidelines. His testimony will explain the accepted criteria for evaluating the reliability of clinical studies, including well-recognized methodological defects or limitations that can prevent a study from rendering reliable results. And he will apply these well-recognized criteria to evaluate specific studies, as well as the evidentiary basis of guidelines that purport to be based on scientific evidence. He is well qualified to offer those opinions.

Under "the plain language of Rule 702," "experts may be qualified in various ways," including "based on 'knowledge, skill, experience, training, *or* education.'" *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (emphasis altered). Dr. Cantor brings precisely the expertise appropriate to his proffered testimony. As his CV and his testimony reveal, "a great deal of … [the] more senior parts of [his] career were specifically about assessing … research studies." Cantor Dep. 29:13-15. He has served as editor-in-chief of one peer-reviewed scientific journal, on the editorial board of five others, and as a peer reviewer for still others. Cantor Rep. ¶3; *id.* Appendix 1 (Cantor CV) at 22/32; Cantor Dep. 29:7–30:5. Dr.

Cantor has served on numerous grant review panels—again, a task calling for the evaluation of the significance and methodological rigor of the research designs of others. Cantor CV 23/32. He has served as the "Principal Investigator" for two grant-funded clinical studies, and a co-investigator in four others. *Id.* 10/32. He has served as "Research Section Head" and "Head of Research" at the Centre for Addiction and Mental Health in Toronto, *id.* 1/32, and as an assistant professor and then associate professor in the Department of Psychiatry at the University in Toronto across ten years, *id.* 2/32. All these roles call for the careful evaluation of the "quality and the research methods" of a wide range of research studies. Cantor Dep. 29:16-21.

In addition, Dr. Cantor's personal participation in clinical research has included research in the field of endocrinology, including the effects on sexual behavior of various hormones, Cantor Dep. 20:7-12, 28:21-25; as well as neuroscience, Cantor Dep. 29:5-10. His more than 60 peer-reviewed scientific articles have included articles relating to gender identity and gender dysphoria at intervals across almost 20 years. Cantor CV 3-6/32 (CV Publications nos. 54, 31, 2, 1). And his peer-reviewed publication most relevant to this case was precisely an analysis of the scientific basis (or lack thereof) of a position statement on use of puberty blockers published by the American Academy of Pediatrics. *Id*. 3/32 (CV Publication no. 2).

The United States understandably does not dispute that Dr. Cantor is an "expert in research methodology" relevant to human sexuality. Cantor Rep. ¶1; *see* Cantor Dep. 28:18-25. Instead, it argues that Dr. Cantor should not be permitted to opine on the evidentiary basis for "medical care he has not provided," U.S. Mot. 9—

the medicalized transition of minors. One might as well argue that if the scientific basis of astrology is the point in question, the court should admit testimony only from practicing astrologers. Unsurprisingly, that is not the law. *See* Defs' Hruz Resp. 7-10 & n.2 (discussing and refuting similar argument and collecting cases). "An expert … is one who qualifies as such by reason of special knowledge and experience, whether or not he" practices in the "special field" at issue. *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (cleaned up). It makes no sense to say that the only experts permitted to testify concerning the safety and efficacy of transitioning treatments for minors are those whose livelihoods depend on providing transitioning treatments to minors. *See, e.g., Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997) ("If the only experts permitted to testify inevitably represent the same side of a civil case, those who possess these experts can, for all practical purposes, set their own standards.").

Indeed, this is the very point of much of Dr. Cantor's testimony. As he explains, in evidence-based medicine "the standard procedure" is for evaluations of evidence "to be conducted by objective assessors with expertise in the science of assessment, and not by those with an investment in the procedure being assessed" Cantor Rep. ¶11. That is "[b]ecause the people engaged in providing clinical services are necessarily in a conflict of interest when claiming that their services are effective." *Id.* As Dr. Cantor explained, that WPATH ignored this general rule is a *problem*, not a virtue: While "the international standard … is for such assessments to be conducted by experts at arm's length from those services—sufficiently familiar with the topic but *not* professionally engaged in performing the clinical practices

under review"—WPATH "essentially *required* this conflict, making membership in WPATH a requirement for appointment of professionals to the guideline development team." Cantor Supp. Rep. ¶¶102, 106.

The United States here seeks to emulate WPATH's error, asking the Court to exclude any expert who is not financially or otherwise dependent on the interventions under review. *See* U.S. Mot. 9 (faulting Dr. Cantor for "mak[ing] no income from the assessment or clinical treatment of children" with gender dysphoria). This is not only bad science, but bad law. Dr. Cantor's knowledge and deep expertise well qualifies him to speak about "the task at hand," *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)): the evaluation of the strength of the scientific evidence-base concerning both benefits and harms from medicalized gender transition of minors.[2]

### B.   Dr. Cantor's Clinical Experience Adds Further Strength to His Expert Opinions.

It is Dr. Cantor's deep experience in the methodological evaluation of research that is most relevant to his proffered opinions, and he proffers no opinions based solely on his personal clinical observations. With that said, the United States' attempt to paint Dr. Cantor as without relevant clinical experience fails. Dr. Cantor testified that he has participated—as the psychologist member of a multi-disciplinary

---

[2] The Court may contrast Dr. Cantor's relevant expertise in the evaluation of clinical research with that of Plaintiffs' proffered experts Dr. Ladinsky and Dr. McNamara, neither of whom has ever participated in any clinical research of any sort (SJ.DX59:7:2-4 (McNamara Dep.); SJ.DX33: 152:10, 231:12-13 (Ladinsky Dep.)), or served on the editorial board (much less as editor-in-chief) of any peer-reviewed scientific publication on any topic (*Daubert*.DX1:34-53 (Ladinsky Rep.) (Curriculum Vitae); *Daubert*.DX3:28-33 (McNamara Rep.) (Curriculum Vitae)).

team[3]—in the treatment of dozens of adolescents and a number of pre-pubertal children experiencing issues of gender dysphoria and gender identity, and as the primary care provider for six to eight such adolescents. Cantor Dep. 14:3–16:6. As a member of an interdisciplinary team, Dr. Cantor has also participated in the diagnosis of gender dysphoria, in decisions to prescribe puberty blockers, *id.* at 18:2–21:20, and in decisions to prescribe cross-sex hormones to "somewhere in the range of 100" adults or late adolescents, *id.* at 22:6-11.[4] The United States' attack on Dr. Cantor as "unqualified" is meritless.

### C. Dr. Cantor Is Well Qualified to Offer Opinions on Conflict-of-Interest Principles.

Finally, Dr. Cantor possesses an "enormous amount of training and experience" in evaluating conflicts of interest relevant to evaluating scientific projects—experience including his service as editor-in-chief of a peer-reviewed journal and service on grant-review boards. Cantor Dep. 181:6-19. This experience has made him not only well-familiar with conflict-of-interest principles, but responsible for their enforcement. *Id*. He extensively demonstrated that expertise in his Supplemental Report and during his deposition. *See, e.g.*, Cantor Supp. Rep. ¶¶96-120; Cantor Dep. 42:5–48:17, 72:12–73:8, 187:15-24.

---

[3] Plaintiffs' experts repeatedly insist that diagnostic and treatment decisions for gender dysphoria are properly done by a "multi-disciplinary team," including a psychologist. *See* Ladinsky Rep. 2; McNamara Rep. 5.

[4] The Court may contrast this to the experience of Plaintiffs' expert Dr. McNamara, who in her whole practice as a non-research pediatrician has *never* participated in diagnosing or treating a minor for gender dysphoria, and has seen only two patients whom she referred to a pediatric gender clinic for diagnosis, neither of whom went on to receive any prescription for puberty-blockers or cross-sex hormones. *See* McNamara Dep. 21:5-17; 22:3-18.

While neither the United States nor Plaintiffs moves to exclude Dr. Cantor's proffered testimony concerning WPATH's extensive but undisclosed conflicts of interest, this expertise and subject-matter is relevant to Dr. Cantor's review of internal WPATH emails, and the plaintiffs' motions to exclude that testimony, as discussed further below. *See* Section III below.

## II.   Dr. Cantor Has Applied An Appropriate Methodology.

### A.   Dr. Cantor Provides Careful Methodological Critique of Studies on Both Sides of the Contested Issues.

Dr. Cantor's methodology is this: He carefully explains the generally accepted criteria for judging the reliability of clinical studies, citing respected authorities (which neither Plaintiffs nor the United States disputes) that confirm his articulation. *See* Cantor Rep. ¶¶38-88. He carefully defines his terms and explains the history and background of gender dysphoria. *Id*. ¶¶106-39. Then, Dr. Cantor applies the methodological criteria he has explained to evaluate studies that have been cited in *support* of medicalized transition of minors, *id*. ¶¶178-201, as well as studies that raise *concerns* about the safety or efficacy of medicalized transition, *id*. ¶¶202-38. Notably, Dr. Cantor provides citations to the relevant peer-reviewed scientific literature at every turn, including studies favored by both sides of this hotly debated topic.

### B.   Dr. Cantor Double-checks His Own Evaluation of the Literature by Considering the Results of Multiple Independent Systematic Reviews of the Safety and Efficacy of Medicalized Transitions.

Central to the concept of "evidence-based medicine," which Plaintiffs and the United States invoke in an effort to accord Olympian authority to the WPATH

12

guidelines, is the "systematic review," a well-defined process designed to review and evaluate the *entire* body of available scientific evidence on a medical topic and give a clear answer as to "what is known [and] what is not known." Cantor Dep. 37:18-19. In addition to his own evaluation of key articles in the field, Dr. Cantor will explain the independent systematic reviews that have been performed concerning the use of puberty blockers and cross-sex hormones (several commissioned by national health authorities of European nations), and the findings of those reviews.

Here again, Dr. Cantor's "methodology" is to start by explaining the terms, the goals, and the process of systematic reviews, Cantor Rep. ¶¶38-45, and then to carefully set out the findings of the available reviews, again with extensive citations and quotations in order to clearly disclose the basis of his opinions, *id*. ¶¶71-105.

Dr. Cantor further "sanity checks" his own conclusions about "what is known [and] what is not known" by summarizing for the Court the findings and conclusions of respected national health authorities—again, providing extensive citations to the bases of these opinions. *Id*. ¶¶16-37, 71-88, 168-72.

### C.   Dr. Cantor Contrasts the Scientific Evidence with Claims That So-called Guidelines Relied On By Plaintiffs Are "Evidence-based."

The very heart of the plaintiffs' case is that Alabama's law denies minors access to treatments that are called for by guidelines which represent "evidence-based medicine." *See, e.g*., Ladinsky Rep. 5; Doc. 263 at 5-7. Having analyzed the research literature and the systematic reviews, Dr. Cantor applies the results of this analysis to determine whether guidelines and position statements issued by WPATH,

the Endocrine Society, and others can legitimately claim the mantle of being "evidence-based." He concludes that they cannot. Cantor Rep. ¶¶239-58. As always, Dr. Cantor "shows his work" by providing citations and clear explications.

## III.  Dr. Cantor's Review Of Internal WPATH Communications Provides Additional Basis And Validation Of His Expert Opinions.

As noted above, Dr. Cantor opined in his opening and supplemental reports that WPATH's SOC-8 is not a product of "evidence-based medicine," but of ideology, guesswork, and politics, all under the influence of conflicts of interest never disclosed to the medical community. *See* Cantor Rep. ¶¶249-50; Cantor Supp. Rep. ¶¶96-120.

While Dr. Cantor identified ample factual basis for those opinions in those reports, the internal WPATH emails—once this Court compelled their production— provided dramatic confirmation. It is an entirely appropriate "methodology" for Dr. Cantor to note that WPATH insiders themselves confirmed the opinions he had already offered. Examples include:

- The statement by an SOC-8 author that "a global consensus on 'puberty blockers' does not exist." SJ.DX4:ii (Cantor Supp. Rep. Appx. A); *compare* Cantor Rep. ¶¶16-37.

- Statements by an SOC-8 author that "we are painfully aware of the gaps in … the kinds of research that are needed to support our recommendations;" that the SOC-8 team was not "as systematic as we could have been" in basing the guidelines on reliable scientific evidence; and that the SOC-8 team did *not* apply the "GRADE" method of evaluating the strength of scientific evidence—even though WPATH falsely claims in its published "Methodology" statement to have applied that method. Cantor Supp. Rep. Appx. A. xii; *compare* Cantor Rep. ¶¶249-50.

14

- The statement by an SOC-8 author that "social factors likely play a role" in the recent explosion of transgender identification among teens. Cantor Supp. Rep. Appx. A. iii; *compare* Cantor Supp. Rep. ¶¶32-54.

- Direct evidence of tailoring of SOC-8 guidelines to maximize insurance coverage (payable to WPATH members), for courtroom advantage, and in response to political pressures. Cantor Supp. Rep. Appx. A. vi-ix; *compare* Cantor Supp. Rep. ¶¶96-120.

Thus, Dr. Cantor's supplemental report is best understood as an extension of his initial report, and reviewing additional relevant evidence does not somehow become "unscientific" (Plfs' Mot. 3) simply because that review primarily involves reading primary sources. Expert testimony is often based partly on an expert's review of documents uncovered in discovery.[5] If the United States or Plaintiffs believes Dr. Cantor's review of this evidence is lopsided, that is a matter for cross-examination, not a question of admissibility. *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1323 (11th Cir. 2022) ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." (cleaned up)). Reviewing primary sources about medical

---

[5] *See, e.g.*, *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 374 (M.D. Fla. 2018) ("One function of an expert … where tens of thousands of documents have been exchanged through discovery[] is to review the documentation and highlight and interpret those pieces of evidence …."); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007) ("[E]xperts may rely on data and other information supplied by third parties"); *In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*, 711 F. Supp. 2d 1348, 1374-75 (M.D. Ga. 2010) (finding expert methodology reliably used opposing party's "own internal documents" to "confirm" product's dangerousness); *Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 323 F. Supp. 3d 837, 852 (S.D. W. Va. 2018) (finding "the doctors' opinions regarding what [pharmaceutical company] knew and communicated to the FDA w[ould] provide helpful insight"); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009) (holding that expert witnesses may "rely on and discuss [the defendant's] internal corporate documents"); *Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 857 (M.D. Tenn. 2010) (similar); *see also Broussard-Wadkins v. Maples*, 895 F. Supp. 2d 1159, 1172 (N.D. Ala. 2012) (finding expert's "reliance solely on documentary evidence," "rather than interviews," did "not undermine the reliability of his method").

organizations' operations is not an *unreliable* method of confirming an opinion on that topic.

Plaintiffs' complaints about the summary descriptions that Dr. Cantor provided in the course of organizing and introducing undisputed quotations from the WPATH internal correspondence—apparently including objecting to Dr. Cantor's reference to email authors as "concerned," "worried," or "acknowledging" or "agreeing with" certain facts (*see* Plfs' Mot. 13)—are equally meritless. These do not go to the substance of the quoted emails or to any expert opinions proffered by Dr. Cantor, but to details of phrasing such as are appropriately dealt with in the course of testimony and cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain the "traditional and appropriate means" of contesting admissible evidence. *Daubert*, 509 U.S. at 596.

Nor is the United States' complaint that by his review of WPATH's internal communications Dr. Cantor is "serv[ing] as a conduit for hearsay" well taken. U.S. Mot. 10. Defendants incorporate their response to similar accusations against Dr. Kaliebe's review of WPATH and HHS documents, *see* Defs' Kaliebe Resp. 13-20, but the short version is this. First, Defendant fully expect to have the documents produced by WPATH directly admitted into evidence. Issues of authentication and admissibility of these quotes have to some extent already been addressed in depositions of WPATH insiders, and will be further addressed at trial—Plaintiffs having designated SOC-8 Chairman Eli Coleman and WPATH President Marci Bowers as trial witnesses. Plus, some of the internal statements about the WPATH

SOC-8 are not hearsay because they need not be taken "for the truth of what they assert." Fed. R. Evid. 801(c)(2). Against Plaintiffs' claims of "scientific consensus," it is enough to note that SOC8 authors *said* these things. A *Daubert* motion is not the time to attempt to sort out questions of hearsay and admissibility.

Second, even if the documents were otherwise inadmissible, "an expert may rely on inadmissible evidence in forming his opinion." *Carrizosa*, 47 F.4th at 1322-23 (quoting Fed. R. Evid. 703). "[T]hat [the expert] relied upon inadmissible evidence is therefore less an issue of admissibility for the court than an issue of credibility for the [fact-finder]." *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993). The United States and Plaintiffs do not argue that Dr. Cantor's reliance on these materials is unreasonable in the field. *See* Fed. R. Evid. 703. The United States' and Plaintiffs' problem—that Dr. Cantor had the temerity to quote the documents he relied on—is even harder to understand. Experts are *required* to provide "a complete statement of all opinions" and "the basis and reasons for them"—including "the facts or data considered." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii).[6] Unlike testimony with an unadorned "narrative," Dr. Cantor "relies on his professional experience and factual testimony to lay the groundwork to provide his own expert opinion—entirely permissible under *Daubert*." *In re Takata Airbag Prod. Liab. Litig.*, 2022 WL 4594123, at *4 (S.D. Fla. July 19, 2022); *see also In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 765019, at *41 (N.D. Fla. Feb. 28, 2021) (Plaintiffs' own case

---

[6] *See FNB Bank v. Park Nat. Corp.*, 996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014) (explaining that an expert may "provide the necessary factual underpinning for his opinions, without which his report would be subject to attack as noncompliant with Rule 26(a)(2)(B)"); *accord* Fed. R. Evid. 702(b) (requiring a showing that "the testimony is based on sufficient facts").

"declin[ing] to parse the experts' reports and depositions for statements that may cross the line into improper factual narration"); *contra* Plfs' Mot. 13 (parsing individual words and phrases, *e.g.*, "second half of sentence after 'but'"); U.S. Mot. 10-11 (similar).

So the only real objection here is that Dr. Cantor's opinions are unhelpful because the emails and documents "could be competently interpreted by the fact-finder without expert testimony. U.S. Mot. 11. "The helpfulness requirement turns on" ""the common sense inquiry of whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved."" *Johnson v. ABF Freight Sys., Inc.*, 2020 WL 7320994, at *4 (N.D. Ala. Dec. 11, 2020) (cleaned up). To ask whether the "untrained layman" knows about the inner workings WPATH and the other medical organizations—and how they produce guidelines—is to answer it. Neither the United States nor Plaintiffs show that any foundation of lay knowledge exists about the rules of evidence-based medicine, conflicts of interest, guideline creation, and systematic evidence reviews at the center of Dr. Cantor's opinion. And neither the United States nor Plaintiffs cite any authority that suggests that an expert may not reasonably rely on statements by authors of a set of clinical guidelines as one part of the basis of his opinions about the scientific integrity of those guidelines.

Accordingly, Dr. Cantor's opinions that were confirmed by his review of the internal WPATH documents produced in discovery are admissible, reliable, and helpful to the trier of fact. Plaintiffs and the United States are free to examine any

concerns they have with Dr. Cantor's opinion during cross-examination, but the Court should allow him to testify.

## CONCLUSION

For these reasons, the Court should deny the United States' and Plaintiffs' motions exclude certain testimony of Dr. Cantor.

Dated: August 12, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*