UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE *et al.*, <br><br> *Plaintiffs*, <br><br> and <br><br> UNITED STATES OF AMERICA, <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, *et al.*, <br><br> *Defendants*. | No. 2:22-cv-00184-LCB-CWB <br> Hon. Liles C. Burke |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' AND THE UNITED STATES' MOTIONS TO EXCLUDE CERTAIN TESTIMONY OF FARR CURLIN, M.D. (DOCS. 590 & 602)**

# TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ............................................................................................ ii

Introduction ......................................................................................................... 1

Background ......................................................................................................... 1

Argument ............................................................................................................. 4

    I.    Dr. Curlin Possesses The Expertise Appropriate To His Opinions. ......... 4

    II.   Dr. Curlin Has An Adequate Basis For His Opinions. ............................. 5

    III.  The United States' Attempt To Disparage Dr. Curlin's Opinions As Religious Is Baseless. ........................................................................... 10

Conclusion ......................................................................................................... 12

Certificate of Service ......................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**

*Am. Key Corp. v. Cole Nat. Corp.*,
   762 F.2d 1569 (11th Cir. 1985) ...............................................................................7

*Dekker v. Weida*,
   No. 22-cv-325 (N.D. Fla. Apr. 7, 2023) ................................................................12

*Doe v. Ladapo*,
   2024 WL 2947123 (N.D. Fla. June 11, 2024) ......................................................12

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ...................................................................................7

*Eberli v. Cirrus Design Corp.*,
   615 F. Supp. 2d 1357 (S.D. Fla. 2009) ...................................................................6

*In re Polypropylene Carpet Antitrust Litig.*,
   93 F. Supp. 2d 1348 (N.D. Ga. 2000) ................................................................8, 9

*In re Wright Med. Tech., Conserve Hip Implant Products Liability Litigation*,
   127 F. Supp. 3d 1306 (N.D. Ga. 2015) ...................................................................6

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................................6

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004) ..............................................................................5

*Schoen v. State Farm Fire and Cas. Co.*,
   638 F. Supp. 3d 1323 (S.D. Ala. 2022) ...............................................................6, 7

*United States v. Brown*,
   415 F.3d 1257 (11th Cir. 2005) ............................................................................12

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ..............................................................................6

**Rules**

Fed. R. Evid. 610 ...................................................................................................... 12

Fed. R. Evid. 702 ................................................................................................ 1, 6, 10

Fed. R. Evid. 703 ........................................................................................................ 7

## INTRODUCTION

Dr. Farr Curlin is a medical doctor and professor in ethics at Duke University who offers an expert opinion here about the ethical and informed consent implications of medical gender transition interventions in minors. The United States attacks only his qualifications, arguing that his expertise is limited to adult medicine, that he improperly uses other experts' opinions as foundations for his own, and that his testimony is improperly based on his religious beliefs. These arguments are wrong.

*First*, as has been reiterated in many of Defendants' *Daubert* briefs, a general expert need not specialize in the exact area at issue, and Dr. Curlin is an undisputed expert in medical ethics. *Second*, Dr. Curlin uses both his own scientific review and testimony by other experts in this case as appropriate foundations for his independent opinions about ethics—a routine practice in his field. *Third*, his testimony is based on accepted principles of medical ethics, and the only references to religion at his deposition came from intrusive questions by United States' own counsel—a precursor to the anti-religious attitude now on full display in the United States' summary judgment and Rule 702 briefing. The motion to exclude Dr. Curlin should be denied.

## BACKGROUND

Dr. Farr Curlin is "the Josiah C. Trent Professor of Medical Humanities in the Trent Center for Bioethics, Humanities, and History of Medicine, and Professor in the Department of Medicine, at Duke University." SJ.DX14:¶1 (Curlin Supp. Rep.). He is licensed to practice medicine in North Carolina with "a subspecialty board

1

certification in Hospice and Palliative Medicine." *Id.* ¶2. Dr. Curlin practiced medicine for twelve years until he moved to Duke University, where he is not only a professor but also "serve[s] as a palliative medicine consultant and hospice physician." *Id.*

Dr. Curlin completed a "clinical medical ethics" fellowship at the University of Chicago and has "served on the medical ethics faculties of the University of Chicago and Duke for 19 years," where he provides consultation, "attend[s] regular ethics case conferences," and teaches and participates in scholarly research. *Id.* ¶3. He is a member of the American Medical Association and the American Society for Bioethics and Humanities, and has served as a reviewer for many journals, edited several journals focused on bioethics, served on several committees and fellowships such as the Ethics Research Group and the American Society for Bioethics and Humanities, given at least 32 speeches mostly pertaining to ethics, conducted 28 "peer-reviewed presentations at scholarly meetings," directed 15 conferences, and taught both undergraduate and medical courses. *Id.* ¶¶4-5; *id.* Curriculum Vitae 1-9. He has also authored or co-authored 141 papers, four book chapters, and 14 commentaries, editorials, and reviews. *Id.* Curriculum Vitae 11-21. Several of his lectures and works pertain to "ethical issues surrounding transgender medicine." *Id.* ¶4. His recently published book, *The Way of Medicine: Ethics and the Healing Profession*, also addresses transgender medicine. *Id.*; *id.* Curriculum Vitae 12.

Here, Dr. Curlin provides his expert opinion as an ethicist about gender transitioning interventions in minors. He "take[s] as a premise, based on the science reviewed and the opinions offered by Drs. Cantor and Laidlaw, that the mental health

2

benefits that are claimed to justify the administration of medicalized gender affirmation treatments [MGT] to minors are currently unproven and disputed." *Id.* ¶14. He opines that "[t]here is not a consensus among medical professionals that MGT is beneficial or suitable for minors." *Id.* ¶¶15, 21-39.

In Dr. Curlin's view, "[i]t is not possible to conclude that it is known beyond 'equipoise' that MGT is on the whole beneficial for minors who suffer from gender dysphoria," so that principle "does not prohibit including control groups [in research studies on transitioning treatments] that receive only psychological counseling but not MGT." *Id.* ¶17. He opines that there is no "basis to assert that it is unethical to withhold MGT from minors in a clinical setting." *Id.* "On the contrary," he states, "for multiple reasons, there is a serious question whether it is allowable, under accepted principles of medical ethics to administer MGT to minors." *Id.* ¶18, 52-57. Not only is it unclear if medicalized interventions are the best option for children with gender dysphoria, Dr. Cantor explains, but "it is not at all clear that meaningful informed consent for administration of MGT to minors can be obtained" from them or their parents. *Id.* ¶¶19, 70-97.

The United States, joined by Plaintiffs (Doc. 602), now moves to exclude Dr. Curlin's opinions about medical gender interventions for minors and their ability to consent to those interventions. U.S. Mot. 11. The United States does not question the reliability or helpfulness of Dr. Curlin's testimony. It challenges only whether he has "qualifying expertise." *Id.*

3

# ARGUMENT

## I. Dr. Curlin Possesses The Expertise Appropriate To His Opinions.

The United States first argues that "Dr. Curlin's experience as an internist who treats adult patients does not qualify him to testify about pediatrics or pediatric subspecialties." U.S. Mot. 11. This argument misses the mark, for Dr. Curlin is an (undisputed) expert in medical ethics. He completed a specialized fellowship in clinical medical ethics at the University of Chicago, then held a faculty appointment in the Center for Clinical Medical Ethics at the University of Chicago Medical School from 2004 through 2013, providing clinical ethics consultations to doctors within that medical center. Curlin Supp. Rep. ¶3; *id.* Curriculum Vitae 1. Dr. Curlin has regularly taught courses and sessions on the ethics of clinical decisionmaking to medical students at Duke University since 2015. *Id.* Curriculum Vitae 1, 9. In peer-reviewed publications, Dr. Curlin has deployed his expertise as a medical ethicist to address ethical issues including birth control, sterilization, maternal-fetal surgery, surrogate decisionmaking in end-of-life settings, and assisted suicide. *Id.* Curriculum Vitae 12, 14, 16, 18-19. He has also addressed ethical questions surrounding the provision of sensitive medical care to minor adolescents. *See id.* Curriculum Vitae 14 (Paper No. 45). And he recently co-authored a book addressing principles of medical ethics—*The Way of Medicine: Ethics and the Healing Profession*—and that book includes a chapter on medicalized gender transition. Curlin Dep. 74:20–75:5.

This knowledge and experience is more than enough to qualify Dr. Curlin as an expert witness under the Eleventh Circuit's precedents. As explained in detail in

4

Defendants' response in opposition to the plaintiffs' motion to exclude opinions by Dr. Hruz (incorporated here), a "proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004); *see generally* Defs' Hruz Resp. at 7-10 & n.2. This case is even easier, for Dr. Curlin is a medical ethicist who renders testimony here on medical ethics, applied to medical gender transition of minors. The United States makes no claim that there are principles of medical ethics unique to "the ethics of providing gender-affirming care," U.S. Mot. 12, and the accepted medical ethics principles (which Dr. Curlin reviews in his report) are broad and of general applicability. But even if there were specific ethical principles here, Dr. Curlin would still be qualified to testify about them as a general expert in medical ethics.

Dr. Curlin is highly qualified to assist the Court to understand relevant principles of medical ethics and their application to the administration of puberty blockers and cross-sex hormones to minors.

## II. Dr. Curlin Has An Adequate Basis For His Opinions.

The United States asserts that "Dr. Curlin's lack of expertise regarding gender-affirming care is confirmed by his extensive reliance on other experts." U.S. Mot. 13. The United States is wrong on both the facts and the law. Dr. Curlin only relies on other experts for background to his opinion, which Eleventh Circuit precedent allows him to do (and which medical ethicists do all the time in performing their duties in the real world).

Indeed, it is commonplace for experts to rely on other experts in forming their opinions. As the Eleventh Circuit has explained, qualifying expertise might arise from "professional studies or personal experience," among other foundations. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Such studies, of course, are by other experts. No surprise, then, that district courts within this circuit have consistently admitted expert testimony that is "formulated by the use of the facts, data and conclusions of other experts." *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009). As one court explained, "[t]he facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert[s'] opinions and findings." *In re Wright Med. Tech., Conserve Hip Implant Products Liability Litigation*, 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015). An expert is "free to rely on information and data from an expert in formulating *his* opinions"; Rule 702 simply requires that "at the end of the day," the witness "apply *his knowledge* to the facts and form *his own opinion*." *Schoen v. State Farm Fire and Cas. Co.*, 638 F. Supp. 3d 1323, 1336 (S.D. Ala. 2022) (emphasis in original). A problem arises only when "an expert adopts another expert's opinion wholesale, *without reaching independent conclusions in reliance on that opinion*." *Id.* at 1337 (emphasis added).

Here, Dr. Curlin used both his independent scientific review—informed by his decades of academic and practicing expertise—and review of Dr. Cantor's and Dr. Laidlaw's expert reports to form a premise for his opinion regarding medical

ethics. Curlin Supp. Rep. ¶20. The point of his testimony is not to "parrot" Dr. Cantor's or Dr. Laidlaw's opinions about the scientific base of the interventions here. *Schoen*, 638 F. Supp. 3d at 1337. Instead, it is to opine about how "accepted principles of medical ethics" apply here, assuming that the state of scientific knowledge is consistent with those expert opinions. *Id.* ¶18. Dr. Curlin has separate expertise in ethics, and he testified that using other experts and scientific sources as a premise for his opinion is customary in his field. Doc. 591-5 at 106:19–107:2 (Curlin Dep.). On that foundation, Dr. Curlin gave his own independent expert conclusions. *See* Curlin Supp. Rep. ¶¶13-19.

None of this is objectionable or even unusual. "[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert," and the second expert may testify *even if the first does not*. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). "The Committee Notes to the 1972 Proposed Rule 703 give the example of a physician who, though not an expert in radiology, relies for a diagnosis on an x-ray." *Id.*; *see also Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) (explaining that expert opinions simply "must be based upon 'facts or data of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject'" (cleaned up) (quoting Fed. R. Evid. 703)).

Likewise here, Dr. Curlin may apply his expertise in ethics and testify accordingly on the foundations of other experts qualified to conduct thorough reviews of the mental health and endocrinology literature about these interventions.

7

The United States' own case is in accord. *See* U.S. Mot. 13. After cautioning that "an expert … may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon," the court allowed a second expert to "testify concerning the *implications* of [the first expert's] analysis" "to the extent [the first expert's] model is otherwise reliable" after the second expert "reviewed [first expert's] analysis and found it acceptable." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000).

This exactly describes Dr. Curlin's approach. *See* Curlin Supp. Rep. ¶¶14-15. The thrust of Dr. Curlin's proffered opinions is to explain the ethical *implications* if the exhaustive reviews of the science and scientific opinion provided by Dr. Cantor and Dr. Laidlaw are accurate. While Dr. Curlin explains that he was "asked to and do[es] assume that the descriptions … they provide are accurate," Curlin Supp. Rep. ¶20, he also details the steps he took to "assess the validity of [those] opinions," *Polypropylene Carpet*, 93 F. Supp. 2d at 1357, specifically summarizing a long list of studies, systematic reviews, and analyses of the relevant science prepared by European health authorities that "I have myself also reviewed."[1] Curlin Supp. Rep. ¶¶ 20-31. Dr. Curlin then properly formed his own "independent, expert opinions based on [his] study, training and experience as a physician, biomedical ethicist, and health services researcher" regarding the ethical implications that he

---

[1] That Dr. Curlin in several paragraphs abbreviated citations to the multiple articles he reviewed by simply cross-referencing paragraphs in the reports of Drs. Cantor and Laidlaw where full citations are given does not contradict Dr. Curlin's representation that "I have myself also reviewed the illustrative examples that I summarize below." Curlin Supp. Rep. ¶ 20.

8

Case 2:22-cv-00184-LCB-CWB   Document 664   Filed 08/12/24   Page 13 of 18

believes follow from Dr. Cantor and Dr. Laidlaw's reports, along with the scientific literature within those reports and in the relevant field. *Id.* ¶¶ 6, 8, 12.

This case is even easier than the usual case in which similar issues arise, for Dr. Curlin is relying on other experts *who are testifying*. Thus, the United States and Plaintiffs have every opportunity to question the underlying premises of Dr. Curlin's testimony, so the Court as factfinder can resolve the "downstream" reliability of this testimony at trial. *Polypropylene Carpet*, 93 F. Supp. 2d at 1357. The United States cites no case excluding expert testimony at the *Daubert* stage because it partially relies on evidence to be submitted by another expert in the case.

Finally, the United States' argument, even on its own terms, does not remotely extend to all the expert opinions proffered by Dr. Curlin, and the United States makes no effort to identify specific opinions to which it contends its arguments do apply. Dr. Curlin lays out governing principles of medical ethics—including the Nuremberg Code, adopted after World War II to condemn improper medical experimentation on humans—and applies those principles to answer ethical questions surrounding avoiding harm, informed consent, and the ability of minors to give informed consent or assent to hormonal interventions that disrupt natural bodily development. Curlin Supp. Rep. ¶¶44-97. In these and many portions of Dr. Curlin's expert report, the Court will find no or few citations to the reports of Drs. Cantor or Laidlaw. When such citations do occur, they are often informative but by no means essential to the opinions offered. The Court will nowhere find Dr. Curlin "simply repeat[ing] or adopt[ing] the findings of another expert." U.S. Mot. 13 (quoting *Polypropylene Carpet*, 93 F. Supp. 2d at 1357). Instead, the Court will find the

9

deeply informed and carefully supported opinions of an expert who is conversant with the subject matter he is addressing. If the United States wishes to test Dr. Curlin's basis and knowledge on particular points, that is a task for cross-examination at trial, not for Rule 702 exclusion.

**III. The United States' Attempt To Disparage Dr. Curlin's Opinions As Religious Is Baseless.**

Finally, the United States says that "[i]n the absence of relevant expertise, it appears that Dr. Curlin is offering his strongly held personal moral judgments" based on religion. U.S. Mot. 13-14. But Dr. Curlin has relevant expertise, as explained, so the United States' nasty insinuation is irrelevant. It is also unfounded.

In an outrageously deceptive parenthetical, the United States characterizes Dr. Curlin as "stating that gender-affirming treatments 'contradict Christian values.'" U.S. Mot. 14 (quoting Curlin Dep. 66:3-12). Nonsense. Here's the full passage, which makes obvious that Dr. Curlin's testimony was the opposite of what the United States suggests:

> Q: Would you say that providing puberty blockers or cross-sex hormones for the treatment of gender dysphoria is against Christian values?
>
> A: Medicalized gender transition, I -- I think contradicts a number of ethical norms, as I've described, or at least appears to, as I've described in my expert report. And insofar as Christianity, as other traditions, embraces some of those values, then at least that far it would contradict Christian values.

Curlin Dep. 66:3-12.

In other words, Dr. Curlin did not testify that medicalized gender transition of children is unethical *because* it "contradict[s] Christian values." Rather, he testified

10

that it is unethical because it violates "ethical norms"—pointing out the obvious corollary that it could "contradict Christian values" "insofar" as Christianity "embraces" those ethical norms. One could put any other religious or moral framework there, and the sentence would be as true: medicalized gender transition contradicts Islamic values insofar as Islam "embraces" the ethical norms identified by Dr. Curlin. And this point only came up thanks to the United States counsel's repeated, intrusive questions about religious beliefs and values:

- "I assume, from your publications, you're Christian; correct?"
- "What denomination?"
- "[A]re you still practicing?"
- "[H]ow long have you been part of the Anglican Church?"
- "Do you still practice religion with the Anglican Church of North America?"
- "[D]id you ever counsel anyone to take a course of action that would not align with Christian values?"
- "Would you say that providing puberty blockers or cross-sex hormones for the treatment of gender dysphoria is against Christian values?"
- "[W]hen faced with those types of questions, did you draw upon Christianity in order to provide advice?"

*Id.* at 64:5–66:12 (quoting counsel for United States).[2]

One searches Dr. Curlin's report in vain for any ethical analysis that rests on anything other than clearly identified and universally accepted secular authorities on medical ethics. And whatever evidence of bias the United States believes exists is

---

[2] *See also* Curlin Dep. at 48:19-20 ("[W]hat role did Christianity play in the care that patients received in the clinic?"), 49:15-19 ("[W]ere choices in treatment options influenced by Christian values?"), 51:16 ("[D]id providers only treat Christians?").

11

within "the province of the factfinder" in assessing Dr. Curlin's "credibility"; it is not a basis for exclusion. *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005).[3]

In the end, the United States' attacks on Dr. Curlin's faith simply reveals its own "anti-religious bigotry." Doc. 650 at 109; *cf.* Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."). Dr. Curlin's expert opinion is founded in principles of medical ethics, and the United States' attack on his personal religious beliefs should be forcefully rejected.

## CONCLUSION

For these reasons, the Court should deny the United States' motion to exclude certain testimony of Dr. Curlin.

---

[3] Indeed, the United States' desperation here is perhaps best evidenced by its reliance on a footnote from *Doe v. Ladapo* about *other* experts—whose testimony that *denied* motions to exclude and allowed to testify. U.S. Mot. 14. That hardly helps the United States' argument for excluding Dr. Curlin. *See* Motion to Exclude, *Dekker v. Weida*, No. 22-cv-325, Doc. 136, at 3 (N.D. Fla. Apr. 7, 2023); Pretrial Order, *id.*, Doc. 212, at 3 (N.D. Fla. May 4, 2023) (denying this motion). The parties' evidence from *Dekker* was used for *Ladapo*. *Doe v. Ladapo*, 2024 WL 2947123, at *1 & n.3 (N.D. Fla. June 11, 2024).

Dated: August 12, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on August 12, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre  
A. Barrett Bowdre  
*Counsel for Defendants*