# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| Brianna Boe, *et al.*, | ) |
| *Plaintiffs*, | ) |
| and | ) |
| United States of America, | ) |
| *Plaintiff-Intervenor*, | ) |
| v. | ) No. 2:22-cv-00184-LCB-CWB |
| Hon. Steve Marshall, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) |
| *Defendants*. | ) |

# PRIVATE PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. ARON JANSSEN

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

LEGAL STANDARD............................................................................................1

ARGUMENT .........................................................................................................2

I. Dr. Janssen is qualified to testify competently regarding the diagnosis and treatment of gender dysphoria in children and adolescents..................................2

    A. Dr. Janssen is qualified to offer testimony regarding analysis of research studies concerning the treatment of gender dysphoria in children and adolescents. ...................................................................................................3

    B. Dr. Janssen is qualified to offer testimony regarding the evidence and methodological underpinning of the WPATH SOC-8. ........................................6

    C. Dr. Janssen is qualified to offer testimony regarding the source of gender identity. ........................................................................................................8

    D. Dr. Janssen is qualified to offer testimony on the psychological assessment of gender dysphoric youth in Alabama ..............................................................9

II. Dr. Janssen's testimony, including that regarding the source of an individual's gender identity, is reliable..................................................................................11

CONCLUSION....................................................................................................13

i

## INTRODUCTION

Dr. Janssen's testimony is qualified, reliable, and helpful. Still, Defendants seek to exclude portions of his testimony citing a general lack of "expertise" and claiming he has "no evidence whatsoever" for one of his opinions. ECF No. 598 at 1. The arguments are not persuasive and fail under the admissibility standards set by both the Supreme Court and the Eleventh Circuit. Defendants' motion should be denied.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. In determining the admissibility of expert testimony under Rule 702, courts engage in a three-part inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004); *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). These three considerations are known as

"qualification," "reliability," and "helpfulness." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

## ARGUMENT

**I.     Dr. Janssen is qualified to testify competently regarding the diagnosis and treatment of gender dysphoria in children and adolescents.**

Federal Rule of Evidence 702 allows an expert to be qualified "by knowledge, skill, experience, training, or education." Dr. Janssen is "five for five" in his qualifications to testify regarding the diagnosis and treatment of gender dysphoria in children and adolescents. *Moore v. Intuitive Surgical, Inc.*, 995 F. 3d 839, 857 (11th Cir. 2021).

After graduating with a medical degree from the University of Colorado School of Medicine, Dr. Janssen completed both a residency and subsequent fellowship in child and adolescent psychiatry at the New York University Langone Medical Center. (Janssen Rept. (*Daubert*.DX12) at 2). In 2011, Janssen founded the Gender and Sexuality Service at New York University, a clinical service dedicated to treating children and adolescents with gender dysphoria. *Id.* Since opening the clinic, Janssen has treated hundreds of children and adolescents with gender dysphoria. *Id.* at 3.

In addition to his medical practice, Dr. Janssen has written numerous peer-reviewed journal articles and chapters in professional textbooks about the treatment of gender dysphoria in children and adolescents and co-edited the first clinical

2

casebook on mental health treatment for children and adolescents with gender dysphoria. *Id.* at 3-4. Dr. Janssen is actively involved in training other healthcare providers in his area of expertise, training over one thousand medical and mental health professionals in the treatment of children and adolescents with gender dysphoria. *Id.* at 4. He is also a member of several well-respected professional medical organizations including the American Psychiatric Association (APA), American Academy of Child and Adolescent Psychiatry (AACAP), and World Professional Association for Transgender Health (WPATH). *Id.*

Finally, Dr. Janssen is a contributing author to the Child and Mental Health chapters of the Eighth Version of WPATH's *Standards of Care for the Health of Transgender and Gender Diverse People*, recognized as the prevailing standard of care by the major professional associations of medical and mental health providers in the United States. *Id.* at 3.

Dr. Janssen is "properly qualified as an expert by virtue of his extensive education, training and experience." *Quiet Tech.*, 326 F.3d at 1343.

**A. Dr. Janssen is qualified to offer testimony regarding analysis of research studies concerning the treatment of gender dysphoria in children and adolescents.**

Defendants first assert that Dr. Janssen is unqualified to critique Dr. Cantor's opinion that "no reliable evidence supports the use of puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria in minors." ECF No. 598 at 2. To

3

make this claim, Defendants point to Dr. Janssen's deposition and statements made that he "would not be testifying here as an expert in study design or methodology." *Id.* at 3. Defendants, however, mischaracterize Dr. Janssen's statements and erroneously broaden their scope of significance.

Dr. Janssen's extensive credentials in this field of medicine, detailed above, clearly demonstrate his vast knowledge, expertise, and experience reviewing, analyzing, and publishing research studies on the diagnosis and treatment of gender dysphoria in children and adolescents. *See* Janssen Depo. (SJ.DX66) at 68:23-69:4) ("[A]s somebody who went through adult psychiatry training and child psychiatry fellowship, learning how to critically review scientific literature is something that we are taught over the course of many years."). And as someone with expertise in the field of transgender health, Dr. Janssen, unlike Dr. Cantor, is even more qualified to assess research literature touching on his area of practice. *Id.* at 69:15-19 ("The capacity to pick out bias and analyze studies in an effective way is benefitted by individuals who have clinical and personal experience working with the patient populations that are being studied.").

Defendants manipulate Dr. Janssen's statements on his specific expert role in this case to then broadly assert that he "lacks expertise in assessing research studies" generally and thus cannot offer testimony that "analyzes published research literature." ECF No. 598 at 3. But by nature of his medical training and expertise

4

treating gender dysphoria, Dr. Janssen is eminently qualified to analyze and critique research literature. Not only does Dr. Janssen analyze research literature in deciding how best to treat his patients, but in preparation for writing the Child Chapter of WPATH SOC-8, Dr. Janssen "reviewed in a systematic way all of the extant literature on the impacts of gender care on childhood." (Janssen Depo. (SJ.DX66) at 58:12-14). That review included assessing studies for bias. *Id.* at 68:19-20.

Further, assessing bias in studies involves "not just the design of the study" but also "how the authors are funded, what is included [and] excluded, what are the patient populations, how are [patients] selected, how are [patients] reported on, how is the text describing what [the authors] are reporting on generated, are there funding sources that are questionable, and do the authors provide any sorts of conflict of interest disclosures that make you question whether or not the studies are valid." *Id.* at 70:9-18. Moreover, study design "does not involve utilization of the Delphi process or understanding of how to use the Delphi process in establish[ing] . . . consensus-based guidelines." *Id.* at 61:4-7.

With over four dozen published peer-reviewed articles, abstracts, and book chapters on the treatment of gender dysphoria in young persons, it "is difficult to imagine how Dr. [Janssen's] experience [can be] more extensive and relevant" to the assessment of *any* medical research studies. This is all the more true with regard to his experience in and knowledge of the field of transgender healthcare. *Adams v.*

5

*Lab. Corp. Of Am.*, 760 F.3d 1322, 1330 (11th Cir. 2014); *see also United States v. Williams*, 865 F.3d 1328, 1339 (11th Cir. 2017) (holding that a witness was qualified to interpret data because he received extensive training on how to interpret that data and had years of experience interpreting data); *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1312 (11th Cir. 2000) (affirming trial court's conclusion that experts were qualified because they "had conducted research, published in peer-reviewed journals and treated hundreds of patients . . . .").

### B. Dr. Janssen is qualified to offer testimony regarding the evidence and methodological underpinning of the WPATH SOC-8.

Defendants next assert that Dr. Janssen is unqualified to testify on "anything relating to the drafting of the WPATH SOC-8 other than limited aspects of the two chapters he was involved in . . . .." ECF No. 598 at 8 (emphasis removed). In doing so, Defendants try to preclude any of Dr. Janssen's testimony that might shed light on the drafting process behind what Defendants describe as "the most pertinent to this case – the adolescent chapter…." *Id.* at 7. But in their same motion, Defendants make abundantly clear that they are challenging the rigor of WPATH SOC-8 *in its entirety*. *See* ECF No. 598 at 4 ("WPATH's SOC-8 is an unreliable, ideologically motivated document that transgress the principles of evidence-based medicine."). Furthermore, in their Motion for Summary Judgment, Defendants point to alleged deficiencies in the drafting process that are wholly unrelated to the adolescent chapter—indeed unrelated to any medical care at issue in this case—as part of their

6

criticism of the overall reliability of WPATH SOC-8. *See* Defs.' Mtn. for Summary Judgment at 15 (ECF No. 619-35) (pointing to WPATH SOC-8's chapter on eunuchs to "drive home how unscientific the enterprise was").

Defendants can't have it both ways, arguing on one hand that the reliability of SOC8 overall is called into question by the process by which a discrete recommendation not at issue in this case was revised, while on the other hand arguing that chapters of WPATH SOC-8 bear no relationships to one another. Dr. Janssen played an active role in writing the WPATH SOC-8. The fact that he was not assigned to the adolescent chapter does not diminish the overall expertise he brings to elucidating the reliability of WPATH SOC-8 overall, nor does it diminish his expertise to opine on the methodological rigor in developing the standard. Dr. Janssen easily meets the standard to testify about all aspects of the SOC-8 drafting procedures that Defendants have put into issue; he is well qualified to do so.

WPATH deployed a standardized methodology across all SOC-8 chapters. (*See* SOC-8 (SJ.DX116) at S247) ("Drafts of the chapters were reviewed by the Chair and the Co-Chairs of the SOC Revision Committee to ensure the format was consistent, evidence was properly provided, and recommendations were consistent across chapters."). As a Chapter Member, Dr. Janssen was held to the same standards and processes as those involved in the adolescent chapter. This process included (1) participating in the development refinement of review questions, (2) reading and

7

providing comments on all materials from the Evidence Review Team, (3) critically reviewing draft documents, including the draft evidence report, (4) reviewing and assessing evidence and draft recommendations, (5) participating in the Delphi consensus process, (6) developing the text to back up the recommendation statements, (7) grading each statement to describe the strength of the recommendation, (8) reviewing and addressing the comments from the Chairs during the whole process, (9) developing the content of the chapters, (10) reviewing comments from public comments and assisting in the development of a revision of guidelines, and (11) providing input and participating in the dissemination of guidelines. *Id.* at S248. Thus, Dr. Janssen's experience as a WPATH committee member and lead author of two SOC-8 chapters permits him to testify broadly as to the rigorous drafting process of SOC-8.

### C. Dr. Janssen is qualified to offer testimony regarding the source of gender identity.

As a trained psychiatrist in the field of transgender healthcare, Dr. Janssen has expertise in diagnosing gender dysphoria in children and adolescents. That expertise, in addition to his research, literature review, and extensive experience treating this patient population, permits Dr. Janssen to offer his qualified opinion on the source of such gender dysphoria. Defendants' contrary assertion, that "as a psychiatrist" Dr. Janssen is unqualified to claim "[g]ender identity has a biological basis,"

8

fundamentally misunderstands the expertise and training of psychiatrists in the field of transgender healthcare. ECF No. 598 at 8.

For psychiatrists treating patients with gender dysphoria, in order to "capture the essence of an individual's experience, [they] have to understand the *biological*, psychological, and social factors that influence the experience of whatever distress is leading the patient to seek care." (Janssen Depo. (SJ.DX 66) at 97:1-6) (emphasis added). For Dr. Janssen, to properly make a diagnosis of gender dysphoria, his "job" is to "understand the individual's identity in the context of biopsychosocial factors." *Id.* at 110:2-5. Only after Dr. Janssen has completed a "biopsychosocial" analysis can he "make a diagnosis and a treatment plan that is effective for the specific needs of that individual patient." *Id.* at 116:5-10.

As the "diagnosis of gender dysphoria is inherently based on the incongruence between sex assigned at birth and [gender] identity," Dr. Janssen has the requisite expertise, knowledge, and experience to comment on the biological source of gender identity. *Id*. at 116:15-17. Defendants' lack of familiarity concerning the expertise of psychiatrists trained to treat and diagnose gender dysphoria should not preclude Dr. Janssen from offering his opinion on the source of gender identity.

### D. Dr. Janssen is qualified to offer testimony on the psychological assessment of gender dysphoric youth in Alabama

As an expert, Dr. Janssen "is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*,

9

509 U.S. at 592. This "relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*

Defendants concede that Dr. Janssen is qualified to offer testimony on "what psychological assessments of gender dysphoric youth should look like." ECF No. 598 at 10-11. This expertise includes working and speaking with a large number of mental health providers across the country treating gender dysphoria, as well as training over 1,000 medical and mental health professionals in the treatment of children and adolescents with gender dysphoria. (Janssen Rept. (*Daubert*.DX12) at 4; Janssen Depo. (SJ.DX66) at 127:6-8).

"[T]he vast majority of mental health providers in the country . . . follow the WPATH standards of care." (Bowers Depo. (SJ.DX18) at 271:1-3 (sealed))[1]. This includes practitioners in Alabama. (*See* Austin Dep. (SJ.DX37) at 58:7-8 (sealed)) (citing WPATH as the standards of care the UAB Pediatric Gender Clinic follows). As an expert in the diagnosis and treatment of youth gender dysphoria, and an author of WPATH's standards of care, Dr. Janssen is sufficiently qualified to offer opinions during trial on the practice of care in Alabama based on his review of other

---

[1] While the Bowers and Austin Deposition transcripts were submitted by Defendants under seal, Private Plaintiffs have not redacted the citations above. The parties agree that those narrow excerpts do not constitute Confidential Information as defined under the Stipulated Protective Order (ECF No. 137).

witnesses' testimony in this case. While this Court can assess the reliability and strength of his testimony in light of his credentials and experience, there is no basis to exclude his testimony on the topic.

## II. Dr. Janssen's testimony, including that regarding the origins of an individual's gender identity, is reliable.

To the extent the State challenges the reliability of Dr. Janssen's testimony regarding the origins of a person's gender identity, "[d]efendants' objections plainly go to the weight and sufficiency of [Dr. Janssen's] opinions rather than to their admissibility." *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001).

In attacking the reliability of his opinion concerning the origins of an individual's gender identity, Defendants incorrectly claim that Dr. Janssen "does not provide any data or specific studies to support his opinion." ECF No. 598 at 8. In contrast, Dr. Janssen includes several papers and articles in the appendix of his expert report that provide empirical evidence demonstrating that gender identity is deep-seated and impervious to external influences. (*See* Janssen Rept. (*Daubert*.DX12) at 31-32). These reports demonstrate the deep-seatedness of a person's gender identity as well as the severe psychological and social harms associated with practices that attempt to change or alter gender identity. They plainly relate to the origins of a person's gender identity.

This opinion is also in line with Dr. Janssen's vast personal and clinical experience working "with countless adolescents . . . who . . . have made every attempt

possible to [alter their gender identity], and yet the identity persists." (Janssen Depo. (SJ.DX66) at 106:4-8. And Dr. Janssen has co-authored peer reviewed publications recognizing that the development of gender development is a complex process involving a variety of factors that include biological elements. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (listing "peer review and publication" as "a relevant . . . consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.").

Thus, based upon his "clinical experience and a review of the literature", Dr. Janssen offers his expert opinion that "there is an innate component of gender identity that is relatively fixed." (Janssen Depo. (SJ.DX66) at 105:9-12, 99:23-100:7). Dr. Janssen "formed [his] opinion by using reliable tools, applying an established body of medical knowledge, and drawing on [his] extensive experience in the field." *Adams*, 760 F.3d at 1330. Moreover, Dr. Janssen, "[a]s a scientist", based his opinions on a "preponderance of the evidence." (Janssen Depo. (SJ.DX66) at 31:4-7). This is the appropriate reliability standard that *Daubert* deems admissible. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.").

## CONCLUSION

For the reasons set forth above, Dr. Janssen's challenged testimony is admissible. If Defendants wish to refute the persuasiveness of Dr. Janssen's opinions, they can do so through "[v]igorous cross examination" and "presentation of contrary evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). At the pre-trial *Daubert* stage, however, it "is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341. Defendants' motion to exclude should be denied.

Respectfully submitted this 12th day of August 2024.

*/s/ Melody H. Eagan*
Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt
Adam Reinke
Misty L. Peterson
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309

Sarah Warbelow
Cynthia Weaver
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

Jennifer L. Levi
Sarah K. Austin
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
jlevi@glad.org
saustin@glad.org

| | |
|---|---|
| apratt@kslaw.com<br>mpeterson@kslaw.com<br>areinke@kslaw.com<br><br>Brent P. Ray<br>Abigail Hoverman Terry<br>KING & SPALDING LLP<br>110 North Wacker Drive, Suite 3800<br>Chicago, IL 60606<br>bray@kslaw.com<br>aterry@kslaw.com<br><br>Abby Parsons<br>KING & SPALDING LLP<br>1100 Louisiana Street<br>Houston, TX 77002<br>aparsons@kslaw.com<br><br>Scott D. McCoy<br>SOUTHERN POVERTY LAW CENTER<br>P.O. Box 12463<br>Miami, FL 33101<br>scott.mccoy@splcenter.org<br><br>Diego A. Soto<br>SOUTHERN POVERTY LAW CENTER<br>400 Washington Avenue<br>Montgomery, AL 36104<br>diego.soto@splcenter.org<br><br>*Counsel for Private Plaintiffs* | Jessica L. Stone<br>SOUTHERN POVERTY LAW CENTER<br>150 E. Ponce de Leon Ave., Suite 340<br>Decatur, GA 30030<br>jessica.stone@splcenter.org<br><br>Christopher F. Stoll<br>Amy E. Whelan<br>Rachel H. Berg<br>NATIONAL CENTER FOR LESBIAN RIGHTS<br>870 Market Street, Suite 370<br>San Francisco, CA 94102<br>cstoll@nclrights.org<br>awhelan@nclrights.org<br>rberg@nclrights.org |

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this case.

<i>/s/ Melody H. Eagan</i><br>
Counsel for Private Plaintiffs