# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | |
| Hon. Steve Marshall, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## PRIVATE PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. MEREDITHE McNAMARA

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

LEGAL STANDARD............................................................................................2

ARGUMENT .........................................................................................................2

I.  Dr. McNamara is qualified to offer expert opinions on the safety and efficacy of gender transition treatments for minors and on clinical practice in adolescent gender medicine. ..................................................................................................2

    A.  Academic Qualifications..........................................................................3

    B.  Clinical Experience .................................................................................5

    C.  Professional Experience ..........................................................................6

II. Defendants' critiques of Dr. McNamara's opinions do not render those opinions unreliable.............................................................................................................7

    A.   Dr. McNamara's opinions about the safety of gender transition treatments are reliable.................................................................................................8

    B.   Dr. McNamara offers a reliable opinion that there is international consensus in favor of gender transition treatments. ..........................................16

    C.   Defendants' remaining arguments for exclusion are unpersuasive. ..........18

CONCLUSION...................................................................................................20

## INTRODUCTION

Defendants' motion suggests that Dr. McNamara is an unqualified partisan witness making disinformation accusations against anyone who questions the safety of gender transition treatments. ECF No. 594 at 1. In reality, Dr. McNamara is a careful and thorough researcher dedicated to promoting rigorous scientific inquiry and protecting against the misuse of scientific research. To that end, she invites a "faithful engagement of risks, benefits, potential unknowns, and knowns" related to gender transition treatments for adolescents. SJ.DX59:96:1–20 (McNamara Dep.).[1] She does not accuse anybody who disagrees with her of engaging in science denialism. *Id.* at 210:7–211:4. But when she notices that legal and political actors are offering inaccurate statements about the medical condition of gender dysphoria, "misrepresent[ing] the standard of care" for treating gender dysphoria, making "false claims about risks associated with treatment," and misusing existing research in the field, she will counter those statements with accurate information. *Daubert*.DX4:1919 (McNamara et al., *Protecting Transgender Health*); *see also*

---

[1] *See also* SJ.DX59: 79:21–80:5 (McNamara Dep.) (indicating she does not consider researchers to be "science deniers" based on their statement that effects on brain development are unknown); *id.* at 85:5–15 (agreeing it's not "science denialism to say that . . . possible negative impacts on brain development and fertility should be considered"); *id.* at 95:9–25 (finding that researchers who make "measured and thoughtful comments" about potential risks and benefits of treatment are not engaging in science denialism); *id.* at 214:23–24 ("In general, I would always agree with the pursuit of even more rigorous research.").

*Daubert*.DX6:1 (McNamara et al., *Combatting Scientific Disinformation*). She is fully qualified to do so.

Dr. McNamara draws on her education, training, knowledge, and experience to explain why scientific evidence supports the use of puberty blockers and cross-sex hormones to treat gender dysphoria in adolescents, and to spell out how Defendants misuse the evidence when attempting to justify the Legislature's decision to criminalize those treatments. Because Dr. McNamara's opinions easily pass muster under Rule 702 and *Daubert*, the Court should deny Defendants' motion.

## LEGAL STANDARD

To avoid duplication, Plaintiffs respectfully refer the Court to the statement of the governing legal principles articulated in Plaintiffs' Opposition to Defendants' Motion to Exclude Selected Testimony of Dr. Aron Janssen.

## ARGUMENT

**I.    Dr. McNamara is qualified to offer expert opinions on the safety and efficacy of gender transition treatments for minors and on clinical practice in adolescent gender medicine.**

"Experts may be qualified in various ways," including by "knowledge, skill, experience, training, or education." *United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2014). Dr. McNamara's opinions are based on her "education, experience, and knowledge," *Daubert*.DX3:26 (McNamara Rep.), including her

"experience treating patients" and her knowledge of "a solid body of scientific evidence," *id.* at 25.

Defendants misrepresent Dr. McNamara's testimony by claiming that her clinical experience is the "lead basis" for her opinions. ECF No. 594 at 2. In fact, the vast majority of her initial report, supplemental report, and supplemental affidavit are dedicated to a rigorous academic analysis of relevant scientific and medical literature. *Id.* at 2–20, 22–24; SJ.PX19:3–16, 18–21 (McNamara Supp. Rep.); SJ.PX7 (McNamara Supp. Aff.). Dr. McNamara also draws on her clinical and professional experiences to contextualize her conclusions about the existing research in the field.

### A. Academic Qualifications

Dr. McNamara is a board-certified pediatrician and adolescent medicine physician. *Daubert*.DX3:2 (McNamara Rep.). She earned a medical degree and a master's degree in clinical research from Emory University, where she completed several courses in evidence-based medicine, biostatistics, epidemiology, study design, and research bioethics. SJ.DX59:9:15–23 (McNamara Dep.). She completed a pediatrics residency at the University of Chicago and a fellowship in adolescent medicine at the University of Illinois-Chicago. *Daubert*.DX3:2 (McNamara Rep.).

Today, Dr. McNamara is an Assistant Professor of Pediatrics at the Yale School of Medicine. *Id.* In that capacity, she has reviewed the literature on gender-

affirming care for adolescents and has published peer-reviewed research[2] and several peer-reviewed commentaries[3] on transgender health care. These publications appear in prestigious medical journals including the New England Journal of Medicine, the Journal of Pediatrics, and JAMA Pediatrics. In addition, Dr. McNamara has been invited to give peer-reviewed presentations at international symposia. *Daubert*.DX3:30–31 (McNamara Rep.). She has also served as a reviewer for several medical journals that publish research relevant to this litigation, including the Journal of Pediatrics, Transgender Health, and LGBTQ Health. *Id.* at 32.

Dr. McNamara's education, training, knowledge of scientific literature relating to the treatment of gender dysphoria in minors, and experience analyzing that literature for peer-reviewed publications easily qualify her to offer opinions on the relevant scientific literature and clinical practice guidelines . *See United States v. Williams*, 865 F.3d 1328, 1339 (11th Cir. 2017) (finding a witness qualified to interpret data because of his training and years of experience).

---

[2] SJ.DX59:11:19–12:10 (McNamara Dep.); Meredithe McNamara et al., *State-Level Bans on the Care of Transgender and Gender Diverse Youth in the United States: Implications for Ethics and Advocacy*, 274 J. Pediatrics 114182 (2024) (online ahead of publication, anticipated in November 2024), doi.org/10.1016/j.jpeds.2024.114182 (attached as Exhibit 1); *Daubert*.DX6 (McNamara et al., *Combatting Scientific Disinformation*).

[3] *Daubert*.DX3:33 (McNamara Rep.); *Daubert*.DX4 (McNamara et al., *Protecting Transgender Health*); *Daubert*.DX7 (McNamara et al., *Scientific Misinformation*); Christina Lepore et al., *Scientific Misinformation Is Criminalizing the Standard of Care for Transgender Youth*, 176 JAMA Pediatrics 965 (2022), doi.org/10.1001/jamapediatrics.2022.2959 (attached as Exhibit 2).

Defendants improperly attempt to undermine Dr. McNamara's expertise by identifying literature she did not comprehensively review in developing her opinions. *See* ECF No. 594 at 4–5. Some of Defendants' criticisms are misleading.[4] All of them are misplaced: Alleged methodological flaws in conducting an expert analysis do not bear on an expert's qualifications. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003).

## B. Clinical Experience

As a clinician, Dr. McNamara provides primary care to youth ages 12 to 25, including transgender patients. *Daubert*.DX3:2 (McNamara Rep.); SJ.PX19:9 (McNamara Supp. Rep.); SJ.DX59:18:21–19:12 (McNamara Dep.); *Daubert*.DX6:3 (McNamara et al., *Combatting Scientific Disinformation*). She has diagnosed gender dysphoria in patients over age 18. SJ.DX59:18:1–15 (McNamara Dep.). When minor patients report symptoms of gender dysphoria, she refers them to Yale's pediatric gender clinic for an assessment. SJ.DX59:17:12–25, 21:5–10 (McNamara Dep.). For

---

[4] For example, Defendants highlight Dr. McNamara's testimony that she not read the SOC8 chapter on treating children. ECF No. 594 at 4. But this testimony is irrelevant: Dr. McNamara only offers opinions regarding the treatment of adolescents, as her initial report makes clear. *See Daubert*.DX3:24–25 (McNamara Rep.); *see also id.* at 2, 6–7, 12–13, 15–16, 21, 23. Defendants also cite a statement by Dr. McNamara that she "would not endeavor to perform counseling on medications that [she herself] would not be prescribing or managing." ECF No. 594 at 5 (citing SJ.DX59:91:13–15 (McNamara Dep.)). But in context, this answer did not suggest that Dr. McNamara was incompetent to provide such counseling or otherwise to offer an opinion about the risks, benefits, and unknowns of gender transition treatments. Rather, she was responding to a line of questioning asking whether she provided such counseling to patients before even referring them to the pediatric gender clinic, SJ.DX59:89:7–11 (McNamara Dep.), and falsely suggesting that she intentionally and improperly withheld information about unproven risks to brain development before referring patients to the gender clinic, *id.* at 90:22–91:2.

both minor and adult patients, she remains the primary care physician, is familiar with her patients' overall health, and tracks their progress through the gender clinic. *Cf.* SJ.DX59:16:22–17:3, 21:11–22:18 (McNamara Dep.); SJ.PX19:9, 11, 12 (McNamara Supp. Rep.). This clinical experience qualifies Dr. McNamara to testify to matters relating to adolescent medicine, the intersection between primary care and gender transition care, and the general health of transgender patients aged 12 to 25.

Contrary to Defendants' suggestion, Dr. McNamara has never misrepresented her clinical experience. She has never claimed to provide gender transition treatments to minors. Rather, she accurately stated that she practices adolescent medicine and treats transgender youth. *See Daubert*.DX3:2 (McNamara Rep.); SJ.PX19:9 (McNamara Supp. Rep.); SJ.DX59:18:21–19:12 (McNamara Dep.); *Daubert*.DX6:3 (McNamara et al., *Combatting Scientific Disinformation*).

### C. Professional Experience

In addition to her familiarity with the relevant literature and her clinical experience, Dr. McNamara's professional experiences also qualify her to offer the challenged opinions. As a member of the Society for Adolescent Health and Medicine, which is the largest international organization of adolescent medicine specialists, she has developed ongoing professional relationships with adolescent gender medicine specialists. SJ.DX59:117:10–21 (McNamara Dep.). She has worked closely with specialists in the field, including gender clinic physicians at

6

Yale, in the course of coauthoring several academic publications. SJ.DX59:117:21–22 (McNamara Dep.).[5] And she has sought out providers from gender clinics outside of Yale to discuss their clinical practices. SJ.DX59:117:22–118:1, 183:17–25, 190:17–191:3 (McNamara Dep.). Dr. McNamara's collaborations with physicians who specialize in treating transgender adolescents provider further support for her testimony.

## II.   Defendants' critiques of Dr. McNamara's opinions do not render those opinions unreliable.

In evaluating reliability, courts may consider factors such as "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

In ruling on a *Daubert* motion, courts should not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341. Alleged weaknesses in admissible expert opinions can and should be exposed at trial

---

[5] *See, e.g.*, *Daubert*.DX6 (McNamara et al., *Combating Scientific Disinformation*) (listing Susan D. Boulware and Christy L. Olezeski among the coauthors); *Daubert*.DX7 (McNamara et al., *Scientific Misinformation*) (same); Boulware et al., *Biased Science in Texas & Alabama*, Yale School of Medicine (Apr. 28, 2022), https://medicine.yale.edu/lgbtqi/clinicalcare/gender-affirming-care/biased-science/ (same) (attached as Exhibit 3); SJ.DX59:17:12–15 (McNamara Dep.) (identifying Boulware and Olezeski as leading members of Yale's gender clinic).

through "vigorous cross-examination" and "presentation of contrary evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

## A. Dr. McNamara's opinions about the safety of gender transition treatments are reliable.

Relying on her education, training, and extensive knowledge of the scientific literature related to gender transition treatments for adolescents, Dr. McNamara analyzed the known benefits of such treatments, risks of such treatments, and risks of withholding such treatments. *Daubert*.DX3:6–9, 16–17 (McNamara Rep.) (benefits of treatment), 12–15 (strategies for mitigating risks), 15–20 (risks of withholding treatment and absence of alternative treatments); SJ.PX19:10–11, 16, 18–19, 25–30 (McNamara Supp. Rep.) (noting additional evidence of benefit). She also comprehensively explained how Defendants' experts and the Cass Review have mischaracterized the existing evidence base on these points. *See Daubert*.DX3:9–12, 17–20, 22–24 (McNamara Rep.); SJ.PX19:3–18 (McNamara Supp. Rep.); SJ.PX7 (McNamara Supp. Aff.). Based on this careful analysis of "what is known," *Daubert*, 509 U.S. at 590, Dr. McNamara reliably concluded that the treatments are safe for adolescents, *Daubert*.DX3:25 (McNamara Rep.), meaning that the benefits of treatment outweigh the risks. SJ.DX59:218:13–19 (McNamara Dep.). Even Defendants' experts agree that this is the proper method for assessing the safety of a medical treatment. *E.g.*, SJ.DX2:¶ 72 (Cantor Rep.) ("[T]he term safety in the clinical context represents a 'risk:benefit ratio,'" citing an FDA regulation).

In addition to being the product of a reliable methodology, Dr. McNamara's safety determination is generally accepted in the medical community. Indeed, both the Endocrine Society Guidelines and WPATH SOC8—the leading clinical practice guidelines in this field—recommend prescribing puberty blockers and cross-sex hormones to adolescents diagnosed with gender dysphoria in appropriate cases after analyzing the risks and benefits associated with such treatments. *See Daubert*.DX3:2–3 (McNamara Rep.); SJ.DX59:211:3–20, 212:5–213:20, 217:20–218:19 (McNamara Dep.); SJ.DX115:3870–71, 3874, 3879–85 (Endocrine Society 2017 Guideline); SJ.DX116:S45–47, S61, S64–66, S113–14, S117–19, S157–58 (SOC-8). Gender transition treatments for adolescents are also supported by major medical associations including the American Academy of Pediatrics, the American Psychological Association, and the American Academy of Child and Adolescent Psychiatry. *See Daubert*.DX3:3 (McNamara Rep.).[6]

---

[6] *See also* SJ.PX9:9 (Br. of Amici Curiae Am. Acad. Pediatrics et al., Doe v. Ladapo, No. 23-12159, Doc. 43); SJ.PX15:5–7, 10 (Prelim. Inj. Hrg. Pl. Ex. 32, ECF No. 78-32); SJ.PX16 (Prelim. Inj. Hrg. Pl. Ex. 23, ECF No. 78-23); American Psychological Association, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70 American Psychologist 832, 841–43 (2015), available at https://www.apa.org/practice/guidelines/transgender.pdf (attached as Exhibit 4); American Academy of Child & Adolescent Psychiatrists, *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. Am. Acad. Child & Adolesc. Psychiatry 957, 968–70 (2012), available at https://www.jaacap.org/action/showPdf?pii=S0890-8567%2812%2900500-X (attached as Exhibit 5).

*Potential risks related to brain development*. Defendants fault Dr. McNamara for refusing to offer opinions specifically about the impact of puberty blockers on human brain development. As an initial matter, even if this were a valid critique, it would not affect the admissibility of her opinion on the safety of puberty blockers. It would only go to the weight the Court accords her analysis of the risks and benefits associated with that medication. *See Quiet Tech.*, 326 F.3d at 1345 (quoting *Cummings v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2002)); *cf. id.* at 1346 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

In any event, Defendants' argument is misplaced. Although Defendants imply that "brain damage" is a near certainty, ECF No. 594 at 12, the record does not support that assertion. SJ.DX115:3882 (Endocrine Society 2017 Guidelines); *see also* ECF No. 594 at 8 (any potential consequences are "as yet unidentified" (quoting the Cass Review, SJ.DX84:178)). Available data is both limited and mixed. SJ.DX115:3883 (Endocrine Society 2017 Guidelines). The existence of potential but unproven risks is not unique to puberty blockers, nor does it render any given medication unsafe. As Dr. McNamara credibly testified, "[t]here is a great deal that is known and unknown, as is the case in many different domains of medicine." SJ.DX59:77:17–19 (McNamara Dep.).

The existing evidence supports Dr. McNamara's conclusion that puberty blockers can be safely administered to transgender adolescents. Defendants point to "two small studies [that] observed a significant decline in IQ in subjects who received puberty blockers across multiple years of adolescence," citing an article published by Dr. Sally Baxendale. ECF No. 594 at 8 (citing SJ.DX154 (Baxendale, *Neuropsychological Function*)). As Dr. McNamara explained at her deposition, one of these studies could not be reliably applied to transgender adolescents because it concerned a different patient population and therefore could not account for expected effects of gender dysphoria on cognitive development. SJ.DX59:112:15–22 (McNamara Dep.); *see also id.* at 75:5–77:2 (untreated gender dysphoria may harm cognitive development). The other study Baxendale noted was a case report from which no conclusions can be drawn—as counsel for Defendants recognized at Dr. McNamara's deposition. SJ.DX59:109:24–112:6 (McNamara Dep.). While these studies, like most scientific studies, raise questions for further research, they do not make Dr. McNamara's opinion unreliable.[7]

In addition, since her deposition, Dr. McNamara has coauthored an academic report that specifically addresses concerns about hypothetical risks to brain

---

[7] It is generally accepted in the community of gender medicine experts that hypothetical risks to brain development do not render puberty blockers unsafe. *See* SJ.DX115:3880–83 (Endocrine Society 2017 Guideline) (Endocrine Society recommends puberty blockers despite unknown effects on brain development); SJ.DX116:S61 (SOC-8) (SOC8 recommends puberty blockers if informed consent and assent are obtained regarding the "limits of what is known" about treatment, including "the impact of pubertal suppression on brain development").

development, in response to the recently released Cass Report. *See* SJ.PX7, Appendix A at 24–26 (McNamara Supp. Aff.). The report notes evidence that teenagers receiving puberty blockers had "intelligence quotient[s] and educational achievement" similar to a control group of teenagers not receiving those medications, which suggests a neutral effect on cognitive functioning. *Id.* at 25. It also cites scientific studies showing that puberty blockers "have long been used for central precocious puberty without negative impact on cognitive development." *Id.* This evidence supports Dr. McNamara's conclusion that any risks of puberty blockers are outweighed by their benefits.

The record does not support Defendants' suggestion that Dr. McNamara lacks knowledge of the literature concerning potential effects of puberty blockers on brain development. At her deposition, Dr. McNamara testified that she had read the studies cited by Defendants. *See* SJ.DX59:66:19–67:9 (McNamara Dep.) (Chen Consensus Parameter, SJ.DX62), 82:13–21 (de Vries, SJ.DX62), 97:4–11 (Baxendale, SJ.DX62). But when asked to opine on untested hypotheses and specific questions that have not been answered even by leading experts in neuropsychology,[8] Dr. McNamara appropriately declined to respond. *See* SJ.DX59:88:12–19 (McNamara Dep.) (time frame during which effects on brain development would be observed),

---

[8] *See* SJ.DX62:39 (Baxendale systematic review) ("[T]here have been no human studies to date that have systematically explored the impact of these treatments on neuropsychological function with an adequate baseline and follow-up.").

104:5–105:2 (reversibility of any effects on brain development). She also appropriately refused to apply findings from animal studies to the human brain. *See id.* 54:2–20, 105:3–14. Her refusal to engage in baseless speculation on these subjects reinforces rather than undermines her expertise and professional integrity.[9]

   *Potential risks relating to fertility.* Next, Defendants challenge Dr. McNamara's opinions that the impact of puberty blockers on fertility is reversible if treatment is discontinued, *Daubert*.DX3:13–14 (McNamara Rep.), and that the effect of cross-sex hormones on fertility can be reversible, *id.* at 14–15. But Dr. McNamara relied on ample scientific evidence in reaching these conclusions. Regarding puberty blockers, Dr. McNamara cites evidence that "pubertal progression," including ovulation and spermatogenesis, resumes after puberty blockers are stopped, *see id.* at 13 n.34, which supports the conclusion that effects on reproductive potential are not permanent.[10] *See* SJ.DX59:136:19–137:4 (McNamara Dep.). Regarding cross-sex hormones, Dr. McNamara cites evidence

---

[9] *Cf., e.g.*, *Chapman v. P&G Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (noting "'there is no fit where a large analytical leap must be made between the facts and the opinion,' such as proffering animal studies concerning a type of cancer in mice to establish a different cancer in humans" (citing *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004))).

[10] *See, e.g.*, Sabine Heger et al., *Long-term GnRH agonist treatment for female central precocious puberty does not impair reproductive function*, 254–55 Molecular Cell Endocrinology 217 (2006), doi.org/10.1016/j.mce.2006.04.012 (finding no impairment of reproductive function in natal females eight to 16 years after discontinuation of puberty blockers) (attached as Exhibit 6); Silvano Bertelloni et al., *Final height, gonadal function and bone mineral density of adolescent males with central precocious puberty after therapy with gonadotropin-releasing hormone analogues*, 159 European J. Pediatrics 369 (2000), doi.org/10.1007/s004310051289 (finding resumption of gonadal function for natal males after discontinuation of puberty blockers) (attached as Exhibit 7).

that natal females can resume menses and become pregnant after discontinuing testosterone, *see Daubert*.DX3:14 n.38 (McNamara Rep.),[11] and that natal males can maintain fertility while taking cross-sex hormones or regain fertility after discontinuing hormone therapy, *id.* at 14–15 n.39–40. She also appropriately notes the opportunities for fertility preservation for some transgender adolescents, which mitigates the potential risk of future infertility. *See id.* at 15; *see also* SJ.DX116:S57, S61 (SOC-8) (healthcare providers should discuss fertility preservation as part of the informed consent process for adolescents and their parents).

Defendants' motion implicitly criticizes the studies cited by Dr. McNamara. ECF No. 594 at 5 (citing SJ.DX59:135:11–18, 146:1–147:4 (McNamara Dep.)). But "objections to the inadequacies of a study" go "to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d1190, 1193 (11th Cir. 2011) (quoting *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)). Defendants also fault Dr. McNamara for not doing an in-depth analysis of the literature on long-term, population-wide fertility outcomes among these patients. ECF No. 594 at 5 (citing SJ.DX59:135:11–18, 146:1–147:4 (McNamara Dep.)). But such critiques do not make her overall opinion on safety inadmissible; Defendants

---

[11] Another recent publication coauthored by Dr. McNamara cites additional evidence. *See* SJ.PX18:25 nn.103–05 (Boulware et al., *Biased Science*).

can address these alleged issues on cross-examination at trial. *See Quiet Tech.*, 326 F.3d at 1341, 1345–46.

Defendants' critiques also suffer from an even more fundamental problem. Although Defendants point to three instances in which Dr. McNamara declined to answer specific questions related to fertility, *see* ECF No. 594 at 11 (citing SJ.DX59:135:11–18, 140:15–141:6, 146:1–147:4 (McNamara Dep.)), they do not mention that the answers to those questions are unknown.[12] Dr. McNamara's refusal to testify beyond the scope of the available data makes her testimony more reliable, not less. Indeed, if the existence of unproven risks necessarily made a treatment unsafe, as Defendants suggest, then it would be impossible to identify safe treatments in "many different domains of medicine." SJ.DX59:77:17–19 (McNamara Dep.).

At bottom, Defendants seek to exclude Dr. McNamara's thorough, evidence-based analysis of safety because she did not give dispositive weight to unproven risks of treatment. But her decision was entirely appropriate and only enhances the

---

[12] *See* SJ.DX65:39 (de Nie study) (stating that "it is unknown if spermatogenesis can recover if GAHT is stopped"); SJ.DX116:S157 (SOC-8) (stating with respect to natal females that "there have been no prospective studies to date evaluating the effect of long-term hormone therapy on fertility (i.e., started in adolescence) or in those treated with GnRHas in early puberty followed by testosterone therapy"); *id.* at S158 (stating with respect to natal males that "[s]permatogenesis might resume after discontinuation of prolonged treatment with anti-androgens and estrogens, but data are limited"); SJ.DX115:3880 (Endocrine Society 2017 Guideline) (stating that "[r]estoration of spermatogenesis after prolonged estrogen treatment has not been studied," and "the effect of prolonged treatment with exogenous testosterone on ovarian function is uncertain").

reliability of her opinions. At most, Defendants' arguments bear on the persuasiveness of Dr. McNamara's conclusions, not their admissibility. *See Quiet Tech.*, 326 F.3d at 1341.

### B. Dr. McNamara offers a reliable opinion that there is international consensus in favor of gender transition treatments.

In concluding that international consensus exists in favor of providing gender transition treatments to transgender adolescents in appropriate cases, Dr. McNamara relied on the Endocrine Society Guidelines and WPATH SOC8, and their reputation as "leading guidelines". *Daubert*.DX3:2 (McNamara Rep.). She noted that the Endocrine Society is "the leading international organization of endocrinologists," and WPATH is a "leading international organization of scientists and other professionals" in the field of gender medicine. *Id.* at 2–3. She also indicated that WPATH SOC8 itself necessarily reflected consensus, given the methods by which it was developed, including its rigorous systematic reviews, its peer review process, and the participation of more than 100 authors. *Id.* at 3. The text of SOC8 confirms as much, stating that all recommendations were made according to a consensus of at least 75% of authors. *See* SJ.DX116:S250 (SOC-8).  In addition, Dr. McNamara's finding of consensus was bolstered by the fact that major medical organizations support gender transition treatments, *see Daubert*.DX3:3 & n.6 (McNamara Rep.), and some cite favorably to the WPATH standards and Endocrine Society Guidelines in their own policy statements, *see, e.g.*, SJ.PX15:4 n.35, 6–7 (Prelim. Inj. Hrg. Pl.

Ex. 32, ECF No. 78-32). *See also* SJ.DX59:180:20–182:3 (McNamara Dep.) (Dr. McNamara credibly testifying that in her expert opinion, the citations constituted an endorsement in context).[13]

Defendants argue that some European countries depart from SOC8 and the Endocrine Society Guidelines. Of course, those countries do not ban gender transition treatments for adolescents.[14] Regarding England, Dr. McNamara has demonstrated that the Cass Report is consistent with WPATH SOC8 in some respects and unreliable in others. *See* SJ.PX7 (McNamara Aff.). Nevertheless, the practices of select countries do not render inadmissible Dr. McNamara's opinion that an international consensus exists; they simply bear on the weight of the evidence. Defendants may present any admissible contrary evidence at trial. *See Quiet Tech.*, 326 F.3d at 1341.

Defendants also incorrectly claim that Dr. McNamara offered unreliable testimony about the import of the Dahlen systematic review. In fact, her testimony

---

[13] As of today, at least 22 major medical associations have endorsed WPATH SOC8 and the Endocrine Society Guidelines in official court filings before the Eleventh Circuit. *See* SJ.PX9:8–9 (Br. of Amici Curiae Am. Acad. Pediatrics et al., *Doe v. Ladapo*, No. 23-12159, Doc. 43).

[14] *See* SJ.DX25:43:¶ 63, 44:¶ 66 (Karasic Rebuttal Rep.) (sealed); SJ.DX103:3–4 (Swedish research reviews and recommendation that providers follow the Dutch protocol); SJ.DX107:2–3 (Finland Summary); SJ.DX108:11–12 (Finnish recommendations); SJ.DX25:43:¶ 64 (Karasic Rebuttal Rep.) (sealed) (England); SJ.DX18:247:10–12, 248:1–3, 248:8, 248:12–19, 250:3–19 (Bowers Dep.) (sealed) (England); SJ.PX6:28–29:¶38 (Antommaria Rebuttal Rep.) (England); SJ.USX23:197:22–198:3 (Cantor Dep.) (sealed) (England). Defendants purport to identify Scotland as a sixth country restricting the banned treatments, but Scotland continues to provide puberty blockers and cross-sex hormones to existing patients. *See* SJ.DX111 (Scotland Policy); SJ.DX112 (Ghorayshi, *Scotland*).

was entirely accurate. That review did not conclude that WPATH SOC8 was unreliable; it reviewed a previous, less rigorous version of the WPATH standards, SOC 7. *Daubert*.DX8:6 (Dahlen et al., *International Clinical Practice Guidelines*). It also did not unanimously rate the Endocrine Society Guidelines as "do not use." *Id.* at 6–7. Further, Dr. McNamara correctly explained that the AGREE II instrument used by Dahlen cannot validate the scientific evidence or clinical recommendations made in a guideline; it simply assesses the guideline's methodology and transparency. *See Daubert*.DX3:4 (McNamara Rep.); *see also* SJ.DX69:11:17–13:9 (Lightdale Dep.); SJ.DX76:69 (AGREE paper). Defendants may explore these matters on cross-examination, as Dr. McNamara's opinion is plainly admissible.

### C. Defendants' remaining arguments for exclusion are unpersuasive.

Defendants also seek to exclude Dr. McNamara's opinion that WPATH SOC8 and the Endocrine Society Guidelines are "evidence-based," ECF No. 594 at 16; that randomized-controlled trials of gender transition treatments would be unethical, *id.* at 17; and any opinion relating to clinical practice related to the treatment of gender dysphoria, *id.* at 17–18. Dr. McNamara offers reliable opinions on each point.

First, as explained above, Dr. McNamara's evidence-based analysis of the safety of gender transition treatments is based on her education and training in evidence-based medicine, as well as her extensive knowledge of the scientific literature related to gender transition treatments for adolescents. The fact that her

evidence-based analysis of that literature led to the same general conclusions as the WPATH SOC8 and Endocrine Society Guidelines is more than sufficient to support a reliable conclusion that both guidelines are evidence-based. Her application of the National Academy of Science's standards for guideline development to WPATH's process only reinforces the validity of that determination. *See Daubert*.DX3:3 (McNamara Rep.).

Second, Dr. McNamara relied on "two years of training in clinical research," including a course on "research bioethics," in developing her opinion about the ethics of randomized-controlled trials in this context. SJ.DX59:9:15–19 (McNamara Dep.). And her evidence-based analysis of the risks and benefits of gender transition treatments provides a more than adequate basis for her opinion that clinical equipoise does not exist, making a randomized-controlled trial unethical and inappropriate. *See Daubert*.DX3:21 (McNamara Rep.). Any claimed weaknesses in that analysis do not support exclusion. Rather, they can be explored at trial through "vigorous cross-examination" and "presentation of contrary evidence." *Quiet Tech.*, 326 F.3d at 1341.

Finally, Dr. McNamara's opinions about the requirements of the governing clinical practice guidelines—including the requirements of informed consent and assent—are reliably based on her understanding of those guidelines. *See, e.g.*, *Daubert*.DX3:5–6 (McNamara Rep.); SJ.DX59:118:1–3 (McNamara Dep.). And

her opinions about clinical practice are based in part on her professional experiences and frequent communications with coworkers, coauthors, and gender medicine specialists. As she has testified, these colleagues carefully counsel their patients about the risks and benefits of treatment before prescribing medication, and they utilize WPATH SOC8 and the Endocrine Society Guidelines. SJ.DX59:117:10–118:3, 183:17–25, 187:6–11 (McNamara Dep.). Dr. McNamara's opinions also rely on scientific literature. For example, she testified that "the literature shows that youth often experience long delays from their first contact with the gender clinic until receipt of medication." *Id.* at 190:3–16. This combination of consultation with practitioners and knowledge of scientific literature are sufficient to establish the threshold reliability required by *Daubert*.[15]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to exclude selected testimony of Dr. Meredithe McNamara.

---

[15] Dr. McNamara does not offer any opinions on prevailing practices in Alabama. *See* SJ.DX59:19:20–24, 183:7–16 (McNamara Dep.). Defendants do not challenge the reliability of her opinions regarding her own clinical practice. *See* SJ.PX19:9, 11, 12, 16 (McNamara Supp. Rep.).

Respectfully submitted this 12th day of August 2024.

/s/ Melody H. Eagan

Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT, FRANKLIN &
WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt
Adam Reinke
Misty L. Peterson
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite
1600
Atlanta, GA 30309
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com

Brent P. Ray
Abigail Hoverman Terry
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
bray@kslaw.com
aterry@kslaw.com

Abby Parsons
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002
aparsons@kslaw.com

Sarah Warbelow
Cynthia Weaver
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

Jennifer L. Levi
Sarah K. Austin
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
jlevi@glad.org
saustin@glad.org

Jessica L. Stone
SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
jessica.stone@splcenter.org

Christopher F. Stoll
Amy E. Whelan
Rachel H. Berg
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

Scott D. McCoy
SOUTHERN POVERTY LAW
CENTER
P.O. Box 12463
Miami, FL 33101
scott.mccoy@splcenter.org

Diego A. Soto
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
diego.soto@splcenter.org

*Counsel for Private Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of August 2024, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to counsel of record in this case.

/s/ Melody H. Eagan
Counsel for Private Plaintiffs