# **<u>EXHIBIT 1</u>**



# State-Level Bans on the Care of Transgender and Gender Diverse Youth in the United States: Implications for Ethics and Advocacy

Meredithe McNamara, MD, MSc[1], Katherine R. Gentry, MD, MA[2,3], Gina M. Sequeira, MD, MS[4,5], and Kacie M. Kidd, MD, MS[6]

Legal policies that interfere with health care, as is the case with bans on gender-affirming care, merit consideration with a bioethical lens. In this Commentary, we argue for a framework based on principlism that considers government as a public health entity that should adhere to bioethics and assess its policies accordingly. Since there is substantial misinformation related to gender-affirming care, its history, and evidence base,[1] a brief overview is necessary to explore the bioethical implications of bans on this care.

Transgender and gender diverse (TGD) people experience a gender identity different from their sex assigned at birth. Some may experience gender dysphoria, meaning distress that arises from the discordance between gender identity and sex assigned at birth. Gender affirming care (GAC) for TGD people describes psychological and medical interventions that affirm an individual's gender identity.[2] Medical interventions include gonadotropin-releasing hormone agonists (commonly called "puberty blockers" and referred to with the abbreviation "GnRHas") and gender-affirming hormones (estradiol and testosterone).[2,3]

A growing body of short- and medium-term observational studies has demonstrated that TGD adolescents who receive GAC in accordance with World Professional Association for Transgender Health (WPATH) or Endocrine Society guidelines experience lower rates of depression, anxiety, and suicidality, and improved quality of life.[2-11] GAC has been variably accessible in the United States for the past 2 decades; thus, studies on long-term outcomes in this country are limited.

TGD individuals, including youth, have sought GAC since the 1930s, when it first became available.[12] Clinicians began formally offering GAC in health care settings on an extremely selective basis in the 1960s. More often, at that time, TGD individuals were subjected to a form of psychotherapy that aimed to force them to deny their gender identity,[13] which was harmful and not successful in improving health for TGD individuals.[14] In the 1990s, the Dutch Protocol was introduced for TGD youth, which derived its model from treatment of precocious puberty with gonadotropin-releasing hormone agonists.[2] WPATH produced the first set of clinical practice guidelines on the care of youth in 1998 and the Endocrine Society followed in 2011.[2,4] Both organizations use well-regarded methods for developing and updating their guidelines based on evidence assessment and consensus development.[2,4] Such methods are widely used to create guidelines in most fields of medicine. These GAC guidelines describe a multidisciplinary, individualized, and family-centered approach for TGD youth that is rooted in informed consent from parents and assent from youth.[2,4] GAC has been endorsed by major medical organizations as best practice for TGD youth.[5,15]

Nearly half of US states have passed legislation banning medical and surgical aspects of GAC since 2020,[16] which directly affects approximately 156 500 TGD youth.[17] Provisions within the 23 existing GAC bans (at the time of this writing) vary state by state.[16] Some ban the initiation of GnRHas and/or hormones, while others force clinicians to stop prescribing these medications for all adolescents currently receiving them.[16,17] Some include aiding and abetting clauses that punish individuals who help TGD youth obtain care out-of-state.[16,17] Others compel clinicians to share biased information about GAC with their patients and their families.[17-19] Some contain language that equates GAC with child abuse and threaten removal of TGD youth from their parents' care.[17] Many GAC bans are being challenged in courts and most judges have ruled that these bans are unconstitutional.[17] The current sociopolitical climate around TGD youth and GAC, likely amplified by GAC bans and associated rhetoric, exacerbates challenges and distress for TGD youth, their families, and their clinicians.[20,21]

These legislative efforts have occurred despite wide recognition of the disparities faced by TGD people. Like other systemically marginalized groups, TGD people, including adolescents, face stark inequities. TGD adolescents experience higher rates of bullying, violence, discrimination, and sexual assault than their cisgender peers.[22] Of the 1 in 25 youth experiencing homelessness, approximately 40% identify as lesbian, gay, bisexual, transgender, or queer.[23] TGD adolescents are overrepresented in foster care systems due to familial rejection.[24] TGD people of all ages experience higher rates of substance use disorder, and housing and

| | |
|---|---|
| APHA | American Public Health Association |
| GAC | Gender affirming care |
| TGD | Transgender and gender diverse |
| WPATH | World Professional Association for Transgender Health |

From the ¹Department of Pediatrics, Yale School of Medicine, New Haven, CT; ²Department of Anesthesiology & Pain Medicine, University of Washington School of Medicine, Seattle, WA; ³Seattle Children's Hospital, Treuman Katz Center for Pediatric Bioethics and Palliative Care, Seattle, WA; ⁴Department of Pediatrics, Seattle Children's Hospital, Seattle, WA; ⁵Department of Pediatrics, University of Washington School of Medicine, Seattle, WA; and ⁶Department of Pediatrics, West Virginia University School of Medicine, Morgantown, WV

0022-3476/$ - see front matter. © 2024 Elsevier Inc. All rights reserved, including those for text and data mining, AI training, and similar technologies.
https://doi.org/10.1016/j.jpeds.2024.114182

employment discrimination, and are more likely to engage in underground economics such as sex and drug work.[25] TGD adolescents also face structural barriers that limit their access to mental health care,[26] with about 60% reporting inability to obtain care despite 1 in 5 attempting suicide in the past year.[27]

These bans, we believe, are therefore not only unresponsive to the needs of TGD youth and in opposition to the growing outcome data, but also violating core principles of respect for persons, beneficence, and justice in addition to the tenets of public health ethics. In this Commentary, we describe the compounded ways we find that GAC bans conflict with core bioethical principles through interference with the clinician-patient relationship, imposition of moral injury on those who seek to provide this care, and propagation of bioethical violations at a population level. Given the degree to which government and public officials now regulate the availability and delivery of health care in the US, as evinced by GAC bans, we conceptualize government as a public health entity and examine these policies through the lens of public health ethics. We conclude that GAC bans violate several core bioethical values, with harms magnified on a population scale. When government exerts controlling influences over the availability and delivery of evidence-based health care, we assert that government should be held to the same ethical standards that are expected of clinicians and public health systems.

## Violation of Bioethical Principles

In forcing clinicians to withhold medical care that is in line with the current medical evidence, GAC bans compel them to violate bioethical principles of respect for persons, beneficence, and nonmaleficence. GAC bans disregard the emerging autonomy of TGD youth and the rights of parents to make sound medical decisions in partnership with their minor children and their child's clinician. Further, some GAC bans have been accompanied by state-sanctioned privacy breaches that serve as a coercive force within the realm of clinician-patient relationships and medical decision-making. Regarding beneficence and nonmaleficence, clinicians and parents who have reported marked improvement in mental health and wellbeing when TGD adolescents receive GAC are deeply concerned that the lack of access to GAC will harm TGD youth.[21,22]

### Emerging Autonomy and Informed Consent

Adolescence is marked by emerging autonomy that clinicians support by involving adolescents and parental figures in medical decision-making.[28-30] When parents and adolescents are aligned on a medical decision, they form a functionally autonomous unit that can provide informed consent through a combination of parental consent and adolescent assent.[30] According to guidelines from WPATH and the Endocrine Society, informed consent guides the provision of GAC.[2,4] When TGD youth and their parents reflect on the decisional processes undertaken on when and how to pursue GAC, they recount long-considered decisions that are not endpoints but rather, are part of a longitudinal journey.[31]

Where GAC presents a range of options that can be explored and pursued in an individual way, the banning of GAC is a "one-size-fits-all" approach. State governments that enact GAC bans position themselves before both parents and adolescents as the unilateral medical decision maker for patients they have no capacity to evaluate. This disregards the emerging autonomy of TGD adolescents.

Emerging autonomy and informed consent are further violated under GAC bans containing specific provisions that infringe on clinicians' professional speech. Aiding and abetting provisions punish clinicians who provide comprehensive information about gender dysphoria, treatment options, or information about how to obtain care in another state.[17] These restrictions on professional speech infringe upon informed consent by restricting free sharing of information. In some states, new regulations require that clinicians overemphasize the potential health harms of gender-affirming hormones and GnRH agonists when counseling patients.[17-19] This constitutes manipulation of information, a related form of a controlling influence that also undermines respect for persons and the legitimacy of informed consent. Concerningly, there is no consistent judicial practice on the professional speech of clinicians that protects patients' ability to receive complete, accurate information. While Florida's 2011 law prohibiting clinicians from asking about gun ownership was overturned,[32] abortion gag rules that require clinicians to provide inaccurate or misleading information about procedure risks have not yet been eliminated from the reproductive health landscape, and should also be evaluated for their adherence to bioethical principles and avoidance of exacerbating inequities.

### Confidentiality and Privacy

State-sanctioned investigations and breaches of privacy are coercive in that they can dissuade TGD individuals from seeking GAC. Some states have violated privacy rights of TGD people by compelling medical organizations to disclose their protected health information without sound reason or attempts to deidentify data. Florida's Governor demanded information about medical services provided to TGD students in state-funded universities (which violates 14th Amendment equal protection, Title IX rights to educational non-discrimination, and privacy protections of the Affordable Care Act).[33] Shortly after Tennessee's GAC ban, the state Attorney General demanded complete medical records of over 100 TGD patients receiving care at Vanderbilt University Medical Center as part of an insurance claims investigation.[34] A staff member at Washington University in St. Louis' pediatric gender

clinic exposed patient information to the lay media, which was then heavily cited by the state Attorney General to justify a now-withdrawn emergency rule that would have severely restricted care for TGD people of all ages.[35] Several affected families filed Health Insurance Portability and Accountability Act and federal civil rights complaints.[35] Such privacy breaches can erode trust, as individuals aware of these violations may delay seeking care or feel unsafe sharing clinically relevant information with their providers. In an era of open clinical documentation and linkage technology that shares health information between clinical systems, potential privacy breaches are particularly worrisome.

### Beneficence and Nonmaleficence

Policies that conflict with scientific evidence and medical consensus built to serve patients' best interests compel clinicians to violate principles of beneficence and nonmaleficence. GAC bans require clinicians to practice contrary to the standard of care, which inflicts harm on their patients. Parents and clinicians have expressed fear that the mental health of TGD youth will worsen if care is forcibly discontinued or inaccessible.[20,36] TGD adults who desired but did not receive GAC during their adolescence report significantly higher rates of suicidality, because they underwent irreversible pubertal change that conflicted with their gender identity.[8] When mental ill-health is underaddressed in adolescence, suffering is often protracted into adulthood. Thus, when TGD adolescents who desire GAC are deprived of this access, they are more likely to be subjected to a preventable burden of depression, anxiety, and suicidality during a key developmental window.

Some state officials who justify GAC bans state that TGD youth may still obtain psychotherapy for gender dysphoria. The Missouri Attorney General stated "Individuals of any age experiencing gender dysphoria or related conditions should be able to and are able to obtain care in Missouri. Often this care takes the form of psychotherapy, also known as talk therapy, rather than any chemical or surgical intervention."[37] This language harkens back the mid-20th century, when gender diverse people were subjected to non-affirming and harmful psychological interventions.[13,14] There is no known form of psychotherapy that helps TGD people achieve the physical characteristics that affirm their gender identity, nor have there been any shown to improve gender dysphoria.

### GAC Bans Inflict Moral Harm on Providers Caring for TGD Youth

Moral distress occurs when a clinician recognizes responsibilities and capabilities in a situation with moral stakes, yet encounters insurmountable obstacles. Moral injury refers to clinicians' negative experiences of "perpetrating, failing to prevent, or bearing witness to acts that transgress deeply held moral beliefs and expectations,"[38] such as being repeatedly prevented from prioritizing patients' needs due to institutional priorities or constraints.[39] The combined experience of moral distress and moral injury is moral harm.

We have identified 4 sources of moral harm that we think are experienced by providers who care for TGD youth in the climate of GAC bans. First, and perhaps most critically, is the dilemma of whether to adhere to the ban and practice in opposition to the standard of care, or to continue to provide GAC and face grave punishments for breaking the law.[40] These punishments range in severity from felony charges and prison sentences of up to 10 years, to loss of licensure and heavy fines.[40] Second, clinicians must witness their patients forgo health care that they desire. They often feel complicit in the deprivation of care because they must devise and enact untested plans for stopping treatment. The Texas GAC ban, for instance, mandates that all adolescents receiving gender-affirming medication "shall wean off the prescription drug over a period of time and in a manner that is safe and medically appropriate and that minimizes the risk of complications."[41] However, there is no evidence-informed guidance for how to discontinue desired treatment, and therefore no "safe and medically appropriate" way to do so. A third source of moral harm is harassment, which limits the provision of care and is potentiated by bans due to influence over some aspects of public opinion. Over 70% of clinicians providing GAC in a recent survey reported targeted harassment and threats, directed at themselves or their practices.[42] This has included protestors outside their doors, sometimes with weapons.[42] Some clinicians have had to change many aspects of their personal and professional lives, including increasing security in their clinical spaces and for themselves and their families.[42] Many have stopped sharing their expertise at conferences and with the media due to anticipated harassment.[42] A fourth cause of moral harm pertains to burdens imposed by recent legislation, which are shouldered by the already limited providers and staff in gender clinics. They may have to field calls from concerned families, consult with their in-house legal counsel on what care can and cannot be provided, and facilitate out-of-state transfers of care. This necessary but time-consuming work detracts from essential workflow.

### Failure to Uphold Bioethical Values on a Population Scale

There are currently no established guidelines on how government should ethically and justly advance health policy on a population scale. The American Public Health Association (APHA) Code of Ethics establishes professional standards for public health organizations and practitioners.[43] It may be conceptually beneficial to consider how government can be held to similar ethical standards when its actions cause harm by restricting the healthcare of its citizens. Thus, we propose a novel application of the public health ethical values

to GAC bans, particularly values of professionalism and trust, and health justice and health equity. In this section, we examine how states that ban GAC do not uphold these values.

## Professionalism and Trust

The APHA Code of Ethics states that public health entities earn public trust "by making decisions that are based upon the highest scientific, professional, and ethical standards" and that they "promote competence, honesty, and accuracy and ensure that their work is not unduly influenced by secondary interests."[43] Entities that influence access to particular types of healthcare should consider the scientific evidence regarding the risks and benefits of that care and the potential harms and benefits of their policies. States that ban GAC have not undertaken a careful inventory of the evidence or considered the absence of evidence supporting the forced discontinuation of care. If states that ban GAC are held to the standards of professionalism and trust, their policies can be construed as violations of these bioethics principles.

Policymakers have misrepresented the evidence on gender-affirming care to justify passage of bans.[1,44-46] A state-issued legal opinion in February 2021 contained incorrect information about gender dysphoria and transgender identity, the safety of medical treatments, standard practices, evidence on the benefits of care, and medical consensus.[44] Another state agency produced a narrow evidence review concluding that GAC confers no benefits to TGD people.[46] A rule terminating Medicaid coverage of GAC followed, which abruptly deprived approximately 7000 low-income transgender individuals of care.[47] A US District Court judge struck down the Medicaid rule in *Dekker v Weida* and found that the state pursued "a biased effort to justify a predetermined outcome, not a fair analysis of the evidence."[48] Many states have paid large sums to academics and medical professionals for testimony and consulting.[49] These individuals express positions on GAC that run counter to medical consensus of others and such testimony has been criticized by judges who consider their testimony.[49] The disinformation embedded in such policies is particularly dangerous for 2 co-occurring reasons. First, to involve those without direct experience in the matters at hand, the sheen of credibility lent by government can warp public perceptions about GAC. Second and simultaneously, state-sanctioned disinformation erodes the social contract between constituents and their elected officials and government.

## Health Justice and Health Equity

The APHA's code states that public health organizations and practitioners "have an ethical obligation to use their knowledge, skills, experience, and influence to promote equitable distribution of burdens, benefits, and opportunities for health…" and further that "public health activities [should] not exacerbate health inequities."[43] Bans on GAC exacerbate pre-existing health disparities by intentionally limiting services for a marginalized and vulnerable subset of the population.

Prior to recent legislative restrictions, GAC for adolescents was available at fewer than 60 tertiary pediatric hospital systems across the United States, most of which were affiliated with academic medical centers in large urban areas.[50] A recent study reported that youth waited a median of over 300 days from referral to receiving medications.[51] This scarcity of specialized care centers has likely contributed to inequitable access to care with respect to race, ethnicity, socioeconomic status, and rurality.[48,50,52-56] Population estimates suggest that adolescents of color and adolescents living in rural communities are as likely to identify as TGD as adolescents who are white or live in urban areas.[48,52,53,56] Disproportionately fewer adolescents of color and adolescents living in rural communities were attending multidisciplinary pediatric gender clinics prior to bans.[53,55,57]

Because of the degree to which care was banned across the southeast and Midwest regions of the United States during the 2023 legislative session, up to 25% of TGD adolescents now live over a day's drive from a clinic that provides GAC.[58] This influx of patients from out-of-state strains health systems that were already struggling to meet the needs of patients in their region. As the availability of gender clinics across the United States become further limited, existing disparities on the basis of race and ethnicity, socioeconomic status, and rurality will likely worsen.[59,60]

## The False Definition of Abuse

One state attorney general opinion concluded that parental consent to GAC constitutes child abuse and should be investigated accordingly.[44] Another state's legislative GAC ban allows the state to take custody of youth whose guardians consented to GAC anywhere, even if care was obtained in a location where it was legal to do so.[17] Child maltreatment language constitutes a violation of professionalism and trust because it shows disregard of established professional standards. Legitimate determinations of abuse or neglect typically involve a combination of law enforcement, child protection specialists, social workers, and medical professionals trained in pediatric forensic evaluation. These states have thus circumvented the necessary rigor used to identify child abuse. Such spurious claims divert the attention and time of trained investigators from serving children who face real harm.

Unfounded claims harm families through scrutiny and threat of separation, with the greatest harm most likely for families of color and for those of limited financial means. The fear of a potential investigation may lead parents to prioritize safety and stability in ways that adversely impact TGD members of their family, such as withdrawing support or encouraging gender identity concealment. This destabilizes

a critical protective factor, as supportive adults and access to gender-affirming environments are associated with improved mental health and reduced suicidality amongst TGD youth.[61]

## Conclusion

We believe that the elected officials and governments who propose, pass, and enforce GAC bans practice medicine without training or accountability. GAC bans harm TGD adolescents, their families, their providers, health systems, the practice of medicine, the sanctity of clinical-patient relationships, and the integrity of health policy. The ethical principles by which clinicians are oath-bound, that safeguard patients in health settings, do not guide the formation of health policy. Yet regulation of healthcare, especially when it encroaches widely and deeply, exemplifies the practice of medicine on a population scale.

Using a framework derived from basic bioethical principals and public health ethics provides an avenue for advocacy as health professionals, particularly those that serve TGD patients, face a critical moment in history. And thus, to fortify advocacy that advances health justice for all, including and beyond TGD people, we argue that health policy be consistently and critically viewed through a bioethical lens. Medical organizations, scientific experts, and bioethical leaders may consider using bioethical terminology to describe health policy in public forums. This would create a new vocabulary by which the harms of governmental overreach can be thoroughly described. Similarly, health policies that respect bioethical principles can be identified and endorsed. This approach requires close partnership between bioethicists and clinician experts – who have much to learn from each other.

Without adherence to a bioethical framework, moral and ethical relativism may prevail and policy will conform to the views of those without scientific expertise or humanistic insight. And while clinicians and advocates have no direct power to compel politicians to adhere to bioethical principles, they are best positioned to call for moral and just standards. Our patients' needs and our own bioethical principles compel us to pursue all avenues oriented toward a more just future. ∎

## CRediT authorship contribution statement

**Meredithe McNamara:** Conceptualization. **Katherine R. Gentry:** Data curation. **Gina M. Sequeira:** Formal analysis. **Kacie M. Kidd:** Supervision, Methodology, Investigation, Formal analysis, Data curation, Conceptualization.

## Declaration of Competing Interest

Dr. Sequeira has received compensation for Pivotal Ventures for participation in an advisory board. Dr. McNamara has received expert witness payments from Human Rights Campaign and GLBTQ Defenders. The other authors have no relevant disclosures.

No sources of funding.

Reprint requests: Meredithe McNamara, MD, MSc, Department of Pediatrics, Yale School of Medicine, 789 Howard Avenue, New Haven, CT 06519. E-mail: meredithe.mcnamara@yale.edu

## References

1. McNamara M, Abdul-Latif H, Boulware SD, Kamody R, Kuper LE, Olezeski CL, et al. Combating scientific disinformation on gender-affirming care. Pediatrics 2023;152:e2022060943. https://doi.org/10.1542/peds.2022-060943
2. Coleman E, Radix AE, Bouman WP, Brown GR, De Vries AL, Deutsch MB, Arcelus J. Standards of care for the health of transgender and gender diverse people, version 8. Int J Transgend Health 2022;23:S1-259.
3. Chen D, Berona J, Chan Y-M, Ehrensaft D, Garofalo R, Hidalgo MA, et al. Psychosocial functioning in transgender youth after 2 years of hormones. N Engl J Med 2023;388:240-50.
4. Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. J Clin Endocrinol Metabol 2017;102:3869-903.
5. Rafferty J, Yogman M, Baum R, et al. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. Pediatrics 2018;142:e20182162. https://doi.org/10.1542/peds.2018-2162
6. Allen LR, Watson LB, Egan AM, Moser CN. Well-being and suicidality among transgender youth after gender-affirming hormones. Clin Pract Pediatr Psychol 2019;7:302.
7. Kuper LE, Stewart S, Preston S, Lau M, Lopez X. Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy. Pediatrics 2020;145.
8. Turban JL, King D, Carswell JM, Keuroghlian AS. Pubertal suppression for transgender youth and risk of suicidal ideation. Pediatrics 2020;145:e20191725.
9. Green AE, DeChants JP, Price MN, Davis CK. Association of gender-affirming hormone therapy with depression, thoughts of suicide, and attempted suicide among transgender and nonbinary youth. J Adolesc Health 2021;70:643-9.
10. Turban JL, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS One 2022;17:e0261039.
11. Tordoff DM, Wanta JW, Collin A, Stephney C, Inwards-Breland DJ, Ahrens K. Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care. JAMA Netw Open 2022;5:e220978.
12. Gill-Peterson J. Histories of the transgender child. Minneapolis, MN: U of Minnesota Press; 2018.
13. Marrow E. "I Hope that as our selection becomes more accurate, the Number … will Be Very Few": the creation of assessment Criteria for gender-affirming care, 1960s–1980s. Psychol Sex Orientation Gend Divers 2023;11:183-201.
14. King M. Stigma in psychiatry seen through the lens of sexuality and gender. BJPsych Int 2019;16:77-80.
15. Brief of Amici Curiae American Academy of pediatrics and additional National and state medical, mental health and educational organizations. Accessed January 19, 2024. https://downloads.aap.org/DOFA/AmicusBriefARtransgenderlaw.pdf
16. Movement Advancement Project. "Bans on best practice medical care for transgender youth". Accessed January 19, 2024. https://www.lgbtmap.org/equality-maps/healthcare_youth_medical_care_bans

17. Redfield E, Conron KJ, Tentindo W, Browning E. Prohibiting gender-affirming medical care for youth. The Williams Institute, UCLA. 2023. Accessed July 2, 2023. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Youth-Health-Bans-Mar-2023.pdf
18. Statement from the Ohio Department of health. 2024. Accessed January 19, 2024. https://odh.ohio.gov/wps/wcm/connect/gov/9b217d95-bcc9-483f-8771-f4786bb93b56/Post+for+Public+Comment+3%2C+59%2C+83.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_79GCH8013HMOA06A2E16IV2082-9b217d95-bcc9-483f-8771-f4786bb93b56-oPsE9DG
19. Florida senate Bill 254, 2023 legislature. Accessed January 19, 2024. https://www.flsenate.gov/Session/Bill/2023/254/BillText/er/PDF
20. Kidd KM, Sequeira GM, Paglisotti T, Katz-Wise SL, Kazmerski TM, Hillier A, Dowshen N. "This could mean death for my child": parent perspectives on laws banning gender-affirming care for transgender adolescents. J Adolesc Health 2021;68:1082-8.
21. Hughes LD, Kidd KM, Gamarel KE, Operario D, Dowshen N. "These laws will be devastating": Provider perspectives on legislation banning gender-affirming care for transgender adolescents. J Adolesc Health 2021;69:976-82.
22. Johns MM, Lowry R, Andrzejewski J, Barrios LC, Demissie Z, McManus T, Underwood JM. Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students—19 states and large urban school districts, 2017. MMWR (Morb Mortal Wkly Rep) 2019;68:67.
23. Deal C, Doshi RD, Gonzales G. Gender minority youth experiencing homelessness and corresponding health disparities. J Adolesc Health 2023;72:763-9.
24. Children's Rights. LGBTQ+ youth in foster care. Accessed January 19, 2024. https://www.childrensrights.org/wp-content/uploads/2023/01/CR-LGBTQ-Youth-in-Foster-Care-2023-Fact-Sheet.pdf
25. James SE, Herman JL, Rankin S, Keisling M, Mottet L, Anafi M. The report of the 2015 U.S. Transgender survey. Washington, DC: National Center for Transgender Equality; 2016.
26. Gridley SJ, Crouch JM, Evans Y, Eng W, Antoon E, Lyapustina M, Breland DJ. Youth and caregiver perspectives on barriers to gender-affirming health care for transgender youth. J Adolesc Health 2016;59:254-61.
27. The Trevor Project. National survey on LGBTQ youth mental health. 2022. Accessed September 12, 2023. https://www.thetrevorproject.org/survey-2022/
28. Appelbaum PS, Grisso T. Assessing patients' capacities to consent to treatment. N Engl J Med 1988;319:1635-8. https://doi.org/10.1056/nejm198812223192504
29. Appelbaum PS. Assessment of patients' competence to consent to treatment. N Engl J Med 2007;357:1834-40. https://doi.org/10.1056/NEJMcp074045
30. Katz AL, Webb SA, COMMITTEE ON BIOETHICS Macauley RC, Mercurio MR, Moon MR, Okun AL, et al. Informed consent in decision-making in pediatric practice. Pediatrics 2016;138:e20161485 https://doi.org/10.1542/peds.2016-1485
31. Clark BA, Virani A. This Wasn't a Split-Second decision": an empirical ethical analysis of transgender youth capacity, rights, and authority to consent to hormone therapy. Bioethical Inquiry 2021;18:151-64. https://doi.org/10.1007/s11673-020-10086-9
32. Hersher R, NPR. Court Strikes down Florida law barring Doctors from Discussing guns with patients. 2017. Accessed January 19, 2024. https://www.npr.org/sections/thetwo-way/2017/02/17/515764335/court-strikes-down-florida-law-barring-doctors-from-discussing-guns-with-patient
33. James L, Mayes K, Brown A, Bonta R, Campbell AJ, Tong W, et al. Letter to governor Ron DeSantis. 2023. Accessed September 12, 2023. https://ag.ny.gov/sites/default/files/desantis_letter_re_gender_affirming_care_at_fl_universities_03.03.23.pdf
34. Bacallo M. Transgender patients sue after Tennessee attorney general obtained their medical records. 90.3 WPLN News. 2023. Accessed September 13, 2023. https://wpln.org/post/transgender-patients-sue-after-tennessee-attorney-general-obtained-their-medical-records/
35. Schrappen C. Parents of patients at St. Louis transgender center fear privacy breaches, File Complaints. St. Louis Post-Dispatch. 2023. Accessed September 12, 2023. https://www.stltoday.com/news/local/metro/parents-of-patients-at-st-louis-transgender-center-fear-privacy-breaches-file-complaints/article_6b623743-e441-5119-92a4-27c19547e4b2.html
36. Abreu RL, Sostre JP, Gonzalez KA, Lockett GM, Matsuno E, Mosley DV. Impact of gender-affirming care bans on transgender and gender diverse youth: parental figures' perspective. J Fam Psychol 2022;36:643-52. https://doi.org/10.1037/fam0000987
37. State of Missouri. Emergency Role: Chapter 17 – gender Transition interventions. 2023. Accessed January 19, 2024. https://ago.mo.gov/wp-content/uploads/2023-04-13-emergency-reg.pdf
38. Litz BT, Stein N, Delaney E, Lebowitz L, Nash WP, Silva C, et al. Moral injury and moral repair in war veterans: a preliminary model and intervention strategy. Clin Psychol Rev 2009;29:695-706.
39. Dean W, Talbot SG, Caplan A. Clarifying the language of clinician distress. JAMA 2020;323:923-4. https://doi.org/10.1001/jama.2019.21576
40. Mallory C, Chin MG, Lee JC. Legal penalties for physicians providing gender-affirming care. JAMA 2023 Jun 6;329:1821-2. https://doi.org/10.1001/jama.2023.8232
41. PBS. Why a proposed Texas mandate to 'wean' Trans youth off their Meds Contradicts medical science. 2023. Accessed January 19, 2024. https://www.pbs.org/newshour/health/why-a-proposed-texas-mandate-to-wean-trans-youth-off-their-meds-contradicts-medical-science
42. Hughes LD, Gamarel KE, Restar AJ, Sequeira GM, Dowshen N, Regan K, et al. Adolescent providers' experiences of harassment related to delivering gender-affirming care. J Adolesc Health 2023;73:672-8.
43. American Public Health Association. Public health code of ethics. 2019. Accessed January 19, 2024. https://www.apha.org//media/files/pdf/membergroups/ethics/code_of_ethics.ashx
44. Boulware S, Kamody R, Kuper L, McNamara M, Olezeski C, Szilagyi N, et al. Biased science: the Texas and Alabama measures criminalizing medical treatment for transgender children and adolescents rely on inaccurate and misleading scientific claims. Accessed January 4, 2024. https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/report%20on%20the%20science%20of%20gender-affirming%20care%20final%20april%2028%202022_442952_55174_v1.pdf
45. Lepore C, Alstott A, McNamara M. Scientific misinformation is criminalizing the standard of care for transgender youth. JAMA Pediatr 2022;176:965-6.
46. McNamara M, Abdul-Latif H, Boulware SD, Kamody R, Kuper L, Olezeski C, et al. A critical review of the June 2022 Florida Medicaid report on the medical treatment of gender dysphoria. Accessed January 13, 2024. https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.pdf
47. Mahoney E, Ellenbogen R, Tampa Bay Times. Florida Veered from Norms to Strip transgender care from Medicaid, records show. 2023. Accessed January 19, 2024. https://www.tampabay.com/news/florida-politics/2023/08/02/florida-transgender-treatments-gender-dysphoria-medicaid-ron-desantis-consultants/
48. Kidd KM, Sequeira GM, Douglas C, Paglisotti T, Inwards-Breland DJ, Miller E, et al. Prevalence of gender-diverse youth in an urban school district. Pediatrics 2021;147:e2020049823. https://doi.org/10.1542/peds.2020-049823
49. Redden M. Huffington Post. Inside the Cottage Industry of 'experts' paid to Defend Anti-Trans laws. 2023. Accessed May 26, 2024. https://www.huffpost.com/entry/paid-experts-defending-anti-trans-law_n_65021a7ee4b01df7c3b6d513
50. Weixel T, Wildman B. Geographic distribution of clinical care for transgender and gender-diverse youth. Pediatrics 2022;150:e2022057054.
51. Tordoff DM, Sequeira GM, Shook AG, Williams F, Hayden L, Kasenic A, Ahrens K. Factors associated with time to receiving gender-affirming hormones and puberty blockers at a pediatric clinic serving transgender and nonbinary youth. Transgender Health 2022;8:420-8.

52. Kahn NF, Sequeira GM, Asante PG, Kidd KM, Coker TR, Christakis DA, Richardson LP. Estimating transgender and gender-diverse youth populations in health systems and survey data. Pediatrics 2024;153:e2023065197.
53. Kahn NF, Asante PG, Coker TR, Kidd KM, Christakis DA, Richardson LP, et al. Demographic Differences in gender dysphoria Diagnosis and access to gender-affirming care among adolescents. LGBT Health 2024. https://doi.org/10.1089/lgbt.2023.0273
54. Kidd KM, Sequeira GM, Katz-Wise SL, Fechter-Leggett M, Gandy M, Herring N, Dowshen NL. "Difficult to find, Stressful to Navigate": parents' experiences accessing affirming care for gender-diverse youth. LGBT Health 2023;10:496-504.
55. Voss RV, Simons L. Supporting the health of transgender and gender-diverse youth in primary care settings. Prim Care Clin Off Pract 2021;48:259-70.
56. Kidd KM, Sequeira GM, Mann MJ, Smith ML, Benton BR, Kristjansson AL. The prevalence of gender-diverse youth in a rural Appalachian region. JAMA Pediatr 2022;176:1149-50. https://doi.org/10.1001/jamapediatrics.2022.2768
57. Sequeira GM, Ray KN, Miller E, Coulter RW. Transgender youth's disclosure of gender identity to providers outside of specialized gender centers. J Adolesc Health 2020;66:691-8.
58. Borah L, Zebib L, Sanders HM, Lane M, Stroumsa D, Chung KC. State restrictions and Geographic access to gender-affirming care for transgender youth. JAMA 2023;330:375-8.
59. Vance SR, Boyer CB, Glidden DV, Sevelius J. Mental health and psychosocial risk and protective factors among black and latinx transgender youth compared with peers. JAMA Netw Open 2021;4:e213256.
60. Leon K, O'Bryan J, Wolf-Gould C, Turell SC, Gadomski A. Prevalence and risk factors for nonsuicidal self-injury in transgender and gender-expansive youth at a rural gender wellness clinic. Transgend Health 2021;6:43-50.
61. Andrzejewski J, Pampati S, Steiner RJ, Boyce L, Johns MM. Perspectives of transgender youth on parental support: Qualitative Findings from the Resilience and transgender youth study. Health Educ Behav 2021;48:74-81.