UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Brianna Boe, *et al.*, | ) |
| | ) |
|    *Plaintiffs*, | ) |
| | ) |
| and | ) |
| | ) |
| United States of America, | ) |
| | ) |
|    *Plaintiff-Intervenor*, | ) |
| | ) |
| v. | )    No. 2:22-cv-00184-LCB-CWB |
| | ) |
| Hon. Steve Marshall, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) |
| | ) |
|    *Defendants*. | ) |

**<u>PRIVATE PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. KENNETH GOODMAN</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

LEGAL STANDARD.............................................................................................1

ARGUMENT ..........................................................................................................1

I.  Dr. Goodman is Qualified to Opine on Conflicts of Interest in Medicine, Including in the Development of Clinical Practice Guidelines. ............................1

II. Dr. Goodman is Qualified to Opine on the Purposes of Clinical Practice Guidelines and Parental Consent to Care for their Minor Children. .....................8

CONCLUSION.....................................................................................................10

# INTRODUCTION

Defendants misconstrue the scope and substance of Dr. Goodman's proffered expert testimony. With decades of experience consulting on ethical issues arising out of clinical practice and practice guidelines—including in pediatric care—Dr. Goodman is qualified to testify on conflicts of interest matters arising out of the development of clinical practice guidelines, the purposes of clinical practice guidelines, and valid consent processes in obtaining care for minor children. To the extent Defendants object to these lines of inquiry, the Court should deny their motion to exclude.

# LEGAL STANDARD

To avoid duplication, Plaintiffs respectfully refer the Court to the statement of the governing legal principles articulated in Plaintiffs' Opposition to Defendants' Motion to Exclude Selected Testimony of Dr. Aron Janssen.

# ARGUMENT

**I.   Dr. Goodman is Qualified to Opine on Conflicts of Interest in Medicine, Including in the Development of Clinical Practice Guidelines.**

Dr. Goodman does not proffer testimony as to whether WPATH or the Endocrine Society followed necessary conflicts of interest procedures in the development of their standards of care and guidelines. He is, however, qualified to testify on the foundational expectations for the identification and management of conflicts that arise from the creation of a guideline development committee.

1

***Conflicts of Interest and Context***.  Defendants' arguments regarding Dr. Goodman's expertise on conflicts of interest principles and their application in differentiated contexts are unfounded. With extensive experience as a bioethicist, Dr. Goodman studies and advises on the implementation of pediatric clinical practice guidelines.  *See* Goodman Rept. (*Daubert*.DX10) at 2:¶ 3; *see also id.* Ex. A (*Curriculum Vitae*).  He has been the Director of the World Health Organization Collaborating Centre in Ethics and Global Health Policy since 2008 (*id.* at 16), the Founder and Chair of the University of Miami Hospital's Ethics Committee since 2012 (*id.* at 18), and offers opinions on these issues routinely (*see, e.g.*, *id.* at 19, 22, 28, 39, 53, 42, 66).  He consults on medical ethics around pediatric care, *see, e.g.*, *id.* at 18 (member of Jackson Memorial Hospital Pediatric Ethics Committee since 1994, consulted with Nicklaus Children's Hospital), *id.* at 25 (conducted pediatric research in Latin America), and advises on conflict-of-interest issues, *id.* at 25 (conflict of interest in online point-of-care clinical support websites).

When asked the reason for not citing sources specific to conflicts of interest in the development of practice guidelines, Dr. Goodman testified that in ethics, conflict of interest principles do not differ in such a way that requires differentiated standards.  "Whether or not you have a conflict of interest is independent of whether you're developing a practice guideline, doing an empirical study, or practicing in any number of professions." Goodman Depo. (SJ.DX7) at 38:21–24. "[T]here's no

2

difference among them. . . . [W]hat frames a conflict of interest or any other kind of conflict is going to be independent of the context in which you're conflicted." *Id*. at 37:25–38:7.

Although Dr. Goodman does not proffer an opinion on the actual way in which WPATH implemented a methodology in developing the Standards of Care, *id*. at 35:9–14, he is qualified to testify about conflicts in the development of clinical practice guidelines, particularly for authorities involving science and practice in the United States. *Id.* at 39:2–16. He is familiar with the anticipated process for preparing for guideline development. Specifically, he explains that the guideline issuing institution would have in place policies to identify and manage conflicts and processes for disclosing information, managing conflicts, and recusing potential members from participating. He provides reliable sources from the National Institute of Health and the United States National Science Foundation to support these points. *See* Goodman Rept. (*Daubert*.DX10) at 4:¶ 13 & n.1. Defendants have not cited expert opinion opposing or evaluating those sources, and further, do not proffer reasons supporting their argument for differentiated conflicts-of-interest standards. Even if they did, the assignment of weight for differing expert opinion sits with this Court as the trier of fact but does not dictate admissibility. *Tampa Bay Water v. HDR Eng'g, Inc.,* 731 F.3d 1171, 1185 (11th Cir. 2013) (stating that

3

experts' "disagreements could be aired out in front of the jury and tested by the crucible of cross-examination").

**Financial Conflicts of Interest**. Dr. Goodman is well-versed on the issue of financial conflicts of interest. At his deposition, he testified about the common issue of conflicts arising from financial relationships related to guideline development, the distinction between an actual conflict and an apparent conflict, and the situations in which conflicts can be adequately managed by, for example, disclosing the value of stocks or reducing certain consulting income. *See* Goodman Depo. (SJ.DX74) at 45:24–66:13; *see also* Goodman Rept. (*Daubert*.DX10) at ¶¶ 13–15.

Dr. Goodman reliably rebutted Defendants' misguided insistence that certain specific information must be disclosed by guideline contributors. For example, on whether "clinical services from which a committee member derives a substantial proportion of his or her income can be a financial conflict of interest" requiring recusal, Dr. Goodman opines that is "plausible" but that alone does not present a conflict as it would screen out subject-matter experts and therefore "undermine the entire guideline process." Goodman Depo. (SJ.DX74) at 52:21–54:25. On whether the Institute of Medicine (IoM) (since renamed the National Academy of Medicine) guidelines require the collection of information to determine whether a provider derives a substantial proportion of income from clinical services and therefore has a financial conflict, Dr. Goodman explains what the IoM guidelines say and do not

4

say:

> In principle, what this is calling for is as much transparency as possible. If someone practices cardiology, then someone who says, 'I practice cardiology,' has, by virtue of that declaration, arguably met that recommendation, hewed to or adhered to that recommendation. Because cardiologists have different incomes depending on their practice.

*Id.* at 56:2–9.

Dr. Goodman does not expect a guideline-issuing organization to collect the *amount of income* from each guideline author because "different people have different clinical practices," and "[i]t might be that the person who makes far more money relies on it less than the person who makes far less money. There is no direct mapping between how much one makes in the practice of one's profession and the likelihood that that alone is going to be significant." *Id.* at 55:10–57:7. He further explained that "if someone derives a substantial percentage of their income, which would be one's compensation for doing one's job, [and] substantial could even be 100 percent of it," "whether that amount is X or two times X would not help anybody decide whether or not that person is fit for purpose on the guideline development group." *Id.* at 59:11–17.

Dr. Goodman does not disagree with IoM's statement that direct financial activities include clinical services from which a committee member derives a substantial proportion of their income, but he clarifies that the statement "doesn't

5

produce a practical way of assessing it." *Id.* at 61:15–62:8.[1] The IoM statement does not provide additional specifics or guidance on the collection of financial information. In other words, Dr. Goodman's testimony on financial conflicts of interest is consistent with the IoM guideline—not contradicted by it as Defendants suggest. Differing interpretations by Defendants' experts do not render Dr. Goodman's testimony unreliable or inadmissible. *See, e.g., TB Food USA, LLC v. American Mariculture, Inc.*, No. 17-9, 2021 WL 4962969, at *13 (M.D. Fla. Oct. 26, 2021) ("[W]here the experts disagree, it is 'precisely the type of dispute that should be decided within the crucible of cross examination, rather than by a judge at the *Daubert* stage.'") (quoting *Moore v. Intuitive Surgical, Inc.*, 995 F. 3d 839, 857 (11th Cir. 2021)).

***Associational Conflict***. Dr. Goodman also addresses Defendants' reliance on the concept of an "associational conflict" as the basis for their objection to the inclusion of WPATH members on the guideline development committee. Goodman Rept. (*Daubert*.DX10) at 7:¶ 17. In Dr. Goodman's expert opinion, selecting authors

---

[1] Dr. Goodman does testify with nuance that there is a difference between salary and income information versus financial attainment from consultancy work.

> But surely there's a difference between someone who receives a check from a drug manufacturer which has a number on it and someone whose livelihood comes from seeing patients, for instance, are really quite different activities and, therefore, a completely different profile with regards to a conflict that we would be concerned might introduce bias.

Goodman Depo. (SJ.DX74) at 63:12–19.

from a pool of dues-paying experts is not an "associational conflict" that is established in professional literature. *Id.* at 7:¶ 18. Otherwise, there would be "no specialized and competent practitioners on the subject matter of a guideline," which "would subvert and undermine the very idea of a practice guideline." *Id.* at 7:¶ 17; *see also id.* at 7–8:¶ 19; Goodman Depo. (SJ.DX74) at 51:13–15 ("If you don't have the expertise . . . I'd be concerned about your capacity to contribute to the preparation of guidelines."); *id.* at 51:22–25 ("I do not think that the practice of a profession itself constitutes a conflict in the preparation of a guideline. Otherwise, we could have no guidelines."). For example, for "practice guidelines for treating rare pediatric cancers, . . . it is essential that those who are debating and drafting guidelines understand the science and practice of treating the maladies." Goodman Rept. (*Daubert*.DX) at 7: ¶ 17. The trier of fact is free to evaluate the strength of Dr. Goodman's testimony on associational conflicts, but his testimony is clearly admissible.

**Intellectual Conflict**. Dr. Goodman also reliably opines that "the idea of an 'intellectual conflict' is not established in the literature." Goodman Rept. (*Daubert*.DX10) at 9:¶ 21; Goodman Depo. (SJ.DX74) at 106:9–107:17. In offering this opinion, Dr. Goodman responds to Dr. Cantor's claim that an "intellectual conflict" exists whenever a guideline author practices in the field governed by the guideline. Dr. Goodman reiterated that "being a provider for the treatment for

7

gender dysphoria does not preclude one from participating in guideline development for that treatment." Goodman Rept. (*Daubert*.DX10) at 9:¶ 22. He also testified that while a conflict could arise "if members of a guideline organization allow a moral, political, or social view or position to shape or alter their contribution to the guideline process,"—which is not established by membership in a professional organization—it does not "arise where individuals involved in guideline development rest their positions on research studies and clinical observations." *Id*. For example, having specialists in an area of practice (such as cardiology or vascular medicine) "advocate[] for access to healthcare in their specialty," does not "constitute[] a conflict." Goodman Depo. (SJ.DX74) at 129:4–15.

Defendants' disagreements with Dr. Goodman's opinions do not serve as a basis for discounting his expertise, nor for excluding his opinions on these topics as unreliable. *See Tampa Bay Water*, 731 F.3d at 1185.

## II. Dr. Goodman is Qualified to Opine on the Purposes of Clinical Practice Guidelines and Parental Consent to Care for their Minor Children.

As an initial matter, bioethicists routinely assess the evidentiary bases of medical treatments. Dr. Goodman is a bioethicist and a widely published expert in the field of evidence-based medicine. *See* Goodman Rept. (*Daubert*.DX10) at Ex. A. Dr. Goodman has spent the entirety of his career as a bioethicist in a hospital setting. During his more than 30 years of experience, he has published numerous books, book chapters, and peer-reviewed journal articles on the use of medical

8

evidence in a broad range of medical settings. *Id.*

Despite Defendants' assertions in their motion (ECF No. 596 at 3), Dr. Goodman's opinions are not focused on the safety, efficacy, outcomes, or necessity of medical treatments for gender dysphoria. Dr. Goodman mentioned treatments for gender dysphoria twice in his report:

- <u>First</u>, he referenced how clinical practice guidelines do not in themselves establish medical need for treatment. Rather, the fact that a treatment is medically necessary provides the basis for developing practice guidelines that then "facilitate access to proper administration of medical treatment." Goodman Rept. (*Daubert*.DX10) at 8:¶ 20. In this way, "the treatment's medical necessity was established antecedent to the guideline." *Id.* As discussed *supra*, Dr. Goodman studies, reviews, and advises on the implementation of pediatric clinical practice guidelines. The purposes of practice guidelines vis-à-vis clinical care, and what they do and do not do, is well within Dr. Goodman's expertise.[2]

- <u>Second</u>, Dr. Goodman wrote that a parent may legally consent to gender transition medications for their minor child as untreated gender dysphoria can impact the child's life. *Id.* at 14:¶ 34. In his decades of work in medical

---

[2] Defendants do not appear to challenge the reliability of this aspect of his testimony on this point.

ethics, Dr. Goodman consults on the issue of valid consent processes carried out in medical settings. *Id.* at 2:¶ 3. Here, Dr. Goodman is opining on how a parent can consent to medical care for their child, a concept that applies to many other pediatric conditions. *See, e.g. id.* at 7:¶ 17.

To the extent Defendants argue that Dr. Goodman is not qualified to testify on the foundational aspects of clinical practice guidelines and valid consent processes, or that his testimony on these points is somehow unreliable, their assertions are clearly misplaced, considering Dr. Goodman's expertise and experience.

## CONCLUSION

For the foregoing reasons, the Court should deny defendants' Motion to Exclude.

*/s/ Melody H. Eagan*
Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt
Adam Reinke
Misty L. Peterson
KING & SPALDING LLP

Sarah Warbelow
Cynthia Weaver
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

Jennifer L. Levi
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
jlevi@glad.org

10

1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com

Brent P. Ray
Abigail Hoverman Terry
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
bray@kslaw.com
aterry@kslaw.com

Abby Parsons
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002
aparsons@kslaw.com

Scott D. McCoy
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101
scott.mccoy@splcenter.org

Diego A. Soto
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
diego.soto@splcenter.org

*Counsel for Private Plaintiffs*

Jessica L. Stone
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
jessica.stone@splcenter.org

Christopher F. Stoll
Amy E. Whelan
Rachel H. Berg
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this case.

*/s/ Melody H. Eagan*
Counsel for Private Plaintiffs
