# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| Brianna Boe, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00184-LCB-CWB |
| | ) | |
| Hon. Steve Marshall, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Alabama, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

# PRIVATE PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. MORISSA LADINSKY

# <u>TABLE OF CONTENTS</u>

A.    Dr. Ladinsky is qualified to offer her proposed opinions, which are based on her familiarity with the prevailing medical standards of care, scientific research, and extensive experience treating transgender adolescents with gender dysphoria. ...........................................................................2

B.    Dr. Ladinsky is qualified to testify about the WPATH and Endocrine Society guidelines, and her testimony is reliable. ........................................................8

C.    Dr. Ladinsky's testimony about the safety of puberty blockers and hormone therapy is admissible. .................................................................................12

Certificate of Service ...............................................................................................22

In their Motion to Exclude Selected Testimony of Dr. Morissa Ladinsky, the Defendants do not ask the Court to preclude Dr. Ladinsky from "describe[ing] to the Court the actual practices and experience of the UAB pediatric gender clinic" or from "tell[ing] the Court what the WPATH and Endocrine Society guidelines recommend" (and, presumably, testifying that the UAB practices conform to those prevailing medical standards).  (Mot. at 26).  The Defendants, instead, narrowly criticize Dr. Ladinsky's proposed opinions.  Based on a contrary view of the underlying facts and evidence, the Defendants ask the Court to preclude Dr. Ladinsky from testifying about (i) "[t]he development of the WPATH and Endocrine Society guidelines, and the nature and quality of evidence on which they rest," and (ii) "[t]he safety of puberty blockers or cross-sex hormones when administered to minors as a treatment of gender dysphoria."  *Id.*

But "the rejection of expert testimony is the exception rather than the rule." *Chemfree Corp. v. J. Walter, Inc.*, No. 04-3711, 2008 WL 4845107, at *2 (N.D. Ga. Oct. 2, 2008) (quoting Fed. R. Evid. 702 advisory committee note (2000)). Oftentimes, as is the case here, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" otherwise admissible expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).  Simply put, Rule 702 "is not intended to supplant the adversary system or the role of the [fact finder]."

*Staten v. Fed. Ins. Co.*, No. 19-1446, 2021 WL 4458875, at *13 (N.D. Ala. Sept. 29, 2021) (quoting *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1334 (11th Cir. 2014)).

Dr. Ladinsky has spent decades treating transgender adolescents.  She is well-informed of the prevailing medical standards of care and has stayed abreast of developments in the medical literature.  Based on her experience and knowledge of the relevant science, she is well equipped to offer her opinions in this case.  To the extent that the Defendants believe otherwise, they are free to cross-examine her at trial and present competing expert testimony of their own.  The Motion should be denied.

A.   **Dr. Ladinsky is qualified to offer her proposed opinions, which are based on her familiarity with the prevailing medical standards of care, scientific research, and extensive experience treating transgender adolescents with gender dysphoria.**

The Defendants do not seriously question Dr. Ladinsky's qualifications.  Nor could they.  Dr. Ladinsky is a medical doctor who is licensed to practice medicine in Alabama.  (Ladinsky Report (*Daubert*.DX-1) at 3).  She is certified by the American Board of Pediatrics and has been since 1993.  *Id.*  Before becoming a doctor at UAB Hospital and Children's Hospital of Alabama in 2015, she was a pediatrician in Texas, Maryland, and Ohio.  *Id.* at 34-36.  Dr. Ladinsky has been a medical school professor for UAB, Ohio State University School of Medicine, Johns Hopkins School of Medicine, and University of Maryland School of Medicine.  *Id.*

"Since starting at the gender clinic at UAB, [Dr. Ladinsky has] personally treated approximately 250 transgender young people for gender dysphoria." *Id.* at 3. Of the UAB patients, "[t]he clinic itself has treated a few hundred transgender young people for gender dysphoria using GnRH agonists and/or hormonal therapies." *Id.* "As part of [Dr. Ladinsky's] practice, [she stays] familiar with the latest medical science and treatment protocols related to differences or disorders of sex development and gender dysphoria." *Id.*

Based on Dr. Ladinsky's extensive history treating young people for gender dysphoria, Dr. Ladinsky has offered two primary areas of opinion testimony: (i) "the treatment protocols as established by medical standards and in use at UAB for transgender adolescents with gender dysphoria, including the provision of pubertal suppression treatment and hormone therapy," and (ii) "the severe harm to these adolescents that would be caused by withholding or withdrawing this medical treatment where such treatment is medically necessary." *Id.* at 4.[1]

First, according to Dr. Ladinsky, "[t]he treatment of gender dysphoria is well-established in the medical profession." *Id.* at 5. As Dr. Ladinsky explains, "[t]here are comprehensive standards of care governing the treatment of gender dysphoria that were developed by [WPATH], founded in 1979, and Endocrine Society, in

---

[1] In addition, Dr. Ladinsky criticizes various opinions offered by the State's retained experts. (Ladinsky Report at 24-31).

collaboration with the Pediatric Endocrine Society." *Id.* Those guidelines, Dr. Ladinsky notes, "are based on considerable scientific and medical research and represent the best evidence-based practice guidelines available for treating [gender dysphoria]." *Id.* (citing scientific literature). In support of her claim that the WPATH and Endocrine Society guidelines reflect "the prevailing standard of care," Dr. Ladinsky notes that (i) they are "recognized" by the "major associations of medical professionals;" and (ii) "[t]he treatment of gender dysphoria is . . . part of medical school curricula across the country and world" (including a module at the UAB School of Medicine). *Id.*

Then, as part of her overall opinion, Dr. Ladinsky summarizes the pertinent portions of the WPATH and Endocrine Society guidelines for the treatment of gender dysphoria. *Id.* at 6-14. She provides citations to and quotations from these guidelines. *Id.* Based on her experience treating transgender patients "as part of an interdisciplinary, specialty-level team at UAB for 7 years" as well as her experience "car[ing] for youth receiving hormonal therapies for an additional 28 years," Dr. Ladinsky confirms that the UAB clinic—with its treatment of hundreds of patients— "follows the process outlined in the Endocrine Society Guidelines and WPATH [standard of care] before beginning any treatment for gender dysphoria." *Id.* at 14. If medicines are prescribed, such as puberty blockers or hormones, then the patients' "progress is monitored at regular intervals, typically every six months." *Id.* at 15.

And, before and during the initiation of medical intervention, UAB generally adheres to the clinical guidelines prescribed by WPATH and the Endocrine Society for the treatment of gender dysphoria. *Id.* at 14-17. If medicines are deemed appropriate, they are prescribed in order "to minimize the patient's dysphoria and initiate puberty consistent with gender identity within the typical age range." *Id.* at 17. Based on Dr. Ladinsky's "extensive clinical experience," she has "observed the substantial benefits of pubertal suppression and hormone therapy, when medically indicated." *Id.*

Second, drawing from her "extensive clinical experience," Dr. Ladinsky opines that puberty blockers and hormone therapy are "safe and effective treatments for transgender youth." *Id.* According to Dr. Ladinsky, "[p]uberty-blocking medication and hormone therapy have greatly improved the physical and mental health and wellbeing of [her] patients." *Id.* In Dr. Ladinsky's view, "[d]enying [her] patients access to these well-established medical treatments will cause the mental health of many of [her] patients to regress, including increasing their suicidality and likelihood of attempting suicide." *Id.* As Dr. Ladinsky notes, "[a]ll medical intervention comes with risk, and any medication can have side effects." *Id.* at 23. But, "[i]n the case of medical treatment for gender dysphoria," "decades of data have shown that the risk of adverse side effects from either puberty blockers or hormone therapy is low, and the benefits of the care greatly outweigh it." *Id.* In Dr. Ladinsky's

experience, her "patients who receive medically appropriate treatment for gender dysphoria experience significant improvement in their health." *Id.* She concludes: "Medical treatment recommended for and provided to transgender adolescents with gender dysphoria can substantially reduce lifelong gender dysphoria and can eliminate the medical need for surgery later in life," and "[p]roviding transition-based medical care can be lifesaving treatment and can improve the short- and long-term health outcomes of transgender youth." *Id.*

To reach those conclusions, in addition to resting on her extensive experience, Dr. Ladinsky considers the evidence and scientific research pertaining to puberty blockers. For example, as Dr. Ladinsky explains, "[p]uberty blockers began to be used in the United States to treat gender dysphoria around 2004," and there is "over 30 years of data on the impact of puberty blockers on children who undergo precocious puberty." *Id.* at 18. Considering that data, Dr. Ladinsky concludes that "there is no scientific evidence of short- or long-term negative effects on patients who receive puberty blockers that would outweigh the benefits of this treatment." *Id.* Indeed, in research published by Pediatrics, the researchers found that "[t]reatment with pubertal suppression among those who wanted it was associated with lower odds of lifetime suicidal ideation when compared with those who wanted pubertal suppression but did not receive it." *Id.* at 19.

As to hormone therapy, Dr. Ladinsky has extensive experience treating transgender adolescents.  *Id.* at 19-21.  The use of hormone therapy has been used with adults for decades, and "no reputable medical organization has concluded that the risk of any negative outcome would outweigh the substantial benefit of the treatment."  *Id.* at 20.  Concerning the potential risks associated with hormone therapy, Dr. Ladinsky acknowledges that the "risks" are "rare" when the treatment "is provided and supervised by a clinician."  *Id.* at 22.  In fact, in her "years of treating transgender patients," Dr. Ladinsky has "never seen" various risks—such as "cardiovascular disease, thromboembolic stroke, asthma, CPOD, and cancer"— "afflict any of [her] patients."  *Id.*  And, to the extent that hormone therapies have any impact on fertility, "patients and their families are informed of this risk and referred to a reproductive endocrinologist for discussion of fertility preservation if desired."  *Id.* at 21.

Considering the available data as well as her extensive experience treating transgender adolescents experiencing gender dysphoria, Dr. Ladinsky concludes that "the medical interventions [including puberty blockers and hormone therapies] are safe, effective, and essential for the well-being of many transgender young people." *Id.* at 23.  She offers that conclusion to a "reasonable degree of scientific certainty based on the materials that [she has] reviewed and based on [her] education, experience, and knowledge."  *Id.* at 32.

7

**B.**     **Dr. Ladinsky is qualified to testify about the WPATH and Endocrine Society guidelines, and her testimony is reliable.**

The Defendants claim that Dr. Ladinsky should be precluded from testifying that the WPATH and Endocrine Society guidelines are "evidence-based" and reflect "considerable scientific and medical research." (Mot. at 15). Their arguments, however, rest on a flawed, one-sided reading of Dr. Ladinsky's deposition as well as her expert report. The Defendants contend that the word "safe" means "risk free." But, for Dr. Ladinsky (and, generally speaking, the medical community), "all medical treatment comes with risk," (Ladinsky Report at 23), and "safe" means "relative safety" that "take[s] into consideration" the "cost-benefit analyses with patients." (Ladinsky Depo. (SJ.DX 33) at 240-41). Considering Dr. Ladinsky's extensive clinical experience together with her knowledge of prevailing scientific research, she is qualified to opine that gender-affirming care, including puberty blockers and hormone therapies, are safe and effective treatments.

First, the Defendants misleadingly criticize Dr. Ladinsky's testimony concerning the term "evidence-based." (Mot. at 16). To the Defendants, they believe that Dr. Ladinsky "does not even know what [the term] means." *Id.* They further assert that Dr. Ladinsky "has never taken any course or attended any seminar covering principles of evidence-based medicine." *Id.* Given the claimed lack of experience in the area, they reason that Dr. Ladinsky should be precluded from

testifying that the WPATH and Endocrine Society guidelines are "evidence-based." *Id.* But the Defendants ignore Dr. Ladinsky's testimony.

When the Defendants asked Dr. Ladinsky to define the term "evidence-based medicine" and asked whether she had been trained in that area, she not only offered a definition, but she also testified about her training:

> Q.   **Can you explain to me what you understand the term "evidence-based" to mean?**
>
> A.   **Meaning simply consensus bodies of experts in the area have and are continually reviewing the best available evidence in the issue standards of care guidelines for practice and are continually reviewing and revising them.**
>
> Q.   Do you understand evidence-based to be a term of art?
>
> A.   I do not. I've not viewed it that way.
>
> Q.   **Have you ever received any training in what is referred to formally as evidence-based medicine?**
>
> A.   **I have.**
>
> Q.   **And describe to me the context in which you've received that training.**
>
> A.   **Through not just my medical training but more so during my fellowship training. We work with – we spent a lot of time in the distillation of different studies, validity consistency, how to read the literature and understand science in the most empirical form relative to the issue in question.**

(Ladinsky Depo. at 88-89) (emphasis added).

In that regard, Dr. Ladinsky—like many of the Defendants' retained experts—received training in evidence-based medicine through medical school and her fellowship. That Dr. Ladinsky has not taken "a course or attended a seminar in principles of formal evidence-based clinical practice," (Ladinsky Depo. at 95), is irrelevant to whether she has received relevant training. As Dr. Ladinsky testified—and the Defendants ignore—she received training on evidence-based medicine in her "medical training" and during her "fellowship training," during which she "spent a lot of time in the distillation of different studies, validity consistency, how to read the literature and understand science in the most empirical form relative to the issue in question." *Id.* at 89. Moreover, she is knowledgeable about the way to evaluate the relative strength of medical research. *Id.* at 100 (testifying about the "GRADE system of evaluating the strength of evidence"). The Defendants cite no authority for the proposition that the training Dr. Ladinsky received—or the knowledge she possesses—is an inadequate basis for the opinions that she has offered. And, to the extent that the Defendants quarrel with Dr. Ladinsky's definition or understanding of "evidence-based medicine," they are free to test her through cross-examination. *See, e.g.*, *Abbott Point of Care, Inc. v. Epocal, Inc.*, No. 08-543, 2012 WL 12897958, at *9 (N.D. Ala. Jan. 18, 2012) ("If [the defendant] believes that [the plaintiff's expert] incorrectly used certain terminology, it will have the opportunity to so convince the jury through cross-examination of [that expert] at trial. There is no

reason, however, to exclude [the expert's] testimony on these topics from the jury's consideration.")

Second, the Defendants argue that Dr. Ladinsky should be precluded from testifying that major medical organizations have endorsed the WPATH and Endocrine Society guidelines.  (Mot. at 16-17).  To support that claim, they rest on internal emails produced by WPATH during discovery in this case.  *Id.*

Their argument misses the mark.   In this case, the major medical organizations—including the American Medical Association, the American Academy of Pediatrics, and the Society for Adolescent Health and Medicine, each of which Dr. Ladinsky cites in her expert report (Ladinsky Rep. at 6)—filed an *amicus curiae* brief.  (Doc. 91-1).  As those organizations explained, "[t]he widely accepted view of the professional medical community is that gender-affirming care is the appropriate treatment for gender dysphoria and that, for some adolescents, gender-affirming medical interventions are necessary."  *Id.* at 16.  They clarified that "[t]he treatment protocols for gender dysphoria are laid out in established, evidence-based guidelines: (i) the Endocrine Society Clinical Practice Guidelines for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and (ii) the WPATH Standards of Care for the Health of Transexual, Transgender, and Gender-Nonconforming People."  *Id.* at 17.  And, according to the organizations, those guidelines "are the product of careful and robust deliberation following the same

types of processes-and subject to the same types of rigorous requirements-as other guidelines promulgated" by various medical organizations. *Id.* at 23. In short, "the use of the gender-affirming medical interventions specified in [the Endocrine Society and WPATH guidelines] is *supported by all mainstream pediatric organizations, representing thousands of physicians across multiple disciplines*." *Id.* at 27 (emphasis added).

The Defendants simply ignore the representations made by those organizations in favor of stray emails circulated internally among WPATH affiliates. (Mot. at 16-17). Whether those individual emails reflect an organizational position is doubtful, especially given the position taken by the organizations in this very case. Dr. Ladinsky correctly observed that the major medical organizations, including those that filed an *amicus curiae* brief in this case, have supported the guidelines promulgated by the Endocrine Society and WPATH. To the extent that the Defendants disagree, they are free to cross-examine Dr. Ladinsky at trial.

C.   **Dr. Ladinsky's testimony about the safety of puberty blockers and hormone therapy is admissible.**

Finally, the Defendants claim that Dr. Ladinsky should be precluded from opining on the "safety" of puberty blockers and hormone therapy. But their argument reads more like a cross-examination outline than a *Daubert* challenge. To the Defendants, because they believe there is evidence undercutting the validity of Dr. Ladinsky's opinions, her opinions pertaining to "safety" should be excluded.

Even accepting the truth of the Defendants' claims, disagreement among experts is a matter of weight, not admissibility.  *See, e.g.*, *Daniels v. City of N.Y.*, No. 16-9080, at *2 (S.D.N.Y. Nov. 13, 2008) ("An expert's opinion is rebutted by the opposing party with other evidence all the time. It does not mean that the expert's opinion must necessarily be precluded under Rule 702 and *Daubert*.").  The Motion should be denied.

First, the Defendants misleadingly describe Dr. Ladinsky's reliance on approval by medical organizations in support of her "safety" claim.  (Mot. at 18).  To the Defendants, Dr. Ladinsky simply "fell back to arguing" that the guidelines said nowhere that the treatments were "unsafe" and that, as a result, the treatments must be "safe."  *Id.*  But context matters.  The Defendants omit Dr. Ladinsky's testimony:

> Q.    Do you believe that you found any representation from the Endocrine Society in this document that either puberty blockers or cross-sex hormones are safe when administered to adolescents?
>
> A.    If you give me your definition of safe that would be great –
>
> Q.    No.
>
> A.    -- to help me.
>
> **Q.    You represented in your expert report that these organizations had stated that it was safe. So we'll work with your -- whatever you meant when you said that. Do you think you looked for and found any such representation before making that statement in your report?**

**A.** **I think endorsing a specific line of treatment carries that notion within it. In other words, everything in medicine is a cost-benefit evaluation application to an individual patient, but I certainly did not see in any of these guidelines a statement that this treatment is unsafe.**

(Ladinsky Depo. at 237-38) (emphasis added); *see also id.* at 240-41 (testifying that "safe" means "relative safety" by taking into consideration "cost-benefit analyses with patients").

The Defendants, therefore, ignore two critical aspects of Dr. Ladinsky's testimony: (i) to Dr. Ladinsky, the notion of medical "safety" does not mean "risk free," as the Defendants try to argue, but a "cost-benefit evaluation" when applied to an "individual patient;" and (ii) Dr. Ladinsky surmised that, because the organizations "endors[ed]" the guidelines, they must have concluded that those guidelines were overall "safe" (again, using her definition, not the Defendants' "risk free" definition). *Id.*; *see also id.* at 240-41. The Defendants offer no argument that either proposition, which they ignore, is unreasonable or without any basis in Dr. Ladinsky's experience.

Second, the Defendants contend that, because others disagree with Dr. Ladinsky's opinions about safety, Dr. Ladinsky's opinions should be excluded. For example, the Defendants cite to the controversial Cass Review[2] conducted in the

---

[2]  Members of the medical community have sharply criticized the results of the Cass Review. *See, e.g.*, McNamara, Meredithe, et al., An Evidence-Based Critique of "The Cass Review" on

United Kingdom for the proposition that pubertal delay "may inflict lasting harm on the child's cognitive development." (Mot. at 18).  They cite a survey that purportedly shows a relationship between puberty blockers and a decline in IQ among subjects. *Id.* at 18-19.  But the Defendants do nothing to demonstrate that either study establishes an irrefutable truth, such that disagreement necessarily warrants exclusion.  Instead, the Defendants cite to their own retained expert, who has reached a contrary result regarding these topics.  *Id.* at 20 (citing to Dr. Cantor's report).

To the Defendants, simply because Dr. Ladinsky disagrees with these various conclusions—based on her clinical experience as well as her reliance on the competing scientific research—warrants exclusion of her opinions.  They cite no decision for that novel proposition.  Nor could they, as caselaw is decidedly to the contrary.  *See, e.g.*, *TB Food USA, LLC v. American Mariculture, Inc.*, No. 17-9, 2021 WL 4962969, at *13 (M.D. Fla. Oct. 26, 2021) ("[W]here the experts disagree, it is 'precisely the type of dispute that should be decided within the crucible of cross examination, rather than by a judge at the *Daubert* stage.'") (quoting *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 857 (11th Cir. 2021)); *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, No. 05-260, 2008 WL 3819752, at *4 (M.D. Fla. Aug. 12, 2008) ("Simply because the experts disagree . . . does not require the

---

Gender-Affirming   Care   for   Adolescent   Gender   Dysphoria,   *available   at* https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf.

exclusion of [one expert's] opinion.  Such arguments go more to the weight of the evidence, than the admissibility of the evidence under *Daubert*.").

Third, the Defendants criticize Dr. Ladinsky's reliance on her own clinical experience.  But the Defendants gloss over the details.  True, Dr. Ladinsky has overseen the treatment of 17 patients with puberty blockers since beginning at UAB in 2015.  (Ladinsky Depo. at 48); (Ladinsky Report at 34).  Dr. Ladinsky, however, relies not only on her own clinical experience, but data derived from decades' worth of medical intervention as well as her own clinical experience pre-dating UAB. (Ladinsky Report at 18, 20, 23, 26, 30).  Coupling that data with staying abreast of scientific literature, (Ladinsky Depo. at 74-75), Dr. Ladinsky is undisputedly knowledgeable about the state of research regarding treatment of transgender adolescents.

The Defendants fault Dr. Ladinsky for failing to "study" her patients once they reach adulthood.  (Mot. at 21).  But they ignore Dr. Ladinsky's testimony.  When asked whether any of her former patients had "committed suicide" after reaching adulthood, Dr. Ladinsky testified that they do not have a "systematic way of tracking parameters of health and well-being once our patients graduate from our space and go on into college or adulthood," but she would expect to "be apprised of a tragedy like that" (though she fortunately has "never received that phone call")  (Ladinsky Depo. at 150-51).  From that modest testimony, the Defendants extrapolate a gap in

Dr. Ladinsky's knowledge.  Regardless, that she does not track her patients into adulthood does not undercut her experience—that, for the hundreds of patients she has treated or the scientific literature that she has reviewed, none of the data has supported the types of dire effects that the Defendants claim to be inevitabilities of puberty blockers and hormone therapies.  (Ladinsky Report at 22).

Courts routinely permit physicians, like Dr. Ladinsky, to rely on their clinical experience as well as scientific literature to form opinions regarding "safety."  *See, e.g.*, *Jackson v. Johnson & Johnson*, No. 11-3903, 2022 WL 110422, at *8 (N.D. Ga. Jan. 12, 2022) ("As a physician and professor, Dr. Schlafstein's experience is sufficiently reliable to allow him to testify as to the clinical risks and benefits of using Prolift and his understanding of the scientific literature on the topic.").  To the extent that the Defendants do not believe that Dr. Ladinsky has a firm basis for her opinions, they are free to cross-examine her on these topics.  Considering her reliance on her experience and knowledge of the scientific literature, she is qualified under *Daubert* to offer her proposed opinions.

Fourth, the Defendants—again, resting on their definition of "safe" to mean "risk free" rather than Dr. Ladinsky's definition of "safe" to mean "relative safety"—claim that bone density, fertility, and neurological risks necessarily mean that the medicines are "unsafe."  (Mot. at 19, 22-26).

As to bone density, the Defendants proclaim that Dr. Ladinsky has not studied it with respect to her own patients.  Dr. Ladinsky testified that, although they do not "routinely" measure bone density among their patients (mostly because they are on puberty blockers for such short periods of time), they do measure it "[i]f [the patients] have other medical indications or other medical challenges that could interfere with calcium metabolism, vitamin D metabolism, or bone density." (Ladinsky Depo. at 71).  Dr. Ladinsky has found no negative effects with regard to bone density among her patients.  The Defendants then claim that Dr. Ladinsky should have relied on a bone density study on which the Defendants' retained expert, Dr. Hruz, relied.  (Mot. at 25).  But Dr. Ladinsky considered and placed little weight on that study because its authors described puberty blockers' effect on bone density to be "*at best tentative*."  (Ladinsky Report at 27-28 n.21) (emphasis added).

As to fertility issues, Dr. Ladinsky acknowledges that potential fertility risks are associated with hormone therapies.  (Ladinsky Report at 12-13).  In that regard, the risk is disclosed to patients and families before initiation of treatment.  *Id.* at 21. She further explains that "[p]uberty blockers do not impair long-term fertility in either transgender or non-transgender patients."  *Id.* at 21.  Among other support for that proposition, Dr. Ladinsky rested on scientific literature suggesting that "viable sperm" were available 0.7 to 3 years after cessation of puberty blockers.  (Ladinsky Depo. at 257-58).  Though Dr. Ladinsky agreed that "the effects of *sustained* puberty

suppression on fertility [are] unknown," as she clarified, "[w]hat does . . . our clinical judgment mean by *sustained*?" *Id.* at 250 (emphasis added). In that regard, as Dr. Ladinsky elaborated, transgender youth receiving puberty blockers are prescribed those medicines for "short durations of time," not for "sustained" periods of time. *Id.* at 279. And, based on her experience and understanding of the scientific literature, placing a patient on puberty blockers poses no fertility risk.

As to neurological risks, the Defendants overstate the testimony. When asked about an unpublished statement regarding neurological effects of pubertal suppression, Dr. Ladinsky acknowledged that commenting on the statement was "[o]utside of [her] expertise to know *quantitatively*, *qualitatively*." (Ladinsky Depo. at 198) (emphasis added). The Defendants then asked Dr. Ladinsky about an author's "conjecture that the effects of pubertal suppression may not appear for several years." *Id.* at 206. To that question, Dr. Ladinsky testified that the author "posed [the issue] as a research question," which was "outside [her] expertise." *Id.* From those modest statements (which have nothing to do with whether Dr. Ladinsky is familiar with the science of the area generally), the Defendants extrapolate that Dr. Ladinsky has "disclaimed knowledge of the science and literature in this area." (Mot. at 19). To the contrary, Dr. Ladinsky is generally familiar with the literature in this area, as reflected in her expert report. As she opined in response to the Defendants' retained expert, Dr. Hruz, she has "not seen [alteration of normal

adolescent brain maturation] in [her] practice and science does not support [Dr. Hruz's claim]." (Ladinsky Report at 29). In support of that statement, Dr. Ladinsky cites to a study undercutting Dr. Hruz's conclusion. *Id.*

Regardless, even if the risks identified by the Defendants are inevitabilities— which, as Dr. Ladinsky and other experts have testified, is not true—risks are inherent to any medical intervention. (Ladinsky Report at 23) ("All medical intervention comes with risk, and any medication can have side effects."). As Dr. Ladinsky explains with regard to fertility risks, "[m]any people undergo fertility preservation before any treatment that could compromise fertility, including for instance, some types of pediatric cancers and autoimmune conditions." *Id.* at 21. For certain patients and their families, those risks are offset by the potential benefits. According to Dr. Ladinsky, "[p]roviding transition-based medical care can be lifesaving treatment and can improve the short- and long-term health outcomes for transgender youth" (a premise which the Defendants do not dispute). *Id.* at 23. Considering Dr. Ladinsky's overall definition of "safe," which considers the costs and the benefits of treatments as they relate to a particular patient, Dr. Ladinsky has a reliable, sufficient basis on which to opine about puberty blockers' and hormone therapies' safety.

For these reasons, the Motion should be denied. Dr. Ladinsky should be permitted to offer the opinions contained in her report.

Respectfully submitted this 12th day of August 2024.


*/s/ Melody H. Eagan*

Melody H. Eagan

Jeffrey P. Doss

Amie A. Vague

LIGHTFOOT, FRANKLIN &

WHITE LLC

The Clark Building

400 20th Street North

Birmingham, AL 35203

meagan@lightfootlaw.com

jdoss@lightfootlaw.com

avague@lightfootlaw.com


J. Andrew Pratt

Adam Reinke

Misty L. Peterson

KING & SPALDING LLP

1180 Peachtree Street Northeast, Suite 1600

Atlanta, GA 30309

apratt@kslaw.com

mpeterson@kslaw.com

areinke@kslaw.com


Brent P. Ray

Abigail Hoverman Terry

KING & SPALDING LLP

110 North Wacker Drive, Suite 3800

Chicago, IL 60606

bray@kslaw.com

aterry@kslaw.com


Abby Parsons

KING & SPALDING LLP

1100 Louisiana Street

Houston, TX 77002

aparsons@kslaw.com

Sarah Warbelow

Cynthia Weaver

HUMAN RIGHTS CAMPAIGN

FOUNDATION

1640 Rhode Island Ave., NW

Washington, DC 20036

sarah.warbelow@hrc.org

cynthia.weaver@hrc.org


Jennifer L. Levi

Sarah K. Austin

GLBTQ LEGAL ADVOCATES &

DEFENDERS

18 Tremont, Suite 950

Boston, MA 02108

jlevi@glad.org

saustin@glad.org


Jessica L. Stone

SOUTHERN POVERTY LAW

CENTER

150 E. Ponce de Leon Ave., Suite 340

Decatur, GA 30030

jessica.stone@splcenter.org


Christopher F. Stoll

Amy E. Whelan

Rachel H. Berg

NATIONAL CENTER FOR LESBIAN

RIGHTS

870 Market Street, Suite 370

San Francisco, CA 94102

cstoll@nclrights.org

awhelan@nclrights.org

rberg@nclrights.org

21

Scott D. McCoy
SOUTHERN POVERTY LAW                    *Counsel for Private Plaintiffs*
CENTER
P.O. Box 12463
Miami, FL 33101
scott.mccoy@splcenter.org

Diego A. Soto
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
diego.soto@splcenter.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2024, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to counsel of record in this case.

*/s/ Melody H. Eagan*
Counsel for Private Plaintiffs