UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Brianna Boe, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| and | ) |
| | ) |
| United States of America, | ) |
| | ) |
| *Plaintiff-Intervenor*, | ) |
| | ) |
| v. | ) No. 2:22-cv-00184-LCB-CWB |
| | ) |
| Hon. Steve Marshall, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

**PRIVATE PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. DAN KARASIC**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD ..................................................................................................... 1

ARGUMENT .................................................................................................................... 1

I. Dr. Karasic is qualified to offer opinions on all of the subjects to which Defendants object. ........................................................................................................ 1

   A. Dr. Karasic is qualified to offer testimony regarding the evidence and methodological underpinnings of WPATH SOC-8. ........................................... 1

   B. Dr. Karasic is qualified to offer testimony relating to the psychological assessment of gender dysphoria in youth in Alabama. .......................................... 4

   C. Dr. Karasic is qualified to offer testimony on the existing medical literature concerning the effects of puberty blockers and hormone therapy used to treat gender dysphoria. ...................................................................................... 5

   D. Dr. Karasic is qualified to testify that transgender people who have received hormone therapy can and do have children, because he has patients who have done so. ................................................................................................ 6

II. Defendants' critiques of Dr. Karasic's opinions do not render those opinions unreliable. .................................................................................................................... 7

   A. Dr. Karasic's opinions about the safety of gender transition treatments are reliable. ................................................................................................................ 8

   B. Dr. Karasic's testimony that very few existing medical interventions are supported by high GRADE scores is reliable. ...................................................... 10

   C. Dr. Karasic's description of factors that could explain demographic characteristics of the transgender youth population is reliable. ........................... 11

III. There is no basis under *Daubert* for Defendants to exclude Dr. Karasic's first-hand testimony about his own experience with WPATH. ................................. 13

CONCLUSION ............................................................................................................... 14

# INTRODUCTION

Defendants' motion to exclude portions of the testimony of Dr. Dan Karasic primarily seeks to reiterate their false depiction of the World Professional Association for Transgender Health (WPATH) as a biased organization that seeks to suppress dissent. Stripped of the bluster, Defendants' motion offers no sound legal basis for the Court to exclude any portion of Dr. Karasic's opinion under the Federal Rules of Evidence. Dr. Karasic is amply qualified to offer opinion testimony on each subject discussed in his expert report, and each of his opinions is reliable and helpful to the trier of fact. Defendants' motion should be denied.

# LEGAL STANDARD

To avoid duplication, Plaintiffs respectfully refer the Court to the statement of the governing legal principles articulated in Plaintiffs' Opposition to Defendants' Motion to Exclude Selected Testimony of Dr. Aron Janssen.

# ARGUMENT

**I.     Dr. Karasic is qualified to offer opinions on all of the subjects to which Defendants object.**

**A. Dr. Karasic is qualified to offer testimony regarding the evidence and methodological underpinnings of WPATH SOC-8.**

Defendants assert that Dr. Karasic is unqualified to testify about "the evidence and methodology underpinning the chapter [of WPATH SOC-8] that matters most in this case—the chapter for adolescents." Mot. at 5. As is readily apparent from

1

their motion, however, Defendants in this case seek to broadly attack the WPATH standards, which are supported by "an international consensus of leaders in providing and researching care for transgender people." *Daubert.*DX40:26 (Karasic Rep.).

WPATH deployed a standardized methodology across all SOC-8 chapters. *See* SJ.DX116:S247 (SOC-8) ("Drafts of the chapters were reviewed by the Chair and the Co-Chairs of the SOC Revision Committee to ensure the format was consistent, evidence was properly provided, and recommendations were consistent across chapters."). And as a Chapter Member, Dr. Karasic was held to the same standards and processes as those involved in the adolescent chapter. This process included (1) participating in the development refinement of review questions, (2) reading and providing comments on all materials from the Evidence Review Team, (3) critically reviewing draft documents, including the draft evidence report, (4) reviewing and assessing evidence and draft recommendations, (5) participating in the Delphi consensus process, (6) developing the text to back up the recommendation statements, (7) grading each statement to describe the strength of the recommendation, (8) reviewing and addressing the comments from the Chairs during the whole process, (9) developing the content of the chapters, (10) reviewing comments from public comments and assisting in the development of a revision of guidelines, and (11) providing input and participating in the dissemination of

guidelines. *Id.* at S248. Dr. Karasic's experience as a WPATH committee member, former WPATH board member, and lead author of the SOC-8 mental health chapter permits him to testify broadly regarding the drafting process of SOC-8.

More generally, Dr. Karasic has a deep and comprehensive understanding of the relevant research underpinning much of SOC-8 as a whole, including the adolescent chapter. His deposition testimony and expert report rebut in detail numerous incorrect assertions made by Defendants' witnesses concerning the quality and extent of the evidence supporting the safety and efficacy of medical treatment for gender dysphoria in adolescents, and specifically the mental health benefits of medical treatment for adolescents. *Daubert*.DX40:25–56 (Karasic Rep.). Defendants offer no reason why he lacks sufficient expertise to offer opinions that "stem from his understanding," Mot. at 6, of that body of research and evidence, regardless of whether such testimony relates to the scientific support for the SOC-8 adolescent chapter's specific recommendations or to the subject of safety and efficacy of treatment more generally. If Defendants contend that Dr. Karasic lacks sufficient knowledge or expertise to testify concerning specific details of the drafting process for the adolescent chapter, they may offer objections to such testimony at trial, if there are any. Their motion, however, offers no sound basis for a vague prohibition on testimony that "stems from" his understanding of the "evidence" supporting SOC-8's adolescent chapter.

3

### B. Dr. Karasic is qualified to offer testimony relating to the psychological assessment of gender dysphoria in youth in Alabama.

Defendants seek to exclude any testimony from Dr. Karasic on "transitioning care in Alabama" because he does not practice in the state. Mot. at 6. This portion of their motion apparently is directed at a single line in Dr. Karasic's report in which he observes that Defendants' experts "assume, without basis, that all or most gender clinics disregard" the prevailing protocols for treatment of gender dysphoria. *Daubert*.DX40:27 (Karasic Rep.). Dr. Karasic's critique of Defendants' experts' unfounded assumptions is not only accurate but firmly rooted in his own clinical experience. Dr. Karasic is a "clinician who, unlike the State's experts, actively works with a multitude of clinicians providing care to transgender youth and adults" and "know[s] firsthand that [Defendants'] characterization of treatment is wholly inconsistent with prevailing practice." *Id*.

"The vast majority of mental health providers in the country...follow the WPATH standards of care." SJ.DX18:271:1-3 (Bowers Dep.) (sealed). This includes practitioners in Alabama. *See* SJ.DX:37:58:7-8 (Austin Dep.) (sealed)[1] (citing WPATH as the standards of care the UAB Pediatric Gender Clinic follows). As an expert in the diagnosis and treatment of gender dysphoria, and based on his extensive

---

[1] While the Bowers, and Austin deposition transcripts were submitted by Defendants under seal, Private Plaintiffs have not redacted the citations to those documents in this brief. The parties agree that the narrow excerpts cited do not constitute Confidential Information as defined under the Stipulated Protective Order (ECF No. 137).

clinical experience working with practitioners caring for transgender youth around the country, Dr. Karasic is qualified to testify that Alabama providers' description of the care they provide is consistent with the prevailing protocols, and that [i]f there are individual doctors who deviate from accepted protocols . . . medical licensing boards can address that without denying care to those who have been appropriately assessed." *Daubert*.DX40:28 (Karasic Rep.).

### C. Dr. Karasic is qualified to offer testimony on the existing medical literature concerning the effects of puberty blockers and hormone therapy used to treat gender dysphoria.

Defendants seek to exclude testimony from Dr. Karasic rebutting the speculation of their expert endocrinologists that using testosterone to treat gender dysphoria could cause mental health problems. Mot. at 8. As Dr. Karasic points out, a study Dr. Laidlaw cites for this opinion involved anabolic steroid abuse in nontransgender men. *See Daubert*.DX40:55 (Karasic Rep.). Other studies have shown that even doses of testosterone "several times [greater than] the typical dose" used to treat gender dysphoria did not cause psychiatric symptoms, and that "improved psychological functioning on multiple domains" occurred when transgender men began taking testosterone. *Daubert*.DX40:55, 56 (Karasic Rep.) (citing studies). Although Defendants might prefer the Court to be unaware of these facts, they are facts nonetheless, and Dr. Karasic is more than qualified to testify to them.

5

Dr. Karasic is a physician and mental health specialist who has personally treated thousands of transgender patients, including many receiving these medications, as well as an emeritus professor of medicine who has closely followed the emerging literature on treatment of gender dysphoria for decades. As a treating physician, he is aware of the medications his transgender patients are taking and the doses that typically are prescribed, and his medical specialty is the diagnosis and treatment of psychiatric disorders. *See* Karasic Declaration ¶ 4 (attached as Exhibit 1). He does not need to be an endocrinologist to testify what the research actually shows about Defendants' unsupported claims that the use of medications to treat gender dysphoria could cause psychiatric disorders.

**D. Dr. Karasic is qualified to testify that transgender people who have received hormone therapy can and do have children, because he has patients who have done so.**

Defendants seek to exclude Dr. Karasic's testimony that "[t]ransgender individuals who have received hormone therapy can and do have children, both biological and non-biological, whether or not fertility preservation occurs." *See Daubert*.DX40:53 (Karasic Rep.). Defendants accuse Dr. Karasic of "freestyling," but if they had asked Dr. Karasic the basis for this statement during his deposition, they would have learned that the reason he knows this is quite simple: Dr. Karasic is personally aware of transgender individuals, including his own patients, who have had biological children after being treated with hormone therapy, even without

6

fertility preservation. *See* Karasic Declaration ¶ 3. It is unclear what more expertise Defendants believe Dr. Karasic would need to make this statement than to have personal knowledge of transgender individuals who have had children after receiving hormone therapy.

## II. Defendants' critiques of Dr. Karasic's opinions do not render those opinions unreliable.

In evaluating reliability, courts may consider factors such as "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). In ruling on a *Daubert* motion, courts should not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F. 3d 1333, 1341 (11th Cir. 2003). Alleged weaknesses in admissible expert opinions can and should be exposed at trial through "vigorous cross-examination" and "presentation of contrary evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)). None of Defendants' critiques of Dr. Karasic's opinions supports a broad exclusion of his testimony on the topics they identify; any purported shortcomings can be fully explored on cross-examination at trial.

### A. Dr. Karasic's opinions about the safety of gender transition treatments are reliable.

Relying on his education, training, decades of experience treating adolescents and adults diagnosed with gender dysphoria, and extensive knowledge of the scientific literature related to gender transition treatments, Dr. Karasic rebuts various claims made by Defendants' experts concerning the benefits and risks of those treatments. *See Daubert*.DX40:29–33 (Karasic Rep.) (evidence of safety and effectiveness); *id.* at 33–37 (absence of evidence supporting effectiveness of psychotherapy alone or other approaches proposed by Defendants' experts). Based on his long clinical experience and deep understanding of the relevant literature, Dr. Karasic reliably concluded that these treatments are the only interventions that have been shown to be safe and effective in treating gender dysphoria when medically indicated. *Id.* at 31–33.

Defendants seek to exclude Dr. Karasic's rebuttal opinion regarding the safety and effectiveness of medical treatments for gender dysphoria solely because the effects of one of those treatments -- puberty blocking medications -- on brain development has been identified as an area in which further research is warranted. Mot. at 11. As Dr. Karasic makes clear, the fact that further research in this area is desirable does not mean that treatment is unsafe or unnecessary, particularly when these hypothesized risks are balanced against a risk that *is* well known and well understood: the risk of withholding medical treatment for gender dysphoria, which

8

can lead to "additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality." *Daubert.*DX40:32 (Karasic Rep.).

Dr. Karasic testified that in his opinion, the hypothesized risk that puberty blocking medications could have brain development effects is something that should be discussed with the adolescent patient and their guardian when considering treatment. *See Daubert.*DX39:155:5–13 (Karasic Dep.). That theoretical possibility, however, needs to be balanced against "a lot of other considerations for which there's more evidence," including the known risks to cognitive development arising from "prolonged depression or gender dysphoria that's impairing their functioning." *Id.* at 156:17-24. From Dr. Karasic's clinical experience, he is aware that puberty blockers have allowed his adolescent patients to "focus on school in a way to excel" and to "get into a college that was consistent with . . . their goals." *Id.* at 161:7-9. In addition, puberty blockers have long been used to treat precocious puberty, which is additional evidence of their safety when used for these relatively short periods of time. *See id.* at 160:22–25.

In sum, Dr. Karasic's opinions concerning the safety and effectiveness of medical treatment in appropriate cases are both reliable and supported by the substantial medical literature cited in his report. Defendants are free to explore any limitations or perceived flaws in those opinions on cross-examination, but the fact

9

that additional research is warranted in some areas, as is true of nearly everything in medicine, is no basis for the wholesale exclusion of his opinions under *Daubert.*

### B. Dr. Karasic's testimony that very few existing medical interventions are supported by high GRADE scores is reliable.

Defendants seek to exclude Dr. Karasic's testimony that systematic reviews ascribing low GRADE scores to research on medical treatment for gender dysphoria are comparable to the GRADE scores supporting many medical treatments in use today. It's understandable why Defendants would prefer the trier of fact not to hear this evidence. As Dr. Karasic states, one study found that "only 36% of national guidelines for care were based on strong or moderate GRADE scores." *Daubert.*DX40:49 (Karasic Rep.). Others have found that "only 5.6% of all medical interventions, and 0.0% of endocrine interventions, had a high GRADE score," or that "for a majority of systematic reviews of medical interventions, GRADE scores were low or very low." *Id.* at 49–50 (citing studies). As Dr. Karasic makes clear, "[i]f only medical interventions with high GRADE scores were permitted by law, most medical interventions and all complex interventions, would be banned." *Id.* at 50.

Dr. Karasic does not need specialized training in the intricacies of GRADE scoring to understand these studies or to explain their reported results to the trier of fact. If Defendants believe he has misunderstood or incorrectly stated the results of the studies he describes, they are free to explore that on cross-examination, and the

10

trier of fact may assign appropriate weight to the testimony. Defendants have failed to show, however, that Dr. Karasic's description of those studies or their significance is so lacking in reliability that the Court, as trier of fact, should not be allowed to hear it.

### C. Dr. Karasic's description of factors that could explain demographic characteristics of the transgender youth population is reliable.

In his report, Dr. Karasic responds to the pure speculation offered by Defendants' experts that the increase in the number of referrals to gender clinics in recent years and changes in the sex ratios of youth identifying as transgender are caused by factors such as "social contagion," peer pressure, cell phone usage, social media, or a hypothesized phenomenon they have dubbed "Rapid Onset Gender Dysphoria." *Daubert*.DX40:37–40 (Karasic Rep.). Remarkably, even as their own experts speculate liberally about such matters, Defendants seek to prevent the trier of fact from hearing Dr. Karasic's rebuttal testimony, which cites relevant demographic data and other evidence demonstrating that other explanations exist.

As Dr. Karasic observes, there are many reasons why some clinics may be seeing more referrals or differences in the sex ratios of those referred for assessment. First, recent years have seen the emergence of "greater awareness on the part of youth and their parents of what gender dysphoria is and that care is available," and there are more clinics providing this care than in the past. *Daubert*.DX40:37–38 (Karasic Rep.). It is not surprising that greater awareness of and availability of

11

treatment would lead to an increase in individuals seeking care. Second, Dr. Karasic observes that one cannot extrapolate from surveys about the number of young people identifying as transgender and assume that this data translates to a change in the number of youth being diagnosed with or treated for gender dysphoria. *See id.* at 38. Gender dysphoria is a medical condition with diagnostic criteria, and "fewer than 1 in 1000 people" have a gender dysphoria diagnosis. *Id.* Because only a "small fraction of the people identifying as transgender" are referred to clinics, any differences in the sex ratios of patients "may reflect referral patterns to clinics rather than changes in the number of people identifying as transgender." *Id.* at 39. Third, "[s]ex ratios of patients vary from clinic to clinic and over time;" from 2003 to 2020, in Dr. Karasic's own youth clinic, "a consistent majority of … patients were assigned female at birth." *Id.* This evidence is inconsistent with Defendants' unqualified assertion that there has been a "dramatic shift," Mot. at 13, in sex ratios. Fourth, while social factors may influence gender "in the sense that social or cultural developments make it more possible for youth struggling with gender dysphoria to access care," there is no evidence supporting "Rapid Onset Gender Dysphoria" or the notion that "peers and social media cause individuals to be transgender." *Daubert.*DX40:39–40 (Karasic Rep.).

In short, Defendants offer no persuasive reason why Dr. Karasic should not be permitted to rebut Defendants' experts' speculative hypotheses by pointing out

the lack of evidence supporting them and by showing, with relevant evidence, that many other explanations exist.

### III. There is no basis under *Daubert* for Defendants to exclude Dr. Karasic's first-hand testimony about his own experience with WPATH.

Finally, Defendants' *Daubert* motion contains a lengthy factual narrative about various events relating to WPATH, including some at which Dr. Karasic was present, and about which they questioned him in his deposition. While Defendants do not specify what testimony from Dr. Karasic concerning these events they are seeking to exclude, one thing is clear: *Daubert* offers no grounds to prevent an otherwise competent witness from offering testimony about historical facts of which he has personal knowledge.

When a witness testifies in a dual role as both a percipient observer of certain events and as a subject-matter expert, there is a clear line that distinguishes the two types of testimony. Percipient-witness testimony is "an account of [the witness's] experience." *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1316 (11th Cir. 2011). This is lay testimony that is not subject to the standards of Rule 702 or *Daubert* and is admissible as long as the witness has personal knowledge of the matter and is otherwise competent to testify. *See id*. *Daubert* becomes relevant only when a witness's testimony "go[es] beyond that sphere and purports[s] to provide explanations of scientific and technical information not grounded in their own observations and technical experience." *Id.* at 1317. It is only when "testimony is

13

based on a hypothesis, not … experience … [that] it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702 and the strictures of *Daubert*." *Id.* 1317–18. Moreover, Rule 701 permits lay witnesses to offer opinions that are "rationally based on the perception of the witness" and "helpful to . . . the determination of a fact in issue." Fed. R. Evid. 701.

Although it is unclear exactly what Defendants do not wish Dr. Karasic to be able to say at trial, it is clear that nothing they describe in their motion is subject to exclusion under Rule 702 or *Daubert*, because none of it is "based on a hypothesis." *Williams,* 644 F.3d at 1317. To the contrary, his testimony relates to events Dr. Karasic personally witnessed and to his personal experience as a member of WPATH. Should Defendants have objections to any questions asked of Dr. Karasic in his lay witness capacity, they may assert them at trial.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion.

Respectfully submitted this 12th day of August 2024.

*/s/ Melody H. Eagan*

Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT, FRANKLIN &
WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt
Adam Reinke
Misty L. Peterson
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com

Brent P. Ray
Abigail Hoverman Terry
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
bray@kslaw.com
aterry@kslaw.com

Abby Parsons
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002
aparsons@kslaw.com

Sarah Warbelow
Cynthia Weaver
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

Jennifer L. Levi
Sarah K. Austin
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
jlevi@glad.org
saustin@glad.org

Jessica L. Stone
SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
jessica.stone@splcenter.org

Christopher F. Stoll
Amy E. Whelan
Rachel H. Berg
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

Scott D. McCoy
SOUTHERN POVERTY LAW
CENTER
P.O. Box 12463
Miami, FL 33101
scott.mccoy@splcenter.org

*Counsel for Private Plaintiffs*

Diego A. Soto
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
diego.soto@splcenter.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this case.

*/s/ Melody H. Eagan*
Counsel for Private Plaintiffs