# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| Brianna Boe, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| and | ) |
| | ) |
| United States of America, | ) |
| | ) |
| *Plaintiff-Intervenor*, | ) |
| | ) |
| v. | ) No. 2:22-cv-00184-LCB-CWB |
| | ) |
| Hon. Steve Marshall, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

**PRIVATE PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. JENIFER LIGHTDALE**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

LEGAL STANDARD............................................................................................1

ARGUMENT .........................................................................................................2

I.   As an expert in the development of clinical practice guidelines, Dr. Lightdale is qualified to offer reliable testimony on the relative rigor, strength, and transparency of WPATH SOC8's publicly stated development processes. ..........2

II.  Dr. Lightdale does not offer factual testimony about how WPATH implemented its methodology..................................................................................................6

III. Dr. Lightdale is qualified to testify and offers reliable testimony concerning conflicts of interest..............................................................................................7

CONCLUSION....................................................................................................12

# INTRODUCTION

An expert in the development of clinical practice guidelines, Dr. Jenifer Lightdale is qualified to testify about the process of developing trustworthy, evidence-based clinical practice guidelines based on her education, training, research, and clinical experience. Her testimony reliably demonstrates how WPATH's publicly disclosed process for developing SOC8 is "comparable or superior to the methodology that has been used by many other medical societies to develop clinical practice guidelines for the treatment of many other medical conditions, both pediatric and adult, and is in line with best clinical practice guideline practices as outlined by the National Academy of Sciences." Daubert.DX9:6–7:¶ 19 (Lightdale Rept.). Attempting to scrutinize WPATH's guidelines in a vacuum, without reference to how they compare to other medical guidelines, Defendants seek to exclude Dr. Lightdale's testimony and deprive this Court of reliable information about the standards by which to judge SOC8's development. Defendants' arguments are incompatible with the admissibility standards governed by the Federal Rules of Evidence, and their motion should be denied.

# LEGAL STANDARD

To avoid duplication, Plaintiffs respectfully refer the Court to the statement of the governing legal principles articulated in Plaintiffs' Opposition to Defendants' Motion to Exclude Selected Testimony of Dr. Aron Janssen.

# ARGUMENT

**I.  As an expert in the development of clinical practice guidelines, Dr. Lightdale is qualified to offer reliable testimony on the relative rigor, strength, and transparency of WPATH SOC8's publicly stated development processes.**

Federal Rule of Evidence 702 allows an expert to be qualified "by knowledge, skill, experience, training, or education." As it relates to clinical guideline development, Dr. Lightdale far exceeds Daubert's expert qualifications standards, meeting all five independent bases of admissibility.

Dr. Lightdale earned a Doctor of Medicine degree from the Mount Sinai School of Medicine and a Master's in Public Health in the field of clinical effectiveness from Harvard School of Public Health. Daubert.DX9:3:¶ 6 (Lightdale Rept.). She completed post-graduate, clinical fellowships at both the University of California and Harvard University. *Id.* Dr. Lightdale has "contributed significantly to both national and international guidelines on endoscopic procedures." *Id.* at 3:¶ 7. For example, she recently "led an international effort to codify the standards and indicators that define high quality pediatric endoscopy, involving clinical experts from 31 medical centers representing 11 countries." *Id.* Under her leadership, five clinical practice guidelines on "key domains of pediatric endoscopy quality" were published, and all were endorsed by the American Society of Gastrointestinal Endoscopy (ASGE) and the Canadian Association of Gastroenterology. *Id.*

In addition, as a member of the ASGE Standards of Practice Committee from 2012 to 2016, Dr. Lightdale was a "primary author on guidelines for endoscopic sedation, inflammatory bowel disease, and pediatric endoscopy." *Id.* at 3–4:¶ 8. In 2018, Dr. Lightdale was appointed to the Editorial Board of *Gastrointestinal Endoscopy*, ASGE's peer-reviewed scientific journal, serving as "editor for all ASGE endorsed statements and clinical guidelines prior to publication." *Id.* at 4:¶ 9.

As a twice-elected Executive Committee member of the Section of Gastroenterology, Hepatology and Nutrition of the American Academy of Pediatrics (AAP), Dr. Lightdale also "took the lead in several published clinical reports, including the AAP statement on GERD that aims to reduce practice variation among pediatricians." *Id.* at 4:¶ 11. Aside from endoscopy, Dr. Lightdale has also contributed to other quality care metrics involving patient care and safety, including serving as an expert in a "public-private partnership consortium with the Food and Drug Administration (FDA) to streamline the discovery and development process for new sedatives." *Id.* at 4:¶ 10. Her highly specialized education, training, and experience more than qualifies Dr. Lightdale to testify regarding the development of clinical practice guidelines.

Defendants challenge Dr. Lightdale's expertise regarding clinical guideline development because she testified in her deposition that she was "not a

3

methodologist." ECF No. 595 at 3 (citing SJ.DX69:26:16 (Lightdale Depo.)). Nevertheless, the fact that Dr. Lightdale does not consider herself an expert methodologist does not mean she lacks the relevant education, training, knowledge, skill, or experience to give her proffered opinions regarding clinical practice guideline development. *See Harvey v. Novartis Pharmaceutical Corp.*, 895 F. Supp. 2d 1206, 1211 (N.D. Ala. 2012). Nor does the fact that guideline development teams on which she has worked "enlist[ed]" a methodologist as a team member (ECF No. 595 at 3) render her unqualified. Dr. Lightdale's testimony was not a disclaimer of expertise; it was an explanation of how, in her extensive experience, methodologists are and should be used in the process of developing clinical practice guidelines. Not only is Dr. Lightdale's experience consistent with WPATH's process in developing SOC8 (*see* SJ.DX116:8, 177, 247, 249 (SOC8)), but her testimony is corroborated by international recommendations regarding best practices for guideline development. For example, the World Health Organization (WHO) recommends that a methodologist "be involved in the development" of clinical practice guidelines.[1] The Institute of Medicine (IoM)[2] recommends that guideline development groups work with a methodologist throughout the systematic review

---

[1] World Health Organization, *WHO Handbook for Guideline Development* 33 (2d ed. 2014) ("The methodologist complements the technical expertise of the subject matter experts . . . .") (attached as Exhibit 1).

[2] The Institute of Medicine has since been renamed the National Academy of Medicine.

4

process and receive advice and training from a methodologist regarding other aspects of guideline development. SJ.DX76:96–97 (IoM, *Clinical Practice Guidelines We Can Trust*).[3] There simply is no reason to doubt Dr. Lightdale's qualifications to offer reliable testimony about her experience developing clinical practice guidelines, including working with methodologists, and how that compares with WPATH's publicly stated development process.

    Dr. Lightdale is similarly qualified to testify about the GRADE system for evaluating evidence. Examining her deposition testimony, Dr. Lightdale clearly demonstrates both a working and academic familiarity with GRADE that qualifies her. She testified in her deposition about the historical evolution of GRADE and current critiques of GRADE. *See, e.g.,* SJ.DX69:65:13–66:11 (Lightdale Depo.). She is familiar with the literature that established the GRADE system. *Id.* at 67:6–9. As part of her experience developing clinical practice guidelines, GRADE has been the most commonly used system for classifying evidence; her colleagues regularly talked about GRADE and "would ask if you're following that"; and she has used GRADE in developing clinical practice guidelines. *Id.* at 52:11–53:19, 58:10–14, 58:19–23, 62:24–63:3. Further, in Dr. Lightdale's experience, "the GRADE methodology can be applied in different ways," and "even the process of putting

---

[3] *See also id.* at 7 (recommending that "methodological experts" be represented in the guideline development group); *id.* at 81 (noting that the using a methodologist can mitigate the influence of potential conflicts of interest).

5

together a guideline [requires] a certain amount of consensus about how you're going to use GRADE methodology." *Id.* at 58:9–58:10, 60:11–60:15.

## II. Dr. Lightdale does not offer factual testimony about how WPATH implemented its methodology.

Defendants move to preemptively strike any future testimony of Dr. Lightdale that speaks to "the methodology actually employed by WPATH to develop SOC-8." ECF No. 595 at 4. But this is a non-issue for the Court, as Dr. Lightdale acknowledges that she "did not have any personal involvement in developing those standards nor . . . any personal knowledge of how the process was implemented." Daubert.DX9:¶ 18 (Lightdale Rept.). Dr. Lightdale simply presents this Court with evidence and examples of how other clinical guidelines are developed and how WPATH's publicly stated development processes for SOC8 -- processes that are part of the record of this case -- compare.

While Defendants claim Dr. Lightdale's testimony is unreliable because she "repeatedly based her opinions and her assertions about WPATH's process on assumptions" (ECF No. 595 at 5), "reliance on . . . assumptions does not render expert testimony inadmissible under *Daubert*." *Griffin v. Coffee Cty.*, 623 F. Supp. 3d 1365, 1379 (S.D. Ga. 2022); *see also FNB Bank v. Park Nat'l Corp.*, 996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014). Dr. Lightdale's testimony properly considered assumptions that are based in record evidence. For example, the record supports that the WPATH SOC8 standards were developed using the Delphi method. It also

6

supports SOC8's use of GRADE. While Defendants are free to challenge these assumptions "through cross-examination" or competing testimony, *id*, her offering an opinion based upon assumptions for which there is record evidence does not render her testimony inadmissible.

**III.    Dr. Lightdale is qualified to testify about and offers reliable testimony concerning conflicts of interest.**

Based on her substantial experience developing high-quality clinical practice guidelines, Dr. Lightdale is qualified to provide testimony on how guideline development groups manage authors' potential conflicts of interest (COI). Under Daubert's admissibility standards, "the court must examine the individual's education, training, and experience, and decide if these credentials make the individual qualified to offer an expert opinion." *Harvey*, 895 F. Supp. 2d at 1211. Whether or not Dr. Lightdale considers herself an expert in "conflict-of-interest principles", she certainly has a wealth of experience creating clinical guidelines and can testify about the role COI typically plays in the guideline development and author selection processes in her experience. *See id.*

Based on her experience and expertise developing national and international guidelines, Dr. Lightdale reliably opined that "[g]uidelines for treating medical conditions are, of necessity and appropriately from a scientific perspective, developed by those with experience and expertise in treating and researching those conditions. It would make no sense—and jeopardize patient health and safety—for

7

such treatment guidelines to be developed by 'outsiders' with no subject matter expertise." Daubert.DX9:¶ 31 (Lightdale Rept.). As WHO recognizes, "[i]ndividuals selected for their technical expertise in a guideline's subject area are critically important" to guideline development groups and should be included along with other members with "a range of expertise and institutional and professional affiliations."[4]

Attempting to undermine this well-reasoned and reliable opinion, Defendants mischaracterize Dr. Lightdale's deposition testimony. It is true that Dr. Lightdale "agreed" at her deposition that a conflict of interest exists if "an independent observer might reasonably question whether the individual's professional actions or decisions are motivated by personal gain, such as financial, academic advancement, clinical revenue streams or community standing." SJ.DX69:170:12–171:7 (Lightdale Depo.); *see* ECF No. 595 at 10 (selectively quoting same). Yet, Defendants conveniently omit Dr. Lightdale's full answer: "Yes, this is consistent with what I think, **which is really around this very important concept of an independent observer might reasonably question whether something is being motivated**." SJ.DX69:171:4–7 (Lightdale Depo.) (emphasis added). Moreover, when asked directly whether she thought clinical income creates a financial conflict of interest, Dr. Lightdale responded, "I disagree with . . . how this is being characterized," consistent with her written report and the above-cited testimony. *Id*.

---

[4] World Health Organization, *WHO Handbook for Guideline Development* 26 (2d ed. 2014)

at 173:10–11. She went on to explain several reasons for her disagreement. For example, she explained why she did not believe an independent observer could reasonably question the motivations of clinicians based on their clinical revenue streams. *See id.* at 173:10–19. Her testimony is consistent with that of other experts in the field, including Dr. Kenneth Goodman. *See* SJ.DX74:52:21–54:25, 55:10–56:9, 59:11–17 (Goodman Depo.); *see also* SJ.DX77:273 (WHO guidance) (indicating that "conflicts of interest represent a spectrum; they are not absolute situations").

      Dr. Lightdale also reliably testified that clinicians should not be excluded from the guideline development process. She explained, "that would make no sense. . . . [W]e know we need experts in guidelines and . . . those experts have to really be doing the medicine in order to be able to be a part of that process." SJ.DX69:173:23–174:4 (Lightdale Depo.); *see also id.* at 176:15–20 ("I think [the IoM is] assuming that the people on a guideline committee are experts in their field and do that type of medicine. . . . There's no point in being in a guideline-writing process if you don't actually practice the medicine."). She testified that financial conflicts of interest are much more concerning when guideline authors are earning income from a company that stands to gain or lose depending on the substance of a guideline. *See id.* at 174:5–14, 176:21–178:10. These opinions are consistent with both WHO and IoM guidance. *See* SJ.DX77:273–75 (WHO guidance) (listing those with substantial ties

9

to industry—and not clinicians—among those who have conflicts of interest that must be managed "at the individual level" through exclusion or other means); SJ.DX76:80 (IoM guidance) (focusing on concerns raised by authors' financial ties to commercial entities, including "pharmaceutical and medical device companies," while noting that clinicians "may provide valuable insight" on a guideline and "may simply be without substitutes"); *id.* at 60–62 (highlighting financial conflicts resulting from industry relationships).

Defendants are free to challenge the persuasiveness of Dr. Lightdale's testimony by providing the Court with contradictory evidence of clinical guidelines created with no subject-matter experts or clinicians who treat the relevant patient population. Yet, neither Defendants nor their experts -- notably -- have identified such a guideline. And, under *Daubert*, "an opinion that is incompatible with a [party]'s case alone does not render that expert unqualified." *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004).

To the extent Defendants imply that WPATH failed to adequately manage conflicts of interest among clinicians, Dr. Lightdale reliably rebuts that argument, concluding based on her experience that WPATH's publicly stated processes for developing SOC8 are "comparable or superior to the methodology that has been used by many other medical societies to develop clinical practice guidelines." Daubert.DX9:¶ 19 (Lightdale Rept.). As she explained, WPATH publicly stated that

10

the SOC8 guideline development committee "was multidisciplinary and consisted of subject matter experts, health care professionals, researchers, and stakeholders with diverse perspectives and geographic representation," *id.* ¶ 29, and an independent methodologist and Evidence Review Team assisted with the planning and execution of systematic reviews, *id.* ¶¶ 20, 29. These procedures are recognized by WHO as strategies for managing conflicts of interest. SJ.DX77:273 (advocating for the use of multidisciplinary groups); *id.* at 275 (indicating that commissioning a methodologist is an effective strategy for managing conflicts).

Similarly, Dr. Lightdale testified based on her experience that WPATH's publicly stated process for requiring authors to disclose COI was "impressive." SJ.DX69:183:19–184:4 (Lightdale Depo.) (noting that "most of us are just starting to do this"). The evidence is consistent with her experience. In a study cited by IoM, 87 percent of individual authors across 37 guidelines "had a financial relationship with industry" and 59 percent "had financial relationships with companies whose products were considered," yet "[t]he majority of respondents reported **no discussion or disclosure** of financial relationships with industry among panel participants during the guideline development process." SJ.DX76:61–62 (emphasis added); *see also id.* at 81 (noting that "COI policies vary with regard to the specific types of information that must be disclosed"). This research only reinforces the reliability and credibility of Dr. Lightdale's testimony about the practical realities of

11

how COI policies vary regarding the specific types of information that must be disclosed for conflicts of interest in her experience when developing clinical practice guidelines.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to exclude selected testimony of Dr. Jenifer Lightdale.

Respectfully submitted this 12th day of August 2024.


*/s/ Melody H. Eagan*
Melody H. Eagan
Jeffrey P. Doss
Amie A. Vague
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt
Adam Reinke
Misty L. Peterson
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com

Sarah Warbelow
Cynthia Weaver
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org

Jennifer L. Levi
Sarah K. Austin
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
jlevi@glad.org
saustin@glad.org

Jessica L. Stone
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340

Brent P. Ray
Abigail Hoverman Terry
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
bray@kslaw.com
aterry@kslaw.com

Abby Parsons
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002
aparsons@kslaw.com

Scott D. McCoy
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101
scott.mccoy@splcenter.org

Diego A. Soto
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
diego.soto@splcenter.org

*Counsel for Private Plaintiffs*

Decatur, GA 30030
jessica.stone@splcenter.org

Christopher F. Stoll
Amy E. Whelan
Rachel H. Berg
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

13

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this case.

*/s/ Melody H. Eagan*
Counsel for Private Plaintiffs
