# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| Brianna Boe, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| and | ) |
| | ) |
| United States of America, | ) |
| | ) |
| *Plaintiff-Intervenor*, | ) |
| | ) |
| v. | )   No. 2:22-cv-00184-LCB-CWB |
| | ) |
| Hon. Steve Marshall, in his official | ) |
| capacity as Attorney General of the | )   **REDACTED COPY;** |
| State of Alabama, *et al.*, | )   **ORIGINAL SUBMITTED** |
| | )   **UNDER SEAL** |
| *Defendants*. | ) |

## PLAINTIFF-INTERVENOR UNITED STATES OF AMERICA'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN TESTIMONY BY DOCTORS JAMES CANTOR, FARR CURLIN, PAUL HRUZ, KRISTOPHER KALIEBE, MICHAEL LAIDLAW, PATRICK LAPPERT, GEETA NANGIA, AND ANGELA THOMPSON

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

ARGUMENT ...................................................................... 3

I.   Dr. Huz Should Be Precluded from Opining on the
     Diagnosis and Treatment of Gender Dysphoria Generally
     and in the Context of Private Plaintiffs' Medical Care ............... 4

     A.   Defendants Fail Their Burden to Show Dr. Hruz is
          Qualified to Opine on the Diagnosis and Treatment of
          Gender Dysphoria, Instead Opting to Rely on General
          Medical Knowledge Insufficient to Qualify Him to
          Testify on a Condition He Neither Diagnoses nor
          Treats ................................................................. 4

          (1)   An Expert's General Medical Knowledge Does
                Not Obviate the Need for Expertise Specific to
                Their Opinion nor Qualify an Expert to Opine on
                Every Possible Medical Issue ................................. 5

          (2)   Dr. Hruz Lacks Expertise in the Treatment of
                Gender Dysphoria ............................................. 9

          (3)   Dr. Hruz Lacks Expertise in the Diagnosis of
                Gender Dysphoria ............................................. 11

     B.   Defendants Cannot Demonstrate Dr. Hruz's Opinions
          Regarding Private Plaintiffs are Reliable, as He Relied
          on Medical Records Without Conducting Any
          Interviews ............................................................ 12

II.  Dr. Cantor Should Be Excluded from Testifying on
     Pediatrics, Endocrinology, and Clinical Practice Guideline
     Development ................................................................ 15

     A.   Defendants Acknowledge Dr. Cantor's Lack of
          Relevant Experience in the Specialized Field at Issue
          and Fail Their Burden to Show that His General

i

            Knowledge as a Psychologist Qualifies Him to Opine
on Medical Care He Does Not Provide .............................     16

B.      Dr. Cantor's Intent and Motive Opinion Are
Impermissible, Unreliable, and Unhelpful.........................     20

III.    Dr. Curlin Should Be Excluded from Testifying on Gender-Affirming
Medical Care Provided to Minors and Their
Ability to Assent...........................................................     23

A.      Defendants Fail Their Burden to Show Dr. Curlin Has Relevant
Experience in the Specialized Field at Issue
or that His General Knowledge as an Ethicist
Qualifies Him to Opine on Medical Care He Does Not Provide
.......................................................................................     24

B.      Dr. Curlin Uncritically Adopts Drs. Cantor and
Laidlaw's Opinions, Rendering Dr. Curlin's Opinions
Unreliable and Unhelpful....................................................     25

C.      Dr. Curlin's Opinions Reflect Bias, Rendering Them Unreliable
and Unhelpful....................................................................     29

IV.    Dr. Kaliebe Should Be Excluded from Offering Opinions on
"Social Contagion," the "Politicization" of Gender-
Affirming Care, and the Unreliable Opinions in His
Supplemental Report ....................................................     30

A.      Defendants Concede that Dr. Kaliebe Lacks Specific Expertise
and Fail Their Burden of Showing that Dr.
Kaliebe is Qualified to Offer His Speculative "Social
Contagion" Theory............................................................     31

B.      Defendants Offer No Specific Background Supporting
Dr. Kaliebe as an Expert Regarding So-Called
"Politicization" of Gender-Affirming Care and Fail
Their Burden to Show that Dr. Kaliebe is Qualified
to Opine on This Topic ......................................................     34

C.    Defendants Do Not Identify Any Particular Methodology Dr. Kaliebe Used to Develop the Opinions in his Supplemental Report and Fail Their Burden to Demonstrate Helpfulness of Motive or Intent Opinions in His Supplemental Report ..................... 36

V.    Dr. Laidlaw Should Be Excluded from Testifying on Gender-Affirming Medical Care for Minors, Clinical Practice Guideline Development, the Private Plaintiffs, and Offering Unreliable Opinions Regarding WPATH ..................... 40

A.    Defendants Fail Their Burden to Show Dr. Laidlaw is Qualified to Offer Opinions on Medical Care for Gender Dysphoria He Does Not Provide, and on Developing Clinical Practice Guidelines Related to Gender Dysphoria, Which He Has Never Done ................ 41

B.    Defendants Cannot Demonstrate Dr. Laidlaw's Opinions Regarding Private Plaintiffs are Reliable Because He Relied on Medical Records Without Conducting Any Interviews ................................................. 45

C.    In the Absence of Dr. Laidlaw Applying Any Methodology to His Review of Third-Party Materials, Defendants Fail Their Burden to Show Opinions in His Second Supplemental Report About WPATH are Reliable and Helpful ........................................... 46

VI.    Dr. Lappert's Opinions Should Be Excluded in Their Entirety ...................................................................... 50

A.    As Dr. Lappert's Testimony is Not Probative of Any Issue in Dispute, Defendants Fail Their Burden to Show Dr. Lappert's Opinions About Surgery are Helpful .......... 50

B.    Defendants Fail Their Burden to Show Dr. Lappert is Qualified to Opine on Gender-Affirming Surgery ............................. 52

VII.   Dr. Nangia Should Be Excluded from Offering Testimony
       on the Medical Treatment of Gender Dysphoria in Minors
       and on the Private Plaintiffs ............................................................   55

       A.     Defendants Fail Their Burden to Demonstrate Dr.
              Nangia is Qualified to Opine on Medical Treatment of
              Gender Dysphoria in Minors, Including the Issues of
              Assent or Consent, Because Her General Medical
              Knowledge Does Not Provide Specific Expertise on
              These Issues .........................................................................   56

       B.     Defendants Fail Their Burden of Showing Dr.
              Nangia's Opinions Regarding Private Plaintiffs are
              Reliable, as She Concedes a Biopsychosocial Exam is
              Needed to Evaluate Consent ................................................   60

VIII.  Dr. Thompson Should Be Excluded from Testifying on
       Medical Treatments Beyond Her Area of Expertise ....................   63

CONCLUSION ........................................................................................   67

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Ciba Specialty Chemicals Corp.*,

   No. CIV.A. 08-0068-WS-B, 2010 WL 779283
   (S.D. Ala. Mar. 2, 2010) ...................................................................26

*Adams v. Lab. Corp. of Am.*,

   760 F.3d 1322 (11th Cir. 2014) .........................................................29

*Ala. Aircraft Industries, Inc. v. Boeing Co.*,

   No. 2:11-cv-03577-RDP, 2019 WL 13172372
   (N.D. Ala. July 1, 2019) ............................................................ 21, 22

*Allison v. McGhan Med. Corp.*,

   184 F.3d 1300 (11th Cir. 1999) ...........................................................3

*Am. Key Corp. v. Cole Nat. Corp.*,

   762 F.2d 1569 (11th Cir. 1985) .........................................................25

*Bowe v. Pub. Storage*,

   No. 1:14-cv-21559-UU, 2015 WL 10857339
   (S.D. Fla. June 2, 2015) ............................................................ 37, 47

*Brandt v. Rutledge*,

   677 F. Supp. 3d 877 (E.D. Ark. 2023) ........................................ 54, 55

*Broussard-Wadkins v. Maples*,

   895 F. Supp. 2d 1159 (N.D. Ala. 2012) ....................................... 38, 39

*Carrizosa v. Chiquita Brands Int., Inc.*,

   47 F.4th 1278 (11th Cir. 2022) .........................................................21

*Cason v. C.R. Bard, Inc.*,

   No. 1:12-CV-1288-MHS, 2015 WL 9913809
   (N.D. Ga. Feb. 9, 2015) ............................................................ 22, 23

**Cases (Cont.)**

*Chikovsky v. Ortho Pharm. Corp.*,

   832 F. Supp. 341 (S.D. Fla. 1993) ........................................ 6, 16, 24, 41

*Companhia Enrgetica Potiguar v. Caterpillar, Inc.*,

   No. 14-24277-CIV-MARTINEZ/GOODMAN,
   2017 WL 10775768 (S.D. Fla. June 12, 2017) ........................... 37, 47

*Cooper v. Smith & Nephew, Inc.*,

   259 F.3d 194 (4th Cir. 2001) ............................................ 12, 14, 45, 61

*Cosseboom v. Royal Caribbean Cruises Ltd.*,

   No. 1:20-cv-20343-UU, 2020 WL 9071566
   (S.D. Fla. Dec. 16, 2020) .................................................. 6, 16, 24, 41

*CP v. Blue Cross Blue Shield of Illinois*,

   No. 3:20-cv-06145-RJB, 2022 WL 17092846
   (W.D. Wash. Nov. 21, 2022) .................................................... 44

*Cunningham v. Masterwear, Inc.*,

   No. 1:04-cv-1616-JDT-WTL, 2007 WL 1164832
   (S.D. Ind. Apr. 19, 2007) ......................................................... 64

*Daubert v. Merrell Dow Pharms., Inc.*¸

   509 U.S. 579 (1993) ............................................................ 3, 51, 65

*Doe v. Ladapo*,

   No. 4:23cv114-RH-MAF, 2024 WL 2947123
   (N.D. Fla. June 11, 2024) ......................................................... 42

*Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*,

   285 F.3d 609 (7th Cir. 2002) ..................................................... 27

*Eberli v. Cirrus Design Corp.*,

   615 F. Supp. 2d 1357 (S.D. Fla. 2009) ........................................ 26

*EEOC v. Modern Group, Ltd.*,

   No. 1:21-CV-451, 2024 WL 1290450
   (E.D. Tex. Mar. 25, 2024) .................................................. passim

**Cases (Cont.)**

*Eknes-Tucker v. Gov. of Ala.*,

   80 F.4th 1205 (11th Cir. 2023) ........................................................ 15, 17

*Eknes-Tucker v. Marshall*,

   603 F. Supp. 3d 1131 (M.D. Ala. 2022) ........................................ 15, 17

*Estate of Gillam v. City of Prattville*,

   667 F. Supp. 2d 1276 (M.D. Ala. 2009) .............................. 6, 16, 24, 41

*Gaydar v. Sociedad Instituto Gineco-Quirugico y Planificacion*,

   345 F.3d 15 (1st Cir. 2003) ...................................................................7

*Gayton v. McCoy*,

   593 F.3d 610 (7th Cir. 2010) ...............................................................6

*Griffin v. Coffee Cnty.*,

   608 F. Supp. 3d 1363 (S.D. Ga. 2022) .............................. 10, 11, 42, 60

*Haller v. AstraZeneca Pharms.*,

   598 F. Supp. 2d 1271 (M.D. Fla. 2009) .................................. 12, 13, 14

*Hamilton v. Louisville Cartage Co.*,

   No. 5:23-cv-00241-TES, 2024 WL 2303889
   (M.D. Ga. May 21, 2024) ...................................................................14

*Harvey v. Novartis Pharm. Corp.*,

   895 F. Supp. 2d 1206 (N.D. Ala. 2012) .............................................64

*Hennessy-Waller v. Snyder*,

   529 F. Supp. 3d 1031 (D. Ariz. 2021) ...............................................44

*Higgins v. Koch Dev. Corp.*,

   794 F.3d 697 (7th Cir. 2015) ..............................................................63

*In re 3m Combat Arms Earplug Prods. Liab. Litig.*,

   No. 3:19md2885, 2021 WL 684183
   (N.D. Fla. Feb. 11, 2021) ..................................................... 37, 47, 49

**Cases (Cont.)**

*In re Paoli R.R. Yard PCB Litig.*,

    35 F.3d 717 (3d Cir. 1994) ...................................................................13

*In re Polypropylene Carpet Antitrust Litig.*,

    93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) .......................................26

*In re Takata Airbag Prod. Liab. Litig.*,

    No. 15-MD-02599-MORENO, 2022 WL 4594123
    (S.D. Fla. July 19, 2022)............................................................ 22, 50

*In re TMI Litig.*,

    193 F.3d 613 (3d Cir. 1999) .................................................................27

*In re Trasylol Prods.*,

    709 F. Supp. 2d 1323 (S.D. Fla. 2010)................................................38

*In re Wright Med. Tech. Inc.*,

    127 F. Supp. 3d 1306 (N.D. Ga. 2015) ...............................................27

*Indus. Eng'g & Dev. v. Static Control Components, Inc.*,

    No. 8:12-cv-691-T-24-MAP, 2014 WL 4986482
    (M.D. Fla. Oct. 6, 2014) .....................................................................37

*Kadel v. Folwell*,

    620 F. Supp. 3d 339 (M.D.N.C. 2022)......................................... 11, 48

*Koe v. Noggle*,

    688 F. Supp. 3d 1321 (N.D. Ga. 2023) ...............................................18

*Kumho Tire Co. v. Carmichael*,

    526 U.S. 137 (1993) ..................................................................... 38, 62

*Levin v. Dalva Bros.*,

    459 F.3d 68 (1st Cir. 2006) ....................................................................7

**Cases (Cont.)**

*Lowery v. Sanofi-Aventis*,

No. 7:18-cv-00376-RDP, 2021 WL 872620
(N.D. Ala. Mar. 9, 2021) ........................................................................64

*Malletier v. Dooney & Bourke, Inc.*,

525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................21

*Marvel Characters Inc. v. Kirby*,

726 F.3d 119 (2d Cir. 2013) .................................................... 20, 37, 49

*McDowell v. Brown*,

392 F.3d 1283 (11th Cir. 2004) ...............................................................7

*Moore v. Intuitive Surgical, Inc.*,

995 F.3d 839 (11th Cir. 2021) ...................................................... passim

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,

326 F.3d 1333 (11th Cir. 2003) ...............................................................8

*Rink v. Cheminova, Inc.*,

400 F.3d 1286 (11th Cir. 2005) .......................................................3, 41

*Schoen v. State Farm Fire and Cas. Co.*,

638 F. Supp. 3d 1323 (S.D. Ala. 2022) ..........................................26, 27

*Stagl v. Delta Air Lines, Inc.*,

117 F.3d 76 (2d Cir. 1997) .......................................................................9

*Tillman v. C.R. Bard. Inc.*,

96 F. Supp. 3d 1307 (M.D. Fla. 2015) ......................................21, 38, 49

*Tindall v. H & S Homes, LLC*,

No. 5:10-CV-044(CAR), 2012 WL 3241885
(M.D. Ga. Aug. 7, 2012) .........................................................................21

*UMG Recordings, Inc. v. Grande Comm. Networks, LLC*,

No. A-17-CA-365-LY, 2019 WL 3207803
(W.D. Tex. Jul. 19, 2022) ........................................................................49

**Cases (Cont.)**

*United States v. Frazier*,

    387 F.3d 1244 (11th Cir. 2004) ..................................................... passim

*United States v. Pablo*,

    696 F.3d 1280 (10th Cir. 2012) ...........................................................37

*United States v. Viglia*,

    549 F.2d 335 (5th Cir. 1977) ................................................................8

*Viterbo v. Dow Chem. Co.*,

    826 F.2d 420 (5th Cir. 1987) ..............................................................21

*Whole Woman's Health All. v. Rokita*,

    No. 1:18-cv-01904-SEB-MJD, 2021 WL 665937
    (S.D. Ind. Feb. 19, 2021) ....................................................................59

*Wilson v. Flack*,

    No. 19-14294, 2022 WL 4477025
    (11th Cir. Sept. 27, 2022) .............................................................. passim

**Other Authorities**

29 Wright & Miller, Federal Practice and Procedure § 6268 (2d ed.) ...................61

**Rules**

Fed. R. Evid. 702 ............................................................................. passim

Fed. R. Evid. 702(b) ......................................................................... 46, 61

Fed. R. Evid. 703 .................................................................... 20, 27, 36

## **INTRODUCTION**

Despite filing 183 pages of opposition briefing, Defendants failed to demonstrate the admissibility of their experts' challenged opinions. All eight of Defendants' experts offer opinions that exceed their areas of expertise. Many of their opinions suffer from fatal defects in methodology that Defendants' oppositions do not address. Defendants fail to refute that many of their experts' opinions are unhelpful because they relate to motive or intent or are not probative of any issue in this case. The Court should limit or exclude the testimony of Defendants' experts accordingly.

First, Defendants fail to qualify their witnesses as experts in the specific topics on which they seek to opine, effectively acknowledging that their proffered experts are actually unqualified to offer their opinions. Instead, Defendants repeatedly rest on their experts' "general experience." Their experts, however, offer highly specific opinions that extend far beyond the scope of any such general experience.

Defendants repeatedly complain that it is unfair for the United States to insist that experts in this case have experience specific to the topic of their opinions. They also argue that requiring expertise specific to the diagnosis and medical treatment of gender dysphoria excludes experts in favor of criminalizing the medical care at issue. But Defendants' failure to identify any qualified experts

that agree with their positions, even after many of their chosen experts have been discredited in court, U.S. Mot. at 1-2, ECF No. 591, only reflects the weakness of their case and the medical consensus in favor of providing medically necessary gender-affirming care across the nation.

Second, Defendants fail to rebut fatal defects in their experts' methodologies, preferring to construct more easily refuted straw-man arguments instead. For instance, Defendants wrongly assert that the United States claims hearsay cannot inform the expert opinions of Drs. Cantor, Kaliebe, and Laidlaw, when the United States challenges their failure to apply any expertise or methodology to that hearsay. Instead of establishing why reviewing medical records without interviewing the Private Plaintiffs or their treatment professionals was a sufficient basis for the specific opinions of Drs. Laidlaw, Hruz, and Nangia, Defendants argue that medical records are a sufficient basis for some opinions.

Finally, Defendants do not refute the unhelpfulness of their experts' testimony. Defendants do not contest that Drs. Cantor, Kaliebe, and Laidlaw impermissibly opine on motive or intent but excuse such opinions as "details of phrasing" or otherwise as ancillary points in their reports. While Defendants attempt to devise reasons why Dr. Lappert's opinions about surgery are relevant, they cannot overcome the fact that Plaintiffs do not challenge Alabama's prohibition on surgical interventions.

Given the numerous deficiencies in Defendants' proffered expert opinions, this Court should exclude the challenged portions of their testimony.

## **ARGUMENT**

The proponent of expert testimony bears the burden of establishing that: (1) the expert is qualified to testify competently as to the matters they intend to address ("qualification"); (2) the expert's methodology is sufficiently reliable under *Daubert v. Merrell Dow Pharms., Inc.*¸ 509 U.S. 579 (1993) ("reliability"); and (3) the expert's testimony will help the factfinder understand the evidence or determine a fact in issue ("helpfulness"). *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). While "the proponent of the testimony does not have the burden of proving that it is scientifically correct," they must establish "that by a preponderance of the evidence, it is reliable." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

Defendants fail to meet their burden of demonstrating the admissibility of their experts' opinions. The United States addresses the particular issues with each of Defendants' eight experts below.

3

## I. Dr. Hruz Should Be Precluded from Opining on the Diagnosis and Treatment of Gender Dysphoria Generally and in the Context of Private Plaintiffs' Medical Care.

Defendants fail to establish Dr. Hruz's expertise in the diagnosis and treatment of gender dysphoria or defend the reliability of his opinions about the Private Plaintiffs' treatment. Dr. Hruz, a pediatric endocrinologist, has never treated a patient for gender dysphoria. Defendants instead rest on Dr. Hruz's "general" knowledge of endocrinology, but that knowledge does not qualify him to offer the highly specific opinions he provides. Although Dr. Hruz has never interviewed any of the minor Private Plaintiffs, their parents, or their medical providers, he still offers opinions about their care. Defendants' argument that medical records are a sufficient basis for his opinions is not persuasive because he lacks sufficient information to rule out alternative explanations for his conclusions. This Court should exclude Dr. Hruz's opinions regarding gender dysphoria diagnosis and treatment, as well as his opinions regarding the Private Plaintiffs' treatment.

### A. Defendants Fail Their Burden to Show Dr. Hruz is Qualified to Opine on the Diagnosis and Treatment of Gender Dysphoria, Instead Opting to Rely on General Medical Knowledge Insufficient to Qualify Him to Testify on a Condition He Neither Diagnoses nor Treats.

Defendants fail to demonstrate that Dr. Hruz is qualified to opine on gender-affirming medical care, let alone "all facets of gender dysphoria and its treatments"

in transgender youth because he lacks the specialized expertise that the Rules of Evidence require. Hruz Opp'n, ECF No. 657 at 5. Defendants attempt to excuse Dr. Hruz's lack of relevant expertise by pointing to his general medical knowledge and experience.[1] *Id.* at 7-11. But his lack of relevant, specific expertise in the diagnosis and treatment of gender dysphoria in minors is clear.

### (1) An Expert's General Medical Knowledge Does Not Obviate the Need for Expertise Specific to Their Opinion nor Qualify an Expert to Opine on Every Possible Medical Issue.

The Eleventh Circuit "has recognized the need for an expert to have expertise *specific to the topic at issue* to satisfy Rule 702." *Wilson v. Flack*, No. 19-14294, 2022 WL 4477025, at *5-6 (11th Cir. Sept. 27, 2022) (recognizing the need for expertise specific to the topic at issue to satisfy Fed. R. Evid. 702) (emphasis added). So, general medical knowledge does not automatically qualify a proffered expert to testify on medical issues beyond the scope of that general knowledge. *See, e.g.*, *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 857 (11th Cir. 2021) (gynecologist would be unqualified to testify on open-heart surgery or brain operation). Heeding the circuit's instructions, district courts have routinely found medical experts to be unqualified when they use their general medical

---

[1] Defendants reference this flawed argument relying on an expert's general knowledge in defending the opinions of their other experts. *See* Cantor Opp'n, ECF No. 663 at 8-10; Curlin Opp'n, ECF No. 664 at 3-5; Kaliebe Opp'n, ECF No. 658 at 7-8; Laidlaw Opp'n ECF No. 661 at 6-7; Lappert Opp'n, ECF No. 659 at 12-16; Nangia Opp'n, ECF No. 660 at 8-13; Thompson Opp'n, ECF No. 662. As discussed *infra*, this argument fails each time.

knowledge to opine on the specific medical topics at issue. *See, e.g.*, *Estate of Gillam v. City of Prattville*, 667 F. Supp. 2d 1276, 1296-98 (M.D. Ala. 2009) (excluding "physician with a general practice in internal medicine" from opining on an issue related to cardiac arrest); *Chikovsky v. Ortho Pharm. Corp.*, 832 F. Supp. 341, 344-46 (S.D. Fla. 1993) (gynecologist excluded from opining on cause of congenital disabilities absent expertise in embryology, teratology, or genetics); *Cosseboom v. Royal Caribbean Cruises Ltd.*, No. 1:20-cv-20343-UU, 2020 WL 9071566, at *3 (S.D. Fla. Dec. 16, 2020) (experience as a plaintiff's family medicine doctor does not qualify him to opine "on all aspects of plaintiff's medical treatment and conditions," including orthopedic issues and spinal conditions beyond the scope of his knowledge and experience). Specialized knowledge and expertise are thus, in fact, required to qualify an expert under Rule 702 to offer specialized opinions.

Even one of the cases cited by Defendants notes that "a medical degree alone does not unequivocally qualify a doctor as an expert—particularly in cases involving nuanced medical issues." *EEOC v. Modern Group, Ltd.*, No. 1:21-CV-451, 2024 WL 1290450, at *15 (E.D. Tex. Mar. 25, 2024). In other words, being a physician does not make one "qualified to opine on all medical subjects." *Gayton v. McCoy*, 593 F.3d 610, 617-18 (7th Cir. 2010) (affirming exclusion of general physician's testimony about effect of medications because he "does not have

specialized cardiac or pharmacological knowledge upon which to base his conclusion" while reversing exclusion of opinion based on "knowledge that any competent physician would typically possess").

The cases Defendants cite suggest that general medical knowledge qualifies an individual to testify to medical issues *within the scope of that knowledge*, but not as to every conceivable medical issue or treatment. Defendants rely on the holding in *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) for the proposition that the "proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." Hruz Opp'n at 8. That case relied on a First Circuit decision, *Gaydar v. Sociedad Instituto Gineco-Quirugico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003). However, *Gaydar* is not persuasive in this context because it held it would have been error to exclude a general practice physician from opining about a pregnancy based on the "mere fact" that he was not a gynecologist. *Id.* Even within the First Circuit, this caselaw does not upend the requirement that a witness actually be qualified to offer their opinion, and "a district court acts properly by excluding opinions that are beyond the witness's expertise." *Levin v. Dalva Bros.*, 459 F.3d 68, 78-79 (1st Cir. 2006) (district court did not abuse discretion in excluding expert with general experience in furniture appraisal from opining about the more specialized area of regence-era furniture). The same is true in the Eleventh Circuit.

*See Flack*, 2022 WL 4477025, at *5-6 (affirming exclusion of testimony by doctor who worked as a forensic pathologist and lacked expertise in hematology or sickle cell disease).[2]

In addition, arguments attacking an expert's lack of relevant expertise do not, as Defendants assert, Hruz Opp'n at 8, conflate qualifications and reliability. In *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003), the Eleventh Circuit focused on the fact the challenging party in that case "simply ha[d] restated its methodology arguments in terms of [the expert's] qualifications," and that "none of the shortcomings in [the expert's] analysis on which [the challenging party] focuses genuinely bear" on the qualification factors in Rule 702. Defendants cite this case to attempt to support their point that the United States conflated qualifications with reliability. But the case is inapposite because the United States is directly challenging Defendants'

---

[2] Other cases Defendants cite rest on the expert's specific qualifications as compared to the opinions they offer, but do not suggest that any doctor can offer any medical opinion or opine on any medical treatments. In *United States v. Viglia*, 549 F.2d 335, 336 (5th Cir. 1977), a physician was qualified to give an opinion "on the bounds and scope of professional practice and the legitimate or illegitimate use of the controlled substances involved in the case." Even though he "did not treat obesity," a condition that one of the parties apparently had, it was not an abuse of discretion to admit the physician due to sufficient relevant expertise in pharmacology to support his opinion, including being a published author and professor in Pharmacology who participated on committees regarding obesity treatment. *Id*. at 337. In *Vaughn v. Hyster Co., Inc*., No. 4:09-CV-570-VEH, 2010 WL 9936530, at * 8 (N.D. Ala. Dec. 3, 2010), the court concluded that an individuals' somewhat related general experience in "the design of an attachment to a forklift" did not qualify him as an expert in forklift design. In *Modern Group*, 2024 WL 1290450, at *15, the challenged expert was not "testifying outside of his specialty"; instead, he opined on "duties that he performs on a regular basis" that related to the practice of addiction medicine, a practice recognized as a unique subspecialty by the American Board of Medical Specialties.

experts' qualifications, specifically, their lack of knowledge of or experience with the specific gender-affirming treatments for minors at issue in this case.

Defendants further argue that the United States is merely attempting to exclude all potential witnesses who disagree with the appropriateness of the care at issue and that the Second Circuit has rejected such efforts. *See* Hruz Opp'n at 9 (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)). However, the United States is not trying to set standards for expert witnesses; Rule 702 already does that. That Defendants cannot identify experts who both categorically oppose gender-affirming care for minors and who are qualified under Rule 702 reflects something else entirely: the overwhelming consensus within the American medical community that this medical care for minors is the appropriate approach when clinically indicated.

### (2) Dr. Hruz Lacks Expertise in the Treatment of Gender Dysphoria.

Turning to Dr. Hruz's opinions specifically, Dr. Hruz's lack of "expertise specific to the topic at issue," *Flack*, 2022 WL 4477025, at *5-6, makes him unqualified to offer his opinions on "nuanced medical issues" *Modern Group*, 2024 WL 1290450, at *15. Defendants do not refute the fact that he has never diagnosed or treated a single patient for gender dysphoria. Defendants instead assert that Dr. Hruz has treated "many" transgender patients, Hruz Opp'n at 10, but, critically, he has not done so for gender dysphoria. Hruz Dep. Tr. at 79:17-

9

80:19, ECF No. 591-7 (discussing addressing thyroid disease, dyslipidemia, and diabetes in patients who are also transgender). And despite boasting that Dr. Hruz has published "many" scholarly articles in recent years addressing gender dysphoria, Hruz Opp'n at 2, his April 2024 curriculum vitae lists fewer than 10 publications on gender dysphoria. *See* Ex. 1 (Hruz CV), Bibliography §§ A., C2., C.4.[3] Dr. Hruz has also never "performed directly a clinical trial related to individuals that have sex-discordant gender identity," Hruz Dep. Tr. at 43:2-4, and an "advisory" role does not change that, *id.* at 43:5.

Recognizing his lack of experience diagnosing and treating gender dysphoria, Defendants assert that his general medical knowledge gives him the requisite experience to opine on "all facets of gender dysphoria and its treatment" in minors. Hruz Opp'n at 5. But, Dr. Hruz's general medical knowledge does not qualify him to opine on all medical care. *See Griffin v. Coffee Cnty.*, 608 F. Supp. 3d 1363, 1370-1371 (S.D. Ga. 2022) (citing the fact that physician pathologist does not "order or perform sedation, support, gastrointestinal decontamination, and

---

[3]The "Journal Articles" section of his April 2024 curriculum vitae only lists two such articles regarding gender dysphoria: one is a letter to the editor; the other is an article in a bioethics journal. § A. (Nos. 48, 50); *see also* Hruz Dep. Tr. at 38:16-40:10 (confirming the latter is a bioethics journal published by the Catholic Medical Association). And Dr. Hruz's remaining published chapters (two) and invited publications regarding gender dysphoria or gender identity (four) appear in the following books or journals: *Transgender Issues in Catholic Healthcare*; *Sexual Identity: The Harmony of Philosophy, Science, and Revelation*; *The New Atlantis*; *National Catholic Bioethics Quarterly*; and *Acta Paediatrica* (pediatrics-focused journal where Dr. Hruz published an editorial). *See* Hruz CV, Bibliography § C.2, C.4.

seizure prophylaxis" as among reasons why expert was unqualified to opine on treatments at issue). And this is true despite his practice in endocrinology.

Defendants fail to rebut the holding in *Kadel v. Folwell*, Hruz Opp'n at 10-11, where the court found Dr. Hruz unqualified to testify, 620 F. Supp. 3d 339 (M.D.N.C. 2022). For example, Defendants point to the *Kadel* dissent's finding that Dr. Hruz has extensively studied the literature. Hruz Opp'n at 10-11. That is insufficient to qualify an expert. *Griffin,* 608 F. Supp. 3d at 1370-1371. Nor does anything else in his curriculum vitae impart him with expertise in the treatment of gender dysphoria that he has never provided. In short, Dr. Hruz lacks the requisite knowledge and experience to discuss gender dysphoria treatment. His medical degree, on its own, does not qualify him either. *Modern Group*, 2024 WL 1290450, at *15.

### (3) Dr. Hruz Lacks Expertise in the Diagnosis of Gender Dysphoria.

Defendants also fail to meaningfully address his purported expertise specific to gender dysphoria diagnosis, which is distinct from treatment. The record illustrates why. He has never diagnosed anyone with gender dysphoria. Hruz Dep. Tr. at 80:20-81:6, 67:7-9. Gender dysphoria is a mental health diagnosis, but Dr. Hruz does not make mental health diagnoses. *Id.* at 61:12-13, 61:19-62:2. He has limited formal training in psychiatry. *Id.* at 63:4-14. To the extent he has published anything regarding gender dysphoria, the primary focus centers on medical

interventions, not diagnosis. *Id.* at 45:5-10, 45:11-17. While he attempts to excuse his lack of experience treating gender dysphoria on his (incorrect) belief that the treatments are "unsafe and unethical," Hruz Opp'n at 6, Defendants make no similar argument to excuse his lack of experience making gender dysphoria diagnoses.

Defendants have not met their burden to demonstrate Dr. Hruz has the requisite qualifications under Rule 702 to testify on gender dysphoria diagnosis or treatment. The Court should exclude his opinions offered on these topics.

## B. Defendants Cannot Demonstrate Dr. Hruz's Opinions Regarding Private Plaintiffs are Reliable, as He Relied on Medical Records Without Conducting Any Interviews.

Defendants fail to demonstrate the reliability of Dr. Hruz's opinions regarding the Private Plaintiffs in his Supplemental Report because his testimony is not based on "sufficient facts or data" as Rule 702 requires. Without interviewing the minor Private Plaintiffs, their parents, or their healthcare providers, reliance on medical records alone is an insufficient basis for Dr. Hruz's opinions.

The failure to interview individuals involved may be problematic when it is "not consistent with the . . . methodology [the expert] employs in his own medical practice." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001); *see also Haller v. AstraZeneca Pharms.*, 598 F. Supp. 2d 1271, 1295 (M.D. Fla. 2009). Or, it may be insufficient because the limited review does not enable the expert to

"rule[] out alternative explanations." *See* Fed. R. Evid. 702 Adv. Comm. Notes (identifying this as one of several factors to consider in performing the gatekeeping function); *Haller*, 598 F. Supp. 2d at 1277 (expert's limited review was problematic because "he might possibly miss explanations"); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758-59 (3d Cir. 1994) (performing physical examinations, taking medical histories, and using reliable laboratory tests, while not required, are all evidence of reliability, while their absence makes reliability "much less likely").

Here, Dr. Hruz's failure to interview Private Plaintiffs or their treatment professionals means he lacked the necessary information to rule out "alternative explanations" that would alter his opinion. Dr. Hruz opines that the "paucity of documented discussion of known and potential medical complications . . . further substantiates my opinions related to relative risk," Hruz Supp. Rep. ¶ 5, ECF No. 591-8, when Rule 702 establishes the opposite. Without speaking to the Private Plaintiffs or their healthcare providers, Dr. Hruz did not fully understand the information discussed or provided regarding the risks and benefits of gender-affirming medical intervention. In other words, he lacked the necessary information to rule out "alternative explanations" as to why that information was not reflected in the medical files—e.g., that information was discussed but not recorded. Importantly, medical providers may not include everything in their

medical records. *See* ███████████████████████████████████

███████████████████████████████). Thus, Dr. Hruz's

opinion is not based on sufficient facts to make his opinion reliable.

Defendants' response that relying on medical records alone is commonplace

ignores the mismatch between the utility of a record review and the specific

opinion Dr. Hruz offers. That a medical record review is a sufficient basis for some

opinions does not mean it is enough for every opinion. *See, e.g.*, *Haller*, 598 F.

Supp. 2d at 1295 (finding that in the facts of that case, "simple logic and common

sense dictated that [the expert] do more than merely 'skim' [patient's] medical

records and summaries to ascertain the cause of" patient's alleged weight gain).

Many courts have excluded opinions that relied only on medical records or were

formed after failing to interview relevant individuals as having insufficient support.

*See, e.g.*, *Cooper*, 259 F.3d at 203 (affirming exclusion of physician's opinion

formed without a physical examination or interviewing the patient); *Haller*, 598 F.

Supp. 2d at 1294-95 (excluding physician's opinion based only on the review of

medical records); *Hamilton v. Louisville Cartage Co*., No. 5:23-cv-00241-TES,

2024 WL 2303889, at *5 (M.D. Ga. May 21, 2024) (excluding physician's

testimony about damages when the physician "neither spoke with nor received any

information from any of Plaintiff's treating physicians"). And while Defendants

assert that the scope of Dr. Hruz's opinions about Private Plaintiffs is "expressly

limited," Hruz Opp'n at 17, ██████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████████).

Defendants have failed to show that Dr. Hruz's opinions regarding Private Plaintiffs are based on "sufficient facts or data." Accordingly, this Court should exclude them as unreliable.

## II.     Dr. Cantor Should Be Excluded from Testifying on Pediatrics, Endocrinology, and Clinical Practice Guideline Development.

This Court already decided that Dr. Cantor's testimony deserves "very little weight" due to his lack of relevant expertise. *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1142-43 (M.D. Ala. 2022), *rev'd sub nom. Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205 (11th Cir. 2023). This has not changed since his preliminary injunction testimony. Defendants' attempt to rebrand Dr. Cantor as a "research scientist," Cantor Opp'n at 1, ECF No. 663, does not cure his lack of credentials. Further, Defendants' assertion that Dr. Cantor's lack of expertise qualifies him as an expert is directly contrary to the requirements of Rule 702. Moreover, Defendants do not refute that Dr. Cantor's intent and motive opinions are impermissible. Defendants fail to meet their burden on Dr. Cantor's qualifications and the reliability and helpfulness of his opinions, and therefore, the Court should exclude his testimony.

**A. Defendants Acknowledge Dr. Cantor's Lack of Relevant Experience in the Specialized Field at Issue and Fail Their Burden to Show that His General Knowledge as a Psychologist Qualifies Him to Opine on Medical Care He Does Not Provide.**

As discussed in Section I(A), *supra*, general knowledge in one field is not a sufficient qualification for an expert to render all opinions in a related but distinct and specialized field. *See, e.g.*, *Moore*, 995 F. 3d at 857 (gynecologist unqualified to testify regarding open-heart surgery or brain operation); *Estate of Gillam*, 667 F. Supp. 2d at 1296-98 ("physician with a general practice in internal medicine" excluded from opining on an issue related to cardiac arrest); *Chikovsky*, 832 F. Supp. at 344-46 (gynecologist excluded from opining on the cause of congenital disabilities absent expertise in embryology, teratology, or genetics); *Cosseboom*, 2020 WL 9071566 at *3 (Plaintiff's family medicine doctor not qualified to opine on all aspects of Plaintiff's medical treatment and conditions including orthopedic issues and spinal conditions). The Eleventh Circuit "has recognized the need for an expert to have expertise *specific to the topic at issue* to satisfy Rule 702." *Flack*, 2022 WL 4477025, at *5-6 (affirming exclusion of testimony by a doctor who worked as a forensic pathologist and lacked expertise in hematology or sickle cell disease) (emphasis added).

Defendants fail to establish that Dr. Cantor holds such "expertise specific to the topic at issue," *id.*, necessary to qualify him to opine on "nuanced medical issues." *Modern Group*, 2024 WL 1290450, at *15. Dr. Cantor is not a medical

16

doctor, Cantor Dep. Tr. at 19:20-25, ECF No. 591-2, not a psychiatrist, *id.* at 20:1-4, not an endocrinologist, *id.* at 20:5-12, and does not prescribe any medications, including those at issue in this case, *id.* at 20:13-21:5. Despite this, Dr. Cantor offers opinions on specialized issues relating to gender-affirming medical care. Cantor Rep. ¶¶ 59-93 *and* 156-238 (opining on the quality of evidence supporting such medical care), 94-104 *and* 239-58 (opining on the development of clinical guidelines for such medical care), 156-164 (discussing evidentiary support for such medical care), ECF No. 591-1; Cantor Supp. Rep. ¶¶ 96-120 (discussing the development of clinical guidelines for such medical care), ECF No. 591-3.

As this Court and the parties are well aware, during the preliminary injunction hearing, "the Court gave [Dr. Cantor's] testimony regarding the treatment of gender dysphoria in minors very little weight." *Eknes-Tucker*, 603 F. Supp. 3d at 1142-43, *rev'd sub nom. Eknes-Tucker v. Gov. of Ala.,* 80 F.4th 1205 (11th Cir. 2023). This came following Dr. Cantor's sworn admissions that: "(1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving transitioning medications; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic." *Id.*;

17

s*ee also Koe v. Noggle*, 688 F. Supp. 3d 1321, 1352 n. 28 (N.D. Ga. 2023) (giving Dr. Cantor's medical conclusions less weight). These admissions remain standing, even with his new testimony that as "part of general clinical planning" he was a member of a multi-disciplinary team that decided to prescribe puberty blockers to a half dozen patients primarily in their early teens in the "[e]arly 2000s," and was also part of an inter-disciplinary team that decided to prescribe cross-sex hormones to adults "somewhere in the range of 100" and "[r]oughly from the late '90s to roughly 2010, 2015." Cantor Dep. Tr. at 21:6-22:18. This new testimony does not specify the purpose for which these medications were prescribed, and without more, does nothing to bolster his credentials to opine on the treatment of gender dysphoria.

As with their other experts, Defendants acknowledge Dr. Cantor lacks experience in the "'special field' at issue" and instead attempt to rely on his more general knowledge. Cantor Opp'n at 9 (citing Hruz Opp'n at 7-10 & n.2). Defendants take it even further—absurdly claiming his lack of relevant experience "is the very point of much" of his testimony. *Id*. To make this argument, Defendants advance a concept of "expertise" based on Dr. Cantor's report, which asserts—citing zero sources—that a practitioner's views cannot be credited because those who practice in this field lack neutrality. Cantor Opp'n at 9; Cantor Rep. ¶ 11. However, qualification in the context of this motion is a function of

expertise, not purported neutrality. Rule 702 requires "knowledge, skill, experience, training, or education," not inexperience under the guise of neutrality. Fed. R. Evid. 702.

In apparent recognition of the disconnect between his qualifications and opinions, Defendants assign Dr. Cantor a new title, that of a "research scientist," and assert that he offers a limited set of opinions fitting the title. Cantor Opp'n at 1. But this is a misrepresentation. Dr. Cantor's opinions span the policies of international health authorities, position statements of medical associations, practices of clinics in the United States, and the processes medical associations follow to develop clinical practice guidelines. Cantor Rep. ¶¶ 16-37, 89-93, 239-58. His opinion is not limited to the quality of studies and the evidence base but extends to all corners of gender-affirming care, including opinions on the concept of "sex" and gender dysphoria as a mental health diagnosis. Cantor Rep. ¶¶ 106-110.

Dr. Cantor's opinion was given little weight before, and even with bolstered claims of experience remembered decades later, his lack of qualification to opine on gender-affirming medical care remains. Dr. Cantor is not qualified, and this Court should exclude his testimony.

## B. Dr. Cantor's Intent and Motive Opinion Are Impermissible, Unreliable, and Unhelpful.

The Court should not allow Dr. Cantor to offer his personal interpretations of individuals' intent, motivation, and state of mind derived from his review of WPATH internal documents because he applied no discernible methodology to reach those opinions, and they are unhelpful. In fact, Defendants do not directly dispute the United States' characterization of his report as including improper intent or motive opinions and instead assert that Dr. Cantor's opinions about individuals being "concerned" or "worried" are mere "details of phrasing." Cantor Opp'n at 16. Instead, Defendants focus their argument on experts' ability to review primary sources and the admissibility of the internal WPATH documents. But this misses the point. The issue is whether Dr. Cantor specifically applied any methodology in his review of the WPATH documents and whether that opinion is reliable and helpful to the Court.

Defendants bear the burden of demonstrating that Dr. Cantor's opinions are reliable and helpful. *Frazier*, 387 F.3d at 1260. An expert may rely on otherwise inadmissible hearsay in forming their opinions, Fed. R. Evid. 703, but the expert must "bring their expertise to bear" when forming an opinion based on hearsay. *Marvel Characters Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). Otherwise, the party is impermissibly using the expert "simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of

his testimony." *Id*. (quoting *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)).[4]

Opinions on "intent, state of mind, or motivations" are "outside the bounds of appropriate expert testimony." *Tillman v. C.R. Bard. Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015); *see also Ala. Aircraft Industries, Inc. v. Boeing Co.*, No. 2:11-cv-03577-RDP, 2019 WL 13172372, at *6 (N.D. Ala. July 1, 2019) (collecting cases). This type of testimony is inadmissible because "such inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *Tindall v. H & S Homes, LLC*, No. 5:10-CV-044(CAR), 2012 WL 3241885, at *12 (M.D. Ga. Aug. 7, 2012) (internal quotes and citation omitted).

Defendants fail to substantiate any methodology Dr. Cantor applied to the documents he reviewed besides "not[ing]" statements. Cantor Opp'n at 14. There is no explanation of Dr. Cantor's qualification to assess internal communications, how Dr. Cantor determined which comments he found notable, or how Dr. Cantor

---

[4] Defendants' citation to *Carrizosa v. Chiquita Brands Int., Inc.*, 47 F.4th 1278 (11th Cir. 2022), is instructive. Cantor Opp'n at 15. After noting that "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned," the court there goes on to say that "[i]n some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion." *Carrizosa*, 47 F.4th at 1323 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). The court determined that a particular hearsay statement was "not the type of evidence on which an expert like [the proposed expert] would reasonably rely on to form an opinion," and the expert's opinion therefore was not the product of a reliable methodology. *Id.* The court also noted that the expert's proffered opinion was "little more than a vehicle" by which to introduce other inadmissible hearsay. *Id.*

could decipher an individual or organization's intent or motive. Defendants instead quote *In re Takata Airbag Prod. Liab. Litig.*, No. 15-MD-02599-MORENO, 2022 WL 4594123, at *4 (S.D. Fla. July 19, 2022) to broadly assert that Dr. Cantor "relies on his professional experience and factual testimony," without mentioning what that is. In *Takata*, the court found the expert referenced in the above quote qualified to testify on accident reconstruction based on his degrees and experience testing air bags, co-authoring an air bag patent, and background in accident reconstruction. *Takata*, 2022 WL 4594123, at *3. Here, Defendants put forth nothing about Dr. Cantor's experience reviewing and opining on an organization's internal communications or how he did so in this case. Defendants have not met their burden of demonstrating that Dr. Cantor's opinions about WPATH are the product of any reliable methodology.

Moreover, Dr. Cantor's opinions derived from a methodology of "not[ing]" statements are not helpful. Cantor Opp'n at 14. Defendants highlight segments of Dr. Cantor's Supplemental Report consisting of quotes from the WPATH materials. *Id.* at 14-15; Cantor Supp. Rep. Appx. A at ii, iii, xii, vi-ix, ECF No. 591-24. But, a report that "simply quote[s] certain documents" is inadmissible. *Ala. Aircraft Industries*, 2019 WL 13172372 at *6. Experts "will not be permitted to testify to 'simple inferences drawn from uncomplicated facts that serve only to buttress [a party's] theory of the case.'" *Id.* (citing *Cason v. C.R. Bard, Inc.*, No.

1:12-CV-1288-MHS, 2015 WL 9913809, at *13 (N.D. Ga. Feb. 9, 2015)).

Defendants claim that Dr. Cantor's opinions are helpful because laymen do not

know the inner workings of WPATH, but neither does he. Defendants put forth no

information on Dr. Cantor's qualifications for WPATH's inner workings, the

development of its clinical practice guidelines, or how he applied this supposed

knowledge. He has never been a member of WPATH and did not participate in the

development of SOC-8 or SOC-7. Cantor Dep. Tr. at 168:25-170:12. His opinion

offers no more than that of a layman—reciting quotes that speak for themselves.

This is not helpful, and Dr. Cantor should be excluded from testifying in this case.

## III.   Dr. Curlin Should Be Excluded from Testifying on Gender-Affirming Medical Care Provided to Minors and Their Ability to Assent.

Dr. Curlin is not qualified to opine on gender-affirming care for minors

because his qualifications—even as an ethicist—are too general. This is

underscored by his unquestioning overreliance on the opinions of Drs. Cantor and

Laidlaw, each of whom carry dubious qualifications themselves. Furthermore, Dr.

Curlin's biases undermine the reliability of his opinions, and Defendants' assertion

that his opinion rests solely on "universally accepted secular authorities" is false

and contrary to his testimony.

**A. Defendants Fail Their Burden to Show Dr. Curlin Has Relevant Experience in the Specialized Field at Issue or that His General Knowledge as an Ethicist Qualifies Him to Opine on Medical Care He Does Not Provide.**

As discussed in Section I(A), *supra*, general knowledge in one field is not sufficient qualification to render all opinions in a related but distinct and specialized field. *See, e.g.*, *Moore*, 995 F. 3d at 857; *Estate of Gillam*, 667 F. Supp. 2d at 1296-98; *Chikovsky*, 832 F. Supp. at 344-46; *Cosseboom*, 2020 WL 9071566 at *3; *Flack*, 2022 WL 4477025, at *5-6. Dr. Curlin lacks the relevant experience and expertise to qualify him to offer opinions about gender-affirming care for minors and the ability of minors to assent to such care. Dr. Curlin has never provided any medical treatment for gender dysphoria or any ethical advice regarding treatments for gender dysphoria. His opinions about whether providing such treatments is ethically "allowable" and whether minors can provide informed consent for such treatment, Curlin Rep. ¶¶ 18, 19, ECF No. 591-4, are therefore beyond the scope of his expertise.

Defendants cannot establish Dr. Curlin's expertise in gender-affirming care because he has no experience in the field. *See* Curlin Dep. Tr. 55:1-15, 57:2-19, 58:1-15 (no experience or recollection treating patients diagnosed or exhibiting symptoms of gender dysphoria); 64:16-19 (no recollection of providing ethical consult on gender dysphoria), ECF No. 591-5. His claim that he has familiarity with professional, ethical norms in the context of "gender affirmation," Curlin Rep.

¶4, exemplifies his lack of understanding of the field, in which "gender affirmation" could have a host of different meanings and is not used to describe the diagnosis of gender dysphoria or the treatments for that condition which are now criminalized by S.B. 184. His general experience in ethics is not a sufficient basis for his opinions about the specialized topic of treatments for gender dysphoria.

## B. Dr. Curlin Uncritically Adopts Drs. Cantor and Laidlaw's Opinions, Rendering Dr. Curlin's Opinions Unreliable and Unhelpful.

Dr. Curlin's dependence on the opinions of Drs. Cantor and Laidlaw are not a reliable basis for his opinions because he uncritically relies on their opinions rather than using them to form his own. As noted by the United States, U.S. Mot. at 13, Dr. Curlin cites Drs. Cantor and Laidlaw, throughout his report and identifies "the opinions offered by Drs. Cantor and Laidlaw" as the basis for his conclusions about the benefits and harms of gender-affirming care. Curlin Rep. at 14, 15; Curlin Dep. Tr. at 109:14-17. Defendants excuse this reliance by saying, "[I]t is commonplace for experts to rely on other experts in forming their opinions." Curlin Opp'n at 6, ECF No. 664. However, the cases cited by Defendants reveal that Dr. Curlin's unquestioning reliance on other experts' opinions undermines his reliability.

Eleventh Circuit case law makes clear that an expert cannot rely on other experts in the way Dr. Curlin does here, and indeed, the cases cited by Defendants prove this point. In *Am. Key Corp. v. Cole Nat. Corp.*, the Eleventh Circuit stated,

"[E]xpert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not." 762 F.2d 1569, 1580 (11th Cir. 1985). And in *Eberli v. Cirrus Design Corp.*, the court wrote that "[w]hile it is true that 'an expert's testimony may be formulated by the use of the facts, data and conclusion of other experts,' . . . such expert must make some findings and not merely regurgitate another expert's opinion," 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009). There, the court excluded an expert for merely adopting another expert's conclusions as his own. *Id.* at 1365 ("[I]t appears that [the expert] made no findings . . . instead, it appears that he simply adopted [the other expert's] conclusions . . . ."). In *Schoen v. State Farm Fire and Cas. Co.*, the court made clear that an expert witness "must in the end be giving his *own* opinion. He cannot simply be a conduit" for another expert. 638 F. Supp. 3d 1323, 1335 (S.D. Ala. 2022). Experts cannot merely "parrot" the opinions of others. *Id.* (citing *Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL 779283 (S.D. Ala. Mar. 2, 2010)). There, the court found an expert's testimony inadmissible because he was "simply serving as the mouthpiece" for another expert rather than forming his own opinion. *Schoen*, 638 F. Supp. 3d at 1337. Similarly, the court in *In re Polypropylene Carpet Antitrust Litig.* stated that experts may not "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon," 93 F. Supp. 2d 1348, 1357 (N.D. Ga.

2000). Finally, *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.* also notes that "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty," 285 F.3d 609, 614 (7th Cir. 2002).

Defendants do not disagree that these cases are the law of this circuit. Instead, they try to assert that an exception applies. Courts have indeed allowed experts to rely on other experts' conclusions in highly specific situations where "experts in the respective field 'would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *In re Wright Med. Tech. Inc.*, 127 F. Supp. 3d 1306, 1323 (N.D. Ga. 2015) (quoting Fed. R. Evid. 703). In *In re Wright*, for example, the court permitted the plaintiffs' experts to rely on the defendants' expert's opinions regarding the highly specialized condition of metallosis, finding that medical professionals and researchers often rely on the observations of treating physicians to reach diagnostic conclusions, decide on courses of treatment and opine on the commonality of disease and injury among patients. *Id.* But that is not what has occurred here.

Here, Dr. Curlin's adoption of Drs. Cantor and Laidlaw's opinions are the uncritical reliance that courts have cautioned against, *In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999), because he adopts "wholesale" several of their opinions that go to the very heart of the issues. *Schoen*, 638 F. Supp. 3d at 1339.

These include whether the treatments have proven benefit, Curlin Rep. ¶¶14, 20, 27-29, 58; Curlin Dep. Tr. at 136:7-11 ("It's my opinion that if the state of the law is as described by Dr. Cantor and Laidlaw, then medicalized gender transition is very clearly unproven . . . ."), whether gender-affirming care is harmful, Curlin Rep. ¶¶15, 34-36, 38, 75, 77, 82, and whether clinical practice guidelines are valid, Curlin Rep. ¶¶43-44. Without these foundational opinions, Dr. Curlin cannot render *any* of the opinions offered in his report.

Dr. Curlin took no steps to validate Drs. Cantor or Laidlaw's opinions. Curlin Dep. Tr. at 105:20-106:12. He did no independent assessment of the evidence Drs. Cantor and Laidlaw relied on. *Id.* at 107:3-11; 121:20-122:3; 178:13-179:13. He conceded his opinions based on the descriptions provided by Drs. Cantor and Laidlaw. *Id.* at 108:19-109:13. He did not read the underlying studies himself. *Id.* at 104:18-105:14; 122:19-123:7; 123:20-124:2; 186:8-16; 187:9-13; *see also* Curlin Rep. ¶¶27-29, 34-35 (citing Cantor's study summaries), 43 (citing Cantor's summaries of WPATH, Endocrine Society and AAP guidelines). He does not know if Drs. Cantor and Laidlaw reviewed all studies on gender-affirming care. *Id.* at 115:9-116:13; 121:5-11. Dr. Curlin has not attempted to review all available evidence on the safety and efficacy of gender-affirming care. *Id.* at 135:14-19. He just cites Dr. Cantor as evidence for his opinion. *See, e.g.*, Curlin Rep. ¶ 38. And simply assumes Drs. Cantor and Laidlaw were correct.

*Id.* ¶¶ 14, 15, 20, 44; Curlin Dep. at Tr. 103:8-15; 121:5-11; 121:22-122:3; 123:2-5; 136:7-11 ("It's my opinion that if the state of the law is as described by Drs. Cantor and Laidlaw, then medicalized gender transition is very clearly unproven . . . ."); 136:20-137:8; 148:18-149:15; 156:19-157:20; 159:4-11; 192:19-193:15).

Because Dr. Curlin adopts wholesale the opinions of Drs. Cantor and Laidlaw—in fact, relying on those as the foundation for his opinions—Dr. Curlin's limited opinions are not helpful to the Court. *See* Curlin Rep. ¶¶ 49-51 (describing personal experience with "cancel culture" related to gender-affirming care issues). His testimony should be excluded.

### C. Dr. Curlin's Opinions Reflect Bias, Rendering Them Unreliable and Unhelpful.

Dr. Curlin's bias undermines the reliability and helpfulness of his opinion. Defendants' assertion that this challenge to the reliability of Dr. Curlin's opinions is the product of the United States' "anti-religious bigotry" is incorrect and baseless. Curlin Opp'n at 12. Dr. Curlin offers his personal moral view, seemingly influenced by his faith, as medical expert opinion. This is improper because his personal moral view, regardless of how deeply held it is, is not based on a reliable methodology, nor is it relevant or helpful to the Court in its factfinding role

Defendants bear the burden of showing that their experts' opinions are reliable and helpful. *Frazier*, 387 F.3d at 1260. While "[b]ias in an expert witness's testimony is usually a credibility issue for the [factfinder]," *Adams v. Lab. Corp. of*

*Am.*, 760 F.3d 1322, 1332 (11th Cir. 2014), the problem with Dr. Curlin's opinions is that in the absence of expertise, he substitutes his personal moral views for expert opinions. It does not matter where Dr. Curlin derives his views of morality—it just matters that this is what his opinions are based on. For example, Dr. Curlin agrees his medical practice relies on a sense of morality. Curlin Dep. Tr. at 84:21-85:9. This aligns with his book's philosophy—that medicine is fundamentally a moral practice. *Id.* at 82:12-22. He also says there is no substantive difference between ethics and morality. *Id.* at 95:18-21. Dr. Curlin admits that "medicalized gender transition" may be contrary to Christian values, which inform his sense of morality. *Id.* at 66:3-12. Dr. Curlin's personal moral views, regardless of their source, and his view that medicine is a moral practice suggest he is effectively substituting his personal moral views for medical or ethical opinions. This illustrates the danger of allowing a witness without relevant expertise to cloak their personal moral views in the guise of expert opinion. The Court should exclude Dr. Curlin from testifying as an expert in this case.

**IV.    Dr. Kaliebe Should Be Excluded from Offering Opinions on "Social Contagion," the "Politicization" of Gender-Affirming Care, and the Unreliable Opinions in His Supplemental Report.**

Unable to defend Dr. Kaliebe's expertise or methodology, Defendants rest on his general experience as a psychiatrist. But such experience does not qualify him to opine on how so-called "technologically induced contagion effects" may

impact the incidence of minors presenting with gender dysphoria. Kaliebe Rep. ¶ 21, ECF No. 591-9. His general experience also does not qualify him to opine on the "politicization" of medical care he does not provide. *Id.* ¶ 81-149. Defendants concede that Dr. Kaliebe's methodology consisted of "review[ing]" emails to form opinions about the intentions and motives of WPATH members. Kaliebe Opp'n at 15, ECF No. 658. The Court should exclude Dr. Kaliebe's "social contagion" theories about gender dysphoria, his personal views about the "politicization" of gender-affirming care, and his interpretations of WPATH members' intentions and motives.

### A. Defendants Concede that Dr. Kaliebe Lacks Specific Expertise and Fail Their Burden of Showing that Dr. Kaliebe is Qualified to Offer His Speculative "Social Contagion" Theory.

Defendants effectively concede Dr. Kaliebe's lack of expertise in his "social contagion" theories because they do not identify him as an expert on that topic. Tellingly, Defendants identify Dr. Kaliebe as an expert in the general area of "the link between social media influences and mental health disorders, of which gender dysphoria is one," instead of as an expert in the topic of his opinions—the supposed link between social media influences and gender dysphoria specifically. Kaliebe Opp'n at 8; *see also id.* at 11. He lacks meaningful experience diagnosing gender dysphoria and has not conducted any original research on the link between social media influences and gender dysphoria. U.S. Mot. at 18; Kaliebe Opp'n at 5

(arguing these "specific experiences are not necessary"). This acknowledged lack of specific expertise is insufficient to qualify Dr. Kaliebe for the very specific opinion he offers. The Court should reject Dr. Kaliebe's speculative opinions that exceed his expertise.

The Eleventh Circuit "has recognized the need for an expert to have expertise *specific to the topic at issue* to satisfy Rule 702." *Flack*, 2022 WL 4477025, at *5-6 (emphasis added). As discussed in Section I(A), *supra*, general knowledge in one field is not carte blanche to offer any opinion in a related field. Instead, the witness' expertise must match the opinions offered. For example, in *Flack*, the Eleventh Circuit affirmed the exclusion of a pathologist who was undisputedly qualified to opine on the cause of death when the pathologist sought to opine on whether an individual would have survived with a particular treatment. *Id*. The expert admitted he had no experience regarding the treatment at issue. Still, the expert's proponent argued that because of related knowledge, he "should be allowed to extrapolate the medical interventions that might have prevented death." *Id.* at *6. The Eleventh Circuit rejected that argument and held that the "district court did not abuse its discretion by concluding that such an extrapolation would clearly veer into the territory of speculation." *Id.*

Here, any general knowledge Dr. Kaliebe may claim about the impact of technology on mental health issues does not allow him to speculate about how

social media may impact gender dysphoria specifically. Dr. Kaliebe's "social contagion" hypothesis[5] is essentially that "the dramatic rise in minors *presenting* with gender dysphoria may be attributable to technologically induced contagion effects." Kaliebe Rep. ¶ 42 (emphasis added). Given the specificity of this opinion, his lack of meaningful experience diagnosing gender dysphoria or otherwise conducting original research into how social influences affect the presentation of gender dysphoria is not a minor detail. Having exceedingly limited experience diagnosing gender dysphoria, Dr. Kaliebe lacks any meaningful experience regarding how minors present with gender dysphoria. He has not compensated for this lack of relevant clinical experience in other ways, like conducting original research. Because of this mismatch between his expertise and opinions, he is not qualified to offer his "social contagion" theories as expert opinion. Like the district court in *Flack*, this Court should not allow Dr. Kaliebe to use his general knowledge of a related topic to offer a speculative opinion on a subject he lacks experience with.

---

[5] Dr. Kaliebe himself labels the speculative opinion as a mere "hypothesis" in his report. Kaliebe Rep. ¶¶ 43, 47, 49, 50.

**B. Defendants Offer No Specific Background Supporting Dr. Kaliebe as an Expert Regarding So-Called "Politicization" of Gender-Affirming Care and Fail Their Burden to Show that Dr. Kaliebe is Qualified to Opine on This Topic.**

Defendants do not even attempt to qualify Dr. Kaliebe as an expert in the politicization of gender-affirming medicine, the topic of nearly half of his original report. Kaliebe Rep. at 27; *id.* ¶¶ 81-174. Defendants instead assert that Dr. Kaliebe's general experience "as a practicing clinician and professor in child and adolescent psychiatry who has contributed to clinical guidelines qualifies him as an expert in assessing the evidence base and clinical guidelines for gender dysphoria." Kaliebe Opp'n at 13; *see also id.* ("a general expert is not required to specialize in a narrowly defined field."). But that limited general experience does not qualify him to opine on the supposed "politicization of gender care." Kaliebe Rep. at 27; *id.* ¶¶ 81-174.

Defendants bear the burden of showing that Dr. Kaliebe is qualified to offer his opinion. *Frazier*, 387 F.3d at 1260. As discussed in Section I(A), *supra*, general knowledge in one field is not a sufficient qualification for all opinions in a related but distinct and specialized field. *See, e.g.*, *Moore*, 995 F.3d at 857. The Eleventh Circuit "has recognized the need for an expert to have expertise *specific to the topic at issue* to satisfy Rule 702." *Flack*, 2022 WL 4477025, at *5-6 (emphasis added).

Here, Defendants do not show how Dr. Kaliebe's general experience qualifies him as an expert in the politicization of gender-affirming medicine. First, Defendants do not even assert that he has expertise in the "politicization" of medicine and do not identify any publications or education that would qualify him to opine on the topic. Kaliebe Opp'n at 11-13. Instead, Defendants point to Dr. Kaliebe's experiences in areas wholly unrelated to the topics of his proffered opinions here. *Compare* Kaliebe Opp'n at 12 (Defendants citing his experience as a "co-author[]" of psychiatric clinical guidelines) *with* U.S. Mot. at 21; Kaliebe Dep. Tr. at 232:7-236:4, ECF No. 591-10 (███████████████████

███████████████████████████████████████████

███████████████████████); *see also* Kaliebe Opp'n at 12 (noting that as a American Psychiatric Association member, he witnessed how "influence[] by pharma" resulted in opioids overprescription, which, again, is not the topic of his opinions). Second, Defendants do not establish that Dr. Kaliebe is otherwise an expert in gender-affirming care, the area of medicine he opines is politicized. *Id.* at 11-13. Defendants do not refute that Dr. Kaliebe has only diagnosed gender dysphoria once or twice. U.S. Mot. at 18; Kaliebe Opp'n at 5 (arguing that this experience is "not necessary"). Defendants avoid holding Dr. Kaliebe out as an expert on the politicization of gender-affirming care, on the politicization of medicine generally, or on gender-affirming care, which is correct

because he is not an expert on any of those topics. But he still opines on them. Therefore, the Court should exclude Dr. Kaliebe's opinions about the politicization of gender-affirming care as he lacks the requisite expertise.[6]

### C. Defendants Do Not Identify Any Particular Methodology Dr. Kaliebe Used to Develop the Opinions in his Supplemental Report and Fail Their Burden to Demonstrate Helpfulness of Motive or Intent Opinions in His Supplemental Report.

Defendants do not explain why Dr. Kaliebe's methodology is a reliable basis for the opinions in his Supplemental Report and do not refute that his conclusions in that report are motive or intent opinions. In fact, Defendants agree that the only methodology Dr. Kaliebe used was to conduct a "review of the documents," Kaliebe Opp'n at 15, and attempt to excuse his motive opinions as "merely background," Kaliebe Opp'n at 18-19. In short, Defendants effectively concede that Dr. Kaliebe's Supplemental Report is not the product of reliable methodology and does not offer any helpful opinions.

Defendants bear the burden of demonstrating that Dr. Kaliebe's opinions are reliable and helpful. *Frazier*, 387 F.3d at 1260. An expert may rely on otherwise inadmissible hearsay in forming their opinions, Fed. R. Evid. 703, but the expert must "bring their expertise to bear" when forming an opinion based on hearsay.

---

[6] Defendants mistakenly assert that "the United States limits its challenge [regarding Dr. Kaliebe's opinions about the politicization of gender-affirming care] to his supplemental report." Opp'n at 11. The United States' motion clearly challenges Dr. Kaliebe's "politicization" opinions in his original report as beyond the scope of his qualifications. *E.g.*, U.S. Mot. at 17-18 (referring to Kaliebe Rep. ¶¶ 81-174).

*Kirby*, 726 F.3d at 136. Otherwise, the party is impermissibly using the expert "simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Id*. Thus, expert opinions that "'do not bring [the expert's] expertise to bear' because they are based on inferences that 'are by and large undergirded by hearsay statements'" are inadmissible. *In re 3m Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19md2885, 2021 WL 684183 at *2 (N.D. Fla. Feb. 11, 2021) (quoting *United States v. Pablo,* 696 F.3d 1280, 1288 (10th Cir. 2012)); *see also Companhia Enrgetica Potiguar v. Caterpillar, Inc.*, No. 14-24277-CIV-MARTINEZ/GOODMAN, 2017 WL 10775768 at *30 (S.D. Fla. June 12, 2017) (noting that expert opinion is not impermissible "merely because the expert considered hearsay information," but excluding opinions that "are merely an attempt to focus on, and emphasize, certain facts which were developed"); *Bowe v. Pub. Storage,* No. 1:14-cv-21559-UU, 2015 WL 10857339 at *8 (S.D. Fla. June 2, 2015) (excluding opinions that were "not based on [the expert's] expertise and instead constituted a presentation of other evidence in the guise of an expert opinion"); *Indus. Eng'g & Dev. v. Static Control Components, Inc.*, No. 8:12-cv-691-T-24-MAP, 2014 WL 4986482 at *3 (M.D. Fla. Oct. 6, 2014) (precluding expert testimony about hearsay information when the expert "does not apply any expertise" to the information and thus is testifying "to introduce evidence" rather than to explain the basis of an opinion and

help the jury evaluate such opinion). Moreover, opinions about intent or motive are unhelpful because forming such conclusions does not require particular expertise. *E.g.*, *Tillman*, 96 F. Supp. 3d at 1326; *In re Trasylol Prods.*, 709 F. Supp. 2d 1323, 1338 (S.D. Fla. 2010).

Defendants cannot explain what methodology Dr. Kaliebe applied to the documents he reviewed to prepare his Supplemental Report or how he brought his expertise to bear when drafting that report. Defendants only describe his methodology as conducting a "review of the documents," "reviewing additional relevant evidence," or "[r]eviewing primary sources." Kaliebe Opp'n at 15-16. This is not a meaningful description of a reliable methodology. *See Frazier*, 387 F.3d at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1993)) (identifying error rate and general acceptance as factors to assess when evaluating reliability). While it is unremarkable that an expert's methodology might *include* reviewing documents, Defendants' failure to elaborate on how Dr. Kaliebe applied any expertise to interpret those documents acknowledges there was no methodology. For example, Defendants rely on *Broussard-Wadkins v. Maples,* 895 F. Supp. 2d 1159, 1172 (N.D. Ala. 2012), for the proposition that an expert's methodology is not unreliable when the expert relies "solely on documentary evidence." Kaliebe Opp'n at 15 n.3. But in that case, the witness had two decades of experience as a "document fraud" investigator, and he applied a discernible

methodology to the documents he reviewed—he examined documents to find

"inconsistent information between applications and identification documents

within the same personnel file." *Broussard-Wadkins,* 895 F. Supp. at 1172-73. Dr.

Kaliebe, on the other hand, did not apply any methodology because he lacks any

experience methodically applying his expertise in such a review of emails—█

███████████████████████████████████, Kaliebe Dep. Tr. at 120:18-23 ███

█████████████████████████████████████████████████████

██████, *id.* at 236:10-22, ███████████████████████████. *Id.* at

19:8-10.

Nor can Defendants explain why Dr. Kaliebe's motive or intent opinions are

helpful to the Court. Yet motive and intent opinions lie at the crux of Dr. Kaliebe's

Supplemental Report. *See* U.S. Mot. at 23 n.5. Instead of refuting that the report

includes motive opinions, Defendants minimize them. Kaliebe Opp'n at 18-19.

Defendants assert that "[w]hatever WPATH's knowledge or motives may have

been, the point is that the resulting *guidelines* (and the purported consensus) are

suspect." *Id.* Thus, if Defendants agree that such opinions are minor and therefore

unhelpful, the Court should, at minimum, preclude Dr. Kaliebe from opining on

any entity's or individual's motive or intent.

The Court should exclude the opinions in Dr. Kaliebe's Supplemental

Report because they are not the product of any reliable methodology.

Alternatively, the Court should at least preclude Dr. Kaliebe from opining on the motive or intent of any entity or individual.

## V.   Dr. Laidlaw Should Be Excluded from Testifying on Gender-Affirming Medical Care for Minors, Clinical Practice Guideline Development, the Private Plaintiffs, and Offering Unreliable Opinions Regarding WPATH.

Despite over two decades working as an endocrinologist, Dr. Laidlaw's focus on issues concerning gender-affirming medical care in minors—an age population that comprises a small fraction of his practice—is relatively new. Dr. Laidlaw's inexperience within the field is evident in his light publication history related to gender-affirming care, his total lack of experience in developing clinical practice guidelines, and a lack of experience providing medical treatment for gender dysphoria in minors. Despite this, Dr. Laidlaw opines on individual Private Plaintiffs he has never interacted with, ascribes motives to WPATH (of which he is not a member), and uses his written testimony to simply regurgitate hearsay without bringing any particular expertise to bear. The Court should exclude Dr. Laidlaw's testimony regarding gender-affirming medical care for minors and its potential outcomes, gender dysphoria clinical practice guideline development, and the Private Plaintiffs' medical treatments.

### A. Defendants Fail Their Burden to Show Dr. Laidlaw is Qualified to Offer Opinions on Medical Care for Gender Dysphoria He Does Not Provide, and on Developing Clinical Practice Guidelines Related to Gender Dysphoria, Which He Has Never Done.

As discussed in Section I(A), *supra*, general knowledge in one field is not sufficient qualification for an expert to render all opinions in a related but distinct and specialized field. *See, e.g.*, *Moore*, 995 F. 3d at 857; *Estate of Gillam*, 667 F. Supp. 2d at 1296-98; *Chikovsky*, 832 F. Supp. at 344-46; *Cosseboom*, 2020 WL 9071566 at *3. The Eleventh Circuit "has recognized the need for an expert to have expertise *specific to the topic at issue* to satisfy Rule 702." *Flack*, 2022 WL 4477025, at *5-6. The party putting forward an expert bears the burden of proving by a preponderance of the evidence that their expert satisfies the qualification requirement. *Rink*, 400 F.3d at 1292.

Defendants fail to establish that Dr. Laidlaw is qualified to opine on the topics of gender-affirming medical care for minors, the potential outcomes of such care, and drafting clinical practice guidelines about that care. Dr. Laidlaw lacks experience providing gender-affirming medical care to minors, and he has not authored clinical practice guidelines; Defendants do not dispute these facts. *See* Laidlaw Opp'n at 6.

Instead, Defendants argue that as a physician, Dr. Laidlaw is qualified to opine on gender-affirming medical care he does not provide. Laidlaw Opp'n at 6.

But being a physician does not qualify a person to opine on any medical issue under any circumstances. *See* Section I(A), *supra*; *see also Doe v. Ladapo*, No. 4:23cv114-RH-MAF, 2024 WL 2947123, at *13 n.19 (N.D. Fla. June 11, 2024), *injunction stayed on other grounds,* No. 24-11996 (11th Cir. Aug. 26, 2024) (concluding Dr. Laidlaw and others "have little or no experience treating transgender patients and no specialized training in the field"). Although Defendants point to Dr. Laidlaw's "extensive knowledge and experience prescribing and managing care using puberty blockers and sex hormones," Laidlaw Opp'n at 5,[7] he does not ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████. In other words, he does not have "expertise specific to the topic at issue," *Flack*, 2022 WL 4477025, at *5.

Defendants also point to his "frequent review" of medical studies conducted by others and his experience assessing their strengths and weaknesses. Laidlaw Opp'n at 5. Yet, reviewing studies does not qualify Dr. Laidlaw as an expert. *See Griffin*, 608 F. Supp. 3d at 1370-1371 (noting that the doctor "reviewed medical literature to render his opinion, but his review of medical literature does not make

---

[7] Defendants cite to "Training" in their response heading (Laidlaw Opp'n at 5) but do not discuss Dr. Laidlaw's training specifically. However, Dr. Laidlaw also lacks adequate training regarding the medical treatment of gender dysphoria. *See* U.S. Mot. at 25.

him qualified"). Nor does Dr. Laidlaw's *use* of clinical practice guidelines in his practice, *see* Laidlaw Opp'n at 5-6, qualify him to opine on their *development*— primarily because he has never ███████████████████████████ ████████████████████ And, despite Defendants' boasts regarding Dr. Laidlaw's "many publications about gender dysphoria," Laidlaw Opp'n at 5, the depth and rigor of his publications do not support his claim of expertise. Three of his eight publications on gender dysphoria appear in *Public Discourse*, an online, non-medical "journal for the public." *See* Laidlaw Rep. at 72-76, Curriculum Vitae ("CV") ("Research and Publications"); ███████████████████. For one *Public Discourse* article, Dr. Laidlaw evaluates a children's book. *See* Laidlaw Rep. at 73, CV (publication dated April 5, 2018). And three of Dr. Laidlaw's additional published works concerning gender-affirming care consist of brief letters to the editor. *See id.* (publications dated Nov. 2018 (online version), 2020 (Am. J. Psychiatry), and Dec. 2021).

Defendants' attempts to lean on Dr. Laidlaw's knowledge and education also fall short. The record lacks support that Dr. Laidlaw has meaningfully studied these issues for "many years," *see* Laidlaw Opp'n at 6. Until recently, Dr. Laidlaw seemed to have only looked into gender-affirming medical care sporadically during his career. *See, e.g.,* █████████████████████████████ ███████████████████████████████████████



). His curriculum vitae

supports this long-time lack of focus on these issues, as it makes no mention of

gender-affirming care before 2018. *See generally* Laidlaw Rep. CV.

. He has not

. None of this background qualifies Dr.

Laidlaw to opine on gender-affirming medical care for minors, the outcome of that

care, or drafting clinical practice guidelines.[8] As Defendants have not met their

burden to establish Dr. Laidlaw's expertise, this Court should exclude Dr.

Laidlaw's opinions regarding gender-affirming medical care for minors, the

potential outcomes of this care, and drafting clinical practice guidelines.

---

[8] Defendants quote *CP v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB, 2022 WL 17092846, at *4 (W.D. Wash. Nov. 21, 2022), but it is worth reiterating that the court there considered his qualifications to be a "close question[.]" The second opinion quoted did not specifically evaluate Dr. Laidlaw's qualifications. *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1042 (D. Ariz. 2021).

### B. Defendants Cannot Demonstrate Dr. Laidlaw's Opinions Regarding Private Plaintiffs are Reliable Because He Relied on Medical Records Without Conducting Any Interviews.

Opinions must be based upon "sufficient facts or data" Fed. R. Evid. 702. Defendants do not demonstrate the reliability of Dr. Laidlaw's opinions regarding the Private Plaintiffs. Dr. Laidlaw did not interview the Private Plaintiffs or their healthcare providers or review Private Plaintiffs' complete medical records. *See* U.S. Mot. at 26-27.

Defendants' argument that other courts have permitted experts to offer testimony based on medical records alone misses the point. *See* Laidlaw Opp'n at 7-9. Just because a medical record review is a sufficient basis for some opinions does not make it enough for any opinions. As discussed, *supra* Section I(B), courts have excluded opinions that relied only on medical records or were formed after failing to interview relevant individuals as having insufficient support. *See, e.g.*, *Cooper*, 259 F.3d at 203. And while some cases Defendants cite allow experts to testify absent fully complete medical records, Defendants have not established that Dr. Laidlaw relied upon sufficient facts to reliably opine on whether the benefits of gender-affirming care outweigh the risks for the minor Private Plaintiffs specifically. Here, it is unclear how Dr. Laidlaw could adequately understand any benefits Private Plaintiffs have individually experienced in receiving gender-

affirming medical care without speaking to them or their providers or reviewing their entire medical records.

Finally, Defendants' attempt to downplay that Dr. Laidlaw's opinion is based upon incomplete records fails. Defendants simply argue that Plaintiff Noe is no longer a plaintiff. However, Defendants do not assert in their response that Dr. Laidlaw's discussion of Plaintiff Noe no longer constitutes a basis for his opinion. The status of Noe as a plaintiff is thus irrelevant to the reliability of Dr. Laidlaw's opinion, of which discussion of Plaintiff Noe was a part.

### C. In the Absence of Dr. Laidlaw Applying Any Methodology to His Review of Third-Party Materials, Defendants Fail Their Burden to Show Opinions in His Second Supplemental Report About WPATH are Reliable and Helpful.

Defendants fail to demonstrate the reliability of Dr. Laidlaw's opinions regarding WPATH outlined in his Second Supplemental Report, ECF No. 591-14, because these opinions lack the requisite basis in "sufficient facts or data." Fed. R. Evid. 702(b). They are also unhelpful and thus independently inadmissible. *See Frazier*, 387 F.3d at 1260. Dr. Laidlaw brings no expertise to bear on his review of WPATH documents produced in discovery. His speculation about WPATH's intent and motivations provide no added value that would benefit this Court as a factfinder.

Defendants assert that "[r]eading primary sources and assessing his opinion in light of them are not unreliable approaches to confirm an expert opinion."

Laidlaw Opp'n at 10. Defendants also argue that experts can rely on inadmissible hearsay. *Id*. at 10-11. However, the problem lies with the fact that Dr. Laidlaw's opinions regarding WPATH "'do not bring [his] expertise to bear' because they are based on inferences that 'are by and large undergirded by hearsay statements'" and are therefore inadmissible. *In re 3m Combat*, 2021 WL 684183, at *2; *see also Companhia Energetica Potiguar*, 2017 WL 10775768, at *30 (noting that expert opinion is not impermissible "merely because the expert considered hearsay information," but excluding opinions that "are merely an attempt to focus on, and emphasize, certain facts which were developed"); *Bowe*, 2015 WL 10857339, at *8 (excluding opinions "not based on [expert's] expertise and instead constitute a presentation of other evidence in the guise of an expert opinion"). It is unclear what expertise Dr. Laidlaw could apply, given that he lacks any experience in

"███████████████████████████████████████████████████████

███████████████████████████████████, and has never ██████

████████████████████████████████████████████████████████

Aside from mentioning his reading of primary sources and using them to assess his opinions, Laidlaw Opp'n at 10, Defendants provide no further insight into his

methodology, underscoring how Dr. Laidlaw's WPATH opinions are devoid of any reliable methodology.[9]

Defendants also fail to demonstrate that Dr. Laidlaw's testimony about WPATH will be helpful to the Court. In support of Defendants' claim that "Dr. Laidlaw has specialized knowledge that a layperson would not," they assert that he is "a member of the relevant industry groups who has studied and published about their guidelines." However, Dr. Laidlaw ███████████████████ █████ ████████████████████████████████████.[10] Defendants do not explain how Dr. Laidlaw's membership in an organization that is not WPATH would provide him specialized knowledge to opine on the purported "political influence" on WPATH. And Defendants' citation to *Kadel* is unavailing, as in that case, another expert was qualified "by *his personal experience with WPATH* to provide background and critique the WPATH Standards of Care," 620 F. Supp. 3d.

---

[9] Looking to Dr. Laidlaw's Second Supplemental Report itself, Defendants fare no better. ███ ████████████████████████████████████████████████████ ███████████████████████████████████████. However, as discussed above, Defendants have failed to demonstrate that he is qualified by professional experience or by his review of the literature. And, neither of the two studies he references are focused on gender-affirming medical care in youth. Laidlaw Rep. at 8 (describing studies as dealing with magnesium and bone density and ultrasound use for detecting recurrent thyroid cancer). Most importantly, as noted, *supra*, ████████████████████████████ ████████████████████████████. In other words, Dr. Laidlaw brings no expertise to bear; he is simply reviewing and summarizing WPATH documents, acting as a conduit for hearsay.

[10] Presumably, Dr. Laidlaw is referring to his membership in the Endocrine Society. However, it appears Dr. Laidlaw is no longer a member of Endocrine Society. Laidlaw Opp'n at 2.

at 372 (emphasis added) (noting that the expert's testimony was "reliably based on [the expert's] expert knowledge and personal experience with the organization"). Dr. Laidlaw cannot claim the same personal experience. His opinions regarding WPATH are unhelpful.

Dr. Laidlaw's opinions about the motives and intent of WPATH are also improper and unhelpful. "[I]ntent, state of mind, or motivations" are "outside the bounds of appropriate expert testimony." *Tillman*, 96 F. Supp. 3d at 1326; *see also supra* at Section II(B). Here, Dr. Laidlaw is not "interpret[ing] evidence that would otherwise elude, mislead, or remain opaque to a layperson," *Marvel*, 726 F.3d at 136. Instead, he is offering pure conjecture about the motivations driving WPATH in the development of SOC 8. And Defendants' response proves the point, as they attempt to pivot and state that at least in one instance, Dr. Laidlaw is "merely summarizing what many documents said." Laidlaw Opp'n at 12. The Court, as the factfinder, is perfectly capable of reviewing the documents at issue and drawing its own conclusions.[11] Dr. Laidlaw's speculation is simply unhelpful and inadmissible.

---

[11] Defendants also try to re-frame Dr. Laidlaw's unhelpful testimony as a dispute over mere "passing words," Laidlaw Opp'n at 12. The cases cited are unavailing. In *In re 3M*, the court admonishes the parties that "that the experts may testify as to their review of internal corporate documents only to the extent necessary to explain the factual underpinnings of their admissible opinions," and they "will not be permitted to stray into 'unfettered, wholesale interpretation of the evidence' or to testify to 'simple inferences drawn from uncomplicated facts that serve only to buttress [one party's] theory of the case.'" 2021 WL 684183, at *41. However, what Dr. Laidlaw offers in his Second Supplemental Report is an "unfettered, wholesale interpretation of" the documents produced. In *UMG Recordings, Inc. v. Grande Comm. Networks, LLC*, No. A-17-

For these reasons, the opinions in Dr. Laidlaw's Second Supplemental Report regarding WPATH are outside the bounds of proper expert testimony. This Court should exclude them.

## VI.   Dr. Lappert's Opinions Should Be Excluded in Their Entirety.

The Court should exclude Dr. Lappert's opinions as not helpful and beyond his expertise. His opinions about gender-affirming surgery are irrelevant in this case, as Plaintiffs do not challenge Alabama's prohibition on such surgical interventions for minors. Dr. Lappert's proposed testimony about surgery provides no basis for deciding whether Alabama's prohibition of other non-surgical treatments can survive scrutiny. Even if such testimony was relevant, Dr. Lappert is unqualified to offer his opinions on gender-affirming surgery he has never performed.

### A.  As Dr. Lappert's Testimony is Not Probative of Any Issue in Dispute, Defendants Fail Their Burden to Show Dr. Lappert's Opinions About Surgery are Helpful.

Defendants cannot show that Dr. Lappert's opinions about surgery are helpful in this case because Plaintiffs are not challenging S.B. 184's prohibitions

---

CA-365-LY, 2019 WL 3207803, at *2 (W.D. Tex. Jul. 19, 2022), the court rejected a party's objection to use of a specific term ("infringe" and variations of the word). Finally, as outlined, *supra,* Dr. Laidlaw lacks the professional experience to "lay the groundwork" to provide his expert opinion. *See In re Takata Airbags*, 2022 WL 4594123, at *4.

on surgical interventions. U.S. Mot. at 7-8.[12] Unsurprisingly, Defendants do not explicitly tie Dr. Lappert's proposed testimony about surgery to any party's claims or defenses. Instead, Defendants offer three reasons for why the testimony is relevant, but none of Defendants' reasons meet their burden of establishing the helpfulness of Dr. Lappert's testimony about surgery.

Expert opinion is helpful if it "help[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This helpfulness requirement relates "primarily to relevance," and testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotation omitted).

Defendants offer three reasons why the Court should entertain Dr. Lappert's testimony: that surgery is part of a "continuum of care," that surgery risks are relevant to an informed consent analysis, and that WPATH SOC-8 recommends surgeries in some situations. Lappert Opp'n at 7-11, ECF No. 659. All fail. First, the "continuum" argument, *id.* at 7-9, is unavailing because not every person who receives gender-affirming medical care as a minor goes on to obtain surgery as an adult. Thus, any focus on later surgeries the individual might undergo in adulthood is merely speculative and not helpful to the Court as the trier of fact. As for the

---

[12] The United States reiterates its position that the opinions regarding gender-affirming surgeries offered by Drs. Nangia, Hruz, and Laidlaw should also be excluded on this basis. *See* U.S. Mot. at 7-8.

other two arguments, Lappert Opp'n at 9-10; 10-11, while WPATH guidelines acknowledge that surgery is a (present or future) part of gender-affirming medical care for some transgender people, this case is not a free-ranging inquiry into every aspect of WPATH guidelines.[13] Instead, this is a legal case with defined elements and defenses—none of which directly relate to gender-affirming surgery. As Alabama's prohibition on gender-affirming surgery for minors is not at issue in this case, Dr. Lappert's opinion does not help the Court "understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The Court should exclude the entirety of Dr. Lappert's opinion as unhelpful.

### B. Defendants Fail Their Burden to Show Dr. Lappert is Qualified to Opine on Gender-Affirming Surgery.

Defendants cannot show that Dr. Lappert is qualified to opine about gender-affirming surgery, which he has never performed. As with other experts, Defendants do not present Dr. Lappert as an expert in the topic of his opinions—gender-affirming surgery. Instead, Defendants rest on Dr. Lappert's general "expertise in plastic surgery" and his "general knowledge" as a plastic surgeon. Opp'n at 12-13. Defendants assert Dr. Lappert is familiar with some of the "techniques involved in transitioning surgeries," but his opinions are not limited to

---

[13] And while this Court previously noted the relevance of "WPATH's standards for treating gender dysphoria," Opinion & Order, ECF No. 263 at 5, in context it is apparent that the Court was referencing the guidelines relating to the hormonal treatments that are at issue in this case. *Id.* (citing to ECF No. 112-1 at 3-4 (discussing WPATH's "guidelines for treating gender dysphoria in minors with these [transitioning] medications.")).

explaining such techniques and extend to areas that exceed his qualifications and experience. *Id.* at 14.

It is Defendants' burden to show that Dr. Lappert is qualified to offer his opinions. *Frazier*, 387 F.3d at 1260. An expert may be qualified by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. General knowledge as a physician does not necessarily qualify an expert to offer any medical opinion, as discussed in Section I(A), *supra*. Instead, the Eleventh Circuit "has recognized the need for an expert to have expertise *specific to the topic at issue* to satisfy Rule 702." *Flack*, 2022 WL 4477025, at *5-6 (emphasis added).

Dr. Lappert is not an expert on the topic of gender-affirming surgery. In fact, Defendants and Dr. Lappert both acknowledge that he has never performed gender-affirming surgery. Lappert Opp'n at 16. Defendants claim Dr. Lappert has expertise on issues like "What are factors that lead a patient to need or want the surgery?" *Id.* at 15, when he has apparently never spoken to any patients needing or wanting the surgery. Though Dr. Lappert has apparently never had a discussion about a patient's informed consent to gender-affirmation surgery, Defendants assert he has expertise in how different "factors interact when it comes to informed consent" for that surgery. *Id.* at 15. Similarly, Defendants say Dr. Lappert has expertise in whether "a particular intervention [is] ethical to perform under the circumstances," *id.,* but he has no direct experience with the circumstances of a

patient seeking gender-affirming surgery. *Id.* at 15. In the absence of qualifying experience, Defendants do not identify any training or education that qualifies Dr. Lappert to offer these opinions specific to gender-affirming surgery and its circumstances. Though Dr. Lappert may have training and experience in some of the surgical techniques involved in such a surgery, *id.* at 14, Defendants' descriptions of Dr. Lappert's proposed testimony extend far beyond the details of those techniques.

Defendants' "no true Scotsman" complaint is unavailing because it improperly mischaracterizes the United States' argument as requiring that any expert in gender-affirming surgery be currently practicing such surgeries. *Id.* at 15-16. For instance, it is conceivable that a surgeon with experience in gender-affirming surgery but who no longer provides it could also be qualified. Moreover, the United States does not claim that experience is the only way of establishing an expert's qualifications. Still, the Defendants have not shown that Dr. Lappert is otherwise qualified despite his lack of experience. In short, Defendants' failure to find a qualified expert to agree with their position reflects their argument's weaknesses rather than a reason to relax the *Daubert* standards.

Finally, Defendants' mischaracterization of the court's opinion in *Brandt* as a "smear" of Dr. Lappert's religious beliefs, *id.* at 16-17, is inappropriate. In its motion, the United States quoted language from another case excluding Dr.

54

Lappert suggesting that in the absence of relevant experience he was offering his own personal views. *See* U.S. Mot. at 29; *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 914-15 (E.D. Ark. 2023) (Dr. Lappert was "testifying more from a religious doctrinal standpoint rather than that required of experts by *Daubert*."). The United States quoted that case to highlight that court's concern that Dr. Lappert was substituting his personal views for expert opinion, regardless of whether those personal views are religious, moral, or arbitrary.

For these reasons, this Court should exclude Dr. Lappert's testimony in its entirety.

## VII.   Dr. Nangia Should Be Excluded from Offering Testimony on the Medical Treatment of Gender Dysphoria in Minors and on the Private Plaintiffs.

This Court should exclude Dr. Nangia's opinions about the medical treatment of gender dysphoria as beyond her expertise and should exclude her opinions about the Private Plaintiffs' medical treatment as lacking an adequate basis. Defendants do not show how Dr. Nangia is qualified to offer her opinions on non-psychiatric medical issues or the topic of informed consent for gender-affirming treatments given her lack of experience with such issues in the context of gender dysphoria. And, despite Dr. Nangia admitting that specific evaluation and follow up are necessary to determine the ability to provide informed consent, Defendants still seek to offer her opinion regarding Private Plaintiffs' ability to

provide informed consent based only on a review of information obtained by others. Defendants assert that her opinions about Private Plaintiffs are in fact narrow—a claim belied by the fact that Dr. Nangia uses these records to support the sweeping conclusion that informed consent is impossible in the context of gender-affirming care for minors. The Court should exclude these portions of Dr. Nangia's testimony.

### A. Defendants Fail Their Burden to Demonstrate Dr. Nangia is Qualified to Opine on Medical Treatment of Gender Dysphoria in Minors, Including the Issues of Assent or Consent, Because Her General Medical Knowledge Does Not Provide Specific Expertise on These Issues.

Defendants have not established that Dr. Nangia is qualified to offer her opinions on non-psychiatric treatments for gender dysphoria or the topics of informed consent or assent related to such care. Dr. Nangia, a psychiatrist, never claims to have ever prescribed gender-affirming medications and yet seeks to opine on issues such as the risks associated with hormone therapy and the ability of patients to understand and consent to those risks. Nangia Rep. ¶¶ 46-56; 38-45, ECF No. 591-18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); *see also* U.S. Mot. at 31-32 (describing Dr. Nangia's opinions). Defendants fail to explain why Dr. Nangia is qualified to offer such opinions given her lack of relevant expertise, and this Court should exclude these opinions.

Once again, Defendants try to equate being a physician to being able to opine on any medical issue. For the reasons discussed in Section I(A), *supra*, that logic fails. In fact, the Eleventh Circuit "has recognized the need for an expert to have expertise *specific to the topic at issue* to satisfy Rule 702." *Flack*, 2022 WL 4477025, at *5-6 (emphasis added).

Defendants' attempts to defend Dr. Nangia's qualifications to discuss gender-affirming medical treatments ultimately fail because she lacks any experience with such medications. That Dr. Nangia prescribes medication, Nangia Opp'n at 7-8, ECF No. 660, does not qualify her to opine on the prescription of gender-affirming medications she does *not* prescribe. ███████████████ ████████████████████████████████████████████. The fact that both Private Plaintiffs' experts and WPATH SOC-8 have affirmed that mental health professionals play a key role in the provision of gender-affirming care, Nangia Opp'n at 9-10, establishes nothing with respect to Dr. Nangia's individual ability to evaluate the risks and benefits of gender-affirming care. Indeed, Dr. Nangia conceded that ████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ████.

Defendants also point to Dr. Nangia's general experience treating patients with gender dysphoria, but that treatment experience did not involve ███████

████████████████████████████████████  ████████████████████

██ Defendants assert Dr. Nangia has treated "hundreds of patients 'with active gender dysphoria or a history of gender dysphoria,' including over 500 minors." Nangia Opp'n at 7. But, this number cannot be independently verified, given that

████████████████████████████████████████████████████████

████████████████████████████████████████████████. It is also unclear how treating individuals with a *history* of gender dysphoria that had purportedly resolved before entering Dr. Nangia's care could inform her opinions regarding medical interventions for the condition. ████████████████████

████████████████████████████████████████████████

███████

Defendants also fail to identify any specialized experience Dr. Nangia has regarding informed consent or assent in the context of gender-affirming care. While Defendants state Dr. Nangia has "helped develop informed consent practices for her practice," Nangia Opp'n at 12, that experience was quite limited. *See*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████). Defendants also note that mental health professionals

play a role in evaluating the capacity to consent. But, this does not equate to Dr. Nangia individually having the requisite experience to opine on these issues in the context of gender-affirming care. And one of Defendants' citations supports the United States' position because, unlike Dr. Nangia, the testifying physician expert had experience obtaining informed consent regarding the procedure at issue. *See Whole Woman's Health All. v. Rokita*, No. 1:18-cv-01904-SEB-MJD, 2021 WL 665937, at *4 (S.D. Ind. Feb. 19, 2021) (noting expert's "significant clinical experience in obtaining informed consent from abortion patients, which qualifies him to offer opinions specifically anchored to the issue of appropriately securing informed consent from this population") (cited at Nangia Opp'n at 13).

Defendants also mischaracterize the United States' argument as asserting that Dr. Nangia must have publications or presentations regarding gender dysphoria or informed consent to opine on these topics. *See* Nangia Opp'n at 13-14, *but see* U.S Mot. at 31 (listing several examples indicating Dr. Nangia's lack of expertise). Rather, the point is that she lacks research experience that might compensate for her lack of relevant clinical experience.[14]

---

[14] Defendants state that the United States "does not dispute" Dr. Nangia has an extensive background in "the areas of child and adolescent development and gender dysphoria." Nangia Opp'n at 13. However, the United States is disputing her background to the extent it concerns the medical treatment for gender dysphoria, including informed consent or assent. *See* U.S. Mot. at 31-32.

Defendants' attempted reliance on Dr. Nangia's knowledge fares no better. While Defendants state that she "has [] extensively reviewed the literature on the subject," Nangia Opp'n at 8, that does alone not establish her expertise to opine on gender-affirming medical care. *Griffin,* 608 F. Supp. 3d at 1370-1371. And regardless, she does not demonstrate a command of the literature. For example, at her deposition, ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ Regarding informed consent or assent, Dr. Nangia was

█████████████████████████████████████████████

██████████████████████████████

In short, Defendants have failed to demonstrate Dr. Nangia is qualified to opine on the non-psychiatric aspects of gender-affirming medical care, including issues of informed consent and assent. The Court should refuse to admit her testimony on those topics.

### B. Defendants Fail Their Burden of Showing Dr. Nangia's Opinions Regarding Private Plaintiffs are Reliable, as She Concedes a Biopsychosocial Exam is Needed to Evaluate Consent.

Defendants do not demonstrate that Dr. Nangia's testimony regarding the Private Plaintiffs is reliable. Like other Defendants' experts offering opinions regarding the Private Plaintiffs, this part of Dr. Nangia's testimony lacks a basis in

"sufficient facts or data," Fed. R. Evid. 702(b), because she has neither interviewed the Private Plaintiffs nor their medical providers.[15] Dr. Nangia's opinions about Private Plaintiffs—based on second- or third-hand information, including medical records, declarations, and deposition testimony by parents and medical providers— are insufficiently reliable and should be excluded.

As discussed in more detail in Section I(B), *supra*, Defendants' response regarding reliance on medical records, Nangia Opp'n at 14-19, fails. *See also Cooper*, 259 F.3d at 203; *accord* 29 Fed. Prac. & Proc. 6268 (included in the Rule 702(b) analysis "should be whether the expert ignored a significant portion of seemingly important data"). Defendants also attempt to lean on the assertion that "doctors in the real world often rely on medical records when treating patients," Nangia Opp'n at 16, ███████████████████████████████ Then, Defendants pivot to Dr. Nangia's review of the deposition testimony of the Private Plaintiffs' parents and treating medical providers. *Id.* at 18. On both points, Defendants ignore the overarching context of evaluating informed consent or assent in a specialized field of medical care (*i.e.,* prescribing puberty blockers and cross-sex hormones) in which Dr. Nangia claims no experience prescribing

---

[15] Defendants' response includes a misplaced emphasis on the phrase "limited set of" medical records. Nangia Opp'n at 18-19. The United States was simply asserting the information within the medical records reviewed is not a sufficient basis for opinion under Rule 702.

medications; in such a case, simply reviewing information compiled by others is insufficiently reliable.

Importantly, Defendants concede that Dr. Nangia believes a full biopsychosocial diagnostic evaluation and adequate follow-up are necessary to determine the ability to provide informed consent. *Id.* at 17. Yet, Dr. Nangia has not performed any such evaluations regarding the Private Plaintiffs. In reaching her opinion, Dr. Nangia thus does not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Attempting to bolster her reliability, Defendants revert to her purported qualifications. Nangia Opp'n at 17. But an expert's qualifications are a distinct requirement from reliability under Rule 702. *See Frazier*, 387 F.3d at 1260. Defendants also claim that the records Dr. Nangia reviewed provide "sufficient facts for the narrow opinions Dr. Nangia offers." Nangia Opp'n at 2. Defendants subsequently contradict themselves, later referencing the decidedly broad "overarching expert opinion" that informed consent is not attainable in this context "period, in *any* minor." *Id.* at 18 (emphasis in original).

Finally, while Defendants try to shift the responsibility to Private Plaintiffs and third-party medical providers to "correct the record," *id.*, the burden remains on Defendants to establish the reliability of Dr. Nangia's testimony, which they have not done.

## VIII.  Dr. Thompson Should Be Excluded from Testifying on Medical Treatments Beyond Her Area of Expertise.

Defendants contend that Dr. Thompson's general background as an OB/GYN makes her a fertility expert, qualified to opine on the risks and ability of patients to assent to a treatment she has never encountered in practice. General knowledge does not extend so far. Especially not Dr. Thompson's general knowledge, as Defendants protestations about her expertise only buttresses the point that she has no knowledge, education, training, skill, or experience concerning the issues in this case. Defendants' attempt to distinguish the applicable case law only reinforces Dr. Thompson's lack of qualifications.

Dr. Thompson's general experience treating women for fertility issues is not enough to meet the requirements of Rule 702.[16] As discussed in Section I(A), *supra*, general knowledge in one field is not sufficient to qualify a purported expert to opine on a related but distinct and specialized field. *See, e.g.*, *Moore*, 995 F.3d at 857. Also, Defendants' attempts to distinguish *Higgins* and *Harvey* fail. *See* Thompson Opp'n at 8-9, ECF No. 662. For example, as *Higgins* notes, a doctor's experience in diagnosing and treating asthma does not qualify him to assess its genesis. *Higgins v. Koch Dev. Corp.* 794 F.3d 697, 705 (7th Cir. 2015) (citing

---

[16] Defendants' assertion that no expert could be qualified to opine on fertility options for transgender youth because no one has successfully provided it is outrageously false. Dr. Shumer's primary and rebuttal reports discuss successful fertility options at length.

*Cunningham v. Masterwear, Inc.*, No. 1:04-cv-1616-JDT-WTL, 2007 WL 1164832, at *10 (S.D. Ind. Apr. 19, 2007)). *Higgins* makes clear that more specific expertise is required, holding that it was not enough that the proposed expert was a pulmonologist because she had no experience in the issues of the case, specifically chlorine gas exposure and toxicology. 794 F.3d at 705. Same with *Harvey*. There, the expert was an experienced maxillofacial surgeon with extensive credentials, but that did not render him qualified to opine about osteonecrosis of the jaw since his education, training, and experience had little to do with that condition. *Harvey v. Novartis Pharm.l Corp.*, 895 F. Supp. 2d 1206, 1211 (N.D. Ala. 2012). Furthermore, Defendants have no response to the citation to *Lowery*, U.S. Mot. at 34. *See Lowery v. Sanofi-Aventis*, No. 7:18-cv-00376-RDP, 2021 WL 872620 at *7 (N.D. Ala. Mar. 9, 2021) (qualification is not about whether the proffered expert is qualified in a general field but whether they are qualified to render an opinion on a specific issue before the court). Defendants' weak attempts to distinguish *Higgins* and *Harvey* should be disregarded.

To be clear, Dr. Thompson does not claim to base her opinions on specialized knowledge. Instead, Dr. Thompson testified that she relied on her training and education as an OB/GYN and "keeping up with the literature" to form her opinions. Thompson Dep. Tr. at 32:7-15, ECF No. 591-23. This is not surprising, as Dr. Thompson states in her report that she only began looking into

transgender healthcare around 2020. Thompson Rep. ¶ 15, ECF No. 591-22.

Before then, she "had not been aware that minors were allowed to undergo

medicalization and surgery to alter their physical bodies in an attempt to provide

aesthetic congruence to match the opposite sex." *Id.* Dr. Thompson's involvement

in this issue did not derive from her experience as a physician but rather from her

"concern" and "shock" from reading various studies. Thompson Rep. ¶¶ 9, 15, 17,

20, 22, 81, 118, 140. Shock and concern do not qualify someone as an expert under

*Daubert* and Rule 702.

Dr. Thompson lacks the credentials to offer opinions on the distinct and

specialized field of gender-affirming medical care that is central to this case. Dr.

Thompson has never provided gender-affirming care to anyone, Thompson Dep.

Tr. at 9:17-20, never prescribed puberty blockers to an adolescent, *id.* at 10:12-14,

never attempted to preserve the fertility of an adolescent seeking gender-affirming

care, *id.* at 10:15-18, does not treat gender dysphoria, *id.* at 11:4-5, and has only

treated two patients who identified as transgender in the context of their

pregnancies, *id.* at 18:16-22, 20:4-7. She also apparently only treats individuals

assigned female sex at birth. Thompson Rep. ¶ 14. Though her experience

prescribing puberty blockers is unclear, the extent to which Dr. Thompson has

prescribed them has been for entirely different conditions, not in the context of

gender-affirming medical care. Thompson Dep. Tr. at 10:19-25. Defendants

provide a list of conditions Dr. Thompson has cared for, none of which are gender dysphoria or any condition following treatment for gender dysphoria. Thompson Opp'n at 3. Despite offering to opine on the "fertility considerations of administering to minors" puberty blockers followed by "supraphysiological doses of cross-sex hormones," *id.* at 4, Dr. Thompson does not claim to have ever seen a patient who had undergone that treatment regimen, Thompson Dep. Tr. at 10:15-18. Without direct experience in gender-affirming care, Dr. Thompson's opinions are not based on her experiences but on her conjecture.

Defendants seek to reframe Dr. Thompson's role as an "expert in *fertility*," Thompson Opp'n. at 11. Such a reframing conflicts with her opinions that extend far beyond that scope. For example, Defendants note that Dr. Thompson opines on "medical evidence regarding the risks such treatment poses to healthy biological function," *id.* at 4, which extends beyond fertility, as her report discusses the effects of treatment on "physiologic processes within the cardiovascular, endocrine, neurologic, pulmonary, and reproductive organ systems," Thompson Rep. ¶ 74, including cardiovascular risks, *id.* ¶¶ 74-77, as well as depression and mortality, *id.* ¶¶ 78-79. Defendants also highlight her opinion on "whether children in early puberty can assent to such treatment," Thompson Opp'n at 4, despite presenting no argument that expertise in fertility translates to expertise in minors' decision-making capacity. Defendants also fail to mention that Dr. Thompson

opines that medical organizations do not treat concerns of sterilization seriously when it comes to transgender youth, critiquing an American College of Obstetrics and Gynecology opinion, Thompson Rep. ¶¶ 15-20, and the WPATH and Endocrine Society medical practice guidelines, *id.* ¶¶ 21-24, an issue far beyond her purported expertise as a fertility expert. Defendants' attempt to couch Dr. Thompson in a more limited role is misleading and betrayed by her report. Dr. Thompson should be excluded from testifying beyond her expertise.

## <u>CONCLUSION</u>

For these reasons, the United States requests that the Court exclude the above-referenced opinions by Defendants' experts.

Dated: September 9, 2024    Respectfully submitted,

KEVIN P. DAVIDSON
Acting United States Attorney
Middle District of Alabama

PRIM F. ESCALONA
United States Attorney
Northern District of Alabama

JASON R. CHEEK
Chief, Civil Division

MARGARET L. MARSHALL
Assistant U.S. Attorney
U.S. Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, AL 35203
Tel.: (205) 244-2104
Margaret.Marshall@usdoj.gov

STEPHEN D. WADSWORTH
Assistant United States Attorney
U.S. Attorney's Office
Middle District of Alabama
Post Office Box 197
Montgomery, AL 36101-0197
Tel.: (334) 223-7280
Stephen.Wadsworth@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief, Federal Coordination and Compliance
Section

COTY MONTAG (DC Bar No. 498357)
Deputy Chief, Federal Coordination and
Compliance Section

RENEE WILLIAMS (CA Bar No. 284855)
KAITLIN TOYAMA (CA Bar No. 318993)
Trial Attorneys
United States Department of Justice
Civil Rights Division
Federal Coordination and Compliance Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 305-2222
Renee.Williams3@usdoj.gov
Kaitlin.Toyama@usdoj.gov

*/s/ James Fletcher*
JAMES V. FLETCHER (MD Bar No.
1412160273)
Trial Attorney
United States Department of Justice
Civil Rights Division
Disability Rights Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel. (202) 598-0083
James.Fletcher@usdoj.gov
*Attorneys for Plaintiff-Intervenor United States
of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

Respectfully submitted,

*/s/ James Fletcher*
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice