# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| and ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff-Intervenor*, ) | |
| ) | |
| v. ) | No. 2:22-cv-00184-LCB-CWB |
| ) | Hon. Liles C. Burke |
| STEVE MARSHALL, in his official ) | |
| capacity as Attorney General of the ) | |
| State of Alabama, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. MORISSA LADINSKY (DOC. 593)**

# TABLE OF CONTENTS

Table of Contents ........................................................................................... i

Table of Authorities ...................................................................................... iii

Introduction .................................................................................................... 1

Argument ........................................................................................................ 1

    I.    Plaintiffs' Efforts To Inflate Dr. Ladinsky's Limited Credentials Are Meritless ................................................................................... 1

    II.    Dr. Ladinsky's Proffered Opinions Concerning The Basis Of The WPATH And Endocrine Society Guidelines Should Be Excluded For Lack Of Expertise And Lack Of Reliable Methodology .............. 3

        A.    Dr. Ladinsky Has No Qualification To Provide Testimony About Whether or To What Extent the WPATH and Endocrine Society Guidelines Were Based On Scientific Evidence ............................................................................... 3

        B.    Dr. Ladinsky Applied No Reliable Methodology To Investigate Whether the WPATH and Endocrine Society Guidelines Are Consistent With the Available Science ................... 4

        C.    Dr. Ladinsky Has No Knowledge or Basis To Testify Concerning Supposed Endorsements By Medical Associations ........................................................................... 5

    III.    Dr. Ladinsky's Proffered Testimony That Medicalized Transition Is "Safe" Should Be Excluded For Lack Of A Reliable Basis ........... 7

        A.    Brain Development. ................................................................. 8

        B.    Harm To Fertility. .................................................................... 9

        C.    Harm To Bone Strength. ....................................................... 10

Conclusion .................................................................................................. 10

Certificate of Service ................................................................................... 12

iii

# TABLE OF AUTHORITIES

**Cases**

*McDowell v. Brown*,
 392 F.3d 1283 (11th Cir. 2004) ............................................................................5

# INTRODUCTION

Defendants do not move to preclude Dr. Ladinsky from testifying about her personal clinical observations, nor from summarizing for the Court the treatment steps the Endocrine Society or WPATH guidelines call for—although such a reading exercise is not likely to be particularly useful to the Court. *See* Doc. 593 at 1 (Mot.). Rather, Defendants have moved to preclude Dr. Ladinsky from testifying to specific propositions proffered in her expert report as to which she identified no reliable basis, and/or disclosed no reliable methodology underlying her opinions:

- How and on what scientific basis the WPATH and Endocrine Society guidelines were developed;
- That medicalized gender transitions of children and adolescents (puberty blockers, cross-sex hormones, and surgeries) are "safe."

Plaintiffs' Opposition attempts to muddy the issues, repeatedly scrambling discussions of qualification, methodology, and bare factual assertions, and Plaintiffs dismiss as mere "factual disputes" what are in fact disqualifying failings of basis and methodology. Defendants' motion should be granted.

# ARGUMENT

## I. Plaintiffs' Efforts To Inflate Dr. Ladinsky's Limited Credentials Are Meritless.

Plaintiffs are mistaken to say that "Defendants do not seriously question Dr. Ladinsky's qualifications." Doc. 668 at 2 (Opp.). On the contrary, Defendants have demonstrated Dr. Ladinsky's utter lack of qualification to offer the opinions that Defendants seek to exclude. Plaintiffs do not dispute these facts concerning Dr. Ladinsky's limited relevant experience and expertise:

1

- Dr. Ladinsky had no involvement whatsoever in the development of either the WPATH or Endocrine Society guidelines. Mot. 9.

- The entire UAB clinic has administered puberty blockers to only 17 patients across the clinic's eight years of existence. Mot. 15.

- Neither Dr. Ladinsky nor the UAB gender clinic as a whole has ever even attempted any systematic follow-up study of outcomes of children treated at UAB with puberty blockers or cross-sex hormones. Mot. 15. The sum total of Dr. Ladinsky's testimony about follow-up is that "one would hope that we would be apprised of a tragedy like that [suicide] through families." SJ.DX33:150:21-23 (Ladinsky Dep.).

- Dr. Ladinsky repeatedly emphasized that "I'm not a researcher," (Mot. 16), and nowhere reports any measurement of either benefit or harm for even a single one of her clinic's patients.

Plaintiffs spend space reciting credentials not relevant to Dr. Ladinsky's claims to testify about the safety of medicalized transitions based on her "clinical experience." They puff her clinical experience by referring to "her own clinical experience pre-dating UAB" (Opp. 16) and "caring for youth receiving hormonal therapies for an additional 28 years" (Opp. 4). But Dr. Ladinsky nowhere claims—and Plaintiffs do not assert—that she ever participated in any way in the treatment of gender dysphoria in even a single patient before arriving at UAB.

Personal experience is just one way in which a witness may acquire expertise. *See* Mot. 3. The threshold point here is that when it comes to the creation of the WPATH and Endocrine Society guidelines, and the safety of medicalized treatments for gender dysphoria in minors, Dr. Ladinsky cannot ground her claim to expertise on her personal experience. The inquiry into her methodology becomes all the more critical.

2

**II.     Dr. Ladinsky's Proffered Opinions Concerning The Basis Of The WPATH And Endocrine Society Guidelines Should Be Excluded For Lack Of Expertise And Lack Of Reliable Methodology.**

Dr. Ladinsky proposes to testify that the WPATH and Endocrine Society guidelines were "evidence-based" and "based on considerable scientific and medical research and represent the best evidence-based practice guidelines available." *Daubert*.DX1:5 (Ladinsky Rep.). As Defendants established in their opening brief, Dr. Ladinsky is merely repeating rumor. She does not know, and did not take any steps to investigate the truth of that rumor.

**A.     Dr. Ladinsky Has No Qualification To Provide Testimony About Whether or To What Extent the WPATH and Endocrine Society Guidelines Were Based On Scientific Evidence.**

Dr. Ladinsky acknowledged that there is "now a whole field developed of evidence-based medicine." Ladinsky Dep. 89:7-9. Whatever training she may have received years ago, when asked how that term is defined within that field, Dr. Ladinsky testified that she did not know "*their* vision and how *they* see it," making clear that she is not qualified to provide expert testimony as to what is or is not "evidence-based" as that term is now understood. *Id.* at 89:13-15 (emphasis added).

Nor do Plaintiffs dispute that Dr. Ladinsky has no actual knowledge of the drafting processes for the WPATH or Endocrine Society guidelines, including to what extent those guidelines were shaped (or not) based on scientific evidence. Mot. 9. And, unlike Defendants' experts, Dr. Ladinsky did not avail herself of the opportunity to gain direct knowledge of how the WPATH SOC-8 sausage was made by reviewing the WPATH correspondence produced in this litigation—documentation which reveals top-level leadership in the SOC-8 development

3

process extensively tailoring guideline language for reasons of politics, litigation advantage, and insurance coverage, at the expense of scientific and medical research and evidence. *See* Doc. 561 at 18-19 (Defs' MSJ Br.); Doc. 650 at 47-56 (Defs' SJ Reply); SJ.DX4 (Cantor Supp. Rep. Appx. A).

**B.     Dr. Ladinsky Applied No Reliable Methodology To Investigate Whether the WPATH and Endocrine Society Guidelines Are Consistent With the Available Science.**

Since Dr. Ladinsky has no direct knowledge of what basis the guidelines were prepared, the methodology she applied to reach her indirect inferences concerning that basis is all the more important. But here, too, Plaintiffs flutter around without actually contradicting the central failings identified by Defendants.

Plaintiffs attempt to imply some methodological rigor by claiming that in her expert report Dr. Ladinsky supported her assertion that the guidelines are "evidence-based" by "citing scientific literature." Opp. 4. But this is simply false. The footnote to Dr. Ladinsky's assertion cites no "scientific literature," but only the guidelines themselves—utterly circular "support". Ladinsky Rep. 5 & n.2.

Indeed, Plaintiffs do not actually deny that Dr. Ladinsky:

- Never attempted any review of the scientific literature to form her own opinion as to whether those guidelines do or do not reflect the available science, Mot. 9;

- Could not say whether she had ever bothered to follow the citations to look at the two systematic reviews referenced by the Endocrine Society in its guidelines, Ladinsky Dep. 114:8–115:13;

- Did not bother even to learn whether WPATH commissioned any systematic reviews of the scientific literature as part of the SOC-8 development process, *id.* at 99:20–100:3;

4

- Relies on email list-servs and things she picks up at conferences to keep abreast of the literature (*id.* at 73:22–74:18)—unstructured methods that somehow did not "elevate to [her] attention" even the internationally hugely influential systematic reviews commissioned as part of the U.K. "Cass Review" process. *Id.* at 132:17-19.

These are not factual disputes, and this is not a reliable methodology for forming an opinion as to whether the guidelines are indeed "evidence-based." Rather, this is mere say-so, "waltzing in" to offer opinions based on no "recognized scientific method." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).

### C. Dr. Ladinsky Has No Knowledge or Basis To Testify Concerning Supposed Endorsements By Medical Associations.

Dr. Ladinsky and Plaintiffs attempt to distract from the lack of basis for her opinions that the guidelines are based on reliable science by asserting that those guidelines are "recognized as the prevailing standard of care" (Ladinsky Rep. 6) or "endorsed" (Opp. 11) "by the major associations of medical professionals" (Ladinsky Rep. 6). Even if true, such endorsements would not provide a reliable basis for *Dr. Ladinsky* to testify concerning the scientific basis (or lack thereof) of the guidelines. But in fact, Plaintiffs cannot repair the fact that Dr. Ladinsky cites not a single "endorsement" or "recognition" adopted by a single medical organization as the basis for that proffered opinion.

Nor do Plaintiffs have any response to the only actual evidence in the record that the American Medical Association and American Academy of Pediatrics flatly *refused* to give any such endorsement (Defs' MSJ Br. 12), or to the somewhat plaintive cry of Dr. Eli Coleman, past-president of WPATH and Chair of both the SOC-7 and SOC-8 development efforts, that "I have no idea how it was ever said

5

that so many medical organizations have ever endorsed SOC7.… My suspicion is that these organizations have never formally endorsed….." Mot. 10. Plaintiffs' dismissal of this evidence as "stray emails … among WPATH affiliates" (Opp. 12) is absurd. Dr. Coleman was no mere "affiliate," and his statements were not "stray": they came as part of his "12-Point Strategic Plan" circulated to the very top WPATH leadership in February of 2023, promptly after the publication of SOC-8. SJ.DX190:1-10 (WPATH 17).

Ironically, Dr. Coleman testified at his deposition that despite his lack of knowledge of any actual endorsement, he now "assume[s] it to be true" that these endorsements must exist because "It's written over and over again and stated in … you know, legal documents." SJ.DX21:264:12-16 (Coleman Dep.). The lawyers are at it again, trying to substitute assertion for fact. But neither Plaintiffs' counsel nor *amici* medical associations identify a single statement or resolution voted by the membership of a major American medical organization endorsing the WPATH or Endocrine Society guidelines. Regardless, after-the-fact assertions in legal briefs cannot provide the basis for expert opinion testimony by Dr. Ladinsky.

Nor should the Court credit mere assertions in amicus briefs—lacking evidentiary foundation and not subject to cross-examination—that the WPATH and Endocrine Society guidelines are "evidence-based," or the products of "careful and robust deliberation" and "rigorous requirements." Doc. 91-1 at 17, 23 (Medical Amicus Br.). Those questions must be left to those who actually know, the documentary evidence about that process, and cross-examination.

### III. Dr. Ladinsky's Proffered Testimony That Medicalized Transition Is "Safe" Should Be Excluded For Lack Of A Reliable Basis.

Plaintiffs try hard to define "safe" down to "acceptable level of harm" (Opp. 13-14, 17), but the fact remains that Dr. Ladinsky nowhere cites (and Plaintiffs in their brief do not cite) a single scientific source, systematic review, or official statement from any medical organization that claims that any form of medicalized transition of children or adolescents is "safe." And it remains true that the sources that Dr. Ladinsky footnoted in support of that proposition do not say that. Mot. 12.

"Safe, except for sterilization, harm to brain development, and seriously weakened bones" is not "safe," and Dr. Ladinsky has thoroughly disqualified herself from delivering expert testimony on the effects of puberty blockers or cross-sex hormones in these three critical areas. It is no doubt true that the same evidence that spotlights Dr. Ladinsky's lack of expertise and failure to apply any defensible methodology could arm devastating cross-examination, but that possibility does not leap-frog the Court's threshold duty under *Daubert* to exclude expert opinion testimony that is not grounded in appropriate expertise and methodology, nor the proponent's burden to establish both qualification and reliability. Mot. 2-6.

As to specific evidence of harm relating to damage to brain development, fertility, and bone health, Plaintiffs miss the point when they cry "factual dispute!" Opp. 10, 12, 15. The point for present purposes is not the factual dispute, but the fact that Dr. Ladinsky has *ignored* the scientific dispute and violated the basic requirements of reliable methodology by cherry-picking and "ignor[ing] contrary data" rather than taking it into account. *See* Mot. 6.

7

### A. Brain Development.

Plaintiffs have no response except word games and flat misstatements to the Defendants' demonstration that Dr. Ladinsky has no reliable basis for her proffered testimony denying that "'alteration of normal adolescent brain maturation' may be another 'possible side effect' of puberty blockers." Ladinsky Rep. 29.

For instance, Dr. Ladinsky was asked at her deposition about a peer-reviewed article by authors from prominent American medical research establishments that warned of potential risks of harm to brain development from puberty suppression. *See* Ladinsky Dep. 193:16–210:3 (discussing SJ.DX36:1 (Chen *Consensus Parameter*)).[1] Plaintiffs admit that Dr. Ladinsky declared it "[o]utside my expertise" to know "quantitatively, qualitatively" whether those authors were correct in cautioning that "the full consequences [for neuro-development] of suppressing endogenous puberty are not yet understood." Ladinsky Dep. 197:20–198:3. That disclaimer is comprehensive—there is no type of scientific knowledge other than the "qualitative" or "quantitative." It is false that Dr. Ladinsky "reflected" a "general[] familiar[ity] with the literature" concerning the known or potential impact of blocking normal healthy puberty on brain development (Opp. 19); she cited a single article (which does not support her assertion, *see* Mot. 14), and proclaimed her ignorance of any other studies on the topic (*id*.).

As to Dr. Ladinsky's dismissal of risk of harm to brain development because "I have not seen this in my practice" (Ladinsky Rep. 29), the Plaintiffs offer no

---

[1] Plaintiffs complain that Dr. Ladinsky was asked about an "unpublished" article, Opp. 19, but the article was published in *Transgender Health* by well-known researchers in the field.

8

response to the disqualifying fact that Dr. Ladinsky never looked for such harm—has never administered before-and-after cognitive evaluation tests. Mot. 15.

### B. Harm To Fertility.

Plaintiffs double down on Dr. Ladinsky's assertion that puberty blockers "do not impair … fertility" (Ladinsky Rep. 21), stating that she proposes to testify that puberty blockers "pose[] no fertility risk." Opp. 19. In defending Dr. McNamara's ignorance on the same topic, however, Plaintiffs have represented to the Court that it is "unknown" whether adolescent girls subject to puberty blockers will ever achieve healthy levels of fertility. *See* Doc. 666 at 15. That admission acknowledges the baselessness of Dr. Ladinsky's proposed testimony, and should be decisive.

Dr. Ladinsky's lack of legitimate basis is evident even without this admission. Plaintiffs claim that Dr. Ladinsky bases her opinion "on her experience and understanding of the scientific literature." Opp. 19. But Dr. Ladinsky has denied having any experience of fertility recovery in a patient after administration of puberty blockers ("Our clinic hasn't been around long enough." Ladinsky Dep. 266:19-267:1; *see also* Mot. 18.) As for the literature, Dr. Ladinsky neither claims nor documents any effort to review the literature relevant to fertility after puberty blockade. She acknowledged that the Endocrine Society reported that there is "no data" regarding recovery of healthy levels of fertility in either males or females in whom puberty blockers have been administered to prevent natural healthy pubertal development. Ladinsky Dep. 256:12–257:10, 264:2-16. And she was unable to identify a single study documenting recovery of fertility after administration of puberty blockers to adolescents as a treatment for gender dysphoria. Her suggestion

9

that "there may be" studies (*id*. 265:9-10) does not represent a methodology that can support an expert opinion of "no risk to fertility."

### C. Harm To Bone Strength.

Defendants noted that the only scientific paper that Dr. Ladinsky cited as supposed support for her claim that it is "well documented" with "excellent data" that puberty blockers have no long-term negative effect on bone strength *contained no data on bone density at all*. Mot. 18-19. Plaintiffs simply do not respond. Nor do they identify any other scientific reference that could support Dr. Ladinsky's proposed "safe as to bone strength" testimony.

And again, as to her own "clinical experience," it remains true that Dr. Ladinsky and the UAB clinic do not routinely measure bone density when applying puberty blockers, and "haven't compiled quantitative data about bone density." Ladinsky Dep. 279:3-19. Dr. Ladinsky's vague testimony that the clinic has measured bone density in an unspecified number of patients who have "other medical indications …that *could* interfere with … bone density" (*id*., emphasis added), with no data provided in her report or in her testimony as to how many patients, what "other" conditions, and what measurements were obtained, has nothing in common with a recognized scientific methodology that could support testimony that puberty blockers have no long-term negative effect on bone density.

## CONCLUSION

For the reasons set out above and in Defendants' opening memorandum, Defendants' motion to exclude certain testimony of Dr. Ladinsky should be granted.

10

Dated: September 9, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
   *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
   *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
   *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
   *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
   *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

11

12

## CERTIFICATE OF SERVICE

    I certify that on September 9, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre  
A. Barrett Bowdre  
*Counsel for Defendants*
