# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff-Intervenor*, | ) |
| | ) |
| v. | ) No. 2:22-cv-00184-LCB-CWB |
| | ) Hon. Liles C. Burke |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. MEREDITHE McNAMARA (DOC. 594)**

## TABLE OF CONTENTS

Table of Contents ............................................................................................. i

Table of Authorities ....................................................................................... iii

Introduction ..................................................................................................... 1

Argument ......................................................................................................... 1

    I.    Plaintiffs Cannot Cure Dr. McNamara's Lack Of Relevant Experience ............................................................................................ 1

    II.    The Aspects Of Dr. McNamara's Proffered Testimony Defendants Have Moved To Exclude Are Not Reliable ............................................. 3

        A.    Dr. McNamara's Testimony That Puberty Blockers and Cross-Sex Hormones Are "Safe" Is Unreliable. ............................. 3

        B.    Dr. McNamara's Testimony That There Is an "International Consensus" Recommending Use of the WPATH and Endocrine Society Guidelines Is Not Based On Fact or Reliable Methodology. ................................................................... 7

        C.    Dr. McNamara's Other Improper Opinions Should Be Excluded. ............................................................................................ 9

            1.    Dr. McNamara's proffered opinion that the WPATH and Endocrine Society guidelines are "evidence-based" is not based on knowledge or any reliable methodology ............................................................................ 9

            2.    Dr. McNamara lacks expertise to opine on the ethics of clinical experiments to investigate the risks and benefits of medicalized transitions of minors. ......................... 9

            3.    Dr. McNamara's proffered opinions concerning actual practices in gender clinics are not based on knowledge or any reliable methodology ................................ 10

Conclusion .................................................................................................... 10

Certificate of Service ................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Kilpatrick v. Breg, Inc.*,
  613 F.3d 1329 (11th Cir. 2010) ..................................................................6

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)(i-ii) ................................................................10

# INTRODUCTION

At her deposition, Dr. McNamara disqualified herself under the requirements of *Daubert* on point after point. Plaintiffs can raise dust clouds, but they cannot erase that transcript. Nor can they evade—or meet their burden to satisfy—the gatekeeping requirements of *Daubert* by crying "fact dispute." Dr. McNamara's testimony should be limited to the extent and for the reasons set out in Defendants' opening memorandum.

# ARGUMENT

## I. Plaintiffs Cannot Cure Dr. McNamara's Lack Of Relevant Experience.

Plaintiffs wish to turn attention away from Dr. McNamara's inflated claims of experience, but it was Dr. McNamara, not Defendants, who listed "my experience treating patients" as the lead basis for her opinion that "Adolescent patients with gender dysphoria who are treated consistent with the standard of care can thrive." *Daubert*.DX3:25 (McNamara Rep.). And Plaintiffs cannot undo the revelation, during her deposition, that Dr. McNamara has essentially no such experience. They do not dispute her testimony that across her entire career she has had a total of two patients she considered appropriate to refer to a gender clinic for evaluation; that neither of these two patients has received any of the hormonal interventions at issue in this case and thus that she has zero experience with such treatments; that, according to Dr. McNamara, "I have not yet encountered a patient who may be eligible for pubertal blockade"; that she has never been responsible for diagnosing gender dysphoria in a patient; and that she has never made the decision to subject any minor to hormonal interventions. *See* Doc. 594 at 3-4 (Mot.). Plaintiffs try to

1

narrow (Doc. 666 at 5 n.4 (Opp.)) Dr. McNamara's testimony—volunteered to avoid answering questions about harm to brain development—that she would not presume to advise patients on risks associated with the puberty blockers "I myself would not be prescribing or managing" (SJ.DX59:89:7–91:15 (McNamara Dep.); Mot. 5), but the fact remains: Dr. McNamara does not have and cannot base her opinions concerning hormonal interventions on clinical experience.

Plaintiffs would shift attention to Dr. McNamara's "academic qualifications," but the spotlight is no kinder to her there. It remains true that Dr. McNamara's "expertise" is in publishing tendentious advocacy opinion pieces. Mot. 3. Plaintiffs assert that Dr. McNamara has now "published peer-reviewed research … on transgender health care" (Opp. 4), but this is untrue; the only new article they cite is not a research paper but a self-described "Commentary" on "State-Level Bans on the Care of Transgender and Gender Diverse Youth"—i.e., yet another advocacy opinion piece explicitly aimed at litigation.[1] Opp. Ex. 1. Dr. McNamara has never published research relating to gender dysphoria or treatment of gender dysphoria.

Plaintiffs claim that Dr. McNamara based her opinions on "a rigorous academic analysis of relevant scientific and medical literature." Opp. 3. But as Defendants reviewed on a topic-by-topic basis in their opening brief, and will touch on below, a rigorous review of the relevant scientific literature is precisely what Dr. McNamara disclaimed at deposition, on topic after topic.

---

[1] In a "Declaration of Competing Interest" in this Commentary, Dr. McNamara discloses that she has "received expert witness payments from Human Rights Campaign and GLBTQ Defenders," but does not disclose to readers that the article advocates on topics as to which she is providing expert testimony in the present ongoing litigation.

Plaintiffs' final argument for Dr. McNamara's qualification seems to be that she knows and mingles with a number of people who actually *are* expert in the field. Opp. 6-7. They cite no authority that such can amount to sufficient expertise.

II. **The Aspects Of Dr. McNamara's Proffered Testimony Defendants Have Moved To Exclude Are Not Reliable.**

   A. **Dr. McNamara's Testimony That Puberty Blockers and Cross-Sex Hormones Are "Safe" Is Unreliable.**

Plaintiffs try by several means to rehabilitate Dr. McNamara's proffered testimony that blocking natural healthy puberty and introducing cross-sex hormones into the bodies of developing adolescents is "safe." None has merit.

Plaintiffs start by attempting to blur the definition of "safe" (Opp. 8), quoting part of a sentence from the report of Defendants' expert Dr. James Cantor, while omitting the operative language he quotes from an FDA regulation, which states that a conclusion of "safety" can be reached only when both potential benefits *and* potential risks can be evaluated *"based upon valid scientific evidence."* See SJ.DX2:¶72 (Cantor Rep.) (complete quotation; emphasis added). Thus, the FDA (or a responsible doctor) will not declare a drug or device "safe" unless both benefits *and risks* are known based on "valid scientific evidence."[2]

It is astonishing, then, that Plaintiffs now attempt to defend Dr. McNamara's lack of knowledge and failure to do any thorough review of the literature by pleading

---

[2] Plaintiffs assert that "Defendants imply that 'brain damage' is a near certainty." Opp. 10. This is false. Defendants have carefully stated and documented that leading responsible voices identify a real risk of harm to adolescent brain development; that the very limited data that exists reinforces concerns about that risk; and that studies sufficient to justify any firm conclusion have not been done. Mot. 7-10; Doc. 561 at 3, 8-9 (Defs' MSJ Br.). This lack of "valid scientific evidence" is the point, and is itself enough to preclude any responsible conclusion of "safety."

*universal* ignorance, arguing that the "fundamental problem" with Defendants' objections is that "the answers to those questions are unknown," citing and quoting sources that Defendants have previously called to the Court's attention. Opp. 15 & n.12. "Those questions" include whether girls subjected to puberty blockers to prevent natural healthy puberty "will *ever* achieve healthy levels of fertility" (McNamara Dep. 135:11-18 (emphasis added)), and whether "cross-sex hormones administered to adolescents … *permanently* sterilize some percentage of those adolescents" (*id.* at 146:13-16 (emphasis added)), even after they stop taking the hormones.

Defendants accept this admission (which is directly contrary to Dr. Ladinsky's proposed testimony[3]) and agree that the risk of permanent, irreversible sterilization by puberty blockers or cross-sex hormones administered to adolescents has not been meaningfully studied by those who are subjecting adolescents to these treatments, and that the answers to those questions are therefore "unknown."[4] What follows from this is not that Dr. McNamara's speculative opinion of "safety" should be admitted, but rather that:

---

[3] Dr. Ladinsky has proffered the (unsupported) opinion that "puberty blockers do not impair long-term fertility." *See* Doc. 593 at 17-18.

[4] Plaintiffs assert that "Dr. McNamara cites evidence that natal females can … become pregnant after discontinuing testosterone" (Opp. 14), citing p. 14 n.38 of her report, which in turn cites an article by Dr. Light and others: "Transgender men who experienced pregnancy after female-to-male gender transitioning." But at her deposition, Dr. McNamara agreed that "no subject reported on in the Light paper began taking testosterone during her years of adolescence while sexual organs and fertility were still in the process of development." McNamara Dep. 153:11-25. Dr. McNamara also acknowledged that the Light study "can tell us literally nothing about how many women who took testosterone for a period of their lives, later wished to but were unable to become pregnant." *Id.* at 156:5-17.

4

- The current absence of scientific knowledge makes it *impossible* for a responsible scientist to conclude that puberty blockers or cross-sex hormones are "safe" for adolescents. "Safe, except that we don't know whether it will sterilize you" is not safe;

- It is not possible for parents to give informed consent, nor for minors to give informed assent, to these treatments, because meaningful information about this life-crippling risk does not exist; and

- It is reasonable for the Alabama legislature to prohibit—at least until "the answers to these questions" become available—injecting drugs into the bodies of physically healthy children and adolescents which may irreversibly sterilize those young people for life.

In any case, it is notable that after all the supplemental reports and briefings, it remains true that neither Dr. McNamara nor counsel cite a *single* clinical guideline or formal scientific statement of a medical organization that declares the administration of puberty blockers and cross-sex hormones to adolescents to be "safe." In proffering that absolute statement, Dr. McNamara is out on a limb alone. And she is out on that limb unsupported by either relevant expertise or any reliable methodology.

Defendants have demonstrated that Dr. McNamara categorically and repeatedly disclaimed relevant expertise in both (a) brain development and the impact of blocking puberty on brain development, and (b) fertility and the impact on future fertility of blocking pubertal development in, or administering cross-sex hormones to, adolescents. Mot. 4-5, 10-11. Plaintiffs try to dismiss these as narrow disclaimers, somehow unfairly elicited (e.g., Opp. 15), but they were not; the deposition transcript and citations Defendants provided show that. Plaintiffs' observation that Dr. McNamara has been equally willing to pontificate on these issues in her related advocacy pieces (Opp. 11-12) adds nothing to her expertise.

5

As to methodology, Defendants have *not* claimed that Dr. McNamara *entirely* "lacks knowledge of the literature concerning potential effects of puberty blockers on brain development" of future fertility (Opp. 12), but that is no relevant standard, and the burden to demonstrate that the expert has employed a reliable methodology rests on Plaintiffs. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). Relying on a partial and cherry-picked knowledge of the relevant literature does not represent a reliable methodology for arriving at scientific conclusions. *See* Mot. 6. Defendants have documented that Dr. McNamara stated again and again that she had not done "*the type of literature search that would be required*" (her words) to form an opinion as to risks of harm to brain development or harm to fertility, and so had no opinion on key (not marginal or eccentric) questions such as whether puberty blockade has "negative long-term effects on brain development." McNamara Dep. 82:1-7; *see id.* 147:4-7; Mot. 4-5, 10-11. Despite Plaintiffs' attempts to obfuscate, the Court is entitled to take Dr. McNamara at her word as to what thoroughness of literature review would be necessary to form an expert opinion, and to accept her word that she has not done that review.

Finally, Plaintiffs would prop up Dr. McNamara's proffered testimony dismissing any risk to brain development by touting a supposedly "academic report" recently co-authored by Dr. McNamara, and by dragging in additional articles never before mentioned by Dr. McNamara in her expert report or deposition. Opp. 12. But the "academic report" is not an academic report; it is just one more unpublished, non-peer-reviewed advocacy piece, and one that nowhere discloses that at least four of its co-authors are currently serving as expert witnesses in multiple litigations

6

around the country relating to the very topics it addresses (Drs. McNamara, Olson-Kennedy, Janssen, and Turban). Plaintiffs' brief then falsely describes "evidence" from an unnamed paper supposedly comparing adolescents who had been subjected to puberty blockers against "a control group of teenagers not receiving those medications." Opp. 12. But that paper[5] specifically tells us that it "*lack[ed]* a control group," and that "neurocognitive skills that develop *specifically during adolescence* like social-emotional processing, executive functioning, risk and reward processing, *were not measured* in the current study." *See* Attachment A, Arnoldussen 2022 at 1074 (emphasis added). Dr. Baxendale, in her thorough review of the relevant literature (*see* Mot. 8), included the Arnoldussen et al. paper and rightly concluded that "No conclusions can be drawn from this study with respect to the impact of puberty suppression on the development of cognitive function." SJ.DX154:9 (Baxendale Neuropsychological Function). In short, lawyers' misleading descriptions of articles nowhere mentioned by Dr. McNamara in her expert reports or deposition are an extremely unreliable source of information, and in any case cannot repair Dr. McNamara's own inadequate knowledge and methodology.

### B. Dr. McNamara's Testimony That There Is an "International Consensus" Recommending Use of the WPATH and Endocrine Society Guidelines Is Not Based On Fact or Reliable Methodology.

Plaintiffs' "defense" of Dr. McNamara's proffered testimony that "International … consensus … recommends use of standards of care from WPATH

---

[5] The paper, Arnoldussen et al. 2022, can be identified by tracking through the referenced discussion and citation in Dr. McNamara's so-called "academic report." *Compare* Opp. 12 (referencing SJ.PX7, Appendix A at 24-26), *with* Doc. 629-7 (SJ.PX7, Appendix A) at 25 & n.70 (referencing Arnoldussen et al. 2022).

and … the Endocrine Society" (McNamara Rep. 2) is circular and damning. In forming this opinion, they say, Dr. McNamara "relied on the Endocrine Society Guidelines and WPATH SOC8, and their reputation as 'leading guidelines'." Opp. 16.

The upshot is that it is now undisputed that to arrive at her opinion that there is an "international" consensus in support of the WPATH and Endocrine Society guidelines, Dr. McNamara did not investigate or reference any policies or policy statements from any other nations, and did not investigate whether any foreign health authority has endorsed those guidelines. Mot. 13. Instead, she considered it sufficient that WPATH—a self-selected echo-chamber organization with a documented record of silencing and punishing dissent (*see* Doc. 561 at 22 (Defs' MSJ Br.))—agree with themselves and have arrogated the name "World." Opp. 16.

Plaintiffs are wrong that multiple European countries including England and Scotland "do not ban gender transition treatments for adolescents." Opp. 17. They do. Mot. 13; *see* Doc. 650 at 24-27 (Defs' SJ Reply). The fact that leading European polices make an exception to allow for carefully controlled experimental clinical trials is a purely academic distinction for present purposes, given Dr. Ladinsky's testimony that no one associated with UAB (the only gender clinic in Alabama) has ever conducted, or even taken the preliminary step of enrolling patients for, any clinical study of any treatment of gender dysphoria in minors. SJ.DX33:1-3, 49:21-50:3, 81:4-9, 104:7-19 (Ladinsky Dep.).[6]

---

[6] Plaintiffs' efforts to differentiate the European prohibitions based on their carve-outs for clinical studies are particularly ironic given Dr. McNamara's expressed opinion that controlled

The point for the present motion is not which health authority or organization has the wisest policy; the point is that where there is sharp disagreement there is not "consensus," and ignoring all foreign sources while proclaiming an "international consensus" is say-so and cherry picking—not a reliable or accepted methodology.

### C. Dr. McNamara's Other Improper Opinions Should Be Excluded.

#### 1. Dr. McNamara's proffered opinion that the WPATH and Endocrine Society guidelines are "evidence-based" is not based on knowledge or any reliable methodology.

Even if Dr. McNamara had conducted her own "evidence-based analysis of the safety of gender transition treatments" (Opp. 18) (she did not), that could not provide a basis for her proffered opinion that the WPATH and Endocrine Society guidelines are in fact "evidence-based." Plaintiffs have no real response to the problem that Dr. McNamara has no knowledge of how those guidelines were developed, and that "[r]eading procedures for how to create clinical guidelines and simply *assuming* that WPATH and the Endocrine Societies followed those procedures is not a methodology." Mot. 16. Testimony about the development and evidentiary basis of those guidelines must be left to those who have direct knowledge, or have troubled to investigate.

#### 2. Dr. McNamara lacks expertise to opine on the ethics of clinical experiments to investigate the risks and benefits of medicalized transitions of minors.

Dr. McNamara testified that she is not an expert in medical ethics. Mot. 17. Plaintiffs urge that she took one course relating to medical ethics long years ago

---

experiments to examine the benefits and harms of medicalized transition *cannot* be ethically conducted. McNamara Rep. 20-21.

9

(Opp. 19), but that is simply to say that she went to medical school, and cannot contradict her own evaluation of her expertise. Dr. McNamara does not satisfy the "qualification" prong of *Daubert* (*see* Doc 593 at 3-4) and should not be permitted to testify to questions of medical ethics.

### 3. Dr. McNamara's proffered opinions concerning actual practices in gender clinics are not based on knowledge or any reliable methodology.

Plaintiffs make only a nominal effort to defend Dr. McNamara's competence to provide opinion evidence as to actual clinical practice in Alabama or elsewhere. *See* Opp. 19-20. They do not dispute her lack of knowledge as to practices at the UAB clinic (much less the Yale clinic), nor her apparent ignorance of the strongly expressed concerns among the practitioners in WPATH leadership about widespread "sloppy, dangerous care" in the real world. Mot. 18. All they can do is invoke "frequent communications with coworkers, coauthors, and gender medicine specialists"—unidentified communications of undisclosed content with unnamed figures. Opp. 20. This does not remotely approach a recognized methodology for forming an expert opinion, nor satisfy the requirement of Rule 26(a)(2)(B)(i-ii) that experts disclose the "basis" of their opinions including the "facts or data" considered.

### CONCLUSION

For the reasons set forth above and in Defendants' opening memorandum in support of their motion to exclude selected testimony of Dr. Meredithe McNamara, Defendants' motion should be granted in all respects.

Dated: September 9, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

11

12

## CERTIFICATE OF SERVICE

I certify that on September 9, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

>s/ A. Barrett Bowdre
>A. Barrett Bowdre
>*Counsel for Defendants*