# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE *et al.*, | ) |
| *Plaintiffs*, | ) |
| and | ) |
| UNITED STATES OF AMERICA, | ) |
| *Plaintiff-Intervenor*, | ) |
| v. | ) No. 2:22-cv-00184-LCB-CWB |
| | ) Hon. Liles C. Burke |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, *et al.*, | ) |
| *Defendants*. | ) |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE SELECTED TESTIMONY OF DR. DANIEL SHUMER (DOC. 599)

# TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ............................................................................................ ii

Introduction .........................................................................................................1

Argument .............................................................................................................2

    I.    The United States Concedes That Dr. Shumer's Opinions Do Not Extend To Alabama Providers ...............................................................2

    II.    The United States Points To No Reliable Evidence Supporting Dr. Shumer's Testimony About Suicidality And Other Outcomes ..................3

    III.    The United States Cites Nothing To Support Dr. Shumer's Claim Of A "Strong Biological Foundation" Of Gender Identity .............................7

Conclusion ...........................................................................................................9

Certificate of Service ........................................................................................11

## TABLE OF AUTHORITIES

**Cases**

*Hendrix ex rel. G.P. v. Evenflo Co.*,
   609 F.3d 1183 (11th Cir. 2010) ..............................................................................6

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   174 F. Supp. 3d 911 (D.S.C. 2016) ........................................................................9

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
   644 F. Supp. 3d 1075 (S.D. Fla. 2022) ...................................................................7

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ..............................................................................8

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*,
   111 F.3d 528 (7th Cir. 1997) ..................................................................................7

*Rider v. Sandoz Pharms. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) .........................................................................8, 9

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ..............................................................................9

*United States v. Valencia*,
   600 F.3d 389 (5th Cir. 2010) ..................................................................................5

## INTRODUCTION

In three discrete areas, Dr. Shumer's testimony flunks Rule 702. The United States' limited responses are unavailing.

First, the United States concedes that Dr. Shumer knows nothing of medical gender transition providers in Alabama or how they practice, so his testimony purporting to describe their practices lacks an adequate foundation. To the extent his testimony is about providers elsewhere, he equally lacks a foundation to opine about them.

Second, the United States cannot point to a reliable basis for Dr. Shumer's sweeping claims about suicidality and other mental harms that purportedly "will" face Alabama minors absent medical transitioning. *Daubert*.DX14:36 (Shumer Rep.). Dr. Shumer did not testify to any experience related to suicidality. And the United States concedes the pervasive deficiencies in the three studies Dr. Shumer relied on for this opinion—one that did not examine suicidality, one that found no statistically significant association with suicidality, and one that did not even ask about a gender dysphoria diagnosis.

Third, the United States cannot point to any source supporting Dr. Shumer's strident claim of a "demonstrate[d]," "strong biological foundation" of gender identity. Shumer Rep. 8 ¶5. Not only does that claim contradict Dr. Shumer's own academic work—written after the sources he now relies on—but it is unsupported by any of those sources. The United States cannot point to anything more than literature that raises a question about a connection between gender identity and biology.

1

Because Dr. Shumer's testimony on that issue goes far past any scientific foundation, it is unreliable and should also be excluded.

## ARGUMENT

### I. The United States Concedes That Dr. Shumer's Opinions Do Not Extend To Alabama Providers.

First, Defendants moved to exclude Dr. Shumer's testimony to the extent that it purports to shed light on Alabama gender transition providers. Many parts of his expert report are written as if he possesses such knowledge, explaining what these providers do, the course of treatment they offer, how they provide counseling, and even what their motivations are. *See* Doc. 599 at 3-4 ("Mot.") (collecting many examples, including ones speaking to "providers across the country" and the "[u]niform[]" motivations of "providers in this field"). He even critiqued one of Defendants' experts who opined on the practices of an Alabama provider as "out of touch with how patients and providers discuss medical decision making in the real world." *Daubert*.DX15:46 ¶73 (Shumer Rebuttal Rep.).[1] As Defendants argued, Dr. Shumer "is not qualified to speak to the practices of Alabama providers of medical gender transition procedures." Mot. 4.

The United States appears to concede that point, backtracking and asserting that Dr. Shumer's "testimony does not opine on how gender-affirming care is provided in Alabama." Opp. 66. Despite Dr. Shumer's reports suggesting otherwise, the United States is welcome to limit its witness's testimony. Any testimony Dr. Shumer

---

[1] The United States insists that this opinion does not "require[] Alabama-specific, firsthand knowledge." Doc. 655 at 66 n.11 ("Opp."). But it is unclear how Dr. Shumer could identify the critique as "out of touch" with the "real world" if he does not know what the "real world" in Alabama is.

2

offers pertaining to gender transition practices should thus not be taken as applicable to practices in Alabama.

The next problem is that Dr. Shumer also has no reliable foundation on which to opine about "uniform" provider practices in other jurisdictions. As Defendants already explained, "Dr. Shumer does not explain how he could know the '[u]niform' motivations and procedures of even non-Alabama providers." Mot. 5 (quoting Shumer Rep. 29). The United States has no apparent response. Dr. Shumer admitted that he has "never conducted a survey about the parameters of gender-affirming care provided by other practitioners." SJ.DX39:59:25–60:3 (Shumer Dep.). And the United States identifies no other basis for his speculation about those practices. Just as Dr. Shumer lacks the requisite knowledge about Alabama providers, he lacks knowledge about providers in other States, too. Dr. Shumer's testimony about provider practices should thus be excluded.

## II. The United States Points To No Reliable Evidence Supporting Dr. Shumer's Testimony About Suicidality And Other Outcomes.

Next, Dr. Shumer's opinion about an increase in mental health problems and suicidality from the absence of gender transition interventions should be excluded because it is unreliable. The United States asserts two bases for this opinion: his experience and scientific literature. Opp. 71-72. Neither provides an adequate foundation for his testimony.

First, the United States notes that Dr. Shumer testified at his deposition "that he has seen 'many patients' with gender dysphoria who persisted in their gender dysphoria absent access to gender-affirming care." Opp. 72. But that's not quite what

3

he testified, and regardless it wouldn't support his opinion. Dr. Shumer testified that he does not track patients once they leave his pediatric clinic, so he would not be aware of their outcomes. Shumer Dep. 174:13-18. He also testified that "most" of his patients "are on medical transition interventions." *Id.* at 174:19-21. So when asked whether he would "know how many adolescent patients *not* on medical interventions would see their gender dysphoria resolve," he answered: "Not from my own clinical experience." *Id.* at 174:22-25 (emphasis added).

Likewise, Dr. Shumer never testified to *any* personal experience with suicidality rates. Though he said that "I have seen many patients with gender dysphoria that for one reason or another were not able to access gender-affirming care and in follow-up those patients tended to have persistence of their gender dysphoria," *id.* at 175:1-4, that says nothing about suicidality. It also does not account for the reasons those patients "were not able to access" the interventions, and Dr. Shumer has no long-term follow-up with patients to begin with.

The literature that Dr. Shumer cites to support his sweeping claim about adverse mental health and suicidality outcomes is also unreliable. The United States seems to concede that "the studies Dr. Shumer cites do not definitely establish a causal link between gender-affirming care and mental health outcomes" and "have other limitations." Opp. 73; *see also* Opp. 72 n.13 (conceding "the lack of definitive causation and limitations of study design"). Though it is of course true that "all scientific studies have limitations," Opp. 73, *these* studies are insufficient to reliably support Dr. Shumer's opinion. Mot. 7-10.

4

The United States seems to agree that the three studies Dr. Shumer uses are "low quality" but misunderstands that term as simply meaning "evidence that cannot demonstrate causation." Opp. 73. But "low" or "very low" quality designations are much more meaningful. Those designations mean that the true effect of the intervention may, or is likely to be, "substantially different" from the estimate of the effect based on the evidence available. SJ.DX28:53 (Balshem, *GRADE Guidelines*); *accord* Shumer Dep. 206:17-23 (agreeing that "low strength of evidence means that it's more likely that the actual effect is different from what the study found").

Given that the estimated effect is therefore likely to be *wrong* for low-quality evidence, the problem isn't just that it can't show causation—though that is one problem. "Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables." *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010).

The deeper problem with low quality evidence is that any association suggested may be entirely wrong. That makes these studies unreliable. And whether unrelated medical treatments "are supported by 'high' quality evidence" (Opp. 73) has nothing to do with whether these studies provide an adequate foundation for Dr. Shumer's opinion to be sufficiently reliable as a matter of Rule 702. Again, that opinion is that youth without medical interventions "*will*" see "an increase in mental health problems and suicidality." Shumer Rep. 36 (emphasis added). The low-quality studies here do not provide an adequate foundation for that opinion to be reliable.

Turning to the United States' responses on the three studies themselves, it seems to concede that the Green study found "no statistically significant correlation between hormone therapy and suicidality in patients under age 18." Opp. 75; *see* Mot. 9. In other words, not only was the study incapable of finding causation, *see id.*, it did not even find an *association*. And though the United States runs to a finding about *suicide*, it had *just* emphasized that "[s]uicide and suicidality are distinct concepts" (Opp. 75)—and Dr. Shumer's opinion was about *suicidality*.

As for the other two studies, the United States abandons de Vries, apparently agreeing that it does not "examine suicidality at all." Mot. 10.[2] And it makes no effort to rehabilitate Turban 2022, simply noting that the study's authors believed they "provide[d] additional evidence to suggest that legislation restricting transgender adolescents' access to gender-affirming medical care" should be opposed. But the "*ipse dixit*" of non-testifying advocates is no substitute for reliable evidence. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010). The critical question is whether Turban 2022 is reliable, and for all the reasons already explained and unrebutted by the United States, *see* Mot. 8-9, it is not. Among many other reasons, the underlying survey did not ask if respondents had been diagnosed with gender dysphoria, and it excluded anyone who no longer identified as

---

[2] The United States appears aggrieved at Defendants' statement that "over one percent of the [de Vries] study participants died '*due to gender-affirming interventions*.'" Opp. 74 (quoting Mot. 9). But that is correct. The United States alludes to some distinction between hormones and "gender-affirming *surgery*," *id.*, ignoring that every patient in the de Vries study was subjected to surgery (Mot. 10)—so its results cannot be understood outside that context. And the Plaintiffs' own witnesses now admit that "these interventions are part of a continuum of care," so the United States' artificial (and politically-motivated) blinders to the end point of that continuum—gender transition surgeries—are unavailing. Doc. 629-7, App. A, at 31 (McNamara Aff.); *see* Doc. 650 at 2.

6

transgender. Shumer Dep. 225:5-14, 228:21-23. "[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court," whether directly or as a purposed basis for an expert's testimony. *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1997). And "[w]hen an expert, in forming his or her expert opinion, relies upon an unreliable expert opinion, their expert opinion is also unreliable." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1181 (S.D. Fla. 2022).

Because Dr. Shumer's opinion that the Act "will" "increase" suicidality and other harms lacks adequate basis in the sources that Dr. Shumer relies on or his experience, this testimony is unreliable and should be excluded.

### III. The United States Cites Nothing To Support Dr. Shumer's Claim Of A "Strong Biological Foundation" Of Gender Identity.

Dr. Shumer's repeated and unqualified claim that gender identity "has a strong biological foundation" is unreliable for similar reasons. Shumer Rep. 8 ¶5; *see* Mot. 10-11 (collecting similar statements). The United States concedes "the lack of an identified biological cause of gender identity." Opp. 79. But if Dr. Shumer does not know of any biological cause of gender identity, how could he reliably testify about a biological foundation—much less assert a "demonstrate[d]," "strong" one? The United States has no explanation. It asserts that "[t]he connection between gender identity and biology has been the subject of scientific research and peer-reviewed publication," Opp. 77, while missing the core problem: that none of that research supports Dr. Shumer's claim of a "strong biological foundation."

7

Presumably that's why the United States points to *no* peer-reviewed study supporting that claim of a "strong" foundation. It acknowledges that the limited studies Dr. Shumer relied on were "not confirmed" in subsequent research or spoke generically of a "likely" "complex interplay of biological, environmental, and cultural factors." Opp. 78, 80 n.17; *see* Mot. 12-15. The authors of these studies "limit the application of their studies consistent with the principles of good science; [Dr. Shumer] expands the application beyond good science." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005).

The United States also concedes "developments in [Dr. Shumer's] thinking"—and does not dispute that his prior position about the absence of supporting literature was reached *after* all the relevant studies he now says bring him to the opposite position. Opp. 80; *see* Mot. 11. And the United States ignores the Endocrine Society's own determinations that "a clear causative biological underpinning of gender identity remains to be demonstrated" and that "it is unknown if the choice to function in society in male, female or other role[s] is" "affected by biological factors." SJ.DX40:38-39 (Shumer Dep. Ex. 3, *Considering Sex*). All this shows that Dr. Shumer's opinion about a "strong biological foundation" does not have "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,

8

174 F. Supp. 3d 911, 932 (D.S.C. 2016) ("[F]ailing to adequately account for contrary evidence is not reliable or scientifically sound.").[3]

The United States claims that "nothing Defendants cite to disproves the proposition that there is evidence of a biological foundation of gender identity." Opp. 80. This gets the burdens exactly backward. Under Rule 702, the United States has the burden of showing that Dr. Shumer's assertion of "*ample* scientific evidence that gender identity has a *strong* biological foundation" is reliable. Shumer Rebuttal Rep. 20 ¶31 (emphases added); *see United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (explaining "the burden of the proponent of this testimony to explain" "a sufficient basis for the opinion"). And the United States makes no effort to carry this burden of showing a basis for Dr. Shumer's assertion of a "strong biological foundation." "Law lags science; it does not lead it." *Rider*, 295 F.3d at 1202. Dr. Shumer's testimony about a "strong biological foundation" should be excluded.

## CONCLUSION

For these reasons, the Court should exclude Dr. Shumer's testimony about the general practices of medical gender transition providers, particularly in Alabama; suicidality and others harms in minors who do not receive medical gender transition procedures; and a purported "strong biological foundation" of gender identity.

---

[3] The United States' reliance on the Cass Review (Opp. 78) is misplaced, both because Dr. Shumer did not rely on it and because it does not support his claim of a "strong biological foundation." The Cass Review concludes that "there is no clear evidence for a straightforward biological cause for gender incongruence." SJ.DX84:117.

Dated: September 9, 2024

Christopher Mills (*pro hac vice*)
SPERO LAW LLC
557 East Bay Street, #22251
Charleston, SC 29413
(843) 606-0640
CMills@Spero.law

David H. Thompson (*pro hac vice*)
Peter A. Patterson (*pro hac vice*)
Brian W. Barnes (*pro hac vice*)
John D. Ramer (*pro hac vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Roger G. Brooks (*pro hac vice*)
Henry W. Frampton, IV (*pro hac vice*)
Philip A. Sechler (*pro hac vice*)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0200
rbrooks@adflegal.org
hframpton@adflegal.org
psechler@adflegal.org

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

*Counsel for Defendants*

10

## CERTIFICATE OF SERVICE

I certify that on September 9, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Defendants*
