# Doc. 557-21

# Defendants' Summary Judgment Exhibit 21 (Redacted)

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5   BRIANNA BOE, et al.,            )

6          Plaintiffs,             ) Civil Action No.

7   UNITED STATES OF AMERICA,      ) 2:22-cv-184-LCB

8          Intervenor Plaintiff, )

9       v.                         )

10   HON. STEVE MARSHALL, in his    )

11   official capacity as Attorney  )

12   General, of the State of       )

13   Alabama, et al.,               )

14          Defendants.            ) (Pages 1-299)

15   -------------------------------)

16        THIS TRANSCRIPT IS DEEMED CONFIDENTIAL

17             VIDEOTAPED DEPOSITION OF

18                ELI COLEMAN, PH.D.

19              FRIDAY, MAY 3, 2024

20                  8:04 A.M.

21

22   REPORTED BY:

23       SUSAN NELSON

24       C.S.R. No. 3202

25   JOB NO. 6669137

CONFIDENTIAL

Page 2

1 Videotaped deposition of ELI COLEMAN, PH.D., the
2 witness, taken on behalf of Defendants, commencing at
3 8:04 A.M., on FRIDAY, MAY 3, 2024, at Cathedral City,
4 California, before SUSAN NELSON, C.S.R. No. 3202.
5
6 APPEARANCES OF COUNSEL
7
8 FOR PRIVATE PLAINTIFFS:
9     NATIONAL CENTER FOR LESBIAN RIGHTS
10     BY: AMY WHELAN, ESQ.
11       SHANNON MINTER, ESQ.
12       (APPEARING REMOTELY)
13     870 Market Street, Suite 370
14     San Francisco, California 94102
15     (415) 365-1338
16     awhelan@nclrights.org
17     sminter@nclrights.org
18
19 FOR PLAINTIFF INTERVENOR (APPEARING REMOTELY):
20     U.S. DEPARTMENT OF JUSTICE
21     BY: RENEE WILLIAMS, ESQ.
22     150 M Street, N.E.
23     Washington, D.C. 20004
24     (202) 598-1480
25     renee.williams3@usdoj.gov

Page 3

1 APPEARANCES OF COUNSEL (CONTINUED)
2 FOR DEFENDANTS:
3     ALLIANCE DEFENDING FREEDOM
4     BY: ROGER G. BROOKS, ESQ.
5       LAURENCE WILKINSON, ESQ.
6     440 First Street, NW, Suite 600
7     Washington, D.C. 20001
8     (202) 393-8690
9     rbrooks@adflegal.org
10     lwilkinson@adflegal.org
11 FOR THE WITNESS:
12     COVINGTON & BURLING LLP
13     BY: CORTLIN H. LANNIN, ESQ.
14     415 Mission Street, Suite 5400
15     San Francisco, California 94105-2533
16     (415) 591-7078
17     clannin@cov.com
18       -- and --
19     COVINGTON & BURLING LLP
20     BY: NOAH S. GOLDBERG, ESQ.
21     One CityCenter, 850 Tenth Street NW
22     Washington, D.C. 20001-4956
23     (202) 662-5179
24     ngoldberg@cov.com
25 ALSO APPEARING: ROBERT CASTILLO, VIDEOGRAPHER

Page 4

1         I N D E X
2 WITNESS     EXAMINATION          PAGE
3 ELI COLEMAN, PH.D.
4     By Mr. Brooks        10
5     P.M. Session      170
6
7     QUESTIONS INSTRUCTED TO NOT ANSWER
8         (NONE)
9
10       E X H I B I T S
11 NO.    PAGE    DESCRIPTION
12 Exhibit 1   10    Toward Version 7 Article
13     (7 Pages)
14 Exhibit 2   30    Standards of Care, Version 8
15     (99 Pages)
16 Exhibit 3   32    Interview of Eli Coleman, Ph.D.
17     (36 Pages)
18 Exhibit 4   51    Endocrine Treatment of
19     Gender-Dysphoric, et al.,
20     Guideline
21     (3869-3903)
22 Exhibit 5   58    The Mental Health
23     Establishment is Failing
24     Trans Kids
25     (5 Pages)

Page 5

1       E X H I B I T S
2 NO.    PAGE    DESCRIPTION
3 Exhibit 6   69    Ethical Concerns About
4     Emerging Treatment Paradigms
5     (16 Pages)
6 Exhibit 7   80    8089 WPATH Standards of Care
7     Version 7
8     (19 Pages)
9 Exhibit 8   89    Emails Re Doctors Have Failed
10     Them, Say Those with
11     Transgender Regret
12     (BOEAL_WPATH_061094-1098)
13 Exhibit 9   97    Confidential: Re Medscape
14     Article with new comments
15     (BOEAL_WPATH_105187-5202)
16 Exhibit 10  133    Friday Agenda for Mental
17     Health Mentors
18     (BOEAL_WPATH_105071-5079)
19 Exhibit 11  139    Important Info Re: Washington
20     Post Article
21     (BOEAL_WPATH_105279-5282)
22 Exhibit 12  146    The American Academy of
23     Pediatrics' Dubious
24     Transgender Science
25     (BOEAL_WPATH_105508-5512)

2 (Pages 2 - 5)

Page 6

```
1            E X H I B I T S
2 NO.      PAGE     DESCRIPTION
3 Exhibit 13  153    Update & Further Steps
4               (BOEAL_WPATH_020387-0390)
5 Exhibit 14  163    Please Review-SOC8 Updates
6               (BOEAL_WPATH_109285-9297)
7 Exhibit 15  170    Standards of Care, Version 8
8               (9 Pages)
9 Exhibit 16  199    Standards of Care, Version 8
10              (16 Pages)
11 Exhibit 17  203    Clinical Practice Guidelines
12              We Can Trust
13              (52 Pages)
14 Exhibit 18  203    WHO Handbook for Guideline
15              Development, 2nd Edition
16              (31 Pages)
17 Exhibit 19  204    December 2018 Emails
18              (JHU_0000001539-1543)
19 Exhibit 20  219    WPATH Policy for Disclosures of
20              Interests and Management
21              of Conflicts
22              (BOEAL_WPATH_001011-1013)
23 Exhibit 21  243    Eli Coleman Institute
24              Annual Report 2023
25              (19 Pages)
```

Page 7

```
1            E X H I B I T S
2 NO.      PAGE     DESCRIPTION
3 Exhibit 22  255    Re: The Imminent Release of
4               SOC8
5               (BOEAL_WPATH_105494-5498)
6 Exhibit 23  260    SOC 8 Strategy Emails
7               (BOEAL_WPATH_091211-1218)
8 Exhibit 24  269    Adolscent SOC8 Next Steps
9               (BOEAL_WPATH_105297-5302)
10 Exhibit 25  273    International Journal of
11              Transgender Health
12              (BOEAL_WPATH_105851-5936)
13 Exhibit 26  278    Some Feedback from Member of
14              Adm Levine's Staff
15              (BOEAL_WPATH_105499-5504)
16 Exhibit 27  281    Feedback Regarding the Age
17              Statement in Adolescent SOC8
18              (BOEAL_WPATH_105505-5507)
19 Exhibit 28  286    SOC8 of WPATH - Minimal Ages
20              for Adolescents
21              (BOEAL_WPATH_072964-2965)
22 Exhibit 29  289    Confidential - AAP
23              Communication to WPATH
24              (BOEAL_WPATH_105822-5831)
25
```

Page 8

```
1        CATHEDRAL CITY, CALIFORNIA;
2           FRIDAY, MAY 3, 2024;
3              8:04 A.M.
4
5        THE VIDEOGRAPHER:  Good morning.  We are
6 going on the record at 8:04 a.m. Pacific Time on    08:04:07
7 May 3rd, 2024.  Please note that the microphones are 08:04:15
8 sensitive and may pick up whispered and private     08:04:21
9 conversations.  Please mute your phones at this time. 08:04:24
10 Audio and video recording will continue to take place 08:04:30
11 unless all parties agree to go off the record.      08:04:34
12       This is media unit one of the video-recorded 08:04:36
13 deposition of Dr. Eli Coleman taken by counsel for  08:04:40
14 Defendant in the matter of Brianna Boe, et al.,     08:04:46
15 versus Steven T. Marshall, et al., filed in the     08:04:49
16 United States District Court for the Middle District 08:04:55
17 of Alabama Northern Division.  The case number is   08:04:58
18 2:22-CV-184-LCB.
19       The location of the deposition is 67711 30th  08:05:11
20 Avenue, Cathedral City, California 92234.           08:05:19
21       My name is Robert Castillo, representing      08:05:25
22 Veritext and I'm the videographer.  The court       08:05:30
23 reporter is Susan Nelson from the firm Veritext.    08:05:32
24       I am not authorized to administer an oath, I  08:05:34
25 am not related to any party in this action, nor am I 08:05:39
```

Page 9

```
1 financially interested in the outcome.  If there are 08:05:41
2 any objections to proceeding, please state them at   08:05:44
3 the time of your appearance.                         08:05:47
4        Counsel and all present, including remotely,  08:05:49
5 will now state their appearances and affiliations for 08:05:52
6 the record, beginning with the noticing attorney.    08:05:55
7        MR. BROOKS:  I'm Roger Brooks with Alliance   08:05:58
8 Defending Freedom, counsel for the defendants.       08:06:02
9        MR. WILKINSON:  Laurence Wilkinson, Alliance  08:06:05
10 defensing -- Defending Freedom, counsel for the      08:06:05
11 defendants.                                          08:06:10
12        MR. LANNIN:  Cortlin Lannin of Covington &    08:06:12
13 Burling here for the nonparty witness                08:06:16
14 Dr. Eli Coleman.  And I'm also joined by my colleague 08:06:18
15 Noah Goldberg.                                       08:06:21
16        MS. WHELAN:  Amy Whelan from the National     08:06:23
17 Center for Lesbian Rights on behalf of the private   08:06:25
18 plaintiffs.                                          08:06:28
19        THE VIDEOGRAPHER:  And the parties online?    08:06:30
20        MS. WILLIAMS:  Good morning.  I'm Renee       08:06:36
21 Williams representing the United States.  Thank you. 08:06:37
22        THE REPORTER:  And Shannon?                   08:06:45
23        THE VIDEOGRAPHER:  Ms. Minter?                08:06:45
24 Will the court reporter please swear the             08:06:54
25 witness and then counsel may proceed.                08:06:54
```

CONFIDENTIAL

Page 10

1    THE REPORTER:  If you'll raise your right    10:01:54
2  hand, please, I will swear you in.
3
4        ELI COLEMAN, PH.D.,
5    having been first duly sworn, was
6    examined and testified as follows:
7
8    THE REPORTER:  Thank you.  Please proceed.
9
10        EXAMINATION
11
12    MR. BROOKS:  Good morning, Dr. Coleman.    08:07:11
13  Thank you for being here.    08:07:12
14    I'm going to ask the reporter to mark as    08:07:14
15  Exhibit 1 an article that I believe you wrote in 2009  08:07:17
16  entitled "Toward Version 7 of the World Professional  08:07:23
17  Association For Transgender Health's Standards of    08:07:26
18  Care."    08:07:28
19    And, I'm sorry, I didn't expect this many    08:07:37
20  folks, and I -- have to share the copy there.    08:07:39
21    (The document referred to was    08:07:39
22    marked as Exhibit 1.)    08:07:37
23  BY MR. BROOKS:    08:07:37
24    Q.  Dr. Coleman, first, let me ask whether this  08:07:43
25  is in fact an article that you wrote back about 2009?  08:07:45

Page 11

1    A.  Yes.    08:07:51
2    Q.  And it recounts to some extent that, at    08:07:51
3  least part of the history of the evolution of the    08:07:56
4  multiple versions of the standard of care of which    08:07:58
5  you chair the most recent Version 8.  Am I correct?  08:08:02
6    A.  That's correct.    08:08:06
7    MR. LANNIN:  Object to the form.    08:08:07
8    So this is a good reminder, Eli.  Just give  08:08:08
9  me a half beat to object to a question if I'm going  08:08:09
10  to before you answer a question.    08:08:12
11  BY MR. BROOKS:    08:08:14
12    Q.  Before I ask you some questions based on    08:08:15
13  this article, let me ask you when you personally    08:08:17
14  first became involved in treating individuals who    08:08:20
15  identified as transgender or who suffered from gender  08:08:26
16  dysphoria?    08:08:29
17    A.  Probably in the early 1980s.    08:08:31
18    Q.  And when, if ever, did you first become    08:08:35
19  involved in treating children or adolescents who    08:08:40
20  suffered from gender dysphoria?    08:08:43
21    A.  I've never treated children or adolescents.  08:08:45
22    Q.  Let me ask you some questions about your    08:08:48
23  involvement in prior SOC versions leading up to the  08:08:52
24  present.    08:08:56
25    If you turn to page 2 of this article and    08:08:57

Page 12

1  second column, you'll find, oh, 2 inches down, a    08:09:00
2  paragraph that begins:    08:09:00
3    "The most radical change in the    08:09:00
4    standard came about in Version 5,    08:09:08
5    Levine, et al."    08:09:10
6    Do you see that paragraph?    08:09:11
7    A.  Yes.    08:09:12
8    Q.  And it goes on to say that the revision    08:09:13
9  committee was headed by psychiatrist Stephen Levine  08:09:18
10  and that the committee included George Brown,    08:09:19
11  yourself Eli Coleman, Peggy Cohen-Kettenis -- I may  08:09:22
12  be saying her name wrong, I apologize -- Joris -- how  08:09:27
13  do I say that next name?    08:09:32
14    A.  Joris.    08:09:33
15    Q.  Joris Hage?    08:09:34
16    A.  Hm-hm.    08:09:36
17    Q.  And some other -- some other names there.    08:09:36
18    Let me ask, this is a relatively small    08:09:40
19  committee, certainly compared to the list of    08:09:42
20  coauthors on SOC-8.  Were these all individuals who  08:09:46
21  at the time were considered to have kind of    08:09:49
22  world-leading clinical experience?    08:09:53
23    MR. LANNIN:  Object to the form.    08:09:54
24    THE WITNESS:  Yes.    08:10:02
25  BY MR. BROOKS:    08:10:03

Page 13

1    Q.  And how was this committee chosen?    08:10:05
2    A.  The committee was chosen by the board of    08:10:09
3  directors of the -- then Harry Benjamin and    08:10:14
4  National Gender Dysphoria Association.    08:10:19
5    Q.  And were you any part of the leadership of  08:10:22
6  that association at that time?    08:10:25
7    A.  No.    08:10:29
8    Q.  Do you have an understanding as to how you  08:10:29
9  came to be selected to be part of the SOC-5 team?    08:10:30
10    A.  Not exactly.    08:10:37
11    Q.  Did Dr. Levine recruit you to assist in that  08:10:39
12  project?    08:10:43
13    MR. LANNIN:  Object to the form.    08:10:43
14    THE WITNESS:  I don't recall whether    08:10:47
15  Dr. Levine recommended me or how I was recommended    08:10:49
16  exactly.    08:10:53
17  BY MR. BROOKS:    08:10:54
18    Q.  Have you had professional interactions on    08:10:57
19  issues relating to gender dysphoria with Dr. Levine  08:10:59
20  for multiple decades now?    08:11:03
21    A.  I was involved in this committee with    08:11:05
22  Dr. Levine.    08:11:11
23    Q.  Is he somebody that you've interacted in a  08:11:13
24  variety of contexts --    08:11:16
25    A.  Yes.    08:11:17

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

```
 1    Q. -- across the decades?                08:11:17
 2    A. Yes.                                   08:11:18
 3    Q. You both, frankly, are -- were early   08:11:19
 4 pioneers in the field. Am I correct?         08:11:22
 5    MR. LANNIN: Object to form.               08:11:24
 6    THE WITNESS: We've been around for a long 08:11:27
 7 time.                                        08:11:27
 8 BY MR. BROOKS:                               08:11:27
 9    Q. You're of a similar age and both of you 08:11:29
10 began working in this area long before it was 08:11:31
11 well-known. Am I correct?                    08:11:35
12    MR. LANNIN: Object to the form.           08:11:36
13    THE WITNESS: I'm trying to remember when I 08:11:38
14 actually met Dr. Levine. But he is the -- he and I 08:11:46
15 both have been involved in a number of different 08:11:54
16 professional organizations over the years, including 08:11:57
17 Harry Benjamin.                              08:12:02
18 BY MR. BROOKS:                               08:12:02
19    Q. And, just to be clear for the record, the 08:12:03
20 Harry Benjamin Society that you've mentioned 08:12:06
21 continue -- simply became renamed as WPATH.  08:12:10
22 Am I correct?                                08:12:14
23    A. That's correct.                        08:12:16
24    Q. They're not different organizations?   08:12:16
25    A. No.                                    08:12:19
```

Page 15

```
 1    Q. All right. If today I accidentally refer to 08:12:19
 2 the Harry Benjamin Society as WPATH you can correct 08:12:21
 3 me, or you can let it slide, whichever you find more 08:12:25
 4 appropriate.                                 08:12:28
 5    And is Dr. Levine somebody who has had     08:12:29
 6 significant publications in the area of gender 08:12:32
 7 dysphoria since at least the seventies?      08:12:36
 8    MR. LANNIN: Object to the form.           08:12:42
 9    THE WITNESS: I don't know when his first  08:12:44
10 publication was, but he has numerous publications in 08:12:46
11 this field.                                  08:12:50
12 BY MR. BROOKS:                               08:12:51
13    Q. And given your interactions with him, am I 08:12:51
14 correct that you have never considered him,  08:12:56
15 Dr. Levine, to be a transphobe?              08:12:58
16    MR. LANNIN: Object to the form.           08:13:02
17    THE WITNESS: I've only recognized him as a 08:13:04
18 scholar in this field.                       08:13:13
19 BY MR. BROOKS:                               08:13:14
20    Q. At the very bottom of this second column on 08:13:20
21 page 2, the last complete sentence reads:    08:13:22
22    "A significant departure                  08:13:26
23    contained new sections of the             08:13:29
24    treatment for children and                08:13:30
25    adolescents. The concept of               08:13:33
```

Page 16

```
 1 administering puberty-delaying               08:13:35
 2 hormones was introduced and further          08:13:36
 3 guidelines for initiating cross-sex          08:13:38
 4 feminization and/or masculization            08:13:41
 5 hormonal treatments were                     08:13:43
 6 articulated."                                08:13:44
 7    Do you see that language?                  08:13:46
 8    A. Yes.                                    08:13:47
 9    Q. And am I correct that you, Dr. Levine, and 08:13:48
10 Dr. Cohen-Kettenis were among this small committee 08:13:51
11 that was entrusted by the Harry Benjamin Society to 08:13:54
12 develop the very first guidelines for treatment of 08:13:57
13 gender dysphoria in children and adolescents? 08:14:00
14    MR. LANNIN: Object to the form.           08:14:05
15    THE WITNESS: In Standards of Care 5, yes. 08:14:06
16 BY MR. BROOKS:                               08:14:08
17    Q. On page 3 in column 2 there is -- the second 08:14:36
18 full paragraph begins "There was an important 08:14:39
19 clarification."                              08:14:41
20    Do you see that?                          08:14:43
21    A. Yes.                                    08:14:44
22    Q. It reads:                              08:14:45
23    "There was an important                   08:14:45
24    clarification made in this version        08:14:46
25    that psychotherapy, though not a          08:14:48
```

Page 17

```
 1 requirement for hormonal or sex              08:14:52
 2 reassignment, was strongly                   08:14:54
 3 recommended in order to assist 'to           08:14:55
 4 create a long-term stable lifestyle          08:14:58
 5 with realistic chances for success           08:15:00
 6 in relationships, education, work,           08:15:03
 7 and gender identity and role,'" and          08:15:06
 8 it cites Levine, et al., the SOC-5.          08:15:08
 9    Do you see that language?                  08:15:13
10    A. Yes.                                    08:15:14
11    Q. And am I correct that there you are -- the 08:15:17
12 language in quotation marks is from the SOC-5 itself 08:15:23
13 of which you're a coauthor.                  08:15:28
14    Am I correct?                             08:15:30
15    A. I can't say with --                    08:15:30
16    MR. LANNIN: Object to the form.           08:15:31
17    THE WITNESS: -- any -- that -- any        08:15:32
18 certainty.                                   08:15:34
19 BY MR. BROOKS:                               08:15:35
20    Q. Okay. Do you agree now that the clinician's 08:15:35
21 goal in treating a gender-dysphoric child or 08:15:43
22 adolescent, whether by psychotherapy or hormonal 08:15:48
23 interventions, must be to create a long-term stable 08:15:52
24 lifestyle with realistic chances for success in the 08:15:57
25 categories listed there?                     08:16:01
```

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1    A. Where are you referring to here?        08:16:03
2    Q. Column 3, the second full paragraph --        08:16:05
3    A. Uh-huh.        08:16:08
4    Q. -- you'll see -- let me just ask you to read   08:16:09
5 that paragraph.        08:16:12
6    A. Oh, I see.        08:16:12
7    Q. Let me just ask you to read that whole        08:16:14
8 paragraph to yourself if you would.        08:16:16
9    A. Sure.        08:16:18
10    Q. Tell me when you've done that.        08:16:18
11    A. Are you talking about the chapter -- the        08:16:25
12 paragraph "Another significant development"?        08:16:27
13    Q. No, I'm talking --        08:16:30
14    A. Oh.        08:16:30
15    Q. -- the paragraph that begins "There was an   08:16:31
16 important clar-" --        08:16:32
17    A. Oh, okay.        08:16:33
18    Q. "clarification."        08:16:34
19    A. Yes. Hm-hm.        08:16:35
20    Okay. And what was your question?        08:16:44
21    Q. My question was, do you agree now that the   08:16:45
22 clinician's goal in treating a gender-dysphoric child  08:16:50
23 or adolescent must be to create a long-term stable   08:16:54
24 lifestyle with realistic chances for success in        08:16:58
25 relationships, education, work, gender identity, and   08:17:01

Page 19

1 role?        08:17:04
2    MR. LANNIN: Object to the form.        08:17:06
3    You can answer.        08:17:08
4    THE WITNESS: The clear goal of any of the   08:17:09
5 treatments, including psychotherapy, was really to   08:17:14
6 assist in creating that long-term stable lifestyle        08:17:18
7 and success, et cetera.        08:17:22
8 BY MR. BROOKS:        08:17:24
9    Q. And you would agree, would you not, that   08:17:24
10 it's not consistent with the professional obligations   08:17:26
11 of a mental health professional working with a        08:17:29
12 gender-dysphoric child or adolescent to focus solely   08:17:33
13 on what that child wants now, rather than their        08:17:36
14 long-term happiness?        08:17:40
15    MR. LANNIN: Object to the form.        08:17:41
16    THE WITNESS: I don't understand that        08:17:51
17 question. It sounds like two different questions.        08:17:52
18 BY MR. BROOKS:        08:17:52
19    Q. Let me ask it again, and then if there's   08:17:59
20 something --        08:18:00
21    A. Yeah.        08:18:01
22    Q. -- unclear, perhaps you can point that out   08:18:01
23 to me.        08:18:03
24    Do you agree that it is not consistent with   08:18:03
25 the mental health professional's obligations as he or   08:18:08

Page 20

1 she works with a gender-dysphoric child or adolescent   08:18:11
2 to focus solely on what the child wants now rather        08:18:15
3 than the long-term happiness and well-being of that   08:18:19
4 child?        08:18:22
5    A. The role of the -- of the assessor of a        08:18:23
6 child and adolescent is to really understand their   08:18:27
7 unique gender identity, their -- their -- their        08:18:34
8 cognitive and emotional maturity to make any kind of   08:18:46
9 informed consent procedure -- process and to develop   08:18:49
10 a individualized treatment plan that might help        08:18:57
11 alleviate their gender dysphoria.        08:19:04
12    They're also required to do a mental health        08:19:09
13 assessment to examine the possibility of any other   08:19:12
14 psychological disorders and to address them as part   08:19:22
15 of the overall treatment plan.        08:19:28
16 BY MR. BROOKS:        08:19:32
17    Q. And my question is, do you consider it to   08:19:36
18 be -- a mental health professional could be        08:19:41
19 fulfilling his or her professional obligations in        08:19:43
20 working with that child if the mental health        08:19:46
21 professional focuses only on short-term alleviation   08:19:50
22 of distress without considering a path that will        08:19:53
23 create a long-term stable life child -- lifestyle for   08:19:58
24 that child?        08:20:02
25    MR. LANNIN: Object to the form.        08:20:03

Page 21

1    THE WITNESS: The assessor has to take many   08:20:05
2 things into consideration in developing that        08:20:07
3 treatment plan in what might be best for that        08:20:09
4 individual in the short term as well as the long        08:20:13
5 term.        08:20:17
6 BY MR. BROOKS:        08:20:17
7    Q. A little farther down in that same column,   08:20:21
8 you introduce -- a new committee was formed to        08:20:25
9 consider further revisions of the SOC as we're moving   08:20:30
10 into SOC-6, I believe. And at the time that that        08:20:33
11 project was initiated, if I understand the article   08:20:36
12 correctly, you were president of the Harry Benjamin   08:20:38
13 Society.        08:20:43
14    Is that correct?        08:20:43
15    A. I became president in 2001.        08:20:43
16    Q. And I don't -- the second sentence of the   08:20:49
17 paragraph -- I'm not playing any tricks -- says,        08:20:52
18 "under the direction of Eli Coleman, the new        08:20:55
19 president of the association." And I just want to        08:20:58
20 get --        08:20:59
21    A. Yeah.        08:20:59
22    Q. -- clear on the record that, as the SOC-6   08:21:00
23 project got underway, you were president of the        08:21:03
24 Harry Benjamin Association -- Society.        08:21:05
25    A. I believe that to be true.        08:21:08

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1   Q.  Okay.  And did you in fact -- was it your   08:21:12
2   decision to initiate at that time a new revision of   08:21:16
3   the standard of care?   08:21:19
4   A.  It wasn't my -- my decis- -- my idea.  That   08:21:21
5   came from a number of concerns that were raised in --   08:21:26
6   in response to Standards of Care 5.  And it was felt   08:21:31
7   that it would be important to reconvene a new   08:21:38
8   committee to examine the -- those potential changes,   08:21:43
9   and -- and they were deemed at that time to probably   08:21:49
10  be very minor and not a major overhaul was needed.   08:21:55
11  But there were some things that were -- it was felt   08:22:02
12  that should be clarified.   08:22:05
13  BY MR. BROOKS:   08:22:07
14      Q.  Well, let me ask you about one that you call   08:22:07
15  out in the very bottom of this page.  The paragraph   08:22:09
16  begins "There were several notable changes."  And you   08:22:13
17  go on to write:   08:22:16
18      "The requirements for   08:22:17
19      recommendation for hormonal therapy   08:22:18
20      were clarified:  Age 18 years,   08:22:20
21      exceptions can be made; three   08:22:26
22      months of real-life experience or a   08:22:30
23      minimum of three months of   08:22:32
24      psychotherapy; informed consent;   08:22:34
25      and one letter from a behavioral   08:22:35

Page 23

1   clinician to a physician."   08:22:37
2                            08:22:37
3      Have I read that language correctly?   08:22:38
4   A.  Yes.   08:22:40
5   Q.  How did the committee settle on age 18 as   08:22:41
6   the default minimum age for hormonal interventions?   08:22:47
7      MR. LANNIN:  Object to the form.   08:22:51
8      You can answer.   08:22:52
9      THE WITNESS:  I wouldn't re- -- I wouldn't   08:22:57
10  recall all of the rationale for that, but it -- I   08:22:59
11  think at that time it was felt that that would be an   08:23:12
12  appropriate age for initiation of, and I think this   08:23:17
13  really meant, cross-sex hormonal treatment.   08:23:25
14  BY MR. BROOKS:   08:23:31
15      Q.  And am I correct that in this time period   08:23:31
16  around 2000, little, if any, data was available on   08:23:33
17  long-term mental and physical health outcomes for   08:23:40
18  adolescents who received cross-sex hormones while   08:23:46
19  adolescent development was still going on.   08:23:50
20      MR. LANNIN:  Object to the form.   08:23:52
21      THE WITNESS:  Well, I think there -- there   08:23:53
22  were -- there was lit- -- there was research that   08:23:54
23  helped support that, but it also was based upon   08:24:01
24  expert opinion of -- of those involved in the   08:24:05
25  development of those revised standards.   08:24:10

Page 24

1   BY MR. BROOKS:   08:24:15
2      Q.  And did you believe at the time that an age   08:24:15
3   18 default cutoff for cross-sex hormones reflected a   08:24:18
4   reasonable balancing of potential benefits and   08:24:23
5   potential harms for young people?   08:24:26
6      A.  Yes.   08:24:28
7      Q.  And do you still think that that was a   08:24:29
8   reasonable position for WPATH guideline to take?   08:24:31
9      MR. LANNIN:  Object to the form.   08:24:35
10      THE WITNESS:  I think -- I think that we   08:24:36
11  have come to realize that that arbitrary age does not   08:24:38
12  reflect an individual's particular, you know,   08:24:43
13  psychosexual development.  And so as we -- as the   08:24:53
14  Standards of Care have evolved over time, and clearly   08:24:57
15  you see in Standards of Care 8, that we moved to   08:25:01
16  clear -- a criteria of the psychological, physical,   08:25:09
17  you know, considerations that could not -- a single   08:25:18
18  number could not be put upon.   08:25:24
19  BY MR. BROOKS:   08:25:26
20      Q.  Thank you, Doctor.  I guess my question --   08:25:28
21  my intended question was, do you believe today that   08:25:31
22  the 18-year default cutoff for cross-sex hormones was   08:25:34
23  a reasonable line for WPATH to draw at the time SOC-6   08:25:39
24  was developed?   08:25:45
25      A.  At that time, yes.   08:25:47

Page 25

1   Q.  Let's move on to SOC-7.  And if you turn to   08:25:48
2   page 4 in column 2, there's a heading for Version 7.   08:26:02
3   And the second paragraph there says that the then   08:26:09
4   president of the Harry Benjamin Society, Stan   08:26:16
5   Monstrey, asked you to chair the SOC-7 project.   08:26:20
6      And am I correct that, at that time, like,   08:26:26
7   you had had no personal experience in treatment of   08:26:33
8   minors or adolescents?   08:26:36
9      A.  No.   08:26:38
10      Q.  Okay.   08:26:39
11      MR. LANNIN:  Object to the form.   08:26:39
12  BY MR. BROOKS:   08:26:40
13      Q.  Pardon me.  Am I correct that, at that time,   08:26:41
14  you had had no personal experience in treating minors or   08:26:44
15  adolescents?   08:26:48
16      MR. LANNIN:  Object to the form.   08:26:49
17      THE WITNESS:  That is correct.   08:26:50
18  BY MR. BROOKS:   08:26:51
19      Q.  Thank you.  I, my question was perhaps   08:26:52
20  inartful.  That's what he objects to the form about.   08:26:55
21      MR. LANNIN:  Among other things.   08:26:59
22  BY MR. BROOKS:   08:27:03
23      Q.  And at the first column on page 5, as we   08:27:04
24  continue, the second complete sentence reads:   08:27:10
25      "I felt that it was time to   08:27:14

Veritext Legal Solutions

877-373-3660                                                          800.808.4958

CONFIDENTIAL

Page 26

```
1      reference the standards and to make      08:27:15
2      clear the evidence base for the          08:27:18
3      standards even if" --                    08:27:20
4      A. I'm sorry. I lost track of where you are.  08:27:21
5      Q. Page 5, column 1, top of the column, second  08:27:23
6  full sentence.                               08:27:27
7      A. Yup.                                   08:27:28
8      Q. Quote: "I felt that it was time" --    08:27:29
9      A. Yes, I got it. I got it.               08:27:31
10     Q. -- "to reference the standards and     08:27:33
11     to make clear the evidence base" --       08:27:34
12     A. Yes.                                   08:27:35
13     Q. -- "for the standards" --              08:27:36
14     A. Yeah.                                  08:27:37
15     Q. -- "even if that base was only on      08:27:37
16     expert consensus."                        08:27:39
17     A. Yeah.                                  08:27:40
18     Q. Pardon me. Sometimes I read the text just  08:27:41
19  so it's in the record. I know you can read perfectly  08:27:42
20  well, but we need it in the transcript, so.  08:27:45
21        THE REPORTER: And I write the words the  08:27:51
22  order they come in, so.                      08:27:51
23        MR. BROOKS: So if you interject, then it  08:27:51
24  becomes quite the interesting transcript.    08:27:53
25        THE REPORTER: Thank you.               08:27:55
```

Page 27

```
1         MR. LANNIN: So the moral of the story is,  08:27:56
2  Dr. Coleman, please let counsel finish his question  08:27:59
3  or recitation of the document in the record before  08:28:01
4  answering any questions about it.            08:28:04
5        THE WITNESS: I'll try.                  08:28:08
6        MR. LANNIN: Thank you.                  08:28:09
7  BY MR. BROOKS:                                08:28:09
8      Q. Why did you consider at this time that it  08:28:10
9  was important to make clear where the SOC -- the new  08:28:13
10  SOC was based on evidence and where it was based on  08:28:18
11  expert consensus?                            08:28:23
12     A. Well, I think at this time there was much  08:28:27
13  more research that was available, and we should  08:28:32
14  really review that -- that literature and -- and use  08:28:36
15  that as part of our decision making for making  08:28:43
16  recommendations in the Standards of Care, along with  08:28:49
17  using expert consensus.                      08:28:54
18     Q. And did you consider that it was important  08:28:57
19  to be clear which recommendations were based on what  08:29:01
20  you've referred to as evidence and which were based  08:29:05
21  on expert consensus?                         08:29:08
22        MR. LANNIN: Object to the form.        08:29:11
23        THE WITNESS: That was the intent.      08:29:12
24  BY MR. BROOKS:                               08:29:24
25     Q. Why did you think that was important to --  08:29:25
```

Page 28

```
1  let me start again.                          08:29:27
2      Why did you think it was important to make  08:29:28
3  that distinction clear?                      08:29:30
4      A. I think that we would be able to point to  08:29:36
5  the evidence based in the -- in the research  08:29:46
6  literature, and when that didn't exist, that we could  08:29:50
7  acknowledge that this was based upon an expert  08:29:58
8  consensus.                                   08:30:02
9      Q. You go on in the next paragraph to say that  08:30:03
10  you asked people to review the existing sections and  08:30:08
11  to write review papers.                      08:30:12
12     And what do you mean by "review papers" in  08:30:15
13  this article? What were you referring to?    08:30:18
14     A. To examine -- to systematically review the  08:30:21
15  literature in the various aspects of the Standards of  08:30:26
16  Care.                                        08:30:30
17     Q. Okay. And the folks you asked to do this  08:30:30
18  included Dr. Cohen-Kettenis whose name we've seen  08:30:33
19  before, Dr. Stephen Levine whose name we've seen  08:30:38
20  before. Also Ken Zucker.                     08:30:41
21     What were your criteria for selecting these  08:30:43
22  individuals as your core group to perform these  08:30:46
23  systematic or thorough reviews?              08:30:50
24        MR. LANNIN: Object to the form.        08:30:54
25        THE WITNESS: These were individuals that  08:30:55
```

Page 29

```
1  were not only familiar with -- with the research  08:30:57
2  literature, but also had published in this area as  08:31:04
3  well.                                        08:31:10
4  BY MR. BROOKS:                               08:31:11
5      Q. And were each one of these individuals whose  08:31:11
6  scientific integrity you personally respected?  08:31:13
7      A. Yes.                                   08:31:13
8      Q. Among others, you did at the time and do  08:31:21
9  respect Ken Zucker as a careful and serious  08:31:23
10  researcher?                                  08:31:25
11     A. Yes.                                   08:31:26
12        MR. LANNIN: Object to the form.        08:31:29
13  BY MR. BROOKS:                               08:31:29
14     Q. And what topic did you ask Dr. Levine to  08:31:30
15  undertake a review paper on as part of the SOC-7  08:31:33
16  development process?                         08:31:38
17     A. I cannot recall.                       08:31:42
18     Q. And did you at the time you asked him to  08:31:54
19  undertake this task and do you today consider  08:31:58
20  Dr. Stephen Levine to be a serious and careful  08:32:01
21  researcher?                                  08:32:04
22        MR. LANNIN: Object to the form.        08:32:04
23     You can answer.                           08:32:05
24        THE WITNESS: Yes, I consider him that way.  08:32:12
25        MR. BROOKS: Let me ask the reporter to mark  08:32:16
```

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1 as Exhibit 2 a subset of the SOC Version 8 so as not 08:32:17
2 to burden the record too much.  This includes a 08:32:24
3 number of complete chapters.  I frankly don't recall 08:32:28
4 which, but it includes a number of complete chapters. 08:32:33
5 We'll get that clear on the record as we go. 08:32:45
6        (The document referred to was 08:32:45
7        marked as Exhibit 2.) 08:32:45
8 BY MR. BROOKS: 08:32:45
9    Q.  And, Dr. Coleman, you were asked -- after 08:33:01
10 chairing the SOC-7 project, you were asked again to 08:33:05
11 chair the SOC-8 project.  Am I correct? 08:33:08
12    A.  That's correct. 08:33:11
13    Q.  Along with -- you had cochairs, as it were, 08:33:12
14 working under you, Asa Radix, if I'm saying the name 08:33:15
15 correctly? 08:33:18
16    A.  (Nods head.) 08:33:19
17    Q.  And Jon -- 08:33:20
18    A.  Asa. 08:33:21
19    Q.  Asa Radix and Jon Arcelus? 08:33:21
20    A.  Yes. 08:33:21
21    Q.  Were the three of you cochairs or were you 08:33:26
22 chair and they were kind of co- -- co-vice chairs? 08:33:31
23    A.  I was -- 08:33:34
24        MR. LANNIN:  Object to the form. 08:33:34
25        THE WITNESS:  I was chair and they were 08:33:35

Page 31

1 cochairs. 08:33:37
2 BY MR. BROOKS: 08:33:38
3    Q.  Okay.  So the list of coauthors on the SOC-8 08:33:39
4 is substantially longer than on any previous version. 08:33:47
5 Tell me how that came about or what the reason was. 08:33:51
6    A.  Well, as you saw from the evolution, I think 08:33:55
7 that our methodology continued to become more and 08:34:00
8 more robust.  And a critical decision was made in 08:34:04
9 SOC-8 to have a much more transparent process and to 08:34:14
10 invite anyone to apply for membership in -- in the 08:34:19
11 committee, compared to in SOC -- well, any of the 08:34:28
12 previous versions, they were selected by the board of 08:34:34
13 directors, approved by the board of directors, and 08:34:39
14 they were people that were just known to everyone as 08:34:41
15 experts in the field. 08:34:47
16        And so this was an effort to really make 08:34:49
17 sure that we -- we had a much more wider 08:34:54
18 representation of people that -- again, there were 08:34:59
19 many of these people that I didn't even -- I wasn't 08:35:05
20 even familiar with. 08:35:08
21    Q.  Okay.  So you -- you couldn't personally 08:35:09
22 vouch for the reputations of all these coauthors? 08:35:12
23    A.  Not -- 08:35:16
24        MR. LANNIN:  Object to the form. 08:35:16
25        THE WITNESS:  Not just by their name, but 08:35:17

Page 32

1 there was an extensive process of -- of applications, 08:35:21
2 reviewing their curriculum vitae, you know, examining 08:35:28
3 their credentials, and -- and, based on that, then 08:35:32
4 there was a -- there was a rating system.  And we 08:35:38
5 looked at that rating, and that -- and using the 08:35:43
6 different cochairs and -- and the chapter leads, the 08:35:48
7 final members of each of the -- of the committees 08:35:53
8 were -- were selected. 08:36:00
9 BY MR. BROOKS: 08:36:02
10    Q.  Do you personally know Dr. Edwards-Leeper? 08:36:02
11    A.  I don't know her that well. 08:36:06
12    Q.  Okay.  Do you know anything about her 08:36:10
13 reputation as an expert clinician in dealing with 08:36:12
14 gender dysphoria? 08:36:16
15    A.  She's very well-respected. 08:36:17
16        MR. BROOKS:  Let me have 52. 08:36:24
17        Let me ask the reporter to mark as Exhibit 3 08:36:30
18 a document entitled -- well, it says "Eli Coleman, 08:36:32
19 Narrator, Academic Health Center, Oral History 08:36:39
20 Project, University of Minnesota." 08:36:43
21        (The document referred to was 08:36:43
22        marked as Exhibit 3.) 08:37:03
23 BY MR. BROOKS: 08:37:03
24    Q.  Dr. Coleman, let me ask, do you recognize 08:37:04
25 this document? 08:37:06

Page 33

1    A.  Yes. 08:37:06
2    Q.  Okay.  It's clear to me you've been 08:37:08
3 interviewed, but whether you'd ever seen the results 08:37:11
4 is another question. 08:37:13
5        So you have seen it and you -- does this in 08:37:14
6 fact represent the transcript of an interview that 08:37:17
7 you gave -- well, first of all, does it represent the 08:37:20
8 transcript of an interview that you gave? 08:37:27
9    A.  It appears so. 08:37:28
10    Q.  And it says on page 4 that this interview 08:37:30
11 was conducted in July of 2012.  And does that 08:37:35
12 generally fit with your memory? 08:37:39
13    A.  Sounds about right. 08:37:44
14    Q.  That's how my memory works. 08:37:47
15        Let me ask you -- I'm not going to spend 08:37:54
16 long on this.  Let me ask you to turn to page 28 -- 08:37:56
17 let me ask you to turn to page 31, pardon me. 08:38:02
18    A.  Okay. 08:38:10
19    Q.  And there, a third of the way down, is an 08:38:11
20 "EC."  I take it that's Eli Coleman.  You chuckled, 08:38:16
21 and you referred to the gender committee. 08:38:30
22        And, frankly, I think that the transcription 08:38:29
23 here has things backwards. 08:38:32
24    A.  It appears so. 08:38:34
25    Q.  And that, while it's generally correct 08:38:35

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 there, the "EC: [chuckles]" is -- should be "EV" and 08:38:39
2 that the following paragraph should be "EC," 08:38:42
3 reflecting you talking. 08:38:45
4    Do you agree with me on that? 08:38:46
5    A. I would agree with you. 08:38:47
6    Q. Okay. Can you explain for the record within 08:38:48
7 the -- within the program in -- that the PHS at 08:38:53
8 University of Minnesota, what did "PHS" stand for? 08:39:02
9    A. Program in human sexuality. 08:39:05
10   Q. And within that, what was the gender 08:39:07
11 committee? 08:39:10
12   A. The gender committee was a subset of the 08:39:10
13 overall program in human sexuality. The program in 08:39:16
14 human sexuality was involved in education, teaching, 08:39:22
15 research, and patient care. And so -- and under the 08:39:25
16 broader patient care umbrella, there were patients 08:39:32
17 who were treated with gender dysphoria, and there was 08:39:39
18 a gender committee that reviewed decisions regarding 08:39:44
19 hormonal or surgical affirmation. 08:39:51
20   Q. And that was a multidisciplinary committee? 08:39:55
21   A. Yes. 08:39:59
22   Q. So that committee, you would -- you would 08:39:59
23 discuss it amongst a multidisciplinary team before 08:40:02
24 you approved hormonal interventions or surgery? 08:40:05
25   A. Yes. 08:40:07

Page 35

1    MR. LANNIN: Object to the form. 08:40:08
2 BY MR. BROOKS: 08:40:08
3    Q. And -- 08:40:08
4    MR. LANNIN: Again, Dr. Coleman -- 08:40:09
5    THE WITNESS: Oh, sorry. 08:40:10
6    MR. LANNIN: Excuse me, Counsel. 08:40:10
7    -- just give me one second to object. 08:40:11
8    THE WITNESS: Yeah, sorry. 08:40:12
9    MR. LANNIN: I appreciate it. 08:40:13
10 BY MR. BROOKS: 08:40:14
11   Q. I tell my witnesses that, if I have to jump 08:40:15
12 in like that, they should consider that I have 08:40:17
13 stomped on their toes under the table, the virtual 08:40:21
14 toe stomp. 08:40:23
15    And why did you consider it important to 08:40:25
16 have those decisions vetted by a multidisciplinary 08:40:28
17 committee before they were approved? 08:40:33
18   A. I think we felt at that time that it was 08:40:35
19 good to examine the -- the patient -- or the 08:40:43
20 committee did not examine the patient. They reviewed 08:40:55
21 the record and were able to weigh in on the de-- on 08:41:00
22 the decision. 08:41:06
23    So, you know, the therapist involved in the 08:41:07
24 case, I think it was important to also consider what 08:41:13
25 was going on with them medically, and make sure that 08:41:25

Page 36

1 all the bases seemed to be covered. 08:41:28
2    Q. That still seems important to you today, 08:41:32
3 does it not? 08:41:35
4    A. Yes. 08:41:35
5    MR. LANNIN: Object to the form. 08:41:36
6    THE WITNESS: Yes. 08:41:39
7 BY MR. BROOKS: 08:41:42
8    Q. On page 32 an inch-and-a-half down, it's 08:41:43
9 hard to find, is a sentence that begins at the very 08:41:52
10 end of the line: 08:41:54
11    "I haven't been on the gender 08:41:55
12    committee for, I think, 08:41:56
13    fifteen years or something like 08:41:58
14    that. It's kind of a mystery 08:41:59
15    what's really going on." 08:42:02
16    Do you see that? 08:42:04
17    And if I ask you to turn to page 34, there's 08:42:07
18 a related statement I wanted to ask you about. In 08:42:14
19 the very bottom of the page at the end of the last 08:42:19
20 full paragraph, you say: 08:42:22
21    "Since I've not -- since I've 08:42:25
22    been really not treating people for 08:42:28
23    a long time, I don't know." 08:42:30
24    So let me ask -- this is 2012, this 08:42:32
25 interview was, and you -- you said you hadn't been on 08:42:35

Page 37

1 the committee for some -- the gender committee for 08:42:38
2 fifteen years or something like that, and that you 08:42:41
3 hadn't really been treating people for a long time. 08:42:44
4    Let me ask you this. When did you last, in 08:42:46
5 your professional capacity, actually treat any 08:42:51
6 individual for gender dysphoria? 08:42:55
7    MR. LANNIN: Object to the form. 08:42:58
8    THE WITNESS: I -- I couldn't recall. 08:42:58
9 BY MR. BROOKS: 08:43:01
10   Q. Was it earlier than 2012? 08:43:02
11   MR. LANNIN: Same objection. 08:43:07
12   THE WITNESS: I really have no idea. 08:43:11
13 BY MR. BROOKS: 08:43:12
14   Q. It hasn't been recently. 08:43:13
15   A. No. 08:43:14
16   Q. At the very bottom of page 34, you said: 08:43:15
17    "If I ever went back to -- into 08:43:23
18    seeing people, I think I'd need 08:43:25
19    some help to get my bearings again 08:43:27
20    about what's the best way of doing 08:43:29
21    it. I feel out of it." 08:43:30
22    After the time of this interview, did you 08:43:33
23 ever in fact make the effort to get your bearings 08:43:35
24 again about the best practices for treating gender 08:43:40
25 dysphoria? 08:43:44

Page 38

1    MR. LANNIN:  Object to the form.        08:43:45
2    You can answer.                         08:43:46
3    THE WITNESS:  I -- I didn't go back into  08:43:48
4 treating individuals with gender dysphoria. I should  08:43:52
5 clarify that I probably saw patients who were   08:43:55
6 transgender or gender diverse, but I was treating   08:44:00
7 them for other conditions.                  08:44:03
8 BY MR. BROOKS:                              08:44:05
9    Q.  Understood.  Thank you.  That's a good   08:44:05
10 helpful clarification.                      08:44:06
11    Let me take you back to page 28.         08:44:14
12    I think this is a tangent, but let me just   08:44:24
13 check.  In the -- halfway down the page, there's a   08:44:32
14 short paragraph that says, "I did that with the   08:44:39
15 cross-dressers."                            08:44:41
16    Do you see that paragraph?  Pretty short.  08:44:42
17    A.  I have to -- where is it?  Towards the --  08:44:45
18    Q.  Page 28, halfway down.              08:44:46
19    A.  Oh, I'm on 27.  Halfway down.  Okay.   08:44:47
20    Q.  Let me ask you to read that two- -- or   08:44:54
21 three-sentence paragraph.                   08:44:58
22    A.  "I did that with cross-dressers.  They were  08:44:58
23 so isolated."  Yeah.                        08:45:00
24    Q.  So my question for you is, first, is it   08:45:03
25 correct that you were instrumental informing a -- an  08:45:05

Page 39

1 association or an organization that was entitled   08:45:11
2 "City of Lakes Crossdressers"?               08:45:13
3    MR. LANNIN:  Object to the form.         08:45:14
4    THE WITNESS:  I did not form that        08:45:16
5 organization.                               08:45:20
6 BY MR. BROOKS:                              08:45:24
7    Q.  Okay.  When you said in this interview --  08:45:25
8 and I recognize it's been twelve years, you may not   08:45:27
9 recall.  When you said, "I did that with the   08:45:29
10 cross-dressers," what was it you were saying that you  08:45:32
11 had done with this cross-dressing group?     08:45:35
12    A.  We -- we invited them to attend potluck   08:45:42
13 dinners so that they had an opportunity to socialize,  08:45:45
14 get to know other cross-dressers.  Oftentimes, that   08:45:51
15 they were very isolated.                    08:45:55
16    Q.  And did that group -- was your interaction  08:45:58
17 with that group related to your work with gender   08:46:04
18 dysphoria, or are they really two separate issues?  08:46:09
19    MR. LANNIN:  Object to the form.         08:46:10
20    THE WITNESS:  These were individuals that  08:46:20
21 usually, I can't say for sure, did not meet criteria  08:46:25
22 for gender dysphoria.  They were natal men who were  08:46:29
23 engaging in cross-dressing which is different from   08:46:38
24 individuals with gender dysphoria.          08:46:43
25 BY MR. BROOKS:                              08:46:44

Page 40

1    Q.  Okay.  Above that in the first full   08:46:49
2 paragraph with an "EC" that begins "Not very well,"  08:46:58
3 you said in the third sentence, quote:        08:47:05
4    "I think that's one of the               08:47:08
5    contributions that Sharon had,           08:47:09
6    although controversial.  Today            08:47:11
7    really encouraging much more             08:47:14
8    therapy in recognition of                08:47:16
9    psychiatric comorbidity, not that        08:47:18
10    that's causing the gender               08:47:20
11    dysphoria, but in terms of              08:47:22
12    adjustment and adaptation with          08:47:23
13    people."                                08:47:25
14    Do you see that language?               08:47:25
15    A.  Yes.                                08:47:25
16    Q.  And can you explain to me why you considered  08:47:31
17 it an important contribution of Dr. Satterfield that  08:47:33
18 she moved the PHS work with transgender patients in  08:47:41
19 the direction of encouraging much more therapy in   08:47:49
20 recognition of psychiatric comorbidity?     08:47:52
21    MR. LANNIN:  Objection to the form.      08:47:55
22    THE WITNESS:  You're asking why she --   08:48:00
23 BY MR. BROOKS:                              08:48:02
24    Q.  Why did you consider that to be an important  08:48:03
25 contribution of Dr. Satterfield?            08:48:06

Page 41

1    A.  Well, the early work at the University of  08:48:07
2 Minnesota in evaluating their patients for what was  08:48:15
3 then called "sex reassignment" was really mainly an  08:48:24
4 evaluation to determine whether they had gender   08:48:29
5 dysphoria or not.  And -- and psychotherapy was not  08:48:33
6 really a part of that, really, that process.  08:48:43
7    And I think Dr. Satterfield recognized that  08:48:50
8 some of these individuals had other psychiatric   08:48:54
9 issues that needed to be dealt with.  But probably   08:49:00
10 the biggest thing is that she was very aware that   08:49:06
11 these people were rather isolated, and that it was --  08:49:11
12 it was very helpful for them to socialize with   08:49:17
13 others.                                     08:49:26
14    She created group therapy as a means of   08:49:27
15 really helping them explore their gender identity,   08:49:32
16 talked about all the ways of dealing with that, you  08:49:37
17 know, beyond just hormonal or, you know, any kind of  08:49:43
18 medical treatments.                         08:49:48
19    There were issues of dealing with their   08:49:54
20 family, their relationships, their work situation   08:49:56
21 that they could use the assistance of -- of therapy,  08:50:02
22 yeah.                                       08:50:06
23    Q.  Turn to page 34, if you would.  I'll follow  08:50:06
24 up a little bit about Dr. Satterfield's initiative.  08:50:10
25    Towards the bottom of the page is a long   08:50:20

CONFIDENTIAL

Page 42

1 paragraph. And you refer to we're dealing with a 08:50:21
2 pronoun here, "her," and let me ask you to check and 08:50:31
3 make sure that I'm correct in believing that to refer 08:50:34
4 to Dr. Satterfield? 08:50:39
5 A. I'm not sure where you are again. 08:50:43
6 Q. At the bottom of page 34 is a large 08:50:44
7 paragraph that begins "I'll tell you something" -- 08:50:47
8 A. Yeah. 08:50:49
9 Q. -- "that I still," and it goes on to refer 08:50:49
10 to, quote, "her capriciousness," but then you say, 08:50:53
11 quote: 08:50:57
12     "She was also very insistent on 08:50:57
13     people really dealing with a lot of 08:50:59
14     their issues before readiness for 08:51:01
15     hormones," close quote. 08:51:03
16     Do you see that? 08:51:05
17 A. Yes. 08:51:05
18 Q. And do you believe that the "she" in 08:51:06
19 question is Dr. Satterfield? 08:51:08
20     MR. LANNIN: Object to the form. 08:51:09
21     THE WITNESS: Yes. 08:51:11
22 BY MR. BROOKS: 08:51:12
23 Q. And you go on to say, two lines down, quote: 08:51:14
24     "We saw so many train wrecks, 08:51:25
25     you know, two years post the high, 08:51:27

Page 43

1     and people were so unprepared. 08:51:28
2     They transitioned, they lost their 08:51:31
3     job, they lost their family. We 08:51:33
4     really felt that they needed to 08:51:36
5     kind of deal with all their issues 08:51:37
6     and not see hormones and surgery as 08:51:39
7     the solution to a lot of their 08:51:42
8     problems, but really more as the 08:51:44
9     icing on the cake." 08:51:47
10     Do you see that language? 08:51:48
11 A. Yes. 08:51:49
12 Q. And can you explain to me -- early in the 08:51:50
13 part I read, you said, "We saw so many train wrecks, 08:51:58
14 you know, two years post the high." Can you explain 08:52:02
15 to me what you were referring to as the -- when you 08:52:05
16 use the phrase "the high"? 08:52:08
17 A. Many individuals, you know, at that time -- 08:52:15
18 and I want to put that in context, "at that time" -- 08:52:19
19 would oftentimes feel enormous relief of their gender 08:52:24
20 dysphoria. And so they would be very happy to -- 08:52:33
21 whether it was going on hormones and saw the changes 08:52:40
22 or had gender-affirmation surgery, they oftentimes 08:52:47
23 felt very relieved after usually a very long period 08:52:53
24 of trying to obtain those kinds of treatments and the 08:53:00
25 barriers that were there for them. 08:53:06

Page 44

1 Q. Now, when you referred to "post the high" 08:53:09
2 and "train wrecks," what were you referring to? 08:53:12
3     MR. LANNIN: Object to the form. 08:53:15
4     THE WITNESS: I think at that time it was 08:53:18
5 very difficult for people to be accepted in this new 08:53:21
6 role, whether it's in -- at work or in family. 08:53:33
7 And -- and she felt strongly that -- that it was -- 08:53:41
8 it would be helpful to them -- for them to get 08:53:50
9 assistance with -- with those issues, and -- and that 08:53:53
10 might really improve the -- you know, the outcome 08:54:03
11 later on. 08:54:09
12 BY MR. BROOKS: 08:54:10
13 Q. And you agreed with that judgment? 08:54:10
14 A. At that time, yes. 08:54:12
15 Q. Do you disagree with it today? 08:54:14
16 A. I think we came to realize that -- that 08:54:16
17 there were -- the world changed. People were more -- 08:54:21
18 much more accepting. They were able to navigate 08:54:27
19 these changes much more effectively, and there wasn't 08:54:32
20 any clear evidence that psychotherapy was -- was 08:54:37
21 needed in every case. 08:54:45
22     And so -- and I think -- so I think our 08:54:47
23 approach at that time was I would say very 08:54:55
24 conservative, you know, trying to do, you know, 08:55:04
25 everything possible to help with a positive outcome. 08:55:15

Page 45

1 But we were learning that many people were doing 08:55:25
2 this. And even the original patients that were 08:55:31
3 treated in the Department of Psychiatry and the -- 08:55:37
4 you know, the outcome study that was published in 08:55:41
5 1978, you know, showed that these were -- these 08:55:45
6 people were doing very well, and they had no 08:55:49
7 psychotherapy. 08:55:52
8     So we had to be -- we were -- we had to be a 08:55:55
9 little humble. While we thought it was helpful, we 08:56:01
10 couldn't say with absolute certainty that that was 08:56:04
11 required in every case. So we really moved -- and 08:56:10
12 that's reflected in the Standards of Care is that 08:56:13
13 that be considered and we certainly suggested that it 08:56:18
14 could be helpful, but we couldn't point to, you 08:56:22
15 know -- and I'm talking mostly about, you know, 08:56:34
16 adults because, at that time, we were treating mostly 08:56:40
17 adults. 08:56:44
18 Q. On page 35, if I could ask you to turn to 08:56:46
19 that. 08:56:50
20 A. Can I get some Kleenex? 08:56:53
21 Q. You're right -- you're right in a wind here. 08:56:57
22 A. I'm here in a wind tunnel, and last night -- 08:57:01
23 I don't usually have allergies, but, boy, they kicked 08:57:03
24 up last night. 08:57:08
25     THE REPORTER: This is the reporter. There 08:57:09

12 (Pages 42 - 45)

CONFIDENTIAL

1 is a box of Kleenex in that cupboard on the right     08:57:09
2 where the lock is. Next cupboard over. Open that     08:57:09
3 one.                                                   08:57:09
4     MR. BROOKS: Perfect.                              08:57:22
5     THE WITNESS: Thank you. Thank you.                08:57:22
6     MR. BROOKS: You're not supposed to have           08:57:26
7 allergies out here in the desert.                     08:57:28
8     THE WITNESS: Never had them before, but I         08:57:30
9 have them.                                            08:57:32
10 BY MR. BROOKS:                                        08:57:32
11    Q. All right. Page 35. You make here in the        08:57:33
12 interview I think part of the point you've just made. 08:57:38
13 It says -- you said, according to the transcript:      08:57:42
14     "Certainly from the Standards                     08:57:46
15     of Care, we have no requirements                  08:57:47
16     for psychotherapy even though I                   08:57:48
17     believe in it. I'm an advocate for                08:57:50
18     that."                                            08:57:52
19    A. Hm-hm.                                          08:57:53
20    Q.  "I really believe in therapy.                  08:57:53
21     But there is no scientific evidence               08:57:55
22     that shows that that is necessary,"               08:57:56
23     close quote.                                      08:57:58
24    Q. Have I read that correctly?                     08:58:00
25    A. Yes.                                            08:58:01

1    Q. And at the time of this interview, SOC-7        08:58:02
2 which you have chaired, was out. And yet -- and if     08:58:08
3 you -- let me just read another line. In the very      08:58:18
4 next answer, you said, quote:                          08:58:21
5     "So that's the way it is, but I                    08:58:23
6     think if I'm going to take                         08:58:24
7     responsibility, I'm going to                       08:58:26
8     probably choose to want people to                  08:58:27
9     do more therapy than minimally                     08:58:29
10     really is required," close quote.                 08:58:31
11    Do you see that?                                   08:58:33
12    A. Yes.                                            08:58:33
13    Q. And so even after chairing the development      08:58:34
14 of SOC-7 that did not require psychotherapy, your     08:58:39
15 personal view was that, if it was a patient that you  08:58:43
16 were responsible for, you were going to require or    08:58:45
17 urge psychotherapy. Correct?                          08:58:49
18    MR. LANNIN: Object to the form.                    08:58:50
19    THE WITNESS: I -- I would encourage it.            08:58:51
20 BY MR. BROOKS:                                        08:58:55
21    Q. And am I correct, then, that you didn't         08:58:56
22 consider the then extant standard of care from WPATH  08:59:03
23 to state a binding definition of the only reasonable, 08:59:11
24 responsible path of care. Correct?                    08:59:14
25    MR. LANNIN: Object to the form.                    08:59:18

1     THE WITNESS: If you'll try to ask that            08:59:19
2 again.                                                 08:59:22
3 BY MR. BROOKS:                                         08:59:24
4    Q. Am I correct that even though you had been      08:59:24
5 chair of the SOC-7 project, you didn't consider those 08:59:27
6 guidelines to state a binding definition of what      08:59:32
7 constituted reasonable and responsible care?          08:59:38
8     MR. LANNIN: Same objection.                       08:59:42
9     THE WITNESS: I still am not -- let me try         08:59:44
10 to explain.                                           08:59:46
11     So there wasn't clear evidence that              08:59:49
12 psychotherapy was absolutely necessary. In Standards 08:59:52
13 of Care 7, there's a whole section on the value of    08:59:58
14 psychotherapy and what that can do. And -- and        09:00:04
15 certainly in Standards of Care 7, there was the       09:00:10
16 recognition of -- that part of the assessment should  09:00:15
17 be an assessment for any other mental health issues   09:00:20
18 and those should be assessed and managed.             09:00:23
19     There are many ways of managing that. And        09:00:28
20 psychotherapy is one of those methods.                09:00:34
21 BY MR. BROOKS:                                        09:00:39
22    Q. You stated there is no scientific evidence     09:00:40
23 that shows that psychotherapy is necessary.           09:00:43
24     Was it also true, at the time of this            09:00:48
25 interview, that there simply were no long-term cohort 09:00:51

1 studies of outcomes for any course of treatment of    09:01:00
2 gender dysphoria in which the patients had not         09:01:06
3 received psychotherapy?                                09:01:09
4     MR. LANNIN: Object to the form.                   09:01:11
5     THE WITNESS: There were clearly long-term         09:01:11
6 follow-up studies at that time showing that -- that    09:01:15
7 gender-affirmation interventions were helpful.         09:01:24
8 BY MR. BROOKS:                                         09:01:27
9    Q. And my question was, is it correct that in      09:01:28
10 all of those then existing long-term studies the      09:01:35
11 patients had received psychotherapeutic support?      09:01:37
12    MR. LANNIN: Object to the form.                    09:01:42
13    THE WITNESS: I don't know that that was           09:01:43
14 parceled out.                                          09:01:48
15 BY MR. BROOKS:                                         09:01:51
16    Q. If that wasn't parceled out, is it fair to     09:01:52
17 say that, while there was no scientific evidence that  09:01:56
18 showed psychotherapy was necessary, there was also no 09:01:59
19 scientific evidence that showed that it was not        09:02:02
20 necessary?                                             09:02:04
21    MR. LANNIN: Object to the form.                    09:02:05
22    THE WITNESS: There was not sufficient             09:02:07
23 evidence to say that that was an absolute             09:02:11
24 requirement.                                           09:02:16
25 BY MR. BROOKS:                                         09:02:17

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1    Q. Is it equally fair to say that there was not   09:02:18
2   sufficient evidence to say that psychotherapy had not   09:02:21
3   been a contributing factor in the well-being of the   09:02:24
4   participants in those studies?                09:02:27
5        MR. LANNIN: Object to the form.        09:02:29
6        THE WITNESS: I -- I -- I don't know that I   09:02:32
7   can comment on that.                         09:02:35
8   BY MR. BROOKS:                             09:02:36
9    Q. All right. 32, back a little bit if we   09:02:36
10   could. Well, actually, let's just move on from   09:02:48
11   there. Pardon me. And you can put this exhibit on   09:03:00
12   one side. What was that? Exhibit 3.        09:03:09
13        MR. LANNIN: Counsel, it happens we've been   09:03:15
14   going for an hour, so may --                 09:03:16
15        MR. Brooks: If you would like to take a   09:03:17
16   break, we certainly can.                    09:03:18
17        MR. LANNIN: May we take a quick break?   09:03:20
18        MR. Brooks: Good idea.                 09:03:22
19        THE VIDEOGRAPHER: Okay. The time is   09:03:23
20   9:03 a.m., and we are now off the record.   09:03:26
21        (Recess taken.)                        09:03:29
22        THE VIDEOGRAPHER: The time is 9:14 a.m.,   09:14:05
23   and we are now back on the record.          09:14:13
24        MR. BROOKS: And let me ask the reporter to   09:14:16
25   mark as Exhibit 4 the 2017 Endocrine Society   09:14:18

Page 51

1   Guidelines for treatment of gender-dysphoric persons.   09:14:27
2        (The document referred to was        09:14:27
3        marked as Exhibit 4.)                  09:14:27
4   BY MR. BROOKS:                             09:14:27
5    Q. Dr. Coleman, am I correct that you're very   09:14:42
6   familiar with these Endocrine Society guidelines?   09:14:44
7        MR. LANNIN: Object to form.            09:14:44
8        THE WITNESS: I'm familiar.             09:14:48
9   BY MR. BROOKS:                             09:14:49
10   Q. Does that mean you don't feel very familiar?   09:14:51
11   A. I don't feel very familiar.             09:14:54
12   Q. Okay. The Endocrine Society guidelines that   09:14:55
13   you're holding overlap to a considerable extent in   09:15:01
14   subject matter with the SOC-7 and SOC-8 guidelines.   09:15:04
15   Correct?                                  09:15:04
16   A. They mainly overlap in -- in terms of the   09:15:13
17   chapter on hormonal treatments.            09:15:16
18   Q. Including puberty blockers. Correct?   09:15:20
19   A. That's correct.                        09:15:25
20   Q. Let me ask you to turn to page 3895, the   09:15:25
21   last textual page.                         09:15:31
22   A. Okay.                                  09:15:41
23   Q. And what I want to do is call your attention   09:15:42
24   to a statement at the bottom of the second column.   09:15:45
25   Under "Acknowledgments" there's a section headed   09:15:49

Page 52

1   "Disclaimer." And beginning with the second sentence   09:15:52
2   in that disclaimer, it's -- the Endocrine Society   09:15:57
3   states:                                   09:16:02
4        "The guidelines should not be        09:16:03
5        considered inclusive of all proper   09:16:04
6        approaches or methods or exclusive   09:16:06
7        of others. The guidelines cannot    09:16:08
8        guarantee any specific outcome, nor   09:16:11
9        do they establish a standard of     09:16:13
10        care."                              09:16:17
11        Do you see that language?            09:16:17
12   A. No, I'm sorry, I'm missing that. Where   09:16:18
13   is --                                     09:16:21
14   Q. 3895 --                                09:16:21
15   A. Yeah.                                  09:16:22
16   Q. -- down at the bottom of the second column,   09:16:23
17   it says --                                09:16:24
18   A. Right.                                 09:16:25
19   Q. -- "Acknowledgments" and --            09:16:25
20   A. Yes.                                   09:16:26
21   Q. -- then it says "Disclaimer"?           09:16:27
22   A. Yeah.                                  09:16:28
23   Q. And the second and third full sentences are   09:16:29
24   what I just read.                          09:16:31
25   A. Okay. Yes.                             09:16:32

Page 53

1    Q. Do you see that language now?           09:16:35
2    A. Yes.                                   09:16:37
3    Q. So that's the Endocrine Society's statement   09:16:39
4   about the meaning of -- of their guidelines.   09:16:42
5        Let me ask you this, and let's start with   09:16:47
6   SOC-5. When the Harry Benjamin Society Committee,   09:16:51
7   under Dr. Stephen Levine's leadership and your   09:16:56
8   participation, finalized the SOC, am I correct that   09:17:02
9   it was not your view as a member of commit-- -- of   09:17:09
10   that committee that that new version spelled out --   09:17:12
11   let me start again. I apologize.           09:17:20
12   A. That's all right.                      09:17:22
13   Q. This is -- sometimes it gets complicated.   09:17:22
14        When the SOC-5 was finalized by a committee   09:17:25
15   of which you were a member, am I correct that it was   09:17:30
16   your view that that SOC outlined a responsible course   09:17:34
17   of addressing gender dysphoria, but not necessarily   09:17:44
18   the only responsible course of addressing gender   09:17:47
19   dysphoria?                                09:17:51
20        MR. LANNIN: Object to the form.        09:17:51
21        You can answer.                       09:17:52
22        THE WITNESS: SOC-5 was our -- our -- you   09:17:52
23   know, our consensus of recommendations of what should   09:18:00
24   be the Standards of Care for individuals with gender   09:18:04
25   dysphoria.                                09:18:10

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

BY MR. BROOKS:                                    09:18:12
2    Q. And did that mean that on every          09:18:12
3  recommendation the committee was unanimous in their  09:18:14
4  vote?                                          09:18:18
5       MR. LANNIN: Object to the form.          09:18:20
6       THE WITNESS: Everything that was in SOC-5  09:18:23
7  was -- was achieved by consensus. And we all agreed  09:18:27
8  in the end, and we were to be authors of that, we had  09:18:37
9  to agree with that in -- in total.            09:18:42
10      There was a lot of debate and discussion  09:18:48
11 about these -- these issues and -- but, in the end,  09:18:50
12 we were able to come to some consensus.       09:18:57
13 BY MR. BROOKS:                                   09:19:01
14   Q. But based on that debate and discussion  09:19:02
15 experience, it was your understanding that reasonable  09:19:05
16 clinicians and scientists could and did differ with  09:19:11
17 regard to some of those recommendations?      09:19:16
18      MR. LANNIN: Object to the form.          09:19:18
19      THE WITNESS: I'm sure that there would be  09:19:20
20 some people that would have objected or viewed things  09:19:22
21 differently.                                   09:19:29
22 BY MR. BROOKS:                                   09:19:30
23   Q. And was your belief, as the committee issued  09:19:30
24 SOC-5, that that document outlined the only   09:19:36
25 responsible approach to treatment of gender   09:19:41

Page 55

1  dysphoria, or, rather, that it outlined one, possibly  09:19:45
2  among others, responsible approaches to addressing  09:19:51
3  gender dysphoria?                              09:19:55
4       MR. LANNIN: Object to the form.          09:19:56
5       THE WITNESS: Our task was to simply develop  09:19:57
6  the best avail- -- the best guidelines based upon the  09:19:59
7  evidence, and that's what we did.             09:20:05
8  BY MR. BROOKS:                                   09:20:08
9    Q. Did you believe, Dr. Coleman, that the    09:20:11
10 Standards of Care outlined the only responsible path  09:20:14
11 that a clinician could take in treating gender  09:20:18
12 dysphoria, or, on the contrary, did you believe that  09:20:21
13 there might also be other responsible paths for  09:20:24
14 treating gender dysphoria?                     09:20:27
15   A. Well, one --                             09:20:29
16      MR. LANNIN: Object to the form.          09:20:29
17      THE WITNESS: One -- one thing is, again,  09:20:31
18 these were deemed as minimal standards. And so it  09:20:33
19 recognized that these guidelines were -- should be  09:20:41
20 flexible and -- and based upon individual      09:20:48
21 circumstances and perhaps again a clinician's view  09:20:54
22 that -- you know, for example, that they would like  09:21:04
23 to see a course of psychotherapy that -- that  09:21:11
24 recognized sit -- the standards recognized that  09:21:18
25 somebody could have some more -- other kind of  09:21:21

Page 56

1  criteria up -- over and above these minimal    09:21:25
2  standards. But these were the -- were considered the  09:21:33
3  minimal standards that people should follow. And if  09:21:39
4  they did not follow them, they had to have a  09:21:42
5  significant rationale for why that was appropriate in  09:21:46
6  that particular case.                          09:21:51
7  BY MR. BROOKS:                                   09:21:53
8    Q. Does what you've just said in respect to  09:21:55
9  SOC-5 continue to be true with respect to SOC-8?  09:21:59
10   A. Yes.                                      09:21:59
11   Q. And, again, in the course of developing  09:22:06
12 SOC-8, among the many coauthors, am I correct there  09:22:13
13 was significant at least initial debate and differing  09:22:20
14 views on some of the recommendations?         09:22:24
15      MR. LANNIN: Object to the form.          09:22:26
16      THE WITNESS: There was a lot of discussion  09:22:27
17 and debate within those committees.           09:22:31
18      Ah, ah, sorry. A Charley horse.          09:22:39
19 BY MR. BROOKS:                                   09:22:41
20   Q. Okay.                                     09:22:42
21   A. Yeah, fine.                              09:22:42
22      Yeah, there was -- there was a lot of     09:22:45
23 discussion and debate. And -- and that was I think a  09:22:50
24 very healthy process.                          09:22:56
25   Q. So as that -- as that group of clinicians,  09:22:59

Page 57

1  researchers was pulled together, despite the   09:23:02
2  existence of SOC-7, as they came together, there was  09:23:09
3  still significant disagreements as they walked in the  09:23:12
4  door, so to speak, on proper -- on best practices for  09:23:15
5  dealing with gender dysphoria.                 09:23:20
6       MR. LANNIN: Object to the form.          09:23:23
7       THE WITNESS: I think that some people had  09:23:24
8  different viewpoints when they came into the process,  09:23:27
9  and we learned a lot from one another. And we  09:23:31
10 learned a lot from examining, you know, the    09:23:35
11 literature and what the literature said.       09:23:39
12 BY MR. BROOKS:                                   09:23:42
13   Q. And did --                               09:23:43
14   A. And so minds --                          09:23:43
15   Q. Pardon me.                               09:23:44
16   A. So minds, you know, were -- were changed.  09:23:44
17 Or, again, the -- the -- there was the development of  09:23:51
18 recommendations that everybody could agree with.  09:23:56
19   Q. Well, in fact, the Delphi process that was  09:24:00
20 used for finalizing recommendations did not require  09:24:04
21 unanimity, did not require everybody to agree, did  09:24:07
22 it?                                            09:24:10
23   A. That's correct.                          09:24:11
24   Q. And, as you sit here today, do you know  09:24:11
25 which recommendations were approved unanimously and  09:24:14

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 which were not?                                          09:24:17
2     A. No.                                              09:24:18
3         MR. BROOKS: Let me ask the reporter to mark  09:24:21
4 as Exhibit 6 -- 5 an article entitled "The mental      09:24:22
5 health establishment the failing trans kids" by Laura  09:24:43
6 Edwards-Leeper and Erica Anderson.                     09:24:48
7         (The document referred to was               09:24:48
8         marked as Exhibit 5.)                         09:25:12
9 BY MR. BROOKS:                                           09:25:12
10     Q. And, Dr. Coleman, is this an opinion piece  09:25:12
11 with which you are well familiar?                      09:25:17
12         MR. LANNIN: Object to the form.             09:25:18
13         THE WITNESS: No.                              09:25:21
14 BY MR. BROOKS:                                          09:25:23
15     Q. No. You didn't participate in substantial  09:25:24
16 discussions about this article within WPATH?          09:25:27
17         MR. LANNIN: Object to the form.             09:25:32
18         THE WITNESS: I recall discussions that --  09:25:33
19 that happened in response to this article.            09:25:36
20 BY MR. BROOKS:                                          09:25:42
21     Q. It came out, it indicates on -- in November  09:25:42
22 of 2021. And did you read it on or about the time  09:25:47
23 that it came out?                                       09:25:53
24     A. I don't recall.                                09:25:55
25     Q. The coauthor -- we've mentioned            09:25:57

Page 59

1 Dr. Edwards-Leeper. The coauthor is Dr. Erica      09:26:06
2 Anderson. What positions within WPATH or its U.S.  09:26:11
3 branch, the USPATH, have Dr. Anderson held by this  09:26:19
4 time 2021?                                             09:26:24
5     A. She was president of USPATH, and I can't  09:26:26
6 recall whether it was before, during. I don't think  09:26:33
7 it was after.                                          09:26:38
8     Q. Do you know Dr. Anderson personally?      09:26:43
9     A. I do, not -- well, I've met her at          09:26:45
10 conferences. We're not friends, but we have met and  09:26:48
11 we've had some conversations with each other.      09:26:52
12     Q. And Dr. Anderson is indeed transgender. Am  09:26:55
13 I correct?                                             09:26:55
14     A. Yes.                                          09:27:06
15     Q. And is a psychologist who specializes in  09:27:06
16 addressing gender dysphoria. Am I correct?         09:27:14
17     A. That's correct.                              09:27:15
18     Q. And what do you consider Dr. Anderson's  09:27:15
19 reputation in the field to be?                        09:27:18
20     A. I think it's -- has been considered good.  09:27:20
21     Q. Let me ask you, just walk through some of  09:27:34
22 these statements. Well, let me -- let me ask this.  09:27:34
23         Is it fair to say that the publication of  09:27:36
24 this op ed stirred up a great deal of heated      09:27:39
25 discussion within WPATH leadership?                 09:27:43

Page 60

1         MR. LANNIN: Object to the form.             09:27:45
2         THE WITNESS: There was quite a bit of      09:27:47
3 discussion and concern that -- that this may have  09:27:50
4 been an overreaction, but not everyone held these  09:28:01
5 same views.                                            09:28:09
6 BY MR. BROOKS:                                          09:28:11
7     Q. Well, let me ask precisely that on some of  09:28:11
8 these. If you would turn to the first text page,  09:28:14
9 down at the bottom, there's a reference to Canada at  09:28:19
10 the very last three lines. It says:                   09:28:24
11         "Canada too is following our             09:28:24
12         lead. A study of ten pediatric          09:28:28
13         gender clinics there found that         09:28:32
14         half do not require psychological       09:28:32
15         assessments before initiating          09:28:37
16         puberty blockers or hormones,"          09:28:37
17         close quote.                              09:28:38
18         Now, that's referring to a study of Canadian  09:28:40
19 clinics. Did you in this -- were you in this time  09:28:44
20 period aware of gender clinics in the U.S. that were  09:28:48
21 not requiring psychological assessments before  09:28:56
22 initiating puberty blockers?                          09:29:02
23         MR. LANNIN: Object to the form.             09:29:02
24         THE WITNESS: No, but an assessment of   09:29:03
25 mental health conditions was a requirement for  09:29:11

Page 61

1 initiation of puberty-blocking hormones.           09:29:16
2 BY MR. BROOKS:                                          09:29:19
3     Q. It was stated as a requirement in SOC-8.  09:29:20
4 Correct?                                               09:29:20
5     A. Yes.                                          09:29:24
6     Q. And my question is, in this time period, did  09:29:25
7 you become aware of reports that there were pediatric  09:29:28
8 gender clinics that were simply not following that  09:29:33
9 and were not requiring a psychological assessment  09:29:36
10 before approving puberty-blocking drugs?            09:29:40
11         MR. LANNIN: Object to the form.             09:29:44
12         THE WITNESS: I think I heard that some  09:29:47
13 people were not following the Standards of Care.  09:29:48
14 BY MR. BROOKS:                                          09:29:51
15     Q. Did that cause you concern for the       09:29:51
16 well-being of the affected children?                 09:29:53
17     A. Yes.                                          09:29:53
18     Q. Dr. Edwards-Leeper and Dr. Anderson wrote  09:29:56
19 just two lines up that many providers were engaging  09:30:06
20 in what they referred to as, quote, "sloppy,       09:30:14
21 dangerous care."                                      09:30:17
22         In 2021, did you share a concern that     09:30:19
23 providers around the nation were engaging in sloppy,  09:30:23
24 dangerous care?                                        09:30:28
25         MR. LANNIN: Object to the form.             09:30:29

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1 THE WITNESS: I -- I didn't share that -- 09:30:30
2 that view, but it's -- but, upon hearing those 09:30:34
3 reports, again, I was certainly concerned if that 09:30:38
4 was -- if that was the case. 09:30:43
5 BY MR. BROOKS: 09:30:45
6 Q. But personally you just didn't know one way 09:30:45
7 or the other whether that was the case? 09:30:47
8 A. Exactly. 09:30:49
9 Q. Okay. Let me ask you to turn to the second 09:30:54
10 text page. There are no page numbers on this 09:30:55
11 document. I apologize. 09:30:57
12 A. That's all right. 09:30:58
13 Q. And there's a paragraph that begins with a 09:30:59
14 big cap A, "American opinions." 09:31:03
15 A. Hm-hm. 09:31:05
16 Q. And the third sentence in that paragraph, 09:31:06
17 these authors have written, quote: 09:31:09
18 "Now the treatment pushed by 09:31:11
19 activists, recommended by some 09:31:12
20 providers and taught in many 09:31:15
21 training workshops is to affirm 09:31:17
22 without question," close quote. 09:31:19
23 In this 2021 time period, did you have any 09:31:24
24 opinion as to whether it was true that activists and 09:31:29
25 some providers were pushing an approach that involved 09:31:33

Page 63

1 affirming transgender identity, quote, "without 09:31:39
2 question"? 09:31:43
3 MR. LANNIN: Object to the form. 09:31:43
4 THE WITNESS: I was not aware that that was 09:31:44
5 happening at that time. This certainly concerned me 09:31:50
6 that she was -- that people were saying that that was 09:31:53
7 happening. 09:31:58
8 BY MR. BROOKS: 09:31:58
9 Q. That is, if it was happening, that concerned 09:31:58
10 you? 09:32:00
11 A. Yes. And I think that that led to, you 09:32:00
12 know, our strengthening the recommendations for 09:32:05
13 mental health assessment, careful assessment, 09:32:11
14 especially with -- with adolescents when we were 09:32:17
15 considering puberty-blocking hormones or -- or 09:32:22
16 hormonal treatments. 09:32:27
17 Q. Let me ask you to turn to the next page. 09:32:29
18 And two-thirds of the way down is a paragraph that 09:32:37
19 begins "Some providers may move quickly." Let me ask 09:32:40
20 you to find that paragraph. 09:32:42
21 A. Yes. 09:32:43
22 Q. And there I'm going to start with the second 09:32:46
23 sentence, quote: 09:32:49
24 "Some assume that a person with 09:32:50
25 gender dysphoria who declares they 09:32:53

Page 64

1 are transgender is transgender and 09:32:54
2 needs medical interventions 09:32:55
3 immediately, yet we know this is 09:32:58
4 not always true," period. 09:32:59
5 Did you, in 2021, share the belief that a 09:33:08
6 young person who declares they are transgender is not 09:33:13
7 always correct in that self-assessment? 09:33:17
8 MR. LANNIN: Object to the form. 09:33:20
9 THE WITNESS: I think that adolescents 09:33:22
10 could -- can be confused about their gender identity, 09:33:27
11 their overall sexual identity, and that's why we 09:33:34
12 insist on a careful assessment by a trained 09:33:39
13 professional. 09:33:45
14 BY MR. BROOKS: 09:33:46
15 Q. And, in your opinion, what experience 09:33:47
16 qualifications does that professional need to have? 09:33:51
17 A. A minimum of a master's degree in a -- in a 09:33:53
18 field of mental health. 09:34:00
19 Q. Does that include social work? 09:34:01
20 A. There are different types of social workers 09:34:07
21 and some have a clinical training background. 09:34:09
22 Q. In your opinion, does a master's degree in 09:34:13
23 social work, including some clinical aspects, provide 09:34:23
24 sufficient expertise to evaluate a child and approve 09:34:27
25 puberty blockers or cross-sex hormones? 09:34:34

Page 65

1 MR. LANNIN: Object to the form. 09:34:36
2 THE WITNESS: It depends on their particular 09:34:38
3 training and expertise. And that is spelled out in 09:34:42
4 our assessment chapter what those requirements are. 09:34:46
5 BY MR. BROOKS: 09:34:51
6 Q. And are you personally comfortable with the 09:34:51
7 idea of a child receiving a prescription for puberty 09:34:52
8 blockers or cross-sex hormones without an evaluation 09:34:57
9 by an experienced psychologist? 09:34:59
10 A. Not -- 09:35:03
11 MR. LANNIN: Object to the form. 09:35:03
12 THE WITNESS: Not only -- that assessment of 09:35:03
13 child-- children for hormonal treatment requires a 09:35:10
14 multidisciplinary team to make that decision. 09:35:18
15 BY MR. BROOKS: 09:35:23
16 Q. Including a psychologist? 09:35:24
17 A. I think that if there is a psychiatrist, a 09:35:30
18 psychologist, a trained clinical social worker that 09:35:35
19 can examine the psychological aspects of that 09:35:39
20 individual, that would be sufficient, along with a 09:35:45
21 physician, other -- that it really needs a 09:35:52
22 multidisciplinary team approach. 09:35:56
23 Q. Let me ask more precisely perhaps. 09:35:57
24 A. Yeah. 09:36:00
25 Q. Are you personally comfortable with the idea 09:36:01

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1 of a child receiving a prescription for body-altering 09:36:02
2 puberty blockers or cross-sex hormones without an 09:36:08
3 evaluation conducted by a psychologist or a 09:36:10
4 psychiatrist? 09:36:14
5     MR. LANNIN: Object to the form. 09:36:16
6     THE WITNESS: I think that people with 09:36:18
7 different degrees -- social work, marriage and 09:36:23
8 family -- can have similar training and experience to 09:36:26
9 be able to make those kinds of assessments and 09:36:31
10 determination. 09:36:38
11 BY MR. BROOKS: 09:36:38
12   Q. Let me ask you to turn to the final page of 09:36:42
13 this op ed. At the very top, Dr. Anderson and 09:36:45
14 Dr. Edwards-Leeper write, quote: 09:36:54
15     "Longer term longitudinal 09:36:57
16     studies are needed to better 09:36:59
17     understand the role of medical 09:37:00
18     interventions on lifetime 09:37:02
19     psychological health, particularly 09:37:04
20     with the newer subset of 09:37:05
21     adolescents presenting with no 09:37:08
22     childhood dysphoria and significant 09:37:09
23     mental health concerns," close 09:37:13
24     quote. 09:37:14
25   Do you see that? 09:37:14

Page 67

1   A. Hm-hm. 09:37:15
2   Q. Do you agree with that statement? 09:37:15
3   A. I think that we need a lot more research 09:37:17
4 looking at the long term effects. And we state that 09:37:21
5 very clearly in SOC-8. 09:37:29
6   Q. We'll look at this topic a little bit more, 09:37:37
7 but let me ask you to look at the second full 09:37:40
8 paragraph on this final page that begins with -- I'm 09:37:45
9 sorry -- the final -- the third full paragraph begins 09:37:51
10 "The pressure by activist." 09:37:58
11   Do you see that? 09:38:00
12   A. Hm-hm, yes. 09:38:00
13   Q. And there these authors have written, quote: 09:38:01
14     "The pressure by activist 09:38:03
15     medical and mental medical health 09:38:05
16     providers, along with some national 09:38:06
17     LGBT organizations, to silence the 09:38:10
18     voices of detransitioners and 09:38:11
19     sabotage the discussion around what 09:38:14
20     is occurring in the field is 09:38:15
21     unconscionable," period. 09:38:16
22   In this time period, 2021, were you aware of 09:38:20
23 anything that you considered to be efforts to silence 09:38:25
24 the voices of detransitioners? 09:38:31
25     MR. LANNIN: Object to the form. 09:38:35

Page 68

1     THE WITNESS: I don't remember anything like 09:38:36
2 that. 09:38:38
3 BY MR. BROOKS: 09:38:39
4   Q. And were you aware of any efforts within 09:38:39
5 WPATH to silence or muzzle public debate about the 09:38:42
6 quality of care being delivered to minors with gender 09:38:50
7 dysphoria? 09:38:55
8     MR. LANNIN: Object to the form. 09:38:55
9     THE WITNESS: No. There was clearly concern 09:38:56
10 about -- we -- we were seeing an increase in cases of 09:39:04
11 regret and that individuals were going through a -- 09:39:10
12 some individuals were going through a detransition -- 09:39:20
13   And so, clearly, one of our intents in SOC-8 09:39:24
14 was to address the needs of those individuals and -- 09:39:30
15 and outline some of the -- the evaluation that should 09:39:42
16 be done more -- even more carefully than as they 09:39:49
17 might consider to, you know, obviously shouldn't want 09:39:59
18 to have them keep going back and forth. 09:40:05
19 BY MR. BROOKS: 09:40:07
20   Q. And with regard to individuals who desire to 09:40:07
21 detransition, am I correct that you feel strongly 09:40:14
22 that those individuals should receive mental health 09:40:18
23 support as they work through that process? 09:40:23
24     MR. LANNIN: Object to the form. 09:40:26
25     THE WITNESS: The -- the requirement for 09:40:31

Page 69

1 adolescents is that they are assessed. There's a 09:40:38
2 mental health assessment, there's a multidisciplinary 09:40:43
3 team, and that is whether they are considering to go 09:40:46
4 on hormones or have surgical interventions or they 09:40:49
5 are considering to detransition. 09:40:56
6 BY MR. BROOKS: 09:41:01
7   Q. Well, putting aside exact language in the 09:41:01
8 SOC, am I correct that you feel strongly that 09:41:03
9 individuals who are considering detransition should 09:41:05
10 receive, have a right to mental health support as 09:41:12
11 they work through that decision and process? 09:41:16
12     MR. LANNIN: Object to the form. 09:41:19
13     THE WITNESS: That their -- their mental 09:41:27
14 health issues need to be assessed and an 09:41:29
15 individualized treatment plan should be 09:41:36
16 addressed to -- should be developed to meet the needs 09:41:39
17 of that individual so that they are able to make 09:41:42
18 the -- a -- an adequate decision for themselves. And 09:41:49
19 that is clearly spelled out in SOC-8. 09:41:56
20     MR. BROOKS: Let me ask the reporter to mark 09:42:05
21 as Exhibit 6 an article by Dr. Stephen Levine, 2017, 09:42:06
22 entitled "Ethical Concerns About Emerging Treatment 09:42:17
23 Paradigms for Gender Dysphoria." 09:42:21
24     (The document referred to was 09:42:21
25     marked as Exhibit 6.) 09:42:32

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1 BY MR. BROOKS:                              09:42:32
2    Q.  And -- and first I'll ask you, Dr. Coleman,  09:42:36
3 whether you believe you've ever read this article by  09:42:39
4 Dr. Levine.                                  09:42:43
5    A.  I -- I couldn't say for sure.        09:42:43
6    Q.  I'll just ask you about a few of his  09:42:47
7 propositions as a springboard to get your  09:42:51
8 understandings.                              09:42:54
9       So let me ask you to turn to page 3.  And  09:42:57
10 towards the bottom of page 3 in the final paragraph  09:43:10
11 is a sentence that begins "Many surgeons, hormone  09:43:17
12 prescribers."  Tell me when you've found that  09:43:21
13 sentence.                                    09:43:23
14    A.  Yes, I found it.                      09:43:24
15    Q.  All right.  Let me read that into the  09:43:25
16 record.  Quote:  "Many surgeons, hormone  09:43:26
17 providers" -- let me start again, do it correctly.  09:43:27
18       "Many surgeons, hormone          09:43:30
19       prescribers, and mental health  09:43:33
20       gender specialists promulgate these  09:43:35
21       assumptions.  Their convictions are  09:43:37
22       reinforced by the fact that they  09:43:40
23       usually work with individuals at  09:43:41
24       the beginning phases of their  09:43:43
25       transitions.  These are  09:43:45

Page 71

1       hope-dominated times followed by  09:43:47
2       the giddy delight of having  09:43:50
3       transitioned socially, hormonally,  09:43:52
4       or surgically," period.          09:43:54
5       Now Dr. Levine refers to hope-dominated  09:43:59
6 times in the beginning phases of transitions.  You in  09:44:03
7 your earlier article referred to a post -- a post  09:44:11
8 high to a high period and a post high period, am I  09:44:15
9 correct that, from your own experience in what you've  09:44:21
10 seen in the field, that the early times, a year, two  09:44:24
11 years, after a medical transition, whether hormonal  09:44:28
12 or surgical, patients tend to be optimistic and  09:44:32
13 hopeful about the effects of that transition on their  09:44:37
14 lives?                                       09:44:42
15       MR. LANNIN:  Object to the form.  09:44:43
16       THE WITNESS:  I think I stated earlier is  09:44:44
17 that many, many people who have finally received  09:44:55
18 treatment that they have sought for a very long time  09:44:58
19 in many cases feel an enormous relief of their gender  09:45:03
20 dysphoria and that makes them very happy.  09:45:11
21 BY MR. BROOKS:                              09:45:16
22    Q.  And is it also consistent with what you've  09:45:17
23 observed that, after a period of years, patients'  09:45:19
24 happiness and optimism about the benefits the  09:45:27
25 transition is going to bring to them, for some  09:45:32

Page 72

1 patients significantly decrease?            09:45:37
2       MR. LANNIN:  Object to the form.  09:45:40
3       THE WITNESS:  I don't think we know that for  09:45:43
4 sure.  Again, clinically, we have seen that  09:45:44
5 phenomena, but we see other cases where they just  09:45:50
6 continue to thrive.                          09:45:54
7 BY MR. BROOKS:                              09:45:58
8    Q.  And I said for some patients.  I understand  09:45:58
9 that it's --                                 09:46:00
10    A.  Yes.                                  09:46:01
11    Q.  -- diverse -- a diverse world out there.  09:46:01
12    A.  Yes.                                  09:46:03
13    Q.  At the very end of page 3 is a sentence that  09:46:07
14 runs into page 4 and says:                   09:46:09
15       "In the United States it is       09:46:12
16       extremely difficult to            09:46:14
17       longitudinally follow cohort      09:46:16
18       patients" --                      09:46:19
19    A.  Wait a minute, I'm not following.  Sorry.  09:46:19
20 What page again?                             09:46:22
21    Q.  Page 3, running into page 4.  09:46:23
22    A.  Okay.                                 09:46:25
23    Q.     "In the United States it is     09:46:25
24       extremely difficult to" --        09:46:27
25    A.  Still not seeing, I'm sorry, but the bottom  09:46:28

Page 73

1 says "The duration of these improvements."  09:46:32
2    Q.  The very last six rows --              09:46:38
3    A.  Oh, "In the United States," okay.  09:46:40
4    Q.  Thanks.  Now let me just --           09:46:42
5    A.  Yeah.                                 09:46:44
6    Q.     "In the United States it is      09:46:45
7       extremely difficult to            09:46:47
8       longitudinally follow cohorts of  09:46:48
9       patients to determine what becomes  09:46:50
10       of these initially pleased and  09:46:52
11       grateful people."                 09:46:56
12       First, do you agree with me that, given the  09:46:58
13 nature of our health care system, it is extremely  09:47:00
14 difficult to longitudinally follow cohorts of  09:47:05
15 patients for long periods of years?  09:47:09
16       MR. LANNIN:  Object to the form.  09:47:11
17       THE WITNESS:  Yes.                 09:47:13
18 BY MR. BROOKS:                              09:47:19
19    Q.  And do you agree with Dr. Levine that, as a  09:47:19
20 result perhaps of that difficulty, it remains an  09:47:22
21 unanswered question what percentage of patients  09:47:28
22 remain satisfied with transition in the long term,  09:47:31
23 let's say a decade or more?                  09:47:38
24       MR. LANNIN:  Object to the form.  09:47:40
25       THE WITNESS:  Without more of those kinds of  09:47:46

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1 longitudinal follow-up studies, we could not answer   09:47:48
2 an exact percentage of people that are satisfied with   09:47:53
3 their transition or return to their natal gender,   09:47:58
4 et cetera, yeah.                            09:48:05
5 BY MR. BROOKS:                          09:48:06
6    Q. And, well, "et cetera" meaning that it   09:48:06
7 remains an unanswered question what percentages of   09:48:08
8 those who are initially happy about their transition   09:48:11
9 are able to sustain stabilized and intimate   09:48:13
10 relationships across adult years of life. Correct?   09:48:18
11    MR. LANNIN: Object to the form.   09:48:22
12    THE WITNESS: Overall the existing research   09:48:23
13 shows that there is -- there is an overall   09:48:25
14 improvement, and -- but we can't say exactly what   09:48:28
15 that exact percentage is.   09:48:36
16 BY MR. BROOKS:   09:48:39
17    Q. When you say an "overall improvement," in   09:48:39
18 what?   09:48:41
19    A. In their overall satisfaction with their   09:48:41
20 decision, the resolution of their gender dysphoria,   09:48:50
21 and their ability to have meaningful intimate   09:48:54
22 relationships.   09:49:03
23    Q. Well, you're not aware of any data, are you,   09:49:04
24 that gives an answer to the question of what   09:49:06
25 percentage of individuals who have transitioned   09:49:11

Page 75

1 medically are able to sustain stable intimate   09:49:18
2 relationships twenty years down the road?   09:49:23
3    MR. LANNIN: Object to the form.   09:49:25
4    THE WITNESS: There are long-term follow-up   09:49:27
5 studies that have given us evidence that this -- that   09:49:34
6 they are -- that this is helpful to them.   09:49:39
7    MR. BROOKS: Let me ask the reporter to read   09:49:47
8 back my question.   09:49:48
9    THE REPORTER: One moment, please.   13:11:09
10    (Record read as follows:   13:11:09
11       "QUESTION: Well, you're not   09:49:04
12    aware of any data, are you, that   09:49:05
13    gives an answer to the question of   09:49:08
14    what percentage of individuals who   09:49:10
15    have transitioned medically are   09:49:17
16    able to sustain stable intimate   09:49:19
17    relationships twenty years down the   09:49:23
18    road?")   09:50:08
19    MR. LANNIN: Same objection.   09:50:08
20    THE WITNESS: No.   09:50:10
21 BY MR. BROOKS:   09:50:10
22    Q. And it's consistent with your understanding,   09:50:23
23 is it not, that a great many studies have been   09:50:24
24 published up to the present that purport to follow   09:50:30
25 patients have a duration of two years or less and   09:50:32

Page 76

1 therefore may be focused on what Dr. Levine called a   09:50:36
2 hope-dominated time and you refer to as an initial   09:50:42
3 high.   09:50:45
4    MR. LANNIN: Object to the form.   09:50:45
5    THE WITNESS: I think that there are   09:50:48
6 longer-term follow-up studies that have been   09:50:50
7 conducted than two -- that two-year length. But, as   09:50:52
8 you said, it is very difficult to carry out long-term   09:50:58
9 longitudinal kinds of studies, given our health care   09:51:06
10 system, and very importantly resources to support   09:51:09
11 that kind of research.   09:51:14
12 BY MR. BROOKS:   09:51:16
13    Q. But, to be specific, it is consistent with   09:51:17
14 your knowledge that many of the prospective lateral   09:51:21
15 studies that have been published to date focus on a   09:51:25
16 period of two years or less and so maybe focusing on   09:51:29
17 a period when the patient is still in what Dr. Levine   09:51:35
18 called hope-dominated time and you referred to as an   09:51:38
19 initial high?   09:51:42
20    MR. LANNIN: Object to the form.   09:51:43
21    THE WITNESS: There are those kinds of   09:51:44
22 studies and there are longer-term follow-up studies,   09:51:47
23 and I think that the longer-term follow-up studies   09:51:51
24 are also consistent with those shorter-term follow-up   09:51:56
25 studies.   09:52:01

Page 77

1 BY MR. BROOKS:   09:52:01
2    Q. A little farther down on page 4, Dr. Levine   09:52:07
3 writes, and I'm taking the last sentence out of the   09:52:10
4 first full paragraph, quote:   09:52:14
5       "Ideally the mental health   09:52:18
6    professional grapples with six   09:52:19
7    tasks which vary with the patient's   09:52:21
8    age and socioeconomic   09:52:24
9    circumstances."   09:52:25
10    Do you see that?   09:52:26
11    A. Yes.   09:52:26
12    Q. And then he has a list.   09:52:27
13    A. Yes.   09:52:29
14    Q. The first item on his list is to ascertain   09:52:32
15 if criteria for gender dysphoria are met. And I --   09:52:35
16 I'll ask, I'm not entitled to assume at a deposition,   09:52:40
17 but you agree that that is one question a mental   09:52:43
18 health professional to whom a young person has been   09:52:48
19 referred for possible gender dysphoria will want to   09:52:53
20 evaluate?   09:52:58
21    MR. LANNIN: Object to the form.   09:52:59
22    THE WITNESS: That is consistent with the   09:52:59
23 requirements of SOC-8, although the world does not   09:53:04
24 always use the American Psychiatric Association.   09:53:08
25 They also use the International Classification of   09:53:12

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1 Diseases.                                    09:53:16
2      But, again, the criteria is that -- that   09:53:17
3 they meet criteria for gender dysphoria or, in the   09:53:21
4 case of ICD-11, it's gender incongruence.     09:53:25
5 BY MR. BROOKS:                               09:53:32
6    Q. Do you also agree with Dr. Levine that that   09:53:32
7 responsible mental health professional confronted   09:53:35
8 with a child or adolescent will want to diagnose any   09:53:37
9 psychiatric comorbidities?                   09:53:43
10   A. Yes.                                    09:53:48
11   Q. And would you consider that an important   09:53:49
12 step to take before prescribing any form of medical   09:53:51
13 intervention?                               09:53:56
14      MR. LANNIN:  Object to the form.         09:53:56
15      THE WITNESS:  Yes.                       09:53:57
16 BY MR. BROOKS:                               09:53:57
17   Q. And do you agree with Dr. Levine that     09:53:59
18 it's -- a responsible mental health professional   09:54:01
19 confronted with this child or adolescent would want   09:54:05
20 to assess the family situation?             09:54:08
21      MR. LANNIN:  Object to the form.         09:54:12
22      THE WITNESS:  In the case of -- of       09:54:13
23 adolescents and consideration of medical     09:54:17
24 interventions, that is a requirement in SOC-8.   09:54:20
25 BY MR. BROOKS:                               09:54:25

Page 79

1    Q. Looking at item 5, do you agree with      09:54:26
2 Dr. Levine that that responsible mental health   09:54:30
3 professional will want to ascertain what the patient   09:54:33
4 actually comprehends about both the short-term and   09:54:38
5 long-term potential negative consequences of gender   09:54:41
6 change?                                     09:54:47
7      MR. LANNIN:  Object to the form.          09:54:47
8      THE WITNESS:  Yes.                        09:54:49
9 BY MR. BROOKS:                               09:54:50
10   Q. And, similarly, looking back at item 4, that   09:54:50
11 the mental health professional will want to   09:54:55
12 understand what benefits the patient expects to   09:54:57
13 receive and help the patient understand whether those   09:54:59
14 are realistic. Correct?                     09:55:03
15      MR. LANNIN:  Object to the -- object to the   09:55:05
16 form.                                       09:55:06
17      THE WITNESS:  Yes.                        09:55:06
18 BY MR. BROOKS:                               09:55:07
19   Q. And Dr. Levine in item 6 there says the   09:55:13
20 mental health professional will want to decide with   09:55:21
21 the patient on the next step, and he provides   09:55:25
22 alternatives that might be considered, one of which,   09:55:27
23 item 6, is "to recommend a wait-and-see attitude to   09:55:34
24 allow for further developments with a follow-up   09:55:39
25 appointment in six to twelve months."       09:55:41

Page 80

1      Do you see that?                         09:55:44
2    A. Yes.                                    09:55:44
3    Q. You don't consider it to be unreasonable or   09:55:46
4 contrary to science for a mental health professional   09:55:49
5 seeing a child or adolescent who may suffer from   09:55:51
6 gender dysphoria, may have psychiatric comorbidities,   09:55:56
7 to recommend a wait-and-see attitude with a follow-up   09:55:59
8 appointment in six to twelve months, do you?   09:56:02
9      MR. LANNIN:  Object to the form.         09:56:06
10      THE WITNESS:  The Standards of Care, you   09:56:07
11 know, recommend that there be an assessment and a   09:56:10
12 case-by-case analysis of what the best treatment plan   09:56:15
13 might be. In some cases, it might be this exact kind   09:56:19
14 of treatment plan. But SOC does not specify the   09:56:28
15 exact treatment plan for every individual, so. But   09:56:33
16 to adequately assess and to see that gender dysphoria   09:56:43
17 is sustained, that's one of the criteria, that there   09:56:49
18 is assessment of comorbid psychiatric issues and   09:56:54
19 looking at issues of family involvement, and getting   09:57:00
20 parental sens- -- parental consent usually takes some   09:57:09
21 time.                                       09:57:19
22      MR. BROOKS:  Let me ask the reporter to mark   09:57:25
23 as Exhibit 7 a document comprising the youth-related   09:57:26
24 chapters from SOC-7.                         09:57:35
25      (The document referred to was             09:57:35

Page 81

1      marked as Exhibit 7.)                     09:57:51
2 BY MR. BROOKS:                               09:58:00
3    Q. And, again, here I have excerpted entire   09:58:00
4 chapters, nothing deleted from the chapters, but not   09:58:03
5 the entire book, simply to lighten the burden on the   09:58:06
6 record.                                     09:58:10
7      Dr. Coleman, I've included the table of   09:58:10
8 contents, the initial page. Does this appear to be   09:58:15
9 chapters from SOC-7 of which you were the chairman?   09:58:18
10   A. Yes.                                    09:58:23
11   Q. Let me ask you to turn to page 11. Oh, I   09:58:26
12 stole your copy.                            09:58:37
13      And there, under the heading "Differences   09:58:39
14 Between Children and Adolescents With Gender   09:58:45
15 Dysphoria," the third sentence reads:        09:58:49
16      "In follow-up studies of                 09:58:54
17      prepubertal children, mainly boys,        09:58:56
18      who were referred to clinics for         09:58:58
19      assessments of gender dysphoria,         09:59:01
20      the dysphoria persisted into            09:59:02
21      adulthood for only 6 to 23 percent       09:59:05
22      of children."                           09:59:08
23      And you cite Cohen-Kettenis and Zucker and   09:59:09
24 Bradley. And it continues, quote:           09:59:12
25      "Boys in these studies were             09:59:15

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1     more likely to identify as gay in          09:59:16
2     adulthood then as transgender."            09:59:19
3     Do you see that?                           09:59:21
4     A.  Yes.                                    09:59:21
5     Q.  And let me ask, do you share the concern    09:59:23
6  that someone articulated that the recent practice of    09:59:27
7  administering puberty blockers and cross-sex hormones    09:59:31
8  to minors may for some children be turning boys who    09:59:35
9  would have grown into gay adults into permanent    09:59:39
10  patients dependent on hormonal treatments for the    09:59:43
11  rest of their lives?                         09:59:47
12     MR. LANNIN:  Object to the form.         09:59:48
13     THE WITNESS:  In order to recommend      09:59:49
14  puberty-blocking hormones, there has to be sustained    09:59:58
15  gender dysphoria, and we also carefully assess the    10:00:01
16  different aspects of sexual identity, including    10:00:11
17  sexual orientation.                          10:00:15
18     But -- and we can -- the -- you know, the    10:00:16
19  we -- we would examine that issue of whether an    10:00:21
20  individual might be confused about their sexual    10:00:25
21  orientation versus their gender identity.    10:00:29
22     But -- and we can -- the -- you know, the    10:00:36
23  children that are put on puberty-blocking hormones    10:00:45
24  are, again, a -- these are really a selected group of    10:00:50
25  individuals that are experiencing, you know, severe    10:00:56

Page 83

1  distress over their gender dysphoria.  And so this    10:01:07
2  decision is not made lightly, but it has shown to be    10:01:19
3  an effective way of relieving some of their gender    10:01:26
4  dysphoria and giving an opportunity for them to    10:01:33
5  further clarify their gender identity before more    10:01:36
6  permanent interventions are employed.        10:01:42
7     And so this has been found to be a very    10:01:48
8  effective approach in dealing with -- with    10:01:53
9  adolescents that have severe gender dysphoria.    10:02:01
10  BY MR. BROOKS:                              10:02:08
11     Q.  Well, let me break up some questions.    10:02:09
12     You're aware, are you not, that multiple    10:02:11
13  published papers have reported that well in excess of    10:02:15
14  90 percent of the children who are put on puberty    10:02:19
15  blockers proceed to cross-sex hormones?      10:02:22
16     MR. LANNIN:  Object to the form.         10:02:24
17     THE WITNESS:  Yes.                       10:02:27
18  BY MR. BROOKS:                              10:02:28
19     Q.  And you're aware, I take it, that WPATH    10:02:28
20  SOC-8 recommends beginning puberty blockers at    10:02:35
21  Tanner Stage 2.  Correct?                    10:02:40
22     A.  That's correct.                      10:02:41
23     Q.  You don't have any personal knowledge as to    10:02:42
24  whether clinics around the country are engaging in    10:02:48
25  the type of rigorous screening that you've just    10:02:51

Page 84

1  described in your answer before approving puberty    10:02:55
2  blockers, do you?                            10:02:59
3     MR. LANNIN:  Object to the form.         10:02:59
4     THE WITNESS:  No.                        10:03:00
5  BY MR. BROOKS:                              10:03:01
6     Q.  And it is not possible to determine with    10:03:02
7  confidence at Tanner Stage 2 the very earliest    10:03:11
8  visible beginnings of puberty the future sexual    10:03:16
9  orientation of a boy.  Correct?              10:03:20
10     MR. LANNIN:  Object to the form.         10:03:23
11     THE WITNESS:  I think it would be difficult    10:03:35
12  to predict the sexual orientation.           10:03:39
13  BY MR. BROOKS:                              10:03:43
14     Q.  Therefore let me go back and ask my question    10:03:44
15  again.                                       10:03:46
16     Do you, to some extent, share the concern    10:03:46
17  that multiple authors have articulated that the    10:03:49
18  practice of administering puberty blockers beginning    10:03:52
19  at Tanner 2 may in some cases be turning children who    10:03:56
20  would have matured into gay men instead into    10:04:02
21  permanent patients dependent on hormonal treatments    10:04:07
22  for the rest of their lives?                 10:04:10
23     MR. LANNIN:  Object to the form.         10:04:11
24     THE WITNESS:  I don't share that view.   10:04:13
25  BY MR. BROOKS:                              10:04:15

Page 85

1     Q.  And you have no such concern?         10:04:17
2     A.  Always concerned about everything in the    10:04:20
3  well-being of the child.                     10:04:23
4     You know, one of the things that, it's not    10:04:25
5  only physicians, is "do no harm."  And so we develop    10:04:29
6  these recommendations with only the best interests of    10:04:39
7  that child, based upon what we know at this time.    10:04:42
8     Q.  Dr. Coleman, have you -- let me back up one    10:04:48
9  moment.                                      10:04:56
10     Have you talked to anybody associated with    10:04:56
11  University of Alabama Birmingham Pediatric Gender    10:05:00
12  Clinic about their practices?                10:05:06
13     A.  No.                                 10:05:08
14     Q.  Do you have any knowledge as to the    10:05:08
15  practices of any gender clinic in Alabama?   10:05:11
16     A.  No.                                 10:05:15
17     Q.  Have you had, in connection with this case    10:05:16
18  or otherwise, any conversations with anybody    10:05:23
19  associated with the gender clinic in Alabama?    10:05:27
20     A.  No.                                 10:05:30
21     Q.  From any source, have you yourself    10:05:31
22  encountered credible reports of minors receiving    10:05:36
23  prescriptions for puberty blockers or cross-sex    10:05:40
24  hormones after just one visit to a gender clinic?    10:05:43
25     MR. LANNIN:  Object to the form.         10:05:47

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    THE WITNESS: I have not.        10:05:48
2 BY MR. BROOKS:                     10:05:48
3    Q. You have not had any one of your colleagues   10:05:49
4 tell you that --                   10:05:51
5    A. I have heard people say that that happens,   10:05:52
6 but I -- I don't have any evidence that that's -- I   10:05:56
7 mean, I've asked some of the clinics what their   10:06:01
8 procedures are, and I've never heard that that is how   10:06:05
9 it is done.  And if it is done in that manner, they   10:06:10
10 are not in compliance with Standards of Care.   10:06:17
11    Q. And indeed if clinics in this nation are   10:06:20
12 prescribing puberty blockers or cross-sex hormones   10:06:25
13 after a single visit with a child or adolescent, does   10:06:27
14 that horrify you?                  10:06:31
15    MR. LANNIN:  Object to the form.   10:06:33
16    THE WITNESS:  It concerns me greatly.  And   10:06:34
17 that's why we articulate the criteria that we do in   10:06:42
18 Standards of Care so that there is a -- there is a   10:06:47
19 standard, there is a rigor in that assessment.   10:06:53
20    And in the case of adolescents, how could   10:06:56
21 you have a multidisciplinary assessment in one   10:06:59
22 session?  Can't do it.  And I've been involved in   10:07:02
23 cases where, again, somebody has not followed the   10:07:11
24 Standards of Care and -- and I've called them out on   10:07:16
25 it.                               10:07:19

Page 87

1 BY MR. BROOKS:                     10:07:20
2    Q. When you say "cases," do you mean   10:07:20
3 litigations?                       10:07:21
4    A. Yes.                         10:07:22
5    Q. And in the capacity as a testifying expert?   10:07:24
6    A. As an expert, yes.            10:07:27
7    Q. When was the last such case that you were   10:07:29
8 involved in?                       10:07:33
9    A. Seems like it's four or five years ago.   10:07:37
10    Q. And what was that --          10:07:39
11    A. Maybe longer.                10:07:40
12    Q. What was that case and in what court?   10:07:41
13    A. Well, let me say that I -- I can recall two   10:07:44
14 cases back then.                   10:07:46
15    Q. All right.  Then tell me what those cases   10:07:48
16 were.                             10:07:52
17    A. One involved a case of -- of an individual   10:07:52
18 who regretted their -- their transition and had a   10:07:56
19 breast reduction and --            10:08:05
20    Q. As a minor?                  10:08:08
21    A. No, as an adult.             10:08:09
22    Q. All right.                   10:08:10
23    A. Both of these cases were of adults.   10:08:11
24    And in the one -- one case, the clinician   10:08:16
25 clearly followed the Standards of Care, and I   10:08:23

Page 88

1 assessed the situation and I said, "Yes, these   10:08:27
2 procedures were followed."          10:08:31
3    In the other case, they were not followed,   10:08:33
4 and I testified that that was not proper, according   10:08:35
5 to the Standards of Care.           10:08:39
6    Q. And where were those cases?    10:08:40
7    A. One was in Utah, and I think the other one   10:08:45
8 was in California.                 10:08:50
9    Q. Do you possess transcripts of your   10:08:53
10 deposition and hearing testimony?    10:08:56
11    A. No.  And I was never deposed in either of   10:08:58
12 those cases.  I provided expert opinion.   10:09:01
13    Q. Did you testify live in any hearing?   10:09:07
14    A. No.                         10:09:10
15    Q. So you submitted a written declaration?   10:09:10
16    A. Yes.                        10:09:12
17    Q. And you were not deposed?     10:09:13
18    A. No.                         10:09:15
19    Q. I guess I wasn't representing the other   10:09:15
20 side.                             10:09:19
21    A. What?                       10:09:19
22    Q. I evidently wasn't representing the other   10:09:20
23 side.  I would never let a witness get away   10:09:22
24 un-deposed.                       10:09:26
25    Have you yourself heard what you consider   10:09:28

Page 89

1 credible reports from peers or colleagues that   10:09:31
2 adolescents who present at gender clinics sometimes   10:09:35
3 deliver prepared accounts that they think will get   10:09:40
4 them hormones, but that do not in fact accurately   10:09:42
5 describe their own life experiences?   10:09:45
6    MR. LANNIN:  Object to the form.   10:09:47
7    THE WITNESS:  I think there is -- been an   10:09:48
8 awareness and concern that some individuals present   10:09:57
9 to clinicians with a narrative that would fit what   10:10:02
10 they think would be meeting the criteria in order   10:10:09
11 to -- to obtain the services that they want.   10:10:13
12 BY MR. BROOKS:                     10:10:17
13    Q. A narrative that they'd learned from   10:10:18
14 somewhere that does not accurately describe their   10:10:20
15 personal experience?              10:10:23
16    A. Right.                      10:10:23
17    MR. BROOKS:  Let me mark -- oh, is it C?   10:10:36
18    Let me mark as Exhibit 8 a document -- and   10:10:52
19 this is the first such -- that's designated   10:10:54
20 confidential under the protective order, bearing   10:10:56
21 Bates number -- I don't know why these Bates numbers   10:10:59
22 are so complicated -- BOEAL_WPATH_061094 through 098   10:11:02
23 which is an email chain headed "Doctors Have Failed   10:11:15
24 Them, Say Those With Transgender Regret."   10:11:20
25    (The document referred to was   10:11:20

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

```
1        marked as Exhibit 8.)           10:11:34
2  BY MR. BROOKS:                        10:11:34
3     Q.  And my first question, Dr. Coleman, of   10:11:40
4  course, there's all sorts of names redacted, but let  10:11:43
5  me ask you to turn -- first question is, looking at  10:11:49
6  what there is of this that hasn't been redacted, do  10:11:56
7  you believe that you've seen this chain before today?  10:11:57
8     A.  I don't recall.                 10:12:01
9
```

[redacted lines 9-18]

Page 91

[redacted lines 1-18]

```
19    Q.  Okay.                          10:13:54
20    A.  Yeah.                          10:13:55
21    Q.  I was afraid, there was quite a number --   10:13:57
22    A.  Yeah.                          10:14:00
23    Q.  -- so I can't sort it down by line.   10:14:00
24    A.  Yeah.                          10:14:03
25    Q.  Let me ask you to turn to page ending in   10:14:03
```

Page 92

```
1  097.  And you will find there a line that says:   10:14:06
2        "Here is a new JSMT article        10:14:11
3     Stephen Levine just published         10:14:14
4     online."                          10:14:16
5     Do you see that?  097.               10:14:16
6     A.  097, where is --                10:14:16
7     Q.  Use the little numbers at the bottom of the   10:14:25
8  page.                                10:14:28
9     A.  Oh, I see.                     10:14:28
10    Q.  And --                         10:14:28
11    A.  Line 7, oh, it's on the back.  Okay.   10:14:29
12    Q.  All I want to point out is that the chain   10:14:32
13  was attaching or included a link to an article   10:14:34
14  published by Stephen Levine.          10:14:38
15    A.  Hm-hm.                         10:14:38
16    Q.  And now I'll ask you to turn back to the   10:14:40
17  page -- previous page ending in 096 where an author   10:14:43
18  apparently from Holland or Belgium writes, quote:   10:14:52
19        "Just another adult             10:14:55
20     psychiatrist jumping on the band     10:14:58
21     wagon."                          10:14:59
22     Do you see that?                   10:15:00
23    A.  Uh-huh.                        10:15:01
24    Q.  Given the background and experience and long   10:15:01
25  experience of Dr. Stephen Levine that we've   10:15:08
```

Page 93

```
1  discussed, you yourself would by no means describe   10:15:11
2  Dr. Levine as somebody who, in 2022, was, quote,   10:15:17
3  "jumping on the band wagon," would you?   10:15:22
4        MR. LANNIN:  Object to the form.   10:15:25
5        THE WITNESS:  Jumping on the band wagon of   10:15:30
6  what?                                10:15:32
7  BY MR. BROOKS:                         10:15:39
8     Q.  Anything relating to transgender medicine.   10:15:40
9        MR. LANNIN:  Object to the form.   10:15:42
10        THE WITNESS:  Let me just -- I think I   10:15:43
11  should just state that, again, I've worked with   10:15:51
12  Dr. Levine, and I certainly listened to his talks   10:15:55
13  and I know his views.  And as he was a part of SOC-5,   10:16:00
14  chaired that, you know, came -- was part of that   10:16:09
15  conclusion that psychotherapy was not a clear   10:16:20
16  criteria that one had to meet.         10:16:22
17     Now, he believes, as I did back then, that   10:16:28
18  psychotherapy could be very helpful, and I think that   10:16:31
19  his views have -- have even strengthened over time   10:16:35
20  that psychotherapy should be used much more even to   10:16:42
21  resolve psychotherapy in the absence of really any   10:16:52
22  data to really support that.          10:17:04
23     And I think that that has concerned many of   10:17:10
24  us, is that people, you know, recommend that   10:17:14
25  psychotherapy be used to treat gender dysphoria where   10:17:20
```

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 there just isn't -- first of all, there's -- there      10:17:27
2 isn't any evidence for that. The evidence for         10:17:30
3 hormonal or surgical reassignment is much more        10:17:34
4 compelling. And I think his -- his views have just     10:17:39
5 stayed very -- again, Dr. Levine is a psycho- --        10:17:44
6 trained psychoanalyst, and those theories have not    10:17:51
7 been supported over time in the treatment of gender   10:18:03
8 dysphoria.                                             10:18:11
9        And, so, but I think he's stuck to and          10:18:11
10 almost kind of become more -- more fervent in his     10:18:16
11 view that that should be used much more without much  10:18:24
12 evidence to support that, even as he reviewed that in 10:18:31
13 SOC-5.                                    10:18:36
14 BY MR. BROOKS:                            10:18:37
15    Q. Is it your view that clinical practice with     10:18:38
16 regard to treatment of gender dysphoria in minors     10:18:41
17 should be based only on solid evidence?               10:18:44
18        MR. LANNIN: Object to the form.               10:18:56
19        THE WITNESS: I'm sorry. Ask -- ask that        10:18:58
20 question again.                            10:19:01
21 BY MR. BROOKS:                            10:19:02
22    Q. Is it your view that treatment choices for      10:19:03
23 gender dysphoria in minors must be based only on       10:19:07
24 solid evidence?                            10:19:11
25    A. On the best available evidence, which           10:19:11

Page 95

1 includes scientific reports as well as expert          10:19:16
2 opinion, people who have been working in this field     10:19:25
3 for a very long time.                        10:19:28
4    Q. Dr. Coleman, expert opinion is not evidence,     10:19:31
5 is it?                                     10:19:34
6    A. Yes, it is.                            10:19:34
7    Q. Well, let me take us back to page 96. The        10:19:50
8 language in this internal email gets a little           10:19:55
9 confrontational, as we sometimes do in internal        10:19:59
10 emails. The author writes, referring to this paper:    10:20:02
11       "JSMT," Journal of --               10:20:05
12    A. Sex and Marital Therapy.                10:20:05
13    Q. -- Marital -- Sex and Marital Therapy --         10:20:11
14       "will publish any s*** because           10:20:11
15       they're really struggling to             10:20:18
16       publish proper research."                10:20:20
17       Do you see that?                       10:20:22
18    A. Yes.                              10:20:22
19    Q. Now, you would not characterize Dr. Levine's     10:20:23
20 2017 article that you and I spent a few minutes        10:20:28
21 looking at as "shit," would you?                10:20:31
22       MR. LANNIN: Object to the form.           10:20:33
23       THE WITNESS: No.                       10:20:34
24 BY MR. BROOKS:                            10:20:36
25    Q. Indeed, you agree that in that paper            10:20:36

Page 96

1 Dr. Levine raised some serious and difficult          10:20:38
2 questions that clinicians need to answer as they       10:20:42
3 address gender dysphoria in children?                10:20:45
4        MR. LANNIN: Object to the form.             10:20:47
5        THE WITNESS: There are many points in that   10:20:48
6 article that I would agree with and we agree in many,  10:20:51
7 many respects.                            10:20:57
8        I think he has some views that have -- he     10:20:58
9 would recommend as -- as that one point, you know,    10:21:06
10 trying to specify a particular protocol or treatment   10:21:11
11 plan that would be applicable to everyone, and that    10:21:16
12 is his stated opinion, maybe shared by others, that    10:21:22
13 are not necessarily shared by the vast majority of     10:21:29
14 people that are working in this field.               10:21:33
15        MR. BROOKS: 9.                        10:21:41
16        MR. LANNIN: Counsel, if we're moving on,    10:21:41
17 we've been going for more than hour at this point, so 10:21:43
18 whenever we reach a good point.                 10:21:45
19        MR. BROOKS: Now is a good point.           10:21:46
20        MR. LANNIN: Great.                     10:21:47
21        MR. BROOKS: I too drank coffee this         10:21:51
22 morning.                                 10:21:52
23        THE VIDEOGRAPHER: The time is 10:21 a.m.,   10:21:52
24 and we are now off the record.                  10:21:55
25        (Recess taken.)                        10:21:57

Page 97

1        THE VIDEOGRAPHER: The time is 10:34 a.m.     10:21:57
2 We are now back on the record.                  10:34:14
3 BY MR. BROOKS:                            10:34:15
4    Q. Dr. Coleman, you have in front of you what's    10:34:20
5 been marked as Exhibit 9, an email chain bearing      10:34:22
6 Bates numbers BOEAL_WPATH_105187 through 2002        10:34:26
7 entitled --                                10:34:26
8        MR. LANNIN: Counsel --                  10:34:26
9        MR. BROOKS: -- "Medscape article with new   10:34:41
10 comments from Dr. Anderson."                   10:34:42
11        MR. LANNIN: Forgive me. Do you have a      10:34:44
12 copy?                                   10:34:45
13        MR. BROOKS: I do have one. Sorry about     10:34:46
14 that.                                   10:34:51
15        (The document referred to was            10:34:51
16        marked as Exhibit 9.)                   10:34:54
17 BY MR. BROOKS:                            10:34:54
18    Q. And, Dr. Coleman, this has some unredacted     10:34:54
19 names, many redacted names. I don't see your name on 10:34:57
20 it. I want to ask you about two of the names I do     10:35:00
21 see.                                    10:35:03
22        First, in various places, Madeline Deutsch   10:35:06
23 shows up. Am I correct that in 2021 this email is     10:35:10
24 dated -- the chain is -- all occurs within November    10:35:16
25 of 2021, but Madeline Deutsch was both a chapter lead 10:35:19

25 (Pages 94 - 97)

1 for the SOC-8 project and a member of the WPATH 10:35:26
2 board? 10:35:30
3     MR. LANNIN: Object to the form. 10:35:32
4     THE WITNESS: She was a member of -- she was 10:35:32
5 a chapter lead, and she -- I don't know if she was a 10:35:34
6 member of the board. She was certainly affiliated 10:35:42
7 with USPATH. 10:35:45
8 BY MR. BROOKS: 10:35:48
9    Q. Okay. 10:35:49
10    A. And, but I can't remember her exact 10:35:49
11 positions. 10:35:52
12    Q. And if you turn to page that ends in 192, at 10:35:53
13 the very bottom, you will see a reference to Marci 10:36:06
14 Bowers, two lines from the bottom on 192. And really 10:36:12
15 my question at the moment is simply am I correct that 10:36:21
16 in 2021 Marci Bowers was president of WPATH? 10:36:23
17     MR. LANNIN: Object to the form. 10:36:28
18     THE WITNESS: She became president in 10:36:29
19 September of '22. 10:36:33
20 BY MR. BROOKS: 10:36:35
21    Q. Okay. So at this time Dr. Bouman was 10:36:36
22 president. 10:36:36
23    A. Okay. 10:36:36
24    Q. And what role did Marci Bowers have in the 10:36:41
25 SOC-8 project? 10:36:44

1    A. She was a member of the committee in the 10:36:46
2 surgical chapter. 10:36:52
3    Q. And let's go back to the first page of the 10:36:53
4 document. Halfway down the page is a redacted -- it 10:36:57
5 says, "I do agree with" redacted, and it's a short 10:37:04
6 name. And my question is did you receive this email? 10:37:08
7 Do you believe that that's a reference to Eli? 10:37:14
8     MR. LANNIN: Object to the form. 10:37:17
9     THE WITNESS: Where are you referring? 10:37:19
10 BY MR. BROOKS: 10:37:21
11    Q. Midway down the first page. 10:37:21
12    A. Midway? 10:37:22
13    Q. Yes. 10:37:22
14    A. "To share my own thoughts on the subjects"? 10:37:23
15    Q. "I do agree with" blank. It's a very short 10:37:26
16 blank. And my question for you is, do you recall 10:37:29
17 receiving this chain? 10:37:31
18    A. I don't. 10:37:33
19    Q. Well, let me -- I'm going to ask you a few 10:37:35
20 questions and see if it refreshes your recollection 10:37:44
21 since it seems to be a fairly significant chain. 10:37:46
22    Turn back to that page ending in 192. And 10:37:50
23 let me ask. In 2021 were you a member -- did you 10:38:03
24 hold any board or executive position in either USPATH 10:38:06
25 or WPATH? 10:38:09

1    A. No. 10:38:11
2    Q. Okay. You chaired the SOC project, but you 10:38:11
3 didn't hold any other position at WPATH at that time? 10:38:16
4    A. No. 10:38:18
5    Q. Okay. Towards the top of the page ending in 10:38:22
6 192 you will see an email sent by Madeline Deutsch 10:38:24
7 which attaches a link to a new article from 10:38:30
8 Dr. Anderson in which she defends her comments to 10:38:35
9 Abigail Shrier. 10:38:38
10    Do you see that? 10:38:40
11    A. Yes. 10:38:40
12    Q. Do you recall discussion about an article by 10:38:41
13 Dr. Anderson in which she defended comments that she 10:38:43
14 made to Abigail Shrier? 10:38:46
15    A. No. 10:38:49
16    Q. Okay. Back up to page 190. And, if you 10:38:51
17 don't mind, I'll just stick with using the last three 10:39:09
18 digits of these things. 190, halfway down begins an 10:39:12
19 email that is copied to Madeline Deutsch. We can't 10:39:24
20 see who the author was, and I have no particular 10:39:26
21 reason to believe that you received it, given your 10:39:29
22 testimony. But since there's so much redacted, let 10:39:32
23 me just take you to a line in the text three-quarters 10:39:38
24 of the way down where this author, copying various 10:39:41
25 folks, including Dr. Deutsch writes: 10:39:45

1    "There's no assessment tool 10:39:48
2    that captures all the ways internal 10:39:49
3    signals can sometimes be misread as 10:39:52
4    related to gender when they're not 10:39:54
5    or not completely, as can happen 10:39:56
6    with borderline personality and 10:39:58
7    other identity-related conditions 10:40:01
8    and which is occurring more often, 10:40:04
9    in my observation, as 10:40:06
10    trans/nonbinary identities are more 10:40:09
11    visible, available, and, yay, 10:40:12
12    accepted" 10:40:15
13    Do you see that language? 10:40:16
14    A. Yes. 10:40:17
15    Q. Do you agree with this author writing to 10:40:22
16 WPATH board members according to the language we saw 10:40:25
17 that adolescents sometimes misunderstand themselves 10:40:29
18 and interpret some distress or disorders such as 10:40:36
19 bipo-- bipolar -- 10:40:40
20    A. I think that that is -- 10:40:44
21    Q. Pardon me. 10:40:46
22    -- borderline personality disorder as 10:40:53
23 indicating they're a transgender when they're not? 10:40:57
24     MR. LANNIN: Object to the form. 10:41:00
25     THE WITNESS: Yes, I -- I agree that, again, 10:41:05

CONFIDENTIAL

1 that sometimes they can misread as -- as is said       10:41:10
2 and -- and especially when there are other -- other     10:41:19
3 disorders that that could be confusing for -- for the   10:41:24
4 individual. And that is the -- that's why we -- we       10:41:31
5 insist on, you know, a good assessment to -- and in      10:41:35
6 the case of when there is especially multiple            10:41:42
7 diagnoses that might interfere in that ability to        10:41:48
8 clarify and to know, that that needs to -- there has     10:41:52
9 to be much more careful assessment.                      10:41:59
10 BY MR. BROOKS:                                           10:42:02
11    Q. And consistent with what this author wrote        10:42:03
12 internally, were you hearing reports that that type      10:42:08
13 of self-misdiagnosis by teens was happening more         10:42:11
14 often in the 2021 time period than had been observed     10:42:19
15 in earlier years?                                        10:42:23
16        MR. LANNIN: Object to the form.                   10:42:24
17        THE WITNESS: I -- I was not aware that it         10:42:29
18 was necessarily more. We were aware that more --         10:42:32
19 more people were coming to treatment, so you would       10:42:36
20 naturally have more people with complicated histories    10:42:40
21 that needed to be sorted through.                        10:42:45
22 BY MR. BROOKS:                                           10:42:49
23    Q. Let me ask you to turn to page -- the             10:42:50
24 previous page ending in 189. And, as best I             10:42:52
25 understand the redactions, I -- we're not able to       10:43:00

1 tell who this is from and all we can tell is one        10:43:04
2 recipient is again Madeline Deutsch.                    10:43:07
3        So the unknown author writes, quote:             10:43:09
4        "De/retransitioners have always                  10:43:16
5     been a part of my community, and to                 10:43:20
6     a lesser degree my medical                          10:43:23
7     practice. There's some idea that                    10:43:25
8     people either essentially are or                    10:43:27
9     are not trans that these people are                 10:43:30
10    running with, which is so dangerous                 10:43:32
11    to people who de/retransition, and                  10:43:34
12    not the idea that different genders                 10:43:38
13    fit people better at different                      10:43:43
14    times and those things are fluid."                  10:43:44
15       So I want to ask you it's correct, is it         10:43:48
16 not, that for years you and other leaders in SOC        10:43:55
17 development have been well aware of the existence of    10:44:04
18 individuals who change their minds or their            10:44:08
19 self-perception after undergoing irreversible medical   10:44:11
20 procedures and do or attempt to detransition back to    10:44:16
21 an identity aligned with their biology?                10:44:22
22        MR. LANNIN: Object to the form.                 10:44:29
23        THE WITNESS: We were aware of such cases,       10:44:29
24 but they were very few and far between.                10:44:37
25 BY MR. BROOKS:                                          10:44:40

1    Q. And do you agree with this author that            10:44:44
2 across time and perhaps across different                10:44:49
3 developmental stages, quote, "different genders fit     10:44:51
4 people better at different times and these things are   10:44:56
5 fluid," close quote.                                    10:44:59
6        MR. LANNIN: Object to the form.                  10:45:01
7        THE WITNESS: I'm not sure what this person       10:45:02
8 is really saying here, so I'm not sure that I can --    10:45:07
9 I can, you know, agree or not -- not agree.             10:45:12
10 BY MR. BROOKS:                                          10:45:16
11    Q. All right. Let me detach -- oh, I'm sorry,       10:45:16
12 I don't mean to interrupt.                              10:45:18
13        If it's helpful, I'm happy to restate the       10:45:24
14 question detached from agreeing with an anonymous       10:45:27
15 author.                                                 10:45:30
16    A. Yeah.                                             10:45:30
17    Q. All right. Is it consistent with your            10:45:31
18 understanding that for some patients, across time and   10:45:35
19 perhaps across different developmental stages           10:45:43
20 different genders fit people better at different        10:45:49
21 times and gender identity can be fluid?                 10:45:52
22        MR. LANNIN: Object to the form.                  10:45:57
23        THE WITNESS: I don't know if I can agree        10:46:06
24 with that. I think that people have a gender            10:46:07
25 identity that's really rather stable. How they          10:46:11

1 express that, what they decide to do about that can     10:46:14
2 differ over time.                                        10:46:18
3 BY MR. BROOKS:                                           10:46:18
4    Q. Let me ask you to turn to page end- -- the        10:46:26
5 previous page ending in 188. Maybe that's a couple      10:46:28
6 of pages back. And here we have an email that is        10:46:32
7 written by Dr. Deutsch. And the substance of that       10:46:38
8 email begins:                                            10:46:47
9        "I see three issues here. One                    10:46:49
10    is that Erica has now given another                 10:46:51
11    press interview on this topic."                     10:46:53
12       Do you see that section?                         10:46:56
13    A. Yes.                                              10:47:04
14    Q. And Dr. Deutsch goes on to say that              10:47:04
15 Dr. Anderson has given this interview, quote,          10:47:10
16 "without notifying or consulting with the board even   10:47:12
17 after her recent letter of reprimand."                 10:47:15
18       Were you aware that the WPATH board or           10:47:20
19 leadership sent a letter of reprimand to               10:47:25
20 Dr. Erica Anderson following -- well, period.          10:47:27
21       Are you aware that the board or other            10:47:33
22 leadership sent a letter of reprimand to               10:47:36
23 Dr. Anderson?                                           10:47:39
24        MR. LANNIN: Object to the form.                 10:47:40
25        THE WITNESS: I seem to recall that.             10:47:40

27 (Pages 102 - 105)

CONFIDENTIAL

1 BY MR. BROOKS:                          10:47:42
2    Q. Did you see that letter?          10:47:43
3    A. No.                               10:47:43
4    Q. Do you know specifically what prompted that  10:47:44
5 letter of reprimand?                    10:47:47
6       MR. LANNIN: Object to the form.   10:47:51
7       THE WITNESS: I really don't know the  10:47:55
8 details of that as I was not on the board of  10:47:56
9 directors at that time.                 10:47:59
10 BY MR. BROOKS:                         10:48:00
11   Q. Dr. Deutsch writes with regard to Erica  10:48:07
12 giving another press interview, quote:  10:48:12
13       "This requires action by the     10:48:14
14    board in my view. I will ask blank  10:48:15
15    to weigh in, but I would in the     10:48:19
16    least want to consider removing her  10:48:21
17    from her past president role."       10:48:23
18    Do you see that language?           10:48:26
19   A. Yes.                              10:48:26
20   Q. Were you part of any discussions about the  10:48:32
21 possibility of removing Dr. Anderson from her past  10:48:35
22 president role or otherwise disciplining her for her  10:48:41
23 statements made to the press?           10:48:47
24       MR. LANNIN: Object to the form.  10:48:49
25       THE WITNESS: I was not involved with any of  10:48:49

1 those discussions or decisions that were made by the  10:48:52
2 board of directors.                     10:48:58
3 BY MR. BROOKS:                          10:49:01
4    Q. Do you yourself consider it appropriate for  10:49:13
5 WPATH leadership to try to prevent members from  10:49:17
6 talking about concerns of harms to children with the  10:49:22
7 media?                                  10:49:29
8       MR. LANNIN: Object to the form.   10:49:30
9       THE WITNESS: I think that the -- the issue  10:49:37
10 is sometimes the problem of when someone is an  10:49:40
11 officer and whether they are speaking for themselves  10:49:46
12 as an individual or for the organization.  10:49:54
13       And so I don't know if WPATH had policies  10:49:58
14 about that, but I've been involved in organizations  10:50:03
15 where, again, it's not appropriate for an officer to  10:50:06
16 speak and use their affiliation. That could be  10:50:13
17 misconstrued as -- as a -- here's an official  10:50:19
18 statement of the organization rather than their  10:50:26
19 personal views.                        10:50:29
20 BY MR. BROOKS:                         10:50:30
21   Q. Well, let me bring that into focus.  10:50:30
22       If a WPATH or USPATH officer had concerns  10:50:33
23 that children were being harmed as a result of sloppy  10:50:40
24 care in gender clinics, do you believe it would be  10:50:44
25 inappropriate or appropriate for WPATH leadership to  10:50:48

1 try to prevent that individual from talking publicly  10:50:51
2 about those harms to children?          10:50:55
3       MR. LANNIN: Object to the form.   10:50:57
4       THE WITNESS: I have no idea about their  10:51:00
5 policies and whether this was an appropriate decision  10:51:03
6 or not, but there was a clear vehicle for anyone to  10:51:06
7 express their views to the Standards of Care  10:51:11
8 committee.                             10:51:17
9       Dr. Anderson was not a member of the  10:51:19
10 committee, but she certainly was well aware of  10:51:21
11 committee members and certainly anyone with concerns,  10:51:27
12 you know, had -- knew of vehicles to really express  10:51:37
13 that.                                  10:51:41
14 BY MR. BROOKS:                         10:51:42
15   Q. Well, if Dr. Anderson and Dr. Edwards-Leeper  10:51:42
16 for that matter had concerns that children were being  10:51:46
17 harmed by sloppy practice, which is a separate  10:51:50
18 question from what the SOC says, that would be  10:51:53
19 important information for parents, for patients, for  10:51:58
20 clinicians to know, would it not?       10:52:02
21       MR. LANNIN: Object to the form.   10:52:04
22       THE WITNESS: I think bringing attention to  10:52:09
23 if there were certain clinics or individuals, you  10:52:16
24 know, that were not following the Standards of Care,  10:52:21
25 I think that that would be good to raise as an issue.  10:52:24

1 BY MR. BROOKS:                          10:52:30
2    Q. Publicly -- correct? -- so that parents and  10:52:31
3 clinicians and policy makers could be aware of that  10:52:37
4 problem?                               10:52:40
5       MR. LANNIN: Object to the form.   10:52:41
6       THE WITNESS: I'm not always sure that the  10:52:41
7 best vehicle -- you know, we have -- we have  10:52:44
8 disciplinary boards that monitor our practice. And  10:52:51
9 so I think that oftentimes those are really good  10:52:55
10 vehicles to examine and -- rather than relying on  10:53:05
11 some sort of hearsay or how a journalist might --  10:53:11
12 might interpret what is -- what is being said.  10:53:16
13 BY MR. BROOKS:                         10:53:21
14   Q. Well, let me get your view on this quite  10:53:21
15 clear. If Dr. Anderson and Dr. Edwards-Leeper were  10:53:24
16 of the opinion that children on an ongoing basis were  10:53:27
17 being harmed by sloppy care in clinics, is it your  10:53:30
18 testimony that they should not have made that concern  10:53:34
19 public even though children were being harmed on an  10:53:38
20 ongoing basis?                         10:53:43
21       MR. LANNIN: Object to the form.   10:53:44
22       THE WITNESS: I think that they -- I think  10:53:48
23 the issue with -- with -- with Dr. Anderson was,  10:53:50
24 again, given her role as -- as USPATH president  10:54:01
25 and -- and, again, obviously the board felt that she  10:54:08

Page 110

1 was -- that was not appropriate as an officer to     10:54:15
2 express that in the media. But, again, I wasn't     10:54:20
3 involved in the rationale for that. But expressing,     10:54:25
4 you know, one's view and basic concerns, I think that     10:54:33
5 that is -- is reasonable for anyone to do that.     10:54:37
6 And -- and certainly when we saw the article, we were     10:54:42
7 concerned about what she was saying.     10:54:56
8 BY MR. BROOKS:     10:54:58
9     Q. Let's look at the first page, the bulk of     10:55:00
10 which appears to be an email written by Dr. Deutsch.     10:55:05
11 And, I apologize, I should know this. Is -- is     10:55:10
12 Madeline Deutsch in fact a doctor?     10:55:13
13     A. Yes.     10:55:13
14     Q. All right. I like to use appropriate     10:55:16
15 titles, but not to award Ph.D.s or M.D.s     10:55:21
16 spontaneously.     10:55:27
17     So Dr. Deutsch writes:     10:55:27
18     "I do agree with blank and     10:55:30
19     would go a step further to the say     10:55:32
20     that I do have concerns about how     10:55:34
21     the door has swung away from more     10:55:36
22     rigorous assessment in general over     10:55:38
23     time."     10:55:38
24     And she goes on to say that:     10:55:41
25     "The reaction to restricted     10:55:43

Page 111

1     access and barriers has been a wave     10:55:46
2     of treatment-on-demand clinics and     10:55:49
3     proponents."     10:55:52
4     Do you see that?     10:55:52
5     A. I'm sorry, I'm not finding it again.     10:56:03
6     Q. I think your counsel can probably point you     10:56:05
7 to it.     10:56:07
8     A. Okay.     10:56:08
9     MR. LANNIN: Apologies, wrong page again.     10:56:11
10     THE WITNESS: See, it's the wrong page.     10:56:13
11     MR. BROOKS: That makes it hard.     10:56:14
12     MR. LANNIN: First page. Correct, Counsel?     10:56:16
13     MR. BROOKS: Yes, that's right.     10:56:18
14     THE WITNESS: Oh, okay. Yeah.     10:56:19
15 BY MR. BROOKS:     10:56:21
16     Q. And halfway down begins this email from     10:56:22
17 Madeline Deutsch. Why don't you just read that first     10:56:24
18 paragraph to yourself and tell me when you've done     10:56:27
19 that.     10:56:27
20     MR. LANNIN: Beginning with "To share."     10:56:31
21     MR. BROOKS: "To share," yes, sir, thank     10:56:32
22 you.     10:56:34
23     THE WITNESS: Okay.     10:57:15
24 BY MR. BROOKS:     10:57:15
25     Q. So Dr. Deutsch expressed the view that there     10:57:16

Page 112

1 was, as of 2021, a wave of treatment-on-demand     10:57:18
2 clinics and proponents. And my question for you is,     10:57:24
3 as of that time period as you were working on SOC-8,     10:57:26
4 do you recall members of that committee expressing     10:57:30
5 the concern that out in the real world there was a     10:57:35
6 wave of treatment-on-demand clinics?     10:57:38
7     MR. LANNIN: Object to the form.     10:57:43
8     THE WITNESS: There was concern about     10:57:46
9 whether there was -- that people were following the     10:57:49
10 Standards of Care carefully. And to describe it as a     10:57:55
11 wave, I'm not sure that I -- I had that assessment.     10:58:05
12 BY MR. BROOKS:     10:58:09
13     Q. Did Dr. Deutsch ever raise that concern with     10:58:09
14 you?     10:58:11
15     A. No, not directly.     10:58:13
16     Q. Did Dr. Deutsch or others express, raise     10:58:14
17 with you a concern that the standard of care had     10:58:23
18 swung too far away from rigorous assessment prior to     10:58:26
19 medical interventions?     10:58:30
20     MR. LANNIN: Object to the form.     10:58:32
21     THE WITNESS: She did not express that to     10:58:33
22 me.     10:58:36
23 BY MR. BROOKS:     10:58:36
24     Q. In the last paragraph on that page, and, of     10:58:38
25 course, things are not yet final when this is     10:58:43

Page 113

1 written, but in the sentence beginning in the middle     10:58:46
2 of that paragraph, four lines down into the last     10:58:50
3 paragraph, Dr. Deutsch wrote, quote:     10:58:52
4     "As it stands, the assessment     10:58:54
5     chapter for SOC-8 has removed all     10:58:56
6     presurgical assessment and     10:59:00
7     requirements for adults, besides a     10:59:02
8     'suggestion' of six months on     10:59:04
9     hormone therapy. In addition to     10:59:07
10     being bad medicine in my view, I     10:59:10
11     think this will add great fuel to     10:59:13
12     the fire we're dealing with and     10:59:15
13     ultimately weaken WPATH and the     10:59:17
14     strength of the SOCs."     10:59:19
15     Do you see that language?     10:59:22
16     A. Hm-hm. Yes.     10:59:24
17     Q. And so in 2021 an SOC-8 chapter head and --     10:59:25
18 well, chapter head at least, believed that having no     10:59:33
19 requirement for presurgical assessment was simply bad     10:59:41
20 medicine. Correct?     10:59:46
21     MR. LANNIN: Object to the form.     10:59:47
22     THE WITNESS: That's what she seems to be     10:59:52
23 saying here.     10:59:54
24 BY MR. BROOKS:     10:59:55
25     Q. And, in fact, that language that is merely a     10:59:55

CONFIDENTIAL

Page 114

1 suggestion of six months on hormone therapy before   11:00:01
2 surgery remained in the final SOC-8 project --   11:00:05
3 product. Correct?   11:00:10
4      MR. LANNIN: Object to the form.   11:00:11
5      THE WITNESS: First of all, I do not recall   11:00:12
6 the -- that there was ever a draft that had removed   11:00:16
7 all presurgical assessment requirements for adults.   11:00:21
8 It always had the requirement of an assessment for   11:00:28
9 adults.   11:00:33
10      There was the issue of the requirement for   11:00:38
11 hormone therapy before surgery and generally that   11:00:45
12 that is advisable for a better surgical outcome. But   11:00:49
13 some people, it's contraindicated because of their   11:00:57
14 medical condition or their own personal beliefs about   11:01:02
15 taking medications, and that needed to be taken into   11:01:08
16 consideration so that there was never an absolute.   11:01:16
17      I think there's a caveat in the   11:01:23
18 recommendation of where it's contraindicated or   11:01:26
19 against the will of the patient.   11:01:31
20 BY MR. BROOKS:   11:01:34
21      Q. At the top of the next page, Dr. Deutsch   11:01:35
22 goes on to say, quote:   11:01:37
23      "I do know that there has been   11:01:39
24      a great deal of pressure placed on   11:01:40
25      that chapter," the assessment   11:01:44

Page 115

1      chapter, "and on the editors by a   11:01:46
2      wing of the community who want to   11:01:50
3      have everything done on demand or   11:01:51
4      it is otherwise transphobic or   11:01:54
5      denying autonomy."   11:01:56
6      Were you aware of pressure being placed on   11:02:01
7 the assessment committee, chapter committee, by WPATH   11:02:04
8 members who felt strongly that surgery should be   11:02:12
9 available on demand?   11:02:16
10      MR. LANNIN: Object to the form.   11:02:18
11      THE WITNESS: Well, there were individuals   11:02:18
12 that expressed the opinion that -- that people had a   11:02:21
13 right to bodily autonomy and that was the main   11:02:28
14 criteria. If they wanted to do this, they should   11:02:32
15 have a right -- right to -- right to do it. And   11:02:37
16 there are jurisdictions in the world that don't   11:02:47
17 require any kind of assessment. And so there's   11:02:50
18 differences of opinion regarding that. But, as you   11:02:57
19 see in SOC-8, that was not the final consensus.   11:03:01
20 BY MR. BROOKS:   11:03:06
21      Q. And do you believe that a doctor or mental   11:03:08
22 health practitioner dealing with a patient who wants   11:03:12
23 surgery has an independent ethical obligation not to   11:03:16
24 proceed with such surgery if the professional does   11:03:22
25 not believe it's in the long-term best interest of   11:03:29

Page 116

1 the patient?   11:03:33
2      MR. LANNIN: Object to the form.   11:03:35
3      THE WITNESS: Yes.   11:03:38
4 BY MR. BROOKS:   11:03:39
5      Q. Let me take you to the first email in   11:03:40
6 this -- well, I should say the last email in this   11:03:43
7 chain at the top of page 187, first page of the   11:03:46
8 document, again, from a mystery author to -- directly   11:03:50
9 to Madeline Deutsch. And let me ask you to read that   11:03:55
10 paragraph to yourself and tell me when you've done   11:03:59
11 that.   11:04:02
12      A. Yes, I've read it.   11:04:51
13      Q. That paragraph contains memorable language,   11:04:53
14 including the line, "Everyone, we have a problem."   11:04:56
15      Let me just ask again. I told you we'd see   11:05:00
16 if it prompted your memory. Do you believe that   11:05:03
17 you've seen that paragraph before today?   11:05:05
18      A. I don't remember seeing this paragraph.   11:05:09
19      Q. Okay. Was it consistent -- towards the end   11:05:10
20 of the paragraph, this author says, quote:   11:05:22
21      "Science is great, but medicine   11:05:27
22      is promulgated by Dr. Google and   11:05:29
23      the ill-informed profiteers taking   11:05:31
24      advantage of trouble youth --   11:05:34
25      troubled youth with little   11:05:35

Page 117

1      reputable resource."   11:05:38
2      Now my question for you is, was it   11:05:41
3 consistent with what you were hearing in 2021 that   11:05:45
4 ill-informed profiteers in the trans medical   11:05:49
5 community were taking advantage of troubled youth?   11:05:55
6      A. I think we were concerned generally that --   11:05:58
7 that, you know, the criteria of people assessing and   11:06:07
8 treating individuals, that there needed to be a   11:06:12
9 heightened standard of training and experience and   11:06:22
10 that there were some individuals -- again, hearsay,   11:06:31
11 anecdotes kind of thing that were going on -- that   11:06:39
12 they may not have that level of training that we   11:06:45
13 recommended.   11:06:49
14      And one of the things that we -- I mean, one   11:06:49
15 of the things that we did in Standards of Care 8 was   11:06:55
16 create a whole chapter on education to highlight the   11:06:59
17 importance of proper training to address this   11:07:06
18 population. And almost in just about every chapter,   11:07:12
19 there was a recommendation for proper training and   11:07:20
20 continuing education for individuals providing this   11:07:27
21 type of care. And I think that that might have been   11:07:30
22 in response to people perceiving that there were   11:07:36
23 individuals that were doing this work with -- without   11:07:44
24 the kind of training and -- and expertise that we   11:07:49
25 felt was optimal.   11:07:57

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1  Q. You began that answer saying that "we were  11:08:02
2  concerned." Let me put an edge on it.  11:08:07
3       Did you at any point in your chairmanship of  11:08:11
4  WPATH, in your leadership of the SOC-7 project or the  11:08:14
5  SOC-8 project have colleagues come to you and say,  11:08:19
6  "Eli, there's some bad stuff going on out there in  11:08:23
7  the real world with sloppy medicine and hasty  11:08:26
8  transition of children"?  11:08:29
9       MR. LANNIN: Object to the form.  11:08:33
10 BY MR. BROOKS:  11:08:34
11  Q. Or words to that effect, strong words.  11:08:35
12       MR. LANNIN: Same objection.  11:08:37
13       THE WITNESS: I -- I don't recall -- I mean,  11:08:38
14 I recall reading Erica's comments and -- and those  11:08:39
15 strong statements. I remember the main concern is  11:08:48
16 that we were concerned that people were getting into  11:08:54
17 this field that didn't have as much training and  11:08:56
18 experience that we thought was necessary.  11:09:01
19       And it's one of the reasons that WPATH  11:09:04
20 started to really develop training programs for  11:09:09
21 individuals to create a pathway for receiving that  11:09:13
22 kind of education and certifying individuals with --  11:09:19
23 with that -- that training, and that they would be --  11:09:30
24 one of the key parts of that training is the  11:09:35
25 knowledge and awareness of the Standards of Care. I  11:09:39

Page 119

1  remember those concerns.  11:09:44
2       People, there were people that were  11:09:47
3  sometimes operating on Standards of Care 5 and were  11:09:53
4  not up-to-date in -- in -- in their -- in their  11:10:00
5  awareness of -- of current standards. And so WPATH  11:10:06
6  as an organization was addressing that to improve  11:10:16
7  education opportunities for -- for everyone. And  11:10:21
8  also it was very much emphasized in Standards of  11:10:27
9  Care 8 that it wasn't just anybody that could do this  11:10:34
10 work.  11:10:36
11 BY MR. BROOKS:  11:10:38
12  Q. Let me -- in this first paragraph at the top  11:10:39
13 of the chain on 5187, this author writing to  11:10:42
14 Dr. Deutsch and others, writes:  11:10:48
15       "Everyone, we have a problem.  11:10:51
16       Erica and Marci know it and so does  11:10:53
17       Maddie thankfully."  11:10:56
18       Do you understand "Maddie" to refer to  11:10:58
19 Madeline Deutsch?  11:11:00
20       MR. LANNIN: Object to the form.  11:11:01
21 BY MR. BROOKS:  11:11:02
22  Q. Does Dr. Deutsch go by "Maddie"?  11:11:03
23  A. Yes.  11:11:03
24  Q. And you would expect, looking at this, that  11:11:06
25 "Erica" and "Marci" refers to Erica Anderson and  11:11:12

Page 120

1  Marci Bowers?  11:11:15
2  A. Yes.  11:11:15
3  Q. And in terms of what's being referred to by  11:11:16
4  "we have a problem," let me ask you a few questions  11:11:21
5  about the article that was attached at the very  11:11:22
6  beginning of this chain which begins at page 192 and  11:11:24
7  continues for several pages. We won't by any means  11:11:30
8  read it all.  11:11:33
9       So if you would find that article, page 192.  11:11:34
10 It's entitled "Transgender Docs Warn About Gender  11:11:43
11 Affirmative Care For Youth."  11:11:47
12       And if you look in the next page, 193,  11:12:00
13 there's just a few propositions I want to ask -- get  11:12:10
14 your views on.  11:12:15
15       If you turn to page 193, two-thirds of the  11:12:19
16 way down is a paragraph that begins "Anderson, a  11:12:23
17 clinical psychologist, told Shrier." Tell me when  11:12:27
18 you've found that. Two-thirds of the way down.  11:12:31
19  A. Ah.  11:12:48
20  Q. Let me read it into the record:  11:12:49
21       "Anderson, a clinical  11:12:51
22       psychologist, told Shrier that 'due  11:12:52
23       to some of the I'll just -- I'll  11:12:56
24       call it just "sloppy" health care  11:12:59
25       work that we're going to have more  11:13:01

Page 121

1       young adults who will regret having  11:13:04
2       gone through this process.'"  11:13:06
3       And my question for you is, today do you  11:13:08
4  have a concern that, due to sloppy work going on in  11:13:12
5  some clinics, we're going to be seeing more adults  11:13:17
6  who regret transitions they went to as minors?  11:13:22
7       MR. LANNIN: Object to the form.  11:13:28
8       THE WITNESS: You know, in many ways even  11:13:32
9  before this, I think that -- that we were all  11:13:34
10 concerned that there were more people that were  11:13:40
11 entering this field without adequate training and  11:13:42
12 experience. And so we were determined to strengthen  11:13:47
13 the standards in terms of professionals, what they  11:13:58
14 needed to -- who they were and what kind of training  11:14:03
15 that they should have and what kind of continuing  11:14:09
16 education they should have.  11:14:11
17       And so, you know, our ultimate, you know,  11:14:16
18 goal is, again, providing the best available care.  11:14:22
19 And I think we have, you know, a problem in many --  11:14:26
20 many fields of -- of medicine that I'm not sure that  11:14:32
21 all people always get the -- the best -- best care,  11:14:41
22 and, like everyone, we wanted to really improve that.  11:14:41
23 And obviously if there wasn't, you know, proper  11:14:46
24 training, yes, you could have more -- more problems  11:14:50
25 down the line.  11:14:54

31 (Pages 118 - 121)

1 BY MR. BROOKS:                              11:14:54
2     Q. That's a concern you have today about what's  11:14:55
3 going on in the real world today in treatment of  11:14:57
4 children. Correct?                          11:15:00
5        MR. LANNIN: Object to the form.      11:15:00
6        THE WITNESS: I think your -- I have the  11:15:01
7 concern that we need to provide and make sure that  11:15:07
8 people that are assessing and treating individuals  11:15:11
9 have the proper qualifications and training and  11:15:15
10 experience as clearly expressed in -- in SOC-8.  11:15:19
11 BY MR. BROOKS:                             11:15:24
12     Q. Well, let me ask my question, which is,  11:15:25
13 today, do you have a concern that because of sloppy  11:15:28
14 practice in the real world we are going to be seeing  11:15:31
15 more young adults who regret having undergone medical  11:15:33
16 transition as minors?                      11:15:37
17        MR. LANNIN: Object to the form.     11:15:38
18        THE WITNESS: I don't know if we have clear  11:15:39
19 evidence of sloppy practice. I think there's a  11:15:43
20 concern expressed. And -- and so we are really  11:15:49
21 trying to make it very, very clear in SOC-8 that  11:15:55
22 these are -- are -- are standards that everyone  11:16:01
23 really needs to adhere to.                  11:16:05
24 BY MR. BROOKS:                             11:16:08
25     Q. Well, to be clear on the scope of your  11:16:08

1 knowledge, we've seen -- you're aware of articles in  11:16:12
2 which Dr. Edwards-Leeper and Dr. Anderson have  11:16:15
3 expressed concern about ill-informed profiteers,  11:16:19
4 about sloppy medicine. And you've seen this email  11:16:24
5 which somebody writing to Madeline Deutsch says,  11:16:27
6 "Erica and Marci and Maddie know that we have a  11:16:33
7 problem."                                  11:16:38
8     Is it your testimony that, as of 2021, you  11:16:39
9 personally didn't feel that you knew whether or not  11:16:43
10 there was a problem with sloppy care resulting in  11:16:45
11 overhasty transition of children?           11:16:50
12        MR. LANNIN: Object to the form.     11:16:52
13        THE WITNESS: I think I was certainly aware  11:16:54
14 that some people were not -- were not getting the --  11:16:58
15 they were not getting care by people that were  11:17:04
16 qualified and -- and following -- following the  11:17:10
17 Standards of Care. And that's -- that's -- the  11:17:18
18 importance of these standards is to make it very  11:17:22
19 clear to professionals, to everyone, to people  11:17:26
20 seeking care that professionals are adhering to these  11:17:30
21 Standards of Care and have some assurance that that  11:17:38
22 clinician is adequately trained to do what they're  11:17:42
23 doing.                                     11:17:46
24 BY MR. BROOKS:                             11:17:46
25     Q. If you would turn to the next page, 194.  11:17:47

1        THE REPORTER: Doctor, if you could raise  11:17:53
2 your microphone up a little bit. It's about to fall  11:17:53
3 off.                                       11:17:55
4        THE WITNESS: Sure. Okay.             11:17:55
5 BY MR. BROOKS:                             11:18:01
6     Q. 194. Down towards the bottom, three  11:18:01
7 paragraphs from the bottom reads:           11:18:05
8        "It disturbs me a great deal,         11:18:09
9        which is why I'm speaking out, even  11:18:11
10        though I've incurred the ire of      11:18:13
11        some people who think that just by   11:18:14
12        speaking out I'm causing problems,"  11:18:16
13        says Anderson.                      11:18:17
14     And then the next paragraph reads:       11:18:18
15        "Bowers, a gynecologic surgeon,      11:18:20
16        has felt similar pressure. She       11:18:25
17        told Shrier: 'There are definitely   11:18:26
18        people who are trying to keep out    11:18:28
19        anyone who doesn't absolutely buy    11:18:30
20        the party line that everything       11:18:31
21        should be affirming and there's no   11:18:34
22        room for dissent.'"                  11:18:35
23     Now, Anderson and, at this point, WPATH  11:18:39
24 President-Elect Bowers have both here and elsewhere  11:18:44
25 expressed concern about attempts to silence dissent  11:18:48

1 about what constitutes best practice for treating  11:18:52
2 gender dysphoria.                          11:19:00
3     Is it your testimony that you yourself have  11:19:00
4 not been aware of any efforts to silence dissent  11:19:03
5 within WPATH?                              11:19:06
6        MR. LANNIN: Object to form.          11:19:06
7        THE WITNESS: I think that there have been  11:19:07
8 people that -- and that have expressed the concern  11:19:08
9 about people speaking out, especially in the public  11:19:15
10 and in the media, that would undermine the public's  11:19:26
11 confidence in the appropriate treatment and care of  11:19:39
12 individuals.                               11:19:45
13     You know, we can have differences of       11:19:47
14 opinion, but -- and I think in my view what was  11:19:51
15 happening at this time is that this -- this whole  11:19:57
16 issue of care, especially for adolescents, was -- you  11:20:02
17 know, it was -- it was juicy journalistic material to  11:20:09
18 work with. And so I'm not sure that that reporting  11:20:14
19 was always as objective as we would like it to be.  11:20:24
20     And our job as the Standards of Care is to  11:20:30
21 really stick to the science and to develop guidelines  11:20:33
22 that were not necessarily influenced by one  11:20:41
23 individual expressing that opinion or another.  11:20:47
24     But, again, we had 119 people viewing these  11:20:53
25 recommendations, voting on them in a Delphi process.  11:21:03

1 So there was a whole rigorous methodology that    11:21:08
2 insured that there were checks and balances, and, in  11:21:12
3 the end, no one person would say this is -- this is  11:21:18
4 the way it should be.    11:21:23
5     So, I don't know if I've answered your    11:21:31
6 question, but --    11:21:32
7 BY MR. BROOKS:    11:21:32
8    Q. Long ago. In the next -- in the very last  11:21:33
9 sentence on this page quotes Dr. Bowers as saying  11:21:38
10 that she was, quote, "not a fan," close quote, of  11:21:42
11 administering puberty blockers at Tanner 2 stage of  11:21:45
12 puberty.    11:21:51
13    Have you heard before now that Dr. Bowers  11:21:52
14 has expressed her opposition to administering puberty  11:21:54
15 blockers at Tanner 2?    11:21:57
16    MR. LANNIN: Object to the form.    11:21:58
17    THE WITNESS: I believe that that would be  11:21:59
18 mischaracterizing her statement. She expressed some  11:22:05
19 concern.    11:22:08
20 BY MR. BROOKS:    11:22:11
21    Q. Dr. Bowers has a fair amount of internal  11:22:11
22 emails after some of her public statements, but I've  11:22:14
23 never seen one in which she claimed to have been  11:22:17
24 misquoted. What's the quote here is that she told  11:22:20
25 Abigail Shrier that she, Dr. Bowers, was not a fan of  11:22:25

1 administering puberty blockers at Tanner 2.    11:22:29
2    Have you heard Dr. Bowers express that    11:22:32
3 opinion?    11:22:35
4    MR. LANNIN: Object to the form.    11:22:35
5    THE WITNESS: I've heard her express the  11:22:36
6 concern about the implications of administering  11:22:38
7 puberty-blocking hormones at that stage.    11:22:50
8 BY MR. BROOKS:    11:22:50
9    Q. And you've heard her express the view that  11:22:51
10 she didn't think it was a good idea. Correct?  11:22:52
11    MR. LANNIN: Object to the form.    11:22:55
12    THE WITNESS: I'm not sure that she's ever  11:22:57
13 expressed it as just things should be carefully  11:22:59
14 considered, and -- and, in some cases, it -- it can  11:23:04
15 complicate what she can do as a surgeon later on.  11:23:14
16 BY MR. BROOKS:    11:23:25
17    Q. Okay.    11:23:26
18    A. And not that that can't be dealt with, but  11:23:26
19 it sometimes limits the types of procedures that she  11:23:34
20 could use to achieve what you would feel is an  11:23:40
21 optimal result for the patient.    11:23:44
22    Q. Do you believe that the view that puberty  11:23:46
23 blockers should not be administered as early as  11:23:58
24 Tanner Stage 2 is one that a responsible and  11:24:00
25 reasonable physician can hold?    11:24:04

1    MR. LANNIN: Object to the form.    11:24:07
2    THE WITNESS: Say that again. I'm sorry.  11:24:09
3 BY MR. BROOKS:    11:24:10
4    Q. Do you believe that the view that puberty  11:24:11
5 blockers should not be administered as early as  11:24:15
6 Tanner Stage 2 is one which an informed and    11:24:18
7 reasonable physician can hold?    11:24:22
8    MR. LANNIN: Same objection.    11:24:24
9    THE WITNESS: They should not be    11:24:25
10 administered before Tanner Stage 2.    11:24:26
11 BY MR. BROOKS:    11:24:30
12    Q. Let me ask the reporter to read back the  11:24:31
13 question.    11:24:33
14    A. Okay.    11:24:33
15    THE REPORTER: One moment, please.    13:11:09
16    (Record read as follows:    13:11:09
17    "QUESTION: Do you believe that    11:24:11
18    the view that puberty blockers    11:24:12
19    should not be administered as early  11:24:15
20    as Tanner Stage 2 is one which an  11:24:18
21    informed and reasonable physician  11:24:22
22    can hold?")    11:24:23
23    MR. LANNIN: Object to the form.    11:24:54
24    THE WITNESS: I'm not -- I'm still not sure  11:24:59
25 that I really get it right. But in Standards of  11:25:00

1 Care, we clearly specify that the patient should have  11:25:10
2 achieved Tanner Stage 2. There are many other    11:25:15
3 considerations and -- and of the considerations  11:25:19
4 is explaining to patients that this might have some  11:25:23
5 implications later and part of the informed consent  11:25:29
6 process essentially communicating to that patient  11:25:34
7 some of the concerns that Dr. Bowers has, and, for  11:25:47
8 example, this may limit the type of surgeries that  11:25:47
9 might be available to you because of the effects of  11:25:52
10 the -- of that intervention at that time.    11:25:58
11 BY MR. BROOKS:    11:26:01
12    Q. Dr. Coleman, you're not answering my    11:26:02
13 question.    11:26:04
14    Do you believe that the view that puberty  11:26:05
15 blockers should not be administered to children as  11:26:08
16 early as Tanner 2 is one that an informed and    11:26:10
17 responsible physician can hold?    11:26:15
18    MR. LANNIN: Object to the form.    11:26:18
19    THE WITNESS: I don't think that there is  11:26:19
20 the -- the evidence overall that this is -- is --  11:26:21
21 that may be an opinion of an individual, but it is  11:26:28
22 not the opinion of -- of a -- of -- that's not the  11:26:34
23 consensus.    11:26:38
24 BY MR. BROOKS:    11:26:38
25    Q. I didn't ask that. I asked whether in your  11:26:38

CONFIDENTIAL

Page 130

1 view that's an opinion which an informed, responsible    11:26:41
2 and reasonable physician can hold?    11:26:44
3       MR. LANNIN:  Object to the form.    11:26:48
4       THE WITNESS:  They can hold that position    11:26:51
5 and that point of view and they decide that that's    11:26:53
6 how they practice.  But a physician must explain, and    11:26:57
7 that's clearly specified, what various treatments    11:27:05
8 are, what is the evidence risk and benefits, and they    11:27:11
9 might say, "In my opinion, I don't -- I don't like    11:27:15
10 that."    11:27:21
11 BY MR. BROOKS:    11:27:22
12    Q.  Do you consider Dr. Bowers to be an    11:27:22
13 informed, responsible and reasonable physician?    11:27:25
14    A.  Yes.    11:27:27
15    Q.  You talked -- we've talked a bit about    11:27:34
16 voicing concerns about care of transgender minors to    11:27:38
17 the public.  Let me ask you a question not about the    11:27:43
18 public.    11:27:45
19       Do you recall an incident at which a W--    11:27:46
20 at which at a WPATH conference a presentation that    11:27:51
21 would have included Dr. Zucker and others was    11:27:55
22 canceled at the last minute due to expressions of    11:28:00
23 opposition by a group of WPATH members?    11:28:03
24       MR. LANNIN:  Object to the form.    11:28:08
25       THE WITNESS:  I -- I know about that    11:28:09

Page 131

1 incident.  I was not there to witness it.    11:28:12
2 BY MR. BROOKS:    11:28:15
3    Q.  At the time that happened, which, if I'm    11:28:17
4 recalling correctly, was perhaps 2017 or 2019, did    11:28:19
5 you hold any position in WPATH or USPATH?    11:28:24
6    A.  No.    11:28:27
7    Q.  And did it cause you concern that, even    11:28:28
8 within WPATH meeting itself, that the voices of    11:28:34
9 respected researchers were being silenced?    11:28:41
10       MR. LANNIN:  Object to the form.    11:28:44
11       THE WITNESS:  Yes, I was very concerned.    11:28:45
12 BY MR. BROOKS:    11:28:47
13    Q.  Did you express that view to anyone?    11:28:47
14    A.  I'm sure I did.    11:28:50
15    Q.  Did you consider that it impairs WPATH's    11:28:51
16 ability to operate as a scientific organization if    11:29:05
17 the voices of researchers are silenced even within    11:29:10
18 WPATH discussions?    11:29:14
19       MR. LANNIN:  Object to the form.    11:29:15
20       THE WITNESS:  I agree with that.    11:29:15
21    I should note that I -- I invited Dr. Zucker    11:29:29
22 to be a part of SOC-8.    11:29:32
23 BY MR. BROOKS:    11:29:32
24    Q.  I -- I recall that.  Well, I'm sorry,    11:29:36
25 actually, that was talking about an earlier one.  You    11:29:38

Page 132

1 invited Dr. Zucker to be a part of SOC-8.    11:29:41
2    A.  Hm-hm.    11:29:43
3    Q.  He declined, I take it?    11:29:44
4    A.  No, he -- he agreed initially.    11:29:45
5    Q.  And then what happened?    11:29:48
6    A.  And then the board developed this different    11:29:49
7 methodology and wanted to have a much more    11:29:56
8 transparent process in selecting members, and so    11:30:02
9 people had to apply for that membership.  And, for    11:30:08
10 whatever reason, he did not apply.    11:30:14
11    Q.  After you had invited Dr. Zucker to    11:30:16
12 participate, did any of your colleagues within WPATH    11:30:23
13 come to you and express opposition to his    11:30:28
14 involvement?    11:30:31
15       MR. LANNIN:  Object to the form.    11:30:31
16       THE WITNESS:  I think there were some people    11:30:33
17 that were not too happy that I invited him.    11:30:34
18 BY MR. BROOKS:    11:30:38
19    Q.  Who told -- from whom did you hear that    11:30:38
20 unhappiness?  Who came to you and expressed that?    11:30:41
21    A.  I wouldn't -- I wouldn't remember exactly    11:30:43
22 who that -- that was.  But he was a controversial    11:30:45
23 figure at that time.  But he had been the -- you    11:30:51
24 know, he was main author of -- of that -- of that    11:30:59
25 child and adolescent section in SOC-7 and certainly    11:31:06

Page 133

1 was extremely knowledgeable about the -- the    11:31:11
2 literature, and so I -- I certainly respected his --    11:31:15
3 his input.    11:31:22
4       MR. BROOKS:  Let me ask the reporter to mark    11:31:28
5 as Exhibit 10 an email chain bearing Bates numbers    11:31:30
6 BOEAL_WPATH_105071 through 079, headed at the top    11:31:35
7 "Friday Agenda for Mental Health Mentors."    11:31:42
8       (The document referred to was    11:31:42
9       marked as Exhibit 10.)    11:32:00
10 BY MR. BROOKS:    11:32:00
11    Q.  And, Dr. Coleman, if I'm not mistaken, I    11:32:06
12 don't know that your name appears on this document,    11:32:09
13 so I will keep that in mind.    11:32:16
14       Let me ask, the final email that is the    11:32:18
15 first one at the top of the first page, is from    11:32:21
16 Lin Fraser.  Am I correct that Lin Fraser was at this    11:32:28
17 time, which is October of 2021, also a past president    11:32:31
18 of WPATH?    11:32:36
19    A.  She was a past president of WPATH.    11:32:38
20    Q.  How long is the term?    11:32:40
21    A.  It is two years.    11:32:44
22    Q.  Okay.  I thought it must be something like    11:32:45
23 that.  There was a lot of -- there are a lot of past    11:32:45
24 presidents hanging around.    11:32:49
25    A.  And I don't know -- I don't know if she was    11:32:49

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 still past president at that time or not.          11:32:50
2    Q. All right. Then let me clarify that.         11:32:56
3       Is "past president" an official title that   11:33:00
4 refers to the person who was most recently president? 11:33:01
5       MR. LANNIN: Object to the form.              11:33:05
6       THE WITNESS: We sometimes use "immediate     11:33:05
7 past president" to distinguish a past president     11:33:07
8 versus an immediate.                                11:33:12
9 BY MR. BROOKS:                                      11:33:13
10   Q. Okay.                                         11:33:14
11   A. And the immediate past president is an       11:33:14
12 officer of the association.                        11:33:17
13   Q. That's helpful.                              11:33:19
14   A. Past president is not.                       11:33:21
15   Q. There are a couple of statements in here     11:33:23
16 that I would just like to contrast and ask your view 11:33:38
17 about.                                             11:33:42
18      If you turn to page 10574, we have an        11:33:43
19 unknown author writing to unknown recipients, and I 11:33:58
20 would apologize for that, but WPATH chose to do the 11:34:03
21 redaction, so it's out of my control.              11:34:07
22      This author writes, five lines from the      11:34:09
23 bottom, quote:                                     11:34:14
24      "We all know that blockers are               11:34:15
25    a good thing for kids and we know              11:34:17

Page 135

1    that ROGD is not a thing," close               11:34:19
2    quote.                                          11:34:19
3    Do you see that?                                11:34:23
4    A. Yes.                                         11:34:23
5    Q. And then if you turn -- let's see here -- to 11:34:25
6 72, 72, two pages earlier. At the top of the page -- 11:34:48
7    A. 72, top of the page.                         11:34:57
8    Q. Okay. Again, as best I can tell, from       11:35:00
9 unknown author to unknown recipient, a member of this 11:35:05
10 chain, WPATH insider, writes, quote:              11:35:10
11      "My understanding is that a               11:35:12
12    global consensus on puberty              11:35:14
13    blockers does not exist."                 11:35:16
14 I want to ask you, Dr. Coleman, is it your        11:35:18
15 view that within WPATH there's universal agreement 11:35:25
16 that blockers are a good thing for kids, or, on the 11:35:31
17 contrary, is it your view that within WPATH there's 11:35:34
18 not a global consensus about the use of puberty    11:35:37
19 blockers?                                          11:35:44
20      MR. LANNIN: Object to the form.              11:35:44
21      THE WITNESS: I'm not sure what this person 11:35:44
22 is referring to as a global consensus. But, you    11:35:47
23 know, starting in SOC-5, as we discussed, the use of 11:35:52
24 puberty blockers and the criteria for using those  11:35:59
25 were clearly articulated and were accepted as      11:36:02

Page 136

1 consensus recommendations and that continued. And we 11:36:07
2 had consensus in SOC-7 and we have consensus in 8.  11:36:14
3 So I don't know what this person's talking about.   11:36:18
4 BY MR. BROOKS:                                      11:36:21
5    Q. You don't know as you sit here today whether 11:36:22
6 the voting consensus in the Delphi process was      11:36:25
7 unanimous. Correct?                                 11:36:28
8       MR. LANNIN: Object to the form.              11:36:30
9       THE WITNESS: On -- on what exactly?          11:36:33
10 BY MR. BROOKS:                                     11:36:35
11   Q. On the recomm- --                            11:36:36
12   A. There's a variety of --                      11:36:41
13   Q. -- on the recommendation --                  11:36:41
14      THE REPORTER: Hold on.                        11:36:44
15      THE WITNESS: Yup.
16      THE REPORTER: Somebody start and --
17      THE WITNESS: Thank you.
18      THE REPORTER: Too many voices.
19 BY MR. BROOKS:
20   Q. Let me finish my question --                 11:36:41
21   A. Yeah.                                         11:36:42
22   Q. -- or restate it.                            11:36:42
23   A. Yeah.                                         11:36:44
24   Q. As you sit here, you don't know, you don't   11:36:44
25 recall whether the Delphi vote on the recommendations 11:36:47

Page 137

1 contained in SOC-8 concerning the use of puberty    11:36:52
2 blockers were unanimous?                            11:36:57
3       MR. LANNIN: Object to the form.              11:36:59
4       THE WITNESS: I'm sure that they were not a   11:37:00
5 hundred percent. The range seemed to go from 75 to  11:37:02
6 97 percent, or something like that. So I don't know 11:37:08
7 what that percentage was for that particular        11:37:13
8 recommendation.                                     11:37:19
9 BY MR. BROOKS:                                      11:37:21
10   Q. And the one author and language I read said, 11:37:22
11 quote, "We know that ROGD is not a thing."         11:37:27
12      Are you familiar with the term with "rapid  11:37:31
13 onset gender dysphoria"?                            11:37:33
14   A. Yes.                                          11:37:35
15   Q. Are you familiar with the term "adolescent   11:37:35
16 onset gender dysphoria"?                            11:37:38
17   A. Less so.                                      11:37:39
18   Q. "Late onset gender dysphoria"?               11:37:40
19   A. I've heard that used.                         11:37:43
20   Q. Do you have a view, or, given your lack of   11:37:45
21 practice with adolescents, do you consider it outside 11:37:53
22 your personal expertise as to whether rapid onset   11:37:56
23 gender dysphoria is an actual phenomenon?           11:38:01
24      MR. LANNIN: Object to the form.              11:38:05
25      THE WITNESS: I think there's a lot of        11:38:06

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1 debate about the existence of that phenomenon or if      11:38:07
2 that is even the correct term to really use, you      11:38:13
3 know, versus the recognition that some -- some people      11:38:20
4 may first present with gender dysphoria later in      11:38:25
5 adolescence and even in adulthood.      11:38:31
6       And so, but the existence of a clinical      11:38:36
7 phenomenon has been -- it has been suggested by some      11:38:51
8 people and -- but there's been a lot of criticism of      11:38:58
9 that research, and there's certainly no consistent --      11:39:03
10 consensus that that is a clinical entity.      11:39:10
11 BY MR. BROOKS:      11:39:15
12      Q. And my question wasn't consensus. My      11:39:15
13 question was --      11:39:18
14      A. Yeah.      11:39:18
15      Q. -- you, do you have an opinion of your own      11:39:18
16 or do you consider it to be outside your expertise      11:39:22
17 whether rapid onset gender dysphoria is a real      11:39:25
18 phenomenon or not?      11:39:28
19      A. I would say that's outside my expertise.      11:39:29
20      Q. All right.      11:39:31
21      MR. LANNIN: Counsel, we've been going for      11:39:37
22 more than an hour, believe it or not.      11:39:37
23      THE WITNESS: Again?      11:39:37
24      MR. BROOKS: Well, I'm going to suggest this      11:39:39
25 because the afternoon always is rough, so to speak,      11:39:40

Page 139

1 and that is we take a break and then we run till,      11:39:43
2 like, 12:30 and break for lunch.      11:39:47
3      Does that seem good?      11:39:49
4      MR. LANNIN: Works for me, but it's the      11:39:50
5 witness's decision.      11:39:52
6      MR. BROOKS: It's always attractive to stop      11:39:53
7 for an early lunch, but then you regret it later,      11:39:55
8 speaking of regret.      11:39:58
9      THE WITNESS: I'm fine with.      11:40:00
10      MR. BROOKS: We can go off the record, I      11:40:02
11 think. We're going to break.      11:40:03
12      THE VIDEOGRAPHER: Okay. The time is      11:40:05
13 11:40 a.m., and we are now off the record.      11:40:07
14      (Recess taken.)      11:40:37
15      THE VIDEOGRAPHER: The time is 11:50 a.m.,      11:49:49
16 and we are now back on the record.      11:50:05
17      MR. BROOKS: Let me ask the reporter to mark      11:50:09
18 as Exhibit 11 a document bearing Bates number      11:50:10
19 BOEAL_WPATH_105279 through 282, an email chain headed      11:50:15
20 "Important info re: Recent Washington Post Article."      11:50:23
21      (The document referred to was      11:50:23
22      marked as Exhibit 11.)      11:50:39
23 BY MR. BROOKS:      11:50:39
24      Q. And, Dr. Coleman, I'll call to your      11:50:40
25 attention the fact that you're one of the copyees of      11:50:43

Page 140

1 this email up at the top of the chain.      11:50:46
2      A. Hm-hm.      11:50:48
3      Q. And indeed also in this penultimate email      11:50:49
4 which shows up on the first page as well. And the      11:50:59
5 chain appears to be a document sent by      11:51:02
6 Dr. Edwards-Leeper, the document appearing -- the      11:51:10
7 text appearing on pages 281 to 282 forwarded by      11:51:14
8 Dr. Leeper at 1:30 a.m. on December 1st, 2021.      11:51:21
9 then there is a couple of back-and-forths.      11:51:28
10      So let me ask you to look at this and tell      11:51:30
11 me whether you recall seeing this email chain.      11:51:34
12      A. I don't recall it, you know, specifically      11:51:39
13 or --      11:51:45
14      Q. We clearly have some time zone issues here      11:51:45
15 since the second email is time-stamped earlier than      11:51:59
16 the first email, but that happens in life.      11:52:03
17      A. Yeah, in time zones.      11:52:05
18      Q. In the email at the bottom of the      11:52:07
19 page ending in 279, the first page,      11:52:11
20 Dr. Edwards-Leeper, writing to various folks      11:52:15
21 including you, says, among other things, quote:      11:52:20
22      "I've decided to go ahead and      11:52:28
23      send what I wrote to the people      11:52:29
24      included on this email as I know      11:52:31
25      them all personally. I'll leave it      11:52:33

Page 141

1      to you to share with the other      11:52:35
2      WPATH leaders," close quote.      11:52:37
3      Whether or not you remember this specific      11:52:41
4 chain, let me ask you to look at the document, the      11:52:44
5 essay, the whatever we want to call it on page 281      11:52:48
6 and whether -- ask whether you recall reading that.      11:52:53
7      A. Again, I don't recall.      11:53:01
8      Q. Okay.      11:53:01
9      A. I must have read it, but I don't --      11:53:03
10      Q. You don't specifically remember?      11:53:06
11      A. -- recall, no.      11:53:07
12      Q. Back on the first page, 279,      11:53:07
13 Dr. Edwards-Leeper -- and let me just note that the      11:53:13
14 copyees include you, marcib, which I assume -- am      11:53:19
15 I -- is it fair to assume that that's Marci Bowers?      11:53:25
16      A. I think that's a fair assumption.      11:53:29
17      Q. And what role did Loren Schechter and      11:53:30
18 Stephen Rosenthal have at this time?      11:53:34
19      A. Loren was a member of the Standards of Care      11:53:37
20 committee and was in the surgical chapter. Stephen      11:53:40
21 Rosenthal was on the committee and he was in the      11:53:48
22 hormone chapter. I can't remember if he was also      11:53:55
23 part of the adolescent chapter.      11:54:01
24      Q. All right. Dr. Edwards-Leeper goes on to      11:54:04
25 state, quote:      11:54:10

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1      "My fear is that if WPATH          11:54:10
2   continues to muzzle clinicians and        11:54:12
3   relay the message to the public          11:54:14
4   that they have no right to know          11:54:15
5   about the debate, WPATH will become      11:54:17
6   the bad guy and not the trusted         11:54:19
7   source," close quote.               11:54:22
8      Do you see that?                11:54:23
9   A.  Yes.                       11:54:24
10   Q.  In late 2021, December of 2021, late in the   11:54:29
11  SOC-8 development process, Dr. Edwards-Leeper      11:54:33
12  expressed her concern to you and to others that WPATH  11:54:40
13  had muzzled clinicians and her concern that they      11:54:47
14  might continue to muzzle clinicians.  Correct?      11:54:50
15      MR. LANNIN:  Object to the form.      11:54:54
16      THE WITNESS:  I'm sorry.  Are you quoting   11:54:55
17  something from here?                 11:55:01
18  BY MR. BROOKS:                    11:55:01
19   Q.  I'm asking you to look at the first page.    11:55:02
20   A.  Yeah.                     11:55:03
21   Q.  And four lines up from the bottom of the    11:55:04
22  email, the bottom email on that page,          11:55:08
23  Dr. Edwards-Leeper refers to her, quote, "fear that   11:55:12
24  if WPATH continues to muzzle clinicians."  And my   11:55:16
25  question is, do you recall in this time period, late   11:55:20

Page 143

1   in the SOC-8 development project, Dr. Edwards-Leeper   11:55:24
2   expressing to you and others her concern that WPATH    11:55:31
3   was muzzling clinicians and that it was going to harm  11:55:36
4   WPATH?                        11:55:41
5      MR. LANNIN:  Object to the form.      11:55:42
6      THE WITNESS:  I don't remember specifically.  11:55:44
7   You know, I remember this whole concern about       11:55:49
8   muzzling, you know, people expressing views, but     11:55:51
9   particularly there was concerns about expressing this  11:55:57
10  in the media.  But, you know, I think this is a     11:56:00
11  really good example of -- of people expressing their   11:56:08
12  concerns, alerting me as part of the -- as chair of    11:56:16
13  the committee of these -- these issues.         11:56:22
14      But most of the -- you know, the issue of    11:56:26
15  muzzling, you know, was -- were, you know, decisions   11:56:29
16  of the board.  And certainly the committee, we were   11:56:36
17  interested in hearing all views, all concerns.  We    11:56:43
18  entertained vigorous debates within all of the      11:56:50
19  committees and we had that public comment period.  We  11:56:56
20  sent this out to organizations.  We wanted to hear    11:57:03
21  from people any of their suggestions, their concerns.  11:57:07
22  And we wanted to have a very transparent process.     11:57:12
23      So I was never in favor of any kind of      11:57:21
24  muzzling of any -- any opinions.  And I know that     11:57:23
25  there was -- every opinion was really listened to.    11:57:34

Page 144

1   BY MR. BROOKS:                    11:57:43
2    Q.  If you look at the essay on page 281, middle   11:57:44
3   of the page is a paragraph that begins "I only      11:58:00
4   recently started a Twitter account."           11:58:03
5      Do you see that?                11:58:05
6    A.  Yes.                      11:58:05
7    Q.  And more than halfway down in that paragraph  11:58:06
8   is a sentence that reads, quote:            11:58:12
9      "There's a list serve I'm on,          11:58:14
10   mostly pediatric trans medical          11:58:18
11   doctors, and I've had medical and        11:58:20
12   mental health providers from that        11:58:23
13   group privately message thanking me       11:58:24
14   and telling me they are too afraid        11:58:26
15   to share their feelings with the         11:58:28
16   entire group," close quote.            11:58:28
17      Do you see that?                11:58:31
18   A.  Yes.                       11:58:31
19   Q.  Do you now recall Dr. Edwards-Leeper telling  11:58:33
20  you that she was finding that physicians were afraid   11:58:38
21  to express their actual views within WPATH        11:58:45
22  discussions?                     11:58:52
23      MR. LANNIN:  Object to the form.      11:58:52
24      THE WITNESS:  I remember her expressing that  11:58:53
25  concern and that was -- that was certainly       11:58:59

Page 145

1   disconcerting.                    11:59:01
2   BY MR. BROOKS:                    11:59:03
3    Q.  Okay.  And at the beginning of the next     11:59:03
4   paragraph, Dr. Edwards-Leeper wrote, quote:        11:59:15
5      "I fear the WPATH's recent           11:59:17
6   stance to shut down this              11:59:20
7   conversation was a huge mistake,"          11:59:22
8   close quote.                    11:59:24
9      Do you believe you understand what        11:59:29
10  Dr. Edwards-Leeper was referring to in this email     11:59:31
11  that she copied you on when she described WPATH as    11:59:34
12  shutting down this conversation?            11:59:38
13      MR. LANNIN:  Object to the form.      11:59:41
14      THE WITNESS:  I'm not sure.  I can only     11:59:43
15  speculate, you know, that it had to do with Dr. --    11:59:47
16  you know, Dr. Anderson and what the board did and --   11:59:53
17  BY MR. BROOKS:                    11:59:57
18   Q.  That is the censor letter --          11:59:57
19   A.  Yes.                       12:00:00
20   Q.  -- sent to Dr. Anderson?             12:00:01
21   A.  I'm assuming, but I haven't -- I'm not sure.  12:00:03
22   Q.  And did the board in fact remove from      12:00:05
23  Dr. Anderson the title of past president?        12:00:10
24      MR. LANNIN:  Object to the form.      12:00:13
25      THE WITNESS:  I don't know that.       12:00:14

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

```
1  BY MR. BROOKS:                         12:00:15
2     Q. Did you yourself ever, whether by    12:00:24
3  conversation or otherwise, discourage any   12:00:29
4  practitioner or researcher from taking concerns about 12:00:31
5  transgender health care to the media?       12:00:39
6        MR. LANNIN:  Object to the form.     12:00:41
7        THE WITNESS:  I don't recall that, but I'm 12:00:41
8  sure that I might have had concerns.  I think we  12:00:47
9  wanted to have lively discussions within the   12:00:51
10 committee and -- and come to our conclusions.   12:00:56
11 BY MR. BROOKS:                         12:01:16
12    Q. So you might have had such conversations?  12:01:16
13    A. I might have.                    12:01:19
14       MR. BROOKS:  Let me ask the reporter to mark 12:01:35
15 as Exhibit 13 -- I just can't get it right -- 12 a  12:01:36
16 document bearing Bates numbers 105 -- I'm sorry --  12:01:48
17 BOEAL_WPATH_105508 through 512 an email chain headed 12:01:51
18 at the top "The American Academy of Pediatrics'   12:01:59
19 Dubious Transgender Science - The Wall Street     12:02:02
20 Journal."                              12:02:05
21       (The document referred to was      12:02:05
22       marked as Exhibit 12.)            12:02:31
23 BY MR. BROOKS:                         12:02:31
24    Q. And the various emails in this chain, you  12:02:32
25 are the author of.  Correct?             12:02:35
```

Page 147

```
1     A. Yes.                          12:02:37
2     Q. To be fair to your memory, I'll ask this.  12:02:37
3  Looking at this, do you recall receiving and sending 12:02:44
4  the emails reflected in this chain?       12:02:48
5     A. I don't re-- -- I wouldn't say that I   12:03:03
6  remember, you know, sending this, but it's clear that 12:03:05
7  I sent it.                            12:03:09
8     Q. Okay.  If you scan over this, you will see  12:03:10
9  that senders and recipients include Dr. Leibowitz,  12:03:17
10 Dr. de Vries.  Those two were cochairs of the  12:03:22
11 adolescent chapter.  Correct?            12:03:25
12    A. That's correct.                 12:03:26
13    Q. Yourself, Dr. Bouman who was both a member  12:03:27
14 of the SOC-8 committee and at the time president of  12:03:37
15 WPATH.  Correct?                       12:03:40
16    A. That's correct.                 12:03:41
17    Q. Okay.  Let me ask you to turn to page ending 12:03:52
18 in 510 which consists of an email written by   12:03:55
19 Dr. de Vries.  Do you see that?          12:04:02
20    A. Yes.                          12:04:02
21    Q. And at the end of the first full paragraph, 12:04:06
22 she writes, quote:                     12:04:09
23       "For sure is that increasing      12:04:10
24       numbers are asking for medical   12:04:12
25       affirming treatment."            12:04:14
```

Page 148

```
1     And then she goes on to write, quote:    12:04:15
2        "What the explanation for this    12:04:18
3        increase is, is unknown and also  12:04:19
4        methodologically challenging to   12:04:22
5        study; social factors likely play a 12:04:24
6        role."                         12:04:28
7     And, in response to that, if we flip to the 12:04:36
8  previous page, 509, Dr. Leibowitz says -- his email 12:04:40
9  begins "I couldn't agree with Annelou more."  12:04:52
10    Do you see that?                   12:04:55
11    A. Hm-hm.                        12:04:55
12    Q. Okay.  So he says, quote:          12:04:56
13       "I couldn't agree with Annelou     12:04:57
14       more.  We cannot outright dismiss  12:04:59
15       the fact that social factors, also 12:05:01
16       don't like the word contagion,    12:05:04
17       impact identity development and   12:05:07
18       decision making in adolescents."  12:05:09
19    Do you agree with Dr. de Vries and     12:05:19
20 Dr. Leibowitz or do you consider it outside your   12:05:22
21 personal expertise that social factors impact   12:05:25
22 identity development as well as decision making in  12:05:31
23 adolescents?                          12:05:34
24       MR. LANNIN:  Object to the form.   12:05:34
25       THE WITNESS:  We -- we acknowledge that 12:05:35
```

Page 149

```
1  social factors could have an impact and that should  12:05:42
2  be examined as part of assessment.        12:05:46
3  BY MR. BROOKS:                         12:05:49
4     Q. And my question for you was, do you have a  12:05:49
5  personal opinion as to whether that's true, or do you 12:05:52
6  consider it to be outside your expertise?  12:05:54
7        MR. LANNIN:  Object to the form.   12:05:57
8        THE WITNESS:  It is -- it's probably safer 12:06:06
9  to say that it's outside of my -- my -- my area of   12:06:07
10 expertise.  But being familiar with what was written 12:06:13
11 by that committee and concerns expressed, I would  12:06:19
12 ag-- -- and as -- and I have a background and training 12:06:24
13 in developmental psychology, and so, yes, we   12:06:29
14 recognize that adolescents can be influenced by   12:06:37
15 social forces.                        12:06:39
16 BY MR. BROOKS:                         12:06:41
17    Q. Looking a little farther down in       12:06:43
18 Dr. Leibowitz's email on page ending in 509, he   12:06:45
19 writes, quote:                        12:06:48
20       "Some adolescents who have        12:06:50
21       certain psychological           12:06:52
22       vulnerabilities feel comfortable  12:06:54
23       within a marginalized community    12:06:55
24       space and come to feel it's a safe 12:06:58
25       space for them."                12:06:59
```

1    My question is, do you agree with          12:07:02
2  Dr. Leibowitz that some adolescents who start with    12:07:04
3  psychological vulnerabilities seek out an identity    12:07:08
4  that aligns them with a marginalized community    12:07:13
5  because that feels like a safe space for them?    12:07:15
6      MR. LANNIN:  Object to the form.          12:07:18
7      THE WITNESS:  Again, this is outside of my    12:07:25
8  expertise.                                 12:07:27
9  BY MR. BROOKS:                             12:07:28
10    Q.  All right.  And the next sentence, he writes  12:07:28
11  for other adolescents he's referring to, quote:    12:07:36
12      "Gender serves a different            12:07:39
13      function, not necessarily one that    12:07:42
14      is about their gender identity even    12:07:44
15      though they may feel it is about    12:07:46
16      their identity in the moment."       12:07:48
17    And do you agree with Dr. Leibowitz or    12:07:50
18  consider it outside your expertise that some    12:07:54
19  adolescents who claim a transgender identity are in    12:07:56
20  fact reacting to some other psychological need that    12:07:59
21  is not actually about their gender identity?    12:08:03
22      MR. LANNIN:  Object to the form.          12:08:06
23      THE WITNESS:  I highly respect Dr. Leibowitz    12:08:08
24  and his expertise in this area.  And, again, that was    12:08:09
25  the consensus of that adolescent chapter to recognize  12:08:17

1  that that is a possibility and that should be looked  12:08:21
2  at in terms of a careful assessment.        12:08:26
3  BY MR. BROOKS:                             12:08:30
4    Q.  But my question wasn't about consensus or    12:08:31
5  about your respect for Dr. Leibowitz.          12:08:36
6      My question was do you agree with him in    12:08:38
7  that regard, or do you consider it to be outside your  12:08:41
8  expertise?                                 12:08:46
9      MR. LANNIN:  Object to the form.          12:08:47
10      THE WITNESS:  I really think you're forcing    12:09:07
11  me into an either/or kind of position.  I mean, I    12:09:09
12  have expertise in really evaluating, you know,    12:09:14
13  people's work and -- and their opinions, and -- and    12:09:18
14  so, you know, I -- everything that I've -- that I've    12:09:24
15  read, everything that I've listened to, I agree with    12:09:31
16  that statement.                            12:09:34
17  BY MR. BROOKS:                             12:09:36
18    Q.  All right.  I don't think I mean to enforce    12:09:38
19  an either/or.  This is not -- there's nothing I'm    12:09:42
20  going to point you to in this email, but it's a    12:09:48
21  related question.                          12:09:50
22      Do you believe that in some cases    12:09:50
23  adolescents are attracted to a transgender identity    12:09:55
24  because of their own discomfort with or societal    12:10:00
25  disapproval of same-sex attractions that they're    12:10:05

1  experiencing?                              12:10:11
2      MR. LANNIN:  Object to the form.          12:10:11
3      THE WITNESS:  I think that that is -- is    12:10:14
4  possible and that is why, especially with    12:10:16
5  adolescents, that we require this careful assessment,  12:10:26
6  and a good clinician can sort out those issues.  And  12:10:30
7  so I think that is -- it's -- it's possible.    12:10:40
8      But I would say that, again, a transgender    12:10:45
9  identity is still a very stigmatized identity, and I  12:10:48
10  don't think many people really take on that    12:10:55
11  stigmatized identity for some sort of social    12:10:58
12  acceptance.  It defies that.  It is -- it's --    12:11:08
13  it's -- in general, it is not socially acceptable.    12:11:13
14      And so people come forward, you know -- so    12:11:18
15  can there be cases like that?  Possibly, and    12:11:29
16  that's -- that's what an assessment is for.  But I    12:11:33
17  would say that, again, for the most part, again,    12:11:36
18  people don't adopt that identity or identify that way  12:11:44
19  because it's fashionable.                   12:11:51
20  BY MR. BROOKS:                             12:11:51
21    Q.  You've heard reports, Dr. Coleman, of    12:12:01
22  multiple teen girls within a so-called friend group    12:12:07
23  within a short period of time deciding, each one of    12:12:11
24  them, that she's transgender.  Correct?  You've heard  12:12:14
25  those reports?                             12:12:17

1      MR. LANNIN:  Object to the form.          12:12:18
2      THE WITNESS:  I've heard reports of that,    12:12:19
3  yes.                                       12:12:22
4  BY MR. BROOKS:                             12:12:23
5    Q.  How do you explain that phenomena, given    12:12:24
6  what you've just testified?                 12:12:26
7    A.  I don't know.  They're -- they're -- they're  12:12:28
8  an-- -- they seem to be anecdotal reports, so I don't  12:12:31
9  know where it's really coming from, and I don't know  12:12:34
10  whether it's true or not.                   12:12:37
11      MR. BROOKS:  Let me ask the reporter to mark  12:12:43
12  as Exhibit 13 a document, an email chain, bearing    12:12:45
13  Bates numbers BOEAL_WPATH_020387 through 390, headed  12:12:50
14  at the top "Update & Further Steps."          12:12:59
15      (The document referred to was          12:12:59
16      marked as Exhibit 13.)                 12:13:20
17  BY MR. BROOKS:                             12:13:20
18    Q.  First, Dr. Coleman, at the top, the sender    12:13:21
19  and recipients are redacted except for a -- what I    12:13:24
20  take it as a -- I'm not technique -- tech savvy.  I    12:13:28
21  probably won't use the right term -- a list serve or  12:13:33
22  a group email name "nonbinary SOC 8."          12:13:38
23      Do you see that?                       12:13:38
24    A.  Yes.                                 12:13:39
25    Q.  Were there list serves or group emails    12:13:39

CONFIDENTIAL

Page 154

1  established for each chapter group?          12:13:45
2    A. That is correct.                        12:13:46
3    Q. And were you as chairman copied on all such  12:13:47
4  groups, a member of all such groups?         12:13:51
5    A. No.                                     12:13:53
6    Q. So then let me just ask. Will you take a  12:13:54
7  look at this and see whether you think that you  12:14:00
8  received this back when it was sent in September of  12:14:02
9  2021.                                        12:14:04
10   A. Your question is do you think that I     12:14:17
11 received this?                               12:14:19
12   Q. Yes.                                    12:14:20
13   A. I don't know.                           12:14:21
14   Q. All right.                              12:14:22
15   A. There was -- you know, the email, the group  12:14:26
16 ones, were designed to -- for communication among the  12:14:29
17 chapter members. And that was one vehicle that I  12:14:35
18 could communicate with all members of a committee  12:14:42
19 using that email, but we were not automatically  12:14:44
20 copied on all of those e- -- all of those emails. If  12:14:51
21 they wanted to communicate to us, they would have  12:14:57
22 copied us on those.                          12:15:00
23   Q. Okay. Then in this email, within the     12:15:02
24 nonbinary SOC-8 chapter, and there was indeed --  12:15:06
25 there's a chapter in SOC-8 for the first time dealing  12:15:10

Page 155

1  with nonbinary. Correct?                     12:15:13
2    A. Yes.                                    12:15:14

[REDACTED]

10   Q. Okay. Whoever wrote the final email, the  12:15:48
11 one at the top, expresses concern about language in  12:15:51
12 the draft referring to, quote, "insufficient evidence  12:15:57
13 and limited data." And goes on to say:       12:16:00
14     "I say this from the                     12:16:03
15     perspective of current legal            12:16:05
16     challenges in the U.S."                 12:16:07
17   And this author goes on to mention, quote:  12:16:10
18     "This is based on two recent            12:16:13
19     federal cases in which I'm an           12:16:15
20     expert witness," close quote.           12:16:16
21   Did you, as chair of the SOC-8 project,     12:16:32
22 consider it ethical and consistent with good practice  12:16:37
23 for the development of evidence-based guidelines for  12:16:43
24 an actively serving expert witness to advocate for  12:16:47
25 changes in guideline language to strengthen his  12:16:52

Page 156

1  position in court?                           12:16:57
2    MR. LANNIN: Object to the form.            12:16:58
3    THE WITNESS: The main thing that I would    12:17:05
4  say is that, you know, lots of different people, lots  12:17:13
5  of different opinions, and everything was -- was  12:17:16
6  listened to. But that was the beauty of our  12:17:24
7  methodology, that we had such a rigorous process of,  12:17:29
8  you know, checks and balances and so that no one  12:17:36
9  individual would be able to dictate, you know, the  12:17:40
10 outcome or the -- it would be heard, but that that  12:17:44
11 would not be able to be held sway in the process.  12:17:51
12 And not only within the committee, but then going to  12:17:59
13 the Delphi process involving all committee members  12:18:04
14 and then public comment period.              12:18:09
15   And so, yeah, I think that some -- some     12:18:11
16 individuals might have wanted certain things for  12:18:20
17 whatever reasons, but we always stuck to the science,  12:18:24
18 and we stuck to a consensus process in arriving at  12:18:29
19 the final recommendations.                   12:18:35
20 BY MR. BROOKS:                               12:18:36
21   Q. Did you consider it consistent with ethics  12:18:36
22 and conflict-of-interest principles for WPATH members  12:18:42
23 who were actively serving as expert witnesses in  12:18:49
24 ongoing litigation to be permitted to advocate for  12:18:52
25 changes to guideline language specifically in order  12:18:56

Page 157

1  to strengthen their arguments in court?      12:19:02
2    MR. LANNIN: Object to the form.            12:19:04
3    THE WITNESS: I think that it's -- it's --   12:19:12
4  it's good that this individual sort of acknowledges  12:19:14
5  their -- why they feel that way, and we could take  12:19:19
6  their comments under that kind of consideration.  12:19:25
7  But, as I said, I think we really tried to be, you  12:19:29
8  know, apolitical, and we really tried to stick to the  12:19:35
9  science.                                     12:19:41
10   And -- and one thing that was of a big       12:19:42
11 concern is that these guidelines would not be written  12:19:46
12 for U.S. courts or U.S. health care systems. Not  12:19:51
13 that we weren't aware of that and the implications of  12:19:56
14 that, but these were global guidelines. And so we  12:19:59
15 continued to really challenge that this is -- this is  12:20:05
16 not being, you know, written for a particular  12:20:10
17 jurisdiction or insurance company or anything like  12:20:18
18 that. We were just really trying to get to the best  12:20:24
19 available recommendations -- I mean recommendations  12:20:29
20 based on the best available evidence.        12:20:34
21 BY MR. BROOKS:                               12:20:37
22   Q. And my question is not about your goals --  12:20:37
23   A. Yeah.                                   12:20:40
24   Q. -- or about your overall process.        12:20:40
25   Did you consider it to be consistent with  12:20:43

40 (Pages 154 - 157)

CONFIDENTIAL

1 ethics and conflict-of-interest principles to allow   12:20:45
2 WPATH committee members who were then serving as   12:20:50
3 expert witnesses to advocate for language changes to   12:20:54
4 strengthen their position in court?   12:20:58
5     MR. LANNIN: Object to the form.   12:20:59
6     THE WITNESS: I think that, again, in   12:21:00
7 situations of -- of conflict of interest, that you   12:21:12
8 have management strategies and one of the management   12:21:21
9 strategies is that, again, this person was not   12:21:23
10 writing one -- it could not be the -- the decision   12:21:27
11 maker.   12:21:34
12     So I think it's very good that the -- we   12:21:34
13 were aware of this and -- and, again, would -- would   12:21:41
14 view any of their recommendations in light of their   12:21:43
15 potential conflict of interest.   12:21:48
16 BY MR. BROOKS:   12:21:50
17     Q. Does that mean it is your view that, yes, it   12:21:50
18 was consistent with ethical principles and   12:21:53
19 conflict-of-interest principles to have a committee   12:21:56
20 member who was actively serving as an expert witness   12:21:59
21 advocate for language changes to strengthen his   12:22:02
22 position in court?   12:22:05
23     MR. LANNIN: Object to the form.   12:22:06
24     THE WITNESS: I think -- I think it would be   12:22:07
25 ethically justifiable.   12:22:10

1 BY MR. BROOKS:   12:22:12
2     Q. And is it your testimony that no language   12:22:12
3 changes were accepted in the course of WPATH drafting   12:22:16
4 at the recommendation of those who were actively   12:22:21
5 serving as expert witnesses on the affected topic?   12:22:24
6     MR. LANNIN: Object to the form.   12:22:28
7     THE WITNESS: I'm sorry. You're going to   12:22:29
8 have to -- it was a long question.   12:22:34
9     MR. BROOKS: I'll ask the reporter to read   12:22:36
10 it back.   12:22:36
11     THE REPORTER: One moment, please.   13:11:09
12     (Record read as follows:   13:11:09
13      "QUESTION: And is it your   12:22:12
14     testimony that no language changes   12:22:13
15     were accepted in the course of   12:22:16
16     WPATH drafting at the   12:22:19
17     recommendation of those who are   12:22:22
18     actively serving as expert   12:22:24
19     witnesses on the affected topic?")   12:22:26
20     MR. LANNIN: Same objection.   12:22:56
21     THE WITNESS: I certainly didn't recall a   12:22:57
22 situation where someone like this that we change   12:23:02
23 lang- -- we could only change language as if it was a   12:23:07
24 consensus of the -- the -- the chapter. And -- and   12:23:11
25 also, as chairs, we also could challenge some of the   12:23:19

1 language if it didn't seem to fit this -- you know,   12:23:25
2 the evidence, the scientific evidence.   12:23:31
3     And so, again, in that checks and balance   12:23:35
4 way with our rigorous, you know, methodology, I think   12:23:38
5 we -- I can't remember anyone -- it -- it -- a   12:23:44
6 recommendation of change of the language might have   12:23:52
7 been made by something like that. But, again,   12:23:54
8 some -- in so many situations, we said yes, we said   12:23:58
9 no, it was debated, and no one ruled the day.   12:24:02
10 BY MR. BROOKS:   12:24:09
11     Q. Did you ever consider or discuss with   12:24:09
12 anybody issuing an instruction that no one who was   12:24:12
13 actively serving as an expert witness should sit on a   12:24:17
14 chapter committee that dealt with the subject matter   12:24:22
15 of their then ongoing expert engagement?   12:24:26
16     A. That was never a clear requirement.   12:24:29
17     Q. Did you ever consider making that a   12:24:33
18 requirement?   12:24:37
19     MR. LANNIN: Object to the form.   12:24:37
20     THE WITNESS: Not that I recall.   12:24:37
21 BY MR. BROOKS:   12:24:38
22     Q. Later in this -- the next paragraph in this   12:24:43
23 document on page 387, the same author says:   12:24:44
24      "I'm wondering if we should be   12:24:48
25     less specific about listing   12:24:49

1     procedures."   12:24:51
2     And his point, as he says at the end of that   12:24:52
3 paragraph is:   12:24:58
4      "Thinking within the framework   12:24:59
5     of the current U.S. legal system,   12:25:00
6     if we leave a procedure out, that   12:25:02
7     may allow insurance companies to   12:25:04
8     deny coverage."   12:25:06
9     Do you see that? It's on the very first   12:25:07
10 page of the document.   12:25:09
11     A. Oh, back there.   12:25:10
12     Q. It's paragraph numbered 2 of the --   12:25:11
13     A. Okay. Hm.   12:25:16
14     Q. And you've -- in your previous answer,   12:25:18
15 you've mentioned that you always were guided by the   12:25:25
16 science.   12:25:31
17     And my question is, is it your testimony   12:25:31
18 that in no case in the drafting of SOC-8 was the   12:25:32
19 committee -- did the committee adopt or modify   12:25:39
20 language for the purpose of increasing the chances of   12:25:44
21 being able to obtain insurance coverage?   12:25:52
22     MR. LANNIN: Object to the form.   12:25:55
23     THE WITNESS: I don't know if I've said this   12:25:58
24 before, but, again, the -- the language and the   12:26:06
25 recommendations needed to be supported by the   12:26:18

CONFIDENTIAL

Page 162

1  evidence.                                    12:26:21
2      In some cases, people challenged the way    12:26:24
3  that we wrote things may not have been as clear and    12:26:28
4  may have suggested language that might better express    12:26:37
5  the -- the meaning that was intended and that could    12:26:47
6  be understood by practitioners, could be understood    12:26:52
7  by legal experts, because we were certainly aware    12:26:58
8  that these standards were being used in different    12:27:02
9  court proceedings.                            12:27:07
10     So we paid attention to language that --    12:27:08
11 that clearly reflected what we meant by what we said.    12:27:16
12 And so that was the main objective, is to make things    12:27:23
13 clear, as clear as possible.                  12:27:31
14 BY MR. BROOKS:                              12:27:35
15     Q. Dr. Coleman, is it your testimony that in no    12:27:36
16 case was SOC-8 language drafted specifically with a    12:27:40
17 view towards improving the chances of obtaining    12:27:45
18 insurance coverage.                           12:27:49
19     MR. LANNIN: Object to the form.           12:27:51
20     THE WITNESS: I -- I can't recall where we    12:28:07
21 wrote something simply based on trying to get    12:28:10
22 insurance coverage.                           12:28:13
23 BY MR. BROOKS:                              12:28:15
24     Q. Do you know who Chase Strangio is?      12:28:16
25     A. Who?                               12:28:18

Page 163

1      Q. Chase Strangio?                      12:28:19
2      A. No.                               12:28:20
3      Q. Or Strangio?                        12:28:21
4      A. No.                               12:28:22
5      Q. You don't know that name?            12:28:22
6      A. No.                               12:28:23
7      Q. Okay.                             12:28:23
8      MR. BROOKS: Shall we break for lunch? Do    12:28:27
9  you want to go longer? I can always flip tabs.    12:28:28
10     MR. LANNIN: Do you want to call it or go    12:28:33
11 another ten? Up to you.                       12:28:36
12     THE WITNESS: Let's go another ten.        12:28:36
13     MR. BROOKS: All right.                  12:28:37
14     Let me ask the reporter to mark as        12:29:07
15 Exhibit 14 an email chain recently produced without    12:29:09
16 Bates numbers headed "Please Review - SOC8 Updates -    12:29:14
17 Timeline, chapter Tracking Sheet," the final email    12:29:21
18 being from Dan Karasic to Dr. Coleman, dated    12:29:26
19 August 28, 2021.                             12:29:30
20     (The document referred to was            12:29:30
21     marked as Exhibit 14.)                  12:29:30
22 BY MR. BROOKS:                              12:29:30
23     Q. And first, Dr. Coleman, let me ask you to    12:30:11
24 look at this and tell me whether this indeed appears    12:30:13
25 to be an email chain in which you were a participant.    12:30:16

Page 164

1      A. Yes.                              12:30:19
2      MR. BROOKS: I'm going for the record, while    12:30:38
3  it doesn't show up on the copies, the document does    12:30:40
4  have a Bates number, and let me put that in the    12:30:43
5  record. BOEAL_WPATH_109285 through 297.        12:30:47
6      And I apologize that just happens sometimes    12:30:53
7  in photocopying. So we'll find our way through it    12:30:56
8  without that.                                12:31:01
9  BY MR. BROOKS:                              12:31:01
10     Q. Let me ask you to turn to the fourth page of    12:31:29
11 the document. And, I apologize, I think you've told    12:31:34
12 me and I've forgotten. What position did Dr. Karasic    12:31:43
13 have in this process?                         12:31:47
14     A. He was the chair of the mental health    12:31:48
15 chapter.                                     12:31:51
16     Q. So he writes an email on August 27th that to    12:31:51
17 folks, including you, the others are redacted, quote:    12:32:00
18     "On a related note, medical               12:32:04
19     necessity for youth care - puberty         12:32:06
20     blockers and chest surgery for            12:32:09
21     transmasculine youth - is often           12:32:12
22     challenged by U.S. insurance              12:32:13
23     companies. I wonder whether,              12:32:15
24     redacted, and the adolescent              12:32:19
25     committee might consider adding a          12:32:20

Page 165

1      medical necessity statement for          12:32:22
2      care of minors?"                        12:32:24
3      Do you see that language?                12:32:27
4      A. Yes.                               12:32:27
5      Q. And do you believe that you received this    12:32:28
6  about --                                     12:32:31
7      A. Yes.                               12:32:32
8      Q. -- at the time indicated?             12:32:32
9      And here, Dr. Karasic requests that a      12:32:34
10 medical necessity statement relating to both hormones    12:32:41
11 and surgery on minors be added to SOC-8 for the    12:32:48
12 express purpose of increasing the chances of getting    12:32:51
13 reinsurance -- insurance reimbursement.        12:32:58
14 Am I Correct?                                 12:33:01
15     MR. LANNIN: Object to the form.           12:33:02
16     THE WITNESS: I'm sorry, what is the        12:33:10
17 question?                                     12:33:25
18 BY MR. BROOKS:                              12:33:25
19     Q. I'm going to ask you to read it back.    12:33:25
20     THE REPORTER: "And here, Dr. Karasic       12:33:34
21 requests that a mindful necessity statement relating
22 to" --
23     MR. BROOKS: All right. I'll start again.
24     THE REPORTER: Yeah, I said, "check
25 document." Thank you.

42 (Pages 162 - 165)

Page 166

1 BY MR. BROOKS:
2   Q. Here, Dr. Karasic specifically requests that    12:33:28
3 SOC-8 add a medical necessity statement relating to    12:33:35
4 both hormonal and surgical procedures on minors for    12:33:40
5 the express purpose of improving the odds of getting    12:33:45
6 insurance reimbursement. Correct?    12:33:49
7      MR. LANNIN: Object to the form.    12:33:51
8      THE WITNESS: Yes.    12:33:52
9 BY MR. BROOKS:    12:33:52
10   Q. And what -- does WPATH have a definition of    12:33:53
11 the term "medically necessary"?    12:34:07
12   A. No.    12:34:10
13   Q. What do you understand personally to be    12:34:10
14 meant by "medically necessary"?    12:34:14
15   A. You know, I don't know who invented the    12:34:16
16 term, but it seems it's a term that is -- is used a    12:34:22
17 lot by insurance companies here in the U.S. to    12:34:28
18 distinguish what is really kind of optional,    12:34:34
19 cosmetic, versus that there is a clear clinical    12:34:40
20 entity, and this is designed to alleviate that    12:34:51
21 problem.    12:34:54
22      And that, thus, when you can demonstrate    12:34:57
23 that it is meeting that kind of criteria, they're    12:35:00
24 willing to cover that. But if you want, you know,    12:35:05
25 this or that and there's no clear indication for why    12:35:09

Page 167

1 that is, the insurance company is not going to cover    12:35:15
2 it.    12:35:20
3   Q. Well, you -- your team was not drafting as    12:35:20
4 experts in insurance law, were they?    12:35:25
5      MR. LANNIN: Object to the form.    12:35:26
6      THE WITNESS: No.    12:35:27
7 BY MR. BROOKS:    12:35:28
8   Q. You were trying to make scientific    12:35:29
9 statements?    12:35:33
10   A. Yes.    12:35:33
11      MR. LANNIN: Same objections.    12:35:34
12 BY MR. BROOKS:    12:35:35
13   Q. And, in your understanding as chair of the    12:35:35
14 SOC-8 project, what was the scientific definition of    12:35:38
15 "medically necessary" when you put in SOC-8 that a    12:35:42
16 certain procedure or treatment was, quote, "medically    12:35:46
17 necessary"?    12:35:49
18   A. We were simply using the -- the definition    12:35:57
19 or the common use of the term "medically necessary."    12:35:59
20 And to -- to recognize that gender dysphoria was a    12:36:07
21 known clinical entity and that it was deserving of    12:36:25
22 necessary medical intervention or psychological    12:36:31
23 intervention to alleviate that disorder.    12:36:38
24      I think that we were aware that some -- you    12:36:46
25 know, to distinguish things -- it was very important    12:37:01

Page 168

1 to distinguish between cosmetic procedures versus    12:37:06
2 medically necess- -- necessary, and we wanted to make    12:37:09
3 it very clear which of those -- those procedures    12:37:14
4 were -- met that criteria being medically necessary    12:37:23
5 rather than cosmetic.    12:37:26
6   Q. From the point of view of physicians and    12:37:28
7 mental health practitioners, the SOC-8 team never    12:37:32
8 devised, articulated a definition of medically    12:37:41
9 neces- -- "medical necessity." Am I correct?    12:37:45
10      MR. LANNIN: Object to the form.    12:37:47
11      THE WITNESS: No. We developed a policy    12:37:50
12 statement to -- or a statement that it is important    12:37:56
13 to recognize that gender dysphoria is a clinical    12:38:05
14 condition and is deserving of medical health care    12:38:10
15 intervention, and that it was not some sort of    12:38:18
16 cosmetic procedure but really procedures that were    12:38:22
17 designed to alleviate that particular condition.    12:38:28
18      MR. BROOKS: How long do want you to go?    12:38:51
19      MR. LANNIN: We can call it now if you like.    12:38:53
20 Take lunch?    12:38:54
21      MR. BROOKS: That's probably a good    12:38:54
22 breakpoint, otherwise it's going to run past one    12:38:56
23 before we hit another breaking point.    12:38:59
24      MR. LANNIN: Oh, yeah.    12:39:02
25      THE WITNESS: Yeah.    12:39:02

Page 169

1      THE VIDEOGRAPHER: All right. The time is    12:39:02
2 12:39 p.m., and we are now off the record.    12:39:04
3      (Whereupon at 12:39 p.m., the
4      videotaped deposition of ELI
5      COLEMAN, PH.D., was adjourned for
6      noon recess.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

```
1              (Whereupon, at 1:35 P.M., the
2      videotaped deposition of ELI
3      COLEMAN, PH.D., was reconvened.)
4
5          THE VIDEOGRAPHER: The time is 1:35 p.m.,    13:35:01
6  and we are now back on the record.              13:35:28
7                                                   13:35:28
8          EXAMINATION (CONTINUED)                  13:35:28
9                                                   13:35:28
10         MR. BROOKS: I'm going to ask the reporter   13:35:32
11 to mark as Exhibit 15 Chapter 9 of SOC-8.       13:35:34
12         (The document referred to was           13:35:35
13     marked as Exhibit 15.)                      13:35:34
14 BY MR. BROOKS:                                  13:35:34
15     Q. And, Dr. Coleman, before we broke, we were   13:35:50
16 talking about medical necessity and scientific basis.   13:35:51
17 And I've handed you Chapter 9 of the SOC-8 which is   13:35:58
18 the chapter entitled "Eunuchs."                 13:36:03
19         Do you see that?                        13:36:07
20     A. Yes.                                      13:36:07
21     Q. And am I correct that SOC-9 was the --    13:36:07
22 SOC-8, pardon me, was the first version of the WPATH   13:36:10
23 SOC-8 that included any discussion of eunuchs?   13:36:14
24     A. That's correct.                          13:36:18
25     Q. And am I correct that, for this to be    13:36:19
```

Page 171

```
1  finalized and approved, your vetting and approval was   13:36:28
2  part of that process?                          13:36:34
3      A. Yes.                                     13:36:35
4      Q. Who first suggested adding a chapter on   13:36:41
5  eunuchs and for what reasons?                   13:36:45
6      A. I think it was first suggested when we   13:36:48
7  were -- I don't know if we had concluded SOC-7, but I   13:36:53
8  think there was immediately some -- some urging to   13:37:00
9  consider addressing the issue of eunuchs in the next   13:37:10
10 revision of SOC-8.                              13:37:17
11     Q. Let me ask you to look at the beginning of   13:37:29
12 the chapter, which I've included the table of   13:37:32
13 contents and whatnot, but it looks like you found   13:37:36
14 that.                                           13:37:37
15         The second paragraph of -- at the beginning   13:37:38
16 of the chapter begins with the definition of "eunuch"   13:37:40
17 as follows, quote:                              13:37:46
18         "Eunuch individuals are those           13:37:47
19     assigned male at birth and wish to          13:37:48
20     eliminate masculine physical                13:37:53
21     features, masculine genitals, or            13:37:53
22     genital functioning."                       13:37:55
23         Do you see that?                        13:37:57
24     A. Yes.                                      13:37:58
25     Q. And it goes on a few lines down to say,   13:37:59
```

Page 172

```
1  quote:                                          13:38:03
2          "This identity-based definition         13:38:03
3      for those who embrace the term              13:38:06
4      'eunuch' does not include others,           13:38:08
5      such as men who have been treated           13:38:10
6      for advanced prostate cancer and            13:38:11
7      reject the designation of eunuch."          13:38:14
8          Correct me if I'm wrong, when I look at   13:38:18
9  these two sentences, it seems to me that the    13:38:20
10 definition of this identity-based -- what's referred   13:38:23
11 to as identity-based definition turns on nothing more   13:38:26
12 nor less than those who wish to use the term found in   13:38:32
13 the guideline to eliminate masculine genitals, along   13:38:39
14 perhaps with other masculine features.          13:38:44
15         Is that correct?                        13:38:47
16         MR. LANNIN: Object to the form.         13:38:47
17         THE WITNESS: Yes.                       13:38:49
18 BY MR. BROOKS:                                  13:38:50
19     Q. And there is no medical test, no DSM     13:38:50
20 diagnostic criteria to determine who is or is not a   13:38:56
21 eunuch, according to this WPATH definition. Correct?   13:39:00
22         MR. LANNIN: Object to the form.         13:39:05
23         THE WITNESS: No, we defined it here. But   13:39:07
24 this is not a recognized particular classification   13:39:10
25 in -- in either the DSM or ICD.                 13:39:18
```

Page 173

```
1  BY MR. BROOKS:                                  13:39:22
2      Q. It's not a medical malady. Correct?     13:39:23
3      A. It is -- again, there -- there's always a   13:39:28
4  category of, you know, not otherwise specified   13:39:31
5  variations of gender identity disorders. And so   13:39:38
6  this -- this would fall under, you know, some subset   13:39:43
7  of a particular kind of syndrome that is not -- you   13:39:55
8  know, there's not necessarily that many of them to --   13:39:55
9  and so it's not as clearly -- clearly defined or   13:40:00
10 clearly researched.                             13:40:08
11     Q. You were referring to language in the DSM.   13:40:09
12 Am I correct?                                   13:40:09
13     A. Yes.                                      13:40:13
14     Q. Which is diagnostic manual for mental health   13:40:13
15 disorders. Right?                               13:40:18
16     A. That's correct.                          13:40:19
17     Q. The status of eunuch is not a -- is not   13:40:20
18 characterized by any physical illness of the body, is   13:40:25
19 it?                                             13:40:30
20     A. No.                                      13:40:31
21     Q. And nor is it, I think you've said, defined   13:40:31
22 by any set of established mental health criteria?   13:40:36
23         MR. LANNIN: Object to the form.         13:40:45
24         THE WITNESS: Not in any of those        13:40:46
25 classification systems, no.                     13:40:52
```

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1 BY MR. BROOKS:                          13:40:53
2    Q. It goes on in the third paragraph to read:   13:40:56
3       "As with other gender diverse      13:41:01
4    individuals, eunuchs may also seek    13:41:03
5    castration to better align their      13:41:06
6    bodies with their gender identity.    13:41:07
7    As such, eunuch individuals are       13:41:09
8    gender non-conforming individuals     13:41:13
9    who have needs requiring medically    13:41:14
10   necessary care."                      13:41:17
11   Do you see that language?             13:41:18
12 A. Yes.                                 13:41:19
13   Q. And we have -- we, WPATH has earlier defined  13:41:21
14 eunuchs as those who wish to eliminate masculine   13:41:25
15 features, including genitals. And am I correct that 13:41:30
16 the WPATH official position, as stated in Chapter 9 13:41:36
17 here, is that if a male wishes to eliminate his male 13:41:39
18 genitals and seeks castration, then castration is   13:41:45
19 medically necessary care?                13:41:49
20     MR. LANNIN: Object to the form.     13:41:51
21     THE WITNESS: It can be, if they meet the 13:41:51
22 diagnostic criteria and have been carefully evaluated 13:41:56
23 and this is clearly distressing for them. And -- and 13:42:02
24 so then that can be -- that is considered, again, a  13:42:13
25 medically necessary treatment.           13:42:24

Page 175

1 BY MR. BROOKS:                          13:42:26
2    Q. You said if they meet the diagnostic 13:42:26
3 criteria. I earlier read the definition of "eunuch." 13:42:28
4      What criteria do you have in mind when you 13:42:37
5 gave that answer?                        13:42:39
6     MR. LANNIN: Object to the form.     13:42:42
7     THE WITNESS: People that have this  13:42:44
8 persistent desire, similar to people who have a 13:42:51
9 persistent and distressing desire to go through 13:42:56
10 gender-affirmation surgery. So, in many ways, they  13:43:06
11 are -- they are similar in that -- that persistent   13:43:09
12 desire and having those particular, you know, body   13:43:14
13 parts is really quite distressing.       13:43:20
14 BY MR. BROOKS:                          13:43:23
15   Q. Do you believe that anywhere in Chapter 9  13:43:24
16 there's a discussion of persistent desire?  13:43:25
17 A. I -- it's clearly in the -- they'd have to  13:43:29
18 meet the criteria in the assessment chapter which is 13:43:35
19 "persistent."                           13:43:40
20   Q. And the assessment chapter specifically  13:43:42
21 discusses eunuchs?                      13:43:49
22     MR. LANNIN: Object to the form.     13:43:50
23     THE WITNESS: Either -- in the eunuch 13:43:56
24 chapter, there is reference to, again, needing to go 13:43:57
25 through these assessment procedures, and those would 13:44:01

Page 176

1 be the same for anyone with any kind of gender  13:44:09
2 identity concern.                        13:44:12
3 BY MR. BROOKS:                          13:44:14
4    Q. You talked earlier about limiting your  13:44:15
5 recommendations to those that are supported by  13:44:17
6 scientific evidence.                     13:44:20
7 A. Hm-hm.                               13:44:21
8    Q. Are you aware of any study that has  13:44:22
9 determined that those who seek castration because 13:44:26
10 they qualify as eunuchs, according to this  13:44:30
11 definition, will in fact be happier in the long run 13:44:32
12 if they're castrated?                    13:44:37
13 A. Yes, there's been research --        13:44:38
14   Q. What --                          13:44:43
15 A. -- demonstrating that.               13:44:43
16   Q. What -- what study do you have in mind in  13:44:44
17 that answer?                            13:44:45
18 A. I don't -- I can't recall the particular  13:44:46
19 study that is demonstrated, but the studies that have 13:44:49
20 been done are referenced in this chapter.  13:44:56
21   Q. In -- on page 89 in the first column, it  13:44:59
22 reads, quote:                           13:45:09
23       "Some other eunuch individuals     13:45:11
24    feel acute discomfort with their     13:45:14
25    male genitals and need to have them  13:45:16

Page 177

1    removed to feel comfortable in       13:45:18
2    their bodies."                       13:45:19
3    Do you see that language?            13:45:21
4 A. Yes.                                 13:45:21
5    Q. Am I correct that WPATH is, in this  13:45:23
6 document, declaring it to be medically necessary to  13:45:28
7 castrate physically healthy mental -- men if they  13:45:33
8 wish to eliminate male genitals so that they can feel 13:45:37
9 comfortable in their bodies?             13:45:41
10     MR. LANNIN: Object to the form.     13:45:42
11     THE WITNESS: I think your use of "wish" and 13:45:44
12 even our language there is -- could be easily  13:45:50
13 misconstrued.                           13:45:56
14   This is a very strong desire on the part of  13:45:57
15 these individuals. There is -- these people go to  13:46:02
16 quite serious lengths to self-castrate themselves or 13:46:08
17 to go to people who will perform this that are not  13:46:17
18 even qualified to -- to do these procedures.  13:46:25
19   And, clearly, the intent of this chapter is  13:46:29
20 to outline some guidelines of how to manage these  13:46:33
21 individuals that heretofore have really been  13:46:40
22 neglected and -- by the medical system.  13:46:44
23   And so we wanted to really try to address  13:46:50
24 this particular population, and -- and we ended up  13:46:58
25 recommending that, again, they should follow the  13:47:07

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1 kinds of assessments that are -- are recommended for   13:47:11
2 any -- any case of gender identity concerns.      13:47:17
3 BY MR. BROOKS:                13:47:21
4    Q. Well, Dr. Coleman, you'll agree that the   13:47:21
5 word "wish" is not one that I've introduced into the   13:47:23
6 conversation, but rather your chapter committee   13:47:26
7 defined "eunuchs" as those who wish to eliminate   13:47:31
8 masculine physical features at the very head of this   13:47:36
9 chapter.  Correct?              13:47:40
10    A. That is correct.            13:47:41
11    Q. And at the very bottom of the second column   13:47:41
12 of page 88, your committee chapter, again, in      13:47:44
13 describing eunuchs, described them as people who wish   13:47:52
14 for a body that is compatible with their eunuch   13:47:54
15 identity.  Correct?             13:47:57
16    A. Yes.                 13:47:58
17    Q. Now, speaking of science, are you aware of   13:47:58
18 data as to how many men in America qualify as   13:48:05
19 eunuchs, according to the WPATH definition?      13:48:15
20    A. How many what?  I'm sorry.       13:48:20
21    Q. Men in America.             13:48:21
22    A. No, we have -- we don't have an exact -- we   13:48:23
23 don't have that data.            13:48:29
24    Q. And do you have any information at all as to   13:48:30
25 how many men actually engage in either physical or   13:48:34

Page 179

1 chemical self-castration each year?      13:48:39
2    A. No.                  13:48:39
3    Q. Nor do you have any data as to how many men   13:48:47
4 have castrations performed by what WPATH considers to   13:48:51
5 be unqualified practitioners, do you?      13:48:57
6       MR. LANNIN:  Object to the form.      13:49:00
7       THE WITNESS:  What we know, based upon the   13:49:02
8 literature that it has, is that this is an unusual   13:49:04
9 manifestation, clinical manifestation.  And so while   13:49:12
10 we don't have any clear estimate of what this   13:49:18
11 population is, we have concern that many of these   13:49:23
12 individuals are -- have -- who have -- and it's   13:49:32
13 described in the literature -- who have sought   13:49:36
14 medical interventions have not been felt like   13:49:39
15 they've -- their concerns have really been heard or   13:49:48
16 validated.                13:49:51
17       And so there's been a reluctance of these   13:49:53
18 individuals to seek proper medical evaluation or   13:49:59
19 consideration for medical treatments or psychological   13:50:07
20 treatments.  And even though this is a -- probably a   13:50:13
21 small population, there's enough evidence that   13:50:20
22 there's quite a few of these individuals that -- that   13:50:25
23 we feel that really we should make it aware that   13:50:31
24 these people can get some help and assess --   13:50:38
25 assessment and -- and that we would provide   13:50:44

Page 180

1 guidelines so that they could get the best available   13:50:50
2 professional care rather than resorting to      13:50:56
3 self-castration or going to people who will perform   13:51:01
4 those procedures upon them.         13:51:07
5 BY MR. BROOKS:                13:51:08
6    Q. Are you aware of any information as to what   13:51:08
7 proportion of men who experience a strong wish to be   13:51:12
8 castrated actually follow through and engage in some   13:51:16
9 form of self-castration?            13:51:22
10    A. Not exactly, but, based upon the -- on the   13:51:24
11 research or surveys of these individuals, it's a --   13:51:27
12 they commonly report that they have made those   13:51:32
13 attempts.                  13:51:35
14    Q. And let me ask you to turn to page S90.   13:51:36
15       And this first full paragraph begins about   13:51:59
16 an inch -- inch-and-a-half down the page, begins --   13:52:02
17       "The large literature on         13:52:06
18    prostate cancer patients who have      13:52:08
19    been medically or surgically      13:52:10
20    castrated provides information on      13:52:12
21    some of the effects of         13:52:14
22    post-pubertal castration, such as   13:52:16
23    potential osteoporosis, depression,      13:52:18
24    or metabolic syndrome," close      13:52:22
25    quote.                 13:52:26

Page 181

1       Do you see that?            13:52:26
2    A. Yes.                  13:52:26
3    Q. So you agree with me, I take it, that WPATH   13:52:26
4 is and was, when this chapter was prepared, aware of   13:52:29
5 a -- what's referred to as a large body of literature   13:52:31
6 about negative bodily and mental health impacts from   13:52:36
7 castration of adult men.  Correct?      13:52:41
8       MR. LANNIN:  Object to the form.      13:52:44
9       THE WITNESS:  I don't know that -- certainly   13:52:51
10 aware of the -- the literature on -- on castration of   13:52:52
11 prostate cancer patients and some of the negative   13:53:03
12 effects as well as some of the positive effects.   13:53:10
13 Obviously, the reduction of -- of -- increasing the   13:53:13
14 negative effects of the cancer.         13:53:21
15       MR. BROOKS:  Let me ask the reporter to read   13:53:23
16 back my question.             13:53:23
17       THE WITNESS:  Yeah.            13:53:23
18       THE REPORTER:  One moment, please.      13:11:09
19       (Record read as follows:            13:11:09
20       "QUESTION:  So you agree with      13:52:27
21    me, I take it, that WPATH is and      13:52:27
22    was, when this chapter was      13:52:29
23    prepared, aware of a -- what's      13:52:31
24    referred to as a large body of      13:52:34
25    literature about negative bodily      13:52:35

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1    and mental health impacts from          13:52:38
2    castration of adult men.          13:52:41
3    Correct?")          13:52:43
4        THE WITNESS:  Yes.          13:53:48
5        MR. LANNIN:  Same objection.          13:53:48
6    BY MR. BROOKS:          13:53:49
7        Q.  And one of those is osteoporosis, that is,          13:53:53
8    weakening of bone strength.  Correct?          13:53:59
9        A.  One of those is potential osteoporosis.          13:54:01
10       Q.  And as a -- one would expect the same effect          13:54:06
11   on boys who are chemically castrated as a treatment          13:54:10
12   for puberty -- for gender dysphoria.  Correct?          13:54:15
13       MR. LANNIN:  Object to the form.          13:54:26
14       THE WITNESS:  I think that we're describing          13:54:31
15   here that these are some of the potential negative          13:54:33
16   side effects that have to be weighed in terms of the          13:54:40
17   potential positive effects of this procedure.          13:54:43
18   BY MR. BROOKS:          13:54:47
19       Q.  I understand.  And my question was, it is --          13:54:47
20   if this is a potential negative effect for men who          13:54:51
21   are castrated, you would agree, would you not, that          13:54:55
22   osteoporosis also has to be weighed as a potential          13:54:57
23   negative effect for boys who are chemically castrated          13:55:00
24   as a treatment for gender dysphoria?          13:55:05
25       MR. LANNIN:  Object to the form.          13:55:07

Page 183

1        THE WITNESS:  That is a potential impact and          13:55:09
2    has to be weighed and -- and certainly monitored.          13:55:13
3    BY MR. BROOKS:          13:55:17
4        Q.  What is metabolic syndrome, if you know?          13:55:18
5        A.  Metabolic syndrome is a combination of -- of          13:55:21
6    high sugar, high blood pressure, weight.  And so          13:55:27
7    it's -- it's a -- it's an overall syndrome that kind          13:55:33
8    of combines a number of medical conditions.          13:55:39
9        Q.  And am I correct that metabolic syndrome is          13:55:41
10   known to increase the risk of heart disease and          13:55:45
11   stroke?          13:55:47
12       A.  That is my understanding.          13:55:48
13       Q.  As well as of Type 2 diabetes?          13:55:49
14       A.  Yeah.          13:55:52
15       Q.  And, similarly, if that is a potential          13:55:54
16   negative effect of castration of adult men, you would          13:55:56
17   have to expect that to be a potential negative effect          13:55:59
18   of chemical castration of boys as well, would you          13:56:03
19   not?          13:56:06
20       MR. LANNIN:  Object to the form.          13:56:07
21       THE WITNESS:  That potential exists.          13:56:08
22   BY MR. BROOKS:          13:56:17
23       Q.  And then there's depression, which, unlike          13:56:17
24   the other two, is strictly a mental health condition.          13:56:19
25   Correct?          13:56:22

Page 184

1        MR. LANNIN:  Object to the form.          13:56:24
2        THE WITNESS:  I think that we have learned          13:56:24
3    and understood that depression is -- is oftentimes          13:56:26
4    biologically based and --          13:56:33
5    BY MR. BROOKS:          13:56:37
6        Q.  Okay.          13:56:38
7        A.  -- is not simply in the mind --          13:56:38
8        Q.  Fair enough.          13:56:40
9        A.  -- in the thought.          13:56:41
10       Q.  Fair enough.          13:56:42
11       The sentence that I read continues to say:          13:56:45
12       "But voluntary eunuchs may          13:56:51
13   interpret the results very          13:56:53
14   differently from those castrated          13:56:54
15   for medical reasons."          13:56:55
16   Do you see that language?          13:56:56
17       A.  Yes.          13:56:56
18       Q.  So WPATH is here drawing a line between          13:57:07
19   those who are castrated for medical reasons, on the          13:57:10
20   one hand, and those who are castrated to conform          13:57:13
21   their bodies to a eunuch identity, on the other hand.          13:57:17
22   Correct?          13:57:20
23       MR. LANNIN:  Object to the form.          13:57:20
24       THE WITNESS:  I'm not sure I understand          13:57:25
25   that.  We were trying to make the distinction that          13:57:27

Page 185

1    many of the eunuchs that go through, this while there          13:57:34
2    may be some potential of some of these negative side          13:57:38
3    effects, one, those oftentimes can be managed, but          13:57:45
4    the -- the relief that they feel oftentimes outweighs          13:57:51
5    any negative feelings about the negative side          13:57:59
6    effects.          13:58:02
7    BY MR. BROOKS:          13:58:02
8        Q.  Well, certainly whether the castration          13:58:03
9    causes osteoporosis or not doesn't depend on how a          13:58:06
10   eunuch interprets things, does it?          13:58:10
11       MR. LANNIN:  Object to the form.          13:58:13
12       THE WITNESS:  I'm not sure I understand          13:58:17
13   that.          13:58:18
14   BY MR. BROOKS:          13:58:19
15       Q.  Well, the statement here says voluntary          13:58:19
16   eunuchs following -- pardon me -- following on the          13:58:21
17   list of potential negative effects, the statement          13:58:25
18   here in SOC-8 says:          13:58:29
19       "But voluntary eunuchs may          13:58:31
20   interpret the results very          13:58:33
21   differently from those castrated          13:58:34
22   for medical reasons."          13:58:36
23       And my question is, how a eunuch interprets          13:58:37
24   the castration you would not expect to have any          13:58:42
25   effect one way or the other as to whether that          13:58:46

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1 castration causes osteoporosis, would you? 13:58:49
2    A. I mean, the main distinction we're talking 13:58:52
3 about here is that the -- the eunuch welcomes this 13:58:54
4 castration. A prostate cancer patient is not so 13:59:00
5 happy about losing what they perceive as a masculine 13:59:05
6 attribute, just as a woman going through a mastectomy 13:59:12
7 as a result of breast cancer. And -- and, yet, a 13:59:17
8 transgender person that is dysphoric about their 13:59:24
9 breasts welcomes that. So they interpret that 13:59:28
10 procedure very differently. 13:59:33
11    Q. Dr. Coleman, the paragraph that I've called 13:59:36
12 your attention to is discussing negative effects. 13:59:37
13    A. Uh-huh. 13:59:41
14    Q. And whether or not the eunuch welcomes the 13:59:41
15 surgery has no effect on the risk that that surgery 13:59:45
16 will inflict osteoporosis on that individual, does 13:59:49
17 it? 13:59:53
18       MR. LANNIN: Object to the form. 13:59:53
19       THE WITNESS: I think I explained this just 13:59:54
20 before too. Not only do they experience the 13:59:58
21 procedure of castration differently, but they would 14:00:01
22 interpret or perceive any potential side effects the 14:00:07
23 positive, while the prostate cancer patient may be 14:00:13
24 concerned about some -- any potential negative side 14:00:19
25 effect. The eunuch, the overriding thing is that 14:00:26

Page 187

1 they are extremely relieved that they do not have to 14:00:28
2 deal with what has been castrated. 14:00:33
3 BY MR. BROOKS: 14:00:37
4    Q. Are you unable to answer my question? 14:00:37
5    A. I'm trying my best to answer it. 14:00:40
6    Q. Let me ask it once more. 14:00:41
7    A. Okay. 14:00:43
8    Q. Whether a castration does or does not 14:00:44
9 inflict osteoporosis on a male does not turn in any 14:00:48
10 degree on whether that individual welcomes or regrets 14:00:54
11 the procedure, does it? 14:00:57
12    A. I don't know. 14:00:58
13       MR. LANNIN: Object to the form. 14:00:59
14       THE WITNESS: That's your statement, not 14:01:00
15 mine. 14:01:01
16 BY MR. BROOKS: 14:01:01
17    Q. It is my statement. And my question is do 14:01:02
18 you believe that to be a true statement? 14:01:04
19       Let me ask the reporter to read it back. 14:01:08
20       THE REPORTER: One moment, please. Just 14:01:08
21 your -- 14:01:08
22       MR. BROOKS: My question. 13:11:09
23       (Record read as follows: 13:11:09
24          "QUESTION: Whether a 14:00:46
25       castration does or does not inflict 14:00:46

Page 188

1       osteoporosis on a male does not 14:00:49
2       turn in any degree on whether that 14:00:53
3       individual welcomes or regrets the 14:00:54
4       procedure, does it?") 14:00:57
5       THE WITNESS: I would not agree with that 14:01:26
6 statement. I'm not even sure what it means. 14:01:28
7 BY MR. BROOKS: 14:01:30
8    Q. And whether castration will inflict 14:01:32
9 metabolic syndrome on a male doesn't turn in any 14:01:36
10 extent on whether that male welcomes or regrets the 14:01:41
11 castration, does it? 14:01:46
12       MR. LANNIN: Object to the form. 14:01:47
13       THE WITNESS: What's being said here and 14:01:49
14 what I'm trying to say is that the eunuch would 14:01:59
15 perceive the procedure or any potential negative 14:02:03
16 effects differently than a prostate cancer patient. 14:02:09
17 BY MR. BROOKS: 14:02:15
18    Q. I know what you're trying to say, but you 14:02:15
19 have an obligation to answer the question that I ask, 14:02:16
20 and that's not the question I asked. 14:02:18
21    A. Well -- 14:02:18
22    Q. Would you like to hear it one more time? 14:02:21
23    A. You can ask it again, but I'm trying to 14:02:23
24 answer it to the best of my ability. 14:02:26
25    Q. No, you're talking about what you want to 14:02:27

Page 189

1 talk about. I'd like you to answer my question. 14:02:29
2       MR. LANNIN: Counsel, you're badgering the 14:02:31
3 witness. He's trying to answer your question. 14:02:32
4       MR. BROOKS: No, the witness is not trying 14:02:33
5 to answer my question. The witness is trying to 14:02:34
6 evade my question. 14:02:36
7 BY MR. BROOKS: 14:02:36
8    Q. Dr. Coleman, you would agree with me, would 14:02:39
9 you not, that whether castration will inflict 14:02:41
10 metabolic syndrome on a patient does not depend on 14:02:46
11 whether the patient desires the castration or not. 14:02:48
12       MR. LANNIN: Object to the form. 14:02:53
13       You can answer if you understand. 14:02:55
14       THE WITNESS: I don't understand. 14:03:03
15 BY MR. BROOKS: 14:03:04
16    Q. Well, maybe you'll understand it better in 14:03:05
17 court. 14:03:06
18       Now, the statement that the eunuch may 14:03:14
19 interpret the results very differently cites no 14:03:16
20 science. Is there any scientific evidence that 14:03:21
21 you're aware of as to how a eunuch who has been 14:03:26
22 castrated will evaluate or interpret osteoporosis, 14:03:32
23 depression, or metabolic syndrome that 14:03:40
24 individual suffers as a result of the castration? 14:03:42
25       MR. LANNIN: Object to the form. 14:03:44

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1      THE WITNESS:  These statements are derived   14:03:46
2 from the -- the research that is cited there, and, in   14:03:55
3 that research, that's what these researchers found.   14:04:00
4 That they -- they view and they perceive things   14:04:05
5 differently than individuals that go through   14:04:10
6 treatment -- that kind of treatment for cancer.   14:04:16
7 BY MR. BROOKS:   14:04:19
8      Q.  At the top of page 91, the first full   14:04:22
9 paragraph reads:   14:04:26
10         "When desired, castration can   14:04:28
11     be achieved either chemically or   14:04:30
12     surgically."   14:04:32
13     A.  I'm sorry.  Let's --   14:04:33
14     Q.  It's the very first paragraph at the top of   14:04:35
15 page 91, if you go on to the next page.   14:04:37
16     A.  "When desired," okay.   14:04:42
17     Q.     "When desired, castration can   14:04:43
18     be achieved either chemically or   14:04:45
19     surgically.  For some, chemical   14:04:47
20     castration can be an appropriate   14:04:50
21     trial prior to undergoing surgical   14:04:51
22     castration to determine how the   14:04:54
23     individual feels when hypogonadal.   14:04:57
24     Chemical castration is usually   14:05:02
25     reversible if the medications are   14:05:03

Page 191

1     discontinued."   14:05:06
2      Do you see that language?   14:05:08
3     A.  Yes.   14:05:08
4     Q.  The reference to supposedly reversible   14:05:11
5 chemical castration is referring to the use of GNRH   14:05:14
6 agonists.  Correct?   14:05:18
7     A.  That's correct.   14:05:19
8     Q.  And most commonly Lupron?   14:05:20
9     A.  That's correct.   14:05:22
10     Q.  And the statement here says that:   14:05:23
11         "Even among adult men who have   14:05:28
12     gone through full male puberty and   14:05:32
13     fertility development chemical   14:05:35
14     castration by application of   14:05:37
15     Lupron, or some other GNRH agonist,   14:05:40
16     is only," and I quote, "usually   14:05:43
17     reversible," close quote.   14:05:44
18      Do you see that?   14:05:46
19     A.  Yes.   14:05:47
20     Q.  And let me ask this.  If in the eunuch   14:05:48
21 chapter WPATH states that chemical castration by use   14:05:57
22 of Lupron is only -- usually reversible, how is it   14:06:04
23 that you permitted SOC-8 adolescent chapters to refer   14:06:09
24 to puberty blocker use as, quote, "fully reversible"?   14:06:14
25     MR. LANNIN:  Object to the form.   14:06:22

Page 192

1      THE WITNESS:  I think that there -- these   14:06:23
2 are people at completely different ages of -- of --   14:06:36
3 of development.  And, again, I'm not an   14:06:42
4 endocrinologist, so this was based upon the evidence   14:06:47
5 of -- of individuals, and the language here is --   14:06:51
6 matches what happens to adult males going through   14:06:59
7 this procedure, and, in many cases, the -- any kind   14:07:03
8 of negative effects can be reversible in an adult   14:07:10
9 male.   14:07:14
10 BY MR. BROOKS:   14:07:15
11     Q.  Well, is the evidence, so far as you're   14:07:15
12 aware, that chemical castration is fully reversible   14:07:19
13 as WPATH states in the adolescent chapter or that   14:07:26
14 it's only usually reversible at WPATH states in the   14:07:30
15 eunuch chapter?   14:07:34
16     MR. LANNIN:  Object to the form.   14:07:35
17     THE WITNESS:  It is usually reversible in --   14:07:40
18 in the case of adolescents.   14:07:47
19 BY MR. BROOKS:   14:07:50
20     Q.  On page 90 is the "Recommendation," column   14:07:57
21 2, clearly headed "Statement 9.2" and it states,   14:08:05
22 quote:   14:08:09
23         "We recommend health care   14:08:09
24     professionals consider medical   14:08:12
25     intervention, surgical   14:08:14

Page 193

1     intervention, or both, for eunuch   14:08:15
2     individuals when there's a high   14:08:17
3     risk that withholding treatment   14:08:20
4     will cause individuals harm through   14:08:22
5     self-surgery, surgery by   14:08:24
6     unqualified practitioners, or   14:08:26
7     unsupervised use of medications   14:08:29
8     that affect hormones."   14:08:30
9      Do you see that language?   14:08:31
10     A.  Yes.   14:08:32
11     Q.  Now, WPATH does not recommend or, for that   14:08:34
12 matter, suggest medical intervention for eunuchs   14:08:40
13 unless there's a high risk that withholding that will   14:08:47
14 cause harm through -- physical harm through   14:08:51
15 self-surgery, surgery by unqualified practitioners,   14:08:56
16 or unsupervised use of hormones.  Correct?   14:08:58
17     MR. LANNIN:  Object to the form.   14:09:03
18     THE WITNESS:  I think that that's what this   14:09:07
19 states here.   14:09:08
20 BY MR. BROOKS:   14:09:09
21     Q.  I think that.  And it's -- am I correct that   14:09:10
22 the mere fact that a eunuch feels distressed.  A   14:09:14
23 eunuch defined, according to this, is not as somebody   14:09:19
24 who's been castrated, but as somebody who wishes to   14:09:23
25 be.   14:09:26

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1  A. Yeah.                                    14:09:26
2  Q. The mere fact that a eunuch feels distress  14:09:26
3  and has felt distressed for a long time does not,  14:09:29
4  according to SOC-8, justify surgery, does it?  14:09:30
5  A. Not in and of itself.                     14:09:33
6  Q. A strong desire to conform one's body to  14:09:35
7  one's gender identity as eunuch does not justify  14:09:42
8  medical intervention, according to SOC-8.  Correct?  14:09:46
9     MR. LANNIN: Object to the form.           14:09:49
10    THE WITNESS: Can you say that again.       14:09:52
11 BY MR. BROOKS:                               14:09:52
12 Q. I can try.  The mere fact that an individual  14:09:54
13 wishes to conform his body with his eunuch identity  14:10:00
14 through castration and has had that wish for a long  14:10:08
15 time does not justify a practitioner in performing  14:10:13
16 surgery or hormonal interventions on a eunuch,  14:10:20
17 according to SOC-8.  Correct?                14:10:23
18    MR. LANNIN: Object to the form.           14:10:25
19    THE WITNESS: It might if, again, the      14:10:26
20 professional should consider those medical   14:10:32
21 interventions and this individual needs to go through  14:10:39
22 an extensive evaluation and education of what this  14:10:41
23 might mean, positive and negative, for them.  Right?  14:10:49
24 BY MR. BROOKS:                               14:10:54
25 Q. Well, the reser- -- the recommendation turns  14:10:56

Page 195

1  on whether physical self-harm is -- there's a high  14:10:58
2  risk of physical self-harm.  Correct?       14:11:03
3  A. That -- again, that's a clear criteria, but  14:11:05
4  the recommendation says consider medical    14:11:07
5  intervention.                               14:11:13
6  Q. And my point is, absent a finding of high  14:11:14
7  risk of physical harm self-inflicted, then SOC-8 does  14:11:18
8  not recommend surgical or hormonal intervention to  14:11:25
9  enable a eunuch to conform his body to the gender  14:11:30
10 identity he desires.                        14:11:35
11    MR. LANNIN: Object to the form.           14:11:36
12    THE WITNESS: I'm not sure that I understand  14:11:47
13 what you're saying here, but.               14:11:51
14 BY MR. BROOKS:                               14:11:53
15 Q. We can hear the question back if that would  14:11:53
16 be helpful?                                 14:11:55
17 A. Let's try that.                          14:11:56
18    THE REPORTER: One moment, please.         13:11:09
19    (Record read as follows:                  13:11:09
20    "QUESTION: And my point is,               14:11:14
21    absent a finding of high risk of          14:11:16
22    physical harm self-inflicted, then        14:11:19
23    SOC-8 does not recommend surgical         14:11:24
24    or hormonal intervention to enable        14:11:27
25    a eunuch to conform his body to the       14:11:30

Page 196

1     gender identity he desires.")            14:11:34
2     MR. LANNIN: Object to the form.           14:12:23
3     THE WITNESS: I think that there could be  14:12:24
4  cases where they don't have these kinds of things and  14:12:26
5  they have that persistent desire.  They have not  14:12:34
6  sought self-surgery or surgery by unqualified persons  14:12:42
7  and have come in good faith to really get evaluated,  14:12:50
8  get the best available treatment, that it may be  14:12:55
9  indicated that that individual would benefit and  14:13:00
10 would be medically necessary to perform that  14:13:05
11 procedure.                                  14:13:10
12 BY MR. BROOKS:                               14:13:11
13 Q. So even though the SOC-8 statement 9.2     14:13:11
14 recommends medical intervention only on the condition  14:13:19
15 that there's a high risk of self-harm, you sitting  14:13:26
16 here today say that, in fact, maybe medical  14:13:30
17 intervention could be appropriate even when there's  14:13:35
18 not a high risk of self-harm?               14:13:38
19 A. I don't --                               14:13:40
20    MR. LANNIN: Object to the form.           14:13:40
21    THE WITNESS: -- interpretate that statement  14:13:41
22 in the same way you do.                     14:13:43
23 BY MR. BROOKS:                               14:13:46
24 Q. Okay.  Is there any discussion in SOC-8 as  14:13:47
25 to how WPATH balanced the risks and the benefits of  14:13:55

Page 197

1  castration of men who suffer from no physical or  14:14:00
2  recognized mental health condition in the case of  14:14:06
3  recommendations about eunuchs?              14:14:10
4  A. State that again.  I'm sorry.  Was there --  14:14:15
5  Q. Is there any discussion in --            14:14:17
6  A. Right, hm-hm.                            14:14:17
7  Q. -- this chapter or anywhere else in SOC-8  14:14:20
8  that explains how WPATH balanced the risks of harms  14:14:27
9  from castration against the potential benefits of  14:14:31
10 castration for men who suffer from no physical malady  14:14:33
11 or recognized mental health condition?      14:14:39
12 A. Well, I think it talks about, again, the   14:14:47
13 potential negative side effects and is part -- and  14:14:49
14 this chapter refers to the assessment chapter which  14:14:54
15 requires a very careful assessment of these  14:14:59
16 individuals, oftentimes recommending that they go  14:15:02
17 through hormonal interventions before any kind of  14:15:06
18 permanent surgical interventions.  And in an informed  14:15:13
19 consent process where they are thoroughly educated on  14:15:23
20 the risks and the benefits so that they can make the  14:15:31
21 best informed decision and that that health care  14:15:33
22 professional can deem that as a medically necessary  14:15:39
23 procedure.                                  14:15:44
24 Q. Dr. Coleman, SOC-8 nowhere provides the   14:15:45
25 slightest guidance as to how a practitioner can  14:15:50

CONFIDENTIAL

Page 198

1 determine whether a man who wishes to be castrated is  14:15:53
2 actually at high risk of self-harm through  14:15:58
3 self-castration or otherwise, does it?  14:16:04
4      MR. LANNIN:  Object to the form.  14:16:06
5      THE WITNESS:  If it is not explicitly  14:16:09
6 stated, that is implied in the informed consent  14:16:15
7 process.  14:16:17
8 BY MR. BROOKS:  14:16:19
9   Q.  I'm sorry.  My question was, SOC-8 provides  14:16:19
10 no guidance whatsoever as to how a practitioner could  14:16:23
11 go about determining which individual who presents as  14:16:28
12 a eunuch is actually at high risk of self-harm, does  14:16:30
13 it?  14:16:34
14      MR. LANNIN:  Object to the form.  14:16:35
15      THE WITNESS:  The -- the Standards of Care  14:16:36
16 do not go into all of the procedures one goes through  14:16:39
17 in assessment and treatment.  It is a Standards of  14:16:44
18 Care.  It is not a complete textbook or guidance step  14:16:49
19 by step of what the clinicians must -- must do.  14:16:54
20      So I think that that is consistent with how  14:17:02
21 the rest of the standards were written.  14:17:11
22 BY MR. BROOKS:  14:17:16
23   Q.  And your opinion is, in the case of a  14:17:17
24 physically healthy mean with no recognized mental  14:17:18
25 health conditions and who presents as a eunuch  14:17:22

Page 199

1 seeking castration, but no finding is made that he's  14:17:26
2 actually at high risk of self-castration,  14:17:33
3 nevertheless, WPATH's official position is that that  14:17:38
4 castration may be a medically necessary procedure?  14:17:41
5   A.  That's correct.  14:17:44
6      MR. BROOKS:  I'm going to ask the reporter  14:18:33
7 to mark as Exhibit 16 what is the Appendix A  14:18:35
8 Methodology Document of SOC-8.  14:18:43
9      (The document referred to was  14:18:43
10      marked as Exhibit 16.)  14:18:43
11 BY MR. BROOKS:  14:18:43
12   Q.  Dr. Coleman, let me ask you to look at this  14:19:11
13 and just confirm that what I have here is the  14:19:13
14 methodology appendix to the SOC-8.  14:19:15
15   A.  Yes.  It also includes the appendix -- some  14:19:22
16 appendices, but yes --  14:19:27
17   Q.  Oh, I may have gotten carried away.  14:19:31
18   A.  -- the methodology here.  14:19:32
19   Q.  All right.  Let me ask you to turn to  14:19:34
20 page S247 --  14:19:38
21   A.  247.  14:19:42
22   Q.  -- which is the beginning of the methodology  14:19:43
23 appendix.  14:19:44
24   A.  Right.  14:19:45
25   Q.  And at the bottom of the first column is a  14:19:45

Page 200

1 sentence that says, "The main differences in the  14:19:54
2 methodology of the SOC-8 when compared with other  14:19:57
3 versions of the SOC are," and then there's a long  14:20:01
4 list.  And one of the those in the list is  14:20:06
5 "Management of Conflicts of Interest."  14:20:07
6      Do you see that?  14:20:09
7   A.  Yes.  14:20:09
8   Q.  Am I correct that in SOC-7 and before there  14:20:11
9 was neither internal reporting nor external  14:20:15
10 disclosure relating to conflicts of interest?  14:20:19
11   A.  There was -- I'm sorry.  Say that --  14:20:22
12   Q.  There was neither internal disclosure nor  14:20:24
13 external reporting of conflicts of interests of  14:20:28
14 participants in the project --  14:20:32
15      MR. LANNIN:  Object to the form.  14:20:33
16 BY MR. BROOKS:  14:20:35
17   Q.  -- SOC-7 and before.  14:20:35
18      MR. LANNIN:  Object to the form.  14:20:36
19      THE WITNESS:  Oh.  SOC-7 before, that is  14:20:37
20 correct.  14:20:40
21 BY MR. BROOKS:  14:20:40
22   Q.  Okay.  And whose decision was it to add that  14:20:41
23 for SOC-8?  14:20:47
24   A.  That was part of the recommendation of Karen  14:20:48
25 Robinson who guided us in developing the entire  14:20:52

Page 201

1 methodology for SOC-8.  14:20:58
2   Q.  Earlier in -- at the first paragraph, the  14:21:01
3 introduction of the methodology, it states at the  14:21:10
4 bottom of the paragraph, quote:  14:21:13
5      "The process for development of  14:21:15
6      the SOC-8 incorporated  14:21:18
7      recommendations on clinical  14:21:20
8      practice guideline development from  14:21:21
9      the National Academies of Medicine  14:21:24
10      and the World Health Organization  14:21:26
11      that addressed transparency, the  14:21:29
12      conflict of interest policy,  14:21:31
13      committee composition, and group  14:21:32
14      process."  14:21:34
15      Do you see that language?  14:21:35
16   A.  Yes.  14:21:36
17   Q.  And is that -- is that accurate?  14:21:37
18   A.  Yes.  14:21:37
19   Q.  And did you have occasion to look at and to  14:21:41
20 any extent familiarize yourself with the documents  14:21:45
21 from the Institute of Medicine and the World Health  14:21:49
22 Organization that are referenced there?  14:21:54
23   A.  I didn't study them in-depth, but, again, we  14:21:56
24 discussed, you know, the various methodologies that  14:21:59
25 could be employed.  And then, again, through the  14:22:04

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1 guidance of Karen Robinson, we arrived at this --    14:22:09
2 this methodology that was probably an amalgam of some  14:22:15
3 of these recommendations.                    14:22:19
4       There's different -- lots of different    14:22:20
5 methodologies for developing clinical guide- --    14:22:23
6 guidelines, and so I think each clinical guideline    14:22:26
7 that is developed is developed a bit differently,    14:22:32
8 depending upon the subject area, or whatever, of may  14:22:36
9 different kinds of considerations.               14:22:41
10      Q.  And was it your intention and belief that    14:22:43
11 when it came to conflict of interest that, in the    14:22:47
12 course of developing SOC-8, WPATH did follow the    14:22:50
13 recommendations of these two documents that you've    14:22:56
14 referred to in the methodology section?           14:23:01
15      A.  As far as I know, yes.           14:23:04
16      Q.  And indeed you told the world that you    14:23:06
17 referred to those documents for recommendations as to  14:23:10
18 conflict of interest and transparency.  Correct?    14:23:15
19      A.  Yes.                         14:23:18
20      MR. BROOKS:  I'm going to make sure that    14:23:21
21 we -- that I know what those documents are.        14:23:22
22      Let me ask the reporter to mark as         14:23:25
23 Exhibit -- I'm not the only one -- 17 a document put   14:23:34
24 out by the Institute of Medicine titled "Clinical    14:23:37
25 Practice Guidelines We Can Trust."             14:23:40

Page 203

1        (The document referred to was        14:23:40
2        marked as Exhibit 17.)            14:23:40
3 BY MR. BROOKS:                       14:23:40
4      Q.  And, just to avoid confusion, you        14:24:02
5 understand, do you not, that the Institute of        14:24:04
6 Medicine is another name for the National Academy of  14:24:06
7 Medicine?                          14:24:10
8      A.  Yes.                         14:24:10
9      Q.  Do you believe this to be the Institute of  14:24:20
10 Medicine or National Academy of Medicine        14:24:22
11 recommendations for guideline development that is    14:24:27
12 referenced in the paragraph we've been looking at?   14:24:29
13      A.  Apparently so.                 14:24:33
14      MR. BROOKS:  And let me ask the reporter to   14:24:35
15 mark as -- 37, whatever you want -- 18, a document   14:24:37
16 entitled "WHO Handbook For Guideline Development,   14:24:45
17 Second Edition."                     14:24:49
18        (The document referred to was        14:24:49
19        marked as Exhibit 18.)            14:25:00
20 BY MR. BROOKS:                       14:25:00
21      Q.  I will just note, since it's a second    14:25:02
22 edition, that the copyright information suggests a    14:25:02
23 copyright date of 2014.                 14:25:04
24      I'm just wanting to label it.  That was 18.  14:25:19
25      And let me ask whether you believe this is   14:25:27

Page 204

1 the WHO guidelines that you referred to in the first  14:25:29
2 paragraph of the SOC-8 methodology?             14:25:32
3      MR. LANNIN:  Object to the form, but you can  14:25:41
4 answer.                           14:25:42
5      THE WITNESS:  Pardon?                14:25:43
6      MR. LANNIN:  I objected to the form, but you  14:25:43
7 can answer.                         14:25:45
8      THE WITNESS:  Oh.  It appears so, yes.    14:25:46
9      MR. BROOKS:  All right.             14:25:56
10      Let me ask the reporter to mark as         14:26:00
11 Exhibit 19 an email from -- it's a chain, actually,   14:26:03
12 of course -- Karen Robinson to named individuals and  14:26:08
13 an Education SOC-8 group at -- did I say as       14:26:14
14 Exhibit 19.                         14:26:20
15        (The document referred to was        14:26:20
16        marked as Exhibit 19.)            14:26:31
17 BY MR. BROOKS:                       14:26:31
18      Q.  And, here, again, I don't want confusion.  14:26:47
19 Do you believe -- I don't think I see your name on   14:26:49
20 this.  I believe that I see SOC -- Education SOC-8.   14:26:52
21 And you talked about how your group -- well, I think  14:26:58
22 there's an education chapter, you also received    14:27:02
23 education from Karen Robinson.                14:27:04
24      Do you believe that you were part of an    14:27:06
25 email group titled "Education SOC-8"?           14:27:07

Page 205

1      A.  I don't think I was.             14:27:11
2      Q.  Okay.  And I'll just ask you a conceptual  14:27:28
3 question, but on page 1541, Gail Knudsen -- let me    14:27:30
4 ask.  Who is Gail Knudsen, if you know?         14:27:37
5      A.  Gail was a cochair of the education chapter.  14:27:41
6      Q.  Okay.  Gail writes to various people:    14:27:44
7        "The form originated from Karen        14:27:49
8        and she expects that people will        14:27:52
9        have conflicts of interest.  The        14:27:54
10        point is not to disqualify people,        14:27:55
11        it is to promote transparency."         14:27:59
12      And my question for you is, was it         14:28:01
13 consistent with your understanding of the conflict   14:28:03
14 disclosure process that the point was to promote    14:28:05
15 transparency, not to disqualify people from        14:28:08
16 participating?                       14:28:12
17      MR. LANNIN:  Object to the form.          14:28:13
18      THE WITNESS:  There was a potential that    14:28:14
19 there would be disqualification.  But, again, it was  14:28:20
20 recognized that -- that many of the -- many of the   14:28:25
21 members would have some -- some level of conflict of  14:28:31
22 interest.                          14:28:36
23 BY MR. BROOKS:                       14:28:37
24      Q.  Let me ask you to take Exhibit 17, which is  14:28:38
25 the IOM "Clinical Practice Guidance We Can Trust,"   14:28:45

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1 and I -- again, I've included table of contents and     14:28:49
2 some preliminary pages just to ensure that we had     14:28:52
3 appropriate context.     14:28:56
4     Let me ask you to turn to page 78.     14:29:01
5     A. Okay.     14:29:22
6     Q. And there, under the heading "Management of     14:29:22
7 Conflicts of Interest," starting perhaps eight lines     14:29:30
8 down is a, what is referred to as "complementary     14:29:34
9 descriptions of COI."     14:29:40
10     Do you understand "COI" to refer to conflict     14:29:42
11 of interest?     14:29:46
12     A. Yes.     14:29:46
13     Q. And in quotes it says a divergence that is a     14:29:46
14 COI is:     14:29:49
15     "A divergence between an     14:29:49
16     individual's private interests and     14:29:51
17     his or her professional obligations     14:29:52
18     such that an independent observer     14:29:55
19     might reasonably question whether     14:29:57
20     the individual's professional     14:29:58
21     actions or decisions are motivated     14:30:00
22     by personal gain such as financial,     14:30:03
23     academic advancement, clinical     14:30:07
24     revenue streams, or community     14:30:09
25     standing, and a financial or     14:30:11

Page 207

1     intellectual relationship that may     14:30:15
2     impact an individual's ability to     14:30:17
3     approach a scientific question with     14:30:19
4     an open mind,'" close quote.     14:30:21
5     Is that consistent with the understanding of     14:30:25
6 what constitutes a conflict of interest that you     14:30:28
7 learned through the course of your work on this     14:30:32
8 project and interactions with Karen Robinson?     14:30:34
9     MR. LANNIN: Object to the form.     14:30:38
10     THE WITNESS: Okay. I need to go back to     14:30:39
11 what you read on the -- can you point to the part --     14:30:42
12 BY MR. BROOKS:     14:30:46
13     Q. I can hold it up and point.     14:30:46
14     A. -- or show me.     14:30:49
15     Q. Yeah. Starts --     14:30:49
16     A. Because I was listening, but I didn't --     14:30:49
17 BY MR. BROOKS:     14:30:51
18     Q. I understand. Starts seven lines down     14:30:51
19 into --     14:30:55
20     A. "A divergence"?     14:30:56
21     Q. Right.     14:30:57
22     A. Where it starts with "A divergence"?     14:31:00
23     Q. That is the -- the definition starts there     14:31:05
24 with the quote, yes.     14:31:07
25     A. Okay.     14:31:07

Page 208

1     Okay.     14:31:32
2     Q. And my question is, are those statements of     14:31:32
3 what constitutes a conflict of interest consistent     14:31:37
4 with the understanding you developed in the course of     14:31:41
5 your work on the SOC-8 project with Karen Robinson?     14:31:43
6     A. Yes.     14:31:47
7     Q. I should say Dr. Karen Robinson.     14:31:48
8     Who made the decision to retain Dr. Robinson     14:31:53
9 and her team at Johns Hopkins to, as you said, guide     14:31:55
10 the process?     14:32:02
11     MR. LANNIN: Object to the form.     14:32:02
12     THE WITNESS: I don't know how many clinical     14:32:03
13 guidance organizations were contacted, but I remember     14:32:07
14 we were down to like two, Mayo and Johns Hopkins.     14:32:14
15     And so certainly the -- the board -- I don't     14:32:19
16 know who on the board, whether it was a     14:32:26
17 subcommittee -- was reviewing those proposals, but we     14:32:28
18 were -- as chairs and cochairs were invited to, you     14:32:43
19 know, weigh in on that decision. Ultimately, it was     14:32:43
20 a decision of the board of directors.     14:32:46
21 BY MR. BROOKS:     14:32:48
22     Q. Okay. Let me ask you to turn to page 76.     14:32:48
23 And there's a heading that says "Establishing     14:32:59
24 Transparency."     14:33:02
25     A. Hm-hm.     14:33:03

Page 209

1     Q. And that paragraph begins:     14:33:03
2     "Transparency connotes the     14:33:05
3     provision of information to CPG     14:33:06
4     users that enables them to     14:33:10
5     understand how recommendations were     14:33:11
6     derived and who developed them."     14:33:13
7     And you understand "CPG" to refer to     14:33:15
8 clinical practice guidelines?     14:33:18
9     A. Yes.     14:33:20
10     Q. Do you agree, is it your opinion that     14:33:23
11 transparency with respect to the process of standards     14:33:32
12 development and who participated in them and any     14:33:37
13 conflicts of interest those individuals might have to     14:33:40
14 users of those clinical practice guidelines is     14:33:46
15 important?     14:33:50
16     A. Yes. And that's why we developed our     14:33:53
17 rigorous process of select-- transparently of     14:33:56
18 selecting committee members, reviewing conflict of     14:34:03
19 interests, and the whole very rigorous methodology     14:34:11
20 with all of its checks and balances, and the fact     14:34:17
21 that we -- once the committee was formed, those names     14:34:29
22 were displayed on the Web site, pictures where they     14:34:31
23 worked, et cetera. And in the -- and in the     14:34:37
24 publication of the Standards of Care, you know,     14:34:44
25 itself, all authors are listed and their affiliations     14:34:46

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1 so that there was a very transparent process. 14:34:51
2     The methodology was available as soon as we 14:34:55
3 defined that on the website. Everyone could really 14:34:59
4 see that. 14:35:03
5     So I feel it was a very transparent process. 14:35:04
6 And, as we talked about before, we didn't have that 14:35:10
7 level of rigor in developing Standards of Care 7, so. 14:35:14
8     I actually don't know of any -- any clinical 14:35:21
9 guidelines for care of transgender and gender-diverse 14:35:30
10 people that has this level of rigor in their 14:35:33
11 methodology. 14:35:37
12     Q. Let me take you to page 79. 14:35:38
13     A. Wait a minute. I'm going which -- 14:35:53
14     Q. 79. We're still in -- 14:35:55
15     A. Oh, we're actually in IOM. 14:35:57
16     Q. We're still in IOM, yes. 14:35:57
17     A. Yeah. 14:35:57
18     Q. "Clinical Practice Guidelines We Can Trust." 14:36:01
19     A. Yeah. 14:36:02
20     Q. Page 79, six lines down at the end begins an 14:36:03
21 explanation of what constitutes direct financial 14:36:08
22 commercial activities. And let me ask you to read 14:36:13
23 that sentence to yourself. It's a rather long one. 14:36:23
24 Tell me when you've done that. 14:36:29
25     A. Okay. 14:36:58

Page 211

1     Q. And does the definition of direct financial 14:36:58
2 commercial activities that constitutes a conflict of 14:37:02
3 interest that's given here consistent with your 14:37:09
4 understanding? 14:37:12
5         MR. LANNIN: Object to the form. 14:37:14
6         THE WITNESS: Yes. 14:37:15
7 BY MR. BROOKS: 14:37:15
8     Q. And that includes clinical services from 14:37:18
9 which a committee member derives a substantial 14:37:22
10 portion of his or her income. Correct? 14:37:25
11     A. Yes. 14:37:27
12     Q. It includes serving as a paid expert 14:37:27
13 witness. Correct? 14:37:31
14     A. Yes. 14:37:31
15     Q. If we go down a little farther, two 14:37:31
16 sentences down, and it reads, quote: 14:37:43
17         "A person whose work or 14:37:44
18         professional group fundamentally is 14:37:47
19         jeopardized or enhanced by a 14:37:49
20         guideline recommendation is said to 14:37:52
21         have intellectual conflict of 14:37:54
22         interest. Intellectual conflict of 14:37:57
23         interest includes authoring a 14:38:00
24         publication or acting as an 14:38:02
25         investigator on a peer-reviewed 14:38:03

Page 212

1         grant directly related to 14:38:05
2         recommendations under 14:38:06
3         consideration." 14:38:07
4     And my question is, is that statement 14:38:09
5 consistent with your understanding of what 14:38:12
6 constitutes an intellectual conflict of interest 14:38:13
7 requiring disclosure and management? 14:38:18
8     A. Yes. 14:38:20
9     Q. Let me ask you now to find Exhibit 18, the 14:38:32
10 WHO -- the WHO handbook. 14:38:35
11     A. Yeah. 14:38:38
12     Q. And all these other things, perhaps you 14:38:39
13 could set them over by your counsel and he can help 14:38:41
14 avoid chaos in front of you there. With rare 14:38:45
15 exceptions, we won't come back to them. 14:38:54
16     A. Okay. I think we got most of them out of 14:38:57
17 the way. Hm-hm. 14:38:59
18     Q. And I believe you've testified that you 14:39:04
19 believe this is the WHO publication that's referred 14:39:07
20 to in Appendix A Methodology. Correct? 14:39:09
21     A. Yes. 14:39:13
22     Q. Okay. Let me ask you to turn in this 14:39:18
23 document to page 63. And there's a heading that 14:39:19
24 reads "What Interests Need to Be Disclosed." And it 14:39:31
25 says there -- 14:39:35

Page 213

1     A. Sorry, I'm not there. 14:39:36
2     Q. Oh, of course. 63. 14:39:37
3     A. Okay. 14:39:41
4     Q. It says in the second sentence under "What 14:39:42
5 Interests Need to Be Disclosed," quote: 14:39:47
6         "A financial conflict of 14:39:49
7         interest arises when an individual 14:39:50
8         or organization receives income or 14:39:52
9         monetary support that is related to 14:39:55
10         or could be affected by the 14:39:58
11         outcomes of the WHO meeting or 14:40:00
12         activity in which they are 14:40:03
13         involved." 14:40:05
14     Now, this document is drafted as -- for 14:40:05
15 those who were doing work for WHO, but if we can put 14:40:07
16 that on one side, is that statement also consistent 14:40:12
17 with your understanding of what constituted a 14:40:15
18 financial conflict of interest? 14:40:18
19     A. Yes. 14:40:19
20     Q. And, so far as you're aware, there's -- 14:40:21
21 there seems to be congruence between the substance of 14:40:24
22 the WHO definition and the substance of the National 14:40:28
23 Institute of Medicine's -- 14:40:36
24     A. Yes. 14:40:36
25     Q. -- definition? 14:40:36

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1    And in the WHO document, continuing a few    14:40:41
2  lines down, it gives examples of financial interests    14:40:48
3  in bullet points, one of which is personal financial    14:40:52
4  gain such as paid work.  Correct?    14:40:54
5    A.  That's correct.    14:40:57
6    Q.  Farther down the page begins a paragraph    14:40:57
7  that says "Nonfinancial Interests Include," and it    14:41:09
8  goes on.  Do you see that?    14:41:12
9    A.  Yes.    14:41:12
10    Q.  It says then "Examples of roles or positions    14:41:15
11  that might interfere with the objective assessment of    14:41:20
12  a body of evidence include," and it has a bullet    14:41:22
13  point list again.  Right?    14:41:25
14    A.  Yes.    14:41:30
15    Q.  One of which is prior publication of a study    14:41:30
16  or systematic review that is part of the evidence    14:41:35
17  base under consideration in the guideline.  Right?    14:41:38
18    A.  That's correct.    14:41:40
19    Q.  According to the WHO document, a    14:41:41
20  nonfinancial interest could also be created by prior    14:41:47
21  public declaration of a firm opinion or position.    14:41:50
22  And it gives examples including statements made in    14:41:55
23  the judicial process, in a journal, or in an    14:41:58
24  editorial.  Correct?    14:42:02
25    MR. LANNIN:  Object to the form.    14:42:03

Page 215

1    THE WITNESS:  Yes.    14:42:04
2  BY MR. BROOKS:    14:42:04
3    Q.  And, finally, it says membership in a    14:42:06
4  professional -- well, it says:    14:42:10
5    "A professional or personal    14:42:11
6    affiliation with an organization    14:42:12
7    advocating for products or services    14:42:15
8    relating to the subject guideline."    14:42:16
9    Correct?    14:42:16
10    A.  That's correct.    14:42:19
11    Q.  And you were aware of and you understood the    14:42:20
12  WHO definition of both financial and intellectual    14:42:24
13  conflict of interest, were you not?    14:42:30
14    A.  Yes.    14:42:30
15    MR. LANNIN:  Object to the form.    14:42:31
16    THE WITNESS:  Yes.    14:42:31
17  BY MR. BROOKS:    14:42:32
18    Q.  Is it your belief that, in creating SOC-8,    14:42:38
19  WPATH complied with that aspect of WHO principles    14:42:42
20  concerning what constitutes a conflict of interest    14:42:52
21  requiring disclosure?    14:42:54
22    MR. LANNIN:  Object to the form.    14:42:55
23    THE WITNESS:  I want to understand that    14:43:00
24  question.  Again, please.    14:43:01
25  BY MR. BROOKS:    14:43:03

Page 216

1    Q.  I'll just -- I'll reask it perhaps better.    14:43:03
2    A.  Yes, sorry.    14:43:06
3    Q.  When SOC-8 was finalized, was it your belief    14:43:07
4  that WPATH had complied with that aspect that we just    14:43:14
5  read of the WHO definition of what constituted a    14:43:22
6  financial or intellectual conflict of interest    14:43:27
7  requiring disclosure?    14:43:30
8    MR. LANNIN:  Object to the form.    14:43:31
9    THE WITNESS:  I -- I believe that we    14:43:35
10  attempted to make sure that people disclosed any    14:43:37
11  financial interests or nonfinancial interests.    14:43:41
12  BY MR. BROOKS:    14:43:47
13    Q.  Turning with me, if you would, to page 71    14:43:49
14  in the WHO document.  And, just for reference, the    14:43:54
15  previous page, we're in a major heading, 6.10,    14:43:58
16  entitled "Managing Conflicts of Interest at the Group    14:44:02
17  Level."  That's on the previous page just for your --    14:44:04
18    A.  Okay.    14:44:10
19    Q.  -- context of where we are.  And then I will    14:44:10
20  ask you to turn to page 71.    14:44:15
21    A.  Go ahead.    14:44:22
22    Q.  At the top of page 71, the WHO guidance,    14:44:23
23  recommendations, state, quote:    14:44:30
24    "The chair, cochair or    14:44:31
25    vice-chair of a GDG," that is    14:44:33

Page 217

1    guideline development group,    14:44:37
2    "should not have any financial    14:44:39
3    conflict of interest."    14:44:41
4    Do you see that language?    14:44:41
5    A.  Yes.    14:44:41
6    Q.  What steps, if any, did you take to make    14:44:46
7  sure that yourself, Asa Radix, Walter Bouman --    14:44:49
8  pardon me, not Water Bouman -- but Jon Arcelus did    14:44:56
9  not have any financial conflict of interest as    14:45:00
10  defined by WHO or the Institute of Medicine?    14:45:02
11    MR. LANNIN:  Object to the form.    14:45:09
12    THE WITNESS:  Again, it was understood from    14:45:10
13  the beginning when Karen Robinson helped us develop    14:45:14
14  that there would be these kinds of conflicts of    14:45:19
15  interest, whether it's among the chairs or any of the    14:45:22
16  committee members, because many of us were involved    14:45:25
17  in the care of individuals, doing research in this    14:45:31
18  area, had academic positions related to -- to this    14:45:36
19  field.  And, as like the development of most clinical    14:45:46
20  guidelines, it is very customary that the committee    14:45:54
21  members or those involved in developing the    14:46:02
22  guidelines are involved in that care and that    14:46:08
23  treatment, that they are part of the evidence, their    14:46:15
24  clinical expertise.    14:46:26
25    Again, I think that if you wanted to develop    14:46:30

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1 guidelines about the treatment of prostate cancer,   14:46:34
2 you would want to have urologists that are involved   14:46:38
3 in that -- in that treatment, and that is an inherent   14:46:42
4 conflict of interest and cannot be avoided. It can   14:46:50
5 be managed, but it cannot be avoided.   14:46:59
6 BY MR. BROOKS:   14:47:03
7     Q. I believe that part of what you just told me   14:47:05
8 is that, at the time the SOC-8 guidelines were being   14:47:07
9 developed and were finalized, you knew that you and   14:47:12
10 the two cochairs both had conflicts of inter-- all   14:47:17
11 three had conflicts of interest. Correct?   14:47:24
12     MR. LANNIN: Object to the form.   14:47:27
13     THE WITNESS: In that broad sense of what   14:47:28
14 constitutes a conflict of interest, yes.   14:47:32
15 BY MR. BROOKS:   14:47:35
16     Q. And you didn't disclose that anywhere in the   14:47:35
17 guidelines, did you?   14:47:37
18     MR. LANNIN: Object to the form.   14:47:38
19     THE WITNESS: Our -- our -- our positions   14:47:41
20 and -- were -- were clearly disclosed.   14:47:47
21 BY MR. BROOKS:   14:47:52
22     Q. Where in the guidelines, if anywhere, was it   14:47:52
23 disclosed that you had conflicts of interest, you the   14:47:54
24 chair and the two cochairs?   14:47:58
25     MR. LANNIN: Object to the form.   14:48:01

Page 219

1     THE WITNESS: There was no section that --   14:48:02
2 going individual by individual that we reported every   14:48:10
3 conflict of interest.   14:48:14
4     MR. LANNIN: Counsel, we've been at it for   14:48:17
5 an hour plus.   14:48:19
6     MR. BROOKS: And having fun the whole time.   14:48:20
7 We can take a break.   14:48:24
8     THE WITNESS: Not too bad.   14:48:25
9     MR. LANNIN: Let go off.   14:48:27
10     THE VIDEOGRAPHER: All right. The time is   14:48:29
11 2:48 p.m., and we are now off the record.   14:48:32
12     (Recess taken.)   14:48:35
13     THE VIDEOGRAPHER: The time is 2:58 p.m.,   14:58:32
14 and we are now back on the record.   14:58:44
15     MR. BROOKS: All right. I'm going to ask   14:58:46
16 the reporter to mark as Exhibit 20 a document headed   14:58:48
17 "WPATH Policy for Disclosures of Interest and   14:58:52
18 Management of Conflicts," bearing Bates numbers   14:58:54
19 BOEAL_WPATH_001011 through 013.   14:58:58
20     (The document referred to was   14:58:58
21     marked as Exhibit 20.)   14:59:26
22 BY MR. BROOKS:   14:59:26
23     Q. Now, Dr. Coleman, this is a redacted version   14:59:28
24 of a form actually filled out by somebody. We can't   14:59:30
25 tell who and I don't really care. That's not the   14:59:34

Page 220

1 point. I simply have it here as an exemplar.   14:59:37
2     Do you recognize this as the -- a conflict   14:59:41
3 of interest form that was circulated to members of   14:59:45
4 the SOC committee in December of 2018?   14:59:50
5     A. Yes, I do.   14:59:55
6     Q. And did you yourself fill out such a form?   14:59:56
7     A. Yes.   14:59:56
8     Q. And, likewise, your cochairs and the heads   15:00:16
9 of each chapter committee, the chapter group?   15:00:20
10     A. I assume so. Everyone was --   15:00:27
11     Q. Was -- was -- was the intent that all   15:00:28
12 participants in the process were to fill one out?   15:00:31
13     A. Yes.   15:00:33
14     Q. And was any other disclosure form circulated   15:00:33
15 to SOC-8 participants to ensure compliance with   15:00:37
16 principles of transparency and management of   15:00:42
17 conflicts of interest?   15:00:45
18     A. Not that --   15:00:47
19     MR. LANNIN: Object to the form.   15:00:48
20     THE WITNESS: Not that I recall.   15:00:48
21 BY MR. BROOKS:   15:00:51
22     Q. This says on it "Please complete and sign by   15:00:54
23 December 22, 2018." Do you see that?   15:00:58
24     A. Yes.   15:00:58
25     Q. And am I correct that this was in fact   15:01:02

Page 221

1 circulated sometime earlier than that, but in   15:01:05
2 December of 2018?   15:01:09
3     A. I wouldn't -- I wouldn't remember when it   15:01:10
4 was actually distributed.   15:01:16
5     Q. Okay. At any rate, members were not   15:01:18
6 required to return it filled out prior to   15:01:27
7 December 22, 2018. Is that right?   15:01:32
8     MR. LANNIN: Object to the form.   15:01:34
9     THE WITNESS: I'm sorry. What --   15:01:34
10 BY MR. BROOKS:   15:01:38
11     Q. The members were not asked to complete and   15:01:39
12 return these forms at any point earlier than   15:01:41
13 December 22, 2018. Am I right?   15:01:44
14     A. Not that I'm aware of.   15:01:46
15     Q. And when were you appointed to chair the   15:01:48
16 whole project?   15:01:52
17     A. In 2015.   15:01:54
18     Q. When were the chairs of the chapter groups   15:01:57
19 selected?   15:02:02
20     A. In probably around May of 2015? No, no, no.   15:02:03
21 Of '17, '18. '18.   15:02:16
22     Q. '18, so just a few months before this form   15:02:18
23 was due. Or was it perhaps '17?   15:02:24
24     A. I can't remember.   15:02:33
25     Q. Okay. When were the nonchair members of the   15:02:35

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

1 whole selected?                                    15:02:42
2    A. After the chapter leads were selected. And  15:02:45
3 how long after those chapter leads, within a month or 15:02:54
4 two, it seems.                                     15:03:00
5    Q. Well, as we go, if anything prompts your    15:03:01
6 recall of what year the chapter leads were selected 15:03:03
7 in, if you'd let me know --                        15:03:06
8    A. Yeah.                                        15:03:08
9    Q. -- I'd appreciate that. I certainly         15:03:08
10 understand it's been a little while.              15:03:10
11    Prior to the selection -- to your selection,  15:03:11
12 the cochair selection and the chapter lead selection, 15:03:18
13 was -- were the candidates for those positions asked 15:03:21
14 for any written disclosure of conflicts of any type? 15:03:24
15    A. Other than this form?                       15:03:33
16    Q. Well, this form happened in December of    15:03:35
17 2018, and you've testified, I believe, that you were 15:03:38
18 selected back in fif- -- years earlier.          15:03:42
19    A. Oh, yes.                                    15:03:45
20    Q. So let me reask my question.                15:03:45
21    Before you and your cochairs and the          15:03:48
22 committee heads were selected, were you folks asked 15:03:52
23 to make any written submission identifying conflicts 15:03:57
24 of interest?                                       15:04:02
25    A. In the application, there was an application 15:04:02

Page 223

1 form other than this form. And, in that form, people 15:04:05
2 were asked to declare any potential conflict of     15:04:12
3 interest.                                           15:04:16
4    Q. Did it provide any more detail than a        15:04:16
5 request to disclose conflict of interest?           15:04:20
6    MR. LANNIN: Object to the form.                 15:04:22
7    THE WITNESS: I cannot recall, but I don't       15:04:23
8 think it was as detailed as this.                   15:04:25
9 BY MR. BROOKS:                                      15:04:28
10    Q. And, at that time, you and your colleagues  15:04:28
11 had never been through a conflict of interest       15:04:30
12 disclosure process for WPATH before. Am I correct?  15:04:32
13    MR. LANNIN: Object to the form.                15:04:36
14    THE WITNESS: In the previous revisions of      15:04:37
15 the Standards of Care, that's correct.             15:04:43
16 BY MR. BROOKS:                                     15:04:45
17    Q. And, at that time, you hadn't yet been      15:04:45
18 educated about more widely accepted conflict of    15:04:47
19 interest principles by Dr. Robinson, had you?       15:04:56
20    A. I think most of the committee members, we   15:04:59
21 have to report our conflict of interests in so many 15:05:03
22 different ways and so many times. Every time we give 15:05:08
23 a presentation, every time we have a publication,   15:05:11
24 whatever, that is so common. So we're -- we're      15:05:16
25 relatively well-versed on what that really means.   15:05:21

Page 224

1    Q. And do you believe that your understanding  15:05:25
2 that point in time was generally consistent with the 15:05:29
3 definitions that we looked at in the IOM and WHO     15:05:31
4 documents?                                          15:05:35
5    MR. LANNIN: Object to the form.                 15:05:36
6    THE WITNESS: I want to say that again,          15:05:36
7 those -- those guidelines are in the ideal sense. I 15:05:39
8 know for a fact that many clinical guidelines are -- 15:05:52
9 are -- do not follow those guidelines.             15:05:59
10    In fact, WHO right now is developing           15:06:03
11 guidelines for transgender health care, and I know  15:06:08
12 the committee members, and I know they have conflicts 15:06:12
13 of interest that don't follow their own guidelines.  15:06:18
14 BY MR. BROOKS:                                     15:06:21
15    Q. My only question was, at the time of your   15:06:22
16 application to be chair or a cochair or a committee  15:06:25
17 head, was your understanding of what constitutes a  15:06:30
18 gui- -- a conflict generally in line with the       15:06:34
19 language that we looked at in the IOM and WHO        15:06:36
20 documents?                                          15:06:40
21    A. Generally speaking --                        15:06:40
22    Q. Okay.                                        15:06:42
23    A. -- yes. Not to every point.                 15:06:42
24    Q. Fair enough. Let me ask you to take this -- 15:06:45
25 the WPATH conflict disclosure form --              15:06:49

Page 225

1    A. And let's clar- -- I mean, I must clarify    15:06:54
2 that you're -- you're triggering that. Again, in    15:06:56
3 2015 when I was appointed, we didn't have the       15:06:59
4 methodology that in- -- that included a declaration  15:07:06
5 of -- I didn't fill out any kind of form like that. 15:07:10
6 And all I said I did -- I think I did. I don't --   15:07:15
7 you know, I can't recall. But that was the procedure 15:07:21
8 for, you know, all the committee members to fill this 15:07:25
9 form out.                                           15:07:31
10    Q. Let me ask you to turn to the second page of 15:07:32
11 Coleman Exhibit 20. And if you look at 2.3, this    15:07:40
12 asks about research grants or contracts from an     15:08:08
13 organization that has interests or activities related 15:08:14
14 to the content of SOC-8.                            15:08:17
15    Did you understand contracts with an            15:08:21
16 organization that has interest or activities relating 15:08:25
17 to the content of SOC-8 to include employment by a  15:08:27
18 organiza- -- a clinic or other organization that    15:08:34
19 treated gender dysphoria?                           15:08:38
20    MR. LANNIN: Object to the form.                15:08:45
21    THE WITNESS: I think it -- again, as I         15:08:45
22 would read this, I wouldn't think of my -- my       15:08:51
23 employer, but this has to do with those with research 15:08:57
24 grants or contracts from outside entities, and -- and 15:09:02
25 like this individual reported a number of           15:09:07

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1 organization that he must have -- or she must have    15:09:13
2 had research grants or contracts.    15:09:16
3 BY MR. BROOKS:    15:09:20
4    Q.  Okay.  That's --    15:09:20
5    A.  Yeah.    15:09:21
6    Q.  -- that's why I was asking 'cause --    15:09:22
7    A.  Yeah.    15:09:23
8    Q.  -- it was unclear to me.    15:09:23
9        Similarly, 2.4 refers to fees or salary from    15:09:25
10 an organization that has interest or activities    15:09:34
11 relating to the contents.  And then it has a list    15:09:36
12 that includes board member, adviser, consultant,    15:09:41
13 speakers bureaus, expert testimony, but does not    15:09:45
14 include salary or ordinary professional income.    15:09:48
15        And then I look at 2.5 and that asks about    15:09:52
16 other financial interests.    15:09:55
17        In your understanding, what part, if any, of    15:09:58
18 this form asked the respondent to disclose income    15:10:00
19 received from providing services, medical or mental    15:10:06
20 health, that could be affected by SOC-8?    15:10:13
21    MR. LANNIN:  Object to the form.    15:10:15
22    THE WITNESS:  I don't see it in these --    15:10:18
23 these first four.    15:10:20
24 BY MR. BROOKS:    15:10:21
25    Q.  Okay.  Certainly there's nothing in this    15:10:21

Page 227

1 form, so far as you recall or see, that asks the    15:10:28
2 participant to disclose the amount that they earn    15:10:34
3 from providing medical or mental Health Services that    15:10:38
4 could be affected by the standard of care, does it?    15:10:41
5    MR. LANNIN:  Object to the form.    15:10:44
6    THE WITNESS:  I'm sorry.  I got distracted    15:10:48
7 looking at something else.    15:10:50
8 BY MR. BROOKS:    15:10:51
9    Q.  I understand.    15:10:51
10    A.  So, yeah.    15:10:52
11    Q.  I can't find, and I just want to make sure    15:10:53
12 I'm not misreading something --    15:10:55
13    A.  Yeah.    15:10:57
14    Q.  -- there's nothing in this form that asked    15:10:57
15 the respondent to disclose the amount that he or she    15:10:59
16 receives from providing medical or mental Health    15:11:03
17 Services to treat gender dysphoria, is there?    15:11:07
18    A.  No.  But, again, I bring your attention to    15:11:09
19 the employer is listed on -- on the first page.  And    15:11:16
20 so then, again, it is clear that this person is    15:11:22
21 employed by someone, receiving a salary.    15:11:27
22    Q.  And the -- oh, pardon me.    15:11:31
23        There's nothing on this form that asks    15:11:34
24 the -- that would enable WPATH management, or you as    15:11:41
25 chair reviewing it, to determine whether fees from    15:11:46

Page 228

1 professional services for treatment of gender    15:11:52
2 dysphoria constituted a substantial portion of the    15:11:55
3 income of the respondent, is there?    15:11:58
4    MR. LANNIN:  Object to the form.    15:12:01
5    THE WITNESS:  No.    15:12:01
6 BY MR. BROOKS:    15:12:01
7    Q.  Do you recall whether any of the -- well,    15:12:07
8 let me -- let me ask this.    15:12:10
9        This respondent says, in 3.1, "I have over    15:12:11
10 30 peer-reviewed publications in the field of    15:12:17
11 transgender health" -- and the nature of the    15:12:21
12 production is that I -- I can't read the whole    15:12:23
13 answer, but such is life.    15:12:25
14        Was it unusual for participants in the SOC-8    15:12:31
15 process to have many published articles already on    15:12:35
16 topics relating to gender dysphoria?    15:12:43
17    A.  It was not unusual at all.  It was    15:12:45
18 actually -- I mean, we looked for people that had    15:12:51
19 peer-reviewed publications.  That would have been not    15:12:54
20 the only criteria, but that would be a big plus to --    15:12:56
21 to have someone that has -- anyone who has published    15:13:02
22 peer-reviewed literature is also -- has to be very    15:13:07
23 aware of other literature to be able to write    15:13:10
24 their -- their articles.  So this would be -- this    15:13:15
25 would be seen as a -- as a plus.    15:13:20

Page 229

1    Q.  Am I correct that by -- am I correct that    15:13:22
2 WPATH itself has issued position statements    15:13:29
3 denouncing laws prohibiting hormonal and surgical    15:13:38
4 interventions on minors such as that passed by    15:13:42
5 Alabama?    15:13:44
6    MR. LANNIN:  Object to the form.    15:13:45
7    THE WITNESS:  I'm not -- I'm -- I'm not    15:13:48
8 aware.  Maybe they have.  I don't know.    15:13:49
9 BY MR. BROOKS:    15:13:52
10    Q.  Okay.  This participant -- this respondent    15:13:52
11 on the last page, line 3.6, says --    15:13:56
12    A.  1-6.    15:14:01
13    Q.  3.6 is on the last page of the document.    15:14:02
14    A.  Oh, sorry, yes.  Look at the numbers, yeah.    15:14:08
15    Q.  The question is, "Do you have any other    15:14:09
16 nonfinancial interest?"    15:14:13
17        And this respondent said, "I do not    15:14:15
18 understand this question.  Everyone involved in the    15:14:17
19 SOC process has a nonfinancial interest."  And    15:14:19
20 neither you nor I can tell whether the answer    15:14:23
21 continued after that.    15:14:27
22        Is it consistent with your understanding of    15:14:27
23 the folks who had been recruited to participate in    15:14:30
24 the SOC-8 process that everyone involved had a    15:14:34
25 nonfinancial conflict of interest?    15:14:37

58 (Pages 226 - 229)

Page 230

1     MR. LANNIN:  Object to the form.          15:14:40
2     THE WITNESS:  I don't know that everyone had 15:14:44
3 a nonfinancial interest.  As we talked about before, 15:14:48
4 when Karen Robinson helped us develop our methodology 15:14:55
5 and guided us in developing this conflict of interest 15:15:02
6 declaration form assumed that many of the committee   15:15:07
7 members would have a financial or nonfinancial        15:15:16
8 interest.  And so for this person to say for sure     15:15:18
9 that everyone involved, I -- I -- I'm not sure that   15:15:24
10 that's true, but that was their -- their pra- --      15:15:29
11 their opinion.                          15:15:34
12     I think that he probably assumed, or she,   15:15:36
13 they, implied that many of them would have had        15:15:40
14 publications, grants, and so, on that assumption,     15:15:45
15 those would be nonfinancial interests.        15:15:51
16 BY MR. BROOKS:                          15:15:55
17     Q.  At any rate, it was your -- given the    15:15:57
18 criteria that were used for recruiting or selecting   15:16:01
19 members, it was your understanding at the time that   15:16:05
20 at least most participants in the SOC-8 process had   15:16:08
21 financial and/or nonfinancial conflicts of interest.  15:16:12
22 Correct?                                15:16:12
23     A.  Yes.                            15:16:16
24     MR. LANNIN:  Object to the form.          15:16:16
25 BY MR. BROOKS:                          15:16:17

Page 231

1     Q.  Let me ask you to find -- I'm sorry, I said 15:16:18
2 we didn't do this much -- but Coleman 19, Exhibit 19, 15:16:21
3 which looks --                          15:16:30
4     A.  Ah, there, yes, hm-hm.              15:16:30
5     Q.  -- which looks like this.  Okay.      15:16:31
6     A.  Got it.                          15:16:31
7     Q.  And I want to call your attention to the  15:16:32
8 email from Karen Robinson that is at the top of the   15:16:35
9 chain, December 21, 2018.  And she says in the second 15:16:38
10 paragraph:                              15:16:43
11     "Disclosure, and any necessary          15:16:44
12     management of potential conflicts,        15:16:46
13     should take place prior to the          15:16:47
14     selection of guideline members.          15:16:49
15     Unfortunately, this was not done          15:16:51
16     here but the decision was made to        15:16:53
17     adhere as much as possible to best        15:16:54
18     practice for guideline development.      15:16:57
19     To that end, disclosures are being        15:16:59
20     collected now from SOC-8 members."        15:17:01
21     Do you see that language?              15:17:04
22     A.  Yes.                            15:17:04
23     Q.  And, just to confirm, I think you testified 15:17:06
24 earlier that you're not sure whether you ever saw     15:17:10
25 this email.  Is that right?              15:17:13

Page 232

1     A.  That's correct.                    15:17:15
2     Q.  Does it appear to be -- the recipients that 15:17:16
3 show Feldman, Vella, et cetera, those are all members 15:17:23
4 of the SOC-8 process.  Am I correct?      15:17:28
5     MR. LANNIN:  Object to the form.          15:17:31
6     THE WITNESS:  These were all committee    15:17:33
7 members, as far as I can tell, except Blaine Vella    15:17:39
8 who was the executive director of WPATH.      15:17:44
9     MR. BROOKS:  Okay.  Thank you.          15:17:49
10     THE REPORTER:  Of who?                15:17:49
11     THE WITNESS:  Of WPATH.                15:17:50
12 BY MR. BROOKS:                          15:17:51
13     Q.  Was any individual excluded from service on 15:18:04
14 any committee as a result of conflicts of interest?   15:18:07
15     A.  Not that I'm aware of.              15:18:11
16     Q.  Dr. Robinson states in this email, which is 15:18:12
17 written, I think, a day before the due date that we   15:18:25
18 saw for turning in those forms, says that internal    15:18:28
19 disclosure and "management of conflicts, should take  15:18:37
20 place prior to the selection of guideline members.    15:18:40
21 Unfortunately, this was not done."            15:18:44
22     Is that consistent with your understanding  15:18:48
23 that conflict disclosures had not been gathered prior 15:18:50
24 to selection of committee members and chairs?        15:18:54
25     MR. LANNIN:  Object to the form.          15:18:58

Page 233

1     THE WITNESS:  You know, I really don't      15:19:05
2 recall, but, again, this does trigger that we        15:19:06
3 obviously had this issue, and -- and Karen was aware  15:19:08
4 of that, and, you know, the circumstances of why we   15:19:11
5 were not able to do that in every case or some people 15:19:19
6 were late, or whatever.                  15:19:23
7     But I can tell you that all of those --     15:19:29
8 these things were reviewed by Karen, and we never     15:19:33
9 moved ahead with anything without, you know, her      15:19:41
10 blessing on things.                      15:19:47
11     And -- and, as I said, there's ideal ways   15:19:50
12 and -- but there's different ways, and one has to     15:19:55
13 accommodate to different circumstances, you know,     15:20:00
14 trying to put together the best available guidelines. 15:20:04
15     The fact that we really did go through a    15:20:10
16 process of disclosure -- and we could have removed    15:20:14
17 any member if we had discovered that there was a      15:20:19
18 situation where we didn't feel like that that could   15:20:27
19 be, you know, managed, we could have removed a member 15:20:30
20 from the committee.  Fortunately, we never had to do  15:20:36
21 that for any ethical or whatever kinds of reasons.    15:20:41
22     We lost some members due to their work      15:20:44
23 circumstances or, even in one case, death, so -- but  15:20:49
24 we never had to dismiss anyone.              15:20:55
25 BY MR. BROOKS:                          15:20:57

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1  Q. Let me ask you to find again the "Clinical  15:20:57
2  Practice Guidelines We Can Trust," Exhibit 17.  15:21:00
3  A. Yes.  15:21:05
4  Q. And if you would turn to page 83. And tell  15:21:07
5  me when you have that.  15:21:20
6  A. I have that.  15:21:29
7  Q. At the bottom of page 82 is a heading,  15:21:29
8  "Management of Conflict of Interest." And the very  15:21:33
9  last item in that list which is mostly found on  15:21:38
10 page 83 states:  15:21:42
11     "Funders should have no role in  15:21:45
12     clinical practice guideline  15:21:47
13     development."  15:21:48
14     Do you see that?  15:21:49
15 A. Is that on the second page?  15:21:54
16 Q. It's on page 83. It is the last -- very  15:21:55
17 last bullet.  15:22:00
18 A. Okay. Yes, I see that.  15:22:01
19 Q. It says -- and it's under heading of  15:22:02
20 "Exclusions," which perhaps is -- goes beyond  15:22:04
21 management. And it says:  15:22:09
22     "Funders should have no role in  15:22:10
23     clinical practice guideline  15:22:12
24     development."  15:22:13
25     Correct?  15:22:13

Page 235

1  A. That's what it says.  15:22:15
2  Q. Now, let me ask you to find page 78.  15:22:16
3  A. Okay.  15:22:39
4  Q. Down at the very bottom, the penultimate  15:22:40
5  sentence -- only lawyers get to use that word.  15:22:50
6     MR. LANNIN: I'm not sure what it means.  15:22:53
7  BY MR. BROOKS:  15:22:55
8  Q. Reads:  15:22:56
9     "Furthermore, an investigation  15:22:58
10    of more than 200 clinical practice  15:22:58
11    guidelines sent" --  15:23:01
12 A. I'm sorry. I'm not there.  15:23:01
13 Q. Very bottom of the page, next-to-the-last  15:23:04
14 sentence.  15:23:07
15 A. Oh, the next-to-the-last one. Okay.  15:23:07
16 "Furthermore," yes.  15:23:09
17 Q.    "Furthermore, an investigation  15:23:10
18    of more than 200 clinical practice  15:23:12
19    guidelines within the National  15:23:15
20    Guideline Clearinghouse determined  15:23:16
21    that greater than half included no  15:23:18
22    information about financial  15:23:21
23    sponsors of guidelines or financial  15:23:23
24    conflicts of interest of guideline  15:23:26
25    authors."  15:23:27

Page 236

1     Do you see that language?  15:23:28
2  A. Yes.  15:23:30
3  Q. That language is certainly consistent with  15:23:30
4  some of the remarks you've made about other  15:23:33
5  guidelines out there in the world. But would you  15:23:35
6  find it concerning if an organization that was  15:23:42
7  creating and publishing guidelines fails to disclose  15:23:46
8  information about financial conflicts of interest or  15:23:50
9  intellectual conflicts of interest of the primary  15:23:57
10 sponsors of the project?  15:23:59
11    MR. LANNIN: Object to the form.  15:24:00
12    THE WITNESS: What -- what do you mean by  15:24:08
13 the primary sponsor?  15:24:09
14 BY MR. BROOKS:  15:24:11
15 Q. If there was -- a lot of the examples they  15:24:12
16 talk about are pharmaceutical companies who are  15:24:16
17 funding. I just mean if there is one largest sponsor  15:24:18
18 funder of a clinical practice guideline development  15:24:24
19 project, would you find it concerning if the  15:24:26
20 organization that created and published the  15:24:30
21 guidelines failed to disclose information about  15:24:32
22 financial or intellectual conflicts of interest of  15:24:35
23 that primary sponsor?  15:24:39
24    MR. LANNIN: Object to the form.  15:24:44
25    THE WITNESS: I think it's -- as it's stated  15:24:47

Page 237

1  here, there's different reporting of conflicts of  15:24:55
2  interest. And I think that we did an outstanding job  15:25:00
3  of really being transparent of who was involved in  15:25:06
4  the -- in the process and the methodology and the  15:25:12
5  evidence on which our recommendations were made.  15:25:19
6     So could we have gone further? But most  15:25:25
7  clinical guidelines do not explicitly state every  15:25:30
8  conflict of interest of every individual or entity  15:25:35
9  that is involved in the development of the  15:25:40
10 guidelines.  15:25:42
11 BY MR. BROOKS:  15:25:42
12 Q. Well, and my question was very specific and  15:25:43
13 not about every individual. But if an organization  15:25:45
14 develops clinical guidelines in a project that is  15:25:51
15 largely funded by one sponsor, would it concern you  15:25:59
16 if in connection with those guidelines the  15:26:06
17 organization failed to disclose intellectual or  15:26:09
18 financial conflicts of interest of the sponsor?  15:26:12
19    MR. LANNIN: Object to the form.  15:26:16
20    THE WITNESS: I don't know exactly where,  15:26:17
21 but, again, this was funded in a large part by the  15:26:20
22 Tawani Foundation. And that was disclosed.  15:26:32
23 BY MR. BROOKS:  15:26:33
24 Q. My -- my question isn't about disclosing who  15:26:33
25 the funder was. My question was, would it concern  15:26:36

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1 you if a organization developing clinical practice     15:26:40
2 guidelines failed to disclose intellectual or     15:26:44
3 financial conflicts of interest of the funder?     15:26:48
4     A. Of the --     15:26:53
5         MR. LANNIN: Object to the form.     15:26:53
6         THE WITNESS: Who the funder is or what     15:26:55
7 their --     15:26:57
8 BY MR. BROOKS:     15:26:58
9     Q. Intellectual or financial conflicts of     15:26:59
10 interest of the funding entity or person.     15:27:01
11         MR. LANNIN: Object to the form.     15:27:04
12         THE WITNESS: I don't -- I'd never seen that     15:27:10
13 happen.     15:27:12
14 BY MR. BROOKS:     15:27:12
15     Q. All right. Let me ask you to find -- what     15:27:13
16 exhibit is this? 2. All right. Down at bottom.     15:27:18
17 It's the multiple chapters of SOC-8. Not the     15:27:25
18 appendix, not the eunuch, way back at the bottom of     15:27:29
19 the stack, Exhibit Number 2.     15:27:34
20     A. Oh, okay.     15:27:35
21     Q. And we will go look at the disclosure that     15:27:40
22 you just mentioned.     15:27:41
23         That looks like it would be it.     15:27:51
24         If you turn to the very last page that I've     15:27:52
25 included which, God willing, is page 177.     15:27:55

Page 239

1     A. The last page?     15:27:59
2     Q. The last page.     15:28:00
3     A. Yeah.     15:28:01
4     Q. Check me, that's 177.     15:28:01
5     A. Yeah.     15:28:03
6     Q. There's a statement that says "Funding."     15:28:04
7     A. Yeah.     15:28:06
8     Q. And it says:     15:28:06
9         "This project was partly funded     15:28:07
10     from a grant of the Tawani     15:28:08
11     Foundation. Most of the expenses     15:28:11
12     went to pay the evidence-based     15:28:12
13     practice center of Johns Hopkins     15:28:14
14     University for their work."     15:28:17
15     A. Hm-hm.     15:28:18
16     Q. Am I correct that indeed the great bulk of     15:28:19
17 the expenses -- of the out-of-pocket expenses     15:28:23
18 actually incurred in this project were the payments     15:28:25
19 made to Johns Hopkins University?     15:28:27
20         MR. LANNIN: Object to the form.     15:28:29
21         THE WITNESS: Yes.     15:28:31
22 BY MR. BROOKS:     15:28:31
23     Q. Because the participants were not paid for     15:28:32
24 their time. Right?     15:28:33
25     A. Right. These were -- everyone was volunteer     15:28:34

Page 240

1 and no one was really paid for any of the work. So     15:28:39
2 all of the -- the funds that -- that were received     15:28:43
3 from the Tawani Foundation, I think almost all of it     15:28:48
4 went to pay Johns Hopkins.     15:28:52
5         There was additional costs, you know, as we     15:28:57
6 went along and were in -- were incurred in this very     15:29:01
7 long and -- and delayed process that were covered by     15:29:08
8 operating -- as I understand, operating funds of     15:29:12
9 WPATH.     15:29:16
10     Q. Did --     15:29:17
11     A. But I don't know of any other, you know,     15:29:18
12 outside funding agency that -- that supported us.     15:29:21
13     Q. But the great bulk of the out-of-pocket     15:29:26
14 expense of developing SOC-8 was funded by the Tawani     15:29:30
15 Foundation.     15:29:32
16     A. That's correct.     15:29:32
17     Q. And who is behind the Tawani Foundation?     15:29:33
18         MR. LANNIN: Object to the form.     15:29:39
19 BY MR. BROOKS:     15:29:39
20     Q. Who controls that foundation?     15:29:39
21     A. The --     15:29:41
22         MR. LANNIN: Same objection.     15:29:41
23         THE WITNESS: Sorry?     15:29:42
24         MR. LANNIN: I was objecting for the record.     15:29:42
25 You can answer.     15:29:44

Page 241

1         THE WITNESS: Oh, okay. The chair --     15:29:45
2         MR. BROOKS: Don't pay attention to that     15:29:45
3 man.     15:29:47
4         THE WITNESS: The chair of the Tawani     15:29:47
5 Foundation is Jennifer Pritzker.     15:29:51
6 BY MR. BROOKS:     15:29:51
7     Q. And Jennifer Pritzker is frequently referred     15:29:51
8 to as the first transgender billionaire. Am I     15:29:55
9 correct?     15:29:58
10         MR. LANNIN: Object to the form.     15:29:58
11         THE WITNESS: Jennifer has been referred to     15:30:01
12 as the probably -- yeah, probably the first openly     15:30:04
13 out transgender billionaire.     15:30:10
14 BY MR. BROOKS:     15:30:17
15     Q. And, to your knowledge, Pritzker has     15:30:17
16 strongly held views regarding transgender medicine.     15:30:24
17 Correct?     15:30:27
18         MR. LANNIN: Object to the form.     15:30:27
19         THE WITNESS: The one thing I know about     15:30:32
20 Jennifer is that she is a firm believer in science.     15:30:34
21 And even her career in the military is -- she's a     15:30:43
22 strong believer that you win by military science.     15:30:52
23 BY MR. BROOKS:     15:30:57
24     Q. And that -- just to connect the records,     15:30:57
25 that career in the military was under the name James     15:31:00

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1  Pritzker?                                    15:31:03
2     A. That's correct.                        15:31:04
3     Q. Am I correct in assuming that you personally  15:31:04
4  interacted with Jennifer Pritzker to obtain grants  15:31:11
5  that helped fund this SOC-8 project?         15:31:16
6     A. I did not.                             15:31:19
7        MR. LANNIN:  Object to the form.       15:31:20
8  BY MR. BROOKS:                               15:31:20
9     Q. You did not.  Do you know whether Pritzker  15:31:21
10 had any opportunity to review any draft of any -- of  15:31:26
11 the whole or any part of SOC-8 before it was  15:31:31
12 published?                                   15:31:34
13    A. Only if she responded to the public comment  15:31:35
14 period.  She was never given any drafts or had any  15:31:38
15 input into the methodology or anything.  And I  15:31:43
16 reviewed all those public comments, and people had to  15:31:52
17 identify who they were, and to my best of my recall,  15:31:54
18 I don't remember her making a comment.        15:31:59
19    Q. Was there any grant from either Pritzker or  15:32:03
20 the Tawani Foundation or any other Tawani entity in  15:32:06
21 connection with the development of SOC-7?     15:32:11
22    A. SOC-7.  That's a good question that I can't  15:32:18
23 remember.  I know that WPATH had received -- has  15:32:26
24 received other funds from Tawani Foundation  15:32:33
25 supporting the symposia.  I cannot recall if we  15:32:37

Page 243

1  received any funding for -- I remember SOC-7, you  15:32:42
2  know, just being down on a shoe string and all  15:32:49
3  volunteer kinds of efforts.  So no, no, you're  15:32:53
4  triggering that.                             15:33:01
5        We had a major expense -- major when I think  15:33:01
6  of it.  I think it was $25,000 that we hired a  15:33:04
7  technical editor.  And was that funded in part or by  15:33:08
8  a grant by Tawani?  I'm not sure.            15:33:17
9        MR. BROOKS:  Let me ask the reporter to mark  15:33:24
10 as Exhibit 21 a document titled "Eli Coleman  15:33:25
11 Institute for Sexual and Gender Health, Annual Report  15:33:30
12 2023."                                       15:33:32
13       (The document referred to was          15:33:32
14       marked as Exhibit 21.)                 15:33:45
15 BY MR. BROOKS:                               15:33:45
16    Q. And is this in fact an annual report of the  15:33:45
17 Eli Coleman Institute that you have seen before  15:33:49
18 today?                                       15:33:51
19    A. That is correct.                       15:33:53
20    Q. Let me ask you to turn to page 28 which is  15:33:56
21 in the "Endowments and Philanthropic Funds" section.  15:34:09
22    A. Yeah.                                  15:34:13
23    Q. And let me just understand.  This institute  15:34:14
24 is one that you spent many years of your professional  15:34:21
25 life building up, but which was only recently renamed  15:34:23

Page 244

1  in your honor.  Am I correct?                15:34:27
2     A. That is correct.                       15:34:29
3     Q. And indeed much of your professional life  15:34:29
4  was spent working with this institute.       15:34:32
5        MR. LANNIN:  Object to the form.       15:34:34
6        THE WITNESS:  Exclusively.             15:34:35
7  BY MR. BROOKS:                               15:34:36
8     Q. And under what name or names did it go  15:34:36
9  previously?                                  15:34:38
10    A. Originally it was called The Program in  15:34:40
11 Human Sexuality.  And then in 2020-'21, we renamed it  15:34:43
12 The Institute For Sexual and Gender Health.  And then  15:34:53
13 shortly after my retirement, they added my name to  15:34:58
14 the institute's name.                        15:35:07
15    Q. It was -- was it originally affiliated with  15:35:08
16 the University of Minnesota?                  15:35:11
17    A. Always affiliated with the University of  15:35:12
18 Minnesota.                                   15:35:14
19    Q. Is that true up to the present?         15:35:14
20    A. Yes.                                   15:35:15
21    Q. Okay.  I didn't know whether it had spun  15:35:15
22 out.                                         15:35:18
23    A. No.                                    15:35:18
24    Q. Such things do sometimes.              15:35:19
25    A. No, I know.                            15:35:20

Page 245

1     Q. Okay.  Let me ask you, take you back to  15:35:21
2  page 28.  And there, as is true in so many such  15:35:22
3  disclosures of gifts, there's a largest category gift  15:35:28
4  of $1 million plus.                          15:35:33
5        And just to make sure I understand this  15:35:36
6  correctly, is this reporting gifts made in 2023, or  15:35:38
7  is this cumulative across some period of time?  15:35:42
8     A. My understanding is that they did a  15:35:46
9  cumulative of all -- from the beginning of our  15:35:50
10 fundraising efforts.                         15:35:54
11    Q. Okay.  And there -- or under the         15:35:55
12 1-million-plus category, there are four unanimous  15:35:59
13 donors.  Do you know who any of those are?   15:36:02
14    A. I am not -- I would not know.  My -- we  15:36:09
15 didn't have that many million-plus donors --  15:36:14
16    Q. I understand, probably not.            15:36:17
17    A. -- certainly, and so I don't know about  15:36:18
18 that.                                        15:36:22
19    Q. Well, let's come at it backwards.       15:36:26
20    A. Yeah.                                  15:36:28
21    Q. Three of the million-dollar-plus gifts that  15:36:29
22 are recognized here are either from Pritzker or an  15:36:31
23 enterprise or foundation associated with Pritzker.  15:36:38
24 Correct?                                     15:36:38
25    A. Yeah, Tawani Enterprise is the for-profit  15:36:41

62 (Pages 242 - 245)

1 aspect of -- of Colonel Pritzker's enterprise.    15:36:47
2    Q. So Colonel Pritzker gave individually    15:36:55
3 through the Tawani Enterprise and through the Tawani    15:37:00
4 Foundation -- correct? -- in each case more than a    15:37:05
5 million dollars, or a million dollars or more I    15:37:07
6 should say.    15:37:08
7       MR. LANNIN: Object to the form.    15:37:09
8       THE WITNESS: To my knowledge, again, I'm --    15:37:18
9 I -- this -- this was after I left and produced this,    15:37:21
10 but I cannot recall that Jennifer and Erin Solaro    15:37:28
11 ever gave that much money personally. Most of it    15:37:35
12 came from Tawani Foundation, and some of it may have    15:37:40
13 come from Tawani Enterprises.    15:37:47
14       Sometimes the way that the foundation works    15:37:50
15 is that, let's say you -- your -- your firm donated a    15:37:58
16 million dollars to us. That would be wonderful.    15:38:07
17 BY MR. BROOKS:    15:38:10
18    Q. Unlikely, but we'll work with the    15:38:11
19 hypothesis.    15:38:11
20    A. You might be a credit, what we call a soft    15:38:12
21 credit --    15:38:17
22    Q. I understand.    15:38:18
23    A. -- that you may have or helped arrange that    15:38:21
24 gift.    15:38:24
25    Q. I understand.    15:38:24

1    A. And that's the only explanation that I can    15:38:25
2 make because, again, up until I left, you know, any    15:38:28
3 of those big donations, I had a -- I wasn't aware of    15:38:34
4 it, and I just don't recall them giving indiv --    15:38:40
5 that individually. It was all through the    15:38:46
6 foundation.    15:38:49
7    Q. Well, am I -- am I correct that over time    15:38:49
8 you yourself cultivated a relationship with    15:38:53
9 Colonel Pritzker in connection with fundraising for    15:38:57
10 the institute?    15:38:59
11    A. Yes.    15:39:00
12       MR. LANNIN: Object to the form.    15:39:01
13 BY MR. BROOKS:    15:39:02
14    Q. And other than Pritzker, do you not recall    15:39:03
15 anybody else of those who gave a million dollars or    15:39:07
16 more?    15:39:11
17    A. I -- I think I may know one of those    15:39:17
18 anonymous donors, but I don't recall four of them.    15:39:20
19    Q. Well, your counsel will be free to designate    15:39:27
20 the relevant portion of the transcript as    15:39:32
21 confidential --    15:39:32
22    A. Yeah.    15:39:32
23    Q. -- but who is the one that you recall?    15:39:33
24       MR. LANNIN: You can answer.    15:39:35

2 BY MR. BROOKS:    15:39:48
3    Q. At any rate, it is true, is it not, that    15:40:02
4 over time by far the largest individual donor to your    15:40:04
5 institute was Colonel Pritzker individually or    15:40:08
6 through controlled enterprises?    15:40:11
7       MR. LANNIN: Objection.    15:40:11
8       THE WITNESS: Clearly.    15:40:14
9 BY MR. BROOKS:    15:40:14
10    Q. Okay. Dr. Coleman, summing up -- we've    15:40:16
11 wandered around about a bit -- it's the case, is it    15:40:33
12 not, that, to your knowledge, many participants in    15:40:34
13 the SOC-8 development project earned a substantial    15:40:37
14 percentage of their income from providing services    15:40:40
15 relating to gender dysphoria to which the Standards    15:40:43
16 of Care could be relevant?    15:40:49
17       MR. LANNIN: Object to form.    15:40:50
18       THE WITNESS: I would not know that for sure    15:40:51
19 because many -- many individuals, you know, were    15:40:57
20 involved in clinical care, and there -- there might    15:41:06
21 have been a substan-- you know, a significant, but    15:41:11
22 to say that the majority of their -- their income    15:41:15
23 derived from that, I don't know if that's -- was the    15:41:24
24 case at all.    15:41:30
25 BY MR. BROOKS:    15:41:31

1    Q. A number of the participants were employed    15:41:32
2 by pediatric gender clinics that derived the bulk of    15:41:33
3 their revenue from services that could be affected by    15:41:37
4 the Standards of Care. Correct?    15:41:39
5       MR. LANNIN: Object to the form.    15:41:41
6       THE WITNESS: To their entire department?    15:41:42
7 Or --    15:41:46
8 BY MR. BROOKS:    15:41:49
9    Q. Multiple participants in the SOC development    15:41:49
10 process were employed by gender clinics that derived    15:41:51
11 the bulk of their revenue from services that could be    15:41:57
12 affected by the Standards of Care. Correct?    15:42:00
13       MR. LANNIN: Same objection. Same    15:42:02
14 objection.    15:42:06
15       THE WITNESS: Several of the members I would    15:42:06
16 say probably did. You know, the bulk of their work    15:42:09
17 was adolescent transgender health care.    15:42:13
18 BY MR. BROOKS:    15:42:17
19    Q. And, to your knowledge, several participants    15:42:19
20 had served or were -- during the time that SOC-8 was    15:42:25
21 developed were serving as paid expert witnesses in    15:42:28
22 litigation relating to transgender medicine.    15:42:31
23 Correct?    15:42:34
24       MR. LANNIN: Object to the form.    15:42:35
25       THE WITNESS: They -- they might have been.    15:42:36

CONFIDENTIAL

Page 250

1 I -- I'm not aware of, you know, each case of that.  15:42:39
2 But oftentimes we have been called -- you know, we  15:42:41
3 get called to, as I told you, you know, serve as an  15:42:45
4 expert, fact witness, or me get involved in  15:42:50
5 litigation, but --  15:42:56
6 BY MR. BROOKS:  15:42:56
7     Q. It's also the ca- --  15:42:56
8     A. -- I don't think that any of them make a  15:43:00
9 living at that.  15:43:03
10     Q. It's also the case that the primary funder  15:43:05
11 of the SOC-8 project and the largest donor to your  15:43:08
12 institute is a transgender individual who has been  15:43:13
13 referred to as the world's first transgender  15:43:18
14 billionaire. Correct?  15:43:22
15     MR. LANNIN: Object to the form.  15:43:23
16     THE WITNESS: That is correct.  15:43:23
17 BY MR. BROOKS:  15:43:24
18     Q. Back to Exhibit 2. Let me ask you to turn  15:43:48
19 back to page 177, the last page of Exhibit 2. It's  15:43:50
20 the big fat SOC excerpt.  15:43:59
21     A. Yes, thank you. And what page?  15:44:02
22     Q. The very last page.  15:44:03
23     A. Okay.  15:44:05
24     Q. And there's a short section entitled  15:44:09
25 "Conflicts of Interest."  15:44:12

Page 251

1     A. Hm-hm.  15:44:12
2     Q. And it says:  15:44:13
3         "Conflicts of interest were  15:44:16
4     reviewed as part of the selection  15:44:16
5     process for committee members and  15:44:18
6     at the end of the process before  15:44:20
7     publication. No conflicts of  15:44:21
8     interest were deemed significant or  15:44:24
9     consequential."  15:44:25
10     Let me ask you this, Dr. Coleman.  15:44:28
11     In light of the numerous and extensive  15:44:29
12 conflicts of interest that we've discussed, how did  15:44:34
13 you conclude, how were you comfortable stating to the  15:44:37
14 world, that no conflict of interests were deemed  15:44:41
15 significant or consequential?  15:44:44
16     MR. LANNIN: Object to the form.  15:44:47
17     THE WITNESS: Again, we entered into this  15:44:48
18 knowing that people would have conflicts of interest.  15:44:51
19 We did not deem any of those -- again, given the  15:44:57
20 guidance that we received from Karen Robinson -- that  15:45:02
21 would fall into a category of significant or  15:45:07
22 consequential that would make us decide not to  15:45:11
23 include someone on the committee.  15:45:17
24 BY MR. BROOKS:  15:45:20
25     Q. Well, as we saw in an earlier email and as  15:45:22

Page 252

1 you and I discussed, conflicts of interest often call  15:45:23
2 for disclosure, not necessarily exclusion. Correct?  15:45:28
3     MR. LANNIN: Object to the form.  15:45:32
4     THE WITNESS: Disclosure, right, and  15:45:33
5 management of that conflict.  15:45:36
6 BY MR. BROOKS:  15:45:39
7     Q. And my question is -- well, let me ask this.  15:45:39
8     Did Karen Robinson sign off on the statement  15:45:41
9 that no conflicts of interest were deemed significant  15:45:44
10 or consequential?  15:45:46
11     A. She did not sign off on this public- --  15:45:50
12 she's not an author on this publication.  15:45:54
13     Q. Who made the decision to declare to the  15:45:56
14 world that no conflicts of interest of any  15:45:58
15 participant in the SOC-8 project were significant or  15:46:01
16 consequential?  15:46:05
17     MR. LANNIN: Object to the form.  15:46:05
18     THE WITNESS: I mean, that's -- that's true,  15:46:08
19 or we would have excluded those -- those people.  15:46:11
20 This is a statement of fact.  15:46:17
21 BY MR. BROOKS:  15:46:18
22     Q. Who made the decision to assert that no  15:46:18
23 conflicts of interest were deemed significant or  15:46:21
24 consequential?  15:46:23
25     MR. LANNIN: Object to the form.  15:46:24

Page 253

1     THE WITNESS: That was language that was  15:46:29
2 approved by the authors of the Standards of Care 8.  15:46:30
3 BY MR. BROOKS:  15:46:33
4     Q. Not all the authors were involved in the  15:46:34
5 process of evaluating conflicts, were they?  15:46:36
6     A. No.  15:46:39
7     Q. Who made the decision to represent to the  15:46:39
8 world that no conflicts of interest were deemed  15:46:42
9 significant or consequential?  15:46:47
10     MR. LANNIN: Object to the form.  15:46:49
11     THE WITNESS: We reported what -- what we  15:46:57
12 knew.  15:46:58
13 BY MR. BROOKS:  15:46:58
14     Q. Somebody evaluated that and somebody drafted  15:46:58
15 that sentence. Who made the decision to tell the  15:47:00
16 world that no conflicts of interest were significant  15:47:02
17 or consequential?  15:47:04
18     MR. LANNIN: Object to the form.  15:47:05
19     THE WITNESS: As I said, we reviewed  15:47:07
20 everyone's conflict of interest, and we did not find  15:47:10
21 that there was any reason that those conflicts of  15:47:16
22 interest couldn't be managed. And we were very  15:47:25
23 transparent with -- with that process and who was  15:47:29
24 involved and their affiliations.  15:47:34
25     I think we went very extensively to be  15:47:38

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1 transparent about our process and who was involved.    15:47:44
2 Did we report every aspect?  As I said, no.  But,    15:47:51
3 again, those things were reviewed, and if we had    15:47:55
4 serious question, we would have -- we would have --    15:47:57
5 and I remember, again, talking about some of those    15:48:03
6 with -- with Karen.                15:48:07
7 BY MR. BROOKS:                15:48:09
8     Q.  Well, this is -- I was going to say there    15:48:09
9 was a lot of passive voice there and "we."    15:48:10
10         You've said that not all the members    15:48:13
11 participated in the conflict review process.    15:48:15
12 Everybody had to submit --        15:48:18
13     A.  No, it --            15:48:20
14     Q.  -- exposure.            15:48:21
15     A.  It was the --            15:48:21
16     Q.  Who is "we"?            15:48:21
17     A.  It was the steering committee.  It was    15:48:21
18 Karen, myself, Asa, and Jon.        15:48:24
19     Q.  But it is not your testimony that Karen    15:48:27
20 signed off on the representation that none of the    15:48:30
21 identified conflicts were consequential or    15:48:32
22 significant.                15:48:35
23         MR. LANNIN:  Object to the form.    15:48:36
24         THE WITNESS:  She knew and never raised --    15:48:37
25 that was -- she understood that we had reviewed the    15:48:42

Page 255

1 conflicts of interest and felt satisfied with that.    15:48:50
2         Her contract had ended by the time that we    15:48:56
3 were -- and she was not -- and she was not a -- and    15:48:59
4 shouldn't have been an author of the Standards of    15:49:07
5 Care.  She was the methodologist.        15:49:09
6         MR. BROOKS:  Let me ask the reporter to mark    15:49:15
7 as Exhibit 22 an email chain bearing Bates numbers    15:49:16
8 BOEL -- BOEAL_WPATH_105494 through 498, a chain    15:49:25
9 titled "The Eminent Release of the SOC-8, and please    15:49:35
10 be so kind as to give us your support or    15:49:38
11 endorsement."                15:49:42
12         (The document referred to was    15:49:42
13         marked as Exhibit 22.)        15:49:58
14 BY MR. BROOKS:                15:49:58
15     Q.  Let me take you to the beginning of this    15:50:01
16 chain which starts on page 105496.        15:50:04
17     A.  Okay.                15:50:15
18     Q.  And at the bottom there begins an email from    15:50:15
19 Walter Bouman, who is, in 2022, the president of    15:50:18
20 WPATH.  Correct?            15:50:22
21     A.  That's correct.            15:50:22
22     Q.  To redacted addressees.  And if you turn the    15:50:23
23 page, you will see that it is an email requesting    15:50:34
24 that the addressee organization officially endorse    15:50:37
25 SOC-8.                    15:50:45

Page 256

1         In this case, we see two-thirds of the way    15:50:47
2 down, page 497, that it's addressed to the AMA:    15:50:50
3         "We, as WPATH would be most    15:50:55
4         grateful if the AMA would be    15:50:57
5         willing to support or endorse the    15:50:59
6         SOC-8."            15:51:01
7         Do you see that?        15:51:02
8     A.  Not yet.                15:51:04
9     Q.  On this page, it is yay far down.    15:51:05
10     A.  Right there, okay.  Yes, I see that now.    15:51:13
11     Q.  Just so we know what we're talking about.    15:51:15
12     A.  Yup.                15:51:17
13     Q.  And on the next page, you'll see that    15:51:18
14 things -- you know, footers get added to emails and    15:51:21
15 this one's got, on the next page, "AMA" all over it.    15:51:24
16         At any rate, did you at any point see    15:51:31
17 Dr. Bouman's email to the AMA requesting their    15:51:35
18 endorsement or support of SOC-8?        15:51:41
19         MR. LANNIN:  Object to the form.    15:51:45
20         THE WITNESS:  Not that I recall.    15:51:47
21 BY MR. BROOKS:                15:51:50
22     Q.  Were you aware that Dr. Bouman sent letters    15:51:51
23 to a number of medical organizations, including the    15:51:54
24 American Medical Association, requesting their    15:51:58
25 support or endorsement of SOC-8?        15:52:00

Page 257

1         MR. LANNIN:  Object to the form.    15:52:03
2         THE WITNESS:  I'm aware that we reached out    15:52:05
3 to organizations like this to see if we could gain    15:52:07
4 their support.                15:52:13
5 BY MR. BROOKS:                15:52:13
6     Q.  Does this appear to you to be an email from    15:52:16
7 Dr. Bouman to the AMA?            15:52:21
8     A.  Yes.                15:52:22
9     Q.  Okay.                15:52:23
10         MR. LANNIN:  Object to the form.    15:52:24
11 BY MR. BROOKS:                15:52:25
12     Q.  And if you look on the page ending in 496,    15:52:25
13 at the top, we have a response -- and tell me, do you    15:52:34
14 have 496?                15:52:38
15     A.  Yes.                15:52:38
16     Q.  At the top we have a response from somebody    15:52:40
17 to Dr. Bouman that says, quote:        15:52:42
18         "Thank you for your outreach to    15:52:45
19         the American Medical Association.    15:52:47
20         Blank asked me to reply on their    15:52:50
21         behalf.  While we appreciate your    15:52:52
22         efforts on the SOC-8, the AMA does    15:52:55
23         not endorse or support Standards of    15:52:57
24         Care.  That falls outside our    15:52:59
25         expertise," close quote.        15:53:00

65 (Pages 254 - 257)

| Page 258 | Page 260 |
|---|---|

**Page 258**

1  Do you see that language?  15:53:02
2  A. Yes.  15:53:02
3  Q. Do you recall learning in the summer of 2022  15:53:05
4  or thereabouts that the AMA had declined to endorse  15:53:07
5  or support SOC-8?  15:53:12
6  A. I don't recall specifically, no.  15:53:13
7  Q. If you go to the first page, 494, there  15:53:31
8  Asa Radix forwards an email from Dr. Bouman, WPATH  15:53:41
9  Chair. Do you see that?  15:53:45
10  A. Yes.  15:53:45
11  Q. And Dr. Bouman writes after sharing the --  15:53:49
12  well, let me just -- let me just ask for clarity.  15:53:55
13  One of the cc's of this chain is WPATH EC  15:53:57
14  2022. Do you understand that to refer to the  15:54:02
15  executive committee?  15:54:05
16  A. That's correct.  15:54:05
17  Q. Which you are not a member of at this time.  15:54:06
18  Correct?  15:54:06
19  A. That's correct.  15:54:09
20  Q. Okay. Dr. Bouman writes and Dr. Radix sends  15:54:09
21  out to the executive committee, quote:  15:54:15
22  "It annoyed the hell out of me  15:54:18
23  and I had to stop my impulsivity to  15:54:21
24  not respond with a very, very rude  15:54:24
25  email response to the AMA and its  15:54:26

**Page 259**

1  current custodians."  15:54:28
2  Do you see that?  15:54:30
3  A. Yes.  15:54:30
4  Q. And Dr. Bouman, president of the WPATH, goes  15:54:30
5  on to describe the AMA leadership as, quote:  15:54:38
6  "Probably some white cisgender  15:54:42
7  heterosexual hillbillies from  15:54:46
8  nowhere," close quote.  15:54:46
9  Do you see that?  15:54:48
10  A. Yes.  15:54:48
11  Q. Do you consider the leadership of the AMA to  15:54:50
12  be a bunch of white cisgender heterosexual  15:54:53
13  hillbillies from nowhere?  15:54:56
14  A. No.  15:54:56
15  MR. LANNIN: Object to the form.  15:54:57
16  BY MR. BROOKS:  15:54:58
17  Q. Do you consider Dr. Bouman to be a serious,  15:54:58
18  careful scientist who makes decisions based on  15:55:01
19  science rather than ideology?  15:55:04
20  MR. LANNIN: Object to the form.  15:55:06
21  THE WITNESS: I do.  15:55:06
22  BY MR. BROOKS:  15:55:08
23  Q. Do you recall -- strike that.  15:55:18
24  MR. BROOKS: Let me ask the reporter to mark  15:55:30
25  as Exhibit 23 an email chain headed -- bearing Bates  15:55:31

**Page 260**

1  numbers BOEAL_WPATH_091211 through 218 headed "SOC-8  15:55:38
2  Strategy."  15:55:47
3  (The document referred to was  15:55:47
4  marked as Exhibit 23.)  15:56:10
5  BY MR. BROOKS:  15:56:10
6  Q. And, Dr. Coleman, the -- halfway down the  15:56:11
7  first page is an email that is in fact sent by you.  15:56:15
8  Correct?  15:56:27
9  Have I got the wrong version here? Well, at  15:56:28
10  any rate, we'll take it backwards.  15:56:33
11  Turn to page ending in 213 which is headed  15:56:34
12  "Draft 12 Point Strategic Plan to Advance  15:56:41
13  Gender-Affirming Care Through Strengthening the WPATH  15:56:46
14  SOC-8."  15:56:49
15  Is that a document you wrote?  15:56:49
16  A. Yes.  15:56:50
17  Q. And am I correct that preceding this we have  15:56:51
18  an email that you sent, circulating this memorandum  15:56:56
19  to a number of your colleagues?  15:57:00
20  A. Yes.  15:57:03
21  Q. And to whom did you send it?  15:57:04
22  A. Who did I send it to? I would imagine that  15:57:07
23  I sent this to the -- the -- either minimally the EC  15:57:11
24  of -- of WPATH or the entire board.  15:57:22
25  Q. Okay. Let me ask you to turn in the memo  15:57:24

**Page 261**

1  that you wrote to page 215. Actually, let's turn  15:57:27
2  first to 214 where the first of your 12-point plan is  15:57:38
3  endorsements. Correct?  15:57:45
4  A. Yes.  15:57:46
5  Q. And you say there:  15:57:47
6  "As far as I know, we have  15:57:48
7  endorsements of the SOC-8 from the  15:57:49
8  World Association For Sexual Health  15:57:52
9  and the International Society For  15:57:54
10  Sexual Medicine."  15:57:56
11  Correct?  15:57:56
12  A. That's correct.  15:57:58
13  Q. And you note farther down that, quote:  15:57:59
14  "I don't know what happened to  15:58:07
15  our efforts to get more support  15:58:08
16  from the American Academy of  15:58:09
17  Pediatrics."  15:58:12
18  Do you see that?  15:58:12
19  A. Yes.  15:58:13
20  Q. And, in fact, the American Academy of  15:58:13
21  Pediatrics has never endorsed SOC-8. Am I correct?  15:58:16
22  MR. LANNIN: Object to the form.  15:58:21
23  THE WITNESS: As far as I know, that's  15:58:22
24  correct.  15:58:24
25  BY MR. BROOKS:  15:58:24

66 (Pages 258 - 261)

Page 262

1    Q. And we've seen that the AMA did not endorse 15:58:24
2 SOC-8. Correct?                               15:58:28
3    A. That's correct.                         15:58:29
4    Q. Other than the two that you list in the  15:58:30
5 opening paragraph, are you aware of any significant 15:58:32
6 medical organization that has endorsed SOC-8?  15:58:35
7        MR. LANNIN: Object to the form.        15:58:38
8        THE WITNESS: I -- I am not.            15:58:39
9 BY MR. BROOKS:                                 15:58:42
10   Q. Let me ask you to turn now to 215, the next 15:58:43
11 page. Tell me when you have that.             15:58:46
12   A. Oh, sorry. 15?                          15:58:53
13   Q. 215?                                    15:58:56
14   A. Yup.                                    15:58:57
15   Q. And in the second paragraph, you write:  15:58:58
16       "I have no idea how it was ever         15:59:04
17       said that so many medical              15:59:07
18       organizations have endorsed SOC-7.     15:59:09
19       This statement is made in many         15:59:12
20       legal briefs and court proceedings,    15:59:14
21       but is that true? How did that         15:59:15
22       ever come about?" Close quote.         15:59:18
23       Do you see that language?              15:59:20
24   A. Yes.                                    15:59:21
25   Q. How did you come to learn that it had been 15:59:22

Page 263

1 said in many of the legal briefs and in court that  15:59:26
2 many medical organizations had endorsed SOC-7?  15:59:31
3        MR. LANNIN: Object to the form.        15:59:35
4        THE WITNESS: How did I what? I'm sorry.  15:59:37
5 BY MR. BROOKS:                                 15:59:39
6    Q. How did you learn that it had been said in  15:59:39
7 many legal briefs and court proceedings that many  15:59:42
8 medical organizations have endorsed SOC-7?     15:59:46
9    A. I read it in these various documents.   15:59:50
10   Q. You -- for fun you read legal briefs from  15:59:53
11 time to time.                                 15:59:58
12   A. Time to time.                           15:59:58
13   Q. I'm sorry.                              15:59:58
14       And you were the chairman of the SOC-7  16:00:03
15 process?                                      16:00:07
16   A. That's correct.                         16:00:08
17   Q. You believe you would know if medical   16:00:09
18 organizations have endor- --- had endorsed SOC-7, do  16:00:15
19 you not?                                      16:00:18
20   A. Not necessarily.                        16:00:18
21   Q. After you circulated this memo to the   16:00:20
22 executive committee and perhaps the whole board  16:00:24
23 questioning whether it was true that many medical  16:00:27
24 organizations had endorsed SOC-7, did anybody come to 16:00:31
25 you and say, "Dr. Coleman, the following     16:00:35

Page 264

1 organizations did endorse SOC-7"?             16:00:39
2        MR. LANNIN: Object to the form.        16:00:42
3        THE WITNESS: No. I mean, that -- this was  16:00:43
4 my point is that I read that many organizations had  16:00:46
5 either endorsed or supported SOC-7, but I thought it  16:00:52
6 would be -- I didn't know where that really came  16:01:03
7 from.                                         16:01:05
8 BY MR. BROOKS:                                 16:01:06
9    Q. As far as you know, it's just not true.  16:01:06
10 Correct?                                      16:01:08
11       MR. LANNIN: Object to the form.        16:01:09
12       THE WITNESS: No, I assumed it to be true.  16:01:09
13 BY MR. BROOKS:                                 16:01:11
14   Q. Why do you assume it to be true?        16:01:12
15   A. It's written over and over again and stated 16:01:14
16 in even legal, you know, documents.           16:01:19
17   Q. Oh, my. You have great faith in lawyers.  16:01:22
18       However, you are not aware of facts that  16:01:28
19 would support that this proposition that many medical 16:01:30
20 organizations endorsed or supported SOC-7, are you? 16:01:36
21       MR. LANNIN: Object to the form.        16:01:41
22       THE WITNESS: Only the fact that I -- I -- I 16:01:41
23 stated.                                       16:01:44
24 BY MR. BROOKS:                                 16:01:47
25   Q. Sorry. That it was -- that you read it in  16:01:47

Page 265

1 briefs?                                       16:01:48
2        MR. LANNIN: Object to the form.        16:01:50
3        THE WITNESS: (Nods head.)              16:01:51
4        MR. BROOKS: All right.                 16:01:52
5        MR. LANNIN: Counsel, we've been going for  16:01:55
6 another hour, believe it or not. Take our final  16:01:57
7 break?                                        16:01:59
8        MR. BROOKS: Take a final break, yes.   16:01:59
9        MR. LANNIN: Okay.                      16:02:01
10       THE VIDEOGRAPHER: Okay. The time is    16:02:02
11 4:02 p.m., and we are now off the record.     16:02:05
12       (Recess taken.)                        16:02:08
13       THE VIDEOGRAPHER: The time is 4:18 p.m.,  16:18:15
14 and we are now back on the record.            16:18:36
15       MR. BROOKS: Pardon me one moment.      16:18:36
16 BY MR. BROOKS:                                 16:18:36
17   Q. I've asked you to find Exhibit 16, the   16:19:03
18 methodology appendix. I'm going to take you back to  16:19:06
19 the beginning of that where there's discussion about  16:19:09
20 the methodological innovations of SOC-8 as compared  16:19:13
21 to its predecessors. And one of those that's  16:19:17
22 identified in the bullet point list that goes from  16:19:25
23 the bottom of the first column to the second is,  16:19:27
24 quote:                                        16:19:29
25       "The use of a Delphi process to         16:19:29

CONFIDENTIAL

Page 266

1    reach agreement on the                16:19:31
2    recommendations among SOC-8          16:19:32
3    committee members."                  16:19:34
4        Do you see that?                 16:19:36
5    A. Yes.                              16:19:36
6    Q. And, in fact, earlier in column 1, an    16:19:37
7    inch-and-a-half up, is a similar statement that says:  16:19:42
8        "Consensus of the final          16:19:46
9    recommendations was attained using   16:19:47
10    a Delphi process that included all   16:19:47
11    members of the Standards of Care     16:19:52
12    revision committee and required      16:19:53
13    that recommendation statement were   16:19:55
14    approved by 75 percent of members."  16:19:57
15        Do you see that?                 16:19:59
16    A. Yes.                             16:20:01
17    Q. Why did you consider the use of the Delphi  16:20:02
18    process to adopt recommendations to be important?  16:20:06
19    A. First of all, that was the recommendation of  16:20:12
20    Dr. Robinson that we use that process.  And this is a  16:20:19
21    well-known, you know, process of achieving, you know,  16:20:31
22    consensus about clinical guidelines, and so we felt  16:20:40
23    that that was a good process to use and was  16:20:47
24    recommended to us and that's what we did.  16:20:51
25        It was a way of -- you know, let's say  16:20:55

Page 267

1    compared to SOC-7, you know, that -- I mean there was  16:21:00
2    a check-and-balance system in that, is that draft  16:21:06
3    articles were written by usually just an individual,  16:21:12
4    but then we put it through a peer-review process, but  16:21:17
5    that may only involve three other individuals  16:21:22
6    reviewing that work, and, in this process, we've got  16:21:26
7    119 people reviewing that work.       16:21:30
8    Q. And am I correct that in the Delphi process  16:21:33
9    voting to approve or disapprove a proposed statement  16:21:37
10    is done anonymously?                 16:21:42
11        MR. LANNIN:  Object to the form.  16:21:44
12        THE WITNESS:  I don't know that that's true.  16:21:45
13    BY MR. BROOKS:                       16:21:57
14    Q. Let me -- fine.  Let me take you to  16:21:58
15    page 250- --                         16:22:02
16    A. I don't think we saw the -- I think I --  16:22:03
17    Q. All right.                        16:22:11
18    A. Yeah, I don't -- I don't -- I'm not sure.  16:22:12
19    Q. Okay.                            16:22:12
20    A. I know we -- Loren looked at those results  16:22:13
21    and those percentages and we looked at all the  16:22:18
22    comments.  I think there must have been a mechanism  16:22:21
23    that we needed to view whatever comment, where was  16:22:24
24    that coming from, and to -- to understand the context  16:22:29
25    of the comments.  Because not only did they vote,  16:22:35

Page 268

1    they -- they wrote comments about why they were  16:22:39
2    supporting or why they were -- had some concerns or  16:22:43
3    made recommendations about different ways of stating  16:22:47
4    the recommendation.                  16:22:54
5    Q. Let me take you to what -- the more detail  16:22:54
6    that you wrote about that.  Page 250 at the bottom of  16:22:57
7    column 1, there's a Section 3.8 headed "Approval of  16:23:01
8    the Recommendations Using the Delphi Process."  16:23:04
9        Now first let me ask, were both suggestions  16:23:07
10    and recommendations approved by the Delphi process?  16:23:10
11    A. All recommen- -- all statements were first  16:23:17
12    approved or disapproved by the Delphi process, so it  16:23:22
13    added that.                         16:23:25
14    Q. It was statements you -- you mean to include  16:23:25
15    both, quote, "suggestions and recommendations"?  16:23:26
16    A. Didn't matter.  All of them.       16:23:29
17    Q. Okay.                            16:23:32
18    A. They didn't -- the whole committee did not  16:23:33
19    vote on the strength of the recommendation.  16:23:35
20    Q. Okay.  I just wanted to get clear since the  16:23:38
21    term is used in a formal --           16:23:42
22    A. Yeah.                            16:23:42
23    Q. -- sense and a more flexible sense, I  16:23:44
24    believe.                            16:23:47
25    A. Yup.                             16:23:47

Page 269

1    Q. It says in the -- at the beginning of this  16:23:48
2    Section 3.8:                         16:23:50
3        "Formal consensus for all         16:23:51
4    statements was obtained using the    16:23:53
5    Delphi process."                     16:23:55
6        And it goes on, I'm skipping a     16:23:56
7    parenthetical:                       16:23:56
8        "For a recommendation to be       16:23:59
9    approved, a minimum of 75 percent    16:24:00
10    of the voters -- of the voters had   16:24:02
11    to approve that statement."          16:24:07
12        How did you decide on the 75 percent  16:24:08
13    threshold?                          16:24:10
14    A. That was at the recommendation of Karen  16:24:13
15    Robinson.                           16:24:14
16    Q. Okay.                            16:24:15
17        MR. BROOKS:  Let me ask the reporter to mark  16:24:24
18    as Exhibit 24 a document bearing Bates numbers  16:24:25
19    BOEL -- BOEAL_WPATH_105297 through 302.  16:24:36
20        (The document referred to was     16:24:36
21    marked as Exhibit 24.)              16:24:45
22        THE WITNESS:  Thank you.          16:24:45
23    BY MR. BROOKS:                       16:24:45
24    Q. So far as I'm aware, Dr. Coleman, this  16:25:09
25    email chain entitled "Adolescent SOC-8 next steps"  16:25:13

CONFIDENTIAL

Page 270

1 includes Dr. Edwards-Leeper, adolescent cochairs    16:25:19
2 Dr. Leibowitz and Dr. de Vries. As far as I'm aware,  16:25:23
3 you didn't receive it, but let me ask you              16:25:25
4 recognize it.                                          16:25:28
5      A. I -- I don't right off the bat, no.            16:25:30
6      Q. Okay. If you turn to page 300, and if you      16:25:32
7 look at the immediately preceding page at the bottom,  16:25:45
8 you'll see that this is an email from Scott            16:25:48
9 Leibowitz. On page 299 you'll see that.               16:25:52
10     A. Yes. Oh, I see how it goes, yes.               16:26:03
11     Q. Okay. Documents used to be simpler before email  16:26:07
12 chains.                                                16:26:11
13     A. Sorry.                                          16:26:11
14     Q. He says, halfway down the page on page 300,    16:26:1
15 and I quote partway through:                           16:26:18
16         "We do have a good amount of                   16:26:20
17     feedback to start looking at."                     16:26:21
18     He's referring to the comment period. He          16:26:23
19 says in bold:                                          16:26:25
20         "The statements themselves are                 16:26:26
21     not changing as they went through                  16:26:27
22     Delphi. However there may be                        16:26:29
23     opportunities to strengthen the                     16:26:31
24     chapter by adjusting the text."                     16:26:32
25     Am I correct that the explanatory text was        16:26:35

Page 271

1 not approved through a Delphi process?                 16:26:39
2      A. That's correct.                                 16:26:42
3      Q. Nor did you feel it was required to be?        16:26:43
4      A. That's correct.                                 16:26:44
5      Q. But the statements, recommendations,           16:26:45
6 suggestions were approved by a vote of 75 percent      16:26:47
7 through the Delphi process?                             16:26:53
8      A. Yes.                                            16:26:54
9      Q. And is it consistent with your understanding   16:26:55
10 of the process that that Delphi process happened       16:26:56
11 before the public comment period, and those           16:27:05
12 Delphi-approved statements were not going to be       16:27:08
13 changed based on public comment?                       16:27:09
14     MR. LANNIN: Object to the form.                   16:27:12
15     THE WITNESS: They could have been. In             16:27:13
16 fact, we sent three new -- new statements through     16:27:17
17 Delphi based upon the feedback, public comment        16:27:24
18 period.                                                16:27:30
19 BY MR. BROOKS:                                         16:27:30
20     Q. In what chapter areas?                         16:27:31
21     A. Don't recall.                                  16:27:33
22     Q. Okay.                                           16:27:34
23     A. But there were several new statements that,   16:27:35
24 based upon the public comment, that we felt could     16:27:38
25 have used some clarity or whatever, and it was agreed  16:27:44

Page 272

1 to put those through Delphi.                           16:27:48
2      Q. Okay. At any rate, here on December 23rd,     16:27:50
3 '21, Dr. Leibowitz, cochair of the adolescent          16:27:57
4 chapter, writes to the adolescent SOC-8 team the       16:28:01
5 statements themselves are not changing as they went    16:28:04
6 through Delphi.                                         16:28:06
7      Is it at least fair to say that, at that          16:28:08
8 stage, if one wanted to change a statement, you would  16:28:10
9 have to, as you've just described, submit a different  16:28:12
10 statement through Delphi?                              16:28:15
11     MR. LANNIN: Object to the form.                   16:28:16
12     THE WITNESS: It was -- if it meant a              16:28:19
13 substantial revision. There were some cases where     16:28:23
14 there was minor edits, you know, like grammar or      16:28:27
15 something like that. We did not send those through    16:28:34
16 another Delphi. But if it was -- yeah, we -- that's    16:28:38
17 how we did it.                                         16:28:45
18     MR. BROOKS: All right.                            16:28:45
19     Let me ask the reporter to mark as                16:28:52
20 Exhibit 26 a document bearing Bates numbers            16:28:56
21 BOEAL_WPATH_105851 through 936, which is a version of  16:28:58
22 SOC-8. And I'll represent to you, and we'll look,     16:29:00
23 that I think it's not the final version.               16:29:09
24     THE REPORTER: Exhibit 25, I believe.              16:29:25
25     MR. BROOKS: Sounds right. Thank you. I            16:29:25

Page 273

1 don't -- have no idea what I said.                     16:29:25
2     (The document referred to was                      16:29:25
3     marked as Exhibit 25.)                             16:29:26
4 BY MR. BROOKS:                                         16:29:26
5     Q. Dr. Coleman, let me ask if you recognize      16:29:39
6 this text that appears to have been published in       16:29:41
7 September 2022 in the International Journal of          16:29:43
8 Transgender Health as a near final version of SOC-8?  16:29:48
9     MR. LANNIN: Object to the form.                   16:29:55
10 BY MR. BROOKS:                                         16:30:02
11     Q. And, to avoid any confusion, let me point     16:30:02
12 out to you that on page ending in 919 there are        16:30:05
13 minimum ages proposed for certain procedures.          16:30:10
14     A. What page is that on?                           16:30:15
15     Q. That's on 919.                                  16:30:17
16     A. Yeah. Yes.                                      16:30:19
17     Q. I'd just -- I'd ask you to identify what       16:30:19
18 this document is.                                      16:30:21
19     A. Yeah, this is the unfortunate online           16:30:23
20 publication that shouldn't have been -- shouldn't      16:30:32
21 have appeared, and that was the error of the           16:30:38
22 publisher because we had clearly stopped this process  16:30:40
23 and we had revisions before it fin- -- was to be       16:30:47
24 finalized.                                             16:30:53
25     Q. All right. So this was late stage. This       16:30:53

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

1 was, if I'm correct, after completion of all Delphi   16:30:55
2 processes, but it was before you intended it to go   16:30:59
3 out the door, is what you're telling me.   16:31:03
4    A.  That's correct.   16:31:04
5    Q.  Okay.  And it's the case that this version   16:31:05
6 that went out in September -- let me ask.  I know how   16:31:10
7 journals work.  It says September 2022.   16:31:15
8      Did it come out in September 2022 or when --   16:31:18
9    A.  Yes, it came out in September 2022.   16:31:21
10    Q.  Sometimes journal dates are fictitious, so   16:31:23
11 I --   16:31:28
12    A.  No.   16:31:28
13    Q.  -- thought I should ask.   16:31:28
14    A.  Yeah.   16:31:28
15    Q.  Okay.  And if we go to the -- page 921,   16:31:31
16 there's -- well, there's highlighting in your copy   16:31:55
17 huh?   16:31:59
18    A.  Hm-hm.   16:31:59
19    Q.  All right.  Well, I can't tell you what it   16:32:00
20 all signifies.  It should signify nothing.  And let's   16:32:04
21 get clear on the record that that highlighting is not   16:32:09
22 original to the publication.  Correct?   16:32:10
23    A.  That is correct.   16:32:13
24    Q.  All right.  However, it will make it easier   16:32:13
25 for me to call your attention to language of the   16:32:16

Page 275

1 bottom of the second column that is highlighted in   16:32:18
2 the version you have that reads:   16:32:21
3      "Age recommendations for   16:32:23
4      irreversible surgical procedures   16:32:25
5      were determined by a review of   16:32:26
6      existing literature and the expert   16:32:28
7      consensus of mental health   16:32:30
8      providers, medical providers, and   16:32:32
9      surgeons highly experienced in   16:32:35
10      providing care to TGD adolescents."   16:32:36
11    A.  Yes.   16:32:41
12    Q.  Was that statement true?   16:32:41
13      MR. LANNIN:  Object to the form.   16:32:47
14      THE WITNESS:  Yes.   16:32:47
15 BY MR. BROOKS:   16:32:48
16    Q.  Let me ask you to turn to page 19.  I'm   16:32:52
17 sorry, 919, the final three digits.   16:33:03
18    A.  Okay.   16:33:08
19    Q.  And there I'm taking you back to the section   16:33:09
20 that has age limits.  And, again, I apologize for the   16:33:12
21 highlighting on the page, which is, I'll represent,   16:33:16
22 not original to the document as produced.   16:33:19
23      And there we see for various procedures   16:33:24
24 minimum ages of 14, 15, 16, 17 and 18 years for   16:33:28
25 different varying procedures.  Correct?   16:33:32

Page 276

1    A.  Yes.   16:33:35
2    Q.  And am I correct that each of those age   16:33:35
3 limits, minimum age limits, had been approved through   16:33:38
4 the Delphi process?   16:33:42
5    A.  This -- the age limits were a subset of one   16:33:46
6 of the recommendation statements, statement 6.12.   16:33:55
7    Q.  So those were part of what had been vetted   16:34:00
8 through the Delphi process?   16:34:03
9    A.  Yes.   16:34:04
10    Q.  And voted by more than 75 percent of the   16:34:04
11 respondents?   16:34:07
12    A.  That's correct.   16:34:07
13    Q.  If you turn to -- well, don't turn.  The second   16:34:24
14 column of page S65, which is the Bates number ending   16:34:26
15 in 919, down at the very bottom, it says, second   16:34:32
16 column:   16:34:36
17      "The age criteria set forth in   16:34:36
18      these guidelines are younger than   16:34:38
19      the ages stipulated in previous   16:34:40
20      guidelines and are intended to   16:34:42
21      facilitate youths' access to   16:34:44
22      gender-affirming treatments."   16:34:48
23      Do you see that?   16:34:49
24    A.  Yes.   16:34:49
25    Q.  And is it -- was it true that the lower age   16:34:50

Page 277

1 limits set out in this version of SOC-8 were lower in   16:34:54
2 each case than had been contained in previous WPATH   16:35:00
3 guidelines?   16:35:04
4      MR. LANNIN:  Object to the form.   16:35:05
5      THE WITNESS:  In some cases, yes.  In some   16:35:08
6 cases, no.   16:35:10
7 BY MR. BROOKS:   16:35:11
8    Q.  Which and which?   16:35:11
9    A.  It was the same, 16, for breast -- breast   16:35:15
10 augmentation, chest mass, it was the same as in   16:35:21
11 SOC-7.  But the other -- in SOC-7, just trying to   16:35:28
12 clarify, is that we simply used the age of majority   16:35:37
13 which here in the United States was 18.   16:35:45
14    Q.  In most jurisdictions.   16:35:49
15    A.  In many other jurisdictions, it can be 12,   16:35:51
16 it can be 16, or whatever.  And so using that   16:35:54
17 terminology, we were -- we thought that we should   16:36:04
18 really look at another way of really setting the   16:36:07
19 criteria regarding age and --   16:36:11
20    Q.  Let me ask -- oh, I'm sorry.   16:36:15
21    A.  -- and there was a lot of discussion, again,   16:36:17
22 is that age is not a number -- it's just a number,   16:36:21
23 and that it may not really reflect -- I mean the   16:36:28
24 adolescents mature at very different rates and age   16:36:34
25 is --   16:36:38

70 (Pages 274 - 277)

Page 278

1  Q. I'm sorry, Dr. Coleman.          16:36:38
2  A. Yeah.                            16:36:39
3  Q. My time is short. All I asked you --   16:36:40
4  A. Right. Okay.                     16:36:40
5  Q. -- was were those numbers lower? I don't --  16:36:43
6  I just -- I need my time.           16:36:45
7  A. Okay.                            16:36:45
8     MR. LANNIN: Counselor, let the witness   16:36:46
9  finish the question.                16:36:47
10    MR. BROOKS: No, not in that case. He's not  16:36:48
11 entitled to finish a lecture not responsive to my  16:36:51
12 question.                           16:36:53
13    Let me ask the reporter to mark as   16:36:54
14 Exhibit 25 -- 26 a document bearing Bates numbers  16:36:56
15 BOEAL_WPATH_105499 through 504 an email chain headed  16:37:05
16 "Some Feedback From a Member of Admiral Levine's  16:37:15
17 Staff."                             16:37:18
18    (The document referred to was     16:37:18
19    marked as Exhibit 26.)            16:37:30
20 BY MR. BROOKS:                       16:37:30
21    Q. And if you turn to the page ending in 501,  16:37:39
22 you will see that at that stage in the chain, you  16:37:43
23 were -- you were one of the recipients if you look  16:37:49
24 down at the bottom of page 501. I just call your  16:37:52
25 attention to that.                  16:37:57

Page 279

1  A. Yes.                             16:37:57
2  Q. And without speaking to the things above  16:37:58
3  that, beneath that in the chain was forwarding a  16:38:02
4  email from someone that says, that begins at the  16:38:09
5  bottom of page 502:                 16:38:12
6     "I just got off the phone with     16:38:14
7     Sarah Boetang who is Adm. Levine's  16:38:15
8     chief of staff."                 16:38:21
9     Do you see that?                 16:38:22
10 A. Yes.                             16:38:22
11 Q. And do you in fact remember receiving that  16:38:23
12 email and being alerted to this conversation with  16:38:25
13 Sarah Boetang?                       16:38:28
14 A. Yes.                             16:38:29
15 Q. And she told whoever it was that, quote:  16:38:31
16    "Her biggest concern is the        16:38:37
17    section below in adolescent chapter  16:38:39
18    that lists specific minimum ages    16:38:42
19    for treatment" -- and she says,    16:38:43
20    jumping ahead, "She wonders if the  16:38:49
21    specific ages can be taken out."   16:38:51
22    Do you see that?                 16:38:52
23 A. Yes.                             16:38:52
24 Q. If we look back on page -- and, in fact, do  16:39:03
25 you recall being told that Adm. Levine's chief of  16:39:06

Page 280

1  staff had requested with some urgency that the  16:39:10
2  minimum ages be taken out?           16:39:15
3  A. Yes.                             16:39:15
4  Q. And if we go back to page 501 that is a  16:39:21
5  little bit later in the chain, we have an email in  16:39:24
6  the middle of the page from Asa Radix, cochair of the  16:39:28
7  SOC-8, who writes, quote:            16:39:34
8     "I am a little surprised that      16:39:40
9     we would be asked to do this after  16:39:41
10    all the care and endless          16:39:43
11    discussions by experts to reach    16:39:45
12    this consensus on ages for         16:39:46
13    surgeries. Is Sarah a             16:39:48
14    clinician/surgeon? I wouldn't make  16:39:53
15    any changes unless the relevant    16:39:54
16    chapters found some new evidence to  16:39:56
17    support age change to 18."         16:39:57
18    Do you see that?                 16:40:01
19 A. Yes.                             16:40:02
20 Q. And did you become aware in this July --  16:40:02
21 July time period that Asa Radix was opposed to making  16:40:11
22 changes to the recommendation that had passed through  16:40:14
23 Delphi?                             16:40:19
24 A. Yes.                             16:40:20
25    MR. LANNIN: Object to the form.   16:40:20

Page 281

1  BY MR. BROOKS:                       16:40:21
2  Q. And at the very beginning of this chain,  16:40:22
3  Dr. Bouman, president of WPATH, writes -- well,  16:40:36
4  below -- yes, writes, quote:         16:40:44
5     "It's disappointing that           16:40:46
6     politics always trumps common sense  16:40:47
7     and what is best for patients."    16:40:49
8     And my question for you is, did you in the  16:40:51
9  same time period become aware that Dr. Bouman was  16:40:54
10 opposed to removing the minimum age limits?  16:40:56
11 A. Yes.                             16:41:00
12    MR. LANNIN: Objection to the form.  16:41:00
13    MR. BROOKS: Let me ask the reporter to mark  16:41:10
14 as Exhibit 27 an email chain bearing Bates numbers  16:41:11
15 BOEAL_WPATH_105508 through 507 an email chain  16:41:18
16 entitled "Feedback regarding the age statement in  16:41:24
17 adolescent SOC-8 chapter."           16:41:28
18    (The document referred to was      16:41:28
19    marked as Exhibit 27.)            16:41:38
20 BY MR. BROOKS:                       16:41:38
21 Q. And this is an email that Dr. Leibowitz sent  16:41:47
22 or forwarded to a number of people, including you and  16:41:56
23 cochair -- cochairs Asa Radix and Jon Arcelus.  16:42:01
24 Correct?                            16:42:06
25 A. Yes.                             16:42:07

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

1     Q. And also to his Chapter Cochair Annalous de   16:42:08
2  Vries. Correct?                          16:42:13
3     A. Yes.                   16:42:14
4     Q. And at the bottom is -- and we're missing   16:42:16
5  some of the redacted information, but it's titled   16:42:22
6  "Transcript of Conversation about the Placement of   16:42:24
7  Age Criteria in the Adolescent Chapter Among the   16:42:27
8  Seven Members of the Working Group."   16:42:32
9        Do you understand "the working group" to   16:42:34
10 refer to the adolescent chapter working group?   16:42:35
11     MR. LANNIN: Object to the form.   16:42:39
12     THE WITNESS: Yes.              16:42:50
13 BY MR. BROOKS:                    16:42:51
14     Q. And on the next page, 506, there's a number   16:42:53
15 of comments that are not attributed to an individual   16:42:59
16 and then indication of responses, many of them   16:43:02
17 indicated from co-lead.              16:43:08
18        If I understand correctly, "co-lead" could   16:43:09
   ███████████████████████████         16:43:15
20     MR. LANNIN: Object to the form.   16:43:15
21     THE WITNESS: I assume.          16:43:19
22 BY MR. BROOKS:                    16:43:20
23     Q. Well, and you saw this document about the   16:43:20
24 time, about August 1st. Am I correct?   16:43:22
25     MR. LANNIN: Object to the form.   16:43:26

Page 283

1     THE WITNESS: When it -- it looks like   16:43:30
2  that's when it was sent, yes.         16:43:32
3  BY MR. BROOKS:                    16:43:33
4     Q. Okay. One of the co-leads says about   16:43:33
5  two inches down from the top of page 506:   16:43:35
6        "I really think the main            16:43:38
7        argument for ages is access        16:43:39
8        insurance."              16:43:42
9        Do you see that? Two inches from the top.   16:43:42
10     A. Yes.                   16:43:51
11     Q. Were you aware that the co-leads of the   16:43:54
12 adolescent chapter, at least one co-lead of the   16:43:57
13 adolescent chapter thought the main argument for   16:44:00
14 including minimum ages in SOC-8 was to gain access   16:44:01
15 and insurance?                   16:44:08
16     MR. LANNIN: Object to the form.   16:44:08
17     THE WITNESS: I think it -- this was -- this   16:44:11
18 was their -- their concern or their perception of   16:44:16
19 what this would mean.              16:44:23
20 BY MR. BROOKS:                    16:44:26
21     Q. And the same co-lead, and we don't know   16:44:26
22 which it is, said, "I don't" -- quote:   16:44:29
23        "I don't know how I feel about       16:44:31
24        allowing U.S. politics to dictate   16:44:32
25        international professional clinical   16:44:35

Page 284

1     guidelines that went through       16:44:37
2     Delphi," close quote.              16:44:38
3        How at this time period did you feel about   16:44:40
4  allowing U.S. politics and advocacy out of   16:44:47
5  Adm. Levine's office to dictate changes to   16:44:51
6  international clinical guidelines?   16:44:55
7     MR. LANNIN: Object to the form.   16:44:57
8     THE WITNESS: Well, I think that this   16:44:58
9  really, you know, reflects this ongoing discussion   16:44:59
10 about is this a good idea or a bad idea, or, as Scott   16:45:04
11 says, there's no right or wrong here. But, you know,   16:45:10
12 in the end, you know, we had thought it best to   16:45:17
13 include those ages.                16:45:22
14        And -- and that thing that we heard from   16:45:25
15 Adm. Levine was sufficient for us to decide to remove   16:45:32
16 those ages, and I agreed with that decision at   16:45:37
17 that -- at that time.              16:45:41
18 BY MR. BROOKS:                    16:45:42
19     Q. And did this co-lead -- I'm sorry. Let me   16:45:42
20 not misattribute. This says --      16:45:46
21     A. Yeah.                   16:45:46
22     Q. -- response from another working group   16:45:49
23 member says it is a large change.   16:45:50
24        Did you agree that the request to remove   16:45:55
25 minimum age limits was a large change to the   16:45:58

Page 285

1  Delphi-approved statement?          16:46:02
2     MR. LANNIN: Object to the form.   16:46:04
3     THE WITNESS: It certainly was a change,   16:46:05
4  but, again, the -- this was a subset of the -- the   16:46:09
5  main recommendation that went through Delphi. And so   16:46:15
6  it was a -- it was certainly a big decision. I don't   16:46:22
7  know if I characterize it as a big decision.   16:46:27
8        Really one of the things that we started to   16:46:32
9  become aware of at this time is that these ages were   16:46:35
10 being looked at and that the -- that the more   16:46:43
11 important criteria that we were establishing seemed   16:46:49
12 to be getting overlooked.           16:46:53
13        And so we didn't decide to remove those ages   16:46:56
14 at that point, given Adm. Levine's, you know,   16:47:05
15 suggestion.                   16:47:13
16 BY MR. BROOKS:                    16:47:19
17     Q. Dr. Coleman, again, let me --   16:47:19
18     A. Yeah.                   16:47:20
19     Q. I want to walk through the story   16:47:21
20 sequentially --                  16:47:24
21     A. Sure.                   16:47:24
22     Q. -- and let's take it one step at a time.   16:47:25
23     MR. BROOKS: We just looked at the   16:47:28
24 discussion about the request out of Adm. Levine's   16:47:29
25 office. And I would now like to ask the reporter to   16:47:34

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

1 mark as Exhibit 28 a document bearing Bates numbers   16:47:36
2 BOEAL_WPATH_072964 through 965 entitled "SOC-8 of   16:47:43
3 WPATH Minimum Ages For Adolescents."   16:47:51
4       (The document referred to was   16:47:51
5       marked as Exhibit 28.)   16:48:01
6 BY MR. BROOKS:   16:48:07
7    Q. The sender and recipient are blanked out.   16:48:07
8       Does this appear to -- well, let me ask   16:48:11
9 this.   16:48:12
10      At the bottom it's signed "in servitude,"   16:48:12
11 which strikes me as having been signed by not a   16:48:17
12 native English speaker.   16:48:19
13      Are you -- is that a citation that you have   16:48:21
14 seen one of your colleagues use before now?   16:48:23
15    A. No, not very much. No.   16:48:25
16    Q. Well, who have you ever seen sign anything   16:48:27
17 "in servitude"?   16:48:30
18      MR. LANNIN: Object to the form.   16:48:31
19      THE WITNESS: I don't know if I've never   16:48:32
20 seen it, but it's unusual.   16:48:35
21 BY MR. BROOKS:   16:48:37
22    Q. Well, did any one of your Dutch-speaking   16:48:38
23 colleagues sometimes sign things "in servitude"?   16:48:40
24    A. I can't recall. It's not a common thing --   16:48:45
25    Q. Okay.   16:48:45

Page 287

1    A. -- about anybody.   16:48:51
2    Q. It just makes you wonder about whether it   16:48:51
3 belongs with the S&M chapter, but that's another   16:48:54
4 topic.   16:48:57
5       The document says:   16:48:58
6       "I would be grateful if you   16:49:00
7       could convey the following message   16:49:01
8       to blank."   16:49:03
9       And it says:   16:49:05
10      "It was a pleasure to meet with   16:49:07
11      you and your staff on Tuesday 26   16:49:08
12      July to discuss the SOC-8."   16:49:10
13      Did representatives of WPATH meet with   16:49:13
14 Adm. Levine and staff in late July?   16:49:15
15      MR. LANNIN: Object to the form.   16:49:20
16      THE WITNESS: We met with Adm. Levine and   16:49:24
17 their staff, yes.   16:49:26
18 BY MR. BROOKS:   16:49:27
19    Q. In that time period?   16:49:27
20    A. Yes.   16:49:28
21    Q. Were you part of that meeting?   16:49:28
22    A. Yes.   16:49:29
23    Q. And this letter which -- do you believe this   16:49:30
24 to be a letter with a message that was intended to be   16:49:34
25 forwarded to Adm. Levine?   16:49:37

Page 288

1       MR. LANNIN: Object to the form.   16:49:39
2       THE WITNESS: It appears so.   16:49:40
3 BY MR. BROOKS:   16:49:41
4    Q. And recalling the context, can you tell me   16:49:42
5 who the signatory of this letter was?   16:49:47
6    A. I assume it was Walter Bouman.   16:49:51
7    Q. All right. What he -- what Walter Bouman   16:49:54
8 says to Adm. Levine is in the second paragraph of the   16:50:00
9 letter:   16:50:05
10      "Given the re-- that the   16:50:06
11      recommendations for minimal ages   16:50:08
12      for the various gender-affirming   16:50:10
13      medical and surgical interventions   16:50:12
14      are consensus based, we could not   16:50:13
15      remove them from the document."   16:50:15
16      Do you see that?   16:50:16
17    A. Yes.   16:50:17
18    Q. So after a contact from Adm. Levine's chief   16:50:18
19 of staff after an in-person meeting with Adm. Levine,   16:50:24
20 the SOC-8 team or Walter Bouman on behalf of the team   16:50:27
21 told them about -- told Adm. Levine that, because the   16:50:32
22 age limits were consensus based, they could not be   16:50:37
23 removed at that late stage from the document.   16:50:41
24 Correct?   16:50:44
25      MR. LANNIN: Object to the form.   16:50:44

Page 289

1       THE WITNESS: That was what -- that's what   16:50:47
2 he reported to -- to her. I think we could have.   16:50:49
3 BY MR. BROOKS:   16:50:55
4    Q. Well, what Adm. Levine was told was that you   16:50:56
5 couldn't because these were consensus based and had   16:51:00
6 already been approved. Right?   16:51:03
7       MR. LANNIN: Object to the form.   16:51:05
8       THE WITNESS: I think that that was one of   16:51:08
9 the -- one of the arguments. But, again, I think we   16:51:10
10 considered this issue, and I didn't feel that she   16:51:19
11 presented any evidence that would, you know, cause us   16:51:22
12 to really reconsider that decision at the time.   16:51:28
13 BY MR. BROOKS:   16:51:28
14    Q. And, in fact, you told Adm. Levine that   16:51:33
15 those ages could not -- those minimum ages could not   16:51:37
16 be removed. Correct?   16:51:40
17    A. That's what Walter Bouman told her.   16:51:41
18      MR. BROOKS: Let me ask the reporter to mark   16:51:44
19 an email chain as Exhibit 29 bearing Bates numbers   16:51:46
20 BOEAL_WPATH_105822 through 831, headed "Confidential   16:51:53
21 - AAP Communication to WPATH."   16:52:00
22      (The document referred to was   16:52:00
23      marked as Exhibit 29.)   16:52:17
24      THE WITNESS: Thank you.   16:52:17
25 BY MR. BROOKS:   16:52:20

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

1  Q. And, Dr. Coleman, first let me ask you, is    16:52:20
2  this an email chain that you received in September of  16:52:22
3  2022?                          16:52:25
4  A. It appears so.                 16:52:26
5  Q. Do you generally recall this email chain?   16:52:27
6  A. Not immediately, no.              16:52:27
7  Q. You recall that there was a sudden and     16:52:38
8  major -- what shall we say? -- blow-up within the  16:52:39
9  SOC-8 team as a result of communications from the AAP  16:52:44
10 in this time period. Correct?          16:52:48
11      MR. LANNIN: Object to the form.       16:52:50
12      THE WITNESS: What happened is that we had  16:52:54
13 received communication from AAP, and that caused us  16:52:57
14 to, once again, listen to -- listen to people, this  16:53:02
15 checks and balances, always listening to dissenting  16:53:13
16 opinion and go back to the science, go back to our  16:53:20
17 evidence and make a decision. And in some cases,  16:53:25
18 based upon sound feedback, we made a -- we made  16:53:29
19 decisions to either change things or disagree and  16:53:34
20 stick with what we had decided before.     16:53:41
21 BY MR. BROOKS:                   16:53:43
22 Q. Let me ask you, at the back of this chain is  16:53:44
23 an email from you -- pardon me -- an email from  16:53:48
24 Dr. Bouman which attaches a large number of links,  16:53:59
25 perhaps to articles.                16:54:05

Page 291

1      Do you see that?                16:54:07
2  A. Yes.                        16:54:07
3  Q. And in each one there's something redacted  16:54:09
4  which makes it impossible to follow the link.   16:54:11
5      What were these links to?          16:54:13
6  A. I have no idea.                16:54:14
7  Q. All right. Needless to say, we'll be asking  16:54:15
8  for unredacted copies of those pages.      16:54:23
9      At the first page, we see that, in the very  16:54:30
10 first email from adolescent chapter -- I'm sorry --  16:54:40
11 from SOC-8 Cochair Jon Arcelus to Scott Leibowitz and  16:54:44
12 you and others, that Marci -- that would be Marci  16:54:49
13 Bowers. Correct? First page, very first page.   16:54:53
14      The last email in the chain, the -- which is  16:54:59
15 to say the one at the top, is from Jon Arcelus to  16:55:01
16 you, Scott Leibowitz, Walter Bouman, Asa Radix.  16:55:06
17 Correct?                       16:55:06
18 A. Yes.                        16:55:09
19 Q. And in it, Jon says, "Marci" -- and that --  16:55:09
20 we would understand that to be Marci Bowers.    16:55:17
21 Correct?                       16:55:17
22 A. Yes.                        16:55:18
23 Q.      -- "informed some people on       16:55:19
24      Monday that AAP were not going to      16:55:20
25      support the SOC-8."             16:55:22

Page 292

1      Do you see that?                16:55:25
2  A. Yes.                        16:55:25
3  Q. And the message that you got that you     16:55:27
4  understood was that they were not going to support  16:55:32
5  SOC-8 if it contained minimum ages for surgeries.  16:55:36
6  Correct?                       16:55:42
7      MR. LANNIN: Object to the form.       16:55:42
8      THE WITNESS: They had that concern and they  16:55:42
9  had a few other concerns.             16:55:44
10 BY MR. BROOKS:                   16:55:46
11 Q. Now, when it came to the minimum ages for  16:55:47
12 surgery, AAP did not submit to you or the adolescent  16:55:50
13 committee any new science, did they?       16:55:56
14      MR. LANNIN: Object to the form.       16:55:58
15      THE WITNESS: They referred to their own  16:56:02
16 guidelines.                     16:56:04
17 BY MR. BROOKS:                   16:56:05
18 Q. That's not new science, is it?        16:56:06
19      MR. LANNIN: Object to the form.       16:56:07
20      THE WITNESS: It's a summation of their  16:56:08
21 review of the science.               16:56:10
22 BY MR. BROOKS:                   16:56:13
23 Q. Did they call to your attention any new  16:56:13
24 science that you were not previously aware of when  16:56:15
25 the guidelines were passed through --      16:56:17

Page 293

1  A. No.                        16:56:19
2  Q. -- Delphi?                    16:56:19
3  A. No.                        16:56:19
4  Q. Let me ask you to find what is Exhibit C59.  16:56:20
5  That's, yeah, Exhibit 25 which is to say the draft or  16:56:29
6  the pre-published SOC-8. Let me ask you to find  16:56:35
7  that. There it --                16:56:38
8  A. Yes, hm-hm.                   16:56:39
9  Q. And you'll see as you look, for instance, at  16:56:40
10 pages -- page ending in 919 that there are various  16:56:44
11 numbered notes. And if you turn the page over,  16:56:49
12 you'll see annotations.              16:56:52
13 A. Yes.                        16:56:57
14 Q. Did these markings reflect comments or    16:57:00
15 changes proposed by AAP?             16:57:08
16 A. I -- this looks like, again, their comments  16:57:15
17 were the concerns that they were expressing.    16:57:20
18 Q. That is, the things that are flagged seem to  16:57:27
19 be the -- the concerns they raised?        16:57:28
20 A. That's what it appears to be.         16:57:31
21 Q. Okay. Okay.                   16:57:33
22      MR. LANNIN: Counsel, you have two minutes.  16:57:36
23      MR. BROOKS: So I do.             16:57:38
24 BY MR. BROOKS:                   16:57:38
25 Q. Let me ask you this, Dr. Coleman. After  16:57:41

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

1 receiving the news that the AAP would not support    16:57:46
2 SOC-8 unless minimum ages for hormones and surgery    16:57:51
3 were removed, in fact, the SOC team did remove those    16:57:56
4 minimums ages from the final version.  Correct?    16:58:04
5      A.  That is correct.                16:58:06
6      Q.  And it did that without repassing that    16:58:06
7 statement through a Delphi process.  Correct?    16:58:10
8      A.  That's correct.                16:58:12
9      Q.  And it did that, so far as you recall,    16:58:14
10 without being presented any new science of which the    16:58:16
11 committee was previously unaware?            16:58:19
12      MR. LANNIN:  Object to the form.        16:58:20
13      THE WITNESS:  That is correct.        16:58:22
14 BY MR. BROOKS:                    16:58:26
15      Q.  Dr. Coleman, the representation in the    16:58:30
16 methodology statement that we looked at earlier that    16:58:33
17 said formal consensus for all statements was obtained    16:58:36
18 using the Delphi process was just false with respect    16:58:38
19 to removing all minimum age limits from WPATH's    16:58:43
20 recommendations regarding performing sterilizing    16:58:48
21 surgeries on minors.                16:58:53
22      Correct?                16:58:54
23      MR. LANNIN:  Object to the form.        16:58:54
24      THE WITNESS:  I'm sorry.  I -- can you    16:58:55
25 repeat that.                    16:59:00

Page 295

1 BY MR. BROOKS:                    16:59:00
2      Q.  I can.  The representation that we looked at    16:59:00
3 in the methodology appendix that stated, quote,    16:59:03
4 "Formal consensus for all statements was obtained    16:59:08
5 using the Delphi process," close quote --    16:59:10
6      A.  Yes.                16:59:12
7      Q.  -- was false with respect to the removal of    16:59:12
8 minimum age limits from WPATH's SOC-8 recommendations    16:59:16
9 regarding performing sterilization -- sterilizing    16:59:20
10 surgeries such as castration and hysterectomy on    16:59:24
11 minors.  Correct?                16:59:30
12      MR. LANNIN:  Object to the -- object to the    16:59:30
13 form.                        16:59:33
14      THE WITNESS:  I'm not sure whether I'm    16:59:33
15 tired.  I'm not following it completely, but we did    16:59:35
16 not submit that change to Delphi at the end.    16:59:37
17      MR. BROOKS:  Thank you.  I have no further    16:59:46
18 questions.  I also have no further time.        16:59:47
19      MR. LANNIN:  Do the plaintiffs have any    16:59:50
20 questions?                    16:59:52
21      MS. WHELAN:  We, do not.            16:59:53
22      MR. LANNIN:  Nor do we.  I confess I'm not    16:59:55
23 familiar with the protective order, but I assume we    16:59:59
24 can designate the transcript confidential.    17:00:01
25      MR. BROOKS:  You can temporarily        17:00:03

Page 296

1 transcript -- designate the transcript confidential.    17:00:05
2 We will ask, given the nature of this deposition,    17:00:07
3 that you promptly narrow that to those substantial    17:00:09
4 portions that discuss confidential documents.    17:00:14
5      MR. LANNIN:  Yes, so we will --    17:00:16
6      MR. BROOKS:  There were more in the    17:00:18
7 afternoon than in the morning.            17:00:19
8      MR. LANNIN:  Yeah, we will -- so we'll    17:00:20
9 designate the transcript confidential provisionally,    17:00:22
10 subject to whatever the PO says, and we'll look at it    17:00:25
11 in whatever timeframe is contemplated by the PO and    17:00:28
12 in consultation with the State --        17:00:32
13      MR. BROOKS:  And --            17:00:33
14      MR. LANNIN:  -- and review it.        17:00:33
15      MR. BROOKS:  -- no doubt with WPATH,    17:00:34
16 since --                    17:00:36
17      MR. LANNIN:  And no doubt with our client    17:00:36
18 and Dr. Coleman and WPATH and everyone else --    17:00:38
19      MR. BROOKS:  And everyone else who may be --    17:00:38
20      MR. LANNIN:  -- who has an interest in this    17:00:41
21 deposition.  Thank you.            17:00:43
22      MR. BROOKS:  Okay.  Thank you for your    17:00:43
23 time --                    17:00:43
24      THE WITNESS:  Thank you.            17:00:43
25      MR. BROOKS:  -- and giving me occasion to    17:00:46

Page 297

1 come to fabulous Palm Springs.  Unfortunately, I have    17:00:47
2 to go now, catch a red-eye to get out of here, but    17:00:50
3 that's cruel life.                17:00:55
4      THE REPORTER:  Off record, Counsel?    17:00:55
5      MR. BROOKS:  Yes.            17:00:56
6      THE VIDEOGRAPHER:  Okay.  This concludes the    17:00:58
7 deposition of Eli -- Dr. Eli Coleman.  The time is    17:01:00
8 5:01 p.m., and we are now off the record.    17:01:05
9      (Whereupon, at 5:01 P.M., the
10      videotaped deposition of ELI
11      COLEMAN, PH.D., was adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

1  STATE OF CALIFORNIA    )
2  COUNTY OF LOS ANGELES  ) ss.
3
4
5       I, ELI COLEMAN, PH.D., hereby declare under
6  the penalties of perjury of the laws of the United
7  States that the foregoing is true and correct.
8       Executed this _____ day of
9  _____, 2024, at
10  _____, California.
11
12
13       _____
14       ELI COLEMAN, PH.D.
15
16
17
18
19
20
21
22
23
24
25

Page 299

1  STATE OF CALIFORNIA    )
2  COUNTY OF LOS ANGELES  )  ss.
3       I, SUSAN NELSON, C.S.R. 3202, in and for the
4  State of California, do hereby certify:
5       That, prior to being examined, the witness named
6  in the foregoing videotaped deposition was by me duly
7  sworn to testify the truth, the whole truth and
8  nothing but the truth;
9       That said videotaped deposition was taken down
10  by me stenographically at the time and place therein
11  named, and thereafter transcribed via computer-aided
12  transcription under my direction, and the same is a
13  true, correct and complete transcript of said
14  proceedings;
15       Before completion of the videotaped deposition,
16  review of the transcript [ ] was [X] was not
17  requested.  If requested, any changes made by the
18  deponent (and provided to the reporter) during the
19  period allowed are appended hereto.
20       I further certify that I am not interested in
21  the event of the action.
22       Witness my hand this 10th day of May, 2024.
23
24       Susan Nelson, C.S.R. No. 3202
         Certified Shorthand Reporter
25       State of California

76 (Pages 298 - 299)