# Doc. 560-28

# Defendants' Summary Judgment Exhibit 178

# (Redacted)

**Fwd: A message from the WPATH Executive Committee (re USPATH meeting, Febr. 3, 2017)**



Privileged

---------- Forwarded message ---------
From: ████████████
Date: Mon, Feb 13, 2017 at 8:49 AM
Subject: A message from the WPATH Executive Committee (re USPATH meeting, Febr. 3, 2017)
To: ████████

Cc: Dan Karasic ████████

Dear Executive Committee:

I think it is a good idea for WPATH to "ensure participation that is representative of the diversity of providers in the trans health field."

I am concerned, however, that WPATH's commitment "to providing a safe and welcoming environment at our scientific meetings" was not met at this month's USPATH meeting in L.A.

Confidential - Subject to Protective Order

BOEAL_KARASIC_000008

The Mini-Symposium entitled "Development of Gender Variations: Features and Factors" that I convened and chaired was interrupted twice by a small group of protesters. A few minutes into my introductory remarks, an attendee interrupted me by taking a position in front of me and yelling into the audience, with some support from others, then leaving after a while with a group of a dozen or so followers, while the overwhelming majority of the audience remained in the room. Near the end of the session, while I was moderating the Q&A for ████████ lecture, another disruption was staged by one person in the back of the audience.

Because of the time used up by the first disruption and related questions from the audience later, I decided to give the first two speakers, ████████ ("Gender dysphoria and dissociative gender identity disorder combined") and ████████ ("Gender variations during childhood") more time for their presentations and Q&A sections and was, therefore, unable to present my own lecture ("Gender Variations in Somatic Intersexuality", which also included a summary of the fourth lecture by ████, ████████, who was unable to attend). Thus, the protests certainly interfered with the presentation of the full range of data and issues covered in the Mini-Symposium's abstract.

From the first paragraph in your statement I conclude that no one from the Executive Committee attended this Mini-Symposium, because otherwise you would have noticed that the apparently primary target of the protesters, ████████, did not address a "clinical modality", but focused on follow-up studies of gender development in children with gender problems. By misrepresenting the content of the session and labelling the entire session as "offensive", "due to this act of negligence" (a vague formulation that also needs explanation), you are aligning yourselves with the small group of protesters, insult the speakers involved, and violate a primary condition of a scientific meeting, namely the open and constructive exchange of ideas, which is particularly important in an area of research as emotion-laden as gender.

I hope you will correct your statement accordingly.

As similar incidents occurred already in two symposia I was involved with at the recent WPATH meeting in Amsterdam, I think WPATH's leadership needs to become more proactive in furthering a constructive style of scientific exchange – rather than inhibiting scientific exchange by suppressing presentations as you did in L.A., when you cancelled ████████ Mini-Symposium on Febr. 4.  In the U.S., we are not living in a dictatorship (at least not yet), and if WPATH intends to continue as a scientific society, it must be able to provide "a safe and welcoming environment" for the entire "diversity of providers".

In a professional society dealing with highly emotional issues, protests are to be expected and should not be outlawed. However, we obviously need to find a better balance between protesting and constructive scientific exchange, and explicit guidelines by the Executive Committee, perhaps to be distributed to every meeting registrant in the future. This may be a task appropriate for the Bylaws, Policies & Procedures Committee; that's why I cc'd its chairperson, ████████

In the hope that my comments will support a constructive discussion among Executive-Committee members of potential solutions to the problem mentioned, with best regards,

Confidential - Subject to Protective Order

BOEAL_KARASIC_000009

2



Confidential - Subject to Protective Order

BOEAL_KARASIC_000010

## Re: Fw: NYTimes Mag fact-checking

**From:**
**To:**
**Cc:**
**Date:**          Tue, 07 Jun 2022 20:16:57 -0400

Thanks, ▮

My responses are integrated below...

On Tue, Jun 7, 2022, 4:18 PM ▮▮▮▮▮▮▮▮▮▮▮ wrote:
▮▮▮▮▮▮▮

New set of fact checks below.

Including you ▮▮▮ since you're mentioned several times.

Thanks for any guidance!

Best,
▮▮▮
**From:** Mark de Silva <▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, June 7, 2022 7:10 PM
**To:** ▮▮▮▮▮▮▮▮▮▮
**Subject:** Re: NYTimes Mag fact-checking

Hi ▮▮▮

I will look forward to the answers to the questions that are still pending. In the meantime, I have some further questions for WPATH. If you could get answers to these, plus the outstanding ones, by Wednesday morning, that would be ideal. We have to close the story soon.

1. Correct that ▮▮▮▮▮▮ was selected by WPATH in 2017 to lead a group of 7 clinicians and researchers to draft a chapter for SOC8 on adolescents? -- ▮ I think this is true.

2. WPATH Standards of Care (SOC) are meant to set the guidelines for transgender health care worldwide? --▮Yes, not specific to any healthcare delivery system, but focused on transgender health as a human/universal concept/need.

3. True that after WPATH was formed in 1979, transgender activists gained increasing influence in the organization? --▮Professionals who happened to be trans people joined the organization; they were not necessarily activists. Some who recognized that a medical association was important for institutionalizing transgender health were interested in strengthening the association functionally and clarifying the SOC, while others took more aggressive positions as clinicians because they saw how interpretations of the SOC were weaponized against their clients/patients in specific regions or environments. Different approaches are present throughout the membership. The Board tries to balance the values that are expressed through the SOC and good association management principles.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064098

4. Yet these activists did not contribute to formulating the SOC and its updates over the years? -- ███ No. Transgender-identified professionals have been given a voice, to varying degrees since version 5. The first 4 versions were very spare. As more trans professionals joined the association and participated in association committees and activities, and their opinions and experience was recognized as credible and respectable, these professionals gained more access to being able to contribute to the SOC. Note that the association membership application does not ask an applicant's gender identity or personal transgender history. It only asks for professional qualifications, which are vetted (right, ███████).

5. Fair to say that a good number of these activists (rightly or wrongly) view SOC criteria as imposing excessively restrictive, paternalistic, and even demeaning barriers to transgender treatment? -███No. There are some members who are clinicians who work with marginalized groups within the transgender community who would like to see standards relaxed in many ways, but in the U.S., it is also true that insurance plans and clinical institutions overlay their own interpretations or additional rules on transgender care and some cliniciansand patients/clients blame WPATH for this when these systems/processes are outside WPATH's influence or control. Activists outside of WPATH blame WPATH, and a lot of misinformation about the SOC is shared throughout the trans community.

We also have questions about a protest in February 2017 [[see video: https://www.youtube.com/watch?v=rfgG5TaCzsk]]. We have spoken with ███████████and he believes it is generally accurate, but we would also like see if WPATH sees anything inaccurate here:

6. In February 2017, the inaugural conference of USPATH--the US branch of WPATH--was held in Los Angeles? --███Yes; is branch the appropriate term, ███████.

7. At this conference, protesters interrupted and picketed a panel featuring ██████████? Yes. Most of the protesters were not WPATH members.

8. That evening of the protest, at a meeting with the conference leaders, a group of activists led by transgender women of color read aloud a statement in which they said the "entire institution of WPATH" was "violently exclusionary" because it "remains grounded in 'cis-normativity and trans exclusion.' "? [[QUOTES ARE FROM VIDEO]] --███Yes. These were Los Angeles activists who had been given free admission to the conference to recognize their community-based healthcare advocacy, and to help them engage with national trans health leaders and researchers who created much of the literature in the field. Some trans-identified clinicians who supported them also attended the meeting where the statement was read.

9. The group asked for cancellation of ███████appearance on a second upcoming panel? --████ Yes.

10. ██████████, who was on the board at the time, agreed to the demand to cancel ████████ appearance on the second panel/symposium? ██████did not appear further at that 2017 USPATH conference? -███Yes. This was not my sole decision; I delivered the consensus of the officers present with regret and sadness, because we recognized we could not guarantee his safety.

11. ██████told the protestors: 'We are very, very sorry." -███Yes, true, because (for me) we were sorry they felt this way.

On Tue, Jun 7, 2022 at 3:36 PM ████████████████████████ wrote:
   Sounds good. Thanks, Mark.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064099

**From:** Mark de Silva <███████████████████>
**Sent:** Tuesday, June 7, 2022 3:29 PM
**To:**███████████████████████
**Cc:**████████████████████
**Subject:** Re: NYTimes Mag fact-checking

OK great, thank you for your help with all of this. I will review and be in touch.
On Tue, Jun 7, 2022 at 3:03 PM ██████████████████████ wrote:
Mark,

Attached you'll see the updated responses to fact checks for Emily Bazelon's article about what constitutes good care and treatment for transgender and gender-diverse youth.

There are still a few items to be completed. You'll see comments about that in the document.

Thanks so much.

███████



**From:**████████████████████
**Sent:** Tuesday, June 7, 2022 1:34 PM
**To:** Lu Fong ████████████████
**Cc:**█████████████████; Mark de Silva <████████████████ Mark Van de Walle ███████████████
**Subject:** Re: NYTimes Mag fact-checking

No worries, Lu!

**From:** Lu Fong <███████████████>
**Sent:** Tuesday, June 7, 2022 12:47 PM
**To:**██████████████████████
**Cc:**████████████████; Mark de Silva <████████████>; Mark Van de Walle <████████████>
**Subject:** Re: NYTimes Mag fact-checking

Many apologies to all— our directory auto populated the wrong "Mark". I'm adding Mark **de Silva**** here who will be handling things.

On Tue, Jun 7, 2022, 12:00 PM Lu Fong <████████████> wrote:
Ah! We seem to have simul-emailed. Adding Mark here so he has what you sent.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064100

He's still getting situated so I'm happy to clarify over the phone—I'm on my cell today:
██████████.

Thanks,
Lu
On Tue, Jun 7, 2022, 11:55 AM ████████████████████████ wrote:
  Hi Lu.

  ██████ and I have worked on your questions and I'm attaching responses to most of
  them.

  However, we are still checking with other WPATH experts on the items you'll see in
  orange.

  As soon as we have clarity on those, I'll get back with you.

  I did have a question for you about # 26, so I'll give you a call about that.

  Thanks

  ██████

  --
  


**From:** Lu Fong <██████████████>
**Sent:** Monday, June 6, 2022 7:02 PM
**To:** ████████████████████
**Cc:** ████████████████████
**Subject:** Re: NYTimes Mag fact-checking

Thanks very much ██████ We can make changes as late as 10 am ET Wednesday
morning but given that there may be some follow-up needed, would be best to hear
back earlier.

Really appreciate your help!

Best
Lu
On Mon, Jun 6, 2022 at 6:19 PM ████████████████████████ wrote:
  Hi Lu.

  A quick circle back to find out your exact deadline tomorrow.

  ██████ and I will be in touch.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    BOEAL_WPATH_064101

Thank you.

**From:** ████████████████████████
**Sent:** Monday, June 6, 2022 11:48 AM
**To:** Lu Fong <██████████████>
**Cc:** ████████████████
**Subject:** Re: NYTimes Mag fact-checking

Hello Lu.

Thanks for sending the updated questions!

Also, ████████████ will be in touch today. I texted with her earlier today to remind her and she will definitely be reaching back out to you.

Best,
████████

**From:** Lu Fong <███████████████>
**Sent:** Monday, June 6, 2022 11:29 AM
**To:** ████████████████████
**Cc:**
**Subject:** Re: NYTimes Mag fact-checking

Hi ████████████████  Apologies for leaving you off my previous emails),

Emily did a little editing over the weekend and I have a few additional questions to add to the list. I've reattached it here, with additional questions in **bold** and I've also pasted the new qs below.

I'm also hoping you can help me get in touch with ████████████ I haven't heard from her since her initial response to Emily and I'm hoping to get her on the phone today or tomorrow. I can also send my questions in writing, if that's easier — please just let me know what might work best.

Appreciate your bearing with our editorial process! Here for any questions or for clarification.

Best,
Lu

ADDITIONAL NYTimes Magazine fact-checking queries

1.

**What exact date in December 2021 was the draft version of SOC8 released?**

2.

**The WPATH SOC8 will be divided into 20 chapters?**

3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064102

8

**Fair to say that the majority of the SOC8 addresses treatment for transgender adults?**

4.

**All authors of the SOC8 sign a confidentiality agreement?**

5.

**You gave Emily Bazelon exclusive**
**access to the final SOC8 draft?**

6.

**The final version of the SOC8 will be released later this month? (June 2022)**

7.

**The SOC7 released in 2012:**

   a.

   **… cited ▮▮▮▮▮ work around a dozen times?**

   b.

   **… described social transition in early childhood as "controversial"**

8.

**Fair to say that after ▮▮▮▮▮▮ clinic shut down at the end of 2015, WPATH's approach to care for children and teenagers "transformed"?**

9.

**If so, would it be fair to assert that as part of this shift, WPATH  began viewing reparative therapy as akin to conversion therapy?**

On Fri, Jun 3, 2022 at 4:46 PM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:
   Thank you, Lu!

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                    BOEAL_WPATH_064103

We'll get back with you before the deadline.

Glad you're speaking with ██████████

Best,

██████████

--

██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████
██████████████████████████

**From:** Lu Fong ████████████████ >
**Sent:** Friday, June 3, 2022 4:35 PM
**To:** ████████████████████████
**Subject:** Re: NYTimes Mag fact-checking

H██████

I hope your week is wrapping up well! Please forgive my delay on this — the piece has been undergoing edits and I wanted to have a more stable version before sending you my queries.

I've attached a Word doc with my questions about WPATH here; I've also pasted them below. Please don't hesitate to reach out with any questions or for any clarification!

Deadline is this Tuesday evening but if necessary, we can make changes through Wednesday morning. I'll also be checking in on ██████████ momentarily.

Many thanks again for your time and help!

All Best
Lu

--

NYTimes Magazine fact-checking queries - WPATH

1.

WPATH stands for World Professional Association for Transgender Health?

2.

WPATH is an international organization?

3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064104

WPATH was originally named after Harry Benjamin?

4.

WPATH currently has 3000 members? (If not, can you share how many members there are?)

5.

Most
 WPATH members are healthcare professionals?

6.

WPATH also includes a small number of social scientists and lawyers?

7.

WPATH was established / founded in 1979?

8.

WPATH also issued its first Standards of Care in 1979?

9.

Fair to say that the first Standards of Care was written by a "small committee"? (That is, how many people were on the first writing committee?)

10.

After its creation, the doctors who
*chose*
 the first committee of authors voted against including a transgender man who asked to join it?

11.

WPATH Standards of Care has been updated periodically since its founding?

12.

BOEAL_WPATH_064105

Fair to say that the WPATH Standards of Care influence the positions taken by major medical groups including the American Academy of Pediatrics
 and the American Psychological Association?

13.

Fair to say that the WPATH Standards of Care also influence the coverage offered by health insurers and national health services around
 the world?

14.

The upcoming Standards of Care will be the EIGHTH edition?

15.

The last update happened in 2012?

16.

██████████████ were among the authors of the 2012 SOC version?

17.

Prior to the SOC8 proposal, all previous SOC versions required trans adults to live for a year as their preferred gender and provide two
 referrals from mental health professionals in order to undergo genital surgery?

18.

The SOC8 has instead adopted a model of collaborative decision-making between adult patient and surgeon?

19.

There are
seven
 clinicians drafting the SOC8 chapter on adolescents
 for the upcoming WPATH guidelines?

20.

All of the following people have been president of WPATH:

  a.

BOEAL_WPATH_064106

██████████

b.    ██████████

21.

██████████ is the president-elect of WPATH and will become
president in September of this year?

22.

WPATH issued a
statement in October 2021 opposing "the use of the lay press" for
scientific debate?

23.

Fair to imply that this statement was in response to the debate
surrounding
this
 post by Abigail Shrier, in which ████████████████
were interviewed?

On Tue, May 31, 2022 at 1:43 PM ██████████████████████
wrote:
Thank you, Lu!
**From:** Lu Fong <██████████████████
**Sent:** Tuesday, May 31, 2022 1:39 PM
**To:** ████████████████████
**Cc:** ██████████
**Subject:** Re: NYTimes Mag fact-checking

Thanks ██████████████ 'm happy to send my questions in writing,
likely some time tomorrow.

Appreciate both your time and help. Will be in touch with queries soon.

Best
Lu
On Tue, May 31, 2022 at 1:30 PM ████████████
████████████████ wrote:
Hello Lu!

Thanks for reaching out!

I'm ccing WPATH's ██████████████████ who I'll be working
with to ensure we can answer all of the fact check questions.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064107

If would be very helpful if you send the questions in writing with the potential for a follow up call to tie up any loose ends. Would that be ok with you?

Best,




**From:** Lu Fong <███████████████>
**Sent:** Tuesday, May 31, 2022 12:53 PM
**To:** ███████████████████
**Subject:** NYTimes Mag fact-checking

Hi 

Thanks again for agreeing to help fact-check Emily's upcoming piece for the NYT Magazine. The story is still being edited into final shape but I will have a list of questions for you regarding WPATH ready in the next day or so ...

Do you have some time in the next few days for a phone call? I'd imagine it'd take around 30-40 minutes and I'm happy to work with your schedule. Just let me know what might work best.

(I can also send my questions in writing, if you prefer, with the understanding that the list will be fairly long.)

**Deadline is coming up next week** — I'm reachable by email or phone at +███████████.

Many thanks and appreciate your time and help!

Best
Lu

--
**Lu Fong**
The New York Times Magazine
(███████████)


--
**Lu Fong**
The New York Times Magazine
███████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064108

--
**Lu Fong**
The New York Times Magazine
█████████

--
**Lu Fong**
The New York Times Magazine
(█████████

--
**Lu Fong**
The New York Times Magazine
█████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064109

**NYTM Fact-checking Queries: World Professional Association for Transgender Health**

*June 3, 2022 | Deadline: Tuesday 6/7/22 | Responses to*
████████████

1. WPATH stands for World Professional Association for Transgender Health? Correct
2. WPATH is an international organization? Yes
3. WPATH was originally named after Harry Benjamin? Correct
4. WPATH currently has 3000 members? (If not, can you share how many members there are?) Currently we have 3309
5. <u>Most</u> WPATH members are healthcare professionals? Correct
6. WPATH also includes a small number of social scientists and lawyers? Yes
7. WPATH was established / founded in 1979? Yes
8. WPATH also issued its first Standards of Care in 1979? Yes, February 12, 1979
9. Fair to say that the first Standards of Care was written by a "small committee"? (That is, how many people were on the first writing committee?) Correct, 6 people
10. After its creation, the doctors who *chose* the first committee of authors voted against including a transgender man who asked to join it? Yes
11. WPATH Standards of Care has been updated periodically since its founding? Yes, 7 times; 1979, 1980, 1981, 1990, 1998, 2005, 2012

BOEAL_WPATH_064157

12.     Fair to say that the WPATH Standards of Care influence the positions taken by major medical groups including the American Academy of Pediatrics and the American Psychological Association? I cannot list groups, but yes, our SOC are accepted and supported by leading professional medical associations.

13.     Fair to say that the WPATH Standards of Care also influence the coverage offered by health insurers and national health services around the world? Yes

14.     The upcoming Standards of Care will be the EIGHTH edition? Yes

15.     The last update happened in 2012. Yes

16.     Ken Zucker and Peggy Cohen-Kettenis were among the authors of the 2012 SOC version? Yes

17.     Prior to the SOC8 proposal, all previous SOC versions required trans adults to live for a year as their preferred gender and provide two referrals from mental health professionals in order to undergo genital surgery?

18.     The SOC8 has instead adopted a model of collaborative decision-making between adult patient and surgeon? (For 17 and 18) The 'real-life test' was removed in 1980. Many people did continue to require it prior to surgery.  Note:  the reference for this is in SOC 2.  It should be noted that version 7 emphasized "care must be individualized" and that deviations from specific requirements were clinically acceptable and should be documented. Thus, a rigid 12 months may not be required for all patients. Individual circumstances and needs can override the guidelines if the clinicians deem it

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064158

appropriate for or in the interest of the patient. Versions 5 and 6 were still a bit rigid about performing socially as "the opposite sex," but version 7 is less demanding, though still concerned that patients have enough time to fully experience their gender role before undergoing irreversible surgeries. Note that this is not the case for procedures involving sterilization, but the concern is for good social and sexual functioning. In other words the evolution is a bit more subtle and continuous than the sentence in the article implies.

19.     There are <u>seven</u> clinicians drafting the SOC8 chapter on <u>adolescents</u> for the upcoming WPATH guidelines? 7 members of the chapter workgroup, including 2 co-chairs, and a community stakeholder.

20.     All of the following people have been president of WPATH:
   a. ██████████ YES
   b. Erica Anderson NO, she was president of USPATH

21.     ████████ is the president-elect of WPATH and will become president in September of this year? Yes

22.     WPATH issued a statement in October 2021 opposing "the use of the lay press" for scientific debate? It was a WPATH / USPATH joint letter – here is an excerpt re scientific discussions "USPATH and WPATH support scientific discussions on the use of pubertal delay and hormone therapy for transgender and gender diverse youth. We believe that such discussions should occur among experts and stakeholders in this area, based on scientific evidence, and in fora such as peer-reviewed journals or scientific conferences, and among

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064159

colleagues and experts in the assessment and care of transgender and gender diverse youth. USPATH and WPATH oppose the use of the lay press, either impartial or of any political slant or viewpoint, as a forum for the scientific debate of these issues, or the politicization of these issues in any way.

23.     Fair to imply that this statement was in response to the debate surrounding this post by Abigail Shrier, in which Erica Anderson and ███████████ were interviewed? Yes

24.     What exact date in December 2021 was the draft version of SOC8 released? December 2, 2021

25.     The WPATH SOC8 will be divided into 20 chapters? There are 18 chapters in the SOC8

26.     Fair to say that the majority of the 18 SOC8 chapters address treatment for transgender adults? Yes.

27.     All authors of the SOC8 sign a confidentiality agreement? Yes

28.     You gave Emily Bazelon exclusive access to the final SOC8 draft? Yes

29.     The final version of the SOC8 will be released later this month? (June 2022) The final draft document will be sent to the editors in approximately the next week, then to the International Journal of Transgender Health (IJTH) publishers for next steps to final publication in IJTH as an open access document. Final publication expected this summer.

30.     The SOC7 released in 2012:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064160

    a. … cited Zucker's work around a dozen times? Sounds correct

    b. … described social transition in early childhood as
       "controversial" No, it states "This is a controversial issue, and
       divergent views are held by health professionals."

31.     Fair to say that after Ken Zucker's clinic shut down at the end of
    2015, WPATH's approach to care for children and teenagers
    "transformed"?

32.     If so, would it be fair to assert that as part of this shift, WPATH
    began viewing reparative therapy as akin to conversion therapy?

> **Commented [1]:**
> This section is being edited by Emily Bazelon.
> Please send back any remaining fact checks after
> her edits are complete.

**Additional Questions from NY Times, sent June 8th**

—

1. Correct that ▮▮▮▮▮▮ was selected by WPATH in 2017 to lead a
group of 7 clinicians and researchers to draft a chapter for SOC8 on
adolescents? — ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were
selected as co-leads of the Adolescent Chapter through a robust
application process, in addition to 5 work group members.

2. WPATH Standards of Care (SOC) are meant to set the guidelines for
transgender health care worldwide? –▮▮ Yes, not specific to any
healthcare delivery system, but focused on transgender health as a
human/universal concept/need.

3. True that after WPATH was formed in 1979, transgender activists gained
increasing influence in the organization? –▮▮ Health care professionals
who happened to be trans people joined the organization; they were not

necessarily activists. Some who recognized that a medical association was important for institutionalizing transgender health were interested in strengthening the association functionally and clarifying the SOC, while others took more aggressive positions as clinicians because they saw how interpretations of the SOC were weaponized against their clients/patients in specific regions or environments. Different approaches are present throughout the membership. The Board tries to balance the values that are expressed through the SOC and good association management principles.

4. Yet these activists did not contribute to formulating the SOC and its updates over the years? – ■: No. Transgender-identified professionals have been given a voice, to varying degrees since version 5. The first 4 versions were very spare. As more trans professionals joined the association and participated in association committees and activities, and their opinions and experience was recognized as credible and respectable, these professionals gained more access to being able to contribute to the SOC. Note that the association membership application does not ask an applicant's gender identity or personal transgender history. It only asks for professional qualifications, which are vetted.

5. Fair to say that a good number of these activists (rightly or wrongly) view SOC criteria as imposing excessively restrictive, paternalistic, and even demeaning barriers to transgender treatment? – ■ No. There are some members who are clinicians who work with marginalized groups within the transgender community who would like to see standards relaxed in many ways, but in the U.S., it is also true that insurance plans and clinical institutions overlay their own interpretations or additional rules on transgender care and some clinicians and patients/clients blame WPATH for this when these systems/processes are outside WPATH's influence or control. Activists outside of WPATH blame WPATH, and a lot of misinformation about the SOC is shared throughout the trans community.

We also have questions about a protest in February 2017 [[see video: https://www.youtube.com/watch?v=rfgG5TaCzsk]]. We have spoken with ■■■■■■■ and he believes it is generally accurate, but we would also like see if WPATH sees anything inaccurate here:

BOEAL_WPATH_064162

6. In February 2017, the inaugural conference of USPATH--the US branch of WPATH--was held in Los Angeles? -- ██ Yes. Please note... USPATH is the US regional affiliate of WPATH.

7. At this conference, protesters interrupted and picketed a panel featuring Ken Zucker? -- ██ Yes. Most of the protesters were not WPATH members.

8. That evening of the protest, at a meeting with the conference leaders, a group of activists led by transgender women of color read aloud a statement in which they said the "entire institution of WPATH" was "violently exclusionary" because it "remains grounded in 'cis-normativity and trans exclusion.' "?  [[QUOTES ARE FROM VIDEO]] -- ██ Yes. These were Los Angeles activists who had been given free admission to the conference to recognize their community-based healthcare advocacy, and to help them engage with national trans health leaders and researchers who created much of the literature in the field. Some trans-identified clinicians who supported them also attended the meeting where the statement was read.

 9. The group asked for cancellation of Zucker's appearance on a second upcoming panel? -- ██ Yes.

10. ████████, who was on the board at the time, agreed to the demand to cancel Zucker's appearance on the second panel/symposium? Zucker did not appear further at that 2017 USPATH conference? -- ██ Yes. This was not my sole decision; I delivered the consensus of the board members present with regret and sadness, because we recognized we could not guarantee his safety.

11. ████ told the protestors: 'We are very, very sorry." -- ██ Yes, true, because (for me) we were sorry they felt this way.

—

**Final question from the NY Times Magazine**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_064163

Is it correct to say that largely in response to █████████ concerns, the December draft of the SOC8 adolescent chapter suggested that health care providers discuss "future unknowns related to sexual health" when families consider puberty blockers?

█████████ believes her comments had this influence, but I wanted to confirm with you.

> **Commented [2]:** We are checking with █████████ on this.









# Fwd: A message from the WPATH Executive Committee

**From:**      "Knudson, Gail [VA]" ███████████████████

**To:**        WPATH EC <wpathec@wpath.org>

**Date:**      Sun, 12 Feb 2017 23:20:45 -0500

**Attachments:**   USPATH1.2017.FINAL.ppt (2.58 MB); ATT00001.htm (168 bytes)

Sent from my iPhone

Begin forwarded message:

From: ████████████████████████████████████████

To: "Knudson, Gail [VA]" ██████████████████████

Subject: A message from the WPATH Executive Committee

Gail:

I have read the above-titled message on the WPATH website.

Since you are the current President, I would ask that you share this message with the other members of the EC: Green, Tangpricha, Ettner, and Bouman.

1. The first sentence reads: "On February 3, 2017 a WPATH member [me, obviously] presented at the USPATH conference on a clinical modality that WPATH opposes."

Comment: Let me begin by saying that I do not know if you or any of the four other EC members were at the Symposium (organized and chaired by Heino Meyer-Bahlburg). The sentence simply astonishes me. My talk was not at all about any "clinical modality"--it was a summary of follow-up studies of children diagnosed with GID (the diagnostic label that was in place for a number of the follow-up studies) or children subthreshold for the diagnosis. I also presented data on predictors of follow-up status (persistence vs. desistance), including new data that I presented for the first time during this talk. I attach the POWERPOINT presentation that I gave.

2. The third sentence reads: "Later that day the same presenter was asked to leave by a group of professionals attending the conference."

Comment: This sentence also simply astonishes me. No one asked me to leave. What did happen is on the evening of February 3 I was called (I think the person I spoke with was ███████████ although perhaps I have the name wrong--perhaps you were in the room at the time the call was made) to inform me that the second Symposium I was to be in on Saturday (along with Scott Leibowitz, Laura Edwards-Leeper, and Dianne Berg) was cancelled because the leadership at the meeting was concerned about safety issues. This symposium was going to discuss several therapeutic models currently in use with pre-pubertal children (labeled as "gender diverse" in the title of the cancelled Symposium). I accepted this decision, as I certainly had no desire for audience members to attend the Symposium if their physical safety was at risk.

I would, therefore, request that the EC issue a correction to both of these sentences, which are inaccurate and misleading.

3. There is, of course, a broader issue at stake here. At WPATH in Amsterdam last June, activists disrupted a Symposium on DSDs and defaced a poster. I find it remarkable that the leadership of WPATH has remained silent about this. If there cannot be meaningful dialogue about complex issues at WPATH or USPATH, how can the organization consider itself to be "Professional"?

I look forward to hearing from you.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106951



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106952



Gender Variations During Childhood

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106953

- **In this talk, I will attempt to follow the "Language Policy" recently recommended by the European Professional Association for Transgender Health and the recommendations of Bouman et al. (2016).**
- **BAM = birth-assigned males; BAF = birth-assigned females**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106954



Robert J. Stoller, M.D. (1924-1991)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106955



Richard Green, M.D., J.D. (1936-    )

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106956

Stoller, R. J., & Rosen, A. C. (1959). The intersexed patient. *California Medicine, 91,* 261-265.

Green, R., Stoller, R. J., & MacAndrew, C. (1966). Attitudes toward sex transformation procedures. *Archives of General Psychiatry, 15,* 178-182.

5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106957

## Outline of Presentation

- The comparative-developmental perspective
- Summary of follow-up studies of children
- Criticisms of the follow-up studies
- Predictors of persistence and desistance
- These follow-up studies as a benchmark for contemporary cohorts of children who socially transition prior to puberty

6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106958

## Retrospective and Prospective Studies: Convergence, Divergence or a Bit of Both?

- So long as we trace…development from its final outcome backwards, the chain of events appears continuous, and we feel we have gained an insight which is completely satisfactory or even exhaustive. But if we proceed the reverse way, if we start from the premises…and try to follow these up to the final result, then we no longer get the impression of an inevitable sequence of events which could not have been otherwise determined.

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106959

We notice at once that there might have been another result, and that we might have been just as well able to understand and explain the latter. The synthesis is thus not so satisfactory…in other words, from a knowledge of the premises we could not have foretold the nature of the result. (Freud, 1920/1955)

8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106960

## The Comparative-Developmental Perspective

- Consider three diagnoses in the DSM-5: Oppositional Defiant Disorder, Conduct Disorder, Antisocial Personality Disorder
- Retrospective Approach: Antisocial Personality Disorder --->Conduct Disorder--->Oppositional Defiant Disorder
- Prospective Approach: Oppositional Defiant Disorder
- --->Conduct Disorder--->Antisocial Personality Disorder

9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106961

## The Comparative-Developmental Perspective

- "Oppositional defiant disorder often precedes the development of conduct disorder….However, many children…with oppositional defiant disorder do not subsequently develop conduct disorder" (DSM-5, p. 464).

- "The course of conduct disorder…is variable. In a majority of individuals, the disorder remits by adulthood" (DSM-5, p. 473).

- In Antisocial Personality Disorder: "There is evidence of conduct disorder with onset before age 15 years" (Criterion C) (DSM-5, p. 659).

- Retrospective and prospective methods do not yield identical findings.

10

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106962

## The Comparative-Developmental Perspective and Gender Dysphoria

- In adults diagnosed with Gender Dysphoria, clinical experience and retrospective studies going back decades suggested an early childhood-onset (particularly for birth-assigned males with an androphilic sexual orientation and for birth-assigned females with a gynephilic sexual orientation). This would be an example of *retrospective continuity*. Indeed, the concept of retrospective continuity had a powerful influence on the first-generation of prospective studies of children who would now be diagnosed with Gender Dysphoria (or, perhaps, more broadly children captured under the "gender-variant/gender non-conforming" label).

11

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106963

# Follow-up Studies

- **Bakwin (1968): n = 7**

- **Lebovitz (1972): n = 10**

- **Zuger (1978, 1984): n = 12**

- **Money and Russo (1979): n = 9**

- **Davenport (1986): n = 10**

- **Green (1987): n = 44**

- **Kosky (1987): n = 6**

- **Drummond et al. (2008): n = 25**

- **Wallien and Cohen-Kettenis (2008): n = 54/77**

- **Singh (2012): n = 139**

- **Steensma et al. (2013): n = 99/127**

**Note: Summarized in Zucker and Bradley (1995) and Ristori and Steensma (2016)** [12]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106964

# Mean Age at Assessment in Childhood

- Green (1987): 7.00 years (range, 4-12)
- Drummond et al. (2008): 8.88 years (range, 3.17-12.95)
- Wallien and Cohen-Kettenis (2008): 8.40 years (range, 5-12)
- Singh (2012): 7.49 years (range, 3.33-12.99)
- Steensma et al. (2013): 9.15 years (range, 6-12)

13

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106965

## Mean Age at Follow-Up

- Green (1987): 19.00 years (range, 14-24)
- Drummond et al. (2008): 23.24 years (range, 15.44-36.58)
- Wallien and Cohen-Kettenis (2008): 18.9 years (range, 16-28)
- Singh (2012): 20.58 years (range, 13.05-39.15)
- Steensma et al. (2013): 16.14 years (range, 15-19)

14

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106966

# Gender Dysphoria ("Persistence") at Follow-Up

- **Assessment of Persistence (variable)**

- **From Bakwin to Kosky: 9%**
- **Green: 2%**
- **Drummond et al.: 12% [birth-assigned females]**
- **Wallien and Cohen-Kettenis: 20.3% [birth-assigned males]; 50.0% [birth-assigned females]**
- **Singh: 12% [birth-assigned males]**

15

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106967



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106968

## Follow-Up Studies Summarized So Far

- The follow-up studies summarized so far, by and large, collected data on children who were assessed (and sometimes treated) prior to the introduction of a pre-pubertal gender social transition as a psychosocial treatment: a treatment that parents may have instituted on their own, in consultation with a clinician, or on the advice of a clinician or some other type of professional (e.g., a teacher).

- Steensma et al. (2013) reported the first (and, to my knowledge, only) systematic follow-up study of children in which some children were classified as having had either a partial or a complete social transition prior to puberty.

17

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106969



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106970



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106971



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106972



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106973

## Criticisms of the Follow-Up Studies

- Method variance
- Inclusion of Threshold and Subthreshold Participants
- Lost to follow-up cases ("non-responders") classified as desisters in the Dutch studies (cf. internal validity analyses)
- The No True Scotsman argument

22

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106974

### Predictors of Developmental Psychosexual Trajectories

It has been argued that desisters were not "truly" gender-dysphoric to begin with, so there was nothing to desist from. Only persisters were "truly" gender-dysphoric.

**If we use the DSM criteria for the childhood diagnosis, what do the data show?**

23

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106975



**Persistence as a Function of a DSM Diagnosis in Childhood (Threshold vs. Subthreshold)**

Note. Data from Drummond et al. (2008) and Singh (2012)

24

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106976



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106977



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106978



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106979

| Gender Dysphoria ("Persistence") at Follow-up | | | |
|---|---|---|---|
| | | Yes | No |
| DSM | Yes | 79 | 162 |
| | No | 9 | 118 |

**Sensitivity = 89.7%**
**Specificity = 42.1%**

28

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106980

## Predictors of Developmental Psychosexual Trajectories

It has been argued that desisters were not "truly" gender-dysphoric to begin with, so there was nothing to desist from. Only persisters were "truly" gender-dysphoric.

• As a diagnostic instrument, the DSM diagnosis for children appears to detect the majority of cases that persist (sensitivity = 89.7%).*

• However, for children who desist, the majority had a DSM diagnosis (specificity = 42.1%), which does not lend strong support for the above-noted claim.

*I have a caveat to this point. Feel free to ask about it during the Discussion.

29

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106981

## Demographic Predictors:
## Multinomial Logistic Regression for the Bisexual/Androphilic Persisters

| Predictor | β | SE | Wald | $p$ | $e^{\beta}$ |
|---|---|---|---|---|---|
| Age | 0.11 | 0.14 | 0.62 | ns | 1.12 |
| IQ | 0.02 | 0.03 | 0.85 | ns | 1.08 |
| Social Class | -0.14 | 0.04 | 13.66 | <.001 | 0.87 |
| Marital Status | -0.76 | 0.80 | 0.88 | ns | 0.47 |

Note: Reference group is the bisexual/androphilic desisters. Data from Singh (2012).

30

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106982

## Demographic and Gender-Behavior Predictors: Multinomial Logistic Regression for the Bisexual/Androphilic Persisters

| Predictor | β | SE | Wald | *p* | e^β |
|---|---|---|---|---|---|
| Age | 0.26 | 0.16 | 2.90 | .09 | 1.30 |
| **IQ** | **0.02** | **0.03** | **0.58** | **ns** | **1.02** |
| Social Class | -0.12 | 0.03 | 13.28 | <.001 | 0.89 |
| Gender *z*-score | 1.32 | 0.55 | 5.82 | .02 | 3.74 |

Note: Reference group is the bisexual/androphilic desisters. Data from Singh (2012). The Gender metric was a combination of several dimensional measures administered at the baseline assessment in childhood.

31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106983

## Predictors of Persistence in Steensma et al. (2013): BAM

| Predictor | Odds Ratio | 95% CI | p |
|---|---|---|---|
| Age | 1.90 | 1.10-3.30 | .05 |
| Childhood role transition | 22.43 | 2.69-187.07 | .01 |
| Gender Identity Interview for Children: Cognitive Factor | 1.55 | 1.06-2.28 | .05 |
| Gender Identity Interview for Children: Affective Factor | 1.10 | .91-1.33 | ns |
| Gender Identity Questionnaire for Children | 7.01 | 7.01-42.01 | .05 |

Note: GIIC (Zucker et al., 1993; Wallien et al., 2009); GIQC (Johnson et al., 2004).

32

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106984

## Predictors of Persistence in Steensma et al. (2013): BAF

| Predictor | Odds Ratio | 95% CI | p |
|---|---|---|---|
| Age | 1.98 | .88-4.49 | ns |
| Childhood role transition | 1.85 | .27-12.87 | ns |
| Gender Identity Interview for Children: Cognitive Factor | 2.04 | 1.02-4.09 | .05 |
| Gender Identity Interview for Children: Affective Factor | 1.47 | 1.05-2.07 | .05 |
| Gender Identity Questionnaire for Children | 0.40 | .05-3.49 | ns |

Note: GIIC (Zucker et al., 1993; Wallien et al., 2009); GIQC (Johnson et al., 2004).

33

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106985

**Predictors of Developmental Psychosexual Trajectories**

- Age (older)
- Social Class (lower)
- Severity measures of gender-variant behavior
- Pre-pubertal social transition

34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106986

## The "I Am" versus the "I Wish" Debate

- Several clinicians and researchers have argued that it is only children who declare that they "are" of the desired gender, as opposed to the mere wish "to be" of the other gender, are the "true" population of transgender children.

35

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106987



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106988

## The "I Am" versus the "I Wish" Debate

- To consider this matter, I looked at data from the Gender Identity Interview for Children. Item 1 asks the child "Are you a boy or a girl?" Item 2 asks a counter question: "Are you a [opposite to their answer on Item 1]." For the analysis, children were classified as answering the question "correctly" or "incorrectly" in relation to their assigned sex at birth.

37

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106989

### The "I Am" versus the "I Wish" Debate

- Of 496 children (age range, 3-12 years), 51 (10.3%) were classified as answering Item 1 "incorrectly" and 54 (10.9%) were classified as answering Item 2 "incorrectly."

- From a gender-developmental cognitive perspective, I predicted that "incorrect" answers would be negatively correlated with age. This was confirmed, with $r$ values of -.12 and -.15, respectively (both $p$s < .001). These are, however, not particularly strong, and lower than the correlation for the total score on the GIIC, where $r$ was -.24 ($p$ < .001). Nonetheless, I think that the influence of developmental cognition should be given some thought in interpreting the meaning of "I am" vs. "I wish."

38

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106990

### The "I Am" versus the "I Wish" Debate

- My statistics professor in graduate school had a sign on his desk: "If you torture data long enough, they will confess to anything." So, I tried.

- Instead of a linear relation between age and the responses to Items 1-2, I looked for evidence of a curvilinear (U-shaped) relation. Perhaps, for example, very young children and those near the end of childhood would answer these questions "incorrectly": in the case of the younger children because of ("immature") cognitive-developmental factors but in the case of older children because such responses reflected, in a more developmentally mature way, their subjective gender identity.

39

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106991

## The "I Am" versus the "I Wish" Debate

- I did a fair bit of data torturing, but was not able to detect convincing evidence for a curvilinear relationship: the linear relationship appeared to be superior. Thus, I am not yet convinced that the distinction between "I Am" versus "I Wish" is the decisive variable in predicting persistence. I am of the view that it is the more general metric of severity (among other factors) that has the best empirical support for predicting persistence.

40

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106992

## Developmental Trajectories
## of Socially Transitioned Children

- We are now in an era in which an early gender social transition (GST) is way more common. At least for BAM, Steensma et al. (2013) have shown that an early GST predicted persistence, independently of other predictors.

41

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106993

**Children Referred for Gender Dysphoria:**
**A Comparison of Those Who Had Socially Transitioned**
**vs. Not at the Time of a Baseline Assessment (2006-2015)**

- **Sex Assigned at Birth**
- **Age**
- **IQ**
- **Social Class**
- **Parent's Marital Status**
- **DSM Diagnosis**
- **Gender Identity Interview for Children**
- **Gender Identity Questionnaire for Children**

42

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106994

## Social Transition at the Time of Baseline Assessment (Yes vs. No)

| Variable | Yes (n = 22) | No (n = 134) | $p$ |
|---|---|---|---|
| Sex Assigned at Birth (% Male) | 59.0 | 76.1 | ns |
| Age in Years (M and SD) | 9.38 (2.62) | 7.27 (2.47) | <.001 |
| IQ (M and SD) | 101.00 (23.52) | 103.93 (16.24) | ns |
| Social Class (M and SD)[a] | 38.76 (14.10) | 46.24 (13.56) | .028 |
| Marital Status (% 2-Parent)[b] | 36.3 | 72.4 | .002 |
| DSM Diagnosis (% Yes) | 100.0 | 77.6 | .029 |
| Gender Identity Interview for Children (M and SD)[c] | 16.76 (5.84) | 7.86 (6.03) | <.001 |
| Gender Identity Questionnaire for Children[d] | 2.12 (0.44) | 2.70 (0.63) | <.001 |

[a]Absolute range, 8-66
[b]From the time of birth (including adoption)
[c]Absolute range, 0-24
[d]Absolute range, 1-5 (lower score indicates more gender-variant behavior)

43

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106995

## Characteristics of Socially Transitioned Children

- Compared to children who had not socially transitioned, the transitioned children were significantly older, came from a lower social class background, and were less likely to be living with two parents.

- They were significantly more likely to have a threshold diagnosis for GID/GD and were more severe on dimensional measures of gender-variant behavior.

- I predict, therefore, that in contemporary cohorts of children who experience a GST prior to puberty that the rate of GD persistence will be substantially higher than that reported in the follow-up studies to date.

44

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106996



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106997



46

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_106998











# RE: script from banquet

**From:**      ██████████████   ███████████████████
**To:**        ████████████████  ████████████████
**Cc:**        ████████████████████████████████████████
**Date:**      Tue, 07 Feb 2017 00:05:10 -0500
**Attachments:** ██ reply to████████ et al _Collective Response to first draft apology.docx (162.55 kB); Script from banquet.docx (150.61 kB)

Hi ████████████████

What is the next step?

Thanks,

████████████████████████████████████████
████████████████████████████████████████

From: ████████████████
Sent: February 6, 2017 8:49 PM
To ████████████████
Subject: script from banquet

████████████████████████████████████████
████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                          BOEAL_WPATH_143749

We feel that this apology is insufficient and does not sincerely and sufficiently address our demands. Please see the recommendations below.

1. This letter fails to include an apology for the invitation of Kenneth Zucker to present his research on conversion therapy for transgender youth, which was clearly stated by us in our meeting with the Board last night as a high priority demand of ours, your intentional (at this point) exclusion of this is cause for additional concern. We have been advised by our attorney not to post anything on the WPATH website that names Ken Zucker. We called him last night and told him we were cancelling the session where he was to appear with 3 other presenters, who were also informed that they would also not be allowed to present (as trans-positive practitioners and researchers, the other 3 presenters had planned to rebut Zucker's theories, and they were disappointed because they had spent a great deal of time in preparation). We have posted the cancellation on the door, and we have communicated verbally with everyone who asks about the cancellation. I also want to make clear that Ken Zucker was not "invited" to present: Both of the sessions he was participating in were submitted as "mini-symposia" with multiple presenters associated with the abstract. The Abstracts were reviewed by both cis and trans peers in the discipline of the presenters, and both received very high scores. As a result, the mini-symposia were accepted for presentation. The only invited speakers were CA Insurance Commissioner Jones and HHS LGBT representative Elliot Kennedy, and no speakers were paid to be here.

2. This statement fails to include the multiple people and range of identities that were affected by the violence that Zucker and WPATH allowed and perpetuated. Did you want the affected people's names to be mentioned? It would be helpful to me if you could provide the range of identities that should be listed.

3. Acknowledgement of the policing of trans community and the willful perpetuation of the policing of trans communities, belonging to a long legacy of racist and transphobic violence against our communities. I do understand this, and I empathize. I can include this for sure.

4. Calling security on transgender conference participants is not being seen by us as an "anonymous" incident, this further minimizes not only the experiences we actually faced, but also the responsibility of the board and the management agency to perform due diligence in screening, training, and informing staff and security on best practices and expectations throughout the duration of the conference. We contacted the hotel and the campus security department to see if they had any knowledge about who made the request for them to come to the Luskin Center. Both said they had no record of who called. The hotel's security policy states that they do not disclose any information about security incidents, and because nothing happened requiring security action there is no written report on file at the campus security office. As such, I can only say it was an anonymous request that brought security to the hotel.

5. "The security staff apologized to the trans people and to WPATH staff." -…. We are professionals, attending the conference, transgender or not. Again highlighting our value as professionals and not minimizing our experiences to our identities as transgender individuals. I understand that you are professionals; I was only trying to emphasize that the security people were apologetic to the people who they had surrounded, and that it was WPATH staff who sent them away. I can certainly rephrase to emphasize your collective professionalism.

6. Instead of simply putting the words "we apologize" can you give specific examples as to what exactly you are apologizing for, how you understand the implications of your actions, and your specific resolutions to addressing our demands and concerns to ensure that this never happens again, containing the inclusion of transgender women of color in the fabric of WPATHs planning processes. Yes. Our staff has embraced

BOEAL_WPATH_143750

the opportunity to partake in sensitivity training, and we look forward to speaking with you on Sunday afternoon to discuss next steps.

7.  Being intentional about creating a safe space for transgender professionals and community for the planning of all future conferences and events. Yes! No worries!! That's our intention for sure!!

Please revisit our list of demands and adjusts your apology so that it is reflective of all of them. The actions of USPATH/WPATH and insincere apology does not align with WPATH's vision, which is to promote the health, respect, and equality for transgender, transsexual and gender-variant people in all cultural settings. We are very sincere in our apology. As a formal statement, usually there isn't a lot of detail. We assure you we have learned from this situation, and we are truly excited to partner with you and your colleagues to make sure this never happens again, and that USPATH in particular will be more adept in meeting the needs of ALL our US members.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_143751

Yesterday a situation involving a scheduled WPATH presenter at the conference which lead to a campus security incident which was not handled well, and I and the other conference organizers and our staff apologize for the pain and disrespect this caused our participants, especially those who identify as trans women of color.

Our scientific chair, Dr. Dan Karasic, has posted an apology on the SOC7 Facebook page, and, there is an explanation posted on the WPATH website. Last night we had a meeting with leaders of the trans people of color and we promise to do all we can to ensure that similar events do not occur.

In the future we will work with local communities when we hold conferences in various locations. The board will include trans people of color, especially trans women of color, in the ongoing work of WPATH. And we are committed to working with trans people of color to guide us in our growth.

Moving forward, USPATH embraces the opportunity to have our colleagues who are trans and people of color involved in every aspect of the organization – as elected leadership, in committee and task force leadership, and

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_143752

in advisory positions that will make USPATH more
relevant to the field of trans health in the United States.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    BOEAL_WPATH_143753