# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This extraordinary case of attorney discipline now comes before the Court on an ordinary legal issue: whether the Court should take judicial notice of proceedings in an unrelated case. These proceedings arose in April 2022 when two teams of attorneys filed high-profile challenges to Alabama's Vulnerable Child Compassion and Protection Act. Moments after those lawsuits were assigned to this Court, both teams dismissed their cases under Rule 41(a)(1)(A)(i), and one of them, led by Melody Eagan and Jeffrey Doss ("the Respondents"), then filed a materially similar suit days later with new plaintiffs in another district court.

The two teams' conduct led to an investigation by a three-judge panel ("the Panel"), which unanimously concluded that the Respondents' express purpose was to circumvent the random case-assignment procedures for the Northern and Middle

Districts of Alabama—all to avoid this Court. Doc. 339 at 51. The matter was referred here in October 2023, *id.* at 52, and these proceedings followed.

On May 31, 2024, the Respondents moved the Court to take judicial notice of allegedly "relevant facts" found in four filings and the docket sheet from *United States v. Williamson, et al.*, No. 2:19-cr-466-ACA-JHE (N.D. Ala. Filed Aug. 23, 2019), a criminal case pending before Judge Annemarie Axon when the Respondents filed suit in April 2022. Doc. 571. The Respondents claim that under the "unambiguous language of [Rule] 41," neither the reason that their lawsuit was reassigned to this Court on April 15 of that year nor the Respondents' reasons for dismissing their case just afterwards are relevant to these proceedings, but the Court should nevertheless take notice of these five items because (1) the Panel had "questioned [the Respondents] about their perceptions surrounding the transfer" and explained to them, both orally and in writing, "about why the case was transferred to this Court"; and (2) "[t]he Panel referenced that explanation as grounds for misconduct findings in [its] Final Report of Inquiry." *Id.* at 2–3.

For the reasons below, Respondents Melody H. Eagan And Jeffrey P. Doss's Motion to Have the Court Take Judicial Notice (Doc. 571) is **DENIED**. The Respondents' Rule 41 argument has no bearing on this motion and will be discussed at length in a separate order to follow instead of here. Rather, the Court denies the motion for two independent reasons. First, Eagan and Doss brought this motion in

bad faith: their threefold, bad-faith purpose in filing the motion was to spin a false narrative about the status of *Williamson*; to malign the integrity of U.S. District Judges Annemarie Axon, Jeffrey Beaverstock, David Proctor, and Keith Watkins; and to distract the Court from their sanctionable misconduct. Second, the information they've asked the Court to notice is irrelevant to these proceedings. The Court will not take notice of irrelevant facts.

## BACKGROUND

Melody Eagan and Jeffrey Doss are party to ongoing attorney-disciplinary proceedings that arose from their handling of a high-profile challenge to Alabama state law. Nearly three years ago, Eagan and Doss were co-lead counsel in an emergency challenge to the constitutionality of Alabama's Vulnerable Child Compassion and Protection Act, a state law that imposes criminal penalties for prescribing or administering puberty blockers or hormone therapy to transgender minors. The Act became law on Friday, April 8, 2022, and the lawsuit, *Ladinsky v. Ivey*, No. 5:22-cv-447-LCB (N.D. Ala. filed Apr. 8, 2022), was filed in the Northern District of Alabama later the same day. *See Ladinsky*, Doc. 1.[1]

Between April 11 and 15, *Ladinsky* was assigned to four judges in Alabama's Northern District. The first, Judge Anna Manasco, recused, *Ladinsky*, Doc. 2; the

---

[1] Citations to the docket in this case are styled Doc. ___. Citations to the dockets in other related cases discussed herein are styled Case Name, Doc. ___.

second, Magistrate Judge Staci Cornelius, did not receive unanimous consent from all parties, *see id.*, Doc. 11; and the third, Judge Annemarie Axon, finally transferred the case for reasons of judicial economy to this Court, *see id.*, Doc. 13, who was presiding over a parallel challenge to the Act, *Walker v. Marshall*, No. 5:22-cv-480-LCB (N.D. Ala. filed Apr. 11, 2022), in which a request for a TRO was pending, *see Walker*, Doc. 9. Judge Axon transferred *Ladinsky* shortly before close of business on April 15, 2022. *Ladinsky*, Doc. 14. Hours later, both teams abandoned their pursuit of emergency relief in coordination with each other, voluntarily dismissing *Ladinsky* and *Walker* under Federal Rule of Civil Procedure 41(a)(1)(A)(i) nine minutes apart. *Ladinsky*, Doc. 15; *Walker*, Doc. 23.

The next day, Eagan told a reporter for AL.com that the *Ladinsky* team "plan[ned] to refile [their lawsuit] immediately."[2] The Court caught wind of Eagan's statement, and in its order closing *Walker* it observed that "[p]laintiffs' course of conduct could give the appearance of judge shopping." *Walker*, Doc. 24. The order was served on the Chief Judges of each of Alabama's three federal district courts. *See id.*

On April 19, the *Ladinsky* team filed a new lawsuit with new plaintiffs in the Middle District of Alabama. The new case, which was then styled *Eknes-Tucker* but

---

[2] Paul Gattis, *Lawsuits Seeking To Overturn New Alabama Transgender Law Dropped, Could Be Refiled*, AL.com (Apr. 16, 2022), https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-lawdropped-could-be-refiled.html.

has since been denominated *Boe v. Marshall*, was initially assigned to Judge R. Austin Huffaker; but under "the authority of the Court to manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case," Judge Huffaker reassigned the case to this Court. Doc. 3.

On April 21, Eagan, Doss, and their colleagues moved for preliminary injunctive relief to enjoin enforcement of the Act before its May 8 effective date. Doc. 7. The next week, the United States moved to intervene under Rule 24 of the Federal Rules of Civil Procedure and then for a preliminary injunction on materially similar grounds to the Plaintiffs. Docs. 58, 62. The Court received extensive briefing, held three days of hearings, and deliberated on the law and the facts. After careful consideration, the Court entered a preliminary injunction barring the State from enforcing the Act pending trial, thus granting all the relief the *Ladinsky* and *Walker* plaintiffs sought. *See* Doc. 107.

While the Court was hearing arguments on those preliminary injunction motions, the Chief Judges convened a three-judge panel to investigate the propriety of counsels' filing activity in light of Eagan's statements to the media.[3] The Panel

---

[3] On Monday, April 18, 2022, Eagan spoke with a reporter at another outlet, the Montgomery Advertiser. Brian Lyman, *Attorney: Plaintiffs Challenging Alabama's Ban On Transgender Medicine Plan New Case*, Montgomery Advertiser (Apr. 18, 2022), https://www.montgomeryadvertiser.com/story/news/2022/04/18/plaintiffs-challengingalabamaban-transgender-medicine-plan-new-case-sb-184-kay-ivey-

comprised Senior U.S. District Judge W. Keith Watkins, designated by Chief Judge Emily C. Marks on behalf of the Middle District of Alabama; now-Chief U.S. District Judge R. David Proctor, designated by then-Chief Judge L. Scott Coogler on the Northern District's behalf; and Chief U.S. District Judge Jeffrey U. Beaverstock on behalf of the Southern District of Alabama. *See* Doc. 339. Every member of the Panel has either served or is serving as Chief Judge of his respective district.

On May 10, 2022, the Panel summoned all attorneys who appeared in *Walker*, *Ladinsky*, and *Boe* to a hearing ten days later in Montgomery, Alabama, "to allow the panel to inquire about the issues raised by counsel's actions." *In re Vague*, No. 2:22-mc-3977 (M.D. Ala. opened May 10, 2022), Doc. 1 at 5. At that May 20 hearing, the Panel explained the procedural histories of *Walker* and *Ladinsky* to the full slate of responding attorneys and offered further details about why Judge Axon had transferred *Ladinsky* to this Court.[4] *See Vague*, Doc. 75 at 31–33. As Judge Proctor told the Respondents and their colleagues that day, "Judge Axon was on day four of what was scheduled to be a two-plus-week criminal trial, an 18 defendant case with four defendants at trial, and quite a lot of moving parts in that criminal case." *Id.* at 33. The *Walker* plaintiffs, he observed, had already moved for a

---

lawsuit/7355576001/.

[4] In the order itself, Judge Axon explained that she was transferring *Ladinsky* to this Court "[i]n the interest of efficiency and judicial economy." *Ladinsky*, Doc. 14.

temporary restraining order, while the *Ladinsky* plaintiffs had not. *See id.* Thus, he said, "Judge Axon would not have had the judicial resources to start the case right away," so "there was a simple determination that we would have the judge who could handle the case and wasn't in a long criminal trial to handle that case." *Id.* Chief Judge Proctor then invited all responding attorneys, their counsel, and counsel for the State of Alabama—about four dozen lawyers in total—to ask questions. *See id.* None did. *See id.*

Later in the same hearing, lead counsel for the *Walker* respondents, Barry Ragsdale, told the Panel about a call he received just after Judge Axon entered her transfer order from Sam Franklin, a senior partner at the Respondents' firm of Lightfoot Franklin & White. *Id.* at 132. According to Ragsdale, Franklin told him that "the weirdest thing" had just happened in *Ladinsky*: the firm just "had a case that got assigned to the second filed judge, not the first filed judge." *Id.* Ragsdale told Franklin the transfer "looked suspicious." *Id.*

In summarizing the call for the Panel, Ragsdale said he believed this to be "an important fact," because the transfer "scared people. It looked to [him] and to others like Judge Burke had reached out to get the case." *Id.* at 133. Moving on, he claimed that "[e]very other time the case moved, it followed the law," but Judge Axon's transfer "got done with nothing in the record," *id.* at 134, and attorneys "suddenly saw the normal rules not followed in a high-profile, controversial case," *id.* at 141.

*But see Ladinsky*, Doc. 14 (transferring *Ladinsky* to this Court in the interest of "efficiency and judicial economy").

The Panel continued to gather evidence for another six months: it invited briefing from all responding attorneys, held a status conference, received *in camera* declarations from twenty-one attorneys, ruled on written motions, and held four more evidentiary hearings. *See* Doc. 339 at 13–16. Throughout this inquiry, Eagan and Doss maintained complete innocence. They repeatedly claimed that they had dismissed *Ladinsky* chiefly because of a perceived procedural irregularity—that Judge Axon did not keep *Ladinsky* and receive *Walker*, but transferred *Ladinsky* to this Court instead—and repeatedly stonewalled the disciplinary proceedings. For instance, when the Panel ordered several members of the *Ladinsky* team to produce *in camera* declarations, the Respondents moved for a protective order on the grounds that the Panel was not "neutral," and so an *in camera* review would not accord sufficient protections to allegedly privileged information. *See Vague*, Doc. 27.

On October 3, 2023, the Panel issued a comprehensive report of its findings. *Vague*, Doc. 70. By way of background, this 53-page Final Report of Inquiry ("the Report") again laid out the procedural history of *Walker*, *Ladinsky*, and *Boe*, and reiterated that "Judge Axon was presiding over day four of a criminal trial with multiple defendants, which at the time of trial was anticipated to last for more than two weeks." Doc. 339 at 8. The Panel observed that every lawyer in the inquiry

testified that they had not been "aware of Judge Axon's criminal trial" until they learned about it from the Panel at the hearing on May 20, 2022. *Id.* at 8 n.1.

In the end, the Panel unanimously found "without hesitation" that eleven attorneys—including Eagan and Doss—had "purposefully attempted to circumvent the random case assignment procedures" for the Northern and Middle Districts of Alabama, enumerating ten discrete categories of misconduct. Doc. 339 at 51–53. The Panel rested none of its analysis nor any findings of misconduct on its explanation or the existence of Judge Axon's criminal proceedings. *See id.*

The Panel directed that its Report be served on this Court to "proceed as appropriate." *Id.* at 52. The Court reviewed the Report and the underlying record, then ordered all eleven responding attorneys to show cause why they should not be sanctioned for (among other things) attempting to manipulate the random case-assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama in violation of controlling precedent. Doc. 406.

In advance of the final show-cause hearings, Eagan and Doss filed this motion, which asks the Court to "take judicial notice of the following court records in *United States v. Williamson, et al.*, Case No. 2:19-cr-466 (N.D. Ala.)," the criminal proceeding that was pending before Judge Axon when she transferred *Ladinsky* here:

- Docket Sheet

- Doc. 601 (N.D. Ala. Apr. 20, 2022)

- Doc. 767 (N.D. Ala. Sept. 19, 2022)

- Doc. 768 (N.D. Ala. Sept. 19, 2022)

- Doc. 769 (N.D. Ala. Sept. 19, 2022)

Doc. 571 at 2. These documents reflect that the jury in the criminal proceedings began deliberating about guilt on the afternoon of Friday, April 15, 2022, before Judge Axon entered the order transferring *Ladinsky* to this Court. Notably, Eagan and Doss did not ask the Court to take judicial notice of several documents in Judge Axon's proceedings that established that her criminal proceedings were likely to go on for several more days.

The Court heard argument on the motion over two days at the final show-cause hearing. *See* Doc. 640 at 8–32; Doc. 642 at 108–19. Sam Franklin signed the motion, and his partners Chris King and Harlan Prater argued it on the Respondents' behalf. *See* Doc. 640 at 8–32; Doc. 642 at 108–19. At the Court's behest, Eagan and Doss answered questions about the motion. *See* Doc. 640 at 30–31; Doc. 642 at 108. The Respondents and their attorneys were each given the opportunity to withdraw the motion. *See id.* None did. *Id.*

## STANDARD OF REVIEW

Under Federal Rule of Evidence 201, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." FED. R. EVID. 201(c)(2). The purpose of judicial notice is to establish as true "adjudicative

facts not seriously open to dispute . . . without the normal requirement of proof by evidence," where adjudicative facts are those "that are relevant to a determination of the claims presented in a case." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F. 3d 1197, 1204 (11th Cir. 2004). Although courts have "wide discretion to take judicial notice of facts," the process of taking such notice is "highly limited." *Id.* at 1204-05 (quoting *Shahar v. Bowers,* 120 F. 3d 211, 214 (11th Cir. 1997)). Courts exercise such caution because "the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Id.* at 1205 (quoting *Shahar*, 120 F.3d at 214).

ANALYSIS

The Court will not take judicial notice of the materials that Eagan and Doss have selected from the *Williamson* record for two reasons: (1) the motion was brought in bad faith, and (2) the filings at issue are irrelevant.

## I.    Eagan and Doss Brought Their Judicial-Notice Motion in Bad Faith.

The chief reason the Court denies the Respondents' motion is that it was brought in bad faith. After considering this peculiar request for some time, turning over the why and what of it until it had seen the matter from all sides, the Court has found no angle from which the motion might be considered proper. Only after the rigors of this exercise would the Court entertain the possibility that two experienced attorneys would knowingly file a motion for the vexatious and improper purposes of

maligning federal judges or distracting the Court from the movants' potentially sanctionable conduct, or that three veteran attorneys would advocate the motion knowing the full measure of its impropriety. But that's exactly what happened here. Eagan and Doss filed this motion to distract the Court from the proceedings and impugn either Judge Axon, the Panel, or both; and their counsel, attorneys Franklin, King, and Prater, pushed it even after the Court warned them that it saw only a bad-faith motive behind the request. The Court is thus bound to make appropriate findings.

### A. The Bad-Faith Standard

The meaning of "bad faith" is well-established. "A finding of bad faith is warranted where an attorney . . . knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (quoting *Primus Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997)). The attorney may also demonstrate "bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order" or by attempting to perpetrate a fraud on the court. *Chambers v. NASCO, Inc.*, 501 U.S. 46, 50–51 (1991) (cleaned up). Similarly, an attorney's willful abuse of judicial processes is equivalent to bad-faith litigation conduct. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980).

In the context of the Hyde Amendment, the Eleventh Circuit has given "bad

faith" its "ordinary meaning," defining it not simply as "bad judgment or negligence," but rather as "the conscious doing of a wrong because of dishonest purpose or moral obliquity," and as a term that "contemplates a state of mind affirmatively operating with furtive design or ill will.'" *United States v. Gilbert*, 198 F.3d 1293, 1298–99 (11th Cir. 1999) (quoting *Bad Faith*, BLACK'S LAW DICTIONARY (6th ed. 1990)); *accord United States v. Shaygan*, 652 F.3d 1297, 1312 (11th Cir. 2011). Similarly, the Eleventh Circuit has held that "[a] determination of bad faith is warranted" under 28 U.S.C. § 1927 "where an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims." *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003).

Bad faith is plainly "satisfied when an attorney knowingly or recklessly pursues a frivolous claim." *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010); *see also Shaygan*, 652 F.3d at 133. A lawyer's use of factual inaccuracies and "dogged pursuit of a frivolous claim" for recusal may also "indicate[] bad faith." *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1274–77 (11th Cir. 2009).

## B. Findings

Having reviewed the Respondents' motion, the filings they've asked the Court to notice, and the full record of *Williamson*, the Court is persuaded that their motion

13

serves no legitimate purpose. The Court has reached this conclusion for four independent reasons:

(1)    The *Williamson* proceedings are irrelevant to these proceedings' central question: whether Eagan and Doss engaged in misconduct. Indeed, Eagan and Doss didn't even know about *Williamson* at the time of the misconduct;

(2)    After reading the documents that Eagan and Doss selected to be noticed, it was immediately obvious to the Court—from his decades of experience presiding over criminal cases—that these few filings failed to provide a full and accurate account of the status of the *Williamson* proceedings as of April 15, 2022;

(3)    Notwithstanding the inaccurate and incomplete account these filings would present, Eagan and Doss asked the Court to take notice of only those documents and the docket sheet and no others;

(4)    In the motion, Eagan and Doss assert falsely and without support that the Panel "referenced" its explanation about the criminal proceedings "as grounds for misconduct findings in the Final Report of Inquiry." Doc. 571 at 2.

What Eagan and Doss's requested documents show is that the jury began deliberating about the defendant's guilt or innocence at 2:15 p.m. on Friday, April 15, 2022, before Judge Axon entered the order transferring *Ladinsky* to the Court at 4:41 p.m. that afternoon. *See Williamson*, Docs. 601, 767, 768, 769. What these materials omit—by excluding the Indictment, among other key filings—is that because of the criminal defendant's opposition to forfeiture, additional and extensive

jury deliberations about specific items and amounts of forfeiture would be required if the jury returned a verdict of guilty.

Filings beyond this cherry-picked selection show that the *Williamson* trial involved four defendants and three criminal cases (2:19-cr-466, 2:20-cr-151, and 2:20-cr-405), one of which was a drug kingpin case. *See Williamson*, Doc. 2, 764, 768; 21 U.S.C. § 853. Crucially, the government before trial had proposed instructing the jury that a guilty verdict would not conclude their service, for they would still need to deliberate on each defendant's forfeiture. *Williamson*, Doc. 579. On April 15, 2022, Judge Axon instructed the jury, and the jury retired to deliberate. *Id.*, Doc. 768 at 18–19. It was not until after the jury returned a guilty verdict on Monday, April 18, 2022, that Mr. Williamson obviated the need for further deliberations by announcing that he would not oppose forfeiture of certain items. *Id.* Doc. 769. Thus, when Judge Axon transferred *Ladinsky* to this Court on April 15, the *Williamson* proceedings were expected to continue well into the following week; indeed, the forfeiture amount for three of the other defendants ultimately required additional testimony. *See id.*, Doc. 772 at 5–20; Doc. 773 at 5–11; Doc. 789 at 6–25.

When the Court took up the motion on June 27, it did not hide the ball—the Court told Eagan, Doss, and their attorneys up front that the motion seemed to have been brought in bad faith and for the sole purpose of supporting a false narrative that

the Panel had misled or outright lied to the attorneys, that Judge Axon had transferred the case improperly, or both. Doc. 640 at 21–23; Doc. 642 at 111–12, 114.

Throughout these proceedings, the Court gave Eagan, Doss, and their attorneys one opportunity after another to explain their motion's basis and the relevance of the information they wanted the Court to notice. *See* Doc. 640 at 8–32; Doc. 642 at 108–19. It expressly raised its concern that the motion's carefully curated list of filings inaccurately reflected the status of the criminal proceedings on April 15, 2022, intentionally omitting filings showing that Judge Axon would have expected the criminal proceedings to continue well into the following week, and why those proceedings would have prevented her from addressing the urgent claims for emergency relief raised in *Walker* and *Ladinsky*. *See* Doc. 640 at 15–32; Doc. 642 at 109–19. But the Respondents and their attorneys were not responsive to the Court's transparent concerns.

The first lawyer to argue for Eagan and Doss was their law partner Chris King. *See* Doc. 640 at 8–24. Asked whether he and his partners "thoroughly went through the court record in Judge Axon's criminal trial before filing this motion," King answered unequivocally: "We sure did." *Id.* at 13. Moments later, however, King walked back this claim, explaining that he had "reviewed none of the record other than the transcript entries that we're offering and the docket sheet and the verdict form," and that Doss had helped him prepare the motion. *Id.* at 13–14.

16

A few minutes later, King declared that he had "been around long enough to know that [the Court has] got something in [its] pocket that [King did not] know about." *Id.* at 15. The Court enumerated key facts about Judge Axon's criminal case that the Respondents' motion had obfuscated—namely, that *Williamson* was a multi-defendant drug kingpin case, and that its jury deliberations, which began on April 15, were then likely to be just the first phase of the trial's jury deliberations. *Id.* at 15–21.

But even when confronted with the facts that his motion seemed to be peddling a false narrative—that Judge Axon used a criminal trial to justify a transfer of the Respondents' case to Judge Burke for sinister reasons—and that the Respondents had not asked the Court to notice the full record or, at the very least, a host of other filings necessary to understand the status of Judge Axon's criminal proceedings on the afternoon of April 15, King pushed back. There could be no concern about selectivity, he falsely claimed, because the motion asked the Court to take judicial notice of the "entire docket." *See id.* at 16, 23.

Moving on, the Court asked King about the motion's purpose. *See id.* at 23. Although King insisted that he was "not attempting to smear anybody," *id.*, at no point during this colloquy did King offer a legitimate reason for the motion or satisfactorily explain the relevance of the information sought to be noticed, *see id.* at 23–24.

Rather, the reason King gave for the motion was that he and his law partners believed the Panel had "based its discrediting of the lawyers' questions they had about the mechanics of the transfer and . . . on their confusion about the state of Judge Axon's trial." *Id.* at 11. To amplify the point, he said they knew "the Court wants all the facts. And we believe it would be appropriate for the Court to have the actual materials that show the actual timeline of Judge Axon's trial." *Id.*

Next up was the motion's signatory attorney, Sam Franklin. *See id.* at 24. Like King, at no point during his colloquy with the Court did Franklin articulate a legitimate purpose for the motion. *See id.* at 24–28. The Court asked Franklin whether the information about the possibility of further jury deliberations on the question of forfeiture was "highly relevant to the narrative that's trying to be told in your motion," and he responded that he did not "see that the same way" as the Court. *Id.* at 25.

When pressed to explain himself, Franklin offered only an elliptical response: During the Panel's inquiry, he said, "it was repeatedly posited that Judge Axon did not have the bandwidth to take on anything about the *Ladinsky* trial." *Id.* But Franklin would not accept the logical consequence of this premise—that he and his partners had offered the motion to suggest that Judge Axon *did* have the bandwidth to handle *Ladinsky*. Spelling the argument out, the Court asked Franklin whether he and his partners had offered the motion to rebut the Panel's explanation or otherwise

impugn Judge Axon's handling of the transfer. *See id.* at 26. Franklin again responded evasively: "We were very careful in the way we wrote the motion not to make any kind of accusations." *Id.* at 26–27.

The third lawyer to argue the motion was Harlan Prater. *See id.* at 28. Prater emphasized that he was "very uncomfortable," and that if the Court believed their motion did not include all relevant materials from *Williamson*, it could take judicial notice of materials above and beyond those cited in the motion. *Id.* at 28–29. As to the motion's purpose, Prater said only that "[w]e, as lawyers, brought to your attention what we thought was important," and that it was not his intention to cast any judge in a light of dishonesty. *Id.* at 30. His demeanor and manner of speaking, however, gave away where his heart was. In twenty-five years as a judge of one court or another, the Court has never seen an attorney so thoroughly agonized to be making an argument that he so wholly disbelieved.

Having heard from their attorneys, the Court next addressed the Respondents themselves. *See id* at 30–31. The Court first asked Doss whether he remained "comfortable with th[e] filing" after hearing the Court's concern about the omitted materials. *Id.* at 30. Doss responded "yes," emphasizing (inaccurately) that the motion asked the Court "to take judicial notice of the whole record." *Id.* at 30–31.

The Court turned next to Eagan. *See id.* at 31. When asked whether she regretted that her "attorney did not point out these relevant parts of the record"—

that the Court had to "point them out and find them [it]self"—Eagan said that she did not. *Id.* In fact, she said she was "very comfortable with [her] attorneys' presentation." *Id.*

After these exchanges, King said that one of the transcripts identified by the motion contained the "information that the Court says we failed to point out." *Id.* at 32; *see also* Doc. 642 at 113 ("I recall that the Court found the withdrawal of the forfeiture issue in the Monday transcript, which we did submit."). Franklin emphasized that neither he nor his partners had "[ever] criticized anything about what [Judge Axon] did" when she transferred *Ladinsky* to the Court. Doc.640 at 32.

At this point in the hearing, the Respondents had still failed to provide a legitimate, credible explanation for the Respondents' motion for the Court to take judicial notice. It had heard from five partners from Lightfoot, Franklin & White, none of whom had been able to explain why the status of Judge Axon's criminal trial on April 15, 2022, had anything to do with whether Eagan and Doss judge-shopped by dismissing their case and filing a materially similar action with new plaintiffs in another district court. The absence of a legitimate, credible explanation after hours of testimony only deepened the Court's concern that the Respondents had filed their motion solely to impugn Judge Axon or the Panel or to distract the Court from potentially sanctionable conduct.

But this was not the only part of the hearing to cause consternation. At least

four additional considerations deepened the Court's concern that Eagan and Doss had filed their motion for the vexatious purposes of maligning the judiciary and distracting the Court:

(1)   Even though the transcript showed that Judge Axon expected the jury to deliberate further on forfeiture, and even when confronted with further information that the criminal proceedings were expected to continue well into the following week, every attorney affiliated with the motion continued to insist that the Panel was either confused or mistaken about Judge Axon's bandwidth to handle *Ladinsky* on an urgent basis. None of them modified or withdrew the motion to address those facts.

(2)   Although they insisted that their motion was not meant to accuse any judge of wrongdoing, the attorneys admittedly knew the motion might be received that way. As Franklin explained during his argument, the team had drafted the motion "very carefully so that it didn't . . . look like any criticism of either Judge Axon or certainly not of your Honor nor of the members of the Panel." *Id.* at 27.

(3)   Some of the attorneys affiliated with the motion erroneously asserted that the motion sought judicial notice of the entire *Williamson* record. It did not. The motion cited only four cherry-picked documents and the docket sheet. *See* Doc. 571.

(4)   Other than Prater, who acknowledged that he was very uncomfortable, no lawyer affiliated with the motion indicated any serious concern for the motion's validity. King inferred from the Court's questions that the motion overlooked something important, but when confronted with the missing facts he merely claimed—falsely—that the motion sought notice for the entire docket. Like the others, he deflected one of the central points of the Court's

questions: the Panel was not confused.

After studying this colloquy overnight, the Court grew increasingly concerned that the Respondents had filed this motion in bad faith, and it decided to return to the matter the next day. *See* Doc. 642 at 108. Thus, on that last day of hearings, the Court corrected counsel's erroneous contention from the day before, noting that their motion had *not* requested judicial notice of the entire *Williamson* record, and it asked Prater directly what the Panel's alleged misconception was. *See id.* at 109.

Prater responded (correctly) that the Panel had told the attorneys the reason why the case was transferred, and he claimed (falsely) that it had "found as misconduct the fact that [his] clients . . . questioned that." *Id.* He emphasized that the motion's purpose was simply to "put[] the evidence, the record into this record. That was it." *Id.* at 110.

The Court gave counsel one last chance to address its concerns. "The only possible relevance I can see for what you submitted," the Court told Prater, was "one of two things." *Id.* at 111. Either "Judge Axon was finished with her trial," so "she should not have transferred *Ladinsky*" to this Court, "or Judge Axon or Judge Proctor were disingenuous with the attorneys." *Id.* at 111–12. Prater insisted that there was "nothing nefarious" about their motion: "With all due respect, Your Honor, that's not accurate. You can draw whatever conclusions you want from what

we've submitted. We didn't lead you in any direction at all. We just wanted the record, in our view, to be complete." *Id.* at 112.

When Prater finished speaking, King followed up with two points. First, he reiterated his belief that "the [P]anel was mistaken in its understanding." *Id.* at 116. Second, he acknowledged that Judge Axon "had a good faith belief" on April 15, 2022, that she was in a trial "which could go on for several more days." *Id.* at 118.

No attorney ever explained why or how the status of Judge Axon's criminal proceedings on April 15, 2022, could be relevant to the central question here— whether Eagan or Doss committed misconduct. The reason for their failure is simple: the status of Judge Axon's criminal proceedings that day had nothing to do with the Respondents' attempts to manipulate the court's random case-assignment procedures by dismissing *Ladinsky* and filing *Eknes-Tucker* with new plaintiffs in another court the next week. Whether *Williamson* wrapped up that Friday afternoon or continued into the next week is simply irrelevant—Eagan and Doss had no notion of the case until May 20, 2022, so nothing about the jury deliberations could have affected their decisions on April 15, 2022, or throughout the following week.

King's explanation of the motion's purpose must be rejected as dishonest for three separate reasons. First, the Panel based neither findings nor analysis on the fact or status of Judge Axon's criminal proceedings. *See* Doc. 339. To the contrary, the Panel acknowledged both in open court and in its Report that none of the responding

23

lawyers knew about Judge Axon's criminal proceedings at the time they dismissed and refiled their cases. *See id.* at 8 n.1. Second, the Panel was not confused. It had all the facts, and it correctly apprehended the "actual timeline" of Judge Axon's criminal proceedings. Finally, the Panel discredited King's partners' explanations for dismissing and refiling their time-sensitive case for a host of reasons, spelled out exhaustively in its Report, none of which concerned *Williamson*. *See* Doc. 339.

Nor can the Court accept Prater's argument that even if the facts to be noticed are irrelevant, the motion is legitimate because it was filed simply to have a complete record. *See* Doc. 642 at 112. It was plain from the tenor and substance of all five attorneys' statements that the record was of no importance to their case. Each attorney was given the chance to change his argument, but each brazenly insisted that the Panel was mistaken about the true reason that Judge Axon transferred *Ladinsky* here. The attorneys clung to this narrative even when confronted with materials they excluded from their motion, materials establishing that both Judge Axon and the Panel had always correctly understood the status of *Williamson* on April 15, 2022. These attorneys sought neither a complete record nor a complete story. If they had in fact been seeking a complete record, they would not have intentionally omitted from their motion the documents that clearly demonstrated Judge Axon's trial was likely to continue for several more days.

The Court is thus compelled to conclude that Eagan and Doss filed this motion without a legitimate purpose. The next question, then, is whether they filed this motion for a purely vexatious or dishonest purpose—whether, that is, they filed this motion in bad faith.

To begin with, the Court must reject the Respondents' assertions (advanced by King) that they accept that Judge Axon had a "good faith belief" that her criminal proceedings would last well into the week after *Ladinsky*'s transfer. *See* Doc. 642 at 118. If the Respondents truly accepted Judge Axon's good-faith belief, they would have no reason to try to develop evidence that the Panel was mistaken, confused, or dishonest about how *Ladinsky*'s transfer promoted judicial efficiency. If the Respondents accepted that Judge Axon had a good-faith belief, they would have no reason to try to develop evidence that she was lying, and that she did, in fact, have the bandwidth to keep *Ladinsky*. And if the Respondents accepted Judge Axon's good-faith belief, they would have no reason to try to develop any evidence at all about the criminal proceedings, because they had no knowledge of those proceedings when *Ladinsky* was transferred.

The only reason for the Respondents to move the Court to take judicial notice of their selective filings is to put evidence in the record to create a false inference that one or more judges acted improperly. There is no reason to develop evidence (however inaccurate or misleading) that Judge Axon *could* have handled *Ladinsky*

urgently unless the Respondents meant to suggest that she *should* have handled *Ladinsky* and acted improperly when she transferred it. There is no reason to develop evidence (however inaccurate or misleading) that the Panel was mistaken about Judge Axon's reasons for transferring *Ladinsky* unless the Respondents meant to suggest that the Panel was unwittingly or improperly covering up a transfer that should not have occurred. And there is no reason to develop evidence about any of this before this Court unless the Respondents hope to evade sanction (either now or on appeal) on the ground that an improper transfer by Judge Axon justified their sustained, brazen misconduct.

The Respondents and their counsel claim not to be accusing any federal judge of anything improper, but these assertions are transparently false. The Respondents took great pains not to make overt accusations in their filing, but the nefarious purpose implicit in their filing is obvious: they want support, now or on appeal, for a false argument that four federal judges deceived them about their case.

Whether the Respondents hope to use this false narrative to gin up an after-the-fact explanation for Eagan's and Doss's actions, distract the Court from those actions, support appellate review of any sanction imposed, or tell a self-serving story in the court of public opinion, their effort is textbook bad faith. It reflects gross ill will for the court and the proper administration of justice, dishonestly peddles

26

factual inaccuracies about the court and judges, and needlessly obstructs these proceedings with irrelevant matters.

Eagan and Doss are just as responsible for this dishonest motion as Franklin (who signed it) and King and Prater (who argued it). The motion was Doss's idea (and apparently mostly or entirely his work-product), *see* Doc. 640 at 14, and both Eagan and Doss told the Court without hesitation that they were comfortable with King's advocacy on their behalf, *see id.* at 31–32, even as they saw firsthand the Court's grave concerns and their partners' total inability to address them.

What's more, Eagan and Doss have consistently argued that they thought Judge Axon's order transferring *Ladinsky* was anomalous. *See, e.g.*, Doc. 642 at 98–99, 105–07, 134; *Vague*, Doc. 78 at 44, 63. They've sung this tune since the Panel's proceedings began: if they did anything wrong, they say, they couldn't have acted in bad faith, because none of it was their fault; rather, the courts spooked them with a perceived procedural irregularity. This motion is of a piece with that position and a substantial escalation of the Respondents' distraction strategy. Instead of defending themselves by explaining the attorneys' conduct, the Respondents offer selectively curated court records as evidence for a false narrative *about the court and its members*.

The Court has made every effort to give Eagan, Doss, and their counsel the benefit of the doubt, and it has given them chance after chance to reconsider, retract,

or otherwise change their specious arguments. But this filing leaves no room for doubt. Try as it might, the Court cannot discern a legitimate purpose for the Respondents' request. Instead, the Court sees plain as day a remarkable display of ill will and dishonesty and an unyielding, remorseless determination to propagate a false narrative.

At the show-cause hearing, the Court carefully observed the demeanor of every attorney affiliated with this motion. In each one it saw only a dogged insistence of their right to launder falsehoods. Not one of these five experienced attorneys showed an iota of concern for their motion's validity or the soundness of their arguments. The Respondents' contention that they wanted only a complete record is wholly unworthy of belief.

The Court thus concludes that Eagan and Doss brought this motion in bad faith, and therefore **DENIES** the motion on that ground.

## II.    The Court Will Not Take Judicial Notice of Irrelevant Information.

Even if the Court believed that Eagan and Doss might have brought their motion in good faith (they did not), it would deny the motion for an independent reason: the facts the motion asks the Court to notice are irrelevant, and "courts would be foolish to take judicial notice of . . . irrelevant fact[s]." 21B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 5104 (2d ed.) (collecting cases). Federal Rule of Evidence 201 does not expressly address relevance, but "[a]n

irrelevant fact could hardly be an 'adjudicative fact' within the meaning" of that rule. *Id.* The Court knows of no other federal rule or statute that would authorize judicial notice of irrelevant facts, nor is there any good reason to do so.

The Eleventh Circuit has consistently refused to take judicial notice of irrelevant facts, and it has likewise affirmed such refusals by district courts. *See, e.g.*, *Vallot v. Cent. Gulf Lines, Inc.*, 641 F.2d 347, 351 (5th Cir. Apr. 3, 1981) ("Although [statute] requires the contents of the Federal Register be judicially noticed, [a party] cannot demand admission of the publications as evidence in cases such as this one where they have no relevance."); *Philippeaux v. Miami Apartments Invs., LLC*, No. 22-11692, 2023 WL 2989831, at *2 n.1 (11th Cir. Apr. 18, 2023) (denying motion for judicial notice "because the documents at issue are not relevant to this appeal"); *Berber v. Wells Fargo, NA*, 798 F. App'x 476, 483 n.7 (11th Cir. 2020) (denying motion for judicial notice of settlement as irrelevant, where settlement would not change court's evaluations of claims); *United States v. Alindor*, 799 F. App'x 678, 684 (11th Cir. 2020) ("The district court was within its discretion to refuse to take judicial notice of facts that are not relevant to the issues in the case."); *United States v. Mayer*, 760 F. App'x 793, 798 (11th Cir. 2019) (affirming district court's denial of motion to take judicial notice of irrelevant information); *BRE Mariner Marco Town Ctr., LLC v. Zoom Tan, Inc.*, 682 F. App'x 744, 748 n.3 (11th Cir. 2017) (denying motion for judicial notice of irrelevant ordinance).

The Court gave Eagan, Doss, and their attorneys countless chances to explain why the information about Judge Axon's criminal trial was (or even could be) relevant to these disciplinary proceedings. Not one gave a satisfactory answer. After all, there was no satisfactory answer to give. The status of the criminal proceedings on April 15, 2022, unknown to the Respondents on that day, had nothing to do with whether Eagan or Doss engaged in professional misconduct that day and the next week. Neither Eagan nor Doss knew about *Williamson*, and nothing about that case is probative of whether either of them intentionally attempted to manipulate the court's random case-assignment procedures to avoid this Court. In short, there is nothing the Court needs to know about those criminal proceedings to decide whether sanctions are warranted for Eagan or Doss. The motion is thus **DENIED** on the separate and independent ground that the Court will not take judicial notice of irrelevant facts.

## CONCLUSION

In total, eleven attorneys remain in these attorney disciplinary proceedings. Eagan and Doss are the only two who pursued this motion. The Respondents claim to have been "very careful . . . not to make any kind of accusations" in the motion. They weren't nearly careful enough—their motion is nothing more than a dishonorable tactic to distort the record, smear U.S. District Judges Proctor, Watkins, Beaverstock, and Axon, and distract the Court from their own misconduct. It was,

as the Court's forthcoming order explains, wholly of a piece with the rest of their case.

The Respondents' law partners—Chris King, Sam Franklin, and Harlan Prater—have been litigating in the state and federal courts of Alabama for decades. Over long and fruitful careers, they have deservedly earned the trust and respect of their clients, their colleagues, and the federal bench. All the more shocking, then, is their reckless disregard for the reputations they've labored with such care to build.

The Court therefore **ORDERS** as follows:

1.    Respondents Melody H. Eagan And Jeffrey P. Doss's Motion to Have the Court Take Judicial Notice (Doc. 571) is **DENIED.**

**DONE** and **ORDERED** this February 24, 2025.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE