## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIANNA BOE**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-184-LCB** |
| | ) | |
| **STEVE MARSHALL**, *et al.*, | ) | |
| | ) | |
| **Defendants,** | ) | |

## <u>ORDER</u>

This case requires the Court to consider a malignant practice that threatens the orderly administration of justice: judge-shopping. The lead attorneys in this case—a high-profile challenge to Alabama state law—tried to avoid their assigned judge by voluntarily dismissing one case and filing anew with different plaintiffs in a neighboring federal district court. This was not just a strategic litigation decision; it was a calculated effort to subvert the rule of law.

The case began in April 2022, when two teams of attorneys from some of the nation's leading law firms and advocacy groups sued the State of Alabama to block enforcement of a new felony healthcare ban on medical treatments for transgender minors. The attorneys had labored over these cases for nearly two years in advance so they could sue the State as soon as the proposed ban became law; and when the Governor signed the legislation on April 8, 2022, they sued immediately. The first

case, *Ladinsky v. Ivey*, was filed that afternoon, No. 5:22-cv-447-LCB (N.D. Ala. Apr. 8, 2022) ("*Ladinsky*"). The second, *Walker v. Marshall*, was filed the following Monday, No. 5:22-cv-480-LCB (N.D. Ala. Apr. 11, 2022) ("*Walker*"). Both teams felt immense pressure to secure an injunction before the law's May 8 effective date.

But within a week, both teams abandoned their cases. *Walker* and *Ladinsky* were reassigned to this Court on the afternoon of April 15, and less than two hours later each team had voluntarily dismissed its case under Rule 41(a)(1)(A)(i). By their own admission, these attorneys were "try[ing] to game the system": one team abandoned the litigation altogether, while the other dropped everything, regrouped, mustered new plaintiffs, and filed suit in another federal district court for the express purpose of manipulating the courts' random case-assignment procedures to avoid the risk of an unfavorable judgment from this Court. *In re Vague*, 2:22-mc-3977, Doc. 75 at 141.

The newly filed case was reassigned to this Court for a full disposition on the merits and a ruling on the plaintiffs' motion for temporary injunctive relief. The Court received voluminous briefing from all parties, including the United States as plaintiff-intervenor and more than three dozen amici; it took testimonial evidence over three days of hearings; it deliberated. After considering the law and the facts, the Court concluded that the plaintiffs had met their high burden of showing a substantial likelihood that the law in question—Section 4(a)(1)-(3) of Alabama's

Vulnerable Child Compassion and Protection Act—violated the Fourteenth Amendment's Due Process and Equal Protection Clauses. Counsels' misguided fears of prejudice were for naught: the attorneys, who believed their clients' chances of success before this Court were "slim to none," won the emergency injunctive relief they had sought in the first instance. Doc. 640 at 42.

But the plaintiffs' filings in *Walker* and *Ladinsky* sparked concern among the federal bench that counsel had tried either to manipulate or circumvent the random case-assignment procedures for the Northern and Middle Districts of Alabama. In May 2022, a three-judge panel consisting of the chief judges for the Northern, Middle, and Southern Districts of Alabama (or their designees) was convened to investigate their conduct. After six months developing a substantial evidentiary record and eleven months deliberating, the Panel found that eleven lead attorneys from *Walker* and *Ladinsky* (the "Respondents") had committed misconduct by judge-shopping. Doc. 339. On October 3, 2023, the Panel published its findings in a 53-page Final Report of Inquiry, which it referred to this Court for further proceedings. *Id.*

Those proceedings continued from the Panel's referral through the publication of this order. In February 2024, the Court ordered each Respondent to show cause why he or she should not be sanctioned for attempting to manipulate the courts' random case-assignment procedures or misrepresenting key facts to the Panel during

its inquiry. It held several preliminary hearings, conducted extensive motion practice, received thousands of pages of briefs and testimonial evidence, and held three days of show-cause hearings at the end of June 2024.

Now, for the reasons discussed below, the Court **PUBLICLY REPRIMANDS attorneys** Melody Eagan and Jeffrey Doss for their intentional, bad-faith attempts to manipulate the random case assignment procedures for the Northern and Middle Districts of Alabama, **DISQUALIFIES** them from further participation in this case, and **REFERS** the matter of their professional misconduct to the Alabama State Bar. The Court declines to exercise its discretion to suspend Eagan and Doss from practice in the Middle District of Alabama.

Moreover, the Court **PUBLICLY REPRIMANDS** Carl Charles for his repeated, intentional, bad-faith misrepresentations of key facts to the three-judge panel about his call to Judge Thompson's chambers, imposes **MONETARY SANCTIONS** in the amount of **$5,000,** and **REFERS** this matter to the United States Attorney for the Middle District of Alabama and Charles's licensing bar organizations.

***

# TABLE OF CONTENTS

**I.    Background** ..................................................................................**9**

    **A.    The Lawsuits** ...................................................................**9**

          **i.    The Vulnerable Child Compassion and Protection Act.**........**9**

          **ii.    Challenges to the Act.** ................................................**10**

          **iii.    *Ladinsky v. Ivey* is filed in the Northern District of Alabama.** ..................................................................**13**

          **iv.    Three days later, *Walker v. Marshall* is filed in the Middle District of Alabama.** ................................**15**

          **v.    The *Walker* team marks the suit related to a closed case.**....**16**

          **vi.    The *Walker* team calls Judge Thompson's chambers**..........**18**

          **vii.    *Walker* and *Ladinsky* are reassigned to this Court.** ............**23**

          **viii.    Hours after being assigned to this Court, the *Walker* and *Ladinsky* teams simultaneously dismiss their suits under Rule 41(a)(1)(A)(i).** ................................**27**

          **ix.    The *Ladinsky* team plans to refile with new plaintiffs in the Middle District of Alabama**................**34**

          **x.    The *Ladinsky* team files as *Eknes-Tucker v. Ivey* in the Middle District of Alabama and again seeks emergency relief.** ......................................................**38**

          **xi.    The Court enjoins enforcement of the Act.** ..........................**40**

    **B.    Proceedings Before the Three-Judge Panel** ....................................**41**

          **i.    The Chief Judges convene the Panel to investigate whether counsel intentionally manipulated the court's random case-assignment procedures.** ..............................................**41**

          **ii.    The Panel's first hearing on May 20, 2022.** ..........................**43**

          **iii.    Charles testifies four times that he did not call Judge Thompson's chambers, then admits he did.**..........................**48**

iv.     At a status conference the next month, the Respondents object to the Panel's proceedings for the first time and move to terminate the inquiry...........................................................52

v.     The Respondents renew their motion to terminate the inquiry. .................................................................54

vi.     The Panel orders the submission of *in camera* declarations. .................................................................54

vii.     The Respondents oppose the order and again renew their motion to terminate the inquiry. ...............................57

viii.     The Panel holds further hearings, releases twenty-one attorneys, and completes its investigation. ...........................58

ix.     The Panel issues a 53-page Final Report of Inquiry and concludes that eleven Respondents engaged in intentional judge-shopping misconduct. ....................................60

C.     Proceedings Before This Court ............................62

     i.     The Respondents resist dissemination of the Panel's findings. ............................................................62

     ii.     At its first hearing, the Court clarifies the Respondents' misconceptions about the Report and solicits input on next steps. ................................................................66

     iii.     The Panel re-opens *In re Vague* and reassigns the matter to this Court. ...........................................................68

     iv.     The Court issues a show-cause order. ....................69

     v.     The Respondents object to the show-cause order. ...............71

     vi.     The Court unseals the Panel's Report and all filings in *Vague*. ...............................................................72

     vii.     The Court grants the motions for clarification and issues new show-cause orders. ........................................73

     viii.     The Court orders the *Walker* Respondents to produce the Q&A Document; they refuse...................................76

     ix.     Some Respondents apologize for their misconduct. ............79

     x.     Eagan and Doss move the Court to take judicial notice of select documents in Judge Axon's criminal proceedings. ....83

xi.     **The Respondents present additional evidence and argument in final show-cause hearings spanning three days.** ............**85**

**II.**     **A Primer on Judge-Shopping** ...................................................**96**

**III.**    **Standard of Review**.................................................................**101**

**IV.**    **Sanctions Authority and Governing Procedure** ...................**104**

     **A.**     **Inherent Authority to Safeguard the Judicial Process** ...............**104**

     **B.**     **Rule 11 of the Federal Rules of Civil Procedure** ..........................**104**

     **C.**     **Inherent Authority to Impose Sanctions**......................................**106**

**V.**     **Findings of Fact & Conclusions of Law** ...............................**109**

     **A.**     **The *Walker* Respondents** ..........................................................**109**

         **i.**      **Kathleen Hartnett** ...........................................................**109**

         **ii.**     **James Esseks**..................................................................**111**

         **iii.**    **LaTisha Faulks** ..............................................................**112**

         **iv.**    **Carl Charles** ...................................................................**112**

     **B.**     **The *Ladinsky* Respondents** ......................................................**120**

         **i.**      **Michael Shortnacy** .........................................................**120**

         **ii.**     **Scott McCoy**...................................................................**121**

         **iii.**    **Asaf Orr** ..........................................................................**122**

         **iv.**    **Jennifer Levi** ..................................................................**124**

         **v.**      **Shannon Minter**.............................................................**125**

         **vi.**    **Melody Eagan** ................................................................**127**

         **vii.**   **Jeffrey Doss**...................................................................**135**

**VI.**    **Sanctions**.................................................................................**142**

     **A.**     **Available Sanctions** ...................................................................**143**

     **B.**     **Sanctions are necessary for Eagan and Doss, because they attempted to manipulate the court's random case-assignment procedures in bad faith.** ................................................................**144**

         **i.**      **Disqualification and public reprimands are reasonable and appropriate sanctions for Eagan and Doss.**........................**145**

ii.    The Lightfoot Respondents' three arguments against sanctions are meritless. ..........................................151

    a.    The Lightfoot Respondents received constitutionally sufficient due process. ...............................152

        1.    First Objection: The Lightfoot Respondents' Due-Process Rights Attached at the Commencement of the Panel's Proceedings. .156

        2.    Second Objection: The Panel Failed to Provide the Respondents with Adequate Notice of the Particular Conduct Under Investigation. ......160

        3.    Third Objection: The Panel Violated the Respondents' Procedural Due-Process Rights under United States v. Shaygan. .....................161

    b.    Sanctions are appropriate because Eagan and Doss engaged in bad-faith misconduct by attempting to manipulate the random case-assignment procedures of two federal district courts. ....................................171

        1.    Sanctions for bad-faith judge-shopping are consistent with binding and persuasive precedent. ..........................................173

        2.    Rule 41 Does Not Permit Judge-Shopping.....183

        3.    *BellSouth* controls.............................................200

    c.    The Court's holding does not burden ordinary litigation decisions....................................214

    d.    The Lightfoot Respondents Sought to Manipulate the Case-Assignment Procedures Themselves, Not Merely a "Random" Assignment...........................................217

C.    Sanctions are warranted for Charles, because he intentionally misrepresented or otherwise failed to disclose key facts to the Panel..........................................222

D.    Sanctions are unnecessary for the remaining Respondents. ........226

VII.  Conclusion ...............................................226

# I. BACKGROUND

The history of these proceedings comes in three parts. Part A concerns the underlying lawsuits. Part B concerns the three-judge panel's evidentiary inquiry into the Respondents' misconduct, with its six months of hearings and its Final Report of Inquiry. Part C concerns the history of the attorney-misconduct proceedings in this Court, which began with service here of the Final Report of Inquiry, continued with the Court's show-cause orders, and terminates with this order.

## A. The Lawsuits

### i. The Vulnerable Child Compassion and Protection Act.

The Alabama Vulnerable Child Compassion and Protection Act (the "Act"), a state law that criminalizes the prescription or administration of puberty blockers and hormone therapy to transgender minors, was enacted by the Alabama Legislature on April 7, 2022, and signed into law the next day. The cornerstone of the Act, Section 4, imposes Class C felony sanctions for any person who "engage[s] in or cause[s] any of the following practices to be performed upon a minor":

> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>
> (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
>
> (3) Prescribing or administering supraphysiologic doses of estrogen to males.

(4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.

(5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

(6) Removing any healthy or non-diseased body part or tissue, except for a male circumcision.

Ala. Code § 26-26-4. These practices are criminal only if they are performed "for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex," and even then, only "if that appearance or perception is inconsistent with the minor's sex."[1] *Id.*

## ii.    Challenges to the Act.

In 2020, when the Alabama Legislature first considered legislation to ban hormonal and surgical treatments for transgender minors, advocacy groups like the National Center for Lesbian Rights ("NCLR"), the Southern Poverty Law Center ("SPLC"), and the American Civil Liberties Union ("ACLU") began evaluating how best to challenge the proposal if it were to become law. *In re Vague*, No. 2:22-mc-3977-LCB (M.D. Ala. May 10, 2022) ("*Vague*"), Doc. 79 at 12–13, 123, 210; *Vague*,

---

[1] The Act defines "sex" as "the biological state of being female or male, based on sex organs, chromosomes, and endogenous hormone profiles, and is genetically encoded into a person at the moment of conception" and "cannot be changed." Ala. Code § 26-26-2(1).

Doc. 77 at 174.[2] That year, NCLR began assembling a team to challenge the bill's constitutionality and drafting pleadings for the lawsuit it would later file as *Ladinsky v. Ivey*. The Director for NCLR's Transgender Youth Project, Asaf Orr, recruited King & Spalding to join NCLR's challenge as co-counsel and, as local counsel, the Birmingham-based firm of Lightfoot, Franklin & White. *Vague*, Doc. 79 at 12; *Vague*, Doc. 80-1 at 2.

These firms immediately began work on a complaint. *See Vague*, Doc. 79 at 11–14. Orr testified that work early on entailed deciding where to file the lawsuit, and that this inquiry led the team to consider "who sat on the bench in each district and . . . how judges would respond to the types of claims that [they] would be raising." *Vague,* Doc. 79 at 20. The team, he testified, "quickly[] felt confident that the Northern District would be the most appropriate venue," *id.* at 21, because "[t]he plaintiffs were primarily in the Northern District of Alabama," *Vague*, Doc. 74 at 7, and because some members of the team, like Lightfoot's Melody Eagan, were "more familiar with the judges in the Northern District." *Vague*, Doc. 78 at 26.

The bill died on the floor in both 2020 and 2021, but it passed on the last day of the 2022 legislative session. The NCLR-led team testified that the bill's passage caught them "flat-footed"; even though they had been together three years, they had

---

[2] Citations to the docket in this case are styled Doc. ___. Citations to the dockets of other related cases discussed in this order are styled *Case Name*, Doc. ___.

to "scrambl[e]" to get their complaint and their preliminary-injunction motion ready to file. *Vague*, Doc. 79 at 143; *Vague*, Doc. 80-6 at 35.

While NCLR was preparing for *Ladinsky*, the ACLU was preparing to challenge the Act in a competing case that it would later file as *Walker v. Marshall*. *See* Doc. 640 at 87–88. The *Walker* team planned to file its suit in the Middle District of Alabama, where it would mark its case as related to another lawsuit the ACLU was then litigating before Judge Myron Thompson. Doc. 492 at 13. Work on *Walker* continued in 2021, when the ACLU partnered with Kathleen Hartnett of Cooley LLP, Lambda Legal, and the ACLU of Alabama to challenge the revived version of the bill. Doc. 521-1 at 4–5. When the Act passed in 2022, the *Walker* team brought the Transgender Law Center onto the team as well. S*ee Walker v. Marshall*, No. 5:22-cv-480-LCB (N.D. Ala. Apr. 11, 2022) ("*Walker*"), Doc. 1 at 47.

The Act was to take effect on May 8, 2022, so both teams had to move quickly. Shannon Minter testified that his team believed first-filed status was imperative, because they "really wanted . . . to have a chance to shape the case," and if the two were consolidated, they believed the first-filed case would be the one "in the driver's seat" with "more control over the course of the litigation." *Vague*, Doc. 79 at 106–07, 143. Eagan testified that the *Ladinsky* team "knew that the ACLU was looking to challenge the law" too and "rushed" to make sure theirs was the first-filed action. *Vague*, Doc. 78 at 23. Eagan also testified that shortly before filing, the team was

12

approached by another family interested in challenging the law, but given "the time constraints" of filing quickly to beat *Walker* and enjoin the law, the team felt too pressed to "add them into the case"; their plan, according to Eagan, was to file the complaint they'd already prepared, draft an amended complaint and preliminary-injunction motion, and file the latter two within the next week. *Vague*, Doc. 78 at 22–23.

### iii. *Ladinsky v. Ivey* is filed in the Northern District of Alabama.

On April 8, 2022, only a few hours after the Act was signed into law, the team led by NCLR and Lightfoot filed *Ladinsky v. Ivey* in the Northern District of Alabama, winning the race to the courthouse. *Ladinsky v. Ivey*, No. 5:22-cv-447-LCB (N.D. Ala. Apr. 8, 2022) ("*Ladinsky*"), Doc. 1. By this time their legal team had grown to include King & Spalding, Lightfoot, NCLR, GLBTQ Legal Advocates & Defenders ("GLAD"), SPLC, and the Human Rights Campaign Foundation. *See id.* at 33–36. Seventeen of these groups' attorneys signed the complaint, among whom were six of the Respondents: Lightfoot's Melody Eagan and Jeffrey Doss, King & Spalding's Michael Shortnacy, GLAD's Jennifer Levi, NCLR's Asaf Orr, and SPLC's Scott McCoy. *See id.* A seventh Respondent, Shannon Minter of NCLR, was materially involved in the litigation but signed none of its filings. *See Vague*, Doc. 75 at 26–27, 47.

The *Ladinsky* plaintiffs comprised two physicians (Drs. Morissa J. Ladinsky and Hussein D. Abdul-Latif), two transgender minors (John Doe and Mary Roe), and those minors' parents and legal guardians (Robert Roe and Jane Doe).[3] *Ladinsky*, Doc. 1. The *Ladinsky* plaintiffs alleged that the Act was preempted by Section 1557 of the Affordable Care Act and violated their constitutional rights under the Equal Protection and Due Process Clauses, and they sought a declaration of the Act's unconstitutionality and a permanent injunction preventing the Governor of Alabama, the State Attorney General, and the district attorneys for Shelby and Jefferson Counties from enforcing it. *Id.*

Because the complaint was filed after business hours on a Friday, the Clerk of Court did not enter the case on the docket till the morning of April 11. *See id.*; *see also* Doc. 339 at 4–5. At docketing, *Ladinsky* was randomly assigned to Judge Anna M. Manasco, who quickly recused, *Ladinsky*, Doc. 2, and the case was randomly reassigned to Magistrate Judge Staci G. Cornelius, *Ladinsky*, Doc. 3.

Meantime, Doss testified, the *Ladinsky* team had been working "tirelessly" to draft their amended complaint and preliminary-injunction motion, which they expected to file about a week later. *Vague*, Doc. 80-2 at 4. Doss testified that to avoid serving the Defendants twice—once with the original complaint, a second time with

---

[3] As their names suggest, the minors and their parents proceeded pseudonymously.

the amended complaint and preliminary-injunction motion—the team planned to defer service of process until the drafts of these latter filings were finished. *Id.*

Even though the State defendants had not yet appeared in *Ladinsky*, not all parties consented to dispositive jurisdiction by Magistrate Judge Cornelius, and so on April 14 *Ladinsky* was randomly reassigned once more, landing this time with Judge Annemarie Carney Axon. *Ladinsky*, Doc. 11. According to McCoy, Eagan told her colleagues that this was a "good development," because Judge Axon is a mother of school-aged children, and Eagan assumed that one of the Axon children had met LGBTQ children through the local theater. Doc. 640 at 80; *Vague*, Doc. 78 at 47–48.

### iv.  Three days later, *Walker v. Marshall* is filed in the Middle District of Alabama.

*Walker* came on the heels of *Ladinsky*. The *Walker* plaintiffs were two transgender minors and their parents (Jeffrey Walker, Lisa Walker, H.W., Jeffrey White, Christa White, and C.W.), who sought declarations that the Act was unconstitutionally vague and violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment and a permanent injunction to restrain the State Attorney General and the district attorneys for Limestone and Lee Counties from enforcing the Act. *Walker*, Doc. 1.

The *Walker* team filed suit in the Middle District of Alabama on the evening of April 11, and the case was entered on the docket the next morning. *See id.*; *Walker*,

Doc.1-1. The complaint was signed by twenty-one attorneys, including four Respondents: Cooley's Kathleen Hartnett, the ACLU's James Esseks, ACLU Alabama's LaTisha Faulks, and Lambda Legal's Carl Charles. *See Walker*, Doc. 1 at 46–47.

**v.  The *Walker* team marks the suit related to a closed case.**

On the civil cover sheet attached to the complaint, the *Walker* team wrote that their lawsuit was related to *Corbitt v. Taylor*, No. 2:18-cv-0091-MHT-SMD (M.D. Ala. Feb. 6, 2018) ("*Corbitt*"). *See Walker*, Doc. 1-1. *Corbitt* was another case brought by the ACLU in the Middle District of Alabama, challenging the State's policy of requiring proof of gender-reassignment surgery to change the gender marker on one's driver's license; the presiding judge was Judge Myron H. Thompson, who ruled for the plaintiffs. Doc. 492 at 13; *see Corbitt*, Docs. 101, 102. When *Walker* was filed, *Corbitt* was closed because Judge Thompson's ruling was issued in January 2021 and was on appeal to the United States Court of Appeals for the Eleventh Circuit. *See Corbitt v. Taylor*, 513 F. Supp. 3d 1309 (M.D. Ala. 2021); *Corbitt*, Doc. 105.[4] There was a motion for attorneys' fees pending in *Corbitt* at the time.

---

[4] The Eleventh Circuit reversed the judgment for the plaintiffs in September 2024. *Corbitt v. Sec'y of the Ala. L. Enf't Agency*, 115 F.4th 1335, 1341 (11th Cir. 2024).

The Director of the ACLU's LGBTQ & HIV Project, James Esseks, testified that the *Walker* team had a good-faith basis for marking the two suits as related, because "there would be a substantial overlap in science, facts, and legal arguments between the cases." Doc. 492 at 14. According to Esseks, twenty years of litigating cases about the rights of transgender persons had shown him that such cases routinely call for factual evidence on background issues (gender identity, gender dysphoria, social transition, available treatments and side-effects and the like) that plaintiffs submit simply to educate the judge, so Esseks expected some factual evidence for *Walker* to overlap with the factual evidence in *Corbitt*. *Id.* at 14–15.

Similarly, because both suits concerned alleged state-law violations of transgender persons' federal equal-protection rights, and because they believed *Corbitt* to be the only case ever filed in the U.S. District Court for the Middle District of Alabama to assert constitutional discrimination claims on behalf of transgender persons, Esseks testified that the *Walker* team believed the two cases would overlap substantially in law. *Id.* at 15. Esseks further testified that from his experience litigating throughout the country, he believed that marking *Walker* as related to *Corbitt* would put the case before Judge Thompson, whereby Judge Thompson would determine whether the two cases were related. *See id.* at 16–17.

The *Walker* team also concluded that the Eleventh Circuit was likely to remand *Corbitt* to the district court, and the case was therefore still pending.

Doc. 423 at 19; *Vague*, Doc. 77 at 20–21. The *Ladinsky* team, on the other hand, thought the idea that the *Walker* case would go to Judge Thompson was outlandish. *See Vague*, Doc. 79 at 115. McCoy called it a "fantasy," while someone else described it as a "Hail Mary." *Id.* Levi, for her part, "was of the very strong view" that the team had no "basis" to mark the cases as related. *Vague*, Doc. 74 at 13.

Hartnett, moreover, testified that she had previously asked an associate to research the Middle District's standard for case-relatedness, concluding afterwards there was no local rule on point. *Vague*, Doc. 77 at 20. After finding a rule in the Southern District and case law in the Northern, the *Walker* team concluded that if the latter standard applied, *Corbitt* would not be related; but, according to Hartnett, absent guidance from the Local Rules for the Middle District of Alabama, the *Walker* team believed it reasonable to mark *Walker* as related to *Corbitt. Id.*

The *Walker* team acknowledged in their testimony that the putative overlap with *Corbitt* was only one of the reasons they wanted their case before Judge Thompson. Esseks, for instance, testified that he also believed Judge Thompson "would be a favorable judge for the *Walker* case in light of his ruling for the transgender plaintiffs in *Corbitt*." Doc. 492 at 20.

### vi. The *Walker* team calls Judge Thompson's chambers.

According to his declaration, Esseks believed that *Walker*'s civil cover sheet had already put the case before Judge Thompson and wished to alert him they would

18

soon ask for emergency injunctive relief. *Id.* at 22. On the morning of April 12—before *Walker* was entered on the docket or assigned to any judge—Esseks suggested that someone call Judge Thompson's chambers to tell him that the *Walker* plaintiffs were about to file a motion for a preliminary injunction or a temporary restraining order to put him on notice of the "scheduling issue" that the motion would present. *Id.* at 22–23. Carl Charles volunteered. *Id.* at 22.

Around 10:00 that morning, Charles called Judge Thompson's chambers and spoke with his law clerk for about ten minutes. Doc. 492 at 62; Doc. 642 at 22. Charles (eventually) testified that during the call, he notified the law clerk that *Walker* had been filed but not yet assigned a case number, that the team had marked the case as related to *Corbitt*, and that the team "intend[ed] to file a motion for a TRO and/or preliminary injunction later" that day. Doc. 642 at 15–16; Doc. 525-1. Charles further testified that he reported the call to his colleagues; by then, however, *Walker* had been randomly assigned to Chief Judge Emily C. Marks. Doc. 492 at 63; *see Walker*, Doc. 1.

According to Charles, Hartnett learned shortly afterwards of *Walker*'s assignment to Chief Judge Marks and shared her discovery with the team. Doc. 492 at 63. Surprised by the news, a Cooley associate called the Clerk of Court for the Middle District of Alabama and learned that to relate the case to *Corbitt*, the *Walker* team would need to file a motion with Chief Judge Marks. Doc. 521-1 at 11. The

19

*Walker* team moved that evening to reassign the case to Judge Thompson. *Walker*, Doc. 8. Minutes later, the team moved for a temporary restraining order or preliminary injunction to block enforcement of the Act. *Walker*, Doc. 9.

Although the case was now before Chief Judge Marks, no one called her chambers to alert her to the impending request for a TRO. Doc. 492 at 25. According to Esseks's testimony, the disparity in treatment between Judge Thompson and Chief Judge Marks had nothing to do with influencing Judge Thompson to take the case; rather, it was because (1) the *Walker* team lacked the bandwidth to make the call, as they were now drafting both the motion for a preliminary injunction and temporary restraining order and a motion to relate *Walker* to *Corbitt*, and (2) Esseks himself was "unsettle[ed]" about his team's fundamental misunderstanding of local practice in the Middle District of Alabama. *Id.*

Regardless, Chief Judge Marks ordered the *Walker* plaintiffs the next day to show cause why the case should not be transferred under 28 U.S.C. § 1404(a) to the Northern District of Alabama, where *Ladinsky*, the first-filed action, was pending, and where, "in the interest of justice, . . . it may be decided with *Ladinsky* to avoid the possibility of conflicting rulings, and to conserve judicial resources." *Walker*, Doc. 3.

Counsel for both groups of plaintiffs held a conference call around 5:00 that evening to discuss the prospect of consolidating their cases. *See Vague*, Doc. 80-1 at

20

5. According to Eagan's testimony, *Walker* counsel reported during that call that they planned to stay in the Middle District and seek a transfer to Judge Thompson, while *Ladinsky* counsel insisted they were happy in the Northern District. *Vague*, Doc. 78 at 37. Eagan testified that members of the *Walker* team also used the call to solicit *Ladinsky* counsel's opinions on the judges of the Northern District. *Id.* at 37–38. Though she stopped short of a full roster, Eagan testified that she offered them her "personal opinion on how [she] thought [the] judges [of the Northern District of Alabama] might receive [their] clients" and how those judges might receive the "controversial issues" raised by their case, which "people have very strong personal opinions about." *Id.* at 38–39. For instance, she testified that Judge Axon was deemed a "favorable draw," because she thought "the whole parental rights issue, the right to make medical decisions for your children, would potentially resonate with her" as a mother. *Id.* at 47–48. On the other end of the spectrum, testified Eagan, was this Court, whose history as a state-court judge implied a social conservatism that would prevent him from "relat[ing] well to [her] clients." *Id.* at 49.

> Judge Burke I viewed as a conservative judge. I was familiar—and this is my personal opinion, please understand. I knew that he had been involved in Alabama politics and had been elected to office in state politics, and my view of, if he had been elected, that he is likely either socially conservative or gives the appearance of being socially conservative. And with the controversial issues that were involved here, I had some questions and concerns about whether Judge Burke would relate well to our clients or also what his personal views would be on

> these issues. I did not know what they were, but that was
> just my impression, is that I had concerns about how he
> would receive these issues from a personal standpoint.

*Id.* Given these impressions, Eagan testified that if she were ranking the draws, she "would have put [this Court] toward the bottom of the list" of judges in the Northern District of Alabama. *Id.* at 50.

According to Hartnett, the *Walker* team was tempted to resist Chief Judge Marks's transfer order and oppose consolidation with *Ladinsky* because they preferred to litigate before Judge Thompson, but they "sense[d]" from Judge Marks's *sua sponte* order that *Walker* "was inevitably going to be transferred" to the Northern District, so they soon opted to consent. Doc. 521-1 at 11; *Vague*, Doc. 77 at 41; *see also* Doc. 521-1 at 12–13. On April 14, the *Walker* team responded to Judge Marks's show-cause order and withdrew their motion to reassign *Walker* to Judge Thompson. *See Walker*, Doc. 18. The plaintiffs' interest, they said, was "in the expeditious injunction of the unconstitutional law they challenge," so they would "seek to pursue their motion for this preliminary relief expeditiously in the Northern District." *Id.* at 3.

For the *Ladinsky* team's part, Doss testified that Judge Axon's assignment "made sense," because "Judge Axon sits in Birmingham," "the *Ladinsky* Litigation was a Southern Division case," and "many of [the case's] plaintiffs resided within the Southern Division." *Vague*, Doc. 80-2 at 5. Moreover, testified Doss, the

proximity of the Birmingham courthouse to Lightfoot's office meant the case, a "pro bono matter," would "remain[] economical." *Id.*

### vii.  *Walker* and *Ladinsky* are reassigned to this Court.

On the morning of April 15, "the pandemonium" began. *Vague*, Doc. 78 at 51. Chief Judge Marks transferred *Walker* to the Northern District of Alabama, a district in which "it might have been brought, . . . and where it [could] be decided with *Ladinsky* to avoid the possibility of conflicting rulings." *Walker*, Doc. 20 at 2. In her transfer order, Chief Judge Marks noted that "[a]lthough the claims [were] not identical," *Walker* and *Ladinsky* both "raise[d] overlapping issues," and *Ladinsky*, the first-filed of the two, was filed in the Northern District. *Id.* at 1. Since one of the defendants named in *Walker* was the district attorney of Limestone County, a county within the Northern District, *Walker* "could have been brought in the Northern District of Alabama" under 28 U.S.C. § 1391, "as a defendant resides in that district and all defendants are residents of Alabama." *Id.* at 1 n.1. Even so, because the *Ladinsky* parties were not before her, Chief Judge Marks expressly "ma[de] no finding on the issues of consolidation." *Id.* at 2.

The case was then transferred to the Northern District of Alabama and docketed in the Northeastern Division, where the only parties from the Northern District named in the suit resided, rather than the Southern Division, where *Ladinsky* was pending. *See Walker*, Doc. 1; *Ladinsky*, Doc. 1. Since the *Walker* team had not

designated a division in the Northern District and no findings had yet been made as to consolidation with *Ladinsky*, its assignment in the Northeastern Division was dictated by party residence, and the case was randomly assigned to this Court. *See Walker*, Doc. 21.

As a stranger to the Northern District's case-assignment procedures, Esseks testified that he and his team expected *Walker* to be assigned directly to Judge Axon for consolidation with *Ladinsky*. Doc. 492 at 39, 42; *see also Vague*, Doc. 80-16 at 7–8. When it was not, a member of the *Walker* team called the Court's deputy clerk, asked how to request that the case be transferred to Judge Axon, and learned that the onus lay with the *Ladinsky* team to move Judge Axon to consolidate the cases. *Vague*, Doc. 80-16 at 8. Charles thus called Levi to ask whether the *Ladinsky* attorneys would object to having *Walker* transferred to Judge Axon and learned they would not. *Vague*, Doc. 80-6 at 10. The *Walker* team prepared a motion to transfer and consolidate, emailing their draft to Eagan around 3:15 that afternoon for the *Ladinsky* team's review. *Vague*, Doc. 80-1 at 6. Soon after, however, attorneys for both teams of plaintiffs learned that the State had been preparing to file its own motion to consolidate *Walker* with *Ladinsky* before Judge Axon. *Id.* at 7–8. Neither team opposed the motion: indeed, Eagan testified that rather than file *Walker*'s draft, she suggested the State simply say the parties consented to the State's motion, since theirs was ready to go. *Id.*; *Vague*, Doc. 78 at 69–70.

Then came two orders. The first issued from this Court at 4:07 that afternoon, when it set *Walker*, the only of the two cases then before it, for an in-person status conference "to discuss the status of the case, not to argue the merits of the motion for injunctive relief," at 10:00 a.m. the following Monday in Huntsville, Alabama. *Walker*, Doc. 22. The second issued from Judge Axon, who was on the fourth day of a complex, four-defendant criminal trial she then expected to last two weeks. *See* Doc. 339 at 8. As the judge presiding over the first-filed case (which did not yet have a pending motion for a TRO or preliminary injunctive relief), Judge Axon transferred *Ladinsky* to this Court at 4:41 that afternoon "[i]n the interest of efficiency and judicial economy." *Ladinsky*, Doc. 14.

When the order came through, Hartnett was on the phone with the State's attorneys to confirm their plan to move for consolidation before Judge Axon and discuss how best to let this Court know of the pending motion for consolidation, given Monday's status conference in *Walker*. Doc. 521-1 at 29. Hartnett testified that the State learned of the transfer midway through the call, nixing their plan to consolidate before Judge Axon on the spot. *Id.* at 29–30. Hartnett shared the news with her *Walker* colleagues, and the State emailed the *Ladinsky* team at 4:50 to make clear the State no longer planned to file its motion. *Vague*, Doc. 80-1 at 8.

Then all hell broke loose. Though Judge Axon had specified that *Ladinsky* was being transferred to this Court for reasons of "efficiency and judicial economy,"

*Ladinsky*, Doc. 14, Eagan and Doss testified after the fact that the order "made no sense" to them, seeming as though *Ladinsky* "had lost [its] random assignment" and "gone through a different process than what [they] understood the process in the Northern District to be." Doc. 642 at 84; *Vague*, Doc. 80-2 at 7.

The *Walker* team was no less distressed. Hartnett, for instance, testified that she suddenly became "concerned" about a host of issues. Doc. 521-1 at 30–31. Although her team filed a motion seeking a TRO, Hartnett testified she was concerned that no senior lawyer would be able to travel to Huntsville (though its airport is far more accessible than Montgomery's) to attend the Monday morning status conference, which she worried might "become a substantive discussion of the case." *Id.* at 30. Although *Walker*'s local counsel (LaTisha Faulks) was available to attend the status conference, Hartnett testified that she came "to have serious questions about [Faulks's] capacity . . . to handle [the case] on her own" at that status conference. *Id.* at 30–31. And although the *Walker* team had only minutes earlier agreed to consolidate its lawsuit with *Ladinsky*, Hartnett testified that she was concerned that the *Walker* team might not be able to "adequately coordinate" strategy with the *Ladinsky* team in the three days before the status conference. *Id.* at 31. She also grew concerned, she testified, "about the sudden, unexpected, and unexplained assignment of both *Walker* and *Ladinsky* to Judge Burke, whom [she]

did not know and had not personally researched, but about whom others had expressed significant concern." *Id.*

### viii. Hours after being assigned to this Court, the *Walker* and *Ladinsky* teams simultaneously dismiss their suits under Rule 41(a)(1)(A)(i).

With both cases assigned to this Court, the *Walker* and *Ladinsky* teams began to discuss whether to voluntarily dismiss their suits under Federal Rule of Civil Procedure 41(a)(1)(A)(i). *Vague*, Doc. 78 at 105. Hartnett testified that the prospect of dismissal was raised by *Walker* counsel as soon as the team learned that *Ladinsky* might dismiss their case; among the *Ladinsky* team, it was raised first by Minter shortly before 5:00 in a one-on-one call with Orr. *Vague*, Doc. 77 at 75–77, 80, 82–84; *Vague*, Doc. 80-6 at 38, 54. Orr testified that he was "concern[ed]," and cautioned Minter "that dismissing *Ladinsky* and refiling a new case could be perceived as judge shopping." Doc. 640 at 38–39.

The risk his team might be seen to be judge-shopping was "a big deal," Minter testified, and he agreed the attorneys would "need to be very careful about that." *Vague*, Doc. 79 at 164. Even so, Orr testified that Minter soon convinced him on the call that there were other "substantive, and even dispositive, reasons for dismissing *Ladinsky*," including the team's concern about "the unexplained process by which *Ladinsky* was reassigned to Judge Burke." *Vague*, Doc. 80-6 at 54.

Around 5:00 that afternoon, several members of the *Ladinsky* team—including Eagan, Doss, Shortnacy, and Minter—held a video conference. Doc. 636 at 19, 23–24; *see Vague*, Doc. 78 at 88. Eagan testified that a chief point of discussion was the team's concerns that the *Walker* litigation might be "moving on a faster track" than their case, because the other team had filed their preliminary-injunction motion. *Vague*, Doc. 78 at 62. And according to Doss, maintaining their first-filed status was "[a]n important strategic goal" for the *Ladinsky* team, and they had become concerned that *Walker* "was inching ahead." *Id.* at 242. Minter similarly testified that it was "hard to contemplate losing the benefit" of the "enormous amount of work" they had put in over the preceding two years, because he "genuinely believed" the *Ladinsky* team's strategy—not *Walker*'s—"would maximize [their] chances of success." Doc. 640 at 201.

The team also discussed their comparative assessments of Judge Axon and this Court. On this front, Shortnacy testified that the team deferred to Eagan and Doss, who knew the Alabama judges better than the rest of the team and whose assessments they had come to trust. *See, e.g.*, Doc. 636 at 9–11. McCoy testified that the team had been "happy to proceed in front of" Judge Axon, *Vague*, Doc. 79 at 186, with whom Eagan "was very comfortable" and whom she considered "a favorable draw," *Vague*, Doc. 78 at 47–48. But according to Orr, the team had "grave concerns" about this Court. *Vague*, Doc. 79 at 71. Doss, for instance, testified that

he believed "it would be very difficult" to prevail in this Court, while the opinions Eagan voiced on that call left Orr with "the impression that . . . the prospects of success were slim to none" and McCoy with the feeling that their prospects "were dim." *Vague,* Doc. 78 at 249; Doc. 640 at 42, 83.

Moving on, Eagan and Doss both testified that their decision to dismiss *Ladinsky* rested on more than just their judge-driven anxieties. Eagan testified that she believed the transfer to be "contrary to the established process in the Northern District relating to first-filed cases and consolidation of related matters—procedures [she] assumed were intended to protect the random assignment of cases." *Vague*, Doc. 80-1 at 8. Doss testified that he was concerned with "how the *Ladinsky* case ended up in front of Judge Burke." *Vague*, Doc. 78 at 252. The case's procedural history, he testified, belied their "very unusual circumstances": they "had a politically sensitive case, [and they] had an appearance of a deviation from the rule of how the first-filed case procedure would work." *Id.* at 242–43.

Ultimately, Doss testified, the *Ladinsky* team "took into account everything." *Id.* "They took into account the venue," they "took into account the *Walker* litigation," and they "took into account the unusual nature of how the case was assigned." *Id.* And "because of the way the case got to [this Court]," Doss testified, the *Ladinsky* team thought "it looked like the standard procedure had not been

followed." *Id.* at 243. For Doss, this "unlocked . . . a different analysis of the situation." *Id.*

In their final analysis, the team concluded that the transfer order was, in McCoy's words, "very suspicious." *Vague*, Doc. 80-6 at 28. McCoy testified "that it looked to [him] like Judge Burke was trying to grab the case outside of the normal course." *Id.* at 28–29. Eagan gave similar testimony, summarizing the team's concerns before cutting herself short: "gosh, maybe Judge Burke really wants this case, and somehow he decided—he got—but, again, it was speculation." *Vague*, Doc. 78 at 137. Doss testified that he also thought "the case was being almost pulled over to him," a fact the team "did take into account" when evaluating their "prospects of potential success based on what we knew of him." *Id.* at 268.

Indeed, Eagan, Doss, and other Lightfoot attorneys had grown so suspicious of the transfer order that Sam Franklin, one of the firm's founding partners who was not then involved in the litigation, called his colleagues about "the weirdest thing" that had just happened in *Ladinsky*. *Vague*, Doc. 75 at 131–32. Those colleagues, Barry Ragsdale and Bobby Segall, attorneys who were not party to *Ladinsky* or *Walker* but now represent several Respondents in these attorney-disciplinary proceedings, would later tell the three-judge panel that Franklin asked for their thoughts on the fact that his firm's case, *Ladinsky*, had been "assigned to the second-filed judge, not the first-filed judge." *Id.* at 132, 140. According to his recapitulation

of the call, Ragsdale responded that he told Franklin the transfer was "out of the ordinary." *Id.* at 132. Indeed, he said that "it looked suspicious" to him "that a case would get transferred with no order, no notation on the record, nothing, but now had been transferred to a judge who wouldn't have got it in the normal course of events." *Id.*

Shortnacy testified that he "floated the idea" that they move for reconsideration of the transfer order before Judge Axon. *Vague*, Doc. 78 at 229; Doc. 636 at 23. This suggestion was quickly rebuffed, he testified, as the team concluded that Judge Axon had lost jurisdiction over the case. Doc. 636 at 23. Eagan testified that this meant that the team "could not identify any acceptable means [of] determin[ing] how or why *Ladinsky* was transferred to Judge Burke," and "considering the inexplicable chain of events and the predicament [they] were facing"—namely, that they "would be stuck"—the *Ladinsky* team concluded that "the best solution" would be to voluntarily dismiss their case under Rule 41(a)(1)(A)(i). *Vague*, Doc. 80-1 at 9; *Vague*, Doc. 78 at 85. Just hours after agreeing to the State's motion to consolidate the cases, Doss urged the team to dismiss *Ladinsky* under Rule 41 and file a new lawsuit later. *See* Doc. 78 at 244–45. According to Doss, this would "get[] the case back on track." *Vague*, Doc. 80-2 at 15–16.

31

Around the same time, the *Walker* team was on Zoom in its own post-transfer huddle when Minter told Hartnett over the phone that his team was considering dismissal. *Vague*, Doc. 77 at 75–77, 80, 82–84. This news planted the seed with the *Walker* team, Hartnett testified, who quickly decided they would dismiss too. *Id.* As discussed above, Hartnett further testified that they believed dismissal was necessary for five reasons at the time. *See supra* pp. 28–29 (citing Doc. 521-1 at 30–31). Most importantly, Hartnett felt it would be difficult to "adequately coordinate with *Ladinsky* counsel regarding strategy" before the status conference (even though they had previously consented to consolidate their cases). *Id.*

Esseks testified that his reasons differed from Hartnett's. "In no world," he said, would the timing of the status conference have been "a reason to dismiss the case." Doc. 640 at 101. Even though the status conference was set on short notice, Esseks testified that he would have driven to Huntsville that weekend himself. *Id.* Four other factors, however, did pique his concern. Doc. 492 at 31. First, he feared that the teams wouldn't be able to collaborate effectively (even though they'd recently consented to consolidation). *Id.* Second, he feared the threat of an answer from the State might limit their right to dismiss. *Id.* Third, he was concerned about "the unexplained transfer of *Ladinsky* from Judge Axon to Judge Burke to be

consolidated with *Walker*." *Id.* And fourth, he was concerned about the case's assignment to this Court. *Id.*[5]

By 6:00 p.m., testified Hartnett, the two teams had "independently" concluded that dismissal was in their clients' bests interest. *Vague*, Doc. 77 at 75–77, 80, 82–85. According to Eagan, there was a "vision" that the teams would "combin[e]" their efforts in a joint lawsuit against the State—or at least that they would discuss next steps over the weekend. *Vague*, Doc. 78 at 95. Per Hartnett, no one doubted that if the teams couldn't work together, "someone" would pursue their challenge to the Act. *Vague*, Doc. 77 at 83–84.

Eagan testified that if both teams were to dismiss, it was crucial that *Walker* be the first to go—she wanted a "guarantee" that her team wasn't going to dismiss their case only for *Walker* counsel to have a change of heart—so Doss and Hartnett coordinated the timing of dismissal. *Vague*, Doc. 78 at 94, 266. There is no testimony to suggest that anyone on the *Ladinsky* team ever considered the reverse (that the *Walker* team might dismiss and the *Ladinsky* team would not) even though it would have guaranteed the preservation of their first-filed status.

Similarly, Hartnett testified to a "sense" on the *Walker* team that *Ladinsky* was "there first," so as a "professional courtesy" her team "ma[de] sure [they] both

---

[5] Esseks alluded in his testimony to a fifth reason that was voiced by one of the families, but he suppressed any explanation for reasons of attorney-client privilege. Doc. 492 at 31.

dismiss[ed] together." *Vague*, Doc. 77 at 84. Members of both teams drafted their notices of dismissal, and according to Orr, the *Ladinsky* team secured their clients' consent to dismiss. *Vague*, Doc. 79 at 57. The *Walker* team, on the other hand, did not contact their clients, and according to Charles, they proceeded without their clients' consent. *Vague*, Doc. 77 at 166.

At 6:24 that evening, the *Walker* plaintiffs voluntarily dismissed their case under Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. *Walker*, Doc. 23. Nine minutes later, the *Ladinsky* plaintiffs dismissed theirs too. *Ladinsky*, Doc. 15.

### ix. The *Ladinsky* team plans to refile with new plaintiffs in the Middle District of Alabama.

Inseparable from the *Ladinsky* team's plan to dismiss was their plan "to file another case." *Vague*, Doc. 78 at 91. Where they would file it, whether they'd join forces with *Walker* counsel, and whether old plaintiffs would join the suit or new plaintiffs would be brought in were all questions still to be answered. *Id.* Minter testified that the team first considered simply refiling in the Northern District with the same plaintiffs to "wipe the slate clean" by dismissing under Rule 41 but filing in a new division lest they draw or be reassigned to this Court. *Vague*, Doc. 79 at 156–57.

According to Eagan, those plans evolved in continuing discussions on Friday evening, when she and Doss began to consider judges in both the Northern and Middle Districts, evaluating each in turn, and predicting how the Middle District

34

judges would "receive these issues." *Vague*, Doc. 78 at 92–93. After two years of unswerving plans to file in the Northern District, a commitment to the State to consent to consolidation, a hairpin turn to dismiss their cases, and with the Act's effective date fast approaching, the *Ladinsky* team decided in a few short hours that evening to pursue a different course altogether.

McCoy testified that they "were wary of the procedural problems that [they] had faced in the *Ladinsky* case, and because [they] were worried about drawing Judge Burke again"—they "were uncertain as to whether he was associated with the procedural irregularities" Friday afternoon—the team chose instead to file their new case with new plaintiffs in the Middle District of Alabama. *Vague*, Doc. 80-6 at 11. There, McCoy testified, they "expected the ordinary, random assignment process to work," and there they "would accept" their assigned judge. *Vague*, Doc. 80-6 at 11.

Eagan likewise testified about the *Ladinksy* team's dim view of both this Court and the Northern District. Eagan acknowledged that *Walker* was randomly assigned to this Court, and that either *Walker* or *Ladinsky* would have to be reassigned to consolidate the cases, but she insisted anyway that the *Ladinsky* team decided to file their new lawsuit in the Middle District to "increase [their] chances of getting a randomly assigned judge." Doc. 642 at 104.

On the morning of Saturday, April 16, the leaders of both teams' advocacy groups—all except the Southern Poverty Law Center—convened by teleconference

to discuss their "next steps" and the prospect of "join[ing] forces [to] file a new case in Alabama." *Vague*, Doc. 80-7 at 14; *Vague*, Doc. 79 at 205. The call, Minter testified, "did not go well." *Vague*, Doc. 79 at 165. The teams' "complicated relationship dynamics," testified Esseks, and their "differences of opinion" on matters of "case strategy and decision-making structure" made collaboration all but impossible. *Vague*, Doc. 80-7 at 14. Levi testified that the call ended "with no agreements." *Vague*, Doc. 74 at 35.

After this call, Esseks said that he told the *Walker* team the ACLU would not "go forward" with its challenge to the Act. *Vague*, Doc. 80-7 at 14 The rest of the team soon reached the same conclusion, according to Minter—*Walker* counsel was out. *Vague*, Doc. 77 at 230–36.

But the *Ladinsky* team pressed on. According to Eagan, the team decided over the weekend to file their new lawsuit alone and began work on the complaint right away. *Vague*, Doc. 80-1 at 10–11; *accord Vague*, Doc. 79 at 167. By then, word had reached the media that both lawsuits challenging the Act had been dismissed, and a reporter from AL.com emailed Eagan for a comment on "whether there were plans to refile the[ir] lawsuit." *Vague*, Doc. 80-1 at 11. Her reply was quoted in an article that ran that evening: "We do plan to refile imminently, to challenge this law that criminalizes medical treatment accepted as the standard of care in the medical profession and deprives parents of their right to choose such medical care for their

children." Paul Gattis, *Lawsuits Seeking To Overturn New Alabama Transgender Law Dropped, Could Be Refiled*, AL.com (Apr. 16, 2022), https://perma.cc/BU8R-UD8T.

According to Doss's testimony, the *Ladinsky* team worked through the holiday weekend to prepare their new case. *Vague*, Doc. 80-2 at 10. Eagan testified that on Easter Sunday, the team conclusively decided they would file the new case in the Middle District of Alabama with a new slate of plaintiffs. *Vague*, Doc. 80-1 at 12. Eagan testified that in light of "the events of April 15," she chose to file in a new district to keep the case from being "taken out of the random assignment process and assigned to Judge Burke," since "all [their] questions about how *Ladinsky* had ended up before Judge Burke remained unanswered," and she chose to file with new plaintiffs to avoid accusations of "judge-shopping." *Id.* She and Doss both testified that "the cleanest path" was thus "to a file a new action with new plaintiffs," which would "provide a clean, fresh start after the procedural issues that arose in the *Ladinsky* Litigation." *Id.*; *Vague*, Doc. 80-2 at 16.

On Monday morning, Eagan reiterated to another publication, the Montgomery Advertiser, that her team would "file a new case in the immediate future." Brian Lyman, *Attorney: Plaintiffs Challenging Alabama's Ban On Transgender Medicine Plan New Case*, Montgomery Advertiser (Apr. 18, 2022), https://perma.cc/3ZXS-UNJG.

The coordinated dismissals and press statements caught this Court's attention, and on Monday afternoon the Court entered an order closing *Walker* and denying the plaintiffs' motion for TRO as moot. *Walker*, Doc. 24 at 3. In that order, the Court related *Walker*'s filing activity, the coordinated dismissals, and Eagan's statement to AL.com, observing that plaintiffs' conduct "could give the appearance of judge-shopping." *Id.* at 1–3. At the Court's direction, that order was served on the Chief Judges of the Northern, Middle, and Southern Districts of Alabama. *Id.* at 3–4.

### x. The *Ladinsky* team files as *Eknes-Tucker v. Ivey* in the Middle District of Alabama and again seeks emergency relief.

On Tuesday, April 19, the *Ladinsky* attorneys filed this suit, originally styled *Eknes-Tucker v. Ivey*, No. 2:22-cv-184-RAH-SRW, and later re-styled *Boe v. Marshall*, No. 2:22-cv-184-LCB, with a new slate of plaintiffs in the Middle District of Alabama. Doc. 1. The new plaintiffs, Rev. Paul A. Eknes-Tucker, Brianna Boe, James Zoe, Megan Poe, Kathy Noe, Dr. Jane Moe, and Dr. Rachel Koe sued the Governor; the Attorney General; the district attorneys for Montgomery, Cullman, Lee, and Jefferson counties; and the district attorney for the 12th Judicial Circuit. *Id.* *Eknes-Tucker* was randomly assigned to Judge Huffaker, and the case was reassigned to this Court the next day under "the authority of the Court to manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case." Doc. 3.

The *Eknes-Tucker* plaintiffs moved the day after for preliminary injunctive relief to enjoin enforcement of the Act before its effective date, supporting their motion with a declaration from Dr. Ladinsky, the first suit's named plaintiff, as an expert witness. Docs. 7, 8. On April 29, the United States moved to intervene under Rule 24 of the Federal Rules of Civil Procedure and filed its own preliminary-injunction motion, likewise moving to enjoin Section 4 of the Act before its effective date. Docs. 58, 62.

Because the Act would become effective May 8, the loss of several days to the dismissal of *Walker* and *Ladinsky* and the refiling of *Eknes-Tucker* intensified the time pressures driving the litigation. The Court received extensive briefing, including amicus briefs joined by fifteen states in support of Alabama and twenty-two professional medical and mental-health organizations in support of the plaintiffs. *See* Docs. 91–1; 95. The Court held three days of hearings on the motions for injunctive relief from May 4 to 6, on the first day of which the plaintiffs indicated that they were not challenging the portions of Section 4 that concerned surgical intervention (subsections (a)(4)–(6)), but would limit the scope of their challenge to those subsections banning puberty blockers and hormone therapy (subsections (a)(1)–(3)). *See* Doc. 103 at 40.

### xi.    The Court enjoins enforcement of the Act.

On May 13, 2022, the Court granted in material part the plaintiffs' motion for preliminary injunction and enjoined the State from enforcing Section 4(a)(1)–(3) of the Act through trial. Doc. 107.[6] The Court concluded that the plaintiffs showed a substantial likelihood of success on the merits of their substantive due process and equal protection claims. *Id.* That meant the State could not enforce a ban on "(1) [p]rescribing or administering puberty blocking medication to stop or delay normal puberty," "(2) [p]rescribing or administering supraphysiologic doses of testosterone or other androgens to females," or "(3) [p]rescribing or administering supraphysiologic doses of estrogen to males" until trial—and that plaintiffs' counsel received all that they sought from the very judge they'd found suspicious and had worked so hard to avoid. Ala. Code § 26-6-4(a)(1)–(3).

The Court of Appeals for the Eleventh Circuit vacated the preliminary injunction on August 21, 2023, but withheld its mandate pending a ruling on the plaintiffs' petition for rehearing *en banc*. Docs. 308, 314. The injunction remained in effect until January 11, 2024, when the Eleventh Circuit granted the State's motion to stay the injunction. Doc. 400. On August 28, 2024, the Court of Appeals denied rehearing *en banc*. *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1242

---

[6] The Court granted the Government's motion "to the same degree and effect." Doc. 107 at 32.

(11th Cir. 2024). This Court stayed the case on the merits pending a decision in a related case, *United States v. Skrmetti*, presently on appeal before the United States Supreme Court. Doc. 633.

### B.    Proceedings Before the Three-Judge Panel

### i.    The Chief Judges convene the Panel to investigate whether counsel intentionally manipulated the court's random case-assignment procedures.

On receipt of the Court's April 18 order closing *Walker*, the Chief Judges of Alabama's three federal district courts consulted with every federal district judge in the State on how best to respond to the attorneys' suspect filing activity. *Vague*, Doc. 75 at 3–4. Ultimately, the Chief Judges decided to empanel three judges—one from each federal district court in Alabama—to investigate whether counsel intentionally tried to subvert the random case-assignment procedures for the Northern and Middle Districts of Alabama. *Id.*; *Vague*, Doc. 1 at 5.

The Panel comprised Senior U.S. District Judge W. Keith Watkins, designated by Chief Judge Marks on behalf of the Middle District of Alabama; now-Chief U.S. District Judge R. David Proctor, designated by then-Chief Judge L. Scott Coogler on the Northern District's behalf; and Chief U.S. District Judge Jeffrey U. Beaverstock on behalf of the Southern District of Alabama. Every member of the Panel has either served or is serving as Chief Judge of his respective district. *Vague*, Doc. 1 at 6.

41

Once empaneled, the judges summoned the attorneys who had participated in *Walker*, *Ladinsky,* or *Eknes-Tucker* to appear for their inquiry. *Vague*, Doc. 1 at 5. After six months of receiving testimony and declarations, briefs and motions, and objections and complaints; after paring the scope of its inquiry, winnowing the pool of attorneys from thirty-nine to eleven; and after eleven months of deliberations, *see* Doc. 339, the Panel concluded "without reservation" that Melody Eagan, Jeffrey Doss, Scott McCoy, Jennifer Levi, Shannon Minter, James Esseks, Kathleen Hartnett, Michael Shortnacy, LaTisha Faulks, Asaf Orr, and Carl Charles had "purposefully attempted to circumvent the random case assignment procedures" for the U.S. District Courts of the Northern and Middle Districts of Alabama, *id.* at 2.

The inquiry began on May 10, 2022, when the Panel opened a miscellaneous, sealed case styled *In re Vague*, 2:22-mc-3977-WKW and ordered all attorneys that signed *Ladinsky*, *Walker*, or *Eknes-Tucker* to appear ten days later at the federal courthouse in Montgomery, Alabama. *Vague*, Doc. 1. To put everyone on notice of the inquiry's scope and purpose, the order admonished counsel that the matter was before the Panel on this Court's April 18 order, apprised them of the sequence of events that seemed to betoken counsel's "intent to circumvent the practice of random case assignment," and confirmed that "a wide range of appropriate remedies" are available to courts policing their dockets for misconduct. *Id.*

42

The Panel also invoked its "inherent authority to address lawyer conduct that abuses the judicial process," setting forth authority from courts nationwide that "universally condemn[]" judge-shopping as conduct that "abuses the judicial process," and citing binding precedent from the Eleventh Circuit that both condemns and proscribes "contrivance[s] to interfere with the judicial assignment process"— such as "attempts to manipulate the random assignment of judges"—as "threat[s] to the orderly administration of justice." *Id.* at 5.

### ii.    The Panel's first hearing on May 20, 2022.

On May 20, the Panel held the first of what would be five days of evidentiary hearings. All the responding attorneys who were present at the hearing were either represented by counsel or retained counsel shortly thereafter. *Vague*, Doc. 75 at 8–10; *Vague*, Docs. 10, 11, 12, 14, 15. Those who had not secured attorneys of their own were counsel from Lightfoot and King & Spalding. *Vague*, Doc. 75 at 10. At the hearing, Eagan spoke on behalf of the Lightfoot attorneys, including herself and Doss, and Shortnacy spoke on behalf of those at King & Spalding. *Id.* These attorneys had secured representation of their own before the next hearing, though in Lightfoot's case, those attorneys were members of their own firm. *Vague*, Docs. 10, 11, 14, 15.

At the outset, all responding attorneys present were sworn in,[7] promising to tell "the truth, the whole truth, and nothing but the truth," and all were apprised of the Chief Judges' bench-wide consultation on the propriety and format of an inquiry. *Vague*, Doc. 75 at 3, 7. The Panel then spoke in sidebar with counsels' attorneys and designated representatives to address a host of procedural matters, including how best to ask any questions that might implicate work product or attorney-client privileged communications while protecting the respondents' rights. *Id.* at 7–12.

Ragsdale, who then represented everyone on the *Walker* team, explained that they stood "ready, willing, and able to answer any questions that the Court [had]," and that they would not "use either of those privileges to refuse to answer" any of the Court's questions. *Id.* at 13–14.

Before soliciting testimony, the Panel took up three matters with the full slate of responding attorneys. First, it explained the procedural history of both *Walker* and *Ladinsky. Id.* at 31–33. Chief Judge Proctor explained that Judge Axon transferred *Ladinsky* to this Court in the interests of "judicial efficiency and economy" because she "was on day four of what was scheduled to be a two-plus-week criminal trial, an eighteen-defendant case with four defendants at trial, and quite a lot of moving

---

[7] Three of those responding attorneys had been excused and were sworn in when they appeared later; the thirty-five others, including all Respondents, were present. *See Vague*, Doc. 75 at 72–73. Shannon Minter, the thirty-ninth, did not come to the Panel's attention till the inquiry had begun and was drawn in thereafter.

parts." *Id.* at 33–34. Second, it received evidence from the Solicitor General of Alabama, Edmund Lacour. *Id.* at 33–45. In opposing plaintiffs' motion for a preliminary injunction in *Eknes-Tucker*, the State had investigated its own concerns and "developed some evidence" of conduct that, from their view, "appeared to be judge shopping." *Id.* at 33.[8]

Finally, the Panel categorized the attorneys based on their knowledge of and roles in the decision-making behind *Walker* and *Ladinsky*, dividing them into three groups: (1) attorneys with knowledge but no input; (2) attorneys with knowledge and input; and (3) leaders and decision-makers. *Id.* at 18. These categories were based on the respondents' knowledge of or input into where to file a lawsuit; who to name as a plaintiff or defendant in a lawsuit; any discussion about making a related case request; any communication about transfer or dismissal of a case; whether or where to refile a case; coordinating between the groups prosecuting the cases; any discussions about judge assignments; any discussions about intentions or efforts to get a judge on a case or avoid a judge on a case; and any communication about any of those topics with anyone outside the groups involved in the cases. *Id.* at 48–49.

Before taking testimony, the Panel admonished everyone in the courtroom— the respondents and their attorneys—of the proceedings' gravity. *Id.* at 73. The Panel

---

[8] Although the State offered testimony, its representatives were not permitted to remain in the courtroom to hear the Respondents' testimony. *Vague*, Doc. 75 at 97.

explained that the matters they were charged with investigating were "serious," and fully warranted an inquiry, but there would be no career-ending sanctions—unless the respondents misled the Panel or failed to be candid. *Id.* at 73–74.

Next, to streamline the inquiry, the Panel designated retired Alabama Supreme Court Justice R. Bernard Harwood to take testimony from those attorneys with knowledge but no input. *Id.* at 12, 74–75, 81. The Panel made clear that these attorneys were not facing sanctions and, to elicit "unvarnished, transparent, candid responses" to his questions, Justice Harwood interviewed them one-by-one and alone in a separate courtroom. *Id.* at 74, 79–81.

The Panel also invoked a modified version of Rule 615 of the Federal Rules of Evidence to prevent the responding attorneys from hearing other respondents' testimony before they had given their own; this modified rule, which continued throughout the proceedings, applied to both oral and written testimony. *Id.* at 74; *see Vague*, Doc. 22 at 3–4 n.3; *Vague*, Doc. 40 at 1–2. Under the modified rule, the only people in the courtroom would be those answering questions, and no one was "to reveal the questions [they're] asked or the answers [they] give to anyone else, period." *Vague*, Doc. 75 at 74.

While Justice Harwood was interviewing the junior attorneys in a separate room, the Panel took the testimony of five *Walker* attorneys, including Respondents Faulks and Charles. *See Vague*, Doc. 75. In a break between witnesses, Ragsdale

informed the Panel about the call he received from Sam Franklin, a call made before Ragsdale had "even thought about" becoming involved in the case. *Id.* at 131–32. Ragsdale said that he found it his duty as an advocate to mention the call because he believed Sam Franklin's reaction to be a particularly "important fact"; Judge Axon's order had "scared people." *Id.* at 132–33. Ragsdale said that it looked to him and others "like Judge Burke had reached out to get the case." *Id.* at 133. Ragsdale claimed that "[e]very other time the case moved, it followed the law and there was something in the record" that explained the transfer, but "[t]his last transfer got done with nothing in the record." *Id.* at 134; *but see Ladinsky*, Doc. 14 (transferring *Ladinsky* to this Court on the record "[i]n the interest of efficiency and judicial economy").

The Panel immediately rejected Ragsdale's sinister inference. Speaking for the Panel, Chief Judge Proctor responded that one "only get[s] to be suspicious about behavior when [one] ha[s] a reason to be suspicious," and here there was no reason for suspicion whatsoever. *Vague*, Doc. 75 at 133. Counsel was reminded that "[n]o one's entitled to have a particular judge assigned to their case," whether "first filed" or "second filed." *Id.* at 134. And though Ragsdale conceded the truth of this, he claimed that the lawyers were right to be suspicious, because they "suddenly saw the normal rules not followed in a high-profile, controversial case." *Id.* at 141. Even so, he acknowledged outright that his clients "tried to game the system." *Id.*

47

### iii.    Charles testifies four times that he did not call Judge Thompson's chambers, then admits he did.

Later in the hearing, the Panel took testimony from several more responding attorneys, including Charles, who testified about the *Walker* team's efforts to relate their suit to *Corbitt* and place it before Judge Thompson. *Vague*, Doc. 75. During this testimony, Charles falsely stated four times that he made no call to any judge's chambers about *Walker*, emphasizing that he would be "incredibly certain" if he had. *Id.* at 178–93. Only after Chief Judge Proctor read his telephone number into the record did Charles revise his testimony. *Id.* at 191–93.

Charles's exchange with the Panel appears in material part below:

> JUDGE WATKINS: All right. Did you have any contact with the clerk's office about who the case was being assigned to? Did you receive a call or did you make a call?
>
> MR. CARL CHARLES: No, Your Honor, I did not make a call. No, Your Honor, I did not receive a call.
>
>             . . . .
>
> JUDGE WATKINS: Did you call anyone's chambers about the assignment of the case?
>
> MR. CARL CHARLES: No, Your Honor.
>
> JUDGE WATKINS: You didn't call any judge's chambers?
>
> MR. CARL CHARLES: I did not make any telephones [sic] calls about this matter on the day we filed, Your Honor.

JUDGE WATKINS: I'm not asking about the day you filed. I guess I'm asking about any day.

MR. CARL CHARLES: My pause is only because I am endeavoring to be as candid as possible. I do not recall ever calling any chambers with this request, Your Honor, at any point.

    . . . .

JUDGE WATKINS: Okay. That's all right now. All right. So I've asked you the question. I'm going to ask you point blank: Are you telling us that you did not speak to any law clerk of any judge in the Middle District of Alabama concerning the *Walker* case and the assignment of the case to that judge?

MR. CARL CHARLES: That is correct, Your Honor. I did not.

JUDGE WATKINS: Okay.

    . . . .

JUDGE PROCTOR: All right. Speaking of good faith, I want you to think very carefully about this next question and answer you're about to give. Are you telling us that you did not call a judge's chambers and speak to a law clerk about the potential for a TRO in the *Walker* case?

MR. CARL CHARLES: I apologize, Your Honor. Could you—I'm not sure I'm understanding your question. When you say potential of a TRO, I'm not sure what you mean.

JUDGE PROCTOR: About the potential filing of a TRO or intent to file a TRO or the handling of a TRO. You're saying that you have never had a communication with a judge's law clerk allowing for—discussing the filing of *Walker* and the potential for a TRO being filed in *Walker*?

49

MR. CARL CHARLES: No, Your Honor.

. . . .

JUDGE PROCTOR: And I don't want to turn this into a deposition, but I want to return to one thing. If you did make a call to a judge's chambers and talk to a law clerk about the *Walker* case, you would remember that?

MR. CARL CHARLES: I am incredibly certain I would, Your Honor.

JUDGE PROCTOR: All right. What's your phone number? Is it (770) 309-1733?

MR. CARL CHARLES: Yes, Your Honor.

. . . .

MR. CARL CHARLES: I'm sorry, Your Honor. I am— may I return to some previous questions that you asked me and amend my testimony?

JUDGE PROCTOR: You may.

MR. CARL CHARLES: Okay. I did call Judge Thompson's clerk. I am now remembering. I want to apologize for any impression I gave that I was trying to obfuscate that fact. That was not my intention. And in candor, I am very nervous, and I am trying to be as forthright with Your Honors as possible. So I want to—

JUDGE PROCTOR: Now you are. Let's be fair. Now you are.

MR. CARL CHARLES: Yes, Your Honor.

JUDGE PROCTOR: You're coming clean.

MR. CARL CHARLES: Well, if I may, Your Honor, those moments of pause were really me trying to contemplate

and remember. And not by way of excuse, but by way of explanations, Your Honor, things were moving extremely quickly over those three days, and it was a very high-stress situation. Again, not an excuse, but there were many things that happened which I have in preparation for this hearing endeavored to recollect and write down. And I do sincerely apologize.

JUDGE PROCTOR: It's better you did it now than us having to do it for you later.

MR. CARL CHARLES: Yes, Your Honor. Thank you.

JUDGE PROCTOR: But let me ask you this: Why were you hesitant to tell us that?

MR. CARL CHARLES: Oh, Your Honor, I was not hesitant at all. I genuinely couldn't recall the conversation. And then—

JUDGE PROCTOR: What sparked your recollection? The phone number?

MR. CARL CHARLES: My phone number. Yes, Your Honor. And so I thought—I was replaying—

JUDGE PROCTOR: It seems to me—I'm going to be unfair with you. I'm just telling you what I'm thinking here. This is not—this is Proctor being cards up. The phone number doesn't spark a recollection. The phone number sparks a realization that I have some information that you didn't think I had.

MR. CARL CHARLES: Your Honor, I did find it unusual that you had that. But then I tried to think about what we had to submit to this Court and had I listed that on other filings. And while you were asking—while Your Honors were asking me other questions, I was trying to think in my mind about the events of those two days.

*Id.* at 178–93.

> **iv.    At a status conference the next month, the Respondents object to the Panel's proceedings for the first time and move to terminate the inquiry.**

At the respondents' request, the Panel next convened on June 17, 2022, for a status conference so that counsel could offer suggestions on how the Panel could "fairly and efficiently conclude this matter." *Vague*, Doc. 16 at 2. During the conference, Ragsdale argued that none of the respondents had impermissibly judge-shopped, and that although the Panel had heard from only a small subset of the *Walker* attorneys and no one from *Ladinsky*, he believed the Panel "already ha[d] enough information to resolve this matter" and urged it to terminate the inquiry at once. *Vague*, Doc. 76 at 6. According to Ragsdale, that information included "counsels' concerns about the undisclosed manner in which the case got transferred from Judge Axon to Judge Burke," which Ragsdale said led him and his clients (doubling down on the suspicions they voiced on the first day of hearings) to worry that "there was a risk . . . that [the transfer] had occurred because Judge Burke had reached out for the case." *Id.* at 6–8.

Ragsdale then explained how he believed the inquiry ought to proceed if it were to do so, and alleged, for the first time, that the Panel had violated the Respondents' due-process rights. *Id.* at 11–18. Those alleged violations included preventing the Respondents from listening to each other's testimony or revealing their own testimony under the modified rule (the Respondents called this

"sequester[ing] the[] witnesses"), insufficient notice under the Eleventh Circuit's decision in *United States v. Shaygan*, and Justice Harwood's questioning junior lawyers without counsel present. *Id.* at 18–24.

Having raised these objections, Ragsdale suggested that the attorneys be permitted to present the "salient facts" at the rest of the hearings; although the Panel had invited counsel to make opening statements, Ragsdale said he "got the impression" at the May 20 hearing that "the Court didn't want to hear a recitation of what the salient facts were." *Id.* at 28–29.

The Panel responded that Ragsdale "got the wrong impression," and his clients had "jumped to some pretty sinister conclusions"—namely, "that an Article III judge . . . , who had taken an oath, was engaging in some type of misbehavior to get a case away from another judge," and that he had "reach[ed] out and grabb[ed] a case" to do so. *Id.* at 29. The Panel made clear that there was "no basis whatsoever, other than machinations of minds, to say that that's what was going on." *Id.* at 29–30. Segall conceded that everyone involved in the proceedings by then "agree[d] that [their] suspicions turned out to be not accurate, so no one [was] suggesting that anyone on the bench did anything wrong."[9] *Id.* at 42.

---

[9] Those accusations would come later. *See* Docs. 571, 707.

At the end of the conference, the Panel ordered the respondents to submit a joint, global proposal on how the inquiry should proceed. *Id.* at 43–44.

### v. The Respondents renew their motion to terminate the inquiry.

The parties filed their joint submission on June 24, urging the Panel a second time to dismiss the inquiry, which they alleged had already proved that counsel had made no attempt to circumvent the Northern and Middle Districts' random case-assignment procedures. *Vague*, Doc. 21 at 1–2. If the Panel denied their request to terminate the proceedings in their entirety, the respondents asked that it dismiss the non-decision-makers; provide the parties with the transcripts of all proceedings; vacate the "sequestration" order; permit the parties to submit written declarations under seal and present oral argument; and forego any further oral testimony. *Id.* at 2–5.

### vi. The Panel orders the submission of *in camera* declarations.

Some of these proposals were accepted, and on July 8, 2022, as part of its effort to streamline the remainder of its inquiry, the Panel ordered twenty-one of the respondents to file *in camera* declarations concerning their participation in and knowledge of eight categories of information:

> (1) The actual or potential judicial assignments in *Ladinsky, Walker,* and/or *Eknes-Tucker*;

(2)     Any actions or decisions taken in the course of preparing to file *Ladinsky, Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama;

(3)     Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file;

(4)     Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*;

(5)     Any and all actions or decisions that relate to coordination and/or dismissal of the *Ladinsky* and *Walker* cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022, and (2) any other communications between *Ladinsky* counsel and *Walker* counsel on that topic;

(6)     Any and all actions that relate to the decision to file *Eknes-Tucker* in the United States District Court for the Middle District of Alabama;

(7)     Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing; and

(8)     The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects

> referenced above and the details of each such
> person's involvement.

*Vague*, Doc. 22 at 2–3.

In addition to these eight categories, Charles was ordered to address five additional subjects concerning *Walker*, *Corbitt*, and his call to Judge Thompson's chambers, *id.* at 2 n.2, and a junior attorney named Milo Inglehart was ordered to submit a "Q&A Document" he had mentioned in his testimony to Justice Harwood, *id.* at 2, n. 1. Charles complied. *See Vague*, Doc. 80-16. Inglehart did not. *See Vague*, Doc. 80-15 at 10.

The order also reiterated the rule against sharing or discussing testimony with other respondents, extending these restrictions to the respondents' declarations, and ordered counsel to preserve any communications relating to these eight topics and all work product relating to *Ladinsky*, *Walker*, or *Eknes-Tucker*. *Vague*, Doc. 22 at 3–4.

The order also responded to the allegation that the Panel had violated the Respondents' due-process rights under *United States v. Shaygan*, 652 F.3d 1297 (11th Cir. 2011).[10] The Panel found that these allegations were fundamentally "misguided," because the Panel had "complied with the mandates of due process" that *Shaygan* delineated. *Vague*, Doc. 22 at 4–5. First, the Panel had provided "fair

---

[10] These allegations, which were baseless, are discussed *infra* at Section VI.B.ii.a.3.

notice that [the attorneys'] conduct may warrant sanctions and the reasons why" in the May 10 order that began the proceedings; second, the Panel had given and would continue to give the attorneys "an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify [their] actions"; and third, the Panel had not issued a sanction, nor even elevated its inquiry to formal charges, and so it had not held any attorney "responsible for the acts or omissions of others." *Id.* at 4–5.

### vii.   The Respondents oppose the order and again renew their motion to terminate the inquiry.

In lieu of the ordered declarations, the respondents filed twelve motions. Some of these sought to clarify or modify the Panel's gag order (*Vague*, Docs. 23, 28), others to release transcripts (*Vague*, Docs. 24–26, 37); some sought a stay of the proceedings while the Panel ruled on pending motions (*Vague*, Docs. 35, 39), while still others sought to terminate the proceedings entirely (*Vague*, Docs. 32, 38). These last two requests rested chiefly on the notions that this Court had exceeded its authority by serving its April 18 order on the Chief Judges, and that Rule 41(a)(1) insulated the attorneys from a finding of bad faith, even if their cases were dismissed "in part to avoid a specific judge." *Vague*, Doc. 32 at 8; *see also Vague*, Doc. 38. Finally, *Ladinsky* and *Walker* counsel each moved for protective orders, *Ladinsky* so as not to "disclose privileged communications or work product in either their declarations or in any testimony they might later give," *Vague*, Doc. 27 at 13, *Walker*

both for this reason and for an order preventing disclosure of the Q&A Document. *Vague*, Doc. 34 at 8.

The Panel resolved all twelve motions on July 25, 2022, with two orders. *Vague*, Docs. 40, 41. The first of these clarified the scope of earlier orders and granted access to some transcripts. *Vague*, Doc. 40. The second denied all requests to issue protective orders, stay the proceedings, or terminate the inquiry. *Vague*, Doc. 41. The second also reiterated the Panel's authority to conduct the inquiry and remonstrated with counsel for their "wrongheaded" rationale that the Panel was not a "neutral referee," so *in camera* review "would be inconsistent with the core function of the attorney client privilege, the attorney work product doctrine, as well as basic norms of fairness and due process." *Id.* at 3. Counsel were reminded that the inquiry was "not an adversarial proceeding"—the Panel remained "neutral"—and, moreover, that its July 8 order had "ma[de] clear" that it was "not seeking the disclosure of privileged *communications*." *Id.* at 4.

### viii. The Panel holds further hearings, releases twenty-one attorneys, and completes its investigation.

The Panel's hearings resumed on August 3, when it took testimony from five attorneys from the *Walker* litigation, including Respondents Hartnett, Esseks, and Charles, the last of whom it wished to ask follow-up questions about his call to Judge Thompson's chambers. *See Vague*, Doc. 77. The hearings continued the next day

with testimony from six attorneys from the *Ladinsky–Eknes-Tucker* team, including Respondents Eagan, Doss, and Shortnacy. *See Vague*, Doc. 78.

At the end of the August 4 hearing, Sam Franklin, counsel for Eagan and Doss and a senior partner at Lightfoot, renewed his motion to terminate the proceedings and told the Panel they were "very traumatic" and weighed heavily over his firm. *Id.* at 274–75. There was even "talk on the streets of Birmingham," he said, and summer law clerks from other law firms were raising questions. *Id.* at 275. In Franklin's words, the inquiry had become "a real life serious problem." *Id.*

On September 23, the Panel released twenty-one lawyers from the inquiry, which had produced no evidence of their intent to circumvent the random case assignment in the Northern or Middle Districts of Alabama. *See Vague*, Doc. 59. That left eighteen attorneys subject to the Panel's inquiry, eight of whom testified at the final hearings on November 3 and 4. *Vague*, Docs. 74, 79. These attorneys, all from *Ladinksy* and *Eknes-Tucker*, included Respondents Orr, McCoy, and Minter, who testified the first day, and Respondent Levi, who testified the second. *Vague*, Docs. 74, 79.

At the close of the November 4 hearing, Judge Proctor warned the attorneys that he was "dubious of any argument that a lawyer doesn't realize that you can't try to manipulate the system to try to avoid a judge or to get a particular judge," issues that had "been before the courts many times, particularly in this state, in this circuit,

and in the former Fifth Circuit . . . ." *Vague*, Doc. 74 at 80. Counsel would be free to make their arguments, but he was skeptical that Rule "41 makes bulletproof any decision to avoid a judge and refile to avoid a judge." *Id.*

> ### ix. The Panel issues a 53-page Final Report of Inquiry and concludes that eleven Respondents engaged in intentional judge-shopping misconduct.

On October 3, 2023, the Panel concluded its seventeen-month inquiry by publishing a 53-page final report of its investigation. *Vague*, Doc. 70; Doc. 339. Written in five parts, the Final Report of Inquiry explained the Panel's legal authority to conduct the inquiry; set forth the histories of *Walker*, *Ladinsky*, and *Eknes-Tucker*, a procedural history of the inquiry itself, and a narrative history of counsels' thoughts and decisions from filing to dismissal; and explained the Panel's findings and conclusions. Doc. 339.

By the time the Report was published, the Panel had released from the inquiry all but eleven attorneys: Eagan, Doss, Shortnacy, McCoy, Levi, Minter, Orr, Esseks, Hartnett, Faulks, and Charles. *Id.* at 16. The Panel found unanimously and "without hesitation" that these eleven attorneys had "purposefully attempted to circumvent the random case assignment procedures" for the U.S. District Courts for the Northern and Middle Districts of Alabama. *Id.* at 51. After careful review and months of deliberation, the Panel rejected these eleven lawyers' protestations that they had done nothing wrong.

The Report concluded that "[c]ounsel's misconduct in the three cases (both individual and collective) included" each of the following:

(1)     *Walker* counsel marking *Walker* related to a case closed one year earlier decided by a "favorable" judge,

(2)     *Walker* counsel contacting the chambers of Judge Thompson (who was never assigned to *Walker*) to directly and indirectly influence or manipulate assignments away from Chief Judge Marks to Judge Thompson,

(3)     *Walker* counsel attempting to persuade *Ladinsky* counsel to transfer the latter case to the Middle District to be before Judge Thompson,

(4)     coordinating the dismissal of the *Walker* and *Ladinsky* cases after their assignment to Judge Burke, and then making clear that the case would be refiled when commenting to the media about re-filing,

(5)     engaging in numerous and wide-ranging discussions about how judges were favorable or unfavorable in the context of deciding whether to dismiss and refile their cases,

(6)     suddenly dismissing *Walker* and *Ladinsky* after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of Judge Burke and that he was a bad draw,

(7)     even though (as they admit) time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law, abruptly stopping their pursuit of emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs,

(8)     *Ladinsky* counsel's over-the-weekend decision to file *Eknes-Tucker* in the Middle District, even though the plan for years had been to file suit in the Northern District,

(9)     *Ladinsky* counsel's decision to file a new case with new plaintiffs in the Middle District to avoid the appearance of judge shopping and to avoid Judge Burke, and

(10)    claiming that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and Judge Burke set *Walker* for a status conference in Huntsville on April 18.

*Id.* at 51–52. The Panel directed the Clerk of Court to serve a copy of the Report on this Court to "proceed as appropriate." *Id.* at 52.

## C.     Proceedings Before This Court

In view of the Panel's directions, the Court treated the Final Report of Inquiry like a charging instrument, reviewing the evidence independently, without deference to the Panel's findings, and allowed the Respondents a full opportunity to respond to the Report.

### i.     The Respondents resist dissemination of the Panel's findings.

The Court began these proceedings on October 4, 2023, by directing the Clerk of Court to serve the Report on all attorneys in *Boe v. Marshall* who were not counsel of record in *Vague*. Doc. 318. All counsel were instructed not to disseminate the Report as long as it remained sealed. *See id.*

Opposition was swift. Later the same day, Respondents Esseks, Charles, and Faulks filed an emergency motion to stay the Report's dissemination, alleging that the Report "contain[ed] testimony and other evidence of privileged matter and other information protected by the work product doctrine," some of which "was gathered by the panel under assurances that it would not be shared with the Alabama Attorney General's office or other adverse parties."[11] Doc. 319 at 1–2. Dissemination to the State Attorney General's office and other parties, they claimed, "would be damaging and injurious to the movants and other parties involved in the inquiry." *Id.* at 2.

The motion cited no law, fact, or finding, so the Court ordered the Respondents to file a sealed memorandum identifying the page and line numbers of the Panel's "assurances" and the privileged evidence set forth in the Report. Doc. 320.

In their memorandum, Esseks, Charles, and Faulks claimed that "virtually all of the Panel's fact section (pages 16-50) . . . [were] protected by at least the work product doctrine and common interest privilege," and so there was "no legitimate reason" for the State (or any other third party) to see it. Doc. 321 at 11 n.7; 12. They asked the Court to rescind its order "and, if necessary, direct that any copies already disseminated be immediately returned." *Id.* at 13. Charles, Esseks, and Faulks again

---

[11] This motion, as well as the brief and memorandum that followed, were later joined by Respondents Eagan, Doss, and Shortnacy. Docs. 331, 333.

provided no legal support for their request. *See* Doc. 321. The Court ordered them to brief the matter further, allowing all parties to respond. Doc. 324. The matter was set for a hearing at which the Court would also address "the next procedural steps" concerning the Panel's Report. *Id.*

Although they were neither instructed nor granted leave to do so, Esseks, Charles, and Faulks submitted their brief under seal and without serving all parties. Doc. 327. These Respondents insisted that the Court should neither share the Report with other parties in this case nor unseal it "[u]nless and until the Panel unseals" it first, because, they claimed, (1) the State of Alabama had "no legitimate interest" in the Report; (2) the Report "contain[ed] privileged and work-product information"; and (3) that information "was disclosed without waiver and under assurances that those protections would be preserved." *Id.* at 6–18 (cleaned up).

Esseks, Charles, and Faulks asserted that the work-product doctrine, which generally precludes inquiries by the opposing party into "an attorney's work files and mental impressions," barred the State of Alabama, whose representatives were named as defendants in *Walker*, *Ladinsky*, and *Eknes-Tucker*, from reviewing the testimony counsel had shared with the Panel. *Id.* at 8 (cleaned up). Although their motion relied on *Drummond Co. Inc. v. Conrad & Scherer, LLP*, Esseks, Charles, and Faulks made no mention of *Drummond*'s central holding: "in cases of attorney

misconduct" like the Panel found here, "there is no protection for the attorney's work product." 885 F.3d 1324, 1337 (11th Cir. 2018).

The State, which had not seen the as-yet unsealed and unserved memorandum and brief, nevertheless predicted the substance of the arguments, and it advanced two chief reasons that it ought to retain the Report. First, the Respondents' "inequitable" judge-shopping conduct "should have 'foreclose[d] preliminary equitable relief," as it had argued in opposing the injunction, and the Report provided evidentiary support they should be permitted to cite. Doc. 336 at 4–7. Second, under *Drummond*, the Respondents would not be entitled to any work-product protections for testimony or other evidence concerning their misconduct of judge-shopping. *Id.* at 7–9.

On October 23, 2023, Respondents Shortnacy, Eagan, Doss, Esseks, Charles, and Faulks appealed the Final Report of Inquiry. Docs. 328, 329, 332; *Vague*, Docs. 86, 87, 92. The same six Respondents moved to stay all proceedings related to *In re Vague* for the pendency of these appeals.[12] Docs. 328, 329, 332.

The next day, the Court directed the Clerk of Court to file the Report under seal in this case—it was docketed only in *Vague* before that—and to unseal five filings the Respondents had impermissibly filed under seal and served on fewer than

---

[12] Eagan and Doss's motion to stay was joined by Orr and McCoy. Doc. 337.

all parties.[13] Docs. 338, 339, 340. The Respondents were admonished that the Federal Rules of Civil Procedure and the Middle District's Local Rules required their motions to be "litigated in the light of day," and they were warned that the Court would "not tolerate any further lapses of process or filing shenanigans." Doc. 340 at 2, 6. Respondents Essesks, Charles, and Faulks then moved the Court on October 31 to take judicial notice of the transcript and filings of *In re Vague*, which the Court had already reviewed, to support their contention that the Report was not part of this case and had not been referred to this Court "in the legal sense." Doc. 346 at 2 n.2.[14]

### ii. At its first hearing, the Court clarifies the Respondents' misconceptions about the Report and solicits input on next steps.

On November 2, the Court held its first hearing in these disciplinary proceedings, which it began by clarifying the Respondents' "fundamental misunderstandings" about the case's posture:

---

[13] That slate of filings included (1) Esseks, Charles, and Faulks's Motion to Stay Proceedings Relating to *In re Vague* Doc. 328; (2) Shortnacy's Motion to Stay Proceedings Relating to *In re Vague, et al.* Doc. 329; (3) Eagan and Doss's Joinder in the Motion, Memorandum, and Brief filed by Esseks, Charles, and Faulks Doc. 331; (4) Eagan and Doss's Motion to Stay Proceedings Related to *In re Vague* Doc. 332; and (5) Shortnacy's Joinder to Esseks, Charles, and Faulks's Emergency Motion to Stay Dissemination of Sealed Final Report and Supporting Memorandum and Brief Doc. 333.

[14] Ragsdale apologized at the November 2 hearing "for not following those proper procedures," because he had been afraid of violating the Panel's instructions limiting disclosure of information. Doc. 354 at 27–28. This was an argument, the Court reminded him, that should have been made in a motion to file under seal. *Id.* at 28.

- The Panel had referred the Report to the Court "to decide all matters";

- Some Respondents had urged the Court to wait on the Panel to unseal the Report, but there was "nothing left for [the] panel to do";

- The Court had properly docketed the Report in this case, because it was this case in which the remaining attorneys had committed misconduct; if this Court rather than a three-judge panel had conducted the inquiry, it would have done so on this docket;

- While some Respondents had expressed concerns that disseminating the Report had improperly disclosed privileged work product to the State, the Report itself contained no work product that was entitled to the doctrine's protections;

- Instead, what the Panel had assured the Respondents is that disclosing potentially privileged information to the Panel would not waive their privilege to open the door to discovery on the matter by the State;

- The Report studiously avoids discussing work-product information related to the case's merits, and all evidence cited in the Report concerns counsels' efforts to manipulate the courts' random case-assignment procedures; and

- The Report contained only findings of fact, so the Respondents' appeals were improper. Bad faith is a mixed question of law and fact, and the Panel had made no such findings.

Doc. 354 at 6–10.

The Court then solicited input from the Respondents on the next steps in the process. Consolidation with *In re Vague*, motion practice, allocutions, show-cause

orders, oral argument, and the appropriate remedies for the Respondents' conduct were all discussed, as well as the question of the Report remaining sealed. *Id.* at 69–103. The Court explained that under the applicable legal standard, the Report was unlikely to stay sealed indefinitely, and it permitted both the Respondents and the State to brief the issue. *Id.* at 96–103.

### iii.    The Panel re-opens *In re Vague* and reassigns the matter to this Court.

The day after the hearing, the Panel re-opened *In re Vague* on its own motion. *Vague*, Doc. 99. The Panel explained that as "neither a final decision under 28 U.S.C. § 1291 nor an interlocutory decision under 28 U.S.C § 1292," the Report "require[d] further proceedings" before this Court. *Vague*, Doc. 99. The Panel's order made explicit that the Report was referred to this Court for further proceedings that "may include, but are not limited to, accepting, rejecting, or modifying in whole or in part the Panel's findings and making additional findings of fact as necessary." *Id.* The *Vague* case was then reassigned to this Court. *Vague*, Doc. 100.

When discussing the next steps for the proceedings at the November 2 hearing, the Respondents agreed to dismiss their appeals if the Panel assured them that the Report was non-final. Doc. 354 at 23–25. All appeals of the Report were thereafter dismissed, and the Court denied the motions to stay pending appeal. *Vague*, Docs. 101, 102, 103, 105; Doc. 350.

### iv.    The Court issues a show-cause order.

With the benefit of counsels' input, the Court concluded that the best way forward was to order each Respondent to show cause why he or she should not be sanctioned for his or her misconduct as outlined by the Report, and to give each one the chance to present his or her evidence and argument in open court. The Court shared its decision at a status conference on November 21, 2023, and asked the Respondents and their attorneys to provide the Court with their dates of availability. Doc. 705.

The Court issued a show-cause order on February 21, 2024. Doc. 406. In this omnibus filing, the Court ordered each Respondent

> to show cause why he or she should not be sanctioned for attempting to manipulate the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, and the rules of professional conduct applicable in the Northern and Middle Districts of Alabama.

*Id.* at 8–9. In responding to this issue, the Respondents were to "address all applicable grounds of individual and collective misconduct that the three-judge panel identified on pages 51–52 of the Final Report of Inquiry, as well as any other pertinent misconduct described by the panel." *Id.* at 9.

The Court also ordered each Respondent

to show cause why he or she should not be sanctioned for misrepresenting or otherwise failing to disclose key facts during the panel's inquiry, all in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, and their sworn oaths.

*Id.* In responding to this second issue, the Respondents were to "address the discrepancies between his or her own testimony and affidavits and those of all other attorneys involved in the panel's inquiry." *Id.*

The Court also ordered Charles "to show cause why he should not be sanctioned for deliberately misleading" the Panel "about his phone call to Judge Myron Thompson's chambers on April 12, 2022," and it ordered Charles, Esseks, and Faulks "to show cause why they should not be sanctioned for failing to . . . secure their clients' consent" before dismissing *Walker*. *Id.* at 9–10.

For these acts and omissions, the Court's show-cause order notified the Respondents that it would consider the following sanctions: "suspension from practice in the Northern and Middle Districts of Alabama; censure; public or private reprimand; disqualification; ineligibility for appointment as court-appointed counsel; ineligibility to appear pro hac vice or on behalf of the United States in the Northern and Middle Districts of Alabama; and monetary sanctions." *Id.* at 10.

The Court gave the Respondents leave to submit additional evidence, ordered them to submit responsive briefing, and further ordered them to identify in a separate

filing those portions of all other Respondents' briefs with which they agreed or disagreed. *Id.* at 11.

> v.    **The Respondents object to the show-cause order.**

The Respondents answered the show-cause order with a flurry of objections, two motions for clarification, and requests for leave to submit additional evidence. Some Respondents alleged that the order did not "appear to comply" with the due-process requirements set forth in *United States v. Shaygan*. Doc. 423 at 2[15]. Others alleged that the order "suffer[ed] from many of the same due process deficiencies that infect[ed]" the Panel's Report, because it incorporated the Panel's findings and packaged the relevant rules and underlying conduct into a single omnibus filing, Doc. 425 at 2.[16]

Shortnacy, Eagan, Doss, McCoy, and Orr moved the Court to clarify precisely how each one had "allegedly committed judge-shopping, misrepresented facts to the Court or to the Panel, or otherwise violated the legal standards set forth in Section I of the Order." Doc. 423 at 4. In a separate filing, Eagan and Doss also moved to clarify Section II of the show-cause order. Doc. 432.[17] Everyone sought leave to

---

[15] These objections were filed by Shortnacy, Eagan, Doss, McCoy, and Orr, and were later joined by Hartnett. Doc. 441.

[16] These objections, filed by Esseks, Charles, and Faulks, were likewise joined by Hartnett, Doc. 441, as well as by McCoy, Doc. 444, and Levi and Minter, Doc. 447.

[17] This alternative request was joined by Hartnett, Doc. 441, McCoy, Doc. 444, and Levi and Minter, Doc. 447.

submit additional evidence. Docs. 433, 434, 435, 436, 437, 438, 439. All such requests were granted except those to submit expert testimony and to later supplement their submissions.[18] Doc. 449.

### vi. The Court unseals the Panel's Report and all filings in *Vague*.

On March 19, the Court held its second hearing in these disciplinary proceedings, this one to discuss whether the Report should remain under seal. After weighing the factors set forth in *Romero v. Drummond Co., Inc.*, 480 F.3d 1234 (11th Cir. 2007), the Court, recognizing that "confidentiality must eventually give way to openness if the public is to trust that courts will vigorously protect the integrity of the judicial process and police misconduct among the bar," concluded that the public's right to access the Report outweighed the Respondents' privacy interests, so the Report should be unsealed immediately to be litigated in the public's view. Doc. 459 at 6–7, 18–20.

The Respondents wished to keep the matter sealed until a final adjudication, but the Court concluded that their "case illustrate[d] the urgency of public access to judicial records," because "eleven attorneys, charged with judge shopping, have

---

[18] The March 18 order reserved ruling on two requests by Esseks, Charles, and Faulks. Doc. 449 at 7. At the March 19 hearing, Esseks, Charles, and Faulks narrowed these two requests, *see* Doc. 460 at 75-76, and the requests were later granted, Doc. 466 at 24–25.

countercharged their judges with 'infect[ing]' the record with 'due process deficiencies." *Id.* at 19.

When the Court announced its intention to unseal the Report, the Respondents requested that all other filings related to the Panel's inquiry be unsealed as well. The Court agreed to the request, ordering that all filings be unsealed that day. Doc. 460 at 14, 31; Doc. 450; Doc. 459 at 20. The Court also lifted the restrictions on sharing or reviewing one another's testimony, permitting all Respondents to talk to each other and review all documents in the case. Doc. 460 at 66. In unsealing the Report, the Court also denied Esseks, Charles, and Faulks's motion to stay the Report's dissemination, finding that (1) the Report contained no attorney work product, and (2) even if it did, the Panel's preliminary findings of misconduct removed any protections those statements might otherwise enjoy. Doc. 459.

### vii. The Court grants the motions for clarification and issues new show-cause orders.

The Court addressed the Respondents' objections and motions for clarification on April 5. The Court found that these filings "belie[d] a gross misunderstanding of the governing law," as the Respondents had "been accorded process far surpassing *Shaygan*'s constitutional minima." Doc. 466 at 2. Even so, the Court agreed to issue separate, individualized show-cause orders to each Respondent out of an abundance of caution. *Id.* The Court granted Shortnacy, Eagan,

Doss, McCoy, and Orr's motion for clarification, and it denied Eagan and Doss's alternative request for clarification—and all objections—as moot. *Id.* at 27.

On May 1, the Court then issued eleven supplemental show-cause orders (one for each Respondent). Docs. 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488. These orders separately charged each Respondent with showing cause why he or she "should not be sanctioned for attempting to manipulate the random case assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama in violation of controlling precedent, Rule 11 of the Federal Rules of Civil Procedure, and the applicable rules of professional conduct," identifying the findings of misconduct set forth in the Report that pertained to the relevant Respondent. Docs. 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488.

The orders also separately charged each Respondent with showing cause why he or she

> should not be sanctioned for misrepresenting or otherwise
> failing to disclose key facts during the Panel's inquiry in
> violation of controlling precedent, Rule 11 of the Federal
> Rules of Civil Procedure, the rules of professional conduct
> applicable in the Northern and Middle Districts of
> Alabama, the Oaths of Admission for the Northern and
> Middle Districts of Alabama, and [their] sworn oath[s].

Docs. 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488. The orders directed each Respondent to address those findings set forth in the Panel's narrative account that implicated his or her credibility, as well as any discrepancies between his or her

own oral and written testimony and those of all other attorneys who testified before the Panel. Docs. 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488.

Esseks, Charles, Faulks, and Hartnett were also each ordered to "show cause why [he or she] should not be sanctioned for failing to seek or secure [his or her] clients' consent in violation of Federal Rule of Civil Procedure 11 and the rules of professional conduct applicable in the Northern and Middle Districts of Alabama before dismissing *Walker v. Marshall*," and to specifically "address the Panel's finding that '*Walker* counsel did not request permission to dismiss from their clients, or even inform their clients of [*Walker*'s] dismissal until after [the dismissal] was filed.'" Docs. 478, 479, 481, 486.

Finally, the Court ordered Charles to

> show cause why he should not be sanctioned for willfully and contrary to his oath stating material matters which he did not believe to be true in violation of 18 U.S.C. § 1623 and the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, and his sworn oath . . . .

Doc. 481 at 15. The Court also ordered Charles to address the Panel's finding that he "deliberately misled [the] Panel about the phone call to Judge Thompson's chambers." *Id.*

All Respondents were reminded that those who "accept[ed] full or partial responsibility for [their] misconduct" should address "with specificity the

misconduct for which [they] accept[ed] responsibility and comment on the appropriate sanction in [their] response[s] to [the Court's] order." Docs. 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488.

The responses were voluminous: supplemental declarations were filed by Esseks, Charles, and Faulks, Doc. 492; Eagan and Doss, Doc. 495; McCoy, Docs. 500, 522; Hartnett, Doc. 506; Orr, Doc. 513; and Levi and Minter, Doc. 520. Charles, Esseks, and Faulks, Doc. 493,[19] and Levi and Minter, Doc. 505, filed objections; and all Respondents filed responsive briefs, Docs. 513, 514, 515, 516, 517, 518, 520, 521.

### viii.   The Court orders the *Walker* Respondents to produce the Q&A Document; they refuse.

On May 17, 2024, the Court also ordered Charles, Esseks, Faulks, Hartnett, and Non-Respondent Milo Inglehart to produce the so-called "Q&A Document" for *in camera* review. Doc. 527. The document first came to the Panel's attention through the testimony of Inglehart, one of the junior attorneys interviewed by Justice Harwood, when he revealed that a "Q and A document . . . was circulated earlier in the week [before the hearing] . . . just to sort of prep folks." *Vague*, Doc. 98 at 54–55. In its order of July 8, 2022, the Panel ordered Inglehart to produce the document, *see Vague*, Doc. 22 at 2 n.1, but at Ragsdale's direction, he never did. Doc. 527 at 1.

---

[19] These objections were joined by Eagan and Doss, Doc. 497; McCoy, Doc. 501; Orr, Doc. 503; and Hartnett, Doc. 508.

According to Esseks, the Q&A Document was a reference sheet that the *Walker* Respondents drafted to help Ragsdale prepare for the first hearing before the Panel; it was prepared in collaboration, and it included "a list of potential questions and answers based on [*Walker* counsel's] collective knowledge of the events leading up to the May 20 hearing." *Vague*, Doc. 34-1 at 3–4.

Based on Esseks's testimony that the document relied on *Walker* counsels' "collective knowledge" and Inglehart's testimony that the document was drafted to help them (rather than their attorneys) prepare for the hearing, the Court concluded that the Q&A Document was relevant to the task of determining whether sanctions were warranted for Esseks, Faulks, Charles, or Hartnett. Doc. 527 at 8–10. Thus, in light of the Panel's ten findings of misconduct, the Panel's express concerns about the Respondents' truthfulness and the inconsistencies and apparent misrepresentations in their testimony, and the Panel's conclusion that Charles had "deliberately misled" it about his call to Judge Thompson's chambers, the Court concluded that the facts supported a good-faith belief by a reasonable person that the crime-fraud exception might apply to the document, defeating any protections that it might otherwise enjoy under attorney-client privilege or the work-product doctrine. *Id.* at 10–16. It thus ordered Inglehart and the *Walker* Respondents to submit the document by email for an *in camera* review so it could determine whether the document reflected a good-faith attempt to prepare for a hearing, as the

Respondents claimed, an orchestrated attempt to distract or mislead the Panel, as their obduracy suggested, or something else entirely. *Id.* at 16–17.

They refused. On May 18, Hartnett responded to the Court's order with an emergency motion for a status conference and a motion to stay the production deadline. Doc. 528. On May 19, Esseks, Faulks, and Charles responded to the order, Doc. 529, and joined in Hartnett's motion, Doc. 531; Inglehart moved to be excused from the directives of the Court's order, Doc. 530; and Hartnett notified the Court of her intent to file an emergency motion to stay and petition for writ of mandamus in the United States Court of Appeals for the Eleventh Circuit, Doc. 532.

On the morning of May 20, the Court set the matter for a status conference at 1:30 the same afternoon. Doc. 533. Before the hearing began, Hartnett filed a petition for a writ of mandamus and notified the Court of her petition. Doc. 534. The Court heard from the Respondents at the status conference, soon thereafter staying the deadline to produce the Q&A Document, allowing additional briefing, and setting the matter for further argument on May 28. Doc. 548. The Respondents withdrew their petition, Doc. 545, and filed joint briefing on the matter, Doc. 552.

The Respondents' opposition to producing the Q&A Document rested in part on three unsupported assertions: that (1) the Court is not a "neutral arbiter," so it would be "fundamentally unfair" for the Court to review certain evidence; (2) once seen, the Court could not "unsee" the document, so the Respondents would be

irremediably prejudiced even if the Court concluded that the document was privileged or irrelevant; and (3) if the document were to be reviewed *in camera*, no federal district judge in the State of Alabama would be capable of deciding impartially whether the document was privileged. *See* Docs. 528, 534, 552.

On May 28, the Court heard argument on the matter. Doc. 568.

On June 14, the Court ordered Esseks, Faulks, Charles, and Hartnett to submit the Q&A Document in its native format, with all metadata, by close of business on June 18. Doc. 573; *Boe v. Marshall*, 2024 WL 5415230, at *1 (M.D. Ala. June 14, 2024). They complied. Doc. 574.

### ix.    Some Respondents apologize for their misconduct.

The Court next held an in-person status conference on May 23 to meet separately with the Respondents and their counsel to discuss the procedures for the upcoming show-cause hearings. *See* Doc. 567. During these meetings, the Respondents were given the opportunity to speak one-on-one with the Court on the record and with counsel present, and many of them took this chance to apologize for their misconduct. *See id.*

First up was Shortnacy:

> I wanted you to hear from me. I believe I acted in good faith. I was involved in this case because I wanted to do good for people who are vulnerable. I wanted to stick up for them because they don't have representation typically. And, you know, the facts of this case, I was on a phone call where a decision was made to dismiss this case. And

> in that phone call, my contribution was to ask for
> reconsideration to Judge Axon. And I accepted the
> recommendation of my co-counsel on the rest. So I will
> make that clear. But maybe I offer that to help Your Honor
> understand my mindset, because I think that's good
> evidence for you to know. And that's the focus, I think, of
> my involvement in what's been put in the order to show
> cause.

*Id.* at 32–33. Hartnett, who came next, spoke little. Her attorney, Brannon Buck,

spoke on her behalf, telling the Court that she was "extraordinarily remorseful that

her actions and her conduct has led us to this place, that, you know, that it gave the

appearance of impropriety. She is very sorry for that, and she will tell you that

herself." *Id.* at 36–37.

Afterwards was Eagan, who said that she was

> truly sorry if [she] did something that the Court found that
> was wrong or that the Court found somehow impugned
> [its] dignity or reputation, or that [she] did something that
> [the Court] felt was wrong or offensive or that bothered
> [the Court] or that [the Court] felt like was disrespectful
> . . .. What we did, I thought was allowed by the rules. I did
> not feel like we were doing anything that we didn't have a
> right to do. But I am truly sorry that this has ended up into
> this two-year process or that Your Honor may feel badly—
> may think badly of me or something that I have done. And
> I just wanted to say that.

*Id.* at 56. Next, Doss said that if he could tell the Court "anything," it would

be that he has "never wanted to be the attorney that gets right up to the line."

*Id.* at 65–66.

> I don't ever want there to even be a question about what I do professionally. And so just even the question . . . being raised in this case or by Judge Proctor, my former boss, it's devastating. And I just don't want Your Honor to think my goal as a lawyer is to be kind of within the rules but—that's never the goal. And I would not have agreed to dismiss this case and file our case if I thought that there was even a question. I would not. I truly sincerely believed then that we had a right to do what we had to do. And it was the best decision we could make under the circumstances. Again, if I could go back in time, I probably would look at the situation entirely differently. One thing I do regret is we didn't wait. Maybe wait just until Monday and just see. You know, it was the lesson of sleep on it at the very least. We should have done that. And so, you know, I've never—I've been in front of Your Honor many times. And I just—I don't want you to think that I did anything that was to disrespect you or violate any rules or do anything like that. I just—that was never the intention. It was never the intention. And I certainly understand how questions could get raised. And I tried my best to answer them when we went through the panel proceeding.

*Id.* at 66–67.

After Doss, Orr said that he was "very sorry that [his] conduct indicated a lack of faith and impartiality of this Court or the Alabama federal courts in general, and that [he] didn't judge the strength of [their] case based on the case law alone." *Id.* at 73. His declaration contained a similar sentiment, but he wished "to reiterate" this apology face-to-face with the Court so that it could "see [his] sincerity and not just read it." *Id.* Levi, like Orr, apologized without qualification:

> I do want to apologize to this Court. I'm really sorry for the time and attention that these proceedings have taken. I

> have tremendously high regard for this Court and for the judiciary. I've never had or been a part of disciplinary proceedings. I've learned a lot in the last two years. I can assure you that my current and future conduct would reflect what I have learned. And, you know, every intention to comply completely with all of the rules, laws, and orders of the Court, so I really do apologize to this Court.

*Id.* at 79–80. Minter said that he was "glad to have a chance" to speak to the Court.

> I am so sorry for the burden this has put on [this Court] and the other judges. . . . I believe in our legal system with my whole heart. And I take the responsibility and the privilege of being a lawyer and officer of the court very seriously. It means a lot to me. And I am sick that my actions have caused you and others to question that and question my integrity. And, sir, I am very sorry.

*Id.* at 83–84. Next, Esseks, Charles, and Faulks appeared together. Esseks spoke

first:

> I recognize that the actions that I took and that we took gave [the Court] and gave apparently every federal judge in Alabama the impression that we were gaming the system or that we were trying to. And I deeply regret that, and I apologize for that. That was not our intent. And I know that this has put the Court through a lot of work and a lot of process. And, again, that was not our intention. I apologize for that.

*Id.* at 86–87. Next was Charles:

> Your Honor, I would just like to add, too, and I did say this to the panel, but I appreciate the opportunity to say it to [the Court] today that I did apologize to them, and I apologize to [the Court] for my forgetfulness at the May 20th hearing. That was reflected in a variety of different circumstances at the time. But most importantly, Your

> Honor, I did not lie, nor did I intentionally mislead the
> panel. I took very seriously the oath that they put us under,
> as I have taken very seriously all the testimony we have
> presented to you since.

*Id.* at 87. Finally, Faulks:

> Your Honor, I am probably the person . . . who has said
> the least on the record in this matter. I was the legal
> director at ACLU at the time that this occurred. I have a
> lot of regret for what everyone has experienced in this.
> Having the opportunity to have these fine lawyers come to
> Alabama to support and assist me as a resident of Alabama
> as I was seeking to make sure that folks knew that their
> concerns were going to be addressed, I carry a lot of
> responsibility as the host to these folks. And the entire
> experience that we have had here is unfortunate, but I think
> that we have all tried to act in good faith. This team took
> very seriously the work they were doing in preparing the
> litigation. And I think that what you have seen from us in
> this process is a demonstration of the careful, close
> attention that we have tried to pay to get it right. I hope
> that it is not lost on this Court that the desire to get it right
> looks messy. But I have no doubt that both I and my
> colleagues have tried to put the letter in the spirit of the
> law. And I apologize that that effort did not demonstrate
> itself clearly to you and to the panel. I am hopeful that we
> can close this out and move on to the next step of doing
> the great work that the people of Alabama need.

*Id.* at 87–88.

### x. Eagan and Doss move the Court to take judicial notice of select documents in Judge Axon's criminal proceedings.

One week after offering these apologies, Eagan and Doss moved the Court to

take judicial notice of the docket sheet and four docket entries from *United States v.*

*Williamson, et al.*, No. 2:19-cr-466-ACA-JHE (N.D. Ala.), the case over which Judge Axon was presiding when she transferred *Ladinsky* to this Court. Doc. 571.

In a separate order, this Court found that Eagan and Doss filed this motion in bad faith, so it is discussed only in limited part here. *See* Doc. 707. During argument on the motion, their attorneys Chris King, Sam Franklin, and Harlan Prater said that Eagan and Doss had offered the motion to show that the jury in Judge Axon's case had (1) begun deliberating two hours before she transferred *Ladinsky* to this Court, and (2) reached a verdict the following Monday. Doc. 640 at 10–11. According to King and Franklin, these facts showed that the Panel might have been "confused" about the true status of Judge Axon's criminal trial on that important Friday. *Id.* at 10, 21, 25–26.

Neither their motion nor the filings they put before the Court, however, showed the full picture. Through their motion to take judicial notice, Eagan and Doss purposefully sought to create a misleading narrative about Judge Axon's reason for reassigning the case, directing the Court only to the documents that would support their version of events. *See* Doc. 707. The full picture, the Court has made clear, would include the indictments, the jury instructions and deliberations, and certain undisclosed transcripts from Judge Axon's criminal case, all of which showed that the proceedings were likely to continue even after the verdict on guilt for further instructions on forfeiture, and the case could well have lasted more than another

week—just as the Panel had said. Doc. 640 at 15–32; *accord* Doc. 707. The sole

purpose of the motion was to defend their own misconduct by intentionally spinning

a false narrative and attempting to impugn the characters of Judge Axon and the

members of the Panel (namely, Judges Proctor, Watkins, and Beaverstock). *See* Doc.

707.

> xi.    **The Respondents present additional evidence and argument in final show-cause hearings spanning three days.**

With their briefs and written evidence submitted, the Respondents presented

additional testimony and argument over three final days of hearings on June 24, 27,

and 28. Shortnacy and Hartnett testified the first day, *see* Doc. 636; Orr, McCoy,

Esseks, Faulks, Levi, and Minter testified the second, *see* Doc. 640; and Charles,

Eagan, and Doss testified the third, *see* Doc. 642.

On the first day of the show-cause hearings, Hartnett offered the following

testimony:

> I've tried throughout the proceedings to testify truthfully.
> I believe I acted in good faith at all times. I apologize and,
> of course, am horrified that a Court would find my actions
> to be contributing to an appearance of problematic
> conduct. But all I can tell you is that I tried my best. I
> didn't knowingly break any rule or standard. I didn't
> knowingly try to subvert the random case assignment
> process.

Doc. 636 at 51. McCoy had been excused from the May 23 status conference for a

family emergency, *see* Doc. 546, but on June 27, he gave the following testimony:

85

> I apologize that I even thought that you could reach out and grab our case, let alone any case. I'm sorry that I expressed that to my colleagues. Even though when I said it, I told them that I would never say this outside of our private deliberations, but I regret the whole thing. Frankly, I am extremely embarrassed by it. And I don't ask for any consideration in terms of sanctions, in apologizing to you. That's not why I'm apologizing to you. I have wanted an opportunity to say this outside of the hearing and in private, but here we are, and I have had to express what I said in my transcript and in my declaration. And that's unfortunate. But I just want to say that, yeah, I am very sorry. And I also want to let you know that this whole experience has caused me a lot of reflection and maybe a few hours of therapy. And I can assure you that I have searched my psyche to try [to] determine why I went there. And in doing so, I think I have gotten to a place where I can assure you that that's not something that I am going to do again with any other judge.

Doc. 640 at 58–59. Similarly, Esseks amplified the apology he had given the month before:

> In closing, Your Honor, I want to state clearly that I deeply regret that my actions may have communicated to Your Honor that we felt that you would not judge our case fairly. Having spent most of my legal career representing clients who often feel that they are wrongfully pre-judged based on who they are, I acknowledge that we pre-judged how Your Honor would handle a transgender rights case like *Walker*. It turns out that we underestimated Your Honor significantly.
>
> I understand how damaging such prejudgment can be to my own clients, and indeed how damaging it has been in my own life. And I apologize to the Court for making an unjust pre-judgment about [the Court].

*Id.* at 94.

Levi, who also apologized at the status conference, testified that she understood "the importance of legal rules and the ethical codes that guide legal practice." *Id.* at 159. She agreed that rules like these "are essential to preserve the integrity of that system," and she testified to "a deep and abiding respect for our judicial system." *Id.* According to Levi, she had "committed [her] entire professional life to this work because of [her] respect and faith in it." *Id.* She also testified that she would not make the same decisions she made in April 2022 again today:

> I can say with all honesty that I would not. I've learned a lot over the two years. And I understand that the actions that I took caused this Court to question my integrity and my commitment to ethical conduct. And while I believe at the time that I made the decisions that they were permissible under the law, and I'm happy to answer any questions relating to that, I regret that they caused this Court to question my ethical conduct and my commitment to the integrity of the judicial system. And I would make a different choice today.

*Id.* at 162.

The Court learned during Minter's examination that the Panel never ordered him to appear for its inquiry; rather, after learning that his colleagues had been summoned to answer for his decisions, he came of his own volition. *Id.* at 195–96. As the Legal Director of the National Center for Lesbian Rights with significant input into *Ladinsky* and supervisory authority over Orr and others, Minter "wanted to take responsibility" for his actions. *Id.* at 191, 194–96.

On the third day of hearings, the Court heard from Charles, Eagan and Doss. After making his case and answering the Court's questions, Charles offered the following testimony:

> Your Honor, I do want to apologize. I know [the Court] [was] not on the panel at the May 2022 hearing, but I do deeply regret my forgetfulness, and my confusion, and my lack of preparation. That is not in keeping with the respect that is owed to the judiciary. And I am honored to be a part of that community of professionals. I apologize to the panel, and I apologize to Your Honor for that lack of preparation and for the confusion that I caused temporarily, even causing the fleeting thought that I was intentionally trying to mislead anyone. And I also apologize, Your Honor, for the colloquy earlier this morning where it appeared I was trying to be evasive. That was not my intent. I was trying to be complete for Your Honor. I did prepare for this hearing extensively. And I took very seriously every order Your Honor has issued and the things that Your Honor has both written and said about me. I take very seriously [the Court's] duty in this inquiry of going all the way back to 2022. And I submit that to [the Court], Your Honor, in earnestness, in heartfeltness. I'm really proud to be a part of this esteemed profession. It was an honor to briefly participate in the courts in Alabama. And I regret that there were various things that we did during that week that did not convey that respect. And so I want to extend that apology to [the Court] again, Your Honor.

Doc. 642 at 72–73.

Eagan appeared next. Before answering any questions from the Court, Eagan gave the following testimony:

> I just want to say to you, Judge, that I am truly sorry. I am very sorry. Judge, I am sorry if I said or I did anything that

> offended Your Honor or that offended any member of this
> judiciary. And I am very sorry if I did anything that Your
> Honor or any member thought that was inappropriate or
> unethical.

*Id.* at 83. In the same presentation, Eagan testified that "having gone through these

two years and all this experience," she "would not" "take the same actions today that

[she] took back in 2022." *Id.* at 88.

> I would change my actions. I still believe, Judge, that our
> actions were permissible and what we did was allowed by
> the law, but I also understand that what we did caused
> Your Honor and other members of the judiciary to
> question my ethics and to question my integrity. And I
> very, very deeply regret that, Judge. Very. And so -- so I
> just want to say that if I were faced with that decision
> today, knowing how Your Honors view that, I would not
> support the dismissal and filing of the new case.

*Id.* at 88–89.

The final person to testify at the show-cause hearings was Doss. In his opening

statement, Doss testified as follows:

> Today, I can tell you this: I am sorry. And I do apologize.
> I am sorry I have let you down. I am sorry that I've let
> every judge in this state down. There have been many days
> where I felt like I've let even my partners down. And I'm
> sorry. I understand that Your Honor and I may have
> different views on what—the legal issues in this
> proceeding. But at the end of the day, that doesn't matter
> to me. What matters to me most is that you even have
> questions, that you even have questions about what I did,
> about the judgments that I made. But to be clear, I
> apologize. I have never doubted your fairness. And I will
> admit, two years ago, I didn't think Your Honor was the
> best draw for our underlying case, and I was wrong.

*Id.* at 132.

During the show-cause hearings, the Court also questioned the Respondents extensively about their testimony and legal arguments. Each Respondent reasserted the oral and written testimony they had given the Panel and submitted to this Court. *See* Docs. 636 at 6, 52; 640 at 38, 83, 95, 120, 163, 190; 642 at 4–5, 82, 131. Each was given the opportunity to change or clarify their earlier testimony, but none did. *See id.*[20] Each was also allowed to cross-examine all witnesses. *See, e.g.*, Doc. 636 at 102.

The Court questioned Eagan about the implications of her chief legal argument against sanctions. As discussed at length below, Eagan and her partner Doss contend that Rule 41 allows attorneys to dismiss and refile cases for any reason, thereby immunizing efforts to judge-shop from judicial review. *See* Doc. 642 at 119; *infra* Section VI.B.ii.b.2. The Court posed four hypotheticals to probe for the factual limits of their argument.

The Court began with the following hypothetical:

> Let's say that there is a white attorney who handles lots of plaintiffs' cases, files 20 or 30 plaintiffs' cases a year. He's in a jurisdiction with a white male judge and a black female judge. Every single time he files a case and he draws the black female judge, he dismisses under Rule 41,

---

[20] Charles's testimony "that the panel had zero evidence of a false statement from [him]," Doc. 642 at 64, was at odds with his admissions to the contrary, *see, e.g.,* Doc. 492 at 90 (recognizing that he had made a "mistake in [his] earlier testimony" that he had "to correct"), but if this amounted to a change in his testimony, he soon walked it back. In closing argument, Charles's counsel conceded that Charles had "answered . . . untruthfully to the panel." Doc. 642 at 76.

> refiles, and draws the white male over a period of years,
> so that he never, ever has to allow—is in front of the black
> female judge, only the white male judge.

Doc. 642 at 119. "Do you believe that's misconduct?" the Court asked Eagan. *Id.*

"My interpretation of Rule 41," Eagan said, "is that unless there is something unique to that jurisdiction, a local rule, that would not be impermissible under the rules." *Id.* at 120.

"Don't you think that conduct is horrific?" *Id.*

"Judge, I don't think that it is good—it may be considered by some to be distasteful . . . But I do think that under the language of Rule 41 that that would be allowed." *Id.*

The Court turned to its second hypothetical:

> Let's say I'm challenging Alabama law that affects a huge
> class of people. I want a certain judge. I file in the Northern
> District of Alabama, where there are usually eight judges.
> I file 12 different cases with 12 different sets of plaintiffs.
> I still don't get Judge Burke, and he's who I really wanted.
> So I dismiss all 12. Refile all 12. This time, one of them
> hits, and I get Judge Burke. I dismiss all the rest of them.

*Id.* at 121–22. "Do you think Rule 41 protects that conduct?" *Id.* at 121.

Eagan first answered that conduct like this is precluded by Rule 41's two-dismissal rule, but when the Court reiterated that the plaintiffs in each of the 12 cases would be different, she modified her answer. *See id.* "Judge," she said, "I think under

the current state of law on Rule 41, that that would be considered permissible based upon my read of the rule." *Id.*

The Court moved onto its third hypothetical:

> Attorney Jones knows that Judge Smith has been having a long-term affair with his law partner. He goes down to the courthouse, files his case, does not get her. Dismisses. Refiles so that he has the judge that he knows is involved in a secret relationship with his client."

*Id.* at 121–22. "Does Rule 41 protects that?" the Court asked Eagan. *Id.* at 122.

"I believe that would be allowed procedurally," she said. "[F]rom a standpoint of the filing of the new case and the refiling, I think that would be allowed under Rule 41." *Id.*

The Court sought to put a finer point on whether Eagan, whose testimony suggested a boundless view of Rule 41, believed the rule inoculates bad-faith litigation conduct against judicial review:

> THE COURT: So is it your contention that a Rule 41 dismissal completely covers misconduct; in other words, even if you're doing it for an improper -- even if you're dismissing and refiling for an improper purpose that would otherwise be misconduct, Rule 41 is the balm that heals it, nobody can look behind the dismissal?
>
> MS. EAGAN: Judge, my understanding of the law is that Rule 41, you can dismiss for any purpose. If you can dismiss for any purpose, I'm not sure how there is an improper purpose.

*Id.* at 122.

The Court then turned to its final hypothetical. The Court noted that Rule 41 applies by "its plain language" to parties, not attorneys, and that while parties typically act through attorneys the Rule does not attach to issues. *Id.* at 123. To illustrate this point, the Court asked Eagan whether she could have dismissed *Eknes-Tucker* [her second-filed case] and refiled it again with new plaintiffs if she'd drawn hypothetically a judge she didn't want. *Id.*

"I believe procedurally, *Eknes-Tucker*, if an answer or a summary-judgment motion had not been filed, could be dismissed by the plaintiffs under Rule 41 and a new case could be filed," Eagan said. *Id.*

The Court pressed the hypothetical further still:

> THE COURT: You file a case in the Northern District. You wind up before Judge Burke on a transfer. You don't want to be before Judge Burke. You dismiss and go to the Middle District, but you get new plaintiffs. You get Judge Burke again. You dismiss again. You refile with new plaintiffs in the Middle District. You get Judge Burke again. You dismiss. You refile with new plaintiffs in the Middle District. You dismiss. You get Judge Burke again. You do this 20 times until Judge Burke says, golly, I am just going to drive back to Huntsville. And you get Judge Thompson. And then you go forward. Does Rule 41 protect that?

> MS. EAGAN: I am not aware of a rule that would prohibit that based upon my current scope of knowledge of the law.

> THE COURT: As an attorney, do you think that's ethical conduct?

MS. EAGAN: Judge, I'm not sure that it violates any rule. I wouldn't do it.

THE COURT: Why wouldn't you do it?

MS. EAGAN: To file a case 20 times trying to—I mean, Judge, I mean, here, that's just—I wouldn't do that.

THE COURT: Why wouldn't you do it?

MS. EAGAN: Because I wouldn't be comfortable doing it. Not because it's unethical or violates some rule, but I just personally would not be comfortable doing it.

THE COURT: Well, if it's not unethical, it's not wrong, doesn't violate a rule, what makes you uncomfortable about it?

. . . .

MS. EAGAN: I would find it to be distasteful, Your Honor, and I don't do things that I think are distasteful.

THE COURT: What if you only did it ten times?

MS. EAGAN: I still would not do that, Your Honor.

THE COURT: How about five?

MS. EAGAN: I wouldn't do that—Judge, this was the first time that I have ever dismissed a case under Rule 41.

THE COURT: Okay. Well, tell me what the difference is between the attorney who files in one district, dismisses, refiles in another district, and stops there, and then the attorney who does it one more time, and then the attorney who does it one more time, and then the attorney who does it 20 times? Where is the line between 2 and 20 [where] it becomes so distasteful and wrong that you can't live with it?

94

> MS. EAGAN: Judge, I don't know where I would draw the line. And, again, I mean, I'm not saying there's anything sanctionable or ethically wrong with it, but I just said that I would find it distasteful.

*Id.* at 123–25.

To understand her answer, the Court asked Eagan whether she would take that course of action ten times, or even five. *Id.* She testified that she would not, and that "this was the first time that [she had] ever dismissed a case under Rule 41." *Id.* The Court further asked why Eagan would do it once, or perhaps twice, but not more, and Eagan testified that she did "not know where [she] would draw the line." *Id.*

The Court closed this line of inquiry by questioning Eagan about the consequences these practices would have on the administration of justice. "In my mind," Eagan testified, "if that type of situation was happening in a jurisdiction, that the court would likely have some local rule or something to address it as many jurisdictions have." *Id.* at 126. This claim was in tension with her Rule 41 argument, so the Court asked for clarification:

> THE COURT: Well, if Rule 41 allows it, . . .—and Rule 41's an absolute bar and protection for the attorney—can we establish a local rule that overturns Rule 41?
>
> MS. EAGAN: I don't believe that you can.

*Id.* at 127.

At the end of that day's hearing, the Court heard closing arguments from the Respondents' attorneys and began deliberations. This order followed.

## II.    A PRIMER ON JUDGE-SHOPPING

In its broadest sense, "judge-shopping"[21] refers to any "attempt to place a matter before a sympathetic judge." *Judge Shopping*, BOUVIER'S LAW DICTIONARY (2012). It is a practice among lawyers of "plac[ing] matters for judicial action before a judge who is perceived to favor the matter or the type of litigant represented by the judge shopper," and although it is "akin to forum shopping," the term refers to the more restrictive practice of "seeking to be heard by one of the several judges *within the forum* in which jurisdiction over the matter involved is clear." *Id.* (emphasis added). Sometimes, the term takes a narrower meaning, describing a species of the practice rather than the genus. Black's, for instance, defines judge-shopping as "[t]he practice of filing several lawsuits asserting the same claims—in a court or a district with multiple judges—with the hope of having one of the lawsuits assigned to a favorable judge and of nonsuiting or voluntarily dismissing the others." *Judge-Shopping*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see In re Fieger*, 191 F.3d 451 (6th Cir. 1999) (upholding sanctions for "judge shopping" where the attorney filed thirteen materially similar suits and dismissed all but one "so that he could select the judge"); *see also Murray v. Sevier*, 145 F.R.D. 563, 569 (D. Kan. 1993) (concluding that plaintiffs' counsel "attempt[ed] to 'judge shop'" in a "deliberate

---

[21] A note on spelling. Although *Bouvier's* spells it as two words, *judge-shopping* is found just as often thus—with the hyphen—in other entries, articles, and opinions. The Eleventh Circuit hyphenates it, so this Court does too. *See, e.g.*, *In re BellSouth Corp.*, 334 F.3d 941, 944 (11th Cir. 2003).

effort to circumvent [the] court's random selection process and secure" a particular judge by filing six separate actions and dismissing the five that were not before their preferred judge). But reporters are replete with less traditional forms of the practice, a few examples of which illustrate the breadth of judge-shopping tactics:

- Suing the assigned judge to force his disqualification;[22]

- Threatening the assigned judge to force his recusal;[23]

- Refiling a case previously dismissed on the merits;[24]

- Voluntarily dismissing and then refiling a case;[25]

- Filing motions for change of venue to avoid randomly assigned judges;[26] and

---

[22] *See, e.g.*, *Azubuko v. Royal*, 443 F.3d 302, 304 (3d Cir. 2006) (affirming the denial of a motion to recuse, as "[a] per se rule of disqualification under § 455(a) would allow litigants to judge shop by filing a suit against the presiding judge.") (cleaned up); *see also Jones v. City of Buffalo*, 867 F. Supp. 1155, 1163 (W.D.N.Y. 1994) (observing that the "tactic of suing federal judges and then seeking their disqualification is nothing more than a tactic to delay and frustrate the orderly administration of justice," one that courts "should not be held hostage to" lest § 455 "be used as a vehicle to engage in judge-shopping, and to 'manipulate the identity of the decision maker.'")

[23] *See, e.g.*, *United States v. Holland*, 519 F.3d 909, 910–11, 915 (9th Cir. 2008) (holding that a district judge "reasonably construed [the defendant's] threatening phone message as an attempt to manipulate the court system which did not warrant his sua sponte recusal," in part because a contrary finding would allow defendants to 'readily manipulate the system, threatening every jurist assigned on the 'wheel' until the defendant gets a judge he preferred.");

[24] *See, e.g.*, *Disability Advocs. & Counseling Grp., Inc. v. Betancourt*, 379 F. Supp. 2d 1343, 1344 (S.D. Fla. 2005) (holding that counsel was "judge-shopping" in 106 cases that had been dismissed by the original judge for lack of standing by filing suit again and drawing a different judge).

[25] *See, e.g.*, *Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*, 341 F. Supp. 2d 69, 73 (D.P.R. 2004) (holding that plaintiffs had "engaged in judge-shopping" by voluntarily dismissing their case under Rule 41(a)(1)(A)(i) and refiling a materially identical case the next day).

[26] *See, e.g.*, *Hader v. St. Louis Southwestern Ry. Co.*, 566 N.E.2d 736, 740 (Ill. Ct. App. 1991), *appeal denied*, 575 N.E.2d 914 (Ill. 1991) (concluding that counsel was "judge shopping" by

- Retaining counsel with a personal connection to the judge to force recusal.[27]

These practices are united by a common theme—they are all "attempts to manipulate the random case assignment process" and are "subject to universal condemnation." *In re BellSouth Corp.*, 334 F.3d 941, 958 (11th Cir. 2003) (internal quotation marks omitted) *(citing United States v. Phillips*, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999)). The reasons for condemnation are myriad, but four reasons stand out above the rest.

First, judge-shopping creates a false appearance of impropriety in the justice system and erodes the public's confidence in a fair, impartial judiciary. As "[t]he legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship," this is its most pernicious effect. *Mistretta v. United States*, 488 U.S. 361, 407 (1989). To let the manipulation of a court's random case-assignment procedures go unpoliced "would bring the judicial system itself into disrepute and would permit unscrupulous litigants and lawyers to thwart our system of judicial administration." *BellSouth*, 334 F.3d at 959–60 (internal quotation marks

---

moving for a change of venue, as "[t]he law is clear that a party should not be allowed to 'judge shop' until he or she finds a jurist who is favorably disposed to his cause of action.").

[27] *See, e.g.*, *In re BellSouth Corp.*, 334 F.3d 941, 943–44 (11th Cir. 2003) (denying a petition for writ of mandamus to vacate an order that disqualified counsel who had been retained "to engineer the recusal of a district judge" in a "strategic" effort to "judge-shop"); *see also McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir. 1983) (holding that "a lawyer may not enter a case for the primary purpose of forcing the presiding judge's recusal").

omitted) (citing *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir. 1983)).

Second, judge-shopping infringes federal law. Under 28 U.S.C. § 137(a), "[t]he business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court." By statute, then, case assignment that is based on a litigant's maneuvering rather than the rules and orders of the court contravenes statutory commands about how the judiciary must conduct its business. The system of random case assignment is one expressly adopted in accordance with this statutory command and "has been well understood by both the bench and the bar to 'prevent judge shopping by any party.'" *Phillips*, 59 F. Supp. 2d at 1180 (citing *States v. Mavroules*, 798 F. Supp. 61 (D. Mass. 1992)).

Judge-shopping necessarily assumes that judges are either (1) so unaccepting of a meritorious claim that manipulating the system to get away from that judge is the claimant's only hope for relief, or (2) so certain to grant relief despite a meritorious defense that manipulating the system to get to that judge is worth the risk of sanctions. In either case, a judge-shopping attorney assumes a judge's complete infidelity to his or her oath, acts on that shameful assumption, and hopes to profit from it without getting caught. This is highly objectionable behavior.

Third, judge-shopping drains scarce judicial resources. It burdens parties, whose substantive rights may be affected; it burdens the court and court staff, who

must investigate counsels' conduct and evaluate the propriety of sanctions; and if sanctions are imposed and appealed, it burdens the circuit courts in their backstop review of the district court's order. These efforts interrupt court work and delay other cases at real cost to the system. Here, for instance, the State argued that judge-shopping substantively affected the Plaintiffs' right to injunctive relief, and the Respondents themselves, as well as their attorneys, were occupied with these proceedings for over two years; four federal district judges have invested an immense amount of time—and staff—into these proceedings; and the Respondents have twice already sought rulings from the Eleventh Circuit.

Fourth, judge-shopping is fundamentally unfair. The realist may be right that judges are not fungible, *see McCuin*, 714 F.2d at 1262, each with his or her own life experiences and beliefs, suffering from ideological biases, and distinguished by intellect, capability, and professional wisdom, but the system tolerates differences among unique judges for the salutary effects of viewpoint-diversity. Those differences do not provide cover for bad-faith attempts to manipulate the administration of justice, and allowing such manipulation to go unpunished would unfairly privilege those willing to see what they can get away with.

Plaintiffs may decide where to file their claims only at their case's outset. A plaintiff might well choose between state and federal court, between the laws of New York and Massachusetts, or even between a district with judges he prefers and a

district with judges he wishes to avoid. Forum-shopping, after all, is "as American as the Constitution, peremptory challenges to jurors, and our dual system of state and federal courts." *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1261 (5th Cir. 1983). But plaintiffs "clearly have no right" in federal court "to a 'judge of their choice'"—a point the Panel made well at the close of its Report.[28] *Id.* at 1262. "It is one thing for attorneys to fret about judicial assignments . . . before a case is assigned," but once "the ball is snapped," there's no changing the play. Doc. 339 at 51 n.9.

## III.   STANDARD OF REVIEW

In its Final Report, the Panel referred its proceedings to this Court "so that he may proceed as appropriate." Doc. 339 at 52. Later, it transferred the underlying miscellaneous case of *In re Vague* to this Court for further proceedings that "may include, but are not limited to, accepting, rejecting, or modifying in whole or in part

---

[28] The Lightfoot Respondents' rhetorical strategy relies in part on their intentional but erroneous conflation of forum-shopping with judge-shopping, framing their conduct as mere forum-shopping rather than a bad-faith attempt to manipulate the judicial process. For instance:

> [T]he Fifth Circuit later acknowledged that certain types of '**judge shopping**' are permissible because various rules authorize it, including Rule 41. *See, e.g., Bechuck v. Home Depot U.S.A., Inc*., 814 F.3d 287, 290 (5th Cir. 2016) ('Although **forum-shopping** is not a trivial concern, Rule 41(a)(1) essentially permits **forum-shopping**.')*.*

Doc. 514 at 32. But forum-shopping looks to laws and juries, judge-shopping to judges; the former is permissible, the latter illicit. Rather than follow the Lightfoot Respondents down the forum-shopping rabbit hole, the Court focuses its analysis on manipulations of the court's random case-assignment procedures.

the Panel's findings and making additional findings of fact as necessary." *Vague*, Doc. 99. In view of these instructions, the Court reviewed the record *de novo*, "mak[ing] a judgment independent of the [Panel's], without deference to that court's analysis and conclusions." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001).

Eagan and Doss observed that "[t]he Panel's inquiry was an evidence-gathering effort, comparable to a grand jury investigation." Doc. 514 at 16. Like a grand jury indictment, the Panel's Report was only an "accusation" that "initiate[d] further process." *Id.* at 16–17. The Court thus considered evidence gathered by the Panel without deferring to its findings or conclusions, much as a petit jury evaluates the evidence rather than the indictment when deciding guilt. *Id.* at 17; *see also* Doc. 520 at 25 ("Levi and Minter do not interpret the Panel Report to contain any legal conclusions," but, to the extent it does, the Court "should review any conclusions of the Panel de novo . . . ."); and Doc. 518 at 59 ("The Panel's findings on mixed questions of law and fact and questions of law regarding whether Respondents' conduct constituted misconduct should be reviewed de novo by this court without any deference.").

Before making its findings and conclusions, the Court reviewed the full record of *In re Vague*. For purposes of its sanctions, the Court considered only the evidence from *Vague* the Respondents expressly incorporated during the June hearings into

their responses to the show-cause orders, including each Respondent's original declarations and all their prior testimony to the Panel. These were adopted by every Respondent without modification or amendment. Docs. 639 at 6, 52; 641 at 38, 83, 95, 120, 163, 190; 643 at 4–5, 82, 131. Neither the Q&A Document nor any testimony, written submissions, or other evidence from any non-Respondent was considered for any purpose.

From the *Boe* docket, the Court has considered the Respondents' briefs, supplemental declarations, and all testimony, written submissions, and unsworn statements to the Court. This included the Respondents' additional written evidence, their unsworn statements to the Court at the May 23 status conference, and the testimony they gave at the show-cause hearings on June 24, 27, and 28.

The Court has independently evaluated each Respondent's credibility. In evaluating the Respondents' candor and credibility, the Court "weighed the testimonies of all the witnesses, taking into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." *U.S. v. Ramirez-Chilel*, 289 F.3d 744, 750 (11th Cir. 2002). All Respondents were given the opportunity to cross-examine all other Respondents. *See, e.g.*, Doc. 636 at 102.

## IV.   SANCTIONS AUTHORITY AND GOVERNING PROCEDURE

### A.    Inherent Authority to Safeguard the Judicial Process

District courts have the "inherent power . . . to investigate conduct that affects the integrity of the court." *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1314 (11th Cir. 2021). Judge-shopping is universally condemned as conduct that abuses the judicial process, because it disrupts "the integrity of the judicial system" and "undermine[s] public confidence in the assignment process." *In re BellSouth Corp.*, 334 F.3d 941, 960 (11th Cir. 2003). Every court to have considered "attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly administration of justice." *Id.* at 959. The Eleventh Circuit thus had "no difficulty concluding that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." *Id.*

### B.    Rule 11 of the Federal Rules of Civil Procedure

District courts may sanction attorneys for wrongful judge-shopping under Rule 11 of the Federal Rules of Civil Procedure or under their own inherent authority. The former authority derives from Rule 11(c)(1), which permits courts, "after notice and a reasonable opportunity to respond," to "impose an appropriate sanction on any attorney, law firm, or party" whom it determines has violated or is responsible for a violation of Rule 11(b).

Under Rule 11(b)(1), an attorney certifies that the pleadings, written motions, and other papers that the attorney has presented to the court—"whether by signing, filing, submitting, or later advocating it"—have not, "to the best of [the attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," been presented "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." District courts may act on their own initiative to "order an attorney to show cause why conduct specifically described in [the Court's] order has not violated Rule 11(b)." *Id.* at (c)(3). The Rule "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). The Rule 11 analysis focuses instead on "the signer's conduct" "at the time of filing." *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (emphasis omitted).

Here, however, Rule 11 is neither the most appropriate vehicle for sanctioning the Respondents nor adequate to do so, because (1) not all Respondents signed the relevant papers presented to the Court, and (2) the core concern is the improper manipulation of the district courts' case assignment procedures rather than the objective reasonableness of counsels' filings. *Chambers*, 501 U.S. at 50.

### C.    Inherent Authority to Impose Sanctions

District courts are also vested with the inherent authority "to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43. Courts may "sanction bad-faith conduct by means of the inherent power" even if "that conduct could also be sanctioned under the statute or the Rules." *Id.* at 50. While the Court should exercise its inherent power "with caution," *Kornhauser v. Comm'r of Social Sec.*, 685 F.3d 1254, 1257 (11th Cir. 2012) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)), it may use it "to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017).

A "primary aspect" of this inherent power is "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45. For this reason, district courts may rely on their inherent power "to sanction bad faith conduct in the course of litigation" in order "to protect their integrity and prevent abuses of the judicial process." *Peer v. Lewis*, 606 F.3d 1306, 1315 (11th Cir. 2010) (quoting *Shepherd v. Am. Broadcasting Cos.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995)).

Courts may not sanction an attorney under their inherent powers without a finding of "subjective bad faith." *Purchasing Power, LLC v. Bluestem Brands, Inc.*,

851 F.3d 1218, 1224 (11th Cir. 2017). Such a finding "is warranted where an attorney . . . knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. *Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001) (*abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)). The attorney may also "demonstrate[] bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* Subjective bad faith can be shown either (1) with direct evidence of the attorney's subjective bad faith, or (2) with evidence of conduct "so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1224–25. Evidence of recklessness alone won't suffice. *Id.* at 1225. *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020).

The meaning of "bad faith" is well-established. A finding of bad faith "is warranted where an attorney . . . knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. *Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001) (*abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)). The attorney may also "demonstrate[] bad faith by delaying or disrupting the litigation or hampering enforcement of a court order" or by attempting to perpetrate a fraud on the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 50–51 (1991). Similarly, an attorney's "willful[] abuse [of] judicial processes" is "bad faith" litigation conduct. *Roadway*

*Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980).

In the context of the Hyde Amendment, the Eleventh Circuit has given "bad faith" its "ordinary meaning," defining it not simply as "bad judgment or negligence," but rather as "the conscious doing of a wrong because of dishonest purpose or moral obliquity," and as a term that "contemplates a state of mind affirmatively operating with furtive design or ill will.'" *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) (quoting *Black's Law Dictionary* 139 (6th ed. 1990)); *accord United States v. Shaygan*, 652 F.3d 1297, 1312 (11th Cir. 2011). Similarly, "[a] determination of bad faith is warranted" under 28 U.S.C. § 1927 "where an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims." *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003).

Bad faith is plainly "satisfied when an attorney knowingly or recklessly pursues a frivolous claim." *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010); *see also Shaygan*, 652 F.3d at 1312. A lawyer's use of factual inaccuracies and "dogged pursuit of a frivolous claim" for recusal may also "indicate[] bad faith." *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1274–77 (11th Cir. 2009).

Consistent with both standard usage and common sense, Black's Law Dictionary identifies dishonesty as the core of bad faith. *See Bad Faith*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "bad faith" as "[d]ishonesty of belief,

purpose, or motive"). Unlike "honest mistake," there is no such thing as "honest bad faith." *See id.*

The Court assumes without deciding that before imposing a sanction, it must find bad faith by "clear and convincing evidence." *See JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988–89 (11th Cir. 2017).

## V.    FINDINGS OF FACT & CONCLUSIONS OF LAW

After careful consideration of the record of these proceedings and the relevant filings in *Vague*, the Court finds the facts below by clear and convincing evidence. These findings are based on the undisputed facts and admissions and the Court's assessment of each Respondent's credibility, evaluated in light of their respective interests, the consistencies and inconsistencies in their testimonies, and their demeanor on the stand. Where the Court describes aspects of a Respondent's demeanor, those observations are illustrative rather than exhaustive; the Court has been evaluating witness credibility from the bench for many years, and its determinations rest on the full range of considerations presented to it.

### A.    The *Walker* Respondents

### i.    Kathleen Hartnett

1.    As a member of the *Walker* team, Hartnett chose neither to file a new suit after dismissing *Walker* nor join the *Ladinsky* team in refiling *Eknes-Tucker* with new plaintiffs in the Middle District of Alabama.

2.    Although she said little in her one-on-one conference with the Court, and although her reasons for dismissing *Walker* and her professed panic about appearing for a status-conference after filing a TRO motion are difficult to credit, Hartnett nevertheless apologized frankly, honestly, and without qualification. Doc. 636 at 51. Voluble but not glib, Hartnett apologized readily and without contrivance, her apology giving no hint of evasiveness or insincerity. Hartnett was plainly mortified that anyone, not to mention four federal judges, would question her integrity, and she appeared genuinely remorseful for her conduct. Her apology was neither conditional nor self-serving.

3.    In substance, Hartnett showed that she (1) accepted responsibility for her conduct; (2) apologized with no expectation that apologizing would diminish the likelihood that she would be sanctioned; and (3) would never again engage in conduct like that the Court has investigated throughout these proceedings.

4.    Based on the Court's observations of Hartnett's demeanor, the substance of her apology, and the fact that she chose not to refile *Walker* or join the *Ladinsky* team in refiling *Eknes-Tucker*, the Court (1) finds her apology to be credible and sincere, and (2) relies on her apology to find that no sanction is necessary to prevent her from engaging in misconduct in the future. Accordingly, the Court exercises its discretion not to impose any sanction on Hartnett, and no further findings as to Hartnett are necessary.

### ii.    James Esseks

5.    Like Hartnett, James Esseks chose neither to file a new suit after dismissing *Walker* nor join the *Ladinsky* team in refiling *Eknes-Tucker* with new plaintiffs in the Middle District of Alabama.

6.    Esseks apologized in his May 23 colloquy with the Court, Doc. 567 at 86–87, apologizing again at the June 27 show-cause hearing—this time more expansively. In each case, Esseks's apology showed, with clear conviction, that he understood the harmful and sprawling effects of his erroneous prejudgments on the judiciary and the reputations of all involved. Esseks spoke firmly and without artifice, offering a sincere, complete, and unqualified apology. His apology was neither conditional nor self-serving.

7.    In substance, Esseks showed that he (1) accepted responsibility for his conduct; (2) apologized with no expectation that apologizing would diminish the likelihood that he would be sanctioned; and (3) would never again engage in conduct like that the Court has investigated throughout these proceedings.

8.    Based on the Court's observations of Esseks's demeanor, the substance of his apology, and the fact that he chose not to refile *Walker* or join the *Ladinsky* team in refiling *Eknes-Tucker*, the Court (1) finds his apology to be credible and sincere, and (2) relies on his apology to find that no sanction is necessary to prevent him from engaging in misconduct in the future. Accordingly, the Court exercises its discretion

not to impose any sanction on Esseks, and no further findings as to Esseks are necessary.

### iii.    LaTisha Faulks

9.    Like her *Walker* co-Respondents, Faulks chose neither to file a new suit after dismissing *Walker* nor join the *Ladinsky* team in refiling *Eknes-Tucker* with new plaintiffs in the Middle District of Alabama.

10.    Even though she was ACLU Alabama's Legal Director and the *Walker* complaint and notice dismissal were both signed with and filed under her name,[29] LaTisha Faulks was not a decision-maker.

11.    Because Faulks had no decision-making role in the conduct under review, the Court finds that no sanction is necessary to deter Faulks from engaging in future misconduct. The Court therefore exercises its discretion not to impose any sanction on Faulks, and further findings as to Faulks are unnecessary.

### iv.    Carl Charles

12.    The Court finds that Carl Charles intentionally misrepresented or otherwise failed to disclose key facts to the Panel by testifying falsely about his call to Judge Thompson's chambers. Specifically, Charles intentionally misled the Panel when he testified that he (1) did not call anyone's chambers about the assignment of the case;

---

[29] Faulks testified that she neither filed nor signed the notice of dismissal herself. Rather, she delegated the task to a colleague, who used her credentials to sign the document electronically and file it on her behalf. Doc. 640 at 129, 134–37.

(2) did not call any judge's chambers; (3) did not speak to any law clerk of any judge in the Middle District of Alabama concerning the *Walker* case and the assignment of the case to that judge; and (4) never communicated with a judge's law clerk discussing the filing of *Walker* and the potential for a TRO being filed in *Walker*.

In each of those four answers, Charles's testimony was false. Charles does not dispute that the transcript from the Panel's May 20 hearing accurately reflects his testimony or that his testimony that day was "untruthful[]."[30] Doc. 642 at 36, 76.

Yet rather than take responsibility for those falsehoods, Charles claims that sanctions are unwarranted because the false testimony he gave to the Panel was not deliberately untruthful, just "erroneous"—the fault not of deceit but of a "lapse in memory." Doc. 517 at 12. According to Charles, he "quickly corrected" his error on the stand as soon as he remembered the call. *Id.*

The Court rejects these claims for two reasons: (1) Charles was not a credible witness, and (2) Charles's innocuous explanations of his testimony strain credulity beyond the point of belief.

13.    First, Charles was not a credible witness. As a threshold matter, Charles claims that the Court should trust his innocent account because lawyers' statements to the tribunal are presumed to be truthful, citing a handful of cases to support this putative proposition. Doc. 517 at 13–14. But none of these cases suggest (even

---

[30] *See supra* note 20.

remotely) that testimony is presumed truthful simply because the declarant is a lawyer. In any event, the Court need not decide whether Charles has the law right here. Presumption or no, the Court finds that Charles intentionally misled the Panel in his testimony about the call he made to Judge Thompson's chambers.

14.    The Court rests this finding in part on its observations of Charles's demeanor, which it observed during his testimony in open court and his *in camera* colloquy. As "middle management" without a meaningful decision-making role, *Vague*, Doc. 77 at 137, Charles recognized that his culpability for any judge-shopping misconduct was plainly lower than that of his decision-making colleagues; thus, when testifying on the bulk of topics—namely, those concerning litigation decisions made by the *Walker* team—Charles answered confidently and without reticence. Doc. 642 at 71. But when the Court began to question him about his false testimony before the Panel, Charles turned his gaze to the ceiling, frequently paused at great length before answering the Court's questions, and equivocated in his testimony. These pauses were so conspicuous that at the May 20 hearing, Charles himself felt the need to justify them to the Panel, *Vague*, Doc. 75 at 179, and at Charles's show-cause hearing, the Court, Charles himself, and Charles's attorney noted them for the record, Doc. 642 at 42, 44, 45. Charles was expressly reminded that a chief purpose of the show-cause hearing was to assess his credibility, observe his demeanor and

manner of testifying, and determine whether he had been honest with the Court and the Panel, but this admonition did not keep him from equivocating. Doc. 642 at 41.

15.    Although he claimed to be nervous, Charles remained composed throughout his testimony. Even when avoiding eye contact with the Court or sizing up its questions in his pregnant pauses, Charles stood calm and collected at the podium. Such composure belied his professed anxiety.

16.    In addition, Charles showed absolutely no remorse for testifying falsely. At both the status conference and the show-cause hearing, Charles's apology simply parroted the key points of his legal defense—he regretted his "forgetfulness," his "confusion," and his "lack of preparation" as well as the "confusion that [he] caused temporarily." Docs. 567 at 87; 642 at 72–73. Even worse, the Court detected no notes of contrition in his voice. There was nothing in his tone, his wording, or his demeanor to suggest soul-searching, sincere regret, or any sort of personal reckoning; indeed, it was delivered as if by rote.

17.    Second, the Court rejects Charles's *ex post* explanation of his false testimony for the simple reason that it rings hollow. To justify his false testimony as a mere lapse in memory, Charles asks the Court to credit a throughline account of his thought process offered on May 20, 2022, as the true rendering of his state of mind that day.

Charles's story goes like this. When Charles was called before the Panel on the first day of the inquiry, he was "surprised" to be put under oath and asked to answer questions. Doc. 492 at 82. Even though all responding attorneys had been ordered to appear in person "to allow the panel to inquire about the issues raised by counsels' conduct," *Vague*, Doc. 1 at 5, Charles claims that Ragsdale told him he would probably not be questioned himself, Doc. 492 at 82. As a result, Charles was anxious when called before the Panel, he says, because he had inadequately prepared for the hearing, and because he had only physically appeared in federal court twice before and spoken on the record (telephonically) one other time. *Id.* at 53, 83. What's more, COVID-19 variants were still spreading, and family health concerns made him "extremely cautious about appearing in public without a mask" during the pandemic. *Id.* at 83.

The main premise of Charles's story, however, is that the Panel's first question—whether he'd had "any contact with the clerk's office about who the case was being assigned to"—inadvertently led to his false testimony. On the one hand, the question failed to refresh his memory, because he hadn't called the clerk's office, and because his call, he claims, was not about the case's assignment. *Id.* at 84. On the other hand, this question, he says, anchored his understanding of all the questions that followed. *Id.* at 87.

Charles further asserts that he was "alarm[ed]" by "[t]he repetitive nature of the Panel's questions," because "[i]t was clear to [him] that that the Panel believed that [he], or someone else from *Walker* counsel had made such a call." *Id.* at 85. When the Panel asked Charles whether he had "call[ed] a judge's chambers and [spoken] to a law clerk about the potential for a TRO in the *Walker* case," he says that he was "so focused on the framing of the initial questions" that he simply "missed the changed question." *Id.* at 87. Even though he had been practicing for seven years, *see* Doc. 642 at 17, and even though his team's motion for emergency relief was styled as a motion for temporary restraining order and/or preliminary injunction, *see Walker*, Doc. 9 at 1, Charles claims the question confused him because he "was unfamiliar with TROs in general at this point in [his] practice." Doc. 492 at 87.

When the Panel then asked whether Charles would remember if he had called "a judge's chambers" and spoken with "a law clerk about the *Walker* case," Charles testified that he was "incredibly certain [he] would." *Vague*, Doc. 75 at 191. Even though Charles had, in fact, called Judge Thompson's chambers and spoken with his law clerk about *Walker*, Charles claims that he gave this response "with the idea in mind that the Panel wanted me to admit to something [he] had not done: calling any judge's chambers to discuss the assignment of *Walker*." Doc. 492 at 88. Thus, he claims, when Judge Proctor finally read his phone number into the record, he was

prompted to reflect on the week's events, remembering only then that he had indeed called Judge Thompson's chambers. *Id.* at 89.

18.     In the light of all the circumstances, the Court finds for the following seven reasons that Charles's *ex post* assertion of an innocent lapse in memory unworthy of belief. First, Charles did not tell the truth until he realized that the Panel had proof of his call. By then, Charles had been asked eight questions about calls he might have made that week, including seven about calls he might have made to a judge's chambers—more than enough prompting to trigger the memory of a call he was "incredibly certain" he would remember. As Judge Proctor said, the recitation of Charles's "phone number doesn't spark a recollection. The phone number sparks a realization." *Vague*, Doc. 75 at 193.

19.     Second, Charles has never been able to explain *how* he could have forgotten such a memorable call. To the contrary, he testified himself that if he had made such a call he was "incredibly certain" that he would remember it.

20.     Third, the circumstances of the call belie Charles's innocent explanation. Many Respondents have testified to a preference for litigating before Judge Thompson. *See, e.g.*, Doc. 492 at 17. Yet at the time of the call, Judge Thompson was not assigned to *Walker*—nor was he ever—and Charles never made a similar call to Chief Judge Marks. Under these circumstances, it's easy to see how Charles would have preferred to conceal the call.

21.    Fourth, Charles claims he had no motive to lie about the call because there was nothing improper about it. But there's no need here to either credit his claim or decide whether the call was, in fact, improper. What matters is that Charles, by his own admission, became "alarmed" that the Panel thought he had done something wrong. Charles's fear that the Panel thought he'd done something wrong—even if he hadn't—was motive enough to lie.

22.    Fifth, Charles claims that it is "very unlikely" that he'd "intentionally lie to the Panel knowing that there was so much conflicting evidence and testimony that could prove him a liar"; after all, he'd reported the call to his team and left a message with Judge Thompson's law clerk. Doc. 517 at 23. But given Charles's fear that the Panel thought he'd done something wrong, the Court finds that it is indeed likely he would have lied about the call lest he get in trouble. It does not matter that he told his colleagues or Judge Thompson's law clerk about it; it is enough that he thought the Panel would not find out. Indeed, when the Panel suggested that the phone number sparked a realization rather than a recollection, Charles admitted that he found it "unusual" that the Panel had his number. *Vague*, Doc. 75 at 193.

23.    Sixth, the Court is not persuaded by Charles's claim that his late decision to amend his testimony shows good faith. Had Charles volunteered that information *before* Judge Proctor read his phone number into the record, it might be the evidence he suggests. After being confronted with proof that the Panel knew of his call,

however, it shows only that Charles knew that he'd been caught; recanting, then, would seem his only shot at mercy.

24.    Finally, Charles justified the long pauses and apparent reticence to the Panel by explaining that he was "endeavoring to be as truthful as possible." Standing alone, this may be a plausible explanation for why someone who had not adequately prepared might need to gather his thoughts in the hot seat. But Charles again paused at great length when testifying at his show-cause hearing even though (1) he'd had ample opportunity to prepare his testimony (and by his own account had done so), and (2) he testified readily when answering questions that had nothing to do with his false testimony. Taken by themselves, each link in Charles's narrative chain is conceivable. But taken together, Charles's behavior, bearing, and testimony have all the hallmarks of an *ex post* attempt to explain intentional falsehoods.

25.    The Court therefore finds that Charles misrepresented and otherwise failed to disclose key facts in bad faith during the Panel's inquiry, and in violation of his oath before the Panel on May 20, 2022, to tell the truth, the whole truth, and nothing but the truth.

    **B.    The *Ladinsky* Respondents**

        **i.    Michael Shortnacy**

26.    Although he was the most senior member of the *Ladinsky* team from King & Spalding, Michael Shortnacy was not responsible for the decisions to dismiss

*Ladinsky* or re-file *Eknes-Tucker* with new plaintiffs in the Middle District of Alabama. In both his written and oral submissions, Shortnacy credibly testified that he deferred to and relied on his Lightfoot co-counsel—Eagan and Doss—for the key decisions under investigation in these proceedings. *Vague*, Doc. 80-5 at 9–11; Doc. 636 at 10–12.

27.    Based on the Court's observations of Shortnacy and the undisputed fact that he had no decision-making role in the conduct at issue here, the Court finds that no sanction is necessary to prevent Shortnacy from engaging in future misconduct. The Court therefore exercises its discretion not to impose any sanction on Shortnacy, and further findings as to Shortnacy are unnecessary.

### ii.    Scott McCoy

28.    Scott McCoy's heartfelt apology obviates the need for further findings about his conduct. McCoy wrote in his supplemental declaration that he was "deeply remorseful for having engaged in what [he] now know[s] to have been entirely erroneous speculation" about the reason that Judge Axon transferred *Ladinsky* to this Court. Doc. 500-1 at 3.

29.    McCoy's live testimony at the show-cause hearing amplified this point at great length, offering a sincere, complete, and unconditional apology for his speculation and his role in the conduct at the heart of these proceedings. Doc. 640 at 57–59. When delivering his apology, McCoy spoke directly to the Court without

hesitation, reservation, or any apparent discomfort. He delivered his testimony with a high degree of professionalism, and the Court observed no indicia of evasiveness or insincerity. It appeared to the Court that McCoy was genuinely relieved to have the opportunity to apologize in person, and that he had invested substantial thought in what he would say.

30.    In substance, McCoy expressed that he (1) accepted responsibility for his conduct; (2) offered the apology without any expectation that it would diminish the likelihood that he would be sanctioned; and (3) would never again engage in the kind of conduct that the Court has investigated throughout these proceedings. McCoy placed no qualifications or conditions on his apology, and it was not self-serving.

31.    Based on the Court's observations of McCoy's demeanor and the substance of his apology, the Court (1) finds his apology to be credible and sincere, and (2) relies on his apology to find that no sanction is necessary to prevent McCoy from again engaging future misconduct. Accordingly, the Court exercises its discretion not to impose any sanction on McCoy, and further findings as to McCoy are unnecessary.

### iii.    Asaf Orr

32.    As with McCoy, Asaf Orr's full-throated apology obviates the need for further findings about his conduct. Orr testified in his supplemental declaration that he "regret[ted] that [his] actions and statements while carrying out the decision to

dismiss *Ladinsky* and file *Eknes-Tucker* suggested a lack of faith in the impartiality of the federal bench in Alabama," and therefore "sincerely apologize[d] to the Court for that conduct and its effects," "accept[ing] full responsibility for [his] actions." Doc. 513-1 at 5. He stressed that "for twenty-three months," he has "lived with . . . the knowledge that [his] conduct did not reflect [his] own values and faith in the federal judicial system." *Id.* Orr also testified—credibly—that if he had been a decision-maker, he would not have recommended that his clients dismiss *Ladinsky*. *Id.* at 6; Doc. 640 at 45.

33.    In his face-to-face apology to the Court at the May 23 status conference, Orr testified with genuine contrition. He spoke earnestly, and his remorse was evident in the regretful tone of his voice during the colloquy. There was nothing in his apology—or the tenor of his presentation—to suggest affectation or deceit.

34.    In substance, Orr expressed that he (1) accepted responsibility for his conduct; (2) offered the apology without any expectation that it would diminish the likelihood that he would be sanctioned; and (3) would never again engage in the kind of conduct that the Court has investigated throughout these proceedings. Like McCoy, Orr placed no qualifications or conditions on his apology, and it was not self-serving.

35.    Based on the Court's observations of Orr's demeanor and the substance of his apology, the Court (1) finds his apology to be sincere and credible, and (2) relies on it to find that no sanction is necessary to prevent Orr from engaging in future

misconduct. Accordingly, the Court exercises its discretion not to impose any sanction on Orr, and further findings as to Orr are therefore unnecessary.

### iv.    Jennifer Levi

36.    Jennifer Levi's apology is likewise dispositive of further findings about her conduct. In the less formal setting of the May 23 status conference, Levi spoke calmly, apologizing to the Court with the frank and heartfelt remarks; her apology was both sincere and unqualified.

37.    At her show-cause hearing, Levi, who "thought [she] would be nervous," read first from prepared remarks, which she set aside to credibly testify that after two years of reflecting on her decisions, she "would make a different choice today." Doc. 640 at 162. Levi's testimony was emotional, and she often spoke rapidly under the strain of the proceedings. Her words to the Court showed an unfeigned expression of profound regret for her actions.

38.    In substance, Levi showed that she (1) accepted responsibility for her conduct; (2) offered the apology without any expectation that it would diminish the likelihood that she would be sanctioned; and (3) would never again engage in the kind of conduct that was under investigation in these proceedings. Levi placed no qualifications or conditions on her apology, and it was not self-serving.

39.    Based on the Court's observations of Levi's demeanor and the substance of her apology, the Court (1) finds her apology to be sincere and credible, and (2) relies

on it to find that no sanction is necessary to prevent Levi from again engaging future misconduct. Accordingly, the Court exercises its discretion not to impose any sanction on Levi, and further findings as to Levi are unnecessary.

### v.    Shannon Minter

40.    Shannon Minter is in the unique case of submitting to these disciplinary proceedings of his own volition. Minter was not among the 38 attorneys the Panel summoned in its initial order; rather, Minter appeared before the Panel without prompting by court or colleagues, because "he wanted to take responsibility" for his actions. Doc. 640 at 195–96. His attorneys advised him to resist sanctions on personal-jurisdiction grounds—he did not, after all, sign any papers in *Walker, Ladinsky*, or *Eknes-Tucker*—but Minter refused to do so. As the Panel had summoned Minter's NCLR subordinate, Orr, who signed the pleadings on NCLR's behalf, Minter wanted to make known that he had been the one calling the shots for the group. None of these courageous details came through in any Respondent's briefing or testimony, least of all Minter's; the Court learned these facts only at the show-cause hearing, when it pointedly asked Minter how he had come to the Panel's attention.

41.    Face-to-face with the Court, Minter said that he "believe[s] in our legal system with [his] whole heart" and "take[s] the responsibility and the privilege of being a lawyer and officer of the court very seriously," and he apologized without guile,

reticence, or qualification. Doc. 567 at 83–84. Minter seemed to be (as he said) both "glad to have the chance" to apologize face-to-face and "sick" with regret for his conduct. Minter placed no qualifications or conditions on his apology, and it was not self-serving.

42.     At the June 26 show-cause hearing, Minter testified that after years of reflecting on his "decision to dismiss one case and file a new one," he "would not do that again."

43.      Minter is to be commended, not sanctioned, for his probity, professionalism, and courage. More than any other Respondent, Minter has shown that he meant what he said: he was not required to submit to these proceedings, but he did so to take ownership of his actions.

44.     Minter's testimony—and above all, his actions—showed that he (1) accepted responsibility for his conduct; (2) apologized without any expectation that apologizing would diminish the likelihood that he would be sanctioned; and (3) would never again engage in the conduct that the Court has investigated throughout these proceedings.

45.     Based on the Court's observations of Minter's demeanor and the substance of his apology, the Court (1) finds his apology to be sincere and credible, and (2) relies on it to find that no sanction is necessary to prevent him from again engaging in

future misconduct. Accordingly, the Court exercises its discretion not to impose any sanction on Minter, and further findings as to Minter are therefore unnecessary.

### vi.    Melody Eagan

46.    The Court finds that Eagan intentionally attempted to manipulate the random case-assignment procedures for the Northern and Middle Districts of Alabama when she abruptly dismissed *Ladinsky* in the Northern District and refiled substantially the same claims on behalf of different plaintiffs as *Eknes-Tucker* in the Middle District. This finding rests primarily on the following undisputed facts and admissions by Eagan:

*Ladinsky* and *Walker* were both pressing cases of the utmost urgency. Eagan was one of *Ladinsky*'s lead counsel: she tried the case, led the direct examination of important witnesses, and made key litigation decisions for the whole team. Indeed, she was the Managing Partner at her law firm, Lightfoot, Franklin & White. She had labored on the *Ladinsky* case for years in advance, anticipated and then won the race to the courthouse, and worked feverishly to secure preliminary injunctive relief for her clients before the Act's effective date. By then, it was less than a month away.

Dismissal was a total about-face from Eagan's professed urgency: She agreed to consolidate *Ladinsky* with *Walker* just hours before dismissing suit, and the *only* intervening event between these decisions was *Ladinsky*'s transfer to this Court. Eagan admits—and her colleagues report—that she feared that relief would be

impossible to obtain in this Court; that she shared this view with her team; that they deferred to and relied on it; and that she knew her colleagues were following her lead.

Even as she was dismissing *Ladinsky*, Eagan fully intended to refile a substantially similar case, and she shared her intention with the press almost immediately. As she admits, Eagan maneuvered *Ladinsky*'s dismissal to assure her team that their case would not lose whatever advantages might accrue from having won the race to the courthouse. For Eagan, a crucial part of this tactic was the chance to file elsewhere; indeed, Eagan believed that refiling in another federal district court was so important to her success on the merits that it was worth both (1) a days-long interruption to urgent litigation she believed would keep children from harm, and (2) the potential loss of first-filed status. The *Walker* team had not yet abandoned their litigation, and as far as Eagan could see, they may well have refiled their case and won the second race to the courthouse.

Only a few days after dismissing *Ladinsky*, Eagan filed a new, materially similar complaint in another federal district court on behalf of different plaintiffs. The Court thus has no difficulty finding that Eagan's true strategic goal—and her animating purpose—was to avoid the assignment of her clients' claims to this Court at all costs (and at great risk).

Eagan offers two arguments—one factual, one legal—why the Court should not make this finding. First, Eagan contends that she didn't manipulate the court's random case-assignment procedures, because *Ladinsky* was never randomly assigned to this Court. Doc. 514 at 18–20. When dismissing *Ladinsky*, she says, her main concern was not the Court's identity, but that the Court was "non-randomly assigned the case," and by filing in the Middle District, she hoped only "to get back in the random-selection pool." Doc. 642 at 95, 103. Second, Eagan contends that even if she was trying to steer her case away from this Court, Rule 41 allowed her to do so.

Because these arguments rest in part on Eagan's testimony, the Court first addresses Eagan's credibility.

47.    The Court finds that Eagan's testimony was intentionally dishonest and patently unworthy of belief; her *ex post* justifications for her conduct are simply not creditable. This finding rests on two grounds: (i) Eagan's demeanor while, and manner of, testifying and (ii) the reality that both her explanations strain credulity in the light of all the evidence before the Court.

First, the Court observed Eagan's live testimony on several occasions both in open court and *in camera*. When confronted with easy questions (for instance, questions about events that were public), Eagan answered readily and directly. But when confronted with questions that were potentially fraught with risk (like

questions about something she told her colleagues or why she took an action), her answers were halting, her posture was at times shifty, and she struggled to maintain eye contact with the Court.

Eagan's discomfort was at its greatest during her *in camera* colloquy with the Court. Although this discomfort came during an apology, it seemed that Eagan's greatest regret was that she'd been publicly embarrassed by the attention. In both form and substance, her apology evinced no remorse for her underlying conduct— conduct that a three-judge panel had already unanimously deemed *mis*conduct.

Indeed, Eagan apologized "if [she] somehow impugned [the Court's] dignity or reputation" without acknowledging, let alone expressing remorse, for having acted improperly. Doc. 567 at 56. As if to underscore her cavalier indifference to the misconduct itself, Eagan, having just seen her counsel confronted with evidence that one of her filings contained a materially omissive misrepresentation, told the Court she was "very comfortable with" counsels' presentation. Doc. 640 at 31.

In short, when the Court questioned Eagan about the heart of the matter—her conduct and intentions—Eagan's demeanor belied her testimony, which did not appear worthy of the Court's confidence, belief, or trust. In an abundance of caution, the Court gave Eagan numerous opportunities to supplement, adjust, or otherwise change her troubling testimony. She never did.

And second, the Court disbelieves Eagan's testimony because her explanations strain credulity in the light of all the evidence before the Court. Eagan urges the Court to believe that (1) she was primarily trying to navigate her clients' claims (whoever those clients happened to be) to a randomly assigned judge, and only secondarily trying to navigate the claims away from this Court, and (2) she genuinely believed that her conduct was not improper.

The Court rejects Eagan's first explanation for six independent reasons:

- There was nothing untoward about *Ladinsky*'s transfer to this Court. *Walker* was randomly assigned to this Court, and *Ladinsky* was transferred here as a related case. Eagan acknowledges *Walker*'s random assignment, but she has offered no reason why this Court could not then properly receive *Ladinsky* on a transfer from its presiding judge.

- Every *Ladinsky* Respondent (including Eagan) testified about the stark differences between Eagan's assessment of their chances of success before Judge Axon and their chances of success before this Court. Eagan's assessment of this Court was so dire that she believed her chances of success here were slim to none, while her assessment of Judge Axon was favorable enough to consider her a "very good draw," allegedly drawing this distinction because the latter has school-aged children, and one of those children might know LGBTQ people through a local theater company. Putting aside Eagan's assumptions about theater, many judges in the Northern District of Alabama—including this Court—have school-aged children, and Eagan had never appeared in Judge Axon's courtroom, but she was sufficiently convinced of her assessments as to offer them as dispositive professional advice worthy of her colleagues' reliance. Given the obvious weight she

accorded these opinions, the Court cannot suspend its disbelief and accept Eagan's *ex post* suggestion that she expected others to trust her advice but did not act on the advice herself.

- At the same time that Eagan was testifying that she believed neither Judge Axon nor the Panel had done anything wrong, Eagan was filing her bad-faith motion to take judicial notice of selected records from Judge Axon's criminal trial. As discussed earlier, that motion was designed to create a false narrative of those proceedings, deflect responsibility for the *Ladinsky* team's hasty dismissal, and cast aspersions on either Judge Axon, the Panel, or both.

- In her show-cause brief, Eagan contends that the only limitations on Rule 41(a)(1)(A)(i) dismissals are those in the rule itself, and cites the two-dismissal rule as one of the controlling limitations. Doc. 514 at 26. Yet at the show-cause hearing, Eagan acknowledged that the two-dismissal rule does not apply to a suit refiled with new plaintiffs like *Eknes-Tucker*. Doc. 642 at 121. In other words, Eagan understood that the construction of Rule 41 she urged the Court to adopt is at odds with her understanding of the rule, and the Court concludes that she urged her preferred construction to mask her misconduct.

- Eagan's testimony shows that she was laser focused on judicial assignments. For instance, when a colleague's friend offered to serve as local counsel in the Middle District, Eagan declined his help in part because she "did not want to run any risk of Judge Huffaker, whom [she] viewed as potentially a favorable draw for the plaintiffs, recusing from the case." *Vague*, Doc. 80-1 at 14.

- Eagan's testimony that she panicked about the case's first-filed status—that the transfer order would rob *Ladinsky* of its advantages as the first-filed case—is literally unbelievable. Her agreement to consolidate

132

*Ladinsky* and *Walker* reflects her concession that the *Ladinsky* team would not have unilateral control over a standalone lawsuit, while her rushed decision to dismiss risked losing those advantages if they should lose to *Walker* in a second race to the courthouse. In real time, then, Eagan did not consider first-filed status a big deal.

- Eagan's testimony that she panicked about the nature of the transfer—that Judge Axon's order suspiciously appeared to contravene the Northern District's standard practice—is also not believable. McCoy candidly acknowledged that the *Ladinsky* team would have been pleased if the judicial roles had been reversed: if this Court, presiding over *Ladinsky* as the first-filed case, had transferred it to Judge Axon presiding over the second-filed *Walker*, the *Ladinsky* team would have considered it a "bank error in [their] favor." *Vague*, Doc. 79 at 214. When the hypothetical was put to her, Eagan could not bring herself to testify that she would still, in that scenario, have dismissed *Ladinsky*. Doc. 642 at 93. Put differently, Eagan would have tolerated a perceived irregularity (assuming she perceived such an irregularity at all) as long as it landed her case with a judge she deemed favorable. But that's not what happened here. The real reason *Ladinsky*'s transfer to this Court led Eagan to panic was that she presumed this Court would rule against her clients.

The Court rejects Eagan's second explanation—that Rule 41 immunized dismissal from judicial review—because if Eagan had truly believed in real time that her *Ladinsky* clients had an absolute right to voluntarily dismiss their lawsuit once without prejudice, she would have felt no need to spend precious time rounding up new plaintiffs for *Ladinsky*'s successor action.

Moreover, if the voluntary dismissal of *Ladinsky* had really been about something other than Eagan's prejudgments of this Court, there would have been no need for her to file the new lawsuit in the Middle District rather than the Northern District, where her team had been planning to file for years. In any event, the Rule 41 explanation fails as a matter of law, as discussed below. *See infra* Section VI.B.ii.b.2. But to be clear, the Court rejects the Rule 41 explanation not only as legally invalid, but also as unworthy of belief as the true reason why Eagan proceeded as she did.

48.    Under the totality of the circumstances, the Court finds by clear and convincing evidence that Eagan acted in bad faith when she dismissed *Ladinsky* and filed the materially similar *Eknes-Tucker* with new plaintiffs in another federal district court for the express and nefarious purpose of interfering with the random case-assignment procedures for the Northern and Middle Districts of Alabama and subverting the orderly administration of justice. The Court rejects Eagan's testimony that she believed that her conduct was proper at the time as dishonest and unworthy of belief. To the contrary, Eagan acted furtively and with ill will toward the judges of two federal district courts and the administration of justice in each of those districts. That's textbook bad faith, and no amount of *ex post* explanation—not even the two years' worth Eagan has offered here—can mask, let alone undo or sanitize, such conduct.

49.     Finally, the Court finds that Eagan is not just willing but perhaps likely to engage in similar conduct in the future. This finding rests on Eagan's stubborn insistence throughout the proceedings that (1) she did nothing wrong, and (2) Rule 41 renders the Court powerless to even consider whether she did anything wrong. This finding is not a penalty for Eagan's vigorous defense throughout the inquiry; rather, it reflects Eagan's obstinate refusal to acknowledge the indisputable impropriety in her conduct and her wholesale willingness to flout the rule of law.

### vii.     Jeffrey Doss

50.     The Court finds that Jeffrey Doss also intentionally attempted to manipulate the random case-assignment procedures for the Northern and Middle Districts of Alabama when he abruptly dismissed *Ladinsky* in the Northern District and refiled substantially the same claims on behalf of different plaintiffs as *Eknes-Tucker* in the Middle District. This finding rests primarily on the following undisputed facts and admissions by Doss:

Like Eagan, Doss was one of *Ladinsky*'s lead counsel: he tried the case, led the direct examination of important witnesses, and made key litigation decisions for the whole team. Doss too labored on the *Ladinsky* case for years. He anticipated, then won the race to the courthouse, and he worked "around-the-clock," *Vague*, Doc. 80-2 at 5, to secure preliminary injunctive relief for his clients before the Act's

then-looming effective date. With less than 30 days before the Act became law, he understood that "time was precious." *Id* at 8.

Doss had been monitoring *Walker* since it was first docketed in the Middle District and expected that it would be consolidated with *Ladinsky*. Nevertheless, he decided to dismiss the case only after Judge Axon transferred *Ladinsky* to this Court, even though no decision had been made about consolidation. Dismissal was thus a total about-face, and the only intervening event between these decisions was *Ladinsky*'s transfer to this Court. Doss told his team that the transfer order seemed very unusual, almost as if the case were being "pulled over" to this Court; his colleagues deferred to and relied on his advice; and that he knew his colleagues were relying on his advice.

Even as he was dismissing *Ladinsky*, Doss fully intended to refile a substantially similar case. Recognizing the apparent impropriety of this tactic, Doss believed it was critical that his team file their new suit in another court with new plaintiffs. Like Eagan, Doss believed that refiling in another federal district court was so important to his success on the merits that it was worth both (1) a days-long interruption to urgent litigation he believed would keep children from harm, and (2) the potential loss of hard-won first-filed status. More importantly, Doss actually understood that dismissing, repackaging, and refiling lawsuits for the purpose of manipulating or interfering with the orderly administration of justice is improper.

136

A few days after dismissing *Ladinsky*, Doss filed a new, materially similar complaint in another court on behalf of different plaintiffs. The Court thus has no difficulty finding that Doss's true strategic goal—and his animating purpose—was to avoid at all costs (and at great risk) the assignment of his clients' claims to this Court.

Doss (who briefed the matter jointly with Eagan) offers the same two arguments why the Court should not make this finding—that (1) he did not manipulate the court's random case-assignment procedures because *Ladinsky* was not "randomly" assigned to this Court, and that (2) even if he had been trying to steer her case away from this Court, Rule 41 allowed him to do so.

As with Eagan, the Court turns first to Doss's credibility.

51.    The Court finds that Doss's testimony was intentionally dishonest and patently unworthy of belief. This finding rests on two grounds: (i) Doss's demeanor and manner of testifying, and (ii) the reality that both his explanations strain credulity in the light of all the evidence before the Court.

First, the Court observed Doss's live testimony on several occasions both in open court and *in camera*. When answering questions that offered no insight to his conduct (for instance, when testifying about legal subtleties), Doss answered with ease, offering precise explanations, often with a slight, sheepish smile. But when he was challenged to account for his thoughts or actions (as when asked why he

dismissed *Ladinsky*), his answers grew rambling but vague, he began to fidget, and his tone lost its note of confidence.

Doss too seemed most ill at ease during his *in camera* colloquy with the Court. Rather than use this chance to apologize, Doss focused his attention on how the proceedings affected his reputation among the judiciary—he did not "ever want there to even be a question about what [he] do[es] professionally," so it was "devastating" to have Judge Proctor (for whom he clerked) or the Court question his integrity. Doc. 567 at 66.

Doss apologized at the show-cause hearing, but with the qualification that he and the Court "may have different views on . . . the legal issues in this proceeding." Doc. 642 at 132. Like Eagan, it seemed that Doss's greatest regret was to have been publicly embarrassed by the negative attention; in both form and substance, his apology showed no remorse for his underlying conduct. In short, when the Court questioned Doss about the heart of the matter—his thoughts and actions—his demeanor belied his testimony, which did not appear worthy of the Court's confidence, belief, or trust. In an abundance of caution, the Court gave him numerous opportunities to supplement, adjust, or otherwise change his troubling testimony. Like Eagan, he never did.

And second, the Court disbelieves Doss's testimony because his explanations strain credulity in the light of all the evidence before the Court. Doss urges the Court

to believe that (1) he was primarily trying to navigate his clients' claims (whoever those clients happened to be) to a randomly assigned judge, and only secondarily trying to navigate the claims away from this Court, and (2) he genuinely believed that his conduct was not improper.

The Court rejects Doss's first explanation for four independent reasons:

- As noted above, there was nothing untoward about *Ladinsky*'s transfer to this Court. *Walker* was randomly assigned to this Court, and *Ladinsky* was transferred here as a related case.

- At the same time that he was apologizing to the Court, Doss was filing his bad-faith motion to take judicial notice of Judge Axon's criminal trial. Indeed, Doss himself was responsible for reviewing the record and choosing which portions to excerpt for the Court's consideration, Doc. 640 at 14, and even after the Court pointed out that the motion spun a false narrative of the trial's posture that Friday afternoon, Doss testified that he was "100 percent comfortable" with the motion, *id.* at 30.

- Doss's testimony that he panicked about the case's first-filed status—that the transfer order would rob *Ladinsky* of its advantages as the first-filed case—is, like Eagan's identical testimony, literally unbelievable. His expectation that *Ladinsky* and *Walker* would eventually be consolidated reflects his concession that the *Ladinsky* team would not have unilateral control over a standalone lawsuit, while his rushed decision to dismiss risked losing those advantages if they should lose to *Walker* in a second race to the courthouse. In real time, then, Doss did not consider first-filed status a big deal.

- Doss's testimony that he became concerned about the
  nature of the transfer—that Judge Axon's order
  suspiciously appeared to contravene the Northern
  District's standard practice—is also unworthy of
  belief. McCoy candidly acknowledged that the
  *Ladinsky* team would have been pleased if the judicial
  roles had been reversed: if this Court, presiding over
  *Ladinsky* as the first-filed case, had transferred it to
  Judge Axon presiding over the second-filed *Walker*,
  the *Ladinsky* team would have considered it a "bank
  error in [their] favor." *Vague*, Doc. 79 at 214. Doss
  himself repeatedly acknowledged that he thought
  Judge Axon was a good draw. Perhaps most tellingly,
  he admitted that that if the case had been reassigned to
  Judge Thompson instead of Judge Burke, he would
  probably not have dismissed. Doc. 642 at 140.

The Court rejects Doss's second explanation—that Rule 41 immunized dismissal from judicial review—because if Doss had truly believed in real time that his *Ladinsky* clients had an absolute right to voluntarily dismiss their lawsuit once without prejudice, he would have felt no need to spend precious time rounding up new plaintiffs for the *Ladinsky* successor action.

Moreover, if the voluntary dismissal of *Ladinsky* had really been about something other than this Court, there would have been no need for him to file the new lawsuit in the Middle District rather than the Northern District, where his team had been planning to file for years. In any event, as discussed below, the Rule 41 explanation fails as a matter of law. *See infra* Section VI.B.ii.b.2. But to be clear, the Court rejects the Rule 41 explanation not only as legally invalid, but also as unworthy of belief as the true reason why Doss proceeded as he did.

140

52.    Under the totality of the circumstances, the Court finds by clear and convincing evidence that Doss acted in bad faith when he dismissed *Ladinsky* and filed the materially similar *Eknes-Tucker* with new plaintiffs in another federal district court for the express and nefarious purpose of interfering with the random case-assignment procedures for the Northern and Middle Districts of Alabama and subverting the orderly administration of justice. The Court rejects Doss's testimony that he believed that his conduct was proper at the time as dishonest and unworthy of belief. To the contrary, Doss acted furtively and with ill will toward the judges of two federal district courts and the administration of justice in each of those districts. That's textbook bad faith, and no amount of *ex post* explanation—not even the two years' worth Doss has offered here—can mask, let alone undo or sanitize, such conduct.

53.    Finally, the Court finds that Doss is not just willing but perhaps likely to engage in similar conduct in the future. This finding rests on Doss's stubborn insistence throughout the proceedings that (1) he did nothing wrong, and (2) Rule 41 renders the Court powerless to even consider whether he did anything wrong. This finding is not a penalty for Doss's vigorous defense throughout the inquiry; rather, it reflects Doss's obstinate refusal to acknowledge the indisputable impropriety in his conduct and his unflinching willingness to flout the rule of law.

## VI. SANCTIONS

Now to the matter of sanctions. As the facts plainly show, some Respondents did everything in their power to avoid this Court by manipulating the court's random case-assignment procedures, and were willing to undertake a scorched-earth campaign to defame the judiciary and justify their malfeasance. Not all Respondents are equally culpable, and some of those whose culpability may have been greater have proven by way of apology and genuine remorse that they need no further deterrence to abstain from future misconduct of the kind they answered for here. The Court has taken great pains to evaluate each Respondent's conduct and culpability individually. *See Shaygan*, 652 F.3d at 1319 (holding that no attorney can "be held responsible for the acts or omissions of others").

When the Panel began its inquiry in May 2022, the Court was immersed in the merits of *Eknes-Tucker*. By devoting seventeen-months to investigating, deliberating, and preparing their findings, the Panel saved the Court from the Herculean task—and enormous distraction—of juggling ancillary proceedings with forty attorneys and adjudicating the merits of the plaintiffs' underlying state-law challenge. The Panel's efforts helped enormously, and the Court is eminently thankful for its work.

And after reviewing the record for itself, and after issuing show-cause orders, receiving additional evidence, and hearing argument from each Respondent, the Court concludes that not all the Respondents' conduct is sanctionable.[31]

For the reasons stated in the Findings of Fact discussed in Section V above, the Court exercises its discretion not to impose any sanction on **James Esseks**, **LaTisha Faulks**, **Kathleen Hartnett**, **Michael Shortnacy**, **Scott McCoy**, **Asaf Orr**, **Jennifer Levi**, or **Shannon Minter**. The Court is not indifferent to the tremendous emotional strain that three years of disciplinary proceedings might have on an attorney; for these Respondents, that is punishment enough. These Respondents are therefore **RELEASED** from these disciplinary proceedings without sanction.

Those same findings do, however, support sanctions for the remaining three Respondents. For lead counsel **Melody Eagan** and **Jeffrey Doss**, and for **Carl Charles**, who violated his oath to the Panel, sanctions are not just warranted; they're imperative.

## A.    Available Sanctions

Sanctions imposed under a district court's inherent power must be "reasonable and appropriate." *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332,

---

[31] Nothing in this paragraph should be construed to suggest that this Court relied on, incorporated, or deferred to the Panel's findings or conclusions for any sanctions it has imposed. It hasn't. *See infra* pp. 152–159.

1335 (11th Cir. 2002) (per curiam) (internal citations omitted). Sanctions for attorney-misconduct "must never be hollow gestures; their bite must be real." *Id.* at 1337. When a district court finds that attorneys have acted in bad faith, it may impose a variety of possible sanctions, including an "assessment of attorneys' fees and costs, disqualification of counsel, and monetary penalties payable to the clerk of court," *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (cleaned up), as well as everything "from a simple reprimand to an order dismissing the action with or without prejudice." *Mingo v. Sugar Cane Growers Co-op. of Fla.*, 864 F.2d 101, 102 (11th Cir. 1989). *See also Chambers*, 501 U.S. at 44–45 (holding that sanctions available under the court's inherent powers include the "severe sanction" of "outright dismissal of a lawsuit" and, by necessity, "less severe sanction[s]" as well).

### B.    Sanctions are necessary for Eagan and Doss, because they attempted to manipulate the court's random case-assignment procedures in bad faith.

The Court has found by clear and convincing evidence that Melody Eagan and Jeffrey Doss (or "the Lightfoot Respondents") intentionally attempted in bad faith to manipulate the random case-assignment procedures for the U.S. District Courts for the Northern and Middle Districts of Alabama. *See supra* Section V. These findings not only support the imposition of sanctions, they demand them: as previously    explained,    judge-shopping    intolerably    threatens    the    orderly

administration of justice. *See supra* Section II. The brand of judge-shopping that occurred here—a brazen, publicized effort coordinated by veteran attorneys—demands condemnation. Eagan and Doss have shown that only serious sanctions (indeed, nothing less than what the Court imposes) will suffice to prevent them from judge-shopping in the future or deter similarly situated attorneys who might be tempted to follow their lead. In the sections below, the Court explains (1) why the sanctions it has chosen are reasonable and appropriate, and (2) how the arguments that the Lightfoot Respondents raise against them lack merit.

>    **i.     Disqualification and public reprimands are reasonable and appropriate sanctions for Eagan and Doss.**

After much deliberation, the Court concludes that nothing less than a public reprimand and disqualification from this case will impress upon Eagan and Doss the gravity of their misconduct and deter them or likeminded attorneys from judge-shopping in the future. The Court takes seriously the reputational harm that comes with sanctions, and it has exercised its inherent powers to impose them with all necessary restraint. *See Chambers*, 501 U.S. at 44. But the Lightfoot Respondents' misconduct has established that sanctions are necessary, and reprimand and disqualification are both reasonable and appropriate sanctions from the wide array of sanctions available under the Court's inherent powers.

Disqualification and public reprimands are appropriate, because recognized standards of professional conduct and the controlling law both forbid bad-faith manipulations of judicial process like those that occurred here. There is no defensible argument that the law permits some bad-faith conduct under some circumstances. The Federal Rules of Civil Procedure simply do not inoculate bad-faith behavior. Rule 15, for instance, enacts a liberal policy for amending pleadings, but the law forbids parties from amending pleadings to assert frivolous claims in bad faith. The Rules likewise enact a liberal discovery policy, but the Federal Reporter overflows with published orders imposing sanctions for bad-faith discovery abuses. In short, lawful means do not grant legal cover for bad-faith ends.

The Eleventh Circuit made this very point in the judge-shopping context. In the case of *In re BellSouth Corp.*, discussed further *infra* Section VI.B.ii.b.1, the Eleventh Circuit recognized that while parties are ordinarily entitled to hire counsel of their choice, they may *not* hire attorneys "as a device to manipulate the orderly administration of justice." 334 F.3d 941, 946 (11th Cir. 2003). The *BellSouth* court had "no difficulty concluding that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice," in part because "[e]very court considering attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly administration of justice." *Id.* at 959.

Throughout these proceedings, the Lightfoot Respondents have continuously defended a right for attorneys to engage in bad-faith contrivances to secure or avoid assignment to a particular judge. They put it differently, of course, couching their argument as a defense of an "absolute" and "unconditional" right to dismiss, one "which necessarily means that the dismissal can be for any reason." Doc. 514 at 4. But the Lightfoot Respondents give short shrift to the logic of their own argument: if dismissal can be "for any reason," then that reason can be to avoid a judge in bad faith. Indeed, the Lightfoot Respondents have made plain that this is their true position by refusing to acknowledge their argument's logical endpoint in their briefing, testimony, and conduct throughout these proceedings.

The clearest illustration that the Lightfoot Respondents endorse a "right" to engage in this misconduct—though far from the only one—came during Eagan's testimony at the show-cause hearing, when the Court presented her with four hypothetical cases of bad-faith misconduct. In each hypothetical scenario, an attorney dismissed his or her lawsuit under Rule 41(a)(1)(A)(i) and refiled new ones for the obvious purpose of manipulating the random case-assignment procedures and securing or avoiding a particular judge; in each case, the attorney's bad faith was baked into the hypothetical. Even so, Eagan claimed in each case that the attorney's misconduct was protected by Rule 41(a)(1)(A)(i). None of those hypotheticals—let alone all of them—can be protected by the rule.

147

Moreover, disqualification and public reprimands are reasonable in this case, because no lesser sanction will suffice to deter the Lightfoot Respondents or the those who might be tempted to follow their lead from trying to judge-shop in the future. A lesser sanction would be a stand-alone public reprimand, and the record contains clear evidence that a mere public reprimand would not suffice. As a practical matter, some of the deleterious effects of a reprimand have already accrued: a three-judge panel found that the Lightfoot Respondents committed misconduct by judge-shopping and published its findings in a now-unsealed report, and the Court has conducted much of these attorney-disciplinary proceedings in the light of day. If such public shame has not convinced Eagan or Doss that they did anything wrong, then a public reprimand, without more, will not do so either.

Other lesser sanctions would also be inadequate. For instance, reassignment to the judge assigned to the first case—which the Lightfoot Respondents have proposed as the only appropriate remedy, *see* Doc. 514 at 45—was already accomplished here when Judge Huffaker reassigned *Eknes-Tucker* to this Court, but such a remedy would neither penalize these Respondents (since the Court gave them precisely the relief they sought) nor serve as a deterrent (since the only thing they're sorry about is getting caught).

Nor would a simple public reprimand serve as a general deterrent to other attorneys who might consider engaging in similar bad-faith litigation tactics. General

deterrence is well-served by disqualification, because disqualification is the least severe sanction that will deprive the Lightfoot Respondents of any further gains from their bad-faith conduct. Were the Court to let them remain in the case—as lead counsel, no less—their strategic calculation may well have paid off, and other litigants, rather than feel deterred, may see their success and feel emboldened to take the same risk. Disqualification eliminates those gains entirely. And because a large team of able counsel will remain in the case following the disqualification of Eagan and Doss, the Court has no concern that disqualification is too severe a sanction or that it otherwise impairs the plaintiffs' ability to litigate the remainder of this case effectively.

Although disqualification is clearly reasonable and appropriate, the Court finds it marginally insufficient for a few practical reasons. First, the Lightfoot Respondents undertook these lawsuits *pro bono*, so disqualification does not reduce or eliminate any financial gains they may have realized from continuing their representation of the plaintiffs in this case. Second, this case is stayed pending a ruling from the Supreme Court of the United States on the constitutional issues at stake. If the Supreme Court rules in some way that leaves relatively little to be done in this action, disqualification may not, in practice, preclude the Lightfoot Respondents from doing very much. And third, absent sincere remorse or even a clearly expressed acknowledgment that their misconduct may have been wrong, the

Court has serious concerns that disqualification will not be severe enough to prevent the Lightfoot Respondents from trying these kinds of tactics in the future, perhaps under slightly distinguishable or less brazen circumstances. The Court has thus considered other potential sanctions with real bite.

Having considered other sanctions, the Court declines to impose a sanction substantially more severe than disqualification. The next rung up the severity ladder would usually be a temporary suspension from practice in one or more federal districts in Alabama. The Court has no doubt that a modest, temporary suspension would be reasonable, but the Court is disinclined to impose that sanction for several reasons. The two most salient, of course, are that a suspension (1) may have the practical effect of depriving clients in other cases of the counsel of their choice, and (2) may seriously impair the ability of Eagan and Doss to earn a living.

Thus, to effectuate its public reprimand for Eagan and Doss, the Court imposes a temporary, limited publication requirement: in any pending state or federal case in which they are counsel of record, the Lightfoot Respondents must provide a copy of this order to their client, their opposing counsel, and the judge presiding over their case, and must share a copy of this order with every attorney in their firm within ten days. This requirement will better serve the goals of specific and general deterrence by increasing the costs of Eagan's and Doss's misconduct, without seriously impairing their ability to earn a living. This requirement will also

serve as a guardrail against any future attempts by Eagan or Doss to engage in similar misconduct: when judges, opposing counsel, and their clients and colleagues learn about their misconduct in this case, it's far less likely that Eagan or Doss will try to manipulate the judicial process in the future.

### ii.     The Lightfoot Respondents' three arguments against sanctions are meritless.

The Lightfoot Respondents insist they deserve a free pass for dismissing *Ladinsky* and filing *Eknes-Tucker*—even if the Court finds that they took these actions in bad faith—and oppose sanctions on three main grounds. The first ground is procedural: they object to the Court's show-cause orders on due-process grounds, because they believe that the Court has improperly relied on the Panel's findings. The Lightfoot Respondents claim that the Panel denied them due process, and so any sanctions that defer to the Panel's findings would perforce be invalid. Their second and third grounds are substantive: these Respondents contend that their conduct is sanction-proof—even if they've attempted to manipulate the court's random case-assignment procedures in bad faith—because they believe that (1) Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure conferred an "absolute" right to voluntarily dismiss their case, and because they claim that (2) *Ladinsky* was not randomly assigned to this Court.

The Court has taken great care to be fair and reasonable to the Lightfoot Respondents, and it has carefully calibrated its sanctions to the nature of their

intentional misconduct. Given the gravity of the sanctions it has imposed, the Court

considers each of their arguments in depth.

### a.    The    Lightfoot    Respondents    received constitutionally sufficient due process.

The Court begins with the Lightfoot Respondents' due-process objections.[32]

As with their opposition to sanctions generally, these objections rest on three

separate grounds. First, the Lightfoot Respondents object that under *In re Ruffalo*,

390 U.S. 554 (1968), the due-process rights of all Respondents attached when the

Panel commenced its inquiry rather than when the Court issued its show-cause order.

In their view, these attorney-disciplinary proceedings have been irremediably tainted

by the Panel's alleged due-process violations, at least so long as the Court

incorporates, relies on, or otherwise defers to the Panel's findings or conclusions.

Second, the Lightfoot Respondents object that the Panel failed to provide adequate

notice of the conduct that it planned to investigate, reasoning that binding law

requires notice of the charge "before the proceedings commence," *Ruffalo*, 390 U.S.

at 551. Finally, they object that the Panel violated their procedural due-process rights

in three separate ways: (i) by questioning the junior attorneys without counsel

present and without the opportunity for cross-examination; (ii) by prohibiting the

attorneys from listening to, reviewing, or discussing each other's testimony until it

---

[32] This framework tracks the objections raised by Charles, Esseks, and Faulks, Doc. 493, and later joined by Eagan and Doss, who filed no separate objections of their own. *See* Doc. 497.

had heard from all responding attorneys; and (iii) by denying all Respondents the opportunity to respond to the evidence before issuing its Report.

These objections are **OVERRULED** for three separate reasons. In the first place, they're moot. The first and third objections are moot because the Court has neither relied on, incorporated, nor deferred to the Panel's findings or conclusions for any sanctions it has imposed. While the Court's findings partly rely on evidence the Panel gathered during its inquiry, those findings rest on the written and testimonial evidence itself—not the Panel's findings. Moreover, all Respondents have expressly incorporated into these proceedings the written and testimonial evidence they gave the Panel—evidence that every Respondent has since had the opportunity to amend or rebut, and which the Court has accordingly reviewed *de novo*. For the same reason, the Court does not separately address the Lightfoot Respondents' further objection to the Court's reliance on the testimony of other responding attorneys "obtained through the panel's inquiry" for the use "against them for purposes of supporting any sanction." Doc. 497 at 1–2. Since the Court has not considered any such testimony to support its sanctions, that objection is likewise **DENIED as moot**.

The second objection contests the sufficiency of notice, and this too is moot because it rests on a putative lack of notice about three aspects of the *Walker* Respondents' misconduct for which no one will be sanctioned.

In any event, even if these objections were not moot (and they are), all but one has been forfeited. To preserve an issue, "it is necessary for counsel timely to object . . . so as to provide the court an opportunity to take corrective action." *S.E.C. v. Diversified Corp. Consulting Grp.*, 378 F.3d 1219, 1226 (11th Cir. 2004). Counsel's "[f]ailure to interpose an objection in a timely manner means that the party foregoes raising the issue." *Id.* at 1227. The Lightfoot Respondents waited until June 17, 2022, to object that the Panel's investigation of their conduct violated due process. That was too late.

The Panel inaugurated these proceedings on May 10, 2022, with a notice of the conduct under investigation and a summons to appear May 20, which some Respondents answered with a pre-hearing brief. No objections. The Panel then took testimony at two evidentiary hearings on May 20, when most Respondents appeared with counsel. No objections.[33] On June 17, during the Panel's first and only status conference, counsel for the *Walker* attorneys objected for the first time that (1) the May 10 order had failed to provide adequate notice of the conduct under investigation, and (2) the May 20 hearings were rife with due-process violations. This was not a case in which the Respondents "had no opportunity to [object] when

---

[33] In fact, Mr. Ragsdale told the Panel at the May 20 hearing that although his clients had flagged concerns about their work-product and attorney-client communications so that the Court might review their communications *in camera*, his clients nevertheless stood "ready, willing, and able to answer any questions that the Court" might have. *Vague*, Doc. 75 at 13.

the . . . order was made." FED. R. CIV. P. 46. These Respondents availed themselves of the opportunity to answer the Panel's questions, then changed course weeks later to object.[34]

Finally, these objections fail because the Lightfoot Respondents received due process. In proceedings for attorney misconduct, due process requires "fair notice" to the attorney "that his [or her] conduct may warrant sanctions and the reasons why." *Shaygan*, 652 F.3d at 1318. Given the "quasi-criminal nature" of such proceedings, courts must inform attorneys of the charges against them "before the proceedings commence." *Ruffalo*, 390 U.S. at 551. The notice may come "from the court," and it must apprise the attorneys charged with misconduct "of the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it." *Shaygan*, 652 F.3d at 1318–19. Once on notice, "the accused must be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his [or her] actions." *Id.* at 1318. Collective punishment is forbidden: the Court may not sanction an attorney for another attorney's misdeeds. *Id.* at 1319 ("Each of these attorneys also cannot be held responsible for the acts or omissions of others").

---

[34] Since then, however, those objections were renewed in substance by all Respondents in answer to the Courts' first show-cause order. Docs. 423, 425, 432, 441, 444, 447. Those objections were denied as moot, Doc. 466, but were renewed once more by Charles, Esseks, and Faulks, Doc. 493—joined by Eagan and Doss, Doc. 497; McCoy, Doc. 501; Orr, Doc. 503; and Hartnett, Doc. 508)—and separately by Levi and Minter, Doc. 505, in answer to the supplemental orders to show cause.

The Court has complied with each of these mandates. Thus, even if these objections were neither moot nor forfeit, they would fail for the additional and independent reasons discussed below.

### 1. First Objection: The Lightfoot Respondents' Due-Process Rights Attached at the Commencement of the Panel's Proceedings.

In their first objection, the Lightfoot Respondents contend that the show-cause orders come too late in the proceedings to provide them with adequate notice of sanctionable conduct. Under *In re Ruffalo*, they claim, their due-process rights attached not with this Court's charge of sanctions, but with the commencement of the Panel's inquiry. Doc. 493 at 4. Under this reasoning, "the unmistakable lesson" of *In re Ruffalo*, 390 U.S. 544 (1968), is that the show-cause orders and the Panel's inquiry are "part of the same proceedings," so the show-cause orders cannot "cure any due-process deficiencies in the proceedings before the Panel." Doc. 493 at 4–8.

This objection fails because there was no deficiency to cure: the Lightfoot Respondents received constitutionally adequate notice whether their due-process rights attached with the commencement of the Panel's inquiry or with this Court's show-cause order. In its May 10 order, the Panel notified all Respondents of all grounds that would underly the sanctions the Court has imposed on the Lightfoot Respondents: it apprised them that their conduct "could be viewed as evidencing an intent to circumvent the practice of random case assignment in the District Courts

for the Northern and Middle Districts of Alabama"; it cited this Court's April 18 order, the dismissals of *Ladinsky* and *Walker,* and the filing of *Eknes-Tucker*; and it notified them that a three-judge panel would "inquire about the issues raised by counsel's actions" as described in the April 18 and May 20 orders. *Vague*, Doc. 1.

In any event, *Ruffalo* makes plain that the right to due process in attorney-disciplinary proceedings attaches only when the attorney first becomes subject to discipline. In *Ruffalo*, the Supreme Court reversed an order disbarring an attorney from practice in the Sixth Circuit for deferring to findings that a state court had reached without due process. In the state-court disciplinary proceedings, the state's disciplinary board had formally charged the attorney with twelve counts of misconduct, including two for soliciting clients through an agent. 390 U.S. at 546. The attorney and his agent sought to rebut the charges, testifying at the show-cause hearing that the latter had solicited no clients at all; rather, he had "merely investigated" the attorney's cases. *Id.* But when the attorney testified that his agent sometimes investigated cases against the agent's own employer, the board was scandalized, and it added a thirteenth count for that putative misconduct. *Id.* The Board took "no additional evidence" on the matter, stipulating instead that the attorney's own testimony and that of his agent sufficed to support a finding of misconduct under charge No. 13. *Id.* at 549. The attorney was given a few more months to respond. *Id.* at 551 n.4.

The disciplinary board found him guilty of seven counts of misconduct, including the *ex post* count thirteen. In reviewing the board's findings, the state's supreme court sustained only two of these counts—number thirteen among them—finding that they required disbarment. *Id.* at 547. In separate proceedings, the Sixth Circuit later ordered the attorney to show cause why he shouldn't be disbarred on the basis of the state's disbarment order. *Id.* at 545. Resting on the state court's record and findings without holding its own "de novo hearing," the Sixth Circuit disbarred him from practice in its court. *Id.* at 549–50.

The Supreme Court reversed. The *Ruffalo* Court reasoned that in "adversary proceedings of a quasi-criminal nature" like disbarment proceedings, "[t]he charge must be known before the proceedings commence." *Id.* at 551. The proceedings "become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused," who "can then be given no opportunity to expunge the earlier statements and start afresh." *Id.*[35]

Here, the Panel never issued a show-cause order, so the threat of discipline first arose on February 21, 2024, with this Court's order to show cause. The Panel

---

[35] The Respondents cite *Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440 (11th Cir. 1985) for the proposition that *Ruffalo*'s fair-notice requirement applies "to each of the district court's prior inquiries from which resulted the findings of bad faith conduct." Doc. 493 at 7. But *Carlucci* is not controlling here. Even if *Vague* is properly characterized as one "of the district court's prior inquiries," the Panel's inquiry did not result in a finding of bad-faith conduct. The findings of bad faith discussed below rest solely on proceedings that post-date this Court's show-cause order.

conducted a non-adversarial evidentiary investigation and issued non-binding findings of fact. Rather than issue a show-cause order, it referred the matter to this Court with instructions to accept, reject, or modify its findings in whole or in part or make additional findings of fact if necessary. *Vague*, Doc. 99.

More to the point, *Ruffalo* is inapt for the same reason this objection is moot: the Court has neither relied on nor incorporated by reference the Panel's findings. According to the Lightfoot Respondents, the right to due process and adequate notice for the attorney in *Ruffalo* did not attach "when the federal courts formally considered sanctions," but rather "at the commencement of the previous state court proceedings on which the federal courts relied and incorporated by reference." Doc. 493 at 7. In *Ruffalo*, of course, the proceedings the Sixth Circuit relied on were attorney-misconduct proceedings. The attorney there was entitled to process once threatened with sanctions in the state-court proceedings, but the courts denied him the process he was due. Yet the distinctions between the Sixth Circuit in *Ruffalo* and the Court here are twofold. Unlike *Ruffalo*'s underlying proceedings, the Panel's inquiry neither threatened nor imposed sanctions, and unlike the Sixth Circuit, the Court has neither relied on nor incorporated those proceedings by reference. Indeed, this Court gave the Lightfoot Respondents many chances to "expunge the[ir] earlier statements and start afresh"—to no avail. *See Ruffalo*, 390 U.S. at 551.

2.    **Second Objection: The Panel Failed to Provide the Respondents with Adequate Notice of the Particular Conduct Under Investigation.**

The Lightfoot Respondents next object that under *Ruffalo*, the Panel denied them constitutionally sufficient notice of the "specific conduct being investigated." Doc. 493 at 8. Neither the Panel's initial order nor this Court's April 18 order "identif[ied] the related case designation, the phone call to chambers, or obtaining client consent" as potentially sanctionable conduct. *Id.* at 9. Because these items were not specifically identified, they contend that "[n]othing in [the] order was designed to give the Respondent Attorneys adequate notice that these actions could subject them to sanctions." Doc. 493 at 9–10.[36] This objection fails because the Court has imposed no sanctions for designating *Walker* as related to *Corbitt*, calling Judge Thompson's chambers,[37] or failing to obtain their clients' consent before dismissing their case.

The Lightfoot Respondents cannot seriously contend that they lacked notice the Panel was investigating them for bad-faith judge-shopping; nevertheless, they assert that "judge-shopping" is "not sufficiently defined" to have put them on notice

---

[36] In contrast, the Respondents do *not* object to the sufficiency of notice on "(1) the voluntary dismissals of *Walker* and *Ladinsky*, (2) the media statements promising refiling, and (3) the filing of *Eknes-Tucker*." Doc. 493 at 8–9.

[37] Although Charles's sanction arises from questions *about* his call to Judge Thompson's chambers, the call itself is not at issue. The basis for his sanction is the misleading testimony about that call; for the call itself, he's off the hook.

160

of conduct not expressly identified by the initial orders. *Id.* at 12–13. As just discussed, this is simply false. And in any event, the Lightfoot Respondents could not have been confused: they were indisputably on notice of their alleged conduct— namely, the voluntary dismissals of *Walker* and *Ladinsky* and the filing of *Eknes-Tucker*. Indeed, their objections expressly concede that "they received adequate notice that the voluntary dismissal of *Walker*, comments to the media about refiling, and the filing of *Ecknes-Tucker* [sic] would be the subject of these proceedings." Doc. 493 at 13 n.7.

### 3. Third Objection: The Panel Violated the Respondents' Procedural Due-Process Rights under United States v. Shaygan.

In their final objection, the Lightfoot Respondents contend that the Panel violated their due-process rights in three ways: (1) by questioning attorneys without counsel present or according the Respondents the opportunity for cross-examination; (2) by "sequestering" them throughout the inquiry; and (3) by denying them the opportunity to respond to the evidence the Panel had gathered before issuing its Report. *See* Doc. 493 at 16–24. Here, these Respondents assume that throughout the Panel's inquiry, they were entitled to the procedural guarantees set forth in *United States v. Shaygan*. The Respondents are mistaken.

Under *Shaygan*, district courts must "comply with the mandates of due process" before sanctioning an attorney by providing him or her with "fair notice

that his [or her] conduct may warrant sanctions and the reasons why," and by identifying "the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it." 652 F.3d at 1318–19. *Shaygan* also guarantees the attorney charged with sanctions "an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions," and prohibits holding attorneys responsible for the acts or omissions of another. *Id.*

Like *Ruffalo*, *Shaygan* is no help to the Lightfoot Respondents. The Panel's proceedings could only have run afoul of *Shaygan* if the Panel had imposed sanctions. Once threatened with discipline, all Respondents were entitled to the full measure of due process guaranteed under *Shaygan*—and once threatened, they received it.

*Shaygan*'s facts illustrate both the scope of its procedural guarantees and its inapplicability to the Panel's proceedings. In *Shaygan*, a district court imposed sanctions on two federal prosecutors at the end of a criminal trial without "notice of any charges of misconduct" or "an opportunity to be heard." 652 F.3d at 1301–02. The underlying suit had been "marked by hard adversarial tactics"—including prosecutorial tactics that the district found to be improper—but the defendant, Dr. Shaygan, was ultimately acquitted of all charges. *Id.* at 1301, 1308. After the jury was dismissed, the district court ordered the attorneys for the prosecution to appear the following Monday to "'hear alternative requests for sanctions,' including

whether a sanction in the form of attorney's fees and costs should be awarded under the Hyde Amendment." *Id.* at 1308. The Hyde Amendment, a "rare waiver of sovereign immunity," is a statute that "allows for the extraordinary remedy of invading the public fisc to pay an acquitted criminal defendant's attorney's fees," and it "applies only when a court determines that the entire 'position of the United States was vexatious, frivolous, or in bad faith.'" *United States v. Shaygan*, 676 F.3d 1237, 1239 (11th Cir. 2012) (Pryor, J.). Sanctions under the Hyde Amendment concern only "wrongful prosecutions, not wrongs that occur during objectively reasonable prosecutions." *Id.*

The district court required the appearance of seven witnesses, including Sean Cronin and Andrea Hoffman, the two prosecutors whose sanctions were on appeal. 652 F.3d at 1308. The court permitted the witnesses in the courtroom only while testifying, and after six had done so, it decided "that it had 'heard sufficiently' and did not need to hear" from the seventh—Hoffman herself. *Id.* The court then heard oral argument on the propriety of sanctions under the Hyde Amendment, and it authorized additional briefing. *Id.* at 1309.

"[A]t no time" did the court "state[] that it was considering sanctions against the individual prosecutors." *Id.* Yet "[w]ithout providing notice to the prosecutors that they were facing individual sanctions, and without even hearing from Hoffman," the court ordered the United States to reimburse Shaygan $601,795.88 for attorney's

163

fees and costs" and "entered a public reprimand" against Cronin and Hoffman. 676 F.3d at 1241 (Pryor, J.). The attorneys "were never given an opportunity to contest the allegations the court made against them" and were thus denied "the two rudiments of the fundamental civil right of due process: notice and an opportunity to be heard." *Id.* at 1241–42.

On review of the district court's order, the Eleventh Circuit reversed these sanctions for two reasons. First, the district court had abused its discretion by applying the wrong standard under the Hyde Amendment. 652 F.3d at 1310–11. Second, as just noted, and worse, the district court had categorically denied the prosecutors "notice of any charges of misconduct and an opportunity to be heard." *Id.* at 1317–18. As this Court noted in an earlier order, the *Shaygan* court's due process violations "were sundry":

> The court denied both prosecutors "a meaningful opportunity to be heard" in the proceeding. Neither prosecutor was represented by counsel. Neither had the opportunity to cross-examine witnesses. And neither was told "that the district court might rely on [their] testimony to impose an individual sanction." "[E]ven more egregious" were the due process violations against Hoffman. Not only was she denied the opportunity to testify, but the district court's sequestration order meant there was "no way for [her] to know about the testimony of the other witnesses at the proceeding."

Doc. 466 at 18 (citations omitted).

"To varying degrees," the Lightfoot Respondents now object, "most of these very same due process violations occurred during the Panel's proceedings." Doc. 493 at 16. But they are mistaken. To illustrate how the objection fails in its particulars, the Court considers each alleged violation in turn.

*First, the Panel questioned attorneys without counsel present and, according the Respondents, without the opportunity for cross-examination.* According to the Lightfoot Respondents, the Panel violated their due-process rights by (1) questioning non-Respondent attorneys separately, and (2) failing to accord them the opportunity for cross-examination. The alleged violation arose after all responding attorneys had been divided into separate categories on the first day of hearings, when the junior attorneys—the non-decisionmakers with no input—were brought to a separate courtroom to be interviewed one at a time by Justice Harwood. Although all seventeen junior attorneys were represented by counsel, neither their counsel nor any other respondent was allowed to accompany the interviewee during Justice Harwood's questioning. The Panel explained its reasoning at the time: as this was merely an evidentiary inquiry and these were "young lawyers," the Panel wished to ensure their "unvarnished, transparent, [and] candid responses to [its] questions." *Vague*, Doc. 75 at 79. Nor was the presence of counsel required, for although the junior attorneys owed the tribunal the same duty of candor the same as the rest of the respondents, they were "not in any way going to be held to the same standard as

senior lawyers if there was some type of inappropriate behavior." *Id.* at 79–81. By placing them in the third bucket of respondents, the Panel had "already acknowledged [that] those [junior] lawyers did not make any decisions and had no input into any decisions made" but were "simply witnesses" who were "not looking at any type of repercussions" for their involvement in the conduct under investigation. *Vague*, Doc. 76 at 24. Although the Lightfoot Respondents "request[ed] that their retained counsel be permitted to attend and participate in the questioning of their clients," they did not object to this manner of questioning the junior lawyers until the status conference weeks later. Doc. 493 at 16.[38]

But questioning the junior attorneys without counsel present—attorneys who are no longer party to these proceedings—did not violate *the Lightfoot Respondents'* due-process rights. Unlike *Shaygan*, where the district court violated the attorneys' due-process rights by questioning them without counsel and then imposing sanctions on them, the junior attorneys were long ago released from these proceedings with no sanctions.

Moreover, like the rights guaranteed by the Fourth and Fifth Amendments, *Rakas v. Illinois*, 439 U.S. 128, 140 n.8 (1978), the Sixth Amendment's right to

---

[38] N.B., that the Lightfoot Respondents never assert that they timely objected, because they did not. When their requests were denied, Segall asked whether it was "appropriate" for his client to be questioned without him present, and Ragsdale voiced "the same concerns." *Vague*, Doc. 75 at 78–84. Neither, however, objected until June 17.

counsel is a personal right. *See Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001). And the Lightfoot Respondents should well know that such "personal rights . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Those attorneys were not then and are not now facing sanctions, and the alleged violation of their right to counsel has not prejudiced the Lightfoot Respondents whatsoever.

Regardless, out of an abundance of caution, to ensure that no alleged deprivation "undermine[d] the reliability of the proceedings" nor "constitute[d] a substantial denial of [the Lightfoot Respondents' own] due process rights" or "their rights to confront witnesses," Doc. 493 at 17, the Court has not considered the testimony of any witness who was questioned by Justice Harwood for the purpose of imposing sanctions. This Court's findings and conclusions rest solely on the testimony of the eleven Respondents themselves, all of whom were subject to cross-examination at the show-cause hearings.

In *Shaygan*, the Court's failure to permit cross-examination during its sanctions inquiry violated the prosecutors' due-process rights because it denied them the opportunity to adequately respond to any charge of sanctions. Here, in contrast, the Lightfoot Respondents had the opportunity to review the full record of written and oral testimony from the Panel's proceedings—including the transcript of Justice

Harwood's proceedings—for more than six months before they were required to respond to the Court's show-cause order.

In the same vein of caution, the Court gave the Lightfoot Respondents the chance to submit any "specific additional evidence" that he or she believed "necessary for the Court to determine [his or her] culpability or an appropriate sanction" in response to its show-cause order. Doc. 406 at 11. They were free to recall any witness from the Panel's proceedings at the show-cause hearing, be it for cross-examination, an affirmative case, or any other evidentiary purpose. No Respondent recalled any attorney who had been released, nor did any Respondent depose or offer written testimony from any such attorney, though some availed themselves of the opportunity to cross-examine each other at the show-cause hearing. The Lightfoot Respondents have thus failed to identify what more was necessary—or even desired.

*Second, the Panel barred the Lightfoot Respondents from listening to, discussing, or reviewing one another's testimony throughout the inquiry.* The Lightfoot Respondents next contend that the Panel violated due-process when it invoked a "modified version of the Rule," whereby the only persons allowed in the courtroom were the witness answering the Panel's questions—and, during questioning, that witness's attorney—and no one was to reveal the questions asked or the answers given. *Vague*, Doc. 75 at 74. This rule persisted in part until October

11, 2023, when the Court directed that all Respondents would be provided with the transcripts from the hearings of May 20 and November 3–4,[39] and in part until March 19, 2024, when the Court lifted the final restriction and permitted the Respondents to talk to each other about their testimony. *See* Docs. 324 at 2; 460 at 66.

This rule did not violate the Lightfoot Respondents' due-process rights. The argument rests once again on *Shaygan*, where the district court's sequestration order prejudiced the prosecutors by denying them "a meaningful opportunity to be heard in that proceeding." 652 F.3d at 1318. Because of the sequestration order, the prosecutors had no chance to learn what the other witnesses had testified, nor were they given the chance to clarify testimony through cross-examination. *Id.*

*Shaygan* did not hold (as Eagan and Doss suggest) that a temporary, partial sequestration of witness testimony is categorically improper; rather, the fault there lay in denying the prosecutors the "opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify [their] actions." *Id.* In stark contrast to the egregious denial in *Shaygan*, the Lightfoot Respondents here were given the chance to review all testimony in the record and accorded ample opportunity to respond both orally and in writing to the charge of sanctions. The prohibition against reviewing others' testimony was lifted more than six months before the Lightfoot

---

[39] The dissemination of the remaining transcripts was hindered, as it were, by "an administrative flat tire," so the Respondents did not receive their last transcript—that from Justice Harwood's session—until November 9, 2023. (Docs. 354 at 83; 493 at 24 n.15).

Respondents' deadline to respond to the show-cause order, and many of the eleven Respondents testified at the show-cause hearing to rigorous familiarity with the full record.

*Third, the Panel denied the Lightfoot Respondents the opportunity to respond to the evidence it had gathered before issuing its Report.* The last *Shaygan*-based objection mounted by the Lightfoot Respondents is that the Panel denied them due-process by issuing its Report without first giving them a chance to respond to the evidence. This alleged violation is the only one that is not forfeit, since the Lightfoot Respondents objected at the earliest opportunity in the proceedings before this Court.

On November 4, 2022, in the final moments of the Panel's final hearing, the Respondents were told that in lieu of closing arguments they would be allowed to provide written submissions, and these would become due only once they had received all transcripts and declarations. But the Panel published its Report before any Respondent had received those portions of the record needed to prepare their submissions, and so their written submissions never came due. Against this background, the Lightfoot Respondents contend that they were denied the opportunity to respond to the evidence gathered during the Panel's proceedings, because the Panel (1) failed to permit post-hearing briefing, and (2) did not release all the proceedings' transcripts before issuing its Report.

But none of these acts or omissions denied the Lightfoot Respondents' due process. As discussed above, this Court has granted full access to the written record; lifted the temporary, partial sequestration order; reopened the submission of evidence; and accorded ample opportunity to respond to all evidence the Panel had gathered. The Lightfoot Respondents' patent familiarity with the full record at the show-cause hearings testifies to that very opportunity.

The Lightfoot Respondents' objections are therefore **DENIED in part** and **OVERRULED in part**.

> ### b. Sanctions are appropriate because Eagan and Doss engaged in bad-faith misconduct by attempting to manipulate the random case-assignment procedures of two federal district courts.

Having addressed the Lightfoot Respondents' due-process objections, the Court now comes to the pith of the matter—whether sanctions should issue for their bad-faith attempts to manipulate the court's random case-assignment procedures and avoid their properly assigned judge. In opposing sanctions, the Lightfoot Respondents offer two main reasons they believe the Court must nevertheless let them off scot-free for their abuse of the judicial process. One is their argument that sanctions are barred by law. Doc. 514 at 23. According to the Lightfoot Respondents, Eleventh Circuit precedent bars courts from sanctioning attorneys for considering a judge's identity when deciding to voluntarily dismiss a lawsuit under

Rule 41(a)(1). *Id.* at 23–24. They thus claim that they've been charged "with having violated a rule that did not exist [when they dismissed *Ladinsky*] and does not exist today: that parties may not voluntarily dismiss an action under Rule 41 due, even in part, to the assigned judge's identity." *Id.* at 23. Their other argument is fact-bound. According to the Lightfoot Respondents, "*Ladinsky* was not randomly assigned to this Court," so they cannot, as a matter of fact, have "attempt[ed] to manipulate the random assignment of judges." *Id.* at 21–23.

Neither argument carries the day. To begin with, the Lightfoot Respondents mischaracterize the show-cause order: they have not simply been charged with *considering* a judge's identity, but with attempting to manipulate the courts' random case-assignment procedures by coordinating the dismissals of two extremely urgent lawsuits and filing another in a new district with new plaintiffs to avoid their properly assigned judge. The latter clearly abuses the judicial process, and abuse of this kind is not whitewashed by Rule 41. Additionally, the Lightfoot Respondents are not charged with subverting a particular "random" assignment but the case-assignment procedures themselves. Taken as a whole, the evidence plainly shows that the Respondents tried to manipulate these procedures to avoid this Court.

1.    **Sanctions for bad-faith judge-shopping are consistent with binding and persuasive precedent.**

Attempts to manipulate a court's random case-assignment procedures are not only "subject to universal condemnation"; they demand investigation and, where appropriate, discipline. *BellSouth*, 334 F.3d at 958. *BellSouth* is the leading precedent about judge-shopping in the Eleventh Circuit. There, the Circuit held that district courts possess the inherent power "to protect the orderly administration of justice and to preserve the dignity of the tribunal" by "discipline[ing] counsel for misconduct," where "attempt[s] to manipulate and to interfere with the random assignment of cases" are "clearly" among such "threat[s to] the orderly administration of justice." *Id.* at 959.

In *BellSouth*, the Eleventh Circuit considered an accusation that a party was "taking strategic advantage of the recusal statute, to, in effect, 'judge-shop.'" *Id.* at 944. In the underlying suit, a putative class of plaintiffs had sued BellSouth for race discrimination*,* marking their class action related to a similar class action then pending before Chief Judge U.W. Clemon. *Id.* at 945. Like the related action, the new case was assigned to Chief Judge Clemon. *Id.* Eleven days after the case was assigned, the Chief's nephew, Terry Price, who was then a partner at the law firm of Lehr Middlebrooks Price & Proctor, filed a standalone "Entry of Appearance" in the action. *Id.* at 945–46. By the time the underlying suit was filed and Price had made

his appearance, it had been "well-documented" that Price's participation had forced Judge Clemon "to relinquish numerous cases" in his tenure, so much so that the Northern District of Alabama adopted a standing order to govern motions to add or substitute counsel that could force the assigned judge to recuse. *Id.* at 944–45. The plaintiffs thus moved to disqualify Price and his firm from the case, alleging that BellSouth had "deliberately chose[n] Price and his firm so as to compel Judge Clemon to disqualify himself" under 28 U.S.C. § 455(b)(5). *Id.* at 946.

The plaintiffs' motion for disqualification was referred to Judge C. Lynwood Smith, Jr. *Id.* In his order on the motion, Judge Smith recognized that a party's right to legal representation does not guarantee an attorney of one's choice; in particular, parties may not hire an attorney "as a device to manipulate the orderly administration of justice," and "a sham hiring for the purpose of forcing the judge's recusal" was a "sufficiently compelling reason" to override one's choice of counsel. *Id.* After analyzing BellSouth's history of hiring both Price and his firm, Judge Smith concluded that BellSouth had chosen Price "to cause the recusal of the assigned judge." *Id.* at 947. Citing an analogous Fifth Circuit opinion, Judge Smith concluded that Price had been hired for "the purpose of forcing Judge Clemon to disqualify," and he must, therefore, be disqualified. *Id.* at 949.

BellSouth and Price petitioned the Eleventh Circuit for a writ of mandamus directing the district court to vacate its disqualification order. *Id.* Their petition rested

on three preliminary issues of alleged procedural flaws and, especially relevant here, four grounds of alleged error: (i) the petitioners had a constitutional right to their choice of counsel and, relatedly, that § 455 required Judge Clemon to recuse; (ii) the district court erroneously failed to apply *Schlumberger Tech., Inc v. Wiley*, 113 F.3d 1553 (11th Cir. 1997); (iii) the district court erroneously applied the Northern District's Standing Order; and (iv) the district court erroneously applied *Robinson v. Boeing Co.*, 79 F.3d 1053 (11th Cir. 1996). *Id.* at 955–65. Rejecting first each of the preliminary issues, the Eleventh Circuit observed that "sufficiently strong evidence that a party and its attorney conspired to interfere wrongfully with the administration of justice" may well warrant disqualification "even if the conspiracy never came to fruition." *Id.* at 951. This is because the "court's inherent power to disqualify an attorney or otherwise sanction a party or attorney is rooted in concern for the integrity of the judiciary and the public's perception thereof"; one must therefore take care to punish unsuccessful "attempts at tampering with the judicial process" just as well as successful ones. *Id.*

The court next turned to the petitioners' four grounds of alleged error. In its rejection of the petitioners' first argument, it held that "the right to counsel of choice is not absolute." *Id.* at 958. This right "can be overridden if a court finds that it would interfere with the orderly administration of justice." *Id.* at 956. And while § 455(b) requires judges to recuse in some circumstances, litigants, and lawyers alike "have

175

a duty to disavow and avoid manipulations of the random assignment system." *Id.* at 958.

Turning next to their second and "principal argument," the court concluded that *Schlumberger*, the putatively controlling case, was inapt. *Id.* at 958–960. Under *Schlumberger*, district courts cannot disqualify attorneys in good standing for "allegedly unethical" conduct without identifying a specific rule of professional conduct the attorney has violated. 113 F.3d at 1561. But *Schlumberger* had distinguished two separate lines of attorney-disqualification cases: those under the standard espoused by *Schlumberger* itself, and those that "involved conduct disruptive of the proceedings or constituting a threat to the orderly administration of the laws." *BellSouth*, 334 F.3d at 959. The second line of cases included *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985), where an attorney had been sanctioned—and disqualified—for violating a court order under the district court's inherent power "to protect the orderly administration of justice and to preserve the dignity of the tribunal." *Id.* (citing *Kleiner*, 751 F.2d at 1209). In affirming the court's disqualification of the attorney in *Kleiner*, the Eleventh Circuit held that "[a] trial judge possesses the inherent power to discipline counsel for

misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt." *Id.*

After reviewing these two lines of cases, the *BellSouth* court concluded that *Kleiner* governs "where the conduct at issue threatens the orderly administration of justice," and explained in emphatic terms why attempts to manipulate a court's random case-assignment procedures numbered among those censurable threats. *Id.* The court's language is worth quoting in full:

> We have no difficulty concluding that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice. Every court considering attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly administration of justice. In *McCuin*, the Fifth Circuit held that permitting such manipulation would bring "the judicial system itself into disrepute" and "would permit unscrupulous litigants and lawyers to thwart our system of judicial administration." 714 F.2d at 1265. This court in *Robinson*, *supra*, expressed the obvious concern with respect to the effects of such manipulation and judge-shopping on the proper administration of justice. The Second Circuit's decision in *FCC*, *supra*, implicitly recognized that such manipulation is disruptive of the orderly administration of justice; the court used its inherent power to disqualify a lawyer in order to preserve "the neutral and random assignment of judges to cases." 208 F.3d at 139. Similarly, the Supreme Court of Michigan, in *Fried*, *supra*, emphatically condemned such manipulation: "It is prejudicial to the administration of justice, because it is an undue interference with the proper assignment of cases." 570 N.W.2d at 267. *See also Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1443 (9th Cir.1995) (stating in dictum that "[j]udge-shopping doubtless

> disrupts the proper functioning of the judicial system and may be disciplined."); *United States v. Phillips*, 59 F.Supp.2d 1178, 1180 (D. Utah 1999) (collecting cases and scholarly literature indicating that manipulation of the random case assignment process is universally condemned as a disruption of the integrity of the judicial system that would undermine public confidence in the assignment process).
>
> In the instant case, the district court found an attempt to manipulate and to interfere with the random assignment of cases, and because that clearly threatens the orderly administration of justice, this case falls squarely within the line of cases distinguished by *Schlumberger* and expressly excluded from its ambit.

*Id.* at 959–60.

The court disposed of the petitioners' third and fourth assertions of error on much the same grounds. Notably, it concluded that the Standing Order was "not operable" under the underlying facts, but that the case plainly "evinced a concern about judge-shopping." *Id.* 960, 962. Indeed, of the *Robinson* factors, "the most significant factor in [*BellSouth*] involve[d] the manipulation of the random assignment system." *Id.* at 962. Ultimately, the court concluded that the petitioners had failed to demonstrate a clear and indisputable right to relief or demonstrable injustice and declined to issue the writ. *Id.* at 965.

*BellSouth* leaves no doubt that a district court may exercise its inherent power to discipline attorneys for manipulating the court's random case-assignment procedures. Mercifully for the administration of justice, *BellSouth* apparently

178

deterred bad-faith judge-shopping so effectively that the Eleventh Circuit has not yet been called upon to review an order imposing sanctions on those grounds.

In reviewing decisions of sister circuits that have conducted such reviews, this Court also found the Ninth Circuit's decision in *Hernandez v. City of El Monte* persuasive. 138 F.3d 393. *Hernandez* was an appeal from the sua sponte dismissal of two suits both arising from the same confrontation with the El Monte police. *Id.* at 396. Exactly one year after the confrontation, the plaintiffs sued the City of El Monte, the El Monte Chief of Police, and several police officers in federal district court in a case styled *Hernandez v. City of El Monte*. *Id.* A month later—after *Hernandez* had been assigned to Judge Manuel Real—the plaintiffs filed a second suit, identical in every way to the first save the ordering of the parties' names, in California Superior Court. *Id.* The second suit, *Garza v. City of El Monte*, was served on the defendants, removed to federal court, and ultimately transferred to Judge Real. *Id.* at 396–97.

With both cases before him, Judge Real confronted counsel about the decision to file *Garza* in state court when *Hernandez* was already pending in federal court. *Id.* at 397. The court discredited counsel's answers as unworthy of belief, found him guilty of "blatant judge-shopping," and dismissed both suits with prejudice. *Id.* The order dismissing *Hernandez* specified that dismissal was "for want of prosecution and plaintiffs' misconduct in blatant judge shopping," while the order dismissing

*Garza* gave as reasons "failure to file and serve within the statute of limitations and plaintiffs' misconduct in blatant judge shopping." *Id.* at 397–98. Both orders were appealed. *Id.* at 398.

On review of these dismissals, the Ninth Circuit concluded that judge-shopping is sanctionable misconduct. *Id.* at 398–99. Looking first to the facts, the court concluded that the circumstances supported the district court's determination "that the plaintiffs were trying impermissibly to judge-shop" in violation of the local rules. *Id.* at 398. The district court had not identified whether its authority to dismiss the two cases came from the local rules or its inherent authority, but the Ninth Circuit clarified "that a district court has the *inherent power* sua sponte to dismiss an action for judge-shopping." *Id.* (emphasis added). Its holding was syllogistically clear: (A) Federal courts have the inherent power to fashion appropriate sanctions, including dismissal, "for conduct which abuses the judicial process," *id.* at 398–99; (B) "Judge-shopping clearly constitutes 'conduct which abuses the judicial process,'" *id.* at 399; therefore, (C) a "district court's inherent power to impose dismissal or other appropriate sanctions . . . must include the authority to dismiss a case for judge-shopping." *Id.*

The Respondents have tried to distinguish *Hernandez* on the ground that the Ninth Circuit ultimately reversed the district court's sanctions. But this is a red herring. The Ninth Circuit did not reverse those sanctions because the district court

lacked the authority to impose them, but because the district court was obligated to consider "the availability of less drastic alternatives" to dismissal and failed to do so. *Id.* at 399–400. The authority to sanction attorneys for bad-faith judge-shopping under a court's inherent powers was expressly affirmed. *Id.* at 399.

The Ninth Circuit is not alone: courts throughout the country have imposed sanctions for bad-faith judge-shopping. For instance, in the case of *In re Fieger*, 191 F.3d 451 (6th Cir. 1999), the Sixth Circuit upheld sanctions against a plaintiffs' attorney, Geoffrey Fieger, who filed thirteen complaints in the same district and voluntarily dismissed all but the one before his preferred judge. *Id.* at *1. On learning of his conduct, the district's Chief Judge ordered him to show cause why he had not "violated Rule 11(b)(1) with the intent to circumvent" the district's random-assignment rule, and he appointed a three-judge panel to consider the matter and independent counsel to prosecute it. *Id.* at *1–2. The panel's final order imposed monetary sanctions, ordered the payment of costs and attorneys' fees, and publicly reprimanded Fieger for his behavior. *Id.* at *2. Upholding these sanctions, the Sixth Circuit remarked that "Fieger's actions fully warranted the imposition of sanctions," as he had "circumvented the random assignment rule, specifically tried to control the assignment of judges to his cases, and boasted public[ly] that he had done so." *Id.* at *3.

Similarly, in *Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*, 341 F. Supp. 2d 69 (D.P.R. 2004), the district court sanctioned two attorneys for voluntarily dismissing a case under Rule 41(a)(1) and refiling a materially identical suit—the only difference being the order of the plaintiffs' names in the caption—the very same day. *Id.* at 70–71. The defendants moved to transfer the new case to the first-assigned judge on the ground that their opponents had "attempted to manipulate the Court's random assignment process by voluntarily dismissing their first suit and refiling again the same day." *Id.* at 71. Given the timing of the filing and refiling (the attorneys had just lost on their motion for preliminary injunction), the court concluded they had "engaged in judge-shopping." *Id.* at 73.

The plaintiffs' response was a familiar one: Rule 41(a)(1) "entitled [them] to voluntarily dismiss their case without prejudice and refile [on] a future occasion." *Id.* Citing *Hernandez*, *Fieger*, *BellSouth*, and a host of other district-court cases, the district court strenuously disagreed: the plaintiffs were "technically correct" in their interpretation of the rule, but "what they may not do," and the district court "[could not] stress this enough," was "abuse the Court's processes by using Rule 41 as a loophole to circumvent an unfavorable ruling." *Id.* The court decried the "impropriety of Plaintiffs' actions" as "blatant." *Id.* The case was transferred to the first-assigned judge, and the court imposed monetary sanctions for counsels' misconduct. *Id.* at 73–74.

## 2.    Rule 41 Does Not Permit Judge-Shopping.

Against this background, the Lightfoot Respondents nevertheless claim that Eleventh Circuit precedent precludes sanctions against them "for considering a judge's identity when deciding to voluntarily dismiss *Ladinsky*." Doc. 514 at 20. Their argument is that Rule 41 lets parties dismiss for any reason at all, and therefore permits judge-shopping. In support of this argument, they make three basic claims: that (i) attorneys cannot be sanctioned for violating an "abstract concept"; (ii) Rule 41(a)(1)(A)(i) was the "only ascertainable standard" at the time of dismissal, "conferr[ing] an 'absolute' and 'unconditional' right to dismiss" subject only to the limits set forth in the rule itself; and (iii) *BellSouth* is "inapplicable." *Id.* at 26–40.

These claims all fail. The Respondents present the issue as a false dichotomy: Rule 41 either grants an "absolute" right to dismiss or it does not; either one's motivations for dismissal are irrelevant, or considering a judge's identity is sanctionable. But this logic stretches the meaning of "absolute" beyond its legal force.

The absolute right accorded by Rule 41(a)(1) is the *procedural* right to dismiss one's case before an answer or summary-judgment motion. This procedural right entitles plaintiffs to nothing more than dismissal of an action without conditions, without the court's approval, and without the consent of any defendants, who may have invested considerable time, money, and effort into the litigation. It does not in

the least permit attorneys to abuse the judicial process, and attempts to hijack Rule 41 for such abuse may be disciplined with sanctions without encroaching on the rule's procedural guarantees. *See, e.g.*, *Int'l Driver Training Inc. v. J-BJRD Inc.*, 202 F. App'x 714, 716 (5th Cir. 2006) ("Although Rule 41(a)(1) guarantees [plaintiffs] an unconditional dismissal, it does not confer on [them] the right to manipulate the designation of a judge."); s*ee also Vaqueria Tres Monjitas*, 341 F. Supp. 2d at 71 (holding that Rule 41 does not permit plaintiffs to "abuse the Court's processes by using Rule 41 as a loophole to circumvent an unfavorable ruling").

The Court must dismiss the Lightfoot Respondents' threshold contention that they have been impermissibly charged with "violating an abstract concept rather than an ascertainable rule." Doc. 514 at 26. These Respondents claim they've been charged with violating a non-existent rule: "that parties may not voluntarily dismiss an action under Rule 41 due, even in part, to the assigned judge's identity." Doc. 514 at 23. Relying on *In re Finkelstein*, 901 F.2d. 1560, they contend that attorneys may not be sanctioned for "violating an abstract concept rather than an ascertainable rule," while "judge-shopping" and "manipulation" are not ascertainable prohibitions. *Id.* at 26–27. But like many of the Respondents' arguments, it's supported only by magical thinking.

Try as they might, Respondents cannot manifest case law to say something it doesn't. *Finkelstein* is plainly inapt—that case concerned the suspension of an

attorney for "apparent unprofessional conduct." 901 F.2d at 1563. In an effort to settle a case between the liability and damages portions of a trial, a plaintiffs' attorney, James Finkelstein, wrote a "coercive" letter to the defendant's general counsel, "leapfrogging" trial counsel altogether. *Id.* at 1562–63. The letter was referred to the Chief Judge, who ordered Finkelstein to show cause why he shouldn't be disbarred for its unprofessional tactics, tone, and requests. *Id.* at 1563. After a show-cause hearing, the court suspended Finkelstein from practice in the Middle District of Georgia for six months, asserting the court's inherent power to "discipline members of the bar whose conduct transgresses a 'code' by which an attorney practices which transcends any written code of professional conduct." *Id.*

The sole question on appeal was whether Finkelstein could be "deemed to have been on notice that the courts would condemn the conduct for which he was sanctioned." *Id.* at 1564. The answer was no. The district court's order had "disclaimed reliance upon a written canon of ethics, a code provision, or a case" that proscribed the allegedly "reprehensible" conduct, depending instead "upon a 'code by which an attorney practices which transcends any written code of professional conduct.'" *Id.* at 1565. To do so was error, because the attorney "had no notice" of this "transcendental code of conduct," which "existed only in the subjective opinion of the court." *Id.* By sanctioning the attorney for conduct deemed unethical only after the fact, the district court denied him due process. *Id.*

*Finkelstein* comes from a line of attorney-disqualification cases that doesn't apply here. The Eleventh Circuit has distinguished two lines of these cases. When disqualification is "based on an alleged ethical violation that did not threaten the orderly administration of justice," as in *Finkelstein*, courts must apply a "higher standard" and "rest their disqualification decisions on the violation of specific Rules of Professional Conduct." *Schlumberger*, 113 F.3d at 1561. But when disqualification "involved conduct disruptive of the proceedings or constituting a threat to the orderly administration of the laws," as in *Kleiner*, district courts may rely on the inherent power "to protect the orderly administration of justice and to preserve the dignity of the tribunal." *BellSouth*, 334 F.3d at 959. Under this second line of cases, the attorney need not have violated a specific rule; it is enough their conduct threatened the orderly administration of the laws. *See id.*

Like the Respondents here, the petitioners in *BellSouth* alleged that *Schlumberger* required the district court "to identify a specific ethical rule that had been violated." *Id.* at 959 n.13. The Eleventh Circuit did not accept that argument and imposed no such requirements on a district court considering bad-faith judge-shopping. Indeed, the *BellSouth* court reiterated that such notice "can be afforded by *the case law*." *Id.* Thus, under the controlling standard set forth in *Kleiner* and *Bellsouth*, attorneys may be disciplined for conduct that "threatens the orderly

administration of justice," including manipulations of a court's case-assignment procedures. *BellSouth*, 334 F.3d at 958–59.

The Respondents seek to recast their behavior as the kind that does not threaten the orderly administration of justice to place their conduct under the aegis of *Finkelstein*'s higher standard. *See* Doc. 514 at 20–21. Not so— the Court's original charge clearly contemplated that their conduct is governed by *Kleiner* and its class. Citing *BellSouth*, the show-cause order charged each Respondent with attempting to manipulate the courts' random case-assignment procedures, and under *BellSouth*, "attempts to manipulate the random assignment of judges . . . constitute a disruption of the orderly administration of justice." 334 F.3d at 959.

The Respondents' contention that they "cannot be disciplined for allegedly violating an abstract concept rather than an ascertainable rule" is both misleading and at war with *BellSouth* and *Kleiner*. Under those authorities, the Court need not identify a specific "rule" the Respondents have violated; it may discipline attorneys under its inherent power "to protect the orderly administration of justice and to preserve the dignity of the tribunal," *id.* (citing *Kleiner*, 751 F.2d at 1209), so long as they have notice from the case law, the applicable court rules, or the codes of professional conduct that their actions were sanctionable, *Finkelstein*, 901 F.2d at

1564–65. As the foregoing discussion makes clear, notice was accorded by the case law, and the Respondents' conduct disrupts the orderly administration of the laws.[40]

The Court turns now to the putatively "fixed and ascertainable" standard on which the Respondents rely—Rule 41. The rule's text and context, its history and purpose, and its delimiting jurisprudence all show that Federal Rule of Civil Procedure 41(a)(1) guarantees nothing more than the procedural right to dismiss one's suit under certain rule-specified circumstances. Courts throughout the nation interpret Rule 41 by its "plain meaning," *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989), and the rule's text is unambiguous:

### (a) Voluntary Dismissal

#### (1) By the Plaintiff

**(A) Without a Court Order.** Subject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute,[41] the plaintiff may dismiss an action without a court order by filing:

**(i)** a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or

---

[40] For additional support on this threshold proposition, the Respondents invoke Rule 83(b)'s proscription against imposing additional obligations on litigants and attorneys for "noncompliance with any requirement not in federal law, federal rules, or the local rules." Doc. 514 at 25. Since there is indeed controlling law on point, this argument fails for the same reasons their *Finkelstein* argument fails.

[41] The right to dismiss by notice or stipulation does not extend to class actions (Rule 23(e)), derivative actions (Rule 23.1(c)), actions relating to unincorporated associations (Rule 23.2), actions in which a receiver has been appointed (Rule 66), or to actions under applicable federal statutes, such as the Fair Labor Standards Act.

**(ii)** a stipulation of dismissal signed by all parties who have appeared.

**(B) Effect.** Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

**(2) *By Court Order; Effect.*** Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

In most cases, plaintiffs may dismiss an action voluntarily and without a court order by notice or stipulation; in all other cases, they may do so only with the court's permission. Rule 41(a)(1), which governs the former category, grants plaintiffs the express right to dismiss an action either unilaterally before the service of an answer or summary-judgment motion, or by the stipulation of all parties who have appeared. All other cases are governed by subsection (a)(2).

By its "plain terms," Rule 41(a)(1)(A)(i) gives plaintiffs the "absolute right to dismiss a lawsuit before the defendant has filed an answer or summary judgment motion." *Carter v. United States*, 547 F.2d 258, 259 (5th Cir. 1977).[42] The right is

---

[42] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

"absolute" and "unfettered" only in that it "sanctions no . . . case-by-case analysis of the amount of effort expended by defendants." *Id.* If the defendant has not answered or moved for summary judgment (and no exceptions apply), the plaintiff may dismiss his case. Since this, after all, is what the rule's "plain terms" say, courts have "consistently held" that its literal terms govern. *Id.*

Consider *Carter v. United States*, where the former Fifth Circuit explained that the "absolute" right accorded by Rule 41(a)(1) was not terminated by a motion to dismiss. 547 F.2d 258. In *Carter*, a pro se plaintiff sued the United States and several officials to expunge the records of an earlier perjury conviction, and the defendants moved to dismiss the case with prejudice. While that motion was pending—and before the defendants filed an answer or summary-judgment motion—the plaintiff moved to dismiss the suit himself *without* prejudice. *Id.* at 258. The district court ignored the plaintiff's motion, concluded that the suit was meritless, granted the defendants' motion, and dismissed the suit with prejudice. *Id.*

The Fifth Circuit reversed the dismissal. Before the service of an answer or a summary-judgment motion, the plaintiff's right to dismiss his suit was "absolute"; the defendants had "concededly filed neither." *Id.* at 259. Even so, they argued that since they'd "expended considerable effort" on their motion to dismiss, their filing should be treated as equivalent to an answer under Rule 41(a)(1). *Id.* But those circumstances were already covered by Rule 41(a)(2), and Rule 41 permits "no such

case-by-case analysis of the amount of effort expended by defendants." *Id.* Rather than read a further procedural exception into the rule, the Fifth Circuit held that the rule "means what it says," and those "who desire to prevent plaintiffs from invoking their unfettered right to dismiss actions under rule 41(a)(1) may do so by taking the simple step of filing an answer." *Id.*

Similarly, in *Pilot Freight Carriers, Inc. v. International Broth. of Teamsters* ("*Pilot*") the Fifth Circuit held that the "absolute" right accorded by Rule 41(a)(1) was not terminated by a motion for preliminary injunction. 506 F.2d 914 (5th Cir. 1975). There, the court refused to narrow Rule 41(a)(1)'s "express parameters" by holding that voluntary dismissals are "unavailable to a plaintiff who has argued, and lost, a motion for preliminary injunctive relief." *Id.* at 915. In *Pilot*, the general freight carrier plaintiff had sought a preliminary injunction in the Middle District of Florida to prevent the enforcement of an arbitration award for Florida locals of the International Board of Teamsters. *Id.* The Florida locals struck to enforce the award, but their picketing, which extended to other states, was soon enjoined by another federal district court in North Carolina. *Id.* When the IBT later propounded discovery in Florida and moved to stay the North Carolina action until the former had resolved, Pilot dismissed the Florida suit by notice under Rule 41(a)(1)(A)(i). *Id.* at 915–16. The defendants moved to vacate the dismissal, their motion was denied, and they appealed. *Id.* at 916.

On appeal, the defendants conceded that "a literal reading of Rule 41(a)(1)" entitled Pilot to dismiss the Florida suit; still, it lobbied for a narrower reading that would prohibit dismissals after any substantive hearing on a preliminary-injunction motion. *Id.* The Fifth Circuit rejected that construction as inconsistent with the rule's plain terms. To proscribe voluntary dismissals under Rule 41(a)(1) "whenever the merits of the controversy have been presented to the court in any manner . . . would amount to no less than a flat amendment of Rule 41(a)(1) to preclude dismissal by notice in any case where preliminary injunctive relief is sought." *Id.* at 916–17. Such amendment being Congress's prerogative, the Fifth Circuit refused to curb the plaintiff's absolute right to dismiss: "Rule 41(a)(1) means precisely what it says," so Pilot was free to dismiss its complaint. *Id.* at 916–17.

In comparison with the five paragraphs of analysis it accorded the appellants' principal argument—that a plaintiff's right to dismiss under Rule 41(a)(1) should terminate whenever plaintiffs present the merits of their case—the Fifth Circuit gave short shrift to their secondary argument; that is, it found "without merit" the ancillary contention that such a construction of Rule 41(a)(1) "permits forum shopping in the sense that a litigant may be able to choose a 'friendly judge.'" *Id.* at 917.

According to the Lightfoot Respondents, however, this one-sentence afterthought constitutes a holding that "there is no 'judge-shopping' exception to Rule 41." Doc. 514 at 29. But here they misrepresent the law, making the twin errors

of equivocating on the ultimate issue and affirming the consequent. The court opined only on the rule's application: by its own terms, it places no constraints on the plaintiffs' reasons for dismissal. The right, in that sense, is "absolute." But that does not mean that there are no such limits on an improper motive; it means only that such limits are not addressed in the rule itself. Moreover, the argument that the *Pilot* court held that Rule 41(a)(1) permits judge-shopping by denying the merits of the defendants' judge-shopping argument is fanciful. On the contrary, the holding in *Pilot* suggests that Rule 41(a)(1) does not permit judge-shopping precisely because judge-shopping is prohibited by other means.

The principles underlying these cases were reaffirmed by the Eleventh Circuit in *Matthews v. Gaither*, 902 F.2d 877 (11th Cir. 1990). In *Matthews*, the district court dismissed a pro se litigant's complaint with prejudice as a sanction for misstating his account balance on his *in forma pauperis* affidavit, even though the plaintiff had first moved to dismiss his case without prejudice. Citing both *Carter* and *Pilot Freight*, the court reiterated the "well established" principle "that Rule 41(a)(1)[A](i) grants a plaintiff an unconditional right to dismiss his complaint by notice and without an order of the court at any time prior to the defendant's service of an answer or a motion for summary judgment." *Id.* at 880.

But *Matthews* also teaches that Rule 41(a)(1) does not insulate a plaintiff from sanctions for bad-faith misconduct before or in connection with the dismissal. The

court held that a plaintiff's right to dismiss by notice under Rule 41 may be "absolute" and "unconditional," but district courts nevertheless "retain jurisdiction" to dismiss a suit with prejudice as a sanction—even after a Rule 41(a)(1) dismissal *without* prejudice—if the plaintiff has misstated the assets on his *in forma pauperis* affidavit in bad faith. *Id.* at 880–81.

The Supreme Court reached the same conclusion exactly one week after *Matthews* was decided. In *Cooter & Gell v. Hartmarx*, the Court held that while Rule 41(a)(1)(A)(i) accords an "absolute" right to dismiss, "nothing" in its language "terminates a district court's authority to impose sanctions after such a dismissal." 496 U.S. 384 (1990). Writing for the Court, Justice O'Connor explained that sanctions—which were imposed there under Rule 11—do "not signify a district court's assessment of the legal merits of the complaint," and for that reason

> the imposition of such a sanction after a voluntary dismissal does not deprive the plaintiff of his right under Rule 41(a)(1) to dismiss an action without prejudice. "[D]ismissal . . . without prejudice" is a dismissal that does not "operat[e] as an adjudication upon the merits," and thus does not have a res judicata effect. Even if a district court indicated that a complaint was not legally tenable or factually well founded for Rule 11 purposes, the resulting Rule 11 sanction would nevertheless not preclude the refiling of a complaint. Indeed, even if the Rule 11 sanction imposed by the court were a prohibition against refiling the complaint (assuming that would be an "appropriate sanction" for Rule 11 purposes), the preclusion of refiling would be neither a consequence of the dismissal (which was without prejudice) nor a "term or

> condition" placed upon the dismissal (which was unconditional).

*Id.* at 396–97 (citations omitted). Rule 41(a)(1) and Rule 11 are "both aimed at curbing abuses of the judicial system, and thus their policies, like their language, are completely compatible." *Id.* at 397. Rule 41(a)(1) might grant plaintiffs the "right to one free dismissal," but it does not "codify the policy" of a "right to file baseless papers," which "is a separate abuse of the judicial system, subject to separate sanction" that "puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay." at 397–98. For these reasons, the Court concluded that "district courts may enforce Rule 11 even after the plaintiff has filed a notice of dismissal under Rule 41(a)(1)." *Id.* at 395.

Although *Cooter & Gell* dealt with the court's authority to exercise post-dismissal jurisdiction for sanctions under Rule 11, the Eleventh Circuit has held that its reasoning "appl[ies] equally to sanctions under a court's inherent powers." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020). That's because it is "both constitutionally permissible and practically important" for courts to exercise jurisdiction over sanctions proceedings, even if they lack jurisdiction over the underlying suits. *Hyde*, 962 F.3d at 1309. Sanctions do not concern the merits of the dismissed case, but rather "a collateral issue: whether [an] attorney has abused the judicial process," and so they don't implicate Article III's "case or controversy" limitations. *Id.* They're also practically important, as "'the interest in having rules of

procedure obeyed' outlives the merits of a case." *Id.* at 1309–10 (citing *Cooter & Gell*, 496 U.S. at 139). If it did not, then "parties who abuse the judicial procedures could get off scot-free anytime it turned out that the district court lacked subject-matter jurisdiction." *Id.* at 1310.

Rule 41(a)(1)'s history likewise shows that it was not enacted to grant a freewheeling right to terminate one's suit; it was created only "to limit a plaintiff's ability to dismiss an action." *Cooter & Gell*, 496 U.S. at 397. Before the Federal Rules of Civil Procedure were enacted, voluntary dismissals or nonsuits were often allowed "as a matter of right until the entry of the verdict." *Id.* Rule 41(a)(1) was thus designed "to curb abuses of these nonsuit rules." *Id.* Where plaintiffs once had "expansive control over their suits, Rule 41(a)(1) preserved a narrow slice: It allowed a plaintiff to dismiss an action without the permission of the adverse party or the court only during the brief period before the defendant had made a significant commitment of time and money." *Id.* The rule, however, "was *not* designed to give a plaintiff any benefit other than the right to take one such dismissal without prejudice." *Id.* (emphasis added); *see also* Absolute Dismissal under Federal Rule 41(a): The Disappearing Right of Voluntary Nonsuit, 63 YALE L.J. 738, 738 (1954).

Against the great weight of this authority, the Respondents cite one other case to explicate the rule's "absolute" and "unconditional" right. In *Am. Cyanamid Co. v. McGhee*, the Fifth Circuit offered a further gloss on the scope of Rule 41(a)(1) and

its interplay with subsection (a)(2). 317 F.2d 295 (5th Cir. 1963). There, the Fifth Circuit was considering an appeal from a dismissal without prejudice under Rule 41(a)(2) that followed a voluntary state-court dismissal. In oft-quoted dicta, the court explained the effects of dismissal by notice in memorable, peremptory terms:

> Rule 41(a)(1) is the shortest and surest route to abort a complaint when it is applicable. So long as plaintiff has not been served with his adversary's answer or motion for summary judgment he need do no more than file a notice of dismissal with the Clerk. That document itself closes the file. There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play. This is a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court. There is not even a perfunctory order of court closing the file. Its alpha and omega was the doing of the plaintiff alone. He suffers no impairment beyond his fee for filing. But this quick and ready tool may be used once, and only once, if clear consequences are to be avoided. A second notice of dismissal not only closes the file, it also closes the case with prejudice to the bringing of another.

*Id.* at 297. Delving deeper into the prejudicial effects of a second notice of dismissal, the court concluded that the "arbitrary limitation" behind the two-dismissal rule was meant "to prevent unreasonable abuse and harassment." *Id.* That limitation, it held, did not extend to Rule 41(a)(2). *Id.*

The Lightfoot Respondents have cited the two-dismissal rule as proof that Rule 41 precludes sanctions for dismissal. They contend that the "only limitations" on a plaintiff's right to dismiss an action are contained in Rule 41 itself, and one of those, found in subsection (a)(1)(B), is the two-dismissal rule's prohibition against

repeat filings. Doc. 514 at 28–29. But a look at the jurisprudence surrounding the two-dismissal rule confirms that Rule 41 neither legitimizes an abuse of the judicial process nor inoculates bad-faith conduct from sanction. *See, e.g.*, *Hyde*, 962 F.3d at 1309.

The two-dismissal rule is found in Rule 41(a)(1)(B): if a plaintiff has "previously dismissed any federal- or state-court action based on or including the same claim," then "a notice of dismissal operates as an adjudication on the merits." FED. R. CIV. P. 41(a)(1)(B); *see also Carter*, 547 F.2d at 258. In the Eleventh Circuit, courts construe the two-dismissal rule by looking to its "plain language" and "reading it as a whole." *ASX Inv. Corp. v. Newton*, 183 F.3d 1265, 1267 (11th Cir. 1999). The rule must not be construed "too broadly," because it's "an exception to the general principle, contained in Rule 41(a)(1) and honored in equity prior to the adoption of the Federal Rules, that a voluntary dismissal of an action does not bar a new suit based upon the same claim." *Id.*

The two-dismissal rule's chief purpose "is to prevent an unreasonable use of the plaintiff's unilateral right to dismiss an action prior to the filing of the defendant's responsive pleading." *Id.* at 1268. Unlike dismissals by notice, dismissals by court order under Rule 41(a)(2) do not implicate the two-dismissal rule, because the court's review screens against the "danger of abuse or harassment." *Id.* In these cases, courts can choose to dismiss a case with or without prejudice and

may condition the dismissal on terms it deems appropriate. *Id.* But that there is no bright-line limit on dismissals under Rule 41(a)(2) does not mean there is *no* such limit, since "the mere repetition of such occurrence may . . . become so oppressively prejudicial as to require the sound conclusion that even once more is too much." *Id.* (citing *Am. Cyanamid Co.*, 317 F.2d at 298). An "[a]buse of the procedure can be sanctioned," and "a court hearing a subsequently filed action may impose sanctions if the facts suggest bad faith or an intent to harass on the part of the plaintiff." *Id.* at 1268–69.

Moreover, the right to dismiss one's case accorded by Rule 41(a)(1)(A)(i) governs plaintiffs, not attorneys. While courts may sometimes apply the two-dismissal rule even though the defendants are not identical among the cases, *see, e.g. Sealey v. Branch Banking & Tr. Co.*, 693 F. App'x 830, 835 (11th Cir. 2017) (holding a third suit barred by the two-dismissal rule where the defendants were in privity), the same is almost never true of plaintiffs, s*ee, e.g.*, *Astornet Techs. Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1281 (Fed. Cir. 2015) ("The plaintiff in the second action must be the same person as the plaintiff in the first action at the time of the voluntary dismissal."). Even in outlier cases where the two-dismissal rule has barred a third suit without identical plaintiffs, the rule applied only on grounds of privity. *See, e.g.*, *Captiva RX, LLC v. Daniels*, 2014 WL 5428295, at *4 (M.D. Ga. Oct. 23,

2014) (holding that the two-dismissal rule applies "where the plaintiffs are nominally the same or in privity with the named plaintiffs in all three lawsuits").

Here, Rule 41 cannot preclude sanctions, because the two-dismissal rule—the chief limit to the pernicious conduct at issue—plainly does not apply. Rule 41(a)(1) unambiguously applies to "plaintiffs," not attorneys, and the rule "means what it says," *Carter,* 547 F.2d at 259. If the Lightfoot Respondents are not subject to the rule's chief limitation, they cannot claim the benefit of its protections.[43]

### 3.    *BellSouth* controls.

The Lightfoot Respondents stake much of their defensive position on the erroneous assertion that *BellSouth* does not control under these circumstances. Doc. 514 at 31. The Lightfoot Respondents distinguish the case as "inapplicable" in five ways:

> *BellSouth* (i) did not involve a plaintiff's absolute and unconditional right to voluntarily dismiss under Rule 41; (ii) addressed whether to prioritize, when they conflict, a litigant's right to counsel of choice or the mandates of the recusal statute, 28 U.S.C. § 455; (iii) involved no sanctions; and (iv) arose from what had "long been a matter of concern that parties in the Northern District of Alabama might be taking strategic advantage of the recusal statute [by hiring a law firm which employed a judge's relative] to, in effect, 'judge-shop,'" so much so that the court had entered a standing order addressing the practice.

---

[43] As noted above, Eagan expressly acknowledged at the show-cause hearing that the two-dismissal rule would not apply in this situation. *See* Doc. 642 at 121.

*Id.* at 32.

Similarly, the Lightfoot Respondents contend that if *BellSouth* did control, then the Eleventh Circuit violated its prior-panel rule in *BellSouth* by overruling its Rule 41 precedent that such "dismissals are 'absolute' and 'unconditional'"; this cannot be the case, they claim, because *BellSouth* did not "silently overrule prior precedent." *Id.* As a result, they claim the case did not "announce a new, sweeping prohibition against 'judge shopping.'" *Id.* at 31.

Eagan and Doss are boxing with a straw man: the Eleventh Circuit's Rule 41 case law is wholly consistent with the imposition of sanctions under *BellSouth* for a bad-faith attempt to manipulate the court's random case-assignment procedures.

First, *BellSouth* plainly applies to the Respondents' conduct. *BellSouth* held that conduct that "threatens the orderly administration of justice" is governed by the *Kleiner* standard, whereby trial courts may rely on their inherent powers to discipline counsel for misconduct. 334 F.3d at 959. The Respondents were charged with attempting to manipulate the court's random case-assignment procedures, and the *BellSouth* court found that such conduct "clearly threaten[s] the orderly administration of justice." *Id.* at 960.

Because *BellSouth*'s reasoning is not cabined to its facts, none of the Respondents' putative distinctions control. For much the same reason that *BellSouth* controls this case, the *BellSouth* court found that the petitioners' case was controlled

by *Kleiner*. For instance, the *BellSouth* court found that *Kleiner* controlled, even though *Kleiner* concerned sanctions for violating a court order, while *BellSouth* concerned attempts to force a judge's recusal. Despite factual differences, both cases, as here, turned on conduct that threatened the orderly administration of justice.

Second, *BellSouth* expressly announced that "a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." *Id.* at 959. The Lightfoot Respondents acknowledge this statement but downplay it as a "stray statement" and "non-precedential 'reasoning.'" Doc. 514 at 33. In doing so, the Lightfoot Respondents grievously understate *BellSouth*'s holding.

The holding of a case "is comprised both of the result of the case and those portions of the opinion necessary to that result." *Powell v. Thomas*, 643 F.3d 1300, 1305 (11th Cir. 2011) (quotations omitted). The petitioners in *BellSouth* sought a writ of mandamus to vacate the district court's order disqualifying counsel and his firm. In denying the writ, the Eleventh Circuit rejected the Petitioners' "principal argument" that *Schlumberger* required the district court "to make a finding that his appearance violated a specific Rule of Professional Conduct of a nature rising to the level of disbarment." *Id.* at 958–59.

In the same stroke, the Eleventh Circuit held that the *Kleiner* standard controlled, whereby district courts could sanction attorneys—including by

disqualification from further representation in a case—under their inherent power "to protect the orderly administration of justice and to preserve the dignity of the tribunal." *Id.* at 959. Specifically, the Circuit held that district courts "possess[] the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resorting to the powers of civil or criminal contempt," and had "no difficulty concluding that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." *Id.*

The Lightfoot Respondents further suggest that even if *BellSouth* disapproved of bad-faith judge-shopping as misconduct, the Eleventh Circuit is unlikely to conclude that such misconduct includes voluntary dismissals. Doc. 514 at 33. Put another way, they argue that case law from sister circuits—even those that otherwise punish judge-shopping—proves that Rule 41(a)(1)(A)(i) immunizes them from sanctions for considering a judge's identity when dismissing a case. In support of this argument, the Respondents point to decisions from the Eighth, Fifth, and Second Circuits.

The Eighth Circuit has recognized that judge-shopping is "a practice which has been for the most part condemned." *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291, 1300 (8th Cir. 1982). In *Adams v. USAA Casualty Ins. Co.*, however, it reversed Rule 11 sanctions for the voluntary dismissal of a case under Rule

41(a)(1)(A)(ii) under certain circumstances. 863 F.3d 1069 (8th Cir. 2017). But *Adams* is not persuasive.

In *Adams*, the plaintiffs brought a putative class action in Arkansas state court, which the defendants removed to federal court, answering the complaint the same day. *Id.* at 1073. A few months into the litigation, the court stayed the proceedings for mediation, during which the parties raised the possibility of dismissing the federal-court suit and returning to state court to certify and settle the class action. *Id.* Nearly a year later, after another unsuccessful mediation and a months-long stay, the parties reached a settlement in principle whose terms included dismissing the federal-court action and refiling in Arkansas state court. *Id.* The parties jointly stipulated to dismissal under Rule 41(a)(1)(A)(ii) and refiled their case in Arkansas state court, where their settlement agreement was ultimately approved. *Id.* at 1073–74. When the federal district judge learned what had happened, he ordered the responding attorneys to show cause why they shouldn't be sanctioned under Rule 11(b)(1) for (i) forum-shopping to the detriment of class members, (ii) wasting government resources to gain leverage in settlement negotiations, and (iii) procedural gamesmanship. *Id.* at 1074. After hearing from the attorneys, the court sanctioned counsel under Rule 11 for "stipulat[ing] to the dismissal of the federal action for the improper purpose of seeking a more favorable forum and avoiding an adverse decision." *Id.* The district court believed that binding precedent

forbade "dismiss[ing] merely to escape an adverse decision []or seek a more favorable forum," and that counsels' "use of properly-attached federal jurisdiction as a mid-litigation bargaining chip was an abuse of the judicial process." *Id.* at 1074–75.

The Eighth Circuit reversed. The district court had concluded that dismissal "to seek a more favorable forum" was an "improper purpose" under Rule 11, because Rule 41(a)(2) jurisprudence in the circuit expressly forbade courts from permitting parties to dismiss under that rule "merely to escape an adverse decision []or to seek a more favorable forum." *Id.* at 1077. But in contrast to dismissals under subsection (a)(2), dismissals under Rule 41(a)(1) are effective upon filing, and so the precedent on which the district court relied was inapt. *Id.* at 1079–81. To underscore this point, the Eighth Circuit noted that it had long recognized "that a federal court should not forbid a citizen to resort to the courts of her own state given that one court is as good as another," and in *Adams*, the plaintiffs had originally filed in—and agreed to return to—their state-court forum. *Id.* at 1081 n.12 (cleaned up).

In brief, the Eighth Circuit reversed sanctions because counsel had not "act[ed] with an improper purpose under Rule 11" or "abused the judicial process

by stipulating to the dismissal of the federal action for the purposes of seeking a more favorable forum and avoiding and adverse decision."[44] *Id.* at 1083.

This case is unlike *Adams*. This Court relies on its inherent authority rather than Rule 11, and the Lightfoot Respondents have intentionally manipulated random case-assignment procedures rather than merely forum-shopped. And unlike the attorneys in *Adams*, the Lightfoot Respondents refiled their suit in a neighboring federal district court with all new plaintiffs for the chief purpose of avoiding their first suit's judicial assignment.

The Lightfoot Respondents point next to the Fifth Circuit's decisions in *McCuin* and *Bechuck* to suggest that there, "certain types of 'judge shopping' are permissible" under and "authorize[d]" by Rule 41. Doc. 514 at 34–36. Like *BellSouth*, *McCuin* held that "counsel may not be chosen solely or primarily for the purpose of disqualify the judge." *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. 1983). Before reaching that conclusion, the court had expatiated on the case's central question—"Is Judge-Shopping Reprobated?"—by discussing the many ways the American judicial system permits forum-shopping. *Id.* at 1261–62. But the Fifth Circuit stated point blank that "[i]n federal court, the parties clearly have no right to a 'judge of their choice.'" *Id.* at 1262. Judge-shopping is thus

---

[44] While the sanctions for dismissal were brought under Rule 11, the district court imposed additional sanctions under its inherent power for "abusing the judicial process" by using "properly-attached federal jurisdiction as a mid-litigation bargaining chip." 863 F.3d at 1075.

impermissible even though "a litigant's motives for selecting a lawyer are not ordinarily subject to judicial scrutiny," because "a contrary ruling would permit unscrupulous litigants and lawyers to thwart our system of judicial administration." *Id.* at 1265. For that reason, lower courts are "obliged to take measures against unethical conduct occurring in connection with any proceeding before it." *Id.* at 1264.

Notwithstanding *McCuin*'s express condemnation of judge-shopping, the Lightfoot Respondents contend that the Fifth Circuit has "acknowledged" that Rule 41 permits judge-shopping. Doc. 514 at 35 (citing *Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287 (5th Cir. 2016)). In *Bechuck*, the Fifth Circuit dealt with the propriety of post-filing conditions imposed on a properly dismissed case. *Bechuck*, 814 F.3d at 290. After the plaintiff had voluntarily dismissed his suit under Rule 41(a)(1)(A)(i), the district court issued a "final dismissal" order, stating that the plaintiff must sue the defendant "before this court" if he should sue that defendant again for the same cause of action. *Id.*

But because Rule 41(a)(1)(A)(i) confers an absolute right to dismiss, the appeals court ruled that plaintiff's notice of dismissal deprived the court of any "power or discretion to deny [his] right to dismiss or to attach any condition or burden to that right." *Id.* at 291. In so holding, the court noted that district courts nevertheless retain their "inherent supervisory powers" to "consider collateral issues

after an action is no longer pending" and determine "whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Id.* at 292 (quoting *Cooter & Gell*, 496 U.S. at 396). But a pre-filing condition imposed after the case was dismissed did not fall into the class of collateral issues or sanction that district courts may consider.

In suggesting that the Fifth Circuit has endorsed judge-shopping under Rule 41, the Lightfoot Respondents point to *Bechuck*'s comment that "Rule 41(a)(1) essentially permits forum shopping." *Id.* at 293. "The effect of a Rule 41(a)(1) dismissal," wrote the court, "is to put the plaintiff in a legal position as if he had never brought the first suit. Therefore, the plaintiff is free to return to the dismissing court or other courts at a later date with the same claim. By placing him back into the situation as though he had never brought suit, Rule 41(a)(1)(A)(i) necessarily allows him to choose his forum anew." *Id.*

But as noted *supra* note 28, the Lightfoot Respondents erroneously merged the issues of forum-shopping and bad-faith judge-shopping, and the two are not the same. The first may be tolerated, but the other is condemned. What's more, the *Bechuck* court recognized that even if Rule 41(a)(1) permits some forum-shopping, it does so in part because that rule "already limit[s] a plaintiff's ability to engage in forum-shopping," as it "require[s] that a second voluntary dismissal under [the rule] operate as an adjudication on the merits." *Bechuck* at 293.

Since Rule 41(a)(1)'s two-dismissal rule attaches to plaintiffs—not attorneys—the forum-shopping limitations baked into the federal rules would not curb the Respondents' judge-shopping activities. And in contrast to *Bechuck*, this case involves no post-dismissal conditions, but rather the proper exercise of the Court's supervisory authority to determine whether the Respondents have "abused the judicial process, and, if so, what sanction would be appropriate." *Id.* at 292. In *Bechuck* "there was no behavior to sanction"—the plaintiff had simply dismissed his case—but here, the *Ladinsky* Respondents dismissed *and* refiled their case in a neighboring district with new plaintiffs, all to avoid a judge they were convinced would rule against them. *Id.* at 293.

In short, the Fifth Circuit has never held that Rule 41(a)(1) permits judge-shopping. To the contrary, in an unpublished opinion favorably cited in *Bechuck*, the Fifth Circuit has recognized that Rule 41 does *not* permit the Respondents' judge-shopping conduct: "Although rule 41(a)(1) guarantees [plaintiffs] an unconditional dismissal, it does not confer on [plaintiffs] the right to manipulate the designation of a judge." *Int'l Driver Training Inc. v. J-BJRD Inc.*, 202 F. App'x 714, 716 (5th Cir. 2006). And as the same court held in *McCuin*, "judges do not choose their cases, and litigants do not choose their judges. We all operate on a blind draw system. Sometimes, both litigants and judges are disappointed by the luck of the draw. But

the possibility of such disappointment is a risk judges and litigants alike must assume." *McCuin*, 714 F.2d 1255, 1265 (5th Cir. 1983).

Turning to one last jurisdiction for support, the Respondents suggest that two cases from the Second Circuit prove that Rule 41 permits judge-shopping. Like the Eleventh and Fifth Circuits, the Second Circuit has held that parties may not choose lawyers to force a judge's recusal. *In re FCC*, 208 F.3d 137, 139 (2d Cir. 2000). Noting the risk of "tactical abuse . . . if a lawyer's appearance can influence the recusal of a judge known to be on a panel," the *FCC* court refused to permit the practice: "As between a judge already assigned to a panel, and a lawyer who thereafter appears in circumstances where the appearance might cause an assigned judge to be recused, the lawyer will go and the judge will stay." *Id.* at 139. Such a policy "preserves the neutral and random assignment of judges to cases" while at the same time implementing "the inherent power of [the court] to manage and control its docket." *Id.*

But in a case much like *Adams*, the Second Circuit overturned non-monetary sanctions against a law firm for voluntarily dismissing the plaintiff's suit under Rule 41(a)(1)(A)(i) for the express purpose of refiling in another forum. *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 115 (2d Cir. 2009). In the underlying suit, Wolters Kluwer sued four of its former employees for injunctive relief in the Southern District of New York. *Id.* at 112. Well into discovery, the defendants

moved to dismiss for lack of personal jurisdiction, as all of them lived in Massachusetts. *Id.* This motion to dismiss gave the plaintiff's attorneys at Dorsey & Whitney, LLP, the idea that they ought to dismiss their suit and refile in the District of Massachusetts. *Id.*

With the plaintiff's permission, the lead partners from Dorsey dismissed the New York suit and refiled a new, materially identical suit in the District of Massachusetts. *Id.* The lead attorney filed a motion for temporary injunctive relief, impermissibly attaching over 100 pages of discovery obtained under a confidentiality order from the New York suit, pages that she had been ordered to return, and which the confidentiality order expressly barred from use in any other litigation. *Id.* at 113. For this breach of the confidentiality order, the defendants moved for sanctions—but the case soon settled, and the motion was withdrawn. *Id.* By then, however, the district court had developed its own concerns about counsel's conduct, and it went forward with an evidentiary hearing on sanctions. *Id.* In its final order, the district court imposed twenty-seven non-monetary sanctions under its inherent power on Wolters Kluwer, Dorsey, and the two lead attorneys, including a sanction against Dorsey for voluntarily dismissing the New York suit. *Id.* The plaintiff did not appeal. *Id.* The lead attorney appealed, but her sanctions were upheld. *Id.* at 112. The law firm and the junior partner also appealed, and only their sanctions were reversed. *Id.*

Sanctions imposed under a court's inherent powers in the Second Circuit require something more than a mere finding of bad faith. For the sanctions to stick, they must rest on specific findings that the conduct at issue was both "entirely without color" and "motivated by improper purpose." *Id.* at 114. An attorney's "[c]onduct is entirely without color" only if it lacks "any legal or factual basis"; if the conduct "has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue," it's colorable. *Id.* With this background, Dorsey's appeal rested on two grounds: (1) the district court made no findings of bad faith personal to the law firm, and (2) its Rule 41 dismissal was not entirely without color.

The Second Circuit agreed. On the first point, it concluded that the district court had improperly imputed bad faith to the firm without making specific findings personal to the firm itself. *Id.* On the second, it explained the district court's erroneous reasoning in the following way:

> The district court found that Dorsey's main purpose in filing a Rule 41 voluntary dismissal of the Wolters litigation was to judge-shop in order to conceal from its client 'deficiencies in counsel's advocacy' that had been noted by the district judge in New York. The district court reasoned that this sort of judge-shopping was an improper purpose and was accordingly sanctionable.

*Id.* But since Rule 41 grants plaintiffs an "unfettered right voluntarily and unilaterally to dismiss an action," the Second Circuit concluded that the plaintiff

212

"was entitled to file a valid Rule 41 notice of voluntary dismissal for any reason, and the fact that it did so to flee the jurisdiction or the judge does not make the filing sanctionable." *Id.* at 115.

In a later appeal involving the same litigation, the Second Circuit offered further insight into the colorable conduct of the Rule 41 dismissal. Namely, "there were legitimate reasons supporting dismissal" of the New York suit, "as both the client's in-house counsel and certain Dorsey attorneys, [the lead attorney] included, had become aware of a possible lack of personal jurisdiction in New York." *In re Peters*, 642 F.3d 381, 397 (2d Cir. 2011). Underscoring that point was the fact that "the defendants had [moved] to dismiss the suit on that basis." *Id.*

This case differs from *Wolters* in four material respects. First, this is a case of bad faith, and findings of bad faith were critically absent in *Wolters*. Second, sanctions here are not imposed simply for exercising one's Rule 41 dismissal rights, but rather for the totality of the Lightfoot Respondents' bad-faith conduct. Third, there were no legitimate jurisdictional concerns here to support dismissal. The Lightfoot Respondents' driving concern was not personal jurisdiction over the defendants, but rather the judge assigned to the first suit. And fourth, the Lightfoot Respondents here are comparable to the lead attorney whose sanctions were upheld rather than the firm itself. As in *Wolters*, the Court sanctions only the partners in

charge of the bad-faith conduct—not the corresponding firm or less culpable attorneys.

### c. The Court's holding does not burden ordinary litigation decisions.

In a final effort to repudiate *BellSouth*, the Lightfoot Respondents claim that any reading of *BellSouth* that prohibits their conduct would necessarily prohibit a host of "ordinary litigation decisions" that may affect judicial assignments. Doc. 517 at 37. By way of illustration, they identify eleven litigation decisions they believe this ruling would preclude, placing these under the broad headings of (1) removal; (2) dismissal post-removal; (3) refusing to consent to a magistrate judge; (4) choosing a federal district court; (5) choosing a federal division; (6) transferring a case; (7) filing class actions; (8) consolidating across districts; (9) consolidating within districts; (10) seeking or not seeking recusal; and, of course, (11) voluntary dismissal. *Id.* at 37–39.

The Lightfoot Respondents grossly overstate the risk. For starters, Respondents' characterization of their own conduct as "ordinary" shows a grossly low opinion of their fellow attorneys. But this Court has no doubt that there is neither sincere nor widespread belief among the bar that bad-faith attempts to manipulate a federal court's random case-assignment procedures are allowed. Indeed, the Court's confidence in the character of those who usually practice before it is part of the reason for the Court's focus on deterrence: if the Lightfoot Respondents are allowed

to profit from their bad-faith misconduct in this case, it is not unreasonable to expect that others would engage in misconduct they would never have considered before.

In any event, many of the decisions they describe involve unilateral decisions that the system tolerates as forum-shopping (removal, choosing a federal district court) or a well-established check against abusive action (transfers, recusals, consolidation). District courts may deny transfers on suspicion of judge-shopping, for instance, and review a litigant's request to screen against impermissible motivations. *See, e.g.*, *Alvarado v. Bank of Am., N.A.*, 2009 WL 720875, at *1 (E.D. Cal. Mar. 17, 2009). And the Lightfoot Respondents' "Magistrate Consent" example, Doc. 514 at 38, is plainly not sanctionable because the Federal Rules of Civil Procedure expressly prohibit "adverse consequences" of any sort for withholding consent. FED. R. CIV. P. 73(b)(2).

Most notably, the Lightfoot Respondents' "Voluntary Dismissal" example contemplates a dismissal materially different from the one that occurred in *Ladinsky*. Doc. 514 at 39. In their hypothetical, a plaintiff is advised that his case has been assigned to a judge whose prior rulings indicate that a loss is likely, and so the plaintiff dismisses suit within the time permitted by Rule 41(a)(1)(A)(i). A few months later, the plaintiff decides to proceed anyway and refiles in the same court. On refiling, the new case is assigned to a different judge. But unlike what the Lightfoot Respondents perpetrated here, their hypothetical contemplates the same

215

plaintiff filing both suits—a situation that falls within the ambit of the two-dismissal rule.

Ultimately, the Lightfoot Respondents' proposed interpretation of Rule 41 is effectively boundless, allowing counsel to engage in unrestrained bad-faith, offensive, or discriminatory conduct. At the show-cause hearings, the Court asked Eagan whether the conduct in each of the following hypotheticals would be protected by Rule 41, and Eagan expressly agreed that it would. That is, if Rule 41 means what the Lightfoot Respondents claim it means, then that rule would also permit all of the following nefarious conduct:

(1)   A white plaintiffs' attorney files thirty cases a year in a jurisdiction with one white male judge and one black female judge. Every time he draws the black female judge, he dismisses under Rule 41, refiles, and draws the white male judge. This happens over many years, and he makes sure never to end up in front of the black female judge.

(2)   An attorney challenges a state law in Alabama that affects a large class of people. The attorney wants a certain judge, so he files twelve different cases with twelve different sets of parties in the Northern District of Alabama. None of the twelve cases are assigned to the judge he wants, so he dismisses all twelve. He files twelve more, one of which is assigned to the target judge, and he dismisses the eleven others.

(3)   An attorney knows that a judge has been having a long-term affair with the attorney's law partner. The attorney files his case but does not draw that judge,

so he dismisses and refiles until he draws the judge he knows is having the affair with his law partner.

(4)    An attorney files a case in the Northern District of Alabama challenging a state law that affects a wide class of people, and the case is transferred to this Court. The attorney doesn't want this Court, so she dismisses this first case and refiles a second case in the Middle District of Alabama with new plaintiffs. The new case is transferred to this Court again, so the attorney dismisses a second time and files anew with fresh plaintiffs. The process repeats over and over till the Court tires of the process, recuses, and the case is randomly assigned to Judge Thompson. Only then does the attorney proceed with her new plaintiffs' case.

*See* Doc. 642 at 119–24.

It cannot possibly be that these bad-faith abuses of judicial process are allowed. If litigants regularly employed these tactics, courts would be thoroughly unable to administer justice in an orderly fashion, dockets would bloat with cases filed only for navigational purposes, the Rule 41 dismissal rate would skyrocket, and the random case-assignment system would be functionally useless. It's no surprise that Rule 41 permits none of this.

### d.    The Lightfoot Respondents Sought to Manipulate the Case-Assignment Procedures Themselves, Not Merely a "Random" Assignment.

So far, the Court has addressed the Lightfoot Respondents' argument that they did not attempt to manipulate the court's random case-assignment procedures as a

matter of law, because Rule 41 and Eleventh Circuit precedent preclude sanctions for their conduct. The Court comes next to their argument that they attempted no such manipulation as a matter of fact.

This second argument is as simple as it is sophistic: the Lightfoot Respondents claim they can't be sanctioned for violating the court's random case-assignment procedures, because "*Ladinsky* was not randomly assigned to this Court." Doc. 514 at 21. They "took no action in response" to *Ladinsky*'s first three randomly assigned judges, but rather dismissed only when *Ladinsky* was "directly assigned to this Court." *Id.* at 22. The Lightfoot Respondents suggest that this last assignment was not only non-random, but also improper, as "*Ladinsky*'s transfer to this Court was not in keeping with the Northern District's practice." *Id.*

All this, they say, adds up to a simple matter of "fact": the Respondents "neither 'manipulate[d]' nor 'circumvent[ed]' the 'random assignment of judges'" by voluntarily dismissing *Ladinsky*, because the case was "directly assigned to this Court, as opposed to being randomly assigned." *Id.* at 22. The same goes for the filing of *Eknes-Tucker*, which they neither steered "to or away from any judge in the Middle District" nor "respond[ed] to the assignment to or away from Judge Huffaker." *Id.* at 22–23.

But like most of the Lightfoot Respondents' arguments, this one is plain specious: it is both intentionally misleading and simply wrong, for each of the following reasons.

First, the transfer from Judge Axon to this Court was the result of, not a deviation from, the Northern District's case-assignment procedures. Transfers in the interest of judicial efficiency are legitimate assignments, not a cause for concern or alarm. If the Respondents' contrary interpretation were right, then every *sua sponte* transfer or reassignment would violate the district court's rules about random assignment. Federal judges have the "'unquestionable' authority to control their own dockets" and "broad discretion in deciding how best to manage the cases before them." *Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1262 (11th Cir. 2014) (internal citations omitted).

Second, this Court *was* randomly assigned to *Walker*. As the Lightfoot Respondents have recognized, *Walker* and *Ladinsky* were all but certain to end up before the same judge, as they themselves expected the cases to be consolidated before Judge Axon and, indeed, planned to effectuate that transfer by motion. If the two were to be consolidated, the final transfer of one of those cases would always be non-random. This is neither untoward nor procedurally improper; it's standard operating procedure.

Third, *Ladinsky*'s assignment to this Court was, in fact, consistent with the Northern District's practice. By arguing the contrary, the Respondents erroneously conflate the so-called "first-filed rule" with an unofficial practice common to many courts. The first-filed rule governs "competing or parallel litigation in separate courts." *Broward Bulldog, Inc. v. U.S. Dep't of Just.*, 939 F.3d 1164, 1196 (11th Cir. 2019). When two suits with "overlapping issues and parties are pending in two federal courts," the first-filed rule creates a "strong presumption across the federal circuits" that "the forum of the first-filed suit" should hear both controversies. *Id.* The presumption rests on "considerations of comity and orderly administration of justice," as "two courts of equal authority should not hear the same case simultaneously and potentially generate dueling appeals." *Id.* (cleaned up). Consequently, the second-filed case should either "be dismissed or transferred to the district where the first-filed case is pending." *Elliott v. Williams*, 549 F. Supp. 3d 1333, 1338 (S.D. Fla. 2021).

Here, the first-filed rule had no bearing on the transfer of *Ladinsky* to this Court, although it did dictate *Walker*'s trajectory. As the second-filed parallel case in another federal district, *Walker* was transferred to the Northern District in accordance with the first-filed rule, because that's where *Ladinsky*, the first-filed suit, was pending. *See Walker*, Doc. 20 (transferring *Walker* to the Northern District of Alabama "in light of the first-filed rule" and "the interest of justice" so that "it

may be decided with *Ladinsky* to avoid the possibility of conflicting rulings and to conserve judicial resources."). Thus, the only time the first-filed rule applied in these proceedings, the transfer followed the rule.

Like many courts, the Northern District of Alabama also follows the practice of coordinating or consolidating parallel cases *within* the district—a practice the Panel called "first cousin" to the first-filed rule—by transferring the second-filed suit to the judge presiding over the first. *See Vague*, Doc. 78 at 250–51. In such cases, litigants often file a motion with the judge in the first-filed action to seek coordination or consolidation with the second. *See id.* This practice does not bar the judge presiding over the first filed case from transferring it to the judge presiding over the second-filed case. The point is that the judge presiding over the first-filed case is the one who makes the determination whether a transfer occurs. And that is exactly what happened her. Judge Axon, as the judge presiding over the first-filed case, transferred that case to this Court.

The Respondents suggest impropriety in the court because the first-filed case was transferred to the judge presiding over the case filed second. But neither the rule nor the practice should be applied when judicial economy requires otherwise, and as Judge Axon made explicit, *Ladinsky* was transferred to this Court to serve "judicial economy." *Ladinsky*, Doc. 14.

* * * *

221

Having thoroughly reviewed the case law, the history and purpose of Rule 41(a)(1), and the implications of the Lightfoot Respondents' proposed construction of the rule, the Court finds their arguments to be wholly without merit. Attempts to manipulate the court's random case-assignment procedures constitute a threat to the orderly administration of justice, and such conduct is flatly prohibited by controlling precedent. Rule 41(a)(1)(A)(i) provides no relief for this abuse.

### C. Sanctions are warranted for Charles, because he intentionally misrepresented or otherwise failed to disclose key facts to the Panel.

In Section IV *supra*, the Court found by clear and convincing evidence that Carl Charles intentionally and in bad faith misrepresented or otherwise failed to disclose key facts to the Panel by testifying falsely about his call to Judge Thompson's chambers. The Court takes no pleasure in the imposition of sanctions, much less on an attorney as young as Charles, and it has spent long hours ruminating over this case to determine the best way to address Charles's testimony. There is nothing more valuable in the legal profession than one's reputation, and it is only with great reluctance that the Court would reprimand a young practitioner. But here the Court is left with no choice: after considering the evidence and evaluating Charles's credibility, the Court finds that his bad-faith misrepresentations were flagrant, intentional, and calculated to mislead. Charles stood before this Court and testified just as he testified before the Panel—with his pants on fire.

The Court concludes that a public reprimand and monetary sanctions are reasonable and appropriate for Charles. A public reprimand is appropriate, because well-established standards of professional conduct and binding law forbid intentionally misleading the tribunal. There can be no serious argument that intentionally misleading a tribunal is proper. As "officer[s] of the court," all lawyers owe "a duty of candor to the tribunal." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). The duty is reinforced not just by the Districts' Local Rules, the State's Rules of Professional Conduct, the ABA's Model Rules of Professional Conduct, the Oaths of Admission for each District, but also by Charles's sworn oath to tell "the truth, the whole truth, and nothing but the truth." Putting aside the universally acknowledged moral duty to tell the truth, courts impose the duty of candor for reasons that should be plain enough: dishonest testimony undermines the integrity of the judicial system, which depends on the truth and candor to function fairly and effectively. Charles knew all this, and he chose dishonesty anyway.

A public reprimand is reasonable, because no lesser sanction will both register the gravity of Charles's ethical and professional breach and deter him and others from intentionally misleading courts in the future. As discussed above, many of the deleterious effects of a public reprimand have already accrued here, and yet Charles remains wholly unwilling to accept responsibility for his misconduct.

To effectuate its public reprimand for Charles, the Court imposes a temporary, limited publication requirement: in any pending state or federal case in which he is counsel of record, Charles must provide a copy of this order to his client, his opposing counsel, and the judge presiding over his case. If he is still employed by the U.S. Department of Justice, Charles must provide a copy of this order to the U.S. Attorney General within ten days; if he has moved to private practice, he must instead provide a copy of this order to every attorney at his firm. This requirement will better serve the goals of specific and general deterrence by increasing the costs of Charles's misconduct, without seriously impairing his ability to earn a living. This requirement will also serve as a guardrail against any future attempts by Charles to engage in similar misconduct: when judges, opposing counsel, and their clients and colleagues learn about his misconduct in this case, it's far less likely that Charles will testify dishonestly in the future.

In light of Charles's unrepentant testimony, the Court considered more severe alternatives. After all, truth is so important to a well-functioning judicial system that willfully testifying to falsehoods—that is, perjury—can carry a criminal penalty. The difference between intentionally misleading a tribunal and willfully testifying to falsehoods is subtle but grave, and while the Court has made no findings of perjury, the criminal penalties it carries illustrate the enormity of knowingly false testimony.

Most of the sanctions more severe than a public reprimand are unavailable here. Charles is not party to *Boe*, so disqualification is off the table. He does not practice in the federal courts of Alabama—*Walker*, so far as the Court knows, was his only appearance—so a temporary suspension from practice is unavailable too.

The only additional penalty appropriate to Charles's case is a monetary sanction. After considering Charles's ability to pay—at the time of the show-cause hearings, Charles had moved to the Department of Justice—the Court finds that a sanction of $5,000 is reasonable and appropriate. *See Martin*, 307 F.3d at 1337 (holding that for the "bite" of monetary sanctions "to be real," the sum must be one "that the person can actually pay").

Like the Lightfoot Respondents, Charles also opposes the show-cause order on due-process grounds; the former's objections, in fact, were adopted from Charles's own filing. Charles's objections thus fail for all the reasons discussed above, and they are therefore **DENIED in part** and **OVERRULED in part.**

Unlike the Lightfoot Respondents, the rest of Charles's arguments against sanctions can be quickly put to rest. His arguments are simple: the Court should not sanction him because (1) he did not, as a matter of fact, intentionally mislead the Panel, and (2) the Report contains insufficient evidence to support sanctions.[45]

---

[45] Charles raises two additional arguments against imposing sanctions under 18 U.S.C. § 1623. Doc. 517 at 24–32. Because the Court's sanctions don't rest on this statute, these arguments are moot.

Doc. 517 at 12–24. Put differently, Charles asks the Court not to sanction him, because "he did not violate 18 U.S.C. § 1623, the rules of professional conduct applicable in the Northern and Middle Districts of Alabama, the Oaths of Admission for the Northern and Middle Districts of Alabama, or his sworn oath." *Id.* at 12.

But these arguments fail: the Court has already found by clear and convincing evidence that Charles did, in fact, violate his sworn oath. The reasons for the Court's findings are discussed in Section V; they need not be repeated here.

> ### D. Sanctions are unnecessary for the remaining Respondents.

Because the Court has declined to sanction any of the remaining Respondents, the Court hereby **RELEASES James Esseks**, **LaTisha Faulks**, **Kathleen Hartnett**, **Michael Shortnacy**, **Scott McCoy**, **Asaf Orr**, **Jennifer Levi**, and **Shannon Minter** from these proceedings.

## VII. CONCLUSION

No case is worth the price of one's integrity; and yet Melody Eagan, Jeffrey Doss, and Carl Charles chose to gamble with theirs. Inexplicably, they decided it was worth the risk.

Judge-shopping is an affront to the rule of law. It erodes public confidence in judicial impartiality, burdens courts with procedural glut, and casts unwarranted suspicion on judges and case assignments alike. In short, it poses an intolerable threat to the fair and orderly administration of justice. There can be no doubt that

judge-shopping undermines what should be a fair and impartial process, one where no matter which judge is assigned litigants feel they have a meaningful opportunity to be heard.

Some of the Respondents have now learned this lesson; others have not. Most have accepted responsibility for their misconduct, shown genuine contrition for their misconduct, and require no further discipline. But the rest have not only refused to accept responsibility or apologize sincerely for their actions; they've also tried to shift the blame for their misconduct to the judiciary.

The Court strove from the first to bring these proceedings to a swift close. But where the Court sought resolution, it met with obstruction; where it asked for compliance, it met with defiance; and where it expected decorum, it met with contempt. With Ragsdale and Lightfoot at the helm, the Respondents stonewalled, obfuscated, and resisted every order, bloating the record with needless motions and briefs. Time and again, they raised frivolous objections, appealed unappealable issues, and deflected responsibility for their unabashed misconduct, sheltering behind the bulwark of Rule 41 and their steadfast belief that the fault lies not with them, nor with their conduct, but with the federal judiciary itself.

Here's a typical example. On the second day of the show-cause hearings, Ragsdale, who represented the *Walker* Respondents for most of the Panel's inquiry but only Charles, Esseks, and Faulks in the proceedings before this Court, devoted

much of his argument to distinguishing *BellSouth* from his clients' case. *See* Doc. 640 at 146–53. The firm that the district court had disqualified was Lehr Middlebrooks Price & Proctor, but Ragsdale insisted on calling it "Judge Proctor's firm." *Id.* at 146, 147, 152. Though Judge Proctor had no part in the case, Ragsdale's implication was clear: if the Respondents were guilty of misconduct for judge-shopping, then so too was a sitting federal judge—and member of the Panel no less—

> What did the lawyers do in that case? Of course, you know that was Judge Proctor's old law firm. And what they did in that case is they intentionally went and hired a lawyer and marketed themselves to potential clients as being able to cause the recusal of Judge Clemon, the only black judge in the Northern District. And they did it so often that the Northern District had to pass and adopt a special order.

*Id.* at 146. True to form, Ragsdale simultaneously denied any untoward insinuation and expressly accused Judge Proctor of judge-shopping:

> THE COURT: [Y]ou continually referred to [the law firm in *BellSouth*] as Judge Proctor's firm . . . instead of Lehr Middlebrooks. Are you telegraphing anything to me right now?

> MR. RAGSDALE: No. Except . . . I think it is significant that that—that one of those lawyers, who engaged in that conduct went on to become a federal judge. I think it is.

*Id.* at 156. Only when the Court confronted him with the truth—that Judge "U.W. Clemon wrote a letter to the senate judiciary committee saying [Judge Proctor] had nothing to do with" the conduct in *BellSouth*—did Ragsdale change his tune. *Id.* at 156–57.

Enough is enough. Judges are not political operatives. To the contrary, the integrity of the justice system rests on the steadfast commitment of an independent judiciary to uphold the rule of law. In the words of Chief Justice Roberts, there are no "Obama judges or Trump judges, Bush judges or Clinton judges"; there is only a "group of dedicated judges doing their level best to do equal right to those appearing before them." 169 CONG. REC. S1456–58 (daily ed. May 2, 2023).

The Court therefore **ORDERS** as follows:

1. The Court **PUBLICLY REPRIMANDS** Melody Eagan, Jeffrey Doss, and Carl Charles for the bad-faith misconduct described in this order;

2. To effectuate their public reprimand, the Court **ORDERS** as follows:  In every pending state or federal case in which they are counsel of record, Eagan and Doss shall provide a copy of this order to their clients, opposing counsel, and the judge presiding over the matter.  Eagan and Doss shall also provide a copy of this order to every attorney in their law firm. Eagan and Doss must comply with this requirement within ten days from the date of this order and must certify to the Court within 24 hours of its completion that the requirement has been met;

3. To effectuate his public reprimand, the Court **ORDERS** as follows: In every pending state or federal case in which he is counsel of record, Charles shall provide a copy of this order to his clients, opposing counsel, and the judge presiding over the matter.  In the event Charles is still employed by the U.S. Department of Justice, Charles must notify the U.S. Attorney General of this order. In the event he has entered private practice, he must provide a copy of this order to every attorney in his law firm. Charles must comply with this requirement within ten days from the date of this order and must certify to the Court within 24 hours of its completion that the requirement has been met;

4. To further effectuate the public reprimands of Eagan, Doss, and Charles, the Court **DIRECTS** the Clerk of Court to submit this order for publication in the Federal Supplement;

5. The Court **DISQUALIFIES** Melody Eagan and Jeffrey Doss from further participation in this case;

6. Carl Charles is **ORDERED** to pay $5,000 into the registry of the United States District Court for the Middle District of Alabama within ten days of the date of this order;

7. The Court **DIRECTS** the Clerk of Court to refer this matter to the U.S. Attorney for the Middle District of Alabama to investigate whether Carl Charles has engaged in any criminal conduct;

8. The Clerk of Court is **DIRECTED** to serve a copy of this order on the General Counsel of the Alabama State Bar, the Bar Counsel's Office of the Board of Bar Overseers of the Supreme Judicial Court of Massachusetts, the Committee on Professional Standards of the New York State Bar Association, the State Bar of Georgia, and any other applicable licensing authorities for further investigation and, if necessary, disciplinary action; and

9. All other Respondents are **RELEASED** from these proceedings.

**DONE** and **ORDERED** this February 25, 2025.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE